# 23-7566

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL COLE, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT
VOLUME I OF VII
(Pages A-1 to A-300)**

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
BRONWYN C. ROANTREE
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
   17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

**TABLE OF CONTENTS**

PAGE

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Indictment, filed December 4, 2019 (Dkt. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-41

Excerpts of First Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-78

Government Memorandum of Law in Opposition to Defendant's
    Motions *in Limine* and Renewed Motion for Rule 17(c)
    Subpoenas, filed October 17, 2022 (Dkt. 226) . . . . . . . . . . . . . . . . . . . A-493

Government's Requests to Charge,
    filed October 20, 2022 (Dkt. 230) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-566

Letter from U.S. Attorney's Office to the
    Honorable Edgardo Ramos,
    dated October 26, 2022 (Dkt. 238) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-626

Letter from David Oscar Markus to the Honorable Edgardo Ramos
    re Ethan Cole, dated November 18, 2022 (Dkt. 247) (with
    attached email from Edward Y. Kim to David Oscar Markus) . . . . . A-630

Excerpts of Final Pre-Trial Conference Transcript,
    dated October 27, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-632

Excerpts of Second Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-648

**Government Exhibits**

GX 104        Iconix Brand Group, Inc. Form 8-K,
              dated October 24, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1139

GX 105        Iconix Brand Group, Inc. Form 10-Q for the Quarterly
              Period Ended September 30, 2014 . . . . . . . . . . . . . . . . . . . A-1152

ii

PAGE

GX 207 — Consultancy Agreement between Iconix Brand Group, Inc. and LF Centennial Limited, dated September 30, 2013 .................................................. A-1190

GX 210 — Letter Agreement between Iconix Brand Group, Inc. and LF Asia Limited, dated June 30, 2014 ............ A-1195

GX 212 — Letter Agreement between Iconix Brand Group, Inc. et al. and Global Brands Group Asia Limited, dated September 17, 2014 .................................... A-1199

GX 1044 — Email from Mark J. Stevens to Nicholas C.A. Cook et al., dated June 25, 2014 ............................. A-1205

GX 1058 — Email from Neil Cole to Seth Horowitz, dated August 14, 2014......................................... A-1405

GX 1068 — Email from Ethan Cole to Jared Margolis, dated August 28, 2014 .................................... A-1407

GX 1091 — Email from Lauren Gee to Robert Smits, dated September 11, 2014 .................................. A-1409

GX 1098 — Email from John Reda to David Maslaton, dated September 26, 2014 .................................. A-1547

GX 1111 — Email from Ethan Cole to Seth Horowitz, dated October 2, 2014..................................... A-1551

GX 1139 — Email from Ethan Cole to Jared Margolis, dated December 1, 2014 .................................. A-1555

GX 1197 — Email from Seth Horowitz to Neil Cole, dated April 13, 2015......................................... A-1557

GX 1255 — Undated notes ...................................... A-1560

GX 1255-B — Metadata associated with GX 1255 .................. A-1561

GX 1335 — Government summary exhibit, "Document Timeline" . A-1562

iii

PAGE

**Defense Exhibits**

DX 0303-A1    Iconix SE Asia Limited First Amended and Restated
Shareholders Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1691

DX 0303-A2    Letter Agreement between Iconix Brand Group, Inc.
and LF Asia Limited, dated June 30, 2014 . . . . . . . . . . . . A-1733

DX 0304-A2    Letter Agreement between Iconix Brand Group, Inc.
et al. and Global Brands Group Asia Limited,
dated September 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . A-1737

DX 0304-A3    Iconix SE Asia Limited Second Amended
and Restated Shareholders Agreement . . . . . . . . . . . . . . . . A-1743

DX 0558        FASB Accounting Standards Codification
605-50-45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1790

DX 1140-U     Email from Neil Cole to Ericka Alford,
dated September 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . A-1792

DX 2334        Stipulation re Jason Rabin, dated October 26, 2021 . . . A-1793

DX 3517-003   Notes re Ethan Cole attorney proffer,
dated July 22, 2019 (not admitted at trial) . . . . . . . . . . . . A-1795

DX 3517-004   Federal Bureau of Investigation FD-302 re Ethan Cole
interview on July 29, 2019 (not admitted at trial) . . . . . A-1797

DX 3517-010   Notes re Ethan Cole, dated September 22, 2021
(not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1807

DX 3517-012   Notes re Ethan Cole, dated October 12, 2022
(not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1809

DX 3539-083   Federal Bureau of Investigation FD-302 re Seth
Horowitz interview on February 11, 2020
(not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1810

iv

PAGE

Excerpts of Sentencing Transcript, dated October 10, 2023 . . . . . . . . . . . A-1814

Notice of Appeal, dated October 27, 2023 (COA Dkt. 1) . . . . . . . . . . . . . A-1819

# A-1

CLOSED,APPEAL,ECF

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CRIMINAL DOCKET FOR CASE #: 1:19−cr−00869−ER−1**

Case title: USA v. Cole

Date Filed: 12/04/2019

Date Terminated: 10/13/2023

Assigned to: Judge Edgardo Ramos

**Defendant (1)**

**Neil Cole**
*TERMINATED: 10/13/2023*
*also known as*
Sealed Defendant 1
*TERMINATED: 10/13/2023*

represented by **Anita Margot Moss**
Markus/Moss PLLC
40 NW Third Street
Ph 1
Miami, FL 33128
305−379−6667
Fax: 305−379−6668
Email: mmoss@markuslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Oscar Markus**
Markus/Moss PLLC
Penthouse 1
40 Nw Third Street
Miami, FL 33128
305−379−6667
Fax: 305−379−6668
Email: dmarkus@markuslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Lorin L. Reisner**
Paul Weiss (NY)
1285 Avenue of the Americas
New York, NY 10019
(212) −373−3000
Fax: (212) 757−3990
Email: LReisner@paulweiss.com
*TERMINATED: 03/02/2022*
*LEAD ATTORNEY*
*Designation: Retained*

**Richard Craig Tarlowe**
Paul, Weiss, Rifkind, Wharton & Garrison LLP (NYC)
1285 Avenue of the Americas
New York, NY 10019
(212) 373−3035
Fax: (212) 492−0035
Email: RTarlowe@paulweiss.com
*TERMINATED: 03/02/2022*
*LEAD ATTORNEY*
*Designation: Retained*

**Andrew David Reich**
DOJ−USAO

# A-2

271–A Cadman Plaza East
Brooklyn, NY 11201
718–254–6452
Email: andrew.reich@usdoj.gov
*TERMINATED: 03/02/2022*
*Designation: Retained*

**Jeffrey Then**
Kaplan Hecker & Fink LLP
350 Fifth Avenue Suite 7110
New York, NY 10118
212–763–0883
Email: jthen@kaplanhecker.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jenna Minicucci Dabbs**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
212–763–0883
Fax: 212–564–0883
Email: jdabbs@kaplanhecker.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Rebecca Ann Sussman**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212–763–0883
Email: rsussman@kaplanhecker.com
*TERMINATED: 05/02/2023*
*Designation: Retained*

**Sean Hecker**
Kaplan Hecker and Fink LLP
350 Fifth Avenue Suite 7110
New York, NY 10118
212–763–0883
Fax: 212–564–0883
Email: shecker@kaplanhecker.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 15:78J.F MANIPULATIVE AND DECEPTIVE DEVICES SECURITIES FRAUD) (2) | IMPRISONMENT: 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. SUPERVISED RELEASE: 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. |
| 15:78M.F PERIODICAL AND OTHER REPORTS (MAKING FALSE SEC FILINGS) (3–8) | IMPRISONMENT: 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. SUPERVISED RELEASE: 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. |
| 15:7202 & 7242 & 78ff.F ACCOUNTS AND RECORDS, REPORTS, EXAMINE EXCHANGE (IMPROPERLY INFLUENCING THE CONDUCT OF AUDITS) (9) | IMPRISONMENT: 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. SUPERVISED RELEASE: 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. |

# A-3

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:371.F CONSPIRACY TO COMMIT SECURITIES FRAUD, MAKE FALSE SEC FLINGS, MISLEAD THE CONDUCT OF AUDITS. (1) | Acquitted by Jury. |
| 18:371.F CONSPIRACY TO DESTROY, ALTER, AND FALSIFY RECORDS IN FEDERAL INVESTIGATIONS (10) | Acquitted by Jury. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**Interested Party**

| Iconix International Inc. | represented by | **Christopher J. Gunther** |
| --- | --- | --- |

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001–8602
212–735–3000
Email: cgunther@skadden.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David M. Zornow**
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001–8602
212–735–2890
Fax: 212–777–2890
Email: david.zornow@skadden.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Plaintiff**

| USA | represented by | **Edward Arthur Imperatore** |
| --- | --- | --- |

Morrison & Foerster LLP
250 West 55th St
New York, NY 10019
212–468–4320
Email: EImperatore@mofo.com
*TERMINATED: 01/27/2022*
*LEAD ATTORNEY*

*Designation: Assistant US Attorney*

**Jared P Lenow**
US Attorneys Office
One St. Andrew's Plaza
New York, NY 10007
(212) 637−1068
Email: jared.lenow@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Scott Andrew Hartman**
U.S. Attorney's Office
One St. Andrew's Plaza
New York, NY 10007
(212) 637−2357
Fax: (212) 637−2527
Email: scott.hartman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Andrew Mark Thomas**
U.S. Attorney's Office− SDNY
One Saint Andrew's Plaza
New York, NY 10007
212−637−2106
Fax: 212−637−2527
Email: andrew.thomas2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Justin Victor Rodriguez**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
212−637−2591
Fax: 212−637−2443
Email: justin.rodriguez@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Noah David Solowiejczyk**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637−2473
Fax: (212) 637−2527
Email: noah.solowiejczyk@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/04/2019 | 1 | SEALED INDICTMENT as to Sealed Defendant 1 (1) count(s) 1, 2, 3−8, 9, 10. (jm) (Entered: 12/05/2019) |
| 12/05/2019 | 2 | Order to Unseal Indictment as to Sealed Defendant 1. (Signed by Magistrate Judge Barbara C. Moses on 12/5/19)(jm) (Entered: 12/05/2019) |
| 12/05/2019 | | INDICTMENT UNSEALED as to Neil Cole. (jm) (Entered: 12/05/2019) |
| 12/05/2019 | | Case Designated ECF as to Neil Cole. (jm) (Entered: 12/05/2019) |
| 12/05/2019 | | Case as to Neil Cole ASSIGNED to Judge Edgardo Ramos. (jm) (Entered: 12/05/2019) |

# A-5

| 12/05/2019 | | Attorney update in case as to Neil Cole. Attorney Edward Arthur Imperatore,Scott Andrew Hartman,Jared P Lenow for USA added. (jm) (Entered: 12/05/2019) |
|---|---|---|
| 12/05/2019 | 16 | Minute Entry for proceedings held before Magistrate Judge Barbara C. Moses:Initial Appearance on disposition sheet as to Neil Cole held on 12/5/2019. Deft present with atty Lorin Reisner and Richard Tarlowe. AUSA Edward Imperatore present. Agreed conditions of release: $1 Million, 1 FRP, Secured by cash and/or property acceptable to USAO, Travel restricted to SDNY/EDNY/Continental US, Surrender travel documents (& No new applications), Pretrial supervision as directed by pretrial services, Deft to be released on own signature, remaining conditions to be met by 12/19/19. Deft to have no contact, direct or indirect, outside of the presence of counsel, with current or former employees of Iconix Brand Group, GBG, or BDO, except for defendant's family members. (jw) (Entered: 01/08/2020) |
| 12/05/2019 | | Minute Entry for proceedings held before Magistrate Judge Barbara C. Moses:Arraignment on disposition sheet as to Neil Cole (1) Count 1,2,3−8,9,10 held on 12/5/2019. Deft present with atty Edward Imperatore. AUSA Lorin Reisner and Richard Tarlowe. Deft arraigned and pleads not guilty. Next conference set before District Judge on 12/10/2019 (jw) (Entered: 01/08/2020) |
| 12/05/2019 | | Minute Entry for proceedings held before Magistrate Judge Barbara C. Moses: Plea entered by Neil Cole (1) Count 1,2,3−8,9,10 Not Guilty. (jw) (Entered: 01/08/2020) |
| 12/05/2019 | 17 | PRB Bond Entered as to Neil Cole in amount of $ 1,000,000. To be cosigned by one financially responsible person; Secured by Cash and/or Property acceptable to USAO; Travel limited to Continental US; Pretrial supervision as directed by PTS; Deft to be released on own signature; Remaining conditions to be met by 12/19/19; Deft to have no contact direct or indirect, Outside the Presence of Counsel with current or former employees of Iconix Brand Group, GBG, OR BDO, Except for Deft's family members (jw) (Entered: 01/08/2020) |
| 12/06/2019 | 4 | NOTICE OF ATTORNEY APPEARANCE: Lorin L. Reisner appearing for Neil Cole. Appearance Type: Retained. (Reisner, Lorin) (Entered: 12/06/2019) |
| 12/06/2019 | 5 | NOTICE OF ATTORNEY APPEARANCE: Richard Craig Tarlowe appearing for Neil Cole. Appearance Type: Retained. (Tarlowe, Richard) (Entered: 12/06/2019) |
| 12/06/2019 | 6 | NOTICE OF ATTORNEY APPEARANCE: Andrew David Reich appearing for Neil Cole. Appearance Type: Retained. (Reich, Andrew) (Entered: 12/06/2019) |
| 12/09/2019 | | Docket Annotation as to Neil Cole: All matters scheduled before the Hon. Edgardo Ramos, U.S.D.J. for the week of December 9, 2019 will be held in Courtroom 14D in the Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, New York 10007 (jar) (Entered: 12/09/2019) |
| 12/10/2019 | | Arrest of Neil Cole. (ap) (Entered: 12/11/2019) |
| 12/10/2019 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Initial Appearance as to Neil Cole held on 12/10/2019. Defendant Neil Cole present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSA Scott Hartman, Edward Imperatore and Jared Lenow present. Special Agent Nicholas Kroll, FBI. Court Reporter: Pam Utter. The government's status letter is due January 10, 2020. A pretrial conference is scheduled for January 17, 2019 at 11:30 AM. Speedy trial time is excluded from today, December 10, 2019, until January 10, 2020, in the interests of justice. Bail continued. (Pretrial Conference set for 1/17/2020 at 11:30 AM before Judge Edgardo Ramos) (Court Reporter Pam Utter) (ap) (Entered: 12/11/2019) |
| 12/11/2019 | 7 | LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 12/11/19 re: enter protective order . Document filed by USA as to Neil Cole. (Attachments: # 1 protective order)(Imperatore, Edward) (Entered: 12/11/2019) |
| 12/16/2019 | 8 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 12/10/19 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2020. Redacted Transcript Deadline set for 1/16/2020. Release of Transcript Restriction set for 3/16/2020. (McGuirk, Kelly) (Entered: 12/16/2019) |

# A-6

| | | |
|---|---|---|
| 12/16/2019 | 9 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 12/10/19 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2019) |
| 12/20/2019 | 10 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re: Scheduling of Trial . Document filed by Neil Cole. (Reisner, Lorin) (Entered: 12/20/2019) |
| 12/20/2019 | 11 | LETTER RESPONSE to Motion by USA as to Neil Cole addressed to Judge Edgardo Ramos from Edward Imperatore, Scott Hartman & Jared Lenow dated 12/20/2019 re: 10 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re: Scheduling of Trial .. (Imperatore, Edward) (Entered: 12/20/2019) |
| 12/20/2019 | 12 | LETTER REPLY TO RESPONSE to Motion by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re 10 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re: Scheduling of Trial .. (Reisner, Lorin) (Entered: 12/20/2019) |
| 12/20/2019 | 13 | MEMO ENDORSEMENT as to Neil Cole (1) on 10 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re: Scheduling of Trial. ENDORSEMENT: The January 17, 2020 conference is rescheduled for January 7 at 11:30 a.m. in Courtroom 14D at 500 Pearl Street. (Signed by Judge Edgardo Ramos on 12/20/2019) (lnl) (Entered: 12/23/2019) |
| 12/23/2019 | | Set/Reset Hearings as to Neil Cole: Pretrial Conference set for 1/7/2020 at 11:30 AM in Courtroom 14D, 500 Pearl Street, New York, NY 10007 before Judge Edgardo Ramos. (lnl) (Entered: 12/23/2019) |
| 01/03/2020 | 14 | OPINION & ORDER as to Neil Cole. The Court is in receipt of the parties' letters regarding the dispute over a date for trial. Docs. 10, 11, 12. The Court will set a trial date in May 2020, but it will promptly inform the parties should the criminal trial before it scheduled in April 2020 be canceled. Should that trial be cancelled, the Court will entertain rescheduling the trial and related deadlines in this matter to April 2020. Accordingly, the status conference set for January 7, 2020 at 11:30 a.m. is canceled. A jury trial is scheduled for Monday, May 11, 2020 at 9:00 a.m, beginning with jury selection. Trial shall commence immediately thereafter. Motions in limine, proposed voir dire questions, proposed jury instructions, and proposed verdict forms are due April 13, 2020, and any responses or oppositions thereto are due April 27, 2020. The Final Pretrial Conference shall be held on May 7, 2020 at 3:30 p.m. It is SO ORDERED. (Signed by Judge Edgardo Ramos on 1/3/20) (jbo) (Entered: 01/03/2020) |
| 01/03/2020 | | Set/Reset Deadlines/Hearings as to Neil Cole: Responses due by 4/27/2020. Jury Trial set for 5/11/2020 at 09:00 AM; Pretrial Conference set for 5/7/2020 at 03:30 PM before Judge Edgardo Ramos. (jbo) (Entered: 01/03/2020) |
| 01/03/2020 | 15 | PROTECTIVE ORDER as to Neil Cole...regarding procedures to be followed that shall govern the handling of confidential material. (Signed by Judge Edgardo Ramos on 1/3/20)(jbo) (Entered: 01/03/2020) |
| 01/13/2020 | 18 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 12/10/19 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/3/2020. Redacted Transcript Deadline set for 2/13/2020. Release of Transcript Restriction set for 4/13/2020. (McGuirk, Kelly) (Entered: 01/13/2020) |
| 01/13/2020 | 19 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 12/10/19 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... |

| | | |
|---|---|---|
| | | (McGuirk, Kelly) (Entered: 01/13/2020) |
| 02/05/2020 | 20 | TRANSCRIPT of Proceedings as to Neil Cole re: Hearing held on 12/5/2019 before Magistrate Judge Barbara C. Moses. Court Reporter/Transcriber: Shari Riemer, (518) 581–8973, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/26/2020. Redacted Transcript Deadline set for 3/9/2020. Release of Transcript Restriction set for 5/5/2020. (mqu) (Entered: 02/05/2020) |
| 02/05/2020 | 21 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Hearing proceeding held on 12/5/2019 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (mqu) (Entered: 02/05/2020) |
| 02/17/2020 | 22 | JOINT LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 2/17/20 re: proposed pretrial schedule . Document filed by USA as to Neil Cole. (Imperatore, Edward) (Entered: 02/17/2020) |
| 02/18/2020 | 23 | MEMO ENDORSEMENT granting 22 JOINT LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 2/17/20 re: proposed pretrial schedule. ENDORSEMENT: The application is granted. SO ORDERED. (Signed by Judge Edgardo Ramos on 2/18/2020) (lnl) (Entered: 02/19/2020) |
| 02/18/2020 | | Set/Reset Deadlines/Hearings as to Neil Cole: Pretrial Motions due by 3/2/2020. (lnl) (Entered: 02/19/2020) |
| 02/19/2020 | 24 | LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 2/19/2020 re: advance trial date . Document filed by USA as to Neil Cole. (Imperatore, Edward) (Entered: 02/19/2020) |
| 02/20/2020 | 25 | ENDORSED LETTERentered 24 LETTER MOTION advance trial date as to Neil Cole (1). Endorsement: Mr. Cole is directed to respond by Monday, February 24, 2020. (Signed by Judge Edgardo Ramos on 2/20/2020) (jar) (Entered: 02/20/2020) |
| 02/24/2020 | 26 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated 2/24/2020 re: 24 LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 2/19/2020 re: advance trial date .. (Reisner, Lorin) (Entered: 02/24/2020) |
| 02/26/2020 | 27 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Edward Imperatore/Scott Hartman/Jared Lenow, dated February 19, 2020 re: Pursuant to the Court's January 2, 2020 Order (Docket 14), the Government respectfully requests that the Court advance the trial date by two weeks in the above–referenced case, from May 11, 2020 to April 27, 2020. ENDORSEMENT: The government's application is DENIED. SO ORDERED. (Signed by Judge Edgardo Ramos on 2/26/2020)(bw) (Entered: 02/26/2020) |
| 03/02/2020 | 28 | MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses*. Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 29 | MEMORANDUM in Support by Neil Cole re 28 MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses*.. (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 30 | DECLARATION of Richard C. Tarlowe in Support as to Neil Cole re: 28 MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses*.. (Attachments: # 1 Exhibit A – 2015 Iconix Form 8–K, # 2 Exhibit B – SEC Subpoena, # 3 Exhibit C – Email from SEC, # 4 Exhibit D – 2018 Iconix Form 8–K, # 5 Exhibit E – SEC Press Release, # 6 Exhibit F – SDNY Press Release, # 7 Exhibit G – Letter to SDNY, # 8 Exhibit H – Letter from SDNY, # 9 Exhibit I – Email to SDNY, # 10 Exhibit J – Email from SDNY, # 11 Exhibit K – Rhodes Transcript, # 12 Exhibit L – Rhodes Order)(Tarlowe, Richard) (Entered: 03/02/2020) |

| 03/02/2020 | 31 | LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated March 2, 2020 re: Defense Rule 17(c) Subpoenas . Document filed by USA as to Neil Cole. (Lenow, Jared) (Entered: 03/02/2020) |
|---|---|---|
| 03/02/2020 | 32 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated March 2, 2020 re: Letter Motion to Seal . Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 33 | MOTION to Compel *Discovery of Certain Electronic Data*. Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 34 | MEMORANDUM in Support by Neil Cole re 33 MOTION to Compel *Discovery of Certain Electronic Data*.. (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 35 | DECLARATION of Richard C. Tarlowe in Support as to Neil Cole re: 33 MOTION to Compel *Discovery of Certain Electronic Data*.. (Attachments: # 1 Exhibit A – 2019 Letter to SDNY, # 2 Exhibit B – 2020 Letter from SDNY (redacted), # 3 Exhibit C – Filed Under Seal, # 4 Exhibit D – Filed Under Seal, # 5 Exhibit E – Filed Under Seal, # 6 Exhibit F – Filed Under Seal, # 7 Exhibit G – Filed Under Seal, # 8 Exhibit H – Filed Under Seal, # 9 Exhibit I – Filed Under Seal, # 10 Exhibit J – Filed Under Seal, # 11 Exhibit K – Filed Under Seal, # 12 Exhibit L – 2020 Email to SDNY (redacted), # 13 Exhibit M – 2020 Email from SDNY, # 14 Exhibit N – Filed Under Seal, # 15 Exhibit O – Filed Under Seal, # 16 Exhibit P – 2018 Iconix 8–K)(Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/17/2020 | 36 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated March 17, 2020 re: 31 LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated March 2, 2020 re: Defense Rule 17(c) Subpoenas .. (Tarlowe, Richard) (Entered: 03/17/2020) |
| 03/27/2020 | 37 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 27, 2020 re: Trial Date (Reisner, Lorin) (Entered: 03/27/2020) |
| 03/27/2020 | 38 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Edward Imperatore, Scott Hartman, and Jared Lenow dated 3/27/2020 re: Trial adjournment Document filed by USA. (Hartman, Scott) (Entered: 03/27/2020) |
| 03/31/2020 | 39 | MEMORANDUM in Opposition by USA as to Neil Cole re 33 MOTION to Compel *Discovery of Certain Electronic Data*., 28 MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses*.. (Attachments: # 1 Exhibit SEC Form, # 2 Exhibit Testimony Excerpt)(Lenow, Jared) (Entered: 03/31/2020) |
| 04/01/2020 | 40 | MEMO ENDORSEMENT as to Neil Cole on 38 LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Edward Imperatore, Scott Hartman, and Jared Lenow dated 3/27/2020 re: Trial adjournment. ENDORSEMENT: The May 11 jury trial is adjourned sine die. The final pretrial conference and all pretrial deadlines are also adjourned sine die as well. A pretrial conference is scheduled for June 4, 2020, at 11:00 AM. SO ORDERED. (Signed by Judge Edgardo Ramos on 4/1/2020) (lnl) (Entered: 04/01/2020) |
| 04/01/2020 | | Set/Reset Deadlines/Hearings as to Neil Cole: Pretrial Conference set for 6/4/2020 at 11:00 AM before Judge Edgardo Ramos. (lnl) (Entered: 04/01/2020) |
| 04/15/2020 | 41 | REPLY MEMORANDUM OF LAW in Support as to Neil Cole re: 28 MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses*. . (Tarlowe, Richard) (Entered: 04/15/2020) |
| 04/15/2020 | 42 | REPLY MEMORANDUM OF LAW in Support as to Neil Cole re: 33 MOTION to Compel *Discovery of Certain Electronic Data*. . (Attachments: # 1 Exhibit A – Excerpt of Spreadsheet, # 2 Exhibit B – Spreadsheet)(Tarlowe, Richard) (Entered: 04/15/2020) |
| 04/27/2020 | 43 | LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated April 27, 2020 re: Exclusion of Speedy Trial Time . Document filed by USA as to Neil Cole. (Attachments: # 1 Text of Proposed Order Exclusion of Speedy Trial Time)(Lenow, Jared) (Entered: 04/27/2020) |

| 04/30/2020 | 44 | ORDER 43 LETTER MOTION as to Neil Cole. It is hereby ORDERED that the time from the date of this Order to June 4, 2020, the date of the next pretrial conference in this matter, is excluded under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A). (Signed by Judge Edgardo Ramos on 4/30/20) (jw) (Entered: 04/30/2020) |
|---|---|---|
| 05/29/2020 | 45 | LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore, Scott Hartman & Jared Lenow dated 5/29/2020 re: adjourn conference . Document filed by USA as to Neil Cole. (Imperatore, Edward) (Entered: 05/29/2020) |
| 05/29/2020 | 46 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated May 29, 2020 re: 45 LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore, Scott Hartman & Jared Lenow dated 5/29/2020 re: adjourn conference .. (Reisner, Lorin) (Entered: 05/29/2020) |
| 06/03/2020 | 47 | ORDER denying 45 LETTER MOTION Adjournment the May 4 conference until late August 2020 as to Neil Cole (1). ENDORSEMENT: The government's application is DENIED. The conference currently scheduled for June 4, 2020, at 11:00 AM will proceed as a telephone conference. Counsel should call (877) 411–9748 and use access code 3029857#. (Members of the press and public may call the same number, but will not be permitted to speak during the conference.). (Signed by Judge Edgardo Ramos on 6/2/2020) (jar) (Entered: 06/03/2020) |
| 06/04/2020 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Pretrial Conference as to Neil Cole held on 6/4/2020 as to Neil Cole. Defendant Neil Cole appeared with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich by telephone. AUSA Scott Hartman, Edward Imperatore and Jared Lenow appeared by telephone. Court Reporter: Alena Lynch. A telephonic pretrial conference is scheduled for July 7, 2020 at 11:00 AM. Speedy trial time is excluded from today, June 4, 2020, until July 7, 2020, in the interests of justice. Bail continued ( Pretrial Conference set for 7/7/2020 at 11:00 AM before Judge Edgardo Ramos.) (jw) (Entered: 06/04/2020) |
| 06/15/2020 | 48 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 6/4/2020 before Judge Edgardo Ramos. Court Reporter/Transcriber: Alena Lynch, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2020. Redacted Transcript Deadline set for 7/16/2020. Release of Transcript Restriction set for 9/14/2020. (McGuirk, Kelly) (Entered: 06/15/2020) |
| 06/15/2020 | 49 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 6/4/2020 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/15/2020) |
| 07/06/2020 | | Docket Annotation as to Neil Cole: Scheduling Notice – A telephonic pre–trial conference is scheduled for July 7, 2020 at 11:00 a.m. The parties should call (877) 411–9748 and use access code 3029857#. (Members of the press and public may call the same number, but will not be permitted to speak during the conference.) (jar) (Entered: 07/06/2020) |
| 07/07/2020 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Pretrial Conference as to Neil Cole held on 7/7/2020. Defendant and counsel for defendant Lorin Reisner and Andrew Reich, by telephone. For the government, Edward Imperatore, Scott Hartmen and Jared Lenow, by telephone. A telephonic pretrial conference is scheduled for August 11, 2020, at 11:00 a.m. Speedy trial time is excluded from today, July 7, 2020, until August 11, 2020, in the interest of justice. **The parties should call the court at (877) 411–9748; access code: 3029857**. (jar) (Entered: 08/10/2020) |
| 08/11/2020 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pretrial Conference as to Neil Cole held on 8/11/2020. Defendant Neil Cole appeared with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich by telephone. AUSA Scott Hartman, Edward Imperatore and Jared Lenow appeared by telephone. A control jury trial date is scheduled for February 8, 2021, at 9:30 a.m. Speedy trial time is excluded from today, August 11, 2020, until February 8, 2021, in the interests of justice. Bail |

**A-10**

| | | |
|---|---|---|
| | | continued. (Jury Trial set for 2/8/2021 at 09:30 AM before Judge Edgardo Ramos) (Court Reporter Kristin Carannante) (ap) (Entered: 08/11/2020) |
| 10/02/2020 | 50 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 7/7/20 before Judge Edgardo Ramos. Court Reporter/Transcriber: Jennifer Thun, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/23/2020. Redacted Transcript Deadline set for 11/2/2020. Release of Transcript Restriction set for 12/31/2020. (McGuirk, Kelly) (Entered: 10/02/2020) |
| 10/02/2020 | 51 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 7/7/20 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/02/2020) |
| 10/02/2020 | 52 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 8/11/20 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kristen Carannante, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/23/2020. Redacted Transcript Deadline set for 11/2/2020. Release of Transcript Restriction set for 12/31/2020. (McGuirk, Kelly) (Entered: 10/02/2020) |
| 10/02/2020 | 53 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 8/11/20 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/02/2020) |
| 12/23/2020 | 54 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 23, 2020 re: Telephonic Status Conference (Reisner, Lorin) (Entered: 12/23/2020) |
| 12/23/2020 | 55 | MEMO ENDORSEMENT as to Neil Cole on re: 54 LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 23, 2020 re: Telephonic Status Conference. ENDORSEMENT: The parties are directed to appear for a telephonic status conference on Tuesday, January 5, 2021 at 2:00 p.m. The parties are directed to dial (877) 411–9748 at that time and enter access code 3029857, followed by the pound (#) sign. (Status Conference set for 1/5/2021 at 02:00 PM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 12/23/2020) (ap) (Entered: 12/23/2020) |
| 12/29/2020 | 56 | MOTION to Quash *Defendant's Rule 17 Subpoena*. Document filed by USA as to Neil Cole. (Attachments: # 1 Exhibit A (Rule 17 subpoena))(Imperatore, Edward) (Entered: 12/29/2020) |
| 12/30/2020 | 57 | ORDER as to Neil Cole. On December 29, 2020, the Government filed a motion to quash Defendants Rule 17 subpoena served on non–party Baked by Melissa. Doc. 56. The Court directs Defendant to submit any opposition by January 20, 2021, and the Government to submit its reply by January 27, 2021. The parties are directed to appear for a telephonic hearing regarding the motion on February 2, 2021 at 11:00 am. The parties shall call the Court at (877) 411–9748 at that time and use access code 3029857, followed by the pound (#) sign.( Government reply due by 1/27/2021., Defendant opposition due by 1/20/2021, Telephone Conference set for 2/2/2021 at 11:00 AM before Judge Edgardo Ramos.) (Signed by Judge Edgardo Ramos on 12/30/2020)(jw) (Entered: 12/30/2020) |
| 01/04/2021 | 58 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated January 4, 2021 re: Pretrial Motions (Attachments: # 1 Exhibit A – July 29, 2020 SEC Letter, # 2 Exhibit B – August 24, 2020 SEC Letter)(Reisner, Lorin) (Entered: 01/04/2021) |

# A-11

| | | |
|---|---|---|
| 01/04/2021 | 59 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from Jared Lenow dated January 4, 2021 re: SEC Communications Document filed by USA. (Lenow, Jared) (Entered: 01/04/2021) |
| 01/05/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Status Conference as to Neil Cole held on 1/5/2021. Defendant Neil Cole appeared with counsel Lorin Reisner, Richard Tarlowe and Andrew Reich and Andrew Reich by telephone. AUSA Scott Hartman, Edward Imperatore and Jared Leno by telephone. A jury trial will be rescheduled to a date in the Spring. Speedy trial time is excluded from today, January 5, 2021, until April 1, 2021, in the interests of justice. Bail continued. (Court Reporter Khris Sellin) (ap) (Entered: 01/07/2021) |
| 01/12/2021 | 60 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 1/5/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Khristine Sellin, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/2/2021. Redacted Transcript Deadline set for 2/12/2021. Release of Transcript Restriction set for 4/12/2021. (McGuirk, Kelly) (Entered: 01/12/2021) |
| 01/12/2021 | 61 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 1/5/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/12/2021) |
| 01/20/2021 | 62 | MEMORANDUM in Opposition by Neil Cole re 56 MOTION to Quash *Defendant's Rule 17 Subpoena*.. (Attachments: # 1 Exhibit A – United States v. Tuzman Letter, # 2 Exhibit B – United States v. Ahuja Transcript Excerpt, # 3 Exhibit C – United States v. Block Letter)(Tarlowe, Richard) (Entered: 01/20/2021) |
| 01/27/2021 | 63 | REPLY MEMORANDUM OF LAW in Support by USA as to Neil Cole re: 56 MOTION to Quash *Defendant's Rule 17 Subpoena*. . (Imperatore, Edward) (Entered: 01/27/2021) |
| 01/29/2021 | 64 | LETTER RESPONSE in Opposition by USA as to Neil Cole addressed to Judge Edgardo Ramos from Edward Imperatore dated 1/29/2021 re: 33 MOTION to Compel *Discovery of Certain Electronic Data*.. (Imperatore, Edward) (Entered: 01/29/2021) |
| 02/01/2021 | | Docket Annotation as to Neil Cole: Revised Teleconference Dial–In Information – The dial–in information for the February 2, 2021 conference is revised as follows: (917)933–2166 and conference ID 125314441#. (jar) (Entered: 02/01/2021) |
| 02/16/2021 | 65 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 2/2/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Vincent Bologna, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/9/2021. Redacted Transcript Deadline set for 3/19/2021. Release of Transcript Restriction set for 5/17/2021. (McGuirk, Kelly) (Entered: 02/16/2021) |
| 02/16/2021 | 66 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 2/2/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/16/2021) |
| 02/25/2021 | 67 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated February 25, 2021 re: Supplemental Authority in Support of Opposition to the Govt's Motion to Quash a Rule 17(c) Subpoena (Attachments: # 1 Exhibit A – United States v. Weigand Order)(Tarlowe, Richard) (Entered: 02/25/2021) |
| 03/10/2021 | 68 | OPINION AND ORDER as to Neil Cole. The Government's motion to quash Cole's Rule 17(c) subpoena is granted. The Clerk of Court is respectfully directed to |

# A-12

| | | |
|---|---|---|
| | | terminate the motion. Doc. 56. (Signed by Judge Edgardo Ramos on 3/10/2021) (See ORDER set forth) (ap) (Entered: 03/10/2021) |
| 03/23/2021 | 69 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Motion to Compel Discovery of Certain Electronic Data (Reisner, Lorin) (Entered: 03/23/2021) |
| 03/23/2021 | 70 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated March 23, 2021 re: Letter Motion to Seal . Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 03/23/2021) |
| 03/23/2021 | 71 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Request for Issuance of Rule 17(c) Subpoenas . Document filed by Neil Cole. (Attachments: # 1 Exhibit A – Proposed Subpoena to Wilmer Cutler Pickering Hale and Dorr LLP, # 2 Exhibit B – Proposed Subpoena to Perkins Coie LLP, # 3 Exhibit C – January 10, 2020 Disclosure Excerpt [Filed under Seal], # 4 Exhibit D – May 6, 2020 Disclosure [Filed under Seal], # 5 Exhibit E – July 31, 2020 Letter to Government [Redacted], # 6 Exhibit F – August 7, 2020 Letter from Government, # 7 Exhibit G – December 28, 2020 Letter to Government [Redacted], # 8 Exhibit H – January 4, 2021 Letter from Government, # 9 Exhibit I – January 6 and 8, 2021 Email Exchange with Government, # 10 Exhibit J – January 25, 2021 Disclosure [Filed under Seal])(Reisner, Lorin) (Entered: 03/23/2021) |
| 03/23/2021 | 72 | MEMO ENDORSEMENT as to Neil Cole re: 69 Letter Motion to Compel Discovery of Certain Electronic Data... ENDORSEMENT: The Government is directed to respond by Monday, March 29, 2021. So Ordered. (Responses due by 3/29/2021) (Signed by Judge Edgardo Ramos on 3/23/21)(jbo) (Entered: 03/24/2021) |
| 03/24/2021 | 73 | LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated March 24, 2021 re: Speedy Trial Time . Document filed by USA as to Neil Cole. (Attachments: # 1 Text of Proposed Order)(Lenow, Jared) (Entered: 03/24/2021) |
| 03/24/2021 | 74 | MEMO ENDORSEMENT as to Neil Cole (1) terminating 70 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated March 23, 2021 re: Letter Motion to Seal. ENDORSEMENT: Granted. The Clerk of Court is respectfully directed to terminate the motion. Doc. 70. (Signed by Judge Edgardo Ramos on 3/24/2021) (ap) (Entered: 03/24/2021) |
| 03/24/2021 | 75 | MEMO ENDORSEMENT as to Neil Cole on re: 71 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Request for Issuance of Rule 17(c) Subpoenas. ENDORSEMENT: The Government is directed to respond by March 31, 2021. (Responses due by 3/31/2021) (Signed by Judge Edgardo Ramos on 3/24/2021) (ap) (Entered: 03/24/2021) |
| 03/26/2021 | 76 | ORDER 73 LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated March 24, 2021 re: Speedy Trial Time. It is hereby ORDERED that the time from the date of this Order through July 1, 2021 is excluded under the Speedy Trial Act, 18 U.S.C.§ 3161(h)(7)(A). (Signed by Judge Edgardo Ramos on 3/26/21) (jw) (Entered: 03/26/2021) |
| 03/29/2021 | 77 | LETTER RESPONSE in Opposition by USA as to Neil Cole addressed to Judge Edgardo Ramos from Jared Lenow dated March 29, 2021 re: 33 MOTION to Compel *Discovery of Certain Electronic Data.*. (Lenow, Jared) (Entered: 03/29/2021) |
| 03/31/2021 | 78 | LETTER RESPONSE in Opposition by USA as to Neil Cole addressed to Judge Edgardo Ramos from Edward Imperatore dated 3/31/2021 re: 71 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Request for Issuance of Rule 17(c) Subpoenas .. (Imperatore, Edward) (Entered: 03/31/2021) |
| 04/06/2021 | 79 | LETTER REPLY TO RESPONSE to Motion by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated April 6, 2021 re 71 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Request for Issuance of Rule 17(c) Subpoenas .. (Reisner, Lorin) (Entered: 04/06/2021) |
| 04/06/2021 | 80 | LETTER REPLY TO RESPONSE to Motion by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated April 6, 2021 re 33 MOTION to Compel |

# A-13

| | | |
|---|---|---|
| | | *Discovery of Certain Electronic Data..* (Attachments: # 1 Exhibit A – March 1, 2020 Discovery Letter [Redacted])(Reisner, Lorin) (Entered: 04/06/2021) |
| 06/01/2021 | 81 | ORDER as to Neil Cole: The Southern District of New York has reconfigured courtrooms and other spaces in its courthouses to allow civil jury trials to proceed as safely as possible during the COVID–19 pandemic. Under the centralized calendaring system currently in place, the Clerks Office schedules up to three jury trials to begin on each day of jury selection: a primary case and up to two back–up cases that may proceed in its place if the primary case does not go forward. The Clerks Office has notified the Court that this case has been placed on the jury trial for July 6, 2021. The case must be trial–ready for that day. The case is second on the list for jury trials for that day. This means that the case will not proceed on July 6, 2021, if the first trial scheduled for that date goes forward. If the case cannot proceed on the scheduled date, the Court will seek another jury trial date for as soon as possible thereafter. As soon as the Court confirms that the matter will proceed on July 6, 2021, it will inform the parties. The previously entered pretrial schedule is revised as follows: Motions in limine and proposed voir dire, jury instructions and verdict sheets are due June 8, 2021. Oppositions thereto are due June 22, 2021. A final pretrial conference will be held on July 1, 2021 at 4:30 p.m. (Motions due by 6/8/2021. Responses due by 6/22/2021. Ready for Trial by 7/6/2021. Pretrial Conference set for 7/1/2021 at 04:30 PM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 6/1/2021) (ap) (Entered: 06/02/2021) |
| 06/02/2021 | 82 | LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/2/2021 re: Motion to adjourn . Document filed by USA as to Neil Cole. (Hartman, Scott) (Entered: 06/02/2021) |
| 06/03/2021 | 83 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated June 3, 2021 re: 82 LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/2/2021 re: Motion to adjourn .. (Reisner, Lorin) (Entered: 06/03/2021) |
| 06/07/2021 | 84 | MEMO ENDORSEMENT as to Neil Cole on 82 LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/2/2021 re: Motion to adjourn. ENDORSEMENT: The parties are directed to appear on June 11, 2021 at 11:00 a.m. for a telephonic hearing regarding the Government's request. The parties are directed to dial (877) 411–9748 at that time and enter access code 3029857, followed by the pound (#) sign. The Clerk of Court is respectfully directed to terminate the motion. Doc. 82. So ordered. (Telephone Conference set for 6/11/2021 at 11:00 AM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 6/7/2021) (lnl) (Entered: 06/07/2021) |
| 06/07/2021 | 85 | LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/7/2021 re: Request to suspend pretrial schedule . Document filed by USA as to Neil Cole. (Hartman, Scott) (Entered: 06/07/2021) |
| 06/07/2021 | 86 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated June 7, 2021 re: 85 LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/7/2021 re: Request to suspend pretrial schedule .. (Reisner, Lorin) (Entered: 06/07/2021) |
| 06/08/2021 | 87 | MEMO ENDORSEMENT as to Neil Cole on 85 LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/7/2021 re: Request to suspend pretrial schedule. ENDORSEMENT: The deadline for motions in limine and proposed voir dire, jury instructions, and verdict sheets is stayed and will be reset at the June 11, 2021 conference. The Clerk of Court is respectfully directed to terminate the motion. Doc. 85. So ordered. (Signed by Judge Edgardo Ramos on 6/7/2021) (lnl) (Entered: 06/08/2021) |
| 06/08/2021 | 88 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated June 8, 2021 re: Scheduling Order (Reisner, Lorin) (Entered: 06/08/2021) |
| 06/08/2021 | 89 | MEMO ENDORSEMENT as to Neil Cole on 88 LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated June 8, 2021 re: Scheduling Order. ENDORSEMENT: The Government's deadline to make Giglio disclosures and to produce 3500 material, a witness list, and exhibits, as well as Defendant's deadline to provide notice of any advice–of–counsel defense, are hereby stayed. A new deadline |

| | | |
|---|---|---|
| | | will be set at the June 11, 2021 conference. So ordered. (Signed by Judge Edgardo Ramos on 6/8/2021) (lnl) (Entered: 06/08/2021) |
| 06/11/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Telephone Conference as to Neil Cole held on 6/11/2021. Defendant Neil Cole appeared with counsel Lorin Reisner, Richard Tarlowe and Andrew Reich and Andrew Reich by telephone. AUSA Scott Hartman and Jared Lenow. The July 6 jury trial is rescheduled for October 4, 2021 at 9:30 a.m. The government is directed to serve the 3500 material by July 15, 2021. Speedy trial time is excluded from today, June 11, 2021, until October 4, 2021, in the interests of justice. Bail continued. (Jury Trial set for 10/4/2021 at 09:30 AM before Judge Edgardo Ramos) (ap) Modified on 8/24/2021 (ap). (Entered: 08/23/2021) |
| 06/22/2021 | 90 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 6/11/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Martha Martin, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/13/2021. Redacted Transcript Deadline set for 7/23/2021. Release of Transcript Restriction set for 9/20/2021. (McGuirk, Kelly) (Entered: 06/22/2021) |
| 06/22/2021 | 91 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 6/11/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/22/2021) |
| 08/30/2021 | 92 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Disclosure of Identity of Witness *[REDACTED]*. Document filed by Neil Cole. (Attachments: # 1 Exhibit A−Government Disclosure−Filed Under Seal)(Tarlowe, Richard) (Entered: 08/30/2021) |
| 08/30/2021 | 93 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Letter Motion to Seal . Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 08/30/2021) |
| 08/30/2021 | 94 | NOTICE OF ATTORNEY APPEARANCE Andrew Mark Thomas appearing for USA. (Thomas, Andrew) (Entered: 08/30/2021) |
| 08/30/2021 | 95 | MEMO ENDORSEMENT as to Neil Cole on re: 92 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Disclosure of Identity of Witness [REDACTED]. ENDORSEMENT: The Government is directed to respond by September 2, 2021. (Responses due by 9/2/2021) (Signed by Judge Edgardo Ramos on 8/30/2021) (ap) (Entered: 08/30/2021) |
| 08/30/2021 | 96 | MEMO ENDORSEMENT as to Neil Cole (1) granting 93 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Letter Motion to Seal. ENDORSEMENT: The requests are granted. The Clerk of Court is respectfully directed to terminate the motion. Doc. 93. (Signed by Judge Edgardo Ramos on 8/30/2021) (ap) (Entered: 08/30/2021) |
| 08/30/2021 | 97 | NOTICE OF ATTORNEY APPEARANCE Noah David Solowiejczyk appearing for USA. (Solowiejczyk, Noah) (Entered: 08/30/2021) |
| 09/02/2021 | 98 | LETTER RESPONSE in Opposition by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 9/2/2021 re: 92 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Disclosure of Identity of Witness *[REDACTED]*.. (Hartman, Scott) (Entered: 09/02/2021) |
| 09/03/2021 | 99 | MEMO ENDORSEMENT 92 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Disclosure of Identity of Witness...ENDORSEMENT...Defendant's request is denied. The Clerk of Court is respectfully directed to terminate the motion. Doc. 92. (Signed by Judge Edgardo Ramos on 9/3/21) (jw) (Entered: 09/03/2021) |

# A-15

| | | |
|---|---|---|
| 09/07/2021 | 100 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the parties dated 9/7/2021 re: Joint Proposed Pretrial Schedule Document filed by USA. (Hartman, Scott) (Entered: 09/07/2021) |
| 09/08/2021 | 101 | MEMO ENDORSEMENT as to Neil Cole on re: 100 LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the parties dated 9/7/2021 re: Joint Proposed Pretrial Schedule. ENDORSEMENT: The parties' proposed pretrial schedule is approved. (Motions due by 9/10/2021. Responses due by 9/27/2021. Replies due by 9/29/2021) (Signed by Judge Edgardo Ramos on 9/8/2021) (ap) (Entered: 09/08/2021) |
| 09/09/2021 | 102 | SCHEDULING NOTICE as to Neil Cole. A final pretrial conference will be held on September 30, 2021 at 2:00 p.m. at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007, Courtroom 318. (Pretrial Conference set for 9/30/2021 at 02:00 PM in Courtroom 318, 40 Centre Street, New York, NY 10007 before Judge Edgardo Ramos) (ap) (Entered: 09/09/2021) |
| 09/10/2021 | 103 | MOTION in Limine *to Exclude Evidence of Financial Resources and Personal Spending*. Document filed by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 104 | MEMORANDUM in Support by Neil Cole re 103 MOTION in Limine *to Exclude Evidence of Financial Resources and Personal Spending*.. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 105 | MOTION in Limine *to Exclude Evidence of Prior SEC Investigation and Settlement*. Document filed by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 106 | MEMORANDUM in Support by Neil Cole re 105 MOTION in Limine *to Exclude Evidence of Prior SEC Investigation and Settlement*.. (Attachments: # 1 Exhibit A−Letter, # 2 Exhibit B−Order, # 3 Exhibit C−Email, # 4 Exhibit D−Proposed Stipulation)(Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 107 | MOTION in Limine *to Exclude Evidence of Stock Sale Proceeds*. Document filed by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 108 | MEMORANDUM in Support by Neil Cole re 107 MOTION in Limine *to Exclude Evidence of Stock Sale Proceeds*.. (Attachments: # 1 Exhibit A−Form 4, # 2 Exhibit B−Form 4, # 3 Exhibit C−Form 4, # 4 Exhibit D−Form 4, # 5 Exhibit E−Form 4, # 6 Exhibit F−Form 4, # 7 Exhibit G−Letter)(Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 109 | Proposed Voir Dire Questions by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 110 | Request To Charge by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 111 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated September 10, 2021 re: Proposed Verdict Form (Attachments: # 1 [Proposed] Verdict Form)(Tarlowe, Richard) (Entered: 09/10/2021) |
| 09/10/2021 | 112 | PROPOSED EXAMINATION OF JURORS by USA as to Neil Cole. (Thomas, Andrew) (Entered: 09/10/2021) |
| 09/10/2021 | 113 | Request To Charge by USA as to Neil Cole. (Thomas, Andrew) (Entered: 09/10/2021) |
| 09/10/2021 | 114 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Andrew Thomas, and Noah Solowiejczyk dated September 10, 2021 re: Proposed Verdict Form Document filed by USA. (Attachments: # 1 Exhibit Proposed Verdict Form)(Solowiejczyk, Noah) (Entered: 09/10/2021) |
| 09/10/2021 | 115 | MOTION in Limine *to (1) admit prior act evidence to establish defendant Neil Coles knowledge of certain accounting rules and intent as to the crimes charged in the Indictment; (2) admit what−if−you−had−known evidence from the companys outside auditors to establish the significance of concealed information; (3) preclude improper good acts evidence; (4) preclude evidence of irrelevant post−conspiracy events; (5) require Cole to make a factual proffer to support any accountant or presence of counsel defense; (6) preclude evidence that Iconix changed its accounting methodology after the charged conduct had ended; (7) preclude Cole from introducing evidence or argument regarding certain personal factors or the general profitability or desirability of Iconixs intellectual property assets; and (8) preclude the testimony of the defendants two proposed expert witnesses*. Document filed by USA as to Neil Cole. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Solowiejczyk, Noah) |

# A-16

| | | |
|---|---|---|
| | | (Entered: 09/10/2021) |
| 09/22/2021 | 116 | MOTION to Compel *the Government to Immunize Certain Witnesses*. Document filed by Neil Cole. (Attachments: # 1 Exhibit A–Witness Interview Notes (Under Seal), # 2 Exhibit B–Witness Interview Notes (Under Seal), # 3 Exhibit C–Witness Interview Notes (Under Seal), # 4 Exhibit D–Letter from Government (Redacted))(Reisner, Lorin) (Entered: 09/22/2021) |
| 09/22/2021 | 117 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated September 22, 2021 re: Letter Motion to Seal . Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 09/22/2021) |
| 09/23/2021 | 118 | MEMO ENDORSEMENT as to Neil Cole on re: 117 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated September 22, 2021 re: Letter Motion to Seal...ENDORSEMENT...The government is directed to respond (Signed by Judge Edgardo Ramos on 9/23/21)(jw) (Entered: 09/24/2021) |
| 09/27/2021 | 119 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 9/27/2021 re: Defense request to Submit Material Ex Parte Document filed by USA. (Hartman, Scott) (Entered: 09/27/2021) |
| 09/27/2021 | 120 | MEMORANDUM in Opposition by USA as to Neil Cole re 105 MOTION in Limine *to Exclude Evidence of Prior SEC Investigation and Settlement.*, 107 MOTION in Limine *to Exclude Evidence of Stock Sale Proceeds.*, 103 MOTION in Limine *to Exclude Evidence of Financial Resources and Personal Spending..* (Attachments: # 1 Exhibit A – GX–1504, # 2 Exhibit B – GX–121, # 3 Exhibit C – GX–170, # 4 Exhibit D – GX–123, # 5 Exhibit E – GX–1236, # 6 Exhibit F – GX–1234, # 7 Exhibit G – GX–242, # 8 Exhibit H – GX–123, # 9 Exhibit I – GX–1235, # 10 Exhibit J – GX–234, # 11 Exhibit K – GX–104, # 12 Exhibit L – GX–105, # 13 Exhibit M – GX–1107, # 14 Exhibit N – GX–1121 (Redacted))(Thomas, Andrew) (Entered: 09/27/2021) |
| 09/27/2021 | 121 | MEMORANDUM in Opposition by Neil Cole re 115 MOTION in Limine *to (1) admit prior act evidence to establish defendant Neil Coles knowledge of certain accounting rules and intent as to the crimes charged in the Indictment; (2) admit what−if−you−had−known evidence from the companys outside audit.* (Attachments: # 1 Exhibit A – SEC Order Instituting Proceedings, # 2 Exhibit B – Mar. 23, 2020 Letter from Government, # 3 Exhibit C – Mar. 16, 2020 Expert Disclosure from Government)(Reisner, Lorin) (Entered: 09/27/2021) |
| 09/29/2021 | 122 | SCHEDULING NOTICE of as to Neil Cole. The final pretrial conference currently scheduled for September 30, 2021 at 2:00 p.m., will be held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007, Courtroom 24B. (ap) (Entered: 09/29/2021) |
| 09/29/2021 | 123 | MEMORANDUM in Opposition by USA as to Neil Cole re 116 MOTION to Compel *the Government to Immunize Certain Witnesses..* (Solowiejczyk, Noah) (Entered: 09/29/2021) |
| 09/29/2021 | 124 | REPLY MEMORANDUM OF LAW in Support as to Neil Cole re: 105 MOTION in Limine *to Exclude Evidence of Prior SEC Investigation and Settlement.*, 103 MOTION in Limine *to Exclude Evidence of Financial Resources and Personal Spending.*, 107 MOTION in Limine *to Exclude Evidence of Stock Sale Proceeds. .* (Attachments: # 1 Exhibit A – Historical Stock Data, # 2 Exhibit B – Government Slides)(Reisner, Lorin) (Entered: 09/29/2021) |
| 09/29/2021 | 125 | REPLY MEMORANDUM OF LAW in Support by USA as to Neil Cole re: 115 MOTION in Limine *to (1) admit prior act evidence to establish defendant Neil Coles knowledge of certain accounting rules and intent as to the crimes charged in the Indictment; (2) admit what−if−you−had−known evidence from the companys outside audit .* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Solowiejczyk, Noah) (Entered: 09/29/2021) |
| 09/30/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pretrial Conference as to Neil Cole held on 9/30/2021. Defendant Neil Cole present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSA Scott Hartman, Andrew Thomas, Noah Solowiejczyk. Jury selection will beheld on October 5, 2021 at 10:00 |

| | | a.m. Jury trial shall begin immediately thereafter. Motions in limine decided on the record. Bail continued. Court Reporter: Sam Mauro and Mike McDaniel. (jbo) (Entered: 10/12/2021) |
|---|---|---|
| 10/02/2021 | 126 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated October 2, 2021 re: reply in further support of motion in limine to exclude stock sale proceeds (ECF No. 107) (Reisner, Lorin) (Entered: 10/02/2021) |
| 10/03/2021 | 127 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Andrew Thomas, and Noah Solowiejczyk dated October 3, 2021 re: Request for Curcio Inquiry Document filed by USA. (Solowiejczyk, Noah) (Entered: 10/03/2021) |
| 10/03/2021 | 128 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin Reisner dated October 3, 2021 re: Juror Vaccination (redacted) . Document filed by Neil Cole. (Attachments: # 1 Exhibit A–United States v. Elder, 18 Cr. 092 (WFK) (E.D.N.Y.))(Reisner, Lorin) (Entered: 10/03/2021) |
| 10/03/2021 | 129 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Hartman, Solowiejczyk, and Thomas dated October 3, 2021 re: Further Response re Stock Sale Evidence Document filed by USA. (Thomas, Andrew) (Entered: 10/03/2021) |
| 10/05/2021 | | Docket Annotation as to Neil Cole: **Trial Notice** – The jury selection and trial in this matter is scheduled to commence on October 5, 2021. Trial will commence immediately after jury selection, and will be held at the Daniel Patrick Moynihan United States Courthouse, 500 Peal Street, New York, NY 10007, Courtroom 24B. An overflow courtroom will be available for the duration of trial at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, Courtroom 619. (jar) (Entered: 10/05/2021) |
| 10/05/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Voir Dire held on 10/5/2021 as to Neil Cole. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury selection held. Jury sworn and empaneled. (jbo) (Entered: 10/12/2021) |
| 10/06/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/6/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial begun. (jbo) (Entered: 10/12/2021) |
| 10/12/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/12/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Jury trial held. (Court Reporter Rose Prater and Steven Greenblum) (ap) (Entered: 10/20/2021) |
| 10/13/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/13/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Jury trial held. (Court Reporter Rose Prater and Steven Greenblum) (ap) (Entered: 10/20/2021) |
| 10/14/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/14/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Jury trial held. (Court Reporter Rose Prater and Steven Greenblum) (ap) (Entered: 10/20/2021) |
| 10/15/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/15/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Jury trial held. (Court Reporter Rose Prater and Steven Greenblum) (ap) (Entered: 10/20/2021) |

# A-18

| | | |
|---|---|---|
| 10/17/2021 | 130 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Noah Solowiejczyk and Andrew Thomas dated October 17, 2021 re: Admissibility of Government Exhibits Document filed by USA. (Attachments: # 1 Exhibit A (GX 1068), # 2 Exhibit B (GX 1139), # 3 Exhibit C (GX 1084))(Solowiejczyk, Noah) (Entered: 10/17/2021) |
| 10/18/2021 | 131 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated October 18, 2021 re: Response to ECF No. 130 (Attachments: # 1 Exhibit A – Declarant's 3500 Statement, # 2 Exhibit B – Declarant's 3500 Statement, # 3 Exhibit C – Witness's 3500 Statement)(Reisner, Lorin) (Entered: 10/18/2021) |
| 10/18/2021 | 132 | MOTION to Seal Document 131 Letter, *(Exhibit B to Letter)*. Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 10/18/2021) |
| 10/18/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/18/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/19/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/19/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/20/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/20/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/21/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/21/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/22/2021 | 133 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 9/30/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Michael McDaniel, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/12/2021. Redacted Transcript Deadline set for 11/22/2021. Release of Transcript Restriction set for 1/20/2022. (Moya, Goretti) (Entered: 10/22/2021) |
| 10/22/2021 | 134 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 9/30/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 10/22/2021) |
| 10/22/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/22/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/23/2021 | 135 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Andrew Thomas, and Noah Solowiejczyk dated October 23, 2021 re: Proposed Modifications to Jury Charge Document filed by USA. (Solowiejczyk, Noah) (Entered: 10/23/2021) |
| 10/24/2021 | 136 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Andrew Thomas, and Noah Solowiejczyk dated October 24, 2021 re: Preclusion of Defense Expert Witnesses Document filed by USA. (Attachments: # 1 |

|  |  | Exhibit A)(Solowiejczyk, Noah) (Entered: 10/24/2021) |
|---|---|---|
| 10/24/2021 | 137 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin Reisner dated October 24, 2021 re: Opposition to the Government's Letter on the Court's Proposed Jury Charges (Reisner, Lorin) (Entered: 10/24/2021) |
| 10/25/2021 | 138 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin Reisner dated October 24, 2021 re: Quash a Subpoena Served on Defendant Neil Cole . Document filed by Neil Cole. (Attachments: # 1 Exhibit A−Subpoena)(Reisner, Lorin) (Entered: 10/25/2021) |
| 10/25/2021 | 139 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin Reisner dated October 25, 2021 re: Opposition to the Government's Letter to Preclude Expert Testimony (Reisner, Lorin) (Entered: 10/25/2021) |
| 10/25/2021 | 140 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin Reisner dated October 25, 2021 re: Requesting that the Indictment Not be Provided to the Jury . Document filed by Neil Cole. (Reisner, Lorin) (Entered: 10/25/2021) |
| 10/25/2021 |  | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/25/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/26/2021 |  | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/26/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. Closing arguments begin. (jbo) (Entered: 11/04/2021) |
| 10/27/2021 |  | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/27/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. Closing arguments conclude. Jury charged, and jury begin deliberations. (jbo) (Entered: 11/04/2021) |
| 10/28/2021 |  | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/28/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. Jury deliberations continue. (jbo) (Entered: 11/04/2021) |
| 10/29/2021 |  | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/29/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. Jury deliberations continue. (jbo) (Entered: 11/04/2021) |
| 11/01/2021 |  | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/1/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury returns a unanimous verdict on Counts 1 and 10. Defendant is found not guilty on both counts. As to counts 2 through 8, the jury was unable to reach a unanimous verdict, and a mistrial was declared. (jbo) (Entered: 11/04/2021) |
| 11/03/2021 | 141 | JURY VERDICT as to Neil Cole (1) Not Guilty on Count 1,10. (lnl) (Entered: 11/03/2021) |
| 11/12/2021 | 142 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 11/12/2021 re: Speedy Trial Exclusion Document filed by USA. (Hartman, Scott) (Entered: 11/12/2021) |
| 11/12/2021 | 143 | MEMO ENDORSEMENT as to Neil Cole on re: 142 The Government further requests that the Court exclude time under the Speedy Trial Act until January 15, 2022. For the reasons set forth above, the Government submits that the ends of justice served by the |

| | | |
|---|---|---|
| | | requested exclusion outweigh the interests of the public and the defendant in a speedy retrial of the open counts. See 18 U.S.C. §§ 3161(e), 3161(h)(7). The defendant consents to the requested exclusion Time excluded from 11/12/21 until 1/15/22....ENDORSEMENT...The application is granted. The Government is directed to inform the Court by January 15, 2022 how it wishes to proceed as to the open counts. Speedy trial time is excluded until January 15, 2022, in the interests of justice (Government Responses due by 1/15/2022) (Signed by Judge Edgardo Ramos on 11/12/21)(jw) (Entered: 11/15/2021) |
| 11/16/2021 | 144 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/5/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 145 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/5/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 146 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/6/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 147 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/6/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 148 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/7/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 149 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/7/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 150 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/8/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |

# A-21

| | | |
|---|---|---|
| 11/16/2021 | 151 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/8/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 152 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/12/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 153 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/12/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 154 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/13/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 155 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/13/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 156 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/14/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 157 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/14/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 158 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/15/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 159 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/15/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven |

**A-22**

| | | |
|---|---|---|
| | | (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 160 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/18/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 161 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/18/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 162 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/19/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 163 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/19/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 164 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/20/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 165 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/20/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 166 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/21/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 167 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/21/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... |

| | | |
|---|---|---|
| | | (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 168 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/22/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 169 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/22/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 170 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/25/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 171 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/25/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 172 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10//26/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 173 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/26/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 174 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/27/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 175 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/27/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |

**A-24**

| | | |
|---|---|---|
| 11/16/2021 | 176 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/28/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 177 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/28/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 178 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/29/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 179 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/29/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 180 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/1/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 181 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/1/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 01/14/2022 | 182 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 1/14/2022 re: Extension of Deadline Document filed by USA. (Hartman, Scott) (Entered: 01/14/2022) |
| 01/14/2022 | 183 | MEMO ENDORSEMENT as to Neil Cole on 182 LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 1/14/2022 re: Extension of Deadline. ENDORSEMENT: The application is granted. (Signed by Judge Edgardo Ramos on 1/14/2022) (lnl) (Entered: 01/14/2022) |
| 01/18/2022 | 184 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated January 18, 2022 re: Extension of Deadline Document filed by USA. (Hartman, Scott) (Entered: 01/18/2022) |
| 01/18/2022 | 185 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman Noah Solowiejczyk Andrew Thomas dated January 18, 2022 re: The Government writes to seek a further extension of the deadline by which it must inform the Court of how it wishes to proceed with respect to the open counts in this matter (Count Two through Nine). Specifically, with the consent of the defendant, the Government respectfully requests that this deadline be extended to the end of the day |

| | | |
|---|---|---|
| | | on Friday, January 21, 2022, to allow discussions between the parties to continue. The Government further requests that the Court exclude time under the Speedy Trial Act until January 21, 2022. ENDORSEMENT: The application is granted. ( Responses due by 1/21/2022 )(Signed by Judge Edgardo Ramos on 1/18/2022)(bw) (Entered: 01/19/2022) |
| 01/21/2022 | 186 | MOTION for Edward Imperatore to Withdraw as Attorney . Document filed by USA as to Neil Cole. (Imperatore, Edward) (Entered: 01/21/2022) |
| 01/21/2022 | 187 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Noah Solowiejczyk and Andrew Thomas dated January 21, 2022 re: Retrial of Open Counts and Request for Status Conference Document filed by USA. (Solowiejczyk, Noah) (Entered: 01/21/2022) |
| 01/24/2022 | 188 | MEMO ENDORSEMENT as to Neil Cole re: 187 Letter Retrial of Open Counts and Request for Status Conference... ENDORSEMENT: A status conference will be held on January 28, 2022 at 11:30 a.m. Speedy trial time is excluded from January 21, 2022 until January 28, 2022, in the interest of justice. SO ORDERED. (Signed by Judge Edgardo Ramos on 1/24/22)(jbo) (Entered: 01/24/2022) |
| 01/27/2022 | 189 | MEMO ENDORSED granting 186 Motion to Withdraw as Attorney. Edward Arthur Imperatore withdrawn from case as to Neil Cole (1)... ENDORSEMENT: The application is granted. (Signed by Judge Edgardo Ramos on 1/27/22) (jbo) (Entered: 01/28/2022) |
| 01/31/2022 | 190 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 1/28/22 before Judge Edgardo Ramos. Court Reporter/Transcriber: Paula Horovitz, (212) 805−0348, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/22/2022. Redacted Transcript Deadline set for 3/3/2022. Release of Transcript Restriction set for 5/2/2022. (Moya, Goretti) (Entered: 01/31/2022) |
| 01/31/2022 | 191 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 1/28/22 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 01/31/2022) |
| 03/02/2022 | 192 | ORDER ON MOTION TO WITHDRAW AS COUNSEL as to Neil Cole: Paul, Weiss' motion to withdraw as counsel is granted. Mr. Cole may contact Chambers should he require additional time to retain counsel in advance of trial. SO ORDERED. (Signed by Judge Edgardo Ramos on 2/25/2022) (lnl) (Entered: 03/02/2022) |
| 04/08/2022 | 193 | NOTICE OF ATTORNEY APPEARANCE: Sean Hecker appearing for Neil Cole. Appearance Type: Retained. (Hecker, Sean) (Entered: 04/08/2022) |
| 04/08/2022 | 194 | NOTICE OF ATTORNEY APPEARANCE: Jenna Minicucci Dabbs appearing for Neil Cole. Appearance Type: Retained. (Dabbs, Jenna) (Entered: 04/08/2022) |
| 04/08/2022 | 195 | NOTICE OF ATTORNEY APPEARANCE: Jeffrey Then appearing for Neil Cole. Appearance Type: Retained. (Then, Jeffrey) (Entered: 04/08/2022) |
| 04/09/2022 | 196 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Noah Solowiejczyk and Andrew Thomas dated April 9, 2022 re: Scheduling of Telephone Conference Document filed by USA. (Solowiejczyk, Noah) (Entered: 04/09/2022) |
| 04/11/2022 | 197 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Noah Solowiejczyk, Andrew Thomas, Jared Lenow, dated April 9, 2022 re: The parties write to jointly request a telephone conference with the Court regarding the scheduling of the retrial in the above−referenced matter. ENDORSEMENT: A telephone conference will be held on April 13, 2022 at 12 p.m. The parties are instructed to call (877) 411−9748 and enter access code 3029857# when prompted. SO ORDERED. ( Telephone Conference set for 4/13/2022 at 12:00 PM before Judge Edgardo Ramos. )(Signed by Judge Edgardo Ramos on |

| | | |
|---|---|---|
| | | 4/11/2022)(bw) (Entered: 04/11/2022) |
| 04/12/2022 | 198 | MOTION for David Oscar Markus to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25997556. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Neil Cole. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Affidavit, # 3 Text of Proposed Order)(Markus, David) (Entered: 04/12/2022) |
| 04/12/2022 | 199 | MOTION for Anita Margot Moss to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25997613. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Neil Cole. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Affidavit, # 3 Text of Proposed Order)(Moss, Anita) (Entered: 04/12/2022) |
| 04/13/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 199 MOTION for Anita Margot Moss to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25997613. Motion and supporting papers to be reviewed by Clerk's Office staff., 198 MOTION for David Oscar Markus to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25997556. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 04/13/2022) |
| 04/13/2022 | 200 | ORDER granting 198 Motion for David Oscar Markus to Appear Pro Hac Vice as to Neil Cole (1). (Signed by Judge Edgardo Ramos on 4/13/2022) (jar) (Entered: 04/13/2022) |
| 04/13/2022 | 201 | ORDER granting 199 Motion for Anita Margot Moss to Appear Pro Hac Vice as to Neil Cole (1). (Signed by Judge Edgardo Ramos on 4/13/2022) (jar) (Entered: 04/13/2022) |
| 04/21/2022 | 202 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 4/13/22 before Judge Edgardo Ramos. Court Reporter/Transcriber: Paula Horovitz, (212) 805−0348, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2022. Redacted Transcript Deadline set for 5/23/2022. Release of Transcript Restriction set for 7/20/2022. (Moya, Goretti) (Entered: 04/21/2022) |
| 04/21/2022 | 203 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 4/13/22 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 04/21/2022) |
| 09/26/2022 | 204 | ORDER as to Neil Cole: At a conference held on April 13, 2022, a jury trial was scheduled for October 31, 2022 at 9:30 a.m. Trial will proceed as scheduled. The pretrial schedule remains unchanged: Motions in limine are due October 3, 2022 and oppositions thereto are due October 17, 2022. Proposed jury instructions, voir dire questions, and verdict sheets are due October 3, 2022 and objections thereto are due October 17, 2022. The final pretrial conference is rescheduled for 3:30 p.m. on October 27, 2022. (Motions due by 10/3/2022. Responses due by 10/17/2022. Pretrial Conference set for 10/27/2022 at 03:30 PM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 9/26/2022) (ap) (Entered: 09/26/2022) |
| 09/27/2022 | 205 | NOTICE OF ATTORNEY APPEARANCE Justin Victor Rodriguez appearing for USA. (Rodriguez, Justin) (Entered: 09/27/2022) |
| 09/30/2022 | 206 | NOTICE OF ATTORNEY APPEARANCE: David Oscar Markus appearing for Neil Cole. Appearance Type: Retained. (Markus, David) (Entered: 09/30/2022) |
| 09/30/2022 | 207 | NOTICE OF ATTORNEY APPEARANCE: Anita Margot Moss appearing for Neil Cole. Appearance Type: Retained. (Moss, Anita) (Entered: 09/30/2022) |
| 09/30/2022 | 208 | NOTICE OF ATTORNEY APPEARANCE: Rebecca Ann Sussman appearing for Neil Cole. Appearance Type: Retained. (Sussman, Rebecca) (Entered: 09/30/2022) |

# A-27

| 09/30/2022 | 209 | LETTER MOTION addressed to Judge Edgardo Ramos from Jenna M. Dabbs dated September 30, 2022 re: 204 Order, Set Deadlines/Hearings,,,, re: joint request for partial adjustment of schedule for pre–trial submissions . Document filed by Neil Cole. (Dabbs, Jenna) (Entered: 09/30/2022) |
|---|---|---|
| 10/03/2022 | 210 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from Attorney Jenna M. Dabbs dated September 30, 2022 re: The parties write to jointly request a partial adjustment to the current schedule for the parties' submissions in advance of trial, see ECF 204, scheduled to commence on October 31, 2022. ENDORSEMENT: Proposed jury instructions, voir dire questions,and verdict sheets are now due October 20, 2022. SO ORDERED. (Signed by Judge Edgardo Ramos on 10/3/2022)(bw) (Entered: 10/03/2022) |
| 10/03/2022 | 211 | MOTION in Limine *to Exclude Conspiracy Evidence and Argument*. Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 212 | MEMORANDUM in Support by Neil Cole re 211 MOTION in Limine *to Exclude Conspiracy Evidence and Argument*.. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 213 | MOTION in Limine *to Permit Evidence of Iconix's December 2015 Purchase of SEA 3 Assets*. Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 214 | MEMORANDUM in Support by Neil Cole re 213 MOTION in Limine *to Permit Evidence of Iconix's December 2015 Purchase of SEA 3 Assets*.. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 215 | MOTION in Limine *to Preclude Cross–Examination as to the Candie's Internal Investigation, SEC Investigation, and Settlement*. Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 216 | MEMORANDUM in Support by Neil Cole re 215 MOTION in Limine *to Preclude Cross–Examination as to the Candie's Internal Investigation, SEC Investigation, and Settlement*.. (Attachments: # 1 Exhibit A – 2020.03.23 Ltr. from USA, # 2 Exhibit B – 2022.09.26 Ltr. from USA)(Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 217 | MOTION in Limine *to Exclude Statements by Ethan Cole*. Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 218 | MEMORANDUM in Support by Neil Cole re 217 MOTION in Limine *to Exclude Statements by Ethan Cole*.. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 219 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 3, 2022 re: permission to file certain exhibits under seal and to redact portion of letter motion . Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 220 | MOTION in Limine . Document filed by USA as to Neil Cole. (Lenow, Jared) (Entered: 10/03/2022) |
| 10/03/2022 | 221 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 3, 2022 re: request for issuance of Rule 17(c) subpoenas . Document filed by Neil Cole. (Attachments: # 1 Exhibit A – Proposed Subpoena to WilmerHale, # 2 Exhibit B – Proposed Subpoena to Perkins Coie, # 3 Exhibit C – DX–0548 (Filed Under Seal), # 4 Exhibit D – 2020.05.06 Govt Disclosure (Filed Under Seal), # 5 Exhibit E – 2021.01.25 Govt Disclosure (Filed Under Seal), # 6 Exhibit F – 2022.9.27 Ltr. From S. Hecker to USA, # 7 Exhibit G – 2022.9.16 Ltr. From USA to S. Hecker, # 8 Exhibit H – 3554–001 (Filed Under Seal))(Hecker, Sean) (Entered: 10/03/2022) |
| 10/05/2022 | 222 | MEMO ENDORSED granting 219 LETTER MOTION permission to file certain exhibits under seal and to redact portion of letter motion as to Neil Cole (1)... ENDORSEMENT: The application to file under seal is granted. The Clerk of the Court is respectfully directed to terminate the motion, doc. 219. SO ORDERED. (Signed by Judge Edgardo Ramos on 10/5/22) (jbo) (Entered: 10/06/2022) |
| 10/17/2022 | 223 | DECLARATION of AUSA Andrew Thomas in Opposition by USA as to Neil Cole re: 217 MOTION in Limine *to Exclude Statements by Ethan Cole*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit |

# A-28

| | | |
|---|---|---|
| | | W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG)(Thomas, Andrew) (Entered: 10/17/2022) |
| 10/17/2022 | 224 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 17, 2022 re: permission to file exhibit under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/17/2022) |
| 10/17/2022 | 225 | MEMORANDUM in Opposition by Neil Cole re 220 MOTION in Limine .. (Attachments: # 1 Exhibit A – October 3, 2022 Government Disclosure (Filed Under Seal))(Hecker, Sean) (Entered: 10/17/2022) |
| 10/17/2022 | 226 | MEMORANDUM in Opposition by USA as to Neil Cole re 215 MOTION in Limine *to Preclude Cross–Examination as to the Candie's Internal Investigation, SEC Investigation, and Settlement.*, 211 MOTION in Limine *to Exclude Conspiracy Evidence and Argument.*, 221 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 3, 2022 re: request for issuance of Rule 17(c) subpoenas ., 213 MOTION in Limine *to Permit Evidence of Iconix's December 2015 Purchase of SEA 3 Assets.*, 217 MOTION in Limine *to Exclude Statements by Ethan Cole..* (Thomas, Andrew) (Entered: 10/17/2022) |
| 10/19/2022 | 227 | MEMO ENDORSEMENT as to Neil Cole (1) granting 224 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 17, 2022 re: permission to file exhibit under seal. ENDORSEMENT: The application to file under seal Exhibit to the Opposition is GRANTED. (Signed by Judge Edgardo Ramos on 10/19/2022) (ap) (Entered: 10/20/2022) |
| 10/20/2022 | 228 | PROPOSED EXAMINATION OF JURORS by USA as to Neil Cole. (Thomas, Andrew) (Entered: 10/20/2022) |
| 10/20/2022 | 229 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Lenow, Rodriguez, and Thomas dated October 20, 2022 re: Reformatted Trial Indictment and Proposed Verdict Form Document filed by USA. (Attachments: # 1 Exhibit A – Proposed Indictment for Distribution to Jury, # 2 Exhibit B – Proposed Verdict Form)(Thomas, Andrew) (Entered: 10/20/2022) |
| 10/20/2022 | 230 | Request To Charge by USA as to Neil Cole. (Thomas, Andrew) (Entered: 10/20/2022) |
| 10/20/2022 | 231 | Proposed Voir Dire Questions by Neil Cole. (Hecker, Sean) (Entered: 10/20/2022) |
| 10/20/2022 | 232 | Request To Charge by Neil Cole. (Hecker, Sean) (Entered: 10/20/2022) |
| 10/20/2022 | 233 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 20, 2022 re: submission of Proposed Verdict Form (Attachments: # 1 Exhibit / Proposed Verdict Form)(Hecker, Sean) (Entered: 10/20/2022) |
| 10/20/2022 | 234 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 20, 2022 re: supplemental authority (Attachments: # 1 Exhibit A – District of Colorado Order in United States v. McGuire)(Hecker, Sean) (Entered: 10/20/2022) |
| 10/25/2022 | 235 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSA Andrew Thomas dated October 25, 2022 re: Correction of Citation Error in Opposition Brief Document filed by USA. (Thomas, Andrew) (Entered: 10/25/2022) |
| 10/26/2022 | 236 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 26, 2022 re: permission to file exhibits under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/26/2022) |
| 10/26/2022 | 237 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 26, 2022 re: Final Pretrial Conference (Attachments: # 1 Exhibit A – GX–1522–A (Filed Under Seal), # 2 Exhibit B – GX–1522–B (Filed Under Seal))(Hecker, Sean) (Entered: 10/26/2022) |
| 10/26/2022 | 238 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Lenow, Rodriguez, and Thomas dated October 26, 2022 re: Response to Defendant's October 26, 2022 Letter Motion Concerning the Defendant's Statements and Double Jeopardy Document filed by USA. (Thomas, Andrew) (Entered: 10/26/2022) |

# A-29

| 10/27/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Pretrial Conference as to Neil Cole held on 10/27/2022. Defendant Neil Cole present with counsel Sean Hecker, Jenna Dabbs, Jeffrey Then, Anita Moss, and David Markus. AUSA Andrew Thomas and Justin Rodriguez. Jury selection is scheduled for October 31, 2022 at 10:00 a.m., the jury trial will begin immediately thereafter. Motions in limine decided on the record. Bail continued. (Jury Selection set for 10/31/2022 at 10:00AM before Judge Edgardo Ramos., Jury Trial set for 10/31/2022 at 10:00 AM before Judge Edgardo Ramos) (ap) (Entered: 10/28/2022) |
|---|---|---|
| 10/28/2022 | 239 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from USA dated October 28, 2022 re: Voir Dire Document filed by USA. (Rodriguez, Justin) (Entered: 10/28/2022) |
| 10/28/2022 | 240 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 28, 2022 re: motion for Rule 17(c) subpoenas (Hecker, Sean) (Entered: 10/28/2022) |
| 10/30/2022 | 241 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Lenow, Rodriguez, and Thomas dated October 30, 2022 re: Further Response to Defendant's Requested Rule 17(c) Subpoenas Document filed by USA. (Thomas, Andrew) (Entered: 10/30/2022) |
| 10/31/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Selection as to Neil Cole held on 10/31/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Jury Selection began. (Court Reporter Pam Utter and Kelly Surina) (ap) (Entered: 11/07/2022) |
| 11/01/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Voir Dire held on 11/1/2022 as to Neil Cole. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Jury Selection completed. Jury sworn and empaneled. (Court Reporter Pam Utter and Kelly Surina) (ap) Modified on 11/15/2022 (ap). (Entered: 11/07/2022) |
| 11/02/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/2/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Jury trial begins. Opening statements. Evidence entered. (Court Reporter Pam Utter and Kelly Surina) (ap) (Entered: 11/07/2022) |
| 11/03/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/3/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Evidence entered. (Court Reporter Pam Utter and Kelly Surina) (ap) (Entered: 11/07/2022) |
| 11/04/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/4/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Evidence entered. (Court Reporter Pam Utter and Kelly Surina) (ap) (Entered: 11/07/2022) |
| 11/06/2022 | 242 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 6, 2022 re: permission to file exhibit under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 11/06/2022) |
| 11/06/2022 | 243 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated November 6, 2022 re: Expected Testimony and certain Government exhibits (Attachments: # 1 Exhibit A – Government Exhibit 1335 (Filed Under Seal), # 2 Exhibit B – Transcript Excerpt United States v. Maxwell)(Hecker, Sean) (Entered: 11/06/2022) |
| 11/07/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/7/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. |

| | | |
|---|---|---|
| | | AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (jbo) (Entered: 11/16/2022) |
| 11/08/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/8/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (jbo) (Entered: 11/16/2022) |
| 11/09/2022 | 244 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Lenow, Rodriguez, and Thomas dated 11/9/2022 re: Defendant's Conduct and Request for Admonishment Document filed by USA. (Thomas, Andrew) (Entered: 11/09/2022) |
| 11/09/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/9/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (jbo) (Entered: 11/16/2022) |
| 11/10/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/10/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (jbo) (Entered: 11/16/2022) |
| 11/13/2022 | 245 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from USA dated November 13, 2022 re: Government Exhibits 409, 1145, and 1147 Document filed by USA. (Rodriguez, Justin) (Entered: 11/13/2022) |
| 11/13/2022 | 246 | RESPONSE in Opposition by USA as to Neil Cole re: 242 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 6, 2022 re: permission to file exhibit under seal .. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Lenow, Jared) (Entered: 11/13/2022) |
| 11/14/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/14/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (bw) (Entered: 11/21/2022) |
| 11/15/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/15/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (bw) (Entered: 11/21/2022) |
| 11/16/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/16/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (bw) (Entered: 11/21/2022) |
| 11/17/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/17/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. The government rests its case. The defense's case begins. (bw) (Entered: 11/21/2022) |
| 11/18/2022 | 247 | LETTER MOTION addressed to Judge Edgardo Ramos from David Oscar Markus dated November 18, 2022 re: Reconsideration of unavailable witness instruction . Document filed by Neil Cole. (Attachments: # 1 Exhibit email re Ethan Cole)(Markus, David) (Entered: 11/18/2022) |
| 11/18/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/18/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: |

|  |  |  |
|---|---|---|
|  |  | Pam Utter and Kelly Surina. Evidence entered. The defense rests its case. (bw) (Entered: 11/21/2022) |
| 11/21/2022 |  | Minute Entry for proceedings held before Judge Edgardo Ramos:Jury Trial as to Neil Cole held on 11/21/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters Pam Utter and Kelly Surina. Summations held. (jw) (Entered: 11/30/2022) |
| 11/22/2022 |  | Minute Entry for proceedings held before Judge Edgardo Ramos:Jury Trial as to Neil Cole held on 11/22/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Jury charged. Deliberations begin. (jw) (Entered: 12/05/2022) |
| 11/23/2022 |  | Minute Entry for proceedings held before Judge Edgardo Ramos: Telephone Conference as to Neil Cole held on 11/23/2022. Defendant's appearance was waived. Counsel for defendant Jenna Dabbs, Rebecca Sussman, and Jeffrey Then. AUSA Andrew Thomas and Justin Rodriguez. Conference was held to discuss the illness of a juror. (ap) (Entered: 11/29/2022) |
| 11/26/2022 | 248 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker, dated November 26, 2022 re: permission to file letter and exhibit under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 11/26/2022) |
| 11/28/2022 | 249 | ORDER as to Neil Cole: For the reasons discussed via email and in camera, Defendant's motion to dismiss Alternate Juror No. 1 is denied. It is SO ORDERED. (Signed by Judge Edgardo Ramos on 11/28/2022) (lnl) (Entered: 11/28/2022) |
| 11/28/2022 | 250 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 10/27/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Sara Beiter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/19/2022. Redacted Transcript Deadline set for 12/29/2022. Release of Transcript Restriction set for 2/26/2023. (McGuirk, Kelly) (Entered: 11/28/2022) |
| 11/28/2022 | 251 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 10/27/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/28/2022) |
| 11/28/2022 |  | Minute Entry for proceedings held before Judge Edgardo Ramos:Jury Trial as to Neil Cole held on 11/28/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Juror 1 excused and replaced by Alternate 1. Jury reaches an unanimous verdict. The defendant was found guilty on counts 2 through 9 of the Indictment. (jw) (Entered: 12/05/2022) |
| 11/28/2022 |  | JURY VERDICT as to Neil Cole (1) Guilty on Count 2,3–8,9. (jw) (Entered: 12/05/2022) |
| 11/30/2022 | 252 | VERDICT FORM as to USA v. Neil Cole. Dated: 11/28/2022. (bw) (Entered: 12/01/2022) |
| 12/16/2022 | 253 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/31/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |

| | | |
|---|---|---|
| 12/16/2022 | 254 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/31/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 255 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/1/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 256 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/1/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 257 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/2/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 258 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/2/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 259 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/3/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 260 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/3/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 261 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/4/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 262 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/4/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven |

# A-33

| | | |
|---|---|---|
| | | (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 263 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/7/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 264 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/7/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 265 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/8/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 266 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/8/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 267 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/10/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 268 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/10/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 269 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/9/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 270 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/9/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... |

| | | |
|---|---|---|
| | | (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 271 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/14/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 272 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/14/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 273 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/15/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 274 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/15/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 275 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/16/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 276 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 12/16/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 277 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/18/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 278 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/18/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |

# A-35

| 12/16/2022 | 279 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/21/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
|---|---|---|
| 12/16/2022 | 280 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/21/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 281 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/22/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 282 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/22/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 283 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/28/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Raquel Robles, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 284 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/28/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 285 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/17/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 286 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/17/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 01/05/2023 | 287 | LETTER MOTION addressed to Judge Edgardo Ramos from USA dated January 5, 2023 re: Proposed Schedule for Post–Trial Motions and Sentencing . Document filed by USA as to Neil Cole. (Rodriguez, Justin) (Entered: 01/05/2023) |

# A-36

| | | |
|---|---|---|
| 01/09/2023 | 288 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from AUSA Justin V. Rodriguez dated January 5, 2023 re: The Government writes on behalf of the parties to propose a schedule for the briefing of post–trial motions and sentencing. The parties have conferred and jointly propose the following: – Defense post–trial motions due on March 3, 2023. – Government response due on April 3, 2023. – Defense reply due on April 24, 2023. – Sentencing during the week of June 5, 2023 or June 12, 2023. ENDORSEMENT: The post–trial motions briefing schedule is approved. Sentencing will be held on June 14, 2023 at 10:30 a.m. SO ORDERED. ( Motions due by 3/3/2023. Responses due by 4/3/2023. Replies due by 4/24/2023. Sentencing set for 6/14/2023 at 10:30 AM before Judge Edgardo Ramos. )(Signed by Judge Edgardo Ramos on 1/9/2023)(bw) (Entered: 01/09/2023) |
| 01/19/2023 | 289 | MEMO ENDORSEMENT as to Neil Cole on re: 287 LETTER MOTION addressed to Judge Edgardo Ramos from USA dated January 5, 2023 re: Proposed Schedule for Post–Trial Motions and Sentencing. ENDORSEMENT: The post–trial motions briefing schedule is approved. Sentencing will be held on June 14, 2023 at 10:30 a.m. (Motions due by 3/3/2023. Responses due by 4/3/2023. Replies due by 4/24/2023. Sentencing set for 6/14/2023 at 10:30 AM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 1/19/2023) (ap) (Entered: 01/19/2023) |
| 02/28/2023 | 290 | JOINT LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated February 28, 2023 re: Post–Trial Motions and Bail (Hecker, Sean) (Entered: 02/28/2023) |
| 03/03/2023 | 291 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from Jared Lenow dated March 3, 2023 re: Related Case Document filed by USA. (Lenow, Jared) (Entered: 03/03/2023) |
| 04/14/2023 | 292 | MOTION for Rebecca Sussman to Withdraw as Attorney . Document filed by Neil Cole. (Sussman, Rebecca) (Entered: 04/14/2023) |
| 04/14/2023 | 293 | DECLARATION of Rebecca Sussman in Support as to Neil Cole re: 292 MOTION for Rebecca Sussman to Withdraw as Attorney .. (Sussman, Rebecca) (Entered: 04/14/2023) |
| 04/27/2023 | 294 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated April 27, 2023 re: request for leave to file letter under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 04/27/2023) |
| 04/27/2023 | 295 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated April 27, 2023 re: request for adjournment of sentencing . Document filed by Neil Cole. (Hecker, Sean) (Entered: 04/27/2023) |
| 05/02/2023 | 296 | MEMO ENDORSEMENT as to Neil Cole (1) on 292 MOTION for Rebecca Sussman to Withdraw as Attorney. ENDORSEMENT: SO ORDERED. Rebecca Ann Sussman withdrawn from case. (Signed by Judge Edgardo Ramos on 4/28/2023) (ap) (Entered: 05/02/2023) |
| 05/02/2023 | 297 | MEMO ENDORSEMENT as to Neil Cole (1) granting 294 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated April 27, 2023 re: request for leave to file letter under seal. ENDORSEMENT: The application to file Cole's April 27, 2023 Letter Motion under seal is granted. (Signed by Judge Edgardo Ramos on 5/2/2023) (ap) (Entered: 05/02/2023) |
| 05/02/2023 | 298 | MEMO ENDORSEMENT as to Neil Cole (1) on 295 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated April 27, 2023 re: request for adjournment of sentencing. ENDORSEMENT: Sentencing is adjourned to July 25, 2023 at 10 a.m. The deadlines for the presentencing report are extended accordingly. (Signed by Judge Edgardo Ramos on 5/2/2023) (ap) (Entered: 05/02/2023) |
| 05/02/2023 | | Set/Reset Hearings as to Neil Cole: Sentencing set for 7/25/2023 at 10:00 AM before Judge Edgardo Ramos. (ap) (Entered: 05/02/2023) |
| 06/12/2023 | 299 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated June 12, 2023 re: request for leave to file letter under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 06/12/2023) |

| 06/12/2023 | 300 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated June 12, 2023 re: request for adjournment of sentencing . Document filed by Neil Cole. (Hecker, Sean) (Entered: 06/12/2023) |
|---|---|---|
| 06/13/2023 | 301 | MEMO ENDORSEMENT as to Neil Cole (1) granting 299 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated June 12, 2023 re: request for leave to file letter under seal. ENDORSEMENT: The application to file under seal is granted.SO ORDERED. (Signed by Judge Edgardo Ramos on 6/13/2023) (lnl) (Entered: 06/13/2023) |
| 06/16/2023 | 303 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from Attorney Sean Hecker dated June 12, 2023 re: We write to respectfully request an adjournment of sentencing, currently scheduled for July 25, 2023, to a date in the first week of October. Mr. Cole respectfully seeks an extension for two reasons. ENDORSEMENT: Sentencing is adjourned to October 5, 2023 at 3:30 p.m. SO ORDERED. ( Sentencing set for 10/5/2023 at 03:30 PM before Judge Edgardo Ramos. )(Signed by Judge Edgardo Ramos on 6/16/2023)(bw) (Entered: 06/16/2023) |
| 08/28/2023 | 304 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated August 28, 2023 re: request for leave to file letter under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 08/28/2023) |
| 08/28/2023 | 305 | CONSENT LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated August 28, 2023 re: request for adjournment of sentencing . Document filed by Neil Cole. (Hecker, Sean) (Entered: 08/28/2023) |
| 08/28/2023 | 306 | MEMO ENDORSEMENT granting 304 LETTER MOTION filed by Neil Cole (1), addressed to Judge Edgardo Ramos from Attorney Sean Hecker dated August 28, 2023 re: request for leave to file letter under seal. ENDORSEMENT: The application to file a letter under seal is granted. SO ORDERED. (Signed by Judge Edgardo Ramos on 8/28/2023) (bw) (Entered: 08/28/2023) |
| 08/28/2023 |  | Transmission to Sealed Records Clerk: as to Neil Cole. Transmitted re: 306 MEMO ENDORSEMENT, to the Sealed Records Clerk for the sealing of document. (bw) (Entered: 08/28/2023) |
| 08/28/2023 | 307 | MEMO ENDORSEMENT as to Neil Cole on re: 305 CONSENT LETTER MOTION filed by Neil Cole addressed to Judge Edgardo Ramos from Attorney Sean Hecker dated August 28, 2023 re: request for adjournment of sentencing. ENDORSEMENT: Sentencing is adjourned to October 11, 2023 at 4:00 p.m. SO ORDERED. ( Sentencing set for 10/11/2023 at 04:00 PM before Judge Edgardo Ramos. )(Signed by Judge Edgardo Ramos on 8/28/2023)(bw) (Entered: 08/28/2023) |
| 09/22/2023 | 309 | RESCHEDULING NOTICE as to Neil Cole. The sentencing hearing previously scheduled for October 11, 2023, is hereby rescheduled for October 10, 2023, at 4:00 p.m. at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, Courtroom 619. ( Sentencing set for 10/10/2023 at 04:00 PM in Courtroom 619, 40 Centre Street, New York, NY 10007 before Judge Edgardo Ramos. ) (/s/Jazmin Trotman, Courtroom Deputy to the Hon. Edgardo Ramos, Dated: September 22, 2023) (bw) (Entered: 09/22/2023) |
| 09/27/2023 | 310 | SENTENCING SUBMISSION by Neil Cole. (Attachments: # 1 Exhibit A – N – support letters)(Hecker, Sean) (Entered: 09/27/2023) |
| 09/29/2023 | 311 | Sentencing Letter by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated September 29, 2023 re: Supplemental Sentencing Submission. (Attachments: # 1 Exhibit O – support letter)(Hecker, Sean) (Entered: 09/29/2023) |
| 10/04/2023 | 312 | SENTENCING SUBMISSION by USA as to Neil Cole. (Thomas, Andrew) (Entered: 10/04/2023) |
| 10/05/2023 | 313 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 5, 2023 re: U.S.S.G. § 4C1.1 . Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/05/2023) |
| 10/09/2023 | 314 | Sentencing Letter by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 9, 2023 re: Supplemental Sentencing Submission. (Attachments: # 1 Exhibit P – support letter)(Hecker, Sean) (Entered: 10/09/2023) |

# A-38

| | | |
|---|---|---|
| 10/10/2023 | | Docket Annotation as to Neil Cole: The sentencing hearing scheduled for today, October 10, 2023, at 4:00 p.m. will be held in **Courtroom 318** at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007. (jar) (Entered: 10/10/2023) |
| 10/10/2023 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Sentencing held on 10/10/2023 for Neil Cole (1) Count 2,3–8,9. Defendant present with counsel Sean Hecker, Anita Moss, and David Markus. AUSA Jared Lenow, Andrew Thomas, and Justin Rodriguez present. The Court sentenced the defendant to 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9 of the Indictment to run concurrently. The defendant shall be on supervised release for a term of 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently, subject to the standard conditions 1 –12, as well as the mandatory and special conditions as set forth in the judgment. No fine imposed. Defendant shall pay the United States $800 special assessment, due immediately. Preliminary Order of Forfeiture in the amount of $790,200 signed. Iconix will submit briefing regarding restitution by November 10, 2023. Defendant advised of his right to appeal. Mr. Cole may remain on bail pending appeal. (jw) (Entered: 10/13/2023) |
| 10/13/2023 | 315 | JUDGMENT In A Criminal Case. Date of Imposition of Judgment: 10/10/2023. Defendant Neil Cole (1) was found guilty on Count(s) 2, 3–8, and 9, after a plea of not guilty. The defendant has been found not guilty on Count(s) 1 and 10. IMPRISONMENT: 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. SUPERVISED RELEASE: 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. Standard Conditions of Supervision (See page 5 of Judgment). Additional Supervised Release Terms (See page 6 of Judgment). ASSESSMENT: $800.00, due immediately. – The determination of restitution is deferred until 1/10/2024. An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination. (Signed by Judge Edgardo Ramos on 10/12/2023)(bw) (Entered: 10/13/2023) |
| 10/20/2023 | 316 | TRANSCRIPT of Proceedings as to Neil Cole re: Sentence held on 10/10/2023 before Judge Edgardo Ramos. Court Reporter/Transcriber: Amy Walker, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/13/2023. Redacted Transcript Deadline set for 11/20/2023. Release of Transcript Restriction set for 1/18/2024. (McGuirk, Kelly) (Entered: 10/20/2023) |
| 10/20/2023 | 317 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Sentence proceeding held on 10/10/203 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/20/2023) |
| 10/25/2023 | 318 | PRELIMINARY ORDER OF FORFEITURE/MONEY JUDGMENT as to Neil Cole. (Signed by Judge Edgardo Ramos on 10/10/2023) (See ORDER set forth) (Forwarded three certified copies to AUSA Tara LaMorte, via interoffice mail) (ap) (Entered: 10/25/2023) |
| 10/25/2023 | 319 | NOTICE OF APPEAL by Neil Cole from 315 Judgment. Filing fee $ 505.00, receipt number 22596. (tp) (Entered: 10/25/2023) |
| 10/25/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Neil Cole to US Court of Appeals re: 319 Notice of Appeal – Final Judgment. (tp) (Entered: 10/25/2023) |
| 10/25/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Neil Cole re: 319 Notice of Appeal – Final Judgment were transmitted to the U.S. Court of Appeals. (tp) (Entered: 10/25/2023) |
| 11/09/2023 | 320 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 9, 2023 re: request for modification of bail conditions . Document filed by Neil Cole. (Hecker, Sean) (Entered: 11/09/2023) |

| | | |
|---|---|---|
| 11/13/2023 | 321 | ENDORSED LETTER as to USA v. Neil Cole addressed to Judge Edgardo Ramos from David M. Zornow dated November 9, 2023 re: We write on behalf of our client, Iconix International Inc. At the defendant Neil Cole's sentencing on October 10, 2023, the Court directed Iconix to make a submission in support of its request for restitution by Friday, November 10. We have not made any previous requests for an extension in this case. We have made good progress in reviewing a voluminous amount of billing records for various service providers, but we still need to complete our review of invoices for several law firms for a discrete period. We have conferred with counsel for Mr. Cole and counsel for the United States, and neither party objects to our request for an extension. Accordingly, we respectfully request an extension of our filing deadline by one week to Friday, November 17, 2023. ENDORSEMENT: The application is granted. Iconix's deadline is extended to Friday, November 17, 2023. SO ORDERED. ( Brief due by 11/17/2023. ) (Signed by Judge Edgardo Ramos on 11/13/2023)(bw) (Entered: 11/14/2023) |
| 11/13/2023 | 322 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from Attorney Sean Hecker dated November 9, 2023 re: We represent Neil Cole in the above–captioned matter. We write to request a modification to Mr. Cole's bail conditions to allow a portion of the money currently posted as bail to be used to pay his forfeiture judgment. ENDORSEMENT: The government is directed to respond by Friday, November 17, 2023. SO ORDERED. ( Responses due by 11/17/2023 ) (Signed by Judge Edgardo Ramos on 11/13/2023) (bw) (Entered: 11/14/2023) |
| 11/16/2023 | 323 | LETTER MOTION addressed to Judge Edgardo Ramos from David M. Zornow dated November 16, 2023 re: Restitution . Document filed by Iconix International Inc. as to Neil Cole. (Attachments: # 1 Exhibit 1 Iconix May 19, 2023 Victim Impact Statement Letter, # 2 Exhibit 2.1 Invoices (Akin Gump Strauss Hauer & Feld LLP), # 3 Exhibit 2.2 Invoices (Ankura Consulting Group, LLC), # 4 Exhibit 2.3 Invoices (Frankfurt Kurnit Klein & Selz PC), # 5 Exhibit 2.4 Invoices (Friedman Kaplan), # 6 Exhibit 2.5 Invoices (Kibbe & Orbe), # 7 Exhibit 2.6 Invoices (Latham & Watkins, LLP), # 8 Exhibit 2.7 Invoices (McGuireWoods LLP), # 9 Exhibit 2.8 Invoices (Perkins Coie LLP), # 10 Exhibit 2.9 Invoices (Petrillo Klein & Boxer LLP), # 11 Exhibit 2.10 Invoices (Pillsbury Winthrop Shaw Pittman LLP), # 12 Exhibit 2.11 Invoices (Richards, Kibbe & Orbe), # 13 Exhibit 2.12 Invoices (Shearman & Sterling LLP), # 14 Exhibit 2.13 Invoices (Simpson Thacher & Bartlett LLP), # 15 Exhibit 2.14 Invoices (Vinson & Elkins), # 16 Exhibit 2.15 Invoices (Wilkie Farr & Gallagher LLP), # 17 Exhibit 3 Restitution Calculation Spreadsheets and Skadden Time Entries)(Zornow, David) (Entered: 11/16/2023) |
| 11/17/2023 | 324 | ORDER as to Neil Cole. Cole is directed to respond to Iconix's letter motion regarding restitution (Doc. 323) by December 1, 2023. SO ORDERED. ( Responses due by 12/1/2023 ) (Signed by Judge Edgardo Ramos on 11/17/2023)(bw) (Entered: 11/17/2023) |
| 11/19/2023 | 325 | LETTER RESPONSE in Opposition by USA as to Neil Cole addressed to Judge Edgardo Ramos from Jared Lenow dated November 19, 2023 re: 320 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 9, 2023 re: request for modification of bail conditions .. (Lenow, Jared) (Entered: 11/19/2023) |
| 11/20/2023 | 326 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 20, 2023 re: request for leave to file letter under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 11/20/2023) |
| 11/20/2023 | 327 | LETTER REPLY TO RESPONSE to Motion by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated November 20, 2023 re 320 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 9, 2023 re: request for modification of bail conditions .. (Hecker, Sean) (Entered: 11/20/2023) |
| 11/22/2023 | 328 | CONSENT LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 22, 2023 re: request for extension of deadline to respond to Iconix's letter motion regarding restitution . Document filed by Neil Cole. (Hecker, Sean) (Entered: 11/22/2023) |
| 11/22/2023 | 329 | MEMO ENDORSEMENT as to Neil Cole (1) granting 326 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 20, 2023 re: |

| | | |
|---|---|---|
| | | request for leave to file letter under seal. ENDORSEMENT: The application to file a reply letter under seal is granted. (Signed by Judge Edgardo Ramos on 11/21/2023) (ap) (Entered: 11/22/2023) |
| 11/27/2023 | 330 | MEMO ENDORSEMENT 328 CONSENT LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 22, 2023 re: request for extension of deadline to respond to Iconix's letter motion regarding restitution as to Neil Cole....ENDORSEMENT...Cole's response to Iconix's letter–motion regarding restitution is due December 8, 2023. SO ORDERED (Signed by Judge Edgardo Ramos on 11/27/23) (jw) (Entered: 11/27/2023) |
| 12/08/2023 | 331 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated December 8, 2023 re: 323 LETTER MOTION addressed to Judge Edgardo Ramos from David M. Zornow dated November 16, 2023 re: Restitution .. (Hecker, Sean) (Entered: 12/08/2023) |
| 12/12/2023 | 332 | LETTER REPLY TO RESPONSE to Motion by Iconix International Inc. as to Neil Cole addressed to Judge Edgardo Ramos from David M. Zornow dated December 12, 2023 re 323 LETTER MOTION addressed to Judge Edgardo Ramos from David M. Zornow dated November 16, 2023 re: Restitution .. (Zornow, David) (Entered: 12/12/2023) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :    **SEALED INDICTMENT**

       - v. -                          :    19 Cr. ___

NEIL COLE,                          :

       Defendant.                      :    **19 CRIM 869**

                         :

- - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Commit Securities Fraud, to Make False Filings with the SEC, and to Improperly Influence the Conduct of Audits)

The Grand Jury charges:

### Relevant Individuals and Entities

1.   At all times relevant to this Indictment, Iconix Brand Group, Inc. ("Iconix") was a publicly traded brand management company headquartered in New York, New York.  Iconix's securities traded under the symbol "ICON" on the NASDAQ.  Iconix was in the business of acquiring various brands, including clothing and fashion brands, and then licensing those brands to retailers, wholesalers, and suppliers, who, in turn, produced and sold clothing and other products bearing the brand names.

2.   At all times relevant to this Indictment, NEIL COLE, the defendant, was the Chief Executive Officer ("CEO") of Iconix.

3.     At all times relevant to this Indictment, Seth Horowitz, a co-conspirator not named as a defendant herein, was the Chief Operating Officer ("COO") of Iconix.

## Iconix's Joint Ventures

4.     Iconix, in certain instances, utilized joint ventures ("JVs") to profit from its brands in foreign markets.  With respect to these JVs, Iconix transferred ownership of a trademark or brand to the JV while maintaining a 50 percent ownership interest in the JV itself.  The other party involved in the JV purchased a 50 percent interest in the JV from Iconix.  The purchase price for a 50 percent interest in the JV was generally set at the valuation of half of the future cash streams from exploitation of the trademarks at issue in the relevant territory.  As part of the JV agreements, each JV partner was generally entitled to 50 percent of the JV's licensing revenue.

5.     When it entered into a JV, Iconix recognized as revenue the buy-in purchase price paid by the JV partner, less Iconix's cost basis in the trademarks.  At all times relevant to this Indictment, the buy-in purchase price that Iconix received from its JV partners comprised a significant portion of Iconix's earnings.

## Public Company Reporting Requirements

6.    At all times relevant to this Indictment, Iconix was required to comply with the federal securities laws, which are designed to ensure that a publicly traded company's financial information is accurately recorded and disclosed to the investing public.  Specifically, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, Iconix was required to: (a) file with the United States Securities and Exchange Commission (the "SEC") annual financial statements (on SEC Form 10-K); (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected Iconix's business transactions.

7.    At all times relevant to this Indictment, NEIL COLE, the defendant, signed Iconix's quarterly and annual financial reports.  Additionally, Iconix filed with each of its quarterly and annual financial reports certifications entitled "Certification of Periodic Report Under Section 302 of the Sarbanes-Oxley Act of 2002" in which COLE certified, in part:

> 1.   I have reviewed this [quarterly or annual] report [] of Iconix Brand Group, Inc.;
>
> 2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

In these certifications, COLE also certified that he had disclosed to Iconix's outside auditor (the "Audit Firm") and the Audit Committee of its Board of Directors (or persons performing the equivalent functions):   "Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

8.   In conjunction with each of its quarterly and annual financial reports, Iconix included a second set of certifications entitled "Certification Pursuant to 18 U.S.C. Section 1350 As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," in which NEIL COLE, the defendant, further certified, in part, that the quarterly or annual financial report:

> [F]ully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and . . . the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

9.   Federal securities law further required that Iconix's annual financial statements be audited by independent certified public accountants.

4

# A-45

10. Among the most critical financial metrics disclosed in Iconix's public filings with the SEC were Iconix's quarterly and annual revenue and earnings per share ("EPS"). EPS is generally derived from calculating revenue, less expenses, and dividing that amount by the number of outstanding shares of common stock. In the press releases it issued in connection with its periodic filings, Iconix regularly touted increases in its revenue and non-GAAP diluted EPS, an EPS metric that excluded certain gains and charges not relevant here. Iconix's press releases, which were typically issued shortly before the company's quarterly filings, included Iconix's actual revenue and EPS for the quarter and year-to-date, as reflected in Iconix's SEC filings.

11. At all times relevant to this Indictment, at the end of each reporting period, in connection with the preparation of Iconix's quarterly and annual financial statements, NEIL COLE, the defendant, signed and caused to be submitted to the Audit Firm a management representation letter, in which COLE represented, among other things:

a. "[t]here are no material transactions that have not been properly recorded in the accounting records underlying the consolidated financial statements," and that "[j]oint ventures or other participations" "have been properly recorded or disclosed in the consolidated financial statements;"

b.  COLE was "not aware of any linked or barter transactions, including transactions entered into under separate agreements where one of the arrangements is contingent upon execution of another arrangements, except for agreements where such linkage, barter, or contingent nature is explicitly stated in the contract terms;" and

c.  COLE was "not aware of any concessions for additional free or discounted services or products under any license arrangements," nor of "any plans to provide more favorable terms than were originally negotiated, especially related to arrangements known internally as fixed term arrangements, that have not been properly accounted for."

**Iconix Touted Its Revenue and EPS Growth and the Fact
That It Had Met Revenue and EPS Analyst Consensus**

12.  Iconix executives, including NEIL COLE, the defendant, publicly identified revenue and EPS as the principal metrics demonstrating Iconix's growth.  They also touted Iconix's consistent record of revenue and earnings growth and of meeting or exceeding Wall Street analyst consensus with respect to these metrics.  The following are excerpts of Iconix's press releases accompanying its quarterly filings in late 2013 and 2014:

| February 20, 2014 Press Release | |
|---|---|
| Headline | *Iconix Brand Group Reports Record Revenue And Earnings For The Fourth Quarter And Full Year 2013* |
| Q4 2013 Results | • Record Q4 revenue of $105.3 million, a 24% increase over prior year quarter<br>• Record 2013 revenue of $432.6 million, a 22% increase over prior year<br>• Record Q4 non-GAAP diluted EPS of $0.54, a 32% increase over prior year quarter<br>• Record 2013 non-GAAP diluted EPS of $2.39, a 41% increase over prior year |

| July 29, 2014 Press Release | |
|---|---|
| Headline | *Iconix Brand Group Reports Record Revenue And Earnings For The Second Quarter 2014* |
| Q2 2014 Results | • Record Q2 revenue of $118.9 million and non-GAAP diluted EPS of $0.75<br>• Non-GAAP diluted EPS for the second quarter of 2014 increased 4% to $0.75 compared to $0.72 in the prior year quarter |

| October 28, 2014 Press Release | |
|---|---|
| Headline | *Iconix Brand Group Reports Record Revenue And Earnings For The Third Quarter 2014* |
| Q3 2014 Results | • Record Q3 revenue of $113.8 million, a 6% increase over prior year quarter<br>• Record Q3 diluted non-GAAP EPS of $0.73, a 23% increase over prior year quarter |

# A-48

| February 26, 2015 Press Release | |
|---|---|
| Headline | *Iconix Brand Group Reports Financial Results For The Fourth Quarter And Full Year 2014* |
| Full Year 2014 Results | • 2014 revenue of $461.2 million, a 7% increase over prior year<br>• Q4 total revenue of $112.4 million, a 7% increase over prior year quarter<br>• 2014 diluted non GAAP EPS of $2.78, a 16% increase over prior year<br>• Q4 diluted non GAAP EPS of $0.56, a 4% increase over prior year |

These press releases were filed with the SEC as exhibits to a Form 8-K, a report companies must file with the SEC to inform the investing public about major corporate events or announcements.

## Overview of the Accounting Fraud Scheme

13. NEIL COLE, the defendant, Seth Horowitz, and others engaged in a scheme to falsely inflate Iconix's reported revenue and EPS by orchestrating a series of "round trip" transactions in which COLE and Horowitz induced a JV partner, a Hong Kong-based international apparel licensing company ("Company-1"), to pay inflated buy-in purchase prices for JV interests, with the understanding that Iconix would then reimburse Company-1 for the overpayments. COLE and Horowitz executed the scheme for the purpose of enabling Iconix to report fraudulently inflated revenue and EPS figures based on the inflated buy-in purchase prices it obtained from Company-1.

14. Specifically, NEIL COLE, the defendant, arranged for Iconix to enter into three JVs with Company-1 that included

inflated buy-in purchase prices from Company-1: (1) the Southeast Asia JV, which closed on or about October 1, 2013 ("SEA-1"), (2) the Southeast Asia first amendment, which closed on or about June 30, 2014 ("SEA-2"), and (3) the Southeast Asia second amendment, which closed on or about September 17, 2014 ("SEA-3") (collectively, the "SEA JVs"). Each of the SEA JVs involved a fraudulent "round trip" transaction, lacking in economic substance, in which Company-1 paid an artificially inflated buy-in purchase price for its interest in the JV, in exchange for COLE's agreement that Iconix would give back the inflated portion of the purchase price to Company-1, through sham payments for "consulting" or "marketing" work or, in the case of SEA-3, through relief from an existing financial obligation.

15. Through the scheme, NEIL COLE, the defendant, and Seth Horowitz caused Iconix to report, among other things, fraudulently inflated revenue and EPS figures to the investing public. COLE and Horowitz did so, in part, to ensure that the reported figures met analyst consensus and to fraudulently convey the impression to the investing public that Iconix was

growing quarter after quarter, as COLE had touted to the investing public.

### SEA-1

16. In or about mid-2013, NEIL COLE, the defendant, and representatives of Company-1 negotiated SEA-1, a JV between Iconix and Company-1, in which Iconix sold to Company-1 the right to manufacture and sell any of approximately 25 Iconix-owned trademarks in approximately ten countries in Southeast Asia.

17. During negotiations, in or about the summer of 2013, NEIL COLE, the defendant, and representatives of Company-1 reached a side agreement that Company-1 would increase the consideration it paid to Iconix by approximately $2 million, from approximately $10 million to $12 million, in exchange for Iconix's agreement to round trip $2 million back to Company-1. As COLE well understood, Iconix would recognize revenue in an amount equal to the inflated consideration paid by Company-1 to Iconix, $12 million, less Iconix's cost basis in the underlying assets.

18. To conceal the fact that the approximately $2 million payment that Iconix agreed to make to Company-1 was a give-back to compensate Company-1 for overpaying for its interest in SEA-1, NEIL COLE, the defendant, and a representative of Company-1 agreed to a written "Consultancy Agreement," which characterized

10

Iconix's $2 million payment to Company-1 purportedly as compensation for "consulting" work that Company-1 had performed. In truth and in fact, and as COLE and a representative of Company-1 had agreed, Iconix transferred $2 million to Company-1 to reimburse Company-1 for its overpayment for its interest in SEA-1, not to compensate Company-1 for consulting work it had performed.

19.   NEIL COLE, the defendant, hid from Iconix's lawyers and the Audit Firm that COLE had arranged with Company-1 for Company-1 to increase its buy-in purchase price for SEA-1 in order for COLE to inflate Iconix's revenue and that the Consultancy Agreement was a pretextual means to reimburse Company-1 for the overpayment.

20.   Iconix's 10-K for year-end 2013, which NEIL COLE, the defendant, signed, and which Iconix filed with the SEC on or about February 27, 2014, disclosed that Iconix and Company-1 had entered into SEA-1 and that Company-1 "had purchased a 50% interest in [SEA-1] for $12 million."  Iconix did not disclose that the $12 million purchase price was inflated by $2 million and that Iconix agreed to pay a $2 million "consultancy" as a give-back to Company-1.

## SEA-2

21.   In or about 2014, NEIL COLE, the defendant, again sought out Company-1 as a partner in a JV that could help Iconix

increase its revenue and EPS, including through the fraudulently inflated buy-in purchase price for Company-1's interest in the JV. COLE and Seth Horowitz negotiated with representatives of Company-1 an amendment to SEA-1, referred to herein as SEA-2, which involved the sale to Company-1 of an interest in certain Iconix trademarks in Korea and various countries in Europe.

22. During the SEA-2 negotiations, NEIL COLE, the defendant, reached a secret, undocumented agreement with representatives of Company-1 that Company-1 would inflate the buy-in purchase price to be paid to Iconix for Company-1's interest in the JV by $5 million, from approximately $10.9 million to approximately $15.9 million, in exchange for Iconix round-tripping approximately $5 million back to Company-1 in the form of payments purportedly for marketing. COLE, with the assistance of Seth Horowitz, structured the transaction in this fashion in order to falsely inflate the revenue that Iconix would recognize from SEA-2 by approximately $5 million.

23. NEIL COLE, the defendant, sought to close SEA-2 in the second quarter of 2014 so that Iconix could recognize revenue during that quarter and meet analyst consensus for revenue and EPS. On or about June 30, 2014, the last day of the second quarter of 2014, Iconix and Company-1 entered into a purchase agreement, which was styled as an amendment to SEA-1 and was signed by COLE (the "SEA-2 Purchase Agreement"). The SEA-2

12

Purchase Agreement provided that Company-1 would pay a purchase price to Iconix of approximately $15,917,500 for Company-1's interest in the JV.  The secret agreement between COLE and Company-1 that Iconix would send back to Company-1 approximately $5 million, purportedly for marketing expenses, was undocumented.

24.  In or about June 2014, Iconix recognized revenue from SEA-2 in the amount of approximately $13.6 million, reflecting the purchase price of $15,917,500, less Iconix's cost basis in the trademarks contributed to the JV.  The undisclosed and undocumented commitment that NEIL COLE, the defendant, made for Iconix to reimburse Company-1 for its $5 million overpayment, purportedly as compensation for marketing expenses incurred by Company-1, was not accounted for in Iconix's books at the time SEA-2 was entered.

25.  Nonetheless, consistent with his undisclosed side agreement with representatives of Company-1, in or about November and December 2014, NEIL COLE, the defendant, authorized wire transfers from Iconix to Company-1 totaling approximately $5 million.  As COLE knew, these transfers from Iconix to Company-1 were not consideration for marketing work Company-1

had performed, but instead constituted a reimbursement to Company-1 for its $5 million overpayment.

26.   NEIL COLE, the defendant, hid from Iconix's lawyers and the Audit Firm that COLE had reached an understanding with Company-1 to increase the consideration Company-1 paid Iconix by $5 million in exchange for COLE's agreement for Iconix to round-trip the $5 million back to Company-1.

27.   Iconix's Form 10-Q for the second quarter of 2014, which NEIL COLE, the defendant, signed, and which Iconix filed with the SEC on or about August 6, 2014, disclosed, with respect to SEA-2, that Company-1 "agreed to pay [Iconix] $15.9 million" and "[a]s a result of this transaction [Iconix] recorded a gain of $13.6 million in the Current Quarter, which is included in licensing and other revenue in the unaudited condensed consolidated income statement."   The Form 10-Q failed to disclose that Iconix's revenue was inflated by approximately $5 million based upon Company-1's overpayment and that Iconix had secretly agreed to reimburse Company-1 for this overpayment. Nor was Iconix's commitment to transfer $5 million to Company-1 as purported consideration for marketing services disclosed or accounted for at the time SEA-2 was entered.

**SEA-3**

28.   In or about the late summer of 2014, NEIL COLE, the defendant, and Seth Horowitz negotiated with representatives of

14

Company-1 a second amendment to SEA-1, referred to herein as SEA-3, which involved the sale to Company-1 of an interest in certain Iconix brands in China, Hong Kong, Macau, and Taiwan. As with SEA-2, COLE orchestrated SEA-3 as a fraudulent means of inflating Iconix's revenue and EPS.

29.  During the SEA-3 negotiations, NEIL COLE, the defendant, and Seth Horowitz reached a secret agreement with representatives of Company-1 that Company-1 would artificially inflate the buy-in purchase price it paid to Iconix by $6 million, from approximately $15.5 million to approximately $21.5 million, in exchange for Iconix's commitment to reimburse Company-1 the $6 million overpayment at a later time.  COLE and Horowitz reached this understanding in order to falsely inflate the revenue that Iconix would recognize from SEA-3 by approximately $6 million.

30.  In or about the summer and fall of 2014, while Iconix and Company-1 were negotiating SEA-3, NEIL COLE, the defendant, Seth Horowitz, and representatives of Company-1 explored potential ways in which Iconix could round-trip back to Company-1 its $6 million purchase price overpayment.  They discussed, among other things, that an affiliate of Company-1 ("Affiliate-1") owed Iconix money in connection with an unrelated licensing agreement for the children's line of a well-known clothing brand ("Brand-1") that Iconix owned and licensed to Affiliate-1 in

15

exchange for guaranteed royalty payments.  By in or about the summer of 2014, Affiliate-1 was struggling to pay the guaranteed minimum royalties it owed to Iconix to license Brand-1, and Affiliate-1 wanted to be released from its payment obligations to Iconix.

31.  On or about August 13 and 14, 2014, NEIL COLE, the defendant, and Seth Horowitz exchanged emails about the possibility of terminating the Brand-1 license and releasing Affiliate-1 of its royalty obligations--which had nothing to do with the SEA JVs--as a fraudulent means of giving back money to Company-1 for its JV overpayments.  In the email exchange, Horowitz told COLE, in relevant part: "Spent a lot of time . . . on [the Brand-1] model today.  Believe we should not go forward with taking this back."  COLE responded, in relevant part: "lets discuss tomorrow.  Will be tough to do China [SEA-3] without [Brand-1] . . . ."  For discussions with Iconix, representatives of Company-1 prepared an internal Company-1 document reflecting the SEA-2 and SEA-3 "Overpay[ments]" and "offset[s]," including Iconix's forgiving the Brand-1 royalty payments owed by Affiliate-1.

32.  NEIL COLE, the defendant, and Seth Horowitz sought to close SEA-3 during the third quarter of 2014 so that Iconix could recognize revenue from the transaction during that quarter and meet analyst consensus for revenue and EPS.  On or about

16

September 17, 2014, Iconix and Company-1 entered into a purchase agreement, which was styled as the second amendment to SEA-1 and signed by COLE (the "SEA-3 Purchase Agreement").  The SEA-3 Purchase Agreement provided, in relevant part, that Company-1 would pay a purchase price of approximately $21.5 million for its interest in the JV.  The secret agreement between COLE and Company-1 that Iconix would give back approximately $6 million to Company-1 was undocumented.

33.  In or about September 2014, Iconix recognized revenue from SEA-3 in the amount of approximately $18.7 million, reflecting the purchase price of approximately $21.5 million, less Iconix's cost basis in the brands contributed to the JV. In truth and in fact, as NEIL COLE, the defendant, well knew, SEA-3 resulted in the false inflation of Iconix's revenue by approximately $6 million.  The undisclosed and undocumented commitment that NEIL COLE, the defendant, made for Iconix to reimburse Company-1 for its $6 million overpayment was not accounted for in Iconix's books at the time SEA-3 was entered.

34.  NEIL COLE, the defendant, hid from Iconix's lawyers and the Audit Firm that COLE had reached an understanding with Company-1 to increase the consideration Company-1 paid to Iconix by approximately $6 million in exchange for COLE's agreement for

17

Iconix to round-trip the $6 million back to Company-1 at a later time.

35.   Iconix's Form 10-Q for the third quarter of 2014, which NEIL COLE, the defendant, signed, and which Iconix filed with the SEC on or about November 7, 2014, disclosed, with respect to SEA-3, that Company-1 "agreed to pay [Iconix] $21.5 million" and "[a]s a result of this transaction [Iconix] recorded an $18.7 million gain, which is included in licensing and other revenue in the unaudited condensed consolidated income statement for the Current Quarter."  The Form 10-Q did not disclose that the purchase prices for SEA-2 and SEA-3 had been inflated by $5 million and $6 million, respectively, and that COLE had agreed that Iconix would reimburse Company-1 for those overpayments.

### The Fraudulent SEA-2 Give-Back

36.   With respect to SEA-2, NEIL COLE, the defendant, reached a secret understanding with Company-1 that Iconix would pay invoices submitted by Company-1, which purported to be for marketing services, as a pretextual means of giving back $5 million to Company-1 to reimburse Company-1 for inflating its SEA-2 purchase price.

37.   On or about September 26, 2014, a representative of Company-1 submitted to Seth Horowitz, among others, three sham invoices for purported "marketing costs," with large, round-

18

dollar figures totaling approximately $5 million, including for brands that did not relate to SEA-2.  Shortly thereafter, NEIL COLE, the defendant, rejected the sham invoices, advising representatives from Company-1, in substance, that Company-1 needed to send more realistic-looking invoices.  In response, Company-1 revised the sham invoices in various ways, including, for example, by eliminating the large, round-dollar figures, to make them look more credible and less obviously fraudulent, and then re-submitted them to Iconix for payment.  Thereafter, in or about November and December 2014, COLE authorized payments to Company-1 totaling approximately $5 million, purportedly as payment for the "revised" marketing invoices that Company-1 had submitted to Iconix.  In truth and in fact, as COLE well knew, the invoices were a sham, and the payments he authorized were not in consideration for marketing services, but, in fact, constituted the promised reimbursement to Company-1 for its inflated purchase price payment for SEA-2.

### Impact of the Fraudulent Round Trips

38.  By virtue of the fraudulent scheme orchestrated by NEIL COLE, the defendant, along with Seth Horowitz, Iconix reported fraudulently inflated revenue and non-GAAP diluted EPS, as follows:

19

| Reporting Period | Reported Revenue | Actual Revenue | Fraudulent Revenue | % Alteration to Reported Revenue vs. Actual Revenue |
|---|---|---|---|---|
| Q4 2013 | $105.3 million | $103.3 million | $2 million | 1.9% |
| Q2 2014 | $118.9 million | $113.9 million | $5 million | 4.4% |
| Q3 2014 | $113.8 million | $107.8 million | $6 million | 5.6% |
| Full Year 2014 | 461.2 million | $450.2 million | $11 million | 2.4% |

| Reporting Period | Reported Non-GAAP Diluted EPS | Actual Non-GAAP Diluted EPS | Fraudulent Non-GAAP Diluted EPS | % Alteration to Reported vs. Actual Non-GAAP Diluted EPS |
|---|---|---|---|---|
| Q2 2014 | $0.75 | $0.69 | $0.06 | 8.7% |
| Q3 2014 | $0.73 | $0.65 | $0.08 | 12.3% |
| Full Year 2014 | $2.78 | $2.70 | $0.08 | 3.0% |

39. By virtue of the fraudulent scheme, Iconix reported revenue and EPS within analyst consensus. Absent the false inflation of revenue from SEA-2 and SEA-3, Iconix would have missed its quarterly revenue consensus in the second and third quarters of 2014 and its annual revenue consensus for the full year 2014. Absent the false inflation of EPS from SEA-2 and SEA-3, Iconix would have missed its annual non-GAAP diluted EPS consensus for the full year 2014.

## Statutory Allegations

40. From at least in or about 2013 through at least in or about 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, and others known and unknown,

20

including Seth Horowitz, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; making false and misleading statements of material fact in applications, reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-1, 240.13a-11, 240.13a-13, and 244.100(b); and improperly influencing the conduct of audits, in violation of Title 15, United States Code, Sections 7202, 7242, and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

### Objects of the Conspiracy

41.  It was a part and an object of the conspiracy that NEIL COLE, the defendant, and others known and unknown, including Seth Horowitz, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities,

21

manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons; and (c) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

42.  It was a further part and an object of the conspiracy that NEIL COLE, the defendant, and others known and unknown, including Seth Horowitz, willfully and knowingly would and did make and cause to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and  244.100(b).

43.  It was a further part and an object of the conspiracy that NEIL COLE, the defendant, others known and unknown, including Seth Horowitz, willfully and knowingly would and did

take actions to fraudulently influence, coerce, manipulate, and mislead independent public and certified accountants engaged in the performance of audits of the financial statements of an issuer for the purpose of rendering such financial statements materially misleading, and did so by, as officers of a company issuing publicly traded securities, (a) making, and causing to be made, materially false or misleading statements to an accountant, and (b) omitting to state, and causing another person to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant; with these false statements and omissions being in connection with audits, reviews and examinations of required financial statements of the company and the preparation and filing of documents and reports required to be filed with the SEC, in violation of Title 15, United States Code, Sections 7202, 7242, and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

Overt Acts

44.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

## A-64

a.      On or about October 1, 2013, NEIL COLE, the defendant, signed the Consultancy Agreement.

b.      On or about February 27, 2014, COLE signed Iconix's Form 10-K for 2013.

c.      On or about June 30, 2014, COLE signed the SEA-2 Purchase Agreement.

d.      On or about August 6, 2014, COLE signed Iconix's Form 10-Q for the second quarter of 2014.

e.      On or about August 14, 2014, COLE sent an email to Seth Horowitz stating, in part, that it "[w]ill be tough to do China without [Brand-1] . . . ."

f.      On or about September 5, 2014, Horowitz sent an email to his assistant requesting that she print for a meeting a summary of the SEA-3 deal terms, SEA-2 marketing expenses, and termination of the Brand-1 license.

g.      On or about September 17, 2014, COLE signed the SEA-3 Purchase Agreement.

h.      On or about November 7, 2014, COLE signed Iconix's Form 10-Q for the third quarter of 2014.

i.      On or about November 25, 2014, COLE approved by email an approximately $1.94 million wire transfer to Company-1 for purported marketing expenses.

j.    On or about December 10 and 17, 2014, COLE signed bank forms authorizing the transfer of a total of approximately $3.4 million to Company-1.

k.    On or about March 2, 2015, COLE signed Iconix's Form 10-K for 2015.

l.    On or about March 31, 2015, COLE signed a management representation letter to the Audit Firm.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

45.   The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

46.   From at least in or about 2013 through at least in or about 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b)

25

# A-66

engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons; and (c) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to wit, COLE engaged in a scheme to fraudulently inflate Iconix's publicly reported revenue and EPS.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT THREE
### (False SEC Filings – Second Quarter 2014 Press Release)

The Grand Jury further charges:

47.    The allegations contained in paragraphs 1 through 39 and paragraph 44 are repeated and realleged as if fully set forth herein.

48.    On or about July 30, 2014, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC a Form 8-K attaching a press release reporting Iconix's

financial results for the three- and six-month periods ending June 30, 2014, which omitted material facts and contained materially misleading statements.

> (Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-11, and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (False SEC Filings – Second Quarter 2014 10-Q)

The Grand Jury further charges:

49.    The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

50.    On or about August 6, 2014, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC Iconix's quarterly filing on Form 10-Q for the second quarter of 2014, which omitted material facts and contained materially misleading statements.

> (Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13, and 244.100(b); and Title 18, United States Code, Section 2.)

27

# A-68

## COUNT FIVE
### (False SEC Filings – Third Quarter 2014 Press Release)

The Grand Jury further charges:

51. The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

52. On or about October 29, 2014, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC a Form 8-K attaching a press release reporting Iconix's financial results for the three- and nine-month periods ending September 30, 2014, which omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-11, and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT SIX
### (False SEC Filings – Third Quarter 2014 10-Q)

The Grand Jury further charges:

53.   The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

54.   On or about November 7, 2014, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC Iconix's quarterly filing on Form 10-Q for the third quarter of 2014, which omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13, and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT SEVEN
### (False SEC Filings – 2014 Year-End Press Release)

The Grand Jury further charges:

55.   The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

56.   On or about February 27, 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in

29

reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC a Form 8-K attaching a press release reporting Iconix's financial results for the full year 2014, which omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-11, and 244.100(b); and Title 18, United States Code, Section 2.)

### COUNT EIGHT
### (False SEC Filings – 2014 10-K)

The Grand Jury further charges:

57.   The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

58.   On or about March 2, 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC Iconix's annual filing on Form 10-K for 2014, which

omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT NINE
### (Improperly Influencing the Conduct of Audits)

The Grand Jury further charges:

59. The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

60. From at least in or about 2013 through at least in or about 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly took actions to fraudulently influence, coerce, manipulate, and mislead independent public and certified accountants engaged in the performance of audits of the financial statements of an issuer for the purpose of rendering such financial statements materially misleading, and did so, as officers of a company issuing publicly traded securities, by (a) making, and causing to be made, materially false or misleading statements to an accountant, and (b) omitting to state, and causing another person to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an

31

accountant; with these false statements and omissions being in connection with audits, reviews and examinations of required financial statements of the company and the preparation and filing of documents and reports required to be filed with the SEC, to wit, COLE made affirmative misrepresentations to, and intentionally withheld information from, the Audit Firm relating to the SEA JVs.

(Title 15, United States Code, Sections 7202, 7242, and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18 United States Code, Section 2.)

## COUNT TEN
### (Conspiracy to Destroy, Alter, and Falsify Records in Federal Investigations)

The Grand Jury further charges:

61. The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

62. In or about late 2014 and early 2015, the SEC Division of Corporate Finance ("Corp Fin") conducted an inquiry into Iconix's accounting treatment for the formation of certain Iconix international JVs, including the SEA JVs. Corp Fin submitted several comment letters to Iconix management that focused on whether the JVs should have been consolidated into Iconix's historical results, and requested written responses from Iconix management.

# A-73

63.   On or about February 24, 2015, Iconix submitted to the SEC a letter response, approved by NEIL COLE, the defendant, describing SEA-2 and SEA-3.  Although the SEC letter directed Iconix to disclose the "business purpose" and material terms of the SEA JVs, COLE intentionally and falsely omitted from the response letter that Company-1 had agreed to inflate the purchase prices for SEA-2 and SEA-3 by $5 million and $6 million, respectively, in exchange for COLE's secret agreement that Iconix would reimburse Company-1 for these overpayments.

64.   NEIL COLE, the defendant, who had previously been the subject of an SEC enforcement action for improper revenue recognition practices while he was chief executive officer of Iconix's predecessor-in-interest, an entity named Candie's, became concerned that the SEC would discover the fraudulent revenue inflation scheme involving the SEA JVs.  Accordingly, COLE knowingly took steps during the Corp Fin inquiry to destroy and conceal relevant evidence.  COLE, among other things, deleted emails related to the SEA JVs and directed Seth Horowitz to do the same in order to prevent the SEC from detecting the scheme.

## Statutory Allegations

65.   From at least in or about 2014 through at least in or about 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, and others known and unknown,

33

including Seth Horowitz, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, to destroy, alter, and falsify records in federal investigations, in violation of Title 18, United States Code, Section 1519.

66.   It was a part and an object of the conspiracy that NEIL COLE, the defendant, and others known and unknown, including Seth Horowitz, knowingly would and did alter, destroy, mutilate, conceal, cover up, falsify, and make false entries in records, documents, and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department or agency of the United States, to wit, the SEC, and in relation to and contemplation of any such matter and case.

### Overt Acts

67.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about February 24, 2015, NEIL COLE, the defendant, caused Iconix to submit a response letter to the SEC discussing SEA-2 and SEA-3.

b.   In or about February 2015, COLE directed Seth Horowitz to delete emails related to the SEA JVs.

34

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

64. As a result of committing one or more of the offenses charged in Counts One through Nine of this Indictment, NEIL COLE, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

### Substitute Assets Provision

65. If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

35

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C);
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461.)

GRAND JURY FOREPERSON

GEOFFREY S. BERMAN DW
United States Attorney

36

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

- v. -

NEIL COLE,

Defendant.

---

**SEALED INDICTMENT**

19 Cr. _____

(Title 15, United States Code, Sections 78j(b),78m(a), 78ff, 7202, and 7242; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, 240.13a-14, 240.13b2-2, and 244.100(b); Title 18, United States Code, Sections 2 and 371.)

_____            _____
Foreperson                           GEOFFREY S. BERMAN
                                     United States
                                     Attorney

37

UNITED STATES OF AMERICA, v.
NEIL COLE,

**LA6PCOL1** — Page 25

you will go to the jury room to deliberate and discuss the evidence in order to decide the facts and render a verdict.

As I indicated yesterday, our trial day will begin at 9:30 and will end at 2:40 in the afternoon. We'll start at 9:30, go an hour and a half, and then take a 20-minute break, go another hour and a half, followed by a second 20-minute break.

So as you'll note, you won't have a traditional lunch break, but we will have snacks for you during the breaks. I found that this truncated trial day is much preferred by jurors because it gives them a large portion at the end of the day to take care of their other obligations.

If you need a break before the scheduled break, just raise your hand. Please be on time in the morning, after the breaks, and after the breaks, if you are late, a lot of us will be sitting here waiting for you.

If you wish, you may take notes. Ms. Rivera will provide you a pads and pens for that purpose, but if you do take notes, you must leave them in the jury room when you go home for the night. And remember, any notes that you take are for your own personal use. They are not to be relied on by anyone else. It's completely up to you whether you want to take notes.

Let me remind you that we have a court reporter that will be taking down every word that is said throughout the

**LA6PCOL1** — Page 26

trial; so you don't, strictly speaking, need to take notes.

(Continued on next page)

**LA6MCOL2** — Opening - Mr. Solowiejczyk — Page 27

THE COURT: However, some people find that it helps them concentrate. When you deliberate, however, you should discuss what the evidence was and not what one juror's or another's notes do or do not say.

We will now begin with the government's opening statement.

Mr. Solowiejczyk.

MR. SOLOWIEJCZYK: Thank you, your Honor.

In July of 2014, the company Iconix Brand Group had good news to share with Wall Street investors. The company had brought in record money or revenue over the past three months. Revenue was going up and the company had done better than Wall Street had predicted. The financials were strong and the future looked bright. It also sounded pretty great, folks.

There was just one problem. None of it was true. Revenue wasn't going up. It had gone down. And the company hadn't beaten Wall Street expectations. It had missed them. But investors, they were told none of that that day in July. Instead, they were fed this bogus story that the company was doing a whole lot better than it really was.

Why? Why were investors being lied to? Because of the defendant, Neil Cole. He was the CEO of Iconix, the man in charge. As you will learn during this trial, he orchestrated a scheme from the top to cook the books of the company, a scheme to deceive investors into believing that his company was doing

**LA6MCOL2** — Opening - Mr. Solowiejczyk — Page 28

better than it really was. That's why we are here today, ladies and gentlemen, because the defendant got caught redhanded lying to investors.

Now, ladies and gentlemen, this is the government's opening statement. It's our opportunity to tell you what this case is all about.

Today I want to do two things. First, I want to tell you about the defendant's crimes and, second, I want to tell you about how we are going to prove them.

Let me start with the defendant's crimes. Now, during this trial, ladies and gentlemen, you are going to hear a lot about Wall Street and accounting, but this case is actually about something very simple. It's about lying, the defendant's lies to be specific. Not just one lie. Lie after lie. Lies that built upon themselves. Today I want to walk you through three sets of lies that the defendant told. Let me start with the first set of lies, the lies that the defendant told to investors.

Now, ladies and gentlemen, you are going to learn during this trial that the defendant was the CEO of the Iconix. He was the boss. Iconix was a fashion company. But it didn't make clothes. It owned various brands, brands you may have heard of, like Joe Boxer and Rocawear. And retailers and suppliers, they paid Iconix for the right to use those brands on clothing and other items.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6MCOL2        Opening - Mr. Solowiejczyk        Page 29

Now, Iconix was a publicly traded company. That means that investors could buy and sell shares of Iconix, just like investors can buy and sell the stock of Amazon or Wal-Mart. You are going to learn during this trial that public companies, they have to file reports every three months. Those reports contain information about how the company is doing financially, what the books look like. Think of it like a check under the hood for investors.

Now, these reports that I'm talking about, they don't get shoved in a filing cabinet somewhere that nobody ever looks at. These reports are critically important to investors. Investors, they care about what's in these reports. They care about the accuracy of the numbers in these reports. And they rely on these reports in deciding whether to buy or sell the stock of a company. This case, it's about the lies that the defendant had his company tell to investors in those reports.

So what was the defendant having his company lie about? We are not talking about details or minutia, ladies and gentlemen. We are talking about big-ticket basic stuff. The defendant was having Iconix lie about revenue, which is one of the most fundamental and basic things there is in a company's public filings. What's revenue? Revenue is simply the money that a company is bringing in from selling its products, the money that's coming in the door. As you might imagine, investors, they care about what revenue looks like for

LA6MCOL2        Opening - Mr. Solowiejczyk        Page 30

companies that they are investing in.

You are going to hear that the defendant, he focused a lot on how much revenue Iconix can say it was bringing in every three months. He didn't just focus on the amount, though. He also focused on whether Iconix could say that revenue was going up, that it was growing. Because that's something that investors like to see, too.

Finally, and this is important, folks, you are going to learn during this trial, that there are Wall Street professionals who closely analyze public companies, and they make predictions about how those companies are going to perform. You are going to learn that if a company comes up short of those predictions, if it doesn't hit those numbers, it's a very big deal. And the defendant, he didn't want to see that happen.

Ladies and gentlemen, you are going to learn that he had powerful reasons to care because he owned a whole lot of Iconix's stock. So coming up short, doing worse than what Wall Street had predicted, that was not something that the defendant wanted to see happen. When it looked like revenue wasn't where it should be, when it looked like the company wasn't going to hit those numbers, the defendant didn't accept it. Instead, he cooked up a scheme to make it look like Iconix was bringing in more revenue than it really was.

How did the defendant do that? How did he make money

LA6MCOL2        Opening - Mr. Solowiejczyk        Page 31

appear out of thin air? Through a series of dirty deals with one of Iconix's biggest business partners. That's how.

Let me tell you about one of those deals, ladies and gentlemen. And there were multiple deals, but this is just an example of one of the deals you will hear about during this trial. In the second quarter of 2014, Iconix needed to bring in some extra revenue, some extra money to hit those Wall Street predictions. Otherwise, Iconix was going to have bad news for investors. But the defendant, he did not want investors to learn the truth. So, instead, he chose to lie.

Here is what the defendant did. The defendant went to executives at the business partner and he proposed a secret dirty deal. The business partner was originally supposed to pay about $10 million to Iconix for the right to use certain of Iconix's brands. The defendant proposed that, instead, the business partner would pay $15 million, $5 million more. The business partner would overpay by $5 million. That $5 million, Iconix can claim that money as revenue. It could tell Wall Street that it was bringing in more money and it could have good news for Wall Street instead of bad news.

But, ladies and gentlemen, when it came to that extra $5 million, it wasn't really Iconix's money because the defendant had cut a secret deal with the business partner that after Iconix had told the public that it had made that extra $5 million, Iconix would turn around and send that $5 million

LA6MCOL2        Opening - Mr. Solowiejczyk        Page 32

right back to the business partner. This was the defendant's scheme. You pay my company more money up front to do a deal so I can claim more revenue for Iconix, and then I'll turn around and send that money right back to you.

The money traveled in a big circle. First, the business partner sent that $5 million excess payment to Iconix so that Iconix could claim extra revenue. Then, after Iconix had told the public that it brought in this excess phony revenue, Iconix turned around and it sent the money right back to the business partner. That $5 million, folks, it was phony because the defendant knew that Iconix wasn't going to keep it. Who was in the dark about these secret side deals? Investors. Investors who believed that the revenue that Iconix said it was making was all legit.

Ladies and gentlemen, this dirty deal that I just described, it was not a one off. You are going to hear that time after time, when Iconix needed to make it seem like it was bringing in more revenue than it was, the defendant went back to the well again and again using secret dirty deals with the business partner to lie to investors, to inflate revenue. Each time the defendant trumpeted financial results to the public that he knew were false.

After one such announcement, after the defendant had put one over on investors by telling them that Iconix had brought in more revenue than it really had, what did the

LA6MCOL2          Opening - Mr. Solowiejczyk          Page 33

defendant do?  He turned around and he sold a huge block of his Iconix stock.

Ladies and gentlemen, that's the first set of lies that the defendant told, the lies to investors.

Let me move on to the second set of lies.  You see, it wasn't enough to have the business partner overpay by $5 million so that Iconix could claim that extra revenue.  To make this scheme work the defendant had to hide the secret dirty deal from Iconix's auditors.  Who are auditors?  They are independent, outside accountants and it's their job to make sure that public companies are accurately reporting their financial results.  So while the rest of the deal between the business partner and Iconix, it was written down in contracts, that secret side deal that Iconix was going to kickback $5 million later, it was an oral agreement.  It wasn't in writing.  The defendant didn't put it in writing because he wanted to be sure that no one, including the company's auditors, found out the truth, that he was cooking the books at the company.  Because as you are going to hear, ladies and gentlemen, if Iconix's auditors had found out about that secret side deal, they would have never let Iconix claim that extra $5 million as revenue.

When it came time, ladies and gentlemen, for Iconix to send the $5 million back to complete the circle, the defendant went to great lengths to hide what was really going on.

LA6MCOL2          Opening - Mr. Solowiejczyk          Page 34

Because at a sophisticated public company, even the CEO can't just send $5 million out the door without an explanation.  There had to be a reason.

So they came up with a cover story.  The defendant had Iconix pay the business partner that $5 million disguised as marketing expenses.  When it came to these supposed marketing expenses, folks, you are going to see that the defendant wanted it to look credible, to look legit.  So when the business partners send invoices over that looked phony, the defendant was not happy.  As you will hear, he instructed the business partner to change those invoices, to make them look more credible, to make them look more legit so that no one would find out the truth, that he was cooking the books.

At this trial, ladies and gentlemen, you are going to see those invoices.  You are going to see that how they were changed to try to make them seem more credible, more legitimate.

Ladies and gentlemen, that brings me to the third set of lies that the defendant told, the lies that he told to the Securities and Exchange Commission, the SEC.  Who is the SEC?  They are the government agency that's in charge of making sure that public companies play by the rules, that public companies are accurately telling investors what their financial performance really is.

When the SEC came around and started asking some

LA6MCOL2          Opening - Mr. Solowiejczyk          Page 35

questions about Iconix's dealings with its business partners, the defendant got nervous.  And to try to make the SEC go away, to try to make sure they didn't figure out what was really going on, the defendant doubled down on the lies.  Just as he had lied to investors, just as he had lied to auditors, now he lied to the SEC.  When it came to telling them what these dealings with the business partners really were, he left out the secret side deals, the deals that required him to give back part of the money that was paid up front.  Everyone that could have stopped this fraud was kept in the dark.

Ladies and gentlemen, using made-up numbers in public filings, hiding secret side deals that require you to give back part of the money you're claiming as revenue, concealing information from your auditors, trying to interfere with the SEC, it's all just a way of hiding the truth.  It's lying, plain and simple.  It's fraud.  That's the defendant's scheme in a nutshell.

Now, ladies and gentlemen, I want to talk to you for a minute or two about how we are going to prove all of this.  At this trial you are going to hear from witnesses.  As you might imagine, to pull this scheme off, the defendant did not work alone.  There were others that worked hand in hand with him to cook the books at Iconix, insiders.  These witnesses, they know the details of the fraud because they worked with the defendant to make it happen, and they are going to give you a firsthand

LA6MCOL2          Opening - Mr. Solowiejczyk          Page 36

account that only an insider can.

One of the insiders you are going to hear from is named Seth Horowitz.  He was the chief operating officer at Iconix and he was the defendant's right-hand man.  He was in on the scheme to cook the books at Iconix.  He is going to tell you about how they used the secret side deals to falsely inflate revenue, how they concealed information from Iconix's auditors, and how the defendant tried to interfere with the SEC's inquiries.

Ladies and gentlemen, let me just say something about Mr. Horowitz.  Make no mistake about it.  Mr. Horowitz has committed crimes.  But he has pleaded guilty to those crimes and he has accepted responsibility for his actions.

As you are going to learn, he is not testifying out of the goodness of his heart, but under a cooperation agreement with the government that requires him to testify.  He hopes to receive leniency when he is sentenced for his crimes.  When it comes to the testimony of Mr. Horowitz, you should scrutinize his testimony closely, ladies and gentlemen, and ask yourself whether it makes sense, whether it's corroborated by the other evidence in the case, whether it's consistent with what the other witnesses are saying happened.  And we expect that when you do that you will see that Mr. Horowitz's testimony is backed up by the other evidence in this case and the testimony of the other witnesses.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    October 6, 2021

| LA6MCOL2 | Opening - Mr. Solowiejczyk | Page 37 |
|---|---|---|

Ladies and gentlemen, you are also during this trial going to hear from executives that worked for the business partner, the one that cut the dirty deals with Iconix. These executives will tell you about how they agreed to pay more money up front to do the deals in return for Iconix sending back that overpayment later.

Now, the executives from the business partner are going to testify under what's called court-ordered immunity. That means that they are being forced to testify even though what they say might incriminate them. But because of that, their truthful statements cannot be used against them.

During this trial you are also going to hear from Iconix's lead auditor. He is going to tell you that the defendant did not tell him and his team about these secret deals, and he will tell you that if he had known the true facts, the ones that the defendant hid from him, he would have never let Iconix claim that phony extra revenue. In addition to the auditor, you are going to hear from a host of other people that worked at Iconix who were kept in the dark about the secret side deals, including the company's in-house attorneys.

Ladies and gentlemen, you also hear from some investors themselves, people who had their investment funds by shares of Iconix. They were going to tell you that it was important to them to know the truth about the company's

| LA6MCOL2 | Opening - Mr. Solowiejczyk | Page 38 |
|---|---|---|

financials and that they relied on the numbers in the public filings in making decisions about whether to buy and sell shares of the company.

Those are just some of the witnesses that you are going to hear from, folks. Aside from witness testimony, you are going to see documents during this trial, documents that show this fraud as it was unfolding. You will see e-mails showing the defendant's involvement in the scheme. You will see those phoney marketing invoices that I spoke about a moment ago and how they were changed to make them look more credible. And you are going do see the document that the defendant's right-hand man, Seth Horowitz, used to keep track of all these overpayments and givebacks, a ledger keeping track of who owed what to whom, a document that literally tracked this fraud in real time as it was happening. That's just some of the evidence that you are going to see and hear during this trial, folks.

Now, ladies and gentlemen, I am about to sit down. At the end of the trial we are going to have another opportunity to speak with you. But between now and then I am going to ask that you do three things: First, pay close attention to the evidence; second, follow Judge Ramos' instructions on the law; and, third, use your common sense, the same common sense you use in your everyday lives. If you do those three things, the defendant is going to get a fair trial, the government is going

| LA6MCOL2 | Opening - Mr. Reisner | Page 39 |
|---|---|---|

to get a fair trial, and you are going to reach the only verdict that is consistent with the evidence in this case, that the defendant is guilty. Thank you.

THE COURT: Thank you, Mr. Solowiejczyk.

Does Mr. Cole wish to present an opening argument?

MR. REISNER: Yes, your Honor.

THE COURT: Mr. Reisner.

MR. REISNER: Thank you, your Honor.

Good morning. Ladies and gentlemen, the evidence will show that there was no crime committed by Neil Cole and that this case never should have been brought. This case involves contracts, contracts between Iconix on the one hand and a company called Li & Fung/GBG on the other hand, two well-established companies with a long-term and extensive business relationship.

The evidence will show that there was no scheme as alleged by the government. There were no commitments or obligations other than what was in the contracts. There were no secret agreements or secret side deals. Just tough negotiations and the kind of back and forth that you would expect from parties with a long-term and extensive business relationship. Negotiations where the seller, Iconix, tried to get the best price available and the purchaser also tried to get the best deal available.

Neil Cole had no reason to believe and did not believe

| LA6MCOL2 | Opening - Mr. Reisner | Page 40 |
|---|---|---|

that there was anything improper about any of the transactions at issue or the accounting for those transactions. He had no reason to believe and did not believe that any SEC filing or other financial reporting was inaccurate in any way. These were not sham transactions. They involved real assets and you will see that Iconix received real money, real value, real revenues, and real profits. Neil acted in good faith and did what he thought was best for the company.

Let me introduce myself. My name is Lorin Reisner and I have the privilege of representing Neil Cole together with my colleagues, Richard Tarlowe, Andrew Reich, Alyson Cohen, and Amanda Weingarten.

This case is about transactions, three, three transactions that took place about seven or eight years ago, during a 12-month period with a single business partner.

Now, while the government characterizes these transactions as a scheme, it's going to be very, very important to look at each of these transactions separately because each transaction involves its own unique facts and those unique facts will demonstrate that Neil had no reason to believe and did not believe that there was anything improper about any of the transactions.

Before I get into the transactions, let me provide some background on Neil Cole and Iconix. For more than 30 years Neil has been a leader in developing, marketing,

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 6, 2021

LA6MCOL2          Opening - Mr. Reisner          Page 41

managing, and promoting brands. He is considered a visionary and a pioneer in the industry. Neil is a lifelong New Yorker. He is 64 years old. Neil and his wife Lizzy live here in New York City with their teenage daughter, and Neil also has two grown sons, and he became a grandfather for the first time last year.

Neil founded Iconix Brand Group in 2005 and served as its chairman and CEO for the next ten years. Neil worked hard. He worked hard to build Iconix into one of the world's leading and most successful brand management companies. When Neil started Iconix, it had two brands. By 2014, Iconix had over 30 brands, recognized by consumers around the world, including Danskin, Joe Boxer, London Fog, Peanuts, Snoopy, Sharper Image, Starter, Umbro, and others.

Under Neil's leadership, Iconix grew to be ranked as the second largest licensing company in the world, behind only Disney. Iconix employed about 150 people full time, most of them here in New York, and some in the United Kingdom.

In general, Iconix made money by licensing its brands to other companies, called licensees, who were usually large retailers or wholesalers. The Iconix's licensees were typically responsible for designing, manufacturing and distributing licensed products, like clothing, homewear or entertainment products. For example, Iconix licensed the Danskin brand to Wal-Mart and Wal-Mart then designed and

LA6MCOL2          Opening - Mr. Reisner          Page 42

manufactured clothing under the Danskin brand and sold it at Wal-Mart stores. Wal-Mart would pay a percentage of those sales, called royalties, to Iconix.

So both Iconix and the licensee had a shared interest in the brands being strong and successful. You will learn that Iconix spent many millions of dollars annually in advertising and marketing to support and strengthen its brands.

In the 2013 to 2014 time frame, Iconix had more than 1,000 license agreements with hundreds of retailers and manufacturers. In 70 countries around the world. Iconix Brands generated over $14 billion of sales per year. And in 2014, Iconix generated revenue of over $450 million and a profit of approximately $150 million.

Now, the three transactions, the three transactions that are at issue here were joint ventures, joint ventures, which were a key part of Iconix's business strategy long before the transactions at issue. The joint venture strategy was to identify and work with a high-quality partner familiar with an international region in order to bring those brands to those region more quickly and efficiently than if Iconix operated on its own. Iconix had joint venturers around the world, including China, Europe, India, Canada, Israel, Latin America, Southeast Asia, and the Middle East and North Africa.

A company called Li & Fung was Iconix's counterparty in the three transactions at issue. Counterparty is just a

LA6MCOL2          Opening - Mr. Reisner          Page 43

company on the other side of the deal. Li & Fung is a well-known and leading company in the apparel industry. It's based in Hong Kong and it's been in business for more than 100 years. It has over 25,000 employees and, in the 2014 time frame, generated sales of more than $19 billion a year.

In July 2014, Li & Fung spun off the division that licensed and managed branded products into a separate company that you will hear about called Global Brands Group, or GBG. GBG itself was one of the world's leading companies in branded fashion, accessories, footwear, and apparel.

In 2014, GBG had approximately 3,000 employees worldwide and generated more than $3 billion of annual revenue. These were big, established companies. I may refer at times to Li & Fung/GBG as LF/GBG. So you know that when I'm talking about LF/GBG, I'm talking about Li & Fung and GBG. You will learn that LF/GBG was among Iconix's most important business partners. Iconix and LF/GBG had an extensive range of commercial relationships throughout the world. LF/GBG was an Iconix licensee for brands like Peanuts, Rocawear, Zoo York, and Echo. LF/GBG served as what was an agent for other Iconix brands. Iconix and LF/GBG were joint venture partners in Europe, Korea, Southeast Asia, China, in the Middle East and North Africa. During the relevant period, LF/GBG had financial commitments to Iconix of more than $140 million.

Now, as a result of this extensive relationship,

LA6MCOL2          Opening - Mr. Reisner          Page 44

Iconix and LF/GBG were in regular constant negotiations with each trying to achieve the best terms available to serve its own business interests while, at the same time, taking steps to preserve the long-term and important business relationship.

Let me now address what the evidence will show as to each of these three transactions and why the government's charges against Neil are baseless.

You will hear these transactions referred to as SEA-1, SEA-2, and SEA-3. SEA is just Southeast Asia. That was the name of the joint venture arrangement between Iconix and Li & Fung/GBG, and you will see that it was periodically amended. That's SEA-1, then SEA-2 and SEA-3. Each transaction had its unique facts, and that's why I am going to walk you through it briefly, each of the three transactions.

Let me start with SEA-1. The evidence is going to show that Neil had no reason to believe and did not believe there was anything improper about the SEA-1 transaction, the accounting for the SEA-1 transaction, or the financial reporting for that transaction.

You will see that the government claims that a $2 million consultancy fee that Iconix paid to LF/GBG and an agreement in which LF/GBG agreed to pay Iconix an additional $2 million as part of SEA-1 operated as a secret. You will hear them call it a secret round trip transaction. You will see during the trial, however, that all of the terms of this

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                    October 6, 2021

LA6MCOL2          Opening - Mr. Reisner          Page 45

transaction, including these $2 million payments, were in the contracts. They were in the written documents. You are going to see those documents during the trial. There were no secrets or undisclosed terms. Those $2 million arrangements are right in the documents and you are going to see them.

The evidence will also show that the SEA-1 transaction documents were drafted by lawyers at major law firms and reviewed by the financial accounting and legal professionals at Iconix, the lawyers and the accountants at Iconix. Neil understood that the documents would be reviewed by these financial, accounting, and legal professionals, and Neil also believed that the company's outside auditors, at a firm called BDO, would review all of the relevant documents before signing off on the company's financials.

You will also see that this side letter agreement and consultancy arrangement was proposed by Li & Fung, proposed by Li & Fung, not by Iconix. That's important. This wasn't some scheme by Iconix to inflate revenue, but an effort by LF/GBG to generate a payment stream for itself. The agreements were prepared by Li & Fung's outside law firm, a very prominent international firm, and sent by that firm to Iconix's lawyers, not the other way around. These agreements were obviously Li & Fung's idea to serve Li & Fung's own business purposes.

Now, although I expect that the government will contend that the relationship between the $2 million received

LA6MCOL2          Opening - Mr. Reisner          Page 46

by Iconix under the terms of this letter and the $2 million consultancy agreement was somehow hidden, that is preposterous. It was absolutely clear from the face of the documents that there was a relationship between these agreements. You will even see that the lawyers sent these two agreements together as a pair and discussed them as a pair. The evidence will show, ladies and gentlemen, that Iconix actually received $12 million as part of this transaction. The only real issue is the accounting for the $2 million consultancy agreement, whether it should have been treated as an expense, as it was, or an offset to revenue.

Now, Neil is not an accountant and he had no reason to question the accounting treatment since he understood that the accounting professionals at Iconix were aware of the terms and reviewed the documents, the documents with those arrangements right in them, long before Iconix reported its results.

Now, I expect the government will use the term round-trip transaction during the trial. That's a term that shouldn't be accepted at face value and can be confusing and lead to mistaken conclusions. Let me tell you why.

You will learn that, over and over again, BDO, Iconix's outside auditor, approved transactions involving payments between counterparties. For example, before the SEA-1 transaction, BDO signed off on an agreement in which Sears agreed to pay royalty fees to Iconix for the Joe Boxer brand

LA6MCOL2          Opening - Mr. Reisner          Page 47

and Iconix simultaneously agreed to pay approximately $4 million to Sears in marketing and brand support. BDO didn't raise any concerns about the transaction and BDO concluded that the Iconix payment to Sears was properly treated as an expense, just like the consultancy fee in SEA-1 was treated. You will see other examples of the same thing.

The evidence will also show, ladies and gentlemen, that Iconix received actual value for this consultancy fee. Li & Fung provided valuable brand development support in distant locations, like Indonesia, Malaysia, the Philippines, and other places where Iconix didn't have offices and personnel.

You will also see that the SEA-1 transaction closed on the first day of the fourth quarter of 2013, at a time when the company's quarterly revenues, earnings and estimates were unknown and uncertain. So the transactions could not possibly have been part of a scheme to inflate revenues to exceed quarterly consensus estimates.

Finally, the $2 million at issue is wholly immaterial from an accounting perspective for a company with annual revenues of $450 million a year. It represents less than one half of 1 percent of 2013 revenues.

Let me now address the second transaction, the SEA-2 transaction. The evidence will show that Neil had no reason to believe and did not believe there was anything improper about the SEA-2 transaction, the accounting for the SEA-2

LA6MCOL2          Opening - Mr. Reisner          Page 48

transaction, or the financial reporting for the SEA-2 transactions. The government's allegations about a secret side agreement, they are baseless. There was no commitment or obligation undertaken by Iconix to make future marketing or other payments to GBG in connection with SEA-2 other than what was in the written contracts, period. If there was no future commitment or obligation, then the accounting issues alleged by the government do not exist.

The terms of the SEA-2 transaction resulted from extensive negotiations between GBG and Iconix, and all of the terms of the agreement, all of the terms of the transaction were in the written contracts. You will see these contracts during the trial, ladies and gentlemen, and you will see that they include no obligation or commitment by Iconix to make any future marketing or other payment to GBG.

You will also see that these contracts included specific terms stating that the written agreements constitute the entire agreement and supersede all prior agreements and undertakings, both written and oral amongst the parties, or any of them with respect to the subject matter hereof and thereof. In other words, the contract is the contract. The parties clearly understood that there was no commitment or obligation unless it was in the written agreements, and there was no commitment or obligation to make future marketing payments in the written agreements.

# A-84

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6MCOL2          Opening - Mr. Reisner          Page 49

The evidence will further show that Neil believed accurately that if a term is not in writing in the agreement, there is no commitment or obligation. Even Seth Horowitz, the government's cooperating witness, told the government that Neil didn't believe there was any commitment or obligation unless it is in writing. You will see other proof that the transaction price of $15.9 million was not based on any purported verbal agreement or oral agreement by Iconix. The $15.9 million contract price was viewed by the parties as a reasonable fair market value for SEA-2 assets, and you are going to see the documents, you are going to see the documents in which GBG expressly acknowledged in writing that the fair value of the interest purchased by GBG was the contract price, $15.9 million. And there is going to be additional documentation demonstrating that there was no commitment or obligation other than what was in the written contracts.

The other side of the transaction, LF/GBG's own company's document approving the transaction, called a PIP, PIP, it's an internal memo describing the terms of the transaction, it has no reference to any $5 million marketing commitment in the future by Iconix or any other terms that are not set forth in the transaction documents.

You will also see, ladies and gentlemen, that the reason that Iconix made a marketing payment of approximately $5.4 million to GBG in the fourth quarter of 2014 was not

LA6MCOL2          Opening - Mr. Reisner          Page 50

because of some purported secret agreement, but because GBG, a very important business partner, was pressing hard for marketing support or some other financial support from Iconix, and Iconix wanted to protect and preserve its business relationship with an important long-term business partner. Iconix knew that GBG was disappointed that Iconix hadn't gone forward with a deal you hear about called the Lee Cooper Europe transaction.

GBG also was disappointed with the financial performance of some of its other deals with Iconix. Iconix wanted to keep GBG happy because GBG was a critical business partner, a business partner with millions of dollars of financial commitments to Iconix and the capacity to do significant additional business in the future.

When GBG pressed Iconix hard for marketing support in the fourth quarter of 2014, Iconix was willing to accommodate GBG to protect and preserve this important business relationship, but only after GBG demonstrated that it had actually provided useful marketing work and after GBG delivered invoices demonstrating that the actual work had been performed and it was work that helped Iconix's brands, just as you would expect from any responsible business decision maker.

Finally, again, although $5 million obviously is a lot of money, the evidence will show that it is immaterial from an accounting perspective for a company with over $450 million in

LA6MCOL2          Opening - Mr. Reisner          Page 51

revenue. It's about 1.1 percent of 2014 total revenues.

Now, I expect that the government's cooperating witness, Seth Horowitz, will say that there was a verbal agreement by Iconix to make a future payment to LF/GBG and that Neil supposedly told Horowitz there was an agreement. That is nonsense. The evidence will demonstrate that is not true and that Horowitz is not credible and that Horowitz is not to be trusted.

Let me tell you what the evidence will show about Mr. Horowitz. From almost his first day at Iconix, Horowitz felt slighted and disrespected by Neil. You will learn that Horowitz had an enormous amount of pent-up bitterness toward Neil. Horowitz even sent messages to himself describing how he had been disrespected and how he was prepared to fight back against Neil, if necessary.

Things came to a boil in the February, March 2015 time frame when Iconix was responding to a series of comment letters from the SEC division of corporation finance. And there was enormous pressure and infighting at the company. Horowitz felt isolated and under attack because he was being blamed by others at Iconix, including Neil, for the accounting questions and difficulties raised by these comment letters.

In particular, Horowitz was being blamed for including certain terms in the SEA-2 and SEA 3 deals that he had negotiated relating to terms called guarantees or puts or puts

LA6MCOL2          Opening - Mr. Reisner          Page 52

with floors. These puts essentially gave LF/GBG the right to require Iconix to buy back the joint venture interest or portions of the interest from GBG in the future at a fixed price.

Now, during the comment letter process, the accountants raised concerns that these terms that Horowitz had negotiated, these puts and puts with floors may have the effect of negating the sale and causing Iconix to have to restate its financial results, which would be a really big deal and potentially damaging to the company.

Horowitz was being accused of negotiating these terms without the proper involvement of the Iconix finance team and without Neil's knowledge, and these discussions became increasingly angry, hostile, and over-the-top combative. Horowitz was told that the situation was all his fault, and he became furious.

You will see that Horowitz actually believed the transactions were proper and done for good business purposes, but he also believed that he would be blamed personally for anything that might go wrong with this comment letter process. By that time, ladies and gentlemen, it was absolutely clear to Horowitz that his hopes and dreams of becoming CEO of Iconix were doomed and that his professional career was in shambles.

So Horowitz started going on the attack against Neil and making stuff up. Horowitz knew that GBG had asked for

Min-U-Script®          **Southern District Court Reporters**          (10) Pages 49 - 52

# A-85

| LA6MCOL2 Opening - Mr. Reisner Page 53 |
|---|

marketing support and that Iconix had made certain concessions in the fourth quarter of 2014. Horowitz became concerned that if he was being blamed for these puts and puts with floors that might be a problem, then he was the one likely to be blamed, to the extent that anyone might claim there was something improper about these concessions that Iconix had provided to GBG.

So after communicating with his own personal lawyers in March 2014, and virtually every day from April 5 through April 12 of 2015, Horowitz submitted a resignation letter on April 13, 2015. In the resignation letter he stated that the price of the SEA-2 transaction increased based on negotiations, including Mr. Cole, regarding a verbal commitment to GBG for marketing expenses. He claimed not to know whether the marketing expenses were discussed with the company's auditors, and Horowitz didn't say that he had done anything wrong.

The truth, the truth, ladies and gentlemen, was that there was no commitment or obligation, verbal or otherwise. But Horowitz did not want to wait around to be blamed if someone claimed that such an obligation existed. Horowitz decided to point the finger at Neil before Neil or anyone else pointed the finger at Horowitz, even if the allegation was baseless. Horowitz did not want to take the risk of holding the bag.

And years later, when the government approached Horowitz and threatened to charge him criminally and offer him

| LA6MCOL2 Opening - Mr. Reisner Page 54 |
|---|

a cooperation agreement, Horowitz decided that the deal offered by the government was better than telling the truth and taking the risk of having to defend himself at a criminal trial. He could simply point the finger at Neil, the big fish, the CEO, and that would be Horowitz's ticket to leniency.

The evidence will show that the claims by Horowitz against Neil are false. There was no commitment or obligation undertaken by Iconix other than what was in the written SEA-2 agreements. In fact, the evidence will show in what you will see or hear about self-serving notes or diaries created by Horowitz, the purpose of which was to manufacture ammunition against Neil, there was absolutely no mention, no mention of any purported secret side agreement or undisclosed commitment by Iconix.

Although I expect that you will hear that Horowitz will now say that Neil told him there was some secret agreement, that allegation doesn't even appear in Horowitz's resignation letter. The supposed conversation with Neil is a fiction. It's a fiction. And you will see that Horowitz's story about this supposed conversation has changed over time and that even in his version no one else was present. He took no notes. He didn't tell anyone else about the conversation. And he can't even tell you where the conversation took place.

Now, you heard that the government will also rely on testimony from two witnesses who have been granted immunity by

| LA6MCOL2 Opening - Mr. Reisner Page 55 |
|---|

the government. Their names are Jason Rabin and Jared Margolis. For similar reasons, you should not rely on their testimony. Rabin initially told the FBI, he didn't remember specifics about the SEA transactions. He then faced enormous pressure from the government which threatened to prosecute him and has identified him as a coconspirator. The evidence will show that Rabin is simply trying to provide testimony that he thinks will make the government happy and will keep Rabin out of harm's way.

The testimony of Jared Margolis also will not support the government's charges. Margolis had almost no direct contact with Neil, and Margolis also is under enormous pressure to tell the government what he believes will be well received by the government and protect him against future prosecution.

Very briefly, let me address the SEA-3 transaction, which is the third transaction. The evidence will show that the government's theory with respect to this SEA-3 transaction is baseless. There was no secret agreement by Iconix to release GBG from any royalty obligations. The evidence will show conclusively that GBG was never released from these royalty obligations and that payments were made in full when due.

The transaction documents for SEA-3 also will confirm that the parties understood that there were no agreements outside the written documents and that the $21.5 million

| LA6MCOL2 Opening - Mr. Reisner Page 56 |
|---|

contract price was viewed as a fair price for the assets negotiated at arm's length. You will see the governing agreement signed by the parties in which the parties expressly acknowledge that the fair market value of the SEA-3 interest purchased by GBG was the 21.5 million dollar contract price.

Again, the transaction documents had specific provisions stating that the written agreements constitute the entire agreement. The contract is the contract. The parties could not possibly have believed there was any other separate verbal agreement. Again, you will see the internal GBG documents approving the transaction, the SEA-3 PIP, which describes the terms of the transaction and doesn't contain any reference to an obligation or a commitment by Iconix to release GBG from royalty payments or do anything else in the future that's not in the written contracts.

Now, the government mentioned during its opening statement quarterly consensus. To the extent that Iconix met quarterly consensus estimates, it was on the basis of transactions and financial results that Neil believed were true and proper in all respects. In addition, the evidence will show that Iconix did not refer to consensus estimates in its SEC filings, earnings releases or other public disclosures, and any suggestion that Iconix touted meeting or beating consensus estimates is simply false.

The evidence also will show that there is nothing

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

| LA6MCOL2 | Opening - Mr. Reisner | Page 57 |
|---|---|---|

improper, from an accounting perspective or otherwise, with a company trying to maximize its revenues and profits in order to meet its financial objectives. That is usually considered good business.

The government also mentioned in its opening a sale of Iconix stock by Neil in October 2014. The evidence will show that there was nothing, nothing improper about this stock sale. The options Neil exercised were awarded in 2005, in 2005, nearly ten years earlier, when Iconix was established, and they were set to expire in the near term. And there was nothing at all improper about the exercise of the options or the sale of stock. Those shares represented ten years of hard work by Neil to build Iconix from a company with two brands to the second largest licensing company in the world with an enterprise value of $3 billion. And the evidence will show that Neil was not cashing out or distancing himself from Iconix. In fact, Neil continued to maintain approximately the same number of Iconix shares he held before the options exercise, and his share holdings in Iconix actually increased in 2015.

Let me also briefly address the SEC corporation finance comment letter process that you will hear about. You will learn that corporation finance is not part of the SEC enforcement division, and you will learn that the comment letter process focused on technical accounting issues, like whether the joint venture should be treated as variable

| LA6MCOL2 | Opening - Mr. Reisner | Page 58 |
|---|---|---|

interest entities and whether certain puts and calls and floors on puts and agreements affected revenue recognition.

The corporation finance process was extremely stressful for the company because the accounting issues under discussion could seriously impact the company's business. But the corporation finance process should not be confused, it should not be confused with the allegations made in this case. And you will learn that at the end of the day, at the end of that corporation finance process, the company's outside auditor, BDO, fully supported the company's position in the comment letter process, and the positions taken by the company were all taken in good faith.

That is what the evidence will show, ladies and gentlemen. Neil Cole had no reason to believe and did not believe that there was anything improper about any of the transactions at issue or the accounting for those transactions. He had no reason to believe and did not believe that SEC filings or other financial reporting at issue were inaccurate or improper in any way. Neil believed that all Iconix financial reporting was accurate in all respects, and the government's allegations will not be supported by the evidence.

So we ask that you listen closely to the evidence, follow the instructions of Judge Ramos, and use your common sense. If you do that, you will return the only verdict that is just and consistent with the evidence, that Neil Cole is not

| LA6MCOL2 | Horowitz - Direct | Page 59 |
|---|---|---|

guilty of any of the charges brought by the government.

THE COURT: Thank you, Mr. Reisner.

Will the government please call your first witness.

MR. HARTMAN: Your Honor, the government calls Seth Horowitz.

SETH HOROWITZ,
    called as a witness by the government,
    having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. HARTMAN:
Q. Good morning, Mr. Horowitz.
A. Good morning.
Q. Mr. Horowitz, how old are you?
A. I'm 45 years old.
Q. How far did you go in school?
A. I got a bachelor's degree.
Q. What did you study?
A. I studied international marketing and communications.
Q. Are you currently employed?
A. I am not currently employed.
Q. What was the last job you held?
A. The last job I held was CEO of Baked by Melissa.
Q. What's Baked by Melissa?
A. Baked by Melissa is a bite-sized cupcake company with both retail stores and e-commerce.

| LA6MCOL2 | Horowitz - Direct | Page 60 |
|---|---|---|

Q. How long did you have that job?
A. I had that job for approximately three years.
Q. Why did your employment at Baked by Melissa end?
A. My employment at Baked by Melissa ended when I pled guilty to charges of fraud and other.
Q. When did that occur?
A. That occurred in December of 2019.
Q. Generally, what offenses did you plead guilty to?
A. I pled guilty to securities fraud, causing the inflation of revenue and EPS for the company, destruction of documents, and providing false information to the SEC.
Q. Why did you plead guilty to those offenses?
A. I pled guilty to those offenses because I am guilty of those.
Q. Did you commit those offenses?
A. Yes, I did.
Q. At the time you committed those offenses, where did you work?
A. I worked at Iconix Brand Group.
Q. Did you commit those offenses alone or with other people?
A. I committed those offenses with other people.
Q. Do you see anyone in the courtroom today who was involved in committing those offenses with you?
A. Yes, I do.
Q. Who do you see?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 6, 2021

| LA6MCOL2 | Horowitz - Direct | Page 61 |

A. I see Neil Cole.
Q. Could you identify Mr. Cole by an article of clothing that he is wearing.
    You can stand up, if you need to.
A. Yes. Mr. Cole is wearing a striped tie and a light-colored mask.
    MR. HARTMAN: May the record reflect that the witness has identified the defendant.
    THE COURT: The record will so reflect.
Q. Was Mr. Cole also employed at Iconix?
A. Yes, he was.
Q. What was his job at Iconix?
A. He was the chief executive officer.
Q. What was your job at Iconix?
A. My job was president of the men's division and then chief operating officer.
Q. We will return to your guilty plea later on, but I want to ask you a little bit more about your work at Iconix.
    What year did you join the company?
A. I joined the company in 2012.
Q. What kind of company was Iconix?
A. Iconix was a brand management company. We owned various brands and licensed them around the world.
Q. When you say licensed them, what do you mean by that?
A. Iconix owned the actual brand and then various companies

| LA6MCOL2 | Horowitz - Direct | Page 62 |

would pay Iconix a royalty to make products under that brand. So if we owned the Starter brand and a company wanted to make Starter jackets, that company and Iconix could have a license arrangement where that company would pay Iconix a royalty, either guaranteed or based on sales, for the use of that Starter trademark.
Q. You gave us a distinction guaranteed versus based on sales for these royalties. Can you explain that distinction?
A. Sure. At times a company would guarantee a minimum amount of royalty to be paid to Iconix, regardless of how much sales they had. That would be considered minimum guarantee. There was also a royalty that could be paid based on sales where a company would pay a percentage of their sales as their licensing or royalty.
Q. Now, you gave us an example of Starter as a brand that Iconix owned. Were there other brands that Iconix owned?
A. Yes.
Q. Can you give us a couple more examples.
A. Iconix owned Starter, Rocawear, Danskin, OP, Massimo.
Q. Were there others as well?
A. I believe there are approximately 40 brands.
Q. Was Iconix a public company?
A. Yes.
Q. What does that mean?
A. That means that Iconix had shares that were publicly traded

| LA6MCOL2 | Horowitz - Direct | Page 63 |

on the stock market.
Q. Was Iconix listed on the stock exchange?
A. Yes, it was.
Q. What stock exchange was Iconix listed on?
A. Iconix was listed on NASDAQ.
Q. Prior to coming to Iconix, what jobs have you held?
A. Prior to coming to Iconix, I was the president of Modell's Sporting Goods. Prior to that, I also held the position of president and CEO of Everlast Worldwide.
Q. What's Everlast?
A. Everlast is a boxing equipment and licensing company.
Q. Did you interview for the job at Iconix?
A. Yes, I did.
Q. Can you describe that process.
A. During the interview process I met with Neil several times, I met with various members of the board of directors, and I was interviewed by Jay-Z.
Q. Why were you interviewed by Jay-Z?
A. At the time there were two positions that were open. One of them was as the leader or president of the Rocawear clothing company that Jay-Z owned that was a licensee of Iconix, and the other position was president of the men's division, which was a position at Iconix.
Q. Tell us, again, what the job was for which you were ultimately hired.

| LA6MCOL2 | Horowitz - Direct | Page 64 |

A. The position I was ultimately hired for was president of the men's division, which meant that I was responsible for the licensing of brands that were designated under that division.
Q. When you joined Iconix, did you have a conversation with Mr. Cole about how he saw your future at the company?
A. Yes, I did.
Q. What did he tell you in that conversation?
A. He told me that he would eventually be looking for somebody to take over his company, and he viewed that as me and that we would work together to get to that point.
Q. And the company you are referring to there is Iconix?
A. That's correct.
Q. Where was Iconix physically located?
A. Iconix was located at 1450 Broadway, New York, New York.
Q. Is that Manhattan?
A. Yes.
Q. Were there other companies in that building besides Iconix?
A. Yes, there were.
Q. What kind of building is it?
A. It's an office building with many floors in the garment center.
Q. How many floors did Iconix have?
A. Iconix had two floors.
Q. When you started working at Iconix, what floor did you sit on?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6MCOL2     Horowitz - Direct     Page 65

A. I sat on the fourth floor when I started working at Iconix.
Q. Was that the same floor as Mr. Cole or a different floor?
A. It was not.
    (Continued on next page)

LA6PCOL3     Horowitz - Direct     Page 66

Q. Where did Mr. Cole sit?
A. He sat on the third floor.
Q. Now, you told us that you were the head of the men's division. Can you tell us a little more about your responsibilities in that capacity?
A. Yes. On a day-to-day basis, I was responsible for communicating with licensees of brands that were designated under the men's division. I worked with the men's marketing team on brand positioning and marketing and negotiated new licensees and renegotiate existing licensees under those brands.
    THE COURT: It's now 11:00; so we'll take our first break. It will be 20 minutes. Ladies and gentlemen, please be prepared to come up to the courtroom at a few minutes before 11:20 so that we can get started on time. Please do not discuss the case.
    (Jury not present)
    THE COURT: Mr. Horowitz, you may step down.
    (Witness temporarily excused)
    Is there anything for us to discuss now? Okay. 20 minutes, folks. Don't be late.
    (Recess)
    (Jury present)
    THE COURT: Okay. Everyone, please be seated. Mr. Hartman.

LA6PCOL3     Horowitz - Direct     Page 67

    MR. HARTMAN: Thank you, your Honor.
BY MR. HARTMAN:
Q. Mr. Horowitz, when you were the head of the men's division, did you interact with Mr. Cole?
A. Yes, I did.
Q. How frequently did you interact with him?
A. I would say we interacted on a daily basis.
Q. Can you describe the nature of Mr. Cole's involvement in your duties?
A. Yes. Neil was very involved, intimately involved in the day-to-day business of the men's brands. He was involved in which partners we would end up licensing with and the relationships with existing licensees.
    THE COURT: Mr. Horowitz, can you bring the microphone up just a little closer?
    THE WITNESS: Sorry.
Q. You might just need to scoot the chair up.
    Mr. Horowitz, at some point, were you promoted when you worked at Iconix?
A. Yes.
Q. When was that?
A. That was in the spring of 2014.
Q. And what position were you promoted to?
A. I was promoted to chief operating officer.
Q. Can you describe your responsibilities as the chief

LA6PCOL3     Horowitz - Direct     Page 68

operating officer?
A. As the chief operating officer, I continued my role as the president of the men's division, and I became a member of the executive team. I worked very closely with Neil on acquisitions and joint ventures and other important aspects of running the company.
Q. Did you continue to sit on the fourth floor?
A. I did not. I moved down to the third floor.
Q. Where was your office on the third floor in relation to Mr. Cole's?
A. My office was approximately four offices down from his office.
Q. How would you describe the frequency of your interactions with Mr. Cole once you became COO, relative to when you were head of the men's division?
A. Our interactions increased significantly. We were together frequently throughout just about every day.
Q. Now, you mentioned as COO, you have had involvement in certain transactions that the company was engaging in. Can you describe those?
A. Yes. I was involved in transactions that included joint ventures. I was involved in the acquisition on different brands and the transition of those brands from other owners to Iconix as an owner.
Q. Okay. And what was Mr. Cole's involvement in those

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6PCOL3    Horowitz - Direct    Page 69

transactions?

A. Neil was directly involved in all of those transactions that I just discussed.

Q. Okay. As the COO of the company, did you interact with anyone in the legal function at Iconix?

A. Yes, I did.

Q. Who did you interact with?

A. I interacted with Jason Schaefer, who was the head of the legal team at the time, Erika Alford and Lauren Gee, who were both lawyers on the Iconix team.

Q. What about the board of directors, did you interact with the board of directors?

A. I had interaction with the board of directors.

Q. What is the board of directors, or what did they do at Iconix?

A. It's -- a board of directors is a group of individuals who had some oversight to the company, and I would be a part of sections of the quarterly meetings.

Q. So tell us about those quarterly meetings, what were they about and who was present for them?

A. The quarterly board meetings were attended by the board of directors, most often all in person. Neil Cole, the general counsel at the time, and the CFO, and various business leaders from the company were brought in throughout the board meeting to give presentations on their area of the business.

LA6PCOL3    Horowitz - Direct    Page 70

Q. Okay. And you mentioned that there were various mergers and acquisitions that you were involved in as COO. Were those discussed at these board of directors' meetings?

A. Yes, they were.

Q. And you also mentioned joint ventures, can you tell us what you meant by that?

A. Sure. A joint venture, in Iconix terms, was when Iconix and another party would form a new entity or a joint venture that would run the brands in a certain geography, certain brands in a certain geography, where Iconix would contribute the trademarks or the brands and the joint venture partner would pay for 50 percent of those brands in that territory.

Q. So a new joint venture would be created, and then Iconix would contribute the brand; is that right?

A. That's correct.

Q. In that territory. So can you give us an example of some of the territories where Iconix had joint ventures?

A. Sure. So Australia is a geography where Iconix had a joint venture. They had a joint venture partner. At the time of the formation of the joint venture, Iconix contributes the actual intellectual property or the brands, and the joint venture partner pays for 50 percent of the value of those brands in that geography.

Q. And who did the joint venture pay in that structure?

A. The joint venture paid Iconix.

LA6PCOL3    Horowitz - Direct    Page 71

Q. Okay. And then once the joint venture is created, how does that interact with the exploitation of the brands in that region?

A. The joint venture is then responsible for the licensing and the marketing of the brand in that geography.

Q. And so the licensing revenue that's generated through the joint venture, how is that taken in?

A. So the licensing revenue that's generated, in this case in Australia, would be split or the profits from the licensing revenue would be split 50/50 between the joint venture partner and Iconix.

Q. Okay. And you made a distinction between revenue and profit; so let's just talk about those terms real quick. What is revenue?

A. Revenue is the amount of sales or kind of money coming in, income that a company records during a certain period of time.

Q. And when you say profits, what do you mean by that?

A. Profit is, in basic terms, the revenue, minus the expenses in this case of running a joint venture, would give you profit.

Q. And what sorts of expenses would a joint venture have?

A. A joint venture would have personnel expenses, potentially marketing expenses, travel expenses.

Q. Okay. And so you described how the joint ventures would work with respect to the profits. Explain that again?

A. Sure. So whatever revenue or sales the joint venture would

LA6PCOL3    Horowitz - Direct    Page 72

have, the joint venture would then have expenses against that revenue; so it would be revenue, minus expenses, equals the profit.

Q. And you mentioned that these joint ventures were something you worked on as COO of Iconix. Were these joint ventures discussed at the board meetings?

A. Yes, they were.

Q. Okay. And was the creation of the joint venture something that was discussed at the board meetings?

A. Yes, they were.

Q. Okay. Did Iconix have a finance department?

A. Yes, it did.

Q. Did you interact with them?

A. Yes, I did.

Q. Who did you primarily interact with there?

A. I primarily interacted with David Maslaton.

Q. And who was he?

A. He was a member of the finance team at Iconix.

Q. Okay. What were his responsibilities, just at a high level?

A. David was responsible for tracking licensing revenue, as well as modeling of the company's financials.

Q. Did Iconix have a chief financial officer?

A. Yes, it did.

Q. Who was that when you became COO?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    October 6, 2021

| LA6PCOL3 | Horowitz - Direct | Page 73 |

A. It was Jeff Lupinacci. I believe is L-u-p-i-n-a-c-c-i, but that might not be perfect.

Q. Did you interact with Mr. Lupinacci when you were COO?

A. Yes, I did.

Q. What were the nature of those interactions?

A. Our interactions were somewhat limited. We would be at meetings together and occasionally would discuss what was going on with certain licensees, but it was rare.

Q. When you were at these meetings with Mr. Lupinacci, who would lead them?

A. Neil Cole.

Q. How would you describe Mr. Cole's management style?

A. Neil was a very aggressive leader. He was mean. He was a yeller. I would say that, at times, he was abusive of the people that reported to him, verbally. He was a difficult person to work with.

Q. Did Iconix have outside auditors?

A. Yes.

Q. Can you explain what an auditor is and what they do?

A. An auditor is an outside company that kind of tests and ensures that the financial reporting of the company is accurate.

Q. And who was the auditor for Iconix?

A. BDO.

Q. Did you interact with Iconix's outside auditors, as the COO

| LA6PCOL3 | Horowitz - Direct | Page 74 |

of the company?

A. Yes, I did.

Q. What was the context in which you interacted with them?

A. I would meet with BDO, along with a member of finance, on a six to 12-month -- every six to 12 months.

Q. Okay. And what was the purpose of those meetings?

A. The purpose of those meetings were to discuss the possible impairment or status of brands in the men's division.

Q. Can you explain what you mean by the possible impairment of the brands?

A. So, yes. A brand has a certain value, the actual IP, the trademark. So let's say Starter, using just an example. If the brand is not performing at a certain level, meaning that there isn't enough licensing revenue coming in for that brand, it is possible that a company would have to take an impairment or a decrease in value of that brand.

So if Starter was worth a hundred million dollars and Starter brand was underperforming and not bringing in enough licensing revenue, then potentially Starter would have to be impaired down to 80 million, as an example.

Q. And these conversations you had with the auditors about impairment, what sort of information were you providing?

A. I was providing detailed financial forecasts for the brands and color to those forecasts.

Q. And what did you understand was the reason that the

| LA6PCOL3 | Horowitz - Direct | Page 75 |

auditors needed that information?

A. The auditors needed that information to have an opinion on whether or not the brand needed to be impaired.

Q. Did you ever discuss with Mr. Cole the possibility that Iconix brands might be impaired?

A. Yes.

Q. What did he say about that?

A. Impairment was not an option.

Q. Did he say why?

A. He did. He was very adamant about Iconix never taking an impairment because if Iconix did take an impairment, it would lead the market to question the entire business model.

Q. And when you say the entire business model, what do you mean by that?

A. Iconix was a unique business model at the time that it was created, and if one of the brands would have to go through an impairment or a decrease in value based on how it was performing, it was Neil's opinion that it would cause the market to completely question the entire business.

Q. And when you say "the market," what are you referring to there?

A. I'm referring to the investors and the stock market.

Q. Now, you told us Iconix was a public company. Was it regulated by the United States government?

A. Yes.

| LA6PCOL3 | Horowitz - Direct | Page 76 |

Q. What agency regulated Iconix?

A. The SEC.

Q. And what does the SEC stand for?

A. Securities and Exchange Commission.

Q. And at a high level, do you have an understanding what the SEC does?

A. Yes, I do.

Q. What does the SEC do?

A. The SEC ensures proper financial reporting and running of public companies.

Q. Was Iconix required to make regular financial filings with the SEC?

A. Yes.

Q. Are you familiar with what's called a form 10-K?

A. Yes, I am.

Q. What is that?

A. It's the financial report and backup that a company files on an annual basis.

Q. And at a high level, what is in a form 10-K?

A. The financial performance of the company is in a 10-K, along with details of any significant events within the company.

Q. And when you say the financial performance of the company, what are you referring to there?

A. Financial reporting included or includes the revenue, the

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6PCOL3    Horowitz - Direct    Page 77

profitability, the earnings per share compared to prior quarters and prior years.

Q. Are these numbers that are being reported?

A. Yes, they are.

Q. Typically when is the form 10-K filed or when was it filed for Iconix?

A. A 10-K is usually filed six to eight weeks after the end of the year.

Q. So in the case of Iconix, for the year ending 2014, so December 2014, when would the 10-K have been filed for Iconix?

A. Mid-February 2015.

Q. And was this form 10-K available to the public, to your understanding?

A. Yes.

Q. Do you know how?

A. A 10-K is filed, I believe, online.

Q. Did you have a role in preparing the 10-K?

A. Yes, I did.

Q. What was your role?

A. My role, in part, was to review the descriptions of the men's businesses, as well as the joint ventures.

Q. Okay. And when you were reviewing those things, what were you reviewing them for?

A. I was reviewing them for accuracy.

Q. Are you familiar with the form 10-Q?

LA6PCOL3    Horowitz - Direct    Page 78

A. Yes, I am.

Q. And what is that?

A. The 10-Q is similar to a 10-K except that it is put out every quarter or every three months.

Q. So in the case of Iconix, what were the three-month intervals that generated these form 10-Qs?

A. So Iconix was on a calendar year. So the first quarter was January, February, March; the second quarter, April, May, June; third quarter, July, August, September; and fourth quarter, October, November, December.

Q. Okay. And typically when would the form 10-Q come out relative to the end of the quarter?

A. A 10-Q would normally come out approximately one month after the end of the quarter.

Q. And did you have a role in preparing the forms 10-Q?

A. Yes, I did.

Q. What was your role there?

A. It was similar to the K in that I wrote, reviewed areas about the men's business and occasionally the joint ventures.

Q. Did Iconix release any financial data for its quarterly and annual reporting prior to filing these SEC forms?

A. Yes, it did.

Q. How did that happen?

A. Iconix would put out a press release highlighting the financial performance and more significant events and

LA6PCOL3    Horowitz - Direct    Page 79

go-forward perspective on the business a few days prior to the Q or the K.

Q. And were you involved in preparing those press releases?

A. Yes, I was.

Q. Can you describe your involvement?

A. I was involved in the drafting of the press release. Jaime Sheinheit, who was the head of investor relations, and I would sit together and review areas about the men's business, and I was a part of larger meetings held by Neil Cole, where we would review the headlines of the press release and the information included.

Q. And when you said you reviewed the headlines and the information, can you explain more about that?

A. Sure. The top of every press release had a few bullet points that were deemed very important, and in this group, we would hear Neil's thoughts on what was important to say there and how to order them, meaning chronologically, and provided feedback.

Q. When you say the headline was deemed very important, who deemed it very important?

A. Neil Cole.

Q. Okay. And you said Mr. Cole would express views about what to highlight in the press releases as well; is that right?

A. That's correct.

Q. Did the press releases usually include a quote from

LA6PCOL3    Horowitz - Direct    Page 80

Mr. Cole?

A. Yes, they did.

Q. Were the press releases also filed with the SEC?

A. I believe they are.

Q. Mr. Charalambous, can you please put up for the witness and the parties only what's been marked for identification as Government Exhibit 102, and can you show Mr. Horowitz the first page and the third page of this document -- sorry, the fourth page.

Mr. Horowitz, do you recognize what this document is?

A. Yes, I do.

Q. What is it?

A. This looks like the press release from the second quarter.

Q. Of what year?

A. Of 2014.

MR. HARTMAN: The government offers Government Exhibit 102.

THE COURT: Any objection?

MR. REISNER: No objection, your Honor.

THE COURT: 102 will be received.

(Government's Exhibit 102 received in evidence)

MR. HARTMAN: Mr. Charalambous, if you could publish that to the jury, or show it to the jury, and let's go back to the first page.

BY MR. HARTMAN:

| LA6PCOL3 | Horowitz - Direct | Page 81 |
| --- | --- | --- |

Q. Okay. The first page says the United States Securities and Exchange Commission form 8-K, and then there's a section that says: Date of report. Mr. Horowitz, can you read the date?

A. The date is July 29th, 2014.

Q. When is this in relation to the quarter that the press release relates to?

A. It is approximately one month later -- to the press release? I'm sorry, I didn't hear it.

Q. I'm sorry. I tell you what, let's go forward to the fourth page. What are we looking at here, Mr. Horowitz?

A. This is the press release for the second quarter of 2014.

Q. Okay. And then can you read the date line there, where it says: New York, New York, July 29th, 2014; can you see that?

A. Yes.

Q. So when is this in relation to the close of this quarter?

A. This is approximately one month after the close of the quarter.

Q. Okay. And remind us again when that quarter closed, the second quarter?

A. The second quarter closed at the end of June.

Q. Now, you mentioned the headline. Could you see the headline here?

A. Yes, I do.

Q. Can you read it?

A. "Iconix Brand Group reports record revenue and earnings for

| LA6PCOL3 | Horowitz - Direct | Page 82 |
| --- | --- | --- |

the second quarter 2014."

Q. Okay. We spoke a little bit about revenue in the context of the joint ventures, but can you just remind us what revenue is?

A. Sure. Revenue is the amount of money that a company takes in for the sale of its products or the licensing of its products during a particular quarter or year.

Q. And when this headline says Iconix reports record revenue, do you have an understanding of what the headline means by "record revenue"?

A. Yes, that means all-time high.

Q. Okay. It also says "earnings." What are earnings?

A. Earnings is basically the revenue minus the expenses gets to your earnings.

Q. The first bullet point here says "Record Q2 revenue of $118.9 million and non-GAAP diluted EPS of 75 cents;" do you see that?

A. Yes, I do.

Q. So first of all, when it says Q2, what does that mean?

A. It's referring to April, May and June of 2014.

Q. Okay. And when it says the revenue for Q2 was 118.9 million, what does that mean?

A. That's the amount of revenue; so licensing income and other income that Iconix brought in during that three-month period.

Q. Okay. There's also a reference to non-GAAP diluted EPS.

| LA6PCOL3 | Horowitz - Direct | Page 83 |
| --- | --- | --- |

First of all, what does EPS stand for?

A. EPS stands for earnings per share.

Q. And can you tell us, at a high level, what that means?

A. Sure. It basically takes the earnings of a company or the profitability of a company and divides it by the number of shares that are being traded on the market.

Q. And this is described as non-GAAP diluted EPS. Just at a high level, what does that mean?

A. GAAP is -- it stands for generally acceptable accounting principles, which is a normal and structured way for all companies to report. Some companies, based on unique circumstances within the company, report on non-GAAP and as long as that's consistent and described, that's how a company can report its EPS.

Q. And in the case of Iconix, did Iconix report a non-GAAP diluted EPS number regularly?

A. Yes, it did.

Q. And to your understanding, does the amount of revenue that the company reports affect the non-GAAP diluted EPS number?

A. Yes, it does.

Q. What's the direction of the affect? That is, if revenue goes up, how does that affect EPS?

A. If revenue goes up, EPS goes up.

Q. Okay. Let's look at the bottom here. There's a section that says "Neil Cole, Chairman and CEO of Iconix Brand Group

| LA6PCOL3 | Horowitz - Direct | Page 84 |
| --- | --- | --- |

commented." Can you just read the quote there?

A. "With record results in the second quarter, we continue to demonstrate the power of our business model with our diversified revenue stream and strong free cash flow. As we look to the future, we believe we can continue to deliver significant growth and increased value for our company and shareholders through our global expansion plans, worldwide Peanuts business and additional acquisitions of global iconic brands."

Q. Mr. Horowitz, there are references to growth here. What's your understanding of what's being referred to there?

A. Growth here is revenue.

Q. Okay. But specifically as compared to what?

A. Compared to prior performance.

Q. Okay. Did you ever discuss with Mr. Cole whether it was important or not for Iconix to show growth?

A. Yes.

Q. Describe those conversations.

A. Those conversations were quite frequent and usually very focused in the last month of the quarter. It was critical to Neil that the company show growth in both revenue and EPS over the prior year, as well as something that was called consensus.

Q. And what do you mean by consensus?

A. When you're a public company, at times you have analysts that cover your stock. They will give their opinion on how a

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6PCOL3     Horowitz - Direct     Page 85

company is going to perform. When you collect those together and come up with an average, that is the consensus.

Q. And what did Mr. Cole say about the consensus?

A. That we needed to beat consensus for every quarter.

Q. Did he say why that was important?

A. Yes, he did.

Q. What did he say?

A. It was important for proof of context of the business model and to increase the stock price.

Q. Mr. Charalambous, can you zoom out and highlight for us the first sentence that begins after "Q1 2014 result." Maybe blow it up a little bit.

So, Mr. Horowitz, it says here total revenue for the second quarter of 2014 was approximately 118.9 million, and then it says a 3 percent increase as compared to approximately 115.1 million in the second quarter of 2013. Can you unpack that for us?

A. Sure. What that is saying is that, in those same time periods, those three months, April, May and June of 2014, the company had a 3 percent increase in revenue versus the prior year.

Q. Okay. So the portion of the year that's being reported here is April, May and June of 2014; is that right?

A. That's correct, and it's comparing it to April, May and June of the prior year.

LA6PCOL3     Horowitz - Direct     Page 86

Q. Of 2013?

A. Correct.

Q. So for April, May and June of 2014, what was the revenue that the company reported?

A. 118.9 million.

Q. And for April, May and June of 2013, what was the revenue the company reported?

A. 115.1 million.

Q. And when you were talking about growth earlier, is this what you were referring to?

A. Yes. We needed to beat the 115.1 million from the prior year.

Q. Okay. Mr. Charalambous, could you highlight the sentence in that paragraph. It's a little further down. I think it's the next-to-the-last sentence. It's the non-GAAP diluted EPS. I think we might need a little bit after that. Sorry, we need the last sentence there as well. Okay.

So, Mr. Horowitz, it says: "Non-GAAP diluted EPS for the second quarter of 2014 increased 4 percent to 75 cents compared to 72 cents in the prior year quarter." What does that mean?

A. It means that we beat the prior year's same period by three cents or 4 percent.

Q. And this is not revenue, this is non-GAAP EPS; is that right?

LA6PCOL3     Horowitz - Direct     Page 87

A. That's correct.

Q. And just remind us again what that is?

A. That is basically the revenue divided by the number of shares outstanding in the market.

Q. Is it the revenue divided by the number of shares?

A. I'm sorry. It's the earnings, which is the revenue minus expenses, generally speaking.

Q. Now, Mr. Horowitz, in connection with these press releases being put out to the market, did Iconix do anything else to tout its performance?

A. Yes.

Q. What did it do?

A. We had a shareholder call.

Q. Can you --

A. Or investor call.

Q. Can you explain what that is?

A. Yes. That's a phone call that starts off with the reading of a script and then opens up to a Q-and-A session with shareholders.

Q. Okay. And can you explain what, if any, preparation went in to holding this investor call?

A. The preparation for these calls included putting together a script of what was going to be said by different individuals that were going to speak, the recording of that script, as well as a series of potential questions that we may face on the call

LA6PCOL3     Horowitz - Direct     Page 88

and potential answers for those questions.

Q. So who was involved in these preparations?

A. Neil Cole, me, Jaime Sheinheit, who was the head of investor relations. At times, it also included the CFO and other members of the compliance team.

Q. What was Mr. Cole's role in preparing for the call?

A. Mr. Cole was responsible for his area that he was going to read, and he led the meetings with the potential questions and answers that we would have up on a large board in the conference room.

Q. You mentioned preparing a script. What went into that script?

A. What went into the script was a recap of either financial performance or some greater detail into the color of how the company was performing, either by brand or by segment.

Q. And then you mentioned it was recorded. Can you explain that?

A. Yes. After the script was completed, we would record, each one of us individually, whoever was speaking, our part and then that would be played at the beginning of the call.

Q. Who was on the call?

A. From the Iconix side?

Q. I'm sorry, from -- other than folks from Iconix, who was on the phone?

A. On the call were analysts, shareholders, and I believe

UNITED STATES OF AMERICA, v.
NEIL COLE,
October 6, 2021

| LA6PCOL3 | Horowitz - Direct | Page 89 |
|---|---|---|

potential investors.

Q. And you told us earlier what analysts are, but can you just remind us what that is?

A. Sure. Analysts are individuals that work for companies that cover, meaning give their opinion on prior performance and future performance of a public company.

Q. At the end of the recorded portion of the call, was there a question-and-answer session?

A. Yes.

Q. And can you explain how that worked?

A. There would be communication from an operator as to who was waiting in line to ask questions. I believe we were able to filter which or choose who went first. Questions would be asked by this group, either an investor or an analyst, and Iconix management would reply.

Q. Mr. Charalambous, can you put up for the parties and the witness what's been marked for identification as Government Exhibit 115.

Mr. Horowitz, does this appear to be a transcript of the second quarter earnings call?

A. I'm sorry, it went back and forth with the pages there. Yes, this does.

MR. HARTMAN: The government offers Government Exhibit 115.

THE COURT: Any objection?

| LA6PCOL3 | Horowitz - Direct | Page 90 |
|---|---|---|

MR. REISNER: No objection, your Honor.

THE COURT: It will be received.

(Government's Exhibit 115 received in evidence)

MR. HARTMAN: Mr. Charalambous, can you put this up for the witness, please. And can we look at, I think it's the -- that page, yes, the fourth page of the document.

At this time, the government would offer the recordings that correspond to the highlighted portions of the document, which are Government Exhibits 115A through D.

THE COURT: Any objection?

MR. REISNER: No objection, your Honor.

THE COURT: They will be received.

(Government's Exhibits 115A through D received in evidence)

MR. HARTMAN: And, Mr. Charalambous, could you just play, please, the recording that corresponds to the first highlighted portion of the document, which is Government Exhibit 115A?

(Audio played)

BY MR. HARTMAN:

Q. Mr. Horowitz, who was that speaking?

A. That was Neil Cole.

Q. Okay. And could we play the second portion highlighted here, which is Government Exhibit 115B.

(Audio played)

| LA6PCOL3 | Horowitz - Direct | Page 91 |
|---|---|---|

Mr. Horowitz, who was that speaking?

A. Again, that was Neil Cole.

Q. And there was a reference there to international joint ventures. What do you understand Mr. Cole to be referring to there?

A. He's referring to the joint ventures that Iconix had in various geographies around the world.

Q. Mr. Horowitz, you talked about the preparation of the scripts for these calls. Who decided what to highlight during these calls?

A. Neil did.

MR. HARTMAN: Mr. Charalambous, could you play Government Exhibit 115C.

(Audio played)

BY MR. HARTMAN:

Q. Mr. Horowitz, who was that speaking?

A. That is Neil Cole.

Q. Okay. There's a section in the first sentence of the highlighted portion that says "A recent spinoff of" and the transcript says "inaudible." Were you able to hear what Mr. Cole said there?

A. Yes.

Q. What did he say?

A. Li & Fung.

Q. Is that L-i and F-u-n-g?

| LA6PCOL3 | Horowitz - Direct | Page 92 |
|---|---|---|

A. Correct. It's L-i, and then F-u-n-g.

Q. And there's a reference here to the relationship with Global Brands. That's not capitalized, but do you understand that to be a reference to a particular company?

A. Yes, I do.

Q. What company is being referenced here?

A. It's Global Brands Group.

Q. What are Li & Fung and Global Brands Group?

A. Li & Fung is a very large international manufacturer and brand owner of both soft goods, meaning apparel and shoes, and hard goods, like equipment.

Global Brands Group is a part of Li & Fung that, similar to Iconix, owned brands and would license and market them.

Q. So the sentence says: "The second quarter we broadened our relationship with Global Brands, a recent spinoff of Li & Fung, by adding additional brands and territories to our existing joint ventures." Can you explain what that means, Mr. Horowitz?

A. Yes. We amended our Southeast Asia joint venture to add additional brands and geographies to that joint venture.

Q. Okay. And you told us earlier that a joint venture is a partnership between Iconix and another company. Who is the other company involved?

A. Global Brands Group.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6MCOL4 Horowitz - Direct Page 93

Q. Now, what was the region or what were the regions that were being added to that joint venture here?

A. Korea was being added to the joint venture for a majority of the Iconix Brands, and Europe was being added to the joint venture for select Iconix brands.

Q. Are those the brands listed in that second paragraph: Ecko, Ed Hardy and Sharper Image?

A. Yes. And New York should be Zoo York.

Q. It's Ed Hardy and there is a separate brand called Zoo York, correct?

A. Correct.

Q. Now, you told us earlier the way these joint venture transactions worked. I think you told us that the counterparty buys an interest in the joint venture from Iconix, is that right?

A. That's correct.

Q. The sentence here reads: As a result of these transactions, we recorded a gain of approximately 14 million in the second quarter.

Do you see that?

A. I do.

Q. Can you explain what that means?

A. Sure. So in this quarter, Iconix recorded $14 million of revenue as a result of this amendment to the Southeast Asia joint venture. The $14 million represents the payment for 50

LA6MCOL4 Horowitz - Direct Page 94

percent of these rights by GBG to Iconix, minus what's considered a cost basis or what the brands were valued at.

Q. Explain that. What is the cost basis?

A. So a cost basis, as I understand it, is a value ascribed to a brand when Iconix first acquires the brand. So if Iconix acquired a brand or bought a brand for $5 million, its cost basis is $5 million. If Iconix then does a joint venture for that $5 million brand and then sells it for 10 million, Iconix gets the $5 million difference between the 10 and the 5.

Q. It takes that as revenue, is that right?

A. That is correct.

Q. When the call refers to gain, is that synonymous with revenue?

A. It is.

Q. Did the gain on these transactions also affect what Iconix reported for its EPS?

A. Yes, it did.

Q. Did it increase it or decrease it?

A. It increased it.

MR. HARTMAN: Mr. Charalambous, could you play the last section of the transcript, please. This is Government Exhibit 115D.

(Audio played)

Q. Mr. Horowitz, can you explain what Mr. Cole is talking about here.

LA6MCOL4 Horowitz - Direct Page 95

A. Sure. The company, Iconix, would give shareholders guidance or expectations on how the company would perform from a revenue perspective and an EPS perspective. So at this point we are advising shareholders and potential shareholders that we are going to raise our revenue guidance to a range of 455 to 465 million, and also our EPS guidance to 260 to 270 per share.

Q. Did Mr. Cole ever talk about the importance of raising guidance?

A. Yes, he did.

Q. Can you explain what he did?

A. What Neil would say is that it was important to continue to show growth and show the public that we were growing. He also would say that if we beat guidance for a certain quarter, like a second quarter, that we would have to increase our guidance for the go forward because if we didn't, it meant that the company would be on the decline. If we were up $10 million in the second quarter, the public would expect that our guidance for the whole year would also go up by $10 million. This was something we discussed at the end of every quarter.

Q. Mr. Horowitz, you told us that this press release and the earnings call occurred prior to the filing of the form 10-Q, is that right?

A. That's correct.

Q. About how much time between the press release and the filing of the form 10-Q?

LA6MCOL4 Horowitz - Direct Page 96

A. A few days.

MR. HARTMAN: Mr. Charalambous, could you please show just for the witness and the parties right now what's been marked for identification as Government Exhibit 103.

Q. Mr. Horowitz, do you recognize this as the form 10-Q that was filed for the period ending June 30 of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 103.

MR. REISNER: No objection, your Honor.

THE COURT: It will be received.

(Government Exhibit 103 received in evidence)

MR. HARTMAN: Mr. Charalambous, you can put that up for the jury as well.

Mr. Charalambous, could we see page 35 of the document.

Q. Mr. Horowitz, could you read the first sentence here.

A. Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Q. Who signed it?

A. Neil Cole and Jeff Lupinacci.

Q. Remind us who Mr. Lupinacci is.

A. He at the time was the CFO and chief financial officer of

# A-96

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 6, 2021

| LA6MCOL4 | Horowitz - Direct | Page 97 |
| --- | --- | --- |

Iconix.

Q. What's the date that this was signed?

A. August 6, 2014.

Q. Approximately when is that in relation to the earnings call we just looked at?

A. I don't recall the date of that.

Q. Is it after the earnings call?

A. Yes, it is.

MR. HARTMAN: Mr. Charalambous, could we look at page 4 of the document, please. Can you just highlight, please, the top three or four -- there you go.

Q. Mr. Horowitz, what's being shown here on page 4?

A. The section that is being shown is the revenue of licensing and other, but the revenue for Iconix Brand Group.

Q. What is the amount of licensing and other revenue that Iconix reported for the three months ending June 30 of 2014?

A. $118.9 million.

Q. Did this include the gain that was referenced in the earnings call on the Southeast Asia transaction?

A. Yes, it does.

Q. What was the gain that the company or the revenue that the company reported for that same period in 2013?

A. $115.1 million.

MR. HARTMAN: Let's look at page 12 and 13 of this document, please.

| LA6MCOL4 | Horowitz - Direct | Page 98 |
| --- | --- | --- |

Q. Mr. Horowitz, there are two paragraphs here. I'd like you to read -- let's start with page 12.

A. Iconix Southeast Asia joint venture. In October 2013, the company contributed substantially all rights to its wholly-owned and controlled brands in Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor, together, the Southeast Asia territory, to Lion Network Limited, Iconix Southeast Asia, a then newly formed subsidiary of the company through an exclusive royalty free perpetual master license agreement with Iconix Southeast Asia. Shortly thereafter, LF Asia purchased a 50 percent interest in Iconix's Southeast Asia for $12 million. LF Asia paid 7.5 million upon the closing of the transaction and committed to pay an additional 4.5 million over the 24-month period following closing. The company may earn an additional $2 million based on certain criteria relating to the achievement of Iconix Southeast Asia revenue targets through the year ending December 31, 2014. As a result of this transaction, the company recorded a gain of 4.7 million, which was included in licensing and other revenue in full year 2013.

Q. Mr. Horowitz, in October of 2013, were you COO of Iconix?

A. No.

Q. Were you involved in the negotiation of the transactions described in this paragraph?

A. No, I was not.

| LA6MCOL4 | Horowitz - Direct | Page 99 |
| --- | --- | --- |

Q. Are you familiar with it from your later role as COO?

A. Elements of it, yes.

Q. Do you understand what's being described in the paragraph?

A. Yes, I do.

Q. Can you explain that as a high level.

A. Sure. At a high level, a new joint venture was formed with a party and, in exchange for forming that joint venture, Iconix received $12 million.

Q. And the party that is joining Iconix in the joint venture is LF Asia, is that right?

A. That's correct.

Q. Are you familiar with LF Asia?

A. Yes.

Q. What is LF Asia?

A. LF Asia is a part of the parent company, Li & Fung.

Q. When we talk about LF Asia, Li & Fung GBG, are those all the same thing, essentially, for your purposes?

A. For our purposes, yes.

MR. HARTMAN: Mr. Charalambous, you can take that down and let's look at the next paragraph.

Q. Can you read that, please, Mr. Horowitz.

A. In June of 2014, the company contributed substantially all rights to the wholly-owned and controlled brands in the Republic of Korea and its Ecko, Zoo York, Ed Hardy, and Sharper Image brands in the European union and Turkey, in each case to

| LA6MCOL4 | Horowitz - Direct | Page 100 |
| --- | --- | --- |

Iconix Southeast Asia. In return, LF Asia agreed to pay the company $15.9 million, of which 4 million was paid at closing. As a result of this transaction, the company recorded a gain of $13.6 million in the current quarter, which is included in licensing and other revenue in the unaudited condensed consolidated income statement.

Q. Mr. Horowitz, were you involved in this transaction?

A. Yes, I was.

Q. Is this the transaction that Mr. Cole was describing on the earnings call that we just heard?

A. Yes, it is.

Q. Just tell us at a high level what's being said here in the document.

A. What's being said here is that Iconix has amended a current joint venture. You can look at it as creating a new joint venture, but it's amending an existing joint venture by adding certain geographies and brands in exchange for $15.9 million of which 13.6 was considered revenue for the company.

Q. Now, you said an existing joint venture was being amended. That the joint venture that was referenced in the first paragraph we looked at, the one from 2013?

A. Yes.

Q. Is that called Iconix Southeast Asia?

A. Yes, it is.

Q. Mr. Horowitz, during the course of your testimony, when we

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6MCOL4          Horowitz - Direct          Page 101

refer to the 2013 transaction, if I call that SEA-1, will you understand what I mean by that?

A. Yes.

Q. If I call this June transaction SEA-2, will you understand what I mean by that?

A. Yes.

MR. HARTMAN: Mr. Charalambous, can we look at page 28 of this document. Could you just zoom in on the section that says highlights from the current quarter.

Q. Mr. Horowitz, can you just read the first bullet point, please.

A. Record Q2 revenue of 118.9 million.

Q. Then can you read the third bullet point, please.

A. Gain related to the sale of certain trademarks to our Iconix Southeast Asia joint venture.

Q. Mr. Horowitz, to your understanding, is this bullet related to the SEA-2 transaction we just talked about?

A. Yes.

MR. HARTMAN: Could we look at page 36, please, Mr. Charalambous. Could we zoom in on the top three paragraphs of that document.

Q. Mr. Horowitz, could you just read this, please.

A. I, Neil Cole, certify that: 1. I have reviewed this quarterly report on form 10-Q for the period ended June 30, 2014 of Iconix Brand Group, Inc.; 2. Based on my knowledge,

LA6MCOL4          Horowitz - Direct          Page 102

this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

MR. HARTMAN: Can we see the bottom of that page, please, Mr. Charalambous.

Q. Who signed this certification, Mr. Horowitz?

A. Neil Cole.

Q. What's the date?

A. August 6, 2014.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Q. Mr. Horowitz, did Mr. Cole ever talk to you about whether investors paid attention to the company's financial disclosures?

A. I wouldn't say he specifically said investors pay attention to that particular thing.

Q. I am just asking about the financial reporting generally. Did he ever talk to you about investors, whether they cared about the numbers that the company was reporting?

A. Yes.

Q. Can you describe those conversations.

A. Sure. The numbers were extremely important, the most important part of the Iconix business. We would almost

LA6MCOL4          Horowitz - Direct          Page 103

exclusively focus on revenue and earnings per share versus the prior year and consensus at the end of every quarter in a very high-pressure -- how do we make a deal, how do we get to these numbers mentality.

Q. You mentioned consensus there. Just remind us what that is.

A. Consensus is the analysts who cover, in this case Iconix stock, give guidance on how they feel the company will perform, and the consensus is kind of those numbers put together and averaged.

Q. Consensus guidance that the analysts give, around what metrics is the guidance?

A. The guidance is usually on revenue and earnings per share.

Q. Did the amount of revenue that the company reported affect your compensation in any way?

A. Yes, it did.

Q. Just at a high level, can you tell us how it affected your compensation?

A. I received stock for the performance of the company, and I believe one of the metrics was revenue.

Q. Do you know whether Mr. Cole had a similar agreement with the company?

A. I believe that he did.

Q. During the course of a quarter, did the company track its anticipated revenue and earnings per share for the Court?

LA6MCOL4          Horowitz - Direct          Page 104

A. Yes.

Q. Where did that occur?

A. The company would track its revenue and earnings per share on a financial update sheet. That sheet we would review, I would say, weekly in the middle of a quarter and within the last month of a quarter it would be -- that sheet would be updated and presented and discussed on a daily, if not more than once-a-day basis.

Q. Who led those meetings that you just described?

A. Neil Cole.

MR. HARTMAN: Mr. Charalambous, could you please show for the witness and the parties what's been marked for identification as Government Exhibit 234.

Q. Mr. Horowitz, is this an example of those sheets that you described?

A. Yes, it is.

MR. HARTMAN: The government offers Government Exhibit 234.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 234 received in evidence)

MR. HARTMAN: You can publish that, Mr. Charalambous.

Q. Mr. Horowitz, is this the type of tracking sheet you described earlier?

A. Yes, it is.

# A-98

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6MCOL4    Horowitz - Direct    Page 105

Q. What's the date of this document?

A. June 6, 2014.

Q. Where does that fall in the company's reporting cycle?

A. That gives us about three weeks until the end of the quarter.

Q. To your understanding, who dictated the format of this document?

A. Yes. It was Neil Cole.

Q. Let's look at the columns on the left first. I am not going to ask you about all of them. But one of them is revenue. Is that the same revenue you have testified about earlier?

A. Yes, it is.

Q. There are also a number of things under the revenue section. What are those?

A. Compensation, advertising, etc. are negatives or expenses against the revenue.

Q. Those reduce the revenue, is that right?

A. That's correct.

Q. Further down there is a line that says net income. Do you see that?

A. I do.

Q. What is that?

A. Net income is basically the revenue minus all the expenses of the company.

LA6MCOL4    Horowitz - Direct    Page 106

Q. Then at the bottom there is a metric non-GAAP EPS. Is this the same EPS metric that we saw referenced in the press release?

A. Yes, it is.

Q. The first column on the right says Q2 forecast. Can you explain what that is.

A. The Q2 forecast is a forecast on how the company would end the quarter if the quarter ended kind of on the path it's on.

Q. As of June 6, what is the company forecasting for its revenue for the second quarter of 2014?

A. 99.9 million.

Q. That's $99.9 million, is that right? The last three decimals or digits are dropped, is that right?

A. That's correct.

Q. What is the company projecting for its non-GAAP EPS as of June 6, 2014?

A. Fifty-one cents.

Q. Now, explain what's happening in the middle of the document here where it says opportunities and risks. What's being shown there?

A. Opportunities and risks here indicate two different joint ventures that the company is in negotiations to complete and the financial implications of those joint ventures.

Q. For the one that says Middle East JV, what's being represented on the revenue line?

LA6MCOL4    Horowitz - Direct    Page 107

A. $6.9 million, which would be the company's gain if the Middle East joint venture is finalized during the quarter.

Q. If I understand correctly, if that transaction occurred, is the idea that that forecasted revenue number would increase by $6.9 million?

A. That's correct.

Q. What about the non-GAAP EPS number at the bottom for the Middle East joint venture. Explain that.

A. The Middle East joint would add nine cents to the non-GAAP EPS, taking the 51 cents in the forecast up to 60 cents.

MR. HARTMAN: Mr. Charalambous, can you zoom out for a minute. Can we see the section that we were just looking at next to the column that says Q2 2013. If you capture that stuff at the bottom.

Q. Mr. Horowitz, the last column here says Q2 2013 and there are rows that line up with the rows on the left.

Can you explain what's being represented here?

A. Sure. Q2 2013 section on the right was the company's financial performance as reported for the prior year for this time period.

Q. Why was that on the sheet, to your understanding?

A. Because it was critical that the company beat those numbers.

Q. As of June 6, 2014, does the company's forecast allow it to beat the numbers from Q2 of 2013, according to this sheet?

LA6MCOL4    Horowitz - Direct    Page 108

A. No, it does not.

Q. With respect to revenue, what's the shortfall?

A. The shortfall is approximately $15 million.

Q. With respect to EPS.

A. Approximately 19 cents.

Q. Did you ever talk to Mr. Cole about whether the company had difficulty beating its prior year's earnings?

A. Yes.

Q. What did he say about that?

A. He expressed concern that the organic business or the regular licensing business was on decline and that we would need more and more joint ventures or sale of IP to make up for the difference.

Q. You used the term organic business. Can you explain what that means.

A. Organic business is the routine licensing of our brands to third parties that pay us a royalty to make product using our brands.

Q. The numbers that are shown in the Q2 forecast column, are those mostly generated by the organic business?

A. Yes.

Q. Now, you said he said something about needing joint ventures to make up the difference.

Can you explain what he said there.

A. Yes. He explained that the gap continued to get bigger

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                          October 6, 2021

| LA6MCOL4 | Horowitz - Direct | Page 109 |
|---|---|---|

between how the company was performing year over year when comparing quarters and that we would need to continue to form new joint ventures or find new geography to form joint ventures in order to make up for that gap and that we were running out of those types of opportunities.

Q. Did he ever use any colorful language to describe the joint ventures?

A. Yes. He described them as a drug.

Q. What did you understand him to mean by that?

A. He had the belief -- he even stated that we were addicted to doing these joint ventures, and somehow we would need to get off of it.

Q. At the bottom on the left-hand side there is a box and it says consensus. And then there are two lines underneath that say revenue and EPS.

What is that?

A. That is what I was referring to before. It's the group of analysts that put together their forecast for the company that's then put together into one number or averaged, and that's the expectation of consensus of analysts, that we would do 116 million of revenue and come in with 67 cents of earnings per share.

Q. Why was that on the sheet?

A. Because it was important that we beat those numbers.

Q. Who told you it was important?

| LA6MCOL4 | Horowitz - Direct | Page 110 |
|---|---|---|

A. Neil did. We would refer to that constantly in these meetings.

Q. Now, at the very bottom of the section on the left there are some numbers and there are rows that say purchase price, cost basis, and net revenue gain, and then there are columns: Middle East, Korea, Europe new.

Do you know what's being shown there?

A. Yes.

Q. Can you explain it.

A. Sure. For each one of the potential joint ventures, Middle East, Korea, Europe New, Umbro China, and Sanrio, the purchase price or what the other company was willing to pay, the cost basis, which is the amount that Iconix owned the brand for, and then the net revenue gain, which is what Iconix would have taken as revenue as part of that joint venture.

Q. For example, with Korea, what is being projected as the purchase price for that interest?

A. The purchase price for Korea is 3.3 million.

Q. What is Iconix's cost basis?

A. $500,000.

Q. So according to this, how much revenue could Iconix record on the sale of the brands in Korea?

A. $2.8 million.

Q. In the opportunities and risks section that we are looking at here there is a reference to the Li & Fung JV.

| LA6MCOL4 | Horowitz - Direct | Page 111 |
|---|---|---|

Do you see that there?

A. Yes, I do.

Q. Do you know what transaction that is?

A. Yes, I do.

Q. What transaction is that?

A. It's the transaction that includes both the Korea joint venture and the new brands being added to Europe or what we refer to as Southeast Asia-2.

Q. Southeast Asia-2, the description of which we looked at before, is what's being model in this middle column, is that right?

A. That is correct.

Q. And the revenue number that's projected here, do you have an understanding of where that's coming from?

A. Yes.

Q. Can you explain it.

A. It's coming from that bottom section, adding the net revenue gain for Korea and the net revenue gain for Europe new.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Q. Mr. Horowitz, I am going to switch gears and talk about the negotiating history of that joint venture, the Southeast Asia-2 transaction.

I want to start by showing you an e-mail.

MR. HARTMAN: Mr. Charalambous, can you please put up

| LA6MCOL4 | Horowitz - Direct | Page 112 |
|---|---|---|

for the witness and the parties what has been marked as Government Exhibit 1028.

Q. Mr. Horowitz, do you recognize this as an e-mail from Mr. Cole to Jason Rabin and Jared Margolis cc'g you, dated April 30 of 2014?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 1028.

MR. REISNER: No objection.

THE COURT: 1028 will be received.

(Government Exhibit 1028 received in evidence)

MR. HARTMAN: Mr. Charalambous, can you put that up for the jury, please.

Q. Mr. Horowitz, this is from April 30 of 2014. What quarter is this for Iconix?

A. This is the second quarter for Iconix.

Q. Remind us when the second quarter closes.

A. The second quarter is April, May, and June. Closes in June.

Q. So the end of June is the end of the second quarter, is that right?

A. That is correct.

Q. Mr. Cole sends this e-mail to Jason Rabin and Jared Margolis. Do you know who they are?

A. Yes, I do.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6MCOL4     Horowitz - Direct     Page 113

Q. Who are they?

A. Jason Rabin and Jared Margolis are both employees at GBG, Jason being more senior.

Q. Next to their names it says LF Asia. Just remind us, is that functionally the same as GBG for these purposes?

A. Yes, it is.

Q. The subject line says Friday and then the text says: Are you guys available to meet on Friday? Would like to discuss Europe, Korea, and China.

Do you know what Mr. Cole was referring to here?

A. Yes, I do.

Q. What was he referring to?

A. He was referring to doing joint ventures in these geographies.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Can we look, for the parties and the witness, at the document that's marked for identification as Government 1032.

Q. Mr. Horowitz, do you recognize this as an e-mail from yourself to Mr. Cole on May 2, 2014?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 1032.

MR. REISNER: No objection.

THE COURT: It will be received.

LA6MCOL4     Horowitz - Direct     Page 114

(Government Exhibit 1032 received in evidence)

Q. Mr. Horowitz, can you read the text, please.

A. Worked with Jason and Jared this afternoon. Proposed the Korea and non Lee Cooper EU transactions first with their right to do LC in second half at predetermined price. Would get us $12 million gross, 9.5 net this quarter. They think they can get it through. We will see. See you later.

Q. Mr. Horowitz, this is May 2. Where is this in relation to the end of the quarter?

A. There is still approximately 60 days left in the quarter.

Q. The subject line says LF. What does LF refers to?

A. Li & Fung or GBG.

Q. The first sentence says: Worked with Jason and Jared this afternoon. Who are Jason and Jared?

A. Jason Rabin and Jared Margolis, the two executives from GBG.

Q. The second sentence says: Proposed the Korea and non Lee Cooper EU transactions first with their right to do LC in second half at predetermined price.

Can you explain what you are saying there.

A. Sure. That I proposed or we proposed the Korea and Europe transactions, not including the Lee Cooper brand first. To do that joint venture first and then they have the right to do the Lee Cooper part in the second half.

Q. Is this discussing the transaction that would become the

LA6MCOL4     Horowitz - Direct     Page 115

Southeast Asia-2 transaction?

A. Yes.

Q. You say: Would get us 12 million gross, 9.5 met this quarter.

What are you saying there?

A. I'm saying that GBG would pay approximately $12 million for the new joint venture or the amended joint venture, and we would be able to recognize nine and a half million dollars of gain or revenue in that quarter.

Q. Why are you telling Mr. Cole this?

A. Because this was important.

Q. Why?

A. This was important as it was part of Iconix achieving its quarterly financial goals.

Q. When you say they think they can get it through, what are you referring to?

A. GBG was in the process of going public in a foreign market, and there was some resistance or thought that they would not be able to complete this transaction in time for the second quarter because of their process.

Q. Was that something that was important to you?

A. It was very important to us.

Q. Why?

A. Because we needed this revenue in the second quarter.

Q. Why did you need it?

LA6MCOL4     Horowitz - Direct     Page 116

A. In order -- we needed this revenue in order to beat last year's financials and come in over the consensus.

MR. HARTMAN: Mr. Charalambous, you can take that down and can you please show for the witness and the parties what's been marked for identification as Government Exhibit 1031.

Q. Mr. Horowitz, do you recognize this as an e-mail from yourself to Jared Margolis, dated May 2 of 2014?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 1031.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1031 received in evidence)

Q. Mr. Horowitz, remind us one more time, who is Jared Margolis?

A. Jared Margolis is one of the principals at GBG.

MR. HARTMAN: Mr. Charalambous, can we see the attachment.

Q. Mr. Horowitz, what is this document?

A. This is a term sheet reflecting the potential joint venture.

Q. What's a term sheet?

A. Term sheet lays out the kind of financial parameters and brand parameters of a potential joint venture in this case.

Q. This is dated May 2. Is this the same date as the e-mail

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                            October 6, 2021

| LA6MCOL4 | Horowitz - Direct | Page 117 |
|---|---|---|

that we just looked at from you to Mr. Cole?
A. Yes.
Q. What's being described in this term sheet?
A. This term sheet lays out in slightly more detail the potential joint venture between the two parties. It lays out the purchase price and the brands and geographies.
Q. What is the purchase price that's being anticipated as of May 2, 2014?
A. As of May 2, the purchase price for amending -- for including Korea, adding brands to Europe and Turkey and doing the Lee Cooper transaction is $25.3 million.
Q. There are two steps described at the bottom. There is the Southeast Asia JV amendment and then there is another section. Can you explain what you are showing here.
A. Sure. So the Southeast Asia JV amendment would occur in Q2, so by the end of June, and the purchase price for GBG being paid to Iconix would be $11.3 million. And then the second step could happen any time in the second half of the year where Li & Fung would have the right to acquire a certain percent of Lee Cooper for approximately $14 million.
Q. Now, typically when you sold brands in these territories, what percentage of the brand would you sell to the counterparty?
A. When we would sell a brand to a counterparty to form a joint venture, we would sell 50 percent or more.

| LA6MCOL4 | Horowitz - Direct | Page 118 |
|---|---|---|

Q. Did you have any understanding about how that percentage affected the amount of revenue that the company could record?
A. It was my understanding that the company needed to sell 50 percent or more in order to take a gain and count it as revenue.
Q. In the case of the Lee Cooper transaction that's being shown here for Q3 and Q4, how much is anticipated to be sold?
A. 49 percent.
Q. Would that have any effect on the company's revenue as a result?
A. It is my understanding that it would not have an effect on revenue.
MR. HARTMAN: Mr. Charalambous, you can take that down. Can you show, just for the witness and for the parties, what's been marked for identification as Government's Exhibit 1035.
Q. Mr. Horowitz, do you recognize this as an e-mail from you to Mr. Cole, dated May 8, 2014?
A. I do.
MR. HARTMAN: The government offers Government Exhibit 1035.
MR. REISNER: No objection.
THE COURT: It will be received.
(Government Exhibit 1035 received in evidence)
MR. HARTMAN: Mr. Charalambous, could you go to the

| LA6MCOL4 | Horowitz - Direct | Page 119 |
|---|---|---|

bottom of the chain, please. Let's read up from the bottom.
Q. So the first e-mail in the chain is an e-mail, Mr. Horowitz, from you, to Mr. Margolis, cc'g Mr. Rabin and the date is May 6. I think the term sheet we looked at before was May 2, is that right?
A. I believe that is correct.
Q. You say here: Good morning. Do you have an update on the status of the term sheet discussed Friday.
What are you referencing here?
A. I'm referencing the term sheet that we just looked at regarding the potential joint venture.
MR. HARTMAN: You can take that down.
Q. Let's see Mr. Margolis's response. He says: Ron is on his way to HK and should have an update in a couple of days.
Do you have an understanding of who Ron is?
A. Yes.
Q. Who is Ron?
A. Ron is another senior partner within the Li & Fung network.
MR. HARTMAN: Mr. Charalambous, you can take that down. Let's go to the next one.
Q. Mr. Horowitz, you respond also on May 6: We need to know as soon as possible on the JV update. As you know, this is time sensitive. If we are not moving forward this quarter, we are going to need to make other decisions.
Mr. Horowitz, what are you saying here?

| LA6MCOL4 | Horowitz - Direct | Page 120 |
|---|---|---|

A. That we need this joint venture to be completed within the second quarter. And if it's not going to be completed in the second quarter, we are going to have to make, meaning Iconix is going to have to make other decisions, whether it be other joint ventures or other ways to make up the revenue gap.
MR. HARTMAN: We could take that down. Let's go to the next section.
Q. Mr. Rabin says: Dow left last night for HK. He is working on it. I will let you know immed. Is that immediately?
A. Yes.
Q. Then you respond: Thank you both. Any news from Dow in HK? Mr. Rabin responds on the 8th: I spoke to him last night, trying really hard. Need until TOM -- is that tomorrow?
A. It is.
Q. -- to find out. The timing is so hard, but we are trying.
When he says the timing is so hard, do you have an understanding of what he means by that?
A. Yes. He knows that we need to finish this deal for our second quarter by the end of June, and they are going through their transaction of becoming a public company, and that is what he is describing.
Q. Is he expressing that it may be difficult for them to do this deal by the end of the second quarter?
A. Yes.
MR. HARTMAN: Let's look at the top section of this

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6MCOL4     Horowitz - Direct     Page 121

e-mail.

Q. You forward this chain to Mr. Cole and you say: Just so you have the e-mail chain below.

You see that?

A. Yes.

Q. Why did you do that?

A. Because Neil was regularly asking me for updates on the status, and I wanted him to have the exact e-mail chain.

Q. What is it that you wanted Mr. Cole to see?

A. I wanted him to see my persistence in following up with him, as well as their slight reluctance in timing.

Q. Why was Mr. Cole asking for updates on this transaction?

MR. REISNER: Objection. Foundation.

Q. Do you have an understanding, based on what he said, about the reasons?

A. I'm sorry. Could you please reask the question.

Q. Sure. Did Mr. Cole tell you why he wanted to know the status of this transaction?

A. Yes, he did.

Q. What did he say?

A. We needed to have this transaction for our second quarter. If we weren't, we were going to have to make other decisions.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Let's look at Government Exhibit 1208, please.

LA6MCOL4     Horowitz - Direct     Page 122

Q. Mr. Horowitz, this is an e-mail from you to Mr. Cole, dated May 14.

Do you see that?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1208.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1208 received in evidence)

MR. HARTMAN: Mr. Charalambous, if you can show it to the jury, please.

Q. Mr. Horowitz, can you read the body of the e-mail.

A. Attached is the term sheet as of May 2. They have told us that they are going to do the whole transaction in Q2. This term sheet contemplates the Lee Cooper portion in the back half of the year.

MR. HARTMAN: Can we see the attachment quickly.

Q. Mr. Horowitz, is this the same term sheet we looked at earlier?

A. I believe it has slight adjustments to it.

Q. Why were you sending Mr. Cole this term sheet?

A. So that he was updated on the status of the transaction.

Q. Why did you want to update him on the status of the transaction?

A. Because he wanted updates on the status of the transaction

LA6MCOL4     Horowitz - Direct     Page 123

as often as they were happening.

Q. At this point what is the purchase price reflected in this term sheet for the Korea brands and the Europe brand?

A. Approximately $10.9 million.

MR. HARTMAN: Can you scroll down a little bit, Mr. Charalambous.

Q. Is that what's reflected under step 1, alternative 1?

A. Yes, it is.

MR. HARTMAN: You can take that down.

Can we see, just for the witness and the parties, what's been marked as Government Exhibit 1036.

Q. Mr. Horowitz, is this an e-mail from yourself to Mr. Margolis, dated May 23, 2014?

A. Yes, it is.

MR. HARTMAN: The government offers Government Exhibit 1036.

MR. REISNER: No objection.

THE COURT: 1036 will be received.

(Government Exhibit 1036 received in evidence)

MR. HARTMAN: If we could show it, please, to the jury.

Q. Mr. Horowitz, what are you forwarding to Mr. Margolis here?

A. I am forwarding the transaction documents or the agreement to amend the Iconix Southeast Asia joint venture.

Q. What's the date of this e-mail?

LA6MCOL4     Horowitz - Direct     Page 124

A. Friday, May 23, 2014.

Q. This is the transaction that we have referred to as Southeast Asia-2, is that right?

A. That is correct.

MR. HARTMAN: Mr. Charalambous, can we look at page 2 of the attachment. I'm sorry. There is a clause here that says whereas.

Q. Mr. Horowitz, as of the date of these documents, what was the anticipated purchase price for the interest in Korea and Europe?

A. The purchase price was $10.9 million.

Q. And there is a reference to the marks having a fair market value of $21.8 million.

Do you see that above?

A. I do.

Q. Do you have an understanding of how that was arrived at?

A. That number was arrived at through a calculation that took projected royalty or prior royalty for that group of brands in that geography and multiplied it by five and a half times.

Q. Why five and a half times?

A. That was the negotiated and acceptable multiple to determine value of the brands in joint ventures.

Q. Of that multiple specific to the transaction or did it apply more broadly?

A. It applied more broadly, although not exclusively.

# A-103

LA6MCOL4   Horowitz - Direct   Page 125

Q. What's the relationship between the 21.8 and the 10.9?
A. 10.9 represents the 50 percent or half of the value that GBG would be paying to Iconix.
 MR. HARTMAN: Mr. Charalambous, you can take that down.
 Can we see just for the parties and the witness what's been marked for identification as Government Exhibit 1037.
Q. Mr. Horowitz, do you recognize this as an e-mail from yourself to Jared Margolis, dated May 30 of 2014?
A. I do.
 MR. HARTMAN: The government offers Government Exhibit 1037.
 MR. REISNER: No objection.
 THE COURT: It will be received.
 (Government Exhibit 1037 received in evidence)
 THE COURT: But before you publish it to the jury, it is now 12:50, so we will take our second break.
 Ladies and gentlemen, we will reconvene here in the courtroom at 1:10, so please do be prepared to come out before that time.
 (Jury not present)
 THE COURT: Mr. Horowitz, you may step down. It's 1:10 folks.
 (Recess)
 (Continued on next page)

LA6PCOL5   Horowitz - Direct   Page 126

 (Jury not present)
 THE COURT: Do you want to bring Mr. Horowitz in?
 (Jury present)
 THE COURT: Everyone, please be seated. Mr. Hartman.
 MR. HARTMAN: Thank you, Judge.
 So, Mr. Charalambous, if we could put up Government Exhibit 1037 for the jury.
BY MR. HARTMAN:
Q. Do you see that?
A. Yes, I can.
Q. This is from you to Mr. Margolis, and the date is May 30th, 2014, the subject is timing. Where are we at this point in the quarter?
A. We have one month left in the quarter.
Q. Can you read the text of your e-mail, please?
A. Sure. "Jared, I know we keep discussing timing, but I want to set an achievable, specific timeline with you. I believe our signing date should be no later than June 18th. We need this because we cannot find ourselves at the end of the Q with our backs to the wall. If we can't sign our deal by then, we will have to make other decisions. I also feel that this should be a very achievable timeline. Can we talk/sit Monday and work backwards from this date? Best, Seth."
Q. Mr. Horowitz, when you say "I believe that our signing date

LA6PCOL5   Horowitz - Direct   Page 127

should be no later than June 18th," why would you say that?
A. I wanted to give us time, if this deal were not to be completed, to make other decisions or do other transactions.
Q. In order to do what?
A. In order to hit our financial goals for the quarter.
Q. You say "We need this because we cannot find ourselves at the end of the Q with our backs to the wall." What does Q stand for there?
A. Q stands for quarter, referring to this quarter.
Q. And what are you saying there?
A. We, Iconix, cannot find ourselves short this amount of revenue, our backs to the wall, with very little time left in our quarter to try to figure out how to make it up.
Q. And you say "if we can't sign our deal by then, we will have to make other decisions." What are you saying there?
A. That we will have to find other joint ventures or sale of IP in order to make up for the shortfall.
Q. Mr. Charalambous, you can take that down, and would you please put up for the parties and the witness what's been marked for identification as Government Exhibit 1038.
 Mr. Horowitz, is this an e-mail from yourself to Mr. Cole dated June 3rd of 2014?
A. Yes, it is.
 MR. HARTMAN: The government offers Government Exhibit 1038.

LA6PCOL5   Horowitz - Direct   Page 128

 MR. REISNER: No objection.
 THE COURT: It will be received.
 (Government's Exhibit 1038 received in evidence)
 MR. HARTMAN: Mr. Charalambous, can you put that up for the jury, please.
BY MR. HARTMAN:
Q. Mr. Horowitz, can you read the first paragraph there, please? Actually, sorry. The second paragraph, "We agreed"?
A. "We agreed that the SE Asia amendment, including Korea and Europe brands (not Lee Cooper) can happen in June, and the Lee Cooper portion of the deal can happen in Q3, if structure delays us. That is okay, as we have no gain on that portion of the deal and we get the anticipated gain in Q2."
Q. Mr. Horowitz, the subject line of this e-mail says: LF meeting. What are you relaying in the body of this e-mail?
A. Describing to Neil what happened at my meeting with Li & Fung or GBG.
Q. You say in the top there, "meeting went well, key takeaways"?
A. That is correct.
Q. When you refer to the southeast Asia amendment, are you referring to the amendment that we've been talking about as Southeast Asia 2?
A. Yes, I am.
Q. You say "including Korea and Europe brands (but not Lee

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                     October 6, 2021

| LA6PCOL5 | Horowitz - Direct | Page 129 |
| --- | --- | --- |

Cooper) can happen in June." Why are you telling Mr. Cole this?

A. Because it was not important to our Q2 financial results that that part of the deal happen in June.

Q. You say, "The Lee Cooper portion of the deal can happen in Q3, if the structure delays us. That is okay, as we have no gain on that portion of the deal and we get the anticipated gain in Q2." What are you saying there?

A. That the gain that we had anticipated or the revenue that we had anticipated from the Southeast Asia amendment stays the same even though Lee Cooper is pushed back into the second half.

Q. Can you explain why that is?

A. Because the Korea and Europe brands that are being amended to join the Southeast Asia GBB are at 50 percent ownership, and what's being contemplated with Lee Cooper is at 49 percent and a different structure.

Q. And you told us earlier that if the company didn't sell 50 percent, it couldn't recognize a gain on the sale; is that right?

A. That was my understanding.

Q. Can you read the third paragraph, please?

A. "There was a lot of questions concern around Ecko, Dirty Jerz and Seth G/MEE. We took them through all of it, full transparency, with a floor on the buyback after five years and

| LA6PCOL5 | Horowitz - Direct | Page 130 |
| --- | --- | --- |

a backstop in year one (both terms of our original term sheet). They got comfortable with the valuation of the IP. It got heated for a bit. Told them we were not moving on price and not going to renegotiate. Then it calmed back down."

Q. Mr. Horowitz, as of the date of this e-mail, on June 3rd, what's the anticipated price of the Korea and Europe marks, roughly?

A. I believe it's roughly $10.9 million.

Q. What are you saying here?

A. That there was negotiation on the part of GBG for a lower price, based on the concerns around one of the brands and its licensee.

Q. Lower than 10.9?

A. That's correct.

Q. What were the concerns? You referenced Ecko, Dirty Jerz and Seth G?

A. Ecko is one of the brands that was being amended to join the joint venture. Dirty Jerz, Seth G and MEE are all part of a licensing network for Ecko. That licensing network was on the verge of bankruptcy; so we walked GBG through exactly the State of Dirty Jerz, Seth G/MEE and the potential future ups and downs of Ecko in this new market.

Q. You say, "We took them through it all, full transparency," and you say, "with a floor on the buyback after five years and a backstop in year one, both terms of our original term sheet.

| LA6PCOL5 | Horowitz - Direct | Page 131 |
| --- | --- | --- |

They got comfortable with the valuing of the IP." Do you see that?

A. Yes.

Q. What's the valuation that you're referring to at this point, numbers-wise?

A. The approximately $10.9 million.

Q. And the floor on the buyback, what's that a reference to?

A. In this joint venture, at the end of five years, GBG had the right to force Iconix to acquire back the brands, and the floor is a minimum purchase price that Iconix would have to pay at the five-year period.

Q. And you also reference a backstop in year one, what's that?

A. The backstop in year one was a guaranteed distribution to GBG in the first year of the joint venture.

Q. What do you mean by guaranteed distribution?

A. So if GBG, as a partner in the joint venture, only received $700,000 of distribution, we had a guarantee in this joint venture that they would get a million dollars of distribution; so Iconix would make up the $300,000 shortfall.

Q. So if the brands didn't generate the required level, then Iconix would make up the shortfall, is that the idea?

A. I would say if the brands didn't generate the anticipated or forecasted revenue, that Iconix would make up the shortfall in profitability and that was GBG's concern around one of the licensees, Ecko, Dirty Jerz or Seth G, going through a

| LA6PCOL5 | Horowitz - Direct | Page 132 |
| --- | --- | --- |

potential bankruptcy.

Q. Spell that out. Why would those things be likely?

A. If MEE, which was the parent company of which Seth G was a principal and Dirty Jerz was a subsidiary; so they're all together, if that company went bankrupt, it would most likely not be able to pay its licensing revenue to the joint venture.

Q. The last thing in paragraph three says "it got heated for a bit," and then it says "told them we were not moving on price." Who told who what?

A. GBG was frustrated with the status of Ecko and the potential bankruptcy. They were negotiating for a lower price for the joint venture. I told them that we were not going any lower on price.

Q. Lower than what?

A. Lower than 10.9 million.

Q. And specifically, you say "and not going to renegotiate." What do you mean by that?

A. We had already negotiated the price for this joint venture, and we were not going to go back on that at this point.

Q. The last paragraph says "the IC will formally approve the deal on June 18th at a meeting in Hong Kong. Prior to that, we will have completed and agreed to legal docs." What are you saying there?

A. The IC was a committee that was a part of GBG or Li & Fung, and they needed to approve the deal in order for it to be

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

| LA6PCOL5 | Horowitz - Direct | Page 133 |

completed. But in advance of that June 18th date, we will have all of the legal documents done and ready to sign.

Q. Mr. Charalambous, you can take that down. And can you put back up Government Exhibit 234, and can you zoom in on the left-hand side, and can you give us the comparison to Q2, 2013, as well, and the consensus as well? Thank you.

Mr. Horowitz, we've looked at this document before. What's the date of this projection?

A. The date is June 6th, 2014.

Q. And this is two days after the e-mail that we just looked at; is that right?

A. That is correct.

Q. Okay. As of June 6th, 2014, what is the -- actually, Mr. Charalambous, can you pull the bottom portion of this as well? I'm sorry. Can you scroll down? Thanks.

As of June 6th, 2014, according to this document, what's the anticipated purchase price of the Korea and Europe New marks?

A. The anticipated purchase price is $10.9 million.

Q. And of that, what does Iconix anticipate recognizing as gain?

A. Iconix anticipates $10.4 million of gain, but is yet to provide a cost basis for Europe.

Q. Okay. And we're going to come back to that. The cost basis for Europe here says zero; is that right?

| LA6PCOL5 | Horowitz - Direct | Page 134 |

A. That's correct.

Q. Is that something you remember noticing at the time?

A. I remember it being discussed that we were waiting for finance to come up with a cost basis.

Q. So as of this date, the gain that's being projected on the revenue line under where it says Li & Fung JV, how much is that?

A. $10.4 million.

Q. And that's based on a purchase price of 10 point -- I'm sorry, what is it, I'm sorry, 10.9?

A. Exact -- yes, 10.9.

Q. Mr. Horowitz, there's also a Middle East joint venture that's being modeled here. Do you know what that was?

A. That was a joint venture that Iconix was working on during this quarter.

Q. And what's the anticipated revenue effect of that joint venture?

A. $6.9 million.

Q. And what's the anticipated EPS effect of that joint venture?

A. It's an additional nine cents.

Q. Did a Middle East joint venture happen in this quarter?

A. No, it did not.

Q. Without the Middle East joint venture, based on this forecast, would the revenue and EPS gain from the Li & Fung JV

| LA6PCOL5 | Horowitz - Direct | Page 135 |

be enough for Iconix to meet its revenue and EPS numbers?

A. No, it would not.

Q. Can you break that down?

A. Sure. The forecasted revenue at this time is approximately $100 million. $100 million, plus the $10.4 million from the Li & Fung JV, gets us to 110 million. That would be short of the 115 million from the prior year and also short of the consensus revenue of $116 million.

So from a revenue perspective, if all we did was the Li & Fung joint venture, we would be short versus last year and consensus.

Q. What about from an EPS perspective?

A. From an EPS perspective, with the Li & Fung joint venture, Iconix would be at approximately 64 cents, which would be short of the consensus and miss the prior year.

Q. Do you remember talking with Mr. Cole about the fact that the Middle East transaction was not going to happen in this quarter?

A. Yes.

Q. And do you remember talking about the fact that Iconix needed the revenue and EPS from that transaction to meet its quarterly goals?

A. Yes.

Q. Did he share with you any ideas about how to make up that difference?

| LA6PCOL5 | Horowitz - Direct | Page 136 |

A. Yes.

Q. What did he tell you?

A. We had discussions around other potential joint ventures and sale of IP, and those conversations would evolve over the next two weeks to include increasing the purchase price on the Li & Fung JV.

Q. Explain that?

A. We discussed Li & Fung paying more for the assets in the joint venture in exchange for various other things.

Q. Now, we looked at an e-mail from June the 4th where Li & Fung was pushing for a lower price for the joint venture; is that right?

A. That is correct.

Q. To your understanding, was Li & Fung inclined to pay more than the purchase price of $10.9 million?

A. No.

Q. Did you discuss that with Mr. Cole?

A. Our discussions revolved around giving them something back in exchange for increasing the purchase price.

Q. And did he discuss with you what that would be?

A. Yes.

Q. Can you describe those conversations?

A. Those conversations started off as in exchange for increasing the purchase price, letting Li & Fung out of a contractual commitment to Rocawear Kids' licensing fees. So in

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

| LA6PCOL5 | Horowitz - Direct | Page 137 |

exchange for increasing the purchase price, Iconix could potentially let them out of a licensing agreement.

Q. And to be clear, when you're having these conversations with Mr. Cole about increasing the purchase price for the JV, are you discussing changing the terms of the JV structure itself, other than the purchase price?

A. No.

Q. So what is the incentive in these conversations for GBG and Li & Fung to pay more for the joint venture?

A. The incentive for them to pay more would be to either let them out of some financial contractual commitment to Iconix or to pay them back in some other way.

Q. Now, you mentioned that Li & Fung wanted out of a licensing agreement they had with Iconix related to Rocawear Kids. Can you explain that a little more?

A. Sure. Li & Fung had a licensing agreement with Iconix that had -- the licensing agreement was for them to make children's apparent with Rocawear on it and pay Iconix a royalty. That licensing agreement had a three-and-a-half million dollar minimum guarantee and a two-and-a-half million dollar minimum guarantee over these two years, 2014 and 2015. And we were contemplating having GBG, or Li & Fung, pay more for the joint venture in exchange for letting them out of their Rocawear Kids agreement.

Q. Now, you talked about minimum guarantees before, but just

| LA6PCOL5 | Horowitz - Direct | Page 138 |

remind us, what are those and how do they work for Iconix?

A. So a minimum guarantee is something that a company -- there's an amount of money that a company guarantees to Iconix, or the brand owner, in exchange for the right to manufacture a product with a brand name on it.

So in this case, Li & Fung had the right to make kids Rocawear apparel, and sell it to retailers for consumers. In exchange for that right, they had a minimum guarantee that they needed to pay Iconix regardless of how many sales they made.

Q. And how did that relate to Li & Fung's desire to get out of the agreement, as you understood it?

A. Li & Fung was losing money on the Rocawear Kids' licensing agreement. They wanted out of that agreement.

Q. And why do you say they were losing money? Did they tell you what they meant by that?

A. Yes. They -- the volume or the sales of the kids Rocawear had gone down significantly since they had signed -- since they had renewed their agreement, and it was now in lower-tier distribution, which was very difficult, if not impossible, for them to make profit in. So not only were they losing money running the business, but they were also contractually obligated to pay Iconix their minimum guarantees.

Q. So is the idea that the money being generated by the brands wasn't enough to cover those minimums?

A. That's correct.

| LA6PCOL5 | Horowitz - Direct | Page 139 |

Q. Mr. Charalambous, you can take that down, and can we see, just for the parties and the witness, what's been marked Government Exhibit 1247.

Mr. Horowitz, do you recognize this as an e-mail that you sent to Mr. Cole on June 9th of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1247.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1247 received in evidence)

MR. HARTMAN: Mr. Charalambous, can you put that up for the jury.

BY MR. HARTMAN:

Q. Mr. Horowitz, this is an e-mail from you to Mr. Cole, and the subject line says "Update." Can you explain what this is?

A. This appears to be one of my weekly updates that I would send to Neil Cole.

Q. Explain that concept?

A. Neil required that I send him weekly updates -- this is from the time I started at the company -- and he asked that I send them to him on Mondays.

Q. And what was supposed to be in the update?

A. The update was to include any significant occurrences from the prior week or updates on items that we had been discussing.

| LA6PCOL5 | Horowitz - Direct | Page 140 |

Q. Okay. And can we see the attachment, please, Mr. Charalambous.

Mr. Horowitz, is this your update?

A. Yes, it is.

Q. And can we zoom in on the top, please, Mr. Charalambous, paragraph one.

Mr. Horowitz, the first paragraph says "Strategic initiatives, LF." What is that a reference to?

A. Li & Fung/GBG.

Q. Paragraph a says: "All legal docs were sent to LF/GC. Goal is to have them completed prior to the June 18, IC meeting. IC meeting on June 18th to approve JV." What are you describing here?

A. I'm describing the meeting that was discussed in the prior e-mail and that we would have the legal documents prepared in advance.

Q. Okay. And this is a reference to the SEA-2 transaction that we've been talking about; is that right?

A. That is correct.

Q. Mr. Charalambous, can you zoom out and just highlight the second paragraph there.

Mr. Horowitz, there's a reference here to China Umbro, what's that?

A. China Umbro is another potential joint venture.

Q. And was this a joint venture that was contemplated for the

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6PCOL5   Horowitz - Direct   Page 141

second quarter or for some other point?

A. It was a potential for the second quarter if we needed to get something done, but more likely set for a third quarter.

Q. And ultimately, did Iconix do a deal related to Umbro in China?

A. Yes, we did.

Q. And when was that?

A. That was in the third quarter.

Q. Okay. And who was the counterparty for that deal?

A. GBG/Li & Fung.

Q. Under this point, there are several different entities, listed a, b, c, d and e. Who are these?

A. These are potential partners that we could do the joint venture with.

Q. And c is Li & Fung?

A. That is correct.

Q. And what does it say there?

A. "Li & Fung verbally committed to $12 million 50/50 JV but need to wait until Q3."

Q. Okay. Mr. Charalambous, you can take that down. And let's look at -- sorry, just for the witness and for the parties, the document identified as Government Exhibit 1039.

Mr. Horowitz, do you recognize this as an e-mail that you wrote to Mr. Cole on June 12th of 2014?

A. I do.

LA6PCOL5   Horowitz - Direct   Page 142

MR. HARTMAN: The government offers Government Exhibit 1039.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1039 received in evidence)

MR. HARTMAN: Mr. Charalambous, can you put that up for the jury, please.

BY MR. HARTMAN:

Q. Okay. And, Mr. Charalambous, could we look at the bottom of this e-mail first, please.

Mr. Horowitz, can you read your e-mail to Mr. Cole on June 12th?

A. "Did a lot of diligence work on margins/product/volume. Very difficult in any model at the current product/pricing/distribution to make money. Good top line-no bottom. Should discuss."

Q. And the subject line here is Rocawear. What are you talking about here?

A. I'm talking about the Rocawear Kids' business.

Q. And what is it that you are describing to Mr. Cole?

A. I'm describing to Mr. Cole the current state of the Rocawear Kids' business so we can make a decision on whether or not we are going to let GBG out of their Rocawear Kids' agreement and our potential ability to find another partner.

Q. And why are you discussing letting GBG out of the Rocawear

LA6PCOL5   Horowitz - Direct   Page 143

Kids' agreement at this point?

A. In order for them to pay more for the joint venture.

Q. The date here is June 12th of 2014; is that right?

A. That is correct.

Q. How close is that to the end of the quarter?

A. It is less than three weeks to go.

Q. What was the upshot of your analysis of the Rocawear Kids' relationship?

A. The upshot is that we would not be able to replace the Rocawear Kids' agreement with the types of minimums or guarantees that we have currently with GBG/Li & Fung.

Q. Why were you considering replacing GBG?

A. We were considering replacing GBG because if we let GBG out of their Rocawear Kids' agreement in exchange for the higher price in the joint venture, we would have to find a solution for the Rocawear Kids' product.

Q. Why not just let them out of the agreement and not find a replacement?

A. Because Iconix desperately needed Rocawear licensing revenue in order to avoid an impairment of the large brands.

Q. Explain that concept again for us?

A. So Rocawear was a brand that had a certain value for Iconix. The business had been on a decline, and the licensing royalty that we were receiving would have suffered greatly without the guaranteed minimums from Rocawear Kids' agreement

LA6PCOL5   Horowitz - Direct   Page 144

with GBG, and without those guaranteed minimums, Iconix was likely to face an impairment on the large brands.

Q. And remind us again, did you talk to Mr. Cole about the concept of impairment and what it would mean for the company?

A. Yes.

Q. And what did he say?

A. Impairment was not an option. In fact, he called it the "I word" and it would not be discussed.

Q. Mr. Charalambous, can you zoom out, and let's look at the rest of the chain.

Mr. Cole responds "Are you referring to Kids?" What did you understand him to mean by that?

A. He's looking for clarification if I'm talking about Rocawear men's or Rocawear kids' products.

Q. And what's your response?

A. "Yes. Sorry about that. I am referring to kids."

Q. And at this point, who was the licensee for Rocawear Kids?

A. GBG/Li & Fung.

Q. Mr. Charalambous, you can take that down, and please put up, just for the parties and the Court, what's marked for identification as Government Exhibit 1041.

Mr. Horowitz, do you recognize this as an e-mail from you to Mr. Cole on June 12th of 2014?

A. I do.

MR. HARTMAN: The government offers Government

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6PCOL5    Horowitz - Direct    Page 145

Exhibit 1041.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1041 received in evidence)

MR. HARTMAN: And could we publish it, please.

BY MR. HARTMAN:

Q. Mr. Horowitz, can you read the body of the e-mail, please?

A. "Neil, I spoke with Jared tonight. Bottom line is that we may complete only part of the total transaction (Europe and Korea) at approximately $15 million of gain/revenue for Iconix in Q2 and wait until third quarter for the Lee Cooper EU portion of the transaction. This gives us everything we want, revenue-wise, for Q2, and the Lee Cooper portion, which is a non-gain transaction, wait until Q3. This is because the structure of the Lee Cooper transaction is not an amendment to an existing JV."

Q. Mr. Horowitz, what are you talking about there?

A. I'm giving Neil an undate on a conversation that I had with GBG and the timing of the SE -- the southeast Asia JV.

Q. And you say "bottom line is that we may complete only part of the total transaction." What are you referring to there?

A. Again, I'm referring to the Korea and additional brands for Europe and not Lee Cooper.

Q. And you say 15 million gain/revenue for Iconix in Q2, what are you saying there?

LA6PCOL5    Horowitz - Direct    Page 146

A. I believe, at this point, we had discussed with GBG the potential of letting them out of the Rocawear Kids' agreement in exchange for increased price; although, I'm not certain.

Q. Mr. Charalambous, you can take that down.

And can we look, just for the parties and for the witness, at Government Exhibit 1042, please.

Mr. Horowitz, do you recognize this as an e-mail from yourself to David Maslaton dated June 17th, 2014?

A. Yes, the middle section, yes.

MR. HARTMAN: The government offers Government Exhibit 1042.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1042 received in evidence)

BY MR. HARTMAN:

Q. And, Mr. Charalambous, can you put this up, please?

Mr. Horowitz, could you read the text of your e-mail, please?

A. "David, per my conversation with Neil this afternoon, we should sit down in the a.m. so I can walk you through the movement on strategic initiatives and their timing so we can have new models for Thursday's meeting. Best, Seth."

Q. Mr. Horowitz, you told us earlier who David Maslaton was but can you remind us?

A. Sure. David Maslaton was a member of the Iconix finance

LA6PCOL5    Horowitz - Direct    Page 147

team and was the keeper of these financial forecasts.

Q. So the opportunities and risks spreadsheets that we've been looking at?

A. Yes.

Q. Mr. Horowitz, what did you mean when you said "per my conversation with Neil, we should sit down so I can walk you through the movement on strategic initiatives"?

A. The only person that could give David direction on making changes to the financial forecast was Neil; so I wanted to be clear that what I was going to tell him was directly -- was coming directly from Neil, and that there was going to be changes based on updates to the opportunities and risks section for our Thursday meeting.

Q. What changes were you expecting to be made to the model?

A. I believe there were eventually two changes, one was that there was a new sale of IP, and the other was an increased price in the Southeast Asia joint venture.

Q. Mr. Charalambous, you can take that down. And can you please show to the witness and for the parties what's been marked for identification as Government Exhibit 235, please.

Mr. Horowitz, is this an opportunities and risks spreadsheet dated June 19th, 2014?

A. Yes, it is.

MR. HARTMAN: The government offers Government Exhibit 235.

LA6PCOL5    Horowitz - Direct    Page 148

MR. REISNER: No objection.

THE COURT: 235 will be received.

(Government's Exhibit 235 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, this is looks like two days after the e-mail we just looked at; is that right? I think that was June 17th?

A. This is June 19th.

Q. So at this point, what is being projected for the revenue associated with the Li & Fung JV?

A. $13.6 million.

Q. And why is the -- what was the number that we previously saw on this spreadsheet for that JV?

A. I don't remember, about ten-and-a-half million dollars, $10.4 million.

Q. What's the reason for the change?

A. The purchase price for this joint venture has increased by $5 million.

Q. Okay. Let's look down at the bottom of this section, and can you point us to how you know that?

A. The Korea section of the bottom chart has gone from $3.3 million to $8.3 million.

Q. And what's the reason for that change?

A. GBG has agreed to pay $5 million more for the joint venture.

Q. So the joint venture interest in Korea was previously

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 6, 2021

LA6PCOL5        Horowitz - Direct        Page 149

contemplated to be sold for $3.3 million, and it is now being contemplated to be sold for $8.3 million; is that right?

A. That is what this spreadsheet reflects. I believe that the -- it was looked at more in totality. So it looked at a $10.9 million combined purchase price that GBG agreed to pay $15.9 million, or a $5 million increase on it.

Q. Okay. You told us earlier that a $10.9 million purchase price implied a total value of the IP in the region of $20 million; is that right?

A. That's correct.

Q. And so what does a $15 million purchase price imply in terms of the value of the IP in the region?

A. It would value the IP at $30 million.

Q. So an increase from 20 million to 30 million; is that right?

A. That is correct.

Q. To your knowledge, Mr. Horowitz, was there any analysis done to conclude that the value of the IP should increase by 50 percent in the region?

A. No.

Q. To your knowledge, Mr. Horowitz, was there any analysis done to support a $30 million valuation?

A. No.

Q. What was the reason for the change in the purchase price of the JV?

LA6PCOL5        Horowitz - Direct        Page 150

A. The purchase price of the JV changed because Iconix assured GBG that it would get the $5 million back to them.

(Continued on next page)

LA6MCOL6        Horowitz - Direct        Page 151

Q. Now, on the revenue line associated with the Li & Fung joint venture, the number that's reported there is 13.6 million.

Do you see that?

A. I do.

Q. I think the number that we saw before was 10 point something million. Is that your recollection as well?

A. Yes.

Q. So that's a difference of about $3 million. I think you told us the increase in that purchase price was $5 million. Can you explain why those two things are different?

A. Yes. At this point there has been a cost basis added to Europe down at the bottom of the spreadsheet. If you look at Europe New, the purchase price is still 7.6 million, and now you will see a negative of 1.8 million. That's on the cost basis. So in order to form a revenue or revenue gain for Iconix, you need to take the purchase price minus the cost basis which has now been added.

Q. Now, you told us that Mr. Cole and you had discussed increasing the purchase price of this JV interest in exchange for releasing Li & Fung from this Rocawear Kids obligation, is that right?

A. That's correct.

Q. Is that ultimately what happened?

A. No, it is not.

LA6MCOL6        Horowitz - Direct        Page 152

Q. What happened?

A. Iconix agreed -- Iconix and GBG agreed that GBG would pay $5 million more for the joint venture in exchange of Iconix paying them back at a later date.

Q. How much?

A. $5 million.

Q. How did you learn about this agreement?

A. I was called into Neil's office, at which point he told me that he had gotten GBG to agree to a $5 million increase in the price in exchange for paying them back in some type of marketing fees in the future.

He instructed me to go tell Lauren Gee, who was the attorney who was working on the documents, of the increased purchase price and to make no mention of our $5 million commitment back.

Q. Did you find it remarkable that he told you to make no mention of the $5 million commitment?

A. I had mixed emotions at the time. I was excited that we were going to hit our quarterly numbers. I felt like Neil was bringing me into his inner circle in trusting me, and, at the same time, I was a little shaken that I was about to omit something that I knew was important.

Q. Why were you shaken about that?

A. Because the only reason why the increase in price was happening is because we were promising to give that money back,

# A-110

| LA6MCOL6 | Horowitz - Direct | Page 153 |
| --- | --- | --- |

and by leaving that out it was wrong.  It was inaccurate.

Q.  Did you have an understanding about whether the $5 million giveback would be disclosed to Iconix's investors?

A.  I did not believe that it would be.

Q.  And why is that?

A.  Because I was told to keep it from our attorneys.

Q.  Did you have an understanding about whether it would be disclosed to Iconix's auditors?

A.  I did not anticipate it being shared with anybody, anybody else.

Q.  Did you do what Mr. Cole told you?

A.  I did.

Q.  Describe what you did.

A.  I left Neil's office and walked directly to Lauren Gee's cubicle and informed her that the price for the joint venture was going to go up by $5 million, asked her to make the change, and she replied that the document was -- that it was GBG's turn to send us back the documents, and we would wait to see what we got back from them.

Q.  What happened after that?

A.  We received a turn of the document or the document redlined back from GBG reflecting the $5 million increase in price.

Q.  Did you tell Mr. Cole that the documents were with GBG, as opposed to with Iconix?

A.  I did.

| LA6MCOL6 | Horowitz - Direct | Page 154 |
| --- | --- | --- |

Q.  What did he say in response?

A.  Let's see what they put in.

Q.  What did he understand to be referencing when he said that?

A.  The $5 million increase in price and whether or not they would make mention of the $5 million commitment back.

Q.  When you got the documents back, was there mention of the $5 million commitment?

A.  There was not.

MR. HARTMAN: Mr. Charalambous, can you put up for the witness and for the parties what's been marked for identification as Government Exhibit 1044.

Q.  Mr. Horowitz, is this an e-mail from a lawyer at Mayer Brown to a number of folks, including yourself?

A.  Yes, it is.

Q.  And is the date of this June 25, 2014?

A.  Yes, it is.

MR. HARTMAN: The government offers Government Exhibit 1044.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1044 received in evidence)

MR. HARTMAN: Mr. Charalambous, keep that up, please.

Mr. Charalambous, can you zoom out and show us the body of the e-mail, please.

Q.  Mr. Horowitz, just generally, what's being conveyed here?

| LA6MCOL6 | Horowitz - Direct | Page 155 |
| --- | --- | --- |

A.  That this is a turn of the documents that incorporates new changes to it.

Q.  Mr. Stevens, the sender, works for a law firm Mayer Brown.

Do you know who they represent in the transaction?

A.  They represent GBG.

MR. HARTMAN: Mr. Charalambous, can you please show us page 8.  Can we zoom in on the paragraph that says Iconix and LF acknowledge and agree.

Q.  Mr. Horowitz, what's being shown here?

A.  That the purchase price for the joint venture has increased by $5 million.

Q.  Mr. Horowitz, to your knowledge, is there anywhere in these documents that the $5 million giveback is disclosed or referenced?

A.  No.

Q.  The increase in the purchase price of $5 million, there is also a change with respect to what's described as the fair market value of the licenses.

Do you see that?

A.  Yes.  The fair market value of the IP.

Q.  And what's the change there?

A.  The change is an increase from 21.8 million to 31.8 million.

Q.  Do you have any understanding about why that change was made?

| LA6MCOL6 | Horowitz - Direct | Page 156 |
| --- | --- | --- |

A.  Only to reflect the increase in price from 10.9 million to 15.9 million.

Q.  Again, are you aware of any valuation work that was done to arrive at a $31 million valuation for this IP?

A.  No.

Q.  In any of your conversations with anyone at Li & Fung, did anyone from that side agree that the IP was worth $31 million?

A.  No.

Q.  What was your understanding about why Li & Fung agreed to pay $15 million for their interest?

A.  They agreed to pay $15.9 million for their interest because they were going to get $5 million back.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Can we see, just for the witness and the parties, Government Exhibit 1046.

Q.  Mr. Horowitz, is this an e-mail you sent to Mr. Cole on June 29 of 2014?

A.  It is.

MR. HARTMAN: The government offers Government Exhibit 1046.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1046 received in evidence)

Q.  Mr. Horowitz, can you read the top part of the e-mail,

LA6MCOL6  Horowitz - Direct  Page 157

please.

A. Sure. Per the e-mails below, the LF docs are signed and wire transfer will happen from New York first thing in the a.m. I will continue to follow up to make sure we get the signature pages and wire in the a.m.

Q. Why are you sending this e-mail to Mr. Cole?

A. Because it's critical that we get the signatures and wire transfer before the end of the quarter.

Q. Why is that?

A. We need this revenue to meet our financial goals for the quarter.

Q. Is this a reference to the SEA-2 transaction?

A. Yes, it is.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Mr. Charalambous can you put up for the witness and for the parties what's been marked for identification as Government Exhibit 210.

Q. Mr. Horowitz, do you recognize this as the final letter agreement related to this transaction?

MR. HARTMAN: Mr. Charalambous, why don't you show Mr. Horowitz the last page.

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 210.

LA6MCOL6  Horowitz - Direct  Page 158

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 210 received in evidence)

MR. HARTMAN: Can we show that to the jury, please.

Q. Mr. Horowitz, is this one of the deal documents that were executed in connection with the SEA-2 transaction?

A. Yes, it is.

Q. What was the purchase price that Li & Fung agreed to pay at the end?

A. $15.9 million.

Q. Who signed this document?

MR. HARTMAN: Mr. Charalambous, can we see page 3.

Q. Who signed on behalf of Iconix?

A. Neil Cole.

Q. Is that Mr. Cole's signature there?

A. It is.

MR. HARTMAN: Can we see the next page, please, Mr. Charalambous.

Q. Who signed on behalf of GBG?

A. Jason Rabin.

Q. I'm sorry. Li & Fung here.

A. Jason Rabin.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Could we see Government Exhibit 103, which I believe

LA6MCOL6  Horowitz - Direct  Page 159

is already in evidence.

Mr. Charalambous, can we see page 13 of this document. Can you zoom in on the paragraph at the top.

Q. Mr. Horowitz, can I ask you to read this paragraph again, please.

A. In June 2014, the company contributed substantially all rights to its wholly-owned and controlled brands in the Republic of Korea, and its Ecko, Zoo York, Ed Hardy, and Sharper Image brands in the European union and Turkey, in each case, to Iconix SE Asia. In return, LF Asia agreed to pay the company $15.9 million, of which $4 million was paid at closing. As a result of this transaction, the company recorded a gain of $13.6 million in the current quarter, which is included in licensing and other revenue in the unaudited condensed consolidated income statement.

Q. Mr. Horowitz, what document is this from?

A. This is from the 10-Q.

Q. Mr. Horowitz, is there any reference in this paragraph to the commitment to return $5 million to Li & Fung?

A. No, there is not.

Q. Was that an important part of the transaction, from your understanding?

A. Yes, it was.

Q. Why?

A. Because it was the sole purpose for Li & Fung agreeing to

LA6MCOL6  Horowitz - Direct  Page 160

pay 15.9 instead of 10.9 million.

Q. Without that commitment, what was Li & Fung willing to pay for the interest?

MR. REISNER: Objection. Foundation.

THE COURT: You want to ask another question, Mr. Hartman?

MR. HARTMAN: Sure.

Q. Mr. Horowitz, what were they telling you they were willing to pay for the interest?

A. $10.9 million, approximately.

Q. I think we saw some e-mails from earlier indicating that they were trying to get it lower than that even, is that right?

A. That is correct.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Let's look at Government Exhibit 1028, please, which I think is already in evidence.

Q. Mr. Horowitz, we saw this e-mail earlier. Mr. Cole sends an e-mail to Mr. Rabin and Mr. Margolis asking to discuss Europe, Korea, and China.

Have we talked about Europe and Korea already?

A. Yes, we have.

Q. What transactions does that relate to?

A. The Southeast Asia transaction in June of 2014.

Q. So that's what we have been calling Southeast Asia-2, is

# A-112

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 6, 2021

LA6MCOL6    Horowitz - Direct    Page 161

that right?

A. That's correct.

Q. The reference to China, do you know what that is a reference to?

A. It's in reference to a potential joint venture or different partnerships in China, including the potential for Umbro.

MR. HARTMAN: Let's take this down.

Mr. Charalambous, can you please put up for the witness and for the parties what's been marked for identification as Government Exhibit 1047.

Q. Mr. Horowitz, do you recognize this as an e-mail that you sent to Mr. Margolis on July 28 of 2014?

A. I do.

MR. HARTMAN: The government offers government Exhibit 1047.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1047 received in evidence)

Q. Mr. Horowitz, can you read the subject line, please.

A. China Umbro and LC.

Q. What's this a reference to?

A. A potential joint venture with GBG in China for the Umbro and Lee Cooper brands.

Q. On the cc line there is two people that I don't think we have talked about, Ethan Cole and Maurice Sasson. Can you tell

LA6MCOL6    Horowitz - Direct    Page 162

us who these people are?

A. Sure. Ethan Cole worked as a member of the GBG team. I believe he worked directly for Jared. And Maurice Sasson was an employee at Iconix working in the business development -- working on the business development team and started to facilitate with some of the joint venture transactions.

Q. What's the date of this e-mail?

A. 7/28/2014.

Q. What quarter are we in at this point?

A. We are now in the third quarter.

Q. Remind us when the third quarter closes.

A. It closes at the end of September.

Q. Can you read the body of your e-mail.

A. Jared, attached is a term sheet that should reflect our most recent conversation. The purchase price went up to 15.15, from 15, for reasons I can explain. It contemplates cost basis and getting the guarantee you requested. Please let me know if this term sheet is acceptable, and then we can lay out next steps to get this completed.

MR. HARTMAN: Can we look at the attachment, please.

Q. Mr. Horowitz, what's this document that's attached?

A. It's an outline of the terms of a joint venture.

Q. What's the joint venture that's being contemplated here?

A. It's a joint venture for the Umbro and Lee Cooper brands in China.

LA6MCOL6    Horowitz - Direct    Page 163

Q. It says here: Iconix SEA Unlimited will be amended, consisting of IP and the territories for the Umbro and Lee Cooper brands.

What's the structure that's being discussed here?

A. There will be another amendment to the Southeast Asia agreement.

Q. If I talk about this transaction as SEA-3, will you understand what I mean by that?

A. Yes.

Q. Can you read the section that says purchase terms.

A. The purchase price will be U.S. $15.5 million, payable 20 percent up front and 20 percent on each of the first, second, third, and fourth-year anniversaries of the effective date.

Q. Can you read the guarantee distribution section, please.

A. Iconix will guarantee a minimum of $1 million of profit distribution in 2014 and $3 million of profit distribution in 2015 to GBG. Any payments of service fees will be credited towards these numbers.

Q. Previously we were talking about the counterparty as being LF Asia or Li & Fung. Here it's a reference to GBG. Why is that?

A. I believe at this point GBG is formed as a public entity on its own, although we would continue in conversation to use those terms interchangeably.

Q. Are the players the same, from your perspective?

LA6MCOL6    Horowitz - Direct    Page 164

A. Yes.

Q. What is being referenced here in this guarantee distribution section?

A. Once again, if the joint venture did not result in a profit in this case of a million dollars for GBG in 2014, then Iconix would guarantee the difference. So if the joint venture generated 1.2 million for GBG, Iconix would not owe GBG anything. But if the joint venture only generated $500,000 of profit for GBG, Iconix would owe them the other $500,000.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Can you show just for the parties what's been marked for identification as Government Exhibit 1052.

Q. Mr. Horowitz, do you recognize this as an e-mail you sent Mr. Cole on August 5 of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1052.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1052 received in evidence)

MR. HARTMAN: Mr. Charalambous, can you put that up for the jury.

Q. Mr. Horowitz, can you read the first two bullet points here.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

| LA6MCOL6 | Horowitz - Direct | Page 165 |
| --- | --- | --- |

A. No. 1. The Win Hanverky call went very well. They would like to be our JV partner but need to make sure economics make sense to their board. We, the CEO and I, are discussing meeting in Manchester as early as next week. He has not been there and would like to see our operation. If not next week, it may have to be first week of September. I can fly in and out in a day.

Q. Can you read the second bullet point.

A. 2. In the interim, we are working with GBG with a goal of closing end of August. I have not mentioned the Rocawear Kids component until we agree it is the right move.

Q. Taking these points together, can you explain what you're telling Mr. Cole here?

A. I'm telling him that we are simultaneously negotiating with two different parties for a joint venture in China. In the case of GBG, there is a Rocawear Kids component.

Q. Explain that.

A. At this point, GBG has still expressed that they would like out of the Rocawear Kids commitment to Iconix, and Neil and I have yet to discuss, and I've yet to be given direction on what we want to do about that.

Q. How does that relate to the potential transaction in China?

A. If we are going to let GBG out of their Rocawear Kids commitment, we would increase the purchase price of the joint venture in this transaction by the same amount.

| LA6MCOL6 | Horowitz - Direct | Page 166 |
| --- | --- | --- |

Q. When you say, until we agree that it's the right move, what are you referring to there?

A. I'm referring to two things. One is, can we replace the Rocawear revenue in order to avoid impairment and, two, do we need the incremental revenue Iconix in this quarter.

Q. Was that something you wanted to discuss with Mr. Cole?

A. Yes.

Q. Over the course of the next several months, did you discuss those things with Mr. Cole?

A. Yes.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Can we see, just for the witness and for the parties, what's been marked for identification as Government Exhibit 1054.

Q. Mr. Horowitz, do you recognize this as an e-mail exchange between you and Jared Margolis at GBG?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 1054.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1054 received in evidence)

Q. Mr. Horowitz, the date of this exchange is August 5 of 2014. Could you start by reading your e-mail to Mr. Margolis

| LA6MCOL6 | Horowitz - Direct | Page 167 |
| --- | --- | --- |

at the bottom of the page.

A. We will have the amendment ready by end of the week. Should we get together with Jason and Neil to discuss Rocawear Kids. Best, Seth.

Q. When you say the amendment, what are you referring to?

A. The Southeast Asia amendment.

Q. The subject line in the e-mail says China update LC and Umbro.

What does that refer to?

A. The joint venture that we will be forming through the Southeast Asia amendment, for both Lee Cooper and Umbro in China.

Q. You say: Should we get together with Jason and Neil to discuss Rocawear Kids.

Do you see that?

A. Yes, I see that.

Q. What is that a reference to?

A. That's in reference to the potential increase in joint venture price, as well as letting them out of their Rocawear Kids obligation.

Q. Mr. Margolis responds. What does he say?

A. Meeting with Jason in the a.m. on amendment. Yes, let's shoot for meeting with Jason and Neil on Thursday. Best regards.

Q. So this is August the 5th, is that right?

| LA6MCOL6 | Horowitz - Direct | Page 168 |
| --- | --- | --- |

A. Yes.

Q. What day of the week is that?

A. That's a Tuesday.

Q. What would Thursday be?

A. August 7.

MR. HARTMAN: Mr. Charalambous, you can take this down and please show for Mr. Horowitz and the parties what's been marked as Government Exhibit 1056.

Q. Mr. Horowitz, do you recognize this as an e-mail exchange you had with Mr. Cole on August 7 of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1056.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1056 received in evidence)

MR. HARTMAN: You can put that up, please, Mr. Charalambous.

Q. Mr. Horowitz, could you read your e-mail to Mr. Cole on August 7.

A. Believe we have an interesting way of working out Rocawear Kids and other issues. I'm meeting with Rabbi Shiff now and will be in the office before 9. Can we meet and discuss prior to heading over.

Q. The subject line here is what?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 6, 2021

LA6MCOL6     Horowitz - Direct     Page 169

A. GBG.

Q. What were you asking Mr. Cole to meet about?

A. Whether or not we were going to let GBG out of the Rocawear Kids agreement and any of the conditions and terms around payments for the joint ventures in exchange for that.

Q. Did you meet with Mr. Cole?

A. I believe that I did.

Q. What was that meeting in anticipation of?

A. That was in anticipation of a meeting with GBG.

Q. To the best of your recollection, did that meeting happen as well?

A. Yes.

Q. Where was that meeting?

A. I believe this meeting was at GBG.

Q. At some point around this time period did you have conversations with GBG about their desire to be released from the Rocawear Kids agreement?

A. Yes.

Q. And did they link that desire to their willingness to do a China deal?

A. Yes.

Q. Can you describe those conversations.

A. GBG continued to express that they wanted out of their Rocawear Kids agreement and how they were getting killed on it. We wanted to do the joint venture in China with Umbro and Lee

LA6MCOL6     Horowitz - Direct     Page 170

Cooper, as I believe they did, too. They were looking for a way out of the Rocawear Kids agreement and were willing to pay more for the joint venture in order to get out of that agreement.

Q. Did Mr. Cole discuss GBG's desire to get out of the agreement with you?

A. Yes.

Q. Specifically, did he link it to any internal financial considerations at GBG?

MR. REISNER: Objection. Leading.

THE COURT: Overruled.

A. Yes. Mr. Cole and Neil expressed to me that it was going to be harder to do deals with GBG because they now had the same pressures on them as a public company as we did. As he told me, in the past, they would be willing to pay more for joint ventures, as long as we got the money back or something back in exchange. Now they needed revenue. They needed a reduction in expenses the same as us, so it was going to be more difficult for us to do transactions that were helpful for both parties.

Q. Do you remember where you were when you had this conversation with Mr. Cole?

A. Yes.

Q. Where were you?

A. We were leaving the GBG offices and got into his car and continued the conversation in Neil's car.

LA6MCOL6     Horowitz - Direct     Page 171

MR. HARTMAN: Mr. Charalambous, you can take that down, and please show for Mr. Horowitz and for the parties what's marked as Government Exhibit 1058.

Q. Mr. Horowitz, do you recognize this as an e-mail exchange that you had with Mr. Cole on August 14 of 2014?

A. It looks like an exchange between August 13 and August 14.

Q. Do you recognize this as being an exchange that you had with him around that time?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 1058.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1058 received in evidence)

Q. Mr. Horowitz, can you read the portion of the e-mail at the bottom, please, first.

First of all, this is an e-mail from Mr. Margolis to you, is that right?

A. That is correct.

Q. And the subject line is Umbro/LC China?

A. Correct.

Q. What's this in reference to?

A. The potential joint venture in China for Umbro and Lee Cooper.

Q. The date of this e-mail is August 13, is that right?

LA6MCOL6     Horowitz - Direct     Page 172

A. That is correct.

Q. Can you read the text.

A. Jason and Dow on board. Meeting with Bruce to get sign-off on Monday. Let me know when we can catch up. Best regards.

MR. THOMAS: Can you zoom out, please, Mr. Charalambous.

Q. Mr. Horowitz, did you forward this e-mail from Mr. Margolis to Mr. Cole?

A. I did.

Q. Can you please read what you said when you forwarded it.

A. Per below, looks like GBG wants to move forward with Umbro and LC in China.

Spent a lot of time with Allyson on Rocawear Kids model today. Believe we should not go forward with taking this back. Also believe we need to start smaller with Ed Hardy and Rainbow. We should start kids division with Jonathan Cohen, with Ecko Unlimited and Ed Hardy. Then be prepared to take over Rocawear Kids, if necessary, at end of GBG term through 2015. We will walk you through the logic and model. With so much uncertain, terms of transition, fixtures, etc., believe we can avoid having a problem with GBG if we don't move forward on Roc kids. Will remain silent with them on all of this until we discuss. Hope you're having a great trip. Best, Seth.

Q. The first sentence says: Per below, looks like GBG wants to move forward with Umbro and LC in China.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

LA6MCOL6     Horowitz - Direct     Page 173

What's that a reference to?

A. The joint venture for the Umbro and Lee Cooper brands in China.

Q. The next sentence says: We spent a lot of time with Allyson on Rocawear Kids model today. Believe we should not go forward with taking this back.

What do you telling Mr. Cole there?

A. I am telling Neil that we should not allow GBG to get out of its commitment to us for Rocawear Kids.

Q. Why were you telling him that?

A. Because the business would be very difficult to relicense, and we needed that guaranteed revenue for Rocawear.

Q. For what reason?

A. To avoid impairment on a significant asset of Iconix.

Q. The last sentence or the last two sentences say: With so much uncertain, terms of transition, fixtures, etc., believe we can avoid having a problem with GBG if we don't move forward on Roc kids. Will remain silent with them on all of this until we discuss.

What are you saying there?

A. There were negotiations around the terms of a transition from GBG as a Rocawear licensee to a potential new licensee, and it's very messy. There is product that needs to be bought and sold between the two parties, there are orders from retailers that need to be shipped from different locations, a.

LA6MCOL6     Horowitz - Direct     Page 174

Transition from one licensee to another is a very detailed oriented difficult thing to pull off.

So what I am expressing to Neil is that I do believe GBG will go forward with the joint venture for Umbro and Lee Cooper in China without letting them out of the Rocawear Kids agreement at this time, and that I won't say anything to them until we discuss it further.

Q. Why are you saying that?

A. Because I was taking Neil's direction on all of this.

MR. HARTMAN: Mr. Charalambous, can you zoom out and zoom in on Mr. Cole's response.

Q. Mr. Horowitz, can you please read what Cole says in response.

A. Let's discuss tomorrow. Will be tough to do China without Roc kids, but agree the risk is huge on both Roc kids and Ed Hardy/Rainbow.

Q. Mr. Horowitz, what do you understand Mr. Cole to mean when he says, it will be tough to do China without Roc kids?

A. He is saying that GBG may not be willing to do the joint venture in China without us letting them out of the Rocawear Kids agreement.

Q. Just to be clear, did the Rocawear Kids agreement have anything to do with the China JV on its terms?

A. No.

Q. What do you understand him to be saying here?

LA6MCOL6     Horowitz - Direct     Page 175

A. That GBG would prefer to pay more for the joint venture and let them out of the Rocawear Kids agreement than just do the China joint venture without the increase in price and letting them out of the Rocawear Kids agreement.

Q. Did you have an understanding of why that was?

A. I did. And it was because GBG was losing money in the Rocawear Kids agreement and wanted out of it.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Can we see, just for the witness and the parties, what's been marked for identification as Government Exhibit 1062.

Q. Mr. Horowitz, do you recognize this as an e-mail that you sent to Jared Margolis at GBG on August 18, 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1062.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1062 received in evidence)

Q. Mr. Horowitz, can you read the body of the e-mail, please.

A. Jared, good morning. Attached please find initial drafts of the SEA China amendment documents, including the (1) second amended and restated shareholders agreement; (2) second amendment to the master license agreement; and (3)

LA6MCOL6     Horowitz - Direct     Page 176

consideration side letter. Best, Seth.

MR. HARTMAN: Mr. Charalambous, can we see the first page of the attachment, please. Can you zoom down.

Q. Mr. Horowitz, as of this set of documents being circulated, which is August 11, what's the contemplated purchase price for the joint venture?

A. The contemplated purchase price is $15.5 million.

Q. What is the value of the marks in China as a whole?

A. $31 million.

MR. HARTMAN: Mr. Charalambous, can you please put up for the witness and for the parties what's been marked as Government Exhibit 250, please.

Q. Mr. Horowitz, do you recognize this as a P&L spreadsheet dated August 19, 2014?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 250.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 250 received in evidence).

Q. Mr. Horowitz, this is August 19, 2014, which is, I think, the day after the e-mail we just looked at.

At the time of this spreadsheet can you tell us how much revenue Iconix was projecting from the China joint venture?

# A-116

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 6, 2021

| LA6MCOL6 | Horowitz - Direct | Page 177 |
| --- | --- | --- |

A. Iconix was projecting $12.5 million of revenue.

Q. How much in terms of earnings was it projecting from that joint venture, earnings per share?

A. Iconix was expecting 20 cents from that transaction.

Q. What was Iconix projecting as far as its organic revenue at this point?

A. Without any of the opportunities or risks, Iconix was projecting $93 million of revenue.

Q. How did that compare to the same quarter in 2013?

A. It was approximately $14 million short.

Q. Is that the difference between 107 and 93 million?

A. Yes.

Q. What was the EPS that Iconix was projecting as of this date?

A. Forty cents.

Q. How did that compare to the prior year's quarter?

A. It was approximately 19 cents short.

Q. What was the revenue that Wall Street analysts were expecting for Iconix in this quarter?

A. Analysts were expecting approximately $111 million of revenue.

Q. What were they expecting in terms of earnings?

A. Sixty-two cents.

Q. So based on these projections, would Iconix meet these numbers without some of these transactions in the middle of the

| LA6MCOL6 | Horowitz - Direct | Page 178 |
| --- | --- | --- |

page here?

A. No, they would not.

Q. Would the Umbro China transaction or the SEA-3 transaction alone allow Iconix to meet its numbers at this point in the quarter?

A. From a revenue perspective, no, it would not, and from an EPS perspective, no, it would not.

Q. Explain to us how you get there.

A. I took the $93 million of Q3 forecasted revenue and added the 12.5, which gets me to approximately 105, almost 106 million, which is short of the 107 million from the prior year and short of the 111.7 from the consensus revenue. I did a similar calculation for EPS. The forecast is currently at 40 cents. The Umbro China transaction is anticipated for a 20-cent gain, which gets the company to 60 cents, which would beat last year's quarter by one penny and fall short of the consensus.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Can you please show for the witness and for the parties what's been marked for identification as Government Exhibit 1063.

Q. Mr. Horowitz, do you recognize this as an e-mail that you sent Mr. Cole on August 18, 2014?

A. Yes, I do.

| LA6MCOL6 | Horowitz - Direct | Page 179 |
| --- | --- | --- |

MR. HARTMAN: The government offers Government Exhibit 1063.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1063 received in evidence)

MR. HARTMAN: Mr. Charalambous, can you put that up for the jury, please. Can we look at the attachment. Let's zoom in on the first paragraph there, business development.

Q. Mr. Horowitz, can you just read what it says under business development, China Umbro?

A. Business development, China Umbro. Both Jason and Jared called me to tell me GBG would like to complete the transaction for LC and Umbro in China. Jason had an additional ask on a plug number of $2 million for this year versus $1 million that we had agreed to.

Q. Then underneath what does it say?

A. GBG DOCS are complete and sent out to GBG.

Q. The reference to a plug number, what do you understand that to be?

A. The plug number is the guaranteed distribution of profit to GBG.

Q. What are you telling Mr. Cole here?

A. That we had initially agreed to guarantee them a million dollars in profit and now -- in year one. Now they are asking for $2 million.

| LA6MCOL6 | Horowitz - Direct | Page 180 |
| --- | --- | --- |

MR. HARTMAN: Mr. Charalambous, can you zoom out, please, and zoom in on the section that says GBG. You can take that whole thing. That's fine.

Q. Mr. Horowitz, this section says GBG. What's the first point here?

A. The first point, which states: $5 million of current marketing liabilities.

Q. What's that a reference to?

A. That refers to the $5 million we owe them from the June joint venture.

Q. When you say you owe them, what do you mean by that?

A. They paid $5 million more for the joint venture in June with our assurance of our paying them back $5 million. We need to discuss how we are going to get them back the $5 million.

Q. At this point did you have any agreement with Mr. Cole about how to get that money back to GBG?

A. Not other than loosely calling it marketing liabilities or marketing obligations.

Q. No. 2 says: 15.5 value of 50 percent of Lee Cooper and Umbro in China.

What is that a reference to?

A. That's the agreed-upon price for the joint venture for Lee Cooper and Umbro in China.

Q. And then you No. 3 says: Desire to terminate Rocawear Kids. Then it says: 2.5M guarantee for back half of 2014,

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                           October 6, 2021

LA6MCOL6                                                            Page 181

3.5M guarantee for '15, 2.2M in fixtures on our books. Can you explain what that is?

A. Sure. The 2.5 million guarantee and the 3.5 million dollar guarantee, or the total of $6 million of guarantee, is what GBG contractually owes to Iconix for their Rocawear Kids license. The $2.2 million in fixtures is what Iconix paid to GBG for the build-out of the Rocawear Kids showroom at their headquarters.

Q. When was that?

A. That was concurrent with the renewal of the Rocawear Kids license by GBG.

Q. Why are you grouping these all together here?

A. Because if we allow GBG to terminate their Rocawear Kids agreement or if we terminate their Rocawear Kids agreement, we would lose the $2.5 million in the back half of the current year, we would lose the $3.5 million in 2015, and we could potentially have to write off or lose another $2.2 million in what we are carrying as our costs for the showroom.

MR. HARTMAN: Judge, I was going to move on to the next section, which is about a call, but I see we are short on time. Would you like me to go forward?

THE COURT: No. It's about two minutes before 2:40, so we can break for the day.

Ladies and gentlemen, that brings us to the end of today, anyway. Please be careful getting home.

Please do endeavor to be in the jury room by no later

LA6MCOL6                                                            Page 182

than 9:20 or so so you can have a cup of coffee and a snack and be ready to come out at 9:30. Please do not discuss the case.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down. Everyone can be seated.

My recommendation is that we meet tomorrow to discuss the government's motion.

I take it that you are not that close to finishing, Mr. Hartman, with this witness?

MR. HARTMAN: That's right, your Honor. I think it will be most of tomorrow.

THE COURT: Let's meet tomorrow at 9.

Is there anything else that we should discuss this afternoon?

MR. HARTMAN: No, your Honor.

THE COURT: Let me just see the lawyers very briefly at sidebar, off the record.

(At the sidebar; discussion off the record)

THE COURT: Have a good night, everyone.

(Adjourned to October 7, 2021, at 9:00 a.m.)

Page 183

INDEX OF EXAMINATION

Examination of:                                        Page
SETH HOROWITZ
Direct By Mr. Hartman  . . . . . . . . . . . . . .59

GOVERNMENT EXHIBITS

Exhibit No.                                        Received
102  . . . . . . . . . . . . . . . . . . . . . .80
115  . . . . . . . . . . . . . . . . . . . . . .90
115A through D  . . . . . . . . . . . . . . . .90
103  . . . . . . . . . . . . . . . . . . . . . .96
234  . . . . . . . . . . . . . . . . . . . . . 104
1028  . . . . . . . . . . . . . . . . . . . . . 112
1032  . . . . . . . . . . . . . . . . . . . . . 114
1031  . . . . . . . . . . . . . . . . . . . . . 116
1035  . . . . . . . . . . . . . . . . . . . . . 118
1208  . . . . . . . . . . . . . . . . . . . . . 122
1036  . . . . . . . . . . . . . . . . . . . . . 123
1037  . . . . . . . . . . . . . . . . . . . . . 125
1038  . . . . . . . . . . . . . . . . . . . . . 128
1247  . . . . . . . . . . . . . . . . . . . . . 139
1039  . . . . . . . . . . . . . . . . . . . . . 142
1041  . . . . . . . . . . . . . . . . . . . . . 145
1042  . . . . . . . . . . . . . . . . . . . . . 146
235  . . . . . . . . . . . . . . . . . . . . . 148
1044  . . . . . . . . . . . . . . . . . . . . . 154

Page 184

1046  . . . . . . . . . . . . . . . . . . . . . 156
210  . . . . . . . . . . . . . . . . . . . . . 158
1047  . . . . . . . . . . . . . . . . . . . . . 161
1052  . . . . . . . . . . . . . . . . . . . . . 164
1054  . . . . . . . . . . . . . . . . . . . . . 166
1056  . . . . . . . . . . . . . . . . . . . . . 168
1058  . . . . . . . . . . . . . . . . . . . . . 171
1062  . . . . . . . . . . . . . . . . . . . . . 175
250  . . . . . . . . . . . . . . . . . . . . . 176
1063  . . . . . . . . . . . . . . . . . . . . . 179

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LA7MCOL1    Page 194

is certainly relevant to a witness' testimony and the Court wrote: Notably, several courts in this district have concluded that trial subpoenas seeking evidence for impeachment are permissible under Rule 17(c). So this threshold matter, the Court has ruled that Rule 17 subpoenas may be used to obtain impeachment material.

Then we turn to Rule 16, which governs the defense's discovery obligations, and Rule 16 only applies to documents that the defendant intends to introduce in his case in chief. Documents that are used for impeachment are not part of the defendant's case in chief.

There is no obligation that the defense turn over impeachment materials in advance of using those materials during cross-examination. The government simply doesn't want their witnesses to be surprised on cross-examination, but that's what cross-examination is for.

THE COURT: I'll take it under advisement, and we will await the jury.

Anything else that either party wanted to raise?

MR. HARTMAN: No, your Honor. Thank you.

MR. TARLOWE: Your Honor, we do have one additional matter to follow up on the discussion that we had in the jury room.

The bank records that were obtained --

MR. HARTMAN: If this is going to relate to the

---

LA7MCOL1    Page 195

discussion in the jury room, could we continue it in the jury room?

MR. TARLOWE: I am not going to reference the conduct that was discussed.

THE COURT: OK. Quickly.

MR. TARLOWE: We have identified a number of large cash withdrawals that were made by Mr. Horowitz out of his bank account, including, for example, a cash withdrawal of $27,000, as well as a series of cash withdrawals in amounts ranging from $8,000, $6,000, $8,000, $5,000. These cash withdrawals, some of them took place during the period of the charged conspiracy. We don't know what these cash withdrawals relate to, but it certainly raises suspicion.

So we have asked the government to ask Mr. Horowitz about these suspicious cash withdrawals because to the extent that they reveal other conduct, this conduct or conduct that has not been disclosed to the government in the course of his proffers, that, obviously, would be Giglio material. So we have requested that the government just inquire of Mr. Horowitz what these cash withdrawals relate to and then inform us of the answer to that. It seems like a pretty simple request. We just wanted to put on the record that we have made that request.

THE COURT: Very well. I think the jury is here. You want to knock on that door, Mr. Thomas.

---

LA7MCOL1    Horowitz - Direct    Page 196

MR. THOMAS: Yes, sir.

THE COURT: Do we have Mr. Horowitz?

(Jury present)

THE COURT: Ladies and gentlemen, good morning. I trust you had a pleasant evening, and thank you, as always, for being prompt. We greatly appreciate it.

We will now continue with the direct examination of Mr. Horowitz.

Mr. Horowitz, you are reminded that you are still under oath.

THE WITNESS: Thank you.

MR. HARTMAN: Mr. Charalambous, can you put back up Government Exhibit 1063, which is, I think, where we left off yesterday.

SETH HOROWITZ, resumed.

DIRECT EXAMINATION (cont'd)

BY MR. HARTMAN:

Q. Mr. Horowitz, is this an e-mail attaching your update from August 18 of 2014?

A. Yes, it is.

MR. HARTMAN: Can we see the attachment, please, Mr. Charalambous.

Q. Mr. Horowitz, just to recap, can you tell us what's being discussed in the first three bullet points here.

A. For clarity, are you looking at the two little i's, three

---

LA7MCOL1    Horowitz - Direct    Page 197

little i's.

Q. Under China Umbro.

A. Under China Umbro, that is a recap of where we stand with the potential joint venture with GBG and the two other partners.

Q. And this is the China joint venture, is that right?

A. That's correct.

Q. This ultimately happens in the third quarter of 2014, is that correct?

A. That is correct.

Q. It's described here as China Umbro. I think we saw some documents yesterday reflecting the negotiations. Is it just Umbro at this point?

A. No. The joint venture with GBG contemplated both Umbro and Lee Cooper.

Q. We talked about these brands. But what is Lee Cooper?

A. Lee Cooper is a denim brand, jeans brand out of the UK. For comparison, it's like the Wrangler of the UK.

Q. And Umbro, what is that?

A. Umbro is an international soccer football brand.

Q. You told us yesterday the sentence: Jason had an additional ask on a plug number of 2 million for this year versus the 1 million that we'd agreed to.

What is that a reference to?

A. That's in reference to the guaranteed distribution to GBG.

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7MCOL1    Horowitz - Direct    Page 198

If the licensing revenue or if the profitability of the joint venture did not get GBG the minimum of a million dollars, Iconix agreed to make that up. Jason was now asking for that number to be $2 million.

Q. Then it says GBG docs are complete and sent out to GBG, is that right?

A. That's correct.

Q. What are those docs that are being referenced there?

A. Those are the legal documents for the formation of the joint venture or the amendment to the existing joint venture.

MR. HARTMAN: Mr. Charalambous, can you zoom out, please. Could we look at the section that begins subsection B, GBG. Let's look at the first three points first.

Q. Mr. Horowitz, the first bullet point references 5 million of current marketing liabilities. What is that?

A. That is the $5 million that we owe to GBG in exchange for the $5 million increase in the June joint venture.

Q. So that's the SEA-2 joint venture that we have been talking about yesterday?

A. That's correct.

Q. What is a liability?

A. It's something that we owe them. We still have not gotten them back the $5 million.

Q. At this point had you decided with Mr. Cole how you were going to get them back the $5 million?

LA7MCOL1    Horowitz - Direct    Page 199

A. No.

Q. Bullet point II says: 15.5 million value of 50 percent of LC and Umbro in China.

What does that mean?

A. That means that GBG has agreed to a 15.5 million dollar purchase price for the joint venture in China.

Q. Is that the amount that was reflected in the deal documents that we looked at yesterday?

A. I believe it was.

Q. Point No. III says: Desire to terminate Rocawear Kids license and then there are three numbers below that. Can you explain what that is.

A. GBG has a desire to terminate their Rocawear Kids license and get out of the financial obligations that they have to Iconix. Below are the implications to Iconix if we were to let them out of the Rocawear Kids license. So GBG had a 2.5 million dollar guarantee to Iconix for the back half of 2014, so Q3 and Q4. They had a 3.5 million dollar guarantee for the next year, 2015. And the $2.2 million of fixtures is part of what Iconix contributed to the build-out of a showroom that would negatively or could potentially negatively impact Iconix's financials if we let them out of the Rocawear Kids agreement.

MR. HARTMAN: Mr. Charalambous, you can zoom out and let's go to the next section that says Jason call. Take that

LA7MCOL1    Horowitz - Direct    Page 200

whole section there.

Q. Mr. Horowitz, who is the Jason that's referenced here?

A. Jason Rabin.

Q. Remind us who he is.

A. He's a principal at GBG.

Q. What are you summarizing here?

A. I'm summarizing a phone call that I had with Jason.

Q. So the first bullet point says: He claims there is gross margin in the go-forward Rocawear Kids orders and that he is transferring to our new licensees and that they can't lose the volume and gross profit. Then there is some discussion here: I explained this business runs at a loss for him. If he was paying the markdowns on the orders he is transferring to new licensees, then you should keep the GM dollars. But, if not, it won't work. We ended you with both of us thinking more about it.

What are you telling Mr. Cole there?

A. That there is a negotiation around the terms of the Rocawear Kids termination. Again, Jason is claiming that there is a certain amount of sales that he has to retailers that he doesn't want to lose and that he makes money on those sales, which is only partially true.

With these retailers, when you sell them product, you also guarantee their margin. So after you sell them the product, if it doesn't make as much profitability as they

LA7MCOL1    Horowitz - Direct    Page 201

anticipated, the retailer anticipated, you are responsible to make up that difference. So Jason is asking for the good side, which is the sales and the profit, and not the bad side, which is -- or the negative side for him, which is paying royalty and having to pay markdowns.

Q. Why at this point are you discussing this termination with Mr. Rabin?

A. Because we are contemplating letting them out of their Rocawear Kids agreement.

Q. In what context?

A. In the context of either using part of that to repay the $5 million that we owe from the June joint venture or in exchange for an increase in price in the September joint venture.

Q. The next bullet point says: He says he needs 10 million and more, as he discussed with you.

First of all, when you say as he discussed with you, what is that a reference to?

A. That's in reference to a conversation that he had with Neil.

Q. When you say he, you mean Mr. Rabin?

A. Yes. Jason.

Q. When you say he said he needs 10 million and more, what are you saying there?

A. Jason explained that he needed $10 million and more for his own P&L. So he needed either $10 million in revenue or $10

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL1          Horowitz - Direct          Page 202

million in expense relief, which could include letting him out of the Rocawear Kids agreement, as he had discussed with Neil.

Q. You said -- you used the term there P&L. What is that?

A. It's a profit-and-loss statement for a company.

Q. Just to make it a little simpler, when someone or when Mr. Rabin said, he needed $10 million for his P&L, what did you understand him to mean by that?

A. He needed to pay more for a joint venture and get back from Iconix things that could affect his profit, which would be either payment for marketing or reduction in expenses.

Q. Did he explain to you why he would be willing to pay more for the joint venture in order to get this $10 million benefit to his P&L?

A. Yes.

Q. What did he say?

A. He said he had financial pressures, and he needed this $10 million and more.

Q. Why wouldn't the two $10 million payments wash out?

A. Because GBG was willing to pay more for joint ventures in order to get things that affected their P&L or their profit and loss.

Q. Did the payment of the joint venture affect their profit and loss, as you understood it?

A. No.

Q. You then have a bullet point below this where you say: I

LA7MCOL1          Horowitz - Direct          Page 203

see it as 5 million of marketing liabilities and 2 million from the LC/china deal.

What are you saying there?

A. I'm suggesting to Neil that the $10 million and more that he needs could be made up by the $5 million of marketing that we already owe them and the $2 million backstop or guarantee that we just discussed from the Lee Cooper China deal.

Q. The next bullet point says: Getting creative about an additional 5 million for this year is difficult. Then you set some things out there below there.

Can you explain what you are relaying there.

A. I am relaying to Neil that the desire from GBG to get $10 million and more gets more difficult and more complicated, potentially, at this point, and then I make a suggestion of how we may get that done.

Q. Can you explain what that suggestion is.

A. What I lay out for Neil and what the suggestion is is an increase in price for the China joint venture in exchange for letting them out of the Rocawear Kids agreement.

Q. Had you discussed these issues with Mr. Cole that desired GBG to obtain benefit for its P&L?

A. Yes.

Q. Can you describe those conversations.

A. Neil and I had a specific conversation that GBG was now going to need revenue and profitability in a way similar to how

LA7MCOL1          Horowitz - Direct          Page 204

Iconix needs it now that GBG was public and that the transaction that was previously done in June -- I'm sorry. The types of terms of the transaction that was done in June would be more difficult to do because GBG had the same needs that we did now.

Q. Is that the conversation in the car that you described yesterday?

A. Yes.

Q. I think you told us that was coming back from a meeting with GBG, is that right?

A. That is correct.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Can you please put up just for the witness and for the parties what has been marked for identification as Government Exhibit 1065.

Q. Mr. Horowitz, do you recognize this as an e-mail you sent Mr. Cole on August 25 of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1065.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1065 received in evidence)

Q. Mr. Horowitz, can you read the chain beginning at the

LA7MCOL1          Horowitz - Direct          Page 205

bottom.

A. I have a call with Jared on the China LC and Umbro JV at 2:00 today. Will update you after the call. Seth.

Q. When you say, you have a call with Jared, who are you referring to there?

A. Jared Margolis.

Q. When you refer to the China LC and Umbro JV, what are you referring to?

A. The joint venture that we have been discussing in China for Lee Cooper and Umbro.

Q. I don't know if we have said this, but if I refer to joint venture as SEA-3, will you know what I'm talking about?

A. Yes.

MR. HARTMAN: You can take that down, Mr. Charalambous, and let's see the next response.

Q. Mr. Horowitz, this is an e-mail from Mr. Cole to you and he says: Saw Jason over the weekend. Said Bruce, et al. approved the deal.

Do you know who the Jason is that he's referencing there?

A. Yes.

Q. Who is that?

A. That's Jason Rabin.

Q. And the Bruce?

A. Bruce is another principal at Li & Fung.

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL1    Horowitz - Direct    Page 206

Q. When he says saw Jason over the weekend, who do you understand him to be saying who saw Jason?

A. That Neil saw Jason.

MR. HARTMAN: You can take this down, Mr. Charalambous and please put up, just for the witness and the parties, Government Exhibit 1069.

Q. Mr. Horowitz, do you recognize this as an update that you sent to Mr. Cole on September 2 of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1069.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1069 received in evidence)

Q. Mr. Horowitz, the date here is September 2, 2014. Where are we in the quarter?

A. We have about four weeks left in the quarter.

MR. HARTMAN: Mr. Charalambous, can we go to the attachment, please.

Q. 1.1 says: Business development, China Umbro.

What is that a reference to?

A. It's an update on the China Umbro joint venture.

Q. It says under GBG: 15.5 million for 50 percent of LC and Umbro in China.

What's the 15.5 million here?

LA7MCOL1    Horowitz - Direct    Page 207

A. The agreed-upon price for the joint venture.

Q. It says: All diligence requests have been completed, including introduction letter to Lee Cooper licensees in China and HK. Is that Hong Kong?

A. Yes.

Q. All legal documents have been sent to GBG, easier docs as we are amending Southeast Asia JV again.

What are diligence requests?

A. Diligence --

Q. Go ahead.

A. Diligence requests came in from GBG and often asked questions about the existing licensees and the geography.

Q. What is the purpose of those requests?

A. The purpose of those requests is for GBG to have a greater understanding or a more specific understanding of the licensees in that geography.

Q. When you say they have been completed, what are you representing there?

A. I'm representing that we have answered all of the questions that GBG had.

Q. Under subsection B here it says: GBG. Then you say: At Jason's request, I walked Jared through our proposed 5 million of current marketing liabilities. Who is Jason here?

A. Jason Rabin.

Q. Who is Jared?

LA7MCOL1    Horowitz - Direct    Page 208

A. Jared Margolis.

Q. When you say our proposed 5 million of current marketing liabilities, who are you referring to when you say our?

A. Iconix and Neil and I.

Q. Then underneath you write: No. 1. 2.5 million, relief of Rocawear Kids in 2014. Still need to discuss the 3.5 million of '15 revenue and 2.0 million in fixtures, 1.5 million of Peanuts marketing in China, and 1.0 million Zoo York marketing in Europe.

Mr. Horowitz, when you say our proposed 5 million of current marketing liabilities, what are you referring to there?

A. I'm referring to a list of things that we are prepared to give GBG as payment for the $5 million that we owe them.

Q. This is repayment from the SEA-2 transaction?

A. That is correct.

Q. When you say our proposed marketing liabilities, had you discussed this proposal with Mr. Cole before you spoke to GBG about it?

A. Yes.

Q. What's the proposal?

A. The proposal is that we will let them out of the Rocawear Kids agreement and that they should invoice us 1.5 million for Peanuts marketing and 1 million for Zoo York marketing.

Q. The first bullet point says: 2.5 million relief of Rocawear Kids in 2014.

LA7MCOL1    Horowitz - Direct    Page 209

What is that in reference to?

A. That's in reference to the guaranteed minimum payments that GBG owes Iconix in 2014.

Q. You say still need to discuss the 3.5 million of revenue and 2.0 million in fixtures.

What are you saying there?

A. That if we let them out of the Rocawear Kids agreement, they still would have owed us 3.5 million in 2015, so we still need to discuss how we are going to make that up.

Q. When you say make that up, what do you mean by that?

A. How Iconix is going to get back the 3.5 million of letting them out of the Rocawear Kids agreement that GBG would have owed us the following year.

Q. Now, the next section says or No. 2 says: 1.5 million of Peanuts marketing in China.

What dictated that number, 1.5 million?

A. It was a made-up number.

Q. What was the purpose of making up 1.5 million?

A. In order to give GBG direction on how they should invoice us so we could pay them back the money we owe them.

Q. Was there specific marketing work that GBG had done that you had identified for Peanuts in China?

A. No.

Q. Did you identify any marketing work that was worth 1.5 million at this point?

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LA7MCOL1          Horowitz - Direct          Page 210

A. No.

Q. There is also a reference to Zoo York here, a million for marketing in Europe.

How was that number arrived at?

A. It was just a number to work backwards to the $5 million we owed them.

Q. To your knowledge, had GBG done a million dollars worth of marketing work for Zoo York?

A. No.

Q. In your conversations with Mr. Cole about this proposal, did he say anything to you that would make you think that he believed that GBG had done equivalent amounts of work for these brands?

A. No.

Q. Did you talk with Mr. Cole about the choice of Peanuts as a brand to invoice for?

A. Yes.

Q. What did he say about that?

A. He said that he chose Peanuts because we would share in the expenses of paying back the 1.5 million with our then partner in Peanuts.

Q. Who was that?

A. I believe it was the Schultz family.

Q. The last point here says: Jared expressed that Jason would like to pay 20 million for the China JV. Discussed other

---

LA7MCOL1          Horowitz - Direct          Page 211

details.

What's that a reference to?

A. That's in reference to GBG now expressing that they would like to pay more than the 15.5 million for the Lee Cooper and Umbro joint venture and discuss other ways in which we can get them back for the overpayment.

Q. Is this a reference to Mr. Rabin's request for benefits to his P&L, like you described earlier?

A. Yes, it is.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Could we see, just for the witness and the parties, what's been marked for identification as Government Exhibit 1070.

Q. Mr. Horowitz, do you recognize this as an e-mail exchange between you and Mr. Cole on September 2?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1070.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1070 received in evidence)

MR. HARTMAN: Mr. Charalambous, can you put that up, please.

Can we start at the bottom of the chain.

---

LA7MCOL1          Horowitz - Direct          Page 212

Q. So the bottom of the chain is your e-mail on September 2 attaching the update. Is that the update we just looked at, Mr. Horowitz?

A. I believe that it is.

MR. HARTMAN: Mr. Charalambous, you can take that down, and let's move up the chain.

Q. Mr. Cole responds: Latest thoughts on Rocawear Kids.

Do you see that, Mr. Horowitz?

A. I do.

Q. What do you understand him to be asking you about when he says latest thoughts on Rocawear Kids?

A. He is asking me for my opinion on what could happen or what we would do with Rocawear Kids if we let GBG out of the Rocawear Kids agreement and whether or not we should let them out of the Rocawear Kids agreement.

Q. Why was that something that you and he were discussing?

A. We were discussing this because it was either a piece of how we were going to pay back GBG or the $5 million we owed them from June, or it was going to be used as a giveback for an increased purchase price on the new joint venture in China with Lee Cooper and Umbro.

Q. Did you or Mr. Cole have reservations about taking back the Rocawear Kids agreement?

A. Yes.

Q. Why?

---

LA7MCOL1          Horowitz - Direct          Page 213

A. We both had reservations on taking back the Rocawear Kids agreement. They were twofold. One was, Rocawear as a brand needed the guaranteed minimum royalty from the GBG deals in order to avoid a likely impairment. That was very important. And, two, which is connected, is that it would be very difficult to replace the Rocawear Kids agreement and the revenue that it was going to bring in for Iconix.

MR. HARTMAN: Mr. Charalambous, you can zoom out. Let's see Mr. Horowitz's response.

Q. Mr. Horowitz, can you read this.

A. We should use it as a bargaining chip with GBG. They lose 8 to 10 million on this business and want out. We can let them out of 2.5 million in royalty this year and 3.5 next year in addition to wiping out a money loser for them. We will operate this business with Rodney/Jonathan Cohen, and Kevin Yapp. We will reduce the Rainbow business as it loses money and do more Citi trend/Burlington, etc. If we cut business back to be profitable in our model, at 10 to $20 million, instead of $30 million this year, we will hit our top line numbers in '15. I have models in the office that run through scenarios that ensure we beat our revenue targets through a transition in what's left of '14 and '15 for Rocawear IP purposes.

Q. Mr. Horowitz, what are you telling Mr. Cole here?

A. That there is a licensee, which is a new model of licensing for Iconix that we were testing at the time, that could or

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LA7MCOL1    Horowitz - Direct    Page 214

would meet our revenue targets for Rocawear for IP purposes, meaning impairment, in '14 and '15, and that I had scenarios that I would like to walk him through.

Q. When you say for Rocawear IP purposes, you are referring to impairment. Is that what you are saying?

A. That is correct.

Q. When you refer to using Rocawear Kids as a bargaining chip with GBG, what are you referring to there?

A. We can -- we know it's something they want. We can use it to increase the purchase price of the joint venture, if we want, or use it as a way to repay part of the -- part or all of the 5 million we owe them.

MR. HARTMAN: You can take that down, Mr. Charalambous, and let's look at the next response. Can you grab the part below that.

Q. Mr. Cole responds and says: If it will be part of the final deal with Umbro/China. Very worried about timing for Q3.

What did you understand him to mean by that?

A. If letting the -- if letting GBG out of the Rocawear Kids agreement was going to be part of the final deal with GBG or Umbro and China, it would be difficult to put together all the documents needed to transition from an old licensee, GBG, to the new licensee, Kevin Yapp, within the next 20 plus days.

(Continued on next page)

---

LA7PCOL2    Horowitz - Direct    Page 216

would take a portion of the revenue in Q3 and then a portion of the revenue in Q4.

Q. And why would that be beneficial to Iconix?

A. It would be beneficial to Iconix because it would allow us to make our Q3 numbers and still have more to put into Q4 to help us make our Q4 numbers.

Q. And he says "Although, with Middle East delayed, might need it." Do you know what he's talking about there?

A. Yes. So at this point, with a little less than a month to go in the quarter, the Middle East was delayed again, and it was not certain that it would happen. And if the Middle East did get delayed, we would need the entire joint venture at the increased purchase price to make our Q3 numbers.

Q. When you say the increased purchase price, what increased purchase price are you talking about?

A. The 23 million.

Q. In exchange for?

A. Letting GBG out of their Rocawear Kids agreement.

Q. You can zoom out, Mr. Charalambous, and let's look at the top.

Mr. Horowitz, can you read your response?

A. "Believe the 15.5 and Marcraft get us there with room. But total deal of 20 million would lock up the quarter. Easy to break deal in pieces by quarter between the two brands if we wanted."

---

LA7PCOL2    Horowitz - Direct    Page 215

Q. And why was the end of the quarter a significant date?

A. It's a significant date because we reported our financials on a quarterly basis, and we knew that the deal had to get done in order to hit our financial goals for that quarter.

Q. And when you say the deal, what deal are you referring to?

A. The Umbro/Lee Cooper JV in China.

Q. Ms. Charalambous, you can zoom out.

Mr. Horowitz, you respond "Agree. Me too."

Can we see the next one?

Mr. Cole says "I also like David's idea if it is 20 million, having option to take over two quarters. Although, with Middle East delayed, might need it."

What do you understand him to be saying here?

A. So what Neil is saying here is that if we let them out of the Rocawear Kids agreement and do the joint venture at a higher price, over $20 million, he might want to take that over two quarters, Q3 and Q4, depending on whether or not we need the full $20 million in Q3.

Q. When you say take it over two quarters, what do you mean by that?

A. He is contemplating splitting the joint venture into two different agreements, one for Lee Cooper in China and one for Umbro in China, and doing them one in Q3 and one in Q4.

Q. And what would be the purpose of doing that?

A. To split the revenue that Iconix would take. So Iconix

---

LA7PCOL2    Horowitz - Direct    Page 217

Q. Mr. Horowitz, what are you saying here?

A. I'm saying that the deal at 15.5 million and Marcraft, which was a licensee that we were contemplating terminating, the termination of the Marcraft license would bring in several million dollars. The combination of those two things would allow us to hit our quarterly numbers.

I'm also saying that if we did the deal at a higher price, it would easily allow us to achieve our quarterly numbers.

Q. And to be clear, what would allow you to do the deal at the higher price?

A. Letting GBG out of their Rocawear Kids agreement in exchange for the higher price in the joint venture.

Q. Mr. Charalambous, you can take that down. Just show for the witness and the parties what's been marked for identification as Government Exhibit 1072.

Mr. Horowitz, do you recognize this as the same thread that we were just looking at from September 2nd?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 1072.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1072 received in evidence)

BY MR. HARTMAN:

---

# A-124

LA7PCOL2     Horowitz - Direct     Page 218

Q. Mr. Charalambous, you can put that up for the jury.

Mr. Horowitz, Mr. Cole responds to your e-mail saying "Agree. Me too." The response -- sorry, at the top. "We need to resolve this week. However, with Bruce around, not sure we can." Who is Bruce, to your understanding?

A. Bruce is another senior member of management of Li & Fung.

Q. And when he says "we need to resolve this week," what do you understand him to be saying there?

A. We need to decide whether or not we're going to do the deal at the increased purchase price with the Rocawear Kids giveback or not.

Q. And why this week?

A. Because we were under a time crunch with a few weeks left in the quarter, and as we had discussed earlier, it would be difficult to get all the paperwork done in such a short period of time.

Q. Okay. This is September 2nd.

You can take this down, Mr. Charalambous. And could we please just show to the witness and the parties what's been marked for identification as Government Exhibit 1078.

Mr. Horowitz, do you recognize this as an e-mail between you and Mr. Cole dated September 3rd of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1078.

LA7PCOL2     Horowitz - Direct     Page 219

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1078 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, this is the day after the e-mail we just looked at. You e-mailed Mr. Cole. The subject line is "GBG" and you say "Worked on various models and analysis for us to discuss tomorrow. David M is also preparing cash flow analysis as we discussed. Best, Seth."

Mr. Horowitz, what are you referring to when you say "worked on various models and analysis"?

A. I had done work on various models of a new Rocawear Kids license, as well as, I believe, an analysis on the Rocawear brand and the licensing revenue that was coming in.

Q. And you say "for us to discuss tomorrow," who would be the "us" you were referring to there?

A. Neil and I.

Q. And what are you referring to there when you say "us to discuss tomorrow"?

A. We're going to discuss the Rocawear Kids agreement and whether or not we're going to let GBG out of that agreement.

Q. You also say "David M is preparing cash flow analysis as we discussed." What's that a reference to?

A. Neil had asked for a cash flow analysis of our relationship with GBG in totality, as well as the cash flow from or the

LA7PCOL2     Horowitz - Direct     Page 220

payment schedule from GBG to Iconix for the Rocawear Kids license.

Q. And why was he asking for that, the latter?

A. I would eventually know that he asked for this because he wanted to mirror the Rocawear Kids payments in the payments for the China Umbro and the Cooper joint venture.

Q. Okay. We'll come back to that.

Mr. Charalambous, can you take this down, please. And show just for the witness and for the parties what's been marked for identification as Government Exhibit 1077.

Mr. Horowitz, do you recognize this as an e-mail you sent yourself on September 3rd, 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1077.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1077 received in evidence)

MR. HARTMAN: Can we see the attachment, please.

BY MR. HARTMAN:

Q. First of all, the subject is GBG, and the attachment is GBG.pdf; is that right, Mr. Horowitz?

A. That is correct.

Q. And you sent this to yourself on the 3rd at 9:51; is that right?

LA7PCOL2     Horowitz - Direct     Page 221

A. That is correct.

Q. And I think we saw that you were supposed to meet with Mr. Cole the next day; is that correct?

A. That is correct.

Q. Okay. Let's go to the next page. Mr. Horowitz, what is this?

A. This is a document prepared to discuss with Neil that reflects some of our conversations to this point.

Q. Okay. The first section here says 5 million in marketing. What's that a reference to?

A. This is in reference to the $5 million that we owe GBG from the June joint venture.

Q. And underneath it says 1 million Zoo York, 2 million for Peanuts China, and 2 million for Mossimo SE Asia. What is that a reference to?

A. That's a reference to the way in which we were going to ask GBG to invoice us in order to repay the $5 million.

Q. What we saw in your update from a couple of days prior, that you had structured the repayment a little differently. Do you remember what you said there?

A. I do.

Q. How is it different from what you've described here?

A. The Peanuts China marketing amount went up from, I think, 1.5 to 2 million, and the $2 million from Mossimo Southeast Asia is a new line item. It was previously part of letting GBG

## A-125

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL2        Horowitz - Direct        Page 222

out of their Rocawear Kids agreement.

Q. And why the change?

A. The change happened because we were now going to let GBG out of the Rocawear Kids agreement in exchange for an increased purchase price for the new joint venture; yet, we still had to get GBG the $5 million we owed them from June.

Q. Didn't it matter the method that you were paying them back?

A. I'm sorry, can you repeat that?

Q. Why couldn't you just swap out one term for another term?

A. Because we were just putting numbers and brand names together to get to a $5 million number.

Q. Did you reflect on that?

A. At the time?

Q. Yes.

A. Yes.

Q. Did that raise concerns for you?

A. Yes.

Q. Tell us about that.

A. Around this time, it became obvious to me that we could play this game almost endlessly; that there was this back channel of funds going between GBG and Iconix that were made up.

I specifically recall a night around this time period where I was out for dinner with my wife and some friends and I was just going over and over in my head how this was spiraling

LA7PCOL2        Horowitz - Direct        Page 223

out of control and there was no kind of limit on what could happen, increased purchase prices, made-up brands to invoice.

I couldn't eat, and I remember this because it was a nice restaurant. I couldn't even like look at food, and I left for the evening, but it was clear to me that we were playing a dangerous game.

Q. Did you tell Mr. Cole you were uncomfortable?

A. I did not.

Q. Why not?

A. I was intimidated by Neil. I was scared of Neil, and there was a part of me that just, so badly, wanted to be in with him.

Q. When you say "in with him," what do you mean by that?

A. He was an extremely difficult person to work for, and I just wanted to be his right hand, somebody that he could have in his inner circle, which was extremely small. And I just wasn't confident or strong enough to express any concern to him.

Q. Returning to the document, the last bullet point here says "2014 Iconix P and L impact of 5 million versus current forecast." What are you saying there?

A. This was -- the result of this $5 million in marketing would negatively impact Iconix's 2014 financial results by $5 million.

Q. When you say "negatively impact," what do you live by that?

A. Iconix hadn't forecasted or taken into account that we owed

LA7PCOL2        Horowitz - Direct        Page 224

GBG $5 million to this point; so this would be a new negative to our earnings.

Q. So it would reduce earnings; is that right?

A. That's correct.

Q. And why are you flagging this for Mr. Cole?

A. Because earnings were extremely, if not the most, important thing.

Q. The next section says "JV in China for Umbro and Lee Cooper." What is that a reference to?

A. That's in reference to SEA-3, I believe we're calling it.

Q. And the first bullet point says "21.5 million, 50 percent JV." What's that a reference to?

A. That is the new purchase price for the joint venture.

Q. And then underneath it says "1.5 million backstop in 2014, 2 million backstop in 2015." What is that a reference to?

A. Those are the new negotiated terms for the guarantees from Iconix to GBG.

Q. And I think we previously saw the numbers were 1 and 3; is that right?

A. I believe so. I believe that Jason had come back and asked for the 1 to become 2.

Q. Okay. And this is -- what is this, then?

A. One-and-a-half is meeting halfway.

Q. Right. You say "900K exposure to Iconix;" what is that a reference to?

LA7PCOL2        Horowitz - Direct        Page 225

A. Iconix anticipated that GBG would make approximately $600,000 from the joint venture; so we would have to make up approximately $900,000 in payments to GBG.

Q. So that's the amount you were anticipating the shortfall being?

A. That's correct.

Q. The last bullet point says "2014 Iconix P and L impact of positive 19 million." What does that mean?

A. That is the revenue that Iconix would gain from this transaction.

Q. And it says "increase of 5.6 million versus current forecast." What are you referring to there?

A. The purchase price increase minus the exposure to Iconix.

Q. And what purchase price increase are you referring to?

A. The purchase price went up approximately $6 million.

Q. Okay. The third point here described Rocawear Kids termination, and it says "See Rocawear termination options doc," and then underneath it says "2.5 million royalty relief in '14 and transfer on orders to new rise." What's that a reference to?

A. That's in reference to the monies owed by GBG to Iconix.

Q. So this is the 2014 minimum that we've seen reference to?

A. Correct. This is the second half guaranteed minimum from GBG to Iconix.

Q. Okay. And then it says "1 million approximate royalty

# A-126

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7PCOL2     Horowitz - Direct     Page 226

relief in '14 and GBG keeps on orders and gross profit."
What's that about?

A. This is an element or a detail to the transaction in which we could reduce their royalty by a certain amount, $1 million, but allow them to keep their orders, meaning the sales that Jason had requested, and the money upfront that they would make on those sales.

Q. Okay. And that's a reference to the conversation that you relayed from your call with Mr. Rabin; is that right?

A. That's correct.

Q. You reference 3.5 million royalty relief in '15, what's that?

A. That's the guaranteed minimum royalty that was owed from GBG to Iconix in 2015.

Q. Okay. And then the last -- the next-to-last bullet point there it says "2014 Iconix P and L impact of approximate 900,000 of Rocawear royalty, plus fixture exposure." What are you relaying here?

A. What I'm relaying here is that this transaction and the details behind it would result in approximately a negative $2.9 million versus our current forecast for Iconix, and that's made up of approximately 900,000 less in Rocawear royalty and our exposure to the $2 million of fixtures that we paid for at GBG headquarters.

Q. Mr. Horowitz, why are you looking at all three of these

LA7PCOL2     Horowitz - Direct     Page 227

items together here?

A. I'm looking at all of three of these together because they're a part -- all a part of our negotiations with one partner, GBG.

Q. Is there a link between all of these transactions?

A. Yes.

Q. In what way?

A. This kind of lays out the flow of money at this point between the two partners.

Q. You can take this down. And, Mr. Charalambous, can you please put up for the witness and for the parties what's been marked for identification as Government Exhibit 1079.
Mr. Horowitz, do you recognize this as an e-mail exchange you had with Erika Alford on May -- excuse me, September 4th, 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1079.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1079 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, remind us the day you were supposed to meet with Mr. Cole about these issues?

A. I believe we were meeting on this date.

LA7PCOL2     Horowitz - Direct     Page 228

Q. September the 4th?

A. September the 4th.

Q. And can we see the bottom of the chain, please, Mr. Charalambous.
Mr. Horowitz, you write: "Jason, can you please prepare a simple termination notice for GBG/LF per the terms below? We will need a schedule on orders wip and existing inventory." First of all, who is Mr. Schaefer?

A. Mr. Schaefer was the general counsel for Iconix.

Q. And what are you asking him to do?

A. To prepare a termination letter that we would use to terminate the Rocawear Kids agreement with GBG.

Q. Why are you asking him to do that?

A. Because, at this point, that was the direction that I was given by Neil, and we were now going to allow Rocawear -- we were going to terminate the Rocawear Kids agreement in exchange for the increased price.

Q. For which transaction?

A. For the China Umbro and Lee Cooper transaction.

Q. Okay. The response from Mr. Schaefer -- well, actually, zoom out. It looks like he forwards your e-mail to someone named Erika Alford. Do you know who that is?

A. Yes.

Q. Who is she?

A. She was an attorney at Iconix.

LA7PCOL2     Horowitz - Direct     Page 229

Q. Okay. You can take that down, Mr. Charalambous. And let's look at the top.
Ms. Alford e-mails you, and she says, "Hi, Seth. Jason asked me to handle this, and I just have a few questions. I know you are out at the conference this morning, but please let me know when you are back and have a moment to discuss."
Did you discuss the termination agreement with Ms. Alford at some point?

A. Yes.

Q. When you discussed it with her, did you tell her the reason that you were terminating the Rocawear Kids agreement?

A. No.

Q. Did you tell her that you and Mr. Cole had decided to terminate the Rocawear Kids agreement in exchange for an increase in the purchase price of the joint venture?

A. I did not.

Q. Did you tell Mr. Schaefer that?

A. I did not.

Q. Why not?

A. Because similar to the prior transaction, the June joint venture, I was only sharing with the legal team what I was instructed to share with the legal team.

Q. Had Mr. Cole said anything to you in connection with the June joint venture that gave you the understanding that you weren't supposed to share that information with legal?

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LA7PCOL2    Horowitz - Direct    Page 230

A. Yes.

Q. What did he say?

A. He specifically said, in his office when he called me in to tell me about the agreement on the increase in the purchase price by $5 million, not to mention to Lauren Gee that we were going to be paying it back.

Q. Mr. Charalambous, you can take this down. Actually, let's just see the attachment real quick. I'm sorry.

Mr. Horowitz, what's being laid out here?

A. These are the terms of a Rocawear Kids termination and transition to new licensing.

Q. So this was to guide the legal team in preparing the termination?

A. I believe that it is.

Q. Okay. Mr. Charalambous, you can take that down. And let's look at Government Exhibit 1080, please, just for the parties.

Mr. Horowitz, do you recognize this as an e-mail that you received from Ms. Alford on September the 4th?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 1080.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1080 received in evidence)

BY MR. HARTMAN:

---

LA7PCOL2    Horowitz - Direct    Page 231

Q. Mr. Horowitz, the body of the e-mail says, "Seth, attached please find a draft of the termination agreement you requested. Please let me know if you have any questions or comments. Please note that I am sending this, in the interest of time, and as we discussed. Jason may have additional comments."

Do you know why she was sending it to, in the interest of time, Mr. Horowitz?

A. Yes. At this point, we were moving quickly to get this done in the third quarter, by the end of September.

Q. Okay. And this e-mail comes on September 4th at 1:14 p.m. Do you see that?

A. I do.

Q. Okay. Let's take this down, please, Mr. Charalambous, and can you put up, just for the parties and for the witness, Government Exhibit 1081.

Mr. Horowitz, do you recognize this as a calendar invite for a meeting that you had with Mr. Cole on September the 4th on 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1081.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1081 received in evidence)

MR. HARTMAN: And can we show that to the jury,

---

LA7PCOL2    Horowitz - Direct    Page 232

please.

BY MR. HARTMAN:

Q. Mr. Horowitz, what time was your meeting with Mr. Cole on September the 4th, according to this calendar invite?

A. 3:00 p.m.

Q. And at that meeting, did you discuss with Mr. Cole the terms that were laid out in Government Exhibit 1077?

A. I believe that we did.

Q. And did you also discuss the termination agreement with him?

A. Yes, we did -- yes, I did.

Q. You can take that down, Mr. Charalambous. Actually, can we look at it one more time, please, 1081.

What's the subject for the meeting?

A. GBG terms.

Q. Okay. Let's take that down. And can we see, just for the parties, Government Exhibit 1082.

Mr. Horowitz, do you recognize this as a calendar invite for a meeting that you had on September the 5th, 2014?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 1082.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1082 received in evidence)

---

LA7PCOL2    Horowitz - Direct    Page 233

BY MR. HARTMAN:

Q. Mr. Horowitz, first of all, it's from Joanna Pompilio. Who is that?

A. Joanna was my assistant at the time.

Q. Okay. And the recipients for the calendar invite was Ethan Cole. Remind us who Ethan Cole was?

A. He was an associate at GBG.

Q. And then you, Jared Margolis. Remind us who that is?

A. Jared was a principal at GBG.

Q. Okay. And Amanda Azzoli. Who is she?

A. I believe she was Jared's assistant.

Q. Okay. The subject line says "2:00 p.m. meeting, Seth Horowitz, Jared Margolis" and the location is 1450 Broadway, conference room 3B. What's 1450 Broadway?

A. The address of Iconix's office.

Q. Okay. And conference room 3B, where is that located?

A. It's on the third floor. When you go to the office, right on the left.

Q. Is that the same floor where you and Mr. Cole sat at this point?

A. Yes.

Q. It's a meeting between you and Mr. Margolis; do you see that?

A. I do.

Q. What did you discuss at this meeting?

---

LA7PCOL2          Horowitz - Direct          Page 234

A. At this meeting, we discussed the payments and how Iconix would like to be invoiced for the $5 million that we owed to GBG. And we discussed the increased purchase price for the joint venture in June, as well as the Rocawear Kids termination.

Q. How did you prepare for this meeting?

A. I updated a sheet based on my discussions with Neil and had prepared it to hand out to GBG at the meeting.

Q. Mr. Charalambous, you can take this down. And would you please show, for the witness and for the parties, what's been marked for identification as Government Exhibit 1084. Mr. Horowitz, do you recognize this as an e-mail you sent to Ms. Pompilio on September the 5th at 2:30?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 1084.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1084 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, you sent this to Joanna Pompilio, and you said, "Please print out three copies and bring it to 3B." The subject is "GBG." What are you printing out? What are you having her print out?

A. The layout of the terms of our GBG payments, the new joint

LA7PCOL2          Horowitz - Direct          Page 235

venture and the Rocawear termination.

Q. Okay. And where are you having her bring that?

A. Into conference room 3B.

Q. And what's going on in conference room 3B at 2:30 on September the 5th?

A. I'm meeting with Jared Margolis.

Q. Can we see the attachment, please, Mr. Charalambous. Mr. Horowitz, this looks like the document that we looked at earlier, Government Exhibit 1069. Are there differences?

A. Yes, there are.

Q. Mr. Charalambous, is it possible to show this next to Government Exhibit 1069? Sorry, is that 1069? Sorry. It's 1077. That's my fault. Okay. So, Mr. Horowitz, the document on the left, is that the one that you asked Ms. Pompilio to print?

A. Yes, it is.

Q. And did you distribute it at the meeting with Mr. Margolis?

A. Yes, I did.

Q. Okay. The document on the right, I believe you told us you prepared it for your meeting with Mr. Cole; is that right?

A. That is correct.

Q. We'll go through the differences in a minute, but what accounts for the differences between these two documents?

A. My discussions with Neil and his direction.

LA7PCOL2          Horowitz - Direct          Page 236

Q. Okay. So starting with the marketing, we have $1 million, Zoo York Europe; $2 million, Peanuts China; $2 million Mossimo Southeast Asia. These are all the same; is that right?

A. That is correct.

Q. Now, you told us you had raised, for Mr. Cole, the impact of the $5 million expenses on Iconix's earnings; is that right?

A. That is correct.

Q. On the left-hand side where that note was, it now says "50 percent Q3/Q4, 50 percent prepay." What is that about?

A. Neil wanted to spread out the payments of the $5 million that we owed for the June joint venture. He wanted 50 percent to be considered prepaid for 2015; so half of it, or 2.5 million, wouldn't hit Iconix's P and L until the following year, and he wanted to split the other two-and-a-half million, 50 percent, in Q3, and 50 percent in Q4.

Q. And did he tell you the reason that he wanted to do that?

A. Yes.

Q. What was the reason?

A. To minimize the impact on the Iconix P and L or spread out.

Q. And did you convey to Mr. Margolis the fact that you and Mr. Cole wanted the marketing to be billed this way?

A. Yes.

Q. In the second section here, there's the reference to the JV at 21.5 million. The contribution guarantee, looks like, has gone up to 2 million for 2014 and 2.5 for 2015; do you see

LA7PCOL2          Horowitz - Direct          Page 237

that?

A. I do.

Q. And then there are some specific terms here. It's 4.3 payment upon signing, 1.3 due 12-13-14, 4.3 payment on anniversary of JV, 1.1 due on 3-31-15, and 1.1 due on 6-31-15, 4.7 on second anniversary of JV, and 4.7 on third anniversary of JV. What is that?

A. That is the payment schedule which GBG will pay to Iconix for the $21.5 million.

Q. And when you say the payment schedule, what do you mean by that?

A. It was necessary that a joint venture partner pay at least 20 percent upfront, and then the balance of what had to be paid could be paid out over time. This now specifically lays out the timing of the payments of the balance of the 21.5 million.

Q. Is there any significance to the 1.3 million that was due December 13th, the 1.1 million that was due March 31st of '15, and the 1.1 million that was due on June 31st of 2015?

A. Yes. These payments directly reflect the timing of the Rocawear Kids payments that were due. It was important to Neil that GBG not get any additional benefit of paying later; so he had us mirror the payments of the increased price in the joint venture with the timing of what had been the Rocawear Kids money episode.

Q. So just to be clear, at this point, are you contemplating

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL2    Horowitz - Direct    Page 238

releasing GBG from its obligations for Rocawear Kids in exchange for the increased purchase price?

A. Yes.

Q. And how does that relate to these payments?

A. The payments have been adjusted so that instead of paying just 20 percent upfront and 20 percent in the following four anniversaries, part of the increase in price of the joint venture is now timed exactly with when the Rocawear Kids' payments would have had to have been made by GBG to Iconix.

Q. Okay. And the last section refers to the Rocawear Kids termination; is that right?

A. That is correct.

Q. And did you discuss that with Mr. Margolis as well?

A. Yes, I did.

Q. Did you discuss all three of these items with Mr. Margolis?

A. Yes.

Q. And did you physically show him the document, the Government Exhibit 1084 on the left?

A. Yes, I did.

Q. Let's take those down. One more thing, Mr. Horowitz. Was Mr. Cole present for this meeting?

A. Neil came by the meeting. He was not present at the entire meeting.

Q. When you say "came by," what do you mean?

A. Neil came into the meeting, sat down for a bit, checked in

LA7PCOL2    Horowitz - Direct    Page 239

to see how everything was going and then left. I have a very clear recollection of this. It was rare for Neil to come into 3B, which is a second conference room.

Q. What conference room did Mr. Cole typically use?

A. 3A.

Q. Okay. We can take this down. And, Mr. Charalambous, can you please put up for the witness and for the parties what's been marked as Government Exhibit 1085.

Mr. Horowitz, do you recognize this as an e-mail that Ethan Cole sent to you on September the 5th, 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1085.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1085 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, the date on this e-mail is September 5th, 2014, at 5:06 p.m. Is this the day of the meeting that you just described?

A. Yes, it is.

Q. Okay. And it's from Mr. Cole, but it's cc'd Mr. Margolis, right?

A. It's from Ethan Cole.

Q. Right. Ethan Cole, sorry, not Neil Cole.

LA7PCOL2    Horowitz - Direct    Page 240

The subject is "Termination letter, soft copy" and the email says "Last thing. At your convenience, can you please send a soft copy of the Rocawear termination letter?" Do you understand what he's referring to there?

A. Yes. He would like an e-mail of the actual termination letter, not just the terms of it.

Q. Okay. We can take that down. And could you please put up, just for the witness and for the parties, Government Exhibit 1253, Mr. Charalambous.

Mr. Horowitz, do you recognize this as an e-mail you sent Neil Cole on September the 8th of 2014?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 1253.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1253 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, is this one of your update e-mails?

A. It is.

Q. And the date here is September 8th, 2014; is that right?

A. That's correct.

Q. So is this about three days after the meeting with Mr. Margolis that we just talked about?

A. Yes.

LA7PCOL2    Horowitz - Direct    Page 241

Q. Okay. Can you show the attachment, please.

Mr. Horowitz, can you just read the first bullet point under "China JV"?

A. "Additional information request came from GBG on Friday. All responses will be done by Monday a.m. Jared is in China meeting with potential licensee this week. I have some fear that this meeting may/can lead to an attempt to renegotiate the JV/push back. As such, have prepared thoughts on alternative."

Q. And, Mr. Horowitz, what are you referring to here?

A. Jared Margolis from GBG is meeting with potential licensees for the Umbro brand in China, and if they are unable to guarantee, or if Jared is negotiating licenses with them that don't quite meet their expectations, they may come back and push for a lower price on the joint venture.

Q. For a lower price than -- at this point, what's the price that the parties are discussing?

A. 21.5 million.

Q. Can you also read the last bullet point, "agreed to"?

A. "Agreed to payment terms for GBG JV in China as discussed, et cetera, with Jared."

Q. When you say "agreed to payment terms," what are you referring to there?

A. I'm referring to the payment terms of the joint venture that reflect payment that is in line with what had been the payments for the Rocawear Kids agreement.

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL2    Horowitz - Direct    Page 242

Q. And when you say "as discussed," what are you referring?
A. I'm referencing the meeting the prior week that Neil and I had discussed that he wanted.
Q. That he wanted what?
A. He wanted those payments to mirror the Rocawear Kids agreement.
Q. Okay. Mr. Charalambous, you can take that down. And can you please put up, just for the witness and the parties, what has been marked as Government Exhibit 231.
    Mr. Horowitz, do you recognize this as a P and L forecast for September 9th of 2014?
A. I do.
    MR. HARTMAN: The government offers Government Exhibit 231.
    MR. REISNER: No objection.
    THE COURT: It will be received.
    (Government's Exhibit 231 received in evidence)
    MR. HARTMAN: Mr. Charalambous, can you put that up for the jury, please.
BY MR. HARTMAN:
Q. Mr. Horowitz, at this point, we're at September 9th, 2014; is that right?
A. That is correct.
Q. And how much time is left in the quarter?
A. Three weeks.

LA7PCOL2    Horowitz - Direct    Page 243

Q. Okay. And there is a reference to Umbro/LC China there. What deal is being referenced there?
A. That's the joint venture with GBG for Umbro and Lee Cooper in China.
Q. And I think previously we saw a lower number here, now 18 million. What does that reflect?
A. 18 million reflects the increased purchase price of 21.5 million minus the cost basis.
Q. And what resulted in that increased purchase price?
A. Our agreement to terminate the Rocawear Kids agreement with GBG.
Q. Without the Umbro -- well, first of all, we previously saw there was a Middle East transaction that was being modeled for this quarter. Do you see that here?
A. I do not.
Q. Do you know why that's gone?
A. I believe, at this point, the Middle East joint venture had fallen through.
Q. Okay. Without this Umbro/Lee Cooper transaction, would Iconix meet its numbers for the third quarter based on this forecast?
A. No.
Q. And why is that?
A. Without the opportunities and risks listed, which include the Umbro/Lee Cooper China joint venture, Iconix would have

LA7PCOL2    Horowitz - Direct    Page 244

been $15 million short in revenue versus last year, and almost $20 million short in revenue versus consensus in revenue.
Q. Okay.
A. And from --
Q. Go ahead.
A. From a non-GAAP EPS, Iconix would have been short to the prior year by approximately 38 cents and would have missed consensus by approximately 23 cents.
Q. Mr. Charalambous, you can take that down. And can you just show for the parties and the witness Government Exhibit 1091, please.
    Mr. Horowitz, do you recognize this as an e-mail from Lauren Gee to Rob Smits at GBG, to a number of folks including yourself?
A. I do.
    MR. HARTMAN: The government offers Government Exhibit 1091.
    MR. REISNER: No objection.
    THE COURT: It will be received.
    (Government's Exhibit 1091 received in evidence)
BY MR. HARTMAN:
Q. Mr. Horowitz, the date of this e-mail is September 11th, 2014, which is two days after the forecast we just looked at. Can you read the body of the e-mail?
A. "Rob, attached please find revised drafts of the SEA JV

LA7PCOL2    Horowitz - Direct    Page 245

amendment documents for China Umbro/Lee Cooper together with black lines marked against the prior drafts. Please let me know if you have any additional comments or if your team is now signed off."
Q. And, Mr. Charalambous, could you please show us page 52 of the PDF. And scroll down. And then you can zoom in on that next-to-last paragraph.
    Mr. Horowitz, what's reflected in the redline here?
A. An increase in purchase price.
Q. Okay. And it looks like the purchase price increased from 15.5 million to 21.5 million. What accounted for that change in purchase price?
A. Our commitment to let GBG out of the Rocawear Kids agreement and the $6 million of minimum guaranteed payments that they had to pay Iconix.
Q. And originally, the marks were deemed to have a fair value of 31 million. That's crossed out and replaced with 43 million; do you see that?
A. I do.
Q. What's the reason for that change?
A. It's a doubling of the price, of the new price of the joint venture.
Q. Are you aware of any valuation work that was done to support the $43 million valuation?
A. I am not.

LA7PCOL2        Horowitz - Direct        Page 246

Q. Did you ever discuss with Mr. Cole any valuation work to support that?
A. No.
Q. What was the reason for the change?
A. The reason for the change in the fair market value was simply because the price had increased, and it was now being doubled.
Q. Mr. Charalambous, you can take that down. And then can you please show just, for the witness and for the parties, Government Exhibit 1244. If you could zoom in on the top.
    Mr. Horowitz, this is an e-mail from Ms. Gee to Rob Smits at Global Brands Group on September the 12th, 2014; so the next day. You're cc'd. Do you see that?
A. I do.
    MR. HARTMAN: The government offers Government Exhibit 1244.
    MR. REISNER: No objection.
    THE COURT: It will be received.
    (Government's Exhibit 1244 received in evidence)
BY MR. HARTMAN:
Q. Mr. Horowitz, could you just read point No. 1 in this e-mail to Mr. Smits?
A. "Revised drafts of the shareholders agreement and consideration letter, reflecting some last-minute changes to the purchase price payment schedule, as mutually agreed by our

LA7PCOL2        Horowitz - Direct        Page 247

business teams."
Q. Okay. And could we see page 4 of this document, please, Mr. Charalambous.
    Mr. Horowitz, when Ms. Gee says there was a last-minute change to the purchase price payment schedule, do you know what she was talking about?
A. Yes.
Q. What was she talking about?
A. She was talking about the adjustment in the payment schedule that we demanded that reflected the Rocawear Kids payment schedule that we were now terminating.
Q. And what are we looking at here?
A. We are looking at a layout of the payment schedule.
Q. So tell us what the changes are?
A. You can see the blue 1.3 million due on December 13th, the blue 1.1 million due on March 31st, and the blue 1.1 million due on June 30th. Those add up to the $3.5 million of guaranteed -- of minimum guaranteed payments that GBG wants to pay to Iconix for the Rocawear Kids agreement that is now being worked into the payment of the joint venture.
Q. And the significance of these dates?
A. These are the particular -- the March and 30 dates are the dates when GBG was contractually obligated to pay its Rocawear Kids payments.
Q. Mr. Horowitz, we saw previously the change in purchase

LA7PCOL2        Horowitz - Direct        Page 248

price. We see here the change in the payment schedule. Is there anywhere in these documents, that you're aware of, where the agreement to release GBG from its Rocawear Kids obligations is set out?
A. No.
Q. And to your knowledge, was that agreement conveyed to Ms. Gee or to anyone else in the Iconix legal department?
    MR. REISNER: Objection, foundation.
    THE COURT: Sustained.
Q. Just to your knowledge, Mr. Horowitz.
    MR. REISNER: Same objection.
    THE COURT: Overruled.
A. Not that I'm aware of.
Q. Had you received direction from Mr. Cole about whether to convey information about overpayments to Iconix's legal department?
A. I had.
Q. Tell us about that.
A. As I stated before, with the overpayment of the June joint venture, it was explicitly said to me to not tell Lauren Gee about the payback of the $5 million that GBG was going to overpay for the joint venture.
Q. Mr. Charalambous, you can take this down. And could you please show, for Mr. Horowitz and for the parties, what's been marked for identification as Government Exhibit 1210.

LA7PCOL2        Horowitz - Direct        Page 249

    Mr. Horowitz, do you recognize this as an e-mail that you received on September the 5th -- September 15th of 2014?
A. Yes, I am copied on it.
    MR. HARTMAN: The government offers Government Exhibit 1210.
    MR. REISNER: No objection.
    THE COURT: It will be received.
    (Government's Exhibit 1210 received in evidence)
BY MR. HARTMAN:
Q. Mr. Charalambous, let's look at the middle e-mail first.
    It's an e-mail to Ms. Gee from Mr. Smits. It says, "Hi, Rob. I just learned that the business teams agreed to a 15.5 million floor on the agreed value attributable to the China Umbro/Lee Cooper rights. We'll update the document to reflect that point and will send it across shortly for the final sign off on your end."
    Do you know who she is referring to when she says "the business teams"?
A. Yes.
Q. Who is she referring to?
A. Neil, myself from the Iconix side, and Jared Margolis and Jason Rabin from the GBG side.
Q. Okay. Let's go up to the next e-mail in the chain just to see that real quick, Mr. Charalambous.
    She says, "Attached please find a draft of the

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL2   Horowitz - Direct   Page 250

shareholders agreement revised per my note below."
And then could we go to page 78 of this PDF, please, Mr. Charalambous.
Mr. Horowitz, there's a change in the document here. Can you tell us what this paragraph relates to?
A. Yes. So at the end of the five-year period of this joint venture, GBG could either force Iconix to buy back the joint venture, the 50 percent, or Iconix could buy back the 50 percent. This paragraph lays out what the minimum amount that GBG could force Iconix to buy the JV back at.
Q. And it looks like originally, or at least in the last term of the documents, there was the amount to 21.5 million, and it was changed here to 15.5 million; is that right?
A. That's correct.
Q. Do you remember this change?
A. I do.
Q. Tell us what you remember about it.
A. The agreed-upon -- originally, the two parties agreed that the value with which Iconix would be forced to buy back the joint venture could not be less than the purchase price, which was originally 15.5 million.
When the purchase price increased to 21.5 million, the attorneys automatically increased the buyback minimum to 21.5 million. But because that 21.5 million was not just for the value of the joint venture, the minimum the company would have

LA7PCOL2   Horowitz - Direct   Page 251

to pay for the buyback of the joint venture was 15.5 million and did not include the overpayment.
Q. Do you recall who directed the lawyers to make these changes?
A. I don't.
Q. To your knowledge, did anyone explain to the lawyers the reason for the change?
MR. REISNER: Objection, foundation.
THE COURT: Overruled.
A. Not that I am aware of.
Q. And you explained that there needed to be this change. Why was it important to the business parties that the buyback amount be 15.5 million, as opposed to 21.5 million?
A. It was important because 15.5 million was the actual value or price of the joint venture without the increase in the price in exchange for the Rocawear Kids termination. The 21.5 -- the 15.5 reflected the negotiated value of the geography and a buyback five years later. The minimum was the amount that would be paid for a joint venture; so it would have been wrong to include the overpayment.
Q. When you say "wrong," do you mean from a business standpoint?
A. Correct.
Q. You can take this down. And can we see, just for the witness and the parties, Government Exhibit 1094.

LA7PCOL2   Horowitz - Direct   Page 252

Mr. Horowitz, do you recognize this as an e-mail exchange you had with Mr. Cole of September 16th of 2014?
A. Yes.
MR. HARTMAN: The government offers Government Exhibit 1094.
MR. REISNER: No objection.
THE COURT: It will be received.
(Government's Exhibit 1094 received in evidence)
BY MR. HARTMAN:
Q. And let's look at the bottom of the chain, please. Mr. Cole e-mails you and Mr. Schaefer. The subject line is GBG, and he says, "Is the deal closed?" What deal is he referencing, Mr. Horowitz, to your understanding?
A. The joint venture in China for Lee Cooper and Umbro.
Q. And you respond, "Waiting for the signature. Rob Smits went to track down Jason half an hour ago for him to sign. Haven't heard back." Do you see that?
A. I do.
Q. Do you have an understanding about why Mr. Cole is inquiring about whether the deal closed?
A. Yes.
Q. What's your understanding?
A. The deal was incredibly important to the financial results of the company for the third quarter.
Q. Okay. Let's look at what's been marked for identification

LA7PCOL2   Horowitz - Direct   Page 253

as Government Exhibit 212, please. And could we look, Mr. -- first of all, let's show Mr. Horowitz the first page and then the last page, please -- the next-to-last page.
Mr. Horowitz, do you recognize this as the final or one of the final deal documents for this SEA-3 transaction?
A. I do.
MR. HARTMAN: Okay the government offers Government Exhibit 212.
MR. REISNER: No objection.
THE COURT: It will be received.
(Government's Exhibit 212 received in evidence)
BY MR. HARTMAN:
Q. And, Mr. Charalambous, let's look at the first page.
Mr. Horowitz, the date on the document is September 17th, 2014; is that right?
A. That's correct.
Q. And then if we zoom in on the last paragraph of the first page -- I'm sorry, the next-to-last paragraph. I'm sorry, Mr. Charalambous.
What is the purchase price of the interests, according to this signed document?
A. $21.5 million.
Q. And, Mr. Charalambous, you can take this down. I'm sorry, keep this up, and just look at the page 4 of that document.
Who signed on behalf of Iconix, Mr. Horowitz?

# A-133

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL2    Horowitz - Direct    Page 254

A. Neil Cole.

THE COURT: Mr. Hartman, it is now 11:00. We'll take our first break. We'll take 20 minutes. Please be prepared to return at 11:20. Ladies and gentlemen, please do not discuss the case.

(Jury not present)

(Continued on next page)

---

LA7MCOL3    Horowitz - Direct    Page 255

THE COURT: Anything for me right now?

MR. HARTMAN: Nothing for us.

MR. REISNER: No, your Honor.

THE COURT: We will see what Ms. Kelly has to say. As the parties may be aware, I'm powerless to force an employer to pay a salary for a juror, but we will see what the particular situation is. I forget exactly what her employment is, whether it's a large corporation or a smaller outfit, but I think that will determine how we go.

Don't be late.

(Recess)

THE COURT: Can we get Mr. Horowitz in.

(Jury present)

THE COURT: Mr. Hartman.

MR. HARTMAN: Thank you, Judge.

Mr. Charalambous, can you put up Government Exhibit 212 again, real quick, please.

Q. Mr. Horowitz, remind us what this is.

A. This is one of the legal documents associated with the China joint venture for Umbro and Lee Cooper with GBG.

Q. We saw that this document was signed by Mr. Cole, is that right?

A. That is correct.

Q. Did Mr. Cole also sign the associated documents, to your understanding?

---

LA7MCOL3    Horowitz - Direct    Page 256

A. I believe that he did.

Q. To your knowledge, is the fact that Iconix had agreed to release GBG from its Rocawear Kids obligations disclosed anywhere in this document?

A. No.

Q. What about any related documents that were signed in connection with this deal?

A. No.

MR. HARTMAN: Mr. Charalambous, you can take this down.

Can we put up, just for the parties and the witness, Government Exhibit 105.

Q. Mr. Horowitz, do you recognize this as the form 10-Q that Iconix filed for the period ending September 30 of 2014?

A. I do.

MR. HARTMAN: The government offers government Exhibit 105.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 105 received in evidence)

Q. Mr. Horowitz, we have covered a lot of ground in the past couple of days. Can you just remind us what a form 10-Q is?

A. Form 10-Q is a quarterly report that a public company files with the SEC.

Q. And it is for the period ending September 30 of 2014. What

---

LA7MCOL3    Horowitz - Direct    Page 257

quarter is that?

A. That is the third quarter or July, August, and September.

Q. The transaction we have been talking about which we have been calling the SEA-3 transaction, did that occur in this quarter, the quarter ending September 30 of 2014?

A. Yes, it did.

MR. HARTMAN: Mr. Charalambous, can we see page 33 of this document.

Q. Mr. Horowitz, could you just read what's written on this page.

A. Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Q. Who signed it?

A. Neil Cole and Jeff Lupinacci.

Q. And the date that they signed it?

A. November 7, 2014.

MR. HARTMAN: Could we see page 34 of the document, please.

Q. Mr. Horowitz, this is the certification. We looked at a similar one in connection with the second quarter filing. Could you just read the first two points, please.

A. I have reviewed this quarterly report on form 10-Q for the period ended September 30, 2014 of Iconix Brand Group, Inc.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7MCOL3     Horowitz - Direct     Page 258

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading with respect to the period covered by this report.

MR. HARTMAN: Mr. Charalambous, can we go to page 12 of the report, please. Could we look at -- I think it's the paragraph that begins in September 2014.

Q. Mr. Horowitz, can you just read what's written here.

A. In September 2014, the company contributed substantially all rights to the Lee Cooper and Umbro brands in the People's Republic of China, Hong Kong, Macau, and Taiwan (together, the greater China territory) to Iconix's Southeast Asia. In return, LF Asia agreed to pay the company $21.5 million, of which 4.3 was paid at closing. As a result of this transaction, the company recorded an 18.7 million dollar gain, which is included in licensing and other revenue in the unaudited condensed consolidated income statement for the current quarter.

Q. Mr. Horowitz, what deal is being described here?

A. This is the joint for China for the Lee Cooper and Umbro brands.

Q. Are there any important parts of the deal that are not described here?

A. Yes.

LA7MCOL3     Horowitz - Direct     Page 259

Q. What?

A. That in exchange for this purchase price, Iconix was going to terminate the Rocawear Kids agreement with GBG.

Q. Why was that important from your perspective?

A. Because that commitment from Iconix was the only reason the purchase price increased from 15.5 million to 21.5 million.

MR. HARTMAN: Mr. Charalambous, can we see page 26 of the document. Can you zoom in on the highlights of the current quarter.

Q. Mr. Horowitz, could you read the three bullet points under the highlights of the current quarter.

A. Record Q3 revenue of 113.8 million, record Q3 operating income of 63.6 million, gain related to the sale of our Umbro and Lee Cooper trademarks in the greater China territory to our Iconix Southeast Asia joint venture.

Q. Mr. Horowitz, what transaction is being described in the third bullet point?

A. The joint venture for Umbro and Lee Cooper in China with GBG.

Q. And the gain that's referenced there is what?

A. The amount of revenue that the company recorded for this transaction.

MR. HARTMAN: Mr. Charalambous, you can take that down and please put up for the parties and the witness what's been marked as Government Exhibit 104. Can we go to the third page

LA7MCOL3     Horowitz - Direct     Page 260

of this, I think. Fourth page.

Q. Mr. Horowitz, do you recognize this as the press release that the company issued in connection with its third quarter 2014 earnings?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 104.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 104 received in evidence)

Q. Mr. Horowitz, could you read the headline -- first of all, what's the date of the press release?

A. The press release is dated October 28, 2014.

Q. When is that in relation to the end of the third quarter?

A. Approximately one month later.

Q. Can you read the headline, please.

A. Iconix Brand Group reports record revenue and earnings for the third quarter 2014.

Q. When the press release says record revenue, what do you understand that to mean?

A. All-time high.

Q. Could you read the first bullet point there.

A. Record Q3 diluted non-GAAP EPS of 73 cents, a 23 percent increase over prior year quarter.

Q. We talked about this yesterday, but can you tell us what

LA7MCOL3     Horowitz - Direct     Page 261

the press release means by a 23 percent increase over a prior year quarter?

A. It means that the non-GAAP earnings per share was 23 percent better than the prior year at the same time.

Q. Can you read the second bullet point.

A. Record Q3 revenue of 113.8 million, a 6 percent increase over prior year quarter.

MR. HARTMAN: Mr. Charalambous, can we zoom in on the quote from Mr. Cole at the bottom of the press release.

Q. Mr. Horowitz, can you read the quote.

A. Our strong third quarter and year-to-date results reflect the continued strength of our overall portfolio and the power of our business model. With solid brand performance domestically, supported by large direct to retail licenses, and double-digit growth around the world driven by our Global Brands and joint ventures, we continue to execute in line with our successful track record. As we look to 2015, we expect to continue to drive positive organic growth, and with our strong balance sheet we plan to deliver additional value as we execute on our acquisition strategy and continue to opportunistically repurchase stock.

Q. Mr. Horowitz, when Mr. Cole references double-digit growth, do you understand what he means by that?

A. Yes.

Q. What does he mean?

# A-135

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL3          Horowitz - Direct          Page 262

A. He means percentages higher than 10.

Q. I think we saw earlier that the company reported 23 percent increase in its non-GAAP EPS over the prior year quarter. Does that sound right?

A. Yes, it does.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Q. Mr. Horowitz, did the company ultimately terminate the Kids Headquarters license for GBG?

A. I do not believe so.

Q. Did you discuss, after this deal was concluded, whether or not that was a good idea with Mr. Cole?

A. Yes.

Q. Describe those conversations.

A. Neil had come to the conclusion that Iconix could not afford to terminate the GBG Rocawear Kids agreement.

Q. Was that conveyed to GBG at the time that this deal closed in September of 2014?

A. No, it was not.

Q. What was the deal, as you understood it, in September of 2014?

A. That Iconix was going to terminate the Rocawear Kids agreement with GBG.

Q. And in exchange for that, what would GBG do?

A. In exchange for that, which would relieve them of $6

LA7MCOL3          Horowitz - Direct          Page 263

million of guaranteed payments to Iconix, GBG would pay $6 million more for the joint venture.

MR. HARTMAN: Could we see what's been marked for identification as Government Exhibit 1096 for the witness and the parties.

Q. Mr. Horowitz, do you recognize this as an e-mail that you sent to Mr. Rabin on September 22, 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1096.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1096 received in evidence)

Q. Mr. Horowitz, I think we saw that the transaction closed, the SEA-3 transaction closed on September 17. Does that sound right?

A. That sounds correct.

Q. The date of this e-mail is September 22. So how long after the close of the transaction is this?

A. Approximately five days.

Q. Can you read the first two sentences in your e-mail.

A. Jason, I worked with the new licensee for Rocawear Kids over the weekend. Below are the terms in which they will take all goods, as they sent to me, existing/aged, on order, and WIP?

LA7MCOL3          Horowitz - Direct          Page 264

Q. Can you read the next sentence as well.

A. Please let me know if this works for you, and we will update the termination agreement and finalize this week.

Q. Mr. Horowitz, why are you sending Mr. Rabin this e-mail?

A. Because we have agreed to terminate his Rocawear Kids license, and now we are working on a transition to the new licensee.

Q. When you say, we will update the termination agreement and finalize this week, what do you mean?

A. That we will terminate the Rocawear Kids agreement and their obligation to pay minimum guaranteed royalties this week.

Q. Why were you agreeing to do that?

A. Because agreeing to do that was part of the increased purchase price of the joint venture that we had just finalized.

MR. HARTMAN: Mr. Charalambous, you can take that down.

And can we see, just for the witness and the parties, Government Exhibit 1214.

Q. Mr. Horowitz, do you recognize this as an e-mail you sent to Mr. Cole on September 22, 2014?

A. I do.

Q. Is that the same date as the e-mail you just sent to Mr. Rabin?

A. I believe that it is.

MR. HARTMAN: The government offers Government Exhibit

LA7MCOL3          Horowitz - Direct          Page 265

1214.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1214 received in evidence)

MR. HARTMAN: Could we see the attachment, please, Mr. Charalambous.

Q. Mr. Horowitz, the first bullet point here references 2014 financial results.

What are you talking about there?

A. I'm talking about the financial results as projected for the company in 2014.

Q. When you say financial results, do you mean year-end financial results?

A. I believe that I do.

Q. There is a bullet here that says: Reviewed Maslaton's new sheet.

What's that a reference to?

A. Those are the sheets that we have looked at with the opportunities and risks.

Q. The next bullet point says: If ME JV does not happen, do we want backups.

Can you explain what that's about?

A. In the 2014 full-year projections, we had still counted on a Middle East joint venture happening. Now it's been pushed back into the fourth quarter, and I am asking Neil if we want

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL3    Horowitz - Direct    Page 266

backups or other options if the Middle East joint venture does not happen again.

Q. What do you mean by other options?

A. Other ways to generate revenue outside of normal licensing, whether it be joint ventures or sale of IP.

Q. No. 2, the bullet point says Rocawear Kids. The first bullet point there says: Negotiating on behalf of New Rise with GBG transition of orders/inventory, etc. The second bullet point says takeover scheduled for October 1.

What is that a reference to?

A. As of this date, we are terminating the Rocawear Kids license with GBG. There is a transition from one licensee, GBG, to the new licensee, New Rise, scheduled for October 1.

Q. As of October 1, would GBG have ongoing obligations under the royalty agreement?

A. No.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Could you please show for the witness and for the parties what's been marked for identification as Government Exhibit 1098.

Q. Mr. Horowitz, do you recognize this as an e-mail you received from someone named John Reda or was cc'd to you on September 26, 2014?

A. Yes.

LA7MCOL3    Horowitz - Direct    Page 267

MR. HARTMAN: The government offers Government Exhibit 1098.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1098 received in evidence)

Q. Mr. Horowitz, the date of this e-mail is September 26, 2014. The sender is John Reda who, according to the signature at the bottom, is an assistant corporate controller, Global Brands Group.

Do you see that?

A. I do.

Q. They are sent to Mr. Maslaton and they are cc'd to you and Ethan Cole. Remind us who Ethan Cole is.

A. Ethan Cole was an associate at GBG.

Q. The subject line says invoices for marketing costs and then the text says: Please see attached invoices for marketing costs related to the respective brands. Our bank information is on the invoices. Please call either Ethan or myself if you have questions.

MR. HARTMAN: Can we see the attachment, please.

Q. Let's look at the first one. This is an invoice, dated September 25, 2014.

Do you see that, Mr. Horowitz?

A. I do.

Q. Can you read the description of the charge.

LA7MCOL3    Horowitz - Direct    Page 268

A. Marketing costs.

Q. Above that, what does it say?

A. For Massimo or SEA, or Southeast Asia, marketing costs.

Q. What's the amount that's being invoiced?

A. $2 million.

Q. Just to be clear, what is an invoice?

A. An invoice is an ask for payment for services rendered.

Q. It says due upon receipt.

Did you understand what that meant?

A. Yes.

Q. What does that mean?

A. It means payment was due immediately upon receipt of this invoice.

Q. Were you surprised to receive an invoice related to Massimo SEA from GBG?

A. Yes and no.

Q. Why no?

A. We had asked GBG to invoice us in this amount for Massimo.

Q. Why do you say yes?

A. This was not, from a timing perspective, how we had asked them to invoice us. We asked or instructed them to invoice us for 50 percent of it as it related to 2015, the next year, and the remaining 50 percent to be split between Q3 and Q4. And this was taking the entire amount and putting it into Q3.

Q. Let's look at the second page of this. How is this

LA7MCOL3    Horowitz - Direct    Page 269

described?

A. For Peanuts China marketing costs.

Q. What's the amount?

A. $2 million.

Q. Do you know or were you surprised to see that you were getting invoiced for Peanuts China?

A. No.

Q. Why not?

A. We had requested that GBG invoice us for marketing for Peanuts China.

Q. Tell us why you had identified Peanuts China as something they should invoice you for.

A. As it was expressed to me, Peanuts was a brand where we shared marketing costs, so part of this $2 million would actually be paid for by our partner in the Peanuts brand.

Q. Let's look at the third invoice. This is a million dollars for Zoo York.

You see that?

A. Yes.

Q. Again, were you surprised with the invoice for Zoo York?

A. Again, I was not surprised at the amount or the brand, but I was taken aback by the timing.

Q. We looked at a document earlier where you had discussed with GBG which brands Iconix wanted to be invoiced for.

Do you recall that document?

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL3    Horowitz - Direct    Page 270

A. I do.

Q. Did you give those instructions to GBG?

A. I did.

Q. Did you discuss with Mr. Cole the fact that you were going to give those instructions to GBG before you did it?

A. Yes, I did.

Q. The invoices are all round numbers. They are 2 million, 2 million, and 1 million.

Is that something that you remember remarking on?

A. I remember having conversations about that after receiving these invoices.

Q. Who were those conversations with?

A. Those conversations were with Neil Cole.

MR. HARTMAN: Can we see the cover page again, Mr. Charalambous.

Q. This e-mail comes on September 26, 2014, is that right?

A. That's correct.

Q. One more question. What dictated the amounts of the invoices, to your understanding?

A. The amount of money that we owed GBG from the June joint venture.

Q. Which was how much?

A. $5 million.

Q. To your understanding, had Iconix determined that it owed GBG $2 million from Massimo marketing?

LA7MCOL3    Horowitz - Direct    Page 271

A. I'm sorry. Can you repeat that.

Q. To your understanding, had Iconix determined that it owed GBG $2 million from Massimo marketing?

A. Yes.

Q. It had determined that it actually owed that to GBG?

A. No. We just came up with brands and numbers kind of with some thought, but haphazardly, but not in relation to any work that had been done.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Can you show, just for the witness and for the parties, Government Exhibit 1101.

Q. Mr. Horowitz, is this an e-mail that you sent to Joanna Pompilio on September 29?

A. It is.

MR. HARTMAN: The government offers Government Exhibit 1101.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1101 received in evidence)

Q. Look at the bottom. Is this a forward of the e-mail that you got from Mr. Reda attaching the invoices?

A. It is.

Q. The date that Mr. Reda sent them was Friday September 26, correct?

LA7MCOL3    Horowitz - Direct    Page 272

A. That's right.

Q. The top part of the e-mail is you forwarding them to her and then you say: Please print out two copies of these attachments.

Do you see that?

A. I do.

Q. Do you know what day of the week September 29 is?

A. It is a Monday.

Q. Do you remember why you asked her to print two copies?

A. I believe it was for Neil and I to discuss what we received.

Q. Why did you want to discuss this with Mr. Cole?

A. Because it did not reflect the direction that we had given GBG, and I needed to know what he wanted to do.

Q. Why were you talking to him about it?

A. Because he was the one who would make decisions on what steps we should take next.

MR. HARTMAN: Could you take this down, please, Mr. Charalambous.

Show, just for the witness and for the parties, what's been marked as Government Exhibit 1104.

Q. Mr. Horowitz, do you recognize this as an e-mail chain between yourself and Pauline Israel on September 29 of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit

LA7MCOL3    Horowitz - Direct    Page 273

1104.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1104 received in evidence)

Q. Mr. Horowitz is this e-mail from the same day that you asked Ms. Pompilio to print out the invoices?

A. Yes, it is.

Q. Let's start at the bottom of the chain. You e-mail Mr. Cole that morning at 9:06 and you say: Neil, I have a meeting with Jason at 3:30 today at the Empire State Building. Then meeting with Jared and Ethan. Can we spend some time today discussing prior to me heading over.

Do you see that?

A. I do.

Q. Who is the Jason that's being referenced here?

A. Jason Rabin.

Q. And the Jared and Ethan, who are they?

A. Jared Margolis and Ethan Cole of GBG.

Q. The reference to the Empire State Building, what is that a reference to?

A. The Empire State Building is where the GBG headquarters were.

MR. HARTMAN: Let's zoom out.

Q. What does Mr. Cole say in response?

A. OK. Will be in around 1.

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL3        Horowitz - Direct        Page 274

Q. You forwarded this chain to Pauline Israel. You say: Good morning, Pauline. Does Neil have 30 minutes at 2 p.m. to discuss GBG?

Who is Pauline Israel?

A. Pauline was Neil's assistant.

Q. What is it that you wanted to discuss with Mr. Cole on this day?

A. The invoices that we had received from GBG.

Q. Did you meet with Mr. Cole on the 29th?

A. I believe that I did.

MR. HARTMAN: Let's take this down.

Actually, can we just read the last one, Mr. Charalambous, on this.

Q. She says: Let's put it in, but we have been moving things around since he got flooded yesterday. So if we have to move it again, I'll try to give ample notice.

MR. HARTMAN: Let's take this down.

Mr. Charalambous, can you please put up for the witness and for the parties Government Exhibit 232.

Q. Mr. Horowitz, do you recognize this as a document you prepared on September 29, 2014?

A. I believe that it is a document that I had created prior to September 29, but was then updating based on a conversation with Neil on September 29.

Q. Does this reflect your conversation with Mr. Cole about how

LA7MCOL3        Horowitz - Direct        Page 275

to deal with the invoices?

A. Yes, it does.

MR. HARTMAN: The government offers Government Exhibit 232.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 232 received in evidence)

Q. Mr. Horowitz, tell us what's going on in this document.

A. This document, under point 1, reflects pieces of a conversation that I had with Neil and his reaction on the invoices that were received the prior Friday.

Q. In yellow it says: Received invoices on Thursday for this amount payable immediately.

Why did you write that?

A. Because that is what we were going to discuss.

Q. And then it says: 1 million Zoo York Europe. Show us work real expenses, billed by TLC.

What does that mean?

A. First bullet point, $1 million, Zoo York Europe. Neil's response to this and Peanuts China was that these invoices were insufficient to kind of cover up that these payments were just round numbers masked to repay what we owed GBG from the June joint venture, and he wanted them to provide us with something that showed work that had actually been done, backed up with expenses and not just a one sheeter that had that round dollar

LA7MCOL3        Horowitz - Direct        Page 276

amount on it, and he wanted it to be billed by TLC, not GBG.

Q. What is TLC?

A. TLC is a licensing and marketing company that was owned by GBG.

Q. Did TLC have a relationship with Iconix?

A. Yes. TLC was part of the joint venture in Europe.

(Continued on next page)

LA7PCOL4        Horowitz - Direct        Page 277

Q. Okay. And tell us about that joint venture?

A. There was a joint venture in Europe that predated all of the joint ventures we have discussed in which Iconix was now a 49 percent -- excuse me, it was a 51 percent, a majority owner, and GBG/TLC was a 49 percent owner.

Q. To the extent TLC did work promoting Iconix brands in Europe, who would pay for the expenses associated with that?

A. The joint venture would pay for that.

Q. So how would that be divided?

A. If TLC did work for a brand that was in the joint venture, the joint venture would be billed, and that expense would be split between the joint venture partners.

Q. And was that pursuant to the joint venture agreement?

A. Yes, it was.

Q. The last bullet point is in red here, and it says fund GBG local marketing for Zoo York/Ecko Unlimited/Ed Hardy, fund from Luxco with money going through JV and back out to GBG. What does this reflect?

A. This reflects an idea that Neil raised, and then we decided to not go forward with, which is why I put it in red. Iconix had been building a large amount of cash in Luxembourg and could not repatriate or bring that money back into the United States to use, and this was one way in which that money might have been able to have been used.

Q. So this is just another way of getting back the 5 million?

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

---

LA7PCOL4    Horowitz - Direct    Page 278

A. Correct, a way of funding that.

Q. Why is it in red?

A. We decided not to do it.

Q. We thought these invoices were for Zoo York, Peanuts and Mossimo. The third bullet point says Unlimited/Rocawear, why was that?

A. I believe it's because Neil changed his mind about which brands he wanted us to be invoiced for.

Q. Didn't it matter which brands you should be invoiced for?

A. No, it did not.

Q. Why not?

A. Because the invoices were not real. They were just prices for the brands in order to get $5 million back from GBG.

Q. Mr. Charalambous, you can take that down. And could we see, just for the witness and the parties, Government Exhibit 1111, please?

A. Could I make a clarification?

Q. Sure.

A. The work done on those invoices were not real. The invoices themselves were real.

Q. Explain what you mean by that.

A. So an invoice is a request for payment. So the actual invoice was real. It was a document, and we requested more backup to these invoices, but the work itself that was put into those invoices was not real.

---

LA7PCOL4    Horowitz - Direct    Page 279

Q. When you say "the work," you mean the marketing work?

A. Correct.

Q. Okay. Let's look at Government Exhibit 1111. Mr. Horowitz, do you recognize this as an e-mail from Ethan Cole to yourself on October 2nd of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1111.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1111 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, after the meeting you had with Mr. Cole on the 29th, did you convey what he told you to GBG?

A. Yes.

Q. Okay. Did you convey anything about how the numbers should be represented on the invoices?

A. Yes.

Q. What did you convey?

A. I conveyed to GBG that it couldn't be round numbers, which was the direction I was given by Neil.

Q. Okay.

A. It had to look like real invoices. It could not have round numbers.

Q. And did Mr. Cole say that to you?

---

LA7PCOL4    Horowitz - Direct    Page 280

A. Yes.

Q. This is an e-mail from Mr. Ethan Cole on October 2nd, 2014. The text, that says "Please find attached the marketing invoices for Zoo York, Mossimo and Peanuts, and in the link below please find the decks related to each," and there's a link.

Let's look at the attachment, please. Okay. Zoom in, please.

Mr. Horowitz, can you read the invoice here?

A. For Zoo York, marketing costs related to: comprehensive positioning, marketing and launch analysis for SEA. Comprehensive research and marketing analysis complete with launch plan for Europe.

Q. Mr. Horowitz, do you understand what the invoice means by comprehensive positioning, marketing and launch analysis for SEA?

A. I'm sorry, can you ask that question again?

Q. Yes. What does that mean?

A. It means that there would have been a tremendous amount of work done for the Zoo York brand in terms of where the brand should be positioned in the marketplace, the actual marketing concepts and potential executions and where to launch the brand.

Q. And to your understanding, had GBG done a tremendous amount of work to do that?

---

LA7PCOL4    Horowitz - Direct    Page 281

A. No.

Q. Is that the same true of Europe?

A. Yes.

Q. The amount on this invoice is $955,710; is that right?

A. That's correct.

Q. Did you ever see any math that would explain how GBG arrived at this number, $955,710?

A. No.

Q. Remind us how much the invoice was for when it was first sent to Iconix?

A. $1 million.

Q. What's your understanding of how this number was arrived at?

A. My understanding is that it was a number made up that was not a million dollars even but that would pass a quick eye test as a justified invoice.

Q. So let's look at the third page. Mr. Horowitz, can you describe the description of the work that was done here?

A. For Mossimo, marketing costs related to: developing a comprehensive marketing strategy plan for SEA, design and trend analysis, comprehensive marketing and positioning analysis for Europe.

Q. And what's the total that's billed under this invoice?

A. $1,940,230.

Q. Did you ever see any explanation of how GBG arrived at this

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7PCOL4    Horowitz - Direct    Page 282

number?

A. No.

Q. What was the amount of the Mossimo invoice in the first iteration that Iconix got?

A. $2 million.

Q. So what's your understanding of how GBG arrived at this number?

A. Again, that it was a made-up number that was close to $2 million but not exactly $2 million.

Q. Can we see the fourth page, please. And can you read the description of the marketing work performed for Peanuts?

A. For Peanuts: marketing costs related to: strategic analysis of China, Hong Kong, Macau and Taiwan market. Marketing and launch strategy for China, Hong Kong, Macau and Taiwan. IAPM mall event. Art and life event. Strategic analysis of Korea and SEA market complete with marketing plan.

Q. And how much is being billed here?

A. $2,104,060 million.

Q. How much was the original of this invoice for?

A. $2 million.

Q. And to your understanding, the description of services performed here, did that correspond to work that GBG had actually done for Iconix?

A. Not that I am aware of.

Q. Okay. And did you ever see back up to support the

LA7PCOL4    Horowitz - Direct    Page 283

$2,104,060?

A. No.

Q. You can take that down. And could you please show -- actually, can you put that back up. I'm sorry, Mr. Charalambous. The first page there.

There's a reference to decks and a link here. Mr. Horowitz, do you see that?

A. I do.

Q. Do you know what was behind that link?

A. In general I do.

Q. What was that?

A. A series of visual representations of work.

Q. Do you remember looking at the visual representations associated with these invoices?

A. Yes.

Q. And did they support the amounts that GBG was billing for?

A. No.

Q. You can take that down. Can we see what's been marked as Government Exhibit 1211.

Mr. Horowitz, do you recognize this as an e-mail that was sent to -- from you to Mr. Cole on October 13th of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1211.

MR. REISNER: No objection.

LA7PCOL4    Horowitz - Direct    Page 284

THE COURT: It will be received.

(Government's Exhibit 1211 received in evidence)

BY MR. HARTMAN:

Q. Could we see the attachment, please.

Mr. Horowitz, is this your update to Mr. Cole on October 13th?

A. It is.

Q. Okay. The revised invoices we just saw came on October 12th. Do you see a reference to them here in the update?

A. I do.

Q. Can you point that out for us?

A. I see one reference under bullet one, four lines down.

Q. Okay.

A. GBG global marketing.

Q. So GBG global marketing relates to those invoices; is that right?

A. That's correct.

Q. And that's a sub-bullet under a bullet that says "update Q4, set goals," right?

A. That's correct.

Q. What are you telling Mr. Cole here?

A. That the Q4 financial goals will be impacted by the GBG global marketing.

Q. Okay. And explain what you mean by that?

LA7PCOL4    Horowitz - Direct    Page 285

A. The GBG global marketing, based on the timing of its invoicing, will now impact negatively the financials for the fourth quarter.

Q. Why is that?

A. Because should Iconix process and pay those invoices in the fourth quarter, then the fourth quarter results will have a negative $5 million against its revenue.

Q. We saw earlier that you testified that you and Mr. Cole had discussed spreading these payments, or repayments, out over several quarters; is that right?

A. That's correct.

Q. When the revised invoices came back, had that been done?

A. It had not.

Q. Okay. And do you remember talking about that with Mr. Cole?

A. Yes.

Q. Describe those conversations?

A. Neil told me not to do anything with the invoices until I heard further from him.

Q. Okay. I think, actually, Mr. Horowitz, I want to skip back a little bit to before your meeting with Mr. Cole on September 29th and look at a document together.

Mr. Charalambous, could you please put up Government Exhibit 1100 just for the witness and for the parties.

Mr. Horowitz, do you recognize this as an e-mail that

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

| LA7PCOL4 | Horowitz - Direct | Page 286 |
| --- | --- | --- |

you sent to David Maslaton?

A. Yes.

Q. On September 29th?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 1100.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1100 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, this is September 29th. So remind us which version of the invoices you've received at this point?

A. At this point, we have received the round number invoices.

Q. Okay. And you -- the original e-mail goes to Mr. Maslaton and is cc'd to you; is that right?

A. That's correct.

Q. And to your understanding, why would it go to Mr. Maslaton?

A. Because Mr. Maslaton was in the finance department.

Q. Okay. And then you responded and you say, "David, please don't do anything with these. Don't know what they are thinking. Meeting with them this afternoon."

Who is the "they" there?

A. "They" is GBG.

Q. Okay. And why did you tell him not to do anything with these?

| LA7PCOL4 | Horowitz - Direct | Page 287 |
| --- | --- | --- |

A. Because these invoices did not reflect the timing that we had agreed to, and I believe that I was instructed by Neil to tell David not to do anything with these.

Q. Okay. Let's take this down. Actually, could we go back to 1211, please, Mr. Charalambous. And can we see the attachment and scroll down, please.

Okay. The section that says "Rocawear Kids," Mr. Horowitz, we're on October 13th of 2014. So how long is this after the close of the SEA-3 transaction?

A. Almost three weeks.

Q. Okay. Can you read what is described here?

A. "Rocawear Kids. Agreed to terms with Jason. Have drafted, but holding off on sending docs until requested. Still no requests for docs. SalesCo will take over January 1st, 2015."

Q. What are you relaying to Mr. Cole here?

A. That I have not sent the new agreement over to GBG and that they have not requested them. In addition, the takeover of the new licensee has been moved from October 1st to January 1st.

Q. Why did you not send a revised documents to GBG?

A. I was told not to send the revised documents to GBG until I had his authorization.

Q. Did he tell you why he wanted you to hold off?

A. Not at the time, he did not.

Q. Now, the takeover had been pushed. We previously saw that it was scheduled for October 1st, and now you're saying it will

| LA7PCOL4 | Horowitz - Direct | Page 288 |
| --- | --- | --- |

happen January 1st. Do you remember any conversations about that?

A. I don't recall any specific conversations about that.

Q. Okay. We had previously discussed concerns that you and Mr. Cole had about releasing GBG from the Rocawear Kids agreement without a replacement. Did you continue to have those concerns after the SEA-3 transaction closed?

A. Yes.

Q. Okay. And did Mr. Cole share those concerns with you?

A. Yes, he did.

Q. Okay. Let's take this down. And can we see, just for the witness and for the parties, what's been marked as Government Exhibit 1118. And let's go to the bottom -- I'm sorry.

Mr. Horowitz, is this an e-mail change between yourself and Erika Alford on October 30th of 2014?

A. It is.

MR. HARTMAN: The government offers Government Exhibit 1118.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1118 received in evidence)

BY MR. HARTMAN:

Q. So let's go to the bottom of this. Mr. Charalambous, do we have the last page there? Well, maybe it got cut off. There we go. Thanks.

| LA7PCOL4 | Horowitz - Direct | Page 289 |
| --- | --- | --- |

Mr. Horowitz, can you read Ms. Alford's e-mail to you?

A. "I've got gotten a few calls and e-mails this week from Global Brands' senior legal team asking for updates and to wrap up this agreement. Let's please discuss this tomorrow, how you would like me to respond. Thanks, Erika."

Q. Do you know what agreement she's referring to?

A. Yes.

Q. What agreement?

A. She's referring to the Rocawear Kids termination.

Q. Okay. Let's go up the chain. You asked for the latest draft.

You can take that down.

She sends it to you. And you say above that "Maurice will sit with you to discuss. In the meantime, please tell their attorneys that the business leaders have two outstanding points to work out."

And then let's go up the chain.

She says "Attached is a revised version based on my discussions with Maurice. Please let me know if either of you has any questions or comments, or if you would like me to send this to Global Brands."

And then you respond, "Thank you. Do not send to anyone external until I approve in writing. Thank you."

Mr. Horowitz, why did you tell Ms. Alford not to send out the revised agreement?

**A-142**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

---

LA7PCOL4     Horowitz - Direct     Page 290

A. Because I was instructed by Neil to make sure that document did not get sent until I have his approval.

Q. Let's take this down. And could you please show, for the witness and for the parties, what's been marked for identification as Government Exhibit 1122.

Mr. Horowitz, do you recognize this as a calendar invite for a meeting that you had with folks from GBG?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1122.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1122 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, what is the date of the meeting that's scheduled?

A. The date of the meeting is November 3rd, 2014.

Q. And what is the location for the meeting?

A. The location appears to be at the GBG headquarters.

Q. Okay. ESB stands for what?

A. I'm not sure.

Q. Okay. How do you know it's the GBG headquarters?

A. The ninth floor executive conference room.

Q. Remind us where the GBG headquarters was located?

A. At the Empire State Building.

---

LA7PCOL4     Horowitz - Direct     Page 291

Q. Okay. Can you take that down, please?

And could you please show, for the witness and for the parties, what's been marked for identification as Government Exhibit 706.

Mr. Horowitz, do you recognize Government Exhibit 706 as a document that you prepared in anticipation of that meeting on November 3rd?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 706.

MR. REISNER: Objection, hearsay and lack of foundation.

THE COURT: Folks, want to come up?

(Continued on next page)

---

LA7PCOL4     Horowitz - Direct     Page 292

(At the side bar)

THE COURT: Tell me what this is.

MR. HARTMAN: Sure, Judge. Mr. Horowitz will testify that this is a spreadsheet that he made to prepare for the meeting with GBG on November the 3rd. The spreadsheet sets out the overpayment for SEA-2 and SEA-3 transactions and the modes in which Iconix proposed to pay back the money to GBG.

It's plainly a statement in furtherance of the conspiracy. I think the Court can make an oral finding based on the information that's been presented so far and so we'd offer it.

MR. REISNER: It sounds like it's a document that Mr. Horowitz created for himself; so it's hard to see how it's a statement in furtherance of the conspiracy. It would seem to be hearsay on its face.

THE COURT: He prepared this document at the time he was employed by Iconix in connection with the proposed transaction?

MR. HARTMAN: That's correct.

THE COURT: I'm going to allow it.

MR. REISNER: Okay.

(Continued on next page)

---

LA7PCOL4     Horowitz - Direct     Page 293

(In open court)

THE COURT: What's the exhibit number?

MR. HARTMAN: 706, your Honor.

THE COURT: 706 will be received.

(Government's Exhibit 706 received in evidence)

BY MR. HARTMAN:

Q. Mr. Charalambous, if you can show that to the jury.

Mr. Horowitz, what is this document?

A. This document is an analysis of the value of the joint ventures versus what was actually paid for the joint ventures and how that money may be returned.

Q. Okay. Mr. Charalambous, can we see the metadata. Can you go to the file and info.

Mr. Horowitz, what's the last modified date of this document?

A. 11-3-2014.

Q. And remind us what was happening on November 3rd of 2014?

A. This meeting with GBG.

Q. Okay. Mr. Charalambous, let's go back to the data.

Mr. Horowitz, there's a lot happening here. First, tell us how this document was prepared?

A. This document was prepared, I believe, by both David Maslaton and I. I believe that David was sitting at my desk, and we were working on it together in my office at Neil's request.

---

Min-U-Script®     Southern District Court Reporters     (26) Pages 290 - 293

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7PCOL4          Horowitz - Direct          Page 294

Q. And what was the reason for putting this together?

A. We needed to settle with GBG the monies that we owed them, the Rocawear termination timing, and whether or not that was going to happen, and begin to contemplate other transactions in which we could payback or move money around.

Q. Row 13, cell B, it says "Korea." Do you know what that's a reference to?

A. That's in reference to the part of the June joint venture with GBG.

Q. And then beneath it says "Europe"?

A. That was the other part of the joint venture from June.

Q. Okay. There's then a description under Summary. Is that a description of that June joint venture?

A. It is.

Q. So that's what we've been referring to as SEA-2; is that right?

A. That's correct.

Q. Okay. Then column E, next to Korea and Europe, the column says "5.5x value," and then there are numbers there. What is being represented there?

A. A valuation of the -- a valuation used to pay for 50 percent of the joint venture, a valuation that was used on a regular basis by Iconix.

Q. Okay. And you testified about this 5.5x multiplier. Explain that again?

LA7PCOL4          Horowitz - Direct          Page 295

A. On many occasions, whether in acquisitions or in sales of IP or joint ventures, Iconix and the marketplace would use a licensing number or a revenue number and multiple that by five-and-a-half times to get a valuation.

Q. Next to that it says "Gross Price;" what is that?

A. That's the amount that GBG paid for its 50 percent interest in the joint venture.

Q. Okay. And then there's a column that says "Net." What is that?

A. Net is the overpayment above the valuation.

Q. Okay. Now, Mr. Horowitz, you've been telling us that the overpayment for the SEA-2 transaction was 5 million. Here, it looks like it's six-and-a-half. Can you explain that?

A. Yes. Using the five-and-a-half times multiple was a little bit more difficult in this scenario because the trailing revenue tied to a licensee that was on the verge of bankruptcy. So those numbers were not exactly accurate under the five-and-a-half-times value. It is a fact that it was a $5 million overpayment.

Q. Okay. The row below, which says "China" and then next to it says "LC and Umbro," and then it says "15.5 million" under the five-and-a-half, gross 21.5, net six, what's being set out there?

A. Again, here, the 15.5 was actually the agreed-upon price for the joint venture for the Cooper and Umbro in China, and

LA7PCOL4          Horowitz - Direct          Page 296

the price paid was actually 21.5 million, and they overpaid by $6 million.

Q. Why were you setting out these amounts in the net column?

A. To display what the overpayment was and how much money Iconix owed back to GBG.

Q. Underneath the China row, there's a row that says U.S., Rocawear Kids termination, eliminate $5 million in royalties for 2014 and 2015, and there's a negative 3.5 million in the net column. Can you explain what's going on there?

A. So net line, the negative $3.5 million takes into consideration Iconix's terminating the Rocawear Kids agreement and, therefore, losing or giving back $3.5 million, Iconix losing the 3.5 million, GBG gaining the 3.5 million.

Q. So why is that negative, as opposed to positive?

A. Because that was a loss for Iconix.

Q. So that's money flowing from Iconix to -- I'm sorry, from how does it go?

A. So that is Iconix relieving GBG of a contractual obligation to pay $3.5 million, resulting in 3.5 million less for Iconix.

Q. Okay. The next row says, Global, marketing initiatives to stimulate JV's incremental 5 million in marketing investment. And if you go over, there's a $5 million amount in column H. What does that represent?

A. That represents the $5 million that we owe to GBG from the June joint venture.

LA7PCOL4          Horowitz - Direct          Page 297

Q. Okay. Mr. Charalambous, can you zoom over to the right, please.
Mr. Horowitz, what is happening on the right-hand side of the spreadsheet?

A. So I think it would be easiest to take just 2014 and those three columns in one bite. The guaranteed -- the first column, the guaranteed distribution/relief and/or investment was the guaranteed money from Iconix to GBG, what was called previously a plug. So GBG had a plug of 1.5 million, 2.5 million and 1 million. GBG was also going to get $5 million in repayment from the June joint venture. Totaling $10 million going back to GBG.

Q. So is this looking at one way in which you could settle up the overpayment?

A. That is correct.

Q. Why were you setting all this out in the spreadsheet?

A. Because Neil wanted all of the tools at his fingertips to negotiate how we were going to settle up all of this money should Iconix not allow GBG out of its Rocawear Kids agreement.

Q. Did you review the spreadsheet with Mr. Cole?

A. Yes.

Q. Can we go over to the left, please, Mr. Charalambous, and go down. Let's go down a little further.
There's a reference to 2014 Middle East North Africa revenue; do you see that?

LA7PCOL4    Horowitz - Direct    Page 298

A. I do.

Q. And there's a section here, Incremental marketing expenses; do you see that?

A. I do.

Q. Why is that on the sheet?

A. At this point, there was -- we were contemplating paying back GBG the $6 million that we owed them, that was supposed to be given back to them through the Rocawear Kids termination, but giving it to them in another, made-up marketing expense, similar to the June joint venture of $5 million.

Q. You told us earlier you don't know whether GBG was ever released from its marketing -- from its obligations under the kids headquarters agreement; is that right?

A. That's correct.

Q. Do you know whether the Middle East transaction was used to repay some of that money?

A. I believe that it was.

Q. Okay. What do you base that on?

A. As part of the eventual Middle East joint venture, Iconix paid back to GBG $3.1 million for market analysis.

Q. Were you involved in negotiating that payment?

A. No, I was not.

Q. Who negotiated it, to your understanding?

A. Neil Cole.

Q. Mr. Charalambous, we can take this down. And can we see,

LA7PCOL4    Horowitz - Direct    Page 299

just for the witness and for the parties, what's been marked for identification as Government Exhibit 1123.

Mr. Horowitz, do you recognize this as an e-mail you sent to Mr. Cole on November 3rd, 2014?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 1123.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1123 received in evidence)

BY MR. HARTMAN:

Q. The e-mail says, "Meeting with Jason and Jared went well. Will update you in the a.m."

Mr. Horowitz, what meeting are you referring to here?

A. I'm referring to the meeting I had at GBG the prior day.

Q. What was discussed at that meeting?

A. I believe that we discussed the marketing payments that were owed to them for $5 million and how and when that was going to be repaid.

Q. Let's take that down. And can you show, just for the witness and the parties, what's been marked for identification as Government Exhibit 1126.

Mr. Horowitz, up until this point, we're in November now; is that right?

A. That's correct.

LA7PCOL4    Horowitz - Direct    Page 300

Q. We saw that there was some invoices that were sent to Iconix around the beginning of October, I think. Had Iconix paid those invoices as of November 3rd?

A. No.

Q. Why not?

A. Neil had told me to hold off on anything to do with the invoices and should -- if we had paid those invoices or any portion of those invoices or even put them through finance, if those invoices dated back to the third quarter, they would have had to have been accounted for in the third quarter.

Q. And why was that an issue?

A. It is my belief that Neil did not want them in the third quarter, and that's why he had me hold off on doing anything with them.

Q. But why not, though?

A. It would have negatively impacted the financial results of the third quarter.

Q. Okay. You described conversations you remember having with Mr. Rabin, Mr. Margolis from GBG around this time. What was their position with respect to the invoices?

A. They wanted to get paid.

Q. Did you discuss that with Mr. Cole?

A. Yes.

Q. And at some point, did Mr. Cole authorize payment of some of the invoices?

LA7PCOL4    Horowitz - Direct    Page 301

A. Yes, he did.

Q. Mr. Horowitz, do you recognize the document marked as Government Exhibit 1126 as an e-mail correspondence between you and Ethan Cole on November 14th, 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1126.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1126 received in evidence)

BY MR. HARTMAN:

Q. The bottom of the chain is Ethan Cole to you. He says, "Hi, Seth. Finance has followed up on the marketing invoices. Any update on when we can expect to receive payment?"

Do you see that?

A. I do.

Q. And let's look at your response. You say, "Just processed one last week. Let me check in on it and get back to you."

What do you mean by that?

A. I mean that the prior week, I had given them, or at least one of them, to our finance department to get processed and paid.

Q. Why did you do that?

A. Because I was told to do so by Neil Cole.

Q. You can take that down. Could we please just show the

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL4    Horowitz - Direct    Page 302

witness and the parties what's been marked as Government Exhibit 1225.

Mr. Horowitz, do you recognize this as an update you sent to Mr. Cole on November 17th of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1225.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1225 received in evidence)

BY MR. HARTMAN:

Q. And, Mr. Charalambous, can we see the attachment, please.

Mr. Horowitz, in the 2014 financial results section, the second bullet point, it says updated Q4, and then there's a bullet point that says "GBG global marketing, processed Mossimo/Zoo York Southeast Asia." What does that mean?

A. That means I have submitted the Mossimo/Zoo York Southeast Asia invoices for payment to the finance department.

Q. And why are you telling Mr. Cole that?

A. To confirm that I had done what he requested.

Q. In the business development options section, there's a reference to the Middle East JV. What is being discussed there?

A. At this point, Iconix is negotiating with two separate partners for a Middle East joint venture, Aboissa, which is a

LA7PCOL4    Horowitz - Direct    Page 303

company that had been negotiating for several months, and now we were in discussions with GBG to do a joint venture in the Middle East.

Q. And you say "Options with GBG if no Middle East." What are you talking about there?

A. Neil had requested some thoughts from myself and others on what to do if the Middle East joint venture did not happen; so these are just some thoughts on other joint ventures that we could do in order to make up for the gap in our financial goals or hitting our financial goals for the fourth quarter.

Q. The bullet No. 2 says "GBG update." Can you read the portion that begins "Rocawear Kids"?

A. "Rocawear Kids. Agreed to terms with Jason. Have drafted but holding off on sending doc until requested. Will sign these docs concurrent with Middle East or alternative transaction, or we can re-trade based on current events with New Rise. Although, I believe very messy and disruptive to brand/organization, organization."

Q. Mr. Horowitz, what are you telling Mr. Cole here?

A. I'm telling him a few things. It's, once again, in the amounts in the termination agreement, but right now we are planning on signing that Rocawear termination agreement along with a Middle East agreement or a different agreement.

Neil has expressed, at this point, his concern over giving the Rocawear Kids business license to New Rise; so I'm

LA7PCOL4    Horowitz - Direct    Page 304

reflecting that I understand what he has told me and potentially we can re-trade based on his feelings about the relicensing.

Q. I'm going to ask you about the term re-trade, why did you use that term?

A. Because that's essentially what we were doing. If we weren't going to let them out of a $6 million obligation, that was the reason for them paying $6 million more the prior quarter for a joint venture. Then we would have to re-trade or give them something else, GBG.

Q. You can take that down, Mr. Charalambous. And can you show for the witness what's been marked for identification as Government Exhibit 214. And, Mr. Charalambous, can you just page through the first three or four pages of the document. That's great, right there.

Mr. Horowitz, do you recognize these as payment records related to one of the invoices related to the transactions we've been talking about here?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 214.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 214 received in evidence)

BY MR. HARTMAN:

LA7PCOL4    Horowitz - Direct    Page 305

Q. Mr. Charalambous -- sorry.

Mr. Horowitz, do you know what this document is on the front page?

A. It looks like a payment of an invoice.

Q. Okay. Let's go forward, Mr. Charalambous. Stop right there.

What is this, page 2?

A. This is a wire transfer for the payment of an invoice.

Q. Okay. How much was the money that was wired?

A. $1,940,230.

Q. And who is it from and to?

A. It's from Iconix and it's to GBG.

Q. Okay. We can zoom out.

There is a signature there where it says "customer signature;" do you see that?

A. I do.

Q. Whose signature is that?

A. That's my signature.

Q. Okay. Let's go to the next page. There's also an e-mail here. I'll just read it, "Neil, please approve the following wire to GBG, $1,940,230. Description, marketing costs, design, trend analysis."

You can zoom out, Mr. Charalambous.

Mr. Cole responds "Okay."

Let's go to the next page. Okay.

**A-146**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7PCOL4    Horowitz - Direct    Page 306

Mr. Horowitz, is this one of the invoices, replacement invoices that we saw earlier?

A. Yes, it is.

Q. And this relates to which brand?

A. Mossimo.

Q. Okay. The date is crossed out and the date 11-1-14 is written there. Is there any significance to that?

A. Yes.

Q. What is that?

A. It's the date -- if the date had remained September 30th, it would have had to have been accounted for in the third quarter for Iconix.

Q. Okay. Let's look at the next page, Mr. Charalambous. Mr. Horowitz, do you recognize what this is?

A. Yes.

Q. What is it?

A. This is the proposed backup to the invoices.

Q. Okay. We saw earlier when the revised invoices came, there was a link to a shared file. Do you believe that this is some of the material that was in that shared file?

A. I do.

Q. Okay. So let's move forward in the deck. Tell us what you understand is being represented here?

A. What's being represented here is work that was done to, on the surface, justify the invoicing to make up for the $5

LA7PCOL4    Horowitz - Direct    Page 307

million owed to GBG.

Q. Okay. And, Mr. Charalambous, what I'm going to ask you to do is just page through the PowerPoint just page by page, and I'll let you know when to stop, but just go slowly so the jury can see it.

(Pause)

Stop right here.

This is page 14. Do you see that, Mr. Horowitz?

A. I do.

Q. There are references to testimonials and social media and events. Are you familiar with the work that's being described here?

A. Generally familiar.

Q. Okay. Does it appear to be work related to the Southeast Asia joint venture?

A. It could be, yes.

Q. Explain?

A. It looks like it was work done on behalf of the Mossimo brand and the geography covered by the Southeast Asia joint venture.

Q. Was the Mossimo brand part of the Southeast -- what geography are you referring to?

A. This looks like the UK.

Q. Okay.

A. So Europe.

LA7PCOL4    Horowitz - Direct    Page 308

Q. Okay. Was the Mossimo brand part of the Southeast Asia joint venture for the UK?

A. No, it was not.

Q. What joint venture was it part of?

A. The Europe joint venture.

Q. Okay. Is that the joint venture we talked about earlier for which the partner was TLC?

A. Yes.

Q. And remind us how the expenses for that joint venture flowed?

A. The expenses for that joint venture would be shared in accordance with the equity -- with the equity of the joint venture. So if Iconix owned, which it did, more than 50 percent of the joint venture, Iconix would have paid for 50 percent of whatever marketing the joint venture did.

Q. Okay. Let's just page through this a few pages more, Mr. Charalambous.

(Pause)

Okay. I think that's the end. Mr. Horowitz, did you see anything in the PowerPoint that would explain the basis for GBG billing Iconix $1.9 million for work done for Mossimo?

A. Absolutely not.

Q. At the time you received this invoice and the backup, did it appear to you that the work that was substantiated by the invoices was worth $1.9 million?

LA7PCOL4    Horowitz - Direct    Page 309

A. No.

Q. Why did you authorize the payment of the invoice?

A. Because we owed GBG $5 million from an overpayment in June, and this was the way that we were getting it back to them.

Q. Did it matter how much marketing they'd actually done?

A. No.

Q. Mr. Charalambous, you can take that down. And could you please show, for the witness and for the parties, Government Exhibit 215, and then let's move forward to the third page, please.

Mr. Horowitz, do you recognize these as payment records for the Zoo York invoice?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 215.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 215 received in evidence)

BY MR. HARTMAN:

Q. Can we zoom out, please, Mr. Charalambous.

Let's look at the invoice. First, Mr. Horowitz, whose initials are on the invoice?

A. Those are my initials.

Q. And how much was the invoice for?

A. $955,710.

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL4    Horowitz - Direct    Page 310

Q. When you got this invoice and the backup, did it appear to you that the backup supported an invoice for $955,710?

A. No.

Q. Why did you agree to pay an invoice in this amount?

A. Because this was part of repaying the $5 million of overpayment from the June joint venture.

Q. Mr. Charalambous, can we look at page 2 of this document. Remind us what this is, Mr. Horowitz?

A. This is a wire transfer of funds.

Q. Whose signatures are on the line where it says "customer signature"?

A. Neil Cole and what appears to be Jeff Lupinacci.

Q. All right. Take this down. And can you show, just for the witness and for the parties, Government Exhibit 1212.
Mr. Horowitz, do you recognize this as an e-mail you sent to Mr. Cole on December 1st of 2014?

A. Yes.

Q. Can we see --

MR. HARTMAN: Actually, the government offers Government Exhibit 1212.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1212 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, could you read the body of the e-mail,

LA7PCOL4    Horowitz - Direct    Page 311

please?

A. "Attached is my weekly update. Look forward to discussing. I would also like to discuss GBG with you. Best, Seth."

Q. Okay. Let's look at the attachment. Okay. And under point one, there is a reference to GBG global marketing. You told us before what that is. What's that a reference to?

A. That's in reference to the $5 million that we owed to GBG from the June joint venture.

Q. You specifically call out the pending Peanuts spend. Do you see that there?

A. Yes.

Q. Why did you call that out?

A. Because Neil had told me to hold off on processing any Peanuts invoices.

Q. And why did he say that, or did he tell you why?

MR. REISNER: Objection, foundation.

Q. Did he tell you why --

THE COURT: Overruled.

Q. -- to hold on?

A. So, yes, he eventually told me why.

Q. What did he tell you?

A. He told me that we couldn't use Peanuts for the invoicing with GBG because it would get too much scrutiny, that the family would look at it.

Q. When he said "the family would look at it," did you

LA7PCOL4    Horowitz - Direct    Page 312

understand who he was referring to there?

A. Yes.

Q. Who was he referring to?

A. He was referring to the Schultz family.

Q. And who is the Schultz family?

A. The Schultz family were our partners and founders of the Peanuts brand.

Q. So at this point, in December, December 1st of 2014, Iconix had paid two of the three invoices; is that right?

A. That's correct. Iconix had paid two invoices. I don't know if it's out of the three.

Q. Okay. And the third one is the Peanuts invoice that we saw earlier; is that right?

A. Yes.

THE COURT: Mr. Hartman, it's now 12:50; so we'll take our second break.
And, ladies and gentlemen, we will reconvene at ten minutes after the hour; so please be prepared to come down then.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

(Witness temporarily excused)

Anything for me?

MR. REISNER: No, your Honor. Thank you.

(Recess)

LA7MCOL5    Horowitz - Direct    Page 313

THE COURT: We are going to be speaking with juror no. 8, I believe it is, Ms. Kelly, concerning her job situation. We are going to be doing it at sidebar.

(At the sidebar)

THE COURT: Why don't you tell me what the situation is.

JUROR: I really can't afford to be here for three weeks, unfortunately. I thought my job was going to be paying me more days than they are, and they are only doing three days. And the lack of pay. I'm a single mom. I have my son's school that I have to pay. I was budgeting it yesterday. I really can't afford to be missing work.

THE COURT: Remind me what it is that you do.

JUROR: Insurance sales.

THE COURT: Who do you work for?

JUROR: Homesite.

THE COURT: What kind of work is that, exactly?

JUROR: I primarily have to also rely on sales. Not being here, I am not making the sales. When I don't make my sales and I just get my regular paycheck, I'm living paycheck to paycheck. Without my sales and being here, I'm really going to be behind.

THE COURT: What has your employer told you about what they are willing to do?

JUROR: Three days.

**A-148**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

---

LA7MCOL5     Horowitz - Direct     Page 314

THE COURT: What kind of an outfit is it? How many employees?

JUROR: Like a hundred or so. I'm not exactly sure. I've been working from home for so long.

THE COURT: Who did you receive this information from?

JUROR: My supervisor.

THE COURT: What reaction do you think it will have if I were to call your supervisor and ask whether they would be able to extend?

JUROR: You can definitely try. I don't know if they would be willing to do that. But he sent me a screenshot of what's in the employee handbook. It said three days.

THE COURT: So there is a policy.

JUROR: Um-hum.

THE COURT: That the employer will only pay three days for jury duty.

JUROR: Um-hum. Is that typical?

THE COURT: It is different for different companies. Larger corporations are more lenient and the government, of course.

JUROR: I'm sorry. When I first came here, I had no idea. I had asked him. He had to look into it. So it took a couple of days to get back to me. That's why last night I was kind of freaking out a little bit. Like I said --

THE COURT: Why don't you do this. Why don't you step

---

LA7MCOL5     Horowitz - Direct     Page 315

back over there where Jazmin is so I can talk to the lawyers.

(Juror not present)

THE COURT: I don't know whether you know this or not, but she is also a juror for whom we provide money for her to travel to and from because she can't afford the transportation costs.

I am inclined to release her. I'm sorry that we are losing a second juror, but she clearly is not looking to get out of jury duty. I credit her statement that she was trying to figure out whether she could afford to stay. So my recommendation would be to release her.

MR. SOLOWIEJCZYK: Your Honor, we are very sympathetic to her situation. I do wonder if your Honor calling the employer might make a difference. I've seen in the past in certain instances it has made a difference with an employer, even with an employer who had a policy. Sometimes when they hear from the federal judge, they say this is an extra circumstance and we are going to be more generous than we usually are. It might be worth a try because of the length of trial and COVID and everything else. If they are not going to change their policy, we are obviously sympathetic to the situation and understand.

MR. REISNER: That sounds like a reasonable suggestion to us, your Honor.

THE COURT: What I'll do, I will get the number, the

---

LA7MCOL5     Horowitz - Direct     Page 316

information from her. I'll call the supervisor this afternoon. Depending on what I'm told, we will let her know whether or not she is released.

(Juror present)

What we are going to is, we are going to have you give Jazmin your supervisor's name and number. I'll give that person a call this afternoon and see what they say.

JUROR: Sure.

(Continued on next page)

THE COURT: Mr. Hartman.

MR. HARTMAN: Thank you, Judge.

Mr. Charalambous, can we go to the second page of the document, please.

Q. We talked about the pending Peanuts spend for GBG global marketing.

Mr. Horowitz, remind us what that relates to.

A. The pending Peanuts spend relates to the outstanding invoice for the money to be paid to GBG for Peanuts.

Q. Let's go to the bottom of this page. There is a GBG update section.

Mr. Horowitz, can you read what's in this section here.

A. GBG update. Rocawear Kids. Potential new terms to propose to GBG: We reduce 2014 minimum guarantees by $1 million. We make '15 a nonexclusive Rocawear Kids license, question mark.

---

LA7MCOL5     Horowitz - Direct     Page 317

Keep 3.5 million minimum guarantee.

Q. What are you referring to?

A. I am referring to a potential concept that would be a renegotiation of letting GBG out of their Rocawear Kids agreement.

Q. I thought there was an agreement at the end of the third quarter to let them out in exchange for the 6 million.

A. There was.

Q. So what's going on now?

A. Neil has changed his mind and will not terminate the Rocawear Kids agreement.

MR. REISNER: Objection. Nonresponsive. Move to strike. Foundation.

THE COURT: Sustained.

Q. Did Cole talk to you about his views at this point?

A. In regards to the Rocawear Kids license, yes.

Q. What did he tell you?

A. He told me that he felt we needed the Rocawear Kids guaranteed royalty from GBG for the Rocawear IP.

Q. At some point was that conveyed to GBG as well?

A. Yes, it was.

Q. What do you remember about that?

A. I recall a meeting with Neil, Jason Rabin, Jared Margolis, and I where Neil explained to GBG that we could not let them out of the Rocawear Kids agreement because of the pressure it

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL5    Horowitz - Direct    Page 318

would put on the Rocawear IP.

Q. Did you understand what he meant by that, the pressure that it would put on the Rocawear IP?

A. Yes. We needed their guarantee royalty to avoid impairment.

MR. HARTMAN: Mr. Charalambous, you can take this down.

Can you please show for the witness and for the parties Government Exhibit 1134.

Q. Mr. Horowitz, do you recognize this as an e-mail exchange that you had with Jared Margolis on December 1 of 2014?

A. I do.

Q. Is that the same day as the update we just looked at?

A. I believe it is.

MR. HARTMAN: The government offers Government Exhibit 1134.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1134 received in evidence)

MR. HARTMAN: Can we look at the bottom, please, Mr. Charalambous.

Q. There is an e-mail from Mr. Margolis. It says: Hi, Seth, can Ethan contact someone in your team to gather all the details of all the allocations so that we are properly prepared for our meeting later today with Jason and Neil.

LA7MCOL5    Horowitz - Direct    Page 319

Ethan doesn't have everything, and I want to make sure we are aligned prior to the meeting.

Mr. Horowitz, do you know what Mr. Margolis was referencing here when he talked about the allocations?

A. Yes, I do.

Q. What did you understand him to be referencing?

A. I understood him to be referencing the allocations of how GBG was going to be repaid any monies that they were owed.

Q. At this point remind us what money is owed to GBG.

A. There is an outstanding balance owed to GBG from the June joint venture, as well as the $6 million of overpayment from the September joint venture.

Q. There is a reference to a meeting later today, on December 1, with Jason and Neil.

Do you have an understanding of what was going to be discussed at that meeting?

A. Yes.

Q. What?

A. My understanding was that the two parties were going to come to terms on how the repayments would be made to settle everything up.

Q. Let's look at your response.

Can you read your response, please.

A. My understanding is that we are going to be aligning at the meeting.

LA7MCOL5    Horowitz - Direct    Page 320

Q. What are you conveying there?

A. That -- I'm conveying that I will not be sending over our understanding of alignment and that it is our goal that we will be defining that at the meeting and not prior to it.

Q. Why were you conveying that?

A. Because that was Neil's desire.

Q. Did he tell you that?

A. Yes, he did.

MR. HARTMAN: Let's take that down and let's look at, Mr. Charalambous, just for the parties right now, Government Exhibit 249.

Q. Mr. Horowitz, do you recognize this as a P&L forecast dated November 21, 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 249.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 249 received in evidence)

Q. Mr. Horowitz, the date on this is November 21, 2014, is that right?

A. That is correct.

Q. When is that in relation to the e-mails we were just looking at?

A. It's around the same time.

LA7MCOL5    Horowitz - Direct    Page 321

Q. I think December 1 was of the date on those e-mails?

A. It's approximately a week before.

Q. What is being forecast here in the opportunities and risks section?

A. In the opportunities and risks section there is a GBG Middle East joint venture.

Q. What is the projected revenue of that joint venture?

A. Projected revenue is $14.6 million.

Q. In terms of Iconix's forecast for its organic brands, what is the revenue that's being projected from those?

A. $99.7 million.

Q. Is that sufficient in its own to match the prior year's quarter?

A. No, it is not.

Q. What are you comparing that number to?

A. I'm comparing that number to the far right, 105 million.

Q. What about the non-GAAP EPS that the company is projecting at this point?

A. The company was projecting 46 cents versus the prior year of 54 cents.

Q. What is the EPS effect of the anticipated Middle East joint venture?

A. A gain of 22 cents.

Q. Would that be sufficient for Iconix to meet its prior year's quarter?

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7MCOL5    Horowitz - Direct    Page 322

A. Alone, without anything else, yes, it would.

Q. There is also a column here called other and it has 5 million in the advertising section.

Do you know what that relates to?

A. That relates to the $5 million that we owed GBG from the June joint venture.

Q. There is a column in the middle that says GBG, but this $5 million payment is in the other column.

Do you know why that is?

A. At some point during one of the iterations of this spreadsheet I recall the $5 million being listed under GBG, at which point in that meeting Neil became very upset, screamed at David Maslaton to move it, didn't belong there, and to move it into another column.

Q. Is that, to your understanding, why it's in the other column here?

A. That is my understanding of why it is there.

Q. Mr. Horowitz, based on your conversations with Mr. Rabin and Mr. Margolis, was there any relationship between GBG's willingness to do the Middle East transaction and its desire to get repaid for the Peanuts invoice?

A. I don't recall them specifically tying it together, but I do recall it being very important to them that they get paid before the end of the year.

Q. When you say they get paid, what are you referring to

LA7MCOL5    Horowitz - Direct    Page 323

there?

A. That they get paid the outstanding amount from the $5 million repayment back from June before the end of 2014.

Q. We saw earlier e-mails indicating a meeting that was scheduled for December 1.

MR. HARTMAN: Let's look at Government Exhibit 1245 just for the witness and the parties, please.

Q. Mr. Horowitz, do you recognize this as an e-mail that you were cc'd on, dated December 1 of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1245.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1245 received in evidence)

THE COURT: Mr. Hartman, I am reminded, I was told that the jurors in the back sometimes have a delay in the documents coming up on their screen. So perhaps we might want to just take a tick or two and then move slowly through the documents.

MR. HARTMAN: I will do that, Judge. Thanks. I had not realized that the back screen was correlated with those. Now I realize that. Thank you.

Q. Mr. Horowitz, this is an e-mail exchange on December 1. Let's look at the bottom of the chain. Mr. Rabin says to

LA7MCOL5    Horowitz - Direct    Page 324

Mr. Cole: Hi, Neil. We can talk about Avirex, but we can't use it for the other reason. I could call you in the meeting. Thanks, Jason.

Above that Mr. Cole says, when can we meet today? This is December 1, 2014.

Mr. Rabin says: I could meet after 5 or early morning tom. Do you know what tom means?

A. Tomorrow.

Q. I could come to you at 8 a.m., whichever is easier for you.

We saw some e-mails or we saw an e-mail earlier where you were talking to Mr. Margolis about aligning. Is that the same meeting that's being set up here?

A. I don't know for sure.

Q. Those e-mails were about a meeting on December 1, is that right?

A. That's correct.

Q. And these appear to reference a meeting on December 1 or December 2, is that right?

A. That's true.

Q. Mr. Cole responds --

MR. HARTMAN: Can we zoom out, please.

Q. He says: Let's do 8:30 tomorrow morning. Do you see that?

A. I do.

Q. Then Mr. Rabin says: Yes, I will be there.

Is that right?

LA7MCOL5    Horowitz - Direct    Page 325

A. That is correct.

Q. Do you remember whether there was a meeting between yourself, Mr. Rabin, and Mr. Cole around this time?

A. Yes.

Q. What was discussed at the meeting?

A. The discussion at the meeting included that we could not let them out of the Rocawear Kids agreement for reasons we just discussed, which included that we needed the Rocawear Kids guaranteed royalty from GBG to help avoid impairment for the Rocawear brand, making them whole on the $5 million that we owed them from June was discussed, as well as different ways in which we could make up for the difference of not letting them out of the Rocawear Kids agreement.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Can we see, just for the witness and for the parties, Government Exhibit 1141, please.

Q. Mr. Horowitz, do you recognize this as an e-mail?

MR. HARTMAN: Can you scroll to the top, please.

Q. This is an e-mail chain that you were forwarded on December 2 of 2014?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 1141.

MR. REISNER: No objection.

**A-151**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7MCOL5    Horowitz - Direct    Page 326

THE COURT: It will be received.

(Government Exhibit 1141 received in evidence)

MR. HARTMAN: Mr. Charalambous, let's go down the chain, please.

Q. The beginning e-mail in the chain is an e-mail from Amanda Azzoli to Joanna Pompilio.

You told us who Joanna Pompilio is. Remind us who that is.

A. She is my assistant.

Q. The subject line is: Meeting with Seth tomorrow. And the body says: Hi, Joanna, I hope you had a great holiday. Jared just informed me that he needs to meet with Seth tomorrow at Iconix at 11:15. Please let me know if that works for Seth, and I will send out the invite.

Do you know who the Jared is that's being referenced here?

A. Yes.

Q. Who is it?

A. Jared Margolis.

Q. Let's go up the chain. Kaitlin Wasylyk, is that right?

A. I believe so.

Q. Sends an e-mail and says: Joanna is no longer with Iconix. However, you can direct any scheduling questions regarding Seth towards me.

Who is Kaitlin Wasylyk?

LA7MCOL5    Horowitz - Direct    Page 327

A. Kaitlin was acting as my assistant at this time.

Q. Let's keep going.

Amanda says: I know Jared was just over at Iconix and may have spoken to Seth in passing. I would say, knowing them, about an hour or so. Let's say 11:15 to 12:15. Would you like me to send out the invite?

THE COURT: Try to slow down, Mr. Hartman.

MR. HARTMAN: Sorry. Thank you, Judge.

Let's go up the chain. We can go up to the top.

Q. Mr. Horowitz, is the top part the calendar invite?

A. Yes.

Q. When is the meeting scheduled for?

A. It's scheduled for 11:15 a.m. on December 3.

MR. HARTMAN: You can take that down, Mr. Charalambous.

Let's look at Government Exhibit 1142, just for the parties and the witness.

Q. Mr. Horowitz, can you read the e-mail from Mr. Margolis?

A. Mr. Margolis wrote: Anything on Peanuts?

MR. HARTMAN: This is not in. I'm sorry. I did not offer it yet.

Q. Mr. Horowitz, do you recognize this as an e-mail from you to Mr. Margolis?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit

LA7MCOL5    Horowitz - Direct    Page 328

1142.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1142 received in evidence)

Q. I'm sorry, Mr. Horowitz. I interrupted you. Can you read the e-mail from Mr. Margolis.

A. Anything on Peanuts, question.

Q. Your response?

A. Working on it. Should have solutions tomorrow.

Q. Did you understand what Mr. Margolis was referring to when he said anything on Peanuts?

A. Yes.

Q. What did you understand him to be referring to?

A. We had made GBG aware that they could not invoice us for Peanuts as part of the repayment, and they were looking for direction on what they should do to invoice us the balance of the $5 million.

Q. Your response is: Working on it, should have solutions tomorrow.

When you say tomorrow, what are you referring to?

A. The next day, when we were planning to get together.

MR. HARTMAN: Let's take that one down.

Could you show, just for the witness and the parties, Government Exhibit 1144.

Q. Mr. Horowitz, do you recognize this as a calendar invite

LA7MCOL5    Horowitz - Direct    Page 329

for a meeting between you and Mr. Cole on December 3, 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1144.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1144 received in evidence)

Q. Mr. Horowitz, what's the date of the meeting with Mr. Cole?

A. December 3, 2014.

Q. Can you read the subject line there.

A. GBG with Seth premeeting.

Q. And the time?

A. 10:15.

Q. Remind us who else you were supposed to meet with on December 3.

A. Jared Margolis.

Q. Do you remember what you met with Mr. Cole about before your meeting with Mr. Margolis on December 3?

A. Yes.

Q. What did you meet about?

A. I was looking for Neil's direction on how we should handle the balance of the invoices.

Q. What did he tell you?

A. I don't recall how we resolved the balance of invoices.

Q. Do you remember speaking to him about the fact that the

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL5          Horowitz - Direct          Page 330

balance of the invoices needed to be paid?

A. Yes.

MR. HARTMAN: You can take that down.

Can we see just for the witness and for the parties what's been marked for identification as Government Exhibit 1151.

Q. Mr. Horowitz, do you recognize this as an e-mail you sent to Mr. Cole on December 9, 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1151.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1151 received in evidence)

Q. Mr. Horowitz, can you read the subject line.

A. GBG.

Q. Can you read the body.

A. Just spoke to Jared from London. He is there with Dow and Ron. They were all celebrating Dow's birthday. They were smashed. Anyway, he confirmed that we will close Middle East, ME JV, Thursday or Friday, the latest, of this week.

Q. What is this a reference to, the ME JV?

A. New joint venture for the Middle East with GBG.

MR. HARTMAN: We can take that down.

Can you show, Mr. Charalambous, just for the witness

LA7MCOL5          Horowitz - Direct          Page 331

and for the parties, Government Exhibit 1206.

Q. Mr. Horowitz, do you recognize this as a correspondence between yourself and Ethan Cole on December 12?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1206.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1206 received in evidence)

Q. Let's look at the bottom here.

Mr. Horowitz, you e-mailed Ethan Cole. Remind us who Ethan Cole is.

A. Ethan Cole is an associate at GBG.

Q. You say: Ethan, what time are you thinking we can get together today? My schedule is getting crazy. I want to make sure we meet.

He responds: Are you available this afternoon after 3:30? If not, let me know what time works for you and I'll be there.

You respond: Can you be at Iconix at 3:30? If not, 4:30.

By the way, this is December 12. What day of the week is that?

A. It's a Friday afternoon.

MR. HARTMAN: Let's keep going.

LA7MCOL5          Horowitz - Direct          Page 332

Q. He says: 4:30 is perfect.

And then you say: Jason mentioned he wanted to talk/meet after we meet. Can you schedule a 5:00 with him.

Then Mr. Cole responds: Yes. I have cc'd Amanda, who will assist.

Mr. Horowitz, why were you meeting with Mr. Cole on Friday, December 12?

MR. REISNER: Just for the record, should we make clear which Mr. Cole it is.

MR. HARTMAN: I'm sorry. Ethan Cole.

Q. Why were you meeting with Ethan Cole on December 12?

A. Ethan Cole was going to be bringing over invoices for Iconix to pay.

Q. Did you meet with him on that Friday?

A. I did.

Q. Can you describe what happened?

A. Ethan dropped off two large folders full of invoices and proposed backup to those invoices and told me that we should pay whatever -- whichever of these invoices we wanted to pay that added up to how much money we owed them.

Q. Do you remember approximately how much money you owed GBG at this point?

A. I believe at this point we owed them approximately $2 million.

Q. Is that just for the SEA-2 transaction?

LA7MCOL5          Horowitz - Direct          Page 333

A. Just for the June joint venture.

Q. We talked earlier about the Peanuts invoice, is that right?

A. Yes.

Q. Was that invoice ever paid?

A. No.

Q. How did that relate, if at all, to these invoices?

A. These invoices were to make up for our desire to change the Peanuts invoicing from a Peanuts invoice to invoices for other brands.

Q. You said Mr. Ethan dropped off a lot of invoices and backup.

When you say a lot, what do you mean by that?

A. It was six to eight inches high of paperwork.

Q. Did the total of those invoices equal the Peanuts invoice or no?

A. No.

Q. What was the relationship?

A. The total of the invoices was greater than the Peanuts invoice.

Q. What was it that Mr. Cole asked you to do?

A. Ethan Cole asked me to have Iconix pay whichever of the invoices we wanted to make up for the Peanuts invoice.

Q. From your perspective, did it matter which invoices you paid?

A. No.

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL5    Horowitz - Direct    Page 334

Q. Why not?
A. Because these invoices were just dollar amounts, like random dollar amounts put towards work that may or may not have been done by the party to which we were paying.
Q. What was the purpose, to your understanding, of Mr. Ethan Cole bringing over these invoices?
A. The purpose was for Iconix to finish the repayment from the $5 million owed from the June joint venture before the end of the year.
MR. HARTMAN: Mr. Charalambous, you can take down Government Exhibit 1206 and please show the witness and the parties what's been marked as Government Exhibit 1248.
The government offers Government Exhibit 1248.
MR. REISNER: No objection.
THE COURT: It will be received.
(Government Exhibit 1248 received in evidence)
Q. Mr. Horowitz, can you read the e-mail at the bottom of the chain. This is an e-mail exchange between you and Neil Cole, is that right?
A. That is correct.
Q. And the date here is December 12, 2014, is that right?
A. That is correct.
Q. Is that the same day that Mr. Ethan Cole dropped off those invoices?
A. It is.

LA7MCOL5    Horowitz - Direct    Page 335

Q. Can you read the bottom of the chain.
A. Just finished with Jason. We will be signing on Monday the GBG Middle East joint venture. Best, Seth.
Q. What are you referring to there?
A. That we will be signing a joint venture with GBG for the Middle East on Monday and that Jason and I had finished our conversation about invoices.
Q. Mr. Cole says open issues and you respond, none left. You say the only issue going into tonight was a disagreement over GBG charging a 15 percent service fee on the Middle East for Umbro and Lee Cooper. There was some further discussion of that. Then at the end you say: Also reviewed all international investments with Ethan, Jared, and Jason, as they needed conceptual signoff.
What are you referring to there?
A. GBG, Ethan, Jared, and Jason wanted to be assured that we would pay whatever invoices we wanted to that they had dropped off, but that it would add up to the amount that we owed them for the original overpayment in June.
Q. When you say international investments, what are you referring to there?
A. I'm referring to the invoices that Ethan dropped off that afternoon.
MR. HARTMAN: Mr. Charalambous, you can take that down.

LA7MCOL5    Horowitz - Direct    Page 336

Can you please show for the witness and the parties, Government Exhibit 1207.
Q. Mr. Horowitz, do you recognize this as an e-mail that you sent to Neil Cole on December 15 of 2014?
A. I do.
MR. HARTMAN: The government offers Government Exhibit 1207.
MR. REISNER: No objection.
THE COURT: It will be received.
(Government Exhibit 1207 received in evidence)
MR. HARTMAN: Can we see the second page, please.
Q. Mr. Horowitz, the date of this update is Monday, December 15. When is this in relation to when Ethan Cole dropped off the invoices?
A. This is the Monday following the previous Friday.
Q. There is a bullet point here that says: GBG global marketing, pending Peanuts spend, we should discuss Monday.
What is that a reference to?
A. That's in reference to my desire to discuss the invoices that were dropped off on Friday.
Q. You say: We should discuss Monday, but it's Monday. Why is that?
A. Because I would write my weekly updates at the end of the week or over the weekend. But Neil wanted them sent to him on Mondays.

LA7MCOL5    Horowitz - Direct    Page 337

Q. Did you have a conversation with him about that?
A. Yes.
Q. What did he say?
A. After my first few months at Iconix, Neil told me that my Friday reports were ruining his weekends and that he wanted to receive them on Mondays so that way his weekends weren't ruined. I had expressed opinions in my weekly reports prior to that change and tried to change the tone of my weekly reports to reflect simply our conversations and at times just mere what he was telling me, and send them on Monday mornings to not ruin his weekends.
Q. Did you have conversations with him that revealed whether or not he had read your updates?
A. Yes.
Q. Can you just give us a flavor for those.
A. We would meet regularly. Especially once I became COO and sat on the same floor as Neil, we would meet almost every week, if not every week, and go through my weekly report for him to provide any feedback.
Q. Further down in the document there is a section that says GBG update. You say: We'd like to review GBG international investments with you. What is that a reference to?
A. It's in reference to reviewing the invoices that were handed to me on Friday.
Q. Why were you telling Mr. Cole that you wanted to review the

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7MCOL5     Horowitz - Direct     Page 338

investment was him?

A. Because I wanted his direction and guidance on what to do with them.

Q. Why did you need direction and guidance about what to do with them?

A. Because that was consistent with what I had done in the past and what I was told to do.

Q. But you knew you had to pay back the money, so what was it that you needed direction from him about?

A. I needed to know if he wanted to pay these at this time, if he wanted me to process them immediately, which ones of the invoices he wanted to have paid.

Q. Did you have an understanding that you would be paying anything more than the amount that you owed to replace the Peanuts invoice?

A. No.

Q. Mr. Horowitz, did anything else of significance happen on this Monday, December 15?

A. Yes.

MR. HARTMAN: Mr. Charalambous, you can take this down.

Q. What happened that Monday?

A. On that day Iconix was the subject of a short report.

Q. Can you explain what a short report is.

A. A short report is a document put out by, in most cases, an

LA7MCOL5     Horowitz - Direct     Page 339

analyst or a firm that believes that a company is overvalued and gives its own hypothesis on why a company is overvalued.

Q. At a very high level, what did this short report focus on?

A. The short report focused -- this short report focused on what they felt was a declining organic business, a heavy reliance on joint ventures to make up the revenue gaps and the kind of cliff that that would fall off of when the company ran out of joint ventures to do.

MR. HARTMAN: Mr. Charalambous, can you please just show for the witness and for the parties what has been marked as Government Exhibit 1213.

Q. Mr. Horowitz, do you recognize this as an e-mail that Mr. Cole sent to Jaime Sheinheit and cc'g yourself and Mr. Lupinacci?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1213.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1213 received in evidence)

Q. Mr. Horowitz, let's start at the bottom here. There is an e-mail from Jeff Lignelli at Incline Global.

Do you know who that is?

A. I'm not familiar with who that is.

Q. He sends an e-mail to Mr. Cole cc'g someone named Noah

LA7MCOL5     Horowitz - Direct     Page 340

Snyder.

Do you know who Noah Snyder is?

A. I do not.

Q. Can you read the text of the e-mail.

A. Hi, Neil. I hope all has been well with you. Thanks again for your time last month.

I am sure you either heard about or saw that there was an off Wall Street short seller report published on ICON today. Given that these reports can put a temporary, often a one or two-quarter cloud over a stock, it may be a good time to address the convertible bonds by buying one of them back and potentially adjusting the hedge on the other. Buying these convertible bonds back can serve essentially as a cost-effective buyback.

I think that this negativity will be short-lived once the additional organic revenue growth hits from Peanuts next year and as you complete accretive acquisitions over the next six to 12 months.

Best wishes for a great holiday season. Jeff.

Q. There is a reference to ICON. What's that?

A. That is the ticker for Iconix on the stock market.

Q. Can you explain what a ticker is?

A. A ticker is a name or abbreviation by which a company sells its shares, buys and sells its shares on a public market.

MR. HARTMAN: Can we see the e-mail above.

LA7MCOL5     Horowitz - Direct     Page 341

Q. Mr. Cole forwards this to Jaime Sheinheit.

Do you know who Jaime Sheinheit is?

A. Yes.

Q. Who is she?

A. She was the head of investor relations at Iconix.

Q. What does that mean?

A. Her responsibilities included day-to-day interactions with shareholders.

Q. It is cc'd to you and Mr. Lupinacci.

Remind us who Mr. Lupinacci is.

A. Mr. Lupinacci was CFO of Iconix at the time.

Q. And Mr. Cole says: See if you can find a copy of the short report, is that right?

A. That's correct.

Q. Did anything else happen on December 15 at Iconix?

A. Yes.

Q. What happened?

A. December 15 is also the date that we received an inquiry from the SEC.

MR. HARTMAN: Let's take this down.

Mr. Charalambous, can you please show for the witness and the parties what's been marked for identification as Government Exhibit 110.

Q. Mr. Horowitz, do you know what this document is?

A. I do.

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LA7MCOL5    Horowitz - Direct    Page 342

Q. What is it?

A. It's an inquiry from Corp. Fin of the SEC.

MR. HARTMAN: The government offers Government Exhibit 110.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 110 received in evidence)

Q. Mr. Horowitz, what's the date of the letter here?

A. December 15, 2014.

Q. The headline says: Securities and Exchange Commission and then it says division of corporation finance.

Do you see that?

A. I do.

Q. Do you have a general understanding of what the division of corporation finance is?

A. Yes. It's an area of the SEC that oversees proper reporting of financials of public companies.

Q. Prior to this letter arriving, did you have any understanding that Iconix had been engaged in correspondence with the division of corporation finance?

A. No, I had not.

Q. Let's look at question 5.

Mr. Horowitz, generally, how did these letters work? The division of corporate finance has written a letter to the company. What is it asking for?

---

LA7MCOL5    Horowitz - Direct    Page 343

MR. REISNER: Objection. Foundation.

THE COURT: Overruled.

A. The SEC is looking for answers to questions in order to either demand or suggest a change in which the way a company is reporting its financials or specific backup to its business practices.

(Continued on next page)

---

LA7PCOL6    Horowitz - Direct    Page 344

Q. Can you read question five, just the top one?

A. "We note that you contributed substantially all rights to your Lee Cooper and Umbro brands in the greater China territory to your 50 percent owned Iconix Southeast Asia joint venture in September 2014 and recorded the $18.7 million gain from this transaction in licensing and other revenue in the third quarter of 2014. We further note that you entered into a similar transaction with Iconix Southeast Asia in June 2014, and also recorded the $13.6 million gain from this transaction in licensing and other revenue in the second quarter of 2014. Please advise us of the following."

Q. Mr. Horowitz, the reference to the joint venture of September 2014, do you know what deal that references?

A. Yes, I do.

Q. Which deal?

A. The Umbro and Lee Cooper joint venture with GBG.

Q. Is that the one we've been calling SEA-3?

A. Yes.

Q. And the transaction in June of 2014, which transaction is that?

A. That's the joint venture with GBG for certain brands in Europe and Korea.

Q. And is that the one we've been calling SEA-2?

A. Yes, it is.

Q. Mr. Charalambous, you can take this down.

---

LA7PCOL6    Horowitz - Direct    Page 345

Mr. Horowitz, did you have any plans to travel on December the 15th?

A. Yes, I did.

Q. Where were you going?

A. I was traveling to Minneapolis to visit Target, the retailer.

Q. Did you go?

A. I did not.

Q. Why not?

A. I was in the car, on my way to the airport, just outside the Lincoln Tunnel with Lanie List, an executive at Iconix who I worked with, and I got a phone call from Neil that we had received this letter and that I should return to the office immediately.

Q. Did he tell you why he wanted you to come back?

A. Yes, it was because we had received this letter, and he was pulling everybody together.

Q. Did you go back?

A. Yes, I did.

Q. What happened when you got back?

A. By the time I had got back, the meeting that Neil had called together, I had missed most of. He told me we'd be meeting again in the morning, and I believe it's at this point, when I got back, that he also handed me a copy of the short report.

---

# A-156

UNITED STATES OF AMERICA, v.
NEIL COLE,

<span style="float:right">CORRECTED<br>October 7, 2021</span>

LA7PCOL6    Horowitz - Direct    Page 346

Q. At some point around this time, did you discuss with Mr. Cole the invoices that Ethan Cole had dropped off the Friday before?

A. I believe I discussed those invoices with him over the next 24 to 48 hours.

Q. Can you describe that conversation?

A. Yes. At that conversation, I brought the pile of invoices to Neil and told him I was not comfortable signing off on these invoices.

Q. Did you tell him why?

A. I did not specifically tell him why.

Q. Why weren't you comfortable signing off on them?

A. Because Neil's response to the SEC letter and the short report was scary. He was very angry. He was upset and thought that there was a conspiracy between the short report writer and the SEC to work together to bring the company down. He was no longer inclined to do the Middle East joint venture, and over those 48 hours -- 24, 48 hours, he went back and forth on whether or not we should move forward with the Middle East joint venture, saying we can't do any more joint ventures, and shortly after saying we have to continue to do joint ventures to show that we did nothing wrong.

Based on his reaction, my knowledge of the false invoices that I was being asked to sign off on led me to no longer being comfortable signing off on them.

LA7PCOL6    Horowitz - Direct    Page 347

Q. How did Mr. Cole react when you told him you weren't comfortable signing the invoices?

A. He was -- I brought the invoices to his office. I just said I was no longer signing these invoices. He was furious. Told me to get the fuck out of his office and proceeded to just sign and flip invoices and write things on them and flip invoices, and I left.

Q. Did you have any further handling of the invoices?

A. Not of the invoices themselves, no.

Q. Okay. Can we look at Government Exhibit 241, with just the witness and the parties, please.

Mr. Horowitz, do you recognize these as payment records with regard to the replacement invoices, the ones that were sent in December?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 241.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 241 received in evidence)

BY MR. HARTMAN:

Q. Mr. Charalambous, could you scroll forward, please. Stop there. Mr. Horowitz, what are we looking at here?

A. We're looking at a wire transfer of funds.

Q. What payment is this associated with?

LA7PCOL6    Horowitz - Direct    Page 348

A. This is associated with the invoices that have been signed off on.

Q. Who signed the wire transfer authorization?

A. Neil Cole and Seth Horowitz.

Q. Why did you sign this wire transfer?

A. Because I knew that Neil had signed the invoices, that we owed GBG the money and I signed it.

Q. Earlier you said that you weren't comfortable signing off on the invoices, why were you comfortable signing the wire transfer?

A. You know, it's hard to separate those two. I knew that the invoices were just made up, but I also knew that we owed GBG the money. So I guess somewhere in the heat of this time period, I decided to sign the transfer.

Q. Mr. Charalambous, let's go forward.

What's the total of the invoices that were signed off on here?

A. $2,467,340.

Q. And do you remember whether this was roughly approximate to the Peanuts invoice that Iconix refused to pay?

A. I believe that it is.

Q. Okay. Let's go forward.

There's quite a lot of documents here, Mr. Horowitz. I'm not going to ask you to go through them here on the stand or subject the jury to that. They are in evidence. Have you

LA7PCOL6    Horowitz - Direct    Page 349

reviewed them before you came to court today?

A. I have.

Q. And based on your participation in the conduct here and your knowledge of this business, do the photographs and slides attached to these invoices support charges for $2.5 million?

A. They do not.

Q. Okay. Was some of the work that is being invoiced here done by that entity, TLC, you talked about earlier?

A. Yes.

Q. And remind us the significance of that entity?

A. TLC was acquired by GBG and was the part of the joint venture partnership in Europe.

Q. And what did that mean for expenses that TLC incurred with respect to Iconix brands in Europe?

A. If TLC did marketing or research or strategy on behalf of the joint venture, the expenses would have already been split 50/50, or 51/49, between Iconix and GBG.

Q. Mr. Charalambous, you can take that down. And could you show, just for the witness and the parties, what's been marked as Government Exhibit 1179.

Mr. Horowitz, do you recognize this as an e-mail that Ethan Cole sent you on January 7th, 2015?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1179.

# A-157

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL6    Horowitz - Direct    Page 350

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1179 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, what's the subject line of the e-mail?

A. "Invoices."

Q. Can you read the body?

A. "Hi, Seth. Sorry I was interrupted. It would be helpful if you could please confirm the invoice numbers for the 2.4 million payment which we received. Thank you."

Q. Mr. Horowitz, did you have an understanding about why Mr. Cole, Ethan Cole, was asking for this information?

A. Yes.

Q. What's your understanding?

A. He was trying to line up our payment of 2.4 -- approximately 2.4 million with the invoices that he had dropped off.

Q. Why did he need your help doing that?

A. Because he had dropped off invoices in excess of the $2.4 million, and we were going to pick which ones to pay, and he needed to kind of match up which we paid and which ones we did not.

Q. Do you remember whether you responded to him?

A. I don't recall.

Q. You can take that down, Mr. Charalambous.

LA7PCOL6    Horowitz - Direct    Page 351

Mr. Horowitz, we talked about the Middle East joint venture earlier and the fact that it was slated to happen in the fourth quarter of 2014. I think you told us it did ultimately happen; is that right?

A. That is correct.

Q. Can you describe for us what you recall about the closing history of that transaction?

A. Sure. The transaction was supposed to close December 15th, that Monday. We received the short report and the SEC inquiry on that day. I would say the office was turned upside down for about 48 hours.

My understanding, as of December 17th, was that although we had gone back and forth on doing the joint venture with GBG, that we were not going to be doing any more joint ventures, as the SEC inquiry was focused in large part on the joint ventures.

On December 18th -- and I remember the dates well because it's my anniversary, and I was off, and I remember where we were -- I got a phone call that -- I got a phone call from Ethan Cole that the joint venture was back on. He started listing the details of it.

I got off the phone. I don't recall whether I called Neil Cole or Neil called me, but he told me -- Neil told me that the deal was on. He had gone over to GBG himself to negotiate any remaining terms.

LA7PCOL6    Horowitz - Direct    Page 352

In an e-mail or phone call, I asked him if there was anything else he needed me to do, and there was not. And that is how I recall that day ending, and the Middle East joint venture happened.

Q. Earlier you told us that you thought that transaction was used to return some of the money that Iconix owed to GBG. Why do you think that?

A. That transaction had a unique and, to my knowledge, unjustified $3.1 million payment back to GBG for something that was called market research and analysis. In this case, the return of funds to GBG was documented in the Middle East joint venture transaction documents.

Q. Mr. Horowitz, you described a number of transactions, two transactions where Iconix agreed to return money in exchange for an increased purchase price. With respect to the two transactions you described, the SEA-2 and the SEA-3 transaction, do you know for certain, based on your conversations with Mr. Cole, that that was the nature of the agreement?

A. Yes.

MR. REISNER: Objection, leading.

THE COURT: Overruled.

A. Yes.

Q. Is the same true with respect to the Middle East transaction?

LA7PCOL6    Horowitz - Direct    Page 353

MR. REISNER: Same objection.

THE COURT: Overruled.

A. I cannot be certain of that.

Q. Mr. Horowitz, after the comment letter and the short report came out, did Mr. Cole give you any instructions for what to do with materials that you had?

A. Yes, he did.

Q. Can you describe that conversation?

A. Yes. It was an evening at the Iconix office, many people had gone home. I was at my desk. Neil came to my door, kind of stood outside my door, looking very frazzled and angry. And he said to me, quite simply, "I need you to get rid of any e-mails with Jason and Jared and" -- I believe he said -- "Yapp, and I'm going to do the same," and he stormed off to his office.

Q. And who is Yapp?

A. Yapp is Kevin Yapp. He was an owner of New Rise, a licensee of ours for Rocawear and somebody that we were considering using for Rocawear Kids.

Q. How did you react to Mr. Cole telling you this?

A. I was scared, nervous, shaking. I remember thinking, I don't know what he wants me to erase but I better do what he said. I was panicked.

Q. And what did you do?

A. I sorted e-mails by their size, looking for what would be

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL6      Horowitz - Direct      Page 354

term sheets with Jason and Jared as recipients, and I deleted them.

Q. Did you do anything else to destroy documents?

A. I did.

Q. Did you have a further conversation with Mr. Cole about this?

A. I did.

Q. Can you describe that conversation?

A. This was, I believe, sometime at the very beginning of 2015. I was in Neil's office, and he asked me if I had gotten rid of any hard documents or any copies of anything with Jason and Jared, and I said I had not but that I would, and I did.

Q. Can you describe what you did?

A. I took home a few of the binders that I had that were labeled GBG and Li & Fung. I took them home and threw them down a garbage chute.

Q. Why did you take them home?

A. I was scared that somebody might find me doing it and felt that I could just take them home and throw them out.

Q. When you say you were scared someone might find you doing it, what do you mean by that?

A. Somebody at the Iconix office would see me. I didn't want to raise any suspicion. I was nervous in making a series of bad decisions.

Q. Did you keep anything?

LA7PCOL6      Horowitz - Direct      Page 355

A. I did.

Q. What did you keep?

A. I kept a binder that had the financial forecasts in them. I just kept that in the office. I did not get rid of that, and at a later date, I sent a series of e-mails from my work account to my personal account to print out to make sure that I had hard copies of things.

Q. Why did you keep those things?

A. I kept those things because I knew that we had done something wrong. I knew that we could be in trouble, and I knew from Neil's behavior then, and going forward, that he would do anything to use others, in his words, as scapegoats or fall guys, and I wanted some record that this had occurred.

Q. Mr. Horowitz, when you refer to having done things that were wrong, what are you referring to?

A. We inflated our revenues to hit quarterly numbers, and we didn't tell our finance team about it. We didn't tell our legal team about it. We dragged out the payments so that way, at the end of the third quarter, we had over $11 million of revenue that was owed back to a partner that was not properly accounted for. And we would lie in our response to the SEC because we left out material terms on why those prices increased.

Q. Let's talk about that. We saw the letter that came in December from the SEC. Was that the last letter that the

LA7PCOL6      Horowitz - Direct      Page 356

company received from the SEC?

A. No, it was not.

Q. What was the next one that you knew about, and when did it come?

A. I believe it came in February.

Q. Of 2015?

A. Of 2015.

Q. Mr. Charalambous, can you please show for the witness and the parties what's been marked as Government Exhibit 112. Mr. Horowitz, is this the letter that came from the SEC in February of 2015?

A. It is.

MR. HARTMAN: The government offers Government Exhibit 112.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 112 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, what's the date of this letter?

A. February 11th, 2015.

Q. Can we go to page 2, please, Mr. Charalambous. Mr. Horowitz, could I ask you to read paragraph 2 here, please?

A. Starting at "Explain"?

Q. Actually, let's start with, "Please further explain," which

LA7PCOL6      Horowitz - Direct      Page 357

is in the middle of that top paragraph.

A. "Please further explain to us the primary business purpose of the (1) initial formations of your international joint ventures between 2012 and 2014; (2) subsequent sales of your wholly owned trademarks in certain international locations to existing joint ventures or licensees (December 2013, June and September 2014); and (3) sale of your controlling interest in OP Japan to your joint venture partner in December 2012."

Q. Let's stop right there. Mr. Horowitz, did you have an understanding at this point of what it was that the SEC was concerned about with respect to these joint ventures?

A. Yes.

Q. What's your understanding of what they were concerned about?

A. Well, my understanding in how it was explained and discussed internally at Iconix, was that these joint ventures were counted as revenue for the company, and there are questions as to whether or not the structure, the actual structure or formation of these joint ventures, were properly accounted for as revenue.

And there was also a great focus on the puts and calls or the ability for the partner to force Iconix to buy back 50 percent after five years, or Iconix's ability to buy back the 50 percent after five years.

Q. To your understanding at this point, had the SEC identified

UNITED STATES OF AMERICA, v.
NEIL COLE,

LA7PCOL6    Horowitz - Direct    Page 358

the revenue inflation that you've testified about over the course of the past couple of days?

A. No.

Q. Were you concerned about the SEC's focus on these joint ventures?

A. Yes.

Q. Why?

A. Because we left out material points to those joint ventures.

Q. And why were you concerned about the SEC's focus on the joint ventures?

A. Because a focus on those joint ventures could lead to the discovery of the overpayments for both the June and September joint ventures.

Q. Can you read the third bullet point, please?

A. "Explain how you budgeted for these transactions, describe the circumstances leading to a decision to enter into each transaction, and identify the individual (or individuals) who is responsible for negotiating and executing these transactions."

Q. You can stop right there. This last question, describe the individuals who are responsible for negotiating and executing these transactions, is that something you were concerned about?

A. Yes, it was.

Q. Why?

LA7PCOL6    Horowitz - Direct    Page 359

A. I was concerned about this because I knew that I was one of the individuals that was a part of negotiating the transactions that included the increase in prices.

Q. Did Mr. Cole ever say anything to you that indicated that he was concerned about this question by the SEC?

A. Yes, he did.

Q. Tell us how you knew he was concerned.

A. Neil and I had at least three different conversations about how to structure our response in terms of who was responsible for what. We disagreed over the placement of different names in terms of who was responsible for what, and at one point, Neil very directly asked me to lie about his involvement in the joint ventures.

Q. Okay. And we'll come back to those in a minute. Let's look at the third question in the letter.

Mr. Horowitz, the third question says, please separately provide us with the following information with respect to each of these transactions noted in comment two above. The first bullet point says, the material terms of any agreements made with the transaction counterparty or owners of the counterparty. For example, minimum revenue guarantees, put or call options, et cetera.

Mr. Horowitz, was this a question that raised concerns for you?

A. Yes.

LA7PCOL6    Horowitz - Direct    Page 360

Q. Why?

A. Because we did not include material terms of those two agreements in our description of those agreements or in any documents or financial reports that included those agreements.

Q. What material terms are you referring to?

A. I'm referring to the $5 million overpayment in the June joint venture with our obligation to pay it back, and the $6 million overpayment in the September joint venture, and our obligation to terminate the Rocawear Kids license.

Q. What was Mr. Cole's -- did you observe Mr. Cole's reaction to the February 11th letter?

A. Yes.

Q. Can you describe it?

A. Neil was far more aggressive than even usual. He was yelling and screaming. He held a meeting that ended with him saying this is going to -- screaming that this is going to blow up the company in front of at least ten associates. He was very aggravated.

Q. Now, you mentioned -- well, let me ask you this. The response asks for the company to describe the material terms of these transactions. Did Mr. Cole ever say anything to you about his level of knowledge of these terms?

A. Yes.

Q. What did he say?

A. On -- you know, in the week following the receipt of this

LA7PCOL6    Horowitz - Direct    Page 361

letter, Neil called me into his office and told me that he had no knowledge of the June joint venture; that he didn't know about any puts or calls. Basically, he knew nothing about the joint venture and couldn't find any e-mails that I sent to him about it.

Q. Did the SEC letter ask for information about other joint ventures besides the June joint venture?

A. Yes.

Q. Did your conversation with Mr. Cole focus on the June joint venture?

A. That conversation did.

Q. How did you respond to Mr. Cole saying that he had no involvement in the June joint venture?

A. I was shocked. It made no sense at all. He drove the entire joint venture in June. I had just become COO and had never even done a joint venture before.

His -- his comment that he knew nothing about it was ridiculous. His reference that I never e-mailed him about it was also insane.

So I went back to my office and looked for e-mails that I had sent to Neil about these joint ventures. There was some weird back and forth because, at first, I couldn't find any, and they were put in an archive folder in my computer that I had not done, but I found them.

I printed them out. I brought them all into Neil's

# A-160

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 7, 2021

LA7PCOL6    Horowitz - Direct    Page 362

office and I said, you know, I have all of these e-mails. His response was, I knew you e-mailed them to me, but do you think I read all of your e-mails? I have so many e-mails, I'm so busy, or something to that effect. And I saw on his desk that he had had my e-mails printed and highlighted, and I was, you know, still equally as shocked.

Q. You mentioned --

A. And, you know, disappointed, kind of to the soul, like disgusted that he could take that approach with me.

Q. You mentioned some back and forth about the response to the SEC comment letter and particularly the description of who was involved in negotiating these transactions. Can you describe that?

A. So a couple of days later, after that interaction, and during the drafting of our response to the SEC, we were within a couple of hours of what Neil referred to as "pencils down" when the draft was done and to be sent back. Neil came into my office, closed the door. He told me -- which was rare. He told me that we were about to have a very difficult conversation.

He told me he sold $40 million of stock around the Middle East joint venture, and that he needed me to put my name as the lead negotiator of the transaction. And I asked him if there were any other changes that were going to be made. He said no. And so long as he was going to be listed as one of

LA7PCOL6    Horowitz - Direct    Page 363

the participants of negotiating, I was okay with that.

He left my office, went back to his office. I then spotted him walk by my door to Willy Burkhardt's office. He was the keeper of our response to the SEC. He was collecting the drafts.

I followed Neil in because I was afraid that he was going to start changing names of other transactions. That is exactly what he did. I stood in there while Neil was dictating to Willy, move my name from -- meaning Neil, moved Neil from negotiated to gave direction, take my name out of this one. He was just changing all the things that we had worked on in terms of who negotiated what.

I told Neil, in front of Willy, that I disagreed with what he was doing. Neil told me that's the way it's going to be. He left Willy's office, stormed to his office and slammed his door. I asked Willy to not press send until he heard from me again. I asked Pauline if I could meet with Neil. She said he was busy. I told her it was time sensitive and very important.

I got into Neil's office. Neil screamed at me, saying things like: Fuck you. What's wrong with you? I'm the one who sold $40 million of stock. I'm the one who's name is on this. I'm the one who signed these documents. What do you have to worry about? Cursing, screaming.

I just took it, and after he had unloaded on me, I

LA7PCOL6    Horowitz - Direct    Page 364

told him that I was still uncomfortable with changing any other names. He said: If that's what you want, go tell Willy. And I went back to Willy's office and asked him to change the names back, and then carefully watched any other draft or iteration before it was sent back.

Q. Mr. Horowitz, you've referenced a couple of times Willy. I don't know if we've talked about him. Who's Willy?

A. Willy Burkhardt was head of international. He was also acting as the keeper of the SEC response.

Q. You mentioned Mr. Cole referenced the fact that he'd sold stock. Do you remember when you first learned that he'd sold stock around this time?

A. I do.

Q. Describe that.

A. We were -- it was December or late November of 2014. We were preparing for a conference with shareholders, and in preparation for that conference, Jaime Sheinheit, the head of IR, investor relations, prepared a Q and A that included questions about Neil selling stock.

Q. To your understanding, when did the stock sale occur?

A. The stock sale occurred the end of October 2014.

Q. And was there any significance to that timing, as you understood it?

A. I understand that subsequently, as the time period between the press release for the Q3 results and the 10-Q of the Q3

LA7PCOL6    Horowitz - Direct    Page 365

results, so within a few-day period, the end of October.

Q. So this was, the Q3 results related to the third quarter of Iconix's earnings; is that right?

A. That's correct.

Q. Did any of the transactions that we've been talking about the past couple of days happen in the third quarter?

A. Yes.

Q. Which ones?

A. The joint venture for Lee Cooper and Umbro in China.

Q. Is that the SEA-3 transactions?

A. It is.

THE COURT: Well, Mr. Hartman, it's 2:40. We've reached the end of the day.

Ladies and gentlemen, please be safe getting home. Please do endeavor to be in the jury room no later than 9:20 or so. I think Ms. Rivera told you she won't be here tomorrow; so it will be Ms. Sangueza who will be escorting you.

Please, do not discuss the case or read anything about the case or see anything about the case, if that should happen. Please be safe.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

(Witness temporarily excused)

THE COURT: Everyone can be seated. About how much more, Mr. Hartman?

# A-161

LA8PCOL1                                        Page 374

understanding. Does the defense have a different view?

MR. REISNER: Hard to respond in the abstract, your Honor, without the specific documents in issues being presented, but we may certainly present evidence during the cross-examination of Mr. Horowitz of Mr. Cole's state of mind based on representations made by Mr. Cole, statements made by Mr. Cole to Mr. Horowitz during the course of conversations, as well as to complete the story, based on conversations that Mr. Horowitz has already testified to.

THE COURT: Very well. Okay. So I guess we'll take it one question at a time.

Anything else?

MR. SOLOWIEJCZYK: Your Honor, we have the immunity orders for your Honor to sign. Would this be a good time to provide them to your Honor, if I may do so?

THE COURT: Sure. Thank you. And if this is all, then, then you're all free to do whatever you wish until 9:30.

(Recess)

THE COURT: Do you want to bring Mr. Horowitz in? All of the jurors are here.

(Jury present)

THE COURT: Everyone, please be seated.

Ladies and gentlemen of the jury, thank you, as always, for being prompt. Hope you all had a pleasant evening. We will now continue with the direct examination of

LA8PCOL1          Horowitz - Direct          Page 375

Mr. Horowitz.

Mr. Horowitz, you are reminded that you are still under oath.

THE WITNESS: Thank you.

THE COURT: Mr. Hartman.

MR. HARTMAN: Thank you, Judge.

SETH HOROWITZ, resumed

CONTINUED DIRECT EXAMINATION

BY MR. HARTMAN:

Q. Mr. Horowitz, we left off yesterday talking about how you learned about Mr. Cole's stock sale. Can you remind us how that was?

A. Sure. I first learned about Mr. Cole's stock sale in preparation for an investor conference in late November or early December of 2014.

Q. Were you surprised to learn that he had sold stock at that time?

MR. REISNER: Objection.

THE COURT: Overruled.

A. Yes, I was.

Q. Why?

A. Neil told me a couple of months earlier that he had planned on selling stock in the spring of 2015 and if I wanted to do so, if I wanted to sell stock, I should do that at the same time as him.

LA8PCOL1          Horowitz - Direct          Page 376

Q. So just to be clear, he told you the spring of 2015 was when he intended to sell stock?

A. That is correct.

Q. And when was it that you learned that he actually sold the stock?

A. When did I learn that he sold the stock?

Q. I'm sorry. That was a bad question. When was it, to your understanding, that he actually sold the stock?

A. Neil sold the stock sometime the end of October, beginning of November of 2014.

Q. Mr. Horowitz, did Mr. Cole ever make reference to his sale of stock in connection with the preparation of the form 10-K for 2015?

A. Yes, he did.

Q. Can you describe the events leading up to that conversation and the conversation?

A. In a meeting that included several members of Iconix management, including Neil and I and members of the finance team, Jaime Sheinheit and others, the company was reviewing its 10-K or its annual financial results for 2014.

It became clear to Neil that the form in which Iconix had been presenting some of its cash flow was different than it was in the past. As a result of him identifying this change, Neil became irate, was screaming at various people in the room. He used the words "this is going to blow up the company; this

LA8PCOL1          Horowitz - Direct          Page 377

is the reason why we had the short report; this is the reason why the SEC is coming after us."

We then had a follow-up meeting only minutes later, a smaller group of us -- Neil and I, I believe it was David Blumberg and Willy Burkhardt -- where Neil told us that he sold $40 million of stock at the wrong time, in between the press release and the quarterly -- the 10-Q, and that he was screwed; the company was going to explode.

He was furious and mentioned or stated that Justin Abrahamson, a member of finance, was responsible for the change in the way in which our accounting was recorded and that Justin was in his office crying and apologizing for his mistake minutes earlier.

Q. Mr. Horowitz, did you ever have a conversation with Mr. Cole subsequently where he discussed whether he knew about the change in presentation?

A. Yes, I did.

Q. Can you describe that?

A. I asked Neil to have breakfast on Sunday. The meeting happened on a Friday. This was now that Sunday. At that meeting, Neil and I discussed various things, and at some point during that breakfast, Neil told me that he had been aware of the timing of his stock sale and the change in the financial reporting, and that's why he had been so upset for the past few weeks.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 8, 2021

---

LA8PCOL1    Horowitz - Direct    Page 378

Q. During that breakfast, did Mr. Cole reference the overpayments and givebacks that you testified about the last couple of days?

A. Yes, he did.

Q. Can you describe that?

A. Neil said that he was concerned about the givebacks, that he had concerns about the floors and guaranteed distributions, and that Iconix had a history of roundtripping and we had to get off of it.

Q. Mr. Horowitz, at the time that you had this meeting with Mr. Cole, had you begun to take notes of your conversations with him?

A. Yes, I had.

Q. And why did you do that?

A. I started to take notes shortly after we received the SEC letter in February because I was concerned. Neil had become very erratic and started using terms like "fall guy" and "throwing people under the bus," including the Justin Abrahamson discussion, and I felt like it was important to record what was going on.

Q. Now, you said that during this breakfast, Mr. Cole made reference to the overpayments. Did you reflect that in your notes of this conversation?

A. I did, and I used what I would call code language or other words to mask the discussion about the paybacks.

---

LA8PCOL1    Horowitz - Direct    Page 379

Q. What did you write?

A. I wrote something about a concern about other items, and what I wrote was I wasn't sure what he was referring to, or something to that effect.

Q. Did you use the term "subset"?

A. I believe that I did.

Q. Why did you use code language in your notes?

A. Because had I not used code language, I would have put in plain writing the fraud that we had committed, and I didn't want to do that.

Q. Why not?

A. We had done things that were wrong, and I didn't want to put in writing that we had done them.

Q. Well, Mr. Horowitz, I thought the point of the notes was to have a record of your conversations with Mr. Cole?

A. It was.

Q. So why deviate from that?

A. I was scared to put in writing what I knew we had done wrong. I just couldn't write that down.

Q. You referenced Mr. Cole using the term "fall guy." Who was that in reference to?

A. Fall guy was used in reference to Jeff Lupinacci.

Q. What was the context of that?

A. The context was if any accounting was done incorrectly, that Jeff Lupinacci would be the fall guy.

---

LA8PCOL1    Horowitz - Direct    Page 380

Q. And remind us who Jeff Lupinacci was?

A. The CFO of the company.

Q. What did you understand Mr. Cole to mean by "fall guy"?

A. That Neil was going to blame Jeff for anything that the SEC might find wrong about how we had been accounting for the joint ventures, the cash flow that they were inquiring about.

Q. Now, you described yesterday a conversation that you had with Mr. Cole about changing the SEC response to represent different information about who the negotiated some of these transactions. Do you recall that testimony?

A. I do.

Q. When you were speaking with Mr. Cole privately about this, did he talk to you about his view of his potential legal exposure around these transactions?

A. Yes, he did.

Q. What did he say?

A. He told me that he was going to hire personal counsel, that this was going to, what he called, enforcement. He stated that I might not fully understand what we did wrong, but he's an attorney and I'm not. I don't understand how my notes look. He said he was going to need an attorney, a personal attorney, but I wouldn't.

Q. Did he ever make reference to potential criminal exposure?

A. My understanding was that -- of what he told me was he was afraid this was going to enforcement and that he would need his

---

LA8PCOL1    Horowitz - Direct    Page 381

own personal attorney.

Q. When he said "enforcement," did you understand what he meant by that?

    MR. REISNER: Objection, foundation.

    THE COURT: Overruled.

A. My understanding of what enforcement meant, that our initial conversations were back and forth with the SEC, was with their corp fin, or corporate finance department, and that enforcement was a deeper level and one that looked into crimes, and that was his fear.

Q. Do you recall him saying, at some point, that he might need a criminal attorney?

    MR. REISNER: Objection, leading.

    THE COURT: Overruled.

A. I believe that he did.

Q. Mr. Charalambous, can you please put up, just for the witness and for the parties, what's been marked for identification as Government Exhibit 113.

    Mr. Horowitz, do you recognize this as the response that was ultimately filed, the February 11th letter by Iconix?

A. Yes, I do.

    MR. HARTMAN: The government offers Government Exhibit 113.

    MR. REISNER: No objection.

    THE COURT: It will be received.

---

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**

October 8, 2021

LA8PCOL1    Horowitz - Direct    Page 382

(Government's Exhibit 113 received in evidence)

BY MR. HARTMAN:

Q. Mr. Charalambous, can you put that up for the jury, please. And could we look at page 71, please.

Mr. Horowitz, do you recognize this as part of the response to the Division of Corporation Finance?

A. I do.

Q. Do you know which specific question this portion of the response is addressing?

A. I believe that I do.

Q. What question?

A. The question was asking for all material terms around the joint ventures.

Q. Is there anything in this response that would indicate that Iconix had promised to return $5 million of the purchase price to GBG/Li & Fung?

A. No, there is not.

Q. And what is the purchase price that's indicated here in the response?

A. $15.9 million.

Q. How was that purchase price obtained?

A. The purchase price was obtained by agreeing to approximately $10.9 million value for the joint venture and GBG agreeing to pay $5 million more for that joint venture in exchange for being paid back.

LA8PCOL1    Horowitz - Direct    Page 383

Q. Mr. Charalambous, can we see page 75, please.

Mr. Horowitz, which transaction is referenced here?

A. This is the joint venture between Li & Fung, or GBG, and Iconix for Umbro and Lee Cooper in China.

Q. Is this the one we've been calling SEA-3?

A. It is.

Q. Mr. Horowitz, is there any reference in here to the promise to release GBG from its obligations under the Rocawear Kids licensing agreement?

A. No.

Q. Was that an important part of this transaction?

A. Yes, it was.

Q. What's the purchase price that's indicated here in this letter?

A. $21.5 million.

Q. And how was that purchase price obtained?

A. There was an agreed-upon price for the joint venture of $15.5 million. GBG agreed to pay $6 million more in exchange for letting them out of their Rocawear Kids obligation.

Q. Mr. Horowitz, did you review this letter before it was filed?

A. I did.

Q. Did you know that these terms were omitted from the letter?

A. Yes.

Q. Were you concerned about that?

LA8PCOL1    Horowitz - Direct    Page 384

A. Yes.

Q. Why?

A. Because we were lying to the SEC.

Q. Did Mr. Cole say anything to indicate to you that he had reviewed the letter before it was filed?

A. Yes.

Q. What did he say?

A. Mr. Neil Cole was in charge of the draft and/or in charge of the response to the SEC questioning, and he was very hands on with every round of every draft of our response.

Q. Mr. Charalambous, you can take that down.

Mr. Horowitz, when did you ultimately leave Iconix?

A. I left Iconix in April of 2015.

Q. And at some point, did you have a conversation with Mr. Cole about your desire to leave Iconix?

A. Yes.

Q. When was that?

A. It was the first week of April.

Q. Of 2015?

A. Of 2015.

Q. What dictated the timing of your conversation with Mr. Cole?

A. I waited until the third anniversary of my employment at Iconix because, at that point, I received shares in the company, and as soon as that date passed, I provided Neil with

LA8PCOL1    Horowitz - Direct    Page 385

my resignation letter.

Q. What were you waiting for?

A. I was waiting for my stock grant after my third anniversary.

Q. Can you describe the conversation you had with Mr. Cole after you gave him your resignation letter?

A. Yes. I gave Neil my resignation letter. He then -- I handed it to him in his office and told him that I was ready to speak about it whenever he would like.

Neil came into my office, asked me -- he asked me if I hated him or if I had had another job. I told him that I had lost faith in the company. He then berated me, told me I was a suicide bomber; that by resigning, I was acting like a suicide bomber, I was going to bring down the company, him and myself.

He threatened me that my resignation would lead to me no longer being able to serve on a public company -- at a public company. He told me that the two of us would be on the cover of The Post; that my career would be over. He told me that if I just waited to resign a few more weeks, that the SEC issue would go away. He told me to take time off, don't come to the office, just go figure out my next steps, but resigning now would be both destroying my career, his career and the company.

Q. Did you tell him you wouldn't resign?

A. I told him that I would think about what he told me over

# A-164

LA8PCOL1          Horowitz - Direct          Page 386

the weekend, but I still wanted him to have my resignation letter. He told me that if he did keep my resignation letter, he would have legal responsibilities to inform others, and that he had already ripped it up; so he didn't have it anymore.

Q. What did you do next?

A. I left the office, called attorneys.

Q. Did you reconsider your decision to resign?

A. No.

Q. Did you do anything to prepare for your resignation?

A. Yes.

Q. What did you do?

A. I set up a meeting with attorneys.

Q. And, Mr. Horowitz, I don't want to hear about your meetings with attorneys. I want to hear about other things you did.

A. In advance of those meetings, I took the printouts that I had at home of the e-mails about the joint ventures and any other e-mails that I had deemed important to keep a record of. I brought them with me.

I then called my assistant, Kaitlyn, in the Iconix office, and I asked her to grab a binder from my office that said "Financial Forecasts." I knew that was the binder that had the forecasts that clearly marked the joint ventures, the changing in price, and I asked her to take them out of the office and meet me on the street corner. I was in a taxi on my way to Penn Station.

LA8PCOL1          Horowitz - Direct          Page 387

She did. She met me on the street corner and literally I was in a taxi on the way to the train station. She handed me the binder, it was either one or two binders, through the window of the taxi, and I continued on to Penn Station.

Q. At some point, did you submit a second resignation letter to Iconix?

A. I did.

Q. Mr. Charalambous, can you please show just the witness and the parties what's been marked for identification as Government Exhibit 1197.

Mr. Horowitz, do you recognize this as the second resignation letter you submitted, or the e-mail containing that?

We can look at the attachment, Mr. Charalambous. Can we look at the second page?

A. Yes, I do.

MR. HARTMAN: Okay. So the government offers Government Exhibit 1197.

MR. REISNER: No objection.

MR. HARTMAN: Look at the first page, please?

THE COURT: It will be received.

(Government's Exhibit 1197 received in evidence)

BY MR. HARTMAN:

Q. Mr. Horowitz, who did you send this e-mail to?

A. I sent this e-mail to Neil Cole and the board of Iconix.

LA8PCOL1          Horowitz - Direct          Page 388

Q. And who is Jason Schaefer, who is also listed on the cc line?

A. Jason Schaefer is the general counsel for Iconix.

Q. The subject line is Resignation.

Can we see the attachment, please.

Mr. Horowitz, can I ask you to read the letter?

A. "Dear Mr. Cole and members of the board. I hereby tender my resignation as Chief Operating Officer of Iconix Brand Group, Inc. under my employment agreement dated April 2, 2012, as amended.

"As Mr. Cole is aware, I initially tendered my resignation last Monday, April 6th, 2015. Mr. Cole did not accept my resignation at that time and suggested that I take some time off away from the office and reconsider. I agreed to do so, and after reflecting over the past week, I remain firm in my decision to resign.

"In addition, I want to bring to your attention certain accounting issues that the company and/or the board may wish to review and which I hope have been or will be properly addressed in the company's ongoing discussions with BDO and the staff of the SEC's Division of Corporation Finance."

Q. Mr. Horowitz, I'm going to ask you to pause there. There's a reference to BDO. Can you remind us what BDO is?

A. BDO is the outside accounting firm.

Q. Okay. Go ahead.

LA8PCOL1          Horowitz - Direct          Page 389

A. "Terms of June 30th, 2014, and September 27th, 2014, amendments to the Southeast Asia joint venture."

Q. Mr. Horowitz, which amendments did this reference?

A. This is referencing the June joint venture for Europe brands and Korea with GBG, and the September joint venture for Lee Cooper and Umbro in China with GBG.

Q. Are these the transactions we've been calling SEA-2 and SEA-3?

A. Yes, they are.

Q. Go ahead.

A. "First, I would like to highlight the negotiations and terms of the June 30th, 2014, and September 27, 2014, amendments to the Southeast Asia joint venture with GBG (known as Li & Fung Asia as of June 30th, 2014). In particular, the price of the June 30, 2014, transaction increased from 10.9 million, based on terms negotiated for additional Southeast Asia joint venture rights in Europe and Turkey, (7.6 million) and Korea (3.3 million) to the eventual closing price of 15.9 million, based on negotiations including Mr. Cole between Iconix and GBG regarding Iconix's verbal commitment to compensate GBG for $5 million in marketing expenses.

"I am aware that Iconix paid GBG a portion of the $5 million for certain marketing expenses in the fourth quarter of 2014. I do not know whether these marketing expenses were considered or discussed with BDO in connection with the

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                        October 8, 2021

---

LA8PCOL1        Horowitz - Direct        Page 390

accounting for revenues from the joint venture."
        (Continued on next page)

---

LA8MCOL2        Horowitz - Direct        Page 391

Q. Mr. Horowitz, let's pause there. What are you describing here?
A. I'm describing the increase in the purchase price by $5 million in exchange for $5 million in repayment.
Q. Mr. Horowitz, there is nothing about your role in this negotiation here. Why is that?
A. I believe that my knowledge of this transaction would reflect on the fact that I was a part of it. And I wanted to be clear that Mr. Cole, Neil, was involved.
Q. The past couple of days you have testified about your understanding that this promise to return $5 million was not disclosed to Iconix's auditors. Here you say, I don't know whether these marketing expenses were considered or discussed with BDO. Why did you say that?
A. I said that because it had been a week since I had been at Iconix. I had some -- I had fear or concern that some of this was being unraveled not in my presence with using me as a fall guy, and I did not know if at that point there were any discussions with BDO about this.
Q. At the time of these transactions did you have an understanding of whether these transactions were going to be disclosed to the auditors?
A. Yes.
Q. What was that understanding?
A. They were not being disclosed to the auditors.

---

LA8MCOL2        Horowitz - Direct        Page 392

Q. Mr. Horowitz, you don't say anything in this paragraph about committing fraud in connection with this transaction. Why not?
A. I was on a fence. I wanted to have the company get the accounting right, and I did not want to admit that we had committed fraud.
Q. Why not?
A. I didn't want to end up facing the penalty of what we had done.
Q. Why write about it at all?
A. Really, it was two reasons. I wanted the company to get the accounting right. I wanted the company to correct its statements to the SEC, and Neil had just told me a week earlier that simply by resigning I was a suicide bomber, and I wasn't going to keep his secret or jump on his grenade. That's why.
Q. For two years you committed fraud with Mr. Cole, according to your telling. Why change your view now?
A. Neil had -- he had turned on me. He had started to -- he didn't start to. He denied knowledge of things that were his creation. He denied reading my e-mails, e-mails that we discussed over and over again. We worked extremely closely together. And now he was distancing himself from the things that he knew we did wrong. And that was not OK.
        At the same time, I still wanted things to work out at Iconix before I resigned. I wanted Neil to see the light. He

---

LA8MCOL2        Horowitz - Direct        Page 393

assured me in the beginning of March that we were going to have new procedures in place to make sure that we were doing joint ventures properly and that it was going to include BDO signoff before any joint ventures were consummated, and then he immediately did the opposite. It was time.
        MR. REISNER: Your Honor, move to strike as nonresponsive and move to strike the witness' testimony as to Mr. Cole knowing or not knowing what was in his mind.
        THE COURT: Overruled.
Q. Mr. Horowitz, you said Mr. Cole had turned on you. Were you worried about your own exposure at this point?
A. Yes.
Q. Can you explain that.
A. I was a part of this fraud. I helped negotiate these deals. I hid the information from the finance team and from the legal team. I was Neil's right hand in this.
Q. How does that connect to your reference to him using the term fall guy?
A. I was one of, if not the only person at Iconix that was aware of the exact relationships between the overpayments and the commitments to return those overpayments. So if Neil was going to have a fall guy, like he was going to use Jeff Lupinacci or Brian Snyderman or Justin Abrahamson, it was going to be me. Jason Schaefer, our attorney, came to me at some point during this and said something to the effect of, Neil was

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

| LA8MCOL2 | Horowitz - Direct | Page 394 |

trying to throw you under the bus, but I wouldn't go along with it.

Q. Let's look at the next paragraph.

Mr. Horowitz, can you read this paragraph.

A. I also understand that the price of the September 17, 2014 transaction increased from 15.5 million, based on terms negotiated for additional Southeast Asia joint venture rights in China, Macau, Hong Kong, and Taiwan, to 21.5 million following negotiations, including Mr. Cole, between Iconix and GBG regarding primarily Iconix's release of GBG from its licensing agreement with Iconix for Rocawear. In particular, GBG's obligation to pay Iconix 2.5 million in 2014 and 3.5 million in 2015 in connection with the Rocawear license. At Mr. Cole's request, I worked with the Iconix legal team to prepare the documents to release GBG from its Rocawear obligations, but, at Mr. Cole's direction, I did not send those documents to GBG, and thus, as far as I know, GBG has not been released from those obligations.

Q. Mr. Horowitz, what transaction did this reference?

A. This references the September joint venture between Iconix and GBG for Lee Cooper and Umbro in China.

MR. HARTMAN: Mr. Charalambous, can we look at the next paragraph that begins: I do not know.

Q. Mr. Horowitz, can you read this, please.

A. I do not know whether the verbal commitment regarding

| LA8MCOL2 | Horowitz - Direct | Page 395 |

marketing expenses and release of GBG from its Rocawear obligations were communicated to BDO for its consideration. I do not have an accounting background and would not be in a position to disagree with the company if it has already considered these matters in connection with the revenue issues regarding these joint ventures.

Q. Mr. Horowitz, why did you write I don't know whether the verbal commitments regarding market expenses and release of GBG from its Rocawear obligations were communicated to BDO for consideration?

A. At this point I was not aware and was not a part of the communications with BDO over the prior week, since I had attempted to resign.

Q. When you say, I wouldn't be in a position to disagree with the company if it had already considered these matters, why did you say that?

Let me ask you a different question. To your understanding, had the company already considered these matters?

A. Not up to the point where I had originally tried to resign a week earlier.

Q. What was the purpose of writing this letter?

A. The purpose of writing this letter was to bring to light these two transactions and the overpayments and paybacks so that the company could get its accounting right, and I wouldn't

| LA8MCOL2 | Horowitz - Direct | Page 396 |

be Neil's fall guy or scapegoat.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Q. Mr. Horowitz, at some point after you left Iconix, did you begin meeting with the United States Attorney's Office about these matters?

A. Yes.

Q. Do you remember approximately when that was?

A. I believe it was approximately 2018.

Q. Where were you working at the time?

A. I was CEO of Baked by Melissa.

Q. When you got the job at Baked by Melissa, did you tell the people who hired you that you had committed accounting fraud at Iconix?

A. No.

Q. Why not?

A. Because I wanted the job, and I felt if they were aware of this, I would not be considered for CEO.

Q. When you began meeting with the government, did you tell anyone at Baked by Melissa that you were meeting with the government about these issues?

A. No.

Q. Why not?

A. I believed that my meetings with the government were confidential.

| LA8MCOL2 | Horowitz - Direct | Page 397 |

Q. Did you understand that if you told them about this conduct, that would have implications for your employment?

A. Yes. I would have been terminated.

Q. At some point were you separated from Baked by Melissa?

A. Yes.

Q. When was that?

A. It was December of 2019.

Q. What prompted that?

A. When it became public that I pled guilty to committing fraud, I was immediately terminated from the company.

Q. Mr. Horowitz, in your meetings with the government did you discuss the issues you've been testifying about the past couple of days?

A. Yes.

Q. Were you also asked to disclose other improper criminal conduct that you had engaged in?

A. Yes.

Q. Did you disclose information about your personal drug use in your meetings with the government?

A. Yes.

Q. What did you disclose?

A. I disclosed that I smoked marijuana for many years.

Q. Did you also disclose information about your use of hallucinogenic mushrooms and other substances?

A. I believe that I did.

| LA8MCOL2 | Horowitz - Direct | Page 398 |
|---|---|---|

Q. During the time you were working at Iconix, did you use drugs on occasion?

A. I smoked marijuana on occasion.

Q. Did anything about your marijuana use affect your perception during the time you were at Iconix?

A. No, it did not.

Q. What about your memory?

A. No, it did not.

Q. To your understanding, did the government know about your drug use before you disclosed it?

A. I do not know.

Q. You said you pled guilty in connection with this case. Before pleading guilty, did you enter into a cooperation agreement with the government?

A. Yes, I did.

MR. HARTMAN: Mr. Charalambous, could you please show for the witness what's been marked for identification as Government Exhibit 1514.

Q. Mr. Horowitz, do you recognize this document?

A. Yes.

Q. What is it?

A. It is a letter of the cooperation agreement.

MR. HARTMAN: The government offers Government Exhibit 1514.

MR. REISNER: No objection.

| LA8MCOL2 | Horowitz - Direct | Page 399 |
|---|---|---|

THE COURT: It will be received.

(Government Exhibit 1514 received in evidence)

MR. HARTMAN: Mr. Charalambous, could you show us the last page, please.

Q. Mr. Horowitz, is that your signature on the last page?

A. Yes, it is.

MR. HARTMAN: You can zoom out.

Q. When did you sign this, Mr. Horowitz?

A. I signed this on December 2, 2019.

Q. Tell us, again, what crimes you pled guilty to.

A. I pled guilty to committing fraud, being a part of a conspiracy to commit fraud, to inflating revenue, and making false statements to the SEC.

Q. Why did you plead guilty to those crimes?

A. Because I am guilty of those crimes.

Q. Have you been sentenced for those crimes?

A. I have not.

Q. What is your understanding of the maximum possible sentence you'd face?

A. I face 70 years of imprisonment.

Q. Could there be a financial component to your sentence as well?

A. Yes.

Q. What are you hoping to obtain by cooperating in this case?

A. I'm hoping to obtain the minimum punishment that I can

| LA8MCOL2 | Horowitz - Direct | Page 400 |
|---|---|---|

obtain.

Q. What are you required to do under your cooperation agreement with the government?

A. I am required to tell the whole truth and to provide any testimony and any court appearances that the government would like me to participate in.

Q. What is your understanding of what the government will do if you live up to your obligations under the agreement?

A. My understanding is that the government can write a letter that describes both the good and bad about my cooperation.

Q. If the government submits that letter, what effect could that have on the sentence that you will face?

A. It could have a positive effect on the sentencing that I potentially face or that I face.

Q. To your understanding, will the government make a recommendation of a particular sentence in connection with your sentencing?

A. No, it will not.

Q. If the government submits that letter -- who will impose sentence on you?

A. The judge will.

Q. Does the government decide what sentence you will receive?

A. It does not.

Q. If the government submits that letter, does the judge have to impose a lower sentence on you?

| LA8MCOL2 | Horowitz - Cross | Page 401 |
|---|---|---|

A. No.

Q. Does the outcome of this trial have any bearing on whether or not the government submits that letter, to your understanding?

A. No, it does not.

Q. What does bear on that, to your understanding?

A. My truthfulness and willingness to cooperate.

Q. Have you been promised what sentence you will receive?

A. I have not.

Q. Who ultimately will decide what your sentence will be?

A. The judge will.

MR. HARTMAN: Your Honor, can I have one moment?

THE COURT: Sure.

MR. HARTMAN: No further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. REISNER:

Q. Mr. Horowitz, during your direct examination you testified that you are not currently employed, correct?

A. That is correct.

Q. Do you offer business consulting services under the company name Turnaround Business Consulting LLC?

A. I do.

Q. Have you referred to yourself as the founder and CEO of Turnaround Business Consulting LLC?

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**                                                                    **October 8, 2021**

| LA8MCOL2 | Horowitz - Cross | Page 402 |
|---|---|---|

A. Yes.

Q. If I were to go online right now to the website www.turnaroundbusinessconsulting.com, I would see a picture of you promoting your services under the company name Turnaround Business Consulting LLC, correct?

A. That is correct.

MR. REISNER: Mr. Klein, can we show to the witness and the parties what's been marked for identification as Defense Exhibit 2009.

Q. Do you recognize that, Mr. Horowitz?

A. I do.

Q. Does it appear to be a web capture for the website www.turnaround business consulting.com?

A. Yes, it does.

Q. Are you responsible for the content of that site?

A. Yes.

MR. REISNER: Your Honor, we offer Defendant's Exhibit 2009.

MR. HARTMAN: Your Honor, could we see the whole document. I don't know if this is one of several different pages.

No objection.

THE COURT: It will be received.

(Defendant's Exhibit 2009 received in evidence)

MR. REISNER: Mr. Klein, can we please go to the page

| LA8MCOL2 | Horowitz - Cross | Page 403 |
|---|---|---|

marked as DX-2009-002.

Q. Mr. Horowitz, that page states: I turn around businesses utilizing my methodical approach to building brands and rebuilding companies. The process is unique and proven.

I work with leaders who have the desire to transform their businesses into something greater. Together we uncover valuable opportunities to maximize your financial performance.

Do you see that?

A. Yes, I do.

Q. Do the services you offer through Turnaround Business Consulting include identifying valuable opportunities to maximize companies' financial performance?

A. If I had any customers, it would.

MR. REISNER: Mr. Klein, if we can go to the page with the Bates stamp number 2009-23. If we can enlarge the entry next to the word numbers.

Q. That states: I have worked with small private businesses and large public businesses. I have vast experience running successful e-commerce, retail wholesale, marketing, merchandising, and licensing businesses. I understand and can teach the most important financial measurements and consumer data for you and your company. Numbers. They are concrete. We will identify which ones are most important for you to achieve and how to track and take action to meet them.

Do you see that?

| LA8MCOL2 | Horowitz - Cross | Page 404 |
|---|---|---|

A. Yes, I do.

Q. When you refer to your ability to teach the most important financial measurements and how to track and take action to meet the numbers, were you proposing unlawful conduct?

A. No.

Q. You don't think it's improper for a company to identify which financial goals are most important to achieve, correct?

A. Correct.

Q. And you don't think it's improper for a company to track and take action to meet its financial objectives, correct?

A. That is correct.

Q. You believe these were customary and ordinary practices for businesses, correct?

A. That is correct.

Q. Mr. Horowitz, identifying opportunities and building a strategic plan to increase revenue and profitability also is a proper business practice, in your view, correct?

A. That is correct.

MR. REISNER: Let's go to the page marked as Defendant's Exhibit 2009-007, Mr. Klein.

Q. Next to the word revenue on that page it says: Over the past 20 years, I have identified and executed strategies to increase revenue, correct?

A. That is correct.

Q. And the last sentence in this entry says: Together, we

| LA8MCOL2 | Horowitz - Cross | Page 405 |
|---|---|---|

will identify your best opportunities and build a strategic plan to increase revenue and profitability for you and your company.

Do you see that?

A. I do see that.

Q. When you refer to identifying the best opportunities and building a strategic plan to increase revenue and profitability for your company, you were not proposing unlawful conduct, correct?

A. I am not proposing unlawful conduct.

MR. REISNER: We can take that down.

Q. Now, during your direct testimony you talked about some of your prior employment, correct?

A. Correct.

Q. You testified that you served as chairman and CEO of a company called Everlast, correct?

A. That is correct.

Q. Is it fair to say that you obtained your position at Everlast, at least in part, based on a family connection?

A. It is fair to say that my father was CEO of the company until he passed away, and then I was elected CEO of the company.

Q. Your father was the chairman and CEO of Everlast immediately before you, correct?

A. That is correct.

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**

October 8, 2021

| LA8MCOL2 | Horowitz - Cross | Page 406 |
| --- | --- | --- |

Q. And after you assumed the position of chairman and CEO of Everlast, you held that position for about one year and ten months, correct?

A. I believe that's correct.

Q. From about December of 2005 to September of 2007, correct?

A. That sounds right.

Q. After that, you worked at Modell's, correct?

A. That is correct.

Q. And you left Modell's in April of 2011, correct?

A. That is correct.

Q. When you left Modell's, is it fair to say you were not on good terms with the CEO of Modell's.

A. I would not agree to that.

Q. You began working at Iconix in April of 2012, correct?

A. That is correct.

Q. When you joined Iconix, your title was president of the men's division, right?

A. That is correct.

Q. Now, in 2011, before joining Iconix, you thought about the possibility of becoming involved in a corporate acquisition of Iconix, correct?

A. Can you repeat the question, please.

Q. You spoke with a banker about the idea of a private group funding a transaction where you could obtain an equity interest in Iconix, correct?

| LA8MCOL2 | Horowitz - Cross | Page 407 |
| --- | --- | --- |

A. I don't recall those conversations.

MR. REISNER: Mr. Klein, can we show the witness and the parties what's been marked as Defendant's Exhibit 1010.

Q. Mr. Horowitz, that's an e-mail that you sent on May 5, 2011, correct?

A. Correct.

Q. Does that e-mail refresh your recollection that at or around that time you spoke about the idea of a private group funding a transaction where you can obtain an equity interest in Iconix?

A. No, it does not.

Q. Did you speak with a banker in the May 2011 time period about the idea of a private group funding a small transaction that would be better for you because it would present an opportunity to have greater equity?

A. I believe that I did.

Q. And you also scheduled meetings with private equity firms to follow up on this idea, correct?

A. I do not recall.

Q. Directing your attention to the document in front of you, the fifth line from the bottom that starts, I will, can you look at that.

Does that refresh your recollection that you scheduled meetings with private equity firms to follow up on this idea of doing a corporation acquisition for Iconix?

| LA8MCOL2 | Horowitz - Cross | Page 408 |
| --- | --- | --- |

A. It does not.

Q. You never participated in an acquisition of Iconix, correct?

A. I'm sorry. Can you repeat the beginning of that question.

Q. You never participated in an acquisition of Iconix, correct?

A. Correct.

Q. You were never involved with a private equity group actually funding a transaction in which you obtained an equity interest in Iconix, right?

A. That is correct.

Q. Now, in the November 2011 time period, you spoke with Neil Cole about a possible position at Iconix, correct?

A. There was a point where Neil approached me about becoming --

Q. My question, Mr. Horowitz, is whether in November 2011 you spoke with Neil Cole about a possible position at Iconix. If you can answer that question yes or no, that would be terrific.

A. I don't recall if it was in November of 2011, but Neil and I did have discussions about potential employment.

MR. REISNER: Mr. Klein, can we place before the witness and the parties what's marked as Defendant's Exhibit 1016.

Q. That's an e-mail that you sent on November 3, 2011, correct, Mr. Horowitz?

| LA8MCOL2 | Horowitz - Cross | Page 409 |
| --- | --- | --- |

A. That is correct.

MR. REISNER: Let's highlight the whole thing, Mr. Klein, under item 3.

Q. Does that refresh your recollection that in November of 2011, you spoke with Neil Cole about a possible position at Iconix?

A. Yes, it does.

Q. And you discussed with Mr. Cole a potential role at Iconix as president and CEO of the men's division, correct?

A. That is correct.

Q. You also discussed with Mr. Cole a board seat on the Iconix board of directors, correct?

A. I believe that we did.

Q. You were never offered the title of CEO of the men's division at Iconix, correct?

A. That is correct.

Q. And you were never offered a seat on the board of directors of Iconix, correct?

A. That is correct.

Q. Now, by November 21, 2011, or so, you had decided that you could not join Iconix, correct?

A. I don't recall the specific timing of it.

MR. REISNER: Mr. Klein, can we please show the witness and the parties what's marked as Defendant's Exhibit 1017.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

---

LA8MCOL2     Horowitz - Cross     Page 410

Q. That's an e-mail that you sent on November 21, 2011, correct?

A. That is correct.

MR. REISNER: Mr. Klein, can we please highlight the second sentence for the sentence. No. The one right before that.

Q. Does that refresh your recollection that by November 21, 2011, you had decided that you could not join Iconix?

A. I recall coming to the conclusion that I was not going to join Iconix.

Q. But by March 2012, your negotiations with Iconix about joining the company had heated up again, correct?

A. That is correct.

Q. And you thought that working at Iconix had some great financial upside for you, correct?

A. Yes.

Q. You thought that great financial upside might put you in a position to buy a bigger apartment in New York City, correct?

A. I don't believe I drew that direct conclusion.

MR. REISNER: Mr. Klein, can we place before the witness and the parties what's been marked as Defendant's Exhibit 1020. Let's highlight for the witness the last two sentences.

Q. Does that refresh your recollection that you believed that the financial upside of going to Iconix might put you in a

---

LA8MCOL2     Horowitz - Cross     Page 411

position to have a bigger apartment in New York City?

A. No, it does not.

Q. And in late March of 2012, you were becoming more fond of the financial parameters of a position with Iconix, right?

A. Yes.

Q. Around that time you believed that an employment agreement that had been offered by Iconix met your financial goals, correct?

A. At some point I agreed to terms with Iconix that met my financial goals.

Q. That was in the late March 2012 time period, correct?

A. That was either late March or early April, correct.

MR. REISNER: Let's, Mr. Klein, place before the witness what's been marked as Defendant's Exhibit 1021. Let's highlight for the witness the bottom of that page.

Q. Does that refresh your recollection that in late March 2012, you believed an employment agreement offered by Iconix met your financial goals?

A. As I believe I stated, my agreement with Iconix did meet my financial goals.

Q. One of the terms of the Iconix offer was a three-year period of employment, correct?

A. It was a three-year contract, correct.

Q. And you signed an employment agreement with Iconix on or about April 2, 2012, correct?

---

LA8MCOL2     Horowitz - Cross     Page 412

A. That is correct.

MR. REISNER: Mr. Klein, let's place before the witness what's been marked as Defendant's Exhibit 1025-A1. Let's just scroll through the document so the witness has an opportunity to see it. Let's look at page 19 of the document.

Q. Do you see your signature on that document, sir?

A. Yes, I do.

Q. Is that a copy of your April 2012 employment agreement with Iconix?

A. Yes, it is.

MR. REISNER: Defense offers Defendant's Exhibit 1021.

MR. HARTMAN: No objection.

MR. REISNER: Apologies, your Honor. It's 1025-A1.

THE COURT: It will be received.

(Defendant's Exhibit 1025-A1 received in evidence)

MR. REISNER: May we publish it to the jury, your Honor?

THE COURT: You may.

Q. The agreement had a three-year term of employment, right?

A. Yes.

Q. Directing your attention to the page that ends in 001 and 002, the agreement provided you with a base salary, a base salary of not less than $500,000 in the first year, correct?

A. That is correct.

Q. It provided you with a base salary of at least $550,000 in

---

LA8MCOL2     Horowitz - Cross     Page 413

the second year, correct?

A. That is correct.

Q. And it provided you with a base salary of at least $600,000 in the third year, correct?

A. That is correct.

Q. Your employment agreement also made you eligible for an annual cash bonus, correct?

A. That is correct.

Q. The annual bonus could be up to 100 percent of your base salary, correct?

A. That is correct.

Q. The bonus was based on whether the company met certain annual EBITDA targets, correct?

A. Yes.

Q. What is EBITDA?

A. EBITDA stands for earnings before interest, tax, depreciation, and amortization.

Q. Your cash bonus was based on annual, not quarterly, EBITDA targets, correct?

A. That is correct.

Q. Your cash bonus was not based on the company reaching any revenue metric, correct?

A. Revenue is a variable of EBITDA, but not revenue exclusively.

Q. And the employment agreement also made you eligible for up

---

# A-171

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 8, 2021

LA8MCOL2          Horowitz - Cross          Page 414

to 75,000 shares of restricted stock, correct? If we look at page 3 of the document under restricted stock.

A. That is correct.

Q. And those restrictions would lapse on one-third of those restricted shares each year, correct?

A. Yes.

Q. So your expectation was that one-third of the shares would be unrestricted and available for sale each year for three years, correct?

A. That is correct.

Q. You just testified that you delayed your resignation at Iconix so that the third tranche, the third year of these restricted stock shares would vest before you departed, correct?

A. I timed my resignation with these restricted shares becoming unrestricted.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, did the board of directors of Iconix make a commitment to you that you would become the CEO of the company within five years of joining the company? Did the board make a commitment to you like that?

A. That topic was discussed, but I don't recall it being a commitment.

Q. You've told people that when you joined Iconix the board made a commitment to make you CEO in five years, right?

LA8MCOL2          Horowitz - Cross          Page 415

A. I do not recall.

MR. REISNER: Mr. Klein, let's put before the witness what's been marked as Defendant's Exhibit 1638. If we can highlight the sixth sentence there, the one that starts with: Make great. Can you highlight that.

Q. Is that an e-mail you sent on June 5, 2015?

A. Yes, this is.

Q. Does it refresh your recollection that you told people that the board made a commitment to make you CEO in five years?

A. It does not.

MR. REISNER: Your Honor, we offer Defendant's Exhibit 1638.

MR. HARTMAN: Hearsay.

THE COURT: You want to come to sidebar.

(Continued on next page)

LA8MCOL2          Horowitz - Cross          Page 416

(At sidebar)

THE COURT: It appears to be hearsay, Mr. Reisner.

MR. REISNER: Not offering it for its truth, but for the witness' state of mind.

MR. HARTMAN: Your Honor, I don't think it goes to the issue of Mr. Horowitz's state of mind. It goes to the issue of whether he said these things, which is something he testified he doesn't remember. It's also relevant.

MR. REISNER: It's just the fact that he said it. It's not for the truth of the matter asserted. He said it and I'll ask him whether it was true or false.

THE COURT: I'll allow it.

(Continued on next page)

LA8MCOL2          Horowitz - Cross          Page 417

(In open court)

THE COURT: It will be received.

(Defendant's Exhibit 1638 received in evidence)

MR. REISNER: May we publish it to the jury, your Honor?

THE COURT: You may.

MR. REISNER: May we please, Mr. Klein, highlight the same excerpt that we highlighted before.

Q. Mr. Horowitz, in the June 2015 time period, in this e-mail you told Mr. Clark that the board had made a commitment for you to be the CEO in five years, correct?

A. That is what I wrote to Mr. Clark.

Q. That was a false statement, correct?

A. That's correct.

Q. Now, within the very first few months of your job at Iconix, you were discussing the possibility of taking a job at a different company, correct?

A. That is correct.

Q. You didn't tell Mr. Cole that you were discussing a possible new job at a different company within months of your arrival at Iconix, correct?

A. I believe it was approximately six months after my arrival, but I did not tell Mr. Cole.

Q. And you interviewed for a job at Tourneau, the watch company, correct?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    October 8, 2021

LA8MCOL2          Horowitz - Cross          Page 418

A. That is correct.

Q. And you were exploring the possibility of a president position at Tourneau, correct?

A. That is correct.

Q. And your view was, that if you took the job at Tourneau, your title needed to be president, correct?

A. I don't recall.

Q. That's what you told people at Tourneau, correct?

A. I don't recall what I told the people at Tourneau.

MR. REISNER: Let's place before the witness, Mr. Klein, what's marked as Defendant's Exhibit 1022. Let's show him the page that ends with 003. If you can highlight the first line of that for the witness.

Q. Does that refresh your recollection that you told the people at Tourneau that the title needs to be president?

A. It does not.

Q. You didn't become president of Tourneau, correct?

A. That is correct.

Q. And after further conversations with Mr. Cole and the Tourneau CEO, you decided to stay at Iconix, correct?

A. I decided to stay at Iconix.

Q. In the June 2012 time period, you were certain that you made the right decision to stay at Iconix, correct?

A. I believe that I was.

(Continued on next page)

LA8PCOL3          Horowitz - Cross          Page 419

BY MR. REISNER:

Q. Now, Mr. Horowitz, in the June, July 2012 time period, you thought that Mr. Cole was being disrespectful towards you, correct?

A. I believe so.

Q. You believed at that time that Mr. Cole had put you down to show his position of strength, correct?

A. That sounds accurate.

Q. Let's place before the witness what's been marked as Defendant's Exhibit 1023 for identification.

It's an e-mail you sent to yourself on June 14th, 2012, correct?

A. That is correct.

Q. And let's place before the witness the attachment to that e-mail. It should be marked as Defense Exhibit 1023-A1 for identification.

So based on the disrespect that you thought Mr. Cole had displayed towards you, you thought you had two choices, two possible reactions, correct?

A. I don't recall.

Q. Well, let's highlight for the witness the bottom. You've got it, Mr. Klein. Just highlight that to the end, please.

Does that refresh your recollection that, in response to this perceived disrespect, you thought you were left with two potential choices or reactions?

LA8PCOL3          Horowitz - Cross          Page 420

A. In response to the disrespect that Neil was showing to me, I wrote myself a letter.

MR. REISNER: Your Honor, I'd ask that the witness be directed to answer my question.

THE COURT: Yes, Mr. Horowitz, are you able to answer the question that was asked?

THE WITNESS: I apologize. I'm sorry. Can you restate the question?

MR. REISNER: Can we please have the court reporter repeat the question for the witness?

THE COURT: Madam Court Reporter.

(Record read back)

A. Yes, it does.

Q. One of those choices or reactions was to ignore it, right?

A. That is correct.

Q. But you thought that that would show weakness and acceptance of disrespectful behavior, correct?

A. That is correct.

Q. And you thought that was something you couldn't stomach, correct?

A. That is correct.

Q. The second choice or reaction was to fight back, correct?

A. The second of what I felt my choices were --

MR. REISNER: Your Honor, again, I ask that the witness be directed to answer my question?

LA8PCOL3          Horowitz - Cross          Page 421

THE COURT: Yes. Why don't you answer the question, Mr. Horowitz?

A. Yes.

Q. And by "fight back," you meant fight back against Mr. Cole, right?

A. No.

Q. And up to that point, you had chosen not to do so, correct?

A. Correct.

Q. And at that time, you thought that your ability not to fight back was not going to last much longer, correct?

A. No.

MR. REISNER: Your Honor, we offer defense Exhibit 1023 and 1023-A1.

THE COURT: Any objection?

MR. HARTMAN: Yes, your Honor, we object.

THE COURT: Overruled. It will be received.

(Defendant's Exhibit 1023, 1023-A1 received in evidence)

MR. REISNER: Can we publish this to the jury, your Honor?

THE COURT: You may.

MR. REISNER: And if you could keep that portion highlighted, Mr. Klein.

BY MR. REISNER:

Q. And so option two identified in this document you sent to

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

| LA8PCOL3 | Horowitz - Cross | Page 422 |
| --- | --- | --- |

yourself in an e-mail, was fight back, correct?

A. Correct.

Q. And at that time, you had chosen not to do so, correct?

A. Correct.

Q. And at that time, your ability not to fight back was not going to last much longer, correct?

A. My ability to ignore what was going on was not going to last much longer.

Q. Okay. And one of the issues you had with Mr. Cole around this time was that when you tried to identify revenue opportunities, Mr. Cole told you to relax, take your time, calm down, it doesn't matter whether we're another $5 million or $10 million off in the men's division, correct?

A. That is one of the reactions, correct.

THE COURT: Mr. Reisner, it's now 11:00; so we'll take our first break. Ladies and gentlemen, that will be a 20-minute break. Please be prepared to come back down at 11:20. Do not discuss the case.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

(Witness temporarily excused)

And everyone can be seated. Any work for me?

MR. HARTMAN: I don't believe so, your Honor.

MR. REISNER: No.

THE COURT: Twenty minutes, folks. Don't be late.

| LA8PCOL3 | Horowitz - Cross | Page 423 |
| --- | --- | --- |

(Recess)

THE COURT: Bring Mr. Horowitz in.

(Jury present)

THE COURT: Everyone, please be seated. Mr. Reisner.

MR. REISNER: Thank you, your Honor.

BY MR. REISNER:

Q. Now, Mr. Horowitz, in April 2013, approximately one year after you started at Iconix, you asked Mr. Cole for an increase in your compensation over and above what was already in your three-year employment agreement, correct?

A. I do not recall that conversation.

Q. Mr. Klein, can we please place before the witness what's been marked as Defendant's Exhibit 1036.

Ian, can you please provide copies to the government.

Mr. Horowitz, does looking at that document refresh your recollection that in April of 2013, you asked Mr. Cole for an increase in your compensation over and above what was in your employment agreement?

A. It does not.

Q. Do you recall preparing a script for yourself for a conversation with Mr. Cole about asking for an increase in your compensation?

A. I do not.

Q. Do you recall in that time period you wanted to double your compensation over the next three years?

| LA8PCOL3 | Horowitz - Cross | Page 424 |
| --- | --- | --- |

A. I do not.

Q. You knew in the April 2013 time period that you had an existing contract for a three-year term, correct?

A. That is correct.

Q. Do you recall essentially threatening that you would pursue other opportunities unless Mr. Cole took a fresh look at your compensation package?

A. I do not.

Q. You can take that down, Mr. Klein.

Now, Mr. Horowitz, on March 18th, 2014, you were promoted to chief operating officer of Iconix, correct?

A. That is correct.

Q. And you considered that a great step, correct?

A. Yes.

Q. But at the time, you also wanted the title of president of Iconix, correct?

A. I don't recall.

Q. Mr. Klein, let's place before the witness what's been marked as Defendant's Exhibit 1181, and let's highlight for the witness the second-to-last line in that document.

Does that refresh your recollection, Mr. Horowitz, that you also wanted the title of president of Iconix?

A. No, it does not.

Q. Do you recall Mr. Cole telling you, in the March 2014 time period, that he was not ready to give up the president title?

| LA8PCOL3 | Horowitz - Cross | Page 425 |
| --- | --- | --- |

MR. HARTMAN: Objection.

THE COURT: Overruled.

A. I do not.

MR. REISNER: Your Honor, we offer Defendant's Exhibit 1181.

THE COURT: Any objection?

MR. HARTMAN: Hearsay, your Honor.

THE COURT: Overruled. It will be received.

(Defendant's Exhibit 1181 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

BY MR. REISNER:

Q. And directing your attention to the highlighted portion, in reference to president, he is "not ready to give this up" but believes it will happen next year. Does that refresh your recollection that Mr. Cole told you that he was not yet ready to give up the president's title?

A. I do not recall him saying that.

Q. You were never given the title of president of Iconix, correct?

A. That is correct.

Q. And in the 2014 time period -- we can take that down, Mr. Klein -- in the 2014 time period, it was your goal to someday run the company, correct?

A. Yes.

# A-174

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 8, 2021

LA8PCOL3          Horowitz - Cross          Page 426

Q. And that meant becoming the CEO of the company one day, correct?

A. One day, correct.

Q. And when you became the chief operating officer in March 2014, you hoped that you would eventually become CEO of the company, correct?

A. That is correct.

Q. And you never became CEO of Iconix, correct?

A. That is correct.

Q. Now, in March of 2014, when you became chief operating officer, you signed an amendment to your employment agreement, correct?

A. That is correct.

Q. Mr. Klein, can you please place before the witness Defendant's Exhibit 1178. If we could just scroll through that document so the witness has an opportunity to see it. Let's go to the first page.

Does that appear to be a copy of the amendment to your employment agreement?

A. It does.

Q. And let's look at page 6. Is that your signature on the document?

A. Yes, it is.

MR. REISNER: Your Honor, we offer defense Exhibit 1178.

LA8PCOL3          Horowitz - Cross          Page 427

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1178 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

MR. REISNER: Mr. Klein.

BY MR. REISNER:

Q. Now, directing your attention to the first page, item 3, this amended employment agreement guaranteed you a base annual salary of at least $625,000 per year, correct?

A. That is correct.

Q. And in addition, you were eligible for an annual bonus on top of that, correct?

A. Yes, that is correct.

Q. And the annual bonus could be up to 100 percent of your $625,000-per-year base salary, correct?

A. That is correct.

Q. In addition, you were granted an award of restricted stock units, or RSUs, correct?

A. Would you mind just scrolling down a little bit? Thank you. Yes, that is correct.

Q. And these restricted stock units, or RSUs, were in addition to the RSUs that you had been awarded in your original employment contract, correct?

LA8PCOL3          Horowitz - Cross          Page 428

A. That is correct.

Q. The fair market value of those RSUs was approximately $800,000, correct?

A. That is correct.

Q. And the way the RSUs worked was that the units vested after set periods of time, as long as you were still working at Iconix, correct?

A. That is correct.

Q. And under the contract, you were also granted performance stock units, or PSUs, correct?

A. That is correct.

Q. And they had a fair market value of approximately $2.8 million, correct?

A. That is correct.

Q. Now, these PSUs vested if the company met certain annual performance goals, correct?

A. That is correct.

Q. And the performance goals were established by the board of directors, correct?

A. I'm not sure.

Q. The performance goals were based on the company's annual performance, correct?

A. That is correct.

Q. There were no performance goals for quarterly results, correct?

LA8PCOL3          Horowitz - Cross          Page 429

A. No, there were not.

Q. And a performance goals were based on annual EBITDA, EPS and free cash flow, correct?

A. I believe so, but would like to confirm in the document.

Q. You'll have to scroll down.

(Pause)

You know, it may be easier if we -- what's that? Okay, got it.

If you look under item (a), that may help you respond to the question.

A. The PSUs were allocated based on EBITDA growth, EPS growth, and free cash flow shares -- free cash flow.

Q. There were no performance goals for revenue targets, correct?

A. That is correct.

Q. So revenue was not one of the metrics that triggered your opportunity to obtain PSUs, correct?

A. Revenue, the driving factor of EBITDA, but alone it is not one of the variables.

Q. Well, one of the metrics for determining your performance stock was not revenue, correct?

A. That is correct.

Q. Do you recall testifying on direct examination that one of the metrics for determining your performance stock was revenue?

A. I believe I may have said that.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

| LA8PCOL3 | Horowitz - Cross | Page 430 |
|---|---|---|

Q. Did you say that, did you not say that, or can you not recall whether you said that?

A. I believe I said that.

Q. And so that was incorrect, right?

A. Yes.

Q. Was it intentionally incorrect, or did you make a mistake?

A. I made a mistake. It was not intentionally incorrect.

Q. And your testimony on direct was that Mr. Cole's performance stock was based on revenue metrics. That was also incorrect, right?

A. That isn't correct. Well, I don't know that to be incorrect.

Q. Your testimony is you don't know?

A. Can you please repeat the question? I want to make sure I answer it properly.

Q. You testified on direct that Mr. Cole's performance stock was based on revenue metrics, and that was incorrect, right?

A. I believe that is incorrect.

Q. Now, as COO, did you believe that investing in marketing and promotion for Iconix Brands increased brand awareness and brand value?

A. Yes.

Q. And so investing in marketing and promotion for Iconix Brands is generally a good thing for Iconix, right?

A. Generally speaking, yes.

| LA8PCOL3 | Horowitz - Cross | Page 431 |
|---|---|---|

Q. And as COO, you were one of approximately ten people who reported directly to Mr. Cole in 2014, correct?

A. That number seems about correct.

Q. And you had about five people who reported to you, correct?

A. I'm sorry, in what year?

Q. 2014. As COO?

A. I believe it was less than that.

Q. And you wanted to -- withdrawn.
Did Rodney Hutton report to you?

A. Rodney Hutton partially reported to me.

Q. Did Richard Millington report to you?

A. Yes, he did.

Q. Did Paul Nugent report to you?

A. Yes, he did.

Q. Did Will Byron report to you?

A. Yes, he did.

Q. Did Ronald Parsons report to you?

A. No, he did not.

Q. As COO, you wanted to make a good impression on Mr. Cole, correct?

A. Yes.

Q. You also wanted to make a good impression on the board of directors of the company, correct?

A. Yes.

Q. Did you complete a performance appraisal plan for 2014?

| LA8PCOL3 | Horowitz - Cross | Page 432 |
|---|---|---|

A. I don't recall.

Q. Mr. Klein, let's place before the witness what's been marked as Defendant's Exhibit 1179, and let's scroll down the document so the witness has an opportunity to see. Let's scroll back up.
Does that appear to be a copy of the performance appraisal plan for 2014 that you completed?

A. I'm just slightly confused because it says 2013.

Q. Well, it was completed in 2013 to identify your 2014 goals, correct? If you look under the heading "2014 Corporate Objectives."

A. This looks like a review of 2013 performance.

Q. And that included commentary with respect to 2014 corporate objectives, correct?

A. Yes, it appears to have set 2014 corporate goals.

Q. And you responded to each of those objectives with actions that you have in mind, correct?
And Mr. Klein can scroll down, if you need him to scroll down.

A. Thank you. Yes, it does.

MR. REISNER: Your Honor, we offer Defendant's Exhibit 1179.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1179 received in evidence)

| LA8PCOL3 | Horowitz - Cross | Page 433 |
|---|---|---|

MR. REISNER: May we publish it to the jury, your Honor?

THE COURT: You may.

MR. REISNER: Thank you.

BY MR. REISNER:

Q. Mr. Klein, can you please go to the page that ends with 002 and enlarge objective one and actions under objective one.
Mr. Horowitz, one of the actions that you identified for 2014 was to identify and execute other needle-moving revenue initiatives across the Iconix portfolio, correct?

A. That is correct.

Q. And let's go to the page that ends with 003.
Under actions, at the bottom, one of your actions for 2014 was navigating and assisting in the potential CAA, game-changing transaction, correct?

A. That is correct.

Q. And the potential CAA, game-changing transaction was a potential transaction between Iconix and CAA, the large talent agency, correct?

A. That is correct.

Q. And that was a potential one billion, with a B, dollar transaction, correct?

A. I believe it was around that valuation, yes.

Q. And the work on that potential, game-changing transaction was being led by Mr. Cole, correct?

**A-176**

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

| LA8PCOL3 | Horowitz - Cross | Page 434 |
|---|---|---|

A. That is correct.

Q. Now, another action you intended for 2014 was to "work more closely with L & F to ensure that we take full benefit" -- we might have to cross the page -- "of our relationship." There we go. Sorry. Let's go back. There we go.

"Work more closely with L & F to ensure that we take full benefit of our relationships," correct, that was one of your action items?

A. That is correct.

Q. And L & F refers to Li & Fung, correct?

A. That is correct.

Q. You knew that Iconix had an extensive and important business relationship with Li & Fung, correct?

A. That is correct.

Q. Li & Fung had over $140 million of commitments to Iconix across the various business relationships, correct?

A. I do not know.

Q. That number sound about right to you?

A. I do not know.

Q. What did you mean when you said "take full benefit of our relationships" with respect to Li & Fung?

A. Li & Fung is one of, if not the, largest manufacturer of apparel and hard goods in the world. We are, Iconix, a licensing company that does not manufacture product. I wanted to take full benefit of their capabilities in terms of

| LA8PCOL3 | Horowitz - Cross | Page 435 |
|---|---|---|

production and distribution to improve the distribution of Iconix products.

Q. And there were also license opportunities with respect to Li & Fung, correct?

A. Correct.

Q. And there was opportunity for more business with Li & Fung, in addition to the business that was already underway with them, correct?

A. Potentially, yes.

Q. And an important part of maintaining an important relationship is to be responsive to requests when possible, correct?

A. Yes.

Q. You can take that down, Mr. Klein.

Now, Li & Fung -- withdrawn.

As COO of Iconix, you were generally familiar with the various license agreements, JV agreements and other commercial arrangements between Iconix and Li & Fung, correct?

A. Generally aware, yes.

Q. And when I refer to Li & Fung, just so that we're speaking the same language, I'm talking about both Li & Fung and their affiliate GBG. You understand that?

A. Yes.

Q. So Li & Fung was a licensee for the Peanuts brand, for sleepwear, costumes and cosmetics, right?

| LA8PCOL3 | Horowitz - Cross | Page 436 |
|---|---|---|

A. I know that they had a desire to obtain that license. I'm not certain that they had that license.

Q. Well, let's place before the witness Defendant's Exhibit 417.

And I'll ask you whether that refreshes your recollection that Li & Fung was a licensee for the Peanuts brand for the sleepwear, costumes and cosmetics area?

A. It does not.

Q. Li & Fung was a licensee for Rocawear for boys and girls' apparel, and boys and girls sleepwear and underwear, correct?

A. Correct.

Q. Li & Fung was a licensee for Zoo York apparel, correct?

A. In the United States, correct.

Q. Li & Fung was a licensee for the Ecko brand, correct?

A. At some point, I believe Li & Fung was a kids licensee for the Ecko brand in the United States.

Q. Li & Fung was a licensee for the Cannon brand, correct?

A. I do not know.

Q. Li & Fung was a licensee for Strawberry Shortcake for sleepwear and beauty products, correct?

A. I do not know.

Q. Li & Fung also acted as an agent for Iconix's own brands, like Peanuts, correct?

A. Yes.

Q. Li & Fung was an agent for the Peanuts brands in the United

| LA8PCOL3 | Horowitz - Cross | Page 437 |
|---|---|---|

Kingdom and France, correct?

A. I do not know.

Q. And they were also an agent for the Peanuts brand in Asia, right?

A. Correct.

Q. And Li & Fung and Iconix were joint venture partners, correct?

A. That is correct.

Q. In October of 2013, Li & Fung and Iconix became joint venture partners in a Southeast Asia transaction, correct?

A. I believe the timing of that is correct.

Q. And you had no role in this transaction, correct?

A. That is correct.

Q. In January of 2014, Li & Fung and Iconix became joint venture partners in Iconix Europe, correct?

A. I'm sorry, would you give me the time for that date again?

Q. January of 2014, did Li & Fung and Iconix become joint venture partners in Iconix Europe?

A. I believe that is correct.

Q. And that occurred when Li & Fung acquired The Licensing Company, or TLC, correct?

A. I'm not sure.

Q. And TLC also provided marketing and advertising services to Iconix, correct?

A. I'm not sure.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                          October 8, 2021

| LA8PCOL3 | Horowitz - Cross | Page 438 |
|---|---|---|

Q. You don't recall meeting with representatives of TLC in Europe and discussing marketing and advertising services that TLC provided to Iconix?

A. I believe they provided those services to the joint ventures, not specifically to Iconix.

Q. In the 2014 time frame, Iconix supported its brands with advertising and promotional campaigns that were designed to increase brand awareness, correct?

A. Yes.

Q. And in 2014, Iconix's annual advertising spending was approximately $36 million, correct?

A. I do not know.

Q. Can we please place before the witness what's marked as Defendant's Exhibit 5.

This is a copy of the Iconix 2014 10-K, and if we can go to page 77, which has the Bates stamp number that ends in 079, and if we could highlight what's under "advertising campaign costs."

Does that refresh your recollection that advertising expenses for fiscal year 2014 for Iconix were approximately $36 million?

A. Yes.

Q. Now, even before you came to Iconix, Iconix had established certain joint venture relationships, correct?

A. That is correct.

| LA8PCOL3 | Horowitz - Cross | Page 439 |
|---|---|---|

Q. And the company established a number of international joint ventures from 2008 through 2014, correct?

A. I believe so.

Q. You knew that Iconix China was established in September of 2008, correct?

A. I did not know when it was formed, but I was aware of its existence.

Q. Iconix Europe was established in December of 2009, correct?

A. Again, I'm sorry. I do not know when it was formed, but I knew of its existence.

Q. Iconix India was established in May of 2012, correct?

A. Same response. I'm aware of its existence, but I did not know when it was formed.

Q. Iconix Canada was established in June of 2013, correct?

A. I know that it was formed. I know that it existed. I do not know when it was formed.

Q. Iconix Australia was established in September of 2013, correct?

A. Again, I don't recall the timing of the joint venture, but I'm aware of its existence.

Q. Iconix Southeast Asia was established in October of 2013, correct?

A. That is correct.

Q. Iconix Israel was established in December of 2013, correct?

A. I believe so.

| LA8PCOL3 | Horowitz - Cross | Page 440 |
|---|---|---|

Q. Iconix Middle East/North Africa was established in December of 2014, correct?

A. That is correct.

Q. And as of December 2014, the company had approximately 150 full-time employees, correct?

A. I do not know.

Q. You were the chief operating officer of the company, correct, Mr. Horowitz?

A. That is correct.

Q. And your testimony is you don't know whether the company had a total of 150 full-time employees?

A. It sounds a bit high, but I don't know how you're counting employees.

Q. Let's show the witness Defendant's Exhibit 5 and go to the page that ends with the Bates stamp 023.

Does that refresh your recollection that as of December 31, 2014, the company had a total of 150 employees?

A. It does not refresh my recollection, but the company had approximately 150 employees.

Q. About 126 resided in the United States and 24 resided in Europe, correct?

A. I don't recall it being that specific breakdown.

MR. REISNER: Your Honor, the government -- your Honor, the defense offers Defense Exhibit 5.

MR. HARTMAN: No objection.

| LA8PCOL3 | Horowitz - Cross | Page 441 |
|---|---|---|

THE COURT: It will be received.

(Defendant's Exhibit 5 received in evidence)

MR. REISNER: Can we just publish this page to the jury, please?

BY MR. REISNER:

Q. Most of the company's employees in the United States, Mr. Horowitz, were based in New York, correct?

A. Yes.

Q. And Iconix's main office was in New York City, correct?

A. That is correct.

Q. And Iconix also had some offices in the United Kingdom, correct?

A. That is correct.

Q. In the 2013, 2014 time frame, Iconix was one of the largest licensing companies in the world, right?

A. That is correct.

Q. And in 2013, Iconix was ranked as the world's second largest licensor, behind Disney Consumer Products, correct?

A. I'm not aware of that.

Q. Can we please place before the witness what's been marked as Defendant's Exhibit 1038. Maybe you could highlight for the witness -- you've got it. You're a step ahead of me.

Does that refresh your recollection that Iconix was ranked as the world's second largest licensor, behind Disney Consumer Products, with $13 billion in retail sales of licensed

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

| LA8PCOL3 | Horowitz - Cross | Page 442 |
|---|---|---|

merchandise?

A. It does not.

    (Continued on next page)

| LA8MCOL4 | Horowitz - Cross | Page 444 |
|---|---|---|

(At sidebar)

THE COURT: First of all, what document is this?

MR. REISNER: It's an industry report, your Honor.

THE COURT: Why isn't it hearsay? You're putting it in for the truth, correct?

MR. REISNER: It's offered for the fact that the company was recognized as the second largest licensor in the world.

THE COURT: That's hearsay. I am not going to allow it.

    (Continued on next page)

| LA8MCOL4 | Horowitz - Cross | Page 443 |
|---|---|---|

MR. REISNER: Your Honor, we offer Defendant's Exhibit 1038.

MR. HARTMAN: Hearsay, your Honor.

THE COURT: May I see the parties at sidebar.

    (Continued on next page)

| LA8MCOL4 | Horowitz - Cross | Page 445 |
|---|---|---|

(In open court)

MR. REISNER: May I proceed, your Honor?

THE COURT: You may.

Q. Now, Mr. Horowitz, you testified on direct examination that Mr. Cole told you he had gotten GBG to agree to a $5 million increase in the SEA-2 price in exchange for paying them back in some type of marketing fees in the future, correct?

A. Correct.

Q. Was anyone else present during this conversation you say you had with Mr. Cole?

A. No.

Q. Did you take any notes of this conversation that you say you had with Mr. Cole?

A. No.

Q. Do you know the date this conversation took place?

A. It happened in June of 2014.

Q. Do you know the date in June that this conversation supposedly took place?

A. I do not know the specific date of the conversation.

Q. Did you speak to anyone else at the time about a supposed agreement to increase the price in exchange for a future payment?

A. No, I did not.

Q. You don't recall speaking to anyone else about these two things being tied together outside the presence of Mr. Cole,

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                    October 8, 2021

| LA8MCOL4 | Horowitz - Cross | Page 446 |
|---|---|---|

right?
A. That is correct.  And external parties.
Q. Mr. Horowitz, you don't remember speaking with anyone else about these two things being tied together outside the presence of Mr. Cole, correct?
A. Not correct.
     MR. REISNER: Mr. Klein, can we please place before the witness Defendant's Exhibit 3539-023 at 001.
Q. You have met with the government a number of times in the last couple of years, correct, Mr. Horowitz?
A. That is correct.
Q. Do you recall telling the government during one of your meetings that you did not remember speaking with anyone else about these two things being tied together outside the presence of Mr. Cole?
A. I do not recall saying that.
Q. Are you denying that you said that to the government?
A. I am not.  I just don't recall saying that.
Q. Looking at the highlighted text on the page before you, does that refresh your recollection that you told the government that you don't remember speaking to anyone else about these two things being tied together outside the presence of Mr. Cole?  Yes or no.
A. I am going to try to give you a yes or no answer.
Q. I think that's a yes or no question.

| LA8MCOL4 | Horowitz - Cross | Page 447 |
|---|---|---|

A. I just want to know the question again so I can --
     THE COURT: Can you rephrase the question, Mr. Reisner.
Q. Looking at the highlighted yellow text, does that refresh your recollection that you told the government you don't remember speaking to anyone else about these two things being tied together outside the presence of Mr. Cole?
A. No, it does not.
     MR. REISNER: We can take that down, Mr. Klein.
Q. The government showed you your April 13, 2015 resignation letter earlier this morning, correct?
A. Correct.
Q. In that resignation letter you didn't say that you had a conversation with Mr. Cole in which he had told you about some give back agreement, correct?
A. Correct.
Q. Now, you testified during your direct examination that this conversation took place in Mr. Cole's office, correct?
A. That is correct.
Q. You previously told the government that you did not recall where the conversation with Mr. Cole took place, correct?
A. I don't believe so.
     MR. REISNER: Let's place before the witness what's been marked as Defendant's Exhibit 3539-023, and go to the page with the last three digits, 001.  If we could highlight.

| LA8MCOL4 | Horowitz - Cross | Page 448 |
|---|---|---|

Q. Does what's been highlighted refresh your recollection that you previously told the government you don't recall where the conversation with Mr. Cole took place?
A. No, it does not.
Q. Are you denying that you told the government previously that you do not recall where the conversation with Mr. Cole took place?
     MR. HARTMAN: Objection.  Asked and answered.
     THE COURT: Overruled.
A. In reference to the conversation --
Q. I think that's a yes or no question.  Are you denying that you previously told the government that you do not recall, did not recall where the conversation with Mr. Cole took place?  Are you denying that, Mr. Horowitz?  Yes or no.
A. Yes.
Q. In fact, you previously told the government that you were not sure if Mr. Cole told you about a $5 million agreement at the same time that you supposedly learned about the $5 million increase in price, correct?
A. I do not recall that.
Q. Did you tell the government during one of your meetings that Cole might have told you about the $5 million agreement at the same time that you learned about the $5 million increase in price?
A. I do not recall.

| LA8MCOL4 | Horowitz - Cross | Page 449 |
|---|---|---|

     MR. REISNER: Let's highlight for the witness the section in the middle of that paragraph.
Q. If you could read what's just been highlighted, Mr. Horowitz, and the question is, does that refresh your recollection that you told the government that Mr. Cole might have told you about the $5 million agreement at the same time that you learned about the $5 million increase in price?
     THE COURT: Read to yourself, Mr. Horowitz.
A. No.
Q. Are you denying that you told the government that Mr. Cole might have told you about the $5 million agreement at the same time that you learned about the $5 million increase in price?
A. I do not recall telling the government that.
Q. The question, Mr. Horowitz, is whether you deny that you told the government that Mr. Cole might have told you.  Are you denying that, yes or no?
     MR. HARTMAN: Objection.  Asked and answered.
     THE COURT: Overruled.
A. I'm sorry.  There is a lot of words for a yes or no.  I just want to make sure I get as close to yes or no as possible.  Can I please just rehear the question.
Q. I'll ask the question again.
A. Thank you.
Q. Are you denying that you told the government that Mr. Cole might have told you about the $5 million agreement at the same

**A-180**

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

| LA8MCOL4 | Horowitz - Cross | Page 450 |
| --- | --- | --- |

time that you learned about the $5 million increase in price? Are you denying you said that to the government, yes or no?

A. Yes.

Q. At one point, Mr. Horowitz, you even told the government that you were present in the room during this supposed conversation between Mr. Cole and Jason Rabin, correct?

A. No.

MR. REISNER: Let's place before the witness what's been marked as Defendant's Exhibit 3539-03 at the page that ends in 010. I think that's the wrong document. If you can highlight for the witness at the very bottom of that page, that paragraph that starts.

Q. Mr. Horowitz, does that refresh your recollection that you told the government you had a recollection of being present in a call in Mr. Cole's office where Cole discussed that they would increase the numbers and the call was with Jason Rabin?

MR. HARTMAN: Your Honor, can the witness see the whole paragraph, please.

THE COURT: Yes. Can you scroll down.

MR. HARTMAN: That's a different page. It should be page 11.

MR. REISNER: Can we have the question reread, your Honor, or should I ask it again?

THE COURT: Why don't you ask it again.

MR. REISNER: Thank you, your Honor.

| LA8MCOL4 | Horowitz - Cross | Page 451 |
| --- | --- | --- |

Q. Does looking at this, Mr. Horowitz, refresh your recollection that you told the government that you had a recollection of a time that you were present for a call in Mr. Cole's office where Cole discussed that they would increase the numbers and the call was with Jason Rabin?

A. No, it does not.

Q. Are you denying that you previously told the government that you had a recollection of a time when you were present for a call in Mr. Cole's office where Cole discussed that they would increase the numbers and that the call was with Jason Rabin? Are you denying you have previously said that to the government?

A. I'm not denying that.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, you also previously told the government that when you first heard of this supposed $5 million obligation, you did not have an understanding about exactly how it would be satisfied, correct?

A. I believe that is correct.

Q. Now, you testified on direct that Mr. Cole told you to make no mention to Lauren Gee of the $5 million commitment back, correct?

A. That is correct.

Q. Do you recall that Mr. Hartman asked you if you found it remarkable that Mr. Cole told you to make no mention of the $5

| LA8MCOL4 | Horowitz - Cross | Page 452 |
| --- | --- | --- |

million commitment. Do you remember being asked that question?

A. I remember something like that.

Q. You said you were shaken, right?

A. I believe that was one of my reactions.

Q. So it stood out in your memory, right?

A. Yes.

Q. Well, when you first met with the government you did not say that Mr. Cole told you not to share information with Ms. Gee, correct?

A. I don't recall.

MR. REISNER: Let's show the witness what's been marked as Defendant's Exhibit 3539-20 and go to page 008.

Q. You told the government at that time that Mr. Cole told you that you should tell Ms. Gee about an increase in the purchase price, correct, and that you should immediately go tell Lauren Gee, an attorney for Iconix, about the increase in the purchase price, correct?

A. That sounds correct.

Q. You didn't say anything about any instruction not to mention something to Ms. Gee, correct?

A. I don't recall.

Q. Are you denying that you didn't tell the government during your very first meeting that Mr. Cole provided an instruction not to mention something to Ms. Gee? Are you denying you left that out?

| LA8MCOL4 | Horowitz - Cross | Page 453 |
| --- | --- | --- |

A. No, I'm not denying that I left that out.

Q. In fact, you met with the prosecutors approximately 13 separate times before claiming that Mr. Cole told you not to share information with Ms. Gee, correct?

A. I'm sorry. I'm still a little confused on the way in which the previous question was asked, and I want to make sure I answer it properly.

Q. Mr. Horowitz, I have asked you a question. You met with the prosecutors approximately 13 separate times before claiming that Mr. Cole told you not to share information with Ms. Gee, yes or no?

A. I don't believe so.

Q. The first time you made that claim was almost a year after starting to speak with the prosecutors in November of 2019, correct?

A. I don't believe so.

Q. Now, you testified on direct that shortly after this supposed conversation with Mr. Cole, you told Mr. Cole that the transaction documents were with GBG, correct?

A. That is correct.

Q. And your testimony is that in response Mr. Cole said, in substance, let's see whether or not they put anything in the documents about a $5 million commitment back, correct?

A. That is correct.

Q. When the documents came back, there was no reference to any

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                              October 8, 2021

LA8MCOL4          Horowitz - Cross          Page 454

$5 million commitment, correct?

A. That is correct.

Q. And you previously told the government that when the SEA-2 deal documents came back, without any marketing expense commitment, Mr. Cole was happy about that, correct?

A. I am not sure that's exactly what I said, but he was relieved or happy.

Q. You told the government that Mr. Cole was happy about that, yes or no?

A. I believe so.

Q. You told the government that Mr. Cole said it would give Iconix wiggle room, correct?

A. I believe so.

Q. And you understood wiggle room to mean the flexibility to make no payment, partial payment, or full payment of marketing expenses that may be requested by GBG, correct?

A. Within a certain period of time, that would be correct.

Q. Mr. Horowitz, you told the government that you understood wiggle room as flexibility to pay or pay a portion, correct?

A. I don't recall putting it precisely that way.

MR. REISNER: Let's place before the witness what's been marked as Defendant's Exhibit 3539-20 and show him what's at pages 5 and 7. Actually, it's just page 7.

A. Thank you.

Q. Does that refresh your recollection that you told the

LA8MCOL4          Horowitz - Cross          Page 455

government wiggle room as in the flexibility to pay or pay a portion of that?

A. No, it does not.

Q. Do you deny that you told the government that wiggle room meant flexibility to pay or pay a portion of that? You denied it, you said, yes or no?

A. No.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, before the signing of the SEA-2 transaction on June 30, 2014, do you recall that the SEA-2 transaction was signed and finalized on June 30, 2014, correct?

A. Correct.

Q. Before that time, were you ever personally present during a conversation between Mr. Cole and any representative of GBG during which Mr. Cole communicated a commitment to make a future payment of $5 million in connection with the SEA-2 transaction?

A. No.

Q. Before June 30, 2014, before the SEA-2 transaction was signed and finalized, did you ever personally hear Mr. Cole undertake any commitment or obligation to GBG in connection with the SEA-2 transaction other than what is in the transaction documents?

A. No.

Q. Mr. Horowitz, you are not aware of any document created at

LA8MCOL4          Horowitz - Cross          Page 456

or before the signing of the SEA-2 transaction that refers to any commitment or obligation by Iconix to reimburse GBG for marketing expenses, correct?

A. That is correct.

Q. I asked you earlier whether you recall the date of this supposed conversation you say took place with Mr. Cole. You told me you don't recall the date of the conversation, correct?

A. I don't recall the specific date in June.

Q. You previously told the government that it coincided with a certain e-mail on which you were copied, correct?

A. I believe that I did.

Q. And the date of that e-mail was June 24, correct?

A. I don't know for sure.

MR. REISNER: Let's put before the witness what's marked as Defendant's Exhibit 1281.

Q. Does that refresh your recollection that the date of the e-mail that you told the government coincided with this conversation with Mr. Cole was June 24?

A. I believe that I told the government it may have coincided with this e-mail, which is dated June 24.

Q. So you say you used the word may, correct?

A. I believe so.

MR. REISNER: Let's put before the witness what's marked as defense's Exhibit 3539-72? Can you please highlight up above. There you go.

LA8MCOL4          Horowitz - Cross          Page 457

Q. Mr. Horowitz, does that refresh your recollection that you told the government the conversation with Cole coincided with an e-mail that Cole sent to Jason Rabin and copied Horowitz? Does that refresh your recollection?

A. It does.

Q. And you didn't use the word may, correct?

MR. HARTMAN: Objection to asking the witness to describe what's in the document.

THE COURT: Sustained.

Q. Did you tell the government that the conversation with Cole coincided with that e-mail, or did you tell the government the conversation with Cole may have coincided with the e-mail?

A. I am not certain.

Q. But the e-mail at issue was dated June 24, correct?

A. That is correct.

MR. REISNER: You can take that down, Mr. Klein.

Q. Now, you told the government that when you learned there was a $5 million payment that Iconix purportedly owed to GBG, you included it in your update reports to Mr. Cole, correct?

A. Correct.

MR. REISNER: Let's place before the witness what's marked as Defendant's Exhibit 1310, as well as 1310-A1.

Q. That's an e-mail that you sent to Mr. Cole on June 27 attaching your update report as of that date, correct?

A. That is correct.

# A-182

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 8, 2021

LA8MCOL4          Horowitz - Cross          Page 458

MR. REISNER: Your Honor, we offer Exhibit 1310 and 1310-A1.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1310 and 1310-A1 received in evidence)

MR. REISNER: May we publish it to the jury?

THE COURT: You may.

Q. You see before you the e-mail you sent to Mr. Cole on June 27, correct?

A. Correct.

Q. That's Defense Exhibit 1310, right?

A. Correct.

Q. And Defense Exhibit 1310-A1 is a copy of your update report, correct?

A. Correct.

Q. Is there any reference to $5 million that Iconix owes GBG in your June 27 update report?

A. Is there another page to this?

Thank you.

No, there is not.

MR. REISNER: We can take that down, Mr. Klein.

Q. I am going to now place before you what's been marked as Defendant's Exhibit 1910 and 1910-A1.

That's an e-mail that you sent to Mr. Cole on July 18,

LA8MCOL4          Horowitz - Cross          Page 459

2014, attaching a copy of your update report, correct?

A. That is correct.

Q. And Defense Exhibit 1910-A1 is a copy of the update report, correct?

A. It is.

MR. REISNER: Your Honor, the defense offers Exhibits 1910 and 1910-A1 in evidence.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1910 and 1910-A1 received in evidence)

MR. REISNER: May we publish it to the jury?

THE COURT: You may.

MR. REISNER: Mr. Klein.

Let's give the witness a moment to review the report before I ask the next question, or maybe I'll ask the next question and then we will give the witness a chance to review the report.

Q. The question is, is there any reference in your July 18 update report to $5 million that Iconix owes GBG?

A. Would you please go to the next page. Thank you.

Is there another page to this? Thank you.

Is there another page? Thank you.

No, there is not.

Q. Directing your attention to the first page of the report

LA8MCOL4          Horowitz - Cross          Page 460

with the number DX1910-A1-001, if you can highlight the item there, Global Brands. That's sort of a status report on matters related to GBG, correct?

A. This is the status of something that Neil has asked me to work on with GBG.

Q. Global Brands refers to GBG, correct?

A. Correct.

Q. And you are reporting on matters relating to GBG, correct?

A. I'm reporting on a specific matter that has been requested of me.

Q. And there is no reference to any $5 million owed to GBG, correct?

A. Correct.

MR. REISNER: We can take that down, Mr. Klein.

Q. Let me now show you what's been marked as Defense Exhibit 1910 and 1910-A1. Pardon me. I think I -- there we go.

Let me place before you what's been marked as Defense Exhibit 1333 and 1333-A1. That's an e-mail that you sent to Mr. Cole on August 5, 2014 attaching a recap of the terms of the SEA joint venture, correct?

A. That is correct.

Q. And 1333-A1 is the substance, is the recap that you attached to your e-mail, correct?

A. Correct.

MR. REISNER: Your Honor, defense offers Defense

LA8MCOL4          Horowitz - Cross          Page 461

Exhibit 1333 and 1331-A1.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1333 and 1333-A1 received in evidence)

MR. REISNER: May we publish it to the jury?

THE COURT: You may.

Q. Mr. Horowitz, your recap on page 1333-A1 and Defense Exhibit 1333-A1, under purchase price, second bullet refers to a $15,917,500 amendment payable as follows. There are payment periods, correct?

A. Correct.

Q. That's a reference to the SEA-2 transaction, correct?

A. Correct.

MR. REISNER: We can pull back and look at the entire document now.

Q. Under buy-sell rights, those are additional terms incorporated in the SEA-2 transaction, correct?

A. I'm sorry. Would you mind pulling it out for one second. Thank you.

Those might be in reference to Southeast Asia 1 and Southeast Asia 2.

Q. In any event, this was your attempt to provide for Mr. Cole a recap of the terms of SEA-1 and SEA-2, correct?

A. That is correct.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                          October 8, 2021

| LA8MCOL4 | Horowitz - Cross | Page 462 |
|---|---|---|

Q. Is there any reference in your recap to any $5 million future marketing commitment by Iconix to GBG?

A. No. This is a recap of the documents.

Q. The documents didn't contain any such commitment or obligation, correct?

A. They did not.

MR. REISNER: Your Honor, I'm about to move on to a completely different topic.

THE COURT: We have got about four minutes before the next break, so let's take it now.

Ladies and gentlemen, 20 minutes. Please do not discuss the case.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down. Everyone can be seated. This can be off the record.

(Discussion off the record)

THE COURT: First of all, I did receive an e-mail from Ms. Kelly's employer, and they are willing to pay her for up to three weeks. So apparently my powers are vast.

Is there anything else that we should be doing during this break?

MR. HARTMAN: Nothing for us, Judge. Thank you.

MR. REISNER: Nothing, your Honor.

THE COURT: Very well.

(Recess)

| LA8PCOL5 | Horowitz - Cross | Page 463 |
|---|---|---|

(In open court; jury not present)

THE COURT: Okay. Bring Mr. Horowitz back in, please.

(Pause)

(Jury present)

THE COURT: Everyone, please be seated.

Mr. Reisner.

MR. REISNER: May I proceed, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. Mr. Horowitz, the SEA-2 transaction was completed the end of June 2014, correct?

A. That is correct.

Q. Mr. Klein, can we please place before the witness what's been marked as Defendant's Exhibit 303, 303-A1, A2 and A3.

Now, Mr. Horowitz, directing your attention to defense Exhibit 303, it's an e-mail that you and others received from Lauren Gee on June 30th, 2014; is that correct?

A. That is correct.

Q. And that e-mail attached copies of the fully executed SEA-2 transaction documents, correct?

A. Correct.

MR. REISNER: Your Honor, defense offers defense Exhibits 303, 303-A1, A2 and A3 in evidence.

MR. HARTMAN: No objection.

THE COURT: It will be received.

| LA8PCOL5 | Horowitz - Cross | Page 464 |
|---|---|---|

(Defendant's Exhibits 303, 303-A1, A2 and A3 received in evidence)

BY MR. REISNER:

Q. Now, Defendant's Exhibit --

MR. REISNER: May I publish these to the jury, your Honor?

THE COURT: You may.

Q. And these are the SEA-2 transaction documents, correct, Mr. Horowitz?

A. Correct.

Q. Defense Exhibit 303-A1 is the first amended and restated shareholders agreement, correct?

A. Yes.

Q. And going to Defense Exhibit 303-A2, that is the letter of acknowledgment and payment of consideration for 50 percent share of the additional marks included in the SEA-2 transaction, correct?

A. That is correct.

Q. And looking at Defense Exhibit 303-A3, that is amendment No. 1 to the master license agreement related to the SEA-2 transaction, correct?

A. That is correct.

Q. And going back to Defense Exhibit 303-A2, the letter of acknowledge and payment of consideration -- can we go back to that, Mr. Klein, and can we highlight the paragraph second from

| LA8PCOL5 | Horowitz - Cross | Page 465 |
|---|---|---|

the bottom.

It provided that Li & Fung or GBG would pay Iconix $15.9 million for the 50 percent JV interest being acquired, correct?

A. That is correct.

Q. And the SEA-2 transaction, as completed, included essentially two components, right?

A. Correct.

Q. One component was the right -- you can take that down now, Mr. Klein.

One component was rights to certain brands in Korea, similar to the SEA-1 brands, OP and Umbro, correct?

A. I'm not sure if those brands are specifically correct.

Q. Okay. Mr. Klein, I apologize, but we'll have to put back up Defense Exhibit 303-A1, and let's go to the page that ends in 032.

Mr. Horowitz, do those appear to be the brands in Korea that were included in the SEA-2 transaction?

A. Yes.

Q. And that's component one of the transaction as completed, right?

A. Yes.

Q. And component two of the transaction was rights in Europe and Turkey to Ecko Unlimited, Zoo York, Marc Ecko Cut and Sew, Ed Hardy and Sharper Image, correct?

**A-184**

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

---

LA8PCOL5    Horowitz - Cross    Page 466

A. That is correct.

Q. And those are listed here as the additional brands, correct?

A. Correct.

Q. And the agreement to include these brands in these territories resulted from negotiations that you had with Jared Margolis and others at GBG, correct?

A. That is correct.

Q. And before SEA-2, had you ever negotiated the terms of an international joint venture transaction?

A. I had not.

Q. So this transaction, as completed, had two components, correct?

A. That is correct.

Q. But during the course of the negotiations, there were really three components, right?

A. Correct.

Q. And that third component was Lee Cooper Europe, correct?

A. Correct.

Q. And Lee Cooper Europe didn't make it into the final transaction, right?

A. That is correct.

Q. And the negotiations for this transaction took many, many months, correct?

A. I believe it took less than two months.

---

LA8PCOL5    Horowitz - Cross    Page 467

Q. Well, you began having discussions with Mr. Margolis about a joint venture arrangement involving brands in Europe in the March, April 2014 time period, correct?

A. I don't know when those conversations began.

Q. Well, let's put before the witness what's been marked as Defense Exhibit 1897. This is an e-mail that you sent to Jared Margolis on February 26, 2014, correct?

A. Yes, correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1897.

MR. HARTMAN: Objection, hearsay.

THE COURT: Overruled.

(Defendant's Exhibit 1897 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And on or about February 26th, 2014, Mr. Margolis asked you, "What's next steps on master license for Umbro for Europe? We want to leverage this with what we plan on doing in SE Asia," right?

A. That is what Jared wrote.

Q. And you responded, "We have no plans for a master license in Europe for Umbro at this time. Happy to discuss China Umbro as we are down several paths, and I have had some

---

LA8PCOL5    Horowitz - Cross    Page 468

communications with Richard Kesembo on this subject," correct?

A. That is correct. That is what I wrote.

Q. And Mr. Cole is not included or copied on the e-mail you sent to Jared Margolis, correct?

A. Correct.

Q. And no one else at Iconix is copied on this e-mail, correct?

A. Correct.

Q. You can take this down, Mr. Klein.

And later in March you told Mr. Margolis that Iconix was working through options for non-Umbro brands in Europe, and you expected to make a proposal to LF/GBG on non-Umbro brands in Europe, correct?

A. I don't recall that specific communication, but that sounds right.

Q. Let's place before the witness what's been marked as Defendant's Exhibit 1898 for identification.

Mr. Horowitz, is that an e-mail string reflecting e-mail communications you had with Jared Margolis on or about March 14th, 2014?

A. Yes, it is.

MR. REISNER: Your Honor, I offer Defense Exhibit 1898.

MR. HARTMAN: No objection.

THE COURT: They will be received.

---

LA8PCOL5    Horowitz - Cross    Page 469

(Defendant's Exhibit 1898 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And so on March 14th, you sent an e-mail to Jared Margolis, telling him that Iconix was working through the structure options for adding the non-Umbro brands to the Europe JV and that you would have something for him early next week, correct?

A. Correct, that is what I wrote.

Q. And Mr. Cole is not included on that e-mail, correct?

A. That is correct.

Q. And no one else at Iconix is copied on that e-mail, correct?

A. On that e-mail below, that is correct.

Q. You can take that down, Mr. Klein.

And a few days later, Mr. Margolis asked you for a timeline for following up on the items that you had discussed with him, correct?

A. I don't recall.

Q. Let's place before the witness what's been marked as Defense Exhibit 1899, and look at the page that ends in 001.

And that's an e-mail exchange that you had with Jared Margolis on or about March 19th, 2014, correct?

A. That is correct.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 8, 2021

LA8PCOL5          Horowitz - Cross          Page 470

MR. REISNER: Your Honor, I offer Defense Exhibit 1899.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1899 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And so on March 19th, Mr. Horowitz, Mr. Margolis sent you an e-mail that said, "Hi, Seth. I wanted to follow up and see if there was a timeline for receiving some of the follow-up items that were discussed in our meeting so that we can better prepare -- "so that we can better prepare for our meetings in London: One, for Umbro Europe, a breakdown specifying what rights are available in each of the territories; and, two, a financial breakdown for the non-JV brands, Lee Cooper, Ed Hardy, Zoo York, and a proposed deal structure for the roll-up of the non-Umbro brands," correct?

A. Correct.

Q. And you responded, "Hello, Jared. Can we set a meeting for Tuesday next week in New York? At that time, I can present to you both follow-up items. Sincerely, Seth," correct?

A. Correct.

Q. And on the e-mail you sent to Mr. Margolis, Mr. Cole is not

LA8PCOL5          Horowitz - Cross          Page 471

copied as a cc, correct?

A. That is correct.

Q. And no one else from Iconix is copied as a cc, correct?

A. Melvin Thomas is a partner at the Iconix joint venture in New York. I don't know if he's considered an employee or not.

Q. He's not an Iconix employee, Mr. Horowitz, correct?

A. Technically, I don't know, but he does sit in Iconix's office in New York.

Q. We can take that down, Mr. Klein. Let's place before the witness Defendant's Exhibit 1901.

Mr. Horowitz, this is an e-mail that you sent to Jared Margolis on April 7th, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1901.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1901 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And this e-mail that you sent to Jared Margolis on April 7th, 2014, states: "Jared, look forward to our meeting on Wednesday. Attached you will find proposed material sheets

LA8PCOL5          Horowitz - Cross          Page 472

on both LF Europe expansion and China Umbro JV," correct?

A. That is correct.

Q. And let's look at Defendant's Exhibit 1901-A1, and why don't we let the witness see -- is that the second page to that or is that the only one?

That was the Umbro China JV proposal that was attached to your message, correct?

A. Yes, correct.

Q. Now, let's look at Defense Exhibit 1902 and 1902-A1.

Defense Exhibit 1902 is an e-mail that you sent to Mr. Margolis on April 7th, 2014, with an attachment, correct?

A. That is correct.

Q. And Defense Exhibit 1902-A1 is the attachment that was sent with your e-mail, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1902 and 1902-A1.

MR. HARTMAN: No objection.

THE COURT: They will be received.

(Defendant's Exhibits 1902 and 1902-A1 received in evidence)

BY MR. REISNER:

Q. And that e-mail and attachment was regarding a potential amendment to the Iconix Europe JV, correct?

A. If I could please see the next page, that would be helpful.

LA8PCOL5          Horowitz - Cross          Page 473

Thank you. Yes, it is.

Q. And was Mr. Cole copied on your e-mail to Mr. Margolis?

A. No, he was not.

Q. Was anyone from the Iconix finance team copied on your e-mail?

A. No, they were not.

Q. Was anyone from the Iconix international team copied on your e-mail?

A. No, they were not.

Q. Was any Iconix lawyer copied on your e-mail?

A. No, they were not.

Q. Now, the proposed amendment to the Europe JV proposal included two components under brand ownership, correct?

A. That is correct.

Q. Component one related to the Lee Cooper brand, correct?

A. That is correct.

Q. And component No. 2 related to the brands Ecko Unlimited, Marc Ecko Cut and Sew, Ed Hardy, Zoo York, Material Girl, Sharper Image and Artful Dodger in Europe, correct?

A. Is there another page?

Q. I don't believe so, but let's make sure. No.

A. Okay. That is correct.

Q. And this is a joint venture proposal, correct?

A. It is.

Q. And the total purchase price for this proposal is $22

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    October 8, 2021

| LA8PCOL5 | Horowitz - Cross | Page 474 |
|---|---|---|

million, correct?

A. That is correct.

Q. And the title of your proposal was: Amendment to Iconix Europe LLC, correct?

A. Correct.

Q. And the idea was to amend the Europe JV agreement that Iconix had originally entered with TLC, correct?

A. I believe so.

Q. And TLC had been acquired by Li & Fung, correct?

A. That is correct.

Q. And the proposal also contemplated a $2 million JV annual marketing contribution, correct?

A. That is correct.

Q. And you can tell that because it's in the written term sheet, correct?

A. That is correct.

Q. Okay. We can take that down. Let's go to Defense Exhibit 1903.

Mr. Margolis (sic) this is in April 9th e-mail exchange that you had with Jared Margolis, April 9th, 2014, correct?

A. I'm sorry, you referred to me --

Q. Mr. Horowitz, this is an April 9th, 2014, e-mail exchange you had with Mr. Margolis, correct?

A. The bottom e-mail is an e-mail from me to Jared Margolis,

| LA8PCOL5 | Horowitz - Cross | Page 475 |
|---|---|---|

correct.

Q. And the top one is an e-mail from him that you received, as well as others, correct?

A. I don't believe I received the above e-mail.

Q. Okay. So let's focus what's on the bottom of the page. That's an e-mail that you sent to Jared Margolis on April 9th, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, we offer Defense Exhibit 1903.

MR. HARTMAN: Relevance.

THE COURT: Overruled.

(Defendant's Exhibit 1903 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. Your e-mail to Mr. Margolis on April 9th, 2014, states, "Leaving my hotel by 10. I'm about 15-20 minutes away. See you soon." Do you see that?

A. I do.

Q. Did you meet with Mr. Margolis and representatives of TLC on April 9th, 2014?

A. I may have.

Q. Do you remember where you met?

| LA8PCOL5 | Horowitz - Cross | Page 476 |
|---|---|---|

A. I believe it was in the UK.

Q. And during that meeting, you reached a general agreement on the terms of your $22 million proposal, contingent on Turkey being added to the territories, correct?

A. I do not recall.

Q. Let's place before the witness what's been marked as Defense Exhibit 1185.

It's an e-mail, Mr. Horowitz, that you sent to Mr. Cole on April 9th, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1185.

MR. HARTMAN: Objection, hearsay.

THE COURT: Overruled.

(Defendant's Exhibit 1185 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And this e-mail, Mr. Horowitz, reports on a meeting you had with Jared Margolis and representatives of TLC on or about April 9th, 2014, correct?

A. That is correct.

Q. And it states, "Spent the last few hours with Jared, Melvin and Angela at TLC. We agreed, and Jason has agreed, to the

| LA8PCOL5 | Horowitz - Cross | Page 477 |
|---|---|---|

additional brands (Lee Cooper, Ecko, Zoo, Ed Hardy, et cetera) in the JV for $22 million, $10 million bottom line for Iconix; contingent upon Turkey being included, as this is a core licensee for Lee Cooper and was included in determining price." Do you see that?

A. I do see that.

Q. And when you referred to, "we agreed and Jason has agreed," "Jason" is Jason Rabin, correct?

A. That is correct.

Q. And you're reporting that there was general agreement on the terms of your $22 million joint venture proposal, correct?

A. That is correct.

Q. You say lower down in the e-mail, "They are also pushing to be our JV partner for China Umbro." Do you see that?

A. I do.

Q. And you also said, "As this can be an amendment to the existing deal, we are attempting to close the week of May 4th." And that refers to the Europe transaction, correct?

A. I believe that that refers to the Europe joint venture.

Q. And during this meeting on which you are reporting, at that meeting, did puts and calls or backstop come up during the meeting?

A. I don't recall.

Q. Well, this e-mail to Mr. Cole doesn't report on any discussions about puts or calls or backstops, correct?

# A-187

LA8PCOL5    Horowitz - Cross    Page 478

A. That is correct.

Q. And a put meant that GBG would have the right to require Iconix to purchase back its interest in a joint venture from GBG at some point in the future at a fixed price, correct?

A. Correct.

Q. Okay. We can take that down. Let's look at Defense Exhibit 1904, and why don't we look at 1904-A1, Mr. Klein.

So, Mr. Horowitz, Defense Exhibit 1904 is an e-mail that you sent to Jared Margolis on April 11th, 2014, correct?

A. That is correct.

Q. And Defense Exhibit 1904-A1 appears to be the attachment to that e-mail, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1904 and 1904-A1.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1904 and 1904-A1 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And so directing your attention, Mr. Horowitz, to Exhibit 1904. Your April 11th e-mail to Mr. Margolis stated,

LA8PCOL5    Horowitz - Cross    Page 479

"Attached is a revised term sheet that should reflect our meeting. Please confirm," correct?

A. Yes.

Q. And the purpose of sending that term sheet was to reflect what you had discussed with him at the recent meeting we just saw the summary of, correct?

A. I believe so.

Q. By the way, is Mr. Cole copied on this e-mail?

A. He is not.

Q. Is anyone else -- withdrawn.

Is anyone from the Iconix finance team copied on your e-mail?

A. No.

Q. Is anyone from the Iconix international team copied on your e-mail?

A. No.

Q. Or any Iconix lawyers copied on your e-mail?

A. No.

Q. So let's look at the term sheet that you forwarded that's marked as Defense Exhibit 1904-A1. The term sheet looks similar to the previous term sheet that we looked at but includes Turkey as a territory, correct?

A. Turkey is included in this term sheet.

Q. And this proposed transaction continued to have a purchase price of $22 million, correct?

LA8PCOL5    Horowitz - Cross    Page 480

A. That is correct.

Q. And it had two components, correct?

A. That is correct.

Q. One component was the Lee Cooper brand in Europe, correct?

A. That is correct.

Q. And the other component was the Ecko Unlimited, Marc Ecko Cut and Sew, Ed Hardy, Zoo York, Material Girl, Sharper Image, Artful Dodger and Modern Amusement brands in Europe, correct?

A. That is correct.

Q. And Turkey, correct?

A. Correct.

Q. We can take that down, Mr. Klein.

Let's look at Defense Exhibit 1905, and why don't we also look at 1905-A1.

Now, directing your attention to 1905 first, Mr. Horowitz, that includes on the first page, the bottom half, an e-mail from Mr. Margolis to you on April 13th, 2014, correct?

A. Correct.

Q. And that e-mail appears to respond to the e-mail you sent him on April 11th that's already in evidence, where you said attached is a revised term sheet that should reflect our meeting, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense

LA8PCOL5    Horowitz - Cross    Page 481

Exhibit 1905.

MR. HARTMAN: No objection.

THE COURT: They will be received.

(Defendant's Exhibit 1905 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And in the e-mail, Mr. Horowitz, Mr. Margolis writes to you: "Hi, Seth. Thank you for providing the draft term sheet. Please see my comments below." Correct?

A. Correct.

Q. And it has a number of bullets. I want to direct your attention to the last bullet, which is on the page that ends with the three digits 002. It's on the right side of the screen. That bullet says, "the put/call option and the backstop is absent from this term sheet." Correct?

A. Correct.

Q. And you then sent a revised term sheet that included the put/call options and backstops that you had discussed with Mr. Margolis, correct?

A. I don't know.

Q. Let's place before the witness what's been marked as Defense Exhibit 1906. Why don't we also put 1906-A1 next to it. Thank you.

# A-188

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

| LA8PCOL5 | Horowitz - Cross | Page 482 |
|---|---|---|

Mr. Horowitz, Defense Exhibit 1906 is an e-mail that you sent to Jared Margolis on April 17th, 2014, correct?

A. Correct.

Q. The subject is "Revised," correct?

A. That is correct.

MR. REISNER: Your Honor, I offer -- withdrawn.

Q. And it attached what appears -- withdrawn.

It attached Defense Exhibit 1906-A1, correct?

A. Correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1906 and 1906-A1.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1906 and 1906-A1 received in evidence)

MR. REISNER: May I publish to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And your e-mail stated, "Attached is the revised term sheet. Do you have time for a call anytime after 4 today to discuss Lee Cooper percentages and rights of first refusal?" Correct?

A. Correct.

Q. And looking at the attachment, 1906-A1 -- I think that's multiple pages; so if we can, Mr. Klein, show side by side

| LA8PCOL5 | Horowitz - Cross | Page 483 |
|---|---|---|

what's marked as 1906-A1, 001, and 002, that would be terrific.

And your revised term sheets included terms for a put/call option, correct?

A. That is correct.

Q. It included terms for a two-year put/call option and a five-year put/call option, correct?

A. That is correct.

Q. Okay. Mr. Klein, can we just go back to the e-mail transmitting this attachment. I think it's Defense Exhibit 1906.

Mr. Cole is not copied on this e-mail, right, Mr. Horowitz?

A. That is correct.

Q. No one from the Iconix finance team is copied on this e-mail, correct?

A. That is correct.

Q. No one from the Iconix international team is copied, correct?

A. Correct.

Q. No Iconix lawyers are copied, correct?

A. That is correct.

Q. And the date of this term sheet is April 17th, correct?

A. That is the date of the e-mail, correct.

Q. You can take that down, Mr. Klein.

Now, at some point, Mr. Horowitz, it was determined

| LA8PCOL5 | Horowitz - Cross | Page 484 |
|---|---|---|

that the proposed Europe transaction could not be structured as an amendment to the existing Europe joint venture, correct?

A. That is correct.

Q. And you reported that development to Mr. Cole, correct?

A. I believe that I did.

Q. Let's look at Defense Exhibit 1199. Is that an e-mail that you sent to Mr. Cole on May 2nd, 2014, Mr. Horowitz?

A. It is.

Q. And the subject is "LF Europe," correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1199.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1199 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

MR. REISNER: Mr. Klein.

BY MR. REISNER:

Q. Your e-mail states, "Neil, we hit a few road bumps today with the LF amendment for Europe, but we have a solution. Because we own 51 percent of the Europe JV, we cannot amend that JV to include the new brands in a manner where we take the gain. However, we can (1) amend the SE Asia JV to extend the rights of Ecko Unlimited, Zoo York, Ed Hardy, et cetera, to

| LA8PCOL5 | Horowitz - Cross | Page 485 |
|---|---|---|

include European distribution for a 10M (gain); and (2) amend the Europe JV to include Lee Cooper (because we are only selling 49 percent) for $12 million. It's neutral to our cost basis." Correct?

A. Correct.

Q. And when you write "we have a solution," who is "we"?

A. The "we" here is Jared and I, or Jared, Jason and I have a solution for Iconix.

Q. Jared and Jason didn't work for Iconix, right?

A. No, they did not.

Q. "Jared" is Jared Margolis from GBG, right?

A. That is correct.

Q. And "Jason" is Jason Rabin from GBG, correct?

A. Correct.

Q. And the three of you had come up with a solution, right?

A. That is correct.

Q. And the solution was to, first, amend the SEA-1 transaction to extend the rights of various brands that were included in SEA-1 to Europe, correct?

A. Correct.

Q. And to amend the Europe JV to include the Lee Cooper brand, correct?

A. Correct.

Q. We can take that down, Mr. Klein.

Now, did you send a revised term sheet to Mr. Margolis

LA8PCOL5          Horowitz - Cross          Page 486

to reflect this development?
A. I do not know but believe so.
Q. Let's look at Defense Exhibit 1198, and let's also put next to it 1198-A1, the attachment.
   Directing your attention to what's been marked for identification as Defense Exhibit 1198, that's an e-mail from you, Mr. Horowitz, to Mr. Margolis, sent on May 2nd, 2014, correct?
A. That is correct.
Q. And the attachment is a term sheet that has been marked for identification as Defendant's Exhibit 1198-A1, correct?
A. That is correct.
   MR. REISNER: Your Honor, I offer Defense Exhibit 1198 and 1198-A1.
   MR. HARTMAN: Your Honor, I think this is already in as Government Exhibit 1031, but we have no objection to admitting it again.
   THE COURT: Very well. It will be received.
   (Defendant's Exhibits 1198 and 1198-A1 received in evidence)
   MR. REISNER: May I publish it to the jury, your Honor?
   THE COURT: You may.
BY MR. REISNER:
Q. And directing your attention to the May 2nd, 2014, term

LA8PCOL5          Horowitz - Cross          Page 487

sheet that's been marked as -- or is in evidence as Defense Exhibit 1198-A1.
   Can we zoom back, Mr. Klein, before we zoom in?
   The overall deal there has three components, correct, A, B and C?
A. That is correct.
Q. And the purchase price is $25,342,500, correct?
A. That is correct.
Q. And the first of the three components of this term sheet is amending SEA -- SE Asia JV to include Korea, minus Umbro, per terms agreed to, correct?
A. That is correct.
Q. And the second term was amending SE Asia to include Europe and Turkey rights for Ecko Unlimited, Zoo York, Marc Ecko Cut and Sew, Ed Hardy and Sharper Image, correct?
A. That is correct.
Q. And the third component of this $25 million proposal was amending the Europe JV to include Lee Cooper, 49 percent ownership in Europe and Turkey, correct?
A. That is correct.
Q. And so as of this May 6th -- withdrawn.
   As of this May 2nd term sheet, Lee Cooper was expected to be part of the transaction, correct?
A. Yes, and in steps.
Q. We can take that down, Mr. Klein.

LA8PCOL5          Horowitz - Cross          Page 488

   Now, a few days later, Mr. Margolis sent you a revised term sheet, right?
A. I don't know.
Q. Let's look at Defense Exhibit 1205.
   That's an e-mail that Mr. Margolis sent to you on May 6th, 2014, correct?
A. That is correct.
Q. And it attached is what's marked as Defense Exhibit 1205-A1, correct?
A. That is correct.
Q. And the subject of the e-mail is terms of proposed amendments, correct?
A. That is correct.
   MR. REISNER: Your Honor, I offer Defense Exhibit 1205 and 1205-A1.
   MR. HARTMAN: No objection.
   THE COURT: It will be received.
   (Defendant's Exhibits 1205 and 1205-A1 received in evidence)
   MR. REISNER: May I publish it to the jury, your Honor?
   THE COURT: You may.
BY MR. REISNER:
Q. So Mr. Horowitz, before we get to the term sheet, do you see that the e-mail that Mr. Margolis sent you also included in

LA8PCOL5          Horowitz - Cross          Page 489

the string an e-mail that Mr. Margolis had sent to Ron Ventricelli and copied Jason Rabin? Do you see that.
A. Yes, I do.
Q. And it says, "Ron, attached are the terms for the proposed amendment," correct?
A. That is what it says.
Q. And what Mr. Margolis did was he essentially -- withdrawn.
   Who is Ron Ventricelli?
A. He is an executive at GBG or Li & Fung.
Q. Now, let's look at the term sheet. The date at the top of the term sheet is still May 2nd, 2014, but it was sent by May 6th, correct?
A. That is correct.
Q. And under "deal overview," it describes a deal with three components, A, B, C, correct?
A. That is correct.
Q. And the purchase price indicated is approximately $24.9 million, correct?
A. That is correct.
Q. And the first of the three components is "amend SE Asia JV to include Korea," correct?
A. That is correct.
Q. And the second component of the proposal is to "amend SEA to include Europe and Turkey rights for Ecko Unlimited, Zoo York, Marc Ecko, Cut and Sew, Ed Hardy and Sharper Image,"

# A-190

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                                                October 8, 2021

LA8PCOL5          Horowitz - Cross          Page 490

correct?

A. That is correct.

(Continued on next page)

LA8MCOL6          Horowitz - Cross          Page 491

Q. There is a reference to the put-and-call provision that's contemplated, correct?

A. That is also correct.

Q. And the third component identified is: Amend JV to include Lee Cooper, 49 percent ownership in Europe and Turkey via a perpetual marketing and a financial services agency agreement, correct?

A. That is correct.

Q. There is also a reference in the next paragraph to put or call provisions that may be applicable, correct?

A. That is correct.

MR. REISNER: We can take that down, Mr. Klein.

Q. The last e-mail we looked at was May 6, 2014, correct, Mr. Horowitz?

A. That is correct.

Q. As of May, you believed that Li & Fung or GBG was prepared to enter into an agreement with all three components of the transaction that you had proposed, Korea, Europe, and Lee Cooper Europe, in the second quarter, correct?

A. Those transactions were going to occur either in the second quarter or over the course of the year.

Q. Well, as of May 14, 2014, it was your understanding that Li & Fung had informed you that they are going to go forward with the whole transaction in the second quarter, correct?

A. I do not recall.

LA8MCOL6          Horowitz - Cross          Page 492

MR. REISNER: Let's look at Defense Exhibit 1213.

Q. This is an e-mail that you sent to Mr. Cole on May 14, 2014, correct?

A. That is correct.

Q. And the subject is LF terms, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer defense Exhibit 1213.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1213 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

Q. Mr. Horowitz, directing your attention to the highlighted portion of the e-mail, it states: They have told us that they are going to do the whole transaction in Q2, correct?

A. Correct.

MR. REISNER: We can take that down, Mr. Klein.

Q. Now, at some point you learned that Li & Fung/GBG might not be able to proceed with the Lee Cooper portion of the proposed SEA-2 transaction in the second quarter because of its upcoming spinoff of GBG, correct?

A. I believe that that we hit another road bump in completing the Lee Cooper transaction in that we could not -- Iconix could not work out the mechanics of doing a joint venture for Lee

LA8MCOL6          Horowitz - Cross          Page 493

Cooper in Europe, and we were working with attorneys on different structures.

Q. And you also learned that Li & Fung had a potential road bump because the transaction being contemplated might not be possible because of the GBG anticipated spinoff, correct?

A. We learned that there might be a delay in doing the transaction, meaning the joint venture, for Europe and Korea based on GBG's current spinoff or going public.

Q. And because of this road bump, you and the Li & Fung individuals you were negotiating with agreed that, if necessary, the first two components could happen in June 2014, in the second quarter, and the Lee Cooper portion could be delayed to the third quarter if the structural issues caused delays, correct?

A. With Neil's approval, that is correct.

Q. Let me show you what's been marked as Defense Exhibit 1227. This is an e-mail that you sent to Mr. Cole on June 4, 2014, correct?

A. That is correct.

Q. The subject is LF meeting, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1227.

MR. HARTMAN: Your Honor, I think this one is in as well, but we have no objection.

**A-191**

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

---

LA8MCOL6     Horowitz - Cross     Page 494

THE COURT: It will be received.

(Defendant's Exhibit 1227 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

Q. This e-mail reports on a meeting that you had with Li & Fung, correct?

A. That is correct.

Q. Directing your attention to item No. 2, the highlighted portion, it states: We agreed that the SE Asia amendment, including Korea and Europe brands, not Lee Cooper, can happen in June and the Lee Cooper portion of the deal can happen in Q3 if the structure delays us, correct?

A. That is correct.

Q. And the contemplated total price for the transaction as a whole at this time, if it went through with all three components, was $24.9 million, correct?

A. That is correct.

Q. And you told Mr. Cole that you expected the Li & Fung investment committee would approve the deal on June 18, correct?

A. That is correct.

Q. You told them that prior to that we will have completed and agreed to legal documents, correct?

A. Correct.

MR. REISNER: We can take that down.

---

LA8MCOL6     Horowitz - Cross     Page 495

Q. Did you receive a revised term sheet from Li & Fung on or about June 4?

A. I do not recall.

MR. REISNER: Let's place before the witness what's been marked as Defense Exhibit 1226.

Q. Is this an e-mail that you received, Mr. Horowitz, from Ethan Cole of Li & Fung on or about June 4, 2014?

A. Yes, it is.

MR. REISNER: Your Honor, I offer Defense Exhibit 1226.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1226 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

Q. This e-mail states: Mr. Horowitz, below is an overview of our understanding of the proposed transaction. Please note the following is intended to serve as a high-level summary only. Correct?

A. That is what it states.

Q. And this is a proposal from Li & Fung regarding the transaction, correct?

A. Yes, it is.

Q. And under deal overview structure and consideration, the purchase price contemplated for the transaction is

---

LA8MCOL6     Horowitz - Cross     Page 496

approximately $24.9 million, correct?

A. That is inclusive of all three components, correct.

Q. That transaction has three components, correct?

A. Correct.

Q. The first component is: Amend SE Asia JV to include Korea. Correct?

A. That is correct.

Q. The second component is: Amend SE Asia to include Europe and Turkey rights for Ecko Unlimited and other brands, correct?

A. That is correct.

Q. And the third component is: LF to enter into a participation agreement with Iconix Lux, $14 million purchase price. In exchange for the purchase price, Iconix Lux would sell to L&F the right to receive 49 percent of all earnings that Iconix Lux and its subs received from the exploitation of the Lee Cooper marks in respect of the European territory, correct?

A. Correct.

Q. So this third component related to the Lee Cooper brand, correct?

A. That is correct.

Q. At this time you continued to expect to enter into an agreement with all three components for a purchase price of approximately $24.9 million, correct?

A. There is an understanding that it might happen in two steps

---

LA8MCOL6     Horowitz - Cross     Page 497

at this point. We don't know for sure.

Q. The term sheet outlines a $24.9 million transaction, correct?

A. That is correct.

Q. And the transaction outlined includes three components, correct?

A. That is correct.

Q. And the third component relates to the Lee Cooper brand, correct?

A. That is correct.

MR. REISNER: By the way, can we go back and look at the e-mail transmitting this attachment. Never mind. That is the e-mail.

Q. Mr. Cole is not included on this e-mail, correct?

A. Neil Cole is not included on this e-mail.

MR. REISNER: We can take that down, Mr. Klein.

Q. Did you subsequently send a revised term sheet back to Li & Fung responding to the term sheet they sent you?

A. I believe I did.

MR. REISNER: Let's look at Defense Exhibit 1908. Let's also put next to it, if possible, Mr. Klein, the attachment 1908-A1.

Q. Directing your attention, first, to Defense Exhibit 1908, is that an e-mail that you sent on June 4, 2014 to Ethan Cole of Li & Fung with copies to Jared Margolis of Li & Fung and

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                    October 8, 2021

LA8MCOL6        Horowitz - Cross        Page 498

Maurice Sasson of Iconix?

A. Yes, it is.

Q. Does Defense Exhibit 1908-1 appear to be the attachment to that e-mail?

A. It does.

MR. REISNER: Your Honor, I offer Defense Exhibit 1908 and 1908-A1.

MR. HARTMAN: Your Honor, can I speak to Mr. Reisner about this very quickly?

THE COURT: Sure.

MR. HARTMAN: Your Honor, could we be heard at sidebar?

THE COURT: Sure.

(Continued on next page)

LA8MCOL6        Horowitz - Cross        Page 499

(At sidebar)

MR. HARTMAN: Judge, maybe if these exhibits we were provided in advance of today. That's fine. It's their cross-examination of exhibits. We understand that. We haven't objected on authenticity or any other grounds to most of them.

This one says it's a red line and the attachment doesn't appear to reflect what the changes were that Mr. Horowitz sent back. We haven't had an opportunity to review the document or look at it to see what the changes were.

So our view is, to admit it now in this form would be misleading to the jury.

THE COURT: We are close to the end of the day. Why don't you move on, figure out -- it doesn't look like a red line.

MR. REISNER: The government produced this document to us. We are offering it in precisely the way the government produced the document to us. I don't think we received a red line. We are using the document that was produced to us by the government.

MR. HARTMAN: I think it was probably produced --

THE COURT: Why don't we do this. We are close to the end. You can continue your cross and figure it out afterwards.

MR. REISNER: Thank you, your Honor.

(Continued on next page)

LA8MCOL6        Horowitz - Cross        Page 500

(In open court)

Q. So, Mr. Horowitz, as of June 4, 2014, the transaction being contemplated remained a $24.9 million transaction with three components, correct?

A. Yes. And both parties were aware of the difficulties of the structure of the third part and that it might have to wait until a later quarter.

Q. The $24.9 million purchase price encompassed, first, amending the Southeast Asia joint venture to include Korea; second, amending the Southeast Asia joint venture to include Europe and Turkey rights for certain brands; and, third, a participation agreement relating to the Lee Cooper brand, correct?

A. That is correct.

MR. REISNER: We can take that down.

Q. Now, at some point it became more unlikely that Lee Cooper could be included as an element of this transaction, correct?

A. That is correct.

Q. If only two components were included in the transaction and not three, the transaction would be a smaller transaction, correct?

A. That is correct.

Q. And it would have a lower dollar amount than the transaction previously being contemplated, correct?

A. That is correct.

LA8MCOL6        Horowitz - Cross        Page 501

Q. If you just included those two components, the Korea component and the non Lee Cooper, the Europe component, the combined price was approximately $10.9 million, correct?

A. That is correct.

Q. And you thought that a $10.9 million price was too low, right?

A. I thought we could negotiate for a higher price.

Q. And you argued that the price of the deal was too low based on developments of brands in certain marketplaces, correct?

A. I believe I stated that opinion to Neil.

Q. And you also stated that opinion to GBG, didn't you?

A. I don't recall.

Q. You understood that LF/GBG was concerned that Iconix may not want to go forward with a smaller transaction with only two components, correct?

A. I don't recall that.

Q. Did you ever speak directly to Dow Famulak to negotiate the terms of the SEA-2 transaction?

A. I don't believe so.

Q. Mr. Famulak was the president of Li & Fung's U.S. business, correct?

A. I'm not sure what his title was.

Q. Mr. Famulak was Mr. Rabin's boss, correct?

A. I knew he was a senior executive. I did not know the reporting structure.

# A-193

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 8, 2021

LA8MCOL6    Horowitz - Cross    Page 502

Q. You knew he was senior to Mr. Rabin, correct?
A. I did not -- I didn't know that they were in the same business channel.
Q. Did you ever speak directly with Ron Ventricelli to negotiate the terms of the SEA-2 transaction?
A. I don't believe so.
Q. Mr. Ventricelli was executive vice-president of finance and operations of Li & Fung's U.S. business, correct?
A. I did not know his title.
Q. And he sat on the GBG investment committee, correct?
A. I did not know that.
Q. You knew that Mr. Famulak sat on the investment committee, didn't you?
A. I don't believe so.
Q. Now you also knew that Li & Fung/GBG at this time, despite the difficulties, continued to view Lee Cooper and the Lee Cooper brand in Europe as a valuable and attractive business opportunity, correct?
A. Yes.
Q. Do you recall when you learned that Li & Fung was very unlikely to be able to proceed with the Lee Cooper component that had been under discussion?
A. I do not recall a specific date.
    MR. REISNER: Let's put before the witness what's been marked as Defense Exhibit 1239.

LA8MCOL6    Horowitz - Cross    Page 503

Q. Is that an e-mail, Mr. Horowitz, that you sent to Mr. Margolis on June 12, 2014?
A. It's an e-mail from Mr. Margolis to me.
Q. It's an e-mail from Mr. Margolis to you, June 12, 2014, correct?
A. That is correct.
    MR. REISNER: Your Honor, I offer Defense Exhibit 1239.
    MR. HARTMAN: No objection.
    THE COURT: It will be received.
    (Defendant's Exhibit 1239 received in evidence)
    MR. REISNER: May I publish it to the jury, your Honor?
    THE COURT: You may.
Q. Mr. Horowitz, the e-mail from Mr. Margolis to you on June 12 says: Please call me on my mobile, then a telephone number, as soon as you can. Correct?
A. Correct.
Q. Does that refresh your recollection when you learned that Li & Fung decided that it was very unlikely to go forward with the Lee Cooper Europe component of the transaction that was planned for the second quarter of 2014?
A. It does not.
Q. Before we take that down, this e-mail appears to have been sent Thursday, June 12, at 11 p.m., correct?

LA8MCOL6    Horowitz - Cross    Page 504

A. That is correct.
    MR. REISNER: We can take that down.
    Can we now place before the witness what's been marked as Defense Exhibit 1244.
Q. Mr. Horowitz, that's an e-mail that you sent to Neil Cole on or about Friday, June 13, 2014 at 12:25 a.m., correct?
A. That is correct.
    MR. REISNER: Your Honor, I offer Exhibit 1244 in evidence.
    MR. HARTMAN: No objection.
    THE COURT: It will be received.
    (Defendant's Exhibit 1244 received in evidence)
    MR. REISNER: May I publish it to the jury, your Honor?
    THE COURT: You may.
Q. Mr. Horowitz, this e-mail appears to have been sent less than 90 minutes after you received the e-mail to call Mr. Margolis as soon as possible, correct?
A. That is correct.
Q. And it says: Neil. I spoke with Jared tonight. Bottom line is that we may complete only part of the total transaction, Europe and Korea, at approximately $15 million of gain/revenue for Iconix in Q2 and wait until third quarter for the Lee Cooper EU portion of the transaction. This gives us everything we want, revenue wise, for Q2, and the Lee Cooper

LA8MCOL6    Horowitz - Cross    Page 505

portion, which is a nongain transaction, waits until Q3. This is because the structure of the Lee Cooper transaction is not an amendment to an existing JV.
    That's what you told Mr. Cole, correct?
A. Correct.
Q. And you were reporting on your telephone conversation with Jared Margolis, correct?
A. That is correct.
Q. When you refer to only part of the total transaction, Europe and Korea, those are the two components that ultimately became the components of the SEA-2 transaction, correct?
A. That is correct.
Q. And the price that Mr. Margolis told you GBG was prepared to pay for that transaction was $15 million, correct?
A. That is correct.
Q. And you reported that information to Mr. Cole, correct?
A. And it included us giving them back something. We were already discussing letting them out of the Rocawear Kids agreement, and Neil and I had had those conversations.
Q. You were reporting what Mr. Margolis told you during this call, correct?
A. That is correct.
Q. There is nothing in that e-mail about any of that stuff you just mentioned, correct?
A. That is correct.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 8, 2021

---

LA8MCOL6          Horowitz - Cross          Page 506

Q. And the plan at this point was to delay the Lee Cooper component to the third quarter, correct?

A. That is correct.

Q. And the $15 million that Mr. Margolis told you he was prepared to pay was for the Europe and Korea components of the transaction, correct?

A. And potentially letting them out of the Rocawear Kids agreement.

Q. There is no mention of that in this e-mail, correct?

A. That is correct.

Q. Now, you expected LF/GBG to propose contractual language that would give GBG the right or option to buy an interest in the Lee Cooper Europe brand later in the year, correct?

A. That is correct.

MR. REISNER: I am going to go back for a second to the June 12 e-mail. Can we go back to the June 12 e-mail for a moment, Defense Exhibit 1244.

Q. Is your testimony, Mr. Horowitz, that as of June 13, 2014, there was an agreement by Iconix to release GBG from its Rocawear Kids license obligations? Yes or no.

A. No.

MR. REISNER: We can take that down.

Q. Now, you expected Li & Fung/GBG to propose contractual language that would give GBG the right or option to purchase an interest in the Lee Cooper brand in Europe later in the year,

---

LA8MCOL6          Horowitz - Cross          Page 507

correct?

A. Correct.

MR. REISNER: Let's show the witness Defense Exhibit 1243.

Q. This is an e-mail that you received from Jared Margolis on or about June 13, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1243.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1243 received in evidence)

Q. Mr. Horowitz, directing your attention to the highlighted portion which states: The proposed language for the LC option, which we will close by the end of Q3, will be articulated in the documents that we will send over.

You see that?

A. I do see that.

Q. And LC and LC option refers to Lee Cooper, correct?

A. That is correct.

Q. And at or around this time the expectation is there would be an option agreement entered with respect to Lee Cooper, correct?

A. Correct.

Q. And that was something that you knew LF/GBG very much

---

LA8MCOL6          Horowitz - Cross          Page 508

wanted, correct?

A. I knew that they very much wanted to be a part of Lee Cooper in the geography. I did not know if they very much wanted it to be in the legal documents.

Q. You knew that LF/GBG perceived the Lee Cooper brand in Europe to be a very valuable asset, correct?

A. They viewed the Lee Cooper brand as a valuable asset.

MR. REISNER: We can take that down.

Q. A few days later, on June 17, you had a breakfast meeting with Mr. Margolis at the Four Seasons Hotel in Las Vegas, correct?

A. I believe so.

Q. Do you remember meeting in a private room at the Four Seasons Hotel?

A. I do not.

Q. You were both in Las Vegas for an industry conference, correct?

A. I don't recall.

MR. REISNER: Let's show the witness what's been marked as Defense Exhibit 1256.

Q. That's a calendar invite for a breakfast meeting --

MR. REISNER: Can we zoom out for a second.

Q. -- produced by Iconix. Does that appear to be a calendar notice from the Iconix notification system?

MR. HARTMAN: Your Honor, we will stipulate that

---

LA8MCOL6          Horowitz - Cross          Page 509

that's what this is.

THE COURT: Very well.

MR. REISNER: Your Honor, I offer Defense Exhibit 1256.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1256 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

Q. Does this refresh your recollection that on June 17, 2014, you had a breakfast meeting scheduled with Mr. Margolis and others at a private room at the Four Seasons Hotel in Las Vegas?

A. It does. It was at a restaurant and I don't believe it was in a private room, but I do recall meeting with them.

Q. You met with Mr. Margolis and representatives of TLC, correct?

A. That is correct.

Q. Mr. Cole did not attend that meeting, correct?

A. That is correct.

Q. Do you recall around that time Mr. Cole was spending substantial time on the worldwide launch of the Peanuts movie?

A. I do not.

Q. Do you recall that the Peanuts movie launched in more than 70 countries in 2014?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                          October 8, 2021

LA8MCOL6                                                      Page 510

A.  I believe that it did in the Q4 of 2014.

MR. REISNER: We can take that down, Mr. Klein.

Let's show the witness what's been marked as Defense Exhibit 1267.

Q.  That's an e-mail exchange that you had with Mr. Margolis on June 19, 2014, correct?

A.  That is correct.

MR. REISNER: I think this is a two-page document, Mr. Klein, so can we just show the witness the second page as well.

Your Honor, I offer Defense Exhibit 1267.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1267 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may, and then on that note we will end the day.  You can go ahead and post it to the jury.

Ladies and gentlemen, this brings us to the end of the week.  As you know, Monday is a federal holiday, so we will not be sitting.  Whether you celebrate Columbus Day or Indigenous Peoples' Day or Free Mondays, have a wonderful weekend.

Do not discuss the case.  Do not read anything about the case.  Do not see anything about the case, should that happen, over the course of the weekend.

LA8MCOL6                                                      Page 511

Please do endeavor to be in the jury room no later than 9:20 on Tuesday morning.  Have a wonderful weekend.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

Everyone can be seated.

I just wanted to mention, with all of the talk about exhibits, I do not keep track of exhibits.  I depend on the parties to keep track of what exhibits are in and which are not.  And at the end of the trial I expect a list from both sides on consent that we can provide to the jury.

With that, is there anything else that we should do today, Mr. Hartman?

MR. SOLOWIEJCZYK: Your Honor, just one matter.  At the final pretrial conference we talked about getting additional 26.2 disclosure with respect to the two expert witnesses.  We still haven't gotten any.  We are hoping to get at least a time frame of when we can expect that.

THE COURT: Mr. Reisner.

MR. REISNER: Your Honor, we will try to do it as promptly as possible, and hopefully by the end of the day on Tuesday.

THE COURT: Anything else?

MR. HARTMAN: Thank you, your Honor.

THE COURT: Anything from the defense?

MR. TARLOWE: Just briefly, your Honor.

LA8MCOL6                                                      Page 512

I'm hoping it doesn't become necessary to involve the Court in this.  Counsel for both sides, we have been extending each other professional courtesies, and I imagine that will continue.

But there are about 23 witnesses left on the government's witness list.  So I would ask the government attorneys to try to let us know tomorrow, if possible, certainly this weekend, whether there are witnesses among those 23 that they don't intend to call.  Given that we are already several days in, I'm sure the government does not currently intend to call 23 more witnesses.  I am hoping we can work that out among counsel over the weekend.  If not, we may contact the Court, if that's OK.

THE COURT: The parties should be giving each other some advance notice of who they expect to be calling over the next day or two going forward so that there is no need to stop the proceedings for that purpose.  I fully expect the parties to work collaboratively in that regard and for any courtesies that the government extends to be reciprocated by the defense.

Anything else?

MR. HARTMAN: Of course.

Nothing further, Judge.

THE COURT: Have a great weekend.  If you need to contact me, you can send an e-mail to chambers.

(Adjourned to October 12, 2021, at 9:00 a.m.)

Page 513

INDEX OF EXAMINATION

Examination of:                                       Page

  SETH HOROWITZ

Direct By Mr. Hartman . . . . . . . . . . . . . 375
Cross By Mr. Reisner . . . . . . . . . . . . . . 401

GOVERNMENT EXHIBITS

Exhibit No.                                     Received

  113  . . . . . . . . . . . . . . . . . . . . . 382

  1197  . . . . . . . . . . . . . . . . . . . . . 387

  1514  . . . . . . . . . . . . . . . . . . . . . 399

DEFENDANT EXHIBITS

Exhibit No.                                     Received

  2009  . . . . . . . . . . . . . . . . . . . . . 402

  1025-A1  . . . . . . . . . . . . . . . . . . . 412

  1638  . . . . . . . . . . . . . . . . . . . . . 417

  1023, 1023-A1  . . . . . . . . . . . . . . . . 421

  1181  . . . . . . . . . . . . . . . . . . . . . 425

  1178  . . . . . . . . . . . . . . . . . . . . . 427

  1179  . . . . . . . . . . . . . . . . . . . . . 432

  5  . . . . . . . . . . . . . . . . . . . . . . 441

  1310 and 1310-A1  . . . . . . . . . . . . . . 458
  1910 and 1910-A1  . . . . . . . . . . . . . . 459
  1333 and 1333-A1  . . . . . . . . . . . . . . 461
  303, 303-A1, A2 and A3 . . . . . . . . . . . 464
  1897  . . . . . . . . . . . . . . . . . . . . . 467

  1898  . . . . . . . . . . . . . . . . . . . . . 469

  1899  . . . . . . . . . . . . . . . . . . . . . 470

  1901  . . . . . . . . . . . . . . . . . . . . . 471

# A-196

LACMCOL1                                                    Page 515

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          19 CR 869 (ER)

NEIL COLE,

               Defendant.             Trial
------------------------------x
                              New York, N.Y.
                              October 12, 2021
                                 9:00 a.m.

Before:

               HON. EDGARDO RAMOS,

                              District Judge
                              -and a Jury-

               APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY:  NOAH SOLOWIEJCZYK
     SCOTT HARTMAN
     ANDREW M. THOMAS
     Assistant United States Attorneys

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     Attorneys for Defendant
BY:  LORIN L. REISNER
     RICHARD C. TARLOWE
     ANDREW D. REICH
     AMANDA WEINGARTEN
     ALYSON A. COHEN

Also Present:
Robert Hupcher, FBI
Micah Gill, Paralegal
Peter Charalambous, Paralegal
Frank Eng, Paralegal

---

LACMCOL1            Horowitz - Cross            Page 516

(Trial resumed; jury not present)

THE COURT: Nothing came into chambers e-mail. I take it there is nothing to raise.

MR. HARTMAN: Not from our perspective.

MR. REISNER: Not from the defense.

THE COURT: Very well.

(Recess)

THE COURT: Can we get Mr. Horowitz, please.

(Jury present)

THE COURT: Ladies and gentlemen, welcome back. I trust you all had a pleasant weekend. Thank you, as always, for being prompt. We all greatly appreciate it.

We will now continue with the cross-examination of Mr. Horowitz.

Mr. Horowitz, you are reminded that you are still under oath.

THE WITNESS: Thank you.

THE COURT: Mr. Reisner.

MR. REISNER: Thank you, your Honor.

SETH HOROWITZ, resumed.

CROSS-EXAMINATION (cont'd)

BY MR. REISNER:

Q. Mr. Horowitz, do you recall on Friday I was asking you questions about negotiations you were having with LF/GBG concerning the terms of the SEA-2 transaction?

---

LACMCOL1            Horowitz - Cross            Page 517

A. Yes.

MR. REISNER: Mr. Klein, can we show the witness what's marked as Defense Exhibit 1908 for identification.

Q. Mr. Horowitz, that's an e-mail you sent to Ethan Cole of LF/GBG on June 4, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1908.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1908 received in evidence)

MR. REISNER: May we publish it to the jury, your Honor?

THE COURT: You may.

Q. That e-mail states: Attached is your document redlined with our comments. Please confirm.

Correct?

A. Correct.

MR. REISNER: Mr. Klein, can we place before the witness what has been marked as Defense Exhibit 1908-A1 and 1908-A1-N.

Q. Does that appear to be the attachment to this e-mail together with the red line of the attachment to this e-mail?

A. Yes, it does.

MR. REISNER: Your Honor, I offer Defense Exhibit

---

LACMCOL1            Horowitz - Cross            Page 518

1908-A1 and 1908-A1-N.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1908-A1 and 1908-A1-N received in evidence)

MR. REISNER: Let's look at the red line, Exhibit 1908-A1-N in evidence.

May I publish it to the jury, your Honor?

THE COURT: You may.

Q. Under the heading deal overview, structure and consideration, a transaction with a purchase price of approximately $24.9 million is described, correct?

A. That is correct.

Q. And the proposed transaction has three components, A, B, and C, correct?

A. That is correct.

Q. Component 1, or A, is: Amend SE Asia JV to include Korea, correct?

A. Yes. With a $3.3 million purchase price.

Q. Component 2, or B, is: Amend SEA Asia to include Europe and Turkey rights for Ecko Unlimited, Zoo York, Marc Ecko cut & sea, Ed Hardy, and Sharper Image, correct?

A. That's correct. And it also lists the purchase price.

Q. The third component, C, is: LF to enter into a participation agreement with Iconix Lux ($14.03M purchase

---

# A-197

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    October 12, 2021

| LACMCOL1 | Horowitz - Cross | Page 519 |
| --- | --- | --- |

price). This is proposed as a tracking stock structure. And in exchange for the purchase price, Iconix Lux would sell to L&F the right to receive 49 percent of all earnings Iconix Lux and its subs receive from the exploitation of the Lee Cooper marks in respect of the European territory and Turkey. Correct?

A. That is correct.

Q. And that refers to a purchase price of $14.03 million, correct?

A. That is correct.

Q. And it says under C2: The idea is that this structure will have all of the economics of owning 49 percent of the IP, correct?

A. That is correct.

Q. And that reference to IP refers to the intellectual property rights in the Lee Cooper brand in Europe and Turkey, correct?

A. That is correct.

Q. And the date of the e-mail that attached these documents was June 4, correct?

A. I'd have to refer back to the e-mail, but I believe so.

MR. REISNER: Let's look back at Defense Exhibit 1908. If you can publish that to the jury, Mr. Klein.

Q. The date was June 4, 2014, correct?

A. Correct.

| LACMCOL1 | Horowitz - Cross | Page 520 |
| --- | --- | --- |

MR. REISNER: We can take that down, Mr. Klein.

Q. I want to direct your attention to what's in evidence as Defendant's Exhibit 1244.

MR. REISNER: May I publish that to the jury, your Honor?

THE COURT: You may.

Q. That's the e-mail that you sent to Mr. Cole on June 13 that stated: Neil, I spoke with Jared tonight. Bottom line is that we may complete only part of the total transaction (Europe and Korea) at approximately 15M of gain/revenue for Iconix in Q2 and wait until third quarter for the Lee Cooper EU portion of the transaction.

Date of that e-mail was June 13, correct?

A. That is correct.

MR. REISNER: We can take that down, Mr. Klein.

Q. Now I'd like to direct your attention to Defendant's Exhibit 1267 in evidence.

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

Q. That's an e-mail exchange that you had with Mr. Margolis on June 19, 2014, correct?

A. That is correct.

Q. Let's start with the earliest message in that string, which should be down toward the bottom.

| LACMCOL1 | Horowitz - Cross | Page 521 |
| --- | --- | --- |

On June 19, 2014, at 10:41 a.m., you sent an e-mail to Jared Margolis that stated -- and if we can just go down a little bit -- did the IC approve the amendment, correct?

A. Correct.

Q. By IC, you were referring to the investment committee of GBG, correct?

A. That is correct.

Q. And Mr. Margolis responded in an e-mail, dated June 19, sent at 3:30 p.m.: Yes. We are good to go. Will close on all non Lee Cooper now and have an understanding to close prior to year end. Best regards.

Do you see that?

A. I do see that.

Q. And the reference to an understanding to close prior to year end related to the Lee Cooper component of the transaction, correct?

A. That is correct.

Q. And you responded to Mr. Margolis: Good news. When can we expect signed documents.

Correct?

A. That is correct.

Q. By signed documents, you were referring to when we can expect the signed SEA-2 transaction documents, correct?

A. That is correct.

Q. And Mr. Margolis responded: Finalizing the DD. Will get

| LACMCOL1 | Horowitz - Cross | Page 522 |
| --- | --- | --- |

back to you with an ETA, correct?

A. That is correct.

Q. By DD, you understood that to refer to due diligence, correct?

A. No, not correct.

Q. And by ETA, you were referring to estimated time of arrival, correct?

A. Correct.

Q. What did you understand DD to mean?

A. I don't recall what I believe it meant at the time, but it could stand for --

MR. REISNER: I am going to ask that the witness just respond to the question I asked, your Honor.

THE COURT: I believe he has responded. Ask another question, sir.

MR. REISNER: Thank you, your Honor.

Q. Your testimony is, you don't believe DD referred to due diligence, correct?

A. It may have. I'm not certain.

Q. Your testimony is it may have referred to due diligence now, correct?

A. That is correct. It may also --

MR. REISNER: We can take that down, Mr. Klein.

Q. Let me show you what's been marked as Defense Exhibit 1909. That's an e-mail that you received from Robert Smits of GBG on

# A-198

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACMCOL1  Horowitz - Cross  Page 523

or about June 24, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1909.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1909 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

Q. Now, Mr. Smits was an in-house lawyer at LF/GBG, correct?

A. That is correct.

Q. Incidentally, is Mr. Cole copied on this e-mail?

A. No. Neil Cole is not copied on the e-mail.

Q. Mr. Horowitz, Mr. Smits was responding to an e-mail that you sent to him on June 24, 2014, with copies to others, that said: Rob, thank you. Per the business agreement between our companies, we need to sign this amendment by Friday of this week. No later. Can you please confirm that Mayer Brown JSM understands this as well? Timing is a critical component.

That's what it says, correct?

A. That is what the e-mail says.

Q. And Mayer Brown was the outside law firm for LF/GBG, correct?

A. That is my understanding, yes.

LACMCOL1  Horowitz - Cross  Page 524

Q. And Mayer Brown is a large international law firm, correct?

A. I am not familiar with their firm.

Q. Your testimony is you don't know that Mayer Brown is a large international law firm?

A. Yes.

Q. Iconix also had outside legal counsel on this transaction, correct?

A. I believe that we did.

Q. Iconix's outside counsel was the Gibson Dunn law firm, correct?

A. That is correct.

Q. And Gibson Dunn is a large international law firm, correct?

A. Yes.

Q. Now, Mr. Smits responded to your e-mail by saying: Seth, they are aware of the timing. I received their comments overnight on some of the documents, which I will forward to your legal team following my review this morning. Rob.

Correct?

A. Yes, that is correct.

Q. And the they in, they are aware of the timing, you understood that mean that the Mayer Brown firm representing GBG was aware of the timing, correct?

A. Yes, correct.

MR. REISNER: We can take that down, Mr. Klein.

Can we please show the witness what's been marked as

LACMCOL1  Horowitz - Cross  Page 525

Defense Exhibit 1279 in evidence. Pardon me. 1279 for identification.

Q. Mr. Horowitz, that's an e-mail that you sent on June 24, 2014 to Jason Rabin with a copy to Jared Margolis, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1279.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1279 received in evidence)

MR. REISNER: May I publish it, your Honor?

THE COURT: You may.

Q. That e-mail states: Jason and Jared, we have not heard back yet with comments/timing from your counsel on the amendment for Europe/SE Asia/Korea that we need to sign by Friday of this week. As you know, timing on this is critical. Can you please help me move this along.

That is what it says, correct?

A. It ends with, can you please help move this along, correct.

Q. Neil Cole is not copied on your e-mail, correct?

A. That is correct.

Q. No one from the Iconix finance team is copied on your e-mail, correct?

A. That is correct.

Q. No one from the Iconix international team is copied on your

LACMCOL1  Horowitz - Cross  Page 526

e-mail, correct?

A. That is correct.

Q. No one from the Iconix legal team is copied on your e-mail, correct?

A. Correct.

Q. No one at all from Iconix is copied on your e-mail, correct?

A. That is correct.

MR. REISNER: We can take that down, Mr. Klein.

Can we place before the witness what's been marked as Defense Exhibit 1283 for identification.

Q. Mr. Horowitz, that's an e-mail that you and others received from Nicholas Cook of Mayer Brown on June 24, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1283.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1283 received in evidence)

MR. REISNER: May I publish it, your Honor?

THE COURT: You may.

Q. I want to direct your attention, Mr. Horowitz, to item 1 in this e-mail. It states: The Lee Cooper agreements have been removed from part B. They have been left in part C, but we understand they should be removed as the Lee Cooper aspects of

# A-199

LACMCOL1 Horowitz - Cross Page 527

the deal will happen later.

Correct?

A. Correct.

MR. REISNER: We can take that down, Mr. Klein. Can we place before the witness what's been marked as Defense Exhibit 1286 for identification.

Q. That's an e-mail, Mr. Horowitz, that you sent to Mr. Cole on June 24, correct?

A. This is an e-mail exchange with Neil Cole on June 24.

MR. REISNER: Your Honor, I offer Defense Exhibit 1286.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1286 received in evidence)

MR. REISNER: May I publish it, your Honor?

THE COURT: You may.

Q. The subject of this e-mail, Mr. Horowitz, is LF update, correct?

A. You're referring to the bottom e-mail. Yes, that's correct.

Q. The earliest e-mail in the chain, the one that's being displayed, states: Neil, we received comments from LF's counsel. It is all clarification/cleanup to schedules. Nothing difficult. Their counsel confirmed we will sign the amendment Friday. Those are the first several sentences of the

LACMCOL1 Horowitz - Cross Page 528

e-mail, correct?

A. Yes. That is correct.

MR. REISNER: Let's look at Mr. Cole's response.

Q. Mr. Cole responded: Friday, question mark, question mark. Can we try for earlier, question mark. Correct?

A. That is correct.

(Continued on next page)

LACPCOL2 Horowitz - Cross Page 529

Q. And let's look at your response. You responded: "We will turn their comments today. So long as there are no surprises, we should be able to sign documents tomorrow or Thursday. They are using counsel in Asia so there is some time/day delay," correct?

A. That is correct.

Q. And this -- withdrawn.

In this June 24th e-mail exchange with Mr. Cole, there's nothing about a future marketing payment or future marketing payment obligation to GBG, correct?

A. That is correct.

Q. We can take that down, Mr. Klein.

Now, Mr. Horowitz, do you recall that on direct examination you testified about a June 25th markup of draft transaction documents that Iconix received from GBG's lawyers at Mayer Brown, correct?

A. That is correct.

Q. Let's place before the witness what's in evidence as Government Exhibit 1044.

I want to direct your attention to the page with the Bates stamp number that ends in 32110. If you look at the top right, crossed out in red is "Gibson, Dunn draft 5/8," correct?

A. That is correct.

Q. And can we please publish this, Mr. Klein, in evidence as Government Exhibit 1044.

LACPCOL2 Horowitz - Cross Page 530

So crossed out on the upper right-hand is "Gibson, Dunn draft 5/8," correct?

A. That is correct.

Q. So this June 25th redline is showing changes in the documents from the May 8th, 2014, version of the document prepared by Gibson, Dunn, correct?

A. I believe so. I'm not sure how documents get tracked over time, if there were other changes made, but I believe so.

Q. And as of May 8th, 2014, Mr. Horowitz, it was expected that the Lee Cooper Europe component would be part of the transaction, correct?

A. I believe as of that date, it may have been part of the transaction.

Q. Your testimony is it may have, correct?

A. My recollection as of that date is that it may have.

Q. Well, let's look at what's Defendant's Exhibit 1205 in evidence.

Will you publish that, please?

That's the e-mail that you sent -- withdrawn.

That's the e-mail that Jared Margolis sent to you on May 6th, 2014, two days before May 8th, correct?

A. That is an e-mail from Jared two days before, May 6th, correct.

Q. Let's look at the attachment to Defendant's Exhibit 1205, 1205-A1. This is the term sheet that was attached to that

# A-200

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

| LACPCOL2 | Horowitz - Cross | Page 531 |

May 6th e-mail, correct?

A. That is correct.

Q. And it refers to a deal with a purchase price of $24.9 million, correct?

A. It does.

Q. And directing your attention to 1(c). It refers to "Amend Europe JV to include Lee Cooper 49 percent ownership in Europe and Turkey," correct?

A. Correct.

Q. So as of May 6th, 2014, it was anticipated that Lee Cooper would be part of this described transaction, correct?

A. No. I would say that it was in discussion, and this was something that GBG had proposed to us in this term sheet and that we were working together on to find a solution for. It was in discussion.

Q. Lee Cooper was part of the transaction described in this term sheet, correct?

A. That is correct.

Q. And Lee Cooper was part of the transaction in the term sheet that you sent to Mr. Margolis to which this term sheet responded, correct?

A. That is correct.

Q. We can take that down, Mr. Klein.
Now, let's look at what's Defendant's Exhibit 1908 in evidence.

| LACPCOL2 | Horowitz - Cross | Page 532 |

That's your June 4th, 2014, e-mail to Mr. Ethan Cole of GBG, correct?

A. That is an e-mail from me to Ethan Cole copying Jared and Maurice, correct.

Q. And it attached a redline term sheet, correct?

A. Correct.

Q. Let's look at Defendant's Exhibit 1908-A1 and the attachment to that e-mail.
The transaction described in that term sheet has a purchase price of approximately $24.9 million, correct?

A. That is correct.

Q. And directing your attention to item 1(c), component 1(c) of the transaction, as described, is "LF enter into a participation agreement with Iconix Lux, proposed as a tracking stock structure. That includes a right to receive 49 percent of all of the earnings from Iconix Lux and its subs receive from the exploitation of the Lee Cooper marks in respect of the European territory and Turkey," correct?

A. That is correct.

Q. And so the transaction described in this term sheet included a Lee Cooper Europe element, correct?

A. The proposed transaction does include a Lee Cooper element.

Q. We can take that down, Mr. Klein. Let's just go back to that for one moment. Withdrawn.
Let's go to Government Exhibit 1044, the June 25th

| LACPCOL2 | Horowitz - Cross | Page 533 |

redline with the page with the Bates stamp number that ends in 32111. Next page, I think.
And that has a note on it, correct?

A. That is correct.

Q. It states, "Note: To discuss further the minimum contribution guarantee and the novation of the SEA and Europe contracts," correct?

A. That is what it states.

Q. And the terms of that guarantee, that minimum contribution guarantee, they were still being discussed at that time, correct?

A. I don't know.

Q. Well, isn't that why there's a note to discuss them, because they were still being discussed?

A. They may have already been discussed between the business partners, but the legal teams needed to discuss them. I don't know.

Q. Well, one of the issues still under discussion, Mr. Horowitz, was how the minimum contribution guarantee would be impacted by the fact that the Lee Cooper Europe component would not be part of the SEA-2 transaction, correct?

A. No, that is not correct.

Q. We can take that down and show the witness Defense Exhibit 1300 for identification.
That's an e-mail that you sent to Jared Margolis on

| LACPCOL2 | Horowitz - Cross | Page 534 |

June 26th, correct, Mr. Horowitz?

A. That is correct.
MR. REISNER: Your Honor, I offer Defense Exhibit 1300.
MR. HARTMAN: No objection.
THE COURT: It will be received.
(Defendant's Exhibit 1300 received in evidence)
MR. REISNER: May I publish it for the jury, your Honor?
THE COURT: You may.
BY MR. REISNER:

Q. Mr. Horowitz, your June 26th e-mail to Mr. Margolis states, "Jared, Based on the separated timing of the Lee Cooper transaction, we have guaranteed a $1.2 million distribution guarantee in 2014 for the brands we are adding to Europe via the SE Asia agreement. We will put in a $1.8 million guarantee for 2014 for Lee Cooper in that agreement. Therefore, the $3 million guarantee for 2014 is in effect. We chose $1.2 million and $1.8 million, as this is the estimated proportional revenue. Please confirm."
That's what the e-mail says, correct?

A. Correct.

Q. And this e-mail between you and Mr. Margolis is discussing the guaranteed distribution terms for the agreement, correct?

A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

| LACPCOL2 | Horowitz - Cross | Page 535 |
|---|---|---|

Q. Yes or no?

A. Yes, correct.

Q. And Mr. Cole is not included on this e-mail, correct?

A. That is correct.

Q. No one else from Iconix is copied on this e-mail, correct?

A. That is correct.

Q. You can take that down, Mr. Klein.

Now, Mr. Horowitz, the final SEA-2 transaction documents were signed on June 30th, 2014, correct?

A. I believe that is correct.

Q. And can we please show the witness Defendant's Exhibit 303-A1, 303-A2 and 303-A3 in evidence. We can go two and then one, if that's easier, Mr. Klein. And can we please publish these to the jury.

Defense Exhibit 303-A1 is the Iconix SE Asia limited first amended and restated shareholders agreement, correct?

A. That is correct.

Q. And Defense Exhibit 303-A2 is the letter acknowledgment and payment of consideration for 50 percent share of additional marks, correct?

A. Correct.

Q. And let's now look at Defense Exhibit 303-A3 in evidence. Defense Exhibit 303-A2 is the amendment No. 1 to the master license agreement, correct?

A. That is correct.

| LACPCOL2 | Horowitz - Cross | Page 536 |
|---|---|---|

Q. And those three documents are the SEA-2 transaction documents, correct?

A. These three documents are for the SEA-2 transaction, correct.

Q. You're not aware of any contracts relating to the SEA-2 transaction, correct?

A. I'm not, not outside of this.

Q. Let's look at Defense Exhibit 303-A2, at page 303-18001. This is the letter acknowledgment and payment of consideration.

Directing your attention to the second paragraph, it states "Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by licensors in the Republic of Korea, Europe or Turkey, granted by licensors to licensee, pursuant to the SEA JV amendments, is deemed to have a fair market value of $31,835,000 and that because Iconix and LF each own 50 percent of licensee, LF's ownership of 50 percent of licensee will provide LF a benefit equal to 50 percent of such fair market value for $15,917,500," correct?

A. That is correct.

Q. And the licensor referenced in that paragraph is Iconix, correct?

A. I believe that is correct.

Q. And the licensee -- withdrawn. Let's go to the next paragraph.

| LACPCOL2 | Horowitz - Cross | Page 537 |
|---|---|---|

Mr. Horowitz, do you agree there's set forth a purchase price of approximately $15.9 million, correct?

A. That is correct.

Q. That paragraph states, "In order to compensate Iconix for the transfer of 50 percent of the fair market value of the additional marks to LF through LF's 50 percent share holding and licensee pursuant to the SEA JV amendments, Iconix and LF hereby agree that LF shall pay Iconix U.S.D. 15,917,500, which amount Iconix and LF shall treat for all U.S. tax purposes as paid by LF to Iconix in exchange for 50 percent of the additional marks," correct?

A. That is what it states, correct.

Q. And looking further down in the letter acknowledgment and payment of consideration agreement, it sets forth a minimum guarantee of $1.5 million for 2014, and a minimum guarantee of $1 million for 2015, correct?

A. That is correct.

Q. And the SEA-2 transactions also included the put and call options you had discussed with GBG, correct?

A. The agreement has put and call functions in it.

Q. And you discussed those put and call functions with Mr. Margolis during your negotiations, correct?

A. I discussed them with Mr. Margolis and Neil Cole.

Q. Let me direct your attention to the shareholders agreement, Defense Exhibit 303-A1, 21. Let's put up on the screen for the

| LACPCOL2 | Horowitz - Cross | Page 538 |
|---|---|---|

witness and the jury the page that ends in 021.

Directing your attention to section 6.04. Put and call options. This provision reflects the floor or backstop you had discussed with Mr. Margolis, correct?

A. This defines the put and call options that were discussed.

Q. It defines the put and call options that you had discussed with Mr. Margolis, correct? Yes or no?

A. Yes.

Q. We can take that down, Mr. Klein.

Now, Mr. Horowitz, there is nothing in any of the SEA-2 transaction documents referring to any commitment or obligation of Iconix to make future marketing payments to GBG, correct?

A. That is correct.

Q. Now, if we can put back up the letter acknowledgment and payment of consideration agreement at 002. That agreement states, "This letter agreement, and the agreements referred to herein, including but not limited to, the SEA JV amendments, the existing master license agreement, the existing shareholder agreements, and any other agreements referred to therein or exhibits or scheduled annexed thereto, constitute the entire agreement and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof," correct?

A. Is the question -- I'm sorry.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                      October 12, 2021

| LACPCOL2 | Horowitz - Cross | Page 539 |
| --- | --- | --- |

Q. The question is, is that the language in the contract?

A. That is the language in the contract.

Q. You can take that down.

Now, let's look at the shareholders agreement for SEA-2, Defendant's Exhibit 303-A1 in evidence, at the page ending in 303-A1, 27, and directing your attention to section 10.06. That provision states, "Entire agreement. This agreement and the purchase agreement, together with all exhibits and schedules hereto and thereto (which are deemed incorporated herein), contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter here of."

That's what the contract says, right, Mr. Horowitz?

A. Correct, that is what the document states.

Q. We can take that down, Mr. Klein.

Now, let me direct your attention to the amendment to the master license agreement, Defendant's Exhibit 303-A3 in evidence, and let's go to the page that ends in 303-A3, 008. Focusing your attention on 6(h), (h), that states, "Exclusivity of representations and warranties. Neither Iconix nor any of its affiliates is making any representation or warranty of any find or nature whatsoever, oral or written, express or implied, except as expressly set forth in this agreement and Iconix hereby disclaims any other such representations and

| LACPCOL2 | Horowitz - Cross | Page 540 |
| --- | --- | --- |

warranties."

That's what the contract says, right, Mr. Horowitz?

A. That is correct.

Q. We can take that down, Mr. Klein.

Now, Mr. Horowitz, Iconix had no commitment or obligation to enter into the Lee Cooper Europe transaction with GBG under the SEA terms, as you understood those terms, correct?

A. Under the SEA agreement, there is no mention of Lee Cooper.

Q. And so your understanding was Iconix had no commitment or obligation to enter into the Lee Cooper Europe transaction as part of the SEA-2 deal, correct?

A. My understanding is the two parties were going to continue to work together to find a solution to incorporate Lee Cooper into the relationship.

Q. They were going to work together, right?

A. That's correct.

Q. And there was no commitment or obligation with respect to Lee Cooper Europe, correct?

A. I believe there was a good-faith commitment to work together to find a proper structure.

Q. A good-faith commitment to work together to find the proper structure, that's your testimony?

A. Yes.

Q. Let's place before the witness what's marked as Defendant's

| LACPCOL2 | Horowitz - Cross | Page 541 |
| --- | --- | --- |

Exhibit 1408 for identification.

That's an e-mail exchange that you had with Willy Burkhardt of Iconix on September 30th, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1408.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1408 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. Mr. Horowitz, on October 1st, 2014, you wrote -- withdrawn.

Willy Burkhardt, he was the president of international at Iconix at this time, correct?

A. I believe that was his title.

Q. And on October 1st you wrote to Mr. Burkhardt, "I will do my best to make it happen. Also, interesting development on EU Lee Cooper. Technically, we never agreed, in writing, to do the Lee Cooper tracking stock in Europe with GBG. We can discuss/offer other alternatives, like an agency fee or something like that, and restructure the deal we offered. Worth thinking about. If we really want to demonstrate authoritative control on the business as we've discussed."

| LACPCOL2 | Horowitz - Cross | Page 542 |
| --- | --- | --- |

That's what you wrote, correct?

A. Those are the words that I wrote, correct.

Q. We can take that down, Mr. Klein.

Mr. Horowitz, a Lee Cooper Europe transaction was never entered into by Iconix and GBG, as far as you know, correct?

A. That is correct.

Q. And you understood that Mr. Cole's view was that if you did not have it in writing, you did not have an agreement, correct?

MR. HARTMAN: Objection.

THE COURT: Sustained.

Q. Now, Mr. Horowitz, you were eventually provided a draft of Iconix 10-Q for the second quarter of 2014 before it was filed, correct?

A. I believe so.

Q. Let's place before the witness what's marked as Defendant's Exhibit 1329. That's an e-mail that Brian Sniderman sent to you and others on July 30th, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1329.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1329 received in evidence)

BY MR. REISNER:

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACPCOL2          Horowitz - Cross          Page 543

Q.  It's stated, "Attached is our" -- withdrawn.

It states, "Attached is our most recent draft of the 10-Q. Kindly send any comments or questions to me by Monday morning," correct?

A.  That is correct.

MR. REISNER: And, your Honor, may I publish this for the jury?

THE COURT: You may.

Q.  And directing your attention to what will be placed before you as Defense Exhibit 1329-A1, that appears to be the attachment to this e-mail, correct?

A.  Yes, it does.

Q.  And that draft of the 10-Q included a description of the SEA-2 transaction.  If we go to the page that ends 0015, it may help the witness with the response.

A.  Yes, it does.

MR. REISNER: Your Honor, I offer 1329-A1.

MR. HARTMAN: No objection.

MR. REISNER: May I publish it to the jury.

THE COURT: You may.

(Defendant's Exhibit 1329-A1 received in evidence)

BY MR. REISNER:

Q.  That states, "In June 2014, the company contributed substantially all rights to its wholly-owned and controlled brands in the Republic of Korea and its Ecko, Zoo York, Ed

LACPCOL2          Horowitz - Cross          Page 544

Hardy, and Sharper Image brands in the European Union in Turkey in each case to Iconix SE Asia.  In return, LF Asia agreed to pay the company $15.9 million, of which $4.0 million was paid at closing.  As a result of this transaction, the company recorded a gain of $13.6 million in the current quarter, which is included in the licensing and other revenue in the unaudited, condensed, consolidated income statement."

That is what the document says, correct?

A.  Correct, that is what the document says.

Q.  Now, let's go back, Mr. Klein, to Defense Exhibit 1329, the e-mail transmitting this attachment.

Mr. Sniderman asked you and others to "kindly send any comments or questions to me by Monday morning," correct?

A.  That is correct.

Q.  You did not send any comments or questions about the description of the SEA transaction, correct?

A.  I don't believe that I did.

Q.  We can take that down.

Mr. Klein, can we place before the witness what's marked as Defendant's Exhibit 3539-20, at 3539-20, 005.

Mr. Horowitz, your understanding was that Mr. Cole believed if he did not have it in writing, you did not have an agreement?

MR. HARTMAN: Objection.

THE COURT: Sustained.

LACPCOL2          Horowitz - Cross          Page 545

BY MR. REISNER:

Q.  We can take that down, Mr. Klein.

Now, Mr. Horowitz, the SEA-2 transaction was completed on June 30th, 2014, correct?

A.  That is correct.

Q.  Now, in mid-August 2014, Jason Rabin of GBG called you with a list of asks, correct?

A.  I believe that is correct.

Q.  Let's place before the witness what's marked as Defense Exhibit 1344 for identification.  That's an e-mail that you sent, Mr. Horowitz, to Mr. Cole on August 14th, with the subject "Jason," correct?

A.  That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1344.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1344 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q.  Mr. Horowitz, your August 14th e-mail to Mr. Cole states in part "Jason Rabin called me today to discuss China Umbro and LC, which he will confirm Monday, and then a list of asks,

LACPCOL2          Horowitz - Cross          Page 546

topics including Roc Kids and how to handle.  On our list of things to discuss."

That's what the e-mail states in part, correct?

A.  That is what I wrote to Neil, correct.

Q.  At the bottom, it says, "Look forward to hearing about the trip."  Do you recall what that refers to?

A.  I don't.

Q.  Do you recall that Mr. Cole was making a trip to Israel at or around this time period?

A.  I recall him taking a trip to Israel.

Q.  We can take that down, Mr. Klein.

Now, in this mid-August time frame, you understood that GBG was having some buyers' remorse over the Korea component of the SEA-2 deal, correct?

A.  I do not recall that.

Q.  Let's place before the witness what's marked as Defense Exhibit 1349.

That's an e-mail from Willy Burkhardt to Neil Cole, copying you, sent on August 22nd, correct?

A.  That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1349.

MR. HARTMAN: Objection, hearsay.

THE COURT: Overruled.

MR. REISNER: Your Honor, I offer defense --

# A-204

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACPCOL2    Horowitz - Cross    Page 547

withdrawn.

May I publish Defense Exhibit 1349 for the jury?

THE COURT: You may.

MR. REISNER: And if I haven't offered it, I offer it in evidence.

THE COURT: It will be received.

(Defendant's Exhibit 1349 received in evidence)

BY MR. REISNER:

Q. Directing your attention to item 10 of this e-mail. On August 22nd, 2014, it states in part -- withdrawn.

Let me start from the beginning. It states, "The counterargument stems from our relationship with Jared and GBG. It seems like they have buyers' remorse over the Korea component of the deal." Do you see that?

A. I see that it states that in the e-mail.

Q. And does that refresh your recollection that as of August 22nd, your understanding was that GBG was having some buyers' remorse for the Korea component of the deal?

A. No, it does not.

Q. And do you recall that an issue developed with the London Fog brand in Korea?

A. I do not.

Q. Do you recall that GBG was unhappy about the Korea component of the deal because London Fog was one of the brands that had been licensed, and it was performing below its

LACPCOL2    Horowitz - Cross    Page 548

expectations?

A. I do not recall that.

Q. And so when you see the language in this e-mail that it seems that GBG had buyers' remorse over the Korea component of the deal, it doesn't trigger any memory for you; that's your testimony, correct?

A. These are Willy's opinions about conversations that he's having --

Q. I'm not asking about Willy's opinions.

A. It does not trigger any memories for me.

Q. I'm not asking about Willy's opinion. I'm asking if it triggers for you a memory that it was your understanding that GBG was having some buyers' remorse over the Korea component of the deal?

A. No.

Q. Okay. You can take that down.

And also in the August 2014 time frame, the Lee Cooper Europe transaction had not taken place, correct?

A. That is correct.

Q. And you understood, based on your discussions with GBG, that they continued to consider Lee Cooper Europe a valuable opportunity, correct?

A. That is correct.

Q. And in this time frame, August of 2014, you were also hoping that Iconix would enter into a China Umbro JV with GBG

LACPCOL2    Horowitz - Cross    Page 549

in the third quarter of 2014, correct?

A. At this point, I believe GBG was one of the parties we were negotiating to form a joint venture in China for Umbro and/or Lee Cooper with.

Q. And you were hoping that Iconix would complete a China Umbro JV with GBG in the third quarter, that's what you were hoping for, right?

A. Again, I believe at this time, I was working on and hoping for a joint venture in China for Umbro with one of the parties we were negotiating with.

Q. And GBG was the leading candidate, correct?

A. I don't recall if that's the case at this time.

Q. GBG was one of the leading candidates, correct?

A. Yes, they were.

Q. And you knew by this time that GBG had acquired TLC, the licensing company, correct?

A. By "this time," meaning August?

Q. Yes.

A. Yes, that is correct.

Q. And before the SEA-2 transaction was signed, you had had discussions with representatives of GBG and TLC about TLC taking over all the marketing for Lee Cooper, correct?

A. I don't recall.

Q. Let's place before the witness what's marked as Defendant Exhibit 1310 and 13-A1 for identification.

LACPCOL2    Horowitz - Cross    Page 550

Mr. Horowitz, 1310 is an e-mail that you sent to Mr. Cole on June 27th, 2014, correct?

A. That is correct.

Q. And 1310-A1 appears to be the attachment to that e-mail, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer 1310 and 1310-A1.

MR. HARTMAN: No objection.

THE COURT: They will be received.

(Defendant's Exhibits 1310 and 1310-A1 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And this is one of your weekly updates to Mr. Cole, correct?

A. That is correct.

Q. And directing your attention to the entry under Europe JV/consolidation, in the middle of the entry, starting with "we can," it states: "We can transition Lee Cooper under Angela/LF right away, as deal is imminent. Willy is far more comfortable learning a lot when he is there this week and going back on."

Does that refresh your recollection that you had had conversations with GBG and TLC about transitioning the Lee

# A-205

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACPCOL2    Horowitz - Cross    Page 551

Cooper brand promotions to TLC?

A. I don't recall.

Q. The reference to Angela/LF, who is that?

A. Angela was a principal at TLC in, I believe, Iconix Europe joint venture.

Q. So Angela was associated with TLC, correct?

A. That is correct.

Q. And "LF" there refers to Li & Fung, correct?

A. That is correct.

Q. And at this time, there had been no transfer of Lee Cooper Europe marketing to TLC, correct?

A. I believe that is correct.

Q. We can take that down, Mr. Klein.

Now, Mr. Horowitz, in the August 2014 time frame, Jason Rabin and GBG were pressing Iconix for the payment of money in order to meet GBG's financial goals, correct?

A. I think there's more detail to that. In -- I believe in August of 2000 --

MR. REISNER: Your Honor, if I could ask you to direct the witness to answer my question?

THE COURT: Yes.

Can you answer the question that was asked, Mr. Horowitz?

THE WITNESS: Sure.

BY MR. REISNER:

LACPCOL2    Horowitz - Cross    Page 552

Q. And the question is, in the August 2014 time period, Jason Rabin and GBG were pressing Iconix for the payment of money in order to meet GBG's financial goals, yes or no?

A. I believe I need to explain the answer. It's not -- can I explain?

Q. You can't answer it yes or no? Is that your testimony?

A. I just wanted to --

Q. The question -- if you're not able to answer the question yes or no, that's fine. Are you able to answer the question yes or no?

THE COURT: Ask another question, Mr. Reisner.

MR. REISNER: Yes, your Honor.

Q. Mr. Horowitz, Jason Rabin explained to you that he needed $10 million and more for his own P and L, correct?

A. Yes, as he had discussed with Neil.

MR. REISNER: Your Honor, I move to strike the last portion of that answer as nonresponsive.

THE COURT: Very well. It will be stricken.

BY MR. REISNER:

Q. Mr. Horowitz, Jason Rabin explained to you that he needed $10 million and more for his own P and L, correct?

A. Yes.

Q. And when Mr. Rabin said that he needed $10 million more, you understood him to mean either $10 million in revenue or $10 million in expense relief, correct?

LACPCOL2    Horowitz - Cross    Page 553

A. That is correct.

Q. And you understood that Mr. Rabin was asking Iconix for these payments to help Mr. Rabin and GBG meet their own revenue objectives, correct?

A. I understood that --

Q. Are you able to answer that question yes or no?

A. You're using the words payments --

Q. Are you able to answer that question yes or no, sir? This is cross-examination.

A. I'm just trying to give a very fair picture, you --

THE COURT: No, Mr. Horowitz. If you can't answer the question that was asked, simply say so and Mr. Reisner will ask another question. Okay?

THE WITNESS: Okay. Sorry.

I can't answer the question as it is asked.

BY MR. REISNER:

Q. Mr. Horowitz, Jason Rabin said he had financial pressures and he needed this $10 million and more, correct?

A. He said he needed the --

Q. Yes or no?

A. I don't recall him saying "financial pressures."

Q. Okay. Do you recall testifying on direct examination, transcript page 202 at 16 to 17. Rabin "said he had financial pressures, and he needed this $10 million and more." Do you recall providing that testimony under oath, sir?

LACPCOL2    Horowitz - Cross    Page 554

A. Yes.

Q. You can take that down. Mr. Horowitz, it was your understanding that amounts paid by LF/GBG for joint venture interests did not hit LF/GBG's profit and loss statements, correct?

A. That is correct.

Q. Your understanding was that those amounts were capitalized by LF/GBG and listed as assets on its balance sheet, correct?

A. Correct.

Q. You also understood that minimum guarantees or marketing support or other types of payments by Iconix would benefit LF/GBG by hitting their profit and loss statement, correct?

A. That is correct.

Q. You viewed Jason Rabin as a wheeler-dealer, correct?

A. Correct.

Q. You viewed him as a little loose, correct?

A. That is correct.

Q. You thought he sometimes seemed to say things impulsively, correct?

A. I don't recall.

Q. Based on your experience, you viewed him as an emotional and passionate guy, correct?

A. That is correct.

Q. You had conversations with Jason Rabin where he took the position that Iconix should make one or another kind of payment

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

---

LACPCOL2    Horowitz - Cross    Page 555

to GBG, correct?

A. Can you please just repeat the question? I'm sorry.

Q. Sure. Would Mr. Rabin sometimes claim that GBG was entitled to payments from Iconix and that it was only fair if Iconix made certain payments to GBG?

A. Mr. Rabin --

Q. Yes or no?

A. No, I don't recall the use of the word "fair."

Q. You had conversations in which Mr. Rabin and Mr. Margolis went through: I owe you this and you owe us that, so what are we going to do, right? You had conversations like that with them, correct?

A. Yes, with Mr. Cole present as well.

MR. REISNER: And, your Honor, I move to strike the end of that response as nonresponsive.

THE COURT: It will be stricken.

Q. So you had conversations in which Mr. Rabin and Mr. Margolis said things like: I owe you this, you owe me that. What are we going to do, correct?

A. Correct.

Q. And that conversation took time -- withdrawn.

That conversation took place sometime after the SEA-2 transaction had already been completed, correct?

A. That is correct.

Q. And you thought, at the time, that maybe Iconix would make

---

LACPCOL2    Horowitz - Cross    Page 556

the payments Rabin was requesting, but you didn't think there was anything weird happening, correct?

A. That's not correct.

Q. Can we please place before the witness what's marked as Defendant's Exhibit 3539-023 and go to the page that ends 002. And if you can highlight starting at -- go two more lines up, please. Keep going. No, not yet. There you go.

Does this refresh your recollection that in this conversation when the deal was finished, you thought at the time that maybe Iconix would reimburse GBG and you didn't think there was anything weird? Does that refresh your recollection?

A. No, it does not.

Q. Do you recall telling the government that this was after the deal was finished, prior to the Middle East JV and that you thought, at the time, that maybe Iconix would reimburse them and did not think there was anything weird? Did you previously tell that to the government?

A. I don't recall.

Q. Are you denying that you previously told that to the government?

A. No, I'm not denying that.

Q. You can take that down, Mr. Klein.

Can we please place before the witness what's in evidence as Government Exhibit 1063.

That's an e-mail you sent to Mr. Cole on August 18th,

---

LACPCOL2    Horowitz - Cross    Page 557

2014, with one of your update reports, correct?

A. That is correct.

Q. I want to direct your attention to the entry under No. 5.

And this is in evidence. I think we can display this to the jury, Mr. Klein.

That states, "5. Simon Bamber Umbro/P and L. Agreed with Simon Bamber, to contribute $1 million in '14 and $1 million in '15 towards the sponsorship of West Ham, top 10 EPL team." That's what it says, correct?

A. That is correct.

Q. And EPL, that's English Premiere League, right?

A. That is correct.

Q. That's the English football or soccer league, correct?

A. That is correct.

Q. And West Ham is a top ten English Premiere team, correct?

A. I believe so.

Q. And who was Mr. Bamber?

A. Mr. Bamber was, I believe, at this point, the licensee for Umbro in Europe.

Q. He was Iconix's licensee for Umbro Europe, correct?

A. Correct.

Q. And you agreed that Iconix would contribute $2 million over two years to support an Umbro sponsorship of the West Ham soccer or football team, correct?

A. That is correct.

---

LACPCOL2    Horowitz - Cross    Page 558

Q. And you thought that this $2 million payment would be beneficial to the Umbro brand from a marketing perspective, correct?

A. I thought that the sponsorship of West Ham would be beneficial there.

Q. And the reason that you agreed and reported on a $2 million sponsorship payment by Iconix relating to the Umbro brand was because you thought that payment would help support and promote the Umbro brand, correct?

A. I thought that the sponsorship would help them promote the brand.

Q. The Umbro brand, correct?

A. Correct.

Q. And that's why Iconix was willing to spend $2 million, right?

A. That is correct.

Q. You thought it would strengthen the Umbro brand, correct?

A. That is correct.

Q. And Iconix had no commitment or obligation to provide that marketing support, correct?

A. We agreed --

Q. Yes or no? Did Iconix have a commitment or obligation to provide the marketing support referenced in your report?

A. Yes.

Q. Your testimony is that you didn't propose -- withdrawn.

---

# A-207

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

| LACPCOL2 | Horowitz - Cross | Page 559 |
|---|---|---|

When you proposed a $2 million payment by Iconix to support the Umbro brand, did Iconix have a commitment or obligation to make that $2 million payment when you proposed it?

A. I don't recall proposing it, but once we made the commitment, we did have the commitment to pay it.

Q. Who proposed it, if you didn't, Mr. Horowitz?

A. I don't recall if it was Iconix or Simon Bamber, one of them.

Q. But at the time that payment was under discussion, there was no commitment or obligation for Iconix to make that payment, correct, when it was under discussion?

A. Correct.

Q. And you undertook that commitment or obligation because you thought it would be good business, correct?

A. Correct.

Q. And there were other times -- we can take that down, Mr. Klein.

There were other times that you advocated internally for Iconix to provide marketing support to business partners where there was no obligation to provide that marketing support, correct?

A. That is correct.

Q. Let's place before the witness what's marked as Defense Exhibit 1143 for identification.

| LACPCOL2 | Horowitz - Cross | Page 560 |
|---|---|---|

That's an e-mail that you sent to Mr. Cole on October 5th, 2013, right, Mr. Horowitz?

A. That is correct.

MR. REISNER: Your Honor, I offer 1143.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1143 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. The subject of the e-mail is Everton, correct?

A. That is correct.

Q. And at the end of the first line, going to the second line, one of the things you're saying is, "It is a great use of our money," correct?

A. That is correct.

Q. And in this e-mail, you were advocating for marketing support for Descente, which owned the Umbro brand in Japan at this time, correct?

A. I just need to take a second to read this e-mail.

(Pause)

Okay. I've read the e-mail. Would you please repeat the question, please?

Q. Sure.

| LACPCOL2 | Horowitz - Cross | Page 561 |
|---|---|---|

A. Thank you.

Q. In this e-mail, you're advocating for marketing support for Descente, which owned the Umbro brand at this time in Japan, correct? Yes or no?

A. No.

Q. Let me direct your attention to the third sentence in the second paragraph which starts, "for 600k net," which says "For 600k net, we get a top-ten team in the world, a necessary component for a global soccer brand whose licensees are positioned well in this space." That's what it says, right?

A. That's correct.

Q. And you wanted Iconix to contribute $600,000 to sponsor the Everton soccer club, correct?

A. A net of $600,000, yes.

Q. And the reason you wanted Iconix to contribute $600,000 to sponsor the Everton soccer club was because you thought it would help the Umbro brand, correct?

A. That is correct and our licensees worldwide.

Q. And you told Mr. Cole that "this is a great use of our money, and there's no better use of our marketing dollars," correct?

A. That is correct.

Q. And in 2014, Iconix made an even bigger marketing commitment for Everton in order to support the Umbro brand, correct?

| LACPCOL2 | Horowitz - Cross | Page 562 |
|---|---|---|

A. I don't recall.

Q. Do you recall that Iconix entered a deal where they, Iconix, contributed $22 million over five years to sponsor the Everton club?

A. I do not recall.

Q. We can take that down, Mr. Klein.

MR. REISNER: Your Honor, I'm about to move on to a very different topic, I can start, or we can break, whatever you think.

THE COURT: We can break now. So it's about five minutes of the hour. We'll reconvene at 11:15. Please do not discuss the case.

(Jury not present)

Mr. Horowitz, you may step down.

(Witness temporarily excused)

Twenty minutes, folks.

(Recess)

THE COURT: Bring in Mr. Horowitz, please.

(Jury present)

THE COURT: Everyone, please be seated.

Mr. Reisner.

MR. REISNER: Thank you, your Honor.

BY MR. REISNER:

Q. Now, Mr. Horowitz, in the early September 2014 time period, early September 2014, you were discussing with GBG potentially

LACPCOL2          Horowitz - Cross          Page 563

releasing them from their Rocawear Kids royalty payment obligations, correct?

A. That is correct.

Q. GBG was claiming that they were losing money as a Rocawear Kids licensee, and they wanted out of the agreement, correct?

A. That is correct.

Q. And Iconix was reluctant to let GBG out of those obligations, correct?

A. Correct.

Q. If Iconix released GBG from its royalty obligations, it would eliminate a revenue source if Iconix couldn't find a replacement licensee to step into the shoes of GBG, correct?

A. That's partially correct.

Q. Well, if Iconix released GBG from its royalty obligations, it would eliminate that as a revenue source unless it could be replaced, correct?

A. Correct.

Q. And one of the things Iconix was evaluating was a potential replacement licensee who could step into the shoes of GBG, correct?

A. That is correct.

Q. In September of 2014, you were also discussing with GBG making marketing payments to them, correct?

A. I believe that is correct.

Q. And in September of 2014, you were also discussing with GBG

LACPCOL2          Horowitz - Cross          Page 564

a possible joint venture in China for the Umbro and Lee Cooper brands, correct?

A. Correct.

Q. And these are all discussions taking place with one partner, GBG, correct?

A. All of those conversations are taking place with one partner.

Q. Now, the China JV transaction, what we've been calling SEA-3, that was finalized and signed on September 17th, 2014, correct?

A. I believe so.

Q. And in September of 2014, Iconix also was hoping to enter into a joint venture agreement with GBG in the Middle East and North Africa in the fourth quarter of 2014, correct?

A. I believe it was an identified opportunity.

Q. Can we please place before the witness what's in evidence as Government Exhibit 1098.

Now, Mr. Horowitz, on September 26th, 2014, Iconix received an e-mail from GBG attaching invoices for marketing costs, correct?

A. That is correct.

Q. And the invoices sent by GBG on September 26th had no backup support, correct?

A. That is correct.

Q. They didn't have anything to show that the marketing work

LACPCOL2          Horowitz - Cross          Page 565

for Iconix brands referenced on the invoices was actually performed, correct?

A. Correct.

Q. And with respect to the invoices sent by Iconix to GBG for marketing work, Mr. Cole told you that the invoices should contain real numbers, correct?

MR. HARTMAN: Objection.

THE COURT: Overruled.

Q. Correct?

A. I'm sorry, I didn't hear.

Q. With respect to the invoices, Mr. Cole told you that the invoices should contain real numbers, correct?

A. I believe he used that term.

Q. And Mr. Cole told you that GBG should show Iconix actual work, and he wanted to make sure the invoices reflected real expenses, correct?

A. I believe that is correct.

Q. And you met with GBG to discuss the invoices in late September 2014, correct?

A. I met with them sometime around then, yes.

Q. And you created a document for yourself to prepare for the meeting, correct?

A. I don't recall.

Q. Let's show the witness what's in evidence as Government Exhibit 232. That's the document you prepared for the meeting,

LACPCOL2          Horowitz - Cross          Page 566

correct?

A. That is not correct.

Q. Do you recall testifying yesterday on direct examination that you recognized that as a document you prepared and updated on September 29th?

A. I believe that I did.

Q. And the document reflects your conversation with Mr. Cole about how to deal with the invoices, correct?

A. That is correct.

Q. And the document states "$5 million in marketing, $1 million Zoo York Europe. Show us real work, expenses," correct?

A. It says "show us work, real expenses."

Q. "Show us work, real expenses," correct?

A. That's correct.

Q. And on the next line, "$2 million Peanuts China." It says, "show us things," correct?

A. That is correct.

Q. And on the next line, "$2 million Ecko Unlimited/Rocawear, show us expenses," correct?

A. That is what it says.

Q. That's what you told GBG, correct?

A. That is part of what I told GBG, correct.

Q. And that's what Mr. Cole had told you to tell GBG, correct?

A. That is part of what Mr. Cole told me to tell GBG.

LACPCOL2  Horowitz - Cross  Page 567

Q. We can take that down. Now, on October 2nd, you received revised invoices from LF/GBG, correct?

A. I believe so.

Q. And this time, the invoices had backup showing marketing activities related to Iconix brands, correct?

A. It had an attempt at backup.

Q. Can we please place before the witness what's in evidence as Government Exhibit 1111. That's the e-mail you received from Ethan Cole of GBG on October 2nd, 2014, correct?

A. Correct.

Q. And it says, "Hi, Seth. Please find attached the marketing invoices for the Zoo York, Mossimo and Peanuts in the link below. Please find the decks related to each," correct?

A. That is correct.

Q. And that link indicated there, https//private.filesanywhere.com, that's a link to a shared site, correct?

A. I believe so.

Q. And when you clicked that link, there was a series of visual representations of work, correct?

A. That is correct.

Q. And let's show the witness what's in evidence that is Government Exhibit 214, some of the representations. Scroll down. Scroll down. Keep going. Keep going. Keep going. Keep going.

LACPCOL2  Horowitz - Cross  Page 568

(Pause)

You can stop there.

Do those appear to be some of the visual representations of work that you saw?

A. Yes.

Q. We can take that down. Can you please place before the witness what's marked as Defendant's Exhibit 415 for identification. Mr. Klein, can we please scroll down on this one as well.

(Pause)

Let's stop there.

It does also appear to be some of the visual representations of work that you saw on the shared site?

MR. HARTMAN: Judge, can I speak to Mr. Reisner about this exhibit?

THE COURT: You may.

(Pause)

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 415 received in evidence)

MR. REISNER: So may I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And, Mr. Klein, can we just go back to the beginning of

LACPCOL2  Horowitz - Cross  Page 569

that document just so the jury can see what it contains. And if you could, please scroll down.

(Pause)

And, Mr. Horowitz, do those also appear to be some of the series of visual representations of work that you saw on the share site link?

A. I believe that is what they appear to be.

Q. You can take that down, Mr. Klein.

Let's now place before the witness what's marked as Defendant's Exhibit 1407 for identification.

MR. REISNER: Your Honor, I offer Defense Exhibit 1407.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1407 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

MR. REISNER: And can we please scroll down, Mr. Klein.

(Pause)

Why don't we stop there.

BY MR. REISNER:

Q. Do those also appear to be part of this series of visual representations of work that you saw on that shared site?

LACPCOL2  Horowitz - Cross  Page 570

A. Yes, they do.

Q. We can take that down, Mr. Klein.

Now, you believed that actual work was done as reflected in the invoices, correct?

A. Some of the invoices reflect actual work.

Q. You believed that actual work was done, correct?

A. By who? Sorry, I just want to be sure --

Q. The question is, did you believe -- withdrawn.

You just saw, we just scrolled through, lots of documents that you saw on that shared site, correct?

A. That is correct.

Q. When you reviewed those materials, you believed that actual work was done, correct?

MR. HARTMAN: Objection, vague.

THE COURT: I'm sorry?

MR. HARTMAN: Vague.

THE COURT: Sustained as to the form.

BY MR. REISNER:

Q. When you saw -- withdrawn.

When you saw those materials on the shared site, you believed that actual work was done, correct?

MR. HARTMAN: Objection.

THE COURT: Sustained.

Q. Do you recall telling the government that you believed actual was done?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

---

LACPCOL2     Horowitz - Cross     Page 571

MR. HARTMAN: Objection.

THE COURT: Overruled.

A. I believe that I did.

Q. And the brands for which the referenced marketing work was performed, those were Iconix brands, correct?

A. Yes.

Q. Zoo York is an Iconix brand, correct?

A. Sure.

Q. Mossimo is an Iconix brand, correct?

A. It's a brand owned by Iconix, yes.

Q. As part of its annual budget, Iconix allocated a certain level of expense toward advertising, correct?

A. That is correct.

Q. And the budget for 2014 included advertising spending of about $36 million, correct?

A. I don't recall the specific number.

Q. Well, in 2014, Iconix, in fact, spent $36 million on advertising, correct?

A. I don't recall.

Q. Let's place before the witness what's in evidence as Defense Exhibit 5, and go to the page with the last three digits 079. This is a copy of Iconix's 10-K for the year ending 2014, correct?

A. I believe so.

Q. And directing your attention to the language underneath

---

LACPCOL2     Horowitz - Cross     Page 572

advertising campaign costs, the last sentence "Advertising expenses for FY" -- fiscal year -- "2014, fiscal year 2013 and FY2012 amounted to $36 million, 25.8 million and $21.4 million, respectively;" do you see that?

A. Yes, I do.

Q. Does that refresh your recollection that in 2014 Iconix undertook advertising expenses in the amount of $36 million?

A. It does not, but I see it here.

Q. We can take that down.

Now, Mr. Horowitz, I'm going to ask you some questions about a period a little earlier in time. In the April, May, June, 2014 time frame, when the SEA-2 transaction was being negotiated, Iconix was working on a potential acquisition of CAA by Iconix, correct?

A. I believe that is correct.

Q. And from what you saw, is it fair to say that that potential acquisition was occupying a significant amount of Mr. Cole's time?

A. It was occupying some of his time.

Q. CAA was the largest talent agency in the country, correct?

A. Correct.

Q. It was based in Los Angeles, California, correct?

A. That is correct.

Q. And it had revenues in excess of $550 million in just 2013, correct?

---

LACPCOL2     Horowitz - Cross     Page 573

A. I believe that is correct.

Q. And you thought the transaction would be game changing for Iconix, correct?

A. That is correct.

Q. You thought that the possibilities of the combined Iconix CAA company were endless, correct?

A. I believe that is correct.

Q. And you thought that the financial potential of the combined company was staggering, correct?

A. I don't recall that specifically, but I was enthusiastic about the potential of the deal.

Q. Let's place before the witness what's marked as Defense Exhibit 1917 for identification. That's an e-mail that you, Mr. Horowitz, sent to Mr. Cole, with a copy to David Blumberg on April 11th, 2014, correct?

A. That is correct.

Q. And that e-mail refers -- if you can zoom out so the witness can see the whole document, Mr. Klein.

That e-mail refers to the CAA deal under discussion, correct?

A. Yes, that is correct.

MR. REISNER: Your Honor, I offer Defendant's Exhibit 1212 -- I have the wrong document. I offer Defendant's Exhibit 1917.

MR. SOLOWIEJCZYK: No objection.

---

LACPCOL2     Horowitz - Cross     Page 574

THE COURT: It will be received.

(Defendant's Exhibit 1917 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. Your e-mail on April 11th to Mr. Blumberg says, "Very nice. And he's right. The possibilities of the new company are endless. Every day we see pieces of our growth engine being executed, but nobody is doing it holistically. The combined strengths of our two companies and the financial potential of our public company are staggering, if planned and executed properly."

That's what you wrote, correct?

A. That's what I wrote to Neil.

Q. And when you refer to "the combined strengths of our two companies," the two companies you were referring to were Iconix and CAA, correct?

A. That is correct.

Q. We can take that down, Mr. Klein.

And in the June 2014 time period -- withdrawn.

In the May 2014 time period, you knew that Iconix was preparing a letter of intent proposing to acquire CAA at a price based on an enterprise value of $1 billion, correct?

A. I don't recall the specific timing and enterprise value,

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

---

LACPCOL2    Horowitz - Cross    Page 575

but I know that we were working on a letter of intent.

Q. Can we please show the witness what's marked as Defense Exhibit 1212 and 1212-A1.

Defense Exhibit 1212 is an e-mail dated May 13th, 2014, from David Blumberg that was sent with copies to you and others, correct?

A. That is correct.

Q. And Defense Exhibit 1212-A1 appears to be the attachment to that e-mail, correct?

A. Correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1212 and 1212-A1.

MR. HARTMAN: No objection.

THE COURT: They will be received.

(Defendant's Exhibits 1212 and 1212-A1 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. The May 13th e-mail that you received states, "Gentlemen, per our discussion earlier today, attached please find revised draft of the LOI. We plan on sending the LOI to Tesla management tomorrow evening and look forward to your feedback."

That's what it says, correct?

---

LACPCOL2    Horowitz - Cross    Page 576

A. That is what the e-mail says.

Q. And "Tesla" is sort of the code name for the CAA business transaction that was under discussion, correct?

A. That is correct.

Q. And directing your attention to the attachment, that's the LOI, or letter of intent, correct?

A. I believe so.

Q. And under "2, Purchase Price," it states the purchase price to be paid by Iconix for CAA would be based on an enterprise value of $1 billion, correct?

A. That is correct.

Q. You can take that down, Mr. Klein.

And were you aware that on or about June 25th, 2014, Iconix made a best and final proposal to buy CAA at a value of $1.15 billion?

A. I do not recall the timing of that.

Q. Did you know that best and final offer that Iconix made was in the amount of $1.15 billion?

A. I don't recall that specific amount.

Q. The CAA transaction ultimately did not take place, correct?

A. That is correct.

Q. The parties did not agree on terms, correct?

A. Correct.

Q. Now, also in the spring of 2014, Iconix was discussing the possibility of releasing GBG from its Rocawear Kids royalty

---

LACPCOL2    Horowitz - Cross    Page 577

obligations, in the late spring of 2014, correct?

A. That is correct.

Q. And those discussions continued into June 2014 time period, correct?

A. I believe so.

Q. Let's show the witness what's marked for identification as Defendant's Exhibit 1271.

That's an e-mail that you sent, Mr. Horowitz, to Jason Rabin of GBG on June 20th, 2014, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defendant's Exhibit 1271.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1271 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. That e-mail states, in part, "We have retained Jonathon Cohen as a consultant to help both Iconix and our men's licensee for Rocawear analyze the kids Rocawear business and to build a plan that should allow us to transition quickly as discussed. If we are able to transition the business, Jonathan will run it."

---

LACPCOL2    Horowitz - Cross    Page 578

You see that, correct?

A. I see that.

Q. And by "transition the business," you meant the possible plan where the Rocawear Kids licensee -- withdrawn.

By "transition the business," you meant a possible plan where the Rocawear Kids licensee would transition or be transferred from GBG to a replacement licensee, correct?

A. I meant a transition that would result in the termination of the Rocawear Kids agreement with GBG and a new party taking it over.

Q. Right. That's what you meant by "transition," correct?

A. That is -- what I said is correct.

Q. And the idea was for a new licensee to step into the shoes of GBG so that Iconix wouldn't lose licensing fees, correct?

A. Not completely correct.

Q. Well, the idea was for a new licensee to step into the shoes of LF/GBG, correct?

A. In certain aspects, yes.

Q. And if a new licensee stepped into the shoes of LF/GBG and paid the same license fees, Iconix wouldn't lose licensing fee revenues, correct?

A. If they paid the same licensing fees, that is correct.

Q. And Iconix retained Jonathon Cohen as a consultant to assist with a possible transition, correct?

A. Amongst other things, correct.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

---

LACPCOL2     Horowitz - Cross     Page 579

Q. And Mr. Cohen was retained to help Iconix and GBG or Kids Headquarter, GBG's affiliate, analyze the Rocawear Kids business, correct?

A. No. He was brought in to help Iconix analyze the business and perform other functions.

(Continued on next page)

---

LACMCOL3     Horowitz - Cross     Page 581

the witness 1310-A1.

Q. 1310 is an e-mail you sent to Mr. Cole on June 27, 2014, correct?

A. That is correct.

Q. And 1310-A1 appears to be the attachment to that e-mail, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibits 1310 and 1310-A1.

MR. HARTMAN: No objection.

THE COURT: They will be received.

(Defendant's Exhibits 1310 and 1310-A1 received in evidence)

MR. REISNER: May I publish it, your Honor?

THE COURT: You may.

MR. REISNER: Let's go to the second page of the attachment, please.

Q. Let me start with 1310, Mr. Horowitz. This is an e-mail transmitting one of your update reports, correct?

A. That is correct.

Q. Directing your attention to the attachment, under the heading Rocawear, if we look at item 4, it says: Signed LF NDA, at Jason's request, for Jonathan and New Rise, to start diligence on kids business. That's what it says, correct?

A. That is what it says, correct.

---

LACMCOL3     Horowitz - Cross     Page 580

Q. The e-mail says: We have retained Jonathan Cohen as a consultant to help both Iconix and our men's licensee for Rocawear analyze the kids Rocawear business, correct?

A. Correct. But the men's licensee is a different entity --

Q. The men's licensee at this time was a company called New Rise, correct?

A. I believe so.

Q. And one idea under consideration was to transfer the Rocawear Kids license from GBG, or Kids Headquarters, to this New Rise company, correct?

A. It was not to transfer the license. It was to transfer the business, and there is a difference.

Q. When I refer to Kids Headquarters, you understood that was an affiliate of GBG, correct?

A. That is correct.

Q. So the idea was to transfer the Roc Kids business to New Rise, correct?

A. Yes, that is correct.

Q. And New Rise was the Iconix licensee for the Rocawear nonkids brand in the 2014 time frame, correct?

A. I believe they were the licensee for the men's part of the business for Rocawear.

MR. REISNER: We can take that down, Mr. Klein. Let's place before the witness what's been marked as Defense Exhibit 1310 for identification. Let's also put before

---

LACMCOL3     Horowitz - Cross     Page 582

Q. And the LF in LF NDA refers to Li & Fung, correct?

A. Correct.

Q. NDA refers to a nondisclosure agreement, correct?

A. That is correct.

Q. When it says at Jason's request, you are referring to Jason Rabin, correct?

A. I am referring to Jason Rabin.

Q. When it refers to for Jonathan and New Rise to start diligence, Jonathan is Jonathan Cohen, correct?

A. That is correct.

Q. And the idea here is that Jason Rabin had requested that Jonathan and New Rise sign an NDA so that they could conduct due diligence on the Rocawear Kids business, correct?

A. That is correct.

Q. And the purpose of all of that was to explore the possibility of a transition of the Rocawear Kids business from GBG to New Rise, correct?

A. That is correct.

Q. New Rise, in fact, signed a confidentiality agreement in June 2014, correct?

A. I don't recall.

Q. Do you recall that Mr. Cohen also signed a nondisclosure agreement in June of 2014?

A. I don't.

Q. Putting aside the time frame, do you recall that each of

---

| LACMCOL3 | Horowitz - Cross | Page 583 |
| --- | --- | --- |

them signed an NDA for the purposes referenced in this document?

A. I don't.

MR. REISNER: We can take that down.

Q. Now, you eventually asked ask the Iconix legal team to prepare a draft termination notice in anticipation of potentially releasing GBG from its Rocawear Kids obligations, correct?

A. I believe so.

MR. REISNER: Let's place before the witness what's in evidence as Government Exhibit 1079.

We can show this to the jury. It's in evidence.

Q. Directing your attention to the bottom of this document, it is an e-mail that you, Mr. Horowitz, sent to Jason Schaefer, the general counsel of Iconix. Subject, Rocawear Kids termination. That states: Jason, can you please prepare a simple termination notice for GBG/LF per the terms below?

Correct?

A. That is the e-mail I sent.

Q. Let's look at the next page of this document. Next page has the heading Rocawear termination, right?

A. Correct.

Q. And it has the proposed terms or potential terms of a Rocawear termination agreement, correct?

A. That is correct.

| LACMCOL3 | Horowitz - Cross | Page 584 |
| --- | --- | --- |

Q. And directing your attention to the third item listed, one of those terms, potential terms is a transfer all on orders to New Rise, correct?

A. That is correct.

Q. The next listed term or potential term is transfer all WIP to New Rise, correct?

A. Correct.

Q. What is WIP?

A. WIP stands for work in process and usually relates to product that's in the middle of being manufactured.

Q. The next item is: Sell all inventory to New Rise at cost with 90-day terms, correct?

A. That is correct.

Q. And the concept being described there is GBG potentially selling all Rocawear Kids inventory to New Rise at cost with 90-day terms, correct?

A. That is correct.

Q. These things never happened, right?

A. That is correct.

Q. GBG didn't transfer all on orders to New Rise, correct?

A. Correct.

Q. GBG didn't transfer all works in progress to New Rise, correct?

A. That is correct.

Q. GBG didn't sell all inventory to New Rise at cost with

| LACMCOL3 | Horowitz - Cross | Page 585 |
| --- | --- | --- |

90-day terms, correct?

A. That is correct.

Q. The draft Rocawear Kids termination letter you asked the legal department to prepare was never finalized and never signed, correct?

A. I don't believe so.

Q. As far as you know, no termination agreement was ever signed by Iconix and GBG, correct?

A. That is correct.

Q. As far as you know, GBG was not released from its Rocawear obligations, correct?

A. That is correct.

Q. As far as you know, GBG paid its Rocawear Kids royalty obligations in 2014, correct?

A. I do not know.

Q. As far as you know, those payments were made, correct?

A. I just don't know.

Q. You never heard that they weren't paid, right?

A. That is correct.

Q. As far as you know, GBG paid its Rocawear Kids royalty obligations in 2015, correct?

A. Again, I do not know.

Q. You never heard that they weren't paid, right?

A. Correct. But I was not with the company for all of 2015.

Q. As far as you know, did GBG ever bring a claim for a

| LACMCOL3 | Horowitz - Cross | Page 586 |
| --- | --- | --- |

lawsuit against Iconix, taking the position that Iconix breached an agreement to release GBG from its Rocawear obligations?

MR. HARTMAN: Objection. Foundation.

THE COURT: Overruled.

A. Not that I'm aware of.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, it was your understanding that GBG viewed the right to market the Umbro and Lee Cooper brands in China as very valuable, correct?

A. To license. I would just add to license and market the brand in China as valuable, correct.

Q. GBG viewed the Umbro and Lee Cooper brands in China as very valuable, correct?

A. I believe they viewed them as valuable.

Q. And GBG had been pursuing an Umbro China deal with Iconix since the spring of 2014, correct?

A. I would characterize it as ongoing discussions and not necessarily pursuing.

Q. Not necessarily pursuing.

MR. REISNER: Let's show the witness what's marked as Defense Exhibit 1185 for identification.

Q. Is this an e-mail that you sent to Mr. Cole on April 9, 2014?

A. Yes, it is.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACMCOL3　　Horowitz - Cross　　Page 587

MR. REISNER: Your Honor, I offer Defense Exhibit 1185.

MR. HARTMAN: I think this is already in, so we have no objection.

THE COURT: Very well. It will be received.

(Defendant's Exhibit 1185 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

Q. This is an e-mail you sent to Mr. Cole on April 9, 2014, correct, Mr. Horowitz?

A. Yes, it is.

Q. Among the things you are reporting on here is discussions with GBG, correct?

A. Yes, that is correct.

Q. And directing your attention to the portion that's been highlighted which states: They are also pushing to be our JV partner for China Umbro.

The they is GBG, correct?

A. That is correct.

Q. So it's fair to say that GBG was pursuing a China Umbro deal in the spring of 2014, correct?

A. Yes, correct.

Q. And you understood?

MR. REISNER: You can take that down, Mr. Klein.

LACMCOL3　　Horowitz - Cross　　Page 588

Q. You understood from your conversations with GBG that they were very excited about the China Umbro opportunity, correct?

A. I believe that they were.

MR. REISNER: Let's place before the witness what's marked as Defense Exhibit 1896 and 1896-A1.

Q. This is an e-mail you sent to Mr. Cole on May 9, 2014, correct?

A. That is correct.

Q. And 1896-A1 appears to be the attachment to that e-mail, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1896 and 1896-A1.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1896 and 1896-A1 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

Q. Let me direct your attention to the bottom of the page on 1896-A1.

MR. REISNER: Can you please highlight where it starts: I told Jared.

Q. I'll read it. It states: I told Jared that if we are not

LACMCOL3　　Horowitz - Cross　　Page 589

able to do our deals in EU and Korea, that we may be forced to do China Umbro with someone else. He asked we try not to, as they are very excited about this opportunity.

That's what it says, correct?

A. That is what it says.

Q. The Jared you are referring to is Jared Margolis, correct?

A. That is correct.

Q. What you are reporting to Mr. Cole is that you have told Jared Margolis that if we are not able to go forward with EU in Korea, we may be forced not to do China Umbro with you, correct?

A. What I'm saying is that we may be forced to do China Umbro with someone else.

Q. And Mr. Margolis asked that you try not to, as they are very excited about this opportunity, correct?

A. That is correct.

Q. And the they in they are very excited about this opportunity is GBG, correct?

A. That is correct.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, Iconix was also discussing a possible Umbro China transaction with other potential partners or bidders, correct?

A. That is correct.

Q. There were other companies that were interested in

LACMCOL3　　Horowitz - Cross　　Page 590

acquiring the rights to Umbro in China, correct?

A. That is correct.

Q. And you told GBG there were other potential buyers as part of your negotiation approach, correct?

A. I believe so.

Q. You tried to use that fact as sort of leverage in your negotiations with GBG, correct?

A. I don't recall.

Q. One of the other potential bidders for China Umbro was a company called Win Hanverky, correct?

A. That is correct.

Q. Another of the potential bidders for China Umbro was Descente, correct?

A. That is correct.

Q. Another of the potential bidders for China Umbro was Simon Bamber, correct?

A. I believe so.

Q. Now, around the time that the SEA-3 transaction was being entered in September of 2014, GBG was negotiating a broad commercial relationship with David Beckham, correct?

A. I have some recollection of that.

Q. David Beckham was one of the most famous soccer players in the world, right?

A. Yes.

Q. And a GBG Beckham business relationship would make Umbro

# A-215

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

---

LACMCOL3          Horowitz - Cross          Page 591

rights in China and worldwide even more valuable, correct?

A. No.

Q. Your testimony is that if GBG had a deal with David Beckham and David Beckham appeared on television and in magazines and on the web wearing Umbro-branded merchandise, that wouldn't make an Umbro China deal more valuable for GBG?

A. There is two assumptions there. One is that David Beckham would be wearing Umbro, which is a big assumption, being that he had a competitive deal. And, again, I don't think it would change the value of the brand until that was executed.

Q. You're aware that GBG and David Beckham did enter a broad commercial relationship, correct?

A. No, I don't recall that.

MR. REISNER: Let's place before the witness what's marked as Defendant's Exhibit 1475.

Q. That's an e-mail that you sent to Mr. Cole on December 3, 2014, correct?

A. December 3, correct.

Q. December 3, 2014.

MR. REISNER: Your Honor, I offer Defense Exhibit 1475.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1475 received in evidence)

MR. REISNER: May I publish it to the jury?

---

LACMCOL3          Horowitz - Cross          Page 592

THE COURT: You may.

Q. In this e-mail that you sent to Mr. Cole on December 3, 2014 you wrote: Here is the link to the announcement by GBG on Beckham JV with Fuller and Beckham.

It has a link, correct?

A. That is correct.

Q. Does that refresh your recollection that in December of 2014, GBG entered into a broad commercial relationship with David Beckham?

A. It does not, but I see the e-mail.

Q. And do you recall that in this time period GBG was granted the right to use Beckham's name and likeness in connection with licensed merchandise?

A. I do not.

Q. And at this time, in December of 2014, GBG, in fact, had entered into the SEA-3 deal and had Umbro rights in China, correct?

A. That is correct.

Q. And this deal was expected to result in the release of a range of new Beckham-branded consumer products across Asia, Europe, and the United States, correct?

A. Beckham-branded, correct, I believe.

MR. REISNER: You can take that down, Mr. Klein.

Q. Now, the SEA-3 transaction was entered on September 17, 2014, correct?

---

LACMCOL3          Horowitz - Cross          Page 593

A. That is correct.

Q. And you considered yourself a primary point of contact at Iconix for the SEA-3 transaction, correct?

A. One of, correct.

Q. And the SEA-3 transaction involved the use of the Umbro and Lee Cooper brands in China, Macau, Hong Kong, and Taiwan, those territories, correct?

A. I believe so.

Q. And those territories are sometimes referred to as CMHT, correct?

A. I don't know.

Q. Do you recall referring to those territories, China, Macau, Hong Kong, and Taiwan, as CMHT in connection with the negotiations around SEA-3?

A. Not specifically, but it's accurate.

MR. REISNER: Let's please place before the witness what's been marked as Defense Exhibit 304.

Q. Mr. Horowitz, that's an e-mail, dated September 17, 2014, sent from Lauren Gee that was received by you and others, correct?

A. Yes, I'm cc'd on the e-mail.

MR. REISNER: Your Honor, I offer Defense Exhibit 304.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 304 received in evidence)

---

LACMCOL3          Horowitz - Cross          Page 594

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

Q. The e-mail states: Rob, attached please find fully executed copies of the transaction documents, in part.

Correct?

A. Correct.

MR. REISNER: Mr. Klein, let's place before the witness, if possible, Defense Exhibits 304-A1, A2, and A3. We can do them one at a time so the witness has an opportunity to see them, please.

A. Thank you.

MR. REISNER: Let's look at all three first.

Q. Those appear to be the attachments to this e-mail, correct?

A. I'm sorry. My screen only has one document on it. OK.

Q. Let's do A1 first.

A. Thank you.

Q. This is A2. There is A3.

Those appear to be the attachments to this e-mail, correct?

A. Correct.

MR. REISNER: Your Honor, I offer 304-A1, A2, and A3.

MR. HARTMAN: No objection.

THE COURT: They will be received.

(Defendant's Exhibits 304-A1, 304-A2, and

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACMCOL3    Horowitz - Cross    Page 595

304-A3received in evidence)

MR. REISNER: Let's please go to 304-A1.

May I publish it to the jury, your Honor?

THE COURT: You may.

Q. This is amendment No. 2 to master license agreement, correct, Mr. Horowitz?

A. That is correct.

MR. REISNER: Now let's look at A2.

Q. That's the letter acknowledgement and payment of consideration for 50 percent share of CMHT marks, correct?

A. That is correct.

MR. REISNER: Let's look at A3.

Q. That's the Iconix SE Asia Limited second amended and restated shareholders agreement, correct?

A. That is correct.

Q. And those are the SEA-3 transaction documents, correct?

A. That is correct.

MR. REISNER: If we could take those down, Mr. Klein, and show the witness and the jury Defense Exhibit 302-A2 in evidence, the letter acknowledgement and payment of consideration.

Q. The first paragraph that appears in this document states, in part: Iconix and GBG acknowledge and agree that the right to use certain trademark registrations or applications owned by Iconix Luxembourg -- and I am going to read forward -- in the

LACMCOL3    Horowitz - Cross    Page 596

People's Republic of China, Hong Kong special administrative region of the People's Republic of China, the Macau special administrative region of the People's Republic of China, and the Republic of China, the CMHT territory, granted by licensors to licensee pursuant to the SEA JV amendments is deemed to have a fair market value of $43 million. And that because Iconix and GBG each owned by 50 percent of licensee, GBG's ownership of 50 percent of licensee will provide GBG a benefit equal to 50 percent of such fair market value, or $21.5.

That's what it says, correct?

A. That is what it says, correct.

Q. Directing your attention to the next paragraph of the document --

MR. REISNER: If we can scroll up and capture that.

Q. That paragraph sets forth the $21.5 million purchase price, correct?

A. Yes, that paragraph sets the $21.5 million purchase price.

Q. It states, in part: In order to compensate the CMHT marks licensors for the transfer of 50 percent of the fair market value of the CMHT marks to GBG, through GBG's 50 percent share holding in licensee, pursuant to the SEA JV amendments, the CMHT marks licensors and GBG hereby agree that GBG shall pay US $21.5 million, correct?

A. Correct, that is what it states.

MR. REISNER: We can take that down, Mr. Klein.

LACMCOL3    Horowitz - Cross    Page 597

Q. The purchase price in the contracts was $21.5 million, correct?

A. That is correct.

Q. And during negotiations over the SEA-3 transaction, you defended $22 million as the actual value of the SEA-3 assets that GBG was negotiating to acquire, correct?

A. I believe so.

Q. You told Mr. Margolis that the actual value of the SEA-3 interest was $22 million, correct?

A. I don't believe so.

MR. REISNER: Let's put before the witness what's marked as Defense Exhibit 1337 for identification.

Let's highlight for the witness, starting on the second line, starting with the word put.

Q. Does this refresh your recollection that you told Jared Margolis that the actual value of the 50 percent IP interest being negotiated for SEA-3 was $22 million?

A. That's not how I would describe this.

Q. Does this refresh your recollection that you told Mr. Margolis that you put the actual GBG value of 50 percent of the IP at $22.5 million, yes or no?

A. I would not put it simply that way.

MR. REISNER: Can we please have the court reporter read back that answer. I couldn't hear it.

MR. HARTMAN: Your Honor.

LACMCOL3    Horowitz - Cross    Page 598

THE COURT: You can.

(Record read)

MR. HARTMAN: Your Honor, if Mr. Reisner would like to offer the document, we have no objection.

MR. REISNER: Your Honor, I offer Defense Exhibit 1337.

THE COURT: It will be received.

(Defendant's Exhibit 1337 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

MR. REISNER: We can take it down now, Mr. Klein.

Q. Now, Mr. Horowitz, as of September 17, when the SEA-3 transaction was completed and signed, that draft agreement that you asked the legal department to prepare terminating the Roc Kids license, that had not been finalized or signed, correct?

A. That is correct.

Q. And there is nothing in the SEA-3 transaction documents stating that Iconix has a commitment or obligation to terminate the Rocawear Kids license, correct?

A. That is correct.

MR. REISNER: Mr. Klein, can you please display for the witness and the jury what's in evidence as 304-A2, the letter of acknowledgement and payment of consideration, and go to page 2, toward the bottom.

Q. This is the letter of acknowledgement and payment of

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACMCOL3    Horowitz - Cross    Page 599

consideration, correct?

A. That is correct.

Q. It's one of the contracts, one of the three transaction documents entered into in connection with SEA-3, correct?

A. That is correct.

Q. And the portion being displayed states: This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV amendments, the existing master license agreement, the existing shareholders agreement, and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof or thereof.

That's what it says, right?

A. That is what it says.

Q. Did you read this provision in or about September 2014?

A. I don't recall.

MR. REISNER: Mr. Klein, we can take that down.

Let's show the witness and the jury what's in evidence as Defendant's Exhibit 304-A3, the shareholders agreement.

If we could go to Section 10.06 at page 27.

Q. That provision states: This agreement and the purchase agreement, together with all exhibits and schedules hereto and thereto (which are deemed incorporated herein), contains the

LACMCOL3    Horowitz - Cross    Page 600

entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof, correct?

A. Correct.

Q. And the title of this section is entire agreement, correct?

A. That is correct.

Q. Did you read this provision in or about September of 2014?

A. I don't recall.

MR. REISNER: We can take that down, Mr. Klein.

Mr. Klein, can we please display for the witness and the jury Defense Exhibit 304-A1 in evidence, the amendment to the master license agreement, at page 9, in the middle of the page.

Q. That provision states at H: Exclusivity of representations and warranties.

MR. REISNER: If we can highlight this, please.

Q. Neither Iconix nor any of its affiliates is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this agreement, and Iconix hereby disclaims any other such representations and warranties.

Do you see that?

A. I do see that.

Q. And did you read that provision in or about September of 2014?

LACMCOL3    Horowitz - Cross    Page 601

A. I don't recall whether or not I read this at that time.

MR. REISNER: You can take that down, Mr. Klein.

Q. Now, after the SEA-3 transaction was signed on September 17, 2014, you continued to discuss with GBG the possible transition of the Rocawear Kids business to New Rise, correct?

A. We discussed the terms of the transition to New Rise.

Q. After SEA-3 was signed, you continued to discuss with New Rise the possible transition of the Rocawear Kids business from GBG to New Rise, correct?

A. Again, we discussed the terms of the transition of the Rocawear business to New Rise.

Q. Well, there had been no transition, right, Mr. Horowitz?

A. Not yet.

Q. And the draft termination notice that you prepared had not been finalized -- withdrawn.

The draft termination notice that you asked legal to prepare had not been finalized and had not been signed, is that correct?

A. That is correct.

Q. And in the September time period Iconix was negotiating on behalf of New Rise with GBG about possible transition of orders and inventory and targeting October 1 as a possible transition date, correct?

A. We were negotiating on behalf of New Rise the terms of the transition with October 1 as the start date.

LACMCOL3    Horowitz - Cross    Page 602

Q. At some point Mr. Rabin told you that he didn't want to ship Rocawear Kids merchandise to New Rise, right?

A. I don't recall that.

MR. REISNER: Let's place before the witness what's marked as Defense Exhibit 1396.

Q. This is an e-mail that you sent Mr. Horowitz on September 22, 2014 to Mr. Cole with the subject Jason, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1396.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1396 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

Q. Mr. Horowitz, the Jason referenced in the subject line and on the first word of the e-mail refers to Jason Rabin, correct?

A. That is correct.

Q. The e-mail states, in part: Jason called. He doesn't want to ship the Rocawear Kids goods to New Rise.

You see that?

A. I do see that.

Q. Does that refresh your recollection that Mr. Rabin told you he did not want to ship Rocawear Kids merchandise to New Rise?

A. Yes, it does.

# A-218

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACMCOL3    Horowitz - Cross    Page 603

MR. REISNER: You can take that down, Mr. Klein.

Q. In October and early November, after the SEA-3 agreement had been entered, you continued discussing a possible transition of the Rocawear Kids business with Mr. Rabin and Mr. Margolis, correct?

A. That is correct.

Q. And in November, Iconix was still discussing with GBG the possibility of releasing GBG from its Rocawear Kids obligations, correct?

A. I believe that is correct.

Q. Iconix considered possibly agreeing to do so as part of the Middle East/North Africa transaction that was entered in December, correct?

A. Partially correct.

Q. In late November, you informed Mr. Cole that you were still discussing potential new terms to propose to GBG concerning the possible termination of the Rocawear Kids license, correct?

A. I believe so.

MR. REISNER: Let's place before the witness what's marked as Defendant's Exhibit 1466 and 1466-A1.

Q. 1466, Mr. Horowitz, is an e-mail that you sent to Mr. Cole on November 24, 2014, correct?

A. That is correct.

Q. And 1466-A1 appears to be the attachment to that e-mail, correct?

LACMCOL3    Horowitz - Cross    Page 604

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1466 and 1466-A1.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1466 and 1466-A1 received in evidence)

MR. REISNER: If you can go to the page that ends 002 and highlight what's under A.

May I publish this to the jury, your Honor?

THE COURT: You may.

Q. In this November 17 update you provided to Mr. Cole, you wrote: A, Rocawear Kids; potential new terms to propose to GBG. Correct?

A. Correct.

Q. It says: We reduce '14 minimum guarantees by $1 million. Correct?

A. That is correct.

Q. II. We make '15 a nonexclusive Rocawear Kids license. Keep $3.5 million minimum guarantee. Correct?

A. That is correct.

Q. III: In exchange for GBG agreeing to discontinue selling Rocawear Kids to Rainbow, Iconix will cover a certain dollar amount of chargebacks on the final season to Rainbow, correct?

A. That is correct.

LACMCOL3    Horowitz - Cross    Page 605

MR. REISNER: You can take that down, Mr. Klein.

Q. As far as you know, Mr. Horowitz, GBG was not released from its Rocawear Kids obligations, correct?

A. As far as I know, that is correct.

Q. And the draft agreement, termination agreement, proposing to release GBG from its Rocawear Kids royalty obligations that you asked legal to prepare was never finalized and was never signed, correct?

A. That is correct.

Q. Mr. Horowitz, in December of 2014, Iconix received a comment letter from the SEC division of corporation finance, correct?

A. That is correct.

Q. And the date of that letter was December 15, 2014, correct?

A. I believe so.

MR. REISNER: Mr. Klein, can we please display for the witness Government Exhibit 110 in evidence, comment letter.

Q. Does that appear to be the December 15, 2014 comment letter?

A. Yes, it does.

Q. Now, directing your attention to page 1 of the comment letter, it asks questions about the company's form 10-K for the year ended December 31, 2013, correct?

A. That is correct.

Q. And directing your attention to page 3, it also asks

LACMCOL3    Horowitz - Cross    Page 606

questions about the company's form 10-Q for the quarter ended September 30, 2014, correct?

A. That is correct.

Q. Among other things, it asks the company to explain why it recorded the net gains resulting from certain joint venture transactions in licensing and other revenue, correct?

A. That is correct.

Q. And it also asks the company, to the extent that any of these individual joint venture formation transactions resulted in the deconsolidation of a former subsidiary, quantify the portion of the gain related to the remeasurement of your retained investment in each form subsidiary to its fair value in connection with its deconsolidation and tell us how you considered the ASC 810-10-50-1B(b) disclosure requirements, correct?

A. That is what it states.

Q. Were you familiar with ASC 810-10-50-1B(b)?

A. No, I'm not.

Q. Among other things, it also asked about the SEA-3 and SEA-2 transactions, the nature of the transaction, the accounting guidance for the transaction, and whether the rights to the brands for the transaction met the ASC 805 definition of a business, correct?

A. That is correct.

Q. Were you familiar with ASC 805?

**A-219**

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

| LACMCOL3 | Horowitz - Cross | Page 607 |
| --- | --- | --- |

A. No, I was not.

Q. Did you come to understand that ASC 805 had something to do with something called a variable interest entity and consolidation or nonconsolidation?

A. Not that I recall.

MR. REISNER: You can take that down, Mr. Klein.

Q. A number of people at Iconix were involved in preparing the company's response to this comment letter, correct?

A. That is correct.

Q. Mr. Snyderman was involved, correct?

A. I believe so.

Q. He was the vice-president of finance at Iconix, correct?

A. I believe that was his title.

Q. Mr. Lupinacci was involved in responding, correct?

A. Yes.

Q. He was the CFO or chief financial officer of the company, correct?

A. Yes.

Q. Mr. Schaefer was involved in developing the response, correct?

A. Yes.

Q. He was the general counsel of the company, correct?

A. That is correct.

Q. Ms. Alford was involved, correct?

A. I believe so.

| LACMCOL3 | Horowitz - Cross | Page 608 |
| --- | --- | --- |

Q. She was another lawyer in the legal department, correct?

A. Yes, she was.

Q. And the company's outside audit auditor, BDO, also participated in preparing the response, correct?

A. I believe so.

Q. And the company had an outside law firm called the Blank Rome law firm, correct?

A. That is correct.

Q. And the Blank Rome law firm also helped the company respond to this comment letter, correct?

A. I believe so.

Q. And did you and others receive drafts of the company's proposed response to the comment letter before it was filed?

A. I believe so.

MR. REISNER: Let's show the witness what's marked as Defense Exhibit 1506.

Q. That's an e-mail from Mr. Snyderman to Mr. Cole and you and others on December 24, 2014, correct?

A. That is correct.

Q. And the subject is: Re, draft of SEC comment letter response, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1506.

MR. HARTMAN: No objection.

| LACMCOL3 | Horowitz - Cross | Page 609 |
| --- | --- | --- |

THE COURT: It will be received.

(Defendant's Exhibit 1506 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

Q. Mr. Snyderman's e-mail says: All. Attached is the most recent draft of our response, which includes all comments and edits received since Monday evening.

Please send me any additional comments or questions no later than Friday morning. We are planning to file on Friday.

That's what it says in part, correct?

A. Yes, that is what it says.

MR. REISNER: If we can enlarge that again. I'm sorry, Mr. Klein.

Q. Again, the from line, Brian Snyderman is the vice-president of finance, correct?

A. That's correct.

Q. It gets sent to Mr. Cole, correct?

A. That is correct.

Q. Mr. Lupinacci, the CFO, correct?

A. That is correct.

Q. Mr. Shapiro, one of the auditors from BDO, correct?

A. He is a member of the team at BDO, correct.

Q. And Avi Geffner, another one of the auditors from BDO, correct?

A. I believe that's who he is, correct.

| LACMCOL3 | Horowitz - Cross | Page 610 |
| --- | --- | --- |

Q. And Jason Schaefer, who is the general counsel of Iconix, correct?

A. That is correct.

Q. And Bob Mittman, who is one of your outside lawyers at the Blank Rome firm, correct?

A. That is correct.

Q. It gets sent to you, correct?

A. That is correct.

Q. It gets sent to Aaron Kopelowitz, correct?

A. Correct.

Q. Mr. Kopelowitz was the head of human resources at Iconix at this time, correct?

A. Yes, I believe so.

Q. It gets sent to Ericka Alford, is that correct?

A. That is correct.

Q. It says: Attached is the most recent draft of our response.

You reviewed drafts of the response before it was filed, correct?

A. I believe that I did.

MR. REISNER: We can take that down, Mr. Klein, and show the witness Defense Exhibit 1508.

THE COURT: Before we do that, we are going to take our second break.

Twenty minutes, ladies and gentlemen. Do not discuss

UNITED STATES OF AMERICA, v.
NEIL COLE,
October 12, 2021

LACMCOL3    Horowitz - Cross    Page 611

the case.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down. Everyone can be seated.

I won't keep you to this, Mr. Reisner, but do you think you will be finished today, or unlikely?

MR. REISNER: I think it's a close call, your Honor, but I think it's unlikely. I think it's more unlikely than likely.

THE COURT: OK. 20 minutes.

(Recess)

THE COURT: Can we get Mr. Horowitz, please.

(Jury present)

THE COURT: I apologize, ladies and gentlemen. Apparently, there is an unusual amount of traffic on the elevators.

MR. REISNER: May I proceed, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. Mr. Horowitz, before the break I was asking you questions about December 15 comment letter and the company's response to that comment letter, correct?

A. That is correct.

Q. I think I asked you whether you reviewed drafts of the response before it was filed and you told me that you had,

LACMCOL3    Horowitz - Cross    Page 612

correct?

A. I believe that I had.

MR. REISNER: Let's place before the witness what's marked as Defense Exhibit 1508.

Q. Is this an e-mail that was sent from Jason Schaefer to you and others, on December 26, 2014, that also includes an earlier string among several of the same participants?

A. Yes, it is.

MR. REISNER: Your Honor, I offer Defense Exhibit 1508.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1508 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

Q. Directing your attention to the e-mail in the middle of the page from you to Brian Snyderman, copying others, that states in part: Brian, thank you. I have no further comments on the two sections we discussed earlier this week.

Correct?

A. Correct.

MR. REISNER: We can take that down, Mr. Klein.

Q. Now, another SEC comment letter was received by Iconix on or about February 11, 2015, correct?

LACMCOL3    Horowitz - Cross    Page 613

A. That is correct.

MR. REISNER: Let's show the witness what's in evidence as Government Exhibit 112.

It's in evidence. We can also display it to the jury, Mr. Klein.

Q. That's a copy of the February 11 comment letter, correct?

A. That is correct.

Q. A response to that letter was filed by Iconix on February 24, 2015, correct?

A. I believe so.

Q. And this comment letter requested, among other things, more detailed information regarding the joint venture transactions and the accounting for those transactions, correct?

A. I believe that it did.

Q. For example, on page 3, under item 3, first bullet it asked for the material terms of any agreements made with the transaction counterparty or owners of the counterparty (e.g., minimum revenue guarantees, put or call options, etc.)

Correct?

A. That is correct.

Q. It also requested, looking at the very last bullet, a detailed ASC 810 analysis to support your conclusion that each joint venture is not a variable interest entity and not subject to consolidation, based on the corporate structure, voting rights, and contributions of the company and the joint venture

LACMCOL3    Horowitz - Cross    Page 614

partner, correct?

A. Correct.

Q. At this time did you know what an ASC 810 analysis was?

A. I don't believe that I did.

MR. REISNER: We can take that down, Mr. Klein.

Q. Now, a number of people at Iconix were involved in preparing the company's response to this February 11 letter, correct?

A. That is correct.

Q. Mr. Snyderman, the vice-president of finance, was involved, correct?

A. Correct.

Q. Mr. Lupinacci, the CFO, was involved, correct?

A. That is correct.

Q. Mr. Burkhardt, the head of international was involved, correct?

A. That is correct.

Q. Mr. Schaefer, the general counsel was involved, correct?

A. That is correct.

Q. Ms. Alford, also from the legal defendant, was involved, correct?

A. I believe so.

Q. Ms. Gee from the legal department was involved, correct?

A. I believe so.

Q. BDO, the company's outside auditor, was also involved in

# A-221

| LACMCOL3 | Horowitz - Cross | Page 615 |
|---|---|---|

preparing the response, correct?

A. I believe that they were.

Q. And that included both Mr. Shapiro and Mr. Geffner, right?

A. I believe so.

Q. And representatives from BDO's national office were also involved, correct?

A. Correct.

Q. Lawyers from the Blank Rome law firm also assisted in preparing the response, correct?

A. I believe so.

Q. And that included Mr. Mittman and Ms. Cunningham from the Blank Rome firm, correct?

A. I don't specifically recall the second name, but Mr. Mittman I do believe was.

Q. And a special forensic accounting firm called AlixPartners also assisted with this response, correct?

A. I believe so.

Q. And you're aware that Mr. Cole was the one who brought in AlixPartners to assist, correct?

A. I don't recall.

Q. There was a high degree of concern at the company about the possibility that corp. fin, the division of corporation finance, may view the joint ventures as variable interest entities and require consolidated reporting and a restatement of the company's financials, correct?

| LACMCOL3 | Horowitz - Cross | Page 616 |
|---|---|---|

A. I understood it may be at a higher level or more simplistic level in which the formation of the joint ventures might not be able to be taken into revenue.

Q. And there was also concern about corp. fin's view on the impact of the minimum guarantees and puts and the floors on the puts and the impact that may have on the accounting, correct?

A. That is correct.

Q. Now, in connection with drafting this response, Ms. Gee sent you a table listing who worked on which joint ventures, correct?

A. I don't recall.

MR. REISNER: Let's place before the witness what's marked as Defense Exhibit 1564 for identification.

Q. Mr. Horowitz, directing your attention to this e-mail exchange, in particular the second e-mail from the top, that's an e-mail from Lauren Gee to you on February 13, 2015, correct?

A. It appears to be that.

MR. REISNER: Your Honor, I offer Defense Exhibit 1564.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1564 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

| LACMCOL3 | Horowitz - Cross | Page 617 |
|---|---|---|

Q. Ms. Gee, she personally worked on the SEA-2 and SEA-3 transactions, correct?

A. I believe so.

Q. And the table she prepared identifies you as the primary business contact in connection with the SEA JV, correct?

A. The original SEA JV. That's the way it is written, although incorrect.

Q. Your testimony is that reference to SEA refers to SEA-1?

A. I'm just reading the e-mails.

Q. It says SEA, right?

A. Yes, it does.

Q. That means Southeast Asia, correct?

A. Correct.

Q. You didn't participate in SEA-1, correct?

A. That's correct.

Q. You participated in SEA-2 and SEA-3, correct?

A. Correct.

Q. And Ms. Gee listed you as the primary business contact for SEA, correct?

A. That's correct.

MR. REISNER: We can take that down, Mr. Klein.

Q. Now, you reviewed drafts of the February 24, 2015 SEC comment letter response before it was sent by Iconix to the SEC, correct?

A. Yes.

| LACMCOL3 | Horowitz - Cross | Page 618 |
|---|---|---|

Q. And you provided input and comments on the response, correct?

A. That is correct.

MR. REISNER: Let's place before the witness what's marked for identification as Defense Exhibit 1568 and 1569-A1.

Q. This is an e-mail that you sent to Willy Burkhardt on February 15, 2015, correct?

A. That is correct.

Q. And Defense Exhibit 1568-A1 appears to be the attachment to that e-mail, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibits 1568 and 1568-A1.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1568 and 1568-A1 received in evidence)

Q. Mr. Horowitz, this is an e-mail attaching your comments or draft response to a portion of the comment letter, correct?

A. I don't believe it is my draft response. I'm not sure what it incorporates in terms of changes, what is new.

MR. REISNER: Can we publish this to the jury, your Honor.

THE COURT: You may.

Q. Your e-mail to Mr. Burkhardt attaches a document at the top

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

| LACMCOL3 | Horowitz - Cross | Page 619 |

that says:  Response to (1) initial formations of your international joint ventures between 2012 and 2014, correct?

A.  That is what it states at the top, correct.

Q.  The reference to response at No. 2 (1) refers to a response to item 2 in the SEC comment letter from February 11, correct?

A.  I believe that it does.

Q.  And your e-mail to Mr. Burkhardt says:  Here it is.  Let me know if you have any issues.

Correct?

A.  That is what it says.

MR. REISNER:  We can take that down, Mr. Klein.

Q.  Now, the company sent its response to the SEC's February 11 comment letter on February 24, 2015, correct?

A.  That sounds right.

MR. REISNER:  Let's place before the witness what's in evidence as Government Exhibit 113.

Q.  That appears to be a copy of the company's response submitted on February 25, correct -- February 24, correct?

A.  Could you please zoom out just for a second just so I can see the date.  Yes.  Thank you.

Q.  The company set out its position in this response, correct?

A.  The company responds to the SEC inquiry in this response.

Q.  And BDO, the company's outside auditor, agreed with the company's position as set forth on the February 24, 2015 response, correct?

| LACMCOL3 | Horowitz - Cross | Page 620 |

A.  I don't recall.

MR. REISNER:  Let's go, Mr. Klein, to page 27 of this document.

Q.  The letter stated:  Please be advised that this letter has been reviewed by BDO USA, LLP, the company's independent audit firm, including its national office, and they agree with the accounting considerations and conclusions expressed herein.

Correct?

A.  Correct.

Q.  The letter is signed by the chief financial officer of the company, Jeff Lupinacci, correct?

A.  That is correct.

MR. REISNER:  We can take that down, Mr. Klein.

Q.  Now, during the course of preparing the response to the comment letters, Mr. Horowitz, there were discussions at Iconix about the puts and call provisions that were included in SEA-2 and SEA-3, correct?

A.  That is correct.

Q.  And those discussions included a discussion of whether the floors on the puts potentially raised accounting issues, correct?

A.  That is correct.

Q.  The accountants raised concerns that the puts with floors could have the effect of negating the joint venture sale, correct?

| LACMCOL3 | Horowitz - Cross | Page 621 |

A.  I don't recall the accountant saying that.

Q.  The accountants raised accounting concerns regarding the puts with floors, correct?

A.  I do not recall that.

Q.  On February 17, 2015, BDO asked questions about the puts and calls, percentages involved, and the business purpose of the puts, correct?

A.  I don't recall.

Q.  Do you recall that there was a great focus on the puts and calls or the ability for the partner to force Iconix to buy back 50 percent after five years or Iconix's ability to buy back the 50 percent after five years?

A.  Yes.

Q.  Do you recall that on February 17, 2015, BDO asked questions about the puts and the calls and percentages and business purpose of the puts?

A.  I do not.

MR. REISNER:  Let's place before the witness what's marked as Defense Exhibit 501 at 001.  If we can highlight for the witness what's under February 17 -- why don't we enlarge it for him, too, and highlight what's on the first line.

Q.  Does that refresh your recollection that on February 17, BDO asked about percentages and puts and calls and the company's business thoughts?

A.  It does.

| LACMCOL3 | Horowitz - Cross | Page 622 |

Q.  And you now recall that on September 17, BDO did ask about percentages and puts and calls and the company's business thoughts, correct?

A.  Yes.

MR. REISNER:  You can take that down, Mr. Klein.

Q.  Mr. Horowitz, you had negotiated the terms of those puts and calls with Mr. Margolis of GBG, correct?

A.  That is partially correct.

Q.  You recall that we looked on Friday at some e-mails between you and Mr. Margolis referring to the puts or the back stops that you were discussing.  Do you recall that?

A.  I recall the discussion of the puts and calls, yes.

Q.  Do you recall on one of the term sheets Mr. Margolis said something, in substance, hey, you forgot the put in this term sheet.  Those put and call provisions we discussed.  And you responded with a term sheet that incorporated the put and call provisions.

Do you recall that?

A.  I believe so.

Q.  Now, on February 22, Mr. Cole told you that he believed that the floors --

MR. HARTMAN:  Objection.

THE COURT:  Sustained.

MR. REISNER:  Your Honor, may we approach?

THE COURT:  Sure.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 12, 2021

LACMCOL3          Horowitz - Cross          Page 623

(Continued on next page)

LACMCOL3          Horowitz - Cross          Page 624

(At sidebar)

THE COURT: I take it the objection is hearsay?

MR. HARTMAN: That's right.

MR. REISNER: None of this is for the truth of the matter asserted. This is solely for state of mind and it's critical. It's about what Mr. Horowitz understood Mr. Cole to believe, and he was saying and what Mr. Cole believed. What's going to happen, your Honor, there is a debate between them, a discussion.

THE COURT: Put the white noise on.

MR. REISNER: There is basically a fight that occurred between Mr. Cole and Mr. Horowitz over these puts and calls and what Mr. Horowitz had told or not told Mr. Cole about them. It's not about the substance of the put and calls, whether they existed, what the terms were.

This is critical. This is what leads to the showdown between Mr. Horowitz and Mr. Cole about who knew what about these terms and ultimately Mr. Horowitz --

THE COURT: I don't know whether this gets to the truth of the matters or not. Would you not be able to form the question in a way that doesn't say that Mr. Cole said --

MR. REISNER: I'll try. But none of it is for the truth of the matter. The question is, did Mr. Cole tell you he believed the floors could impact the accounting? The truth is irrelevant.

LACMCOL3          Horowitz - Cross          Page 625

The question is Mr. Cole is -- he understood that Mr. Cole is expressing a concern about the accounting and he is saying: You knew about this. And Mr. Cole saying: No, I didn't know about it. The truth is irrelevant. This is the mindset. This is the friction that's taking place between these two individuals.

MR. HARTMAN: Judge, I think they want this to show Mr. Cole's belief. They want to elicit from Mr. Horowitz that Mr. Cole said he believed XYZ. Our position is that's hearsay. To say state of mind is just a different way of saying it's hearsay. For that reason it should be excluded.

THE COURT: It is hearsay.

MR. REISNER: I'll try to form the question differently. But, respectfully, your Honor, it is state of mind. It is not hearsay. It's the opposite of hearsay. It's state-of-mind evidence. It's not offered for the truth of the matter asserted. It is state-of-mind evidence, which is classic nonhearsay.

MR. SOLOWIEJCZYK: Your Honor, it is hearsay. It doesn't fall within the state-of-mind exception, which is narrow because, after the fact, two people that were party to this trying to characterize what they did in the past is not the same thing as a forward-looking statement. Your Honor has had this issue before, has ruled as such, and the Second Circuit has affirmed it.

LACMCOL3          Horowitz - Cross          Page 626

THE COURT: What you are about to ask about concerns stuff that they had discussed prior, correct?

MR. REISNER: It concerns --

THE COURT: About actions that had been taken.

MR. REISNER: It concerns the events on February 22 and what Mr. Cole's state of mind and what Mr. Horowitz's state of mind was at that time on that day, which is a very important, sort of core to the case here is what they were thinking on that day. The only way to know what they were thinking in part was what they were saying to each other. It's not for the truth of the matter asserted. The puts of the calls, the substance is not; it's irrelevant. This is just that these statements were made to reflect Horowitz's state of mind and Mr. Cole's state of mind. It is a classic nonhearsay. It has nothing to do with the truth of the matter asserted. It has only to do with the state of mind of these individuals at this time, on February 22.

MR. HARTMAN: Can we have a proffer of what the questions are. We can take them one by one and analyze them.

MR. REISNER: It's necessary to show that Horowitz believed that he was being blamed for something. It's our whole defense. He believed he was being blamed for something by Mr. Cole. The only way to demonstrate his belief that he was being blamed for something by Mr. Cole is to elicit the statements that led him to believe that he was being blamed for

Min-U-Script®                    Southern District Court Reporters              (28) Pages 623 - 626

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

| LACMCOL3 | Horowitz - Cross | Page 627 |
|---|---|---|

something by Mr. Cole.

MR. HARTMAN: They can ask Mr. Horowitz what he believed. He testified on direct about what he believed. What they can't do is elicit from Mr. Horowitz what Mr. Cole said for the truth of what Mr. Cole believed or the truth of what Mr. Cole's involvement, for example, in these transactions were. For example, I expect Mr. Reisner is going to ask Mr. Horowitz questions about Mr. Cole's representations at this time about things he did or didn't know with respect to these transactions. In our view, that's hearsay.

THE COURT: It's hearsay.

(Continued on next page)

| LACMCOL3 | Horowitz - Cross | Page 628 |
|---|---|---|

(In open court)

THE COURT: Whenever you are ready, Mr. Reisner.

MR. REISNER: Thank you, your Honor.

Q. Mr. Horowitz, was it your understanding on February 22 that Mr. Cole believed that the floors on the puts could impact the accounting for those transactions?

MR. HARTMAN: Objection.

THE COURT: Overruled.

A. It was my understanding that Neil had concerns about the floors and the puts.

Q. Was it your understanding that Mr. Cole believed that the floors on the puts could impact the accounting for the transactions?

A. I recall Mr. Cole expressing that to me.

Q. Was it your understanding that Mr. Cole believed that the minimum guarantees on the puts could ruin the joint venture sales?

A. I recall Neil telling me that that is how he felt.

Q. Was it also your understanding that Mr. Cole had concerns about transactions involving an individual named Kevin Yapp?

MR. HARTMAN: Objection.

THE COURT: Sustained.

Q. Mr. Horowitz, did you tell Mr. Cole that these transactions involved real brands and real assets?

MR. HARTMAN: Objection.

| LACMCOL3 | Horowitz - Cross | Page 629 |
|---|---|---|

THE COURT: Overruled.

A. Which transactions are you referring to?

MR. REISNER: Mr. Klein, let's place before the witness Defendant's Exhibit 501 at 004. If you can enlarge that and highlight what's after I.

Q. Did you tell Mr. Cole that Iconix had bought real brands and real assets?

A. I believe that I did.

MR. REISNER: We can take that down.

Q. Now, Mr. Cole criticized you for failing to consult with other members of senior management with respect to the puts and the floors on the puts in the SEA-2 and SEA-3 agreements, correct?

A. He accused me of not doing so.

Q. Mr. Cole asked you who in finance were you working with on these terms, correct?

A. I believe he may have said something to that effect.

Q. And you didn't think these questions and comments were fair, correct?

A. I thought that they were self-serving on his part.

Q. You didn't think it was fair to you, right?

A. They were outlandish questions.

Q. Mr. Cole told you he didn't remember being aware of the floor --

MR. HARTMAN: Objection.

| LACMCOL3 | Horowitz - Cross | Page 630 |
|---|---|---|

THE COURT: Sustained.

Q. -- in the SEA-2 and SEA-3 transactions?

MR. HARTMAN: Objection.

THE COURT: The objection was sustained.

Q. You and Mr. Cole had a disagreement on that topic, correct?

A. We had an argument over that topic.

Q. And this argument became heated at times, correct?

A. Neil became heated at times.

Q. Did you also become heated, Mr. Horowitz?

A. I don't believe in this scenario I did.

Q. You had a back and forth with Mr. Cole about what you had informed him about and what you had not informed him about, correct?

A. I had a back and forth with Neil about what I had told him about.

Q. And on February 23, 2015, you had what you considered a showdown with Mr. Cole, correct?

A. I believe so.

MR. REISNER: Let's place before the witness what's marked as Defense Exhibit 501 at 501-006.

Q. Mr. Cole asked you why you never told him about the floors on the puts, right?

A. I'm sorry. Can you repeat that.

Q. Mr. Cole asked you why you never told him about the floors on the puts.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

| LACMCOL3 | Horowitz - Cross | Page 631 |
| --- | --- | --- |

A. He said something to that effect.

Q. And you got angry with him, correct?

A. No, I did not get angry with him. I was frustrated.

Q. Mr. Horowitz, showing you what's in front of you, what's highlighted, does that refresh your recollection that you got angry with Mr. Cole?

A. I was angry, but not at Mr. Cole.

Q. On February 23, you wrote down the words --

MR. HARTMAN: Objection.

Q. You got angry, didn't you?

THE COURT: Sustained.

Q. On February 23, during this conversation with Mr. Cole, you got angry, correct?

A. Yes.

Q. And you explained the logic of the transactions to Mr. Cole, correct?

A. That is correct.

Q. And you told Mr. Cole that the SEA transactions were good deals, correct?

A. I believe that I did.

Q. Mr. Cole asked you who in finance you had worked on these deals with, correct?

A. I believe so.

Q. And you told Mr. Cole to stop pointing fingers at you, correct?

| LACMCOL3 | Horowitz - Cross | Page 632 |
| --- | --- | --- |

A. I said something to that effect.

Q. And you reminded him why these were good deals, correct?

A. I believe so.

MR. REISNER: We can take that down, Mr. Klein.

Q. Now, while the comment letter response was being prepared, you understood that Mr. Cole wanted certain descriptions in the draft to be changed from negotiated by the CEO, Neil Cole, and the COO, Seth Horowitz, to negotiated by COO Seth Horowitz with guidance from Neil Cole, correct?

A. I believe that it was different for each joint venture, but that is an accurate description of at least one of them.

Q. And you agreed with this, correct?

A. I believe that I did.

Q. You believed that his involvement in those transactions was consistent with other joint ventures in which the term guidance was used to describe Mr. Cole's role, correct?

A. It was close enough.

Q. Now, you and Mr. Cole continued to disagree about whether you had told him about the puts and floors -- withdrawn.

You and Mr. Cole continued to disagree about whether you had told him about the puts and the floors on the puts or not, correct?

A. I don't believe so.

Q. It was Mr. Cole's position that you had not told --

MR. HARTMAN: Objection.

| LACMCOL3 | Horowitz - Cross | Page 633 |
| --- | --- | --- |

THE COURT: Overruled.

Q. It was Mr. Cole's position that you had not been told, correct? Withdrawn.

It was Mr. Cole's position that you had not told him, correct?

A. At what point in the timeline are we discussing?

Q. February 23, February 24.

A. I just want to be clear because you said it was ongoing, and it was not.

Q. On February 24, you understood it was Mr. Cole's position that you had not told him about the puts and the floors on puts, correct?

A. At some point around that date, that is the position that Neil took.

Q. And it was your position that you had told him about that, right?

A. Yes. I then printed e-mails and showed them to him.

MR. REISNER: Mr. Klein, let's place before the witness Defendant's Exhibit 529.

Q. Now, Mr. Horowitz, on or about February 27, 2015, you thought you were being blamed unfairly for issues that the company was facing with the SEC, correct?

A. As it pertains to knowledge of puts and calls, correct.

Q. Mr. Cole told you that he thought the SEC situation was all your fault, correct?

| LACMCOL3 | Horowitz - Cross | Page 634 |
| --- | --- | --- |

MR. HARTMAN: Objection.

THE COURT: Sustained.

Q. On February 27, was it your understanding that Mr. Cole believed the SEC situation was all your fault?

MR. HARTMAN: Objection.

THE COURT: Overruled.

A. No.

Q. Let me ask the question again. On February 27, 2015, was it your understanding that Mr. Cole believed the SEC situation was all your fault?

A. No.

Q. On February 27, 2015, were you continuing to argue with Mr. Cole?

A. Is that the question?

Q. Yes.

A. On and off. Sometimes he put me under his wing and sometimes he was at me.

Q. On February 27, 2015, did you meet with Mr. Cole and David Blumberg?

A. Yes. And there may have been another person there.

Q. Was there screaming during that meeting?

A. I believe there were elevated voices. I don't recall screaming. Yes.

Q. Directing your attention to the word that has been highlighted, do you recall there being screaming?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACMCOL3          Horowitz - Cross          Page 635

MR. HARTMAN: Objection.

THE COURT: Overruled.

A. I recall there being what you can refer to as screaming or yelling, loud voices, yes.

Q. And did Mr. Blumberg call you a name?

A. Not directly, no.

Q. Did he imply that he thought you were a cowboy?

A. Yes, he did.

Q. This is the same conversation in which you understood that Mr. Cole was taking the position that this was all your fault, correct?

MR. HARTMAN: Objection.

THE COURT: Overruled.

A. No. In fact, he said it was all his fault.

Q. And based on the back and forth in this conversation, you were furious, correct?

A. Yes.

MR. REISNER: We can take that down, Mr. Klein.

Q. During this time period you thought that this somehow felt like a setup, correct?

A. Yes.

Q. You thought that Mr. Blumberg and Mr. Cole were trying to make you the bad guy, correct?

A. That was one of my concerns, yes.

Q. By on or about March 9, 2015, you believed that Mr. Cole

LACMCOL3          Horowitz - Cross          Page 636

would do or say anything to blame anyone for anything that may go wrong with the SEC response, correct?

A. He had already --

Q. Yes or no.

A. Yes.

Q. You continued to tell Mr. Cole that the joint venture transactions made great business sense, correct?

A. I don't recall if that was the case at this time.

MR. REISNER: Let's put before the witness what's marked as Defense Exhibit 538.

(Continued on next page)

LACPCOL4          Horowitz - Cross          Page 637

Q. Does that refresh your recollection that on or about March 9th, 2015, you told Mr. Cole that you did JV transactions that made great business sense?

A. Yes, it does.

Q. You also told Mr. Cole that you believed that all of these deals were done for good business purposes, correct?

A. I believe so.

Q. And when you told Mr. Cole that the joint venture transactions made great business sense, were you being truthful?

A. Partially.

Q. And when you told Mr. Cole that all of these deals were done for good business purposes, was that a truthful statement?

A. Again, partially.

Q. By March 2015, Mr. Horowitz, it was clear to you that you no longer were viewed as a potential successor to Mr. Cole as CEO of Iconix, correct?

A. I don't believe so.

Q. You didn't think your relationship with Mr. Cole could continue, correct?

A. I had great concerns about Neil Cole.

Q. Do you recall telling the government that you didn't think your relationship with Mr. Cole could continue?

A. I may have.

Q. And you wanted to ensure that Mr. Cole wouldn't try to

LACPCOL4          Horowitz - Cross          Page 638

blame you alone for the transactions, correct?

A. That is correct.

Q. And you created a series of notes to yourself during this February, March 2015 time period, correct?

A. That is correct.

Q. And there's nothing in any of those notes referring to any verbal agreement between Iconix and GBG, correct?

A. There is a -- there is at least one coded message to myself that there is.

Q. You say it was a coded message to yourself?

A. Yes.

Q. Do you remember what it said, that code said?

A. That something to the effect of Neil mentioned subsets.

Q. So these were notes to yourself and not anyone else, correct?

A. That is correct.

Q. And your testimony is you wrote something in code in notes to yourself, correct?

A. That is correct. Two days earlier --

MR. REISNER: I'm going to ask that the witness be directed not to answer a question when none is pending.

THE COURT: There was not a question before you, Mr. Horowitz.

THE WITNESS: Sorry, your Honor.

BY MR. REISNER:

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

---

LACPCOL4     Horowitz - Cross     Page 639

Q. Now, you testified that you deleted certain e-mails from your e-mail account, correct?

A. That is correct.

Q. And, Mr. Horowitz, you knew that Iconix had a corporate server, a company server that stored company e-mails, correct?

A. I didn't know the inner workings of how that data was stored.

Q. So is it your testimony that you thought that if you delete an e-mail from your own e-mail account, it was deleted permanently from the company's server? Is that your testimony?

A. I didn't give that much thought at the time, I don't believe.

Q. Are you aware of a single e-mail that was permanently deleted and couldn't be retrieved from the Iconix company server?

A. No.

Q. And we've been looking at many, many Iconix e-mails over the last few days, including e-mails captioned SEA term sheets, correct?

A. That is correct.

Q. On your direct testimony, you claim that Mr. Cole told you to get rid of certain e-mails, correct?

A. That is correct.

Q. Was anyone else present during the conversation in which you claim Mr. Cole told you to get rid of e-mails?

---

LACPCOL4     Horowitz - Cross     Page 640

A. No.

Q. Now, what Mr. Cole actually told you was to go through your e-mails and read them to better understand the terms that were agreed to, correct?

A. No, that is not correct. Those are two separate incidents.

Q. Let's place before the witness what's been marked as Defense Exhibit 538.

Did Mr. Cole tell you that you should be going through all of your e-mails, re-look at agreements and re-read everything?

A. I remember him telling me --

Q. The question is, did Mr. Cole tell you that you should go through all of your e-mails so that you understood the transactions, re-look at the agreements, and re-read everything, yes or no?

A. It's impossible for me to answer that question yes or no without a little bit of time here.

Q. Did Mr. Cole tell you that you should be going through all of your e-mails?

A. At some point, yes, Mr. Cole did say that.

Q. Did he tell you to look back at agreements?

A. He told me to look back at specific agreements.

Q. And did he tell you you should re-read everything?

A. I don't recall.

Q. Now, Mr. Horowitz -- you can take that down, Mr. Klein.

---

LACPCOL4     Horowitz - Cross     Page 641

In March of 2015, did you ask Iconix to recalculate your stock-based compensation?

A. Yes, I did.

Q. And this was sort of in the middle of the continuing swirl of the SEC corporation finance comment letter, right?

A. That is correct.

Q. And you wanted the company to award you additional compensation, correct?

A. I wanted the company to award me what I was contractually due for.

Q. You wanted the company to use a certain methodology specifically to include the Latin America JV, known as ILA, in GAAP EPS so that you would receive additional shares of compensation, correct?

A. All I wanted the company to do was to follow my agreement in the calculation of my bonus.

Q. And you took the position that you were entitled to more money, right?

A. I believed I was entitled to more stock.

Q. And Mr. Cole -- withdrawn.

You understood that Mr. Cole believed that that was not appropriate, correct?

MR. HARTMAN: Objection.

THE COURT: Overruled.

A. No.

---

LACPCOL4     Horowitz - Cross     Page 642

Q. Mr. Cole resisted your requests that there be a recalculation of EPS in order for you to receive additional stock-based compensation, correct?

A. I would say pushed back in time, that request.

Q. And that was on March 9th, 2015, correct?

A. I believe it's sometime around then.

Q. Well, let's show the witness what's marked as Defense Exhibit 1615.

Does this refresh your recollection that that conversation took place on March 9th, 2015?

A. No, it does not.

Q. Do you have any reason to think it didn't happen on March 9th, 2015?

A. Yes.

Q. This is --

MR. HARTMAN: Objection.

THE COURT: Overruled.

Q. This is an e-mail you wrote to yourself on March 9th, 2015, correct?

A. That is correct.

Q. And the subject of the e-mail is stock bonus, correct?

A. That is correct.

MR. REISNER: Your Honor, I offer Defense Exhibit 1615.

MR. HARTMAN: Objection, hearsay.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

| LACPCOL4 | Horowitz - Cross | Page 643 |
| --- | --- | --- |

THE COURT: Sustained.

MR. REISNER: We can take that down, Mr. Klein.

BY MR. REISNER:

Q. Now, you made the decision to leave Iconix on or about March 12th, 2015, correct?

A. I don't believe so.

Q. You communicated with a personal lawyer on March 12th, 2015, to discuss resigning from Iconix, correct?

A. I may have. I don't recall.

Q. And you delayed your resignation until after your third-year restricted stock units vested, correct?

A. That is correct.

Q. You understood that if you resigned before those stock units vested, you would no longer be entitled to them, correct?

A. That is correct.

Q. And so you waited until after the vesting date, correct?

A. That is correct.

Q. And the vesting date was April 2nd, 2015, correct?

A. That sounds correct.

Q. And before submitting your resignation, you began preparing a resume, correct?

A. I don't recall.

Q. Let's place before the witness what's marked as Defense Exhibit 1625. I think it's 1625 and 1625-A1.

Does that refresh your recollection that on or about

| LACPCOL4 | Horowitz - Cross | Page 644 |
| --- | --- | --- |

April 5th, 2015, you began preparing a resume?

A. I don't really recall putting together a resume at this time.

Q. And is Defense Exhibit 1625 an e-mail you sent to yourself on April 5th, 2015?

A. Yes, it is.

Q. And is the subject of that e-mail resume STRATBOLD?

A. Yes, it is.

Q. And does that refresh your recollection that you prepared a resume on or about April 5th, 2015?

A. I see the e-mail, but I don't independently recall. I don't recall putting together a resume at this time.

Q. Now, on or about April 5th, 2015 -- withdrawn.

On or about April 5th, 2015, at that time, you considered yourself to have led strategy, negotiation and consummation of global joint ventures in China, Europe, Korea and the Middle East for Iconix, correct?

A. I don't recall.

Q. Look at what's been highlighted on the screen and tell me whether that refreshes your recollection that, at that time, you considered yourself to have led strategy, negotiation and consummation of global joint ventures in China, Europe, Korea, and the Middle East for Iconix. Does that refresh your recollection?

A. It does not.

| LACPCOL4 | Horowitz - Cross | Page 645 |
| --- | --- | --- |

Q. And at that time, Mr. Horowitz, you believed that the formation of these joint ventures generated significant short-term and long-term benefits for shareholders, correct?

A. I don't recall putting together this resume.

Q. The question is, at this time, did you believe that the formation of these joint ventures generated significant short-term and long-term benefits for shareholders?

A. At that time, yes.

Q. You submitted your resignation letter on April 13th, 2015, correct?

A. I believe that's the date.

Q. And you sent it by e-mail to Mr. Cole and the Iconix board of directors, correct?

A. That is correct.

Q. And you initially attempted to resign on April 6th, 2015, correct?

A. It was sometime around then.

Q. And your plan at that time was to give the company 60 days' notice, correct?

A. I don't recall.

Q. Let's place before the witness what's marked as Defense Exhibit 1912 for identification, and let's highlight the second-to-last line.

Does that refresh your recollection that you planned to give 60 days' notice when you attempted to resign on

| LACPCOL4 | Horowitz - Cross | Page 646 |
| --- | --- | --- |

April 6th?

A. It does not.

Q. And is this a copy of the resignation letter that you initially prepared on or about April 6th?

A. It appears to be, but I'm not sure.

MR. REISNER: Your Honor, I offer Defense Exhibit 1912.

MR. HARTMAN: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1912 received in evidence)

MR. REISNER: May I publish it to the jury?

THE COURT: You may.

BY MR. REISNER:

Q. And on April 6th, Mr. Horowitz, Mr. Cole did not accept your resignation, correct?

A. There's more to it, but that's correct.

Q. On April 6th, Mr. Cole did not accept your resignation, correct?

A. That is correct.

Q. He told you to take some time away from the office and reconsider, correct?

A. That is one of the things he told me.

Q. But you, nevertheless, decided to resign, correct?

A. Are you referring to that date or a later date? Just to be clear.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    **October 12, 2021**

| LACPCOL4 | Horowitz - Cross | Page 647 |
|---|---|---|

Q. Notwithstanding what Mr. Cole said to you and you said to him on April 6th, you thereafter decided to resign; is that correct?

A. That is correct.

Q. You can take that down, Mr. Klein.

And you submitted your resignation letter on April 13th, 2015, correct?

A. I believe so.

Q. And before you submitted your resignation letter, you communicated with personal lawyers that you had hired, correct?

A. Yes.

Q. And your lawyers provided you with the legal advice regarding your resignation on March 12th, 2015, and then again nearly every day from April 6th through April 13th of 2015, correct?

A. I believe you're mixing two different lawyers.

Q. Let's place before the witness what's marked as Defense Exhibit 1707.

MR. REISNER: If I could have just one moment, your Honor?

(Pause)

BY MR. REISNER:

Q. Mr. Horowitz, I want to direct your attention to entry No. 96 on the document in front of you. On March 12th, 2015, did you communicate with your lawyer concerning legal advice

| LACPCOL4 | Horowitz - Cross | Page 648 |
|---|---|---|

regarding resignation in anticipation of litigation or regulatory proceedings?

A. I don't recall, but it appears that I did.

Q. I want to direct your attention to entries 101 --

MR. HARTMAN: Your Honor, we object to this line of questioning. I think there's a 401 and 403 issue. I think there's also an issue with respect to the witness' foundation.

THE COURT: If you want to use this document to refresh his recollection, Mr. Reisner, you can do that, but --

MR. REISNER: Very well, your Honor.

THE COURT: -- get him to say he doesn't remember something.

MR. REISNER: I understand, your Honor.

BY MR. REISNER:

Q. Mr. Horowitz, do you recall communicating with your personal lawyers on April 6th concerning legal advice in anticipation of litigation or regulatory proceedings? Do you recall that?

A. I recall meeting with my --

Q. Do you recall that, yes or no?

A. Not in its totality, no.

Q. Now, directing your attention to the entries 101, 102 and 103, does that refresh your recollection that on April 6th, 2015, you communicated with your personal lawyers concerning legal advice in anticipation of litigation or regulatory

| LACPCOL4 | Horowitz - Cross | Page 649 |
|---|---|---|

proceedings?

A. Yes.

Q. Mr. Horowitz, do you recall that on April 7th you communicated with your personal lawyers concerning legal advice in anticipation of legal or regulatory proceedings, yes or no? Do you recall that?

A. Yes.

Q. And you did, correct?

A. Correct.

Q. Mr. Horowitz, do you recall that on April 8th, you communicated with your personal lawyers concerning legal advice in anticipation of legal or regulatory proceedings? Do you recall, yes or no?

A. I believe so.

Q. Yes, you recall it?

A. Yes.

Q. Mr. Horowitz, do you recall that on April 11th, you communicated with your personal lawyers concerning legal advice in anticipation of legal or regulatory proceedings, yes or no? Do you recall that?

A. Yes.

Q. Mr. Horowitz, do you recall on April 12th, you communicated with your personal lawyers 25 separate times --

MR. HARTMAN: Objection.

Q. -- concerning legal advice in anticipation of legal or

| LACPCOL4 | Horowitz - Cross | Page 650 |
|---|---|---|

regulatory proceedings?

THE COURT: Overruled.

A. I don't recall specifically how many times.

Q. Directing your attention to the entries 116 through --

MR. HARTMAN: Objection.

Q. -- 140, does that refresh your recollection --

THE COURT: Overruled.

Q. Does that refresh your recollection that on April 12th, you communicated with your personal lawyers 25 separate times concerning legal advice in anticipation of legal or regulatory proceedings?

A. I'm sorry?

Q. Does that refresh your recollection, yes or no?

A. On my screen, I can only see something 138. Would you please go back? I apologize. A lot of screens.

Q. 116 through 140.

A. If you could just give me a second.

Q. Keep scrolling down.

A. Yes.

Q. You don't have to highlight it, just keep on scrolling down for the witness through 140.

And the question is: Does that refresh your recollection that on April 12th, you communicated with your personal lawyers 25 separate times concerning legal advice in anticipation of legal or regulatory proceedings; yes or no?

UNITED STATES OF AMERICA, v.
NEIL COLE,
October 12, 2021

| LACPCOL4 | Horowitz - Cross | Page 651 |
|---|---|---|

A. Yes, I --

Q. Mr. Horowitz, on April 13th, did you communicate with your personal lawyers 19 separate times concerning legal advice in anticipation of legal or regulatory proceedings? Do you recall, yes or no?

A. This includes e-mails, yes.

Q. So you recall that on April 13th, you communicated with your personal lawyers 19 separate times concerning legal advice in anticipation of legal or regulatory proceedings, correct?

A. I recall approximately that number, correct.

Q. You can take that down, Mr. Klein.
Mr. Horowitz, your goal in connection with these meetings was to best position yourself in connection with possible litigation or regulatory proceedings, correct?

A. No.

Q. You did not want to be blamed for things that may go wrong with the company's SEC comment letter process, correct?
I'll ask the question again. You did not want to be blamed for things that may go wrong with the company's SEC comment letter process, correct?

A. That is correct.

Q. Can we please place before the witness what's marked -- what's in evidence as Government Exhibit 1197. Government Exhibit 1197, not Defense Exhibit 1197. If we could scroll down for the witness.

| LACPCOL4 | Horowitz - Cross | Page 652 |
|---|---|---|

That's a copy of your resignation letter dated April 13th, 2015, correct?

A. That is correct.

Q. In your resignation letter, you stated that you wanted to bring to the attention of Mr. Cole and the board certain accounting issues, correct?

A. That is correct.

Q. You did not state in your letter that you had done anything wrong or anything illegal, correct?

A. Correct.

Q. In your April 13th resignation letter, you did not say that Mr. Cole had told you, in a conversation, that he agreed to make a future marketing payment to GBG, correct? You didn't say that in your resignation letter, right?

A. Not specifically.

Q. You didn't say any -- withdrawn.
Did you say that you had been told in a conversation by Mr. Cole that he had agreed to make a future marketing payment to GBG? Did you say anything in that letter referring to a conversation with Mr. Cole, yes or no?

A. No.

Q. And prior to submitting your resignation letter, you never expressed concerns to anyone at Iconix about the negotiation of the SEA-2 or SEA-3 transactions, correct?

A. That is correct.

| LACPCOL4 | Horowitz - Cross | Page 653 |
|---|---|---|

Q. And you worked directly with several lawyers at Iconix, correct?

A. That is correct.

Q. You worked with Mr. Schaefer, right?

A. At times, yes.

Q. You worked with Ms. Gee at times, correct?

A. That is correct.

Q. You worked with Ms. Alford, correct?

A. That is correct.

Q. You didn't tell any of them about any supposed verbal agreement related to SEA-2, correct?

A. That is correct.

Q. And you also worked with outside lawyers at the Blank Rome law firm and the Gibson, Dunn law firm, correct?

A. Indirectly, correct.

Q. And you didn't tell any of those outside lawyers about any supposed verbal agreement related to SEA-2, right?

A. That is correct.

Q. And while at Iconix, you had the ability to communicate directly with the audit committee of the board of directors, correct?

A. That is correct.

Q. And prior to the allegations in your resignation letter of April 13th, you didn't tell the audit committee about any supposed verbal agreement relating to SEA-2, correct?

| LACPCOL4 | Horowitz - Cross | Page 654 |
|---|---|---|

A. That is correct.

Q. And you were aware that Iconix had a fraud hotline where complaints could be made anonymously, correct?

A. No, not correct.

Q. You didn't make any complaints to the Iconix fraud hotline, correct?

A. I wasn't aware of one.

Q. We can take that down, Mr. Klein.
Now, Mr. Horowitz, less than two weeks after submitting your resignation letter on April 13th, you demanded additional money from Iconix, correct?

A. I don't recall.

Q. A lawyer, acting on your behalf, demanded immediate payment of a bonus equal to one hundred percent of your base salary, correct?

A. I don't recall.

Q. Let's place before the witness what's marked as Defense Exhibit 1634 and 1634-A1.
That's an e-mail sent by your lawyer to the lawyers for Iconix on April 17th, 2015, correct?

A. It appears the e-mail above is from Robert Mittman.

Q. Let me draw your attention to the e-mail at the bottom of the page of 1634. That's an e-mail sent by --

MR. HARTMAN: Objection to describing the document that's not in evidence.

# A-231

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACPCOL4    Horowitz - Cross    Page 655

MR. REISNER: I'm just doing basic -- laying a foundation.

MR. HARTMAN: If you want to offer it, we object.

BY MR. REISNER:

Q. Directing your attention to Defense Exhibit 1634, do you recognize that e-mail as an e-mail sent --

MR. HARTMAN: Objection.

Q. -- by your lawyer --

MR. HARTMAN: Objection.

THE COURT: Overruled.

Q. -- to a lawyer for Iconix, correct?

THE COURT: You can answer.

A. It's from an attorney representing me, to an outside attorney that represented Iconix.

Q. So it's an e-mail from an attorney that represents you, to an attorney that represents Iconix, correct?

A. That is correct.

Q. And does that refresh your recollection that on or about April 22nd, 2015, a lawyer, on your behalf, demanded that Iconix provide for immediate payment to you a bonus equal to one hundred percent of your base salary?

A. No.

Q. Are you denying that on or about April 17th, 2015, a lawyer, on your behalf, demanded that Iconix make immediate payment to you of a bonus equal to one hundred percent of your

LACPCOL4    Horowitz - Cross    Page 656

base salary? Are you denying that?

A. Yes. I do not see it as a demand.

Q. Does it refresh your recollection that a lawyer on your behalf requested --

MR. HARTMAN: Objection, your Honor, asked and answered.

THE COURT: He hasn't gotten to the end of the question yet.

Q. Does it refresh your recollection that a lawyer, on your behalf, requested that Iconix provide for the immediate payment to you of a bonus equal to one hundred percent of your base salary?

A. I do not recall that.

Q. Are you denying that it happened?

A. I'm not denying that that happened.

Q. And on April 17th, 2015, a lawyer, on your behalf, also asked again that the company recalculate EPS so that you could receive additional performance-based stock warrants or PSUs, correct?

A. To the extent that I was contractually due, correct.

Q. A lawyer made that request on your behalf to Iconix, correct, that all performance stock units be recalculated for your benefit, correct?

A. That it be recalculated accurately, correct.

Q. You can take that down, Mr. Klein.

LACPCOL4    Horowitz - Cross    Page 657

Now, Mr. Horowitz, you're aware that after your resignation, an investigation was conducted by a special committee of the Iconix board of directors, correct?

A. That is correct.

Q. And the lawyers for the special committee conducting the investigation asked to speak with you, correct?

A. I believe so.

Q. And you refused to speak with them, correct?

A. I don't recall.

Q. Your testimony is you don't recall refusing to speak to the lawyers for the special committee conducting the investigation?

A. I did not speak with them, but I don't recall refusing to speak with them.

Q. Well, you were aware that your lawyers spoke with the special committee on your behalf, correct? You're aware of that, right, Mr. Horowitz?

A. I believe so.

Q. And you met with the lawyers to help them prepare for their conversation with the special committee, correct?

MR. HARTMAN: Objection.

THE COURT: Sustained.

Q. Can we place before the witness what's marked as Defendant's Exhibit 1673. In particular, the page with the last three digits 007, and enlarge it so the witness can see it clearly.

LACPCOL4    Horowitz - Cross    Page 658

Mr. Horowitz, on October 22nd, 2015 --

MR. HARTMAN: Objection. I think this is covered by the ruling on the prior question.

THE COURT: Ladies and gentlemen, it's now 2:40; so we'll end for the day. Please be safe getting home. Do not discuss the case amongst yourselves or with anyone else, and do not read or see anything about the case if you do encounter it.

Please try to be on time tomorrow so we can get started at 9:30. Have a wonderful evening.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

THE WITNESS: Thank you, your Honor.

(Witness temporarily excused)

THE COURT: Can we see that document again, or can I see that document again?

MR. REISNER: Mr. Klein, can you display that document for the judge, please.

THE COURT: What is it?

MR. REISNER: It's a text message string from Mr. Horowitz to others, your Honor.

Andy, just highlight and enlarge the one that's relevant so the Judge can see it.

It starts, "My SEC attorneys need to spend time with me today and most of tomorrow. It's unexpected, to say the least."

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 12, 2021

LACPCOL4     Horowitz - Cross     Page 659

And the purpose of this, your Honor, is that we need to establish that Mr. Horowitz spoke with his attorneys before those attorneys made certain representations to the special committee on his behalf. You'll recall, we've discussed this earlier. We have evidence that Mr. Horowitz's lawyers made a series of statements to the special committee along the lines of Mr. Horowitz believes he acted appropriately, Mr. Horowitz didn't do anything he thought was wrong, Mr. Horowitz didn't think there were any problems with these transactions.

And we want to confront Mr. Horowitz with those statements that his lawyers made on his behalf to the special committee. In order for those statements to have meaning and for us to be able to tie them to Mr. Horowitz, we need to make it clear that Mr. Horowitz had discussions with his lawyers right before they made those representations, and this e-mail allows us to do it -- this text message allows us to do it.

THE COURT: Mr. Hartman?

MR. HARTMAN: Judge, I think my understanding is the Court sustained the prior question, which was whether Mr. Horowitz spoke with his attorneys, because the inference the defense is asking the jury to draw is that during Mr. Horowitz's communications with his lawyers, he communicated the information that they then communicated to the special committee.

Our view is that's improper. It invites the jury to

LACPCOL4     Horowitz - Cross     Page 660

speculate about a privileged conversation about which there won't be any evidence. They can certainly ask Mr. Horowitz if he knows what his lawyers told the special committee, but to the extent he says he doesn't know or he doesn't have any recollection of that, I think they're stuck with their answer.

THE COURT: I think that's right. I mean, there's any number of ways, Mr. Reisner, that you can get at this. You can ask him, you know, whether his attorneys met with the special committee, and is he aware of what his attorneys told the special committee, and did you meet with your attorneys prior to that meeting. I mean, all of that is perfectly appropriate. But you're getting a little close to --

MR. REISNER: Okay. I will limit it to the questions that you just suggested, your Honor.

MR. HARTMAN: Judge, the only one we have concern about is the: Did you meet with your attorneys prior to the meeting?

THE COURT: There's nothing improper about that question.

MR. HARTMAN: Okay.

THE COURT: Okay? Anything else?

MR. REISNER: Nothing further, your Honor.

MR. HARTMAN: Judge, just with respect to that. To the extent Mr. Horowitz says he doesn't know or doesn't recall what his attorneys conveyed, it certainly would be fine for

LACPCOL4     Horowitz - Cross     Page 661

Mr. Reisner to show Mr. Horowitz the notes and see if that refreshes his memory.

We do have some concern about the fact that there appears to be a pattern of reading, or making clear to the jury what is in these documents that are being used to refresh. We'd ask the Court to instruct the defense that, to the extent they want to use those notes to refresh Mr. Horowitz, they should just put them in front of him and allow him to review them.

THE COURT: I think that's right. I think, Mr. Reisner, you're getting a little close to reading from the documents, if you are not actually reading from the documents, which in fact you are. So be a little bit more careful. My working assumption is that you know what you're doing and that you are doing it on purpose.

So be a little bit more discrete in front of the jury with respect to the documents that you're using to refresh his recollection.

MR. REISNER: Understood, your Honor. I'm just trying to keep it moving along.

THE COURT: I get that. Okay. Anything else?

MR. HARTMAN: No, your Honor. Thank you.

THE COURT: Okay.

MR. REISNER: Nothing further, your Honor. Thank you.

(Adjourned to October 13, 2021, at 9:00 a.m.)

Page 662

INDEX OF EXAMINATION

Examination of:              Page
SETH HOROWITZ
Cross By Mr. Reisner . . . . . . . . . . . . . 516

DEFENDANT EXHIBITS

Exhibit No.             Received
1908   . . . . . . . . . . . . . . . . . . . 517
1908-A1 and 1908-A1-N   . . . . . . . . . . 518
1909   . . . . . . . . . . . . . . . . . . . 523
1279   . . . . . . . . . . . . . . . . . . . 525
1283   . . . . . . . . . . . . . . . . . . . 526
1286   . . . . . . . . . . . . . . . . . . . 527
1300   . . . . . . . . . . . . . . . . . . . 534
1408   . . . . . . . . . . . . . . . . . . . 541
1329   . . . . . . . . . . . . . . . . . . . 542
1329-A1   . . . . . . . . . . . . . . . . . 543
1344   . . . . . . . . . . . . . . . . . . . 545
1349   . . . . . . . . . . . . . . . . . . . 547
1310 and 1310-A1 . . . . . . . . . . . . . . 550
1143   . . . . . . . . . . . . . . . . . . . 560
415   . . . . . . . . . . . . . . . . . . . . 568
1407   . . . . . . . . . . . . . . . . . . . 569
1917   . . . . . . . . . . . . . . . . . . . 574
1212 and 1212-A1 . . . . . . . . . . . . . . 575
1271   . . . . . . . . . . . . . . . . . . . 577

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

---

LADPCOL1        Page 664

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.             19 CR 869 (ER)

NEIL COLE,

        Defendant.      Trial
------------------------------x

                 New York, N.Y.
                 October 13, 2021
                 9:00 a.m.

Before:

           HON. EDGARDO RAMOS,

                 District Judge
                 -and a Jury-

             APPEARANCES

AUDREY STRAUSS
      United States Attorney for the
      Southern District of New York
BY:   NOAH SOLOWIEJCZYK
      SCOTT HARTMAN
      ANDREW M. THOMAS
      Assistant United States Attorneys

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
      Attorneys for Defendant
BY:   LORIN L. REISNER
      RICHARD C. TARLOWE
      ANDREW D. REICH.
      AMANDA WEINGARTEN
      ALYSON A. COHEN

Also Present:
      Robert Hupcher, FBI
      Micah Gill, Paralegal
      Peter Charalambous, Paralegal
      Frank Eng, Paralegal

---

LADPCOL1     Horowitz - Cross     Page 665

(Trial resumed; jury not present)

THE COURT: Is there anything that the parties wish to raise?

MR. HARTMAN: Judge, the only thing we wanted to flag is we expect the next witness to be Mr. Rabin, who's testifying pursuant to a compulsion order, and so we may need to take a short break after Mr. Horowitz so that Mr. Rabin can invoke.

THE COURT: Very well. If there's nothing else to raise, you don't even have to be here for the next half hour.

MR. HARTMAN: Thank you, your Honor.

(Recess)

THE COURT: Can we get Mr. Horowitz, please.

(Pause)

(Jury present)

THE COURT: Everyone, please be seated. Ladies and gentlemen of the jury, good morning. I trust you all had a pleasant evening.

We will now continue with the cross-examination of Mr. Horowitz, who is reminded that you are still under oath.

THE WITNESS: Thank you.

MR. REISNER: May I proceed, your Honor?

THE COURT: You may.

SETH HOROWITZ, (resumed)

CROSS-EXAMINATION

BY MR. REISNER:

---

LADPCOL1     Horowitz - Cross     Page 666

Q. Mr. Horowitz, at the end of the trial day yesterday, I asked you whether you were aware if your lawyers spoke with the special committee of the Iconix board of directors on your behalf. Do you remember that question being asked?

A. Yes.

Q. And you told me that you believe you were aware that your lawyers spoke with the special committee on your behalf, correct?

A. I believe that is what I said.

Q. Now, the conversation between your lawyers and the special committee took place after you had resigned from Iconix, correct?

A. That is correct.

Q. And at or around the time your lawyers had this conversation with the special committee, were you aware of what your lawyers told the special committee on your behalf?

A. I don't believe so. Oh, could you repeat the question, please? I'm sorry.

Q. Sure. At or around the time that your lawyers had this conversation with the special committee, were you aware of what your lawyers told the special committee on your behalf?

A. Yes, I was.

Q. Did you meet with your lawyers prior to their meeting with the special committee?

A. Yes, I did.

---

LADPCOL1     Horowitz - Cross     Page 667

Q. When your lawyers spoke with the special committee on your behalf, your lawyers were emphatic that you did not think you were doing anything wrong, correct?

A. I don't recall.

Q. Your lawyers told the special committee that you were transparent in negotiating the joint venture transactions, correct?

A. I don't recall.

Q. Your lawyers told the special committee that you didn't think you were doing anything inappropriate at the time the transactions were negotiated and executed, correct?

A. I don't recall.

Q. Your lawyers told the special committee that it was your view that the increase in the SEA-2 purchase price was arrived at through a business negotiation, correct?

A. I don't recall.

Q. Can we please place before the witness what's marked as Defendant's Exhibit 548 for identification.

I'm going to ask you to read that document to yourself, Mr. Horowitz.

(Pause)

A. I have read the document.

Q. Does that document refresh your recollection about what your lawyers told the special committee on your behalf?

A. It does not.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 13, 2021

LADPCOL1          Horowitz - Cross          Page 668

Q. Can you take that down, Mr. Klein.

Now, Mr. Horowitz, in the August 2015 time period, just a few months after leaving Iconix, you spoke to private investors about Iconix, correct?

A. I don't recall.

Q. In the August 2015 time period, were you trying to encourage certain private investors to consider a purchase of Iconix?

A. I don't recall that.

Q. In the August 2015 time period, did you speak with an individual named Lew Frankfort about a possible acquisition of Iconix?

A. Not that I recall.

Q. Mr. Frankfort is -- withdrawn.

Mr. Frankfort is with an investment firm called the The Benvolio Group, correct?

A. That is correct.

Q. And in August 2015, you sent Mr. Frankfort excerpts from Iconix's earnings call for the second quarter of 2015, correct?

A. I don't recall.

Q. Can we please place before the witness what is Defendant's Exhibit 1644.

And do you recognize that as an e-mail that you sent on or about August 11th, 2015?

A. Yes.

LADPCOL1          Horowitz - Cross          Page 669

Q. And does it refresh your recollection that on or about August 11th, 2015, you sent Mr. Frankfort excerpts from the Iconix earnings call for the second quarter of 2015?

A. No, it does not.

MR. REISNER: Your Honor, I offer Defense Exhibit 1644.

MR. HARTMAN: Objection, relevance.

THE COURT: May I see the parties at sidebar.

(Continued on next page)

LADPCOL1          Horowitz - Cross          Page 670

(At the side bar)

THE COURT: This is after he left Iconix. What is the relevance of this?

MR. REISNER: One of the things that we intend to argue, your Honor, is one of the reasons he left Iconix was to try to hatch a plan to acquire Iconix with the support of investment bankers and hedge funds after he left, and this e-mail is the first step towards doing that, and there will be a couple of other documents as well.

MR. HARTMAN: Judge, I'm just looking at the document. We haven't seen this before today.

MR. REISNER: It was produced.

MR. HARTMAN: It was produced in discovery, but it wasn't marked beforehand. It appears to be an excerpt from the earnings call. Mr. Horowitz sent it to this person, Frankfort, who I think he will testify is an advisor of his.

THE COURT: Who will testify, Mr. Horowitz?

MR. HARTMAN: Mr. Horowitz will testify. He said he doesn't remember this.

THE COURT: Is this the Coach guy?

MR. HARTMAN: Yes.

MR. REISNER: If you recall, your Honor, this is the same Mr. Frankfort that he was communicating with in 2011 when he had the idea of trying to acquire Iconix. Now, he's trying to do it again.

LADPCOL1          Horowitz - Cross          Page 671

THE COURT: So what? So you're saying that at the time that he was at Iconix, this was being hatched?

MR. REISNER: One of the reasons he left Iconix was not because of some concerns about wrongdoing, but he thought it would be financially advantageous for him to leave Iconix and then try to acquire Iconix, both because it was financially advantageous and as a method of getting back at Mr. Cole.

THE COURT: Okay. Mr. Hartman?

MR. HARTMAN: Judge, argue that there is no foundation for that. He said he doesn't remember this. This document itself doesn't indicate that in any way. If they have other things to support that argument, that would make this relevant, the argument is it would come in, but absent that, it doesn't seem to go to that issue at all.

THE COURT: As I understand his testimony thus far, he doesn't remember this, he doesn't recall. Correct?

MR. REISNER: That is his testimony so far, your Honor, but I think the document itself contradicts his lack of recollection directly.

THE COURT: Okay. I'll admit it subject to connection.

(Continued on next page)

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADPCOL1     Horowitz - Cross     Page 672

(In open court)

THE COURT: Defendant's Exhibit 1644 will be received.

(Defendant's Exhibit 1644 received in evidence)

BY MR. REISNER:

Q. Now, Mr. Horowitz, in August of 2015, you were also involved in communications with representatives of an investment firm called Sycamore Partners about Iconix, correct?

A. I don't recall.

Q. Sycamore Partners is a private equity firm, correct?

A. That is correct.

Q. And the founder of Sycamore Partners is Stefan Kaluzny, correct?

A. He was the principal there. I'm not sure if he was the founder.

Q. And Mr. Frankfort also was associated with Sycamore, correct?

A. I believe so.

Q. Mr. Frankfort was an executive in residence, correct?

A. I don't know.

Q. And you provided information about Iconix to Mr. Frankfort to pass on to Mr. Kaluzny, correct?

A. Not that I recall.

Q. Let's place before the witness what's marked as Defendant's Exhibit 1645.

I want you to read that document to yourself,

LADPCOL1     Horowitz - Cross     Page 673

Mr. Horowitz.

And, Mr. Klein, this is a multiple-page document, and so that the witness has the chance to see the entire document, can you please display the second two pages of the document.

A. Sorry, would you please go back one page? Thank you.

(Pause)

Okay. Thank you.

Q. Have you had an opportunity to look at the document?

A. I have. Thank you.

Q. And directing your attention to the first page of the document, it's an e-mail that you sent August 18th, 2021, correct?

A. That is correct.

Q. Does that document refresh your recollection that you provided information about Iconix to Mr. Frankfort so that he could pass on to Mr. Kaluzny?

A. It does not.

MR. REISNER: Your Honor, I offer Defense Exhibit 1645.

MR. HARTMAN: Your Honor, subject to the same objection.

THE COURT: Very well. It will be received subject to connection.

(Defendant's Exhibit 1645 received in evidence)

BY MR. REISNER:

LADPCOL1     Horowitz - Cross     Page 674

Q. Now, in the August 2015 time period, you understood that Sycamore was evaluating the possibility of buying Iconix or making an investment in Iconix, correct?

A. I just don't recall.

Q. In August 2015, you wanted to assist Sycamore in its evaluation of Iconix for possible purchase, correct?

A. No, not that I recall.

Q. In August of 2015, you hoped that you could become the CEO of Iconix if Sycamore bought Iconix, correct?

A. No, not that I recall.

Q. You were hoping to get an equity stake in Iconix, just like back in 2011, correct?

A. No.

Q. And Mr. Frankfort wanted you to provide your thoughts on Iconix for him to pass along to others at Sycamore, correct?

A. Not that I recall.

Q. Did you provide any additional information for Mr. Frankfort to pass on to Sycamore, correct?

A. Not that I recall.

Q. Did you provide information to Mr. Frankfort as to whether Iconix securitizations included the recently acquired IP?

A. Not that I recall.

Q. If you provided information to Mr. Frankfort as to whether certain Iconix securitizations included recently acquired IP, that would be information you knew from working at Iconix,

LADPCOL1     Horowitz - Cross     Page 675

correct?

A. I don't know.

(Continued on next page)

# A-236

LADMCOL2          Horowitz - Cross          Page 676

Q. Did you make suggestions to Mr. Frankfurt on how Iconix's organic growth should be modeled?

A. Not that I recall.

Q. Did you suggest to Mr. Frankfurt that joint venture revenue should be removed to model the company's organic growth more accurately?

A. Not that I recall.

Q. In the August 2015 time period, did you believe that excluding joint venture revenues provided a more accurate measure of the company's organic growth?

A. I believe that I did.

MR. REISNER: We can take that down, Mr. Klein.

Q. Your employment agreement with Iconix had a confidentiality provision, correct?

A. I believe that it did, but I'm not certain.

MR. REISNER: Can we please place before the witness what's in evidence as Defense Exhibit 1025-A1 and go to page 0013, please.

Your Honor, may we publish this to the jury? It's in evidence.

Q. Mr. Horowitz, your employment agreement provided confidentiality. The executive shall not divulge to anyone, either during or at any time after the term, any information constituting a trade secret or other confidential information acquired by him concerning the company, any subsidiary or any

LADMCOL2          Horowitz - Cross          Page 677

other affiliate of the company except in the performance of his duties hereunder. Then it goes on.

That's what it says in part, correct?

A. That is what it says.

Q. Did you understand that this confidentiality obligation survived the termination of your employment by Iconix?

A. I did not have an understanding or give it thought at that time.

Q. Did you read your employment agreement at or around the time you signed it?

A. Yes.

Q. Did you understand that the confidentiality provision applied either during or at any time after the term of your employment? Did you understand that?

A. I don't recall if I understood that at the time.

MR. REISNER: We can take that down, Mr. Klein.

Q. Iconix also had a policy that prohibited you from passing material nonpublic information related to the company to others, correct?

A. I don't know.

MR. REISNER: Can we please place before the witness what's marked as Defense Exhibit 1151-A1.

Let's scroll through some pages so that the witness has a sense of what this document is.

Q. Take as much time as you need, Mr. Horowitz.

LADMCOL2          Horowitz - Cross          Page 678

Have you had an opportunity to look at the document?

The question is, does that refresh your recollection that Iconix had a policy that prohibited you from passing material nonpublic information relating to the company to others?

A. It does not, but I am aware of my obligation to not pass along material nonpublic information.

Q. You did not receive authorization from Iconix to speak with Mr. Frankfurt or Sycamore or any other investors about Iconix, correct?

A. Correct.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, you had conflicts with your bosses in each of your last three jobs, correct?

A. No, that's not correct.

Q. When you worked at Modell's, you had run ins with the CEO, Mr. Modell, correct?

A. We had different opinions on direction.

Q. You left that job because you were angry and resentful of Mr. Modell, correct?

A. Not correct.

Q. Mr. Modell called you little Mussolini, correct?

A. I don't recall him saying that.

Q. And you thought the Modell family was greedy and ungrateful, correct?

LADMCOL2          Horowitz - Cross          Page 679

A. In a certain context, that is correct.

Q. With respect to Iconix, you thought Mr. Cole was an unworthy person, correct?

A. No.

MR. REISNER: Can we please place before the witness what's marked for identification as Defense Exhibit 1651-A2.

Why don't you highlight starting at the second line in the middle.

Q. Does that refresh your recollection that you viewed Mr. Cole as an unworthy person?

A. No, it does not.

MR. REISNER: We can take that down, Mr. Klein.

Q. When you left Baked by Melissa, the owner of the company, the president, refused to provide you with a reference letter, correct?

A. That is correct.

Q. And you understood that she refused because she thought you were dishonest, correct?

A. That is not correct.

Q. She accused you of deliberately lying to her, correct?

A. I believe she did.

Q. And you were deliberately dishonest with the owner, the president of Baked by Melissa, correct?

A. That is correct.

Q. You were in the middle of a federal criminal investigation

LADMCOL2    Horowitz - Cross    Page 680

while serving as CEO of the company and you didn't tell her, correct?

A. That is correct.

Q. She told you that you seemed distracted and you told her everything was fine, correct?

A. I don't recall that specifically, but something to that effect.

Q. And that was dishonest, correct?

A. Yes.

Q. And you could have resigned from the company, correct?

A. Sure.

Q. And you didn't, right?

A. That is correct.

Q. Mr. Horowitz, in October 2018, you knew that the SEC enforcement division told your lawyers that you had significant exposure, correct?

A. I don't recall.

Q. The SEC told your lawyers that you might be well placed to be a cooperating witness, correct?

A. I don't recall.

Q. Sometime in the October, November of 2018 time period you knew that your lawyers were contacted by prosecutors from the U.S. Attorney's Office, correct?

A. Yes. I'm not certain of the time period.

Q. And you understood that the prosecutors envisioned a

LADMCOL2    Horowitz - Cross    Page 681

cooperation agreement path for you, correct?

A. No.

MR. REISNER: Can we please place before the witness what's marked as Defense Exhibit 3539-013.

MR. HARTMAN: Judge, there is a technology issue, and we are not able to see what's being put on the screen. I don't know if there are copies that the defense can provide.

Mr. Reisner, can you give us the number again.

MR. REISNER: Sure. 3539-013.

MR. HARTMAN: Thank you.

Q. Read that document to yourself, Mr. Horowitz.

A. I've read it.

Q. Does that document refresh your recollection that in or about the November 2018 time period you understood that the prosecutors envisioned a cooperation agreement path for you?

A. I knew it was a possibility. I don't recall the use of the word envisioning or the words envisioning as a path.

MR. REISNER: We can take that down, Mr. Klein.

Q. And you met with prosecutors and representatives of the SEC on December 10, 2018, correct?

A. I don't recall the specific date.

MR. REISNER: Can we please put up for the witness Defendant's Exhibit 3539-020 for identification.

Q. Does that document refresh your recollection that you met with representatives of the U.S. Attorney's Office and the SEC

LADMCOL2    Horowitz - Cross    Page 682

on December 10, 2018?

A. Specifically as it relates to December 10, it does not.

Q. Do you deny that you met with the prosecutors and the SEC on December 10, 2018?

A. No, I do not deny that.

MR. REISNER: You can take that down, Mr. Klein.

Q. At some point around that time you remember meeting with the prosecutors and the SEC, correct?

A. That is correct.

Q. And you understood that the purpose of that meeting was for the government to evaluate the information you provided and determine whether to offer you a cooperation agreement, correct?

A. That is not correct.

Q. You spent hours with the prosecutors at this meeting that you recall, is that correct?

A. That is correct.

Q. Since December 2018, you've met with the prosecutors either in person or by video conference more than 30 times, correct?

A. That sounds correct.

Q. In fact, you've met with the government 36 times between December 10, 2018 and the beginning of this trial, correct?

A. I don't recall the exact number.

MR. REISNER: Let's please place before the witness what's marked as Defense Exhibit 2012. I think it's a two-page

LADMCOL2    Horowitz - Cross    Page 683

document, so let's make sure the witness can see both pages.

Q. Does that document refresh your recollection that between December 10, 2018 and the beginning of this trial you met with the prosecutors 36 times?

A. It does not refresh a recollection of the exact number of 36, but I have already stated that it is likely I met with them more than 30 times.

Q. You are not denying that you met with the prosecutors 36 times, correct?

A. I am not denying that.

Q. Some of those meetings, some of those individual meetings lasted several hours, correct?

A. That is correct.

Q. And in the last few weeks you've met with the government about nine times, correct?

A. I'd say I met with them approximately that amount of times over the last month or so.

Q. Between September 8, 2021 and October 4, you met with the prosecutors nine separate times, correct?

A. If you are asking for a specific number, I do not recall the specific nine times.

Q. You are not denying that you have met with the prosecutors nine separate times between September 8 and October 4 of this year, correct?

A. That is correct.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL2 | Horowitz - Cross | Page 684 |
|---|---|---|

MR. REISNER: We can take that down, Mr. Klein.

Q. During some of these meetings the prosecutors went over the questions you would be asked at trial, correct?

A. I don't believe so.

Q. During these meetings you went through most of the questions that you were asked on direct examination, correct?

A. I don't know.

Q. You didn't hear most of those questions for the first time on the witness stand during direct examination, correct?

A. It was subject matters that I had been asked about, but I don't recall if the questions were new or not.

Q. You had been asked those questions or very similar questions many times by the prosecutors, correct?

A. I have been asked many questions many times by the prosecutors.

Q. No. You were asked those questions in substance that you were asked on direct by the prosecutors many times before your direct examination, correct?

A. I don't know.

Q. Is it fair to say that you rehearsed your testimony during the meetings with the prosecutors?

A. No.

Q. Mr. Horowitz, you tried to memorize key portions of your testimony, correct?

A. No.

| LADMCOL2 | Horowitz - Cross | Page 685 |
|---|---|---|

Q. And during your meetings with the prosecutors you also practiced questions you might be asked on cross-examination, correct?

A. That is correct.

Q. And at some point in 2019, the prosecutors told you that you would be offered a cooperation agreement, correct?

A. Yes.

Q. And you signed a cooperation agreement with the government on December 2, 2019, correct?

A. I believe that date is correct.

Q. And you pled guilty pursuant to that cooperation agreement, correct?

A. That is correct.

Q. Now, under the cooperation agreement, if you provide substantial assistance to the government, your understanding is that the government will write a 5K1 letter on your behalf, is that correct?

A. That is not my full understanding.

Q. Let me ask the question again, Mr. Horowitz. Is it your understanding that if you provide substantial assistance to the government, the government will write a 5K1 letter on your behalf? Yes or no.

A. I don't recall the term substantial assistance.

MR. REISNER: Now, let's place before the witness what's in evidence as Government's Exhibit 1514. Let's show

| LADMCOL2 | Horowitz - Cross | Page 686 |
|---|---|---|

the witness page 4, the bottom of the page. 3539-071. It's page -- I apologize. It's page 3 of the agreement. Down at the bottom. Can we highlight the beginning of that sentence.

Q. Mr. Horowitz, does that refresh your recollection that the government has undertaken to file a 5K1 letter on your behalf if you provide substantial assistance in the investigation or prosecution of this matter?

A. Yes, it does.

MR. REISNER: You can take that down, Mr. Klein.

Q. And you expect that a 5K1 letter would result in a lower sentence for you, correct?

A. I would hope so.

Q. In fact, you hope it results in no jail sentence at all, correct? That is your hope.

A. Yes, that is my hope.

Q. And you understand that the government decides whether to write the 5K1 letter, correct?

A. I believe that is correct.

Q. And you understand that the government decides whether you provided substantial assistance, correct?

A. Substantial --

Q. Substantial assistance. You understand that the government decides whether you provided substantial assistance in an investigation or prosecution, correct?

A. That is correct.

| LADMCOL2 | Horowitz - Cross | Page 687 |
|---|---|---|

Q. And you understand that it's the government that decides whether to tell the sentencing judge that you have been truthful or untruthful, correct?

A. Yes.

Q. You don't expect to testify at any other trials, correct?

A. Not that I'm aware of, as I sit here today.

Q. And the government has asked to postpone your sentencing several times until you testify in this case, correct?

A. I believe that is true.

Q. And you want the government to be happy with your testimony, correct?

A. No.

Q. Your cooperation agreement also protects you against further prosecution related to these matters, correct?

A. I believe so.

Q. It provides that you will not be further prosecuted for these matters, correct?

A. I believe so.

Q. And you entered the cooperation agreement with the government because you thought it would serve your interests, correct?

A. It's part of the reason.

Q. You are trying to help yourself, correct?

A. Partially.

Q. Mr. Horowitz, on January 17, 2014, you withdrew $9,000 in

# A-239

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL2 | Horowitz - Cross | Page 688 |
|---|---|---|

cash from your personal bank account at Citibank, correct?

A. I don't recall.

MR. REISNER: Let's place before the witness, please, what's been marked as Defense Exhibit 2079. Can we please scroll to the page marked DX-2079-003. Can you please highlight the January 17 entry down below.

Q. Does that refresh your recollection that on January 7, 2014, you withdrew $9,000 in cash from your bank account at Citibank?

A. No, it does not.

Q. Are you denying that on January 17, 2014, you withdrew $9,000 in cash from your bank account at Citibank? Are you denying that?

A. I'm not denying that.

Q. Mr. Horowitz, on July 14, 2014, you withdrew $8,010 in cash from your bank account at Citibank, correct?

A. I don't recall.

MR. REISNER: Let's please place before the witness what's marked as Defense Exhibit 2079-B and scroll to the page 2079-B003. Please highlight the entry for July 14.

Q. Does that refresh your recollection that on July 14, 2014, you withdrew $8,010 in cash from your bank account at Citibank?

A. No, it does not.

Q. Are you denying that on July 14, 2014, you withdrew $8,010 in cash from your bank account at Citibank?

| LADMCOL2 | Horowitz - Cross | Page 689 |
|---|---|---|

A. No, I am not.

Q. Mr. Horowitz, on August 12, 2014, you withdrew $8,010 again in cash from your bank account at Citibank, correct?

A. I don't recall.

Q. And on August 7, 2014 and August 18, 2014, you withdrew a total of $11,000 in cash in separate withdrawals of $6,000 and $5,000, correct?

A. Not that I recall.

MR. REISNER: Let's please place before the witness what's been marked as Defense Exhibit 2079C. If you can scroll to the page that ends 003 and highlight the entries for August 7, August 12, and August 18.

Q. Does that refresh your recollection that on August 12, 2014, you withdrew $8,010 in cash from your bank account at Citibank?

A. No, it does not.

Q. Are you denying that occurred?

A. No, I am not.

Q. Does looking at this document refresh your recollection that on August 7 and August 18, 2014, you withdrew $11,000 in cash in two separate transactions, one for $6,000 and one for $5,000? Does that refresh your recollection?

A. No it does not.

Q. Are you denying that took place?

A. No, I am not.

| LADMCOL2 | Horowitz - Cross | Page 690 |
|---|---|---|

MR. REISNER: You can take that down, Mr. Klein.

Q. Mr. Horowitz, on October 3, 2014 --

MR. HARTMAN: Your Honor, can we have a sidebar on this?

THE COURT: Sure.

(Continued on next page)

| LADMCOL2 | Horowitz - Cross | Page 691 |
|---|---|---|

(At sidebar)

MR. HARTMAN: Judge, we let some of these questions be asked. I don't know how many there are.

MR. REISNER: Two more.

MR. HARTMAN: This is completely irrelevant. There is nothing improper about Mr. Horowitz withdrawing money. I'll note that his wife is actually on the account as well, so there is no basis to conclude that it was he that withdrew the money, as opposed to his wife. The only probative information here is Mr. Horowitz withdraws a lot of cash from the bank. I haven't heard any factual predicate that goes to his credibility or anything else.

THE COURT: Mr. Reisner.

MR. REISNER: Yes, your Honor. We have two more instances in which Mr. Horowitz withdrew amounts of cash in either $9,000 or $8,000 or in two separate combined transactions for less than $10,000 that equaled greater than $10,000 very close together. This all appears to have been done for the obvious purpose of avoiding the filing of a currency transaction report with the treasury department as required for withdrawals of over $10,000.

It is probative of character of untruthfulness and admissible under Rule 608(b) for three separate reasons:

First, it demonstrates that he was not truthful with the government when they asked him about issues that could

# A-240

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL2 | Horowitz - Cross | Page 692 |
| --- | --- | --- |

raise questions about his integrity. We do not believe that Mr. Horowitz disclosed any of these large cash withdrawals to the government prior to trial.

Second, it is evidence of deceptiveness and untruthfulness because seeking to avoid the filing of a currency transaction report with the treasury department is itself evidence of character for untruthfulness, and there are cases so holding.

MR. HARTMAN: Mr. Reisner, can you lower your voice.

MR. REISNER: Third, Mr. Horowitz's lawyers have told the government that some of this money was for drugs. We want to know the amount that was for drugs because it may be inconsistent about the type and frequency of drug purchases and drug use that the witness has disclosed to the government.

To be clear, we will not refer to the personal-conduct issue we have previously discussed with the Court.

THE COURT: I'm sorry. You have been told that Mr. Horowitz's lawyers advised the government that some of this money was used for narcotics.

MR. HARTMAN: Can we confer for just a second?

THE COURT: Sure.

MR. HARTMAN: Judge, first of all, there is no predicate to establish that Mr. Horowitz knew about the filing requirement, which I think would be a requirement to establish structuring. They haven't asked him any questions about that.

| LADMCOL2 | Horowitz - Cross | Page 693 |
| --- | --- | --- |

I don't know what he would say to that question.

Second of all, we don't know whether there was a currency transaction report filed. There is no indication in the proffer of whether there was or wasn't one filed.

Third of all, this is purely speculative with respect to a claim that he was somehow structuring some of these transactions dates apart. I don't know what the rules are that the banks have about cash withdrawals and how that works.

There is just simply not a factual predicate for this, and our view is that it's prejudicial precisely for the reasons that defense argued that we shouldn't be able to bring up evidence about Mr. Cole's personal wealth. Really, all it does is show that Mr. Horowitz is someone who can go to the bank and withdraw $9,000.

THE COURT: The mere fact of having a sufficient amount in your bank account to withdraw large sums is obviously not relevant. However, I think a sufficient proffer has been made, given the amounts that Mr. Horowitz was withdrawing and those amounts in order to avoid the reporting requirements.

Mr. Hartman is also correct, however, that we don't know yet whether in fact Mr. Horowitz knows about the reporting requirements. So you'd have to establish that. But at this point I am not going to preclude further inquiry into the issue.

MR. REISNER: Thank you, your Honor.

| LADMCOL2 | Horowitz - Cross | Page 694 |
| --- | --- | --- |

(In open court)

MR. REISNER: May I proceed, your Honor?

THE COURT: You may.

Q. Mr. Horowitz, on October 3, 2014, you withdrew $9,000 in cash from your bank account at Citibank, correct?

A. I don't recall.

MR. REISNER: Let's please place before the witness what's marked as Defense Exhibit 2079-D and go to the page with the last three digits 003 and please highlight the October 3 entry.

Q. Does that refresh your recollection that on October 3, 2014, you withdrew $9,000 in cash from your Citibank bank account?

A. It does not.

Q. Are you denying that occurred?

A. I'm not denying that.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, on May 11, 2015, you withdrew $8,000 in cash from your bank account at Citibank, correct?

A. I don't recall.

MR. REISNER: Can we please place before the witness what's marked as Defense Exhibit 2079-F and scroll to the page that ends with the digits 003 and highlight the May 11 entry.

Q. Does that refresh your recollection that on May 11, 2015, you made a cash withdrawal from your bank in the amount of

| LADMCOL2 | Horowitz - Cross | Page 695 |
| --- | --- | --- |

$8,000?

A. No, it does not.

Q. Do you deny that that occurred?

A. No, I do not.

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, on January 26, 2016, you withdrew $8,500 in cash from your bank account at Citibank, correct?

A. I don't recall.

MR. REISNER: Can we please place before the witness what's marked as Defense Exhibit 2079-J. Can we please scroll to the page that ends with the digits 003 and highlight the January 26 entry.

Q. Does that refresh your recollection that on January 26, 2016, you made a cash withdrawal from your Citibank account of $8,500?

A. No, it does not.

Q. Are you denying that took place?

A. No, I am not.

Q. Mr. Horowitz, in your 36 meetings with the government, between December 2018 and the start of this trial, you didn't tell the government about any large cash withdrawals from your account, correct?

A. Assuming that was the number of meetings, I don't recall us having any discussions or being asked any questions about withdrawals.

# A-241

| LADMCOL2 | Horowitz - Cross | Page 696 |
|---|---|---|

Q. And you claim that some of these cash withdrawals were for keeping cash at home, correct?

A. That is correct.

Q. You claim that your financial adviser at UBS told you to keep cash at home, correct?

A. That is correct.

Q. And your bank accounts are at Citibank, correct?

A. Some of them were at Citibank.

Q. And you have investment accounts at UBS, correct?

A. At the time, yes.

Q. And your testimony is that your financial adviser at UBS advised you to keep large amounts of cash at home rather than at the bank. That's your testimony?

A. My testimony is that our UBS adviser told us to keep cash at home and to make regular withdrawals.

Q. You claim that some of the cash withdrawals were to buy gold, correct?

A. No.

Q. You also claim that some of the money was for drugs, correct?

A. Correct.

Q. How much of the money do you think was for drugs?

A. I don't recall.

Q. What types of drugs?

A. Marijuana.

| LADMCOL2 | Horowitz - Cross | Page 697 |
|---|---|---|

Q. Anything else?

A. No.

Q. Now, Mr. Horowitz, you're aware, and you were aware in 2014 and 2015 and 2016, that if you withdraw $10,000 or more in cash at one time, the bank has to file a report with the treasury department, correct?

A. No.

Q. Your testimony is, you didn't know that the bank was required to file a currency transaction report for withdrawals of over $10,000. That's your testimony.

A. I knew there was some importance to the $10,000 number, but I was not aware of what it was.

Q. You knew there was some significance to the withdrawal of $10,000 or more, correct?

A. That is correct.

Q. And you knew that had to do with federal regulations, correct?

A. No.

Q. You knew that had to do with legal requirements, correct?

A. No.

Q. You knew that had to do with some regulatory requirement, correct?

A. I did not know what it had to do with. I just knew that it was a number that we were supposed to withdraw less than.

Q. On January 17, 2014, did you withdraw $9,000 in cash from

| LADMCOL2 | Horowitz - Cross | Page 698 |
|---|---|---|

the bank with the purpose of keeping that amount under $10,000?

A. I don't recall.

Q. On July 14, 2014 --

MR. HARTMAN: Objection, your Honor.

THE COURT: Sustained.

Q. Mr. Horowitz, are you familiar with the term structuring?

A. I'm familiar with the word structuring. I don't know in what reference you are referring to.

Q. Do you know that it's a crime to structure cash transactions in order to avoid triggering the $10,000 reporting requirement?

A. No.

Q. But you knew that $10,000 was the number that you were supposed to keep these cash withdrawals under, correct?

A. That's what I was advised to do.

Q. Now, Mr. Horowitz, you're the type of person who can know what is right and not do it, correct?

A. In general terms, I believe so.

Q. Mr. Horowitz, you feel a thrill when doing something knowingly wrong, correct?

A. No.

MR. REISNER: Mr. Klein, can we please place before the witness what's been marked as Defense Exhibit 3539-001.

Q. Why don't you take a moment to look at that.

MR. REISNER: If we can highlight the first line,

| LADMCOL2 | Horowitz - Cross | Page 699 |
|---|---|---|

please.

Q. Mr. Horowitz, that's a handwritten note --

MR. HARTMAN: Objection.

THE COURT: Sustained.

Q. Mr. Horowitz, do you recognize that document?

A. I do.

MR. HARTMAN: Objection.

Q. Is it in your handwriting?

A. I'm sorry.

Q. Is it in your handwriting?

A. Yes, it appears to be in my handwriting.

Q. Did it reflect your thoughts at the time you wrote it?

A. I don't recall.

Q. Let me ask again. Did it reflect your thoughts at the time you wrote it?

MR. HARTMAN: Objection. Asked and answered.

THE COURT: Sustained.

Q. Do you dispute that it reflected your thoughts at the time you wrote it?

A. I don't know.

Q. And you wrote it at a time no earlier than October 2015, correct?

A. I believe that is true.

MR. REISNER: Your Honor, I offer Defense Exhibit 3539-053.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 13, 2021

| LADMCOL2 | Horowitz - Cross | Page 700 |
|---|---|---|

MR. HARTMAN: Objection. Hearsay.

THE COURT: Sustained.

MR. REISNER: May we be heard, your Honor?

THE COURT: You may.

(Continued on next page)

| LADMCOL2 | Horowitz - Cross | Page 701 |
|---|---|---|

(At sidebar)

MR. REISNER: Your Honor, this is admissible, a straightforward application of Rule 803(3) of the Federal Rules of Evidence which permits the admissibility of existing mental conditions, including a witness' then existing state of mind. This was a statement clearly, all we have to do is look at it, of what Mr. Horowitz was thinking in the present at that time. Under United States v. DeMaria, 727 F.2d 265 (2d Cir. 1984), this document is admissible under Rule 803(3) of the Federal Rules of Evidence as evidence of a witness' then existing state of mind.

MR. HARTMAN: Judge, I don't think they have established the factual predicate for state-of-mind exception. He hasn't said that it reflected his thinking at the time. The document itself does not establish that. Some of the questions they are asking, for example, they asked, do you get a thrill of doing something you know is wrong? That's not what the note says. It references the thrill of doing something you know is wrong. It doesn't say anything about his personal state of mind. It's also improper character propensity evidence. This doesn't go to his character or truthfulness. We don't know when this note was generated. We don't know whether it's relevant to the case or not. And there is no factual predicate for it.

MR. REISNER: Your Honor, it's obvious, it reflects

| LADMCOL2 | Horowitz - Cross | Page 702 |
|---|---|---|

his state of mind. All you have to do is look at the document. He said it's in his handwriting. It was produced to us by the government as 3500 material for this witness, and he said that he prepared it at a time after October 2015.

What this reflects, your Honor, is that this is a person, this witness testifying right now is a person who gets a thrill out of doing things he knows are wrong. It says it right on the face of the document and it says, also -- I don't have it in front of me. But the first --

MR. SOLOWIEJCZYK: Can you bring it up, actually.

MR. REISNER: Yes. We can provide a hard copy.

What Mr. Tarlowe is telling me is this exception is used all the time for out-of-court declarants. There is no requirement that there would be testimony from the witness that it reflects his state of mind. You can look at the document and see that the document reflects the individual's state of mind.

What the first sentence says is: I know it's right. Why don't I do it. If I stop such things tomorrow, how does that make me feel? And it goes down to say: What will I miss about the thrill of doing something knowingly wrong.

This is a witness who knows what's right and doesn't do it. This is a witness who gets a thrill out of doing something wrong, like testifying falsely at a federal trial.

MR. SOLOWIEJCZYK: Your Honor, I think there is a lot

| LADMCOL2 | Horowitz - Cross | Page 703 |
|---|---|---|

of reasons to keep this out. The very simple one is this. As your Honor is very familiar with, the state-of-mind exception, it doesn't swallow every statement that anybody has ever made about their state of mind. They are saying that this is from October 2015.

THE COURT: Not earlier than.

MR. SOLOWIEJCZYK: Or not earlier.

MR. REISNER: That is what you told us.

MR. SOLOWIEJCZYK: There is no evidence to suggest this is his state of mind while this conspiracy is actually ongoing.

No. 1, it's not a forward-looking statement. No. 2, his state of mind after he resigned from Iconix, why is that coming in in this case? How does that fit into the state of mind exception? It doesn't.

MR. REISNER: It's his state of mind right now.

MR. HARTMAN: You can't document his state of mind.

MR. REISNER: I can. If I say you're the type of person that does it.

MR. HARTMAN: That's propensity.

MR. REISNER: It's not propensity.

MR. SOLOWIEJCZYK: DeMaria doesn't say that you can get in somebody's state of mind as they are sitting on the witness stand. The whole point what their state of mind -- it has to be a forward-looking statement of what their state of

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL2 | Horowitz - Cross | Page 704 |
| --- | --- | --- |

mind was when this stuff was happening, not just, oh, this is my state of mind at the moment I'm on the witness stand.

MR. REISNER: That's just wrong. DeMaria says exactly that if the remark is something of what the witness was thinking in the present, it's admissible. When he wrote this, this is what he was thinking at the present.

MR. HARTMAN: Judge, in DeMaria, I know this case. It's a guy who is stopped by the cops and he says something extemporaneously about what's going on. The conduct is ongoing when he makes the statement. That's not what this is.

THE COURT: There are, I think, insufficient indicia of the circumstances under which this was made such that, in combination with the arguments from the government, lead me to conclude that it should not come in.

MR. REISNER: Thank you, your Honor.

(Continued on next page)

| LADMCOL2 | | Page 705 |
| --- | --- | --- |

(In open court)

MR. REISNER: We can take that down, Mr. Klein.

Q. Mr. Horowitz, testifying falsely about Mr. Cole would advance your goal of fighting back against Mr. Cole that you've been harboring for more than nine years, correct?

A. Not correct.

Q. Your deal with the government protects you from further prosecution in this matter and rewards you for your testimony, correct?

A. I don't believe that it rewards me for my testimony.

MR. REISNER: No further questions at this time, your Honor.

THE COURT: Ladies and gentlemen, we are about ten minutes short of our first break. However, so that everyone can get themselves situated, we will take our first break now. Be prepared to come back at ten minutes after the hour.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

THE WITNESS: Thank you.

THE COURT: Twenty minutes, folks.

(Recess)

THE COURT: Can you bring Mr. Horowitz in, please.

(Jury present)

THE COURT: Ladies and gentlemen, we will now proceed with the redirect examination of Mr. Horowitz.

| LADMCOL2 | Horowitz - Redirect | Page 706 |
| --- | --- | --- |

Mr. Hartman.

MR. HARTMAN: Thank you, your Honor.

REDIRECT EXAMINATION
BY MR. HARTMAN:

Q. Mr. Horowitz, do you remember being asked questions about a letter that you drafted where you referred to fighting back about Mr. Cole?

A. I do.

MR. HARTMAN: Could we put that up, Mr. Charalambous. That's Defense Exhibit 1023-A1.

Q. Mr. Horowitz, you were asked questions about this second or third full paragraph here that begins however.

Do you remember being asked those questions?

A. I do.

Q. Mr. Reisner did not ask you about the first paragraph of this letter, did he?

A. I don't believe that he did.

Q. Can you read the first sentence here.

A. I am completely confused by your directions and actions.

Q. What does it say next to it?

A. Below are just a few examples.

Q. Mr. Horowitz, do you remember what this letter was or why you were drafting it?

A. I believe I was writing a letter to kind of express my feelings and sending it to myself.

| LADMCOL2 | Horowitz - Redirect | Page 707 |
| --- | --- | --- |

Q. Did you ever give it to Mr. Cole?

A. I don't believe so.

Q. Can you read the next paragraph that begins three weeks ago.

A. Three weeks ago, when I was asked to look through the budgeted numbers, and I responded with a $5 million approximate discrepancy and shortfall, you called me into your office and yelled and screamed, if these are the fucking numbers, then go upstairs and start fucking firing people, quote.

I had many take aways from this interaction. No. 1, there are 12 people in the entire department and the entire payroll, including me, of the people on this team is under $2 million annually and, as such, is an absurd comment. 2. I better do something to drive revenue to make up for the accurately depicted shortfall. Then we were discussing hiring someone to do PR and to help in other marketing functions. Again, I was challenged with, quote, finding the 160,000 in revenue to justify the hire. You also recently had me in your office and said, what are you going to do about Ed Hardy? It's a fucking disaster. All three of these instances made it sound as if I better take action and quickly.

Q. Mr. Horowitz, what are you describing here?

A. Interactions that I had with Neil Cole.

Q. Do you recall Mr. Cole saying, what are you going to do about Ed Hardy, it's a fucking disaster?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 13, 2021

| LADMCOL2 | Horowitz - Redirect | Page 708 |
| --- | --- | --- |

A. Yes.

Q. When he said that, what did you understand him to mean by that?

A. That the business was in a quickly declining state.

Q. Now, the next paragraph is the paragraph that Mr. Reisner had you read, is that right?

A. I don't recall.

Q. This is the paragraph that says: I was told, relax, take your time, calm down. It doesn't matter.

Do you see that?

A. Yes, I do.

Q. Why were you writing this letter to Mr. Cole?

A. Because I was writing this letter to Mr. Cole because I was confused by his actions and felt as if he was being borderline abusive.

MR. HARTMAN: Let's look at the next line after this part that's highlighted here, Mr. Charalambous.

Q. Can you read that, Mr. Horowitz.

A. Please do not yell, scream, and curse at me about the numbers if I am not given the authority to do something about it.

Q. When you said the numbers here, what were you referring to, Mr. Horowitz?

A. The financial results of the men's business.

Q. Now, at the bottom of the paragraph or the page you lay out

| LADMCOL2 | Horowitz - Redirect | Page 709 |
| --- | --- | --- |

two options. You were asked about this on cross.

Do you remember this, ignore it or fight back?

A. Yes, I do.

Q. What did you mean when you said fight back?

A. To stand up to Neil.

Q. What do you mean, stand up to Neil?

A. Instead of just taking his cursing and screaming, to his face, in the middle of his wrath, tell him to stop.

Q. Did you mean falsely implicating him in federal crimes?

A. No.

Q. Did you mean yourself pleading guilty to five federal felonies?

A. No.

Q. Did you mean testifying falsely under oath in a federal court?

A. No.

MR. HARTMAN: You can take this down.

Q. Mr. Horowitz, you were asked some questions on cross about the Lee Cooper transaction. Do you recall those questions?

A. I do.

Q. Just remind us at a high level, the Lee Cooper Europe transaction, what was that about?

A. It was a potential transaction, as I don't believe it ever occurred.

Q. What was the concept?

| LADMCOL2 | Horowitz - Redirect | Page 710 |
| --- | --- | --- |

A. The concept was that we would form some type of joint venture with GBG for the Lee Cooper brand in Europe.

MR. HARTMAN: Now, let's look at Defense Exhibit 1185, please.

Q. Mr. Horowitz, you were shown this document on cross as well.

Do you remember this?

A. Yes, I do.

Q. There is a reference here to getting them to a total of 44 total value.

Do you see that?

A. Yes, I do.

Q. Then there is a reference to the JV for 22 million.

Do you see that at the top?

A. Yes, I do.

Q. In parens next to that it says: 10 million bottom line for Iconix.

Do you see that?

A. Yes, I do.

Q. What are you describing in this e-mail?

A. I'm sorry. Can you repeat that.

Q. What is the structure of the deal that you are describing here?

A. The structure of the deal that I am describing at this point is a joint venture.

| LADMCOL2 | Horowitz - Redirect | Page 711 |
| --- | --- | --- |

Q. And it has these three components that Mr. Reisner asked you about on cross, is that right?

A. Yes, that is correct.

Q. When you say 10 million bottom line for Iconix, do you understand what that means?

A. Yes.

Q. What does that mean?

A. It means $10 million of revenue for Iconix.

Q. So we are talking about a $22 million with $10 million of revenue, is that right?

A. That is correct.

Q. Why was it that it was only $10 million worth of revenue?

A. Because the Lee Cooper portion that was being contemplated did not drive any revenue or result in any revenue, but the Korea and Europe men's brands would result in approximately $10 million of revenue.

Q. At any time in the negotiations over this Lee Cooper transaction, whether it was in April or May or June or July or August, September, November, December, at any time, was it conceptualized that the Lee Cooper portion, the Europe Lee Cooper portion would generate revenue for Iconix?

A. No.

Q. Why not?

A. Because the portion of the Lee Cooper brand that we were going to sell was less than 50 percent.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL2 | Horowitz - Redirect | Page 712 |
|---|---|---|

Q. You testified about the significance of that. You testified on direct, but remind us.

A. My understanding was that in order for Iconix to recognize revenue in a joint venture transaction, it needed to sell 50 percent or more of its equity for IP.

MR. HARTMAN: Let's look at Defense Exhibit 1199. Let's zoom in.

Q. Mr. Horowitz, you were asked about this document as well on cross. Can you just read the e-mail again. Just read it out loud.

A. Neil, we hit a few road bumps today with the LF amendment for Europe, but we have a situation. Because we own 51 percent of the Europe JV, we cannot amend that JV to include the new brands in a manner where we take the gain. However, we can (1) amend the Southeast Asia JV to extend the rights of Ecko Unlimited, Zoo York, Ed Hardy, etc. to include European distribution for $10 million (gain) and (2) amend the Europe JV to include Lee Cooper (because we are only selling 49 percent) for $12 million. It is neutral to our cost basis.

Q. Mr. Horowitz, when you talk about the thing under bullet point 1, what transaction are you describing there?

A. I'm describing the joint venture in June.

Q. Is that what would become SEA-2?

A. Yes, it is.

Q. And the gain that's described there is how much?

| LADMCOL2 | Horowitz - Redirect | Page 713 |
|---|---|---|

A. $10 million.

Q. With respect to point 2, amending the Europe JV to include Lee Cooper for $12 million, you say that's neutral to our cost basis. What does that mean?

A. That the amount we were going to sell was not greater or less than the amount that we had it valued at.

Q. What implications, if any, did that have for the revenue that would be generated through the sale of the interest in Lee Cooper for Europe?

A. There would not be any revenue.

Q. And this is you telling Mr. Cole this in May of 2014, is that right?

A. That is correct.

Q. So as of May 2014, how much revenue are you projecting for these two pieces of the deal, the Lee Cooper and the Southeast Asia?

A. $10 million.

MR. HARTMAN: Let's look at Government Exhibit 1031, please. Sorry. Government Exhibit 1031.

First of all, Mr. Charalambous, can you put up Government Exhibit 1031 next to Defense Exhibit 1198.

Q. Mr. Horowitz, do these appear to be the same e-mail?

A. They do.

Q. Do you see that the times are different?

A. Yes, I do.

| LADMCOL2 | Horowitz - Redirect | Page 714 |
|---|---|---|

Q. Do you know why that is?

A. I believe there is some kind of time difference in how e-mails are stored, like a time zone.

Q. A time zone difference?

A. I believe so.

MR. HARTMAN: Can we see the attachments to both of these, Mr. Charalambous.

Q. Mr. Horowitz, do these appear to be the same attachments as well?

A. Yes, they do.

Q. In fact, if you look in the lower right-hand corner there is a number.

Do you see that?

A. Yes, I do.

Q. GBG 0005695?

A. I do.

Q. Is that the same for both these documents?

A. Yes, it is.

MR. HARTMAN: Mr. Charalambous, let's take down the defense exhibit and let's just look at the attachment for the government exhibit.

Q. Mr. Horowitz, this is as of May 2, is that right?

A. That is the date on the document.

Q. So this is almost two months before the transaction ultimately closes, is that right?

| LADMCOL2 | Horowitz - Redirect | Page 715 |
|---|---|---|

A. That is correct.

Q. And you saw on cross some e-mails about a phone call you had with Mr. Margolis. I think that was around June 13.

Does that sound right to you?

A. That does.

Q. So this is several weeks before that, is that right?

A. That is correct.

Q. At this point the total value of the transaction is listed here as $25 million.

Do you see that? Ballpark.

A. I do.

Q. What is the purchase price that is being contemplated for the Korea portion of the joint venture?

A. $3.7 million.

Q. What is the purchase price that's being contemplated for the Europe portion of the joint venture?

A. $7.6 million, approximately.

Q. What is the purchase price that's being contemplated for the Lee Cooper portion of the joint venture?

A. $14 million, approximately.

MR. HARTMAN: Let's look at the bottom part, Mr. Charalambous.

Q. There is two steps that are set out here.

Do you see that?

A. Yes, I do.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADMCOL2    Horowitz - Redirect    Page 716

Q. Explain what the steps are.

A. These two steps are, No. 1, to form the joint venture for Korea and the men's brands in Europe as step 1 for $11.3 million, and step 2, which is listed as Q3 or Q4, laying out the rights for Li & Fung to become our 49 percent partner in Lee Cooper in Europe.

Q. Step 1, it says in Q2. What does that mean?

A. In the second quarter.

Q. Remind us when the second quarter ends.

A. It ends on June 30.

Q. The next one says Q3 and Q4. What's being represented there?

A. Any time between July and December.

Q. So as of May 2, at least, this term sheet suggests that the Lee Cooper portion may not happen in the second quarter, is that right?

A. That is correct.

Q. And the deal price for the Southeast Asia joint venture is $11 million, is that right, 11.3?

A. That is correct.

Q. Let's look at Government Exhibit 1032, which is an e-mail in evidence from you to Mr. Cole on the same day. Can you read that.

A. Worked with Jason and Jared this afternoon. Proposed the Korea and non Lee Cooper EU transactions first with their right

LADMCOL2    Horowitz - Redirect    Page 717

to do LC in second half at predetermined price. Would get us $12 million gross, 9.5 net this quarter. They think they can get it through. We will see. See you later.

Q. And what are you explaining to Mr. Cole here?

A. That the transaction for the second quarter will happen for the Korea and non Lee Cooper EU part of the deal and that the Lee Cooper portion of the deal, they would have the right to do in the second half.

Q. When you say would get us 12 million gross, 9.5 net this quarter, what are you telling Mr. Cole?

A. That they would -- that GBG would pay approximately $12 million, and we would recognize about nine and a half million of revenue.

Q. And this is May 2, is that right?

A. That is correct.

Q. Do you see anywhere a statement that you made indicating that you thought the nine and a half million was too small for this deal?

A. No.

Q. Do you remember thinking that the nine and a half million was too small for this deal --

MR. REISNER: Objection. Leading.

Q. -- at this time.

THE COURT: Overruled.

A. Not at this time.

LADMCOL2    Horowitz - Redirect    Page 718

MR. HARTMAN: Let's look at Defense Exhibit 1205, which is an e-mail from May 6.

Q. You were asked about this document on cross as well, Mr. Horowitz. Do you remember --

MR. HARTMAN: Let's look at the attachment, Mr. Charalambous. It's 1205-A1.

Q. Mr. Horowitz, what's the total deal price that's being contemplated as of this term sheet?

A. $24.9 million, approximately.

Q. What is the purchase price for Korea, as contemplated by this term sheet?

A. 3.3 million.

Q. What is the purchase price for the non Lee Cooper brands in Europe, as contemplated by this term sheet?

A. 7.6 million.

Q. What is the purchase price for SEA-2 contemplated by this term sheet?

A. Approximately 10.9 million.

Q. What is the purchase price for the Lee Cooper brand in Europe that's contemplated by this term sheet?

A. Approximately 14 million.

MR. HARTMAN: And then let's look at the bottom, please.

Q. Mr. Horowitz, what's being reflected here?

A. Step 1 of the transaction and a step 2 and two alternatives

LADMCOL2    Horowitz - Redirect    Page 719

within step 1.

Q. As of this term sheet on May 6, does it appear that this transaction is being envisioned as being two separate steps?

A. Yes.

Q. For the portion of the transaction that became SEA-2, what is the purchase price reflected in this term sheet?

A. Approximately 10.9 million.

MR. HARTMAN: Let's look at Government Exhibit 1208. We can see this next to Defense Exhibit 1213.

Q. Mr. Horowitz, do these appear to be the same e-mail other than the time difference?

A. Yes, they do.

Q. And the e-mail says: Attached is the term sheet as of May 2. They have told us they are going to do the whole transaction in Q2. This term sheet contemplates the Lee Cooper portion in the back half.

This is May 14, is that right?

A. That is correct.

MR. HARTMAN: Let's look at the attachment, Mr. Charalambous.

Q. Mr. Horowitz, what's the price in the term sheet for the Korea brands?

A. 3.3 million.

Q. What's the price in the term sheet for the non Lee Cooper Europe brands?

# A-247

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL2 | Horowitz - Redirect | Page 720 |
| --- | --- | --- |

A. 7.6, approximately, million.

Q. What does that add up to?

A. Approximately 10.9 million.

Q. What's the price in the term sheet for the Europe Lee Cooper interest?

A. Approximately 14 million.

MR. HARTMAN: Take this down, Mr. Charalambous. Let's look at Government Exhibit 1036.

Q. Mr. Horowitz, can you read the e-mail from Lauren Gee at the bottom of the page.

A. In connection with the amendment of the SEA JV, attached please find drafts of the following documents. Amendment No. 1 to the master license agreement; amendment No. 1 to the shareholders agreement of Iconix SE Asia limited (F/K/A Lion Network Limited); and side letter regarding the consideration payable in respect of the transaction. The Europe and Turkey Lee Cooper participation documents are being drafted and will follow under separate cover.

Q. Mr. Horowitz, do you have an understanding of what she means when she says the Europe and Turkey Lee Cooper participation documents are being drafted and will follow under separate cover?

MR. REISNER: Objection. Foundation.

THE COURT: Overruled.

A. Yes, I do.

| LADMCOL2 | Horowitz - Redirect | Page 721 |
| --- | --- | --- |

Q. What is your understanding?

A. My understanding is that there are documents being prepared to reflect Europe and Turkey participation agreement between Iconix and GBG.

Q. Do you know whether that was a separate contract entirely?

A. Yes, it was.

MR. HARTMAN: Let's look at the second page here, Mr. Charalambous, of this document. Can you zoom in on the third whereas paragraph right there, whereas in recognition of.

Q. Mr. Horowitz, as of May 8, how much is the purchase price that's being contemplated for the SEA-2 joint venture?

A. $10.9 million.

Q. I think we actually saw this was sent on May 23, is that right?

MR. HARTMAN: We can look at the first page again.

A. I don't recall.

MR. HARTMAN: Can we see that first page, Mr. Charalambous.

Q. Do you see that, Mr. Horowitz? It says May 23.

A. Yes, that is correct.

MR. HARTMAN: Let's look at Defense Exhibit 1226. This is June 4, 2014.

Q. Do you see that, Mr. Horowitz?

A. I do.

MR. HARTMAN: Let's zoom out.

| LADMCOL2 | Horowitz - Redirect | Page 722 |
| --- | --- | --- |

Q. Point 1 talks about the purchase price. Do you see that, Mr. Horowitz?

A. Yes, I see that.

Q. What is the purchase price for Korea?

A. 3.3 million.

Q. What is the purchase price for Europe?

A. 7.6 million.

Q. That's the non Lee Cooper Europe brands, correct?

A. That is correct.

Q. By the way, do you see Massimo there?

A. I do not.

Q. Do you know who had the rights for Massimo in Europe at this point?

A. The joint venture, the existing Europe joint venture.

Q. Which joint venture is that?

A. The joint venture between Iconix and GBG/TLC.

Q. Was that called Iconix Europe?

A. I believe that it was.

Q. So Massimo was not part of the Europe brands that were being added as part of this transaction, is that right?

A. That is correct.

Q. How much is being contemplated for the Lee Cooper participation agreement?

A. $14 million.

Q. So it's 10 for what would become SEA-2, is that right, 10

| LADMCOL2 | Horowitz - Redirect | Page 723 |
| --- | --- | --- |

and change?

A. 10.9.

Q. How much for Lee Cooper?

A. 14.

MR. HARTMAN: Let's look at Government Exhibit 1038.

Q. Mr. Horowitz, you saw this e-mail, I think, on direct and cross. Do you remember it?

A. I do.

Q. Let's take it piece by piece. The first paragraph, can you read that, please.

A. The LF attorneys wanted to know more about our Lux structure. They did not oppose to the tracking stock and understood our need for alternative structure. We did not bring up the agency option at this point, as we are still working with Sang to determine if it is possible. We have a call with him tomorrow. If it is possible and we prefer it or LF rejects tracking stock, we can change courses.

Q. Mr. Horowitz, did this refer to the Lee Cooper transaction in any way?

A. Yes.

Q. Can you explain.

A. There were obstacles in creating an entity or a structure that would allow GBG to have 49 percent of Lee Cooper in Europe, and we were working with attorneys to figure out which structures would and would not work.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADMCOL2  Horowitz - Redirect  Page 724

Q. And paragraph 2, can you read that.

A. We agreed that the SEA Asia amendment, including Korea and Europe brands (not Lee Cooper) can happen in June and the Lee Cooper portion of the deal can happen in Q3 if structure delays us. That is OK as we have no gain on that portion of the deal and we get the anticipated gain in Q2.

Q. Mr. Horowitz, when you say the Lee Cooper portion of the deal can happen in Q3 if the structure delays us, what are you referring to there?

A. I am referring to point 1 where we are looking at different structures, whether it be tracking stocks or other options.

Q. You say that's OK, as we have no gain on that portion of the deal and we get the anticipated gain in Q2.

What are you saying there?

A. I'm saying that the anticipated gain from a transaction with GBG will stay the same, even if Lee Cooper gets pushed out.

Q. As of this date, June 3, what is the anticipated deal price for that SEA-2 piece?

A. Approximately $10.9 million.

Q. When you say that is OK, what did you mean by that?

A. We are still going to get the $10.9 million of revenue that we expect.

Q. Point 3, I asked you about on direct, but refresh us on that. What are you saying there?

LADMCOL2  Horowitz - Redirect  Page 725

A. There was concern on the GBG side about one of the licensees that was a part of the Europe -- soon to be Europe joint venture on men's brands. They may be going or may have been going bankrupt at that time, and we wanted to walk them through the details of what that would mean.

Q. You said it got heated and I told them we weren't moving on price. We are not going to renegotiate.

What are you describing there for Mr. Cole?

A. That GBG was concerned over this potential bankruptcy and were trying to negotiate a lower price, to which I told them we will not.

Q. A lower price. What's the reference point at this point for the price?

A. $10.9 million.

Q. This is June 3, is that right?

A. That is correct.

MR. HARTMAN: Can we toggle back to Defense Exhibit 1226.

Q. This is June 4, is that right, Mr. Horowitz, according to the e-mail?

A. That is correct.

MR. HARTMAN: Can you zoom out, please.

Q. How do you get to 10.9?

A. Under A1A, amend Southeast Asia JV to include Korea for 3.3 million. And A1B, amend Southeast Asia to include Europe and

LADMCOL2  Horowitz - Redirect  Page 726

Turkey rights for Ecko Unlimited, Zoo York, Marc Ecko Cut & Sew, Ed Hardy, and Sharper Image for 7.6175 million.

Q. Does that add up to about 10.9?

A. Yes.

MR. HARTMAN: Mr. Charalambous, can you pull the amount for the Lee Cooper portion of the transaction.

Q. How much is the Lee Cooper portion of the transaction being priced at as of June 4, Mr. Horowitz?

A. $14 million.

Q. This is June 4, right?

A. That is correct.

Q. Remind us when the SEA-2 deal closes.

A. I believe it's on June 30.

Q. Was the Lee Cooper Europe piece of the deal closed in the second quarter of 2014?

A. No, it was not.

MR. HARTMAN: Mr. Charalambous, can you please put up, just for the witness and for the parties, what's been marked for identification as Government Exhibit 1265.

Q. Mr. Horowitz, do you recognize this as an e-mail that Mr. Cole sent you on December 21 of 2014?

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1265.

MR. REISNER: No objection.

LADMCOL2  Horowitz - Redirect  Page 727

THE COURT: It will be received.

(Government Exhibit 1265 received in evidence)

MR. HARTMAN: Mr. Charalambous, can you put that up on the screen for the jury.

Can you zoom in on the e-mail in the middle from Rob Smits to various people.

Q. Mr. Horowitz, the e-mail says: Lauren, I have been advised that the parties want to finalize/execute the Iconix Lux/Lee Cooper transaction documents on Monday. My understanding is the total subscription price under the CPEC will be $14,025,000 payable as follows.

Mr. Horowitz, do you know what Mr. Smits is referring to here?

A. In general, I do.

Q. Can you explain it.

A. He is referring to executing some type of joint venture structure between GBG and Iconix for Lee Cooper in Europe.

Q. What is the price that he says is being contemplated for that structure?

A. Approximately $14 million.

Q. Is that the same amount, more or less, that we saw being modeled for that portion of the transaction back in May and June?

A. Yes.

MR. HARTMAN: Mr. Charalambous, you can take that

| LADMCOL2 | Horowitz - Redirect | Page 728 |
|---|---|---|

down.

Let's look at Government Exhibit 1041. Can you put it up next to Defense Exhibit 1244.

Q. Mr. Horowitz, other than the time zone difference, do these appear to be the same e-mail?

A. Yes, they do.

Q. You were asked a lot of questions on cross about this e-mail.

Do you remember that?

A. I remember being asked questions about this e-mail.

Q. And there was a suggestion on cross that the change in gain from about $10 million to 15 million had something to do with the fact that that Lee Cooper transaction wasn't going to happen.

Do you remember that?

A. I don't recall that.

Q. Let me just ask you, did the change in gain for this deal have anything to do with the timing of the Lee Cooper Europe transaction?

A. No.

Q. What was the reason for the change in gain?

A. The reason for the eventual change in gain was a commitment by Iconix to pay back the incremental $5 million to GBG.

Q. At the time that this e-mail was sent, do you believe that there had already been discussions about that between GBG and

| LADMCOL2 | Horowitz - Redirect | Page 729 |
|---|---|---|

Iconix?

A. I believe at this point there were discussions about an increased purchase price in exchange for something.

Q. What do you recall?

A. I recall a period of time around this point in June where we were contemplating letting GBG out of its Rocawear Kids commitment in exchange for an increased price.

Q. Mr. Horowitz, on cross you were asked this question. You were asked: Is your testimony, Mr. Horowitz, that as of June 13, 2014, there was an agreement by Iconix to release GBG from its Rocawear Kids license obligations, yes or no? I think it was asked with some force.

Do you remember that?

A. I recall something like that.

Q. And the answer you gave was no. Can you explain why you answered that way.

A. At this point there was not a firm commitment from Iconix to let GBG out of its Rocawear Kids agreement, and there was not a firm commitment for the increased revenue.

Q. When you are referring to 15 million of gain here, what are you referring to?

A. I'm referring to the revenue that Iconix would receive for the Southeast Asia amendment 2.

Q. And this is the e-mail that follows the e-mail about a phone call with Mr. Margolis.

| LADMCOL2 | Horowitz - Redirect | Page 730 |
|---|---|---|

Do you remember seeing that e-mail on cross?

A. I do.

Q. I think that was the same day, maybe just hours before this e-mail, is that right?

A. I believe that's correct.

MR. HARTMAN: Mr. Charalambous, can you please put up, just for the parties and for the witness, what's been marked for identification as Government Exhibit 1255-C.

Q. By the way, what was the date we were just looking at?

A. I believe we were looking at June 12.

Q. Let's look at 1255-C.

MR. HARTMAN: Can you first let Mr. Horowitz take a look at it.

Can you also show him the metadata, Mr. Charalambous, in the info section. If you go to file and phone, you can see that.

Q. Mr. Horowitz, do you recognize this as a document that you created that was last modified on June 10 of 2014?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 1255-C, 1255, which is the produced image of this document, 1255-A, which was the production metadata, and 1255B, which is the metadata for the native.

THE COURT: Any objection?

MR. REISNER: Your Honor, may I consult briefly with

| LADMCOL2 | Horowitz - Redirect | Page 731 |
|---|---|---|

Mr. Hartman?

THE COURT: Yes.

MR. REISNER: Your Honor, no objection, subject to connection and further consultation on logistics issues.

THE COURT: Very well. It will be received.

(Government Exhibits 1255, 1255-A, 1255-B, and 1255-C received in evidence)

MR. HARTMAN: Mr. Charalambous, can you put back up 1255-C. Can you show it to the jury.

Let's look at the metadata, if you go to file info.

Q. Mr. Horowitz, who is the author of this document, according to this?

A. I am.

Q. What's the last modified date of the document?

A. June 10, 2014.

Q. You would agree with me that that's before June 13, is that right?

A. That is correct.

Q. It is also before June 12?

A. Yes, it is.

Q. It was created when, according to this?

A. Created on June 10, 2014.

Q. At what time?

A. About 5 p.m. 4:59.

Q. The last modified time, according to this?

# A-250

LADMCOL2          Horowitz - Redirect          Page 732

A. 5:12 p.m.

MR. HARTMAN: Let's go back to the document, Mr. Charalambous.

Q. Mr. Horowitz, can you read point 1.

A. LF pays 13.3 million for 50 percent of Korea IP rather than 3.3 million.

Q. Read point 2.

A. Iconix terminates Rocawear Kids license with LF USA.

Impact on fixturing, question mark. Currently amortizing over length of license agreement.

2014 immediate handoff to New Rise.

Q. Why don't you tell us -- keep going.

A. C. Goes into new Rocawear model with KY. Hire Jonathan Cohen, hire kids designer, royalty average 20 percent on 20 to $25 million business. Budgeted royalty 2014, 5 million. Actual will be 2.5 from LF, 2.5 approximately from New Rise. OK.

Q. Then point 3 here.

A. Iconix amends existing LF Zoo York license to 1 percent on actual sales over course of the business.

LF agrees to act as global sourcing partner for all Zoo York international business.

Q. Mr. Horowitz, what are you outlining here?

A. I'm outlining a potential increase in joint venture price in exchange for, amongst other things, the termination of the

LADMCOL2          Horowitz - Redirect          Page 733

Rocawear Kids commitment from GBG.

Q. Mr. Horowitz, when was the last time you remember seeing this document?

A. Maybe when I wrote it.

Q. You were asked a lot of questions about your preps with the government.

Do you remember that?

A. Yes.

Q. Do you remember seeing this document in your preps with the government?

A. No.

Q. Mr. Horowitz, why were you preparing this document?

A. I was preparing this document because we were contemplating a larger or an increase in price for the joint venture in Europe in exchange for giving GBG something back.

Q. When you say we were contemplating that, who were you referring to?

A. Neil and I.

Q. At this point had you discussed that with Mr. Cole?

A. Yes.

Q. What do you remember about that discussion?

A. I remember that there was concern that the Middle East joint venture was not going to come through and that we could ask Li & Fung to pay more for the joint venture to get them out of the Rocawear Kids license.

LADMCOL2          Horowitz - Redirect          Page 734

MR. HARTMAN: Mr. Charalambous, could you please put up on the screen Government Exhibit 1255A, which is the metadata from this production.

Q. Mr. Horowitz, there is a section called file path here and it says users/SHorowitz/desktop/NCole/jason.docx.

Do you see that?

A. I do.

Q. Did you have a folder on your desktop called NCole?

A. I did.

Q. What did you keep in that folder?

A. Documents that I shared with Neil.

Q. It looks like this document is called Jason.docx.

Do you see that?

A. I do.

Q. Do you know who the Jason is that's being referenced there?

A. It's likely Jason Rabin.

Q. Remind us who that is.

A. Principal at GBG.

Q. So we saw that this was June 10 in the evening that you prepared this document. Does that seem right? You can go back to the native, if you want.

MR. HARTMAN: Let's look at 1255-C again.

A. Yes. That seems right. It had it there.

MR. HARTMAN: We can look at it one more time.

Q. It says: Last modified June 10 at 5:12 p.m.

LADMCOL2          Horowitz - Redirect          Page 735

Do you see that?

A. Yes, I do that.

MR. HARTMAN: Mr. Charalambous, can you put up, just for the witness and for the parties, what's been marked for identification as Government Exhibit 1256.

Q. Mr. Horowitz, do you recognize this as an e-mail exchange you had with Mr. Cole on the evening of June 10 and the morning of June 11?

A. Yes, I do.

MR. HARTMAN: The government offers Government Exhibit 1256.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1256 received in evidence)

Q. Mr. Horowitz, do you remember seeing this in prep to testify?

A. No.

MR. HARTMAN: Let's make sure it's up for the jury.

Q. So the document we just looked at, Government Exhibit 1255-C, was last modified at 5:12 p.m. on June 10.

What did you e-mail Mr. Cole on June 10 at 10:59?

A. That I had been thinking about the LF transaction and liked it and was prepared to discuss it in the morning.

Q. Do you know what you are referring to when you say the LF transaction?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL2 | Horowitz - Redirect | Page 736 |
|---|---|---|

A. Yes.
Q. What are you referring to?
A. The joint venture with the increased purchase price in exchange for allowing GBG out of its commitments around Rocawear Kids.
Q. Do you remember discussing that with Mr. Cole after you prepared these documents?
A. I remember discussing it with Mr. Cole.
MR. HARTMAN: Let's look at Government Exhibit 1039 in evidence.
Q. This is June 12 at 8:14 a.m., is that right?
A. That is correct.
Q. Start at the bottom of the chain. Can you read that, please.
A. The e-mail from me to Neil?
Q. Yes.
A. Did a lot of diligence work on margins/product/volume. Very difficult in any model at the current product/pricing distribution to make money. Good top line-no bottom. Should discuss. Best, Seth.
Q. Mr. Horowitz, why are you sending this e-mail to Mr. Cole on June 12?
A. Because I was asked to do diligence -- due diligence on the Rocawear Kids business.
Q. Who asked you to do that?

| LADMCOL2 | Horowitz - Redirect | Page 737 |
|---|---|---|

A. Neil.
Q. Why did he ask you to do it?
A. Because we were contemplating letting GBG out of their Rocawear Kids agreement.
Q. In exchange for what?
A. In exchange for an increased purchase price in the joint venture.
Q. And you were contemplating that as of June 12 at 8 a.m., is that right?
A. That is correct.
Q. Mr. Cole responds and says: Are you referring to kids? What do you understand him to be asking you there?
A. He was asking me if I was referring to the Rocawear Kids business.
Q. Mr. Horowitz, let's look at Government Exhibit 1041, which is also Defense Exhibit 1244. This e-mail is on June 12 at 8 p.m., is that right?
A. That is correct.
Q. Tell us, again, when you talk about the $15 million gain, what's producing that $15 million gain?
A. An increased purchase price for the joint venture in exchange for letting GBG out of its Rocawear Kids commitment.
MR. HARTMAN: Let's look at Government Exhibit 235, which is in evidence. Mr. Charalambous, can you zoom in at the bottom on the

| LADMCOL2 | Horowitz - Redirect | Page 738 |
|---|---|---|

left. Actually, can you pull the date, please, Mr. Charalambous. It's in the top left corner.
Q. Mr. Horowitz, do you remember looking at Government Exhibit 235 in your direct examination?
A. I do.
Q. Can you remind us what's shown at the bottom here.
A. The bottom is the calculation to get to the revenue that Iconix would obtain from completing a joint venture in each of the areas listed. So it has a purchase price, minus a cost basis to get the revenue that Iconix would be able to take.
Q. As of June 19, what is the purchase price that's being contemplated for the SEA-2 transaction?
A. 15.9 million.
Q. How are you getting that?
A. I'm adding Korea at 8.3 million with Europe at 7.6 million.
Q. How does that compare to the purchase price that we saw in the documents we looked at earlier on your redirect?
A. It's $5 million more.
Q. What accounts for $5 million increase in purchase price?
A. A commitment to give that $5 million back to GBG.
Q. Where is that being attributed here?
A. It is not.
Q. In the math in the columns, where is it being attributed?
MR. REISNER: Objection. Asked and answered.
THE COURT: Overruled.

| LADMCOL2 | Horowitz - Redirect | Page 739 |
|---|---|---|

Q. Let me ask you this. How much is the purchase price for Korea, as reflected here?
A. 8.3 million.
Q. Previously, in the documents we looked at, what was the purchase price for Korea?
A. 3.3 million.
Q. What's the difference between those two?
A. $5 million.
Q. You would agree with me that Lee Cooper in Europe is not the same thing as Korea, is that right?
A. That is correct.
MR. HARTMAN: Let's go back to Government Exhibit 1255 real quick. Can you pull up bullet point 1, please, Mr. Charalambous.
Q. Mr. Horowitz, what's written here?
A. LF pays 13.3 million for 50 percent of Korea IP, rather than 3.3 million.
Q. What are you describing?
A. An increase in the purchase price for the Korea IP.
MR. HARTMAN: Now let's look at Government Exhibit 1281. I'm sorry. Defense Exhibit 1281. I'm sorry.
Q. Mr. Horowitz, do you remember being asked about this e-mail on cross-examination?
A. I believe so.
Q. Do you remember this e-mail?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

---

LADMCOL2          Horowitz - Redirect          Page 740

A. Yes, I do.

Q. What do you remember happening around the time of this e-mail?

A. I remember Neil calling me into his office to tell me that GBG had agreed to raise the purchase price of the joint venture by 5 million and that we would pay them back the 5 million over time. He instructed me to go tell Lauren Gee to increase the purchase price, but make no mention of our commitment to pay it back, and that's what I did.

Q. Mr. Horowitz, was that the very first time you had ever heard about a potential increase in the price of the JV in exchange for returning something to GBG?

A. No, it was not.

Q. Had you heard about that as early as June 10, based on these documents?

A. Yes.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Q. I want to ask you some questions about the SEA-3 transaction.

MR. HARTMAN: Mr. Charalambous, can you put up Defense Exhibit 1475.

Q. Mr. Horowitz, do you remember being asked about the Beckham JV on cross?

A. Yes, I do.

---

LADMCOL2          Horowitz - Redirect          Page 741

Q. What's the date of this e-mail?

A. December 3, 2014.

Q. When is that in relation to when the third SEA transaction closed, roughly?

A. It's, roughly, two months later.

MR. HARTMAN: Mr. Charalambous, can you put up, just for the witness and for the parties, Government Exhibit 1517 marked for identification.

Q. Mr. Horowitz, does this appear to be the announcement related to the Beckham JV?

A. It does.

MR. HARTMAN: The government offers Government Exhibit 1517.

MR. REISNER: Objection. Hearsay.

THE COURT: Overruled.

(Government Exhibit 1517 received in evidence)

MR. HARTMAN: Can we show that to the jury, please.

Q. Mr. Horowitz, the announcement says. The board of directors of Global Brands Holding Limited is pleased to announce that on December 3, 2014, the company entered into an agreement with Mr. David Beckham and his business partner, Simon Fuller, to establish a new joint venture to drive the continued development of the Beckham brand globally.

Do you see that?

A. I do.

---

LADMCOL2          Horowitz - Redirect          Page 742

Q. Does this relate to Umbro?

A. It does not.

Q. When it says the Beckham brand, do you have an understanding of what that is referencing?

A. I do.

Q. What is your understanding?

A. An actual brand for Beckham, his personal brand.

Q. So not Umbro; a Beckham brand, is that right?

A. That is correct.

Q. What's the date of this agreement, or at least the announcement of it?

A. December 3, 2014.

MR. HARTMAN: Let's look at Defense Exhibit 1337.

Q. Mr. Horowitz, do you remember being shown this exhibit on cross-examination?

A. I do.

Q. Can you explain what's going on here in your e-mail to Mr. Margolis.

A. I believe that it reflects a conversation that Jared and I had about justifying what normally would be a five and a half times multiple to get to a purchase price of 15.5 million.

Q. So is this before or after the agreement to inflate the purchase price of the SEA-3 joint venture?

A. Before.

Q. Why was Mr. Margolis asking for your help justifying the

---

LADMCOL2          Horowitz - Redirect          Page 743

15.5 million purchase price?

A. Because in prior joint ventures a multiple of revenue times 5.5 was used, and in this case there was not -- there was not licensing revenue from Umbro in China because it had been previously operated by Nike.

Q. How did that implicate driving the price?

A. Because Nike was the prior owner of Umbro, there was no licensing revenue to use as a multiple to justify the five and a half times or the purchase price of 15.5 million. So we worked backwards to justify the $15.5 million purchase price.

Q. You worked backward from the guaranteed distribution, is that right?

A. That is correct.

Q. Remind us what that is.

A. The guaranteed distribution is how much money or how much money Iconix guaranteed GBG in the form of a distribution from the joint venture. So if the joint venture resulted in $13 million of profit for GBG, Iconix would owe them nothing. But if the joint venture only generated $2 million in profit from the joint venture, Iconix would owe GBG the difference, or a million dollars.

Q. Did Iconix expect to have to owe money to GBG under the guaranteed distribution?

A. Yes, we did.

Q. Explain that.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL2 | Horowitz - Redirect | Page 744 |
| --- | --- | --- |

A. We were aware of the market and had had initial conversations in the marketplace about the brand, and we anticipated that there would not be enough licensing revenue or profit to allow GBG to get -- to earn a $3 million distribution without Iconix making it whole.

Q. Does that fact have implications for the arguments you are making to Mr. Margolis here?

A. It does.

Q. Explain.

A. This position contemplates that the $3 million distribution would be met and calculates a royalty off of that and an IP value off of that, when that was not the case.

Q. Were you representing here that the IP was actually worth $22 million.

A. I was representing that you could make a backwards argument to justify the purchase price.

Q. Did you believe the IP was worth 22 million?

A. No.

Q. What was the purchase price that was being negotiated at this point?

A. 15.5 million.

Q. Ultimately, it was 21.5 million, is that right?

A. That is correct.

Q. Why was that?

A. The purchase price increased by $6 million in exchange for

| LADMCOL2 | Horowitz - Redirect | Page 745 |
| --- | --- | --- |

our commitment to allow GBG out of its Rocawear Kids commitment.

MR. HARTMAN: Mr. Charalambous, can we look at Defense Exhibit 415, please.

Q. Mr. Horowitz, you saw these invoices on direct. You saw them on cross. Can you read the description of the marketing work here.

A. For Zoo York, marking costs related to: Comprehensive positioning, marketing, and launch analysis for SEA; comprehensive research and marketing analysis complete with launch plan for Europe.

Q. Mr. Horowitz, what type of support would you expect to see for an invoice like this, typically?

A. I would expect to see itemized deliverables. Comprehensive research at this level would include consumer analysis, interviews with consumers, shop and shops, and it would all be itemized and laid out.

Q. Did you ever see any support like that for this invoice?

A. No.

MR. HARTMAN: Let's look at page 13 of this document, Mr. Charalambous.

Q. There is a reference to a survey.

Do you see that, Mr. Horowitz?

A. I do.

Q. Are you familiar with this group Rose Research?

| LADMCOL2 | Horowitz - Redirect | Page 746 |
| --- | --- | --- |

A. I am.

Q. What's Rose Research?

A. Research company that Iconix New York used.

Q. The survey here indicates that it was conducted among 5 -- the date on the research is 2012, is that right?

A. That is correct.

Q. When was that in relation to when these invoices were submitted?

A. Two years earlier.

Q. When was that in relation to when the Southeast Asia joint venture was executed?

A. Prior to.

Q. Do you see anywhere any indication that the survey was conducted in Southeast Asia or Europe?

A. No.

MR. HARTMAN: Let's look at page 21 of this document. Let's zoom in.

Q. Mr. Horowitz, do you see the Facebook page there?

A. I do.

Q. Do you know what that photo is in the background?

A. It's a photo from New York.

Q. Where is it?

A. I don't know exactly.

MR. HARTMAN: Zoom out, please.
Let's see the top part of that again, Mr.

| LADMCOL2 | Horowitz - Redirect | Page 747 |
| --- | --- | --- |

Charalambous.

Q. Can you read the Facebook post there, please, Mr. Horowitz.

A. Congratulations to Chaz for taking home second place at street league LA.

Q. Do you understand LA to be Los Angeles?

A. Yes.

MR. HARTMAN: Zoom out, please, Mr. Charalambous. Let's look at the bottom.

Q. Mr. Horowitz, do you know what's being described here?

A. Yes, I do.

Q. What is this?

A. This is a viral video that we shot at Yankee Stadium with our indoor skaters.

Q. When you say we, who are you referring to there?

A. Iconix New York, my team and I.

Q. You were involved in the production of this, is that right?

A. That is correct.

Q. Did GBG have a role in producing this?

A. No.

Q. And it took place at Yankee Stadium, is that right?

A. That is correct.

Q. You mentioned indoor skaters. What are you referring to there?

A. Iconix endorsed at least two skaters that were there that night: Chaz Ortiz and Brandon Westgate.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADMCOL2     Horowitz - Redirect     Page 748

MR. HARTMAN: Let's look at page 23. Can you zoom in there.

Q. Mr. Horowitz, there is a skate team described here. Chaz Ortiz and Brandon Westgate are among the people who are named.

What's the nature of the relationship between Zoo York and those guys?

A. We paid them to endorse Zoo York.

Q. When you say we, who are you referring to?

A. Iconix New York.

MR. HARTMAN: Mr. Charalambous, can you show, just for the witness and for the parties, what's been marked for identification as Government Exhibit 1266.

Q. Mr. Horowitz, do you recognize this, at least the bottom portion, as an e-mail that Jameel Spencer sent to you and Mr. Cole in March of 2013.

A. I do.

MR. HARTMAN: The government offers Government Exhibit 1266.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1266 received in evidence)

Q. The bottom part there is an e-mail from Mr. Spencer to you and Mr. Cole.

Mr. Horowitz, who is Jameel Spencer?

A. Jameel Spencer was the head of men's marketing, I believe,

LADMCOL2     Horowitz - Redirect     Page 749

at this time.

Q. Who did he work for?

A. He worked for both Neil and I.

Q. Was he an Iconix employee?

A. At this point he was.

Q. The subject line is Friday at 5. What is that?

A. That refers to his weekly Friday report that we sometimes called Fridays at 5.

MR. HARTMAN: Mr. Charalambous, can we look at the attachment, please. Go to the bottom, the bottom of that first page.

(Continued on next page)

LADPCOL3     Horowitz - Redirect     Page 750

Q. So under Zoo York it says Chaz Ortiz is officially resigned. Yankee Stadium spot scheduled to shoot in window of dates ranging from April 5th to 15th. Yankee contracts for signage and production have both been received and include all necessary approvals. Gary is reviewing, and we anticipate being able to sign Monday.

Mr. Horowitz, do you know what Mr. Spencer is describing here?

A. Yes, I do.

Q. What is he describing?

A. He is describing the viral video that we shot for Zoo York that we just discussed.

Q. Mr. Charalambous, can we go back to Government Exhibit 415, please, and can we look at page 25. And can you just zoom in on some of these screen grabs.

The section that says "product placement," Mr. Horowitz, do you see that?

A. I do.

Q. Do you recognize the people in the top left?

A. I do.

Q. Who are those people?

A. That's Adam Sandler.

Q. And who is the other person?

A. I believe it's Jay Leno.

Q. Okay. Do you recognize the logo in the lower left-hand

LADPCOL3     Horowitz - Redirect     Page 751

corner?

A. Yes.

Q. What's that?

A. That's the peacock.

Q. For what network?

A. I believe it's NBC.

Q. Okay. So this is not Southeast Asia; is that right?

A. That is correct.

Q. And it's not Europe; is that right?

A. I don't believe so.

Q. Okay. You can zoom out. Let's look at the lower right-hand corner.

Mr. Horowitz, can you tell where this photograph appears to be taken?

A. It appears to be taken in a New York City subway.

Q. Okay. So that's not Europe or Korea either; is that right?

A. That is correct.

Q. Okay. Mr. Charalambous, you can take that down, and let's look at Defense Exhibit 1407.

This is the Mossimo invoice. Do you remember this, Mr. Horowitz?

A. I do.

Q. Can you read the description?

A. "For Mossimo marketing costs related to developing a comprehensive marketing strategy and plan for SEA. Design and

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

---

LADPCOL3  Horowitz - Redirect  Page 752

trend analysis, comprehensive marketing and positioning analysis for Europe."

Q. Okay. Earlier you testified about the status of Mossimo in Europe. Remind us was Mossimo in Europe part of the Southeast Asia joint venture?

A. No, it was not.

Q. What joint venture was it part of?

A. It was in the Europe joint venture between Iconix and GBG/TLC.

Q. To the extent expenses were incurred on behalf of Mossimo in Europe, how would those be paid for?

A. Iconix would have incurred its percent or 51 or 52 percent of those expenses and GBG/TLC would have had the rest.

Q. Mr. Charalambous, can we look at the deck that's associated with this one. Okay, go forward. Okay. Zoom in on the lower right corner. Right there.

Mr. Horowitz, what's the logo that appears in the lower right-hand corner here?

A. Iconix Europe and Mossimo.

Q. Does it appear that this deck was prepared by Iconix Europe?

A. It does have that appearance.

Q. Mr. Charalambous, zoom out. And let's just flip through the deck, please. Stop right there. Can you zoom in on this, please, page 17.

---

LADPCOL3  Horowitz - Redirect  Page 753

Mr. Horowitz, there's some publicity here for Mossimo at an awards show. Can you tell where that awards show is taking place?

A. Austin, Texas.

Q. Mr. Horowitz, is Austin Texas in Southeast Asia?

A. No, it is not.

Q. Is Austin Texas in Europe?

A. No, it is not.

Q. Okay. Zoom out, please. You can finish going through the deck, Mr. Charalambous. Okay. You can take it down.

Now, could you please put up Government Exhibit 210, Mr. Charalambous.

Can we look at -- first of all, Mr. Horowitz, what is this agreement?

A. This appears to be the agreement for the June joint venture.

Q. Okay. And let's look at page 2. Let's look at the next-to-last paragraph that begins "this letter agreement."

The language says: This letter agreement and the agreements referenced herein, including but not limited to the SEA JV agreements, and there's some more language, constitute the entire agreement and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

Do you remember being asked questions about this

---

LADPCOL3  Horowitz - Redirect  Page 754

language, Mr. Horowitz?

A. I remember hearing this language yesterday.

Q. Is what is stated here true?

A. No.

Q. Explain.

A. In this joint venture, there was an agreement by GBG and Iconix to increase the purchase price in exchange for paying them back the $5 million.

Q. And was that documented in any of these agreements that are referenced here?

A. No, it was not.

Q. Is there any doubt in your mind that there was such an agreement?

A. No, there is not.

Q. Did you draft this language?

A. No, I did not.

Q. To your knowledge, did Mr. Cole draft this language?

A. No, I do not believe so.

Q. Do you have an understanding of who drafted that?

A. I believe it was drafted by the legal team.

Q. And to your knowledge, was the legal team aware of the side agreement you just described?

A. No, they were not.

Q. Did Mr. Cole, in fact, give you instructions on what to tell the legal team or not tell them about that?

---

LADPCOL3  Horowitz - Redirect  Page 755

A. Yes, he did.

Q. What did he tell you?

A. He told me not to tell them about the commitment to give the $5 million back.

Q. Okay. And there's similar language in the documents for the SEA-3 agreement. Do you recall seeing that on cross?

A. Yes, I do.

Q. Okay. And is that representation true with respect to the SEA-3 agreement?

A. No, it was not.

Q. Why not?

A. Because there was an agreement between the two parties to increase the purchase price by $6 million in exchange for letting GBG out of its obligations in the Rocawear Kids agreement.

Q. Is there any doubt in your mind that there was such an agreement?

A. No.

Q. Okay. You can take that down, Mr. Charalambous.

Mr. Horowitz, you were asking questions on cross about communications your lawyers had with the special committee for Iconix. Do you recall being asked those questions?

A. Yes, I do.

Q. Were you present for those meetings?

A. No, I was not.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

---

LADPCOL3　　Horowitz - Redirect　　Page 756

Q. And do you know what was said during those meetings?
A. No, I do not.
Q. You were asked some questions about Lew Frankfort and some communications you had with him after you left Iconix. Do you remember being asked those questions today on cross?
A. Yes, I do.
Q. Let's put up Defense Exhibit 1644. Oh, sorry, you don't have it. Do you have a way to do it? Could we ask the defense to do that? I think it's in.
　　Mr. Horowitz, can you see that?
A. I can.
Q. Okay. First of all, who is Lew Frankfort?
A. Lew Frankfort is the former CEO of Coach Brand.
Q. Okay. And what's the nature of your relationship with him?
A. He was a mentor of mine.
Q. Okay. You pasted some information into this document. Can you see that the part that says Eric M. Beder; do you see that?
A. Yes, I see that.
Q. What does this appear to be?
A. This appears to be a Q and A section of a quarterly phone call.
Q. Okay. Can you tell from the subject line what quarter this appears to reference?
A. It appears to reference the second quarter of 2015.
Q. Were you working at Iconix during the second quarter of

---

LADPCOL3　　Horowitz - Redirect　　Page 757

2015?
A. No, I was not.
Q. Okay. There's a CFO named David K. Jones who is being referenced here in the transcript; do you see that?
A. I do.
Q. Was Mr. Jones the CFO when you worked at Iconix?
A. No, he was not.
Q. Okay. Was this information public information when you e-mailed it to Mr. Frankfort?
A. Yes.
Q. Was there anything in your employment agreement that prohibited you from discussing Iconix entirely?
A. Not that I'm aware of.
Q. Was there anything in your employment agreement that prohibited you from sharing public information with anyone?
A. No.
Q. And did you ever trade stock or participate in an investment based on nonpublic information with respect to Iconix?
A. No, I did not.
Q. Let's look at Defense Exhibit 1645 as well. Let's look at point 3, please. Sorry, on the first page. Sorry, first page, numbered paragraph 3.
　　Do you see there, Mr. Horowitz, where it says, "point 5, the company acquired Strawberry Shortcake and Pony Athletics

---

LADPCOL3　　Horowitz - Redirect　　Page 758

in Q1 of 2015"?
A. Yes, I see that.
Q. Is this information that the company would have disclosed publicly in its SEC filing?
A. Yes, I believe it is.
Q. Okay. With respect to the issues around joint venture revenue that you reference in the paragraph 2 there, do you see that?
A. I do.
Q. Did those issues become public at some point as well?
A. Yes.
Q. Okay. Can we see just a little bit further down the chain, please, the e-mail from Mr. McLinden to Stefan Kaluzny and others? Right there. Go back. I think it's on page 2. Yes, right there.
　　Let's look at A and B under subparagraph 3, "stock decline seems to be driven by three factors"?
　　THE COURT: Mr. Hartman, your voice sometimes wears down.
　　MR. HARTMAN: Sorry.
　　THE COURT: Keep your voice up.
BY MR. HARTMAN:
Q. Let's look at paragraph 3, please. "Stock decline seems to be driven by three factors;" do you see that, Mr. Horowitz?
A. I do.

---

LADPCOL3　　Horowitz - Redirect　　Page 759

Q. Can you read what it says under paragraph A?
A. It says "Accounting issues and an SEC investigation, which seems to be centered around pulling forward revenue of international JV's. Hard to tell where this shakes out but could be sizeable. Filings mentioned 47 million of JV income in 2014 that could be reversed."
Q. Okay. So at this point, was this information public with respect to the issues around the JV?
A. It appears so.
Q. Okay. You can take that down. Thank you. Thank you very much.
　　Mr. Horowitz, you were asked some questions on cross about your interactions with the CEO of -- sorry, the owner of Baked by Melissa?
A. That is correct.
Q. What's her name?
A. Melissa.
Q. Okay.
A. Melissa Ben-Ishay.
Q. And you were asked some questions about was it a conversation or an e-mail you had?
A. I believe the questions were about an e-mail I received.
Q. Okay. Where she indicated that she was unhappy with some things you did while you worked there; is that right?
A. That is correct.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    **October 13, 2021**

| LADPCOL3 | Horowitz - Redirect | Page 760 |
|---|---|---|

Q. Okay. First of all, what was the context for this e-mail exchange?

A. I had asked her for a letter of recommendation for an application to become an educator.

Q. Okay. Why were you asking her for a letter of recommendation?

A. I was asking her for this because we had an amazing time working together and growing her company.

Q. Okay. And do you think she shared that view?

A. Yes.

        MR. REISNER: Objection, foundation.

        THE COURT: Sustained.

Q. Did she indicate anything to you that -- or did she say anything to you that would indicate that she shared that view?

        MR. REISNER: Objection, hearsay.

        THE COURT: Overruled.

A. Yes, she did.

Q. Okay. Did she say that even in the e-mail that you were asked about?

A. I don't recall.

Q. Okay. Why didn't you tell her that you were involved in this case?

A. Two -- I guess there are two reasons. One, is that I didn't want to be terminated. Being CEO of Baked by Melissa was a dream job for me.

| LADPCOL3 | Horowitz - Redirect | Page 761 |
|---|---|---|

And the second is that I believed that any meetings I was having around this were to be kept strictly confidential.

Q. Okay. Mr. Charalambous, could you please put up Government Exhibit 1514, which is Mr. Horowitz's cooperation agreement.

    Mr. Horowitz, I think you've testified about this agreement on direct and cross. Do you remember doing that?

A. Yes, I do.

Q. Okay. Mr. Reisner asked you a question about promises that the government had made to you with respect to whether you'd be further prosecuted for these offenses. Do you remember him asking you those questions?

A. I do.

Q. Is it your understanding that you won't be further prosecuted for these offenses?

A. I believe so.

Q. Okay. Have you pled guilty in this case?

A. Yes, I have.

Q. How many felonies have you pled guilty to?

A. I believe it's five counts.

Q. Okay. What is the maximum sentence that you face at sentencing?

A. 70 years.

Q. Do you feel like you got a free pass in this case?

A. No.

Q. You were asked some questions about the government's

| LADPCOL3 | Horowitz - Redirect | Page 762 |
|---|---|---|

obligation or commitment to write you a 5K letter. Do you remember being asked those questions?

A. I do.

Q. And you were shown, in particular, some language on the bottom of page three that said "If this office determines that the defendant has provided substantial assistance in an investigation" and so forth and so on. Do you see that?

A. I do.

Q. And do you see where it says "If he has fully complied with the understandings specified in the agreement"?

A. I do.

Q. To your understanding, what are the obligations that you have under the agreement?

A. To be one hundred percent truthful and be available to discuss any topics.

Q. And to your understanding, if you're not a hundred percent truthful, are you entitled to a 5K letter?

A. No, I am not.

Q. Who is going to impose sentence on you, Mr. Horowitz?

A. A judge.

Q. And do you understand that in connection with sentencing, the judge will review your trial testimony?

A. That is my understanding.

Q. And do you understand that the judge's assessment of your truthfulness may be a factor in the sentence that you

| LADPCOL3 | Horowitz - Redirect | Page 763 |
|---|---|---|

ultimately receive?

A. Yes.

Q. Can the government dictate to the judge what sentence you will receive?

A. No.

Q. Mr. Charalambous, you can take that down.

    Mr. Horowitz, do you remember being asked questions yesterday about the people who were involved in preparing the SEC response?

A. Yes.

Q. Do you remember being asked about Mr. Lupinacci?

A. I do.

Q. Mr. Burkhardt?

A. Yes.

Q. Mr. Schaefer?

A. Yes.

Q. Ms. Alford?

A. Yes.

Q. Ms. Gee?

A. Yes.

Q. Mr. Geffner?

A. I remember being asked about him.

Q. Mr. Shapiro at DBO?

A. Yes.

Q. Mr. Mittman?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADPCOL3     Horowitz - Redirect     Page 764

A. Yes.

Q. AlixPartners?

A. I remember a reference to AlixPartners.

Q. Okay. Mr. Horowitz, you've testified that you had secret side deals with GBG in connection with the SEA-2 and the SEA-3 transactions; is that right?

A. That is correct.

Q. Did you tell Mr. Lupinacci about the secret side deal?

A. No.

Q. To your knowledge, did Mr. Cole tell Mr. Lupinacci about the secret side deal?

A. No.

Q. Did you tell Mr. Burkhardt about the secret side deals?

A. No.

Q. To your knowledge, did Mr. Cole tell Mr. Burkhardt about the secret side deals?

A. No.

Q. What about Mr. Schaefer, did anyone tell him, to your knowledge?

A. No.

Q. What about Ms. Alford?

A. No.

Q. Ms. Gee?

A. No.

Q. What about anyone at DBO?

LADPCOL3     Horowitz - Redirect     Page 765

A. No.

Q. Mr. Mittman?

A. No.

Q. AlixPartners?

A. No.

Q. You were asked some questions yesterday about whether making these deals made good business sense, and you responded that that was partially true. Can you explain what you meant by that?

A. Sure. As it relates to forming joint ventures in those markets for our brands, with this partner, it made good business sense.

Q. Okay. And what part of it did not make good business sense?

A. Increasing the purchase price in exchange for give-backs.

Q. Why not?

A. Because that's illegal.

Q. Mr. Horowitz, you were asked some questions about your initial resignation letter to Mr. Cole. Do you remember being asked those questions?

A. I do.

Q. And Mr. Cole -- or sorry, we saw the letter, and it indicated that your resignation would be effective within two weeks; is that right?

A. We saw a letter that did state that.

LADPCOL3     Horowitz - Redirect     Page 766

Q. To be clear, do you remember whether that was the letter or not?

A. Are you referring to the first letter?

Q. Yes, the first letter.

A. I'm not certain that that was the letter.

Q. Okay. Do you remember that your first resignation letter did not identify issues with respect to the transactions you've been talking about here?

A. Yes.

Q. Okay. Your second letter did identify issues like that; is that right?

A. That is correct.

Q. Describe again for us -- and I think Mr. Reisner asked you a lot of questions about your conversations with counsel between those two events. Do you remember being asked those questions?

A. Yes.

Q. Describe for us what happened when you submitted your initial resignation letter to Mr. Cole.

A. I gave Mr. Cole -- I gave him my resignation letter and told him I was prepared to discuss it. I was in his office. He shortly thereafter came to my office and asked me if I hated him or if I found another job. I told him that I had lost confidence in the company. He started screaming at me, that I was a suicide bomber; that this would be the end of our

LADPCOL3     Horowitz - Redirect     Page 767

careers; that I should just wait another three weeks, four weeks, take time off, don't come to work; that the SEC situation is almost closed, and doing this would -- I think he said "suicide bomber" several times -- ruining both our careers; that we would both end up on the cover of the papers; that I would never be able to work at a public company again. He was furious.

MR. HARTMAN: Your Honor, can I have one moment?

THE COURT: You may.

(Pause)

MR. HARTMAN: No further questions.

THE COURT: Okay. Ladies and gentlemen, we will take our second break now. Please be prepared to come back at about five minutes after the hour.

Don't discuss the case.

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

Everyone can be seated.

(Witness temporarily excused)

THE COURT: Mr. Reisner, is there going to be any recross?

MR. REISNER: Yes, your Honor.

THE COURT: Okay. Twenty minutes.

MR. REISNER: Thank you.

(Recess)

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADPCOL3 | Horowitz - Recross | Page 768 |
|---|---|---|

MR. HARTMAN: Judge, our next witness is Mr. Rabin. Can he come in and invoke before we start the recross? Do we have time for that?

THE COURT: No, we do not.

And can I have a copy of the order? Is it an exhibit here?

MR. THOMAS: We will get you a copy. It is 16, I believe, but we will give you a standalone copy.

(Pause)

THE COURT: Can we get Mr. Horowitz, please?

(Jury present)

Everyone, please be seated. Recross examination.

MR. REISNER: May I proceed, your Honor?

THE COURT: You may.

RECROSS EXAMINATION

BY MR. REISNER:

Q. Mr. Horowitz, do you recall being asked on redirect examination about the extent to which the Lee Cooper component of the SEA-2 transaction being negotiated generated revenue for Iconix? Do you remember being asked those questions?

A. Yes, I do.

Q. And do you remember being shown Defense Exhibit 1227 during redirect examination and being asked about the reference to there being no gain on that portion of the deal?

A. I believe that I do.

| LADPCOL3 | Horowitz - Recross | Page 769 |
|---|---|---|

Q. Now, Mr. Horowitz, regardless of the revenue to be received or not received by Iconix, you knew that LF/GBG viewed the Lee Cooper Europe assets as valuable assets, correct?

A. That is correct.

Q. Generally, when you're negotiating with someone and you know you have an asset that your counterparty thinks is valuable, all other things being equal, you can demand concessions or a higher price from your counterparty, correct?

A. There are a lot of assumptions there, but you are generally correct.

Q. And, Mr. Horowitz, on redirect, you were shown an e-mail that you sent on May 2nd to Mr. Margolis, Government Exhibit 1031.

Why don't we put it up on the screen, if that's okay. It's in evidence. Government Exhibit 1031.

Do you recall being shown this e-mail and the attachment? That refers to, under steps one, SEA Asia JV amendment in Q2 for a price of approximately $11.3 million. Do you recall being asked about this document on your redirect?

A. I do.

Q. And the date of your e-mail that forwarded this document was May 2nd, correct?

A. That is correct.

Q. But you recall that on May 6th, a term sheet was exchanged with LF/GBG in which the overall transaction purchase price was

| LADPCOL3 | Horowitz - Recross | Page 770 |
|---|---|---|

$25 million, and there were three components to the transaction, including Lee Cooper, correct?

A. I believe that is correct.

Q. And you recall that on June 4th, there was a term sheet exchanged between Iconix and LF/GBG, and that term sheet included an overall transaction price of $25 million and three components to the transaction, including the Lee Cooper Europe component, correct?

A. That is correct.

Q. Mr. Horowitz, on redirect you were asked about Government Exhibit 1255 in evidence.

Can we please put that up on the screen?

And these are essentially notes that you prepared for yourself, you said, correct, sometime around June 10th; is that right?

A. I believe that these are notes reflecting conversations with Neil.

Q. These are notes, when you wrote these, you -- withdrawn.

You wrote these and saved these on that drive you described, correct?

A. That is what the metadata said.

Q. Does the metadata show that you e-mailed this document to anyone?

A. Not that I'm aware of.

Q. Does the metadata show that you e-mailed this document to

| LADPCOL3 | Horowitz - Recross | Page 771 |
|---|---|---|

Mr. Cole?

A. Not that I'm aware of.

Q. Are you aware of any evidence that you e-mailed this document to Mr. Cole?

A. No.

Q. Are you aware of any evidence that you e-mailed this document to anyone at Iconix?

A. No.

Q. We can take that down.

Do you recall also testifying during your redirect examination that in or about the June 10th time frame, you were discussing with GBG the possible release of GBG from its Rocawear Kids obligations?

A. Yes.

Q. GBG was not released from its Rocawear obligations, correct?

A. As far as I know, that is correct.

Q. And you are not claiming that the SEA-2 purchase price was increased based on an agreement to release GBG from its Rocawear Kids obligation, correct?

A. Regarding the June joint venture, correct.

Q. You're claiming that the June joint venture prices increased based on an agreement having to do with giving back to GBG marketing expenses, correct?

A. A repayment, correct.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADPCOL3 | Horowitz - Recross | Page 772 |
| --- | --- | --- |

Q. And the basis of your testimony about this agreement was a conversation you say you had with Neil Cole in which he told you about this supposed agreement, correct?

A. In part, correct.

Q. And that's the conversation that no one else was present for, correct?

A. Correct.

Q. That's the conversation that you didn't take any notes of, correct?

A. Correct.

Q. That's the conversation that you couldn't tell us the date it took place, correct?

A. I couldn't tell you the exact date, but I could tell you approximately when it happened.

Q. That's the conversation that you testified on direct took place in Mr. Cole's office, but you previously told the government you couldn't recall where it took place, correct?

A. Not correct.

Q. That's the conversation that you previously told the government that when you first heard about the obligation, you did not have an understanding about exactly how it would be satisfied, correct?

A. I don't recall.

Q. Mr. Horowitz, you were asked on redirect about the David Beckham deal with GBG that you became aware of. Do you

| LADPCOL3 | Horowitz - Recross | Page 773 |
| --- | --- | --- |

remember those questions?

A. I do.

Q. And do you recall understanding in the 2014 time frame, that there were possible synergies based on GBG's simultaneous ownership of the Beckham brand and GBG's ownership of the Umbro brand in China as part of the SEA JV?

A. I do not recall that.

Q. Let's place before the witness what's marked as Defense Exhibit 1479.

Does that document refresh your recollection that there were discussions about potential synergies based on GBG's simultaneous ownership of the Beckham brand and its ownership rights to Umbro in China as part of SEA-3?

A. It does not.

MR. REISNER: Your Honor, I offer Defense Exhibit 1479.

MR. HARTMAN: Objection, hearsay.

THE COURT: Sustained.

Q. Mr. Horowitz, do you recognize this as an e-mail from Mr. Cole to you?

MR. HARTMAN: Objection.

THE COURT: It's sustained -- actually, no, overruled.

Q. Do you recognize this as an e-mail from Mr. Cole to you, sent on December 3rd, 2014?

A. I do.

| LADPCOL3 | Horowitz - Recross | Page 774 |
| --- | --- | --- |

MR. REISNER: Your Honor, I offer it in evidence.

MR. HARTMAN: Objection, hearsay.

THE COURT: Sustained.

MR. REISNER: Okay. We can take that down, Mr. Klein.

BY MR. REISNER:

Q. Do you remember being asked questions about the SEA-2 transaction documents in one of the contracts that was part of the SEA-2 transaction documents, Government Exhibit 210?

A. I do. It would be helpful to see the exhibit.

Q. Yes. Why don't we put up Government Exhibit 210, Mr. Klein?

A. Thank you.

Q. Do you remember being asked questions about this document?

A. I do.

Q. And we can show it to the jury as well, please.

And do you recall being asked a question about this paragraph, which -- do you recall being asked a question about this paragraph during redirect?

A. I do.

Q. That paragraph states, "This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV amendments, the existing master license agreement, the existing shareholders agreement and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior

| LADPCOL3 | Horowitz - Recross | Page 775 |
| --- | --- | --- |

agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof."

That's what the agreement says, right, Mr. Horowitz?

A. Yes.

Q. We can take that down, Mr. Klein.

Do you recall being asked on redirect about the minimum guarantee for 2014 on SEA-3?

A. Yes, in reference -- yes, I do.

Q. You were asked whether Iconix expected to have to owe money to GBG under the guaranteed distribution, and you said yes, correct?

A. Correct.

Q. And you testified that you anticipated that there would not be enough licensing revenue or profit to allow GBG to earn a $3 million distribution without Iconix making GBG whole, correct?

A. That is correct.

Q. And do you recall, in or about October 2014, being asked by -- being asked by BDO whether you believed that the $3 million projection would be met?

A. I do not.

Q. And do you recall telling BDO, in or about October 2014, that based on preliminary discussions with all involved parties, that the $3 million projection for 2014 will probably be achieved? Do you recall that?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADPCOL3          Horowitz - Recross          Page 776

A. I do not.

Q. Let's place before the witness what's marked as Defense Exhibit 2106 for identification. Do you want to make a moment -- enlarge that for the witness.

And take a moment to look at that.

(Pause)

And does that refresh your recollection that you told BDO that, based on preliminary discussions with all of the involved parties, that the $3 million projection for 2014 will probably be achieved and that the projections for future years is very reasonable? Does that refresh your recollection?

A. It does not.

Q. You can take that down. Let's look at Defense Exhibit 1645.

Do you recall being asked some questions -- and we can show it to the jury, please.

You recall being asked on redirect some questions about this document, correct?

A. Correct.

Q. You were asked whether certain information in this document was public information, correct?

A. I believe so, yes, yes.

Q. Will you please highlight what's underneath -- can you please highlight No. 1, right after "just a few additional comments."

LADPCOL3          Horowitz - Recross          Page 777

Directing your attention to the entry "The securitization of $730 million described in 4a does not include some of the recently acquired IP. I would estimate that by securitizing the cash flows of the newer IP, the company could borrow an incremental 250 to $300 million." Do you see that?

A. I do.

Q. Was the securitization information you communicated in this e-mail public information?

A. I believe that it was, but I'm not sure.

Q. You can take that down.

Do you recall during your redirect examination, you were asked some questions about your cooperation agreement?

A. Yes.

Q. And, Mr. Horowitz, you hope and expect that the government will write a 5K1 letter on your behalf, correct?

A. I hope that they will.

Q. And you understand that based on that 5K letter, the judge will be able to reduce your sentence, correct?

A. Not correct.

Q. Your understanding is that the judge will not be permitted to reduce your sentence based on the 5K1 letter?

A. My understanding is that the judge can do whatever the judge wants regardless of the 5K letter.

Q. And, Mr. Horowitz, you hope that based on the 5K letter from the government, you won't be required to spend any time in

LADPCOL3          Horowitz - Recross          Page 778

jail; that's your hope, correct?

A. My hope is that I do not have to spend any time in jail regardless of the 5K letter.

MR. REISNER: Nothing further at this time, your Honor.

MR. HARTMAN: Nothing for us. Thank you.

THE COURT: Mr. Horowitz, you may step down.

THE WITNESS: Thank you, your Honor.

(Witness excused)

THE COURT: Ladies and gentlemen, before we call our next witness, there's just a couple-of-minutes' worth of legal work that we have to do; so I'm going to have Ms. Rivera take you out. I don't know that you have to go down to the jury room. You can go to the jury room here. Just make sure that you keep an appropriate distance from each other. It won't be more than a few minutes.

(Jury not present)

THE COURT: You can be seated. Do you want to bring Mr. Rabin in?

Sir, please step all the way forward, please. Watch your step. There may be some wires on the floor. Please step up into the plastic box and remain standing.

JASON RABIN,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

LADPCOL3          Horowitz - Recross          Page 779

THE COURT: Sir, you may take off your mask while you're in the witness box. Please have a seat, make yourself comfortable. Pull your chair up to the microphone. And if you could, sir, tell us your full name and spell your first and last name.

THE WITNESS: Jason Rabin, J-a-s-o-n, R-a-b-i-n.

THE COURT: And, sir, I just need to ask you a few questions; so let me begin by asking, how old are you, sir?

THE WITNESS: Fifty-one.

THE COURT: Please speak directly into the microphone.

THE WITNESS: Fifty-one.

THE COURT: And how are you feeling today?

THE WITNESS: I feel okay.

THE COURT: Is your mind clear today?

THE WITNESS: Yes, it is.

THE COURT: In the last 24 hours, have you taken any drugs, medicine or any pills, or have you consumed any alcohol?

THE DEFENDANT: Just medicine for my health.

THE COURT: Again, I need you to get closer to the microphone. If you could pull your chair up --

THE WITNESS: Sorry.

THE COURT: And you'll need to repeat that question because I couldn't hear you.

THE WITNESS: Just my medication for my health.

THE COURT: Does that medication affect your ability

# A-262

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADPCOL3 | Horowitz - Recross | Page 780 |
| --- | --- | --- |

to think or to reason or to remember?

THE WITNESS: No.

THE COURT: Now, I understand that you've been subpoenaed to testify in this trial; is that correct?

THE WITNESS: That's correct.

THE COURT: Mr. Rabin, do I understand that if you were to be asked questions without a grant of immunity, that you would invoke your right against self-incrimination? Is that correct?

THE WITNESS: That is correct.

THE COURT: And have you discussed that with your attorneys?

THE WITNESS: Yes.

THE COURT: And, sir, do you understand that I have issued an order, after the application by the United States attorneys, that grants you immunity for the testimony that you are going to be giving at this trial? Do you understand that?

THE WITNESS: Yes, I do.

THE COURT: And, sir, do you understand that this order grants you immunity for any information that you may provide at this trial, except that it does not provide immunity if you were to perjure yourself or give a false statement or otherwise fail to comply with this order?

THE WITNESS: Yes.

THE COURT: And understanding that, you will be

| LADPCOL3 | Rabin - Direct | Page 781 |
| --- | --- | --- |

willing to answer the questions that the prosecution and the defense will give to you, correct?

THE WITNESS: Yes.

THE COURT: Very well. Anything further that I should ask, Mr. Thomas?

MR. THOMAS: No, your Honor.

THE COURT: Okay. Let's bring out the jury.

And, Mr. Rabin, I will have you sworn again before the jury so that they can see that you're testifying under oath.

THE WITNESS: Okay.

THE COURT: And I need you to be right on top of that microphone.

(Jury present)

THE COURT: Everyone, please be seated.

And, Mr. Rabin, will you please stand to be sworn.

JASON RABIN,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE COURT: Mr. Thomas.

MR. THOMAS: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. THOMAS:

Q. Mr. Rabin, are you testifying voluntarily today?

A. No.

Q. And why are you testifying?

| LADPCOL3 | Rabin - Direct | Page 782 |
| --- | --- | --- |

A. I'm being compelled.

Q. If you refuse to answer questions today, what could happen to you?

A. I could be held in contempt.

Q. Are you, nevertheless, under oath and required to tell the truth?

A. Yes.

Q. If you admit to wrongdoing today, can your words be used against you?

A. No.

Q. Does the Court order giving you immunity protect you from prosecution in the event that you lie to the jury?

A. No.

Q. Does the Court's order give you immunity from all prosecution or just prosecution based on your words today?

A. Just my words today.

Q. Has the government promised you anything in exchange for your testimony?

A. No.

Q. Has the government promised you that you will not be prosecuted?

A. No.

Q. Mr. Rabin, I want to back up and talk about your background a bit, but as you answer, please answer into the microphone so that the jury can hear you clearly.

| LADPCOL3 | Rabin - Direct | Page 783 |
| --- | --- | --- |

A. Okay.

THE COURT: Can I begin by asking you to state your full name for the jury?

THE WITNESS: Jason Andrew Rabin.

THE COURT: Mr. Thomas.

BY MR. THOMAS:

Q. Mr. Rabin, where do you work?

A. I work at Centric Brands.

Q. What is Centric Brands?

A. Centric Brands is a manufacturer, designer of clothing and accessories that we sell to retailers across North America.

Q. What is your role at Centric Brands?

A. I'm the CEO.

Q. As the CEO, what are your responsibilities?

A. To run the company, to create the strategy and build the business.

Q. And how long have you been in that line of work?

A. Over 30 years.

Q. In the course of your career, have you encountered an entity known as Li & Fung?

A. Yes.

Q. What is it?

A. Li & Fung is a very large company that primarily was built on sourcing. Over the past 20 years, they went into an operating business where they would acquire companies that

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADPCOL3 | Rabin - Direct | Page 784 |
|---|---|---|

would produce different products across the world.

Q. Mr. Rabin, did you ever work at Li & Fung?

A. Yes.

Q. Approximately when was that?

A. Approximately 12 years ago.

Q. When you worked there, what did you do?

A. My first year when I worked there, I was running the company that I sold to Li & Fung as president of the kids division, and then eventually they moved me to Asia.

Q. What did you do for them in Asia?

A. My job was to build brands in Asia.

Q. What sorts of brands?

A. Well-known American brands.

Q. Brands in fashion and clothing?

A. Yes.

Q. Are you familiar with a business known as Global Brands Group?

A. Yes.

Q. What is it?

A. Global Brands Group is a spinoff from Li & Fung. Quite a few years ago. Global Brands Group was designing, manufacturing, selling brands in different product categories across the world.

Q. Did you work at Global Brands Group?

A. Yes, I did.

| LADPCOL3 | Rabin - Direct | Page 785 |
|---|---|---|

Q. What was your role there?

A. My first role was chief marketing officer.

Q. What does it mean to be chief marketing officer?

A. It means to be involved with the product, the design of the product, the way the product looks, the brands that we have, and to build the retail relationships.

Q. When you worked for Global Brands Group, geographically where were you working in the world?

A. I was working on 34th Street in New York City.

Q. And, Mr. Rabin, I think I heard you say a minute ago that you were the chief marketing officer. Did I hear that correctly?

A. Chief merchandising officer.

Q. I want to turn your attention a little bit. In your work, have you come across a company called Iconix Brand Group?

A. Yes.

Q. How are you familiar with it?

A. Iconix is a brand group that is an intellectual property owner, and I worked with them for many years in my career.

Q. Are there occasions when you have negotiated business deals with Iconix?

A. Yes.

Q. Mr. Rabin, I want to focus on a few of those occasions. Did you negotiate a transaction with Iconix that closed in the fall of 2013?

| LADPCOL3 | Rabin - Direct | Page 786 |
|---|---|---|

A. Yes.

Q. What was the nature of that deal?

A. The nature was that LF Asia -- it was my job to build brands international, especially in Asia. The Iconix group had a business in Southeast Asia that my goal was to work with them to take their brands, distribute them, grow them, find licensees and expand their licensing base.

Q. What form was the transaction supposed to take?

A. I'm sorry, the question?

Q. What form did that transaction take place?

A. A joint venture.

Q. If I refer to the joint venture from the fall of 2013 as SEA-1, will you be able to follow along?

A. Yes.

Q. I'll come back to SEA-1 in a minute.
Did you negotiate an amendment to SEA-1 with Iconix?

A. Yes.

Q. Approximately when did that happen?

A. Approximately in June.

Q. In June of what year, sir?

A. 2014.

Q. If I refer to that amendment as SEA-2, will you be able to follow along?

A. Yes.

Q. And was there an occasion when you negotiated a second

| LADPCOL3 | Rabin - Direct | Page 787 |
|---|---|---|

amendment to the Southeast Asia joint venture?

A. Yes.

Q. Approximately when did that happen?

A. I believe, to the best of my knowledge, approximately September.

Q. Of what year?

A. 2014.

Q. If I call that transaction SEA-3, will that make sense to you?

A. Yes.

Q. Did you personally participate in negotiations about SEA-1, SEA-2 and SEA-3?

A. Yes.

Q. Did you negotiate with Iconix directly?

A. Yes.

Q. Who from Iconix did you deal with?

A. Mr. Cole.

Q. Do you see Mr. Cole in the courtroom today?

A. I believe so.

Q. Where is he? Would you describe an article of clothing and indicate his position?

THE COURT: You can stand up, if you wish. We can't hear a word you're saying. Now you have to sit down again.

A. I believe he's to your right.

MR. THOMAS: Can the record reflect that the witness

# A-264

LADPCOL3          Rabin - Direct          Page 788

has identified the defendant?

THE COURT: The record will so reflect.

Q. Mr. Rabin, I want to step back and talk a little bit more about each of these deals starting with SEA-1.

A. Okay.

Q. You described before that you were in the business of trying to develop brands in Southeast Asia. How is it that SEA-1, as a business idea, came onto your radar?

A. SEA-1 was a business that the Iconix group had brands that were already established in Southeast Asia.

(Continued on next page)

---

LADMCOL4          Rabin - Direct          Page 789

Q. What was the idea behind establishing a joint venture in Southeast Asia, from your perspective?

A. It was to help the Iconix group build those particular brands in that part of the world.

Q. Would that arrangement be formalized in some fashion?

A. Yes.

Q. How would it be formalized?

A. As a joint venture.

Q. From your perspective, what did it mean to participate in a joint venture?

A. It meant that the Iconix group provided the brands and LF Asia's responsibility was to build a business, market the brands, find new licensees, and grow the existing business.

Q. In order to participate in that arrangement, was LF Asia required to pay something to Iconix?

A. Yes.

Q. What was it paying for?

A. It was paying for half of the income that that territory generated.

Q. Explain to the jury, if you could, how it is that you envisioned LF Asia would profit from its participation in the joint venture.

A. The business today would generate royalty income. Royalty would be monies paid from the licensee to the brand owner. Those royalties would be minus expenses and then that would be

---

LADMCOL4          Rabin - Direct          Page 790

the profit.

Q. You mentioned expenses. What sort of expenses did you expect?

A. People expenses, rent expense, travel expense, marketing expense.

MR. THOMAS: Mr. Gill, if we can show the witness and the parties only Government Exhibit 200.

Q. Mr. Rabin, do you see Government Exhibit 200 on your screen?

A. Yes.

Q. Do you recognize it?

A. Yes.

MR. THOMAS: The government offers Government Exhibit 200.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 200 received in evidence)

MR. THOMAS: Mr. Gill, would you publish to the jury as well.

Q. Mr. Rabin, now that's up on the screen for everyone. Could you tell us what it is that we are looking at here.

A. A share purchase agreement.

Q. For what?

A. For the joint venture.

Q. You say this is a share purchase agreement. What is it

---

LADMCOL4          Rabin - Direct          Page 791

that Li & Fung was purchasing?

A. Approximately 50 percent of the joint venture.

Q. Now, Mr. Rabin, I want to direct you to the bottom of the page.

MR. THOMAS: Mr. Gill, if you could enlarge, for everyone's sake, the numbered paragraph 2, payment of purchase price.

Q. Mr. Rabin, do you see that paragraph?

A. Yes.

Q. As documented in this agreement, what was the total purchase price that Li & Fung was committing to pay to Iconix?

A. $12 million.

Q. Lean a little bit closer to that microphone, if you will.

A. Sorry. $12 million.

MR. THOMAS: Mr. Gill, if we could advance to page 2 of the document in the subparagraphs of paragraph 2.

Q. Mr. Rabin, was a total of 12 million due to Iconix at signing?

A. No.

Q. How were the payments to be structured?

A. $5.5 million was paid on closing, $3.5 million was paid after year one, $1 million would be after year two, and then $2 million would be paid on the second year if the royalty income was more than the target royalty.

Q. Focusing on that last paragraph, the $2 million payment

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 13, 2021

| LADMCOL4 | Rabin - Direct | Page 792 |
| --- | --- | --- |

that would be made if the royalty income exceeded the target royalty, could you tell the jury what that means?

A. It means that the time the deal was done there was a certain amount of royalty income. If the royalty income was higher than that, that the seller could get an additional $2 million.

Q. What happened if it was lower?

A. Nothing would happen.

Q. By nothing, do you mean no payment would be due?

A. Correct.

Q. In total, how much was Li & Fung guaranteeing that it would pay Iconix at the signing of this agreement?

A. $10 million.

Q. Did you discuss the payment terms directly with Mr. Cole?

A. Yes.

Q. Did you and Mr. Cole discuss the possibility of Iconix receiving additional compensation beyond what's reflected in Government Exhibit 200?

A. Yes.

Q. What did you discuss?

A. That I wanted $2 million to get paid for the services that we did, and he wanted $2 million more.

Q. When you say he wanted $2 million more, what do you mean?

A. That he wanted to be paid $2 million more, and I would get paid $2 million for my services.

| LADMCOL4 | Rabin - Direct | Page 793 |
| --- | --- | --- |

Q. Mr. Rabin, by that, are you saying that you asked Mr. Cole for an additional $2 million?

A. I asked Mr. Cole for $2 million for the services that we were doing.

Q. Did he agree to pay that to you?

A. Yes.

Q. Did he ask for anything in exchange?

A. For $2 million.

Q. Did you agree to pay that 2 million back to him?

A. Yes.

Q. So, Mr. Rabin, I want to talk a little bit about the negotiations that led up to that moment.

MR. THOMAS: Mr. Gill, if we could remove the exhibit.

Q. Mr. Rabin, do you recall when you first began talking with Mr. Cole about the possibility that became SEA-1?

A. I don't remember the exact date, no.

Q. Was it something that you had been discussing over the summer of 2013?

A. Yes.

MR. THOMAS: Mr. Gill, could we show the witness and the parties only Government Exhibit 1001.

Q. Mr. Rabin, do you recognize Government Exhibit 1001?

A. Yes.

Q. As a message you wrote on July 23, 2013?

A. Yes.

| LADMCOL4 | Rabin - Direct | Page 794 |
| --- | --- | --- |

Q. Is it a fair and accurate copy of a message that you wrote?

A. Yes.

MR. THOMAS: The government offers 1001.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1001 received in evidence)

MR. THOMAS: Mr. Gill, if you would please publish to the jury.

Mr. Gill, could you zoom in on the top matter of this e-mail.

Q. Mr. Rabin, you're sending this message to Kevin Chow, Dave Thomas, Jared Margolis, and Chris Wright.

Could you introduce the jury to those people.

A. Kevin Chow was head of M&A, mergers and acquisitions, at LF Asia; Dave Thomas was the company CFO; Jared Margolis headed up the brand management division of LF Asia; and Chris Wright, I believe, worked in operations.

MR. THOMAS: Mr. Gill, if you could enlarge the substance of the top message of this chain.

Q. Mr. Rabin, what is it that you were conveying here in this message?

A. An e-mail to my team about my recent conversation with Neil Cole.

Q. I want to focus you, if I could, on the third sentence beginning: He is agreeable.

| LADMCOL4 | Rabin - Direct | Page 795 |
| --- | --- | --- |

Do you see that?

A. Yes.

Q. What does that mean?

A. The first part means that he is agreeing to all the items that we discussed. He is saying that he needs the right to buy the business. I'm not familiar with the two years so he could record sales.

Q. You said the 5 percent part refers to the right to buy the business. Did I hear you correctly?

A. No. It seems like there is an issue that there needs to be -- to the best of my knowledge, there needs to be an extra percentage for Iconix to have the ability -- I am sure -- I don't remember exactly why it's 5 percent.

Q. The text here says: Right to buy it in two years.

Do you see that?

A. Yes, I do.

Q. Is that a concept that you discussed directly with Mr. Cole?

A. Yes.

MR. THOMAS: Mr. Gill, if you would go down three more lines to the sentence beginning: He will also give us a six-week contract.

Q. Mr. Rabin, do you see that sentence?

A. Yes.

Q. What does that refer to?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

| LADMCOL4 | Rabin - Direct | Page 796 |
| --- | --- | --- |

A. That he will give us the six-week contract for an agency agreement while we are negotiating this deal.

MR. THOMAS: Mr. Gill, you can remove the exhibit. Let's show the witness and the parties only Government Exhibit 208.

Q. Mr. Rabin, do you see Government Exhibit 208?

A. Yes.

Q. Do you recognize it?

A. Yes.

Q. Is it a fair and accurate copy of a document you have seen before?

A. Yes.

MR. THOMAS: The government offers 208.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 208 received in evidence)

MR. THOMAS: Mr. Gill, can you publish for the jury.

Q. Mr. Rabin, now that that's up on the screen for everyone, can you tell us what this is?

A. This is an authorization letter that gives LF Asia the right to talk to the licensees or potential licensees in the Southeast Asia territory discussing these brands.

Q. What is it that you thought that you would be doing with those brands when you spoke to them?

A. Doing diligence on these brands and seeing opportunities

| LADMCOL4 | Rabin - Direct | Page 797 |
| --- | --- | --- |

with these brands coming in in that part of the world.

MR. THOMAS: Mr. Gill, you can remove the exhibit. Let's show the witness and the parties Government Exhibit 1003.

Q. Mr. Rabin, do you recognize Government Exhibit 1003?

A. Yes.

Q. Is this a message that you received from Mr. Cole on August 13, 2013?

A. Yes.

MR. THOMAS: The government offers 1003.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1003 received in evidence)

MR. THOMAS: Mr. Gill, if you would publish for the jury, please.

Q. Mr. Rabin, now that that's on the screen, can you tell the jury what it is you are writing Mr. Cole about here?

A. That we are doing diligence on the numbers and my team is reviewing the JV structure.

Q. In deals like this deal, the Southeast Asia 1 deal, what is the purpose of doing diligence?

A. We do diligence to make sure the numbers that are in that territory that are being provided by the Iconix group check up with the numbers that they are providing us to evaluate the potential value of the business.

| LADMCOL4 | Rabin - Direct | Page 798 |
| --- | --- | --- |

Q. Mr. Rabin, how does that diligence work impact the negotiations that you conduct?

A. My team will do diligence and hire an outside company to do diligence. We would take the results of the findings, and then we would negotiate the findings with the Iconix group.

MR. THOMAS: Mr. Gill, if we could show the witness and the parties Government Exhibit 1006.

Q. Mr. Rabin, do you recognize Exhibit 1006?

A. Yes.

Q. Is this a fair and accurate copy of a message that you received from Dave Thomas on September 4, 2013?

A. Yes.

MR. THOMAS: The government offers 1006.

MR. TARLOWE: Objection. Hearsay.

THE COURT: Overruled.

(Government Exhibit 1006 received in evidence)

MR. THOMAS: Mr. Gill, if you would publish the exhibit to the jury, please.

Q. Mr. Rabin, now that this is available to everyone, can you tell us what Mr. Thomas is conveying to you in this message.

A. He is telling us that throughout the course of due diligence that was done by Pricewaterhouse that some of these brands are not performing to the same level that we thought they would or some of the brands were not performing at all.

MR. THOMAS: Mr. Gill, if we could enlarge the text

| LADMCOL4 | Rabin - Direct | Page 799 |
| --- | --- | --- |

that precedes the numbered paragraphs.

Q. Mr. Rabin, was the diligence report positive or negative on the performance of the brands?

A. It was negative.

Q. Did Mr. Thomas provide you with a forecast of revenue for that year, year 2013?

A. Yes.

Q. What was the forecast?

A. Approximately 3.2 million.

Q. Mr. Rabin, for joint venture deals that you negotiated, what importance, if any, does a royalty forecast figure into your price negotiations?

A. The royalty forecast is an integral part of the company's valuation.

THE COURT: Closer to the microphone, please.

A. Sorry. The royalty is an integral part of the valuation.

MR. THOMAS: Mr. Gill, if you could move down and enlarge, for example, paragraph 2, Ed Hardy.

Q. Mr. Rabin, do you see that paragraph?

A. Yes.

Q. What does Mr. Dave Thomas convey to you about Ed Hardy?

A. That the brand is not performing at all.

Q. Do you see the words dead brand?

A. Yes.

Q. What does that mean?

LADMCOL4        Rabin - Direct        Page 800

A. That the brand is not performing very well in that territory.

Q. Now, Mr. Rabin, how did you use the information in this report in your negotiations?

A. We would discuss with the Iconix group that the brands that are in the portfolio aren't performing to the level we thought they were or that we were potentially told they were performing at.

Q. You told us a few minutes ago that this deal ultimately ends up with a purchase price. Did this information impact your assessment of the appropriate purchase price?

A. Yes.

Q. How did it do that?

A. The performance of these brands or their diligence came back at a lower royalty income, which would lower the purchase price.

MR. THOMAS: Mr. Gill, if we could show the witness and the parties only Government Exhibit 1008.

Q. Mr. Rabin, do you recognize this to be a message you received on September 6, 2013?

A. Yes.

Q. Is that a fair and accurate copy of that message?

A. Yes.

MR. THOMAS: The government offers 1008.

MR. TARLOWE: No objection.

LADMCOL4        Rabin - Direct        Page 801

THE COURT: It will be received.

(Government Exhibit 1008 received in evidence)

MR. THOMAS: Mr. Gill, would you publish for the jury.

Q. Mr. Rabin, in this message Mr. Chow writes you a number of individual points. Can you tell the jury what it is that he is trying to convey to you here.

A. He is trying to convey different valuations of the Iconix business in Southeast Asia.

Q. To what purpose would you put this kind of information?

A. To give us a range in terms of what price we want to pay for their business, what the multiple would be if we paid a certain price.

Q. When you say multiple, could you tell the jury what you mean.

A. When we acquire companies, we apply a multiple times the earnings to create a valuation.

Q. Based on this message, what multiple was being discussed at this time?

A. A 5.5 times multiple.

Q. That is a multiple against what figure, Mr. Rabin?

A. Against the royalty.

Q. If I could direct you to the Roman numeral V., do you see that portion of the message?

A. Yes.

Q. Do you see subparagraph C, earn-up?

LADMCOL4        Rabin - Direct        Page 802

A. Yes.

Q. Could you tell the jury what an earn-up is.

A. An earn-up is -- it gives the seller an opportunity to earn more money if certain metrics are met.

Q. Focusing on paragraph A, what was the total consideration that your team was evaluating in this message?

A. $12 million.

Q. What portion of that 12 million was going to be guaranteed on signing?

A. 10 million.

Q. Did you convey this proposal to Mr. Cole?

A. To the best of my knowledge, yes.

MR. THOMAS: Let's show the witness and the parties Government Exhibit 1012.

Q. Do you recognize Government Exhibit 1012?

A. Yes.

Q. Is this a fair and accurate copy of a message Mr. Cole sent around September 12, 2013?

A. Yes.

MR. THOMAS: The government offers 1012 into evidence.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1012 received in evidence)

MR. THOMAS: Mr. Gill, if you would publish for the jury.

LADMCOL4        Rabin - Direct        Page 803

Q. Mr. Rabin, in the top part of this message do you see Mr. Cole writes you: What we are willing to do is 12M with a 2M reduction if certain things don't happen.

Do you see that?

A. Yes.

Q. What did you understand him to mean by that message?

A. That we were willing to pay you $12 million, but if we don't hit certain royalty, there could be a $2 million price reduction.

Q. Is that the same thing as an earn-up or is it different in some way?

A. Different.

Q. Different in what way, sir?

A. An earn-up you would make money if the business performed better.

Q. What is Mr. Cole proposing here?

A. He reduced the price if the business doesn't perform to a level that he thinks it may perform at.

MR. THOMAS: Mr. Gill, if we could show the witness and the parties Government Exhibit 1013.

Q. Do you recognize Government Exhibit 1013, sir?

A. Yes.

Q. Is this a message that you wrote to members of your team on September 18, 2013?

A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADMCOL4          Rabin - Direct          Page 804

MR. THOMAS: The government offers 1013.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1013 received in evidence)

MR. THOMAS: Mr. Gill, if you would publish Government Exhibit 1013 to the jury, please.

Q. Mr. Rabin, what is it you are conveying to your team in this message?

A. That Neil was OK with paying $5.5 million, and he's OK with paying $2 million for agency.

Q. Now, to start first with the 5.5 million, do you recall what that related to?

A. The first payments of the deal.

Q. And the 2 million for agency, do you recall what that relates to?

A. I'm not familiar with 100 percent what it relates to.

Q. Mr. Rabin, I am not sure I totally understand that answer. To the extent that you do remember, what is it that you remember?

A. That it's $2 million that I wanted for the work that we were doing as an agent or as the work we were doing in Southeast Asia.

MR. THOMAS: Mr. Gill, if we could show the witness and the parties Government Exhibit 1014, please.

Q. Mr. Rabin, do you recognize Government Exhibit 1014?

LADMCOL4          Rabin - Direct          Page 805

A. Yes.

Q. Is this a message thread between you and Mr. Cole around September 22, 2013?

A. Yes.

MR. THOMAS: The government offers Exhibit 1014.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1014 received in evidence)

MR. THOMAS: Mr. Gill, if we could publish this to the jury.

While that's coming up, Mr. Gill, would you enlarge the message from Mr. Cole.

Q. Mr. Rabin, what is it that Mr. Cole wrote you on September 22 here?

A. We got drafts back that didn't change much as per our conference call and explanations of control. Should we have another call with everybody? Might be only way if we are going to close this month. Also, did you ever send the 2M payment for agency?

Q. Mr. Rabin, that last sentence, also, did you ever send the 2 million payment for agency, do you remember what that relates to?

A. I remember that I wanted $2 million from the Iconix group.

Q. Did Mr. Cole want anything in exchange?

A. He wanted $2 million back.

LADMCOL4          Rabin - Direct          Page 806

MR. THOMAS: Mr. Gill, if you could remove that exhibit.

Let's show the witness and the parties only Government Exhibit 1004.

Q. Mr. Rabin, do you recognize Government Exhibit 1004?

A. Yes.

Q. Is this a message that you and Mr. Cole received from Mr. Chow?

A. Yes.

Q. Is it a fair and accurate copy of that message?

A. Yes.

MR. THOMAS: The government offers 1004.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1004 received in evidence)

MR. THOMAS: Mr. Gill, if you could enlarge the subject matter that precedes the solid line in the middle of the page.

Q. Mr. Rabin, did there come a point in your discussions with Mr. Cole where you guys involved lawyers?

A. Yes.

Q. What was the job of the lawyers in the negotiations?

A. To work out all the open points.

Q. What types of open points do you mean?

A. The business points that have not been finalized.

LADMCOL4          Rabin - Direct          Page 807

Q. Here what is it that Mr. Chow is conveying to the folks copied on this message?

A. That he would like to set up a conference call with Iconix lawyers, as well as our lawyers, to go through a preliminary list of issues so we can get the deal done.

Q. Would you yourself draft any of the legal paperwork involved in these kind of deals?

A. No.

Q. Did you draft any of the legal paperwork in this deal?

A. No.

MR. THOMAS: Mr. Gill, if we could go back to Government Exhibit 1015 and enlarge the top part.

Q. Mr. Rabin, do you recognize Government Exhibit 1015?

A. Yes.

Q. Is this a message between you and Mr. Cole?

A. Yes.

MR. THOMAS: The government offers 1015.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1015 received in evidence)

Q. Mr. Rabin, focusing on Mr. Cole's message to you at the bottom, what is it that Mr. Cole conveys to you on September 24, 2013?

A. He is communicating to me that he received two of the four agreements. He was not happy with, I guess, our markups. He

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 13, 2021

---

LADMCOL4      Rabin - Direct      Page 808

is saying that the meetings with the lawyers didn't go too well and that he doesn't believe this deal could happen, close by next Monday. So he thinks it's better to pass.

Q. Did you have an understanding of what was coming up next Monday?

A. The end of his quarter.

Q. Did you discuss with Mr. Cole the timing of this transaction?

A. He communicated to me that it was important to have it close by the end of the month.

Q. Did he tell you why it was important to him?

A. Just that he wanted to announce the deal.

Q. When you say announce the deal, what do you mean?

A. Communicate the deal to the market.

Q. Now, Mr. Rabin, in this message before you, you respond to Mr. Cole and say: I will handle when I get to the office.
     Do you see that?

A. Yes.

Q. Do you recall how you handled the issue that he was concerned about?

A. No.

Q. At this time do you remember if Mr. Cole had wired Li & Fung the 2 million that you wanted from him?

A. No.

Q. Do you remember if you had sent to Iconix the 2 million

---

LADMCOL4      Rabin - Direct      Page 809

Mr. Cole wanted?

A. No.

     MR. THOMAS: Mr. Gill, can we show the witness and the parties Government Exhibit 2006.

Q. Do you recognize Government Exhibit 206?

A. Yes.

     MR. THOMAS: Mr. Gill, if you could advance to the signature page.

Q. Is that your signature, sir?

A. Yes.

     MR. THOMAS: The government offers 206.

     MR. TARLOWE: No objection.

     THE COURT: It will be received.

     (Government Exhibit 206 received in evidence)

Q. Mr. Rabin, is this a document that you signed on September 30 of 2013?

A. Yes.

     MR. THOMAS: Mr. Gill, if you could enlarge the top matter beneath the salutation dear sirs.

Q. Mr. Rabin, did this relate to SEA-1?

A. Yes.

     MR. THOMAS: Mr. Gill, if you could enlarge for us the paragraph that follows the numbered paragraphs, beginning: In consideration of.

Q. Mr. Rabin, what is the significance of this paragraph here?

---

LADMCOL4      Rabin - Direct      Page 810

A. That we agree to pay $2 million to Iconix.

Q. Is this 2 million in addition to the 10 million in the share purchase agreement?

A. Yes.

Q. Would paying an additional 2 million in addition to the share purchase agreement have been supported by the due diligence work your team did?

A. Yes.

Q. Did your team tell you an estimate of what it was that you should negotiate for in terms of price?

A. Yes.

Q. What was that?

A. 12 million.

Q. How much of that 12 million was in the form of an earn-up?

A. 2 million.

Q. How much was guaranteed to Iconix?

A. 10 million.

Q. Is this 2 million here in addition to that 10 for a total guarantee of 12?

A. Yes.

Q. Was that supported by what your team had done in diligence?

A. No.

     MR. THOMAS: If we could show the witness Government Exhibit 207.

Q. Do you recognize Government Exhibit 207?

---

LADMCOL4      Rabin - Direct      Page 811

A. Yes.

     MR. THOMAS: Mr. Gill, if we could advance to the signature page. I think it's page 4.

Q. Is that your signature?

A. Yes.

     MR. THOMAS: The government offers Exhibit 207.

     MR. TARLOWE: No objection.

     THE COURT: It will be received.

     (Government Exhibit 207 received in evidence)

Q. Mr. Rabin, this is a document you signed the same day as the document that we looked at before, right?

A. Yes.

Q. Now, this says consultancy agreement at the top. Who are the parties to this consultancy agreement?

A. Iconix Brand Group and LF Centennial.

     MR. THOMAS: Mr. Gill, if you could go down and enlarge for us the paragraph beginning: 3. Fee.

Q. What's the effect of this agreement?

A. That the company shall pay the consultant $2 million.

Q. Here is the consultant LF Centennial Limited?

A. Yes.

     MR. THOMAS: Mr. Gill, if you could go to the next page and enlarge the text beneath the lettered paragraphs at the top.

Q. Mr. Rabin, was that 2 million due to LF Centennial

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

---

LADMCOL4      Rabin - Direct      Page 812

regardless of any services that it performed?

A. Yes.

Q. Mr. Rabin, sitting here today, can you think of any consulting work that LF Centennial performed for Iconix?

A. Not LF Centennial, no.

Q. Do you know what LF Centennial is?

A. No.

MR. THOMAS: Mr. Gill, you can remove the exhibit.

Q. Mr. Rabin, I want to turn and talk about SEA-2. You told us a little bit about that as a first amendment to the Southeast Asia joint venture. Could you remind the jury what the business concept of that deal was to be.

A. That we would have the rights for Europe, Korea, and Turkey.

Q. When you say it would have the rights, could you explain?

A. We would expand our business to building the brands in that territory.

Q. In addition to the original Southeast Asia territories, it now adds in which areas?

A. Europe, Turkey -- Europe, Turkey, Korea.

Q. Did you participate directly in those negotiations?

A. Yes.

Q. Who from Iconix did you negotiate with about that deal?

A. Mr. Cole.

MR. THOMAS: Mr. Gill, if we could show the witness

---

LADMCOL4      Rabin - Direct      Page 813

and the parties Government Exhibit 1040.

Q. Mr. Rabin, do you recognize Government Exhibit 1040?

A. Yes.

MR. THOMAS: The government offers 1040.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1040 received in evidence)

MR. THOMAS: Mr. Gill, if you could publish to the jury.

Q. Mr. Rabin, now that that's up, can you tell us what's reflected here on your screen.

A. I'm asking him if he is free.

Q. You are asking who?

A. Mr. Cole.

Q. Were you and Mr. Cole in direct touch with one another in this time period?

A. Yes.

Q. Do you think that you needed to talk to Mr. Cole's subordinates before talking to him directly?

A. No.

MR. THOMAS: Mr. Gill, let's go to Government Exhibit 1254, for the witness and the parties.

Q. Do you recognize that?

A. Yes.

MR. THOMAS: The government offers 1254.

---

LADMCOL4      Rabin - Direct      Page 814

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1254 received in evidence)

MR. THOMAS: Mr. Gill, if you would publish.

Q. Mr. Rabin, what are we looking at here?

A. I'm asking Neil if he is free for a call.

Q. Asking who?

A. Mr. Cole.

Q. So is this another occasion of you reaching out to Mr. Cole directly?

A. Yes.

Q. In this message, June 9, 2014, is this a time where you and Mr. Cole were talking about SEA-2?

A. I can't remember.

Q. Is this time period a time period when SEA-2 was being discussed?

A. Yes.

MR. THOMAS: Mr. Gill, you can remove the exhibit.

Q. Mr. Rabin, in the course of your work on SEA-2, did you and your team make any effort to determine what an interest in SEA-2 would be worth to Li & Fung?

A. Yes.

Q. What did you and your team determine?

A. The price would be 10.9 million.

Q. Did you convey that price to Mr. Cole?

---

LADMCOL4      Rabin - Direct      Page 815

A. Yes.

Q. When you told Mr. Cole that Li & Fung would be willing to pay 10.9 million, did he accept it?

A. Yes.

Q. When Mr. Cole said he accepted 10.9, did you and he ultimately sign a deal at that price?

A. No.

Q. At what price did you ultimately sign a deal?

A. At 15.9 million.

Q. How did the price go from 10.9 to 15.9?

A. Mr. Cole said: If you raise the price by 5 million, you can bill it back for marketing.

Q. Mr. Rabin, I want to break it down. What is it that Mr. Cole proposed to you?

A. Raise the price from 10.9 to 15.9., and Li & Fung can bill back Iconix for $5 million.

Q. Is that a proposal that you accepted?

A. Yes.

Q. What happened as a result of you accepting that proposal?

A. We finished the negotiations.

Q. At what price?

A. At 15.9.

Q. Without Mr. Cole's promise to you to permit the billing for marketing, would you have agreed to the increase in the price?

MR. TARLOWE: Objection.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADMCOL4      Rabin - Direct      Page 816

A. No.

THE COURT: Sustained.

I'm sorry. Overruled.

Q. Did you and Mr. Cole reach an agreement, as you understood it, that the price would go up by 5 million in exchange for 5 million coming back as marketing?

A. Yes.

Q. Did you understand that to be a firm commitment from Mr. Cole?

A. Yes.

Q. Was there any doubt in your mind that he was committing to pay 5 million back to Li & Fung?

A. No.

Q. After the Southeast Asia 2 joint venture closed, did Li & Fung, or later GBG, make any efforts to actually recoup that 5 million that Mr. Cole had promised it?

A. I believe so.

Q. What efforts are you aware of?

A. Sending the Iconix group invoices.

Q. Did you ever speak to Mr. Cole about invoices that had been sent to Iconix?

A. Yes.

Q. What do you remember about that conversation?

A. That Mr. Cole wanted more detail on the invoices.

Q. Do you know if one of the invoices related to Peanuts?

LADMCOL4      Rabin - Direct      Page 817

A. I'm sorry?

Q. Do you know if any of the invoices related to the company Peanuts?

A. I don't remember.

Q. When Mr. Cole asked for more detail, what did you do?

A. I spoke to the marketing team to present to Iconix group more detail.

Q. When you say the marketing team, was there a point person for that team that you interacted with?

A. Mr. Margolis.

Q. Is Mr. Margolis Jared Margolis?

A. Yes.

Q. I want to ask a few questions about the marketing.

You told us at the beginning of our discussion that one of the expenses of the Southeast Asia joint venture could be marketing.

Do you remember that?

A. Yes.

Q. As a joint venture partner, would Li & Fung have marketed the brands?

A. Yes.

Q. Would it have marketed the brands, regardless of whether Mr. Cole offered to pay for marketing support?

A. Yes.

Q. Did the $5 million that Mr. Cole promised to allow Li &

LADMCOL4      Rabin - Direct      Page 818

Fung to bill as marketing buy Iconix any additional marketing at all?

A. It may have.

Q. As a joint venture partner, what additional marketing did you do because of that 5 million that you wouldn't have done, anyway?

A. I don't remember.

Q. As a joint venture partner, would you be entitled to bill Iconix, as opposed to the joint venture itself?

A. No.

MR. THOMAS: Let's turn for a moment to SEA-3.

Q. Do you have that deal in mind?

A. Yes.

Q. Similar to SEA-2, did you participate in an effort to determine or compute the value that Li & Fung was willing to pay for its interest?

A. Say the question again. I'm sorry.

Q. Did you participate in an effort to compute the value that Li & Fung was willing to pay to participate in SEA-3?

A. Yes.

Q. What sort of work was done on that?

A. We did the same diligence that we did with the other two deals and came up with a number times a multiple.

Q. What was that number?

A. 15.5 million.

LADMCOL4      Rabin - Direct      Page 819

Q. Did you convey that number to anyone at Iconix?

A. Yes.

Q. Did you convey it to Mr. Cole?

A. Yes.

Q. When you conveyed that number to Mr. Cole, did he accept it?

A. Yes.

Q. Notwithstanding the fact that he accepted it, is that the price at which the deal was finalized?

A. No.

Q. Why not?

A. There was discussion about increasing the price by $6 million to recover Rocawear's shortfall.

Q. I want to take that in pieces, if we could. You said Rocawear shortfall. Could you tell the jury what that refers to.

A. Each license has a minimum guarantee that would be paid to the licensor. If that number is not met, the licensee would have a shortfall against the guaranteed minimum.

Q. What was the situation with Rocawear specifically?

A. Rocawear was in a shortfall position.

Q. Was it Rocawear writ large or Rocawear Kids?

A. Rocawear Kids.

Q. Was Rocawear Kids related in any way to SEA-2 or the negotiations about SEA-3?

# A-272

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 13, 2021

LADMCOL4          Rabin - Direct          Page 820

A. I'm sorry. Say that again.
Q. Was Rocawear Kids related in any way to the Southeast Asia joint venture?
A. No.
Q. The license holder that was having a shortfall, who was the license holder?
A. Global Brands Group.
Q. Was it the joint venturer?
A. No.
Q. You mentioned discussion about 6 million to cover the shortfall. Could you explain what you were referring to.
A. The purchase price was increased by 6 million to cover a shortfall.
Q. Is that something you discussed with Mr. Cole?
A. Yes.
Q. How did those discussions unfold, to the best of your memory?
A. To the best of my memory, I thought that's how the deal was finalized.
Q. Did you bring up to Mr. Cole the fact of this shortfall and Rocawear Kids?
A. Yes.
Q. When you did, what did he say?
A. I don't remember what he said.
Q. You mentioned the price going up by 6 million. Where did

LADMCOL4          Rabin - Direct          Page 821

that come from?
A. I am not sure if it came from my CFO, Ron Ventricelli, or it came from Iconix group.
Q. Is that something that you discussed with Mr. Cole?
A. Yes.
Q. Did you reach an agreement on that point?
A. Yes.
Q. What was the agreement?
A. That we would pay $6 million to offset the Rocawear shortfall.
Q. Did you understand that to be a firm commitment from Mr. Cole?
A. Yes.
     MR. TARLOWE: Objection. Asked and answered.
     THE COURT: Overruled.
Q. Mr. Rabin, did you understand that to be a firm commitment?
A. Yes.
Q. Without that commitment, would you have agreed to increase the purchase price by 6 million?
A. No.
     MR. TARLOWE: One moment, your Honor.
     Nothing further.
     THE COURT: Thank you.
     We are just a few minutes short of the day, so why don't we stop there. We will convene again tomorrow at 9:30.

LADMCOL4          Rabin - Direct          Page 822

Until then, have a very pleasant evening. Do not discuss the case or read anything about the case or look at anything about the case that you may encounter.
     (Jury not present)
     THE COURT: Mr. Rabin, you may step down.
     Any issues either side wants to bring up?
     MR. REISNER: I would just ask, your Honor, and we can do this offline with the government. I think it would be useful for all concerned if the government can tell us who their next couple or few witnesses are so we can plan for tomorrow and the rest of the week.
     THE COURT: Absolutely. Please do tell them.
     MR. HARTMAN: We will do that for sure.
     MR. REISNER: Can we know now?
     MR. HARTMAN: Sure. We will tell you right now.
     THE COURT: It doesn't have to be on the record.
     MR. HARTMAN: We will tell them right now.
     MR. REISNER: Thank you, your Honor.
     Thank you, Mr. Hartman.
     (Adjourned to October 14, 2021, at 9:00 a.m.)

Page 823

                    INDEX OF EXAMINATION
Examination of:                                    Page
  SETH HOROWITZ
Cross By Mr. Reisner . . . . . . . . . . . . . . 665
Redirect By Mr. Hartman . . . . . . . . . . . 706
Recross By Mr. Reisner . . . . . . . . . . . . 768
  JASON RABIN
Direct By Mr. Thomas . . . . . . . . . . . . . 781
                 GOVERNMENT EXHIBITS
Exhibit No.                                   Received
  1265    . . . . . . . . . . . . . . . . . . . . 727
  1255, 1255-A, 1255-B, and 1255-C  . . . . . . 731
  1256    . . . . . . . . . . . . . . . . . . . . 735
  1517    . . . . . . . . . . . . . . . . . . . . 741
  1266    . . . . . . . . . . . . . . . . . . . . 748
  200     . . . . . . . . . . . . . . . . . . . . 790
  1001    . . . . . . . . . . . . . . . . . . . . 794
  208     . . . . . . . . . . . . . . . . . . . . 796
  1003    . . . . . . . . . . . . . . . . . . . . 797
  1006    . . . . . . . . . . . . . . . . . . . . 798
  1008    . . . . . . . . . . . . . . . . . . . . 801
  1012    . . . . . . . . . . . . . . . . . . . . 802
  1013    . . . . . . . . . . . . . . . . . . . . 804
  1014    . . . . . . . . . . . . . . . . . . . . 805
  1004    . . . . . . . . . . . . . . . . . . . . 806

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                    October 14, 2021

---

LAEMCOL1                                      Page 825

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                    19 CR 869 (ER)

NEIL COLE,

            Defendant.           Trial
------------------------------x
                                 New York, N.Y.
                                 October 14, 2021
                                 9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                 District Judge
                                 -and a Jury-

                    APPEARANCES

AUDREY STRAUSS
       United States Attorney for the
       Southern District of New York
BY:    NOAH SOLOWIEJCZYK
       SCOTT HARTMAN
       ANDREW M. THOMAS
       Assistant United States Attorneys

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
       Attorneys for Defendant
BY:    LORIN L. REISNER
       RICHARD C. TARLOWE
       ANDREW D. REICH
       AMANDA WEINGARTEN
       ALYSON A. COHEN

Also Present:
       Robert Hupcher, FBI
       Micah Gill, Paralegal
       Peter Charalambous, Paralegal
       Frank Eng, Paralegal

---

LAEMCOL1          Rabin - Cross          Page 826

THE COURT: It's 9 a.m. Is there any issue that either side wanted to raise?

MR. HARTMAN: Not for us, Judge.

MR. REISNER: Nothing from the defense, your Honor.

THE COURT: As you were.

MR. REISNER: Thank you, your Honor.

(Recess)

THE COURT: Can we get Mr. Rabin, please.

(Jury present)

THE COURT: Ladies and gentlemen of the jury, good morning. I trust you all had a pleasant evening.

We will now begin the cross-examination of Mr. Rabin.

Mr. Tarlowe.

MR. TARLOWE: May I proceed, your Honor?

THE COURT: You may.

JASON RABIN, resumed.

CROSS-EXAMINATION

BY MR. TARLOWE:

Q. Mr. Rabin, my name is Richard Tarlowe. I represent Neil Cole. You and I have not met before, correct?

A. Correct.

Q. Now, you testified on direct examination about three joint venture transactions between LF or GBG and Iconix, correct?

A. Correct.

Q. And those transactions we are referring to as SEA or

---

LAEMCOL1          Rabin - Cross          Page 827

Southeast Asia 1, SEA-2, and SEA-3, correct?

A. Correct.

Q. Now, with respect to those three transactions that you testified about, SEA-1, SEA-2, and SEA-3, Mr. Cole never asked you to keep any of those terms secret, correct?

A. Correct.

Q. And you did not take any steps to keep any of the terms of those transactions secret, correct?

A. Correct.

Q. Mr. Cole never asked you to keep any of the terms of the transactions out of the written agreements, correct?

A. Correct.

Q. And you did not take any steps to keep any of the terms of those transactions out of the written agreements, correct?

A. Correct.

Q. Mr. Cole never asked you to withhold any information about the transactions from lawyers or accountants, correct?

A. Correct.

Q. And you did not withhold information about these transactions from lawyers or accountants, correct?

A. Correct.

Q. Mr. Cole never asked you to delete any e-mails, correct?

A. Correct.

Q. Mr. Cole never asked you to destroy any documents, correct?

A. Correct.

---

LAEMCOL1          Rabin - Cross          Page 828

Q. Mr. Rabin, do you believe that you committed any crimes in connection with SEA-1, SEA-2, or SEA-3?

A. No.

Q. Are you aware that Mr. Cole has been charged with a conspiracy to violate the law?

A. Yes.

Q. Are you aware that the government alleges that you participated in a conspiracy with Mr. Cole and others to break the law?

A. I'm not aware of that.

Q. Did you conspire with Mr. Cole or anyone else to break the law?

MR. THOMAS: Objection.

THE COURT: Sustained.

Q. Did you commit any crimes with Mr. Cole?

A. No.

Q. If the government alleges that you were part of an unlawful conspiracy with Mr. Cole, that allegation would be false, correct?

MR. THOMAS: Objection.

THE COURT: Sustained.

Q. Now, I want to go through with you each of the three transactions you testified about yesterday. Let's start with the transaction that we are all referring to as SEA-1.

You recall which transaction that is?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEMCOL1     Rabin - Cross     Page 829

A. Yes.

Q. That's a transaction that took place in October of 2013, correct?

A. I believe so, yes.

Q. That was the first international joint venture transaction between Li & Fung and Iconix, correct?

A. Correct.

Q. And the concept for the SEA-1 transaction was that Iconix would contribute its fashion and home brands, right?

A. Yes.

Q. And LF or Li & Fung would provide its market expertise and its platform in the Southeast Asia region, right?

A. Correct.

Q. Before the joint venture was formed, Iconix had a business in Southeast Asia, correct?

A. Correct.

Q. But Iconix did not have any personnel in Southeast Asia, right?

A. To the best of my knowledge, correct.

Q. Iconix was running its business in Southeast Asia out of New York, correct?

A. Correct.

Q. Do you recall that there was only one person in New York who was running the Southeast Asia business?

A. Yes. To the best of my knowledge.

LAEMCOL1     Rabin - Cross     Page 830

Q. Now, Li & Fung, on the other hand, had people on the ground in Southeast Asia, right?

A. Correct.

Q. And, in fact, the concept was that Li & Fung would actually have a team in each country in the region?

A. Correct.

Q. And you thought that Li & Fung could do a better job helping the licensees in the region sell products, right?

A. Correct.

Q. You thought that Li & Fung could better penetrate the market in Southeast Asia for the Iconix Brands, right?

A. Correct.

Q. You thought that Li & Fung was in a better position than Iconix to increase the value of the brands in Southeast Asia, correct?

A. Correct.

Q. And you talked yesterday in your direct testimony about discussions or negotiations with Iconix about the purchase price.

Do you recall testifying about that?

A. Yes.

Q. And you testified about a difference of opinion with respect to the royalty projections, right?

A. Correct.

Q. And the royalty projections, what you mean by that are

LAEMCOL1     Rabin - Cross     Page 831

forecasting or projecting what the royalties may be in the future.

A. Say that again. I'm sorry.

Q. Sure. When you are talking about royalty projections, what that means is a forecast or a prediction of what the royalties might be in the future.

A. Correct.

Q. There was some disagreement about whether the valuation for SEA-1 should be based on prior historical royalties or expected or projected future royalties, correct?

A. Correct.

Q. If Li & Fung were successful in enhancing or building the value of the brands, the future royalties would go up, correct?

A. Correct.

Q. And that was the whole idea behind the joint venture, right?

A. Correct.

Q. That Li & Fung would contribute its expertise in the region and increase sales, right?

A. Correct.

Q. So the royalties would go up, right?

A. Correct.

Q. And the value would go up, right?

A. Yes.

Q. Now, during the course of the discussions or negotiations

LAEMCOL1     Rabin - Cross     Page 832

about the purchase price, Mr. Cole told you that if the joint venture did not perform as well as hoped, he would work with you or give you some relief?

MR. THOMAS: Objection.

THE COURT: Overruled.

Q. Do you recall that?

A. Perhaps.

Q. Well, do you remember it, Mr. Rabin, or not?

A. Ask the question again. I'm sorry.

Q. Sure. Do you recall that Mr. Cole told you that if the joint venture did not perform as well as hoped, he would work with you or give you some relief?

A. Correct.

Q. When Mr. Cole told you that if the joint venture did not do as well as hoped, he would work with you or give you some relief. You understood that Iconix was not undertaking a commitment or an obligation to do anything, right?

A. Please repeat the question.

Q. Sure. You recall that Mr. Cole told you that if things did not -- if the joint venture did not perform as well as hoped, he would work with you or give you some relief, right?

A. Yes.

Q. And you understood that when he was saying that, Iconix wasn't taking on the commitment or an obligation to do something.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEMCOL1          Rabin - Cross          Page 833

A. Correct.

Q. He was basically telling you that we are going to be a good business partner, right?

A. Correct.

Q. By being a good business partner, if it doesn't pan out as hoped, we will work with you. That's essentially what he was saying, right?

A. Correct.

Q. And that's the kind of thing that business partners say to each other, right?

A. Correct.

Q. It's the kind of compromise or accommodation that one business partner might make for another, correct?

A. Correct.

Q. And sometimes when you have a long-term business relationship, one of the partners makes an ask, right?

A. Correct.

Q. And sometimes the other business partner accommodates that ask, right?

A. Right.

Q. Li & Fung and Iconix were long-term business partners, correct?

A. Correct.

Q. There were many business relationships between Li & Fung and Iconix, correct?

LAEMCOL1          Rabin - Cross          Page 834

A. Correct.

Q. Even before the joint ventures, there were lots of other business arrangements between Iconix and Li & Fung, correct?

A. Correct.

Q. Li & Fung was an agent for certain Iconix brands, right?

A. I am not sure about that.

Q. Do you recall that Li & Fung was an agent for Peanuts in China?

A. Yes, correct.

Q. Li & Fung was a licensee under various licensing agreements with Iconix, correct?

A. Correct.

Q. Now, Li & Fung became an agent for Peanuts in China in about 2012, right?

A. Approximately, yes.

Q. And Peanuts is a brand that was jointly owned by Iconix and the Schultz family, correct?

A. Correct.

Q. What was Li & Fung's role as an agent? What does that mean, to be an agent?

A. To represent a brand in the country, to look for more potential licensees, and increase the royalty income.

Q. Do you remember that when that deal was being negotiated that Mr. Cole said he would support Li & Fung with the marketing they would need to grow the business?

LAEMCOL1          Rabin - Cross          Page 835

MR. THOMAS: Objection.

THE COURT: Overruled.

A. I don't remember.

Q. Do you remember something like that? In substance, do you remember Mr. Cole saying something along those lines, in substance?

A. Repeat that question again.

Q. Sure. Did Mr. Cole say, in substance, that he would support Li & Fung with the marketing they would need to grow the business?

A. I don't remember.

Q. Under the Peanuts agency agreement Li & Fung did marketing work, right?

A. Yes.

Q. And Li & Fung would sometimes go to Peanuts and ask Peanuts to reimburse Li & Fung for some of that marketing work, right?

A. Say the question again.

Q. Sure. Li & Fung would go out and do marketing work, correct?

A. Yes.

Q. To try to help the brand Peanuts, right?

A. Yes.

Q. Then Li & Fung would go to Peanuts and ask for reimbursement of some of those marketing expenses, right?

A. Yes.

LAEMCOL1          Rabin - Cross          Page 836

Q. Sometimes Peanuts would pay the reimbursement and sometimes they wouldn't, right?

A. Correct.

Q. Do you remember that there were discussions in which Li & Fung was asking Peanuts for reimbursement -- let me break it down. Let me start with that.

Do you remember times when Li & Fung would be asking Peanuts for reimbursement of marketing expenses?

A. I don't remember.

Q. Generally, you recall that Li & Fung did, from time to time, seek reimbursement of marketing expenses from Peanuts?

A. It's possible.

Q. Do you remember hearing that during those discussions people from Li & Fung would quote Mr. Cole as saying he would support Li & Fung with the marketing they would need to grow the business?

MR. THOMAS: Objection. Hearsay.

THE COURT: Can I see counsel at sidebar.

(Continued on next page)

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEMCOL1          Rabin - Cross          Page 837

(At sidebar)

THE COURT: There have been now three objections based on questions beginning or including: Didn't Neil Cole say or tell you. The objections are based on hearsay.

Just so you are aware of my philosophy, it's hearsay. But can you get the information by asking another two or three questions that don't include hearsay? Yes. So do that. We can avoid --

MR. THOMAS: Yes, your Honor. This particular circumstance involves two levels of hearsay: Out-of-court declarant summarizing the statements of a third party.

THE COURT: It's subject to another compound and vague. You know what to do.

MR. TARLOWE: Sure.

THE COURT: Good.

(Continued on next page)

LAEMCOL1          Rabin - Cross          Page 838

(In open court)

Q. Mr. Rabin, to go back to where we were, you understood that from time to time Li & Fung would seek reimbursement from Peanuts for marketing expenditures, correct?

A. Perhaps, yes.

Q. Was it your understanding that Mr. Cole had expressed a willingness to support Li & Fung's marketing efforts on behalf of Peanuts?

A. To the best of my knowledge, yes.

Q. Let's go back to SEA-1.

I believe you testified yesterday that at some point Li & Fung wanted to pay $10 million, correct?

A. Yes.

Q. At some point Iconix believed that $12 million was an appropriate price, right?

A. Correct.

Q. In your experience, Mr. Rabin, it's not uncommon in a business transaction for the seller to want a higher price and the buyer to want a lower price, right?

A. Correct.

Q. And Iconix was the seller, right?

A. Yes.

Q. And LF was the buyer?

A. Correct.

Q. The goal for LF, from your perspective, was to get the best

LAEMCOL1          Rabin - Cross          Page 839

deal possible, right?

A. Correct.

Q. Now, in addition to the discussions about the purchase price, you wanted to be paid $2 million for the work that Li & Fung was doing, right?

A. Correct.

Q. You wanted to be paid $2 million for work Li & Fung was doing on behalf of Iconix brands in Southeast Asia, right?

A. Yes.

Q. That included consulting work, right?

A. Correct.

Q. And that included work that Li & Fung was doing before the joint venture was formed, right?

A. Correct.

Q. Li & Fung did a lot of work before the joint venture was formed, right?

A. Correct.

Q. And Li & Fung wanted payment for the work that had been done, right?

A. Correct.

Q. Li & Fung wanted recognition for the work that had been done, right?

A. Correct.

Q. And Li & Fung in fact received $2 million from Iconix for that work, right?

LAEMCOL1          Rabin - Cross          Page 840

A. Yes.

Q. Now, just to be clear, so there is no confusion, the $2 million that you were seeking for the work that you had done, that's separate from the discussions about a purchase price of 10 versus 12, right?

A. Correct.

Q. Do you recall yesterday you were shown a document, a letter of authorization?

MR. TARLOWE: Why don't we publish Government Exhibit 208 in evidence.

Q. Do you recall this document, Mr. Rabin?

A. Yes.

Q. This is a letter of authorization, correct?

A. Correct.

Q. It's between Li & Fung and Iconix?

A. Yes.

Q. And the purpose of this letter of authorization was to allow Li & Fung to get the work started on the joint venture before the joint venture was actually formed, correct?

A. Correct.

Q. If we turn to the next page, it's signed on behalf of Iconix by Daniel Castle, correct?

A. Correct.

Q. And it's signed by you on behalf of LF Asia, correct?

A. Correct.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEMCOL1 | Rabin - Cross | Page 841 |

Q. You signed it August 7, right?

A. Yes.

Q. And the joint venture was not formed until October 1, right?

A. I believe so.

Q. So Li & Fung was doing work under this letter of authorization between early August and October 1, correct?

A. Correct.

MR. TARLOWE: We can take that down.

Q. Now, I'd like to take a look at another document that the government showed you yesterday. This is in evidence.

MR. TARLOWE: Your Honor, may we publish Government Exhibit 1001 in evidence?

THE COURT: You may.

Q. Mr. Rabin, do you recall being shown this document yesterday during your direct testimony?

A. Yes.

Q. This is an e-mail you sent to several of your colleagues at Li & Fung, correct?

A. Correct.

Q. Let me pause here for one moment. I just want to talk a little bit about Li & Fung. Li & Fung was an enormous company, correct?

A. Correct.

Q. Billions and billions of dollars in revenue.

| LAEMCOL1 | Rabin - Cross | Page 842 |

A. Correct.

Q. 25,000 employees around the world.

A. Potentially.

Q. Something in that ballpark.

A. A lot of employees.

Q. You were not a principal of Li & Fung, right?

A. Correct.

Q. Your title in 2013, you were president of LF Asia, right?

A. Correct.

Q. And that was just one segment or one part of the overall Li & Fung conglomerate, right?

A. Correct.

Q. And there were many people senior to you at Li & Fung, right?

A. Correct.

Q. Mr. Ventricelli was one of those people?

A. Yes.

Q. Dow Famulak?

A. Yes.

Q. What was Mr. Famulak's role?

A. He was president of North America.

THE COURT: I'm sorry, Mr. Rabin. Can I ask you to get a little closer to the microphone.

A. Sorry. He was president of -- I believe at that time he was president of North America.

| LAEMCOL1 | Rabin - Cross | Page 843 |

Q. He was senior to you, correct?

A. Correct.

Q. Mr. Famulak had a relationship with Mr. Cole, correct?

A. Correct.

Q. Ron Ventricelli, I just asked you about him a moment ago, do you remember what his title was?

A. Chief financial officer.

Q. He was senior to you, right?

A. Perhaps.

Q. Mr. Ventricelli sometimes spoke with Mr. Cole directly, correct?

A. Correct.

Q. Do you know who Bruce Rockowitz is?

A. Yes.

Q. Who is Bruce Rockowitz?

A. The company CEO.

Q. He was senior to you, right?

A. Yes.

Q. And he had a relationship with Mr. Cole, correct?

A. Correct.

(Continued on next page)

| LAEPCOL2 | Rabin - Cross | Page 844 |

Q. And there were also members of the Fung family at Li & Fung, right?

A. Correct.

Q. They were senior to you, right?

A. Yes.

Q. Now, going back to this e-mail in which you sent an update to several of your colleagues at Li & Fung about a conversation with Neil Cole, that's what this e-mail is, right?

A. Correct.

Q. Okay. And where you say, "He has his attorney working on all the papers and the contact person will have all the info you need;" do you see that?

A. Yes.

Q. And when you wrote, "He has his attorney working on all the papers," you meant that the Iconix lawyers were drafting the agreement, correct?

A. This appears that way, correct.

Q. And that's how business deals worked, right?

A. Yes.

Q. And that's how business arrangements are documented, right?

A. Correct.

Q. The lawyers draft agreements and the parties sign them, right?

A. Correct.

Q. Now, further down there's a line in here that the

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEPCOL2 | Rabin - Cross | Page 845 |

government did not ask you about, where it says, "He also will work on the 2 million for us this year. Just need to give him wording that works;" do you see that?

A. Yes.

Q. And the "he" is Neil Cole, right?

A. Yes.

Q. And when you told your colleagues that Mr. Cole will "work on the two million for us," the "for us" is for Li & Fung, right?

A. Correct.

Q. This was a request that Li & Fung was making to Iconix for a $2 million deal?

A. Correct.

Q. And when you wrote "need to give him wording that works," what you meant was you needed to provide a written agreement, correct?

A. Correct.

Q. You needed to provide a written agreement that included terms that would be acceptable to Li & Fung and to Iconix, right?

A. Right.

Q. And it was your understanding that Mr. Cole was okay with your proposal, as long as the lawyers and accountants were okay with it, right?

A. Say that again, please?

| LAEPCOL2 | Rabin - Cross | Page 846 |

Q. Sure. You understood -- your understanding was that Mr. Cole was okay with Li & Fung's proposal for a $2 million payment as long as the lawyers and accountants were okay with it?

MR. THOMAS: Objection, foundation.

THE COURT: Sustained.

Q. Your understanding was that -- you had a conversation with Mr. Cole prior to sending this e-mail, right?

A. Yes.

Q. You met with him that day, right?

A. Yes.

Q. And during that meeting, you discussed Li & Fung's request for $2 million, right?

A. Correct.

Q. And based on your discussion with Mr. Cole, you understood that Li & Fung was supposed to prepare documents for that agreement, right?

A. I don't remember.

Q. Okay. Your understanding was that -- well, let me ask you this. Where you say "give him wording that works," your understanding at the time was that Li & Fung would put together paperwork and send it to Iconix, right?

A. Yes.

Q. And your understanding was that the paperwork would then be reviewed by the Iconix legal team, correct?

| LAEPCOL2 | Rabin - Cross | Page 847 |

A. Correct.

Q. You can take that down.

You also understood that Mr. Cole wanted to share the details of what you were proposing with the Iconix CFO, correct?

MR. THOMAS: Objection, foundation.

THE COURT: Sustained.

Q. Do you recall learning that Mr. Cole wanted to understand in detail the $2 million you were proposing so he could share it with the Iconix CFO?

A. I'm not aware of that.

Q. Can we please show just the witness what's marked for identification as Defense Exhibit 1077.

And, Mr. Rabin, if you could just please read to yourself the highlighted portion, and then let us know when you've done that.

A. Okay.

Q. Does that refresh your recollection that your understanding was that Mr. Cole wanted to understand in detail the $2 million proposal you were making to share it with his CFO?

A. It does not reflect -- it does not refresh my memory.

MR. TARLOWE: Your Honor, we --

Q. Mr. Rabin, this is an e-mail that you received from Mr. Margolis?

A. Yes.

| LAEPCOL2 | Rabin - Cross | Page 848 |

Q. And the subject was "Iconix"?

A. Yes.

Q. And it's about a conversation with Mr. Cole, correct?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 1077.

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

MR. TARLOWE: Please take that down.

BY MR. TARLOWE:

Q. Now, yesterday, Mr. Rabin, you were shown during your direct examination two agreements that related to the SEA-1 transaction. One was a consultancy agreement; do you recall that?

A. Yes.

Q. And one was called a side-letter agreement; do you recall that?

A. Yes.

Q. And your understanding is that Kevin Chow of Li & Fung came up with the side-letter idea, right?

MR. THOMAS: Objection, foundation.

THE COURT: Overruled. You can answer.

A. To the best of my knowledge.

Q. And Li & Fung then asked Li & Fung's outside lawyers at the law firm Mayer Brown to prepare the consultancy agreement and the side-letter agreement, right?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEPCOL2          Rabin - Cross          Page 849

A. Yes.

Q. And if we could please show the witness and the parties what's marked for identification as Defense Exhibit 1108.

MR. TARLOWE: We offer Defense Exhibit 1108.

MR. THOMAS: No objection, your Honor.

THE COURT: It will be received.

(Defendant's Exhibit 1108 received in evidence)

MR. TARLOWE: May we publish it, your Honor?

THE COURT: You may.

BY MR. TARLOWE:

Q. Mr. Rabin, this is an e-mail from Kevin Chow at Li & Fung to you and others?

A. Correct.

Q. And remind us who Kevin Chow is?

A. He was my M and A for Li & Fung. He was running mergers and acquisitions for Li & Fung.

Q. The mergers and acquisitions refers to like buying another company, essentially, right?

A. Correct.

Q. Or making investments. And the subject is "Project Brand." That was the project name at Li & Fung for the SEA-1 transaction, correct?

A. Correct.

Q. And the other recipients of this e-mail include Jared Margolis, who we talked about yesterday, who worked in

LAEPCOL2          Rabin - Cross          Page 850

marketing, right?

A. He was in development and marketing.

Q. Dave Thomas, he was in finance?

A. Yes.

Q. Butt Lau, who is that?

A. Kevin Chow's boss.

Q. Was Mr. Lau also your boss?

A. Not my boss, no.

Q. He was more senior than you at L & F, right?

A. Yes.

Q. And then there's a py.chui; do you see that e-mail address?

A. Yes.

Q. Do you know who that person is?

A. I don't know who that person is, no.

Q. And you see it's a PWC e-mail address, right?

A. Yes.

Q. PWC was hired to do due diligence in connection with SEA-1, correct?

A. Correct.

Q. Hired by Li & Fung, right?

A. Correct.

Q. PWC is a big accounting firm, right?

A. Yes.

Q. And PWC was also Li & Fung's outside auditor, right?

A. Yes.

LAEPCOL2          Rabin - Cross          Page 851

Q. And then the next name is Mark Stevens. Mark Stevens is a lawyer, or was a lawyer, at the Mayer Brown law firm, correct?

A. Correct.

Q. And Mayer Brown is the law firm that was representing Li & Fung in connection with SEA-1, right?

A. Correct.

Q. And Mr. Chow writes, "Dear Jason, Dave and the team. Would like to give you an update on Project Brand." Do you see that?

A. Yes.

Q. And In the first numbered item is Documentation, and let's look at D. "Mark is working on the first draft of the side letter and consultancy agreement."

"Mark" refers to Mark Stevens, right?

A. Yes.

Q. That's the lawyer at Mayer Brown, right?

A. Yes.

Q. And so Li & Fung asked its lawyers to draft the side letter and consultancy agreement, correct?

A. Correct.

Q. And Mayer Brown was, in fact, drafting the side letter and consultancy agreement, correct?

A. Correct.

Q. And Li & Fung asked its lawyers to get involved to make sure that the documents would be appropriate, correct?

A. Correct.

LAEPCOL2          Rabin - Cross          Page 852

Q. You didn't withhold information about these agreements from Mayer Brown, correct?

A. Correct.

Q. You didn't ask anyone else to withhold information about these agreements from Mayer Brown, correct?

A. Correct.

Q. And the next sentence says, "Draft will be available today," and then it says, "We need to discuss it and may need to get F and A team input."

What was F and A? Is it finance and accounting?

A. I'm not sure.

Q. Well, "Dave" is Dave Thomas, right?

A. Yes.

Q. And Dave Thomas is in finance, right?

A. Yes.

Q. Okay. Does that help you determine what F and A team means?

A. Yes.

Q. Does it mean finance and accounting?

A. I don't know what it means.

Q. Okay. Now, you didn't withhold any information about these agreements from anyone at PWC, right?

A. Correct.

Q. You didn't ask anyone else to withhold information about these agreements from PWC, right?

| LAEPCOL2 | Rabin - Cross | Page 853 |
| --- | --- | --- |

A. Correct.

Q. You can take that down. And if we could please show the witness what's been marked for identification as Defense Exhibit 1109.

Mr. Rabin, this is a follow-up e-mail to the one we just looked at, correct?

A. I can't tell by this.

Q. Well, does the bottom e-mail --

A. Yes.

Q. -- appear to be the one we just looked at?

A. Correct.

MR. TARLOWE: We offer Defense Exhibit 1109.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1109 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. So if we could just show the bottom one first.

Was that the e-mail that we just looked at, right?

A. Correct.

Q. And this is the e-mail where Mr. Chow said that Mark Stevens at Mayer Brown was working on the first draft of the side letter and the consultancy agreement, correct?

A. Correct.

| LAEPCOL2 | Rabin - Cross | Page 854 |
| --- | --- | --- |

Q. And now the top e-mail, now Mark Stevens sends an e-mail saying, "Please see attached for your consideration a first draft, one-page side letter." Do you see that?

A. Yes.

Q. And then it says, "We are currently working on a short-form consultancy agreement." Do you see that?

A. Yes.

Q. And so this e-mail indicates that Mr. Stevens sent to this group for consideration a draft of the side letter, correct?

A. Correct.

Q. And Mr. Stevens, from Mayer Brown, indicated that Mayer Brown was still working on this consultancy agreement, right?

A. Yes.

Q. And if we can show the witness 1109-A. I'm sorry, can you put 1109 back up for one moment.

And in this e-mail where Mr. Stevens sent a draft of the side letter, that e-mail -- those e-mail recipients include PWC, right?

A. Yes.

Q. That includes Dave Thomas, right?

A. Yes.

Q. Butt Lau?

A. Yes.

Q. Right?

A. Yes.

| LAEPCOL2 | Rabin - Cross | Page 855 |
| --- | --- | --- |

Q. You can take that down.

And so Mayer Brown were the lawyers for Li & Fung, right?

A. Yes.

Q. And Iconix also had its own lawyers working on the transaction, correct?

A. Correct.

Q. Iconix's lawyers were the law firm Gibson, Dunn, right?

A. Yes.

Q. And no one asked you to withhold any information from the lawyers at Gibson, Dunn, right?

A. Correct.

Q. You were aware that in-house lawyers at Iconix were also working on the SEA-1 transaction, right?

A. I don't remember.

Q. Why don't we just show the witness Defense Exhibit 1116 for identification.

Mr. Rabin, I'd ask you to just take a look at this. Read to yourself and take a look at the cc on the e-mail, and do you recognize -- well, let me ask it differently.

Does this refresh your recollection that in-house lawyers at Iconix were also working on the SEA-1 transaction?

A. No.

Q. If you look at the name that was just highlighted, does that refresh your recollection?

| LAEPCOL2 | Rabin - Cross | Page 856 |
| --- | --- | --- |

A. Which name?

Q. The first one.

A. Lauren --

Q. No, no. Don't read the document. Just read it to yourself. It's the first recipient, yes.

Does that refresh your recollection that in-house lawyers at Iconix were working on the SEA-1 transaction?

A. No.

Q. Okay. You can take that down.

Now, in connection with the negotiation of the SEA-1 transaction, you also spoke to the Iconix CFO Warren Clamen, right?

A. I may have.

Q. Can we please show the witness what's been marked for identification as Defense Exhibit 2078.

And if you could read the top e-mail, the top one, to yourself?

Can we highlight the first sentence.

Does that refresh your recollection, Mr. Rabin, that you spoke to Warren Clamen, the Iconix CFO, about the SEA-1 transaction?

A. I remember speaking to him.

Q. And you spoke to him about the SEA-1 transaction, right?

A. I don't remember.

Q. You thought that Mr. Clamen was a tough negotiator, right?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEPCOL2     Rabin - Cross     Page 857

A. Yes.

Q. And you asked Mr. Cole to please make sure that Mr. Clamen communicates clearly with the lawyers, right?

A. Yes.

Q. And the reason that you asked Mr. Cole to please make sure that Mr. Clamen communicates clearly with the lawyers was so that the written agreements would accurately reflect the terms of the deal?

A. Yes.

Q. You can take that down.

Now, Mr. Cole did not ask you to withhold information about the SEA-1 transaction from Mr. Clamen, right?

A. Correct.

Q. And you did not withhold information from Mr. Clamen about the SEA-1 transaction, correct?

A. Correct.

Q. And Mr. Clamen was the chief financial officer of Iconix, right?

A. I believe so, yes.

Q. You understood, Mr. Rabin, that the letter agreement and the consultancy agreement were authorized by LF's counsel, right?

A. Yes.

Q. You understood that the letter agreement and consultancy agreement were also authorized by the M and A team, right?

LAEPCOL2     Rabin - Cross     Page 858

A. Yes.

Q. Now, those two documents that you were shown yesterday, the letter agreement and the consultancy agreement, those were just two of a larger set of transaction documents for the SEA-1 deal, right?

A. Yes.

Q. There were a whole bunch of agreements, right?

A. Yes.

Q. There was a share purchase agreement, right?

A. Yes.

Q. A shareholders agreement?

A. I believe so, yes.

Q. A master license agreement?

A. Yes.

Q. And you signed the various agreements on behalf of Li & Fung, right?

A. Yes.

Q. Now, I want to show you what's in evidence as Government Exhibit 207.

MR. TARLOWE: May we publish it, your Honor?

THE COURT: You may.

Q. This is the consultancy agreement that you looked at yesterday, right?

A. Yes.

Q. And you believe that LF, Li & Fung, was acting as a

LAEPCOL2     Rabin - Cross     Page 859

consultant, correct?

A. Yes.

Q. Now, you were asked during your direct testimony about this entity LF Centennial, right?

A. Yes.

Q. LF Centennial was just a subsidiary of Li & Fung, right?

A. I'm not familiar with LF Centennial.

Q. Well, let's take a look at -- let's show the witness and the parties Defense Exhibit 423 for identification.

Mr. Rabin, do you recognize that as Li & Fung's annual report for 2014?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 423.

MR. THOMAS: No objection, your Honor.

THE COURT: It will be received.

(Defendant's Exhibit 423 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. So this is an annual report that Li & Fung filed for the year 2014, right?

A. Yes.

Q. And could we please go to 206, page 206.

And you see on top the heading that says "Principal, subsidiaries and associated companies"? Do you see that?

LAEPCOL2     Rabin - Cross     Page 860

A. Yes.

Q. And then if you look down, the first sort of category is "Principal subsidiaries held directly;" do you see that?

A. Yes.

Q. And the second name under there, what's the second name?

A. LF Centennial.

Q. Okay. And scrolling over a couple of columns away, it says, "Percentage of equity held by the company," and for that one it says a hundred percent, right?

A. Correct.

Q. So LF Centennial was a 100 percent-owned subsidiary of Li & Fung, right?

A. Yes.

Q. We can take that down.

And, Mr. Rabin, LF Centennial was not used as the party to the consultancy agreement in order to hide anything, correct?

A. Correct.

Q. It was no secret that the side agreement -- sorry. The consultancy agreement was part of SEA-1, right?

A. Correct.

Q. And it's no secret that LF Centennial was related to LF, right?

A. Correct.

Q. And you're aware that sometimes corporations use a

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEPCOL2 | Rabin - Cross | Page 861 |
|---|---|---|

subsidiary for a particular agreement for tax or accounting reasons or legal reasons, right?

A. I'm not sure.

Q. Well, in all your years of business, Mr. Rabin, have you ever seen companies use subsidiaries to sign documents?

A. Yes.

Q. And, in fact, many of the agreements with Iconix were not with Iconix. They were with other names, like Iconix DE or Redline, right, or Red Diamond?

A. Yes, yes.

Q. And the agreement, the consultancy agreement, that used the name LF Centennial, that was the agreement drafted by LF's lawyers, right?

A. Yes.

Q. Now, you wanted to do the SEA-1 deal, right?

A. Yes.

Q. You thought it would be good for LF Asia, right?

A. Yes.

Q. You wanted to expand LF Asia's relationship with Iconix, right?

A. Yes.

Q. You considered Iconix to be an award-winning leader within the fashion and home branded, licensing industry, right?

A. Yes.

Q. And you thought it was a good deal, even at a higher price

| LAEPCOL2 | Rabin - Cross | Page 862 |
|---|---|---|

than what Li & Fung had proposed, right?

A. Yes.

Q. You thought that after five years, the business should be generating a minimum of $10 million in royalty income, right?

A. That, I don't remember.

Q. Okay. Let's show the witness what's been marked for identification as Defense Exhibit 1048.

And if you could please read to yourself only the highlighted lines.

A. Okay.

Q. Does that refresh your recollection that in 2013, you believed that in five years, the business should be generating a minimum of $10 million in royalty income?

A. Yes.

Q. You thought that it would be worth $55 million in five years, right?

A. Yes.

Q. And you talked yesterday about applying a multiple to royalties, right?

A. Yes.

Q. If you applied a multiple of 5.5 to 10 million, what value would that generate?

A. 55 million.

Q. And you thought this was an amazing deal for Li & Fung, correct?

| LAEPCOL2 | Rabin - Cross | Page 863 |
|---|---|---|

You can take that down.

A. I thought it would be a great deal, yes.

Q. You thought it would be an amazing deal.

A. Are you asking me a question?

Q. Yes. You thought it would be an amazing deal?

A. I thought it would be a good deal.

Q. Okay. You don't adopt "amazing"?

A. Sure.

Q. Well, let's show the witness what's marked for identification as Defense Exhibit 1129, please.

And if you could just read to yourself, Mr. Rabin, the highlighted language. Does that refresh your recollection that as of September 30th, 2013, you thought that the SEA-1 transaction was an amazing deal for Li & Fung?

A. Correct.

Q. You thought that the deal had huge, huge upsides, correct?

A. Correct.

Q. And, in fact, when the internal approval was being delayed, you were getting emotional about it, right?

A. Correct.

Q. Because you thought it was such an amazing deal?

A. Correct.

Q. We can take that down.

And you expected the SEA joint venture to become an integral part of LF Asia's business going forward, right?

| LAEPCOL2 | Rabin - Cross | Page 864 |
|---|---|---|

A. Yes.

Q. Now, in the 2013 time frame, LF Asia also received consultancy fees from other business partners, correct?

A. I don't remember.

Q. Do you remember that in 2013, Li & Fung became the lead agent for the Spyder brand in China and Southeast Asia?

A. I don't remember.

Q. Do you remember at some point that Li & Fung was the lead agent for the Spyder brand in China and Southeast Asia?

A. Yes.

Q. And as an agent, Li & Fung was entitled to agency fees, right?

A. Correct.

Q. And by the way, the Spyder brand has nothing to do with Iconix, right?

A. Correct.

Q. And in addition to agency fees, Li & Fung also received consultant fees, correct?

A. Correct.

Q. And in 2013, for example, LF Asia received a $750,000 consultant fee for Spyder Active Sports; do you recall that?

A. I don't recall that, no.

Q. And in late 2013, you were the president of LF Asia, right?

A. In what year? I'm sorry.

Q. In 2013.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 14, 2021

---

LAEPCOL2          Rabin - Cross          Page 865

A. Yes.

Q. Can we please show the witness what's been marked for identification as Defense Exhibit 1174-A22. Can you put up the next one, please, the next page of-A22.

Mr. Rabin, does that refresh your recollection that LF Asia received a $750,000 consultant fee in 2013 for work done on the Spyder brand?

A. It doesn't refresh my memory.

Q. Does this document appear to be an invoice from LF Asia Limited to Spyder Active Sports?

MR. THOMAS: Objection, your Honor, relevance. May I be heard?

THE COURT: Okay.

(Continued on next page)

---

LAEPCOL2          Rabin - Cross          Page 866

(At the side bar)

MR. THOMAS: Your Honor, the in limines, we discussed other transactions that occurred and other business deals that could come up at trial. The discussion that we had at that time with the Court was that the relevance predicate would be that Mr. Cole was aware of them or knew of them.

THE COURT: Or?

MR. THOMAS: Aware of them or knew of them.

THE COURT: Okay.

MR. THOMAS: Exploring, as Mr. Tarlowe has pointed out, the gigantic business affairs of Li & Fung doesn't bear on any issue of consequence in the case.

MR. TARLOWE: Judge, it's an entirely different issue. That issue was about other agreements Iconix entered into. The relevance of this is to demonstrate that, as a matter of course, Li & Fung entered into consultancy agreements with other business partners.

The government is arguing that there's something sinister about the consulting agreement between Li & Fung and Iconix, and one of the arguments they're making is that if Li & Fung was being compensated as an agent or otherwise, why would they need a consultancy agreement.

We are intending to demonstrate, through these documents, that this is how Li & Fung operated, that Li & Fung entered into these sorts of consulting agreements with all

---

LAEPCOL2          Rabin - Cross          Page 867

sorts of parties. It's clearly relevant to show that this particular consulting agreement is not out of the ordinary, suspicious or sinister.

And also, Judge, it has large, round-numbered dollars, which the government is arguing is something sinister when an invoice has large-number dollars, and it's relevant to show that Li & Fung invoiced other partners in the same way.

THE COURT: How many of these do you have?

MR. TARLOWE: A few.

THE COURT: What's a few?

MR. TARLOWE: Four?

MR. THOMAS: Your Honor, for the Court's consideration is a preliminary question here, like this page, which is ending Bates No. 33139. It doesn't even say that it's for consultancy services; so the --

MR. TARLOWE: The page I showed does, the next page.

MR. THOMAS: Well, just as an example. We've got the business -- a stack of other transactions that are not the transactions that are at trial that, as yet, don't involve Mr. Rabin directly and don't bear on his understanding or the understanding reached by the parties in the transaction.

MR. TARLOWE: He was the president of the company that issued the invoice. These are documents that were produced to us from Li & Fung, and I don't plan to -- it was produced as an attachment with 27 attachments. I'm intending to just offer

---

LAEPCOL2          Rabin - Cross          Page 868

the invoices, unless you want to put in the whole thing. It's clearly a business record.

THE COURT: I'll give you leeway to do that.

MR. TARLOWE: Thank you, your Honor.

(Continued on next page)

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEPCOL2     Rabin - Cross     Page 869

(In open court)

BY MR. TARLOWE:

Q. Mr. Rabin, do you recognize this as an invoice from LF Asia Limited to Spyder Active Sports?

A. Yes.

MR. TARLOWE: We offer Defense 1174-A22.

MR. THOMAS: Objection, your Honor, foundation.

THE COURT: Overruled. It will be received.

(Defendant's Exhibit 1174-A22 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. And so this is an invoice from LF Asia Limited, right?

A. Yes.

Q. The date is November 30, 2013?

A. Yes.

Q. And it's addressed to Spyder Active Sports?

A. Yes.

Q. And again, that has nothing to do with Iconix, right?

A. Correct.

Q. That was owned by Authentic Brands?

A. I'm not sure at that time, but perhaps.

Q. But Iconix was not the owner of the IP?

A. Correct.

Q. And the description is 2013 consulting fees for China and

LAEPCOL2     Rabin - Cross     Page 870

SEA - Spyder; do you see that?

A. Yes.

Q. And the amount of the invoice was $750,000, correct?

A. Correct.

Q. And we can take that down. Now, if we could please show the witness what's marked for identification as Defense Exhibit 1174-A21, and if we could go to the third page.

Mr. Rabin, do you recognize this document as an invoice from LF Asia in connection with the Marilyn Monroe brand?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 1174-A21.

MR. THOMAS: No objection, your Honor.

THE COURT: It will be received.

(Defendant's Exhibit 1174-A21 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. Now, this is an invoice from LF Asia dated November 30, 2013, right?

A. Yes.

Q. It's addressed to the Estate of Marilyn Monroe?

A. Yes.

Q. That's a brand that Li & Fung did work for?

A. Yes.

LAEPCOL2     Rabin - Cross     Page 871

Q. That was not owned by Iconix, right?

A. Correct.

Q. Nothing to do with Iconix, right?

A. Correct.

Q. And the description of this invoice is "2013 consulting fee for China and SEA-Marilyn Monroe," and the amount is $500,000, correct?

A. Correct.

Q. You can take that down. And if we could please show the witness Defense Exhibit 1174-A23 for identification, please.

Mr. Rabin, do you recognize this as another LF Asia invoice for consultancy fees?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 1174-A23.

MR. THOMAS: No objection.

THE COURT: It will be received.

MR. TARLOWE: May we publish it?

THE COURT: You may.

(Defendant's Exhibit 1174-A23 received in evidence)

BY MR. TARLOWE:

Q. Mr. Rabin, this is an invoice from LF Asia to Authentic Brands Group, correct?

A. Correct.

Q. And Authentic Brands Group is a brand management company?

A. Yes.

LAEPCOL2     Rabin - Cross     Page 872

Q. It's not Iconix, right?

A. Correct.

Q. And this invoice is for consulting fee for China and SEA - Juicy Couture, right?

A. Correct.

Q. And the amount of this invoice is $500,000, correct?

A. Correct.

Q. Juicy Couture is a brand that has nothing to do with Iconix, right?

A. Correct.

Q. You can take that down.

I'd like to switch gears for a moment, Mr. Rabin, and talk about the transaction that we've been referring to as SEA-3. I'll come back to two, but I want to ask you some questions about SEA-3. You'll know what I'm talking about?

A. Yes.

Q. And just so we're all on the same page, SEA-3 is the transaction that took place in September of 2014, right?

A. Yes.

Q. And it involved the Umbro and Lee Cooper brands in China, correct?

A. Correct.

Q. And some other regions in Asia. Right?

A. Yes.

Q. And you were not very involved in SEA-3, right?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                        **October 14, 2021**

| LAEPCOL2 | Rabin - Cross | Page 873 |
| --- | --- | --- |

A. Correct.

Q. You were transitioning the business to Mr. Margolis, correct?

A. Correct.

Q. Now, you testified yesterday that a price of 15.5 million was initially arrived at by coming up with a number times a multiple; do you recall that testimony?

A. Yes.

Q. What multiple did you use?

A. I don't recall.

Q. At that time, was there an existing China Umbro business?

A. I don't recall.

Q. Now, you testified yesterday that in 2014 -- withdrawn. In 2014, there was a royalty shortfall in connection with the Rocawear Kids license agreement with Iconix, correct?

A. Correct.

Q. And what a royalty shortfall means is the license agreement had certain guaranteed minimum royalty obligations, right?

A. Correct.

Q. Those are obligations that Li & Fung had to pay, right?

A. Correct.

Q. And the actual revenue being generated from the Rocawear Kids license was not enough to cover those minimum obligations, right?

A. Correct.

| LAEPCOL2 | Rabin - Cross | Page 874 |
| --- | --- | --- |

Q. And you referred to that as a royalty shortfall, correct?

A. Correct.

Q. And you were hoping that Iconix might provide relief from that shortfall, right?

A. Correct.

Q. And that was something that you thought most brand owners would help out with, right?

A. Right.

Q. Because in a business relationship, that's the kind of thing that one business partner might help the other business partner out on, right?

A. Correct.

Q. And in your experience, when there's a royalty shortfall, that's something that brand owners often help out with, right?

A. Correct.

Q. They don't have an obligation to do so, right?

A. Correct.

Q. But they do so to preserve and protect the business relationship, right?

MR. THOMAS: Objection, your Honor, opinion.

THE COURT: Sustained.

MR. TARLOWE: I'm sorry, I didn't hear the objection?

THE COURT: Sustained.  It was opinion.

BY MR. TARLOWE:

Q. Mr. Rabin, have you received royalty relief on occasion

| LAEPCOL2 | Rabin - Cross | Page 875 |
| --- | --- | --- |

from other brand owners?

A. Yes.

Q. Have you received royalty relief from other brand owners in situations where they have no obligation to provide that relief?

A. Yes.

Q. What is your understanding as to why they do that if they have no obligation?

MR. THOMAS: Objection, relevance.

THE COURT: Overruled.

A. Ask the question again, please?

Q. Sure.  You said that there were times when brand owners provided relief from royalty shortfalls even when they had no obligation to do so. And so my question, Mr. Rabin, is if they have no obligation to provide that relief, what's your understanding as to why they provide it?

A. Because of the business relationship.

THE COURT: Sir, can you get close to the microphone.

THE WITNESS: Sorry.  Because of the business relationship.

Q. That's part of the give-and-take between business partners, right?

A. Correct.

Q. And sometimes business partners make compromises on behalf

| LAEPCOL2 | Rabin - Cross | Page 876 |
| --- | --- | --- |

of the relationship, right?

A. Correct.

Q. Sometimes they accommodate requests made by the business partners, right?

A. Correct.

Q. Even if they have no obligation to do so?

A. Correct.

Q. Now, do you recall that in September of 2014, a draft termination letter was drafted in connection with the Rocawear Kids license agreement?

A. I don't remember.

Q. Okay.  Why don't we show the witness what's been marked for identification as Defense Exhibit 1371 and 1371-A1. Does this appear to be an e-mail that you received from Ethan Cole of LF on September 9th, 2014?

A. Yes.

Q. And do you see it has an attachment?  There's a line that says "Attachments" with a file name; do you see that?

A. Yes.

Q. Does the document on the right, does that appear to be the attachment?

A. I think that's the attachment.  Okay.

MR. TARLOWE: We offer Defense Exhibit 1371 and 1371-A1.

MR. THOMAS: No objection.

# A-286

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEPCOL2 Rabin - Cross Page 877 |
| --- |

THE COURT: They will be received.

(Defendant's Exhibits 1371 and 1371-A1 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. Now, starting with the e-mail, which is the document on the left, Ethan Cole sent to you and copied Jared Margolis, the e-mail saying "Hi Jason. Attached please find the first draft of the termination letter that Seth provided. See below for a quick summary." Do you see that?

A. Yes.

Q. And you understand the "Seth" to be Seth Horowitz?

A. Yes.

Q. And you knew that Mr. Margolis was having discussions with Seth Horowitz, correct?

A. I didn't -- I didn't know at that time, but possible.

Q. Well, even if you didn't know they were discussing this subject, you knew that Mr. Horowitz and Mr. Margolis were in discussions with each other?

A. Yes.

Q. And the document that's attached, it's a draft termination letter, correct?

A. Yes.

Q. And if we could turn to the second page of that document.

| LAEPCOL2 Rabin - Cross Page 878 |
| --- |

Is there another page? Okay. Do you see it's unsigned?

A. Yes.

Q. And, Mr. Rabin, you told the government that you were not sure if the draft termination letter was tied to the increasing price for SEA-3, correct?

A. Can I please hear the question again?

Q. Sure. You told the government that you were not sure whether the draft termination letter for Rocawear Kids was tied to the increase in purchase price for SEA-3?

A. I don't remember that. I'm sorry.

Q. Can you please show the witness what's marked for identification as Defense Exhibit 3570-11 at page 7. No, I'm sorry, that's not it. It's on the bottom. And the sentence that starts with "Rabin" second up from the bottom, second from the bottom. And just the first sentence.

Read that to yourself, Mr. Rabin.

Does that refresh your recollection that you told the government you were not sure if the termination letter was tied to the overpayment for SEA-3?

A. I don't remember, I'm sorry.

Q. Do you deny that you told the government that?

A. No.

Q. You can take that down.

Now, the draft termination letter for Rocawear Kids, that was never finalized or signed, correct?

| LAEPCOL2 Rabin - Cross Page 879 |
| --- |

A. Ask the question again, please?

Q. Sure. We looked at a draft termination letter for the Rocawear Kids license agreement, right?

A. Yes.

Q. That letter was never finalized or signed, right?

A. This particular letter? I don't remember if there was --

Q. Well, Mr. Rabin, you know that GBG -- Li & Fung/GBG was not released from its Rocawear Kids royalty obligations, right?

A. Yes.

Q. GBG continued to pay its royalty obligations under the Rocawear Kids license agreement, right?

A. Correct.

Q. So the license agreement was not terminated, right?

A. I believe it was terminated at a certain point.

Q. Okay.

A. I don't remember --

Q. It was not terminated in 2014, right?

A. Possibly.

Q. It was not terminated in 2015?

A. That, I don't know.

Q. Well, Mr. Rabin, you know that GBG continued to make the minimum royalty payments due under the Rocawear Kids license agreement?

A. Yes.

Q. And GBG did not sue Iconix or file a claim asserting that

| LAEPCOL2 Rabin - Cross Page 880 |
| --- |

Iconix had breached an agreement --

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

Q. Did Iconix, to your knowledge, file a lawsuit alleging that GBG had breached on agreement to terminate the Roc Kids claim -- sorry.

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

MR. TARLOWE: Withdrawn. I misspoke, your Honor.

BY MR. TARLOWE:

Q. The question I meant to ask is, as far as you know, GBG did not sue Iconix claiming that Iconix had breached an agreement to terminate the Roc Kids license?

MR. THOMAS: Objection, your Honor.

A. Not to my knowledge.

THE COURT: The objection was sustained.

MR. THOMAS: Move to strike the response, your Honor.

THE COURT: It will be stricken.

MR. TARLOWE: I'm going to move on to another topic, your Honor. I'm happy to keep going.

THE COURT: We can break now. We'll take our first break, ladies and gentlemen. We'll reconvene at 15 minutes after the hour.

(Jury not present)

Mr. Rabin, you may step down.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    **October 14, 2021**

---

LAEPCOL2          Rabin - Cross          Page 881

(Witness temporarily excused)

And we can be seated.  Anything for me?

MR. THOMAS: Nothing from the government, your Honor.

MR. TARLOWE: Not from us either.

THE COURT: Don't be late.

(Recess)

---

LAEMCOL3          Rabin - Cross          Page 882

THE COURT: Can we get Mr. Rabin in, please.

(Jury present)

THE COURT: Mr. Tarlowe.

MR. TARLOWE: May I proceed, your Honor?

THE COURT: You may.

BY MR. TARLOWE:

Q. Mr. Rabin, I'd like to ask you some questions now about an internal process at LF and GBG known as the PIP.  What is that?

A. To the best of my recollection --

Q. Let me see if I can help you.

LF and GBG had an investment committee, right?

A. Correct.

Q. And the investment committee had to approve investments or transactions, right?

A. Correct.

Q. And the way that the internal process worked was that the people working on a transaction would prepare a memo, right?

A. Correct.

Q. And the memo would be called or sometimes was referred to as a PIP or PIP memo, correct?

A. Yes.

Q. That stands for preliminary investment proposal?

A. Correct.

Q. And the way the process worked was, the deal team put together the memo and then submitted it to the investment

---

LAEMCOL3          Rabin - Cross          Page 883

committee, right?

A. Correct.

Q. And the investment committee would consider the proposal, right?

A. Yes.

Q. And they would decide whether to authorize it or not.

A. Correct.

Q. The investment committee included senior people from Li & Fung and then GBG, right?

A. Correct.

Q. And the investment committee wasn't a rubber stamp, right?

A. Define rubber stamp.

Q. Sure.  What I mean by that is, they actually -- they asked questions, they engaged, right?

A. Correct.

Q. They didn't just sign off automatically on every proposal.

A. Correct.

Q. And you didn't have authority to just go out and enter into transactions on your own.  They had to be approved by the investment committee, right?

A. Correct.

Q. And when the deal team prepares a PIP memo, it's important that the PIP memo include all of the material terms of the deal, right?

A. Correct.

---

LAEMCOL3          Rabin - Cross          Page 884

Q. If the deal terms change, the PIP memo has to be updated or revised, right?

A. Correct.

Q. Because whatever the final deal is, it's got to be approved by the investment committee.

A. Correct.

Q. And even though we have seen examples of you signing transaction documents, you can't sign those until the investment committee approves the transaction.

A. Correct.

MR. TARLOWE: Can we please show the witness and the parties what's marked for identification as Defense Exhibit 1384 and 1384-A1.

Can we look at 1384-A1 first, please.

Q. Mr. Rabin, 1384-A1, is that a PIP memo for the SEA-3 transaction?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 1384-A1.

MR. THOMAS: Objection.  Foundation, your Honor.

THE COURT: Ask another question, Mr. Tarlowe.

Q. The PIP memo is something that's prepared in the ordinary course of business?

A. Yes.

Q. It's prepared by people who have knowledge of the information?

---

# A-288

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    October 14, 2021

| LAEMCOL3 | Rabin - Cross | Page 885 |
| --- | --- | --- |

A. Yes.

MR. TARLOWE: We offer it.

MR. THOMAS: Objection, your Honor. We could explain at sidebar. OK.

(Continued on next page)

| LAEMCOL3 | Rabin - Cross | Page 886 |
| --- | --- | --- |

(At sidebar)

MR. THOMAS: Your Honor, Mr. Tarlowe has presented the witness with an attachment to an e-mail that he is not on that has a version of a PIP that he was not asked if he had reviewed at the time. Without that foundation, I think it's hearsay at this point.

MR. TARLOWE: It's a business record. It was prepared in the ordinary course. It is submitted to the committee that reviews the transactions.

THE COURT: I am going to allow it.

MR. THOMAS: Yes, your Honor.

(Continued on next page)

| LAEMCOL3 | Rabin - Cross | Page 887 |
| --- | --- | --- |

(In open court)

MR. TARLOWE: May we publish it?

THE COURT: The objection is overruled. The exhibit will be received and you may publish it.

(Defendant's Exhibit 1384-A1 received in evidence)

MR. TARLOWE: Thank you.

Could you zoom out for one moment.

Q. Mr. Rabin, this is a PIP memo for project named Brand 3. That's SEA-3, right?

A. Yes.

Q. And the date is September 12, 2014?

A. Yes.

Q. It says from Jared Margolis to members of the investment committee, correct?

A. Correct.

Q. The first line says: Southeast Asia JV, Umbro China and Lee Cooper China.

You see that?

A. Yes.

Q. That's SEA-3, right?

A. Yes.

Q. Then it says: Total consideration of $21.5 million is fixed and will not be adjusted based on results of base year.

You see that?

A. Yes.

| LAEMCOL3 | Rabin - Cross | Page 888 |
| --- | --- | --- |

Q. Total consideration of $21.5 million, that is what the final purchase price was for SEA-3, correct?

A. Correct.

MR. TARLOWE: If you turn to the next page, please.

Are we able to turn to the next page? Thank you.

If you could just scroll through so Mr. Rabin can see the document.

Stop there for a moment. Sorry. Can you go to the next page. Thank you.

Q. Mr. Rabin, this describes a transaction in which GBG is purchasing an interest in a joint venture with the rights to Lee Cooper in China and Umbro in China, correct?

A. Correct.

Q. And the purchase price is $21.5 million, correct?

A. Correct.

Q. There is nothing in this PIP memo about a termination of the Rocawear Kids license, correct?

A. I don't know.

Q. Well, why don't we take a moment. You can scroll through. Have you reviewed this before, this document?

A. I don't know.

Q. Mr. Rabin, do you see anything on those pages about a termination of Rocawear Kids?

A. No.

Q. Do you see anything on those pages about a commitment or

LAEMCOL3     Rabin - Cross     Page 889

obligation on the part of Iconix to relieve GBG of its Rocawear Kids royalty obligations?

A. No.

Q. The investment committee approved the SEA-3 transaction with a purchase price of $21.5 million, correct?

A. Correct.

MR. TARLOWE: We can take that down.

Q. Now, did you prepare that PIP memo? Did you have a role in preparing that PIP memo?

A. Not that I recall.

Q. Did you instruct anybody to keep any information out of the PIP memo?

A. No.

Q. You signed the SEA-3 transaction documents on behalf of GBG, correct?

A. Correct.

MR. TARLOWE: Can we please show the witness -- it's in evidence so we can show everybody Defense Exhibit 304-A2.

Q. Mr. Rabin, this is a letter agreement relating to SEA-3, correct?

A. Yes.

MR. TARLOWE: Can we go to the last page.

Q. Look at the signature page. That's your signature, Mr. Rabin?

A. Yes.

LAEMCOL3     Rabin - Cross     Page 890

MR. TARLOWE: We can go back to the first page.

Q. You see there that it says: Iconix and GBG acknowledge and agree that the right to use certain trademark registrations or applications in the People's Republic of China, Hong Kong, and some other territories, referred to as CMHT, is deemed to have a fair market value of $43 million and that because Iconix and GBG each own 50 percent of licensee, GBG's ownership of 50 percent will provide GBG a benefit equal to 50 percent of such fair market value or $21.5 million.

You see that?

A. Yes.

Q. $21.5 million, that's the purchase price, correct?

A. Correct.

MR. TARLOWE: Go back to the document, please, and the next paragraph.

Q. You see here it says: In order to compensate the CMHT marks licensors -- that's essentially Iconix, right?

A. I'm sorry. What's the question?

Q. Let me continue for a moment. To compensate the licensors for 50 percent of the fair market value, the licensors and GBG hereby agree that GBG shall pay $21.5 million.

You see that?

A. Yes.

Q. That's saying the purchase price is $21.5 million, right?

A. Correct.

LAEMCOL3     Rabin - Cross     Page 891

MR. TARLOWE: If we turn to page 2 of this, the bottom paragraph.

Q. You see here it states: This letter agreement and the agreements referred to herein, and then it lists some other agreements, and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

You see that?

A. Yes.

Q. There is nothing in this agreement about a termination of the Rocawear Kids license agreement, correct?

A. Correct.

Q. There is nothing in this agreement that creates an obligation on the part of Iconix to terminate the Rocawear Kids license, right?

A. Correct.

Q. There is nothing in the agreement that creates an obligation on the part of Iconix to relieve GBG of its Roc Kids royalty obligations, right?

A. Correct.

MR. TARLOWE: If we could now show the witness what's in evidence as Defense Exhibit 304-A1.

Q. This is amendment No. 2 to master license agreement. This

LAEMCOL3     Rabin - Cross     Page 892

is a document related to the SEA-3 transaction?

A. OK.

Q. Do you recognize it, Mr. Rabin, as a document related to the SEA-3 transaction?

A. Yes.

MR. TARLOWE: If we scroll to the end.

Can we go back to the beginning, please.

Q. On page 1, the second-to-the-bottom whereas clause, do you see here that this provision says that the fair market value of SEA-3 is $21.5 million?

A. Are you asking me a question?

Q. Yes. Do you see that it says that the fair market value of GBG's 50 percent interest in SEA-3 is $21.5 million?

A. Yes.

Q. That's the purchase price, right?

A. Yes.

MR. TARLOWE: If we could go to page 9 of this document.

Q. You see that paragraph that says: Exclusivity of representations and warranties?

A. Yes.

Q. It says: Neither Iconix nor any of its affiliates is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this agreement, and Iconix hereby

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                                    October 14, 2021

LAEMCOL3          Rabin - Cross          Page 893

disclaims any other such representations and warranties.
You see that language?
A. Yes.
Q. There is nothing in this agreement about the termination of the Rocawear Kids license agreement, right?
A. Correct.
Q. There is nothing in this agreement that obligates Iconix to relieve GBG of any royalty obligations, right?
A. Correct.
MR. TARLOWE: If we could publish what's in evidence as Defense Exhibit 304-A3, please.
Q. This is another transaction document from the SEA-3 transaction?
A. I'm sorry.
Q. This is an amended and restated shareholders agreement in connection with the SEA-3 transaction?
A. Yes.
MR. TARLOWE: If we could please take a look at page 27 where it says entire agreement.
Q. Mr. Rabin, you see that this document has a section entitled entire agreement that states: This agreement and the purchase agreement, together with all exhibits and schedules hereto and thereto, contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the

LAEMCOL3          Rabin - Cross          Page 894

subject matter hereof.
You see that language?
A. Yes.
Q. There is nothing in this agreement about a termination of the Rocawear Kids license agreement, right?
A. Correct.
Q. There is nothing in this agreement that obligates Iconix to relieve GBG of its Rocawear Kids royalty obligations, correct?
A. Correct.
Q. Mr. Cole did not ask you to keep any of the terms of the SEA-3 transaction out of the written agreements, correct?
A. Correct.
Q. You did not take steps to keep any of the terms out of the SEA-3 transaction documents, correct?
A. Correct.
Q. You did not take any steps to keep any terms of the transaction secret, correct?
A. Correct.
MR. TARLOWE: We can take that down.
Q. Now, I am going to show you what's marked for identification as Defense Exhibit 1343.
Do you recognize this as an e-mail exchange between you and Steven Pinkow of GBG?
A. Yes.
Q. Do you remember that Mr. Pinkow did work to analyze a

LAEMCOL3          Rabin - Cross          Page 895

potential transfer of the Rocawear Kids license to another party?
A. Yes.
MR. TARLOWE: We offer Defense Exhibit 1343.
MR. THOMAS: Objection, your Honor. Hearsay.
THE COURT: Sustained.
Q. Do you recall discussing with Mr. Pinkow the Rainbow giveback?
A. I don't remember the details of the conversation, no.
Q. Even if you don't remember the details, Mr. Rabin, do you remember discussing with Mr. Pinkow how to handle the Rainbow giveback if the Rocawear Kids license were transferred?
A. I don't remember.
Q. Are you familiar --
MR. TARLOWE: We can take that down.
Q. Now, you're currently the CEO of a company called Centric, right?
A. Correct.
Q. There are times when Centric is asked for support from its customers, correct?
A. Correct.
Q. One type of support is known as a markdown allowance, right?
A. When the customer asked us, the company, to give them back -- give them markdown money if the goods are not

LAEMCOL3          Rabin - Cross          Page 896

performing to the level that the agreement is.
Q. Just to give the jury an example of this, let's say your company, you sell a bunch of goods to Macy's. Macy's pays you, right?
A. Yes.
Q. And then if Macy's has trouble selling those goods, Macy's might offer a discount in order to help sell them, right?
A. Correct.
Q. And then Macy's might come back to you and say, hey, we paid you all that money, but we had to mark down the prices. We want you to give some of that money back.
A. Correct.
Q. That's sometimes called a giveback?
A. Markdown money.
Q. Have you heard that referred to as a giveback?
MR. THOMAS: Objection, your Honor. 701.
THE COURT: Overruled.
A. Yes.
Q. Centric offers markdown allowance to help promote their goods, right?
A. Correct.
Q. And you also do that to maintain goodwill with your customers, correct?
A. Correct.
Q. Markdown allowances are typically negotiated every quarter,

**A-291**

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 14, 2021

| LAEMCOL3 | Rabin - Cross | Page 897 |

right?
A. Correct.
Q. When a brand is not performing well and a retailer looks to you for support, you sometimes then will go to the IP owner and ask them to provide support, right?
A. Sometimes.
Q. Centric also provides cooperative advertising, correct?
A. Correct.
Q. And cooperative advertising is essentially a partnership between manufacturers, like Centric and their customers, to share the cost of advertising, right?
A. Correct.
Q. And cooperative advertising is common in the fashion apparel industry, correct?
    MR. THOMAS: Objection. 703.
    THE COURT: Overruled.
    THE WITNESS: Can I answer?
    THE COURT: You can answer.
A. Can you repeat the question?
Q. Sure. Cooperative advertising programs like the one Centric participates in, those are common in the fashion apparel accessories industry, correct?
A. Right.
Q. Markdown allowances are common, right?
A. Right.

| LAEMCOL3 | Rabin - Cross | Page 898 |

Q. What about chargebacks? Are you familiar with chargebacks?
A. Yes.
Q. What's a chargeback?
A. When the retailer -- there is different forms of chargebacks.
Q. Is it essentially another example of a customer requesting money from the brand owner?
A. It's a brand operator.
Q. And going back to cooperative advertising for a moment, sometimes that's negotiated as a fixed dollar amount, right?
A. Correct.
Q. Part of the purpose of programs like cooperative advertising is to maintain positive productive and profitable relationships with customers, right?
A. Please restate what you are saying.
Q. Sure. One of the reasons why companies like Centric provide cooperative advertising or markdown allowances is to maintain positive relationships with its business partners?
A. Cooperative -- I don't agree with the statement you are making. I'm sorry.
Q. There are jobs at Centric that involve managing the givebacks with customers, right?
    MR. THOMAS: Objection. Relevance.
    THE COURT: Sustained.
Q. I am going to shift gears now, Mr. Rabin, to SEA-2. Again,

| LAEMCOL3 | Rabin - Cross | Page 899 |

just to orient us all, that's the transaction that closed at the end of June 2014, correct?
A. Correct.
Q. And you were not as involved in the SEA-2 and SEA-3 transactions as you were in SEA-1, right?
A. Correct.
Q. You had some serious medical issues in 2014, right?
A. Correct.
Q. You had open-heart surgery in March of 2014?
A. Yes.
Q. And then at the end of June you had to go back to the hospital, right?
A. Yes.
Q. Now, you were aware in April 2014 that Jared Margolis was having discussions with Seth Horowitz about other potential transactions between GBG and Iconix, correct?
A. I can't tell you the date of when they had conversations. I'm sorry.
Q. That's understandable. Let me see if we can help you out.
    MR. TARLOWE: Can we show the witness Defense Exhibit 1184 for identification.
Q. Does that help refresh your recollection, Mr. Rabin, that you were aware in April 2014 that Jared Margolis was having discussions with Seth Horowitz about other potential transactions with Iconix?

| LAEMCOL3 | Rabin - Cross | Page 900 |

A. It doesn't refresh my memory.
    MR. TARLOWE: We could take that down.
A. I'm sorry?
    MR. TARLOWE: We can take that down.
Q. By the way, you did not like dealing with Seth Horowitz, right?
A. Correct.
Q. You thought he had a big ego, right?
A. Correct.
Q. And you also had previously dealt with Horowitz when he was at Modell's, right?
A. Correct.
Q. And you had unpleasant experiences with him at that time as well, right?
A. It depends how you define unpleasant.
Q. Did you have bad experiences with him?
    MR. THOMAS: Objection, your Honor. Relevance.
    THE COURT: Overruled.
A. I don't know if it was bad. It just -- I don't remember exactly the experiences I had with him.
Q. But you remember you didn't like dealing with him.
A. Correct.
Q. Now, the final SEA-2 transaction amended SEA-1 in essentially two ways, right? Do you remember that?
A. Please repeat that.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

---

LAEMCOL3          Rabin - Cross          Page 901

Q. Sure. The SEA-2 transaction essentially had two components. One was Europe for certain brands and the other was Korea. Do you recall that?

A. SEA-2, yes.

(Continued on next page)

---

LAEPCOL4          Rabin - Cross          Page 903

Q. Okay. Why don't we look back at 1233.

And is this an e-mail that you received from Joseph Favuzza?

A. Yes.

Q. And you see it has an attachment?

A. Yes.

Q. Okay.

MR. TARLOWE: We offer Defense Exhibit 1233 and 1233-A.

MR. THOMAS: In light of the Court's earlier ruling, no objection.

THE COURT: It will be received.

(Defendant's Exhibits 1233 and 1233-A received in evidence)

BY MR. TARLOWE:

Q. And so, Mr. Rabin, who is Joseph Favuzza?

A. The senior vice president of M and A.

Q. Okay. And he sent this e-mail to you and Ron Ventricelli, right?

A. Yes.

Q. Okay. And now, let's look at the attachment. This is a draft of the SEA-2 PIP memo, correct?

A. Yes.

Q. And it's dated June 5th, 2014, right?

A. Yes.

---

LAEPCOL4          Rabin - Cross          Page 902

Q. Now, before the terms of SEA-2 were finalized, GBG and Iconix discussed a potential transaction that included those two components and a third component, Lee Cooper Europe, correct?

A. I don't remember.

Q. Why don't we see if this helps. Can we please show the witness Defense Exhibit 1233 for identification. Do we have the attachment? You know what, I think it will be easier to use -- sorry. Why don't we use Defense Exhibit 1233? Can we use 1233 for identification? I think that will be easier. And, Mr. Klein, can you put up the first two pages of-A1, 1233-A1.

And, Mr. Rabin, take a moment to read that to yourself and then see if that refreshes your recollection that before the SEA-2 deal was finalized, there was a transaction being considered that included three components.

(Pause)

A. Okay.

Q. Does that help -- does that refresh your recollection, Mr. Rabin, that there was a discussion about an SEA-2 transaction that involved three components, Korea, Europe and Lee Cooper Europe?

A. It doesn't refresh my memory.

Q. I'm sorry, it does not?

A. It does not. I'm sorry.

---

LAEPCOL4          Rabin - Cross          Page 904

Q. It's from Mr. Famulak and you, right?

A. Yes.

Q. To members of the investment committee, correct?

A. Correct.

Q. And then, if you look in that first box, it says A, B and C, Southeast Asia-Korea brand, Southeast Asia-JV Europe brand and, C, Europe participation agreement-Lee Cooper; do you see that?

A. Yes.

Q. And if you look at the next box, it says total consideration for all amendments, $24.9 million. So as of June 5th, 2014, the transaction being contemplated included three components, right?

A. Yes.

Q. It included, and you can see this under the executive summary, A, Korea brands; B, Europe brands; and C, Lee Cooper. Do you see that?

A. Yes.

Q. And the total price being considered for all three was $24.9 million, right?

A. Yes.

Q. Okay. We can take that down.

Now, in the June 2014 time frame, GBG was preparing for a spinoff from Li & Fung, right?

A. I'm not aware of the timing, but I'm agreeing with the

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEPCOL4 | Rabin - Cross | Page 905 |
|---|---|---|

spinoff.

Q. Do you recall that the spinoff took place in July of 2014?

A. I don't recall when the spinoff took place.

Q. And do you remember that there was some uncertainty about whether the Lee Cooper Europe portion of the transaction could take place before the spinoff?

A. I don't recall.

Q. Do you remember that Li & Fung determined that it could not go forward with the Lee Cooper Europe portion of the transaction prior to the spinoff?

A. Again, I don't recall.

Q. Why don't we show the witness what's marked for identification as Defense Exhibit 1261.

This is an e-mail that you received, Mr. Rabin, from Mr. Famulak on June 18, 2014?

A. Correct.

MR. TARLOWE: We offer Defense Exhibit 1261.

MR. THOMAS: Objection, hearsay.

THE COURT: Overruled.

(Defendant's Exhibit 1261 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. Now, in this e-mail from Mr. Famulak to you, Ron Ventricelli and Joseph Favuzza. Mr. Famulak says, "Not sure

| LAEPCOL4 | Rabin - Cross | Page 906 |
|---|---|---|

what this does to the deal, but Ed is def" -- I guess definitely -- "right. We can't do the option."

The "option" referred to Lee Cooper Europe, correct?

A. I don't remember.

Q. We can take that down.

Now, if the Lee Cooper portion of the SEA-2 transaction was -- let me rephrase that.

If the SEA-2 transaction included two components instead of three, it would have a lower -- you would expect it to have a lower purchase price, correct?

A. Correct.

Q. So the price that was being considered for all three was $24.9 million, right?

A. I believe that's what it said.

Q. And if Lee Cooper was removed from that, the price would come down, right?

A. I would agree, correct.

Q. And GBG was concerned that without Lee Cooper, the deal might be too small, and Iconix may not want to go forward?

A. I don't remember.

Q. You don't remember one way or the other?

A. Correct.

Q. GBG viewed the Lee Cooper Europe rights as valuable, right?

A. I don't remember.

Q. Do you remember, Mr. Rabin, that GBG was enthusiastic about

| LAEPCOL4 | Rabin - Cross | Page 907 |
|---|---|---|

getting the rights to Lee Cooper Europe?

A. Perhaps, yes.

Q. And GBG was hoping that even though it couldn't do the Lee Cooper portion of the transaction prior to the spinoff, GBG was hoping that it could do it after the spinoff?

A. I just don't remember. I'm sorry.

Q. Do you remember discussions with the investment committee about the impact of Lee Cooper coming out of the SEA-2 transaction?

A. I'm sorry, I don't remember.

Q. Was it your understanding that Mr. Ventricelli spoke to Mr. Cole about the timing of Lee Cooper Europe?

A. Again, I don't -- I can't deny it. I just don't remember.

Q. Okay. Why don't we see if maybe this helps. Defense Exhibit 1258 for identification, if we could just show that to the witness.

Mr. Rabin, does that refresh your recollection that you had an understanding that Mr. Ventricelli spoke with Mr. Cole about the Lee Cooper portion of the transaction?

A. It doesn't refresh my memory, no.

Q. Well, this is an e-mail that you received on June 18th, 2014?

A. I'm sorry?

Q. This is an e-mail that you received?

A. Yes.

| LAEPCOL4 | Rabin - Cross | Page 908 |
|---|---|---|

MR. TARLOWE: Okay. We offer Defense Exhibit 1258.

MR. THOMAS: Objection, hearsay.

THE COURT: Sustained.

Q. Was it your understanding that Mr. Famulak spoke with Mr. Cole about the timing of the Lee Cooper Europe component of SEA-2?

A. I don't -- I don't remember.

Q. Can we show Mr. Rabin what's marked for identification as Defense Exhibit 1264, please, the top e-mail.

Does that refresh your recollection, Mr. Rabin?

A. It doesn't refresh my recollection, no.

Q. Does it refresh your recollection that the Lee Cooper Europe portion of SEA-2 was the one that GBG wanted the most?

A. I don't -- I just don't remember about that, I'm sorry.

Q. Okay. It's hard for you to remember in 2014?

A. Yes.

Q. It was a long time ago.

Now, in connection with the SEA-2 transaction, before you could sign the transaction documents, you needed approval from the investment committee, correct?

A. Correct.

Q. And I think you said this earlier, but if the terms of a deal changed after the PIP, it would have to be revised and resubmitted, right?

A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

---

LAEPCOL4     Rabin - Cross     Page 909

Q. Let's take a look at Defense Exhibit 1312 and 1312-A1 for identification for the witness and the parties, please.

Mr. Rabin, do you recognize this, the document on the left, as an e-mail to you and others, to members of the investment committee, setting up a meeting of the investment committee?

A. What's the question?

Q. Yes. Is this an e-mail that you received in connection with an investment committee meeting in June 2014?

A. Yes.

Q. And the subject, does the subject indicate that it relates to SEA-2?

A. Yes.

Q. And it attaches a PIP memo, correct?

A. Correct.

Q. And the PIP memo is what's marked as 1312-A1, correct?

A. Correct.

MR. TARLOWE: And we offer Defense Exhibit 1312 and 1312-A1.

MR. THOMAS: In light of the Court's prior ruling, no objection.

THE COURT: They will be received.

(Defendant's Exhibits 1312 and 1312-A1 received in evidence)

MR. TARLOWE: May we publish it?

---

LAEPCOL4     Rabin - Cross     Page 910

THE COURT: You may.

BY MR. TARLOWE:

Q. And so starting with the e-mail on the left, this is an e-mail to members of the investment committee, right?

A. Correct.

Q. And it's concerning an investment committee meeting that will be held at 11:00 p.m. on June 28th, 2014, to discuss Project Brand 2, correct?

A. Correct.

Q. And it's sent to members of the investment committee?

A. Correct.

Q. Okay. And then the document that we have to the right -- we can take down, the one on the left.

The document on the right, this is the updated PIP memo, correct?

A. Correct.

Q. And if you look at down below, the size of amendments, do you see it says 15.9 million?

A. Yes.

Q. And now, the executive summary shows that the deal has two components, not three, right?

A. Correct.

Q. Korea and Europe, right?

A. Yes.

Q. And there's no Lee Cooper Europe anymore, right?

---

LAEPCOL4     Rabin - Cross     Page 911

A. Right.

Q. Okay. Can we turn to the next page, please.

And do you see it says, "the documents have been fully negotiated and are in substantially final form;" do you see that?

A. Yes.

Q. Okay. And then it says, "LF Asia requests approval from the investment committee to finalize and sign;" do you see that?

A. Yes.

Q. Okay. And so the price reflected in this document for SEA-2 is $15.9 million, correct?

A. Yes.

Q. And there's nothing in the PIP memo about the commitment of Iconix to make a future marketing payment to GBG, correct?

A. Correct.

Q. And you did not purposely keep any terms of the agreement out of the PIP memo, right?

A. Correct.

Q. And, in fact, you thought it was important that the PIP memo include all of the material terms, correct?

A. Correct.

Q. And you didn't ask anyone else to keep any of the terms of the transaction out of the PIP memo, right?

A. Correct.

---

LAEPCOL4     Rabin - Cross     Page 912

Q. We can take that down.

And you signed the transaction documents for SEA-2, right?

A. I believe so, yes.

Q. And you discussed the terms of the SEA-2 transaction with the M and A team, the mergers and acquisitions team, at GBG, correct?

A. Correct.

Q. You also discussed the terms of the SEA-2 transaction with Rob Smits, correct?

A. Correct.

Q. Rob Smits was a lawyer at GBG, correct?

A. Correct.

Q. And Mr. Smits was involved in drafting and reviewing the SEA-2 transaction documents, right?

A. I would assume so.

Q. You didn't withhold information from Mr. Smits, right?

A. Correct.

Q. You did not ask Mr. Smits to leave anything out of the written agreement, right?

A. Correct.

Q. Now, if we take a look at Defense Exhibit 302 -- sorry, 303-A2, which is in evidence, Mr. Rabin, this is a letter agreement in connection with SEA-2, right?

A. Yes.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 14, 2021

| LAEPCOL4 | Rabin - Cross | Page 913 |
| --- | --- | --- |

Q. And if we look at the second paragraph, it says that Iconix -- can we blow that up, please.

It says that "Iconix and LF acknowledge and agree that the right to use certain trademark registrations" -- skip a bunch of words -- "is deemed to have a fair market value of $31,835,000" and that "because Iconix and LF each own 50 percent, LF's ownership of 50 percent will provide LF a benefit equal to 50 percent of such fair market value or U.S. dollars $15,917,500." Do you see that?

A. Yes.

Q. And so this is saying that the fair market value of the interest that LF was purchasing in SEA-2 was $15.9 million, right?

A. Correct.

Q. And that was the purchase price paid by LF, right?

A. Yes.

Q. And if we look at page 2, the paragraph the second from the bottom that says "this letter agreement," this is the language that we saw -- that was in the SEA-3 agreement as well, right?

A. Yes.

Q. That it says that "this agreement and the agreements referred to herein constitute the entire agreement," right?

A. Yes.

Q. And "supersede all prior agreements and undertakings, written and oral;" do you see that?

| LAEPCOL4 | Rabin - Cross | Page 914 |
| --- | --- | --- |

A. Yes.

Q. Okay. And there's nothing in this agreement about Iconix making a future marketing payment to GBG, correct?

A. Correct.

Q. Let's take a look at Defense Exhibit 303-A3, which is in evidence. And you see the third paragraph from the bottom, there's a "whereas" clause, and there it says that "LF has agreed to pay Iconix 50 percent of the fair market value or U.S. $15,917,500;" do you see that?

A. Yes.

Q. All right. And if we go to page 8 of this document, on the bottom you see there's a section "Exclusivity of representations and warranties." Do you see that?

A. Yes.

Q. Did we look at a similar provision in the SEA-3 agreement, right?

A. Yes.

Q. And there's nothing in this agreement that obligates Iconix to make a future marketing payment to GBG, right?

A. Correct.

Q. And if we could look at Defense Exhibit 303-A1, which is also in evidence, and look at page 27 in this agreement, the section 10.06, entire agreement -- it was just there -- yes, 10.06, entire agreement.

Again, it says "This agreement and the purchase

| LAEPCOL4 | Rabin - Cross | Page 915 |
| --- | --- | --- |

agreement, together with exhibits and schedules, contain the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof." Do you see that?

A. Yes.

Q. And there's nothing in this agreement that obligated Iconix to make a future marketing payment to GBG, correct?

A. Correct.

Q. There's nothing in any of the SEA-2 transaction documents stating that Iconix has an obligation to pay $5 million in future marketing expenses to GBG, correct?

A. Correct.

Q. And you didn't ask anybody to keep any terms out of the written agreements, right?

A. Correct.

Q. Mr. Cole did not ask you to keep any terms out of the written agreement, correct?

A. Correct.

Q. And you did not take any steps to keep any of the terms out of the written agreement, right?

A. Correct.

Q. Now, one of the people you discussed the SEA-2 transaction with was Ron Ventricelli at GBG, right?

A. Okay.

Q. Well, do you remember having discussions with

| LAEPCOL4 | Rabin - Cross | Page 916 |
| --- | --- | --- |

Mr. Ventricelli -- even if you don't remember the specific discussions, do you recall that you discussed the SEA-2 transaction with Mr. Ventricelli?

A. I don't remember, but I can't deny it.

Q. And it was important for Mr. Ventricelli to understand the terms in order to determine the accounting for the transaction, right?

A. Yes.

Q. Mr. Ventricelli is an accountant, right?

A. Yes.

Q. And earlier in his career, he actually worked as an auditor at an accounting firm, right?

A. That, I don't know.

Q. Are you aware that GBG accounted for the SEA-2 transaction by attributing a full $15.9 million purchase price to the SEA-2 interest?

A. I'm not aware.

Q. When GBG made an investment like an investment in the joint ventures, that investment did not impact the GBG P and L, right?

A. I'm not aware.

Q. Okay. Let me break it down a bit. So when GBG -- let's take SEA-2 for example. GBG paid $15.9 million for its interest in SEA-2, right?

A. Yes.

# A-296

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

---

LAEPCOL4     Rabin - Cross     Page 917

Q. And that is considered, on the GBG side, as an investment, right?

A. Yes.

Q. And so your P and L, or profit and loss, statements, there's no expense of $15.9 million, right?

A. Again, I'm not an accountant. I don't know. I don't know.

Q. Okay. Do you know, Mr. Rabin, that -- even if you don't know the specifics, do you know that the purchase price, P, for the JV interest doesn't affect the company's profits or loss?

MR. THOMAS: Objection, asked and answered.

THE COURT: I'll allow it.

A. (Indiscernible).

THE COURT REPORTER: I'm sorry, I didn't hear the answer. Was there an answer?

THE COURT: There was an answer. Mr. Rabin, get closer to the microphone.

A. I'm sorry, can you ask the question again, please?

MR. TARLOWE: The question was asked and answered.

THE COURT: Now I'm lost. Why don't you repeat the last question, madam court reporter.

(Record read)

Can you answer that question, Mr. Rabin?

THE WITNESS: Can you say it louder so I can hear it?

THE COURT: I'm sorry, you didn't hear it?

THE WITNESS: Vaguely.

---

LAEPCOL4     Rabin - Cross     Page 918

MR. TARLOWE: I can try to ask it again.

THE COURT: Ask another question, Mr. Tarlowe.

MR. TARLOWE: Sure.

BY MR. TARLOWE:

Q. Did you know, Mr. Rabin, that the purchase price paid by GBG for a joint venture interest did not impact GBG's profit or loss?

A. Did I know? I don't know.

Q. Okay. Did you know today?

A. If you asked me the question do I know today does it affect it? For today's business? I do know.

Q. Okay. But you're saying you don't remember whether you knew at the time?

A. Correct.

Q. Do you know today whether, in 2014, the purchase price paid impacted the P and L?

MR. THOMAS: Objection.

A. No, no.

THE COURT: Objection is sustained.

Q. Do you recall telling Mr. Ventricelli that GBG -- withdrawn.

You remember that the purchase price for SEA-2 changed at some point, right?

A. Yes.

Q. And do you recall telling Mr. Ventricelli that the increase

---

LAEPCOL4     Rabin - Cross     Page 919

in purchase price was consideration for guarantees going forward for the Lee Cooper deal?

A. I don't recall.

Q. Do you deny saying that?

A. I don't remember.

Q. Can we show just the witness what's marked for identification as Defense Exhibit 3593-001 and go to page 12.

MR. THOMAS: Your Honor, can the witness be shown the first page so he knows what he's looking at?

THE COURT: Yes, of course. It doesn't matter at this point unless he can't place it.

Mr. Rabin, does seeing that refresh your recollection?

THE WITNESS: No.

BY MR. TARLOWE:

Q. Does it refresh your recollection, Mr. Rabin, that you told Mr. Ventricelli that Li & Fung was essentially paying for the right to hold the Lee Cooper deal?

A. I don't remember.

Q. You can take this down.

Do you recall discussing the SEA-2 transaction with Dow Famulak?

A. I don't remember.

Q. Do you recall telling Mr. Famulak that SEA-2 was a good deal at the $15.9 million purchase price?

A. Again, I don't remember.

---

LAEPCOL4     Rabin - Cross     Page 920

Q. Do you remember telling Mr. Famulak that it was a good deal because GBG would get an additional million dollars of guaranteed distribution, pay the deal off relatively quickly and could get some marketing money?

A. Again, I don't remember having a conversation.

Q. Now, there were other transactions between Iconix and Li & Fung or GBG where there were written agreements for Iconix to provide marketing support, right?

A. Again, I don't remember. I'm sorry.

Q. Okay. So do you recall that in 2013 there was an amendment and consolidation of the Rocawear Kids license agreement?

A. Ask the question again, please?

Q. Sure. Maybe a document will help.

Can you show Mr. Rabin what's marked for identification as Defense Exhibit 408-A1.

Do you recognize that as an amendment and license consolidation agreement?

A. Yes.

Q. And between Iconix and KHQ, right?

A. Yes.

Q. KHQ, Kid Headquarters?

A. Yes.

Q. That's an affiliate of GBG?

A. Yes.

MR. TARLOWE: Okay. We offer Defense Exhibit 408-A1.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEPCOL4 | Rabin - Cross | Page 921 |
|---|---|---|

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 408-A1 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. And so, Mr. Rabin, this is an agreement -- this is an amendment and license consolidation agreement, right?

A. Yes.

Q. And it's between Iconix, on the one hand, and GBG, on the other, right?

A. Correct.

Q. And this has to do with Rocawear Kids, right?

A. Correct.

Q. And it says in the first paragraph "effective as of January 1st, 2014," right?

A. Correct.

Q. Okay. And under this license agreement, there were certain royalty obligations that GBG had to Iconix, right?

A. Correct.

Q. And now if we take a look at page 5 and the paragraph No. 8, that says "Showroom support." Now, the licensee in this is GBG, right?

A. Yes.

Q. Okay. And so it says that -- the licensor is Iconix?

| LAEPCOL4 | Rabin - Cross | Page 922 |
|---|---|---|

A. That's correct.

Q. So this says that "The licensor" -- Iconix -- "shall make a one-time payment of $3,500,000 to licensee" -- that's GBG -- "to be used strictly in connection with support of the showroom, including costs incurred by licensee prior to the date hereto related to the showroom."

And this was a showroom for the marketing, display, promotion and sale of Rocawear Kids products, right?

A. Correct.

Q. Okay. And that was a showroom was that at the Empire State Building?

A. Correct.

Q. And Iconix's commitment or obligation to make a payment of $3.5 million, that's right there in the agreement, right?

A. Yes.

Q. This is an agreement that's signed by the parties, right?

A. I believe it's signed, yes.

Q. We can look at the last page. Okay. I want to ask you some questions, Mr. Rabin, about marketing invoices that GBG sent to Iconix in 2014.

A. Okay.

Q. Okay? You don't recall who came up with the idea for GBG to bill Iconix for marketing expenses, correct?

A. Not correct.

Q. Well, did you testify before a grand jury in October of

| LAEPCOL4 | Rabin - Cross | Page 923 |
|---|---|---|

2019?

A. I believe so.

Q. And this is at the transcript page 26, lines 12 through 15. Were you asked the question:

"Q. Who proposed that GBG would be -- would bill for marketing expenses? Who came up with that idea, to the best of your recollection?

"A. I'm not sure."

Did you provide that testimony?

A. Yes.

Q. Now, you testified yesterday about a conversation you recall with Mr. Cole about the invoices in detail, correct?

A. Correct.

Q. And the first set of -- it was the first set of invoices that were sent from GBG to Iconix, right?

A. Correct.

Q. And you did not believe those were phony invoices, right?

A. Correct.

Q. And you thought it was important for money to be spent on marketing the brand, right?

A. Correct.

Q. To get the most value out of the brand, you thought it was important to spend money to market it?

A. Correct.

Q. In fact, you always told Mr. Cole that GBG needed marketing

| LAEPCOL4 | Rabin - Cross | Page 924 |
|---|---|---|

dollars to build the brand, correct?

A. Correct.

Q. Now, the conversation you testified about yesterday in which you recall Mr. Cole asking for more detail in invoices, is it possible that that's a conversation you had with Seth Horowitz?

A. Not to my recollection, no.

Q. Do you recall meeting with Seth Horowitz on September 29th, 2014, at the Empire State Building and discussing the marketing invoices?

A. I don't recall.

Q. Well, do you recall Iconix telling you that the invoices were too high-level and needed to have more detail?

A. Yes.

Q. Do you recall Mr. Cole saying that the invoices had to relate to services that GBG was actually doing?

A. Yes.

Q. Do you recall being told that the invoices needed to show actual fixtures?

A. To the best of my knowledge, yes.

Q. And that Mr. Cole wanted more specific invoices, correct?

A. Correct.

Q. To show the specific work that was done, correct?

A. Correct.

Q. You understood that Mr. Cole wanted to see the specifics of

**A-298**

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEPCOL4 | Rabin - Cross | Page 925 |
|---|---|---|

what was being billed for?

A. Correct.

Q. You then spoke to the marketing team at GBG and asked them to prepare more detail, right?

A. Correct.

Q. You didn't ask them to create invoices for fake work, right?

A. Correct.

Q. And you're aware that a revised set of invoices were sent to Iconix with more detail, correct?

A. Correct.

Q. And you understood that Iconix had no obligation to pay those invoices, correct?

A. Not correct.

Q. Well, did you tell the government that Iconix had no obligation to pay the invoices?

A. Say that again?

Q. Sure. Did you tell the government, on October 1st of this year, that Iconix had no obligation to pay the invoices?

A. I don't recall that.

Q. Can we please show Mr. Rabin what's marked for identification as Defense Exhibit 3570-30 and the highlighted part.

Did that refresh your recollection that you told the government that Iconix had no obligation to pay the invoices?

| LAEPCOL4 | Rabin - Cross | Page 926 |
|---|---|---|

A. I don't remember that. I'm sorry.

Q. Okay. Do you deny that you told the government that, on October 1st of 2021?

A. That I -- October 1st, 2021.

Q. It's about two weeks ago.

A. Ask the question again?

Q. Do you deny that you told the government on October 1st, 2021, that you understood that Iconix had no obligation to pay the invoices?

A. I don't agree. I'm sorry.

Q. So you deny that you told the government that?

A. I'm just -- when I'm saying the words -- can you ask the question again? Because I don't --

Q. Do you deny that you told the government, on October 1st of this year, that you understood that Iconix had no obligation to pay the invoices?

A. From my recollection, I told the government --

Q. No, no, Mr. Rabin. Do you deny making that statement to the government, yes or no?

A. And the statement again is? I'm sorry.

Q. You understood that Iconix had no obligation to pay the invoices?

A. I don't agree with that. I'm sorry.

Q. So you did not tell the government that?

A. To the best of my knowledge, correct. I'm confused.

| LAEPCOL4 | Rabin - Cross | Page 927 |
|---|---|---|

Q. There's no question.

A. Sorry.

Q. I'll move to another question, sir.

Mr. Rabin, did you tell the government that you understood that you were causing Iconix to pay bills that it had no obligation to pay?

A. I'm sorry, the question again?

Q. Sure. Did you tell the government that you understood that you were causing Iconix to pay bills that it had no obligation to pay?

A. I do not remember telling the government that.

Q. Do you deny that you told the government that?

A. Was it the invoices for which particular -- is it for particular SEA-2?

Q. Do you deny telling the government that you understood you were causing Iconix to pay bills that it had no obligation to pay?

A. I don't deny -- again, I feel like I'm -- it's clear -- it's clear to me that I told the government that I --

MR. TARLOWE: This is nonresponsive.

THE COURT: Ask another question, Mr. Tarlowe.

Q. The invoices that were prepared by GBG, those invoices related to marketing services that GBG performed, right?

A. Yes.

Q. And you personally were not familiar with the granular

| LAEPCOL4 | Rabin - Cross | Page 928 |
|---|---|---|

details, but you understood that there was real work behind the invoices, correct?

A. Correct.

Q. You understood that the marketing team had done work on these brands, right?

A. Yes.

Q. You understood that TLC had done work on these brands, right?

A. Yes.

Q. And TLC was an advertising company that was purchased by GBG in early 2014, right?

A. Yes.

Q. Do you recall telling Ron Ventricelli that the marketing reimbursement from Iconix was not related to the purchase of SEA-2?

A. I don't remember the conversation.

Q. Can we please show the witness Defense Exhibit 3593-001 for identification and page 12.

(Pause)

Mr. Rabin, does that refresh your recollection that you told -- so does that refresh your recollection that you told Mr. Ventricelli that the marketing was not related to the purchase of the SEA-2 JV, and that it was a separate thing that you were working on?

A. I don't remember.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

| LAEPCOL4 | Rabin - Cross | Page 929 |
|---|---|---|

Q. Do you recall telling Mr. Ventricelli the marketing was a separate thing you were working on, where you tried to get money back for prior marketing?

A. I don't remember.

Q. Do you deny that you told Mr. Ventricelli that?

A. I don't deny it. I just don't remember.

Q. You can take that down.

Now, yesterday the government showed you two e-mails between you and Mr. Cole from 2014. Do you recall that?

A. I believe so.

Q. I think one asked if someone was free for a call; do you recall that?

A. Yes, I do remember that.

Q. You don't recall whether you spoke, right?

A. I don't recall.

Q. And if you did speak, you certainly don't remember what you spoke about, right?

A. Correct.

Q. You had a lot of other things going on in 2014, correct?

A. Correct.

Q. And during the 2014 time frame, there were frequent discussions between Iconix and GBG, correct?

A. Correct.

Q. There were discussions about existing business arrangements, correct?

| LAEPCOL4 | Rabin - Cross | Page 930 |
|---|---|---|

A. I would assume so.

Q. There were conversations about future business arrangements?

A. Correct.

Q. Some of those actually happened and some didn't, right?

A. Correct.

Q. And you have a hard time remembering which conversations relate to which transactions today, seven years later, correct?

A. Correct.

Q. And you told the government that, right?

A. That's correct.

Q. And you previously told the government that you did not remember a conversation with Mr. Cole about paying money back through marketing being particular to a certain deal, correct?

A. Ask the question again?

Q. Sure. You previously told the government that you did not remember a conversation with Mr. Cole about paying money back through marketing being particular to a certain deal?

A. I don't remember that. I can't deny it. I just don't remember.

Q. And you always were telling Mr. Cole that GBG needed marketing dollars to build the brand, right?

A. Yes.

Q. Now, you were first interviewed by the FBI in March of 2019, right?

| LAEPCOL4 | Rabin - Cross | Page 931 |
|---|---|---|

A. Yes.

Q. That interview took place at your apartment, correct?

A. Correct.

Q. And the FBI asked you questions about the SEA joint ventures, right?

A. Yes.

Q. You told the FBI that you were not familiar with the specifics of the SEA agreement, right?

A. Correct.

Q. You told them that you would not have paid more than fair market value for a joint venture, correct?

A. I don't remember the conversation that much.

Q. Okay. Let's see if we can help refresh your recollection. Can we please show Mr. Rabin Defense Exhibit 3570-001.

Does that highlighted language refresh your recollection that when you were first interviewed by the government, you said that you believed you would not have paid more than fair market value for a joint venture?

A. I don't remember the conversation I had with the FBI.

Q. Do you deny that you said that?

A. No.

Q. You can take that down.

Now, after that initial interview, your lawyer spoke with the prosecutors, right?

A. Yes.

| LAEPCOL4 | Rabin - Cross | Page 932 |
|---|---|---|

Q. And you understood that the prosecutors considered you a subject of their investigation, right?

A. No.

Q. You understood that the prosecutors considered your conduct to be within the scope of their investigation, right?

A. No.

Q. You did not understand that?

A. No.

Q. Well, let's take a look at, for the witness, Defense Exhibit 3570-004.

Does that refresh your recollection that you understood that the government defined you as a subject of their investigation?

A. Again, I don't remember this.

Q. Does it refresh your recollection that you understood that the government stated that your conduct was within the scope of their investigation?

A. Yes.

Q. If we could take that down.

And that meant -- you understood that meant you could be charged with a crime, right?

A. Did not.

Q. You did not understand that the U.S. Attorney's Office was considering whether or not to charge you with a crime?

A. No.

# A-300

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 14, 2021

| LAEPCOL4          Rabin - Cross          Page 933 |
| --- |

Q. Now, you're testifying today and yesterday under a grant of immunity, correct?

A. Correct.

Q. And you refused to testify unless you were given immunity, correct?

A. Correct.

Q. And back in April of 2019, so after you were first interviewed at your apartment, the prosecutors -- the government gave you a grand jury subpoena, right?

A. Yes.

Q. And they told you, the prosecutors told you, that if you did not meet with them, they would make you appear before the grand jury, correct?

A. I don't recall that. I'm sorry.

Q. Do you remember that when the FBI came to your apartment, they gave you a grand jury subpoena?

A. I remember them giving me -- I remember a subpoena.

Q. Do you remember that you were told -- or was it your understanding that if you did not agree to meet with the government, they would make you appear before the grand jury?

A. I'm sorry, I don't recall that.

Q. And you met with the prosecutors for the first time on May 1st, 2019, right?

A. I don't recall the date.

Q. Okay. Let's show Mr. Rabin Defense Exhibit 3570-23 for

| LAEPCOL4          Rabin - Cross          Page 934 |
| --- |

identification, please.

This is an agreement between you and the United States Attorney's Office.

We can show the second page as well, please. Can we show both.

This is an agreement that you signed with the United States Attorney's Office?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 3570-023.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 3570-023 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. Mr. Rabin, this is an agreement that you signed with the U.S. Attorney's Office, right?

A. Yes.

Q. And do you see in the first paragraph, the date is May 1st, 2019?

A. Yes.

Q. And it refers to -- so the first meeting you had with the U.S. Attorney's Office was May 1st, 2019, correct?

A. Correct.

Q. And then paragraph 1 says, "the client," that's you, right?

| LAEPCOL4          Rabin - Cross          Page 935 |
| --- |

If you look --

A. Yes.

Q. -- at the first paragraph, it defines the client. You as the client?

A. Yes.

Q. Okay. So "the client" -- saying Jason Rabin -- "has agreed to provide the government with information and to respond to questions so that the government may evaluate client's information and responses in making prosecutive decisions."

Do you see that?

A. Yes.

Q. And you understood that that meant that the government was going to evaluate your information and your responses to their questions in deciding whether or not to prosecute you?

A. Yes.

THE COURT: Mr. Tarlowe, it's now 12:50; so we'll take our second break.

We'll reconvene at ten minutes after the hour, ladies and gentlemen. Please do not discuss the case.

(Jury not present)

THE COURT: Mr. Rabin, you may step down.

(Witness temporarily excused)

THE COURT: Everyone can be seated. Any issues to raise?

MR. THOMAS: Not from the government.

| LAEPCOL4          Rabin - Cross          Page 936 |
| --- |

MR. REISNER: No, your Honor.

THE COURT: Okay. Let me just make an observation, or let me ask. About how much longer, Mr. Tarlowe, do you think?

MR. TARLOWE: Not much. I'll definitely finish in the next block.

THE COURT: Let me just make an observation. We have now been through almost six full trial days, and we are on witness one-and-a-half. I heard a number of about 23 government witnesses earlier in the week, and we told the jury three weeks.

You don't need to respond now, but at some point, I'm going to want a realistic reassessment, if a reassessment needs to be made, about how long this trial will take. All right?

MR. THOMAS: Yes, your Honor.

THE COURT: Don't be late.

(Recess)