# 23-7566

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆━◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL COLE, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT
VOLUME II OF VII
(Pages A-301 to A-565)**

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
BRONWYN C. ROANTREE
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
   17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

**TABLE OF CONTENTS**

PAGE

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Indictment, filed December 4, 2019 (Dkt. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . A-41

Excerpts of First Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-78

Government Memorandum of Law in Opposition to Defendant's
    Motions *in Limine* and Renewed Motion for Rule 17(c)
    Subpoenas, filed October 17, 2022 (Dkt. 226) . . . . . . . . . . . . . . . . . . . A-493

Government's Requests to Charge,
    filed October 20, 2022 (Dkt. 230). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-566

Letter from U.S. Attorney's Office to the
    Honorable Edgardo Ramos,
    dated October 26, 2022 (Dkt. 238) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-626

Letter from David Oscar Markus to the Honorable Edgardo Ramos
    re Ethan Cole, dated November 18, 2022 (Dkt. 247) (with
    attached email from Edward Y. Kim to David Oscar Markus) . . . . . A-630

Excerpts of Final Pre-Trial Conference Transcript,
    dated October 27, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-632

Excerpts of Second Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-648

**Government Exhibits**

GX 104       Iconix Brand Group, Inc. Form 8-K,
             dated October 24, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1139

GX 105       Iconix Brand Group, Inc. Form 10-Q for the Quarterly
             Period Ended September 30, 2014 . . . . . . . . . . . . . . . . . . A-1152

ii

                                                                        PAGE

GX 207          Consultancy Agreement between Iconix Brand Group,
                Inc. and LF Centennial Limited, dated September 30,
                2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1190

GX 210          Letter Agreement between Iconix Brand Group, Inc.
                and LF Asia Limited, dated June 30, 2014 . . . . . . . . . . . . A-1195

GX 212          Letter Agreement between Iconix Brand Group, Inc.
                et al. and Global Brands Group Asia Limited, dated
                September 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1199

GX 1044         Email from Mark J. Stevens to Nicholas C.A. Cook et
                al., dated June 25, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1205

GX 1058         Email from Neil Cole to Seth Horowitz, dated August
                14, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1405

GX 1068         Email from Ethan Cole to Jared Margolis, dated
                August 28, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1407

GX 1091         Email from Lauren Gee to Robert Smits, dated
                September 11, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1409

GX 1098         Email from John Reda to David Maslaton, dated
                September 26, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1547

GX 1111         Email from Ethan Cole to Seth Horowitz, dated
                October 2, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1551

GX 1139         Email from Ethan Cole to Jared Margolis, dated
                December 1, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1555

GX 1197         Email from Seth Horowitz to Neil Cole, dated April
                13, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1557

GX 1255         Undated notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1560

GX 1255-B       Metadata associated with GX 1255 . . . . . . . . . . . . . . . . . . A-1561

GX 1335         Government summary exhibit, "Document Timeline" . A-1562

iii

PAGE

**Defense Exhibits**

DX 0303-A1    Iconix SE Asia Limited First Amended and Restated
Shareholders Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1691

DX 0303-A2    Letter Agreement between Iconix Brand Group, Inc.
and LF Asia Limited, dated June 30, 2014 . . . . . . . . . . . . A-1733

DX 0304-A2    Letter Agreement between Iconix Brand Group, Inc.
et al. and Global Brands Group Asia Limited,
dated September 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . A-1737

DX 0304-A3    Iconix SE Asia Limited Second Amended
and Restated Shareholders Agreement . . . . . . . . . . . . . . . A-1743

DX 0558    FASB Accounting Standards Codification
605-50-45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1790

DX 1140-U    Email from Neil Cole to Ericka Alford,
dated September 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . A-1792

DX 2334    Stipulation re Jason Rabin, dated October 26, 2021 . . . A-1793

DX 3517-003    Notes re Ethan Cole attorney proffer,
dated July 22, 2019 (not admitted at trial) . . . . . . . . . . . . A-1795

DX 3517-004    Federal Bureau of Investigation FD-302 re Ethan Cole
interview on July 29, 2019 (not admitted at trial) . . . . . A-1797

DX 3517-010    Notes re Ethan Cole, dated September 22, 2021
(not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1807

DX 3517-012    Notes re Ethan Cole, dated October 12, 2022
(not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1809

DX 3539-083    Federal Bureau of Investigation FD-302 re Seth
Horowitz interview on February 11, 2020
(not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1810

iv

PAGE

Excerpts of Sentencing Transcript, dated October 10, 2023 . . . . . . . . . . . A-1814

Notice of Appeal, dated October 27, 2023 (COA Dkt. 1) . . . . . . . . . . . . . A-1819

# A-301

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEMCOL5     Rabin - Cross     Page 937

THE COURT: Can we get Mr. Rabin.

(Jury present)

THE COURT: Mr. Tarlowe.

MR. TARLOWE: Thank you, your Honor.

BY MR. TARLOWE:

Q. I think before the break we were looking at Defense Exhibit 3570-23, the proffer agreement.

Mr. Rabin, when you met with the government, each time you met with the government you signed that agreement, right?

A. Yes.

Q. And the government, they went over that agreement with you the first time, they explained it to you?

A. Yes.

Q. They went over each paragraph with you?

A. To the best of my memory, yes.

Q. Let's take a look at the second page, paragraph No. 7., the second sentence. You see it says: No understandings, promises, agreements and/or conditions have been entered into with respect to the meeting other than those set forth in this agreement and none will be entered into unless in writing and signed by all parties.

You see that?

A. Yes.

Q. That's part of the agreement that you signed?

A. Yes.

LAEMCOL5     Rabin - Cross     Page 938

Q. You understand that what that means is, the only terms that govern your relationship with the government are what are in the written agreement, right?

A. Yes.

Q. And the government, they explained that to you?

A. I believe so.

Q. If promises or agreements or other things were said, it doesn't really matter because this is saying that it's only the agreement that matters, right?

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

MR. TARLOWE: We can take the highlighting down but please leave up the second page.

Q. You can see from the dates of continuation, those are additional meetings you had with the government?

A. Yes.

Q. You met with them again on September 19, 2019?

A. Yes.

Q. You signed this agreement again when you met with them on September 19?

A. Yes.

Q. So you understood that as of September 19, the government was still continuing to evaluate the information and responses you provided to their questions in making prosecutive decisions, right?

LAEMCOL5     Rabin - Cross     Page 939

A. Yes.

Q. You met with them in October 2019, signed this again, right?

A. Yes.

Q. In February of 2020, right?

A. Yes.

Q. So at each of these meetings you continued to understand that the government was evaluating the information you provided and your responses to their questions, right?

A. Yes.

Q. And they were evaluating that in deciding whether or not to charge you with a crime, correct?

A. I guess.

Q. At the September 2019 meeting --

MR. TARLOWE: We can take that down.

Q. At the September 2019 meeting, the government also asked you to sign a different type of agreement called a tolling agreement, right?

A. I'm sorry?

Q. A tolling agreement.

A. I don't remember.

MR. TARLOWE: Why don't we show Mr. Rabin Defense Exhibit 3570-13 for identification. Maybe we can show Mr. Rabin the second page as well.

Q. Do you recognize your signature on this document, Mr.

LAEMCOL5     Rabin - Cross     Page 940

Rabin?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 3570-13.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 3570-13 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

Q. This is an agreement that you signed with the government on September 19, 2019, correct?

A. Correct.

Q. And do you understand that this is an agreement that's known as a tolling agreement?

A. I'm sorry. I'm not familiar.

Q. Let's look at paragraph 1. It says: The government is conducting an investigation concerning possible violations of federal criminal law.

You see that? And then it lists a bunch of provisions. You see that?

A. Yes.

Q. The government is conducting an investigation concerning possible violations of federal law.

MR. TARLOWE: Now let's put paragraph 2 under that, if we can.

Q. Paragraph 2 says: With respect to any charges that Jason

# A-302

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                  October 14, 2021

---

LAEMCOL5          Rabin - Cross          Page 941

Rabin violated any law of the United States, including, but not limited to, those listed above, it is hereby agreed that the period beginning on September 16, 2019, and terminating on March 16, 2020, shall be tolled and excluded from any calculation of time for the purposes of any statute of limitations.

Do you see that?

A. Yes.

Q. Do you understand, Mr. Rabin, what the statute of limitations is?

A. No.

Q. Do you understand that what the statute of limitations is is a period of time within which the government must bring charges, correct?

A. I'm listening to you.

Q. Do you have an understanding that there is something called a statute of limitations?

A. Yes.

Q. You understand that what that means is, after a crime or an alleged crime takes place, charges must be brought within a certain amount of time or else the government can't bring charges anymore.

A. OK.

Q. So what a tolling agreement does is, it stops or pauses the running of the statute of limitations.

---

LAEMCOL5          Rabin - Cross          Page 942

MR. THOMAS: Objection, your Honor.

THE COURT: Is there a question, Mr. Tarlowe?

Q. You understand that what this agreement does is it pauses that clock, correct?

A. OK.

Q. So it extends --

MR. THOMAS: Your Honor, move to strike. The witness' response was not substantive evidence.

THE COURT: I am not going to strike it.

Ask another question, Mr. Tarlowe.

Q. So the effect of this agreement is to give the government more time within which they can bring charges against you, right?

A. If that's what it means.

Q. The period of time in paragraph 2, it's an extra six months, correct? September 16.

A. Yes.

Q. If we can take a look at paragraph 4., it says this agreement does not limit or affect the government's right to seek a return of an indictment at any time the government deems appropriate.

You see that?

A. Yes.

Q. You understand what that language means is that even though you were agreeing to pause that clock, the government could

---

LAEMCOL5          Rabin - Cross          Page 943

still go ahead and charge you, correct?

A. Correct.

Q. You did not want to be charged with a crime, correct?

A. Correct.

Q. And you wanted to do what you could to avoid being charged with a crime, correct?

A. Not correct.

Q. You did not want to do what you could to avoid being charged with a crime?

A. I just want to be honest.

Q. But you didn't want to be charged with a crime, correct?

A. Correct.

MR. THOMAS: Objection. Asked and answered.

THE COURT: Overruled.

MR. TARLOWE: We can take that down.

Q. Paragraph 5 says: This agreement supersedes any prior understandings, promises, or conditions between the government and Rabin. No additional understandings, promises, or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties.

You see that?

A. Yes.

Q. This is a document the government drafted, right?

A. Yes.

---

LAEMCOL5          Rabin - Cross          Page 944

MR. TARLOWE: We can take that down.

Q. Now, you met with the government about 13 times, correct?

A. I am not sure how many times.

Q. Does that number sound about right to you, 13?

A. Could be.

Q. You met with them on Monday of this week?

A. Yes.

Q. You met with them Tuesday of this week?

A. Did I meet with them?

Q. Whether by phone, WebEx.

A. Yes.

Q. You are testifying today pursuant to a grant of immunity, correct?

A. Correct.

Q. You are required to testify, right?

A. Yes.

Q. But you are not required to meet with the government, right?

A. I am required to meet with the government, I thought.

Q. So you thought that you were required to meet with the government to prepare for your testimony?

A. No.

Q. You understand that you were not required to meet with them in advance of your testimony?

A. Correct.

---

# A-303

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEMCOL5          Rabin - Cross          Page 945

Q. The only requirement is that you appear here and testify.
A. I'm compelled to testify.
Q. Correct. And the compulsion order compels you to testify in court, correct?
A. I believe so.
Q. But you agreed voluntarily to meet with the prosecutors approximately 13 times?
A. No.
Q. What's wrong about that?
A. What is your question again?
Q. I think you answered no.
A. I am trying to understand the question.
Q. When you met with the government approximately 13 times, you did that voluntarily?
A. Yes.
Q. Now, during your meetings with the prosecutors, there were times when you told them that you didn't remember things, right?
A. Correct.
Q. And the events at issue here took place seven or eight years ago, right?
A. Yes.
Q. And there were times when the prosecutors told you that they didn't believe you, right?
A. Perhaps.

LAEMCOL5          Rabin - Cross          Page 946

Q. There were times that they got angry, right?
A. I don't know if I would say angry.
Q. There were times when they raised their voice with you?
A. Yes.
Q. There were times when they were stern with you?
A. Yes.
Q. And there were times when they told you that they knew what happened, right?
A. I'm not aware of the last point.
Q. There were times where you said you didn't remember things, and they told you that they didn't believe that, right?
A. I don't remember that.
Q. Now, after you met with the prosecutors a number of times, they arranged for you to get immunity and testify before a grand jury, correct?
A. Correct.
Q. When you testified before the grand jury, do you remember there was a court reporter there, like there is here in this courtroom?
A. Yes.
Q. And that court reporter creates a transcript of the grand jury testimony, correct?
A. Correct.
Q. Before you went into the grand jury, you met with the prosecutors at their office, right?

LAEMCOL5          Rabin - Cross          Page 947

A. Yes.
Q. There was no court reporter there, right?
A. Correct.
Q. And at that meeting they went over with you the same questions that they then asked you in the grand jury, right?
A. Not correct.
Q. They did not ask you the same questions the morning of your grand jury testimony?
A. The same questions?
Q. Well, in substance, the same questions, even if not word for word.
A. They asked me a lot of questions.
Q. And they asked you the same questions that they then asked you in front of the grand jury.
A. I don't remember exactly the questions that they asked me in the grand jury. I don't remember the questions they asked me before the grand jury.
Q. Do you remember that it was very similar?
A. Potentially, yes.
Q. And you met with the prosecutors to prepare for your testimony here, right?
A. Yes.
Q. And they went over questions that they planned to ask you during this trial?
A. They went over a lot of questions.

LAEMCOL5          Rabin - Cross          Page 948

Q. And they practiced cross-examination with you?
A. Very little.
Q. And you refused to testify unless you received immunity, right?
A. Correct.
Q. And immunity means that your testimony can't be used against you, right?
A. Correct.
Q. And you understand that the prosecutors decide whether they think you are being -- whether you are being truthful or not on the witness stand.
     MR. THOMAS: Objection, your Honor.
     THE COURT: Sustained.
Q. Now, you testified earlier that you don't believe you committed any crimes, correct?
A. Correct.
Q. That continues to be your belief, right?
A. Correct.
Q. But you wanted a grant of immunity because you didn't want to take the risk that the government might claim you did commit a crime?
A. Not correct.
Q. Well, you refused to testify without immunity, right?
     MR. THOMAS: Objection. Asked and answered.
     THE COURT: Overruled.

# A-304

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 14, 2021

| LAEMCOL5 | Rabin - Cross | Page 949 |
|---|---|---|

Q. You wanted that protection, correct?

A. Correct.

Q. Because you were concerned about the risk of the government charging you with a crime.

A. Not correct.

Q. Well, you could have just come into court and testified without immunity, correct?

A. On the advice of my lawyer, he told me to get immunity.

Q. Now, I want to go back just very briefly to SEA-1. It feels like a long time ago that we talked about that, but SEA-1 is the transaction from October of 2013.

You recall that?

A. Yes.

Q. Now, the $2 million that you asked Iconix for for the work that you were doing, you understood that that $2 million will help your internal P&L, correct?

A. I don't remember.

Q. Well, did you have internal forecasts at Li & Fung, financial forecasts?

A. Yes.

Q. And the business you were responsible for had to submit a financial forecast to Li & Fung, correct?

A. It was a start-up company, so I don't remember.

Q. Do you remember the term contribution, the contribution from your business to the overall Li & Fung financials?

| LAEMCOL5 | Rabin - Cross | Page 950 |
|---|---|---|

A. The word contribution I'm familiar with, yes.

Q. Do you recall contribution in the context of your business unit's contribution to the Li & Fung financials?

A. What is your question?

Q. Do you recall the use of the term contribution in that context?

A. It's so long ago. Maybe.

MR. TARLOWE: Can we please show the witness and the parties what's marked for identification as Defense Exhibit 1047.

Q. This is an e-mail exchange between you and Dave Thomas.

Who is Dave Thomas?

A. CFO.

MR. TARLOWE: We offer Defense Exhibit 1047.

MR. THOMAS: No objection, your Honor.

THE COURT: It will be received.

(Defendant's Exhibit 1047 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

Q. Let's start with the bottom e-mail.

Who is Dave Thomas?

A. CFO.

Q. So Dave Thomas sent you an e-mail with the subject 2013 full-year forecast. You understand that that's a financial forecast for the business for 2013, correct?

| LAEMCOL5 | Rabin - Cross | Page 951 |
|---|---|---|

A. Correct.

Q. And Mr. Thomas asked you: We need to consider if we are going to reduce the full year's forecasted contribution of $30 million.

Do you see that?

A. Yes.

Q. What Mr. Thomas was referring to was the forecasted contribution from your business to Li & Fung, correct?

A. I believe so, yes.

Q. He was asking you whether you needed to reduce your forecast of $30 million, right?

A. Yes.

Q. And that's $30 million of revenue?

A. I am not sure.

Q. It's money coming into Li & Fung, correct?

A. It's coming in, yes.

Q. Now, let's look at your response to Mr. Thomas. You said: I'm not worried about the 30. We have many things in the pipeline, including Disney, that will cover any shortfalls.

Then you list a few things. The things you listed there, those items are various Li & Fung transactions, correct?

A. Correct.

Q. And Iconix is a real 2 mil. That refers to a request that you were going to make to Iconix for $2 million?

A. I don't remember that.

| LAEMCOL5 | Rabin - Cross | Page 952 |
|---|---|---|

MR. TARLOWE: We can take that down.

Let's please show the witness and parties Defense Exhibit 1082 and 1082-A1.

Q. This is another e-mail exchange between you and Mr. Thomas. Is that right, Mr. Rabin?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 1082 and 1082-A1.

MR. THOMAS: No objection.

THE COURT: They will be received.

(Defendant's Exhibits 1082 and 1082-A1 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

Q. Now, in the e-mail Mr. Thomas said: I listed out the potential deals and opportunities for the balance of the year. I listed out the 2013 payments per each deal and the corresponding 2013 contribution pickup.

Now let's look at the attachment. You see the attachment is labeled deal status, remaining 2013 payments versus contribution pickup.

The payment is the amount of money that Li & Fung would be spending, correct, the payment that Li & Fung would be making?

A. Potentially.

# A-305

| LAEMCOL5 | Rabin - Cross | Page 953 |
|---|---|---|

Q. And the contribution pickup is the money that Li & Fung hoped to receive, correct?

A. Correct.

Q. In order to increase its contribution to the overall Li & Fung financials.

A. Correct.

MR. TARLOWE: We can take that down.

Q. The $2 million that you received from Iconix for the work that you were doing in Southeast Asia, that went towards Li & Fung's income, right?

A. I don't remember.

Q. You see that you certainly expected that that money would count towards your contribution to the financials, correct?

A. I don't know what else we would do with Iconix, so I can't say that exact.

Q. Now, I showed you earlier today some consulting invoices for consulting fees that Li & Fung or LF Asia sent to other parties.

You recall looking at those invoices?

A. Yes.

Q. And the money received from those invoices, that was income to LF Asia, correct?

A. I don't remember.

Q. In addition to charging those other entities consulting fees, you also invoiced them for marketing contributions,

| LAEMCOL5 | Rabin - Cross | Page 954 |
|---|---|---|

correct?

A. I don't remember.

MR. TARLOWE: Let's take a look at Defense Exhibit 1174-A21 in evidence. Let's go to the second page, please.

Q. You see that this is an invoice from LF Asia limited to the estate of Marilyn Monroe.

You see that?

A. Yes.

Q. The description is 2013 marketing contribution for China and SEA Marilyn Monroe.

You see that?

A. Yes.

Q. The amount is $500,000, right?

A. Yes.

Q. This brand, Marilyn Monroe, has nothing to do with Iconix, right?

A. Correct.

Q. If we go to page 1 of this same document, it's another invoice to Marilyn Monroe and this is for 2013 trade shows, correct?

A. Correct.

Q. That's a form of marketing?

A. It could be.

Q. And that amount is $250,000, correct?

A. Yes.

| LAEMCOL5 | Rabin - Cross | Page 955 |
|---|---|---|

Q. And the payment of these invoices would count as income to Li & Fung, correct?

A. I don't remember.

Q. Well, do you know, Mr. Rabin, that if you receive marketing money that that counts as revenue?

A. Do I know that?

Q. Yes.

A. Not a hundred percent.

MR. TARLOWE: Let's take a look at Defense Exhibit 1174-A22 in evidence, the first page.

Q. This is an invoice from LF Asia to Spyder Active Sports, right?

A. Yes.

Q. And the description is 2013 marketing contribution for China and SEA Spyder, right?

A. Yes.

Q. The amount is $500,000, right?

A. Yes.

Q. And Spyder Active Sports has nothing to do about Iconix, right?

A. Correct.

Q. And this invoice wasn't sent to Iconix, correct?

A. Correct.

Q. And the $500,000 in marketing contribution, that would count towards Li & Fung's revenue or income, correct?

| LAEMCOL5 | Rabin - Cross | Page 956 |
|---|---|---|

A. Potentially.

Q. It would help your P&L, right?

A. Potentially.

MR. TARLOWE: Let's take a look at Defense Exhibit -- let's go to the third page of this same exhibit.

Q. You see here is another invoice to Spyder and this one says for 2013 brand support and start-up fees.

Do you see that?

A. Yes.

Q. The amount is $750,000, correct?

A. Yes.

Q. Again, this has nothing to do with Iconix, correct?

A. Correct.

MR. TARLOWE: The last one, if we can look at 1174-A23.

Q. This is an invoice from LF Asia to Authentic Brands Group, right?

A. Yes.

Q. This one is for 2013 marketing contribution for China and SEA Juicy Couture?

A. Right.

Q. The amount is $500,000, correct?

A. Correct.

Q. Nothing to do with Iconix, right?

A. Correct.

# A-306

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

---

LAEMCOL5     Rabin - Cross     Page 957

MR. TARLOWE: You can take that down.

Q. Now, I want to go back to the 2014 time frame just on orient everyone.

So SEA-2 takes place on June 30, 2014, correct?

A. Correct.

Q. Now, in August 2014, so about two months later, you called Seth Horowitz with a list of asks, correct?

A. I don't remember.

Q. You asked Seth Horowitz for marketing money, correct?

A. I don't remember.

Q. You told Horowitz that you needed $10 million and more, correct?

A. I don't remember.

Q. Now, in August 2014, GBG had just gone public, right?

A. Yes.

Q. So you went from being part of a small piece of a giant company to being part of an independent public company called GBG, right?

A. Correct.

Q. And in that role you were feeling financial pressure to perform, correct?

A. I don't remember.

Q. You were feeling pressure to show positive financial performance, correct?

A. I don't remember.

---

LAEMCOL5     Rabin - Cross     Page 958

Q. Did you tell Horowitz that you had financial pressures and needed $10 million and more?

A. I don't remember.

Q. Did you tell Horowitz that you needed either $10 million in revenue or $10 million in expense relief?

A. I don't remember.

Q. Now, you understood that if GBG billed Iconix for marketing and Iconix paid, the money would go to GBG's income statement, right?

A. I don't know.

Q. Well, did you previously tell the government that if GBG was billing for marketing, it would hit the income statement?

A. Perhaps.

Q. Now, GBG also sought and received marketing support from other business partners, correct?

A. Correct.

Q. For example, GBG invoiced Authentic Brands Group $2 million in connection with Juicy Couture for retail rollouts?

A. I don't remember.

MR. TARLOWE: Can we please show the witness Defense Exhibit 2102-A3.

THE COURT: Do we have hard copies of that? Can we give one to Mr. Rabin.

Q. Mr. Rabin, do you recognize that as an invoice from Global Brands Group USA?

---

LAEMCOL5     Rabin - Cross     Page 959

A. In 2102?

Q. Yup.

A. I see an e-mail I can skip over.

2102-A1 you're talking about? Yes, A1, A2.

OK. Question.

Q. So you have 2102-A1, A2 and A3?

A. Yes.

Q. Those are all invoices from GBG to Authentic Brands Group, correct?

A. Correct.

MR. TARLOWE: We offer 2102-A1, A2, and A3.

MR. THOMAS: Objection, your Honor. Hearsay and relevance.

THE COURT: Why don't we meet at sidebar and someone bring a copy of that.

(Continued on next page)

---

LAEMCOL5     Rabin - Cross     Page 960

(At sidebar)

THE COURT: What is this?

MR. TARLOWE: Your Honor, these are invoices that GBG sent to other companies. They are identical in format to the invoices that were sent to Iconix that the government claims are sham invoices. They are all for very large dollar amounts, and they are to a company that is not Iconix.

A big part of the government's case involves invoices that were sent to Iconix that were sham invoices, in part because they had large dollar amounts. These demonstrate very clearly that GBG routinely sent these types of invoices to business partners. It's clearly a business record.

MR. THOMAS: That foundation hasn't been laid. But what is obvious from the face of the document is that this is years after the conduct, and what Mr. Tarlowe is proposing to do is to show after-the-fact specific instances of conduct to explain something that occurred before. It's irrelevant.

THE COURT: I think it is irrelevant. It's temporally removed. I have given you some leeway in terms of the invoices that you put in earlier with respect to Marilyn Monroe, etc.

MR. TARLOWE: Judge, these are really important because the other ones are from Li & Fung. These are the exact format of the invoices in our case that the government says were sham invoices. We need to be able to show the jury that it is not a sham.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

---

**LAEMCOL5**   Rabin - Cross   Page 961

The government is arguing that big round-number invoices is somehow inherently suspect or suspicious. We need to be able to show that this is GBG's business practice.

The other thing it shows, Judge, is, and I'm establishing this with him now, these transactions, these were all done by GBG.

THE COURT: What's the difference between those and these?

MR. TARLOWE: Because those are Li & Fung. These are GBG. And these match exactly the invoices that were sent to Iconix. The other ones that we put in earlier don't look anything like this.

THE COURT: I should not have allowed those in. Is that what you are saying?

MR. TARLOWE: I think you should allow them both in.

THE COURT: I will receive them.

Move on, please.

(Continued on next page)

---

**LAEMCOL5**   Rabin - Cross   Page 963

Q. Group for the Jones New York brand, right?
A. Yes.
Q. To support, to launch in-store marketing fixtures at Dillard's, correct?
A. Correct.
Q. How many Dillard's stores are there?
A. Over 300.
Q. That's $3 million, correct?
A. Yes, it is.
Q. Let's look at A3.

This is an invoice from GBG to Authentic Brands Group for the Juicy Couture brand, right?
A. Yes.
Q. It's to support newest retail rollouts, right?
A. Yes.
Q. The amount is $2 million, correct?
A. Yes.

MR. TARLOWE: Can we please show the witness Defense Exhibit 2088-A1 for identification.
Q. Mr. Rabin, do you recognize this as another invoice from GBG to Authentic Brands Group?
A. Yes.
Q. What was your position at GBG in December of 2015?
A. I believe, the chief marketing officer.
Q. You recognize this format as a type of invoice that GBG

---

**LAEMCOL5**   Rabin - Cross   Page 962

(In open court)

THE COURT: They will be received.

(Defendant's Exhibits 2102-A1, 2102-A2, and 2102-A3 received in evidence)

MR. TARLOWE: May we please publish 2101-A1, A2, and A3?

THE COURT: You may.
Q. Mr. Rabin, starting with the one on the left, that's an invoice from GBG to Authentic Brands Group dated March 31, 2017, correct?
A. Correct.
Q. And it's for $8 million?
A. Correct.
Q. And it's for the Spyder brand, right?
A. Yes.
Q. That has nothing to do with Iconix, right?
A. Correct.
Q. And the description of the service is licensor contribution for margin support to launch new categories and then marketing support for e-commerce.

You see that?
A. Yes.
Q. That's $8 million, right?
A. Yes.
Q. If we look at A2, this is an invoice to Authentic Brands

---

**LAEMCOL5**   Rabin - Cross   Page 964

sent to its business partners?
A. I don't recognize that, no.
Q. Does it look like the ones that we just looked at?
A. Yes.

MR. TARLOWE: We offer Defense Exhibit 2088-A1.

MR. THOMAS: Your Honor, the government renews its objection.

THE COURT: Sustained.
Q. Now, Mr. Rabin, you continued to press Iconix for marketing support even after Mr. Cole was no longer at the company, correct?
A. I don't recall.

MR. TARLOWE: Can we please show the witness what's marked for identification as Defense Exhibit 1706 and -- let's start with 1706.

(Continued on next page)

---

# A-308

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEPCOL6          Rabin - Cross          Page 965

Q. Mr. Rabin, these are text messages that you sent and received, correct?

A. It looks like that, yes.

Q. And Defense Exhibit 1706-A for identification is one of those text messages. Can we show -- yeah.

That's a text message between you and Joe Favuzza, correct?

A. Yes.

MR. TARLOWE: Defense offers Defense Exhibit 1706-A.

MR. THOMAS: Objection, your Honor, relevance, time.

THE COURT: Sustained.

MR. TARLOWE: Judge, may we approach on this?

THE COURT: Sure. Thank you.

(Continued on next page)

LAEPCOL6          Rabin - Cross          Page 966

(At the side bar)

MR. TARLOWE: Judge, this is the last exhibit. I have maybe two or three more questions. The relevance here is we are establishing that, contrary to the government's allegation that this was some sort of scheme by Mr. Cole to inflate Iconix's revenue, these deals were driven by Mr. Rabin and his desire to help his own P and L.

This e-mail shows that he was pressing Iconix for $2 million in marketing money three years after Neil Cole left the company. That is highly relevant because the government is arguing that the only reason why Iconix paid marketing invoices in 2014 was because it was a secret side agreement. This shows that in 2018, when Mr. Cole is not there, there's no allegation of secret side agreements, he thinks he can get $2 million in marketing money from Iconix.

And in the same text, he talks about asking prior business partners, including Authentic which we just looked at all those invoices, for marketing money. It shows that GBG operated and did business. It's highly, highly relevant.

MR. THOMAS: Your Honor, there's certainly no dispute from the government that Mr. Rabin's conduct exposes him to questions of criminal jeopardy. That's why we're in this compulsive situation, but the inference that the defense is asking the Court and the jury -- inferences that the defense is asking the Court and the jury to draw here is a propensity

LAEPCOL6          Rabin - Cross          Page 967

inference, that his conduct in 2013 and 2014 can be explained by instances of conduct in 2018. That's both improper, removed in time and highly prejudicial.

MR. TARLOWE: It has nothing to do with propensity. It's direct evidence that GBG asked Iconix for marketing money. It has nothing to do with character or propensity, nothing --

MR. REISNER: Bad acts.

MR. TARLOWE: -- bad acts. It's not prejudicial.

THE COURT: It's too far removed from the facts that are at issue in this case, and I'm not going to allow it.

(Continued on next page)

LAEPCOL6          Rabin - Cross          Page 968

(In open court)

THE COURT: Mr. Tarlowe.

BY MR. TARLOWE:

Q. Mr. Rabin, the document that was just before you, did that refresh your recollection that you continued to press Iconix for marketing money after Mr. Cole was no longer at the company?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

A. No.

Q. It does not?

A. Refresh my memory?

Q. Yes.

A. No.

Q. Can we please put that up for the witness again? Mr. Rabin, read that to yourself.

A. Okay.

Q. Does that refresh your recollection that in March of 2018, you were thinking that you would go hard at Iconix about marketing?

A. It does not refresh my memory.

Q. Do you recall in 2018 asking other business partners for $10 million?

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

---

LAEPCOL6          Rabin - Redirect          Page 969

A. I do not remember.

THE COURT: No, the objection was sustained.

THE WITNESS: All right.

MR. TARLOWE: One moment, your Honor. No further questions.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MR. THOMAS:

Q. Good afternoon, Mr. Rabin.

A. Good afternoon.

Q. Do you remember you were asked whether you thought you had done anything wrong?

A. Correct.

Q. Now, Mr. Rabin, do you know whether or not Mr. Cole told the truth about your deals to his auditor?

MR. TARLOWE: Objection.

THE COURT: Sustained.

Q. Mr. Rabin, did you speak to Iconix's auditors?

A. No.

Q. Did you tell them about the agreements that you struck with Mr. Cole?

A. No.

Q. Did you speak to Iconix's in-house counsel?

A. About?

Q. About the agreement that you struck with Mr. Cole?

---

LAEPCOL6          Rabin - Redirect          Page 970

A. I don't believe so, no.

Q. Mr. Rabin, do you know what Mr. Cole did with the substance of your agreement inside Iconix?

A. No.

Q. Now, Mr. Rabin, you were just asked some questions about Marilyn Monroe's estate; do you remember that?

A. Yes.

Q. And in 2013 and 2014, was Marilyn Monroe's estate a partner in a joint venture with Li & Fung?

A. No.

Q. You were also asked questions about Spyder. In 2013 and 2014, was Spyder a partner in a joint venture with Li & Fung or GBG?

A. No.

Q. And you were also asked questions about Authentic Brand; do you remember that?

A. Yes.

Q. In 2013 and 2014, was Authentic Brand a JV partner of Li & Fung or GBG?

A. No.

Q. Now, the marketing expenses that were reflected in the documents that Mr. Tarlowe showed you, were those marketing expenses of a licensee?

A. I'm sorry, say that question again?

Q. Let me ask it this way. We talked about joint ventures

---

LAEPCOL6          Rabin - Redirect          Page 971

yesterday; do you remember that?

A. Yes.

Q. How is it that marketing is typically handled in a joint venture?

A. It's done by the joint venture.

Q. Where are the expenses charged?

A. To the joint venture.

Q. And how do the parties profit from a joint venture?

A. After the -- royalty after the expenses.

Q. Now, Mr. Rabin, I want to talk a little bit about each of these deals very briefly. So let's start with SEA-1, if we could. Could you remind the jury what it is that you and Mr. Cole agreed to beyond the terms of the purchase share agreement?

MR. TARLOWE: Objection.

THE COURT: Overruled.

And before you start answering, Mr. Rabin, could I just bother you to get a little closer to the microphone.

A. Sorry. Can you ask the question again, please?

Q. Do you remember we looked at the share purchase agreement yesterday?

A. Yes.

Q. The share purchase agreement reflected a purchase price for the interest in the JV; is that right?

A. Yes.

---

LAEPCOL6          Rabin - Redirect          Page 972

Q. Do you recall what the purchase price was?

A. $12 million.

Q. And how much of that was guaranteed on the day of signing?

A. $10 million.

Q. Was that the only money that you promised to pay Mr. Cole on signing?

A. No.

Q. What else did you promise to pay?

A. $2 million.

Q. How did you come to that agreement?

A. I remember telling Mr. Cole that I wanted $2 million for the services that were provided, and he wanted $2 million more.

Q. Did he accept your offer?

A. Yes.

Q. Now, the services that you provided, could you tell the jury when those services happened in time?

A. I believe it was 2013.

Q. Did they happen before or after the joint venture agreement?

A. To the best of my knowledge, before.

Q. Now, in connection with the joint venture, do you remember the letter of authorization?

A. Yes.

Q. Now, did that letter of authorization have any terms that related to whether you could make commissions for your work?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

LAEPCOL6          Rabin - Redirect          Page 973

A. I don't believe so.

Q. Let's show the witness the letter of authorization. One moment, your Honor, let me grab it.

It's Government Exhibit 208. Do you remember this one?

A. Yes.

Q. Now, Mr. Gill, if you could enlarge the final paragraph of this page. And Mr. Gill -- yes, let's publish to the jury.

Mr. Rabin, do you see that it reads, "In the event that the parties or their respective subsidiaries or affiliates should enter the into a joint venture agreement related to the development of the licensed marks in the territory prior to September 15, 2013" -- Mr. Gill, can we continue to the second page.

In subparagraph one it says, "All licensing agreements entered into by LF Asia and any third party from the date hereof until the joint venture agreement date granting use of the licensed marks in the territory, shall be assigned to the joint venture." Do you see that?

A. Yes.

Q. And the second paragraph says, "The terms of this letter of authorization, and any other agreement entered into between the parties related to the agency relationship" --

THE COURT: Slow down.

Q. -- "between the agency relationship between LF Asia and

LAEPCOL6          Rabin - Redirect          Page 974

Iconix, including agreements providing for past or future commissions arising therefrom, shall be voided." Do you see that?

A. Yes.

Q. Can you tell the jury what the idea was behind this letter of authorization?

A. It gave Li & Fung the ability to talk to the licensees in that territory.

Q. And how is it that Li & Fung expected to profit from that work that it did?

A. That the work that it did for the -- I'm confused with the question.

Q. Mr. Rabin, did you do work pursuant to the letter of authorization?

A. Yes.

Q. How is it Li & Fung expected it would be compensated for that work?

A. We were looking to -- as we were looking to the marketplace for potential licensees and examining what licensors -- licensees were performing at that time, we felt there was an opportunity to grow the business.

Q. If Li & Fung entered into a joint venture, would it profit from that work?

A. Yes.

Q. How would it profit?

LAEPCOL6          Rabin - Redirect          Page 975

A. With the high royalty income.

Q. Now, Mr. Rabin, what was your understanding of whether Li & Fung was entitled to commissions in the event that it entered into a JV?

A. There would be no further commissions.

Q. Now, Mr. Rabin, do you recall being asked about PWC and PWC's role with respect to SEA-1?

A. Yes.

Q. What was PWC's role?

A. To do due diligence on the territory.

Q. Was PWC auditing in any fashion the bookkeeping of the transaction?

A. I'm not exactly sure what they actually -- I'm not exactly sure.

Q. Do you have any memory of PWC auditing the bookkeeping of the joint venture transaction?

A. I believe so.

Q. What kind of audit did they do?

A. They would look at the royalty income -- I mean, they should have looked at the royalty income coming in from the licensee.

Q. You mean the brand licensees in the territory?

A. Yes.

Q. Okay. So can we have on the screen, and this will require some assistance from the defense, what was marked as Defense

LAEPCOL6          Rabin - Redirect          Page 976

Exhibit 1048? And that's just for the witness and the parties.

Mr. Rabin, while that's coming up, do you recall you were asked questions about whether SEA-1 could be worth millions?

A. Yes.

Q. Do you recall you were asked that question with this document in front of you, 1048?

A. Ask the question again, please?

Q. You were shown this document on cross-examination, right?

A. Yes.

MR. THOMAS: And the government offers Defense Exhibit 1048.

A. I'm sorry?

Q. No question.

THE COURT: You don't have a question before you.

THE WITNESS: Okay.

MR. TARLOWE: Your Honor, I think the government objected to this.

MR. THOMAS: Not to this one.

MR. TARLOWE: Objection, hearsay.

THE COURT: Sustained.

MR. THOMAS: Let's remove that Defense Exhibit 1048.

BY MR. THOMAS:

Q. Now, was there a time during the due diligence process where your team reported back what they had found?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 14, 2021

---

LAEPCOL6    Rabin - Redirect    Page 977

A. Yes.

Q. Can we show the witness Government Exhibit 1006. We can publish that to the jury, Mr. Gill. Mr. Gill, why don't you remove that enlargement.

Mr. Rabin, do you recognize this?

A. Yes.

Q. What is it that your team reported back to you in the due diligence process?

A. The findings of the brands, the quality of the brands, the potential of the brands.

Q. And how was the quality of the brands, as compared to what you expected?

A. Not to the same level that I expected.

Q. Do you see under Umbro, No. 1, there's a paragraph beginning "the really disturbing issue"?

Do you see that Mr. Dave Thomas writes to you, "The really disturbing issue is that PWC and CJ have requested from David at Iconix the new agreements, even just term sheets and the comment was, use the existing ones"?

THE COURT: Please show down, Mr. Thomas.

MR. THOMAS: Yes, your Honor.

Q. "It appears, quite obviously, that MGs will come down substantially and Iconix needs to be transparent"?

A. I see that.

Q. What does "MGs" refer to?

---

LAEPCOL6    Rabin - Redirect    Page 978

A. Minimum guarantees.

Q. What was the significance of that?

A. That the minimum guarantees we use to also potential value the asset.

Q. Mr. Gill, if you could remove the enlargement.

We can move on from this entirely.

Now, Mr. Rabin, do you remember being asked about consulting work?

A. Yes.

Q. In connection with SEA-1, when you said you did consulting work, what were you referring to?

A. The diligence, looking for opportunities, analyzing the business in Southeast Asia, talking to the licensees about what they would require to grow the business, stuff like that.

Q. What was the purpose, from Li & Fung's perspective, of undertaking that work?

A. That -- to my best of my memory, that was something that we did in the beginning to assess the market, to see if there's opportunities to grow the business and to show the Iconix group the opportunities for their brands in that territory.

Q. And after that work, were you and your team able to compute a purchase price you were willing to pay for the interest?

A. Yes.

Q. What was the purchase price?

A. $10 million.

---

LAEPCOL6    Rabin - Redirect    Page 979

Q. Now, Mr. Rabin, in connection with SEA-1, you also signed a consultancy agreement, right?

A. Yes.

Q. Do you remember that agreement was between Iconix and LF Centennial Limited?

A. Yes.

Q. Did LF Centennial Limited do any of the things you just said or the consulting work that was performed?

A. Not LF Centennial.

Q. Are you aware of any other occasion when Li & Fung or GBG billed a joint venture for consulting work when it was a partner in a joint venture?

A. I don't remember.

Q. Now, on cross-examination you were asked about the notion of goodwill between business partners; do you remember that?

A. Yes.

Q. So I want to separate out what could happen from what did happen. Okay?

A. Okay.

Q. Did you and Mr. Cole strike an agreement with respect to the purchase price for SEA-2?

A. Yes.

Q. What was the agreement?

A. 10 million -- ten-point-something-million dollars.

Q. And after you settled on that purchase price, did you

---

LAEPCOL6    Rabin - Redirect    Page 980

discuss raising it further?

A. Yes.

Q. What were those discussions?

A. To increase the price by $5 million and have the ability to bill it back in marketing.

Q. Did those discussions result in an actual agreement in front of you?

MR. TARLOWE: Objection, leading.

THE COURT: Overruled.

A. What's the question again? I'm sorry.

Q. What did Mr. Cole say to you, if anything, with respect to the increase in the purchase price for SEA-2?

A. If we increased the price by 5 million, we can bill it back by marketing.

Q. Did you accept that offer?

A. Yes.

Q. Did you understand that you had an agreement with Mr. Cole about that matter?

A. Yes.

Q. Having now looked at a bunch of records with Mr. Tarlowe, do you doubt your memory of that fact?

A. No.

Q. Now, I want to talk about the marketing that results from SEA-2 for a moment. Why is it that GBG billed marketing in the total amount of 5 million to Iconix?

---

# A-312

LAEPCOL6          Rabin - Redirect          Page 981

A. That was the agreement I had with Mr. Cole.

Q. From your perspective, was the marketing done worth 5 million precisely?

A. Not a hundred percent 5 million.

Q. Is the marketing work that was undertaken work that GBG would have done anyway?

A. Yes.

Q. You were also asked a bit about the marketing. Right now, can you recall any marketing work precisely that GBG undertook for SEA-2?

A. I wasn't involved with the marketing side of the business.

Q. But, Mr. Rabin, can you think of a single thing that GBG did to market SEA-2?

A. Building brand books.

Q. Now, aside from Iconix, have you ever entered into a deal that involved increasing the purchase price for a commitment to give back money in some other fashion?

A. Not that I'm aware of.

Q. And, Mr. Rabin, with respect to SEA-1, why is it that you agreed to pay an additional 2 million to Iconix?

MR. TARLOWE: Objection, foundation.

THE COURT: Overruled.

A. I was going to get back $2 million.

Q. Did you think you were getting something from the deal too?

A. Yes.

LAEPCOL6          Rabin - Recross          Page 982

Q. And with respect to SEA-2, why is it that you agreed to increase the purchase price by 5 million?

A. Because I was getting back the $5 million.

Q. And with respect to SEA-3, why did you agree to increase the purchase price by 6?

A. To reduce the Rocawear shortfall.

Q. Now, without Mr. Cole's assurance to send 2 million back to you on SEA-1, would you have agreed to pay him the extra 2?

A. No.

Q. And without Mr. Cole's assurance to send 5 million back as marketing for SEA-2, would you have agreed to increase the purchase price by 5 million?

A. No.

Q. And without Mr. Cole's assurance to send or relieve $6 million in obligations on SEA-3, would you have agreed to increase the purchase price?

A. No.

MR. THOMAS: Nothing further.

THE COURT: Recross?

RECROSS EXAMINATION

BY MR. TARLOWE:

Q. Mr. Rabin, you were just asked about SEA-1, and on SEA-1, there was no commitment to make any payment or do anything that was not in the written agreement, correct?

A. Correct.

LAEPCOL6          Rabin - Recross          Page 983

Q. All of the parties' commitments were documented in the written agreement, correct?

A. Correct.

Q. And on SEA-2, the written agreements do not contain any obligation on the part of Iconix to pay future marketing money, correct?

A. Correct.

Q. And doesn't that demonstrate that others at GBG did not believe that there was an agreement?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

A. I don't know.

Q. And on SEA-3, the deal documents did not include any obligation on the part of Iconix to relieve GBG of its royalty obligations, correct?

A. Correct.

Q. And Mr. Cole didn't ask you to keep anything out of any of those agreements, right?

A. Correct.

MR. TARLOWE: Nothing further.

THE COURT: Anything else?

MR. THOMAS: No, your Honor.

THE COURT: Mr. Rabin, you may step down.

(Witness excused)

Will the government please call your next witness?

LAEPCOL6          Cuneo - Direct          Page 984

MR. SOLOWIEJCZYK: The government calls Peter Cuneo.

THE COURT: Sir, please step all the way forward, and watch your step and avoid the wires on the floor. Please step into the witness box and remain standing.

FRANK PETER CUNEO,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE COURT: Sir, you may take off your mask in the witness box. Please have a seat. Make yourself comfortable. Pull your seat up to the microphone, and please begin by stating your first and last name and spelling it, first and last name.

THE WITNESS: My name is Frank Cuneo, F-r-a-n-k, C-u-n-e-o.

THE COURT: Mr. Solowiejczyk.

DIRECT EXAMINATION

BY MR. SOLOWIEJCZYK:

Q. Good afternoon, Mr. Cuneo. You said your name was Frank Cuneo. Do you sometimes go by Peter Cuneo?

A. Yes. My second name is Peter Cuneo, and actually, my family has called me Peter since I was born.

Q. What do you currently do for a living?

A. I'm currently an investor and an executive involved in actually numerous activities.

Q. During your career, have you been an executive at publicly

# A-313

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 15, 2021

LAFMCOL2          Cuneo - Redirect          Page 1073

2014 time period learning about and understanding that potential transaction?

A. Well, some time was spent, I can't tell you the amount. My recollection is that that particular transaction never got to the point where there was a serious negotiation.

Q. Do you recall that Iconix delivered a letter of intent to CAA?

A. Yes.

Q. Do you recall that the enterprise value identified in that letter of intent was over $1 billion?

A. I don't recall that.

Q. Who from Iconix was leading the discussion with the board concerning the potential CAA transaction?

A. Neil Cole.

MR. REISNER: Nothing further at this time, your Honor.

THE COURT: Any redirect?

MR. SOLOWIEJCZYK: Very briefly, your Honor.

REDIRECT EXAMINATION
BY MR. SOLOWIEJCZYK:

Q. Mr. Cuneo, you were asked some questions about certain stock options that were exercised by Mr. Cole.

Do you recall that?

A. Yes.

Q. When you exercise a stock option, do you basically get

LAFMCOL2                              Page 1074

stock at that point?

A. Yes.

Q. When you get that stock, are you required to sell it?

A. No.

Q. So you can just keep the stock?

A. Yes.

Q. Were there various occasions prior to October 2014 where there were open trading windows?

A. Yes.

Q. In which Mr. Cole could have sold stock?

A. Yes.

MR. SOLOWIEJCZYK: Nothing further.

THE COURT: Anything further?

MR. REISNER: Nothing further, your Honor.

THE COURT: Mr. Cuneo, you may step down.

MR. MARGOLIS: Thank you.

(Witness excused)

THE COURT: Do we need to exit the jury?

Ladies and gentlemen, you may recall, I believe it was last week, we asked you to step out just for five minutes so we can do some legal work with respect to a particular witness. We are going to have to ask you to do it again. It will just be a couple of minutes. Everyone, please stand.

(Jury not present)

THE COURT: Bring him in.

LAFMCOL2                              Page 1075

Sir, please step all the way forward. Step into the witness box and remain standing.

(Jared Margolis sworn)

THE COURT: Can you please state your full name for the record.

MR. MARGOLIS: Jared Margolis.

THE COURT: How old are you, sir?

MR. MARGOLIS: Forty-seven.

THE COURT: Are you feeling well today?

MR. MARGOLIS: Yes, your Honor.

THE COURT: Your mind is clear?

MR. MARGOLIS: Yes, your Honor.

THE COURT: In the last 24 hours, have you taken any drugs medicine or pills or have you consumed any alcohol.

MR. MARGOLIS: Just one drink.

THE COURT: That's not affecting your ability to think or to remember as you sit here today?

MR. MARGOLIS: No, your Honor.

THE COURT: Now, Mr. Margolis, have you been subpoenaed to come here today?

MR. MARGOLIS: I have.

THE COURT: Do you have a lawyer, sir?

MR. MARGOLIS: I do.

THE COURT: Have you discussed this matter with your lawyer?

LAFMCOL2                              Page 1076

MR. MARGOLIS: I have.

THE COURT: In your discussions with your attorney, did you determine that if you were to come here without an immunity order that you would invoke your right against self-incrimination?

MR. MARGOLIS: I would.

THE COURT: Did you discuss that decision thoroughly with your lawyer?

MR. MARGOLIS: I did.

THE COURT: Do you understand that I have issued an order granting you immunity with respect to the testimony that you provide here today?

MR. MARGOLIS: I am.

THE COURT: Do you understand that because I have entered that order, you will be required to answer truthfully all of the questions that are put before you today?

MR. MARGOLIS: I do.

THE COURT: Do you understand that the order that I have issued does not protect you from any perjury that you may engage in with respect to your testimony here today?

MR. MARGOLIS: I do.

THE COURT: Anything further that I should ask, Mr. Solowiejczyk?

MR. SOLOWIEJCZYK: No. Thank you, your Honor.

THE COURT: Anything from you, Mr. Reisner?

# A-314

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

LAFMCOL2          Margolis - Direct          Page 1077

MR. TARLOWE: No, your Honor.

THE COURT: Very well.  Let's get the jury.

Mr. Margolis, you will be sworn again in front of the jury when they come out.  OK.

MR. MARGOLIS: Yes, your Honor.

(Jury present)

THE COURT: Will the government please call its next witness.

MR. SOLOWIEJCZYK: The government calls Jared Margolis.

JARED MARGOLIS,
    called as a witness by the government,
    having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. SOLOWIEJCZYK:

Q.  Mr. Margolis, did you receive a subpoena to testify here today?

A.  I did.

Q.  Are you testifying under a court order that compels you to testify?

A.  I am.

Q.  Does that court order require you to testify even if you don't want to testify?

A.  Yes.

Q.  If you refuse to answer questions here today, could you be

LAFMCOL2          Margolis - Direct          Page 1078

held in contempt of court?

A.  Yes.

Q.  What is your understanding about whether you can be prosecuted based on the things you say today?

A.  That if I don't tell the truth, I can be prosecuted.

Q.  Do you understand that you are under oath and you are required to tell the truth?

A.  Yes, sir.

Q.  If you lie or commit perjury, does the immunity order protect you?

A.  No.

Q.  Does the court order give you immunity from prosecution in general or just the use of your words here today?

A.  Just the use of my words here today.

Q.  Has the government promised you anything in exchange for your testimony?

A.  No.

Q.  Has the government promised you that you will not be prosecuted?

A.  No.

Q.  Mr. Margolis, I want to start by asking you a couple of questions about your background.

Where do you currently work?

A.  With Payless.

Q.  Are you an executive there?

LAFMCOL2          Margolis - Direct          Page 1079

A.  I am.

Q.  Payless.  Like the shoe company, Payless?

A.  Yes, sir.

Q.  What industry have you worked in most of your professional life?

A.  The world of fashion and consumer products.

Q.  Prior to getting into the fashion industry, how far did you go in school?

A.  I graduated high school.

Q.  How did you first get started in the fashion industry, Mr. Margolis?

A.  I started in the custom leather jackets and suit business.

Q.  During that time did you end up essentially starting your own business?

A.  I did.

Q.  How long were you doing that?

A.  For close to 16 or 17 years.

Q.  Did you eventually sell that business?

A.  I did.

Q.  After that, did you end up working at a company called Li & Fung?

A.  Yes, sir.

Q.  Approximately when did you start working at Li & Fung?

A.  2011, 2012.

Q.  What kind of company was Li & Fung when you began working

LAFMCOL2          Margolis - Direct          Page 1080

there?

A.  It was a consumer products trading company and a distribution business company.

Q.  What was your initial position at Li & Fung?

A.  I was the senior vice-president of business development, and licensing.

Q.  Prior to that were you briefly a consultant for the company?

A.  I was.

Q.  When you became the senior vice-president of business development and licensing, were you working for a company called LF Asia?

A.  I was.

Q.  Is that part of this Li & Fung group of companies?

A.  Yes, sir.

Q.  Now, in the 2012, 2013 time period, when you were the senior vice-president of business development and licensing, where were you living?

A.  I relocated to Hong Kong.

Q.  And then later on, starting in late 2013, early 2014, did you come back to the United States?

A.  I did.

Q.  Were you still working for LF Asia at that point?

A.  Yes, sir.

Q.  Were you still the executive vice-president of business

# A-315

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

| LAFMCOL2 | Margolis - Direct | Page 1081 |
|---|---|---|

development and licensing?

A. Yes, sir.

Q. Who was your boss during this time period in 2013 and 2014?

A. Jason Rabin.

Q. At some point in 2014, did Li & Fung spin off its U.S. business?

A. Yes, sir.

Q. Did that company become Global Brands Group?

A. Yes.

Q. Sometimes called GBG?

A. Yes, sir.

Q. Did you start working there?

A. I did.

Q. During this time, when you were the executive vice-president of business development and licensing, could you just give us a sense of kind of what your mandate was.

A. To grow the business and continue to build.

Q. Did that include being involved in strategizing about certain joint ventures?

A. Yes, sir.

Q. When you came back to the United States and you were working for Li & Fung and later GBG, where were the offices located?

A. In New York City, in the Empire State Building.

Q. During your time working for Li & Fung and GBG, did you

| LAFMCOL2 | Margolis - Direct | Page 1082 |
|---|---|---|

ever do business with a company called Iconix?

A. Yes, sir.

Q. What kind of company was Iconix?

A. A licensing -- an IP company.

Q. Can you name a couple of brands that Iconix owned.

A. Starter, Lee Cooper, Umbro.

Q. Was Iconix a publicly traded company at the time?

A. Yes, sir.

Q. Who was the CEO of Iconix at the time that you dealt with them in 2013 and 2014?

A. Neil Cole.

Q. Did you interact with Neil Cole from time to time during your time working for Li & Fung and GBG?

A. Yes, sir.

Q. Were there other Iconix executives that you interacted with during that time period?

A. Yes.

Q. Can you name a few.

A. Seth Horowitz, Dan Castle.

Q. You mentioned Seth Horowitz. What was your understanding of what his position was?

A. He was the COO of the company.

Q. Do you recall how you first started interacting with Neil Cole, what brought that about?

A. When we took the master license for Peanuts.

| LAFMCOL2 | Margolis - Direct | Page 1083 |
|---|---|---|

Q. What's Peanuts?

A. Peanuts is Snoopy on Charlie Brown and the rest of the characters that Mr. Schultz created.

Q. When was that, approximately?

A. In 2012.

Q. That was a master license agreement relationship between your company and Iconix?

A. Yes, sir.

Q. That was with respect to Peanuts?

A. Yes.

Q. That's kind of how you first started interacting with Neil Cole?

A. Yes, sir.

Q. During your time working at GBG, did you become involved in discussions that related to a joint business venture between Iconix and GBG and Southeast Asia?

A. I did.

Q. Did that ultimately mature into GBG and Iconix entering into a joint venture partnership?

A. Yes, sir.

Q. Originally, did that cover the geographic region of Southeast Asia?

A. Yes, sir.

Q. What was Iconix going to be contributing to this joint venture?

| LAFMCOL2 | Margolis - Direct | Page 1084 |
|---|---|---|

A. All of their intellectual properties in their portfolio.

Q. So various brands that they owned?

A. Yes, sir.

Q. What was GBG able to bring to the table?

A. Our local presence of people to go out there and help manage the partners and grow the business with new partners.

Q. The joint venture was ultimately formed, is that right?

A. Yes, sir.

Q. Did GBG and Iconix own that 50/50?

A. We did.

Q. And then you shared in the revenue stream, essentially?

A. Yes, sir.

Q. Now, for GBG to do this joint venture with Iconix, did you have to pay some money up front?

A. We did.

Q. Who was GBG paying that money to?

A. To Iconix.

Q. Originally, I think you said the joint venture covered certain parts of the world, right?

A. Yes, sir.

Q. Now, to come up with that purchase price, did GBG -- I am going to call GBG and Li & Fung interchangeably if that works for you, Mr. Margolis.

A. Yes, sir.

Q. Before entering into that initial transaction and forming

# A-316

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

| LAFMCOL2 | Margolis - Direct | Page 1085 |

the joint venture, did the company perform some due diligence?

A. We did.

Q. Generally, what does that involve? What is due diligence?

A. To meet the partners, see the trajectory of the business of where it's going, and looking at all the contracts.

Q. What was the goal of this? What were you trying to figure out?

A. What the value of the business was.

Q. Now, was there a formula that Li & Fung used in trying to determine the value it should pay as the purchase price?

A. Yes, sir.

Q. At a high level could you explain that.

A. We would pay a multiple on the revenue.

Q. Do you recall what the multiple was?

A. It was five and a half times.

Q. So was part of the due diligence figuring out what that revenue stream was going to be?

A. Yes, sir.

Q. Mr. Margolis, I want to direct your attention to the fall of 2013. OK?

A. Yes.

Q. Were you involved in negotiations with Iconix to enter into a joint venture transaction in Southeast Asia?

A. I was.

Q. I am going to refer to that today as SEA-1. Will you

| LAFMCOL2 | Margolis - Direct | Page 1086 |

understand what I mean if I do that?

A. Yes, sir.

Q. In the fall of 2013, I think you said this, but where were you living?

A. In Hong Kong.

Q. Who was your boss at the time?

A. Jason Rabin.

Q. Was he in Hong Kong, too, at that time?

A. He was.

Q. Who was primarily involved in negotiating that SEA-1 transaction from the Li & Fung side?

A. Jason Rabin.

Q. What was your understanding as to who Mr. Rabin was negotiating with at Iconix?

A. With Neil Cole.

Q. So you talked about using a formula to come up with the purchase price, right?

A. Yes.

Q. Were you involved in the process of trying to do that due diligence?

A. Yes, sir.

MR. SOLOWIEJCZYK: I want to show the witness, as well as the jury, Government Exhibit 208, Mr. Charalambous.

Q. Mr. Margolis, have you seen this document before?

A. I have.

| LAFMCOL2 | Margolis - Direct | Page 1087 |

Q. Did you see it at the time you were working at Li & Fung?

A. I believe so, yes.

Q. If we could just look at the top half of the page it says: To whom it may concern: This letter of authorization confirms that Iconix Brand Group, Inc., the intellectual property owner and trademark owner of the following marks, and then it lists a bunch of companies.

A. Yes.

Q. These are all various Iconix brands?

A. Yes, sir.

MR. SOLOWIEJCZYK: If we can go back to the bottom half, Mr. Charalambous, below the brands.

Q. It says that Iconix has appointed LF Asia Limited as its nonexclusive agent and representative for Southeast Asia. It lists a bunch of countries. And then it says: To develop the license marks in the territory through licensing and other opportunities with the right to negotiate licenses with potential licensees to enable the full exploitation of the merchandising rights in relation to the licensed marks. You see that?

A. Yes, sir.

Q. Generally speaking, what was this letter of authority allowing you, LF Asia, to do?

A. To go and speak with partners, to do our due diligence, and to try to do new deals.

| LAFMCOL2 | Margolis - Direct | Page 1088 |

Q. To do your due diligence were you going to need to have conversations that related to at times confidential business matters?

A. I don't understand the word confidential.

Q. To do the due diligence, you needed to talk to Iconix's business partners in the region, right?

A. Yes.

Q. To do that, were they going to talk to you if you didn't have some kind of authorization from Iconix?

A. No.

Q. Is this letter essentially giving you that authorization?

A. It is.

Q. If we could look at the bottom of page 1, it states: This letter of authorization will expire on September 15, 2013. In the event that the parties or their respective subsidiaries or affiliates should enter into a joint venture agreement related to the development of the licensed marks in the territory prior to September 15, 2013, the joint venture agreement date: (I) all licensing agreements entered into by LF Asia and any third party from the date hereof until the joint venture agreement date granting use of the licensed marks in the territory shall be assigned to the joint venture. Do you see that part?

A. I do.

Q. If the joint venture went forward, Mr. Margolis, what would

# A-317

LAFMCOL2        Margolis - Direct        Page 1089

happen with respect to any new licensing agreements that LF Asia had been able to form?

A. They would go into the joint venture.

Q. I want to go to point 2 here. It says: The terms of this letter of authorization and any other agreement entered into between the parties related to the agency relationship between LF Asia and Iconix, including agreements providing for past or future commissions arising therefrom, shall be voided.

You see that?

A. I do.

Q. So under this part of the agreement we just read, if Iconix and LF Asia went forward with the joint venture, was LF Asia going to be entitled to any commissions?

A. No.

MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous.

Q. The joint venture ultimately did go forward, right, Mr. Margolis?

A. Yes, sir.

Q. You mentioned that you participated in the due diligence process, right?

A. Yes, sir.

MR. SOLOWIEJCZYK: I am going to show what's already in evidence as Government Exhibit 1008.

Q. This is an e-mail from Kevin Chow to Jason Rabin and then

LAFMCOL2        Margolis - Direct        Page 1090

it copies Dave Thomas and you, right?

A. Yes.

Q. Who was Kevin Chow?

A. He was -- he led the M&A team for us at LF Asia.

Q. You said Jason Rabin was your boss, right?

A. Yes, sir.

Q. Who was Dave Thomas?

A. Dave Thomas was the -- I believe he was the CFO or COO. I don't remember exactly.

Q. If you could come a little closer to the microphone.

A. Sorry.

Q. Perfect. Thank you.

Is this e-mail generally related to that due diligence process you were doing?

A. Yes, sir.

Q. I just want to look at point 1. It says: To get Iconix 10 million now while keeping 5.5, they have to have a 3.64M gross royalty for 2013.

Looking at point 2 it says: If the gross royalty for 2013 is less than 3.64 million, which is very likely, we are paying more than 5.5.

You see that?

A. Yes.

Q. What is Mr. Chow generally conveying to you and the others in those two points?

LAFMCOL2        Margolis - Direct        Page 1091

A. That the royalty would need to be higher in order for us to pay a five and a half times multiple.

Q. What purchase price is being contemplated at this point? What amount?

A. Ten million.

MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous.

Mr. Charalambous, if you can put up Government Exhibit 200.

Q. Looking at the top, is this a share purchase agreement dated September 30, 2013?

A. Yes, sir.

Q. Does this relate to the SEA-1 deal?

A. It does.

MR. SOLOWIEJCZYK: If we can go down to point 2 at the bottom.

Q. Mr. Margolis, it says: In consideration of the sale, transfer and delivery of the sale share, buyer shall in full payment thereof pay to seller the aggregate consideration of up to $12 million.

You see that?

A. I do.

Q. What follows is a payment schedule?

A. Yes, sir.

Q. Item A is 5.5 million, right?

LAFMCOL2        Margolis - Direct        Page 1092

A. Yes.

Q. It's going to be paid on the closing date, right?

A. Yes, sir.

Q. And item B is 3.5 million and it is going to be paid on the first anniversary of that closing date?

A. That's correct.

Q. Item C is 1 million. It's going to be paid on the second anniversary of the closing.

A. Yes, sir.

Q. Those three items, am I correct that that adds up to $10 million?

A. It does.

Q. Are those payments that LF Asia is saying it's definitely going to make?

A. Yes, sir.

Q. Item D says: U.S. 2 million will be paid on or before the second anniversary of closing conditional upon FY14 royalty being more than target royalty.

Do you see that?

A. I do.

Q. For that payment to occur did certain targets have to be hit?

A. Yes, sir.

Q. Was that payment definite or was it going to depend on what happened in the future?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                              October 15, 2021

---

LAFMCOL2       Margolis - Direct       Page 1093

A. It depended on what had to be done in the future.

MR. SOLOWIEJCZYK: If we could go to Government Exhibit 206, which is in evidence. If we can look at the top heading. All the way from the top, with the letterhead. Sorry.

Q. This is dated September 30, right?

A. Yes, sir.

Q. Is that the same date as the agreement we just looked at?

A. Yes, sir.

Q. So this is from LF Asia to Iconix, right? Am I understanding that correctly?

A. That is correct.

Q. Mr. Margolis, prior to meeting with the government, do you recall ever seeing this document?

A. Can I please --

MR. SOLOWIEJCZYK: Can you zoom out, Mr. Charalambous.

A. I don't recall this.

MR. SOLOWIEJCZYK: If we can look at the bottom paragraph that says: In consideration of Iconix.

Q. It says: In consideration of Iconix entering into, or causing the JV company and any applicable subsidiaries of Iconix to enter into, as applicable, the share purchase agreement, the shareholders agreement, the master license agreement, the local services agreement, and the administrative services agreement, we agree to pay you an amount equal to $2

---

LAFMCOL2       Margolis - Direct       Page 1094

million on or before October 7, 2013.

Do you see that?

A. Yes, sir.

Q. Mr. Margolis, at the time do you recall being aware of a $2 million payment from LF Asia to Iconix that was going to occur at the time this transaction closed?

A. I don't recall.

Q. Do you have any understanding of the business reasons for that agreement, for that payment?

A. I wasn't involved with this. I don't recall it or understand it.

MR. SOLOWIEJCZYK: Can we put up Government Exhibit 207, please. If we could just show the top third, half.

Q. We are looking at a consultancy agreement from September 30, 2013, is that right?

A. Yes, sir.

Q. Who is the agreement between?

A. Iconix Brand Group, Inc. and LF Centennial Limited.

Q. Iconix Brand is the company under this agreement, right?

A. Yes, sir.

Q. LF Centennial is the consultant?

A. It is.

Q. Do you recall ever having heard of LF Centennial during your time working for LF Asia?

A. I haven't. I don't recall.

---

LAFMCOL2       Margolis - Direct       Page 1095

MR. SOLOWIEJCZYK: If we go down to the bottom, the fee section, 3.

Thank you, Mr. Charalambous.

Q. It says: The company shall pay to the consultant a fixed fee of $2 million, which shall be payable in four installments.

You see that?

A. I do.

Q. Were you aware at the time this transaction closed of a $2 million consulting payment going to LF Centennial?

A. I don't recall.

MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous.

Q. That was an agreement to form the joint venture in Southeast Asia, right, Mr. Margolis?

Do you need me to repeat the question?

A. What you just had on the screen?

Q. The share purchase agreement we looked at.

A. Yes.

Q. The joint venture got formed -- now you had a joint venture in Southeast Asia, right?

A. Yes, sir.

Q. And that covered a certain part of the world?

A. Yes, sir.

Q. In about June of 2014, did the Southeast Asia joint venture ultimately get amended to cover additional parts of the world?

---

LAFMCOL2       Margolis - Direct       Page 1096

A. Yes, sir.

Q. An additional brands in those parts of the world?

A. Yes, sir.

Q. Did you participate in the negotiations relating to that June 2014 amendment?

A. I did.

Q. I am going to refer to that June 2014 amendment as SEA-2. Will you understand what I mean?

A. Yes, sir.

Q. Besides you, who else from LF Asia GBG was primarily involved in those negotiations of SEA-2?

A. Jason Rabin.

Q. From the Iconix side who were the people primarily involved?

A. Seth Horowitz and Neil Cole.

MR. SOLOWIEJCZYK: Mr. Charalambous, if we can put up Government Exhibit 1028. It's already in evidence.

Q. This is an April 30 e-mail from Neil Cole to you and Mr. Rabin, is that right?

A. Yes, sir.

Q. And it's copying Seth Horowitz?

A. It is.

Q. Friday is the subject, right?

A. Yes, sir.

Q. He says: Are you guys available to meet on Friday? Would

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

LAFMCOL2     Margolis - Direct     Page 1097

like to discuss Europe, Korea, China.  Right?

A. Yes, sir.

Q. The SEA-2 deal that we talked about, did that end up relating to Europe and Korea?

A. It did.

Q. We will get to that, but later on was there another deal that you were involved in that involved China?

A. Yes, sir.

Q. Was that in about September of 2014?

A. I believe so.

Q. If I refer to that deal as SEA-3, will you understand what I mean?

A. Yes, sir.

MR. SOLOWIEJCZYK: Mr. Charalambous, you can take this down.

Q. This was April 30, right?

A. Yes.

MR. SOLOWIEJCZYK: If we go to Government Exhibit 1031.

Q. Is this an e-mail from Seth Horowitz to you?

A. Yes, sir.

Q. What's the date?

A. It was May 2, 2014.

Q. That's just a couple of days after that e-mail from Neil Cole, right?

LAFMCOL2     Margolis - Direct     Page 1098

A. Yes, sir.

Q. There is an attachment to this, right?

A. There is.

MR. SOLOWIEJCZYK: If we could look at the attachment, Mr. Charalambous.

Q. This is dated May 2, right?

A. Yes, sir.

Q. Is what's being sent to you here by Mr. Horowitz, is this a final done deal or just a proposal?

A. Just a proposal.

MR. SOLOWIEJCZYK: If we could zoom in on the top portion, top half, above steps.

Q. Mr. Margolis, it talks about a total proposed purchase price of 25.3 million, right?

A. Yes, sir.

Q. Then there are different components to that, right?

A. Yes, sir.

Q. Component A says:  Amending SE Asia JV to include Korea minus Umbro per terms agreed to.

What's the purchase price being proposed as to that piece of the deal?

A. 3.7 million.

Q. Then B says:  Amending SE Asia to include Europe and Turkey rights for Ecko Unlimited, Zoo York, Marc Ecko, Cut & Sew, Ed Hardy and Sharper Image.

LAFMCOL2     Margolis - Direct     Page 1099

What's the proposed purchase price as to that piece of the deal?

A. 7.6 million.

MR. SOLOWIEJCZYK: Can we go down to steps and No. 1.

Q. So step No. 1 under this proposal would be an amendment covering both pieces A and B, is that right?

A. Yes, sir.

Q. What's the proposed purchase price as to those two pieces of the deal?

A. 11.3 million.

Q. Now, if we go back up, there is also an item C, right?

A. Yes, sir.

Q. And that talks about amending the Europe joint venture, right?

A. That's correct.

Q. That's different than the Southeast Asia joint venture, right?

A. That is.

Q. It says:  Amending Europe JV to include Lee Cooper 49 percent ownership in Europe and Turkey via a perpetual marketing and brand services agency agreement.

You see that?

A. I do.

Q. What's Lee Cooper?

A. Lee Cooper is one of the brands in the Iconix portfolio.

LAFMCOL2     Margolis - Direct     Page 1100

Q. Do you remember the Europe JV?  Do you recall who the original parties to that JV were?

A. It was TLC, The Licensing Company, and Iconix.

Q. So TLC stands for The Licensing Company?

A. Yes.

Q. You believe they were the original parties to that JV?

A. Yes.

Q. And then what happened with TLC?  How did LF Asia get involved?

A. LF Asia acquired TLC.

Q. So the proposed purchase price as to this piece was how much?

A. Fourteen million.

Q. If we look at the steps below, step 2 relates to that piece, right?

A. Yes, sir.

Q. And step 1 was talking, when it came to Korea and Europe, was talking about quarter 2, Q2, right?

A. That is correct.

Q. And this step is talking about Q3 or Q4 at this point?

A. Yes, sir.

Q. And this relates to the Lee Cooper Europe piece of the deal?

A. It does.

Q. Ultimately, Mr. Margolis, the SEA-2 deal, did it include

# A-320

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 15, 2021

---

LAFMCOL2      Margolis - Direct      Page 1101

parts A and B of this?

A. Can you please repeat the question.

Q. Did the SEA-2 deal ultimately involve amending the Southeast Asia joint venture to cover Europe and Korea?

A. Yes, sir.

Q. Did the SEA-2 transaction end up including this Lee Cooper Europe component?

A. It did not.

Q. Once again, Mr. Margolis, did you have to conduct some analysis and due diligence to figure out what purchase price was going to make sense for LF Asia/GBG?

A. Yes, sir.

Q. Were you generally involved in that process?

A. I was.

MR. SOLOWIEJCZYK: If we could put up -- it's in evidence -- Defense Exhibit 1205. That's the wrong exhibit. Sorry. Please take that down.

Q. The bottom e-mail here is an e-mail from you on May 2 to Ron Ventricelli and Jason Rabin, right?

A. Yes, sir.

Q. Who is Ron Ventricelli?

A. He was the CFO of GBG.

Q. And Rabin was your boss, right?

A. Yes, sir.

Q. Then in this e-mail you said: Attached are the terms of

---

LAFMCOL2      Margolis - Direct      Page 1102

the proposed amendment.

MR. SOLOWIEJCZYK: I want to go up to the top e-mail.

Q. This e-mail is May 6, right?

A. Yes, sir.

Q. A couple of days after May 2, right?

A. Yes, sir.

Q. It's from you to Seth Horowitz, correct?

A. Yes, sir.

Q. And it has an attachment?

A. Yes.

MR. SOLOWIEJCZYK: If we could turn to the attachment, which is A1, which is in evidence.

Q. I want to focus on the top half of this, the deal overview.

Mr. Margolis, had you and the folks that you were working with made some changes to what Mr. Horowitz had originally proposed to you?

A. In regards to?

Q. In regards to the potential SEA-2 deal, this is an attachment to a May 6 e-mail you sent to Mr. Horowitz, right?

A. Correct.

Q. In that attachment had LF Asia made some changes to what the deal was going to look like?

A. Yes, sir.

MR. SOLOWIEJCZYK: Let's look sort of briefly.

Q. Item A says: Amend the SEA Asia JV to include Korea, and

---

LAFMCOL2      Margolis - Direct      Page 1103

it says 3.3M purchase price.

Do you see that?

A. I do.

MR. SOLOWIEJCZYK: If we could put up side by side with Government Exhibit 1031, page 2, I believe, and zoom in.

Q. As to piece No. A, you were saying 3.3 million, right?

A. Yes, sir.

Q. On the left, the original proposal, what was proposed was originally 3.7 million, right?

A. That's right.

Q. Were you proposing a lower purchase price when it came to the Korea piece?

A. We were.

Q. Then if we look down towards the bottom half of each of these documents under steps, No. 1, the original proposal on the left proposed a purchase price of about 11.3 million, is that right?

A. Yes, sir.

Q. In the proposal you sent back on May 6, when it came to steps A and B, what price were you proposing in that document?

A. 10.9 million.

Q. So you were proposing a lower price, right?

A. Yes, sir.

Q. At this time were you already engaging in some due diligence about this deal?

---

LAFMCOL2      Margolis - Direct      Page 1104

A. Yes, sir.

MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous. Thank you.

Mr. Charalambous, if you could, just the bottom portion of this exhibit, Government Exhibit 1035, which is in evidence. Go to the bottom, please. Thank you. I'd like to look specifically at the bottom of page 1 to the top of page 2. Just right there. If you could zoom in on the May 6 e-mail from Mr. Horowitz that starts on the top -- the bottom of 1 and goes into 2.

Q. This is on May 6, Mr. Margolis. And Mr. Horowitz wrote to you: Jared, we need to know as soon as possible on the JV update. As you know, this is time sensitive. If we are not moving forward this quarter, we are going to need to make other decisions. Obviously, you are our first choice as a partner as we consolidate Europe and extend our relationship in the Asia region, but timing is critical.

You see that?

A. I do.

Q. By this point you already were having some conversations with Mr. Horowitz about potentially doing this deal, right?

A. Yes, sir.

Q. When Mr. Horowitz said to you that this was time sensitive and if we are not moving forward this quarter we are going to need to make other decisions, what did you understand him to

---

| LAFMCOL2 | Margolis - Direct | Page 1105 |
|---|---|---|

mean?

A. That we needed to get the deal done.

Q. By when?

A. As soon as possible. I'm sorry. By this -- by the quarter.

Q. By the end of the quarter?

A. Yes, sir.

Q. Mr. Margolis, were you aware that Iconix was a public company?

A. I was.

Q. Were you aware they filed quarterly reports?

A. Yes, sir.

Q. Had quarterly earnings announcements?

A. Yes, sir.

Q. So this is May 6. Am I correct the end of the quarter would be the end of June?

A. That is correct.

Q. When he said, if we are not moving forward this quarter we are going to need to make other decisions, what did that mean to you?

A. That we had to get the deal done or they potentially would go elsewhere.

MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous.

If you could show just the witness and the parties

| LAFMCOL2 | Margolis - Direct | Page 1106 |
|---|---|---|

Government Exhibit 1241.

Q. Do you recognize this document, Mr. Margolis?

MR. SOLOWIEJCZYK: You can zoom in on the top piece.

A. I do.

Q. What is it?

A. It's an e-mail from Seth Horowitz to myself on May 22, 2014.

MR. SOLOWIEJCZYK: The government offers Government Exhibit 1241.

MR. TARLOWE: Can we just see the whole document?

MR. SOLOWIEJCZYK: Sure.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1241 received in evidence)

MR. SOLOWIEJCZYK: You can publish that, Mr. Charalambous.

Q. I am going to start down the chain. It's an May 22 e-mail from Seth Horowitz to you. He says: We thought the IC committee meeting was Thursday in Hong Kong. I believe we were told, also, that we were moving forward while answering questions. It's May 22 and we need to close this deal in June.

Do you see that?

A. I do.

Q. What's the IC committee?

A. The investment committee.

| LAFMCOL2 | Margolis - Direct | Page 1107 |
|---|---|---|

Q. Is that a committee of Li & Fung?

A. It is.

Q. Did they have to approve the deal before it could happen?

A. Yes, sir.

Q. In terms of the timing, when does Mr. Horowitz want to get this done?

A. Before the end of June.

Q. Going up to the top e-mail from Mr. Horowitz to you he said: Team is working on all information. We should have everything by midday tomorrow. Please confirm we are going to make this a Q2 event.

You see that?

A. I do.

Q. What did you understand him to mean by a Q2 event?

A. That we need to close prior to the end of the quarter.

Q. What was your understanding as to what Iconix wanted to do, if anything, with respect to this transaction?

MR. TARLOWE: Objection.

THE COURT: Overruled.

Q. You can answer.

A. They are to be able to put it in their earnings, to announce it.

Q. As part of their earnings, is that what you said?

A. Yes, sir.

MR. SOLOWIEJCZYK: If we could go to Government

| LAFMCOL2 | Margolis - Direct | Page 1108 |
|---|---|---|

Exhibit 1037, please, which is already in.

Q. Do you recognize this document, Mr. Margolis?

A. I do.

Q. Is this a May 30 e-mail from Seth Horowitz to you?

A. It is.

Q. What's the subject?

A. Timing.

Q. Mr. Horowitz says to you: I know we keep discussing timing. I want to set an achievable, specific timeline with you. I believe our signing date should be no later than June 18. We need this because we cannot find ourselves at the end of the Q with our backs to the wall.

You see that?

A. I do.

Q. When he said that they couldn't find themselves at the end of the Q with our backs to the wall, what did you understand that to mean?

A. That we need to get this deal done before the end of the quarter.

Q. Mr. Margolis, I just want to take a step back for a second. We just went through a couple of e-mails where Mr. Horowitz was telling you, essentially, they need to get the deal done by the end of the second quarter, right?

A. Yes, sir.

Q. How important did you think that was to Iconix, based on

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                    October 15, 2021

---

LAFMCOL2          Margolis - Direct          Page 1109

your interactions with Mr. Horowitz?

MR. TARLOWE: Objection.

THE COURT: Sustained.

Q. You had conversations with Mr. Horowitz about this transaction, correct?

A. I did.

Q. They are priorities?

A. Yes.

Q. Based on those conversations with Mr. Horowitz, did you think it was important to Iconix to close this by the end of the quarter?

A. I did.

Q. And you said that you understood they were going to make an earnings announcement at the end of the quarter, right?

A. I did.

Q. Now, Mr. Margolis, did there come a time when the price that GBG was going to be paying for this transaction went up?

A. Yes.

Q. Do you recall how much it went up by?

A. I believe 5 million.

Q. Who did you first learn that from?

A. From Jason Rabin.

Q. What was your understanding as to whether that idea came from Iconix or GBG?

MR. TARLOWE: Objection. Foundation.

---

LAFMCOL2          Margolis - Direct          Page 1110

THE COURT: Overruled.

Q. You can answer.

A. I believe Iconix.

Q. So you said the deal was going to go up by 5 million?

A. Yes, sir.

Q. Did the deal ultimately happen at $5 million higher?

A. It did.

Q. Now, when it came to that extra 5 million, what was your understanding as to whether GBG was ultimately going to be out that money?

A. That we would get it back.

MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous.

If you can put up Government Exhibit 1036, please.

Q. This is May 23, right?

A. It is.

Q. What's Mr. Horowitz sending you here?

A. The legal docs for the joint venture.

Q. If we look at the bottom of page 1, he is forwarding you some documents, correct?

A. Yes, sir.

Q. And this is from a Lauren Gee of Iconix, right?

A. That's correct.

Q. To Mr. Horowitz and some others. And she says: In connection with the amendment of the SEA JV, attached please

---

LAFMCOL2          Margolis - Direct          Page 1111

find drafts of the following documents.

A. That's correct.

Q. What's being sent over here were just draft agreements, right?

A. Yes, sir.

MR. SOLOWIEJCZYK: If we could turn to page 27 of the document, Mr. Charalambous: If we could go to the second paragraph.

Q. Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by licensors in the Republic of Korea, Europe, or Turkey granted by licensors to licensee pursuant to the SEA JV amendment, the additional marks, is deemed to have a fair market value of $21,835,000 and that because Iconix and LF each own 50 percent of the licensee, LF's ownership of 50 percent of the licensee will provide LF a benefit equal to 50 percent of such fair market value, or 10.9 million.

Do you see that?

A. I do.

Q. In this draft agreement, what purchase price was being proposed that LF Asia was going to pay?

A. 10.9 million.

Q. The fair market value total was 21.8 million, is that right?

A. Yes, sir.

---

LAFMCOL2          Margolis - Direct          Page 1112

Q. This was a draft that Iconix sent over to you, right?

A. That's correct.

MR. SOLOWIEJCZYK: If we could take a look at Government Exhibit 1044. It's already in evidence.

Mr. Charalambous, you can publish this to the jury as well. If we look at just the top piece, the e-mail header, please.

Q. So this is from somebody named Mark Stevens at Mayer Brown, is that right?

A. Yes, sir.

Q. It's to a lot of people, right?

A. That is correct.

Q. Lawyers?

A. Lawyers.

Q. People who work at Iconix, people that work at LF Asia, right?

A. Yes.

Q. Among the people on the e-mail is you, correct?

A. Yes, sir.

MR. SOLOWIEJCZYK: If we look at the text of that top e-mail, please.

Q. Mark Stevens writes: Dear Gibson Dunn/Iconix teams, I attach the following revised draft documents. Consideration side letter, the word version is clean, the PDF version shows a comparison as against the GDC draft.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                     October 15, 2021

| LAFMCOL2 | Margolis - Direct | Page 1113 |

Do you see that?

A. I do.

Q. Are these revised drafts of the agreement being sent over?

A. I believe so.

MR. SOLOWIEJCZYK: If we can look at page 8, Mr. Charalambous.

Q. Are you familiar with the term red line, Mr. Margolis?

A. I am.

Q. Is this a red line, essentially, what we are looking at here?

A. It is.

Q. Showing changes against a prior draft?

A. Yes, sir.

Q. Just looking at the top, including the header, these revisions are dated June 25, is that right?

A. Yes, sir.

Q. The quarter is going to end at the end of June, right?

A. It is.

MR. SOLOWIEJCZYK: If we could go down to the paragraph that starts with Iconix and LF acknowledge.

Q. We looked at this paragraph a couple of minutes ago, right?

A. Yes, sir.

Q. Now, certain changes have been made?

A. They have.

Q. The fair market value went up from 21,835,000 to

| LAFMCOL2 | Margolis - Direct | Page 1114 |

31,835,000?

A. That's right.

Q. The 50 percent share that LF was going to be getting, instead of paying 10.9 million, now you were going to be paying 15.9 million, is that right?

A. Yes, sir.

Q. Mr. Margolis, at the time did you actually believe the fair market value was worth 31.8 million instead of 21.8 million?

A. No, sir.

Q. Did you think that the interest that LF Asia was going to be buying was worth 15.9 million instead of 10.9 million?

A. I did not.

Q. And LF Asia ended up paying 15.9 million, right?

A. We did.

Q. Five million more, is that correct?

A. Yes, sir.

Q. Between the original agreement we saw and this revised version, was there any change in the terms of what assets LF Asia actually was going to be purchasing an interest in?

A. No, sir.

Q. Had you decided that the assets were actually worth more money?

A. No, sir.

Q. Mr. Margolis, fair to say you were one of the principal people involved in negotiating the SEA-2 transaction, right?

| LAFMCOL2 | Margolis - Direct | Page 1115 |

A. I was.

Q. Let me ask you simply, Mr. Margolis, why did the price increase by $5 million?

MR. TARLOWE: Objection. Foundation.

THE COURT: Overruled.

A. Because we were going to get the money back.

Q. Who were you going to get the money back from?

A. From Iconix.

Q. And the return of that $5 million, Mr. Margolis, was it your understanding at the time that you had a firm commitment from Iconix they would return that money?

MR. TARLOWE: Objection. Foundation.

THE COURT: Overruled.

Q. You can answer.

A. That was my understanding.

Q. Would GBG have been willing to pay $15.9 million if there not been that firm commitment from Iconix to return $5 million?

A. No.

Q. Now, this agreement that LF Asia/GBG was going to pay $5 million more in return for later getting that $5 million back, was it written down in the contracts, to the best of your knowledge?

A. It wasn't.

Q. Was it an oral agreement?

A. I believe so.

| LAFMCOL2 | Margolis - Direct | Page 1116 |

MR. SOLOWIEJCZYK: You can take that down.

Mr. Charalambous, if you could just quickly put up Defense Exhibit 1233-A1, which I believe is in evidence.

THE COURT: Before we do that, it is time for our second break. Do be prepared to come back in 20 minutes. Don't discuss the case.

(Jury not present)

THE COURT: Mr. Margolis, you may step down. I actually miscalculated. Ms. Rivera tells me that the jury has already begun chirping.

(Recess)

(Continued on next page)

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

| LAFPCOL3 | Margolis - Direct | Page 1117 |
|---|---|---|

(Jury not present)

THE COURT: Do you want to bring Mr. Margolis out.

MR. TARLOWE: Your Honor, may I bring one thing out?

THE COURT: Yes, yes.

MR. TARLOWE: I just want the Court to know the reason for the foundation objection. I'm not trying to be difficult with these two objections. The issue is that, with Mr. Margolis, from the 3500 material, for some of these things I actually don't think he has a basis to know.

So when he's asked what's his understanding of X or Y, I'm objecting because I actually don't know that he has a basis. I think in some of the 3500, he's saying "I'm assuming," "I think there must have been;" so that's why I'm making those type of objections.

THE COURT: The reason why they're being overruled is because my assumption is if he doesn't have a basis for knowing them, he'll tell us.

MR. TARLOWE: Okay. Understood.

THE COURT: Okay. Can we bring him in? You can bring the jury in and also bring Mr. Margolis in.

(Jury present)

THE COURT: Okay. Everyone, please be seated. Mr. Solowiejczyk.

MR. SOLOWIEJCZYK: Thank you, your Honor.

BY MR. SOLOWIEJCZYK:

| LAFPCOL3 | Margolis - Direct | Page 1118 |
|---|---|---|

Q. Mr. Margolis, I think when we left off, we were just talking about the SEA-2 transaction and that it closed at the end of June?

A. Yes, sir.

Q. And before you could go forward with that, did the investment committee of LF Asia have to approve it?

A. Yes, sir.

Q. And it went forward at 15.9 million, right?

A. Yes.

Q. And, Mr. Charalambous, if you could pull up Defense Exhibit 1233-A1, which is in evidence.

And this is a -- is this an earlier version of the preliminary investment proposal from June 5th, 2015?

A. This is.

Q. And if we go down a little ways, how much was the Korea brand being valued at?

A. 3.3 million.

Q. Okay. And this proposal actually also included possibly doing the Europe Lee Cooper piece, right?

A. Yes, sir.

Q. All right. Can we put up 1312-A1, which -- Defense Exhibit. I'm sorry, Defense Exhibit 1312-A1, which is in evidence, and just the top part.

This is a later version of the PIP; is that right?

A. That is.

| LAFPCOL3 | Margolis - Direct | Page 1119 |
|---|---|---|

Q. And sorry, Mr. Margolis, I should have asked you this. PIP stands for preliminary investment proposal, right?

A. Yes, sir.

Q. And this is what would get submitted to the investment committee to approve the transaction?

A. Yes, sir.

Q. Okay. So this is a later one. It's from the 27th of June, right?

A. Yes, sir.

Q. If we go down to the chart.

So now, it just includes Korea amendment to Southeast Asia JV and to amendment to Southeast Asia JV Europe, right?

A. Yes, sir.

Q. It does not include the Lee Cooper piece, right?

A. It does not.

Q. And that Korea piece is now up to 8.3 million instead of 3.3 million; do you see that?

A. Yes.

Q. It went up by $5 million, right?

A. Yes, sir.

Q. You did some due diligence on this deal, correct?

A. I did.

Q. Did the due diligence support a $5 million increase on the valuation of the Korea piece?

A. It did not.

| LAFPCOL3 | Margolis - Direct | Page 1120 |
|---|---|---|

Q. You can take that down.

Mr. Margolis, I'm going to switch gears. SEA-2 closed at the end of June 2014. Soon after that, did you begin talking to people at Iconix about doing another amendment to the Southeast Asia joint venture?

A. Yes, sir.

Q. If we could put up Government Exhibit 1047 and, Mr. Charalambous, I believe this is in evidence so we can publish it to the jury.

So this is an e-mail from Seth Horowitz to you; is that right?

A. Yes, sir.

Q. And Ethan Cole?

A. Yes, sir.

Q. And Maurice Sasson?

A. Yes, sir.

Q. And what's the date of it?

A. 7-28-2014.

Q. About a month after SEA-2 closed?

A. Yes, sir.

Q. All right. And we'll come back to this in a minute, but Ethan Cole was copied on this e-mail; is that right?

A. Yes, sir.

Q. Did he work for LF Asia?

A. Yes, sir.

# A-325

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

| LAFPCOL3 | Margolis - Direct | Page 1121 |

Q. Who did he report to?

A. To me.

Q. Was he related to Neil Cole, by the way?

A. No, sir.

Q. Okay. So they just happen to have the same last name?

A. Yes.

Q. So the subject line of this e-mail is China Umbro and LC. What's that referring to?

A. To Lee Cooper.

Q. And the Umbro piece, what's that?

A. That's the other brand.

Q. Are these both Iconix brands?

A. They were.

Q. And were you, at this point, having discussions with Mr. Horowitz about amending the Southeast Asia joint venture for the region of China?

A. Yes, sir.

Q. With respect to the Umbro and Lee Cooper brands?

A. Yes, sir.

Q. Okay. So here, Mr. Horowitz says, "Jared, attached is a term sheet that should reflect our most recent conversation. The purchase price went up to 15.5, from 15 for reasons that I can explain." Do you see that?

A. I do.

Q. If we look at page 2, so this says, "It's a possible China

| LAFPCOL3 | Margolis - Direct | Page 1122 |

JV for Umbro and Lee Cooper," right?

A. Yes, sir.

Q. July 28th is the date?

A. Yes.

Q. This is just a proposal, correct?

A. That's correct.

Q. So under this proposal, if you look at the purchase terms, what's being proposed is that LF Asia is going to pay, as a purchase price for this amendment, that would cover China for Umbro and Lee Cooper, and I should say Hong Kong, Makau and Taiwan, as well?

A. 15.5 million.

Q. Now, Mr. Margolis, did the SEA-3 transaction end up closing at 15.5 million?

A. No.

Q. Did it close at a higher number?

A. It did.

Q. And we'll get to this in a few minutes, Mr. Margolis, but did GBG end up paying 21.5 million instead?

A. Yes, sir.

Q. And why did GBG pay $6 million more?

MR. TARLOWE: Objection, foundation.

THE COURT: Overruled.

A. Because we were going to get the money back.

Q. From who?

| LAFPCOL3 | Margolis - Direct | Page 1123 |

A. From Iconix.

Q. All right. Mr. Margolis, I want to go back to talking about SEA-2. So SEA-2 closed at 15.9 million end of June. What were you expecting was supposed to happen next, after that? Was there anything you were expecting?

A. I don't understand the question, I'm sorry.

Q. Sure. I'll rephrase it.

I think you testified before the break that you paid $5 million more than you had originally thought you would and that there was a commitment from Iconix to give 5 million back to GBG, right?

A. Yes, sir.

Q. So what needed to happen next?

A. We had to send them invoices.

Q. Did you expect to get the money back?

A. Yes, sir.

Q. Okay. Now, this arrangement with respect to -- that you paid $5 million more with a firm commitment to get the $5 million back from Iconix, did you have conversations with Ethan Cole about that arrangement?

A. I did.

MR. TARLOWE: Objection.

THE COURT: Overruled.

Q. Did you make him aware of what the deal was?

MR. TARLOWE: Objection.

| LAFPCOL3 | Margolis - Direct | Page 1124 |

THE COURT: Overruled.

A. Can you please repeat the question?

Q. Did you make him aware of the fact that LF Asia had overpaid by 5 million and expected to get the 5 million back from Iconix?

A. I believe so.

Q. Just for the witness and the parties, could you put up Government Exhibit 1068.

I'm going to show you the first page, Mr. Margolis. Could you just take a look at that. Do you recognize this document?

A. Yes, sir.

Q. What is it?

A. It's an e-mail from Ethan Cole to myself that was dated on August 28th, 2014.

Q. And if you could look at the second page, quickly. Do you recognize that as well?

A. Yes, sir.

Q. Okay.

MR. SOLOWIEJCZYK: Your Honor, the government offers Government Exhibit 1068.

MR. TARLOWE: Objection, hearsay.

THE COURT: Sustained.

MR. SOLOWIEJCZYK: Your Honor, may we have a sidebar?

THE COURT: Sure.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

---

**LAFPCOL3 — Margolis - Direct — Page 1125**

(At the side bar)

MR. SOLOWIEJCZYK: Your Honor, this is the e-mail in question, if your Honor wants to look at it, and the attachment is of particular significance. This is -- should come in for multiple reasons. No. 1, it is a co-conspirator statement at this point. Ethan Cole was aware, Mr. Margolis just testified, to the fact that GBG had overpaid by $5 million in turn for a firm commitment to get the 5 million back.

What this is is literally laying out how they're going to do that $5 million overpayment, get it back, and then it talks about contemplated future overpayments related to SEA-3. The co-conspirator exception, your Honor, covers -- it doesn't have to be in the indictment that is charged, the conspiracy that was charged in the indictment. It's really any common scheme or plan that there's a preponderance of the evidence that the defendant and declarant were both members of.

THE COURT: I'm familiar with the co-conspirator statement exception. This was not a subject of a motion in limine, correct?

MR. SOLOWIEJCZYK: It was not.

THE COURT: Might have been helpful.

MR. TARLOWE: Judge, the only -- I think the only testimony we heard about Ethan Cole, I think the witness just said, I believe that I told him about the deal. That doesn't establish that Ethan Cole was a co-conspirator. I don't think

---

**LAFPCOL3 — Margolis - Direct — Page 1126**

there's any other evidence.

MR. SOLOWIEJCZYK: I can lay a foundation, you Honor, but there's a lot of other record evidence already. So Seth Horowitz testified that Ethan Cole brought him a stack of invoices to his office, way more than was actually owed, and said, pick which ones you want to make up for the $5 million overpayment.

He also testified about an e-mail between himself, Jared Margolis -- Horowitz testified about an e-mail between himself, Margolis and Ethan Cole, which related directly to the overpayment arrangement in an upcoming meeting with Neil Cole, where they were supposed to discuss that.

So there's much record evidence before your Honor in the transcript already. I'd also point out this is Gmail to Gmail, which is obviously of some significance, your Honor, because they're keeping this off of the company's servers when they're talking about this, which shows they understand the nature of what they're doing.

THE COURT: Why is this evidence of consciousness of guilt, if you will, if they're going Gmail to Gmail?

MR. SOLOWIEJCZYK: This is about GBG business, and they did a Gmail to Gmail. They kept it off of GBG's server. It's, obviously, not a typical practice, your Honor, that we've known about, GBG business using Gmail.

But, your Honor, all your Honor has to find is that

---

**LAFPCOL3 — Margolis - Direct — Page 1127**

there was a common plan among these folks, including Ethan Cole, that GBG was going to overpay by five and Iconix was going to give it back. There's more than enough here to do that. This is clearly a statement in furtherance of that.

THE COURT: Well, except I don't know enough about this Ethan Cole. And by the way, thank you for finally letting everyone know that he's not related to Neil. There could be people at lower levels of the organization that are told the facts and not know that there is a corrupt agreement.

And I've heard Mr. Ethan Cole's name quite a bit, obviously, but I don't know that I can, on the basis of what's been presented, determine that he is a knowing member of the conspiracy. So look, I'm going to move on. Don't use this, and we will discuss it some more. If you want to submit something, I'm happy to consider it.

MR. SOLOWIEJCZYK: Okay. Thank you, your Honor.

(Continued on next page)

---

**LAFPCOL3 — Margolis - Direct — Page 1128**

(In open court)

BY MR. SOLOWIEJCZYK:

Q. Mr. Margolis, I was asking you about Ethan Cole; do you remember that?

A. Yes, sir.

Q. And just to be clear, he worked for you, right?

A. Yes, sir.

Q. And did you end up working on getting that $5 million back from Iconix?

A. Yes, sir.

Q. And did you make Ethan Cole aware of the fact that GBG had overpaid by 5 million?

A. Yes, sir.

Q. And that Iconix was supposed to give that money back?

MR. TARLOWE: Objection, leading.

THE COURT: Sustained. Why don't you rephrase the question, Mr. Solowiejczyk.

BY MR. SOLOWIEJCZYK:

Q. The fact that -- did you have conversations with Ethan Cole about what the invoices were that were going to be submitted to Iconix were for?

A. Yes, sir.

Q. And what did you tell him?

A. Sorry, can you please repeat the question?

Q. What did you tell Ethan Cole?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

| LAFPCOL3 | Margolis - Direct | Page 1129 |

A. That we were going to invoice the -- we were going to invoice them for -- to get the money, the overpay back.

Q. Now, Mr. Margolis, I'm going to show you what's been in evidence as Government Exhibit 1084. I'd just like to show you page 2. Do you recognize this document?

A. I do.

Q. Do you remember seeing this during your time working for LF Asia/GBG?

A. I do.

Q. So I want to focus on the piece that says, one, 5 million marketing. And, Mr. Margolis, what's being laid out here? What does this relate to?

A. It's the amount for us to submit to be able to get back the money from the overpay.

Q. If you could just come slightly closer to the microphone. Sorry, Mr. Margolis. So the 5 million marketing, what does that relate to?

A. For us to get the money back.

Q. And then it's got different amounts here, right? It's got 1 million, Zoo York Europe; 2 million, Peanuts China; 2 million, Mossimo SE Asia. Do you see that?

A. Yes, sir.

Q. Okay. And are those different Iconix brands?

A. They are.

Q. Who decided which Iconix brands were going to be billed for

| LAFPCOL3 | Margolis - Direct | Page 1130 |

this $5 million? Was that GBG's decision or Iconix's decision?

A. I believe it was Iconix's decision.

Q. So did you end up invoicing Iconix for these amounts for these brands?

A. We did.

Q. Were you involved in that process?

A. I was.

Q. Was Ethan Cole also involved in that process?

A. Yes, sir.

Q. All right. If we could zoom out. If we look at Item No. 3, this talks about a Rocawear Kids termination option. Do you see that?

A. I do.

Q. And the first item under there talks about 2.5 million royalty relief in '14 and transfer on orders to New Rise or TBD; do you see that?

A. I do.

Q. For the 2.5 million?

A. Yes.

Q. What does that relate to? What's royalty relief?

A. It's typically, in a license agreement, there are minimum guarantees, and if you don't hit those guarantees, minimum guarantees, there's a shortfall and royalty relief is relieving you of those shortfalls.

Q. Okay. If we could look at the next one, it says -- so

| LAFPCOL3 | Margolis - Direct | Page 1131 |

that's for 2014; is that right?

A. That's right.

Q. And then the item under that is 3.5 million royalty relief for 2015; is that right?

A. Yes, sir.

Q. So do you recall around this time generally having discussions with Iconix about getting royalty relief on Rocawear Kids?

A. I wasn't really involved in that.

Q. The 2.5 million and the 3.5 million, if you put those together, what does it add up to?

A. Six million.

Q. All right. If we could put up Government Exhibit 1082, please. Do you recognize this?

A. I do.

Q. What is it?

A. It's a calendar invite from Joanna.

Q. Who is she?

A. I believe she was Seth Horowitz's assistant.

Q. And who was on this e-mail?

A. Myself, Ethan Cole, Seth Horowitz, and my assistant at the time.

Q. Okay. All right. If we could now look at Government Exhibit 1082 that's in evidence -- oh, sorry. If we could look at 1085, please.

| LAFPCOL3 | Margolis - Direct | Page 1132 |

Is this an e-mail from Ethan Cole to Seth Horowitz?

A. That's correct.

Q. And a copy to you; is that right?

A. Yes, sir.

Q. And the subject is "termination letter soft copy." Do you see that?

A. I do.

Q. And he says, "Last thing. At your convenience, can you please send a soft copy of the Rocawear termination letter?" What's your understanding of what a soft copy is?

A. An e-mail.

Q. As opposed to a hard copy, which is a printout?

A. Yes, sir.

Q. And just going back, this is September 5th, 2014, at 5:06 p.m.; is that correct?

A. That's correct.

Q. If we go back to 1082 for a second, am I correct that there's a calendar entry for a meeting at 2:00 p.m. that day, just a couple of hours before that e-mail?

A. Yes, sir.

Q. And you were on that calendar invite?

A. I was.

Q. And so was Ethan Cole?

A. Yes.

Q. And so was Seth Horowitz?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

---

LAFPCOL3     Margolis - Direct     Page 1133

A. Yes.

Q. Mr. Margolis, if we could look at 1087 just for the witness and the parties.

And do you recognize this document, Mr. Margolis?

A. I do.

Q. And what's it dated?

A. 9-9-2014.

Q. And it's to Jason Rabin, copying you; is that right?

A. That's correct.

Q. And "Subject: Termination letter"?

A. Yes, sir.

Q. It has an attachment, right?

A. It does.

Q. Okay.

MR. SOLOWIEJCZYK: Your Honor, the government offers 1087.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government's Exhibit 1087 received in evidence)

BY MR. SOLOWIEJCZYK:

Q. In it he says -- you can publish that, Mr. Charalambous. Thank you.

He says, "Hi Jason. Attached please find a first draft of the termination letter that Seth provided." Do you see that?

---

LAFPCOL3     Margolis - Direct     Page 1134

A. Yes.

Q. "See below for a quick summary"?

A. Yes.

Q. Okay. And then, if we look at the attachment, is this a draft of a potential termination letter for Rocawear Kids?

A. It is.

Q. All right. Take a look at Government Exhibit 1091, please, and this is September 11th, right?

A. It is.

Q. Just a couple of days after that e-mail from Ethan Cole?

A. Yes, sir.

Q. This is an e-mail from Lauren Gee to Robert Smits, copying you, Seth Horowitz and some others, right?

A. That's correct.

Q. And it's dated September 11th, and the subject is revised China Umbro/Lee Cooper transaction documents, correct?

A. Yes.

Q. And, Mr. Margolis, is that the SEA-3 transaction that that's referring to?

A. That is.

Q. And she says, "Rob, attached please find revised drafts of the SEA JV amendment documents for China Umbro/Lee Cooper, together with black lines marked against the prior drafts." Do you see that?

A. Yes, sir.

---

LAFPCOL3     Margolis - Direct     Page 1135

Q. Okay. So if we take a look at page 52 of this, is this a letter to LF Asia?

A. It is.

Q. Is this another redline?

A. Yes, sir.

Q. And what's it dated?

A. 11-20 -- I'm sorry, 9-11-20.

Q. September 11th, 2014?

A. Yes.

Q. And if you look at the second paragraph of the letter, it says, "Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by Iconix Luxembourg Holding, Iconix Luxembourg, Red Diamond Holdings, SARL," and then it goes on to say "In the People's Republic of China, the Hong Kong Special Administrative Region, the People's Republic of China Makau, the Special Administrative Region of the People's Republic of China, the Republic of China, granted licensors to licensee pursuant to the SEA JV amendment is deemed to have a fair market value of," and Mr. Margolis, am I right that the total fair market value went from 31 million to 43 million; is that right?

A. That's correct.

Q. And because Iconix and LF each own 50 percent of licensee, LF's ownership of 50 percent of licensee will provide a benefit equal to 50 percent of such fair market value, or the amount

---

LAFPCOL3     Margolis - Direct     Page 1136

has gone, because of the 50 percent share, from 15.5 to 21.5?

A. That's correct.

Q. The amount that GBG/LF Asia was going to be paying went up by 6 million in this draft, right?

A. Yes, sir.

Q. Did LF actually believed the rights to use and exploit these brands in China was worth 21.5 million?

MR. TARLOWE: Objection, foundation.

THE COURT: Overruled.

A. No.

Q. But GBG and -- sorry, withdrawn.

But LF ended up paying 21.5 million; is that right?

A. Yes, sir.

Q. And why did LF pay that much?

A. Because we were going to get the money back.

Q. If we could show -- you can take that down. If we could show DX1384 just to the witness and the parties.

And is this an e-mail from Edward Poon of Global Brands Group to Ethan Cole, copying you, dated September 16th of 2014?

A. Yes, sir.

Q. And others?

A. Yes, sir.

MR. SOLOWIEJCZYK: The government offers Defense Exhibit 1384.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

LAFPCOL3     Margolis - Direct     Page 1137

MR. TARLOWE: Objection, hearsay.

THE COURT: Sustained.

MR. SOLOWIEJCZYK: Your Honor, could we be heard again briefly at sidebar?

THE COURT: Sure.

(Continued on next page)

LAFPCOL3     Margolis - Direct     Page 1138

(At the side bar)

MR. SOLOWIEJCZYK: So, your Honor, 1384-A1, which is the PIP, which is in. I think the defense put it in. This is the e-mail it was attached to. The e-mail -- No. 1, this is a business record. I mean, this is basically standard. This is literally how they go about taking official action as a company. They review the PIPs, and then they approve them. So this e-mail is part of that sort of regular practice.

And No. 2, your Honor, you know, I am, to be transparent, going to ask about an e-mail from Ethan Cole to Edward Poon. The purpose of that section of the e-mail is -- it's literally opposite of for its truth. It's for the fact that Ethan Cole said something about this that left things out. It's for the fact that it was -- what he said was not true, which I have some cases I can send you. I forgot to bring them. It's pretty well understood that statements to show the statement wasn't true comes in as not hearsay.

THE COURT: I get that, but we're talking about the other document.

MR. SOLOWIEJCZYK: This is just an attachment.

MR. TARLOWE: Well, it is not just attaching the PIP. There are a lot of statements in this cover email that are hearsay.

MR. HARTMAN: There's no statement that's being offering for the truth.

LAFPCOL3     Margolis - Direct     Page 1139

MR. TARLOWE: "The hurdles are slightly worse off" is a statement. There's other information here. These are all statements.

THE COURT: It may be able to come in in a redacted fashion.

MR. SOLOWIEJCZYK: That's fine. If I just showed him -- can we offer this now, and then just agree we'll redact out this piece?

THE COURT: Redact out the hearsay?

MR. SOLOWIEJCZYK: Yeah, we'll redact this and just show him this, and make this a sub-exhibit.

MR. TARLOWE: May I just look at this part.

(Pause)

I think this is all hearsay. This is the same issue with Ethan Cole. They are being offered for their truth.

THE COURT: Are they being offered --

MR. SOLOWIEJCZYK: No, your Honor. The fact is that they closed at 21.5 million, that's already in the record lots of time. So that's not the point. The point of this is I'm going to ask him, did Mr. Cole tell Mr. Poon, you know, sort of the reason that it went up to 21.5 million, or did he leave that out? I think he left it out.

THE COURT: How do you do this through this witness?

MR. SOLOWIEJCZYK: It got forwarded it to him. I guess if we redact that, it's a problem. Look, going back to

LAFPCOL3     Margolis - Direct     Page 1140

the defense exhibit, this is how they --

THE COURT: That means nothing.

MR. SOLOWIEJCZYK: This is --

THE COURT: You didn't offer it, did you?

MR. TARLOWE: Not for the PIP, which is a business record, and I believe he objected that it wasn't but the e-mail was not.

MR. SOLOWIEJCZYK: The PIP, this is them attaching the PIP, and this is the part of the process. They said he paid -- here's the PIP, this is how we did the calculation. These numbers are part of this business record activity.

MR. HARTMAN: Judge, we could redact from here to the end of the page and show that this e-mail is forwarded to him, and then I think the only hearsay is what's in here. To Mr. Solowiejczyk's point, none of this is being offered for the truth. It's being shown for the fact that Mr. Ethan Cole did not disclose the fact of the overpayment, and Mr. Margolis was aware of that.

THE COURT: That would work.

MR. TARLOWE: Doesn't the PIP show that? That's not in the PIP. I don't understand what the e-mail is.

THE COURT: I mean, the fact that it was forwarded to Margolis.

MR. SOLOWIEJCZYK: Yes, it was sort of --

MR. TARLOWE: Edward Poon is not on the investment

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 15, 2021

| LAFPCOL3 | Margolis - Direct | Page 1141 |
| --- | --- | --- |

committee.

MR. SOLOWIEJCZYK: "Here is a last-minute change to the PIP. We now need to amend the financials to reflect the purchase price of 21.5 million. I understand that this will throw off the purchase price multiples and ROI calculations. However, this is how they have asked that the information be presented in the PIP. I apologize for the last-minute change."

THE COURT: So you propose to redact the entirety of the prior?

MR. SOLOWIEJCZYK: I think this part.

MR. HARTMAN: I think, Judge, we could just leave the header, redact the part below, and then just have this part, this, the Ethan Cole e-mail to Edward Poon.

THE COURT: And with respect to the substance of this e-mail, this is not being offered for the truth?

MR. HARTMAN: No.

MR. SOLOWIEJCZYK: No.

THE COURT: But isn't that what happened?

MR. REISNER: That's my problem. It's like it's obviously being offered for the truth. That's your whole theory of the case.

MR. SOLOWIEJCZYK: Nobody disputes it went up to 21.5 million. The question is when Ethan Cole described it to this person, who was giving him a new number, did he tell him why it had gone up or did he leave it out?

| LAFPCOL3 | Margolis - Direct | Page 1142 |
| --- | --- | --- |

MR. TARLOWE: We don't know what the conversations are between Ethan Cole and Edward Poon.

MR. REISNER: It's very convoluted.

MR. THOMAS: Your Honor could also admit this under the rule of completeness, since the defense here has offered all the attachments but not the cover letter that unites them. And for that reason, in addition to the other reasons. The defense counsel could explore the weight of the inference on cross.

THE COURT: I think this can come in in some fashion. Expecting it to work through the hurdles, I don't know that we can do it now in front of the jury.

MR. SOLOWIEJCZYK: Okay. Your Honor, I can come back to it. It's clear to me the direct will go into Monday; so I can create a redacted exhibit that we can then agree on.

THE COURT: That you all can agree on, yes. Good luck.

MR. SOLOWIEJCZYK: Thank you, your Honor.

(Continued on next page)

| LAFPCOL3 | Margolis - Direct | Page 1143 |
| --- | --- | --- |

(In open court)

BY MR. SOLOWIEJCZYK:

Q. Mr. Margolis, I'm going to show you Government Exhibit 1210, which is already in evidence. This is a September 15th e-mail from Lauren Gee to you and Seth Horowitz and some other folks, and I want to look at the bottom e-mail to start. Sorry, the bottom of the first page. Yes, that one.

So Ms. Gee said to Robert Smits -- copying you and Seth Horowitz and Ethan Cole -- "I just learned that the business teams agreed to a $15.5 million floor on the agreed valuable attributable to the China Umbro/Lee Cooper rights in connection with the put/call options in the shareholder's agreement. We will update the document to reflect that point and will send it across shortly for final sign off on your end." Do you see that?

A. I do.

Q. And generally, what is this put/call option?

A. Where Iconix or GBG can -- GBG can sell it back and Iconix would buy it back.

Q. And if we could turn to page 78 of this, Mr. Charalambous, and item 4A. Actually, if you could show -- sorry, just above that. Yeah, exactly.

So it says, "If the CHMT five-year put/call is exercised in the six-month period following the fifth anniversary of the second amendment effective date, the agreed

| LAFPCOL3 | Margolis - Direct | Page 1144 |
| --- | --- | --- |

value shall be equal to" and then it says, "the GBG shareholders' percentage share holding, multiplied by 5.5, multiplied by the greater of the royalty generated by the company under the master license agreement and other license agreements in respect of the CHMT rights for (i) the year ended December 31, 2015, and (ii) the year ended December 31, 2019, provided, however, the agreed value attributable to the CHMT rights shall not be less than 15.5 million." Do you see that?

A. I do.

Q. And do you see how it said 21.5, but that got crossed out?

A. Yes.

Q. And, Mr. Margolis, GBG was paying upfront purchase price of 21.5 million; is that right?

A. That's correct.

Q. But to buy it back, Iconix would only have to pay 15.5 million?

A. Yes.

Q. And what did you think at the time was the actual value of this -- of these marks in this territory?

A. 15.5 million.

Q. If we could look at Government Exhibit 212.

Mr. Margolis, this is dated September 17th, 2014, and if we go down a couple of pages, you'll see it's a signed version of the letter agreement. Okay?

A. Yes, sir.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

LAFPCOL3     Margolis - Direct     Page 1145

Q. If we go back up, so this is dated September 17th, 2014; is that right?

A. That's correct.

Q. Okay. And if we look at the second paragraph, am I correct that GBG did end up paying 21.5 million?

A. Yes.

Q. And that was 6 million more than the 15.5, right?

A. That's correct.

Q. At the time the transaction was completed and signed, what commitment did you understand GBG had, if any, from Iconix as to that extra 6 million?

A. That we would get it back.

Q. And if you didn't have that commitment from Iconix to get back the 6 million, would you have recommended that GBG should pay this $21.5 million price?

A. No.

Q. You can take that down, Mr. Charalambous. Thank you. If we can go back to 1084, page 2, please, Mr. Charalambous, point one. So I showed you this a couple of minutes ago, Mr. Margolis.

A. Yes.

Q. And there were different amounts of marketing that GBG was going to invoice Iconix for?

A. Yes, sir.

LAFPCOL3     Margolis - Direct     Page 1146

Q. And did GBG end up invoicing Iconix for these amounts for these brands?

A. Yes, sir.

Q. All right. If we could look at Government Exhibit 1097. Do you recognize this document?

A. Yes.

Q. What is it?

A. It's an e-mail from Ethan Cole to myself on 9-25-2014 related to Iconix invoice.

MR. SOLOWIEJCZYK: Your Honor, the government offers Government Exhibit 1097.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government's Exhibit 1097 received in evidence)

BY MR. SOLOWIEJCZYK:

Q. If we could publish that, Mr. Charalambous, please. So, Mr. Margolis, looking at the bottom e-mail. It's from John Reda to Ethan Cole; is that right?

A. Yes, sir.

Q. And who is John Reda?

A. He was the corporate controller for GBG.

Q. And Ethan Cole forwards this e-mail on to you; is that right?

A. Yes, sir.

Q. And he says, "The invoices for Iconix have been prepared.

LAFPCOL3     Margolis - Direct     Page 1147

Five million in total, see below. Unless you have any comments, I will confirm with John that he can send." Do you see that?

A. Yes, sir.

Q. Okay. If we could look at the attachments to this e-mail. So what is this, Mr. Margolis?

A. It's an invoice for $2 million for Mossimo marketing costs.

Q. It's an invoice from GBG to Iconix?

A. Yes, sir.

Q. Was Mossimo one of the Iconix brands?

A. Yes, sir.

Q. All right. If we could go to the next invoice, which I think is at page 5. And Mossimo, that was part of the Southeast Asia joint venture; is that right?

A. That's right.

Q. Page 5, please. So what's this, Mr. Margolis?

A. It's the marketing invoice for Peanuts China for $2 million.

Q. And was Peanuts one of the brands in the Southeast Asia joint venture?

A. It was not.

Q. If you look at page 7, Zoo York marketing costs, $1 million?

A. Yes.

Q. Okay. And all of these invoices, they just have marketing

LAFPCOL3     Margolis - Direct     Page 1148

costs, right?

A. That's correct.

Q. No description beyond that?

A. No, sir.

Q. And they end -- and the amounts are round dollar figures, ending in zeros; is that correct?

A. That's correct.

Q. Now, the invoices add up to 5 million; is that right?

A. Correct.

Q. Why did the invoices add up to 5 million?

A. To offset the $5 million overpay.

Q. Now, in preparing these invoices -- you were involved in preparing these invoices, Mr. Margolis?

A. I was.

Q. Besides you, who else was involved?

A. Ethan Cole.

Q. In preparing these invoices, to your knowledge, did GBG conduct analysis of the number of hours that were worked by GBG in marketing for these brands?

A. No.

Q. Mr. Margolis, given what you knew at the time, how would you characterize the amounts of these invoices?

A. Can you -- I don't know --

Q. I'll withdraw that question. Mr. Margolis, absent the commitment from Iconix to

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

| LAFPCOL3 | Margolis - Direct | Page 1149 |

give you back the $5 million, would you have invoiced Iconix for these marketing expenses?

A. No.

Q. What was your understanding of who was supposed to pay for marketing expenses as part of the Southeast Asia joint venture?

A. It would be the joint venture.

Q. All right. So these three invoices we looked at ending in zeros, they were round-dollar figures; is that right, Mr. Margolis?

A. Yes, sir.

Q. Now, did there come a point where the invoices were revised?

A. Yes.

Q. And was that something GBG did on its own, or was it at a request?

A. I believe it was a request.

Q. From who?

A. From Iconix.

Q. What was the purpose of revising the invoices?

A. To make them more precise and provide backup.

Q. And was the -- withdrawn.

Did the invoices change because you actually wanted them to be more precise or for some other reason?

MR. TARLOWE: Objection, leading.

THE COURT: Overruled.

| LAFPCOL3 | Margolis - Direct | Page 1150 |

A. Can you please repeat the question?

Q. Did the invoices change because you actually wanted them to be more precise, or for some other reason?

A. Because we were told to change the invoices.

Q. All right. Let's go through the ways the invoices changed. So if we could look at Government Exhibit 1111. This is already in evidence.

And is this an e-mail from Ethan Cole to Seth Horowitz dated October 2nd, 2014?

A. It is.

Q. And are you copied?

A. I am.

Q. So this is a couple of days after the original invoices were sent; is that right?

A. Yes, sir.

Q. And Mr. Cole, Ethan Cole, says, "Please find attached the marketing invoices for Zoo York, Mossimo and Peanuts. In the link below please find the decks related to each." Do you see that?

A. I do.

Q. Okay. And then there are attachments to this, right?

A. Yes, sir.

Q. So let's take a look at the attachments. So the first one is Zoo York, and it's in an amount of 955,710; is that right?

A. Yes, sir.

| LAFPCOL3 | Margolis - Direct | Page 1151 |

Q. And the description is "marketing costs related to comprehensive positioning, marketing and launch analysis for SEA comprehensive research and marketing analysis complete with launch plan for Europe." Do you see that?

A. I do.

Q. And, Mr. Charalambous, can you put up side by side with this exhibit, Government Exhibit 1097, page 7.

So with respect to the descriptions, the revised invoice, did it provide more detail?

A. Sorry, can you please repeat that?

Q. The one on the left, the revised invoice, did it provide more detail --

A. Yes, sir.

Q. -- than the original?

And the amount was originally one million, and it changed to a number that didn't end in zeros, right?

A. Yes.

Q. Okay. And if we look at the next one, page 3 of this, it's Mossimo, right?

A. Yes.

Q. Can we go to page 3 of 1111? Yes.

Again, more detailed description provided; is that right?

A. Yes, sir.

Q. And the amount changed from 2 million to 1,940,230, right?

| LAFPCOL3 | Margolis - Direct | Page 1152 |

A. Yes, sir.

Q. And if we look at the last one, the Peanuts invoice, and if we look at -- yes, thank you, Mr. Charalambous.

Again, more detailed description, right?

A. Yes.

Q. And it changed from 2 million to 2,104,060, right?

A. Yes, sir.

Q. Mr. Charalambous, you can take down 1097 and just do Exhibit 1111.

So, Mr. Margolis, there were three invoices here, right, in the revised invoices?

A. Yes, sir.

Q. One for 2,104,060, right?

A. Yes, sir.

Q. The next one, if we go to the next page, is for 1,940,000; is that right?

A. That's correct.

Q. And then the last one was for 955,710; is that right?

A. Yes.

Q. Okay. Did you have a chance, before you testified, to add up these three invoices?

A. I did.

Q. What did they add up to?

A. To 5 million.

Q. Was it a coincidence they added up to 5 million?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

LAFPCOL3      Margolis - Direct      Page 1153

A. No.

Q. Why did they add up to 5 million?

A. To offset the overpay.

Q. Now, Mr. Margolis, to come to these new amounts, did you conduct any kind of analysis?

A. Not really.

MR. SOLOWIEJCZYK: One moment, your Honor.

(Pause)

(Continued on next page)

LAFMCOL4      Margolis - Direct      Page 1154

Q. Mr. Margolis, other than making sure they added up to 5 million, did you really do any other analysis as to these revised invoices?

A. No.

MR. SOLOWIEJCZYK: Now, if we can go back to page 1 of this e-mail.

Q. This is from Ethan Cole to Seth Horowitz, right?

A. That's correct.

Q. He is attaching the marketing invoices and then in the link below: Please find the decks related to each.
What were the decks?

A. Those are the -- the backup to the work that was applied to go against the 5 million.

Q. Were you involved with Mr. Ethan Cole in the process of getting the documentation for the backup?

A. I was.

MR. SOLOWIEJCZYK: Showing just the witness Government Exhibit 1106.

Q. Do you recognize this document?

A. I do.

Q. What is it?

A. It's from Ethan Cole to myself on 9/29/2014 regarding the Iconix invoices.

MR. SOLOWIEJCZYK: The government offers Government Exhibit 1106.

LAFMCOL4      Margolis - Direct      Page 1155

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1106 received in evidence)

MR. SOLOWIEJCZYK: You could publish that, Mr. Charalambous.

Q. Mr. Margolis, the original invoices were sent, I believe, on September 26, is that right?

A. I believe so.

Q. Then the later revised, I think we just saw, were on October 2 or so, is that right? I can show them to you again.

MR. SOLOWIEJCZYK: If we can put up 1111 for the witness briefly, Mr. Charalambous.

A. Yes.

Q. So this e-mail we are looking at, 1106, that was before you ended up sending over the revised invoices, right?

A. Correct.

Q. Mr. Cole says to you: Need your input on how I should position the marketing invoices to Angela and Gahl when I speak with them.
Do you see that?

A. I do.

Q. Who was Angela?

A. Angela was one of the cofounders of TLC, the licensing agency that we acquired.

Q. Who was Gahl?

LAFMCOL4      Margolis - Direct      Page 1156

A. Gahl worked for us based -- he was responsible for Southeast Asia.

Q. When Mr. Ethan Cole said to you that he wanted to get your input on how I should position the marketing invoices to Angela and Gahl, what did you understand him to mean by position?

A. What did we need this information for.

Q. Was that to have a conversation with Angela and Gahl?

A. Yes.

Q. Mr. Margolis, you testified a few minutes ago -- Ethan Cole, was he aware of the $5 million overpayment and the fact you were going to get a giveback?

A. He was.

MR. SOLOWIEJCZYK: My apologies, your Honor. Your Honor, I had asked a question. Defense objected.

THE COURT: The objection is overruled.

Q. You and Ethan Cole, you had talked to him about it and he knew about it, right?

A. Yes, sir.

Q. Did Angela know about the fact GBG had overpaid by 5 million in return for a commitment to get the 5 million back?

MR. TARLOWE: Objection.

THE COURT: Overruled.

Q. You can answer.

A. Not that I'm aware of.

Q. Did Gahl know about it?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

---

LAFMCOL4     Margolis - Direct     Page 1157

A. No.

Q. Mr. Margolis, besides Ethan Cole and Jason Rabin, did you really talk to anybody else about this?

A. No, not that I recall.

Q. Fair to say you weren't broadcasting this overpayment and giveback to others?

MR. TARLOWE: Objection.

THE COURT: Sustained as to the form of the question.

Q. Other than Ethan Cole and Jason Rabin, were you having conversations with other people at GBG about the overpayment and the giveback?

A. No.

Q. Ethan Cole was asking you what exactly?

A. How we should communicate why we need these -- the backup to these invoices.

MR. SOLOWIEJCZYK: If we can put up, just for the witness and the parties, Government Exhibit 1257.

Q. Do you recognize this, Mr. Margolis?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole to Anabel regarding our marketing plan sent on 9/30/2014.

Q. Who is Anabel?

A. Anabel was based out of Singapore. She was a brand manager for the -- for many brands in our portfolio.

---

LAFMCOL4     Margolis - Direct     Page 1158

Q. Were you on this e-mail?

A. Yes, sir.

MR. SOLOWIEJCZYK: The government offers Government Exhibit 1257.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1257 received in evidence)

MR. SOLOWIEJCZYK: You can publish it, Mr. Charalambous.

Q. This is before you submitted the revised invoices, right?

A. That's correct.

Q. Is this during the period you were trying to obtain the backup documentation?

A. Yes, sir.

Q. Anabel Higgin worked for you, I think you said, in Asia?

A. That's correct.

Q. Would she have been involved in marketing work?

A. Yes, sir.

Q. Ethan Cole writes to Anabel Higgin, copying you: Hi, Anabel, can you please send me the marketing plan for Zoo York and Massimo in SEA. It came up in a conversation with Jared and he asked to take a look. It's OK if it is a high-level draft.

Do you see that?

A. I do.

---

LAFMCOL4     Margolis - Direct     Page 1159

Q. Now, Mr. Margolis, at this time, why was Ethan Cole actually asking for this marketing plan?

MR. TARLOWE: Objection.

THE COURT: Overruled.

A. So we could provide it, more backup for the invoicing for the overpay.

Q. So had the marketing plan merely come up in conversation between you and Ethan Cole?

A. Sorry. Can you please repeat the question.

Q. Was what Ethan Cole was saying to Anabel Higgin about why he needed these materials true?

A. I mean, yeah.

Q. Mr. Margolis, let me ask you this.

A. I'm sorry.

Q. You just said the reason Ethan Cole needed these materials was as backup for invoices, is that correct?

A. That's correct.

Q. When he wrote to Anabel Higgin to ask for this marketing plan, did he tell her that's why he needed it?

A. No.

Q. He told her it had just come up in conversation with you, isn't that right?

MR. TARLOWE: Objection. Leading.

THE COURT: Overruled.

A. That's correct.

---

LAFMCOL4     Margolis - Direct     Page 1160

Q. That wasn't true, was it?

A. No.

MR. SOLOWIEJCZYK: If we could put up, just for the witness and the parties, Government Exhibit 1258.

Q. Do you recognize this e-mail?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole to Angela, copying myself, sent on 9/30/2014.

Q. What is it generally regarding?

A. Marketing.

MR. SOLOWIEJCZYK: The government offers Government Exhibit 1258.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1258 received in evidence).

Q. Mr. Margolis, is this another e-mail that happened before you sent the revised invoices?

A. Yes.

Q. And this is from Ethan Cole to Angela. I think she was mentioned in the prior e-mail about how you were going to position the conversation, right?

A. That's correct.

Q. Who was she again?

A. She is the -- one of the cofounders of TLC.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

| LAFMCOL4 | Margolis - Direct | Page 1161 |

Q. Ethan Cole says: Hi, Angela. Can you please send me the marketing plan for Zoo York and Massimo. Jared recalled seeing impressive marketing initiatives in the global week presentations, but the FTP site wouldn't allow him to log in. Jared asked that I follow up with you so he can take a quick look.

Do you see that?

A. I do.

Q. Mr. Margolis, why was Ethan Cole asking for these materials from Angela?

A. To provide better backup for the invoices that we submitted to Iconix.

Q. In this e-mail am I correct he did not tell Angela why he needed these materials?

A. Correct.

MR. SOLOWIEJCZYK: If we can put up Government Exhibit 1260, please, just for the witness and the parties.

Q. Do you recognize this document?

A. I do.

Q. What is it?

A. It's an e-mail from Anabel to Ethan Cole, copying myself, regarding a marketing plan sent on 10/1/2014.

MR. SOLOWIEJCZYK: The government offers Government Exhibit 1260.

MR. TARLOWE: Can we just see the whole document?

| LAFMCOL4 | Margolis - Direct | Page 1162 |

MR. SOLOWIEJCZYK: Sure.

Mr. Charalambous, if you could show them the whole thing and the attachments, too.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1260 received in evidence)

Q. Mr. Margolis, the bottom e-mail I think we saw before. This was when Ethan Cole asked Anabel for the marketing plan for Zoo York and Massimo, is that right?

A. Yes, sir.

Q. He said it just came up in conversation, correct?

A. Correct.

Q. And then Anabel responded to him and she provided an attachment. She said: Sure. Here you go. Any questions, please shout. Right?

A. Yes.

Q. Then what follows is, if we can look at the attachments, is some marketing-related materials related to Zoo York and Massimo, right?

A. That's correct.

Q. To the best of your recollection, did these materials end up getting submitted as backup for the invoice?

A. Yes.

Q. To the best of your recollection, did you ever tell Anabel what these materials were really for?

| LAFMCOL4 | Margolis - Direct | Page 1163 |

A. No.

MR. SOLOWIEJCZYK: If we could just show the witness and the parties Government Exhibit 1263.

Q. Looking at the top e-mail, do you recognize this document, Mr. Margolis?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole to Robert Burnell and Angela, copying myself and Daisy regarding a marketing plan.

MR. SOLOWIEJCZYK: Your Honor, the government offers 1263.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1263 received in evidence)

MR. SOLOWIEJCZYK: If you could publish that, Mr. Charalambous.

If we could look at the bottom e-mail, actually.

Q. This is the e-mail we looked at originally, right, to Angela? He was asking for the marketing plan and how you recalled seeing some impressive initiatives.

Do you see that?

A. Yes.

MR. SOLOWIEJCZYK: You can take that down.

Q. Then Angela wrote back: Hi, guys, I have a good Massimo one that we developed for Blue, Inc., but Zoo York is a work in

| LAFMCOL4 | Margolis - Direct | Page 1164 |

progress. Will send what I have.

Daisy and Rob, could you forward our latest decks on both.

Do you see that?

A. I do.

Q. Did you ultimately get some materials from Daisy and Rob?

A. We did.

Q. Mr. Margolis, this says that for Zoo York it's just a work in progress.

Do you see that?

A. I do.

Q. Would you typically send as backup for an invoice something that was just a work in progress?

A. No.

Q. Did you ever tell Angela Farrugia why you really needed this documentation?

A. I did not.

MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous.

One moment, your Honor.

My apologies, your Honor.

Q. Mr. Margolis, I am going to direct your attention to what's been marked for identification as Government Exhibit 1136.

MR. SOLOWIEJCZYK: Just for the witness and the parties, Mr. Charalambous. If we could zoom in.

# A-336

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 15, 2021

LAFMCOL4     Margolis - Direct     Page 1165

Q. Do you recognize this?
A. I do.
Q. What is it?
A. It's an e-mail from a calendar invite from Amanda, my former assistant, to myself.
Q. Is it also to Ethan Cole?
A. Yes, sir.
Q. It's a calendar entry, is that right?
A. That's right.
MR. SOLOWIEJCZYK: Your Honor, the government offers Government Exhibit 1136.
MR. TARLOWE: No objection.
THE COURT: It will be received.
(Government Exhibit 1136 received in evidence)
MR. SOLOWIEJCZYK: If you could publish that, Mr. Charalambous.
Q. So this is a calendar invite from Amanda, your assistant, is that right?
A. Yes.
Q. It's to you and Ethan Cole, is that right?
A. Correct.
Q. What is the subject of the calendar invite?
A. A meeting with Jason Rabin and Neil Cole.
Q. Were you going to be at the meeting as well?
A. I was.

LAFMCOL4     Margolis - Direct     Page 1166

Q. Where was it going to happen?
A. At the Iconix office on 1450 Broadway.
Q. When was it going to happen?
A. On December 2, 2014 at 8:30 a.m.
Q. Now, Mr. Margolis, in advance of that meeting did you ask Ethan Cole to prepare certain materials for you for your meeting with Neil Cole?
A. I did.
MR. SOLOWIEJCZYK: If we could look at, just for the witness and the parties, Government Exhibit 1133. If we could look at the top e-mail.
Q. Do you recognize this e-mail, Mr. Margolis?
A. I do.
Q. What is it?
A. It's an e-mail from myself to Ethan Cole.
Q. What date?
A. On December 1, 2014.
MR. SOLOWIEJCZYK: The government offers Government Exhibit 1133, your Honor.
MR. TARLOWE: Can we just see the whole --
MR. SOLOWIEJCZYK: Can you show him the whole thing, Mr. Charalambous.
MR. TARLOWE: No objection.
THE COURT: It will be received.
(Government Exhibit 1133 received in evidence)

LAFMCOL4     Margolis - Direct     Page 1167

MR. SOLOWIEJCZYK: If we could go down to the bottom e-mail, please.
Q. You wrote to Jason Rabin: What time are we meeting with Neil?
You see that?
A. I do.
Q. If you can go up to the next e-mail, Mr. Margolis, you wrote to Mr. Cole -- Ethan Cole, just to be clear -- I'm meeting with Neil and Jason in the afternoon. I need to have everything organized in paper where all the money is going in detail, as discussed last week.
I also need to know status on Middle East.
Do you see that?
A. I do.
Q. Then, going up, Ethan Cole writes to you: Got it. Will have prepared. Welcome back, exclamation point. Right.
And then you respond to him: Additionally, what has been paid so far and schedule on the balance.
You see that?
A. I do.
Q. Mr. Margolis, what were you generally asking Ethan Cole to prepare for you?
A. The monies that were owed to us from the overpay.
Q. From the overpay?
A. Yes.

LAFMCOL4     Page 1168

MR. SOLOWIEJCZYK: If we could take that down and show just the witness and the parties Government Exhibit 1139.
Q. Do you recognize this document, Mr. Margolis?
A. I do.
Q. What is it?
A. It's an e-mail from Ethan Cole sent to me on December 1, 2014. The subject was notes for the Iconix meeting.
Q. Did Ethan Cole prepare this on his own or at your direction?
A. At my direction.
Q. And it was for a meeting?
A. It was.
Q. A meeting with who?
A. With Jason Rabin and Neil Cole.
MR. SOLOWIEJCZYK: Your Honor the government offers Government Exhibit 1139.
MR. TARLOWE: Objection. Hearsay. The same issue at sidebar.
THE COURT: Did you say sidebar?
MR. TARLOWE: No. I'm sorry. Same issue that was discussed before.
THE COURT: Why don't we do this, ladies and gentlemen, while I speak with the lawyers. It's almost the end of the day. We will end now.
Have a wonderful weekend. We will see you Monday

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                          October 15, 2021

LAFMCOL4                                                                    Page 1169

morning bright and early.  Please be safe getting home.  Do not discuss the case amongst yourselves or with anyone and to not read anything or see anything about the case.

(Jury not present)

THE COURT: Mr. Margolis, you may step down.  Everyone can be seated.

I'm sorry about that objection, Mr. Tarlowe.  I heard something, but I didn't hear objection.

MR. TARLOWE: Sorry.  Between the mask --

THE COURT: Then I checked.  Neither did the court reporter.  I don't feel so bad.

The issue with this document, you said, is the same as with the prior one.

MR. TARLOWE: It's the same issue of whether the government has established that Ethan Cole is a coconspirator.

THE COURT: I guess you will submit something over the weekend.

MR. SOLOWIEJCZYK: Your Honor, we will submit something.  And I would just say, I think since the last sidebar, obviously and, your Honor, even in the last couple of minutes, learned a lot more about Ethan Cole's role in all of this, including that he was essentially going around lying to people at the company to get the backup documentation, but we will put something in.  We have multiple bases of admissibility for these two.

LAFMCOL4                                                                    Page 1170

THE COURT: I don't know about all of that, but I did get the gravamen of your questions.

MR. SOLOWIEJCZYK: Thank you, your Honor.

THE COURT: I take it that Mr. Margolis will not be here Monday morning?

MR. SOLOWIEJCZYK: No.  I think he will be available again -- I am told he can be here by 12:30.

I think our plan would be to take a witness out of order, and our next witness we intend would be Jason Schaefer, who was the GC of Iconix at the relevant time.

THE COURT: The general counsel of Iconix?

MR. SOLOWIEJCZYK: Yes.

THE COURT: Anything else from you, Mr. Reisner?

MR. REISNER: Nothing further, your Honor.

THE COURT: In that event, we are adjourned.  Have a wonderful weekend, all.

(Adjourned to October 18, 2021, at 9:00 a.m.)

Page 1171

INDEX OF EXAMINATION

Examination of:                                                  Page

FRANK PETER CUNEO

Direct By Mr. Solowiejczyk . . . . . . . . . .1000
Cross By Mr. Reisner . . . . . . . . . . . .1042
Redirect By Mr. Solowiejczyk . . . . . . . .1073

JARED MARGOLIS

Direct By Mr. Solowiejczyk . . . . . . . . . .1077

GOVERNMENT EXHIBITS

Exhibit No.                                               Received

506 and 507  . . . . . . . . . . . . . . . .1002
238, 239, 240, 243 and 244  . . . . . . . .1008
238A  . . . . . . . . . . . . . . . . . . .1009
101, 107, 101A, 101B, 103A, 103B, 105A, . . .1016
        105B, 107A and 107B
121  . . . . . . . . . . . . . . . . . . .1034
1241  . . . . . . . . . . . . . . . . . . .1106
1087  . . . . . . . . . . . . . . . . . . .1133
1097  . . . . . . . . . . . . . . . . . . .1146
1106  . . . . . . . . . . . . . . . . . . .1155
1257  . . . . . . . . . . . . . . . . . . .1158
1258  . . . . . . . . . . . . . . . . . . .1160
1260  . . . . . . . . . . . . . . . . . . .1162
1263  . . . . . . . . . . . . . . . . . . .1163
1136  . . . . . . . . . . . . . . . . . . .1165
1133  . . . . . . . . . . . . . . . . . . .1166

Page 1172

DEFENDANT EXHIBITS

Exhibit No.                                               Received

550 and 550-A1  . . . . . . . . . . . . . . .1052
34  . . . . . . . . . . . . . . . . . . . .1053
86  . . . . . . . . . . . . . . . . . . . .1061
33  . . . . . . . . . . . . . . . . . . . .1062
1151-A1  . . . . . . . . . . . . . . . . . .1063
85  . . . . . . . . . . . . . . . . . . . .1065

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 18, 2021

| LAIPCOL4 | Schaefer - Cross | Page 1277 |
|---|---|---|

Q. We can put those up for the jury, Mr. Klein. They are in evidence.

And so-A1, A2 and A3 are the final SEA-2 transaction documents, correct?

A. Yes, sir.

Q. A1 is the amended and restated shareholders agreement, correct?

A. Yes, for the joint venture vehicle.

Q. And A2 is the letter acknowledgment and payment of consideration for 50 percent share of additional mark, correct?

A. Yes, sir.

Q. And A3 is the amendment No. 1 to master license agreement, correct?

A. Yes, sir.

Q. And it was entered into effective as of June 30th, 2014, correct?

A. That's correct.

Q. As were the other documents, correct?

A. Yes, sir.

Q. Did you review these agreements at or around the time they were entered?

A. Not that I remember.

Q. Let's show the witness Defendant's Exhibit 303-A2, that's the letter acknowledgment and payment of consideration for 50 percent share of additional mark, correct?

| LAIPCOL4 | Schaefer - Cross | Page 1278 |
|---|---|---|

A. Yes, sir.

Q. And directing your attention to the second full paragraph, it states, "Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by licensors in the Republic of Korea, Europe or Turkey, granted by licensors to licensee, pursuant to the SEA JV amendments, is deemed to have a fair market value of $31,835,000 and that because Iconix and LF each own 50 percent of licensee, LF's ownership of 50 percent of licensee will provide LF a benefit equal to 50 percent of such fair market value, or $15,917,500."

Do you see that?

A. Yes, I do.

Q. So in this agreement, Iconix and LF agreed that ownership of 50 percent of the licensee will provide LF a benefit equal to 50 percent of such fair market value, or approximately $15.9 million, correct?

A. Yes, sir.

Q. And if we can go to Defendant's Exhibit 303-A3, the amendment to the master license agreement, that states in part "Whereas, in recognition of the fact that the right to use certain trademark registrations or applications owned by licensors in the Republic of Korea, Europe or Turkey is deemed to have a fair market value of $31,835,000, and that Iconix and LF each own 50 percent of licensee, LF has agreed by a side letter dated on or about the date of this amendment to pay

| LAIPCOL4 | Schaefer - Cross | Page 1279 |
|---|---|---|

Iconix 50 percent of such fair market value, or approximately $15.9 million, in exchange for Iconix and licensors agreeing to amend the existing license agreement," et cetera, correct?

A. Yes.

Q. And so in this agreement, LF and Iconix agreed that LF would pay Iconix 50 percent of such fair market value of the assets or approximately $15.9 million, correct?

A. Yes, sir.

Q. Let's go back to the letter acknowledgment and payment of consideration, and let's go to the page that ends in 002.

The letter agreement stated "This letter agreement and the agreements referred to herein, including but not limited to the SEA JV amendments, the existing master license agreement, the existing shareholders agreement, and any other agreements referred to therein, or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties or any of them, with respect to the subject matter hereof and thereof." That's what it says, correct?

A. Yes, sir.

Q. And so you understand that in connection with the SEA-2 transaction, the parties agreed that the letter agreement and other agreements referred to therein constitute the entire agreement and supersede all prior agreements and undertakings, both written and oral, among the parties or any of them with

| LAIPCOL4 | Schaefer - Cross | Page 1280 |
|---|---|---|

respect to the subject matter, correct?

MR. THOMAS: Objection, foundation.

THE COURT: Overruled.

Q. Was it your understanding that was the agreement between the parties?

A. Yes.

Q. Is there any provision in this agreement for a future $5 million marketing payment to be made by Iconix to Li & Fung or GBG?

A. I don't believe so.

Q. Let's look at Defense Exhibit 303-A1 in evidence. That's the shareholders agreement, and if we can go to section 10.06 on page 24.

That provision states, "Entire agreement. This agreement and the purchase agreement, together with all exhibits and schedules hereto and thereto, which are deemed incorporated herein, contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof." Do you see that?

A. Yes, sir.

Q. Did you read that provision at or around the time SEA-2 was entered?

A. I don't think so.

Q. You can take that down.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                  **October 18, 2021**

| LAIPCOL4 | Schaefer - Cross | Page 1281 |

Now, these entire agreement provisions that we've been looking at, do you understand those to be referred to from time to time as merger or integration clauses?

A. Yes.

Q. And while you were general counsel at Iconix, did Iconix generally include a merger or integration clause in significant agreements?

A. All contracts typically include it.

Q. And one of the purposes for including a merger and/or integration clause in an agreement is so that the parties know unambiguously what their obligations are, correct?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

A. Yes, that's correct.

Q. And as general counsel at Iconix, you relied on an integration clause to defeat a claim by a party that alleged there was some separate oral agreement, correct?

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

Q. Now, you have no personal knowledge of any agreement to increase the purchase price of SEA-2 by $5 million in exchange for a future payment by Iconix, you have no personal knowledge of any such agreement, correct?

A. That's correct.

Q. And there's nothing in any of the transaction documents for

| LAIPCOL4 | Schaefer - Cross | Page 1282 |

SEA-2 that refers to an obligation on the part of Iconix to pay $5 million in future marketing expenses to Li & Fung, correct?

A. That's correct.

Q. And you were never present for any conversation in which anyone from Iconix undertook a commitment in connection with SEA-2 to make future marketing payments to GBG, correct?

A. That's correct.

Q. Mr. Horowitz never told you that Iconix had made a commitment to pay $5 million in future marketing expenses to GBG in connection with the SEA-2 transaction, correct?

A. No, he did not. That's correct.

Q. Now, Mr. Schaefer, as part of its regular business while you were general counsel at Iconix, as part of Iconix's regular business, did Iconix from time to time provide marketing or advertising support to business partners?

A. It did, yes.

Q. So as an example, Iconix would from time to time give licensees money for fixturing, which included racks and displays to promote licensed goods, correct?

A. Yes, I definitely heard that during my time there.

Q. And you're aware, from your experience as general counsel, that Iconix entered into written agreements with counterparties that included commitments or obligations by Iconix to provide marketing or advertising support, correct?

A. I believe in the form of license agreements, yes.

| LAIPCOL4 | Schaefer - Cross | Page 1283 |

Q. And for example, do you recall that there was a Candie's license agreement that included written provisions relating to providing marketing or advertising support?

A. Yes, that does sound familiar.

Q. And do you recall that there was a Mudd's brand license agreement that included a written commitment to provide marketing or advertising support?

A. Yes, that sounds familiar as well.

Q. And sometimes those commitments included fixed dollar amounts, correct?

A. I don't remember that specifically.

Q. Well, let's place before the witness what's marked as Defense Exhibit 1610. Why don't you take a moment to look at that, Mr. Horowitz, and just --

A. I'm Mr. Schaefer, but thank you.

Q. Sorry, Mr. Schaefer. If you can look at that, Mr. Schaefer.

And, Mr. Klein, if this document is more than one page long, can we just make sure the witness has the opportunity to see the second page as well. I don't know whether it's easier to show them side by side. Why don't you show them one at a time?

A. Actually, why don't you just show me the last page again?

Q. Don't read it out loud.

A. Okay. Thank you.

| LAIPCOL4 | Schaefer - Cross | Page 1284 |

Q. Going back to the first page of Defense Exhibit 1610, that's an e-mail from you to Neil Cole on March 5th, 2015, correct?

A. Yes, sir.

MR. REISNER: Your Honor, I offer Defense Exhibit 1610.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1610 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. And that's an e-mail in which you summarized some of the terms of license agreements that Iconix had with respect to the Candie's and Mudd brands, correct?

A. Yes, sir.

Q. And these were agreements relating to the sale of Candie's and Mudd based -- withdrawn.

These agreements related to the sale of Candie's and Mudd branded products at Kohl's department store, correct?

A. Yes, licensing the brands to Kohl's.

Q. And your summary of the material terms was based on the terms set forth in the written agreements between Iconix and Kohl's, correct?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJPCOL1                                    Page 1336

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                    19 CR 869 (ER)

NEIL COLE,

          Defendant.           Trial
------------------------------x

                                New York, N.Y.
                                October 19, 2021
                                    9:00 a.m.

Before:

                HON. EDGARDO RAMOS,

                            District Judge
                            -and a Jury-

                    APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY:  NOAH SOLOWIEJCZYK
     SCOTT HARTMAN
     ANDREW M. THOMAS
     Assistant United States Attorneys

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     Attorneys for Defendant
BY:  LORIN L. REISNER
     RICHARD C. TARLOWE
     ANDREW D. REICH.
     AMANDA WEINGARTEN
     ALYSON A. COHEN

Also Present:
     Robert Hupcher, FBI
     Micah Gill, Paralegal
     Peter Charalambous, Paralegal
     Frank Eng, Paralegal

LAJPCOL1                                    Page 1337

(Trial resumed; jury not present)

THE COURT: Good morning, everyone. Okay, it's 9:00. There is one issue that I wanted to close the loop on and that was the government's request to admit as evidence Government Exhibits 1068 and 1139.

Primarily for the reasons set forth in the government's letter of October 17, 2021, I find that they have proven by at least a preponderance of the evidence that these exhibits should come in as co-conspirator statements.

There is now substantial evidence in the record that Mr. Ethan Cole was well aware, by virtue of explicit conversations and meetings that he was a part of with Jared Margolis, among others and Mr. Horowitz, that there was a scheme to overcharge the counterparty to the joint venture in SEA-2 and 3 in order that that money would be paid back, and that it would be paid back in a way as to hide the fact that there was an overpayment in the first place. So they will be allowed.

Is there anything else that the parties wish to bring up?

MR. SOLOWIEJCZYK: Your Honor, we wanted to bring up one issue because we anticipate that the cross of Mr. Margolis may begin during the first section of today's proceedings. And during the cross of Mr. Rabin, there were some questions that were initially asked, some of which we believe -- your Honor

LAJPCOL1                                    Page 1338

sustained some objections on that, and there were others that we think were improper and should not be asked.

And specifically, Mr. Rabin was asked if he believed he committed any crimes, which calls for a legal conclusion. He was asked whether he was aware that he was listed as a co-conspirator in the government's co-conspirator notice, which is not something that's going to be before the jury, and he was asked if he was aware -- if it was alleged that he participated in a conspiracy with Mr. Cole and others to break the law; as well as: Did you conspire with Mr. Cole or anyone else to break the law. Did you commit any crimes with Mr. Cole? If the government alleges that you were part of an unlawful conspiracy --

THE COURT: What's wrong with those two, did you knowingly commit a crime?

MR. SOLOWIEJCZYK: I think it calls for a legal conclusion, your Honor, in the sense that, you know, questions about the underlying facts of, you know, did you participate in a give-back scheme, did you knowingly do this, did you knowingly do that, that's a little different than saying: Did you commit a crime with Mr. Cole?

He's charged with a conspiracy here. You're asking for the legal -- he wasn't -- Mr. Margolis isn't going to know, you know, exactly what -- if he did -- did he commit a crime or not even.

LAJPCOL1                                    Page 1339

The question, sort of, isn't their knowledge and understanding of the underlying facts and their motives, sure, that's fair. But to frame it in that way, did you commit a crime, and then, obviously, your Honor sustained the question. Did you conspire with Mr. Cole or anyone else to break the law, your Honor sustained the objection on that because, really, at the end of the day, these are asking for legal conclusions of fact witnesses.

THE COURT: Mr. Reisner or Mr. Tarlowe?

MR. TARLOWE: Your Honor, the witness' state of mind is critical because Mr. Cole is charged with conspiring with these people, and if they did not believe that they were agreeing to do anything wrong, that they were agreeing to violate the law, that's relevant.

I'd also note, Judge, that the government asked Mr. Horowitz the following question:

"Did you commit those offenses?
"A. Yes, I did.
"Q. At the time you committed those offenses, where did you work?
"A. I worked at Iconix.
"Q. Did you commit those offenses alone or with other people?
"A. I committed those offenses with other people.
"Q. Do you see anyone in the courtroom today who was involved in committing those crimes with you?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

| LAJPCOL1 | Margolis - Direct | Page 1344 |

THE WITNESS: Good morning, your Honor.

(Jury present)

THE COURT: Everyone, please be seated.

Good morning, ladies and gentlemen. I trust you all had a pleasant evening. As I indicated yesterday, we took one witness out of turn, and that was Mr. Schaefer, and so today we will return or we will continue with the direct examination of Mr. Margolis, who is reminded that you are still under oath.

THE WITNESS: I do, your Honor.

THE COURT: Mr. Solowiejczyk.

MR. SOLOWIEJCZYK: Thank you, your Honor.

JARED MARGOLIS, (Resumed)

CONTINUED DIRECT EXAMINATION

BY MR. SOLOWIEJCZYK:

Q. Mr. Margolis, I believe we left off on Friday talking about a December 2nd meeting that you were going to be having with Neil Cole and Jason Rabin; do you recall that?

A. Yes, sir.

Q. And, Mr. Charalambous, if you could put up Government Exhibit 1136, which is in evidence, and publish that for the jury, please.

And so, Mr. Margolis, this is a meeting invitation, correct?

A. Yes.

Q. For December 2nd at 8:30 a.m., a meeting between you, Jason

| LAJPCOL1 | Margolis - Direct | Page 1345 |

Rabin and Neil Cole; is that right?

A. Yes.

Q. At Iconix's offices?

A. That's correct.

Q. Now, in preparation for that meeting -- you can take that down, Mr. Charalambous -- did you ask Ethan Cole to prepare a summary for you?

A. I did.

Q. And, Mr. Charalambous, if you could put up just for the witness and the parties Government Exhibit 1139.

Do you recognize that, Mr. Margolis?

A. I do.

Q. What is it?

A. It's a summary of the three joint ventures that we were working on.

Q. Is it an e-mail?

A. It's an e-mail from Ethan Cole sent to me on 12-1-2014.

MR. SOLOWIEJCZYK: Your Honor, the government offers Government Exhibit 1139.

MR. TARLOWE: No objection, subject to the earlier ruling.

THE COURT: It will be received.

(Government's Exhibit 1139 received in evidence)

MR. SOLOWIEJCZYK: And, Mr. Charalambous, if you could publish it, please.

| LAJPCOL1 | Margolis - Direct | Page 1346 |

BY MR. SOLOWIEJCZYK:

Q. So, Mr. Margolis, just looking at the heading to start, what's the subject line of this e-mail from Ethan Cole to you?

A. Notes for the Iconix meeting.

Q. And was this the meeting you had coming up the next day with Neil Cole and Jason Rabin?

A. Yes.

Q. Okay. And Ethan Cole, did he work for you?

A. He did.

Q. And what did you know about his training when you hired him?

A. That he was -- that he just started as a lawyer, as an attorney.

Q. Okay. If you could now, Mr. Charalambous, focus on the chart that's at the top of the e-mail under "Plugs," just that chart.

So, Mr. Margolis, just looking at -- I'm going to take one column at a time, okay? So it mentions here Europe/Korea; do you see that?

A. I do.

Q. Okay. And which deal was that?

A. That was SEA-2.

Q. Okay. And that had already closed by this point, right?

A. Yes.

Q. So it indicates there was a purchase price of 15.9 million,

| LAJPCOL1 | Margolis - Direct | Page 1347 |

right?

A. That's correct.

Q. Then there's the "Value based on rev multiple;" do you see that?

A. I do.

Q. What does "rev" stand for?

A. The royalty -- the royalties that were generated on an annual basis.

Q. Okay. So that $10.9 million that's there, what does that represent?

A. Five-and-a-half times the number that we -- the purchase price.

Q. Is that what you -- based on your due diligence, you actually thought the deal was worth?

A. Yes.

Q. And then there's this "Plug" row; do you see that?

A. I do.

Q. Okay. And that says 5 million?

A. Yes.

Q. And what is that 5 million, Mr. Margolis?

A. It was the overpay to get to 15.9 million.

Q. Okay. So we can zoom out, Mr. Charalambous. And go down to the first bullet point under the chart.

So this says, "Thus far, we have invoiced 5 million in marketing for the Europe/Korea amendment;" do you see that?

# A-342

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                              October 19, 2021

| LAJPCOL1  Margolis - Direct  Page 1348 | LAJPCOL1  Margolis - Direct  Page 1350 |
|---|---|

A. Yes.

Q. Okay. So are these the invoices we looked at previously on Friday that are summarized here?

A. Yes, sir.

Q. Okay. And those added up to 5 million, right?

A. Yes.

Q. If we can zoom out, Mr. Charalambous, and go back to the chart.

So the next column over says "LC/Umbro China;" do you see that?

A. I do.

Q. And what was the purchase price that was paid on that deal?

A. 21,500,000.

Q. And what had LF/GBG determined was the value based on the revenue multiple, the royalty multiple?

A. 15.5 million.

Q. So what was this 6 million number we see here as the plug?

A. The overpay.

Q. Okay. If you could go down, Mr. Charalambous, and the third bullet point, the 6 million.

So this says the "6M." Does that stand for million, Mr. Margolis?

A. It does.

Q. The 6M for China Umbro/LC will be offset the following. What does "LC" stand for again?

| LAJPCOL1  Margolis - Direct  Page 1349 | LAJPCOL1  Margolis - Direct  Page 1351 |
|---|---|

A. Lee Cooper.

Q. And then it talks about Rocawear royalties at 4.5 million; do you see that?

A. I do.

Q. One million in 2014; 3.5 million in 2015?

A. Yes.

Q. And what were those royalties, Mr. Margolis?

A. Those were minimum guarantees that were owed from GBG to Iconix.

Q. And what was contemplated at this point would happen with those to make up for the $6 million overpay?

A. That they would be -- that they would be offset.

Q. Was it -- at this point, was GBG going to have to pay them, or no, based on what's here?

MR. TARLOWE: Objection, form.

THE COURT: I'm sorry?

MR. TARLOWE: Objection to the form.

THE COURT: Sustained as to the form.

BY MR. SOLOWIEJCZYK:

Q. As to that 4.5 million, Mr. Margolis, GBG was supposed to pay it, right?

A. Yes.

Q. And it was possible Iconix could relieve that, right?

A. That's correct.

Q. And at this point, what was being contemplated would happen

---

to offset the $6 million overpay?

A. Waiving the minimum guarantee.

Q. Then it also talks about fixtures of 1.5 million; do you see that?

A. I do.

Q. Do you know specifically what that refers to?

A. I don't know in detail.

Q. But 4.5 million in Rocawear royalty relief and the fixtures of 1.5 million would add up to 6 million, right?

A. That's correct.

Q. All right. And then finally, in the last column, up top, it references Middle East; do you see that?

A. I do.

Q. And this e-mail dated December 1, 2014, at that point, were you involved in discussions with Iconix about doing another joint venture together?

A. I was.

Q. And was that going to cover the Middle East region?

A. Yes, sir.

Q. Is there an acronym that's commonly used for that deal?

A. MENA.

Q. And at this point, this deal had not closed yet; is that right?

A. That's correct.

Q. So at this point, as of this e-mail, it mentions a purchase

---

price of 23.6 million; do you see that?

A. I do.

Q. But what had GBG determined was the value based on its revenue multiple analysis?

A. 18,600,000.

Q. So what was this $5 million going to represent if the deal went forward in this fashion?

A. An overpay.

Q. And, Mr. Margolis, this was sent on the evening of December 1st, 2014; is that correct?

A. That's correct.

Q. And you asked Ethan Cole to prepare it for you for a meeting with you and Neil Cole and Jason Rabin, correct?

MR. TARLOWE: Objection.

THE COURT: Sustained.

Q. Why did you ask Ethan Cole to prepare this e-mail?

A. For the meeting.

Q. With who?

A. With Jason Rabin and Neil Cole.

Q. Now, Mr. Margolis, did you previously, on a prior occasion, ask Ethan Cole to prepare a similar summary for you?

A. I did.

Q. Mr. Charalambous, if you could put up, just for the parties and the witness, Government Exhibit 1068. And if you could show him both the first page and the second page,

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJPCOL1          Margolis - Direct          Page 1352

Mr. Charalambous.

Mr. Margolis, is this an e-mail from Ethan Cole to you?

A. It is.

Q. Dated August 28, 2014?

A. Yes.

Q. And does it contain an attachment?

A. It does.

Q. And generally, summarizing certain information about monies owed?

A. Yes.

MR. SOLOWIEJCZYK: Your Honor, the government offers Government Exhibit 1068.

MR. TARLOWE: Object, hearsay.

THE COURT: It will be received.

(Government's Exhibit 1068 received in evidence)

MR. SOLOWIEJCZYK: And, Mr. Charalambous, if you could please publish that, and first look at the first page.

BY MR. SOLOWIEJCZYK:

Q. So, Mr. Margolis, this is -- we're looking at that e-mail, right?

A. Yes.

Q. And it's from Ethan Cole, right?

A. Correct.

Q. To you, correct?

LAJPCOL1          Margolis - Direct          Page 1353

A. Yes.

Q. Now, what e-mail address was Ethan Cole using to send this to you?

A. Gmail.

Q. And what e-mail address of yours did he send it to?

A. To my Gmail.

Q. And was it common for you, Mr. Margolis, to be talking about GBG business over Gmail?

A. It wasn't the first time that we used it, but no, it typically would be our work e-mail.

Q. All right. If we could look at -- the subject is Iconix notes; is that right?

A. Yes.

Q. And then there was an attachment, right?

A. Yes.

Q. All right. So if we could look at the next page.

So the title of the document is "Summary of Various Amounts with Iconix," right?

A. Yes.

Q. And I'm just going to go through this one item at a time. Okay, Mr. Margolis?

A. Yes, sir.

Q. So it says under Item A, "$5 million overpay from Iconix Korea;" do you see that?

A. I do.

LAJPCOL1          Margolis - Direct          Page 1354

Q. And which overpayment is that referring to?

A. To SEA-2.

Q. And then below that it says "the $5 million overpay from Iconix Korea will be offset by;" do you see that?

A. I do.

Q. And it lists "1 million for Zoo York, SEA marketing," and "1.5 million for Peanuts China marketing;" do you see that?

A. I do.

Q. Those are marketing expenses; is that correct?

A. Yes.

Q. And then there's a 2.5M Rocawear; do you see that?

A. I do.

Q. And what's your understanding of what that was referring to?

A. The royalty shortfall.

Q. Okay. And so this is for SEA-2; is that right?

A. Yes, sir.

Q. Now, this is from August. Ultimately, did the way you tried to get the $5 million back change after this?

A. Yes.

Q. Just to marketing invoices, right?

A. Yes, sir.

Q. If we could move down to B. So this talking about a $4.5 million proposed overpay for Umbro/Lee Cooper China; do you see that?

LAJPCOL1          Margolis - Direct          Page 1355

A. I do.

Q. And Umbro/Lee Cooper China, which deal is that?

A. SEA-3.

Q. And it says "proposed," right?

A. Yes.

Q. Because the deal hadn't closed yet?

A. Correct.

Q. And then it talks about a "$4.5 million overpay for Umbro/Lee Cooper China will be offset by Iconix paying the 4.5 million in markdown money to Rainbow."

Do you recall what this is referring to, the "markdown money for Rainbow"?

A. I really wasn't involved in the details.

Q. Okay. And then -- sorry, one moment. So this is prior to SEA-3 closing, correct?

A. Yes.

Q. And ultimately, did the amount of the overpay go up from the time of this e-mail?

A. I don't -- I don't remember.

Q. Okay. Can you just show him 1139 really quickly, Mr. Charalambous. And the chart.

Did it ultimately become a $6 million overpay, instead of a $4.5 million overpay?

A. Yes.

Q. Thanks, Mr. Charalambous. You can take that down. If we

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 19, 2021

LAJPCOL1          Margolis - Direct          Page 1356

could go back to 1068, page 2.

And then C lists off additional amounts; do you see that?

A. Yes.

Q. And, again, it talks about 3.5 million in Rocawear royalty for year two remains outstanding, correct?

A. Correct.

Q. And does that, again, refer to the minimum guarantees?

A. Yes.

Q. Okay. You can take that down, Mr. Charalambous.

So, Mr. Margolis, I want to go back to the December time period now, okay, December 2014, and we saw the discussions you were having in preparation for the December 2nd meeting. I want to now ask you some questions about getting repaid on some of these marketing invoices, okay?

A. Yes.

Q. So if we could show the witness Government Exhibit 1126, which is in evidence. And this can be published to the parties as well.

So this is an e-mail from Ethan Cole on November 14th, 2014, at the bottom -- sorry, to Seth Horowitz. And he says "Hi, Seth. Finance has followed up on the marketing invoices. Any update on when we can expect to receive payment?"

So on November 14th, 2014, you were still waiting for payment on the invoices; is that right?

LAJPCOL1          Margolis - Direct          Page 1357

A. That's correct.

Q. You should take that down -- sorry. Go up to the top e-mail.

And Mr. Horowitz says that he "just processed one last week. Let me check in on it and get back to you," right?

A. Yes.

Q. All right. And just pulling up the invoices for a second, Mr. Charalambous, Government Exhibit 1111.

Looking at page 2, so there was an invoice for Zoo York for 955,710, right?

A. Yes.

Q. And did that get paid?

A. It did get paid.

Q. And then there was an invoice, going to the next page, for Mossimo for 1.9 million, right?

A. Yes.

Q. Did that get paid?

A. Yes, sir.

Q. And then, finally, you had originally submitted -- or in the revised invoice, you submitted an invoice for Peanuts in the amount of 2.1 million; do you recall that?

A. I do.

Q. Now, did this one get paid?

A. No.

Q. And what was your understanding, based on your

LAJPCOL1          Margolis - Direct          Page 1358

conversations with Mr. Horowitz, as to why it didn't get paid?

A. Because it wasn't a part of the -- the joint venture, I believe.

Q. Now, was LF/GBG out that money, or did you do something to try to make up for that shortfall?

A. We submitted another invoice.

Q. One invoice or multiple invoices?

A. Multiple invoices.

Q. All right. If I could show you -- actually, if we could show him Government Exhibit 1143, which is not yet in evidence, and just focusing on the top.

Do you recognize this, Mr. Margolis?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole to John Reda, copying myself and Ethan Cole.

MR. SOLOWIEJCZYK: Your Honor, the government offers Government Exhibit 1143.

MR. TARLOWE: Can we just see the whole document?

MR. SOLOWIEJCZYK: Yes, sorry.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government's Exhibit 1143 received in evidence)

BY MR. SOLOWIEJCZYK:

Q. So just looking at that first page, the middle portion, the

LAJPCOL1          Margolis - Direct          Page 1359

e-mail from John Reda to Angie Bacalzo and Linda Hernandez, this got forwarded to you, but he is looking for the confirmation that the 1.9 million came in; is that right?

A. Yes, sir.

Q. And then going up the chain, it says that the funds were received on November 25th, 2014, right?

A. That's correct.

Q. Okay. And then going up to the top e-mail, Ethan Cole -- sorry, John Reda said to you "Received the funds. The balance has to be received before year end, or we are going to have problems with the auditors. Can you make this happen? If not, we need to know now so Jason, Ron and Mark are aware and can exert pressure." Do you see that?

A. I do.

Q. So was it becoming important for you that you get the remainder of these invoices paid?

MR. TARLOWE: Objection, form, leading.

THE COURT: Overruled.

A. Yes.

Q. And going to the top e-mail, Ethan Cole wrote back to John Reda, copying you, "Hi, John. Glad to see that we have received the first payment." And then it says, "Jared met with Iconix today and the remainder will be sent out this week." Do you see that?

A. I do.

| LAJPCOL1    Margolis - Direct    Page 1360 |
| --- |

Q. And had you had a meeting at Iconix earlier that day with Neil Cole and Jason Rabin?

A. I believe so.

Q. You can take that down.

So if we could turn to Exhibit 1145.

And just looking at the top e-mail, do you recognize this?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole sent to Angela, copying myself on 12-4-2014.

MR. SOLOWIEJCZYK: Your Honor, the government offers Government Exhibit 1145.

Do you want to see the whole e-mail.

MR. TARLOWE: Yes.

MR. SOLOWIEJCZYK: Sorry. Zoom out. Thanks.

(Pause)

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government's Exhibit 1145 received in evidence)

BY MR. SOLOWIEJCZYK:

Q. So if we go down to the third page, there's an e-mail here from Daisy Laramy-Binks to Inam Shah, "Subject: For Jared." Do you see that?

A. I do.

| LAJPCOL1    Margolis - Direct    Page 1361 |
| --- |

Q. And this has -- it says "Hi, Jared. I do hope the below is helpful. Key brand turnaround summaries, (see images in attachment by way of example);" do you see that?

A. I do.

Q. And then what follows, if you look at three and four, is essentially a summary of work that had been done on different brands; is that right?

A. That's correct.

Q. Okay. If we go up to page 2, Ethan Cole writes to Daisy Laramy-Binks. By the way, her e-mail is at Iconix-Euro; do you see that?

A. I do.

Q. And was Iconix-Euro different than the Southeast Asia JV?

A. It was.

Q. She writes -- or sorry, Ethan Cole writes to her, "Following up on below. I didn't see anything about Brooklyn's Own. Would you mind sending me a similar recap of our work on the brand to date. Also, for each initiative listed below, wherever applicable, can you please send me some backup documentation?"

And then it goes on to say, towards the bottom of the e-mail "It is okay if you cannot dig up everything, but whatever supporting documentation you do have would be helpful. Just as an FYI, we are using this info to show Iconix the amazing brand building work TLC has done thus far, as Iconix

| LAJPCOL1    Margolis - Direct    Page 1362 |
| --- |

will be engaging us to perform some consulting work on these brands." Do you see that?

A. I do.

Q. At the time, the backup documentation, Mr. Margolis, what were you and Ethan Cole actually going to do with it?

A. We were going to submit it with the invoices.

Q. So going up the chain to the top e-mail, actually, the middle e-mail from Angela to you. So she asks Ethan Cole -- she worked for TLC, right?

A. That's correct.

Q. And she asked Ethan Cole, "What is this for? Please cc me on these requests," right?

A. Yes.

Q. And I think you testified about this on Friday, but Angela Farrugia, as far as you knew, was not aware of the overpayments and the plan to invoice to get them back, right?

A. That's correct.

Q. Looking at the top e-mail, so Ethan Cole says to Angela, "Copying you. Apologies for not cc'ing you. We will discuss in detail on our call, but Iconix would like to engage us for a number of consulting agreements. These requests arose out of those discussions, not as a means of verifying the work we did, but rather, just to use as illustrative purpose. That said, we do not need to beef up or change the esthetics of what we have on file. We don't need to make it pretty." Do you see that?

| LAJPCOL1    Margolis - Direct    Page 1363 |
| --- |

A. I do.

Q. And, Mr. Margolis, when Ms. Farrugia -- when Mr. Cole said we didn't need to "make it pretty," why is that?

A. Because we were just looking for backup to attach to the invoices.

(Continued on next page)

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    October 19, 2021

LAJMCOL2          Margolis - Direct          Page 1364

Q. For what purpose?
A. For the overpay.
MR. SOLOWIEJCZYK: You can take that down.
If you could take a look at 1147, please, just for the witness and the parties. If you could just show the witness --
Q. Can you read that, Mr. Margolis? Can you see it in the font size?
A. I can.
Q. Do you recognize this?
A. I do.
Q. What is it?
A. It's an e-mail from Ethan Cole to myself.
Q. On what date?
A. December 8, 2014.
MR. SOLOWIEJCZYK: Your Honor, the government offers Government Exhibit 1147.
MR. TARLOWE: No objection.
THE COURT: It will be received.
(Government Exhibit 1147 received in evidence)
MR. SOLOWIEJCZYK: If you could publish that, Mr. Charalambous.
Q. This is picking up on the e-mail chain we were looking at earlier, right, between Ethan Cole and Daisy Binks, right?
A. Yes.
Q. This was something we saw before that he asked for some

LAJMCOL2          Margolis - Direct          Page 1365

backup on Brooklyn's own, correct?
A. Correct.
Q. If we look at the top e-mail, the very top e-mail, he says to you -- this is just to you, right?
A. It is.
Q. Hey, do you mind nudging the team on this? I can't send invoices to Iconix without the backup info. Is that correct?
A. Correct.
Q. Is that really why he was asking for this stuff from Daisy Binks?
A. It is. It was.
MR. SOLOWIEJCZYK: If we could look at Government Exhibit 1148. Actually, 1150.
Q. Do you recognize this document?
A. I do.
Q. What is it?
A. It's an e-mail from Ethan Cole to myself on December 9, 2014.
MR. SOLOWIEJCZYK: The government offers Government Exhibit 1150, your Honor.
MR. TARLOWE: No objection.
THE COURT: It will be received.
(Government Exhibit 1150 received in evidence)
MR. SOLOWIEJCZYK: If we can go to the bottom e-mail.
Q. This is on December 9. Ethan Cole says to you: Daisy sent

LAJMCOL2          Margolis - Direct          Page 1366

over -- Daisy sent over the backup documents --
MR. SOLOWIEJCZYK: Mr. Charalambous, you can publish this to the jury.
Q. Daisy sent over the backup documents for the invoices. Ecko -- I was told to include an invoice for Ecko, but I'm not sure what we are invoicing for. Need direction.
Do you see that?
A. I do.
Q. Mr. Margolis, where was the direction coming from about what Iconix should be invoiced for?
A. Sorry. Can you please repeat that.
Q. Who was giving direction on what Iconix should be invoiced for? Was that coming from you or was it coming from Iconix?
A. From Iconix.
Q. He tells you the backup documents were sent?
MR. SOLOWIEJCZYK: Can we go up one.
Q. You say: Call you after dinner with Bruce and Dow.
Who were Bruce and Dow?
A. Bruce was the CEO of GBG and Dow was the president.
MR. SOLOWIEJCZYK: If you could go up to the next e-mail.
Q. Ethan Cole says: OK. Just spent an hour with Ron, Mark, and Jason on this.
Do you see that?
A. I do.

LAJMCOL2          Margolis - Direct          Page 1367

Q. Who was Ron?
A. Ron was our CFO.
Q. Who was Mark?
A. Mark was controller.
Q. And Jason. Was that Jason Rabin?
A. Yes.
Q. And you ask: And?
A. I do.
Q. Mr. Cole responds: There is an issue with invoicing for consulting that won't take place until 2014. Need to increase amounts for work already complete.
Do you see that?
A. I do.
Q. What did you understand Ethan Cole to be saying here about increasing the amounts for work already complete?
A. That we would have to submit additional invoices for the overpay.
MR. SOLOWIEJCZYK: You can take that down.
If we can put up government Exhibit 1153.
Q. Do you recognize this, Mr. Margolis?
A. I do.
Q. What is it?
A. It's an e-mail from Ethan Cole to Serom, copying myself, dated December 11, 2014.
MR. SOLOWIEJCZYK: Your Honor, the government offers

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL2    Margolis - Direct    Page 1368

Government Exhibit 1153.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1153 received in evidence)

MR. SOLOWIEJCZYK: If you could publish that, Mr. Charalambous. Thank you.

Q. So this is December 11. That's a couple of days after that e-mail we just looked at between you and Ethan Cole, correct?

A. Correct.

Q. Just looking at the header, the subject of this is Iconix Korea?

A. Yes.

Q. Who was Serom Hwang?

A. Serom worked for us in our Korea office.

Q. Ethan Cole says to her, copying you: Fairly random, but time sensitive request. Can you please send me over all branding/strategy/positioning/creative/marketing/analysis for the Iconix brands which our team has completed. It does not need to be perfectly presentable. Just anything that we have complete.

Do you see that?

A. I do.

Q. Mr. Margolis, he says: It doesn't have to be perfectly presentable.

What was your understanding as to why that was?

LAJMCOL2    Margolis - Direct    Page 1369

A. Because we were looking to provide the backup to the invoices that we were submitting for the overpay.

Q. At the time did you have an understanding as to whether Iconix was going to care if it looked perfectly presentable?

A. I did not.

MR. SOLOWIEJCZYK: If we could take that down, Mr. Charalambous, please.

If you could put up, just for the witness and the parties, Government Exhibit 1154.

Q. Do you recognize this?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole sent on December 11, 2014 to myself regarding showroom pictures from Southeast Asia.

MR. SOLOWIEJCZYK: The government offers Government Exhibit 1154.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1154 received in evidence)

MR. SOLOWIEJCZYK: If you could publish that, Mr. Charalambous.

Q. This is from Ethan to you, right?

A. Yes.

Q. He says: Please remind Clair and Anabel that we urgently need images of the Massimo/Candies/Zoo York showrooms. Even if

LAJMCOL2    Margolis - Direct    Page 1370

they are not the most impressive, we need them.

You see that?

A. I do.

Q. Again, what was the purpose of getting these pictures?

A. To provide backup to the invoices we were submitting for the overpay.

Q. And did you think it was going to matter if they looked impressive or not?

A. No.

MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous.

Q. Mr. Margolis, just putting up 1139 quickly for a second, we talked briefly about the last column, the Middle East deal.

Do you remember that?

A. I do.

Q. Sometimes referred to as MENA?

A. Yes, sir.

Q. And were you involved in some of the due diligence work on figuring out what the purchase price should be?

A. I was.

Q. What number had you and the folks you were working with come to?

A. The 18,600,000.

MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous.

LAJMCOL2    Margolis - Direct    Page 1371

If we can look at Government Exhibit 1167, just for the witness and the parties.

Q. Do you recognize this?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole.

Q. To who?

A. To Neil Cole and Seth Horowitz, Lauren Gee, Jason Schaefer.

Q. Who was copied on it?

A. Jason Rabin, myself, Rob Smits.

MR. SOLOWIEJCZYK: The government offers Government Exhibit 1167.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1167 received in evidence)

MR. SOLOWIEJCZYK: If you could just put that up for the jury, Mr. Charalambous.

Q. So this is from December 18 of 2014, is that right?

A. It is.

Q. It's to Neil Cole and Seth Horowitz and then you and Mr. Rabin and Robert Smits are copied.

Whose Robert Smits, by the way?

A. He was our general counsel.

Q. Ethan Cole is saying -- he is attaching a revised draft of the summary of material terms for the Middle East JV.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL2          Margolis - Direct          Page 1372

Do you see that?

A. I do.

Q. And he says: The purchase price was going to be 18.7 million, right?

A. Yes.

Q. And is that about what you had concluded was the appropriate price, based on the revenue multiple?

A. Yes.

Q. Now, he also mentions here a diligence/market analysis payment that had increased 3.1 million.

Do you see that?

A. I do.

MR. SOLOWIEJCZYK: If we could go to page 2, please.

Q. So, this lays out the terms of the deal in more specificity, right?

A. Yes.

Q. And looking at item 1, it talks about the payment of the purchase price of 18.7 million, right?

A. Correct.

Q. And it gives a schedule for how those payments are going to be made?

A. Yes.

Q. And then there is some call option discussed and a put call option discussed, certain services agreements discussed. And then at the bottom it has a diligence market analysis payment.

LAJMCOL2          Margolis - Direct          Page 1373

It says: Iconix to pay GBG 3,100,000 in closing for expenses related to diligence and market analysis in the Middle East and North Africa.

Do you see that?

A. I do.

Q. Mr. Margolis, are you aware of other instances where GBG got paid by a counterparty in a joint venture for the costs it incurred in conducting due diligence and analysis?

A. I'm not.

Q. Does this payment make any sense to you?

A. Not really.

Q. If the purchase price was going to be 18.7 million, but they were going to give you a due diligence payment of 3.1 million, what does that net out to?

If the purchase price was 18.7, but they were going to pay back to you a due diligence payment of 3.1, what were you paying net.

A. 15.6.

Q. Was that less than the purchase price that you had determined was appropriate, based on the revenue multiple?

A. Yes.

MR. SOLOWIEJCZYK: You can take that down.

If you could show the witness Government Exhibit 1170.

Q. Do you recognize this?

A. I do.

LAJMCOL2          Margolis - Direct          Page 1374

Q. What is it?

A. It's an e-mail from myself to Seth Horowitz, dated December 22, 2014.

MR. SOLOWIEJCZYK: The government offers Government Exhibit 1170.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1170 received in evidence)

MR. SOLOWIEJCZYK: If you could publish that, Mr. Charalambous.

Q. So, this is December 22, 2014, Mr. Margolis, correct?

A. Yes.

Q. This is from you to Seth Horowitz?

A. That's correct.

Q. What's the subject of the e-mail?

A. Jason.

Q. Which Jason were you referring to?

A. Jason Rabin.

Q. Then you say: Jason is available for the next hour and a half. Please make sure that Neil discusses with Jason. Please let me know when you can.

Do you see that?

A. I do.

Q. Do you know what specifically you were referring to in this e-mail, why you wanted Neil to call Jason Rabin?

LAJMCOL2          Margolis - Direct          Page 1375

A. I don't remember.

MR. SOLOWIEJCZYK: You can take that down.

If you could put up, just for the witness and the parties, Government Exhibit 1171.

Q. Do you recognize this?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole sent December 23 to Seth Horowitz copying myself regarding the Middle East invoice.

MR. SOLOWIEJCZYK: The government offers Government Exhibit 1171.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1171 received in evidence)

MR. SOLOWIEJCZYK: If you could publish that, Mr. Charalambous.

Q. So the subject of this e-mail is Middle East invoice, right?

A. Yes.

Q. This is December 23, correct?

A. That's correct.

Q. And Mr. Mr. Ethan Cole says: Please find attached an invoice for transaction-related expenses for the Middle East.

MR. SOLOWIEJCZYK: If we could look at the attachment. Zoom in. Thank you.

LAJMCOL2          Margolis - Direct          Page 1376

Q. This is an invoice to Iconix, is that right?

A. Yes.

Q. It says for Middle East and North Africa transaction-related expenses, correct?

A. Correct.

Q. Commercial and financial due diligence in connection with the Middle East and North Africa joint venture transaction, market and positioning analysis of Middle East and North African brand portfolio. Right?

A. Yes.

Q. Mr. Margolis, given that you were going to be entering into a joint venture with Iconix forming MENA, did it make sense to you that they were paying you 3.1 million for your due diligence?

A. No.

    MR. SOLOWIEJCZYK: You can take that down, Mr. Charalambous.

    If you could put up, for the witness and the parties, Government Exhibit 1178.

Q. Do you recognize this?

A. I do.

Q. What is it?

A. It's an e-mail from John Reda to Ethan Cole and myself regarding monies received from Iconix on January 6, 2015.

    MR. SOLOWIEJCZYK: Mr. Charalambous, if we can just

LAJMCOL2          Margolis - Direct          Page 1377

show the second page to counsel.

    The government offers Government Exhibit 1178.

    MR. TARLOWE: Objection. Hearsay.

    THE COURT: Overruled.

    (Government Exhibit 1178 received in evidence)

Q. Mr. Margolis, just focusing on the top e-mail --

    MR. SOLOWIEJCZYK: You can publish this, Mr. Charalambous.

Q. Who was John Reda?

A. He worked for Mark as a controller.

Q. What's a controller, generally?

A. Handles monies going in and going out.

Q. So he says: We received the attached money from Iconix with no backup as to what this is for. Would you know the purpose of these payments. Is there someone at Iconix that I could contact.

    You see that?

A. I do.

Q. Then, looking at the attachment, he summarizes -- what's being summarized here?

A. The $5.5 million between two payments.

Q. Were these two incoming payments that had come in from Iconix?

A. Yes.

Q. The 3.1 million, I think we saw a minute ago, that was the

LAJMCOL2          Margolis - Direct          Page 1378

amount of the MENA due diligence invoice, right?

A. That's correct.

    MR. SOLOWIEJCZYK: You can take that down.

    If we could look at Government Exhibit 1180.

Q. Mr. Margolis, do you recognize this?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole to John Reda, copying myself, Dina Casper and Jewell Millner.

Q. What is it dated?

A. January 7, 2015.

    MR. SOLOWIEJCZYK: Mr. Charalambous. If you could zoom out and just show all the pages to counsel. If you could go back to the first page.

    Your Honor, the government offers Government Exhibit 1180.

    MR. TARLOWE: No objection.

    THE COURT: It will be received.

    (Government Exhibit 1180 received in evidence)

    MR. SOLOWIEJCZYK: Your Honor, we also offer Government Exhibit 1180-A, 1180-B, 1180-C, 1180-D, 1180-E, 1180-F, 1180-G, 1180-H, 1180-I, all the way through O, which are native versions of the attachments to this e-mail.

    THE COURT: Are those the ones that counsel just saw?

    MR. SOLOWIEJCZYK: It's native versions of the ones

LAJMCOL2          Margolis - Direct          Page 1379

counsel just saw.

    THE COURT: Any objection?

    MR. TARLOWE: No objection.

    THE COURT: They will be received.

    (Government Exhibits 1180-A thru 1180-O received in evidence)

    MR. SOLOWIEJCZYK: So it's clear for the record, it's 1180-A through 1180-O.

    THE COURT: Very well.

    MR. SOLOWIEJCZYK: Thank you, your Honor.

    If we could go down to page 2.

Q. John Reda had asked this question we saw in the prior e-mail: We received the attached money from Iconix with no backup as to what this is for, the purpose of these payments.

    Ethan Cole responds: Hi, John. The first amount received is a lump sum payment for approximately 16 invoices. These invoices primarily relate to showrooms, marketing and creative work done for Zoo York, Candies, Starter, Rocawear, Danskin, Modern Amusement, Joe Boxer, Ed Hardy, and Umbro.

    Do you see that?

A. I do.

Q. You had mentioned earlier, Mr. Margolis, Peanuts did not get paid, right?

A. That's correct.

Q. These additional invoices that were submitted later, what

**A-350**

| LAJMCOL2 | Margolis - Direct | Page 1380 |
|---|---|---|

was the purpose of them?

A. So we can get reimbursed for the overpay.

Q. Did it make up for that Peanuts shortfall?

A. It did.

Q. And then he goes on to say: The second amount is related to commercial and financial due diligence in connection with the Middle East and North Africa joint venture transaction, correct?

A. Yes.

Q. If we can go up the chain, John Reda writes back: Thank you, Ethan. For the first amount we received, there are no invoices on the books for this cash. Do you have copies of these 16 invoices? Were they ever processed by the GBG billing/AR: Department.

Do you see that?

A. I do.

Q. What is Mr. Reda asking here?

A. He is asking if we submitted -- he wanted clarity and confirming that we submitted these invoices to the billing and AR department.

MR. SOLOWIEJCZYK: If you could go up the chain, Mr. Charalambous.

Q. John Reda writes back: As per my phone message today, please get back to me on these 16 invoices. We are closing the books and need to know how these invoices were recorded or if

| LAJMCOL2 | Margolis - Direct | Page 1381 |
|---|---|---|

we need to make adjustments.

You are copied on that, right?

A. I am.

Q. Then Ethan Cole responds: Hi, John. Apologies for missing your call, as I am in HK.

What's HK?

A. Hong Kong.

Q. I'm available to speak now. If not, please see 17 invoices attached. The one titled Middle East DD is for 3.1 million in transaction-related expenses. The other 16 amount to 2.4 million, which is the second amount we received from Iconix.

Do you see that?

A. I do.

Q. Then attached to this e-mail, if we go through the pages, the first is the MENA invoice, right, the due diligence invoice?

A. Yes.

Q. And then beyond that are various invoices. If we go page by page, there is Candies, Danskin, Ed Hardy, Joe Boxer, Modern Amusement, Rocawear, Brooklyn's Own, Rocawear, various brands. Starter Black. More Starter Black. Zoo York USA --

MR. SOLOWIEJCZYK: Actually, on that, can you go back to that one. Zoo York USA.

Q. It says it's cost related to fixturing and signage for J.C. Penney, is that right?

| LAJMCOL2 | Margolis - Direct | Page 1382 |
|---|---|---|

A. Right.

Q. As far as you know, is that in the United States?

A. Yes.

MR. SOLOWIEJCZYK: Keep going down.

Q. Those e-mails we saw, Mr. Margolis, earlier in the month, was the point to get some backup documentation so you can submit all these invoices?

MR. TARLOWE: Objection. Leading.

THE COURT: Sustained.

Q. What was the point of these 16 invoices, Mr. Margolis?

A. So we can get paid back from the overpay.

MR. SOLOWIEJCZYK: You can take that down. We can look at Government Exhibit 1181.

Q. Do you recognize this?

A. I do.

Q. What is it?

A. It's an e-mail from Ethan Cole sent on January 8, 2015 to John Reda, copying myself, Dina, and Jewell.

MR. SOLOWIEJCZYK: Mr. Charalambous, if you could zoom out so counsel can see the whole e-mail and just show them the pages of it. Go back to the first page. I think that's the thing that's new.

MR. TARLOWE: No objection.

THE COURT: It will be received.

(Government Exhibit 1181 received in evidence)

| LAJMCOL2 | Margolis - Direct | Page 1383 |
|---|---|---|

MR. SOLOWIEJCZYK: I don't know if I said it, the government offers 1181.

Q. Mr. Margolis, going back to page 2, John Reda had asked for the first amount received. There are no invoices on the books for this cash. Do you have copies of these 16 invoices? Were they ever processed by the GBG billing/AR department?

Do you see that?

A. I do.

Q. Going to page 1, he says, second from the top e-mail: I just need to know if these invoices were processed in the accounting system, or did you just prepared the invoices and gave them to Iconix? Did the invoices go to anyone else related to the GBG finance team?

I need to know so I could do the proper accounting.

Then Ethan Cole responded, and you were copied: Hi, John. These invoices were submitted directly to Iconix and were not processed by the GBG accounting system.

You see that?

A. I do.

Q. So these invoices that were used to make up that 2.4 million shortfall, they were just given straight to Iconix?

A. They were.

Q. Not given to the billing department at the time they were submitted?

A. Correct.

# A-351

LAJMCOL2          Margolis - Cross          Page 1384

MR. SOLOWIEJCZYK: One moment, your Honor. Nothing further.

THE COURT: Cross-examination.

MR. TARLOWE: May I proceed, your Honor?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. TARLOWE:

Q. Mr. Margolis, you have testified about several joint venture transactions between Li & Fung, or GBG, and Iconix, correct?

A. Yes, sir, sir.

Q. In connection with those joint venture transactions, Mr. Cole, Neil Cole, never asked you to keep any terms of the agreements out of the written agreements, correct?

A. Correct.

Q. And you never heard Mr. Cole ask anyone else to keep any terms of the transactions out of the written agreements, correct?

A. That's correct.

Q. And you were just shown a whole bunch of e-mails, internal e-mails from GBG, on your direct examination, correct?

A. Yes, sir.

Q. E-mails about gathering invoices, right -- excuse me. Let me rephrase it. E-mails about gathering documentation, right?

A. That's correct.

LAJMCOL2          Margolis - Cross          Page 1385

Q. Mr. Cole, Neil Cole, is not on any of those e-mails, correct?

A. That's correct.

Q. When you worked on these transactions, you didn't think that you were committing a crime, correct?

MR. SOLOWIEJCZYK: Objection, your Honor.

THE COURT: Sustained.

Q. Now, in connection with the various transactions that you were asked about, you talked about the purchase price based on a revenue multiple.

Do you recall that?

A. Yes, sir.

Q. And your testimony was that on each of the transactions, you and others, based on your due diligence, came up with a purchase price based on the multiple, correct?

A. That's correct.

Q. That was a 5.5 times multiple?

A. Yes, sir.

Q. And you described the amount paid above that as an overpay, right?

A. That's correct.

Q. To be clear on how a multiple works, let's say a business has a million dollars in revenue. OK. If you apply a 5.5 times multiple, that would generate a value of $5.5 million, right?

LAJMCOL2          Margolis - Cross          Page 1386

A. That's correct.

Q. Your testimony is that on SEA-3 the purchase price, based on a 5.5 multiple, was $15.5 million, right?

A. Can you please repeat that.

Q. Sure. Your testimony was that, based on a 5.5 multiple, that would get you to a purchase price of 15.5 million, correct?

A. I need to see the -- apologies. I don't want to say anything inaccurate.

Q. Which document would you like to see?

A. The outcome was five and a half times whatever the number was. You are asking me to confirm a calculation.

Q. My question, sir, you were shown a document. We can find it. But you were shown a document -- let's show you the document.

A. Sorry.

Q. We will show you the document.

MR. TARLOWE: Let's look at Government Exhibit 1139.

Q. The box on top, you were asked about that. You remember you were asked about that just a few minutes ago?

A. Yes, sir.

Q. The row that says value based on rev multiple, that's the value generated by applying a 5.5 times multiple.

That's your testimony?

A. Yes, sir.

LAJMCOL2          Margolis - Cross          Page 1387

Q. So under LC Umbro/China, that's SEA-3, right?

A. Correct.

Q. So your testimony is that the value based on a 5.5 times multiple was just 15.5 million, right?

A. Yes.

Q. Do you know, Mr. Margolis, that there was no China Umbro business at the time of the joint venture?

A. Correct.

Q. So no royalties, right?

A. That's correct.

Q. So 5.5, that 15.5 million is not a 5.5 multiple, right?

A. That's correct. But --

Q. You have answered the question. Thank you.

In fact, it's far more than 5.5, correct?

A. That's correct.

MR. TARLOWE: Now let's look at Europe/Korea. We can leave that up for a second, Government Exhibit 1139.

Q. Your testimony is that the Europe/Korea -- that's SEA-2, right?

A. Yes, sir.

Q. Your testimony is that 10.9 million was based on a 5.5 times multiple, right?

A. That's correct.

MR. TARLOWE: And let's take a look at Defense Exhibit 1312-A1 in evidence. Can you scroll, please. And I will tell

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL2          Margolis - Cross          Page 1388

you when to stop, Mr. Klein. Keep going. If we could look at the bottom of 6 and the top of 7, please, the section that says deal valuation summary. It's on its bottom of 6 and it continues to the top of 7.

Q. Now, Mr. Margolis, the $7.6 million that was attributed to the Europe and Turkey portion, you did not consider that an overpayment, correct?

A. Sorry. Can you please repeat.

Q. Sure. $7.6 million of the purchase price for SEA-2 was attributed to the Europe and -- Europe and Turkey portion, correct?

A. That's correct.

Q. You did not view that portion as an overpayment, correct?

A. Correct.

Q. Now, the multiple used to get to the $7.6 million was 11.3 times, correct?

A. Correct.

MR. TARLOWE: We can take that down.

Q. Now, you moved to Hong Kong in around 2010, right?

A. Closer to 2012.

Q. And you moved with Jason Rabin and his family?

A. That's correct.

Q. You and Mr. Rabin were trying to build something together, right?

A. Yes, sir.

LAJMCOL2          Margolis - Cross          Page 1389

Q. And Mr. Rabin, he's a pretty charismatic guy, right?

A. Yes.

Q. He is energetic?

A. Yes.

Q. Outgoing?

A. Yes.

Q. Charming?

A. Yes.

Q. Passionate?

A. Yes.

Q. Now, you were senior vice-president of business development for LF Asia, correct?

A. That's correct.

Q. To be clear, you were senior vice-president of business development not for all of Li & Fung, right?

A. That's correct.

Q. Just LF Asia?

A. Yes, sir.

Q. Which was a small component of Li & Fung?

A. Correct.

Q. Li & Fung is a huge company?

A. Yes, sir.

Q. It's got something like $30 billion of revenue, right?

A. Back then it was up there.

Q. And you reported to Jason Rabin, right?

LAJMCOL2          Margolis - Cross          Page 1390

A. Yes, sir.

Q. And there were many levels of people between you and the CEO of Li & Fung, correct?

A. That's correct.

Q. And Mr. Cole, Neil Cole, was the CEO of Iconix, correct?

A. That's correct.

Q. And Mr. Cole interacted directly with people at Li & Fung who were far senior to you, correct?

A. That's correct.

Q. Before the SEA-1 transaction, Li & Fung and Iconix already were -- already had a number of business arrangements with each other, right?

A. Yes, sir.

Q. In fact, Li & Fung had done a tremendous amount of business with Iconix before SEA-1, right?

A. That's correct.

Q. Do you recall telling people in the 2013 time frame that you love Iconix?

A. That's correct.

Q. And you told people that LF, or Li & Fung, does a huge business with Iconix, correct?

A. That's correct.

Q. That was before any of the SEA joint venture transactions.

A. That's correct.

Q. And LF/GBG continued to have business arrangements with

LAJMCOL2          Margolis - Cross          Page 1391

Iconix after 2013, right?

A. That's correct.

Q. And Iconix and GBG had a much larger relationship than what you were a part of, correct?

A. That's correct.

Q. You spoke with Seth Horowitz quite frequently, right?

A. Yes, sir.

Q. You met Neil Cole a handful of times, right?

A. That's correct.

Q. You primarily dealt with Seth Horowitz, correct?

A. That's correct.

Q. You told the government that Mr. Cole was the guy for brands, right?

A. I did.

Q. You said he was like a celebrity, right?

A. He was very -- yes.

Q. He was the person who had developed this brand management model, right?

A. Correct.

Q. And he was well known in the industry for that.

A. Yes.

Q. Other companies later adopted that same business model that Mr. Cole had created, right?

A. That's correct.

Q. He was seen as a visionary or pioneer in the brand

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL2     Margolis - Cross     Page 1392

management field?

A. Yes.

Q. Mr. Cole never asked you to withhold information from a lawyer or an accountant, correct?

A. Correct.

Q. You never heard Mr. Cole ask anyone else to withhold information from a lawyer or an accountant, correct?

A. That's correct.

Q. And you looked at the SEA joint venture transactions as being favorable deals to Li & Fung, correct?

A. That's correct.

Q. Now, I want to ask you some questions about the SEA-1 joint venture. OK?

A. Yes, sir.

Q. Just so we are all on the same page, that's the first international joint venture between Iconix and Li & Fung, correct?

A. Yes, sir.

Q. And it took place on or about October 1 of 2013, right?

A. Yes.

Q. Now, it took place on or about October 1, 2013, but you began discussing that transaction with Iconix several months earlier, correct?

A. Yes, sir.

Q. You were discussing a possible Southeast Asia joint venture

LAJMCOL2     Margolis - Cross     Page 1393

at least as early as May of 2013, correct?

A. I believe so.

Q. And in May your team in Southeast Asia was anxious to get started, right?

A. Yes.

Q. Before the joint venture was formed, Iconix didn't have any personnel on the ground in Southeast Asia, right?

A. That's correct.

Q. Iconix was running that business out of New York, right?

A. Yes, sir.

Q. GBG, or Li & Fung, had offices and infrastructure throughout Asia, right?

A. That's correct.

Q. And you wanted to use the GBG offices and infrastructure in Asia to drive the business, right?

A. Yes.

Q. To grow the business, right?

A. Yes, sir.

Q. Because you thought GBG could do a better job generating sales in Southeast Asia than Iconix?

A. Yes.

Q. So you thought that the Southeast Asia joint venture was a great opportunity for Li & Fung, right?

A. That's correct.

Q. To get the work started, Li & Fung drafted a letter of

LAJMCOL2     Margolis - Cross     Page 1394

authorization for Iconix to sign, right?

A. Yes.

MR. TARLOWE: Can we please show the witness what's marked for identification as Defense Exhibit 1050 and 1050-A1.

Q. Mr. Margolis, do you recognize the document on the left as an e-mail that you sent to Neil Cole on July 15, 2013?

A. I do.

Q. The document to the right is the attachment to that document or the attachment to that e-mail?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 1050 and 1050-A1.

MR. SOLOWIEJCZYK: No objection.

THE COURT: It will be received.

(Defendant's Exhibits 1050 and 1050-A1 received in evidence)

MR. TARLOWE: May we publish?

THE COURT: You may.

MR. TARLOWE: Let's start with the e-mail, Defense Exhibit 1050.

Q. Mr. Margolis, this is an e-mail you sent to Neil Cole copying Jason Rabin and a couple of others from Li & Fung, right?

A. Yes, sir.

Q. And you wrote: Hi, Neil. It was good touching base, and

LAJMCOL2     Margolis - Cross     Page 1395

I'm excited about moving forward together on Iconix brands for Southeast Asia.

You see that?

A. I do.

Q. Then you wrote: To get the work started while we finalize the long form, we've drafted an authorization letter for your review and allows us to begin pursuing potential licensees.

Do you see that?

A. That's correct.

Q. When you wrote to get the work started while we finalize the long form, the long form referred to the joint venture agreement, correct?

A. That's correct.

Q. To get the work started meant to get started on the joint venture before the JV was formally formed.

A. Yes, sir.

Q. When you wrote: We've drafted an authorization letter, the we is Li & Fung, correct?

A. That is correct.

Q. Let's look at the attachment that you sent. That's a draft letter of authorization, correct?

A. Yes.

Q. Again, this is the letter of authorization that would allow Li & Fung to get started on the joint venture, right?

A. Correct.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL2     Margolis - Cross     Page 1396

Q. If you see under the bullets the paragraph that starts with has appointed, this draft says that Iconix has appointed LF Asia to develop the licensed marks in the territory through licensing and other opportunities.

     Do you see that?

A. I do.

Q. If we look back at the e-mail for one moment, the e-mail says: In that duration, LF Asia will collect 30 percent commission. That duration, what you meant by that was the period of time between the letter of authorization and the joint venture, right?

A. That's correct.

Q. And commissions would be generated if you entered into new license agreements, right?

A. Correct.

Q. But if you worked with existing licensees to help them build their business, that wouldn't produce commissions, right?

A. Correct.

     MR. TARLOWE: We can take that down.

Q. Now, do you recall on Friday, during your direct examination, you were shown a consultancy agreement between Iconix and a Li & Fung affiliate.

     Do you recall that?

A. I do.

Q. That was an agreement entered into as part of the SEA-1

LAJMCOL2     Margolis - Cross     Page 1397

transaction, correct?

A. Correct.

Q. And you testified that it wasn't a document that you were familiar with, correct?

A. I didn't recall that document.

Q. Before being shown it or before being contacted by the government, you didn't recall seeing that document?

A. I don't.

Q. In 2013, you specifically referred to the letter of authorization as a consultancy agreement, correct?

A. I don't -- I don't recall.

Q. You think that's possible?

A. I just don't remember.

Q. So you may have referred to it as a consultancy agreement?

     MR. SOLOWIEJCZYK: Objection.

     THE COURT: Overruled.

A. I could have.

     MR. TARLOWE: Why don't we show the witness and parties what's marked for identification as Defense Exhibit 1052 and 1052-A1. The e-mail is pretty small, so maybe we can enlarge it for Mr. Margolis.

     Are we able to show the witness Defense Exhibit 1052 for identification.

Q. Mr. Margolis, do you recognize that as an e-mail exchange between you and Daniel Castle from July of 2013?

LAJMCOL2     Margolis - Cross     Page 1398

A. Yes.

Q. The subject is Iconix SEA JV.

     You see that?

A. I do.

Q. What's marked as 1052-A1 is the attachment to that e-mail, correct?

A. Yes.

     MR. TARLOWE: We offer Defense Exhibit 1052 and 1052-A1.

     MR. SOLOWIEJCZYK: No objection.

     THE COURT: They will be received.

     (Defendant's Exhibits 1052 and 1052-A1 received in evidence)

     MR. TARLOWE: May we publish it, your Honor?

     THE COURT: You may.

     MR. TARLOWE: Let's start with the e-mail, 1052. Let's start -- that's fine.

     Mr. Klein, can we publish that for the jury, please.

Q. Mr. Margolis, let's start with the e-mail on the bottom here that you sent to Daniel Castle, copying Neil Cole and Jason Rabin.

     Who is Dan Castle, by the way?

A. Dan Castle used to work for Iconix.

Q. He handled the international business for Iconix?

A. Yes, sir.

LAJMCOL2     Margolis - Cross     Page 1399

Q. And you wrote: Hi, Daniel, Jason forwarded to us your e-mail below. Can you please let us know when we can receive the consultancy agreement so we can start working on the business.

     That's what you wrote?

A. That's correct.

Q. And Mr. Castle replied: Hi, Jared, the consultancy agreement (agent authorization letter) was sent to Jason and part of the e-mail you received. I have reattached. Please sign and send back to me.

     Do you see that?

A. I do.

Q. So Mr. Castle says that he has reattached the document that's being described as the consultancy agreement, correct?

A. Yes.

     MR. TARLOWE: Can we look side by side maybe --

Q. The document that was attached is the draft or a draft letter of authorization, correct?

A. That's correct.

Q. When you referred in your e-mail to the consultancy agreement, you were talking about the letter of authorization, right?

A. Correct.

Q. When Mr. Castle referred to the consultancy agreement in his e-mail, you understood that he was referring to the letter

# A-355

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL2        Margolis - Cross        Page 1400

of authorization, correct?

A. Correct.

MR. TARLOWE: We can take that down. Actually, let's look at the e-mail for one moment, 1052. Can we enlarge the e-mail for Mr. Margolis. Can we enlarge the e-mail in the middle of 1052 from Mr. Margolis to Daniel Castle. Thank you.

Q. You wrote: Please let us know when we can receive the consultancy agreement so we can start working on the business. Right?

A. Correct.

Q. And the business you wanted to start working on was the SEA-1 joint venture, correct?

A. Correct.

Q. Which ultimately did not get formed until October 1, right?

A. Correct.

Q. So there was a period of time between the letter of authorization and the joint venture in which Li & Fung was doing work, correct?

A. Correct.

Q. By the way, in 2013, other people at Li & Fung also referred to the letter of authorization as a consultancy agreement, correct?

A. That's correct.

MR. TARLOWE: Let's take a look at Defense Exhibit 1053 for identification and 1053-A1 for identification, just

LAJMCOL2        Margolis - Cross        Page 1401

the witness and the parties, please.

Q. Do you recognize, Mr. Margolis, the e-mail on the left as an e-mail exchange among you and others at LF Asia?

A. I do.

Q. The subject is Iconix SEA JV, correct?

A. Correct.

Q. And the document on the right is the attachment to that e-mail, correct?

A. Correct.

MR. TARLOWE: We offer Defense Exhibit 1053 and 1053-A1.

MR. SOLOWIEJCZYK: Objection. Hearsay.

THE COURT: Can I see the parties at sidebar.

(Continued on next page)

LAJMCOL2        Margolis - Cross        Page 1402

(At sidebar)

THE COURT: Haven't two or three just like this have come in without objection?

MR. SOLOWIEJCZYK: Here, your Honor, I think they are trying to prove up the beliefs -- the other documents didn't relate to this issue. What they are trying to do now is prove up the beliefs of internal Li & Fung personnel as to the meaning when they refer to the term consultancy agreement, what they mean by that. I guess they are going to try to extrapolate from that what others meant later when they said that, but that's hearsay for the purpose we are trying to offer it.

MR. TARLOWE: We are not offering it for its truth. We are simply offering it to show that people within Li & Fung were referring to this letter of authorization as a consultancy agreement.

The reason why that's significant is because the consultancy agreement that is later entered into, it is our position that that was, at least in part, a fee that was paid for work that Li & Fung had done pursuant to the letter of authorization.

The government has made a big deal about this consultancy agreement being some sort of sinister document with no legitimate purpose. Our position is that part of the purpose of the consultancy agreement related back to the letter

LAJMCOL2        Margolis - Cross        Page 1403

of authorization. The fact that people are referring to the letter of authorization as a consultancy agreement is relevant. It's not being offered for its truth. We are simply offering it to show that people were describing the letter of authorization as a consultancy agreement.

THE COURT: If it is being offered for that purpose, why is it not allowable?

MR. SOLOWIEJCZYK: I am not sure the relevance of what internal -- this person, he showed me an e-mail earlier where Mr. Margolis called it a consultancy agreement. We didn't object to that. But now we are talking about various other employees within the company, what they refer to it as. I think it is of minimal relevance, at best.

THE COURT: I'll allow it.

(Continued on next page)

# A-356

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    October 19, 2021

**LAJMCOL2    Margolis - Cross    Page 1404**

(In open court)

THE COURT: 1053 and 1053-A1 will be received.

(Defendant's Exhibits 1053 and 1053-A1 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

Q. So the document on the left is an e-mail that you received -- you were copied on from Chris Wright of LF Asia, correct?

A. That's correct.

Q. Who is Chris Wright?

A. Chris Wright worked for LF Asia.

Q. And the e-mail to Mona. Who is that?

A. Mona was on the Li & Fung legal team.

Q. Chris Wright wrote: Hi, Mona. Please, can you review and advise your thoughts on the attached consultancy letter from Iconix.

You see that?

A. I do.

Q. If we look at the attachment, that's a draft letter of authorization, correct?

A. That's correct.

(Continued on next page)

**LAJPCOL3    Margolis - Cross    Page 1405**

Q. So Mr. Wright also was referring to the letter of authorization as a consultancy letter, correct?

A. That's correct.

Q. You can take that down. Now, a letter of authorization was, in fact, signed, correct?

A. That's correct.

Q. And can we please show the witness Defense Exhibit 2043 for identification and 2043-A1. 2043 and 2043-A1.

The document on the left is an e-mail exchange among you and people from Li & Fung and Iconix regarding the Southeast Asia joint venture, correct?

A. Correct.

Q. And the document on the right is the attachment, right?

A. The document on the right is the attachment, correct.

MR. TARLOWE: We offer Defense Exhibit 2043 and 2043-A1.

MR. SOLOWIEJCZYK: No objection.

THE COURT: They will be received.

(Defendant's Exhibits 2043 and 2043-A1 received in evidence)

BY MR. TARLOWE:

Q. And let's first enlarge the e-mail. Let's start with the e-mail on the left. If you start at the bottom, you see, Mr. Margolis, these are the e-mails we just looked at a moment ago, right?

**LAJPCOL3    Margolis - Cross    Page 1406**

A. Yes.

Q. All right. And the e-mails where you asked Daniel Castle on the bottom, "Please let us know if when can receive a consultancy agreement," and then Mr. Castle wrote back, "The consultancy agreement was sent to Jason and I agreed." We looked at that a moment ago, correct?

A. Correct.

THE COURT: Okay. Mr. Tarlowe, it is now 11:00. We will now take our morning break. Ladies and gentlemen, please do not discuss the case.

(Jury not present)

THE COURT: Mr. Margolis, you may step down.

(Witness temporarily excused)

Twenty minutes, folks, unless there's anything either side wants to raise.

MR. SOLOWIEJCZYK: Not from the government.

MR. TARLOWE: No, your Honor. Thank you.

(Recess)

THE COURT: Do you want to get Mr. Margolis?

(Jury present)

Everyone, please be seated.

Mr. Tarlowe.

MR. TARLOWE: Thank you, your Honor.

BY MR. TARLOWE:

Q. Can we please show the witness Defense Exhibit 2043 and

**LAJPCOL3    Margolis - Cross    Page 1407**

2043-A1, please.

And the e-mail on the left is an e-mail exchange. Do you see these are the e-mails that we looked at a moment ago?

A. Yes, sir.

Q. And if we look up at the e-mail chain at the top -- you can take that down and go back to the old e-mail, please.

THE COURT: Mr. Tarlowe, I think we're having a technical issue with a --

JUROR: My screen isn't working.

THE COURT: You can move, if you want, and we'll have someone take a look at that screen.

I'm sorry, Mr. Tarlowe. You may proceed.

MR. TARLOWE: Thank you, Judge.

BY MR. TARLOWE:

Q. The e-mail on the top of the thread is from Daniel Castle, and it says, "Chris, attached is the authorization. Have a nice weekend." Do you see that?

A. I do.

Q. And attached is the letter of authorization, and if you scroll to the next page of the letter of authorization, do you see it's signed by Daniel Castle on behalf of Iconix and Jason Rabin on behalf of LF Asia, right?

A. That's correct.

Q. And by the way, we've seen several e-mails now from Dan Castle, right?

UNITED STATES OF AMERICA, v.
NEIL COLE,
October 19, 2021

LAJPCOL3  Margolis - Cross  Page 1408

A. Yes.

Q. And he was one of the people who represented Iconix in connection with the negotiations of SEA-1?

A. That's correct.

Q. Mr. Cole was not the only person who represented Iconix in connection with the negotiations of SEA-1, correct?

A. That's correct.

Q. Do you recall being asked the following question and giving the following answer before the grand jury -- you testified before a grand jury, correct?

A. I did.

Q. This is at transcript page 8, lines 2 to 4:
"Q. In connection with the negotiations of that September 2013 transaction, who represented Iconix?
"A. It was Neil Cole, and I believe that was it."
Do you recall giving that testimony?

A. I'm -- I believe -- I mean, I believe -- I'd have to see it, but I take your word for it that I would have said that.

Q. But you remember now that that's not accurate, right?

A. Correct.

Q. Now, after the letter of authorization was signed, Li & Fung began contacting licensees throughout Southeast Asia, right?

A. Correct.

Q. And you were part of that effort, right?

LAJPCOL3  Margolis - Cross  Page 1409

A. I was.

Q. You and others met with licensees throughout Southeast Asia, correct?

A. Correct.

Q. And you met with them to better understand their business, their future outlook, and how Li & Fung could best support them, correct?

A. That's correct.

Q. And the Li & Fung team on the ground in Southeast Asia thought that a lot of work had to be done to get the brands on track, right?

A. Correct.

Q. And the letter of authorization permitted Li & Fung to get that work started, right?

A. Correct.

Q. And by meeting with licensees, there were two different objectives that you and others at Li & Fung were trying to achieve, correct?

A. If you tell me the two.

Q. Sure. So one objective was due diligence, correct?

A. Correct.

Q. And you testified about that on your direct examination, correct?

A. Correct.

Q. There was also a second objective, and that was business

LAJPCOL3  Margolis - Cross  Page 1410

development, correct?

A. Correct.

Q. That was in an effort to try to grow the business with the licensees, right?

A. That's correct.

Q. And you planned a seven-day tour throughout Southeast Asia to meet with the licensees, right?

A. I don't recall how many days, but I did go.

Q. You went to the Philippines?

A. Yes.

Q. Thailand?

A. Yes.

Q. Indonesia?

A. Yes.

Q. Singapore?

A. Yes.

Q. Malaysia?

A. Yes.

Q. And do you recall that during that trip, you discovered an unauthorized seller of Mossimo products?

A. I don't believe it was an unauthorized seller. There was some -- there was a partner in place, but we didn't -- I don't recall exactly that.

Q. Do you recall discovering that there were -- there was a seller of Mossimo products that wasn't paying the royalties

LAJPCOL3  Margolis - Cross  Page 1411

that were owed to Iconix?

A. Correct.

Q. And you were proud of making that discovery, correct?

A. Correct.

Q. And after you made that discovery, Iconix ultimately did recovery royalties from that seller, correct?

A. I believe so.

Q. Now, you testified during your direct examination that you had not -- you did not recall seeing either the consultancy agreement or the side letter agreement in connection with SEA-1, correct?

A. Correct.

Q. You were aware in 2013 that Li & Fung's lawyers at Mayer Brown were drafting the side letter and consultancy agreement, correct?

A. I did not recall that.

Q. May we please publish what's in evidence as Defense Exhibit 1108.
Do you see this is an e-mail that Kevin Chow at LF Asia sent to Jason Rabin, you and others, correct?

A. Yes.

Q. You're one of the recipients of this e-mail?

A. I am.

Q. Okay. And under bullet 1(d), it says, "Mark is working on the first draft of the side letter and consultancy agreement."

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                    October 19, 2021

| LAJPCOL3 | Margolis - Cross | Page 1412 |
|---|---|---|

Do you see that?

A. I do.

Q. No reason to believe that you didn't receive this e-mail at the time?

A. Correct.

Q. And by the way, it says, "We need to discuss it and may need to get F and A team input." Do you know what "F and A" is?

A. I don't recall.

Q. Is it finance and accounting?

A. Makes sense, yes.

Q. We can take that down.
And you then actually received a follow-up e-mail with a draft of the side letter agreement, correct?

A. I don't -- I don't recall.

Q. Okay. Let's publish Defense Exhibit 1109, which is in evidence.
And you see that this is a follow up to the e-mail we just looked at, right? The e-mail we just looked at is on the bottom?

A. Correct.

Q. And there's a followup from Mark Stevens of Mayer Brown, he was the lawyer for Li & Fung, correct?

A. Correct.

Q. And you see you're one of the recipients of the e-mail?

| LAJPCOL3 | Margolis - Cross | Page 1413 |
|---|---|---|

A. I do. I was.

Q. And it says, "Please see attached for your consideration, a first draft, one-page side letter." Do you see that?

A. I see that.

Q. And then it goes on to say, "We are currently working on a short-form consultancy agreement." Do you see that?

A. I do.

Q. And if we could look at Defense Exhibit 1109-A1, and that's the -- that's a draft of a side letter that was attached to that e-mail, correct?

A. Correct.

Q. And you have no reason to doubt that you received that e-mail, correct?

A. Correct.

Q. We can take that down. Can you please show the witness, let's please publish Government Exhibit 207, which is in evidence.
This is a consultancy agreement you were shown during your direct testimony, correct?

A. Yes.

Q. And do you recall testifying that you had never heard of LF Centennial before?

A. Correct, I didn't recall.

Q. You know now that it's an affiliate of Li & Fung?

A. I do.

| LAJPCOL3 | Margolis - Cross | Page 1414 |
|---|---|---|

Q. And do you recall now that you actually were familiar with LF Centennial in 2013?

A. Yes.

Q. You can take that down.
And do you recall that LF Centennial was the party that entered into various license agreements?

A. I was not aware of that, but it's possible.

Q. So you're aware that Li & Fung was a licensee for the Strawberry Shortcake brand?

A. I don't recall. We had many licenses; so it wouldn't be shocking.

Q. Were you aware that -- and by the way, Strawberry Shortcake -- Li & Fung was a licensee for Strawberry Shortcake before Iconix had anything to do with Strawberry Shortcake, correct?

A. It very well could be.

Q. Now, if we could just look at the consultancy agreement again, it's Government Exhibit 207 in evidence.
And if we look at the section that says "Appointment," it says, "The company," which is Iconix, "has since 1st August 2013, retained and continues to retain the consultant, and the consultant agrees to provide to the company brand strategy services in Asia to assist the company in developing its brands." Do you see that?

A. I do.

| LAJPCOL3 | Margolis - Cross | Page 1415 |
|---|---|---|

Q. And the letter of authorization that we looked at, that was signed in early August of 2013, correct?

A. Correct.

Q. And as we saw previously, you and others at both Li & Fung and Iconix, referred to that letter of authorization as a consultancy agreement, correct?

A. Correct.

Q. And you don't know one way or the other whether there's a relationship between a consultancy agreement and the letter of authorization?

A. It's -- it was all confusing to me. I thought there was one agreement. I didn't realize that there was three.

Q. And you don't know one way or the other whether there's a relationship between a consultancy agreement and the letter of authorization?

A. I wasn't aware.

Q. You're not saying they're unrelated, you just don't know?

A. I just don't know.

Q. You were aware in 2013 that Jason Rabin was asking Iconix for a $2 million fee, correct?

A. Based on what I just saw, yes.

Q. That's the only basis for you to know that?

A. I -- no, but I saw -- you showed me e-mails. Based on those e-mails.

Q. Who showed you e-mails?

# A-359

**LAJPCOL3        Margolis - Cross                    Page 1416**

A. I just saw what you showed me earlier.

Q. Do you recall being aware in 2013 that Jason Rabin was asking Iconix for a $2 million fee?

A. Yes.

Q. And, in fact, in September 2013 -- well, before we do that, let's publish Government Exhibit 1001 in evidence.

This is an e-mail that Jason Rabin sent to you and others, correct?

A. Correct.

Q. And it says, in the third line, "I met with Neil Cole today." Do you see that?

A. I do.

Q. And the second-to-last sentence in the bottom says, "He will work on the 2 million for us this year." Do you see that?

A. I do.

Q. And that was 2 million for Li & Fung, correct?

A. Correct.

Q. We can take that down.

And in September 2013, you spoke directly with Mr. Cole about a $2 million fee that Li & Fung was requesting from Iconix, correct?

A. I don't -- I don't recall.

Q. Let's show the witness what's marked for identification as Defense Exhibit 1077.

Can you take a moment, Mr. Margolis, and just read

**LAJPCOL3        Margolis - Cross                    Page 1417**

that to yourself, and you can read the whole thing, but if you focus on the last sentence.

A. I see it.

Q. Does that refresh your recollection that in September 2013, you spoke directly with Mr. Cole about a $2 million fee that Li & Fung was asking Iconix for?

A. It does.

Q. And based on your conversation with Mr. Cole, you understood that Mr. Cole wanted to understand what you were proposing in detail to share with the Iconix CFO, correct?

MR. SOLOWIEJCZYK: Objection.

THE COURT: Overruled.

A. Sorry, can you please repeat that?

Q. Based on your conversation with Mr. Cole, you understood that Mr. Cole wanted to understand what you were proposing in detail in order to share with his CFO?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 1077.

MR. SOLOWIEJCZYK: Objection, your Honor.

THE COURT: Sustained.

MR. TARLOWE: We can take that down.

BY MR. TARLOWE:

Q. And you testified on direct examination that you do not recall being aware at the time of SEA-1, that there was a $2 million consultant payment to Li & Fung. Do you recall that

**LAJPCOL3        Margolis - Cross                    Page 1418**

testimony?

A. I do.

Q. Okay. And sitting here today, do you recall that there was a $2 million consulting payment made to Li & Fung?

A. Correct.

Q. Do you recall that?

A. Now, I do, yes, based on -- I'm aware of the $2 million based on the e-mails that I just saw. This was eight years ago, so I --

Q. And both of the events you were testifying about were eight years ago, correct?

A. Correct.

Q. It's hard to remember things that happened eight years ago?

A. Yes.

Q. And were you -- do you recall being aware at the time that there was a $2 million consulting payment received by Li & Fung?

A. I -- yes. Based on what I just saw, I would have had to have if I read the e-mail.

Q. Okay. And you're not sure whether you read them or not?

A. I'm sure I read them.

Q. And you did know that Li & Fung received a one-time consultant fee of $2 million from Iconix in connection with SEA-1, correct?

A. Correct.

**LAJPCOL3        Margolis - Cross                    Page 1419**

Q. And you knew that at the time?

A. Correct.

Q. And, in fact, you were -- do you recall that you and Dave Thomas were working on a model, a financial model, relating to the integration of TLC?

A. I do.

Q. And TLC is a licensing company in the UK, correct?

A. Correct.

Q. And Li & Fung purchased TLC in January 2014?

A. That's correct.

Q. And you and Mr. Thomas were working on a financial model relating to the combination of Li & Fung and TLC, correct?

A. That's correct.

Q. And one of the things that you and Mr. Thomas were doing, you were trying to establish a baseline of revenue for the business going forward, correct?

A. Correct.

Q. And in order to establish the baseline, you wanted to exclude one-time items that were not recurring items. Do you recall that?

A. I do recall that.

Q. And one of the items that you suggested be excluded was a $2 million consultant fee from Iconix in connection with SEA-1?

A. That -- that would make sense if it was a one time, a one-time fee.

LAJPCOL3        Margolis - Cross        Page 1420

Q. And you understood that that fee was revenue to Li & Fung, correct?
A. I would believe so, yes.
Q. In 2013, Li & Fung also received a $1.8 million consultancy fee from FCI, right?
        MR. SOLOWIEJCZYK: Objection.
        THE COURT: Overruled.
A. I don't -- I don't remember the exact term when we acquired FCI.
Q. And FCI refers to Fun Characters International?
A. Yes.
Q. And you worked on the Disney portion of the FCI transaction?
A. Yes.
Q. And do you recall that Li & Fung received a $1.8 million consultant fee from FCI?
A. I don't remember the details of the transaction.
Q. Can we please show the witness what's marked for identification as Defense Exhibit 2091.
        Mr. Margolis, read to yourself -- take a moment read to yourself the top e-mail.
        (Pause)
        Does that refresh your recollection that in 2013 Li & Fung received a $1.8 million consultancy fee from FCI?
A. Yes.

LAJPCOL3        Margolis - Cross        Page 1421

Q. We can take that down.
        And in 2013, Li & Fung also received consulting fees from other business partners, correct?
A. I -- I don't -- yes.
Q. Let's take a look at Defense Exhibit 1174-A21, which is in evidence. And if we could go to page 3, please.
        Do you recall that -- well, do you recall that Li & Fung received a $500,000 consulting fee from the estate of Marilyn Monroe?
A. I -- I don't remember this.
Q. Okay. Marilyn Monroe has nothing to do with Iconix, correct?
        MR. SOLOWIEJCZYK: Objection, foundation.
        THE COURT: Overruled.
A. Correct.
Q. Let's take a look at Defense Exhibit 1174-A22 in evidence, and if we could look at page 2. Do you recall, in 2013, LF received a $750,000 consulting fee for China and Southeast Asia for the Spyder brand?
A. I do. I don't recall this.
Q. Okay. It's -- the Spyder brand is not an Iconix-owned brand, correct?
A. That's correct.
Q. And let's also take a look at Defense Exhibit 1174-A23 in evidence. If we could look at page 2. Do you recall Li & Fung

LAJPCOL3        Margolis - Cross        Page 1422

receiving, in 2013, a $500,000 consulting fee for China and Southeast Asia for the Juicy Couture brand?
A. I don't.
        (Continued on next page)

LAJMCOL4        Margolis - Cross        Page 1423

Q. The Juicy Couture brand was owned by Authentic Brands Group?
A. Yes, sir.
Q. That's not Iconix, correct?
A. Correct.
Q. The government asked you on direct questions about whether you did certain things with other joint venture partners.
        Do you recall that?
A. Yes.
Q. In 2013, Li & Fung didn't have other joint venture partners. LF Asia, right?
A. That's correct.
Q. You weren't allowed to do joint ventures before 2013, right?
A. That's correct.
Q. The invoices I just showed you from Marilyn Monroe, Spyder, and Juicy Couture, do you recall that Li & Fung was acting as an agent for those brands?
A. We were.
Q. As an agent you received agency fees, correct?
A. Correct.
Q. You received commissions?
A. Yes, sir.
Q. And then you invoiced those partners for additional consulting fees, correct?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

---

LAJMCOL4     Margolis - Cross     Page 1424

A. I don't recall.

Q. The consulting fees received from those parties were revenue for Li & Fung, correct?

A. Correct.

Q. Do you recall that there were instances in which Li & Fung specifically invoiced parties for consultancy fees so that Li & Fung could recognize the revenue?

A. I am not aware.

MR. TARLOWE: Let's show the witness what's marked for identification as Defense Exhibit 2276. If we could focus on the top e-mail.

Q. Mr. Margolis, take a moment and read that to yourself.

Does that refresh your recollection, sir, that there were times when Li & Fung, or LF Asia, invoiced a business partner for one-time consultancy fees so that Li & Fung could recognize the amount as revenue?

A. Yes, sir.

MR. TARLOWE: You can take that down.

Q. I want to shift gears for a moment and talk about what we have been referring to as SEA-2. OK?

A. Yes.

Q. And that is the joint venture transaction on or about June 30, 2014, correct?

A. Correct.

Q. By the way, we are calling these SEA-1, SEA-2, SEA-3

---

LAJMCOL4     Margolis - Cross     Page 1425

because 2 and 3 were structured as amendments to the first one, right?

A. That's correct.

Q. But 2 and 3 have nothing to do with Southeast Asia, right?

A. Correct.

Q. Now, you're aware that in the SEA-2 transaction documents there is nothing about any obligation on the part of Iconix to make a future marketing payment to GBG, correct?

A. Correct.

Q. And you did not personally hear anyone at Iconix make a commitment to make a future marketing payment to GBG at the time of the SEA-2 transaction, correct?

A. I believe Seth Horowitz.

Q. Sir, at the time of the transaction you did not personally hear anyone make a commitment to make a future payment?

A. Correct.

Q. If you didn't hear anyone make a commitment, you certainly didn't hear anyone make a firm commitment, correct?

A. Correct.

Q. And you testified on direct that it was your understanding that there was a firm commitment, correct?

A. Correct.

Q. But you didn't hear anyone make a firm commitment, correct?

A. Correct.

Q. You didn't hear anyone make a commitment at all.

---

LAJMCOL4     Margolis - Cross     Page 1426

A. Correct.

Q. In fact, you are making an assumption that there was an agreement by Iconix to make a future payment, correct?

A. Correct.

Q. And you told the government you don't recall a specific conversation where Jason Rabin said that he specifically spoke to Neil Cole about this deal, correct?

A. Correct.

Q. You don't recall a specific conversation with Jason Rabin about a supposed commitment or promise by Iconix to make a future marketing payment?

A. Jason Rabin told me --

Q. Sir, you don't recall a specific conversation with Mr. Rabin?

A. I don't.

Q. Now, the transaction closed on or about June 30, 2014, but you began discussing a possible transaction with Seth Horowitz months before that, correct?

A. Correct.

Q. And in April of 2014, you met with Seth Horowitz to discuss potential Umbro China and Lee Cooper Europe transactions, correct?

A. Correct.

Q. By the way, the Umbro China, that ultimately became part of SEA-3, correct?

---

LAJMCOL4     Margolis - Cross     Page 1427

A. Yes.

Q. And Lee Cooper Europe ultimately never happened, right?

A. Correct.

Q. When you spoke with Mr. Horowitz in April 2014, Mr. Horowitz agreed to both of those deals having backstops, correct?

A. Correct.

Q. And the backstop referred -- the backstop related to puts, correct, put options?

A. Correct.

Q. What the backstop refers to is if after a certain number of years Li & Fung were to sell its JV interest back to Iconix, there would be a floor or a minimum price that Iconix would have to pay, correct?

A. Correct.

Q. And that was sometimes referred to as a backstop.

A. Correct.

Q. That was something that Seth Horowitz agreed to, correct?

A. Correct.

Q. After that April 2014 meeting with Seth Horowitz, you continued in May and June to have conversations with Seth Horowitz about a potential transaction, correct?

A. Correct.

MR. TARLOWE: Let's take a look at Defense Exhibit 1198 and 1198-A1, which are in evidence.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,
October 19, 2021

| LAJMCOL4 | Margolis - Cross | Page 1428 |
| --- | --- | --- |

Q. Mr. Margolis, do you recognize this as a draft term sheet that Seth Horowitz sent you on May 2, 2014?

A. Yes, sir.

Q. The term sheet proposed an overall deal with a purchase price of approximately $25.3 million, correct?

A. Correct.

Q. It included three components, correct?

A. Yes.

Q. The first was Korea, right?

A. Yes, sir.

Q. Second was Europe and Turkey for certain brands?

A. Correct.

Q. And the third was Lee Cooper Europe, correct?

A. Correct.

Q. Now, you made some revisions to this term sheet and sent it back to Seth Horowitz, correct?

A. Correct.

MR. TARLOWE: And let's take a look at Defense Exhibit 1205 and 1205-A1, both in evidence.

Q. Here Mr. Margolis, this is an e-mail where you sent to Seth Horowitz a revised term sheet, correct?

A. I see an e-mail to Ron. I don't see it to Seth.

Q. The top e-mail.

A. Oh, yes.

Q. Looking at the attachment, the e-mail is May 6, 2014,

| LAJMCOL4 | Margolis - Cross | Page 1429 |
| --- | --- | --- |

correct?

A. Correct.

Q. And the attachment has a deal with a purchase price, a proposed deal with a purchase price of approximately $24.9 million, correct?

A. Correct.

Q. It's got the same three components, correct?

A. Correct.

Q. Korea is the first one, right?

A. Correct.

Q. And Europe and Turkey for certain brands?

A. Yes.

Q. Then third, Lee Cooper Europe, correct?

A. Yes.

MR. TARLOWE: We can take that down.

Q. You learned from Seth Horowitz that the Lee Cooper Europe component of the transaction would have to be structured differently than had been discussed.

A. Correct.

MR. TARLOWE: Let's please show the witness what's marked for identification as Defense Exhibit 1210.

Q. This is an e-mail that Seth Horowitz sent to you and Ethan Cole?

A. Correct.

MR. TARLOWE: We offer Defense Exhibit 1210.

| LAJMCOL4 | Margolis - Cross | Page 1430 |
| --- | --- | --- |

MR. SOLOWIEJCZYK: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1210 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

Q. So this is a May 13, 2014 e-mail from Seth Horowitz to you and Ethan Cole, correct?

A. Correct.

Q. Seth Horowitz wrote: Jared and Ethan, below is an explanation of the structure that our attorneys feel is necessary for our Lee Cooper relationship in Europe. It is slightly different than what we discussed, as explained below.

So this was Seth Horowitz informing you that the Lee Cooper Europe portion of the transaction would have to be structured in a slightly different way than you had discussed, correct?

A. Correct.

Q. And Seth Horowitz then wrote: Want to make sure this gets in the PIP.

You see that?

A. Correct.

Q. And the PIP is a reference to an internal memo at Li & Fung that goes to the investment committee, correct?

A. Yes, sir.

Q. That's a memo that goes to the investment committee because

| LAJMCOL4 | Margolis - Cross | Page 1431 |
| --- | --- | --- |

the investment committee has to approve transactions, correct?

A. Correct.

Q. So Seth Horowitz was updating you on the structure so that you could make sure that PIP was accurate and complete, correct?

A. Correct.

MR. TARLOWE: We can take that down.

Q. On June 3, 2014, you and others from GBG had a meeting with Seth Horowitz to continue the discussions about a potential transaction.

Do you recall that?

A. Yes.

MR. TARLOWE: Let's show to the witness, please, Defense Exhibit 1229 for identification.

Q. This is an e-mail exchange between you and Seth Horowitz and Ethan Cole?

A. Yes.

Q. It's relating to discussions about a potential SEA-2 transaction?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 1229.

MR. SOLOWIEJCZYK: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1229 received in evidence)

MR. TARLOWE: May we publish it?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                   October 19, 2021

| LAJMCOL4 | Margolis - Cross | Page 1432 |
| --- | --- | --- |

THE COURT: You may.

MR. TARLOWE: Let's start chronologically. Let's go to page 4.

Q. The e-mail in the middle, that's an e-mail from Ethan Cole to Seth Horowitz, right?

A. Yes.

Q. And he refers to today's meeting. I wanted to reach out to address the confusion in today's meeting.

You see that?

A. I do.

Q. And that was a meeting that you and others at GBG had with Seth Horowitz, right?

A. Yes.

Q. And Ethan Cole said -- he explained the confusion had to do with the floor on the put call, right?

A. Yes.

Q. And then Ethan Cole said: I believe Jared -- that's a reference to you, right?

A. Yes.

Q. -- is going to reach out to you separately to discuss how best to proceed.

You see that?

A. I do.

Q. Then if we go up to the bottom of the first page, at the very bottom of this page, the very bottom there is an e-mail

| LAJMCOL4 | Margolis - Cross | Page 1433 |
| --- | --- | --- |

from Ethan Cole to Seth Horowitz on June 4, correct?

A. Correct.

Q. All the way on the bottom.

If we scroll to the next page, you see that you were cc'd on that e-mail, right?

A. Yes.

Q. It says: Hi, Seth, below is an overview of our understanding of the proposed transaction.

You see that?

A. I do.

Q. And the proposed transaction includes a total purchase price of approximately $24.9 million, correct?

A. Correct.

Q. And it includes those same three components that we saw before, correct?

A. Correct.

Q. Korea was the first, second was Europe and Turkey for certain brands, and third was Lee Cooper Europe, right?

A. Correct.

Q. If we go back to the first page of the e-mail, so the next e-mail in sequence, Seth Horowitz replies: Ethan, attached is your document redlined with our comments.

That means Seth Horowitz provided comments on the proposed deal terms, correct?

A. Correct.

| LAJMCOL4 | Margolis - Cross | Page 1434 |
| --- | --- | --- |

Q. Now, let's look at your response to Seth Horowitz. You say: After reviewing your markup, I believe we are generally in agreement. The one item of note is regarding the $3 million plug. During our conversations, we came to the understanding that LF would receive 3 million in contribution for 2014 if we closed by June 30.

You see that?

A. Yes.

Q. And the $3 million plug was a minimum guaranteed distribution from the joint venture, correct?

A. Correct.

Q. So the way that works is, the joint venture, the parties generally each receive about 50 percent of the profits from the joint venture, right?

A. Correct.

Q. And the plug, which you were referring to as the plug, or the minimum guaranteed distribution, what that meant was, Seth Horowitz was telling you that if the profits aren't enough to pay out $3 million, we will guarantee you at least $3 million?

A. Correct.

Q. That $3 million contribution was essential to GBG, correct?

A. Yes.

Q. The next sentence says: Needless to say, this $3 million contribution was a large factor in getting the requisite approvals to move this deal forward.

| LAJMCOL4 | Margolis - Cross | Page 1435 |
| --- | --- | --- |

Do you see that?

A. Correct.

Q. Now, the $3 million contribution, that was based on a $25 million transaction, correct?

A. I don't recall.

Q. The summary that we just looked at --

A. Was 25 million.

Q. Was 25 million, correct?

A. Correct.

Q. That included Lee Cooper Europe, right?

A. Correct.

Q. So the $3 million contribution that was a large factor in getting the requisite approvals, that was based on a transaction that included Lee Cooper Europe, correct?

A. Correct.

Q. And then you said, regarding the $1 million plug in 2015: I believe your markup, while contrary to my understanding, is fair and reasonable, so we are in agreement on that point.

You see that?

A. I do.

Q. So you and Seth Horowitz came to an agreement about that, correct?

A. Correct.

Q. And that's on June 5, 2014, this e-mail, correct?

A. Correct.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL4    Margolis - Cross    Page 1436

MR. TARLOWE: We can take that down.

Let's please publish Defense Exhibit 1239 in evidence.

Q. On June 12, you e-mailed Seth Horowitz asking him to please call you on your mobile as soon as he can, right?

A. Yes.

Q. And do you recall around this time --

MR. TARLOWE: We can take that down.

Let's publish Defense Exhibit 1243, which is in evidence.

Q. This is an e-mail from the next day, June 13, 2014, correct?

A. Correct.

Q. And you are reporting to Seth Horowitz on the status of the transaction, correct, or the discussions within LF about the transaction, correct?

A. Correct.

Q. And you write: I spoke with the team last night to discuss the upcoming IC meeting and the finishing touches for the PIP.

Upcoming IC meeting refers to an investment committee meeting at Li & Fung, correct?

A. Correct.

Q. And the finishing touches for the PIP is the PIP memo that goes to the investment committee, right?

A. Correct.

Q. And you said: As a final point, we need to add the details

LAJMCOL4    Margolis - Cross    Page 1437

of the procedure/mechanism that Iconix will use to pay LF the $3 million in contribution in 2014 and the $1 million plug in 2015. Right?

A. Yes.

Q. What you are talking about is the minimum guarantee, right?

A. Correct.

Q. That minimum guarantee, that was important to GBG, correct?

A. It was.

Q. And you then say: I also received an update from legal. The documents will be turned by Monday, Tuesday at the latest. The proposed language for the LC option, which we will close by the end of Q3, will be armed in the documents that we will send over.

Do you see that?

A. I do.

Q. The LC option is a reference to Lee Cooper option, correct?

A. Correct.

Q. The Lee Cooper option, the reason you referred to it as an option was because what you were discussing with Mr. Horowitz was that GBG would have the right to acquire Lee Cooper later in the year?

A. That's correct.

Q. And that's what an option -- an option gives the option holder the right to buy or sell something in the future.

A. That's correct.

LAJMCOL4    Margolis - Cross    Page 1438

Q. And your understanding was that Li & Fung's lawyers would include language in the written agreement for a Lee Cooper option, right?

A. Yes.

Q. That's what you meant when you said, the proposed language for the LC option will be articulated in the documents that we sent over, right?

A. Correct.

Q. You meant Li & Fung's lawyers would draft an agreement that included a Lee Cooper option, right?

A. Correct.

Q. And that they would send those documents over to Iconix so that they could be reviewed by the Iconix lawyers, right?

A. Correct.

MR. TARLOWE: If we could now show the witness what's marked for identification as Defense Exhibit 2077.

Q. Mr. Margolis, this is an e-mail exchange between you and Seth Horowitz from June 13, 2014. If you look at the e-mail all the way on the bottom, it's a continuation of what we were just looking at. Correct?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 2077.

MR. SOLOWIEJCZYK: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 2077 received in evidence)

LAJMCOL4    Margolis - Cross    Page 1439

MR. TARLOWE: May we publish it?

THE COURT: You may.

Q. So the e-mail on the bottom, the June 13, 10:55 a.m. e-mail from you to Seth, that's the one we just looked at, right?

A. Correct.

Q. Then Seth Horowitz replies and he says: Number 1. Will your legal team add those terms in the turn of the doc.

You see that?

A. I do.

Q. You understood he was referring to the Lee Cooper option, right?

A. Yes.

Q. Now let's look at your reply on top. You say: Yes. Our legal team will add the LC option language to the documents.

You see that?

A. I do.

Q. Then you said: Once you have a chance to discuss internally, please let me know when we can expect to receive an overview of the mechanism for the two guarantees.

You see that?

A. I do.

Q. Do you recall that there was an issue at Li & Fung about whether Lee Cooper could take place in the second quarter because of the upcoming spinoff?

A. I do.

# A-365

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL4     Margolis - Cross     Page 1440

Q. Because of the upcoming spinoff, there was some uncertainty about whether the Lee Cooper Europe transaction could happen in the second quarter, right?

A. Yes.

Q. And you wanted to make sure that you still got the full $3 million guarantee even if Lee Cooper dropped out of the transaction, correct?

A. That's correct.

MR. TARLOWE: We can take that down.

Q. Do you recall that on June 17, 2014, you had a breakfast meeting with Seth Horowitz, Angela Farrugia, and Melvin Thomas at the Four Seasons Hotel in Las Vegas?

A. I remember we met. I don't recall breakfast, but I remember we met.

MR. TARLOWE: Let's show the witness what's marked for identification as Defense Exhibit 2112.

Q. Does that refresh your recollection that you met on June 17, 2014 with Seth Horowitz, Melvin Thomas, and Angela Farrugia?

A. Yes.

Q. The meeting was at the Four Seasons Hotel in Las Vegas?

A. Correct.

MR. TARLOWE: We can take that down.

Q. Do you remember that while you were at that meeting with Seth Horowitz -- by the way, Angela Farrugia is somebody from

LAJMCOL4     Margolis - Cross     Page 1441

TLC?

A. Correct.

Q. And Melvin Thomas, who is that?

A. They were partners. They were the cofounders.

Q. Do you recall that while you were at that meeting at the Four Seasons Hotel in Vegas, Ethan Cole asked you to confirm certain details about the Lee Cooper option with Seth Horowitz?

A. I don't remember.

MR. TARLOWE: Can we please show the witness what's marked for identification as Defense Exhibit 1255. You know what. We don't. Sorry.

Q. Do you recall discussion at that June 17 meeting about when the Lee Cooper option would have to be exercised by?

A. I don't remember.

Q. Do you recall discussion at that June 17 meeting about TLC taking over all of the marketing work for Lee Cooper Europe?

A. I do remember those conversations.

Q. In fact, there were a number of conversations about TLC taking over the Lee Cooper Europe marketing work, correct?

A. Yes.

Q. That was something that TLC was excited about, right?

A. Yes.

Q. Now, on June 18, the day after that meeting, do you recall speaking with Joe Favuzza about the Lee Cooper Europe deal?

A. I don't remember.

LAJMCOL4     Margolis - Cross     Page 1442

MR. TARLOWE: Let's show the witness what's marked for identification as Defense Exhibit 1259, please.

Q. Does that refresh your recollection that on June 18, 2014, you spoke with Joe Favuzza regarding the Lee Cooper deal?

A. Yes.

MR. TARLOWE: We offer Defense Exhibit 1259.

MR. SOLOWIEJCZYK: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1259 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

Q. On June 18, you received a message from Amanda Azzoli. Who was that?

A. She was my former assistant.

Q. It says: If you don't mind, could you please make sure that Jared calls Ethan and Joe Favuzza ASAP. It's regarding Lee Cooper deal.

Do you see that?

A. I do.

Q. Joe Favuzza was who?

A. He was part of the GBG team.

Q. The Lee Cooper deal, that's the Lee Cooper Europe deal, right?

A. That's correct.

Q. Then you confirm that you did speak with Joe Favuzza,

LAJMCOL4     Margolis - Cross     Page 1443

correct?

A. Correct.

Q. Do you recall that as of June 18, 2014, Li & Fung had determined that it could not proceed with the Lee Cooper Europe option?

A. I recall -- I don't remember exactly when, but I recall us not being able to move forward with it.

Q. Do you recall specifically not be able to move forward with the option?

A. Correct.

Q. And that had to do with the upcoming spinoff?

A. I believe so.

MR. TARLOWE: Let's take a look at Defense Exhibit 1261, which is in evidence.

Q. If we look at the top e-mail, it's June 18, 2014, correct?

A. Correct.

Q. Mr. Famulak says: Not sure what this does to the deal, but Ed is definitely right. We can't do the option.

You see that?

A. I do.

Q. Your understanding is, the option refers to a Lee Cooper Europe?

MR. SOLOWIEJCZYK: Your Honor, objection. He is not on this e-mail, as far as I can tell.

THE COURT: He can still ask the question.

# A-366

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

---

LAJMCOL4     Margolis - Cross     Page 1444

A. Can you please repeat the question?

Q. Sure.

Your understanding is that that reference by Mr. Famulak, that we can't do the option, is a reference to the Lee Cooper option, correct?

MR. SOLOWIEJCZYK: Objection. He is asking for his understanding as to words that were uttered he wasn't even privy to.

THE COURT: Sustained.

Q. You had discussions with Mr. Favuzza around June 18, 2014, about Lee Cooper?

A. Yes.

Q. Those discussions were about a Lee Cooper option?

A. I don't remember the actual discussion, but I saw the e-mail.

Q. You recall that you spoke with Mr. Favuzza about the Lee Cooper Europe portion of the component -- sorry, the Lee Cooper Europe component of the transaction.

A. I don't remember the specifics, but, yes, I was told to meet -- to speak with him about it, so I'm sure I spoke with him about it.

Q. Are you aware that a revised PIP memo was circulated on June 18, 2014?

A. I believe so.

Q. Are you aware that a revised PIP memo was circulated on

---

LAJMCOL4     Margolis - Cross     Page 1445

June 18, 2014 with a proposed purchase price of $14.9 million?

A. I believe -- I don't remember the exact number, but that sounds in the ballpark.

MR. TARLOWE: Can we please show the witness what's marked for identification as Defense Exhibit 2280.

Q. Does that refresh your recollection that a revised PIP memo was circulated on June 18, 2014 with a purchase price of $14.9 million?

A. Yes.

Q. And that was for a transaction that no longer included Lee Cooper Europe, correct?

A. Correct.

Q. It included the Korea component, right?

A. Yes, sir.

Q. And it included the Europe component for certain brands.

A. Correct.

MR. TARLOWE: We can take that down.

If we could please publish Defense Exhibit 1267 in evidence. Let's take a look at the very bottom of the first page. Very bottom is an e-mail from Seth Horowitz to Mr. Margolis. Then it spills over to the second page.

Q. You see that in this e-mail Seth Horowitz asked you: Did the investment committee approve the amendment?

You see that?

A. I do.

---

LAJMCOL4     Margolis - Cross     Page 1446

Q. Let's look at your response. Your response is: Yes. We are good to go. Will close on all non Lee Cooper now and have an understanding to close prior to year end.

Do you see that?

A. I do.

Q. Your understanding, as of June 19, 2014, was that GBG would close on all non Lee Cooper components of the transaction in the second quarter and have an understanding to close Lee Cooper Europe sometime before the year end, correct?

A. Correct.

MR. TARLOWE: Let's show the witness what's marked for identification as Defense Exhibit 1291-A1.

Q. This is an e-mail exchange between you and Kevin Chow of LF Asia regarding the SEA-2 transaction?

A. That's right.

MR. TARLOWE: We offer Defense Exhibit 1291-A1.

MR. SOLOWIEJCZYK: May I just review it for a moment, your Honor?

THE COURT: Um-hum.

MR. SOLOWIEJCZYK: Objection. Hearsay.

THE COURT: Let's see the parties at sidebar.

(Continued on next page)

---

LAJMCOL4     Margolis - Cross     Page 1447

(At sidebar)

THE COURT: This is a purely internal e-mail?

MR. SOLOWIEJCZYK: It's between Mr. Margolis and Kevin Chow. It seems like it's being offered for its truth to me. That's how it appears, based on the face of it.

THE COURT: Is it being offered for the truth?

MR. TARLOWE: I don't think so, Judge. It's being offered to show that Mr. Margolis believed that there was an understanding that the deal would get done. It's his state of mind.

MR. SOLOWIEJCZYK: They could ask him that question if he had such an understanding. But it seems like they are trying to offer it to show that understanding existed based on the face of the e-mail.

THE COURT: That's what it seems like to me, Mr. Tarlowe.

MR. TARLOWE: I'm trying to establish that he believed there was an understanding, which is important because this ends up not happening. So I wanted to compare that to the understanding he has testified about with respect to a purported giveback to make the point that understandings are not necessarily agreements.

THE COURT: Has he been asked whether he had such an understanding just now?

MR. TARLOWE: No. I don't think so.

---

# A-367

| LAJMCOL4 | Margolis - Cross | Page 1448 |
|---|---|---|

THE COURT: Why don't you ask him.

(Continued on next page)

| LAJMCOL4 | Margolis - Cross | Page 1450 |
|---|---|---|

A. Correct.

Q. And Mr. Chow was concerned that GBG might end up in a weak bargaining position if the deal didn't happen, right?

A. Correct.

Q. And the concern was that if you ended up in the third or fourth quarter and Lee Cooper had not happened, Iconix would have greater bargaining power, correct?

A. Correct.

Q. Because you wanted the $3 million guarantee?

A. Correct.

Q. And sometimes in business negotiations the bargaining power of the parties can change, right?

A. Correct.

Q. So, for example, if one side wants something and something is really important to them, the other side might be able to extract something in return for that, right?

A. Correct.

Q. And that was Mr. Chow's concern, correct?

MR. SOLOWIEJCZYK: Objection.

THE COURT: Sustained.

Q. You told Mr. Chow that there was nothing to worry about because the terms had already been agreed to, correct?

A. Correct.

Q. And that was with respect to the Lee Cooper Europe component, correct?

| LAJMCOL4 | Margolis - Cross | Page 1449 |
|---|---|---|

(In open court)

THE COURT: Mr. Tarlowe.

Q. Mr. Margolis, was it your understanding, as of June 25, 2014, that there was an understanding between Iconix and Li & Fung to do the Lee Cooper Europe deal in the third quarter?

A. Yes.

Q. And it was your understanding, as of June 25, that the terms had already been agreed on, right?

A. Correct.

Q. And do you recall having a discussion with Kevin Chow on June 25, 2014 about the timing of Lee Cooper?

MR. SOLOWIEJCZYK: Objection.

THE COURT: Overruled.

A. I do.

Q. And there was some concern on the part of Mr. Chow that if the Lee Cooper Europe transaction did not happen by the end of the third quarter, GBG might not get that $3 million guarantee, right?

A. Correct.

Q. Because that $3 million guarantee, that was based on a transaction that included all three components: Europe, Korea and Lee Cooper Europe, right?

A. Correct.

Q. But now Lee Cooper Europe was no longer part of the SEA-2 transaction, right?

| LAJMCOL4 | Margolis - Cross | Page 1451 |
|---|---|---|

A. I believe so.

Q. You believed that the Lee Cooper Europe deal was going to happen, correct?

A. I thought it was going to happen.

Q. You believed there was already an understanding between Li & Fung and Iconix that Lee Cooper Europe would happen later in the year, correct?

A. I did.

Q. That understanding was not a part of the written agreements, correct?

A. I don't believe so.

Q. And a Lee Cooper Europe transaction between GBG and Iconix never took place, right?

A. Can you please repeat that?

Q. Sure. A Lee Cooper Europe transaction never took place.

A. Correct.

Q. Iconix decided not to proceed with the Lee Cooper Europe transaction, correct?

A. I don't recall who --

Q. Well, GBG wanted Lee Cooper Europe, correct?

A. Yes.

Q. In fact, that was the component of the transaction that you wanted the most.

A. Correct.

Q. So -- go ahead.

LAJMCOL4          Margolis - Cross          Page 1452

A. I answered my question.  Yes.
Q. Now, do you recall that it was Iconix that decided not to go forward with the Lee Cooper Europe transaction?
A. Correct.
Q. And you were devastated that it didn't happen, correct?
A. I was disappointed.
Q. You were not devastated?
A. I don't remember exactly, but I was looking forward to it.
Q. Do you recall telling the government that you were devastated that Lee Cooper Europe did not happen?
A. I very well could have.
Q. The agreement that you thought existed in June 2014 turned out not to exist, correct?
A. Correct.
Q. You were making an assumption that there was an agreement, correct?
A. With Lee Cooper?
Q. Yeah.
A. Yes.
Q. And you were wrong?
A. Yes.
      MR. TARLOWE: May we publish Government Exhibit 1044, which is in evidence.
      THE COURT: You may.
Q. Mr. Margolis, this was an e-mail you were shown during your

LAJMCOL4          Margolis - Cross          Page 1453

direct examination.
      Do you recall this e-mail?
      MR. TARLOWE: We can maybe fly through a few pages.
Q. This is the e-mail where the Mayer Brown lawyer sent revised versions of the SEA-2 deal documents?
A. Yes.
Q. Do you recall that?
      If we look at page 2 of the e-mail and we look at number 1, it says the Lee Cooper agreements have been removed from part B.  They have been left in part C, but we understand they should be removed, as the Lee Cooper aspects of the deal will happen later.
      Do you see that?
A. I do.
Q. As of this e-mail on June 25, 2014, the transaction being contemplated does not include Lee Cooper Europe, correct?
A. Correct.
      MR. TARLOWE: Now let's look at the pages with the Bates numbers that end in 110 to 111.
Q. You recall you were shown this markup of a transaction document during your direct testimony?
A. Yes.
Q. And you see here the purchase price is $15.9 million, approximately?
A. Yes.

LAJMCOL4          Margolis - Cross          Page 1454

      MR. TARLOWE: If we could turn to the next page.
Q. You see that there is a line that says note:  To discuss further, the minimum contribution guarantee and the novation of the SEA and Europe contracts.
      Do you see that?
A. Yes.
Q. That's a note that the lawyers have added to the document, correct?
A. Correct.
Q. One of the things to discuss further was what would happen to that $3 million minimum contribution now that Lee Cooper was no longer part of the deal, correct?
A. Correct.
Q. If you look at the top of this document, the date, you see that it has Mayer Brown comments June 25 as compared to a Gibson Dunn draft on May 8.
      Do you see those dates?
A. I do.
Q. And as of May 8, Lee Cooper Europe was part of the contemplated transaction, correct?
A. Correct.
Q. And the minimum guarantee, as of May 8, was expected to be $3 million, right?
A. Yes.
Q. So between the time of the original draft on May 8 and this

LAJMCOL4          Margolis - Cross          Page 1455

revised version, there was a change in the terms of what assets LF was going to be purchasing an interest in, correct?
A. Correct.
Q. Now, do you recall you were asked that exact same question on direct and gave the opposite answer?
A. I don't.
Q. You were asked on direct:  Between the original amendment we saw and this revised version, was there any change in the terms of what assets LF Asia actually was going to be purchasing an interest in?
"A.  No, sir."
      That's at 1114, line 17 to 20.
      Do you recall that testimony?
A. I do.
      MR. TARLOWE: Let's take a look at Defense Exhibit 2116 in evidence.
Q. Let's start with the e-mail on the bottom, which is from Seth Horowitz to you.
      Do you see that?
A. Yes.
Q. And Seth Horowitz wrote to you, this is on June 25:  Based upon the separated timing of the Lee Cooper transaction, we have guaranteed a $1.2 million distribution guarantee in 2014 for the brands we are adding to Europe via the SE Asia agreement.  We will put a $1.8 million distribution guarantee

| LAJMCOL4 | Margolis - Cross | Page 1456 |
|---|---|---|

for 2014 for Lee Cooper in that agreement. Therefore, the $3 million guarantee for 2014 is in effect.

Do you see that?

A. I do.

Q. So what Seth Horowitz is telling you is, the $3 million guarantee that had been discussed is now being split, 1.2 million to what's left in SEA-2 and 1.8 million will go with the Lee Cooper deal when that happens, correct?

A. Correct.

Q. And then let's look at the response to that. Actually, you forwarded -- it looks like you forwarded to Ethan Cole saying: Shouldn't be a problem, question mark.

Do you see that?

A. I do.

Q. And then Ethan Cole responds to you: So you guys have -- now Seth Horowitz is off the chain, and Ethan Cole writes to you: I don't see a problem with this other than the fact that we put 1.5 million for the non Lee Cooper Europe brands in the PIP.

Do you see that?

A. Yes.

Q. And then Ethan Cole goes on to say: I'm sure Seth wouldn't mind allocating it 1.5 LC and 1.5 non LC brands.

Do you see that?

A. I do.

| LAJMCOL4 | Margolis - Cross | Page 1457 |
|---|---|---|

Q. So Ethan Cole was letting you know that the only problem with this could be that the PIP included a guarantee of 1.5 million and now Seth Horowitz is saying 1.2 million, right?

A. Yes.

Q. Ethan Cole then said: I'm sure Seth wouldn't mind allocating it 1.5 and 1.5.

You see that?

A. I do.

Q. The reason you and Ethan Cole were discussing making that change or getting Mr. Horowitz to make that change was so that the PIP would be accurate, right?

A. Correct.

Q. Because the PIP had a $1.5 million guarantee number, but Seth Horowitz was saying it was going to be 1.2 million, right?

A. Yes.

Q. And it's important for the PIP to be accurate, right?

A. Correct.

Q. This was a $300,000 difference, right?

A. Yes.

Q. Even as to a $300,000 difference, you and Ethan Cole wanted to make sure that the PIP was accurate, correct?

A. Correct.

Q. Let's look at your response to Ethan Cole. You said: Yes. Please ask him. Meaning, please ask Mr. Horowitz to agree to the $1.5 million number, correct?

| LAJMCOL4 | Margolis - Cross | Page 1458 |
|---|---|---|

A. Correct.

Q. And Horowitz in fact did agree to the $1.5 million number, correct?

A. Correct.

Q. He was willing to accommodate that request from GBG, correct?

A. Correct.

MR. TARLOWE: Let's take a look at Defense Exhibit 1312 and 1312-A1 in evidence.

Q. The document on the right is a PIP memo, dated June 27, 2014.

Do you see that?

A. I do.

Q. And the project named Brand 2, that was the project name for SEA-2, correct?

A. Correct.

Q. And the document on the left is an e-mail transmitting the PIP memo to members of the investment committee, correct?

A. Correct.

Q. For a meeting that will be held on June 28.

A. Correct.

Q. Now, I want to look at the to line of the e-mail. That includes the members of the investment committee, correct?

A. Correct.

Q. Bruce Rockowitz, who was that?

| LAJMCOL4 | Margolis - Cross | Page 1459 |
|---|---|---|

A. Bruce was the CEO of GBG.

Q. Dow Famulak?

A. He was the president of GBG.

Q. Ed Lam?

A. He was the CFO of Li & Fung.

Q. Emily Mak?

A. She was the president of one of the Li & Fung divisions.

Q. There were 10 to 15 different Li & Fung divisions?

A. Yes.

Q. Jason Rabin was the head of one of them?

A. Correct.

Q. All of those division leaders, they reported up to -- who did they report up to?

A. Either Dow or Bruce.

Q. Also on the to line is Victor Fung. He is one of the principals of Li & Fung?

A. That's correct.

Q. And William Fung is also one of the principals?

A. That's correct.

Q. These are among the most senior people within all of Li & Fung, correct?

A. Correct.

Q. That's who sits on the investment committee?

A. Correct.

Q. These people are all senior to you or were all senior to

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

---

LAJMCOL4    Margolis - Cross    Page 1460

you, correct.

A. Correct.

Q. Let's take a look at the PIP memo. The opinion memo is from Jason Rabin and Dow Famulak, correct?

A. That's correct.

MR. TARLOWE: If we look where it says executive summary down to the bottom. Maybe we can just blow up that. Yes. Thank you.

Q. You see that the transaction includes two components, Korea and Europe, correct?

A. That's right.

Q. While those early term sheets that we were looking at that had three components, this has just the first two of those components, right?

A. Yes.

Q. It doesn't have the Lee Cooper Europe component, right?

A. Correct.

Q. And the total price for these components in this PIP memo is $15.9 million, correct?

A. Correct.

THE COURT: Mr. Tarlowe, it's 12:50, so we will take our next break.

Twenty minutes, ladies and gentlemen. Don't discuss the case.

(Jury not present)

---

LAJMCOL4    Margolis - Cross    Page 1461

THE COURT: Mr. Margolis, you may step down. Anything to bring up?

MR. SOLOWIEJCZYK: Not from the government.

MR. REISNER: No, your Honor.

THE COURT: Don't be late.

(Recess)

(Continued on next page)

---

LAJPCOL5    Margolis - Cross    Page 1462

(In open court; jury not present)

THE COURT: Okay. Can we get Mr. Margolis?

(Jury present)

THE COURT: Everyone, be seated.

Mr. Tarlowe.

MR. TARLOWE: Thank you, your Honor.

BY MR. TARLOWE:

Q. I think when we broke, we were talking about Defense Exhibit 1312 and 1312-A1. Yes, we can just do-A1. So this is the PIP memo, a revised PIP memo from June 27th, 2014, correct?

A. Correct.

Q. And we saw that on the bottom it's got a $15.9 million purchase price for two components, Korea and Europe, correct?

A. Correct.

Q. And that's not Lee Cooper, the other brands in Europe, correct?

A. Correct.

Q. And if we turn to page 2 of this document and look at the section entitled "Iconic," which I gather should be Iconix, "Minimum Guarantee;" do you see that?

A. I do.

Q. And that describes the $1.5 million guarantee for 2014 and a $1 million guarantee for 2015, correct?

A. Correct.

Q. And those guarantees were an important part -- withdrawn.

---

LAJPCOL5    Margolis - Cross    Page 1463

The guarantees were an important term from GBG's perspective, correct?

A. Correct.

Q. It was an important part of the deal, right?

A. Yes.

Q. And that added up to about two-and-a-half million dollars?

A. Correct.

Q. And it's in the PIP, right?

A. It is.

Q. There's nothing in the PIP memo about a $5 million future marketing payment by Iconix to GBG, correct?

A. That's correct.

Q. You can take that down.

And you were not part of the investment committee, correct?

A. I was not.

Q. You never attended investment committee meetings, right?

A. That's correct.

Q. What's your understanding as to whether the investment committee knew of the agreement that you claim existed?

A. That they didn't -- that they weren't aware.

Q. So the investment committee, which included the most senior people at Li & Fung, it's your understanding that they agreed to pay $15.9 million based on the terms that are outlined in the PIP memo, correct?

---

# A-371

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

---

LAJPCOL5     Margolis - Cross     Page 1464

A. I -- I don't -- I would not -- I wasn't involved in the conversations with the investment committee.

Q. You have no reason to believe that the investment committee did not agree to pay $15.9 million for the SEA-2 assets?

MR. SOLOWIEJCZYK: Objection, foundation.

THE COURT: Sustained.

Q. Now, you testified during your direct examination that GBG would not have paid $15.9 million without this supposed promise to get it back, right?

A. Correct.

Q. But you're not the one who decided how much money GBG would pay for a transaction, correct?

A. That's correct.

Q. The investment committee decided that, right?

A. That's correct.

Q. And the PIP memo that the investment committee relied on in approving this transaction said nothing about a future $5 million marketing payment, correct?

A. That's correct.

Q. And you have no firsthand knowledge as to why the investment committee decided to pay that price, correct?

A. Correct.

Q. And you understand that the deal documents, the transaction documents, those were prepared by attorneys, correct?

A. That's correct.

---

LAJPCOL5     Margolis - Cross     Page 1465

Q. Including Mr. Smits?

A. Yes, sir.

Q. He was the in-house lawyer at GBG?

A. That's correct.

Q. And there's nothing in any of the transaction documents that obligates Iconix to make a future marketing payment to GBG, correct?

A. That's correct.

Q. And the government showed you this morning a document that referred to overpays; do you recall that?

A. Yes.

Q. And that's something that you discussed with Mr. Smits, the in-house lawyer, correct?

A. That's correct.

Q. And you didn't ask Mr. Smits to keep anything out of the written agreements, correct?

A. I did not.

Q. And you're aware that Li & Fung or GBG entered into other arrangements with Iconix that included commitments or obligations by Iconix to provide marketing support that were in the written agreement, right?

A. That's correct.

Q. And, for example, if you take a look at Defense Exhibit 408-A1, which is in evidence, do you recall that there was a license agreement entered into in December of 2013

---

LAJPCOL5     Margolis - Cross     Page 1466

between a GBG affiliate, Kids Headquarters, and Iconix for a Rocawear Kids brand?

A. Yes.

Q. And under this arrangement, GBG or Kids Headquarters, had to make royalty payments to Iconix, correct?

A. That's correct.

Q. And if we look at page 5, there's a paragraph No. 8, Showroom Support; do you see that?

A. I do.

Q. And that provides that Iconix will make a one-time payment of $3,500,000 to the licensee, which is GBG, to be used to support a showroom; do you see that?

A. I do.

Q. And Iconix's obligation to make a one-time payment of $3.5 million in showroom support, it's right there in the document, right?

A. It is.

Q. And you had testified on your direct examination earlier today about a joint venture with Iconix in the Middle East and North Africa, correct?

A. Correct.

Q. And in that transaction -- we can take the exhibit down. Thank you.

In that transaction, Iconix agreed to make a $3.1 million payment to GBG for due diligence and market analysis,

---

LAJPCOL5     Margolis - Cross     Page 1467

correct?

A. Correct.

Q. And that commitment to make a $3.1 million payment, it's in the documents, right?

A. Can you -- I believe -- I believe it's in the documents.

Q. You don't know whether it's in the document or not in the documents?

A. Correct.

Q. Well, why don't we show the witness what's marked for identification as Defense Exhibit 549.

This is a subscription agreement relating to the MENA transaction, correct?

A. Correct.

MR. TARLOWE: We offer Defense Exhibit 549.

MR. SOLOWIEJCZYK: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 549 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. So this is one of the transaction documents for the MENA transaction, correct?

A. Yes.

Q. And if we turn to page 17 and what's in the paragraph M, like Michael, "Iconix shall pay to GBG by wire transfer in

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

---

LAJPCOL5    Margolis - Cross    Page 1468

immediately available funds, an amount equal to $3,100,000 for expenses related to due diligence and market analysis in the Middle East and North Africa."  Do you see that?

A.  I do.

Q.  And that commitment by Iconix to pay $3.1 million to GBG, it's in the agreement, correct?

A.  Correct.

Q.  And by the way, Iconix did do -- sorry, withdrawn. Li & Fung did work for Iconix in the Middle East, correct?

A.  That's correct.

Q.  And you were aware that the team did things in relation to due diligence, correct?

A.  That's correct.

Q.  And the Middle East was much more difficult and fragmented than the China or Southeast Asia markets, correct?

A.  That's correct.

Q.  And let's take a look at Government Exhibit 1167, which you looked at this morning during your direct testimony.  And do you recall that you were shown this this morning?

A.  Yes.

Q.  And you testified this morning, I believe, that the diligence market analysis did not make sense to you, correct?

A.  I did.

Q.  And this e-mail includes Robert Smits, who was the general

---

LAJPCOL5    Margolis - Cross    Page 1469

counsel at GBG, correct?

A.  Correct.

Q.  Did Mr. Smits tell you that he thought it didn't make sense?

A.  He did not.

Q.  And there was work that had to be done because the Middle East was more difficult and fragmented than the other markets, correct?

A.  Correct.

Q.  We can take that down. Now, part of the SEA-2 transaction included Korea, correct?

A.  Correct.

Q.  And you believed that Li & Fung's strongest team in Asia was in Korea, correct?

A.  That's correct.

Q.  And just a few weeks before the SEA-2 transaction took place, GBG acquired a company called Cocobon, right?

A.  That's correct.

Q.  You worked on that transaction, right?

A.  I did.

Q.  And Cocobon was a licensing company in Korea, right?

A.  That's right.

Q.  And you expected that Cocobon would provide additional local knowledge and expertise to help develop the Iconix brands

---

LAJPCOL5    Margolis - Cross    Page 1470

in Korea, correct?

A.  Correct.

Q.  One of the brands in the Korea portion was London Fog, correct?

A.  Correct.

Q.  And do you recall that shortly after the SEA-2 transaction took place, a problem developed with London Fog in Korea?

A.  I do.

Q.  And GBG had some buyer's remorse about the Korea portion of the transaction, right?

A.  Yes.

Q.  Let's take a look at Defense Exhibit 1349, which is in evidence, and this is an e-mail from Willy Burkhardt at Iconix to Neil Cole, copying Seth Horowitz.  You're not on this e-mail.  The subject is "London Fog Korea;" do you see that?

A.  Yes.

Q.  And No. 10 says "It seems like they have buyer's remorse over the Korea component of the deal," and I think you just testified you do remember having some buyer's remorse?

A.  I remember that we had an issue with London Fog.

Q.  Do you remember what the issue was?

A.  The licensee was going out of business, or there was something with the partner in Korea.  I don't remember specifically.

Q.  Okay.  But a problem had developed?

---

LAJPCOL5    Margolis - Cross    Page 1471

A.  Right.

Q.  With respect to London Fog in Korea?

A.  Correct.

Q.  And it then says, "Jared is salivating at the possible 500 to 650,000 and is agitating that if Iconix decides not to accept the deal from NS despite the assessment of the team on the ground, that the brand is dead, then he expects us to make him whole."  Do you see that?

A.  Yes.

Q.  And do you recall -- do you know what "NS" is a reference to?

A.  I don't remember.

Q.  Okay.  Do you recall that there was some discussion about a possible settlement for 500 to $650,000?

A.  Vaguely.

Q.  And do you recall communicating to Iconix that if Iconix did not accept that deal, you expected them to make you whole?

A.  Yes.

Q.  And what you meant by that was if London Fog in Korea did not perform as expected, you would expect Iconix to make you whole for that, correct?

A.  Correct.

Q.  And there was no commitment or obligation by Iconix to do that, right?

A.  Not that I -- not that I recall.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJPCOL5     Margolis - Cross     Page 1472

Q. And what you were saying was, we're business partners, and if this doesn't pan out, make it up to me; that's what you're saying, right?

A. Yes.

Q. And that's how long-time, long-term business partners talk to each other, right?

A. That's correct.

Q. You're asking them to make an accommodation for you, right?

A. Yes.

Q. You can take that down.

And internally at GBG, you guys had attributed a value of $3 million just to the London Fog brand in Korea, correct?

A. I remember it was a significant part of the overall business.

Q. Let's show just the witness Defense Exhibit 1348 for identification.

Take a moment, Mr. Margolis, and read that to yourself, please.

(Pause)

And if you could just highlight the third sentence, the third line.

Does that refresh your recollection, Mr. Margolis, that GBG valued the London Fog portion of the Korea component of the deal at $3 million?

MR. SOLOWIEJCZYK: Could we have a quick sidebar, your

LAJPCOL5     Margolis - Cross     Page 1473

Honor?

THE COURT: Sure.

(Continued on next page)

LAJPCOL5     Margolis - Cross     Page 1474

(At the side bar)

MR. SOLOWIEJCZYK: I'm just a little confused as to what it is Mr. Tarlowe is showing him because it's got a "from" line, there's no "to" line, and I also just want to be sure because in this courtroom, obviously, we load things up, we can zoom in, that it's clear to him. He's reading something that it says from Ethan Cole but it doesn't have a "to" line or anything like that. I'm just kind of confused what the document is.

MR. TARLOWE: It was produced to us by --

MR. SOLOWIEJCZYK: No, I know.

MR. TARLOWE: It's an e-mail from Ethan Cole. I'm not planning to offer it. I'm just asking to refresh his recollection. I'm happy to show him the whole document.

THE COURT: You did show him the whole document.

MR. TARLOWE: Yes.

MR. SOLOWIEJCZYK: I wasn't sure.

THE COURT: This is the whole document.

MR. SOLOWIEJCZYK: Okay. All right. I just wanted to be sure what this was.

THE COURT: It's a little stream of consciousness, but....

MR. TARLOWE: Yes.

MR. SOLOWIEJCZYK: Okay. Thank you, your Honor.

(Continued on next page)

LAJPCOL5     Margolis - Cross     Page 1475

(In open court)

BY MR. TARLOWE:

Q. Mr. Margolis, does that refresh your recollection that GBG internally valued the London Fog portion of Korea at $3 million?

A. I really don't remember.

THE COURT: Sorry, Mr. Margolis, could I just bother you to get a little closer to the microphone.

THE WITNESS: Sorry.

THE COURT: Thank you.

THE WITNESS: Should I repeat my answer?

THE COURT: Sure.

A. I don't -- I really don't recall what the value was for London Fog.

BY MR. TARLOWE:

Q. Now, GBG was spun off from Li & Fung in July of 2014?

A. Yes.

Q. And after that spinoff, GBG became a separate, standalone company, correct?

A. That's correct.

Q. It was a public company, correct?

A. Yes, sir.

Q. And there was some pressure to meet financial goals?

A. Yes.

Q. And you understood that the brand management group, that's

# A-374

| LAJPCOL5 | Margolis - Cross | Page 1476 |
| --- | --- | --- |

the group you were part of?

A. Yes, sir.

Q. You understood that the brand management group had to try to stay within its budget, correct?

A. Correct.

Q. Management would ask if brand management was going to hit its numbers for the year, correct?

A. That's correct.

Q. And Mr. Rabin told you that if the business underperformed, you might not get your bonus, right?

A. I don't recall that.

Q. Why don't we show the witness what's marked for identification as Defense Exhibit 3558-007, and if we could go to page 3, please, and the sentence there. Yes.

Does that refresh your recollection that you were always told that if the business underperformed, you would not get a bonus?

A. Yes.

Q. We can take that down.

And the brand management business in the 2014 time frame generated around 17 to $20 million in EBITDA?

A. I -- I recall that.

Q. Do you recall in August of 2014, that Jason Rabin called Seth Horowitz with a list of asks?

A. A list of?

| LAJPCOL5 | Margolis - Cross | Page 1477 |
| --- | --- | --- |

Q. Asks, A-s-k-s.

A. I don't.

Q. Do you recall Mr. Rabin telling Mr. Horowitz that Mr. Rabin needed $10 million and more?

A. I don't.

Q. Do you recall Mr. Rabin looking for opportunities to generate $10 million and more of revenue for GBG?

A. I don't.

Q. Do you recall Mr. Rabin expressing to Iconix that he had financial pressure to generate revenue?

A. I don't.

Q. When GBG gets paid for marketing expenses, that comes in as revenue to GBG, right?

A. I don't know for sure the answer on that.

Q. Can we please show the witness Defense Exhibit 3558-025 for identification, page 2.

Does that refresh your recollection that you understand that when GBG gets paid for marketing expenses, it comes in as revenue?

A. Yes.

Q. And based on your discussions with Mr. Rabin, is it your understanding that he understood that as well?

A. I don't -- I don't know what he understood.

Q. Do you recall that in August 2014, Jason Rabin asked Iconix for marketing support?

| LAJPCOL5 | Margolis - Cross | Page 1478 |
| --- | --- | --- |

A. I don't recall.

Q. Now, you were shown a number of invoices during your direct examination, invoices for marketing work; do you recall that?

A. Yes.

Q. And the first set of invoices was for Mossimo, Zoo York and Peanuts China, correct?

A. Correct.

Q. And you believed that those invoices incorporated work that had been done, correct?

A. Correct.

Q. And the first time, first time you met with the government, you told them that there was a lot of work done for Mossimo, right?

A. I -- that makes sense.

Q. You also told the government during your first meeting with the prosecutors, that there was a lot of stuff done for Zoo York, correct?

A. That's correct.

Q. And you also told the government during your first meeting with the prosecutors, that there was work for Peanuts too, correct?

A. That's correct.

Q. And you didn't know -- you told them you didn't know the exact amount of work that was done, right?

A. I don't remember exactly what I said, but....

| LAJPCOL5 | Margolis - Cross | Page 1479 |
| --- | --- | --- |

Q. Do you recall telling the government that you did not remember getting paid for marketing besides from Iconix?

A. I believe so.

Q. Do you recall getting paid for marketing besides from Iconix?

A. I don't believe so.

Q. And you were in a marketing function at GBG, correct?

A. It wasn't a licensing function.

Q. You didn't do marketing?

A. We did some marketing.

Q. Let's publish Defense Exhibit 2102-A2.

And was GBG a licensee for the Jones New York brand?

A. Yes.

Q. And that's a brand that was controlled by Authentic Brands Group?

A. Yes.

Q. Not Iconix, correct?

A. Correct.

Q. And this is an invoice to Authentic Brands Group from Global Brands Group U.S.A. for $3 million, correct?

A. Correct.

Q. And the description is "Support to launch in-store marketing fixtures at Dillards," correct?

MR. SOLOWIEJCZYK: Objection to this line of question.

THE COURT: I'm sorry, what did you say?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJPCOL5          Margolis - Cross          Page 1480

MR. SOLOWIEJCZYK: We object to this line of questioning on foundation grounds, among others.

THE COURT: Overruled.

BY MR. TARLOWE:

Q. The description is "support to launch in-store marketing fixtures at Dillards," right?

A. Yes.

Q. The amount in that invoice is a round dollar figure ending in zeros, right?

A. Correct.

Q. And that's the same question the government asked you about the Iconix invoices, correct?

MR. SOLOWIEJCZYK: Objection, your Honor. Maybe we could have a sidebar quickly?

THE COURT: Okay.

(Continued on next page)

LAJPCOL5          Margolis - Cross          Page 1481

(At the side bar)

MR. SOLOWIEJCZYK: Your Honor, I think there are two issues. No. 1 is I'm not sure that we elicited anything that he's now impeaching, but more fundamentally, there's no testimony that this man has ever seen this invoice before in his life.

He's just throwing up pieces of paper from internal GBG documents and acting like Mr. Margolis has some idea what this is or has seen it before. And, you know, that, I don't believe, is a proper foundation for this line of questioning. I understand it's in evidence, but he's basically showing him stuff that we don't know if he's ever seen.

MR. TARLOWE: Mr. Rabin testified that this witness was in charge of marketing and that when Rabin needed to prepare invoices for Iconix, he went to Mr. Margolis. There was extensive testimony this morning about preparation of invoices.

The government's position is that those are sinister in some way, and I'm just trying to establish that, to show him that GBG routinely issued marketing invoices that look exactly like the ones that were sent to Iconix. The document is in evidence. I'm happy to ask him whether he's seen it.

MR. SOLOWIEJCZYK: That's what we would ask.

MR. TARLOWE: Yes.

THE COURT: Do that.

LAJPCOL5          Margolis - Cross          Page 1482

(In open court)

BY MR. TARLOWE:

Q. Mr. Margolis, did you work at all on the Jones New York brand?

A. I did not.

Q. Who did?

A. The GBG -- the U.S.A. GBG team.

Q. And in 2017, were you part of Global Brands Group U.S.A.?

A. I was still part of the brand management business. I wasn't affiliated with this.

Q. You weren't affiliated with what?

A. I wasn't involved, I should say. The business that I was responsible for had nothing to do with the Jones New York brand.

Q. Did you have any involvement with Authentic Brands Group?

A. With -- yes, with Spyder.

Q. Okay. And what was your relationship with Spyder?

A. We became the licensee. We looked for partners -- we looked for licensing partners in Asia, and then we ended up taking a license to operate in Korea.

Q. Okay. And you helped build the Spyder business in Korea, correct?

A. That's correct.

Q. Do you recall invoicing Spyder for reimbursement of start-up costs in Korea in 2015?

LAJPCOL5          Margolis - Cross          Page 1483

A. I don't remember exactly the terms of the deal.

Q. Let's take a look. Let's show the witness, please, Defense Exhibit 2086-A1 for identification.

And do you recognize that as an invoice from Global Brands Group Korea relating to Spyder in Korea?

A. I do.

MR. TARLOWE: We offer Defense Exhibit 2086-A1.

MR. SOLOWIEJCZYK: Your Honor, we object for reasons we have stated previously.

THE COURT: Overruled. It will be received.

(Defendant's Exhibit 2086-A1 received in evidence)

MR. TARLOWE: May we publish it?

THE COURT: You may.

BY MR. TARLOWE:

Q. And so this, what we're looking at, is an invoice from GBG Korea to Spyder Active Sports, correct?

A. Correct.

Q. That is not an Iconix brand, correct?

A. Correct.

Q. And it says, invoice to ABG. That's Authentic Brands Group?

A. Correct.

Q. And it says, "Reimbursement of start-up costs;" do you see that?

A. I do.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

---

LAJPCOL5          Margolis - Cross          Page 1484

Q. And the amount is $2,500,000, correct?
A. Correct.
Q. And that amount, that's a round dollar figure ending in zeros; is that correct?
A. It is.
Q. And you worked on the Spyder brand in Korea?
A. I did.
Q. And when you were preparing this invoice, to your knowledge, did GBG conduct an analysis of the number of hours that were worked by GBG in connection with the startup of Spyder?
A. No.
Q. We can take that down.
    Did you have anything to do with the Marilyn Monroe brand?
A. In Asia, I did.
Q. During what time period?
A. Around 2014 or 2013.
Q. Do you recall invoicing Marilyn Monroe for 2013 marketing distribution for China and Southeast Asia?
A. I don't.
Q. Can we please publish Defense Exhibit 1174-A21 at page 2.
    And you see that this is from November 30th, 2013, in the top right? Do you see that?
A. Yes.

---

LAJPCOL5          Margolis - Cross          Page 1485

Q. So at that time, you were part of LF Asia, right?
A. Yes.
Q. And you had some involvement with the estate of Marilyn Monroe you just testified, right?
A. Yes.
    (Continued on next page)

---

LAJMCOL6          Margolis - Cross          Page 1486

Q. And this is an invoice for a 2013 marketing contribution for China and SEA for Marilyn Monroe, correct?
A. Correct.
Q. For $500,000?
A. Yes.
Q. This has nothing to do with Iconix, correct?
A. Correct.
Q. And $500,000 amount, that's a round dollar figure ending in zeros, correct?
A. Correct.
Q. In preparing this invoice, to your knowledge, did GBG conduct analysis of the number of hours that were worked by GBG in marketing the Marilyn Monroe brand?
A. No.
    MR. TARLOWE: Let's take a look at Defense Exhibit 1174-A22 in evidence at page 1.
Q. Now, you testified a moment ago that you were involved in the Spyder brand in Asia, correct?
A. Correct.
Q. In fact, you helped build the Spyder business in Korea, correct?
A. Correct.
Q. And do you recall invoicing Spyder Active Sports in 2013 for a marketing contribution for China and Southeast Asia for $500,000?

---

LAJMCOL6          Margolis - Cross          Page 1487

A. I don't.
Q. Do you recognize this document?
A. I don't.
    MR. TARLOWE: Can we flip to the third page of the same document.
Q. This one is for 2013 brand support and startup fees, $750,000.
    Do you see that?
A. Yes.
Q. Are you familiar with this document?
A. I'm not.
    MR. TARLOWE: Let's take a look at Defense Exhibit 2102-A1, which is in evidence.
Q. This is for the Spyder brand, correct?
A. Correct.
Q. And you see this invoice is for $8 million?
A. Yes.
Q. And Spyder is a brand you worked on, correct?
A. Correct.
Q. And it has nothing to do with Iconix, correct?
A. Correct.
Q. Did you have anything to do with the Juicy Couture brand?
A. I did not.
    MR. TARLOWE: Let's take a look at Defense Exhibit 1174-A23 in evidence.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                      October 19, 2021

LAJMCOL6          Margolis - Cross          Page 1488

Q. Again, in 2013, you were part of LF Asia, correct?

A. I was.

Q. Do you recall in 2013 invoicing Authentic Brands Group $500,000 for a marketing contribution for China and Southeast Asia?

A. I don't recall.

Q. Do you now recall that GBG did in fact get paid for marketing besides from Iconix?

A. Yes.

Q. And you told the government during one of your meetings that you did not remember getting paid for marketing besides from Iconix?

MR. SOLOWIEJCZYK: Objection, your Honor.

THE COURT: Overruled.

A. I did.

Q. That was not accurate, correct?

A. I wasn't involved in these -- in this, so I only spoke to the best of my memory.

Q. I think you testified a few moments ago that payments received by GBG for marketing invoices results in revenue for GBG, correct?

A. That's correct.

Q. Now, you previously told the government during one of your meetings that you did not know how marketing payments flowed to the P&L, or profit-and-loss, statement.

LAJMCOL6          Margolis - Cross          Page 1489

Do you recall that?

A. I do.

MR. SOLOWIEJCZYK: Objection, your Honor.

THE COURT: Overruled.

Q. I'm sorry. I didn't hear if there was an answer.

THE COURT: I overruled the objection.

Did you answer it?

A. Can you please repeat the question.

Q. You previously told the government that you did not know how marketing payments flowed through to the P&L, or profit-and-loss, statements?

A. Yes, I was confused. At the end of the day, we would --

Q. It's a yes or no question. You've answered it.

A. Yes.

Q. Thank you.

And you previously told the government that your understanding was that GBG was not benefiting from the marketing services in the P&L, right?

MR. SOLOWIEJCZYK: Objection, your Honor, to the manner in which this is being done.

THE COURT: Overruled.

A. Yes.

Q. But, in fact, GBG was benefiting from the marketing services, correct?

A. That's correct.

LAJMCOL6          Margolis - Cross          Page 1490

Q. Because it was going to GBG's profit-and-loss statement, or P&L, right?

A. Correct.

Q. And within GBG there were different groups, right?

A. Yes.

Q. Those groups had their own financial targets or goals, correct?

A. Correct.

Q. So brand management had the own goal?

A. Correct.

Q. And TLC was separate from that, correct?

A. It was part of. They were part of us.

Q. They didn't have their own P&L?

A. They had their own P&L.

Q. So there was a P&L for a TLC and there was a P&L for brand management, correct?

A. Correct.

Q. There were bonus pools for the different groups, right?

A. Correct.

Q. And there was a different bonus pool for the brand management and for TLC, right?

A. Correct.

Q. And those bonuses depended on the P&L for the respective businesses, correct?

A. Correct.

LAJMCOL6          Margolis - Cross          Page 1491

Q. And you were shown a number of e-mails this morning, mostly Ethan Cole e-mails, where he was gathering information from TLC.

Do you recall that?

A. I do.

Q. If those invoices were associated with TLC, then TLC would get credit for the payments from Iconix, correct?

A. Correct.

Q. But if they were associated with brand management, they would go to your P&L, correct?

A. I --

Q. Can you answer that question yes or no?

A. I don't think so.

Q. You don't think you can answer it yes or no?

A. No. I don't think it came to my P&L.

Q. Where do you think it went?

A. To the overall business.

Q. But there were different P&Ls for different businesses within GBG.

A. Correct.

Q. And you wanted your business to get the credit, correct?

A. My business was all -- I was responsible for all of those. The TLC business rolled into the brand management business.

Q. TLC had a separate P&L?

A. TLC had an earn-out in their acquisition.

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**                                                                 **October 19, 2021**

| LAJMCOL6 | Margolis - Cross | Page 1492 |
|---|---|---|

Q. Do you recall after the first set of invoices was sent you met with Seth Horowitz at GBG office at the Empire State Building?

A. I don't remember exactly when I met with Seth Horowitz, but I met with him multiple times.

Q. Do you recall meeting with him in September of 2014 at which you discussed the invoices, the marketing invoices?

A. I believe so.

Q. And your understanding from that meeting was that GBG needed to provide additional detail to the invoices, correct?

A. Correct.

Q. And you told the government that you discussed the marketing with Seth Horowitz from the Iconix side, right?

A. That's correct.

Q. And on the GBG side Jason Rabin asked you to figure out what was done for marketing because GBG had an opportunity to bill for the services, right?

A. I don't remember exactly the conversation, but I was instructed to figure out the invoicing for the marketing.

Q. Do you recall telling the government that Jason Rabin asked you to figure out what was done for marketing because GBG had an opportunity to bill for the services?

A. I believe so.

Q. Now, Li & Fung and GBG acted as an agent for the Peanuts brand, correct?

| LAJMCOL6 | Margolis - Cross | Page 1493 |
|---|---|---|

A. Correct.

Q. That was a brand owned by Iconix and the Schultz family, correct?

A. Correct.

Q. Li & Fung would do work, would do marketing work, and then sometimes seek reimbursement for that work, correct?

A. Correct.

Q. And sometimes Peanuts would reimburse Li & Fung for the marketing, correct?

A. Correct.

Q. And sometimes they wouldn't, correct?

A. Correct.

Q. Do you remember, in December 2014, that you suggested asking Iconix for a consultancy payment for management time that was spent on Peanuts?

A. I don't remember.

MR. TARLOWE: Let's show the witness Defense Exhibit 1497 for identification.

Q. Sir, does that refresh your recollection that in December 2014, you suggested asking Iconix for a consultancy payment for management time spent on Peanuts?

A. Yes.

Q. And that was time that had already been spent on Peanuts, correct?

A. That's correct.

| LAJMCOL6 | Margolis - Cross | Page 1494 |
|---|---|---|

Q. And you undertook that work without an expectation of being reimbursed for it, correct?

A. Correct.

Q. And then you considered asking for reimbursement, correct?

A. Correct.

Q. That was real time that was spent, correct?

A. Correct.

MR. TARLOWE: We can take that down.

Q. Now, the e-mails you were shown earlier today by the government with Ethan Cole collecting documentation, those were real documents that he was collecting, correct?

A. Correct.

Q. Those were real materials, right?

A. Yes.

Q. They weren't fabricated, right?

A. No.

Q. And the invoices reflected real work that the team did, correct?

A. Correct.

Q. And some of the marketing that GBG did for markets outside the U.S. could also be used in the U.S., right?

A. That's correct.

Q. And GBG, for example, GBG created marketing materials for Starter Black, correct?

A. Correct.

| LAJMCOL6 | Margolis - Cross | Page 1495 |
|---|---|---|

Q. And those were prepared for a market outside the U.S., correct?

A. Correct.

Q. And then Iconix said, essentially, these are pretty good, we want to use these in the U.S., right?

A. Yes.

Q. So GBG invoiced Iconix for the right to use that marketing material in the U.S., correct?

A. We invoiced them. Yes, we did invoice them.

Q. One of invoices was for the use of the Starter Black marking materials in the U.S., correct?

A. Correct.

Q. That's one of the invoices that you were shown this morning by the government?

A. Yes.

Q. There was also money spent on the Zoo York showroom in the United States, right?

A. Yes.

Q. Some of the invoices related to that, correct?

A. Correct.

Q. That's not work that would be the responsibility of the joint venture, right?

A. Correct.

Q. It's not work that would be the responsibility of Iconix Europe, right?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

| LAJMCOL6 | Margolis - Cross | Page 1496 |
|---|---|---|

A. No.

Q. Because it was in the U.S., right?

A. Correct.

Q. And the success of the business in the U.S. can also help the other markets, correct?

A. Correct.

Q. And you testified this morning, I believe, that the invoices from GBG to Iconix were not paid right away, correct?

A. Correct.

Q. In fact, GBG had difficulty getting paid on those invoices, correct?

A. Correct.

MR. TARLOWE: If we look at Government Exhibit 1140 in evidence, and we scroll down.

Ethan Cole. We can start with that one.

Ethan Cole was saying: I just wanted to circle back and see if we received payment. Please let me know if I need to nudge them.

You see that?

A. Yes.

Q. The response is: A sledgehammer may be more effective than a nudge.

You see that?

A. Yes.

Q. That's because Iconix was not paying the invoices, correct?

| LAJMCOL6 | Margolis - Cross | Page 1497 |
|---|---|---|

A. Correct.

Q. If we look at the first page of the e-mail, further up, it says: Please confirm that we have received the first payment as Jared will be with Neil Cole tomorrow and can pressure him if not.

You see that?

A. I do.

Q. And you were asked a number of questions about a document Ethan Cole prepared that you testified was for a December 2 meeting, correct?

A. Correct.

Q. And that was a document prepared in order to assist in your negotiations with Iconix the next day, correct?

A. Correct.

Q. And one of the things you thought you might have to do at that meeting was pressure Iconix to pay the outstanding invoices, correct?

A. Correct.

Q. And you don't recall threatening Iconix that GBG would sue Iconix if they didn't pay those invoices, right?

A. I don't.

MR. TARLOWE: Let's take a look at Government Exhibit 1150 in evidence, which you were shown this morning.

Q. When Ethan Cole told you there is an issue with invoicing at the very top, there is an issue with invoicing for

| LAJMCOL6 | Margolis - Cross | Page 1498 |
|---|---|---|

consulting that won't take place until 2014, the e-mail is dated December of 2014. Do you think that's a typo and he meant 2015?

A. I don't remember.

Q. It's sent December 9, 2014, correct?

A. Yes.

Q. It says: There is an issue for invoicing for consulting that won't take place until 2014. Need to increase amounts for work already complete.

You see that?

A. Yes.

Q. Having read that, do you think that the 2014 reference is a typo and that Ethan Cole meant 2015?

A. Could very well possibly be.

Q. And the issue with invoicing for consulting that wouldn't take place until the following year was that GBG would not be able to record revenue in 2014, correct?

A. Correct.

Q. Let's take a look at those Ethan Cole documents you were shown this morning.

MR. TARLOWE: Let's start with Government Exhibit 1067. You can put it side by side.

Q. This document --

MR. SOLOWIEJCZYK: It's 1068 that's in, Mr. Tarlowe.

MR. TARLOWE: I am being told that the version that's

| LAJMCOL6 | Margolis - Cross | Page 1499 |
|---|---|---|

in is Government Exhibit 1068. It's the same document.

Q. And this document that Ethan Cole prepared, that was an internal GBG document, correct?

A. Correct.

Q. And you told the government you are not sure why Ethan Cole used his Gmail address, correct?

A. Correct.

Q. But that was something that you did from time to time, correct?

A. I'm sure that there is other e-mails from my Gmail --

THE COURT: Mr. Margolis, can you get closer to the microphone, please.

A. I am sure there were other e-mails from the Gmail account.

MR. TARLOWE: We can take that down.

Q. You are not aware of that document ever being provided to Neil Cole, correct?

A. I'm not.

Q. The term overpay, that's a term that was used within GBG, correct?

A. Correct.

Q. There were communications about overpayments with Dow Famulak?

A. I believe so.

Q. With Joe Favuzza?

A. I believe so.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL6    Margolis - Cross    Page 1500

Q. With Rob Smits?

A. Yes.

Q. And he was the general counsel, right?

A. Yes.

Q. And you don't recall whether that term was ever used in discussions with Iconix, correct?

A. I don't recall.

MR. TARLOWE: If we could just look at that for one moment. If we could put that back up for one moment. The next page, please.

Q. Under the $5 million overpay from Iconix Korea, the first bullet point is 2.5 million Rocawear. That's got nothing to do with marketing, correct?

A. Correct.

Q. On the bottom, the additional amounts, the last two bullets say: No wiggle room with Iconix Latin America and possible wiggle room.

You see that?

A. I do.

Q. Those were ongoing negotiations, correct?

A. Correct.

MR. TARLOWE: We can take that down.

Q. And the other document you were shown that Ethan Cole prepared, Government Exhibit 1139, now, this was also an internal GBG document, correct?

LAJMCOL6    Margolis - Cross    Page 1501

A. Correct.

Q. And the term plug, that's not a sinister term, right?

MR. SOLOWIEJCZYK: Objection.

THE COURT: Overruled.

Q. You weren't using plug in any sinister way, correct?

A. No.

Q. And we established earlier, I think, that 15.5 million for LC Umbro China, that's not based on a 5.5 revenue multiple, correct?

A. Correct.

MR. TARLOWE: Can we put that up for one second.

Q. This document is GBG e-mail to GBG e-mail, correct?

A. It is.

Q. There is no Gmail, correct?

A. Correct.

MR. TARLOWE: Now we can take it down. Thank you.

Q. Again, that was a document that you wanted to use in your negotiations with Iconix, right?

A. Correct.

Q. Sometimes in your negotiations with Iconix or other companies you would say things like, hey, we did something for you, we did you a solid, now you do us a solid.

A. Correct.

Q. And at that meeting you asked Iconix to pay the remaining invoices, correct?

LAJMCOL6    Margolis - Cross    Page 1502

A. I believe so.

Q. I am going to move on to the SEA-3 transaction. This is the Lee Cooper and Umbro China transaction in September 2014.

Now, you negotiated the SEA-3 transaction with Seth Horowitz, correct?

A. Correct.

Q. The negotiator on the GBG side was more you than Jason Rabin, right?

A. That's correct.

Q. On the Iconix side the negotiator was Seth Horowitz, correct?

A. Correct.

Q. And you don't specifically remember Mr. Cole being involved, right?

A. That's correct.

Q. In or around September 2014, did you tell Seth Horowitz that Jason Rabin would like to pay $20 million for the China JV?

A. I don't remember.

Q. You testified earlier that you thought the value was 15.5 million, right?

A. Yes.

Q. By the way, how did you come up with that?

A. Based on the numbers that they guaranteed us on.

Q. So your valuation was based on the guarantee?

LAJMCOL6    Margolis - Cross    Page 1503

A. Correct.

Q. Isn't it true that when you do the valuation based on the guarantee, the value is $22 million?

A. I don't know the math offhand.

MR. TARLOWE: Let's take a look at Defense Exhibit 1337, which is in evidence.

Q. Seth Horowitz sent this e-mail to you on August 6, 2014. The subject is multiple and value. And he says: Iconix guaranteeing 3 million in distribution in '15. A 3 million distribution means that revenue would need to be approximately 8 million with approximately 20 percent overhead. 8 million in royalty at 5.5 times put the actual GBG value of 50 percent of the IP at $22 million, not 15.5.

Do you see that?

A. Yes.

Q. Does that refresh your recollection that the value of a 50 percent interest in SEA-3 was actually closer to $22 million?

A. Yes.

MR. TARLOWE: Let's take a look at Government Exhibit 1069, which is in evidence. Let's look at page 2 of this document.

Q. This is a document you are not on, Mr. Margolis. Is this a document you have ever seen before?

A. Not that I remember.

MR. TARLOWE: Under 1b, GBG -- just 1b. It's b2. 1b,

# A-381

LAJMCOL6          Margolis - Cross          Page 1504

little ii, Jared expressed.

Q. You see it says: Jared expressed that Jason would like to pay 20 million for China JV.

Do you recall telling Seth Horowitz that Jason Rabin would like to pay 20 million for the China JV?

A. I don't remember.

MR. TARLOWE: We can take that down.

Q. When GBG pays a purchase price for an investment like a joint venture, that payment does not hit the P&L, right?

A. I don't believe so.

Q. So the payment is treated as a capital expenditure, right?

A. I believe so.

Q. It's an investment. Your profit or loss is not impacted by the price you pay, correct?

A. Correct.

Q. Is that something that you believe, based on your interactions with Mr. Rabin, that he also understood?

A. I can't speak for what he understood.

Q. You had a lot of conversations with Jason Rabin, correct?

A. Yes.

Q. You worked with him on a daily basis?

A. Yes.

Q. Who had a more sophisticated understanding of financial?

A. Jason would.

MR. TARLOWE: May I just have one moment, your Honor?

LAJMCOL6          Margolis - Cross          Page 1505

THE COURT: Yes.

Q. You met with Seth Horowitz on September 11, 2014 to discuss the SEA-3 transaction.

Do you recall that?

A. Yes.

Q. And at that meeting you asked Mr. Horowitz to amend some of the terms to mitigate the risks to GBG.

Do you recall that?

A. I do.

Q. And Mr. Horowitz in fact agreed to those amendments, correct?

A. I believe so.

Q. For example, you asked Horowitz to increase the value of the backstop, correct?

A. Yes.

Q. And he agreed to do that.

A. I believe so.

Q. Now, you viewed the Lee Cooper and Umbro assets in China as valuable, correct?

A. Yes.

Q. In addition to the value of the assets themselves, there was a strategic rationale behind building GBG's relationship with Iconix from a sourcing perspective, correct?

A. Correct.

Q. You understood during the course of the SEA-3 negotiations

LAJMCOL6          Margolis - Cross          Page 1506

that Seth Horowitz was also having conversations with multiple big companies?

A. Yes.

Q. GBG wasn't the only company in the mix, right?

A. Correct.

Q. There was competition for those assets, right?

A. Yes.

Q. And you thought that SEA-3 was a very good opportunity for GBG, correct?

A. Correct.

Q. And later in 2014, GBG entered into a joint venture with David Beckham, correct?

A. Correct.

Q. Do you recall having discussions with Mr. Cole and others about how the David Beckham relationship could be used to the benefit of Umbro and China?

A. I do.

Q. That was something that you were excited about, correct?

A. Correct.

Q. And others were excited about that, correct?

A. Yes.

Q. Because Beckham is maybe the most famous soccer player in the world, right?

A. At the time he was, yes.

Q. And that could benefit Umbro in China, correct?

LAJMCOL6          Margolis - Cross          Page 1507

A. Correct.

MR. TARLOWE: Let's please publish Defense Exhibit 1384-A1, which is in evidence.

Q. Now, this is the PIP memo submitted to the investment committee for project named Brand 3. That's SEA-3, correct?

A. Yes.

Q. And the date is September 12, 2014, correct?

A. Correct.

Q. And it says: Size of amendments, total consideration, $21.5 million.

You see that?

A. I do.

Q. And the line above it, this is for the Southeast Asia JV: Umbro China and Lee Cooper China.

You see that?

A. I do.

Q. This is from you, this memo, correct?

A. Correct.

Q. And it's important that the PIP memo contain all the material terms of a transaction, correct?

A. Correct.

Q. Because the investment committee has to evaluate whether the transaction makes sense from GBG's perspective, correct?

A. Correct.

Q. And the investment committee has to evaluate the purchase

# A-382

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL6          Margolis - Cross          Page 1508

price, correct?

A. Correct.

Q. And the purchase price reflected in this opinion memo from you to the investment committee is $21.5 million, correct?

A. Correct.

Q. And you weren't trying to deceive the investment committee, correct?

A. No.

Q. And there is nothing in this memo that refers to relieving GBG of its Rocawear Kids obligations, correct?

A. Correct.

Q. There is nothing in this memo about GBG getting back $6 million in some way, correct?

A. Correct.

Q. And, in fact, the financial analysis in this memo is based on a purchase price of $21.5 million, correct?

A. Correct.

Q. If you'll turn to page 4 of the memo, you see there is a section on the Iconix guarantee?

A. Yes.

Q. And that's important to include in the memo because that's an important part of the deal, right?

A. Yes.

Q. And it's part of the value that GBG is getting, right?

A. Correct.

LAJMCOL6          Margolis - Cross          Page 1509

Q. If you will turn to the next page of the document, there is a discussion of the five-year put and call rights.
     You see that?

A. I do.

Q. And that also was an important part of the deal from the GBG perspective, right?

A. Yes.

Q. So you wanted to make sure the investment committee had that information, correct?

A. Correct.

Q. Again, there is nothing in here about GBG getting $6 million from Iconix, right?

A. That's correct.

     MR. TARLOWE: We can take that down.

Q. You're aware that lawyers prepared the transaction documents for SEA-3, correct?

A. I am.

Q. Including Mr. Smits?

A. Yes.

Q. And including outside counsel at the Mayer Brown law firm?

A. Yes.

Q. And there is nothing in any of the SEA-3 transaction documents about the termination of the Rocawear Kids license, right?

A. Correct.

LAJMCOL6          Margolis - Cross          Page 1510

Q. There is nothing in any of the SEA-3 transaction documents about GBG being relieved of its Rocawear Kids royalty obligations, correct?

A. Correct.

Q. And you told the government that you did not remember specific conversations surrounding the circumstances of being let out of the Rocawear Kids agreement, right?

A. Correct.

Q. You were not involved in discussions with Iconix about getting royalty relief on Rocawear Kids, right?

A. I wasn't.

Q. And you don't recall talking to Iconix about using Rocawear Kids royalty relief in order to somehow return money to GBG, correct?

A. I don't recall.

Q. When the SEA-3 transaction was finalized on or about September 17, 2014, there was no signed termination agreement for the Rocawear Kids license, right?

A. I don't believe so.

Q. Now, the first time that you spoke with the government was in March of 2019, correct?

A. I believe so.

Q. That was at your home in Florida, right?

A. Yes.

Q. They asked you about the SEA joint ventures, right?

LAJMCOL6          Margolis - Cross          Page 1511

A. Yes.

Q. And you told them that you didn't remember the exact terms of the JV or its amendments, right?

A. Yes.

Q. And you suggested they speak with Rob Smits. You do you recall that?

A. I don't really recall the conversation.

Q. Do you remember telling them that GBG did a lot of marketing for Iconix?

A. I really don't remember what I told them.

Q. After that meeting at your home, there came a time when you started meeting with prosecutors at its U.S. Attorney's Office, right?

A. Yes.

Q. And you understood that they considered you a subject of their investigation, right?

A. Yes.

Q. You understood from the government that your conduct was within the scope of their investigation, correct?

A. I don't remember.

Q. You understood that you could be charged with a crime, correct?

A. I believe so.

Q. Obviously, you did not want that to happen.

A. No.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL6    Margolis - Cross    Page 1512

Q. And you met with the government several times, correct?
A. Correct.
Q. In fact, you have now met with the government about 16 times?
A. In that ballpark.
Q. And you began testifying on Friday of last week, correct?
A. Correct.
Q. You met with them Thursday before your testimony?
A. Correct.
Q. Wednesday?
A. Correct.
Q. Tuesday?
A. Correct.
Q. Monday?
A. Yes.
Q. So you met with them every day last week prior to your testimony on Friday?
A. Yes.
Q. Before that, you met with them several times in October and September, correct?
A. Correct.
Q. October 7?
A. I don't recall --
    MR. TARLOWE: Can we please show the witness Defense Exhibit 3558-41.

LAJMCOL6    Margolis - Cross    Page 1513

    Mr. Klein, can we go to the page before that, please. Maybe we can also show Mr. Margolis the first page.
Q. Mr. Margolis, you recognize this as an agreement that you entered into with the United States Attorney's Office?
A. Yes.
    MR. TARLOWE: We offer Defense Exhibit 3558-41.
    MR. SOLOWIEJCZYK: No objection.
    THE COURT: It will be received.
    (Defendant's Exhibit 3558-41 received in evidence)
    MR. TARLOWE: May we publish it?
    THE COURT: You may.
Q. This is called a proffer agreement, right?
A. Yes.
Q. If you look at the first paragraph it says: The client -- that's you, right?
A. Yes.
Q. -- has agreed to provide the government with information and to respond to questions so that the government may evaluate client's information and responses in making prosecutive decisions.
    You see that?
A. I do.
Q. You understand that that means that the government was going to evaluate the information you provide and your responses to their questions in making their prosecution

LAJMCOL6    Margolis - Cross    Page 1514

decisions, correct?
A. Correct.
Q. On the right -- you sign this agreement every time you meet with the government, correct?
A. Yes.
Q. So you see that the original date is September of 2021 and then there is a whole bunch of other dates for other meetings, correct?
A. Correct.
Q. By the way, the first one is September, but there was an agreement even before this one, right? You started meeting with them before September.
A. Yes.
Q. The government also had you sign a different type of agreement, correct?
A. Correct.
Q. Do you recall that they had you sign something called a tolling agreement?
    MR. TARLOWE: We can take this exhibit down, Mr. Klein. Thank you.
Q. Do you recall that you sign an agreement called a tolling agreement?
A. Yes.
Q. And the tolling agreement extends the time that the government has to bring charges, correct?

LAJMCOL6    Margolis - Cross    Page 1515

A. Correct.
Q. It keeps the threat of a criminal prosecution alive, correct?
A. Correct.
    MR. TARLOWE: Let's take a look at Defense Exhibit 3558-12 for identification. Why don't we show Mr. Margolis the next page as well.
Q. Do you recognize this, sir, as the agreement that you entered into with the government?
A. I do.
    MR. TARLOWE: We offer Defense Exhibit 3558-12.
    MR. SOLOWIEJCZYK: No objection. It will be received.
    (Defendant's Exhibit 3558-12 received in evidence)
    MR. TARLOWE: May we publish it?
    THE COURT: You may.
Q. Mr. Margolis, is your signature on the second page?
A. It is.
Q. This is that tolling agreement?
A. Yes.
Q. So it says in the first paragraph: The government is conducting an investigation concerning a possible --
    THE COURT: Could you slow down, Mr. Tarlowe.
Q. The government is conducting an investigation concerning possible violations of federal criminal law.
    Do you see that?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 19, 2021

LAJMCOL6    Margolis - Cross    Page 1516

A. I do.

Q. Then it lists a bunch of regulations or laws, right?

A. Yes.

Q. And then paragraph 2 says: With respect to any charges that Jared Margolis violated any law of the United States, including, but not limited to those listed above.

You see that?

A. I do.

Q. You understood that this agreement was about potential charges against you?

A. I do.

Q. What the rest of this paragraph says is that the statute of limitations is stopped or paused for the six-month period from September 25, 2019 to March 25, 2020.

Do you see that?

A. I do.

Q. Again, that has the purpose of giving the government more time within which to bring criminal charges against you, correct?

A. Correct.

MR. TARLOWE: If we can zoom out for a moment.

We can take that down.

Q. Now, Mr. Margolis, is it fair to say that you want the prosecutors to be pleased with your testimony?

A. No.

LAJMCOL6    Margolis - Cross    Page 1517

MR. TARLOWE: Can we show the witness Government Exhibit 1257 in evidence.

Q. You were shown this e-mail by the government during your direct testimony on Friday.

Do you recall that?

A. I do.

Q. You were asked the question by the prosecutor: Was what Ethan Cole was saying to Anabel Higgin about why he needed these materials true.

Do you recall being asked that question?

A. I do.

Q. And your answer was: I mean, yeah.

Do you recall giving that answer?

A. I mean, yeah. What was the question again?

Q. Sure.

MR. TARLOWE: Your Honor, may we publish this portion of the transcript?

THE COURT: Of the trial transcript?

MR. TARLOWE: Yes.

THE COURT: Any objection?

MR. SOLOWIEJCZYK: No objection. But we can see it as well.

MR. TARLOWE: It is at page 1159, lines 10 to 14.

Let's start with 10 through 12. Just highlight 10 through 12.

LAJMCOL6    Margolis - Cross    Page 1518

Q. The question was: Was what Ethan Cole was saying to Anabel Higgin why he needed these materials true? You answered: I mean, yeah.

You see that?

A. Yeah.

Q. And then he began another question: Mr. Margolis, let me ask you this. And you said: I'm sorry.

Do you see that?

A. I do.

Q. You said: I'm sorry.

Because it was apparent to you from his question that that wasn't the answer that he wanted, correct?

MR. SOLOWIEJCZYK: Objection.

THE COURT: Overruled.

MR. SOLOWIEJCZYK: Objection, your Honor.

THE COURT: Overruled.

A. That wasn't because I didn't have the answer. I thought I might have been confused on the question.

Q. You said I'm sorry before there was another question asked, right?

A. It's something that I typically say. I've said it to you a couple of times as well.

Q. And then he asked you a few follow-up questions which ended with: That wasn't true, was it? And you said: No.

Right?

LAJMCOL6    Page 1519

A. Yes.

Q. That was the answer you realized you were supposed to give the first time?

A. I'm here to tell the truth and to the best of my memory.

THE COURT: It's 2:40 now, so we will end now.

Ladies and gentlemen, have a wonderful evening. Be safe getting home. Do not discuss the case or read anything about the case.

(Jury not present)

THE COURT: Anything to raise?

MR. SOLOWIEJCZYK: Your Honor, just a scheduling matter. I think it will be fine. But I assume Mr. Tarlowe is close to being done. That's the sense I get. And then we will do a quick redirect.

We just have a witness that we have to -- he has surgery on Thursday, so we have to finish him tomorrow. Given who the witness is, he's an investor, I have no reason to think we would run past 2:40 with that witness, but I just wanted to flag it for your Honor that he's literally going to be operated on Thursday morning. I just want to make sure your Honor is aware of that, and we can get a sense from the defense that they don't have three hours of cross in store for this investor.

MR. REISNER: Is he going to be the immediate witness after this?

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**                                                                                  **October 20, 2021**

| LAKMCOL1 | Page 1523 |
| --- | --- |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

         v.                              19 CR 869 (ER)

NEIL COLE,

                  Defendant.            Trial
------------------------------x
                                New York, N.Y.
                                October 20, 2021
                                    9:00 a.m.

Before:

                HON. EDGARDO RAMOS,

                            District Judge
                             -and a Jury-

                    APPEARANCES

AUDREY STRAUSS
      United States Attorney for the
      Southern District of New York
BY:  NOAH SOLOWIEJCZYK
      SCOTT HARTMAN
      ANDREW M. THOMAS
      Assistant United States Attorneys

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
      Attorneys for Defendant
BY:  LORIN L. REISNER
      RICHARD C. TARLOWE
      ANDREW D. REICH
      AMANDA WEINGARTEN
      ALYSON A. COHEN

Also Present:
      Robert Hupcher, FBI
      Micah Gill, Paralegal
      Peter Charalambous, Paralegal
      Frank Eng, Paralegal

| LAKMCOL1 | Page 1524 |
| --- | --- |

(Trial resumed; jury not present).

THE COURT: Good morning, everyone. It's 9 a.m. Is there anything either side wishes to raise?

MR. SOLOWIEJCZYK: Not from the government, your Honor.

MR. REISNER: Not from the defense, your Honor.

THE COURT: I don't know if this bodes well or ill, but this is the only case I have ever had where there has been almost nothing to discuss in between.

So you are free to do whatever you want.

MR. SOLOWIEJCZYK: Thank you, your Honor.

MR. REISNER: Thank you, your Honor.

(Recess)

THE COURT: Ms. Rivera reports that the jury is asking whether we are on track and, in particular, whether closings will be on Monday or on Tuesday, which is the third week. I would ask that the parties talk and give me an updated estimate so that I can tell the jury after the first break where we are.

MR. THOMAS: Your Honor, in recognition of the time, the government is cutting witnesses from its case and doing everything in its power to rest on Friday of this week.

THE COURT: Wonderful.

Can we get Mr. Margolis.

(Jury present)

THE COURT: We will just get Mr. Margolis in here.

| LAKMCOL1 | Margolis - Cross | Page 1525 |
| --- | --- | --- |

Mr. Tarlowe.

MR. TARLOWE: Thank you, your Honor.

JARED MARGOLIS, resumed.

MR. TARLOWE: Can we please publish Government Exhibit 215 in evidence.

CROSS-EXAMINATION (cont'd)

BY MR. TARLOWE:

Q. Mr. Margolis, this is one of the sets of invoices, correct, or this is one of the invoices?

A. Yes, sir.

Q. The amount of this invoice is $955,710?

A. Yes, sir.

MR. TARLOWE: Can we look at Government Exhibit 214.

Q. That's for $1,940,230 dollars, correct?

A. Yes.

MR. TARLOWE: If we could look at Government Exhibit 241.

Q. That's for $2,467,340, correct?

A. Correct.

Q. If you add those up, those three sets of invoices, it adds up to $5,363,280.

A. I need to -- I'll take your word for it. I don't have a calculator in front of me.

Q. Understood.

Do you know why the amount is greater than $5 million?

| LAKMCOL1 | Margolis - Cross | Page 1526 |
| --- | --- | --- |

A. I don't.

Q. In addition to those three sets of invoices, GBG also received reimbursement of Peanuts' marketing expenses for 2014, correct?

A. Can you please repeat that.

Q. Sure. In addition to those three sets of invoices that we just looked at, GBG also received reimbursement for Peanuts marketing expenses in 2014, correct?

A. I believe so.

Q. Now, you testified during your direct examination about efforts by Ethan Cole to gather information from TLC.

Do you recall that?

A. I do.

Q. And that was an effort to gather supporting documentation to go along with the invoices to Iconix, correct?

A. Correct?

Q. The materials that Ethan Cole collected, those were real materials, correct?

A. They were.

Q. You testified that Mr. Ethan Cole was not transparent with the TLC people about why he was asking for that documentation, right?

A. Yes.

Q. Now, Ethan Cole -- your testimony is that he was not transparent because of this agreement that you claim existed to

UNITED STATES OF AMERICA, v.
NEIL COLE,
October 20, 2021

---

LAKMCOL1        Margolis - Cross        Page 1527

give money -- for Iconix to give money back to GBG, right?

A. Correct.

Q. Now, Ethan Cole could have said to TLC, hey, good news, Iconix is going to reimburse us for some expenses. Can you send me some documentation. Right?

A. He could have.

Q. And that wouldn't have revealed any supposed agreement, right?

A. Correct.

Q. But he didn't do that because you didn't want TLC to get credit for the money coming in from Iconix, correct?

A. I don't remember the reason why. I don't know.

Q. So you don't know why Ethan Cole was not transparent with TLC?

A. It was a long time ago. I don't remember.

MR. TARLOWE: Can we please show the witness Defense Exhibit 2299 for identification.

Q. You recognize this as an e-mail exchange among Ethan Cole, you and others at GBG?

Mr. Margolis, you recognize that?

A. I believe so.

MR. TARLOWE: We offer Defense Exhibit 2299.

MR. SOLOWIEJCZYK: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 2299 received in evidence)

---

LAKMCOL1        Margolis - Cross        Page 1528

MR. TARLOWE: May we publish it?

THE COURT: You may.

Q. I want to start with the e-mail that's in the middle of that page from Ethan Cole to John Reda and others. I think we looked at this e-mail. I think you were shown this on your direct examination the other day.

Do you recall that?

A. Yes.

Q. John Reda, he was in accounting at GBG?

A. Yes.

Q. He was the assistant corporate controller?

A. Correct.

Q. He's an accountant, right?

A. I believe so.

Q. And this is an e-mail between Ethan Cole and John Reda about invoices that were paid by Iconix, correct?

A. Correct.

Q. In reference to the other 16 amount to 2.4 million, that relates to the document we looked at a moment ago, that sort of stack of invoices that added up to approximately $2.4 million, right?

A. Sorry. Which invoices?

Q. Sure. We looked at Government Exhibit 241, which was a set of invoices that added up to approximately $2.4 million.

A. OK.

---

LAKMCOL1        Margolis - Cross        Page 1529

Q. That's what Ethan Cole was referring to in that sentence, correct?

A. I don't know if it was specifically to that.

MR. TARLOWE: Let's scroll up.

Q. And you see John Reda then asks --

MR. TARLOWE: Mr. Klein, can we just go down a little bit so we also capture the e-mail at 10:57 p.m. Thank you.

Q. John Reda responds saying: Ethan and Jared, does this belong to TLC or GBG USA.

Do you see that?

A. Yes.

Q. Ethan Cole responds: These are for GBG. These are unrelated to TLC.

Do you see that?

A. I do.

Q. And your understanding is that Ethan Cole said that in order to ensure that GBG got credit for that money and not TLC, correct?

A. That's what it looks like.

Q. TLC had an earn-out, right?

A. Correct.

Q. What that meant was, if TLC generated a certain amount of profit, TLC would be entitled to more money from GBG, correct?

A. Correct.

Q. That was part of the deal when GBG bought TLC, right?

---

LAKMCOL1        Margolis - Cross        Page 1530

A. Correct.

Q. When GBG bought TLC, GBG paid a flat amount up front, right?

A. Yes.

Q. And then GBG gave TLC an earn-out, right?

A. Correct.

Q. So that if TLC reached certain performance goals, TLC would get more money, right?

A. Correct.

Q. By Ethan Cole telling John Reda that these are for GBG, not TLC, the revenue credit would go to GBG and not to TLC, correct?

A. Correct.

Q. I asked you some questions yesterday about whether you recalled Jason Rabin telling Seth Horowitz in or about August 2014 that Mr. Rabin needed $10 million and more. I think your testimony was you did not recall that. Is that right?

A. Correct.

Q. I think you also said you don't recall Mr. Rabin reaching out to Seth Horowitz in August of 2014 with a list of asks. You don't recall that?

A. I don't.

Q. Do you recall around that time, August 2014, GBG needing a big upfront payment because you were short on your financial goals for 2014?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

**October 20, 2021**

| LAKMCOL1 | Margolis - Cross | Page 1531 |

A. I don't.

MR. TARLOWE: Can we please show the witness what's marked for identification as Defense Exhibit 2308.

Q. Mr. Margolis, does that refresh your recollection that GBG needed a big upfront payment because GBG was short of its financial goals in 2014?

A. I don't remember this.

MR. TARLOWE: We can take that down.

Q. Do you recall a meeting in August of 2014 that you and Ethan Cole had with Iconix where you guys were unhappy with Iconix?

A. I don't.

Q. Ethan Cole at that time, in August 2014, he was relatively new to GBG, right?

A. Yes.

Q. He tended to be pretty quiet in meetings at that time in his career?

A. Correct.

Q. Do you remember that there was a meeting with Iconix in August 2014 where he spoke up, and you had a beef with Iconix?

A. I don't recall that.

MR. TARLOWE: Can we please show the witness what's marked for identification as Defense Exhibit 2309.

Q. Have you had a chance to read that to yourself?

A. I'm reading it.

| LAKMCOL1 | Margolis - Cross | Page 1532 |

Q. Take your time.

A. I don't remember this.

Q. Reading that does not refresh your recollection that you had a meeting in August 2014 with Iconix where you and Ethan Cole had a beef with Iconix?

A. I don't.

MR. TARLOWE: You can take that down.

Q. Ethan Cole, by the way, he didn't deal directly with Neil Cole, correct?

A. Correct.

Q. Now, I asked you some questions yesterday about a Lee Cooper Europe option.

Do you recall we talked about that?

A. Yes.

Q. Now, typically when somebody acquires an option, they pay for an option, right?

A. Correct.

Q. And you pay in order to have the right to buy or sell something in the future, correct?

A. Correct.

Q. That's what an option is.

A. Yes.

(Continued on next page)

| LAKPCOL2 | Margolis - Cross | Page 1533 |

Q. Now, to be clear, Mr. Cole, Neil Cole, never asked you to keep any terms of any of these deals out of the written agreements, correct?

A. Correct.

Q. And you never heard Mr. Cole ask anyone else to keep any terms of the deals out of the written agreements, correct?

A. Correct.

Q. Mr. Cole never asked you to withhold information from a lawyer or an accountant, correct?

A. Correct.

Q. You never heard Mr. Cole ask anyone else to withhold information from a lawyer or an accountant, correct?

A. Correct.

Q. With respect to the SEA-2 transaction, you did not hear Mr. Cole make any commitment to make a future marketing payment to GBG of $5 million, correct?

A. Correct.

Q. And you do not know why the GBG investment committee agreed to pay $15.9 million for the SEA-2 interest, correct?

A. I don't understand that question, I'm sorry.

Q. Sure. The investment committee of GBG decided to pay $15.9 million for GBG's interests in SEA-2, correct?

A. Correct.

Q. And you don't have firsthand knowledge as to why the investment committee decided to pay $15.9 million for that

| LAKPCOL2 | Margolis - Cross | Page 1534 |

interest, correct?

A. Correct.

Q. You do know, however, that the PIP memo that was submitted to the investment committee did not include anything about a $5 million future marketing payment, correct?

A. Correct.

Q. Now, with respect to the SEA-3 transaction, I believe you testified yesterday that you were the principal negotiator of that transaction, correct?

A. Correct.

Q. And Seth Horowitz was the principal negotiator on behalf of Iconix, correct?

A. Correct.

Q. And you were not involved in discussions with Iconix about getting royalty relief on the Rocawear Kids license, right?

A. Yes.

Q. And you don't recall talking to Iconix about using Rocawear Kids royalty relief as some way of returning money to GBG, correct?

A. Correct.

Q. And you did not ever hear Mr. Cole make a commitment to relieve GBG of its Rocawear Kids royalty obligations, correct?

A. Correct.

Q. You do not have firsthand knowledge as to why the investment committee of GBG agreed to pay $21.5 million for

UNITED STATES OF AMERICA, v.
NEIL COLE,

**October 20, 2021**

---

LAKPCOL2          Margolis - Redirect          Page 1535

GBG's interest in SEA-3, correct?

A. Correct.

Q. You do know, however, that the PIP memo that was submitted to the investment committee in connection with SEA-3 did not say anything about GBG getting money back, correct?

A. Correct.

Q. And that was a memo that you authored, correct?

A. It was put together for me, yes.

Q. And you testified about the term "overpay" sometimes being used at GBG, correct?

A. Correct.

Q. But you don't remember ever using that term with Iconix, correct?

A. Correct.

MR. TARLOWE: No further questions.

THE COURT: Anything further, Mr. Solowiejczyk?

MR. SOLOWIEJCZYK: Yes, your Honor.

REDIRECT EXAMINATION

BY MR. SOLOWIEJCZYK:

Q. Mr. Margolis, you were asked a lot of questions by Mr. Tarlowe over the last day. I just want to ask you some very basic questions about some basic facts, okay?

A. Yes.

Q. Mr. Charalambous, if we could put up Government Exhibit 1068 and publish that for the jury.

---

LAKPCOL2          Margolis - Redirect          Page 1536

Mr. Margolis, this is an e-mail from Ethan Cole to you dated August 28th of 2014, correct?

A. Correct.

Q. And the attachment to this e-mail was called "Summary of Various AR," correct?

A. Correct.

Q. "AR" means accounts receivable; is that right?

A. That's right.

Q. That means money that GBG feels it's actually owed; is that right?

A. Yes.

Q. And at this point, as of August 28th, 2014, the SEA-2 deal had already closed; is that correct?

A. Correct.

Q. If you could go to page 2, Mr. Charalambous.

And if we could look at bullet point A, Mr. Margolis, this says "$5 million overpay from Iconix Korea;" do you see that?

A. I do.

Q. Iconix Korea, that's the SEA-2 deal, right?

A. It is.

Q. And by "overpay," you mean pay more than what the parties agreed the deal was worth; is that right?

MR. TARLOWE: Objection, your Honor, to the leading.

THE COURT: Overruled.

---

LAKPCOL2          Margolis - Redirect          Page 1537

A. Correct.

Q. And GBG ended up paying $15 million instead of $10 million on SEA-2; is that correct?

A. Correct.

Q. And to be clear, Mr. Margolis, would GBG have been willing to pay $15 million on SEA-2 if there hadn't been a commitment from Iconix to give the $5 million back?

A. No.

Q. And, Mr. Margolis, in what actually happened after that, in real life, did GBG end up getting back $5 million?

MR. TARLOWE: Objection.

THE COURT: Overruled.

A. Yes.

Q. And that was through the $5 million in marketing invoices; isn't that right?

A. Correct.

Q. That's what actually happened, correct?

A. Correct.

Q. Now, Mr. Margolis, you just got asked this morning about some pretextual reasons that Ethan Cole was giving for why he needed the backup for the invoices, remember that?

A. I do.

Q. And you were asked particularly about TLC; do you remember that?

A. I do.

---

LAKPCOL2          Margolis - Redirect          Page 1538

Q. Mr. Charalambous, if you could put up Government Exhibit 1257, please.

This is from Ethan Cole on September 30th of 2014, correct?

A. Correct.

Q. And it's to Anabel Higgin, right?

A. Right.

Q. And he says, "Can you please send me the marketing plan for Zoo York and Mossimo in SEA? It came up in conversation with Jared and he asked to take a look." Do you remember seeing this e-mail?

A. I do.

Q. And in reality, he was asking for this to get backup for an invoice, right?

A. Correct.

Q. And Anabel Higgin didn't work for TLC, did she?

A. She did not.

Q. You can take that down, Mr. Charalambous.

You were asked some questions about the marketing invoices on cross-examination; do you remember that?

A. I do.

Q. Now, originally, you submitted original invoices in round numbers that added up to 5 million, correct?

A. Correct.

Q. And then you ended up submitting revised invoices with more

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 20, 2021

LAKPCOL2      Margolis - Redirect      Page 1539

random numbers, but they still added up to 5 million; is that right?

A. Correct.

Q. And you were asked some questions on cross-examination, and you were shown round-number invoices for other business partners; do you remember that?

A. Sorry, can you please repeat it?

Q. You were shown invoices that ended in zeroes with various other --

A. Yes.

Q. -- business partners; do you remember that?

A. Yes.

Q. Now, to your knowledge, were any of those invoices subsequently revised to make the numbers appear more random?

A. Not that I'm aware of.

Q. And, Mr. Margolis, Iconix and GBG, they were joint venture partners, right?

A. Correct.

Q. If GBG had not overpaid by 5 million on SEA-2, would GBG have even billed Iconix for this $5 million in marketing?

A. No.

Q. Mr. Margolis, yesterday you were asked if you could recall a specific conversation at a specific moment with Jason Rabin about the overpayments, and you said you couldn't; do you remember that?

LAKPCOL2      Margolis - Redirect      Page 1540

A. Can you please repeat it?

Q. Yesterday, Mr. Tarlowe was asking you if you could remember a specific conversation at a specific moment with Jason Rabin about the SEA-2 overpayments; do you remember that?

A. Yes.

Q. Okay. Now, Mr. Margolis, you started to say something about what Jason Rabin told you, and then Mr. Tarlowe, he didn't let you finish; do you remember that?

A. I do.

Q. Now, Mr. Margolis, even if you don't remember the precise circumstances, did you have a conversation with Jason Rabin about the fact that GBG was overpaying by $5 million on SEA-2?

A. I did.

Q. And did you have a conversation with Jason Rabin about the fact that GBG would be no worse off because Iconix would return that 5 million?

A. Yes.

Q. Mr. Margolis, I'm almost done. I just have a couple more questions. I want to talk briefly about SEA-3.

And, Mr. Charalambous, if you could put up Government Exhibit 1139, and if you could just focus on the top half, yes, with the e-mail header, please. Thanks.

So, Mr. Margolis, you remember seeing this, right?

A. I do.

Q. And I believe you testified on direct that this was

LAKPCOL2      Margolis - Redirect      Page 1541

prepared by Ethan Cole for you at your direction, correct?

A. Correct.

Q. That was in advance of a December 2nd meeting between you, Neil Cole and Jason Rabin, correct?

A. Correct.

Q. And this e-mail, it's just between you and Ethan Cole. There's no one else on it; is that right?

A. That's right.

Q. And the overpayments and the givebacks, those weren't a secret from Ethan Cole; you had told him about them, right?

A. Yes.

Q. Now, in the chart above, I'm looking at the LC/Umbro column, Mr. Margolis, it says the purchase price was 21.5 million, correct?

A. Correct.

Q. And then it says 15.5 million was the value based on rev multiple; do you see that?

A. I do.

Q. And then it says that the plug was 6 million, right?

A. Correct.

Q. And I believe you testified on direct the "plug" was an overpayment; is that right?

A. Correct.

Q. And that 6 million, am I correct, that it's the difference between the purchase price and the value based on rev multiple?

LAKPCOL2      Margolis - Recross      Page 1542

A. Correct.

Q. If we go down to the third bullet point, it says the "6 million for China Umbro/LC will be offset the following;" do you see that?

A. I do.

Q. Mr. Margolis, were you expecting Iconix to return that $6 million overpayment on SEA-3 to GBG?

A. Yes.

MR. SOLOWIEJCZYK: Nothing further.

THE COURT: Mr. Tarlowe, anything further?

MR. TARLOWE: Just briefly, your Honor.

RECROSS EXAMINATION

BY MR. TARLOWE:

Q. Mr. Margolis, you were just asked whether GBG would have been willing to pay $15.9 million for SEA-2 if there hadn't been a commitment to get the money back; do you recall that?

A. Correct.

Q. And you said GBG would not have been willing to do that?

A. Based on my understanding.

Q. But you don't know why the investment committee decided to pay $15.9 million, correct?

A. Yes, I wasn't part of those conversations.

Q. So you don't know whether the investment committee would have authorized -- well, withdrawn.

Your understanding is that the investment committee

# A-390

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    October 20, 2021

| LAKPCOL2 | Margolis - Recross | Page 1543 |
|---|---|---|

did not know about this supposed agreement to give money back, correct?

MR. SOLOWIEJCZYK: Objection.

THE COURT: Overruled.

A. I don't.

Q. You testified yesterday, I believe, that your understanding was that they did not know about it?

MR. SOLOWIEJCZYK: Objection, mischaracterizes.

THE COURT: Overruled.

A. I was not a part of the conversations with the investment committee; so I can't answer that question.

Q. So you don't know why the investment committee decided to pay $15.9 million for an interest in SEA-2?

A. I don't.

Q. And, therefore, you can't say whether the investment committee would have authorized $15.9 million under some other hypothetical set of circumstances, right?

A. I can't.

Q. And you testified just now that GBG would not have billed Iconix for marketing support if there weren't some sort of agreement, right?

A. Correct.

Q. But GBG billed Iconix for marketing support on other occasions when there was no agreement, correct?

A. Not that I'm aware of.

| LAKPCOL2 | Margolis - Recross | Page 1544 |
|---|---|---|

Q. Well, what about Peanuts?

A. Yes, Peanuts.

Q. And you don't remember any other occasion where Mr. Rabin went hard at Iconix for marketing money?

A. I don't.

Q. Do you recall generally that Mr. Rabin would ask Iconix to support GBG's marketing efforts?

A. I wasn't a part of all of those conversations, but based on what you've shown me, there's clearly those instances.

Q. And you were assuming -- you were making an assumption that Iconix agreed to pay back $5 million in SEA-2, correct?

A. That's what I was told.

Q. Do you recall -- you testified before a grand jury, correct?

A. I did.

Q. And do you recall being asked this question and giving this answer, this is on page 21, lines 20 to 21:

"Q. Did Iconix agree to refund that $5 million?

"A. I assume so."

Do you recall giving that testimony?

A. I -- I suppose, yes.

Q. And you were just asked on redirect about a conversation or conversations you had with Mr. Rabin; do you recall that? Conversations about the supposed agreement.

A. Yes.

| LAKPCOL2 | Margolis - Recross | Page 1545 |
|---|---|---|

Q. And do you recall testifying before the grand jury that you would have had to have had a conversation at some point?

A. Yes, somebody would have to give me the direction to do what I did.

Q. Okay. And so you are assuming that you must have had a conversation at some point, but you don't recall any such conversation?

A. I don't recall the specific time and date of the conversation.

Q. And you were asked some questions about what happened in real life. Now, you believed that there was an agreement between Li & Fung, or GBG, and Iconix for a Lee Cooper option, right?

A. Yes.

Q. You believed that there was an agreement that Iconix would sell an interest in Lee Cooper Europe to GBG in 2014, correct?

A. Correct.

Q. You believed that that was a firm agreement, correct?

A. Correct.

Q. Let's look at what happened in real life. It didn't happen, correct?

A. Correct.

MR. TARLOWE: Nothing further.

MR. SOLOWIEJCZYK: Nothing further, your Honor.

THE COURT: Mr. Margolis, you may step down.

| LAKPCOL2 | Snyder - Direct | Page 1546 |
|---|---|---|

(Witness excused)

Would the government please call your next witness.

MR. SOLOWIEJCZYK: Your Honor, the government calls Noah Snyder.

THE COURT: Sir, please step all the way forward. Step up into the witness box and remain standing.

NOAH SNYDER,
   called as a witness by the Government,
   having been duly sworn, testified as follows:

THE COURT: Sir, you may remove your mask in the witness box. Please sit down, make yourself comfortable. Pull your seat up to the microphone, and when you speak into the microphone, speak clearly and slowly, and please begin by stating and spelling your first and last name.

THE WITNESS: Hello. Noah Snyder, N-o-a-h, S-n-y-d-e-r.

THE COURT: Mr. Solowiejczyk.

MR. SOLOWIEJCZYK: Thank you, your Honor.

DIRECT EXAMINATION
BY MR. SOLOWIEJCZYK:

Q. Good morning, Mr. Snyder.

A. Good morning.

Q. What do you do for a living?

A. I'm an investment analyst.

Q. And where do you currently work?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 21, 2021

LALMCOL4          Shapiro - Direct          Page 1810

amount, then -- but the expenses were not incurred until later, then the impact would have been -- in the situation you described, EPS would have been overstated by $5 million because the expense amount would not have been incurred until a later period.

MR. THOMAS: Let's show the witness Government Exhibit 503. It's not on my screen, for some reason.

Q. Mr. Shapiro, do you see it on your screen?

A. I do.

Q. Do you recognize it?

A. I do.

Q. Is this something that you relied upon in your work for the year-end audit?

A. I did.

Q. Did you receive it from Iconix?

A. We did.

MR. THOMAS: The government offers 503.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 503 received in evidence)

MR. THOMAS: Can we publish that for everyone.

Q. Mr. Shapiro, now that that's up on the screen, can you describe for the jury what you are looking at.

A. Yeah. It's the year-end representation letter from management of the company and individuals who we relied on

LALMCOL4          Shapiro - Direct          Page 1811

during the conduct of the audit, which I described a couple of times in the past.

MR. THOMAS: Mr. Gill, if we could go to the signature page. It might be page 9.

Q. Do you see that signature page?

A. I do.

Q. Who signed on behalf of the company?

A. The company chief executive officer, Neil Cole; the company chief financial officer and the controller, the same individuals who signed the rep letters that we commented on during the quarters for 2014.

So this would be the year-end affirmation representation from management summarizing what their responsibilities were in connection with the audit, as well as their representation to us that everything we have been provided is an accurate, true, complete picture of the company's activities for the year.

Q. If management had been unable or unwilling to sign this document, what would have happened in your audit?

A. We would be unable to opine and issue our opinion on the financial statements.

MR. THOMAS: Mr. Gill, let's go to paragraph 3.

Q. Do you see paragraph 3 on your screen, sir?

A. I do.

Q. What topic does paragraph 3 relate to?

LALMCOL4          Shapiro - Direct          Page 1812

A. This is management's representation to us that they provided all the information to us to enable us to conduct an appropriate audit.

Q. If there were oral agreements on the Southeast Asia joint venture transactions that had not been supplied to you previously, would you have expected management to bring them to your attention before making this representation?

A. Yes, clearly, if it affected the accounting or the proper accounting for that underlying transaction. There is no distinction between whether something is written or oral as long as it binds the company. It would be something we should know about if it affects the accounting for the transaction.

MR. THOMAS: Mr. Gill, let's go to paragraph 36. If you could enlarge that when you get there for Mr. Shapiro.

Q. Mr. Shapiro, what's the topic for paragraph 36?

A. Well, this deals to the round-tripping transactions we have discussed, at least in this context, with the three joint venture transactions. And it clearly is intended to cover transactions, any and all transactions that might have occurred in addition to the -- in addition to the three joint venture transactions we have talked about. So this deals with transactions that are linked to one another and as to how the accounting for those linkages should be accounted for.

Q. If there were supplemental oral agreements between the parties to SEA-1, SEA-2, and SEA-3, would you have expected

LALMCOL4          Shapiro - Direct          Page 1813

management would have brought them to your attention before providing this representation?

A. Yes.

MR. THOMAS: Mr. Gill, let's put on the screen side by side Government Exhibit 107-A and 107-B.

Q. Mr. Shapiro, do you see 107-A and 107-B?

A. I do.

Q. What are they?

A. These are the certifications required by the SEC from upper management. These particular certifications come from Neil Cole, the CEO of the company, where he certifies -- as the heading would suggest, certification -- where he is certifying that the financial information is fair and accurate and that all the information in this filing complies with the regulations of the SEC.

Q. Did Mr. Cole in fact make those certifications?

A. As signified by his signature on the bottom of each page, yes.

Q. Were they filed?

A. They were filed as exhibits to the company's 10-K.

Q. Were those filings made available to the public?

A. Yes.

MR. THOMAS: Let's show the witness Government Exhibit 106. Actually, that one is in evidence, so we can show it to everyone.

# A-392

| LALMCOL4 | Shapiro - Direct | Page 1814 |
| --- | --- | --- |

Q. Do you recognize Government Exhibit 106?

A. I do.

MR. THOMAS: Mr. Gill, if we could advance to the attachment. It might be page 4. Stop there. If you could enlarge the top.

Q. What is it we are looking at here?

A. This is a copy of the company's press release that was issued and included in the company's 8-K filing. So this is a press release which presents key operating results and other key information related to the financial performance of the company for the calendar year ended 2014.

Q. Focusing you on the first bullet, 2014 revenue of 461.2 million.

Do you see that?

A. I do.

Q. If the gain on SEA-2 had been reduced by 5 million and the gain on SEA-3 had been reduced by 6 million, would this figure be accurate?

A. No. It would be overstated by $11 million.

Q. To turn and focus on the second bullet, do you see it relates to 2014 diluted non-GAAP EPS of $2.78?

A. I do.

Q. Mr. Shapiro, we will try to walk through a couple more hypotheticals, if you will bear with me, about EPS.

With respect to SEA-2, if the agreement were to

| LALMCOL4 | Shapiro - Direct | Page 1815 |
| --- | --- | --- |

increase the purchase price of the transaction by 5 million in exchange for a commitment to pay 5 million back in the form of marketing and only some of the marketing expenses had occurred in 2014, would there be an impact on EPS?

A. Yes.

Q. Why is that?

A. To the extent that a portion of the marketing was to occur in a future period, then revenues would be overstated and expenses would not be overstated because those expenses that applied to the future periods would not have been incurred in that year. So, therefore, the difference -- the amount of the services that were to be provided in future year would result in an overstatement of income, which would then, by definition, result in an overstatement of EPS.

Q. With respect to SEA-3, if it were the case that the purchase price for SEA-3 were increased by 6 million in exchange for a promise to relieve $6 million in future obligations that had not arisen in 2014, would there be an impact on EPS?

A. Yes. That would be easier to describe. That entire 6 million, that revenue was overstated by -- since there would be no offsetting expense, since nothing would have been booked, since nothing had been determined as to what payment of 6 million represented, the entire 6 million that overstated revenues would similarly overstate net income, which, by

| LALMCOL4 | Shapiro - Direct | Page 1816 |
| --- | --- | --- |

definition, would overstate EPS to the tune of the full 6 million.

Q. Mr. Shapiro, I want to turn your attention to a different topic.

MR. THOMAS: We can remove this exhibit.

Q. Let me direct you to the fall of 2014, if I could. Did there come a time where BDO participated in a comment letter process with the SEC?

A. Yes.

Q. What was the nature of BDO's participation?

A. Well, the SEC has a requirement under the law to review the company's filings over some specified period of time. And during the period of time you've discussed, the SEC reviewed the previous SEC filings, primarily the company's prior 10-K and previous 10-Qs. As oftentimes occurs and most of the time occurs, they ask questions. They review the filing, both the financial statements and the nonfinancial information. And if something piques their interest or results in confusion, they issue what's called a common letter to the company asking further explanation to either better explain or to permit the SEC to conclude as to the accuracy and fairness of either the accounting impact, if it's financial related, or nonfinancial information that's otherwise disclosed.

It's very common that the SEC -- it's required that the SEC review filings. It's very common that they have

| LALMCOL4 | Shapiro - Direct | Page 1817 |
| --- | --- | --- |

questions that they get upon reviewing those filings. And they issue those questions in the form of what's called a comment letter. When that is issued to the company, the company needs to respond.

To the extent that those questions involve financial -- questions that involve accounting for matters that are reflected in financial statements, then the audit firm has a vested interest since the auditor opined on those financial statements. To the extent that the SEC is raising questions and possible concerns regarding the appropriate accounting for these transactions, then, obviously, the auditor wants to be involved in the process to ensure that the company's responses, and it's the company's obligation to respond, are accurate, to the knowledge of the auditor, and the auditor might assist in providing some guidance to the company to assist in a more accurate and complete explanation to the SEC to better describe the reason for the accounting being made that the accounting -- that the company made as it relates to the accounting.

Q. Mr. Shapiro, I don't want to explore entirely the comment-letter process, but could you give the jury a sense of what the sorts of issues were that were coming up.

A. Well, if I recall, there were a number of them. But the primary issue that was raised related to the company's recording of the gains in connection with the joint ventures. There were some other transactions as well. But the thrust of

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                    **October 21, 2021**

LALPCOL5          Shapiro - Cross          Page 1822

(In open court; jury present)

THE COURT: Mr. Reisner.

MR. REISNER: Thank you, your Honor.

THE COURT: Good afternoon, Mr. Shapiro.

THE WITNESS: Good afternoon.

CROSS-EXAMINATION

BY MR. REISNER:

Q. Mr. Shapiro, Mr. Thomas, on direct examination, asked you a number of what he called hypothetical questions, correct?

A. He did.

Q. You have no firsthand knowledge of the negotiations for SEA-1, SEA-2 or SEA-3, correct?

A. Correct.

Q. You didn't participate in those negotiations, correct?

A. Correct. As independent auditors, we wouldn't be permitted to anyway.

MR. REISNER: Your Honor, I'm going to ask if the witness is able to answer my questions "yes" or "no," if they're "yes" or "no" questions, that he be directed to answer them "yes" or "no," if possible?

THE COURT: Do you think you will be able to do that, Mr. Shapiro?

THE WITNESS: I will certainly try.

THE COURT: Very well.

BY MR. REISNER:

LALPCOL5          Shapiro - Cross          Page 1823

Q. You didn't participate in those negotiations, right?

A. I did not.

Q. And you never spoke with Li & Fung or GBG regarding the terms of those transactions, correct?

A. Correct.

Q. You didn't receive contemporaneous reports or term sheets during the course of those negotiations, correct?

A. Correct.

Q. Now, with respect to SEA-1, you have no firsthand knowledge of whether it was actually Li & Fung that proposed the consultancy agreement and side letter, correct? You have no firsthand information?

A. Correct.

Q. And you have no personal knowledge of whether services were provided under the consultancy agreement, correct?

A. I wasn't aware there was a consulting agreement; so I wasn't aware that there would be any consulting services performed.

Q. You have no personal knowledge of the extent to which Li & Fung performed consulting services, correct?

A. At the time of the audit, I had no knowledge of that, correct.

Q. And you had no personal knowledge of the value of those services, correct?

A. I didn't know there were services; so I assume I wouldn't

LALPCOL5          Shapiro - Cross          Page 1824

know of any value.

Q. Now, sir, with respect to SEA-1, did you know in 2014 that the Iconix CFO and finance team received all of the relevant transaction documents for their review and analysis, including the consultancy agreement and the side letter? Did you know that?

A. Did I know that who received that all? Rephrase the question or repeat the question?

Q. In 2014, did you know that the Iconix CFO and finance team received all of the relevant SEA-1 transaction documents for their review and analysis, including the consultancy agreement and the side letter? Did you know that?

A. There would be no way for me to know if they received all of the documents.

MR. REISNER: Your Honor, again, I ask that the witness be directed to answer "yes" or "no" when they are "yes" or "no" questions?

THE COURT: If you can, Mr. Shapiro, and if you can't, you can simply say so. Okay?

THE WITNESS: Thank you.

BY MR. REISNER:

Q. Mr. Shapiro, in 2014, did you know that the Iconix CFO and finance and the legal team had all of the SEA-1 transaction documents in October of 2013, months before the company reported its fourth quarter results in February of 2014? Did

LALPCOL5          Shapiro - Cross          Page 1825

you know that?

A. No.

Q. And, Mr. Shapiro, you have no firsthand knowledge of whether Iconix undertook any commitment or obligation to Li & Fung or GBG in connection with the SEA-2 or SEA-3 transactions that was not in the written agreement? You have no firsthand knowledge of that, correct?

A. Correct.

Q. And you have no firsthand knowledge of any agreement for Li & Fung or GBG to increase the purchase price for SEA-2 by $5 million in exchange for an agreement by Iconix to give back $5 million to Li & Fung in the form of marketing payments? You have no firsthand knowledge of that, correct?

A. I have to clarify. During the course of the audit, I had no firsthand knowledge.

Q. And, Mr. Shapiro, if there was no such agreement, if there was no such commitment or obligation, there would have been nothing for Iconix to inform BDO about with respect to any such agreement, commitment or obligation, correct?

A. Correct.

Q. And you have no firsthand knowledge of any agreement for GBG to increase the buy-in purchase price for SEA-3 by $6 million in exchange for an agreement by Iconix to relieve GBG of royalty payments? You have no firsthand knowledge of that, correct?

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 21, 2021

A. Correct.

Q. And if there were no such agreement or commitment or obligation, there would have been nothing for Iconix to inform BDO about with respect to any such agreement, commitment or obligation, correct?

A. Correct.

Q. You were asked some questions in direct examination about whether Mr. Cole raised questions about the accuracy of transactions descriptions. Do you remember being asked those types of questions on direct?

A. I do.

Q. If Mr. Cole believed that those transaction descriptions were accurate, there would be nothing for him to raise, correct?

A. I would agree with that.

Q. Mr. Shapiro, during its audit and review processes in 2013 and 2014, did BDO review the governing contracts with respect to the SEA-1, SEA-2 and SEA-3 transactions?

A. We reviewed the agreements that were provided to us, yes.

Q. And -- withdrawn.

Now, Mr. Shapiro, you testified on direct examination about BDO's 2013 audit of Iconix, correct?

A. I did.

Q. And you testified concerning certain documents that you say BDO received and didn't receive from Iconix in connection with

that audit, correct?

A. I did.

Q. Mr. Shapiro, BDO cannot locate its permanent file for its Iconix audit work for year-end 2013, correct?

A. Well, there wasn't a permanent file. Whether it was missing or whether it was never created, I can't speak to.

Q. Do you recall telling the government that BDO's permanent file for its Iconix audit work for 2013 is missing in action? Do you recall telling that to the government?

A. I don't recall telling the government that, but there wasn't -- there wasn't a permanent file to provide.

Q. Can you please place before the witness what's marked for identification as Defense Exhibit 3581-011.

Mr. Shapiro, does that refresh your recollection that you told the government that BDO's 2013 permanent file for Iconix was missing in action?

A. I don't recall if I used those particular words. I know I would have said there was no file.

Q. Are you denying that you told the government that BDO's 2013 permanent file for Iconix was missing in action? Are you denying that, Mr. Shapiro, yes or no?

A. I'm not denying or affirming. I don't know if I used those terms or not. I do know that I told the government there was no permanent file.

Q. Mr. Shapiro, did you tell the government that you could not

explain what happened in 2013 or why the permanent file was not retained?

A. Well, I don't know if it existed to be retained, but I couldn't explain why there was no file.

Q. Can we please show the witness what's marked as Defense Exhibit 3581-11.

Directing your attention to what's been highlighted, does that refresh your recollection that you told the government you could not explain what happened in 2013 or why the permanent file was not retained? Does that refresh your recollection?

A. These are, obviously, notes. There was no file. I said there was no file. I don't know if there was a file that was missing. All I know is that there was no file to turn over to the government.

Q. Mr. Shapiro, are you denying that you told the government that you could not explain what happened in 2013 and why the permanent file was not retained? Are you denying that you said that, yes or no?

A. I can't answer that yes or no. I don't know what I said other than there was no file for 2013.

Q. And, Mr. Shapiro, BDO was able to locate the SEA-1 side letter in BDO's permanent file for its Iconix audit for the year-end 2014, correct?

A. Which side letter are you referring to?

Q. The letter agreement regarding the $2 million to be paid from GBG to Iconix as part of SEA-1?

A. I understand that was in the 2014 files, yes.

Q. And BDO was able to locate certain other audit work papers for 2013 and 2014, correct?

A. That were contained in the 2014 files?

Q. Or elsewhere.

A. Yes.

Q. Now, Mr. Shapiro, Brian Snyderman was an accountant at Iconix who served as the vice president of finance in Iconix, correct?

A. Correct.

Q. And you dealt with him directly from time to time, correct?

A. Correct.

Q. And Mr. Snyderman reported, in 2013, to the CFO, Warren Clamen, correct?

A. Correct.

Q. And Mr. Snyderman, the vice president of finance, was responsible for preparing accounting memos, discussing transactions or white papers, correct?

A. Correct.

Q. And BDO would review those white papers from time to time, correct?

A. Correct.

Q. And Mr. Snyderman did technical research with respect to

# A-395

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**                                                                 **October 21, 2021**

| LALMCOL6 | Shapiro - Cross | Page 1874 |
|---|---|---|

commitment by Kids Headquarters to make payments to Iconix and a near simultaneous commitment by Iconix to make a $3.5 million payment to Kids Headquarters for showroom support, correct?

A. Correct.

Q. And Iconix treated the $3.5 million showroom support payment as an expense and not a reduction of revenue, correct?

A. Correct. Over the related period, but correct.

MR. REISNER: We can take that down.

Q. By the way, Mr. Shapiro, I asked you earlier about your attendance in 2011 at an audit committee meeting of Iconix, correct?

A. Correct.

Q. And you attended, on behalf of BDO, that audit committee meeting with the Iconix audit committee, correct?

A. Correct.

Q. That was in 2011, right?

A. Correct.

Q. In 2011, you had some involvement with Iconix Brand Group, correct?

A. I explained that involvement. I was consulted by the engagement partner on that particular matter.

Q. Mr. Shapiro, I am going ask you another hypothetical question. You ready?

A. I'm ready. I'm good on hypotheticals.

Q. I want you to assume that at the time of the SEA-2

| LALMCOL6 | Shapiro - Cross | Page 1875 |
|---|---|---|

transaction, the SEA-2 transaction, that agreement was entered into by Iconix in good faith and not for the purpose of inflating reported results. I also want you to assume that there was no commitment or obligation by Iconix to make any future marketing or other payments to LF/GBG other than what was in the written contracts.

You got me on those assumptions? Are you with me?

A. I got it.

Q. Based on those assumptions, there would be nothing for Mr. Cole to include in the management representation letter or report to BDO about any side agreements relating to SEA-2, correct?

A. Maybe I don't have the facts again. Could you give me the hypothetical again.

MR. REISNER: Sure. I would be pleased to.

Q. I want you to assume that at the time of the SEA-2 transaction, the agreement was entered into in good faith and not for the purpose of inflating reported rules, and I want you to further assume that there was no commitment or obligation by Iconix to make any future marketing or other payments to LF/GBG other than what was in the written contracts. That's the assumption.

Based on those assumptions, there would be nothing for Mr. Cole to report to BDO about any side agreements relating to the SEA-2 transaction, correct?

| LALMCOL6 | Shapiro - Cross | Page 1876 |
|---|---|---|

A. Does that assume the fact that marketing was in the written agreement in the amount of 5 million?

Q. There was no marketing in the written agreement, Mr. Shapiro.

A. I'm just asking in your hypothetical situation. We are talking about hypothetical now. I am just trying to clarify your hypothetical.

Q. Let me try to make it even clearer.

A. Please.

Q. Let's assume that at the time of the SEA-2 transaction the agreement was entered into in good faith and not for the purpose of inflating reported results and there was no commitment or obligation by Iconix to make any future marketing or other payments to LF/GBG and the only undertakings by Iconix were in the written contracts.

You got those assumptions with me now?

A. I finally got it. Thank you.

Q. Based on those assumptions, there would be nothing for Mr. Cole to report to BDO about any side agreements relating to SEA-2, correct?

A. Correct.

Q. Based on those assumptions, BDO wouldn't have had any issue during the 2014 audit with Iconix recognizing revenue for SEA-2 based on the $15.9 million purchase price to be paid by LF/GBG, correct?

| LALMCOL6 | Shapiro - Cross | Page 1877 |
|---|---|---|

A. Correct.

Q. Brian Snyderman prepared and BDO reviewed a white paper about the SEA-2 transaction, correct?

A. He did.

MR. REISNER: Can we please place before the witness what's marked as Defense Exhibit 432 for identification.

Q. Mr. Shapiro, is this the white paper prepared by Mr. Snyderman received by BDO and on which BDO commented with its accounting observations?

A. Yes.

Q. Is this the type of document that it was BDO's regular practice to prepare as part of its audit responsibilities?

A. Yes.

Q. Was it made and kept in the ordinary course of business at BDO?

A. Yes.

Q. Were you the audit partner at or around the time this was prepared?

A. I was.

MR. REISNER: Your Honor, I offer Defense Exhibit 432.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 432 received in evidence)

MR. REISNER: Can we please turn to page DX-432-002. Pardon me. 003 of this document. If we could highlight what

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                          October 22, 2021

| LAMMCOL1          Shapiro - Cross          Page 1886 |
| --- |

with another hypothetical question.

I think, with the Court's permission, you can probably take your mask off since you're in the witness seat.

A. I'm sorry.  Sure.

Q. I'd like you to assume, Mr. Shapiro, that Iconix had no commitment or obligation to make any future marketing payments to GBG in connection with the SEA-2 transaction, so no commitment or obligation to make any future marketing payments with respect to SEA-2.

Now I'd like you to further assume that in the fourth quarter of 2014, Iconix decided separately and independently to make marketing payments to GBG based on a request or ask by GBG for the payments and that those payments provided an identifiable benefit to Iconix and fair value.

Do you understand the assumptions?

A. I do.

Q. In those circumstances, Iconix's payment of marketing expenses in the fourth quarter of 2014 would have no impact on the company's second-quarter gain from the SEA-2 transaction, correct?

A. Correct.

Q. And now I'd like you to assume the opposite.  Let me ask this hypothetical question.  Assume there was linkage between a $5 million marketing payment made by Iconix in the fourth quarter of 2014 and the SEA-2 transaction.

| LAMMCOL1          Shapiro - Cross          Page 1887 |
| --- |

Now, if Iconix received an identifiable benefit for that payment and the fair value of that benefit to Iconix was in the $5 million range, then the marketing payment could be properly treated as an expense rather than an offset to revenue, correct?

A. With those facts -- in those assumptions, I would agree.

Q. It's sort of similar to the $3.1 million payment from Iconix to GBG in the MENA agreement, correct?

A. Correct.

Q. And BDO signed off on the Iconix accounting treatment of that payment in the MENA transaction as an expense rather than an offset to revenue, correct?

A. Correct.

Q. Now, you testified during your direct examination about GAAP, or generally accepted accounting principles, correct?

A. Correct.

Q. And public companies in the United States are required to prepare their financial statements in accordance with GAAP, correct?

A. Most of them, certainly.

Q. And the principal source of GAAP currently is the accounting standards codification, or ASC, correct?

A. Correct.

Q. Under GAAP, generally, revenue may be recognized when it's realized or realizable and earned, correct?

| LAMMCOL1          Shapiro - Cross          Page 1888 |
| --- |

A. Correct.

Q. And under GAAP, the timing of revenue recognition depends on when the money is earned rather than when cash is actually received, correct?

A. Correct.

Q. And that's sometimes called accrual accounting, correct?

A. Yes.

Q. And ASC 605-10S99-1 sets forth certain criteria for determining when revenue is considered realized or realizable and earned, correct?

A. I believe so.

Q. And, generally, that provision provides that revenue is realized or realizable and earned when persuasive evidence of an arrangement exists, delivery has occurred, or services have been rendered, the seller's price to the buyer is fixed or determinable, and collectibility is reasonably assured, correct?

A. Correct.

Q. In addition to those criteria, ASC 605 also provides further guidance on revenue recognition, correct?

A. Correct.

Q. Are you familiar with ASC 605-10-25-1-B?

A. I haven't memorized all the code numbers, but I think I know how to record revenue.

Q. Is it your understanding that that provision provides

| LAMMCOL1          Shapiro - Cross          Page 1889 |
| --- |

generally that revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues, correct?

A. I'm not particularly familiar with that phrase, but that sounds correct.

Q. And are you aware that ASC 605-10S99-1 provides that when a company receives nonrefundable fees upon entering into arrangements or on certain specified dates, the upfront fee in exchange for the products delivered or services performed that represent the culmination of a separate earnings process can be recognized properly as revenue.

Are you aware of that?

A. That sounds correct.

Q. And the application of GAAP revenue recognition criteria can require the exercise of accounting judgment, correct?

A. Clearly.

Q. And the application of accounting principles is not necessarily black and white, correct?

A. Clearly.

Q. And two different accountants could reach different conclusions about the appropriate way to account for a particular transaction and both conclusions could be reasonable, appropriate, and reached in good faith, correct?

A. Depending on the complexity of the matter, I agree.

Q. I am going to ask you some questions now about the SEA-3

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                          October 22, 2021

| LAMMCOL1 | Shapiro - Cross | Page 1890 |
| --- | --- | --- |

transaction. You know when I refer to SEA-3, you understand I'm referring to the September 2014 joint venture transaction, correct?

A. I do. I know that.

Q. So you're aware, Mr. Shapiro, that the government alleges that the price paid by GBG for SEA-3 was increased by $6 million in exchange for an agreement to terminate the Kids Headquarters Rocawear Kids license agreement and relieve GBG of remaining obligations under that agreement.

You understand that's the government's allegation, correct?

MR. THOMAS: Objection, your Honor. Foundation. Misdescribes the indictment.

THE COURT: Overruled.

Q. Is that generally your understanding?

A. I do.

Q. I'd like you to assume that there was no commitment or obligation by Iconix at the time of the SEA-3 transaction to release GBG from its Rocawear Kids payment obligations. I'd like you to further assume that the SEA-3 purchase price was an agreed upon fair market value of $21.5 million negotiated at arm's length.

Do you understand those assumptions?

A. I do.

Q. In those circumstances, BDO would not have had any issue or

| LAMMCOL1 | Shapiro - Cross | Page 1891 |
| --- | --- | --- |

problem in 2014 with Iconix recognizing gain based on a $21.5 million purchase price, correct?

A. Under those assumptions, I agree.

Q. And you are aware, Mr. Shapiro, that GBG's obligations under the Rocawear Kids license agreement were not terminated, correct?

A. I believe that's correct.

Q. And you are aware that GBG satisfied its royalty obligations under that license agreement, correct?

A. Correct.

Q. And you are aware that the royalty payments from GBG were received by Iconix, correct? That is your understanding?

A. That is my understanding.

Q. And your understanding is that those payments were recorded as revenue by Iconix, correct?

A. When earned, correct.

Q. Are you aware that Iconix recognized as revenue payments from GBG in connection with that license agreement of $1,250,000 in the third quarter of 2014, and $1,250,000 in the fourth quarter of 2014, and $3,500,000 in 2015.

Is that consistent with your understanding?

A. It is.

Q. We talked yesterday about Mr. Snyderman, Brian Snyderman.

Do you recall that?

A. I do.

| LAMMCOL1 | Shapiro - Cross | Page 1892 |
| --- | --- | --- |

Q. He was the vice-president of finance at Iconix while you served as audit partner, correct?

A. Correct.

Q. And Mr. Snyderman prepared and BDO reviewed a white paper concerning the SEA-3 transaction, correct?

A. Correct.

MR. REISNER: Can we please place before the witness what's marked as Defense Exhibit 431 for identification.

Q. Mr. Shapiro, do you recognize that document as the white paper prepared by Mr. Snyderman in connection with the SEA-3 transaction together with BDO's accounting notes with respect to the white paper?

A. I do.

Q. Directing your attention to the portion of the document prepared by BDO, was that BDO's regular practice to prepare documents and commentary like that as part of its audit responsibilities?

A. You're referring to the comments in red?

Q. Yes, I am.

A. Yes.

Q. And was this document made and kept by BDO in the ordinary course of business?

A. It was.

Q. Were you the audit partner at BDO when this was prepared?

A. I was.

| LAMMCOL1 | Shapiro - Cross | Page 1893 |
| --- | --- | --- |

MR. REISNER: Your Honor, I offer Defense Exhibit 431.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 431 received in evidence)

MR. REISNER: May I publish it to the jury, your Honor?

THE COURT: You may.

MR. REISNER: Can we go to page 4 of the memo, please, Mr. Klein.

Q. Mr. Shapiro, the memo states in substance that Iconix recognized a gain of $18.7 million based on a purchase price of $21.5 million, correct?

A. Correct.

MR. REISNER: If we can go to the first page of the document.

Q. Directing your attention to BDO's comments on the white paper and directing your attention to the last sentence of the comments which says: Based on procedures performed, BDO concludes that the transaction was properly accounted for.

Do you see that?

A. I do.

Q. Was that BDO's conclusion with respect to the SEA-3 transaction?

A. At the time, yes, it was.

MR. REISNER: We can take that down, Mr. Klein.

**A-398**

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LAPPCOL1  Wolfson - Direct  Page 2118

or before December 28th, 2015. The options vested immediately on December 28, 2005, at the time they were granted.

"It is further stipulated and agreed that this stipulation may be received into evidence as a Government Exhibit at trial. Dated: New York, New York. October 25th, 2021."

MR. SOLOWIEJCZYK: Thank you, Ms. Wolfson. And, your Honor, we have no further questions at this time.

THE COURT: Very well.

MR. REISNER: No questions, your Honor.

THE COURT: Ms. Wolfson, you may step down.

(Witness excused)

THE COURT: And will the government please call its next witness?

MR. HARTMAN: Your Honor, we had one exhibit that I think was offered but not reflected in the transcript. There's an agreement on that, and so with that understanding, the government rests.

THE COURT: Very well. The government has rested, ladies and gentlemen. I just need to speak with the lawyers at sidebar for a minute.

(Continued on next page)

---

LAPPCOL1  Wolfson - Direct  Page 2119

(At the side bar)

THE COURT: I just wanted to ask the parties how you want to proceed. If you want to make motions now, should I excuse the jury for ten minutes or --

MR. REISNER: We can reserve, your Honor.

THE COURT: Very well. So you'll be calling your first witness?

MR. REISNER: Yes, your Honor.

THE COURT: Very well.

(Continued on next page)

---

LAPPCOL1  Wolfson - Direct  Page 2120

(In open court)

THE COURT: Ladies and gentlemen, as I instructed you at the outset, it is the government's burden to prove Mr. Cole's guilt beyond a reasonable doubt, and it is always the government's burden to carry. The defendant, in a criminal case, does not have to lift a finger. However, the defendant may, if he or she wishes to put on a case. Mr. Cole has chosen to put on a case.

And with that, Mr. Reisner, would the defense please call its first witness.

MR. REISNER: Your Honor, the defense calls Neil Cole.

THE COURT: Sir, please step up into the witness stand and remain standing.

NEIL COLE,
    called as a witness by the Defendant,
    having been duly sworn, testified as follows:

THE COURT: Mr. Cole, you know the drill. Please bring your chair up to the microphone. Speak directly into the microphone, speak slowly and clearly, and please begin by stating and spelling your first and last name.

THE WITNESS: My name is Neil Cole, N-e-i-l, C-o-l-e.

THE COURT: Mr. Reisner.

MR. REISNER: May I proceed, your Honor?

THE COURT: You may.

DIRECT EXAMINATION

---

LAPPCOL1  Cole - Direct  Page 2121

BY MR. REISNER:

Q. Mr. Cole, how old are you?

A. I am 64 years old.

Q. And where do you live?

A. I live in Manhattan.

Q. With whom do you live?

A. I live with my wife, Lizzy, and my daughter, Charlie.

Q. How old is your daughter Charlie?

A. Charlie is 16 years old.

Q. Do you have any other children?

A. I have two big boys, Branden and Alex, and I also have a grandchild, Simon.

THE COURT: Mr. Cole, could I ask you to just -- perhaps you're a little too close to the microphone.

THE WITNESS: Okay.

Q. Mr. Cole, you've been sitting here listening to the testimony during this trial, correct?

A. I have.

Q. And you listened to the government's opening statement, correct?

A. Yes.

Q. Mr. Cole, at any time in 2013, 2014 or 2015, while you were the CEO of Iconix, did you believe that Iconix provided false or misleading information about its financial results at any time in any manner?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LAPPCOL1     Cole - Direct     Page 2122

A. Absolutely not.

Q. Mr. Cole, at any time in 2013, 2014, or 2015, while you were CEO of Iconix, did you try to mislead the company's auditors?

A. No, I'd never do that.

Q. Now, Mr. Cole, several of the charges in this case involve -- several of the charges in this case involve public filings that Iconix made with the SEC and certifications that you signed in connection with those filings.

When you signed those certifications, what was your understanding as to whether those filings and certifications were accurate?

A. I believed everything I signed was accurate. I believed everything I signed was accurate.

Q. Did you believe that Iconix's public filings during the time that you were the CEO were truthful and accurate?

A. Yes, I did.

Q. Now, Mr. Cole, you've heard testimony from witnesses about transactions called SEA-1, SEA-2 and SEA-3, correct?

A. Correct.

Q. Mr. Cole, as far as you know, what commitments or obligations, if any, did Iconix undertake with Li & Fung or GBG in connection with SEA-1, SEA-2 or SEA-3 that were not in the written transaction documents?

A. Nothing that was not in the documents.

---

LAPPCOL1     Cole - Direct     Page 2123

Q. Mr. Cole, you've been charged with several different crimes in this case. Did you commit those crimes?

A. I did not.

Q. Let's take a moment and step back and talk a little bit about your background. Where did you grow up, Mr. Cole?

A. I grew up on Long Island in New York.

Q. Did you graduate high school?

A. I did. I graduated high school, John L. Miller High School.

Q. Did you go to college?

A. I did. I went to the University of Florida in Gainesville.

Q. Did you graduate from college?

A. I did. I got a Bachelor of Arts degree in political science.

Q. What did you do after college?

A. After college, I went to law school.

Q. Where did you go to law school?

A. For a year I went to Boston, to something called New England Law. Then I transferred back to Hofstra Law School on Long Island.

Q. You said Hofstra Law School?

A. I did.

Q. After law school, did you take the bar exam?

A. I did. I was admitted to the New York bar in 1982.

Q. Are you still practicing law today?

---

LAPPCOL1     Cole - Direct     Page 2124

A. No. I barely -- I practiced for roughly six months after I graduated, and I decided that it wasn't for me. I enjoyed business better, and so I have not practiced law since 1982 or '83, I'm sorry.

Q. Do you have -- do you have any formal accounting training?

A. I do not.

Q. Are you now or have you ever been a CPA, a certified public accountant?

A. No.

Q. So what did you do for work after law school?

A. After law school, I joined the family business, and in the beginning, I was a lawyer for a short period, and then I got involved in other areas of the business that I enjoyed more, which was more of the marketing, licensing, branding sides of the business. It was a footwear company called Candie's; so I joined the family business.

Q. Just so it's clear, what was the family's business?

A. We had a brand called Candie's New York Footwear Company, but we also had a licensing business along with -- but the majority of the revenue of the company and the profits were made from selling Candie's shoes.

Q. For how long did you work at Candie's?

A. Roughly three years.

Q. And what was your next job after that?

A. Next, I started a licensing company called New Retail

---

LAPPCOL1     Cole - Direct     Page 2125

Concepts in, I believe it was, 1986.

Q. What was your title with New Retail Concepts?

A. Founder, CEO.

Q. Where was the business located?

A. We were based in Manhattan.

Q. And generally, what type of business was it?

A. Originally, we were a licensing company, and we had a brand called No Excuses, and after a few years of licensing, we ended up going into the jeans-wear business.

Q. What relationship was there, if any, between New Retail Concepts and Candie's?

A. In 1991, New Retail Concepts, which had gone public earlier in the '80s or late '80s purchased Candie's. So we somewhat bought Candie's, which was really to buy the trademark and focus once again on the licensing in 1991.

Q. And was New Retail Concepts a public company or a private company?

A. We had gone public, I believe, around 1987, and when we purchased Candie's in 1991, we changed the name of the public company to Candie's, Incorporated.

Q. And after that acquisition that you described, after acquiring Candie's and changing its name, what was the business of the company?

A. Originally, similar to the retail. We started out licensing, but we ended up going into the footwear business

---

**A-400**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

---

LAPPCOL1     Cole - Direct     Page 2126

after a couple of years of licensing. Similar to retail, we went in the jean business. So really, for the next ten, 15 years, we were wholesale and distributing footwear.

Q. Mr. Cole, can you tell the jury about the creation of Iconix?

A. Yes. Iconix started in 2005 and was a licensing concept that we had come up with. So we licensed out all of our operations. We kept our brands, Candie's and Bongo, and right around the time that Iconix started, we bought another brand called Joe Boxer.

So Iconix started in July of 2005, and we had three -- or we also had another small brand called Badgley Mischka; so we had four brands when we started in 2005.

Q. And so just so it's clear, when Iconix was established in 2005, how many brands did Iconix own or control?

A. As I -- I believe we had four brands, but two of the more recent acquisitions based on being in the licensing business.

Q. And by 2014, how many brands did Iconix own and control?

A. We had gone on an acquisition spree over the period, and I believe we had roughly 35 different brands that we had bought.

Q. And can you just describe, at a high level, how Iconix acquired those brands?

A. We were able to raise a lot of capital because in the business model, we bought the intellectual property and just did the marketing and the advertising, and we let third

---

LAPPCOL1     Cole - Direct     Page 2127

parties, whether it be retailers or wholesalers, do what I considered the tough work, the whole supply chain of the business.

And, for lack of a better definition, I used to tell people we were an advertising agency who owned our own intellectual property. So we would get royalty, and we did all the advertising for the brands and, you know, it was really a dream come true, that the banks would finance all of these acquisitions, and we brought them and we bought -- and it was amazing.

Q. How were the prices determined for the brands that Iconix acquired?

A. It was a negotiation. Every deal was different. You know, usually bought it from founders and usually long diligence. Some brands had never been in business. For instance, we bought -- we did a deal with Madonna, and we developed some plans with her, her name, Material Girl; so that had no business.

Other brands had -- we were taking out of being in the apparel business or the home business, and bringing them into the licensing or intellectual property business. So sometimes we pay, you know, five times; sometimes, if it was a big brand, we'd pay ten times. But, you know, we tried to stay with the barometers of five or six or seven times what we projected would be the royalty.

---

LAPPCOL1     Cole - Direct     Page 2128

So if we thought we could bring in $10 million, we would pay between 50, 60, $70 million for the brand to show the bank that we could get the money back quickly over a period of a few years.

Q. Mr. Cole, you mentioned Material Girl. What were some of the other brands that Iconix acquired between 2005 and 2014?

A. Well, my background was footwear and apparel so we started in that area, and we bought brands like OP, Ocean Pacific, London Fog, Danskin and Rocawear, Ecko, all different types of what I thought were really strong brands that were necessarily in, let's say, misplaced or they weren't doing well either because of poor manufacturing, or they didn't have a good retail home.

So we would buy the intellectual property there. Then, after we did evolve in there, then we realized the model works in other areas. So we went into the home business, and we bought brands like Charisma, which were licensed to Costco and Fieldcrest, which were licensed to Target, Cannon.

And then realizing that it worked, we were doing so well with apparel and home, we ventured out and bought a really exciting brand, which was Peanuts, ala Snoopy, Charlie Brown, and we worked with the Schultz family. And here we were making very different than making money selling T-shirts or socks or linens. We were making money on movies. Well, the movie was something we did, which is really great, but we made money

---

LAPPCOL1     Cole - Direct     Page 2129

on -- ABC paid us a lot of money every year to run the specials. Hallmark had a hundred-year-old deal with the Schultz family, or Peanuts, or maybe not a hundred, but it was I think 60 or 70, and so we got royalty there.

And then we even ventured -- after Peanuts, we saw how this model works and everything, but we bought a brand called Sharper Image. So we were just looking for strong brands in different fields that we could be the ad agency or the marketing company, and we license them to big-box retailers.

We had three major deals with Wal-Mart for OP, Starter, Danskin, and then Target, we owned Mossimo, and Kohl's we had Candie's and others, on and on. It was a very exciting time.

(Continued on next page)

---

**A-401**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

LAPMCOL2          Cole - Direct          Page 2130

Q. Just so it's clear, Mr. Cole, what types of products did Iconix license its brands for?

A. All types of products. Everywhere, as I mentioned, from T-shirts to we made money on the Peanuts movie. We made money when the Peanuts show ran or electronics, all types.

Q. What types of companies served as licensees for Iconix?

A. Our biggest customers were the retailers. As I mentioned, Wal-Mart was our biggest customer because there we were able to bring great brands to the mass market and they were able to give us -- turned into billions of dollars of shelf space that Starter took over their whole sports department and Danskin took over the whole female agent leisure department and OP. Retailers -- we ended up doing about $14 billion and retailers were about 7 billion. Then we had over a thousand license agreements around the world with different wholesalers or different types of businesses for the brands.

Q. Mr. Cole, how large was Iconix relative to other licensors of brands in the 20132014 time frame?

A. At our peak, which was 2014, we were the second largest licensing company in the world only behind Disney. As I mentioned, we had grown to about $14 billion in sales, and we were buying roughly three or four different companies a year, and we had raised a couple of billion dollars of capital to continue our acquisitions.

Q. What, if anything, did Iconix do to support its brands?

LAPMCOL2          Cole - Direct          Page 2131

A. We did everything we possibly could under the concept that each brand, we couldn't rest on the laurels that London Fog was great in 1920 or 1930. We had to make it relevant today.

So every brand we treated with care, and we had brand management teams, and we would do at the time, because seven years ago was pre social media, more focused on advertising, and the way we did what we considered viral at the time was mostly celebrities. We worked with some of the greatest celebrities in the world, having the celebrity work with us and buy the brands. It caused tremendous press, and we utilized press to make our brands famous worldwide.

Q. Mr. Cole, in the 2014 time period, approximately how much did Iconix spend on advertising in connection with its brands?

A. We had a budget process where management would meet with the board. Let's say October, roughly, I think we had finalized our budget for the next year. In 2014, having gone through a lot of notes over the last couple of years and this trial, we spent roughly $36 million in advertising. But the goal was to get the retailer to double. We spent most our money of the production of getting the celebrity and shooting the ads. Ideally, we would get Kohl's or K-Mart or Wal-Mart on the advertising that we produced, but we spent roughly about $36 million that year.

Q. In your experience, when, if ever, is a brand owner asked to provide marketing or advertising support by a business

LAPMCOL2          Cole - Direct          Page 2132

counterparty like a business partner licensee, as you described?

A. Every day. That was our big value add. So any time I'd go to a meeting with a retailer or licensee, they wanted more advertising. They wanted to know who the new celebrity was or what the -- what we were doing to support their business. They did all of the distribution, the retail, the sourcing, the design. We had a design team working doing some of it. But our primary function was advertising and marketing. So the retailer was always pushing us to spend or to give them money for what they were spending. So it was a common practice.

Q. In the 2013 through 2014 time period, approximately how many employees did Iconix have?

A. We had roughly 150 employees, of which 100 were based mostly in New York, and we also had purchased two big brands that were important to us in the UK, which were Umbro, which we purchased from Nike, and also Lee Cooper. So on the Umbro brand we took on a development team because we had so many licensees worldwide. So we also had 50 employees based in either London or Manchester, England.

Q. Mr. Cole, focusing, again, on the 2013 through 2014 time frame, can you describe generally how you viewed your responsibilities as CEO.

A. The CEO is in charge and to me it was -- I get -- I had a lot of reports and I was responsible for everything. One day I

LAPMCOL2          Cole - Direct          Page 2133

got to work on an ad campaign if I wanted to.

But I was responsible -- I worked for the board of directors, and I signed up for a budget, and I was trying to grow. I was -- fortunately to some, I was a workaholic, so I loved my work. So I did everything in the business, which was all great to me.

Q. In that 2014 time period, approximately how many people reported directly to you?

A. I had roughly ten reports at that time. I was, you know, trying to lighten up. I probably at other times in my career had more, but at this time I had ten.

Q. As best you can, can you please describe who those direct reports were and what their titles were and, generally, what their responsibilities were in or about the 2014 time period.

A. I had a chief marketing officer, a woman named Dari Marder, who had been with me my whole career, roughly 29 years. I had a woman named Lanie List, who was running the merchandising who was with us about 10, 11 years. Both of them started, obviously, through Candies when we were in the shoe business. Also had head of HR was a gentleman named Aaron Kopelowitz. I had a woman who was running just the Peanuts business who came out of Nickelodeon, Leigh Anne Brodsky. I had a woman who ran the Martha Stewart business, but now she was running our home business, named Carolyn D'Angelo. I had also the CFO named Jeff Lupinacci, who was new, about a year in, and I had a new

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LAPMCOL2          Cole - Direct          Page 2134

general counsel -- I guess not so new, about two years in, a gentleman you met named Jason Schaefer, and a gentleman named Willy Burkhardt. He was hired right in the middle of 2014 who was running international. And then I also had Seth Horowitz, who you have met, who was running the men's business and had recently been promoted to COO.

Q. Can you describe the legal function at Iconix as it existed in or about the 2013, 2014 time frame.

A. Yes. We had a lot of outside lawyers and legal bills were really high. White & Case did our global tax business and Gibson Dunn did our international and Blank Rome did our SEC work. In-house, I believe we had seven full-time lawyers and maybe two or three paralegals.

Big part of the job was we owned -- I am not going to guess, but hundreds of thousands of trademarks because every time we bought a trademark, it was in hundreds of countries in different styles, in different forms, in different products. So a lot of the legal department was maintaining the trademarks around the world.

Q. Before Mr. Schaefer, who was the general counsel at Iconix?

A. Andy Tarshis, who had kind of built the company with me, and he was, I believe, with me about eight or nine years before Mr. Schaefer, and Andy, he moved back up to Westchester to where his family was -- I'm sorry. To Westport, Connecticut, so he left us and we hired Mr. Schaefer.

---

LAPMCOL2          Cole - Direct          Page 2135

Q. Mr. Cole, can you describe the role of the CFO and finance and accounting function at Iconix in the 2013, 2014 time frame.

A. The CFO in a public company is responsible for the numbers and working with the banks, working with the independent auditing and accounting, dealing with accounts payables and accounts receivables. So all functions to do with money moving in and out and reporting and making sure that the numbers are correct and that everything is copasetic.

Q. What was the responsibility of the CFO and the finance and accounting team with respect to transactions that were undertaken by Iconix?

A. They were involved. I would make sure that the finance team or Warren, when he was the CFO, and then Jeff, when he joined for the last part, whenever there was a transaction that was close or that we had agreed we are going to start the lawyers, get the lawyers involved, we also got the accountants involved and made sure -- we also brought BDO into every transaction -- I shouldn't say every transaction, but most transactions that were substantial, as we conceived them and made them because we didn't want to get to an end of a transaction where we didn't know what the accounting was before we did it.

Q. I think you have referred to them, but who was Iconix's auditor during the period 2005 through 2015?

A. We had a firm called BDO Seidman that was with us for 18

---

LAPMCOL2          Cole - Direct          Page 2136

years, but they were with us during that time.

Q. Who were the individuals at BDO who worked most closely with Iconix?

A. You met Larry Shapiro, and he rotated. There was a woman named Natalie Kotlyar, who was the lead contact when Larry wasn't there. Then there was a big group of accountants that worked under Larry or Natalie. One was a gentleman named Avi Geffner, who actually lived in Israel and flew in four times a year, and there was a gentleman named Mike Mazzo, which I have heard his name in the trial. I don't remember spending too much time with him.

Q. Who were the people at Iconix with whom BDO interacted most frequently?

A. With the finance team. They would work with the CFO, which Warren had a great relationship with BDO, and also Brian Snyderman, who was the VP in charge of finance. And the third person that worked closely with them would be Justin Abrahamson, who was the controller.

Q. You have referred a couple of times to Warren. Are you referring to Warren Clamen?

A. Yes.

Q. And he was the CFO of the company prior to Mr. Lupinacci, correct?

A. Yes. Warren had been there nine years, also with me when we started the company. Had been there a long time. I don't

---

LAPMCOL2          Cole - Direct          Page 2137

remember the exact time. But had helped built the company.

Q. Can you describe what your own interactions with BDO generally consisted of.

A. I would see Larry once a quarter, probably privately, with Warren. And then I would see him -- I was invited to audit committee meetings as an observer. So I would see him at audit committee meetings, and I would see him probably once a year -- I'm sorry -- once a quarter, maybe spent a little more time on a year end if we were doing -- but it was periodically, probably, four, five times a year.

Q. Based on your own experience and observations, how would you compare the frequency of your own interactions with BDO as compared to the interactions with the accounting and finance team with BDO?

A. As I mentioned, I think I saw them once quarterly, and I think I would gather -- my accounting team would speak to them many times a week. Kind of an important function to make sure they were kept abreast of what was happening in the company.

Q. Mr. Cole, I want to direct your attention to international joint ventures undertaken by Iconix.

THE COURT: Mr. Reisner, now might be a good time to break. We will take 20 minutes. Ladies and gentlemen, don't discuss the case.

(Jury not present)

THE COURT: Mr. Cole, you may step down.

---

**A-403**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

| LAPMCOL2 | Cole - Direct | Page 2138 |
| --- | --- | --- |

Everyone can be seated.

Anything to raise?

MR. REISNER: No, your Honor.

THE COURT: Twenty minutes.

(Recess)

THE COURT: Mr. Reisner.

MR. REISNER: May I proceed, your Honor?

THE COURT: You may.

BY MR. REISNER:

Q. Mr. Cole, I want to direct your attention to international joint ventures undertaken by Iconix. What, in general, was the strategic rationale for these joint ventures?

A. We were based in New York and we had -- we thought -- our business was wonderful in the United States and we owned all of this valuable IP or brands that were -- a lot of them had license agreements all over the world. It would have been very expensive to open up offices in all of these countries and teach people; plus, even learn the customs or what happens in these countries.

The model we came up with was to find a local business that was strong, that knew the retailer, had credit, that we were sure we were going to get paid. And originally they were going to license, and then we realized that if they became our partner and invested in the business they would be -- care more and they would be a good partner.

| LAPMCOL2 | Cole - Direct | Page 2139 |
| --- | --- | --- |

So we came up with the strategy of, if we sell them half of the intellectual property, it could be a great business model because half of a hundred is better than a hundred percent of very little. That was the concept of the JVs.

Q. What were the qualities and characteristics that Iconix looked for, generally, in a joint venture partner?

A. As I kind of just alluded a little bit, we wanted a strong company who knew the market, who knew -- in the beginning it was fashion and apparel and footwear, all of the products we had, and someone who we knew we could trust because we found out in a lot of these markets the licensees just don't pay you. We are so many miles away. It's a big joke that they all had two sets of books. But having a local in the market who they knew and would be watching them is someone. So we looked for strong, powerful companies who could be our partners.

Q. What role, if any, did BDO play in the development of this model?

A. BDO helped conceptualize it with us. As much as Larry was up here saying they audit, they have a whole team around the world and they came up with the concept of the joint ventures or how it could work, and they were involved in structuring them with us. I think they wrote the first white papers, but they were an integral part of helping us structure the JVs.

Q. When did Iconix begin entering joint ventures and in what territories?

| LAPMCOL2 | Cole - Direct | Page 2140 |
| --- | --- | --- |

A. Our first joint ventures, I believe it was like 2006, 2007. The first one was with a gentleman named Silas Chou, who is very famous in the apparel business because he owned Tommy Hilfiger and Michael Kors, and Silas was an innovator.

He took the first JV in China and it became very successful. We had -- I think we had 900 stores that were opened under our brands. The second one was done in South America with a group of guys called -- I called them the Falic brothers, although Leon was in charge. I think they owned duty-free shops.

They also hit it out of the park and our business was four times what it was when we were doing it out of New York. Both of them very good. One of the things we realized, though, is 50/50 and now it became big and successful and, for instance, Silas was very busy with Michael Kors. We were looking for a way to be able to possibly buy them back once they had scale and, that way, because we sold them -- they also were no longer on revenue. They became -- went below the line.

Although everyone is talking about getting revenue to sell them is a big discussion here, second year, they are gone. They are below the line. We were looking for a way, not only that, but to control the business. When they were big and successful, we wanted to own a hundred percent of them.

So we put in these mechanisms, I think it was around '09, '10, placed some calls. So after five years, you could

| LAPMCOL2 | Cole - Direct | Page 2141 |
| --- | --- | --- |

either buy it or sell it to the partner, if you wanted. Because 50 percent in a private setting doesn't mean it can go on forever.

So that's how they developed, and we started doing them all over the world. We partnered with Reliance in India. We partnered with a company called Dunlap in Australia, some of the leaders of the multibillion dollar companies around the world.

Q. Did there come a time, Mr. Cole, that Iconix established a joint venture relationship with Li & Fung?

A. We did.

Q. Why did you believe that Li & Fung would be a good joint venture partner?

A. At the time, in let's say 2013, Li & Fung was the gold standard. They were -- I believe they were doing over $20 billion. They were the leading apparel sourcing company in the world, and they had offices throughout the world and especially in Southeast Asia, which we didn't -- never visit. We had licenses in Thailand and Philippines and places, but we didn't have anyone on the ground there nor did we ever visit. Li & Fung seemed like the perfect partner at the time.

Q. When did Iconix initially establish a joint venture relationship with Li & Fung?

A. I believe the first joint venture happened for Southeast Asia in 2013.

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

LAPMCOL2          Cole - Direct          Page 2142

Q. Was that in October of 2013?

A. Yes.

Q. Is that the transaction that we have heard referred to during the trial as SEA-1?

A. Yes.

Q. I want to ask you a few questions about the SEA-1 transaction.

What was the rationale behind the SEA-1 transaction, from your perspective?

A. I kind of just said a little bit. It was having a great partner who had boots on the ground, was a phrase we used, offices all over the Southeast Asia territory, knew all the trading partners, knew the retailers who could license them directly. So they were -- Li & Fung was a good, rational and, in our minds, the best partner we could get.

Q. How would you describe your role, if any, in connection with the negotiation of the SEA-1 transaction?

A. I was involved. I wanted to be -- I had a relationship with Li & Fung. I had helped them out of a problem I believe they had in 2011, 2012, where they had a company called Ecko. Marc Ecko owed them about $125 million and they had no money. So I ended up helping them working together, I bought -- not I. I apologize. Iconix Brand Group bought Ecko and Li & Fung was able to get paid back.

In that process I met Victor Fung and William Fung and

LAPMCOL2          Cole - Direct          Page 2143

Bruce Rockowitz, the CEO, and I became friends with them, somewhat, and, also coincidently, knew a lot of people in the company: Dow Famulak, who was president, and Ron Ventricelli, who ironically had interviewed with me before he took the job at Li & Fung.

So I had a good knowledge of really top management at Li & Fung, and I wanted to -- in my mind, they were possibly the acquirer down the road because at that time I thought they were such a great company.

MR. REISNER: Mr. Klein, can we please place before the witness and display for the jury what's in evidence as Defense Exhibit 302 and Defense Exhibit 302-A1 through A13. If we can put those side by side for a moment as well, 302 and 302-A1, maybe to start. Just for the benefit of the witness and the jury, if you could just scroll down from 302-A1 through 302-13 so we know what those documents are. Keep going. Maybe you can go to A4. There you go.

Q. Mr. Cole, does 302-A1 through A-13 appear to be the SEA-1 transaction documents?

A. Yes.

Q. I want to direct your attention to Defense Exhibit 302. That's the e-mail from Ericka Alford to Warren Clamen with a copy to Lauren Gee that has the subject Iconix SEA Asia Limited transaction documents and states, in part: Warren, per your request, final SEA documents are attached. I will take a look

LAPMCOL2          Cole - Direct          Page 2144

at the put/call options in the shareholders agreement now to better remember what finally agreed to with respect to price.

You see that document, Mr. Cole?

A. I do.

Q. And that e-mail appears to forward an e-mail that Ms. Gee had received from Jessica Lau of Gibson Dunn to copy to Ms. Alford of the SEA-1 transaction documents, correct?

A. Correct.

Q. And they are listed in that e-mail from 1 through 14, correct?

A. Yes.

Q. Who is Ericka Alford, the person who sent the e-mail?

A. Ericka was our assistant general counsel. We had -- she joined the company I think about a year or two before this, and she was the general counsel at Warnaco.

Q. Who is Warren Clamen?

A. Warren was our CFO at the time who had been with the company for many years.

Q. Who is Laura Gee?

A. She was an attorney who I believe worked with Horowitz on this deal.

Q. Looking at the e-mail down below, who is Jessica Lau?

A. Jessica Lau, it looks like she is from Gibson Dunn.

Q. There is also a cc with a name I haven't mentioned yet, Alyssa Perlowitz. Who was she?

LAPMCOL2          Cole - Direct          Page 2145

A. She was another attorney in the legal department.

Q. What was your understanding, in or about the October 2013 time frame, as to whether financial and accounting professionals at Iconix received and reviewed the transaction documents for SEA-1 prior to your execution of the documents?

A. Very tough for me to understand what my understanding was eight years ago. But just -- this document just shows that you have the top professionals in the company involved in these -- in the transaction.

Q. Was it generally your understanding, Mr. Cole, that financial and accounting professionals at Iconix reviewed significant transaction documents before you signed them?

MR. HARTMAN: Objection. Leading.

THE COURT: Sustained.

Q. What was your understanding, generally, as to whether financial and accounting professionals at Iconix reviewed documents for significant transactions? What was your understanding?

A. That would be our practice. Any good public company would make sure that all the top professionals in both legal and finance would review any transaction that is unique rather than just the ordinary course of business as an international joint venture.

Q. I want to just direct your attention to the shareholders agreement. Just for the record, it's Defense Exhibit 302-A11.

# A-405

LAPMCOL2 Cole - Direct Page 2146

MR. REISNER: If we can go to page 29.

Q. Is that your signature on the document?

A. It is.

Q. Did you sign several of the other transaction documents for the SEA-1 transaction?

A. Yes, I believe so.

MR. REISNER: We can take that down.

Q. What understanding, Mr. Cole, did you have, if any, in the October 2013 time frame, as to whether the legal team at Iconix reviewed transaction documents for significant transactions before you signed them?

MR. HARTMAN: Objection. Foundation.

THE COURT: Overruled.

A. I wouldn't sign a transaction. Normal practice is, one of the lawyers, when they came in and asked for signatures, they usually verbally, or in written, gave me a review sheet because I didn't read the substantial phone books, and I literally had -- I signed hundreds of documents a week, usually, so usually lawyers and accountants would come and talk to me and tell me what's in the agreements, remind me if I was involved in negotiation before I would sign them.

Q. What understanding, if any, did you have, in the October 2013 time frame, as to whether outside counsel reviewed transaction documents for significant transactions before you signed those documents where outside counsel was involved in

LAPMCOL2 Cole - Direct Page 2147

the transaction?

A. We only used -- to do international joint ventures or anything internationally, we either used Gibson Dunn or White & Case because they all had offices around the world. So they would have to be involved in any transaction that was outside the U.S.

Q. What understanding, if any, did you have in the October 2013 time period as to whether BDO reviewed transaction documents for significant transactions before the company reported its financial results?

A. BDO reviewed every transaction -- substantial or unique transaction and reported to the audit committee who then reported to the board of directors. So BDO would have been involved in all parts of it, probably when the negotiation was happening.

MR. REISNER: Can we go back to Defense Exhibit 302 for a moment, Mr. Klein, and just display that.

Q. You see, Mr. Cole, that in the list of SEA-1 transaction documents that were ultimately sent?

MR. REISNER: Can you please scroll back.

Q. Among the documents that were ultimately sent to Ms. Alford and Mr. Clamen and Ms. Gee were number 7, a consultancy agreement, correct?

A. Correct.

Q. And number 6 a side letter, correct?

LAPMCOL2 Cole - Direct Page 2148

A. Correct.

Q. We have heard testimony during this trial about a consultancy agreement entered into between Iconix from Li & Fung and you heard that testimony, correct?

A. Yes, I have.

Q. What conversations, if any, do you recall having with Jason Rabin concerning the SEA-1 transaction and anything having to do with a consultancy agreement?

A. Once again, I am not going to sit here today and say I remember a conversation from eight years ago. But I did, unfortunately -- I was going to say fortunately -- sit here for the last three weeks and see all the documents.

Q. Mr. Cole, I'm not asking you about the documents. My question is, what conversations, if any, do you recall having with Mr. Rabin concerning the SEA-1 transaction and anything at all having to do with a consultancy agreement or payment to Li & Fung?

A. I can't tell you I recall a conversation from eight years ago, but I know what the e-mails say.

Q. Apart from what's in the e-mails, do you recall any conversation with Mr. Rabin where he asked you for anything relating to SEA-1?

A. I don't recall because, obviously, I've been dealing with this for seven years. I do recall a conversation where he was pushing me for -- or requesting $2 million. But it's a vague

LAPMCOL2 Cole - Direct Page 2149

conversation from over eight years ago.

Q. What, if anything, do you recall that you responded when he made this request?

A. I was OK with it as long as it didn't negatively impact Iconix, and I told him to draft -- send to the lawyers what you want, and that's what I remember or what I believe happened.

Q. What did you mean by send to the lawyers what you want?

A. Have his attorneys draft what he needed or wanted. He was a customer. I was trying to accommodate the customer. I was OK if he sent something, and I told him that if it was OK with my accountants and lawyers, I was OK with it. I knew we were a public company.

Q. What was your understanding, if any, as to whether Mr. Rabin would send those documents?

A. He said was going to draft the agreements that he wanted.

MR. REISNER: We can take that down, Mr. Klein.

I want to place before just the witness at this point what's been marked as Defense Exhibit 1140-U.

Q. Is that an e-mail, Mr. Cole, that you sent to Ericka Alford with copies to Lauren Gee, Jason Schaefer, and Warren Clamen on or about September 30, 2013?

A. Yes.

MR. REISNER: Your Honor, I offer Defense Exhibit 1140-U.

MR. HARTMAN: Objection. Hearsay.

# A-406

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

---

LAPMCOL2          Cole - Direct          Page 2150

THE COURT: Sustained.

MR. REISNER: Let's take that down and place up for the witness Defense Exhibit 1140.

Q. I've placed before you what's in evidence as Defense Exhibit 1140. Is that an e-mail that you sent on September 30, 2013 to Ericka Alford with copies to Lauren Gee, Jason Schaefer, and Warren Clamen?

A. Yes.

MR. REISNER: We can publish that for the jury, Mr. Klein. It's in evidence.

Q. Your e-mail to Ms. Alford states: Be firm and not critical to give into anything, not comfortable with.

Do you recall what you meant by that?

A. I think just what it says. That's how I believe I conducted business, and I would never want my lawyers to do anything that they were not comfortable with. So I was saying, as these negotiations were happening on different issues, just be firm and not critical and don't give in what you are not comfortable with.

MR. REISNER: You can take that down, Mr. Klein.

Q. Now, with respect to the SEA-1 transaction and the transaction documents that we saw listed, including the consultancy agreement and the letter agreement, did you hide these documents from anyone?

A. No, I did not hide any documents.

---

LAPMCOL2          Cole - Direct          Page 2151

Q. Did you tell anyone to keep information about these agreements away from BDO?

A. No, I never told anyone to keep anything away from BDO or these agreements.

Q. By entering into these agreements, were you trying to falsely inflate Iconix's revenue in any way?

A. Absolutely not.

Q. We have seen the consultancy agreement and references to the consultancy agreement with Li & Fung. What services, if any, did you understand Li & Fung had performed or would perform pursuant to the consultancy agreement?

A. It was my understanding that they had people in each of the countries and territories, and I believe they met with all of the licensees. I think at the time we had -- I believe I have seen roughly around 13 different companies and there were a few prospects. I believe they met with each of them looking to see if there was more opportunities and what they were saying.

I also remember clearly, because I remember they sent me pictures, they found out there was 100 Massimo stores. Massimo was one of the brands we owned and there was 100 stores in the Philippines and we were not getting paid. So they had discovered a large nonpaying, call it a counterfeiter or someone who is using our trademark without our permission. That was a big opportunity and I believe it resulted in us getting a lot of money, maybe close to a million bucks.

---

LAPMCOL2          Cole - Direct          Page 2152

So they were quote/unquote boots on the ground working in at least July and August. I'm sorry. August and September.

Q. Mr. Cole, with respect to SEA-1, was there any agreement with Li & Fung to falsely inflate the purchase price of that transaction so that Iconix could inflate its revenues?

A. No. It really doesn't make sense. Iconix was doing 430 million that year and we made, I believe, close to 250 million profit. The concept that we are going to inflate a revenue -- and the fact it also closed on the first day of a quarter the next quarter when we don't even know what's happening in the quarter. So the notion that we would inflate revenue is, in my mind, although I guess I'm sitting here, is beyond absurd.

Q. Mr. Cole, was Seth Horowitz involved in any way in the SEA-1 transaction, to the best of your recollection?

A. No.

Q. I want to fast forward to the March 2014 time period. That's approximately when you appointed Seth Horowitz to become chief operating officer of Iconix, correct?

A. Correct.

Q. Why did you decide to promote Seth Horowitz to chief operating officer in March of 2014?

A. I ask myself that question every day. But looking back -- and we had lost a great executive who had built the company with me, a guy named Yehuda Shmidman. He left us and became CEO of another licensing company. I believe recently we had

---

LAPMCOL2          Cole - Direct          Page 2153

also lost another executive.

I just had a lot on my plate. I figured for the first time I would have a COO. We never had that title before. Seth was -- we had some issues when he first started, but we had kind of learned how to deal with each other, and he was on a different floor and far away. I thought wrote interesting reports, although they were long. I gave him that position with the approval of the board somewhere in that time period.

Q. Mr. Cole, I am going to ask you some questions about the SEA-2 transaction. You'll know what I'm referring to when I describe the SEA-2 transaction, correct?

A. Yes.

Q. Who negotiated the SEA-2 transaction on behalf of Iconix?

A. Seth Horowitz.

Q. What was your role in connection with the negotiation of the SEA-2 transaction?

A. I'm not going to run away from it. I was the CEO. So my role was -- I signed the agreement and periodically throughout the three or four months' negotiation I would see certain documents, not a lot. Most people in my company cc'd me on everything. Seth had this little insular thing where he didn't like to cc a broad group of people. So I did see documents periodically throughout. But I wasn't involved in the negotiation of the deal.

Q. How was it that Horowitz took the lead on negotiating

---

## A-407

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAPMCOL2          Cole - Direct          Page 2154

SEA-2? How did that come to happen?

A. There was a lot of -- in his area Li & Fung had a lot of men's licensees. So he knew Li & Fung -- they were the licensee for Rocawear -- Echo, Zoo York. He knew all the people there.

Quite honestly, because of my friendships with Dow and Bruce and Jason, I didn't want to be involved, plus I was working on other transactions, so Seth took the lead.

Q. In that April, May, June 2014 time frame, what were you spending your time on at Iconix?

A. There were two major what I call needle-moving opportunities that were happening at the time. One of them, we were approached by 20th Century Fox to do a movie for Peanuts. That was very exciting because it was going to be a global release in a hundred countries. I had never been involved in making a movie before. So I was pretty excited about how that work. I went out to L.A. and met with 20th Century Fox and the people and working on the script and things like that.

What I remember, the focus of my attention during that May and June was, we were working on a huge transaction to purchase either the largest or second largest talent agency in the world, a company called Creative Artist, or CAA. I was spending a lot of my time focused on figuring out how to merge Iconix Brand Group with CAA.

Q. You referred to reviewing some documents from time to time.

LAPMCOL2          Cole - Direct          Page 2155

Other than that, what, if anything, do you recall doing with regard to the SEA-2 transaction?

A. I don't recall doing anything. I read Friday at Fives. In each of my ten reports -- actually, I think, I got 15 Friday at Fives. Usually, I had about 50 pages to read every weekend or on Monday. I might have had a phone call or two checking in, but I don't believe I had anything to do with the negotiation of it.

Q. How would you compare the time that you spent on the CAA potential transaction to the time you spent on the SEA-2 transaction?

A. Noncomparable. One was hundreds of hours verse reading a few e-mails and maybe taking a phone call or two, which I don't recall.

Q. Do you recall anything about the Lee Cooper brand being exploited in Europe in connection with the SEA-2 transaction?

A. Yes. Lee Cooper was a brand we had purchased maybe earlier in the year or let's say around 2013 or could have been 2012. Very powerful denim brand that was based in London. It had a really strong business throughout Europe. It was kind of maybe as good as Levi's. There were Lee Cooper stores everywhere. Maybe not as good as Levi's, but a strong brand. I remember that Li & Fung was very interested in Lee Cooper.

One thing we didn't discuss, which in -- I believe earlier in the year, there was a company called TLC, which was

LAPMCOL2          Cole - Direct          Page 2156

our partner in Europe. They sold their business to Li & Fung. So Li & Fung became a new partner of ours in Europe after SEA-1 and before SEA-2. So I knew the team pretty well because I had worked with them as my partner, the European people.

So now GBG, or we call it Icon Europe, Li & Fung was now our partner not only in Southeast Asia, but also in Europe, and they had a strong marketing group, which is this woman, Angela Formica, who ran the company, and she was really a strong marketer and they marketed globally for Jeep and for Ford. She really wanted the Lee Cooper brand. It was an important part that she really wanted to market it because it was so powerful in London or in England. I'm sorry I rambled.

Q. What was your understanding in the April, May, early June time period, if any, as to whether Lee Cooper Europe was a component part of the SEA-2 transaction being discussed?

A. Once again, I am not going to say what I remembered seven years ago or eight years ago. But having seen documents over the last seven years and been involved in four investigations, I know that there was -- there was an e-mail that Lee Cooper was a huge part of the deal when it was a $25 million deal in May, that Li & Fung really wanted the Lee Cooper brand.

Q. Was Lee Cooper Europe ultimately part of the SEA-2 transaction?

A. No.

Q. What, if anything, do you recall learning about whether or

LAPMCOL2          Cole - Direct          Page 2157

not it would be part of the transaction?

A. GBG was -- I believe I learned sometime in May, June, although I think it was from Dow or Bruce, that GBG -- I shouldn't say GBG because there was no GBG. But they were doing a spinoff of Li & Fung, that they were going to take all of their American businesses, American licensing businesses, and spin it off into a new company called GBG, which was going to be a separate public company from Li & Fung, and now there was going to be this new company called GBG. And they were having I wouldn't say regulatory, but they were worried that they couldn't do -- Lee Cooper was a little too big. I shouldn't say big. I don't know why. But they couldn't do Lee Cooper in the spinoff because the spinoff was supposed to happen on July 1 and this deal was going to close towards around that date or at the end of June. So they couldn't do the Lee Cooper transaction.

Q. At or around that time, what was your understanding, if any, of Lee Cooper's level of interest -- withdrawn.

What was your understanding at that time of Li & Fung's level of interest in Lee Cooper Europe?

A. I believe -- it was very important. It was a big part of the deal. And I do remember when they couldn't put it in the deal that I got phone calls from both Dow Famulak, who was the president, and from Ron Ventricelli, who was the CFO or COO, asking me to make sure that they could do Lee Cooper as soon as

# A-408

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED<br>October 25, 2021

LAPMCOL2          Cole - Direct          Page 2158

the spinoff happened after or later in the fall or third quarter, fourth quarter. And they wanted to make sure that Lee Cooper -- whether it was an option or some sort -- they wanted to make sure they could still do Lee Cooper if they went ahead with SEA-2 without it.

Q. Mr. Cole, did you make a verbal agreement with GBG to increase the purchase price for SEA-2 by $5 million in exchange for Iconix agreeing to make a $5 million payment to GBG in the future?

A. No. I was CEO of a public company and had a legal background. I was an attorney. To me, oral agreements are negotiations, people discussing. Terms of a deal are put in writing. I think if you ask any CEO of any public company, you have to have it in writing and signed by everyone, or else it's just chatter and negotiation.

MR. HARTMAN: Objection. Move to strike as nonresponsive.

THE COURT: Sustained.

Q. Mr. Cole, at the time of the SEA-2 transaction, did Iconix undertake an obligation for commitment to reimburse Li & Fung for $5 million of the purchase price paid by GBG for SEA-2?

A. Absolutely not.

Q. What conversations, if any, do you recall having with LF/GBG in connection with SEA-2 regarding future marketing payments?

LAPMCOL2          Cole - Direct          Page 2159

A. None.

Q. Did Iconix undertake any commitment or obligation to LF/GBG in connection with SEA-2 that was not in the written transaction documents?

A. Absolutely not.

Q. Now, Mr. Rabin has testified that you told him that if he raised the SEA-2 price by $5 million, Li & Fung could bill back Iconix for $5 million.

Did that conversation happen?

A. Absolutely not.

Q. Mr. Horowitz has testified that you told him that you had gotten GBG to agree to a $5 million increase in the SEA-2 joint venture in exchange for Iconix paying them back at a later date.

Did that conversation with Mr. Horowitz happen?

A. Absolutely not.

Q. When is the first time that you recall learning about a supposed verbal agreement to pay GBG back for a portion of the SEA-2 purchase price?

A. I believe it was around September. I'm sorry.

Q. Let me ask the question again. When is the first time you recall learning about a supposed verbal agreement to pay GBG back for a portion of the SEA-2 purchase price?

A. When Mr. Horowitz resigned in April of 2015.

MR. REISNER: Can we please place before the witness

LAPMCOL2          Cole - Direct          Page 2160

what's in evidence as Defense Exhibit 303, 303-A1 through A3. If we can put them side by side, 303 next to 303-A1. For the benefit of the witness and the jury, if we can just briefly scroll from A1 to A2 and then to A3 so that everybody knows what those documents are.

Q. Mr. Cole, do those appear to be the SEA-2 transaction documents?

A. Yes.

MR. REISNER: Let's look at the shareholder agreement, DX-303-A1. I think it's page 30. A1 at 30.

Q. Is that your signature on the document?

A. It is.

Q. Directing your attention to the e-mail that's in evidence as Defense Exhibit 303 that transmitted the SEA-2 transaction documents, the e-mail was sent by Lauren Gee. Again, who is she?

A. She was an attorney who Horowitz liked to work with in the legal department.

Q. Who is Jeff Lupinacci?

A. Jeff Lupinacci was the CFO at the time.

Q. Who was Brian Snyderman?

A. Brian Snyderman was the vice-president of finance.

Q. Who is Justin Abrahamson?

A. He was the controller.

Q. And who is David Maslaton?

LAPMCOL2          Cole - Direct          Page 2161

A. He worked in the finance group.

Q. Who is Willy Burkhardt?

A. Willy was the brand-new president of international.

MR. REISNER: Mr. Klein, we can pan back out and show 303 next to 303-A1, 2, and 3, or 303-A1 is fine.

Q. Mr. Cole, what obligations or commitments did Iconix undertake for Li & Fung or GBG in connection with the SEA-2 transaction other than those set forth in the written SEA-2 contracts?

A. Nothing, no obligations.

MR. REISNER: We can take that down, Mr. Klein.

Q. Now, in late 2014, did you authorize Iconix to pay marketing invoices from GBG totaling approximately $5.4 million?

A. I did.

Q. Did you believe that Iconix had an obligation to make those payments?

A. No.

Q. If Iconix didn't have an obligation to make those payments, why did you authorize payment of those invoices?

A. GBG was obviously a big partner of ours. We had over $100 million of contracts. A few things were happening where they were pretty upset. Number 1, the Lee Cooper option had not happened as of then, and they wanted to go forward, but Willy Burkhardt, our new president, thought it was not the right

**A-409**

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAPMCOL2          Cole - Direct          Page 2162

decision.

The other thing that happened, there was an issue in Korea with London Fog where they thought it was worth 3 million or something and it turned out it was only worth a million, million and a half or something.

The other thing at the time is, they wanted us to find a replacement to take over Rocawear because they were not happy with Rocawear Kids, and we were looking for a replacement for about six months and didn't find anyone who would step into their shoes. So the combination of those and also knowing that TLC and Angela were doing some good marketing around the world, I agreed, I was definitely getting pushed by Seth, and probably Jason at the time, so I agreed to give them $5.4 million of marketing. We also had it available in our budget. We had a $36 million budget at the time. And we had an extra money to -- still within budget. So between November and December, I agreed to give them $5.4 million of chargebacks for marketing.

Q. Mr. Cole, what connection, if any, was there in your mind between the SEA-2 transaction and these marketing invoices paid by Iconix?

A. Absolutely no connection.

Q. And you testified earlier about advertising expenses at Iconix. What was the Iconix advertising budget for 2014, if you recall?

A. I believe I have already said it was roughly $36 million.

LAPMCOL2          Cole - Direct          Page 2163

Q. Approximately how much did Iconix actually spend on advertising in 2014?

A. I believe we came in on budget.

Q. Now, Mr. Horowitz testified that he spoke with you in late September 2014 regarding invoices from GBG and sending more detailed invoices. Do you recall a conversation with Mr. Horowitz about GBG marketing invoices around that time?

A. Yes.

Q. What do you recall?

A. Seth came to me, and he wanted to give GBG some money, and he thought it was good for business and good to promote the brands. And he showed me these invoices and I said, shouldn't we see some backup for the invoices? So I said: Go get some backup. Let's see what Angela -- let's see what they did. Let's see the work. So I believe Seth went over to get that.

Q. Why did you want to see backup?

A. I just wanted to see what was happening around the world and what Angela was doing, and I thought if we were going to write that size check, we were at least entitled to see some backup of what they were doing.

Q. What happened next? What happened next with respect to the invoices, as you recall?

A. I recall or I have seen over the last few weeks they resubmitted invoices. We approved them. And we paid them $5.4 million between November and December and January.

LAPMCOL2          Cole - Direct          Page 2164

Q. Did you believe that those invoices were a sham?

A. No.

Q. What was your understanding, if any, as to whether LF/GBG actually performed the work reflected in those invoice backup?

A. I didn't look too closely at the backup, but I saw they performed work and I was comfortable.

Q. Can I ask you some questions now about the SEA-3 transaction. You will know what I'm referring to if I refer to the SEA-3 transaction, correct?

A. Yes.

Q. Who negotiated the SEA-3 transaction on behalf of Iconix?

A. Seth Horowitz.

Q. Before we get into the details of the SEA-3, and I think you referenced this, there was testimony about the Kids Headquarters license agreement for Rocawear Kids. What, if anything, do you recall about that license agreement in the 2014 time frame and the background of the agreement?

A. I believe because I had -- we purchased Rocawear and became -- and working with Jay-Z and his team, that Kids Headquarters was the first licensee from way back in early 2000. And it was -- at one point Kids Rocawear was well over a million dollars in business and it was a pretty good business for many, many years. When we purchased Rocawear in, I think it was around 2007, 2008, we inherited the license. I believe we had renewed it once or twice or previously in 2011.

LAPMCOL2          Cole - Direct          Page 2165

Q. What was your understanding in the 2014 time period as to GBG's views of the then existing Rocawear Kids license?

A. They weren't happy with the whole category and that business wasn't trending well, and they were hoping that we could find someone to replace them and find someone who would quote/unquote step into their shoes and become a new licensee. So they were asking us to get out of the license or to find someone to get out. We weren't going to let them out unless we had someone because it was a lot of money. So that was my understanding.

Q. Was a replacement licensee identified successfully?

A. Ultimately, no. We thought we had one, but GBG didn't like them because they were trying to sell them the inventory. I think it was about 7, $8 million of inventory, and the new company that we considering wanted to buy it, and GBG did a credit check, so they didn't approve this company, New Rise, to become the new licensee. So GBG stayed on.

Q. Mr. Cole, was GBG released from its Rocawear royalty obligations?

A. No. They continued to pay throughout the term in 2014, 2015, and they were never released.

Q. As far as you know, GBG continued to make the royalty payments it owed to Iconix in connection with the Rocawear license in 2014 and 2015, correct?

A. Correct.

LAPMCOL2          Cole - Direct          Page 2166

MR. REISNER: Let's place before the witness and we can display for the jury as well, because it's in evidence, Defense Exhibit 304, as well as 304-A1 through A3. Maybe we can do that side by side again.

For the benefit of the witness and the jury, can just scroll from 304-A1 to A2 to A3 so we can see what those documents consist of. We can go back to A1.

Q. Mr. Cole, Defense Exhibit 304-A1, A2, and A3 appear to be the SEA-3 transaction documents?

A. Correct.

MR. REISNER: Let's go to Defense Exhibit 304-A3. I think it's page 34. It's the shareholders agreement.

Q. Is that your signature on the document?

A. It is.

MR. REISNER: We can scroll back or pan back and go back to A1. Let's look at the e-mail transmitting these transaction documents.

Q. It's sent by Lauren Gee, correct?

A. Correct.

Q. Looking at Defense Exhibit 304, I think I have already asked you who the Iconix folks are. Do you know who Robert Smits is?

A. I believe he was the general counsel for Global Brands Group.

Q. Mr. Cole, directing your attention to the SEA-3

LAPMCOL2          Cole - Direct          Page 2167

transaction, what obligations or commitments did Iconix undertake to Li & Fung or GBG in connection with the SEA-3 transaction other than those set forth in the written SEA-3 contracts?

A. None.

Q. Did Iconix make a verbal agreement with GBG to increase the buy-in purchase price by SEA-3 by $6 million in exchange for Iconix terminating the Rocawear Kids license?

A. No.

Q. Was GBG released from its Rocawear Kids payments obligations?

A. No. GBG paid the 21 million, and they also paid 6 million on top of that for all the Rocawear --

Q. What was your understanding as to GBG's level of interest or excitement about the SEA-3 transaction?

A. They were very excited about this. I heard from -- I spoke to Bruce. I spoke to Dow. I knew they were working on a deal with David Beckham. David wore Umbro when he grew up and as part of Team England. They felt if they acquire --

MR. HARTMAN: Objection. Hearsay.

THE COURT: Overruled.

A. They felt that if they had the rights to Umbro and David, that they spoke to David about doing something with Umbro in China. They were excited about the transaction.

Q. To go on to another topic, Mr. Cole, we have heard

LAPMCOL2          Cole - Direct          Page 2168

testimony about your sale of stock, your exercise of options, and your sale of Iconix stock in October of 2014.

Why did you exercise options and sell stock in October of 2014?

A. The options were expiring in the near future, and I decided, after nine and a half years, that I was going to sell them. And 90 percent of my wealth, or even more, was in Iconix. And after nine and a half years, I wanted to diversify, so I sold the stock or I exercised the option. Then I sold the stock.

Q. Just so it's clear, when had those options been granted?

A. They were granted when I started -- when we started the company in 2005.

Q. What connection was there, if any, between the sale of your stock and the SEA transactions?

A. Absolutely none. And it doesn't make sense because the stock was higher prior to the SEA transactions.

Q. Why didn't you exercise your options and sell stock earlier?

A. Just didn't think of it, or I at the time was just -- when a CEO sells, it's never -- it's not a wonderful thing, but after nine and a half years of not selling stock, I thought it was fine. And they were expiring, so I probably never thought of it prior.

Q. Why didn't you just exercise the options and not sell the

LAPMCOL2          Cole - Direct          Page 2169

shares?

A. You had to pay taxes for -- immediately. I could have kept the stock. I could have paid taxes and sell half of them. But I figure if I was going to sell them and publicly sell stock to pay taxes, I might as well sell the rest of them and diversify my holdings.

Q. Mr. Cole, we have heard testimony about the corp. fin comment letter process in the December 2014 through early 2015 time period. Can you describe, from your perspective, what happened in the December 2014 through early 2015 time period with respect to the comment letters received from corporation finance and the responses to those comment letters?

A. We started getting letters from corp. fin, which was normal, somewhat, but then they started getting heavier and lots of comments about everything we did, how we reported in our segment reporting, various other comments. And a little frustrating because the woman who was running it, she signed all the letters that she handles mining, apparel, and something else. So she had no idea what we did for a living or our business model. So it was a little frustrating dealing with corp. fin.

But they ended up focusing, or as the process got more difficult, there was a lot of questions, as there were questions about everything, but a lot of questions about the JVs and how they were structured and how we were reporting and

LAPMCOL2        Cole - Direct        Page 2170

all sorts of information about the global joint ventures around the world.

Q. Was the key focus VIE or, variable interest entity, accounting, as you recall?

A. It ended up one of the key focuses. There was a discrepancy when we sold the joint ventures and took in a partner, whether we should -- whether they were variable interest entities or they were really 50/50 partners. If they were variable interest entities, we wouldn't have been able to book the gain on selling half of the trademark.

Q. What was your understanding as to the level of complexity of this VIE issue and the accounting for VIEs?

A. It was complex accounting. But what was frustrating to me was BDO is the one who set it up or advised us on how to do this, and they were the ones who were advising me to keep fighting, that they are wrong, they don't understand it. The Iconix business model was new. No one had ever done what we had done and how we -- except maybe if you look at our real estate, we were kind of similar. There was no public IP companies who were selling IP around the world. So BDO wanted to fight. They took in or they encouraged the company, you are right, don't give in. It ended up being an 18-month discussion or battle with corporate finance.

Q. Who from Iconix participated in the review and preparation of responses to the SEC comment letters?

LAPMCOL2        Cole - Direct        Page 2171

A. It was -- as I have heard the expression here, it was all hands on board. All the senior executives who weren't involved, let's say, in fashion or marketing, the CFO and general counsel and head of strategy, head of international, all of our lawyers, accountants, we all were involved because there was so much -- besides for the joint venture VIEs, there were lots of other subjects, too, and we were worried because we thought at the time it could result in a restatement, which is the last thing a public company wants. So we were spending a lot of time and working on dealing with the corporate finance to make sure we got it right, and they understood our position.

Q. In general, what was Mr. Snyderman's role in this process?

A. Brian was, you know, authoring the document. So he was working closely with BDO and -- but Brian was the one who was dealing with all the accounting regulations and all the different numbers which -- on our position because he was familiar with accounting.

Q. What was Mr. Horowitz's role?

A. Doing whatever Mr. Horowitz does. He was working, reporting on JVs or whatever transactions he would have been involved in. We were all giving our input and reading proofs of the documents, working with our lawyers, working with the accountants and trying to get this behind us so we can go back to business. Because it was really taking an inordinate amount of time of the company, and we had stopped acquisitions. We

LAPMCOL2        Cole - Direct        Page 2172

had stopped JVs. Basically, we were focused on getting through this.

Q. What was BDO's role in the comment letter process?

A. BDO was very involved. It was also -- coincidently, we were dealing with a year end. Our 10-K was due right around that time in February. So BDO called in national, which -- I don't know what national is, but someone from Dallas came in, someone from Chicago came in. And there were lots of accountants moved into our facility and were working on this, dealing with the corporate finance group.

Q. Did a firm called AlixPartners also help with this process?

A. Yes.

Q. What was their role?

A. I was getting nervous about BDO and how they advised us, properly or unproperly. So I had reached out to this group called AlixPartners, which had a forensic auditing team, for a quote/unquote second opinion. I thought they worked closely with BDO until I heard Larry sitting in this seat say he didn't work with them. But we retained them to, for lack of a better word, I'll say shadow BDO just to see what was happening because at that point I was getting a little uneasy about BDO's advice.

Q. What was your role in the comment letter process?

A. I was the CEO, so I was responsible to make sure that letter was correct and make sure we put our best foot forward

LAPMCOL2        Cole - Direct        Page 2173

and make sure we can go back to doing business and that the SEC was fine with what we were doing.

Q. Mr. Cole, in the course of preparing responses to the questions from corp. fin, what information, if any, did you learn that you did not recall previously knowing about some of the joint venture transactions?

A. Yes. I think it was in January, I think probably mid February, it was brought to my attention, I don't remember by who and when, that the accountants or the SEC or the corporate finance group was questioning the joint venture transactions for what I refer to as the put and the calls. And they had mentioned there was a new feature in our calls or puts that there was a quote/unquote floor on the puts.

Let me try to explain this because I've heard a lot of people sitting here and maybe haven't explained it well. If we sold the JV for $15 million and at the end of five years the person we sold it to could put it back to us at close to the price they bought it, the SEC was troubled that I started hearing the word round-trip it, that possibly it wasn't a legitimate sale.

Part of the problem was also, I think -- in the documents, the JV was sold for 15. It had a floor on the put, which, minimum, they could buy it back at 10 or 11. But they were also minimum guarantees in the deal, which were also a little new, where they got at least three or four million

**A-412**

---

LAPMCOL2      Cole - Direct      Page 2174

bucks.

Basically, it was saying that there was a possibility that they would nullify the whole transaction and say that we shouldn't have sold it. Because if they had the right to give it back to us, it wasn't a real deal, or it wasn't a real sale.

I was upset, obviously, because the concept of restating -- and I didn't know or didn't believe I knew that Horowitz had negotiated floors on puts and these minimums. So BDO was questioning whether they were going to have to restate or nullify these transactions, which would have looked awful for a public company.

Q. Mr. Cole, what interactions do you recall having with Mr. Horowitz with respect to these puts with floors?

A. Well, Seth felt he was being attacked by not only me, but by others in the company. We were all questioning -- my first question was, Seth, who did you work with on these transactions? Who did SEA-2 and 3? And the CFO wasn't involved. The head of strategic planning wasn't involved. The head of international wasn't involved.

Seth had this little micro group of junior people, and nobody stood up and said they knew about it, what Seth had done, or what this group of people, whether it be Lauren Gee or Snyder, some of the people involved. Seth felt he was being attacked.

One thing I remember clearly, because he was in my

---

LAPMCOL2      Cole - Direct      Page 2175

office and nothing like that had ever happened before. Seth, who you saw, is not very tall, but there is someone who works for us that was like six-two and six-three, and Seth and him almost got into a physical fight. This guy could have -- It was bizarre. In our company no one ever touched anyone. I thought we were all courteous to each other. But Seth felt under siege. He felt that the whole company was attacking him, and he felt that he was going to be quote/unquote thrown under the bus with the SEC and the corp. fin letter.

Q. Mr. Cole, how would you describe the temperature level or level of intensity of the interactions with Mr. Horowitz concerning the put-with-floor discussions and the SEC comment letter response?

A. I kind of just described it. It was hot. It was intense. In retrospect, I should have kept my cool a little bit better because I think I lost him. And he became -- whatever happened happened, but it was definitely confrontational, and he thought he was the executive who was going to be in trouble.

Q. Mr. Cole, during these discussions what, if anything, did Mr. Horowitz say about supposed verbal agreements with GBG?

A. Absolutely nothing. Never mentioned a word about verbal agreements. Never mentioned a word about these deals. He basically didn't tell anybody, the accountants, which is why it was all newly fabricated in his April 13 resignation.

Q. Mr. Cole, did you direct Mr. Horowitz to delete e-mails?

---

LAPMCOL2      Cole - Direct      Page 2176

A. Absolutely not. It's somewhat impossible because the server can't delete an e-mail. We all knew how servers worked, but I never told Seth to delete his e-mails. I did tell Seth to read his e-mails because after this I was very concerned about everything he touched. I knew he worked kind of like a little team, and he wanted to do things without me. So I was questioning every transaction he was involved in, and I asked him to go back and read everything he did numerous times, but I never told him to delete anything.

Q. Mr. Cole, did you tell Mr. Horowitz to destroy any documents?

A. No. I never told anyone to destroy documents.

Q. Did you delete e-mails related to this the SEA joint ventures?

A. No. I never deleted an e-mail related to the SEA joint ventures.

Q. You reviewed the submission that Iconix made to the division of corp. finance on or about February 24, 2015, correct?

A. Correct.

Q. Did you believe that that submission was truthful and accurate?

A. Yes.

Q. Was any material information intentionally omitted from that submission, as far as you knew?

---

LAPMCOL2      Cole - Direct      Page 2177

A. No.

Q. Mr. Cole, do you recall any back and forth with Mr. Horowitz during the corp. fin process about what role various individuals had played with respect to the joint venture transactions, the SEA joint venture transactions?

A. Yes.

Q. What do you recall about that?

A. Once again, I think this is where things got -- I think you used the word hot. The corporate finance asked who negotiated the deals, who agreed on the deals, who signed off on the deals. There was a whole questionnaire.

I said to Seth: You know, you did these deals. I was working on CAA. I was doing -- he said no. You did them. I said: What do you mean I did them? I said: I don't remember any negotiating with anyone on the other side. Jason Rabin, I think, had a heart attack or had open-heart surgery. He was the person I knew. I never dealt with Jared Margolis. I said, you did these deals. He went bonkers and got very upset.

I said to him: Show me where I was involved in these transactions. So he stormed out of my office and he came back with a couple of e-mails. One was May 2 that he had forwarded to me Friday at 5, which had the $25 million deal. I think that was it. There were maybe a couple of June e-mails. But it was definitely a heated argument about who was involved in SEA-2 or 3, and I told him I wasn't.

---

# A-413

LAPMCOL2          Cole - Direct          Page 2178

But I also at one point, when he was really upset, I said, I will -- I said I'm CEO. I sign the documents. I will stand in the oversight role and take responsibility for what I did. So I think that's how we compromised or how it went down.

Q. Mr. Cole, in the March 2015 time period, do you recall becoming aware of an issue with Mr. Horowitz's bonus or claim bonus or 2014?

A. Yes.

Q. What do you recall about that?

A. I recall we were still not out of the woods with the SEC corporate finance group and we were still discussing VIEs and other things. And Horowitz came into my office after bonuses were given out and was complaining. He said: I'm entitled to another few hundred thousand dollars. And I was stunned. Because I was ready to -- I was pretty upset at the guy. I thought he put our company in jeopardy and it was somewhat incredulous to me that he would ask for more money.

Ironically, the bonus calculation was the same for every executive. Every executive, the comp committee, the compensation committee, and the board made it so we were all aligned. I think it was on EBITDA or EPS or budget. So he was the only one out of ten executives, or how many executives were given PSUs, came into my office and said I'm entitled to more money. So it was somewhat shocking to me that he didn't understand the gravity of what we were going through as a

LAPMCOL2          Cole - Direct          Page 2179

company. I said this guy -- whatever. I was upset and it was -- I am going to use your word, hot.

Q. Did you reject his request for additional bonus payment?

A. Yes.

Q. We have heard testimony about Mr. Horowitz's resignation from the company. What's the earliest discussion, if any, you remember having with Mr. Horowitz about resignation?

A. Early April. Still dealing with SEC, corporate finance, Horowitz came into my office, I remember what he was wearing, and he was sweating and he said: I'm resigning.

Q. When you say you remember what he's wearing, why don't you explain --

A. I remember it was a warm day and he was wearing a big down coat. He was -- he didn't look well. He said: I resign. He put a letter on my desk. I said: Seth, please, let's get through this corp. fin. I will work with you. I'll help you find another job. I'll give you a termination. Don't do this in the middle of this process. It's only going to set off more alarms and more bells and whistles throughout everything that's happening. I said: Please stay around. Let's get through this corporate finance together. He left my office and said he would reconsider. I said: Let's figure out how to discuss this. I said: Go see a lawyer if you feel you did something wrong. I said, let's talk to a rabbi. Do whatever you want. But let's calm down, take some time off. I don't need you here

LAPMCOL2          Cole - Direct          Page 2180

at the moment. Please don't resign.

Q. What happened next with respect to Mr. Horowitz and resignation?

A. Next I got a bomb, a bomb in my life. I think it was an e-mail to the board and myself that he resigned, and he questioned the accounting. He questioned SEA-2 and 3 and said that I knew about it.

It was the beginning of the end for the company from a lot of perspectives. I remember nerve pain shot through my leg. Reading this letter, I didn't agree and didn't understand.

Q. Mr. Cole, before receiving that resignation letter, had Mr. Horowitz ever mentioned to you anything about a verbal agreement in connection with SEA-2 or SEA-3?

A. He never ever said anything to me about anything to do with SEA-2 and 3.

Q. You mean a verbal agreement relating to SEA-2 and SEA-3, correct?

A. Correct. He never said anything that was not in the documents.

Q. What did you do upon receiving this resignation letter from Mr. Horowitz?

A. I did what I have to do. I called all the board together. I called a meeting. I think that day they formed a special committee. I think the next morning everybody came in and took

LAPMCOL2          Cole - Direct          Page 2181

everyone's servers and cleaned out the office. And the office -- everyone was kind of in turmoil when they took everyone's computers away, and they started an investigation I think the morning after that afternoon.

Q. Mr. Cole, when did you stop working at Iconix?

A. I left Iconix in August of 2015.

Q. What happened after that?

A. It's been a very difficult time, obviously, after that. Watching Iconix somewhat wither away. Until recently the stock went from $40 to, I think, 30 cents. It was just recently took private for its debt. Watching everything I built or we built become worthless was very difficult.

Also, I tried to start a business. I didn't know what happened. It was going OK. But then it appears people working for me started getting subpoenas and my customers got subpoenas. So my business -- I lost my customer. I've been living under a cloud. I haven't been able to do anything as far as banks or credit cards or anything.

The one I feel for is the most is my family. My wife and kids are kind of living under a cloud that I'm a crook or whatever. After reading the allegations when I was arrested, it's been obviously just a very difficult time.

Q. Mr. Cole, have you been able to work over the last several years?

A. No. I tried to start a business. It didn't -- I didn't

# A-414

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAPMCOL2          Cole - Direct          Page 2182

realize what happened until I found out about some people working for me were subpoenaed. My biggest customer told me they couldn't work with me anymore. In the beginning I didn't realize what was going on and I started -- went to banks to borrow money to be in the brand business and no banks would do business with me under the cloud I've been under over the last six or seven years.

MR. REISNER: One moment, your Honor.

Nothing further at this time, your Honor.

THE COURT: Ladies and gentlemen, it's almost 12:50. Let's take our break now.

Twenty minutes. Do not discuss the case.

(Jury not present)

(Continued on next page)

LAPPCOL3          Page 2183

THE COURT: Mr. Cole, you may step down.

(Witness temporarily excused)

Everyone can be seated. Anything to discuss?

MR. HARTMAN: Judge, a couple of issues that I think were raised by the testimony.

THE COURT: Okay.

MR. HARTMAN: One is with respect to the Candie's evidence. There was a motion in limine to admit that evidence under rule 404(b). Our view is that that evidence, or at least cross-examination on those subjects, is fair game, given Mr. Cole's testimony as to his credibility at issue under rule 608. That's so for multiple reasons; one, is that the allegation in that case was that Mr. Cole was involved in deceptive practices at Candie's.

And it's also at issue because Mr. Cole, in that investigation, admitted to backdating certain documents, which is also an issue that goes to his credibility. And so for those reasons, we do intend to ask a few targeted questions on that issue subject to the Court telling us we can't.

The other issue we wanted to raise is Mr. Cole testified to the stock price drop, and I think it's relevant for the jury the understand --

THE COURT: This is at the end.

MR. HARTMAN: That's right, your Honor. I think it's relevant for the jury to understand that the context of that

LAPPCOL3          Page 2184

was, at least in part, the fact that an internal investigation was conducted at the company and identified a number of accounting irregularities, not just with respect to these transactions but with respect to a number of other transactions while Mr. Cole was CEO. So we intend to ask that as well.

THE COURT: Mr. Reisner?

MR. REISNER: Your Honor, first, on the Candie's evidence, it's exactly the same 403 analysis that the Court has already ruled on. Mr. Cole was not asked questions during his direct examination about issues relating to Candie's or the Candie's business, and Mr. Cole didn't refer to that during his testimony. So there's no reason to deviate from the Court's prior ruling with respect to the Candie's evidence.

THE COURT: Well, I'm sorry, but he did testify about Candie's, and what I'm not recalling now exactly, it came to a point it was like a family business and then it was sold and then it changed names. And I, quite honestly, didn't follow what was going on there. So what is the story there?

MR. REISNER: It has nothing to do with the evidence that the government proposes to admit, your Honor. It was just telling the story of his professional history and what he did before he started at Iconix. We didn't go into anything about the Candie's business and how it -- accounting for the Candie's business, public filings by the Candie's business. There was no evidence like that, your Honor.

LAPPCOL3          Page 2185

It's completely -- it's well beyond the scope of direct, and for the reasons that the Court has already ruled, it's entirely inappropriate and unduly prejudicial under rule 403.

MR. HARTMAN: Judge, can I respond to that?

THE COURT: Yes.

MR. HARTMAN: I do think what is different here is that Mr. Cole has testified, and he has put his credibility at issue. And his credibility is absolutely within the scope of proper cross. Rule 608 is very clear about the fact that the Court can allow, on cross-examination, questioning about prior instances that go to credibility. That's exactly what this is.

I don't intend to ask a lot of questions about it. I propose to ask four or five questions about it. And if Mr. Reisner or the Court thinks we've gone beyond that, then, you know, the Court can cut us off, but our view is it's absolutely relevant for the two reasons I explained.

MR. REISNER: Your Honor, it was 22 years ago, and there was no finding of wrongdoing. It was a settlement on a neither admit nor deny basis. It was 22 years ago. There was no finding of wrongdoing, and it's unduly prejudicial to dredge this up 20 years after the fact. For the same reason that the Court has already ruled, it should be precluded. It should continue to be precluded.

MR. HARTMAN: I just wanted to note, there's no time

**A-415**

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LAPPCOL3     Page 2186

limitation on rule 608. We are not seeking to admit substantive evidence on this point. I would propose to ask Mr. Cole the questions, and he can deny them, if he wants. He will be under oath, of course, but we're not posing to put in any evidence other than just asking the question.

THE COURT: Right.

MR. REISNER: Just one more thing, your Honor. Look, this is a surprise. If we had known that the government was going to propose to introduce the excluded Candie's evidence, Mr. Cole may not have taken the stand in the first place. So this is really an ambush and shouldn't be permitted.

THE COURT: Well, I mean, I think I said, as I always do in ruling on motions in limine, that given the nature of motions in limine, they are subject to being revisited, depending on how things play out at trial.

When I ruled on the Candie's evidence, obviously, it was in the context or without any anticipation that Mr. Cole would testify. He has testified. I will give the government some leeway, very limited leeway, in terms of what they can ask, but I think they are entitled to inquire, at least to some extent, as to that evidence.

MR. TARLOWE: Your Honor, may I just be heard very briefly on this?

THE COURT: Sure.

MR. TARLOWE: Thank you. I think there's a particular

---

LAPPCOL3     Page 2187

unfairness here, given the ruling that was made in the government's position with respect to Mr. Horowitz. As the Court knows, we were not permitted to cross-examine Mr. Horowitz into prior instances of conduct, and I won't refer to what the conduct is in open court, but we were precluded from doing that because the government took the position and the Court I think, ultimately, agreed that it was not probative of his character for truthfulness, which is the only basis for this line of cross-examination.

Cross-examining Mr. Cole about unproven allegations cannot possibly be probative of his character for truthfulness unless the government could establish, which they cannot, that he actually engaged in conduct that is probative of his character for truthfulness.

The fact of an investigation and the fact of a settlement is not probative of the character for truthfulness and, in fact, when this issue was litigated in the in limine motions, the government argued that it wanted to offer Candie's evidence solely to demonstrate that Mr. Cole had knowledge of certain accounting rules. It was never about his actual conduct.

And so there's nothing about the fact of the investigation or the fact of the settlement that is probative of Mr. Cole's character for truthfulness or untruthfulness, which is the only basis on which such questioning would be

---

LAPPCOL3     Page 2188

allowed.

THE COURT: I've ruled. Next item.

MR. REISNER: Your Honor, on the stock price drop and somehow to link it to the internal investigation, that shouldn't be permitted because it's not true. The stock did drop after the company restated, but that restatement, 90 percent-plus of that restatement had to do with VIE accounting and the technical accounting or certain operations of the companies under whether to be consolidated or not to be consolidated. There was a restatement on that basis and the stock price did drop, but that has nothing to do with this case.

It has nothing to do with any unlawful conduct, and to try to suggest that the stock drop because of an internal investigation shouldn't be permitted because it's unfair, and it's inconsistent with the facts. The facts are the restatement was almost entirely related to this VIE accounting. As I said, more than 90 percent of the restatement was connected to the VIE accountancy.

MR. HARTMAN: Judge, can I address the factual issue there?

THE COURT: Sure.

MR. HARTMAN: There were actually two restatements. There was one that was filed as a part of a super 10-K and there was a later restatement in which the VIE issue was

---

LAPPCOL3     Cole - Cross     Page 2189

addressed.

The first restatement, as I understand it, dealt exclusively with the findings of the internal investigation. So I don't think it's correct that the restatement was all about this VIE issue.

The problem with the testimony that Mr. Cole gave is it leaves the impression that somehow the stock price plummeted because Mr. Cole departed from the company and that's just not accurate.

THE COURT: That's certainly the way it came across, that he left and the place fell apart. And to the extent that there are issues concerning certain accounting practices or other practices that were taking place during the time that Mr. Cole was there, that that came out during the internal investigation, I think an appropriate basis is present for cross-examining in that regard.

Okay. You have about ten minutes.

(Recess)

(Jury present)

THE COURT: Everyone can be seated.

MR. HARTMAN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. HARTMAN:

Q. Mr. Cole, you can take your mask off.

A. Thank you.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

LAPPCOL3     Cole - Cross     Page 2190

Q. Sure. Mr. Cole, you'd agree with me that there's been a lot of talk at this trial about revenue; would you agree?
A. Yes.
Q. And earnings per share, as well, right?
A. Yes.
Q. And you talked about that a little bit on your direct testimony as well; do you remember that?
A. I don't remember specifically, but I guess I could have.
Q. Okay. You spoke about the call options with respect to these JV's; do you remember testifying about that?
A. Yes.
Q. And one of the purposes of the call options was that Iconix wanted to be able to buy back the interest in these JV's if the JV's were successful; isn't that right?
A. Correct.
Q. And the reason for that was because when the JV's were operating independently, the revenue from the JV's, the full revenue from the JV's did not show up on Iconix's topline for revenue; isn't that right?
A. Correct.
Q. And so by buying them back, Iconix was allowed to consolidate them and report the full revenue for the JV's?
A. Yes, and profit.
Q. Both revenue and profit, right. And profit is a factor in EPS; is that right?

LAPPCOL3     Cole - Cross     Page 2191

A. Yes, profit was important in EPS and EBITDA.
Q. Okay. And that was important -- it was an important feature of these JV's that Iconix be able to do that, right?
A. Yes, towards -- as we were growing, and it became a big company, a bigger company, we definitely wanted the opportunity to get a hundred percent of the JV's, once they were big businesses.
Q. Okay. And when you say get a hundred percent of them, what you mean is get a hundred percent of the revenue and the earnings from the JV's; is that right?
A. Correct.
Q. Okay. And you would agree with me, Mr. Cole, that revenue was important for Iconix?
A. It was one of our categories that were important, yes.
Q. Okay. It was an important metric for measuring the performance of the company; isn't that right?
A. Yes, one out of many.
Q. Okay. It was one that you highlighted in your press releases, right?
A. Correct.
Q. It was one that was called out in the company's management and discussion analysis; isn't that right?
A. I believe so.
Q. Okay. You understood that investors cared about revenue, didn't you?

LAPPCOL3     Cole - Cross     Page 2192

A. Yes, it was one of the metrics.
Q. And they also cared about EPA, right, earnings per share?
A. Correct.
Q. And, in fact, we saw during this trial a number of these -- I don't know what you call them -- flash reports or P and L reports, where you were looking at the metrics for the company's P and L, or profit and loss, statement during the course of a quarter, right?
A. Correct.
Q. And one of the things you were focused on was beating revenue and EPS for the prior year's quarter; isn't that right?
A. Correct.
Q. And you were also focused on beating consensus for revenue and EPS; isn't that right?
A. Correct.
Q. Now, this was something that you directed people at the company was important as well; isn't that right?
A. Yes. We were -- as CEO, I'm very concerned about the company's financial performance and was always trying to do good at that.
Q. Okay. And I think we heard Mr. Schaefer talk about getting direction from you in connection with his performance appraisal to make sure to drive $85 million in additional revenue; do you remember that testimony?
A. I don't recall that, and it doesn't seem like an attorney

LAPPCOL3     Cole - Cross     Page 2193

can drive revenue.
Q. Let's show, just for the witness and for the parties, what's marked for identification as Government Exhibit 1520. Sorry, is this -- I'm sorry. We'll come back to that.
You also told Mr. Horowitz that he needed to drive revenue as part of the men's division; isn't that right?
A. I don't recall, but I'm sure all management was trying to, you know, do good on all financial performance.
Q. I think he testified that you told him something like: If these are the fucking numbers, then go upstairs and start fucking firing people. Do you remember that testimony?
A. I don't. I don't believe I used those terms, and I'm not sure you should in open court either.
Q. Okay. Mr. Cole, I'm going to ask you just to respond to my questions. Is that okay?
A. As long as you don't curse at me, I will definitely respond to your question.
Q. If I ask you a "yes" or "no" question, I'm going to ask you to answer a "yes" or "no." Okay?
A. Yes.
Q. Now, you understood that beating consensus estimates for revenue and EPS was important for the company's stock price, didn't you?
A. Yes.
Q. You understood that if the company missed consensus, it's

# A-417

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

LAPPCOL3     Cole - Cross     Page 2194

possible the stock price would go down?
A. Yes, temporarily.
Q. Okay. And you understood that if the company failed to show growth, that too could be a reason that the stock price would go down; isn't that right?
A. Possibly.
Q. Did you understand that?
A. No, I mean, every -- the street looks at lots of things. Most importantly lately, it's been guidance. They want to see not so much how you've done but where you're going.
Q. Mr. Cole, I'm going to stop you and ask you --
    MR. REISNER: Objection. I think he interrupted the witness in the middle of an answer.
    MR. HARTMAN: The answer was not responsive.
    THE COURT: Mr. Cole, if you are asked a "yes" or "no" question and you're not able to answer "yes" or "no," simply let us know. Okay?
    THE WITNESS: Yes, your Honor.
BY MR. HARTMAN:
Q. Mr. Cole, you recognize that missing consensus could have bad effects on the stock price, correct?
A. Short term, yes.
Q. And you also understood that missing guidance could have bad effects on the stock price; isn't that right?
A. Yes.

LAPPCOL3     Cole - Cross     Page 2195

Q. And you understood that if a company failed to grow, investors could conclude that their money was better used elsewhere; isn't that right?
A. I don't want to -- I can't answer yes or no.
Q. Okay.
A. I don't know the mind of an investor.
Q. That's fine. If you can't answer "yes" or "no," you can't answer "yes" or "no."
    Now, Mr. Cole, you testified about the SEA-1 transaction on your direct.
A. Is that a question? Is that a yes or no or --
Q. I'll ask you the question.
A. Go ahead.
Q. Mr. Cole, you concede that Mr. Horowitz had nothing to do with the SEA-1 transaction; isn't that right?
A. Correct.
Q. That was a transaction that you negotiated on behalf of Iconix?
A. Yes, along with my team.
Q. Okay. But you were the primary negotiator for that transaction; isn't that right?
A. Yes.
Q. And your counterparty in that negotiation was Jason Rabin; is that right?
A. Yes.

LAPPCOL3     Cole - Cross     Page 2196

Q. Now, you mentioned a number of people who you were good friends with at GBG/Li & Fung on your direct. I don't think you mentioned Mr. Rabin, but you were good friends with him, weren't you?
A. Yes.
Q. You vacationed together?
A. No.
Q. You had dinners together?
A. We had dinner together, yes.
Q. You lent him your plane?
A. I don't recall. He would have rented it.
Q. He rented your plane, is that --
A. He might have. I don't -- when I owned a plane many years ago, it was up for lease, but I don't remember. I don't know if Mr. Rabin rented it.
Q. Did you give him the family rate when he borrowed your plane?
A. I don't know.
Q. Let's look at what's been marked for identification as Government Exhibit 1820.
    MR. HARTMAN: The government offers Government Exhibit 1820.
    THE COURT: Any objection?
    MR. REISNER: No objection.
    THE COURT: It will be received.

LAPPCOL3     Cole - Cross     Page 2197

    (Government's Exhibit 1820 received in evidence)
BY MR. HARTMAN:
Q. Mr. Cole, can you read the top line of Government Exhibit 1820, once it's up on the screen?
A. "See if my plane or Bob's can take Jason back and forth to Alabama on the below date. Let's quote the family rate. Do you have someone at Landmark who does this or still all through Charlie?"
Q. Mr. Cole, does that refresh your recollection that you gave Mr. Rabin the family rate for your plane?
A. It doesn't refresh my recollection, but I have no doubt that this e-mail is correct.
Q. And you testified about Mr. Rabin's health problems. You checked up on him when he was not feeling well, didn't you?
A. I did.
Q. You spoke with him frequently?
A. Well, not really because when he had open heart surgery, I think he was out for a while, but I did check to see if he was okay.
Q. He was the primary person that you negotiated with as part of the SEA-1 transaction; isn't that right?
A. Correct.
Q. You testified -- Mr. Charalambous, you can take that down.
    You testified about that transaction at length, but Mr. Reisner did not ask you any questions on cross-examination

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

LAPPCOL3      Cole - Cross      Page 2198

about the negotiation of the purchase price, did he?

A. No.

Q. You're aware, Mr. Cole, that there was a disagreement between you and Mr. Rabin about the purchase price for that JV, aren't you?

A. I would call it more of a negotiation.

Q. Okay. GBG -- you wanted to sell the joint venture for $12 million; is that right?

A. I believe so, yes.

Q. Okay. And GBG didn't want to pay $12 million; isn't that right?

A. Probably, yes.

Q. They told you that the diligence did not support a $12 million price; isn't that right?

A. I don't recall. That makes sense.

Q. Okay. And by "diligence" what they meant is they went out and they looked at the licensees, and the licensees were not generating enough income to support that price; isn't that what diligence means?

MR. REISNER: Objection, foundation.

THE COURT: Overruled.

A. No.

Q. Diligence is the work that's done in preparing to enter into a transaction; isn't that right?

A. Correct.

LAPPCOL3      Cole - Cross      Page 2199

Q. Okay. And as part of that work, one of the things parties do is they examine the books of the potential interest that they're purchasing; isn't that right?

A. Correct.

Q. And they talk to customers of the interest that they're purchasing, don't they?

A. Correct.

Q. And that was done here by GBG; isn't that right?

A. I believe so.

Q. Okay. Let's look at Government Exhibit 1010, which I believe is in evidence. Mr. Cole, could I ask you to read the first paragraph in the bottom half of this e-mail?

A. We have -- this is from Warren Clamen?

Q. Yes.

A. Okay. "Neil we have two alternatives for you to present to L & F. Jason's ask for an earn out. Iconix takes 9 million at close and the earn out is for an additional 3 million. With this scenario, we would book the gain based on a selling price of 9 million when the transaction closes. This would be 3.425. The 3 million earn out would be treated as a contingent gain because we are the seller in the case, not the buyer. This 3 million would be recognized only when it is earned and would be recorded as a gain in our topline revenue."

Q. You can stop right there. Thanks very much. Mr. Cole, what this is saying is that Mr. Rabin

LAPPCOL3      Cole - Cross      Page 2200

doesn't want to pay $12 million upfront; isn't that right?

A. I was reading, not really comprehending. Okay.

Q. Do you want to read it again?

A. Sure. I'll read it to myself.

(Pause)

Yes, he's negotiating to pay 9 million and pay 3 million on an earn out.

Q. So he'll pay 9 million upfront and 3 million if the business performs; is that what he's saying here?

A. Not necessarily 9 upfront. Let's call it 9 million guaranteed.

Q. Nine million guaranteed, three million contingent; is that right?

A. Correct.

Q. And what Mr. Clamen says is if there's a contingency, you can only book gain on the portion that's not contingent; isn't that right?

A. Correct.

Q. Let's look at your response. Mr. Cole, you respond "Not really the concept I was looking for. Trying to recognize 12 minus six basis on signing." Do you see that?

A. Yes.

Q. And what you mean there is that you don't want to defer revenue recognition for the 3 million. You want to recognize revenue for the 12; isn't that right?

LAPPCOL3      Cole - Cross      Page 2201

A. Correct.

Q. Which would be $6 million; is that right?

A. If the other 6 is at the basis, then it would be a $6 million profit, yes.

Q. Okay. And this was a subject of dispute between you and Mr. Rabin; isn't that right?

A. I would call it a negotiation, not a dispute.

Q. Okay. There were negotiations between you and Mr. Rabin about this issue; isn't that right?

A. About lots of issues, but yes, this issue, we were negotiating.

Q. He wanted an earn out, and you didn't want one, at least at this time; isn't that right?

A. I don't know because we ended up agreeing on an earn out, but -- let me as, "this time" are you talking about on this e-mail?

Q. Yes.

A. I just remember reading something to me and Warren. I don't know between me and Jason.

Q. Do you say anything about an earn out here?

A. Can you scroll down? I have to look at it.

Q. Well, this is the full e-mail is from you. Do you see any reference to an earn out here?

A. No, not me to Warren and my team, with my general counsel and my CFO and my VP of strategy, I don't see that.

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAPPCOL3      Cole - Cross      Page 2202

Q. Okay. You want to recognize revenue immediately on the 12 million purchase price; isn't that right?
A. That's what this says. I was not looking for an earn out concept.
Q. I'm sorry?
A. I was not looking for an earn out concept.
Q. Okay. And that was because you wanted to announce this transaction as part of your third quarter earnings; isn't that right?
A. Possibly.
Q. Okay. Let's look at Government Exhibit 1015, which I think is another one.
     Mr. Cole, can you read the paragraph at the bottom here that begins, "Obviously"?
A. "Obviously your attorneys don't believe me, but I have no interest in this deal if it doesn't close by this Monday."
Q. Okay. And this is on Tuesday, September the 24th; isn't that right?
A. Correct.
Q. So what would Monday be?
A. Probably the end of our quarter.
Q. Okay. That would be September 30th; is that right?
A. Yes.
Q. Okay. You can take that down, Mr. Charalambous.
     And, in fact, Mr. Cole, you did announce this deal on

LAPPCOL3      Cole - Cross      Page 2203

your third quarter earnings call, didn't you?
A. I don't recall. I thought it was the fourth quarter.
Q. Okay. Let's look at Government Exhibit 126, which is in evidence. Let's look at page 4, please. Mr. Charalambous, can you zoom in on the portion that says "Also this October."
     And, Mr. Cole, can I ask you to read that for the jury, please?
A. "Also, this October, we formed a joint venture in Southeast Asia with Li & Fung, the world's leader in consumer good design, development sourcing and distribution. And we plan to continue to evaluate similar partnerships in additional territories and geographies around the globe."
Q. Okay. Mr. Charalambous, you can take that down. Sorry.
     Mr. Cole, that's a reference to the SEA-1 deal, correct?
A. Correct, but October would be the fourth quarter.
Q. Okay. But this is the third quarter earnings call, correct?
A. Correct. It would be a subsequent event that happened in the fourth quarter.
Q. So can you answer my question? You announced this on the third quarter earnings call; isn't that right?
A. Yes, as a subsequent event.
Q. Is that a yes?
A. Yes, we --

LAPPCOL3      Cole - Cross      Page 2204

Q. Thank you.
A. Although, can I clarify?
Q. No.
     Mr. Charalambous, could you please put up Government Exhibit 1520 just for the witness and for the parties.
     Mr. Cole, can you see this?
A. I can.
Q. Do you recognize this as Jason Schaefer's performance evaluation?
A. Okay.
Q. Is that what it appears to be?
A. Yes.
     MR. HARTMAN: The government offers Government Exhibit 1520.
     MR. REISNER: Objection, hearsay.
     THE COURT: May I see the parties?
     (Continued on next page)

LAPPCOL3      Cole - Cross      Page 2205

     (At the side bar)
     THE COURT: As I understand it, this is Horowitz's performance?
     MR. HARTMAN: It's Mr. Schaefer's performance appraisal.
     THE COURT: I'm sorry, Mr. Schaefer's appraisal.
     MR. HARTMAN: Yes.
     THE COURT: And you want to use it, what's the deal?
     MR. HARTMAN: Mr. Schaefer testified that Mr. Cole told him, as part of his performance review, that he needs to drive revenue. And when I asked Mr. Cole about that, he said that, something to the effect of he didn't think it was likely because he didn't understand how the general counsel could drive revenue. In fact, that's exactly what the performance appraisal said.
     MR. REISNER: You know, we don't know who wrote it. We don't know the source of the information. It hasn't been -- there's been no foundation laid for it. I don't have the document. But it sounds, from its description, that it's something Mr. Schaefer wrote in his performance appraisal, and maybe Mr. Schaefer was attributing something to Mr. Cole, but it's hard to know without the foundation having been laid.
     THE COURT: I haven't seen the entire document, but generally these documents are signed and countersigned by company personnel. I don't know.

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LAPPCOL3          Cole - Cross          Page 2206

MR. HARTMAN: This one is not signed.

MR. REISNER: Is or is not?

MR. HARTMAN: Is not signed, but it was a company document, as we understand.

THE COURT: But, again, based solely on my experience with respect to these types of documents, very often the employee is asked to fill it out, and then there's a back and forth concerning, ultimately, what's going to be agreed upon. So I don't think a sufficient basis has been established for the admission of this document.

MR. HARTMAN: Okay.

MR. REISNER: Thank you, your Honor.

(Continued on next page)

---

LAPPCOL3          Cole - Cross          Page 2207

(In open court)

MR. HARTMAN: Mr. Charalambous, could you put that document back up just for the witness and the parties, and could you scroll down, please. Keep going. Right there.

BY MR. HARTMAN:

Q. Mr. Cole, does looking at Government Exhibit 1520 refresh your memory that one of the objectives that you identified for Mr. Schaefer was to provide for approximately 85 million in additional revenue?

A. No.

MR. REISNER: Objection, foundation.

THE COURT: Overruled.

MR. HARTMAN: You can take that down.

BY MR. HARTMAN:

Q. Now, Mr. Cole, returning to SEA-1, you mentioned -- we were talking about the disagreement between you and Mr. Rabin with respect to the purchase price. Do you remember that?

A. I believe I characterized it as a negotiation.

Q. The negotiation, I'm sorry. At some point, you told Mr. Rabin that Iconix would do the deal at $12 million with a $2 million reduction if certain things didn't happen. Didn't you tell him that?

A. I don't recall, but it sounds probable, possibly.

Q. Let's look at Government Exhibit 1012.

Mr. Cole, can you read what you wrote to Mr. Rabin at

---

LAPPCOL3          Cole - Cross          Page 2208

the top of this e-mail?

A. "What we are willing to do is 12 million with a 2 million reduction if certain things don't happen. Working on a formula for those things."

Q. Okay. And under this scenario, Iconix would only be able to immediately recognize revenue on the $10 million purchase price; isn't that correct, Mr. Cole?

A. I am not an accountant, I don't know.

Q. Okay. Well, we just saw your correspondence with Mr. Clamen about this issue, right?

MR. REISNER: Objection, foundation.

THE COURT: Overruled.

Q. And what he said is if there was a contingency, you couldn't recognize the revenue on that portion of the purchase price that was contingent; isn't that right?

A. That's what he said, yes.

Q. Based on that, is it your understanding that this proposal would mean that Iconix could immediately recognize revenue only on $10 million of the purchase price, yes or no?

A. I don't know.

Q. Mr. Charalambous, you can take that down.

Now, Mr. Cole, two weeks after that, two agreements are added to the negotiations, the consulting agreement and the side letter; isn't that right?

A. Yes.

---

LAPPCOL3          Cole - Cross          Page 2209

Q. Let's look at Government Exhibit 1017. Mr. Cole, do you remember seeing this during the course of the trial?

A. Not specifically, but there's been lots of documents during this trial.

Q. The dates of these e-mails is September 25th, 2013; isn't that right?

A. Yes.

Q. And you'd agree with me that that's about 13 days after the September 12th e-mail that we just looked at?

A. Yes.

Q. Mr. Charalambous, let's look at Defense Exhibit 1118. This is the 27th of September. Mr. Cole, do you see that?

A. I do.

Q. Could you read the body of Ms. Parnes e-mail, beginning "Attached"?

A. "Attached please find markups of the side letter and consultancy agreement that we received from Mayer Brown yesterday. Mark Stevens of Mayer Brown indicated that Neil is aware of the intent behind these two documents." Do I keep going?

Q. You can stop right there. Mr. Cole, is it your testimony that you don't recall discussing these two documents with Mr. Rabin?

A. I don't.

---

**A-421**

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAPPCOL3          Cole - Cross          Page 2210

Q. Do you recall discussing with him what concept of increasing the purchase price by $2 million around this time?
A. No.
Q. Do you recall the fact that around this time, these two documents were drafted?
A. I don't recall that.
Q. Do you have any independent recollection of what was happening here with respect to these two documents?
A. Yes. If you want me to say?
Q. Well, let me ask you. Just with respect to the side letter, you didn't provide any testimony about the side letter on direct, did you?
A. I don't recall.
Q. Do you recall speaking with Mr. Reisner about this this morning?
A. No.
Q. Now, let's look at Government Exhibit 206, which is the final side letter. And can we see the attachment, please. Mr. Cole, did you sign this document?
A. Yes.
Q. It's a three-page document; isn't that right?
A. Yes, but it was probably the part of a hundred-page binder.
Q. So is that a yes?
A. I don't know. You only showed me one page. If you'd ask me, I'd say it was a two-page document.

LAPPCOL3          Cole - Cross          Page 2211

Q. Mr. Charalambous, can we show all the pages, please. Mr. Cole, do you agree that it's a three-page document?
A. I see two different signature pages and one regular page; so I'm not sure whether that's two page or three page.
Q. Two plus one is three; isn't that right, Mr. Cole?
A. Two plus one is three.
Q. Okay. And the amount to be paid as part of this agreement by Li & Fung to Iconix is $2 million; do you see that?
A. Yes.
Q. And that is on top of the JV interests that was being purchased as part of this negotiation; isn't that right?
A. Okay.
Q. Isn't that right?
A. Yes. I'm okay with that.
Q. Okay. And we saw, during the course of this trial, several times that the purchase agreement provided for a $10 million purchase price with a $2 million earn out; isn't that correct?
A. Correct.
Q. And so this would be $2 million on top of that; isn't that correct?
A. Correct.
Q. And so the total effect of these two agreements would be a purchase price of 12 million with the possibility of 2 million more; isn't that right?

LAPPCOL3          Cole - Cross          Page 2212

A. Correct.
Q. Let's look at Government Exhibit 207. Mr. Cole, do you recognize this as the consultancy agreement that was signed in connection with SEA-1?
A. I recognize it from this trial and in preparing for this trial, yes.
Q. Okay. And do you agree that this document is dated September 30th of 2013?
A. Yes.
Q. And that's the date on the other documents for this transaction as well; isn't that right?
A. I did not notice the date on the other transaction.
Q. Let's go back to Government Exhibit 206, please. Can we just highlight the upper right, please. Mr. Cole, can you read that date?
A. September 30th.
Q. Okay. So is that the same as the date on the consultancy agreement?
A. Yes, for these two documents.
Q. All right. Mr. Charalambous, let's go back to 207. Okay. And can you zoom in on the portion that says "fee, 3," at the bottom. Mr. Cole, can you read that, please?
A. "The company shall pay to the consultant a fixed fee of $2 million, which shall be payable in four installments as

LAPPCOL3          Cole - Cross          Page 2213

follows."
Q. Which is the next part?
A. You want me to read all -- each of --
Q. You can skip the installments, but I'd ask you to read the last part.
A. "This fee shall be payable regardless of the level of services required by the company and rendered by the consultants."
Q. And what -- Mr. Cole, what that means is Iconix is going to pay the money irrespective of how much work Li & Fung does; isn't that right?
A. Or did.
Q. Yes or no?
A. Yes. I'm just adding that I believe they previously did the work, not does --
Q. Whether they did or didn't, whether they would or wouldn't, that doesn't matter for the purpose of this agreement; isn't that right?
A. Correct.
Q. Now, let's look at the SEC filing. Mr. Charalambous, can you put up Government Exhibit 101, please, and can we see page 79. Mr. Cole, could I ask you to read the sentence that begins "Shortly thereafter"?
A. "Shortly thereafter, LF Asia (LF Asia), an affiliate of

# A-422

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

LAPPCOL3        Cole - Cross        Page 2214

Li & Fung Limited, purchased a 50 percent interest in Iconix SE Asia for $12 million."

Q. Okay. And then could you read the final sentence in that paragraph, please?

A. "The company may earn an additional $2 million based on certain criteria relating to the achievement of Iconix SE Asia revenue targets through the year ending December 31st, 2014."

Q. So, Mr. Cole, 12 million plus 2 million, what does that equal?

A. Fourteen.

Q. Okay. So does this description include the $2 million for the side letter?

A. I believe so.

Q. And do you see any discussion in this portion of the SEC filing of the $2 million consultancy payment?

A. No.

Q. Mr. Charalambous, you can take that down.
Now, Mr. Cole, Mr. Reisner did not ask you any questions about the change in deal price from 10 million to 12 million, did he?

A. I don't recall.

Q. And we haven't seen any e-mails that explain why that happened; isn't that right?

MR. REISNER: Objection.

THE COURT: Overruled.

LAPPCOL3        Cole - Cross        Page 2215

A. I believe so.

Q. You don't have any handwritten notes of conversations with Mr. Rabin about the reasons that that happened; isn't that right?

A. No.

Q. There's not even a cocktail napkin that provides a valuation of $14 million; isn't that right?

A. I don't have a cocktail napkin.

Q. Okay. Now, to the extent the accounting for these transactions was wrong, you blame the lawyers; isn't that right?

A. No.

Q. Well, you were asked questions about the lawyers' involvement in these transactions; isn't that right?

A. Correct.

Q. And you were asked some questions about the accountants' involvement in these transactions; isn't that right?

A. Correct.

Q. Would you agree with me, Mr. Cole, that in order for the lawyers and the accountants to do their jobs, they have to know all the facts about a transaction?

A. Yes, and Warren Clamen knew all the facts. He's the one who negotiated. He was the CFO.

Q. Mr. Cole, is that a yes?

A. Yes, Warren Clamen --

LAPPCOL3        Cole - Cross        Page 2216

Q. Mr. Cole, is that a yes?

A. Can you repeat the question? I apologize.

Q. You would agree with me that in order for the accountants and lawyers to do their jobs, they have to know all the facts about a transaction, yes or no?

A. Yes, of course.

Q. Let's move on to the SEA-2.
Now, Mr. Cole, that transaction closed on June 30th of 2014; isn't that right?

A. Correct.

Q. That was the last day of the second quarter?

A. Yes.

Q. Now, we saw in connection with SEA-1, that the purchase price of that deal went up about $2 million at the end of the negotiations; isn't that right?

A. Okay.

Q. Well, you saw that $2 million side letter appear in mid-September; isn't that right?

A. Correct. The end of September.

Q. The end of September?

A. Yes.

Q. And the same thing happened with respect to the SEA-2 transaction; isn't that right?

A. I disagree.

Q. You disagree that the purchase price increased at the end

LAPPCOL3        Cole - Cross        Page 2217

of the transaction?

A. I believe it happened somewhere around June 12th.

Q. Okay.

A. Or June 13th.

Q. This was a deal you'd been negotiating since March; isn't that right?

A. No. Mr. Horowitz negotiated.

Q. Okay. This was a deal that the company had been negotiating since March; isn't that right?

A. I believe so.

Q. Okay. And you supervised Mr. Horowitz; isn't that right?

A. I tried.

Q. The corp. fin response, which you signed, says that you had oversight over this transaction; isn't that right?

A. Correct.

Q. And you received term sheets about this deal from Mr. Horowitz; isn't that right?

A. I believe I saw one on May 2nd or May 6th.

Q. Let's look at that term sheet, Defense Exhibit 1205-A1.
Mr. Cole, the portion where it says "A," can you read that, please?

A. "Amend Southeast Asia JV to include Korea, 3.3 million purchase price as previously submitted for waiver."

Q. So, Mr. Cole, would you agree with me that, under this term sheet, the proposed purchase price for the Korea interest is

# A-423

LAPPCOL3     Cole - Cross     Page 2218

$3.3 million?

A. Yes.

Q. Can you read paragraph B, please?

A. "Amend Southeast Asia to include Europe and Turkey rights for Ecko Unlimited, Zoo York, Marc Ecko Cut and Sew, Ed Hardy and Sharper Image. 7.6175 purchase price."

Q. And, Mr. Cole, would you agree with me that the 7.6175 is the purchase price that this term sheet contemplates for the Europe portion of the SEA-2 joint venture?

A. Yes.

Q. The next paragraph, can you read that?

A. Yes. "Upon the put/call provision contemplated in the Southeast Asia agreement, the value of these brands will not be less than the purchase price of 7.6175."

Q. And what that's saying is under this put/call provision that you'd been talking about, the counterpart in the case of a put, which would be GBG returning the interest to Iconix, the purchase price that Iconix would be obliged to pay would not be less than $7.6 million; isn't that right?

A. Correct.

Q. And you received this term sheet on May 2nd, didn't you, Mr. Cole?

A. I don't recall. It could have been later or around that time.

Q. You acknowledge that you received this term sheet?

LAPPCOL3     Cole - Cross     Page 2219

MR. REISNER: Objection. If we could -- there was an e-mail that transmitted this. I believe it's Defense Exhibit 1205.

Q. Mr. Cole, irrespective of when you got this term sheet, you acknowledged that prior to entering into the deal, you received it from Mr. Horowitz; isn't that right?

A. Probably.

Q. Do you have any reason to doubt that you received it?

A. No, but I -- I have no reason to doubt I received it. It has my name on it.

Q. Let's look at Defense Exhibit 1205, please. Sorry, we'll come back to that.

Mr. Cole, the purchase prices that we just saw in the term sheet, those were also the purchase prices that the company was modeling for this transaction as of June 6th; isn't that right?

A. I don't know.

Q. Let's look at Government Exhibit 234. And, Mr. Charalambous, could you scroll in on the bottom portion of this where it says "Purchase price, cost basis."

Mr. Cole, where it says "Korea," do you agree with me that that purchase price is $3.3 million?

A. Yes.

Q. And where it says "Europe," do you agree with me that the purchase price that's here is $7.6 million?

LAPPCOL3     Cole - Cross     Page 2220

A. Yes.

Q. And are those the same prices, more or less, that we saw on the term sheet from May 2nd?

A. Yes.

Q. Now, Mr. Cole, are you aware that the ultimate price for this deal was $15 million?

A. Yes. I think it was 15.9.

Q. And you were asked some questions about the Lee Cooper option. Do you remember being asked those questions on direct?

A. Yes.

Q. Mr. Cole, we haven't seen any e-mails that explicitly tie the change in purchase price to the Lee Cooper option, have we?

A. I don't know.

Q. We haven't seen any in court, have we?

A. I've seen some. I'm not sure you have.

Q. You've seen e-mails during this trial that explain that the purchase price was tied to the Lee Cooper option explicitly?

A. No, I have e-mails from Ron Ventricelli and Dow Famulak.

Q. Mr. Cole, my question is, in this courtroom, have we seen e-mails during the trial that tie these two things together?

A. I don't recall.

Q. Mr. Cole, during this trial, we did see Government Exhibit 1041.

Could you please put that up, Mr. Charalambous. This is a June 12th e-mail; isn't that right,

LAPPCOL3     Cole - Cross     Page 2221

Mr. Cole?

A. Yes. Do you want me to read it?

Q. Go ahead.

A. "I spoke with Jared tonight. Bottom line is that we may complete only part of the transaction, Europe and Korea, at approximately $15 million of gain/revenue for Iconix in Q2 and wait until Q3 for Lee Cooper EU portion of the transaction." Should I keep reading?

Q. No, you can stop right there. Is this one of the e-mails you were referring to earlier?

A. Possibly.

Q. Okay. This e-mail is on June 12th; isn't that right?

A. Correct.

Q. You'd agree with me, Mr. Cole, that June 12th is after June 10th; isn't that right?

A. That's two days after.

Q. And it's after June 11th; isn't that right?

A. One day after June 11th.

Q. And, Mr. Cole, you were in court when we looked at Government Exhibit 1255.

Mr. Charalambous, can you put that up, please. And can you put it up to Government Exhibit 1255-B.

Mr. Cole, do you see that the date on this document is June 10th, 2014?

A. I do.

# A-424

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAPPCOL3          Cole - Cross          Page 2222

Q. Okay. And at point one that's listed here, can you read that, please?

A. "LF pays $13 million for 50 percent of Korea IP rather than 3.3 million."
Can I ask a question? What is this document?

Q. Mr. Cole, I'm asking the questions right now. If your lawyer wants to ask you some questions, he can do that on redirect.

A. I just have to know what I'm reading.

Q. Mr. Cole, I'm just asking you to read it.

A. Okay.

Q. Can you read point two, please?

A. "Iconix terminates Roc Kids license with LF U.S.A. Impact on fixturing? Currently amortizing over length of license agreement."

Q. You can stop right there. Thanks. Mr. Cole, you remember seeing this during the course of the trial, don't you?

A. I don't recall.

Q. You don't remember this document coming into evidence during the trial?

A. If you give me some context, maybe I will. Who wrote it and who is it to?

Q. I'm just asking the question. Do you remember seeing this document, Mr. Cole?

A. I don't remember seeing this document.

LAPPCOL3          Cole - Cross          Page 2223

Q. We also saw in the trial Government Exhibit 1256.
Can we show that, please.
This is an e-mail from that night and the next day. It's from Mr. Horowitz to you, Mr. Cole. Can you read what Mr. Horowitz says at the bottom?

A. When you say the next day, are you talking about the June 12th one I got?

Q. No, Mr. Cole. It's the day following, June 10th.

A. Okay. So what happened June 10th? Okay. You want me to read the one at the bottom?

Q. Just read the bottom. Thanks.

A. "I've been thinking about the LF transaction, and I like it. Can share my thoughts in the a.m."

Q. And what do you respond, Mr. Cole?

A. "Okay. Let's discuss in the morning. I also have San Rio and Camelot in the office tomorrow."

Q. Let's look at Government Exhibit 1039, please.
Mr. Cole, do you remember seeing this e-mail during the course of the trial?

A. Yes.

Q. Can you read the bottom, please?

A. "Did a lot of diligence work on margins/product/volume. Very difficult in any model at the current product/pricing/distribution to make money. Good top line. No bottom line. Should discuss."

LAPPCOL3          Cole - Cross          Page 2224

Q. And how do you respond, Mr. Cole?

A. "Yes, sorry about that" -- oh, I'm sorry. "Are you referring to kids?"

Q. And what does he say?

A. Horowitz says, "Yes, sorry about that. I am referring to kids, Seth."

Q. You can take that down, Mr. Charalambous.
Mr. Cole, we also saw the PIP that GBG prepared for this transaction. Do you remember seeing that?

A. I saw a few different ones. You'd have to show it to me.

Q. Let's look at Defense Exhibit 413-A1.
Mr. Cole, did this appear to be the PIP for this transaction?

A. I'm a little, honestly, confused. Is this the final PIP or is it the June 18th or the June 27th PIP?

Q. Can you read the date in the top left corner?

A. I see two dates. I see June 27th, and I see June 18th. So this would be the June 27th?

Q. Mr. Cole, I'll ask the questions.

A. Okay.

Q. Let's look at the bottom, please, where it says "size of amendments."

A. Yes.

Q. How much is the Korea brands in price here?

A. I'm sorry, 8.3 million.

LAPPCOL3          Cole - Cross          Page 2225

Q. And how much was the value of the Korea brands in the term sheet that we looked at from May 2nd?

A. I don't recall. If you put it back up.

Q. You don't recall how much it was?

A. No. I think it was --

Q. If I told you it was 3.3 million, would that refresh your memory?

A. Okay.

Q. Do you agree with me, it was 3.3?

A. If you say it, Mr. Hartman, I'll agree.

Q. Okay. Mr. Charalambous, let's go to the next page. Can we go to the next page of that document, page 2. Yes, thanks.
Mr. Cole, can you read what it says at the bottom there "In previous PIP"?

A. I'm sorry, can you yellow what you want me to read?

Q. Yes. In bold at the top, "In previous PIP"?

A. "In previous PIP, Korea brands consideration was 3.3 million and total consideration was 10.9."

THE COURT: I'm sorry, Mr. Cole, could I bother you to read slowly when you read, or more slowly?

THE WITNESS: More slowly. I apologize, your Honor.

A. "In previous PIP Korea brands, consideration was 3.3 million and total consideration was 10.9 million."

MR. HARTMAN: And I understand that this is not admitted, but can I admit it?

# A-425

LAPPCOL3     Cole - Cross     Page 2226

MR. REISNER: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 413-A1 received in evidence)

MR. HARTMAN: Let's just show that to the jury. Sorry, I didn't realize it wasn't admitted.

Mr. Charalambous, can you zoom in on the bottom portion there where it says "Size of amendments."

And then let's look at the next page, please.

BY MR. HARTMAN:

Q. Mr. Cole, did you review this document before coming to court?

A. No.

Q. You haven't looked at it at all?

A. I don't believe I looked at it.

Q. Okay. During the course of the past however many years you mentioned you'd been dealing with these issues, you'd never looked at this document before?

A. I don't recall looking at it. It's a GBG document, in-house GBG.

Q. Well, you're aware that your attorneys received documents from the government in discovery, including this document, aren't you, sir?

A. Correct. I just don't know if I saw this PIP. I know there's been a few PIPs, and I know that we were trying to get one of them that we didn't have, and we were trying --

LAPPCOL3     Cole - Cross     Page 2227

Q. Mr. Cole, were you in court when this document was shown?

A. I don't recall specifically reading this document.

Q. Okay. Mr. Cole, in any of the versions of the PIPs that you've seen, is there any mention of the Lee Cooper transaction?

A. I don't recall.

Q. Mr. Charalambous, you can take that down.

Now, that deal closed on June 30th of 2014; isn't that right, Mr. Cole?

A. Correct.

Q. And you were asked some questions about marketing on your direct examination. Do you remember being asked those questions?

A. I don't remember the specific questions, but I know we probably talked about marketing.

Q. Okay. And you testified that there was no link between the SEA-2 transaction and the marketing payments that Iconix made later in the year; isn't that right?

A. Correct.

Q. You said you made those payments voluntarily; isn't that right?

A. Correct.

Q. Okay. Let's look at Government Exhibit 1063, please, Mr. Charalambous.

Mr. Cole, would you agree that this is an e-mail from

LAPPCOL3     Cole - Cross     Page 2228

Mr. Horowitz to you on August the 18th of 2014?

A. Correct. It looks like probably a Friday at 5:00.

Q. Okay. Can we look at the attachment, please, Mr. Charalambous. And can you zoom in on the portion that says "GBG."

Mr. Cole, can you guarantee that first line there, please?

A. "GBG, (i) 5 million of current marketing liabilities."

Q. It says "5 million of current marketing liabilities;" isn't that right, Mr. Cole?

A. It does.

Q. A liability is something that you owe; isn't that right, Mr. Cole?

A. Correct.

Q. And "current" means something that exists as of the time; isn't that right, Mr. Cole?

A. Correct.

Q. You can take that down.

And, Mr. Cole, you don't dispute that you paid these bills, do you?

A. When you say "these bills," you mean the invoices from November and December? No.

Q. You don't dispute that, right?

A. We paid 5.4 million. I saw the checks.

Q. You signed off on that, right?

LAPPCOL3     Cole - Cross     Page 2229

A. I did.

Q. We looked at the invoices, and they had your initials on them; isn't that right?

A. Correct.

Q. Let's look at Government Exhibit 216, please. Go forward, please. Go back one, please, Mr. Charalambous.

Mr. Cole, that's your signature on the wire transfer, isn't it?

A. It is.

Q. Okay. And go forward, please.

And, Mr. Cole, these are your initials on these invoices, aren't they?

A. Yes.

Q. Now, you can take that down, Mr. Charalambous. Thank you.

Now, Mr. Cole, as the CEO of Iconix, it was your job to be a good steward of the company's finances, wasn't it?

A. Oversee finances, yes.

Q. Is that a "yes" or a "no"?

A. I don't know what the word "steward" means, but I, as CEO, I was responsible to make sure that the finances were correct.

Q. It was your job to maximize shareholder value; isn't that right?

A. Correct.

Q. You had a fiduciary duty to the shareholders to do that?

A. I did.

# A-426

LAPPCOL3     Cole - Cross     Page 2230

Q. And that meant driving revenues, as we talked about, right?
A. It meant making profits, whether it was driving revenues or reducing expenses it was making profits and revenue helps.
Q. Okay. And you mentioned about reducing expenses, that was something that was your job as well; isn't that right?
A. Sure. If it resulted in profits, it was my job.
Q. Okay. You had a budget, you testified about that on direct; isn't that right?
A. We always had a budget.
Q. The company budgeted out every year how much it was going to spend for things; isn't that right?
A. Yes.
Q. And one of the things it budgeted out for was marketing; isn't that right?
A. Correct. Marketing was really important. Can I explain why?
Q. No.
A. Okay.
Q. Isn't it true that you budgeted out for marketing?
A. We did.
Q. Okay. And you would question expenses if you thought they were excessive, didn't you, Mr. Cole?
A. I would.
Q. Let's look at Government Exhibit 1808, just for the witness and for the parties, please.

LAPPCOL3     Cole - Cross     Page 2231

Mr. Cole, do you recognize this as an e-mail you sent to Jameel Spencer and Seth Horowitz on February 11th on 2013?
A. Do you want me to read the top?
Q. No. I'm just asking you who's on the e-mail?
A. It's an e-mail from myself to Jameel Spencer and Seth Horowitz.
MR. HARTMAN: The government offers Government Exhibit 1808.
MR. REISNER: No objection.
THE COURT: It will be received.
(Government's Exhibit 1808 received in evidence)
BY MR. HARTMAN:
Q. Mr. Cole, can you read what you say at the top of this e-mail, please?
A. "Would like to see total budget of all men's and what is spent or committed. With Yankee Stadium and Chaz, we must be going way over; so let's discuss where and if we can find money."
Q. And "Chaz," Mr. Cole, is a reference to Chaz Ortiz; isn't that right?
A. Correct.
Q. He's a person who was paid to endorse Zoo York?
A. Yes. He was one of the skaters.
Q. And the person who paid him was Iconix; isn't that right?
A. I believe so, yes.

LAPPCOL3     Cole - Cross     Page 2232

Q. But when you say you were worried about the budget, that's because it was Iconix's budget that was being used to pay him, correct?
A. Correct.
Q. And when you talk about Yankee Stadium here, that's a reference to a viral video that was made at Yankee Stadium; isn't that right?
A. Correct.
Q. And that was paid for by Iconix, as well; isn't that right, Mr. Cole?
A. I believe so.
Q. You can take that down, Mr. Charalambous. Let's look at Government Exhibit 1809, just for the witness and the parties.
Mr. Cole, do you recognize this as an e-mail you sent to Dari Marder on February 12th of 2013?
A. I see that I sent an e-mail to Dari Marder.
MR. HARTMAN: The government offers Government Exhibit 1809.
MR. REISNER: No objection.
THE COURT: It will be received.
(Government's Exhibit 1809 received in evidence)
BY MR. HARTMAN:
Q. Mr. Cole, this is an e-mail that you're sending Ms. Marder about the expense associated with a sign at Yankee Stadium. Does that seem right to you?

LAPPCOL3     Cole - Cross     Page 2233

A. Yes.
Q. And you say, "He wants 500,000 for a sign?" Isn't that right?
A. Yes.
Q. And that's because you thought that was excessive for a sign; isn't that right, Mr. Cole?
A. I don't know.
Q. You don't know what that means when you ask that question?
A. It was a question. I don't know if I thought it was excessive or cheap. It's "He wants 500,000 for a sign," with a question mark.
Q. Okay. You can take that down, Mr. Charalambous, and show just for the witness and for the parties what's been marked as Government Exhibit 1810.
Mr. Cole, do you recognize this as an e-mail between you and Mr. Horowitz on February 12th of 2013?
A. I do.
MR. HARTMAN: Okay. The government offers Government Exhibit 1810.
MR. REISNER: No objection.
THE COURT: It will be received.
(Government's Exhibit 1810 received in evidence)
BY MR. HARTMAN:
Q. Mr. Cole, can you please read what you say here.
A. "I think I might have showed too much frustration and anger

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAPPCOL3          Cole - Cross          Page 2234

to Jameel in front of the whole team, comparing his spending to my ex-wife.  However, when I heard he was...going to be in for the next three days and spent 400,000 on starter trade, I was pretty upset."

Q.  Mr. Cole, this is referring to some expenses that Jameel Spencer made; isn't that right?

A.  Yes.

Q.  And what he was paying for was a booth at the Super Bowl; isn't that right?

A.  I don't know.

Q.  You don't remember that that's what's being referenced here?

A.  I don't.

Q.  Do you recognize it as being an expense that Mr. Spencer was involved in?

A.  Yes.

Q.  And what was Mr. Spencer's role at the company?

A.  He was in charge of the men's marketing.

Q.  Okay.  Mr. Charalambous, you can take that down and show, just for the witness and for the parties, Government Exhibit 1812.

Mr. Cole, do you recognize this as an e-mail between you and Marcia McLaughlin on February 15th, 2013?

A.  Yes.

MR. HARTMAN: The government offers Government

LAPPCOL3          Cole - Cross          Page 2235

Exhibit 1812.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1812 received in evidence)

BY MR. HARTMAN:

Q.  Mr. Cole, could you read Ms. McLaughlin's e-mail to you on February 15th?

A.  "Hi, Neil.  I noticed you approved a bill for The Strategic Agency for their work on the Super Bowl event.  Did you mean to approve it, as there are two others you have not yet approved."

Q.  And what do you respond?

A.  "Yes, I finally gave in, even though ridiculous.  What was the total cost?"

Q.  Mr. Cole, this is referring to a marketing event at the Super Bowl; isn't that right?

A.  It looks that way.

Q.  Okay.  You can take that down, Mr. Charalambous.  And let's look at one more of these.  For the witness and for the parties, Government Exhibit 1826, please.

Mr. Cole, do you recognize this as an e-mail between you and someone named James Mischka?

A.  Yes.

Q.  And the date of this e-mail is September 8th, 2014; is that right?

A.  Yes.

LAPPCOL3          Cole - Cross          Page 2236

MR. HARTMAN: The government offers Government Exhibit 1826.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government's Exhibit 1826 received in evidence)

BY MR. HARTMAN:

Q.  Now, Mr. Cole, do you remember testifying on direct that one of the important ways that Iconix drove marketing for its brands was the use of paid celebrities?

A.  Yes.

Q.  Do you know who Naomi Campbell is?

A.  I do.

Q.  Who is Naomi Campbell?

A.  She's one of the first great super models.

Q.  Okay.  And this e-mail concerns a request for a potential payment to Naomi Campbell for supporting the Badgley Mischka brand; is that correct?

A.  Yes.  It's pronounced Badgley Mischka.

Q.  Thank you.  And the payment here is $75,000; isn't that right?

A.  Yes.

Q.  Can you read what you say about that?

A.  "75,000 seems like a ridiculous amount."

Q.  And this is September 8th of 2014; isn't that right?

A.  Correct.

LAPPCOL3          Cole - Cross          Page 2237

Q.  Remind us again, when you first remember seeing the invoices for GBG?

A.  Somewhere in September.

Q.  Of 2014?

A.  Correct.

Q.  You can take that down.

Now, I want to talk about the SEA-3 transaction, Mr. Cole.

A.  Okay.

Q.  Let's look at Government Exhibit 1052, please, which is in evidence.  Can we zoom in on the top part.

Mr. Cole, this is an e-mail from Mr. Horowitz to you on August the 5th of 2014; isn't that right?

A.  Yes.

Q.  Okay.  Can you zoom out, please.

Can you read the first part, please, Mr. Cole?

A.  "The Win Hanverky call went very well.  They would like to be our JV partner, but need to make sure economics make sense to their board.  We, the CEO and I, are discussing meeting in Manchester as early as next week.  He has not been there and would like to see our operation.  If not next week, it may have to be the first week of September.  I can fly in and out in a day."

Q.  Mr. Cole, do you recognize this as being about the Umbro transaction in China?

# A-428

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LAPPCOL3     Cole - Cross     Page 2238

A. Yes, makes sense.

Q. Okay. And let's look at the second paragraph. Mr. Cole, can you read that, please?

A. "In the interim, we are working with GBG, with a goal of closing the end of August. I have not mentioned the Rocawear Kids component until we agree it is the right move."

Q. Mr. Cole, the reference to the Rocawear Kids component, that's a reference to potentially releasing GBG from its Rocawear Kids obligation; isn't that right?

A. Yes, as soon as we found someone else.

Q. Take that down. Let's look at Government Exhibit 1058. Mr. Cole, this is an e-mail you sent to Seth Horowitz on August the 14th of 2014; do you see that?

A. I do.

Q. And the subject line is "Umbro/LC China;" isn't that right?

A. Correct.

Q. And that Umbro/LC China, that's the SEA-3 transaction; isn't that right?

A. Yes.

Q. Can we zoom out, please, Mr. Charalambous. Can you read, Mr. Cole, what you say to Mr. Horowitz?

A. "Let's discuss tomorrow. Will be tough to do China without Roc Kids, but I agree the risk is huge on both Roc Kids and Ed Hardy/Rainbow."

Q. Mr. Charalambous, you can take that down.

---

LAPPCOL3     Cole - Cross     Page 2240

you're right.

(Continued on next page)

---

LAPPCOL3     Cole - Cross     Page 2239

Now, Mr. Cole, you're aware that at some point during the negotiations of this deal, the price changed from $15.5 million to $21.5 million; isn't that right?

A. Yes.

Q. You weren't asked about that by Mr. Reisner on your direct, were you?

A. I don't recall.

Q. Mr. Cole, that change resulted in an increase in the JV interest of about a third; isn't that right?

A. You want me to do the math thing? What do you mean?

Q. Sure. 15 million to --

A. It seems to me like 25 percent.

Q. Okay. All right.

A. It seems about 25 percent.

Q. 15 million to 21 million?

A. Yeah, is it -- I'm okay. I'll let you do your math. I don't do math.

Q. You agree it's between 25 percent and a third; isn't that right?

A. Okay.

Q. Do you agree with that?

A. I -- six out of 21 is -- yeah, it's about 28, 29 percent.

Q. Of the 15 -- a $5 million increase -- or a $6 million increase of 15, is more than a third; isn't that right?

A. I would look at it as a six million increase out of 21, but

---

LAPMCOL4     Cole - Cross     Page 2241

Q. Either way, it's a difference of $6 million, isn't that right, Mr. Cole?

A. Correct.

Q. That's the third time that a transaction with GBG involved an increase in purchase price after there were deal documents circulated, isn't that right?

A. I don't know. There could have been more. We did probably 25 documents -- 25 different deals with GBG.

Q. Of the deals we saw in this trial, the SEA-1, SEA-2, and SEA-3 transaction, each one of those involved a change in purchase price, isn't that right?

A. Correct.

Q. Each time the change in purchase price went in favor of Iconix, isn't that right?

A. OK.

Q. Isn't that true?

A. SEA-1, there was a 2 million cost, so it was kind of a break even.

Q. For the purchase price for the JV interest that went up for Iconix, isn't that right?

A. You mean from a revenue or a profit?

Q. The purchase price of the JV interest that you booked was $12 million, isn't that right?

A. Correct.

Q. And the purchase price of the JV interest that you booked

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

| LAPMCOL4 | Cole - Cross | Page 2242 |
| --- | --- | --- |

for SEA-2 was $15 million, isn't that right?

A. Yes.

Q. And the purchase price that you booked for SEA-3 was $21.5 million, isn't that right?

A. Correct.

Q. Now, you were asked some questions on your direct about David Beckham. Do you remember being asked those questions?

A. I do, yes. Go ahead. I'm sorry.

Q. We haven't seen any documents in this trial that link the change in purchase price for the SEA-3 transaction to David Beckham, have we?

A. I don't know in the trial.

Q. You've been sitting here, right?

A. I've been sitting here, yes. I have heard a lot of discussion about it.

Q. You have seen the evidence come in?

A. I haven't seen all of it because I haven't gone to the sidebars.

Q. But you've been paying attention to what came before the jury, right?

A. Yes.

Q. You've been taking notes?

A. Yes.

Q. You've been paying attention, right?

A. I've been trying to.

| LAPMCOL4 | Cole - Cross | Page 2243 |
| --- | --- | --- |

Q. This is important, right?

A. It's very important to me.

Q. And you haven't seen any documents that link that change in purchase price to David Beckham to come before the Court, have you?

A. I don't recall. I remember seeing an article about David Beckham. I don't know if it was put into evidence.

Q. But that didn't link to the purchase price, did it, Mr. Cole?

A. I don't know what linked to the purchase price.

MR. HARTMAN: Let's look at Government Exhibit 1063.

Q. Mr. Cole, this is an e-mail that Mr. Horowitz sent you on August 18, 2014.

Do you see that?

A. This is the same one we saw a few minutes ago?

Q. I think it may be.

A. Then I've seen it.

MR. HARTMAN: Can we look at the attachment, please. Can we zoom in on the bottom, please, numbered paragraph 2.

Q. Mr. Cole, can you read what's written there at the beginning of numbered paragraph 2.

A. He says he needs 10 million more, as he discussed with you.

Q. Mr. Cole, I am going to stop you there. Can you read it again, please.

A. He says he needs the 10 million and more, as he discussed

| LAPMCOL4 | Cole - Cross | Page 2244 |
| --- | --- | --- |

with you.

Q. He says he needs the 10 million and more, isn't that right?

A. Yes.

Q. That's what it says?

A. Correct.

Q. And then underneath Mr. Horowitz says: I see it as 5 million of marketing liabilities. Isn't that right?

A. Yes.

Q. Then he says: Getting creative about an additional 5 million for this year is difficult. Underneath, it says: Rocawear Kids. Transition. Reduce GBG liability of 2.5 million of royalty and 5 million of Rainbow markdowns in exchange for 23M price for China JV.

Do you see that, Mr. Cole?

A. I do.

Q. You received this document, isn't that right, Mr. Cole?

A. Probably.

Q. Do you have any reason to doubt that you received the e-mail?

A. I was away --

Q. Mr. Cole, yes or no, do you have any reason to doubt that this e-mail went to your e-mail box?

A. No.

Q. And the 23 million price for the China JV, that's a reference to the SEA-3 transaction, isn't that right?

| LAPMCOL4 | Cole - Cross | Page 2245 |
| --- | --- | --- |

A. I believe.

MR. HARTMAN: You can take that down. Let's look at Government Exhibit 1210, page 78.

Q. Mr. Cole, you testified about the floors on these agreements, isn't that right?

A. We discussed in various different ways the floors on the agreement.

Q. You were asked questions about that on your direct examination, isn't that right?

A. Correct. The floors on the puts, correct.

Q. You would agree with me that for this agreement the put and the call had the same floor?

A. I don't know. You'll have to show it to me. I'm not familiar with the agreement.

Q. Mr. Cole, have you reviewed this document?

A. I have reviewed parts of the document at different times over the last six years, but I don't remember the whole document.

MR. HARTMAN: Why don't we zoom in -- let's grab the fourth paragraph and paragraph A, please, Mr. Charalambous.

A. Just to be careful, I would love for you to show me what you're talking about.

MR. HARTMAN: Mr. Charalambous, can you grab the paragraph above that as well.

Q. Mr. Cole, can you read paragraph 4, please.

# A-430

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAPMCOL4          Cole - Cross          Page 2246

A. If the CMHT five-year put/call is exercised in the six-(6-) month period following the fifth anniversary of the second amendment effective date, agreed value shall be equal to.

Q. Let's read the second little Roman numeral there.

A. The year ended December 31, 2019; provided, however, that the agreed value attributable to the CMHT rights shall not be less than -- 21,5 crossed out -- 15,500,000. Such agreed value attributable to the CMHT rights, the parenthesis, adjust CMHT purchase price, close quotations, plus.

Q. Mr. Cole, do you understand this to be showing a change in this number from 21.5 million to 15.5 million?

A. Yes.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Let's look at Government Exhibit 1225, please.

Q. Mr. Cole, do you recognize this as an e-mail that Seth Horowitz sent you on November 17, 2014?

A. Yes.

Q. November 17, 2014 is after the SEA-3 deal closed, isn't that right?

A. Yes. Two months.

MR. HARTMAN: Let's look at the attachment, please. Could we scroll down, please, Mr. Charalambous.

Q. Mr. Cole, could you just read the paragraph 2A, please, that begins Rocawear Kids?

LAPMCOL4          Cole - Cross          Page 2247

A. Rocawear Kids. Agreed to terms with Jason. Have drafted but holding off on sending doc until requested. Will sign these docs concurrent with Middle East or alternative transaction. Or we can retrade based on current events with New Rise. Although I believe very messy and disruptive to the brand/ORG.

Q. Mr. Cole, when Mr. Horowitz says retrade, did you understand that he meant there had been a trade in the past?

A. No.

Q. What is your understanding of what the term retrade means, as a general matter?

A. It's changing a trade of what you did.

MR. HARTMAN: You can take that down.

Let's look at Government Exhibit 1136.

Q. Mr. Cole, do you remember seeing this document? It's a calendar invite.

A. I don't remember the document.

Q. You'd agree with me that it reflects a meeting between you, Jason, and Jared Margolis on December 2, 2014, isn't that right?

A. It does. But I'd like to reiterate for the jury --

Q. Mr. Cole?

A. I don't know Ethan Cole.

Q. I'm just asking you whether you agree that that's what the document says.

LAPMCOL4          Cole - Cross          Page 2248

A. The document says there was a meeting with Jason, Neil Cole, and Jared Margolis.

Q. You said on your direct that you never dealt with Jared Margolis, but that's not true, right?

A. Rarely.

Q. But you acknowledge that you did deal with him sometimes, don't you?

A. I don't recall a lot -- sometimes he would be with Jason.

Q. Mr. Cole, do you acknowledge that you dealt with him sometimes, yes or no?

A. I don't remember direct dealings, but I am sure --

Q. Were you at meetings where he was also present?

A. Yes.

MR. HARTMAN: You can take this down, please.

Q. The date of that meeting was December 2, 2014, right, Mr. Cole?

A. That's what the invite says, yes.

Q. During the trial you saw this exhibit, Government Exhibit 1139. Do you remember seeing this, Mr. Cole, during the trial?

A. I did.

Q. Where it says Europe/Korea, there is a number there in the row that says purchase price. It says 15,917,500.

Do you see that?

A. Yes.

Q. Underneath it says: Value based on rev multiple. Do you

LAPMCOL4          Cole - Cross          Page 2249

see that?

A. I do.

Q. Then beneath that it says plug. Isn't that right?

A. Correct.

Q. Do you agree that the value that's on the row plug is the difference between the 15 million and the 10 million?

A. As a math question?

Q. Yes.

A. Math, yes.

Q. That's just the question. Does the math make sense to you, yes or no?

A. It makes sense. The document I have never seen.

Q. The math makes sense, right, Mr. Cole?

A. Yes.

Q. It does, right?

A. 15 minus 15 equal 5.

Q. 21 minus 15 is 6, right?

A. Correct.

Q. And 23 minus 18 is 5, right?

A. Correct.

MR. HARTMAN: You can take that down.

Q. Now, Mr. Cole, we were talking about a deal with David Beckham that GBG was entering into.

Do you remember talking about that?

A. With you a few minutes ago, yes.

# A-431

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

LAPMCOL4          Cole - Cross          Page 2250

Q. Yes. Absolutely.

MR. HARTMAN: Mr. Charalambous, just for the witness and for the parties, what's been marked for identification as Government Exhibit 1855.

Q. Mr. Cole do you recognize this as an e-mail between you and Mr. Famulak on March 25, 2015?

A. Yes.

MR. HARTMAN: The government offers Government Exhibit 1855.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1855 received in evidence)

Q. Mr. Cole, the date of this e-mail is March 25, 2015, isn't that right?

A. Correct.

Q. And that's almost six months after the SEA-3 transaction closed, isn't that right?

A. Yes. They worked on the deal a long time.

Q. And the subject line here is Beckham/Umbro, isn't that right?

A. Yes.

MR. HARTMAN: Let's zoom out, please.

Can you zoom in on the portion that says the discussion went well, Mr. Charalambous.

Q. Mr. Cole, can you read the first two sentences, please.

LAPMCOL4          Cole - Cross          Page 2251

A. The discussion went well. There is no question that he thinks that at this time Adidas may be done and he is looking for alternatives. He is certainly favorably disposed to Umbro, given his historical ties.

Q. You can stop right there.

Mr. Cole, does this refresh your memory that Mr. Beckham had a deal with Adidas at this time?

A. But it was terminated.

Q. He says it may be done, isn't that right? That's what the document says, right?

A. Yes.

MR. HARTMAN: You can take that down, Mr. Charalambous.

Q. Now, Mr. Cole, you were asked some questions about your stock sale on your direct.

Do you remember being asked those questions?

A. Yes.

Q. Mr. Cole, isn't it true that before you decided to sell your stock through Barclays, you considered selling it over a longer period of time pursuant to a 10b-5 plan?

A. I believe so, yes.

Q. And that's a plan that spreads out your sales over a longer period, isn't that right?

A. Correct.

Q. And you chose not to do that, right?

LAPMCOL4          Cole - Cross          Page 2252

A. Correct.

Q. Instead, what you did was you made a block trade, right?

A. Correct.

Q. What a block trade is is that you can sell all of the stock at one time, isn't that right?

A. Correct.

Q. And you sell it at a discount, isn't that right, to market?

A. A small discount.

Q. And the reason for the discount is because you have to sell the whole thing at once, isn't that right?

A. Yeah. The transaction is a bulk trade.

Q. You want the counterparty to take the whole thing, so they negotiate a discount, isn't that right?

A. Correct.

Q. That's what happened with Barclays, right?

A. Correct.

Q. So the price that you sold the stock for was lower than the market price as of the transaction date, isn't that right?

A. I believe Karetsky testified 2 percent or 2 and a half percent.

Q. That's lower, 2 percent lower?

A. Sure.

MR. HARTMAN: Let's look at Government Exhibit 1864, please.

Q. Mr. Cole, do you recognize this as an e-mail between you

LAPMCOL4          Cole - Cross          Page 2253

and several people, including Robert Mittman at Blank Rome?

A. Yes.

Q. The date of this is September 30 of 2014, isn't that right?

A. Correct.

Q. That's the day the quarter closed, isn't that right?

A. Yeah. If September has 30 days, that would be the day the quarter closed.

Q. 30 days has September, April, June, and November, right?

A. Yes.

Q. The quarter closed September 30 and you send this e-mail and the subject line is 10b-5.1 plan.

Do you see that?

A. Yes.

Q. That's the plan we have been talking about that would have spread your stock sales over time, isn't that right?

A. Correct.

Q. Can you read, please, the body of this e-mail.

MR. HARTMAN: Mr. Charalambous, can you zoom out. Let's look at 1864.

Can we offer this, please.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1864 received in evidence)

MR. HARTMAN: We will also offer 1865, which is the attachment.

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 25, 2021

LAPMCOL4          Cole - Cross          Page 2254

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1865 received in evidence)

MR. HARTMAN: Mr. Charalambous, can we just show the body of the e-mail, please. Can you blow up what Mr. Cole says.

Q. Mr. Cole, can I ask you to read it?

A. All, considering filing this in the next week. Please notice we did a new schedule A to coincide with the new date. Please provide any comments you have. Thanks very much. Neil.

Q. Mr. Cole, when you said filing this, you said you're considering filing the 10b-5.1 plan, is that right?

A. Correct.

MR. HARTMAN: Mr. Charalambous, can we just see Government Exhibit 1865 really quickly.

Q. Mr. Cole, do you recognize this as the draft plan that you were circulating?

A. I don't recognize it, but I am happy to -- I am not disputing that this is probably it.

MR. HARTMAN: Mr. Charalambous, you can take that down.

Judge, may I have one moment?

THE COURT: Yes.

Q. Mr. Cole, in 2014 and 2015, you had been a public company executive for a number of years, isn't that right?

LAPMCOL4          Cole - Cross          Page 2255

A. Yes.

Q. How many years exactly?

A. Twenty-nine years.

Q. During the course of your 29 years, did you come to understand that there were special rules that applied to accounting?

A. Accounting?

Q. Yeah.

A. Yes.

Q. Those are called the generally accepted accounting principles, right?

A. OK.

Q. Yes or no. Do you know about that?

A. I have heard the phrase GAAP, but there is lots of accounting rules besides for GAAP, including GAAP.

Q. So you are familiar with the accounting rules at a high level, is that right?

A. I wouldn't hold myself out as someone who knows the accounting rules.

Q. You've testified a lot today about revenue recognition and other things. You learned those things by being a public company executive, right?

A. Sure. As a CEO of a public company, I definitely probably know the basics without knowing any of the numbers or all the rules that go under the accounting.

LAPMCOL4          Cole - Cross          Page 2256

Q. You are not a CPA, right?

A. No.

Q. A CPA is like a licensed accountant, isn't that right?

A. I believe so, yes.

Q. But Jeff Lupinacci, who is the CFO of the company, he wasn't a CPA either?

A. I don't believe Jeff was a CPA.

Q. You hired Mr. Lupinacci as the CFO of the company, right?

A. I did. He had an accounting background.

Q. Is that a yes or no?

A. I already told you I hired him.

Q. Thanks. That's the response.

Mr. Cole, you know that if a company publishes numbers in its public disclosures, those numbers can't be materially misleading, right?

A. Sure.

Q. You know that as a chief executive of a public company, isn't that right?

A. I think we all know that.

Q. It's common knowledge, right? You can't mislead investors, right?

A. No. You should do the best numbers you possibly can to make sure they are accurate.

Q. In order to do that, you have to make sure that the professionals who were involved in preparing the financial

LAPMCOL4          Cole - Cross          Page 2257

statements had the relevant information, isn't that right?

A. Correct.

Q. And that involved your accountants, isn't that right?

A. Correct.

Q. And your lawyers, isn't that right?

A. Correct.

Q. And your auditors, isn't that right?

A. I think the accountants were the auditors, but OK.

Q. You had internal accountants and you had external accountants, right?

A. Sure. And we had a CFO, vice-president, and then we also had outside general auditors.

Q. In order to do their jobs, all those people had to know about the relevant terms, right?

A. Sure. And they also --

Q. Yes or no, Mr. Cole?

A. But they have audit procedures.

Q. Mr. Cole, is that a yes?

A. Repeat the question.

Q. In order to do their jobs, those people had to know all the relevant facts, yes or no?

A. Yes. Assuming they are in the documents.

Q. Thank you.

Now, one of the questions that your auditors asked you about every year was whether there were ever linked

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAPMCOL4    Cole - Cross    Page 2258

transactions.

Do you remember seeing that during the course of the trial?

A. I heard Mr. Shapiro talk about linked transactions, yes.

Q. You knew that was something that was important for your auditors to know, isn't that right?

A. I learned it during this trial, but I don't remember being it being called out anything like linked transactions.

Q. Mr. Cole, you are familiar with the term round tripping, aren't you?

A. I have learned it in February of -- during the SEC corp. fin process.

Q. Mr. Cole, you testified about that on direct, right, what round tripping was?

MR. REISNER: Objection. Misstates the evidence.

THE COURT: Overruled.

A. I don't know -- I could say what think --

Q. Tell us what you think it is.

A. I think it's -- when I talked about the puts and the floors on the calls, the floors on the puts, that if you sell something for one price and you are getting it back automatically, then maybe it wasn't a legitimate sale.

Q. Mr. Cole, you were asked about round tripping in your testimony before the SEC in a related matter.

Do you remember being asked that?

LAPMCOL4    Cole - Cross    Page 2259

A. I don't recall.

Q. You were asked this question and you gave this answer:

"Q. What is your understanding of the term round tripping?

"A. I believe I heard about it for the first time around this time."

This time you were referring to Mr. Horowitz's resignation. You say: And my understanding is, when you do a transaction that has no real basis, just to give money to one person and give money to another person.

Do you remember testifying that way, Mr. Cole?

MR. REISNER: Objection. Foundation. Don't have a page or a reference or context.

THE COURT: Overruled.

Q. Do you remember testifying that way, Mr. Cole?

A. No.

MR. HARTMAN: Mr. Charalambous, can you please show for the witness and for the parties what's been marked for identification as Government Exhibit 1890, page 78 of the PDF. It's page 309, transcript lines 15 through 20.

MR. REISNER: Can we go out just so we can see the whole document?

MR. HARTMAN: No. You can see it. We have copies for you. Page 78, transcript page 309, lines 15 through 20. The government offers these lines.

MR. REISNER: Your Honor, I am going to object based

LAPMCOL4    Cole - Cross    Page 2260

on the characterization of what this referred to. I think the question was something of a first of Seth Horowitz's resignation time period. It doesn't.

No objection to the reading in of the question and the answer.

THE COURT: The objection is overruled.

(Government Exhibit 1890 received in evidence)

That brings us to the end of the day.

Ladies and gentlemen, we will see you tomorrow. Be safe getting home. Be safe getting in tomorrow. Don't discuss the case or read anything or look at anything about the case.

(Jury not present)

THE COURT: We will see everyone at 3:30.

(Recess)

(Continued on next page)

LAPPCOL5    Charge Conference    Page 2261

(In open court; jury not present)

THE COURT: Okay. We have a number of issues to discuss. Let's take the easiest one first. As I indicated previously, it is my practice to provide a copy of the indictment to the jury. The defense has indicated that I should not do that in this case because the indictment is essentially a speaking indictment. There's, obviously, no requirement that I give the indictment to the jury. I give it to them because I think it just helps them sort of maybe structure their deliberations, makes it easier for them to know what's what.

However, I will not give them the indictment in its current state. What I will do, and I leave this up to the government, if you want to go through the trouble, is I can provide them with a copy of the indictment which includes only the statutory allegations and the overt acts. So, for example, with Count One, I would provide them only with -- and you can take the numbers out or renumber, it doesn't matter to me -- paragraphs 40 through 44, with the overt acts, and then Counts Two through Eight. I think those are fine as they are. Count Nine is fine as it is, and Count Ten, I would give them only paragraph 65 through 67, including all of the overt acts, and I'd take out the forfeiture allegations. So if you want to give me something that looks like that, I will provide that to the jury.

# A-434

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

LAQMCOL1                                    Page 2315

understanding of the term round tripping? He says: I believe I heard about it for the first time around this time. And my understanding is, when you do a transaction that has no real basis, just to give money to one person and give back to another.

MR. REISNER: Again, the question there was the term, not the concept. I actually think, and I believe this was entirely inadvertent, but I think yesterday Mr. Hartman, when he was reading that second excerpt, linked it to the time period of Mr. Horowitz's resignation, and that's wrong under the record. The time frame set by the questioner was the corp. fin process, but not Mr. Horowitz's resignation. That's a quibble. That's a small issue. So that it is not repeated today, I bring that to the government's attention. I think it was entirely inadvertent. I am not attributing any intent.

MR. HARTMAN: I was going to clean that up, Judge. I recognize that the testimony was, I think they happened around the same time, but that he learned about it in 2015.

THE COURT: Let me just quickly inquire of Ms. Rivera whether she has received any notes from any jurors.

THE DEPUTY CLERK: No. They were all there except one.

THE COURT: It looks like we will have a jury. Anything else? Again, if you want to propose any limiting instruction language, I'm happy to give it.

LAQMCOL1          Cole - Cross          Page 2316

MR. REISNER: Thank you, your Honor.

THE COURT: Anything else?

MR. HARTMAN: No, thank you, your Honor.

(Recess)

THE COURT: I'm told that the jury will be out in a minute.

(Jury present)

THE COURT: Ladies and gentlemen, good morning. We are particularly grateful for your promptness today. We trust that your commute was not too unpleasant.

We will now continue with the cross-examination of Mr. Cole, who is reminded that you are still under oath.

NEIL COLE, resumed.

CROSS-EXAMINATION (cont'd)

BY MR. HARTMAN:

Q. Good morning, Mr. Cole.

A. Good morning, Mr. Hartman.

Q. Mr. Cole, I want to go back to some first principles.
You were the chief executive officer of Iconix, right?

A. Correct.

Q. That was an important job at the company, right?

A. Yes.

Q. The most important job in management, isn't that right?

A. From my perspective, yes.

Q. You were the boss?

LAQMCOL1          Cole - Cross          Page 2317

A. I was.

Q. And the buck stopped with you?

A. Yes.

Q. You had been an executive of public companies for over 30 years.

A. Close to 30. I think it was 29.

Q. You told a reporter from Women's Wear Daily that while you were serving in that function, you had to deliver every quarter.
Do you remember saying that?

A. I don't.

Q. You felt a lot of pressure to grow the company and meet Wall Street expectations, didn't you?

A. In my 29-year career, I don't believe I felt pressure, but I always did the best I could to deliver the best financial performance I could as a CEO. It was kind of my job.

Q. You don't remember telling a reporter that you had to deliver every quarter while you were the CEO of Iconix?

A. I don't remember telling a reporter that, no.

MR. HARTMAN: Could we see what's been marked for identification as Government Exhibit 1892, please. Could we go to the bottom of this document. Can you highlight, please, the language that's in the final paragraph.

Q. Mr. Cole, do you see this?

A. Yes.

LAQMCOL1          Cole - Cross          Page 2318

Q. Does this refresh your memory that you told a reporter that you had been a public company CEO for 32 years, having to deliver every quarter?

A. Do you want me to read it?

Q. I am just asking if it refreshes your memory.

A. Yes. But I think it reads: I think for 32 years. It doesn't say: For 32 years. I think you read it wrong.

Q. Does it refresh your memory that you told the reporter that you had to deliver every quarter?

A. No. But I don't doubt the reporter. Although sometimes reporters are not that good. But I don't doubt that I said this.

Q. You don't dispute that you said it, is that right?

A. I don't.

MR. HARTMAN: The government offers Government Exhibit 1892.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1892 received in evidence)

MR. HARTMAN: We can just put that up for the jury. Could we see that final paragraph, please.

Q. Mr. Cole, can you read the quote.

A. I've been a public CEO, I think, for 32 years, having to deliver every quarter, every quarter. And now we're kind of thinking long term, which is a novel idea, he said.

# A-435

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED<br>October 26, 2021

LAQMCOL1          Cole - Cross          Page 2319

Q. That's a reference to you, isn't that right, Mr. Cole?
A. Yes.
     MR. HARTMAN: Take that down, please.
Q. Mr. Cole, the reality was that you and your team at Iconix felt that the company had revenue needs, isn't that right?
A. I don't know what you mean by that question.
Q. You referred to them as needs, right?
A. I don't know what you mean by needs.
Q. You needed to meet consensus, you needed to meet quarterly earnings goals, isn't that right?
A. No. We needed to pay the bills, and we needed to pay our payroll, I think, were the first needs, and to keep 150 families getting their paychecks. So I don't think our first need was what you mentioned, consensus or guidance.
     MR. HARTMAN: Mr. Gill, could we show for the witness what's been marked for identification as Government Exhibit 1024.
Q. Mr. Cole, do you recognize this as an e-mail from Dan Castle to yourself on March 7, 2014.
A. Do you want me to read it?
Q. I am just asking if you recognize it.
A. I recognize the top. I haven't read the e-mail.
     MR. HARTMAN: The government offers government Exhibit 1024.
     MR. REISNER: Is this the whole document? Can we

LAQMCOL1          Cole - Cross          Page 2320

scroll down to see if there is anything else there.
     You don't have a hard copy, do you?
     MR. HARTMAN: This one was premarked.
     MR. REISNER: Can we go back to the first page, please.
     Objection. Hearsay.
     THE COURT: Overruled.
     (Government Exhibit 1024 received in evidence)
     MR. HARTMAN: Can we show that to the jury, please.
Q. Mr. Cole, can you read the first paragraph, what Mr. Castle said to you.
A. Mr. Castle said: If we add a new business/optionality line to existing revenue of $400,000, we would get to a purchase price of 4 million, which gives us approximately -- a gain of approximately 3 million. I'm not sure what our Q1 needs are, so will defer to Neil on whether this would work.
Q. Mr. Cole, do you recognize this as an early discussion of the Korea joint venture that was ultimately part of SEA-2?
A. I don't know if it's in relation to SEA-2, but it discusses Korea.
Q. Can you read the subject line, please.
A. Korea JV royalty.
     MR. HARTMAN: Mr. Gill, you can take that down.
Q. Now, Mr. Cole, you mentioned the other obligations you had as CEO besides delivering revenue. One of those

LAQMCOL1          Cole - Cross          Page 2321

responsibilities was ensuring that Iconix had internal controls in place to make sure that the financial results the company was reporting to the public were correct, isn't that right?
A. Yes. Very important to make sure your financials are correct.
Q. That was an important part of your job responsibilities as CEO, isn't that right?
A. Yes. To the best of my ability.
Q. Because you knew that investors relied on the company's financial results in making their decisions, isn't that right?
A. Correct.
Q. And it was important to you personally that those results be correct, isn't that right?
A. Correct, to the best of my ability.
Q. As the CEO it was ultimately your responsibility to ensure that Iconix got it right?
A. To the best of my ability.
Q. In fact, you put your signature on Iconix's SEC filings, didn't you?
A. I did.
Q. Mr. Cole, would you agree with me that proper accounting is not results driven?
A. I don't know what you mean.
Q. Well, a company can't just pick a number that it wants to report and make up documentation to meet that number, isn't

LAQMCOL1          Cole - Cross          Page 2322

that right?
A. Yes. You have to have factual -- you have to do it. You just can't make up a number.
Q. There has to be economic substance to a transaction, isn't that right?
A. I think you are now changing the subject. You're talking about a transaction or you're talking about making numbers?
Q. Let me just ask you, for accounting for a transaction, there has to be economic substance to the transaction, right?
     MR. REISNER: Objection to form.
     THE COURT: Sustained as to form.
A. I'm not an accountant, but I would never --
     THE COURT: You don't have to answer that, Mr. Cole.
     THE WITNESS: Sorry.
Q. Mr. Cole, is it your understanding that in order to properly account for a transaction there must be economic substance to it?
A. I don't know the accounting rules, but it makes sense.
Q. You understand that you can't engage in a transaction solely for the purpose of inflating revenue or earnings, correct?
A. Correct. If it's not substance.
Q. As the CEO of Iconix, you had a duty to make sure that Iconix's financial disclosures were complete?
A. Yes, to the best of my ability.

**A-436**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

LAQMCOL1          Cole - Cross          Page 2323

Q. And you had a duty to make sure they weren't misleading, isn't that right?
A. To the best of my ability.
Q. In fact, as we said, you certified that each time Iconix made a filing with the SEC, isn't that right?
A. I did.
   MR. HARTMAN: Let's look at Government Exhibit 103, page 36.
Q. Can you read paragraph 2, please.
A. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements are made, not misleading with respect to the period covered by this report.
Q. Let's look at paragraph 4, please.
   Can you read that, please?
A. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures as defined in the Securities Act rules of 13A-15(e) and 15D-15(e) and internal control over financial reporting, as defined in Exchange Act rules 13A-15(f) and 15D-15(f) for the registrant and have.
Q. Mr. Cole, this is referring to the concept of internal controls, isn't that right?
A. I don't know. I just read a lot of numbers.

LAQMCOL1          Cole - Cross          Page 2324

Q. It says: I'm responsible for establishing and maintaining disclosure controls and procedures, isn't that right?
A. Correct.
Q. Internal controls over financial reporting.
A. Yes.
Q. What that is, that was procedures at the company to make sure the transactions are properly documented, isn't that right?
A. Correct.
Q. And you certified each time you filed a document with the SEC that it was your responsibility, along with the certificate certifying officers, to make sure that the company had appropriate controls, isn't that right?
A. I did the best I can to my ability.
Q. Mr. Cole, you would agree with me that proper internal controls don't permit a company to make commitments that are not reflected in the company's books and records, right?
A. Correct.
   MR. REISNER: Objection, foundation.
   THE COURT: Overruled.
Q. And you'd agree with me that proper internal controls would not allow executives to enter into undisclosed side agreements that materially affect the financial results, correct?
A. Correct.
Q. Mr. Cole, these certifications were important, isn't that

LAQMCOL1          Cole - Cross          Page 2325

right?
A. Yes.
Q. You knew that the investing public relied on them, right?
A. Yes.
   MR. HARTMAN: You can take that down, Mr. Gill.
Q. Mr. Cole, as the CEO of Iconix, you had to submit a management representation letter to Iconix's outside auditors every quarter, isn't that right?
A. I did.
Q. You knew that BDO required that letter before it would sign off on Iconix's financial statements, isn't that right?
A. Yes.
Q. You knew that BDO relied on those representations in order to conduct the audit, isn't that right?
A. Yes.
Q. It was important to BDO that you signed that letter, right?
A. Correct.
Q. And you understood that it was important for you to be truthful in signing that letter?
A. Of course.
   MR. HARTMAN: Let's look at Government Exhibit 500. Can we see paragraph 37.
Q. Mr. Cole, can you read this, please.
A. We are not aware of any linked or barter transactions, including transactions entered into under separate agreements

LAQMCOL1          Cole - Cross          Page 2326

where one of the arrangements is contingent upon execution of another arrangement, except for arrangements where such linkage, barter, or contingent is explicitly stated in the contract terms.
Q. Mr. Cole, you represented this when you signed this letter, isn't that right?
A. If I signed the letter, I represented it.
Q. Do you have any reason to doubt that you signed the letter?
A. If you show me my signature, I'll be happy to verify it.
   MR. HARTMAN: Mr. Gill, can we show Mr. Cole his signature.
A. Yes, that's my signature.
   MR. HARTMAN: Mr. Gill, caused we see paragraph 3(a), please.
Q. Mr. Cole, can you read what's written here.
A. We have made available to you all: Financial records and related data, as agreed upon in the terms of the aforementioned audit engagement letter.
Q. This is something you certified as well, isn't that right, Mr. Cole?
A. I signed the letter, if that's what you mean by certified.
Q. Did you understand that by signing it you were representing to BDO that you made these documents available?
A. Correct.
   MR. HARTMAN: Let's look at paragraph 5.

# A-437

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

LAQMCOL1          Cole - Cross          Page 2327

Q. Can you read the first sentence, please.
A. There are no material transactions that have not been properly recorded in the accounting records underlying the consolidated financial statements.
Q. Mr. Cole, this is something you represented when you signed this letter as well, isn't that right?
A. Correct.
        MR. HARTMAN: Mr. Gill, you can take that down.
Q. Now, Mr. Cole, you understood, didn't you, that oral agreements between parties could be binding?
A. I don't know that. I don't understand that.
Q. That's not your understanding?
A. You'd have to tell me more.
Q. I'm just asking, is it your understanding that oral agreements between parties can be binding?
A. I don't think I learned that in law school.
Q. What is your current understanding of that?
A. I believe -- I'm trying --
Q. The question is a yes or no question.
A. You're asking me what my understanding was.
Q. Let me pose a different question.
        Mr. Cole, is it your understanding, yes or no, that oral agreements between parties can be binding?
A. I answered no.
Q. Your understanding is, that they cannot be?

LAQMCOL1          Cole - Cross          Page 2328

A. No. I understand that under a certain dollar amount -- excuse me -- when it's over a certain dollar amount, I think $10,000 or it -- it has to be in writing.
        MR. HARTMAN: Let's look at Government Exhibit 1871, please.
Q. Mr. Cole, do you recognize this as an e-mail between you and someone named Bill McComb on October 11 of 2013?
A. I know who Bill McComb was, but I haven't read the document, if you asked me to read it.
Q. Can just look at the header. Does it look like an e-mail from you to him?
A. Yes.
        MR. HARTMAN: The government offers Government Exhibit 1871.
        MR. REISNER: Objection. Relevance.
        THE COURT: Overruled.
        MR. HARTMAN: Mr. Gill, could you please go down the second page.
        The government offers 1871.
        THE COURT: It will be received.
        (Government Exhibit 1871 received in evidence)
        MR. HARTMAN: Mr. Gill, is there a way to capture the top portion of page 2 and the bottom portion of page 1. Is there a way to show the sender on the e-mail on page 2. Can you just pull the top portion down a little bit more. Sorry,

LAQMCOL1          Cole - Cross          Page 2329

Mr. Gill. Can you just grab the bottom of that. Can we get the top of the second page.
Q. Mr. Cole, do you see where you write to Mr. McComb: Do you plan on paying 500,000, as per our agreement of September 17, 2013? If I do not hear back today, I will assume not.
        Do you see that?
A. Yes.
Q. Can you read Mr. McComb's response.
A. Neil, when we discussed that a few weeks back, we never contemplated a deal with ABG-LGP as the primary competitor to Iconix. You even drafted an agreement, which ultimately no one signed, naming IDG as the trigger for such a payment. All that said, I will in fact offer you $500,000. Not because we agreed to it, but because it's a good thing to do. So I will authorize George to make a payment. We worked with your company, I good faith, spent as much as you did in trying to get an agreement. Let's move on as friends. It's a small world after all. Bill McComb.
        MR. HARTMAN: Mr. Gill, can you take that down and show us Mr. McComb's response: You can pull the rest of it, all the way down.
Q. Mr. Cole can you read your response on October 11, 2013.
A. I am not bulling, only demanding monies that are owed. Pay it today or you will read our court action.
Q. Earlier in the chain you say: So I am clear and

LAQMCOL1          Cole - Cross          Page 2330

straightforward, unlike others, if we do not have 500,000 by the end of the day, we will file a court action.
        Do you see that?
A. I do.
        MR. HARTMAN: You can take that down, Mr. Gill.
Q. Mr. Cole, you knew that one of the things that BDO needed to know about were agreements that bound the company, isn't that right?
A. Yes.
Q. They needed to know that to get the accounting right, isn't that right?
A. Correct.
Q. And that included oral agreements as well, isn't that right?
A. No. I don't know what you mean by oral agreements.
Q. Agreements made verbally.
A. Our practice was not to do oral agreements. I would never be able to -- I had 150 people working for me.
Q. Mr. Cole, the question is, did you understand you needed to tell BDO about oral agreements, yes or no?
A. No. There were no oral agreements.
Q. You understood that you had to be candid with the auditors, isn't that right?
A. Of course.
Q. But you weren't always candid with them, were you?

**A-438**

LAQMCOL1  Cole - Cross  Page 2331

A. I did my best to tell them what I thought was relevant and important to getting the numbers correct.

MR. HARTMAN: Let's look at Government Exhibit 1891 for identification.

Q. Mr. Cole, do you recognize this as an e-mail that you sent to Mr. Lupinacci, the CFO of the company, on July 18 of 2014?

A. Yes, I recognize the header, Neil to Jeff.

MR. HARTMAN: The government offers Government Exhibit 1891.

MR. REISNER: No objection.

THE COURT: It will be received.

(Government Exhibit 1891 received in evidence)

Q. Mr. Cole, can you read your response to Mr. Lupinacci at the top, please.

A. One of the tricky elements in probability we hit GAAP numbers would be possible impairment. Although this is not something I would highlight to the auditors, it is a major concern which we are working to alleviate, but there is a definite risk on a couple of brands. Do you agree an impairment would wipe out these bonuses.

Q. Mr. Cole, an impairment is a reduction in the carrying value of a brand, isn't that right?

A. Correct.

Q. If Iconix were to suffer an impairment of one of its brands, that would have been a big deal for Iconix, isn't that

LAQMCOL1  Cole - Cross  Page 2332

right?

A. I don't necessarily agree. I am not sure I can answer.

Q. An impairment reduces the company's profit and loss, isn't that right?

A. Yeah. But it's a noncash profit or loss.

Q. It reduces the profit and loss, isn't that right?

A. Yes. Noncash.

Q. The answer to that is yes, is that right?

A. Can you reask the question.

Q. It reduces the company's profit and loss, isn't that right?

A. Correct.

Q. It would reduce the company's EPS, isn't that right?

A. I am not sure if it's --

Q. If you know.

A. I am not sure. It could be nonaudited.

Q. Yes or no?

A. I don't know.

Q. The business model for Iconix was owning these brands, isn't that right?

A. Yes. We owned intellectual property.

Q. That was Iconix's prior asset was the brands, isn't that right?

A. Correct.

Q. If the brands were determined to be less valuable than folks otherwise thought, that would go a big deal for the

LAQMCOL1  Cole - Cross  Page 2333

company, isn't that right?

A. Possibly. It's all relative.

Q. Now, Mr. Cole, yesterday we were talking about the concept of round tripping. Do you remember being asked about that?

A. I did.

MR. HARTMAN: You can take this down, Mr. Gill.

Q. You were asked, Mr. Cole, you're familiar with the term round tripping, aren't you? And you responded: I have learned it in February of -- during the SEC corp. fin process.

Do you remember being asked that question and giving that answer?

A. Correct.

Q. We also saw your testimony to the SEC in a related matter. That's Government Exhibit 1890.

MR. HARTMAN: Can we see that, please. I think it has been received.

Q. Mr. Cole, this is the testimony that you gave in the SEC matter related to this case. The question was: What is your understanding of the term round tripping? Your answer was: I believe I heard about it for the first time around this time. And my understanding is, when you do a transaction that has no real basis, just to give money to one person and give money back to another.

Isn't that right?

A. Correct.

LAQMCOL1  Cole - Cross  Page 2334

Q. And you knew that round tripping was wrong, isn't that right?

A. Correct.

Q. You knew about that well before February of 2015, isn't that right?

A. I never heard the term round tripping before February. But the concept of doing business with someone for no real purpose doesn't really make sense to me.

Q. But you understood, irrespective of whether it makes sense or not, that when you do a transaction that has no real basis just to give money to one person and you give money back to another, you understood that that was wrong, isn't that right?

A. Yes.

Q. And you understood that well before 2015, isn't that right?

A. The concept, yup. It would make sense --

Q. The question is not whether it would make sense, Mr. Cole. The question is whether you understood that it was wrong well before 2015, yes on no?

A. Yes. If you are trying to inflate revenues as a public company, it's wrong.

Q. That's not the question. The question is, you testified here that your understanding is, when you do a transaction that has no real basis, just to give money to one person and give money back to another, you understood that that was wrong well before 2015, yes or no?

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQMCOL1      Cole - Cross      Page 2335

A. It depends.

Q. Did you understand that was wrong well before 2015, yes or no?

A. I would have to answer with, it depends.

Q. Sorry. Is your answer yes or no?

A. It depends on the circumstances.

MR. REISNER: Objection. Asked and answered.

THE COURT: I'm sorry. I didn't hear what Mr. Cole said.

MR. HARTMAN: It's OK, your Honor. I'll move on.

Q. Mr. Cole, you understood that round trip transactions, whether you knew them by that name or not, were illegal and violated the accounting rules well before 2015, yes or no?

MR. REISNER: Objection. Foundation. Assumes facts not in evidence.

THE COURT: Overruled.

A. In a public company, I would say I knew that it was wrong to give money to some person who gave back to you to artificially increase revenue.

(Continued on next page)

LAQPCOL2      Cole - Cross      Page 2336

Q. Okay. And you knew it was not only wrong, but that it violated the securities laws, yes or no?

A. I'm not familiar with it, but I knew it was wrong.

Q. Did you know, yes or no, that doing that, doing a transaction that has no real basis, just to give money to one person and give it back to another, violated the securities laws, yes or no?

A. I can't answer that because I don't believe I followed it.

Q. Mr. Cole, my question is: Did you know, prior to 2015, that when you do a transaction that has no real basis, just to give money to one person and give money back to another, that violates the securities laws, yes or no?

A. I don't know what I knew before 2015. I never was part of -- I don't -- I don't recall.

Q. You don't recall?

A. I don't recall what I ever thought. The concept doesn't make sense to me; so I can't imagine how I would think about it.

Q. Mr. Cole, the question is not whether it makes sense to you or not --

A. I told you I didn't think about it.

Q. You never thought about it before 2015?

A. No.

Q. You never --

A. Not that I can recall.

LAQPCOL2      Cole - Cross      Page 2337

Q. You never thought about whether it was illegal to do a transaction that has no real basis, just to give money to one person and give money back to another, yes or no?

MR. REISNER: Objection, asked and answered multiple times now.

THE COURT: Sustained.

Q. Mr. Cole, is it your testimony that you never thought about whether this was illegal prior to 2015?

MR. REISNER: Objection, asked and answered.

THE COURT: Sustained.

Q. Mr. Cole, isn't it true that as early as 1999, you knew that just giving money to one person to get it back -- when you do a transaction that has no real basis, just to give money to one person and give money back to another, could be illegal under the securities laws, yes or no?

A. I don't recall.

Q. You don't recall learning that in 1999?

A. No.

Q. Do you recall these issues being raised by Candie's auditors in 1999?

A. Not the way you described it.

Q. You don't recall anyone from Candie's auditors at the time raising concerns about doing transactions that have no real basis, just to give money to one person and give money back to another, yes or no?

LAQPCOL2      Cole - Cross      Page 2338

A. No.

Q. You don't recall that?

A. No. Every transaction I've done in my life had a purpose, where there was quid pro quo.

Q. That's not the question. The question is, do you recall Candie's auditors raising those issues in 1999, yes or no?

A. I do not believe that those were the issues that they raised.

Q. Okay. Let's look at Government Exhibit 600 just for the parties and for the witness.

Mr. Cole, do you recognize this document?

A. Let me look. I don't recognize the document from 1999, but I have no doubt that my name is on it.

Q. Mr. Cole, let's look at the final page of this document.

Mr. Cole, can you read the last paragraph silently to yourself?

A. Yes.

Q. Does this refresh your memory that in 1999, Ernst & Young, which was Candie's auditors, raised concerns about whether there were offsetting payments that had no economic substance?

A. No. I think the company is saying that there was economic substance.

Q. That's not the question. The question is, does this refresh your memory that Ernst & Young raised questions about that in 1999?

# A-440

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQPCOL2        Cole - Cross        Page 2339

A.  It says E and Y raised whether there was a correlation.  I don't believe they were saying that there was no substance.

MR. HARTMAN: The government offers this paragraph.

MR. REISNER: Objection.

THE COURT: May I see the parties.

(Continued on next page)

LAQPCOL2        Cole - Cross        Page 2341

THE COURT: I think that it doesn't mean this isn't an appropriate record, an appropriate basis, foundation to put this in and to challenge Mr. Cole's not only recollection, but his characterization of the investigation that was conducted back in 1999.  So I will allow the admission of that paragraph.

MR. REISNER: Well, we continue to object.  This isn't right.

(Continued on next page)

LAQPCOL2        Cole - Cross        Page 2340

(At the side bar)

MR. HARTMAN: Mr. Cole has repeatedly testified that he has no recollection of these issues being raised.  This document impeaches that assertion.  This was a big deal at the company, and there was a memo that was prepared that set this forward.

MR. REISNER: Your Honor, it's improper.  It's the mini-trial that I feared would take place.  The witness has been shown a document and asked whether it refreshes his recollection.  He said it doesn't refresh his recollection.  That's it.

The document is not admissible, and Mr. Hartman represented earlier during our colloquy that he was going to ask the question, elicit an answer.  If the answer was "I don't recall," he'd move on, and that's not what's happening.

THE COURT: Well, Mr. Cole is doing more than that.  He's pushing back on the way that the document is phrased.  He's, from my standpoint, fighting him on every question, on every word.

Mr. Hartman?

MR. HARTMAN: Judge, I'm trying not to get into the SEC investigation because I understand that it's a sensitive area.  I believe the other way to impeach this is to say there was an SEC investigation and it was a big deal.  I'm trying not to do that, but I don't know what alternative I have.

LAQPCOL2        Cole - Cross        Page 2342

(In open court)

MR. HARTMAN: The government offers just this paragraph.

MR. REISNER: Objection.

THE COURT: It will be received over objection.

MR. REISNER: Your Honor, just so that the record is clear, can we put the date of this document in evidence as well?

MR. HARTMAN: Judge, I'm happy to offer the header to the memo as well.

THE COURT: Very well.

MR. HARTMAN: Is there any way to do that, Mr. Gill?

MR. REISNER: Just the date.

MR. SOLOWIEJCZYK: Let's do the whole header.

MR. REISNER: Objection.

THE COURT: Put in from "to" to "date."

MR. HARTMAN: Okay.  And we offer these two excerpts, the section from "to" to "date" and the final paragraph that begins "E & Y has raised" and ends "completely coincidental."

MR. REISNER: Objection.

THE COURT: It will be received.

MR. HARTMAN: This is Government Exhibit 600.

(Government's Exhibit 600 received in evidence)

BY MR. HARTMAN:

Q.  Mr. Cole, do you see that this is an e-mail from Deborah

# A-441

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQPCOL2          Cole - Cross          Page 2343

Sorell to you and Larry O'Shaughnessy?

A. Yes.

Q. And the date of the memo is May 27th, 1999; is that right?

A. Yes.

Q. At that time, were you the CEO of Candie's?

A. Yes. It's when we were a shoe company.

Q. Okay. Can you read the last paragraph, please?

A. The one that's in front of me?

Q. Yes. I'm sorry, "E & Y has raised"?

A. E & Y has raised the issue of whether there is a correlation between the million six five hundred -- $1,650,000 credit that the company took in connection with the volume incentive credit. 650,000 and the business disruption claim of one million and the million 650 constituting the first three payments toward the equipment. DG has stated that fact that the numbers are the same is completely coincidental.

Q. Mr. Cole, the million-six that's being referenced here, that's a credit that the company took to its P and L; isn't that right?

A. I -- I don't remember. It was 22 or three years ago.

Q. Okay. You would agree with me that it says the million-six-fifty credit that the company took in connection with the volume incentive credit and the business disruption claim; do you see that?

A. I do.

LAQPCOL2          Cole - Cross          Page 2344

Q. And the next phrase says: And this million 650 constituting the first three payments toward the equipment; do you see that?

A. I do.

Q. Does it appear to you to be that the issue that's being raised here is whether these two payments are offsetting?

A. I -- you know, it was a long time ago; so however you can interpret it.

Q. I'm just asking you, based on the text that you see here, does it appear to you that the issue that E & Y is raising is whether there's a correlation between these two offsetting payments, yes or no?

A. Yes. They're asking if there's a correlation between the business interruption, the volume incentive and the three things towards the equipment.

Q. And the credits are a reduction in expenses; isn't that right?

A. I don't know.

Q. Okay. Well, credit is something that reduces the company's expenses, right?

A. It depends if we were getting a credit or they were getting the credit.

Q. If you were getting the credit, it would reduce the company's expenses; isn't that right?

A. Or it could be the income. I'm not sure.

LAQPCOL2          Cole - Cross          Page 2345

Q. Either way, it would benefit the P and L; isn't that right?

A. Yes. If someone gives you money, it's a benefit.

Q. Okay. And the 1,650,000 constituting the first three payments towards the equipment, do you know what this refers to, Mr. Cole?

A. No.

Q. Does it refer to payments that Candie's was making to the counterparty?

A. I don't recall. This was -- I apologize, but it's almost 23 years ago.

Q. Mr. Cole, do you recall that these issues were brought up by -- by the way, E & Y, that's a reference to Ernst and Young; isn't that correct?

A. Correct.

Q. And Ernst & Young was Candie's auditor in 1999; isn't that right?

A. Correct.

Q. Do you recall that these issues were brought up in a meeting that you had with Candie's auditors in 1999?

A. I don't recall this specific issue, but I recall there was an issue and an SEA -- SEC issue in 19 -- I think it started in 1997, '98 and went all the way into early 2000.

Q. Do you recall that one of the things that came up in connection with those issues was these offsetting expenses and credits?

LAQPCOL2          Cole - Cross          Page 2346

A. No, I don't recall this.

Q. Do you recall that during the meeting with Candie's auditors, they expressed concerns that these offsetting payments could have been part of an effort to manage earnings, yes or no?

MR. REISNER: Objection, foundation, relevance.

THE COURT: Sustained.

Q. Mr. Cole, do you recall this concept of offsetting payments being something that E & Y raised in connection with the investigation you talked about?

MR. REISNER: Objection, asked and answered, foundation.

A. No, I do not recall.

THE COURT: Objection is overruled, but move it along, Mr. Hartman.

BY MR. HARTMAN:

Q. Mr. Cole, there was an internal investigation, as well, in connection with the events that you just described; isn't that right?

A. I believe so.

Q. And during that internal investigation, you admitted that the credits that are referenced here were back-dated by you when they were provided to the company's auditors; isn't that right?

A. I don't recall.

**A-442**

---

LAQPCOL2      Cole - Cross      Page 2347

Q. Could we show, just for the witness, Government Exhibit 1889 at page 41.

Mr. Cole, do you remember giving testimony in a prior proceeding about these issues?

A. I don't remember giving testimony, but I have no doubt that if there's a record, that it is a correct record.

Q. Okay. Do you remember giving testimony in a prior proceeding about the issues that we've just been talking about that occurred at Candie's?

MR. REISNER: Time frame, your Honor?

A. I don't.

Q. Mr. Cole, do you see the question beginning on line 19 here?

A. From Mr. Gizzi?

Q. Yes.

A. Mr. Gizzi: And the fact that you knew --

Q. Mr. Cole, don't -- just read it to yourself.

A. Okay. Got it.

Q. Mr. Cole, do you understand that you were being asked here about these credit memos?

A. I -- you would have to take me back to the pages, but I don't understand I was asking about these memos.

Q. Okay. Mr. Cole, do you recall admitting, in connection with your testimony in this proceeding, that you back-dated documents while you were at Candie's?

---

LAQPCOL2      Cole - Cross      Page 2348

MR. REISNER: Objection, asked and answered.

A. I don't recall.

THE COURT: Overruled.

MR. REISNER: Objection, asked and answered.

THE COURT: Overruled.

A. I don't recall, but I know I did nothing wrong.

Q. Okay. Did you back-date documents while you were working at Candie's, yes or no?

A. I don't recall, but I know I did nothing wrong.

Q. Okay. Did you back-date documents that were being submitted to the company's auditors?

A. I don't know. You'd have to take me through.

MR. HARTMAN: The government offers Government Exhibit 1889. I guess we'll need the cover page, and lines 9 through 15.

MR. REISNER: Objection, hearsay, relevance, 403.

THE COURT: Overruled. It will be received.

(Government's Exhibit 1889 received in evidence)

MR. HARTMAN: Is there a way to redact just the top portion of that, Mr. Gill, the portion at the top of the first page?

MR. REISNER: Maybe we could just capture the date and the below line.

MR. HARTMAN: Let's do that. Let's start "in the matter of." Great.

---

LAQPCOL2      Cole - Cross      Page 2349

MR. REISNER: The place should be redacted.

MR. HARTMAN: Is there a way to redact the place, Mr. Gill? Yes, that's good. And can you show that to the jury, please.

BY MR. HARTMAN:

Q. Mr. Cole, does this appear to be testimony that you gave on December the 5th of 2002?

A. Yes.

Q. And does this refresh your memory that in connection --

MR. REISNER: For the record, I think it says November 5th.

Q. I'm sorry. For November 5th, 2002.

A. Sorry. Correct, that it is November.

Q. And does this refresh your memory that, in connection with that testimony, you signed documents knowing that they were dated earlier than they actually were represented to be?

A. No. I mean, it doesn't remind me, take me back 23 years to that, but I have no doubt that that's what this says.

Q. The question says: "And the fact that you knew you were dating it earlier than the time you signed it; is that right?"

And you answered: "Yes."

Do you see that?

A. Yes.

Q. And the question is: "And that didn't prompt you to read the document?"

---

LAQPCOL2      Cole - Cross      Page 2350

And you answered: "No."

Isn't that right?

A. Correct.

Q. Mr. Cole, do you remember this testimony?

A. No.

Q. Do you have any memory of these issues as you sit here today?

A. Not a lot. I haven't thought about these issues in a while.

Q. Okay. But, Mr. Cole, this was a big deal at Candie's; isn't that right?

A. It was 23 years ago. I remembered that I ended up paying a fine of $75,000, but it went away, and it really wasn't a big issue, and I know I didn't do anything wrong.

Q. The company's auditors refused to certify Candie's financial statements; isn't that right?

A. I believe we ended up changing auditors during this process.

Q. You no longer had E & Y after this process; isn't that right?

A. Yes. BDO, I believe, joined after this process.

Q. You ceased to do business with E & Y; isn't that right?

A. I believe so.

Q. And that was because they wouldn't sign --

MR. REISNER: Objection, objection.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

---

LAQPCOL2     Cole - Cross     Page 2351

THE COURT: Sustained.

Q. Mr. Cole, the documents that are being referenced in your testimony on Government Exhibit 1889, those are the credit memos that are referenced in the memo that we just looked at from Ms. Sorell; isn't that right?

A. I'm not sure.

Q. You don't know one way or another?

A. I don't know.

Q. Do you have any recollection of this issue coming up?

MR. REISNER: Objection, form.

A. I --

THE COURT: Overruled.

A. I recollect this issue, yes.

Q. So you do recollect this issue?

A. Yes. I'm just not sure one has something to do with the other.

Q. You are not sure that the documents that you signed were the credit memos at issue; is that right?

A. I'm not sure that the document you showed me has something to do with these four lines of testimony.

Q. Do you recall that you signed credit memos that were back-dated related to the Redwood counterparty?

MR. REISNER: Objection, asked and answered.

THE COURT: Sustained.

Q. Mr. Cole, I want to return to the subject we were talking

---

LAQPCOL2     Cole - Cross     Page 2352

about earlier. Isn't it true that as early as 1999, you knew that it was improper to engage in a transaction where money was sent to one counterparty and returned by the other one for the purpose of inflating earnings, yes or no?

A. I don't believe those were the issues under discussion here; so I can't say that one had anything to do with the other, to my knowledge.

Q. Mr. Cole, you don't have a memory of those issues coming up in 1999; is that right?

A. I have a little memory, and you've refreshed with those five lines in the memo. But I don't think they relate to what you're talking about.

Q. We looked at that memo earlier. The issues that E & Y were raising were related to offsetting payment; isn't that right?

A. If you take me back, I have to see it. I'm sorry.

Q. Can we go back to that memo again. The last paragraph. Yup. Not the subject. Yes, there we go. And can we see that last paragraph, please.

And can we show that to the jury again?

A. Yes, that is the question of correlate. Can you ask the question again? I'm sorry.

Q. Yes. My question is, seeing this and the testimony we just looked at and the conversation we've been having for the last 15 or 20 minutes, refresh your memory that as early as 1999, you were aware that offsetting payments like this were a focus

---

LAQPCOL2     Cole - Cross     Page 2353

of regulatory scrutiny and could be illegal, yes or no?

A. No, I don't believe this has anything to do with the way you're describing it.

Q. Okay. Let's take that down, Mr. Gill.

Mr. Cole, I want to end by talking to you about the SEC comment process.

A. Sure.

Q. You testified on direct that during that comment process, things got hot. Do you remember testifying that way?

A. Okay. Sounds like I general --

Q. But --

A. I don't remember my specific words, but hot would be a good word.

Q. This was a very stressful time for you; isn't that right?

A. It was.

Q. The SEC was scrutinizing the company's accounting; isn't that right?

A. The corporate finance group at the SEC was questioning not just the canon but really the whole business model.

Q. Okay. And at some point during this process, Jeff Lupinacci, the CFO of the company, resigned; isn't that right?

A. I don't know the exact date when Jeff resigned. It could have even before this process.

Q. Do you remember that it was in early 2015?

A. I believe he left in the spring of 2015.

---

LAQPCOL2     Cole - Cross     Page 2354

Q. Okay. The spring of 2015 would be the first three months of 2015; is that right?

A. It could be April, May.

Q. Okay. Do you remember whether he left before Mr. Horowitz or after?

A. I don't remember.

Q. Mr. Cole, at some point, do you remember sending an e-mail suggesting that you should tell Wall Street that Mr. Lupinacci was the culprit behind the issues that the SEC was investigating?

A. I don't recall.

Q. Do you remember telling people that you wanted him to be the fall guy?

A. No, I don't remember.

Q. Do you remember blaming him for what was going on with the SEC?

A. I don't. I know that -- can I explain a little bit?

Q. I'm just asking whether you blamed him, yes or no?

A. I -- I blamed a lot of people.

Q. Just yes or no, did you blame Mr. Lupinacci?

A. I don't recall.

Q. I'm sorry?

A. I don't recall.

Q. Do you now blame Mr. Lupinacci for what was going on with the SEC?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

LAQPCOL2      Cole - Cross      Page 2355

A. I think --
Q. Yes or no?
A. It can't be answered with a "yes" or "no."
Q. Okay. Did you blame BDO in connection with this process for not supporting the accounting?
A. I blamed BDO for creating the accounting. They were the ones who told me how to do it, and I think BDO totally messed up.
Q. Mr. Cole, on that subject, you testified about that yesterday. I want to go back really quickly to your audit representation letter, Government Exhibit 500.
    And could we go forward, Mr. Gill, to page -- I think it's paragraph 11. Yes. Can you blow up that part at the bottom, "management not aware of any situations where a member."
    Mr. Cole, can you read that?
A. "Management is not aware of any situations where a member firm of the international BDO network has provided bookkeeping or other non-attest services to any of our foreign operations that could result in potentially -- result in violations of the SEC's independence rules."
Q. The SEC independence rules that are referenced here, Mr. Cole, those are the rules that require a company's auditors to remain independent from the company; isn't that right?
A. I'm not familiar with those rules.

LAQPCOL2      Cole - Cross      Page 2356

Q. Well, you signed this document; isn't that right?
A. Yes, but it doesn't mean I was familiar with the SEC --
Q. Was it your understanding that SEC had rules that required BDO to remain independent?
A. Correct.
Q. Mr. Gill, you can take that down.
    So, Mr. Cole, we've established that you blame BDO for some of the accounting in connection with the corp. fin inquiry, correct?
A. Not -- I don't blame them for that. I blame them for the JV structures.
Q. So you blame them, and you blame Mr. Horowitz for the puts and the floors and the puts, right?
A. I blame Mr. Horowitz for SEA-2 and 3 and how he negotiated them.
Q. And you blame Mr. Snyderman for his white papers; isn't that right?
A. No.
Q. You blamed Justin Abrahamson, the company's controller, for changing the presentation of the company's financial statements; isn't that right?
A. Yes, without telling myself, the CFO or the board of directors.
Q. You made him cry; isn't that right?
A. I believe he was upset when I asked him why he changed the

LAQPCOL2      Cole - Redirect      Page 2357

financial statement without talking to me, the CFO or the board of directors.
Q. And you blamed him for that, and he cried; isn't that right?
A. I believe he cried.
Q. And you blame Seth Horowitz for the situation you're in right now; isn't that right?
A. Yes.
Q. Just to be clear, Mr. Cole, is it true that at Iconix, the buck stops with you?
A. It did. That's why I gather I'm sitting here.
    MR. HARTMAN: That's all.
    THE COURT: Redirect?
REDIRECT EXAMINATION
BY MR. REISNER:
Q. Mr. Cole, do you recall at near the beginning of Mr. Hartman's cross-examination, he asked you some questions about the third-quarter 2013 earnings call, and he showed you a transcript?
A. I believe so. I don't remember the questions.
Q. Do you recall questions along the lines of, do you remember referring to the SEA-1 transaction during the third-quarter 2014 earnings call?
A. Oh, correct, when he was showing me a transaction that happened in October and not in the third quarter.

LAQPCOL2      Cole - Redirect      Page 2358

Q. And, Mr. Cole, do you recall what month in 2014 the third-quarter earnings call took place?
A. I don't, but it would have been, you know, we closed our quarters --
Q. If you don't recall, that's fine.
A. October or November.
Q. Can we please place before the witness and the jury what's in evidence as Government Exhibit 126. Let's show the front page.
    That's the transcript for the third-quarter earnings call that Mr. Hartman showed you. Does that refresh your recollection of the date of that earnings call?
A. Yes, October 29th.
Q. And by October 29th, the SEA-1 transaction had been completed, correct?
A. Correct.
Q. And having a third-quarter earnings call in or about October or late October is entirely ordinary course, correct, Mr. Cole?
A. Correct.
Q. We can take that down.
    Mr. Cole, do you recall on cross-examination Mr. Hartman showed you copies of Government Exhibit 206 and 207?
    Why don't we put 207 on the screen.

UNITED STATES OF AMERICA, v.
NEIL COLE,

**CORRECTED**
October 26, 2021

LAQPCOL2          Cole - Redirect          Page 2359

That's the side letter and the consultancy agreement. Do you remember being shown those documents and being asked some questions about those documents?

A. I do.

Q. Mr. Cole, based on your experience and Iconix's practices in 2014, what would your understanding have been as to whether Iconix's in-house lawyers reviewed these documents and the other SEA-1 transaction documents before the company finalized that transaction and publicly reported that transaction?

A. I would assume my lawyers would have both in-house and outside lawyers would have reviewed the agreement.

Q. And what was your understanding with respect to whether the CFO and the finance team would have reviewed this document and the other SEA-1 transaction documents before the company completed the transaction and reported on the transaction?

A. That was their jobs; so I would assume they would have done it.

Q. And what was your understanding as to whether BDO would have reviewed this document and the other SEA-1 transaction documents before the transaction was completed and the company reported on that transaction?

MR. HARTMAN: Objection, foundation.

THE COURT: Overruled.

A. I would have thought they had thought it was a quarter --

Q. The question is, what was your expectation? What would

LAQPCOL2          Cole - Redirect          Page 2360

your expectation have been?

A. That they would have reviewed the documents.

Q. We can take that down. Let's place before the witness Defense Exhibit 1205 and 1205-A1. Can we put them side by side. There you go.

Do you recall Mr. Hartman asking you some questions on cross-examination about Defense Exhibit 1205 and this term sheet marked as Defense Exhibit 1205-A1?

A. I do.

Q. And you're not on the e-mail that's marked -- that's in evidence as Defense Exhibit 1205, correct?

A. Correct.

Q. But I think you said you have some recollection of seeing a term sheet relating to this transaction in or about May 2014, correct?

A. Correct.

Q. Now, Mr. Hartman asked you some questions about the Korea and Europe, Turkey components of this transaction as set forth in the terms sheet, correct?

A. Correct.

Q. And the transactions set forth in the term sheet is a $24.9 million transaction, correct?

A. Correct.

Q. Mr. Hartman did not ask you questions about the Lee Cooper component of this transaction as set forth in the term sheet,

LAQPCOL2          Cole - Redirect          Page 2361

correct?

A. Correct.

Q. And the dollar value attributed to the Lee Cooper component as set forth in this term sheet is over $14 million, correct?

A. Correct.

Q. And you understood that the Lee Cooper Europe component was an attractive asset to Li & Fung, as you understood it, correct?

A. Yes.

Q. We can take that down. Let's place before the witness what's in evidence as Defense Exhibit 413-A1, the GBG PIP document.

You're not listed as a sender or recipient of this PIP document, correct?

A. No. It's an internal GBG document.

Q. And did you receive a copy of this document in 2014?

A. No.

Q. We can take that down.

Mr. Cole, do you recall on cross-examination Mr. Hartman asked you some questions about written updates or Friday-at-five memos you received from direct reports? Do you recall that?

A. Yes.

Q. Approximately how many different direct reports sent you weekly updates or Friday-at-five memos?

LAQPCOL2          Cole - Redirect          Page 2362

A. I believe -- you know, I definitely got them from my ten reports, and I usually got another five or ten others from people that wanted to show me what they were doing. So it was roughly about 20, you know, roughly. I don't know, between 50, 75 pages at a time.

Q. And how lengthy were these individual reports? How did they vary in length?

A. Anywhere from long, they would be five or ten if they had agreements to them or longer, and they could also be one page.

Q. And how frequently did you receive these types of reports?

A. Every week. I would get a lot of e-mails about what was happening in the company weekly.

Q. And, Mr. Cole, did you read every word of every one of these reports that you received?

A. Not necessarily. I was traveling often, and I couldn't -- sometimes when I got back from trips, I would read what's the newest ones because a lot of time people put them in form letter and just updated categories. So if I was traveling, I would catch up on the next one.

Q. Mr. Cole, do you recall that Mr. Hartman asked you a question about a document prepared by Ethan Cole from GBG?

A. Yes.

Q. Did you ever receive a copy of that document?

A. No. I never communicated with Ethan Cole. I don't believe I even met him. You know, he might have been at a meeting that

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQPCOL2          Cole - Redirect          Page 2363

I was at, but I don't recall who he is.

Q. Mr. Cole, do you recall that Mr. Hartman asked you some questions about the super model Naomi Campbell, and he showed you an e-mail stating, in substance, that $75 million seems like a ridiculous amount? Do you recall being asked questions on that topic and being shown that document?

A. Yeah, I believe it was 75,000.

Q. Pardon me, $75,000.

A. Yeah, not 75 million, but yes, I believe --

Q. Take it slow. Do you recall being shown a document referring to the super model Naomi Campbell and a $75,000 payment she was requesting?

A. Yes.

Q. And do you recall that that document stated, in substance, $75,000 seems like a ridiculous amount?

A. Yes. It was her personal appearance.

Q. Was Naomi Campbell a critical Iconix business partner?

A. No. I don't believe we ended up using her, or she might have done that appearance but, no, she had nothing to do with our company.

Q. Did Naomi Campbell have commitments of over $100 million to Iconix?

A. No.

Q. Were you hoping to negotiate transactions in which Iconix would potentially receive tens or hundred millions of dollars

LAQPCOL2          Cole - Redirect          Page 2364

in future revenues from Naomi Campbell?

A. No.

Q. Mr. Cole, do you recall, during cross-examination, being asked some questions about Mr. Lupinacci and what financial professionals need to do their job?

A. Yes.

Q. Mr. Cole, did you set priorities for Mr. Lupinacci?

A. I don't recall, but I have no doubt that I discussed what his job should be or would be.

Q. Can we please place before the witness what's marked for identification as Defense Exhibit 485.

Mr. Cole, is that an e-mail exchange between you and Mr. Lupinacci on June 11th, 2014?

A. Yes.

MR. REISNER: Your Honor, I offer Defense Exhibit 485.

MR. HARTMAN: Objection, hearsay.

THE COURT: Sustained.

Q. Mr. Cole, does that refresh your recollection that you set priorities for Mr. Lupinacci?

A. Yes.

Q. What were the priorities you set for Mr. Lupinacci?

MR. HARTMAN: Objection, hearsay.

THE COURT: Overruled.

A. No. 1 is always correct and timely numbers in the Qs and the Ks.

LAQPCOL2          Cole - Redirect          Page 2365

Q. We can take that down.

Do you recall earlier this morning Mr. Hartman showed you some certifications you signed in public filings?

A. Yes.

Q. Did you believe that the certifications that you signed were accurate in all respects?

A. I did.

Q. And let's place before the witness what's marked as Government Exhibit 500.

Do you recall that Mr. Hartman asked you some questions about this representation letter?

A. Yes.

Q. Did you believe that the representations made in this letter were accurate in all respects?

A. Yes. I believed the financials were accurate in all respects.

Q. And can we go to the bottom of this page, please. The bottom of this document, please. The bottom of the document, please, the signatures.

That's your signature on that page, right, Mr. Cole?

A. It is.

Q. And can we publish this for the jury, please. It's in evidence.

Did anyone else sign this document?

A. Yes, the --

LAQPCOL2          Cole - Redirect          Page 2366

Q. Who?

A. Warren Clamen, the chief financial officer, and Justin Abrahamson, the controller.

MR. REISNER: Nothing further at this time, your Honor.

THE COURT: Anything else?

MR. HARTMAN: No recross.

THE COURT: Mr. Cole, you may step down.

THE WITNESS: Thank you, your Honor.

(Witness excused)

THE COURT: And does the defense have another witness?

MR. REISNER: Your Honor, at this time, the defense would like to offer some documents in evidence that I think will come in without objection.

THE COURT: Very well.

MR. REISNER: The defense offers the following documents in evidence. Defense Exhibit 2881.

MR. HARTMAN: No objection.

MR. REISNER: And 2881-A1.

MR. HARTMAN: No objection.

MR. REISNER: Defense Exhibit 2061.

MR. HARTMAN: No objection.

MR. REISNER: Defense Exhibit 1415 and 1415-A1.

MR. HARTMAN: No objection.

MR. REISNER: Defense Exhibit 1961.

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LAQPCOL2          Cole - Redirect          Page 2367

MR. HARTMAN: No objection.

MR. REISNER: Defense Exhibit 1993, 1993-A1, 1993-A2 and 1993-A3 and 1993-A4.

MR. HARTMAN: No objection.

THE COURT: All of those exhibits will be received.

(Defendant's Exhibits 2881, 2881-A1, 2061, 1415, 1415-A1, 1961, 1993, 1993-A1, 1993-A2 and 1993-A3 and 1993A4, received in evidence)

MR. REISNER: And, your Honor, I also have some stipulations that I'd like to read to the jury.

THE COURT: Very well.

MR. REISNER: The first stipulation is marked as Defense Exhibit 2335, and it reads:

"It is hereby stipulated and agreed by and between Neil Cole, the defendant, by and through his counsel, Lorin Reisner, Richard Tarlowe and Andrew Reich, and the United States of America, by Damian Williams, United States Attorney, Scott Hartman, Noah Solowiejczyk and Andrew Thomas, Assistant United States Attorneys, of counsel, that:

1. If called as a witness, an employee of Iconix Brand Group Inc., ("Iconix") with personal knowledge of Iconix's e-mail systems and electronic data retention practices, would testify as follows:

a. Throughout the period from 2013 through 2015, Iconix used an e-mail archiving tool that captured and

---

LAQPCOL2          Cole - Redirect          Page 2368

preserved all e-mails sent to or from an Iconix e-mail account.

B. Even if an individual user of an Iconix e-mail account deleted an e-mail from his or her in-box, that e-mail still would be preserved and retrievable by Iconix.

It is further stipulated and agreed that this stipulation may be received into evidence as a Defense Exhibit at trial, and it's signed by the parties."

You can take that down.

The next stipulation is Defense Exhibit 2333, and it reads:

"It is hereby stipulated and agreed by and between Neil Cole, the defendant, by and through his counsel, Lorin Reisner, Richard Tarlowe and Andrew Reich, and the United States of America, by Damian Williams, United States Attorney, Scott Hartman, Noah Solowiejczyk and Andrew Thomas, Assistant United States Attorneys, of counsel, that:

On December 17, 2018, Seth Horowitz was interviewed at the United States Attorney's Office for the Southern District of New York by Assistant United States Attorneys, attorneys from the United States Securities and Exchange Commission and special agents of the Federal Bureau of Investigation. Horowitz's attorneys were present for the interview.

FBI Special Agent Robert Hupcher took contemporaneous notes of the interview and created a memorandum from those notes in a FD-302 memorandum. The notes and the FD-302

---

LAQPCOL2          Cole - Redirect          Page 2369

memorandum were not verbatim transcripts of the interview and were not provided to Horowitz to review for accuracy.

According to the FD-302 memorandum, Seth Horowitz made the following statements in sum and substance:

(i) When Horowitz first heard of the $5 million obligation, he did not have an understanding about exactly how it would be satisfied. Cole might have told Horowitz about the $5 million agreement at the same time Horowitz learned about the $5 million increase in price.

2. On July 10th, 2019, Seth Horowitz was interviewed at the United States Attorney's Office for the Southern District of New York by Assistant United States Attorneys, attorneys from the United States Securities and Exchange Commission and special agents of the FBI. Horowitz's attorneys were present for the interview.

A. FBI Special Agent Nicholas Kroll took contemporaneous notes of the interview and created a memorandum from those notes in a FD-302 memorandum. The notes and the FD-302 memorandum were not verbatim transcripts of the interview and were not provided to Horowitz for review for accuracy.

b. According to the FD-302 memorandum, Seth Horowitz made the following statements, in sum and substance:

(i) On the June JV, Horowitz had a recollection of a time when Horowitz was present for a call in Cole's office,

---

LAQPCOL2          Cole - Redirect          Page 2370

where Cole discussed that they would increase the numbers.

(ii) The call was with Rabin.

3. On December 10th, 2018, Seth Horowitz was interviewed at the United States Attorney's Office for the Southern District of New York by Assistant United States Attorneys, attorneys from the United States Securities and Exchange Commission, and a special agent of the FBI. Horowitz's attorneys were present for the interview.

A. FBI Special Agent Robert Hupcher took contemporaneous notes of the interview and created a memorandum from these notes in a FD-302 memorandum. The notes and the FD-302 memorandum were not verbatim transcripts of the interview and were not provided to Horowitz to review for accuracy.

According to the FD-302 memorandum, Seth Horowitz made the following statement, in sum and substance:

(i) Horowitz recalled Cole calling Horowitz into Cole's office and telling Horowitz that Cole got GBG to increase the purchase price by $5 million and that Horowitz should immediately go tell Lauren Gee, an attorney for Iconix."

That concludes that stipulation.

The next stipulation is Defendant's Exhibit 2334 and it states:

"It is hereby stipulated and agreed by and between Neil Cole, the defendant, by and through his counsel, Lorin

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

LAQPCOL2          Cole - Redirect          Page 2371

Reisner, Richard Tarlowe and Andrew Reich, and the United States of America, by Damian Williams, United States Attorney, Scott Hartman, Noah Solowiejczyk and Andrew Thomas, Assistant United States Attorneys, of counsel, that:

1. On October 1st, 2021, Jason Rabin was interviewed via WebEx by an Assistant United States Attorney for the Southern District of New York. Rabin's attorney was present for the interview.

An AUSA took contemporaneous notes of the interview and created an e-mail memorandum from those notes that was sent to Peter Charalambous, a contractor for the United States Attorney's Office for the Southern District of New York. The notes in the e-mail memorandum were not verbatim transcripts of the interview and were not provided to Rabin to review for accuracy.

According to the e-mail memorandum, Jason Rabin made the following statement in sum and substance:

(i) Rabin understood he was causing Iconix to pay marketing invoices that Iconix had no obligation to pay. Period.

It is further stipulated and agreed that this stipulation may be received into evidence as a Defense Exhibit at trial."

The next stipulation is marked as Defense Exhibit 2336. It states:

LAQPCOL2          Cole - Redirect          Page 2372

"It is hereby stipulated and agreed by and between Neil Cole, the defendant, by and through his counsel, Lorin Reisner, Richard Tarlowe and Andrew Reich, and the United States of America, by Damian Williams, United States Attorney, Scott Hartman, Noah Solowiejczyk and Andrew Thomas, Assistant United States Attorneys, of counsel, that:

The document admitted as Government Exhibit 706 contains metadata reflecting that it was created by Seth Horowitz on November 3rd, 2014, and stored at a file path labeled '\desktop\personal.'

It is further stipulated and agreed that this stipulation may be received into evidence as a Defense Exhibit at trial."

Two more.

The next one is Defense Exhibit 2337. It reads:

"It is hereby stipulated and agreed by and between Neil Cole, the defendant, by and through his counsel, Lorin Reisner, Richard Tarlowe and Andrew Reich, and the United States of America, by Damian Williams, United States Attorney, Scott Hartman, Noah Solowiejczyk and Andrew Thomas, Assistant United States Attorneys, of counsel, that:

1. If called as a witness, a custodian of records of Iconix Brand Group, Inc. would testify as follows:

a. Defense Exhibits 2305, 2306 and 2307 are true and accurate copies of accounts receivable records that were kept

LAQPCOL2          Cole - Redirect          Page 2373

by Iconix in the course of a regularly conducted activity, were made at or near the time by someone with knowledge and making these records was a regular practice of Iconix.

B. Defense Exhibits 2305, 2306 and 2307 reflect that Iconix received full payment of the 2014 and 2015 minimum guaranteed royalties owed to Iconix by Kids Headquarters, an affiliate of Li & Fung, pursuant to the amendment and license consolidation agreement for certain children's categories for the Rocawear brand dated December 16, 2013, which has been admitted into evidence as Defense Exhibit 408-A1. Those payments include $5 million in minimum guaranteed royalties for 2014 and $3.5 million in minimum guaranteed royalties for 2015.

These include the following payments:

(i) $1,250,000 was due on April 30th, 2014" --

THE COURT: Slow down just a little bit, Mr. Reisner.

MR. REISNER: "And was paid on May 22nd, 2014.

(ii) $502,253.62 was due on June 30th, 2014, and was paid on August 12th, 2014.

(iii) $747,746.38 was due on July 30th, 2014, and was paid on August 12th, 2014.

(iiii) $373,723.39 was due on October 30th, 2014, and was paid on October 31, 2014.

(v) $876,276.61 was due on September 30th, 2014, and was paid on October 31, 2014.

(vi) $526,571.69 was due on January 30th, 2015 and

LAQPCOL2          Cole - Redirect          Page 2374

was paid on February 24th, 2015.

(vii) $723,428.31 was due on December 31, 2014, and was paid on February 24, 2007.

(viii) $875,000 was due on April 30th, 2015 and was paid on June 3rd, 2015.

(viiii) $875,000 was due on July 30th, 2015 and was paid on August 27th, 2015.

(x) $875,000 was due on October 30th, 2015 and was paid on November 24th, 2015.

(xi) $875,000 was due on January 31, 2016, and was paid on February 4, 2016.

It is further stipulated and agreed that this stipulation may be received into evidence as a Defense Exhibit at trial."

And the final stipulation is Defense Exhibit 2338, and it reads:

"It is hereby stipulated and agreed by and between Neil Cole, the defendant, by and through his counsel, Lorin Reisner, Richard Tarlowe and Andrew Reich, and the United States of America, by Damian Williams, United States Attorney, Scott Hartman, Noah Solowiejczyk and Andrew Thomas, Assistant United States Attorneys, of counsel, that:

1. In or about February 2008, official Pillowtex, LLC, an affiliate of Iconix, and Millwork Trading Company Limited, doing business as Li & Fung U.S.A., entered into

# A-449

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQPCOL2      Cole - Redirect      Page 2375

amendment 2 to the Cannon license agreement. The agreement provided for minimum payments to Iconix in the approximate amount of $20.5 million during the period from 2008 to 2013, including $1.75 million in 2013.

2. In or about October 2009, Ecko Complex LLC, d/b/a Ecko Unlimited, an affiliate of Iconix, and Wear Me Apparel LLC, an affiliate of Li & Fung, entered into an amendment to intellectual property license agreement - Ecko Unlimited. The agreement provided for minimum payments to Iconix in the approximate amount of $17 million during the period from 2010 to 2013, including $4.5 million in 2013.

3. In or about December 2009, IP Holdings Unlimited LLC, an affiliate of Iconix, and KHQ Investment LLC, an affiliate of Li & Fung, entered into a license agreement. The agreement provided for minimum payments to Iconix in the approximate amount of $15 million during the period from 2009 to 2014, including $6 million during the period 2013 to 2014.

4. In or about July 2012, Peanuts Worldwide LLC, an affiliate of Iconix, and The Licensing Company, an affiliate of Li & Fung, entered into a Peanuts agency agreement. The agreement provided for payments to Iconix as a percentage of revenue during the period from 2012 to 2014.

(Continued on next page)

LAQMCOL3      Page 2376

MR. REISNER: 5. In or about November 2012, Peanuts Worldwide LLC, an affiliate of Iconix, and LF Asia Limited entered into a Peanuts agency agreement. The agreement provided for minimum payments to Iconix in the approximate amount of $33 million during the period from 2013 through 2017.

6. In or about April 2014, Peanuts Worldwide LLC, an affiliate of Iconix, and LF Centennial Limited entered into a Peanuts license agreement. The agreement provided for minimum payments to Iconix in the approximate amount of $60,000 during the period from 2014 to 2016.

7. In or about May 2014, Peanuts Worldwide LLC, an affiliate of Iconix, and LF Centennial Limited entered into a Peanuts license agreement. The agreement provided for minimum payments to Iconix in the approximate amount of $5,000 during the period from 2014 to 2016.

8. In or about May 2014, ZY Holdings LLC, an affiliate of Iconix, and KHQ Investment LLC, an affiliate of Li & Fung, entered into an amendment to the license agreement. The agreement provided for minimum payments to Iconix in the approximate amount of $10.9 million during the period from 2014 to 2017.

9. In or about October 2014, Peanuts Worldwide LLC (as successor in interest to United Feature Syndicate, Inc.) an affiliate of Iconix, and GBG USA, Inc. (Formerly known as LF USA, Inc.) entered into a fifth amendment to agreement. The

LAQMCOL3      Page 2377

agreement provided for minimum payments to Iconix in the approximate amount of $810,000 during the period from 2014 to 2016.

10. In or about November 2014, Peanuts Worldwide LLC, an affiliate of Iconix, and Added Extras LLC, an affiliate of Li & Fung, entered into a Peanuts license agreement. The agreement provided for minimum payments to Iconix in the approximate amount of $135,000, during the period from 2014 to 2017.

11. In or about January 2015, those characters from Cleveland, Inc, an affiliate of Iconix, and GBG Beauty LLC (formerly known as LF Beauty LLC) entered into a Strawberry Shortcake license agreement. The agreement provided for minimum payments to Iconix in the approximate amount of $250,000 during the period from 2015 to 2017.

12. In or about February 2015, Peanuts Worldwide LLC, an affiliate of Iconix, and Added Extras LLC, an affiliate of Li & Fung entered into a Peanuts license agreement. The agreement provided for minimum payments to Iconix in the approximate amount of $15,000 during the period from 2015 to 2016.

13. In or about February 2015, Peanuts Worldwide LLC, an affiliate of Iconix, and the licensing company, an affiliate of Li & Fung, entered into a first amendment to Peanuts agency agreement. The agreement provided for payments to Iconix as a

LAQMCOL3      Page 2378

percentage of revenue in 2015.

It is further stipulated and agreed that this stipulation may be received into evidence as a defense exhibit at trial. It's signed by the parties.

THE COURT: Does that conclude the reading, Mr. Reisner?

MR. REISNER: Pardon me, your Honor?

THE COURT: Does that conclude the reading?

MR. REISNER: It does, your Honor. And I offer each of the stipulations in evidence.

THE COURT: By stipulation, they will be received.

(Defendant's Exhibits 2333 thru 2338 received in evidence)

Ladies and gentlemen, that brings us to our first break. We will take 20 minutes. Don't discuss the case.

(Jury not present)

THE COURT: Will you be calling one more witness, Mr. Reisner?

MR. REISNER: We will not, your Honor. We do not intend to call Professor Wertheim. We will rest when the jury returns. We do have one or two evidence issues, document issues, that we wish to raise to the Court. But we plan to rest when the jury returns.

THE COURT: Will you be prepared to give your closing statement after the government today?

# A-450

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQMCOL3 Page 2383

MR. HARTMAN: Judge, could I propose one other thing. I don't know if the Court has the charge ready. But you can charge the jury today, and we can have all three summations tomorrow.

THE COURT: I was told that the defense did not want to go that route. I take it that that's still the case, Mr. Reisner?

MR. REISNER: We would prefer not to go that route.

THE COURT: Therefore, we will not.

I think that I would be inclined to have the government sum up and then tell the jury that we will end early and come back tomorrow for the defense summation and rebuttal.

MR. REISNER: Thank you, your Honor.

THE COURT: Anything else that we wanted to raise?

I have just one other thing, if the government wants me to provide the jury with the indictment.

MR. SOLOWIEJCZYK: Could I get it to your Honor right after court today?

THE COURT: Absolutely.

MR. SOLOWIEJCZYK: It's ready. I just want to proofread it one more time and send it to the defense.

THE COURT: All we are doing is taking out the first few paragraphs, up until paragraph 40, I believe, and then there is some additional narrative in the last conspiracy count.

LAQMCOL3 Summation - Mr. Thomas Page 2384

Let's bring out the jury.

I was also going to propose the defense can start, go until 2:30 and come back tomorrow, but I know that lawyers' brains explode at those kinds of suggestions.

I believe we have provided you a copy of the verdict form. Please look it over very carefully.

MR. REISNER: Your Honor, if you could just give us one minute to see whether our brain does explode with that concept. It may not.

We will do the whole thing tomorrow, your Honor.

THE COURT: OK. But please do keep it to an hour and a half.

(Jury present)

THE COURT: Ladies and gentlemen, I apologize for the slightly longer break. It was necessary for reasons that are about to become clear.

Mr. Reisner, do you have another witness?

MR. REISNER: Your Honor, the defense rests.

THE COURT: Ladies and gentlemen, the defense has now rested. That concludes the evidence portion of the trial. We will now move to the phase of closing arguments. Because the government has the burden of proof, they will go first.

Mr. Thomas.

MR. THOMAS: Neil Cole lied. He lied to auditors, he lied to the SEC, and he lied to his own investors. Neil Cole

LAQMCOL3 Summation - Mr. Thomas Page 2385

lied because he wanted everyone to believe that his business was growing, revenues were up, earnings were rising. The future was bright. It was not true. Neil Cole had built a business that had come to depend on international joint ventures. Without the sale of his brands to joint ventures, Cole would not have the gain, the revenue, or the earnings per share he needed to impress Wall Street.

So Cole cheated. He developed a scheme with executives at one of Iconix's partners, Li & Fung, who were willing to play ball. They would overpay on joint venture deals so Cole could report more revenue. In exchange, Cole promised to send the overpayments back. The money would move in a circle. And then Cole and his collaborators, they put that plan into action. Three times the deal prices jumped before they were done. Three times Li & Fung paid more than its own due diligence supported. And every time Neil Cole trumpeted that news to Wall Street. Neil Cole lied. He lied on purpose. When the auditors came asking and the SEC came knocking, he lied again.

Now, ladies and gentlemen, the government has charged the defendant with a number of federal crimes for his scheme to deceive shareholders and auditors and the SEC, and it is the government's burden to prove Mr. Cole's guilt beyond a reasonable doubt.

Let's talk about the evidence that proves that he did

LAQMCOL3 Summation - Mr. Thomas Page 2386

exactly what he is charged with doing. Now, in talking about the evidence I am going to refer to some points raised by defense counsel, things they developed in opening statements, questions they asked in cross-examination.

So let me say, at the outset, the defendant has no burden, none whatsoever. His lawyers didn't have to stand up and say anything to you. They didn't have to ask any questions. Mr. Cole did not have to take the stand. The burden in this case rests solely with the government and it's a burden that we embrace, it's a burden you will hear we have certainly met.

If the defense chooses to make an opening statement, if they choose to ask questions of witnesses, if they put forward theories, if the defendant takes the stand, then you can and you should ask, does it make sense? Do these positions find any support at all in the evidence?

Let's start talking about the evidence. Before I get to anything controversial, I want to lay out some basics, some things I think are not seriously disputed at the trial.

First, in 2013, in 2014, in 2015, Neil Cole led Iconix. And not just led the business, he controlled it. He was the chairman of the board. He was the chief executive officer. He made the decisions. He even approved expenses down to as little as $5,000. He is the guy who chose when and where and how the company would do business. He gave the

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQMCOL3     Summation - Mr. Thomas     Page 2387

orders.  He signed the documents.

One of the things that Neil Cole decided to do was to orient Iconix away from licenses and toward international joint ventures.  As you have heard, ladies and gentlemen, joint ventures are partnerships between Iconix and some other company.  The two businesses team up to make money.

Typically, Iconix contributed the rights to certain brands in the country and the partner supplied the boots on the ground in that country to get the brand turned into clothing or goods to sell to consumers.  If the joint venture made money, Iconix and the partner made money.

And Iconix started doing a lot of international joint ventures.  It did one in China, it did another in Europe, another in Central America, another in India, in Canada, in Israel, even Australia.  International joint ventures were becoming the business model.  So no surprise that Cole and Iconix boasted any time it struck one of those deals.  Cole wanted investors to know whenever it formed a new joint venture.

Look here at this 2013 10-K, boasting about the joint ventures or, in 2014, boasting again about the joint venture.

Now, Iconix was pursuing these international joint ventures because its old business model had lost a little steam, you know, regular licensing deals.

Seth Horowitz, the former COO who we heard from, heard

LAQMCOL3     Summation - Mr. Thomas     Page 2388

Cole describe the problem this way.  The organic business, the regular licensing business was on decline.  To make up the difference, Horowitz told us that Neil's view was, we would need more and more joint ventures or sale of IP to make up the difference.  The difference would come from the joint ventures and Iconix got hooked.

The joint ventures, Mr. Cole said, they were like a drug.  We heard that from Mr. Horowitz.  And Iconix became addicted to doing the joint ventures to get the revenue it needed.  That's not just Mr. Horowitz.  That's also from Mr. Schaefer, the general counsel.  He remembered Cole saying it this way.  The old model was broken.  Licensees, they didn't want to be licensees anymore.  It's like they were just paying rent to use a brand.  The model was broken, licensees who didn't want to be licensees.  The old model wasn't cutting it.

So Iconix had a problem and it turned to joint ventures to fill the gap.  We know that Iconix thought about it in just this way in plugging the gaps because it tracked where it was financially all the time, noting where it made the money and how much more money it needed to make in order to meet its guidance and consensus.  It did that in sheets that look like this one here.  This is Government Exhibit 234.  It shows where they are, what they might have in the pipeline, and where they need to get.

When you look at these sheets you will see that time

LAQMCOL3     Summation - Mr. Thomas     Page 2389

and time and time again Iconix would be missing its targets.  It would be shrinking, not growing, without the joint ventures.  They were the stitches holding the whole business together.

So it makes perfect sense that Mr. Cole became obsessed with them and not just with the deals generally, not with the brands, but with the metrics, with precisely how each deal would impact the company's financial reporting.

There are lots of examples of this.  Take, for example, Government Exhibit 1010.  Cole is writing his team precisely how much gain he wants to recognize in the transaction, or it comes up again in Government Exhibit 1070 where Cole and Horowitz correspond about precisely how much gain they want to recognize or revenue they want to get in for the deal that they are considering.

Now, let's pause here for a moment.  Are we saying it's a crime for a CEO to think about revenue or to negotiate deals with the company's bottom line in mind?  Of course not.  No one is saying that.  That's not the charge here.

But the point is that Neil Cole was precisely the sort of CEO who cared about those things.  This is not a guy who is lost in the clouds.  He is not distracted by the big picture.  Neil Cole was a CEO who was reading the expense reports.  He's a CEO who has an eye on the calendar, ticking down the days until he needs to announce earnings to Wall Street.

And Cole knew then what you all have learned now.

LAQMCOL3     Summation - Mr. Thomas     Page 2390

Iconix needed to show profits from selling trademarks to joint ventures in order to show growth, in order to have that record revenue that they boasted about, and to make it look to shareholders like earnings per share were going up and not down.

Look, as I'm sure we will all hear tomorrow morning, Iconix had a fabulous streak from 2005 to 2011 or so and made a lot of money.  It kept setting records.  But here is the reality that started to set in in 2013.  Those records, they weren't coming so easy anymore.  Growth depended on closing more joint ventures and closing them at higher prices.  Just doing joint ventures, regular old deals, that wasn't enough.

The deals needed to be at high-enough prices to meet consensus, to meet guidance.  So it became so harrowing that the timing of deals, down to the day, became something that Mr. Cole focused on.  They need to make sure that particular deals closed in particular quarters to avoid coming up short.  That makes sense.

As we have heard, investors pay attention to the company's announcements, to its quarterly figures, to its filings.  And even Mr. Cole himself acknowledged on the stand that investors tracked these sorts of things.  If Mr. Cole did not have new deals to announce, investors would notice.  It's not like he could say, you know, stay tuned, deal coming next time, guys.  It's like showing up to a birthday party and

**A-452**

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQMCOL3     Summation - Mr. Thomas     Page 2391

saying like, I'll bring the gift, you know. Nobody believes you. It's not coming.

That's why we heard from Jason Rabin, for example, that Neil Cole was pushing him on the timing. He wants the deals to wrap up so Mr. Cole can announce them at the end of the quarter. We saw e-mails even where Mr. Cole was threatening to yank the whole thing if it didn't happen precisely at the time that he wanted it.

Ladies and gentlemen, there is also no dispute about the basics of the joint ventures that we have been discussing. The original Southeast Asia joint venture, SEA-1, that closed on October 1, 2013 and had a number of brands, including Ecko and Massimo and Ed Hardy, and the paperwork describes it as a deal for 10 million with an additional 2 million for performance and an additional 2 million that came in the form of a side letter.

The amended Southeast Asia joint venture, SEA-2, that closed in June of 2014 and it took a number of the brands from SEA-1 and allowed the joint venture to use them in Europe and Turkey and Korea as well. The paperwork says that's a deal for 15.9 million.

The second amendment to the Southeast Asia joint venture, SEA-3, that closed in September of 2014. That would enlarge the joint venture again by giving the joint venture the right to use Lee Cooper and Umbro in China. The paperwork says

LAQMCOL3     Summation - Mr. Thomas     Page 2392

that's a deal for 21.5.

Ladies and gentlemen, that's the background. That's the Iconix business. That's what Neil Cole was focused on. That's why he needed to communicate good news to investors.

That brings us to the crimes, to what Neil Cole did to make sure he could keep up that good news story. It brings us to the fact that Neil Cole cheated.

Now, you can imagine the pressure. As the defendant's lawyers made to point out over the course of the trial, at the time people thought Neil Cole was a visionary. He was an innovator. Noah Snyder, one of the investors, called him an outsider, gave him that book. Mr. Cole's reputation was as someone who was coming up with very clever business strategies.

Ladies and gentlemen, that's precisely the reputation that Mr. Cole stood to lose if his business model was found out. When meeting or making the quarter meant more deals at higher prices than he could by playing fair, Neil Cole needed something more than a vision.

(Continued on next page)

LAQPCOL4     Summation - Mr. Thomas     Page 2393

MR. THOMAS: He needed a scheme, and he needed partners to help him pull it off. And the defendant found both of those things at Li & Fung.

See, the defendant found businessmen who were willing to work out something a little more than the ordinary deal, guys who understood the saying: You scratch my back; I'll scratch yours. And, frankly, he found guys that were not as smart as he was.

And so they came up with a secret side arrangement for SEA-1, and another for SEA-2, and another for SEA-3, and then talking about doing it again before the SEC started asking questions. And this is the concept of the dirty deal in a nutshell. Li & Fung agreed to overpay for the Southeast Asia deals, and Cole agreed to send the overpayments back to Li & Fung later. That's basically it. Extra money for Iconix. Extra money returned to Li & Fung. The money would move in a circle.

That may seem simple enough, but to pull it off, however, Cole had to keep it a secret. If the auditors found out, it would ruin the whole thing. If investors learned that the prices for these joint ventures did not reflect the value of the brands, the company would be toast.

So when Cole's staff summarized the deal documents, Cole did not tell them about his secret side deals. In fact, he instructed his COO to keep it a secret. And when those

LAQPCOL4     Summation - Mr. Thomas     Page 2394

deals came up in audit meetings that Mr. Cole attended, he said nothing about the side deals. And when the auditors asked Mr. Cole to certify that he had told them everything, Mr. Cole did it, even though one of the questions he was asked is were there any linked transactions that we hadn't heard about, and he knew that he was telling a lie when he said there was no warranty.

When it came time to file the company's financials with is SEC, Mr. Cole let down. And by doing so, Mr. Cole ensured that the investing public would be presented with false information about the Southeast Asia JV's and false information about Iconix. That's lies to the auditors, lies to the SEC, and lies to the investing public. Three sets of lies that flow from three dirty deals.

Now, it seems like the defense theory on a lot of this is that there was no scheme to have overpayments and givebacks because Mr. Cole didn't write it down in a contract document. So I want to address that argument right upfront.

But let's think about it for a moment. If a person made a secret deal, would they write it down? Would you send the secret deal terms to the lawyers? Of course not. That's no way to keep a secret. That's like a bank robber who calls the bank and says: Hey, guys, I'm on the way. I hope you're ready. It doesn't make any sense. It defeats the purpose of what you're trying to do. It didn't make sense for Mr. Cole

**A-453**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

LAQPCOL4          Summation - Mr. Thomas          Page 2395

because secrecy here was the point.

And that leads us to the central question in this case. Were there secret agreements? Did Mr. Cole strike dirty deals? And was there a scheme for overpayments and givebacks? And the answer, ladies and gentlemen, is overwhelming, yes.

First of all, the witnesses say so. Cole didn't strike these deals all by his lonesome. Remember, these are joint ventures; he has partners. And Cole found a counterparty at Li & Fung, Jason Rabin, and Jason Rabin told us about these deals. Jason Rabin admitted that he allowed Li & Fung to intentionally overpay Iconix by 5 million because Cole promised him to send the money back.

As you can see here, without that promise, Rabin would have never allowed Li & Fung to increase the deal price by 5 million. And Jason Rabin admitted that he caused GBG to overpay Iconix by 6 million on SEA-3 because Cole promised to send that money back too. It would come back as a shortfall.

Jason Rabin admitted that they had done these kinds of things before. You see, he told us with SEA-1 that when Cole got an increase in the deal price, that he would send the money back through a consultancy agreement with a company that provided no consulting. Those promises were also linked, and that testimony, ladies and gentlemen, lays it out. If you credit Mr. Rabin's testimony, that testimony alone is enough to show that the deals happened, and they happened as part of a

LAQPCOL4          Summation - Mr. Thomas          Page 2396

scheme to create overpayments.

Rabin was in the room with Neil Cole. Rabin was e-mailing Neil Cole. Rabin was on the phone with Neil Cole, and he signed the documents, just like Neil Cole. Rabin is the guy at GBG who would know about this, and he knew.

But as it happens, Mr. Rabin is not the only one who remembers the secret side deals. Both Neil Cole and Jason Rabin had junior executives assisting them, Seth Horowitz for Iconix, and Jared Margolis from Li & Fung. And both of those guys say they also learned about secret side deals.

Horowitz testified about SEA-2. You can see that here. He said they agreed to pay 15.9 million for their interest because they were going to get 5 million back, and he told you that the valuations were bogus. "In any of your conversations with anyone at Li & Fung, did anyone from that side agree that the IP was worth 31 million? No."

And he said similar things about SEA-3. He said that they were going to let GBG out of the Rocawear Kids agreement in exchange for an increased purchase price in the new joint venture. As you remember, Horowitz gave detailed, devastating testimony about the lack of valuations -- it's on your screen here -- about e-mails, about charts, about documents.

Horowitz was running the Iconix business for Neil Cole. Horowitz was updating Neil Cole. Horowitz was working for Neil Cole. So that's why it was particularly telling

LAQPCOL4          Summation - Mr. Thomas          Page 2397

yesterday when Mr. Cole took the stand and asserted that Mr. Horowitz ran off and did his own thing with a little group of people. That's just not true.

Remember Jason Schaefer? He recounted how his office was next to Mr. Cole's, and when he would come in in the morning, he would see people huddled up with Mr. Cole? Well, over time, the person that was in that office huddled up with Mr. Cole gravitated to only being Seth Horowitz.

There may have been a small, close-knit group at Iconix that included Mr. Horowitz. It was Mr. Cole's group, and Cole and Horowitz worked hand in glove to make things happen. Horowitz was the guy at Iconix who would know about the secret side deals, and he knew.

We also heard from Jared Margolis. He told us, with respect to SEA-2, that they agreed to that extra 5 million because they would "get it back." And for SEA-3, he also said they would get the 6 million back, back from Iconix. As you heard, Margolis was a guy in the weeds, on the ground, carrying out the transactions. He's the guy on the ground who would know, and he knew, too.

Now, all that testimony tells us the obvious. Mr. Cole, he knew these were not real purchase prices. These were not deals for real value. These deals didn't generate real profit. What was real was this, the money was moving in a circle, and they all knew, including Mr. Cole.

LAQPCOL4          Summation - Mr. Thomas          Page 2398

So, ladies and gentlemen, you have before you testimony from three different people, from two different companies, who all tell one story, Neil Cole was cooking the books. Now, for three weeks we have heard all manner of testimony about odds and ends, about David Beckham, about puts and calls and floors on puts, about terms of deals that don't involve GBG, about VIE accounting and about the mysterious Lee Cooper option. So much testimony, so many questions to get to something so straightforward. Cole, Rabin, Margolis and Horowitz all worked together to inflate the JV prices, and three of them admitted it.

There is zero doubt that Cole made those promises. There is zero doubt that Cole used those promises to inflate the deal terms and there is zero doubt that Cole used those inflated figures to tout his business to investors. All of that is proof beyond a reasonable doubt.

But let's be conservative. Put Rabin's, Horowitz's and Margolis' testimony to the side and match it with what the records say, the other testimony in the case. Is what they testified to supported? Is it corroborated? Does it hold up? Absolutely. Let's take it deal by deal.

So start with SEA-1. This is the deal where two new contracts materialized at the last moment. Remember Jason Schaefer, the general counsel at Iconix? He testified that days before the deal was supposed to conclude, two new

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

LAQPCOL4          Summation - Mr. Thomas          Page 2399

documents appeared without warning. Here they are, Government Exhibit 1017 had both attachments. One was the side letter that's on the right side, and that called for LF Asia to pay an additional 2 million to Iconix for the deal, and the other was a consultancy agreement, which called for Iconix to pay 2 million back to LF Asia. Two million going one way; two million going the other way. The money was moving in a circle.

And before it got signed, the parties substituted LF Centennial Limited in for LF Asia. Ladies and gentlemen, the consultancy agreement was a total sham. In the agreement itself it says the 2 million is due regardless of whether any work was done. That's this text right here, "regardless of the level of services required by the company and rendered by the consultant." What kind of deal was that?

Jason Schaefer, the GC, he told you he wasn't aware of any consulting that was done. Mr. Rabin told you on direct he didn't even know what LF Centennial was and neither, on direct, did Mr. Margolis.

Now, defense counsel sort of proved this point when they showed Mr. Rabin this document. You may remember it, this annual report. It's hundreds of pages long, and way back in the document, one of the LF entities that's listed is LF Centennial. Does that mean that consulting work was legitimate because LF had this entity on the shelf? Of course not. It's like the corporate equivalent of picking a name out of a hat.

LAQPCOL4          Summation - Mr. Thomas          Page 2400

They used something that worked. They used something that made it slightly less obvious that the money was going right back to where it came from.

And the lawyers, they didn't know what was going on. They drafted the consultancy agreement, but the people who knew its real purpose, the secret deal part, that was Mr. Cole and Mr. Rabin. And you can see back here in DX-1118. When the Gibson, Dunn lawyer is writing "Neil is aware of the intent behind these two documents," that's something he knew. And he did.

Cole and Rabin, they both knew. They knew the money wasn't for LF Centennial Limited. They knew it wasn't so LF Centennial Limited could provide consultancy services. This was a thinly disguised payment for Rabin; so he had something to show for the work he had done, and it was money Rabin had been asking for for months.

Remember July 23rd, Rabin updated his team about what Neil had told him. "He will also work on the 2 million for us this year. Just need to send him wording that works." And that was before LF Asia actually signed up on this letter of authorization on August 7th, 2013. And it is money that Rabin was not entitled to by the terms of the contract itself.

The agency agreement, which is in evidence, said if they formed a JV, they would profit in that way, no more commissions. And that's, ladies and gentlemen, how the JV's

LAQPCOL4          Summation - Mr. Thomas          Page 2401

worked. You're partners. A number of witnesses told us that you share in the expenses and you share in the profits.

So why is it that Iconix would pay 2 million that it didn't have to pay? Because that's what Li & Fung got out of this agreement. And yesterday you may have heard it, Mr. Cole slipped up on the stand talking about this. He said, "I was okay with it as long as it didn't negatively impact Iconix." It didn't negatively impact Iconix because there was something Iconix wanted too from this deal, and paying that extra money to Li & Fung made it happen.

In the negotiations with LF Asia, Cole wanted to be paid a guaranteed 12, but Rabin and Li & Fung refused. They looked at the business in Korea, and they discovered the marks were not worth what Cole had said. Remember this? Kevin Chow reports back on the diligence for one of these brands, Ed Hardy. He goes so far as to write "dead brand." That's not a deal worth paying 2 million more for.

These brands weren't performing. So Li & Fung proposed an earn-out. You know, if the performance is better than we think, we'll pay more. But they wouldn't guarantee that 2 million now, and the contracts got drawn up that way, a guaranteed 10, two more if the business exceeded expectations.

But 10 was not the guaranteed 12 that Neil Cole was looking for. He basically said as much when he wrote that message to Schaefer that we looked at a minute ago. This one

LAQPCOL4          Summation - Mr. Thomas          Page 2402

here, Government Exhibit 1010. He was trying to recognize 12 with a cost basis of six.

Ladies and gentlemen, the reason for that you can find in Mr. Shapiro's testimony. Remember Mr. Shapiro, the auditor? He told us that that 2 million contingency, that was an earn-out. So that meant that that revenue couldn't be counted until it was earned. If Mr. Cole only got 10 plus two, Mr. Cole would not get the 12 that he wanted.

So when Mr. Rabin pestered Mr. Cole about the 2 million that Mr. Rabin wanted, Neil Cole saw a chance to get up to the 12 that he had been asking for. The 2 million in the side letter was not for Southeast Asia-1, it's not for the brands. Li & Fung had determined that they were not worth a guaranteed 12. The dead brands, the diligence didn't support it. The 2 million side letter gave Cole the extra revenue he wanted, and it allowed Cole to give Rabin something he wanted without negatively impacting Iconix. It was a win-win. And that, ladies and gentlemen, is how the side letter and the consultancy payment came to be. Two million to Iconix; so 2 million could go back to Li & Fung with the money moving in one big circle.

Now, ladies and gentlemen, Iconix would have made its numbers that quarter with or without the inflation from SEA-1. Carina Chambarry showed us that in her charts. It's no secret but the lies that Cole told in SEA-1, the dirty deal that he

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQPCOL4          Summation - Mr. Thomas          Page 2403

struck, the understanding and trust that he developed with Mr. Rabin, that was the start of something much bigger. It was the start of a sustained scheme to mislead Iconix's shareholders, and that's really what this case is about. Cole's agreement with others to tell investors that Iconix was doing better than it was, and all the false filings he had to make along the way to pull it off.

Now, as I said, Cole found partners willing to play ball. You know, you scratch my back and I'll scratch yours. So let's talk for a moment about GBG or Li & Fung was getting out of this. And this is something I have to credit the defense for making clear.

Arranging to overpay and have the money come back in some other fashion was better for Rabin and Margolis than not doing the overpayment at all. They got to record the money coming back as profit on the P and L statement. Mr. Margolis told us that on cross-examination, when he agreed that GBG was benefiting from the marketing. And he also told us that it was going to the P and L.

And Mr. Horowitz told us here that GBG was willing to pay more for joint ventures in order to get things that affected their P and L, or their profit and loss. It was win-win.

And after SEA-1, Cole wanted more deals with Li & Fung. Remember, they were addicted to the joint ventures. So

LAQPCOL4          Summation - Mr. Thomas          Page 2404

he wrote them about the future. Here, in 1028, he wants to talk about Europe and Korea, that becomes SEA-2, and China, that becomes the core of SEA-3.

So let's talk next about SEA-2. Let's go to Government Exhibit 1031. This is one of the early term sheets from May 2nd, and it shows that, at this time, the parties are talking about a transaction for the Korea, Europe and Turkey piece was going to be worth 11.3 in the first step, to be followed in the second step, which would involve Lee Cooper and the Europe joint venture.

But that's just the start of the negotiations. As the parties get into it, as the diligence happens, the price comes down. You can see that here in these documents. See, the Korea was 3.7 on Government Exhibit 1031, and it goes down to 3.3 in Defense Exhibit 1205-A1. The price comes down by 400,000 as the parties negotiate.

The price is going down, and then Li & Fung tried to get it down even further, even as the documents were being finalized. You can see that in Government Exhibit 1038, where Seth Horowitz updates Neil Cole, and one of the things that he updates him in this document is that he held firm. It got heated for a bit, he said, "told them we were not moving on price and not going to renegotiate." They weren't going to move the price down any more.

And while we're on this document, let's pause for a

LAQPCOL4          Summation - Mr. Thomas          Page 2405

moment because this e-mail also includes a reference to a floor. You can see it here with a floor on the buyback after five years. Think about all of those times that we heard over the last few weeks that Mr. Horowitz somehow snuck in floors into these contracts without Mr. Cole's knowledge. The evidence does not support it. It's right here in black and white in Mr. Cole's own in-box.

But as the SEA-2 negotiations get going, they strike an agreement. The lawyers actually draw up a contract. You can see that in the attachments to Government Exhibit 1036. And when they did it, they ultimately put the deal for the Korea and Europe pieces at 10.9 for a 50 percent interest.

And while all that's going on, Iconix was tracking how this deal would effect their financials, and they were doing it in these charts. This is Government Exhibit 234, and it's from June 2014. And you can see that Iconix was tracking the deal at Korea for 3.3, and the deal for Europe at 7.6, for a total of 10.9.

And if you look as of the date of this spreadsheet, Iconix was on track to miss its revenue and EPS targets if it just did the SEA joint venture. That's because the other big JV that Iconix had in the works, the Middle East North Africa joint venture, it wasn't ready to go. And that created a problem because Cole's clever company was about to come up short, and we heard what that would mean.

LAQPCOL4          Summation - Mr. Thomas          Page 2406

Investors who wanted to invest in winners, like Noah Snyderman, would put their money elsewhere, and investors who quantified everything, like Sudhir Nanda, they would rank Iconix lower in the model, meaning they would buy less stock and maybe even start selling it.

So Cole decided to double down on the strategy that he had worked out with Rabin for SEA-1. Give a little, get a little. And that's when Cole told Horowitz how to bridge the gap. Get Li & Fung to pay more by agreeing to give the money back again. And that's when Cole specifically asked Horowitz to evaluate whether they could do the giveback through granting relief on the Rocawear Kids license.

Now, ladies and gentlemen, I can't tell you at precisely what time and on what day Cole shared his plan with Horowitz, or when he struck it with Rabin, or what any of them were wearing in the room when they did it, but the evidence gets us pretty close. You see, on June 6th of 2014, the spreadsheet was tracking the deal at 10.9. That's what we saw.

And on June 9th, 2014, Cole -- Rabin reached out to Cole directly. Was it this call when Rabin and Cole discussed the overpay? Mr. Rabin doesn't remember the call at all, but what we do know, what the records show us, is that by June 10th, Horowitz was writing notes of the overpayment proposal. That's Government Exhibit 1255. Remember this document?

**A-456**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

LAQPCOL4    Summation - Mr. Thomas    Page 2407

You know it's important because it caused Mr. Cole yesterday on the stand to bluster, that he didn't know what it was, hadn't seen it, doesn't know what it is. This is a terrible document for Neil Cole. This is the one, by the way, saved to Horowitz's desk top on June 10th in a folder labeled "NC," for Neil Cole. You see it right there in the metadata.

It's terrible for Mr. Cole because it details the overpayment proposal in realtime. LF pays 13.3 for 50 percent of Korea IP rather than 3.3. This is the intellectual property, the IP, that Li & Fung had been negotiating down, down to 3.3. This is what Iconix had been tracking in its own charts as was 3.3. So why would Li & Fung pay 10 million more than it bargained for, especially when it had been trying to bargain down? Well, Horowitz wrote down the possibilities. One was giving them relief on Rocawear Kids, another was amending the Zoo York license.

Ladies and gentlemen, this Government Exhibit 1255, these are notes ripped straight from the conspiracy. This is Neil Cole and Seth Horowitz trying to figure out how to bridge the gap in their books by engineering a second overpayment and giveback with Li & Fung, and it shows that they were already working it out on June 10th.

These things are hard. This is a public company. That's a lot of money, and so they had to put in the labor to figure out how exactly to make it happen. And on June 12th,

LAQPCOL4    Summation - Mr. Thomas    Page 2408

this is Government Exhibit 1039, Seth Horowitz starts writing Cole about the work he's doing to figure out the best way to get the money back. He writes, "very difficult in any model at the current product/pricing/distribution to make money." He's looking at Rocawear Kids. You know, one of the options is to send the money back.

Now, around this time, Mr. Rabin reaches out to Mr. Cole again. That's here at Government Exhibit 1040. "Hi, Neil. Are you free?" These are guys negotiating this deal, principals of both sides. And around that same time, Horowitz updates Cole to reflect, as expected, that Li & Fung is willing to overpay and that's reflected at Government Exhibit 1041 in the message that says "They're on track for a $15 million deal." That means a $5 million overpayment. Because up to that point, the Europe, Korea portion of the deal had been 10.9. So 15 meant an almost 30 percent increase in the purchase price.

And after all these guys get together and work it out, lo and behold, it shows up in Iconix's tracking, right there on Government Exhibit 235. It shows that Korea is now up to 8.3. This, by the way, is June 19th, I think. That's a $5 million increase in Korea, and that's the $5 million overpayment right in Iconix's records.

But here's the thing, it's not just in Iconix's records. It's in Li & Fung's records too. You know, we've

LAQPCOL4    Summation - Mr. Thomas    Page 2409

heard a little bit from time to time about Li & Fung's investment committee. Well, Li & Fung, those guys had to shoehorn the $5 million into their paperwork too.

So if you look at Defense Exhibit 1312-A1 and you flip to the third page, you'll see it shows a $10.9 million deal with Korea valued at 3.3. But a week later, the Korea brands jump by 5 million. And when you go back to the jury room and you take a look at that investment proposal, you'll see there is no analysis, none whatsoever, to support the $5 million jump.

Now, what does happen before that jump is that Cole tells Rabin that he understood the deal from Horowitz. It's right here, at Defense Exhibit 1281, where Cole confirms, perhaps, that they are all on the same page about how this giveback is going to happen.

And after that, the deal documents suddenly reflect a new higher price of 15.9 million for that 50 percent interest. Ladies and gentlemen, it's no mystery why the price jumped. It's not because they were real assets with real value that got real big at that time. It's because there was a real conspiracy.

It's because Cole proposed to Rabin that Li & Fung pay more in exchange for getting the money back. It's what Rabin said. It's what Horowitz said. It's what Margolis said, and it's what these documents show. They all agreed to inflate the

LAQPCOL4    Summation - Mr. Thomas    Page 2410

number for Iconix in exchange for a promise to get the money back. That is proof beyond a reasonable doubt.

So let's pause for a moment to talk about what the $5 million is not. It is not $5 million that Li & Fung paid for the right for a Lee Cooper Europe deal in the future. Lee Cooper, we've heard, is a denim brand; so I think it's fair to talk about this as the denim defense, just a good word handle.

The $5 million price jump in SEA-2, ladies and gentlemen, that's a devastating fact. It shows up out of nowhere, no support. There's not one shred of evidence, not one, that supports that figure in the contract. And as we saw, Li & Fung had been pushing to get the price down, and that jump comes even as the deal is close to closing, after months of negotiating, and it jumps by nearly 30 percent.

It's like a glaring, obvious, flashing sign. You know, like a big neon banner that says: Overpayment, look here. That's where the denim defense comes in. It's an alternate reality explanation for why that price jumped by 5 million.

And I expect that we'll hear tomorrow that perhaps it involved Dow Famulak on the golf course with his cell phone, like it's a game of Clue. Don't get me wrong, I appreciate the chutzpa, a defense that Mr. Cole struck a different secret side deal is certainly a bold one. There is overwhelming proof that he was doing secret side deals.

**A-457**

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQPCOL4          Summation - Mr. Thomas          Page 2411

The problem is, the denim defense, that's not one of the deals that he struck. First of all, no witnesses, not one, say it happened; not Horowitz, not Rabin, not Margolis and not, if you read the testimony, even Mr. Cole. He couldn't bring himself to say it on the stand yesterday.

And the notion that Li & Fung paid more for Korea in Europe portions of the deal once Lee Cooper dropped out, that's nearly incomprehensible. Why would Li & Fung pay Iconix more money for less property? That makes no sense whatsoever. You know, that's like ordering a burger and fries, and then telling the restaurant you'll pay double because they're out of potatoes. It doesn't add up. It doesn't make any sense whatsoever. That's upside down, backwards reasoning.

And for another thing, there are e-mails going back to at least May that show the negotiations contemplated a second step involving Lee Cooper in the Europe JV. It's no surprise that those two things were being treated differently. All the negotiators understood that there would be two possible steps, and as we saw a few slides back, the lawyers drafted the documents for Korea Europe and Turkey but didn't have Lee Cooper involved at all.

And, of course, remember the Horowitz meeting with Neil Cole on June 10th and sketching out various ways to give back $10 million in overpayment to GBG. Those notes say nothing about the Lee Cooper option, and within a day or so,

LAQPCOL4          Summation - Mr. Thomas          Page 2412

Horowitz is conducting an analysis of the Roc Kids licensing agreement. Isn't it coincidence that Horowitz is evaluating giveback possibilities right before the price jump? That's not a coincidence. That's a conspiracy.

And finally, there's also the fact that the parties put the inflated amount into Korea. Iconix does it in its tracking spreadsheets, and Li & Fung does it in the investment proposal. If the $5 million related in some way to some kind of Lee Cooper Europe option, then why put it in the Korea column? The truth is the parties didn't have a Lee Cooper option. They had a cover story, plain and simple.

So let's talk about SEA-3. The proof on SEA-3 is even stronger. The parties were talking about doing a deal at 15.5, that's at Government Exhibit 1047, and they even had paperwork drafted at that price. But that wasn't going to be enough. As of August, Iconix was projecting that it needed the joint ventures to close the gap. That's at Government Exhibit 250.

You notice the license revenue wouldn't do it, and you can see that right here in these forecast columns that are broken down with the metrics they track. And for the second quarter in a row, Iconix and Cole face the prospect of a quarter with a missed consensus and even underperformed relative to last year's figures.

So once again, Cole and Horowitz decided to solve the problem with the assistance of Li & Fung. You see, Cole and

LAQPCOL4          Summation - Mr. Thomas          Page 2413

Horowitz knew that Jason Rabin needed to show profits for his own business. He had his own needs, just like they did, and he was reminding Cole and Horowitz at this time not only to pay him the 5 million they owed him from SEA-2, but to do more.

We know he said it because it's written down right here in Government Exhibit 1063 under "Jason call." This is an update that goes to Mr. Cole, where Seth Horowitz writes, of Mr. Rabin, "He says he needs the 10 million and more as he discussed with you." Ladies and gentlemen, this update it talks about a call between Cole and Mr. Rabin. It goes straight to Mr. Cole.

And after this, Cole and his conspirators, you know, they cranked the dirty deal machine into action once more. What happens is Horowitz hosts a meeting. You can see the invitation here. It's Government Exhibit 1082. It's a meeting at Iconix's offices, and all these guys get together. Neil Cole even pops into the room, Horowitz told us, and they try to figure out who owes what to who.

And the outcome of that meeting is that Cole would finally give Rabin something that Rabin really wanted, relief from the Rocawear Kids guaranteed minimum royalty payments. And that outcome, that Roc Kids would be forgiven, that was exactly how Cole anticipated the whole thing would play out a few weeks earlier, when he wrote Mr. Horowitz -- and this is Government Exhibit 1058 -- "will be tough to do China without

LAQPCOL4          Summation - Mr. Thomas          Page 2414

Roc Kids." China is SEA-3, ladies and gentlemen. They wouldn't get the deal done if they weren't giving Mr. Rabin a little something in return.

Cole knew that Rabin wanted out of the agreement, but Rabin knew -- but Rabin would give Cole something he wanted, too, enough revenue to make the quarter work. So they made another deal, another win-win. And that's why a few days after the meeting, the GBG guys write for the Rocawear termination agreement, "Please send a soft copy of the Rocawear termination letter." That's them following up on paper with the deal that they struck.

And that's why suddenly Iconix starts tracking SEA-3 at this time as 18, meaning a purchase price plus the cost basis inflated by 6 million. And you can see that right here on Government Exhibit 231, just like you see in all these tracking charts.

And then, of course, the deal documents changed, too. So if you look, one place, for example, at Government Exhibit 1091, it gives us a black line where the price jumps by 6 million deep into the negotiation. And then the parties go through with it. GBG sends the inflated price to Iconix just as agreed.

Now, ladies and gentlemen, all that evidence shows us that there were three secret side deals. Three times the deal jumped shortly before the deals closed. Three times Li & Fung

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQPCOL4          Summation - Mr. Thomas          Page 2415

suddenly agreed to pay more than its due diligence supported, and three times the surrounding e-mails and written notes show that the price jump was an overpayment engineered by Cole based on a promise to give back the money. Three overpayments, three promises to give it back, three dirty deals. All of them arranged by Neil Cole.

Now, Cole told us on the stand that he never agreed to dirty deals. He sat right up there and said, never made any agreements. In fact, he called it "beyond absurd" that he would do that.

So let's consider the testimony for a moment. For SEA-2 and SEA-3, the four business people who worked on those deals in any serious way were Cole, Rabin, Horowitz and Margolis. Three of them say Cole agreed to overpay in exchange for givebacks.

Now, I'm sure if we had asked him, Mr. Shapiro would say that three is greater than one. But when it comes to witness testimony, it's not a numbers game. You have to evaluate the credibility, match it up to the facts and the other testimony, and ask yourself, does it make sense? And here, the only testimony that does not add up is Mr. Cole's.

Think about it. Did Mr. Horowitz make all of this up as some sort of multi-year plot to get back at him? Did he time travel back to 2014 and date documents with updates about the overpay? Why did Mr. Horowitz plead guilty to crimes if

LAQPCOL4          Summation - Mr. Thomas          Page 2416

Mr. Horowitz didn't do them? None of it makes any sense.

Especially because Rabin says it, too. Did Rabin make it all up as well? Why would he do that? What does Mr. Rabin get from describing a scheme he committed with Neil Cole? He gets nothing. And this isn't testimony he volunteered. As you remember, he had to be compelled to come to court. He had to be ordered to answer questions. Did he seem like a guy who was happy to be here? Of course not. But even Mr. Rabin had to admit the obvious, that the deals happened because they did.

And Jared Margolis, he says the same thing too. Why would he make it up? All three of these guys happened to come up with the same lie about the same guy for the same deals? None of it makes any sense.

But, ladies and gentlemen, here's an easy way to know that Horowitz, Rabin and Margolis are telling the truth. The conspiracy kept records. Cole's security fraud conspiracy involves so many different deals and so many different amounts, it became hard to track. It's one of the reasons, of course, that businesses have accountants.

Following all the money can be hard, and here, both sides of the dirty deals wanted to follow the money; so they wrote it down. Remember this document? This is Government Exhibit 706. This is something Horowitz prepared on November 3rd, 2014, in the heart of the conspiracy, on the heels of an announcement. And you don't have to take his word

LAQPCOL4          Summation - Mr. Thomas          Page 2417

for it on the timing, you can inspect the document properties right there.

This is something Horowitz shared with Cole as they were trying to sort out who owes what to who, and it's a document that he brought with him to a meeting with the guys from Li & Fung or GBG. And what does this document show? It tallies up the costs of the conspiracy for Iconix. It has a net column. It calculates the difference between what the price should have been, based on the revenue multiple, you know, how these deals normally work, and the price that was actually paid, with the net showing what was owed back to GBG by Iconix.

And on the GBG side, we have a couple of documents, including this one, Government Exhibit 1068, and this is a Gmail-to-Gmail summary of various AR. "AR" is accounts receivable, money that you are owed. And this, by the way, is from Ethan Cole, yet another person who knew about the overpayments.

If there was no agreement for money to move in a circle, then why is it that GBG was keeping track of what it was owed as receivables? What was it supposed to be receiving? Here, the attachment tells us pretty clearly it's a $5 million overpay from Iconix Korea. That's the SEA-2 overpayment, the one that causes Korea to jump from 3.3 to 8.3, and it specifically identifies the plan to effectuate the giveback,

LAQPCOL4          Summation - Mr. Thomas          Page 2418

marketing payments for Rocawear, Zoo York and Peanuts China. Three payments totaling an even $5 million.

And this document even lets us in on the secret negotiations that were ongoing between the parties before SEA-3, right there in the proposed overpay for Umbro, Lee Cooper China.

So let's go to Government Exhibit 1069. This is an update Seth sends to Neil, and it shows that he's keeping Neil in the loop on the discussion. He says here is a reflection of the proposed $5 million of current marketing liabilities. That's the money they owe back on SEA-2, and he describes how he walked Jared through how it would be broken down. This is not a favor. This is not a hope. This is not, like, business partners doing nice things for one another. This is a liability, written down, recorded and updated to Neil Cole.

And to the extent there's some suggestion that Mr. Cole's too busy and important to read documents like this, he has too many Fridays-at-five updates, well, we know it's not true for this one because he responds to it. And that's in Government Exhibit 1070, where Mr. Cole specifically asks for the latest thoughts on Roc Kids. One of the ways in which the money for SEA-3 is going back. And the top message on this one, which we saw earlier, refers to $20 million over two quarters. That $20 million is a reference to the inflated amount for SEA-3.

**A-459**

UNITED STATES OF AMERICA, v.
NEIL COLE,

CORRECTED
October 26, 2021

| LAQPCOL4 | Summation - Mr. Thomas | Page 2419 |
| --- | --- | --- |

Now, GBG, on their side, essentially updated their own documents again, after they sent over the first wave of marketing invoices. And while the parties were talking about a potential overpay in MENA, and you can see that here in Government Exhibit 1139, where they call the overpay a "plug." That's the giveback.

Now, ladies and gentlemen, these three documents, these are effectively a second set of books, a ledger set of the secret side deals, and they show that this story is not some revenge fantasy cooked up by Horowitz. This is not some failure of memory from an ill Mr. Rabin. It's not some assumption made by Mr. Margolis. These are cold, hard facts, written down at the time, discussed, documented, quantified. What they are, ladies and gentlemen, is proof beyond a reasonable doubt.

Now, we've heard a lot at this trial about what was written and what was not written into the contract. And perhaps more than anything, we've heard about the merger and integration clauses in these contracts. You know, the ones that Mr. Reisner has kindly read for us that use a lot of jargon like these are the only agreements, there are no other agreements.

Well, the evidence is that that language isn't anything special. Mr. Schaefer told us that they were used in a lot of contracts, and Mr. Schaefer told us he didn't give

| LAQPCOL4 | Summation - Mr. Thomas | Page 2420 |
| --- | --- | --- |

Mr. Cole any particular advice about them.

Here, the people who negotiated and signed these agreements, other than Mr. Cole, they say there were other promises. They say these deals would not have happened without those promises, and they say those promises were part of a fraud. The fact that the lawyers did not write agreements in the contracts isn't part of the point. The lawyers who put those clauses into the contract were not told about the secret side deals. You might, in fact, say that the secret side deals were, in fact, a secret.

But an interesting thing about these agreements is that although the secret side deals are not written into them expressly, the documents themselves hint at what is missing. There are signs of what happened behind the scenes, sort of the fingerprints, you might say, of the fraud.

For SEA-1 you can see it in a few places, but the easiest one is this. The consultancy agreement does not require LF Centennial to do any work at all. LF Centennial Limited gets 2 million just because it signs the document. Why on earth would tough negotiating, visionary CEO Neil Cole agree to send $2 million to a consultant that didn't give him any work? The answer is because it didn't cost him anything. He was going to get the same 2 million back in the form of the side letter.

The fact that the side letter and the consultancy

| LAQPCOL4 | Summation - Mr. Thomas | Page 2421 |
| --- | --- | --- |

agreement are linked is not written into the documents. That's the secret. But you don't need to see it written out to know that it's true. One promise depended on the other, and the fingerprints are right there.

For SEA-2, you can see it in the purchase price itself. The economic terms of the deal don't change, but the price does. The purchase price is 15.9, but for weeks the parties had exchanged drafts and term sheets with a $10.9 million price. The purchase price increases by nearly 30 percent shortly before the deal is signed and with no additional brands or territories, nothing new.

And what's more, we saw that when the price increased, it was recorded entirely for Korea. So it's not just that the overall price increased by 30 percent, but that that Korea portion increased by more than a hundred percent. Suddenly, Li & Fung was basically paying twice as much for the same interest, if you believe what was written in the contract. That doesn't make any sense to anyone.

But there's another thing about the Korea brands. Neither party thought that they were particularly valuable at the time. Remember, that's what Mr. Margolis was negotiating down from 3.7 to 3.3, and that shows up here in the comparison between the Defense Exhibit 1205 and Government Exhibit 1031. So the price on SEA-2 was another fingerprint.

And for SEA-3, you can actually see it in at least two

| LAQPCOL4 | Summation - Mr. Thomas | Page 2422 |
| --- | --- | --- |

different places, first, in the puts and calls section. Remember the purchase price jumps up by 6 million? Well, Government Exhibit 120, which hopefully we can put up. If you look at Government Exhibit 120, it's a black-line, and it shows edits to the puts and the calls. And what it shows you is a reversal of a change. The lawyers had accidentally put in the inflated purchase price for the floor, and then they had to change it back.

Now, normally it would make sense to have those prices match, so that Li & Fung couldn't force Iconix to buy back the same interest at a different price than it paid to obtain it. But the parties change it back from 21.5 to 15.5, and they do that because Cole and Rabin knew that the $6 million increase in the purchase price had nothing to do with the value of the assets. It had to do with the overpayment, and Cole did not want to give the same 6 million to Li & Fung twice.

The second place you can see it in SEA-3 is in the installment payment schedule. That was a long time ago, but Mr. Horowitz testified that Mr. Cole asked for the payment to line up with when the Rocawear royalty payments would be due because that's what they were talking about as the manner to give the money back, to relieve the royalty payments. And that's changes here to this payment schedule, and Mr. Horowitz's testimony on direct that adjustments in the payment schedule were demanded because they reflected the

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQPCOL4          Summation - Mr. Thomas          Page 2423

Rocawear Kids payment schedule that they were planning to terminate.

So when you think about the claim, do the deal documents contain all of the terms of the agreement, there are no other terms, these are the only ones? Mr. Cole's assertion there's no such thing as an oral agreement, ask yourself, what explains the radical increases in the price? Why was the floor of the option changed to match what the parties actually valued the interest at? Why was LF Centennial being paid no matter what it did?

The answer is that the documents aren't the end of the story. The documents are just part of the fraud. They are nothing more than a fancy way for Mr. Cole to hide his crimes in paperwork prepared by lawyers who did not know what he was up to.

And all of that, ladies and gentlemen, all of that is proof well beyond any doubt that there was a scheme to defraud. You have witnesses. You have records. You have memos that actually say "overpayment." It's all there, but the proof is even worse for Mr. Cole because he actually gave the money back. He didn't just agree to do it. He didn't just develop a scheme to do it. He did it.

First, with SEA-1, Cole managed to sneak the giveback right under everyone's noses. It was the consulting agreement, the one that required 2 million to go back to LF Centennial

LAQPCOL4          Summation - Mr. Thomas          Page 2424

Limited for no services.

For SEA-2, Cole sent the money disguised as marketing, and I really do mean Cole himself. Cole, the visionary, you know, the guy negotiating billion dollar CAA mergers. Well, he approved every invoice, every single one. Remember Marcia McLaughlin? She took us through all of the paperwork, and they each had Neil Cole's signature on them.

So Cole promised Rabin that he would send him $5 million disguised as marketing, and then he did it. He sent the 5 million back through these sham invoices, and that is a catastrophic fact. There's no doubt that Cole knew what he was doing. There's no doubt that he knew what those payments were for, and there's no doubt that all of this is just one giveback captured in a fixed deck of printer paper.

Now, Mr. Cole has said that this was some sort of kindness, you know, professional courtesy. Sometimes businesses just send millions to each other to support them. None of that adds up. It's not like Mr. Cole was running a charity for billion dollar Chinese corporations. And this is a guy, we say yesterday, who was criticizing people for the cost of a Super Bowl booth.

The invoices were a total fabrication and the evidence proves it. So let's quickly talk through how the invoices came to be. Remember GBG sent round-dollar invoices, no details. They all added up to 5 million. That's very substandard work

LAQPCOL4          Summation - Mr. Thomas          Page 2425

for something this delicate. So Mr. Horowitz immediately wrote someone else at Iconix "don't know what they were thinking." You know, those GBG guys, not so quick sometimes.

And on cross, the defense implied there's nothing unusual about big, round-dollar amounts. GBG sent big, round-dollar amounts on other occasions to other people, but the context matters. And the context here is that Iconix had advised GBG to hide the money as marketing requests and to do it for those brands in those amounts.

So let's go to Government Exhibit 1077. It's a meeting between Horowitz and Neil Cole. And Horowitz comes to the meeting prepared with notes, and he and Cole walk through the issues. And Horowitz revises his notes based on what Mr. Cole told him, and that was reflected at what we just saw, I think, at Government Exhibit 1084.

And then the revised version Horowitz brings with him to a meeting on September 5th. As you can see here, he asks for three copies to be printed out and brought to room 3B. That's a copy for him, for Margolis and for Ethan Cole.

And then GBG does what they were told, but they take it a little too literally. They send big, round-dollar invoices for precisely the brands in precisely the amounts suggested by Mr. Horowitz, without making any effort to have them look legitimate.

And now that you've met Jason Rabin and Jared

LAQPCOL4          Summation - Mr. Thomas          Page 2426

Margolis, all of that should make a little bit more sense. They are not, I would say, master criminals. They didn't get that Iconix was a public company with auditors. It needed to make the payments look legitimate, but for the sake of argument, fine. Assume that's normal, assume everybody in this business, this IP business, is sending big, round-dollar invoices to one another.

Ask yourself, is it normal to resubmit the invoices with different numbers, but the same amounts, and have them still add up to 5 million? Of course not. It's obvious that the invoices don't matter. It's obvious they don't reflect any sort of real work assessment done. What matters is 5 million, and it matters because Iconix promised that money back to GBG.

See, Horowitz and Cole, they discussed the invoices when they came in. That's reflected here at Government Exhibit 1104. And during the meeting with Cole, Horowitz revised some notes that he had with him. That's Government Exhibit 232. And Horowitz takes those notes over to the Empire State Building to meet with Li & Fung, to give Rabin and Margolis and Ethan Cole a little bit of help pulling this off in a way that won't show those costs.

They said it had to look like real invoices. That's what Horowitz told us on direct. And Cole, himself, spoke to Rabin on the telephone. Mr. Rabin told us that and said basically the same thing, they needed more detail.

UNITED STATES OF AMERICA, v.
NEIL COLE,

LAQPCOL4     Summation - Mr. Thomas     Page 2427

And so GBG tried again, and that's how they came to send invoices with different figures that all add up to 5 million because they were doing what Cole and Horowitz advised them was necessary to make it look like a legitimate payment. After all, Iconix was a public company that had to deal with auditors.

At this time, the backup was essentially a couple of power points, you may remember them. And as you saw, a bunch of this so-called marketing work was done in the United States, and some of it was done years ago, and some of it, like the Yankees Stadium video, that was work done by Iconix itself. That's something Mr. Cole acknowledged yesterday. Iconix paid for it.

Think about that for a moment. GBG was essentially sending as backup evidence of marketing that Iconix had already paid for directly. Cole approved the payments anyway. It was a total sham.

Now, on the GBG side, getting all this together was a bit of a circus. Ethan Cole had to write around for marketing copy that he could use as backup, and he would say things like "it came up in conversation with Jared," even though, obviously, it was a plan. He was lying. And one of the people that Ethan Cole got backup from actually worked at Iconix -- at Iconix Europe, excuse me, and not for GBG, for the joint venture. So when Cole approved that invoice, it was another

LAQPCOL4     Summation - Mr. Thomas     Page 2428

example of Iconix paying a second time for marketing it only received once.

And if you think about it, all of the marketing invoices, the billing directly to Iconix, all of that is inconsistent with what we heard about how joint ventures work. Horowitz told us that the expenses would be split between the joint venture parties. The costs go to the joint venture. Rabin said the same thing. The expenses are charged to the joint venture.

And you know all of that is correct because you can look in the documents, and there are a lot of them, but take, for example, 302-A05, it's the local services agreement that spells out who does what, what the joint venture partners are responsible for. And what it says is that the joint venture partner, here GBG, will bill the joint venture to develop marketing and advertising strategies. It is billing a joint venture, not billing Iconix.

Now, Mr. Charalambous, I'm going to jump ahead a little bit. The invoices, the back and forth, the showing up ultimately with a stack of invoices to get the remainder, all of it was ugly. It was ugly. It was unprofessional. The GBG guys just wanted their money, and they didn't know how to get it done.

(Continued on next page)

LAQMCOL5     Summation - Mr. Thomas     Page 2429

MR. THOMAS: We heard from Mr. Horowitz that it was Ethan Cole who came by with a large folder of invoices. It was essentially, pick whichever ones you want. Just pay us the money that you owed us.

And what ends up happening, and we heard this from Marcia McLaughlin, is that Neil Cole selected some from the stack. The trouble was, Iconix and GBG, they didn't talk about which ones from the big stack were actually being paid. So this chart that we saw recently in Government Exhibit 1332, it spells out that they don't match up. The marketing that Iconix was paying for, it doesn't synch up perfectly to the marketing that GBG recorded in its own books. The left hand and the right hand didn't know what they were doing. It took a couple of tries. It was a saga. But ultimately the money goes back, a $5 million round-trip giveback successful.

As for Southeast Asia 3, Iconix was preparing to send the money back again, and we remember in SEA-3 we talked about the $6 million overpay, and Horowitz and Cole were working out the kinks in that plan. The plan was to use it to cover the Rocawear shortfall. But they were talking about the different strategies they could use to send the money back.

If you look, for example, at Government Exhibit 232, they talk about Rocawear Kids termination options. There is option 1 and there is option 2. They even went so far, as we saw, to have Alford prepare a termination sheet, Government

LAQMCOL5     Summation - Mr. Thomas     Page 2430

Exhibit 232.

I expect tomorrow we will hear that because GBG did not pay the Rocawear Kids royalty, it made the whole thing somehow disappear. It's like the promise didn't happened. That doesn't make any sense, ladies and gentlemen.

What matters is, what was Mr. Cole's promise at the time? What was the obligation he had at the moment that he was describing these deals to shareholders? The answer is, he was required to send the money back. That was the understanding. We know it's the understanding because the price increased by 6 million. Li & Fung would not increase the deal price if they didn't have a promise to send it back. It doesn't matter that they hadn't worked out precisely the form it would take. That's like store credit. You have it there. You could spend it on whatever you want. And this is how they were trying to figure out how the money would get spent.

I want to turn now and talk about lying to the SEC. You see when the SEC showed up it created a serious headache for Mr. Cole because the more the SEC learned about joint venture, the more likely it is that they would come across something that they found concerning, something about secret side deals. Mr. Cole tried to rewrite history. Both Mr. Schaefer and Mr. Horowitz told you that there was an argument about who should be identified in the agreement as leading the negotiations. Ultimately, Mr. Cole relented and he

# A-462

LAQMCOL5        Summation - Mr. Thomas        Page 2431

was listed in the documents, described as oversight or participating. But he couldn't relent on everything.

So the deal terms, the true deal terms, the secret side deals, they were left out. They weren't reflected. They were missing. When those letters go back to the SEC and they say the deal is ABC, the prices are 123, it doesn't reflect the secret side deals. That's a lie. It's an omission. It's Mr. Cole trying to obstruct the SEC from figuring out what was going on. You will hear from the judge that that's one of the charges in the case.

Now, we talked at length about the scheme to cook the books, so I want to turn and talk a little bit about some of the other charges that you will see when the judge describes them to you. All of the lies, all of the hiding in this case, it all had a very specific purpose, to make the company look better than it should and specifically to make it look better in the quarterly and annual filings. You may have noticed that accounting has come up a time or two, but here is the thing. It's not complicated. The accounting issues in this case are simply a matter of common sense. As Noah Snyder put it to you, garbage in, garbage out.

When Cole and Horowitz hid the secret hide deals from the auditors, they all but ensured the accounting would be wrong. As Shapiro told us, the basic necessity for the audit is to understand what happened. What are the promises? What

LAQMCOL5        Summation - Mr. Thomas        Page 2432

did the parties actually agree to?

When Mr. Cole hid the real terms of these agreements from BDO, BDO never had a chance. The secret side deals are left out of the white papers the BDO relied on. Those are these: 225, 226, 227. The consultancy agreement isn't even mentioned. Mr. Cole makes management representation letters that show that there are no linked transactions, that he provided all the material terms. When Mr. Cole signed those, he was lying. Each time Cole signed letters for BDO he was lying. That's a first set of lies, lies to the auditors.

After that, Mr. Cole had to lie to the SEC. In the 10-Ks and the 10-Qs that we have looked at, those all contain false statements about the SEA deals and the gain and the revenue that Iconix could recognize on the deals. And Cole certified those filings were accurate and those certifications are in evidence, also. Those are the Sarbanes Oxley certifications. That's a second set of lies, lies to the SEC.

And what's more, Cole caused the company to issue false press releases trumpeting this cooked information to investors. Those also got filed with the SEC. They are attached to the form 8-Ks. They boast about results that are inaccurate.

This is where Ms. Chambarry's charts can help us out. In Q2 2014, Cole claimed the company was growing, but it was shrinking. In Q3 2014, he claimed that the company was beating

LAQMCOL5        Summation - Mr. Thomas        Page 2433

consensus, but it was missing. And for year end 2014, the company would have missed its own guidance. That's the third set of lies, lies to the investing public.

Let me pause here to address quickly one concept, I think, that may come up, which is materiality. I expect the judge will instruct you that a false statement is material to auditors if it would have mattered to a reasonable auditor and it would have been a material misstatement in the securities fraud count if the statement would have mattered to a reasonable investor.

Would Cole's lies and omissions have mattered on the SEA-1, 2, and 3 deals? Of course. It's common sense. From BDO's perspective, we know they would have mattered because they specifically asked if there were any linked transactions, and they specifically identified in all the audit planning documents that they were looking at the joint ventures.

It also would have mattered to investors. Wouldn't a reasonable investor want to know if the company was lying to them? Of course. That's common sense. And Cole himself clearly thought that these things mattered to investors because he kept bringing them up again and again and again in the filings. Those are in the highlights portions that we went through, like this one that focused on what it is that the company is up to.

Now, we may hear that it's just off by a little bit.

LAQMCOL5        Summation - Mr. Thomas        Page 2434

It's just a little bit of revenue. But, you know what, a few percent matter. Investors can put their money anywhere. And saying you just missed by a few percent, that's kind of like saying the plane missed the runway by a few percent. It's a circumstance where getting it exactly right or better would be most helpful.

Investors here, they look at these things. We heard from two of them who say they didn't want to invest in losers or their algorithm would rank the company lower. In fact, as Noah Snyder put it, if a company has a revenue problem, it has an everything problem. And Iconix had an everything problem, and Neil Cole knew it.

But he told his auditors, he told his investors something different, and that was the whole point of the scheme. All of the givebacks, all of the overpayment, all of that was designed to mislead each of those sets of people, the auditors who had to approve the filings, the SEC that received the filings and followed up in the comment letters, and the investors who used them to make decisions about where to put their money.

Now, all of this is a lot for Mr. Cole to handle, trying to stretch every quarter or trying to keep growth to impress the market.

So there comes a point, ladies and gentlemen, where Mr. Cole cashes out. He sells his stock, not just a little,

UNITED STATES OF AMERICA, v.
NEIL COLE,

---

LAQMCOL5          Summation - Mr. Thomas          Page 2435

but millions. He pockets millions in profit after misstating three of the last four quarters. Think about that timing, ladies and gentlemen. He has had these options for years, nearly nine years, maybe longer. He could have exercised them at any time. But what he chooses to do is to exercise the options and sell them after misstating the financials for the company three out of the last four quarters.

Schemes like this are hard. You can't depend on the GBG guys. At any moment it could come crashing down on investors when they figure out what had happened. Cole needed to get out while the getting was good, so he did.

Ladies and gentlemen, all of the e-mails, all of the spreadsheets, all of the deal documents, all of the fake invoices, all of the back and forth about making sure they all match up, the stacks of paperwork, all of that makes plain what the witnesses told you. Neil Cole developed a scheme. Li & Fung would overpay for the joint ventures so Cole could report more revenue, and, in exchange, Cole would send the overpayments back. The money would move in a big circle.

The purpose of the scheme was to make his business look better than it was, even if by just a little bit, to beat guidance, to meet consensus, to attract those additional dollars from investors. And it affected revenue and it affected earnings per share, and it affected how people thought about what value there was in these brands. They are not dead

---

LAQMCOL5          Page 2436

brands. These are multimillion dollar brands. Look at the deal prices.

Mr. Cole, in deal after deal after deal, rigged the prices. He lied to the auditors. He filed false documents to the SEC. And he told the public something that wasn't true. When Neil Cole did that, he committed crimes. When Neil Cole lied to the auditors, he hindered their audits. When Neil Cole lied to the SEC, he falsified records. When Neil Cole lied to investors, he was committing fraud. When Neil Cole did all of that with other people, he committed conspiracy.

Ladies and gentlemen, Neil Cole did it. He knew it was fraud. He wanted the money and did it anyway. Neil Cole is guilty.

THE COURT: Thank you, Mr. Thomas.

Ladies and gentlemen, it is now approximately a quarter after the hour. We are going to end early today for two reasons: One, because we anticipate that the defense summation will take us past 2:40 in the afternoon, and I made a commitment to you that I would not keep you past that hour; two, because it's important that that presentation be made to you in one sitting so that you can understand and appreciate it.

I do want to mention one thing to you. I anticipate that the case will be handed to you sometime tomorrow afternoon. Once the case is in your hands, our schedule is

---

LAQMCOL5          Page 2437

also in your hands. So if you want to stay beyond 2:40 tomorrow, or any subsequent days that you deliberate, or even if you want to come in earlier, that's going to be entirely up to you, and we will be guided by what you unanimously decide in that regard.

Until then, the case is still ongoing, so you should still not discuss it. You should still not read anything about it or see anything about it in the media.

Have a wonderful evening.

(Jury not present)

THE COURT: Just a couple of questions about the jury charge. The charge currently has an instruction on law enforcement witnesses. Arguably, Ms. Chambarry is law enforcement, but she doesn't carry a gun. Should I still keep that instruction in?

MR. HARTMAN: Judge, our view is it's not necessary, but we don't have a problem if the defense wants it.

MR. REISNER: We agree. It's not necessary.

THE COURT: That will be taken out.

The other thing is, we did receive stipulations today concerning testimony. So that part of the stipulation instruction will go back in. They will have both stipulations as to facts and stipulations as to testimony.

By the way, this is last call. If there are any other changes to the charge, let us know within the hour.

---

LAQMCOL5          Page 2438

MR. REISNER: I think that there is a placeholder for like defense theory of the case. I don't think there needs to be any special text there and it can be eliminated.

THE COURT: Very well. We will take that out as well.

Mr. Tarlowe.

MR. TARLOWE: I just have one suggestion. On the instruction about the charts and the demonstrative aids, I don't think it will be clear to the jury what charts or summary charts that are actually evidence and which charts are demonstrative aids. My only suggestion or request is that we just specify that the Chambarry charts are demonstrative aids and not evidence.

MR. HARTMAN: That's fine with us, Judge.

THE COURT: Again, I have not been keeping track of what is in and what is not. Give us exactly the exhibit numbers of what those charts are.

MR. HARTMAN: We will figure it out.

THE COURT: Anything else?

MR. HARTMAN: Not from us, your Honor.

MR. REISNER: No, your Honor.

THE COURT: Have a wonderful evening.

(Adjourned to October 27, 2021, at 9:00 a.m.)

---

**A-464**

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

LARPCOL1     Page 2444

the Candie's investigation evidence. We're just concerned that a limiting instruction will draw additional attention to evidence that we don't think should be in the record.

I just didn't want there to be any ambiguity about whether or not we were waiving that objection. We are not waiving that objection.

THE COURT: Very well.

MR. REISNER: Thank you, your Honor.

THE COURT: Okay.

(Pause)

(Jury present)

THE COURT: Everyone, please be seated.

Ladies and gentlemen, good morning. At this time, we will proceed with Mr. Cole's summation.

Mr. Tarlowe.

MR. TARLOWE: Thank you, your Honor.

Good morning. At the beginning of this trial, my colleague, Mr. Reisner, told you that the evidence would show that Neil Cole is not guilty of any of the crimes he is charged with, and that is what the evidence has shown. Let me be clear at the outset. Mr. Cole did not participate in any scheme. Mr. Cole did not intend to defraud anyone, and he did not lie to investors or auditors.

Now, in a criminal case like this, the burden always rests with the prosecution. We have no obligation to prove

LARPCOL1     Page 2445

anything. To carry their burden, the prosecution has to prove that Mr. Cole is guilty as to each element of each offense, and they have to prove it beyond a reasonable doubt. That's the highest standard that exists in our legal system, and it's because the stakes are enormous.

When somebody's liberty is at stake, when somebody's freedom is on the line, the prosecution must establish guilt beyond a reasonable doubt. And here, ladies and gentlemen, the government has failed to meet that burden. You'll hear from Judge Ramos later today what reasonable doubt means, and I expect you'll hear that it's a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her life.

So think to yourselves for a moment. If you had a decision in your life that was really important, perhaps the most important decision in your life -- because this one is certainly the most important decision in Neil Cole's life -- would you hesitate, would you hesitate before relying on Seth Horowitz or Jason Rabin? Of course you would. And if you would even hesitate in making an important decision in your own life, that's reasonable doubt.

Now, I also want to emphasize, before I get into the evidence, that the charges in this case involve Neil Cole's state of mind, what was in Neil's mind and whether Neil acted with an intent to defraud. I expect that Judge Ramos will

LARPCOL1     Page 2446

explain to you and will instruct you that good faith on the part of Mr. Cole is a complete defense to each and every one of the charges in this case.

And what that means is if Mr. Cole believes, in good faith, that he was acting properly, that Iconix's financial reporting was accurate, then even if he was mistaken in that belief, he cannot be found guilty. And Mr. Cole has no burden to prove his good faith. The prosecution must prove bad faith and intent to defraud beyond a reasonable doubt.

Now, in their opening statement, and then again yesterday in their closing argument, the prosecution got up here and they told you a nice, convenient story. They told you it was very simple. Well, it's not as simple as they want to make it out. When you evaluate the evidence carefully, and when you look at all of the facts, and when you use your common sense, the government's story does not add up, and I'm now going to walk you through each of the transactions and show you why that is.

Let me start with SEA-1. The government claims that this is the beginning, the beginning of this supposed scheme to defraud. Well, the evidence paints a very different picture, and it shows that Mr. Cole did not intend to defraud anyone.

Neil had no reason to believe anything was improper on SEA-1, and the reasons for that, there were no secret or undisclosed terms. Everything was in the transaction

LARPCOL1     Page 2447

documents, and those documents, including the consultancy agreement and the side letter that the government emphasizes, were received and reviewed by accountants and lawyers. They didn't raise any issues or concerns.

The side letter and consultancy agreement, they were proposed by Li & Fung, not Iconix. And the transaction took place on the first day of the quarter, at a time when the results for the quarter were unknowable. And the government's allegation with respect to SEA-1, it's about $2 million, which was 0.46 percent of the company's revenue that year. The company generated revenue of over $430 million.

So let me now walk through each of those points.

First, there were no secret terms. Everything was set forth in the documents. All of the parties' obligations were clearly set forth in the written documents. The letter agreement provides that LF will pay $2 million to Iconix. It's right there in the documents. The consultancy agreement says Iconix will pay $2 million to Li & Fung. It's right there in the documents.

Now, Mr. Thomas said yesterday that the fact that the side letter and consultancy agreement are linked is not written in the documents. That's the secret. That's what the government said yesterday. You see, the government's got a problem about SEA-1 because everything is in documents.

There are no obligations outside of the agreements.

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

LARPCOL1                                    Page 2448

The government acknowledges that. So instead, what they say is, ah-hah, the fact that they're linked, that's the secret. Are you kidding me? Are you kidding me? That's a secret? It's absurd. The connection between those two agreements and the fact that they provided for offsetting payments? It was obvious. It wasn't a secret.

The two agreements were sent by the lawyers as a pair in the same e-mail. Multiple times. Of course they were connected to each other. They're both for $2 million. Of course those two payments evened out, and not only is that clear from the agreements themselves, the lawyers who were working on the transaction expressly recognized that.

Here's an e-mail from a lawyer at Gibson, Dunn to lawyers at Mayer Brown, the outside law firms representing Iconix and Li & Fung. And the lawyers said "Iconix understands that the only amounts being wired will be the closing payment, as the exchanges in the side letter and the consultancy agreement even out." That's the secret? There are eight lawyers on this e-mail, literally eight lawyers, lawyers from Gibson, Dunn, lawyers from Mayer Brown, in-house lawyers from Iconix. This is not what fraud looks like, ladies and gentlemen.

Even Mr. Thomas said yesterday, if you make a secret deal, would you write it down? Would you send the secret deal terms to the lawyers? This is, obviously, not a scheme to

LARPCOL1                                    Page 2449

defraud. And when the SEA-1 negotiations were coming down to the wire on September 30th, what direction did Mr. Cole give to the lawyers? Mr. Cole tells the lawyers "Be firm and not critical to give in to anything not comfortable with." That's not what someone says when they're committing fraud. That's evidence of good faith.

And by the way, look what else Neil Cole says in this e-mail on the next line, "If the deal does not close, we are fine. Although, would still prefer to close." The government keeps arguing that Neil Cole was trying to close the deal before the end of the quarter, and by the way, there's nothing wrong with that. Companies do that all the time, but he's saying the opposite here. He's saying I prefer it closed, but if it doesn't close, we're fine.

And it wasn't just the lawyers who reviewed these agreements and understood that they provided for offsetting payments of $2 million. The finance and accounting professionals at Iconix, they knew that, too. And those are the people responsible for determining the accounting for the transaction, and they're the people who prepared the transaction descriptions that went into the SEC filings like the 10-K.

Here's an e-mail where a lawyer at Iconix, Erika Alford, sends to Warren Clamen, the chief financial officer, the CFO. You heard that Mr. Clamen was the person at Iconix

LARPCOL1                                    Page 2450

responsible for ensuring compliance with GAAP, generally accepted accounting principles. You heard from Mr. Shapiro, of BDO, and Peter Cuneo, the board member, that Mr. Clamen was a reliable CFO with a strong accounting background.

Well, in this e-mail, on October 23rd, Warren Clamen receives from the lawyers a full set, a full set, of the SEA-1 transaction documents, including the side letter and the consultancy agreement. They're not a secret, and there's no attempt to hide the fact that they're part of the SEA-1 transaction. They're being circulated as part of the transaction documents.

Mr. Shapiro at BDO, the outside auditor, he told you his expectation was that the CFO and his finance team would review all of the agreements and determine the appropriate accounting treatment. Neil Cole had the same expectation. That's how the process worked at Iconix.

And here's an e-mail where Brian Snyderman, another person in finance, receives a copy of the consultancy agreement. Warren Clamen's on it. Justin Abrahamson is on it. Those are accountants at Iconix. And the e-mail talks about the "first installment of the consultancy fee payable to LF in connection with the SEA JV transaction." And it says, "The relevant agreement is attached and attached is the same consultancy agreement."

No one says: Wait a minute, what consultancy

LARPCOL1                                    Page 2451

agreement? No one says: Hold on, we can't make a payment to Li & Fung if they're making a payment to us. It's not hidden. No one's pretending that this is something else.

And Mr. Shapiro also told you that Brian Snyderman, the person on this e-mail, the person who got the consultancy agreement, he's the one who wrote those white papers or memos analyzing the joint venture transactions and analyzing the accounting treatment for those joint venture transactions. Those white papers were reviewed by the CFO, and they were provided to BDO. And there's no evidence at all that Neil Cole had anything to do with the preparation of the white paper or that he even saw it.

And here's another e-mail from Brian Snyderman about the consultancy agreement. And here, he confirms that the wire to Li & Fung for $1 million has been released. That's the first installment of the consultancy payment. See attached confirmation. And then the attached confirmation shows that it's signed by Warren Clamen, the CFO, and it's approved by Brian Snyderman and the subject is "Wire to LF Cent." for LF Centennial.

So the finance and accounting professionals, they're well aware of these agreements and the payments provided for these agreements, and Mr. Cole reasonably believed that these experienced accounting professionals would and did review all of the agreements and determine the proper way to account for

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

LARPCOL1      Page 2452

them.

And Neil Cole had no reason to believe that these professionals were not sharing all of the relevant information and documents with BDO. In fact, Neil Cole was told, quarter after quarter after quarter by BDO that "all records and information requested were freely available for our inspection. Management's cooperation was excellent. We received full access to all information." That's what Mr. Cole was hearing over and over again.

Now, Iconix announced results for the fourth quarter of 2013, which is the quarter in which SEA-1 took place. They announced those results on February 20th of 2014, and the 10-K was filed on February 27th, 2014. So the evidence makes clear, the e-mails that I just showed you made clear, that the lawyers and the accountants, the accountants, had all of the transaction documents, including the side letter and the consultancy agreement for four months, four months, before results were announced and the 10-K was filed.

And to be clear, we're not blaming Mr. Clamen or Mr. Snyderman. It's not a question of blame. The question is what was in Neil Cole's mind, and did Neil Cole have an intent to defraud. And the point is that Neil Cole understood that the accountants had all the documents. They had all the information, and so if they made a mistake, that's not evidence of an intent to defraud. It's certainly not a crime by Neil

LARPCOL1      Page 2453

Cole.

And the government argued to you yesterday that the consultancy agreement was a sham. It's a sham. You got to be careful of these labels that the government wants to slap onto things. The government says it's a sham. The government says, ah-hah, it's not with LF, it's with LF Centennial. It must be a fraud. It must be a scheme. It's a dirty deal. Are you kidding me? It's ridiculous.

And it shows how the government is trying to twist and distort perfectly legitimate and ordinary things to make them look sinister. LF Centennial is an affiliate of LF. That's the "LF" in LF Centennial. No one is hiding it. Big corporations use affiliates all the time, and the lawyers for Li & Fung made that change. You can see it in the red line.

No one on the Iconix side or the GBG side is trying to disguise that this agreement was with Li & Fung or that it related to the SEA-1 transaction. Everybody knows that and, in fact, Jason Rabin, the government's own witness, he confirmed on cross-examination that LF Centennial was not used in order to hide anything. That's what he said.

And then, even after Mr. Rabin said that, the government did it again with Jared Margolis. They had him say on direct examination he had never heard of LF Centennial. Again, trying to make it sound sinister and bad, a dirty deal. And then when I confronted Margolis with documents on

LARPCOL1      Page 2454

cross-examination, he acknowledged, oh, yeah, I was familiar with LF Centennial.

Yet, incredibly even after that testimony, the government is still clinging to this argument. They argued to you yesterday that LF Centennial is evidence of a sham. Why? Oh, because it appears on page 200 of the Li & Fung annual report. That's evidence of a sham? Come on.

The government also argued yesterday that the consultancy agreement is a sham because it has that language that says the fee is payable regardless of the services rendered, and Mr. Thomas yesterday sort of mocked that language and said: Who does an agreement like that?

Well, apparently, the law firms Mayer Brown and Gibson, Dunn did because the lawyers drafted that language, not Neil Cole. You see that in the e-mails and the documents. The lawyers drafted that. The accountants and the financial professionals reviewed it.

So whether Mr. Thomas thinks it's an unusual provision or not is irrelevant. The lawyers and accountants clearly thought it was fine, and no one raised any concerns about it with Mr. Cole.

And the government also argued yesterday repeatedly that it was a sham because no consulting work was done. That's what they said yesterday, repeatedly, no consulting work was done, but that's not what the testimony from their own

LARPCOL1      Page 2455

witnesses was.

Jason Rabin, their witness, said he wanted to be paid $2 million for work that Li & Fung was doing.

"That included consulting work, right?

"Correct.

"That included work that Li & Fung was doing before the joint venture was formed, right?"

Answer: "Li & Fung did a lot of work before the joint venture was formed." I think that's actually a question. The answer is "Correct."

"And Li & Fung wanted payment for the work that had been done, right?

"Correct."

So Jason Rabin said there was consulting work. He said there was a lot of consulting work, and he wanted to get paid for it. Then they stand up before you yesterday and say there's no consulting work. They're contradicting their own witnesses.

And Li & Fung did that work under that letter of authorization that you've seen during this trial. The letter of authorization, you'll remember, was entered into before the joint venture is formed. So there's a period of time in which Li & Fung is doing work under the letter of authorization before the joint venture is formed.

And the letter of authorization, you saw people

# A-467

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

LARPCOL1                                          Page 2456

referred to that as a consultancy agreement, people at GBG and people at Iconix. That's not a coincidence. It's obvious that the $2 million consultancy agreement was tied to the work that Li & Fung had done under the letter of authorization.

In fact, let's look at changes that were made to the consultancy agreement. This is one of those redlines or markups that showed the lawyers' changes. And if you look where it's highlighted under "Appointment," the consultancy agreement originally as drafted said "the company hereby retains" and the lawyer changed that from the present tense, "hereby retains," to "has since August 1st, 2013, retained and continues to retain."

Why did they change it to August? Because that's when the letter of authorization was signed, and that's when Li & Fung started doing work. If this is all a sham, why are the lawyers making these changes? Why are they bothering to revise and edit the documents? It's not a sham.

You also know that the government's theory doesn't add up because the side letter and consultancy agreement, they were proposed by Li & Fung, not by Iconix. The government says this is a scheme that was orchestrated by Mr. Cole to inflate Iconix's revenue.

Well, it can't possibly be a scheme by Mr. Cole when the idea came from Jason Rabin and Li & Fung, not from Mr. Cole or anyone else at Iconix. Jason Rabin sent this e-mail to his

LARPCOL1                                          Page 2457

colleagues, reporting on a call with Neil Cole where Jason said, "he" -- meaning Neil Cole -- "will work on the 2 million for us." Rabin told you that meant for Li & Fung. And he says, "Just need to give him" -- just need to give Neil -- "wording that works," meaning a written agreement that would be acceptable to both sides.

Neil told him prepare the documents and send them over so the lawyers can review them. That's how deals are done, in written agreements prepared by lawyers, and that's what happened. The side letter and the consultancy agreement are drafted, prepared by Li & Fung's lawyers at Mayer Brown. Mark is Mark Stevens at Mayer Brown, is working on the first draft of the side letter and consultancy agreement. By the way, once again, they're discussed as a pair in the same e-mail.

And PWC is also on this e-mail. Those were the auditors for Li & Fung. Now, after the lawyers from Li & Fung and Mayer Brown prepare these drafts, they send them to Iconix's lawyers at Gibson, Dunn, and then Gibson, Dunn forwards them to the in-house lawyers at Iconix.

And you can see on the bottom -- or the top e-mail is from Mayer Brown, attached are two more documents, side letter, which deals with the key payment and a short form consultancy. And then Gibson, Dunn forwards that to the Iconix lawyers. LF's counsel has sent over the attached drafts of a key payment side letter and consultancy agreement. This demonstrates they

LARPCOL1                                          Page 2458

were drafted by Li & Fung's lawyers. They were sent as a pair. Everybody understands that they are connected.

And you also know that this idea originated with Li & Fung because Li & Fung routinely requested and received consulting payments from other business partners. And here are some of the examples you've seen, 500,000, consulting for Marilyn Monroe; 750,000, consulting for Spyder; 500,000, consulting for Juicy Couture. These have nothing to do with Iconix. These are Li & Fung consulting invoices.

And when Li & Fung proposed this to Neil Cole, Neil communicated that he needed to understand in detail to share with the Iconix CFO, Warren Clamen. Mr. Margolis told you that: "Based on your conversations with Mr. Cole, you understood that Mr. Cole wanted to understand what you were proposing in detail to share with the Iconix CFO, correct?

"Yes."

Neil's acting responsibly by making sure the CFO knows what LF is proposing and is okay with it. It's the opposite of a scheme to defraud. It's evidence of good faith.

And by the way, speaking of evidence of good faith, when Warren Clamen left the company and a new CFO joined, Jeff Lupinacci, a few months later Mr. Lupinacci reached out to Neil by e-mail and said, I'd like to discuss with you what my priorities should be, and he lists a whole bunch of potential priorities. And what does Neil Cole say in response to Jeff

LARPCOL1                                          Page 2459

Lupinacci? "The No. 1 priority is always correct and timely numbers in the Qs and K." That's the instruction that Mr. Cole gives to the CFO. That's your No. 1 priority. That's evidence of good faith.

And there's another reason that the government's theory doesn't make sense on SEA-1. The transaction took place on the first day of the fourth quarter, October 1st, the first day. The quarter ends on December 31st. The government claims these agreements are part of some scheme to try to beat consensus and guidance. It's the first day of the quarter, the company can't know the first day of the quarter what the results are going to be or what the consensus is going to be by the time they report earnings.

And finally on SEA-1, the letter agreement and the consultancy agreement, they had no impact on net income. No impact on EPS, no impact on free cash flow, no impact on EBITDA. The only effect was $2 million of revenue in the year in which Iconix generated revenue of more than $430 million, that's 0.46 percent.

(Continued on next page)

**A-468**

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 27, 2021

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2460 |
|---|---|---|

MR. TARLOWE: The government does not dispute, they said it yesterday, the $2 million had no impact on whether the company met guidance or consensus. The company met it with or without the $2 million. They want you to believe that Neil Cole hatched some scheme to defraud so Iconix could generate $2 million of revenue and no profit on the first day of the quarter. It doesn't make sense, ladies and gentlemen.

Let me now turn to the SEA-2 transaction. I want to emphasize a threshold issue before getting into SEA-2 and SEA-3. If there was no commitment or obligation undertaken by Iconix at the time of the transaction, at the time of SEA-2, then the government's claims, they all go away.

Mr. Shapiro of BDO told you that if there is no commitment or obligation to make a future marketing payment, at the time of the SEA-2 transaction, then the marketing payments would have no impact on the company's second quarter gain. So if at the time of SEA-2 there is no commitment or obligation to make a future payment, there is no problem with the accounting and there is no information that could have been told to auditors or others.

There was no commitment or obligation undertaken by Iconix at the time of the transaction to make a future payment to GBG. How do you know that? Several reasons. One, there is no mention of marketing in the contract. The contract is the contract. There is no mention of marketing in any

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2461 |
|---|---|---|

contemporaneous documents. And Li & Fung first asked for marketing support nearly two months after the SEA-2 transaction took place.

Let me now go through each one of these points. First, no mention of marketing, marketing commitment in the contract. You know there was no commitment or obligation in the written agreements. We all agree on that. The government doesn't dispute that. You've seen the agreements. The parties, Iconix and Li & Fung, acknowledge and agree that the fair market value is $15.9 million. That's the purchase price.

You've seen these clauses that the government yesterday said contained legal jargon. They are pretty clear on their face. The letter agreement and the agreements referred to herein constitute the entire agreement. They supersede all prior agreements, whether written or oral. It's pretty clear what that means. It means the contract is the contract, and there are no agreements other than what's in these documents. That's what it means. You also saw this provision that Iconix is not making any representation, oral or written, except as expressly set forth in this agreement.

You've seen that there were virtually constant negotiations between Iconix and GBG. They were talking at any given time about a whole range of different things, existing business, future business, possible business. Some of the things they discussed materialized. Some didn't.

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2462 |
|---|---|---|

But the only thing that mattered at the end of the day was the final deal, as reflected in the signed written contracts, and they understood that. The parties understood that. Companies can't conduct business unless their obligations are clear. That's why you have contracts and that's why contracts make clear that there are no other agreements other than what's in the contracts. Even the government has these provisions in their agreements with the witnesses. It's the same concept. And there is a difference between expressing a willingness to be supportive of a business partner and undertaking an obligation.

Mr. Shapiro testified that what matters from an accounting perspective is an obligation that binds the company. That's what Mr. Shapiro said. He used the word obligation repeatedly and he said an obligation that binds the company.

Now, you heard from Rabin, for example, that in connection with SEA-1, Mr. Cole said, if the joint venture doesn't perform as well as hoped, he'd work with you or give you some relief. Correct. And Rabin -- I asked him: You understood that when Mr. Cole was saying that, Iconix wasn't taking on a commitment or an obligation. He said: Correct, he understood that.

There are other examples of conversations like that where the parties understand there is no commitment or obligation being undertaken. Look what happened with Lee

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2463 |
|---|---|---|

Cooper Europe, the option. Horowitz and Margolis both thought that an understanding had been reached. But it turned out that in fact there was no obligation because it had never been put in the documents, and they understood that. There was no argument about it.

Here is Horowitz saying in October, so this is a couple of months after SEA-2, interesting development on EU Lee Cooper. That's Europe Lee Cooper. Technically, we never agreed, in writing, to do the Lee Cooper tracking stock in Europe with GBG. We can discuss/offer other alternatives.

He recognizes, if it's not in writing and there is no commitment or obligation, that Iconix was free to offer a different deal or no deal. In fact, Iconix decided not to go forward with Lee Cooper. And GBG didn't jump up and down screaming saying, we had an agreement; you had an obligation. Everyone understood there was no obligation.

On the GBG side Margolis testified that he also thought there was a firm agreement on Lee Cooper Europe. He told a colleague at GBG, there is nothing to worry about. The terms are agreed to. But it wasn't in writing, so there was no agreement. It never happened. Margolis said he was devastated that it didn't happen.

Even in Horowitz's twisted account, Horowitz claims that when Neil learned there was no marketing commitment in the written agreements -- remember, Horowitz's story is, the

Min-U-Script®                     Southern District Court Reporters                     (6) Pages 2460 - 2463

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2464 |
|---|---|---|

agreements come back from GBG and, aha, there is no marketing commitment in there. Horowitz testified that when Neil learned that, Neil was happy. Why? Because it provided wiggle room, wiggle room, as in the flexibility to make a payment, make a full payment, make no payment, or make partial payment. Wiggle room is the opposite of an obligation.

Now, the government can't dispute and they acknowledge that there is no commitment or obligation in the agreements. And they know that that is a huge problem for their case.

So what is the government's response? What is their explanation? What the government argued yesterday was, well, it's not in writing because it's all a big secret. It's all a big secret. Mr. Thomas said they couldn't put it in the documents. That would be like calling the bank to let them know that you are planning to rob them.

Mr. Thomas said "secrecy here was the point." Secrecy was the point. That's the government's theory for why it's not in the documents. Look at what Jason Rabin said. The government called Jason Rabin as a witness. The government is asking you to rely on Jason Rabin's testimony.

I asked him: With respect to those three transactions, SEA-1, SEA-2, and SEA-3, Mr. Cole never asked you to keep any of those terms, correct? Correct.

And you did not take any steps to keep any of the terms of those transactions secret, correct?

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2465 |
|---|---|---|

"A. Correct."

The government said secrecy here was the point. This is a big scheme to defraud. It's a big secret. Jason Rabin says Mr. Cole never told him to keep it secret. Jason Rabin never did anything to try to keep it secret. What kind of secret is that one?

If this was an unlawful, secret, dirty deal, don't you think somebody would have mentioned that to Jason Rabin? Don't you think somebody would have said, hey, Jason, don't tell anybody, we could get in trouble? Don't tell anybody. Jason Rabin said there is no secret.

And Rabin also contradicted the government's theory when he said that there was -- the terms -- there were no terms that were intentionally kept out of the written agreements. Again, the government's theory is, they are not in the agreements because everyone had to keep them out. It was a secret. So what did Jason Rabin say?

"Q. Mr. Cole never asked you to keep any of the terms of the transactions out of the written agreements, correct?" Correct.

And you did not take any steps to keep any of the terms of those transactions out of the written agreements, correct.

"A. Correct."

That's their witness. The government told you he's one of the main players of the scheme. He's at the center of

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2466 |
|---|---|---|

it. He didn't take any steps to keep it out of the documents. Mr. Cole never asked him to. The government says there is no agreement, there is no commitment in the documents because Neil Cole and Jason Rabin schemed to keep it out? It's just not true. It's inconsistent with what their own witnesses testified to.

By the way, the government also tries to pretend that this testimony didn't happen:

Mr. Rabin, do you believe that you committed any crimes in connection with SEA-1, SEA-2, or SEA-3? "A. No.
"Q. Did you commit any crimes with Mr. Cole? "A. No."

This is the Cole conspirator, this is the guy in the center of the dirty deals, the scheme. It doesn't make sense. Remember, he has immunity. He can't be prosecuted for what he says on the stand unless he perjures himself.

So if there really was a commitment or obligation undertaken by Iconix at the time of SEA-2, why isn't it in the documents? Why isn't it in the transaction documents? You just saw from Rabin's testimony, it's not because they were trying to keep it a secret. Why isn't it there? It's not there because there was no commitment or obligation.

GBG was very careful to include terms that they wanted in the transaction documents for amounts far less than 5

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2467 |
|---|---|---|

million. They cared about those guarantees a lot and they made sure those were in the contracts. They cared about the puts and calls. They made sure those were in the contracts.

If there was an agreement, a commitment or an obligation to get $5 million back, they would have documented that. On the Iconix side, why leave it out? If there is a commitment or obligation, why leave it out? The government's theory, again, is, you got to leave it out because it has got to be a secret. But that doesn't make sense. It doesn't make sense both because of the Rabin testimony that I just showed you, but it also doesn't make sense because Iconix entered into other written agreements with obligations in the documents to provide marketing support, and nobody raised issues or concerns about that. No one said, you can't do that.

So take a look, for example -- I skipped this one but I should mention this because it is important. Margolis also said that Mr. Cole never asked him to keep any terms of the deals out of the written agreements. Again, if terms were kept out, the testimony is clear.

This is what I was talking about. This is December 2013. This is about six months before SEA-2, six months before. This is an agreement between Iconix and a GBG affiliate and it says: The licensor, which is Iconix, shall make a one-time payment of $3.5 million for showroom support. It's right there in the document. It's right there in the

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 27, 2021

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2468 |
|---|---|---|

agreement. And there is no dispute that the lawyers saw this, the accountants saw this, BDO saw this. Nobody said it's a problem.

So if they can do this in December 2013, why in June 2014 would Neil Cole or anyone else think, oh, we can't put a marketing commitment in an agreement? Why not? If such an agreement existed, if Iconix had really undertaken a commitment or obligation, it would be in the document, just like it is here.

They did that after SEA-2, also. This is from December 2014. This is the MENA agreement for the Middle East. It's right there. Iconix shall pay to GBG $3.1 million for expenses related to due diligence and market analysis. It's right in the agreement. It's right there. So if Iconix included these marketing commitments in written agreements before and after SEA-2, why would Neil have thought it had to be kept out of the SEA-2 agreements? It doesn't make sense.

The government's theory that it was some big secret that had to be hidden. It doesn't even line up with Horowitz's story. Horowitz claims that Mr. Cole said, in substance, let's see whether or not GBG puts anything in the documents about a $5 million marketing commitment. If it was a big secret that had to be kept hidden, why would they be waiting to see if the documents came back with it? The real reason that there is no commitment or obligation in the SEA-2 transaction documents is

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2469 |
|---|---|---|

not because it was kept a secret. It's because there was no commitment or obligation undertaken by Iconix.

Now, the next point I want to make on SEA-2 as to how you know that there was no commitment or obligation undertaken by Iconix is, there is not a single document from the time of the SEA-2 transaction or the lengthy negotiations leading up to it that refers to a commitment or obligation by Iconix to pay future marketing expenses, not a single document. The government argued to you yesterday that the witness' testimony is corroborated by the documents.

So where is the document from June 2014 talking about future marketing payments? You haven't seen one. It doesn't exist. You know Iconix and GBG, they generated a lot of documents in June 2014 in connection with SEA-2. You've seen term sheets, transaction summaries, internal e-mails within GBG, internal e-mails within Iconix, e-mails between Iconix and GBG. You've probably seen more of those than you'd like. But you can see in those documents discussions of many of the different terms of the deals. You see the deal changing. You see the price changing. Lee Cooper in, out. You see guarantees, puts and calls, all sorts of terms. But you haven't seen a document from the time of the transaction referring to a $5 million marketing commitment. Even Seth Horowitz had to admit that because he can make up conversations that didn't happen, but he can't create documents that don't

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2470 |
|---|---|---|

exist.

Mr. Horowitz, you are not aware of any document created at or before the signing of the SEA-2 transaction that refers to any commitment or obligation by Iconix to reimburse GBG for marketing expenses, correct?
"A. That is correct."

Now, the government gets a chance to go up here after I do, so I don't know exactly what they are going to say, but to the extent the government is going to say, well, there is no documents because it was a secret, you know that doesn't make sense because the government claims that all these other documents from later in the year, those show the conspiracy. So the government can't have it both ways. They can't say that later on people are putting stuff in writing, but in June they are not. So there is no document from June 2014 in the negotiations leading up to the SEA-2 transaction that talk about this supposed marketing commitment. It didn't happen.

It's the same on the GBG side. It's not just on the Iconix side that there is no document. There is no document on the GBG side. Here is the internal PIP memo. This is the memo that goes to the investment committee at GBG. The PIP memo seeks approval for a transaction at a purchase price of $15.9 million. That's the final purchase price for SEA-2. There is nothing in the PIP about a future marketing payment, nothing.

Jason Rabin told you that the PIP includes all

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2471 |
|---|---|---|

material terms. If the deal terms change, the PIP memo has to be updated or revised, right? Correct.

That was the revised PIP. It had a $15.9 million purchase price and it said nothing about a future marketing payment by Iconix.

It's important to have all the material terms in the PIP memo because the investment committee, the investment committee, has to decide on behalf of GBG whether the transaction makes sense, whether it's fair, and whether the purchase price is fair. So the investment committee needs to know all of the terms.

If GBG had actually secured a $5 million commitment, you can be sure that that would have been included in the PIP memo. Jason Rabin wanted to get approval. He wanted this deal to get done. So he had every incentive to include in that PIP memo any term that was favorable to GBG.

If there really was a commitment by Iconix to pay $5 million, of course that would have been in the PIP. And the government keeps arguing that GBG would not have paid $15.9 million unless there was a commitment to get money back. They keep saying that the assets were only worth 10.9.

But it's the investment committee at GBG that decided what price GBG was going to pay, not Jason Rabin, not Jared Margolis, and certainly not the government. The government can keep saying that SEA-2 wasn't worth $15.9 million. But the

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                          **October 27, 2021**

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2472 |
|---|---|---|

investment committee of GBG authorized a transaction at $15.9 million and there is no evidence, there is zero evidence that the investment committee believed there was any commitment to get money back.

So think about this for a moment. The investment committee you heard includes the most senior people at the company, those people like Dow Famulak and William Fung and Victor Fung. It's a group of the most senior people. Li & Fung, you heard, is as respected a public company that's been around for over 100 years. Is the government claiming that the entire investment committee was part of this supposed scheme? Is that what they are claiming? Because either the investment committee was all in on this or the investment committee in fact agreed to pay $15.9 million without any expectation of something in return. It's got to be one of the two. And it is not credible that the entire investment committee is part of some big scheme.

Also, Seth Horowitz even admitted on cross-examination that he believed Iconix could negotiate for a higher price than $10.9 million. The government keeps arguing to you, it was only worth 10.9. They never would have paid more unless they were getting something back.

Seth Horowitz said: I thought we could negotiate for a higher price.

And he was then asked: And you argued that the price

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2473 |
|---|---|---|

was too low at 10.9, based on developments of brands in certain marketplaces.

"A. I believe I stated that opinion to Neil."

Neil's state of mind. Seth Horowitz is telling Neil, 10.9 is too low. We can get more than that. This directly contradicts the government's argument that the assets were not worth more than $10.9 million. It sounds a lot like a typical negotiation between two parties trying to get the deal best deal possible, not a dirty deal.

Horowitz claims that at the time of SEA-2, Neil supposedly told him of a supposed agreement with GBG to make a future payment. Horowitz can't identify anyone who was present for that supposed conversation. He has got no record of it. And he has told wildly inconsistent stories about when and where it supposedly happened.

At one point he said it happened on June 24. He connected it to an e-mail. You know that can't be true because the Iconix P&L forecast as of June 19 has the $15.9 million purchase price. Now Horowitz says: It happened sometime in June. I don't when, but at some time in June.

At one point he claimed to the government that he was in Neil's office while Neil was on the phone with Jason Rabin making this supposed deal. That's what he told the government at one point. Now he says, Neil came to his office and told him. These are significant inconsistencies as to perhaps the

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2474 |
|---|---|---|

most critical conversation that Horowitz testified about.

And Horowitz was forced to admit that he was asked before the SEA-2 transaction: Were you ever personally present during a conversation between Mr. Cole and any representative of GBG during which Mr. Cole communicated a commitment to make a future marketing payment of $5 million?

"A. No."

He was also asked: Did he ever personally hear Mr. Cole undertake any commitment or obligation to GBG in connection with the SEA-2 transaction other than what is in the transaction documents?

"A. No."

You also know that Horowitz's account, that his story is not true because of this e-mail from June 12. Here Seth Horowitz is reporting to Neil Cole after Seth has just spoken to Jared Margolis. Seth Horowitz is reporting, bottom line: We may complete only part of the total transaction, Europe and Korea, at approximately $15 million of gain/revenue in Q2 and wait until the third quarter for Lee Cooper portion of the transaction.

Those are the terms of the final deal that Horowitz is reporting to Neil, not the other way around.

When Horowitz was confronted with this document, he claimed, oh, well, there is a discussion around that time about letting GBG out of Rocawear Kids. But Horowitz -- even

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2475 |
|---|---|---|

Horowitz confirmed that there was not an agreement as of the date of this e-mail to let GBG out of Roc Kids. So what that means is, even by Horowitz's own account, Horowitz was telling Neil that SEA-2 would get done for $15 million without -- without any agreement to give anything to GBG in return.

How else do you know that Horowitz is not telling the truth? Horowitz claimed that when he learned that Iconix owed $5 million to GBG, he included it in those weekly updates. Well, there is no mention of it in his weekly updates in June or July. June 27, no mention. July 18, no mention. August 5, Horowitz sends to Neil a recap of the terms of the SEA Asia joint venture. No mention of any marketing commitment.

The first time there is any mention of $5 million in marketing is on August 18. The transaction happened on June 30. The first mention is August 18, two months later. It's further proof that there was no commitment or obligation at the time of the SEA-2 transaction.

It's not only the timing of this update that's significant, but it's also the context in which the reference to 5 million first appears. What happens is, on August 14, Horowitz has a call with Jason Rabin, and he reports to Neil. Jason Rabin called to discuss China, Umbro and LC, which he will confirm Monday, and then a list of asks, a list of asks.

So August 14, Rabin calls Horowitz with a list of asks. And then four days later, four days later, Horowitz

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 27, 2021

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2476 |
| --- | --- | --- |

says, Jason -- Jason call. Rabin says he needs 10 million and more. I see it -- I see it as 5 million of marketing and 2 million from LC/China deal. He writes: I see it as, I see it as, meaning, here is my suggestion for how we accommodate Rabin's asks.

These were asks from Rabin. He was pressing hard. Horowitz was feeling pressure, trying to find ways to accommodate those asks from an important business partner. It would make no sense for Horowitz to say this. It would make no sense for Horowitz to say I see it as 5 million for marketing if that had already been agreed to by Iconix in June. These are requests, asks from Rabin. They are not demands for money that had been promised to him.

One question you may be asking yourselves is, if there was no commitment or obligation, why did the price increase? Well, first of all, it's not unusual for a purchase price to change during the course of a negotiation. You saw on SEA-2 that it's not as simple as the government says. It's not 10.9 and 15.9. You saw that it was around 25 million. Then it was 10 million. At one point it was 14.9. Then it was 15.9. It's not as simple as the government wants it to sound.

Mr. Thomas said yesterday, he argued to you, the change in the price is like a glaring obvious flashing sign. It's a like a big neon banner that says overpayment.

Really? The redline of the agreement, the markup that

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2477 |
| --- | --- | --- |

changes it from 10.9 to 15.9, that was created by the lawyers and it was sent by the lawyers to another group of lawyers. Apparently, they didn't think it was a big neon banner. They didn't raise any concerns about that. There wasn't a red flag that the price changed. Again, the government can try to attach labels to things to make them sound bad, but that doesn't make it so, and don't be fooled by that.

Now, it's the government's burden to prove beyond a reasonable doubt that the price increased based on a purported agreement by Iconix to pay GBG $5 million and they failed to do that for all the reasons I just described.

But I submit to you that the evidence shows that the price increased as a result of negotiations between GBG and Iconix after Lee Cooper Europe dropped out of the deal.

Mr. Thomas sort of mocked the Lee Cooper story yesterday, calling it the denim defense. They can make jokes about it, but Lee Cooper obviously was an important part of the discussions, and the government chose to leave it out of its story entirely because it didn't fit neatly with the government's theory.

You've seen that there were various versions of the SEA-2 transaction discussed in April, May, and June of 2014, mostly between Horowitz and Margolis. And shortly before the deal was finalized it had those three components that you have now seen many times: Europe, Korea, and Lee Cooper Europe.

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2478 |
| --- | --- | --- |

The total purchase price for those three was $25 million.

But GBG determined they could not proceed with the Lee Cooper Europe portion in the second quarter and could only complete the other two parts, Europe and Korea, in the second quarter, and they hoped to do Lee Cooper later in the year.

When Lee Cooper dropped out, it became a smaller deal and GBG understood that Iconix would be less likely to do the smaller transaction at the lower price. The government yesterday said, that doesn't make any sense. Mr. Thomas said something about burgers and fries and paying more for less. Sometimes when you buy the combo meal, the individual items are cheaper than when you buy them separately. So the price of Korea, as part of a $25 million deal, may not be the price for Korea as part of a much smaller transaction.

You have also heard that Lee Cooper Europe was actually the component of the transaction that GBG wanted the most. They couldn't do it in June because of the spinoff of GBG, and they wanted to be able to complete Lee Cooper Europe later in the year. And GBG thought that if they compromised on the price on SEA-2, Iconix would be more likely to go through with Lee Cooper Europe later in the year.

On June 18, Dow Famulak, one of the most senior people at GBG who you heard dealt directly with Neil Cole, on June 18, Dow Famulak sends an e-mail to colleagues at GBG about the SEA JVs. This is SEA-2. Not sure what this does to the deal,

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2479 |
| --- | --- | --- |

meaning SEA-2, but Ed is definitely right. We can't do the option. Will look at the PIP later and see what it means. And then an option is clearly the Lee Cooper option.

That same day, June 18, that same day, the PIP changes to $14.9 million. The government has no explanation for that. And neither Horowitz nor Rabin said anything in their testimony about a $14.9 million purchase price.

And the government yesterday, what did they say about Lee Cooper option? It's a cover story. It's just a cover story. Well, clearly it's not a cover story. It was important to GBG. It had an effect on the deal and it had an effect on the -- it wasn't a cover story. The government has no explanation. It's not a part of their simple story. So they say to you it's just a cover story. It's the denim defense. It's part of the negotiations. It's an important part and they have got no explanation for it.

They referred to it yesterday as the mysterious Lee Cooper option, the mysterious Lee Cooper option. If there is any mystery about what happened, that's on them. That's reasonable doubt. If there is a mystery, it's because they haven't explained it to you. They can't just ignore inconvenient facts. They can't just pretend they don't exist. Something happened with Lee Cooper. It's their burden to tell you, and they haven't.

Let me talk about the marketing payments that were

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

LARMCOL2          Summation - Mr. Tarlowe          Page 2480

made by Iconix in the fourth quarter of 2014, in November and December. You saw in a stipulation yesterday that Jason Rabin told the government that he understood he was causing Iconix to pay marketing invoices that Iconix had no obligation to pay, no obligation to pay.

That's significant because, as I mentioned before, Mr. Shapiro of BDO repeatedly testified that the accounting would be impacted if Iconix had an obligation to make a future marketing payment. Rabin says, there was no obligation. If there was no obligation, which is what Jason Rabin said, then the government's claims about SEA-2, they all go away.

So it leaves the question, why would Iconix pay the invoices if they hadn't undertaken a commitment or obligation to do so? It's simple. Iconix wanted -- GBG was pressing hard for marketing support. Iconix knew that GBG had done a lot of marketing work. There was no dispute about that. The witnesses told you that they had. And Iconix wanted to protect and preserve one of its most important business relationships with a key business partner.

GBG was one of Iconix's most important business partners. They had arrangements together in over 80 countries covering 27 brands, and Li & Fung had financial commitments to Iconix of over $140 million, $140 million. So you've got to view the request for $5 million in marketing support in that context. When GBG was pressing hard for marketing support in

LARMCOL2          Summation - Mr. Tarlowe          Page 2481

the fourth quarter of 2014, Iconix was willing to provide it. It was an accommodation to an important business partner.

Ladies and gentlemen, that's how the real world works. You know that from your common sense. I'm not suggesting, as the government said yesterday, that Iconix was a charity. Of course it wasn't. But this is how the real world works. Sometimes you make accommodations to business partners.

In fact, you heard that that happened over and over again. Seth Horowitz acknowledged in his testimony that Iconix paid $2 million to support Umbro in marketing, even though Iconix had no commitment to do so. And he also said there were other times where he advocated for Iconix to provide marketing support to business partners where there was no obligation to do so.

Rabin also told you that this happens in this industry. He was asked: Have you received royalty relief from other brand owners where they have no obligation? Yes. If they have no obligation, why do they provide it? Because of the business relationship. That's part of the give and take between business partners, right? Yes. Sometimes when you have a long-term business relationship, one of the partners makes an ask, right? Correct. And sometimes the other business partner accommodates that act, right? Li & Fung and Iconix were long term business partners, correct? Correct.

Now, the government makes a big deal that the first

LARMCOL2          Summation - Mr. Tarlowe          Page 2482

set of invoices were from round numbers and they were then revised to include more detail.

Well, you've seen other invoices. Rabin testified that he was always telling Mr. Cole that GBG needed marketing dollars to build the brand. You have seen other invoices for big round numbers. Here is an invoice that Iconix received from J.C. Penney, $800,000 even. Description: Advertising support. That's it. You saw that GBG sent invoices that looked nearly identical to the Iconix invoices to other business partners. These have nothing to do with Iconix. These are brands owned by other companies. $3 million, $8 million, $2 million. Big round numbers, general descriptions.

Now, the invoices that Iconix received, they were not revised to make them look more legitimate. They were revised because Neil wanted to ensure that there was documentation confirming that Iconix Brands were actually benefiting from the work being done by GBG. It's responsible business, not a fraud, and the government tries to twist that into something sinister.

Look at Horowitz's notes. These are notes that he took of a conversation with Neil before Horowitz went to GBG to talk about the invoices. And the highlighting reflects what Neil told him, to communicate to GBG, show us work, real expenses, real us expenses, show us things, show us expenses.

And Rabin told you the same thing. Mr. Cole said the

LARMCOL2          Summation - Mr. Tarlowe          Page 2483

invoices had to relate to services that GBG was actually doing. Do you recall being told the invoices needed to show actual fixtures? Yes. Then Mr. Cole wanted more specific invoices. Correct. To show the specific work that was done. That's why they are revised. This idea that the invoices had to be changed to be made more realistic, that's a total fabrication.

The government spent a lot of time on those internal GBG e-mails with Ethan Cole and TLC where Ethan Cole perhaps is not being totally transparent with people at TLC. That's infighting and politics at GBG and who gets revenue credit. It has nothing to do with Neil Cole. He wasn't part of those conversations. From Neil Cole's state of mind, Neil Cole sees invoices that appear appropriate. And the witnesses from GBG, the government witnesses, they confirmed, the marketing invoices were not phony, and they reflected actual work.

And the government ignores, by the way, the invoices add up to almost $5.4, plus Iconix also reimbursed GBG for Peanuts marketing on top of that. You heard that from Margolis.

So the government keeps saying it's very simple, five for five. It's a big circle. Well, it's about $5.4 million, another fact that they just skip over.

The government also showed you those summaries prepared by Ethan Cole. These are internal GBG documents

# A-474

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2484 |
|---|---|---|

prepared by someone who had no contact with Neil Cole. They have nothing to do with Neil Cole, those documents. They were prepared by GBG in order to negotiate with Iconix to try to get more money from Iconix.

Margolis testified that the term overpay was used at GBG. He didn't think it was anything sinister. He told you he discussed it with the general counsel, the general counsel and others. They didn't think it was something secret or dirty deal. It was part of their negotiation strategy. And Margolis also told you that even though it was discussed within GBG, he couldn't recall it ever being discussed with Iconix.

Now, the government also showed you that spreadsheet that Seth Horowitz prepared in November 2014. There is no evidence that that was shared with Neil Cole. The government, interestingly, they showed you one part of this metadata. Metadata is the information that shows you like who created it, when. And they showed you a part of the metadata that showed that it was created by Horowitz on a particular day.

What they did not show you is that the metadata also shows where that document was saved on Horowitz's computer. You know where it was saved? In a folder called personal. That's where it was saved, personal. Horowitz claimed that he had a folder to use for documents that were shared with Neil. It wasn't this one, personal.

By the way, look at Horowitz's spreadsheet. This is

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2485 |
|---|---|---|

supposedly the tracking of the givebacks and the overpays. SEA-2, he has got $6,567,400. That's the supposed overpayment. The government just skipped over that. They showed you this document. They said it corroborates the witnesses. They said it's simple. It's a simple story. It's five for five. It's a big circle. Why does Horowitz have $6,567,400? Did he forgot it was five? It doesn't add up. And Horowitz gave some convoluted explanation on the witness stand about this that made no sense. If it's so simple, five for five, this would say five.

There is no evidence, there is no documentary evidence that this or other Horowitz documents that the government relied on yesterday were ever sent to or shared with Neil Cole. If they had been e-mailed to Neil Cole, you sure as heck would have seen those e-mails. They showed you Seth Horowitz documents that were Seth Horowitz documents. The fact he kept this in a personal folder undermines the testimony he gave that he shared it with Neil.

Let me turn to SEA-3. The evidence on SEA-3, like SEA-2, has shown that there was no commitment or obligation undertaken by Iconix to release GBG from its royalty obligations under the Rocawear Kids license. How do you know that? Well, there is no mention of anything about Rocawear Kids in the contract. The contract is the contract. There is no mention of Rocawear Kids in the PIP memo. And, most

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2486 |
|---|---|---|

significantly perhaps, GBG kept making the payments.

The clearest evidence that there was no commitment or obligation to release GBG is that GBG was not released. Horowitz claimed that there was a $6 million increase in purchase price in SEA-3 in exchange for an agreement to terminate, to terminate the Rocawear Kids license. There is no dispute, ladies and gentlemen, that license agreement was not terminated. GBG was not released from its obligations under that agreement, and GBG continued to make all of the required payments. That's not in dispute. There was a stipulation on this yesterday.

So think about this. The government's theory is that GBG overpaid by $6 million in exchange for a giveback, in exchange for a termination. But where is the giveback? It didn't happen. The government hasn't identified one. Horowitz doesn't know. Rabin doesn't know. Margolis doesn't know. These are the people supposedly making and tracking the purported arrangements, and they don't know? It's absurd.

They talked about a big circle, the money goes in a circle. There is no circle. The $6 million that GBG pays to Iconix for SEA-3, there is no $6 million that goes back. It doesn't exist. And there is no evidence of GBG jumping up and down screaming, hey, we gave you that $6 million because you undertook an obligation to terminate Roc Kids. Why aren't you terminating it? That doesn't exist. Don't you think GBG would

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2487 |
|---|---|---|

be demanding that if they had paid in exchange for that?

Mr. Thomas, the government knows, this is a huge problem, huge problem. It makes no sense. So yesterday what they said was, well, it was like getting store credit. They could use the $6 million at some other point. That's not what Horowitz said. Horowitz didn't say it was store credit. What Horowitz said was, $6 million was in exchange for Iconix was going to terminate the Rocawear Kids agreement, and that did not happen.

If on rebuttal they get up here and suggest to you that the MENA transaction, that included a giveback, it was $3 million, well, remember that they didn't mention MENA in their closing yesterday and no witness, no witness can say that MENA involved a giveback. It's pure speculation and it's $3 million, by the way, not $6 million.

How else do you know there was no commitment or obligation undertaken by Iconix at the time of the transaction? The written agreements. You know the agreements by now. The parties agree that the fair market value is 21.5 million. That's the purchase price. They have got those clauses. These agreements constitute the entire agreement. There is nothing else other than what's in these agreements. You have seen these clauses before. There is nothing other than what is in these agreements.

By the way, when the price does go up to 15.5 to 21.5,

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

LARMCOL2    Summation - Mr. Tarlowe    Page 2488

Horowitz confirms that for the lawyers at Iconix. The lawyer asked: Just confirming that the price is increased from 15.5 to 21.5. And Horowitz confirms.

Mr. Thomas said yesterday, remember, big blinking neon sign when the price goes up. The lawyer doesn't say that. She doesn't say, oh, my God, the price went up $6 million? She doesn't even ask a question about it. It's normal business.

The internal documents at GBG say nothing about a Rocawear Kids termination. This is the PIP memo. It's a PIP memo from Jared Margolis for SEA-3 and it has got a consideration of $21.5 million. That's the purchase price. The PIP memo says nothing about termination of the Rocawear Kids license agreement.

The financial analysis in the PIP memo that the investment committee relied on, it's based on a $21.5 million purchase price. That's the price the investment committee determined was fair value and appropriate to pay.

The government still clings to this argument that the value was only 15.5. It wasn't worth more than 15.5. And they even got Jared Margolis to say that on his direct testimony.

Then I asked him: How did you come up with 15.5? He had no idea. Then when I showed him a document from August of 2014, he acknowledged that he actually thought it was worth closer to 22 million. That's more than the purchase price, the final purchase price.

LARMCOL2    Summation - Mr. Tarlowe    Page 2489

Again, the government keeps arguing -- they argued yesterday, this was now worth more than 15.5. The only reason to pay more was if there was a giveback. Jared Margolis said he thought it was worth $22 million. The investment committee decided to pay $21.5 million. The investment committee made that determination without any expectation of getting anything in return.

Look at Horowitz's update. Jared, meaning Margolis, expressed that Jason Rabin would like to pay 20 million for China. Would like to pay. The government is arguing GBG only wanted to pay 15.5. Look at the document. Rabin wanted to pay 20 million.

Now, there is no question that GBG and Iconix had been discussing for months the possibility of transitioning the Rocawear Kids license to another licensee. Iconix was willing to do it if they found a suitable replacement to take over the license. They didn't and so they never terminated the license agreement. The price on SEA-3 increased because the assets were very valuable. GBG was eager to acquire those assets, so Iconix was able to extract the higher price. That's how negotiations work. GBG knew that other big companies were interested in and were bidding for the same assets, and GBG was. They were hopeful that Iconix would help find their replacement licensee for the Rocawear Kids license agreement. But this was no commitment or obligation to do so.

LARMCOL2    Summation - Mr. Tarlowe    Page 2490

You also know that there was no commitment or obligation at the time of SEA-3 because the parties continued to negotiate a possible termination after SEA-3 took place. SEA-3 took place on September 17. Five days later Seth Horowitz says: Rabin called. He doesn't want to ship the Rocawear Kids goods to New Rise. New Rise was the replacement licensee. This is five days after SEA-3. The government's theory is, there was a commitment or obligation as of December 17 to terminate Rocawear Kids. Five days later Rabin says he doesn't want to ship the goods to the new licensee.

Let me touch very briefly on materiality, which the government talked a little bit about yesterday. You learned from BDO that BDO found or learned of an error concerning Iconix Canada and that error was $9.8 million in pretax income. This has nothing to do with the SEA JV. It has nothing to do with the allegations in this case. It was inadvertent error. And BDO analyzed that error and concluded, as you can see here, that the misstatement of $9.8 million is not deemed to be material. So BDO is concluding that they didn't think this error would be misleading to readers of the Iconix financial statements.

That $9.8 million in pretax income, that's a lot more than any of the alleged inflation announced here. Even if you combine SEA-2 and SEA-3, even if you take the government's assumptions that Ms. Chambarry used, she precalculated a pretax

LARMCOL2    Summation - Mr. Tarlowe    Page 2491

income impact of around 7 million. That's less than this.

There is something else interesting in this BDO memo. In BDO's materiality analysis they look at the impact on meeting or not meeting guidance. And BDO says, BDO did note that the revenue guidance of 425 to 435 would have fallen only slightly short at 422.8 if the gain was reversed. So BDO is saying, a miss of a few million dollars is only a slight miss. It doesn't make it material. Mr. Thomas yesterday told you, missing guidance is like a plane missing the runway. Well, apparently not because BDO considered this a slight miss that was not material.

Let me turn to the corporate finance or corp. fin comment letter process. The government has not identified any material omission or misstatement in the company's submission to the SEC corporation finance division, and there was none. The government's claim that the submissions were in some way misleading relies on the same allegations underlying SEA-1, SEA-2, and SEA-3. Since those allegations all fail for the reasons I have described, including that there were no undisclosed or secret commitments or obligations, there is no misstatement or omission.

Now, one of the most obvious lies Horowitz told during his testimony was that Neil directed him to delete e-mails and that Horowitz did so. Notice how the government did not even mention that testimony in its summation yesterday. Even they

**A-476**

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2492 |

recognize it's ridiculous, that it's totally incredible. It's ridiculous because all e-mails sent to and from Iconix were automatically preserved and retained by Iconix. There was a stipulation yesterday confirming, that's how the Iconix server worked, that's how corporate servers work. If an individual user at Iconix deletes an e-mail, it doesn't disappear. It's saved by the company. So it makes no sense.

And the government showed you no evidence of a single document, single e-mail that Horowitz supposedly deleted. If he really had done that, you can be sure you would have seen evidence. You didn't see any forensic analysis, no electronic evidence, not a shred of evidence that anything was deleted.

If that really were true, if Horowitz really had deleted e-mails, there would be a digital paper trail of that, and the government showed you nothing. Horowitz made it up and they know it. If he will lie about that, he will lie about anything. The government knew that this was not true. They knew there is no evidence, and they still asked the question and had Horowitz give that testimony. That should make you doubt their case. It shows their desperation.

It's like yesterday on cross-examination of Mr. Cole, when the government was asking him about a memo or a conversation from 22 years ago, 22 years ago. It's bad enough the charges in this case relate to things from seven or eight years ago. They are dredging up stuff from 22 years ago. Give

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2493 |

me a break.

Now, at the end of the day the government is asking you to rely on Seth Horowitz, and the evidence shows that he is not reliable. He is not credible and he is not to be trusted. Horowitz does what he believes is in his own best interests, regardless of the consequences for others. And his only objective now, his objective is to avoid going to jail, and he will do and say whatever he thinks will help him achieve that objective.

I expect that Judge Ramos will instruct you that a cooperating witness' testimony should be scrutinized with special care and caution because a witness who realizes that he may be able to receive a lighter sentence by giving testimony favorable to the prosecution has a motive to testify falsely.

There are many reasons not to credit Horowitz's testimony. For one, he never raised any concerns about these transactions at the time. He was involved in the corp. fin process. He reviewed the Ks and the Qs. He didn't raise any concerns. He didn't claim there were verbal agreements.

Second, you heard that Horowitz started keeping these detailed notes to himself in 2015. He was keeping these notes to have a record to use against Neil if he needed to. It was ammunition against Neil. And he tried to document his conversations with Neil Cole for himself, to have a record he could use. There is nothing in the notes about a verbal

| LARMCOL2 | Summation - Mr. Tarlowe | Page 2494 |

commitment, about a secret side deal. If that had happened, if there really was such a commitment, if Neil Cole really told Horowitz that he had made such a verbal agreement, Horowitz would have put that in his notes. The whole point of the notes was to build a record to use against Neil. It's not there.

The government and Horowitz know that that is a huge problem for their case. What did they say? Seth Horowitz, how did he explain it? There is no good explanation. How did he explain it? He said: Oh, it's in code. It's in code? In his own notes to himself it's in code? What was the code? He said: Well, I think it was a reference to subset. Subset refers to verbal? It makes no sense. You don't write a code to yourself. Writing in code defeats the whole purpose of keeping this record, keeping the notes to have a record to use against Neil. Code doesn't help. It's absurd.

As I talked about, the contemporaneous evidence does not support and in fact contradicts Horowitz's testimony. There is no explanation. No explanation for why there is not a single document from June 2014 at or before the time of the SEA-2 transaction talking about a marketing commitment.

Horowitz raised these accusations about a supposed verbal agreement for the first time in April 2015, at a time when he was angry and, in his words, furious. He was being criticized by Neil and others for having agreed to certain terms on the deals.

| LARPCOL3 | Summation - Mr. Tarlowe | Page 2495 |

MR. TARLOWE: He was being criticized for not consulting with management before agreeing to these terms and deals. You heard there was an argument David Blumberg, another person at Iconix, implied that Horowitz was a cowboy. Horowitz admitted there were screaming, yelling, loud noises, and at the time, what was Horowitz's response? He insisted that these were good deals. He explained the logic of the transactions to Mr. Cole. He told Mr. Cole that these were good deals. He told Mr. Cole that the JV transactions made great business sense, that they were done for good business purposes. That doesn't sound like someone who thinks they're participating in a scheme.

And Horowitz's relationship with Neil soured, and Horowitz understood that he no longer had Neil's support to be the next CEO of Iconix, which was Horowitz's goal all along. Horowitz was bitter and he was angry, and he felt cornered and isolated. He decided to resign in mid-March, but he deliberately waited several more weeks, until his stock vested. He communicated with his personal lawyer over 45 times, over 45 times between March 12th and the date of his resignation on April 13th.

And even then, when he submitted his resignation letter, making these allegations for the first time, he did not say, he did not say, that he did not believe that he had done anything improper or unlawful. The letter says he didn't know

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

| LARPCOL3 | Summation - Mr. Tarlowe | Page 2496 |
|---|---|---|

whether the supposed verbal commitments were communicated to BDO. And he said he did not have an accounting background and would not be in a position to disagree with the accounting treatment determined by the company.

It's clear, he didn't think he had done anything wrong or illegal. You think that he thought that he was confessing to a crime when he sent his resignation letter to the board of directors? He didn't think he was confessing to a crime. He didn't think he had done something wrong.

And in his resignation letter, he didn't say anything about this conversation that he now claims happened, where Neil told him, I just made this arrangement, this agreement with Jason Rabin in SEA-2. If that conversation had happened, you can be sure that Horowitz would have included it in his resignation letter. That letter is not some spontaneous, off-the-cuff note that he threw together. That's a carefully crafted letter that was drafted after numerous, numerous consultations with his personal lawyers.

It was only about three years later, after his resignation, when the government was threatening to bring criminal charges, that's when Horowitz first took the position that he was part of a purported conspiracy. His lawyers tried to convince the government not to charge him. But when that effort failed and the government made clear that they intended to charge him, Horowitz agreed to cooperate and testify against

| LARPCOL3 | Summation - Mr. Tarlowe | Page 2497 |
|---|---|---|

Neil to receive leniency.

Mr. Thomas asked yesterday, why would Horowitz plead guilty if he wasn't guilty? Because Horowitz was -- Horowitz decided that the deal he was offered by the government was better for him than telling the truth and taking the risk of having to defend himself at a criminal trial. He could simply point the finger at Neil, at the big fish, the CEO, and that would be his ticket to leniency.

And I expect Judge Ramos will instruct you that you may not draw any conclusions or inferences of any kind about Mr. Cole from the fact that Horowitz pled guilty. Horowitz did that for his own reasons, to help himself.

The government's met with him over 35 times. They knew exactly what he was going to say before he took that witness stand, but they keep delaying his sentencing. Why did they do that? They do that because they want to have that leverage hanging over his head. He has to provide what's called substantial assistance in order to get that letter from the government that enables him to get the lower sentence. Who decides -- who decides if he provides substantial assistance? They do, the prosecution does.

You saw him on the witness stand. He said "I don't recall" about eight times on direct. He said it over a hundred times on cross. He's not someone deserving of your trust. You heard that he lied to others. He had no hesitation about lying

| LARPCOL3 | Summation - Mr. Tarlowe | Page 2498 |
|---|---|---|

to the founder, creator, CEO of Baked by Melissa. He had no hesitation about putting her entire career and reputation at risk, her company at risk, just because he wanted to keep his job at Baked by Melissa.

And as I mentioned at the outset, and I think you'll be instructed by Judge Ramos, reasonable doubt is a doubt that would cause you to hesitate in a matter of importance in your life. Would you hesitate to make an important decision based on Seth Horowitz? Of course. Of course you would. That's reasonable doubt.

And in my remaining few minutes, let me just say a couple of words about Rabin and Margolis, both of whom say -- I've shown you the transcript cites -- that Neil never asked them to keep terms secret or out of a written agreement.

When Rabin was first interviewed by the government, he said he didn't recall the specifics, but he didn't overpay for any joint ventures. When Margolis was first interviewed, he said GBG did a lot of marketing work.

But the government, the prosecution, they subsequently told Rabin and Margolis that they were subject to an investigation, and they could be charged with crimes. Rabin and Margolis felt immense pressure to tell the government what they thought the government wanted to hear, and by doing so, they were able to get immunity for themselves.

Look at those tolling agreements that they signed.

| LARPCOL3 | Summation - Mr. Tarlowe | Page 2499 |
|---|---|---|

These tolling agreements that refer to charges against Jared Margolis, charges against Jason Rabin. The government wanted to have the threat of criminal charges hanging over their heads.

Rabin told you when he met with the government, he told them he didn't recall things. They didn't want to hear that. He told you they raised their voices with him. They were stern. I asked, "Did they tell you that they didn't believe you?" And he paused and he said "Perhaps." And I don't know if you noticed, or if you remember, but you could see how concerned he was about answering that question and potentially antagonizing the prosecutors.

Why would the government raise their voices with him? He's trying to remember details from seven or eight years ago at a time when he was dealing with a serious medical issue. He says he doesn't remember. They yell at him? Rabin is clearly intimidated by the government. You saw him on the stand. He was basically catatonic.

This is someone who was described by Horowitz and Margolis as emotional, passionate, charismatic, outgoing. That's not the Jason Rabin you saw on the witness stand. You can see he's terrified of the government, and he's saying what he thinks will keep him from getting charged with a crime.

And as to Margolis, he had no direct -- almost no direct dealings with Neil. He had virtually nothing to say in

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                    October 27, 2021

---

| LARPCOL3 | Summation - Mr. Tarlowe | Page 2500 |
|---|---|---|

his testimony about Neil. He doesn't claim that Neil made any undisclosed commitment or obligation. He says the opposite: "Q. You did not hear Mr. Cole make a commitment to make a future marketing payment?

"A. Correct.

"And you did not ever hear Mr. Cole make a commitment to relieve GBG of its Rocawear Kids royalty obligations?

"Correct."

Mr. Margolis on the stand was like a programmed robot. He had a few phrases he memorized, that he kept repeating, and the government was very careful, very careful about the way they questioned him. They kept asking him what his understanding was. What was your understanding as to why this happened? What was your understanding?

But they didn't probe about what that understanding was based on, and you know why? Because they knew he was just making assumptions about the existence of these supposed arrangements; that's what he said on cross-examination: "You are making an assumption that there was an agreement by Iconix to make a future payment, correct? Correct." It's an assumption. You can't rely on Jared Margolis' assumptions.

And the government had Jared Margolis talk on behalf of all of GBG. It's preposterous. They asked him how much GBG was willing to pay for SEA-2 and SEA-3. Jared Margolis didn't make those decisions. He was so many levels removed from the

---

| LARPCOL3 | Summation - Mr. Tarlowe | Page 2501 |
|---|---|---|

investment committee. He never attended investment committee meetings. He had no idea why the investment committee agreed to pay 15.9 million for SEA-2 or 21.5 million for SEA-3. He did know that the PIP memos, on which the investment committee relied, had no mention of any supposed giveback.

And finally, just very briefly, let me touch on the stock sale. There was nothing improper about Neil's exercise of stock options and sale of stock in the fourth quarter of 2014. Nothing. It was done openly. It was done with the approval of lawyers and the board of directors, and it was publicly disclosed in an SEC filing.

The stock options that Neil received were given to him, were granted to him in 2005, the year Iconix was launched. Over the next nine years, from 2005 to 2014, Neil helped build the company from a few brands to about 35 brands. It became the second largest licensing company in the world behind only Disney, with more than 14 billion dollars of annual sales.

The company's market capitalization, you heard, that's the value of all the shares out there in the market. It went from 150 million in the year the options were granted, to $2 billion in 2014. That's value created from all of the shareholders. And Neil, like all other shareholders, benefited from that increase in the value of the shares.

In October 2014, the options were set to expire in a few months, and if they expired before they were exercised,

---

| LARPCOL3 | Summation - Mr. Tarlowe | Page 2502 |
|---|---|---|

they were deemed worthless. And you heard that there were all these restrictions on when Neil or other executives or board members could transact in Iconix stocks. They had to do it right after earnings announcements, and then there were other restrictions.

So if Neil waited longer, he ran the serious risk of losing all those options and having them expire worthless. So he exercised the options and sold the stock, and he made a lot of money and that's not a crime.

And the Iconix stock, by the way, before any of the alleged inflation, was even higher than it was at the time of the stock sale. The stock price in early 2014 before any of these transactions were reported was higher than at the time of the stock sale. So if Neil had sold earlier, he actually would have made more, not less money.

And Neil wasn't trying to distance himself from Iconix. He continued to hold more than 2 million shares, the same exact amount of shares he had before the October 31 transaction. Going into October 31st, he had 2,071,000 shares. October 31st, he exercised his options, sells the stock and he still has 2,071,000 shares. He continued to maintain the same stock position.

Neil Cole built Iconix into an incredibly successful, highly respected brand management company with more than a thousand licenses in 70 countries around the world and more

---

| LARPCOL3 | Summation - Mr. Tarlowe | Page 2503 |
|---|---|---|

than a dozen joint ventures with all sorts of different business partners.

The government would have you believe that all that was happening at Iconix was SEA joint ventures. It's not true. This case is about just three transactions, seven and eight years ago, transactions with a single business partner. It's about $13 million of revenue over a period in which Iconix generated nearly $900 million of revenue.

Ladies and gentlemen, thank you for your attention, for your time. Thank you for accepting this really important responsibility. On behalf of defense team, my colleagues, on behalf of Mr. Cole, on behalf of Mr. Cole's family, many of whom you've probably seen in the courtroom throughout this trial, we thank you. We know that this has been an imposition in your lives, and we thank you.

This is a really important civic duty. It's one of the most important civic duties that a citizen can perform, particularly in a criminal case like this, where the stakes are so high. And it means that you, and only you, get to decide the facts and what happened. They don't decide. The judge doesn't decide. You decide.

Neil Cole did not commit any crimes. He did not engage in a scheme. He acted in good faith and did not intend to defraud anyone. So we ask that you please consider all of the evidence carefully, follow the judge's instructions, use

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

LARPCOL3          Rebuttal - Mr. Hartman          Page 2504

your common sense, and we ask that you return the only verdict that is consistent with all of the evidence and the law, the only fair and just verdict, that Neil Cole is not guilty of each and every count. Thank you.

THE COURT: Thank you, Mr. Tarlowe.

Ladies and gentlemen, what's going to happen next is that the government will present their rebuttal summation and then I will instruct you as to the law. What's going to happen next is we are going to take our last 20-minute break. Please continue to not discuss the case.

(Jury not present)

THE COURT: Everyone can be seated. And do what you want.

(Recess)

(Jury present)

THE COURT: Everyone, please be seated.

Ladies and gentlemen, we will now continue with the government's rebuttal summation.

Mr. Hartman.

MR. HARTMAN: Thank you, Judge.

Folks, it is almost over. I'm going to speak very briefly, and then the judge is going to charge you, and then you're going to go back to the jury room to deliberate. I don't have as much time as Mr. Thomas and Mr. Tarlowe did to speak to you; so what I'm going to ask you to do is remember

LARPCOL3          Rebuttal - Mr. Hartman          Page 2505

the arguments that were made in the government's principal summation, and I'm also going to ask you to think back to the testimony that you heard at the beginning of the trial, to the testimony that you heard from Seth Horowitz.

Mr. Tarlowe spent a lot of time in his closing in attacking Seth Horowitz, attacking his credibility, but I think when you go back and you look at that testimony, what you'll see is that everything Mr. Horowitz was saying was corroborated by the documents. We spent a lot of time going through that testimony, going through those documents, looking at those things.

And the purpose of that was both so that you could understand the documents in context, and so that you would have a roadmap to the case. And so if you look at nothing else in the jury room, what I would ask you to do is go back, look at that testimony and look at the documents that came in with it, and what you'll see is that those documents tell the tale, totally apart from Mr. Horowitz's testimony or Mr. Rabin's testimony or Mr. Margolis' testimony.

You can look at the documents, and you can see that there were firm commitments to these givebacks. You can look at the documents, and you can see that Mr. Cole agreed to these arrangements. You can look at the documents, and you can see that Iconix understood that it had an obligation to repay GBG for the overpayments for SEA-2 and SEA-3.

LARPCOL3          Rebuttal - Mr. Hartman          Page 2506

Now, Mr. Horowitz did not testify about SEA-1. Mr. Tarlowe spent a fair amount of time on that. I am not going to talk about that very much at all, and the reason I'm not going to talk about it is because that is not a substantive charge in the case.

You're going to be asked to make specific findings with respect to SEA-2 and SEA-3, but for SEA-1, that is only part of the conspiracy. Why did we present that evidence to you? We presented it to you for two reasons. No. 1, we anticipated, as occurred, that Mr. Horowitz would be blamed for what happened here, and it's absolutely true that Mr. Horowitz shares some blame, a lot of the blame. And he pled guilty and accepted responsibility for that, but Mr. Cole has blame, too.

And what the SEA-1 events show you is that the commitment to do these givebacks and to manipulate revenue, it started long before Mr. Horowitz showed up on the scene. And so if you look back at the testimony from Mr. Rabin on this, what you'll see is that this was going on long before Mr. Horowitz showed up.

Now, a couple of things I do want to say about the arguments that Mr. Tarlowe presented. First of all, with respect to the involvement of lawyers and accountants in SEA-1, there is absolutely no evidence that any of those lawyers or any of those accountants were ever shown the fact or the fact was disclosed to them that the increase in the price for SEA-1

LARPCOL3          Rebuttal - Mr. Hartman          Page 2507

was directly designed to offset that consulting agreement and that the increase in the price from SEA-1 was simply a commitment to overpay in exchange for that consulting agreement.

There's no evidence of that. You've seen no indication of that and even Mr. Cole in his testimony did not indicate that he sought advice on that issue or disclosed that to any lawyer or accountant. So that's a red herring.

There's also no explanation for why Iconix would be paying twice for any consulting work that Li & Fung would have done. Mr. Tarlowe tied that consulting work to the letter of authorization. Go look at that letter of authorization. What you'll see is it actually provides for the means by which GBG will be compensated for any work that they will do.

What it says is if they enter into the JV, then GBG gets the profits of the JV. That's what actually happened here. And if they don't enter into the JV, then GBG can bill for those services. So there are provisions in that contract itself that govern the payments. This consulting agreement is simply a way to round-trip money, and you'll see that when you look at the documents.

The last thing I want to address on this is this argument that it couldn't possibly be earnings management or revenue management because it closed on the first day of the quarter. Folks, you sat through this trial. You saw the

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

| LARPCOL3 | Rebuttal - Mr. Hartman | Page 2508 |
| --- | --- | --- |

documents, and you know that Mr. Cole was pushing, at every step of the way, to get this done in that third quarter.

And I'll just point you to one, it's Government Exhibit 1115. You can go back and look at it, if you have concerns about this. He says "I have no interest in this deal if it doesn't close by the end of the quarter."

So what I do want to talk about is SEA-2 and SEA-3 because, as I said, those are the issues on which you're going to have to make specific findings. And Mr. Tarlowe, in his argument, talked about the issue of secrecy, and he said, well, there's no evidence that Mr. Cole tried to keep it a secret; so there couldn't be a nefarious deal.

First of all, Mr. Horowitz talked at length about that, and the fact that he understood from Mr. Cole that they were supposed to keep it secret. In fact, Mr. Cole told him specifically not to tell the company's lawyer, Lauren Gee, about the commitment to return the money.

Now, it is true Mr. Rabin got on the stand and said Mr. Cole never asked him to do the same. Why is that? Mr. Rabin wasn't talking to Iconix's investors. Mr. Rabin wasn't talking to Iconix's auditors. Mr. Rabin wasn't talking to Iconix's lawyers. Mr. Cole had no reason to be worried that Mr. Rabin talking to other people was going to blow this up from an accounting perspective or from an earnings management perspective because Mr. Rabin did not work at Iconix.

| LARPCOL3 | Rebuttal - Mr. Hartman | Page 2509 |
| --- | --- | --- |

And that's something important to understand, too, in thinking about Mr. Rabin's point of view when he comes to testify. Mr. Rabin doesn't have to be accountable to Iconix's shareholders because Mr. Rabin doesn't sign certifications. He's not a corporate officer. So he has no obligation the same way the defendant does. He has no obligation in the same way that Mr. Horowitz does.

With respect to whether there is an obligation, Mr. Thomas talked about this yesterday. Three witnesses came in here and they testified credibly and truthfully, we would submit, that there was an obligation, that there was a commitment. And two of them, Mr. Horowitz and Mr. Rabin, said that they spoke in particular to Mr. Cole about this.

Now, the defense attacked Mr. Horowitz's credibility. They attacked Mr. Rabin's credibility, but what you'll see is that they're supported by the documents. I'm going to take you through that now, but I also note that the defense doesn't get to pick and choose. They don't get to point to certain aspects of Mr. Rabin's credibility and say -- well, they can make the argument. You don't have to credit it.

They don't get to point to particular aspects of Mr. Rabin's testimony and say, believe him on this, don't believe him on that. And the one thing that all three of these witnesses were rock solid on, is that these were firm commitments and that they understood them as such at the time.

| LARPCOL3 | Rebuttal - Mr. Hartman | Page 2510 |
| --- | --- | --- |

Now, Mr. Tarlowe made an argument, he said, well, if there was a firm commitment, don't you think there would be contemporaneous documents that would show that the price intended for there to be an overpay? And I think the way the argument was phrased was a little -- it was very narrow. What he said is there would be a document that documented the fact that there was a commitment to return money as marketing.

Let's look at Government Exhibit 1255 and 1255-A. Can we put that up as well, Mr. Gill. Government Exhibit 1255 is a set of notes from June 10th, 2014. And Mr. Horowitz testified about this on redirect. These notes, which are before the June 30th transaction closes, reflect a conversation that he had with Mr. Cole on or about June 10th. And what it says in point one is LF pays 13.3 million for 50 percent of Korea IP rather than 3.3 million. This is the roundtripping. This is the overpayment.

The next thing he talks about here is Iconix terminated Rocawear Kids license. This is the giveback. This is a contemporaneous document showing you that the parties were discussing this at the time.

Let's talk about other documents. Mr. Tarlowe argued, well, if there were a commitment, it would have been documented. You would have seen it other places. They would have had it on their books. It would have been part of the company's records.

| LARPCOL3 | Rebuttal - Mr. Hartman | Page 2511 |
| --- | --- | --- |

It was part of people's records. It was part of the company's records. Mr. Horowitz kept a ledger, where he kept track of it. There were two sets of books because they were engaging in criminal activity, but they did keep track of it.

Let's look at some examples of that. Let's look at Government Exhibit 703, which is the spreadsheet that Mr. Horowitz had. Sorry, 706. Sorry about that. So Government Exhibit 706 showed you the overpay. Mr. Horowitz was tracking that.

And let's look at Government Exhibit 1068. This is that e-mail that Ethan Cole sent to Jared Margolis, and it's called "summary of various AR." "AR" means accounts receivable. It means money that is owed. This is August 28th of 2014, and let's look at the attachment. This is GBG tracking the overpayments and tracking the obligations.

Let's look at Government Exhibit 1063. This is an update that Mr. Horowitz sent to Mr. Cole on August 18th, 2014. Mr. Tarlowe talked to you about this on cross -- or excuse me, on his summation. Let's look at the attachment.

And can you zoom in, please, Mr. Gill, on the bottom part, where it says, "He says he needs 10 million and more as he discussed with you."

Now, Mr. Tarlowe showed you this on his summation, but he left out a couple of parts when he read it. He left out the part where Mr. Horowitz says "as he discussed with you," which

| LARPCOL3 | Rebuttal - Mr. Hartman | Page 2512 |
|---|---|---|

reflects the fact that Mr. Rabin had a conversation with Mr. Cole about this.

And he also read point A here, but he left out the word "liabilities." Why is that significant? Because a liability is an obligation. It's a commitment. It's something you have to do. It's not something you're doing out of the goodness of your heart or because you want to make the business relationship better. It's something you have to do, and you know, having sat through this trial, that the $5 million of marketing liabilities that are here are the repayment for the SEA-2 overpayment. You know that because you sat through this trial. And when Mr. Horowitz uses that terminology, what you know is that this was a firm commitment.

Let's look at Government Exhibit 1319. Is that the right exhibit? 1139, sorry about that. This is the plugs e-mail, Government Exhibit 1139. Now, this e-mail is really important both because it shows the tracking and it shows the fact that they're keeping track of the overpayments, but it also occurs -- and, Mr. Gill, could you zoom out, please.

It shows the overpayments here at the bottom, and the way that they're going to be repaid. It talks about the marketing and the fact that the marketing has been invoiced. And one of the things that's discussed here is royalty relief with respect to Rocawear.

Now, one of the reasons this e-mail is really

| LARPCOL3 | Rebuttal - Mr. Hartman | Page 2513 |
|---|---|---|

important is because if you look back at Mr. Horowitz's testimony, there was a meeting on December 2nd of 2014, and the meeting involved Mr. Cole, Mr. Rabin, Mr. Margolis, and Mr. Horowitz. And during the meeting, they talked about the overpayment and the commitment to return money and settling the scores. This is the preparation that GBG was doing for that meeting.

Now, Mr. Margolis, he testified that he couldn't remember the meeting, but you can tell from the documents, and you can tell from the e-mails around it, that that meeting occurred. And if you go back and you look at Mr. Horowitz's testimony, you'll see that that's exactly what happened. And Mr. Cole was present when that occurred, and he was involved in the conversation.

Let's talk about the Lee Cooper defense. Now, we talked about the Lee Cooper defense a number of times. It came up on the redirect of Mr. Horowitz. It came up on the cross of Mr. Cole. The Lee Cooper defense is completely refuted by that June 10th e-mail because what it shows you is that the increase in purchase price has nothing to do with Lee Cooper.

What it has to do with is a commitment to return money in some other way. It's exactly the allegation that the government has brought here. Now, Mr. Tarlowe made an argument, he said, well, the government has to prove that the Lee Cooper defense is not a defense, you know, or it didn't

| LARPCOL3 | Rebuttal - Mr. Hartman | Page 2514 |
|---|---|---|

occur. That is not the government's burden.

The government's burden is to prove that Mr. Cole engaged in a scheme to defraud. You don't have to conclude that every tin-hat conspiracy is -- the government doesn't have to disprove everything in a tin-hat conspiracy. What you have to find, ladies and gentlemen, is that there were commitments here and that those commitments were designed to inflate revenue.

We talked about a PIP, and Mr. Tarlowe talked about the PIP in his summation. It's Defense Exhibit 1312-A1. Can we put that up, please. Folks, this is the final PIP that was done internally at GBG. And what you see is the Korea brands went up from 3.3 to 8.3, and you can see that in the "Size of the amendment" here at the bottom.

And we can look at the second page? The second page, please. It says, "In previous PIP Korea brands consideration was 3.3 and a total consideration of 10.9;" do you see that? Now, there's nothing in here about the givebacks. That's true. But Mr. Rabin and Mr. Margolis told you that they had discussed these facts with other people, including people on the investment committee. There's testimony about that.

It's also true that there's nothing in here about Lee Cooper. So to the extent the argument is there's some Lee Cooper option that's hidden here, that's not here either.

There was also an argument made about the June 18th

| LARPCOL3 | Rebuttal - Mr. Hartman | Page 2515 |
|---|---|---|

version of the PIP. Can you put that up, please, again, and can we go to the third page.

This is the June 18th version of the PIP; do you see that? Mr. Tarlowe asked the question on cross-examination of Mr. Margolis, where he led him to say that in a June 18th version of the PIP, or that he recalled in a June 18th version of the PIP that the valuation was 14-something-million dollars. This says 10.9. So to the extent there's some argument here that this has to do with the Lee Cooper defense or the timing of some phone call, this document is completely inconsistent with that argument.

Let's talk about the marketing invoices for a minute. There was an argument in Mr. Tarlowe's summation that the marketing -- you can take that down. There was an argument in Mr. Tarlowe's summation that somehow the marketing invoices are consistent with normal business practice, that, you know, nothing remiss was going on there.

If you look at those marketing invoices, what you see is they come in as round dollars, then they're replaced with uneven amounts that add up to exactly $5 million. And that is not normal, and they didn't show you any documents or any instances where something like that happened in another circumstance. They didn't show you any documents or instances where a set of marketing invoices were pulled, as the Peanuts invoices were pulled, and replaced with something else, as

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

LARPCOL3          Rebuttal - Mr. Hartman          Page 2516

occurred here.

And in terms of the history of that $5 million giveback and what happened, it's important to understand the factual record. So, Mr. Gill, can you put up slide 2000-01. This is not an exhibit. It's a slide that shows two different exhibits.

Government Exhibit 1068 is an e-mail between Ethan Cole and Jared Margolis. It's one we looked at earlier. It's that overpayment e-mail. And what you can see is they're modeling that $5 million giveback here in the $1 million for Zoo York marketing, $1.5 million for Peanuts and 2.5 million for Rocawear.

That matches Government Exhibit 1069, which is Mr. Horowitz's update to Mr. Cole. And what he says here about the 2.5, it's relief of Rocawear Kids royalties in 2014. That's not marketing. And what that shows you is that the effort here was just to return $5 million. It didn't matter how it came back. It could be anything. It was an overpayment and the commitment to give the money back, and that's exactly what happened.

So let's look at the second page of this, Government Exhibit 1332. When they ultimately pay the replacement invoices for the Peanuts invoice, they don't even match. On the GBG side, the invoices that they think were paid are different from the invoices that the Iconix side thinks were

LARPCOL3          Rebuttal - Mr. Hartman          Page 2517

paid. They don't even have agreement on which invoices they are paying. How could there be value for this work? How could this be something that was done in good faith if they don't even agree on what it was they're sending the money for? That's a really important fact, and that's something you should keep in mind.

Let's talk about SEA-3 for a minute. Let's go back to 706. Was it 709? 706. Can we see the full?

We saw the spreadsheet, and we saw the overpay being modeled, the $6,000 overpay. This is Mr. Horowitz keeping track of the overpay. This is November; so the deal is already closed, and he's looking at how to give the money back. And one of the things you can see is that $6,000, the overpay, it matches up with a potential return of money for MENA and he talked about that.

This is evidence of the giveback and the anticipated return. They say the GBG deal to release GBG from its marketing didn't happen and, therefore, you should conclude that there was no deal to return the money. That's absolutely wrong. This document shows you.

So what happened here? Mr. Horowitz testified about this. Mr. Cole got worried about impairment. He decided he didn't want to let GBG out of its obligations under the Kids Headquarters deal, but he recognized that he had an obligation to return the money, and that is what is being discussed here.

LARPCOL3          Rebuttal - Mr. Hartman          Page 2518

You see it in this document. You see it in that plugs e-mail. You see it in the overpay e-mail, where they're talking about the overpay and getting the money back.

How else do you know? Let's look at slide 2005-09. Slide 2005-09 shows you the $15.5 million floor. This is Government Exhibit 1210. It was changed from 21.5, which is the ultimate deal price, to 15.5, and the reason for that is the parties recognized that the actual value of this interest was $15.5 million. This is SEA-3.

And you don't have to take my word for it. Let's look at the next page here. This is Mr. Cole's testimony. He talked about this concept of the floors, and he said the idea of the floor was to allow the counterparty to put the interest "back to us at close to the price they bought it for."

Now, in addition to this, you also saw -- and I'm just going to reference it here. You saw what Mr. Thomas described yesterday as the fingerprints of the deal in the SEA-3 documents, there's this change in the floor, but the other thing you see is the structure of the payment is designed to mirror the structure of the Rocawear Kids royalty payments. Mr. Horowitz testified about this. I direct you to his testimony on that. You'll see it's the same thing.

So now the question is, why did the six million never get paid back? Well, part of it could have come from that $3.1 million MENA payment, and Mr. Horowitz said he didn't know for

LARPCOL3          Rebuttal - Mr. Hartman          Page 2519

sure, but it was possible that that was one way it could come back.

But another reason that the money may not have not have come back is because the SEC showed up in December, and there was a corp. fin letter process, and the company was under scrutiny. Let's look at one more exhibit. Actually, can we look at Government slide 2010-02.

This is Mr. Horowitz's update to Mr. Cole on November 17th, 2014. He talks about re-trading for the SEA-3 overpayment. And I asked Mr. Cole about this on cross. This is further evidence that the parties recognize that they had an obligation to return that 6 million, even if it wasn't through a release from the Rocawear Kids royalties.

You can take that down.

Let's talk about materiality. There was some argument in Mr. Tarlowe's summation about the BDO memo, and that extrapolation of that misstatement. Two witnesses took the stand and they told you that overpayments or manipulations of earnings and revenue of these amounts would have mattered to them, that it would have been important in their investment decisions.

And the fact is, it's just common sense that if Mr. Cole and Mr. Horowitz were intentionally engaging in a scheme to manipulate the numbers of the company, that would have mattered to investors. So you know that these

UNITED STATES OF AMERICA, v.
NEIL COLE,

October 27, 2021

LARPCOL3          Rebuttal - Mr. Hartman          Page 2520

adjustments, they are material. They would matter.

With respect to the submission to the Division of Corporate Finance, we agree that if you conclude the scheme occurred, you have to conclude that they lied to the SEC when they submitted their response. They left out important terms and those terms mattered.

There was some argument about document destruction and Mr. Horowitz, and the fact that he wasn't corroborated on the fact that he destroyed e-mails. Look, Mr. Horowitz came in and he testified, and he told you that he destroyed documents. He had no reason to make that up. He had no way of knowing whether that could or could not be corroborated. He came in and told you what happened. He told you what Mr. Cole told him to do, and he told you what he did.

Now, turns out that the server for the company preserved documents, but that doesn't mean that Mr. Horowitz didn't do it. It just means that there are backups that he didn't know about that preserved those documents.

The stock sale. The timing of the stock sale is important, ladies and gentlemen. Mr. Cole changes his plan with respect to what he's going to do with the stock. He had a plan to sell it over time. Mr. Horowitz told you he told him he was going to sell after the year-end earnings announcement in the spring of 2015, in that window, and he changes his plan he sells after the third quarter of 2014.

LARPCOL3          Rebuttal - Mr. Hartman          Page 2521

And the reason for that, I would submit, is because at that point, he knows it's getting harder and harder to meet the company's earnings obligations. He knows that this plan could blow up. He's already received the phony invoices from GBG, the clumsily round numbered invoices with no backup, and he realizes that now is the time to take his profits.

Mr. Cole testified at this trial. He had no obligation to do it, but given that he did, you should scrutinize his testimony and think about what happened when he testified. The defense has no obligation to explain anything to you, but Mr. Cole, in his testimony and the arguments that were made by defense counsel, offer no convincing explanation for the fact that the purchase price of the SEA-1, SEA-2 and SEA-3 agreements went up by significant amounts right before the deals closed. Lightning does not strike three times, ladies and gentlemen.

And with respect to the SEA-2 agreement, what you saw is that the value of that Korea interest went up by nearly three times. It went from 3.3 to 8.3. That is not the result of tough business negotiations. That doesn't have anything to do with a combo meal. That is fraud, ladies and gentlemen, and you know that.

Now, Mr. Cole took the stand, and he played the blame game. And it was exactly as Mr. Horowitz was worried he would do, and he told you that one of the reasons that he wrote that

LARPCOL3          Rebuttal - Mr. Hartman          Page 2522

whistleblower letter is that he was worried that Mr. Cole would try to blame everything on him when he left.

(Continued on next page)

LARMCOL4          Rebuttal - Mr. Hartman          Page 2523

MR. HARTMAN: And Mr. Cole talked about his reliance on the auditors and the accountants and the lawyers and he talked about Mr. Horowitz, and he blamed him for not telling him about the puts and the calls and not telling him about the aspects of these deals.

But what you know, ladies and gentlemen, from looking at the evidence and from hearing the testimony over the course of the last three weeks, is that Mr. Cole and Mr. Horowitz were in this together. They conspired to mislead investors. They conspired to lie to auditors. They conspired to mislead the SEC.

When Mr. Cole took the stand, he testified and he lied. And his lies, those are evidence too. We talked about three lies in this case. There was a fourth. Mr. Cole took the stand and in front of you he lied about these events. He lied about what he knew. He refused to acknowledge things that were obvious based on the documents.

I want to point you to two things in particular about his testimony. Let's look at the slide that's 2020-01. This is part of Mr. Cole's direct. Mr. Reisner was asking him about the SEA-1 transaction. He talks about an e-mail that was forwarded to a lawyer named Ms. Gee. And Mr. Cole, he slips up a little bit when he was testifying and he says she was an attorney who worked with Mr. Horowitz on this deal. You might have missed it if you weren't paying attention, but he

**A-484**

---

LARMCOL4          Rebuttal - Mr. Hartman          Page 2524

mentioned Mr. Horowitz. Mr. Horowitz was not involved in the SEA-1 deal. Everybody understands that. But this is Mr. Cole reflexively pushing blame for whatever happened here on to Mr. Horowitz, and you can see that from this slip in his testimony here.

This happened another time, too, but this time Mr. Reisner caught it. Let's look at slide 2020. This is Mr. Cole's testimony.

The question is: Mr. Cole, before receiving the resignation letter, had Mr. Horowitz ever mentioned to you anything about a verbal agreement in connection with SEA-2 or SEA-3?

"A. He never said anything to me about anything to do with SEA-2 and SEA-3."

That's a problem for Mr. Cole because, as you know, having sat through the trial, there are many, many documents where Mr. Horowitz says things to Mr. Cole about SEA-2 and SEA-3, and Mr. Cole is not answering Mr. Reisner's question. He is saying something much broader. He is saying Mr. Horowitz didn't tell him anything. Mr. Reisner catches it and he bails him out.

Let's look at the next slide. You made a verbal agreement relating to SEA and SEA-3, correct? Mr. Cole says: Correct. He never said anything to me that was not in the documents.

---

LARMCOL4                                          Page 2525

Folks, this testimony is telling.

You can take it down.

You know, having sat through this trial, that Mr. Cole has spent years shirking responsibility for what happened at Iconix. From the day this occurred, in 2013 and 2014, until he came into this courtroom and lied to you, he blamed others and denied responsibility for things that were obvious.

This is Mr. Cole's day to be held accountable. The government has proved beyond a reasonable doubt that he conspired with Mr. Horowitz and others to mislead Iconix's investors, to lie to its auditors, and to lie to the SEC, and now it is your obligation to hold him responsible for his actions. Thank you very much.

THE COURT: Thank you, Mr. Hartman.

Ladies and gentlemen, that concludes the summation phase of the trial. I will now instruct you as to the law. I ask that you remain where you are. It's going to be a couple of minutes. We are going to hand you some documents. If you want to stand and stretch, you are free to do so. And we will get started in a minute.

I see that all of you has a binder. If yours is structured in the same way mine is, there are three documents in the binder. The first one is a copy of the indictment. As I will instruct you in just a bit, there is absolutely no evidentiary value to the indictment. It's just the

---

LARMCOL4                    Charge                    Page 2526

accusations. However, we are providing it to you so that it may help you to whatever extent during your deliberations.

And then there are a copy of the jury instructions which I am going to read to you. You will have this with you as you deliberate. So as I read, you can follow along and read as well, or you can simply listen. But, in other words, there is no need to memorize anything that I'm about to tell you.

Then at the very back, the last two pages, are a copy of the verdict form, and this is the form that your foreperson will be required to fill out and sign once you have reached a unanimous verdict.

The instructions themselves, they represent the law that you are required to apply. The actual words of the instructions and the actual words of the statutes are very important and it simply will not do for a judge to ad-lib the instructions. So it is the tradition that the instructions are read to the jury.

If history is any guide, it will take me approximately an hour and 15 minutes or so to read through 46 pages. Once we are done with that, the case will be given to you for deliberation.

Let's begin with the jury instructions on page 1.

Members of the jury, we have almost reached that point where you will begin your final function as jurors. As you all appreciate, this is one of the most important duties of

---

LARMCOL4                    Charge                    Page 2527

citizenship in this country.

My instructions to you will be in four parts. First, I will give you some introductory instructions about the role of the Court and of the jury, and about the presumption of innocence and the government's burden of proof. Second, I will describe the charges and the law governing those charges, which you will apply to the facts as you find them to be established by the proof. Third, I will give you instructions concerning the evaluation of evidence. The fourth and final section of these instructions will relate to your deliberations.

I will first describe the role of the Court and of the jury.

It is my duty to instruct you as to the law and it is your duty to accept these instructions of law and apply them to the facts as you determine them. If an attorney stated a legal principle different from any that I state to you in my instructions, it is my instructions you must follow. You should not single out any instruction as alone stating the law, but you should consider my instructions as a whole when you retire to deliberate. You should not be concerned about the wisdom of any rule that I state. Regardless of any opinion you may have about what the law may be or ought to be, it would be a violation of your oath to base your verdict on any view of the law other than that which I give you.

You, the members of the jury, are the sole and

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                October 27, 2021

LARMCOL4          Charge                    Page 2548

you find beyond a reasonable doubt that the government has proven that someone committed the substantive offense, and that he helped or assisted that person in the commission of the offense.

The first requirement of aiding and abetting liability is that someone else has committed the crime at issue. Mr. Cole cannot be convicted of aiding and abetting if nobody committed the underlying crime. But if you find that the underlying crime at issue was committed by someone other than him, you should consider whether he aided or abetted the person who actually committed the securities fraud, made false statements in filings with the SEC, or misled the conduct of audits.

To aid and abet another to commit a crime, the defendant must have willfully and knowingly associated himself in some way with the crime, and he must have willfully and knowingly sought by some act to help make the crime succeed. In the aiding and abetting context, participation in a crime is willful if action is taken voluntarily and intentionally.

The mere presence of the defendant in a place where a crime is being committed, even coupled with knowledge that a crime is being committed, is not enough to make him an aider and abettor. A defendant's acquiescence in the criminal conduct of others, even with guilty knowledge, is not enough to establish aiding and abetting. An aider and abettor must have

LARMCOL4          Charge                    Page 2549

his own affirmative interest in the criminal venture. To determine whether Mr. Cole aided and abetted the commission of the crime, ask yourselves these questions:

Did someone other than Mr. Cole commit the crime at issue?

Did Mr. Cole participate in the crime charged as something that he wished to bring about?

Did he associate himself with the attempt to commit the crime by other people knowingly and willfully?

Did he seek by his actions to make their criminal venture succeed?

If so, Mr. Cole is an aider and abettor and, therefore, he is guilty of the offense under consideration. If not, then he is not an aider and abettor, and he is not guilty as an aider and abettor of that offense.

I have just instructed you on the substantive offenses alleged in the indictment. Let me turn now to the conspiracy offenses. Count One charges Mr. Cole with conspiring or agreeing with others to commit securities fraud, to make false filings with the SEC, if to improperly influence the conduct of audits. Conspiracy is an entirely distinct and separate offense from the substantive securities fraud. To sustain its burden of proof with respect to the conspiracy charge in Count One, the government must prove beyond a reasonable doubt each of the following three elements:

LARMCOL4          Charge                    Page 2550

First, that the charged conspiracy existed;

Second, that Mr. Cole intentionally joined and participated in the conspiracy during the applicable time period; and

Third, that at least one of the members of the conspiracy knowingly and willfully committed an overt act in furtherance of the conspiracy.

The first element is simply the existence of a conspiracy. A conspiracy is an agreement, or an understanding, by two or more persons to accomplish one or more illegal goals by working together. The object of the conspiracy is the illegal goal the coconspirators agree or hope to achieve. In this case, the government charges that the unlawful objects of the conspiracy are the objects of committing securities fraud, making false filings with the SEC, and improperly influencing the conduct of audits.

To prove that a conspiracy exists, the government must prove that two or more people explicitly or implicitly came to an understanding to achieve the specified objective. For the government to satisfy this element, the government does not have to prove that the alleged members of the conspiracy met together and entered into any express or formal agreement.

Similarly, the government need not prove that the alleged conspirators stated, orally or in writing, what the scheme was, its object or purpose, or every precise detail of

LARMCOL4          Charge                    Page 2551

the scheme or a means by which its object or purpose was to be accomplished. What the government must prove is that there was a mutual understanding, either spoken or unspoken, between at least two people to cooperate with each other to accomplish the illegal goals of the conspiracy alleged in Count One.

The indictment charges that this conspiracy lasted from approximately 2013 to 2015. It is not necessary for the government to prove that the conspiracy lasted throughout the entire period alleged, but only that it existed for some period within that time frame.

The objects of a conspiracy are the illegal goal or goals the coconspirators agree or hope to achieve. The indictment charges three such unlawful purposes, also referred to as the objects of the conspiracy. You should keep in mind that you need not find that the conspirators agreed to accomplish each of these objects. An agreement to accomplish any one of these objects is sufficient.

Although the finding of one unlawful object is sufficient to satisfy the illegal purpose element, I instruct you that you must unanimously agree on which object, if any, was the specific object or objects alleged in the conspiracy. If the government fails to prove beyond a reasonable doubt that at least one of the unlawful objectives alleged in Count One was in fact an objective of the conspiracy, or if you cannot unanimously agree as to which of the unlawful objects alleged

UNITED STATES OF AMERICA, v.
NEIL COLE,
October 27, 2021

LARMCOL4        Charge        Page 2552

in the indictment have been proven beyond a reasonable doubt, then you must find Mr. Cole not guilty as to the conspiracy charge. Moreover, if you conclude that an agreement existed but that its purpose, even if unlawful, was not one of the specific unlawful objectives alleged in the indictment, you must also find Mr. Cole not guilty as to Count One.

The first object of the conspiracy charged in the indictment is to commit securities fraud. I have already instructed you on the elements of the substantive crime of securities fraud in connection with my instructions for Count Two, and you should apply those instructions here to determine whether Mr. Cole conspired or agreed to commit that crime.

The second object of the conspiracy charged in the indictment is making, or causing to be made, false statements in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934.

I have already instructed you on the elements of the substantive crime of making false statements in SEC filings in connection with my instructions for Counts Three through Eight, and you should apply those instructions to determine whether Mr. Cole conspired, or agreed, to commit that crime.

The third object of the conspiracy charged in the indictment is misleading the conduct of audits. I have already instructed you on the elements of the substantive crime of misleading the conduct of audits in connection with my

LARMCOL4        Charge        Page 2553

instructions for Count Nine, and you should apply those instructions here to determine whether Mr. Cole conspired, or agreed, to commit that crime.

If you conclude that the government has proven beyond a reasonable doubt that the charged conspiracy existed, you must then consider whether the government has proven beyond a reasonable doubt that Mr. Cole intentionally joined the conspiracy, either at the outset or at some later point. To prove this element, the government must prove beyond a reasonable doubt that Mr. Cole knowingly and willfully joined the conspiracy as I have previously described those terms to you, for the purpose of furthering its unlawful goals.

As I have already instructed you, knowingly means to act intentionally and voluntarily, rather than by mistake or accident or carelessness, and willfully means to act deliberately and with a purpose to do something that the law forbids. It is not necessary that Mr. Cole be fully informed of all the details of the conspiracy, or all of its participants. He need know only one other member of the conspiracy and need know only one of its objectives. He can join the conspiracy at any point and need not have received any benefit in return, so long as he in fact participated in the conspiracy in the manner I have explained.

On the other hand, mere association between Mr. Cole and a conspirator does not make him a member of the conspiracy,

LARMCOL4        Charge        Page 2554

even if he knows that the conspiracy exists. In other words, knowledge and association are not enough. Mr. Cole must have intentionally participated in the conspiracy with the purpose of helping to achieve at least one of the unlawful objectives.

The third element that the government must prove beyond a reasonable doubt is that some member of the conspiracy, not necessarily Mr. Cole, knowingly committed at least one overt act in furtherance of the conspiracy. An overt act can be any act of any kind taken toward effectuating the conspiracy in any respect. An overt act need not itself be a criminal act, but it must contribute to one or more of the goals of the conspiracy.

The overt act requirement may be met, even if the conspiracy never actually accomplishes its goals. Thus, for example, if two people conspire to commit a fraud and one of them makes a telephone call to get the fraud going, the overt act requirement is met, even if the fraud is never otherwise carried out.

In sum, if you find that the government proved, beyond a reasonable doubt, that the conspiracy charged in Count One existed, that Mr. Cole joined it, and that at least one overt act was committed in furtherance of the conspiracy, then you should find Mr. Cole guilty of Count One. On the other hand, if you find that the government has not proved, beyond a reasonable doubt, any of those essential elements, then you

LARMCOL4        Charge        Page 2555

must find Mr. Cole not guilty of Count One.

Count Ten of the indictment charges Mr. Cole with conspiracy to destroy, alter, and falsify records in a federal inquiry from 2014 to 2015. Specifically, the indictment charges Mr. Cole with conspiring to destroy, alter, and falsify records in an investigation conducted by the SEC Division of Corporation Finance.

The elements of conspiracy are the same as the elements that I instructed you as to Count One, and you should apply them here. The object of the conspiracy charged in Count Ten is to alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States. I instruct you that the SEC Division of Corporation Finance is an agency of the Federal Government. In order to satisfy its burden of proof, the government must prove beyond a reasonable doubt each of the following elements:

First, that the conspiracy charged in the indictment existed; that is, that there was an agreement or understanding between two or more people to commit the crime charged as the object of the conspiracy in the indictment.

Second, that Mr. Cole knowingly and willfully became a member of the conspiracy; and

**UNITED STATES OF AMERICA, v.**
**NEIL COLE**                                                                                               **October 28, 2021**

LASMCOLF                                                                Page 2586

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                              19 CR 869 (ER)

NEIL COLE,

                Defendant.              Trial
------------------------------x

                                        New York, N.Y.
                                        October 28, 2021
                                          9:00 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                        District Judge
                                        -and a Jury-

                        APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY:  NOAH SOLOWIEJCZYK
     SCOTT HARTMAN
     ANDREW M. THOMAS
     Assistant United States Attorneys

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     Attorneys for Defendant
BY:  LORIN L. REISNER
     RICHARD C. TARLOWE
     ANDREW D. REICH
     AMANDA WEINGARTEN
     ALYSON A. COHEN

Also Present:
Robert Hupcher, FBI
Micah Gill, Paralegal
Peter Charalambous, Paralegal
Frank Eng, Paralegal

LASMCOLF                                                                Page 2587

         (Trial resumed; jury not present)

         THE COURT: Good afternoon, everyone.

         There is a note from the jury. I only have a picture of it taken by my clerk.

         It reads as follows: "your Honor, after a day of deliberations, we are at an impasse. There are jurors who are standing firm in their decisions, so we are unable to come to a final verdict today."

         We will get you a copy of this. It will be marked -- I think it's Court Exhibit 1.

         It doesn't sound like they are asking us to do anything. Maybe they are ready to go home for the day. I guess the only thing for us to do is tell them that we received their note and that they should continue to deliberate.

         MR. HARTMAN: We agree with that, Judge.

         MR. REISNER: No objection.

         Your Honor, do we know what time the note was delivered?

         THE COURT: We received a call maybe 10 minutes ago. It's signed by the jury foreperson, whose name I cannot make out, but I believe it's juror no. 1.

         MR. REISNER: Your Honor, has the jury previously given any indication as to what time they plan to stay this afternoon, or is that unknown?

         THE COURT: If they have, it has not been communicated

LASMCOLF                                                                Page 2588

to me, so I don't think that they have. We were about to ask them so that we could tell you all.

         They are going to stay until 3:00 today.

         MR. REISNER: Thank you, your Honor.

         THE COURT: I don't think it's worth it to bring them in for this message, so I will simply write out -- again, you'll get a copy of this as well. It will be part of the same court exhibit.

         My message is simply this: "We have received your message. We understand that you will continue to work until 3 p.m. today. We encourage you to continue your deliberations with an open mind."

         Any objection to that?

         MR. REISNER: I think you said 2 p.m., your Honor. I think you meant 3 p.m.

         THE COURT: If I said 2 p.m. just now, I wrote 3 p.m.

         MR. REISNER: Excellent. Thank you, your Honor.

         THE COURT: We will make a copy, send a copy to the jury or the original to the jury.

         I don't think that there is anything else for us to do today.

         MR. HARTMAN: Thank you, Judge.

         MR. REISNER: Thank you, Judge.

         THE COURT: Have a good evening, everyone.

         (Adjourned to October 29, 2021, at 9:00 a.m.)

**UNITED STATES OF AMERICA, v.**
**NEIL COLE**                                                                 **October 29, 2021**

LATPCOL1                                    Page 2589

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                    19 CR 869 (ER)

NEIL COLE,

          Defendant.         Trial
------------------------------x

                  New York, N.Y.
               October 29, 2021
                9:00 a.m.

Before:

         HON. EDGARDO RAMOS,

               District Judge
               -and a Jury-

           APPEARANCES

AUDREY STRAUSS
    United States Attorney for the
    Southern District of New York
BY: NOAH SOLOWIEJCZYK
    SCOTT HARTMAN
    ANDREW M. THOMAS
    Assistant United States Attorneys

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
    Attorneys for Defendant
BY: LORIN L. REISNER
    RICHARD C. TARLOWE
    ANDREW D. REICH.
    AMANDA WEINGARTEN
    ALYSON A. COHEN

Also Present:
    Robert Hupcher, FBI
    Micah Gill, Paralegal
    Peter Charalambous, Paralegal
    Frank Eng, Paralegal

---

LATPCOL1                                    Page 2590

(In open court; jury not present)

(At 1:36 p.m., a note was received from the jury)

THE COURT: Good afternoon, everyone. Do we have a court reporter?

We have a note. Do you all have a copy?

MR. REISNER: We do, your Honor.

THE COURT: Let me just read it into the record: "Your Honor, we need to end our deliberation today at 3:00 p.m. and again, jurors are standing firm after reviewing the evidence. We have a juror, No. 4, that will not be returning next week" -- news to me -- "so we want to check to see how to proceed next week.

"Additionally, we'd like to know if it is possible to reach a unanimous decision for some counts but are not in agreement for others."

I have been made aware, I think her name is Ms. Pistoia, about her work commitments, but I was not aware that she decided not to come next week. Obviously, the answer to the second question is yes, but that raises the issue that, and it has happened before, that we can have one jury give a verdict on some counts and a different jury give a verdict on others.

My guess, my gut, is that the answer is no, but I don't know how inventive you folks want to be. But my inclination is to say, yes, but only if we have the same jury.

---

LATPCOL1                                    Page 2591

MR. SOLOWIEJCZYK: Yes, your Honor, if we have the same jury, and I don't think we're at this stage yet, but they have to keep trying to deliberate to work things out, given the length of this trial, et cetera.

THE COURT: Correct.

MR. SOLOWIEJCZYK: Is juror No. 4 the juror that had the employer that wasn't -- it's a different juror.

THE COURT: That's a different juror.

MR. SOLOWIEJCZYK: I see.

THE COURT: Juror No. 4 is Ms. Pistoia, and according to what she told Ms. Rivera earlier, her situation at work has changed because one of her colleagues has been sent on an overseas assignment and, therefore, she has to pick up that colleague's responsibilities. So she would have to return to work. Am I getting that about right, Ms. Rivera?

THE DEPUTY CLERK: Yes.

THE COURT: Okay. So how do we proceed?

MR. REISNER: Your Honor, do you intend to inquire of juror No. 4 further about her situation and the extent to which there may be some flexibility in her availability for next week?

THE COURT: I do. I mean, I had thought that I would be doing that in any event; so I will do that, and we take it one step at a time.

Now, the parties, do you have your favorite Allen

---

LATPCOL1                                    Page 2592

charges at hand?

MR. SOLOWIEJCZYK: Your Honor, we did take the time to prepare one, but we think, at this point, it's probably a little premature to give an Allen charge.

THE COURT: No, I agree with that. I just want to make sure that we will be prepared to proceed with one if we need to.

So I propose that we bring down the jury, tell them that we received their note, speak separately with Ms. Pistoia, perhaps at sidebar, and then take it from there.

But I think I would propose to tell them that if Ms. Pistoia cannot proceed, then we will replace her with an alternate, whichever alternate is next, and that the deliberations will begin anew starting Monday morning. Any objection?

MR. SOLOWIEJCZYK: No objection, your Honor. And with Ms. Pistoia, one question we'd have is, is it possible even for her to say, okay, I can stay until Monday or --

THE COURT: No, I think if she can't proceed, she can't proceed. I'd rather not take it sort of one day at a time.

MR. SOLOWIEJCZYK: Understood, your Honor.

THE COURT: Mr. Reisner?

MR. REISNER: We defer to the Court.

THE COURT: Okay. Let's get the jury. This will be

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 1, 2021

Page 2601

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

         v.                      19 CR 869 (ER)

NEIL COLE,

              Defendant.          Trial
------------------------------x

                                New York, N.Y.
                                November 1, 2021
                                   9:00 a.m.

Before:

                 HON. EDGARDO RAMOS,

                               District Judge
                               -and a Jury-

                    APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY:  NOAH SOLOWIEJCZYK
     SCOTT HARTMAN
     ANDREW M. THOMAS
     Assistant United States Attorneys

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     Attorneys for Defendant
BY:  LORIN L. REISNER
     RICHARD C. TARLOWE
     ANDREW D. REICH.
     AMANDA WEINGARTEN
     ALYSON A. COHEN

Also Present:
Robert Hupcher, FBI
Micah Gill, Paralegal
Peter Charalambous, Paralegal
Frank Eng, Paralegal

Page 2602

(In open court; jury not present)

(At 10:49 a.m., a note was received from the jury)

THE COURT: Morning, all. Everyone can be seated. I take it you have a copy of their note?

MR. SOLOWIEJCZYK: Yes, your Honor.

THE COURT: Will this be Court Exhibit 3 or 4?

THE DEPUTY CLERK: Three.

THE COURT: It will be marked. And for the record, it reads as follows: "Your Honor, we have made a decision on two counts, and we are at an impasse for the remainder of the charges after reviewing all of the evidence and do not believe continuing to deliberate will yield a different result."

What say you, Mr. Government?

MR. SOLOWIEJCZYK: Your Honor, we think, at this point, it makes sense to take the verdict on the two counts with the unanimity, and then for the Court to deliver an Allen charge with respect to the remaining eight counts. And we have a proposed Allen charge for your consideration.

THE COURT: Okay. Mr. Reisner?

MR. REISNER: Your Honor, we propose either that the Court take the verdict, as proposed, as to the two counts and declare an impasse as to the balance of the charges, or issue an Allen charge now, without taking the proposed partial verdict, instruct the jury that a partial verdict is a final verdict and deliver an Allen charge with respect to the entire

Page 2603

indictment.

THE COURT: I don't understand the next-to-last piece that you said, Mr. Reisner.

MR. REISNER: If the instruction for the jury -- if the decision of the Court is to -- the two alternatives we have in mind are either: One, taking the verdict as to the two counts and declaring an impasse and a mistrial as to the rest; or telling the jury, I want to make sure you understand that a partial verdict is a final verdict as to those counts, and sending the jury back either with an Allen charge or without an Allen charge.

MR. SOLOWIEJCZYK: Your Honor, the Second Circuit has spoken on this. I'm happy to read from Dolah, D-o-l-a-h. Sorry, I don't have the full cite in front of me, but it states in relevant part: "A jury is entitled to report partial verdicts as to less than all defendants. See Federal Rule of Civil Procedure 31(b).

And as to less than all counts, citing United States v. Dilapi, D-i-l-a-p-i, 651 F.2d 140, 146 (2d Cir. 1981): As we have noted, juries "should be neither encouraged nor discouraged to return a partial verdict but should understand their options, especially when they have reached a stage in their deliberations at which they may well wish to report a partial verdict as to some counts for some defendants."

MR. REISNER: Well, all that does is state the rule

Page 2604

under rule 31, which there's no controversy about, but there's a lot of scholarship, as well as decisions, making clear that there's a concern that jurors sometimes don't realize that a partial verdict is a final verdict as to those counts.

So there's scholarship, and cases that support the proposition, that it's reasonable to instruct the jury before they provide a partial verdict that a partial verdict is a final verdict as to those counts. There's nothing --

THE COURT: I'm sorry, that means what? Meaning that you've reached a verdict on those counts, you can't change it?

MR. REISNER: Yes.

THE COURT: Okay.

MR. REISNER: Yes. Once you've rendered your verdict on those counts, I want to make sure you understand that's a final verdict as to those counts.

THE COURT: So I take it -- Mr. Solowiejczyk, I did not understand that the portion that you read to direct courts to take the partial verdict as soon as one is announced.

Now, the issue that we discussed last week was that there is a possibility still, although I think it's remote, that we take this verdict, give them an Allen charge, they continue to deliberate past tomorrow. We lose juror No. 4. We replace her with another juror. That creates a new jury. That suggests to me, but I'm willing to listen further, that we should give them the Allen charge, direct them that the partial

**A-490**

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                      November 1, 2021

LB1PCOL2                                                              Page 2617

agree, announce the verdict on the two counts you have reached. Alternatively, you can decide not to announce the verdict on those two counts until your deliberations are complete. In that event, however, you are instructed that your verdict on those two counts are final and may not be revisited by you."

And with that, let me ask Mr. Foreperson, I take it that you have decided that you do not wish to issue the verdict at this time; is that correct?

THE FOREPERSON: That's not correct.

THE COURT: Oh, I'm sorry. We have new information. So you have decided to issue the verdict at this time?

THE FOREPERSON: Correct.

THE COURT: Can I just see the lawyers at sidebar for one quick second?

(At the side bar)

THE COURT: My only question is, does either side want me to poll the jury on this partial verdict?

MR. THOMAS: We no request on that.

MR. REISNER: Yes, your Honor. We would request that you poll the jury.

THE COURT: The jury will be polled.

MR. REISNER: Thank you.

(In open court)

THE COURT: Okay. Ms. Rivera, will you please take the verdict on the two counts that have been agreed upon?

LB1PCOL2                                                              Page 2618

THE DEPUTY CLERK: Please stand. And which is the first count in which you have agreed upon?

THE FOREPERSON: Count One.

THE DEPUTY CLERK: On Count One, which charges the defendant with conspiring to commit securities fraud, make false filings with the Securities and Exchange Commission, and improperly influence the conduct of audits, we, the jury, find Neil Cole the defendant?

THE FOREPERSON: Not guilty.

THE DEPUTY CLERK: And the second charge in which you --

THE FOREPERSON: Count Ten.

THE DEPUTY CLERK: On Count Ten, which charges the defendant with conspiracy to destroy, alter and falsify records in a federal investigation conducted by the Securities and Exchange Commission, Division of Corporate Finance, we, the jury, find Neil Cole the defendant?

THE FOREPERSON: Not guilty.

THE COURT: Thank you, Mr. Foreperson.

I am now going to ask a question of each of the jurors. It's a "yes" or "no" question, and I will start with juror No. 1.

Juror No. 1, is this your verdict?

JUROR: Yes, it is.

THE COURT: Juror No. 2, is this your verdict?

LB1PCOL2                                                              Page 2619

JUROR: Yes.

THE COURT: Juror No. 3, is this your verdict?

JUROR: Yes.

THE COURT: Juror No. 4, is this your verdict?

JUROR: Yes.

THE COURT: Juror No. 5, is this your verdict?

JUROR: Yes.

THE COURT: Juror No. 6, is this your verdict?

JUROR: Yes.

THE COURT: Juror No. 7, is this your verdict?

JUROR: Yes.

THE COURT: Juror No. 8, is this your verdict?

JUROR: Yes.

THE COURT: Juror No. 9, is this your verdict?

JUROR: Yes.

THE COURT: Juror No. 10, is this your verdict?

JUROR: Yes.

THE COURT: Juror No. 11, is this your verdict?

JUROR: Yes.

THE COURT: And juror No. 12, is this your verdict?

JUROR: Yes.

THE COURT: And so say you all.

At this time, ladies and gentlemen, I'm going to give you a supplemental instruction, and I ask that you listen carefully. Counsel and I appreciate the efforts you have

LB1PCOL2                                                              Page 2620

already made in your deliberations. You have indicated that you are at an impasse with respect to the balance of the counts.

I must request, however, that you continue your deliberations in a further effort to try to agree upon a unanimous verdict. Here is why. As you know, it is an important case for all concerned. It has involved the expenditure of a great deal of time, effort and expense by both sides, not just in trying the case but in preparing for trial.

If you do not agree upon a verdict at this time, then this case will most likely be tried again before another jury; thus, requiring much of that time and effort to be repeated. There is no reason to believe that this case can be tried any better than it has been tried before you.

In particular, there is no reason to believe that the case could ever be submitted to persons who are more conscientious, more impartial or more competent to decide it than you are.

That is why it is necessary for me to ask you to make one last effort to try to reach a verdict in this case. However, under no circumstances should any juror abandon his or her conscientious judgment.

As I have previously instructed you, you must be guided at all times by the calm and careful exercise of reason. But part of reasoning is taking into account the views of your

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 1, 2021

LB1PCOL2                                                    Page 2621

fellow jurors, as well as your own, for common experience suggests that no large group of persons will ever reach unanimity unless they make a concerted effort to reason together.

It is incumbent on all jurors to carefully reexamine their views, taking full account of the fact that their fellow jurors view or weigh the evidence differently than they do. Now, no juror should change his or her mind simply because that juror is outnumbered. Rather, each juror should make a diligent effort to approach the evidence with an eye towards understanding the perspective of the jurors with whom they disagree, in the hopes that a consensus can be reached.

No juror is expected to yield a conscientious view that he or she may have as to the weight or effect of the evidence. But remember also that, after a full deliberation and consideration of the evidence, it is your duty to agree upon a verdict, if you can do so, but without surrendering your conscientious conviction.

So I am requesting that you resume your deliberations and make another effort to examine the case with these additional comments in mind to be applied in conjunction with all of the instructions that I gave you earlier.

And with that, ladies and gentlemen, you may continue your deliberations.

(Jury not present)

LB1PCOL3                                                    Page 2622

THE COURT: Everyone can be seated. Unless there's anything that either side wants to raise?

MR. HARTMAN: Nothing.

THE COURT: We will continue to wait.

MR. REISNER: Thank you, your Honor.

(Recess pending verdict)

(In open court; jury not present)

THE COURT: Good afternoon, everyone.

MR. REISNER: Good afternoon, your Honor.

THE COURT: We have received another note, and it will be marked Court Exhibit 5, and it reads as follows: "Your Honor, taking into consideration your guidance, we have continued to discuss the case but multiple jurors are standing strong in their convictions and we will not be able to reach a unanimous decision."

I am inclined to let them go, but I'm happy to hear the parties.

MR. SOLOWIEJCZYK: You've given them the Allen charge, your Honor. We think, at this point, that makes sense. They tried to reach unanimity on the remaining counts and they've not been able.

MR. REISNER: We agree, your Honor.

THE COURT: Okay. So we'll bring them out, tell them that we are releasing them. Just so that -- go ahead, Mr. Solowiejczyk.

LB1PCOL3                                                    Page 2623

MR. SOLOWIEJCZYK: It might be best to address this. We just wanted to raise it. It is important to the government to be able -- they're, obviously, not required to speak with us, but to have the opportunity.

THE COURT: Absolutely. What I was going to tell you is that I typically speak with the jury very briefly after trial. I don't talk to them about the case. I don't get into the substance. I simply ask them how the process was, what we can do to make it better, that sort of thing.

I do tell them that once the trial is over, they are free to speak with anyone about anything, but they're also free to go back to their lives and not be bothered. And if you approach any one of them and they wish to just go home, you are directed to respect those wishes.

MR. SOLOWIEJCZYK: I think our concern would be that they run out of the building before we are given the opportunity. Is it possible to say directly to them that the lawyers have asked to speak to you. If you're willing to speak to them, just stay back in the room? Because I think it's going to be very informative for the government to have that opportunity.

THE COURT: Back in the jury room?

MR. SOLOWIEJCZYK: If possible. I know that I've heard that has been done before.

THE COURT: I guess I have no problem with that.

LB1PCOL3                                                    Page 2624

MR. REISNER: We'd like to be there, too, if that's what the government has in mind.

MR. SOLOWIEJCZYK: We have no problem with that.

THE COURT: Okay. Very well. Now, I want to be there too.

MR. REISNER: You should.

THE COURT: I won't. Very well, then. We'll bring them on out, but in that event, I will tell them that if they don't want to speak with you all, they are free to leave.

MR. REISNER: Understood, your Honor.

THE COURT: I don't know whether the government is in a position now to tell me what it is that wish to do, if you want to think about it, send me a letter in the next few days.

MR. SOLOWIEJCZYK: I think that makes sense, your Honor.

THE COURT: Okay.

(Pause)

I think the jury room is courtroom 9A; is that right, Ms. Sangueza?

THE LAW CLERK: That's right.

(Pause)

(Jury present)

THE COURT: Everyone, please be seated.

Ladies and gentlemen, I have received your note. It's been marked Court Exhibit No. 5. It reads as follows: "Your

**A-492**

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                November 1, 2021

LB1PCOL3                                                   Page 2625

Honor, taking into consideration your guidance, we have continued to discuss the case, but multiple jurors are standing strong in their convictions, and we will not be able to reach a unanimous decision."

Folks, after discussing the matter with the parties, we all agreed that it would be appropriate at this time to release you, to let you know that your turn as jurors has come to an end.

On behalf of the parties, I want to thank you for your efforts. It's clear to us, first of all, not only have you been calm throughout the trial but very alert and very attentive throughout these proceedings. We understand that you were not able to reach a unanimous verdict, but it was not for lack of sincere effort on all of your parts. Thank you.

I also want to let you know that in this very important matter, and on matters like this every day in this courthouse, when we have very serious issues to discuss, issues that touch upon even the liberty of our fellow citizen, we literally rely on our neighbors and ask you, in your wisdom and your collective wisdom, to help us decide these very serious issues.

So it is my hope that you have had a good experience. It is my hope that when your friends and loved ones tell you with some level of exasperation that they received a jury notice, that you tell them that they should not hesitate to

LB1PCOL3                                                   Page 2626

want to serve on a jury because not only is it important, but it's an important experience to go through. So thank you.

I am going to ask just a couple of other favors. First of all, I do want to speak with you briefly; so if you will hang on in the jury room, and I will come down in just a minute. And also, as you might imagine, the lawyers would like to speak with you, too. They want to be able to ask you questions about your insights, what you thought worked, what didn't, et cetera.

Now, you are free to speak with whomever you want about the case from this point forward, friends, loved ones, you can talk to them. You can talk to the lawyers, or you can just say, you know what, I just want to get on with my life and just go on about your business. You can leave. But if you would not mind staying, even after I speak with you briefly, I know that the lawyers would be very appreciative.

So I'll leave you with that. I'll see you in just a couple of minutes downstairs.

(Jury excused)

THE COURT: Everyone can be seated. Like I said, I speak to them briefly. I expect it to take about five to ten minutes. All lawyers want to ask me how I thought they did. I don't answer that question. I simply talk about process. Folks, thank you very much. Thank you for your professional courtesies. It was a very tough and well-tried case.

LB1PCOL3                                                   Page 2627

MR. SOLOWIEJCZYK: Thank you, your Honor.
MR. REISNER: Thank you, your Honor.
MR. HARTMAN: Thank you, your Honor.
(Adjourned)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

       :

UNITED STATES OF AMERICA    :

       :

     - v. -     :       19 Cr. 869 (ER)

       :

NEIL COLE,     :

       :

      Defendant.    :

       :

--------------------------------------------------------x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE* AND RENEWED
MOTION FOR RULE 17(C) SUBPOENAS**

             DAMIAN WILLIAMS
             United States Attorney
             Southern District of New York

Jared Lenow
Justin V. Rodriguez
Andrew Thomas
Assistant United States Attorneys

- Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ................................................................................................ 2

I.    COLE MAY NOT AVOID A RETRIAL ON THE REMAINING COUNTS BY
      CLAIMING COLLATERAL ESTOPPEL .......................................................... 2

      A.   Background ........................................................................................ 3

      B.   Applicable Law .................................................................................. 3

      C.   Discussion .......................................................................................... 5

II.   THE COURT PROPERLY ADMITTED STATEMENTS OF NEIL COLE'S CO-
      CONSPIRATOR, ETHAN COLE, AT THE FIRST TRIAL AND SHOULD DO SO
      AGAIN ...................................................................................................... 9

      A.   Background ........................................................................................ 10

      B.   Applicable Law .................................................................................. 13

           1.   Co-Conspirator Statements ......................................................... 13

           2.   Conspiracy Verdicts and Preliminary Evidentiary Questions ............... 14

      C.   Discussion .......................................................................................... 17

           1.   Cole's Prior Acquittal Does Not Alter the Admissibility of Co-Conspirator
      Statements as a Matter of Law ............................................................ 17

           2.   The Facts Amply Support the Court's Prior Ruling ............................ 19

      D.   Ethan Cole's Statements Are Admissible on Other Grounds .................... 30

III.  EVIDENCE OF ICONIX'S POST-SCHEME PURCHASE OF SEA-3 ASSETS SHOULD
      BE PRECLUDED. ......................................................................................... 30

      A.   Background ........................................................................................ 31

      B.   Discussion .......................................................................................... 32

IV.   IF COLE TESTIFIES, THE CANDIE'S EVIDENCE IS FAIR CROSS ..................... 37

      A.   Background ........................................................................................ 38

      B.   Applicable Law .................................................................................. 41

           1.   Impeachment .......................................................................... 41

           2.   Uncharged Acts as Direct Evidence of Knowledge ........................... 42

           3.   Rule 404(b) ............................................................................. 43

C.   Discussion ................................................................................................ 44

    1.   Questioning About the Concerns of Candie's Auditors Was and Would Be Proper Impeachment by Contradiction.................................................................. 44

    2.   Questioning About Cole's Practice of Backdating Documents Was and Would Be Proper Impeachment with a Prior Statement of the Defendant ......................................... 48

    3.   Rule 403 Does Not Support the Exclusion of Candie's Questions on Cross-Examination ............................................................................................ 50

    4.   The Court Correctly Modified Its Rulings as the Record Developed................... 53

V.   THE COURT SHOULD AGAIN DENY COLE'S REQUEST FOR IMPROPER RULE 17 SUBPOENAS................................................................................................. 54

A.   Background ............................................................................................. 55

B.   Applicable Law ....................................................................................... 59

C.   Discussion .............................................................................................. 61

    1.   The Proposed Subpoenas Fail the *Nixon* Requirements ..................................... 61

    2.   Cole Fails to Cite Any Legal Basis for His "Interests of Justice" Argument....... 68

CONCLUSION.................................................................................................. 70

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                       :
UNITED STATES OF AMERICA                               :
                                                       :
              - v. -                                   :            19 Cr. 869 (ER)
                                                       :
NEIL COLE,                                             :
                                                       :
              Defendant.                               :
                                                       :
-------------------------------------------------------x

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Neil Cole's five pretrial motions: (1) to preclude, on collateral estoppel grounds, conspiracy evidence and argument, ECF Doc. No. 211 (motion) & No. 212 (memorandum of law, hereinafter "Collateral Estoppel Br."); (2) to preclude the statements of Cole's co-conspirator, Ethan Cole, ECF Doc. No. 217 (motion) & No. 218 (memorandum of law, hereinafter the "Co-Conspirator Brief"); (3) to admit evidence that, following Cole's departure from Iconix, other executives purchased SEA-3 assets for a higher price than Cole sold them in 2014, ECF Doc. No. 213 (motion) & No. 214 (memorandum of law, hereinafter the "SEA-3 Br."); (4) to preclude cross-examination of Cole regarding prior inconsistent statements made by Cole during a prior accounting fraud investigation, ECF Doc. No. 215 (motion) & No. 216 (memorandum of law, hereinafter the "Candie's Br."); and (5) for the issuance of two Rule 17(c) subpoenas for lawyers' notes, ECF Doc. No. 221 (hereinafter, the "Subpoena Motion").

The Court should deny each of the defendant's motions—most of them for the second time. Neil Cole's motions to preclude co-conspirator statements, to spare Neil Cole cross-examination on his past conduct and inconsistent statements, and to admit evidence of later sales prices retrace failed arguments from the first trial, and are now only further undermined by the full record of the prior trial. Cole's motion for the issuance of Rule 17 subpoenas goes back even further, reprising

an issue litigated since March 2021, and ultimately seeking to obtain privileged material to use for impeachment purposes. And Cole's new motion—to preclude the Government from introducing any evidence or argument that Cole committed wrongdoing with others—is as bold as it is wrong. The Government respects that the prior jury acquitted Cole of the conspiracy counts; but that jury did not acquit Cole of the scheme, false filing, or misleading the conduct of audits counts, and the Government should be permitted to introduce evidence to demonstrate that Cole committed those offenses, including evidence that he did so working in concert with others.

## ARGUMENT

### I.  COLE MAY NOT AVOID A RETRIAL ON THE REMAINING COUNTS BY CLAIMING COLLATERAL ESTOPPEL

In his first motion in limine, the defendant seeks extraordinary relief: preclusion of any evidence or argument that he "entered, joined, or participated in any sort of conspiracy, agreement, scheme, joint plot or plan, or committed wrongdoing or illegal acts with others." (Collateral Estoppel Br. at 5.) Tellingly, however, the defendant does not cite a single case in which a court has granted such relief following an acquittal on a conspiracy count and in advance of a retrial on the substantive counts. Instead, he asks this Court—contrary to governing law—to be the first.

If the Court were to accept the defendant's pioneering invitation, there should no misunderstanding about what the consequences would be: the Government will, in effect, be prohibited from retrying the substantive counts. As the Court knows, the Government's theory with respect to the substantive counts is that the defendant engaged in a scheme with others, including his own chief operating officer, Seth Horowitz, to fraudulently inflate Iconix's revenue and earnings per share and, in the process, lie to the SEC and interfere with audits. The Government cannot remove from the equation the other people the defendant "committed wrongdoing or illegal acts with" and preserve fidelity to the evidence. Therefore, as the defendant would have it, he is entitled to escape liability on the substantive counts even though the prior jury did not return a

2

unanimous verdict on those counts. Not surprisingly, the law does not call for such an absurd result.

### A.  Background

The parties proceeded to trial last year on ten counts. Count One charged the defendant with conspiracy to commit securities fraud, to make false filings with the SEC, and to improperly influence the conduct of audits. Count Two charged the defendant with the substantive crime of securities fraud. Counts Three through Eight charged the defendant with making false filings with the SEC. Count Nine charged the defendant with improperly influencing the conduct of audits. Count Ten charged conspiracy to destroy, alter, and falsify records in federal investigations.

The Government's theory was that, from 2013 to 2015, the defendant engaged in a scheme with others to falsely inflate Iconix's reported revenue and earnings per share ("EPS") by inducing a Hong Kong-based joint venture ("JV") partner, Global Brands Group Asia Limited ("GBG"), to purchase JV interests at artificially inflated prices based on the defendant's promise to reimburse GBG for the overpayments. (*See, e.g.*, Trial Tr. 738 (Horowitz); Trial Tr. 815 (Rabin: "Mr. Cole said: If you raise the price by 5 million, you can bill it back for marketing."); Trial Tr. 1145 (Margolis)). The defendant conducted that scheme with the knowledge and assistance of Seth Horowitz, who served under the defendant as chief operating officer of Iconix, and with the aid of executives at GBG, among other individuals at the two companies. The defendant and Horowitz executed the scheme so that Iconix "could hit quarterly numbers," (*see* Trial Tr. 355), such as revenue and EPS.

The jury returned a not guilty verdict on the two conspiracy counts (Count One and Count Ten), but the jury was not able to reach a unanimous verdict with respect to the substantive counts.

### B.  Applicable Law

It is firmly established "that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton v. United States*, 328 U.S. 640, 643 (1946).

Thus, if a jury acquits a defendant of a conspiracy count and fails to reach a verdict on substantive counts, the Government may—and very often does—retry the substantive counts.

In "rare case[s]," the doctrine of collateral estoppel precludes relitigating an issue in such a retrial that "has *necessarily* been determined in favor of the defendant" by the prior jury's verdict. *United States v. Cala*, 521 F.2d 605, 607-608, 609 (2d Cir. 1975) (emphasis added). The defendant fails to mention in his brief, however, that he bears the burden of making this showing and that his burden is "a heavy one." *United States v. Seijo*, 537 F.2d 694, 697 (2d Cir. 1976). The defendant's burden is to persuade "the court that the issue he seeks to foreclose was necessarily decided in his favor by the prior verdict." *United States v. McGowan*, 58 F.3d 8, 12 (2d Cir. 1995). It is "a most difficult burden since it usually cannot be determined with any certainty upon what basis the previous jury reached its general verdict." *United States v. Gugliaro*, 501 F.2d 68, 70 (2d Cir. 1974). "The burden is particularly onerous where the acquittal in the first trial involves the crime of conspiracy[.]" *United States v. Clark*, 613 F.2d 391, 400 (2d Cir. 1979); *see also United States v. Jackson*, 778 F.2d 933, 940 (2d Cir. 1985) ("When the first trial results in an acquittal on the conspiracy charge, generally there is no way of telling whether the basis for acquittal was disbelief of some portion of the Government's evidence, and what that portion might have been, or whether the jury simply regarded the evidence as insufficient to prove an agreement."). In light of the considerably high bar, "it is a rare case where a defendant can sustain his burden of establishing that the prior jury necessarily decided an essential issue in his favor." *Cala*, 521 F.2d at 609.

"In determining what issues were necessarily resolved by the prior proceedings, the court is to take a practical approach, examining the record, pleadings, evidence and jury instructions in order to decide whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Cala*, 521 F.2d at 608. "If the jury could have done so in the prior case, the claim of collateral estoppel must fail, since the defendant can prevail only if the issue which he seeks to preclude from consideration was necessarily resolved in his favor in the prior proceeding." *Id.*

4

**C.  Discussion**

The defendant has not met his "particularly onerous" burden, because he has not shown that the prior jury "necessarily" decided with its verdicts of acquittal on two conspiracy counts that the defendant did not enter, join, or participate in any sort of conspiracy, agreement, scheme, joint plot or plan, or commit wrongdoing or illegal acts with others. *Clark*, 613 F.2d at 400, 402.

The jury's verdict on Count One—conspiracy to commit securities fraud, to make false filings with the SEC, and to improperly influence the conduct of audits—is not nearly as illuminating as the defense suggests. The defendant claims that the verdict on this count shows that the jury found that either "the conspiracy never existed or Mr. Cole never joined it." (Collateral Estoppel Br. at 3). Not so.

As noted, Count One alleged three different objects of the charged conspiracy—securities fraud, making file filings with the SEC, and improperly influencing the conduct of audits. The Court instructed the jury that "if you cannot unanimously agree as to which of the unlawful objects alleged in the indictment have been proven beyond a reasonable doubt, then you must find Mr. Cole not guilty as to the conspiracy charge." (Trial Tr. 2551-2552). Thus, consistent with the Court's instructions, each one of the jurors may have found that the Government had proven all the necessary elements of Count One beyond a reasonable doubt, but simply could not unanimously agree on the same object of the conspiracy. On this record, without a special verdict form, "there is no way of telling," which, *if any*, of the objects of Count One the jury necessarily and unanimously found the Government did not prove beyond a reasonable doubt. *Jackson*, 778 F.2d at 940.

Another possibility is that the jury may have determined that, while Cole and others were knowingly assisting each other in the commission of their crimes, they were not able to unanimously find that the Government had proven an agreement beyond a reasonable doubt. *See United States v. Massino*, 311 F. Supp. 2d 316, 324 (E.D.N.Y. 2004) ("[A]cquittal for lack of proof of a conspiratorial agreement has no bearing on whether a second jury could find, examining the

5

same acts, that the defendant had joined a 'community of unlawful intent.'"). But more to the point, it is simply "impossible to determine with any precision upon what basis the jury reached [its] verdict" in the prior trial. *United States v. Citron*, 853 F.2d 1055, 1058 (2d Cir.1988). Thus, the defendant cannot carry his heavy burden.

Whatever may have led the jury to conclude that Government had not proven beyond a reasonable doubt that the defendant engaged in the charged conspiracy, there is no basis to preclude relevant and admissible evidence tending to prove up the counts as to which the jury did not reach a verdict. Indeed, even if it were possible to conclude that the jury found that the charged "conspiracy" did not exist, the jury certainly did not pass any judgment on whether "Mr. Cole . . . participated in any sort of . . . agreement, scheme, joint plot or plan, or committed wrongdoing or illegal acts with others" (Collateral Estoppel Br. at 5), as the defendant now asserts. The Government therefore remains entitled to prove that the defendant engaged in the charged substantive schemes, even if the evidence tends to show the involvement of other individuals. At the retrial on the substantive counts, the Government may—consistent with Second Circuit law—introduce evidence and make arguments that the defendant agreed with, directed and worked with others to execute a scheme to fraudulently inflate Iconix's revenue and earnings per share and, in the process, lie to the SEC and interfere with audits, even though the same evidence and arguments were presented on the acquitted conspiracy count.

The Second Circuit's decision in *United States v. Clark*—which the defendant does not address in his brief—is instructive here. At their first trial, Kenneth Clark and Eric Romandi were acquitted of conspiring to import heroin, but the jury was unable to reach a verdict on substantive counts of heroin importation. *Clark*, 613 F.2d at 394-395. The Government retried Clark and Romandi on the substantive counts and they were convicted. *Id.* at 396-399. At both trials, the Government's case centered primarily on the testimony of two "cooperating accomplices." *Id.* at 396. The cooperators testified about how Clark and Romandi worked with other members of "the scheme" to import heroin from Thailand. *Id.* On appeal, Clark and Romandi complained "the same

6

evidence" that was introduced to show their participation in the conspiracy in the first trial was introduced to show their guilt on the substantive counts in the retrial, in violation of the collateral estoppel doctrine. *Id.* at 399. The Second Circuit rejected that argument.

The Circuit emphasized the defendants' "particularly onerous" burden and the "reality that the basis upon which the general verdict was reached usually cannot be demonstrated with certainty." *Clark*, 613 F.2d at 400, 402. Even though the court recognized that the acquittal on the conspiracy count in the first trial meant that the jury had concluded that the defendants were not members of the conspiracy, the Circuit nonetheless found that the defendants had failed to sustain their burden of establishing that the conspiracy acquittal "necessarily resolved" the substantive counts. *Id.* at 402. The Circuit took no issue with the fact that, at the retrial, two cooperating witnesses testified that Clark and Romandi worked with others to import heroin from Thailand.

As in *Clark*, the conspiracy acquittal in this case does not "necessarily resolve" the substantive counts. Thus, notwithstanding the prior conspiracy acquittal, at the retrial on the substantive counts, the Government may still present evidence and argument of the defendant's participating in a "scheme" with "cooperating accomplices." *Clark*, 613 F.2d at 396; *see also United States v. Massino*, 311 F. Supp. 2d 316, 324 (E.D.N.Y. 2004) ("[A]cquittal for lack of proof of a conspiratorial agreement has no bearing on whether a second jury could find, examining the same acts, that the defendant had joined a 'community of unlawful intent.'").

While the defendant does not point to a case in which a court has granted the sweeping relief he requests, he claims his request was "contemplated by the Second Circuit's analysis in *Hicks*." (Collateral Estoppel Br. at 5). The Circuit's *dicta* in *Hicks* that the defendant cites does not bear the weight the defendant places on it.

In *Hicks*, the defendant (Aaron Hicks) was acquitted in his first trial of conspiracy to distribute cocaine and the jury did not reach a verdict on a RICO conspiracy count. *United States v. Hicks*, 5 F.4th 270, 273 (2d Cir. 2021). Hicks was later retried on the RICO conspiracy count and convicted. "At the retrial, the Government relied on substantially the same evidence that it had

7

presented during the first trial. In particular, it reintroduced evidence that Contreras [a cooperating witness] regularly shipped cocaine from Texas to Hicks in Buffalo—the same evidence that it had used unsuccessfully in the first trial to convict Hicks of engaging in a cocaine conspiracy." *Id.* at 274. The Second Circuit found no issue with the reintroduction of this same proof. *Id.* at 275-277. The Court did note, however, that that the Government came close in summation but "did not cross the line to encourage the jury to find that Hicks was a member of a cocaine conspiracy *separate and apart* from the RICO conspiracy." *Hicks*, 5 F.4th at 277 (emphasis added). Nonetheless, the Circuit affirmed.

Here, the Government does not intend to argue to the jury that the defendant agreed to commit and did commit wrongful and illegal acts with others "separate and apart from the" substantive charges that remain.[1] It is the very essence of the Government's theory that the substantive charges involved the defendant working with others as part of a scheme to fraudulently inflate Iconix's revenue and earnings per share and, in the process, lie to the SEC and interfere with audits. With the prior jury having failed to reach a verdict on those counts, the Government is entitled to pursue its case again.

In short, the defendant has not met his "particularly onerous" burden of showing that the prior jury "necessarily" decided with its verdicts of acquittal on two conspiracy counts that the defendant did not enter, join, or participate in any sort of conspiracy, agreement, scheme, joint plot or plan, or commit wrongdoing or illegal acts with others. *Clark*, 613 F.2d at 400, 402.

---

[1] As detailed further herein, however, the Government does argue that the Court should find, by a preponderance, that the defendant participated in a conspiracy in connection with the Court's assessment of co-conspirator statements.

II. **THE COURT PROPERLY ADMITTED STATEMENTS OF NEIL COLE'S CO-CONSPIRATOR, ETHAN COLE, AT THE FIRST TRIAL AND SHOULD DO SO AGAIN**

Cole next renews his argument to preclude the statements of Ethan Cole, a GBG employee who worked to effectuate central aspects of Neil Cole's overpayments-for-givebacks scheme. Neil Cole specifically objects to the admission of three messages that formed a core of the Government's trial proof:

- GX-1068, an August 28, 2014 message from Ethan Cole to Jared Margolis that attaches a "Summary of Various Amounts with Iconix," such as the "$5 Million Overpay from Iconix Korea"; a "$4.5 Million Proposed Overpay for Umbro/Lee Cooper China"; and notes about how the "overpay from Iconix Korea will be offset."

- GX-1139, a December 1, 2014 message from Ethan Cole to Jared Margolis that tabulates the various "Plugs" for the difference between (a) the final purchase prices for joint ventures related to Europe/Korea, LC/Umbro China, and Middle East and (b) the actual value of those deals based on revenue multiples. Like GX-1068, GX-1139 breaks out GBG's progress in recouping from Iconix the value of the overpayments.

- GX-1165, a December 15, 2014 message from Ethan Cole to an administrative assistant, attaching a list of brand names and amounts, ultimately totaling a little less than $9 million. Ethan Cole sent this message the Monday after he delivered "two large folders full of invoices and proposed backup to those invoices and told [Horowitz] that [Iconix] should pay . . . whichever of these invoices [Iconix] wanted to pay that added up to how much money [Iconix] owed them," (Trial Tr. 332), and the message shows Ethan Cole keeping track of the sham invoices GBG had delivered to Iconix.

These messages (collectively, the "Ethan Cole Exhibits") constitute strong and obvious proof of a conspiracy in which GBG overpays for joint venture interests in exchange for Iconix's agreement to send the overpayment back to GBG in various disguised forms, including sham invoices. Indeed, GX-1068 explicitly refers to two "Overpay" events and, as the Government argued in its summation, GX-1139 is essentially "a ledger . . . of the secret side deals." (Trial Tr. 2419).

The Court correctly admitted the Ethan Cole Exhibits as co-conspirator statements during the first trial. The record is replete with evidence that Ethan Cole and Neil Cole jointly participated

in a conspiracy to cause GBG to overpay on joint ventures with Iconix in exchange for givebacks (or offsets) by Iconix to GBG for the amount of the overpayment. The Ethan Cole Exhibits corroborate multiple witnesses who testified to Neil Cole's overpayments-for-givebacks scheme. They also confirm that Neil Cole concealed material details of multiple transactions from Iconix's auditors.

Cole points to no new facts that could alter the Court's original analysis of the record or that would justify the exclusion of these messages. Instead, Cole primarily invites the Court to "revisit" its earlier ruling because of the jury's verdict on the Count One conspiracy. In so doing, however, Cole encourages the Court to ignore decades of law in the Second Circuit holding that a jury's verdict, based on a beyond-a-reasonable-doubt standard, does not diminish a trial court's evidentiary finding, based on a preponderance standard, that a statement is admissible as a co-conspirator statement. Cole also repeats and intensifies a claim he made during his testimony—that he does not know and has never communicated with Ethan Cole—and thus, in his view, could not have conspired with him. Cole's claim is legally irrelevant and utterly wrong. Neil Cole and Ethan Cole participated in numerous business communications with each other during 2014. The claim is so strained that Cole's insistence now that he never communicated with Ethan Cole should be viewed as consciousness of guilt evidence that further supports the Court's finding that a conspiracy existed and both Neil Cole and Ethan Cole had parts in it.

**A. Background**

The Government has alleged and argued that Neil Cole, as CEO of Iconix, struck a corrupt agreement with executives at GBG: GBG would pay inflated sums to Iconix for joint ventures based on Neil Cole's promise that the excess would be returned to GBG in disguised form. (*See, e.g.*, Trial Tr. 32 (summarizing the scheme as, "You pay my company more money up front to do a deal so I can claim more revenue for Iconix, and then I'll turn around and send that money right back to you.")). To prove this allegation, the Government called Seth Horowitz, Iconix's former Chief Operating Officer, who testified that he and Neil Cole pursued an overpayments-for-

10

givebacks scheme with GBG to protect and enhance Iconix's quarterly and annual financial results. (*See, e.g.*, Trial Tr. 355 ("We inflated our revenues to hit quarterly numbers, and we didn't tell our finance team about it.")). Horowitz described how he effectuated the scheme with help from GBG personnel, including Jared Margolis and Ethan Cole. (*See, e.g.*, Trial Tr. 210-11, 318-19, 331, 335).

The Government also presented testimony from Jared Margolis, Ethan Cole's former supervisor, who explained that he and Ethan Cole worked on the GBG side to implement the overpayments-for-givebacks arrangement with Iconix. (*See* Trial Tr. 1123, 1128-29). Through Margolis, the Government offered GX-1068—a communication from Ethan Cole to Margolis— as a co-conspirator statement. (Trial Tr. 1124). Before admitting the email, however, the Court required the Government to augment the record regarding Ethan Cole's involvement in, and awareness of, the conspiracy. (Trial Tr. 1125-28). The Government thereafter elicited substantial additional testimony about Ethan Cole's role in the plot, including:

- Margolis and Ethan Cole were part of the process of preparing and submitting the marketing invoices to Iconix to effectuate the return of the $5 million overpayment (Trial Tr. 1130:3-9, 1148:12-16).

- To prepare these invoices GBG did not conduct any analysis of the number of hours that were worked on marketing these brands. (Trial Tr. 1148:17-20).

- Absent the commitment from Iconix to return the $5 million overpayment, GBG would not have invoiced Iconix for these marketing expenses because these marketing expenses should have been paid for by the joint venture itself. (Trial Tr. 1148:25-1149:6).

- Ethan Cole, in fact, did prepare the original round dollar figure invoices (GX-1097) and the revised invoices that provided more detail and, while still totaling $5 million, were in non-round dollar figures. (GX-1111). With respect to the revised invoices in non-round dollar figures, Margolis testified that, other than making sure they still added up to $5 million, no other analysis was conducted. (Trial Tr. 1154:1-4).

- To support the revised invoices requested by Iconix, Ethan Cole and Margolis worked together to obtain backup documentation as Iconix had requested. (Trial Tr. 1154:14-16).

11

- Ethan Cole had multiple interactions in which he made misleading and incomplete statements to other GBG employees in connection with obtaining this backup documentation for the revised invoices. (GX-1106; Trial Tr. 1156:19-1157:15; GX-1257; Trial Tr. 1159:1-1160:2 (Q. "He told her it had just come up in conversation with you, isn't that right?"; A. "That's correct." Q. "That wasn't true, was it?" A: "No."); GX-1258; Trial Tr. 1160:3-1161:15).

(*See generally* ECF Doc. 130 (summarizing record evidence of Ethan Cole's conspiratorial conduct at mid-trial)).

The parties then provided the Court with letters and oral argument addressing the admissibility of Ethan Cole's statements in GX-1068 and GX-1139. (*See* Trial Tr. 1125-1128, 1169, 1174-1178 (argument about admissibility of E. Cole's statements); ECF Doc. 130 (USA Letter re E. Cole Statements); ECF Doc. 131 (Cole Letter re E. Cole Statements)). The Court ultimately concluded, by a preponderance of the evidence, that the Government had satisfied the prerequisites for the co-conspirator statements rule:

> Primarily for the reasons set forth in the government's letter of October 17, 2021, I find that they have proven by at least a preponderance of the evidence that these exhibits should come in as co-conspirator statements. There is now substantial evidence in the record that Mr. Ethan Cole was well aware, by virtue of explicit conversations and meetings that he was a part of with Jared Margolis, among others and Mr. Horowitz, that there was a scheme to overcharge the counterparty to the joint venture in SEA-2 and 3 in order that that money would be paid back, and that it would be paid back in a way as to hide the fact that there was an overpayment in the first place. So they will be allowed.

(Trial Tr. 1337).

In later stages of the trial, the Government adduced still further proof that Ethan Cole participated in Neil Cole's overpayments-for-givebacks scheme. For example, the Government introduced a series of invoices, summarized in GX-1332, that demonstrated that Iconix and GBG had each identified different invoices as the invoices that had been paid. That evidence corroborated Horowitz's earlier testimony that Ethan Cole had dropped off a stack of invoices and

12

"asked [Horowitz] to have Iconix pay whichever of the invoices we wanted" to enable "Iconix to finish the repayment from the $5 million owed from the June joint venture before the end of the year." (Trial Tr. 333-34). Neil Cole himself later admitted at trial that he had authorized the payments to GBG, but disputed that they related to the SEA-2 transaction. (Trial Tr. 2161 (Cole: Q: "[I]n late 2014, did you authorize Iconix to pay marketing invoices from GBG totaling approximately $5.4 million." A: "I did.")). Further, Larry Shapiro, Iconix's outside auditor, testified that the substance of GX-1139 raised immediate red flags: "[T]he word 'plug' is always something that would get my attention. . . . Plug is—it's a difference, and they're just plugging it in. It's like they're making it up. So that normally connotes something bad." (Trial Tr. 1931).

### B. Applicable Law

#### 1. Co-Conspirator Statements

Statements of a defendant's co-conspirator made in furtherance of the conspiracy between them are admissible out-of-court statements. *See* Fed. R. Evid. 801(d)(2)(E). To admit a statement under Rule 801(d)(2)(E), a district court must find by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012).

"The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial. *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999); *United States v. Coppola*, 671 F.3d at 246 (the objective of the joint venture need not be any particular "crime charged in the indictment"); *United States v. DeVillio*, 983 F.2d 1185, 1193 (2d Cir. 1993) (it is not even necessary that the Government charge a conspiracy to admit statements under Rule 801(d)(2)(E)); Christopher Mueller & Laird Kirkpatrick, Evidence § 8.33, at 870 (6th Ed.) ("the exception operates even if no conspiracy charges are brought . . . or if the charged conspiracy differs from (or is not as broad as) the one suggested as the basis for admitting coconspirator statements").

13

In determining whether the predicate conspiracy has been established in order to admit the co-conspirator statement, the Court must make a finding by the preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). When determining whether the predicate conspiracy has been established, "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181 ). If it does so, however, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy.'" *Padilla*, 203 F.3d at 161 (quoting *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996)). In assessing whether a statement qualifies as a co-conspirator statement, the Court may consider inadmissible evidence (such as hearsay). *See Bourjaily*, 483 U.S. at 177-78 (citing Fed. R. Evid. 104(a)); *Gigante*, 166 F.3d at 82.

### 2. Conspiracy Verdicts and Preliminary Evidentiary Questions

The findings a jury must make beyond a reasonable doubt to convict a defendant of a conspiracy differ materially from the findings that a judge must make by a preponderance in order to admit a statement under the co-conspirator exception. As the U.S. Supreme Court has observed:

> Evidence is placed before the jury when it satisfies the technical requirements of the evidentiary Rules, which embody certain legal and policy determinations. The inquiry made by a court concerned with these matters is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied. Thus, the evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case or a civil case.

*Bourjaily*, 483 U.S. at 175.

For this reason, the law is clear: acquittal on a conspiracy count does not preclude introduction of co-conspirator statements at a subsequent retrial on substantive counts. *Clark*, 613 F.2d at 403; *United States v. Jackson*, 778 F.2d at 942 n.3.

In fact, courts have properly admitted statements under the co-conspirator exception even though there either was no conspiracy count charged at all or the conspiracy count was dismissed at the close of the Government's case. *See United States v. Stanchich*, 550 F.2d 1294, 1297–300 (2d Cir. 1977) (no error where district court admitted statements under co-conspirator exception only to later dismiss the conspiracy counts at the close of the government's case; "A judge may . . . consistently find that the evidence (even including admissible hearsay declarations) did not meet the higher test required for submission of a conspiracy count to a jury, although the independent evidence did meet the lower test required for admission of the declaration."); *United States v. Trowery*, 542 F.2d 623, 626–27 (3d Cir. 1976) ("The distinction should be noted between 'conspiracy' as a crime and the co-conspirator exception to the hearsay rule. Conspiracy as a crime comprehends more than mere joint enterprise. It also includes other elements, such as a meeting of the minds, criminal intent and, where required by statute, an overt act. When these elements are established, the crime of conspiracy is proved. . . . It follows, therefore, that the absence of a conspiracy count has no bearing on the court's determination of the competence of co-conspirator evidence."); *see also Gigante*, 166 F.3d at 82 ("[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 696 (S.D.N.Y. 2014), aff'd, 833 F.3d 74 (2d Cir. 2016) ("[A]dmission of a statement under Rule 801(d)(2)(E) does not require that the technical elements necessary to obtain a conspiracy conviction all have been satisfied—only that the statements were made 'in furtherance of some joint purpose.'. . . . Rule 801(d)(2)(E), if otherwise satisfied, therefore would have warranted receipt of the statements even if the participants in the two conversations could not have been convicted of conspiracy to commit bribery in addition to bribery.") citing *Trowery*, 542 F.2d at 626)).

Similarly, when defendants have been acquitted at trial of the conspiracy count and have thereafter argued on appeal that the admission of statements under the co-conspirator exception

were in error in light of their acquittal, these arguments have been rejected in light of the differences in the applicable standards for admitting co-conspirator statements versus convicting on a conspiracy count. *See United States v. Lysaith*, 49 F. App'x 407, 408 (4th Cir. 2002) (Per Curiam) ("We find that Lysaith's argument fails because the burden of proof for admission of testimony under Rule 801(d)(2)(E) is a mere preponderance rather than the higher standard— beyond a reasonable doubt—that would apply in order to convict him of the conspiracy count."); *United States v. Hernandez-Miranda*, 78 F.3d 512, 513 (11th Cir. 1996) ("Hernandez-Miranda contended at oral argument that his acquittal on the conspiracy charges operates retroactively to make the admission of these statements erroneous. He reasons that his acquittal of conspiracy established that he and Mercado were not coconspirators and, therefore, that Rule 801(d)(2)(E) does not apply to Mercado's testimony. Several criminal defendants have invoked this reasoning in our cases. We have regularly rejected this reasoning and continue to do so."); *United States v. Carroll*, 860 F.2d 500, 506 (1st Cir. 1988) ("Provided that the trial court properly exercised its discretion and applied the correct test for admissibility of such statements, 'the admission of testimony under the co-conspirator exception to the hearsay rule is not rendered retroactively improper by subsequent acquittal of the alleged co-conspirator.'" (quoting *United States v. Cravero*, 545 F.2d 406, 419 (5th Cir. 1976), cert. denied, 429 U.S. 1100 (1977))*; United States v. Gil*, 604 F.2d 546 (7th Cir. 1979); *United States v. Todd*, 920 F.2d 399, 406–07 (6th Cir. 1990) ("Defendant objected to this testimony on the ground that Gerald Todd had been tried previously and acquitted of the charge of conspiracy. Based on this acquittal, Gerald Todd was not part of the alleged conspiracy. Thus, according to defendant, Rule 801(d)(2)(E) did not apply, and Diehl's testimony constituted inadmissible hearsay evidence. This argument, however, fails to distinguish between the burden of proof necessary to convict a person of a crime—beyond a reasonable doubt—and the burden of proof necessary to admit evidence—preponderance of the evidence.").

### C. Discussion

#### 1. Cole's Prior Acquittal Does Not Alter the Admissibility of Co-Conspirator Statements as a Matter of Law

Neil Cole argues that his acquittal on the conspiracy charges is a "relevant and compelling" reason to conclude that the Government cannot meet its burden to show the existence of a conspiracy (Co-Conspirator Br. 1-2). But, as noted above, the law of the Circuit is that "[t]he fact that the defendants were acquitted on the conspiracy count does not destroy the admissibility of the declarations of co-conspirators on the substantive charge." *Clark*, 613 F.2d at 403 (citing *Stanchich*, 550 F.2d at 1299). For example, in *Jackson*, 778 F.2d 933, Jackson was charged with one count of narcotics conspiracy and one substantive count of possession of heroin with intent to distribute. At the first trial, the jury acquitted Jackson of conspiracy but could not reach a verdict as to the substantive count. The Second Circuit specifically noted that admission of co-conspirator statements under Rule 801(d)(2)(E) "because of the difference in standards, would be fully available even though Jackson had been acquitted of participation in the conspiracy." *Id.* at 942 n.3 (citing *Stanchich*, 550 F.2d at 1299 & n.4). Other more recent cases have reached similar conclusions. *See United States v. Goodwin*, 131 F.3d 132 (2d Cir. 1997) (rejecting defendant's challenged to the sufficiency of the evidence supporting his conviction for possession with the intent to distribute narcotics in light of "all of the evidence admitted against him, including the hearsay testimony of his co-conspirators" and expressly noting that "admission of the co-conspirator evidence against [the defendant] was proper despite his acquittal on conspiracy charges" (citing *Clark*, 613 F.2d at 402–03)); *United States v. Delligatti*, No. 15 CR. 491 (KBF), 2018 WL 1033242, at *4 (S.D.N.Y. Feb. 23, 2018) ("The standard for a judicial determination that the elements to allow admission pursuant to the co-conspirator exception are met is lower than that for a criminal conviction. Courts repeatedly have found that even an acquittal on a conspiracy count 'does not destroy the admissibility of the declarations of coconspirators on the substantive charge.'" (quoting *Clark*, 613 F.2d at 403)); *United States v. Corrao*, No. 86 Cr. 0556 (SWK), 1988 WL 36322, at *7 (S.D.N.Y. Apr. 11, 1988) ("In *United States v. Clark . . .* the Second Circuit

17

held that an acquittal on a conspiracy count has no effect on the admissibility of co-conspirator statements relating to the substantive charge because different standards govern the two determinations; the court may consistently find that evidence did not meet the guilt beyond a reasonable doubt test required to submit a conspiracy count to a jury but did meet the lower preponderance of the evidence test requirement for admission of the statement."); *United States v. Simmons*, 374 F.3d 313, 320–21 (5th Cir. 2004) ("Simmons claims that out-of-court statements were improperly admitted as coconspirator statements under FED.R.EVID. 801(d)(2)(E). . . . Specifically, he argues that the testimony of Akin, Cuevas, and Crafton (and the tape of a conversation between Cuevas and Simmons) relating to the Lubbock conspiracy, should have been excluded . . . because Simmons had already been acquitted of participation in that conspiracy. . . . The government correctly contends that Simmons' prior acquittal was no bar to its evidence that Simmons participated in the Lubbock conspiracy for purposes of admitting coconspirator statements."); *United States v. Lacey*, 856 F. Supp. 599, 601–02 (D. Kan. 1994) ("'[E]ven where the declarant has been tried and acquitted in another proceeding, courts may permit receipt of the statement as a coconspirator's admission if [the elements for admitting the statement under 801(d)(2)(E) have been established by a preponderance of the evidence].'" (quoting 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(E) [01] (1993))).

Cole nevertheless insists that the "jury's verdict . . . must be given weight and meaning" in this Court's assessment of the co-conspirator exception at the retrial. (Co-Conspirator Br. 5-6). But the only support Cole provides for this claim (*see* Co-Conspirator Br. 5 & 6 ) is *United States v. Gil*, an opinion of the United States Court of Appeals for the Seventh Circuit where the court remarked that "an acquittal *might* be relevant and persuasive" in considering the applicability of the co-conspirator exception, 604 F.2d at 549. *Gil* counsels against Cole's argument, however, because the Seventh Circuit approved the admission of co-conspirator statements against the defendant even though the co-conspirator had been acquitted of the conspiracy on the basis of an entrapment defense. *See Gil*, 604 F.2d at 548-50. As that court noted:

> The substantive criminal law of conspiracy, though it obviously overlaps in many areas, simply has no application to [the co-conspirator statements] evidentiary principle. Thus, once the existence of a joint venture for an illegal purpose, or for a legal purpose using illegal means, and a statement made in the course of and in furtherance of that venture have been demonstrated by a preponderance of the evidence, it makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy.

*Id*. at 549-50. The Seventh Circuit's observation that "an acquittal *might* be relevant and persuasive" in considering the applicability of the co-conspirator exception, *id.* at 549 (emphasis added), neither supports the rule urged by Cole now—that a court "must" give weight to the jury's verdict—nor, being *dicta*, does it create any rule at all. Moreover, the trial in *Gil* was a bench trial, so the observation that the trial judge should consider his or her verdict in evaluating the evidence is both obvious and inapplicable.

### 2.   The Facts Amply Support the Court's Prior Ruling

This Court's decision to admit certain Ethan Cole communications pursuant to Rule 801(d)(2)(E) rested on a firm factual foundation and followed extensive argument and briefing on the topic. The Court's ruling stands on an even stronger record now.

#### a.   A Conspiracy Existed

The record from the first trial demonstrates well beyond a preponderance of the evidence that an overpayments-for-givebacks scheme existed. Deal documents showed that millions of dollars for Iconix materialized near the end of negotiations for each of SEA-1, SEA-2, and SEA-3. Horowitz (with respect to SEA-2 and SEA-3), Rabin (with respect to all three deals), and Margolis (with respect to SEA-2 and SEA-3) testified that those last-minute additions reflected an agreement by GBG to increase the purchase price in exchange for offsetting later payments to GBG from Iconix. (*See, e.g.*, Trial Tr. 258-59, 295-96 (Horowitz) ("[T]hat commitment from Iconix was the only reason the purchase price increased from 15.5 million to 21.5 million."); Trial

19

Tr. 980-82 (Rabin) (Q: "[W]hy is it that you agreed to increase the purchase price by 5 million?" A: "Because I was getting back 5 million."); and Trial Tr. 1115, 1122 (Margolis)). That testimony was corroborated by contemporaneous notes, calendar appointments, emails, marketing invoices, and draft royalty relief documents. Among them, of course, are Ethan Cole's emails that explicitly refer to "overpay" and "offset" in connection with the joint ventures. (*See* GX-1068; GX-1139).

The trial record is further bolstered by Iconix's auditor's conclusion, after investigation into Horowitz's allegations, that the economic substance of Iconix's $2 million payment to GBG in connection with SEA-1 payments could not be supported by contemporaneous records; nor could the $5 million payments to GBG for purported marketing after SEA-2; nor could the $3.1 million payment to GBG for due diligence and market analysis for the Middle East/North Africa JV.

Accordingly, while the jury ultimately acquitted Neil Cole of the alleged conspiracies, the record of the existence of such a conspiracy remains robust and credible, and it continues to support the Court's finding by at least a preponderance of the evidence.

### b.   Ethan Cole and Neil Cole Took Part in the Conspiracy

The overpayments-for-givebacks scheme involved both Neil Cole, at Iconix, and Ethan Cole, at GBG, along with other participants at both companies. Multiple trial witnesses and exhibits described Ethan Cole's active role in facilitating Iconix's givebacks to GBG.

To take an example: Horowitz testified about a September 5, 2014 meeting that Ethan Cole also attended where the overpayments and givebacks were discussed.[2] Per Horowitz, at the meeting the group "discussed the payments and how Iconix would like to be invoiced for the $5 million that we owed to GBG" and also discussed "the increased purchase price for the joint venture in June, as well as the Rocawear Kids termination." (Trial Tr. 233-34). Horowitz further

---

[2] A calendar invite sent from Seth Horowitz's assistant to Margolis, Ethan Cole and Horowitz (and certain of their assistants) reflects that a September 5, 2014 meeting occurred at 2:00 p.m. at Iconix's offices in Conference Room 3B. (GX-1082).

testified he prepared a sheet summarizing the givebacks and overpayments that he handed out at the meeting (GX-1084), and his account is corroborated by the cover email to this document which shows that he had his assistant print three copies of the document to bring into the conference room where the calendar entry indicates Horowitz was meeting with Margolis and Ethan Cole. The attachment to that email sets out information about the $5 million in marketing invoices that were used to effectuate the SEA-2 giveback, and also reflects discussion of the inflated $21.5 million purchase price on SEA-3 and the contemplated giveback for that inflation (royalty relief for GBG regarding minimum payments owed to Iconix for the brand Rocawear). (GX-1084, at 2). On September 5, 2014 at approximately 5:06 p.m. – mere hours after the 2:00 P.M. meeting at Iconix – Ethan Cole emailed Horowitz, copying Margolis, requesting a "soft copy" of the Rocawear license termination letter, that is, the contemplated secret giveback for SEA-3. (GX-1085).

For an illustration that Ethan Cole and Neil Cole operated within the same scheme, the Court need look no further than the exhibits and testimony surrounding the invoices used to effectuate part of the SEA-2 giveback. As the Court may recall, GBG's initial attempts to invoice Iconix were met with frustration because the invoices were in large, round-dollar amounts with no backup and called for immediate payment. (*See* Trial Tr. 268-70, 275, 311). Eventually, Ethan Cole dropped off to Horowitz a stack of invoices with instructions that Iconix select acceptable invoices to pay. (Trial Tr. 332). Horowitz delivered the invoices to Neil Cole, who initialed a subset of them, and authorized payment. (Trial Tr. 346-47 (Horowitz); Trial Tr. 1666-67 (McLaughlin)). Taken together, this evidence shows the coordination between Ethan Cole, Seth Horowitz, and Neil Cole in furtherance of the giveback for the SEA-2 overpayment, as agreed, in the form of pretextual marketing payments.

Largely ignoring the record, Neil Cole urges the Court to credit his own testimony that he did not participate in a conspiracy with Ethan Cole or anyone and, more specifically that, "I don't know Ethan Cole." (Trial Tr. 2247), and "I never communicated with Ethan Cole," (Trial Tr. 2362). Indeed, Cole now goes so far as to call those facts "undisputed," arguing: "It remains true

21

that Neil Cole and Ethan Cole do not know each other. There are no email communications between them or including both of them. They never discussed Iconix and GBG business. They never reached or discussed any agreement with each other, illegal or otherwise." (Co-Conspirator Br. 1).

Each of Cole's assertions is demonstrably false. Neil Cole and Ethan Cole are repeatedly on the same correspondence during the period of the alleged scheme. They correspond about Iconix and GBG business. And they both participate in negotiating, finalizing, and implementing agreements between their respective companies. To illustrate the point, the Government has collected more than 30 examples of correspondence, calendar appointments, and conversations relating to both Ethan Cole and Neil Cole as exhibits to an accompanying declaration (the "Cole & Cole Exhibits"). (*See* Ex. A through Ex. HH to the October 17, 2022 AUSA Declaration).

The Cole & Cole Exhibits reflect numerous communications between Neil Cole, Ethan Cole, and other senior executives at Iconix and GBG during the period of the alleged scheme. Those communications between and among Neil Cole, Ethan Cole, and others include:

- A March 11, 2014 message from Jared Margolis to Neil Cole, copying Ethan Cole, Daniel Castle, and Jason Rabin regarding royalty projections for a potential Korea joint venture. *See* Ex. A to AUSA Decl.

- An April 24, 2014 message from Margolis to Neil Cole and Daniel Castle, copying Ethan Cole, regarding a potential royalty payments arrangement with "Victor." *See* Ex. G to AUSA Decl.

- A July 11, 2014 message from Ethan Cole to Neil Cole, copying Jared Margolis, asking Neil Cole a question. ("Hi Neil, I am revising the Mossimo term sheet . . . .") *See* Ex. M to AUSA Decl.

- A July 11, 2014 message from Neil Cole to Ethan Cole, copying Margolis, in which Neil Cole informs Ethan Cole that Margolis "would know better" the answer to his question. *See* Ex. N to AUSA Decl.

- An August 5, 2014 message from Jared Margolis's assistant to Jason Rabin, Seth Horowitz, and Neil Cole, copying Ethan Cole, among others, relating to a potential August 7, 2014 meeting at GBG's offices. *See* Ex. O to AUSA Decl.

- An August 15, 2014 email from Ethan Cole to Seth Horowitz, copying Neil Cole, Willy Burkhardt, and Jared Margolis. *See* Ex. Q to AUSA Decl.

22

- An August 15, 2014 email from Neil Cole to Ethan Cole and Seth Horowitz, copying Willy Burkhardt, Jared Margolis, and Jason Rabin, asking a question about the proposed terms. *See* Ex. R to AUSA Decl.

- An October 8, 2014 email from Jared Margolis to Neil Cole and Willy Burkhardt, copying Ethan Cole. *See* Ex. Z to AUSA Decl.

- A December 18, 2014 message from Ethan Cole to Neil Cole, Seth Horowitz, Jason Rabin, Jared Margolis, and lawyers for Iconix and GBG, in which Ethan Cole sends a revised draft of summary material terms for the Middle East joint venture. *See* Ex. CC to AUSA Decl.

The Cole & Cole Exhibits also reflect numerous instances in which Iconix personnel forwarded messages from Ethan Cole to Neil Cole or otherwise apprised Neil Cole of something Ethan Cole had said or done. These messages include:

- A May 8, 2014 message from Daniel Castle to Neil Cole, forwarding a message from Ethan Cole about a term sheet, in which Castle advises Neil Cole, "Lets approve this." *See* Ex. K to AUSA Decl.

- A September 16, 2014 message in which Seth Horowitz writes Neil Cole, "Ethan just called to tell me we will have signatures this afternoon," in apparent reference to SEA-3. *See* Ex. W to AUSA Decl.

- A September 29, 2014 message in which Horowitz writes Neil Cole, "Neil, I have a meeting with Jason at 3:30 today at the Empire State Building. Then meeting with Jared and Ethan. Can we spend some time today discussing prior to me heading over? Best/Seth." *See* Ex. X to AUSA Decl.

- A December 13, 2014 message thread in which Cole asks about open issues with the Middle East JV and Horowitz responds, in part, "Also reviewed all International investments with Ethan, Jared and Jason—as they needed conceptual sign off." *See* Ex. BB to AUSA Decl.

- A December 18, 2014 message thread between Neil Cole and Seth Horowitz, in which Horowitz writes "Neil, Just spoke to Ethan. Can we have a quick call? Seth" and Neil Cole replies, "Yes at desk" and supplies his phone number. *See* Ex. EE to AUSA Decl.

- A December 18, 2014 message in which Seth Horowitz forwards to Neil Cole a message from Ethan Cole, writing, "Please let me know if you would like me to follow up/do anything on this." *See* Ex. FF to AUSA Decl.

Finally, the Cole & Cole Exhibits also reflect numerous instances in which both Neil Cole and Ethan Cole received invites to the same Iconix JV board meetings, including invites for meetings

23

scheduled on August 14, 2014, August 26, 2014, September 15, 2014, November 18, 2014, and December 18, 2014. (*See, e.g.,* Ex. P, Ex. U, Ex. V, and Ex. DD to AUSA (calendar appointments and revised appointments)).

The Cole & Cole exhibits demonstrate that—contrary to Neil Cole's testimony and his factual assertions in his motion—Neil Cole and Ethan Cole were recurring collaborators on Iconix-GBG business issues; were routinely on the same message threads with each other, as well as the other significant members of the alleged conspiracy, such as Horowitz and Margolis; and directly interacted during the central period of the alleged scheme.

Of course, whether Neil Cole and Ethan Cole interacted often—or ever—is of no special significance. As this Court observed during the last trial, "it's fairly straightforward longstanding law, at least in the Second Circuit, that you don't have to know the other members of the conspiracy." (Trial Tr. 1175). *See also United States v. Sureff*, 15 F.3d 225, 230 (2d Cir. 1994) ("A single conspiracy may encompass members who neither know one another's identities, nor specifically know of one another's involvement."). The fact that Cole falsely insists that he does not know his co-conspirator is, however, further consciousness of guilt evidence that supports the Court's earlier finding that Neil Cole and Ethan Cole participated in the same conspiracy.

The proof of Ethan Cole's participation in the overpayments-for-givebacks scheme is not undermined in any way by notes of a 2019 attorney proffer on behalf of Ethan Cole. Indeed, this argument was rejected when raised by the defendant prior to the last trial. (*See* ECF Doc. 131). During that attorney proffer, Ethan Cole's counsel informed the Government, in substance, that Ethan Cole "understood at some point that GBG had paid more for its share of Iconix shares tha[n] GBG believed they were worth, GBG believed it could recoup by billing Iconix for marketing and strategy work. At the time, Ethan did not think there was anything improper about that." The notes also reflected that he didn't "know if services actually [were] provided" to Iconix. (*See* 3517-003).

If credited, the Ethan Cole proffer notes constitute further proof of the existence of the conspiracy: they demonstrate that Ethan Cole understood there was a common agreement that

24

GBG executives would overpay for SEA assets in exchange for a promise by Iconix to return the amount of the overpayment some other way.[3] They also reflect that Cole worked to implement that agreement by attending meetings, taking notes, and assembling invoices. (3517-003).

Neil Cole, however, seizes on Ethan Cole's counsel's assertion that "Ethan did not think there was anything improper about" Ethan Cole's conduct as determinative of whether Ethan Cole joined any conspiracy. (Co-Conspirator Br. 9). This point cannot bear the weight Neil Cole assigns to it. First, as a matter of law, the relevant question is whether Ethan Cole understood and shared in a common plan with Neil Cole, not whether Ethan Cole recognized the plan as criminal. Indeed, as the Second Circuit has repeatedly acknowledged, "the objective of the joint venture that justifies deeming the speaking as the agent of the defendant need not be criminal at all." *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) (citing *Fischl v. Armitage*, 128 F.3d 50 (2d Cir. 1997)). The Ethan Cole attorney proffer notes make plain the Ethan Cole understood the objective of the joint venture: overpayments-for-givebacks. Second, Neil Cole engages in a bit of calculated naivete when he asserts that the Ethan Cole attorney proffer must necessarily reflect the "truthful statements of Ethan Cole," as opposed to merely an accurate summary of what Cole told his counsel, whether true or otherwise. (Co-Conspirator Br. 7). After all, the record includes evidence that Ethan Cole misled and deceived other GBG employees who were not knowing participants the scheme in connection with obtaining documentation to use to effectuate the SEA-2 giveback. (GX-1106; Trial Tr. 1156:19-1157:15; GX 1257; Trial Tr. 1159:1-1160:2 (Q. "He told her it had just come up in conversation with you, isn't that right?"; A. "That's correct." Q. "That wasn't true, was it?" A: "No."); GX-1258; Trial Tr. 1160:3-1161:15).

---

[3] Also, if credited, Ethan Cole's statements represent yet one further reason to conclude Neil Cole offered perjured testimony during the first trial. (*See* Trial Tr. 2122 (Cole) (Q: "[W]hat commitments or obligations, if any, did Iconix undertake with Li & Fung or GBG in connection with SEA-1, SEA-2 or SEA-3 that were not in the written transactions documents?" A: Nothing that was not in the documents.")).

25

Neil Cole further argues that the Court must require "independent corroborating evidence" that will "link Ethan Cole to the conspiracy" before it can conclude that the Ethan Cole Exhibits are co-conspirator statements. Neil Cole misapprehends the law. The Second Circuit has held that "there must be some corroborating evidence of *the defendant's* participation in the conspiracy" beyond the proffered hearsay statement itself before admitting the statement. *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996) (emphasis added); *Gigante*, 166 F.3d at 82 (citing *Tellier*). Here, of course, the Government presented multiple witnesses who spoke to the defendant's involvement in the overpayments-for-givebacks plan, including Jason Rabin, Jared Margolis, and Seth Horowitz—to say nothing of dozens of emails and other records. To be sure, there is also evidence of Ethan Cole's knowledge and participation—as summarized above—but the Government has far exceeded its actual burden to show "some independent corroboration" of the *defendant's* involvement in the conspiracy, and Neil Cole cannot seriously contend that the Government is relying on Ethan Cole's statements alone to show Neil Cole's participation in the conspiracy.

       *c.*   *Ethan Cole's Statements Furthered the Conspiracy*

The record also supports the Court's finding, by a preponderance, that each of GX-1068, GX-1139, and GX-1165 constitute statements made in furtherance of the overpayments-for-givebacks conspiracy.

With respect to GX-1068, the document expressly acknowledges the "overpayment" scheme and includes notes about how to accomplish the givebacks, which were a core part of the scheme. For example, the attachment to the email describes a "$5 Million Overpay from Iconix Korea" and goes on to state that "[t]he $5M overpay from Iconix Korea will be offset by . . . $2.5M Rocawear, $1.0 M Zoo York SEA Marketing, [and] $1.5M Peanuts China Marketing." The document also describes a "$4.5 Million Proposed Overpay for Umbro / Lee Cooper China" and goes on to state that this proposed overpayment "will be offset by Iconix paying the $4.5M in markdown money to Rainbow." (*Id.*). The attachment also references "Additional Amounts – TBD

26

[To Be Determined]," which consist of, among other things, "$3.5M in Rocawear royalty for YR [year] 2" that "remains outstanding" and "$3.5M in fixtures" that "remains outstanding."

With respect to GX-1139, a December 1, 2014 message from Ethan Cole to Jared Margolis that tabulates the various "Plugs" for the difference between (a) the final purchase prices for joint ventures related to Europe/Korea, LC/Umbro China, and Middle East and (b) the actual value of those deals based on revenue multiples. Like GX-1068, GX-1139 breaks out GBG's progress in recouping from Iconix the value of the overpayments, an ongoing effort that was central to the scheme. As the auditor Larry Shapiro later testified, the use of the word plug is significant: "[T]he word 'plug' is always something that would get my attention. . . . Plug is—it's a difference, and they're just plugging it in. It's like they're making it up. So that normally connotes something bad." (Trial Tr. 1931).

Moreover, GX-1139 bears a strong resemblance to GX-706, a spreadsheet prepared by Horowitz during the heart of the scheme and reflects amounts owed to GBG to make them whole for overpayments. Both documents reflect efforts by each side of the conspiracy to keep track of their obligations to each other and what progress had been made toward achieving them. These documents enabled the conspirators to have productive discussions about what to do next. Horowitz, for example, testified about a December 2, 2014 meeting between Neil Cole, Jason Rabin, Jared Margolis, and himself. Margolis testified that Ethan Cole prepared GX-1139 at Margolis's direction in anticipation of that same meeting. (Trial Tr. 1168). That testimony is further corroborated by a December 1, 2014 email chain between Horowitz, Margolis, and Ethan Cole (GX 1134), in which Margolis referenced "the allocations" that were to be discussed at a meeting with Neil Cole and Jason Rabin. Horowitz further stated that his understanding of what was going to be discussed at that upcoming meeting was that "the two parties [that is, Iconix and GBG] were going to come to terms on how the repayments would be made to settle everything up." (Trial Tr. 319; *see also* Trial Tr. 319-20).

27

GX-1165, for its part, reflects Ethan Cole's continuing attempts to secure the SEA-2 giveback disguised as marketing payments. Horowitz testified that on December 12, 2014—less than two weeks after the December 2 "allocations" meeting—Ethan Cole "dropped off two large folders full of invoices and proposed backup to those invoices and told me that we should pay whatever – whichever of these invoices we wanted to pay that added up to how much money we owed them." (Trial Tr. 332:6-20). These invoices related to the giveback on the SEA-2 transaction (Trial Tr. 333:25-1). The invoices and backup that Ethan Cole dropped off with Horowitz were "six to eight inches high of paperwork" and totaled more than the remainder of the $5 million that was owed by Iconix to GBG on the overpayment. (Trial Tr. 333:10-22). The following Monday, December 15, 2014, Cole sent the message in GX-1165, directing his secretary to print a list of invoices—that is, the collection of invoices that Ethan Cole had dropped off at Iconix the prior Friday.

Neil Cole resorts to the generic assertion that the documents "are not, by themselves, statements in furtherance of a conspiracy" and argues that "[u]nder the government's reasoning, every email sent about these deals would be admissible regardless of who sent them and regardless of what the declarant believed about the email." (Co-Conspirator Br. 10). If Neil Cole means to say that the Court should look at the context of the messages to assess their meaning, the Government agrees. Here the context is that a small group of Iconix and GBG executives worked together for months to inflate deal prices for Iconix's benefit and to arrange for disguised payments to GBG to offset the inflated prices. As described in detail above, Neil Cole and Ethan Cole both formed part of that group and each of them took steps to accomplish the overpayments-for-givebacks plan within their separate corporations. In that context, the statements by Ethan Cole contained in GX-1068, GX-1139, and GX-1165 represent efforts by Ethan Cole to further the scheme.

Finally, the Court should reject the argument that the Government must call Ethan Cole himself in order to secure the admission of his statements. (*See* Co-Conspirator Br. 10). This

28

argument is legally erroneous, as co-conspirator statements are admissible whether the witness is available or not, and Rule 801(d) says nothing about requiring the proponent of a party admission to call the declarant to explain the purpose of the statement. *See* Fed. R. Evid. 801(d). Nor does Rule 104(a), which describes the Court's role in assessing preliminary questions such as the existence of a conspiracy, require the Court to hear from a declarant before finding a particular statement is admissible pursuant to Rule 801(d)(2). Nor do any of the cases that Cole cites as authority for his assertion support his view of the law. (*See* Co-Conspirator Br. 10 (citing *United States v. Maliszewski*, 161 F.3d 992, 1008-09 (6th Cir. 1998) (affirming introduction of statement about "jumping" a person in a narcotics conspiracy); *United States v. West*, 142 F.3d 1408, 1413-14 (11th Cir. 1998) (finding a district court abused its discretion by admitting written statements pursuant to Rule 801(d)(2)(E) where "[t]he court never identified the author, or declarant, of the notebook, and was thereby unable to determine if its author was a member of the conspiracy and if the entries in the notebook were in furtherance of the conspiracy"); and *United States v. Urbanik*, 801 F.3d 692, 698 (4th Cir. 1986) (finding a reference to a drug supplier to be "merely a casual aside to the discussion of [a particular] weight-lifter."))). The Court's task is to decide the evidentiary question by a preponderance of the evidence, and there is no fact or source the Court must consider or ignore in doing so.

In the end, Neil Cole's insistence that the Government must call Ethan Cole runs counter to the rationale for admitting co-conspirator statements in the first place. The Supreme Court has observed that co-conspirator statements "provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court." *United States v. Inadi*, 475 U.S. 387, 395 (1986). And the Supreme Court has emphasized that providing the jury with the statement may be superior to providing testimony from the declarant: "The declarant himself may be facing indictment or trial, in which case he has little incentive to aid the prosecution, and yet will be equally wary of coming to the aid of his former partners in crime. In that situation, it is extremely unlikely that in-court testimony will recapture the evidentiary significance of statements

made when the conspiracy was operating in full force." *Id.* Here, Ethan Cole's contemporaneous communications—including the telling choice to refer to "overpay" and "offsets"—provides the jury with highly probative evidence of how the participants of the scheme understood their work at the time they undertook it.

### D.  Ethan Cole's Statements Are Admissible on Other Grounds

As articulated in the Government's earlier letter brief on GX-1068 and GX-1139, those records are admissible as statements against penal interest and statements of Ethan Cole's then existing state of mind. (*See* ECF Doc. 130). Neil Cole's assertion that Ethan Cole would have no plausible basis to assert his right to silence, and thus is an "available" witness within the meaning of the hearsay rules, is simply wrong. Ethan Cole's counsel has informed the Government as recently as last week that Ethan Cole would invoke his right to silence if called to testify.

As to GX-1165—the email by which Ethan Cole directs his secretary to print a document— neither the email nor the attachment are actually being offered for their truth and so do not run afoul of the rule against hearsay at all. *See* Fed. R. Evid. 801. The email illustrates an action Ethan Cole took with respect to the invoices, nothing more.

The Court correctly admitted the Ethan Cole Exhibits at the first trial and it should do so again.

### III.    EVIDENCE OF ICONIX'S POST-SCHEME PURCHASE OF SEA-3 ASSETS SHOULD BE PRECLUDED.

In advance of the first trial, the Government moved to exclude evidence of Iconix's purchase of assets from the SEA-3 JV *after* the defendant left the company as irrelevant and inadmissible under Rule 403. (ECF Doc. 115 at 11-16). After full briefing, the Court granted the Government's motion. (Sept. 30, 2021 Tr. at 22). The Court's ruling was manifestly correct, and the defendant has offered no reason for the Court to change course.

### A.  Background

In September 2014, GBG paid Iconix a total of $21.5 million for a fifty-percent interest in the SEA-3 JV, which consisted of trademark rights to the Umbro and Lee Cooper Brands in China, Hong King, Macau, and Taiwan. During the SEA-3 negotiations, Cole reached a secret agreement with GBG representatives that GBG would artificially inflate the buy-in purchase price it paid to Iconix by $6 million, from approximately $15.5 million to approximately $21.5 million, in exchange for Iconix's commitment to reimburse GBG the $6 million overpayment at a later time. Cole reached this understanding in order to falsely inflate the revenue that Iconix would recognize from SEA-3 by approximately $6 million. In September 2014, Iconix recognized revenue from SEA-3 in the amount of approximately $18.7 million, reflecting the purchase price of approximately $21.5 million, less Iconix's cost basis in the brands contributed to the JV. In fact, SEA-3 resulted in the false inflation of Iconix's revenue by approximately $6 million. The undisclosed and undocumented commitment that Cole made for Iconix to reimburse GBG for its $6 million overpayment was not accounted for in Iconix's books at the time SEA-3 was entered.

In December 2015, after the reporting periods at issue in this case and several months after Cole left Iconix, Iconix purchased GBG's interest in the Umbro and Lee Cooper in the China region for $24.7 million. Thus, Iconix paid GBG several million dollars more in 2015 for the same interest that GBG had purchased from Iconix in 2014.[4]

In his motion, Cole argues that he should be permitted—contrary to the Court's prior ruling—to introduce evidence of the 2015 sale. In one portion of his motion, the defendant represents that "[t]he *sole purpose* for introducing this evidence is so that the jury may be fully

---

[4] Based on its investigation to date, the Government expects that the Iconix executive who negotiated the 2015 sale would testify, in substance, that he believed Iconix could do better with Umbro (an SEA-3 asset) with a local Chinese partner, rather than GBG, because GBG had not been performing well with the brand in China in the year or so after the formation of SEA-3. The Government further expects that former Iconix executive would testify that, as a result, Iconix bought Umbro back from the SEA-3 JV for a small premium and that buying it back at a lower price would have risked impairment.

31

informed when evaluating the fair value of the SEA 3 assets, and whether the SEA 3 purchase price was artificially inflated, as the government contends." (SEA-3 Br. at 10 (emphasis added)). In another portion, however, Cole claims that the evidence "is critical to show" that the defendant "acted in good faith." (SEA-3 Br. at 8).

### B. Discussion

Cole is charged in this case with securities fraud, making false statements in SEC filings, and misleading the conduct of audits, with respect to Iconix's financial reporting in the fourth quarter of 2013 and in calendar year 2014. In assessing these issues, the relevant facts are those that Cole knew or understood at the time of the alleged misconduct, not subsequent developments that have no bearing on how the transactions should have been reported at the time they occurred in 2013 and 2014. Nothing about the 2015 sale of SEA-3 assets has any bearing on the negotiations that took place in August and September 2014 about the valuation of those assets. The subsequent asset sale is thus irrelevant to Cole's state of mind or intent in carrying out SEA-3, which he booked in order to reach analyst consensus for revenue and earnings per share in the third quarter of 2014. As noted above, the 2015 sale took place after Cole resigned from Iconix.

The defendant is wrong to suggest that the jury is being called upon to "evaluat[e] the fair value of the SEA 3 assets." (SEA-3 Br. at 10). The fair value or intrinsic worth of SEA-3 is not an element of any offense and is entirely beside the point. Contrary to the defense's suggestion, the Government will not attempt to prove that SEA-3 had one inherent "correct valuation" or "one uniformly accepted valuation and price of the assets." (SEA-3 Br. at 1, 6). Instead, the Government will prove that GBG and Cole agreed GBG would pay $15.5 million for the interest in SEA-3, further agreed to pay an additional $6 million as part of an undisclosed side deal, and reached those agreements in order to create the appearance of gain for Iconix that would not have been booked if Cole had disclosed all of the terms of the deals to Iconix's auditors. Later valuations of the SEA-3 interest do not at all tend to prove those allegations true or false, so they should be excluded. *See* Fed R. Evid. 401, 402. After all, GBG did not, and could not, know that Iconix would seek to

32

reacquire the SEA-3 interest at the end of 2015, and so that later development cannot explain in any way GBG's assessment of the deal in 2014.

Moreover, the relevant issue is what the Iconix and GBG executives who negotiated these transactions believed they were buying and at what price. There will be ample evidence in the record that the defendant and others at Iconix, as well as the executives at GBG negotiating the deal, recognized that the purchase price GBG ultimately paid represented more than GBG would have paid without an assurance from Iconix to send the amount of the overpayment back. Even assuming for the sake of argument that the parties were somehow mistaken in their belief about what the then-existing fair value purchase price should have been before they added on an overpayment, such a mistaken belief ultimately has no bearing on this case.

In addition, even if testimony about the intrinsic value of the interest GBG was acquiring through the joint ventures were relevant, which it is not, looking to a subsequent transaction price (reached through negotiations after Cole was no longer even employed by Iconix) to determine intrinsic value would be inappropriate. What would matter is what the intrinsic value was at the time transaction closed, not what it was later valued to be worth in a subsequent transaction. There could be any number of factors—including changes in the business environment and other macroeconomic factors—that would lead to the intrinsic value going up or down in the months and years that followed the transaction closing, all of which would require the presentation of evidence that would be confusing, irrelevant, and a waste of the jury's time. But that has nothing to do with whether at the time the transaction closed GBG paid a fair value.[5]

---

[5] This testimony about the fair value of SEA-3 is plainly irrelevant. But even assuming *arguendo* it were not, to conduct a valuation of the transactions at the time they closed—not on a later date— the defendant would ultimately have to call an expert witness who could conduct a detailed and reliable economic analysis that complies with all of the requirements of *Daubert* and its progeny. The defense has not given expert notice for such an expert and any notice at this late juncture would be untimely. *See Glenwood Cap., LLC v. W. Plains Co.*, No. 13-2109-RDR, 2014 WL 3359310, at *4 (D. Kan. July 9, 2014) ("The law is also clear that generally the valuation of a

Nor should Cole be permitted to introduce evidence of a post-scheme sale of SEA-3 assets to demonstrate his purported good faith in negotiating or entering into SEA-3, as the defendant suggests in his brief. (SEA-3 Br. at 8 (arguing 2015 sale evidence "is critical to show" that the defendant "acted in good faith")). The "well-intentioned belief that a business venture in which a defendant was involved would be successful and would allow for repayment of money taken from victims does not supply a basis for a defense that there was a good faith belief that a representation was true." *United States v. Okun*, Cr. No. 08-132, 2009 WL 414009 (E.D. Va. Feb. 18, 2009) (citing *United States v. Godwin*, 272 F.3d 659, 666-67 (4th Cir. 2001)); *United States v. Berger*, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) (finding that a guilty verdict on securities fraud charges based on the fact that the defendant intentionally caused others to issue false or misleading statements to investors would be proper regardless of evidence of the defendant's belief that his investment strategy would be successful financially); *United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) ("The definition of good faith addresses the defendant's belief in the truth of the representations, and not the defendant's belief as to the ultimate success of the plan." (citing 1A Sand, Modern Federal Jury Instructions, ¶ 44.01)).

When granting the Government's motion *in limine* in advance of the first trial, the Court correctly found that this issue is similar to a "no ultimate harm" charge. (Sept. 30, 2021 Tr. at 22). In situations where a defendant has improperly presented evidence or argument of his good faith belief in the success of a scheme in which false representations have been made to victims or

_____

business requires expert testimony."); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 324 (S.D.N.Y. 2015) ("there comes a point at which expert testimony is rightly seen as based on speculation, conjecture, or an assumption so unrealistic as to warrant exclusion through the court's role as gatekeeper.") (citations omitted); *Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186–87 (7th Cir. 1993) (reversing district court's admission of business valuation testimony because the judge did not undertake a preliminary assessment, mandated by Daubert, of whether the methodology underlying the testimony was scientifically valid and whether it could be applied to the facts in issue); *Ullman-Briggs, Inc. v. Salton/Maxim Housewares, Inc.*, No. 92 C 2394, 1996 WL 535083, at *3 (N.D. Ill. Sept. 17, 1996) (collecting cases regarding necessary expert methodology to conduct a valuation of a business).

investors, the Second Circuit has routinely upheld the issuance of a "no ultimate harm" charge, which instructs the jury that "a belief of a defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by you that he acted in good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by [the defendant]." *United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008) (finding that instruction in a securities fraud trial was appropriate where the defendants, who had defrauded investors in a movie by misleading those investors about how investment monies would be spent, had argued at trial that they had a good faith belief that the movie would be completed); *United States v. Levis*, 488 F. App'x 481, 486 (2d Cir. 2012) (finding that instruction was appropriate where the defendant, who had made misrepresentations regarding the independent valuation of his company to investors, had argued at trial that he did not believe any harm would befall investors). Often the instruction is given when this improper argument arises at trial. Where it is clear prior to trial, as is the case here, that the defense intends to advance an improper legal theory, the argument should be precluded, as the Court did in advance of the first trial. *See United States v. Watts*, 934 F. Supp. 2d 451, 473 (E.D.N.Y. 2013) (precluding argument that defendant believed his lies to a victim lender would cause no ultimate harm because the lender would be repaid); *accord United States v. Binday*, No. 12 Cr. 152 (CM), 2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013). And even if there were a valid legal defense along the lines suggested by the defendant, evidence of a later transaction in which he had no involvement certainly could not inform his state of mind or provide evidence of his good faith.

In his motion, the defendants relies on two inapposite cases in an attempt to manufacture the relevance of the 2015 sale. Neither of them call for the Court to change its prior ruling.

First, the defendant cites Judge Wood's decision in *United States v. Ghavami*, in which the district court rejected an Ex Post Facto Clause challenge and explained that "[w]hen it is shown that a conspiracy straddled the enactment of a statute, the government may introduce pre-

35

enactment evidence to demonstrate the conspiracy's genesis, its purpose, and its operation overtime," and "to prove the intent and purpose of the conspirators' later acts." No. 10 Cr. 1217, 2012 WL 2878126, at *1 (S.D.N.Y. July 13, 2012), *aff'd sub nom. United States v. Heinz*, 790 F.3d 365 (2d Cir. 2015). This case offers the defendant no help for several reasons. First, the defense is not making an Ex Post Facto Clause challenge. Second, this case is the opposite of *Ghavami*: Cole wants to use later evidence to explain earlier acts, while *Ghavami* involved the use of earlier evidence to explain later acts. Finally, *Ghavami* involved proof of the "conspiracy's genesis" and the "conspirators' later acts." Here, at the time of the 2015 sale, the primary coconspirators at Iconix—Neil Cole and Seth Horowitz—had already left the company. Thus, the 2015 sale is not evidence of those "conspirators' later acts."

The Third Circuit's non-precedential decision in *United States v. Wheeler* is also unavailing. No. 16-3780, 2021 WL 4129731, at *1 (3d Cir. Sept. 10, 2021), *cert. denied*, 142 S. Ct. 842 (2022). In that case, involving a narcotics conspiracy, the Third Circuit found that drug paraphernalia evidence seized from a co-conspirator's home after the conclusion of the charged conspiracy was properly admitted as relevant to the defendant's membership in the conspiracy. *Id.* at *14-*15. Just like in *Ghavami*, the evidence at issue in *Wheeler* involved evidence of members of the conspiracy at some later time. Here, as noted above, the defense seeks to admit evidence of an asset sale that occurred several months after Cole left Iconix and that did not involve any of the charged scheme's principal participants. None of Neil Cole, Seth Horowitz, Jason Rabin, or Jared Margolis were involved in the December 2015 SEA-3 asset sale. It is therefore irrelevant to the undisclosed side deal they struck when negotiating the formation of SEA-3 in August and September 2014.

The Court should also preclude evidence of the 2015 asset sale under Rule 403 on multiple grounds, including unfair prejudice, confusion of issues, misleading the jury, undue delay and waste of time. *See* Fed. R. Evid. 403 (providing that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues,

36

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). As noted above, the post-scheme 2015 sale is simply irrelevant to any issue in this case, and even if the evidence had any marginally probative value, which it does not, that probative value is substantially outweighed by the danger of unfair prejudice, confusion, undue delay and waste of time.

Because the sale took place after Cole's criminal conduct was complete and, in fact, after he left Iconix, the sale would confuse the issues at trial, and invite the jury to speculate on the basis of facts and findings that were unknown to Cole at the time he committed the alleged crimes, or to nullify on the view that the falsely inflated price turned out not to be out of line with some later, separate transaction. (*See United States v. Milton*, No. 21 Cr. 478 (ER), Trial Tr. 2899-901, 2906-10, 2951-55 (addressing and rejecting that claims a victim received fair market value provides a defense). Evidence of the 2015 sale would also require a time-consuming mini-trial to determine and understand the valuations ascribed to the assets underlying that sale.

Finally, while the defense suggests a limiting instruction may address the danger of unfair prejudice to the Government, there is no limiting instruction that can address the irrelevancy of the evidence and the risk of jury confusion, undue delay, and waste of time.

**IV.   IF COLE TESTIFIES, THE CANDIE'S EVIDENCE IS FAIR CROSS**

As this Court correctly recognized during the first trial, Cole's trial testimony and trial strategy can provide a proper basis by which to impeach Cole using his statements, conduct, and understanding, whether from the Candie's investigation or elsewhere. Cole's argument to preemptively preclude any cross-examination based on statements or conduct occurring at Candie's is tantamount to a request that he be permitted to contradict his experiences and statements during the Candie's investigation without fear of impeachment, and indeed to testify without affording the jury a full and fair opportunity to evaluate his credibility. The Court should reject the argument. The appropriate scope and manner of cross-examination will necessarily

depend on what Cole says during his testimony at the retrial, but it is clear from the record of the last trial that the Candie's Evidence is likely to be fair game for cross-examination.

## A. Background

In April 1999, Candie's auditors at Ernst & Young ("EY") questioned, among other things, certain transactions while auditing Candie's January 31, 1999 financial statements. Specifically, EY raised concerns that approximately $1.65 million in expense credits that Candie's received from a sourcing agent, Redwood, at the end of the 1998 fiscal year, were improperly offset by a $1.6 million capital contribution that Candie's made to Redwood at the same time. The expense credits had the effect of moving the company from loss to profitability, while the capital expenditures did not reduce earnings for the quarter.

In response to the concerns raised by EY, Cole and the company's assistant general counsel, Deborah Sorell, prepared a memorandum that summarized EY's concerns. The memorandum noted, for example, that EY had concerns about offsetting amounts:

> E&Y has raised the issue of whether there is a correlation between the $1,650,000 credit that the Company took in connection with the volume incentive credit ($650,000) and the business disruption claim ($1,000,000) and the $1,650,000 constituting the first three payments toward the equipment. DG has stated that fact that the numbers are the same is completely coincidental.

(GX-600).

Candie's board of directors also conducted an internal investigation during which they interviewed Cole, among others. The SEC also investigated the allegations and took Cole's testimony on two occasions.[6] During his interviews with the board of directors and in his testimony

---

[6] Notwithstanding Cole's assertion that the Department of Justice did not independently investigate the issue (*see* Candies Br. 3), the U.S. Attorney's Office for the Southern District also conducted a criminal investigation. On or about March 17, 2020, the government produced files from that investigation to the defense in this matter as Rule 16 material. *See* Bates range USAO-005-0000001-USAO-005-00001325.

with the SEC, Cole admitted that he "knew" he was "dating [a document] earlier than the time [he] signed it." (GX-1889). In 2003, Cole entered into settlements with the SEC personally and on behalf of Iconix in which he did not contest that Candie's earnings were improperly inflated due to the credits.

Prior to the first trial, the Government moved to admit the Candie's Evidence (a) to show Cole's knowledge and understanding that linked financial transactions, particularly transactions in which funds between counterparties are flowing in both directions, could have accounting implications and lead to the misstatement of revenue or earnings; and (b) to show that Cole was on notice of regulator scrutiny of accounting and revenue recognition issues, therefore explaining and giving context for the affirmative steps he took to conceal the scheme charged in the Indictment. The Government argued that, in the alternative, the Candie's Evidence was admissible under Rule 404(b), including to show Cole's knowledge, intent, absence of mistake, and lack of accident as to the conduct alleged in the Indictment. (*See* ECF Doc. 115).

After considering briefing and argument from both parties, the Court precluded the evidence at that time. The Court noted that "[t]his issue represents a very close case" and expressly cautioned that "this is all subject to revisiting if circumstances allow." (Sept. 30, 2021 Tr. 14). Consistent with the Court's ruling, the Government did not offer the Candie's evidence during its case-in-chief.

In the defense case, Neil Cole testified and made series of assertions about his own character, knowledge, and business experience that substantially increased the probative value of aspects of the Candie's Evidence. Among them:

- When asked if he tried to mislead the company's auditors in 2013, 2014, or 2015, Neil Cole asserted, "No, I'd never do that." (Trial Tr. 2122).
- Neil Cole testified about his work at Candie's, including how he started there in the early 1980s and returned, following a corporate acquisition, in 1991. (Trial Tr. 2124-25).
- Neil Cole represented that, "I would never want my lawyers to do anything that they were not comfortable with." (Trial Tr. 2150).

39

- Neil Cole asserted that the notion he would try to inflate revenue "is beyond absurd." (Trial Tr. 2152).
- Neil Cole testified that he first encountered roundtripping in February 2015. (Trial Tr. 2258).

In light of Cole's testimony, the Government advised the Court and the defendant that it believed aspects of the Candie's Evidence had become admissible notwithstanding the Court's earlier Rule 404(b) ruling. The Court agreed. As the Court succinctly put in during the last trial, "Mr. Cole has testified that he first became aware of this concept in connection with the 2015 inquiry into the SEA transactions. In fact, some 15 years prior he was introduced, at the very least 15 years prior, he was introduced to this concept, and I think the government is entitled or is allowed to inquire into it." (Trial Tr. 2313-14).

On cross-examination, the Government pursued two limited lines of inquiry based on the Candie's evidence: one, which related to what Cole knew or learned, focused on the fact that Candie's auditors had raised concerns to Cole about offsetting payments and expenses; a second related to impeaching Cole with his admission that he had backdated documents.

When the Government attempted to examine Neil Cole on these topics, it struggled to obtain any responsive answers. Neil Cole repeatedly professed failures of memory and knowledge. (*See* Trial Tr. 2343:20 (I—I don't remember."); 2345:09 ("I don't recall."); 2346:13 ("No, I do not recall."); 2346:25 ("I don't recall."); 2347:05 ("I don't remember giving testimony…."); 2348:02 ("I don't recall."); 2348:06 ("I don't recall, but I know I did nothing wrong."); 2348:09 ("I don't recall, but I know I did nothing wrong?"); 2348:12 ("I don't know."); 2348:2350:04 (Q: "Mr. Cole, do you remember this testimony?" A: "No."); 2351:06 ("I'm not sure."); 2351:08 ("I don't know"). Remarkably, Cole even claimed, "I haven't thought about these issues in a while," even though Cole's counsel (presumably with his knowledge and consent) filed multiple briefs on the admissibility of the Candie's evidence and Cole sat in court as his lawyers and the Government argued about the issue at the final pretrial conference. (*Compare* Trial Tr. 2350 *with* Trial Tr. 12-13).

40

After Cole's sustained nonresponsive answers regarding concerns raised by Candie's auditors, and his assertions that he did not recall the issue, the Government offered, and the Court admitted, a single paragraph from the Candie's memorandum that had summarized the auditor's concerns. (GX-600; Trial Tr. 2338-2341). Even then, Cole would not acknowledge the meaning of the words on the page or admit to remembering the concern the auditors raised. Cole's obstructive demeanor led the Court to remark upon it: "[Mr. Cole is] pushing back on the way that the document is phrased. He's, from my standpoint, fighting [government counsel] on every question, every word." (Trial Tr. 2353). Similarly, after Cole simultaneously claimed both that he did not recall admitting to back-dating documents and that he done "nothing wrong" (Trial Tr. 2346, 2346), the Government offered, and the Court admitted, a half-page portion of a transcript of a 2002 deposition of Mr. Cole, in which Cole admitted to back-dating documents (GX-1889; Trial Tr. 2347-48).

The Government did not assert in its questioning that Cole had been accused of wrongdoing during the Candie's investigation, did not raise the fact of criminal and regulatory investigations, and did not later argue that Cole's conduct in the charged scheme could be explained by his conduct in the Candie's episode.

### B. Applicable Law

#### 1. Impeachment

Federal courts and the Federal Rules of Evidence generally recognize five modes of proper impeachment: bias, sensory or mental incapacity, bad character for truth and veracity, contradiction, and inconsistent statements. *See generally* Mueller & Kirkpatrick, *Federal Evidence* § 6:75 ("Impeachment of Witnesses-The Five Methods"). As most relevant here, Rule 608(b) regulates the cross-examination of witnesses, including a defendant, regarding "specific instances of conduct" concerning the witness's character for untruthfulness. Rule 613 regulates impeachment of a witness by reference to prior inconsistent statements. Rule 613 explicitly authorizes that extrinsic proof of those prior statements may be admitted if a witness is shown the

statement and given an opportunity to admit or deny the statement. Matters of impeachment are firmly within the discretion of the trial courts. *See, e.g., United States v. Elfgeeh*, 515 F.3d 100, 127-28 (2d Cir. 2008); *see* Fed. R. Evid. 611.

A criminal defendant is not immune to impeachment. "By choosing to testify . . . the defendant gives up his right to refuse to answer questions that fall within the proper scope of cross examination." *United States v. Spinelli*, 551 F.3d 159, 167 (2d Cir. 2008) (citing *Rogers v. United States*, 340 U.S. 367, 373 (1951)); *United States v. Gates*, 176 F.2d 78, 79 (2d Cir. 1949) (A defendant who testifies "subjects himself to cross-examination, within the limits of the appropriate rules of evidence, like any other witness. He may be cross-examined for the purpose, among others, of impeaching his credibility." (citation omitted)). Indeed, the Supreme Court has emphasized that "[i]t is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States v. Havens*, 446 U.S. 620, 626-27 (1980). Moreover, "[a] defendant has no right to avoid cross-examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him." *United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998) (emphasis added).

Significantly, "'[w]hen a defendant offers an innocent explanation he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination.'" *Elfgeeh*, 515 F.3d at 128, quoting *Payton*, 159 F.3d at 58; *see also United States v. Desposito*, 704 F.3d 221, 234 (2d Cir. 2013) ("[w]hen a defendant offers an exculpatory explanation for the government's evidence, he 'opens the door' to impeachment of his credibility, even by previously inadmissible evidence").

### 2.   Uncharged Acts as Direct Evidence of Knowledge

Evidence of an uncharged act is admissible as direct evidence, without regard to Rule 404(b), if the uncharged act "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged

42

offense"; or (3) "is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *see also United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (explaining that some kinds of evidence offered "to show the background of a conspiracy" is not "other crimes" evidence subject to Rule 404(b), but rather "'direct proof of the charged conspiracy'"); *accord United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

### 3. Rule 404(b)

Rule 404(b), while prohibiting the introduction of other act evidence to prove that the defendant has a propensity to commit the offenses charged, nonetheless explicitly allows admission of such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit has adopted an "'inclusionary' approach" to Rule 404(b), under which "all 'other act' evidence is generally admissible unless it serves the sole purpose of showing a defendant's bad character." *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012); *see also United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("'Other act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense."). To determine admissibility under Rule 404(b) (in conjunction with Rule 403), the Court should consider whether (1) the evidence is offered for a proper purpose; (2) the evidence is relevant to a disputed issue; and (3) the probative value of the evidence is substantially outweighed by its prejudicial effect. *Curley*, 639 F.3d at 56-57. In addition, the Court should give an appropriate limiting instruction to accompany any such evidence, if requested. *Id.*

43

### C. Discussion

Cole's motion to preemptively foreclose any cross-examination based on the Candie's Evidence runs counter to the law and the Federal Rules of Evidence. As the Court correctly found during the first trial, Cole's testimony properly opened the door to limited examination on the Candie's Evidence and, were he to testify similarly at this trial, would do so again.

As Neil Cole retells it now, the Candie's cross-examination involved a sustained detour into irrelevant and prejudicial facts before culminating in improper extrinsic proof of allegations of prior wrongdoing. (*See* Candie's Br. 7-10 (collecting cases), 12-13). In painting with a broad brush, however, Cole mischaracterizes his own testimony and elides the various bases by which the Government ultimately pursued, and the Court permitted, questioning about the Candie's Evidence. In short, Cole opened the door to cross examination on the Candie's evidence, and the Court properly allowed it.

1. **Questioning About the Concerns of Candie's Auditors Was and Would Be Proper Impeachment by Contradiction**

The Government cross-examined Cole on the fact that Candie's auditors had alerted him to concerns about offsetting credits and expenses. The Government's questions did not suggest that Cole had done anything wrong and the Government did not in summation argue that he had. Rather, the Government's questions impeached Cole's direct testimony that he had not encountered the concept of round-trip transactions before 2015, since that was precisely the concern raised by Candie's auditors. The Court expressly acknowledged this was the Government's aim and the purpose of the evidence: "Mr. Cole has testified that he first became aware of this concept in connection with the 2015 inquiry into the SEA transactions. In fact, some 15 years prior he was introduced, at the very least 15 years prior, he was introduced to this concept, and think the government is entitled or is allowed to inquire into it." (Trial Tr. 2314). The Government properly perfected its impeachment by introducing a single paragraph of a memo that Cole helped prepare (GX-604), which contradicted Cole's failure of memory and his assertions

44

that round-trip concerns were news to him in 2015. Cole's efforts to recast that cross-examination as a generalized character attack misunderstands the testimony.

Under the applicable law, the Court's ruling to permit cross-examination on what Cole learned from Ernst & Young was manifestly correct. Rule 608(b) limits a questioner's ability to "attack or support the witness's *character for truthfulness*" by resort to "extrinsic evidence" of specific instances of the witness's conduct that show the character trait. Rule 608(b) (emphasis added). Rule 608(b) does not, however, limit a party's ability to offer extrinsic evidence to demonstrate a prior inconsistent statement of the witness—indeed, Rule 613 specifically contemplates that a questioner may do so—nor does Rule 608(b) limit a party's ability to offer extrinsic proof of proper impeachment on grounds other than the witness's character for truthfulness. To the contrary, "where contradiction is proper because it shows error or mistake in testimony, FRE 608(b) has not application." Mueller & Kirkpatrick, *Federal Evidence* § 6:43. Indeed, "Federal Rule of Evidence 608 ('Rule 608') was amended in 2003 to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness character for truthfulness and not to bar extrinsic evidence for bias, competency and contradiction impeachment." (quotation marks and alterations omitted) (citing and quoting Fed. R. Evid. 608, Advisory Committee's Note to 2003 Amendment). *United States v. Watts*, No. 10 Cr. 627 (KAM), 2013 WL 5423748, at \*28 (E.D.N.Y. Sept. 26, 2013). The Court properly conformed to this rule and permitted the Government to confront Neil Cole, with prior statements he had adopted, to demonstrate a contradiction and to show his knowledge.

For this reason, Cole's various arguments about why the Ernst & Young evidence has little probative value "of Mr. Cole's character for untruthfulness" simply miss the point. (Candie's Br. 7). It is unremarkable to observe, as Cole does, that trial courts sometimes preclude questioning about allegations of misconduct where the probative value of the evidence is outweighed by the potential unfair prejudice. *See, e.g. United States v. Ahmed,* No. 14 Cr. 277 (DLI), 2016 WL

3647686, at *3 (E.D.N.Y. July 1, 2016) (precluding cross-examination of expert witness based on existence of prior malpractice lawsuits). After all, Rule 403 also applies to matters of impeachment. *See, e.g.*, Fed. R. Evid. 608, Notes of Advisory Committee on Proposed Rules (remarking that the Rule 403 cabins the scope of cross-examination otherwise admissible under Rule 608). But Cole's argument assumes the probative value of the Ernst & Young evidence is its strength to explain Cole's current untrustworthiness. Instead, the point was (and, at retrial, would be again) that Cole was told about relevant accounting concerns in 1999—possessed knowledge in 2013 when he commenced the charged scheme—and lied in 2021 when he said he lacked that knowledge. The continued passage of time from the Candie's experience does not diminish the value of the evidence in explaining what Cole knew at the time of the charged conduct, and the circumstances of the Candie's episode—its multiyear duration, Cole's sustained involvement, the resignation of Candie's auditors, the fact Cole was questioned under oath, and the settlement with the SEC—indicate it would have been something Cole remembered in 2013.

Nor can Cole justify the exclusion of the evidence by emphasizing that the Candie's investigation did not result in findings of wrongdoing. This argument, too, miscasts the record, as the Government did not use the Ernst & Young evidence to imply that Cole had been accused of accounting improprieties. So Cole's assemblage of cases where courts excluded disproven or unproven cases to impeach a witness's character do not address the relevant legal issue, and each of them turns on the particulars of their respective circumstances. *See, e.g.*, *United States v. Schwab*, 886 F.2d 509 (2d Cir. 1989) ("The principal issue on this appeal is whether a prosecutor may seek to impeach a defendant's credibility by asking the defendant on cross-examination about prior misconduct that the prosecutor knows has been the subject of a trial and an acquittal."); *Ad-Vantage Telephone Directory Consultants v. GTE Directories Corp.*, 37 F.3d 1460, 1464 (11th Cir. 1994) ("The outcome of the grievance proceedings . . . negates the 1990 accusation's value as evidence probative of untruthfulness. After investigation, the Bar did not find probable cause to believe that Anton had violated the ethical rules."); *United States v. Teman*, 465 F. Supp 3d 277,

342-43 (S.D.N.Y. 2020) (denying post-trial *Brady* motion and remarking that undisclosed landlord-tenant complaints were not "material" because they would not be admissible at trial); *United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012) (finding SEC complaint not admissible as Rule 404(b) evidence because the record lacked sufficient evidence from which jury could reasonably conclude that the defendant committed the alleged act as the law of the circuit required).

And Cole omits the fact that many of the cases he cites point to the admissibility of the evidence the Government elicited here. In *United States v. Crowley*, for example, although the Second Circuit concluded the trial court had not abused its discretion in excluding cross-examination of "alleged instances of false accusation" that "were certainly relevant to the witness's credibility" but could not be proved-up extrinsically, the Court noted that "we might have taken a different course in the position of the trial judge." 318 F.3d 401, 418 (2d Cir. 2003). Further, in *United States v. Schwab*, which considered cross-examination based on acquitted conduct, the Second Circuit specifically observed that questioning of a witness about "ancient" prior misconduct could still be proper if it related to issues such as knowledge, intent, or identity and fit within Rule 404(b). 886 F.2d 509, 511, 513 (2d Cir. 1989).

For similar reasons, the litany of cases Cole cites that relate to Rule 609(b), which regulates when a witness may be impeached by evidence of a conviction occurring more than 10 years in past, do not help him to avoid questions about what he learned from Ernst & Young. None of the Candie's Evidence relates to a past conviction, so Rule 609 does not apply, as Cole impliedly concedes. (Candie's Br. 11). Nor does the Candies' Evidence resemble an arrest or acquitted criminal charge that might be analogized to the type of impeachment contemplated by Rule 609. *Cf. United States v. Toner*, 728 F.2d 115, 122 (2d Cir. 1984) (not abuse of discretion for trial court to exclude evidence of "1953 arrest for grand larceny and his 1973 arrest for forgery and possession of stolen property" as "both matters would have been excludable under Fed. R. Evid. 609, had they resulted in convictions, because they antedated the ten year time limit set forth in that rule"); *Anwar v. United States*, 648 F. Supp. 820, 829 & n.12 (N.D.N.Y. 1986) (observing "courts in construing

47

Rule 608, no doubt noting the inconsistency which would result if the credibility of a witness could not be attacked by reference to convictions that are more than ten years old but could be impeached by inquiry into mere arrests that are just as stale, have generally applied Rule 608(b) as if the time limits imposed by Rule 609 were a part of Rule 608"). Nor is the Candie's Evidence an attempt to elicit the conduct underlying a conviction that itself would be beyond Rule 609. *Cf. United States v. Vereen*, No. 99 Cr. 279 (CFD), 2000 WL 490740 (D. Conn. March 2, 2000) (denying under Rule 403 a Government request to impeach defendant with evidence underlying a conviction that occurred more than ten years ago).

### 2. Questioning About Cole's Practice of Backdating Documents Was and Would Be Proper Impeachment with a Prior Statement of the Defendant

The Court also correctly permitted the Government to question Neil Cole about the backdating conduct discovered during the Candie's investigation and to admit Neil Cole's prior statement about backdating, and should do so again.

The fact that Neil Cole backdated documents that were submitted to auditors bears directly on his character for truthfulness as it reflects an act of dishonesty. General questioning about Cole's backdating conduct fits squarely within Rule 608(a), therefore, and Cole does not appear to make any serious argument otherwise. Moreover, Cole's broad characterization that Candie's Evidence amounts to unproven allegations cannot describe Cole's backdating conduct specifically, because Cole admitted to the conduct under oath. (*See e.g.*, GX-1889). Finally, Cole's arguments about the conduct being old ignore the context that Cole in his direct testimony brought up his time at Candie's, scoffed at the notion he would mislead auditors, and repeatedly professed to have little recall of the multiyear Candie's investigation. Those circumstances made Cole's credibility a central issue in the case and made Cole's past dishonesty correspondingly more important. *See, e.g.*, *Payton*, 159 F.3d at 58 (noting, in the context of applying Rule 609, that "[t]he centrality of the credibility issue and the impeachment value of the prior convictions are highly relevant factors"

48

to admissibility decision). Should those or similar circumstances recur, it would again be proper for the Government to impeach Cole by reference to his admitted dishonest conduct.

The Court's further decision to permit the Government to admit Cole's prior statement about his back-dating conduct was also correct. Cole contends that the admission of GX-1889 represented inadmissible extrinsic evidence and a "digression." (Candie's Br. 13). But while being questioned about back-dating, Cole claimed he did not remember his own admission. The Government impeached that claim and its counterproof took the form of Cole's own statements, which rebutted his assertions on the stand that he "didn't know" and did not "recall" back-dating documents while simultaneous recalling that he "did nothing wrong." (Trial Tr. 2347-48). Accordingly, the transcript of Cole's statement was properly admitted as a party admission, pursuant to Rule 801(d), and as a prior inconsistent statement, pursuant to Rule 613, and nothing about that impeachment is limited by Rule 608(b).

Indeed, the Second Circuit specifically approved of impeachment of this sort in *United States v. Jackson*, 882 F.3d 1444 (2d Cir. 1989). There, the Government impeached the defendant with evidence of his statement in which he admitted to misappropriating $2,500 from a former client. The Government confronted the defendant with his past statement when he equivocated about the conduct on cross-examination (though it did not move the document into evidence), and the defendant later argued, as Cole does here, that the statement represented improper extrinsic proof under Rule 608. Pointing to Rule 613 (about prior inconsistent statements) and Rule 801(d) (about party admissions), however, the Second Circuit concluded that "the government could properly impeach the defendant with evidence of the disciplinary action. When the defendant attempted to deny the event, the government could then use the signed document as an admission of prior misconduct." *Id.* at 1448-49. Similarly, the Government here can fairly impeach Cole's equivocations about backdating with proof of Cole's own past admission to the conduct, should he profess ignorance yet again.

### 3. Rule 403 Does Not Support the Exclusion of Candie's Questions on Cross-Examination

Following Neil Cole's direct testimony, the Court properly concluded that the probative value of questioning about Candie's substantially outweighed any prejudicial effect.

First, the Candie's cross-examination offered significant probative value insofar as it bore on the truthfulness of Cole's testimony. As a general matter, "'[w]hen a defendant offers an innocent explanation he "opens the door" to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination.'" *Elfgeeh*, 515 F.3d at 128 (quoting *Payton*, 159 F.3d at 58); *see also United States v. Desposito*, 704 F.3d 221, 234 (2d Cir. 2013) ("[w]hen a defendant offers an exculpatory explanation for the government's evidence, he 'opens the door' to impeachment of his credibility, even by previously inadmissible evidence"). Cole's multipage exhortation that the topic consumed 15 to 20 minutes of the jury's time ignores the quantitative insignificance of 15 to 20 minutes on the cross-examination of the defendant during a month-long trial. And a review of the transcript shows that most of that time owed to the defendant's repeated refusal to provide responsive answers to the Government's questions.

The Government's questions also responded to specific assertions and issues presented by Cole on direct examination. During his testimony, Cole not only described his time and work at Candie's (Trial Tr. 2124-25), but also made a number of representations about his knowledge of the relevant accounting concepts and his own good character, such as:

- When asked if he tried to mislead the company's auditors in 2013, 2014, or 2015, Neil Cole asserted, "No, I'd never do that." (Trial Tr. 2122).
- Neil Cole testified about his work at Candie's, including how he. started there in the early 1980s and returned, following a corporate acquisition, in 1991.
- Neil Cole represented that, "I would never want my lawyers to do anything that they were not comfortable with." (Trial Tr. 2150).
- Neil Cole asserted that the notion he would try to inflate revenue "is beyond absurd." (Trial Tr. 2152).
- Neil Cole testified that he first encountered roundtripping in 2015. (Trial Tr. 2258).

Cole's affirmative testimony on these points increased the probative value of the aspects of the Candie's Evidence that impeached those assertions. Cole's testimony also highlights the absurdity of his argument that the Candie's Evidence is too old to have any probative value now, as Cole himself told the jury about his work with Candie's starting in the early 1980s.

Second, the Candie's Evidence was directly relevant to Cole's state of mind and, at least by the time of cross-examination, was admissible pursuant to Rule 404(b). Of course, the state of mind of the defendant is not generally susceptible to direct proof and must be proven circumstantially. For that reason, the Supreme Court has recognized that this is precisely the type of issue about which other act evidence should be admitted:

> Federal Rule of Evidence 404(b) . . . generally prohibits the introduction of extrinsic acts that might adversely reflect on the actor's character, unless the evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.

*Huddleston v. United States*, 485 U.S. 681, 685 (1988); accord *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged."). The Candie's auditors issues demonstrated Cole's knowledge and understanding that linked financial transactions, particularly transactions in which funds between counterparties are flowing in both directions, could have accounting implications and lead to the misstatement of revenue or earnings.

Cole's continued suggestion that that the accounting concerns identified at Candie's were entirely dissimilar to those at issue here remains wrong. Notwithstanding Cole's repeated references to "bill and hold practices," (*cf.* Candie's Br. 2-3), Government Exhibit 600—a memorandum that Cole, according to his own SEC testimony, helped to prepare—memorializes

51

the fact that Candie's auditors at Ernst & Young raised roundtripping concerns because the company had recorded certain capital expenditures on behalf of a counterparty that equaled expense credits from that counterparty that had the effect of increasing Candie's earnings. In other words, E&Y was seeking to verify that Candie's had not engaged in precisely the sort of improper roundtripping that the Government alleges occurred in this case.

Third, the fact that the SEC investigation into Cole's Candie's conduct resulted in a no-admit, no-deny settlement does not tilt the Rule 403 balance against admission. The Government did not seek to question Cole based on the fact that the SEC investigated him or based on the fact that Cole settled an SEC suit. Indeed, Cole, not the Government, mentioned the SEC's involvement in passing and without much elaboration (Trial Tr. 2345), and the Government has no plans to question Cole about the settlement at the retrial. For the Government's part, and as described above, a cross-examination on these topics would be narrowly focused on (a) whether Cole had been given notice about accounting concerns posed by linked and offsetting transactions and (b) whether Cole had admitted to back-dating documents.

Cole also takes specific issue with the Government's question that the back-dating "was a big deal at Candie's," (Candie's Br. 15), but that question, which concerned the internal investigation at Candies' generally, addressed and impeached Cole's incredible claim that he did not remember giving a sworn statement about his back-dating conduct, and the Government did not attempt to offer extrinsic evidence to prove the point. (Trial Tr. 2350). Notably, Cole's counsel at the time did not object to the "big deal" question, which makes sense given that the "big deal" question itself does not imply that Cole engaged in any wrongdoing and fairly followed from Cole's responses.

In a circumstance where Cole testifies, the Candie's Evidence represents highly probative impeachment evidence. It also represents significant evidence of the defendant's knowledge and statement of mind. As the Second Circuit has held in the Rule 404(b) context, such evidence is not unduly prejudicial if it is "not more sensational than the evidence of the charged crime" and does

not "consume a major portion of trial time." *United States v. Rahim*, 339 F. App'x 19, 23 (2d Cir. 2009). The Candie's Evidence does not pose either concern.

### 4. The Court Correctly Modified Its Rulings as the Record Developed

At various points both at the last trial and in his current briefing, Cole suggests that there was something nefarious and improper about the Government asking the Court to reconsider the admissibility of the Candie's Evidence in light of developments in the record. As the Court repeatedly—and correctly—observed, however, admissibility decisions are subject to change based on the arguments and evidence that arise at the trial, and certainly the calculus changes if the defendant puts his credibility at issue by testifying. (Sept. 30, 2021 Hr'g Tr. 14; Trial Tr. 2186 ("I think I said, as I always do in ruling on motions in limine, that given the nature of the motions in limine they are subject to being revisited, depending on how things play out at trial.").

The Government argued (and maintains now) that the Candie's Evidence would be proper direct evidence of Cole's knowledge in its case-in-chief or, in the alternative, admissible Rule 404(b) evidence. When the Court ruled otherwise, the Government did not elicit any of that proof during its case. But once Neil Cole testified and offered self-serving assertions of his truthful character, regaled the jury with his business success at Candie's, denied knowing relevant accounting concepts, made facially absurd claims about not having thought about Candie's in years (despite sitting through pretrial argument on the subject, and presumably assisting his counsel in briefing the issue), and even denied remembering his own sworn statement, the record had fundamentally changed. As the Second Circuit has observed, this kind of testimony justifies vigorous cross-examination, even on previously forbidden topics:

> Central to the proper operation of the adversary system is the notion that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth. Once a defendant has put certain activity in issue by offering innocent explanations for or denying wrongdoing, the government is entitled to rebut by showing that the defendant has lied. Where a defendant testifies on direct about a specific fact, the prosecution is

53

entitled to prove on cross-examination that he lied as to that fact. The same holds true for defendant's false statements on cross-examination. Finally, the government's opportunity to impeach the defendant's credibility once he has taken the stand includes the opportunity to use evidence that it was barred from using on its direct case.

*United States v. Beverly*, 5 F.3d 633, 639–40 (2d Cir. 1993); *See United States v. Benedetto*, 571 F.2d 1246, 1250 (2d Cir. 1978) ("Once a witness (especially a defendant-witness) testifies as to any specific fact on direct testimony, the trial judge has broad discretion to admit extrinsic evidence tending to contradict the specific statement, even if such statement concerns a collateral matter in the case.").

Whether viewed as Rule 404(b) evidence elicited on cross-examination or mere impeachment evidence, the Candie's Evidence became a fair subject for inquiry. If Cole were to testify again, the circumstances may once more justify the admission of the Candie's Evidence. The Court properly permitted limited cross-examination last time—particularly about Cole's knowledge of auditor concerns about roundtripping and one specific instance of dishonest conduct established by Cole's own admission—and very likely those topics would be proper in cross-examining Cole again.

Whether the Government can cross-examine Cole on various aspects of the Candie's Evidence will ultimately turn on what Cole says at trial and what his lawyers argue on his behalf.

## V.   THE COURT SHOULD AGAIN DENY COLE'S REQUEST FOR IMPROPER RULE 17 SUBPOENAS

At the outset of the first trial, the Court denied Cole's request for the issuance of Rule 17 subpoenas to two law firms concerning alleged impeachment material for cooperating witness Seth Horowitz. Specifically, Cole sought statements made by Horowitz's legal counsel in the course of an internal investigation conducted by a Special Committee of the Iconix Board of Directors. The requested subpoenas were directed to (1) Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), which represents Horowitz, and (2) Perkins Coie, which is now representing the

54

Special Committee. The Court denied that request because (a) Cole already possessed the substance of those statements; (b) the statements were not made by Horowitz himself (and instead constituted hearsay or double hearsay statements of lawyers); and (c) the materials were subject to claims of work product protection and/or attorney-client privilege. (Trial Tr. 9-10). In the Subpoena Motion, Cole asks the Court to reverse itself, and to authorize the issuance of Rule 17 subpoenas virtually identical to those that that Court previously found improper under governing law. The Court should deny Cole's renewed request for the same reasons it denied the initial request.

### A.  Background

At the retrial, the Government expects again to call Seth Horowitz, Iconix's former chief operating officer, who reported to Neil Cole. In December 2019, Horowitz pled guilty, pursuant to a cooperation agreement with the Government, to participating with Cole in the accounting fraud scheme alleged in the Indictment.

Horowitz resigned from Iconix on April 13, 2015. On that date, Horowitz emailed a resignation letter to Cole and Iconix's Board of Directors raising questions about potential accounting improprieties in connection with two of the transactions at issue in the Indictment. Horowitz's resignation letter caused the Board of Directors to form a Special Committee, which originally retained Richards Kibbe & Orbe LLP ("RKO") to conduct an internal investigation in or about 2015. RKO's internal investigation predated the Government's investigation into the conduct at issue in the Indictment. Perkins Coie was subsequently retained by the Special Committee after RKO lawyers representing the Special Committee moved to Perkins Coie.

A grand jury returned the Indictment against Cole in December 2019. Following the return of the Indictment, the Government voluntarily undertook to obtain from the SEC material that would constitute Rule 16, *Brady*, or *Giglio* material if it were in the possession of the Government, notwithstanding that the Government was under no obligation to search the SEC's files.

On or about May 6, 2020, the Government voluntarily disclosed to the defense excerpts of notes that SEC attorneys took during a meeting with RKO in or about December 2015, long before the Government's investigation began. (Subpoena Motion, Exhibit D). The SEC's notes document statements made by RKO purporting to summarize arguments and statements made by counsel for Cole and Horowitz to counsel for the Special Committee. (*Id.*). Although Cole demanded more information from the Government, the Government advised Cole that it had produced the notes verbatim as they appeared in the original SEC document and the Government could not provide additional information or context surrounding the SEC notes because the Government was not present at the meeting between the SEC and RKO. (ECF Doc. 71-6).

On December 28, 2020, Cole demanded that the Government obtain from RKO "any statements made by Mr. Horowitz or his counsel and then disclose those statements to the defense." (ECF Doc. 71-7). Cole did not argue or assert that the Government was withholding any discoverable information in its possession. Cole likewise failed to cite any legal authority in support of his argument that the Government was obligated to obtain material from a third-party law firm in order to fulfill its discovery obligations. The Government advised Cole that it had satisfied its disclosure obligations, the information Cole sought was not in the Government's possession, and Cole's assertion that the Government had "declined" to provide the information was not accurate. (ECF Doc. 71-8). The Government further noted that Cole's request lacked any legal basis. (*Id.*).

On January 25, 2021, the Government voluntarily disclosed additional information that it learned from Perkins Coie, the law firm now representing the Special Committee, during a phone call that took place on that date. (Subpoena Motion, Exhibit E).

On March 23, 2021, Cole filed a letter motion with the Court (the "Prior Subpoena Motion") requesting the issuance of two Rule 17 subpoenas virtually identical to the subpoenas sought by the Subpoena Motion. Although Cole did not mention it in the Prior Subpoena Motion, the Government learned that Cole had obtained from Perkins Coie a word-for-word verbal

# A-552

summary of what counsel for the Special Committee told the SEC about what RKO had heard from Horowitz's counsel. The Government responded to the motion on March 29, 2022, and alerted the Court to Cole's failure to disclose this fact (which, as discussed above, was one of the grounds that led the Court to deny Cole's motion). (ECF Doc. 77). That verbal summary is attached to Cole's renewed Subpoena Motion as Exhibit C.

At the initial pretrial conference before the first trial, the Court heard argument on the Prior Subpoena Motion. (Sept. 30, 2021 Tr. 65-77). Thereafter, on the first day of trial, the Court denied Cole's request for Rule 17 subpoenas directed to WilmerHale and Perkins Coie on the ground that Cole already possessed the substance of the requested materials, the materials at issue did not contain statements by Horowitz himself (and instead constituted hearsay or double hearsay statements of lawyers), and the materials were subject to claims of work product protection or attorney-client privilege. (Trial Tr. 9-10). Specifically, the Court stated:

> [W]ith respect to the rule 17 subpoenas to counsel for Mr. Horowitz or special counsel for the special committee concerning the substance of statements that were provided by counsel for Mr. Horowitz to the special counsel and statements that were provided by counsel to the special committee to the SEC, that request is denied. Obviously, this is not a matter that affects the government's discovery obligations, and I do not believe that the subpoenas meet the Nixon standard. First of all, as I understand it, the defense has the statements of the entirety of what they would have received pursuant to the subpoenas. It appears that there is a substantial question concerning the admissibility of those statements both because they are hearsay or double hearsay, or subject to work product or subject to attorney-client privilege. They are not the statements of Mr. Horowitz, and they are statements that could only have been obtained by his lawyer through attorney-client privileged communications. Obviously, the notes also were not notes that were prepared by Mr. Horowitz. It's unclear whether he knew about them at all, and in any event, even if I were to grant this request, it would certainly create a mini trial, maybe not in front of the jury, but a mini trial as to the substantial evidentiary issues and attorney-client issues in a matter where the defense already has essentially what they are

57

asking for with respect to the subpoena. So that application is also denied.

(*Id.*).

When Horowitz testified at Cole's initial trial, Cole's counsel questioned him about his counsel's statements to the Special Committee. (Trial Tr. 666-67). Horowitz testified that he was aware that his counsel spoke with the Special Committee on his behalf, that he met with his counsel in advance of that discussion, and that he was aware of what his counsel told the Special Committee on his behalf at the time, but that he did not recall if his counsel told the Special Committee that Horowitz did not believe he had done anything wrong or inappropriate with respect to the SEA transactions. (Trial Tr. 666-67). Defense counsel sought to refresh Horowitz's memory with a written summary of what counsel for the Special Committee told the SEC about what RKO had heard from Horowitz's counsel, but Horowitz testified that this did not refresh his recollection about what his counsel told RKO. (Trial Tr. 667).

Approximately one year later, on September 7, 2022, Cole's counsel sent the Government a letter demanding additional facts about information the Government obtained from counsel for the Special Committee. (Subpoena Motion, Exhibit F). Approximately one week later, on September 16, 2022, the Government responded to that request. (Subpoena Motion, Exhibit G).

In the Subpoena Motion, filed on October 3, 2022, Cole once again requests that the Court authorize Rule 17 subpoenas to WilmerHale and Perkins Coie. The proposed subpoenas are virtually identical to those that this Court rejected during the initial trial. The proposed subpoena to WilmerHale seeks the following from the firm's internal files: "Talking points or other script, or presentation materials used during, and contemporaneous notes or memoranda memorializing, attorney proffers made on behalf of Seth Horowitz to counsel for the special committee of the board of directors of Iconix that took place in September 2015 and October 2015." (Subpoena Motion, Exhibit A). The proposed subpoena to Perkins Coie similarly seeks the following from the firm's internal files: "Contemporaneous notes, memoranda memorializing, or any presentation

58

materials utilized during attorney proffers made on behalf of Seth Horowitz to counsel for the special committee of the board of directors of Iconix that took place in September 2015 and October 2015." (Subpoena Motion, Exhibit B).

### B. Applicable Law

Rule 17(c) governs the issuance of trial subpoenas in criminal cases. A subpoena issued pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure "may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." Fed. R. Crim. P. 17(c)(1). The Rule provides that "[t]he court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." *Id*.

It is axiomatic that "Rule 17 was not intended to provide an additional means of discovery" to a defendant in a criminal case. *Bowman Dairy Co. v. United States,* 341 U.S. 214, 220 (1951). Indeed, "'courts must be careful that rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed R. Crim. P. 16.'" *United States v. Cherry*, 876 F. Supp. 547, 552 (S.D.N.Y. Feb. 17, 1995) (quoting *United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir. 1980)).

Rule 17 subpoenas "are held to a strict standard" developed by the Supreme Court in *United States v. Nixon*:

> A defendant seeking the production of documents pursuant to Rule 17(c) has the burden of demonstrating: (1) the documents are evidentiary and relevant; (2) they are not otherwise procurable by the defendant reasonably in advance of trial by the exercise of due diligence; (3) the defendant cannot properly prepare for trial without such production and the failure to obtain it might delay the trial; and (4) the application is not intended as a general 'fishing expedition' and was therefore made in good faith.

418 U.S. 683, 699-700 (1974).

*Nixon* held that, to show that the documents are "evidentiary and relevant," the party requesting the subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity."

59

418 U.S. at 700. "This test is the hallmark of Rule 17(c)(2) analysis, and courts in this jurisdiction and elsewhere have repeatedly and consistently applied it to determine whether third-party subpoenas served by defendants must be quashed as unreasonable or oppressive." *United States v. Barnes*, No. 04 Cr. 186 (SCR), 2008 WL 9359654, at *2 (S.D.N.Y. Apr. 2, 2008) (collecting cases); *see also United States v. Cherry*, 876 F. Supp. 547, 552 (S.D.N.Y. 1995) ("In order to be procurable by means of a Rule 17(c) subpoena, materials must themselves be admissible evidence."). The *Nixon* standard applies to Rule 17(c) subpoenas issued by criminal defendants to third parties. *See United States v. Conway*, 615 F. App'x 46, 48 (2d Cir. 2015).

Rule 17(c) is different from the civil rules which permit the issuance of subpoenas to seek production of documents or materials which, although themselves not admissible, may lead to admissible evidence. *See Cherry*, 876 F. Supp. at 552; *see also United States v. Gross*, 24 F.R.D. 138, 141 (S.D.N.Y. 1959) (Rule 17(c) cannot be used "to obtain leads as to the existence of additional documentary evidence or to seek information relating to the defendant's case. This type of discovery, permissible under the Federal Rules of Civil Procedure, has not been authorized for criminal trials"). Importantly, "Rule 17(c) subpoenas cannot be used to obtain documents that would be excluded on hearsay grounds or would otherwise be inadmissible as evidence at trial." *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018). "It is well established . . . that Rule 17(c) does not provide a basis for pre-trial 'production of materials whose evidentiary use is limited to impeachment.'" *United States v. Kaufman*, No. 13 Cr. 411 (JMF), 2014 WL 2048198, at *10 (S.D.N.Y. May 19, 2014) (quoting *Cherry*, 876 F. Supp. at 553); *see also United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 2292773, at *1-2 (S.D.N.Y. June 4, 2021) ("the potential impeachment of a witness does not provide grounds for issuance or enforcement of a Rule 17(c) subpoena because such materials would only become relevant *after* a witness has testified"). Thus, "a mere hope that the documents, if produced, may contain evidence favorable to the defendant's case will not suffice. Rule 17(c) requires a showing that the materials sought are *currently admissible* in evidence; it cannot be used as a device to gain

60

understanding or explanation." *United States v. Rich*, No. 83 Cr. 579 (SWK), 1984 WL 845, at \*3 (S.D.N.Y. 1984) (emphasis added; quotations and citations omitted); *see also United States v. Purin*, 486 F.2d 1363, 1368 (2d Cir. 1973); *United States v. Murray*, 297 F.2d 812, 821 (2d Cir. 1962).

### C.  Discussion

Cole makes two arguments in support of his motion. First, Cole asserts that the requested subpoenas satisfy the *Nixon* standard of relevancy, admissibility and specificity. Second, Cole cites the fact that the Government did not request information from counsel to the Special Committee about the substance of WilmerHale's attorney proffers, and appears to argue that this fact creates some independent basis for a Rule 17 subpoena that does not satisfy the *Nixon* requirements. (Subpoena Motion at 2). Cole's arguments are meritless and should be rejected. As the Court already determined, the requested subpoenas fail the *Nixon* requirements, and Cole cites no new facts that would dictate a different result. In fact, the defense's cross examination of Horowitz at the prior trial only reinforces the Court's determination that the requested subpoenas cannot satisfy *Nixon*. Further, the law in this circuit is that a Rule 17 subpoena must satisfy the *Nixon* requirements, and Cole fails to cite any authority to the contrary.

### 1.  The Proposed Subpoenas Fail the *Nixon* Requirements
#### a.  *Cole Already Possesses the Substance of the Materials He Seeks*

Cole has not met his burden to demonstrate that the material he seeks is "not otherwise procurable reasonably in advance of trial by exercise of due diligence." *Nixon*, 418 U.S. 683 at 699-700. As this Court determined in denying Prior Subpoena Motion, "the defense has the statements of the entirety of what they would have received pursuant to the subpoenas." (Trial Tr. 10). That is because the Government has already produced to Cole verbatim excerpts of the SEC's notes memorializing RKO's statements characterizing what RKO heard from Horowitz's counsel, and Perkins Coie provided a word-for-word verbal summary to Cole's counsel of what the Special

Committee told the SEC about what it had heard from WilmerHale. Cole therefore already has in his possession the substance of what he is now seeking from WilmerHale and Perkins Coie. The material sought by the proposed subpoenas—WilmerHale's internal "talking points" for its discussion with RKO, and RKO's own notes of what WilmerHale told RKO—are thus cumulative of information Cole already has obtained and actually used to cross-examine Horowitz.

Cole's request for Rule 17 subpoenas to WilmerHale and Perkins Coie should be denied—yet again—for this reason alone. *See* Opinion & Order, Mar. 10, 2021 (ECF Doc. 68), at 10 (quashing Rule 17 subpoena issued to Baked by Melissa; "Because Cole fails to provide an explanation as to why these documents 'are not otherwise procurable' . . . , *see Nixon*, 418 U.S. at 699, Rule 17(c) is not the proper method for obtaining these materials at this time."); *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *11 (S.D.N.Y. Oct. 9, 2020) (denying defense request to issue Rule 17 subpoena where material was available through other means); *United States v. Boyle*, No. 08 CR 523 (CM), 2009 WL 484436, at *2 (S.D.N.Y. Feb. 24, 2009) (ruling subpoena improper when the material sought was expected to be provided through discovery process "with little or no diligence required").

Cole asserts that the internal law firm materials he seeks may contain additional facts useful to the defense, or that they may be more helpful in refreshing Horowitz's recollection than the notes Cole currently possesses, but both of those claims amount to unfounded speculation. (Subpoena Motion at 7, 8). Cole's motion makes clear that he already possesses detailed information about the WilmerHale attorney proffers, including the following passages:

- "Mr. Cole and Mr. Horowitz [sic] emphatic that they did not think they were doing anything wrong in the transactions. Both Mr. Cole and Mr. Horowitz have asserted that they were transparent in negotiating these transactions."

- "Mr. Cole and Mr. Horowitz have stated that they did not think they were doing anything inappropriate at the time the transactions were negotiated and executed. Instead, both of them have told us that their realization that there could be issues arose much later."

- With regard to SEA 2: "Mr. Horowitz has claimed that the increase in the SEA 2 purchase price was arrived at through a business negotiation. Mr. Horowitz denies that he made a promise to pay 5 million to GBG in return for an increase of 5 million in the transaction purchase price."

(Subpoena Motion at 3). There is nothing in Cole's motion providing any reason to believe that the requested law firm materials contain additional substantive facts that would be favorable to the defense, beyond the information already in the defense's possession. (Subpoena Motion at 3).

Cole's asserts that the requested internal law firm materials are "much more likely . . . to refresh Mr. Horowitz's recollection" because they were "prepared at the time of the proffers" and "likely capture the proffer with a higher level of specificity and accuracy." That assertion consists of one layer of speculation on top of another. First, Cole does not know the substance of the requested materials, including whether they contain additional detail and are more accurate than the materials already in his possession. Second, there is no basis for Cole's naked assertion that such materials would be likely to refresh Horowitz's recollection, especially because (a) Horowitz was not even present for the attorney proffers at issue; and (b) Cole's counsel already showed Horowitz a document containing detailed information about WilmerHale's proffer statements, and this did not refresh Horowitz's memory.

### b.   *The Materials Sought By Cole Are Inadmissible Hearsay*

The Subpoena Motion should also be denied for the independent reason that Cole has failed to demonstrate that the material he seeks concerning Horowitz "would be admissible, rather than excluded by the hearsay rule or some other bar." *Blakstad*, 2020 WL 5992347, at *12.

Cole asserts that the requested law firm materials satisfy *Nixon*'s admissibility requirement because they may be used to impeach Horowitz. But the fact that a document may have potential impeachment value is not by itself sufficient; the document must be *admissible* impeachment material to satisfy the *Nixon* requirements. Judge Wood addressed this important distinction in *United States v. Skelos*, 2018 WL 2254538, at *2, which this Court previously cited for the proposition that Rule 17 subpoenas may be used to obtain impeachment material. (ECF Doc. 68

63

at 7). In *Skelos*, Judge Wood affirmed that materials sought under Rule 17 "must themselves be admissible at trial," and "cannot be used to obtain documents that would be excluded on hearsay grounds or would otherwise be inadmissible as evidence at trial." *Skelos*, 2018 WL 2254538, at *2 (quotation marks omitted). Judge Wood determined that Rule 17 subpoenas may be used to obtain impeachment material only if that material is admissible. *Id.* For example, "documents containing prior statements of a witness that are inconsistent with that witness's testimony at trial can be admissible under Federal Rule of Evidence 613, and so can be the proper subject of a Rule 17(c) subpoena." *Id.*

Other Rule 17 decisions cited by this Court similarly draw a distinction between admissible and inadmissible impeachment material. *See United States v. Avenatti*, No. S1 19 Cr. 373 (PGG), 2020 WL 508682, at *5 (S.D.N.Y. Jan. 31, 2020) ("Impeachment statements are generally not subject to pretrial production under Rule 17(c) because such statements ripen into evidentiary material for purposes of impeachment only if and when the witness testifies at trial," and only then do "prior inconsistent statements of the witness become admissible against him on cross-examination to undermine his credibility." (quotation marks omitted)); *United States v. Seabrook*, No. 16 Cr. 467 (ALC), 2017 WL 4838311, at *3 (S.D.N.Y. Oct. 23, 2017) (quashing subpoena request for impeachment material because it "fails to meet the admissibility prong of the *Nixon* standard").

Here, Cole contends that the requested subpoenas seek materials that would be admissible as prior inconsistent statements by Horowitz under Rule 613. Federal Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of *a witness's prior inconsistent statement* is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." (emphasis added). However, the statements at issue were not made by Horowitz. Rather, they are statements of Horowitz's counsel, or counsel for the Special Committee, and thus not admissible as a prior inconsistent statement by Horowitz. Indeed, it is well established that "a 'third party's

64

characterization' of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization." *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992) (quoting *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980)). "Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words." *Id.*

Notably, in *United States v. Seabrook*, Judge Carter similarly quashed a subpoena seeking law firm internal records on admissibility grounds. In *Seabrook*, as in this case, the defense served a Rule 17 subpoena seeking potential impeachment material on a law firm representing a cooperating witness, specifically for "documents, notes and memoranda reflecting statements made by or on behalf of" the cooperator. 2017 WL 4838311, at *3. The court observed that impeachment under Rule 613(b) "requires that the statement is the witness's own; a third party's characterization of a witness's statement, on its own is insufficient." *Id.* As a result, "notes, documents, and memoranda cannot be admissible as they consist of a characterization of [the cooperator's] statements and thus do not constitute impeachment material." *Id.*; *see also United States v. Weissman*, No. 01 CR. 529 (BSJ), 2002 WL 31875410, at *2 (S.D.N.Y. Dec. 26, 2002) (quashing Rule 17 subpoena directed to law firm on inadmissibility grounds because "it is important to note that while a prior inconsistent statement of a witness may be admitted to impeach a witness's testimony, Kramer Levin—not the witnesses—prepared the interview notes.").

Cole also asserts that the requested materials may be useful to refresh Horowitz's recollection. However, documents used solely to refresh a witness's recollection are of course not admitted into evidence. *See United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2022 WL 305145, at *5 (S.D.N.Y. Feb. 1, 2022); 28 Fed. Prac. & Proc. Evid. § 6184 (2d ed.). Thus, the fact that a document may be used to refresh a witness's recollection does not satisfy the admissibility prong of *Nixon*, and Cole fails to cite a single case to the contrary. The cases Cole cites in support of his refreshment point in fact undermine his argument. *See, e.g., Avenatti*, 2020 WL 508682, at *6 ("In

65

order to obtain enforcement of a Rule 17(c) subpoena, Avenatti must demonstrate that the emails and text messages he seeks either contain *admissible* evidence or impeachment material. Because Avenatti has not met this standard, Franklin and Auerbach's motion to quash will be granted." (emphasis added)); *United States v. Harry*, No. 86 Cr. 766, 1987 WL 30695, at *1 (E.D.N.Y. Dec. 23, 1987) (quashing subpoena to lawyer because, among other reasons, it sought inadmissible hearsay, attorney work product, would require attorney to become a witness against former client, and the substantive information sought might have been available from other sources).

### c. The Materials Sought By Cole Are Subject to Attorney-Client Privilege and/or Work Product Protection Claims

As the Government previously informed the Court, Perkins Coie, in response to an inquiry by the Government, advised the Government that it views the material sought as protected by both the corporate attorney-client privilege, which extends to former employees, and the work-product doctrine. Similarly, in response to the Government's inquiry, WilmerHale has advised the Government that it views the material sought as protected by the work-product doctrine and/or attorney-client privilege. As a result, in denying the Prior Subpoena Motion, the Court observed that "[i]t appears that there is a substantial question concerning the admissibility of those statements both because they are hearsay or double hearsay, or subject to work product or subject to attorney-client privilege," and "in any event, even if I were to grant this request, it would certainly create a mini trial, maybe not in front of the jury, but a mini trial as to the substantial evidentiary issues and attorney-client issues in a matter where the defense already has essentially what they are asking for with respect to the subpoena." Those considerations still apply with equal force. (Trial Tr. 10).

Further, if Cole were to obtain the documents he seeks, he still could not pursue his proposed line of questioning without running afoul of Horowitz's attorney-client privilege. While Horowitz testified at trial that he was aware of what his counsel proffered to the Special Committee on his behalf at the time the proffer occurred (approximately seven years ago), he stated that he

66

did not presently have a recollection of whether that included an assertion that he had done anything wrong or inappropriate with respect to the SEA transactions. But even if Horowitz did have such a recollection, it would be improper to elicit it from Horowitz because any such knowledge would necessarily be derived from privileged communications with his own counsel (and such privileged communications would obviously be an improper subject for cross examination). *See United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989) (attorney client privilege "applies regardless of the manner in which it is sought to put the communications in evidence, whether by direct examination, cross-examination, or indirectly as by bringing out facts brought to knowledge solely by reason of a confidential communication" (citation omitted)); *cf. United States v. Katsougrakis*, 715 F.2d 769, 779 (2d Cir. 1983). The Court recognized this fact in its prior ruling, observing that the proffer statements made by WilmerHale to RKO "are not the statements of Mr. Horowitz, and they are statements that could only have been obtained by his lawyer through attorney-client privileged communications." (Trial Tr. 10). That remains the case, and continues to provide a basis to deny the requested subpoenas.

### d.   The Materials Sought By Cole Are Inadmissible under Rule 403

The notes that Cole seeks are inadmissible under Federal Rule of Evidence 403 because any probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues. The probative value of any notes sought by Cole is low, given that Cole has already received from Perkins Coie a substantive summary of what the Special Committee disclosed to the SEC about what it heard from Horowitz's counsel. To the extent such questioning is permissible, Cole thus already has at his disposal the information he would need to cross-examine Horowitz. The likelihood of prejudice and juror confusion is likewise significant. Because Horowitz's counsel made the statements at issue, introduction of those statements into evidence would necessarily pry into the nature of Horowitz's relationship with his counsel and their privileged discussions. As noted above, even if Horowitz had any knowledge of his attorneys' statements, it would be derived only from privileged discussions with his own attorneys. *See, e.g., United States*

*v. Jung*, 473 F.3d 837, 841-42 (7th Cir. 2007) (observing that "more exacting standard . . . must be demanded for admission of statements by attorneys under Rule 801(d)(2)(D)"); *United States v. Kaplan*, 490 F.3d 110, 119-20 (2d Cir. 2007) (holding district court erred in admitting attorney testimony about client's knowledge of fraud, where Government failed to demonstrate that attorney testimony was rationally based upon interactions between attorney and client and lacked foundation). Introducing statements of counsel likewise may cause parties or witnesses to "be chilled from sharing information with their attorneys, defense attorneys [to] be deterred from vigorous advocacy, and the attorney-client relationship [to] be impaired." *Jung*, 473 F.3d at 842.

Among other things, admitting the notes sought by Cole into evidence would threaten the attorney-client relationship between Horowitz and his counsel. To the extent WilmerHale made the statements on Horowitz's behalf, admitting the notes into evidence would entail the introduction of evidence concerning the substance of their privileged communications, including details as to what information Horowitz provided to his counsel and the legal advice that his counsel provided to him as to the Special Committee investigation. In this way, WilmerHale will, in essence, be called as a defense witness against Horowitz. *Cf. United States v. Cochran*, 546 F.2d 27, 29 n.5 (5th Cir. 1977) ("The mere appearance of an attorney testifying against a former client, even as to matters of public record, is distasteful and should only be used in rare instances."). The probative value of such evidence is substantially outweighed by the risk of unfair prejudice and juror confusion.

**2. Cole Fails to Cite Any Legal Basis for His "Interests of Justice" Argument**

Cole appears to argue that even if the Court were to hold once again that he cannot satisfy the *Nixon* requirements for the law firm subpoenas, the Court may still issue the requested subpoenas "in the interests of justice." (Subpoena Motion at 2). This argument is meritless. Cole fails to cite a single case finding an "in the interests of justice" exception to the Supreme Court's decision in *Nixon*, and the law in this circuit is that a Rule 17 subpoena must satisfy the *Nixon*

68

requirements. *See, e.g., United States v. Conway*, 615 F. App'x 46, 48 (2d Cir. 2015) ("A party seeking the enforcement of a subpoena 'must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general fishing expedition.'" (quoting *Nixon*, 418 U.S. at 699-700); *Skelos*, 2018 WL 2254538, at \*2 (Although the *Nixon* Court did not decide whether this four-part test applies to subpoenas served on third-parties in particular, courts in the Second Circuit have almost unanimously applied *Nixon* to subpoenas served on third-parties.").

Moreover, the narrative that Cole seeks to advance about the Government turning a blind eye to arguably exculpatory or impeaching material is inaccurate. Cole ignores the fact that the Government provided discovery to Cole that goes well beyond what is required and included the substance of the information that Cole seeks, as relayed to the SEC by counsel for the Special Committee. The Government has no obligation to obtain and review SEC files where, as here, the Government and the SEC conducted separate and parallel investigations. *See, e.g.*, *United States v. Collins*, 409 F. Supp. 3d 228, 242-43 (S.D.N.Y. 2019). Nevertheless, the Government voluntarily and in good faith sought and obtained records from the SEC that would constitute Rule 16, *Brady*, and *Giglio* material if it were in the possession of the Government. As part of that process, the Government voluntarily obtained and produced verbatim excerpts of the SEC's notes of the meeting between the SEC and RKO in 2015 that put Cole on notice of this issue. Thus, far from turning a blind eye to material that is arguably favorable to the defense, the Government made a disclosure to Cole that was entirely appropriate, exceeded its discovery obligations, and provided Cole the core of what he seeks through the Subpoena Motion.

69

**CONCLUSION**

For the foregoing reasons, the defendant's motions should be denied.

Dated: New York, New York
October 17, 2022

Respectfully submitted,
DAMIAN WILLIAMS
United States Attorney

By: _____
Jared Lenow
Justin V. Rodriguez
Andrew Thomas
Assistant United States Attorneys
(212) 637-1068/2591/2106