# 23-7566

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆━◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL COLE, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**APPENDIX FOR DEFENDANT-APPELLANT
VOLUME III OF VII
(Pages A-566 to A-865)**

---

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
BRONWYN C. ROANTREE
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

**TABLE OF CONTENTS**

PAGE

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Indictment, filed December 4, 2019 (Dkt. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . A-41

Excerpts of First Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-78

Government Memorandum of Law in Opposition to Defendant's
    Motions *in Limine* and Renewed Motion for Rule 17(c)
    Subpoenas, filed October 17, 2022 (Dkt. 226) . . . . . . . . . . . . . . . . . . . A-493

Government's Requests to Charge,
    filed October 20, 2022 (Dkt. 230). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-566

Letter from U.S. Attorney's Office to the
    Honorable Edgardo Ramos,
    dated October 26, 2022 (Dkt. 238) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-626

Letter from David Oscar Markus to the Honorable Edgardo Ramos
    re Ethan Cole, dated November 18, 2022 (Dkt. 247) (with
    attached email from Edward Y. Kim to David Oscar Markus) . . . . . A-630

Excerpts of Final Pre-Trial Conference Transcript,
    dated October 27, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-632

Excerpts of Second Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-648

**Government Exhibits**

GX 104       Iconix Brand Group, Inc. Form 8-K,
              dated October 24, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1139

GX 105       Iconix Brand Group, Inc. Form 10-Q for the Quarterly
              Period Ended September 30, 2014 . . . . . . . . . . . . . . . . . . . A-1152

ii

PAGE

GX 207  Consultancy Agreement between Iconix Brand Group, Inc. and LF Centennial Limited, dated September 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1190

GX 210  Letter Agreement between Iconix Brand Group, Inc. and LF Asia Limited, dated June 30, 2014. . . . . . . . . . . . A-1195

GX 212  Letter Agreement between Iconix Brand Group, Inc. et al. and Global Brands Group Asia Limited, dated September 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1199

GX 1044  Email from Mark J. Stevens to Nicholas C.A. Cook et al., dated June 25, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1205

GX 1058  Email from Neil Cole to Seth Horowitz, dated August 14, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1405

GX 1068  Email from Ethan Cole to Jared Margolis, dated August 28, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1407

GX 1091  Email from Lauren Gee to Robert Smits, dated September 11, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1409

GX 1098  Email from John Reda to David Maslaton, dated September 26, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1547

GX 1111  Email from Ethan Cole to Seth Horowitz, dated October 2, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1551

GX 1139  Email from Ethan Cole to Jared Margolis, dated December 1, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1555

GX 1197  Email from Seth Horowitz to Neil Cole, dated April 13, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1557

GX 1255  Undated notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1560

GX 1255-B  Metadata associated with GX 1255 . . . . . . . . . . . . . . . . A-1561

GX 1335  Government summary exhibit, "Document Timeline" . A-1562

iii

PAGE

**Defense Exhibits**

DX 0303-A1 Iconix SE Asia Limited First Amended and Restated Shareholders Agreement ........................... A-1691

DX 0303-A2 Letter Agreement between Iconix Brand Group, Inc. and LF Asia Limited, dated June 30, 2014............ A-1733

DX 0304-A2 Letter Agreement between Iconix Brand Group, Inc. et al. and Global Brands Group Asia Limited, dated September 17, 2014 ......................... A-1737

DX 0304-A3 Iconix SE Asia Limited Second Amended and Restated Shareholders Agreement................ A-1743

DX 0558 FASB Accounting Standards Codification 605-50-45 ......................................... A-1790

DX 1140-U Email from Neil Cole to Ericka Alford, dated September 30, 2013 .......................... A-1792

DX 2334 Stipulation re Jason Rabin, dated October 26, 2021 ... A-1793

DX 3517-003 Notes re Ethan Cole attorney proffer, dated July 22, 2019 (not admitted at trial) ............ A-1795

DX 3517-004 Federal Bureau of Investigation FD-302 re Ethan Cole interview on July 29, 2019 (not admitted at trial) ..... A-1797

DX 3517-010 Notes re Ethan Cole, dated September 22, 2021 (not admitted at trial) ............................... A-1807

DX 3517-012 Notes re Ethan Cole, dated October 12, 2022 (not admitted at trial) ............................... A-1809

DX 3539-083 Federal Bureau of Investigation FD-302 re Seth Horowitz interview on February 11, 2020 (not admitted at trial) ............................... A-1810

iv

PAGE

Excerpts of Sentencing Transcript, dated October 10, 2023 . . . . . . . . . . . A-1814

Notice of Appeal, dated October 27, 2023 (COA Dkt. 1) . . . . . . . . . . . . . A-1819

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

UNITED STATES OF AMERICA      :

      :

      - v.-      :      19 Cr. 869 (ER)

      :

NEIL COLE,      :

      :

      Defendant.      :

-------------------------------------------------------------x


# GOVERNMENT'S REQUESTS TO CHARGE


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America


Jared Lenow
Justin V. Rodriguez
Andrew Thomas
Assistant United States Attorneys
    - Of Counsel -

**A-567**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

                                              :

       - v.-                          :          19 Cr. 859 (ER)

                                              :

NEIL COLE,                                        :

                                              :

        Defendant.                    :

-------------------------------------------------------------x


## <u>GOVERNMENT'S REQUESTS TO CHARGE</u>

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the Government respectfully requests the Court to include the following in its charge to the jury.

**TABLE OF CONTENTS**

**Page**

General Requests ................................................................................................. 1

The Indictment ................................................................................................... 2

Summary of Indictment ...................................................................................... 3

Count One: Securities Fraud – The Indictment and the Statute ......................... 5

Count One: Securities Fraud – Statutory Purpose ............................................. 7

Count One: Securities Fraud – Elements of the Offense ................................... 9

Count One: First Element – Fraudulent Act ..................................................... 10

Count One: Second Element – Knowledge, Intent and Willfulness ................. 16

Count One: Third Element – Instrumentality of Interstate Commerce ............. 19

Counts Two Through Seven: False Statements in Filings with the SEC – The Statute and the Indictment ...................................................................................................... 21

Counts Two Through Seven: False Statements in SEC Filings – Elements of the Offense ......... 23

Counts Two Through Seven: False Statements in SEC Filings First Element – Required Filings ...................................................................................................... 24

Counts Two Through Seven: False Statements in SEC Filings Second Element – Material Falsity ...................................................................................................... 25

Count Eight: Misleading Conduct of Audits .................................................... 26

Aiding and Abetting .......................................................................................... 28

Willfully Causing a Crime ................................................................................ 31

Conscious Avoidance ........................................................................................ 33

Venue ................................................................................................................ 35

Cooperating Witness Testimony & Non-Prosecution Agreements ................... 36

Law Enforcement and Government Employee Witnesses ................................. 40

Expert Witnesses .............................................................................................. 41

Character Testimony ......................................................................................... 42

Defendant's Testimony ..................................................................................... 43

Defendant's Right Not to Testify ...................................................................... 44

Statements of the Defendant ............................................................................. 45

Uncalled Witnesses – Equally Available to Both Sides ................................................. 46

Particular Investigative Techniques Not Required ...................................................... 47

Persons Not on Trial ................................................................................................... 48

Preparation of Witnesses............................................................................................ 49

Charts and Summaries ................................................................................................ 50

Use of Audio Recordings and Transcripts [If applicable] ........................................... 51

Stipulations ................................................................................................................ 52

Conclusion .................................................................................................................. 53

**A-570**

**REQUEST NO. 1**

**General Requests**

The Government respectfully requests that the Court give its usual instructions to the jury on the following matters:

a. Function of Court and Jury.

b. Indictment Not Evidence.

c. Statements of Court and Counsel Not Evidence.

d. Burden of Proof and Presumption of Innocence.

e. Reasonable Doubt.

f. Government Treated Like Any Other Party.

g. Definitions, Explanations, and Example of Direct and Circumstantial Evidence.

h. Inferences.

i. Credibility of Witnesses.

j. Right to See Exhibits and Have Testimony Read During Deliberations.

k. Sympathy: Oath of Jurors.

l. Punishment is Not to Be Considered by the Jury.

m. Verdict of Guilt Must Be Unanimous.

**REQUEST NO. 2**

**The Indictment**

The defendant, NEIL COLE, has been formally charged in what is called an Indictment. An Indictment is simply an accusation. It is no more than the means by which a criminal case is started. It is not evidence. It is not proof of the defendant's guilt. It creates no presumption, and it permits no inference that the defendant is guilty. You are to give no weight to the fact that an Indictment has been returned against the defendant.

[*Before you begin your deliberations, you will be provided with a copy of the Indictment.*] I will not read the entire Indictment to you at this time. Rather, I will first summarize the offenses charged in the Indictment and then explain in detail the elements of the charged offenses.

**REQUEST NO. 3**

**Summary of Indictment**

The Indictment contains eight counts or "charges." You should know that there is no significance to the order of these numbers or the specific number of counts charged, and indeed my instructions will follow a different order from the order in which the various counts appear in the Indictment.

Count One of the Indictment charges that, from in or about 2013 through in or about August 2015, the defendant committed the substantive offense of securities fraud.

Counts Two through Seven of the Indictment each charge that the defendant made false statements in documents that Iconix filed with the SEC. Count Two relates to Iconix's second quarter 2014 press release on Form 8-K. Count Three relates to Iconix's second quarter 2014 quarterly report on Form 10-Q. Count Four relates to Iconix's third quarter 2014 press release on Form 8-K. Count Five relates to Iconix's third quarter 2014 quarterly report on Form 10-Q. Count Six relates to Iconix's 2014 year-end press release on Form 8-K. Count Seven relates to Iconix's 2014 annual report on Form 10-K.

Count Eight of the Indictment charges that, from at least in or about 2013 through at least in or about 2015, the defendant misled the conduct of audits.

The Indictment alleges that the substantive securities fraud offense charged in Count One, the false statements in SEC filings charged in Counts Two through Seven, and the misleading the conduct of audits charged in Count Eight relate to an alleged fraud scheme in which the defendant and others caused Iconix to report, in public filings with the SEC and to the investing public, falsely inflated revenue and earnings per share figures to the investing public.

That is a summary of all eight counts in the Indictment. In a moment, I will instruct you on each of these charges in more detail. At the outset, however, let me instruct you that you must

**A-573**

consider each individual charge separately and evaluate each on the proof or lack of proof that

relates to that charge. Whether you find the defendant guilty or not guilty as to one offense

should not affect your verdict as to any other offense charged.

> Adapted from the original jury charge in this case, Trial Tr. 2525-2582 ("Cole I"), Sand, et al., Modern Federal Jury Instructions, Instr. 3-6.

**REQUEST NO. 4**

**Count One: Securities Fraud – The Indictment and the Statute**

Let us turn first to Count One, which charges NEIL COLE, the defendant, with committing the substantive crime of securities fraud.

Count One alleges as follows:

[The Court is respectfully requested to read Count One of the Indictment.]

The relevant law here is Section 10(b) of the Securities Exchange Act of 1934, which is set forth in 15 U.S.C. § 78j(b). Section 10(b) provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Based on its authority under this statute, the SEC has created a number of rules and regulations, one of which, known as Rule 10b-5 is relevant here. Rule 10b-5 reads as follows:

> **Employment of manipulative and deceptive devices.** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
>
> (a) to employ any device, scheme, or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

> Adapted from the charge of the Honorable Loretta A. Preska in United States v. Collins, 07 Cr. 1170 (LAP) (the

**A-575**

"<u>Collins</u> Charge"); Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 57-18.

**REQUEST NO. 5**

**Count One: Securities Fraud – Statutory Purpose**

The 1934 Securities Exchange Act was the second of two laws passed by Congress to provide a comprehensive plan to protect the investing public in the purchase and sale of securities that are publicly distributed.

The stock market crash of 1929 led to much legislation in the area of federal regulation. Included in this legislation was the Securities Act of 1933, and the creation of the Securities and Exchange Commission ("SEC"). The Securities Act was enacted to protect the investing public in the purchase of stock that is publicly distributed. The Act provides a comprehensive plan requiring full and fair disclosure of all important facts in connection with a distribution of securities. Such disclosures are designed to enable the investing public to make realistic appraisals of the merits of securities so that investors can make informed investment decisions.

When it enacted the Securities Act, Congress recognized that the purchase of a stock is different from the purchase of a vegetable bought in a grocery store, in that the average investor is not in a position to make a personal investigation to determine the worth, quality, and value of securities.

Following enactment of the Securities Act of 1933, which requires full and fair disclosures relating to the offering of stock to the investing public, Congress enacted the Securities Exchange Act of 1934 to ensure fair dealing and outlaw deceptive and inequitable practices by those selling or buying securities on the securities exchanges, in over-the-counter markets, or in face-to-face transactions. Among the primary objectives of the Exchange Act are the maintenance of fair and honest security markets and the elimination of manipulative practices that tend to distort the fair and just price of stock. Congress recognized that any deceptive or

**A-577**

manipulative practice that influenced or related to trading activity undermined the function and

purpose of a free market.

> Adapted from the <u>Collins</u> Charge; Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 57-19.

**REQUEST NO. 6**

**Count One: Securities Fraud – Elements of the Offense**

To establish a violation of Section 10(b), as charged in Count One of the Indictment, the Government must prove each of the following three elements beyond a reasonable doubt:

First, that in connection with the purchase or sale of stock, or shares in a company, the defendant did <u>any</u> <u>one</u> or more of the following:

(1) employed a device, scheme or artifice to defraud, or

(2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

(3) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller;

Second, that the defendant acted knowingly, willfully, and with the intent to defraud; and

Third, that, in furtherance of the fraudulent conduct, the defendant used or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails or the use of any facility of any national securities exchange.

I will discuss each element in turn.

> Adapted from <u>Cole</u> I at Trial Tr. 2525-2582; the charge in <u>United States v. Milton</u>, 21 Cr. 478 (ER) (the "<u>Milton</u> Charge"); Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 57-20; <u>see</u> <u>United States</u> v. <u>Litvak</u>, 808 F.3d 160, 178 (2d Cir. 2015) (noting that scienter for securities fraud is "intent to deceive, manipulate or defraud" and does not require an intent to harm); <u>United States</u> v. <u>Gleason</u>, 616 F.2d 2 (2d Cir. 1979).

**REQUEST NO. 7**

**Count One: First Element – Fraudulent Act**

The first element that the Government must prove beyond a reasonable doubt is that, in connection with the purchase or sale of securities, such as shares of Iconix, the defendant did any one or more of the following:

(1) employed a device, scheme or artifice to defraud, or

(2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

(3) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller.

To prove this element, it is not necessary for the Government to prove all three types of unlawful conduct in connection with the purchase or sale of securities. Any one will suffice. You must, however, be unanimous as to which type of unlawful conduct, if any, the defendant committed.

Let me now explain some of these terms.

**"Device, Scheme, or Artifice to Defraud"**

A device, scheme or artifice is merely a plan for the accomplishment of any objective. Fraud is a general term that embraces all ingenious efforts and means that individuals devise to take advantage of others. It includes all kinds of manipulative and deceptive acts. The fraud or deceit need not relate to the investment value of the securities involved in this case.

**False Statements and Omissions**

A statement, representation, claim, or document is false if it is untrue when made and was then known to be untrue by the person making it or causing it to be made. A representation or statement is fraudulent if it was made with the intention to deceive. The concealment of material

**A-580**

facts in a manner that makes what is said or represented deliberately misleading may also constitute false or fraudulent statements under the statute.

The failure to disclose information may also constitute a fraudulent representation if the defendant was under a legal, professional or contractual duty to make such a disclosure, the defendant actually knew such disclosure was required to be made, and the defendant failed to make such disclosure with the intent to defraud.

The deception need not be based upon spoken or written words alone. The arrangement of the words, or the circumstances in which they are used, may convey the false and deceptive appearance. If there is deception, the manner in which it is accomplished does not matter.

**"In Connection With"**

You cannot find that the Government has proven the first element unless you find that the defendant participated, or agreed to participate, in fraudulent conduct that was "in connection with" a purchase or sale of securities. The requirement that the fraudulent conduct be "in connection with" a purchase or sale of securities is satisfied so long as there was some nexus or relation between the allegedly fraudulent conduct and the sale or purchase of securities. Fraudulent conduct may be "in connection with" the purchase or sale of securities if you find that the alleged fraudulent conduct "touched upon" a securities transaction. You need not find that the defendant actually participated in any specific purchase or sale of a security if you find that the defendant participated, or agreed to participate, in fraudulent conduct that was "in connection with" a "purchase or sale" of securities.

It is no defense to an overall scheme to defraud that the defendant was not involved in the scheme from its inception or played only a minor role with no contact with the investors and purchasers of the securities in question. A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and intentionally

acts in a way to further the unlawful goals, becomes a member of the scheme and is legally responsible for all that may have been done in the past, in furtherance of the criminal objective, and all that is done thereafter.

Even if the defendant participated in the scheme to a lesser degree than others, he is, nevertheless, equally guilty so long as the defendant became a member of the scheme to defraud with knowledge of its general scope and purpose.

Nor is it necessary for you to find that the defendant was or would be the actual seller of the securities. It is sufficient if the misrepresentation or omission of material fact involved the purchase or sale of stock. By the same token, the Government need not prove that the defendant personally made the misrepresentation or that he omitted the material fact. It is sufficient if the Government establishes that the defendant caused the statement to be made or the fact to be omitted. With regard to the alleged misrepresentations and omissions, you must determine whether the statements were true or false when made, and, in the case of alleged omissions, whether the omissions were misleading.

**"Material Fact"**

If you find that the Government has established beyond a reasonable doubt that a statement was false or a statement was omitted rendering the statements that were made misleading, you must next determine whether the statement or omission was material under the circumstances. The word "material" here refers to the nature of the false or misleading statements. We use the word "material" to distinguish between the kinds of statements we care about and those that are of no real importance. Matters that are "material" may also include fraudulent half-truths or omissions of material fact. A material fact is one that a reasonable person would have considered important in making his or her investment decision. That means

that if you find a particular statement of fact or omission to have been untruthful or misleading, before you can find that statement or omission to be material, you must also find that the statement or omission was one that would have mattered to a reasonable person in making such an investment decision.

Any testimony that you may have heard from any witness with respect to whether a particular fact would or would not have been important to him or to investors in general reflect that witness's individual views. Although you may consider such testimony, it is not controlling. It is for you to determine whether a particular fact would have been significant to a reasonable investor in making an investment decision.

In considering whether a statement or omission was material, let me caution you that it is not a defense if the material misrepresentation or omission would not have deceived a person of ordinary intelligence. Once you find that the offense involved the making of material misrepresentations or omissions of material facts, it does not matter whether the intended victims were gullible buyers or sophisticated investors, because the securities laws protect the gullible and unsophisticated as well as the experienced investor.

Nor does it matter whether the alleged unlawful conduct was or would have been successful, or whether the defendant profited or would have profited as a result of the alleged scheme. Success is not an element of a violation of Section 10(b) or Rule 10b-5. If, however, you find that the defendant expected to or did profit from the alleged scheme, you may consider that in relation to the element of intent, which I will discuss in a moment.

In assessing whether a misstatement or omission is material, both quantitative and qualitative factors should be considered. In assessing whether a stated or omitted fact is quantitatively material, you should consider the financial magnitude of the misstatement or

omission. Under this inquiry, an omission or misstatement of an item in a financial report is quantitatively material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item. However, the magnitude of a misstatement is only the beginning of an analysis of materiality. You should also consider whether qualitative factors make a misstatement or omission material. With respect to financial statements, qualitative factors may cause misstatements of quantitatively small amounts to be material.

In assessing whether a misstatement or omission is qualitatively material, you may consider, among other factors:

- whether the misstatement masks a change in earnings or other trends;

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;

- whether the misstatement changes a loss into income or vice versa;

- whether the misstatement affects the registrant's compliance with regulatory requirements;

- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

- whether the misstatement involves concealment of an unlawful transaction.

This is not an exhaustive list of the circumstances that may render material a misstatement that is quantitatively small. Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance

as to whether investors regard quantitatively small misstatements as material. When management expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material.

You should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial. While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.

Remember, in assessing materiality, you should consider all the relevant facts and circumstances, both quantitative and qualitative. Furthermore, you should consider both the individual misstatements or omissions, and their aggregate effect, in determining materiality.

> Adapted from the Collins Charge; Sand, et al., Modern Federal Jury Instructions, Instr. 57-20, 57-21; SEC Staff Accounting Bulletin ("SAB") 99; see also United States v. Skelly, 442 F.3d 94, 98 (2d Cir. 2006); United States v. Santoro, 302 F.3d 76, 80-81 (2d Cir. 2002) ("Unlike customers who independently find their stocks and whose brokers merely execute trades at their command, customers who rely on investment recommendations reasonably trust their brokers to fully disclose all information pertinent to the recommendation and quality of the investment."); United States v. Szur, 289 F.3d 200, 210 (2d Cir. 2002); Ganino v. Citizens Utilities Co., 228 F.3d 154, 163 (2d Cir. 2000) ("SAB No. 99 is thoroughly reasoned and consistent with existing law – its non-exhaustive list of factors is simply an application of the well-established *Basic* analysis to misrepresentations of financial results – we find it persuasive guidance for evaluating the materiality of an alleged misrepresentation.").

**REQUEST NO. 8**

**Count One: Second Element – Knowledge, Intent and Willfulness**

The second element of Count One that the Government must establish is that the defendant acted knowingly, willfully and with intent to defraud.

"Knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently.

To act "willfully" means to act voluntarily and with a wrongful purpose.

"Intent to defraud" in the context of the securities laws means to act knowingly and with intent to manipulate or deceive.

The question of whether a person acted knowingly, willfully and with intent to defraud is a question of fact for you to determine, like any other fact question. This question involves one's state of mind.

Direct proof of knowledge and fraudulent intent is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he committed an act with fraudulent intent. Such direct proof is not required.

The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestations, his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

What is referred to as drawing inferences from circumstantial evidence is no different from what people normally mean when they say, "use your common sense." Using your common sense means that, when you come to decide whether a defendant possessed or lacked an intent to defraud, you do not limit yourself to what the defendant said, but you also look at what he did and what others did in relation to the defendant and, in general, everything that occurred.

As I have previously explained, circumstantial evidence, if believed, is of no less value than direct evidence. In either case, the essential elements of the crime charged must be established beyond a reasonable doubt.

In order for you to find the defendant guilty of securities fraud, the Government need only prove that the defendant acted with an intent to deceive, manipulate or defraud. The Government need not show that the defendant acted with an intent to cause harm.

Because an essential element of the crime charged is intent to deceive, good faith on the part of the defendant is a complete defense to the charge of securities fraud. That is, the law is not violated if the defendant held an honest belief that his actions were proper and not in furtherance of any unlawful scheme. An honest belief in the truth of the representations made by a defendant is a complete defense, however inaccurate the statements may turn out to be. A defendant, however, has no burden to establish a defense of good faith; it remains the Government's burden to prove, beyond a reasonable doubt, that the defendant acted knowingly, willfully, and with intent to deceive.

In considering whether or not a defendant acted in good faith, however, you are instructed that a belief by the defendant, if such belief existed, that ultimately everything would work out so that no investors would lose any money does <u>not</u> necessarily constitute good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by him.

As a practical matter, then, to prove the charge against a defendant, the Government must establish beyond a reasonable doubt that the defendant knew that his conduct was calculated to deceive and that he nevertheless associated himself with the alleged fraudulent scheme.

Adapted from <u>Cole</u> I at Trial Tr. 2538-2540, 2557-2558,
the <u>Collins</u> Charge, the <u>Milton</u> Charge, and the charge of

**A-587**

the Honorable Jed S. Rakoff in <u>United States</u> v. <u>Petit & Taylor</u>, 19 Cr. 850 (JSR); Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 57-16; <u>United States</u> v. <u>Litvak</u>, 808 F.3d 160, 178 (2d Cir. 2015) (intent element for securities fraud is "intent to deceive, manipulate or defraud" not "intent to harm").

**REQUEST NO. 9**

**Count One: Third Element – Instrumentality of Interstate Commerce**

The third and final element of Count One — the substantive securities fraud count — that the Government must prove beyond a reasonable doubt is that the defendant knowingly used, or caused to be used, the mails or the instrumentalities of interstate commerce in furtherance of the scheme to defraud.

Let me first note that it is unnecessary for the Government to prove both the mails and an instrumentality of interstate commerce were used in furtherance of the fraudulent scheme. Only one of the above – either the mails <u>or</u> an instrumentality of interstate commerce – is enough. But you must be unanimous as to at least one.

In considering this element, it is not necessary for you to find that the defendant was or would have been directly or personally involved in any mailing or the use of an instrumentality of interstate commerce. If the conduct alleged would naturally and probably result in the use of the mails or an instrumentality of interstate commerce, this element would be satisfied.

Nor is it necessary that the items sent through the mails or communicated through an instrumentality of interstate commerce did or would contain the fraudulent material, or anything criminal or objectionable. The matter mailed or communicated may be entirely innocent so long as it is in furtherance of the scheme to defraud or fraudulent conduct.

The use of the mails or instrumentality of interstate commerce need not be central to the execution of the scheme or even be incidental to it. All that is required is that the use of the mails or instrumentality of interstate commerce bear some relation to the object of the scheme or fraudulent conduct.

In fact, the actual purchase or sale of a security need not be accompanied by the use of the mails or instrumentality of interstate commerce, so long as the mails or instrumentality of

interstate commerce are used in furtherance of the scheme and the defendant is still engaged in actions that are part of a fraudulent scheme when the mails or the instrumentalities of interstate commerce are used.

The use of the term "mails" is self-explanatory, and includes the U.S. Mail and Federal Express. Examples of instrumentalities of interstate commerce include telephone calls, emails, or text messages, or use of a facility of a national securities exchange, such as a stock or options trade made on the NASDAQ.

> Adapted from Cole I, 2540-2542, the Collins Charge; Sand, et al., Modern Federal Jury Instructions, Instr. 57-20, 57-25; United States v. Giordano, 442 F.3d 30, 40 & n.11 (2d Cir. 2006) (defining "instrumentality of interstate commerce").

**REQUEST NO. 10**

**Counts Two Through Seven: False Statements in Filings with the SEC – The Statute and the Indictment**

Now, let's turn to Counts Two through Seven of the Indictment, which charge that the defendant made, or caused to be made, false statements in reports and documents required to be filed under the Securities Exchange Act of 1934. Counts Two through Seven charge different filings in which the defendant either made or caused to be made false statements. Count Two relates to Iconix's second quarter 2014 press release on Form 8-K. Count Three relates to Iconix's second quarter 2014 quarterly report on Form 10-Q. Count Four relates to Iconix's third quarter 2014 press release on Form 8-K. Count Five relates to Iconix's third quarter 2014 quarterly report on Form 10-Q. Count Six relates to Iconix's 2014 year-end press release on Form 8-K. Count Seven relates to Iconix's 2014 annual report on Form 10-K.

Counts Two through Seven of the Indictment read in pertinent part as follows:

[The Court is respectfully requested to read Counts Two through Seven of the Indictment.]

These counts charge violations of Section 32 of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78ff. Section 78ff provides in relevant part:

> [A]ny person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this title or any rule or regulation thereunder . . . which statement was false or misleading with respect to any material fact [shall be guilty of a crime].

This section is the general provision of the federal securities laws that makes it unlawful to willfully violate any provision of the Securities Exchange Act of 1934, or any rule or regulation thereunder, by making materially false and misleading statements in applications, reports, and documents required to be filed with the SEC.

The SEC requires public companies to file quarterly reports, or Form 10-Qs, for each of the first three quarters of every fiscal year. The SEC also requires public companies to file a

current report on a form called a Form 8-K for, among other reasons, any public announcement or release that discloses material non-public information regarding that company's results of operations or financial condition for a completed quarterly or annual fiscal period.

> Cole I, Trial Tr. 2542-2544; Title 15, United States Code, Sections 78m(a); and Title 17, Code of Federal Regulations, Section 240.13a-11 and 13a-13; Form 8-K, Section 2, Item 2.02.

**A-592**

## REQUEST NO. 11

**Counts Two Through Seven: False Statements in SEC Filings – Elements of the Offense**

For each of Counts Two through Seven, to establish a violation of Title 15, United States Code, Section 78ff, the Government must prove each of the following elements beyond a reasonable doubt:

<u>First</u>, that Iconix was required by the Securities Exchange Act of 1934 to file the document charged in that Count; and

<u>Second</u>, that the defendant knowingly and willfully made, or caused to be made, a materially false or misleading statement in that document.

Now I will explain these two elements in more detail.

> Adapted from <u>Cole</u> I, at Trial Tr. 2543-44, and the charge of the charge of the Honorable Paul A. Crotty in <u>United States</u> v. <u>Tomasetta</u>, 10 Cr. 1205 (PAC) (the "<u>Tomasetta</u> Charge"); Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 36-9.

**REQUEST NO. 12**

**Counts Two Through Seven: False Statements in SEC Filings First Element – Required Filings**

With respect to each of Counts Two through Seven, the Government must show, first, that Iconix was required by the Securities Exchange Act of 1934 to file the document charged in the particular Count. I have already instructed you that public companies are required to file documents and reports as prescribed by the SEC. These include quarterly reports on Form 10-Q and current reports on Form 8-K for, among other reasons, any public announcement or release that discloses material non-public information regarding the company's results of operations or financial condition for a completed quarterly or annual fiscal period. As I explained previously, if you find that Iconix was a public company, it was required to file these reports.

> Adapted from <u>Cole</u> I, the <u>Tomasetta</u> Charge; Title 15, United States Code, Sections 78m(a) and 78o(d); and Title 17, Code of Federal Regulations, Section 240.13a-11 and 13a-13; Form 8-K, Section 2, Item 2.02.

**REQUEST NO. 13**

**Counts Two Through Seven: False Statements in SEC Filings Second Element – Material Falsity**

The Government next must prove, with respect to each of Counts Two through Seven, that the defendant, NEIL COLE, made, or caused to be made, materially false and misleading statements in the filing you are considering.

As I have instructed you, a statement or representation is "false" if it was untrue when made, and known at the time to be untrue by the person making it or causing it to be made. A statement is misleading if it is either an untrue statement as to a material fact or if it omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

I have defined the term "material" for you previously and you should use that definition here.

I have also defined the terms and "knowingly" and "willfully." Those same definitions apply here.

To establish this element, the Government need not prove that the defendant himself physically made or otherwise personally prepared the statements in question. It is sufficient if the Government has proved the defendant caused materially false information to be filed by some person.

Adapted from Cole I; the Tomasetta Charge; Sand, et al.,
Modern Federal Jury Instructions, Instr. 36-10.

s

**A-595**

### REQUEST NO. 14

### Count Eight: Misleading Conduct of Audits

Count Eight of the Indictment charges NEIL COLE, the defendant, with misleading the conduct of audits, from at least in or about 2013 through at least in or about 2015.

Count Nine alleges as follows:

[The Court is respectfully requested to read Count Nine of the Indictment.]

The relevant law here is Title 15, United States Code, Sections 7202, 7242, and 78ff, which provide, in pertinent part:

> It shall be unlawful . . . for any officer or director of an issuer, or any other person acting under the direction thereof, to take any action to fraudulently influence, coerce, manipulate, or mislead any independent public or certified accountant engaged in the performance of an audit of the financial statements of that issuer for the purpose of rendering such financial statements materially misleading.

The law prohibits directors or officers of a corporation that has publicly traded securities from making or causing to be made false or misleading statements to an accountant either in connection with an audit or examination of the company's financial statements or in connection with the preparation and filing of documents with the SEC.

To establish that the defendant committed the offense charged in Count Eight, the Government must prove each of the following elements beyond a reasonable doubt:

First, that the defendant was a director or officer of a public company;

Second, that the defendant, directly or indirectly, made, or caused to be made, a materially false or misleading statement or omitted to state, or caused another person to omit to state, a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

**A-596**

Third, that the statements or omissions at issue were directed to an accountant in connection with (a) an audit or examination of the financial statements of the company, or (b) the preparation or filing of any document or report required to be filed with the SEC; and

Fourth, that the defendant acted willfully.

I have already described for you the concepts of willfulness, falsity and materiality, and have explained that a public company is required to file financial statements with the SEC. You should apply those same instructions here, except that you should consider whether the false or misleading statement would have been material to a reasonable auditor, instead of a reasonable investor.

> Adapted from Cole I at Trial Tr. 2545-2546, the charge of
> the Honorable Barbara S. Jones in United States v.
> Weissman, 01 Cr. 529 (BSJ)

**REQUEST NO. 15**

**Aiding and Abetting**

Each of the counts of the Indictment also charge the defendant with violating 18 U.S.C. § 2, the "aiding and abetting" statute. That is, the defendant is charged not only as a principal who committed the crime, but also as an aider and abettor and with having willfully caused the crime. As a result, under 18 U.S.C. § 2, there are two additional ways that the Government may establish a defendant's guilt on Counts One through Eight. One way is called "aiding and abetting," and the other is called "willfully causing a crime." Let me explain each of these.

"Aiding and abetting" is set forth in Section 2(a) of the statute. That section reads, in part, as follows:

> Whoever commits an offense against the United States or aids or abets or counsels, commands or induces, or procures its commission, is punishable as a principal.

Under the aiding and abetting statute, it is not necessary for the Government to show that a defendant himself physically committed the crime with which he is charged in order for you to find the defendant guilty. Thus, even if you do not find beyond a reasonable doubt that the defendant himself committed the crime charged, you may, under certain circumstances, still find the defendant guilty of that crime as an aider or abettor.

A person who aids or abets another to commit an offense is just as guilty of that offense as if he committed it himself. Accordingly, you may find a defendant guilty of the substantive crime if you find beyond a reasonable doubt that the Government has proved that another person actually committed the crime, and that the defendant aided and abetted that person in the commission of the offense.

As you can see, the first requirement is that another person has committed the crime charged. Obviously, no one can be convicted of aiding and abetting the criminal acts of another

**A-598**

if no crime was committed by the other person in the first place. But if you do find that a crime was committed, then you must consider whether the defendant aided or abetted the commission of the crime.

In order to aid or abet another to commit a crime, it is necessary that a defendant willfully and knowingly associate himself in some way with the crime, and that he willfully and knowingly seek by some act to help make the crime succeed.

Participation in a crime is willful if action is taken voluntarily and intentionally.

The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. An aider and abettor must have some interest in the criminal venture.

To determine whether a defendant aided or abetted the commission of the crime with which he is charged, ask yourself these questions:

-- Did he participate in the crime charged as something he wished to bring about?

-- Did he associate himself with the criminal venture knowingly and willfully?

-- Did he seek by his actions to make the criminal venture succeed?

If he did, then the defendant is an aider and abettor, and therefore guilty of the offense. If he did not, then the defendant is not an aider and abettor, and is not guilty as an aider and abettor of that offense.

> Adapted from Sand, et al., Modern Federal Jury Instructions, Instr. 11-1 and 11-2, and from the charge approved in United States v. Stanchich, 550 F.2d 1294 (2d Cir. 1977); see United States v. Labat, 905 F.2d 18, 23 (2d Cir. 1990) (discussing requirements of aiding and abetting

**A-599**

liability); <u>United States</u> v. <u>Clemente</u>, 640 F.2d 1069 (2d Cir.) (same).

**REQUEST NO. 16**

**Willfully Causing a Crime**

The second way in which the Government can prove a defendant's guilt under 18 U.S.C. § 2 is through a finding beyond a reasonable doubt that the defendant willfully caused a crime. Section 2(b) of the aiding and abetting statute, which relates to willfully causing a crime, reads as follows:

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States [shall be guilty of a federal crime].

What does the term "willfully caused" mean? It means that the defendant himself need not have physically committed the crime or supervised or participated in the actual criminal conduct charged in the Indictment.

The meaning of the term "willfully caused" can be found in the answers to the following questions:

First, did the defendant did the defendant have the mental state necessary to commit the offenses you are considering; and

Second, did the defendant intentionally cause another person to commit the action or actions that constituted the crime?

If you are persuaded beyond a reasonable doubt that the answer to both of these questions is "yes" then the defendant is guilty of the crime charged just as if the defendant himself had actually committed it. To find the defendant liable under this provision of the statute, the Government need not prove that he acted through a guilty intermediary.

> Adapted from Sand, et al., Modern Federal Jury Instructions, Instr. 11-3; see United States v. Gabriel, 125 F.3d 89, 99 (2d Cir. 1997) ("Generally, to establish a conviction through the use of section 2(b), the government

must prove that the defendant had the mental state necessary to violate the underlying criminal statute and that the defendant 'willfully caused' another to commit the necessary act."); United States v. Margiotta, 688 F.2d 108, 131 (2d Cir. 1982) (defendant may be found guilty even if he acts through "innocent intermediaries" to "cause[] the commission of an indispensable element of the offense"); United States v. Ordner, 554 F.2d 24, 29 (2d Cir. 1977), cert. denied, 434 U.S. 824 (1978) (under the "willfully causes an act to be done" provision "the guilt or innocence of the intermediary is irrelevant").

### REQUEST NO. 17

### Conscious Avoidance

### [If Applicable]

As I have explained, each of the counts charged in the Indictment requires the Government to prove that the defendant acted knowingly, as I have already defined that term.

As you all know, if a person is actually aware of a fact, then he knows that fact. But the law also allows you to find that a defendant had knowledge of a fact when the evidence shows that he was aware of a high probability of that fact, but intentionally avoided confirming that fact. The law calls this "conscious avoidance" or "willful blindness."

In determining whether the Government has proven beyond a reasonable doubt that the defendant acted knowingly with respect to each of the ten counts charged in the Indictment, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him. One may not willfully and intentionally remain ignorant of a fact important to his conduct in order to escape the consequences of criminal law.

 Thus, if you find beyond a reasonable doubt that the defendant acted with a conscious purpose to avoid learning some relevant fact – for example, that certain statements were false or misleading without additional information – then you may treat the defendant as though he knew that the fact existed. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, or mistaken, and you may not rely on willful blindness as the basis for treating the defendant as though he was aware of the existence of a fact

**A-603**

if you find that the defendant actually believed that the fact did not exist. It is entirely up to you whether you find that the defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.

> Adapted from the <u>Collins</u> Charge; Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 3A-2, 57-24.

# A-604

## REQUEST NO. 18

### Venue

Now, in addition to dealing with the elements of each of the offenses, you must also consider the issue of venue as to each offense, namely, whether any act in furtherance of the unlawful activity occurred within the Southern District of New York. The Southern District of New York includes Manhattan, the Bronx, as well as several other counties, so anything that occurs in Manhattan occurs in the Southern District of New York.

It is sufficient to satisfy the venue requirement if any act by anyone in furtherance of the crime charged occurred within the Southern District of New York. To satisfy this venue requirement <u>only</u>, the Government need not meet the burden of proof beyond a reasonable doubt. The Government meets its burden of proof for venue if it establishes by a preponderance of the evidence that an act in furtherance of the crime occurred within the Southern District of New York. A preponderance of the evidence means that something is more likely than not.

> Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 3-11.; the <u>Collins</u> Charge; the <u>Tomasetta</u> Charge; <u>see also</u> <u>United States</u> v. <u>Gonzalez</u>, 922 F.2d 1044, 1054-55 (2d Cir.) (affirming that venue is governed by a preponderance standard).

**REQUEST NO. 19**

**Cooperating Witness Testimony & Non-Prosecution Agreements**

You have heard from a witness – Seth Horowitz – who testified that he was actually involved in carrying out aspects of the crimes charged in the Indictment and who testified pursuant to a cooperation agreement with the Government.

With respect to that witness, you have heard testimony that he pled guilty to charges arising out of some of the same facts as this case. You are instructed that you are to draw no conclusions or inferences of any kind about the guilt of the defendant on trial from the fact that a prosecution witness pled guilty to similar charges. A witness's decision to plead guilty is a personal decision about his or her own guilt. It may not be used by you in any way as evidence against or unfavorable to the defendant on trial here.

You may consider the guilty plea only in determining the witness's believability. In that connection, let me remind you that Mr. Horowitz pled guilty after entering into an agreement with the Government to testify. There is evidence that, in exchange for the promise to testify truthfully, completely, and fully, the Government promised to bring that cooperation to the attention of the sentencing court. The Government is permitted to enter into this kind of plea agreement. You, in turn, may accept the testimony of such a witness and convict a defendant on the basis of such testimony alone, if it convinces you of that defendant's guilt beyond a reasonable doubt.

However, you should bear in mind that a witness who has entered into such an agreement has an interest in this case different from an ordinary witness. A witness who realizes that he or he may be able to obtain his or her own freedom, or receive a lighter sentence by giving testimony favorable to the prosecution, has a motive to testify falsely. Therefore, you must

examine such testimony with caution and weigh it with great care. If, after scrutinizing such testimony, you decide to accept it, you may give it whatever weight, if any, you find it deserves.

Mr. Horowitz has admitted involvement in planning or carrying out aspects of the crimes charged in the Indictment. There has been much said about him in the summations of counsel and whether or not you should believe him. The Government argues, as it is permitted to do, that it must take the witnesses as it finds them. It argues that only people who themselves take part in criminal activity have the knowledge required to show criminal behavior by others. For these very reasons, the law allows the use of such testimony.

However, it is also the case that the testimony of each such witness must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe.

I have given you some general considerations on credibility and I will not repeat them all here. Nor will I repeat all of the arguments made on both sides. However, let me say a few things that you may want to consider during your deliberations on the subject of such a witness.

You should ask yourselves whether the witness would benefit more by lying or by telling the truth. Was his testimony made up in any way because she believed or hoped that she would somehow receive favorable treatment by testifying falsely? Or did he believe that her interests would be best served by testifying truthfully? If you believe that the witness was motivated by hopes of personal gain, was this motivation one which would cause him to lie, or was it one which would cause him to tell the truth? Did this motivation color him testimony? In sum, you should look at all of the evidence in deciding what credence and what weight, if any, you will want to give to the witness's testimony.

**A-607**

Keep in mind that it does not follow that, simply because a person has admitted to participating in one or more crimes, he is incapable of giving a truthful version of what happened. Like the testimony of any other witness, the testimony of someone who has participated in a crime should be given such weight as it deserves in light of the facts and circumstances before you, taking into account the witness's demeanor, candor, the strength and accuracy of a witness's recollection, her background, and the extent to which her testimony is or is not corroborated by other evidence in the case.

One final note in this regard. It is no concern of yours why the Government made agreements with Mr. Horowitz. Your sole concern is to decide whether the witness was giving truthful testimony in this case before you. In sum, you should look to all the evidence in deciding what credence and what weight, if any, you will give to a witness's testimony.

You have also heard testimony from Government witnesses who testified pursuant to compulsion and immunity orders entered by the Court. The Government is entitled to call such witnesses. The fact that a witness's testimony cannot be used against him in a prosecution does not disqualify him from testifying and does not preclude you from accepting that testimony as true.

As with the cooperating witness testimony, you may want to consider whether such witnesses would benefit more by lying or by telling the truth. If you believe the witness was motivated by personal gain, was the motivation one that would cause him to lie or was it one that would cause him to tell the truth? Again, if you find the testimony is false, you should reject it. If you are satisfied that the witness told the truth, you should accept it.

As I have previously instructed you, the issue of credibility need not be decided in an all or nothing fashion. Even if you find that a witness testified falsely in one part, you still may

**A-608**

accept his testimony in other parts, or may disregard all of it. Credibility is a determination

entirely for you, the jury.

> Adapted from the Collins Charge; the Tomasetta Charge; Sand, et al., Modern Federal Jury Instructions, Instr. 7-5; the charge in United States v. Projansky, 465 F.2d 123, 136-37 fn. 25 (2d Cir.) (specifically approving charge set forth in footnote); see United States v. Gleason, 616 F.2d 2, 15 (2d Cir. 1979) ("Where the court points out that testimony of certain types of witnesses may be suspect and should therefore be scrutinized and weighed with care, such as that of accomplices or coconspirators . . . it must also direct the jury's attention to the fact that it may well find these witnesses to be truthful, in whole or in part.") (citations omitted); see also United States v. Swiderski, 539 F.2d 854, 860 (2d Cir. 1976) (can be reversible error not to give accomplice witness charge if requested by defense).

**A-609**

**REQUEST NO. 20**

**Law Enforcement and Government Employee Witnesses**

**[If Applicable]**

You have heard testimony from law enforcement officials and employees of the Government. The fact that a witness may be employed by the Federal Government as a law enforcement official or employee does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

In this context, defense counsel is allowed to try to attack the credibility of such a witness on the ground that his or her testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement or Government employee witness and to give to that testimony the weight you find it deserves.

Adapted from Sand et al., <u>Modern Federal Jury Instructions</u>, Instr. 7-16.

**REQUEST NO. 21**

**Expert Witnesses**

**[If Applicable]**

You have heard testimony from what we call an expert witness [or witnesses]. An expert is a witness who by education or experience has acquired learning or experience in a specialized area of knowledge. Such witnesses are permitted to give their opinions as to relevant matters in which they profess to be an expert and give their reasons for their opinions. Expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

Now, your role in judging credibility applies to experts as well as to other witnesses. You should consider the expert opinions that were received in evidence in this case and give them as much or as little weight as you think they deserve. If you should decide that the opinion of an expert was not based on sufficient education or experience or on sufficient data, or if you should conclude that the trustworthiness or credibility of an expert is questionable for any reason, of if the opinion of the expert was outweighed, in your judgment, by other evidence in the case, then you might disregard the opinion of the expert entirely or in part.

On the other hand, if you find the opinion of an expert is based on sufficient data, education and experience, and the other evidence does not give you reason to doubt his conclusions, you would be justified in placing reliance on his testimony.

Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 7-21.

**A-611**

**REQUEST NO. 22**

**Character Testimony**

**[If Applicable]**

You have heard testimony that the defendant has a good reputation for [to be completed as appropriate].

Along with all the other evidence you have heard, you may take into consideration what you believe about a defendant's reputation for [to be completed as appropriate] when you decide whether the Government has proven, beyond a reasonable doubt, that the defendant committed the crime.

# A-612

**REQUEST NO. 23**

**Defendant's Testimony**

**[Requested only if the defendant testifies]**

[The Government respectfully requests that the Court include the following instruction in its general instruction on witness credibility, rather than as a separate instruction:]

The defendant testified at trial and was subject to cross-examination. You should examine and evaluate this testimony just as you would the testimony of any witness with an interest in the outcome of the case.

**REQUEST NO. 24**

**Defendant's Right Not to Testify**

**[If requested by defense]**

The defendant did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt. That burden remains with the Government throughout the entire trial and never shifts to a defendant. A defendant is never required to prove that he or she is innocent.

You may not attach any significance to the fact that the defendant did not testify. No adverse inference against him may be drawn by you because he did not take the witness stand. You may not consider this against the defendant in any way in your deliberations in the jury room.

> Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 5-21.

**REQUEST NO. 25**

**Statements of the Defendant**

**[If applicable]**

There has been evidence that the defendant made certain statements in which the Government claims he made admissions or denials relevant to the charges in the Indictment.

Evidence of these statements was properly admitted in this case, and may be properly considered by you. You are to give the statements such weight as you feel they deserve in light of all the evidence.

Whether you approve or disapprove of the use of these statements may not enter your deliberations. I instruct you that no one's rights were violated, and the Government's use of this evidence is entirely lawful.

> Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 5-19.

**REQUEST NO. 26**

**Uncalled Witnesses – Equally Available to Both Sides**

There are people whose names you heard during the course of the trial but did not appear to testify. [If applicable: One or more of the attorneys has referred to their absence from the trial.] I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way.

You should remember my instruction, however, that the law does not impose on the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

> Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 6-7.

**REQUEST NO. 27**

**Particular Investigative Techniques Not Required**

**[If Applicable]**

You have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by the Government. There is no legal requirement, however, that the Government prove its case through any particular means. While you are to carefully consider the evidence adduced by the Government, you are not to speculate as to why they used the techniques they did or why they did not use other techniques. The Government is not on trial. Law enforcement techniques are not your concern.

Your concern is to determine whether or not, on the evidence or lack of evidence, the defendant's guilt has been proved beyond a reasonable doubt.

> Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 4-4.

**A-617**

### REQUEST NO. 28

### Persons Not on Trial

You may not draw any inference, favorable or unfavorable, towards the Government or the defendant on trial from the fact that any person in addition to the defendant is not on trial here. You also may not speculate as to the reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors.

**A-618**

**REQUEST NO. 29**

**Preparation of Witnesses**

You have heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.

Although you may consider that fact when you are evaluating a witness's credibility, I should tell you that there is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects and have the opportunity to review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time. In fact, it would be unusual for a lawyer to call a witness without such consultation.

Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

**A-619**

## REQUEST NO. 30

### Charts and Summaries

### [If Applicable]

The parties presented exhibits in the form of charts and summaries. As you will recall, some of the charts and summaries were not admitted into evidence, but were shown to you as aids to make the other evidence more meaningful and to help you in considering the evidence. Others were admitted into evidence as exhibits. I admitted these charts and summaries in place of or in addition to the underlying documents that they represent in order to save time and avoid unnecessary inconvenience. They are no better than the testimony or the documents upon which they are based. Therefore, you are to give no greater consideration to these charts or summaries than you would give to the evidence upon which they are based. It is for you to decide whether they correctly present the information contained in the testimony and in the exhibits upon which they were based.

Adapted from the Milton charge, Sand, et al., Modern Federal Jury Instructions, Instr. 5-13.

**A-620**

**REQUEST NO. 31**

**Use of Audio Recordings and Transcripts [If applicable]**

Audio recordings have been admitted into evidence in this case. This evidence was lawfully obtained, and properly admitted in this case. Whether you approve or disapprove of the recording of these conversations may not enter your deliberations. I instruct you that these recordings were made in a lawful manner and that no one's rights were violated, and that the Government's use of this evidence is entirely lawful.

You must, therefore, regardless of any personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the Government has proved beyond a reasonable doubt the guilt of the defendant.

To help your listening, transcripts have also been prepared. However, the transcripts were not admitted into evidence; only the audio recordings were. You are not to regard the transcripts as anything more than as an aid to you. It is what you hear on the recordings that controls. Nonetheless, if you wish to view the transcripts, they will be made available to you during your deliberations.

> Adapted from the charge of the Honorable Pierre N. Leval in United States v. Mucciante, 91 Cr. 403 (PNL) (S.D.N.Y. 1992); see also Sand, et al., Modern Federal Jury Instructions, Instr. 5-9, 5-10.

## REQUEST NO. 32

### Stipulations

In this case you have heard evidence in the form of stipulations.

A stipulation of testimony is an agreement among the parties that, if called, a witness would have given certain testimony. You must accept as true the fact that the witness would have given the testimony. However, it is for you to determine the effect to be given that testimony.

You also heard evidence in the form of stipulations that contain facts that were agreed to be true. In such cases, you must accept those facts as true.

> Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 5-6 and 5-7.

**Conclusion**

Members of the jury, that about concludes my instructions to you. You are about to go into the jury room to begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request to see them and we will either send them into the jury room or we will bring you back out to the courtroom to see them. If you want any of the testimony read or any of the recordings played again, you may also request that. Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of the testimony. If you want any further explanation of the law as I have explained it to you, you may also request that from the Court. If there is any doubt or question about the meaning of any part of this charge, you should send me a note asking for clarification or for a further explanation. Your requests for exhibits or testimony – in fact any communications with the Court – should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

Many of you have taken notes periodically throughout this trial. I want to emphasize to you, as you are about to begin your deliberations, that notes are simply an aid to memory. Notes that any of you may have made may not be given any greater weight or influence in determination of the case than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence. Any difference between a juror's recollections and another juror's notes should be settled by asking to have the court reporter read back the transcript, for it is the court record rather than any juror's notes upon which the jury must base its determination of the facts and its verdict.

**A-623**

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence. It would be improper for you to consider, in reaching your decision as to whether the Government sustained its burden of proof, any personal feelings you may have about any defendant's race, religion, national origin, sex, or age. The parties in this case are entitled to a trial free from prejudice and our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

Your function now is to weigh the evidence in this case and to determine the guilt or innocence of the defendant with respect to each count of the Indictment.

You must base your verdict solely on the basis of the evidence and these instructions as to the law, and you are obliged on your oath as jurors to follow the law as I instruct you, whether you agree or disagree with the particular law in question.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty, as jurors, however, to consult with one another, and to deliberate with a view to reaching an agreement, if you can possibly do so without violence to individual judgment. Each of you must decide the case for him or herself, but do so only after an impartial discussion and consideration of all the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change an opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors.

Remember at all times, you are not partisans. You are judges – judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

**A-624**

You should by your own vote select one of you to sit as your foreperson. The foreperson will send out any notes, and when the jury has reached a verdict, he or she will notify the marshal that the jury has reached a verdict, and when you come into open court, the foreperson will be asked to state what the verdict is.

We have prepared a verdict form for you to use in recording your decisions. After you have reached a verdict, the foreperson should fill in the verdict sheet, sign and date it, and then give a note to the marshal outside your door stating that you have reached a verdict. Do not specify what the verdict is in your note. Instead, the foreperson should retain the verdict sheet, and hand it to us in open court when you are all called in. If you are divided, do not report how the vote stands.

I will stress again that each of you must be in agreement with the verdict that is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

**A-625**

In conclusion, Ladies and Gentlemen, I am sure that if you listen to the views of your fellow jurors and if you apply your own common sense you will reach a fair verdict here. Remember that your verdict must be rendered without fear, without favor, and without prejudice or sympathy.


Dated: October 20, 2022
        New York, New York


                                Respectfully submitted,

                                DAMIAN WILLIAMS
                                United States Attorney

                    By:         /s/
                                _____
                                Jared Lenow
                                Justin V. Rodriguez
                                Andrew Thomas
                                Assistant United States Attorneys
                                Tel: (212) 637-1068/2591/2106

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 26, 2022

**BY ECF**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

> Re:    *United States v. Neil Cole*,
>        19 Cr. 869 (ER)

Dear Judge Ramos:

The Government respectfully submits this letter in response to the defendant's October 26, 2022 letter motion that seeks (a) to authorize the defendant to tell the jury that certain of his prior factual admissions were made in voluntary testimony "at a criminal trial before a jury"; and (b) to dismiss the Indictment on the grounds that the first jury's findings would make a retrial a violation of Cole's right against double jeopardy. Cole Letter Motion dated October 26, 2022, ECF Doc. 237 ("Cole October 26, 2022 Letter Motion").

*Cole's Admissions and References to the Prior Trial*

Little more than a week ago, Cole assured the Court "it need not waste judicial resources" on the Government's motion for an order directing the parties to refer to the prior trial as a prior proceeding, as the "defense plans to do just that." *See* ECF Doc. 225 at 6, 8. Cole now requests permission to tell the jury that he gave testimony to a jury in a prior criminal trial. Cole attributes his about-face to surprise that the Government may seek to admit as evidence at this trial Cole's factual admissions during the last trial.

Cole admitted during his prior testimony to, among others, the following facts:

- Iconix established a joint venture relationship with Li & Fung. (Trial Tr. 2141).
- Seth Horowitz was not involved in any way in the SEA-1 transaction. (Trial Tr. 2152).
- Cole personally authorized payment on marketing invoices from GBG totaling approximately $5.4 million. (Trial Tr. 2161).
- Revenue was one of the categories of financial information that was important for Iconix. (Trial Tr. 2191).
- Iconix highlighted revenue in its press releases. (Trial Tr. 2191).
- One of the things Cole was focused on was beating revenue and EPS for the prior year's quarter. (Trial Tr. 2192).
- Cole was also focused on beating consensus for revenue and EPS. (Trial Tr. 2192).

Page 2

- Cole understood that beating consensus estimates for revenue and EPS was important for the company's stock price. (Trial Tr. 2193).

Cole's factual statements are classic party admissions, admissible as non-hearsay statements pursuant to Rule 801. *See* Fed. R. Evid. 801(d)(2)(A). These statements are therefore admissible whether Cole testifies again or not. Further, because the statements are reflected in a transcript of a court proceedings certified by a court reporter, transcript excerpts reflecting these statements would be self-authenticating exhibits pursuant to Rule 902(4). *See Ball v. A.O. Smith Corp.*, 451 F.3d 66, 71 (2d Cir. 2006) ("The original transcript, which includes a certification by the court reporter, is self-authenticating."); *see also United States v. Lumumba*, 794 F.2d 806, 815 (2d Cir. 1986) (describing trial transcript as certified copy of a public record admissible under Rule 902(4)).

The Rules of Evidence do not afford Cole special protections against the admission of his own voluntary statements. The United States Supreme Court has long observed "the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings." *Harrison v. United States*, 392 U.S. 219, 222 (1968). Cole points to no authority that holds he is entitled to tell the jury when and how he came to make the statements, especially when doing so would prejudicially and needlessly reveal the fact of a prior trial. *See* Gov't Memorandum, ECF Doc. 220, at 12-14 (collecting cases regarding references to a prior trial). *Blackson v. Rapelje*, which Cole offers as support, addresses the unrelated issue of a defendant's Confrontation Clause rights against an uncalled witness whose gave prior testimony. There, before a retrial of a murder case, "two of the state's key witnesses recanted their testimony" and "were later determined to be unavailable at the new trial." 780 F.3d 340, 345 (6th Cir. 2015). The trial court ordered their prior testimony read to the jury but denied the defendant the right to impeach that testimony through proof of the subsequent recantations. The U.S. District Court, in considering habeas relief, found a Confrontation Clause violation and the Sixth Circuit affirmed. *Id.* at 348-353. The introduction of Cole's own statements raises no similar issues whatsoever.

Ultimately, the primary evidentiary consideration for the Court will be whether additional portions of the trial transcript ought in fairness be considered along with whatever sections the Government seeks to admit, in accordance with Rule 106 of the Federal Rules of Evidence. As the Second Circuit has explained, Rule 106—which codifies the Rule of Completeness—only requires consideration of the remainder of the statement:

> The rule of completeness provides that even though a statement may be hearsay, an omitted portion of the statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion. The rule does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages.

*United States v. Kopp*, 562 F.3d 141, 144 (2d Cir. 2009) (quotation marks and citations omitted). Here, if the Government offers certain of Cole's admissions—such as his admission on direct examination that he personally authorized marketing invoices form GBG totaling approximately

$5.4 million—the defense is free to argue that other related portions of the transcript must be admitted to explain the selected portion and the Court can rule on that application as the exhibit is offered. But Rule 106 does not entitle a defendant to explain how a statement came to be before it is admitted, let alone to obtain an instruction that Cole made the prior statements "in the presence of counsel, a presiding judge and jury of his peers, during a criminal trial at which he enjoyed but chose to waive his fifth amendment right to remain silent and to subject himself to cross examination." *Cf.* Cole October 26, 2022 Letter Motion at 2. Indeed, the party opponent rule does not require the offering party to supply the circumstances of the opponent's statement and it is not obvious that conveying such information to the jury here would do anything other than to improperly bolster Cole's credibility and reveal the existence of a prior trial.

### *Cole's Motion to Dismiss*

A year after his prior trial and five days before his retrial, Cole moves to bar the Government from retrying the remaining substantive counts, or in the alternative, to dismiss those counts. This belated motion should be denied.

As an initial matter, Cole's motion is untimely. Cole seems to suggest that he is only now coming to appreciate that the Government, as it explained in its opposition to his motion *in limine*, cannot remove from the equation the other people Cole committed wrongdoing or illegal acts with and preserve fidelity to the evidence. The suggestion is fanciful. The Government's core theory of the case—that Cole agreed and worked with others to commit the crimes charged in the Indictment—has been known to the defense for years. Indeed, the essence of each of the counts is that Cole and Jason Rabin agreed to an overpay-for-giveback arrangement and then worked with their subordinates to accomplish that plan. It is the theory reflected in the Indictment, each count of which incorporates by reference the same factual allegations; it is the theory reflected in the discovery and Section 3500 material produced in advance of the last trial; it is the theory that the Government presented to the jury at the last trial; it is the theory articulated in the Government's motions *in limine*; and it is the theory that the Government will present at the retrial. In any event, and whatever the Government's theory, Cole could have made his motion to dismiss at any time after the prior trial, but he failed to do so.

In any case, the defendant's motion to dismiss is wholly without merit. The Double Jeopardy Clause does not prevent retrial on offenses to which a jury has been unable to reach a verdict. *See, e.g.*, *Richardson v. United States*, 468 U.S. 317, 324 (1984) ("we have constantly adhered to the rule that a retrial following a 'hung jury' does not violate the Double Jeopardy Clause"). And, as explained in the Government's opposition, the defendant cannot meet his particularly onerous burden of precluding retrial on the substantive counts to which the jury did not reach a verdict merely because the jury acquitted on a separate conspiracy count. Gov't Memorandum in Opposition, ECF Doc. 226, at 5-11.

Cole also mischaracterizes how the Government intends to present its proof at the retrial. In its original motion, the defense sought to bar the Government from presenting any evidence and argument that Cole entered, joined, or participated in an agreement, scheme, joint plot or plan, or committed wrongdoing and illegal acts with others. Doc. No. 212 at 8. The Government's response noted that, if there were such a bar, it will be impossible for the Government to prove a case that

had at its core collective efforts by Cole, Rabin, and their respective subordinates to implement an overpay-for-giveback arrangement. But Cole is incorrect to claim that this point reveals the Government intends "to rely *solely* on Mr. Cole's participation in a conspiracy or agreement to prove the remaining substantive charges." Cole October 26, 2022 Letter Motion at 4 (emphasis added). First, there are certain aspects of the crimes that the Government will prove Cole did by himself, such as certifying the false SEC filings. Second, the Government does not intend to argue to the jury that Cole was in a conspiracy or was a co-conspirator and, of course, the Government does not seek to have the Court instruct the jury on principles of conspiracy liability. The Government will, however, present evidence and argue that Cole was part of a scheme to commit wrongdoing and illegal acts with others, as Count Two charges him with participating in such a scheme. While the prior jury may have acquitted Cole of conspiracy, Cole has not met his "particularly onerous" burden, *United States v. Clark*, 613 F.2d 391, 400 (2d Cir. 1979), of showing that the prior jury made the much more expansive finding that he did not enter, join, or participate in "any sort of . . . agreement, scheme joint plot or plan," or commit "wrongdoing or illegal acts with others." ECF Doc. No. 212 at 8.

Finally, the Supreme Court's 1948 decision in *Sealfon v. United States*, 332 U.S. 575 (1948), is of no help to Cole. The Supreme Court was clear that its decision in that case was based "on the particular facts [t]here involved." *Id.* at 576. That case, unlike this one, involved a sole object conspiracy. As the Government argued in its opposition brief, consistent with the Court's instructions, each one of the jurors at the prior trial in this case may have found that the Government had proven all the necessary elements of Count One beyond a reasonable doubt, but simply could not unanimously agree on the same object of the conspiracy. *See* ECF Doc. 226 at 5. Thus, without a special verdict form, "there is no way of telling," which, if any, of the objects of Count One the jury necessarily and unanimously found the Government did not prove beyond a reasonable doubt. *Id.* Cole does not address this argument at all in his letter brief. This point distinguishes this case from *Sealfon* and defeats Cole's motion.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Jared Lenow
Justin V. Rodriguez
Andrew Thomas
Assistant United States Attorneys
(212) 637-1068/ 2591/2106

cc:     Defense counsel (by ECF)

MARKUS / MOSS

November 18, 2022

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    **Re:   _United States v. Neil Cole,_ No. 19 Cr.869 (ER)**

Dear Judge Ramos:

    Please find attached an email from Attorney Edward Kim explaining that his client Ethan Cole is unavailable as a witness for the defense because he would invoke his right to silence. We respectfully request you reconsider your ruling to give the instruction regarding unavailable witnesses as that instruction is factually and legally incorrect in these particular circumstances because Ethan Cole is simply not available to the defense.

        Very truly yours,

        David Oscar Markus

MARKUS/MOSS PLLC

40 NW 3rd Street, PH 1
Miami, FL 33128
T 305 379-6667
F 305 379-6668
markuslaw.com

# A-631

**From:** Edward Kim (KKL) <Edward.Kim@KKLllp.com>
**Sent:** Friday, November 18, 2022 9:00 AM
**To:** David Oscar Markus <dmarkus@markuslaw.com>
**Subject:** Ethan Cole

David,

Hope all is well.  I'm writing to confirm that, if called as a witness at trial, Mr. Cole would invoke his Fifth Amendment right and decline to testify.

Best,

Ed

_____

**Edward Y. Kim**

KRIEGER KIM & LEWIN LLP

500 Fifth Avenue, 34th Floor | New York, NY 10110

212.390.9555 (w) | 917.842.3148 (c)

edward.kim@KKLllp.com | vCard | www.KKLllp.com

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive this message), you may not use, copy, or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail or contact Krieger Kim & Lewin LLP at (212) 390-9550, and delete the message. Thank you.

# A-632

21

this, it is a particularly onerous burden as to what the jury necessarily, not could have, but necessarily decided with its prior verdict.

THE COURT: Let me ask you. I take it that the government agrees that there's almost an entirety of overlap between the conspiracy counts and the substantive counts that are still in the indictment, correct?

MR. RODRIGUEZ: Certainly with respect to the first conspiracy, right? So there's the second conspiracy that had to do with the destruction of evidence and things of that nature. With respect to that, the only plans that the government has there is to elicit that kind of testimony from its cooperating witness or witnesses to front as *Giglio*, not as substantive evidence against Mr. Cole.

But I think to address what I think is the core of the Court's question, yes, the core of the government's theory here is that Mr. Cole agreed with and worked with others to commit the crimes charged in the indictment.

THE COURT: Thank you.

Mr. Markus.

MR. MARKUS: Just briefly, your Honor, I will agree with Mr. Rodirguez on one thing, this is a showstopper. And the reason it's a showstopper under the multi-object conspiracy point is because the jury's necessarily found him not guilty of each of those objects. If they didn't, they would have hung on

**A-633**

22

Count One. So each object as we know is looked at basically as a separate crime; a conspiracy to commit crime one, a conspiracy to commit crime two, and a conspiracy to commit crime three. The jury had to be unanimous one way or the other on each of those objects. By finding Mr. Cole not guilty on Count One, the jury necessarily said he is not guilty on each of those objects. That's why the government loses on this theory.

So I think glaringly absent from their argument right now is *United States v. Sealfon*. That was a multi-object conspiracy count where the Supreme Court said after a general verdict, no retrying on the same exact theory in evidence on an aiding and abetting theory. You just can't do that. That's the same situation here, your Honor. So we would ask the Court to dismiss the substantive counts.

THE COURT: The motion is denied. As both sides acknowledged, in determining what issues were necessarily resolved by the prior proceedings, the Court is to take a practical approach examining the record, pleadings, evidence, and jury instructions in order to decide whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. And that is the *U.S. v. Cala* case reported at 521 F.2d 605, the Second Circuit case from 1975.

It is the defendant's burden to establish that the

MAR7COLE1 case cannot move forward. And it is, as the parties also acknowledge, a difficult burden since is usually cannot be determined with any certainty upon what basis the previous jury reached its general verdict. And I'm here citing *U.S. v. Gugliaro* reported at 501 F.2d 68, a Second Circuit case from 1974.

And the burden is particularly onerous where the acquittal in the first trial involves the crime of conspiracy, citing *U.S. v. Clark* 613 F.2d 391. While the defense certainly makes a compelling argument, I don't believe that they meet the necessary burden that they have to carry. I think the government has the better of the argument that the jury could have found beyond a reasonable doubt that Mr. Cole participated in a conspiracy but disagreed over the object of the conspiracy.

With respect to whether the government calls it a scheme or some other thing, I mean, I note that in this one case, *U.S. v. Massino*, an Eastern District case from 2004, the Court referred to a community of unlawful intent. You can call it anything you want, so long as you don't call it a conspiracy. But certainly it is the case that you don't need to establish a conspiracy in order to establish Mr. Cole's knowing and intentional participation in the substantive crimes that are charged. Accordingly, even though those crimes did require the involvement of other individuals.

**A-635**

24

MAR7COLC1 So for those reasons, the motion is denied.

If we can next go over the Mr. Cole's motions, motions *in limine*. First is to commit evidence of Iconix December 2015 purchase of the Southeast Asia, three assets. At the prior trial, I precluded evidence of that purchase.

Who wants to argue why I was wrong or why I should rule differently this time?

MR. THEN: Well, you should just revisit it, your Honor.

This is Jeffrey Then for Mr. Cole.

Again, your Honor, as the Court is aware, the government's case focuses on three transactions SEA-1, SEA-2, and SEA-3, SEA-2 and SEA-3 being transactions that were not negotiated by Neil Cole but who were negotiated by Seth Horowitz. This motion seeks to introduce evidence of a fourth transaction, one that was very similar to SEA-3 that happened in December 2015, so almost -- just a year after SEA-3 where the transactions closed at a price for $24.7 million, which is significant because that's only $3 million more than what the SEA-3 closed for and $9 million more than what the government alleges the SEA-3 should have, or what the proper value of that motion was.

We, your Honor, argue that this is critical evidence for two primary reasons. First, it's critical evidence to rebut the government's argument that the SEA-3 was, in fact,

MAR7COLC1

these emails mean. Read them in this way. The defense would like to say, Hey, that's not what these emails mean. We know they don't mean that because the declarant, Ethan Cole, says they don't mean those things. So we'd like to call Ethan Cole to rebut exactly what the government's reading is.

The problem here, your Honor, is that the government has threatened the witness. The government has told Ethan Cole, we believe you have obstructed justice by saying that you're not a member of the conspiracy. We believe that you are obstructionist here. And so now Ethan Cole is invoking his Fifth Amendment, not because of the underlying activity, the statute of limitations has run for that, and he says he's innocent. He's invoking his Fifth because of the threats from the government. So here's the situation that we're left with --

THE COURT: I just want to be able to follow you. Are you saying that the statute has run, but Mr. Ethan Cole is still being intimidated by the government. But if the statute is run, what does it matter what the government says.

MR. MARKUS: Great question, your Honor. The government is saying, now that you've said to us that you're innocent and that these emails don't mean what we say they mean, we think you're obstructing. So they've threatened him with a new offense, not the underlying securities fraud, but with this new obstruction offense. So he would be taking the

40

Fifth, based on an obstruction threat by the government made during these debriefings.

THE COURT: Okay.

MR. MARKUS: What we're left with is, the government wants to put emails in, say they mean X, when they have a witness who says they mean Y. And we can't call that witness to rebut. I think the government has two choices. They can immunize the witness and have him tell his truth about what happened, or they're stuck with not putting those emails in. It's not fair to be able to put emails in and tell the jury they mean something that the declarant himself says they don't mean.

THE COURT: Well, Ethan Cole says he's innocent. Ethan Cole says that the emails don't mean what you, the government, think they mean. So what. The government has proffered evidence of emails and other communications where they argue -- and which once upon the time I accepted by a preponderance of the evidence -- that Mr. Ethan Cole knowingly engaged in certain acts which contributed to the scheme or the conspiracy, and therefore what's different now?

MR. MARKUS: Just to clarify, they have to prove more than he contributed. They have to prove that he was a knowing and willful participant of the conspiracy. They have to prove he was a conspirator.

THE COURT: Right.

41

MAR7COLC1MR. MARKUS:  What's different is, one, we had a full trial; and two, the jury has acquitted of the conspiracy counts.  That's not determinative.  I admit that, but it's something the Court can consider.  And three, we have Ethan Cole's reaffirmation through his lawyers that he would say he's innocent and has been threatened with obstruction.  And so what we know now, what's different than the first trial is that the jury will be left with a misimpression about those emails.  Remember, I mean, just to go back to sort of first principles, the reason we don't let hearsay in is because it's unreliable, right, that's the whole purpose, and so we have these hearsay exceptions.

THE COURT:  Let me ask you this, Mr. Markus, obviously when a member of the bar of this court, even a pro hac member of the bar in this court tells me that the government has engaged in substantial wrongdoing and I happen to consider that the government threatening witnesses with a prosecution if they don't testify in a particular way is wrongdoing.  You're going to have to give me more than that.  When did you learn that?  What specifically was said, etc.

MR. MARKUS:  of course, I wasn't at the beginning, but we have interview reports that say -- and I'm new to the case -- but in reading the interview reports what they say is, first, that when the government re-interviewed Ethan Cole, they told his lawyer, a man named Ed Kim, that they believe based on

Ethan's Cole's first interview that he obstructed justice.

THE COURT:  When was the second interview?

MR. MARKUS:  It was eight days before the last trial, your Honor.

THE COURT:  Okay.

MR. THOMAS:  Just a point of clarification here. He's referring to notes of a phone call with Mr. Kim, not a second interview of Mr. Cole.

THE COURT:  Okay.

MR. MARKUS:  That's right.  And so at that phone call, I believe the government said -- and there's notes to reflect this, we believe he obstructed when he told us what he told us at the first interview, and here's what the government views as the truth.  To be honest, this happens everyday.  Witnesses say certain things and the government doesn't view them as being honest.  But the government sort of has decisions to make when that happens, right.  They can immunize the witness. They can do all sorts of things.

What I think they can't do, your Honor, is try to put into evidence documents and tell the jury that they mean something, and then the defense is hamstrung and can't call the witness to rebut it.  It puts us at a huge disadvantage.

THE COURT:  Except I suppose, Mr. Markus, all we're talking about, in the first instance, is whether or not the government can meet its burden under 801(d)(2)(E) I think.

MAR7COLC1 gets immunized or he's going to take the Fifth. Mr. Thomas, I'm happy to hear from you.

MR. THOMAS: Thank you, your Honor. So I think the Court alluded to some basic principles that are worth observing here cause they can get lost, I think, in the presentation that Mr. Markus made there.

First of all, as the Court noted, co-conspirator statements are just not hearsay. They're definitionally outside the bounds of the hearsay rule. The question that the Court has to confront by a preponderance is just whether or not there was a conspiracy and the statements that Ethan Cole made were in furtherance of it. The record amply supports that. We've got the passage of time with the identification of some new emails and witnesses the government will call. We're going to be able to prove quite convincingly that Mr. Cole misappropriated work product that he had access to.

THE COURT: I'm sorry, Mr. Ethan Cole.

MR. THOMAS: Mr. Ethan Cole, yes, your Honor. Ethan Cole misappropriated work product, that he lied to people that he worked with. He did all of that in order to come with a sham backup for sham invoices which demonstrates sort of his mental state at the time. Obviously, neither we nor the defense are bound by a witness's subjective perception of their own wrongdoing. And I'm sure that counsel can think of examples where witnesses have been less than candid about their

MAR7COLE1    cole and wrongdoing.  And Mr. Cole's attorney's proffer about his own subjective awareness is not the determinative of the issue.  And what he does concede in those attorney proffers and in the one meeting he had with the government is that he knew there was an overpay and that he was working with GBG to get the money back, which is precisely the core of the allegation here, and what the emails that he sends reflect.

THE COURT:  Did the government threaten Mr. Ethan Cole?

MR. THOMAS:  No, your Honor.  And certainly Mr. Markus reduces this to a matter of emails and Mr. Cole's description of them.  Mr. Cole was not forthcoming or candid at his meeting with the government some years ago about the fact that he was going around the company and lying to people.  After that interview, the government obtained further evidence that he had done that, including from a laptop that Mr. Cole had taken with him to Canada which was only recovered later.

THE COURT:  Could I bother you, Mr. Thomas, just so the record is clear.  When you refer to Mr. Ethan Cole, you refer to him as Mr. Ethan Cole.

MR. THOMAS:  I'll try my best for this one.  It's all Ethan.  And that in the eve of the last trial if I recall correctly, the fact that Mr. Ethan Cole had been repeatedly specifically dishonest with his colleagues was something that we brought up to Ed Kim, Mr. Ethan Cole's lawyer, and said that

MAR7COLC1 it revealed that he had been -- Ethan Cole had been less than candid in the first meeting. Mr. Ed Kim told us that Ethan Cole would not meet with us to discuss it. That if he were called or subpoenaed to testify, he would invoke the Fifth. And when we called Ed Kim back up a few weeks ago to see if that was still his position, he said that it was.

THE COURT: And would you summarize for me what the evidence is of Mr. Ethan Cole's knowing participation in the conspiracy.

MR. THOMAS: Yes, your Honor. So first of all, I think the fact that Mr. Cole is going around and lying to the people he works with to get backup is an important fact the Court ought to take specific notice of. But here if you look at the emails themselves, the ones that were most focus on use the very terminology that the government describes, the scheme they talk about, overpays they talk about, offsets they talk about, plugs, differences in value that reflect Mr. Cole's specific awareness that the deals that had been struck between Iconix and GBG reflected a payment to Iconix that was then going to be returned to GBG. That is an overpayment and a giveback.

And Ethan Cole is documenting that fact in the emails that we're talking about. Separately we know from Mr. Margolis -- who testified at the last trial, that Ethan Cole was aware of that arrangements, the overpay for giveback

MAR7COLC1

arrangement. And then we know from the other internal GBG records that what Ethan Cole did to facilitate the giveback was go around the company to find examples of prior marketing work that he could sort of redescribe, chop apart, and then bill Iconix for. Even though that work had nothing to do with the joint ventures, even that work did not have any value -- at least not the value associated on the invoice, and even though Iconix would not normally be paying that kind of thing given the commitments in the joint venture arrangement.

So you have Ethan Cole, you know he's involved because he writes it in an email. You know he's involved because you heard it from Mr. Margolis. We expect you'll hear it, at least in part, from Mr. Ravin. And you know that he knew it was wrongful because he has to go around and lie to his co-workers in order to make it happen.

And the last point I want to make for the Court, and which I think directly addresses Mr. Markus's point about unfairness, is that the rules actually contemplate an out-of-court declarant who is unavailable to either party. And Rule 806 specifically addresses attacking the credibility of that person. It is not a remarkable circumstance that there would be a co-conspirator's statements who are admitted without the speaker present in court. And the procedural remedy is the one the rules are for. If they have evidence that would be admissible under 806, they can do that. Mr. Markus --

48

MAR7COLC1 THE COURT: They can do that without Mr. Ethan Cole on the stand?

MR. THOMAS: Correct, your Honor. And there's no rule -- and I don't think they cited any authority otherwise that says that just because it's important to them, we should bring Mr. Cole in. There's no rule that makes that happen.

THE COURT: Do you agree with Mr. Markus that the statute of limitations as to Mr. Ethan Cole has run?

MR. THOMAS: As to the underlying conduct?

THE COURT: Yes.

MR. THOMAS: We think that is likely correct, yes, your Honor. I can't say that we've done a specific analysis, but certainly many years now have passed, more than six, so I think that would be true here.

THE COURT: Mr. Markus, anything else.

MR. MARKUS: Thank you, your Honor. Really briefly. So this idea of whether Mr. Ethan Cole was threatened or not, he certainly believes he has been, that's why he's taking the Fifth. So if we called him to testify, both he and his very experienced lawyer say that he feels so intimidated by what the government said. And what they said to him was, we believe he obstructed justice, and that we could charge him with that. That if we called him to the stand, Ethan Cole, to rebut exactly what the government just told the Court, Ethan Cole would invoke his Constitutional right to remain silent.

MAR7COLC1 So whether the government believes they've threatened him or not, I'm not going to quibble with. All I can tell you is, Ethan Cole believes he was threatened and so does his experience lawyer.  The government points out that Ethan Cole lied in his emails, lied to his colleagues.  That's an interesting position to take because they're going to take the position that in the emails they like, he was truthful.

This is part of the problem for us.  It's not as easy as being able to cross-examine some other witness under 806. The declarant himself contradicts what the government is going to tell the jury to see in those emails.  And so, yes, 801(d)(2)(E) statement is not hearsay if the government can satisfy its burden.  And in this rare circumstance, I would ask the Court where a witness has expressed this concern that we have a pretrial hearing.  If Ethan Cole invokes the Fifth, the government if it wants to satisfy its burden can immunize him. If they choose not to, they have to live with that decision, but they have the power to make him available, your Honor.

THE COURT:  It's really not that unusual a situation, a very common situation, in fact, at least in my experience, what Mr. Ethan Cole's subjective feeling about what the government said is his subjective feeling, and it doesn't really move the analytical needle for me one way or the other. As I understand at the state of play, the government has information.  They interviewed Mr. Ethan Cole.  The testimony

that he provided or the information that he provided was contradicted by the documentary and other information that they had. And they stated that if he were to testify consistently with his, Ethan Cole's, statements at the interview, then the government believes that he would be subject to prosecution for obstruction of justice if that's what happened. I don't know, but that seems to me to be a reasonable or a rationale explanation for how all this played out how we are at this point.

I don't see that as a threat. If Mr. Ethan Cole honestly believes that he told the government the truth and the government in its estimation reasonably and honestly believes that what Mr. Ethan Cole said is inconsistent with the truth, and they told him, so I don't see how that rises to the level of a threat. And, in addition, it is entirely up to the government as to which witness they will immunize or not. That is a prerogative that only in the most rarest of circumstances are courts allowed to intervene in.

And I certainly would not on the basis of the information that's before me require the government to immunize Mr. Ethan Cole if he were to come here and take the Fifth if he were to be sworn in. So where that leaves me is back to Rule 801(d)(2)(E) and whether or not the government has proven by preponderance of the evidence that Mr. Ethan Cole was a knowing and willing participant in the conspiracy. And based on the

51

MAR7COLC1 emails and other communications that they have provided in their response, I find that they have.  And I find that, therefore, that the three emails I believe that are at issue can be used by the government under the co-conspirator statement rule.  And with that, I think that resolves all of the defense's  motions in limine.

We turn now to the government's motions in limine.  I think now that there shouldn't be any issue concerning whether or not we use or don't use the word "prior trial" at this coming trial given my holding on the double jeopardy issue.  I think the parties agree that there will be no mention of a prior trial, correct.  Mr. Hecker

MR. HECKER:  Your Honor, we had initially agreed that was no need to make reference to a prior trial, and certainly we're not suggesting -- and still are not suggesting that there should be any reference to the outcome of that trial.  But what we learned after we submitted our initial brief and why we supplemented the record is that the government intends to choose certain selected portions from Mr. Cole's testimony in trial one and present that in its case in chief, not through witness, but just to move it into evidence self-authenticated prior statements of the defendant.

And in those circumstances we think it is important for the jury to understand the context in which Mr. Cole made those statements.  Just as would be the case if a defendant in

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

MB25col1     Opening - Mr. Lenow     Page 33

November 11, is Veterans Day, it is a national holiday, we will not be sitting on Friday, November 11.

With that, we will begin with the government's opening argument.

Mr. Lenow.

MR. LENOW: Thank you, Judge.

There is a con called the shell game. A con artist takes a ball, places it under one of three shells, slides the shells around, and then asks the average person on the street to bet money on which shell is covering the ball. But it's not a game, it's a scheme. The con artist uses trickery and deceit to move or side the ball while the shells are being shuffled to cheat the player -- the victim -- out of their money. This man, Neil Cole, the defendant, ran a similar con at a company called Iconix. Cole was the CEO of Iconix and he used tricks and lies to hide the truth from investors in his company to make it seem like his company was making millions of dollars more than it really was. And at the height of his fraud, as he shuffled money around to hide the truth about how Iconix was doing from outsiders, he sold tens of millions of dollars of Iconix stock, cashing in on his scheme. Neil Cole may have been sitting in a corporate executive suite, but behind closed doors he was running a con, a shell game, a scheme designed to cheat investors and enrich himself.

Now, to follow Cole's fraud you need to know just a

MB25col1     Opening - Mr. Lenow     Page 34

little bit about his company Iconix. You will learn that Iconix was in the fashion business but it didn't make clothes or other things sold in stores. Instead, Iconix owned various brand names like Umbro or Rocawear. It made money by charging other companies to use those brand names to make clothing and other products. So, if you wanted to manufacture and sell a t-shirt that had Umbro on it or Rocawear on it, you could rent the right to use that brand name from Iconix.

Iconix was a public company. What does that mean? It means its shares traded on the stock exchange so anyone could buy or sell Iconix stock. Cole was this company's CEO, the chief executive officer, the guy in charge, and you will learn that Cole was a micro manager, intensely focused on the details of his business. He was a demanding boss.

Now, in the time leading up to Cole's fraud, Iconix' growth had stalled out. Some of its brand were not selling very well. Cole, the micro manager, kept close tabs on Iconix' financial outlook. He cared deeply about making sure that the company's revenue and the amount of money it made grew each year and exceeded what Wall Street was predicting for the company. Cole knew that, as a public company, Iconix had to publicly and accurately report information about its revenue and profits every three months. Basically it was a financial report card so investors could look under the hood, kick the tires, decide whether they wanted to buy, sell, or hold Iconix

MB25col1     Opening - Mr. Lenow     Page 35

stock. Cole wanted, he demanded that these report cards showed that Iconix' revenue and profits were growing, that Iconix had beaten Wall Street's expectations. Cole believed the best way to make sure that Iconix' stock price stayed high was to hit these targets. He cared a lot about the stock price because he owned huge amounts of Iconix stock.

Well, in 2014 Cole saw that the company's revenue was going down. He knew this meant the company was going to fall behind its financial goals and miss Wall Street's expectations. Cole believed this meant Iconix' stock price could fall. For Cole this was a big problem. Cole was obsessed with making sure that Iconix hit its revenue and profit numbers. He talked about it constantly at the company. He did not want Iconix to fall short and miss those numbers.

For Cole, even if Iconix fell short by only a few cents, it made a big difference to him. Cole did not want to miss -- he did not want to fail, even by one cent.

So, what did he do? He cheated. He used tricks and he used lies to make it look like Iconix had hit those financial numbers to make it appear to investors that the company was doing better than it really was.

Now, there is nothing wrong with a CEO focusing on the bottom line. But there is something wrong, something criminal, when a CEO lies and cheats in order to inflate -- falsely inflate their company's financial results. And that's what

MB25col1     Opening - Mr. Lenow     Page 36

Cole did in 2014 when he saw that Iconix was coming up short.

So how de he pull it off? How did Cole move money around in a way that hid Iconix' revenue, profits were going down, and how did he make it seem like instead they were going up? The answer is dirty business.

Cole found a business partner that was willing to play the shell game with him, to help him trick people into thinking that business partner paid Iconix more money than it actually did in several business loans, and then Cole lied to investors. He reported that phony extra money from the business partner as Iconix' revenue.

Let me explain how this worked. These dirty business deals actually started off like normal deals. Cole sold a share of some of his brands, like Rocawear, to the business partner, and in return the business partner agreed to give Cole's company -- Iconix -- cash. And the deal would be that the business partner at Iconix would split the profits earned by those brands and Cole would get to tell Iconix investors how much the business partner had paid him for sharing those profits. Simple enough. And if that was the whole deal, that's totally fine. A buyer pays a seller for something. The seller then takes the money and puts it in the cash register once it comes in the door.

There is no shell game there. But that is not how it ended with these dirty deals. You see, even after the two

# A-649

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

MB25col1          Opening - Mr. Lenow          Page 37

sides, Cole's company Iconix and the business partner, had reached an agreement on price, Cole wanted to make it look like Iconix was getting paid even more than had been agreed to. But Cole had a problem. The business partner was not willing to pay more for what Cole was selling. So, what did Cole do? He made a secret side deal with the other company. If the other company would pay extra money up front, then Iconix would turn around later and give that extra money back to the business partner. The extra money would go from the business partner to Iconix, and then later on from Iconix back to the business partner. The extra money would move in a big circle. Cole pretended like Iconix was keeping that extra money to trick investors into thinking the company was doing better than it really was and bringing in more revenue. And the business partner wouldn't actually be out the extra money to pay Iconix because that money would come back in a secret round trip. That was the con. And both sides got something. Cole got his extra revenue, the business partner got to keep Cole happy, got the deal done, it didn't have to spend another penny on it.

This was the kind of deal that Neil Cole used to falsely inflate his company's revenue. This was Cole's shell game: Pay me more today and I will pay it back to you later.

This sort of financial trickery is illegal, it is fraudulent, and Cole knew that, but he did it anyway, because his con tricked people into thinking Iconix was doing better

MB25col1          Opening - Mr. Lenow          Page 38

than it really was and made its brands look more valuable, it made Iconix seem like it was making more revenue, it made it seem like Iconix' growth was on track. But, the inflated prices were not real, they were a trick. They were a scam.

Let me just use a moment more of my time with you today to talk about two of Cole's dirty deals in particular; one in June of 2014, the other in September of 2014. I expect in this trial you are going to hear evidence about some other business deals, not just these two dirty deals in 2014, but those are the two deals that lie at the heart of this case, that lie at the heart of Cole's fraud, and each one of those two deals took place just before Iconix had to publicly report its numbers, issue those financial reports. And each time Iconix -- Cole -- used the promise of secret givebacks from Iconix to arrange for the deal price with the business partner to jump up just in the nick of time in June of 2014 and in September 2014, just when Cole needed it. Coincidence? Not at all.

Let's talk about the June deal first. In the June deal, the real terms -- the real terms -- of this deal were the business partner would pay Iconix $10 million for certain brand rights. But $10 million was not enough for Neil Cole, not enough for Iconix and its financial partners. So, Cole dressed up this deal -- a $10 million deal -- to look like a $15 million deal -- $5 million more. And he promised to pay

MB25col1          Opening - Mr. Lenow          Page 39

back the business partner that extra $5 million in the future. Cole secretly sent this $5 million extra payment back to the business partner disguised as payments for marketing expenses, things like advertising. But you will see that secret $5 million giveback didn't actually buy the extra marketing work for Iconix. That's because this $5 million purported marketing payment was a total and complete sham. Its sole purpose was to sneak the $5 million overpayment back to the business partner.

You may be asking, Why does Cole need a cover story? Why does he make it look like he is paying this money? He is the CEO after all, right? Well, at a sophisticated public company like Iconix that employs teams of accountants and lawyers, even a CEO can't just send $5 million out the door without some sort of explanation. Cole had to provide a reason, he had to provide an excuse so he came up with this marketing expense as cover story and hid the truth about the sham expenses from his lawyers and from his accountants.

Just a few months later, in September of 2014, Cole did another dirty deal, this time using the same playbook. And this time Cole got greedy. Instead of a $5 million extra payment that went right back to the business partner, this time Cole promised, Give me an extra $6 million and I will give that $6 million back to you later so I can meet my revenue targets. This was the Cole playbook in both June and in September of

MB25col1          Opening - Mr. Lenow          Page 40

2014 and Cole profited handsomely from this fraud. After Iconix announced revenue and its profits in late 2014, after Cole had lied to investors about the company's performance to keep its stock price high, What did Cole do? He turned around, days later -- days later -- and sold tens of millions of dollars worth of Iconix stock reaping the fruits of his scheme.

But around that same time Cole's luck began to run out. When Cole was in the midst of making these secret giveback payments to the business partner, federal regulators from the Securities and Exchange Commission -- the SEC -- began sniffing around, they began focusing on Iconix and asking them questions about finances. The SEC is the government regulator that is responsible for overseeing public companies. The federal regulators began asking questions about the terms of the June and September dirty deals and Cole's scheme began to unravel. The stress became too much. Another Iconix executive, who is in on the scheme, alerted the company's board of directors about the dirty deals. And now, Cole stands here, in federal court, in this criminal trial, charged with securities fraud, with making false public filings about Iconix' finances, and lying to his accountants.

You are going to see as it was occurring, Cole's scheme fooled even Iconix' own lawyers. I talked about that a bit earlier. But during this trial we are going to present you with the witnesses and the documents with the evidence that is

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

MB25col1          Opening - Mr. Lenow          Page 41

going to help you see what those lawyers and those accountants did not see. You will see what Cole hid. We are going to introduce evidence that will allow you to follow the money at the core of Cole's fraud to discover for yourself how he committed these crimes. I wish I could tell you this trial would be as simple as a couple of witnesses and few sheets of paper, but it is going to take a number of witnesses and a number of documents.

That's the scheme that Cole was able to hide from even his lawyers and own accountants. But once you follow that money, once you see the core of Cole's scheme as revealed by these witnesses and documents, you are going to see that a simple truth lies at the heart of it, a simple truth, that Cole lied to make it seem like Iconix was doing better than it really was. I'm not going to summarize all of this evidence for you right now but I do want to ask you to look out for a few key pieces, the evidence that really cuts to the core of Cole's scheme.

What is some of that key evidence? You are going to see secret ledgers kept by employees of both Iconix and the business partner, secret ledgers tracking inflated prices and secret givebacks, ledgers that were hidden from Iconix' lawyers, from its accountants and from investors. You will see documents showing the terms of those dirty deals I mentioned including how the deal prices jumped up just in the nick of

MB25col1          Opening - Mr. Lenow          Page 42

time for Iconix to hit its revenue goals on multiple occasions.

You will see e-mails to and from Cole himself showing he was updated on the progress of the fraud and how he made the essential decisions to make it succeed. You will hear from an executive at Iconix' business partner who negotiated the dirty deals directly with Cole. That executive will tell you how he agreed to pay more money up front and do the deals in exchange for Cole's agreement to turn around and send that money back later. That executive from the business partner is going to testify under what is called Court-ordered immunity. That means the executive is being forced to testify under Court order and it protects him from being prosecuted from what he says in court, even though what he says could incriminate him.

You are also going to hear from in Iconix's lead outside accountant and it's legal. You will hear how Cole disguised the dirty deals from these men so that they could not figure out his fraud. In fact, the accountant will tell you that Cole officially certified to him there were no hidden promises in the dirty deals, but you will know all the facts that Cole hid from the accountant during the fraud and you will hear the accountant tell you that if he had known the true facts, the facts Cole hid from him, he would never allowed Iconix to claim that extra, phony revenue.

And you are going to hear directly from Cole's second in command, the former chief operating officer or COO of Iconix

MB25col1          Opening - Mr. Lenow          Page 43

who was in on Cole's scheme to cook Iconix' books. Cole's COO is going to take that witness stand and give you an insider's account of what happened.

Now, let me say something about the COO. He committed serious federal crimes when he participated in this fraud with Cole, but he has pled guilty to those crimes and accepted responsibility for his actions. You will learn that the COO has entered into a cooperation agreement with the government and that he hopes to receive more lenient treatment at sentencing because of his testimony in this trial. You should scrutinize his testimony and ask yourself whether what he says makes sense, whether it is backed up by the other evidence, with the secret ledgers, with the e-mails to and from Cole, with the testimony from the executive from that business partner, from the accountant and the lawyer of all the evidence before you. When you do that, we expect you will see that his testimony is backed up by all the other evidence.

Now, before I sit down I want to ask you to do three things. First, please listen carefully to the evidence. Second, follow Judge Ramos' instructions on the law. And third, use and trust your common sense, the same common sense used to make decisions in your everyday lives. I expect your common sense will tell you that money doesn't just appear out of thin air when you need it. I expect that your common sense tells you that sending money around and around and around in a

MB25col1          Opening - Mr. Hecker          Page 44

big circle is not a legit way to do business or, rather, the telltale sign of a con. If you use your common sense, you will reach the only verdict that is consistent with the evidence and with justice in this case: Neil Cole is guilty of using tricks and lies to make his business look like it was doing better than it really was, that Cole is guilty of playing a financial shell game.

THE COURT: Thank you Mr. Lenow.

Does Mr. Cole wish to make an opening argument?

MR. HECKER: Yes, your Honor. Thank you.

THE COURT: Mr. Hecker.

Neil Cole is innocent. We have waited a long time to say that so I'm going to say it again. Neil Cole is innocent. He didn't deceive anyone. He didn't lie or direct anyone to lie in any report. And notwithstanding the story you just heard from the government, there isn't going to be a single e-mail or text or any document, any hard evidence, supporting the idea that Neil Cole did something wrong here.

Now, almost three years ago, on December 4th, 2019, Neil Cole's life changed forever. That day he was wrongly charged with the federal crimes he is on trial for today and today, finally, he gets his day in court, his chance to clear his name. And at the end of this case we will be back up in front of you and ask you to do just that, find Neil Cole not guilty, clear his name, and send him home to his family.

**A-651**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

| MB25col1 Opening - Mr. Hecker Page 45 |
|---|

Over the course of more than a decade Neil Cole built a successful career as founder of a company called Iconix. Now, none of you have heard of Iconix before but it was one of the largest branding companies in the world. Its stock traded on the Nasdaq stock exchange. We will talk more about what Iconix' business was exactly in a few moments, but first I want to tell you a little bit more about Neil Cole.

Neil is a life-long New Yorker. His parents were born in Brooklyn, they raised their family in Long Island. He is 65 years old. Neil and his wife Lizzy live here in Manhattan with their high school-aged daughter Charley. He has two older sons, Brandon and Alex, and he is a proud grandfather to Simon who is 2 years old. You will learn Neil wasn't the first Cole to go into the fashion business. His father, Charles Cole, created a company who made shoes, and his brother Kenneth Cole may be known to some of you as a successful designer. But Neil Cole built a different kind of company. He founded Iconix in 2005 and he served as its CEO for the next 10 years. You heard Iconix is a brand management company. What does that mean? It means that Iconix owns many different brands, brands that it started acquiring in 2005. Some of them are going to be familiar to you, you see here a few of them: Starter, London Fog, Peanuts, Rocawear. And when I say that Iconix owned the brands, it means that Iconix owned the name and the logo and the right to sell things with that brand name and logo. So,

| MB25col1 Opening - Mr. Hecker Page 46 |
|---|

for example, take the Starter brand, which is one of the brands Iconix owned. That means if you want to sell something with the Starter logo, you have to get permission from Iconix and you have to pay Iconix a fee to use the logo.

Now, we all know that brand names are important and that they have value. We know that that's why Nike, for example, can sell shoes that may cost $200 when similar shoes without the swoosh sell for much less. It is why a sweatshirt with the Champion logo may cost $50, but one with Chanel logo may cost $500.

There is great value in a brand name. It sells you something about the quality of the product, whether something is supposed to be cool or stylish. And I get that brand names may not be important to everyone, they may not be important to you, but they're important to enough people that brands carry great value. And the one thing that can really increase a brand's value, its cool factor, its demand, is by being worn by a celebrity or an athlete. And I want you to remember that because I'm going to come back to that in a little bit. Iconix owned these brands but they didn't make the products, you heard that from the government. Let's take Starter.

I suspect some of you have seen the Starter logo on jackets and hats. Iconix bought the Starter brand from Nike in 2007. People see the Starter brand and they know what they're getting, the level of quality. There is a certain cool factor

| MB25col1 Opening - Mr. Hecker Page 47 |
|---|

in it because professional athletes often wear it. It's iconic. Hence, the name Iconix. But the jackets and the hats and the sweatshirts with the Starter logo aren't made by Iconix. Instead, Iconix licenses the brand and logo to other companies like Wal-Mart, that manufacture products and then sell them. And for the right to make and sell the brands, these manufacturers pay Iconix a fee to use the Starter brand.

So, we think of Wal-Mart as a big box store but it is also a huge clothing manufacturer. And it has obviously got a lot of stores where it can sell products. Sometimes they sell clothes made under a Wal-Mart label and sometimes, let's be honest they don't want to put a Wal-Mart label on it because they think it will sell better with a branded label, and that's where Iconix and Wal-Mart can come together and partner. Iconix licenses the Starter brand to Wal-Mart, and now Wal-Mart has the right to manufacture and put the Starter brand on it. So now they aren't selling Wal-Mart jackets, they're selling Starter branded jackets at Wal-Mart, and now consumers who love the Starter brand go to Wal-Mart, get their jackets, and both Wal-Mart and Iconix can make money.

But Iconix doesn't just license its brands and say, Hey, Wal-Mart. Good luck. Iconix wants to support its brands however it can. It wants to make the brand hip and cool. It wants to get the most popular celebrities in the world to wear its brands. And that was Iconix' business model. They made

| MB25col1 Opening - Mr. Hecker Page 48 |
|---|

money by licensing the brands the company owned to other businesses with the expertise to make and sell the brands. It was incredibly innovative and it was Neil Cole who came up with the idea. Neil was able to help Iconix grow into one of the largest licensing companies in the world. Iconix employed 150 people, most of them right here in New York City, some in England. Iconix had licensees in 70 countries and thousands of licensing agreements with global retailers and manufacturers including some of those listed on the lower right-hand portion of the slide.

Neil worked incredibly hard to make Iconix successful. This meant looking to buy brands that maybe weren't doing well, but with the right vision and the right partnership, maybe a celebrity posting on social media, Neil and his team could make that brand relevant again. Neil and his team had a real eye for finding brands that may have been beat up a little bit but with a little bit of care, could be made relevant again. It is a little like driving around the block and seeing an old house that has gone into disrepair, but with a little TLC could be made into a beautiful home once again.

Now, one way that Iconix made its brand successful was by expanding them into new markets around the world. Most of the brands that Iconix owned were American brands or British brands. They would be well known here in the U.S. or in England, maybe in Europe, but maybe not in India and maybe not

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

| | | |
|---|---|---|
| MB25col1 | Opening - Mr. Hecker | Page 49 |

in China. And the same thing worked in reverse. There are some brands that are found overseas, for example, Gucci is found in Italy, Ikea is found in Sweden, but they come to the United States and become well known here as well.

So, how would Iconix take a brand that maybe was doing well in the United States or in Europe and introduce it into another part of the world? You will learn that the answer was much like what made them successful to begin with, partnering with other companies through the licensing of their brands. And if you think about it, that makes sense. The evidence will show that to expand around the world, Iconix didn't simply license its brand and sit back hoping to collect licensing fees. You will learn Iconix took an active role in helping the brand succeed. Remember, if the brands do well, the partners did well and Iconix did well, it would be win/win.

So, you will learn that Iconix partners with these international business partners to help expand the reach of its brand through transactions called joint ventures. You just heard from the government a series of conclusory allegations about dirty deals with dirty business partners. You are going to hear much more about who these business partners were and there was nothing dirty about them. These were joint ventures and the strategy for expanding Iconix' global reach was to identify and work with high quality partners that knew a particular part of the world extremely well and could bring

| | | |
|---|---|---|
| MB25col1 | Opening - Mr. Hecker | Page 50 |

these brands to those new regions more quickly and effectively than Iconix could on its own. The evidence will show that Iconix had these joint ventures all over the world including in Europe, in Latin America, and in parts of Asia. Now, obviously if you are going to enter into a joint venture with another company you want them to be reliable. Iconix wanted reputable partners that could help them grow their brands. And for Iconix you will learn that one of those trusted partners was call Li & Fung. Li & Fung was headquartered in Hong Kong and had an affiliate called Global Brands Group or GBG, which was spun off as a separate company in mid-2014, very relevant to the time period of this case.

During this time Li & Fung and Global Brands Group or GBG may be used interchangeably, but we are referring to the same company and its affiliate.

I suspect none of you had heard of Li & Fung before either, but it is actually one of the largest apparel companies in the world. It's been around for over a hundred years and it is actually much bigger and more established that Iconix. Iconix was founded in 2005, Li & Fung was founded in 1906. So, when Iconix wanted to expand some of its brands into Asia, it wanted to partner with Li & Fung. Li & Fung knew the lay of the land in Asia and could advise Iconix on who to do business with and who to avoid if they wanted to maximize their brands.

Now, the government focused, in its opening, on two

| | | |
|---|---|---|
| MB25col1 | Opening - Mr. Hecker | Page 51 |

transactions, but this trial is actually going to focus on three transactions and those occurred between Iconix on the one hand and Li & Fung -- or GBG -- on the other, and they date back eight or nine years ago. The deals will be called SEA-1, SEA-2, and SEA-3. SEA just stands for Southeast Asia, because these were joint ventures with a partner that was based in Asia. And these three transactions are literally out of thousands of licensing agreements that Iconix had with various partners. These three transactions amounted to just a tiny fraction of Iconix' overall revenue.

You will learn at the time of the first SEA-1 transaction, which was in 2013, Iconix had revenue of over $430 million. In 2014, at the time of the SEA-2 and SEA-3 transactions, you will learn they had annual revenue of over $460 million. These three transactions were a minuscule portion of that amount, to say nothing of the relatively tiny amounts that the government is wrongly calling overpayments. They make reference in their opening to the real price. Your job will be to try to understand what the real deal was in these cases, don't accept those labels.

You will see that in our slide here, SEA-3 has dotted lines around it. Why is that? Because you just heard the government talk about the secret round trips, the shell games, the money is moving and coming back around. You will learn that for SEA-3, no money ever came back around. It never

| | | |
|---|---|---|
| MB25col1 | Opening - Mr. Hecker | Page 52 |

happened.

Now, SEA-1 was a deal that closed on October 1st, 2013. That's when Iconix and Li & Fung formed a joint venture involving the following brands: Iconix agreed to allow Li & Fung to co-own these 25 brands in Southeast Asia, meaning that Li & Fung could make and sell products using these brands in the specific countries that are identified on the map. Li & Fung paid Iconix $12 million to buy into the partnership and share in those profits. Think about it this way. Iconix was basically saying we've got the brands, you've got the contacts in Asia, let's try to go make money together.

Now, was $12 million a good price for this first SEA-1 transaction? The reality is nobody knows. These were brands that were new to Southeast Asia. Nobody knew how they would do. Nobody knew if Starter or Umbra would be a hot brand in a Asia. Sure they had a track record in other parts of the world -- in the Unites States, maybe in Europe -- but when you are expanding into a new market, both Iconix and Li & Fung had their own ideas about what these brands would be worth. Nobody could tell the future so they negotiated a price, $12 million, that each thought was fair, a price that, in theory, could allow them each to make money.

Now, this transaction closed on October 1st, 2013. The evidence will show that there was nothing secret or hidden or improper about SEA-1, maybe why the government didn't

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

MB25col1          Opening - Mr. Hecker          Page 53

mention it in its opening. You will see the transaction documents. You will see that all the terms of the deal are right there in the written agreements. These transactions were documented in contracts that lawyers wrote, reviewed, and approved. I'm going to ask you to look very closely at the transaction documents that are put into evidence in this case. You will see lawyers from established law firms, in-house lawyers at Iconix on all the e-mails circulating the key transaction documents.

Now, the government, almost a decade later, is taking issue with the fact that the agreement included a $2 million payment on SEA-1 from Iconix to Li & Fung for strategic consulting services that Li & Fung performed in Asia. And you will learn it was Li & Fung, not Neil Cole, who suggested the $2 million consulting agreement. But once you understand the relationship between Iconix and its international partners like Li & Fung, you will conclude there was nothing unusual about the payment. Iconix had every reason to support its brands, especially with respect to its critical partnership with Li & Fung. And, as importantly, you will see that nothing about this was secret, it wasn't hidden from anyone.

And, not for nothing, but this is a case of alleged fraud. The government is alleging that Neil Cole intentionally deceived others. And in a fraud case you would expect to see documents where the person on trial says something about the

MB25col1          Opening - Mr. Hecker          Page 54

secret deal, some evidence of an intent to deceive someone. But you are not going to see anything like that in this case because Neil Cole wasn't looking to deceive anyone. Instead, you will see evidence that includes an e-mail that Iconix sent to the Iconix lawyers who were negotiating the first SEA-1 transaction, the first joint venture agreement in Asia with Li & Fung telling them to be tough in negotiations but not to do anything they aren't comfortable with. That evidence, standing alone, will be powerful evidence of Neil Cole's good faith. And it's not just that you won't see a smoking gun document suggesting any fraud on SEA-1. What you will see is document after document with lawyers and accountants reviewing these deal documents and no one having any problem with it in real-time.

The government is hoping that you won't read the agreements and believe what you see in the agreements. They're going to claim that the $2 million consulting agreement for consulting work was fake. The evidence will show, though, that it was real. And you will hear from a Li & Fung executive who will describe for you the consulting work that Li & Fung did in Southeast Asia, including talking to potential business partners and licensees of Iconix brands. That's why they got paid for the consulting work. It's simple.

The other thing that will tell you that the government's theory in this case makes no sense relates to the

MB25col1          Opening - Mr. Hecker          Page 55

timing of the SEA-1 transaction and this is key. It may be why the government didn't mention it in its opening. The government wants you to think that Neil Cole arranged this deal and the later SEA deals to help Iconix meet financial targets for specific reporting periods called quarters. What are quarters? You can probably guess, but in business the 12 months of the year are divided up into four quarters of three months each, so the first quarter of the year is January to March, the second is April to June, the third is July to September, and you get it, the fourth quarter is September -- I mean is October to December. So, right now we are in the fourth quarter of 2022, and this is true for every year.

With publicly traded companies like Iconix, some investors and Wall Streeters don't just track how a company does at the end of the year, they track how the company is doing each quarter. So, every quarter Iconix had to report how it was doing. To make it more complicated, Wall Street investors expect companies like Iconix to predict how they're going do in the future. And people on Wall Street make their own predictions about how a company is going to do in the future. So, you not only have to tell the public how you did in the past, you have to predict how you will do in the future, and the Wall Street folks predict how they think you will do in the future and, as you have heard, if you beat expectations, investors may buy more stock, the stock price might go up, and

MB25col1          Opening - Mr. Hecker          Page 56

if you miss what is expected, it is possible the stock could go down, although I think we all know that the stock market sometimes goes up and down for reasons having nothing to do with the company's performance.

Now, for the SEA-1 transaction, you will hear the government allege that the deal was done to help Iconix beat expectations for the quarter, specifically, the fourth quarter of 2013. Remember, the fourth quarter is October to December, but the evidence will show that there is a huge problem with the government's theory as it relates to this first transaction, it is a massive hole in their case. The evidence will show that the SEA-1 transaction closed on the very first day of the fourth quarter, October 1st, 2013. And the problem is that on day one of the quarter, no one has a clue whether a company is going to be able to meet or beat Wall Street expectations, the quarter just started. The timing of the SEA-1 transaction will tell you it couldn't have been part of a plan to beat expectations to pump up the price of the stock. The government's theory just makes no sense.

So, let's talk about what the evidence will show with respect to the SEA-2 and SEA-3 transactions. First, you wouldn't know this from the government's opening but the evidence will show that Neil didn't negotiate those deals. They were negotiated by a man named Seth Horowitz, the former Iconix executive -- the COO -- who cut a deal the government to

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

MB25col1          Opening - Mr. Hecker          Page 57

testify against Neil, who was his boss. A boss he deeply resented. That will be one good reason you shouldn't believe what Seth Horowitz will be telling you. There are more reasons and I will come back to him in a moment, but for now I want to focus on why, as was true with SEA-1. There wasn't anything problematic happening with respect to SEA-2 or SEA-3, viewed not only from Neil Cole's perspective, but also from the perspective of the lawyers, the accountants, and the executives who all signed off on the same deal. So, let's talk about SEA-2.

SEA-2 closed on June 30th, 2014. It was an amendment to SEA-1, it was another joint venture in which Iconix is agreeing to allow Li & Fung and GBG, that spin-off I mentioned, to co-own certain brands in Korea and then a subset of those same brands in certain European countries and in Turkey. This allowed GBG to make and sell products using those brand names in those countries. This time GBG agreed to pay Iconix $15.9 million. And just like with SEA-1, GBG brought their Korean and European contacts and know-how to the table and Iconix brought the brands and the financial firepower to help market them. Seth Horowitz negotiated this deal directly with GBG. Neil was given the agreements that had been negotiated and told what the deal price was. He understood those agreements to be the deal. And that makes sense. These were sophisticated businesses negotiating a transaction that

MB25col1          Opening - Mr. Hecker          Page 58

involved significant sums of money. The terms of a transaction like that go into formal agreements, legal documents, so that the obligations of both parties are clear and binding.

During this trial we are going to ask you to put yourself in Neil Cole's shoes. Look at the agreements from his perspective as the CEO of the global company. You will get a chance to read them. And just like with SEA-1, the SEA-2 agreements were approved by lawyers, accountants, Iconix' board, and GBG's investment committee. None of those people are going to come in here and tell you that the agreements looked suspicious to them at the time. No one will tell you that they thought there was something fraudulent about them. And importantly -- this is really important -- that agreement includes a key provision that makes clear that the only obligation either party has are those that are expressly set forth in the agreement itself. You will see it yourself. It meant that the written agreement was the entire agreement no matter what either party may have said during negotiations or even orally discussed during negotiations. Nothing counts if it is not spelled out in the agreement. The written agreement is the deal.

I suspect you will also see documents called Preliminary Investment Proposals -- or PIP, P-I-P -- memos that went to GBG's investment, the other side of the transaction. And those, too, spell out the terms of the deal and for SEA-2,

MB25col1          Opening - Mr. Hecker          Page 59

all the senior GBG people who reviewed that memo and approved that transaction, none of them saw a problem, they all thought the deal was a good deal, as written, without anything coming back on the side.

Now, eight years later, the government is claiming that that deal is a fraud because later in 2014 Iconix paid $5.4 million to GBG for marketing services. But so what? So what. Iconix and GBG were business partners. They both wanted the brands to do well. Each had a job to do and each was better off if its partner did its job well. And part of Iconix' job, part of its business was to promote the brands. These are still Iconix' brands and Iconix has the most incentive to promote and to market them. Li & Fung -- or GBG -- has shared in the profits in return for helping bring these new brands -- these brands to new regions. It is sort of like if you rent an apartment from a landlord. You are the person living there. You want to maintain it but the landlord who owns it has the most to gain by keeping the place nice to invest in repairs and upgrades, at least that's what we want them to do. And the same is truth with Iconix. Whatever interest GBG or Li & Fung had, Iconix is still the owner and has the greatest incentive to grow the brands.

Now, the government is claiming that when Iconix paid $5.4 million for marketing services it wasn't actually for marketing services but it was a giveback of this supposed

MB25col1          Opening - Mr. Hecker          Page 60

overpayment that Iconix was paid for the SEA-2 transaction. The evidence will show that Iconix made this payment not because it was obligated to make it under any contract. It wasn't. But because GBG was an important business partner pressing for marketing support and Iconix wanted to support its brands. It is just like the renter and the landlord. The renter might ask for a new dishwasher because it is too noisy, the old one is noisy, the landlord may not be obligated to replace it under the lease, but if you are good tenant who always pays your rent on time, you keep the place nice, the landlord may get you the new dishwasher because they want to keep you happy and they have incentive to maximize the value of their own property.

SEA-2 will be another example of the government trying to make the ordinary seem extraordinary, to make normal business seem criminal. But, as will be true with SEA-1, the government's theory on SEA-2 has huge holes. The marketing expense wasn't some gift, it was in Iconix' own best interest to provide that support to its larger customer and partner.

And, by the way, you are going to see evidence that even though Neil Cole wasn't the person who negotiated that transaction, when the marketing bills did come in he didn't just pay them, you will see that he demanded to see invoices showing the specific marketing work that he understood that GBG and Li & Fung had done. And not for nothing, but one question

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

| MB25col1 | Opening - Mr. Hecker | Page 61 |
|---|---|---|

you should have as this trial progresses is if the government's theory is that the alleged overpayment for SEA-2 is $5 million, why are the marketing expenses Iconix paid for $5.4 million? The government's math will not add up because its theory makes no sense.

You will see that Neil Cole didn't have any reason to think there was anything wrong with the SEA-2 transaction and neither did any of the others -- the lawyers, the accountants, the other executives -- who reviewed the deal. So, let's talk about SEA-3.

SEA-3 was a second amendment to that first joint venture agreement again negotiated by Seth Horowitz, the COO, not Neil Cole. It joined another joint venture with Iconix attributing its interest in the Lee Cooper brand, and the Umbro brand in China, Hong Kong, Macau, and Taiwan. And this time GBG is paying Iconix $21.5 million to be a part of that deal. That's a larger amount than the other deals but you will see that this deal includes China, which is a massive market, and a brand Umbro, in particular, that is quite valued.

Now, here you heard the government is claiming that Mr. Horowitz and GBG negotiated some unwritten side deal in which GBG would pay $6 million more than it otherwise would have. They're claiming $6 million more than the deal was actually worth in exchange for $6 million coming back. The evidence will show, I believe, that the government's theory is

| MB25col1 | Opening - Mr. Hecker | Page 62 |
|---|---|---|

that the $6 million that was supposed to come back was the cancellation of a licensing agreement between the parties involving the Rocawear brand. But the evidence will show there was no binding agreement to release GBG from any obligation and certainly not one that Neil Cole knew about and he didn't agree to release anyone from anything. And guess what? You are going to hear from three of the government's witnesses that GBG was never released from having to make payments on that other licensing agreement, it never happened. It never happened. It will be another gigantic reason to doubt the government's story, another huge hole in their theory.

Now, the evidence will include documents that represent the actual deal, the full written agreement for SEA-3, the same agreement that was approved by GBG's investment committee and by Iconix, the same agreement that says, in substance, if it is not a term of this agreement, it doesn't count, you aren't obligated to do it. So, as you look at the evidence ask yourself, if all of these experienced executives and professionals seeing the same information as Neil Cole don't see anything wrong with the deal, why should Neil Cole have? Why should you?

The government's theory as to each of the three deals has massive holes in it and they're going to try and pile them one on top of the other and hope you don't notice the hole in each. So, you aren't going to see smoking gun documents that

| MB25col1 | Opening - Mr. Hecker | Page 63 |
|---|---|---|

involve Neil Cole, no e-mail where Neil Cole says let's keep this secret deal quiet. No text where he says oh, we know Li & Fung is overpaying and they're going to get some money back later. Nothing like that. You are going to see typical business documents for three typical business deals.

So, to try to make normal business look nefarious the government has done something interesting, they have put pressure on a former Iconix employee who hated Neil to come in to court and testify against him. And the government is going to tell you: Ignore the normal business documents, ignore all the lawyers who reviewed these documents, ignore the business people who saw these deals -- all of which was approved out in the open and as written. Ignore that the timing on the first transaction makes no sense in their theory. Ignore that this license agreement, the supposed payback never happened. Ignore that Neil Cole wasn't involved in negotiating SEA-2 and 3. Ignore that it was in Iconix' financial interest to provide financial support to market these brands. Instead, just accept what this former employee, who hated Neil, will tell you. Oh, and by the way, we made a deal with him, we are going to ask him to cooperate with our investigation, testify against Neil, and if he does those things, we are going to ask the Court to go easy on him when he is sentenced.

(Continued on next page)

| MB2YCOL2 | Opening - Mr. Hecker. | Page 64 |
|---|---|---|

MR. HECKER: (Continuing)

Otherwise he would be sitting here facing a jury because it's entirely clear that if there are is anything fraudulent about the SEA-2 and the SEA-3 transactions, he's the one who made them.

The person the government will ask you to rely on to convict Neil Cole of serious federal crimes is Seth Horowitz. They're going to ask you to put your faith and trust in Seth Horowitz to convict Neil Cole.

Forget everything else I just said. Forget all the holes in the government's theories. Forget that the government has the burden of proving this case beyond a reasonable doubt. They're going to tell you just accept what Seth Horowitz says.

Well, guess what. Horowitz is going to come into this courtroom, he's going to get on that witness stand, he's going to raise his right hand and swear to tell you the truth, and he's going to lie to you.

He's going to do it to try to save himself and to bury Neil Cole, his old boss, whom he hates because Neil won't support him to be the next CEO of Iconix.

Now, putting aside that Seth Horowitz has all these motives to lie -- hating Neil, trying to save himself -- there will be other ways to know he's lying. And when he takes the stand, I'm going to ask each of you to look at him carefully.

Try to look him in the eye. Watch his body language.

# A-656

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

| MB2YCOL2 | Opening - Mr. Hecker. | Page 65 |

Listen to his voice, to his words. Ask yourself whether he's being evasive, whether he's hiding something. All of us have the ability to tell when someone is lying to us. Use that ability with Seth Horowitz.

One thing to look out for is whether Seth Horowitz remembers only the things the government wants him to remember and then conveniently forgets things he doesn't want to remember. Seth Horowitz will be looking out for Seth Horowitz.

You'll learn from the moment he stepped inside Iconix, he had a chip on his shoulder. We all know people like that. He felt disrespected by Neil. You'll learn he even sent bizarre messages to himself about how he felt disrespected and about how he wanted to "fight back" against Neil.

But it's not just that Seth Horowitz felt disrespected. As you heard from the government, in March of 2015, there was something that happened that set him off. It was then that the Securities and Exchange Commission began investigating the accounting for some of the transactions that Seth Horowitz personally negotiated.

And I want to be clear about something. It may well be that the company, Iconix, or its auditors messed up the accounting on these transactions for reasons that have nothing to do with why with we're here, nothing to do with why we're here. Mr. Horowitz may have messed up. But regardless, he was worried that he was going to be blamed that required Iconix to

| MB2YCOL2 | Opening - Mr. Hecker. | Page 66 |

fix the accounting, and he didn't want the blame.

So the evidence will show that he quit, and he decided he was going to take down Neil Cole. The evidence will show that it was Seth Horowitz who ran point on this deal, which makes sense, given how Iconix was organized.

Neil Cole was the CEO. He's at the top. He had ten different departments of the company reporting up to him, including five chiefs, a chief marketing officer, a chief financial officer. You see here the chief financial officer. That was Mr. Horowitz.

But there were 150 employees working ultimately for Mr. Cole. He had to be able to delegate. He could not run a business of this size alone. So Seth Horowitz was responsible for what were, for Iconix, basic ordinary transactions in terms of their nature, their structure, and their size. These weren't big deals for Iconix. They weren't deals that Neil Cole had to micromanage.

The second thing to understand is that during this same time period that these deals were being negotiated, the SEA-2 and SEA-3 transactions in 2014, Neil's attention was elsewhere on a potentially massive deal, a deal so big that it would have transformed Iconix and its business, a deal that was more than 100 times bigger than each of the alleged overpayments that the government claims occurred in this case.

Neil Cole was in negotiations to buy the largest

| MB2YCOL2 | Opening - Mr. Hecker. | Page 67 |

talent agency in the world. It's called CAA. It was a deal valued at $1.5 billion. That's billion with a B. And that deal occupied much of Neil's time.

You'll learn CAA is a talent agency, and it represents megastars like Tom Cruise, Viola Davis, Ryan Gosling, and Scarlett Johansson. You may be saying to yourself, well, why would Neil Cole be and Iconix be interested in buying a talent agency and what does that have to do with branding.

The answer is actually everything. Iconix's business was all about brands. The best marketing in the world is if you can get a celebrity to wear your brands. They can help make a brand trendy or cool. It's like Michael Jordan or Tiger Woods wearing Nike shoes or shirts.

And as you guess, it matters which celebrities or influencers are wearing or endorsing a brand. An Instagram post from a major celebrity can send sales skyrocketing. So if Jennifer Lopez, for example, has a photo of herself with a Gucci bag, the sales skyrocket. And the same is true when a Kardashian uses a certain brand of makeup.

So Neil had a game-changing idea, buy CAA and have the two businesses work together, to get the celebrities that were managed by CAA to wear and promote Iconix brands, help make them cool.

And as the CEO, the big-picture guy, Mr. Cole was the guy coming up with the next big business opportunity. The

| MB2YCOL2 | Opening - Mr. Hecker. | Page 68 |

evidence will show that he left negotiations of smaller deals like the SEA-2 and SEA-3 transactions to Mr. Horowitz while he worked on that big deal.

So while Neil is working on CAA, Seth Horowitz was negotiating the SEA-2 amendments. The evidence will show that in real time, Mr. Horowitz never raised a concern. Actions speak louder than words.

And you'll learn that Mr. Horowitz only took the position that he'd done something wrong, that there was something problematic about these deals, years later when he was first confronted with the possibility that the government was going to criminally charge him in 2019.

I want to be clear about something. Whether Seth Horowitz even committed a crime is not for you to decide. Who knows what was going through his mind. We'll never likely know.

But what's is key is that he believed the only way out for him was to make a deal with the government and to point a finger at Neil Cole. Seth Horowitz looks out for Seth Horowitz, and that meant taking down Neil Cole.

Now, the government is also going to rely on the testimony of a couple of people who worked at GBG, the counterparty on these transactions, Jason Rabin and Jared Margolis.

Like Mr. Horowitz, the evidence will show that these

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

MB2YCOL2          Opening - Mr. Hecker.          Page 69

two men faced enormous pressure from the government. You heard a little bit about that. You'll learn that each is testifying with immunity after the government suggested that they could be charged with a crime.

In other words, they got an even better deal than Mr. Horowitz. Mr. Horowitz's with the government required him to plead guilty to something and hope, after testifying, that he won't have to serve time in prison. But with Mr. Rabin and Mr. Margolis, the government gave them a complete pass in connection with coming to court and testifying against Mr. Cole.

But even though they got immunity, you're going to hear these men say they didn't think they did anything wrong with Neil Cole. In fact, you'll learn that Mr. Margolis hardly interacted directly with Neil Cole.

And I predict they will testify that they did not think and still do not think they did anything wrong in terms of the very transactions that the government is focusing on to try to convict Neil Cole of serious federal crimes.

The government's entire theory of this case is that there were secret side deals that GBG orchestrated with Seth Horowitz. But listen very carefully to when these GBG witnesses testify.

Neither will tell you there were secret side deals. They will tell you there when no terms of the agreement not

MB2YCOL2          Opening - Mr. Hecker.          Page 70

reflected in the written documents, and you won't have to take their your word for it.

I mentioned those preliminary investment proposals, those pip memos. Those went up the chain within GBG. Mr. Rabin and his colleagues prepared those memos to describe the terms of the deal to the investment committee at GBG.

These documents are critical, and I'm going to ask you to look at them closely because you're going to see they don't contain any reference to any deal term not included within the written agreement with Iconix.

Wouldn't you think that if there was some commitment that Iconix had to provide additional value to GBG in connection with these deals, that the investment committee at GBG would want to know about that?

The evidence will show that these deals were approved; that they were seen as fair and not inflated, not included any overpayment by the most experienced people at GBG. The agreement is the deal, and these pip memos will reflect that.

Finally, we expect the government will call investors who invested money in Iconix. And I want you to pay very close attention to what they do and don't say.

What I expect you'll hear is testimony that if Iconix had engaged in a fraud, this con, this shell game, they'd want to know that. Well, yeah. Duh. Of course they would want to know about fraud before investing. Any investor would.

MB2YCOL2          Opening - Mr. Hecker.          Page 71

But it assumes there was a fraud. That's the question you're here to answer. You're going to be asking yourself why these folks are here when they know nothing about the underlying deals that are at the heart of the case.

Ladies and gentlemen, when you see the evidence, what will be clear is that Neil Cole at no time intended to deceive anyone. You'll see he had no reason to believe and did not believe there was anything improper about any of the transactions. He operated within the bounds of the law trying to do what every single CEO of a public company does, which is get the best outcome for his company shareholders.

And if you listen closely to the evidence and you use your common sense, you'll see that the only terms of these deals are the ones that ended up in the actual agreements. The agreement is the deal.

We're counting on you. Neil Cole is counting on you to uphold your oath as jurors. We're counting on you to hold the government to its burden of proof in this case to prove this case beyond a reasonable doubt because we know that if you do that, you'll have to vote not guilty in this case.

Neil Cole didn't lie, he didn't cheat, he acted in good faith, and he did not intend to defraud anyone. At the end of this trial, we will be up here again. And we will be asking you to find Neil Cole not guilty of all the charges.

THE COURT: Thank you.

MB2YCOL2          Cuneo - Direct          Page 72

Thank you, Mr. Hecker.

Do you want to call your first witness.

MR. RODRIGUEZ: Your Honor, the United States calls Peter Cuneo.

Sir, do you want to step forward. And you'll want to snake your way between this front table and the booth there. Please watch your step. There may be wires there. Step up to the witness stand and remain standing.

FRANK CUNEO,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE COURT: Sir, you may be seated. Please bring your chair as close as you can to the microphone in front of you. You can adjust the microphone to bring it down closer to you.

Please begin by stating and spelling your first name and your last name.

THE WITNESS: My name is Frank Cuneo, F-r-a-n-k. My last name is spelled C-u-n-e-o.

THE COURT: Mr. Rodriguez.

DIRECT EXAMINATION
BY MR. RODRIGUEZ:
Q.  Good morning, sir.

You introduced yourself as Frank Cuneo.

Do you sometimes use the name Peter Cuneo?
A.  I always use the name Peter Cuneo. Peter is my second

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

---

MB2YCOL2    Cuneo - Direct    Page 73

name, and my mother preferred my second name to my first name.

Q. Thank you, sir.

Sir, what do you currently do for a living?

A. I'm engaged in investing in companies, both public and private. I also serve on a number of public boards.

Q. When you say "boards," are you referring to a board of directors?

A. Yes, I am.

Q. And by "public," do you mean you serve on the board of directors of public companies?

A. That's correct.

Q. Sir, for approximately how many years have you been serving on the board of directors of various public companies?

A. Over 30 years.

Q. Did you go to business school?

A. I did.

Q. What did you do before you went to business school?

A. I grew up in Queens in Flushing. I went to Flushing High School. I have a degree from Alfred University in upstate New York in glass science or ceramic engineering.

After undergraduate, I worked for a year in a fiberglass factory. I then went into the United States Navy. I was an officer into the Vietnam War. I did two tours in the Vietnam War first on a guided-missile destroyer, first as a damage control officer. And on the second tour, I was

---

MB2YCOL2    Cuneo - Direct    Page 74

communications officer.

Q. Now, Mr. Cuneo, I'm not going to ask you to describe all of the positions you've held in your career, but let me just focus you on a few, please. And specifically let me direct your attention to around July of 1999.

What were you doing around that time?

A. In July of 1999, I became the CEO of Marvel Entertainment. Marvel had just emerged from bankruptcy at that point. In my career, I do turnarounds of companies that are troubled, particularly financially. I've done seven turnarounds. The one that gets the most attention is Marvel.

Q. Just so we're talking about the same company, would that be the Marvel Entertainment responsible for comic books and superhero movies?

A. Yes. I made 14 of the films when I was CEO and vice-chairman at Marvel. Yes. Comic books as well was a big factor.

Q. How long, up until what time, were you the CEO of Marvel Entertainment?

A. I was the CEO for about 3 1/2 years, from 1999 to December 31 of 2002.

Q. And you made reference to being the vice-chairman of Marvel Entertainment as well.

When did you serve in that function?

A. 2003 to 2009 I, was the vice-chairman. On the last day of

---

MB2YCOL2    Cuneo - Direct    Page 75

2009, we sold the company to the Walt Disney Company.

Q. Before you were the CEO of Marvel Entertainment, had you previously held CEO positions in other companies?

A. CEO positions or presidents of divisions or presidents of groups in other companies, yes. Those companies would include clearly, Black & Decker, Remington, the shaver company, not the firearms company.

Q. Sir, are you familiar with a company called Iconix Brand Group?

A. Yes.

Q. How did you first learn about that company?

A. In 2006, I was approached by a man named Warren Clayman who had been -- when I was CEO of Marvel, he had been the controller of Marvel. And he said that Iconix was looking to upgrade its board and wanted to know if I would be interested in going on the board of Iconix. He was the CFO of Iconix at the time.

Q. Did you in fact later join the board of directors of Iconix?

A. Yes.

Q. And was that around October of 2006?

A. Yes.

Q. Approximately how long did you serve on the board of directors of Iconix?

A. Approximately 14 years.

---

MB2YCOL2    Cuneo - Direct    Page 76

Q. Mr. Cuneo, when you joined the board of directors of Iconix, did the company have a CEO?

A. Yes.

Q. Who was it?

A. Neil Cole.

Q. I want to focus you now on the period between when you joined the board of directors in October of 2006 to approximately August of 2015, so that period.

During that period, just to be clear, were you on the board of directors of Iconix that whole time?

A. Yes.

Q. Was Neil Cole the CEO of Iconix that whole time?

A. Yes.

Q. Sir, when you were a member of the Iconix board, what kind of business as a company did Iconix engage in?

A. Well, the business of Iconix was around well-known brands -- the company wanted to own well known brands -- and also to license, give the rights, to use those brand names to other people to make products under the name. So the company would license to individuals, to other companies, as well as directly to retailers.

Q. Can you give the jury just a few examples of some of the brands that you recall Iconix owning.

A. Yes. The company participated in a number of different categories. Women's apparel would be Mossimo and Danskin,

---

MB2YCOL2          Cuneo - Direct          Page 77

for example. Men's apparel would be Rocawear. Outerwear, London Fog. In entertainment, Peanuts.

Q. Peanuts look Snoopy and Charlie brown?

A. Yes. In sports, Umbro and Starter. In homeware, Canon and Fieldcrest. The company had, at its peak, over 30 different brands that it owned and controlled.

Q. Where were Iconix's offices located?

A. Here in Manhattan.

Q. Did that include Mr. Cole's office as well?

A. Yes.

Q. During your time there, did Iconix enter into arrangements from time to time with its business partners called joint venture?

A. Yes.

Q. Generally speaking, what is a joint venture?

A. Well, normally most of the deals that Marvel would do would what I would call would be straight licenses.

Q. Sir, I hate to interrupt you. I believe you said "Marvel."

A. I'm sorry. At Iconix. At Marvel too. By the way, we did the same thing with the superhero characters.

And basically those would give rights to use a brand name for a certain category of product for a certain period of time. That would be the normal arrangement. But in international markets where we really did not have the same knowledge of the markets and competition and so on, we often

MB2YCOL2          Cuneo - Direct          Page 78

did what we call joint ventures where we would sell some of the actual ownership of the brands to another party so that they would actually own the brand, as well as have licensing rights.

Q. Were joint ventures of the type that you've been describing a significant part of Iconix's business?

A. Yes.

Q. And did these joint ventures typically involve specific brands covering specific territories?

A. Yes.

Q. I believe you touched on this earlier, but did they typically focus on domestic or international regions?

A. They were typically international regions.

Q. Generally speaking, what would Iconix contribute to a joint venture with one of its business partners?

A. Well, Iconix would contribute, of course, the ownership of the brand and, in some cases, provide some marketing money as well and, in this some cases, would study a market and help out with growing the business.

Q. What would the business partner contribute to the joint venture?

A. Well, the business partner of course would be very knowledgeable about that particular geography that was in the deal. They would know the right partners to produce products, to sell products. And they would know the right retailers to approach as well and so on. So they would know, if you will,

MB2YCOL2          Cuneo - Direct          Page 79

the right players in a particular market; whereas Marvel -- excuse me -- whereas Iconix would not.

Q. Did the business partners in joint ventures typically have to pay a cash purchase price to Iconix to buy into the joint venture?

A. Yes.

Q. Would joint ventures typically be formed through Iconix and its business partner entering into legal documents?

A. Yes.

Q. And I should say "legal arrangements"?

A. Yes.

Q. Would those arrangements be governed by contracts and other legal documents?

A. Yes.

Q. And would those contracts typically set out who was responsible for what expenses?

A. Yes.

Q. Would they also typically set out how profits from the joint venture would be split or shared between Iconix and its business partner?

A. Yes.

Q. Sir, during your time as a member of the board of Iconix, did you have opportunities to interact with Neil Cole about the operations of Iconix?

A. Yes.

MB2YCOL2          Cuneo - Direct          Page 80

Q. And based on those interactions, how would you describe his level of knowledge and involvement in the details of the company's business?

A. He was very involved in the details.

Q. Were there occasions when you had the opportunity to discuss and interact with him about the joint ventures that Iconix had entered into?

A. Yes.

Q. And did that include a joint venture called the Southeast Asia joint venture?

A. It did.

Q. And based on your conversations and interactions with him, how would you describe Neil Cole's level of knowledge and involvement in the details of the Southeast Asia joint venture?

A. His knowledge was very, very deep.

Q. Mr. Cuneo, I want to step back for a moment and ask you some questions about some of the terms and concepts that you've already mentioned. We've been talking about public companies.

Was Iconix a public company when you were a member of the board of directors?

A. Yes.

Q. And what does it mean for a company to be a public company?

A. Well, a public company is a company that can sell shares in the company to the public that is listed on a recognized stock exchange such as the New York Stock Exchange or NASDAQ here in

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

MB2YCOL2          Cuneo - Direct          Page 81

New York.
Q. Who are, generally speaking, the owners of a public company?
A. Well, the owners are anyone that wants to buy a share in the company.
Q. Are those sometimes referred to as "shareholders" or stockholders?
A. Yes.
THE COURT: Mr. Rodriguez, it's now 11:00. So we'll take our first break.
Ladies and gentlemen, it will be 20 minutes. So please do be prepared to come out to the court in 20 minutes. Do not discuss the case.
THE DEPUTY CLERK: All rise.
(Continued on next page)

MB2YCOL2          Cuneo - Direct          Page 82

(In open court; jury not present)
THE COURT: Mr. Cuneo, you may step down. Everyone can be seated.
(Witness temporarily excused)
THE COURT: Anything to raise with the Court?
MR. THOMAS: Just one procedural matter.
THE COURT: Okay.
MR. THOMAS: I don't know if we'll get to Mr. Rabin today, but we may. Because the Court had an immunity order entered last time, as we read it and as Mr. Rabin's counsel reads it, that order continues to today. It was not our plan to admonish or execute a new order before Mr. Rabin began. We just wanted to make sure that we're good.
THE COURT: I believe that that's probably the case. I haven't thought about it, but I don't see any reason why it wouldn't continue.
MR. HECKER: I have no say in the government's immunity. So I have nothing to say about it, your Honor.
THE COURT: Anything else? Anything from you folks?
MR. MARKUS: No, your Honor.
THE COURT: Don't be late.
MR. HECKER: Thank you, your Honor.
(Recess)
(Continued on next page)

MB2YCOL2          Cuneo - Direct          Page 83

(In open court; jury present)
THE COURT: Everyone please be seated.
Mr. Rodriguez.
BY MR. RODRIGUEZ:
Q. Sir, before the break, I was asking you questions about what it means to be a public company.
On what stock exchange were Iconix's shares traded when you were on the board?
A. On the NASDAQ.
Q. Is the NASDAQ stock exchange located here in New York City?
A. Yes, it is.
Q. We've also been talking about your membership on the Iconix board of directors.
Can you please describe for the jury at a high level what the board of directors is and what role it plays in a public company.
A. Sure. The board of directors is an independent organization that is really designed to oversee the operations and the financial results of a public company.
Q. Generally speaking, in whose best interests is the board of directors charged with looking out for?
A. The board of directors is charged with looking out for, of course, the shareholders, the owners of the company.
Q. And who, if anyone, answers to the board of directors?
A. Well, the senior management led by this chief executive

MB2YCOL2          Cuneo - Direct          Page 84

officer, the CEO, reports to the board.
Q. We've mentioned "CEO" a few times.
Does that stand for chief executive officer?
A. Yes.
Q. Generally speaking, what does a chief executive do in a public company?
A. The chief executive officer in a public company runs the business of the company day to day.
Q. Who has the power to hire or fire the CEO of a public company?
A. The board of directors.
Q. Was the Iconix board of directors made up of members of Iconix management or people from outside the company or something else?
A. No. The board was a mixture of both. However, the boards of public companies have to have a majority of what are called "independent board members." These are board members that do not have any of their own personal business or financial compensation, depending on the company itself.
Q. Were you one of the independent directors on the Iconix board of directors?
A. Yes.
Q. Was Neil Cole, in addition to being the CEO of the company, also a member of the board of directors?
A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

| MB2YCOL2 | Cuneo - Direct | Page 89 |
| --- | --- | --- |

A. Yes.

Q. What's an "audit committee"?

A. So boards of public companies are required to have certain mandatory committees. One called is the compensation committee. A compensation committee is just what is sounds like. It will review the compensation of senior members of the leadership of the company and so on.

The nomination and governance committee, again, what it sounds like, basically, if you're going to change how the board is organized or members of the board, etc., that would come under the nomination and governance committee.

But the most important board committee by far is the audit committee. The audit committee is made up of people who, one, are independent; two, who have a financial background and are qualified to sit, if you will, and judge what's going on financially in the company.

And the audit committee works not only on the financial results with the senior leadership of the company but also works very closely with the company's auditors because the company's auditors are actually closer, with the numbers closer to the details, than the board members would be, members of the auditor committee.

Q. Now, you just mentioned the "company's auditors." Can you explain a little bit more to the jury what you were referring to when you referred to the "company's auditors"

| MB2YCOL2 | Cuneo - Direct | Page 90 |
| --- | --- | --- |

and what role they play.

A. So all companies in the United States are required by the Securities and Exchange Commission and by the stock market and like NASDAQ are all required to have audit committees, etc.

Q. Did you say "audit committees"?

A. Yes.

Q. And what about the role of the auditors?

A. So they're also required to have independent auditors as well, and these are accounting firms that are in the business of providing the service to public companies.

Q. I want to focus on the period of 2013 to 2015. During that time, what company was Iconix's outside auditor?

A. A company called BDO.

Q. And how often did the audit committee of the Iconix board generally meet?

A. The audit committee would meet at least four times a year.

Q. And, again, focusing on that same period, 2013 to '15, were you, Mr. Cuneo, on the audit committee of the Iconix board during that time?

A. Yes, I was.

Q. And did you have the necessary expertise to be on that committee?

A. Yes.

Q. Very briefly speaking, can you describe that relevant

| MB2YCOL2 | Cuneo - Direct | Page 91 |
| --- | --- | --- |

expertise to the jury.

A. Yes. If you have been -- if you've been a professional auditor, that would qualify you. But also from an operating standpoint, if you've been a CEO or a president or a business a leader in another organization or if you've been a chief financial officer of another company. And I have been both.

Q. Let me direct your attention now, Mr. Cuneo, to October of 2013.

Did you become familiar with a jointer that Iconix entered into around that time with a company called Li & Fung?

A. Yes.

Q. Was that joint venture sometimes referred to as the "Southeast Asia joint venture"?

A. Yes.

Q. Can you describe for the jury what kind of company Li & Fung was.

A. My recollection is that Li & Fung was an Asian-based company that was a manufacturer of products, primarily apparel.

Q. And did there come a point during the life of the joint venture when Li & Fung created a spinoff company called Global Brand Group or GBG that then became Iconix's partnered in the joint?

A. Yes.

Q. Was this Southeast Asia joint venture later amended in June and then again in September of 2014?

| MB2YCOL2 | Cuneo - Direct | Page 92 |
| --- | --- | --- |

A. That's my general recollection, yes.

Q. And, Mr. Cuneo, were you personally involved in negotiating the formation of the joint venture in October of 2013?

A. No. Typically all board members do not get involved in actually negotiating a deal.

Q. What about the amendments in June and September of 2014? Were you involved in negotiating those?

A. No.

Q. Based on your experience, who would you expect to be involved in negotiating those kinds of transactions?

A. The chief executive officer of the company.

MS. MOSS: Objection.

THE COURT: Overruled.

THE WITNESS: The chief financial officer of the company; the chief operating officer of the company, if there was one, which there was at that time; and the inside -- our inside chief lawyer, the chief counsel of the company as well.

BY MR. RODRIGUEZ:

Q. You mentioned earlier in your testimony, I believe, the Securities and Exchange Commission.

A. Yes.

Q. At a very high level, can you explain to the jury what that agency does with respect to public companies.

A. Well, the Securities and Exchange Commission, the SEC, actually came about in the 1930's. There was a terrible

**A-662**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

| MB25col3 | Cuneo - Direct | Page 145 |
|---|---|---|

(Jury present)

MR. MARKUS: Your Honor, I believe Mr. Cole is just coming up from the restroom. Here he comes.

THE COURT: I'm sorry. I didn't notice.

Mr. Rodriguez.

BY MR. RODRIGUEZ:

Q. Mr. Cuneo, before the break we were looking at Government Exhibit 240, specifically page 20, and under the bullet Significant Transactions there is a paragraph there that says: Southeast Asia, and it begins: In September of 2014...

Do you see that?

A. Yes.

Q. And does that describe the September 2014 amendment to the Southeast Asia joint venture?

A. Yes.

Q. At the time you were considering this document as part of the audit committee, did you have any reason to believe that the counter-party in this joint venture overpaid for the deal in exchange for an agreement from Iconix to give back part of the purchase price later on?

A. No.

Q. Would you have wanted to know about that if it happened?

A. Yes.

Q. Would that have mattered to you as a member of the audit committee?

| MB25col3 | Cuneo - Direct | Page 146 |
|---|---|---|

A. Absolutely.

Q. If we can please go to Government Exhibit 105 which is in evidence? Looking at the top, Mr. Cuneo, is this the Form 10-Q that Iconix filed with the SEC for the third quarter of 2014?

A. Yes.

Q. And that's the period ending September 30th, 2014; is that right?

A. That's correct.

Q. And this is the actual filing that was made with the SEC; is that right?

A. Yes.

Q. Was this publicly available to investors after it was filed?

A. Yes.

Q. And does it include the financial results that the audit committee and the board of directors approved?

A. Yes, it does.

Q. Does it include the revenue figure we looked at earlier?

A. Yes.

Q. Can we go to page 3 of the document, please? Looking at the very first row there, licensing and other revenue, what is listed under licensing and other revenue for this quarter?

A. $113,750,000.

Q. Did you vote to approve the contents of this Form 10-Q?

A. I did.

| MB25col3 | Cuneo - Direct | Page 147 |
|---|---|---|

Q. Can we go to the bottom of page 12, please? At the bottom of page 12 there should be a paragraph that begins in September of 2014...

Sir, does this portion of the 10-Q describe the Southeast Asia joint venture amendment in September of 2014?

A. Yes.

Q. And at the time did you believe that its description contained all of the material terms of the transaction?

A. Yes.

Q. Did you think anything was left out?

A. No.

Q. Does this exhibit, Government Exhibit 105, the 10-Q for quarter, the third quarter of 2014, make any mention of the purchase price increasing by $6 million from $15.5 million to $21.5 million?

A. No.

Q. Does it make any mention of the purchase price increasing, based on a commitment from Iconix, to release GBG from its licensing agreement for Rocawear?

A. No, it does not.

Q. At the time it was filed, this Form 10-Q, did you know or have reason to believe that the purchase price increased by $6 million based on Iconix' commitment to release GBG from its licensing agreement for Rocawear?

A. No.

| MB25col3 | Cuneo - Direct | Page 148 |
|---|---|---|

Q. Is that something you would have wanted to know, sir?

A. Yes.

Q. If you had known that, would you have voted to approve this 10-Q?

A. No.

Q. Let's turn now to Iconix' financial reporting for the entire 2014 fiscal year, and Ms. Wolfson, if you can please publish Government Exhibit 243, which is already in evidence?

Mr. Cuneo, is this an agenda for the February 19th, 2015 meeting of the audit committee of the board of directors?

A. Yes.

Q. At this meeting did you review the financial results for not only the fourth quarter of 2014, but also the full fiscal year of 2014?

A. Yes.

Q. We can go to page 6, please. Is this a set of draft financials for the full year of 2014 that was presented for the audit committee?

A. The three columns on the right, yes.

Q. And that first row there that says Licensing Revenue, two rows down, that says Total Revenue?

A. Yes.

Q. For the full year of 2014, what is listed as the total revenue for that year?

A. $461,243,000.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

MB25col3     Cuneo - Direct     Page 157

A. It can, yes.

Q. So, generally speaking, if revenue is higher, will EBITDA be higher or lower?

A. It would be higher, generally speaking.

Q. If we can go to page 11, please? Is this the calculation for Neil Cole's PSUs for 2014?

A. Yes.

Q. And am I correct that there are two different ways this is calculated, one relating to EBITDA and one relating to EPS?

A. Yes.

Q. And on the left-hand side, is that the calculation based on EBIDTA?

A. Yes, it is.

Q. And on the right-hand side, is that the calculation based on EPS?

A. Yes, it is.

Q. And just to remind the jury, does EPS stand for earnings per share?

A. Yes, it does.

Q. So, if earnings per share was over a certain threshold, would Mr. Cole receive performance stock units?

A. Yes.

Q. Looking at the left-hand side, the EBITDA side. Did Mr. Cole earn any performance stock units based on the EBITDA targets?

MB25col3     Cuneo - Cross     Page 158

A. No, he did not.

Q. Then looking at the right-hand side, did Mr. Cole earn any performance stock units based on the earnings per share targets?

A. Yes. He earned 113,843 shares of the company.

MR. RODRIGUEZ: Nothing further at this time, your Honor.

THE COURT: Cross-examination.

MS. MOSS: Yes, your Honor. Your Honor, before I get started, at this time I would move to admit a list of exhibits, without objection from the government, and those are DX 33, DX 34, DX 90, DX 550-A1, and DX 1151-A1.

MR. RODRIGUEZ: No objection.

THE COURT: They will be received.

(Defendant's Exhibits 33, 34, 90, 550-A1, 1151-A1 received in evidence)

CROSS-EXAMINATION

BY MS. MOSS:

Q. Good afternoon, Mr. Cuneo.

A. Good afternoon.

Q. How are you today?

A. I'm fine.

Q. We have never met, have we?

A. No.

Q. I'm going to be asking some follow-up questions. Is that

MB25col3     Cuneo - Cross     Page 159

OK?

A. Sure.

Q. Now, Mr. Cuneo, when you were responding to questions by the prosecutor, you spoke broadly about joint ventures. Do you recall those questions?

A. Yes.

Q. And I believe that what you said is that Iconix entered into agreements with a partner and the agreement that was formed with an international parter, that is what is called the joint venture; is that right?

A. Yes.

Q. And I believe also what you said is that Iconix was providing into the joint venture brand, and also marketing money at times; correct?

A. I said marketing expertise and that could take a number of different forms, yes.

Q. A number of different forms meaning including marketing money?

A. Yes.

Q. And what the partner is also providing in joining into this joint venture, is their knowledge of this particular international area and also the actual making and selling of the products; correct?

A. Yes.

Q. Now, we have spoken about a number of these joint ventures

MB25col3     Cuneo - Cross     Page 160

and we have referred to them as SEA-1, SEA-2, SEA-3. Are you OK if I refer to them that way?

A. Yes.

Q. Now, SEA-2, that joint venture is a joint venture that closed on June 30th of 2014 and you were asked a number of times about that. Do you recall that?

A. Yes.

Q. And this is a joint venture that was entered into with a partner in Southeast Asia called Li & Fung or GBG. Do you recall that?

A. Yes.

Q. And Li & Fung paid Iconix $15.9 million in order to enter this joint venture.

A. Yes.

Q. And it wasn't that Li & Fung actually paid that amount at the closing date, it is that they agreed to pay that amount over a period of time.

A. I don't recall, but yes, it is possible that they paid the full amount or it was paid in installments.

Q. And, in fact, we actually just looked at a 10-Q for the third quarter of 2014 which stated that only $4.3 million was paid at the closing in June of 2014. Do you remember looking at that?

A. Yes, I did.

Q. Now, as part of this joint venture, Iconix agreed to

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    **November 2, 2022**

| MB25col3 | Cuneo - Cross | Page 169 |
| --- | --- | --- |

A. That's correct.

Q. They act separate and apart, correct? Yes?

A. Yes. They're not going to sign off on just anything.

Q. And, as a member of the audit committee, you want the outside auditors -- you want BDO to be accurate, thorough, and to do a good job.

A. Yes.

Q. And they did that, didn't they?

A. We thought so or we wouldn't have retained them every year.

Q. Understood.

Let's go to page 10, to the top of page 10. This is part of -- actually, I don't think the government pointed this out, but this page is focusing on the primary areas that BDO looked at. It says: Primary areas of focus and integrated audit strategy.

Do you see that?

A. Yes.

Q. So these are things that the outside auditors are looking at the most, correct?

A. Yes.

Q. And I believe that you spoke about, with the prosecutor, how there could be hundreds or maybe even thousands of transactions at a time. So, BDO is going to do a deep dive into particular things and this is where they are outlining those particular things; is that right?

| MB25col3 | Cuneo - Cross | Page 170 |
| --- | --- | --- |

A. That's correct.

Q. Now, when we look at the bottom, now, this is a section that I believe the government did point out, and it talks about revenue recognition and the inherent risk due to certain following factors. Do you remember those questions?

A. I do.

Q. And one of those was many transactions recorded near quarter end. Do you see that one?

A. I do.

Q. Now, Mr. Cuneo, let me ask you, is October 1st near the quarter end?

A. October 1st is past the quarter end.

Q. So, October 1st is actually the first day of a quarter, it is not the last day of a quarter; is that right?

A. That's correct.

Q. So, a transaction recorded on the first day of a quarter does not fall within this risk factor, does it?

A. No.

Q. And if a company closes a transaction on the first day of a quarter, they still have three months to figure out whether they are going to be able to reach consensus or earn enough revenue to meet their numbers, correct?

A. That's correct.

Q. Now, even though SEA-1 closed on the first day of the quarter, a company can close transactions on any day of the

| MB25col3 | Cuneo - Cross | Page 171 |
| --- | --- | --- |

quarter; isn't that correct?

A. That's correct.

Q. And so, let's say a transaction fell on the last week or the last day of the quarter. There is nothing wrong with that, right?

A. No.

Q. That happens all the time in public companies, correct?

A. Yes, it does.

Q. And BDO would review the transaction just the same if it closed on the first day as if it closed on the last day. Isn't that correct?

A. I'm not sure. You have to ask BDO. I don't know.

Q. Well, we know that there are certain transactions that closed on the last day of the quarter, correct?

I know you are nodding your head but we need a verbal answer.

A. Yes.

Q. And we know that BDO looked at those, some of those include SEA-2 and we are going to get to that. So, the government talked again a lot about revenue and I just want to make it clear for everyone here that there is nothing wrong with a company trying to increase their revenue; right?

A. Correct.

Q. There is nothing illegal about that.

A. No.

| MB25col3 | Cuneo - Cross | Page 172 |
| --- | --- | --- |

Q. You have done that as a CEO yourself.

A. Yes.

Q. That's what CEOs do.

A. Yes.

Q. In fact, a CEO would be breaching their fiduciary duty to the company and to the shareholders if they didn't try to increase the revenue of its company; isn't that right?

A. That's correct.

Q. And it is everybody's hope, obviously, that the revenue is going to go up and shareholders would be disappointed if the revenue did not go up. Do you agree with that?

A. I do.

Q. Now, on this same page in GX- 506, the prosecutor also pointed out another area that says, I believe it is the bottom bullet point: External pressure to meet certain revenue guidance.

Do you see that?

A. Yes.

Q. And you spoke to us about what guidance is and what consensus is. Do you recall all of those questions?

A. I do.

Q. And I'm going to ask you the same questions with regard to guidance and consensus, that there is nothing wrong with trying to meet consensus or guidance; is there?

A. No.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                              November 2, 2022

MB25col3          Cuneo - Cross          Page 173

Q. That is what companies do.
A. Yes.
Q. And I believe what you had said is that it is true of many public companies that that's what they do.
A. Yes.
Q. And it would raise serious questions about how a company was doing if they weren't meeting consensus, correct?
A. Yes.
Q. So that's important to you as a board member, correct?
A. Yes.
Q. It's important to a company's shareholders?
A. Yes.
Q. And, again, there is nothing illegal about it.
A. No.
Q. Now, in addition to consensus, which may be coming from an external individual or analyst, the company also comes up with internal guidance; isn't that correct?
A. That's correct.
Q. And Iconix, instead of doing it on a quarterly basis, Iconix provided guidance to itself on an annual basis. Do you recall that?
A. I do.
Q. So, instead trying to meet targeted goals every quarter, they gave itself a full year; is that correct?
A. I believe so, yes.

MB25col3          Cuneo - Cross          Page 174

Q. Now, I want to point out something that the government didn't talk about and that's on the right-hand side of this document, the Approach section. So, if we can highlight those?
    And what BDO is saying here -- again, this is the audit planning report -- is that there are certain risks, there could be certain risks, but what they're doing is they're providing, with their approach, as to how they're going to handle these risks in order to alleviate and eliminate any problems.
    Do you see that?
A. Yes.
Q. So they've, in this document, listed four different bullet points, one is work closely with management to discuss contract terms for significant transactions during contract negotiations.
    Do you see that?
A. Yes.
Q. It also talks about performing testing of significant transactions as they are completed throughout the year, that's the second bullet point. Third bullet point: Understand and test the effectiveness of the control environment surrounding revenue recognition. And the final bullet: Perform substantive testing on significant licenses.
    Do you see that?
A. I do.

MB25col3          Cuneo - Cross          Page 175

Q. So, BDO has actually done things, again to address and to make sure there is no risk and they did those things; didn't they?
A. Apparently, yes.
Q. Yes.
    Now, we can take that down.
    Now, as far as working closely with management which was the first bullet point approach, to eliminate any risk; BDO was able to do that, weren't they?
A. Yes.
Q. And BDO actually would report to the audit committee and to the board that management's cooperation was excellent and we received full access to all information that we requested while performing an audit. Do you recall that?
A. Yes.
Q. And they did that for their audit report in 2013 and for 2014. Do you recall that?
A. Yes.
Q. And they also reported that all the records and all the information were freely available to them to look at. Do you recall that?
A. Yes.
Q. So, they didn't say that there were things that were kept from us or things that are secret from us. They said all records and information were freely available to our

MB25col3          Cuneo - Cross          Page 176

inspection. Do you recall that?
A. Yes.
Q. Now, this trial is talking about the Southeast Asia joint ventures and, as I mentioned before, you know that BDO specifically looked at the Southeast Asia joint ventures; don't you?
A. Yes. That's correct.
Q. And you expected them -- you expected that BDO, the company's outside independent auditors, would review all these joint venture transactions and review all the documents that went along with the transactions, correct?
A. Yes.
Q. And so, again, that was another way to eliminate risk, any sort of risk.
    Let's just pull up, very briefly, GX- 506, page 12.
    And again, at the top, this is the primary areas of focus and integrated audit strategy, and if we go to the bottom it shows joint ventures. Do you see that?
A. Yes.
Q. So, again, we know that this was one of the primary areas of focus for BDO, that they were going to look at the joint venture transactions specifically, they were going to take a deep dive and study those documents.
A. Yes.
Q. Isn't that correct?

# A-666

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 2, 2022

| MBYCOL4 | Cuneo - Cross. | Page 189 |

So what you're saying is that to the audit committee and to the board, that if it was 20 percent of the quarter's revenue, that would be material to you?

A. Yes.

MS. MOSS: We can take that down. Thank you.

Q. Another huge transaction -- we talked about SEA-1, -2, and -3. But an actual huge transaction that Iconix was working on during the time period of spring and summer of 2014 was the potential acquisition of CAA or Creative Artists Agency.
Do you recall that?

A. I do.

Q. And CAA is the itself -- or it calls itself the world's leading entertainment, sports, and media agency.
Do you know that?

A. I've heard that, yes.

Q. So they represent a lot of famous people -- Scarlett Johansson and Tom Cruise, a lot of famous athletes.
Do you know that?

A. Yes.

Q. So this is a billion-dollar acquisition that Iconix was focused on in the time period of 2014.
Is that right?

A. I don't recall the billion dollars in the transaction, but, yes. It was a very large transaction.

Q. Very large. And we'll hear about that later.

| MBYCOL4 | Cuneo - Cross. | Page 190 |

But it was a very large transaction in your memory?

A. Yes.

Q. And that was a transaction that Mr. Cole was working on?

A. Yes.

Q. And that was presented to the board during that spring and that summer of 2014.
Do you recall that?

A. Yes, I do.

Q. So, again, just to wrap this up, again, we've talked a lot about SEA-1, SEA-2, SEA-3, those smaller deals.
There was a lot more going on at Iconix, other than those three smaller transactions; correct?

A. Yes.

Q. Including some that were monumentally bigger, potentially huge for Iconix, like the CAA potential transaction.
Do you recall that?

A. The only one I recall was CAA.

Q. That's fine.
Now, the next area that I'd like to get into with you is talking about Seth Horowitz, and you were asked about Seth Horowitz's resignation.
Do you recall that?

A. I do.

Q. And you said that this was a surprise to you; correct?

A. Yes.

| MBYCOL4 | Cuneo - Cross. | Page 191 |

Q. And we've seen the letter, and the letter was dated April 13, 2015.
Do you recall that?

A. Yes, I do.

Q. Now, are you aware that Seth Horowitz purposely waited to resign until after his stock units had vested?

A. I don't recall that, no.

Q. Even though he complained that there were possible issues with the Southeast Asia transactions, he never said a word of that until after he had collected his stock units.
We just looked at this in the compensation report; that he was awarded a number of performance stock units in December of -- at the end of December of 2014. But he waited until he got that, and then he resigned after that. Isn't that right?

A. Yes.

Q. And so, even though he says that there were issues with these transactions -- so, again, so everybody remembers, these transactions were dating back to October 1, 2013. And that was before Seth Horowitz was the chief operating officer. Then we have June 2014 SEA-2; correct? And September 2014 SEA-3.
Isn't that correct?

A. That's correct.

Q. So even though those transactions had occurred in the summer and the early fall, Mr. Horowitz never raised these

| MBYCOL4 | Cuneo - Cross. | Page 192 |

issues with you, with the board, or with the audit committee in the spring of 2014, did he?

A. No.

Q. He never raised them with the board or the audit committee in the summer of 2014, did he?

A. No.

Q. Or in the fall of 2014?

A. No, he did not.

Q. Or in the winter of 2014?

A. No, he did not.

Q. He never raised them, certainly before he got his stock units leaving the company, did he?

A. Apparently he did not. That's correct.

Q. And after he resigned, he even hired lawyers to demand more money from Iconix, didn't he?

MR. RODRIGUEZ: Objection.

THE COURT: Let's see you at sidebar.

(Continued on next page)

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

MB3YCOL2    Schaefer - Direct    Page 261

8:45 in the morning. And as I would walk into my office, I would look left, and I would see down the hall to that picture that you showed earlier that was a view into Neil Cole's office.

And when I first started at the company, I would often, when I would walk in in the morning, see David Blumberg in the chair opposite Neil Cole's desk. So he would be meeting with Neil Cole.

And eventually over time, that gravitated to David Blumberg and Seth Horowitz being there in the morning when I would come in this Neil Cole's office. And eventually, that gravitated to just being Seth Horowitz in Neil Cole's office. But each morning -- I won't say every morning -- but most mornings, those meetings would you be going on.

MR. THOMAS: Let's show the parties, you, and the jury Government Exhibit 305, which is in evidence.

Q. Mr. Schaefer, could you tell us what we're looking at here.

A. Yes. This is a picture of Neil Cole's office.

Q. Are there any differences between the way Neil Cole had the furniture arranged and the way it's depicted in this photograph?

A. Yes.

Q. Could you tell the jury what the differences are so they can keep that in mind.

A. Sure, in the picture, there is a table in the middle of the

MB3YCOL2    Schaefer - Direct    Page 262

room with six black leather chairs around it. That was not there. There was a round table under the television with three chairs around it. And then there was also a couch under the painting on the left side of the office.

Q. So with reference to this photograph, could you tell the jury where it was that you saw Mr. Cole, Mr. Horowitz, and Mr. Blumberg meet those early mornings.

A. Sure. There are two blue chairs in front of Neil Cole's desk. Seth or David would be in one of those chairs.

Q. Now, you said those meetings eventually just had Mr. Horowitz and Mr. Cole.

Did I understand that correctly?

A. You did.

Q. Do you know what they discussed together?

A. No, I did not.

Q. Were you invited to those meetings?

A. No. I had asked on multiple occasions to be invited to those meetings because I had explained that it would be much easier for me and more helpful for me to do my job if I had more information to deal with the company. But it fell on deaf ears any time I spoke or asked.

Q. What do you mean by "it fell on deaf ears"?

A. I never received any invitation to join those meetings.

Q. Now, leaving aside these small meetings, did Mr. Cole ever lead broader meetings of management at the company?

MB3YCOL2    Schaefer - Direct    Page 263

A. Yes. Regularly.

Q. Were there meetings of that sort that you were invited to attend?

A. Yes.

Q. What kinds of meetings?

A. Generally, from time to time Neil Cole would hold a meeting with all the members of management. Across from his office, there was a large conference room, and he would call of the members of management to talk about with whatever was on his mind or whatever was going on at the company at the time.

MR. THOMAS: Let's publish for the jury Government Exhibit 313.

Q. Do you recognize this?

A. Yes. This is the conference room I was referring to.

Q. Is this the room that Neil Cole had these bigger meetings in?

A. Yes, it is.

Q. Now, at those bigger meetings that you attended, did the subject of the company's finances ever come up?

A. Yes, fairly often.

Q. Did it ever come up from Mr. Cole himself?

A. Yes. Absolutely.

Q. What do you recall about Mr. Cole's role in discussing the company's finances at those meetings?

A. I have to admit the terms were somewhat foreign to me, but

MB3YCOL2    Schaefer - Direct    Page 264

he would often refer to something called top-line revenue. He would say that very often. But he would also refer to things like EPS and free cash flow which were basically metrics that the company was measured on, financial metrics.

Q. Mr. Schaefer, I want to be very clear about this point.

Those are subjects Mr. Cole himself was speaking about?

A. Yes. Absolutely.

MR. THOMAS: Mr. Bianco, we can remove the photograph here.

Q. Now, earlier you talked about Iconix's business model.

Is that a subject you ever heard Mr. Cole personally speak about?

A. Absolutely.

Q. How did Mr. Cole explain to you Iconix's business model?

A. He described Iconix's business model as "asset light." And what he meant by that was Iconix didn't have a lot of hard goods or have to do very much operationally. Iconix's sort of model was to go out and purchase brands or the intellectual property, the trademarks or the intellectual property rights that gave you the ability to produce brands and essentially loan those rights out to a third party so they could actually produce goods and sell goods in stores and operate stores, etc.

So Iconix basically just loaned out the intellectual property in order to receive checks. And Neil Cole would often

UNITED STATES OF AMERICA, v.
 NEIL COLE,                                                    November 3, 2022

MB3YCOL2          Schaefer - Direct          Page 265

refer to the model as just collecting checks.

Q. You mentioned that Iconix would go out and get brands.

Did Mr. Cole ever describe for you what sorts of brands they would try to go get?

A. Not really. But generally the way that the company would operate was when a brand was in trouble financially for whatever reason, on the verge of bankruptcy, the idea was to go out and purchase that brand from its owners and then exploit it.

Q. Did Mr. Cole ever speak to you, during your time there, about whether that model was still working?

A. Yes. Often in the management meetings, he would say that the model was broken.

Q. What did he say about that?

A. That licensees, the people who would borrow the rights to the intellectual property, didn't want to be licensees any more. They wanted to be brand owners because what they would find is that they would put a lot of investment into promoting the brands in order to sell their goods.

But then also there is a license agreement, and eventually, the license agreements ends. So they would put a lot of capital in it when the license agreement terminated. So they had eventually gravitated to wanting to own brands as opposed to license them.

Q. Did Mr. Cole describe any kind of business response to that

MB3YCOL2          Schaefer - Direct          Page 266

development?

A. I'm sorry. I'm not sure I understand the question.

Q. It was probably a very poorly phrased one.

Did Mr. Cole ever articulate any initiatives to try to address the fact that licensees didn't want to be licensees any more?

A. Not that I remember. The company had pursued a joint venture strategy, but I'm not sure if that's what you're referring to.

Q. So let me follow up about joint ventures.

What are joint ventures?

A. Sure. Joint ventures are basically partnerships between two or more people.

Q. And how did joint ventures work at Iconix?

A. Sure. So what Iconix would do is it would form a new company that it owned a hundred percent of, and then it would contribute the rights relating to certain brands -- the trademarks, etc., relating to brands -- to that company which it owned a hundred percent of.

It would then sell 50 percent of its ownership of the company to a third party, that joint venture partners. So at the end of the transaction, Iconix owned 50 percent of the brands that had contributed to this new company, and the joint venture partner own 50 percent of the brands that had contributed to this new company.

MB3YCOL2          Schaefer - Direct          Page 267

Q. Mr. Schaefer, I want to take that one step at the same time to make sure we all follow along.

Speaking generally, what's the first step for Iconix to form a joint venture?

A. Iconix forms a new company that it owns a hundred percent of.

Q. And after Iconix has formed a new company that it owns, what's the next step?

A. The next step is Iconix contributes certain of its assets, the trademarks and intellectual property relating to certain brands and for certain territories of the world, into this company.

Q. Would it be fair to say that Iconix gives the rights to that brand to that subsidiary?

A. Yes. That's correct.

Q. If that's step two, what's the next step after that?

A. The next step after that is half of the company is sold to a third party.

Q. And when you say "the company," could you clarify for the jury which company you're talking about.

A. I apologize. Half of the subsidiary the new company that Iconix had contributed and given these brands to, giving these brands to, was sold to a third party.

Q. In that arrangement, how is it that Iconix would make money?

MB3YCOL2          Schaefer - Direct          Page 268

A. So Iconix would be selling half of its interests, half of its ownership of the company, in exchange for cash.

Q. And as the business operated, would Iconix also profit through its ownership?

A. Yes. So obviously both Iconix and the third party, the joint venture partner, owned 50 percent of the business. So as the business earned money, it paid its expenses. And then whatever was left over would be distributed, half to Iconix, half to the joint venture partner.

Q. Did the topic of joint ventures and potential joint ventures come up at management meetings with Mr. Cole?

A. Yes.

MR. THOMAS: For the witness and the parties, could we show Government Exhibit 255.

Q. Mr. Schaefer, do you recognize 255 to be the sort of chart that would be presented at a management meeting that you attended?

A. Yes. The format of the document looks familiar. I'm not exactly sure of all the inputs there.

MR. THOMAS: Your Honor, the government offers Exhibit 255, including on the basis of the parties' stipulation that 255 is a business record of Iconix.

MS. MOSS: No objection.

THE COURT: It will be received.

(Government's Exhibit 255 received in evidence)

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

| MB35col2 | Schaefer - Direct | Page 313 |
|---|---|---|

for giving back the money through an expense -- through marketing expenses.

Q. On that call was Mr. Cole asked whether he had paid marketing to GBG?

A. I believe he was, yes.

Q. Did Mr. Cole deny paying marketing?

A. No, he did not.

Q. What did he say?

A. I believe he said that he had paid marketing but he wasn't sure that was the exact number, that the number Seth had alleged of $5 million, he thought that there might have been more that was paid, marginally more.

Q. If the marketing payment had been related to the increase in price, would you, as the GC, have wanted to know at the time you were doing the transaction documents?

A. Absolutely.

Q. What was Mr. Horowitz' second allegation?

A. I would need to see more of it.

Q. Mr. Bianco, if you can scroll down?

A. His second allegation was that there was an oral agreement to terminate the Rocawear Kids license agreement in exchange for a higher purchase price with respect to the Southeast Asia 3 joint venture.

Q. Mr. Schaefer, around the time that the Southeast Asia 3 transaction was being papered, were you and the legal

| MB35col2 | Schaefer - Cross | Page 314 |
|---|---|---|

department asked to prepare a termination for Rocawear Kids?

A. Yes, I was.

Q. Do you know if that agreement was ever finalized?

A. I do not.

Q. If there had been an arrangement whereby the price for SEA-3 was increased based on a promise to terminate the Rocawear Kids licensing agreement, as the GC would you have wanted to know when you were papering the deal?

A. Absolutely.

MR. THOMAS: Nothing further, your Honor.

THE COURT: Cross-examination.

MS. MOSS: Thank you, your Honor.

CROSS-EXAMINATION
BY MS. MOSS:

Q. Good morning, still, Mr. Schaefer. How are you today?

A. Very well. Good morning.

Q. Good morning.

I would like to start off by asking you about joint venture agreements that we have been speaking about throughout this morning. Is that OK?

A. Yeah.

Q. So, a joint venture is a form of a transaction. As a form of a transaction it is not a novel concept, is it?

A. No.

Q. It is not unique to Iconix, correct?

| MB35col2 | Schaefer - Cross | Page 315 |
|---|---|---|

A. No.

Q. And you testified that you have, I believe, 20 years of experience as an M&A lawyer?

A. That's correct.

Q. And just to be clear, M&A means mergers and acquisitions, either the joining of companies or acquiring new companies; correct?

A. That's correct.

Q. And so, joint ventures are not an uncommon form of a transaction that takes place, correct?

A. That's correct.

Q. And in this particular case you described the structure of the joint ventures that Iconix entered into. Do you recall that?

A. Yes, I do.

Q. And so, what you described is that Iconix would form a new subsidiary company, contribute brands to that subsidiary company, and then sell half of that subsidiary company to a third-party partner; correct?

A. That's correct.

Q. And that structure is completely legal, correct?

A. Absolutely.

Q. Nothing wrong with that.

Now, before we get to the Southeast Asia transactions, I want to ask you about other things that Iconix did. In the

| MB35col2 | Schaefer - Cross | Page 316 |
|---|---|---|

2013 and 2014 time frame Iconix had more than a thousand licensing agreements around the world, correct?

A. Sounds accurate.

Q. And licensing agreements are different from joint venture agreements as you described on your direct examination, correct?

A. Yes.

Q. And the legal team at Iconix was responsible for drafting those license agreements?

A. Yes.

Q. And Iconix, as we have all heard, had joint venture agreements with partners around the world.

A. That's correct.

Q. And again, the legal team was responsible for drafting these joint venture agreements.

A. That's correct.

Q. And that included the legal team of Iconix in-house lawyers and outside counsel.

A. That's correct.

Q. And when we are talking about the joint venture agreements at Iconix we are not just talking about the Southeast Asia transactions, are we?

A. There are a number of joint ventures.

Q. And that's exactly what I am talking about, is there were a number of joint ventures with partners across the globe;

**A-670**

UNITED STATES OF AMERICA, v.
 NEIL COLE,

November 3, 2022

| MB35col2 | Schaefer - Cross | Page 317 |
|---|---|---|

correct?

A. Yes. That's correct.

Q. And so, do you recall joint ventures with Israel, with South America, with Canada?

A. Yes.

Q. All sorts of countries?

A. Yes, I do.

Q. And the legal team also maintained thousands of trademarks applications worldwide, correct?

A. That's correct.

Q. Now, I want to ask you about another area and this is when the government was talking to you about you were not involved in the business of at Iconix. Do you recall that area of questioning?

A. Yes, I do.

Q. When you first started at Iconix that was in early September of 2013?

A. That's correct.

Q. And when you joined the company, the SEA transactions, the Southeast Asia joint venture transaction, that was already far along in term of its documentation and also negotiation; isn't that correct?

A. That's correct.

Q. Now, there was a former general counsel before you started at Iconix, correct?

| MB35col2 | Schaefer - Cross | Page 318 |
|---|---|---|

A. That's correct.

Q. That individual is Andrew Tarshis?

A. That's correct.

Q. And you know that he had been there for a number of years?

A. Yes.

Q. And when you started at Iconix, you sat down with Mr. Tarshis and he went through some of the ongoing transactions and ongoing joint ventures that were being entered into, correct?

A. With Neil Cole as well; that's correct.

Q. And so, he had already been involved in that ongoing negotiation, papering, and documenting the Southeast Asia joint venture?

A. Yes. I don't know the specific extent of his involvement, but yes.

Q. Understood.

Now, you said you weren't involved in business affairs but your position at Iconix, again, was general counsel; correct?

A. That's correct.

Q. So, your position was not the head of international.

A. No, it was not.

Q. And there was an individual that was the head of international, that gentleman is Dan Castle; correct?

A. When I first joined the company, yes.

| MB35col2 | Schaefer - Cross | Page 319 |
|---|---|---|

Q. Your position was not the head of strategic development, correct?

A. That's correct.

Q. But there was an individual named David Blumberg who was the head of strategic development at Iconix?

A. That's correct.

Q. And we saw his photograph.

And so, you're the general counsel at Iconix and so you had oversight and responsibility for the legal aspects of the company and all these transactions, correct?

A. That's correct.

Q. So, when the government asked you if Mr. Cole ever sought your advice about the appropriate purchase price for these transactions, that's not necessarily your role, is it?

A. No, it is not.

Q. So, the market value brands is not something that you were knowledgeable about, that is not something you could contribute?

A. No. Not at all.

Q. And you have no knowledge of the value of the brands in, say, the Southeast Asia market in Korea, or China, or Macau; do you?

A. I do not.

Q. And you don't have any prior experience working in brand valuation, or you did not prior to coming to work as a GC at

| MB35col2 | Schaefer - Cross | Page 320 |
|---|---|---|

Iconix?

A. That's correct.

Q. So, again, that was not your background, that was not your expertise.

A. That's correct.

Q. So, it doesn't surprise you that Mr. Cole or Mr. Castle or Mr. Blumberg would not consult you about the appropriate purchase price for these brands in other markets in Southeast Asia.

A. No, it does not.

Q. Now, the government also asked you whether Mr. Cole sought your advice about accounting issues with regard to the Southeast Asia transactions. Do you recall that?

A. I do.

Q. And again, to be clear, Mr. Schaefer, you are not an accountant, right?

A. No.

Q. You don't have a CPA license?

A. I do not.

Q. You don't have a degree in accounting or finance?

A. I do not.

Q. So that's, again, not your area of expertise; is it?

A. That's correct.

Q. So, it does not surprise you that Mr. Cole did not consult you about the accounting of the Southeast Asia transactions,

# A-671

| MB35col2 | Schaefer - Cross | Page 321 |
| --- | --- | --- |

correct?

A. That's correct.

Q. But there were people at the company that had that expertise and had that particular knowledge, correct?

A. I believe so. Yes.

Q. There was a finance department, was there not?

A. There was.

Q. There was a chief financial officer, was there not?

A. There was.

Q. And so Mr. Cole could, if he wanted, consult with people who were knowledgeable about accounting for the Southeast Asia transactions?

A. That's correct.

Q. Let me start asking you about the Southeast Asia joint ventures. Now, I want to start looking at --

MS. MOSS: Your Honor, this may be a good time to move into evidence some exhibits, if I may?

THE COURT: Very well.

MS. MOSS: And I believe I am offering these without any objection from the government. So, I would like to admit GX- 1017, GX- 1080, GX --

THE COURT: GX or DX ?

MS. MOSS: GX .

THE COURT: OK.

MS. MOSS: 1080 and 1090. And now DX 301, DX 301A-1,

| MB35col2 | Schaefer - Cross | Page 322 |
| --- | --- | --- |

DX 303, DX 1118, DX 1118A-1, DX 1118A-4, DX 1138, 1138A-1, 1138A-4, 1140R, 1151A-1, 1154, 1154A-1, 1161A-1, 1283, 1294, 1294A-2, and 1987. And, I will add to that, GX- 1010.

THE COURT: Any objection?

MR. THOMAS: No, your Honor.

THE COURT: They will be received.

(Government's Exhibits 1010, 1017, 1080, 1090 received in evidence)

(Defendant's Exhibits 301, 301A-1, 303, 1118, 1118A-1, 1118A-4, 1138, 1138A-1, 1138A-4, 1140R, 1151A-1, 1154, 1154A-1, 1161A-1, 1283, 1294, 1294A-2, 1987 received in evidence)

MS. MOSS: Thank you, your Honor.

BY MS. MOSS:

Q. If we can start with GX- 1010, if we can pull that up, please?

Can everyone see that?

A. Yes.

Q. It looks like the jury cannot, though.

A. Oh.

Q. Mr. Schaefer, do you see GX- 1010 in front of you?

A. Yes, I do.

Q. And this is an e-mail from September 9, 2013?

A. Yes, it is.

Q. And this is regarding the Southeast Asia transaction?

A. Yes, it is.

| MB35col2 | Schaefer - Cross | Page 323 |
| --- | --- | --- |

Q. And this is the original Southeast Asia transaction that we are talking about from 2013, correct?

A. That's correct.

Q. Now, in the top e-mail we see that Mr. Cole has written an e-mail to Mr. Clamen, and Mr. Clamen was the chief financial officer at the time; is that right?

A. That's correct.

Q. And he is included as a cc in this, David Blumberg, correct? And you yourself, correct?

A. That's correct.

Q. Now, we see below that there is an e-mail from Mr. Clamen, correct?

A. That's correct.

Q. And in this e-mail below, from Mr. Clamen, he is talking about how Jason is making an ask. Do you see that?

A. Yes, I do.

Q. Now, the Jason that he is referring to is not yourself, is it?

A. No, it is not.

Q. The Jason that he is referring to is Jason Rabin who was an individual who worked for Li & Fung; is that correct?

A. Yes.

Q. And what he is talking about at the bottom here when he refers to an earn out -- do you see where it refers to an earn out in no. 1 in the bottom e-mail?

| MB35col2 | Schaefer - Cross | Page 324 |
| --- | --- | --- |

A. Yes, I do.

Q. Now, an earn out is a contractual provision stating that the seller of a business wants to obtain additional compensation in the future but only if the business were to achieve certain financial goals.

Are you familiar with that term?

A. Yes, I am.

Q. And so, there is nothing illegal about that term; correct?

A. No.

Q. Nothing wrong or nefarious about that term?

A. Not at all.

Q. And so, what we see here is that Jason Rabin is making this ask for an earn out; correct?

A. That's correct.

Q. And what we also see is that at the bottom they're talking about different possible purchase prices, correct, in the little chart at the bottom?

A. Yes.

Q. So, what we are seeing here is the purchase price has not been finalized, correct?

A. Yes; with or without Umbro as part of the transaction, correct.

Q. Right. So, they're discussing different possibilities of how this transaction could possibly go and different purchase prices that could apply; correct?

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

MB35col2          Schaefer - Cross          Page 325

A. That's correct.

Q. And that's normal for these types of transactions, that there is going to be negotiations back and forth between the parties for the different sides, correct?

A. That's correct.

Q. So, Iconix on one side and then whoever the joint venture partner is on the other side. In this example it is Li & Fung; correct?

A. That's correct.

Q. So, there may be very many iterations of purchase prices going back and forth throughout the negotiations, in other words?

A. Sure.

Q. And obviously each side is trying to get the best deal for themselves, correct?

A. That's correct.

Q. OK. Now, and when, just to make a final point on this, when this e-mail gets forwarded to Mr. Cole, Mr. Cole sends it out to Mr. Clamen, Mr. Blumberg and to yourself. He includes you because he wants you to see this, correct?

A. I don't think that's correct.

Q. I'm sorry?

A. I do not think that is correct.

Q. Well, he does cc you, right?

A. I think he probably hit "reply to all" to Warren Clamen's

MB35col2          Schaefer - Cross          Page 326

e-mail.

Q. OK. Well, so let me just say it did go to you, correct?

A. Absolutely.

Q. And you saw it?

A. Yes, ma'am.

Q. Thank you.

Let's take a look at GX- 1017, if we can. Do you see that in front of you, Mr. Schaefer?

A. Yes, I do.

Q. I am just going to tell everyone right now that I understand that the government spoke to you about a very high level about these Southeast Asia transactions, and I am going to be taking a deeper dive into these transactions. So, I'm going to be looking at a lot more e-mails and documents so it will make it a little tedious, OK?

MR. THOMAS: Your Honor, move to strike.

THE COURT: Overruled.

BY MS. MOSS:

Q. Taking a look at this e-mail, the date of this is September 25, 2013. Do you see that?

A. Yes, I do.

Q. And this is an e-mail between the lawyers for the two sides of the transaction, we see lawyers from Iconix and lawyers from LF; correct?

A. I do not.

MB35col2          Schaefer - Cross          Page 327

Q. OK. Well, let's go through it. Starting with the bottom e-mail, do you see that Mark Stevens sends an e-mail to Jessica Lau?

A. Yes. In that e-mail I see it from Li & Fung's counsel, yes.

Q. So, Mark Stevens is a lawyer for Li & Fung, right?

A. Outside counsel, yes.

Q. Outside counsel.

Jessica Lau is a lawyer for Iconix, she works at Gibson Dunn, she is the outside counsel for Iconix. Do you see that?

A. Yes, I do.

Q. And then do you see in the upper e-mail that Ms. Lau forwards this e-mail to you, to Ericka Alford, and to Lauren Gee. Do you see that?

A. Yes, I do.

Q. And cc's Barbara Becker and Shelby Parnes. Do you see that?

A. Yes, I do.

Q. Again, going back to the question, this is an e-mail going back and forth between the lawyers of Iconix and LF or it includes the lawyers for Iconix and Li & Fung?

A. This is an e-mail that the lawyers for Li & Fung sent to Iconix' outside counsel, that Iconix' outside counsel then forwards on to Iconix.

MB35col2          Schaefer - Cross          Page 328

Q. Got it.

Now, I want to step back for a minute. So, you were the general counsel at Iconix, correct, so you're head of the legal team and legal department; correct?

A. That's correct.

Q. And this wasn't a newly created legal department when you started at Iconix, correct?

A. That's correct.

Q. The legal team had already been in place before you got there?

A. That's correct.

Q. And you also had five or six other lawyers who worked on this legal team with you, correct?

A. That's correct.

Q. So we know that Ericka Alford, who was the deputy general counsel at Iconix; correct?

A. That's correct.

Q. Ms. Alford went to Harvard Law School and Yale University; top schools, correct?

A. Yes. Very much so.

Q. Lauren Gee was also part of the team?

A. That's correct.

Q. Am I pronouncing her name correctly?

A. Actually, I think Lauren Gee.

Q. Lauren Gee.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

| MB35col2 | Schaefer - Cross | Page 329 |
|---|---|---|

Lauren Gee was part of the legal team at Iconix?

A. Yes, she was.

Q. She went to the University of Pennsylvania Law School, Wharton School of Business; also went to very good top schools, correct?

A. Yes.

Q. You also had other individuals on the legal team, Gara Marinoff, Alyssa Perlowitz, Richard Millington, who worked in the UK. Do you recall that?

A. Yes. Only Richard Millington was in the UK, the other two were in New York.

Q. And you also had paralegals that worked there?

A. I believe we had one paralegal, yes.

Q. So, there was a legal team and it was composed of good lawyers at Iconix; correct?

A. I don't know if they're all good or not but there was a legal team at Iconix; yes.

Q. These lawyers are referred to as the internal in-house counsel at Iconix; correct?

A. That is correct.

Q. Now, Iconix also had, in addition to this five or six member internal legal team, they also had outside counsel; correct?

A. That's correct.

Q. And one of Iconix' outside counsel was Gibson Dunn?

| MB35col2 | Schaefer - Cross | Page 330 |
|---|---|---|

A. That's correct.

Q. So Gibson Dunn, so we all understand, is a large international law firm?

A. Absolutely.

Q. A firm with an excellent reputation?

A. Absolutely.

Q. And so, even though you are the general counsel and Iconix has a team of inside lawyers, companies also often hire outside counsel because they may want to have counsel who have particular expertise in certain areas. Would you agree with that?

A. Yes, that's correct.

Q. And again, these are known as outside counsel?

A. That's correct.

Q. And those lawyers work with you?

A. Yes.

Q. Now, going back to the e-mail, these e-mails are referring to a side letter and a consultancy agreement. Do you see that?

A. Yes, I do.

Q. And if we can just scroll down really quickly so that Mr. Schaefer can see, we see that the side letter, and then we see the consultancy agreement are following the e-mails. Do you see that, Mr. Schaefer?

A. Yes, I do.

Q. Now, these documents -- and we need to go back to the

| MB35col2 | Schaefer - Cross | Page 331 |
|---|---|---|

original email -- these documents and the side letter and consultancy agreement, these were drafted by the lawyers for Li & Fung; correct?

A. That's correct.

Q. And we see, again, that they were sent by Li & Fung's lawyer Mark Stevens, to a lawyer for Iconix Jessica Lau?

A. That's correct.

Q. And then they are sent to you, correct?

A. That's correct.

Q. Sent to you, Ms. Alford, and Ms. Gee?

A. That's correct.

Q. So, when we look at the top e-mail, just briefly, we see there is six lawyers on this top e-mail. Do you see that? We have Lau, we have you, we --

A. Yes. I do see it. I'm sorry, I was just counting them.

Q. That's fine.

Ericka Alford, Ms. Gee, Barbara Becker and Ms. Parnes. Do you see that?

A. Yes, I do.

Q. So, inside counsel, outside counsel; correct?

A. That's correct.

Q. And Mr. Cole is not on this e-mail?

A. No, he is not.

Q. And again, it attaches the consultancy agreement and the side letter. So you saw this?

| MB35col2 | Schaefer - Cross | Page 332 |
|---|---|---|

A. Yes.

Q. And what Ms. Lau writes at the top is: LF's counsel has sent over the attached drafts of a key payment side letter and a consultancy agreement and asked that I forward them to you. Do you see that?

A. Yes, I do.

Q. So she sent them to you, she sent them to Ms. Alford, she sent them to Ms. Gee, so that you would see these key documents?

A. Yes.

Q. And she didn't say attached are drafts of a secret side deal, did she?

A. No, she did not.

Q. And they're obviously not secret, these are documented, papered side letter and consultancy agreement?

A. That's correct.

Q. Now, if we can take a look at DX 1118-A1?

What we see here is a revised draft of the side letter. Do you see that? Does everyone see that? Do you see that in front of you, Mr. Schaefer?

A. Yes, I do.

Q. Now, if we can zoom in just a little bit or just highlight at the top, do you see where it says GDC comments and September 26, 2013?

A. Yes, I do.

**A-674**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

| MB35col2 | Schaefer - Cross | Page 333 |

Q. So, this is the day after the previous e-mail; correct?
A. That's correct.
Q. And when it says GDC comments, what this means is Gibson Dunn, the outside counsel, they're reviewing and they're editing the side letter that Li & Fung's counsel had drafted; correct?
A. That's correct.
Q. Now, if we can just scan through the body of the letter, and what we are seeing here, Mr. Schaefer, there is a lot of underlines and also a lot of cross outs; correct?
A. That's correct.
Q. And I believe that you spoke on direct -- and unfortunately this one is not in color -- but usually when there is underlines that means things are being added, when there is a strikeout in something it means that things are being deleted. Is that correct?
A. That's correct.
Q. So, we can see, and we see a number of underlines, we see a number of strikeouts in the body of this letter; correct?
A. That's correct.
Q. And so, would you agree with me it is clear that the lawyers have read this, they've gone over it, they've reviewed it, they've made edits to this document?
A. That's correct.
Q. If we can please pull up DX 1118A-4? If we can go to the

| MB35col2 | Schaefer - Cross | Page 334 |

top of that page, please?
    Now, there we see GDC comments September 26 at the top; correct?
A. That's correct.
Q. And again, this is Gibson Dunn that is reviewing this document and editing this document and this is the consultancy agreement; correct?
A. That's correct.
Q. And if we can just, again, scan through the first, say, three pages?
    So, Mr. Schaefer, do you see in this document as well there are strikeouts, there are underlines, there are edits that are being made?
A. Yes, I do.
Q. So, again, would you agree with me that it is clear that the lawyers are going through the consultancy agreement, reviewing it, analyzing it, making changes to it?
A. That's correct.
Q. Let's pull up DX 1118, please.
    Now, this is an e-mail from Shelby Parnes. Do you see that?
A. Yes, I do.
Q. She is an Iconix lawyer, again, outside counsel at Gibson Dunn; correct?
A. That is correct.

| MB35col2 | Schaefer - Cross | Page 335 |

Q. And she is sending these drafts that we just looked at to Ms. Gee and to Ms. Alford, and you were cc'd. Do you see that?
A. Yes, I do.
Q. And this is September 27th, the very next day?
A. That's correct.
Q. So, this is, again, before the transaction is closed; correct?
A. That's correct.
Q. We have got seven lawyers on this e-mail; we have got Ms. Parnes, Ms. Gee, Ms. Alford, Barbara Becker, David Kennedy, you, and Ms. Lau. Do you see that?
A. Yes, I do.
Q. So, again, this e-mail includes Iconix inside lawyers and Iconix outside lawyers, correct?
A. That's correct.
Q. And let me just ask you briefly about Barbara Becker. Barbara Becker was not only a lawyer at Gibson Dunn but she was the chair and managing partner of the mergers and acquisitions section, was she not?
A. I believe she was, yes.
Q. A very well respected, excellent lawyer. Would you agree to that?
A. Yes, I would.
Q. And eventually became the managing partner of all of Gibson Dunn over hundreds of lawyers?

| MB35col2 | Schaefer - Cross | Page 336 |

        MR. THOMAS: Objection, your Honor.
        THE COURT: Overruled.
        THE WITNESS: That's correct.
BY MS. MOSS:
Q. Now, going to the body of the e-mail Ms. Parnes writes: Ericka and Lauren. Attached please find markups of the side letter and consultancy agreement that we received from Mayer Brown yesterday.
        Do you see that?
A. Yes, I do.
Q. And just in case it is not clear, Mayer Brown is the name of a law firm?
A. Yes. Li & Fung's lawyers.
Q. That's the outside counsel for the other party?
A. That's correct.
Q. Now, the e-mail from Ms. Parnes does not say we have a problem with this side letter and consultancy agreement, does it?
A. No, it does not.
Q. She doesn't say Iconix can't enter into these agreements, does she?
A. No, she does not.
Q. She doesn't say these agreements are improper, we can't do this; does she?
A. No.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

MB35col2          Schaefer - Cross          Page 337

Q. And after she sends this e-mail and she is sending it again to Iconix' inside counsel, they review them and also analyze the documents.

A. Yes. I would expect so.

Q. And so, the inside counsel, the legal team at Iconix, they don't make those comments either, right? They don't say Iconix can't enter into this side letter and consultancy agreement, do they?

A. No. I wouldn't expect them to do that.

Q. And when you say you wouldn't expect them to do that, now, Mr. Schaefer, you are a lawyer, right?

A. Yes, I am.

Q. And as a lawyer you take an oath?

A. Absolutely.

Q. And you have an obligation to follow the law and provide sound legal advice, correct?

A. That's correct.

Q. So, if you had a question about the propriety of a document you would raise it, would you not?

A. If the document suggested to do something illegal, that's correct.

Q. And you are obligated to raise that, correct?

A. Yes.

Q. And so, to tie this back, the Iconix lawyers and the outside counsel lawyers did not see any impropriety in these

MB35col2          Schaefer - Cross          Page 338

agreements, did they?

A. No. There was nothing illegal in the agreements.

Q. And just so we are clear, there is nothing wrong with having side letters to a transaction, correct?

A. That's correct.

Q. There is nothing -- and we see this as not secret, right? We see there is a document, it's written, and we see that it has been reviewed multiple times by lawyers, correct?

MR. THOMAS: Objection, your Honor. Scope. May we be heard briefly at side bar?

THE COURT: Sure.

(Continued next page)

MB35col2          Schaefer - Cross          Page 339

(At side bar)

THE COURT: Yes, sir.

MR. THOMAS: Your Honor, at this point we have tried to give Ms. Moss wide latitude to explore and support the defense that they have generally, but we think it is important to observe at this moment that the government didn't open on SEA-1, didn't elicit any questions or answers from Mr. Schaefer about secret side deals with respect to SEA-1, and the repeated framing of questions to suppose that we had done that but that it was fine in Mr. Schaefer's view, is both beyond the scope and prejudicial.

MR. HECKER: Your Honor, can I be heard? This is Sean Hecker on this issue.

We asked the government before trial if they were going to prove up SEA-1 and they told us we should assume that they would, which is why we assumed that they would. But, more importantly, the SEA-2 and SEA-3 transactions that are at the heart of this trial are amendments to the SEA-1 transaction. It's undisputed that Neil Cole negotiated the SEA-1 and informed his understanding of the nature of the joint venture. So, it is impossible to disentangle SEA-2 and SEA-3 from SEA-1.

MS. MOSS: I would just add to that, your Honor, that we did make a great effort to help the Court, help the jury, to agree to the entrance of exhibits and the government agreed to all of these exhibits and --

MB35col2          Schaefer - Cross          Page 340

THE COURT: No, no. I understand. I am going to let you proceed. My concern is one of are we going to go in that level of detail with each of these e-mails where we count up the lawyers, etc? Not that you aren't able to do that but we want to take into consideration our time.

MS. MOSS: I'm mindful of the jurors so yes.

THE COURT: OK. Very well.

# A-676

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

MB3YCOL3     Schaefer - Cross     Page 369

A. Into the letter, yes. Into this specific language, no.

Q. Do you see your name in that language?

A. Yes, I do.

Q. And you want to make sure that correct information goes to the SEC?

A. Yes. Of course.

Q. Of course. You want the correct information in the final response letter to be correct to the SEC.

Right?

A. Yes. To the extent of my knowledge, yes.

Q. Understood.

Very briefly, on the Rocawear Kids termination -- and this was addressed very briefly during your direct.

Do you recall questions about that?

A. Yes, I do.

Q. This is a licensing agreement with a company called KIDS' headquarters?

A. That's correct.

Q. And you know that to be an affiliate of Li & Fung GBG?

A. That's correct.

Q. And, Mr. Schaefer, you know that the licensing agreement was never terminated; correct?

A. That's correct.

Q. The government spoke to you about Mr. Horowitz's resignation.

MB3YCOL3     Schaefer - Cross     Page 370

Do you recall that?

A. Yes, I do.

Q. Are you aware that Mr. Horowitz waited to resign from Iconix until after his stock units had invested?

A. No. That would be pretty foolish.

Q. Even though he made some complaints about the SEA transactions --

Do you recall he made complaints or raised concerns about the SEA transactions in his resignation letter?

A. Yes, I do.

Q. Those transactions had occurred several months prior to this; correct?

A. Yes. I believe that's correct. Yes.

Q. We saw that SEA-2 closed in June of 2014; right?

A. That's correct.

Q. So at least eight or nine months before this resignation. And we saw that SEA-3 closed in September of 2014.

Correct?

A. That is correct.

Q. So, again, another at least five or six months before this resignation; correct?

A. That's correct.

Q. And that's the first time he is ever raising any sort of issues with this; correct? That you were hearing.

A. That I'm aware of, that's correct.

MB3YCOL3     Schaefer - Redirect     Page 371

Q. And after Mr. Horowitz resigns, he hires some lawyers. And those lawyers start making financial demands on Iconix.

Isn't that correct?

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

MS. MOSS: May I have one moment, your Honor?

(Defense counsel confer)

THE COURT: Yes.

MS. MOSS: Thank you, Mr. Schaefer. I have nothing further.

THE COURT: Anything further, Mr. Thomas?

MR. THOMAS: Briefly, your Honor.

While Ms. Moss is clearing that up, if I could ask the defense team to kindly put up defense 1600A1 which I don't think we have in our system. Go to page 8 if you don't mind.

REDIRECT EXAMINATION

BY MR. THOMAS:

Q. Ms. Moss just showed you this part of the finalized response to the SEC Division of Corporate Finance; right?

A. That's correct.

Q. Now, Mr. Schaefer, would you remind the jury what interaction between Mr. Horowitz and Mr. Cole occurred before the company sent back this letter to the SEC.

A. Sure. Neil Cole and Seth went back to each other's offices I think two or three times arguing with each other about what

MB3YCOL3     Schaefer - Redirect     Page 372

these statements were going to include.

And then at one point, the company's president of international, head of international, Willy Burkhardt, got involved almost as an arbitrator between the two of them and sat with the two of them. I believe it was in Seth Horowitz's office.

Q. What is it that Mr. Cole wanted done to the document that wasn't being done?

A. He wanted to be removed from having being stated as negotiating the agreement -- the transaction. Excuse me.

MR. THOMAS: Thank you. You can take down this exhibit.

Q. So I want to talk very briefly about some of the exhibits that you were shown that related to the first Southeast Asia joint venture.

Do you recall that from cross-examination?

A. Yes.

MR. THOMAS: If we could, Mr. Bianco, could we go to Government Exhibit 1010.

Q. Mr. Schaefer, does this have anything to do with SEA-2?

A. No.

Q. Does this have anything to do with SEA-3?

A. No.

Q. Does this have anything to do with a promise to increase the purchase price of SEA-2 in exchange for $5 million in

# A-677

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

| MB3YCOL3 | Schaefer - Recross | Page 381 |

respect to license agreements in the territory which has been provided."

Do you see that?

A. I can't see it now. Yes. I do see it.

Q. "And they communicated we will have their comments to the draft documents on Monday. L&F also understands we are working towards a closing by the end of the quarter, and they are doing the same." Correct?

A. That's correct.

Q. That's the extent of your update to Mr. Cole on this date, March 14, 2014.

A. That's correct.

MS. MOSS: And going to Exhibit 2101. Mr. Bianco, if you could please pull this up for me.

Q. A similar-type thing. This is on May 11, 2014. You call it a "Friday at Five" again. You're going through all of the deals that the legal department is working through for that week.

Do you see that?

A. Yes, I do.

Q. So you agree that the legal department is not just working on the Southeast Asia transactions. They're working on a number of other different things; correct?

A. That's correct.

Q. And I believe I counted 14 separate projects on this one.

| MB3YCOL3 | Schaefer - Recross | Page 382 |

Now, with regard to Southeast Asia, which is ii under joint ventures, do you see that section?

A. Yes, I do.

Q. What you've written there is:

"We prepared draft amendments to the SEA joint venture agreements to add the men's brand with respect to Europe/Turkey, along with the Korea territory generally. The documents are with Seth so he can send in the event L&F can get something done."

Do you see that. Yes, I do.

Q. And then you talk about the GBG spinoff.

Do you see that?

A. Yes, I do.

Q. And that is the extent of the update that you provide to Mr. Cole on Southeast Asia.

A. Yes. Everything I'm aware of or what I'm aware of. Correct.

Q. Now, the government asked you whether you saw anything in the documents for SEA-2 and SEA-3 related to an increase in price due to a giveback.

Do you remember those questions?

A. Yes.

Q. That's the whole point of an integration clause; correct? That if it's not in the documents, then there is no legal obligation. Correct?

| MB3YCOL3 | Schaefer - Redirect | Page 383 |

A. Outside of fraud, that's correct.

Q. Now, when we're talking about the integration documents, we're talking about a binding contract. And I don't want to have to get into all of this again.

It's what's in the terms of the contract that are legally binding; correct?

A. That's what the provision says. Correct.

Q. And you have no personal knowledge of any sort of givebacks.

You were not part of those negotiations, were you, Mr. Schaefer?

A. No.

MS. MOSS: Thank you.

MR. THOMAS: Briefly, your Honor.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MR. THOMAS:

Q. Mr. Schaefer, I just want to follow up on what you just said.

If there's fraud in the contract, does it vitiate the merger clause?

A. That's correct.

MR. THOMAS: Nothing further, your Honor.

THE COURT: Mr. Schaefer, you may step down. Government, do you want to call your next witness.

| MB3YCOL3 | Rabin - Direct | Page 384 |

MR. THOMAS: The United States calls Jason Rabin. Mr. Rabin.

THE COURT: Step up into the witness box and remain standing.

JASON RABIN,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE COURT: Sir, you may be seated. Please bring your chair up to the microphone. Please bring the microphone as close to you as you can. When you speak, speak directly into the microphone.

Please begin by stating and spelling your first name and your last name.

THE WITNESS: Jason, J-a-s-o-n, Rabin, R-a-b-i-n.

DIRECT EXAMINATION

BY MR. THOMAS:

Q. Good afternoon, Mr. Rabin.

A. Good afternoon.

Q. Would you please introduce yourself to the jury.

A. Hi. I'm Jason Andrew Rabin.

Q. Mr. Rabin, are you testifying voluntarily today?

A. No.

Q. Why are you testifying?

A. I'm being compelled.

Q. If you refuse to answer questions today, what may happen to

# A-678

UNITED STATES OF AMERICA, v.
 NEIL COLE,

November 3, 2022

MB3YCOL3    Rabin - Direct    Page 385

you?
A. I could be held in contempt.
Q. Are you nonetheless under oath and required to tell the truth?
A. Yes.
Q. If you admit to wrongdoing today, can your words be used against you?
A. No.
Q. Does the court order compelling you to testify protect you from prosecution in the event that you lie to the jury?
A. No.
Q. Does the court order give you immunity from prosecution for all time or just for what you say today?
A. Just what I say today.
Q. Has the government promised you anything in exchange for your testimony?
A. No.
Q. Has the government promised you that you will never be prosecuted?
A. No.
Q. Mr. Rabin, I want to step back and give the jury a little background about you.
A. Sure.
Q. Where do you work?
A. Centric Brands.

MB3YCOL3    Rabin - Direct    Page 386

Q. What kind of business is Centric Brands?
A. We design, manufacture, and sell children's, adult apparel, and accessories.
Q. What is your current role at Centric?
A. I'm the company CEO.
Q. Have you had any professional experience that prepared you to be the CEO of Centric Brands?
A. Yes, I have.
Q. What experience was that?
A. I've been in the industry over 25 years.  I started my own company in the kids' industry and then grew and grew and then just learned more in the last 25 years.
Q. Just to pause there for a second.
    When you say the "industry," could you tell the jury what industry you're speaking about.
A. The clothing, apparel, and accessories industry.
Q. From your time in that industry, have you encountered Iconix Brand Group?
A. Yes, I have.
Q. How have you encountered Iconix?
A. I've done business with Iconix for many years.
Q. In your career, have there been occasions where you have personally negotiated business deals with Iconix representatives?
A. Yes, I have.

MB3YCOL3    Rabin - Direct    Page 387

Q. I want to focus you on the fall of 2013.
    Did you negotiate a transaction with Iconix at that time?
A. Yes, I did.
Q. What transaction was that?
A. Southeast Asia 1.
Q. Did there come a time when you negotiated an amendment to that transaction in the summer of 2014?
A. Yes, I do.
Q. What was the amendment?
A. Southeast Asia-2.
Q. And did you negotiate a Second Amendment to Southeast Asia in September of 2014?
A. Yes, I did.
Q. And what was that?
A. Southeast Asia-3.  Southeast Asia-3.  Sorry.
Q. Mr. Rabin, when you participated in the negotiations for Southeast Asia-1 and -2 and -3, was there a principal representative at Iconix that you dealt with?
A. Yes.
Q. Who was that?
A. Neil Cole.
Q. Do you see Mr. Cole in the courtroom today?
A. Yes, I do.
Q. Would you identify him by pointing to his position or

MB3YCOL3    Rabin - Direct    Page 388

describing something he's wearing.
    MR. MARKUS: We stipulate that this is Neil Cole.
BY MR. THOMAS:
Q. Mr. Rabin, at the time that you negotiated the Southeast Asia transactions, where is it that you worked?
A. Southeast Asia-1.
Q. Let's start there.
    At the time of the original Southeast Asia deal, where were you employed?
A. With Li & Fung.
Q. Did you work for Li & Fung generally or for a business unit.
A. For a unit.
Q. What unit was that?
A. LF Asia.
Q. Can you tell the jury a little bit about what LF Asia was.
A. Sure.  LF Asia was a company that was created to bring well-known North American brands to help distribute those brands in Asia.
Q. When you were at LF Asia at that time, what was your title?
A. President of LF Asia.
Q. And what were your day-to-day responsibilities?
A. To set the strategy, build the business, and just help build businesses in Asia.
Q. When you began there, how big was LF Asia?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                    November 3, 2022

| MB3YCOL3 | Rabin - Direct | Page 389 |
|---|---|---|

A. When I got there, it was brand new, and then it grew from there.

Q. When you say "brand new," can you give the jury a sense of how many employees there were at LF Asia.

A. In the beginning, there were about five to ten employees.

Q. On a day-to-day basis, what kinds of responsibilities did you handle?

A. In the beginning, it was doing a lot of research in the marketplace in Asia, understanding what the opportunities were for well-known North American brands, setting the strategy for what the future of LF Asia should be.

Q. And geographically like where in the world were you doing your work?

A. I was based in Hong Kong and focused on China and Southeast Asia.

Q. By the time of the SEA-3 transaction, were you employed with a different business?

A. Yes.

Q. What business was that?

A. Global Brands Group.

Q. What was Global Brands Group?

A. Global Brands Group was the manufacturer/designer, and they would sell products to North America and other parts of the world.

Q. What was your title at Global Brands Group at that time?

| MB3YCOL3 | Rabin - Direct | Page 390 |
|---|---|---|

A. Chief merchandising officer.

Q. What does it mean to be a chief merchandising officer?

A. My role was to set the strategy, work with the different brand owners, analyze the business, and look for opportunities to grow.

Q. When you were at GBG as opposed to LF Asia, where was your workplace?

A. At the Empire State Building.

THE COURT: I'm sorry. Mr. Rabin, I'm going to have to ask you to keep your voice up. I'm having a little difficulty hearing.

THE WITNESS: Empire State Building.

MR. THOMAS: So we show the witness and the parties Government Exhibit 317 and 318.

Q. Mr. Rabin, do you recognize those?

A. Yes, I do.

MR. THOMAS: The government offers 317 and 318.

MR. MARKUS: No objection. That is the Empire State Building.

THE COURT: Very well. They will be received.

(Government's Exhibits 317 and 318 received in evidence)

MR. THOMAS: Let's publish those for the jury so they can have a look.

Q. Mr. Rabin, is this where you worked?

| MB3YCOL3 | Rabin - Direct | Page 391 |
|---|---|---|

A. Yes.

Q. When you were at LF Asia and then GBG, were there junior executives who assisted you to carry out your work?

A. Yes.

Q. What were some of the junior executives that you worked with?

A. Gerald Margolis.

MR. THOMAS: If we can show the witness Government Exhibit 321.

Q. Do you recognize 321?

A. Yes.

Q. Is this a depiction of Mr. Margolis?

A. Yes, it is.

MR. THOMAS: The government offers 321.

MR. MARKUS: No objection.

THE COURT: Received.

(Government's Exhibits 321 received in evidence)

MR. THOMAS: Mr. Bianco, if you could show that to the jury.

Q. Who is Mr. Margolis?

A. He was in charge of running the brand management business of GBG.

Q. What does that mean?

A. His main responsibility -- GBG had a division that was brand management where it would -- it would basically work with

| MB3YCOL3 | Rabin - Direct | Page 392 |
|---|---|---|

brands and license the brands to other companies around the world.

(Continued on next page)

UNITED STATES OF AMERICA, v.
 NEIL COLE,                                                                November 3, 2022

| MB35col4 | Rabin - Direct | Page 393 |
|---|---|---|

BY MR. THOMAS:

Q. Show the witness and the parties Government Exhibit 323?

Do you recognize 323?

A. Yes.

Q. What do you recognize it to be?

A. Ethan Cole.

MR. THOMAS: Your Honor, the government offers 323.

MR. MARKUS: No objection.

THE COURT: It will be received.

(Government's Exhibit 323 received in evidence)

BY MR. THOMAS:

Q. Mr. Bianco, if you will show that to the jury?

Now, Mr. Rabin, I want to be clear from the start, is there any relation between Ethan Cole and Neil Cole?

A. Not that I'm aware of.

Q. Who was Ethan Cole?

A. Ethan was a junior executive who worked for Jared Margolis.

Q. What were Ethan Cole's responsibilities?

A. He worked with Jared to hem build brands, basically, around the world.

Q. I want to turn your attention back to the Southeast Asia joint ventures and we are going to spend a little time talking about each of those three transactions, but before we do, I want to ask you to describe for the jury, at a high level what the business idea behind doing the joint venture was in the

| MB35col4 | Rabin - Direct | Page 394 |
|---|---|---|

first place.

A. Having a joint venture would give us the opportunity to work with a brand owner and have the ability to share in the profits and the increased value of the company over time.

Q. You mentioned a brand owner. When it came for the Southeast Asia joint ventures, when we are talking about that, who is the brand owner we are speaking about?

A. Iconix.

Q. So, to focus on the business idea of the partnership with Iconix for a moment, what is it that you thought LF Asia or GBG would bring to the deal?

A. LF Asia, their responsibility was to have, we used the term "boots on the ground," but have employees in those territories who were located in the countries that would work with the existing licensees in those countries and help them build a brand, give them marketing tools. Just, you know, help -- help build the brand and look for new opportunities in those countries.

Q. What was it you thought Iconix would be bringing to the deal?

A. The intellectual property, which means the brands itself.

Q. And you mentioned licensees. I want to pause on that for a second. What are licensees in this context?

A. A licensee is a company that would pay a royalty to the brand owner to use the brand and sell the products into their

| MB35col4 | Rabin - Direct | Page 395 |
|---|---|---|

territories.

Q. How would licensees and the joint venture work together? If that question makes sense.

A. The licensee -- the joint venture's goal is to give the licensee, you know, help, assistance, marketing, relationships to help them build their business in those territories.

Q. If the licensees do well, does it benefit the joint venture?

A. Yes.

Q. If the joint venture does well, does it benefit the partners?

A. Yes.

Q. So, how is it that GBG would make money through the joint venture?

A. If the licensees grew their business it would generate more royalty income. That royalty income is how we create the value of these businesses.

Q. And that income would be split between the partners in the joint venture?

A. Yes.

Q. Now, with respect to the Southeast Asia joint venture -- this is going to sound obvious -- did it relate to a specific territory?

A. Yes.

Q. What territory was that?

| MB35col4 | Rabin - Direct | Page 396 |
|---|---|---|

A. Southeast Asia.

Q. And did it apply to specific brands?

A. Yes.

Q. Now, you mentioned in your discussion about the joint venture marketing so I want to talk about that for a second. How does marketing figure into this brand licensing business, generally?

A. The marketing usually has a responsibility from the brand owner as well as the licensees to help market or build the brands in those territories.

Q. So, to take first the brand owner licensee arrangement, would it be common for the licensee to have a responsibility to market the brand?

A. Yes.

Q. And in a joint venture context, would it be common for the joint venture to have responsibilities to also market the brand?

A. Yes.

Q. Now, if the joint venture incurred expenses, like marketing expenses, who would pay them?

A. The joint venture.

Q. So, to focus you very specifically on the Southeast Asia joint ventures, to participate in the joint venture with Iconix would Li & Fung or LF Asia, later GBG, have to pay anything to Iconix to participate?

MB35col4        Rabin - Direct                Page 397

A. Yes.
Q. Why is that?
A. To own or have the ability to own 50 percent of the company.
Q. The company that you are referring to is the joint venture?
A. Correct.
Q. Are you, in that way, buying the right to share in the profits of the joint venture?
A. Correct.
Q. Did the Southeast Asia joint venture ultimately produce a final agreement?
A. Yes.
Q. If we can show the witness Government Exhibit 200, which I believe is in evidence?
   Mr. Rabin, do you see Government Exhibit 200 on your screen?
A. Yes.
Q. Do you recognize this to be the share purchase agreement for SEA-1?
A. Yes.
Q. Did you participate in the negotiations that led up to this agreement?
A. Yes.
Q. Mr. Bianco, if we could go ahead to page 22?
   Who is it that signed this agreement on behalf of

MB35col4        Rabin - Direct                Page 398

Iconix?
A. Neil Cole.
Q. Did Mr. Cole participate in the negotiations that led up to SEA-1?
A. Yes.
Q. And if you go to page 23, Mr. Bianco, Mr. Rabin, is that your signature on behalf of LF Asia?
A. Yes, it is.
Q. Let's show the witness and the parties Government Exhibit 203.
   Do you recognize Government Exhibit 203?
A. Yes.
Q. Do you recognize this to be the local services agreement that was executed in connection with the Southeast Asia joint venture?
   Mr. Bianco, if you can enlarge the first part of the text and, Mr. Rabin, please take your time to read through the document.
A. Yes.
Q. Let's go to the tenth page of this document, if we could, Mr. Bianco? Who signed here on behalf of the joint venture?
A. Neil Cole.
Q. Let's go back to the first page, Mr. Bianco.
   Mr. Rabin, could you explain to the jury what the purpose of a local services agreement was?

MB35col4        Rabin - Direct                Page 399

A. I don't remember.
Q. Mr. Bianco, why don't we go to PDF page 12.
   Mr. Rabin, do you see there there is a list of responsibilities?
A. Yes.
Q. And these are responsibilities of the local services partner?
A. Yes.
Q. And in this case the local services partner is going to be LF Asia, right?
A. Yes.
Q. Is what was happening that the joint venture was retaining LF Asia to provide the services on this schedule?
A. Yes.
Q. Is one of the services that was going to be provided related to developing marketing?
A. It says providing marketing expertise.
Q. And Mr. Bianco, if you would enlarge paragraph 3 under Brand Management?
A. Yes.
Q. Mr. Rabin, do you see there it says developing marketing and advertising strategies?
A. Yes.
Q. And you had said a moment ago marketing expertise --
   Mr. Bianco if you could enlarge the very first number in the

MB35col4        Rabin - Direct                Page 400

paragraph of the document?
   Was LF Asia also agreeing to provide marketing expertise?
A. Yes.
Q. Mr. Rabin, in exchange for providing these services, would LF Asia be compensated with a monthly fee?
A. I believe there was a fee, yes. I'm not sure if it was monthly, but yes.
Q. Mr. Bianco, if we can go to page 3?
   Mr. Rabin, do you see this section is entitled Fees and Payments?
A. Yes, I see that.
Q. And do you see in the first section it refers to a monthly fee?
A. Yes.
Q. Of 15 percent?
A. Yes.
Q. So, Mr. Rabin, to be clear for the jury, by participating in this deal as a partner, LF Asia gets 50 percent of the profits of the joint venture; right?
A. Correct.
Q. And as the local services partner, it additionally gets paid 15 percent of the monthly revenue; right?
A. Correct.
Q. So, LF Asia gets paid in two ways to participate in the

# A-682

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

---

MB35col4  Rabin - Direct  Page 401

deal?

A. Correct.

Q. So, I am going to turn your attention now and focus most of our time on Southeast Asia 2 and 3. Those were amendments to this first agreement; is that right?

A. Yes.

Q. So, with respect to Southeast Asia 2, could you tell the jury what was going to be different about the deal from the original Southeast Asia agreement?

A. SEA-2 was to include more territories.

Q. Mr. Rabin, do you recall which territories?

A. Europe, Korea, and Turkey.

Q. Because more territories were going to be added to the deal, would LF Asia have to pay to participate?

A. Yes.

Q. Why would it have to pay?

A. Those territories were generating royalty income, so in order to be able to participate in 50 percent of those royalties, we would have to pay for 50 percent of the company.

Q. In the lead-up to SEA-2, did you and Iconix negotiate about how much LF Asia would pay to participate?

A. Yes.

Q. And who is it that you primarily negotiated with?

A. With Neil Cole.

Q. While the deal was being worked out, were you in touch

---

MB35col4  Rabin - Direct  Page 402

directly with Mr. Cole from time to time?

A. Yes, I was.

Q. Can we show the witness and the parties Government Exhibit 1288?

Mr. Rabin, do you see this is an e-mail from Mr. Cole to you on Monday, March 31st, 2014?

A. Yes, I do.

MR. THOMAS: The government offers 1288.

MR. MARKUS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1288 received in evidence)

BY MR. THOMAS:

Q. Mr. Rabin, March 31st, 2014, is before the Southeast Asia amendment is final; right?

A. Yes.

Q. And this e-mail here, which is now published to the jury, reflects you and Mr. Cole being directly in touch?

A. Yes.

Q. Let's show the witness and the parties Government Exhibit 1028.

MR. MARKUS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1028 received in evidence)

BY MR. THOMAS:

Q. Let's publish 1028, Mr. Bianco.

---

MB35col4  Rabin - Direct  Page 403

Mr. Rabin, is 1028 Mr. Cole writing you, Mr. Margolis, and copying Seth Horowitz?

A. Yes.

Q. He says in his message here: Would like to discuss Europe, Korea, China.

Right?

A. Correct.

Q. You mentioned before Europe and Korea, those become part of SEA-2?

A. Correct.

Q. Does China figure into a future deal?

A. A future deal.

Q. Is that SEA-3?

A. Yes.

Q. Let's show the witness and the parties Government Exhibit 1289.

Mr. Rabin, is this Mr. Cole writing you on June 9th, 2014?

A. Yes.

MR. THOMAS: The government offers 1289.

MR. MARKUS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1289 received in evidence)

BY MR. THOMAS:

Q. Mr. Bianco, if you would publish?

---

MB35col4  Rabin - Direct  Page 404

Mr. Rabin, this chain begins with you asking Neil: Are you free for a quick call? And then he responds: Yes. With a phone number.

Do you see that?

A. Yes.

Q. Would you speak to Mr. Cole on the telephone from time to time?

A. Yes.

Q. Do you feel like you had to work through any of his subordinates in order to speak to him?

A. No.

Q. Why is that?

A. I had a good relationship with him.

Q. What does that mean?

A. I have known him -- I have known Neil for many years and we did a lot of business together.

Q. Show the witness and the parties Government Exhibit 1040.

MR. MARKUS: No objection.

MR. THOMAS: We offer 1040.

THE COURT: 1040 is received.

(Government's Exhibit 1040 received in evidence)

BY MR. THOMAS:

Q. Is this you reaching out to Mr. Cole directly again?

A. Yes.

Q. This is just a few weeks before SEA-2 is finalized?

---

UNITED STATES OF AMERICA, v.
 NEIL COLE,

November 3, 2022

MB35col4     Rabin - Direct     Page 405

A. Potentially, yes.

Q. Mr. Bianco, you can take this down.

As the negotiations about the price that LF Asia would pay progressed, did LF Asia ultimately determine what it would be willing to pay to participate in the SEA-2 territories and markets?

A. Yes.

Q. How would it do that?

A. It would hire an outside consulting firm to do diligence in the market to come up with a valuation that Iconix would provide to make sure the numbers that they were providing, they felt they were accurate. And if we all agreed, we would come up with a purchase price.

Q. Now, ultimately, did LF Asia determine what it would be willing to pay to participate in SEA-2?

A. Yes.

Q. What was that amount?

A. $10.9 million.

Q. Did you communicate that figure to Mr. Cole?

A. Yes.

Q. How did he respond?

A. I think it was fine.

Q. Did he accept your proposal to pay that price?

A. Yes.

Q. After he accepted your proposal to pay that price, did you

MB35col4     Rabin - Direct     Page 406

finalize the deal documents at $10.9 million?

A. No.

Q. Why not?

A. The price went from 10.9 to 15.9.

Q. Why is that?

A. Neil said if I raised the price by $5 million, we could bill it back for marketing.

Q. Mr. Rabin, I want to take that in two pieces. First you said the price went up to 15.9. Why did it go up?

A. Neil said if the price goes up $5 million you can bill it back for marketing.

Q. Mr. Rabin, I want to make sure that I absolutely understand what you are saying. Did you understand Mr. Cole to be saying that if LF Asia were willing to pay $5 million more than the $10.9 million you had proposed? Is that what you are talking about?

A. Yes.

MR. MARKUS: I'm sorry, your Honor. I'm going to object. He has asked it twice and now he is leading him to a different answer.

THE COURT: The objection is sustained.

Ask another question, Mr. Thomas.

MR. THOMAS: Yes, your Honor.

BY MR. THOMAS:

Q. Why did you agree to increase the amount that LF Asia paid?

MB35col4     Rabin - Direct     Page 407

A. Because I could bill back the $5 million in marketing.

Q. What did you understand that to be?

A. Ask the question again?

Q. What did you understand that to mean that you could bill back $5 million in marketing?

A. Is that LF Asia could bill Iconix for $5 million for marketing.

Q. Did you accept his proposal for that arrangement?

A. Yes.

Q. Were the deal documents finalized at that higher price?

A. Yes.

Q. I show the witness Government Exhibit 210 -- actually, this one is in evidence so I think we can publish. Can we launch the second paragraph?

Mr. Rabin, do you see the second paragraph relates to both a fair market value and 50 percent of the fair market value?

A. Yes.

Q. And that 50 percent figure, is the 15.9 million?

A. Correct.

Q. Is 15.9 million more than LF Asia determined the interest to be worth?

A. Yes.

Q. Why did you agree to pay $15.9 million?

MR. MARKUS: Objection. Asked and answered now four

MB35col4     Rabin - Direct     Page 408

times, I think.

THE COURT: Overruled.

BY MR. THOMAS:

Q. Mr. Rabin, why did you agree to pay that higher price?

A. Because we had the ability to bill back $5 million for marketing.

Q. Without that promise, would you have agreed to pay more than $10.9 million?

A. No.

Q. Is there any doubt in your mind whether Mr. Cole was firm in his commitment to let you bill that money?

A. No.

Q. Let's turn to Southeast Asia 3. In the summer of 2014 did you participate in negotiations that led up to Southeast Asia 3?

A. Yes.

Q. And what, at a high level, was the business concept of Southeast Asia 3?

A. To acquire more territories.

Q. Which territories?

A. Greater China, Macau, Taiwan.

Q. Do you know if there were additional marks that would be in those territories?

A. Yes; Umbro and Lee Cooper.

Q. To participate in those new territories with those brands

UNITED STATES OF AMERICA, v.
 NEIL COLE,

November 3, 2022

MB35col4          Rabin - Direct          Page 409

would GBG have to pay something to Iconix?
A. Yes.
Q. Why is that?
A. Those -- in those territories there was royalty income that was generating a profit, and to participate in the profit we have to buy part of the company which was basically paying for the royalty income at that time.
Q. What role did you have in the negotiations?
A. I was involved.
Q. Is there someone that you were in touch with at Iconix about SEA-3?
A. Yes.
Q. Who was this?
A. Neil Cole.
Q. Can we show the witness Government Exhibit 1286?
    A moment, Mr. Rabin, we are pulling it up. Mr. Rabin, I will ask you some other questions while that is coming up. In the summer of 2014, did you experience any personal medical events?
A. Yes, I did.
Q. What were those?
A. I had open heart surgery.
Q. In connection with that, were you hospitalized on occasion?
A. Yes.
Q. Did your hospitalizations prevent you from participating in

MB35col4          Rabin - Direct          Page 410

any of your work?
A. I'm sorry. Say that again?
Q. That was a poor question.
    That summer, did you still work when you could?
A. Yes.
Q. And did you work on the Southeast Asia 3 deal at that time, too?
A. Yes.
Q. Now, leading up to Southeast Asia 3, the second amendment, did GBG attempt to quantify how much it would be willing to pay for the interest in the Chinese marks?
A. Yes.
Q. How did it do that?
A. The same thing, the diligence in the marketplace, hire PWC, came up with a value based on royalty income.
Q. And what amount was it that GBG determined it was willing to pay?
A. $15.5 million.
Q. Did you communicate that price to Mr. Cole?
A. Yes.
Q. Did he accept it?
A. Yes.
Q. After accepting the price, was the deal papered at 15.5?
A. No.
Q. Why not?

MB35col4          Rabin - Direct          Page 411

A. There was discussion about raising the price to cover Rocawear shortfall.
Q. Who was involved in that discussion?
A. I remember my CFO was heavily involved.
Q. Was Mr. Cole involved?
A. Yes.
Q. What did Mr. Cole say about raising the price in relation to the shortfall?
    MR. MARKUS: Objection, your Honor. It is unclear if he said it to him or someone else.
    THE COURT: Why don't you try to clear it up, Mr. Thomas.
    MR. THOMAS: Yes, your Honor.
BY MR. THOMAS:
Q. Did you speak to Mr. Cole directly on the subject?
A. Yes.
Q. What did he tell you?
A. I don't know the exact words he said but if the price gets raised by $6 million, we could beat the Rocawear shortfall or offset the Rocawear shortfall.
Q. Just to pause there on the word "shortfall." is that a term of art in your business?
A. Yes.
Q. What does it refer to?
A. When a license that -- when the license that a licensee has

MB35col4          Rabin - Direct          Page 412

and you don't achieve the sales minimum, it results in a shortfall.
Q. I am going to take a moment to try to pull out each of those steps.
    You told us earlier what a licensee is. You referred now to minimums. What are those?
A. Minimums are -- it is an amount established with the licensee and the licensor on what guarantees the licensee has to pay the licensor.
Q. How did the minimums impact that relationship?
A. If the minimums were not being met, that potentially could be called a shortfall.
Q. And you said before that there was a Rocawear Kids short fall?
A. Yes.
Q. Can you tell the jury what you are referring to there?
A. That GBG had the Rocawear Kids license and they were operating under a license shortfall.
Q. Was the Rocawear Kids license agreement part of the Southeast Asia joint venture?
A. No.
Q. When Mr. Cole brought up the prospect of relieving that shortfall in exchange for a higher price, did you accept that?
A. Yes.
Q. And did Southeast Asia 3 ultimately conclude?

# A-685

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                      **November 3, 2022**

| MB35col4 | Rabin - Direct | Page 413 |
|---|---|---|

A. Yes.

Q. Let's show the witness and the parties Government Exhibit 1287.

Do you recognize Government Exhibit 1287 to be an e-mail from Mr. Cole to you on September 17th?

A. Yes.

MR. THOMAS: The government offers 1287.

MR. MARKUS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1287 received in evidence)

BY MR. THOMAS:

Q. Mr. Bianco, if we can publish that for the jury?

Mr. Rabin, can you tell us what we are looking at here?

A. It seems like -- I mean, I don't remember exactly the date, what this --

Q. Mr. Rabin do you see this is signed on September 17th?

A. Yes.

Q. And you see in your message below, you say: We are good with the deal. I signed it yest.

Is that a reference to yesterday?

A. It is referring to the Rocawear, it is referring to the SEA deal; yes.

Q. So, Mr. Rabin, let's show you Government Exhibit 212, which I believe is in evidence.

| MB35col4 | Rabin - Direct | Page 414 |
|---|---|---|

And Mr. Bianco, if you can enlarge the top third of this document?

Give us a moment, Mr. Rabin.

A. I got it. I understand.

Q. Do you see that this is the consideration side letter for SEA-3?

A. Yes. Yes, I do.

Q. Do you see the date is September 17th?

A. Yes.

Q. That's the same date as the e-mail?

A. Yes.

Q. OK. With this now before you, what did that e-mail refer to?

A. This particular deal.

Q. Now, Mr. Bianco, if we can go ahead to page 4? Who signed on behalf of Iconix?

A. Neil Cole.

Q. And if we could go to page 6, Mr. Bianco?

Who signed on behalf of GBG?

A. I did.

Q. And Mr. Bianco, let's go back to page 1 and enlarge the second paragraph.

Mr. Rabin, do you see here, yet again, there is a description of a fair market value and then a computation of 50 percent of the fair market value?

| MB35col4 | Rabin - Direct | Page 415 |
|---|---|---|

A. Yes.

Q. And is it that 50 percent figure that GBG was required to be paid to Iconix?

A. Yes.

Q. 21.5 is higher than the 15.5 you told us GBG computed its interest to be worth; is that right?

A. Yes.

Q. Why did you agree to 21.5 in this letter?

A. $6 million was going to be used to offset the Rocawear shortfall.

Q. Did you understand that to be a firm commitment from Mr. Cole?

A. Yes.

Q. If he had not made that commitment to you, would you have agreed to 21.5 in this document?

A. No.

Q. Is there any doubt in your mind about whether Mr. Cole was promising you that he would relieve that shortfall at that time?

A. No.

Q. Mr. Bianco, you can take this down.

Now, Mr. Rabin, after the Southeast Asia deals 1, 2, and 3 closed, did you and your team make any efforts to recoup the $5 million from SEA-2 that you had paid?

A. I don't remember.

| MB35col4 | Rabin - Direct | Page 416 |
|---|---|---|

Q. Did you ask any of your team to send marketing invoices?

A. Actually SEA-2? You said SEA-2?

Q. After the deals are over, I want to focus you on the fall of 2014. So, SEA-2 has signed, SEA-3 has been signed.

A. OK.

Q. Did there come a time where GBG billed Iconix for marketing?

A. Yes.

Q. And what was the amount in marketing that it sent bills for?

A. For $5 million.

Q. Why was $5 million the amount that was billed?

A. That was the amount agreed upon to pay -- that's the amount agreed upon that we could bill Iconix back for marketing.

Q. Now, Mr. Rabin, did you personally prepare those invoices?

A. No.

Q. Did someone on your team prepare them?

A. Yes.

Q. Who is it that was responsible for working on the invoices?

A. Jared Margolis.

Q. Was he assisted by anyone?

A. Yes.

Q. Who was that?

A. Ethan Cole.

Q. Now, did you ever hear from Mr. Neil Cole about the

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

| MB35col4 | Rabin - Direct | Page 417 |

invoices that were prepared?

A. Yes.

Q. How did you hear from him?

A. He just told me to make sure the invoices had more detail.

Q. After he said that, did you direct Mr. Margolis to revise the invoices?

A. Yes.

Q. And when you say that Neil -- Mr. Cole -- told you to add more detail or have more detail, did he communicate that directly to you?

A. Did he communicate what to me?

Q. That message to you personally.

A. Yes.

Q. Do you remember if that was on the telephone or in person?

A. I don't remember.

Q. Now, Mr. Rabin, if Mr. Cole hadn't agreed to let LF Asia or GBG bill for $5 million in marketing, would GBG have sent those invoices for $5 million in marketing?

A. No.

Q. Was marketing an obligation of the local services partner to the JV anyway?

A. Yes.

Q. Is the reason you sent the $5 million invoices to give back the $5 million you had paid for SEA-2?

A. Yes.

| MB35col4 | Rabin - Cross | Page 418 |

MR. THOMAS: Nothing further, your Honor.

THE COURT: Cross-examination.

MR. MARKUS: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. MARKUS:

Q. Good afternoon, ladies and gentlemen.

Good afternoon, Mr. Rabin.

A. Good afternoon.

Q. My name is David Markus. I am one of Neil Cole's lawyers and I just have some follow-up questions, if I might, about these transactions?

A. Sure.

Q. Great. Thank you. We have never met before, by the way, right?

A. Correct.

Q. This is our first time communicating?

A. First time.

Q. Well, nice to meet you. I would like to ask you, first, about these SEA-1, 2, and 3 transactions that you discussed. Is it fair to say that you are the boss of Margolis and Ethan Cole?

A. Yes.

Q. OK. And I want to be clear that Neil Cole never asked you, Mr. Rabin, to keep anything secret; correct?

A. Correct.

| MB35col4 | Rabin - Cross | Page 419 |

Q. And this is really important. He never asked you to take any steps to keep anything out of a contract, right?

A. Correct.

Q. He never asked you to keep the terms of the deal secret from anyone, correct?

A. Correct.

Q. And you never took any steps to keep it secret from anyone, correct?

A. Correct.

Q. He never asked you -- Neil Cole never asked you to keep anything from any lawyers, right?

A. Correct.

Q. And you never did keep anything from any lawyers, correct?

A. Correct.

Q. And Neil Cole never asked you to keep anything from any accountants, correct?

A. Correct.

Q. And you never took any steps to keep anything secret from any accountants, correct?

A. Correct.

Q. I also want to be clear, Mr. Rabin, that in addition to never keeping anything secret, you do not believe you have ever committed a crime in this case, right?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

| MB35col4 | Rabin - Cross | Page 420 |

BY MR. MARKUS:

Q. You can answer, sir.

A. Correct.

Q. And so that we are crystal clear with the jury, you don't believe you have committed a crime with SEA-1, SEA-2, or SEA-3; correct?

A. Correct.

Q. And you don't believe you have committed any crimes with Neil Cole, correct?

A. Correct.

Q. All right. By the way, when the prosecutor started his questioning he told you -- well, he asked you if you admit to any crimes while you are on the stand, those admissions couldn't be used against you.

Do you remember him asking you those questions?

A. Yes.

Q. But you haven't committed -- you haven't admitted to any crimes, you don't believe you have committed any crimes; right?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

BY MR. MARKUS:

Q. You can answer, sir.

A. What was the question?

Q. Sure.

A. Sorry.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

MB35col4          Rabin - Cross          Page 421

Q. I will move on. Let me ask you this way. The word "dirty shell game" has been used in this case. Do you believe you were involved in a dirty shell game?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

A. No.

Q. The words "dirty business partner" have been used in this case. Do you believe you were a dirty business partner?

A. No.

Q. The words "sham deals" have been used in this case. Do you believe you engaged in sham deals?

A. No.

Q. The words "criminal fraud" have been used in this case. Do you believe you engaged in criminal fraud?

A. No.

Q. Let me move on, Mr. Rabin, to a time in your life that I am sure is a little tricky but the prosecutor asked you and I just want to ask you a few follow-up questions about it.

When you were diagnosed with your heart issue in 2014, I imagine that was one of the scariest times of your life, correct?

A. Correct.

Q. And it was a really important and nerve-wracking time in addition to being scary, correct?

A. Correct.

MB35col4          Rabin - Cross          Page 422

Q. And you had to meet with lots of doctors I imagine, right?

A. True.

Q. And I imagine those doctors asked you lots of questions and you answered those questions honestly and accurately and to the best of your knowledge, right?

A. Correct.

Q. Because they had to have all the information from you before they would go forward with that open heart surgery, correct?

A. Correct.

Q. I now want to move on to probably the second scariest moment of your life, and that's when you got the knock on your door from the FBI. Correct?

A. Not correct.

Q. Was that a scary time in your life?

A. I wouldn't -- I wouldn't respond to that, no.

Q. Well, your heart surgery dealt with a life or death situation. The FBI knocking on your door dealt with your liberty, correct?

A. My what?

Q. Liberty. Your freedom.

A. Oh. Yes.

Q. And so, just like you had to tell your doctors the truth, you knew at the time the FBI questioned you back in 2019 you had to tell them the truth, correct?

MB35col4          Rabin - Cross          Page 423

A. Correct.

Q. And what you told the FBI back on March 18th, 2019 was that you were not familiar with the specifics of the SEA agreements. Do you remember that?

A. I don't remember what I said to them. Sorry.

Q. Do you remember telling them that LF would only pay fair market value in these SEA transactions?

A. It's possible I said that, yes.

Q. And you told them that LF and GBG would not have paid more than fair market value for the joint ventures. Do you remember telling them that?

A. I remember having a discussion. I don't remember exactly what I said to them.

Q. Do you remember telling the FBI that these transactions were a minuscule amount of the business that your company and Iconix were doing?

A. Again, I'm sorry, I don't remember the actual conversation.

Q. Sure. Well, it is fair to say that you and -- that LF and GBG was an enormous company, correct?

A. Correct.

Q. They had, what, 25,000 employees?

A. Possibly, yes.

Q. And billions of dollars in revenue, correct?

A. Correct.

Q. And when you told the FBI these things, they handed you a

MB35col4          Rabin - Cross          Page 424

subpoena. Do you remember that?

A. Yes.

Q. For the grand jury?

A. Yes.

Q. But they told you, Mr. Rabin, that if you met with prosecutors, you would not have to testify immediately before the grand jury. Do you remember that?

A. No, I don't remember that.

Q. Do you remember meeting with prosecutors before going to the grand jury?

A. Yes.

Q. And do you remember entering into a contract or an agreement with the prosecutors at that meeting?

A. What kind of contract? I don't know.

Q. Sure. Let me show it to you.

MR. MARKUS: I will move to admit at this point, I think without objection, Defendant's Exhibit 3570-23.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Government's Exhibit 3570-23 received in evidence)

BY MR. MARKUS:

Q. Mr. Rabin, we are going to put on the screen for you and the jury an agreement. If we go to the page showing the signatures do you recognize the signature on that page?

A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 3, 2022

| MB35col4 | Rabin - Cross | Page 425 |
| --- | --- | --- |

Q. Who is that?

A. My signature.

Q. And who is right below you?

A. My lawyer.

Q. By the way, your lawyer is here in court today, right?

A. Yes, he is.

Q. He is sitting in the back row there?

A. Yes, he is.

Q. We can zoom out of that. And let's go to page one at the top. Do you see where it says Proffer Agreement?

A. Yes.

Q. So this was an agreement that you signed with the prosecutors outlining both what you plan on doing and what they plan on doing, right?

A. I don't remember what proffer agreement actually -- I don't remember.

Q. OK. Let's look at paragraph 1 then. Do you see where it says: This is not a cooperation agreement?

A. Yes.

Q. And what this agreement is, then it says: The client -- that's you, right?

A. Yes.

Q. -- has agreed to provide the government with information, and to respond to questions, so that the government may evaluate client's information and responses in making

| MB35col4 | Rabin - Cross | Page 426 |
| --- | --- | --- |

prosecutive decisions.

Do you see that?

A. Yes.

Q. So, we have, before you have entered this agreement you have told the FBI that you wouldn't pay more than fair market value, and now you are entering into an agreement where the government gets to say we can evaluate what you are saying; correct?

MR. THOMAS: Objection.

THE COURT: Overruled.

BY MR. MARKUS:

Q. Do you see that?

A. Yes.

Q. And so, after this meeting you go on to meet with the prosecutors before testifying today how many times, Mr. Rabin?

A. I don't remember how many times.

Q. Would you believe me if I told you that you have met with the government 20 times since you first signed this agreement back in 2019?

A. I don't remember if it was 20 times but I met with them many times.

Q. Why did you have to meet with them 20 times?

A. They asked to see me.

Q. Right. Let's turn to page 2 of this agreement and look at paragraph 7. I would like to focus you on the second line of

| MB35col4 | Rabin - Cross | Page 427 |
| --- | --- | --- |

paragraph 7. Do you see where it says: No understandings, promises, agreements, and/or conditions have been entered into with respect to the meeting other than those set forth in this agreement and none will be entered into unless, in writing, and signed by all parties.

Do you see that?

A. Yes.

Q. And your understanding of that, Mr. Rabin, is that if the prosecutor or an agent promised you something orally or verbally not in this contract, it doesn't count; right?

A. They didn't promise me anything.

Q. Right, but if they did, it wouldn't matter because what matters is what is in the agreement; right?

A. If that's what this says.

Q. Well, I mean, you have signed lots of agreements in your life, this is a provision that is in many agreements, right, that what is in writing controls; correct?

A. Yes.

Q. And that's to protect both sides so that if somebody makes you a promise that's not in writing, everybody knows you have got to get it into the contract, right?

A. I understand from this point of view, yes.

Q. And this is a provision that is so important that even prosecutors put it into their contracts with folks like you, correct?

| MB35col4 | Rabin - Cross | Page 428 |
| --- | --- | --- |

A. Correct.

THE COURT: Mr. Markus, we are at 2:40 so we will end there.

MR. MARKUS: Time flies.

THE COURT: Ladies and gentlemen, that brings us to the end of today. We well see you tomorrow. Please, in the jury room by quarter after 9:00 or so. Please be safe getting home. Do not discuss the case or read or look at anything about the case.

(Continued on next page)

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1 — Page 433

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

      v.            19 Cr. 869 (ER)

NEIL COLE,

          Defendant.      Trial

------------------------------x

                 New York, N.Y.
                 November 4, 2022
                 9:00 a.m.

Before:

        HON. EDGARDO RAMOS,

               District Judge

        APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  ANDREW M. THOMAS
    JUSTIN V. RODRIGUEZ
    JUSTIN RODRIGUEZ
    Assistant United States Attorneys

KAPLAN HECKER & FINK, LLP
    Attorneys for Defendant
BY:  SEAN HECKER
    JEFFREY THEN
    JENNA M. DABBS
    REBECCA A. SUSSMAN

MARKUS/MOSS, PLLC
    Attorneys for Defendant
BY:  DAVID O. MARKUS
    ANITA M. MOSS

MB45col1 — Page 434

(Trial resumed; jury not present)

THE COURT: Good morning, everyone.

MR. HECKER: Good morning.

MR. THOMAS: Good morning.

THE COURT: We received a phone call this morning, it came in sometime after 7:00 a.m., from juror no. 1, Ms. Rosario Colon, telling us that she was sick and would not be coming in today.

How do the parties wish to proceed.

MR. THOMAS: Your Honor, the government would favor taking the day off to see if Ms. Colon could heal by Monday. If she is not ready by Monday, then to excuse her and proceed with an alternate. We are concerned that given the number of potential conflicts that multiple jurors have flagged for the Court, we could easily find ourselves in a situation where we don't have the jury to conclude the trial and we would prefer to wait and ensure that we have the best chance of getting to the end, than to risk it.

MR. HECKER: Your Honor, this is Sean Hecker.

We are have a different instinct. We had three alternates for a reason. And the two others who raised issues, at least our read of it was with respect to the first alternate, while he raised the issue about his employment, he was actually pretty easy going about the whole thing and he was pretty clear that he was going to stick around if that's what

MB45col1 — Page 435

we asked him to do, if it became necessary.

Mr. Kulm, and his travel to Minnesota, while he was saying that I was going on the Delta website. There are tons of flights, every day, to Minneapolis. I realize he may have a charge fee or not, depending on the flight being cheaper or more expensive. I don't know if there is a way we can cover it if it came to that, but my instinct is we could keep both of those other two and we would rather proceed today and seat one of the alternates.

THE COURT: I think that that would be my preference as well. My other concern is that the other jurors might see that we excuse someone for being sick -- and I'm not suggesting any of these jurors, because I think we have a very good jury, by the way, that any of these jurors would feign illness -- but we are at a very busy time of the year and people have a lot of responsibilities.

MR. HECKER: Your Honor, just one other fact I think that is worth noting, but the other jurors are obviously on their way in and it is more respectful to them to actually keep things moving than it is to send them back home and tell them that this whole thing is going to be extended by another day.

THE COURT: I'm sure they would be fine going back home.

My preference is to go forward. We will excuse Ms. Colon and go forward. Not that this means anything because

MB45col1 — Page 436

it is all reading tea leaves, but I do get the sense that the balance of the jury, I do have questions about those other two, but the balance of the jury is pretty solid and so we will go forward. OK?

Any issues to raise?

MR. THOMAS: Yes, your Honor. We, I think, have a couple of issues that we can use to occupy ourselves until 9:30.

THE COURT: OK.

MR. THOMAS: The first issue is yesterday we alerted the defense that in between witnesses today we expected to move into evidence a couple of exhibits to include the Ethan Cole e-mails, and we understand that defense has an objection to that so we wanted to flag that right now to talk through it.

THE COURT: Is this an objection beyond the objections that were discussed pretrial?

MR. MARKUS: Yes, your Honor.

THE COURT: OK.

MR. MARKUS: So my understanding is that the government wants to move in the Ethan Cole e-mails without a sponsoring witness. And if you remember from the motion in limine argument, one of the main arguments that the government raised is that it was routine to put these e-mails in through a witness because we would be able to cross-examine the witness under Rule 806 and impeach the declarant -- in this case Ethan

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1                                    Page 437

Cole. Now what the government wants to do is put these e-mails in with no witness so we won't be able to cross-examine anyone about the e-mails, they will just be in evidence without -- it is now two steps removed. We wanted the ability to cross Ethan Cole, the Court ruled against us on that, and now we don't get to cross-examine anyone and I haven't seen cases where that is permitted where the government, without a witness to say, how this e-mail comes in is permitted.

MR. THOMAS: Your Honor, may I respond to that?

THE COURT: Yes.

MR. THOMAS: So, from an evidentiary perspective, the defense has signed a stipulation that the e-mails are authentic. From a hearsay perspective the Court has ruled that they are not hearsay. And, based on the record at trial, they're clearly relevant. It is not Mr. Cole's prerogative to determine when and how the government, within the bounds of the rules, proves up its case. And, entirely separately, we do intend to call Mr. Margolis later and Rule 806 is available going forward in the trial for them to attack the declarant of the e-mail.

THE COURT: As I recall, Mr. Margolis was the -- he wasn't the counter-party, but he and Mr. Ethan Cole were the ones communicated via those e-mails, correct?

MR. THOMAS: Mr. Margolis is recipient of two of the three messages, your Honor.

MB45col1                                    Page 438

THE COURT: And who is the third? Is there a person for the third.

MR. THOMAS: The third is a secretary, I believe, or administrative assistant to Mr. Cole who will never be called. But, again, it illustrates the point that there is no rule of evidence that says you need a sponsoring witness to rule it is authentic. And, they have stipulated it is. And we are entitled, as we do in many cases, either to show the document to the jury or have an unsworn witness read the e-mails that is authenticated through other evidence. This is totally normal.

THE COURT: I think that's right. Remind me how it was done in the last trial.

MR. THOMAS: At the last trial it was introduced through Mr. Margolis and the reason it couldn't have been introduced earlier is there was not a record from which the Court could make the finding the Court now has already made about it being not hearsay.

THE COURT: So, Mr. Margolis will get on the stand after the e-mails will be in evidence.

MR. THOMAS: We expect he will be on the stand either the end of next week or beginning of the week after.

MR. MARKUS: Judge, then that's when they should introduce these e-mails, because it is irregular to put them in now and then leave the jury with these e-mails over the weekend without cross-examination on them. In the last trial they put

MB45col1                                    Page 439

them in through a witness, which is how we do trials, and then the defense was able to cross-examine the witness on the e-mails. They want to avoid cross-examination for, it sounds like a week on these e-mails, which I don't understand. If they have the witness who they put the e-mails in through last trial, why wouldn't we do it in the normal course through that witness?

THE COURT: I agree that there is no particular magic necessarily to when a piece of evidence comes in, but throughout this trial, I mean, I don't know but there have been several stipulations where the parties on both sides have put in a couple of dozen e-mails, presumably through stipulation, as to which there was no witness and so why is this different?

MR. MARKUS: Because we have not stipulated to the admission of these e-mails. What happened, your Honor, is we have reached agreements before the witness testifies as to exhibits coming in. So, for example with the current witness Mr. Rabin, Mr. Thomas and I exchanged exhibits beforehand so we can move it along. Those exhibits still come in through the witness and we are able to cross-examine the witness. I think it is pretty transparent what the government is trying to do here, which is leave the jury with an impression of documents without the defense being able to cross-examine them. And we have not stipulated to the admission. And frankly, I mean, we were trying to work with the government on authenticity but, I

MB45col1                                    Page 440

mean, we would never have agreed to this procedure had the government told us what its intentions were and that it was going to stray from how it did it in trial no. 1, which is putting these documents in through a witness where we could cross-examine the witness and, frankly, on these three documents, we would withdraw our stipulation if this is how they're going to do it.

MR. THOMAS: Your Honor, may I respond?

THE COURT: Sure.

MR. THOMAS: So, I absolutely understand that Mr. Cole does not want us to do this. It is entirely consistent with the rules of evidence for us to proceed in this manner. The fact that he can't cross-examine a document doesn't give him an extra procedural right that doesn't exist in the law. As the Court knows from its time on the bench, many unsworn witnesses are called to read e-mails, documents, or moved without a witness on the stand. Just because Mr. Cole doesn't like this document doesn't make there any kind of evidentiary problem. Because, there isn't.

MR. MARKUS: We have a confrontation problem, Judge. The truth is we asked the government yesterday, cite us a case where you can just put in an e-mail without a witness and without a stipulation. We have not stipulated to the admission of these documents and so --

THE COURT: Isn't the admission of these documents,

**A-691**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1                                              Page 441

hasn't that already been determined, determined at pretrial?

MR. THOMAS: Yes, your Honor.

MR. MARKUS: No. Your Honor. All that the Court has determined is that Ethan Cole is a co-conspirator and that these e-mails are in furtherance. They have not come in -- for example, they haven't shown that these documents are business records. There are other objections that we could raise that we haven't raised with a sponsoring witness; Margolis would have to say, yes, I received this e-mail, this was made in the ordinary course of business. Other hurdles. And they haven't jumped through or jumped over those hurdles yet. And the truth is when Margolis comes, we probably wouldn't make those objections because they would come in, but at this point there is no witness to get them through rules of evidence. They still have to comply with the rules.

MR. THOMAS: Your Honor, may I respond one more time?

THE COURT: Yes, yes.

MR. THOMAS: First of all, a document need not be a business record to be admitted. As the Court ruled, these communications are non-hearsay statements of a co-conspirator, they're not hearsay.

Second of all, they've stipulated to the authenticity. With those two things, the only remaining question for the Court would be relevance, and that is obvious on its face and I don't hear Mr. Markum arguing otherwise. And to suggest that

MB45col1                                              Page 442

there is a confrontation clause problem is preposterous. It is settled law that there are not -- statements within the proffered sense from co-conspirators that provide testimonial evidence against a defendant. There is no law, there is no rule that prohibits the government from proving its case as it wishes to do so in the order it wishes to do so.

THE COURT: OK. So, I am going to let the government do it. I suppose I could ask, Mr. Thomas, tell me why they're doing it today or why they're doing it between witnesses in this fashion, but the fact of the matter is that's not for me to say. I have already determined that these are co-conspirators' statements that are not hearsay that are admissible. I think that they are clearly relevant. So, I will let them do it.

And I will also state, I mean, I know that in the moment each one of these e-mails seems so important and the argument is, well, the jury is going to be stewing about the e-mails for a week. I frankly don't think that's going to be the case.

MR. MARKUS: I hear you. I hear you, your Honor. If I could make two more points? And I am sorry because I hear what the Court is saying. One is the government's whole argument to the Court on why they should come in under co-conspirator exception is that we would get to cross-examine the witness.

MB45col1                                              Page 443

THE COURT: But you will.

MR. MARKUS: Imagine if they don't call Margolis. Then we don't. I mean he has so, the government gets its emails in, Margolis gets hit by a truck over the weekend.

THE COURT: Then you can make an application to have them stricken from the record.

MR. MARKUS: Then it is too late, your Honor. If they are going to call Margolis they should put the e-mails in for Margolis as they did at the last trial. They haven't called him yet. He may not be called for their strategic reasons or for other reasons. He was only subpoenaed for the first time last night for trial. So, I don't understand what the defense is supposed to do when these e-mails come in. I understand the Court doesn't think the e-mails are the end-all be-all but the government does because they don't want us to cross-examine a witness on them.

THE COURT: Are you calling Margolis?

MR. THOMAS: We are, your Honor.

MR. MARKUS: They say that now. We got an e-mail yesterday where they say at this time we intend to. But what if they decide, over the weekend, now we have got the e-mails in and we don't, or Margolis gets sick with COVID, or whatever the situation is, then now the defense is stuck.

THE COURT: I think that's highly speculative. We have a recommendation on the record that they are going to call

MB45col1                                              Page 444

Mr. Margolis and again, if they don't, then you can make an application to have the e-mails stricken from the record and I am sure that this jury will follow that instruction.

Next?

MR. THOMAS: Your Honor, I think the remaining issues, hopefully, are minor by comparison. I understand from the collaborative dialogue with Mr. Markus that on cross-examination he may wish to offer two exhibits that the Court precluded last time during the cross-examination of Mr. Rabin that the Court precluded last time as hearsay. We just wanted to tee that up in case that was an issue that could be decided now. If it needs to wait for Mr. Rabin's testimony about the documents we are happy to take it at side bar at that time, but didn't want it to come as a surprise to the Court.

THE COURT: OK.

Any issue that you folks wanted to raise? OK. So, what I will tell the jury, and I am happy to take suggestions, is that obviously one of their members is sick and because of the efforts of proceeding as efficiently as possible with the case, we have taken -- or I have decided that it is best to excuse her so that we take full advantage of every day that we have available. Period.

Anything more? Or is that too much?

MR. THOMAS: That seems acceptable to the government, your Honor.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1                                    Page 445

MS. DABBS: Your Honor, I think we are just trying to think through the impact of making clear that the reason for the issue with juror no. 1 is illness because we have a juror who is obviously very sensitive to health considerations. I suppose we don't -- I don't expect, as your Honor said, that other jurors are going to see some opportunity here and take advantage of it but you could see the other jurors having concerns about health as a result of this and that having some impact on how we move forward. So, I am just wondering if there might be some less specific way of just saying an issue has come up for juror no. 1 and we are going to move forward. We have excused her, we are going to move forward without her.

THE COURT: Without mentioning illness.

MS. DABBS: Correct.

THE COURT: I think that's fine. I think that's going to raise a number of issues in the minds of the jurors.

MS. DABBS: Your Honor, we have, as I said, been kicking it around. I think what the Court initially proposed makes sense. Let's just stick with that.

THE COURT: OK. Unless there is anything else, we will see you at -- I will be back at 9:25.

(recess)

THE COURT: Is Mr. Rabin here? Actually, before he comes in, I actually did have something else to share with the parties. Mr. Kulm has advised that he is able to change

MB45col1                                    Page 446

flights, so he will be leaving Tuesday evening, which means that we should also tell the jurors that we will not be sitting next Wednesday either. OK?

MR. THOMAS: Did the Court mean the Wednesday the week following?

THE COURT: Well, Tuesday the week of Thanksgiving.

MR. THOMAS: Yes. Shall we get Mr. Rabin, your Honor?

THE COURT: Yes, please.

(Witness resumes the stand)

(Continued on next page)

MB45col1                                    Page 447

(Jury present)

THE COURT: Everyone, please be seated.

Ladies and gentlemen, good morning. I trust you all had a pleasant evening. Thank you, as always, for being so prompt. As you might have noticed, one of your members is not here this morning. We learned from her this morning that she was quite ill and would not be able to make it in today. So, in conversation with the parties, I made the determination that rather than lose today, given that this matter is so important that it will take such an effort to get this matter done, it will be better for all of the parties and better for all of you, from an efficiency standpoint, to continue today. So, we have made the determination to excuse her and what that means, as a practical matter, is that you will have to change where you sit. So, if I could have you four move one over and Mr. Kulm, if I could have you move over to the last seat in the first row? And then all of you move over one as well. Ms. Horowitz, you are fine where you are as well, unless you want to move. And if you want to come down, as well, to the second row? And, obviously, this is one of the reasons why we pick alternate jurors.

And, Mr. Kulm, on behalf of the parties, we also wanted to thank you for your flexibility.

JUROR: Thank you.

THE COURT: And with that, we will continue with the

MB45col1        Rabin - Cross        Page 448

cross-examination of Mr. Rabin.

MR. MARKUS: Thank you, your Honor.

JASON RABIN, resumed.

CROSS-EXAMINATION

BY MR. MARKUS:

Q. Good morning, ladies and gentlemen. Happy Friday, everybody.

Good morning, counsel.

Good morning, your Honor.

Mr. Rabin, good morning.

A. Good morning.

Q. I wanted to follow up with you on something from yesterday because intent is really important in this case and I wanted to ask you, did you intend to deceive investors and shareholders or did you intend to increase shareholder value through these SEA-1, 2, and 3 deals?

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

Q. So let me just break it down then. Did you intend to deceive investors and shareholders --

MR. THOMAS: Objection, your Honor.

Q. -- with these deals?

THE COURT: Sustained.

Q. All right. Let's turn to Neil Cole for a moment. Before the first SEA transaction, Mr. Rabin, you knew Neil Cole for

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1     Rabin - Cross     Page 449

what, eight to 10 years?  Something like this?
A. Yes.
Q. And you had done a number of deals with him before, correct?
A. Correct.
Q. And you and Mr. Cole had a professional relationship?  Yes?
A. Yes.
Q. He was a good business partner, correct?
A. Correct.
Q. He was a fair business partner, correct?
A. Correct.
Q. And business with Mr. Cole had worked out well for both companies, correct?
A. Correct.
Q. In fact, you had done a number of deals between you and Mr. Cole over the course of your professional career, yes?
A. Yes.
Q. For example, one of the deals was a deal, Peanuts, where you were the exclusive agent of Peanuts in China.  Do you remember that deal?
A. Yes.
Q. And both companies made lots of money, correct?
A. I believe so.
Q. And that was the idea behind all the deals you did with Mr. Cole between the two companies, is to make money; right?

MB45col1     Rabin - Cross     Page 450

A. Yes.
Q. For shareholders, correct?
A. I mean, yes.
Q. In good faith, correct?
A. Yes.
Q. Let me turn also to a few of the 20 meetings you had with the government.  I want to take you back to a meeting you had on October 30th, 2019, about three years ago.  Now, do you remember at that meeting repeatedly answering questions from the government with the answer "I don't remember"?
A. I don't remember.
Q. Let me ask you this then, Mr. Rabin.  Do you remember that prosecutors got upset with you during those early meetings when you would answer "I don't remember"?
A. Perhaps.
Q. Do you remember that they raised their voices with you?
A. I don't know how to quantify raising their voices but, I mean, there was conversations.
Q. Well, do you remember that they got stern with you?
A. Yes.
Q. And even as soon as a year ago in meeting number fifteen, do you remember telling them over and over again that you don't remember about these specific deals?
A. I don't remember what -- I don't remember that time frame or those meetings.  I'm sorry.

MB45col1     Rabin - Cross     Page 451

Q. That's OK.  Let me ask you this then.  Do you remember about a year ago, on October 12th, 2021, that the prosecutors got so upset with your answers, "I don't remember," that they stopped your meeting and had to get your lawyer Paul Schoeman on the phone?  Do you remember that?
A. I don't remember that, no.
Q. Is it fair to say, Mr. Rabin, that you don't have the best memory of these deals, correct?
A. Correct.
Q. Is it fair to say that, in truth, we shouldn't rely too heavily on your memory about these deals?
A. That's not true.
Q. Let's turn to the deals, then, if we might.
     Now, when you refer to SEA-1, that is the original Southeast Asia transaction, correct?
A. Correct.
Q. And that happened in October 2013.  Do you remember that?
A. Yes.
Q. Do you remember?  Or no.
A. The exact date I don't remember, but I remember the time frame.
Q. OK.  And the idea was that Iconix -- which was Neil Cole's company, right?
A. Correct.
Q. -- was going to provide fashion, home brands, and your

MB45col1     Rabin - Cross     Page 452

company -- Li & Fung -- was going to provide the market expertise in the platform in Southeast Asia; correct?
A. Correct.
Q. And the idea was that your company could really penetrate that market in Asia, correct?
A. Yes.
Q. And the synergy between the two companies was Iconix was going to provide these great brands and you guys were going to provide the platform in Southeast Asia, yes?
A. Yes.
Q. And both companies were hoping that these brands would increase in value and you would make a lot of money, correct?
A. Correct.
Q. And, if successful, the royalties would go up, correct?
A. Correct.
Q. And Iconix was an award-winning company, right?
A. Yes.
Q. And your company was a great company too, was it not?
A. Correct.
Q. And this would be a good deal, Southeast Asia.  The Southeast Asia joint venture you considered a good deal for your company, right?
A. Correct.
Q. In fact, you thought the deal that was negotiated for $12 million might produce royalties in excess of $55 million,

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                November 4, 2022

MB45col1          Rabin - Cross          Page 453

right?

A. I don't remember those exact numbers.

MR. MARKUS: Mr. Lam, if we could call up Defendant's Exhibit 1048, I would like to move it in, I believe without objection from the government.

MR. THOMAS: Yes, your Honor.

THE COURT: Yes, there is an objection?

MR. THOMAS: No objection.

THE COURT: Very well. It will be received.

(Defendant's Exhibit 1048 received in evidence)

BY MR. MARKUS:

Q. Let's go through some of the e-mails regarding Southeast Asia. Looking at the top of the e-mail, which is an e-mail you wrote back in July of 2013; correct?

A. July 7th -- oh yes. Yes. Correct.

Q. Now, Mr. Rabin, in the summer of 2013 was when the idea of Southeast Asia joint ventures first came up; correct?

A. Perhaps.

Q. Do you remember?

A. I don't remember the exact date it came up.

Q. I'm not asking for an exact date. Do you remember that if the deal closed in the fall of 2013, that sometime in the summer was when you and Mr. Cole started to discuss these deals?

A. Yes.

MB45col1          Rabin - Cross          Page 454

Q. Now, let's look at this e-mail. If you scroll down do you see that line that starts: I want to submit the deal, and we could say in the PIP we could figure out the proper structure of the JV.

A. I see that.

Q. I would like to break that sentence down for the jury. What you are talking about there, Mr. Rabin, is that you want to submit the deal to your superiors, correct?

A. Correct.

Q. Because you didn't have the authority to sign a deal with Iconix, you needed to get approval for that, right?

A. Correct.

Q. And you needed to get approval from a number of people at Li & Fung, right?

A. Correct.

Q. And the way you would get approval is through what is called the investment committee at Li & Fung, correct?

A. Correct.

Q. And you had to submit paperwork to that investment committee called a PIP, right?

A. Correct.

Q. Do you know what a PIP stands for?

A. Yes.

Q. What does it stand for?

A. I think its preliminary investment proposal, maybe.

MB45col1          Rabin - Cross          Page 455

Q. Do you remember?

A. That's what I remember, so.

Q. OK. So when this PIP, with this preliminary investment proposal, you would submit the proposal to the investment committee and they would decide whether to approve or not approve the deal, correct?

A. I'm not a hundred percent correct.

Q. Tell me where I got it wrong.

A. What I remember is it's something that it's some -- it's like if we feel that it makes sense, before we go further we need to get different measures approved.

Q. And to get those measures approved you had to prepare this memo, this PIP, and give it to your superiors, correct?

A. Yes.

Q. And that PIP had to contain all of the important terms for the contract, correct?

A. Yes.

Q. Let's look at the next line. The bottom line: If we put the business back to him in five years, we are extremely safe and profitable.

Do you see that?

A. Yes.

Q. What you are saying there is that there is very little risk in these deals for your company, correct?

A. Correct.

MB45col1          Rabin - Cross          Page 456

Q. Because what the deal provides for is that if it's not working out, you can put this, these companies, back to Iconix; right?

A. Correct.

Q. You can force them to buy it back, correct?

A. Correct.

Q. So this was a really good deal for your company, right?

A. I thought so. Yes.

Q. Because there is a lot of upside if the brands are doing great; your company is going to make money, right?

A. Uh-huh.

Q. You have to say yes or no, actually.

A. I'm sorry. Yes.

Q. And if the brands aren't doing well you can say we want out of this, we are going to give it back to Iconix, and they're going to have to pay us a minimum amount to put it back to them; right?

A. I believe so, yes.

Q. And in fact, if we go down two lines, do you see in all caps you write: There is no downside risk to the deal. Also paying the deal over three years also helps.

Do you see that?

A. Yes.

Q. So, in your view, there was no overpayment here, if anything there was an underpayment. You had no downside risk.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1     Rabin - Cross     Page 457

A. What's the question?
Q. Did you have any risk in this deal, sir?
A. From looking at this, no.
Q. Well, this is your e-mail, right?
A. Yes.
Q. This is what you wrote in all caps, right?
A. Yes.
Q. Let's turn to the next page of your e-mail about this deal. If we look at the paragraph that starts, he said in most of his JVs... Now, the last clause of that paragraph says: Clearly, our relationship with Neil go very long with Li & Fung and he knows we will do the right thing.
      Do you see that?
A. Yes.
Q. And what you are talking about there, Mr. Rabin, is that you and Mr. Cole had a long-time business relationship, right?
A. Correct.
Q. And you guys weren't going to screw each other over in this business, correct?
A. Correct.
Q. You were going to do the right thing by each other, right?
A. Correct.
Q. In an ethical and above board way, correct?
A. Correct.
Q. Now, in the next paragraph do you see where you say: He

MB45col1     Rabin - Cross     Page 458

also said any new brands that he takes on for our territory that has no business will be given to the JV free of charge.
      Do you see that?
A. Yes.
Q. Now, what is going on there, Mr. Rabin, is Mr. Cole is telling you, look. Once we have this JV formed, if we acquire new brands I'm going to put them in the JV so you can produce the money for us, right?
A. Correct.
Q. And that's going to be free, right?
A. Correct.
Q. Now, that didn't make it into the contract, correct?
A. Correct.
Q. So, in fact there was no legal obligation for Mr. Cole to give you those brands for free, right?
      MR. THOMAS: Objection, your Honor.
      THE COURT: Overruled.
BY MR. MARKUS:
Q. Mr. Rabin, the question was there was no legal obligation for him to give you those brands for free, this was just something he would tell you he would do as a good business partner, correct?
A. Correct.
Q. In other words, if he told you something orally that didn't make it into the contract, like this term here, there was no --

MB45col1     Rabin - Cross     Page 459

there was no legal obligation for it, it was just good business partners trying to do the right thing, right?
      MR. THOMAS: Objection, your Honor. Calls for legal conclusion.
      THE COURT: Overruled.
BY MR. MARKUS:
Q. You can answer, sir.
A. I forgot the question.
Q. With this promise that Mr. Cole was making to you, this was just part of the good business relationship that you and he had, right?
A. Correct.
Q. There was no contractual or legal obligation, correct?
A. Correct.
Q. OK. If we scroll down, do you see at the very bottom of that page it says: In five years the business...?
A. Yes.
Q. That's what I was talking to you about earlier where you believed the business, in five years, should be a minimum of $10 million in royalty with a $55 million value.
      Do you see that?
A. Yes.
Q. In other words, Mr. Rabin, you, in your mind, expected this to be a really profitable business; correct?
A. Correct.

MB45col1     Rabin - Cross     Page 460

Q. And a really good deal for your company, correct?
A. Correct.
Q. And you did not believe that you were overpaying for the Southeast Asia deal, did you?
A. No.
Q. Thank you. We can take that down.
      During the course of these negotiations, Mr. Rabin, on this first deal, do you remember that your company initially wanted to pay $10 million and Mr. Cole wanted $12 million? Do you remember that?
A. I think so. OK.
Q. Do you remember or not, sir?
A. I don't remember exactly, but.
Q. Well, do you remember that there were negotiations over what the price of the first deal should be?
A. Yes.
Q. Because buyers typically want a lower price and sellers want a higher price. That's the way of the world, right?
A. Correct.
Q. And in every negotiation that you have ever encountered that's what happens, right? There is sellers are trying to get the price higher and buyers are trying to get the price lower, right?
A. Yes.
Q. There is nothing abnormal about that, right?

# A-696

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1    Rabin - Cross    Page 461

A. No.

Q. And in all of these SEA deals we see the price go up and down, that happens because of negotiation, right?

A. Yes.

Q. And in this deal, whether it was $10 million or $12 million, in your mind it really didn't matter because eventually this deal was going to be making so much money that that $2 million difference did not matter, correct?

A. I don't -- I wouldn't say that. I would say I remember it being a good deal, I don't remember -- I'm not going to agree that -- what you just said.

Q. Well, you ended up closing at $12 million, correct?

A. If that's the number that I closed at, yes.

Q. And you believed that that number was a good deal for your company, correct?

A. If that was the number, correct.

Q. Whatever the final number was.

A. Yes.

Q. You believed it was a good deal, correct?

A. Yes.

Q. Because you would not have entered the contract or the joint venture if you thought it was a bad deal for your company, would you?

A. Correct.

Q. By the way, same for Neil Cole. I mean, you know his

MB45col1    Rabin - Cross    Page 462

negotiation, he wouldn't have done it if he didn't think it was good for him, right?

A. Correct.

Q. Both of you were trying to do what was best for your companies, correct?

A. Yes.

Q. In good faith, correct?

A. Yes.

Q. And by the way, this wasn't just you doing this, this was a number of people senior to you at your company, correct?

A. Yes.

Q. And, by the way, in this first deal, SEA-1, there was a final purchase price of $12 million and then there was a -- do you remember that there was a side deal that there would be a contribution from Iconix to your company of $2 million? Do you remember that?

A. Yes.

Q. And so, there was nothing wrong with this side letter of money coming back from the original deal to you all, correct?

A. Correct.

Q. And, in fact, lots and lots of lawyers and accountants and people senior to you reviewed money going to Iconix and then money coming back to you all in a perfectly legal fashion, correct?

A. Correct.

MB45col1    Rabin - Cross    Page 463

MR. MARKUS: If we could call up defense Exhibit DX 1047, which I believe there is no objection to?

THE COURT: Is there an objection?

MR. THOMAS: No, your Honor. I was just waiting for it to appear on the screen to confirm it is what we thought it was. No objection.

THE COURT: Very well. It will be received.

(Defendant's Exhibit 1047 received in evidence)

BY MR. MARKUS:

Q. Sir, do you see this is an e-mail from you back in early July, again to one of your superiors, Dave Thomas?

A. Yes.

Q. And if you look about four lines down do you see where it says: Iconix is a real $2 million?

A. Yes.

Q. And so, what you are telling your superior there is that even though this deal is going to close at whatever it is going to close at, $12 million, you expect to get $2 million back; correct?

A. I believe so.

Q. And there is nothing wrong with that, right?

A. No.

Q. Your superior was copied on this e-mail, correct?

A. He is not my superior but he is on the e-mail, yes.

Q. Who is Dave Thomas?

MB45col1    Rabin - Cross    Page 464

A. The company CFO.

Q. And the CFO saw that you were going to be getting $2 million back from Iconix, right?

A. I believe so. Yes.

Q. And by the way, this wasn't abnormal, Mr. Rabin. Do you see that you are also going to be getting contributions from other companies like TLC and Disney?

A. Yes.

Q. In other words, those companies were going to be sending you back contributions, even though you had deals to pay them a larger amount of money, correct?

A. That's not correct.

Q. Let's examine that. Let's go to the next e-mail which -- we can take that down, Mr. Lam.

MR. MARKUS: Defendant's Exhibit 1001, which, again, I believe there is no objection from the government, if we could --

MR. THOMAS: That's correct, your Honor. No objection.

MR. MARKUS: I'm sorry. It should be Government Exhibit 1001.

Sorry, Mr. Lam. I don't know if we have that handy. There we go.

Sorry about that.

THE COURT: It will be received.

**A-697**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

---

MB45col1        Rabin - Cross        Page 465

(Government's Exhibit 1001 received in evidence)

BY MR. MARKUS:

Q. And here is another e-mail from you in July, correct, Mr. Rabin?

A. Yes.

Q. And you see a number of people are copied on that e-mail -- Kevin Chow, Dave Thomas, etc.?

A. Yes.

Q. Who is Kevin Chow?

A. He was head of mergers and acquisitions.

Q. He is your superior?

A. No.

Q. If you look, you are sending an e-mail to him and Dave Thomas about your discussions with Neil Cole, correct?

A. Yes.

Q. And do you see where you say in the second line: I met with Neil Cole today to go over all open points?

A. Yes.

Q. This is about the SEA transaction, correct?

A. Correct.

Q. And if you look down, do you tell your colleagues he has his attorney working on all the papers and the contact person will have all the information you need, correct?

A. Correct.

Q. Because both you and Neil Cole wanted to make sure this was

---

MB45col1        Rabin - Cross        Page 466

done the right way, correct?

MR. THOMAS: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. Did you want to make sure it was done the right way, sir?

A. Yes.

Q. And were you aware here that Mr. Cole wanted his attorney to look at the papers as well?

A. Yes.

Q. And if you scroll down to the bottom of that e-mail, do you see where you say he -- referring to Neil Cole -- also will work on the $2 million for us this year. Just need to give him wording that works.

Do you see that?

A. Yes.

Q. In other words, you had asked Mr. Cole for $2 million back on this deal for work that you had done, correct?

A. Correct.

Q. And he agreed to it, right?

A. Yes.

Q. He wanted wording that works, right?

A. Yes.

Q. And your understanding of that is he was going to check with the lawyers to make sure it worked, correct?

A. I would assume so, yes.

---

MB45col1        Rabin - Cross        Page 467

Q. Because nobody in this wanted to do anything that was even close or over the line, correct?

MR. THOMAS: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. You certainly didn't want to do anything over the line, did you?

A. Correct.

Q. And you were conveying to your colleagues here that Mr. Cole was going to check with his attorneys to make sure there was wording that worked for the $2 million going back to your company, correct?

A. Correct.

Q. We can take that down.

MR. MARKUS: The next e-mail I would move in, your Honor, is Government Exhibit 1003, I believe without objection.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1003 received in evidence)

BY MR. MARKUS:

Q. Now, if we scroll to the bottom of that, do you see that Neil Cole is sending you an e-mail the next month in August?

A. Yes.

Q. And he is asking what is the status of our deal. He is referring to the Southeast Asia deal, correct?

---

MB45col1        Rabin - Cross        Page 468

A. I am assuming so, yes.

Q. Do you know?

A. It looks like it is, yes.

Q. OK. And he is asking you thoughts on timing, correct?

A. Yes.

Q. So what's going on there, Mr. Rabin, your understanding is he is asking, hey, when do you think we are going to get this done. Right?

A. Yes.

Q. Is he saying, hey, we have to get this done by the end of the quarter?

A. Not from this e-mail, no.

Q. He is asking what you think the timing is going to be, right?

A. Correct.

Q. He is not pushing you to close it by the end of the quarter, is he?

A. Not from this e-mail, no.

Q. And, in fact, this deal doesn't close by the end of the quarter, does it?

A. I'm not sure exactly when it closed. I'm sorry.

Q. Would you take my word for it that it closed on October 1st, the first day of the next quarter?

A. If you are saying it, the truth, I would take your word.

Q. OK. We can take that down.

---

**A-698**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB45col1 | Rabin - Cross | Page 469 |
|---|---|---|

MR. MARKUS: Next I move in Defense Exhibit 1108, I believe without objection.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1108 received in evidence)

BY MR. MARKUS:

Q. If you look at the top of this e-mail, Kevin Chow is e-mailing you and a bunch of people, now in September 2013. Do you see that, Mr. Rabin?

A. Yes.

Q. Now, the people on this e-mail, if we look at the end there is an e-mail address: PWC.com. Do you see that e-mail towards the end of the "to" line?

A. Yes.

Q. And what is PWC? PricewaterhouseCoopers?

A. Yes.

Q. And what is that?

A. A diligence firm.

Q. I'm sorry?

A. A due diligence firm.

Q. Are they on this e-mail to make sure that this deal is done correctly and accurately?

A. Yes.

Q. And if we look at the next person on the e-mail, is that Mark Stevens?

| MB45col1 | Rabin - Cross | Page 470 |
|---|---|---|

A. Yes.

Q. Who is that?

A. A lawyer for Mayer Brown.

Q. And who is he is a lawyer for?

A. Mayer Brown.

Q. I know he works at Mayer Brown but who is he representing in this deal?

A. Oh. Li & Fung.

Q. Your company, right?

A. Yes.

Q. Why do you have due diligence people and lawyers on e-mails regarding the deal?

A. I mean, that's the process they follow.

Q. To make sure it is done right?

A. Yes.

Q. Legal?

A. Yes.

Q. In good faith?

A. Yes.

Q. And if we look at that e-mail, do you see in part B where it says: Mark is following up with Iconix' lawyer. It is in 1(b) at the top: Mark is following up with Iconix' lawyers. Do you see that?

A. Yes.

Q. So, in other words, your lawyer is following up with

| MB45col1 | Rabin - Cross | Page 471 |
|---|---|---|

Iconix' lawyers, right?

A. Yes.

Q. To make sure this is done correct, right?

A. Yes.

Q. Now, if we look in part D of that section, 1(d), do you see where it says: Mark is working on the first draft of the side letter and consultancy agreement?

A. Yes.

Q. Mr. Rabin, that's the $2 million coming back to your company, correct, that side letter?

A. Correct.

Q. And so, everybody knew about the money coming back, correct?

A. Correct.

Q. And there was nothing wrong with money coming back to your company, correct?

A. Correct.

Q. Lawyers knew about it, right?

A. Yes.

Q. Accountants knew about it, right?

A. Yes.

Q. And due diligence people knew about it, right?

A. Yes.

Q. And certainly if lawyers and due diligence people see money coming back to your company, in your mind you think this is

| MB45col1 | Rabin - Cross | Page 472 |
|---|---|---|

kosher, right?

A. Yes.

Q. This is OK, right?

A. Yes.

Q. All right. Thank you. We can take that down.

MR. MARKUS: Next, your Honor, I would move in Defendant's Exhibit 1109, without objection, I believe.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1109 received in evidence)

BY MR. MARKUS:

Q. Do you see that this is the e-mail in response to that e-mail before? If we scroll down a little you can see this is the same e-mail we just looked at, and then we get an e-mail in response from Mark Stevens, right?

A. Yes.

Q. And that's the lawyer for your company, correct?

A. Yes.

Q. And what he is saying is: Please see attached for your consideration. A first draft one-page side letter. Do you see that?

A. Yes.

Q. We are currently working on a short form consultancy agreement, right?

A. Yes.

**A-699**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB45col1 | Rabin - Cross | Page 473 |
|---|---|---|

Q. So, what he is saying there is he and his firm are the ones drafting this agreement to send money back to your company, right?

A. Yes.

Q. So that everything is above board and legal, correct?

A. Correct.

Q. All right. We can take that down.

MR. MARKUS: One moment, your Honor? Your Honor at this time we move in Defendant's Exhibit 2078, without objection.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 2078 received in evidence)

BY MR. MARKUS:

Q. Now, this is just a few days later, Mr. Rabin. Do you see that you sent an e-mail to Neil Cole?

A. Yes.

Q. And this is September 30th, right as the deal is starting to close, correct?

A. Correct.

Q. And you tell Neil, you know, call me because my team has been up all night, we are very close, we need to finish -- because when deals are being finalized people work really hard, right?

A. Yes.

| MB45col1 | Rabin - Cross | Page 474 |
|---|---|---|

Q. Because there is a lot of paperwork and edits and the lawyers get in the way all the time, right?

A. Correct.

Q. And it is just a pain to get these things finalized, right?

A. Sometimes, yes.

Q. And so, you tell Neil, call me, so we can finalize this thing. Yes?

A. Yes.

Q. And Neil writes back to you a few minutes later saying that he gave Warren the OK.

Do you see that?

A. Yes.

Q. Who is Warren?

A. I don't remember.

Q. Do you remember Warren Clamen?

A. I know the name, yes, I just don't remember what position he had at Iconix.

Q. So you remember he was at Iconix, right?

A. Yes.

Q. And do you remember Warren Clamen was the CFO of Iconix?

A. I don't remember what his title was.

Q. OK. He was the senior person at Iconix. Do you remember that?

A. I would assume so, yes.

Q. OK. And what Neil is saying here is that he gave this man,

| MB45col1 | Rabin - Cross | Page 475 |
|---|---|---|

Warren Clamen, the OK; right?

A. Yes.

Q. Now, if we go to the top e-mail you respond, again that same day, and you say that you in fact spoke to Warren, correct?

A. Yes.

Q. And you say, wow, he is really tough. Right?

A. Yes.

Q. Because you are still, like, working on the fine details of the deal, correct?

A. Yes.

Q. And you say you gave in to him on an issue. Do you see that?

A. Uh-huh.

Q. You have to say yes or no for the court reporter.

A. I'm sorry. Yes.

Q. And then you say: I just need to make sure we are consulted on ordinary course but it's your approval. My team is waiting and still up. And this is what I will ask about: Please make sure Warren communicates clearly with the lawyers.

Do you see that?

A. Yes.

Q. And what you are telling Neil here is that, hey, make sure that Warren gets the final details cleared with the lawyers, right?

| MB45col1 | Rabin - Cross | Page 476 |
|---|---|---|

A. Yes.

Q. Make sure the lawyers are cool with it, right?

A. Yes.

Q. Because you want to make sure that every last detail of the contract gets into the written contract; right?

A. Yes.

Q. Because if something is left out of the contract, then it is not part of the deal, right?

A. Not in all cases, but for this case I would say yes.

Q. Well, that's why your team is scurrying around at night and you are talking with Neil and Warren, because you want to make sure that that final contract is accurate; right?

A. Yes.

Q. Because that final contract controls, correct?

A. Yes.

Q. What's in that contract is what the deal is, correct?

A. Correct.

Q. All right. We can take that down.

MR. MARKUS: Next is Defendant's Exhibit 1077, I believe without objection.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1077 received in evidence)

BY MR. MARKUS:

Q. Just to back up for a moment, this is early September of

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB45col1 | Rabin - Cross | Page 477 |
|---|---|---|

2013. If you look at the second sentence: I think we can get the 10.9 if we guarantee by closing.

Do you see that?

A. Yes.

Q. So you are still, in early September, haggling over price and timing. Do you see that?

A. I'm sorry. Say that again, please?

Q. In early September you are still haggling over price and timing of the deal, correct?

A. Correct.

Q. If we go to the bottom line of that e-mail, do you see where you say: He is OK with the $2 million agency fee but wants to understand, in detail, to share with his CFO.

Do you see that?

A. Yes.

Q. In other words, you are asking for $2 million back and he is OK with that, right?

A. Yes.

Q. He just wants to understand the details and share it with others, correct?

A. Correct.

Q. And so, it seems like in your mind you believe that you might get $2 million back, even if the deal closes at $10.9 million; correct?

A. Correct.

| MB45col1 | Rabin - Cross | Page 478 |
|---|---|---|

Q. And that would have even been a better deal for you, correct? Than the $12 million?

A. Yes.

Q. In other words, if you had Closed at 10.9 instead of 12 and still gotten the $2 million back, that's even better for your company, correct?

A. Correct.

Q. All right. We can take that down.

MR. MARKUS: Next up is Defendant's Exhibit 1121, without objection from the government, I believe.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1121 received in evidence)

BY MR. MARKUS:

Q. We are back in late September. You see the bottom e-mail from a guy named -- and this is a tough name -- Butt Lau?

A. Yes.

Q. I feel bad for that guy as a kid.

MR. THOMAS: Objection, your Honor. Move to strike the commentary.

THE COURT: It will be stricken.

MR. MARKUS: I will withdraw it.

BY MR. MARKUS:

Q. Who is Butt Lau?

A. He was in charge of the company Li & Fung's M&A

| MB45col1 | Rabin - Cross | Page 479 |
|---|---|---|

transactions.

Q. Was he your superior?

A. Yes.

Q. Do you see this e-mail from him to you, and in the second paragraph Mr. Lau is saying he said that -- by the way, he is referring to Victor. Do you see in the first paragraph it says: As Victor's final authorization is required?

A. Yes.

Q. Who is Victor?

A. Victor Fung.

Q. Is he your superior?

A. Yes.

Q. Is he one of the names on the door?

A. Yes.

Q. And so here is Mr. Lau telling you he spoke to Victor who is the top guy, right?

A. Yes.

Q. And Victor said that, in principle, he would not be tolerating any deviation from the PIP. Do you see that?

A. Yes.

Q. This is important for all of us to understand. The PIP, as we discussed before, is the memo that goes to the investment committee, correct?

A. Correct.

Q. And so, the investment committee won't tolerate deviations

| MB45col1 | Rabin - Cross | Page 480 |
|---|---|---|

from that memo, correct?

A. Correct.

Q. That memo to the investment committee needs to contain all of the material terms of the contract, correct?

A. Correct.

Q. Because the investment committee, who is made up of people with their name on the door, need to make sure that they understand the terms of the deal before they sign off on it, correct?

A. Correct.

Q. And so, it's important Mr. Lau is telling you, and others, that the PIP needs to contain everything and we cannot -- cannot -- deviate from it, correct?

A. Correct.

Q. And so, if there was a promise that was made to you that's not in the PIP, the investment committee wouldn't see that, correct?

A. Correct.

Q. And so the investment committee, the higher-ups at the company are only approving what is in that PIP or that final contract; correct?

A. That's what this says, correct.

Q. And that was your understanding, correct?

A. Yes.

Q. And you respond to the e-mail, do you not? See at the top

# A-701

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB45col1 | Rabin - Cross | Page 481 |

there?

A. Yes.

Q. And you say: The only deviation I can think of is that the deal value is now better in our favor.

Right?

A. Yes.

Q. And so you think this deal -- again, just to underscore this point -- is really good for your company; correct?

A. Correct.

Q. You did not believe you were overpaying for this deal, correct?

A. Correct.

Q. All right. We can take that down.

MR. MARKUS: Two more e-mails with this particular deal, Mr. Rabin. Next up is Defendant's Exhibit 1129. Move it in without objection, your Honor.

MR. THOMAS: No objection.

THE COURT: It will be received. Incident.

(Defendant's Exhibit 1129 received in evidence)

BY MR. MARKUS:

Q. If you look at the middle of this page you are sending an e-mail to Bruce Rockowitz. Who is Bruce Rockowitz?

A. The company CEO.

Q. So, your superior, correct?

A. Correct.

| MB45col1 | Rabin - Cross | Page 482 |

Q. And you are complaining, at the very end of September, why you want to get the deal finalized do you see there you say: Hi Bruce, I need your help, this is crazy. We have been working over the weekend to get this deal finalized.

Do you see that?

A. Yes.

Q. In the next paragraph you say: This is the Neil deal -- referring to Neil Cole, correct?

A. Correct.

Q. Neil has been very patient with us on this deal; right?

A. Correct.

Q. He is only doing it because of our relationship; right?

A. Correct.

Q. So, in other words what you are saying is, listen, this is the first deal on SEA, we are trying to get this done with Neil, and he is doing it because he wants to continue our good relationship; right?

A. Correct.

Q. Look at the next paragraph, you say: It's an amazing deal for us. Right?

A. Yes.

Q. Again, you are not overpaying for this deal, are you?

A. No.

Q. If you scroll down, do you see where you say: I'm sorry if I am getting emotional over this.

| MB45col1 | Rabin - Cross | Page 483 |

A. Yes.

Q. But it is an amazing deal that costs very little money with huge, huge upside.

Do you see that?

A. Yes.

Q. In other words, what you are telling your boss here, Bruce Rockowitz, is that, man, we have to do this deal, it is going to be really good for the company. Right?

A. Correct.

Q. You were getting emotional about it, right?

A. It says I was, yes.

MR. MARKUS: Last e-mail on SEA-1, DX 1123 I would move in, I believe without objection.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1123 received in evidence)

BY MR. MARKUS:

Q. If we look towards the bottom of this e-mail, here is another e-mail from you to Thomas and Chow. Do you see that?

A. Yes.

Q. This is at the very end of September again right before the deal closes, right?

A. Yes.

Q. And you tell your colleagues Thomas and Chow that you spoke to Neil and told him the situation; right?

| MB45col1 | Rabin - Cross | Page 484 |

A. Yes.

Q. And Neil said: If we need to keep the deal at the original 10.9 price, we could like the PIP, he would do that as a favor instead of the 12.

Correct?

A. Yes.

Q. What you are saying to your colleagues here is that even though that you all finally agreed to pay 12, which is what Neil had asked for, Neil will do it for 10.9 if that's going to mess up the deal. Correct?

A. Correct.

Q. By the way, that would mean less money for Mr. Cole, correct? For Mr. Cole's company?

A. Correct.

Q. And you say there that he would be doing that as a favor, correct?

A. Correct.

Q. Because, just like you, Mr. Cole wants to get this deal done, correct?

A. Correct.

Q. And the reason there was a problem is because the PIP, that investment memo to your superiors at the investment committee, had the 10.9 price in it and not the 12; right?

A. Correct.

Q. And so, what's happening here is even though you had agreed

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1     Rabin - Cross     Page 485

to this 12, the PIP had already been submitted at 10.9, right?

A. Again, I don't remember what exact numbers were on the PIP but what it says here, I do agree.

Q. And again, if you could look at the next paragraph you are saying: Again, this is an amazing deal?

A. Yes.

Q. And at the bottom you say: We need this deal and it makes so much sense because of the put.

Do you see that?

A. Yes.

Q. And again, just for the jury, what the put means is that if these brands don't work out, if this deal doesn't work out, you can put the whole deal back to Iconix and get paid for it, right?

A. Correct.

Q. So, you have no downside risk, correct?

A. Correct.

Q. So there was no overpayment, correct?

A. Correct.

Q. We can take that down.

And just to tie this first deal up, the $2 million that was coming back to you, that was for work that you had done between July and September or October when the deal closes, correct?

A. I don't remember the exact dates but it was work that we

MB45col1     Rabin - Cross     Page 486

had done in a certain time frame, yes.

Q. And there was a lot of work done to try to do due diligence to make sure that this was going to be a good deal for you all, right?

A. Yes.

Q. You had to travel throughout Asia and make sure that the brands were on the ground and talk to licensees, correct?

A. Correct.

Q. And so you got this $2 million coming back to your company and there was nothing wrong with that, right?

A. Correct.

Q. And, in fact, you get contributions from business partners all the time on deals, do you not?

A. Not all the time, no.

Q. Do you get them on occasion? From Disney, TLC, and other companies?

A. I don't -- I don't -- the word "contribution," it depends what it means. I know what it means but I don't know if I agree with what you are saying.

Q. All right. Well, let's call up Defendant's Exhibit 1082A-1. Without objection, I move it in.

THE COURT: Any objection?

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1082A-1 received in evidence)

MB45col1     Rabin - Cross     Page 487

BY MR. MARKUS:

Q. Do you see this chart in evidence called Deal Status for the Remaining 2013 Payments Versus Contribution Pickup?

A. Yes.

Q. And do you see where it says: Iconix JV, the 2013 payment was 5.5.

Do you see that?

A. Yes.

Q. Because the whole $12 million wasn't going to be due in 2013, correct?

A. Correct.

Q. It was going to be made in certain payments, right?

A. Yes.

Q. And so, had you to pay 5.5 to Iconix as part of the JV deal, correct?

A. That's what this shows, yes.

Q. And you see in the next column where it says 2013 contribution pickup, you were getting $2 million back from Iconix, correct?

A. Correct.

Q. Nothing wrong with that, right?

A. No.

Q. And you did deals with Playboy and licensing projects, TLC, also where you would be paying out $10 million and $40 million.

Do you see that?

MB45col1     Rabin - Cross     Page 488

A. Yes.

Q. And do you see that you would be getting contribution pickups of $9.2 and $17 million?

A. I don't know if these deals actually ever happened.

Q. Did you say you don't know if these deals actually happened?

A. Yes.

Q. Well, fair to say that there is nothing wrong with getting a contribution pick up from your business partners, correct?

A. From what -- the word "contribution," but yes.

Q. Let me ask you this, Mr. Rabin. Is there anything unusual with you or LF/GBG getting marketing contributions from your business partners? There is nothing unusual about that, correct?

A. Correct.

Q. Even if it's not in the original contract, there is nothing unusual about it, correct?

A. Correct.

Q. In other words, if you have a deal with a partner for X amount of dollars, you may go to that partner later and say, Hey, Disney; Hey, Iconix; Hey, TLC; we need some marketing money, we need some contributions here; correct?

A. Correct.

Q. And you yourself, Mr. Rabin, have gone to business partners and asked for marketing contributions even when it's not in the

# A-703

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1    Rabin - Cross    Page 489

contract; correct?

A. Correct.

Q. Now, when you do that, Mr. Rabin, there is no obligation for your business partner to pay those marketing contributions, correct?

A. Correct.

Q. You are making an ask of your business partner, correct?

A. Correct.

Q. And sometimes they pay it and sometimes they don't; right?

A. Correct.

Q. And when you are talking about the contributions from Iconix that you asked for, sometimes they did it and sometimes they didn't; right?

A. Correct.

Q. And the reason you ask is because sometimes good business partners do things that aren't in the contract; right?

A. Correct.

Q. Now, if you asked Iconix to make a contribution that wasn't in the contract and Iconix said, no; you couldn't go to court and sue them, could you?

A. No.

Q. You can only obligate them for things in the contract; right?

MR. THOMAS: Objection, your Honor. Calls for legal conclusion.

MB45col1    Rabin - Cross    Page 490

THE COURT: Overruled.

BY MR. MARKUS:

Q. You can answer, sir.

A. Say the question again?

Q. Sure. In your mind you could only obligate Iconix or other business partners only for things in the contract with the business parters, correct?

A. What was the first?

Q. Obligate, in other words force them to pay.

A. Yes.

Q. Sorry.

A. Correct.

Q. When you, as a good business partner, ask your other good business partner, hey, I need some help on the marketing or I need some help with the showroom, if they agree to do it they're doing it because of the relationship, correct?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

BY MR. MARKUS:

Q. You can answer, sir.

A. Correct.

Q. And you have sent invoices, or your company has sent invoices to numerous companies for marketing contributions when those asks are not in the contract. Am I right?

A. Correct.

MB45col1    Rabin - Cross    Page 491

Q. I mean, you have asked, for example, Spyder Brands, you have asked for money for Marilyn Monroe, Authentic Brand Groups; different companies you have asked for marketing help, correct?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: Perhaps. I don't remember exactly, but perhaps. It is possible.

BY MR. MARKUS:

Q. By the way, even after Neil Cole leaves Iconix, you still ask Iconix for marketing contributions, even after he left; correct?

A. I don't remember.

Q. You don't remember whether you have asked Iconix for marketing contributions since Neil Cole left?

A. Correct.

Q. If we could show just the witness and the government table Defendant's Exhibit 1706A?

Take a look at this exhibit that is in front of you and see if it refreshes your recollection.

A. I see that.

Q. I'm sorry?

A. What is your question?

Q. Does this refresh your recollection that even after Mr. Cole left, as recent as 2018, you were asking Iconix for

MB45col1    Rabin - Cross    Page 492

marketing money that was not in a contract?

A. I don't remember this but I see it.

Q. This text message from you doesn't refresh your recollection?

MR. THOMAS: Objection, your Honor, to the description.

THE COURT: Sustained.

BY MR. MARKUS:

Q. This doesn't refresh your recollection, sir?

A. No, sir.

Q. OK. We can take that down.

I want to ask you for a moment about Seth Horowitz. Do you know who he is?

A. Yes.

Q. Who is he?

A. He used to work at Iconix.

Q. Before he worked at Iconix, did you ever have dealings with this man Horowitz? Mr. Horowitz?

A. Yes.

Q. And when he worked at a company called Modell's --

A. Yes.

Q. -- you didn't like dealing with Mr. Horowitz, did you?

A. No.

Q. He was a pain, wasn't he?

A. I mean, I don't know what the word pain means, but.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col1          Rabin - Cross          Page 493

Q. Well, let me ask you this. Did he have a huge ego?
A. Yes.
    MR. THOMAS: Objection, your Honor.
    THE COURT: Overruled.
BY MR. MARKUS:
Q. And the truth is, you could not stand working with Seth Horowitz, correct?
A. Correct.
Q. All right. Let's move on to SEA-2. Would you agree with me, Mr. Rabin, that you were less involved with SEA-2 than you were with SEA-1?
A. Yes.
Q. This was a deal, do you remember, that closed towards the end of June 2014?
A. Yes.
Q. And this was a crazy time for both you and your company; correct?
A. Yes.
Q. I mean, you have those horrible health issues; right?
A. Yes.
Q. And so you were, of course, focused primarily on your health, which is understandable, right?
A. Yes.
Q. And the company Li & Fung was spinning out another company called GBG, right?

MB45col1          Rabin - Cross          Page 494

A. Correct.
Q. What does it mean to spin out a company?
A. To basically separate the company from the original company.
Q. And, by the way, this company that was going to be separated out was going to be a publicly-traded company, correct?
A. Correct.
Q. And you were going to have a major role at it, right?
A. I had the same role that I had at Li & Fung, but.
Q. What was your role at this new company GBG?
A. At that time I believe I was still CMO.
Q. And did you work your way up?
A. Eventually.
Q. To what?
A. President.
Q. So you ended up being president of this new publicly-traded company called GBG, right?
A. Correct.
Q. And there is lots of issues with spinning out a new company, getting it started, you being on the ground for this new company, correct?
A. Correct.
Q. And you are not only dealing with all of this new stuff with the new company but you are also dealing with your health

MB45col1          Rabin - Cross          Page 495

issues, right?
A. Yes.
Q. You are not primarily focused on the amendment to the Southeast Asia joint venture, correct?
A. I mean, quantify the word -- would you say it again?
Q. Do you remember all the deals about SEA-2, sir?
A. No.
Q. Do you remember that SEA-2 initially had three components to it; Europe, Korea, and Lee Cooper?
A. Correct.
Q. And do you remember that the original price being discussed for these three components was $24.9 million?
A. The total price $24.9 million? I don't remember that exact price, no.
Q. Do you remember that at some point of these three components -- Europe, Korea, and Lee Cooper -- that Lee Cooper had to come out of the deal?
A. I don't remember that.
Q. You don't remember that -- well, do you remember that Lee Cooper was an important part of the deal for your company GBG?
A. I don't remember.
Q. Do you remember that the terms of the SEA deal changed to reduce the price from 24.9 to something less?
A. I don't remember.
Q. And so, all these things that you don't remember, are you

MB45col1          Rabin - Cross          Page 496

still saying that we should rely on your memory for events that happened regarding SEA-2?
    MR. THOMAS: Objection, your Honor.
    THE COURT: Sustained.
BY MR. MARKUS:
Q. Do you remember -- well, let me show you the initial PIP for this deal which is at 1233A. Let's just show the witness and the government, if we could. Defendant's Exhibit 1233A, do you see that on your screen, sir?
A. Yes.
Q. Do you see in the middle where it says: Size of the amendments, Korea Brands --
    MR. THOMAS: Objection, your Honor, to the reading from the document. It is not in evidence.
    MR. MARKUS: I apologize. I will withdraw that, you are right.
Q. Does that refresh your recollection about what was in the original deal?
A. No.
Q. I'm sorry?
A. No.
Q. This doesn't refresh your recollection?
A. It doesn't.
Q. OK. We will take it down.
    MR. MARKUS: Let's call up the final PIP, which I

# A-705

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB45col1 | Rabin - Cross | Page 497 |
| --- | --- | --- |

believe there is no objection to, Defendant's Exhibit 1312A-1.

THE COURT: Any objection?

MR. THOMAS: No objection, your Honor.

THE COURT: It will be received.

(Defendant's Exhibit 1312A-1 received in evidence)

BY MR. MARKUS:

Q. This is the final PIP, sir. Do you recognize this document?

A. I recognize it. I don't remember it but I recognize it.

Q. Do you see who it is from, from Dow Famulak and you?

A. Yes.

Q. And do you see at the top where it says the date of PIP 1 was June 18th and the date of this PIP, PIP 2, was June 27?

A. Yes.

Q. In other words, this memo, the preliminary investment proposal had been amended, correct?

A. Correct.

Q. And you are saying you don't remember how it was amended?

A. Correct.

Q. Well, let's scroll down and see if we can get through it. Do you see that in the executive summary under A it talks about Korea brands?

A. Yes.

Q. And B talks about Europe brands?

A. Yes.

| MB45col1 | Rabin - Cross | Page 498 |
| --- | --- | --- |

Q. Now, you don't see anything there regarding Lee Cooper, do you?

A. No.

Q. Do you see where it says in the box there, size of the amendments, that the Korea brands were going to be $8.3 million and the Europe brands were going to be $7.6 million?

A. Yes.

(Continued on next page)

| MB4YCOL2 | Rabin - Cross. | Page 499 |
| --- | --- | --- |

BY MR. MARKUS:

Q. The total consideration was $15.9 million. Right?

A. I see that.

Q. Now, what you're doing here is you're sending a summary of the SEA-2 deal to your superiors. Correct?

A. I don't know if I sent this. I'm sorry.

Q. Well, it says from you at the top; right?

A. It either said from me or from Dow.

Q. From Dow and you.

A. I don't remember. He may have sent it and attached my name to it.

Q. In any event, this pip, you know, gets sent to the investment committee; correct?

A. Correct.

Q. And the investment committee has to approve this deal; correct?

A. Yes.

Q. By the way, who was Dow Famulak?

A. He was president of the Global Brands Group.

Q. And what the president of the Global Brands Group and you are telling the investment committee is that here are the terms for SEA-2. Correct?

A. Correct.

Q. Total consideration, $15.9 million. Correct?

A. Correct.

| MB4YCOL2 | Rabin - Cross. | Page 500 |
| --- | --- | --- |

Q. Now, there is nothing in this document that says Iconix will be kicking you back money. Correct?

A. Correct.

Q. There's nothing in here that says Iconix will be paying $5 million in marketing. Correct?

A. Correct.

Q. The investment committee sees the deal as $15.9 million. Correct?

A. Correct.

Q. And they approve it. Correct?

A. Correct.

Q. So your investment committee says, we believe $15.9 million is a fair price for Korea and Europe brands. Correct?

MR. THOMAS: Objection, your Honor. Calls for hearsay.

THE COURT: Sustained.

BY MR. MARKUS:

Q. Do you know whether this deal gets approved at $15.9 million?

A. No. I don't remember.

Q. Whatever the price it gets approved at, the process would be that the investment committee reviews this memo and decides whether to approve it or not. Is that correct?

A. Yes.

Q. So if they believed it was a good deal, they approve it;

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                          November 4, 2022

| MB4YCOL2 | Rabin - Cross. | Page 501 |
|---|---|---|

right?

A. Correct.

Q. So they believed, when they approved this, that $15.9 million is a fair deal. Correct?

A. I just don't remember these numbers. So it's throwing me off. I'm sorry.

Q. Whatever the final number is, if they approve it, they give their stamp of approval on it; right?

A. Rightest.

Q. And, by the way, the process of approval, this wasn't kind of a rubber stamp. They examine it; right?

A. Correct.

Q. Because this is a very successful company, Li & Fung GBG; right?

A. Correct.

Q. They've been around for 100 years; right?

A. Yes.

Q. They're not going to approve a deal willy-nilly, are they?

A. No.

Q. They're going to make sure that the deal is a really fair deal; right?

A. Yes.

Q. And there's no mention of this pip of any marketing money coming back to you all; correct?

A. Correct.

| MB4YCOL2 | Rabin - Cross. | Page 502 |
|---|---|---|

Q. So even without the marketing money coming back to you all, the investment committee, the higher-ups, the bigwigs, believed this was a good deal. Correct?

A. Correct.

Q. And there was no commitment for the money to come back; correct?

A. Not correct.

Q. Is it in the pip?

A. It's not in the pip, no.

Q. Is it in the contract?

A. No.

Q. By the way, would it surprise you that during this time when you're out sick, that Mr. Cole is dealing with your bosses -- Bruce Rockowitz, Dow Famulak and Ron Ventricelli?

A. What was the first part of the question?

Q. Would it surprise you that during this time period of SEA-2 that you're having trouble remembering that Mr. Cole was discussing these transactions with your bosses?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

BY MR. MARKUS:

Q. Would that surprise you, sir?

A. It would not surprise me, no.

Q. I'm sorry?

A. He could be dealing with them.

| MB4YCOL2 | Rabin - Cross. | Page 503 |
|---|---|---|

Q. I'm going to show you now -- and if I may have one moment, your Honor.

I'm going to show just you at this point and the government Defense Exhibit 1258.

This is an email from one of your bosses to you. Correct?

A. It wasn't my boss, but it's a co-worker, yes.

Q. Who is Ron Ventricelli?

A. The company CFO.

Q. Is this an email that you received?

A. Yes.

Q. During the time of SEA-2?

A. Yes.

MR. MARKUS: Judge, I'd move in Defense Exhibit 1258 at this point.

MR. THOMAS: Objection, Judge. This is the issue we raised this morning.

THE COURT: Sustained.

BY MR. MARKUS:

Q. Does this email refresh your recollection that Mr. Cole was discussing the terms of SEA-2 with folks like Dow Famulak and Ron Ventricelli?

A. I'm sorry. It does not refresh my memory.

Q. It does not?

A. It does not.

| MB4YCOL2 | Rabin - Cross. | Page 504 |
|---|---|---|

Q. Seeing an email doesn't refresh your memory?

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

BY MR. MARKUS:

Q. By the way, during this time period, Mr. Rabin, are you aware that your company acquired another company called Coco Bahn?

A. I don't remember. No.

Q. Do you know what Coco Bahn is?

A. I don't remember.

Q. Do you remember that Li & Fung bought Coco Bahn which was a huge marketing company in Korea?

A. Yes. I'm aware of that.

Q. Are you aware that that company made the Korea brands that you were acquiring in the joint venture more valuable?

A. Yes.

Q. Did you discuss the increase in value in Korea because of that purchase with your bosses, Dow Famulak, and others?

A. I don't remember.

Q. Do you remember that there was a discussion about the value of Korea moving up from $3 million to $8 million because of the acquisition of Coco Bahn?

MR. THOMAS: Objection, your Honor. Hearsay. Foundation.

THE COURT: Sustained.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB4YCOL2 | Rabin - Cross. | Page 505 |
|---|---|---|

BY MR. MARKUS:

Q. Going back to the pip that we discussed for a moment, you would agree that the pip was accurate and complete to your bosses. Correct?

A. I don't know which pip you're talking about.

Q. The one that we just had the screen a few moments ago.

Do you remember that --

A. I don't remember that pip. So it's hard for me to say anything.

Q. Let's take a step back, Mr. Rabin.

A. Sure.

Q. Let's talk about pips in general.

A. Sure.

Q. When you submit a pip to the investment committee, a memo about the investment, you want to make sure, in general, that it's complete and accurate. Right?

A. Yes.

Q. You don't want to leave out any terms; correct?

A. Correct.

Q. Because you want to make sure that whatever gets approved is the final deal. Correct?

A. Correct.

Q. Let's talk about the final deal for SEA-2.

Your Honor, at this point, I'd move in Defense Exhibit 303A2 and 303A1 I believe without objection.

| MB4YCOL2 | Rabin - Cross. | Page 506 |
|---|---|---|

MR. THOMAS: No objection, your Honor.

THE COURT: They will be received.

(Defendant's Exhibits 303A2 and 303A1 received in evidence)

MR. MARKUS: All rightful let's call up 303A2 first.

Q. Now, do you see at the top the date is June 30, 2014?

A. Yes.

Q. So this is SEA-2; correct?

A. I believe so, yes.

MR. MARKUS: If we could look at the second paragraph.

Q. Do you see here the terms of the deal discussed that the parties deemed the deal to have a fair market value of 31 plus million dollars?

Do you see that?

A. Yes.

Q. And so for you to acquire 50 percent interest in the JV, you would have to pay $15.9 million.

Do you see that in the last line there?

A. Yes.

Q. And the parties agreed that this was the fair market value; correct?

A. Yes.

Q. And this deal was approved by your investment committee, lawyers, and accountants; correct?

A. Again, I don't remember this. So it's hard for me to say

| MB4YCOL2 | Rabin - Cross. | Page 507 |
|---|---|---|

who approved it because I don't remember those numbers.

Q. Do you dispute the numbers in the final deal, sir?

A. I don't, no.

MR. MARKUS: Okay. Let's turn to the next page.

Q. Do you see at the very top, A, B, C, and D, how payments were going to be made to Iconix each year of $3.9 million?

A. Yes.

Q. And so $15.9 million wasn't going to be due all at once, was it?

A. No.

Q. All right. And do you also see in the next paragraph that there are minimum guarantees to your company in year one of $1.5 million and $1 million?

A. Yes.

Q. And so what that means for the jury is that in year one, the minimum royalties that you would get from this deal is $1.5 million. Right?

A. Yes.

Q. And in year two, it's $1 million. Right?

A. Yes.

Q. So we're going to work out the math in a moment. But this year one, you're only paying 3.9, and you're guaranteed back 1.9. Is that right?

A. Yes.

Q. If we go to the bottom of this document, do you see in this

| MB4YCOL2 | Rabin - Cross. | Page 508 |
|---|---|---|

paragraph where it says: "This letter agreement?"

A. Yes.

Q. Now, what this is, Mr. Rabin, is this is the integration clause that says: "This constitutes the entire agreement."

Do you see that four lines down?

A. Yes.

Q. "It supersedes all prior agreements and undertakings, both written and oral, among the parties."

Do you see that?

A. Yes.

Q. And there's nothing in this deal document that mentions $5 million coming back to your company; correct?

A. Correct.

Q. This is the whole deal; correct?

A. Again, I don't remember this exact. I am seeing what you're showing me, but I don't remember these numbers. So I --

Q. Okay. Fair enough.

Let's look at 303A1.

If we look at -- this is the shareholders' agreement; correct?

A. Yes.

MR. MARKUS: If we look at DX303A1, 27.

Q. Do you see in the middle there that this is the entire agreement?

A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                                    **November 4, 2022**

| MB4YCOL2 | Rabin - Cross. | Page 509 |
|---|---|---|

Q. In other words, what's in the contract is the whole thing; right?
A. I see what it says, yes.
Q. If it's not in the contract, it's not part of the deal. Correct?
A. That's what this says, yes.
Q. And this is the binding contract on the parties; correct?
A. Correct.
Q. Now, I just want to go through the math here.
     If we could take that down for a second. This is why I'm a lawyer. I'm not great at math.
     But I do want to talk just briefly about how the numbers work because 15.9 was a really good deal for your company, was it not?
A. The numbers -- I'm sorry. The numbers don't come into my head. 15.9.
     MR. MARKUS: Let's go back to 303A2 for a second.
Q. Mr. Rabin, do you see here in paragraph 2 that the final price that you're going to be paying is $15.9 million for your portion of the JV?
A. Yes.
Q. I'm sorry?
A. I see that, yes.
Q. You have to speak up just a little.
A. I'm sorry. I do see that.

| MB4YCOL2 | Rabin - Cross. | Page 510 |
|---|---|---|

Q. So will you agree with me that that's the final price of SEA-2?
A. Yes.
Q. And will you agree with me that that's a good price for your company? Correct?
     Let's go through the math then. Turn to page 2 of it. In the first year of that 15.9, you're only paying 3.9. Right?
A. Yes.
Q. And of that 3.9, we've already seen that you're going to get 1.5 million back. Right?
A. Correct.
Q. So really, your company is only out of pocket what? What is that? 2.4?
A. Close, yeah.
Q. Close.
     And in the second year, you're getting back a million. Right?
A. That's what it says, yes.
Q. And I want to be very clear on this. At the end of five years, you could put the company back to Iconix for $7.6 million. Right?
A. If that's what it says. I don't remember.
Q. Let's look at the contract then. If we could call up 303A1.
     And at page 22, do you see right in the middle of that

| MB4YCOL2 | Rabin - Cross. | Page 511 |
|---|---|---|

page under big A, do you see that $7.6 million figure at the bottom there?
A. Yes.
Q. That's the put. Right?
     Do you not remember any of this, sir?
A. No. I remember a lot of it. There's one part that I remember that we're not discussing.
Q. We're going to get there. But I want to talk about the numbers.
     Do you remember the $7.6 million guarantee put price in the contract?
A. No, I do not remember that number.
Q. Do you remember that there was a put price for this deal?
A. I remember there was a put to the deal. I don't remember the put price.
Q. And you see here that the put price was $7.6 million. Right?
A. Yes.
Q. So with $7.6 million and $2.5 million in guarantees, you know for sure that at the end of five years, you're going to be guaranteed, guaranteed, $10.1 million. Right?
A. Yes.
Q. So the purchase price is $15.9 million that we just saw a second ago. Correct?
A. Correct.

| MB4YCOL2 | Rabin - Cross. | Page 512 |
|---|---|---|

Q. So the only downside to your company is $5 million. Correct?
A. From that math, you are correct.
Q. And that's a great deal for your company; correct? There is almost no risk.
     MR. THOMAS: Objection, your Honor. Compound.
     THE COURT: Overruled.
     THE WITNESS: From what you're saying, you are correct, from what you're saying. But that's not the deal.
BY MR. MARKUS:
Q. Sir, I'm looking at the contract and the terms of the contract. We agree that the terms of the contract are 15.9. Right?
A. Yes.
Q. And that at the end of five years, you're guaranteed 10 million-plus dollars back. Right?
A. Correct.
Q. So on the terms of the contract -- put aside the marketing for a second. We're going to talk about that. Put aside the marketing.
     On the terms of the contract, this is a great deal for your company; right?
A. In terms of the contract, yes.
Q. Because there's no downside risk.
A. There's $5 million.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB4YCOL2          Rabin - Cross.          Page 513

Q. That's it. With huge upside; right?
A. Correct.
Q. So this was a good deal for you, was it not?
A. Correct.
Q. This was not an overpayment, was it, sir?
A. There was $5 million coming back from marketing.
Q. Let's talk about that.
   If $5 million was guaranteed to come back to you, then there would be zero risk. It would be 15 and 15. Correct?
A. Correct.
Q. Is Mr. Cole in the business of charity?
   MR. THOMAS: Objection, your Honor.
   THE COURT: Sustained as to form.
BY MR. MARKUS:
Q. Do you think, if Mr. Cole guaranteed you $5 million back so at the end of five years you were going to get $15 million back, that that deal would make any sense at all to Mr. Cole and Iconix? Any sense at all, sir?
   MR. THOMAS: Objection, your Honor.
   THE COURT: Sustained.
BY MR. MARKUS:
Q. Do you think it would make sense, sir?
A. That's his choice.
Q. Even under the terms of the contract without the $5 million in marketing, this was a good deal for your company, was it

MB4YCOL2          Rabin - Cross.          Page 514

not?
   MR. THOMAS: Objection. Asked and answered.
   THE COURT: Overruled.
   THE WITNESS: Under the terms of the contract, yes.
BY MR. MARKUS:
Q. Just so the jury is clear, it was a good deal for your company because there was tons of upside; right?
A. Yes.
Q. And almost no downside risk, a couple million bucks. Right?
A. In the contract, yes.
Q. So under the terms of the contract, this was not an overpayment. Correct?
A. Under the terms of the contract?
Q. So anybody viewing the terms of the contract, say, for example, Mr. Cole, he would not view this as an overpayment, would he?
   MR. THOMAS: Objection, your Honor. Calls for speculation.
   THE COURT: Sustained.
BY MR. MARKUS:
Q. You don't view it as an overpayment, do you?
A. No.
Q. Now, we've talked about this $5 million that you say was promised to you. We can all agree -- everybody in this

MB4YCOL2          Rabin - Cross.          Page 515

courtroom can agree -- it's not in the contract. Correct?
A. Correct.
Q. And we all agree that what's in the contract is the entire agreement; correct?
A. Correct.
Q. So you if you were to sue Mr. Cole for that $5 million, you wouldn't get that, would you?
   MR. THOMAS: Objection, your Honor.
   THE COURT: Sustained.
BY MR. MARKUS:
Q. In your mind, is there any way legal way you could force Mr. Cole to pay you that 5 million bucks?
A. No.
Q. Because all of the actual obligations are in the contract; right?
A. Correct.
Q. Now, we've looked at lots of emails from you to your supervisors, to your colleagues, to your superiors.
   Is there one email, sir, one email from you, that says, Mr. Neil Cole promised me $5 million?
A. I don't know.
Q. Certainly the government would have shown it to you; right?
   MR. THOMAS: Objection, your Honor.
   THE COURT: Sustained.
BY MR. MARKUS:

MB4YCOL2          Rabin - Cross.          Page 516

Q. Have you seen one?
A. I don't remember.
Q. Have you seen a text message that says Mr. Cole promised $5 million more?
A. I don't recall, but I'm not -- I don't remember.
Q. Do you remember any piece of paper anywhere in the world where you say, Mr. Cole promised me $5 million back?
A. I don't remember, no.
Q. Let's look at the exhibits that the government showed you yesterday regarding phone calls with Mr. Cole, Government Exhibit 1288, 1289, and 1240. These are all in evidence. Let's start with Government Exhibit 1288.
   Do you remember the government showed you this email?
A. Yes.
Q. Do you see here where you're saying to Mr. Cole: "Let me know when you're free"?
A. Yes.
Q. And Mr. Cole responds "Now is good"?
A. Yes.
Q. What did you discuss on that call?
A. I don't remember.
Q. So why did the government show it to you yesterday?
   MR. THOMAS: Objection, your Honor.
   THE COURT: Sustained.
BY MR. MARKUS:

# A-710

MB4YCOL2          Rabin - Cross.                    Page 517

Q. You have no recollection what this was about; right?
A. No.
Q. It could have been about the Nets; right?
A. That's possible.
Q. Not that they're doing too good this year.
A. Definitely not.
Q. Let's look at 1289.
   Do you remember the government showed you this email?
A. Yes.
Q. It's an email where you're asking Neil if he's free for a call; right?
A. Yes.
Q. What was the call about?
A. I don't know.
Q. So why did we talk about this email yesterday?
   MR. THOMAS: Objection, your Honor. Sidebar.
   THE COURT: Objection sustained.
   MR. MARKUS: I'll move on.
Q. Let's talk about Government Exhibit 1040.
   Do you see here in the email where you're asking Mr. Cole if he's free to talk?
A. Yes.
Q. Do you remember what that phone call was about?
A. No.
   MR. MARKUS: We can take that down.

MB4YCOL2          Rabin - Cross.                    Page 518

Q. My last questions regarding SEA-2, Mr. Rabin, are, again, about these marketing deals.
   Mr. Rabin, when your company wants to have marketing money guaranteed in a deal, it knows how to put that in a contract. Correct?
A. Correct.
Q. We saw that in is SEA-1 where the contract talked about $2 million coming back; right?
A. Yes.
Q. And, by the way, you've done that in other deals where you've put in contracts that the company you have on the other side is required to pay money to build a showroom out. Correct?
A. Correct.
Q. For example, there are contracts where you have the other company agreeing to pay $3.5 million for example in marketing or building a showroom, etc. Right?
A. I don't remember. But --
Q. It's not uncommon to have those kinds of terms in the contract; right?
A. Correct.
Q. And when it's in the contract, you can force the other side to pay; correct?
A. Correct.
Q. By the way, do you remember that on October 1, 2021, when

MB4YCOL2          Rabin - Cross.                    Page 519

you met with the government about a year ago, you told them that Iconix had no obligation to pay the marketing invoices that were sent?
A. No.
Q. You don't remember that?
A. I don't remember, no.
Q. Do you remember that they got upset with you when you told them that?
A. No.
Q. Let's talk about the invoices for a moment, Mr. Rabin.
   Do you believe that the invoices, the marketing invoices that were sent to Iconix, were phony or fraudulent invoices?
A. No.
Q. So those marketing invoices that you all sent to them, there was nothing phony or fraudulent about them. Correct?
A. Correct.
Q. And to take a step back for a second, in these deals, Mr. Rabin, it's important to market the brands. Right?
A. Correct.
Q. Because you want them to be successful; right?
A. Correct.
Q. And so you told Mr. Cole that you needed marketing money to be spent on the brands. Right?
A. Yes.

MB4YCOL2          Rabin - Cross.                    Page 520

Q. And Mr. Cole told you, send invoices over. Correct?
A. Yes.
Q. And when the invoices were sent over, they were initially for just 5 million flat. Right?
A. I don't remember exactly, but -- I don't remember exactly how they were sent over.
Q. Do you remember that Mr. Cole sent back. And he said, no, no, no, Mr. Rabin. I need to see what the real work was on marketing.
   This has to be real; right?
A. Yes, in order to be counted.
Q. He asked you for more specifics on these invoices; right?
A. Correct.
Q. He didn't just write you a check; right?
A. Correct.
Q. I take it if he would have promised you $5 million in the past, he could have just cut you a check for $5 million. Right?
A. I don't know.
Q. That's not the way it happened; right?
   MR. THOMAS: Objection, your Honor.
   THE COURT: Overruled.
   THE WITNESS: That's not the way what happened?
BY MR. MARKUS:
Q. Let me ask you this, Mr. Rabin: After Mr. Cole asked you

# A-711

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

---

MB4YCOL2     Rabin - Cross.     Page 521

for more detail on the invoices, did the invoices that got sent total $5 million, or did they total $5.4 million?

A. I don't remember.

Q. Do you remember that it did not equal $5 million anymore?

A. No.

Q. Do you remember speaking with the marketing team at GBG and saying, we need to send specific and detailed invoices to Iconix?

A. Yes.

Q. And did you ever ask anyone at your company to create fake invoices?

A. No.

Q. Were these real invoices?

A. Yes.

Q. For real marketing work?

A. Yes.

Q. Okay. Last area, SEA-3. We're getting there.

A. Okay.

THE COURT: Actually, let's take our first break. It's 11:00, ladies and gentlemen. We'll get back together at 20 after the hour. Do not discuss the case.

(Continued on next page)

---

MB4YCOL2     Rabin - Cross.     Page 522

(In open court; jury not present)

THE COURT: You may step down, Mr. Rabin.

(Witness temporarily excused)

THE COURT: Everyone can be seated.

Any issues to raise, Mr. Thomas?

MR. THOMAS: Your Honor, we just want to point out that there have been a number of dramatic episodes, some of which speak to the government's intentions. It makes for good theater but bad law. We'd ask the Court to direct Mr. Markus to focus on the evidence.

THE COURT: I don't know that it's been all that dramatic.

But I will say this, Mr. Markus -- and I meant to say it with respect to you as well, Ms. Moss -- there are is some editorializing that preface your questions like: "This is very important," things of that nature. Try to not do that.

MR. MARKUS: Fair enough.

THE WITNESS: Your Honor. This is so tedious, these documents, that I try to tell the jury when something is important. But I understand the Court's point.

THE COURT: Very well. Anything for you to raise?

MR. MARKUS: No, Your Honor.

THE COURT: Okay. Twenty minutes. Don't be late.

MR. THOMAS: Thank you, your Honor.

(Recess)

---

MB4YCOL2     Rabin - Cross.     Page 523

(Continued on next page)

(In open court; jury present)

THE COURT: Everyone be seated.

Mr. Markus.

MR. MARKUS: Good morning, Mr. Rabin, counsel, your Honor.

Q. Before we get to SEA-3, which is the last area, just a quick question about Peanuts.

Do you remember that was a deal you had with Neil Cole and Iconix?

A. Yes.

Q. And from time to time with the Peanuts brand, you all would ask for marketing support from Iconix. Correct?

A. I don't remember.

Q. Do you remember that you would ask for marketing support that was not in the contract?

A. I don't remember.

Q. If you did ask for marketing support that was not in the contract, there would be nothing wrong with that. Right?

A. Nothing wrong with that, no.

Q. Okay. Let's talk about SEA-3.

SEA-3 was a deal -- do you remember when that closed?

A. The end of -- maybe the third quarter, third quarter of '14.

Q. Do you remember what that deal involved? What companies.

---

MB4YCOL2     Rabin - Cross.     Page 524

A. Yes.

Q. Go ahead.

A. Lee Cooper and Umbro for greater China.

Q. Were you more involved or less involved with SEA-3 than SEA-2?

A. Less involved.

Q. So this deal, SEA-3, was the last involved you were. Correct? Of 1, 2, and 3.

A. Correct.

Q. Now, we heard yesterday you were asked questions about Rocawear Kids.

Do you remember that?

A. Yes.

Q. Now, in 2014, was it your view that there was what's called a royalty shortfall with Rocawear Kids?

A. Yes.

Q. And just so the jury understands what that means, that means that the brand isn't meeting its guaranteed minimum. Correct?

A. Correct.

Q. And so you were hoping that Iconix would help you out by finding a replacement. Correct?

A. Explain that again.

Q. You explain it. Let me ask you: What were you expecting from Iconix with Rocawear Kids?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB4YCOL2 | Rabin - Cross. | Page 525 |

A. To help relieve the shortfall.

Q. What does that mean?

A. Reduce the financial exposure to the company.

Q. So when you asked your close business partner for help, you thought most brand owners might help you out with that. Right?

A. Yes.

Q. Now, there was no business obligation, there was no contractual obligation, to help you out with that. Right?

A. That's correct.

Q. But a company might agree to help preserve and protect the relationship between the two companies. Right?

A. Correct.

Q. But I want to be very clear, Mr. Rabin.
Was the Rocawear Kids ever terminated? In 2014 or 2015, was it ever terminated?

A. I believe so.

Q. You think it was terminated in 2014 or 2015?
That your testimony?

A. To the best of my memory, yes.

Q. Do you remember testifying in a prior proceeding in this matter?

A. Yesterday?

Q. No. About a year ago.

A. Which matter?

Q. Do you not remember testifying in a prior proceeding?

| MB4YCOL2 | Rabin - Cross. | Page 526 |

A. I do remember testifying, yes.

MR. MARKUS: May I have a moment, your Honor?

THE COURT: Yes.

(Pause)

BY MR. MARKUS:

Q. Do you remember that the minimums for Rocawear Kids continued to be paid in 2014 and 2015?

A. I didn't remember that we were -- I didn't remember that we were still paying them, no.

Q. You do not remember that?

A. What's the question?

Q. Do you remember whether GBG, your company, continued to pay the Rocawear minimum guaranteed royalty payments to Iconix?

A. Looking at something, I remember -- looking at something, I could see that we paid them. I don't remember about those deals at that time.

Q. Isn't it true, sir, that one year ago, you testified in a prior proceeding:
"Q. "GBG continued to pay its royalty obligations under the Rocawear Kids license agreement. Right?
You answered:
"A. "Correct."

A. That's possible.

Q. Do you remember?

A. No.

| MB4YCOL2 | Rabin - Cross. | Page 527 |

Q. Do you remember when asked:
"Q. "It was not terminated in 2014; right?"
"A. Possibly.
"Q. It was not terminated in 2015.
"A. I don't know."
You answered those questions in a prior proceeding a year ago under oath. Correct?

A. Yes.

Q. And finally, sir, when asked: "Well, Mr. Rabin, you know that GBG continued to make the minimum payments due under the Rocawear Kids license agreement?"
You answered: "Yes."
Correct?

A. I don't remember.

Q. Sir, yesterday you testified.
When the government was asking you questions about SEA-3, did you ever once say you didn't remember when they were asking you questions?

A. It depends on the question they asked.

Q. Do you remember what you said yesterday?

A. It depends on the question they asked.

Q. Do you recall, sir, that on SEA-3, there was a pip submitted, an investment memo, submitted to your superiors on the investment committee?

A. Sorry. What's the question?

| MB4YCOL2 | Rabin - Cross. | Page 528 |

Q. One moment, sir.

(Pause)

BY MR. MARKUS:

Q. My question is: Do you remember that there was a pip submitted on SEA-3 to your investment committee and your superiors?

A. Yes.

Q. And do you remember: What was the deal amount for? For SEA-3.

A. 21.5.

Q. $21.5 million?

A. Yes.

Q. And was there any mention in the investment memo to your superiors about Rocawear Kids or termination of that obligation?

A. No.

Q. And so your superiors saw that the price for SEA-3 was $21.5 million, and that was approved. Correct?

A. Yes.

Q. So that was the fair market value of that deal. Correct?

A. That was the price we paid for the deal.

Q. And that was the price that your superiors approved; correct?

A. Correct.

Q. Without any release of Rocawear Kids. Correct?

UNITED STATES OF AMERICA, v.
NEIL COLE,
November 4, 2022

---

MB4YCOL2          Rabin - Cross.          Page 529

A. From what the documents say, correct.

Q. And the documents are what needs to be approved by your superiors; correct?

A. Correct.

Q. If there were other material terms, that would be submitted to your superiors. Correct?

That's the whole purpose of the pip; right?

A. Correct.

Q. And there was anything in the pip about Rocawear Kids; correct?

A. Correct.

Q. And this was another great deal for your company, was it not?

A. Yes, it was.

Q. Putting aside the Rocawear Kids for a minute, the 21.5, you were excited about this SEA-3 deal. Right?

A. I was excited about the deal, yes.

Q. Because you believed that at $21.5 million, with or without Rocawear Kids, you and your company and Iconix were going to make a lot of money. Correct?

A. I believed it was a good deal, but I -- I believed it was a good deal and we could make a lot of money.

Q. Let's look at the specific terms of the deal.

Your Honor, at this point, we'd move in, without objection, Defense Exhibit 3304A2 and A3.

---

MB4YCOL2          Rabin - Cross.          Page 530

MR. THOMAS: No objection.

THE COURT: They will be received.

(Defendant's Exhibits 3304A2 and A3 received in evidence)

BY MR. MARKUS:

Q. Let's start with 304A2, sir.

Do you see, just like with SEA-2 and SEA-1 that we looked at, this is the final acknowledgment and consideration. Correct?

A. Yes.

Q. If we look at paragraph 2, we can see what the amount was. The fair market value in the very last line is the 21.5 that we see there; right?

A. Yes.

Q. So this document which was reviewed by all the lawyers and accountants -- we're not going to go through those emails again and see everybody copied.

But lots of folks reviewed that contract; correct?

A. Yes.

Q. And everyone who signs off, signs off on the fair market value being 21.5; correct?

A. Correct.

Q. And there's no mention of Rocawear Kids in here; correct?

A. Correct.

Q. And if we go to page 2, that 21.5 isn't going to be paid

---

MB4YCOL2          Rabin - Cross.          Page 531

all at once; correct?

A. Correct.

Q. There's a schedule of payments that we see there, A through H. Right?

A. Yes.

Q. In other words, the first payment is $4.3 million, and then we go down the list. Right?

A. Correct.

Q. And those payments are broken up over four years; right?

A. Yes.

Q. And in the next paragraph, we see that there are certain guarantees back to your company. So in the first year, you see that the guarantee is 2 million and. In the second year. 2.5 million and. In the third year, 300,000, a couple lines down; and in the fourth year, 335,000.

Do you see that?

A. Yes.

Q. So just to be clear for the jury, 15.9 -- I'm sorry. I'm still thinking of the last.

21.5 is going out; right?

A. Correct.

Q. Over four years. And in minimum distributions, you're getting back what? About 5.1?

A. Yes.

Q. That's the minimum. You could get a lot more than that;

---

MB4YCOL2          Rabin - Cross.          Page 532

right?

A. Yes.

Q. And there's also what's called a "put" in this deal; correct?

A. I believe so.

Q. If we look at 304A3, page 24, if we scroll down to the big A there at the bottom, do you see the put back is $15.5 million?

A. I see that.

Q. In other words, just so everybody understands, the minimum amount that you could get after five years is you could force Iconix to buy this all back for 15.5. Right?

A. Yes.

Q. And you've already gotten a minimum guarantee, the lowest amount, 5.1 that we saw before; right?

A. Yes.

Q. So 15.5 plus 5.1 is what? 20.6?

A. I think so, yes.

Q. And you've agreed to pay $21.5 million -- right? -- on this deal?

A. Yes.

Q. So just so everybody is clear, Mr. Rabin, the contract says you're paying 21.5 for these brands, and you're guaranteed a minimum back of 20.6. Right?

A. I don't know if it's guaranteed. I don't know if it's the

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB4YCOL2          Rabin - Cross.          Page 533

15.5 minus what was already paid. I don't know.

Q. This was a sick deal for your company; correct?

A. It was a good deal for the company.

Q. This was not an overpayment, was it?

A. In terms of what the contract shows, no.

Q. Well, let's take this Rocawear Kids. Let's assume that there was an obligation for a second releasing you from the $6 million in payments for Rocawear Kids.

Are we on the same page?

A. Yes.

Q. So that would mean that in addition to the 20.6, you would be getting another 6 million. Right?

A. That's what I was saying earlier. I don't know if it's 20.6 or if it's 15.5 minus the original.

Q. Go with me for a second that it's 15.5 minimum plus the 5.1.

A. Okay.

Q. So it's 20.6 plus the 6 million, that would mean 26.6 million. Right?

A. Yes.

Q. That would mean.

Just so we're all clear, that would mean Iconix is promising more in the contract than you're paying them. Right?

A. Yes.

Q. That doesn't make any sense; right?

MB4YCOL2          Rabin - Cross.          Page 534

A. I'm not going to quantify what makes sense. But that's how I understood it.

Q. You're a businessman; right, sir?

A. Yes.

Q. How long have you been in the business world?

A. Over 25 years.

Q. Would that deal make any economic sense if you were sitting in their shoes?

A. No.

Q. Can we agree that if we take out the Rocawear Kids, the 6 million bucks, that the 20.6 million that is guaranteed back to you, if you assume that to be correct, means that there is no overpayment by your company?

Can we agree on that?

A. State the question again.

Q. Sure.

The contract says you've agreed to pay over four years 21.5 million. Correct?

A. Yes.

Q. And understand my math -- this is without the Rocawear Kids. I want you to go with that assumption for a moment.

A. Okay.

Q. So you've agreed over four years to pay 21.5. Iconix, with the put and the minimum guarantees, has guaranteed a minimum back of 20.6.

MB4YCOL2          Rabin - Cross.          Page 535

Correct?

A. Correct.

Q. So would you agree with me that under that math, there is no overpayment? Without Rocawear Kids.

A. Yes.

Q. So just to tie this up -- and we can move on -- under the terms of the contract, there's no overpayment here.

A. Correct.

Q. By the way, one of the brands in this SEA-3 --

We can take this down. Thank you.

One of the brands in SEA-3 is Umbro. Correct?

A. Yes.

Q. Umbro is this great brand, soccer brand. Right?

A. Correct.

Q. And lots of the soccer stars wear Umbro?

A. I'm sorry?

Q. Let's of the soccer stars wear Umbro?

A. I believe so.

Q. Including David Beckham; right?

A. I don't know. I'm not sure what David Beckham wears.

THE COURT: Mr. Rabin, you need to keep your voice up.

THE WITNESS: Sorry. I'm not sure what David Beckham wears.

BY MR. MARKUS:

Q. Do you remember having meetings with David Beckham in

MB4YCOL2          Rabin - Cross.          Page 536

relation to Umbro and this joint venture?

A. I don't remember having any meeting with David Beckham.

Q. Did people from your company?

A. Perhaps.

Q. Were you excited about getting this brand Umbro because you thought you could really ramp it up if you were able to join with David Beckham?

A. It's possible.

Q. Do you remember that or not?

A. I don't remember that, but it's possible.

Q. You don't remember having discussions about making lots of money if you were able to join and partner with David Beckham?

A. That I do remember, yes.

Q. And you had those discussions, yes?

A. With David Beckham or about Umbro?

Q. You had discussions about being able increase the revenue with Umbro if you were able to partner with David Beckham?

A. I'm saying it's possible I had those conversations. I just don't remember.

Q. Do you remember whether anyone from your team in fact spoke with David Beckham?

A. I believe they have.

Q. And that's something you were excited about in this deal; correct?

A. If that was to come to fruition, that would be exciting for

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

---

MB4YCOL2　　　Rabin - Cross.　　　Page 537

the deal, yes.

Q. Because that means that, even though you were paying 21.5, those guarantees of 20.6, you thought they would be much higher.

A. If that was to happen, I would assume so, yes.

Q. And even if it wasn't to happen, you were still expecting to get more than the minimums; right?

A. Yes.

Q. So you believed this was a truly amazing deal for your company. Correct?

A. Yes.

Q. And you were acting in good faith when you did it; correct?

A. Correct.

Q. Now, do you remember a deal called MENA?

A. No.

Q. I'm sorry?

A. No.

Q. Do you have any recollection of any terms of a deal called MENA?

A. No.

Q. Did me that have anything to do with SEA-3?

A. I do not remember anything about me that.

MR. MARKUS: Mr. Rabin, that's all I have. Thank you, sir.

THE WITNESS: Thank you.

---

MB4YCOL2　　　Rabin - Redirect　　　Page 538

THE COURT: Any redirect?

MR. THOMAS: Yes, your Honor.

May I inquire?

THE COURT: You may.

REDIRECT EXAMINATION

BY MR. THOMAS:

Q. Mr. Rabin, I want to focus you on SEA-2.

Did you have an argument with Mr. Cole because you would bill it back as part of marketing?

A. Yes.

Q. With respect to SEA-3, did you an arrangement with Mr. Cole that you were going to pay 6 million more for that deal because he was going to relieve the Rocawear shortfall?

A. Yes.

Q. When you had that deal, did you understand from Mr. Cole that these commitments were firm commitments?

MR. MARKUS: Objection. Leading, your Honor.

THE COURT: Overruled.

BY MR. THOMAS:

Q. Did you understand that his commitments were firm commitments?

A. Yes.

Q. Did you believe him?

A. Yes.

Q. Did you take his word for it?

---

MB4YCOL2　　　Rabin - Redirect　　　Page 539

A. Yes.

Q. Now, on cross-examination, you were asked about people that you told about the arrangement. I want to focus on that for a second.

Did you tell Mr. Ventricelli?

A. Yes.

Q. Who was Mr. Ventricelli?

A. The company's CFO.

Q. Did you tell Mr. Famulak?

A. Yes.

Q. And who was Mr. Famulak?

A. The president of GBG.

Q. Do you know if Mr. Cole told his CFO about your arrangement?

A. I don't know.

Q. Do you know if Mr. Cole told his auditors about the arrangement?

A. I don't know.

Q. Do you know if Mr. Cole told the company's accountants about the arrangement?

A. I don't know.

Q. Do you know if Mr. Cole accurately described the deal in Iconix's public filings?

A. I don't know.

Q. Do you know if Mr. Cole played a shell game with his

---

MB4YCOL2　　　Rabin - Redirect　　　Page 540

investors' money?

A. I don't know anything he did.

Q. Now, Mr. Rabin, you were asked some questions about contract language on cross-examination.

How much legal training have you had?

A. None.

Q. Do you know how contracts work in litigation?

A. No.

Q. Do you know which terms can be enforceable in a court?

A. No.

Q. Mr. Rabin, are you an accountant?

A. No.

Q. Have you had accounting training?

A. No.

Q. Do you know how Mr. Cole accounted for these transactions in his own books?

A. No.

Q. Now, I want to focus for a moment on the marketing payments and obligations.

Mr. Markus asked you some questions about other payments that could be asked for or made to GBG from some of its partners, but I want to try to focus on some specifics.

In certain cases, is GBG a licensee for a brand owner?

A. Yes.

Q. And are there license agreements that require the brand

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB4YCOL2     Rabin - Redirect     Page 541

owner to support the brand with marketing payments?

A. Yes.

Q. In other circumstances, is GBG the brand owner who licenses it to someone else?

A. I'm sorry. What was the last?

Q. Are there some brands that GBG is the owner of the IP for?

A. Yes.

Q. And it, in those circumstances, will license them out to a licensee. Correct?

A. Correct.

Q. Are there arrangements where a licensee has an obligation to support the brand with marketing payments?

A. Yes.

Q. Now, the arrangements for Southeast Asia was a joint venture; right?

A. Yes.

Q. That means that GBG or, earlier, LF Asia, was a partner with Iconix. Right?

A. Yes.

Q. How much of the joint venture is it that LF Asia and GBG owned?

A. Approximately 50 percent.

Q. Okay. Did the joint venture then have licensees?

A. Yes.

Q. Did the licensees have marketing obligations of their own?

MB4YCOL2     Rabin - Redirect     Page 542

A. I believe so.

Q. And did the joint venture have an obligation to market the brands?

A. Yes.

Q. And how, according to the arrangement, was it that marketing done by the JV was supposed to be paid?

A. Through the JV.

Q. Now, Mr. Rabin, I want to show you Government Exhibit 203.

I think yesterday I was remiss in not formally offering it.

So the government offers 203 now.

MR. MARKUS: No objection.

THE COURT: It will be received.

(Government's Exhibit 203 received in evidence)

MR. THOMAS: Mr. Bianco, if you could publish that for the jury.

Q. Mr. Rabin, do you remember this from yesterday?

A. Yes.

Q. I want to flip forward to page 12.

Do you see these are the responsibilities of the local services agent of the joint venture?

A. Yes.

Q. And do you see under number one, providing marketing expertise to the company?

A. Yes.

MB4YCOL2     Rabin - Redirect     Page 543

Q. And that's, in this circumstance, the company is the joint venture; right?

A. I believe so, yes.

Q. And under "Brand Management," do you see number three is "developing marketing and advertising strategies"?

A. Yes.

Q. And in exchange for providing those services, was GBG, as the local partner, the local management services partner, going to be compensated?

A. Yes.

MR. THOMAS: Mr. Bianco, could you go to page 3.

THE COURT: It's Ms. Wolfson.

MR. THOMAS: Thank you, your Honor.

Q. Mr. Rabin, how much is it that GBG would be compensated for providing those services?

A. 15 percent.

Q. 15 percent of the monthly gross revenue?

A. Yes.

Q. Mr. Markus asked you many times whether the deals had or you thought there was an overpay.

Do you recall that?

A. Yes.

Q. What is it you thought he meant by "overpay"?

A. Pay more money than the value of the company.

Q. Now, in these negotiations with Mr. Cole, did you and he

MB4YCOL2     Rabin - Redirect     Page 544

reach an agreement as to what GBG was willing to pay for the interest?

A. Yes.

Q. Now, with respect to SEA-2, what was the amount that GBG or Li & Fung was willing to pay?

A. $10.9 million.

Q. Was that the price at which the deal closed?

A. No.

Q. Why not?

A. The price was increased by $5 million.

Q. Why was the price increased by $5 million?

A. Because we had the ability to bill back Iconix for $5 million of marketing.

Q. How did you know you had that ability?

A. I had a conversation.

Q. With who?

A. Neil Cole.

Q. Did you believe him when he said that?

A. Yes.

Q. Without that promise, would you have increased the price by $5 million for SEA-2?

A. No.

Q. Now, I want to take a moment to talk about quarter-end timing.

Mr. Rabin, were there occasions where Mr. Cole pressed

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB4YCOL2          Rabin - Redirect          Page 545

for deals to close at specific quarters?

A. Yes.

Q. Did you understand he did that so he could report the deal in his --

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

BY MR. THOMAS:

Q. Did you understand he did that so he could report the deal in his earnings?

A. Yes.

Q. Mr. Rabin, with respect to SEA-3, did you and Mr. Cole negotiate about the price that GBG was willing to pay for the interest in the SEA-3?

A. Yes.

Q. And what was the price that GBG was willing to pay?

A. 15.5.

Q. Is that the price that it ultimately paid?

A. No.

Q. Why not?

A. We paid $6 million more to relieve the Rocawear shortfall.

Q. Who told you could do that?

A. The CFO.

What's the question? I'm sorry.

Q. The question is:

Is there someone at Iconix who told you could do that?

MB4YCOL2          Rabin - Recross          Page 546

MR. MARKUS: Objection, your Honor. Leading.

THE COURT: Overruled.

BY MR. THOMAS:

Q. Did you speak to somebody at Iconix about that deal?

A. Yes.

Q. Who was that?

A. Neil Cole.

Q. What did he say about the Rocawear shortfall?

A. That he would relieve the Rocawear shortfall.

Q. In exchange for what?

A. The $6 million.

Q. Is that you what you did?

A. Yes.

Q. Did you believe that was a firm commitment, no matter what was in the contract?

A. Yes.

Q. Did you take Mr. Cole at his word?

A. Yes.

MR. THOMAS: Nothing further.

THE COURT: Anything more, Mr. Markus?

RECROSS EXAMINATION

BY MR. MARKUS:

Q. You took Mr. Cole at his word with regards to the Rocawear Kids; right?

A. Yes.

MB4YCOL2          Rabin - Recross          Page 547

Q. So it wasn't terminated. So apparently what you thought was firm was not.

MR. THOMAS: Objection, your Honor.

BY MR. MARKUS:

Q. Whatever you thought was a firm commitment apparently was not firm because Rocawear Kids was not terminated, was it?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: Am I answering?

MR. MARKUS: Yes, sir.

THE WITNESS: What is the question?

BY MR. MARKUS:

Q. Let me put it this way: Whatever you may have thought, you don't know what Mr. Cole thought. Right?

A. I don't know what he thought, no.

Q. And all that we know is that on SEA-3, even though you thought the Rocawear Kids obligation would be terminated, it was not terminated in 2014 or 2015; correct?

A. Correct.

Q. Now, you just said on redirect for the first time that you told Mr. Ventricelli and Mr. Famulak.

Do you remember telling the prosecutor that just now?

A. I said it, yeah. I don't know what I said, but I said something, yes.

Q. Tell me when you told them.

MB4YCOL2          Rabin - Recross          Page 548

A. I'm sorry?

Q. When did you tell them?

A. Tell them what?

Q. You don't remember now what you just told the prosecutor?

A. If you ask me the question, I'll give you an answer.

Q. Mr. Rabin, do you remember whether you told Mr. Famulak and Mr. Ventricelli about marketing expenses coming back to your company?

A. Say the question again.

Q. Do you remember telling Mr. Famulak and Mr. Ventricelli about marketing expenses coming back to your company?

A. Yes.

Q. When?

A. I don't remember.

Q. Did you tell them in a phone call?

A. I don't remember.

Q. Did you tell them in person?

A. I'm sure I did.

Q. Did you tell them in an email?

A. I don't remember.

Q. Did you tell them in a text message?

A. I don't remember.

Q. Did you tell them before or after the deal closed?

A. Before.

Q. Now, we saw, if it was before, that you and Mr. Famulak

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB4YCOL2 | Rabin - Recross | Page 549 |

authored an investment memo to the investment committee. Correct?

A. Correct.

Q. And we can agree that there was nothing about the marketing expenses in that memo. Correct?

A. Correct.

Q. So are you saying that Mr. Famulak lied to his investment committee?

A. No.

Q. Because the memo was accurate and complete. Correct?

A. Correct.

Q. And there was nothing in there about any marketing expenses coming back. Correct?

A. Correct.

MR. MARKUS: If I could ask your table, Mr. Thomas, to just call up Government Exhibit 203 that you just showed to the jury. Is that okay?

Q. Just go to page 12 for a moment, the same page that the prosecutor was asking about.

Do you remember just being asked questions about this?

A. Yes.

Q. And do you see under number one that the prosecutor asked you about whether you would be paid for marketing expertise?

A. Yes.

Q. Marketing expertise isn't marketing expenses; correct?

| MB4YCOL2 | Rabin - Recross | Page 550 |

A. Correct.

Q. Marketing expertise is that you would be telling your partners your thoughts on marketing using your expert opinion on it; right?

A. Correct.

Q. It has nothing to do with marketing expenses; correct?

A. Correct.

Q. And later down under "Brand Management" where the prosecutor asked you under number three about marketing and advertising strategies, again, you're being paid for your expertise there. Right? Your strategy.

A. Correct.

Q. You're not being paid for out-of-pocket expenses. Correct?

A. Correct.

Q. You're not being paid for, for example, building a showroom; right?

A. Correct.

Q. You're not being paid for developing a deck with how you plan to market these strategies and hiring another company. Correct?

A. Correct.

Q. Those were captured in the marketing invoices that you sent to Iconix; right?

A. Correct.

Q. And those were real invoices, not sham. Correct?

| MB4YCOL2 | Rabin - Redirect | Page 551 |

A. Correct.

MR. MARKUS: Thank you. I have nothing further.

THE COURT: Briefly, your Honor.

REDIRECT EXAMINATION
BY MR. THOMAS:

Q. Mr. Rabin, with respect to the invoices, do you know which invoices Iconix actually paid?

A. No.

Q. Do you know what was submitted along with those invoices as backup?

A. Not to my memory, no.

Q. Do you know if the backup reflected real work done by GBG?

A. I don't remember what's in the invoices.

Q. How much in marketing was sent over in terms of total positions?

A. $5 million.

Q. Why was $5 million selected?

A. That was the amount that we were entitled to bill back, we were told we could bill back for marketing.

Q. Told by who?

A. Told by Neil Cole.

Q. Would you have sent those invoices if Mr. Cole hadn't made that commitment to you?

A. No.

MR. THOMAS: Nothing further.

| MB4YCOL2 | Rabin - Redirect | Page 552 |

THE COURT: Anything further?

MR. MARKUS: No, your Honor.

THE COURT: Mr. Rabin, you may step down.

(Witness excused)

THE COURT: Government, do you want to call your next witness.

MR. LENOW: Judge, we're going to offer two email exhibits. And a paralegal from our office, Madeline Sonderby, is going to assist with reading those into the record for the jury.

THE COURT: Very well.

MR. LENOW: Judge, we're going to offer Government Exhibits 1139 and 1068 at this time pursuant to an authenticity stipulation and prior rulings of the Court.

THE COURT: Very well. Consistent with our prior conversation, those exhibits will be received.

(Government's Exhibits 1139 and 1068 received in evidence)

MADELINE SONDERBY,
    called as a witness by the Government,
    having been duly sworn, testified as follows:
BY MR. LENOW:

Q. Let's start, Ms. Wolfson, if we could please publish for Ms. Sonderby, Government Exhibit 1068.

Ms. Sonderby, can you please read who this email is

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB4YCOL2     Rabin - Redirect     Page 553

from and who it's to.

A. It's from Ethan Cole, and it's to Jared Margolis.

Q. What are the email addresses?

A. For Ethan Cole is it's erapcole@gmail.com. For Jared Margolis, it's jaredmargolis24@gmail.com.

Q. What is the subject of this email?

A. "Iconix notes."

Q. Do you see the attachment listed there below?

A. Yes.

Q. What is it called?

A. "Summary of Various AR."

Q. What is the date of this email?

A. August 28, 2014.

Q. So approximately how many weeks before September 17 would that be?

A. About 2 1/2 weeks.

MR. LENOW: All right. Let's go to the next page.

Q. Can you please read the header on this document, please.

MR. MARKUS: Your Honor, at this point we would renew our prior objections and also state that the document speaks for itself, and we would object to this procedure.

THE COURT: The objection is overruled.

BY MR. LENOW:

Q. Ms. Ms. Sonderby, can you read the header of that.

A. "Summary of Various Amounts with Iconix."

MB4YCOL2     Rabin - Redirect     Page 554

MR. LENOW: Can we highlight that, Ms. Wolfson, please. Can you, please, Ms. Wolfson highlight what's under A: "$5 million overpay from Iconix Korea."

Q. Ms. Sonderby, could you please read through that.

A. "A, $5 million overpay from Iconix Korea. The $5 million overpay from Iconix Korea will be offset by $2.5 million Rocawear, $1 million Zoo York SEA marketing, and $1.5 million Peanuts China marketing."

Q. Just continue reading if you could.

A. "B, $4.5 million proposed overpay for Umbro/Lee Cooper China. The $4.5 million overpay for Umbro/Lee Cooper China will be offset by Iconix paying $4.5 million to Rainbow.

Q. And then C, can you read it, please.

A. "C, additional amounts TBD. $3.5 million in Rocawear royalty for YR2 remains outstanding. $3.5 million in fixtures remains outstanding. No wiggle room with Iconix Latin America transaction. And possible wiggle room with Iconix Australia/Japan.

MR. LENOW: Let's now turn, Ms. Wolfson, if we can, to the other exhibit just offered, government 1139.

Q. Can you please read the "From," "To," "Subject," and "date this email, Ms. Sonderby.

A. "From Ethan Cole, ethancole@globalbrandsgroup.com, to Jared Margolis, jaredmargolis@globalbrandsgroup.com. Subject notes: For Iconix meeting," and it was sent on December 1, 2014.

MB4YCOL2     Rabin - Redirect     Page 555

Q. Can you just please read the left-hand side of the table starting with "plugs" and then just going down the next three rows.

A. "Plugs, purchase price. Value-based on revenue multiple. Plugs."

Q. If you could just pause there.
Could you just read the three lines under "Europe Korea."

A. "$15,917,500. $10,900,000 and $5,17,500."

Q. And then turning to the right under "LC Umbro China," can you please read the three lines under that.

A. "$21,500,000, $15,500,000, and $6 million."

Q. And then turning to the right of that under "Middle East," please read those three lines.

A. "23,604,000, 18,604,000, 5 million."

Q. All right. Ms. Sonderby, can you please just now read the first -- there are kind of three black bullet points under this chart.
Can you please read those bullet point points beginning with: "Thus far."

A. Right under the chart?

Q. Yes. Right under the chart from: "Thus far."

A. "Thus far, we have invoiced $5 million in marketing for the Europe/Korea amendment; zoo York, $95,000; Mossimo, $1.9 million. Iconix says payment has been made. We requested

MB4YCOL2     Rabin - Redirect     Page 556

confirmation of receipt from John Wida (phon.).

"Peanuts. $2.1 million. Contribution plugs will be paid to GBG at year end along with distributions from the JV. No invoice required. This $6 million for China Umbro/LC will be offset the following:

"Rocawear royalties of $4.5 million, $106 million in 2014 plus $3.5 million in 2015; fixtures of $1.5 million. Confirm how we would like legal to handle this arrangement. Can the Roc termination arrangement also cover the fixtures."

(Continued on next page)

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col3        Sonderby        Page 557

BY MR. LENOW: (Continuing)

Q. Then, just the last three bullets under plugs, miscellaneous points?

A. How to allocate the $5 million plug for the Middle East JV. Canoli, $3 million. Consultancy agreement.

MR. LENOW: Thank you, Ms. Sonderby.

MR. MARKUS: Judge, may I cross-examine?

MR. LENOW: She is an unsworn witness.

THE COURT: She is not sworn. No, you may not. You may step down.

(Witness excused)

THE COURT: Do you want to call your next witness?

MR. RODRIGUEZ: Your Honor, the United States calls Jaime Sheinheit.

JAIME SHEINHEIT,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT: You may be seated, please pull your chair up to the microphone -- maybe not that close. When you speak, please speak directly into the microphone and if I could ask you to begin by stating and spelling your first name and your last name.

THE WITNESS: Jaime Sheinheit. J-A-I-M-E, Sheinheit, S-H-E-I-N-H-E-I-T.

THE COURT: Mr. Rodriguez.

MB45col3        Sheinheit - Direct        Page 558

DIRECT EXAMINATION

BY MR. RODRIGUEZ:

Q. Good afternoon, Ms. Sheinheit. Ms. Sheinheit what do you do for a living?

A. Currently?

Q. Yes.

A. Currently I work for a handbag company.

Q. Let me direct your attention to the time between approximately 2007 and January of 2018. Where did you work during that time?

A. Iconix Brand Group.

Q. During your time at Iconix, did you serve in different positions?

A. I guess some various financial-related positions.

Q. Let me focus you on 2014 and 2015. What was your title at Iconix at that time?

A. Director of investor relations.

Q. What were your duties and responsibilities as director of investor relations?

A. I helped the company communicate the financials to investors.

Q. Focusing, again, on 2014, and this time until August of 2015, who was the CEO of Iconix during that time?

A. Neil Cole.

Q. Ms. Sheinheit, are you familiar with something called

MB45col3        Sheinheit - Direct        Page 559

earnings press releases?

A. Yes.

Q. What are earnings press releases?

A. So, a company reports quarterly earnings and that's basically when they report their financials, typically revenue and earnings per share, or net income, to the investment community.

Q. And when they do that, do companies file reports with the SEC called 10-Qs and 10-Ks?

A. Yes.

Q. And, did Iconix typically issue earnings press releases in advance of the filing of 10-Qs and 10-Ks?

A. Yes.

Q. And would those kinds of earnings press releases typically be filed with the SEC as well?

A. Yes.

Q. And would they typically be filed on what is called a Form 8-K?

MR. MARKUS: Your Honor, I'm going to object to leading at this point.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. RODRIGUEZ:

Q. In addition to being filed with the SEC, where else would earnings press releases typically be published?

MB45col3        Sheinheit - Direct        Page 560

A. PR Newswire, so they would go out to the public.

Q. Who is responsible, at Iconix, for preparing an initial draft of earnings press releases?

A. I was.

Q. Can you describe for the jury how you would go about preparing an initial draft of an earnings press release, including who you would speak to, what kind of information you would gather, and where you would get it from?

A. Sure.

    I would get the financials from the financial team. Typically a press release is really like a template that we use every quarter so just really filling in the numbers, the revenue numbers, the EPS numbers, updating the tables, and that typically all came from the finance team.

Q. After you prepared an initial draft of an earnings press release, what did you do next?

A. I circulated it to senior management for review.

Q. Would that include the CEO Neil Cole?

A. Yes.

Q. Did Mr. Cole provide you with comments from time to time on draft earnings press releases?

A. Yes.

Q. What portions of the earnings press release would Neil Cole typically comment on when reviewing your drafts?

A. He would typically comment on the top bullets and his

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB45col3 | Sheinheit - cross | Page 573 |
| --- | --- | --- |

Q. Can we play C?

(audio file played)

Q. And can we play D, please?

(audio file played)

Q. Ms. Sheinheit, was that Mr. Neil Cole speaking in those clips?

A. Yes.

MR. RODRIGUEZ: Thank you. I have no further questions.

THE COURT: Any cross-examination?

MR. MARKUS: Yes, your Honor.

CROSS-EXAMINATION

BY MR. MARKUS:

Q. Good afternoon. Good afternoon, everybody. Good afternoon, Ms. Sheinheit.

A. Hello.

Q. I'm David Markus, I'm one of Neil Cole's lawyers. I have a few follow-up questions, if I can?

A. Sure.

Q. So, the clips that the prosecutor just played for you, that wasn't the whole earnings call, right?

A. Correct.

Q. That was a very small portion of it?

A. Yes.

Q. In fact, the call goes on for, let's see, 10 single-spaced

| MB45col3 | Sheinheit - cross | Page 574 |
| --- | --- | --- |

pages, right? It goes on for a long time?

A. I mean, I think the calls are typically 45 minutes or so.

Q. OK. And what, did we hear about 30 seconds total?

A. Maybe.

Q. Yes. OK. We will get to that earnings call in a minute, Ms. Sheinheit, but let me ask you this. Did you ever hear anyone at Iconix ever say that we need to do a JV deal for earnings reasons?

A. No.

Q. And one of the things that the prosecutor highlighted in those reports was organic groaning. Do you remember seeing those words?

A. Yes.

Q. Were the JV deals considered organic growth?

A. Yes.

Q. That was your understanding?

A. That was my understanding.

Q. Let me ask you, you worked at Iconix for, what, about 10 years?

A. Yes.

Q. It was really quite an amazing company, right?

A. It was a good company.

Q. Yeah. I mean, it was an exciting time for you and the company there. The company was growing, right?

A. Uh-huh, yes.

| MB45col3 | Sheinheit - cross | Page 575 |
| --- | --- | --- |

Q. It went from like a $100 million company to a $2 billion company, right?

A. I believe so.

Q. So, it really was growing, wasn't it?

A. Yes.

Q. There was tremendous growth at Iconix, right?

A. Yes.

Q. During your time there?

A. Correct.

Q. And what the company would do is they would take these underutilized brands and make them relevant again, right?

A. Yes.

Q. And that was a pretty innovative thing that Mr. Cole was doing, right?

A. Yes.

Q. By the way, Neil Cole has no relation to a guy named Ethan Cole, right? Do you know who Ethan Cole is?

A. I do not.

Q. You never heard of him before, right?

A. No.

Q. One of the things that Neil Cole would do is he would try to partner with celebrities to make these brands cool and relevant again, right?

A. I don't know if it was necessarily celebrities but it was to reinvigorate older brands.

| MB45col3 | Sheinheit - cross | Page 576 |
| --- | --- | --- |

Q. And that's something he was certainly passionate about, right?

A. Yes.

Q. And he was passionate about his company, right?

A. Yes.

Q. This is a company he founded?

A. Correct.

Q. And he wasn't the kind of CEO that just sat at home collecting a check, right?

A. Yes. Correct, that is. That is a correct statement.

Q. Right. He came into the office every day, right?

A. Yes.

Q. He was a hard worker, wasn't he?

A. Yes.

Q. And you could see he wanted to make the company great, right?

A. I believe so, yes.

Q. Let me ask you, would you describe him as a tyrant and a jerk or as professional and respected?

MR. RODRIGUEZ: Objection.

THE COURT: Overruled.

THE WITNESS: I had a good working relationship with Neil.

Q. He was professional with you, right?

A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB5YCOL4    Snyder - Direct    Page 609

this.

Does this refresh your recollection that after the press release of July 29, 2014, Incline continued to buy Iconix stock in August, September, and October of that year?

A. Yes.

MR. RODRIGUEZ: We can take that down.

Q. Mr. Snyder, in making those investment decisions, were you, in part, relying on the new financial information that the company had reported in that press release?

A. Absolutely.

Q. And so if it had turned out that the company's revenue had gone down instead of up, would you have recommended that Incline buy more stock?

A. No.

Q. If it turned out that they had actually missed revenue analyst consensus, would you have recommended that Incline buy more stock?

A. No.

Q. If it turned out that instead of the company's EPS having grown, it had gone down, would you have recommended that Incline buy more stock?

A. Unlikely.

MR. RODRIGUEZ: Can we go to government 103, please.

Q. Do you recognize this as a Form 10-Q for Iconix for the second quarter of 2014?

MB5YCOL4    Snyder - Direct    Page 610

A. Yes.

Q. This is the kind of document that you relied on in your model?

A. Yes.

MR. RODRIGUEZ: Can we go to page 4, please.

Q. Do you see that top line row there: "Licensing and other revenue"?

A. Uh-huh.

Q. Is that a number that you would rely on in your model?

A. Yes.

Q. Would you use that to predict where the stock was going?

A. Yes.

MR. RODRIGUEZ: Can we go to page 28 of the document, please.

Q. Now, right in the middle there, there is a heading that says: "Highlights of Current Quarter."

Do you see that?

A. Yes.

Q. And it says: "Record Q2 revenue, record Q2 operating income, and then gain related to the sale of certain trademarks to our Iconix Southeast Asia joint venture."

Do you see that?

A. Yes.

MR. RODRIGUEZ: And let me ask Ms. Wolfson to zoom back out. And now zoom into that first paragraph under:

MB5YCOL4    Snyder - Direct    Page 611

"Results of Operation."

Q. Do you see where it says:

"Licensing and other revenue for the current quarter totaled $118.9 million, a 3 percent increase as compared to $115.1 million for the prior year quarter. The increase of approximately 3.8 million dollars of revenue was driven by, 1, a $13.6 million gain realized on the sale of certain trademarks to our Iconix Southeast Asia joint venture."

Do you see that?

A. Yes.

Q. And then there are some other components there as well.

Do you see that?

A. Yes.

Q. Is all of the information that we're looking at here, was that important to you when making decisions?

A. Yes.

Q. All of that information with respect to the Southeast Asia joint venture?

A. Yes.

MR. RODRIGUEZ: Can we go to page 12, please. I'm sorry. It's the next page, page 13, zooming in on that top paragraph that begins: "In June of 2014."

Q. Do you recognize this, sir, as one of the descriptions of Iconix's Southeast Asia transactions?

A. Yes.

MB5YCOL4    Snyder - Direct    Page 612

Q. I want to direct your attention to that second row.

Do you see that it lists a price of $15.9 million?

Do you see that?

A. Yes.

Q. And did that price that was being paid as part of this transaction matter to you?

A. Yes.

Q. If it had turned out that Iconix had committed to give back $5 million of that $15.9 million, would you have wanted to know that?

A. Yes.

Q. Would that have mattered to your investment decisions?

A. Yes.

MR. RODRIGUEZ: We can take this down now. And if we can show Mr. Snyder Government Exhibit 104, please. Let's go to the fourth page and, zooming in, if we could, on the headline and the bullets.

Q. Mr. Snyder, do you recognize this as a press release that Iconix issued about its third quarter in 2014?

A. Yes.

Q. Again, these numbers reported here went into your model?

A. Yes.

Q. Let's take a look at that first paragraph again under "Q3 2014 Results."

It says: "Total revenue for the third quarter of 2014

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB5YCOL4          Snyder - Direct          Page 613

was approximately $113.8 million, a 6 percent increase as compared to approximately $107.2 million."

Do you see that?

A. Yes.

Q. If it had turned out that instead of revenue being $113.8 million it had been approximately $6 million less, would that have mattered to you?

A. Yes.

Q. If that figure, $113.8 million, beat analyst consensus but if the revenue was actually about $6 million less and that meant that the company missed analyst consensus, would that have mattered to you?

A. Yes.

Q. Why?

A. Once again, I wouldn't want to invest in a company that can't beat what the market expects of it.

MR. RODRIGUEZ: We can take that down.

Q. Now, Mr. Snyder, did you buy on behalf of Incline more stock after this press release?

A. I don't recall.

MR. RODRIGUEZ: Could we show Mr. Snyder again, and just Mr. Snyder, the parties, and the Court, Government Exhibit 1510 and going to the second page and to the third page.

Q. Mr. Snyder, does this refresh your recollection that Incline bought more Iconix stock after the issuance of the

MB5YCOL4          Snyder - Direct          Page 614

October 28, 2014, press release?

A. Yes. Stock and call options.

MR. RODRIGUEZ: We can take that down.

Q. Would you have done so in at least partial reliance on the information reported in that press release?

A. Definitely.

Q. And what does it signal to you, sir, that you bought additional call options at that time?

A. That our conviction had not wavered.

MR. RODRIGUEZ: Could we please show Mr. Snyder what's in evidence and everyone else as Government Exhibit 105, please.

Q. Do you recognize this, sir, as Iconix's 10-Q for the third quarter of 2014?

A. Yes.

MR. RODRIGUEZ: If we can go to page 3, please.

Q. Again, that top line, the licensing and other revenue number, is that something that would have gone into your model?

A. Yes.

Q. Is it something that would have been important to you?

A. Yes.

MR. RODRIGUEZ: If we can go to page 26, please. Let's zoom in on the highlights in the middle.

It says: "Highlights of Current Quarter," and the third bullet says:" Gain related to the sale of our Umbro and

MB5YCOL4          Snyder - Direct          Page 615

Lee Cooper trademarks in the greater China territory to our Iconix Southeast Asia joint venture."

Q. Do you see that?

A. Yes.

Q. Did you pay attention to that?

A. Yes.

Q. Is this in this portion of the 10-Q the only transaction that Iconix chose to highlight in its bullets for highlights of current quarter?

A. This looks like the only transaction they've highlighted, yes.

MR. RODRIGUEZ: We can take that down. Can we go, again, to page 12 and 13.

Q. I'm not going to go through this in too much detail with you, Mr. Snyder.

But do you see a heading there that says: "Iconix Southeast Asia Joint Venture"?

A. Yes.

Q. And it continues. We can show you on to the next page.

But is the information in here something that you would have paid attention to?

A. Yes.

Q. And were you relying on the information in here to be accurate and complete?

A. Yes.

MB5YCOL4          Snyder - Direct          Page 616

Q. Let me now just focus you on just one thing which is on the top of page 13. I'm sorry. It's on the previous page, page 14.

A. Can I add one thing about the joint ventures?

Q. Sure.

A. From my memory, these were booked as 100 percent revenue pass-throughs. If they booked a $5 million gain from the sale, 100 percent of that would go down to pretax profits. There was no operating cost associated with it. So these one-time sales were a super high margin.

Q. And that was important to you?

A. Yeah. They derived more bang for the buck so to speak in terms of profitability.

Q. So if they had to give some of that back, would that be important to you?

A. Yes.

MR. RODRIGUEZ: We can take that down.

Q. Now, at some point, Mr. Snyder, did you have a second meeting with Mr. Cole in November of 2014?

A. Yes.

Q. Where was that meeting?

A. I believe at their offices.

Q. Do you recall who attended it besides you and Mr. Cole?

A. I believe the CFO and Jeff Lignelli.

Q. What did you talk about that meeting?

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB5YCOL4 | Snyder - Cross | Page 629 |
|---|---|---|

A. If it's an SEC document, I'm supposed to believe that it's been vetted and the CFO and CEO are pledging that it's true. So that's the best I can get.

Q. Very good. All right. Mr. Snyder, I'd like to show you now Defense Exhibit 2282, which I believe there is no objection to.

MR. RODRIGUEZ: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 2282 received in evidence)

BY MR. MARKUS:

Q. Now let's look at the top. This is an email from you to Mr. Cole on November 15, 2013.

Do you see that?

A. Yes.

Q. Now, Mr. Snyder, this is before any of the joint ventures had ever been publicly reported.

Correct?

A. I don't know.

Q. Well, the prosecutor was asking you about amendments 2 and 3 which were all in 2014.

Correct?

A. Yes.

Q. And are you aware that the first time that the initial Southeast Asia joint venture was reported in a 10-Q or a 10-K was in January of 2014?

| MB5YCOL4 | Snyder - Cross | Page 630 |
|---|---|---|

A. Yes. I just don't recall if there were any joint ventures prior to us investing in the stock.

Q. Very good. But in terms of Southeast Asia joint venture 1, 2, and 3, this email predates those, the public filings of those.

A. Correct.

Q. And even though you had no idea about Southeast Asia 1, 2, and 3 -- it had not been publicly reported yet -- and, by the way, 2 and 3 hadn't even happened yet. Those happened in 2014 -- you decided to make Iconix one of the biggest positions.

Do you see that in the first paragraph? "Due to this reason, my fund has made Iconix one of our biggest positions."

A. Yes.

Q. So would you agree with me that your decision to make Iconix one of your firm's biggest positions had nothing to do with the Southeast Asia joint ventures which had not occurred yet?

A. Nothing specifically to those joint ventures.

(Continued on next page)

| MB45col5 | Snyder - Cross | Page 631 |
|---|---|---|

BY MR. MARKUS: (Continuing)

Q. What your decision, your investment decision thesis had to do with, as you describe in the previous sentence: At the time I explained how I thought Iconix fit the mold of the great capital allocators from the book, "The Outsiders," by William Thorndike.

Do you see that?

A. Yes.

Q. What is "The Outsiders," by William Thorndike?

A. It's a book that was written, I believe in 2014 or '13 -- around this time, and he highlighted eight of the best CEOs, eight of the best public stocks in the market, historically, and talked about the management teams behind these businesses, how they were extremely unorthodox but figured out a way to create a ton of value for their investors.

Q. And before you ever thought about SEA-1, 2, and 3, you thought that Iconix fit the mold of great capital allocators from this book, right?

A. Yes.

MR. MARKUS: Your Honor, at this point I would like to show the jury and the witness a demonstrative. I am not going to move it in; the cover of the book, if I might.

THE COURT: Sure.

Q. Is that the book we are talking about, sir?

A. Yes, sir.

| MB45col5 | Snyder - Cross | Page 632 |
|---|---|---|

Q. It is called Eight Unconventional CEOs and their Radically Rational Blueprint for success, right?

A. Correct.

Q. And before you ever thought about SEA-1, 2, and 3, you thought Neil Cole fit that model, correct?

A. Correct.

Q. We can take that down. Thank you. If we can put that e-mail back up, please, 2282.

In the second paragraph you discuss that you're long-term investors, right?

A. That's correct.

Q. And you asked Mr. Cole if you could set up a meeting, do you see there, in the second sentence?

A. Yes.

Q. And you say you would love to meet him, right?

A. Correct.

Q. And learn more about Iconix' strategy, correct?

A. Correct.

Q. And you tell him in the next paragraph that you have attached the investment memo on Iconix, right?

A. Correct.

Q. And what this investment memo is --

MR. MARKUS: Your Honor, at this time we would move in the investment memo which is 2282A-1, which I believe there is no objection.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                              November 4, 2022

| MB45col5 | Snyder - Cross | Page 633 |
|---|---|---|

MR. RODRIGUEZ: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 2282A-1 received in evidence)

BY MR. MARKUS:

Q. What this investment memo discusses is your thesis about Iconix, correct?

A. Correct.

Q. And if we could zoom in on the very top, you discuss how Iconix is a $2.1 billion market cap brand/owner manager which currently trades at about 38 bucks a share, right?

A. Correct.

Q. This business is a misunderstood compounder roll-up with an Outsiders-like management team and I think fair value is closer to 55 bucks, right?

A. Correct.

Q. Can you explain to the jury what you meant by this business is a misunderstood compounder roll-up with an Outsiders-like management team?

A. Start with misunderstood. There were few, if any, public companies doing the same sort of strategy at the time so I don't think a lot of people understood how the business worked or they would like legacy brands and try to monetize them through franchise deals and essentially shut the businesses down and just use their IP to generate revenue.

The compounder roll-up is a company with -- it is

| MB45col5 | Snyder - Cross | Page 634 |
|---|---|---|

actually an organically growing company that has an ability to create a lot of value through capital allocation like M&A and share buybacks.

The roll-up would, you know, would entail M&A as part of that compounder compounding nature.

And the Outsiders-like management is reference to that book by William Thorndike. I thought he was a very unconventional CEO that, even at this time, had created a lot of value for shareholders.

Q. And this thesis that you wrote about the company, it goes on for nine single-spaced pages, correct?

A. I don't know how long it was.

Q. This is before you had ever met Neil Cole and had those meetings that you discussed, right?

A. Yes.

Q. And this is before you had taken a deep dive into these joint ventures, right?

A. Correct.

Q. And you came to this thesis based on your review of the company up to this point, correct?

A. Yes.

Q. If we look at the paragraph it says: Iconix brands is a little known company which owns 33 diverse brands and is the no. 2 brand licensor in the world after Disney, earning more than $13 billion in retail sales in 2012. To understand

| MB45col5 | Snyder - Cross | Page 635 |
|---|---|---|

Iconix, you must first understand what Iconix is not -- it is not a retailer.

What are you saying there, sir?

A. Retail is not a good business, in general. They struggle with low returns on capital for the most part and it is very risky, and capital intensive uses a lot of money. So, I was saying this is a business that is growing without the normal headwinds that most brick and mortar retailers have to deal with.

Q. And by the way, this is a report that goes to who?

A. Mostly internal.

Q. In other words, to your colleagues at Incline?

A. Yes. This is a pitch that I would send to Jeff Lupinacci to convince him that we should be investing in the stock.

Q. Did you convince him?

A. Yes.

Q. Let's turn to the next page. Do you see at the very top where you say: The company has now come to dominate the brand royalty industry while focusing exclusively on licensing, marketing, and providing trend direction with respect to its diverse portfolio of consumer brands which now span fashion, sports apparel, linens, electronics, and entertainment brands.

That's one of the things that attracted you to the company, right?

A. Yes.

| MB45col5 | Snyder - Cross | Page 636 |
|---|---|---|

Q. Because, as you say, they didn't have all of that overhead with the brick and mortar and inventory and all that stuff and it takes away from the bottom lines, right?

A. Correct.

Q. They had a pretty great cash flow kind of business, right?

A. Definitely.

Q. Because as the brands got better, their real expenses were just marketing, right?

A. Yes.

Q. And so, the more they would spend on marketing, the better the brands would do. At least that's the theory behind the company, right?

A. Supposedly, yes.

Q. And that's really the only cost item for the company other than employees, is this marketing?

A. For the most part, yeah. They weren't owning and operating stores.

Q. Right. And acquiring the brands of course, right?

A. Yes.

Q. And so that's unlike, for example, the company Amazon we were talking about that has all the warehouses and delivery trucks and boxes and all the stuff they have to pay for, right?

A. Yes.

Q. So this is a pretty brilliant idea by Neil Cole, right?

A. That's why I was a big fan of it.

**A-726**

UNITED STATES OF AMERICA, v.
NEIL COLE,
November 4, 2022

| MB45col5 | Snyder - Cross | Page 637 |
|---|---|---|

Q. OK. Let's turn to the next paragraph: Iconix has created a unique high margin.
     That's what we were just talking about, right, the ability to make money with very small costs, right?
A. Correct.
Q. How free cash flow business, again, that's another thing we were talking about, is when the company was making money it was basically just cash into the business, right?
A. Correct.
Q. Nothing wrong or illegal about that, right?
A. No.
Q. Just smart business?
A. Exactly.
Q. And again, we were talking, nor does it expose itself to operational overhead, fashion risk and/or any other issues that traditional retailers are exposed to.
     Do you see that?
A. Yes.
Q. That's one of the things that made it very attractive to you in making it one of the highest purchases for Incline, right?
A. That, and its valuation.
Q. And another thing later down in the paragraph is we see Peanuts at 20 percent of sales, and that's one of the things you discussed with the prosecutor, is that Peanuts was a big

| MB45col5 | Snyder - Cross | Page 638 |
|---|---|---|

deal for Iconix; right?
A. Yes.
Q. They were making movies and the brand was really starting to flourish, right?
A. Yes.
Q. Have you seen the movie?
A. No, I haven't.
Q. At the bottom of that page, the very last sentence: We value Iconix based on free cash flow yield as cash generation is the key driver of value creation for Iconix shareholders.
     Do you see that?
A. Yes.
Q. And, you know, what is being discussed there is one of the things we just talked about which is the money coming into the company, right?
A. Correct.
Q. By the way, the joint ventures which happened later, the idea behind the joint ventures is that we are going to spread these brands internationally; right?
A. Yes.
Q. And that was a good idea, right?
A. Yes.
Q. Because as the brands do well overseas, that's more cash for the business, right?
A. Correct.

| MB45col5 | Snyder - Cross | Page 639 |
|---|---|---|

Q. And so, if they could partner with Li & Fung -- by the way, Li & Fung is a great company, right?
A. Yes.
Q. If they could partner with a company like Li & Fung they could make more money, have more cash flow, by spreading these brands overseas, correct?
A. Yes.
Q. And if we just flip through the pages, you go on and on about your thesis for this company just being awesome, right? If we turn to page -- that's a good page, page 4, if we look at the bottom there it says: Like all great acquirers, Iconix has a very specific acquisition strategy and it will not deviate from its agenda.
     Do you see that?
A. Yes.
Q. First and foremost, the company only targets iconic brands or those which have more than 90 percent brand recognition.
     Do you see that?
A. Yes.
Q. What you are saying there is it is only acquiring brands that are going to make money, right?
A. That's the plan.
Q. That's the plan.
     And once you acquire the brand, then you need to sort of spread the brand both in the United States and

| MB45col5 | Snyder - Cross | Page 640 |
|---|---|---|

internationally, right?
A. Yes.
Q. And you have to spend some money to do that with bargaining, right?
A. Yes.
Q. And that's good for the brands and good for the business?
A. If done intelligently, yes.
Q. In fact, you discuss one of the intelligent examples towards the bottom of that paragraph where you say Iconix' purchase of London Fog is a perfect example of this strategy, right?
A. Correct.
Q. London Fog was one of these brands that people had forgotten a little about but everybody has heard the name London Fog, right?
A. Yes.
Q. So Iconix gets London Fog, they pay $35 million for it, right?
A. Yes.
Q. It already had $40 million of licensing revenues by deal close, right?
A. Yes.
Q. What you are saying there is they paid $35 million but they're already getting revenue from the brand of $40 million. Great business decision, right?

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB45col5 | Snyder - Cross | Page 645 |
|---|---|---|

A. Yeah. Perhaps.

Q. Even before anything to do with SEA-2 and 3, correct?

A. Yes.

Q. And you start -- you have an investor memo that you inform investors about your view of the company, correct?

A. Yes.

Q. And in that investor memo -- I'm not going to walk you through again each page and paragraph of it, but basically it is the same as we saw in that thesis memo where you are explaining why you really like this company.

A. Yes.

Q. Before anything to do with the Southeast Asia joint ventures, correct?

A. Yes.

Q. And if I could just summarize -- if I can find my note here. One second?

MR. MARKUS: Your Honor, may I have one moment? I just lost my spot.

THE COURT: Sure.

Q. So am I right, Mr. Snyder, that some of the reasons you found Iconix attractive in the fall of 2013 is, one, they had been successful in turning brands around, right?

A. Yes.

Q. Two, they were buying back their own stock; correct?

A. Yes.

| MB45col5 | Snyder - Redirect | Page 646 |
|---|---|---|

Q. Three, they were investing in the brands; right?

A. Yes.

Q. Four, the owner CEO Neil Cole was what you described as an outsider; right?

A. Yes.

Q. And the company was, you viewed, as one of these outsider companies, right?

A. Yes.

MR. MARKUS: Your Honor, may I have one moment to confer with my colleagues?

THE COURT: Certainly.

MR. MARKUS: Thank you.

(Counsel conferring)

MR. MARKUS: Nothing further, your Honor. Thank you. Thank you, Mr. Snyder.

THE COURT: Mr. Rodriguez, anything else?

MR. RODRIGUEZ: Very briefly, your Honor.

REDIRECT EXAMINATION
BY MR. RODRIGUEZ:

Q. Just a few follow-up questions for you, Mr. Snyder. If, during the time period of 2014, Iconix' revenue had gone down, would you have bought more stock?

A. No.

Q. And did you buy more stock after SEA-2?

A. I believe we were buying throughout the whole year.

| MB45col5 | Snyder - Recross | Page 647 |
|---|---|---|

Q. All of 2014?

A. Yes.

Q. Did you continue buying in the beginning of 2015?

A. Yeah. I think we then started selling it early 2015.

Q. I think Mr. Markus asked you, you thought Iconix was awesome. Do you recall being asked that question?

A. Yes.

Q. Did your view of Iconix being awesome change at some point?

A. Yes.

Q. There was a lot of discussion about The Outsiders book. Do you remember that?

A. Yes.

Q. If a CEO commits fraud, do you think they should be included in the next Outsiders book?

A. No.

MR. RODRIGUEZ: Nothing further.

RECROSS EXAMINATION
BY MR. MARKUS:

Q. We can all agree on that, Mr. Snyder, but what we are here to think about is whether there was fraud committed, right?

MR. RODRIGUEZ: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. I mean, have you examined the deal documents in SEA-2 and 3?

| MB45col5 | Snyder - Recross | Page 648 |
|---|---|---|

A. Not extensively, but I believe I looked at them.

Q. Did you see, in the SEA-2 documents, any promise to return $5 million in marketing?

A. I don't recall that.

Q. In SEA-3, did you see any reference to releasing GBG from its Rocawear contract?

A. I don't recall.

Q. And are you aware that they were never released from it?

A. Didn't know.

MR. MARKUS: Thank you, sir.

THE COURT: Mr. Snyder, you may step down.

(witness excused)

THE COURT: The government please call your next witness.

MR. LENOW: The government calls Seth Horowitz.

THE COURT: Sir, please snake yourself around -- right through there, right through there, and up into the witness box and remain standing.

THE DEPUTY CLERK: Please raise your right hand.

SETH HOROWITZ,
called as a witness by the Government,
having been duly sworn, testified as follows:

THE COURT: Sir, you may be seated. Please bring your share as chose as you can to the microphone and bring the microphone as close as you can to yourself. Please speak

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB45col5 | Horowitz - Direct | Page 649 |
|---|---|---|

directly into the microphone. And please, begin by stating and spelling your first name and your last name.

THE WITNESS: Seth Horowitz. First name S-E-T-H. Last name, Horowitz H-O-R-O-W-I-T-Z.

THE COURT: Mr. Lenow.

MR. LENOW: Thank you, Judge.

DIRECT EXAMINATION

BY MR. LENOW:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Mr. Horowitz, did you ever work at a company called Iconix Brand Group?

A. Yes.

Q. When was that?

A. From April of 2012 to April of 2015.

Q. When you left the company, Mr. Horowitz, what was your job title?

A. Chief operating officer.

Q. Where did that fall in the company's hierarchy?

A. It was below the president/CEO and part of the executive team.

Q. Who was the CEO during your time at Iconix?

A. Neil Cole.

Q. Did you commit any crimes while working at Iconix Brand Group?

| MB45col5 | Horowitz - Direct | Page 650 |
|---|---|---|

A. I did.

Q. Did those crimes include securities fraud and other offenses?

A. It does.

Q. And did there come a time you pled guilty to those crimes?

A. Yes.

Q. Did you commit those crimes alone or with others?

A. I committed those crimes with others.

Q. Look around the courtroom, Mr. Horowitz. Do you see anyone with whom you committed securities fraud when you were at Iconix?

A. I do.

Q. Can you identify who that person is, and where they are sitting, and a piece of clothing they are wearing?

A. They are sitting with their back to the right-hand wall.

Q. Who is that person, Mr. Horowitz?

MR. MARKUS: This is Mr. Cole here, we all agree.

MR. LENOW: I will ask the witness.

Q. Mr. Horowitz, who do you recognize?

A. Neil Cole.

Q. And where is Mr. Cole sitting and can you identify a piece of clothing he is wearing?

A. He is sitting to my far right and wearing, it looks like a black jacket.

MR. LENOW: I ask that the record reflect that the

| MB45col5 | Horowitz - Direct | Page 651 |
|---|---|---|

witness identified the defendant.

THE COURT: The record will so reflect.

BY MR. LENOW:

Q. Mr. Horowitz, I'm going to start by asking you to provide an overview of the fraud that you committed with Mr. Cole. Did the fraud you committed with Mr. Cole, does it relate to any particular business deals?

A. Yes, it did.

Q. And when were those business deals?

A. Those business deals were in June of 2014 and September of 2014.

Q. Did the deals involve a particular business partner?

A. Yes.

Q. What partner was that?

A. GBG or Global Brands Group.

Q. Did that entity have any relation to a company called Li & Fung?

A. Yes, it does.

Q. What was that?

A. It was a subsidiary of Li & Fung, part of Li & Fung company.

Q. Mr. Horowitz, generally speaking, what was fraudulent about the deals in June and September of 2014?

A. We inflated the prices of the joint ventures with promises of givebacks in order to hit our financial goals.

| MB45col5 | Horowitz - Direct | Page 652 |
|---|---|---|

Q. Let's take each deal in turn. Starting with the June of the 2014 deal, how was that deal inflated?

A. The June deal was inflated by $5 million.

Q. Can you explain what the price it ended up at at the end of the day?

A. It went from $10.9 million to $15.9 million.

Q. Why did it go up in that fashion?

A. It went up in that fashion because we had agreed to give the $5 million back to GBG in the future.

Q. So, what was the sticker price, the price of the deal that was reflected in the contracts?

A. $15.9 million.

Q. Mr. Horowitz, what do you view as the real price for that deal?

A. $10.9 million.

Q. And why do you say -- why is there a difference between those numbers?

A. Because the $15.9 million represents a $5 million inflated price, of which we were going to give back to GBG.

Q. To be clear, Mr. Horowitz, the number in the agreement said 15.9?

A. That is correct.

Q. And over time would $15.9 million actually go from GBG accounts to Iconix' bank accounts?

A. Yes.

# A-729

MB45col5          Horowitz - Direct          Page 653

Q. So, to be clear, why do you say the real price was $10.9 million, approximately?

A. Because $5 million was going back to GBG from Iconix in exchange for the inflated price.

Q. Mr. Horowitz, why did you and Neil Cole work to inflate the price of this June deal from around $10 million to around $15 million?

A. We inflated the price so that way we could hit our financial goals, revenue, profit.

Q. Let's turn to the second deal, just summarizing in big picture, how is the September 2014 deal falsely inflated?

A. The September deal was falsely inflated by $6 million.

Q. And can you explain, where did the price end up and what was the price that was publicly reported to investors?

A. The price ended up at $21.5 million and that is what was recorded.

Q. Was there any other secret side deal of that agreement that was not publicly recorded?

A. Yes, there was.

Q. And what was that side deal?

A. To relieve GBG of $6 million of payments that it would owe to Iconix.

Q. So, again, the sticker price for the September deal was what?

A. $21.5 million.

MB45col5          Horowitz - Direct          Page 654

Q. Mr. Horowitz, what do you understand the real price of that September 2014 deal to be when you consider this $6 million you just mentioned?

A. $15.5 million.

Q. And same question as before, what number was actually in the final documents?

A. $21.5 million.

Q. And under the agreement, would $21.5 million, over time, go from GBG bank accounts -- Iconix' bank accounts?

A. Yes, it would.

Q. To be clear, sir, why do you say the real price was around $15.5 million for that deal if the sticker price said $21.5 million?

A. Because we had agreed to inflate the price from $15.5 million to $21.5 million, and to then relieve GBG of $6 million of payments it would owe to Iconix.

Q. Did anything subsequently change about the giveback for that transaction, the $6 million giveback?

A. Yes.

Q. Can you explain what happened?

A. At a certain point, Neil and Jason decided not to do the giveback through relieving them of the $6 million that they owed to us because it had bigger financial ramifications on Iconix.

Q. When you say Jason, who is Jason?

MB45col5          Horowitz - Direct          Page 655

A. Jason Rabin.

Q. And who is Neil?

A. Neil Cole.

Q. Now, were you part of those final decisions about finding the alternative way to make the giveback for the September 2014 deal?

A. I was not.

Q. Were you part of some of the earlier negotiations or discussions about that?

A. Yes, I was.

Q. Was anything occurring around the time that you and Neil Cole were taking steps to complete the secret givebacks that gave you concern about doing so?

A. Yes, there was.

Q. What was happening around that time that gave you concern?

A. The SEC had started to ask us questions about our financials including the joint ventures.

Q. Did those SEC inquiries occur at around the same time as you were seeking to make those secret givebacks?

A. Yes, it did.

Q. Why did that give you concern?

A. Because the SEC, which is the governing body over financial reporting of public companies, was now asking questions about the very joint ventures which were falsely inflated.

Q. Mr. Horowitz, I'm going to --

MB45col5          Horowitz - Direct          Page 656

Let's put up for the witness and the parties only Government Exhibit 1344.

Mr. Horowitz, do you recognize the chart that is reflected on your monitor?

MR. HECKER: Your Honor, objection.

THE COURT: Can I see you folks at side bar?

(Continued next page)

UNITED STATES OF AMERICA, v.
NEIL COLE,
November 4, 2022

MB45col5          Horowitz - Direct          Page 657

(At side bar)

MR. HECKER: This is Sean Hecker.

This slide includes adjectives that are not designed to simply inform the jury about the math here but things like the real price, which is obviously something the jury needs to decide and shouldn't come in in this way. They can simply ask him what was the price before, what was the price after. This exhibit is -- it's designed to be inflammatory. It reminds me of being told that the opening slides had unnecessary attempts to inflame. This is a perfect example of that and it's not necessary. It is a 403 problem.

THE COURT: I believe I allowed all of the objected-to slides pretrial, but, Mr. Lenow?

MR. LENOW: Judge, Mr. Horowitz just testified to these facts using this language and is he going to say this is an accurate -- this is Jared Lenow -- description of the terms of the deal. It's a standard demonstrative, he will explain what it is, and it is helpful to the jury to make sure he understands the numbers and keeps things straight. And, it is not inflammatory.

MR. HECKER: If it is just a demonstrative and not being moved into evidence I have no objection. I thought they were trying to move it into evidence.

MR. LENOW: I think this would be in the -- well, let me give this some thought.

MB45col5          Horowitz - Direct          Page 658

MR. THOMAS: At this time we are offering it as a pedagogical chart so the jury will be instructed that it is not substantive evidence but that it summarizes the testimony.

MR. HECKER: This is not a body of data that needs to be summarized in a pedagogical chart, this is trying to repeat his testimony.

THE COURT: This is not a 1006.

MR. LENOW: Judge, there is two kind of charts 1006 would be summarizing, but the Second Circuit has plainly said for phone charts, for charts of keeping track of e-mail addresses, that pedagogical charts are a separate and independently acceptable basis to put in visuals that simply help illustrate testimony. And I think this is literally just mirroring the testimony he just gave.

THE COURT: I believe Mr. Lenow is correct -- I mean, I haven't examined the chart, studied the chart, but I believe he is correct that the chart contains the very language that Mr. Horowitz just used.

MR. HECKER: I have no -- if they want to use it in their closing I have no objection but it is not a pedagogical chart, it is not trying to tie up phone calls so that the jury can map out what is happening, this is an advocacy chart.

THE COURT: We don't have to get into a debate. They can use is as demonstrative for now.

MR. MARKUS: Without admitting.

MB45col5          Horowitz - Direct          Page 659

MR. HECKER: Yes.

MR. MARKUS: Without admitting.

MB45col5          Horowitz - Direct          Page 660

(In open court)

MR. LENOW: Judge, we offer is this as a pedagogical chart, Government 1344.

MR. HECKER: Same objection, Judge.

THE COURT: The government may use it for now as a demonstrative.

MR. LENOW: Thank you, Judge.

BY MR. LENOW:

Q. May we publish this for the jury?

Mr. Horowitz, did you create this chart?

A. I did not.

Q. Have you reviewed it in advance of your testimony today to confirm that you believe it accurately reflects facts relating to the two deals you just testified to?

A. I did.

Q. Now, let's start on the left-hand side of this chart, Mr. Horowitz. If you can walk the jury through what each field is? Let's start on "Deal Date". What is "Deal Date"?

A. The date that each of the transactions were completed.

Q. Then turning to the right, "Territory". What does "Territory" indicate?

A. The territory indicates the region or regions of the world in which brands were added to joint venture.

Q. I think we haven't talk about this yet so to be clear, these two deals, they were related to joint ventures?

# A-731

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

| MB45col5 | Horowitz - Direct | Page 661 |
|---|---|---|

A. That is correct.

Q. And these are the geographies in which the deals pertained to?

A. That is correct.

Q. So, the June 30th, 2014 deal pertained to what territories?

A. Europe, Turkey, and Korea.

Q. And then the second deal, the September 2014 deal, related to what territories?

A. China, Macau, Hong Kong, and Taiwan.

Q. Moving to the next column, the "Inflated Price" column. What is the inflated price listed as for the June 30th, 2014 deal?

A. $15.9 million.

Q. And there is an indication to GBG and the arrow to Iconix. What does that indicate about the 15.9, approximately, is going from and to?

A. It is going from $15.9 million down to $10.9 million, which is inclusive of the giveback.

Q. Let me rephrase. That $15 million payment, what party is paying it to what party?

A. The $15.9 million is being paid by GBG to Iconix.

Q. Then let's keep on going with the numbers on the June 2014 deal. There is a minus $5 million in the next column or the next row under Secret Promised Giveback. What does that $5 million signify?

| MB45col5 | Horowitz - Direct | Page 662 |
|---|---|---|

A. The $5 million that Iconix was going to pay back GBG.

Q. And then on the far right in that same column, the $10,917,000. What does that indicate?

A. That indicates the actual price of the joint venture.

Q. And now let's turn to the September Deal Prices, starting with the Inflated Price column, $21.5 million. What does that reflect?

A. It reflects the price that GBG was going to pay Iconix.

Q. For what?

A. For the September joint venture.

Q. And then, if you turn to the immediate row to the right, column to the right, there is a minus $6 million. What does that indicate?

A. The $6 million indicates the inflated price and the giveback associated with it.

Q. And then to the right, again, there is a $15.5 million figure under Real Price, GBG to Iconix; what does that mean? What does that indicate?

A. Indicates the $21.5 million in the contracts, now including the $6 million giveback which gets you to the $15.5 million real price.

Q. Mr. Horowitz, there is the phrase Secret Promised Giveback. What was secret about these givebacks?

A. These givebacks were not included in the contracts.

Q. Was the fact that these are secret givebacks related to

| MB45col5 | Horowitz - Direct | Page 663 |
|---|---|---|

these deals? Was that disclosed to Iconix investors?

A. It was not.

Q. To Iconix' auditors?

A. It was not.

Q. To Iconix' lawyers, to your knowledge?

A. No, it was not.

Q. We can take this down.

Mr. Horowitz, I'm going to back up a bit, I'm going to ask you some questions about these deals later but let's start a bit with your personal background. How old are you, sir?

A. I am 46 years old.

Q. How far did you go in school?

A. I got a bachelors degree.

Q. What was the degree?

A. International marketing and communications.

Q. Can you generally describe your employment history from the time you left school through the present? And just big picture.

A. When I left school I joined my father's company, I worked in several positions there in marketing and operations. When he passed -- may he rest in peace -- I became CEO of Everlast Worldwide. After the sale of the company I joined Modell's Sporting Goods as head of merchandising and marketing. I later became president of Modell's Sporting Goods. After approximately four years at Modell's, I joined Iconix Brand

| MB45col5 | Horowitz - Direct | Page 664 |
|---|---|---|

Group where I spent three years.

Q. And then, after Iconix, what was your next area of employment?

A. After Iconix I was CEO of Baked by Melissa.

Q. And what kind of work are you doing now?

A. Now I do full-time consulting work.

Q. Have you done some consulting work over the prior years before that, at times?

A. At times, but only recently full-time.

Q. Now, what year did you actually join Iconix? You mentioned this earlier but just sketching this in in a little bit more detail.

A. I joined Iconix in 2012.

Q. Were you familiar with the company before 2012?

A. Yes, I was.

Q. How was that?

A. Neil and I knew each other prior to me joining the company, we were both a part of the same non-profit organization and Iconix, while I was at Everlast, Iconix and Everlast had a few meetings.

Q. How did you come to work at Iconix?

A. There was a -- I was approached by Neil to join Iconix. There was -- or there were several interviews with Neil. I met with several members of the board and I was interviewed by Jay-Z.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 4, 2022

MB45col5     Horowitz - Direct     Page 665

Q. Why were you interviewed by Jay-Z as part of the interview process?
A. There were two positions that I was being considered for, one was the president of the mens division at Iconix, which included Rocawear which was a brand which Jay-Z was a licensee for, the other position was to run the mens apparel business for Jay-Z as a licensee. So, in either case, there would be interaction and I was asked to interview with Jay.
Q. And what was the position you actually ended up taking at Iconix?
A. I took the position of president of mens division.
Q. What sort of responsibilities did that job include?
A. While president of mens division, I interacted with our existing licensees and looked for new licensees for a select amount of the Iconix brands.
Q. And what were some of the Iconix mens brands?
A. The Iconix mens brands included Starter, Zoo York, Ecko, Rocawear, Ed Hardy, and others.
Q. Why did you decide to work at Iconix and take the mens brands position, the head of the mens division?
A. I decided to work at Iconix because it was an excellent opportunity to make money, to make significant money. It gave me and my family the ability to stay in New York City close to the rest of our family, and I found Iconix to be a very interesting, intriguing company.

MB45col5     Horowitz - Direct     Page 666

Q. Mr. Horowitz, you mentioned that you came to hold the role of chief operating officer or COO. When did you make that transition to being COO?
A. I became COO in early spring of 2014.
Q. And, Mr. Horowitz, when you were first hired to work at Iconix, did you have any understanding from Mr. Cole, from Neil Cole, about how he saw your future at the company?
A. Yes.
Q. And what was that?
A. Neil expressed to me, in my interviews, that he would like to groom me, he made references to not wanting to do this forever, and that he saw me as potential to take his place.
Q. Mr. Horowitz, where were Iconix' offices located?
A. Iconix' offices were at 1450 Broadway.
Q. Can we show the witness what is in evidence as Government Exhibit 303, please?
     Do you recognize what is in this document or this photograph?
A. Yes.
Q. What is it?
A. It's 1450 Broadway where Iconix' offices were.
Q. Mr. Horowitz, when you were head of the mens division, what floor did you sit on?
A. As head of the mens division I sat on the 4th floor.
Q. When you became COO, did you move to another area of the

MB45col5     Horowitz - Direct     Page 667

building?
A. I did.
Q. Where was that?
A. I moved to the third floor.
Q. What was on the third floor?
A. Neil Cole's office and the conference rooms.
Q. Horowitz, how far away from Mr. Hecker's office were you in terms of just if you wanted to walk from your office to Mr. Cole's office, how long would that take once you moved to the third floor?
A. 10 seconds, or less.
     MR. LENOW: Judge, I think we are at 2:40. This may be a good breaking point.
     THE COURT: We are. We are at 2:40, so that brings us to the end of the day. Ladies and gentlemen, I am happy to report, if you haven't all realized, it is Friday. So that brings also to the end of the week. I hope you appreciate that we have gotten a lot done, you have put in a lot of work, so you have earned this weekend.
     Have a wonderful weekend. Be safe getting home. Over the course of the weekend please do not read anything about the case, listen to anything about the case, don't discuss the case. Please, do endeavor to be in the jury room no later than 9:15 Monday morning. We will see you then. Take good care.
     (Continued on next page)

MB45col5     Page 668

     (Jury not present)
     THE COURT: Mr. Horowitz, you may step down, and everyone can be seated.
     (Witness steps down)
     MR. HECKER: Your Honor, Mr. Cahn from the WilmerHale firm just walked out. Can we get him back with the one issue pending with the motion to quash?
     THE COURT: I haven't read the papers.
     MR. HECKER: It is just about timing, it is not about something else.
     THE COURT: OK. Sure.
     MR. THOMAS: Your Honor, while we wait for him, can we clear up one item?
     THE COURT: Sure.
     MR. THOMAS: So, I think I'm the one who introduced the phrase "pedagogical chart," but what we are saying is we are not offering the chart as substantive evidence, it is not a summary of voluminous data, we are just trying to use the language that some of the cases used when it is an aid to juror comprehension. That's all we meant by that.
     THE COURT: I'm sorry?
     MR. THOMAS: We are just trying to use the chart as an aid to juror comprehension and not as substantive evidence and that was all we meant by describing it as a pedagogical chart.
     THE COURT: OK. But you are still looking to have it

UNITED STATES OF AMERICA, V
 NEIL COLE,                                                    **November 7, 2022**

MB1YCOL1                                              Page 681

THE COURT: We have received the documents from Wilmer. So we'll get back to you on that.

And all the jurors are here.

Can we get Mr. Horowitz in here, please.

(Continued on next page)

(In open court; jury present)

THE COURT: Good morning, please be seated.

Ladies and gentlemen, good morning. I had you all had a wonderful and warm weekend. Thank you, as always, for being so prompt.

We will now continue with the direct examination of Seth Horowitz, who I remind you that you are still under oath.

MR. LENOW: Thank you, Judge. We are actually going to begin by actually reading a number of exhibits that have been admitted by the parties.

I'll read the government exhibit numbers.

THE COURT: Very well.

MR. LENOW: 110, 113, 213, 214, 215, 216, 231, 232, 232B, 234, 235, 236, 241, 247, 249, 250, 257, 320, 325, 708, 1029, 1031, 1032, 1035, 1036, 1037, 1038, 1039, 1041, 1042, 1043, 1046, 1047, 1052, 1054, 1056, 1058, 1062, 1063, 1065, 1069, 1070, 1077, 1078, 1079, 1081, 1082, 1084, 1085, 1094, 1096, 1098, 1100, 1101, 1104, 1105, 1111, 1118, 1122, 1123, 1126, 1134, 1141, 1142, 1144, 1151, 1168, 1179, 1206, 1207, 1208, 1211, 1212, 1213, 1214, 1225, 1244, 1245, 1247, 1248,

MB1YCOL1                                              Page 682

1253, 1255, 1255B, 1256, 1514A, and then Defense Exhibits 415 and 1407.

MR. HECKER: No objection.

THE COURT: Very well. They will be received.

(Government's Exhibits 110, 113, 213, 214, 215, 216, 231, 232 received in evidence)

(Government's Exhibits 232B, 234, 235, 236, 241, 247, 249, 250, 257, 320, 325, 708 received in evidence)

(Government's Exhibits 1029, 1031, 1032, 1035, 1036, 1037, 1038, 1039, 1041, 1042 received in evidence)

(Government's Exhibits 1043, 1046, 1047, 1052, 1054, 1056, 1058, 1062, 1063, 1065 received in evidence)

(Government's Exhibits 1069, 1070, 1077, 1078, 1079, 1081, 1082, 1084, 1085, 1094 received in evidence)

(Government's Exhibits 1096, 1098, 1100, 1101, 1104, 1105, 1111, 1118, 1122, 1123 received in evidence)

(Government's Exhibits 1126, 1134, 1141, 1142, 1144, 1151, 1168, 1179, 1206, 1207 received in evidence)

(Government's Exhibits 1208, 1211, 1212, 1213, 1214, 1225, 1244, 1245, 1247, 1248 received in evidence)

(Government's Exhibits 1253, 1255, 1255B, 1256, 1514A received in evidence)

(Defendant's Exhibits 415 and 1407 received in evidence)

MR. LENOW: Good morning, Mr. Seth Horowitz.

MB1YCOL1                                              Page 683

THE WITNESS: Good morning.

MR. LENOW: Let's publish this for everybody. Actually, it's in evidence.

SETH HOROWITZ, resumed
    called as a witness by the Government,
    having been duly sworn, testified as follows:

DIRECT EXAMINATION CONTINUED

MB7YCOL1                 Horowitz - Direct

BY MR. LENOW:

Q. Mr. Horowitz, where was your office in this photograph?

A. My office is the third door in from the right.

Q. Where kind of the red Exit sign is reflecting around?

A. That is correct.

Q. And Mr. Cole's office, where was that office?

A. Neil Cole's office was straight down the hall.

Q. Where that little chair is in the open doorway?

A. Correct.

Q. How far a walk was it from your office to his office?

A. Very short.

Q. Mr. Horowitz, once you became COO of the company, how commonly would you speak with Mr. Cole on the average business day?

A. On the average day, we would speak several times.

Q. Can you describe how that occur.

Would it always be formal meetings, or would there be

MB1YCOL1                                              Page 684

informal ones?

A. Oftentimes it is informal meetings where I would be called to Neil Cole's office or a conference room to meet with him.

MR. LENOW: Let's publish what's in evidence as Government 304 and 305 at the same time.

Q. Mr. Horowitz, what do those photos depict?

A. These are pictures of what was Neil's office.

Q. Do you notice anything that's a little different from how you recall it compared to how it's depicted in the photographs?

A. Yes.

Q. Can you describe that, please.

A. I recall there being a round, wooden table close to the window on the left. And I believe there was a couch in there as well.

Q. And those are not depicted in this photograph?

A. That's correct.

Q. Mr. Horowitz, how would you describe Mr. Cole's management style as you experienced it?

A. As I experienced Neil's management style, it was a wide range. He could be charismatic, charming as a successful executive. He also was, to me and others in front of me, a screamer, abusive, and used lots of foul language.

Q. Did Mr. Cole's management style at times depend on who he was interacting with at the company?

A. Yes.

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                    November 7, 2022

MB1YCOL1                                                      Page 685

Q. And how many direct reports did Mr. Cole have approximately?
A. I believe he had about eight to ten direct reports.
Q. Mr. Horowitz, was Iconix a public or a private public when you were working there?
A. Iconix was a public company.
Q. What does that mean?
A. It means that the public can own shares or own pieces of the company.
Q. How often would Iconix release information on its financials such as its revenue and its earnings to the public?
A. Iconix would release financials every three months.
Q. Are you familiar with a metric calls EPS?
A. Yes.
Q. What is EPS?
A. EPS stands for earnings per share. So that is basically how much profit the company makes per each individual share that's available for buying and selling on the market.
Q. And for a given quarter at Iconix, was EPS typically measured in cents or dollars?
A. In quarters, it was typically measured in cents.
Q. Are you familiar with the metric of revenue?
A. Yes.
Q. What is revenue?
A. Revenue is basically equivalent to sales or the sales of a

MB1YCOL1                                                      Page 686

company.
Q. For a given quarter at Iconix, was revenue measured in terms of cents or some other metric typically?
A. It was measured in dollars, millions of dollars.
Q. Mr. Horowitz, during your time as COO of the company, did you ever talk to Mr. Cole about Mr. Cole's views about what financial metrics Iconix's investors cared about?
A. Yes.
Q. And what did Mr. Cole say about the metrics that Iconix's investors cared about?
A. They were primarily concerned with revenue and EPS and, to some extent, EBITDA.
Q. Mr. Horowitz, in terms of those metrics, what, if anything, did he say in terms of what he thought investors wanted to see from Iconix?
A. During my time as COO, Neil insisted that investors wanted to see growth over last year and over consensus.
Q. What is "consensus" as you understood it to mean?
A. There are analysts who put out coverage or reports on public companies, and they give a range of what's expected, how the company is expected to perform. Consensus is the average of what those analysts think are going to happen.
Q. Was it a regular practice at Iconix for Mr. Cole to bring up how Iconix was doing relative to growth metrics or analyst consensus?

MB1YCOL1                                                      Page 687

A. Yes.
Q. Can you describe how that would come up and how often.
A. That would come up often and even more often towards the end of a quarter. We would have meeting where we would look at a financial forecast sheet that would measure our performance or what looked like was going to be our performance for that quarter versus last year and versus consensus. And we would do that regularly towards the end of a quarter and sometimes even many times a day towards the end of a quarter.
Q. Did Mr. Cole explain actually why he thought showing growth and showing beating of consensus mattered to investors?
A. Yes.
Q. What did he say about that?
A. Neil expressed that we need to show growth in these numbers as it related to the value of the company. And he was afraid, if we did not show growth, that the market would question the entire business model.
Q. And why was that, according to Mr. Cole?
A. There was a need to show growth so that people could believe in the future of the company and not question our ability to sustain growth.
Q. What, if anything, did Mr. Cole say would be the consequences if, during your time as COO, Iconix fell short of either beating its growth targets or falling short of consensus?

MB1YCOL1                                                      Page 688

A. Neil was concerned that if we did not hit our financial goals and beat the prior year in consensus, that the stock price would fall and people would question again the entire business model.
Q. Mr. Horowitz, was your compensation affected by Iconix's financial performance?
A. Yes, it was.
Q. How so?
A. On an annual basis, I was rewarded for stock for our EBITDA, EPS, and cash flow.
Q. Was revenue an ingredient in any of those metrics?
A. Yes.
Q. Can you explain.
A. Revenue is the top of the filter. Sales is where everything starts, and then you take away expenses and EBITDA and everything else.
Q. So everything else being equal, if you have higher revenue, would you have higher EBITDA?
A. Yes.
Q. And everything else being equal, would you have higher earnings per share or earnings?
A. Yes.
Q. Do you know if Mr. Cole had a similar compensation package of yours in terms of these financial metrics mattering for his compensation?

UNITED STATES OF AMERICA, V
 NEIL COLE,
November 7, 2022

MB1YCOL1      Page 689

A. Yes. I believe he did.

Q. All right. Mr. Horowitz, I want to ask you some more questions about the meetings you mentioned with Mr. Cole where these financial metrics were tracked and discussed.
 Who led these meetings?

A. Neil led these meetings.

Q. Where did they take place?

A. They took place in conference room 3A.

MR. LENOW: Mr. Bianco, could we please publish Government Exhibit 313.

Q. Mr. Horowitz, what is depicted in this photograph?

A. That is conference room 3A.

Q. Who would typically attend these meetings where the company's financial forecasts were discussed?

A. Neil and I, David Maslaton, most of the time David Blumberg, Jeff Lupinacci, occasionally Jason Schaefer and occasionally Willy Burkhardt.

Q. Who was David Maslaton?

A. David Maslaton was a member of the financial team.

MR. LENOW: Can we show the Exhibit 325 in evidence.

Q. Who is depicted in Government Exhibit 325?

A. That's David Maslaton.

Q. You also mentioned some other people, David Blumberg.
 Who was he?

A. David Blumberg was the head of strategic acquisitions at

MB1YCOL1      Page 690

Iconix.

Q. And Jeff Lupinacci?

A. He was the chief final officer.

Q. Jason Schaefer?

A. Jason was the general counsel.

Q. Willy Burkhardt?

A. Willy Burkhardt was in charge of international business.

Q. Were there any written materials that were used during these tracking meetings?

A. Yes.

Q. What materials?

A. It was most of the time one-pager that was a financial forecast.

Q. Do you know who prepared those financial forecast documents?

A. Yes.

Q. Who?

A. David Maslaton.

Q. Let's start with the hard version, and then we'll shift back to this.
 Mr. Horowitz, can you see what's under the Elmo as GX250?

A. Yes. Very closely.

MR. LENOW: This may not work. Let's go to the electronic version now.

MB1YCOL1      Page 691

Mr. Bianco, can you please publish electronic version 250.

Q. Mr. Horowitz, what are we looking at in GX250?

A. This is one of the financial forecasts I was referencing.

MR. LENOW: Let's break this down item by item.
 Mr. Bianco, can you please highlight the word "revenue" on the left-hand side.

Q. What does "revenue" indicate here?

A. Revenue indicates the sales forecast for the entire third quarter.

Q. Just looking at the top left-hand corner, August 19, 2014, do you see that date?

A. I do.

Q. What does that indicate about this document?

A. That we are in the third quarter.

Q. Above where it says Q3 2014, does that indicate the same thing?

A. It does.

Q. Is this the sort of document that Mr. Maslaton would hand out during -- or that would be handed out and created by Mr. Maslaton during these forecast meetings?

A. Yes, it is.

Q. When we look at revenue --
 Mr. Bianco, can you please highlight non-GAAP EPS at the bottom left-hand column.

MB1YCOL1      Page 692

Remind the jury what is non-GAAP EPS.

A. EPS are the earnings per share. So it's basically the profit of the company divided by the number of shares that are out in the marketplace.

Q. Now, the column to the right, Q3 forecast --
 Let's just hold off on highlighting that.
 Broadly speaking, what is Q3 forecast?

A. It indicates the track that the company is on for the third quarter in terms of its financial performance.

Q. So if Iconix didn't do any other significant deals and was just continuing as expected at this point in time, what would its revenue be for the third quarter of 2014 under this document?

A. It would have been $93 million approximately.

Q. That was the 93 million that was just highlighted?

A. That's correct.

Q. How does the Q3 forecast column here, the 93 million --
 Do you see a block at the very bottom that says "consensus"?

A. I do.

Q. We'll just turn to that for a second.
 What are those consensus numbers -- revenue, 111 approximately; EPS, .62?

A. Consensus relates to the market consensus put out by analysts that I just referenced before.

UNITED STATES OF AMERICA, V
NEIL COLE,
November 7, 2022

MB1YCOL1 Page 693

Q. So at this point in time, if Iconix was just tracking as normal and didn't do any more big deals this quarter, how would its revenue stack up to what Wall Street expected of Iconix's revenue?

A. It would have been extremely short.

MR. LENOW: Mr. Bianco, can you please just highlight the consensus revenue, the 111.70.

Q. How far off from consensus for revenue was Iconix at this point in time in August of 2014?

A. Approximately $18 million.

Q. And now EPS. If Iconix didn't do any more big deals this quarter, would it have met Wall Street's consensus for EPS?

MR. HECKER: Objection to form, your Honor, "big deals."

THE COURT: Sustained as to form.

BY MR. LENOW:

Mr. Horowitz, if Iconix didn't do any other significant transactions and just continued the quarter as it was and ended the quarter where it was with its current organic business, what would its EPS have been according to this chart?

MR. HECKER: Same objection.

THE COURT: Overruled.

THE WITNESS: It would have been 40 cents.

MR. LENOW: Mr. Bianco, can we highlight that 40 cents at the bottom of that Q3 forecast column.

MB1YCOL1 Page 694

Q. How does that number compare to the EPS that analysts were predicting for the company?

A. It was short by 22 cents.

MR. LENOW: Mr. Bianco, can we highlight the 62 EPS down there next to consensus.

Q. Mr. Horowitz, do you see in this chart any reflection of the third quarter for the prior year?

A. Yes.

Q. What column reflects the results for the prior year third quarter?

A. It's the column all the way to the right.

Q. Q3 2013?

A. Yes.

Q. So similar questions with consensus.

Based on the Q3 forecast number where Iconix is trending at this time, would Iconix have met or exceeded its results from last year's third quarter for either revenue or EPS?

A. No, it would not.

MR. LENOW: Mr. Bianco, could we please highlight for the revenue column of the Q3 2013, the 107.177 number.

Q. At this point, how far short, Mr. Horowitz, was Iconix from the prior year's Q3? The prior year's third quarter.

A. Proximately $14 million.

MR. LENOW: And then, Mr. Bianco, let's highlight the

MB1YCOL1 Page 695

59 cents at the bottom of the Q3 column.

Q. Mr. Horowitz, how far short was Iconix of the last Q3's results for the EPS at this point in time in Q3 2014?

A. 19 cents.

Q. Now, Mr. Horowitz, let's talk about the middle of this chart, the opportunities and risks and the Q3 latest.

What do the opportunities and risks and the Q3 latest field represent? the stuff in the middle.

A. The opportunities and risks represent transactions that the company was considering or working towards during that quarter, as well as other updates to the business. And then the Q3 latest basically takes the first column, which is the Q3 forecast, and adds the opportunities and risks to come up with the total number.

Q. What are "opportunities and risks"?

A. Opportunities and risks are transactions that the company is contemplating, as well as updates to various columns based on trend.

Q. So, here, under opportunities and risk on the left side, one of the columns says Umbro China.

What is Umbro China, as you understand it?

A. It's a potential joint venture for Umbro and Lee Cooper in China.

Q. How, if at all, does that relate to the fraudulent deals you mentioned at the beginning of your testimony?

MB1YCOL1 Page 696

A. This turns into one of the fraudulent deals.

Q. Which one?

A. SEA-3.

Q. So according to this chart, if Iconix closed Umbro China at this quarter at these figures at this time, how much revenue is Umbro China going to bring into the company?

A. $12.5 million.

Q. And then how much EPS is Umbro China going to bring into the company at this point in time if it gets done at this price.

A. 20 cents.

Q. Now, Mr. Horowitz, do you know at this point in time on August 19, had the price of that deal been inflated yet, or is this the non-inflated price?

A. This is the non-inflated price.

Q. Are there other transactions reflected on this chart that Iconix was contemplating at this time according to the document?

A. Yes.

Q. What is Middle East JV?

A. We were working on another joint venture in the Middle East.

Q. With what other business?

A. I believe at the time it was with a company called Avalisa.

Q. Were there other suitors they considered apart from

UNITED STATES OF AMERICA, V
NEIL COLE,

MB1YCOL1      Page 697

Avalisa.

A. I don't recall at this time if there were other suitors.

Q. Did there come a time when Iconix actually entered into a Middle East joint venture?

A. Yes.

Q. With whom did it enter into that deal with?

A. GBG.

Q. And according to this chart, how much revenue would be brought in by the Middle East joint venture at this time?

A. $6.9 million.

Q. And how much EPS?

A. 10 cents.

Q. Mr. Horowitz, if Iconix got these two deals done, Umbro China and Middle East JV, how would that have affected its revenue projection for the quarter?

A. Iconix would have achieved over $112 million of revenue beating both last year and consensus.

Q. Same question for EPS.

If it closed both those deals, the deal that became SEA-3 and Middle East JV, how much EPS would get added to Iconix's EPS projection for the quarter?

A. It would have added 30 cents of EPS.

Q. Would that have been enough between those two deals to hit your financial targets?

A. Yes.

MB1YCOL1      Page 698

Q. Now, did the Middle East deal get done this quarter?

A. No, it did not.

Q. Without the Middle East deal, according to this sheet, was the Umbro China, the SEA-2 deal, where it was, enough to make Iconix's financial targets for the quarter at this price?

A. No, it was not.

Q. Now, Mr. Horowitz, can you explain why doing a deal like this, SEA-3 in particular, why does that bring in revenue and EPS into Iconix's pocket book?

A. When Iconix forms a joint venture in this format, Iconix takes the revenue from the transaction as the price paid minus cost basis. Cost basis in this case is how much Iconix paid for that brand.

So if Iconix paid $5 million for a brand and did a joint venture for $10 million with that brand, Iconix would get $5 million of revenue, and it would all drop to the EPS or earnings per share.

Q. Mr. Horowitz, just to be clear, are you able to claim all of the money that the other side pays you for a joint venture interest as revenue or only part of it?

A. Part of it.

Q. Can you explain.

A. There is a cost basis that is subjected from the purchase price. The cost basis is based on how much Iconix paid for that brand.

MB1YCOL1      Page 699

Q. So you don't get to count for the amount you paid for the brand. That gets lopped off of the incoming dollars, and then you get revenue.

Is that fair?

A. That's fair.

Q. Here, for SEA-3, the Umbro China deal, is the $12.5 million the price that GBG was expected to pay at this time, or is that some other number?

A. It's some other number.

Q. Can you explain what that means.

A. It's the price that GBG was willing to pay at that time, that we had agreed to at that time, minus the cost basis.

Q. Minus the amount that Iconix had paid for the interest?

A. Exactly.

Q. Mr. Horowitz, are you familiar with the concept of "organic growth"?

A. Yes.

Q. What is "organic growth"?

A. Organic growth, as it related to Iconix, was the growth of existing brands. So we had a portfolio of brands, and the amount of revenue that those brands or sales that those brands brought in would be considered organic. And we wanted that business to be growing.

Q. Was Iconix able to hit its financial numbers, either in the third or second quarter of 2014, using only organic growth?

MB1YCOL1      Page 700

A. No.

Q. Can you explain.

A. Iconix had several large brands that were in a state of decline. And in total, we would not have shown organic growth in either Q2 or Q3.

Q. Mr. Horowitz, did that ever give you concern at the time, that Iconix's organic growth by itself was not enough for it to meet its financial targets?

A. At the time, it gave me some concern.

Q. Did you ever talk to Mr. Cole about organic growth versus one-time deals to make financial numbers for Iconix to make its financial goals?

A. Yes.

Q. And what, if anything, did Mr. Cole say about Iconix's inability to hit its numbers solely with organic growth?

A. He was frustrated by it. He was aware and made it be known that that gap or drop in organic growth was growing and we were running out of one-time transactions to make up for the business.

Q. Did you view that as a sustainable model? To do one-time deals to hit your numbers.

A. No.

Q. Explain to the jury why that is, why you didn't view the one-time deals as sustainable ways for Iconix to make its financial goals.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB1YCOL1      Page 701

A. The one-time transactions were one time. If you sold the rights to brands in a certain geography, you could only sell those rights once. You've sold those rights. And we were running out of geography and brands to continue this use of one-time transactions to fill the gap in our shrinking organic growth or lack of growth.

Q. Did Mr. Cole ever use any fort of euphemisms or short-hand expressions to refer to Iconix's use of these one-time deals to hit its numbers?

A. Yes.

Q. What did he say?

A. He referred to it as a drug, the one-time transactions, and it was something that we would have to get off of.

Q. And turning back to this chart for a second, GX250, the EPS for the company's organic numbers, at this time, what was it? What was the EPS as of August 19, 2014, that Iconix's organic business was throwing off?

A. 40 cents.

Q. And how much EPS was brought in by the SEA-3 deal, according to this, prior to the price being inflated?

A. 20 cents.

Q. And just comparing those two, what percent of the organic growth was equivalent to the SEA-3 deal?

A. It was 50 percent.

Q. How was it, Mr. Horowitz, that a single deal at the

MB1YCOL1      Page 702

uninflated price year accounted for about 50 percent, was equivalent to 50 percent, of the organic EPS that the company was throwing off?

A. The joint venture transactions were like concentrated profit. Once you took off the cost basis, the revenue went straight to the bottom line.

Q. So in terms of your thinking at the time, the EPS that was being brought in or what you brought in if this deal got done, was that significant in your mind?

A. Yes.

Q. Was it significant in terms meeting -- a step towards meeting Iconix's financial goals, that additional 20 cents?

A. Yes.

Q. Now, Mr. Horowitz, I'm going to switch gears and talk to you about joint ventures a little bit more broadly. Just generally speaking, what is a "joint venture"?

A. A joint is a partnership between two or more people or businesses that combine forces to form one company.

Q. Did Iconix have multiple joint ventures during your time at the company?

A. Yes, it did.

Q. Can you give us some examples of countries where Iconix found a joint venture partner.

A. Canada, Israel, Australia, Europe.

Q. Was there a joint venture started in Southeast Asia?

MB1YCOL1      Page 703

A. Yes.

Q. Did there ever come to be situations in which there would be an existing joint venture for one area and you would add other countries, other geographies, to that existing joint venture?

A. Yes.

Q. And you testified about the SEA-2 deal, the June 2014 deal, including Korea and Turkey and Europe. Do you recall that testimony?

A. I do.

Q. So when that deal was done adding some Korea rights -- First of all, is it correct that that deal involved adding Korea rights to the Southeast Asia joint venture?

A. It is.

Q. Did Iconix already have a European joint venture at that time?

A. Yes.

Q. Can you explain to the jury: Why didn't Iconix just add these new European rights to the existing Iconix joint venture?

A. If Iconix added new brands to the European joint venture, we would not have been able to recognize any revenue from the transaction because of the state of the current JV.

Q. Were these JVs structured differently? The Iconix Europe and the Iconix Southeast Asia joint venture.

A. They were.

MB1YCOL1      Page 704

Q. There was something about their legal structure that would allow you to take the gain if the assets were added to one but not the other?

MR. HECKER: Objection to form. Leading.

THE COURT: Sustained.

BY MR. LENOW:

Q. Was there a difference in the legal structure of the Iconix Europe joint venture and the Southeast Asia joint venture?

A. Yes, there was.

Q. Did that legal structure have any effect on the financials of whether you could add revenue or adding geographies to those joint ventures?

A. Yes. In Europe, Iconix had a majority ownership. And in Southeast Asia, we did not. And that technicality led us to be able to take revenue if we added the brands to the Southeast Asia JV rather than the Europe JV, even though they were Europe brands.

Q. Mr. Horowitz, generally speaking, these JVs on a day-to-day basis, can you just explain how they would operate.

A. In most cases, the joint venture partner was a company that had relationships in that geography, and they would run the day-to-day licensing and communication with potential licensees.

Q. When a joint venture, in the typical case, had an expense where something had to get paid, a bill that needed to get

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                November 7, 2022

MB1YCOL1                                                    Page 705

paid, who would pay the joint venture's bills typically?
A. The joint venture would pay its own bills.
Q. Was that true of the Southeast Asia joint?
A. Yes.
Q. So, for example, if some advertising work was done for the Southeast Asia joint venture, where should that bill be directed?
A. The bill would be paid by the Southeast Asia joint venture.
Q. All right. Let's talk about the Southeast Asia joint ventures a bit more.
So, to be clear, how many different transactions did Iconix enter into relating to the Southeast Asia joint venture entity?
A. There were three transactions.
Q. Do you recall approximately when the first one was? What year.
A. It was in 2013.
Q. Were you involved in negotiating --
Let's take down GX250. Thank you.
Mr. Horowitz, were you involved in negotiating the first, that initial, JV deal in 2013?
A. No, I was not.
Q. Were you involved in negotiating the subsequent deals, the amendment in June of 2014 and the amendment in September of 2014?

MB1YCOL1                                                    Page 706

A. Yes, I was.
Q. Mr. Horowitz, what, if anything, is the relationship between those two amendments and the fraudulent deals you mentioned earlier in your testimony?
A. Both of those amendments represent fraudulent deals.
Q. And, Mr. Horowitz, for your testimony, is it okay if we refer to the first Southeast Asia deal as "SEA-2" and the third as "SEA-3"?
Would that be okay in terms of nomenclature?
A. Yes.
Q. So let's talk about the June 2014 deal, SEA-2.
Can you remind the jury what is the real price you and Neil Cole agreed to pay -- you and Neil Cole agreed on for GBG to pay for that deal and then what the falsely inflated price was.
A. $10.9 million was the real price. $15.9 million was the inflated price.
Q. You mentioned giveback earlier in your testimony.
What, if anything, did you and Mr. Cole agree to give back GBG in connection with that transaction?
A. We agreed to give back $5 million.
Q. Did you expect to obtain anything of value for that $5 million payment, apart from the overpay?
A. No.
Q. Mr. Horowitz, on the GBG side, do you recall having

MB1YCOL1                                                    Page 707

interactions with executives at that company during the negotiations?
A. Yes.
Q. And is that also true for the SEA-3 deal?
A. Yes.
MR. LENOW: Can we please show the witness what's marked for identification as Government Exhibit 320 and is in evidence.
Q. Do you recognize who this person is?
A. I do.
Q. Who is it?
A. Jason Rabin.
MR. LENOW: Can we please show the witness and let's also put up on the screen Government Exhibit 321.
Q. Do you recognize that individual?
A. Yes.
Q. Who is it?
A. That's Jared Margolis.
Q. And where were Mr. Margolis and Mr. Rabin employed in the kind of June 2014 timeframe and September 2014 timeframe?
A. They were employed at GBG.
MR. LENOW: We can take those down.
Mr. Bianco, can we please publish what is now in evidence as Government Exhibit 1028.
Q. Mr. Horowitz, drawing your attention to this email, do you

MB1YCOL1                                                    Page 708

see the date of April 30, 2014?
A. I do.
Q. From Neil Cole to Jason Rabin, Jared Margolis, copy Seth Horowitz.
Do you see those names listed?
A. I do.
MR. LENOW: Mr. Bianco, highlighting the top two lines of the subject and the body of the email.
Q. Can you please read that text.
A. "Are you guys available to meet on Friday? Would like to discuss Europe, Korea, China."
Q. What do you understand Mr. Cole, Neil Cole, is referring to there when he says: "Europe, Korea, and China"?
A. He's referring to potential joint ventures with GBG in those geographies.
Q. Did you subsequently engage in negotiations with GBG with the deals that became SEA-2 and SEA-3?
A. Yes.
Q. Was Mr. Cole involved in those negotiations?
A. Yes.
Q. Can you generally describe his level of involvement in the negotiations. This is Neil Cole.
A. Neil was very involved in the details and negotiations of this joint venture.
Q. Did you have some direct dealings with GBG in which Neil

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB1YCOL1 Page 709

Cole was not a participant?

A. Yes.

Q. In those situations, would Neil give you any direction on how to conduct the dealings? Or would you essentially be operating as a free agent?

A. Neil would give me very specific directions.

Q. When you had meetings with GBG when Neil Cole was not present, would it be common or was it your practice to report to him on the results of the meetings?

A. Yes.

MR. LENOW: Let's turn now to Government Exhibit 1029, which is in evidence.

Q. All right. Mr. Horowitz, do you see at the top an email from Seth Horowitz to Neil Cole dated May 21, 2014?

A. I do.

Q. I want to draw your attention to the part of the body of the email where it says -- and this is starting at the end of the first line -- "Because we own 51 percent of the Europe JV, we cannot amend that JV to include the new brands in a manner where we take the gain."

Do you see that?

A. I do.

Q. Let's just stop there.

What are you telling Mr. Cole in this email with that comment?

MB1YCOL1 Page 710

A. That in order to take the gain or the revenue from the formation of the joint venture, we cannot do it through the existing Europe JV.

Q. Why are you telling him that?

A. Because gaining the revenue from the formation of the joint venture was critical.

Q. Did Neil Cole express that to you, that getting gain from this transaction was important to him?

A. Yes.

Q. Drawing your attention where you say: "However, we can amend the SEA JV to extend the rights of Echo Unlimited, Zoo York, Ed Hardy, etc., to include European distribution for $10 million gain."

What are you saying there to Mr. Cole.

A. That there is another way to take the transaction in which we can take the gain.

Q. Then after that, there's talk of Lee Cooper. It says -- this is point two -- "Amend the Europe JV to include Lee Cooper because we are only selling 49 percent for 12 million. Neutral to our cost basis."

What are you saying there about Lee Cooper and the Europe JV?

A. That we would be adding Lee Cooper to the existing Europe JV because we were selling a minority of the business and we were selling it at our cost basis. So there was no reason or

MB1YCOL1 Page 711

possibility of getting revenue from that transaction.

Q. What is Lee Cooper?

A. It's like a British denim brand.

Q. Did that transaction, to your recollection, ever get done with GBG?

A. No, it did not.

MR. LENOW: All right. We can take that down.

Let's now turn to government 1031, which is in evidence. We can show it to all parties and the jury. It's an email dated May 2.

Q. Do you see where it says: "From Seth Horowitz to Jared Margolis. Subject: LF amend"?

A. I do.

MR. LENOW: Let's go to the attachment to this document, the next page. Let's zoom out of it so we can get a bit more sense of the whole document. If we can pull just the text out above the signature lines. Thank you.

Q. Mr. Horowitz, I just want to highlight --

Let's start by highlighting, Mr. Bianco, points B and C and the text under them. Great. I'm sorry. Not C. A and B. My apologies.

All right. Mr. Horowitz, do you see in this sheet any reference to the assets that ultimately became the assets at the heart of SEA-2?

A. Yes.

MB1YCOL1 Page 712

Q. Where is that reflected?

A. It's reflected in A and B.

Q. Can you just walk the jury through what this is saying about -- let's back up a little bit more.

What is this document? What kind of document is this?

A. It's a draft term sheet that's being sent back and forth between Iconix and GBG.

Q. So what is A referring to? There's $3.7 million purchase price.

What is that?

A. It's the purchase price for GBG for Korea.

Q. And then under B, there's a description of Europe and Turkey rights for various brands and then a $7.6175 million purchase price.

What is that?

A. The 7.6 approximately million dollars was the purchase price for adding brands to Europe through the Southeast Asia JV.

Q. If you add the 3.7 and 7.6, approximately what number do those reach?

A. 11.3 million.

Q. So according to this document, what does this term sheet reflect as being contemplated for the purchase price of the SEA-2 brand assets?

A. $11.3 million proximately.

**A-741**

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB1YCOL1        Page 713

Q. Now stepping back a bit, there is an overall deal described here with a $25 million cost in purchase price.

What is the additional approximately $14 million being discussed here for Europe JV and Lee Cooper?

A. The $14 million is the proposed price for 49 percent of Lee Cooper in Europe and Turkey.

Q. And, again, does that deal end up getting done?

A. It does not.

Q. And this term sheet, as you understood it, if this had gotten done, would it have been a single contract covering all these terms? Or would it have been multiple different deals?

MR. HECKER: Objection. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: It would have been different deals as we were amending the Southeast Asia in one area and amending the Europe joint venture in another.

BY MR. LENOW:

Q. So this term sheet for the purchase price, is this talking about the purchase price that would have been one single deal or multiple deals?

A. Multiple deals.

Q. Again, to be clear, what is the price being discussed here for the purchase price of what becomes SEA-2?

A. Approximately $11.3 million.

Q. Was there any connection or linkage between the purchase

MB1YCOL1        Page 714

price for the Europe and Korea assets that become SEA-2 and this other Lee Cooper Europe JV transaction that's being contemplated?

A. No.

Q. Was there independent valuation work done at Iconix for each of these assets separately?

A. Yes.

Q. All right. Let's turn now to --

MR. LENOW: We can take this down, and let's turn now to Government Exhibit 1032. Let's zoom in on the top part of the email, Mr. Bianco. Thank you.

Q. Now, drawing your attention, Mr. Horowitz, to the top of this email, it says from Seth Horowitz to Neil Cole dated May 22, 2014.

Do you see that header?

A. I do.

Q. I want to draw your attention to the text.

Mr. Bianco, if you can highlight it as I just read it.

"Work with Jason and Jared this afternoon. Proposed the Korea and non-Lee Cooper EU transactions first with the right to do LC in second half at predetermined price would get us 12m gross, 9.5 this quarter. They think they can get it through."

What are you expressing to Mr. Cole in this email?

A. That we have proposed that the transactions happened at

MB1YCOL1        Page 715

different times; that we can do the -- what becomes SEA-2 in this quarter, and Lee Cooper they would have the right to do in the future quarter.

Q. And the "9.5 net this quarter," what are you referring to there?

A. The revenue that Iconix would gain from the joint venture transaction.

Q. And in the last document we saw the price for those SEA-2 assets. It was like $11.3 million.

How does that $11.3 million relate to this $12 million figure here?

A. It's referring to the same thing.

Q. So this 12 million is sort of a shorthand for the 11.3?

A. I believe that's correct.

Q. And just remind the jury. If the deal did happen at $11.3 million as contemplated in that document, why are you only getting 9.5 net in revenue?

A. There was a cost basis for the brands that we were adding for this joint venture. So we would have had to reduce the purchase price by the cost base to get our cost revenue.

(Continued on next page)

MB75col2     Horowitz - Direct     Page 716

BY MR. LENOW: (Continuing)

Q. Why are you emphasizing to Mr. Cole net this quarter? Why do you mention this quarter?

MR. HECKER: Objection. Foundation.

MR. LENOW: I will withdraw and ask it differently, Judge.

THE COURT: OK.

BY MR. LENOW:

Q. Mr. Horowitz, why are you using the words "this quarter" here, 9.5 net this quarter?

A. I was updating Neil on the status of this transaction which was needed for this quarter.

Q. In your conversations with Mr. Cole around this time, do you recall him expressing any views about whether getting revenue from this deal was important for Iconix?

A. Yes.

Q. And what was that, that Mr. Cole, do you recall him expressing about importance for revenue from this deal?

A. In the financial forecast meetings it was made -- it was prominently discussed that we needed these transactions to make our numbers.

Q. We can take this down and let's go to Government 1035. So, first of all, let's just kind of start towards, I think this e-mail kind of, the bottom one bleeds into the next bank. Mr. Bianco, can we put the first and second page side by side,

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB75col2          Horowitz - Direct          Page 717

please?

Now, Mr. Horowitz, drawing your attention to the bottom of the first page and going into the second page, do you see on the right of the e-mail -- we don't have to highlight them, we can squint a little bit here -- do you see where you said: Jared, we need to know as soon as possible on the JV update. As you know this is time sensitive. We are now moving forward this quarter. We are going to need to make other decisions.

Do you see that?

A. I do.

Q. And then you go on to say about a sentence later: Timing is critical.

Can you highlight that, Mr. Bianco?

Why are you stating to, in this e-mail, timing is critical, to Jared?

A. The timing of closing this transaction is critical as we need it for our quarterly financials.

Q. And there is a few additional e-mails between Mr. Rabin and you and Mr. Margolis, but going to the very top of the e-mail do you see there is a from/sent forward to Neil Cole? Do you see that?

A. I do.

Q. Is Mr. Cole on the bottom part of the e-mail chain?

A. He is not.

MB75col2          Horowitz - Direct          Page 718

Q. And, why are you forwarding this to him?

A. Because he would regularly ask for updates and I wanted him to have the update from GBG's mouth.

Q. We can take this down and go to Government 1208.

Do you see at the top here, now we are May 14th, so a few days later now -- a week later -- from Seth Horowitz to Neil Cole, subject LF terms.

Do you see that?

A. I do.

Q. And then you write in the body: Attached is the term sheet as of May 2nd. They have told us that they are going to do the whole transaction in Q2. This term sheet contemplates the Lee Cooper portion in the back.

Let's go to the attached term sheet. Let's zoom out, Mr. Bianco. Now, highlighting points A and B -- sorry, the little A and little B, under point 1.

Do you see where it says amend SE Asia JV to include Korea $3.3 million purchase price, and then amend SEA Asia to include Europe, Turkey rights, Ecko Unlimited, Zoo York, Marc Ecko and some other brands 7.6.

Do you see that?

A. I do.

Q. What do those numbers add up to, the Korea and the Europe brands here?

A. $10.9 million.

MB75col2          Horowitz - Direct          Page 719

Q. How does that compare to the approximately $11.3 million we saw in the earlier term sheet?

A. It is slightly lower.

Q. So, just to be clear, in the course of the last few days or weeks had the purchase price associated with the Korean and Europe assets that become SEA-2 gone up or have gone down?

A. They've gone down.

Q. Do you recall why that was, generally speaking?

A. Yes.

Q. Why was that?

A. There was negotiation around the health of one of the brands in Europe that led to --

Q. Is it -- sorry.

A. -- that led to a lower price, or slightly lower price.

Q. Can you unpack that a bit? You said health of one of the brands in Europe. Why did concerns about the health of one of the brands in Europe cause the price for the SEA-2 assets to go down?

A. One of the licensees in Europe for the Ecko brand, which was in this joint venture, was on the brink of bankruptcy and, therefore, GBG was negotiating a lower price.

Q. Again, just to explain something a bit more, why would the fact that one of the brands was about to go into bankruptcy, why did that result in the price going down a little bit?

A. Because if one of the licensees for a brand in the

MB75col2          Horowitz - Direct          Page 720

geography would file bankruptcy it would, at least temporarily, lower the revenue and the value of the joint venture.

Q. Mr. Horowitz, were there negotiations between the parties around this time over the deal price?

A. Yes.

Q. Did Iconix and you the others at Iconix advocate for -- withdrawn.

Did you advocate for a higher price for GBG to pay for this deal around this time, higher than 11.3 or higher than $10.9 million?

A. I did.

Q. Did you make those arguments to GBG?

A. Yes.

Q. Did they listen?

A. They listened but --

Q. Did that ultimately, did those arguments prevail on GBG around this time and cause them to increase the purchase price?

A. No.

Q. Did you make arguments about the value of the brands and their potential future?

A. I did.

Q. Did those arguments ultimately result in the purchase price going up to Iconix' benefit?

A. No.

Q. And, in fact, what are we now seeing in terms of the trend

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB75col2    Horowitz - Direct    Page 721

line of the purchase price listed in these deal documents for the SEA-2 assets; did it go down or has it gone up over the last several weeks?

A. It went slightly down.

Q. And, Mr. Horowitz, again we see the reference to the deal overview including a $24 million, approximately, overall package for the, that includes Lee Cooper. Again, did that Lee Cooper aspect of the deal happen?

A. No, it did not.

Q. What part of this deal did happen?

A. Little A and little B.

Q. The Korean and Europe rights?

A. That's correct.

Q. And just again, looking now -- Mr. Bianco, would you please highlight the $10,917,500 number at the bottom?

What does that number represent, Mr. Horowitz?

A. It represents the agreed upon purchase price for SEA-2.

Q. And that's under the heading Alternative One, make one single amendment to the comparable for both A and B above. What does that represent, the step one option?

A. That we would have one amendment for adding both Korea and the Europe brands to the Southeast Asia JV.

Q. And what were the other possible stops here being discussed about other additional transactions beyond that deal? Just to be clear.

MB75col2    Horowitz - Direct    Page 722

A. Lee Cooper for Europe.

Q. Did that happen?

A. It did not.

Q. We can take this down, and let's turn to Government 1036.

Do you see that the date here, Mr. Horowitz, now we are at May 23rd, so about a week later, from Mr. Horowitz -- you -- to Jared Margolis. Do you see the header there?

A. I do.

Q. Do you see where you say: Attached are the legal docs discussed?

A. I do.

Q. What are you forwarding here to Mr. Margolis?

A. The contracts and legal documents for SEA-2.

Q. Let's turn to the next page. Actually, let's pause for a second. Who is forwarding the bottom part where it says there is an e-mail from Lauren Gee, to you, copying Jason Schaefer; who is Lauren Gee?

A. Lauren Gee was an attorney at Iconix.

Q. And who was Jason Schaefer?

A. Jason Schaefer was also an attorney at Iconix, he was the general counsel.

Q. So, this initial attachment is documents that came from Ms. Gee and you are forwarding them along? Is that what is happening here?

A. That is correct.

MB75col2    Horowitz - Direct    Page 723

Q. Let's go to the next page.

Mr. Horowitz, I want to highlight for you in the third whereas clause the number $10,917,500. Do you see that?

A. I do.

Q. What does that number represent?

A. The purchase price for the joint venture SEA-2.

Q. How does this compare to the number we just saw in that term sheet for the SEA-2 assets for the Korean and Europe assets that became SEA-2?

A. This reflects that number.

Q. And earlier in that sentence there is a reference to -- I will just read it -- if you wouldn't mind reading it Mr. Horowitz, the whereas clause and pause when you get to $21 million.

A. Whereas, in recognition of the fact that the right to use certain trademark registrations or applications owned by licensors in the Republic of Korea, Europe, or Turkey, is deemed to have a fair market value of $21,830,000.

Q. Let's just pause there.

Mr. Bianco, if we can highlight the $21 million figure?

What does that number represent, to your understanding?

A. It represents the value of a hundred percent of the joint venture.

MB75col2    Horowitz - Direct    Page 724

Q. And then, how do you get from that number to the $10,917,500 number that is a purchase price?

A. The $10.9 million is 50 percent of the value of the fair market value of the marks.

Q. Why is that, just in terms of how this deal is structured. Why is there that 50 percent relationship between these numbers?

A. Because in the formation of this joint venture, GBG is buying 50 percent.

Q. Had Iconix done valuation work to support these approximate numbers?

A. Yes.

Q. Now, Mr. Horowitz, we will take this down and let's turn now to Government Exhibit 1038. So, moving forward a bit more in time, about another week or two, do you see where it says June 3rd, 2014?

A. I do.

Q. Who is this e-mail from and to?

A. It's from me to Neil.

Q. And what's the subject?

A. LF meeting.

Q. Highlighting the first part where it says: Meeting went well, key take aways. Do you see that?

A. I do.

Q. Why are you giving Mr. Cole a summary of your meeting

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

| MB75col2 | Horowitz - Direct | Page 725 |

with -- well, first of all, who is LF referring to?

A. LF is the parent company and referring to GBG.

Q. Why are you giving Neil Cole an update on your meeting with LF or GBG?

A. Because Neil wanted an update and it was regular practice for me to do that.

Q. Highlighting now, there is two -- there is a 1, 2, and 3, and another 3 point. I want to draw your attention to the first 3, the first no. 3 and the last line: It got heated for a bit. Told them we were not moving on price and not going to renegotiate. Then it calmed back down.

Do you see that?

A. I do.

Q. What are you saying to Mr. Cole here about it got heated for a bit, told them we are not moving on price, not going to renegotiate, then it calmed back down. What are you explaining there?

A. I am telling Neil that GBG was negotiating for a lower price based on the status of the Ecko brand in licensing but that we held firm and I held firm on the price of the joint venture.

Q. And so, what was the price as of this time, if you recall, the parties being at, for the SEA-2 price?

A. $10.9 million.

Q. Was GBG arguing for a higher or lower price than

| MB75col2 | Horowitz - Direct | Page 726 |

$10.9 million?

A. They were arguing for a lower price?

Q. What was your response, then, to GBG about the lower price requested than $10.9 million?

A. That we would not agree to that.

Q. Did you communicate that to Mr. Cole?

A. I did.

Q. So, when you say not going to renegotiate, what are you expressing?

A. That we have an agreed-upon price and that we were not going to change it.

Q. And, just generally speaking, without getting too much into the nitty-gritty here, the issue that was causing GBG to seek a lower price or even lower at this time, what was that issue?

A. The issue was that one of the licensees for Ecko in Europe was struggling and on the brink of bankruptcy.

Q. That is the same issue mentioned earlier?

A. Yes.

Q. We can take this down.

Let's now go to Government Exhibit 234 and let's zoom in on, I guess, as much as we can on the text here.

Mr. Horowitz, do you recognize generally what this document relates to?

A. Yes.

Q. What is it?

| MB75col2 | Horowitz - Direct | Page 727 |

A. This is another one of the financial forecasts that we would review in the meeting we discussed.

Q. Is this similar to Government Exhibit 250, the one that we kind of spent a fair amount of time going through?

A. Yes.

Q. So, what is the day -- drawing your attention to the upper left-hand side of this, do you see June 6, 2014 listed?

A. I do.

Q. And so, how long after the June 3rd e-mail that we just looked at did this happen?

A. A few days.

Q. According to this document, in terms of where Iconix stands without the opportunities and risk column, is its revenue and its EPS going to hit its financial targets for this quarter?

A. No.

Q. And so, drawing your attention under the Q2 forecast, do you see where it says $99.9 million approximately?

A. I do.

Q. And Mr. Bianco, let's highlight the EPS under Q2 forecast, and then, Mr. Bianco, let's highlight the consensus numbers for revenue EPS.

About how far short is Iconix at this time on June 6, 2014, approximately, of hitting its revenue targets for the consensus target?

A. It's approximately $17 million short.

| MB75col2 | Horowitz - Direct | Page 728 |

Q. And then what about the EPS?

A. We were approximately 16 cents short.

Q. Do you see the SEA-2 deal as of this time reflected in this chart?

A. I do.

Q. Where do you see it?

A. It's listed under opportunities and risks as the Li & Fung JV.

Q. Now let's highlight that, Mr. Bianco, and if we can highlight the revenue from that deal, the 10418 number and the EPS .13 number.

Mr. Horowitz, do you see that deal represented anywhere else on this forecast sheet?

A. Yes.

Q. Where is that?

A. It's one of the options in various columns called initiatives.

Q. And drawing your attention to the bottom or bottom part of the sheet, do you see the SEA-2 deal represented anywhere towards the bottom of the sheet?

A. Yes.

Q. Where is that?

A. Under the bottom section where it says Korea and Europe New.

Q. Mr. Bianco, if we can please highlight Korea and Europe New

# A-745

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

---

MB75col2     Horowitz - Direct     Page 729

and then the numbers under them, kind of the bottom leftish? There we go, Korea and Europe new and then the numbers under each of them.

So, let's just start there. According to this document, what is the purchase price for the SEA-2 deal at this point in time adding up the Korea and Europe New components?

A. It is $10.9 million.

Q. Then there is this kind of cost basis number listed, under Korea it is .5. What does that refer to?

A. Cost basis refers to what that cost Iconix originally, which in this case was $500,000.

Q. And, again, for the revenue calculation, why does cost basis matter?

A. Because, for revenue, Iconix would take the purchase price minus the cost basis.

Q. Here for the Korea component, what is the purchase price of the Korea part of the deal?

A. $3.3 million.

Q. And what is the cost basis that gets cut off before it gets to revenue?

A. $500,000.

Q. So what is the revenue coming in from the Korea part of that deal?

A. $2.8 million.

Q. And then, turning to Europe New, what's the kind of

---

MB75col2     Horowitz - Direct     Page 730

purchase price part attributed to the Europe part of SEA-2?

A. $7.6 million.

Q. Do you see a cost basis listed?

A. No. It's zero.

Q. Do you know why that is?

A. Finance had yet to calculate the cost basis for Europe.

Q. So, does that get an aggregate at some point in time in the future?

A. It does.

Q. If you wanted to consider the revenue that was being earned at this time, it would be lower than what is listed here once you consider the cost basis?

MR. HECKER: Objection to form. Foundation.

MR. LENOW: I can rephrase.

THE COURT: Why don't you. Objection sustained.

BY MR. LENOW:

Q. Mr. Horowitz, once the cost basis is added, would that actually affect the revenue you get to claim from the combined Korea and Europe new deal for SEA-2?

A. Yes.

Q. Can you explain how?

A. The revenue would be lowered by the cost basis for Europe new.

Q. So when we look at the top, going back to the top of the chart in terms of how this all figures together and how much

---

MB75col2     Horowitz - Direct     Page 731

revenue gets added for this deal. So, you see where it says $10,418,000 from JV?

A. I do.

Q. Once the cost basis gets added by finance, is that going to affect that number at all?

A. Yes.

Q. In what direction?

A. It would reduce it by the cost basis.

Q. So just stepping back and spending another 30 seconds on this document or so. Mr. Horowitz, at this point in time are there other transactions being considered for this quarter apart from the LF joint venture, the SEA-2 deal?

A. Yes?

Q. What transaction?

A. The Middle East joint venture.

Q. If both the Middle East joint venture deal, as contemplated here, and the SEA-2 deal as contemplated here, at this price, got done for this quarter, what does this document say about whether Iconix would hit its numbers?

A. It says that we would hit our numbers.

Q. Now, did the Middle East joint venture happen that quarter?

A. It did not.

Q. Without the Middle East JV transaction happening that quarter, would you hit your numbers, according to this document?

---

MB75col2     Horowitz - Direct     Page 732

A. No, we would not.

Q. Did anything change in the numbers reflected here, that allowed Iconix to hit its numbers for this quarter?

A. Yes.

Q. What?

A. The Li & Fung joint venture was inflated by $5 million.

Q. We can take this down.

Now, let's turn to Government Exhibit 1247, which is in evidence. Do you see the date on this, June 9?

A. I do.

Q. Who is the e-mail from and who is it to?

A. It's from me to Neil.

Q. You write at the top, do you see where it says: Attached is a brief update on key topics.

Do you see that?

A. I do.

Q. Mr. Horowitz, what do you mean by brief update?

A. An update on the few issues that were going on.

Q. And was it -- withdrawn.

Drawing your attention -- actually, if we can zoom out a bit, Mr. Bianco? Let's look at the next page and just pause.

Mr. Horowitz, here it says weekly update. Is this the only weekly update you sent to Neil Cole or were there others?

A. This is not the only update -- weekly update I have sent to Neil Cole.

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

---

MB75col2     Horowitz - Direct     Page 733

Q. Can you explain, was there any kind of policy that Mr. Cole put in place about you and others sending him weekly updates?

A. Yes. It was normal practice to send Neil an update, a weekly update for me and others.

Q. Have you heard the phrase "Friday at fives"?

A. Yes.

Q. What does that phrase mean to you?

A. Friday at fives was the weekly report that Neil requested.

Q. From whom?

A. From me.

Q. And are you aware of approximately how many other people were submitting Friday at fives you or weekly updates to Mr. Cole?

A. Roughly, yes.

Q. Approximately how many were there?

A. I would say six to eight.

Q. Did there come a time -- the name Friday at fives, what was the original day that you sent Mr. Cole your weekly updates?

A. Originally I would send them Friday at five or around five.

Q. Did there come a time where that changed, where you stopped sending them on Friday?

A. Yes.

Q. Can you explain why that changed?

A. Early in my time at Iconix, Neil told me that my Friday at fives were ruining his weekend and that I should wait until

---

MB75col2     Horowitz - Direct     Page 734

Monday morning to send him my reports.

Q. Why is that?

A. So that way he could enjoy his weekend more without my report.

Q. Now, Mr. Horowitz, drawing your attention to the first part in the weekly update here where it says: All legal docs were sent to LF GC. What do you understand that to refer to?

A. That refers to the documents relating to SEA-2, the joint venture.

Q. And what is LF GC, to your understanding?

A. That stands for Li & Fung, the "LF," and the "GC" stands for general counsel, their attorneys.

Q. And then you say goal was to have them completed prior to June 18th IC meeting. What is that in reference to?

A. That's in reference to getting the transaction done or agreed to by June 18th, and the IC meeting was a GBG corporate meeting.

Q. Mr. Horowitz, let's just pause for a second and we can take this down. So, Mr. Horowitz, this e-mail we looked at, it was dated June 9th, how close are you to the end of the quarter on June 9th?

A. We are approximately three weeks from the end of the quarter.

Q. And did the Middle East transaction JV that we saw in that forecast document, did that happen in that quarter, Q2?

---

MB75col2     Horowitz - Direct     Page 735

A. No, it did not.

Q. What did that do to Iconix' projections about where it was going to land relative to its financial targets for Q2 2014?

A. Without the Middle East joint venture we would not have hit our revenue or EPS goals.

Q. Do you recall talking to Neil Cole about that around that time?

A. Yes.

Q. Can you describe that conversation or those conversations? Can you describe the conversation? If there was more than one, describe all of them generally.

A. During the first couple of weeks of June, Neil and I discussed having GBG pay an inflated price for SEA-2 in exchange for letting them out of future payments that they owed to Iconix.

Q. And was this one conversation or is this a series of conversations?

A. This was a series of conversations.

Q. And what was the status of the negotiations with GBG at this point around SEA-2?

A. Status was that we had an agreed upon deal at $10.9 million.

Q. And we looked at that earlier June 3rd e-mail where you told Mr. Cole, told him we were not moving on price. At any time when these discussions you have described are ongoing, did

---

MB75col2     Horowitz - Direct     Page 736

GBG appear to you willing to pay more than the approximate $10.9 million that was reflected in the deal documents that had been circulated?

MR. HECKER: Object to the form.

THE COURT: Sustained.

BY MR. LENOW:

Q. Mr. Horowitz, while you were having those discussions with Mr. Cole, did you also have ongoing calls or meetings with GBG around this time?

A. Yes.

Q. At any point in time did GBG express an interest or view that they would pay more money than the $10.9 million reflected in the documents around that time?

MR. HECKER: Objection to form.

THE COURT: Overruled.

THE WITNESS: Not for those assets, no.

BY MR. LENOW:

Q. When you had discussions with Mr. Cole that you just described about getting a higher price, did Mr. Cole propose to alter the written terms of the deal in any way?

A. Yes.

Q. And what was his proposal about what he would change in written terms?

A. He would change the price.

Q. Was there any unwritten terms that Mr. Cole proposed to you

---

MB75col2    Horowitz - Direct    Page 737

about how to address the revenue and EPS concerns, the concerns that you discussed with him?

A. Yes.

Q. What did he say?

A. At the time of the transaction Neil told me that I should go tell the attorneys to increase the purchase price by $5 million and we would get the money back to GBG through some type of marketing fund but not to tell the lawyers that.

Q. Mr. Horowitz, I want to rewind the time a little bit, though, before that conversation. Did there come a time where Mr. Cole expressed a view about anything of value that Iconix could provide to GBG in connection with this transaction, the SEA-2 deal?

A. Yes.

Q. What was that?

A. We discussed letting GBG out of millions of dollars of payments that they owed us for a license that they had.

Q. Let's talk about that license for a bit. What was the license that Mr. Cole was referring to in that conversation?

A. The license was for Rocawear Kids.

Q. What is Rocawear Kids?

A. Rocawear is a brand. GBG had the license to make or design, manufacture, and sell kids product under the Rocawear brand.

Q. Mr. Horowitz, around the time of these discussions in June

MB75col2    Horowitz - Direct    Page 738

of 2014, what was the state of the Rocawear brand generally, including Rocawear Kids?

A. The Rocawear brand was in a steep decline in terms of popularity and sales.

Q. Who had the Rocawear Kids license?

A. GBG.

Q. So, what does that mean in terms of -- practically speaking. What was GBG doing at that time with the Rocawear Kids brand?

A. GBG was designing, manufacturing, and selling Rocawear Kids' clothes to retailers and was paying Iconix a royalty and a guaranteed minimum royalty for those rights.

Q. So, let's talk about royalties, just generally speaking, to begin with. So, when Iconix licenses a brand to another company, how typically does that other company pay Iconix for the right to use the brand?

A. The other company pays Iconix a percent of its sales. So let's say it is 8 percent of sales, for every dollar they sell they would pay 8 cents to Iconix. That was a normal licensing structure.

Q. And you mentioned a phrase, I think guaranteed minimum royalties or guaranteed royalties. What are guaranteed royalties and how do those relate to non-guaranteed royalties?

A. Many times in licensing agreements a company agrees to pay a brand owner a guaranteed minimum royalty for those rights and

MB75col2    Horowitz - Direct    Page 739

that amount is the minimum amount that they would have to pay the owner of the brand regardless of how many sales that they make.

Q. So, if you have an agreement, license agreement with guaranteeing them royalties but the brand isn't selling, what happens?

A. What can happen is that a company ends up paying its guaranteed minimum royalties which are greater than whatever they would pay based on the sales of the product.

Q. So, under the Rocawear Kids license, if GBG was selling no clothes at all with Rocawear Kids, they just weren't selling in stores, does it still have to pay its guaranteed minimum royalties to Iconix?

A. Yes, it does.

Q. And then, for 2014 and 2015, do you recall what those guaranteed minimum royalties that GBG owed Iconix was?

A. It was approximately $6 million.

Q. And do you recall around that time having discussion with GBG and hearing about how Roc Kids license was doing?

A. Yes.

Q. And what, if anything, do you recall GBG expressing about how Roc Kids was doing and its view of the brand's future?

A. GBG was very disappointed and frustrated with the performance of Rocawear Kids. They had the license during the peak of the brand and the minimum royalties were set at a time

MB75col2    Horowitz - Direct    Page 740

when the brand was far more popular and they wanted out of that license.

Q. Had they expressed that view by in or around June 2014 to you and others at Iconix?

A. Yes.

Q. Now, Mr. Horowitz, you mentioned some meetings, or you mention at least one conversation with Mr. Cole about increasing the price of the deal and I want to ask you about that. Let's turn to Government Exhibit 1255, please. This is in evidence, we can show it to the jury.

Mr. Horowitz, do you recognize what Government Exhibit 1255 is?

A. I do.

Q. What is it?

A. It's notes that reflect a conversation that I had with Neil.

Q. And let's turn to point 1. LF pays 13.3 M for 50 percent of Korea IP rather than 3.3 M.

What do these notes reflect?

A. They reflect us discussing an inflated price going from 3.3 million for Korea to 13.3 million, or a $10 million inflation.

Q. And then, under that -- well, let's just pause. The 3.3 M part, what does the 3.3 refer to?

A. 3.3 is the agreed upon price for Korea between GBG and

# A-748

UNITED STATES OF AMERICA, V
 NEIL COLE,

November 7, 2022

---

MB75col2          Horowitz - Direct          Page 741

Iconix at this time.

Q. Is that part of the SEA-2 deal, one part of it?

A. Yes.

Q. And we had saw that kind of opportunities and risk spreadsheet, the forecast document. Do you recall seeing a 3.3 figure there listed, approximately?

A. I do.

Q. And in point two, just that first line, Iconix terminates Rocawear Kids' license LF USA. What does that line reflect?

A. That reflects the giveback for the inflated price which would be us terminating the Rocawear Kids license and GBG's contractual obligation to pay us those millions of dollars.

Q. To be clear, this document reflects what again? Broadly speaking?

MR. HECKER: Objection to form.

THE COURT: Overruled.

A. Conversations I had with Neil.

THE COURT: Mr. Lenow, it is now 11:00 so we will take our first break.

Ladies and gentlemen: 10 minutes. Do not discuss the case.

(Continued on next page)

---

MB75col2          Horowitz - Direct          Page 742

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

(witness steps down)

THE COURT: Everyone can be seated. Anything to raise by either side?

MR. LENOW: Nothing from us, Judge.

MR. HECKER: No, your Honor.

THE COURT: Don't be late, folks.

(Recess)

(Continued on next page)

---

MB75col2          Horowitz - Direct          Page 743

(Jury present; witness resumes the stand)

THE COURT: Everyone, please be seated.

Mr. Lenow.

MR. LENOW: Thank you, Judge.

BY MR. LENOW:

Q. Mr. Bianco, can we publish simultaneously both GX- 1255 and 1255-B, which are both in evidence?

Mr. Horowitz, do you recognize what is depicted in Government Exhibit 1255-B?

A. I do.

Q. What is it?

A. It appears to be the metadata for the document on the left.

Q. And according to -- what is metadata, again, just broadly speaking?

A. The -- like, who made the document, when was it updated. Kind of details behind the formation of a document.

Q. And according to the metadata for this document, when was Government Exhibit 1255 created and then last modified?

A. It was created on June 10th at 4:59 p.m.

Q. And last modified?

A. About 13 minutes later at 5:12 p.m.

MR. HECKER: Objection, your Honor.

THE COURT: Overruled.

BY MR. LENOW:

Q. So, Mr. Horowitz, just to kind of provide some time

---

MB75col2          Horowitz - Direct          Page 744

context, how long after -- you testified earlier about a June 9 e-mail where the legal docs were sent to LF GC on June 9th?

MR. HECKER: Your Honor?

Q. How long after that would this e-mail be?

A. This would be the day after.

Q. And --

MR. HECKER: Your Honor, may we voir dire on this issue of the connection between these two documents?

THE COURT: Sure.

MR. LENOW: Judge, can I ask my question first? This is admitted by stipulation, it is already in evidence, so I'm not sure the purpose of voir dire at this point. The document is in.

THE COURT: Well, two documents. But, ask some more questions, Mr. Lenow.

MR. LENOW: Sure.

BY MR. LENOW:

Q. Mr. Horowitz, have you reviewed the underlying Word document prior to your testimony today here?

A. Yes.

Q. And did you look into the Word document's metadata properties to match up to confirm for yourself that 1255-B was the metadata for 1255?

A. Yes.

MR. LENOW: Judge, I ask to continue because these are

---

**A-749**

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

---

MB75col2     Horowitz - Direct     Page 745

in evidence and there has now been testimony on this point.

THE COURT: Sorry, I can't hear.

MR. LENOW: I ask to continue my examination in light of the fact these are both in evidence and the testimony just given.

MR. HECKER: Your Honor, voir dire on the connection between the two documents?

THE COURT: Sure.

VOIR DIRE EXAMINATION

BY MR. HECKER:

Q. Mr. Horowitz, do you work in an IT function?

A. No, I do not.

Q. How did you get the metadata that's reflected in 1255-B?

A. I did not get the metadata.

Q. Was it provided to you by the government?

A. Yes, it was.

Q. OK. And with respect to the document that's on the left, 1255. Do you see that document?

A. Yes.

Q. Was that document provided to you by the government?

A. Yes, it was.

Q. And how did you determine --

MR. LENOW: Can we have side bar on this point?

THE COURT: Sure.

(Continued next page)

---

MB75col2     Horowitz - Direct     Page 746

(At side bar)

MR. LENOW: So, Judge -- this is Jared Lenow. This document is in evidence and Mr. Hecker will have a chance to cross. I have heard of voir dire in terms of the questions of admissibility, but once a document is in evidence, I have never come across a defense lawyer being able to essentially do some cross-examination in the middle of a direct when the document is already in evidence. Mr. Hecker is not seeking to keep this document out, he is just seeking to start his cross now.

I would also note that this is a document produced by Iconix, this was in Iconix' systems and was subject to a separate written stipulation in addition to the fact that it was just entered into evidence by agreement.

So, I think this is -- Mr. Hecker will have his shot at cross but I have just never heard of voir dire for a document that's already in evidence where there is not an issue of admissibility. This is just cross.

MR. HECKER: This witness is asked to connect two documents that have been put into evidence. It's true they've been both put into evidence. It is true we are not challenging the authenticity of each document. But, the connection between them is something that the government is trying to establish with Mr. Horowitz and they're suggesting to the jury that he has some way of knowing that one is related to the other and

---

MB75col2     Horowitz - Direct     Page 747

the reality is there is no foundation for that -- which I think we established through the voir dire. The government gave him two documents and suggested they're related to one another. He can't testify to that from his personal knowledge.

THE COURT: Which is why I allowed some limited voir dire but are you complete with your voir dire, Mr. Hecker?

MR. HECKER: I am, Judge.

THE COURT: OK.

---

MB75col2     Horowitz - Direct     Page 748

(In open court)

THE COURT: Mr. Lenow.

MR. LENOW: Thank you, Judge. May I proceed?

THE COURT: Yes.

BY MR. LENOW:

Q. Now, Mr. Horowitz, in terms of the timeline here, you mention a conversation with Mr. Cole. Did that conversation occur before or after you drafted this document?

A. That conversation occurred before.

Q. And can you describe how that came about? How did that conversation begin where these topics were discussed with Neil Cole?

A. I don't recall the specifics of the conversation other than, in general, the Middle East joint venture was looking less likely to happen or may have even fallen apart at this point and we were brainstorming other ways to make up the revenue.

Q. And, Mr. Horowitz, do you recall who mentioned first the notion of using the Rocawear Kids issue that GBG was having as a way to increase the purchase price for SEA-2?

A. Yes.

Q. Who mentioned it first?

A. It was Neil.

Q. And, Mr. Horowitz, eventually was relieving GBG Rockaway Kids' guaranteed minimums, was that in fact a giveback that was

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

| MB75col2 | Horowitz - Direct | Page 749 |

agreed on for the SEA-2 deal?

A. No, it was not.

Q. Was there a different giveback that was eventually agreed to in terms of that deal?

A. Yes.

Q. What was the different giveback that was agreed to?

A. The different giveback was that we would pay back GBG $5 million under marketing invoices.

Q. So, let's talk a Little bit more about GX- 1255. So, here it says: LF pays 13.3 M for 50 percent of Korea IP rather than $3.3 M. So, what was the inflated price contemplated under these notes?

A. The inflated price for Korea was by $10 million to $13.3.

Q. How much was SEA-2 ultimately inflated by, the deal price?

A. $5 million.

Q. Do you know why -- explain to the jury why there is a $10 million contemplated inflation here. Did anything change?

A. Yes.

Q. What was that?

A. To replace the revenue and EPS that we were going to get from Middle East we did two transactions; one with Sharper Image and the other one was the inflated $5 million price.

Q. So, just to be clear, explain why the relationship between this $10 million inflation was here and then what actually happened.

| MB75col2 | Horowitz - Direct | Page 750 |

A. We ended up only needing $5 million to hit our numbers and that was the inflated price.

Q. And, Mr. Bianco, highlighting point 2 again here?
Was there any connection between -- apart from the notion of a giveback and an inflated price, was there any other business relationship between the SEA-2 deal and Rocawear Kids?

A. No.

Q. And why are they listed as points 1 and 2 in these notes?

A. Because it was going to be one in exchange for the other, inflated price in exchange for terminating Rocawear Kids.

Q. And there are some other notes listed here apart from those points we focused on. Generally speaking, what do those reflect?

A. Details about a transition out of Rocawear Kids license with GBG.

Q. Why do you have to consider the issue of a transition out of Rocawear Kids if there is a termination of that license?

A. For other financial reasons we would have needed to make up the revenue within Rocawear.

Q. Just explain that for a minute. What were the other financial considerations that led you to need to find another person or another company to take on the Rocawear Kids license?

A. As I stated, Rocawear was in a steep decline and there is a measurement called brand value, and if a brand isn't generating enough revenue, you might have to take an impairment and

| MB75col2 | Horowitz - Direct | Page 751 |

Rocawear was extremely close to that level. So, had we let GBG out of their Rocawear Kids' agreement we would have also had to have found a replacement for the Rocawear revenue.

Q. Just to break this down. What do you mean by an impairment?

A. An impairment is when a brand loses value and needs to be reduced in value in the financials of a company.

Q. Does the revenue -- the licensing revenue that the brand is bringing in affect whether or not it gets impaired?

A. Licensing revenue is the key component to an impairment measurement.

Q. And if Iconix had to take an impairment on a brand because it wasn't bringing in enough licensing revenue, could that have other bad financial effects on Iconix?

A. Yes. Very bad.

Q. Separate from revenue and earnings considerations?

A. That is correct.

Q. Just the value of Iconix's assets, was that a consideration that Iconix -- that you heard Mr. Cole express concern about?

A. Yes.

Q. Can you explain a bit more about that?

A. Neil was emphatic that we could never take an impairment. He wouldn't let people use the word "impairment," he referred to it as the I word. It was a non-negotiable.

Q. And, just to be clear, what was Iconix' basic business

| MB75col2 | Horowitz - Direct | Page 752 |

model?

A. Iconix owned 40 or so brands and licensed and marketed them around the world.

Q. And if the value of its brands on its books went down, would that be a bad thing for Iconix?

A. Yes.

Q. If you lost Rocawear revenue on your books, would that cause the Rocawear brand to potentially go down in value?

A. Yes.

Q. Mr. Horowitz, we can take this down now and turn to Government 1256. Actually, let's take this down for a second and go back to something else.
Your Honor, I would like to read a stipulation between the parties in relevant part, it is Government Exhibit 2004.

THE COURT: Very well.

MR. LENOW: And the stipulation reads, in part: Government Exhibit 1255 consists of a true and accurate copy of a Microsoft Word document created by Seth Horowitz and maintained by Iconix.

BY MR. LENOW:

Q. Mr. Horowitz, to be clear, did you review the underlying Microsoft Word document version 1255?

A. Yes.

Q. Did you read the metadata in that underlying Microsoft Word document?

**A-751**

UNITED STATES OF AMERICA, V
  NEIL COLE,

MB75col2       Horowitz - Direct       Page 753

A. Yes.

Q. Did it match up to the metadata that we just saw on the screen?

A. Yes.

Q. Let's now turn to Government Exhibit 1256. Now, Mr. Horowitz do you see where it says June 11th on this document?

A. I do.

Q. How long after the June 10th date we just saw in the metadata would this be?

A. The following day.

Q. And let's read from the bottom. And do you see the date there at the bottom, the bottom e-mail at June 10, 2014 at 10:59 p.m.?

A. I do.

Q. Was that the same or different day from the metadata we saw in the document?

A. Later that same day.

Q. Can you please read what you wrote to Neil Cole on June 10th in the late evening?

A. I have been thinking about the LF transaction and I like it. Can share my thoughts in the a.m. Best, Seth.

Q. Do you see where Mr. Cole replies: OK. Let's discuss in the morning?

A. Yes.

MB75col2       Horowitz - Direct       Page 754

Q. What deal are you referring to when you refer to the LF transaction?

A. I am referring to SEA-2.

Q. Mr. Horowitz, do you continue, after this e-mail, to discuss the SEA-2 transaction with Mr. Cole?

A. Yes.

Q. Did you continue to discuss potential overpayment by GBG to Iconix to help Iconix make its revenue and earnings per share figures?

A. Yes.

Q. Did you continue to discuss the potential of giveback payment in exchange for that overpayment?

A. Yes.

Q. Did there come a time when Mr. Cole gave you any specific direction or direction on a specific number that he had decided -- withdrawn.

Did there come a time when Mr. Cole mentioned a specific inflation number for SEA-2 that differed from the $10 million inflation figure we saw on that document?

A. Yes.

Q. What did he say?

A. He told me that GBG had agreed to pay $5 million more.

Q. In exchange for what?

A. In exchange for paying them back with some type of marketing fees.

MB75col2       Horowitz - Direct       Page 755

Q. Now, let's take this down and we can show the witness Government Exhibit 1039.

Now, do you see the date on -- let's start at the bottom of the e-mail chain here. Do you see the bottom e-mail from Seth Horowitz to Neil Cole; subject: Rocawear.

A. I do.

Q. Do you see where it says in the e-mail: Did a lot of diligence work on margins, product, volume. Very difficult in any model at the current product pricing distribution to make money. Good top line, no bottom. Should discuss.

Do you see that?

A. I do.

Q. What is the date of that e-mail?

A. Thursday, June 12th.

Q. And what is the subject?

A. Rocawear.

Q. Why are you writing to Mr. Cole about Rocawear and the economics of Rocawear on this date?

A. Neil had asked me to do work on whether or not we would be able to replace GBG's Rocawear Kids' agreement.

Q. Did that have anything to do with the document we just reviewed where Rocawear was discussed as potential giveback for an inflated price?

A. Yes.

Q. Can you explain?

MB75col2       Horowitz - Direct       Page 756

A. As I said, Rocawear was in a state of decline, and if we were to let GBG out of its guaranteed payments for Rocawear, we would have had to go out and find replacement revenue for Rocawear.

(Continued on next page)

MB7YCOL3          Horowitz - Direct.          Page 757

BY MR. LENOW:

Q. And when you say -- what are you essentially telling Mr. Cole in this email about the diligence work you've done for Rocawear Kids?

A. That it would be very difficult, if not impossible, to find a replacement for Rocawear Kids.

MR. LENOW: Mr. Bianco, can you please highlight the subject of the email exchange that says "Rocawear."

Q. What does Mr. Cole respond when you write this email?

A. He responds: "Are you referring to Kids?"

Q. And how do you respond?

A. "Yes. Sorry about that. I am referring to Kids."

MR. LENOW: Let's move forward to another email from this date, June 12. Let's put up Government Exhibit 1041 in evidence.

Q. Now, Mr. Horowitz, do you see the date of this email?

A. I do.

Q. What's the date?

A. June 12.

Q. Who is the email from and to?

A. It's from me to Neil.

Q. Let's start at the beginning of the email. If you could please read the first several sentences.

A. "Neil, I spoke with Jared tonight. Bottom line is that we may complete only part of the total transaction, Europe and

MB7YCOL3          Horowitz - Direct.          Page 758

Korea, at approximately $15 million of gain revenue for Iconix in Q2 and wait until third quarter for the Lee Cooper EU portion of the transaction. This gives us everything we want revenue-wise for Q2, and the Lee Cooper portion, which is a non-gain transaction, waits until Q3."

Q. Mr. Horowitz, let's break this down.

First, just in terms of timing, how long after the June 9 email we looked at where you had written "All legal docs were sent to LF GC" are we in this email?

A. We're three days later.

Q. And how long after the metadata we saw for that Word document, how long after that June 10 date?

A. We're two days later.

Q. When you say: "May complete only part of the total transaction in Europe and Korea at approximately 15 million," why are you now referring to $15 million?

A. Because at this point, we're discussing an inflated price.

Q. What had changed in the interim between those earlier numbers we saw, the 11.3 and the 10.9?

Why is it now that 15 million is being discussed?

A. Because we are now entertaining doing a deal with GBG at an inflated price with a giveback.

Q. When you say: "This gives us everything we want revenue-wise for Q2," what does that refer to?

A. This fills the gap for what we need in terms of revenue to

MB7YCOL3          Horowitz - Direct.          Page 759

hit our Q2 numbers.

Q. You mentioned that Mr. Cole told you that the inflation would be $5 million.

Do you know why $5 million was chosen by Mr. Cole?

A. Yes.

Q. Why?

A. It is what we needed to hit our financial goals in Q2.

Q. Was the number dictated by the value of the assets or by negotiations or by something else?

A. By something else.

Q. Was this change in price, was it in any way tied to the Lee Cooper part of the deal in any fashion?

A. No.

MR. LENOW: Let's turn to Government Exhibit 1042.

Q. Do you see the date of this email, Mr. Horowitz?

A. I do.

Q. And what is the date of the email?

A. June 17, 2014.

Q. And reading the first part of this line here, can you just read the first -- what you say in this email: "David, per my conversation."

A. "David, per my conversation with Neil this afternoon, we should sit down so I can walk you through the movement on the strategic initiatives and their timing so we can have new models for Thursday's meeting."

MB7YCOL3          Horowitz - Direct.          Page 760

Q. What are you referring to with respect to "strategic initiatives" and the "Thursday meeting"?

A. Strategic initiatives are the transactions, the joint venture transactions for the quarter. And "Thursday's meeting" is a financial forecast meeting where we would be looking at one of those financial forecast sheets.

Q. Drawing your attention to the part where it says: "Per my conversation with Neil this afternoon," what are you referring to there?

Who is the "Neil" in that clause?

A. Neil Cole.

Q. Why are you referencing Neil in your conversation in this email to David Maslaton?

A. David Maslaton, to my knowledge, would not make any changes to the financial forecast sheet unless it came directly from Neil.

MR. LENOW: We can take this down, and let's put up Government 235. Let's just zoom in for now on the left-hand side of the chart, I guess what everyone wants to call it, the table.

Q. Mr. Horowitz, do you recognize generally what this document relates to?

A. Yes.

Q. What is it?

A. It's a financial forecast sheet as of June 19 for the

MB7YCOL3          Horowitz - Direct.          Page 761

quarter ending June 30.

Q. And is this before or after that Word document we saw with the metadata earlier?

A. This is after.

Q. Is this before or after -- where is this in relation to the email with David Maslaton that we just saw from June 12?

A. This is after.

Q. I'm sorry. Not June 12. I misspoke.

If I could just have one moment, Judge.

I'm sorry. June 17. My apologies.

Where is this in relation to the June 17 email with David Maslaton we just saw?

A. This is after.

Q. Now, Mr. Horowitz, do you know if anything has changed in this document relating to the SEA-2 deal?

A. Yes.

Q. What has changed?

A. The purchase price.

Q. For what?

A. For SEA-2.

MR. LENOW: Let's just highlight the bottom portion on "Korea and Europe new" at the very bottom of this chart, "Korea and Europe new" and then the lines under it at the bottom, bottom center.

Q. Mr. Horowitz, do you see where it says: "Korea" and then

MB7YCOL3          Horowitz - Direct.          Page 762

"8.3" under it?

A. I do.

Q. What, if anything, is different about the Korea 8.3 compared to the last version of this that we saw?

A. It's $5 million more than it was in the last version that we saw.

Q. Why is it $5 million more?

A. Because of the new inflated price for the joint venture.

Q. Had there been any additional valuation work, to your knowledge, for that deal?

A. No.

Q. And do you see the SEA-2 deal reflected at the top part of this table under "Opportunities and Risks" anywhere?

A. I do.

Q. Where is that?

A. Where it states: "Li & Fung JV."

Q. How, if at all, has this changed from the last time we saw it? The version of this document.

A. The revenue has gone up.

MR. LENOW: We can take this down.

Q. Mr. Horowitz, you testified a bit earlier about how Roc Kids for giving those guaranteed royalties was not the way that was used for a giveback to SEA-2.

What was the mechanism that was used as the giveback for SEA-2?

MB7YCOL3          Horowitz - Direct.          Page 763

A. We paid back GBG the $5 million under the cloak of marketing invoices.

Q. How did you learn about this new arrangement for SEA-2? That it would be a $5 million giveback.

A. I learned about this directly from Neil.

Q. Can you describe what the conversation was.

A. Yes. I was called into Neil's office, and he told me that GBG had agreed to pay $5 million more for the joint venture in exchange for paying them back with some type of marketing fees.

He informed me that I should go tell Lauren Gee, one of our attorneys, to change the price of the joint venture and not make any mention of the giveback.

Q. To who?

A. To Lauren Gee.

Q. Mr. Horowitz, did it give you any concern that Mr. Cole told you that, to not tell Lauren Gee about those facts?

A. Yes.

Q. Can you explain.

A. Well, it gave me concern because we were now inflating our revenue falsely and we were hiding the details of the arrangement from our attorneys.

Q. Did you push back on Mr. Cole at the time?

A. No.

Q. Why not?

A. I had worked hard to get in Neil's good graces. There was

MB7YCOL3          Horowitz - Direct.          Page 764

a bit of excitement that we were going to hit our quarterly numbers, and I was on his team.

MR. LENOW: Mr. Bianco, can we please publish what's in evidence as Government Exhibit 1043. Also zoom in on the email, please.

Q. Who is this email from, Mr. Horowitz?

A. It's from Neil Cole.

Q. Who is it to?

A. Jason Rabin.

Q. Who does it copy?

A. Me.

Q. What does the subject matter of the email say?

A. "Phone Discussion."

Q. What does the body say?

A. "Spoke to Seth, and we are fine."

Q. What do you understand this email to relate to, Mr. Horowitz?

A. It relates to Neil telling me about the inflated price and that I was going to go execute it in the documents.

Q. Mr. Horowitz, did you later have that conversation with Lauren Gee that Neil directed you to have?

A. Yes.

Q. Can you describe what happened.

A. I walked right out of Neil's office over to Lauren Gee and told her that we'd be increasing the price of the joint venture

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB7YCOL3    Horowitz - Direct.    Page 765

by $5 million.

Q. And what, if anything, did she say in response?

A. Lauren told me that the documents were with GBG. So, in other words, she was waiting for their comments, and we would see where they put it.

Q. What did you understand her to mean that the documents were "with GBG"?

A. That it was -- we had made whatever the last changes were to the document. She was waiting for a response from GBG. So she wanted to wait and to see if they put the increased $5 million price in there.

Q. Did you report that to Mr. Cole?

A. I did.

Q. Describe what occurred.

A. Excuse me?

Q. Can you describe that conversation.

A. I told Neil that Lauren said we were waiting for a return of the documents from GBG.

And he said, great. Let's see what they put in.

MR. LENOW: Okay. Let's take this down and go to Government 1044.

Q. Do you see the date on this email, Mr. Horowitz?

A. June 25, 2014.

Q. How long after that June 24 email saying: "Spoke to Seth, and we are fine" is this email?

MB7YCOL3    Horowitz - Direct.    Page 766

A. One day.

Q. Do you know who it's from?

A. I do.

Q. Who is it from?

A. Mark Stevens.

Q. What do you understand this email is including with the bunch of attachments?

A. The updated documents for the SEA-2 joint venture.

Q. Are you on this email, Mr. Horowitz?

A. I am.

Q. Along with others?

A. Yes.

Q. Did Iconix have lawyers working on this transaction?

A. Yes.

Q. Did GBG have lawyers working on the transaction?

A. Yes.

Q. To your knowledge, at this time or at any other time while you were working at Iconix, did you inform any of Iconix's lawyers about the inflated price and the giveback?

A. No.

Q. Why didn't you inform the lawyers of that fact?

A. Because the inflated price, tied with the giveback, that's what we were doing in order to hit our financial goals. If we had told them about the giveback, the fraud would not have worked.

MB7YCOL3    Horowitz - Direct.    Page 767

Q. Mr. Horowitz, let's turn to page 8 and zooming on the second-to-the-bottom paragraph, what, if anything, has changed about the price reflected in the document for the SEA-2 deal?

A. The price for the deal has gone up by $5 million.

MR. LENOW: We can take this down. Let's go to Government Exhibit 1046.

Q. Mr. Horowitz, looking at the top of this email, who is it from, and who is it to?

A. It's from me to Neil.

Q. What's the date?

A. June 29.

Q. How close are you to the end of the quarter?

A. One day.

Q. Do you see where it says: "Per the emails below, the LF docs are signed, and the wire transfer will happen from NY first thing in the a.m. I will continue to follow up to make sure we get the signature pages and wire in the a.m."

A. I see that.

Q. Why did you provide that update to Neil Cole?

A. Because Neil was asking me for regular updates as this deal needed to be signed and money needed to be wired by June 30 in order for it to make our quarter.

MR. LENOW: We can take this down, and let's put up Government Exhibit 209. Mr. Bianco, can we actually go to page 29 of this document to start.

MB7YCOL3    Horowitz - Direct.    Page 768

Q. Do you see who actually signs this document?

A. I do.

Q. What is the name, the top signature there?

A. Neil Cole.

MR. LENOW: Let's go back to the first page.

Q. Do you understand generally what this document to be, Mr. Horowitz?

A. I do.

Q. What is this document?

A. It's the document for SEA-2, the June joint venture.

Q. And the third to bottom paragraph, what was the final deal price for the SEA-2 deal that GBG paid to Iconix?

A. $15.9 million.

MR. LENOW: Mr. Bianco, let's turn to page 8 of this document.

Q. Do you see the bottom paragraph: "Exclusivity of Representations and Warranties?"

A. I do.

Q. I'll just read this out loud.

"Neither Iconix nor any of its affiliates is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this agreement, and Iconix hereby disclaims any other such representations and warranties."

Do you see that, Mr. Horowitz?

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB7YCOL3          Horowitz - Direct.          Page 769

A. I do.
Q. Mr. Horowitz, was this paragraph accurate?
A. No, it was not.
Q. Explain why it wasn't accurate.
A. GBG paid an inflated price by $5 million with the unwritten agreement for us to pay them back the $5 million.
Q. Mr. Horowitz, what was the point of inflating the price in the fashion you've described?
A. The point was so that Iconix could hit its revenue and EPS goals for the quarter.
Q. Mr. Horowitz, why didn't you put the full terms of your fraudulent scheme in this document?
A. Had we put the full terms in this document, we would not have hit our financial numbers.
Q. Why is that?
A. We would have had to take into account the $5 million we were going to pay back, thus netting out the 10.9 actual price.
Q. Did you believe Iconix's lawyers and accountants would let you count that additional $5 million in revenue if you told them about the secret terms?
A. No.
Q. Mr. Horowitz, let's turn now --
You can take this down and turn to Government Exhibit 102. Let's go down actually, a few pages, the next page. I think we're on page 4 here. Let's highlight the top language

MB7YCOL3          Horowitz - Direct.          Page 770

with the four bullet points. I'm sorry. Also the date below it. Yes. The bullet points and then the dateline below it. Thank you very much.
Mr. Horowitz, what kind of document is this we're looking at here?
A. This is a press release for our quarterly results.
Q. What is the date of the press release?
A. July 29, 2014.
Q. I'm going to read out loud here at the top line. It says: "Iconix Brand Group reports record revenue and earnings for the second quarter of 2014."
Do you see that?
A. I do.
Q. And then below that: "Record Q2 revenue $118.9 million and non-GAAP diluted EPS of .75 cents."
Do you see that?
A. I do.
Q. Mr. Horowitz, that figure, the $118.9 million figure, would that include any of that additional $5 million that you referred to as the fraudulently inflated revenue?
A. Yes, it does.
Q. Would Iconix have been able to make this claim in its press release without that fraudulently inflated revenue?
A. No, it would not.
Q. Would Iconix have been able to make this claim about

MB7YCOL3          Horowitz - Direct.          Page 771

non-GAAP diluted EPS of .75 cents without that fraudulently inflated revenue?
A. No, it would not.
Q. Would Iconix have been able to announce "Record revenue and earnings for the second quarter of 2014" without the fraudulently inflated revenue?
A. No, it would not.
Q. Let's switch gears now, Mr. Horowitz. I wanted to ask you about the other deal you highlighted at the beginning of your testimony, the September 2014 transaction.
Can you remind the jury what the real price for that transaction was and what the inflated price was.
A. The real price was $15.5 million, and the inflated price was $21.5 million.
Q. I want to ask you about some of the discussions leading up to that deal.
Let's go back to Government Exhibit 1028 to start.
What's the date of this email?
A. April 30.
Q. Who is it from?
A. It is from Neil.
Q. And who is Neil writing the email to?
A. Jason Rabin, Jared Margolis.
Q. Are you copied on this?
A. I am.

MB7YCOL3          Horowitz - Direct.          Page 772

Q. Do you see any reference to some of the assets that eventually become part of the SEA-3 deal here?
A. I do.
Q. Where?
A. China.
Q. And what territories were covered by the SEA-3 deal?
A. China and the surrounding territories.
Q. What brands were covered by the SEA-3 deal?
A. Umbro and Lee Cooper.
MR. LENOW: Let's take this down and turn to government Exhibit 1047 moving forward in time to July.
Can you please zoom in on this, Mr. Bianco.
Q. Mr. Horowitz, just generally speaking, we've looked at some emails here, but are there other emails that discuss with you and others these transactions that we've talked about?
A. Yes.
Q. Do these discussions go back further, before July, for example?
A. Yes.
Q. Now, do you see this email where it refers to -- where there's a statement: "Attached is a term sheet that should reflect our most recent conversation"?
A. Yes. I see that.
Q. Who is the email from and to?
A. It's from me to Jared Margolis.

# A-756

MB7YCOL3      Horowitz - Direct.      Page 773

Q. Who is copied on the email?

A. Ethan Cole and Maurice Sasson.

Q. Who was Ethan Cole?

A. Ethan Cole was an employee at GBG.

Q. Now, after the line that's highlighted, it says: "The purchase price went up to 15.5 from 5 for reasons I can explain."

So as of this date, what is the purchase price for the SEA-3 deal?

A. $15.5 million.

MR. LENOW: We can take this down and go to Government Exhibit 257.

Q. Mr. Horowitz, do you recognize, generally speaking, what this document relates to?

A. I do.

Q. What is it?

A. It's one of the financial forecast documents that we have looked at other examples of.

MR. LENOW: Let's, if we can, Mr. Bianco, zoom in on kind of the chart portion of it or the table portion of it. Perfect. We can exclude that bottom part just to make it a little bigger. Let's go from the consensus block up to the top. Great. Thank you.

Q. And what is the date of this forecast document, Mr. Horowitz?

MB7YCOL3      Horowitz - Direct.      Page 774

A. August 4.

Q. When does the third quarter, third financial quarter, end for Iconix?

A. The end of September.

Q. So how far away from the end of the quarter are you in this document?

A. About 60 days.

Q. And looking at what's listed in this document, do you know at this point in time whether the existing organic revenue and the existing deal pipeline is sufficient for the company to meet its revenue and EPS?

A. Yes. It would be.

Q. Using the Q3 forecast line, where are you as of this time without any additional deals?

Are you where you need to be to make your revenue in EPS targets? Or would you be short just based alone on that?

A. We would be short based alone on that.

MR. LENOW: Mr. Bianco, could we highlight the 97.410 figure.

Q. How far short of the consensus revenue figure listed on the bottom would you be?

A. Approximately $15 million short.

Q. And then there are a number of deals under "Opportunities and Risks." There's Umbro China, there's Middle East, and then there is some other category.

MB7YCOL3      Horowitz - Direct.      Page 775

If these deals happen, would they be enough to get you to your targets?

A. Yes.

Q. So based on what you're seeing here, was there a need at this point in time, from your perspective, for any sort of inflated deal price for Iconix to make its numbers?

A. No, there was not.

Q. Did you have ongoing discussions with Mr. Cole about the facts related in these documents and where Iconix was in terms of its targets and forecasts?

A. Yes.

Q. So based on your conversation with Mr. Cole around this time in August, do you know whether he was looking to do any inflated deal prices?

A. I don't believe he was.

Q. Can you just explain why that was the case, to your understanding.

A. Under the current forecast with the current opportunities, it appeared we would make our numbers without any inflated price.

Q. Now, did Cole's views on that topic change as you got closer to the end of the quarter?

A. Yes.

Q. Can you explain what happened broadly.

A. Broadly speaking, the Middle East joint venture, once

MB7YCOL3      Horowitz - Direct.      Page 776

again, did not happen and created a bigger hole or gap for us to fill.

Q. Did there come a time when you had discussions with him about needing to find initial revenue for Iconix?

A. Yes.

MR. LENOW: Let's take this down and go to Government Exhibit 1052.

Q. Mr. Horowitz, can you please read who this is from, who it's to, and the date.

A. It's from me to Neil. And the date is August 5, 2014.

Q. I want to draw your attention to under the second point, the second kind of sentence in this longer email, this longer paragraph: "I have not mentioned the Rocawear Kids component until we agree it is the right move."

And proceeding now, you stated: "In the interim, we are working with GBG with a goal of closing in August."

What are you saying to Mr. Cole in this email about GBG and Rocawear Kids?

A. What I'm telling Neil is that I have not mentioned the inflated price request and exchange for letting them out of Rocawear Kids until the two of us agree it is the right move.

Q. Why, in this email -- why are these two topics listed under the same point? Under point two.

A. Because they are connected.

Q. Can you explain.

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                    November 7, 2022

MB7YCOL3          Horowitz - Direct.          Page 777

A. GBG continued to want out of its Rocawear Kids agreement. And Iconix, Neil and I, were considering letting them out of their Rocawear Kids agreement in exchange for another inflated price.

Q. And just explain for the jury.

Why is it that Neil Cole had decided to not use, from what he explained to you, to not use the Rocawear Kids piece as the giveback for SEA-2?

A. Because we needed that Rocawear specific revenue to avoid an even bigger financial problem for Iconix.

Q. Did GBG continue to want out of that Rocawear Kids deal?

A. Yes.

Q. In the end you say: "Until we agree it's the right move." Who is the "we" in that sentence?

A. Neil and I.

Q. Why are you phrasing it that way?

A. Because we would make that decision together.

Q. And then looking at the first point of part 2, "With the goal of closing at the end of August," why were you looking to close the GBG deal by the end of August?

A. So that way we wouldn't find ourselves with another last-second quarter deal. We were trying to give ourselves a little breathing room.

Q. Now, Mr. Horowitz, around this time, were you having discussion with other possible business partners about the

MB7YCOL3          Horowitz - Direct.          Page 778

assets that were eventually part of the SEA-3 deal?

A. Yes.

Q. And do you see some of those discussions reflected in this email?

A. I see at least one of them, yes.

Q. Who is that? The other possible partner.

A. Win Hanverky.

Q. Did Win Hanverky also have interest in some of the assets that became part of SEA-3?

A. Yes.

Q. All of them or some of the assets?

A. One of the assets.

Q. Which asset?

A. Umbro.

Q. Did they have an interest in the Lee Cooper portion of it?

A. They did not.

Q. Around this time, did you still have concerns about what would happen if you let GBG out of the Rocawear Kids deal?

A. Yes.

MR. LENOW: We can take this down.

Turning to Government 1054. Rocawear Kids. Let's zoom on kind of the top half of the email. Let's get that bottom email in too.

Q. Now, Mr. Horowitz, starting at the bottom here, what's the date of the email?

MB7YCOL3          Horowitz - Direct.          Page 779

A. August 5.

Q. Who is it from and to?

A. It's from me to Jared Margolis.

Q. Do you see where it says: "We will have the amendment ready by the end of the week"?

A. I do.

Q. What is the amendment you're referring to?

A. What becomes SEA-3.

MR. LENOW: Mr. Bianco, can you highlight the subject of this email: "China update LC and Umbro."

Q. And then the second line of this email, can you read, what you say, "after the end of the week."

A. "Should we get together with Jason and Neil? To discuss Rocawear Kids? Best, Seth."

Q. How does Jared respond, Jared Margolis?

A. He responds by saying that he's meeting with Jason on the amendment and that we should shoot for a meeting with Jason and Neil on Thursday."

Q. What's the day of the week of this exchange, August 5? Can you tell from this email?

A. Tuesday.

Q. So what would that Thursday be?

A. August 7.

MR. LENOW: We can take this down. Let's go to Government 1056.

MB7YCOL3          Horowitz - Direct.          Page 780

Q. The bottom email, Mr. Horowitz, on August 7, so that Thursday, you write: "I believe we have an interesting way of working out Rocawear Kids and other issues."

And then there's a response from Mr. Cole: "Will be there in about 15 minutes."

Do you see that?

A. I do.

Q. What were you writing Mr. Cole about here as "an interesting way of working out Rocawear Kids"?

A. I believe I was referring to a potential new licensing relationship that could replace the Rocawear Kids revenue if we let GBG out of its commitment.

Q. If you were able to make that happen and find someone else to step in on Rocawear Kids, what's the significance of that?

A. It would have given us the ability to exchange an inflated price for letting GBG out of its financial commitments for Rocawear Kids.

Q. Do you recall meeting with Mr. Cole around this time about these topics?

A. Yes.

Q. Did there come a time when you and Mr. Cole actually went to GBG's offices to discuss these matters?

A. Yes.

Q. Where were GBG's offices located?

A. They were located at the Empire State Building.

MB7YCOL3          Horowitz - Direct.          Page 781

MR. LENOW: Mr. Bianco, could we please publish what's in evidence as Government Exhibit 318.

Q. Mr. Horowitz, what do we see on 318?

A. The bottom portion of the Empire State Building.

Q. Now, who do you recall being present at the meeting at GBG that you went to?

A. Neil, myself, Jason Rabin, and Jared.

Q. Mr. Horowitz, at that time, what do you recall GBG's position being on Rocawear Kids?
     What did they want?

A. They wanted out of the Rocawear Kids licensing agreement.

Q. And do you recall discussing that issue at the meeting with GBG?

A. Yes.

Q. Do you recall discussing the potential of a China deal as well?

A. Yes.

Q. Now, did you reach any final resolution at that meeting to your recollection?

A. I don't believe so.

Q. Do you recall talking to Mr. Cole around that time about his views of doing GBG deals generally?

A. Yes.

Q. What, if anything, did Mr. Cole say about GBG as a business partner and the possibility of doing future deals? Just big

---

MB7YCOL3          Horowitz - Direct.          Page 782

picture.

A. Neil expressed to me on the car ride back that it was going to be more difficult to do deals with GBG because they had the same pressures we did now that they were a public company.

Q. What do you mean by that?

MR. HECKER: Objection. Foundation.

THE COURT: Overruled.

THE WITNESS: As a public company, there was a requirement of putting out your financials. And now GBG would be under that same requirement, although a different market, that Iconix would be making joint venture transactions more difficult.

BY MR. LENOW:

Q. GBG had become a public company it's your understanding?

A. Yes.

Q. Do you know where it was listed? Was it a U.S.-based company or somewhere else?

A. Somewhere else.

Q. Just to be clear, what were the pressures that GBG now faced according to Mr. Cole?

A. They would now be faced with hitting quarterly numbers for revenue and profit.

Q. Why, according to Mr. Cole, did that -- why did that matter to Iconix?
     Why did that matter to Neil that GBG now had those

---

MB7YCOL3          Horowitz - Direct.          Page 783

pressures?

MR. HECKER: Objection to form.

THE COURT: Overruled.

THE WITNESS: There was a format or a template to these transactions that worked well because Iconix was public and GBG was not under those constraints. Now that that changed, both parties had the same goals.

BY MR. LENOW:

Q. The goals being what?

A. Increase revenue and profit.

MR. LENOW: Let's now turn to Government 1028.

Q. Mr. Horowitz, there are a couple of emails here. Let's start with the bottom email, August 13.
     Do you see the date of that email?

A. I do.

Q. Who is it from and to?

A. It's from Jared Margolis to me.

Q. What is Jared telling you?

A. He is telling me that Jason and Dow are on board with the Umbro Lee Cooper China joint venture.

Q. Is that the deal that becomes SEA-3?

MR. LENOW: Mr. Bianco, let's zoom out again here. Let's now highlight the top two emails together if we could or pull them out. Thank you.
     So, Mr. Horowitz, I want to break this down a bit

---

MB7YCOL3          Horowitz - Direct.          Page 784

here. The bottom email from you, do you see where it says: "Per below, it looks like GBG wants to move forward with Umbro and LC in China"?

A. I do.

Q. What are you saying there?

A. I'm sharing with Neil the email that I received below, that GBG would like to move forward with the joint venture.

Q. In the next line, do you see where you say: "Spent a lot of time with Allyson on Rocawear Kids model today"?

A. Yes. I see that.

Q. And then you say: "Believe we should not go forward with taking this back."

A. Yes. I see that.

Q. What are you expressing there?

A. Allyson was a bit more of a technical expert on sales and gross profit margin in that business. And after spending time with her, I did not believe that we should move forward with taking back the Rocawear Kids agreement from GBG.

Q. And just again why is that? From your perspective, what's the problem with letting GBG out of Roc Kids at this time, based on the time you spent with Allyson getting into the nitty-gritty financials?

A. I was not confident that we could replace the Rocawear revenue that we needed to avoid impairment.

MR. LENOW: Let's turn to the top email.

# A-759

MB7YCOL3          Horowitz - Direct.          Page 785

Q. Who's it from?

A. From email.

Q. What's the date of the email?

A. 8-14.

Q. What does Neil say to you in this email? If you could read it out.

A. "Let's discuss tomorrow. It will be tough to do China without Roc Kids but agree the risk is huge on both Roc Kids and Ed Hardy Rainbow."

Q. Mr. Horowitz, what did you understand Neil to mean by: "Will be tough to do China without Roc Kids"?

A. That it will be tough to do China with an inflated price without letting GBG out of the Rocawear Kids agreement.

Q. To be clear, Mr. Horowitz, in terms of just the business deal or the substantive business, was there any connection at all between the SEA-3 deal, the China deal, and the Rocawear Kids license?

A. No.

Q. Why do you understand Mr. Cole is linking them in this email, "Will be tough to do China without Roc Kids"?

A. Because in exchange for an inflated price for the joint venture, GBG desperately wanted out of the Rocawear Kids agreement.

MR. LENOW: If we can go to Government 1062, please.

Q. Mr. Horowitz, what's the date of this email?

MB7YCOL3          Horowitz - Direct.          Page 786

A. This is now August 18.

Q. Do you see the email is from you to Jared Margolis?

A. That is correct.

Q. What are you attaching in this email?

A. The legal documents related to SEA-3.

MR. LENOW: Let's go to page 2. Let's go to the bottom paragraph. Let's zoom in to the second-to-the-bottom paragraph. Mr. Bianco, can you highlight the very last number listed in this paragraph.

Q. Mr. Horowitz, what is the number listed here, and what does it indicate?

A. The number listed here is $15.5 million, and it indicates the price that the parties have agreed to for the joint venture.

Q. Which joint venture?

A. SEA-3.

Q. And then there's a $31 million listed above that. Do you see that?

A. I do.

Q. What is the $31 million?

A. The value of the entire joint venture.

Q. Mr. Horowitz, had Iconix done valuation work and engaged in negotiation to reach these numbers?

A. I believe that it had.

MR. LENOW: Let's take this down and turn to another

MB7YCOL3          Horowitz - Direct.          Page 787

email from the same day, Government 1063.

Q. Do you see the date on this, Mr. Horowitz, the date of the email?

A. I do.

Q. What's that?

A. August 18.

Q. What are you attaching to the email?

A. My weekly update to Neil.

Q. And who is the email directed to?

A. To Neil.

MR. LENOW: Let's go to the update. Mr. Bianco, if we could page down.

Q. Let's go to the -- there's a lot I want to ask you, Mr. Horowitz. So let's start with point B, GBG, and go to the bottom of the page.

Let's pull that whole section out if we can and zoom in. Let's start at the top. This will be a little easier. You don't have to zoom on this.

Under point one business development, point A, China Umbro, do you see that, Mr. Horowitz?

A. I do.

Q. Do you see where it says: "Both Jason and Jared called me to tell me GBG would Mike to complete the transaction for LC and Umbro in China"?

Do you see that.?

MB7YCOL3          Horowitz - Direct.          Page 788

A. I do.

Q. What does that refer to, that statement?

A. That Jason and Jared would like to do SEA-3.

Q. There's also this reference to "Jason had an additional ask on a plug number of 2m for this year versus 1m."

Do you see that?

A. I do.

Q. What does the "plug" refer to in this context?

A. The plug refers to a minimum guaranteed distribution from the joint venture to GBG.

Q. In terms of some of these deals that we've discussed, did they have minimum guaranteed distributions to GBG?

A. In the two deals that we have discussed, yes.

Q. And what was the purpose of having minimum guarantees?

A. The purpose was unique in each case, but it was to provide some benefit or comfort to the joint venture partner.

Q. GBG?

A. Correct.

Q. And eventually was there an agreement reached with GBG that there would be some minimum distributions in SEA-3?

A. Yes.

Q. And SEA-2 as well?

A. Yes.

MR. LENOW: And now, Mr. Bianco, let's go back to that point B. If we can zoom in to point B and everything that is

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

| MB7YCOL3 | Horowitz - Direct. | Page 789 |
|---|---|---|

below it.

Q. Starting at the top: "$5 million of current marketing liabilities," what does that refer to?

A. The repayment for the inflated price from the June joint venture.

Q. So unpack that a bit.

Why specifically does it say 5 million?

A. Because the June joint venture was inflated by $5 million and we owed that $5 million back to GBG.

Q. And just to talk about these marketing payments, the $5 million that was going to be sent by GBG, was it your understanding that that was going to buy Iconix additional marketing work that wouldn't be done?

A. No.

Q. Then what was your understanding of why $5 million was going to be sent to GBG if Iconix wasn't going to get anything for it?

A. To pay them back for the inflated price in June that let us hit our numbers.

Q. And then going down to the next bullet point, it says: "15.5m value of 50 percent for LC and Umbro in China."

What does the 15.5 refer to?

A. It refers to the agreed-upon price for SEA-3.

Q. Was this an inflated price at this time or a non-inflated price?

| MB7YCOL3 | Horowitz - Direct. | Page 790 |
|---|---|---|

A. It is not an inflated price.

Q. Did there come a time when the price was inflated?

A. Yes.

Q. What was it inflated to?

A. $21.5 million.

Q. Now, going down a bit, it says: "Desire to terminate Rocawear Kids license." And it has some numbers on it.

What is the desire to terminate Rocawear Kids license?

A. GBG's desire to get out of the Rocawear Kids contractual payments.

Q. And then starting with bullet points one and two, what do those each refer to?

A. Guaranteed minimum royalties that GBG would owe Iconix.

Q. And if you add those up, the minimums for 2014 and 2015, what number do you reach?

A. $6 million.

Q. And what was the amount that SEA-3 was ultimately inflated?

A. $6 million.

Q. There's also a reference to $2.2 million in fixtures.

What does that refer to?

A. Iconix had paid for fixtures at the GBG headquarters that were still on our books.

Q. Why were you referencing that here?

A. Because it was another component of Rocawear Kids.

Q. The financial situation surrounding it?

| MB7YCOL3 | Horowitz - Direct. | Page 791 |
|---|---|---|

A. Yes.

MR. LENOW: Mr. Bianco, let's unhighlight this so we don't have too much highlighted.

Let's turn to the Jason call portion and specifically point two. We don't need to highlight it. That's fine.

Q. But the Jason call under point two where it says: "He says he needs the 10 million more as he discussed with you," what do you understand -- let me pause for a second.

Mr. Bianco, let's just highlight the point two and everything underneath that and then pull it out for the jury where he says he needs the 10 million and more under point two. That's okay. We can just go as is.

He says he needs the 10 million and more as he discussed with you.

What are you telling Neil here?

A. That Jason says that he needs $10 million of either revenue or reduced expenses, "as he discussed with you," Neil.

Q. Can you provide the jury some context.

What's going on here? What is the 10 million more, as you understand it?

A. Jason is expressing now that he needs additional revenue to hit his numbers.

Q. And then you say here: "I see it as $5 million of marketing. Liabilities in $2 million from LC China."

What are you saying there?

| MB7YCOL3 | Horowitz - Direct. | Page 792 |
|---|---|---|

A. I'm starting to lay out the $10 million and more that Jason says he needs.

Q. So the $5 million of marketing refers to what?

A. The giveback from the initial inflated price of the joint venture in June.

Q. How are you, in this email, counting that $5 million?

Why is the 5 million, the giveback, being listed under the 10 million that Jason says he wants or needs?

A. Because it's $5 million that we already owe them.

Q. Do you understand whether that $5 million could be reflected as revenue by GBG if Iconix paid $5 million in marketing invoices?

A. I believe that it could be. Yes.

Q. Just to pause on the marketing expenses, at this point, had you been given any guidance by Neil Cole about how specifically the $5 million in marketing expenses would be broken down, for example, by brand?

A. I don'ts believe we've discussed that yet.

Q. Did there come a time later when that did happen?

A. Yes.

Q. You then say: "Getting creative about an initial $5 million for this year is difficult."

What are you expressing there?

A. Trying to get GBG back another $5 million or more would be difficult.

MB7YCOL3     Horowitz - Direct.     Page 793

Q. Why is that the sentiment you're expressing?

A. Because there's a tension between our desire to have inflated revenue and their desire to get revenue or reduced expenses, and there's not an easy solution.

Q. Does this relate in any way to that conversation that you and Neil had in the car ride back from GBG?

MR. HECKER: Objection. Leading.

THE COURT: Sustained.

BY MR. LENOW:

Q. What, if anything, does this have to do with the conversation you had in the car with Neil?

A. This is pretty much a direct correlation the new-found friction between the company's goals.

Q. Can you explain a bit more.

A. Both companies are now under the pressure to achieve revenue and earnings goals where that was not the case before GBG became public.

Q. At the very bottom you say: "23m price for China JV."

What are you saying there?

A. This is a contemplated inflated price with a giveback.

Q. For what?

A. For letting GBG out of its Rocawear Kids and some additional payments.

Q. To be clear, Mr. Horowitz, you looked at some forecast sheets earlier.

MB7YCOL3     Horowitz - Direct.     Page 794

In your discussions with Mr. Cole at the time, did the two of you discuss whether or not you needed an inflated price at this time? Whether you knew you needed it.

A. We were discussing it, but I don't believe we had settled on whether or not we needed it.

Q. Was the Middle East JV still in play at this point to your recollection?

A. I believe that it was.

Q. If that had happened, would you have needed an inflated price for SEA-3?

A. No.

Q. And, Mr. Horowitz, just to kind of address a bit more the relationship between the companies, you've explained why higher purchase prices benefited Iconix. I just want to ask you about your understanding of why these transactions benefited GBG.

If GBG was going to pay more for these deals and get money back, why, to your understanding, would that be helpful to GBG if it was sending money out and bringing money back in?

Why didn't it all just kind of net out?

Why did they still want to do these deals with inflated prices for invoices?

MR. HECKER: Objection to the form of the question.

THE COURT: You asked about four different questions there.

MR. LENOW: I apologize. I'll break it down.

MB7YCOL3     Horowitz - Direct.     Page 795

Q. Mr. Horowitz, what was your understanding about why these deals benefited GBG?

A. These deals benefited GBG because my understanding is when you buy an asset, a brand, it doesn't hit what's known as your P&L or your profit and loss. But if you get expenses paid or if you get a reduction in payments you have to make, that does hit your P&L, your profit-and-loss statement.

So there's a separation of financial data or financial presentation that is different when you pay for a brand or equity than when you have expenses or revenue.

Q. Just to be clear, you just mentioned this $23 million price you raised.

In terms of discussions between the parties, what was the price that had been discussed at that point?

A. 15.5 million.

MR. LENOW: We can take this down.

Let's go to Government Exhibit 250 which we looked at a lit earlier.

Q. Do you see where it says August 19 in this document?

A. I do.

Q. At this point in time, August 19, is the price for Umbro China -- does that reflect an inflated price or not?

A. It does not.

Q. According to this document, is the Middle East JV still under consideration for the quarter or not?

MB7YCOL3     Horowitz - Direct.     Page 796

A. It is.

Q. And at this point in time, if both Umbro China and the Middle East JV got done, would those two deals have been enough for Iconix to make its financial targets?

A. Yes, it would have.

Q. Without any inflated prices?

A. That is correct.

Q. Did there come a point later where that changed?

A. Yes.

Q. We'll get into the details.

But generally speaking, what occurred such that that situation changed?

A. The Middle East joint venture was no longer going to happen in this quarter.

Q. And what, if anything, did you and Mr. Cole decide to do as a result of that?

A. One of the things that we decided to do was to inflate the China joint venture or SEA-3.

MR. LENOW: We can take this down.

Let's go to Government Exhibit 1065.

Q. Looking at the bottom email, August 25, from you to Neil Cole, do you see where it says: "I have a call with Jared on the China LC and Umbro JV deal at 2:00 today. Will update you after the call"?

Do you see that?

# A-762

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

---

MB7YCOL3 — Horowitz - Direct. — Page 797

A. Yes, I do.

Q. What is Neil Cole's response to your email?

A. "Saw Jason over the weekend. Said Bruce, et al. approved the deal."

Q. Mr. Horowitz, why are you updating Mr. Cole about the status of this deal?

A. Neil and I regularly communicated on these deals, and this was normal practice.

Q. Did Mr. Cole seem to care about these deals and the prices that they were done?

MR. HECKER: Objection to form.

MR. LENOW: Based on what you perceived.

THE COURT: Overruled.

THE WITNESS: Yes. Very much so.

BY MR. LENOW:

Q. Based on what he said, why did you understand that he cared about these deals and the prices for them?

A. We needed these deals and certain revenue and EPS from this deal in particular to hit our financial goals.

Q. Now, when Mr. Cole says, when Neil Cole says: "Bruce, et al., approved the deal," who is the "Bruce" that you understand him to be referring to?

A. I don't recall Bruce's last name, but he was another executive at Li & Fung GBG.

Q. What was the price that you understood this deal had been

---

MB7YCOL3 — Horowitz - Direct. — Page 798

approved at by GBG?

A. $15.5 million.

MR. LENOW: We can take this down.

Let's turn now to Government Exhibit 1069.

Q. Mr. Horowitz, do you see here the date is September 2, 2014, so about a week later after that last email?

A. I do.

Q. Who is it from, and who is it to?

A. It's from me to Neil.

Q. What are you attaching to the email?

A. An update.

MR. LENOW: Let's turn to the next page, the actual update. Let's start at the top. Let's highlight the first.

Q. Under "China Umbro GBG," do you see where it says: "15.5m for 50 percent LC Umbro in China"?

A. I do.

Q. What does the 15.5 number represent?

A. The agreed-upon purchase price for SEA-3.

Q. Do you see where it says: "All diligence requests have been completed, including introduction letter to Lee Cooper licensees in China and HK"?

A. Yes, I see that.

Q. "All legal documents have been sent to GBG."

Do you see that?

A. Yes, I do.

---

MB7YCOL3 — Horowitz - Direct. — Page 799

Q. What are your referring to as having occurred already with the SEA-3 deal at the $15.5 million price?

A. That any work that had to be done prior to the deal and the documents themselves had all been completed.

Q. Mr. Horowitz, when you were at Iconix as the COO, would you ever discuss the subject matter of these weekly updates with Mr. Cole?

A. Yes.

Q. And how common was that?

A. It was very common.

Q. Do you recall specifically discussing these topics with Mr. Cole around this time?

A. Yes.

MR. LENOW: Let's zoom out again, Mr. Bianco. Under "GBG" point B, let's zoom in there.

Q. Let's walk through this.

So do you see where it says: "At Jason's request, I walked Jared through our proposed $5 million of current marketing liabilities"?

A. I do.

Q. Who is the "Jason" and who is the "Jared" in that statement?

A. It is Jason Rabin and Jared Margolis of GBG.

Q. Why do you phrase this as "our proposed $5 million of current marketing liabilities"?

---

MB7YCOL3 — Horowitz - Direct. — Page 800

A. This is what Neil and I discussed proposing to GBG to pay them back the $5 million we owed them from June.

Q. Mr. Horowitz, why is it that you are proposing to GBG what marketing to pay them for as opposed to them doing work and just invoicing for what they've done?

A. Because these invoices were just a cover, something to pass a sniff test, in order to get the money back to GBG for the June joint venture.

Q. Let's walk through points one, two, and three. Let's start with point two actually and move back. So point two is 1.5 million of Peanuts marketing in China.

What does that refer to?

A. It refers to asking them to invoice us for $1.5 million of marketing for Peanuts in China.

Q. Do you recall discussing with Mr. Cole the decision of having GBG invoice you for Peanuts as part of this agreement?

A. Yes.

Q. What, if anything, did Mr. Cole say about why he selected Peanuts as the brand that should be invoiced for as part of the giveback?

A. At first, he selected Peanuts was we had a joint venture for Peanuts or a partner with the Schulz family. And they would have had to pay or been responsible for paying part of this Peanuts marketing.

Q. What is Peanuts?

---

# A-763

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB7YCOL3     Horowitz - Direct.     Page 801

A. Snoopy, Charlie Brown.

Q. It's the name of the Charlie Brown Snoopy comic?

A. Yes.

Q. So when you say you had a JV with them, explain that. We've talked about JV for a fair bit.

What does it mean that Iconix had a JV with the Schulz family?

A. With had shared ownership with Peanuts between Iconix and the Schulz family.

Q. So if Iconix was paying something relating to Peanuts, was there some agreement with how that would be done with the Schulz family?

A. The payment of invoices for Peanuts would be per the percentage of ownership of the brand. So Iconix would not foot the entire bill of the $1.5 million.

Q. So the Schulz family would pay a portion of this invoice. That's how that would work?

A. Netted out of their payments, yes.

Q. And had you identified at this point -- or had you heard Mr. Cole identify -- an actual $1.5 million worth of marketing that GBG had done for Peanuts in China?

A. No.

Q. Were you aware of any such work that amounted to that value of marketing work?

A. No.

MB7YCOL3     Horowitz - Direct.     Page 802

Q. Did you ever hear Mr. Cole reference marketing work equivalent in value to that?

A. No.

Q. So why was the $1.5 million of Peanuts marketing chosen for one of the invoices?

A. So that way we could pay back GBG a portion of the $5 million we owed them, and that some of it would be paid by somebody else.

Q. Going now to the point three, $1 million Zoo York marketing in Europe.

What is Zoo York?

A. Zoo York is a brand that Iconix owned.

Q. What kind of brand was it?

A. A New York skate brand.

Q. What are you saying here to Mr. Cole about the $1.5 million Zoo York marketing in Europe?

What are you expressing to him about what you've told Jason and Jared about this?

A. That GBG, as Neil and I discussed, should invoice us $1 million for Zoo York marketing.

Q. Were you aware of $1 million in value of Zoo York marketing that had been done by GBG?

A. No.

Q. Had Mr. Cole referenced any such work?

A. No.

MB7YCOL3     Horowitz - Direct.     Page 803

Q. Why was the $1 million of Zoo York marketing conveyed to GBG?

A. Because that is what Neil instructed me to do.

Q. Now let's go back to point one, the $2.5 million of the relief of Rocawear Kids in 2014.

THE COURT: Before we do that, it's 12:50. So we're going to take our second break, twenty minutes. So we'll be back at 10 minutes after the hour. Don't discuss the case.

(Continued on next page)

MB7YCOL3     Horowitz - Direct.     Page 804

(In open court; jury not present)

THE COURT: Mr. Horowitz, you may step down. Everyone else can be seated.

(Witness temporarily excused)

THE COURT: Anything to raise?

MR. LENOW: Just briefly, Judge.

THE COURT: Yes.

MR. LENOW: Just to preview, the parties have agreed on virtually all of the exhibits for Mr. Horowitz. There are like four or so that we're still having discussions about.

I think the approach is that Mr. Hecker is going to see what the foundation is, and then we can discuss. Just to preview what one of them is, it's Government Exhibit 706 which your Honor might remember is a chart Mr. Horowitz created along with David Maslaton. It's a chart of kind of the overpayments and givebacks, and this chart was used for discussions with Neil Cole. It was admitted last time.

THE COURT: It was or was not?

MR. LENOW: It was. We obviously are going to seek to offer it. We admitted it last time. We may have some disagreement about it. We may not. I just wanted to flag it for your Honor to know that it might be coming.

There may not be an objection. I think Mr. Hecker just wants to see the foundation. So that's the one exhibit that's coming up on that point. There are a few others that he

MB7YCOL3     Horowitz - Direct.     Page 805

similarly wants a foundation. They're a little simpler. They weren't dealt with last time, and we'll see them as they come. So I just think there are a few exhibits that may result in a need for a sidebar. We just want to give your Honor a heads-up that there are some things that may need resolution.

THE COURT: Okay.

MR. LENOW: That's it from us, Judge.

THE COURT: Okay. Don't be late.

(Recess)

(Continued on next page)

MB75col4     Horowitz - Direct     Page 806

(Jury present)

THE COURT: Everyone, please be seated.

Mr. Lenow.

MR. LENOW: Thank you, Judge. And, your Honor, I want to start by offering a new exhibit, Government Exhibit 1255-C, a Word version. This is on consent.

THE COURT: Very well. It will be received.

(Government's Exhibit 1255-C received in evidence)

BY MR. LENOW:

Q. Mr. Bianco, can you please publish what is now in evidence Government Exhibit 1255-C?

Mr. Horowitz, can you take a look at this Word document and do you recognize this?

A. I do.

Q. Is this a Word version of that that you looked at earlier in your testimony?

A. Yes, it is.

Q. We can take that down. Mr. Bianco, let's go back to Government Exhibit 1069 where we left off.

So, I asked you about, you spoke about the Peanuts and the Zoo York marketing. Why is 2.5 M relief of Rocawear Kids in '14 listed on this document that you sent to Neil?

A. At is this point we are considering letting them out of some of the payment for Rocawear Kids as part of the repayment for the June joint venture.

MB75col4     Horowitz - Direct     Page 807

Q. Is Rocawear Kids relief a marketing liability?

A. No.

Q. Why is it listed under marketing liabilities, the $5 million of current marketing liabilities?

A. Because Neil and I would commonly refer to the $5 million that we owed GBG from June as marketing liabilities.

Q. And so, based on this description, what was the potential thinking here about how the $5 million giveback would be comprised of? What would it be comprised of?

A. It would be comprised of $2.5 million of repayment based on the cover of marketing invoices and $2.5 million of relief of some of what they owed GBG owed for Rocawear Kids.

Q. Just to pause for a second, Mr. Horowitz. So, in terms of that time -- Mr. Bianco, let's zoom out -- what is the date of this, the date of this update to Mr. Cole?

A. September 2nd.

Q. How close are you to the end of the quarter?

A. One month.

Q. Now, to be clear, did Mr. Cole express a desire from the very beginning of this quarter to do an inflated price for SEA-3?

A. No.

Q. What changed and why, to your understanding?

A. What changed was that Middle East joint venture, which was going to bring in revenue and profit, was no longer going to

MB75col4     Horowitz - Direct     Page 808

happen.

Q. Why did that matter to Mr. Cole from your discussions with him?

A. It was very significant because without the Middle East joint venture, Iconix would not make its sales or revenue and EPS goals.

Q. We can take this down.

Let's look at another e-mail from September 2nd, Government Exhibit 1070, in evidence. Let's start at the very bottom of this e-mail and we will highlight this so we can keep it all on the screen, Mr. Bianco.

The latest thoughts on Rocawear kids. Do you see the text at the bottom?

A. I do.

Q. Who is that e-mail from?

A. It's from Neil.

Q. Just to pause, do you recognize what -- let's go to the second page of this e-mail for a second. What is the bottom e-mail on this chain?

A. My weekly report.

Q. How does that relate to the document we just looked at a second ago?

A. I believe the document we just looked at was attached to this e-mail.

Q. And so, according to this chain did Mr. Cole respond to

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB75col4  Horowitz - Direct  Page 809

your update?

A. Yes.

Q. Mr. Bianco, let's go back to that page 1.

What does he say in response to the e-mail you send on the $5 million of market liabilities?

A. Latest thoughts on Rocawear Kids, question mark.

Q. What did you understand him to be asking there in response to your update?

A. He is asking me for my thoughts on whether or not we could find a replacement for the Rocawear revenue that we would give up if we gave back -- that we would give up if we let GBG out of its contract.

Q. Was that still an important consideration for you and Mr. Cole at this time, based on your discussions?

A. Yes.

Q. Explain why, again, that was important to find that person to step in for the Rocawear Kids license?

A. As I have stated, Rocawear was in a state of decline. The revenue that we did have for Rocawear was barely holding it out of impairment, and if we lost this much revenue for Rocawear, we would have to replace it or face bigger financial problems.

Q. The e-mail above it, just focusing on first sentence of it, your response.

Mr. Bianco, can we highlight: We should use it as a bargaining chip with GBG.

MB75col4  Horowitz - Direct  Page 810

What do you express to Mr. Cole there?

A. Well, that we know that GBG wants out of the Rocawear Kids license badly and we can use that as a bargaining chip.

Q. For what purpose?

A. For the purpose of inflating our revenue if we need it.

Q. Then you see Mr. Cole's response where he writes: If it will be part of final deal with Umbro China, very worried about timing for Q3.

A. Yes.

Q. What do you understand Mr. Cole to be saying about if it will be part of final? What is the "it" he is referring to there?

A. Letting GBG out of their Rocawear Kids' agreement.

Q. And the final deal with Umbro China, what is that?

A. SEA-3.

Q. Then, the very word about timing for Q3, what do you understand Mr. Cole to be saying there?

A. We needed this transaction either with or without the inflated price in order to hit our financial goals at this point.

Q. Did Roc Kids end up in fact being part of the final agreement between Iconix and GBG?

A. Yes.

Q. For SEA-3?

A. Yes.

MB75col4  Horowitz - Direct  Page 811

Q. Was it reflected in the actual deal documents?

A. No.

Q. And your response to Mr. Cole here -- withdrawn.

The timing for Q3 refers to what, in your understanding?

A. Getting the revenue and EPS we needed for Q3s financials.

Q. So, above that you say, in your response e-mail I will brief it too, and then you see where Neil says: Also like David's idea, if it is 20 M having an option to take over two quarters. Although Middle East delay might not need it.

Let's break that down. What do you understand Mr. Cole to be saying in that first line, about taking $20 million over two quarters?

A. If we negotiated the inflated price we would have $20 million of revenue, and if we don't need the whole amount in Q3, we would like to take the half we do need in Q3 and the other half in Q4.

Q. Do you understand who the "David" is there that he is referencing?

A. I believe it is Davis Maslaton.

Q. And the next sentence: Although Middle East delayed, might need it. What do you understand Neil Cole to be saying there about might need it, if Middle East is delayed?

A. If Middle East joint venture gets delayed or doesn't happen in September, we might need the full inflated price in the

MB75col4  Horowitz - Direct  Page 812

third quarter.

Q. And, Mr. Horowitz, drawing your attention back to those four cash sheets, based on your review of those documents around this time, did Iconix need that Middle East JV to make its numbers?

A. Yes, it did.

Q. And then, turning to your response at the top -- we can unhighlight everything and start again, to not overwhelm highlighting.

I believe the 15.5 in Marcraft get us there with groom but total deal of 20 would lock up the quarter. Easy to break deal in pieces by quarter between the two brands, if we wanted.

What are you proposing there or what are you referring to when you say 15.5 in Marcraft gets us there?

A. I'm saying that the price of the joint venture at 15.5 million, the non-inflated price, plus another license would get us to where our financial goals need to be, where our financial goals are. Marcraft was a licensee that was on the verge of bankruptcy and had accelerated payments that would have partially or fully made up for the Middle East joint venture falling out.

Q. Do you recall if the Marcraft situation happened as you laid out here?

A. It did not.

Q. And so, in light of that, would it be the case that you

**A-766**

UNITED STATES OF AMERICA, V
NEIL COLE,

---

MB75col4      Horowitz - Direct      Page 813

would get there on your own with an uninflated price?

A. No.

Q. And then you say: A total deal of 20 would look lock up the quarter.

What are you saying there about the 20 deal?

A. If we did the inflated deal for SEA-3, we would make our quarterly numbers.

Q. Let's take this down and go to Government Exhibit 1077, an e-mail from the next day.

Mr. Horowitz, do you see the date listed on this e-mail?

A. I do.

Q. Who is it from and who is it to?

A. It's from me to me, from my personal account, to my work account.

Q. Do you recall why you had sent an e-mail to yourself here?

A. Sometimes if I worked on documents at home I would e-mail them to my work account so I would have them in the office.

Q. Let's go to the second page of this document. Let's get the full picture if we can and zoom out.

Mr. Horowitz, broadly speaking, what are we looking at here? What are you laying out in this document?

A. An overview of where we are at with GBG and the potential inflated deal with Rocawear giveback.

Q. And do you recall around this time discussing these topics

---

MB75col4      Horowitz - Direct      Page 814

with Mr. Cole?

A. Yes.

Q. Let's break it down and start at the top and work our way down. Now, the $5 million in marketing, what does that refer to?

A. That refers to the $5 million that we owed GBG from the June joint venture.

Q. Now, is it broken out here the same way that it was before or is there something that is different?

A. It is different.

Q. What is different?

A. We no longer have the Rocawear forgiving of payment, and in its place we have added Mossimo for $2 million and increased Peanuts by half a million dollars.

Q. Mr. Horowitz, do you would have discussed these issues, the subject matter here, with Mr. Cole around this time?

A. Yes.

Q. And this change, why did you change the breakdown of the $5 million in marketing from the prior document and Rocawear forgiveness as an option to what we are seeing here today -- Zoo York, Peanuts, and Mossimo? Why did you make that change?

A. We made that change because we were going to include letting GBG out of its Rocawear commitment as part of the SEA-3 for an inflated price.

Q. Who made that decision?

---

MB75col4      Horowitz - Direct      Page 815

A. Neil did.

Q. And how did you learn that, that he had made that decision?

A. Neil told me.

Q. Were you regularly meeting with Mr. Cole around this time on these topics?

A. Yes. He dictated the brands for the givebacks.

Q. Let's zoom out again. Now, focusing on no. 2, JV in China for Umbro and Lee Cooper. What is the price at now?

A. $21.5 million.

Q. Why has the price gone up to $21.5 million in this document?

A. Because we have agreed -- or that we are modeling the inflated price in exchange for letting GBG out of its Rocawear Kids agreement.

Q. If we can zoom out again, Mr. Bianco?

And then looking at point 3, Rocawear Kids termination, what is that reflecting?

A. This reflects both the reduction in payments that would be due from GBG, as well as a transition to a new licensee.

Q. If we can highlight, Mr. Bianco, first and third bullet point?

There is a number of menu of options here but just, can you give the jury a big picture about what all of these bullet points relate to and why you are setting them out in this document?

---

MB75col4      Horowitz - Direct      Page 816

A. All of these bullet points relate to relieving GBG of its Rocawear Kids agreement and how that agreement might be replaced.

Q. And, in terms of the inflation of the price to $21.5 million for the SEA-3 deal, were there any Rocawear Kids provisions listed here that specifically related to those, that new price?

A. Yes. GBG had a financial commitment of $6 million in guaranteed minimum royalties that we would let them out of in exchange for the inflated price.

Q. And what are the other -- there is a number of other bullet points here. Just generally speaking, what do those relate to and why are you putting them in this sheet to yourself?

A. They are kind of pieces of a transaction in which a new licensee would try to take over the existing business or businesses in Rocawear Kids.

Q. Let's zoom out. And we don't have to zoom in again but just highlight, Mr. Bianco, at very the bottom where it says minus 2.3 M under total impact, very bottom. What does that mean, Mr. Horowitz, the total impact minus $2.3 M?

A. That's taking the totality of the document, paying them the $5 million we owe them, doing the inflated praise for SEA-3, and letting GBG out of Rocawear Kids, and the total of all of that to Iconix would be a negative $2.3 million versus our current forecast.

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

| MB75col4 | Horowitz - Direct | Page 817 |

Q. For what? That quarter or for something else?

A. For the entire year.

Q. The entire year. OK.

Now, did all of these things in fact happen in 2014?

A. No.

Q. And, subsequently, with respect to the invoices, did you have specific discussions with Mr. Cole about the timing of those invoices?

A. Yes.

Q. We will get to the details later but for now, at least generally, what did Mr. Cole express to you, if anything, about the timing of when the $5 million in marketing invoices should be paid?

A. He wanted them spread out 25 percent in Q3, 25 percent in Q4, and then 50 percent for the following year.

Q. Why is that? Why did Mr. Cole want those $5 million in invoices spread out?

A. Because it would benefit Iconix' financials to not take in the full expense in any one quarter.

Q. And if the full expense was taken in this quarter, what would the total impact of all of these arrangements be in this year, according to your sheet?

A. If the full $5 million of invoices or marketing expenses were paid back in this quarter it would have basically undone the $6 million inflated price for the SEA-3.

| MB75col4 | Horowitz - Direct | Page 818 |

Q. Based on your conversation with Mr. Cole was that timing issue, does it appear to be important to him?

A. Yes.

Q. And one more thing. Under point 2, Mr. Horowitz, can we please highlight the bottom bullet point under point 2, the 2014 Iconix P&L impact of positive 19 M, increase of 5.6 M versus current forecast.

What does that mean?

A. The impact and the difference between the current forecast is the inflated price.

Q. Mr. Horowitz, one last question about this document. Why was it that you could just change the $5 million of marketing, what it was composed of and the amounts, changing Peanuts from one number to another, for example. Why couldn't you do that?

A. Because these invoices did not represent marketing for those dollar amounts, they were simply a cover to get GBG back its money from the original joint venture.

Q. You can take that down.

Mr. Horowitz, let's go to Government Exhibit 1078 and zoom in. Who is the e-mail from and to, Mr. Horowitz?

A. It is from me to Neil.

Q. What is the date?

A. September 3rd.

Q. How does that relate to that last e-mail we just looked at in terms of the date?

| MB75col4 | Horowitz - Direct | Page 819 |

A. I believe it is the following day.

Q. If we go back to that other e-mail, Government Exhibit 1077 for a second? Let's put them side by side.

What is the relative date, Mr. Horowitz?

A. It is the same date, later that evening.

Q. Let's go to, if we can take 1077 down and just look at 1078. What do you state to Mr. Cole in this e-mail? Start with the subject line too, if you could.

A. The subject is GBG and I am telling Neil that we have prepared something for us to discuss the following day. I am also making him aware that David M. is preparing something that we had discussed.

Q. I'm sorry. The subject matter is what, the subject line?

A. GBG.

Q. Who is the "us" in there? Who is that referring to?

A. Neil and I.

Q. What are you referring to here when you say David M. is preparing cash flow analysis as we discuss. Do you know what you are referring to?

A. I do.

Q. What is that?

A. Neil made it clear that if we were going to let GBG out of its Rocawear agreement, that we would need to be paid on the same terms as the Rocawear Kids agreement but within the joint venture.

| MB75col4 | Horowitz - Direct | Page 820 |

Q. What do you mean on the same terms?

A. That the $6 million that GBG owed us for Rocawear, now that it was a part of the joint venture, would have to be paid on the same dates that it would have been paid if it was at the Rocawear kids agreement.

Q. Let's break that down. Now, first, when you say that the Rocawear Kids, now that it was part of the joint venture, what do you mean by that statement?

A. Well, now the joint venture included an inflated price and a secret promise to let GBG out of its Rocawear Kids agreement.

Q. Did that secret promise make its way into the contracts?

A. No.

Q. Now, you mentioned the payment terms. What do you mean by payment terms of -- let's break it down, actually. Withdrawn.

So, under the Rocawear Kids licensing agreement, was there any sort of schedule under which GBG paid money to Iconix?

A. Yes.

Q. Was there, like, a regular schedule or was it whenever they wanted to?

A. It was a contractual schedule.

Q. And what was the total amount of those minimum payments in 2014 and 2015 that GBG would have to pay to Iconix?

A. $6 million.

Q. That was supposed to be paid on some sort of fixed

**A-768**

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

| MB75col4 | Horowitz - Direct | Page 821 |
|---|---|---|

schedule?

A. That is correct.

Q. And then, under the SEA-3 deal, just explain again, what would change? What would change about that deal in light of a Rocawear Kids payment schedule, if anything?

A. Well, the price would go up from 15.5 to 21.5 million, and the additional 6 million of the inflated price would have to get paid on the same schedule as the Rocawear Kids agreement.

Q. On next due date, for example, that the Rocawear Kids minimums would have had to have been paid, what would then happen instead under what you described?

A. A payment would have been made to the joint venture in that amount -- to Iconix in that amount.

Q. By whom?

A. By GBG.

Q. There would be some sort of payment coming to Iconix?

A. That is correct.

Q. Let's take this down and go to government 1079. Mr. Horowitz, at the time that the SEA-3 deal was finalized, did you understand there was to be a firm commitment -- there was a firm commitment to relieve GBG of Rocawear Kids' payment obligations?

A. Yes.

Q. Let's turn to this. In government 1079, what do you say in the bottom e-mail here, September 3rd, 2014 from Horowitz to

| MB75col4 | Horowitz - Direct | Page 822 |
|---|---|---|

Jason Schaefer?

Do you see that?

A. I do.

Q. What do you say in the e-mail?

A. I am asking Jason Schaefer, our general counsel, to prepare a termination notice for Rocawear Kids.

Q. Why?

A. Because we had agreed to let GBG out of its Rocawear Kids agreement.

Q. You can take it down. Did you explain to Mr. Schaefer or another lawyer at Iconix why that was, you were asking for that?

A. No.

Q. Let's publish, for everyone, government 1080 in evidence. Drawing your attention from the top, from Ericka Alford to Seth Horowitz, cc to Jason Schaefer, subject Rocawear Kids termination letter. Do you see where it says: Seth, attached please find a draft of the termination agreement you requested.

A. I do.

Q. And what do you understand Ericka Alford to be saying here?

A. A termination letter for the Rocawear Kids agreement with GBG.

Q. Who is Ericka Alford?

A. She is an attorney -- was an attorney at Iconix.

| MB75col4 | Horowitz - Direct | Page 823 |
|---|---|---|

Q. Did you ever tell Ms. Alford about the inflated deal price in exchange for the giveback for this or any other deal?

A. No.

Q. Did you discuss around this time, with Mr. Cole, that you were engaging Iconix' legal counsel about these issues?

A. Yes.

Q. Did you make these inquiries on your own?

A. No.

Q. Explain why you reached out to legal to have them draft the termination agreement.

A. Neil had asked me to prepare a termination agreement for Rocawear Kids.

Q. Would you have done that if he hadn't directed you to?

A. No.

Q. Why?

A. That is not something that I was authorized to do.

Q. Mr. Horowitz, we can take this down and lets go to Government Exhibit 1082. Zoom in at the top. Did you see what is in evidence, Mr. Horowitz, as Government Exhibit 1082?

A. I do.

Q. What is it?

A. It's a schedule for a meeting.

Q. And drawing your attention in the "to" line, do you see the names Ethan Cole, Seth Horowitz, and Jared Margolis?

A. I do.

| MB75col4 | Horowitz - Direct | Page 824 |
|---|---|---|

Q. Remind the jury of who Ethan Cole is.

A. Ethan Cole was an employee at GBG.

Q. Any relation to Neil Cole, as far as you are aware?

A. No.

Q. Jared Margolis was who again?

A. An executive at GBG.

Q. Do you see the subject where it says: 2:00 p.m. meeting Seth Horowitz/Jared Margolis, location 1450 Broadway at 40th Street, conference room 3B?

A. Yes, I see that.

Q. What did you understand this calendar invite relates to?

A. This invite relates to a meeting that I had with Jared and Ethan about the structure of the initial giveback and the SEA-3 and Rocawear Kids termination.

Q. Did you discuss these issues with Mr. Cole in advance of that meeting with GBG?

A. Yes.

Q. Where did it occur? Whose offices?

A. These occurred at Iconix' offices.

Q. This conference room 3B, where is that located in relation to where Neil Cole's office was?

A. A very short distance from -- one of his doors.

Q. Did Neil Cole come by the meeting at any point in time?

A. Yes, he did.

Q. Can you describe, generally speaking, when that occurred

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

---

MB75col4  Horowitz - Direct  Page 825

and how long he stayed?

A. He came in, sat down with three of us, wanted to make sure everything was going OK, it was a relatively brief visit, and then he left.

Q. Now, did you do anything to prepare for this meeting with GBG that occurred at Iconix' offices on September 5?

A. Yes, I did.

Q. What did you do?

A. I prepared a one-page sheet that we would share with GBG.

Q. Let's turn to -- can we take this down and go to Government Exhibit 1084?

Mr. Horowitz, do you see this e-mail from you to Joanna Pompillio?

A. I do.

Q. Who is Joanna?

A. She was my assistant at the time.

Q. And what do you say to her in this e-mail?

A. Please print out three copies and brick into 3B. Thank you, Seth.

Q. Do you recall why you were asking her to print out three copies of whatever was attached and bring it into 3B?

A. Yes.

Q. Explain.

A. I was going to keep one copy for myself and hand the other two to Jared and Ethan.

---

MB75col4  Horowitz - Direct  Page 826

Q. Why do you say three copies?

A. One for each of us.

Q. Let's go to the attachment. Now, Mr. Horowitz, is this -- we looked at a similar document before but are there some differences between that document you read to yourself and this document?

A. That's true.

Q. Focusing on the top one, point 1, do you see where it says: 50 percent Q3/Q4, 50 percent prepay?

A. I do.

Q. What does that refer to?

A. That refers to the timing of the payment of invoices.

Q. Why is that included in this sheet? How did it get there?

A. Neil informed me that this is the way he wanted the invoices to come in and I was relaying that information to GBG.

Q. So, just to break it down, "50 percent Q3/Q4" means what?

A. It means that of the $5 million, Neil wants -- we want to pay $2.5 million in Q3 and Q4 and $2.5 million in the following year.

Q. Did Mr. Cole say why that -- Neil Cole -- did Neil Cole say why that was important to him?

A. Yes.

Q. Why?

A. So that way we could hit our financial goals.

Q. If all of the $5 million in marketing were paid and hit

---

MB75col4  Horowitz - Direct  Page 827

Iconix' books in the third quarter, what would have happened?

A. We would not have achieved our numbers.

Q. We can zoom out now, please.

Turning now to the second, Mr. Horowitz, this document, what are the contribution guarantees a reference to?

A. They're in reference to minimum guarantees of distribution to GBG.

Q. And what is the term, what is the first point here?

A. $21.5 million.

Q. And what does that refer to?

A. The inflated price for SEA-3.

Q. The numbers under that for contribution guarantees, what do those refer to?

A. Those are guarantees to GBG of minimum contributions from the joint venture.

Q. And then underneath that, what do we see the next four bullet points here about payments and anniversaries listed? What is that?

A. Those are -- that reflects the payment schedule for the $21.5 million that incorporates the timing of the Rocawear Kids agreement.

Q. Who made that decision about this is how the payment schedule should be done?

A. Neil did.

Q. So, the differences between that document that you emailed

---

MB75col4  Horowitz - Direct  Page 828

yourself earlier and this document, what accounted for those changes?

A. Neil's directives.

Q. Did you meet with him around that time about these topics?

A. Yes.

Q. Did he give you directives on these specific issues?

A. Yes.

Q. We can take this down. Let's put up Government Exhibit 1253, which is in evidence. Moving forward about four days past the last e-mail, do you see the date September 8, 2014, Mr. Horowitz?

A. I do.

Q. And who is the e-mail from and who is it to?

A. It is from me to Neil.

Q. And what are you attaching for him?

A. One of my weekly updates.

Q. Let's go to the update, please, on the next page.

Mr. Horowitz, this update -- was this before or after the meeting where you had your assistant bring in three copies of that document?

A. This is after that meeting.

Q. And I am going to draw your attention to the third bullet point here if you can highlight that under China JV: Agreed to payment terms for GBG, JV and China as discussed, etc., with Jared.

---

# A-770

UNITED STATES OF AMERICA, V
NEIL COLE,

MB75col4    Horowitz - Direct    Page 829

What are you alerting Mr. Cole to here?

A. That GBG has agreed to pay us according to the inflated price according to the timing of the Rocawear Kids agreement.

Q. And when was that agreement reached?

A. The prior week.

Q. At that meeting or at another time?

A. It was either at that meeting or following that meeting.

Q. And did you also, in addition to providing this update, did you talk to Mr. Cole around this time?

A. Yes.

Q. If we can zoom back out, Mr. Bianco? Now, moving to the bottom of the page, do you see where it says Rocawear? Actually, let's zoom back out -- I'm sorry point 3, Rocawear Kids termination.

"Walk Jared through termination terms/agreement. Will have feedback this week."

What are you referring to there?

A. The details of the termination of the Rocawear Kids agreement as it pertains to inventory and other business variables.

Q. We can take that down: Mr. Bianco, let's put up Government Exhibit 231. Let's zoom in just on the table portion of this, starting with the consensus blog and above it? Thank you.

Drawing your attention to the date and the top left corner, Mr. Horowitz, do you see where it says September 9,

MB75col4    Horowitz - Direct    Page 830

2014?

A. I do.

Q. Has anything, in your mind, significantly changed about this forecast document compared to the last one we saw?

A. Yes.

Q. Can you walk the jury through what is new and different?

A. The Umbro China transaction is now increased in price, the Middle East joint venture is no longer there, and there is an additional column for MetLife.

Q. What is the MetLife line, to your understanding?

A. My understanding is that MetLife was an advertising payment that was made to use Peanuts characters along with MetLife.

Q. Were you involved in that discussion?

A. Peripherally.

Q. Who did you understand to be the primary person on the Iconix side negotiating that deal?

A. Neil.

Q. Focusing on the MetLife line and also the Umbro/LC China line, how much revenue now, the inflated price is, for SEA-3, how much revenue is each of these deals bringing into Iconix in the third quarter?

A. I'm sorry. Can you repeat that?

Q. Sorry. I will withdraw the question.

Let's start with MetLife. How much revenue is MetLife bringing in, according to this document?

MB75col4    Horowitz - Direct    Page 831

A. $5 million.

Q. And then, going to the very bottom of that column, how much EPS is the MetLife deal going to result in?

A. Two cents.

Q. Let's now talk about the SEA deal. First of all, does this price reflect the inflated or not inflated price for SEA-3?

A. This reflects the inflated price.

Q. And so, according to this document, how much revenue is Iconix going to get at that inflated price of $21.5 million?

A. Iconix is going to get $18 million in revenue.

Q. Going down to the bottom, let's highlight this if we can. How much EPS is Iconix getting from the inflated price?

A. 30 cents.

Q. How much EPS is Iconix getting from that MetLife deal?

A. 2 cents.

Q. And according to this document, how much EPS was Iconix getting from its organic business this quarter, just the organic business?

A. 39 cents.

Q. If we can highlight that, Mr. Bianco?

So, Mr. Horowitz, how much EPS is the SEA-3 deal bringing into Iconix relative to its regular organic growth in this quarter, according to this chart?

A. It's a very significant amount, 30 cents from the inflated price of the joint venture and 39 cents for the rest of the

MB75col4    Horowitz - Direct    Page 832

business.

Q. Without the inflated price for the SEA-3 deal, without that extra EPS, would Iconix have hit its financial targets, both consensus and for the prior year's quarter?

A. No, it would not.

Q. Were you aware of any new valuation work done to justify the increase in the SEA-3 deal price to this new price?

A. No.

Q. Why did the price increase?

A. Because Iconix needed the additional inflated revenue to hit its goals.

Q. Have you seen any deals drop out of this sheet that were in the prior versions?

A. Yes.

Q. What in particular?

A. The Middle East joint venture.

Q. We can take this down. Let's go to government 1091.

Do you see this e-mail from Lauren Gee dated September 11, 2014?

A. I do.

Q. How far are you in the quarter here? How far are you before the end of the quarter, Mr. Horowitz?

A. It's about three weeks.

Q. If you see here where Ms. Gee writes: Please find a revised draft of the SEA JV amendment documents for China

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB75col4        Horowitz - Direct        Page 833

Umbro/Lee Cooper, together with blacklines marked against the prior drafts.

A. Yes, I see that.

Q. Let's go to page 52 of this, Mr. Bianco, and zooming in on the second to last paragraph, what do you see at the very end of this paragraph?

A. The price for the joint venture has increased from $15.5 million to $21.5 million.

Q. And above that there is a reference to valuation, a fair market -- sorry, withdrawn.

The fair market value, do you see that?

A. I do.

Q. Do you know why that increased from 31 to 43 million?

A. It increased to reflect a doubling of the new purchase price.

Q. Are you aware of any additional valuation work that was done to reflect that?

A. No.

Q. To support that?

A. No.

Q. Do you know why that number increased from 31 to 43?

A. Yes.

Q. Why?

A. Because the purchase price was inflated by $6 million and that represented 50 percent of the JV, so it simply doubled the

MB75col4        Horowitz - Direct        Page 834

21.5.

Q. Mr. Horowitz, was there any part of this deal that was not included in the written contracts?

A. Yes.

Q. What was that?

A. Forgiving GBG of its Rocawear Kids agreement.

Q. Why wasn't that part of the deal?

A. Because if it had been, we would not have been able to recognize the $6 million in revenue that we needed.

Q. Let's take this down and go to government 1244, another e-mail from Lauren Gee dated September 12. Do you see that, Mr. Horowitz?

A. I do.

Q. And drawing your attention to the line where Ms. Gee writes: Just learned that the business agreed to a 50.5 million floor.

Do you see that?

A. I do not.

Q. Hold on one second. Oh. I'm sorry. That is my mistake. We are working with that document in a second. My apologies.

Do you see where she writes that there are last minute changes to the purchase price payment schedule in the top e-mail? In her point 1. Reflecting some last minute changes to the purchase price payment schedule, as mutually agreed by our business teams.

MB75col4        Horowitz - Direct        Page 835

A. Yes, I see that.

Q. What do you understand she is referring to there?

A. She is referring to matching the payment terms of the Rocawear Kids relief with the payment terms of the joint venture.

Q. Who had decided on that payment schedule change?

A. Neil had.

Q. And why did Mr. Cole want that? According to what he said to you.

A. Because he wanted to make sure that we were paid on the same schedule at the same time that we would have been paid if we had the Rocawear Kids agreement in place.

Q. We can take this down. Let's go to Government Exhibit 1210. This is what I was referring to earlier, sorry for the confusion. In the middle e-mail do you see a September 15th e-mail from Lauren Gee where it states: I just learned that the business teams agreed to a 15.5 million floor on the agreed value attributable to the China Umbro/Lee Cooper rights?

A. I do.

Q. What do you understand? What does this mean, floor? 15.5 million floor?

A. Floor is a minimum amount that GBG could cause Iconix to pay for the joint venture or Iconix could buy back the joint venture.

Q. And let's unpack this a bit to make sure it is clear.

MB75col4        Horowitz - Direct        Page 836

So, under the SEA final agreement, were there any provisions about five years out the parties having specific rights about what they could do with their 50 percent interests in the joint venture?

A. Yes.

Q. And just explain this and walk us through it slowly, if you could?

A. After a certain period of time, GBG could put the joint venture back to Iconix forcing Iconix to buy it back. Also, Iconix could call -- put and call -- could call back the joint venture and buy it back from GBG. In this case there was a floor or a minimum price that the put or the call would have.

Q. And according to this document -- actually let's unpack that a bit more. In terms of both parties' interest, why did Iconix want the right to make GBG sell it back, the call right, to call back the 50 percent interest that GBG -- sorry, the 50 percent interest that GBG purchased? Why did Iconix want the right to call that back?

A. Iconix wanted the right to call that back because if the Umbro brand was doing extremely well, or Lee Cooper, the China joint venture was doing extremely well, Iconix would want to be able to buy it back. Conversely, if it wasn't doing very well, Iconix might want to buy it back, and in another joint venture that we had we didn't have that right and we desired to put that in every future joint venture.

**A-772**

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

---

MB75col4 — Horowitz - Direct — Page 837

Q. So if the deal ends up, you know, Umbro and Lee Cooper ends up being very successful in China and making a ton of money, what could Iconix then do with the $5 million? What could it require GBG to do.

A. It could require GBG to sell its 50 percent share in the joint venture back to Iconix.

Q. And, as a result, if Iconix called those rights back, let's say GBG had invested a lot of money in growing these brands, would GBG be left with anything?

A. They would be paid for it but they could not have any equity or anything left.

Q. Everything would be owned once again, a hundred percent, by Iconix?

A. Correct.

Q. And then just the reverse scenario, if GBG got the put right, in five years what did GBG have the right to do with Iconix?

A. They had the right to force Iconix to buy back the portion that they had bought.

Q. Now, turning back to this e-mail, we looked at a prior document where -- do you recall seeing the prior document where the purchase price changed from $15.5 million to $21.5 million?

A. Yes. I recall that.

Q. And in that document do you recall whether or not that floor for the put option changed similarly, from 15.5 million

---

MB75col4 — Horowitz - Direct — Page 838

up to $21.5 million?

A. It did.

Q. Was that a problem, from Iconix' perspective, around this time?

A. Yes.

Q. Explain.

A. If Iconix was going to be forced to buy back the equity or the joint venture, we weren't going to pay the inflated price, we were going to pay the agreed upon price. We would have already paid GBG back for the inflated price.

Q. So here where you are saying: I just learned the business team is -- sorry, when Ms. Gee is saying: I just learned the business team is agreed to a 15.5 million floor on the agreed value attributable to the China Umbro/Lee Cooper rights in connection with the put/call options, what do you understand her to be saying about what's going to change from the last version of the documents?

A. The put/call minimum is going to go from 21.5 million to 15.5 million.

Q. Did that 15.5 million end up being the put call price -- the final floor price in the final field documents.

A. I believe that did.

Q. And why did the final deal document say the price today was 21.5 being paid by GBG to Iconix, but if in five years that same interest was bought back by Iconix it would not be 21.5

---

MB75col4 — Horowitz - Direct — Page 839

but 15.5. Why?

A. Because the $21.5 million is an inflated price.

Q. And why didn't Iconix want to pay $21.5 million again in five years, if it exercised that call option?

A. Because Iconix would have already paid back the $6 million inflated price.

Q. Let's turn now -- we can take this down -- and go to Government Exhibit 1094. Let's zoom in, if we could.

Do you see the bottom e-mail, Mr. Horowitz, where it says: September 16, e-mail from Neil Cole to you and Mr. Schaefer: Is the deal closed?

A. Yes, I see that.

Q. Do you see the subject is GBG?

A. Correct.

Q. And how do you respond to Mr. Cole?

A. That I am still waiting for signature but we are working on tracking it down.

Q. Why do you understand Mr. Cole to be checking in -- based on your interactions with him and your conversations around this time, why did you understand him to be checking in on whether the deal was closed on September 16th?

A. Because this deal was incredibly important to Iconix' financial performance in the quarter.

Q. Why?

A. It made up 40 percent of our EPS, approximately.

---

MB75col4 — Horowitz - Direct — Page 840

Q. Was that important to Iconix?

A. It was extremely important.

Q. Based on what Neil Cole said, was it important to him?

A. Yes.

Q. Was it important to you?

A. Yes.

Q. Take this down.

Let's go to Government Exhibit 212. Mr. Horowitz, take a second look at this document. Do you recognize what it is?

A. Yes.

Q. Broadly speaking, what is this document related to?

A. It is one of the documents related to SEA-3.

Q. Is it one of the kind of contract documents?

A. Yes, it is.

Q. So, let's go to page 4 just to begin with. Who signed this -- who signed the SEA-3 deal documents on behalf of Iconix?

A. Neil Cole.

Q. Whose signature is that?

A. It is Neil's.

Q. Let's go back to the first page. Looking at the second to bottom paragraph, what is the final price reflected in these deal documents?

Can you highlight the last number there, please?

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

---

MB75col4     Horowitz - Direct     Page 841

A. $21.5 million.

Q. And let's turn to page 2 of this document. Do you see the last paragraph begins: This letter agreement...

A. I do.

Q. Let's highlight that paragraph.

I am going to read this out loud, Mr. Horowitz: This letter agreement and the agreements referred to herein, including but not limited to the SEA JV amendments, the existing master license agreement, the existing shareholders agreement, and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties or any of them with respect to the subject matter hereof and thereof.

Do you see that?

A. I do.

Q. Mr. Horowitz, despite this clause, were there any commitments that were made in connection with this deal that were not reflected in these deal documents?

A. Yes.

Q. What specifically?

A. That Iconix would let GBG out of its Rocawear Kids agreement.

Q. Mr. Horowitz, why was that? What was the point, from your perspective, from what Neil Cole said about why this deal price

---

MB75col4     Horowitz - Direct     Page 842

was inflated?

A. This deal price was inflated to $21.5 million so Iconix could hit its quarterly financial goals.

Q. And the $6 million giveback, why wasn't that documented in this agreement?

A. Had it been documented, we would not have been able to recognize the inflated revenue price.

Q. Mr. Horowitz, to be clear, at this time, did you believe you were engaged in a fraudulent scheme with Mr. Cole?

A. Yes.

Q. And the giveback for Rocawear, was that part of that fraudulent scheme?

A. Yes.

Q. So why didn't you include that part of your fraudulent scheme in the deal documents?

A. Why didn't we?

Q. Why didn't you. Why didn't you include the details of your fraud in these deal documents?

A. Because it would have undone the fraud. We would not have been able to recognize the revenue we needed to hit the financial goals.

Q. Mr. Horowitz, I want to ask you about the financial terms of these final deal contracts and I think we have spoken about some of them before but let's just talk about them together. So, you recall testifying a little while ago about Iconix'

---

MB75col4     Horowitz - Direct     Page 843

five-year call option?

A. Yes.

Q. If Iconix exercised that option on this agreement, could that result in GBG losing out on substantial revenues depending upon how this business worked out?

A. It could, and Iconix would pay for it.

Q. So under this deal GBG -- even if they invested a lot in Umbro and Lee Cooper in China and everything worked out really well and the brands were making a ton of money, what could happen at the five-year mark if Iconix exercised its call option?

A. Iconix would be able to buy back the GBG equity at a predetermined multiple.

Q. Do you recall testifying earlier about how there was also a put option that GBG could make Iconix buy -- or also the flip side of what you described, GBG could make Iconix buy the 50 percent interest back? Do you recall that?

A. Yes.

Q. What was the minimum price, once it was changed, that Iconix could make GBG buy it back from?

A. Well --

Q. What was the put for, the minimum price that GBG was guaranteed if it forced Iconix to buy 50 percent interest back?

A. $15.5 million.

Q. Were there other guaranteed aspects of this contract

---

MB75col4     Horowitz - Direct     Page 844

that -- sorry.

Were there other guaranteed monies GBG got under the contract?

A. Yes.

Q. And let's look specifically on page 2 of these distributions. Do you see where it says: That in 2014 -- this is under the various lettered list there. Do you see that there is $2 million minimum distribution in 2014?

A. I do.

Q. And a $2.5 million distribution in 2015?

A. I do.

Q. And then a $300,000 and $335,000 for the 2016 and 2017 guaranteed distributions?

A. Yes, I see that.

Q. Doing the math roughly, what are the guaranteed distributions that Iconix has to pay to GBG under this contract? Just these provisions.

A. Approximately $5.1 million.

Q. So, if you add up the $5.1 million in guaranteed distributions plus the $15.5 million guarantee that GBG could get from forcing Iconix to buy the interest back, what does the 15.5 plus approximately 5.1 add up to?

A. About 20.6 million.

Q. And that would be after five years of this deal happening, it is the five-year put option and five-year option, is that

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

---

**MB75col4 — Horowitz - Direct — Page 845**

right?
A. I believe so.
Q. So just to step back, just based on the deal documents, in this scenario where GBG decides to walk away from this deal in five years, sell everything back to Iconix and just take these minimums set forth in the agreement, what is the total amount of money that GBG is guaranteed at five years?
A. About 20.6 million.
Q. And how much -- just on the face of the document at least, putting aside the giveback for now, what was the purchase price that Iconix received from GBG for this deal?
A. $21.5 million.
Q. So, under that scenario, for giving Iconix for the $21.5 million price, five years later, what is GBG's guaranteed return on its $21.5 million?
A. For getting the giveback it is $20.6 million.
Q. Sorry, but putting aside the giveback, putting that aside for a second and just look at the contract documents, after GBG pays the $21.5 million, what are the guaranteed amounts that GBG is guaranteed back over the next five years if it puts the deal back to Iconix?
A. $20.6 million.
Q. So, what's the return then for GBG in that situation on its $21.5 million, if it gets the $20 million bag or so?
A. GBG would lose about a million dollars.

---

**MB75col4 — Horowitz - Direct — Page 846**

Q. So --
A. There would be no return.
Q. It would be a negative return?
A. Yes.
Q. Would you categorize a -900,000 return after five years after investing $21.5 million as a -- quote unquote -- sick deal?
A. No.
Q. Why is that?
A. If you invest $20-plus million and then you would lose $900,000 over five years, that is not a good deal.
Q. Were there other terms though, Mr. Horowitz, of this deal, that GBG was promised additional funds not reflected in the contract?
A. Yes.
Q. And what was that?
A. It was the termination of the Rocawear Kids agreement which let them out of $6 million of guaranteed minimums.
Q. And on top of what we just discussed, Mr. Horowitz, the upside of these brands that did fantastically well, did GBG have any guarantee of keeping them under this contract after five years or could Iconix call those rights back?
A. Iconix could call those rights back.
Q. Now, Mr. Horowitz, so what day -- let's go to the first page of this document. What is the date of it?

---

**MB75col4 — Horowitz - Direct — Page 847**

A. September 17th.
Q. Mr. Horowitz, did the SEA-3 deal close on that date?
A. I believe so.
Q. Mr. Horowitz, you have now testified about two deals you have described as fraudulently inflated that you participated in. Did you at all reflect at this point that there are now two times this had happened and the road that you and Mr. Cole were going down?
A. Yes, I did.
Q. Can you describe for the jury your thought process at this time?
A. Sure. Significantly conflicted and overwhelmed. I was now kind of in Neil's inner circle which I was excited about. I was equally or more so scared that we had come up with a fraudulent recipe that was out of control. I remember going out to a dinner with friends around this time period -- it may very well have been for my birthday -- and it was just racing through my head that we had now come up with a formula, a way to inflate our prices and get money back that was good for both parties and, like, I couldn't eat, felt sick, and had to leave. It was out of control.
(Continued on next page)

---

**MB7YCOL5 — Horowitz - Direct. — Page 848**

BY MR. LENOW:
Q. Did you believe this was sustainable; that you could keep on doing this with Mr. Cole as needed?
A. No.
Q. Why not?
A. This was a path that was only going to get dirtier and more difficult. And, you know, I was nervous.
Q. Did you talk to Neil Cole about those concerns around that time?
A. Not around that time.
Q. Why not?
A. He was my boss. I wanted to be in good standing with him, and maybe it's immaturity. I wanted to be his right hand in how he was running this company.
MR. LENOW: Let's publish for the witness and for the jury government 105, please.
Q. Mr. Horowitz, do you see the phrase "Form 10-Q" listed on this document?
A. I do.
Q. And Iconix Brand Group?
A. Yes.
Q. For the quarterly period ended September 14. Do you see that?
A. Yes. I see it.
Q. What is this document, generally speaking?

---

UNITED STATES OF AMERICA, V
NEIL COLE,                                                    November 7, 2022

MB7YCOL5          Horowitz - Direct.          Page 849

A. This is the quarterly financial report for Iconix for the quarter ending September 30.

MR. LENOW: Mr. Bianco, could we go to page 33. Let's highlight the top part. That's perfect.

Q. Do you see where it says: "Neil Cole, chairman, president, and chief executive officer"?

A. I do.

Q. Do you see a slash as to the name next to that?

A. I do.

Q. What's the name?

A. Neil Cole.

Q. Mr. Horowitz, I want to turn now to page 12 of this document. I'm sorry. Let's go to page 26. Let's just highlight where it says: "Heights of the current quarter" and the three bullet points.

Are there any other highlights, or is it just these three?

A. These are the three highlights.

MR. LENOW: Let's zoom in on them now.

Q. Can you read the first highlight.

A. "Record Q3 revenue of $113.8 million."

Q. Mr. Horowitz, would Iconix have had record Q3 revenue of $113.8 million without the inflated SEA-3 purchase price?

A. No.

MR. LENOW: Let's highlight the third bullet point

MB7YCOL5          Horowitz - Direct.          Page 850

there.

Q. Can you read that.

A. "Gain related to the sale of our Umbro and Lee Cooper trademarks in the greater China territory to our Iconix Southeast Asia joint venture."

MR. LENOW: We can take that down.

Q. Now, Mr. Horowitz, I want to switch gears again for a bit.

Let's go to government 1096.

Mr. Horowitz, we looked at some earlier documents relating to Rocawear Kids.

Did you continue to have conversations with others at GBG and Iconix about the Rocawear Kids license after the SEA-3 deal closed?

A. Yes.

Q. And let's focus on this email in particular. Let's focus on the top part of this email.

Who is the email from, and who is it to?

A. It's from me to Jason Rabin.

Q. What's the title and the subject of the email?

A. The subject is "Rocawear Kids."

Q. Do you see above where it says: "Please let me know if this works for you and we will update the termination agreement and finalize this week"?

A. Yes.

Q. At the time the SEA-3 deal closed, was it your

MB7YCOL5          Horowitz - Direct.          Page 851

understanding that a firm commitment had been made to GBG to release it from the Rocawear Kids minimum payments, the $6 million?

A. Yes.

Q. And how long after the September 17 SEA-3 deal are we at now in this email?

A. Less than a week.

Q. And why are you emailing Jason Rabin that you will update the termination agreement and finalize this week?

A. Because we were committed to letting them out of the Rocawear Kids agreement and I was working steadily towards that.

MR. LENOW: Let's turn now to Government 1214, an email from the same date.

Q. Do you see the email from you to Neil Cole, the same date, September 22, 2014?

A. September 22. Yes. That's correct.

Q. Let's go to the attachment, the update.

Do you see in point two it says: "Rocawear Kids takeover scheduled for October 1?"

A. Yes. I see that.

Q. What is that referring to?

A. It refers to a new licensee taking over Rocawear Kids from October 1.

MR. LENOW: We can take that down.

MB7YCOL5          Horowitz - Direct.          Page 852

Q. That was an update from Neil Cole?

A. That's correct.

Q. Based on your discussions with Neil Cole in the weeks following the SEA-3 deal closing, what was your understanding of whether or not there was still a firm commitment to relieve GBG of that $6 million in payments?

A. That firm commitment existed.

MR. LENOW: Let's turn to Government Exhibit 1098.

Q. Mr. Horowitz, who is this email from?

A. This email is from John Reda, who is an employee Li & Fung, or GBG.

Q. Who is it to?

A. David Maslaton.

Q. Is it copying anybody?

A. Yes.

Q. Who is it copying?

A. Ethan Cole and I.

Q. Do you see the subject that says "Invoices for Marketing Costs"?

A. I do.

Q. Do you see the attachments listed -- Iconix Massimo SEA, Iconix Peanuts China, Iconix Zoo York?

Do you see that?

A. Yes. I see that.

Q. And then John Reda writes: "Dear David please see the

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB7YCOL5          Horowitz - Direct.          Page 853

attached voices for the marketing costs relating the respective brands. Our bank information is on the invoices. Please call either Ethan or myself if you have any questions."

Do you see that?

A. Yes, I do.

MR. LENOW: Let's turn to the invoices. Mr. Bianco, if we can find a way to put all three on the screen at once, let's try. If not, we can just do the first two. Mr. Bianco, can we zoom in on everything after "Due upon or receipt." Let's start with this one.

Q. Mr. Horowitz, walk us through this invoice.

First of all, what do you see at the top, the header of the document? Who is it from?

A. It's an invoice from Global Brands Group.

Q. Who is it to?

A. To Iconix.

Q. What is the date of the invoice?

A. September 25, 2014.

Q. Is that the date before the email's date?

The email was dated September 26.

So that would be the day before. Is that fair?

A. That is fair.

Q. So the date is September 25. And then you see above the date, there's an invoice, 09.25.14 M-SEA.

Do you see that?

MB7YCOL5          Horowitz - Direct.          Page 854

A. Yes. I see that.

Q. And "SEA," what is your understanding that's shorthand for?

A. Southeast Asia.

Q. What does the information list below that, "Information provided below"?

A. It says: "For Mossimo SEA marketing costs."

Q. What's the amount?

A. $2 million.

Q. And when is it due, according to this?

A. Due upon receipt.

Q. And that would be when?

A. September 26.

MR. LENOW: Let's look at the next one. So that's Mossimo $2 million. Let's look at the next one.

Q. How much is this next one for?

A. This next one is also for $2 million.

Q. What details are provided about what's it for?

A. It's for Peanuts China marketing costs.

Q. Does it say what kind of marketing costs?

A. No.

Q. Does it say exactly what anyone has done for this?

A. No.

MR. LENOW: Let's look at the next one. We can take the Peanuts one down.

Q. For this third one, do you see where it says Zoo York?

MB7YCOL5          Horowitz - Direct.          Page 855

A. I do.

Q. What is the Zoo York invoice for?

A. Marketing costs.

Q. How much?

A. For $1 million.

Q. And is there any detail provided?

A. No.

Q. When does this say it's due?

A. Due upon receipt.

Q. Mr. Horowitz, when you saw these invoices, what was your reaction?

A. I was aggravated.

Q. Why were you aggravated?

A. These clearly did not follow the instructions that we had given GBG on how to invoice us for the $5 million.

Q. When you say "we," who is the "we" in your description?

A. Neil and I.

Q. What had jumped out at you in terms of they were not following instructions?

A. The timing.

Q. What about the timing?

A. These invoices would have called for Iconix to pay $5 million in marketing fees on September 26 or 25 which would have ruined our quarter.

Q. Why?

MB7YCOL5          Horowitz - Direct.          Page 856

A. Because we didn't have room for $5 million of marketing expenses in this quarter. We just falsely inflated our revenue by $6 million. This would have undone most of it.

Q. To be clear, would that have affected your revenue, or would it have affected something else?

A. It would have affected our EPS.

Q. If you had paid all $5 million at this time in the third quarter, the same time when the SEA-3 was done, why does that create an EPS problem for you and Neil?

A. We would have had an additional $5 million in expenses or a negative off of revenue that would have plugged down into our EPS and reduced it.

Q. Just to back up, who had selected these brands as the ones to be invoiced for?

In other words, what resulted in your getting invoices for Zoo York, Peanuts, and Mossimo?

A. Neil and I.

Q. Why were those selected?

A. For various reasons but just so we had coverage to pay back the $5 million of the overpayment in June.

Q. Were you aware of any work that GBG had done corresponding to these brands in these amounts?

A. No.

Q. Did Neil Cole ever say anything to you suggesting that he thought that GBG had done work in these amounts deserving of

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB7YCOL5     Horowitz - Direct.     Page 857

these payments?

A. No.

Q. Why were these invoices sent?

A. To pay back GBG for the inflated price back in June.

MR. LENOW: You can take that down. Let's go to Government 1101, moving forward about three days, September 29, 2014.

Q. First, do you see the email we looked at just a second ago listed here anywhere?

A. Yes, I do.

Q. Where is that?

A. It's the bottom of this email.

Q. And then on the top email, you write from you to Joanna Pompilio: "Please print out two copies of these attachments."

Do you see that?

A. I do.

Q. Why are you asking Ms. Pompilio to print out two copies?

A. So I could sit and review these with Neil.

Q. Did you in fact do that?

A. I believe that I did.

MR. LENOW: Let's take this down and go to Government Exhibit 1104.

Q. Let's start from the bottom, same day, September 29.

Can you read the email you have read at the bottom from you to Neil Cole.

MB7YCOL5     Horowitz - Direct.     Page 858

A. "Neil, I have a meeting with Jason at 3:30 today at the Empire State Building. Then meeting with Jared and Ethan. Can we spend some time today discussing prior to me heading over. Best, Seth."

Q. What did you want to talk with about Neil that morning?

A. The GBG invoices that we had received.

Q. Why?

A. Because they were troubling.

Q. And do you see where Neil Cole responds: "Will be in around 1:00"?

A. Yes, I do.

Q. Do you remember when he actually came in that day?

A. No.

Q. In the top two emails, do you see where you write to Pauline Israel --

Who is Pauline Israel?

A. Pauline was Neil's executive assistant.

Q. Do you see where you ask: "Does Neil have 30 minutes at 2 p.m. to discuss GBG?"

A. Yes. I see that.

Q. Do you see where Pauline responds: "Put it in. Things are moving around a lot since we got flooded."

Do you see that?

A. I do.

MR. LENOW: You can take that down.

MB7YCOL5     Horowitz - Direct.     Page 859

Q. Did you in fact meet with Neil Cole in person that day prior to heading over to GBG?

A. I did.

Q. Where did you meet with him?

A. I met with him at Iconix.

Q. Where in Iconix? Do you recall?

A. I believe it was in his office.

Q. What happened during that meeting?

A. Neil give me instructions on how to go back to GBG regarding the invoices.

Q. And what, if anything, did Neil say about these invoices once he saw them?

Once they had been printed out and handed to him, what did he say?

A. Neil was concerned about the timing. But he was more concerned about the format -- the round numbers, the lack of detail, and who it was billed from.

Q. What, if anything, did he say about why he had those concerns?

A. He was concerned that these didn't pass a "sniff test." That was his concern.

Q. What do you understand the meaning of they didn't pass any "sniff test"?

A. It would have drawn attention from accountants to pay $5 million of marketing without any detail or reported backup.

MB7YCOL5     Horowitz - Direct.     Page 860

MR. LENOW: Let's publish now for the witness what's in evidence as Government Exhibit 232. I also want to offer at this time Government 232C, the Word version of this document.

THE COURT: Any objection?

MR. LENOW: It's on consent.

THE COURT: Since it's on consent, it will be received.

(Government's Exhibit 232C received in evidence)

BY MR. LENOW:

Q. Mr. Horowitz, do you recognize what we are seeing now in Government Exhibit 232?

A. I do.

Q. What are we seeing here?

A. We're seeing the original document that I had to give GBG instructions on how to invoice us that now includes Neil's feedback after seeing the invoices.

Q. Let's start the top.

Why is the highlighted text: "Received invoices on Thursday --"

We don't have to it highlight this. We can just leave it as is.

Why is it highlighted: "Received invoices on Thursday for this amount. Payable immediately"?

A. Because that was a critical component to the invoices we received.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB7YCOL5          Horowitz - Direct.          Page 861

Q. Just actually stepping back for a second, what is this document?

Is this something that you created?

A. Yes.

Q. When did you create this document?

A. This document had many iterations. This was created -- this update was made while Neil and I were talking.

Q. All right. Can you explain how that occurred.

A. Yes. At the time, I believe it was on an iPad that I kept various notes and documents.

Q. Why did you highlight in --

Just to be clear, these are notes that you were making yourself on this document?

A. Correct.

Q. During a conversation with Mr. Cole?

A. That is correct.

Q. Just for avoidance of doubt, when I refer to "Mr. Cole," it's Neil Cole. There's an Ethan Cole. But when I refer to "Mr. Cole," it's Neil Cole.

Can we agree on that?

A. Sure.

Q. So when you're sitting with Neil Cole, what are you doing with this document?

A. I am taking notes on what he's saying so that I can go communicate that to GBG.

MB7YCOL5          Horowitz - Direct.          Page 862

Q. So there's highlighted portion on the top: "Received invoices on Thursday for this amount. Payable immediately."

A. It's kind of a key -- it's the key fact.

Q. Did you bring this point up with him, that he would receive these invoices?

A. Yes.

Q. Did you show him the invoices?

A. Yes.

Q. Underneath, next, there's a $1 million, $2 million, and $2 million lines. Let's go through each one by one. $1 million is Zoo York. Show us work. Real expenses billed by TLC.

What, if anything, did you add to this in the course of your meeting with Mr. Cole?

A. I added: "Show us work. Real expenses billed by TLC."

Q. Why did you add: "Show us work. Real expenses billed by TLC."

A. Because that is what Neil was telling me.

Q. So let's break it down.

What does the "show us work" portion means?

A. He wanted backup, show us something that shows some work that had been done.

Q. What did you understand him to mean by that?

A. There were any number of ways to put documents behind these invoices to try to have them pass that sniff test that would look a lot better than nothing.

MB7YCOL5          Horowitz - Direct.          Page 863

Q. And how did showing work or attaching things to the invoices, why was that important to Neil based on what he said to you?

A. If somebody in finance or an accountant or an auditor looked through it, there would be something there.

Q. To be clear, did you understand Mr. Cole to be saying he actually wanted GBG to do additional work for what Iconix was paying here, for the $1 million payment for Zoo York?

A. No.

Q. Explain.

A. This was our dictated way of GBG invoicing us so we could pay them back for the overpayment.

Q. And why, based on your conversation with Mr. Cole, did you understand he wanted this "show us work" behind the invoices?

A. Because the numbers and brands were simply made up. We wanted something behind it that would make these made-up numbers and brands to look real, at least in an initial passthrough.

Q. And you said "made-up brands."

What do you mean by "made-up brands"?

A. We changed the brands that we wanted them to be invoiced for. We changed the amount we wanted them to be invoiced for.

Q. Just to be clear, the brands referred to are real brands. Zoo York is a real brand. Is that right?

A. Yes.

MB7YCOL5          Horowitz - Direct.          Page 864

Q. You're referring to something else when you're saying "made-up." Is that right?

A. That's correct.

Q. Could you just explain a little more what you mean by that.

A. Sure. We would change the brands we wanted to be invoiced for without any work. It was just us coming up with different brands to put the dollar amounts to to get the money back to GBG.

Q. And then the "real expenses," what, again, does that reflect?

A. Again, we wanted these to have the appearance of being real.

Q. And so what does "real expenses" mean here?

What do you understand Mr. Cole wanted changed or added to these GBG invoices with the round dollars?

A. To not have just the line "marketing," to have some itemized list of real expenses.

Q. Did you understand Mr. Cole to mean he actually wanted Iconix to get something for paying this $1 million invoice?

A. No.

Q. And what is the "billed by TLC" line? What does that refer to?

A. TLC was a company that was bought by GBG. So this was a further way to distance the invoices from going circular right back to GBG, if they could be invoiced by somebody else.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 7, 2022

MB7YCOL5  Horowitz - Direct.  Page 865

Q. To be clear, we saw that invoice that had GBG at the top. What did Neil want changed about the invoice relating to TLC?

A. He wanted the invoices to come from TLC.

Q. What's TLC?

A. It's a company that was acquired by GBG.

Q. Part of a corporate relationship but a different part of the structure, a subsidiary of some sort?

A. That's correct.

Q. And turning now to the 2 million PF China line, what part of this line was added, if any, as a result of your meeting with Mr. Cole?

A. The "Show us things -- billed by master license in China."

Q. What did you understand him to mean by that? What does the "show us things" comment reflect?

A. He wanted visuals, something behind an invoice that just said $2 million marketing.

Q. By this comment "show us things," if you can elaborate some more, what do you understand Neil wanted GBG to show you in connection with these invoices?

A. Anything that could pass a brief look or test of the invoice.

Q. Just turn to Zoo York for a second. We'll get to this later. But did there come a time when GBG sent you some

MB7YCOL5  Horowitz - Direct.  Page 866

show-us work that was attached to these invoices or included with them in any way?

A. Yes.

Q. So for Zoo York, did they include some literature?

A. Yes.

Q. Did you review that literature in advance of your testimony today?

A. Yes.

Q. We'll get to this in more detail later. But what did the literature that GBG ended up sending you relating to Zoo York, what did it relate to?

A. It related to work, marketing work, that Iconix USA had done.

Q. Explain that again to the jury, please.

A. They were invoicing us for work that we had done ourselves and paid for it to be done.

Q. Why does it make any sense for GBG to be sending Iconix copies of work that Iconix had already done and paid for itself in support of GBG getting payments from Iconix?

A. Only to return the money from the overpayment in June.

MR. LENOW: I think we're at 2:40. Now would be a good place to stop.

THE COURT: It is. Ladies and gentlemen, that brings us to the end of the day. We will see you again tomorrow morning. Until then, don't discuss the case. Don't read

MB7YCOL5  Horowitz - Direct.  Page 867

anything or see anything about the case. Be safe getting home. Please be sure to be here by no later than 9:15 tomorrow morning. Have a very good night.

(Continued on next page)

MB7YCOL5  Horowitz - Direct.  Page 868

(In open court; jury not present)

THE COURT: Mr. Horowitz, you may step down. You folks can be seated.

(Witness temporarily excused)

THE COURT: The folks from Wilmer are here. I have received the documents. I am in the process of reviewing them. They came during the course of the day today. It may be helpful for you to be here tomorrow morning at 9:00. I don't know that I'll need to speak to you. But in the event I do, it may be helpful.

Anything to raise?

MR. THOMAS: Just a scheduling matter, your Honor. We expect that the cross-examination of Mr. Horowitz will begin likely midday and will probably take the rest of the day. Based on that, we're not planning to have any witness here tomorrow. We just want to make sure that everyone is in accord with that.

THE COURT: That sounds reasonable to me. Although I don't know, Mr. Hecker, what your intentions are.

MR. HECKER: I think that's safe.

MR. MARKUS: Your Honor, one issue from the defense.

THE COURT: Yes, sir.

MR. MARKUS: I just want to point out that in the motions in limine, we sort of predicted that the testimony regarding the conspiracy that Mr. Cole was acquitted of would

UNITED STATES OF AMERICA, V
 NEIL COLE,                                                                     **November 7, 2022**

MB7YCOL5          Horowitz - Direct.                    Page 869

replay itself through Mr. Horowitz.

        And that was our concern and the reason why we had first moved to exclude and then changed it to a motion to dismiss.  It's playing out exactly as we predicted.  This is the same exact testimony and playbook that the jury acquitted Mr. Cole of.  We just wanted to renew that motion and preserve it for the record.

        THE COURT: Very well.  I think it's already been preserved.

        MR. MARKUS: Yes, your Honor.

        THE COURT: Anything else?

        MR. THOMAS: Nothing else.

        THE COURT: See you tomorrow at 9:00.  Everyone have a good night.

        (Adjourned to November 8, 2022, at 9:00 a.m.)

---

                                                        Page 870

                    INDEX OF EXAMINATION

Examination of:                                    Page

SETH HOROWITZ

Direct By Mr. Lenow  . . . . . . . . . . . . . 683

                  GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 110, 113, 213, 214, 215, 216, 231, 232  . . . 682
 232B, 234, 235, 236, 241, 247, 249, . . . . . 682
        250, 257, 320, 325, 708
 1029, 1031, 1032, 1035, 1036, 1037, . . . . . 682
        1038, 1039, 1041, 1042
 1043, 1046, 1047, 1052, 1054, 1056, . . . . . 682
        1058, 1062, 1063, 1065
 1069, 1070, 1077, 1078, 1079, 1081, . . . . . 682
        1082, 1084, 1085, 1094
 1096, 1098, 1100, 1101, 1104, 1105, . . . . . 682
        1111, 1118, 1122, 1123
 1126, 1134, 1141, 1142, 1144, 1151, . . . . . 682
        1168, 1179, 1206, 1207
 1208, 1211, 1212, 1213, 1214, 1225, . . . . . 682
        1244, 1245, 1247, 1248
 1253, 1255, 1255B, 1256, 1514A  . . . . . . . 682
 1255-C   . . . . . . . . . . . . . . . . . . 806

 232C    . . . . . . . . . . . . . . . . . . 860

                  DEFENDANT EXHIBITS

Exhibit No.                                    Received

 415 and 1407  . . . . . . . . . . . . . . . 682

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

---

MB85col1                                   Page 875

MR. HECKER: No, your Honor.

THE COURT: OK. In that event, I will come back out at 9:25.

MR. HECKER: Thank you, Judge.

(recess)

MR. LENOW: Judge, would you like the witness on the stand now?

THE COURT: Yes. Why don't you bring him in. The jury has been here for 10 minutes, by the way.

(Witness resumes the stand)

THE COURT: Good morning.

(Continued on next page)

---

MB85col1          Horowitz - Direct          Page 877

background of this document, when did you last modify this document, to your recollection? What were you doing at the time?

A. I was taking notes of what Neil was instructing me to tell GBG as it pertained to the invoices.

Q. And what were the point of these invoices?

A. The point of the invoices were to pay back GBG for the $5 million inflated price from joint venture.

Q. And how recently had you received the first batch of invoices from GBG at this point in time?

A. I believe it was a day or two before.

Q. Can you read the highlighted portion in yellow?

A. Received invoices on Thursday for this amount, payable immediately.

Q. And going down again, just -- I don't think we have had a chance to finish this list here: The $1 million Zoo York Europe, show us work, real expenses billed by TLC.

What was added there as a result of your meeting with Neil Cole?

A. The "- show us work.. real expenses.. billed by TLC."

Q. Why did you add that text to this document?

A. These were Neil's instructions for GBG.

Q. What do you understand him to be telling you to relate to GBG?

A. That they needed to make these invoices look more real.

---

MB85col1          Horowitz - Direct          Page 876

(Jury present)

THE COURT: Everyone, please be seated.

Ladies and gentlemen, as always thank you for being so prompt. We will continue now with the direct examination of Mr. Horowitz.

Mr. Horowitz, you are reminded that you are still under oath.

THE WITNESS: Thank you.

SETH HOROWITZ, resumed.

THE COURT: Mr. Lenow.

MR. LENOW: Thank you, Judge.

DIRECT EXAMINATION (Continued)

BY MR. LENOW:

Q. Mr. Horowitz, good morning.

A. Good morning.

Q. Mr. Horowitz, do you recall when we ended yesterday you were testifying about some notes that you took as a result of your meeting with Neil Cole concerning some GBG invoices and other matters? Do you recall that?

A. Yes, I do.

Q. Mr. Bianco, can you please publish what's in evidence as Government Exhibit 232?

Is this that document, Mr. Horowitz?

A. Yes, it is.

Q. Just returning to, just to remind the jury about the

---

MB85col1          Horowitz - Direct          Page 878

Q. Why did the invoices need to look more real?

A. They needed to look more real in case anybody from accounting would take a look at them.

Q. What was the concern? If they didn't look real enough, what did you understand Neil was worried about?

A. If they didn't look real enough it would be obvious that these were just made up invoices.

Q. Would your scheme with Mr. Cole be able to succeed if these were to be discovered to be sham invoices?

A. No. It would draw or raise a red flag.

Q. And then, going to $2 million Peanuts China, show us things billed by Master License in China.

What was that as a result of your meeting with Neil?

A. That was what I was instructed to tell GBG.

Q. Which portion?

A. The "- show us things - billed by Master License in China."

Q. What did you understand Mr. Cole -- Neil Cole -- to mean when he said these things to you that you then memorialized in this document?

A. That, again, the invoice for Peanuts China needed to look more real, there needed to be some type of list of work or photographs, things that make these pass a "sniff" test.

Q. Turning to the last, the $2 million Ecko Unlimited, Rocawear, show us expenses billed by TLC; what, if anything, was added there by you as a result of your meeting with Neil?

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col1          Horowitz - Direct          Page 879

A. I believe it is the "- show us expenses.. billed by TLC."

Q. And what do you understand Mr. Neil Cole to mean when he relayed these things to you in this meeting, "show us expenses billed by TLC"?

A. Again, that these invoices needed to look more real and that he wanted the invoice to come from a party other than GBG, which was TLC, which is owned by GBG.

Q. Mr. Horowitz, why was it that Iconix could dictate to GBG what GBG's own invoices said?

A. Simply because these were a mask to pay GBG back the $5 million of the overpayment from June.

Q. And then, Mr. Horowitz, do you see where it says at the next bullet point: 50 percent Q3/Q4, 50 percent prepay '15?

A. I do.

Q. And remind the jury, what does that mean, that notation?

A. That breaks down when Iconix would like to account for these payments. So, of the $5 million, Iconix wanted 50 percent of it to be split between Q3 and Q4 of that year, and 50 percent to be allocated to the following year.

Q. Mr. Horowitz, was this something that was important to Neil from what he said?

MR. HECKER: Objection. Form.

THE COURT: Overruled.

A. Yes. This was very important.

Q. What did Neil say about why it was important?

MB85col1          Horowitz - Direct          Page 880

A. He inferred and said that we couldn't take the $5 million marketing into the third quarter. Again, if we would have taken the $5 million negative in the third quarter it would have undone the fraudulent transaction of SEA-3. Where one was inflated by $6 million, this would have now cost us $5 million.

Q. And would that have affected earnings or revenue? Or both? If you took the $5 million expense would that have negative effect on revenue?

A. No.

Q. What would that affect on earnings?

A. Earnings, and therefore EPS.

Q. Can you explain to the jury why, if you had paid an expense as $5 million in marketing expense in the third quarter, the same quarter you did SEA-3, why is that going to hurt Iconix on the earning side but not on the revenue side for that quarter?

A. Revenue is the sales of company. Everything that gets reduced from the sales results in earnings. Marketing would be something that would be reduced from sales and therefore lowering earnings. So, if we would have taken the $5 million hit on the payback in the third quarter, our earnings would have been lowered by $5 million but it would have not affected the revenue.

Q. All right. And Mr. Horowitz, turning down to the red highlighted part, what does that generally refer to and why is it in red?

MB85col1          Horowitz - Direct          Page 881

A. It was something that Neil and I were brainstorming and then I marked it in red because we decided not to do it.

Q. And what is this fund from LuxCo. Generally speaking, what was this notion how funding from LuxCo to GBG might also have something to do with this $5 million marketing?

MR. HECKER: Objection to form.

THE COURT: Overruled.

BY MR. LENOW:

Q. You can answer it. What did this LuxCo to GBG idea have to do with the $5 million in marketing, if anything?

A. My understanding was that we were going to -- or we were brainstorming using cash from our Luxembourg company to pay the marketing invoices.

Q. And what, if anything, did Neil say at the end of the day? Was that going to happen or not going to happen?

A. Not going to happen.

Q. Did he say why?

A. I don't recall him saying why.

Q. And then just looking down toward the bottom of the sheet it says, there is a "really 8.5" highlighted in yellow. What is that "really 8.5" in yellow highlighting indicating?

A. It indicates feedback from Neil on the Rocawear Kids termination.

Q. Mr. Bianco, can we put up the second page of this document, as well as the first page?

MB85col1          Horowitz - Direct          Page 882

So the "really 8.5" refers to what about the Rocawear Kids termination?

A. It refers to the value of the Rocawear Kids agreement which I believe at this point was $6 million of guaranteed royalty and taking into consideration the fixture.

Q. And so, apart from the $6 million, are there other financial implications that come with that Rocawear termination?

A. Potentially.

Q. And are some of those outlined here in the document?

A. I don't believe that's what this is.

Q. So, the "really 8.5," what does the 8.5 refer to?

A. It refers to Neil's feedback that terminating the Rocawear Kids agreement gave us exposure of $8.5 million made up of $6 million of guaranteed payments that GBG owed us and $2.5 million of fixtures that we had paid for at GBG's office.

Q. Now, was that money that you could get back if you cancelled the Rocawear Kids termination agreement and get back the fixturing costs you had paid?

A. No.

Q. We can take this down and can we publish for the witness Government Exhibit 805-C, the Word version of this document.

MR. LENOW: I think this was offered but just in case, out of an abundance of caution we are offering 805-C which is the Word version of this document.

# A-783

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                November 8, 2022

| MB85col1 | Horowitz - Direct | Page 883 |
| --- | --- | --- |

Q. Mr. Horowitz, do you see what is now on your screen --

MR. LENOW: I think this is without objection, your Honor, if we can publish this for the jury, 805-C?

THE COURT: Very well.

BY MR. LENOW:

Q. Mr. Horowitz, do you recognize this as the same document but a Word version of it?

A. Yes.

Q. Mr. Bianco, can you please go to the file part of the Word document here? Actually, we can go back, this is in evidence. Mr. Bianco, let's now publish Government Exhibit 805-B.

And Mr. Horowitz, do you recognize this, what is depicted in this exhibit?

A. I do.

Q. I'm sorry, is this -- this looks like 232-B, do we have 805-B? Sorry, this is correct. 232-B. My apologies.

Do you recognize this, Mr. Horowitz?

A. I do.

Q. And prior to your meeting with the U.S. Attorney's office have you reviewed the Word version of 232-B?

A. I have.

MR. HECKER: Objection to the predicate to the question.

THE COURT: Overruled.

BY MR. LENOW:

| MB85col1 | Horowitz - Direct | Page 884 |
| --- | --- | --- |

Q. Did you review the Word version file we just viewed a second ago that is marked as 232-C?

A. I did.

Q. And did you look in the properties section of that Word document? Or the info section of the Word document?

A. I did.

Q. Did you see metadata there reflecting a last modified and a created date?

A. I did.

Q. And does how does this document match up to what you saw from that metadata in the Word document that you reviewed?

A. This is the same.

Q. And what's the time, the last modified time listed for the metadata for this Word document?

A. 9/29 at 12:11 p.m.

Q. So, based on this, using this as a time frame, 12:11 p.m., what time, approximately, do you believe Mr. Cole and you met that day in person to discuss the topics listed in the document?

A. I believe we met either right before this time or at this time.

Q. We saw an e-mail earlier on about Mr. Cole coming in around this 1:00 p.m. Based on the time stamp of this document, what time do you believe Mr. Cole arrived in the office that day, at the latest?

| MB85col1 | Horowitz - Direct | Page 885 |
| --- | --- | --- |

A. I believe he must have arrived before 12:11 p.m.

Q. We can take this down. Can we now publish what is in evidence Government Exhibit 1100?

Mr. Horowitz, the time stamp we just looked at, what time, approximately, did you say the metadata for that Word document?

A. 12:11 p.m.

Q. Do you see this e-mail now in front of you that is dated 9/29/2014 -- so September 29 -- 12:28 p.m.?

A. I do.

Q. So, how long after that Word document was last modified was this e-mail sent?

A. Approximately 15, 20 minutes.

Q. And do you see who it is from and who it is to?

A. I do.

Q. Can you tell the jury?

A. It is from me to David Maslaton.

Q. And what do you say in the e-mail?

A. Would you like me it read it?

Q. Yes, please.

A. David. Please don't do anything with these. Don't know what they are thinking. Meeting with them this afternoon. Seth.

Q. Mr. Horowitz, based on the dates and times you reviewed, do you believe this was before or after you met with Neil that day

| MB85col1 | Horowitz - Direct | Page 886 |
| --- | --- | --- |

about invoices and the instructions on them?

A. I believe this was after.

Q. And what are you telling -- first of all, who is David Maslaton? Just to remind the jury.

A. David Maslaton was a member of the accounting team at Iconix.

Q. When you tell David "please don't do anything with these, don't know what they are thinking," what are you saying to David?

A. Do not process these, do not put these into our system.

Q. Why do you say "don't know what they are thinking"?

A. Because they had not followed -- GBG had not followed our instructions on how to invoice us.

Q. And what instructions -- had Neil Cole given you instructions one way or the other on what to do with the invoices at this time?

A. Yes.

Q. What was that?

A. Do not do anything with them.

Q. When you say meeting with them this afternoon, Seth, who are you referring to?

A. I am referring to GBG.

Q. And, just to be clear, there is an e-mail on the bottom here, September 26. Have we seen that e-mail earlier in your testimony?

MB85col1    Horowitz - Direct    Page 887

A. Yes.

Q. And what was that e-mail, just to remind the jury?

A. That e-mail was from GBG and it had the three attached invoices.

Q. And, "don't know what they are thinking," why did you frame it that way?

A. Because we had an agreement with GBG on how these invoices were to be done and they didn't follow it.

Q. And, specifically, what was it that gave you initial pause and concern about how GBG had sent the invoices?

A. The timing of the invoices. The "payable immediately" would have devastating the quarter.

Q. In addition to your initial concerns, did Neil Cole raise additional concerns in your meeting with him about these invoices?

A. Yes, he did.

Q. Let's take this down, let's go to Government Exhibit 1105. Do you see the date of this calendar invite, the calendar invite for meeting 9/29/2014, September 29th at 3:30 p.m.? Do you see that, Mr. Horowitz?

A. I do.

Q. And do you see where the location says ESB 9th floor, Jason's office?

A. I do.

Q. What is ESB?

MB85col1    Horowitz - Direct    Page 888

A. Empire State Building.

Q. What was at the Empire State Building?

A. GBG's offices.

Q. And do you see the subject?

A. I do.

Q. What is the subject?

A. Seth and Jason.

Q. Drawing your attention to the "to" line, drawing your attention to the name, do you see where it says Ethan Cole?

A. I do.

Q. Do you see Jared Margolis?

A. I do.

Q. Do you see your own name there, Seth Horowitz?

A. I do.

Q. And then Jason Rabin?

A. I do.

Q. And then there is a cc Maurice Sasson?

A. Yes.

Q. Mr. Horowitz, did you meet with GBG later that day after meeting with Neil about these invoices?

A. I did.

Q. Did you convey what Neil told you to convey to GBG?

A. I did.

Q. And what did you convey to GBG?

A. In general that the invoices had to look more real, per the

MB85col1    Horowitz - Direct    Page 889

direction that I was given, and that they couldn't be round numbers.

Q. And, do you recall who actually attended that meeting at GBG?

A. I recall several members of GBG being in the room when I gave the feedback.

Q. Who do you recall being there?

A. Jared, Ethan, and I believe a member of their finance team.

Q. Who was there on the Iconix side?

A. I was there.

Q. Just you?

A. Just me.

Q. So, it looks like Maurice Sasson is an optional. Did he attend, to your recollection?

A. I don't believe he attended.

Q. We can take that down. Let's now turn to Government Exhibit 1111. Mr. Horowitz, did there come a time where GBG sent you revised invoices after those first set of invoices?

A. Yes.

Q. Let's look at this e-mail. What is the date of it?

A. 10/2.

Q. And so, approximately how long after that September 26 e-mail with the invoices was this e-mail?

A. Approximately a week later.

MB85col1    Horowitz - Direct    Page 890

Q. And could you see where it says from Ethan Cole?

A. Yes.

Q. To Seth Horowitz?

A. Yes.

Q. And then copied Jared Margolis and John Reda?

A. I see that.

Q. And then: Subject: Marketing invoices?

A. Yes.

Q. And then the attachments Zoo York invoice, Mossimo invoice, Peanuts invoice. And the text: Hi Seth. Please find attached the marketing invoices for Zoo York, Mossimo and Peanuts. In the link below please find the decks related to each. Do you see that?

A. I do.

Q. Mr. Horowitz, what did you understand was being attached here or what do you understand was attached to this e-mail?

A. Attempts to satisfy our request for more detailed invoices.

Q. And then there is this sentence: In the link below please find the decks related to each. And there is a URL link. What was that line referring to about the decks related to each?

A. That was referring to the attempted backup for each of the brands Zoo York, Mossimo, and Peanuts.

Q. And earlier, I think yesterday in your testimony you talked about seeing some backup, you talked about the Zoo York backup

| MB85col1 | Horowitz - Direct | Page 891 |
|---|---|---|

to begin with. Is this the same thing that you were testifying about at the end of yesterday about seeing some purported backup for the Zoo York invoice?

A. Yes.

Q. Do you remember clicking on this link and seeing materials?

A. Yes.

Q. And did you see materials that purported to relate to Zoo York, Mossimo, and Peanuts marketing work?

A. Yes.

Q. Let's go to the next page of this document. If we can actually show pages 2 and 3 next to each other, that would be great. So, let's start on the left-hand side. Mr. Bianco, can you zoom in on the everything from "due upon receipt" to the top and just pull that out for us? Great.

Mr. Horowitz, let's walk through thin voice. First, starting in the top right, do you see where it says: Invoice 9.30.14 ZY?

A. I do.

Q. What do you understand the "ZY" relates to?

A. Zoo York.

Q. And under that the date September 30, 2014?

A. I see that.

Q. And then going down to the bottom part of the e-mail, if you can just read out what is listed in the description?

A. Marketing costs related to: Comprehensive positioning,

| MB85col1 | Horowitz - Direct | Page 892 |
|---|---|---|

marketing, and launch analysis for SEA. Comprehensive research and marketing analysis complete with launch plan for Europe.

Q. And then what does it say under that?

A. Due upon receipt.

Q. Just to pause there. "Due upon receipt," once you saw this, did you have a reaction to seeing "due upon receipt" and the date being September 30, 2014?

A. Yes.

Q. What was that?

A. Again, I was frustrated that they did not follow our instructions on payment timing.

Q. And when you look at the other invoices, do they all say "due upon receipt"?

A. I believe so.

Q. And why was that of concern to you at the time?

A. Because, again, if they were dated September 30th and they were due upon receipt, we would have had to account for this in the third quarter.

Q. And you also just talked through the description above. How does that compare to the description we saw before for that Zoo York invoice that was around a million dollars -- exactly a million dollars?

A. It previously just said marketing costs, I believe, or marketing, and now it has two line items beneath it.

Q. And does it mention any specific territories here?

| MB85col1 | Horowitz - Direct | Page 893 |
|---|---|---|

A. Yes.

Q. What territories are listed?

A. Southeast Asia and Europe.

Q. And what's the total amount of this invoice?

A. It is now $955,710.

Q. What do you recall it being before?

A. $1 million.

Q. Mr. Horowitz, what's your understanding of why this invoice changed from being $1 million the week before to now being $955,710 in this invoice?

A. To make it look more real.

Q. Who had given those instructions? Who had made that decision that that's what should happen?

A. Neil did.

Q. Was that decision communicated to GBG?

A. Yes.

Q. By who?

A. By me.

Q. And, Mr. Horowitz, were you aware of any work fitting this description, comprehensive positioning, etc., that had been done by GBG that was worth $955,710?

A. No.

Q. What was the point of this invoice?

A. To pay back GBG for the inflated price from June.

Q. Let's now go to the next page which is on the right-hand

| MB85col1 | Horowitz - Direct | Page 894 |
|---|---|---|

side of the screen, if we can push this back and pull out the same part of the next invoice, the top? Great.

So, starting with what's the date of this invoice?

A. 9/30.

Q. Do you see the invoice, it looks like an invoice, some kind of number of 9.30.14 M?

A. I do.

Q. What do you understand the "M" there to refer to?

A. Mossimo.

Q. And can you read the description listed in this invoice?

A. Marketing costs related to: Developing a comprehensive marketing strategy and plan for Southeast Asia. Design and trend analysis. Comprehensive marketing and positioning analysis for Europe.

Q. When is it due, according to this invoice?

A. Due upon receipt.

Q. What was the total amount?

A. $1,940,230.

Q. And what was the amount of Mossimo invoice we saw from just a week before?

A. $2 million.

Q. Did you have an understanding of why this invoice changed from a $2 million invoice to an approximately $1.94 million invoice?

A. To give the appearance that it was real.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col1          Horowitz - Direct          Page 895

Q. Mr. Horowitz, were you aware of any work from these descriptions that was worth this amount that GBG had done?

A. No.

Q. What was the point of this invoice?

A. To pay back GBG the monies owed from the inflated price back in June.

Q. And now, Mr. Bianco, let's go to the next page of this document, page 4. And also, Mr. Bianco, can we now, on the left-hand side, can you keep up page 4 where it is, on the left-hand side let's pull up Government Exhibit 1098, the September 26, 2014 e-mail, and let's go to the Peanuts invoice from that document as well, from 1098, so they can be side by side. Take it down a bit? There we go. Great. And Mr. Bianco, can you please call out everything from the "due upon receipt" portion for both of them up including the description above that as well? In other words, the "for Peanuts" and then down to "due upon receipt." Great. Now, Mr. Horowitz, staying with the more recent one for now, do you see where it says invoice 9.30.14 PC?

A. I do.

Q. And what did you understand the "PC" to relate to?

A. Peanuts.

Q. Do you see the date on the right-hand side, September 30th, 2014?

A. I do.

MB85col1          Horowitz - Direct          Page 896

Q. Can you please now read the description on the right-hand side invoice starting with for Peanuts?

A. For Peanuts: Marketing costs related to: Strategic analysis of China, HK, Macau, and Taiwan market. Marketing and launch strategy for China, HK, Macau and Taiwan. IAPM mall event. Art & life event. Strategic analysis of Korea and SEA market, complete with marketing plan.

Q. When is this due, according to the document?

A. It's due upon receipt and dated September 30th.

Q. What is the amount of the September 30th invoice?

A. $2,104,060.

Q. Mr. Horowitz, what has changed between that September 25th invoice on the left and the September 30th invoice on the right?

A. The dollar amount and the description.

Q. Mr. Horowitz, why did that change, to your understanding?

A. It changed because of the instructions that we gave to GBG.

Q. Who made that decision?

A. Neil did.

Q. Mr. Horowitz, were you aware of any work done for Peanuts that fit this description that was in this amount, $2.1 million, approximately?

A. No, I was not.

Q. Why was this invoice sent, to your understanding?

A. It was sent as part of the repayment for the inflated price

MB85col1          Horowitz - Direct          Page 897

from the June joint venture.

Q. Let's take all of these down and let's put up and publish Defendant's Exhibit 415. Mr. Horowitz, do you recognize this invoice? Have you seen this before?

A. Yes, we have.

Q. We can zoom out of this. Mr. Bianco, can you please page through this document, just go through the first 10 or so pages, kind of skip through them? As he is doing that, Mr. Horowitz, have you reviewed this document before your testimony today?

A. Yes, I have.

Q. And do you recognize this, these kind of colorful materials that are attached to this invoice? This Zoo York invoice?

A. I do.

Q. What do you generally recognize it to be?

A. In general, they reflect work that Iconix U.S.A. had done.

Q. Do you remember talking about there was a link? Do you remember testifying about a link that was sent with that e-mail with the revised invoices?

A. Yes.

Q. And you clicked on that link?

A. Yes.

Q. Do you recognize these as some of the materials that were included in that link?

MB85col1          Horowitz - Direct          Page 898

A. I believe that they are.

Q. Mr. Bianco, so now we are scrolling through Zoo York, let's keep going through a few more pages. Do you see a person standing, it looks like, next to a subway area there?

A. Yes.

Q. Who is that?

A. That's Chaz Ortiz.

Q. Who is Chaz Ortiz?

A. He was a very well known skater that was part of our Zoo York team.

Q. And when you say our Zoo York team, what do you mean?

A. Iconix USA paid various skaters to be a part of our brand ambassador program.

Q. And to be clear, to your understanding was Chaz Ortiz paid by GBG?

A. No.

Q. Let's keep on going through this deck. First of all, these are images, what areas are we seeing here depicted, geographically?

A. New York.

THE COURT: Can I ask a question, Mr. Horowitz? When you say "skater," are you referring to skate boarders?

THE WITNESS: Yes, I am.

THE COURT: Thank you.

# A-787

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB85col1 | Horowitz - Direct | Page 899 |
|---|---|---|

BY MR. LENOW:

Q. Mr. Horowitz, let's keep on going. These slides here, these documents, who created them, to your understanding?

A. My understanding is that we created them, meaning Iconix USA and my team.

Q. And do you know how GBG came to get copies of these?

A. GBG would have obtained copies of some of this from Iconix USA because GBG was a licensee for Zoo York in the United States.

Q. And is that separate and apart from the joint venture we have been talking about in your testimony in Southeast Asia?

A. Yes.

Q. Let's pause there, Mr. Bianco.
Did any of this material relate to marketing in Europe or Southeast Asia?

A. No.

Q. Did any of this relate to marketing work that GBG had done?

A. No.

Q. Who had done this work?

A. Iconix USA.

Q. And focusing on this slide in particular, this page 21, do you see where it says: Social media, multiple platform, daily activation, initiates and fosters engagement, dialogue and brand visibility. Then the Zoo York takes Yankee Stadium viral video featuring many of the New York Stater took over

| MB85col1 | Horowitz - Direct | Page 900 |
|---|---|---|

200 million impressions in its first week.
Do you see that?

A. I do.

Q. What is the Zoo York takes Yankee Stadium viral video?

A. It is a marketing campaign that we, at Iconix USA, filmed, paid for, and produced.

Q. Where did it take place?

A. Yankee Stadium.

Q. Mr. Horowitz, where is Yankee Stadium?

A. In the Bronx.

Q. Are there any Yankee Stadiums in Europe or Southeast Asia?

A. No.

Q. Mr. Horowitz, did you actually attend this video shoot?

A. I did.

Q. Please describe for the jury what it involved.

A. It involved working with Yankee Stadium for access to the stadium at night, having our skate boarders filmed as they skate boarded through Yankee Stadium producing a clip that we then played or released on YouTube. It also included some signage that we paid for at Yankee Stadium for Zoo York.

Q. Mr. Horowitz, was GBG involved in any of that in any fashion, that you recall?

A. No.

Q. Does this backup provided by GBG support the approximately $955,000 invoice for marketing work in Southeast Asia and

| MB85col1 | Horowitz - Direct | Page 901 |
|---|---|---|

Europe?

A. No.

Q. Why not?

A. Because this was work that we did, Iconix USA, and paid for in the United States.

Q. Mr. Horowitz, did Iconix eventually pay this invoice, to your understanding?

A. We did.

Q. Mr. Horowitz, why did Iconix pay the almost a million dollar invoice sent by GBG for work that Iconix USA itself had done?

A. Because we were repaying GBG for the inflated price of the June joint venture.

Q. Did Iconix get anything for that approximately $1 million payment, apart from the inflated price?

A. No.

Q. We can take this down.
Mr. Horowitz, do you know if -- do you have an understanding of whether Mr. Cole -- Neil Cole -- was aware that Iconix paid for these materials including the Yankee Stadium shoot?

A. Yes, he was.

Q. How do you know that?

A. Neil was involved in the budgeting and approvals of almost each of the steps of the Zoo York shoot in Yankee Stadium.

| MB85col1 | Horowitz - Direct | Page 902 |
|---|---|---|

Q. Can we publish, just for the witness, Government Exhibit 2108 which is not yet in evidence?
Mr. Horowitz, do you see what is on your screen, Government Exhibit 2108?

A. I do.

Q. Generally speaking, what topic did this e-mail relate to?

A. Zoo York skate boarding team and Yankee Stadium.

Q. What is the date of the e-mail?

A. 2/ -- February 12, 2013.

Q. Are you on this e-mail?

A. I am.

Q. Is Neil Cole on the e-mail?

A. He is.

MR. LENOW: The government offers 2108.

MR. HECKER: No objection.

THE COURT: It will be received.

(Government's Exhibit 2108 received in evidence)

BY MR. LENOW:

Q. Let's start with the bottom e-mail on this chain, and let's publish for the jury, too, if we can.
Mr. Horowitz, do you see this e-mail dated February 11, 2013, from Jameel Spencer to Neil Cole and Seth Horowitz?

A. I do.

Q. Do you see the line where it says: We need to sign Brandon Westgate and Chaz Ortiz' contracts?

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col1    Horowitz - Direct    Page 903

A. I do.

Q. What is that a reference to?

A. Contracts that we had with two different skate boarders.

Q. And when you say "we," who is that?

A. Iconix.

Q. Let's move up in the e-mail a bit and let's pause there, Mr. Bianco. Let's highlight if we can: Would like to see total budget of all mens and what is spent or committed with Yankee Stadium and Chaz. We must be going way over so let's discuss where and if we can find money.
     Do you see that?

A. I do see that.

Q. Who is writing that e-mail?

A. Neil.

Q. What did you understand Neil was referring to when he says "with Yankee Stadium and Chaz"?

A. He is referring to the potential deal with Yankee Stadium to film the commercial we just looked at.

Q. And then he says at the end of the e-mail: If we can find money. Do you see that? If we can find money?

A. Yes.

Q. To your understanding, did Iconix eventually pay for this shoot?

A. Yes.

Q. The Yankee Stadium shoot?

MB85col1    Horowitz - Direct    Page 904

A. Yes.

Q. Did GBG have anything to do with paying for that, to your recollection?

A. No.

Q. Did GBG have anything to do with paying for these skaters' contracts, to your understanding?

A. No.

Q. We can take that down. Let's now publish for the witness government 2107.
     Mr. Horowitz, do you see this e-mail dated February 22nd, 2013, on your screen?

A. I do.

Q. Are you on this e-mail?

A. I am.

Q. And is Neil Cole on this as well?

A. He is.

Q. What does it generally relate to?

A. Generally relates to the Yankee Stadium Zoo York shoot.

Q. Is this a fair and accurate copy of this e-mail as it was actually sent and received by you?

A. I believe so.

     MR. LENOW: Government offers 2107.

     MR. HECKER: No objection.

     THE COURT: It will be received.

     (Government's Exhibit 2107 received in evidence)

MB85col1    Horowitz - Direct    Page 905

     BY MR. LENOW:

Q. Let's start with the bottom e-mail here, starting with that e-mail from Jameel Spencer. Do you see where it says: Yankee Stadium. Good news is for broadcast rights online for six months usage (obviously the spot will live beyond once launched into the digital stratosphere) Tusiani is quoting a fee of 25K.
     And then above that, what do you respond?

A. Great. Not prohibitive.

Q. And then above that, do you see where Neil responds: What is all-in including shooting campaign?

A. I do.

Q. Let's keep on going up. And then the response from Jameel Spencer. First, who is Jameel Spencer? What is his role at the company?

A. Jameel was the head of marketing for the mens division.

Q. At?

A. Iconix.

Q. And what does Jameel then say in response to Neil's question?

A. Will let you know tom/Monday the latest, but if you include the sign, probably a $600,000 investment.

Q. And what does the $600,000 investment refer to, to your understanding?

A. The Yankee Stadium Zoo York shoot.

Q. Who was paying that $600,000 investment?

MB85col1    Horowitz - Direct    Page 906

A. Iconix.

Q. Did GBG or TLC or any other GBG affiliated company have any role in that, to your understanding?

A. No.

Q. Let's go up a little bit more in this e-mail and let's go to the very top e-mail from Neil Cole. Do you see where he says: If we spend the 600 K do we also need to invest in media or will we get enough PR and socia?
     Do you understand what Mr. Cole is saying there?

A. Yes.

Q. What is he referring to, to your understanding?

A. He is referring to how much coverage our how many people will see the Yankee Stadium Zoo York shoot.

Q. We can take that down.
     Mr. Horowitz, let's turn to another invoice, Defendant's Exhibit 1407. This is in evidence, we can publish it for the jury and all parties. Mr. Horowitz do you recognize what is marked as Defendant's Exhibit 1407?

A. I do.

Q. Have we seen this invoice before in your testimony?

A. We have.

Q. Just remind the jury how this invoice first came to your attention.

A. Originally it was an e-mail from GBG with a invoice just for marketing.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB85col1 | Horowitz - Direct | Page 907 |
|---|---|---|

Q. And this one, do you see where it is dated September 30th, 2014?

A. I do.

Q. Is this the same September 30th, 2014 Mossimo invoice you testified about earlier?

A. It is.

Q. Now, Mr. Bianco, can we scroll down through this related documents and just keep on going, if you can keep on going through those?

Mr. Horowitz, when you clicked on that link in the original e-mail from GBG, do you recall seeing some of these materials relating to Mossimo?

A. I believe so.

Q. Was this some of the purported backup that GBG provided for that Mossimo invoice?

A. It was.

Q. And, Mr. Horowitz, again, why did you understand that these supporting materials were being provided by GBG?

A. In order to give more coverage to the invoices or the invoice from Mossimo.

Q. Let's just pause for a second. Mr. Bianco, can you zoom in on the bottom right-hand corner of the Iconix logo?

What does the Iconix logo say -- what does, right underneath the Iconix logo there, Mr. Horowitz?

A. Europe.

| MB85col1 | Horowitz - Direct | Page 908 |
|---|---|---|

Q. Mr. Horowitz, was Mossimo in -- was Mossimo one of the brands added to the European part of the Southeast Asia joint venture?

A. No, it was not.

Q. And have you looked through these materials before your testimony today?

A. Yes.

Q. Do you see any materials in there relating to Southeast Asia? Do you recall seeing any?

A. I do not.

Q. And, Mr. Horowitz, with respect to the European joint venture that Iconix had with GBG and TLC, did GBG have any existing marketing obligations, to your understanding, under that joint venture?

A. I believe that it did.

Q. And how was marketing supposed to work -- to the extent the Iconix Europe joint venture didn't work in Europe, how would that work and who would pay for it --

A. Marketing --

Q. -- if it was done above board?

A. Marketing work for the Iconix Europe joint venture would have been done by the joint venture and paid for by the joint venture. GBG had an obligation of doing both licensing and marketing as part of their responsibilities and the Europe joint venture.

| MB85col1 | Horowitz - Direct | Page 909 |
|---|---|---|

Q. Mr. Horowitz, does this backup support the invoice that it is attached to, the claim for $1.9 million in marketing work from Mossimo?

A. It does not.

Q. Mr. Horowitz, were you aware of approximately $1.9 million in work -- and let's go to the first page of this. Are you aware of approximately $1.9 million in actual work that GBG had done in Southeast Asia and Europe for Mossimo that was worth anywhere near this amount of money?

A. I was not.

Q. Did Iconix eventually pay this invoice?

A. Yes.

Q. Why did Iconix pay this invoice, Mr. Horowitz?

A. As part of the repayment for the overpayment and inflated price of the June joint venture.

Q. We can take this down.

Let's turn to a new topic. Mr. Horowitz, I'm going to show you what's marked for identification and in evidence as Government Exhibit 1211. So, turning away from the invoices for a second and let's get back to the updates. What is the date of this e-mail from you to Neil Cole?

A. This update is dated 10/13.

Q. So, approximately how long after that, after these, after September 30th, the date of the invoices, would this e-mail have been sent?

| MB85col1 | Horowitz - Direct | Page 910 |
|---|---|---|

A. A little less than two weeks.

Q. And let's go to the next page, the actual update. Under the first bullet point, financial results, I want to draw your attention to where it says GBG Global Marketing. What is that a reference to, Mr. Horowitz?

A. The $5 million payback.

Q. At that point in time had Iconix paid any of these, those invoices that we saw?

A. It had not.

Q. Why are you including this in your weekly update to Mr. Cole?

A. I'm including it in my weekly update under financial results because we had not yet accounted for the GBG Global Marketing giveback.

Q. And then, turning to point 2, do you see where it says Rocawear Kids?

A. I do.

Q. And can you read the first bullet of your update?

A. Agreed to terms with Jason. Have drafted, but holding off on sending doc until requested. Still no request for docs.

Q. What are you referring to there, by holding off on sending doc until requested?

A. Neil told me not to send the Rocawear Kids termination until it was requested from the other side.

Q. At this point in time, Mr. Horowitz, your understanding was

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB85col1 | Horowitz - Direct | Page 911 |
|---|---|---|

Iconix was still going to release from the Roc Kids payment obligations?

A. Yes.

Q. And, underneath it, do you see where it says SalesCo will take over on January 1, 2015?

A. Yes.

Q. What does that refer to?

A. It refers to the new licensee taking over in place of GBG for Rocawear Kids.

Q. Earlier you had mentioned some secondary negative effects that might happen if Iconix lost the Rocawear Kids payments from GBG. How, if at all, does SalesCo relate to that concern?

A. SalesCo would have been able to take over the Rocawear Kids business and provide Iconix with some of the necessary revenue for Rocawear.

Q. We can take this down, let's now publish what is in evidence as Government Exhibit 1118.

Moving forward about two weeks, do you see where it says October 30th, 2014 at the top of this e-mail chain?

A. I do.

Q. Turning to the second page now, Mr. Bianco, we can go down to the bottom -- the bottom e-mail, there we go.

Do you see the e-mail from Ericka Alford at the bottom dated October 29 where she says: I have gotten a few calls and e-mails this week from Global Brands' senior legal team asking

| MB85col1 | Horowitz - Direct | Page 912 |
|---|---|---|

for updates and to wrap up this agreement. Let's discuss tomorrow how you would like me to respond.

Do you see that?

A. I do.

Q. What did you understand Ericka Alford was conveying to you?

A. That GBG's legal team was requesting the Rocawear Kids termination agreement.

Q. Let's zoom out of it here. Drawing your attention to the point where there is an e-mail here to pull out, go to the first page -- do you see Mr. Horowitz where you say that there are two outstanding points to work out? It is in the kind of bottom half?

A. Yes.

Q. What are you expressing there when you say there are two outstanding points to work out?

A. That the Rocawear Kids termination still has points being negotiated.

Q. Why did you write that to her?

A. I believe I wrote that to her to buy time.

Q. Why were you trying to buy time?

A. So that way I could get Neil's direction on what we should do.

Q. Why did you need Neil's direction upon what to do at this point in late October about Roc Kids?

A. Because I was instructed to hold off on doing anything.

| MB85col1 | Horowitz - Direct | Page 913 |
|---|---|---|

Q. By who?

A. By Neil.

Q. Do anything about what?

A. About the Rocawear Kids termination.

Q. Do you understand why Mr. Cole, from what he said to you, do you understand why he gave that instruction to hold off on doing anything until you heard further from him?

A. Yes.

Q. Why?

A. Neil was starting to have trepidation about letting GBG out of their Rocawear Kids agreement.

Q. Did Neil Cole express to you why he had that trepidation?

A. Yes.

Q. Can you explain?

A. He was worried about the potential new licensee and he very much liked GBG as the licensor for Rocawear Kids. In his words, they were a much better credit.

Q. We can take that down.

Mr. Horowitz, I want to turn to what is in evidence as Government Exhibit 104.

Turning to the, I think we want the third or fourth page. Let's go to page 3 to start. Pause here. Let's highlight the top portion above Q3 2014, everything above that line. There we go.

Mr. Horowitz, do you recognize what this is?

| MB85col1 | Horowitz - Direct | Page 914 |
|---|---|---|

A. I do.

Q. And what's the date -- what is this document?

A. It's a press release of Iconix' financial performance in Q3.

Q. What date was this released, based on what you are seeing up on your screen?

A. October 28th.

Q. And, Mr. Horowitz, do you see where the headline says Iconix Brand Group reports record revenue and earnings for the third quarter 2014?

A. I do.

Q. And then, underneath that: Record Q3 diluted non-GAAP EPS of 73 cents, a 23 percent increase over prior year quarter?

A. I do.

Q. Mr. Horowitz, did this result, this EPS result, did that include the SEA-3 -- EPS for the SEA-3 transaction?

A. Yes, it did.

Q. And how much of this EPS, just approximately to your understanding, was due to that SEA-3 transaction?

A. I believe it was about 30 cents.

Q. And was some of that due to the inflated price you testified about?

A. Yes.

Q. Without the inflation would Iconix have been able to make these claims about this 23 percent increase over the prior year

UNITED STATES OF AMERICA, V
NEIL COLE,

MB85col1     Horowitz - Direct     Page 915

quarter?

A. No.

Q. And turning to the next bullet point, do you see where it says: Record Q3 revenue of $113.8 million, a 6 percent increase over the prior year quarter?

A. I see that.

Q. Mr. Horowitz would Iconix have been able to make that claim without the extra inflated revenue from the SEA-3 deal?

A. No, it would not.

Q. Mr. Horowitz, did there come a time that you learned Neil Cole had sold a large amount of Iconix stock around this date of late October 2014?

A. Yes.

Q. When did you first learn that fact?

A. I first learned about the sale of the stock in late November or early December.

Q. And what was the context for that?

A. We were preparing for a shareholder conference and in preparation for the conference we were reviewing questions we might be asked.

Q. And how -- specifically, how did it come to be that you learned during that prep session that Neil had sold a large amount of stock?

A. Jaime Sheinheit, who was in charge of our investor relations, puts together slides of potential questions we might

MB85col1     Horowitz - Direct     Page 916

get and one of her slides pertained to Neil's stock sale.

Q. And that's the first time you learned about it?

A. That is first time I learned about it.

Q. Do you know approximately how much stock Mr. Cole sold during that time?

A. Approximately $40 million.

Q. And, Mr. Horowitz, to your understanding, was that sale before or after this press release?

A. It was after this press release.

Q. Mr. Horowitz, what was the state of the scheme to falsely inflate Iconix' revenue and EPS at the time Mr. Cole made that stock sale of $40 million?

A. We had $11 million of extra revenue and EPS and none of the payback or giveback to GBG.

Q. Was the scheme ongoing?

A. Yes.

Q. Was the scheme at its height at that point, would you say?

     MR. HECKER: Objection to form.

     THE COURT: Sustained.

BY MR. LENOW:

Q. Mr. Horowitz, what was the state of the scheme at that time?

A. We had all of the benefit of the scheme and none of the giveback, none of the negative.

Q. We can take this document down.

MB85col1     Horowitz - Direct     Page 917

     Mr. Horowitz, showing you what is in evidence Government Exhibit 1122. So, Mr. Horowitz, moving into November now, do you see this calendar invite with a meeting time of November 3rd, 3:30 p.m.?

A. I do.

Q. Do you see the subject and the location listed as meeting with Seth, ESB 9th floor exec conference room?

A. I do.

Q. And then, just drawing your attention to some of the required attendees, do you see Jason Rabin listed here?

A. I do.

Q. Jared Margolis?

A. Yes.

Q. Ethan Cole?

A. Yes.

Q. And then your name Seth Horowitz is also listed?

A. Yes.

Q. And who is Amanda Azzoli?

A. I believe she was one of the assistants at GBG.

Q. Now, Mr. Horowitz, do you recall meeting with -- withdrawn.

     What is ESB?

A. The Empire State Building.

Q. Where was this meeting taking place?

A. At GBG.

Q. Do you recall a meeting with GBG around this time,

MB85col1     Horowitz - Direct     Page 918

Mr. Horowitz?

A. I do.

Q. And what was the purpose of meeting with GBG in this early November time frame?

A. It was to review the state of various transactions and givebacks.

Q. And, specifically, what givebacks are you referring to?

A. The invoices that GBG had sent to Iconix that we had not paid.

Q. We can take this down.

     Mr. Horowitz, in advance of going to GBG that day for this meeting, first of all, was Neil Cole at that meeting, to your recollection?

A. No.

Q. Did you meet with him in advance of that meeting, though?

A. Yes.

Q. And, in advance of -- to prepare for the meeting with Neil Cole that came before the GBG meeting, did you do anything to prepare?

A. Yes.

Q. What did you do to prepare?

A. I worked with David Maslaton to put together a spreadsheet laying out some of the basics of where -- the status of the overpayments and givebacks.

Q. Why did you work with David Maslaton on that project?

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col1    Horowitz - Direct    Page 919

A. I believe Neil had asked the two of us to work together on it for him.

Q. Did you actually create a document with Mr. Maslaton?

A. Yes.

Q. We will get into the details in a second but, very broadly, what was this document?

A. Very broadly, this document showed how much GBG had paid for various joint ventures and somewhat how the money was going back to GBG. And, it also had potential joint ventures in the future.

Q. Do you recall e-mailing this document at any point in time?

A. No.

Q. Why did you e-mail around this document that had tracked these pieces of information that was described?

MR. HECKER: Objection. Foundation.

THE COURT: Overruled.

A. I didn't want to e-mail around documents that had traces or even evidence of our inflated prices and givebacks.

Q. Did this document explicitly list out the overpays and givebacks?

A. Yes.

Q. And who directed you to work on this document?

A. Neil did.

Q. Did you then, after you and David worked on it, did you then sit down with Neil and meet about this document that

MB85col1    Horowitz - Direct    Page 920

listed out specifically the overpays and givebacks?

A. Yes.

Q. Mr. Bianco, let's publish for the witness Government Exhibit 706. This is not in evidence yet.

Do you recognize what Government Exhibit 706 is?

A. I do.

Q. Can we also publish for the witness 706-C and 706-B? Let's start with 706-B. It will be a little easier with the technology -- I'm sorry 706-A, I meant. I apologize.

Do you recognize 706-A, Mr. Horowitz?

A. I do.

Q. What is that?

A. It's the metadata to the document.

Q. And then let's publish for just the witness and the parties 706-C, a Word version of the document -- or Excel version of the documents. My apologies.

Do you recognize what is marked as 706-C in front of you, Mr. Horowitz?

A. I do.

Q. Let's just stay there for now. Mr. Horowitz, is this a document, an Excel version of the document that you prepared at Mr. Cole's direction and later met with him about that listed the overpays and the givebacks?

A. Yes.

MR. LENOW: Government offers 706-A, 706-C, and 706.

MB85col1    Horowitz - Direct    Page 921

MR. HECKER: No objection.

THE COURT: They will be received.

(Government's Exhibits 706, 706-A, 706-C received in evidence)

BY MR. LENOW:

Q. Let's publish for the jury Government Exhibit 706-C. And let's zoom in and focus in just on the top left two boxes, zoom in on this a little bit more if we can.

Mr. Horowitz, let's walk through this slowly. Starting on the left-hand side, Transactions. What is listed there?

A. What is listed there is SEA-2, SEA-3, and the givebacks.

Q. And so is SEA-2 -- where is SEA-2 listed here?

A. SEA-2 is listed as South Korea and Europe.

Q. So, if you add those two together, that's SEA-2?

A. That's correct.

Q. And is SEA-3 listed here?

A. It is.

Q. And then the next column over, column C there is all mens additional and Umbro. What does the "all" mean next to Korea?

A. The brands that were added to Korea.

Q. And why does it say "all"?

A. Because it was all brands with the exception of the two laid out to the right.

Q. And then Europe it says: Mens additional. Why does it say mens additional?

MB85col1    Horowitz - Direct    Page 922

A. Because in that transaction there were additional brands added.

Q. Should we be looking at that column and the one at the right as well to have the picture of the brands? Column C and D, do those pair together?

A. Yes.

Q. So all, add all brands, no Peanuts, no Umbro, means what about Korea?

A. That for the Korea part of the transaction we were adding Korea for all brands other than Peanuts and Umbro.

Q. Then Europe, next to mens additional, add mens brands to EU portfolio. What does that, the mens additional and add mens brand to EU portfolio, mean?

A. That is the part of SEA-2 where we added mens brands to European distribution through the Southeast Asia joint venture.

Q. And then under that, LC and Umbro, add LC and Umbro for China. What does that mean?

A. That describes SEA-3.

Q. So let's kind of move to the right here. So, let's start with the Gross price. So, the gross price column where we see 15,917,400. What is that number listed under gross price?

A. That is the price that GBG paid for SEA-2.

Q. That's the price in the documents?

A. That is the price in the documents.

Q. Then under that, the 21.5 million figure for China, what

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col1      Horowitz - Direct      Page 923

does that represent?

A. It represents the price that GBG paid per the documents of SEA-3.

Q. And then going to the net side, do you see where it says net on the right-hand side?

A. I do.

Q. So, just starting with the China one first, do you see where it says $6 million?

A. I do.

Q. Why does it say $6 million there? What does that represent?

A. $6 million represents the overpayment from SEA-3.

Q. And then turning to the role above that, do you see where it says $6,067,400?

A. I do.

Q. What does that represent?

A. It represents the $5 million overpayment for SEA-2.

Q. And so, just why is this listed as a $6.5 million number as opposed to a $5 million number? Had something changed since that deal was agreed to?

A. Yes. The Ecko bankruptcy had caused greater doubt in collecting those revenues and therefore the value had dropped.

Q. Just to be clear, I probably should have done this first bur the 5.5 value column on the left-hand side, what does that represent?

MB85col1      Horowitz - Direct      Page 924

A. It represents a multiple that was being used in some cases to come up with the value.

Q. So here, what is the 5.5 multiple value for the SEA-3 deal listed as?

A. 15.5 million.

Q. And what about for SEA-2?

A. 9.3 million.

Q. And is that different from what the 5.5 value listed as at the time of that transaction?

A. Yes.

Q. So what changed here such that this number has dropped a little bit?

A. The Ecko expected royalty went down.

Q. And is that that bankruptcy issue you were talking about earlier in your testimony?

A. Yes.

Q. So, if you had done this, this calculation had been done at the time of the SEA-2 deal, would this be different?

A. Yes.

Q. What would it list it as at that time, approximately?

A. 10.9 million.

Q. So this, the net here being a 6.5 million figure, instead of 5 million, is that due to subsequent events and just how this is calculated in November?

A. Yes.

MB85col1      Horowitz - Direct      Page 925

Q. What was the overpay that was still due from SEA-2 at this point in time?

A. It was $5 million.

Q. And what was the overpay that was still due from SEA-3 at this point in time?

A. $6 million.

Q. So, to get the actual overpay, is this net column you have to justify that Ecko issue?

A. Correct.

Q. Now, going down a little more in this part of the chart, do you see where it says under line 16 Rocawear Kids termination?

A. I do.

Q. Why is that listed here?

A. Because that was one of the givebacks for the overpayments.

Q. And then, underneath that, do you see where it says marketing initiatives to stimulate JVs incremental $5 million in marketing investment?

A. I do.

Q. Why is that listed there?

A. Because it is part of the givebacks.

Q. Let's kind of zoom out a little bit more now, just to bring in some of these columns on the right.

Under the marketing initiatives, what is the number listed? If you can follow it over to the right, the number listed for marketing?

MB85col1      Horowitz - Direct      Page 926

A. $5 million.

Q. And then, if you look at the Rocawear Kids termination, what are the numbers being considered here?

A. The Rocawear Kids is eliminating $5 million of royalty.

Q. And that's at 14 and 15?

A. That is correct.

Q. And can we highlight column D, 16?

MR. HECKER: Objection, your Honor. Foundation. Maybe we are not looking at the same document.

Q. We are in column D, 16. Eliminate 5 M royalty, '14 and '15.

Do you see that, Mr. Horowitz?

A. I do.

Q. And then let's keep on going to the right. Just to pause there is -- why for net under the Rocawear column does it say minus 3.5 million?

A. I believe that that may take into account the fixturing but I'm not sure.

Q. And then looking at the -- there is two kind of boxes on the right, 2014 and 2015. What are those in total trying to add up? What are you trying to reflect there in those boxes?

A. Trying to add up what the net payback or the total payback to GBG was.

Q. In considering what?

A. Considering the inflated prices for the joint ventures.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col1          Horowitz - Direct          Page 927

Q. Did the JV deals have other guarantees in them for payments to GBG?

A. Yes.

Q. Were there guaranteed distributions for various years in those contracts?

A. Yes.

Q. Did you try to -- are those reflected anywhere in those boxes?

A. They are.

Q. Just drawing your attention to where it says: Guaranteed distribution, relief and/or investment. Do you see a number of areas listed there?

A. I do.

Q. So, for example, the $1.5 million guaranteed distribution from SEA-2 to GBG that's in that document, is that fact reflected in this chart anywhere?

A. Yes.

Q. Where is that? Is that that $1.5 million figure?

A. Each portion.

Q. Under each.

    Mr. Horowitz, stepping back and asking you broadly about those two boxes, why did you also include in this chart not only the overpays and givebacks but also the guaranteed distributions that GBG was owed under the written contracts?

A. Because Neil wanted to see the total financial picture of

MB85col1          Horowitz - Direct          Page 928

our relationship with GBG.

Q. So not only things in the contracts but the things out of the contracts too?

A. That is correct.

Q. Let's kind of, let's go down to the next row below to potential transactions and let's zoom in on that.

    Mr. Horowitz, we see Middle East/N Afric listed.

    Mr. Bianco, can we expand that box a little bit? Great.

    What does that Refer to?

A. It refers to a potential joint venture in the Middle East.

Q. And there is some other potential transactions listed in Europe LC and then U.S. Rocawear Kids termination. What are those?

A. Europe LC refers to the Europe Lee Cooper transaction and the U.S. Rocawear Kids termination associated with a rainbow M-down -- mark downs -- that's what M-downs stands for -- was the giveback or potential giveback in a new transaction.

Q. So, here, starting with the Middle East North Africa transaction, do you see where it says 5.5 values at about 18 million but then it listed a gross price of 24 million, approximately, and net of 6 million.

    Do you see that?

A. Yes.

Q. What are you reflecting there in this document for

MB85col1          Horowitz - Direct          Page 929

discussion purposes with Neil Cole?

A. We were contemplating doing another joint venture with an inflated price in the fourth quarter.

Q. What was that transaction?

A. That transaction was for Middle East and north Africa.

Q. Did the Middle East and North Africa transaction in fact close in the fourth quarter?

A. It did.

Q. And, to your understanding, was it used to -- how is it actually used in this? Was it used in this fashion to result in an overpay by Iconix?

    MR. HECKER: Objection to form.

    MR. LENOW: I will withdraw and reask.

    THE COURT: Very well.

BY MR. LENOW:

Q. Mr. Horowitz, did the Middle East transaction actually close in the first quarter?

A. Yes.

Q. Did it involve any inflated purchase prices or givebacks, to your understanding?

A. Yes.

Q. And describe your understanding of how it was actually used in that fashion when it closed.

A. My understanding is that it was used strictly for a giveback, a pay-back of $3.1 million.

MB85col1          Horowitz - Direct          Page 930

Q. And what were the mechanics of how it was actioned, how did it include a $3 million giveback payment?

A. There was a line item for market analysis that charged Iconix $3.1 million and was payable right away to GBG.

Q. And is that a different structuring that is reflected here as a potential transaction for discussion with Neil Cole?

A. Yes.

Q. And just, again, how it actually ended up different from your understanding and what is reflected here?

A. It ended up being different in that I don't believe it included an inflated price and it was strictly used as a mechanism to get money back to GBG that was owed from prior deals.

Q. And what is your understanding of why it was used in that fashion as a mechanism to make a giveback to GBG?

A. Because Iconix still owed money to GBG from prior transactions.

Q. And, specifically, what transaction, if any?

A. SEA-3.

Q. Mr. Horowitz, ultimately speaking, did Iconix relieve GBG of the Rocawear Kids $6 million minimum payments?

A. No.

Q. Is your understanding that a decision was reached to pay them back in alternative ways?

A. Yes.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col1    Horowitz - Direct    Page 931

Q. Did the Middle East transaction, to your understanding, have any role in that?
A. I believe that it did.
Q. And what, specifically?
A. It paid back GBG over $3 million that was owed from SEA-3 for the $6 million overpayment.
Q. And why is that your understanding that that's how that the Middle East transaction was used partially in place of the Rocawear Kids giveback?
A. At the time of the $3.1 million payback, Iconix owed GBG money and, to my knowledge, there was no work worth that amount of money that was done or that was done by GBG in that fashion.
Q. Mr. Horowitz, did you have some role in the negotiation of the Middle East transaction?
A. Yes.
Q. Were you involved in the final stages of it?
A. No.
Q. Who was involved in the final stages of the Middle East deal getting done, to your understanding?
A. Neil was.
Q. And, do you have direct knowledge of those very final stages?
A. Yes.
Q. And where does that knowledge come from?
A. My experience.

MB85col1    Horowitz - Direct    Page 932

Q. Did you talk to Mr. Cole, did you talk to Neil about that deal later?
MR. HECKER: Objection. Leading.
Q. Did there come a time when spoke to Neil Cole about the Middle East transaction?
A. Yes.
Q. And did there come a time you also spoke to individuals at GBG about the Middle East transaction later on?
A. Yes.
Q. Did that form the part of the basis of your knowledge and inference about how the Middle East deal was used?
A. Yes.
Q. Now, let's continue on down to the bottom of this document, Mr. Horowitz. Do you see this kind of block at the bottom that starts in 2014 ME/N Africa revenue?
A. I do.
Q. What does that reflect?
A. That reflects the current or forecasted revenue for the Middle East and North Africa as it existed as of that date.
Q. And is this something that had been done or is it rather under discussion?
A. I'm sorry. What are you referring to?
Q. Sorry. The Middle East/North Africa transaction, to be clear at this point in time, had this been done or something that was you under consideration?

MB85col1    Horowitz - Direct    Page 933

A. It was under consideration.
Q. And Mr. Horowitz, I am going to back up a bit and talk more about the preparation of this document. So, you testified earlier about meeting with GBG and then having a pre-meeting with Neil Cole, and then, before that, meeting with David Maslaton. So, let's walk through those steps. Starting with the David Maslaton meeting, where did you and he actually work on this document?
A. We worked on this document in my office.
Q. And why were you creating this document at that time?
A. We were creating this document because Neil had requested it.
Q. Who directed you about what content to put in the document and what options to show?
A. Neil did.
Q. And did you follow through on Neil's instructions on what to put in this document?
A. I believe we did.
Q. And after you and David worked on creating this document, did you then in fact meet with Mr. Cole -- Neil Cole -- about this document?
A. Yes.
Q. Did you go through everything with him that we just went through today?
A. I believe so.

MB85col1    Horowitz - Direct    Page 934

Q. What, if anything, did Neil say in response to, at that meeting, relating to this document?
A. He had expressed concern about letting GBG out of their Rocawear Kids commitment.
Q. All right. Let's now turn to Government Exhibit 706-A, the metadata document. Mr. Horowitz, when does this document reflect that it was last printed?
A. At 11:56 a.m.
Q. And last modified?
A. At 1:43 p.m.
Q. And when was it created?
A. Earlier the same day at 9:24 a.m.
Q. And, Mr. Horowitz, did there come a time after you met with Mr. Cole relating to this document that you in fact met with GBG that day?
A. Yes.
Q. Just turning back to Government Exhibit 1122, what time was that meeting?
A. It was scheduled for 3:30 p.m.
Q. On that same day, November 3rd?
A. That is correct.
Q. Now let's turn to -- let's put this on the right-hand side, Mr. Bianco, and let's keep this document up and let's publish now Government Exhibit 1123. Let's zoom in on this e-mail to bring it out.

# A-796

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB85col1 | Horowitz - Direct | Page 935 |

What is the date of this e-mail, Mr. Horowitz?

A. That same date, 11/3.

Q. Who is it from and to?

A. It is from me to Neil.

Q. How long after the scheduled GBG meeting was this, approximately?

A. A couple of hours.

Q. What do you say to Neil in this e-mail?

A. Meeting with Jason and Jared went well. Will update you in the a.m.

Q. What is the subject of the e-mail?

A. GBG.

Q. What are you referring to in this e-mail when you say: Meeting with Jason and Jared went well. Will update you in the a.m.?

A. I am referring to the meeting that I just had with GBG with Jason and Jared.

Q. Now, Mr. Horowitz, this says November 3rd. At this time what was the status of the three invoices that GBG emailed to you on earlier in October on October 2nd? Had those been paid yet?

A. No, they had not.

Q. Why hadn't those invoices been paid almost a month later?

A. Because Neil had not authorized us to do so.

Q. Did he explain his thinking?

| MB85col1 | Horowitz - Direct | Page 936 |

A. No.

Q. Did he give you a direction?

A. Yes.

Q. What was that?

A. Do not do anything with those invoices until he tells me to.

Q. And you had just met with GBG. Did they express their views on the state of play with the invoices?

A. Yes.

Q. What view was expressed by Jason and Jared?

A. They wanted to get paid.

Q. Did you convey GBG's position on this to Neil?

A. Yes.

Q. We can take that down.

MR. LENOW: Judge, I think we are at 11:00, if now would be a good time to stop.

THE COURT: It is a convenient time to stop.

Ladies and gentlemen it will be 20 minutes, 20 minutes after the hour. Don't discuss the case.

(Continued on next page)

| MB85col1 | Horowitz - Direct | Page 937 |

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

(Witness steps down)

THE COURT: Everyone can be seated.

Mr. Lenow, I am not going to hold you to this, at least not now, but do we see an end?

MR. LENOW: Judge, we will finish today. There may not be -- I had hoped to get to cross today by Mr. Hecker. It may not be --

MR. HECKER: That makes two of us.

MR. LENOW: It may not be much cross, but we will finish today.

THE COURT: OK.

MR. LENOW: There is a very small issue to raise, just a flag for the Court on cross.

Mr. Hecker and I have been conferring and I think we have reached a lot of agreements on various issues on both sides. One thing to flag that may pop up as an issue is there was cross last time, we expect there to be cross again, about Wilmer Hale and what they represented to others and the work they did for Mr. Horowitz. Wilmer's invoices, it's possible they may come up in some fashion or another and they were attached I think as an exhibit to one of the defense's filings. The fees that Wilmer charged were substantial and I think the amount of money that Mr. Horowitz' lawyers have been paid or

| MB85col1 | Horowitz - Direct | Page 938 |

that Mr. Horowitz spent on lawyers is not something that should come in, in other words, the fact that there were millions of dollars spent on legal fees I think is something that has no place in the trial. Mr. Hecker does not, I think, intend on getting into that, unless it is raised by something else. But we want to plant a flag now that we think the amount of legal fees paid is a fact that is a 403 issue and, frankly, I think is an issue the defense probably will be sensitive to because, obviously, Mr. Cole's legal fees is not something we are trying to inject in the case.

So, I want to flag that as an issue. We could see the invoices coming up in some area of our cross so we could see some appropriate uses, but I think the amount that someone pays their lawyer is something that shouldn't come in

THE COURT: Mr. Hecker?

MR. HECKER: I really don't have much to add. I haven't told Mr. Lenow that I was planning to use them or talk about monies that were reimbursed to Mr. Horowitz so I think I can --

THE COURT: I think I saw, I know that there was reference to Wilmer Hale's fees in the materials that I provided this morning.

MR. HECKER: I don't think we saw that. The Court may have but we, in our Rule 17 briefing, I think we certainly made reference to invoices only because they established the time of

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB85col1 | Horowitz - Direct | Page 939 |
| --- | --- | --- |

certain meetings with Mr. Horowitz.

THE COURT: OK. Anything else?

MR. LENOW: No. Thank you, Judge.

MR. HECKER: No, your Honor.

(recess)

(Continued next page)

| MB8Ycol2 | Horowitz - Direct | Page 940 |
| --- | --- | --- |

(In open court; jury present)

THE COURT: Everyone please be seated.

Mr. Lenow.

MR. LENOW: Thank you, Judge.

Q. Mr. Horowitz, I just want to go back just for a second to Government 706C, the Excel version of that chart we looked at.

Mr. Bianco, can you please pull up 706C and then publish it for the jury. Mr. Bianco, in this Excel file, can you please go to file and then go down to "info" under that, file info.

Mr. Horowitz, directing you to the right-hand side of this document, when you go to "file" and "info," do you see where it lists document properties and related dates and related people?

A. I do.

Q. What do you see under "related dates" for when it was last modified?

A. It was last modified on 11-3 at 1:43 p.m.

Q. In 2014?

A. Yes.

Q. Now, Mr. Horowitz, this process we just went through of just clicking on the file tab and then going to "info" and then looking at these fields, is this the process you followed when you were looking at the metadata for the Word and Excel files you testified about?

| MB8Ycol2 | Horowitz - Direct | Page 941 |
| --- | --- | --- |

A. Yes.

MR. LENOW: You can take this down.

Q. Mr. Horowitz, at the end of your testimony this morning, you mentioned how GBG's position was they wanted to get paid.

Let's turn now to Government Exhibit 1126.

Now, did there come a time when Neil Cole did in fact authorize the payment of at least some of the GBG invoices?

A. Yes.

Q. And drawing your attention to this November 14 email string, let's start at the bottom, Ethan Cole to you copying Jeremy on November 14.

Do you see that?

A. I do.

Q. And Ethan writes: "Hi, Seth. Finances followed up on the marketing invoices. Any update on when we can expect to receive payments?"

Do you see that?

A. I do.

MR. LENOW: Let's zoom out.

Q. What do you respond to Ethan?

A. "Just processed one last week. Let me check in on it and get back to you."

Q. Mr. Horowitz, had Neil Cole approved an invoice at that point in time?

A. Yes.

| MB8Ycol2 | Horowitz - Direct | Page 942 |
| --- | --- | --- |

Q. And you said: "Just processed one last week."

Why did it take a while for the invoice, this invoice at least, to get processed?

A. It might take a bit of time, once an invoice is processed in accounting, for it to get paid.

Q. Did it take a while here for the approval to also happen?

A. Yes.

Q. Why was there a delay in Neil approving based on what he said to you?

A. He told me to not process the invoices.

Q. Based on your discussions with him, do you know why he didn't want them processed for some period of time?

A. Yes.

Q. Why?

A. He wanted to control the timing of the invoices.

MR. LENOW: All right. Let's take this down and go to Government Exhibit 1225.

Q. Mr. Horowitz, do you see the email here from you to Neil Cole dated November 17, 2014?

A. Yes.

MR. LENOW: Let's go to the next page.

Q. I'm going to draw your attention to the top kind of fourth on the page where it says: "GBG Global Marketing processed Mossimo/Zoo York SEA Asia"?

A. I see.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB8Ycol2          Horowitz - Direct          Page 943

Q. What are you conveying to Neil there in your update to him?
A. That, per his instructions, I processed those invoices.
Q. Did you in fact process them?
A. Yes.
Q. Are these the invoices that we looked at earlier, the Zoo York one with the backup, including the Yankee Stadium work?
A. Yes.
Q. And the Mossimo invoice that had no Southeast Asia support?
A. Yes.
Q. Mr. Horowitz, why did you process those invoices for GBG that was in your testimony earlier?
A. Because I was told to do so.
Q. By who?
A. By Neil.
Q. Turning to the bottom of this document, GBG update, do you see where it says: "Rocawear Kids. Agree to terms with Jason. Have drafted but have been holding off on sending doc until requested."
    Do you see that?
A. I do.
Q. What is that in reference to?
A. It's in reference to the Rocawear Kids termination.
    MR. LENOW: Let's go to the next page as well. If you can pull that up on the right-hand side. That's fine. Yes. If you can zoom in. That's perfect.

MB8Ycol2          Horowitz - Direct          Page 944

Q. And then continuing that statement, you say: "Will sign these docs concurrent with Middle East or alternative transaction --" and I want to focus on this language "-- or we can retrade based on current events with New Rise, although I believe very messy and disruptive."
    What do you mean "or we can retrade based on current events with New Rise"?
A. As Neil and I discussed, we could retrade and not let GBG out of its Rocawear Kids guaranteed payments. In exchange, pay them in other ways.
Q. Why do you say "retrade" instead of "trade"?
A. The first trade was for the inflated price for SEA-3. We were letting GBG out of its Rocawear Kids commitments. A retrade would be swapping out the Rocawear Kids termination in exchange for getting them money in other ways.
Q. To your understanding, did it come to be that there was a retrade where some other giveback was going to be slotted in for Roc Kids forgiveness?
A. Yes.
    MR. LENOW: If we can take this down and go to government 214.
Q. Mr. Horowitz, have you seen this document before?
A. I have.
Q. And generally speaking, what does it relate to?
A. A wire transfer to GBG.

MB8Ycol2          Horowitz - Direct          Page 945

Q. For what?
A. For $1.940.232.
Q. Does this pertain to one of the invoices that we looked at earlier?
A. Yes, it does.
Q. Let's go down to the third page -- the second page. I'm sorry.
    What is this here? The Chase Bank, this Chase form with the number $1,940,230 listed?
A. This is the document we would sign for a wire transfer.
Q. Whose signature is this?
    Do you recognize it in kind of the right-hand middle side?
A. I do recognize it.
Q. Whose signature is that?
A. That is mine.
Q. Why did you sign off on this wire transfer, Mr. Horowitz?
A. Because we owed GBG money and we were paying them back.
Q. For what?
A. For an overpayment, in this case, for SEA-2.
    MR. LENOW: Let's go to page 5 of this document.
Q. For what invoice was that? Sorry.
    Was this in connection with an invoice?
A. Yes.
Q. Do you see the invoice depicted on the screen here?

MB8Ycol2          Horowitz - Direct          Page 946

A. I do.
Q. Which brand, and what was the amount?
A. This is for Mossimo for $1,940,230.
    MR. LENOW: Let's go to page 4, the immediately preceding page of this document. Sorry. One more before that I guess. Pause here.
Q. Do you see this email dated November 25, 2014?
A. I do.
Q. And from Neil Cole to Brian Schneiderman?
A. That is correct.
Q. And the underlying email that Neil is responding to Brian about, what is Brian asking Neil to do?
A. He's asking for Neil's approval for the wire of money.
Q. What does Neil say?
A. Neil approves it.
Q. All right. Now, Mr. Horowitz, I want to go a little forward into this document, going to page 6.
    Mr. Horowitz, we've seen a number of documents here bundled together -- the form on the top with the amount listed, the Chase Bank document, the invoice, this email from Neil.
    Do you have an understanding as to why these are all bundled together?
    Do they relate to one thing or another?
A. Yes.
Q. What do they relate to?

UNITED STATES OF AMERICA, V
NEIL COLE,
November 8, 2022

| MB8Ycol2 | Horowitz - Direct | Page 947 |
|---|---|---|

A. They relate to the giveback from SEA-2.

Q. Did Iconix keep records relating to payments it made in its files typically?

A. Yes.

Q. Do these records relate to the payment of that $1.9 million figure approximately?

A. Yes, they do.

Q. All right. And then going to -- let's kind of page through this document a little bit. Go all the way to the end.

Mr. Horowitz, do you see some of -- do you recognize some of these materials from documents we've reviewed earlier?

A. Yes.

Q. What are these? What are some of these documents we're seeing now with kind of the images and -- images and texts and photographs?

A. This is the fake backup to the invoices we had requested from GBG.

MR. LENOW: We can take this down. Now let's also turn to Government Exhibit 215. Let's just page through this document for the witness, please. Keep on going. Let's go back to the prior page.

Q. Mr. Horowitz, do you recognize this document?

A. I do.

Q. Have we seen this invoice before?

A. We have.

| MB8Ycol2 | Horowitz - Direct | Page 948 |
|---|---|---|

Q. What brand is it for?

A. Zoo York.

Q. What's the amount?

A. $955,710.

Q. And going to the prior page now before the invoice, what is this document that says "Chase" at the top?

A. This is the wire transfer of money for $955,710.

Q. Do you see signatures on this document, Mr. Horowitz?

A. I do.

Q. Whose signatures do you see?

A. Neil Cole and Jeff Lupinacci.

Q. Which one is Neil Cole's signature? The one on the left-hand side or the one on the right-hand side?

A. The one on the left-hand side.

Q. Mr. Horowitz, the invoice we saw for this said "Zoo York."

Do you recall your testimony earlier about the Yankee Stadium video?

A. I do.

Q. And was that some of the support provided in connection with this invoice by GBG?

A. It was.

MR. LENOW: We can take this down. Let's turn to Government Exhibit 1212.

Q. This is an email dated December 1 from Seth Horowitz to Neil Cole. "Subject: Update" stating "Attached is my weekly

| MB8Ycol2 | Horowitz - Direct | Page 949 |
|---|---|---|

update."

Do you see that?

A. I do.

MR. LENOW: Let's go to the next page.

Q. Drawing your attention to where it says: "GBG Global Marketing pending Peanuts spend," do you see that? It's under one of the top few bullet points.

A. Yes.

Q. What are you saying in your update to Neil here "pending Peanuts spend"?

A. There is still the outstanding invoice under the Peanuts brand that we have not paid.

Q. Did you talk to Neil about that at around this time?

A. Yes.

Q. What did Neil say to you, if anything, about the Peanuts invoice that was still outstanding?

A. He had decided that we were not going to ask GBG to invoice us under Peanuts now. He had changed his mind.

Q. Did he explain to you his thinking about why he didn't want that giveback payment made under the Peanuts umbrella?

A. Yes.

Q. Why?

A. Because he was afraid it would draw more scrutiny from the Schulz family because they would have a chance to review these expenses as well.

| MB8Ycol2 | Horowitz - Direct | Page 950 |
|---|---|---|

Q. Remind the jury.

Who is the Schulz family?

A. The creators of Peanuts and our partners in the Peanuts brand.

Q. And then drawing your attention to the "Rocawear Kids potential new terms to propose to GBG." It's under "2 GBG update" kind of at the bottom third of the page.

A. I see it.

Q. And then say: "We reduce 14 minimum guaranteed by 1 mil --" 1 million. "Zoo we make 15 in non-exclusive Rocawear Kids license. Keep 3.5 mil minimum guarantee."

What are you saying there about potential new terms to propose to GBG?

A. This reflects conversations that we are no longer comfortable letting GBG out of the Rocawear Kids commitment and need to find other ways to structure this.

Q. To structure what?

A. The giveback.

Q. Was there ever any time where you and Neil discussed just not paying this giveback?

A. No.

Q. Do you have a sense for why that is? Why that wasn't an option, just walking away?

A. Because that was the terms of the deal and the reason for the inflated price.

# A-800

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB8Ycol2　　Horowitz - Direct　　Page 951

Q. If you had tried to do that, what do you think would have happened?

MR. MARKUS: Objection.

BY MR. LENOW:

Q. Based on your relationship with GBG at the time, did you view that as an option, just to walk away?

A. No.

Q. Explain.

A. GBG had other financial commitments, including paying the Rocawear Kids agreement, as well as other licenses. If we would have walked away from our commitment, it would have started a huge battle. GBG had some leverage.

Q. Now, Mr. Horowitz, do you recall conveying to GBG these discussions or these possibilities of finding an alternative to the Rocawear Kids mechanism of paying GBG back?

A. Yes.

Q. And what do you recall?

A. I recall a meeting where Neil and Jason agreed that they would find an alternative solution to paying them back and not let them out of their Rocawear Kids agreement.

MR. LENOW: Now let's go to the first page of this actually. There is just one other point I want to ask you about. Let's zoom in on the message.

Q. Do you see where it says: "Look forward to discussing. I would also like to discuss GBG with you"?

MB8Ycol2　　Horowitz - Direct　　Page 952

Do you recall discussing GBG with Mr. Cole as you requested here around this time?

A. Yes.

Q. Including the matters discussed in your weekly update to him?

A. Yes.

MR. LENOW: We can take this down. Let's go to Government Exhibit 1134, also a December 1 document.

Q. Do you see at the top there's an email from you, Seth Horowitz; Jeremy, copying Ethan Cole, with the date being December 1, 2014?

A. I do.

Q. Let's start at the bottom of this email chain.

Do you see at the bottom, Jared writes: "Hi, Seth. Can Ethan contact someone in your team to gather all the details of all the allocations so we are properly prepared for our meeting today with Jason and Neil. Ethan doesn't have everything, and I want to make sure we are aligned prior to the meeting."

What did you understand Jared Margolis to be saying about the details of all of the allocations?

A. "The details of all the allocations" refers to the details of how we're going to pay back GBG for the inflated prices.

Q. And then he says -- refers to "our meeting later today with Jason and Neil."

MB8Ycol2　　Horowitz - Direct　　Page 953

Do you recall having a meeting with Neil and these folks at GBG around this time?

A. Yes.

Q. And at the bottom of his email, Jared writes: "I want to make sure we are all aligned prior to the meeting."

What did you understand his reference to be "aligned" prior to the meeting mean?

A. That we are all in agreement on how GBG would be paid back for its inflated prices.

Q. How do you respond to Jeremy's email?

A. I respond by telling him that we are going to be aligning at the meeting.

Q. Can you just read your response, Mr. Horowitz.

A. "My understanding is that we are going to be aligning at the meeting."

Q. What are you saying to him about --

Withdrawn.

The phrase "aligning at the meeting," what are you conveying to him there?

A. At the meeting, we are going to agree upon how GBG will be paid back for its inflated prices.

MR. LENOW: Let's take this down. Let's go to another email from this day, Government 1245 in evidence. No need to zoom in, but let's just read from the bottom.

Q. Do you see the bottom email from Neil Cole to Jason Rabin,

MB8Ycol2　　Horowitz - Direct　　Page 954

December 1, 2014?

A. I do.

Q. Do you see where Neil writes: "When can we meet today?"

A. I do.

Q. Jason responds: "I could meet after 5 or early morning tom. I could come to you at 8 a.m., whichever easier for you."

Do you see that?

A. I do.

Q. And then there's a response that includes -- you're now c.c.'d on it: "Let's do 8:30 tomorrow morning."

And Jason then writes, replying all: "Yes. I will be there."

Do you recall in fact meeting -- having a meeting from the Iconix and GBG sides around this time?

A. Yes.

Q. What was discussed at that meeting?

A. We discussed at that meeting that Iconix was no longer going to be letting GBG out of its Rocawear Kids termination or out of its Rocawear Kids commitment, and we discussed the change that we needed in the Peanuts invoices. And there was discussion how we would make up the Rocawear Kids money that we owed GBG.

Q. Did you settle on a final decision at that meeting about what to retrade in for Rocawear Kids?

A. No, but there was an agreement -- there was an agreement

# A-801

| MB8Ycol2 | Horowitz - Direct | Page 955 |
| --- | --- | --- |

that it was not going to be Rocawear Kids anymore.

Q. Now, in terms of the Peanuts invoice, what, if anything, did Neil say at that meeting about that Peanuts invoice and what GBG should do?

A. At that meeting, we informed GBG that we may not be able to do the invoice under Peanuts.

Q. Did Mr. Cole talk about or Neil Cole talk about alternatives?

A. I believe at the meeting, in general, we talked about alternatives but did not land on something.

Q. Was there a discussion about the invoices more broadly? Even if there weren't specifics about Peanuts, was there any talk about timing?

A. Yes. GBG wanted to be paid prior to doing the next joint venture, and we committed to giving them direction on how to invoice us differently than Peanuts.

MR. LENOW: We can take this down. Let's go to another document from the next day, Government 1142, an email dated December 2.

Q. Do you see where Jared writes to you: "Anything on Peanuts?"

And you respond: "Working on it. Should have solutions tomorrow."

A. Yes.

Q. Why do you understand Jared is checking in on December 2

| MB8Ycol2 | Horowitz - Direct | Page 956 |
| --- | --- | --- |

about Peanuts?

A. Because they're following up and would like to get paid.

Q. When you say, "solutions tomorrow," what are you referring to?

A. I'm referring to giving GBG other direction on how they should invoice us, other than Peanuts.

MR. LENOW: We can take that down. Let's go to Government Exhibit 1141.

Q. There's an email chain here. Let's go to the bottom.

Now, do you see this very bottom email from Amanda Azzoli to Joanna Pompilio writing, among other things: "Jared just informed me that he needs to meet with Seth tomorrow at Iconix 11:15 a.m."?

Do you see that?

A. I do.

MR. LENOW: Let's go up to the first email. Pause.

Q. And then do you see later on in this chain Amanda writes to another person, Kaitlin Wasylyk: "I know that Jared was just over at Iconix and may have spoken to Seth about this meeting in passing"?

Do you see that?

A. I do.

Q. And then eventually, according to this chain, does an invite then get circulated off of this series of messages?

A. Yes, it does.

| MB8Ycol2 | Horowitz - Direct | Page 957 |
| --- | --- | --- |

Q. And just drawing your attention to the very top, what is the meeting time?

Let's just zoom in on that top block.

What is the meeting time reflected in this calendar invite?

A. 11:15 a.m. on 12-3.

Q. What's the subject?

A. "Meeting with Seth Horowitz and Jared Margolis."

Q. And drawing your attention to the invites, do you see where it says Seth Horowitz?

A. I do.

Q. Ethan Cole?

A. I do.

Q. And Jared Margolis?

A. I do.

Q. Do you recall meeting with Jared Margolis and/or Ethan Cole around the time reflected in this calendar invite?

A. Yes.

Q. What was the purpose of that meeting, Mr. Horowitz?

A. The purpose of that meeting was to discuss the open Peanuts invoice issue and the potential Middle East joint venture.

Q. Did you meet with Neil in advance of that meeting with GBG?

A. Yes.

MR. LENOW: Let's take this down and show the witness Government Exhibit 1144 in evidence. Let's zoom in on the top

| MB8Ycol2 | Horowitz - Direct | Page 958 |
| --- | --- | --- |

block.

Q. You see it's from Neil to Pauline Israel. "Subject: Accepted forward 10:15 GBG with Seth pre-meeting."

Do you see that?

A. I see that.

Q. Do you recall meeting with Neil Cole around that time?

A. I believe so.

Q. And what direction, if any, did Neil give you around this time about how to handle the Peanuts invoice?

A. Neil was clear that we could no longer pay the invoice under the Peanuts brand and that we would be replacing it with other brands.

Q. Did he specify what other brands he wanted?

A. I don't recall.

Q. Did there come a time when you conveyed Neil's directions to GBG?

A. Yes.

Q. Did you subsequently meet with Jared Margolis?

A. Yes.

Q. And did you subsequently meet with Ethan Cole around these issues?

A. Yes.

Q. To draw your attention, this says: "Seth pre-meeting with GBG."

This was before the actual meeting with GBG on that

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB8Ycol2          Horowitz - Direct          Page 959

date. Is that correct?

A. That is correct.

Q. When you did meet with GBG, did you give them direction on the invoices?

A. Yes.

Q. Now, Mr. Horowitz --

We can take this down.

Was the Peanuts invoice ever paid to your knowledge?

A. No, it was not.

Q. Why not?

A. Because the Peanuts invoice would have drawn extra eyes and scrutiny as the Schulz family would have had to see it as well.

Q. Did there come a time when GBG provided other invoices in place of the Peanuts invoice?

A. Yes.

Q. Can you describe what happened.

A. Ethan Cole dropped off two large folders of invoices and backup at the Iconix office.

MR. LENOW: Let's put up Government Exhibit 1206 and publish it for all parties. You don't have to zoom in on this one. Let's start at the bottom email.

Q. Do you see the December 12 email, so about a week after the ones we were just looking at, from you to Ethan Cole copying Kaitlin Wasylyk, Jared Margolis: "Ethan, what time do you think we can get together today? My schedule is getting crazy

MB8Ycol2          Horowitz - Direct          Page 960

and want to make sure we meet."

Response from Ethan Cole: "Are you available this afternoon after 3:30? If not, let me know what time works for you, and I'll be there."

Reply Seth Horowitz: "Can you be at Iconix at 3:30? If not, 4:30?"

Response: "4:30 is perfect."

Let's just pause there.

What are you and Ethan coordinating to meet about?

A. The outstanding invoices.

Q. And then continuing up, you write to Ethan: "Okay. Jason mentioned he wanted to talk/meet after we meet. Can we schedule a 5 call with him."

Response, in substance, yes.

Do you see that?

A. Yes.

Q. What was your response to Jason wanted to "talk/meet after we meet"?

A. Jason wanted to confirm that we had the invoices; that we had committed to pay them by the following week in advance of signing the Middle East joint venture.

Q. And, Mr. Horowitz, can you describe -- had GBG expressed its views at this point in time on the timing of getting paid on these invoices?

A. Yes.

MB8Ycol2          Horowitz - Direct          Page 961

Q. Specifically, the length of time it was taking to get paid? Did they express any opinion or point of view on that?

A. Yes.

Q. What was that?

A. They wanted to get paid immediately. They were agitated at the amount of time it had taken us to pay them.

Q. So you mentioned Ethan Cole came over with some invoices. Walk the jury through what happened. And take it slowly, if you could.

A. Ethan Cole showed up at the Iconix office. He handed me two relatively large folders full of invoices and backup. He said something to the effect of, we don't care which ones you pay. Just pay us.

I understood that. I took those invoices back to my office. I had a follow-up call with Jason Rabin.

Q. What did you and Jason Rabin discuss on that follow-up call?

A. Jason wanted to hear from me that we were going to pay those invoices in the amount that we owed them in advance of signing the Middle East joint venture.

Q. And what, if anything, did you convey to Jason in response to what he said to you?

A. I conveyed that he had our commitment to do so.

Q. Mr. Horowitz, you described these thick binders or thick folders of invoices.

MB8Ycol2          Horowitz - Direct          Page 962

Did the total add up to the same amount of the Peanuts invoice? Or was it more than that from what you saw?

A. It was more than that.

Q. So why did understand Ethan to be dropping off these very large number of documents, including invoices that added up to more than the Peanuts invoice?

A. We had changed our mind on how we wanted them to invoice us. And at this point, they didn't care what the invoices said. They just wanted to get paid.

Q. And so what did you understand Ethan was leaving open to Iconix in terms of these two thick folders or thick piles of documents?

A. It's what basically he said, which was, you pick the ones you want to pay. Just pay us.

Q. Mr. Horowitz, stepping back for a second, why is it that you could just pick from a grab bag of invoices what you paid? Why didn't it matter what you paid?

MR. HECKER: Objection. Leading. This is the third time he's sought the same answer.

THE COURT: Overruled.

You can answer, Mr. Horowitz.

THE WITNESS: Thank you.

It didn't matter -- it did not matter which invoices under what brands we paid so long as we paid back GBG the money we owed them.

# A-803

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB8Ycol2 | Horowitz - Direct | Page 963 |
|---|---|---|

MR. LENOW: We can take this down. Let's publish for the jury Government 1248.

Q. Do you see this email dated December 12, the same day as the last one, from you, Mr. Horowitz, to Neil Cole?

A. I do.

Q. All right. Drawing your attention to the language at the end of the first email: "Also review all international investments with Ethan, Jared, and Jason as they need conceptual sign off," what's that reference to "also review all international investments with Ethan, Jared, and Jason"?

A. That's referring to the invoices that we were using to pay back GBG from the June joint venture.

Q. Do you recall whether or not you or Neil Cole signed off on any of these new Ethan Cole invoices, the invoices that Ethan had dropped off? Did that happen that day?

A. It did not.

Q. Did there come a time the following week when you spoke to Neil about these invoices that Ethan had dropped off and about having them signed or not signed?

A. Yes.

Q. And there's a reference in here to, in the bottom email, "Just finished with Jason. Will be signing on Monday the GBG Middle East JV."

What is that a reference to?

A. The Middle East joint venture transaction.

| MB8Ycol2 | Horowitz - Direct | Page 964 |
|---|---|---|

Q. And had that Middle East transaction been discussed in prior quarters?

A. A Middle East joint venture had been discussed in prior quarters.

Q. But had it actually been finalized in prior quarters?

A. No.

Q. So according to this email, when is this GBG Middle East joint venture with Iconix supposed to be signed?

A. The Monday following this 12-12.

Q. Did that actually happen on Monday?

A. It did not.

Q. I want to ask you about the events of that following Monday, Mr. Horowitz.

Do you recall that day? Monday, December 15.

A. I do.

Q. Do you recall getting a phone call from Neil on that day?

A. I'm not sure if it's that Monday or that Tuesday, but I do recall getting a call from Neil.

MR. LENOW: Let's put up Government Exhibit 1213 in evidence.

Q. Mr. Horowitz, do you see the -- let's start with the bottom email, December 5, 2014, around 2:00 in the afternoon, an email from Jeff Lupinacci at Incline Global to Neil Cole copying Noah Snyder at Incline Global.

Drawing your attention to the second paragraph, the

| MB8Ycol2 | Horowitz - Direct | Page 965 |
|---|---|---|

statement: "I am sure you either heard about or saw that there was an Off Wall Street short seller report published on Icon today."

Do you see that, Mr. Horowitz?

A. I do see that.

Q. What is a "short seller report"?

A. A "short seller report" is a report put out by an analyst that covers a company that takes the position that the company is underperforming or will underperform versus its prior performance and future expectations.

Q. Generally speaking, do short sellers want the stock of a company to go up or go down?

A. Short sellers want the price of the stock to go down.

Q. Do they typically place a bet on that or a stock market bet?

MR. HECKER: Objection. Foundation.

THE COURT: Sustained.

MR. LENOW: Withdrawn.

Q. Mr. Horowitz, are you generally familiar, from your time in the business world, with what short seller reports are?

A. I'm generally familiar, yes.

Q. Generally speaking, are you familiar with the purpose in the investment world of why people put out short seller reports?

A. Yes.

| MB8Ycol2 | Horowitz - Direct | Page 966 |
|---|---|---|

Q. From your understanding, typically speaking, what are short sellers betting is going to happen to a company's stock?

A. Short sellers are betting that the stock will go down.

Q. And in this case, had there been a short seller that put out a report on Iconix?

A. Yes.

Q. And do you recall at some point in time later seeing the report?

A. Yes.

Q. Generally speaking, what did the short seller say about Iconix?

A. The short seller basically stated that Iconix did not have organic growth; that we were using joint ventures to plug holes. It also made claims about the performance of some of our larger brands and questioned some of our accounting.

Q. Mr. Horowitz, did you agree with any of the statements or claims made in the short seller report?

A. I did.

MR. LENOW: All right. Now we can take this down. I'm sorry. Put that back up and just go to the very top, if you could.

Q. Do you see the top email from Neil Cole to Jamie Sheinheit, copying Seth Horowitz and Jeff Lupinacci: "See if you can find a copy of the report"?

A. I do.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB8Ycol2 | Horowitz - Direct | Page 967 |

Q. Do you recall getting this email from Mr. Cole that day?

A. I do.

MR. LENOW: We can take this down. Now we can publish for the witness Government 110 in evidence.

Q. Do you see at the top of this email it says: "United States Securities and Exchange Commission"?

A. I do.

Q. And the date, December 15, 2014?

A. I do.

Q. Is that the same date or a different date from the email we just saw with the short seller report?

A. The same date.

Q. Mr. Horowitz, very generally speaking, what did you understand this December 15 letter from the Securities and Exchange Commission Sentencing Commission -- and it looks like it's sent by email to Mr. Lupinacci at Iconix.

What did you understand this to be? This letter.

A. It was an inquiry into how Iconix was handling its financial statements and records.

Q. And do you recall learning about this December 15, 2014, email or letter from the SEC the same day?

A. Yes.

Q. Can you describe how you learned about this.

A. Yes. I was in a car with another executive from Iconix. We were on our way to Newark Airport to fly to Minneapolis to

| MB8Ycol2 | Horowitz - Direct | Page 968 |

see Target, the retailer. And I got a call from Neil telling me that we had received an SEC inquiry and we should turn around immediately.

Q. What did you do?

A. At the mouth of the Lincoln Tunnel, we turned around and went back to the Iconix office.

Q. What happened when you got back to Iconix?

A. Neil was frustrated and upset. He told me that I had missed the meeting he had with other executives and that I should read the short report. I believe it was at that point I was given a copy and the SEC letter.

Q. Did Mr. Cole say anything about whether he thought there was any connection between those two events? The SEC letter and the short report.

A. Yes.

Q. What, if anything, did Mr. Cole say?

A. At some point, Neil said that these two parties often work together; that they are in it with each other; and that this was like a conspiracy.

MR. LENOW: You can take down Government 110 by the way.

Q. Did Mr. Cole make any comments around that time about the effects he thought this could have on the company?

A. Yes.

Q. What did he say?

| MB8Ycol2 | Horowitz - Direct | Page 969 |

A. At some point, Neil said that the company was going to implode.

Q. Over the next several days, did he make any comments about Iconix's joint ventures to you?

A. Yes.

Q. What did he say?

A. Over the next couple of days after receiving both the letter and the short report, Neil first took the position that we could no longer do any joint ventures. And then he took the opposite position, that we needed to continue to do joint ventures to show everybody that there was nothing wrong with them. And he went back and forth on that over the 48 hours after receiving this letter.

Q. To be clear, the letter from the SEC, did it specifically ask questions aimed at the fraudulent aspects of the deals that you have described in your testimony? Or were the letters directed at some other topic?

A. The letters were, in part, directed at the fraudulent transactions.

Q. Did they specifically ask questions though about inflation of revenue and inflation of EPS?

A. I don't recall them using those specific words, but they asked for details of those transactions.

Q. Now, Mr. Horowitz, moving past December 15 and the receipt of the short report and this SEC letter, did you have a

| MB8Ycol2 | Horowitz - Direct | Page 970 |

conversation with Neil in the following days about the remaining GBG invoices that had to be paid? The invoices that Ethan Cole had dropped off.

A. Yes.

Q. Can you describe for the jury what happened.

A. I took the invoices to Neil's office, both piles, and told him I was no longer comfortable signing these invoices.

Q. All right. Mr. Horowitz, let's just pause there.

Why at this point -- had you ever refused to follow one of Neil's instructions before this relating to this revenue inflation scheme?

A. No.

Q. Why do you draw a line now?

A. The SEC letter scared me, scared Neil. And I didn't want to sign off on what I knew to be false invoices in light of the SEC now looking at our reporting.

Q. How did Neil respond to you saying you were not going to sign these invoices?

A. His exact words were: "F you" -- but he used the word -- and told me to get the F out of his office.

Q. What did you see him doing at that time?

A. He started to sign and flip through invoices, the invoices that I had just put down.

Q. And can you describe how he did that, the manner.

A. Sure. It was quick and haphazardly, and I was only there

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                November 8, 2022

MB8Ycol2        Horowitz - Direct        Page 971

for a few seconds.

Q. Did he seem to be precisely adding up the numbers in the invoices as he was going?

MR. HECKER: Objection. Leading.

THE COURT: Sustained.

BY MR. LENOW:

Q. Mr. Horowitz, did you see how quickly was he moving from one invoice to the next?

A. Very.

Q. Did he seem to be pausing between any of them?

MR. HECKER: Same objection, your Honor.

THE COURT: Sustained.

MR. LENOW: I'll move on.

Q. Now, Mr. Horowitz, did you further handle or see these invoices after that interaction with Mr. Cole?

A. Yes.

Q. Can you describe what that further interaction with these invoices was.

A. A few days later, I was asked for -- or a day or two later, I was asked to sign the wire transfer that related to these invoices.

Q. Mr. Horowitz, did you agree to sign the wire transfer?

A. I did.

Q. Why did you agree to sign the wire transfer but not the underlying invoices?

MB8Ycol2        Horowitz - Direct        Page 972

A. The invoices were so obviously made up. And with the SEC letter now in hand, I was not -- just not comfortable signing them; whereas, I looked at the wire transfer as a completion of getting the money back to our partner who had overpaid.

MR. LENOW: Now let's publish for the jury government 241.

Q. Mr. Horowitz, the wire transfer, to be sure, related to invoices.

Is that correct?

A. Yes.

Q. So why did you view that as different? Why were you willing to sign one but not the other?

A. As I sit here today, it's hard to explain all of the emotion and intensity going on at the time. But somewhere, I drew a line that said I was not going to sign invoices that I knew to be fraudulent with the SEC looking. But I was still willing to go along with the fraud and pay GBG, our partner, back the money it was due.

MR. LENOW: For the witness, let's start at the beginning of 241 and just page through this exhibit a little bit. Just pause here for a second.

Q. Mr. Horowitz, do you recognize this as part of Government Exhibit 241?

A. I do.

Q. Do you see the signatures listed on it?

MB8Ycol2        Horowitz - Direct        Page 973

A. I do.

Q. Whose signatures do you see?

A. Neil and I.

Q. Where is your signature?

A. Mine is on the right-hand side under 12-17-14.

Q. Where is Neil's?

A. To the left under the phone number with 212.

Q. What is the amount of the wire transfer?

A. $2,467,340.

Q. And do you see the date next to the signatures? Next to your signature.

A. I do.

Q. What is it?

A. 12-17-14.

Q. Mr. Horowitz, the number $2,467,000 approximately, is that more or less than the Peanuts invoice that we looked at earlier?

A. It's more.

Q. Do you know why Neil ultimately signed invoices adding up to more than the Peanuts invoice?

A. I do not.

Q. All right. Mr. Horowitz, the date of the signature, 12-17, December 17, how many days after the SEC letter would that have been?

A. Two.

MB8Ycol2        Horowitz - Direct        Page 974

MR. LENOW: Now let's keep on going through this document, the materials accompanying the -- let's pause here.

Q. Do you see all of these invoice numbers and amounts listed?

A. I do.

Q. And did you read this document before today, Mr. Horowitz?

A. I have.

Q. What do you understand, generally speaking, these different amounts to be?

MR. HECKER: Objection. Foundation.

THE COURT: Overruled.

THE WITNESS: These amounts -- my understanding is that the amounts in the right-hand side correlate to the invoices on the left-hand side.

MR. LENOW: Let's keep on going through the document. Let's just stop here for a bit, and let's zoom in on this one.

Q. We won't go through every one, Mr. Horowitz. But let's just do a few of them.

Do you see the date of this invoice?

A. I do.

Q. What is it?

A. It looks like December 8 of 20 -- I'm sorry. 12-3-2014.

Q. Okay. Let's walk through both of them.

Mr. Bianco, can you highlight or zoom in on the top half of the document.

Do you see the date now that it's a little clearer?

**A-806**

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                                                November 8, 2022

---

MB8Ycol2                Horowitz - Direct                Page 975

A. Thank you. Yes. It's 12-8 or December 8, 2014.

Q. And then do you see under that it says: "For Starter Black, costs related to fee for use of marketing materials and brand assets USA?

A. I do.

Q. And then "Due upon receipt. Total $225,000."

Do you see that?

A. I do.

MR. LENOW: Let's zoom out of it here and go down.

Q. What, if anything, does this have to do with the invoices that Ethan Cole dropped off in those two thick piles?

A. I believe this is one of the invoices that was in those piles.

Q. And do you see --

MR. HECKER: Objection, your Honor. Foundation. I believe this witness testified that he didn't review them and didn't sign them. I'm not understanding the competence to answer these questions.

THE COURT: I don't recall that.

Mr. Lenow, why don't you ask another question.

MR. LENOW: I can lay a foundation, Judge.

Q. So, Mr. Horowitz, just to kind of back up a second, you testified earlier that Ethan Cole had dropped off a number of invoices.

Is that correct?

---

MB8Ycol2                Horowitz - Direct                Page 976

A. That is correct.

Q. And you then brought those to Neil Cole?

A. Days later, yes.

Q. Did you see Neil Cole, after you dropped them off, begin to start signing some of those invoices?

A. Yes.

Q. And then later on, were you presented or provided with copies of those signed invoices by Neil Cole along with a wire transfer for you to sign?

A. That is correct.

Q. Did you have an understanding of where the underlying signed invoices from Neil Cole had come from?

A. I did.

Q. What was your understanding, and what's the basis for that understanding?

A. My understanding is that the invoices came from the pile of invoices that Ethan had dropped off, and the basis of that is that those invoices were to be paid to GBG before the Middle East joint venture.

Q. And this wire transfer, who was it to?

A. GBG.

Q. And how long was it that you signed this after you saw Neil Cole after he said "F you" and then started signing invoices?

A. One or two days.

Q. So based on that, what do you understand this invoice --

---

MB8Ycol2                Horowitz - Direct                Page 977

where do you understand this invoice to have come from?

A. This invoice, from Ethan Cole and GBG.

Q. To be clear, Mr. Horowitz -- I won't ask this for every invoice. Let me withdraw.

With respect to this invoice and every other invoice in this exhibit that you reviewed, were you aware of any work that had been done by GBG corresponding to these amounts and the work that's listed in the invoices?

A. No.

Q. Had Neil Cole ever said anything to you indicating that he believed that GBG had done this amount of work for these brands and these invoice amounts?

A. No.

Q. What was the point of these invoices?

A. To pay back GBG the remaining amount we owed them from the June joint venture.

Q. And do you see there's kind of a squiggle or initial in the middle of this document below 14059?

A. I see that.

Q. Do you recognize that?

A. I do.

Q. What is it?

A. That's Neil Cole's signature.

Q. How do you know that?

A. I've seen it many times.

---

MB8Ycol2                Horowitz - Direct                Page 978

MR. LENOW: Let's continue down on this document. Let's go to the next page, and let's kind of keep on paging through.

Q. I'll ask you some questions as we go through, Mr. Horowitz.

What do you understand these kind of supporting -- these images and texts to be that are following behind that invoice for Starter?

A. This is supposed to be the cover to make the invoices look more realistic.

Q. Were these materials included in what Ethan Cole had dropped off with you in those big piles?

A. Yes.

MR. LENOW: Just keep on going through this entire document. Let's pause here.

Q. Mr. Horowitz, what are we seeing on this document now, on this page now of this document?

A. Another invoice.

Q. How much is this one more?

A. $44,416.

Q. Zooming back out, do you see the kind of squiggly, the initials?

Zoom back out.

The squiggles in the middle of the document.

A. I do.

Q. Do you recognize that?

---

UNITED STATES OF AMERICA, V
 NEIL COLE,

November 8, 2022

MB8Ycol2    Horowitz - Direct    Page 979

A. Yes.

Q. What do you recognize it to be?

A. That appears to be Neil's initials again.

Q. Have you reviewed this document before and seen a similar indication of Neil Cole's signatures on each of these invoices?

A. Yes.

MR. HECKER: Can we just be clear about the time period of when that review occurred.

Are we talking about contemporaneously or subsequently? I don't think it's clear for the record.

BY MR. LENOW:

Q. Mr. Horowitz, prior to today, did you review this document in the presence of government lawyers?

A. Yes.

MR. HECKER: I'm sorry. So it's not contemporaneous. It's with the government.

Is that what the testimony is?

BY MR. LENOW:

Q. Mr. Horowitz, you've met with myself and other government lawyers prior to today. Right?

A. Yes.

Q. And you reviewed this document in those meetings?

A. Yes.

Q. So I don't think we have to go through the whole document.

Is it fair to say that in those meetings prior to

MB8Ycol2    Horowitz - Direct    Page 980

today, you reviewed this entire document?

A. Yes.

Q. In those prior meetings with the government, did you see Neil Cole's initials listed on each of these invoices to your recollection?

A. I believe so.

MR. LENOW: We can take this down.

Q. Mr. Horowitz, did anyone from GBG follow up with you about some of the invoices we just reviewed for which you signed the payment slip for on December 17?

Was there any subsequent followup by GBG on that?

A. Yes, there was.

Q. All right.

MR. LENOW: Let's go to Government Exhibit 1179.

Q. Do you see this email from Ethan Cole to Seth Horowitz dated January 7, 2015?

A. I do.

Q. "Subject: Invoices"?

A. I do.

Q. Do you see the message: "Hi, Seth. Sorry. I was interrupted. It would be helpful if you could please confirm the invoice numbers for the 2.4m payment which we received"?

A. I see that.

Q. Mr. Horowitz, do you have an understanding of why Ethan is following up with you about confirming the invoice numbers for

MB8Ycol2    Horowitz - Direct    Page 981

the 2.4 million payment?

A. Yes.

Q. Why?

A. He's not aware which of the invoices we chose to pay.

Q. Why not?

A. Because we had been given a large amount of invoices to choose from.

Q. And who selected which invoices to actually pay?

A. Neil did.

Q. All right. Turning to another topic, a slightly different topic, Mr. Horowitz.

Earlier, you testified about the Middle East joint venture transaction. You said that deal was supposed to close on that Monday, the same Monday of the SEC letter.

Do you recall that?

A. Yes.

Q. Now, did you come to later learn that that deal did close on another day?

A. Yes.

Q. And when did you learn that the Middle East joint venture deal actually closed?

A. I learned that the Middle East joint venture closed on the 18th of December.

MR. LENOW: Could we please publish for the jury Government Exhibit 1168.

MB8Ycol2    Horowitz - Direct    Page 982

Q. Do you see this email from Ethan Cole to Neil Cole to and copying others referring to a revised draft to the summary of material terms for the Middle East JV, purchase price increased by 200,000 to $18,762,083?

A. Yes. I see that.

Q. And then the bottom bullet point, do you see: "Diligence market analysis payment increased to $3.1 million"?

A. Yes. I see that.

Q. Mr. Horowitz, as of December 15, the day the SEC letter came, just explain again your understanding of the state of play of the MENA deal, so just three or four days before this.

A. The Middle East transaction was on and off the table several times over the 48 hours following the SEC letter.

Q. And how did you first learn the deal was back on?

A. It was my understanding, when I left the office on the 17th, the day before, that we were not moving forward with the joint venture.

Q. Did there come a time that changed, where you learned there was a different state of play?

A. Yes.

Q. Can you describe that, please.

A. On December 18, I received a phone call from Neil Cole outlining new bullet points of the deal and a reference to Neil having been at the office and working out the Middle East joint venture.

# A-808

| MB8Ycol2 | Horowitz - Direct | Page 983 |
|---|---|---|

Q. Were you present for those last conversations about the deal?

A. No. I was on vacation that day.

Q. And earlier in your testimony, you spoke to how you had an understanding that -- withdrawn.

The last bullet point here references a "diligence/market analysis payment increased to $3.1 million."

Do you see that?

A. I do.

Q. Now, earlier in your testimony, you mentioned having a view that this $3.1 million payment was kind of a retrade, a substitute giveback, for Rocawear Kids.

Do you recall that testimony?

A. I do.

Q. Now, to be clear, did you have firsthand knowledge of discussions where that arrangement was discussed? Of this being a giveback in place of Roc Kids.

A. No.

Q. Okay. So what is your testimony then based on? Your belief that this was a giveback.

MR. HECKER: Objection. Foundation. He just testified he had no firsthand knowledge.

THE COURT: Sustained.

MR. LENOW: Your Honor, I just want to ask him what his understanding was that he spoke to earlier.

| MB8Ycol2 | Horowitz - Direct | Page 984 |
|---|---|---|

MR. HECKER: Same objection.

BY MR. LENOW:

Q. Mr. Horowitz, let me ask you this then: The $3.1 million marketing analysis payment, did you have any understanding of whether any such marketing or analysis work had been done in this amount?

MR. HECKER: Same objection. Lacks foundation.

THE COURT: I believe the question was does he have any knowledge. I'll allow him to answer that question.

BY MR. LENOW:

Q. Mr. Horowitz, have you been personally involved in some of the negotiations of this Middle East joint venture?

A. Yes.

Q. Did you have discussions directly with GBG about this transaction and what GBG was doing as part of it?

A. Yes.

Q. Okay. And did you have a sense from interacting with GBG for the work they were doing and towards closing it and towards the work that was reflected in the actual contract documents?

A. Yes.

Q. And when you saw this $3.1 million in the final agreement, what was your view of that $3.1 million?

MR. HECKER: Objection. Lacks foundation.

BY MR. LENOW:

Q. Based on your direct involvement in the negotiations.

| MB8Ycol2 | Horowitz - Direct | Page 985 |
|---|---|---|

MR. HECKER: Objection. Lacks foundation.

THE COURT: Overruled.

THE WITNESS: That this $3.1 million was a giveback of money to GBG for overpayments.

MR. HECKER: Objection. Motion to strike.

THE COURT: Overruled.

BY MR. LENOW:

Q. And why was that your conclusion based on your personal involvement in these negotiations and your knowledge of this deal?

A. It was the justification for the payment of the $3.1 million in this fashion.

Q. Can you explain some more, please.

A. There was no diligence or market analysis done to the extent of $3.1 million.

Q. And how do you know that?

A. Because I was involved with GBG in negotiating the Middle East joint venture up until the final days before it happened.

Q. And did you have communications about the work that they were doing?

A. Yes.

Q. Now, Mr. Horowitz, I want to switch gears and talk about the SEC a little bit more.

Did the SEC, or the Securities and Exchange Commission, make any additional inquiries of Iconix after the

| MB8Ycol2 | Horowitz - Direct | Page 986 |
|---|---|---|

December 15, 2014, letter that you testified about earlier?

A. Yes.

Q. That December 15 letter, was that the last letter that Iconix got from the SEC?

A. No.

MR. LENOW: Let's publish what's in evidence as Government Exhibit 112.

Q. Do you recognize this letter dated February 11, 2015, from the SEC to Iconix?

A. I do.

Q. And did you review this letter when it was received around that time?

A. Yes.

Q. All right. I want to turn your attention to page 2 of this document.

On the last bullet, the second line -- let's zoom out. Perfect.

Do you where it says: "Identify the individual or individuals who is responsible for negotiating and executing these transactions"?

Do you see that?

A. I do see that.

Q. When this letter came in, did anything about this give you concern?

A. Yes.

# A-809

MB8Ycol2 — Horowitz - Direct — Page 987

Q. What?

A. I was concerned that the SEC was now digging deeper into the fraudulent transactions.

Q. And did the SEC's inquiry, did it include questions about the June 2014 and the September 2014 deal, SEA-2 and SEA-3?

A. Yes. It asked for details, and it asked for individuals who were responsible for negotiating. And I knew that I was one of them.

Q. And for the sake of completeness, did the SEC's inquiries also touch on other transactions, including other JVs or other JVs that Iconix had entered into, apart from SEA-2 and SEA-3?

A. Yes, it did.

Q. Mr. Horowitz, did you speak with Mr. Cole, Neil Cole, about this letter after it was received from the SEC in February of 2015?

A. Yes.

Q. What was Neil's response to the SEC following up and asking for, among other things, identifying the individuals responsible for negotiating and executing the transactions?

A. Neil had a series of responses to this letter. Specifically as to identifying which individuals who had negotiated -- who were responsible for negotiating these transactions, Neil and I had a series of heated exchanges.

Q. All right. Mr. Horowitz, let's walk through those exchanges. Talk to the jury about what happened. Just walk us

MB8Ycol2 — Horowitz - Direct — Page 988

through each of them.

A. In the initial response from Iconix to the SEC, in the initial draft, I disagreed with the names being used as to who negotiated some of these transactions. I raised that issue. Neil said that it was still in draft and that we would get back to it.

The day that our response was due to the SEC, Neil came into my office, closed the door, and told me we were about to have a very difficult conversation. He told me he sold $40 million of stock too close to these transactions, specifically, the Middle East transaction, and that he needed me to put my name as the one who negotiated that transaction.

I agreed to do so and confirmed with Neil that that was the only other change that was going to be made to the document, the document where Neil and I were both listed as responsible for negotiating.

Several minutes later, I see Neil pass by my door heading to a colleague's office, Willy Burkhardt. Willy was in charge of the draft of the response. And I followed Neil in there for fear that he was going to change the names as to who was responsible for negotiating these deals and, based on our conversations, distance himself from them.

When I walked into Willy's office, that is what Neil was doing. He was changing the names next to each transaction, removing his and removing other peoples' names around as to

MB8Ycol2 — Horowitz - Direct — Page 989

their involvement, whether they were the lead negotiator or whether they were giving guidance.

I told Neil I disagreed. This was in front of Willy. Neil said he didn't care. This is what it was going to be, and he left and went back to his office.

I asked Willy not to send it until he heard back from me. Neil closed his door, and I asked Pauline for a meeting with Neil.

Q. Just to pause, Mr. Horowitz.
Who's Pauline?

A. Pauline is Neil's assistant or was Neil's assistant.

Q. What happened after that?

A. I had a meeting with Neil in his office. He is screaming at me that he was the one who sold $40 million in stock. It doesn't matter what it says in the SEC response because he's the one who signed the deals and that's ultimately what matters.

I held my ground to some extent, and we concluded with Neil saying, well, if that's what you want, then we'll leave it as it was. And in this case, that is what happened.

Q. So it went back. The changes that Neil tried to make were not fully implemented in the final letter?

A. They were not fully implemented. Correct.

Q. Now, you mentioned Neil expressed concern about the MENA transaction.

MB8Ycol2 — Horowitz - Direct — Page 990

In the course of the time surrounding or following this 2015 letter from the SEC, were there any other deals that Mr. Cole, that Neil Cole, referenced being concerned about?

A. Yes.

Q. What deals were those?

A. The Southeast Asia joint ventures. So SEA-2 and SEA-3. And Kevin Yapp transactions.

Q. Now, to be clear, are these the only interactions you had with Mr. Cole about this letter, or were there others?

A. No. We had several interactions about this letter.

Q. And I think you just spoke about some interactions around the specific drafting of Iconix's response to this letter.
But when it first came in, did you have any conversations with Mr. Cole earlier in that process when this letter first came in the door?

A. Yes.

Q. Can you describe those earlier conversations, how Neil Cole -- his initial reaction to this letter.

A. There were several substantial meetings that I recall. There was one meeting where he blames a member of the finance team for the short report and the SEC inquiry making him cry and apologize in front of many people.

There is another smaller meeting where Neil tells a few of us that the company is going to implode and that he's screwed and he sold $40 million of stock at the wrong time.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

---

MB8Ycol2     Horowitz - Direct     Page 991

There are a series of meetings where he denies knowledge about the joint ventures.

Q. Mr. Horowitz, I just want to pause you there, and I want to ask you some more questions about that.

Just to step back, in your testimony, you've spoken about -- we've looked at a number of emails surrounding these transactions.

Is that fair?

A. Yes.

Q. For SEA-2 and SEA-3, was Neil Cole involved in those negotiations?

A. Yes.

Q. How deeply was Neil Cole involved in those discussions in terms of meetings with you and giving you direction on how to meet with GBG and also Neil Cole's direct involvement with GBG in those negotiations?

A. Neil was involved in every step of both of those joint ventures.

Q. And I want to just ask you about your comment though.

When this letter came in the door from the SEC, what did Neil say about his involvement at that point in time?

THE COURT: The first letter or the second letter?

MR. LENOW: This letter here, the February 11 letter.

Q. Did Neil make any comments about his involvement in the SEA-2 and the SEA-3 deals around that time?

---

MB8Ycol2     Horowitz - Direct     Page 992

A. Yes.

Q. What did he say?

A. He denied any knowledge of the joint ventures whatsoever and told me that he couldn't find any emails proving that I had told him about it.

Q. And just to pause.

Mr. Horowitz, when Neil Cole told you that, what did you think?

What was your response to hearing that?

A. I mean, I was shocked. I had -- I was not the driver of these joint ventures. I had never done a joint venture. Neil was giving me guidance on every negotiating point of these joint ventures. It was ridiculous.

Q. And after Neil told you -- made those statements to you about having had no involvement, what did you then do?

A. He told me to go find emails that proved that he knew about the joint ventures. So I did. I went back to my office and eventually was able to find emails from me to Neil going through all of the details of the joint venture. And I brought it back to his office.

Q. What did you do then when you got back to Neil's office?

A. At that point, he then said that he also found emails between the two of us about the joint ventures but that he never read his emails from me.

Q. And how did you respond to that comment?

---

MB8Ycol2     Horowitz - Direct     Page 993

A. That was equally as absurd, but there was no arguing with that. It was just outrageous.

Q. And when you walked back into his office, did you see anything on his desk or anywhere else?

A. He had emails between us scattered on his desk and highlighted.

Q. Did you see what was highlighted?

A. I could see my name was highlighted and that it was an email or at least a few emails between the two of us.

Q. What was your reaction to this back-and-forth of Neil first saying he had no involvement and then disclaiming having read his emails and you seeing that he had all these emails spread out on his desk or in that area?

A. I mean, I am scared. The SEC is looking into the fraudulent joint ventures that we did together. And now he is denying knowledge of those joint ventures or denying emails about those joint ventures. And that's a scary place to be.

Q. Now, in the time following the receipt of the SEC letters, did you speak privately with Mr. Cole, with Neil Cole, about whether he or you might have any legal exposure as a result?

A. Yes.

Q. What do you recall Neil saying?

A. At some point, Neil told me that he was going to need to hire personal attorneys. At some point he said in one of his tirades that he was going to need criminal counsel and I wasn't

---

MB8Ycol2     Horowitz - Direct     Page 994

as part of him trying to get me to sign off on who did what in the SEC response. Those are two that I recall.

Q. Did Neil make any reference to lie detector tests around this time?

MR. HECKER: Objection. Leading.

THE COURT: Sustained.

BY MR. LENOW:

Q. Mr. Horowitz, did Neil make any comments that made you concerned for yourself about what he was going to do around this time?

A. Yes.

Q. Can you explain to the jury what those were.

A. Eventually, Neil would threaten me that my career was over and that I would no longer be able to work at a public company. He said something to the effect that he knew about the transactions but that he could pass a lie detector test saying he didn't but he knew I could too, essentially building a he-said-versus-he-said scenario.

Q. Now, Mr. Horowitz, switching gears for a second, around the time that -- well, we saw this letter come in from the SEC. Did Iconix begin drafting a response to the letter?

A. Yes.

Q. And you spoke a bit about that earlier?

A. Yes.

MR. HECKER: Counsel, are you done with the document

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB8Ycol2     Horowitz - Direct     Page 995

that's up on the screen?

MR. LENOW: Yes. We can take this document down.

Q. Now, Mr. Horowitz, during that timeframe, did you hear Mr. Cole ever express any views, Neil Cole ever express any views, about what led to the SEC inquiry in the first place?

A. Yes.

Q. What did he say?

A. In a larger meeting of Iconix employees -- I'd say about 10 to 12 of us -- Neil said that a change in the way we reported our financials back in October led to the SEC questions and the short report.

Q. And what did that change relate to, as he told it?

A. The change related to a line item in cash flow that related to how the joint ventures were being paid for.

Q. Did Mr. Cole -- was there anyone to blame for this, according to him?

A. Yes.

Q. Who was that?

A. Justin Abrahamson.

Q. Who is Justin Abrahamson?

A. Justin was a member of the finance team.

Q. And what, if anything, did Mr. Cole say about what it was Justin Abrahamson that was to blame?

A. At this later meeting, Justin said that he had indeed made the change at the request of BDO, our accounting firm. And

MB8Ycol2     Horowitz - Direct     Page 996

Neil went crazy on Justin telling him that it was his fault that the SEC letter came, his fault that the short report because those two things were triggered by this line item that called out the payments for the joint ventures.

Q. And, Mr. Horowitz, why did -- withdrawn.

Do you have an understanding of why Mr. Cole, Neil Cole, was so upset with Justin Abrahamson?

Did Neil say why specifically this was such a problem?

A. Because Justin was responsible for making that change.

Q. And that meeting where Neil yelled at Justin Abrahamson, do you recall what day of the week that was?

A. It was a Friday.

Q. And do you recall meeting with Neil that weekend?

A. Yes.

Q. And describe where the meeting was and how it came about.

A. That meeting was for coffee on Sunday morning, and it came about because I asked Neil to have coffee or breakfast that morning.

Q. And just to kind of make sure we have the chain of events correct, the meeting where Neil got very angry at Justin, how many people approximately were at that meeting?

A. Ten to twelve.

Q. That was on Friday?

A. Correct.

Q. Were there any other meetings later on that day you recall

MB8Ycol2     Horowitz - Direct     Page 997

with Neil?

A. Yes.

Q. Describe that other meeting, the later meeting.

A. After the meeting with Justin and the other ten to twelve people from Iconix, Neil called a smaller group of us together in his office. I believe it was David Blumberg, Willy Burkhardt perhaps, and I.

And he told us that he was screwed; that he sold $40 million of stock at the wrong time. He described the timing of his stock sale and again used this phrase: "The company is going to implode."

Q. And then following that meeting, when was the next time you recall meeting with Neil?

A. The next time I met with Neil was that Sunday morning.

Q. And where was the meeting?

A. It was at a -- I believe it was an LPQ or a coffee place on the upper east side.

Q. And what did you say to Neil and Neil to you at this meeting at the LPQ on the upper east side?

A. I had prepared a few things I wanted to discuss with Neil. One of them was who else he had told about this timing of his stock sale to and whether or not he had told the board. We discussed whether or not we needed a PR firm to help us get through the next few weeks.

And I believe my other topic was about not acting --

MB8Ycol2     Horowitz - Direct     Page 998

about helping Neil not act in such a way in front of so many employees.

Q. And, Mr. Horowitz, in terms of the stock sale point, just in terms of what you thought was new information about the stock sale, to be clear, did you have an understanding of whether or not Neil's -- the fact of the stock sale had been public before this point in time?

A. The stock sale was public.

Q. So what was the new information about the stock sale that you were concerned and wanted to talk to Neil about?

A. The new information was the timing of the stock sale which, as Neil told us on that Friday afternoon, was between the press release of the quarterly results and the more detailed release that included this new line item for joint venture accounting.

Q. So what did you want Neil to do about the stock sale at that point in time?

A. Based on his reaction to it, I wanted to be sure I wasn't one of the few to know about it, and I wanted to confirm that he informed the board.

Q. Again, we're not talking about the fact of the stock sale but about these other facts that put the stock sale in context.

Is that fair?

MR. HECKER: Objection. Leading.

MR. LENOW: I'm just trying to clarify the point,

UNITED STATES OF AMERICA, V
NEIL COLE,

MB8Ycol2    Horowitz - Direct    Page 999

Judge.

THE COURT: The objection is overruled.

MR. LENOW: I'm sorry.

Q. Mr. Horowitz, just to clarify, are you talking about informing the board about the fact of the stock sale or other factors and facts surrounding it that you wanted to make sure were known to others?

A. I'm talking about the timing of the stock sale as it pertained to Neil's concerns and reaction on Friday.

Q. What did you want Neil to do about that additional information relating to the stock sale?

A. Share it with the board.

Q. And why did you think that was important?

A. It was important because I didn't want to be any further into this scheme. If it now included the selling of stock, I didn't want to be drawn in or pulled in, and I wanted others to know.

Q. Had you been part of Neil Cole's decision about selling stock when he did in the fall of 2014?

A. No.

Q. Did you have advance notice of that?

A. No.

Q. Now, during this breakfast conversation, did the topic of the givebacks come up at all?

A. Yes.

MB8Ycol2    Horowitz - Direct    Page 1000

Q. Can you describe, please.

A. Neil expressed his concerns about the SEC response, the question in response. He was concerned about the givebacks. He was concerned about other deals that related to Rocawear that he used the term "round tripping." And, again, he expressed that he was considering hiring his own counsel.

Q. You used the phrase "round tripping."

Had you heard that phrase before Mr. Cole used it at that breakfast meeting?

A. No. I was not familiar with that phrase.

Q. Did Mr. Cole explain to you what "round tripping" referred to?

A. Yes.

Q. What did he say?

A. It was when one company gives money to another company and then gets it back in another form.

Q. Did he explain whether he thought that was a problem or whether it was okay or anything in between?

A. He expressed that it was a problem for Iconix and something that we needed to stop doing.

Q. Could you explain that comment a bit more.

What do you mean by he said, "It was a problem for Iconix and something you needed to stop doing"?

A. It was something that we had -- I forget the exact words -- but grown accustomed to and needed to stop doing.

MB8Ycol2    Horowitz - Direct    Page 1001

Q. And I'm sorry. These are your words, or these are his words?

A. These are his words.

THE COURT: Mr. Lenow, it is 12:50. So we'll take our second break. We'll get back together at 10 after the hour. Don't discuss the case.

(Continued on next page)

MB8Ycol2    Horowitz - Direct    Page 1002

(In open court; jury not present)

THE COURT: Mr. Horowitz, you may step down.

(Witness temporarily excused)

THE COURT: Everyone can be seated. Anything to raise?

MR. LENOW: No, Judge.

MR. HECKER: One issue, your Honor. I don't recall ever having had the government elicit the fact that someone suggested that they might hire counsel as consciousness of guilt which seems to be how it was elicited.

We're happy to propose language, but we would ask for an instruction to the jury that they should not infer bad conduct from the fact that someone thought that they should consult with counsel after an SEC inquiry came into the company.

THE COURT: After what? I'm sorry.

MR. HECKER: An SEC inquiry came into the company.

THE COURT: Do you have a view as to whether such an instruction should be given?

MR. THOMAS: Your Honor, may we think about it over the break?

We're certainly happy to take a look at any proposed language to see if we can agree upon that, but we want to think through the issue more generally for a few minutes.

THE COURT: Why don't you talk and come up with an

**A-813**

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

---

Horowitz - Direct    Page 1003

agreement.  Don't be late, folks.
        (Luncheon recess)
        (Continued on next page)

---

Horowitz - Direct    Page 1004

        THE COURT: Is there any agreement?
        MR. HECKER: One moment, your Honor.
        (Counsel conferring)
        THE COURT: Come on up, Mr. Horowitz.
        (Witness resumes the stand)
        (Continued on next page)

---

Horowitz - Direct    Page 1005

        (Jury present)
        THE COURT: Everyone, please be seated.
        Mr. Lenow.
        MR. LENOW: Thank you, Judge.
    BY MR. LENOW:
Q.  Now, Mr. Horowitz, when we left off you were testifying about this breakfast meeting you had with Mr. Cole where he mentioned the phrase "round tripping."  So, what did Mr. Cole say about what "round tripping" was?
A.  "Round tripping" was agreements or relationships where money was paid from one company to another, only to be returned in another way.
Q.  Had you heard that phrase before Mr. Cole mentioned it to you?
A.  I had not.
Q.  Now, Mr. Horowitz, at this time after the events the following day, the prior Friday and the prior weeks, had you begun taking notes of any of your conversations with Neil?
A.  Yes.
Q.  Why did you start to take notes of those conversations?
A.  I was concerned about -- I was concerned about what was going on internally at Iconix.  It was a practice that I had done once before, keeping track and taking notes of meetings.
Q.  Why did you think you would need to have a written record of some of these conversations with Neil?

---

Horowitz - Direct    Page 1006

A.  I believe that the first time I started to take notes was after Neil had referred to using members of our finance team as the "fall guy" or "fall guys" for certain transactions.
Q.  The phrase "fall guy," what is that?
A.  Somebody who would take blame or be blamed for what had happened.
Q.  What did Neil say about who would be a fall guy?
A.  Neil used various people as fall guys or potential fall guys and that included Justin Abrahamson in the meeting that we just talked about, it included Brian Snyderman, it included Jeff Lupinacci.  At various points he would define these people as fall guys.
Q.  And let's take those in turn.  What did Mr. Cole say about how Lupinacci would be a fall guy?
A.  He said something to the effect that if BDO or our accounting firm did not sign off on our quarterly or annual financials, that Jeff would be the fall guy.  If anything, the fall guy with a Q or K.
Q.  And what did you understand Neil meant by that, that Jeff would be the fall guy if there was a problem there?
A.  That Jeff would be the one to take the blame if our outside accounting firm would not sign off on the financials.
Q.  And who would not take the blame?
A.  Neil.
Q.  You mentioned Brian Snyderman.  When did the notion of Neil

---

UNITED STATES OF AMERICA, V
NEIL COLE,

MB85col3    Horowitz - Direct    Page 1007

mentioning Brian Snyderman being a fall guy come up?
A. In discussions about the response to the SEC letter and whether or not BDO, our accounting firm, was going to sign off on our financials, Neil said that Brian didn't include enough details in his recaps to BDO of our joint ventures and that he would be a fall guy.
Q. So, why did Neil talking about people being fall guys, how did that play in your decision making about starting to take notes?
A. I was concerned for the part that I played in the fraudulent transactions. I was concerned about the overall communications that Neil was having with me and other team members.
Q. Mr. Horowitz, you started to have concerns that you would be used as a fall guy?
A. Yes.
Q. By who?
A. By Neil.
Q. Mr. Horowitz, in the notes that you wrote to yourself, did you, in any way, document or refer to the overpays or givebacks?
A. Yes.
Q. Did you do it explicitly?
A. No.
Q. What do you mean by no?

MB85col3    Horowitz - Direct    Page 1008

A. I didn't write explicitly "overpayment" and "giveback" referring to my conversation with Neil when that is what we discussed.
Q. Why didn't you explicitly refer to it that way in your notes?
A. I was scared to put in writing what it is that I had done.
Q. Do you remember the phrase you had used to refer to the givebacks in your notes?
A. I don't recall the specific phrase.
Q. But it wasn't the word "giveback?"
A. No, it was not.
Q. Now, Mr. Horowitz, if you weren't going to be explicit in your notes about the exact words that you used and what was happening, why take any notes at all?
A. It was a bit of self-preservation. I wanted to keep track of what was going on at the company, and in this instance I did not want to record, in writing, what I had done wrong.
Q. Did you have any concerns -- withdrawn.
Did you believe that Neil was keeping notes or other recordings of what you said to him?
A. Yes.
Q. Can you explain those concerns?
A. I had watched Neil record a conversation with our outside accountants and then parade it around the room as something that he now had on recording, and from that point on I was very

MB85col3    Horowitz - Direct    Page 1009

careful about what I said to Neil. He had tried to distance himself in transactions that he was obviously a part of, he was recording conversations, and he was blaming fall guys and I was aware of that.
Q. Mr. Horowitz, let's publish for the witness what is in evidence Government Exhibit 113.
Mr. Horowitz do you see this document dated February 24, 2015?
A. I do.
Q. It is a letter addressed to -- do you see the U.S. Securities and Exchange Commission?
A. It is.
Q. Generally speaking, Mr. Horowitz, we will get to specifics in a second, what is this February 24th letter?
A. It's the answer response to the SEC letter from prior, about two weeks ago.
Q. Earlier you testified that -- did you testify about the negotiation of this letter earlier? Actually, withdrawn.
Earlier you testified about going back and forth with Neil in the terms of a draft letter. Is this the same letter you are talking about?
A. Yes, this is the response.
Q. Let's go to page 8 of that document, if we could. Let's go to page 7 to give context.
Do you see the underline: Iconix SEA Asia amendment

MB85col3    Horowitz - Direct    Page 1010

June 2014?
A. I do.
Q. Is that the SEA-2 deal?
A. Yes, it is.
Q. Let's go down to the next page and just pause there. Looking at the last paragraph before the next underlined portion, do you see that where it says: The transaction was negotiated by the COO Seth Horowitz, with guidance from the CEO Neil Cole?
A. I do.
Q. Was this one of the terms that you and Neil went back and forth about in that testimony you described earlier?
A. Yes, it was.
Q. And in terms of the "with guidance from CEO Neil Cole." How did that language get landed on?
MR. HECKER: I'm sorry. I can't hear the question.
Q. Sorry.
How did that language get landed on, "negotiated by Seth Horowitz with guidance from CEO Neil Cole?"
A. That was landed on through the arguments that Neil and I had.
Q. What did Neil Cole want described in this document?
A. Neil wanted to move his name down from guidance to support.
Q. Let's, moving down to the Iconix SE Asia amendment September 2014. Do you see that?

**A-815**

MB85col3    Horowitz - Direct    Page 1011

A. I do.
Q. Let's go down to the next page, page 9.
Do you see the last line, the first paragraph now on this page, page 9: "The transaction was negotiated by the COO Seth Horowitz and VP of licensing Umbro Will Byron with guidance from CEO Neil Cole." How was that language, language that ultimately landed in this letter, negotiated by Horowitz, Byron and support with guidance from the CEO?
A. Again, that was the result of our disagreements.
Q. And let's move up to page 6 -- actually, just one more.
Do you see the list of Iconix Middle East and North Africa, that header?
A. I do.
Q. And then this one, the last paragraph: "The transaction was negotiated by the CEO Neil Cole and the COO Seth Horowitz."
Do you see that?
A. I do.
Q. And remind the jury, what did Neil want this to say?
A. Neil wanted his name to be removed from the Iconix Middle East negotiation.
Q. As a result of the back and forth you described, did that ultimately -- did he get his way?
A. No.
Q. You can take this down.
Do you know whether Neil reviewed this letter before

MB85col3    Horowitz - Direct    Page 1012

it was sent to the SEC?
A. I believe that he did.
Q. What is that belief based on?
A. This was an extremely important letter. We had many meetings about the drafting and redrafting of this letter.
Q. Mr. Horowitz, did there come a time that you decided to leave Iconix?
A. Yes.
Q. Approximately when did you reach that decision?
A. Sometime in early 2015.
Q. And what prompted -- was there any kind of immediate prompt or kind of decision for the exact timing of when you left?
A. Yes.
Q. What was that?
A. I waited until the third anniversary of my employment, at which point I received 25,000 shares of Iconix stock.
Q. Why did you wait until that stock vested before you left, before you resigned?
A. Had I resigned before that date I would not have received that stock, or that stock would not have vested and it was a significant amount of money.
Q. Mr. Horowitz, are you familiar with stock options, by the way?
A. Yes.
Q. Did you have stock options as part of your employment

MB85col3    Horowitz - Direct    Page 1013

agreement with Iconix?
A. Yes.
Q. Just, when a stock option vests, when you can take the stock, is there any obligation to sell the stock right away? Or can you Hold on to it?
A. You can hold on to it.
Q. Mr. Horowitz, what was your three-year anniversary at Iconix?
A. I believe it was April 2nd, 2015.
Q. Is that around the time you decided to resign?
A. Yes.
Q. Mr. Horowitz, did you do anything immediately in advance of your resignation, around April 2015?
A. Yes.
Q. What did you do?
A. I emailed myself, from my work account to my personal e-mail, several documents that I wanted to maintain after my time at Iconix -- and printed them out.
Q. After you did that, did you then tell Neil about your decision to resign?
A. Yes.
Q. Where did that happen?
A. I initially informed Neil of my resignation in his office.
Q. What did you say to him, and he to you, in that conversation?

MB85col3    Horowitz - Direct    Page 1014

A. I told him that I was resigning and handed him a resignation letter, and told him that if he wanted to discuss it I would be in my office.
Q. What did he say?
A. I left his office and he came to my office minutes later.
Q. What happened then?
A. He asked me if I hated him. He threatened me. Said that my career was over if I resigned. He told me that I would never work for a public company again and I should just not resign, take 60 days off -- 30 days, 60 days off, just don't resign, I won't have to come to work, but let the SEC investigation end.
Q. What did you say in response, if anything?
A. I told him that I would think about what he said but I still wanted him to have my resignation.
Q. How did he respond to that comment?
A. He told me that he had already ripped up my resignation letter and that if I did resign, he would have certain obligations that he didn't want to have.
Q. What did you understand him to mean by that?
A. That he would have to report my resignation to the board and to the stock market.
Q. Did Neil tell you at that time what he thought would happen as a consequence if you resigned?
A. Yes.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col3          Horowitz - Direct          Page 1015

Q. What did he say?

A. He called me a suicide bomber and told me that we would be on the cover of The Post. And other things that I said including my career being over, and never being able to work for a public company again.

Q. Mr. Horowitz, after that -- anything else that you recall from that meeting?

A. No.

Q. After that meeting -- well, withdrawn.

What was your reaction to Neil's comments during that meeting, including the comment about you being a suicide bomber?

A. My reaction was I was scared of what he might do. I mean, this was a borderline abusive response to a simple resignation and I decided to reconsider how I was going to resign.

Q. And this first resignation letter that you handed Neil that he then ripped up, how detailed was it?

A. I believe it was one, maybe two sentences.

Q. Did it have any detail beyond the fact of the resignation, if you recall?

A. No.

Q. And you said you reconsidered how to handle your resignation after this meeting. What do you mean by that?

A. At this point, I mean, I was aware and afraid and threatened that I would be the fall guy for these transactions

MB85col3          Horowitz - Direct          Page 1016

and I decided to take some of this into my own hands.

Q. Now, Mr. Horowitz, in the immediate aftermath of this meeting with Neil what, if anything, did you do to start taking things into your own hands?

A. Amongst other things I met with counsel and I retrieved a folder or a binder from my office through somebody else.

Q. Can you just describe what you mean by that, about retrieving a binder from your office through someone else?

A. I knew that there was a binder in my office that had some of the financial sheets that we have looked at that laid out the changes in prices and some of the givebacks, and I asked my assistant to bring that binder outside of the office and hand it to me.

Q. So, just to break this down a bit, what is your assistant's name?

A. Kaitlin.

Q. So, when these events transpired, were you at the time, were you in the Iconix offices or not?

A. No. I had already left the Iconix office.

Q. And what did you ask or direct Kaitlin to do?

A. I was in, I believe, a taxi on my way to Penn Station, and I asked Kaitlin to take that binder and bring it to me on my way to Penn Station.

Q. And did she do that?

A. She did.

MB85col3          Horowitz - Direct          Page 1017

Q. Can you describe how she actually handed you the binder?

A. She handed me the binder through the window of the taxi.

Q. Where was the taxi at the time this happened?

A. We were on 7th Avenue heading down towards Penn Station.

Q. Were you close to Iconix' offices when this occurred?

A. Yes.

Q. How far away?

A. Block and a half.

Q. What did you do after you got that binder with the forecast documents in it?

A. I went down to Washington, D.C. to meet with my attorneys.

Q. Mr. Horowitz, let's now publish for you and then the jury and the parties Government Exhibit 1197 which is in evidence: Mr. Horowitz, do you recognize this document, an April 13, 2015 e-mail from Seth Horowitz to Neil Cole copying a number of other individuals?

A. I do.

Q. And do you see the name -- do you see Jason Schaefer's name in the cc list?

A. I do.

Q. Do you see Pete Cuneo listed as well?

A. I do.

Q. Who are the people cc'd on this e-mail that you sent to Neil?

A. The people cc'd on the e-mail are the board of directors

MB85col3          Horowitz - Direct          Page 1018

for Iconix.

Q. Does that include Jason Schaefer?

A. And Jason Schaefer is the -- or was the general counsel for Iconix.

Q. What is attached to this e-mail?

A. A resignation letter.

Q. Is this the same resignation letter that you handed to Neil that he then tore up earlier in April?

A. No.

Q. What is different about this one?

A. This is a more detailed resignation letter.

Q. Let's go with the letter, the next page, please. Just, Mr. Bianco, can we please highlight, let's zoom in on the text here.

Who is it addressed to, the letter itself?

A. The letter is addressed to both Neil Cole and the board of directors.

Q. Let's start with the first two paragraphs of this. Can you please read the first paragraph for the jury?

A. "I hereby tender my resignation as chief operating officer of Iconix Brand Group, Inc. ("Iconix" or "The Company") under my employment agreement dated April 2nd, 2012, as amended. As Mr. Cole is aware, I initially tendered my resignation last Monday, April 6, 2015. Mr. Cole did not accept my resignation at that time and suggested that I take some time off away from

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB85col3 | Horowitz - Direct | Page 1019 |
|---|---|---|

the office and reconsider. I agreed to do so, and after reflecting over the past week, I remain firm in my decision to resign."

Q. Let's just pause there. The April 6 date you are referring to there, just explain what that was.

A. That was the date that I initially handed in my resignation.

Q. Is that the same meeting where Mr. Cole called you, among other things, a suicide bomber?

A. Yes.

Q. Continue reading, please.

A. "In addition, I want to bring your attention certain accounting issues that the company and/or the board may wish to review, and which I hope have been or will be properly addressed in the company's ongoing discussions with BDO and the staff of the SEC's Division of Corporation Finance."

Q. Let's focus then on the next paragraph and get the header as well, the terms of June 30th, and then the rest of the page. Let's do that.

Can you please continue reading, Mr. Horowitz?

A. "Terms of June 30th, 2014 and September 27th 2014 amendments to the Southeast Asia joint venture.

First, I would like to highlight the negotiations and terms of the June 30th, 2014 and September 27th, 2014 amendments to the Southeast Asia joint venture with GBG (known

| MB85col3 | Horowitz - Direct | Page 1020 |
|---|---|---|

as Li & Fung Asia as of June 30th, 2014). In particular, the price of the June 30th, 2014 transaction increased from $10.9 million based on terms negotiated for additional Southeast Asia joint venture rights in Europe and Turkey ($7.6 million) and Korea ($3.3 million), to the eventual closing price of $15.9 million based on negotiations including Mr. Cole, between Iconix, and GBG regarding Iconix' verbal commitment to compensate GBG for $5 million in marketing expenses. I am aware that Iconix paid GBG a portion of the $5 million for certain marketing expenses in the fourth quarter of 2014. I do not know whether these marketing expenses were considered or discussed with BDO, in connection with accounting for revenues from the joint venture."

Q. And then let's just pause there. Mr. Horowitz, what deal are you referring to here, the June 30th, 2014 joint venture?

A. SEA-2 or the June joint venture.

Q. And then what's the September 2014 date referring to?

A. SEA-3.

Q. Let's now turn, if you can read the next paragraph, starting with: I also understand...

A. I also understand that the price of the September 17, 2014 transaction increased from $15.5 million, based on terms negotiated for additional Southeast Asia joint venture rights in China --

Q. Let's go to the next page and bring up the top two

| MB85col3 | Horowitz - Direct | Page 1021 |
|---|---|---|

paragraphs?

A. -- Macau, Hong Kong, and Taiwan, to $21.5 million following negotiations including Mr. Cole, between Iconix and GBG regarding primarily Iconix' release of GBG from its licensing agreement with Iconix for Rocawear, in particular GBG's obligation to pay Iconix $2.5 million in 2014, and $3.5 million in 2015, in connection with the Rocawear license. At Mr. Cole's request, I worked with the Iconix legal team to prepare the documents to release GBG from its Rocawear obligations, but, at Mr. Cole's direction, I did not send those documents to GBG, and thus, as far as I know, GBG has not been released from those obligations.

Q. Let's just pause there for a second.

In stepping back, what were you hoping to accomplish with this letter to Neil and the board and Jason Schaefer?

A. I was hoping to accomplish that Neil could not make me the fall guy for these joint ventures, these fraudulent joint ventures.

Q. Mr. Horowitz, what changed between a week or two earlier when you had submitted a bare bones resignation letter to this letter now where you were including all of this information about these two deals and the overpayments and givebacks?

A. In my initial resignation letter Neil's response was what we discussed; suicide bomber, career over, never going to work in a public company again. Based on his use of fall guys and

| MB85col3 | Horowitz - Direct | Page 1022 |
|---|---|---|

his denial of knowledge of these transactions at various points, I wanted to get out to the board that Neil was aware of these transactions before he had the chance to say he wasn't.

Q. Mr. Horowitz, what about that meeting, that resignation meeting, that first one made you think that that was -- that you were concerned about what Neil would do with respect to you?

A. He threatened my career just in response to a two-line resignation letter.

Q. Mr. Horowitz, in this letter do you anywhere reference your own direct involvement in these transactions?

A. No.

Q. And Mr. Horowitz, anywhere in this letter do you say that you were engaged in fraud directly yourself along with Neil?

A. No.

Q. Do you use the word "fraud" directly in these letters in any way?

A. No.

Q. Mr. Horowitz, why didn't you use -- why didn't you provide all the detail you told this jury about in this letter about your knowing involvement with Neil in a fraudulent scheme? Why didn't that get into the letter?

A. I didn't want to admit committing a fraud. I didn't want to suffer the consequences of it. I knew that we had done illegal activities but I was not at a point where I wanted to

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col3    Horowitz - Direct    Page 1023

say, hey, we committed a fraud. But I did want to get in front of Neil's threats and make sure that the board was aware of his involvement.

Q. And, Mr. Horowitz, this letter, we saw some language in the first page about -- if we can go to the first page -- about BDO -- and let's just pause there.

You say, "I do not know whether the marketing expenses were considered or discussed with BDO in connection with accounting for revenue from this joint venture."

Do you see that?

A. I do.

Q. Now, Mr. Horowitz, when you resigned from Iconix, to your knowledge, had BDO been informed of the giveback?

A. No.

Q. So why, in this letter, do you say you don't know whether the marketing expenses were considered or discussed with BDO in connection with accounting for revenue?

A. Because I was not aware of any actions that were taken in the week that I was not at the company.

Q. What did you think might have happened in the week since you left the company?

A. That I was potentially being blamed for wrongdoing. And that's based on my experience at Iconix.

Q. And then you thought that BDO might have been informed as part of that scapegoating effort?

MB85col3    Horowitz - Direct    Page 1024

A. That was a possibility.

Q. And then, turning to the second page, I don't think you read this paragraph before but you can read it now, the "I do not know" paragraph in the middle above Accounts Receivable?

Just the paragraph, please Mr. Bianco. Thank you.

Can you read that portion?

A. "I do not know whether the verbal commitment regarding marketing expenses and release of GBG from its Rocawear obligations were communicated to BDO for its consideration. I do not have an accounting background and would not be in a position to disagree with the company if it has already considered these matters in connection with the revenue issues regarding these joint ventures."

Q. Mr. Horowitz, why did you include this language in the letter?

A. As a form of self-protection and communication.

Q. Mr. Horowitz, to your knowledge when you left the company, had you or anyone else ever informed BDO, Iconix' lawyers, or other auditors or accountants of the company, about the fraudulent overpayments and givebacks?

A. No.

Q. At any point in time had Neil given you any specific direction in that regard?

A. Yes.

Q. What had he told you?

MB85col3    Horowitz - Direct    Page 1025

A. In the case of SEA-2 he specifically told me not to tell Lauren Gee, the lawyer working on the transaction documents, about the giveback.

Q. And, after that, did you tell any lawyers or auditors or accountants at Iconix?

A. No.

Q. Why not?

A. Because it would have shed light on the fraud that we were doing.

Q. Mr. Horowitz, I want to ask you about the months following this April 2015 letter. First of all, Mr. Horowitz, you said you had retained counsel at this time; is that correct, meaning lawyers?

A. That is correct.

Q. And you consulted with your lawyers around this time; is that right?

A. That is correct.

Q. Now, I don't want to ask you about your privileged communications with your own lawyers but I want to ask you about your own mental state and thinking about these issues at that time. In the months following the resignation from Iconix in April 2015, were you prepared to admit to outsiders, whether it be the Iconix board of directors, the SEC, criminal authorities, any other outsiders, were you prepared to admit that you and Neil had engaged in criminal conduct at Iconix?

MB85col3    Horowitz - Direct    Page 1026

A. No, I was not.

Q. Why not?

A. I didn't want to face the consequences of what we had done.

Q. Mr. Horowitz, would it surprise you if around that time your lawyers advocated to others on your behalf and claimed that you were not involved in criminal conduct?

A. No.

Q. Why wouldn't that surprise you?

A. I had not come to terms with or had the ability to openly communicate what I knew that I had done wrong and what we had done wrong and that was a big human hurdle for me.

Q. Did there come a time that changed where you did admit to what you had done wrong with Neil?

A. Yes.

Q. Mr. Horowitz, did you in fact engage in fraudulent conduct with Neil Cole at Iconix relating to the June 2014 and September 2014 Southeast Asia deals?

A. Yes.

Q. Did that conduct include falsely inflating the company's revenue and earnings per share?

A. Yes, it did.

Q. Now, Mr. Horowitz, at some point in time after you sent this longer April resignation letter, did you take another job?

A. Yes.

Q. Where was your next position after Iconix?

# A-819

UNITED STATES OF AMERICA, V
NEIL COLE,                                                November 8, 2022

| MB85col3 | Horowitz - Direct | Page 1027 |

A. My next position was at Baked by Melissa.

Q. What is Baked by Melissa?

A. Baked by Melissa is a bite-sized cupcake company with both retail stores and e-commerce.

Q. And when you started working at Baked by Melissa did you tell your new employer that had you engaged in fraud at Iconix?

A. No.

Q. Why not?

A. I thought that that would not allow me to get the job and it was not public knowledge that I had shared with anybody.

Q. Mr. Horowitz, what was your position when you were hired at Baked by Melissa?

A. I was hired as CEO.

Q. While you were working at Baked by Melissa, did there come a time when you started meeting with federal prosecutors about this case?

A. Yes.

Q. And in those meetings, did you speak to federal prosecutors about the topics we have discussed in your testimony at this trial?

A. Yes.

Q. And did you tell anyone at Baked by Melissa that you were meeting with federal prosecutors about the conduct in this case?

A. No, I did not.

| MB85col3 | Horowitz - Direct | Page 1028 |

Q. Why not?

A. It was my understanding that those meetings were confidential.

Q. Did there come a time where you were terminated by Baked by Melissa?

A. Yes.

Q. And when did that come about and why?

A. I was terminated from Baked by Melissa as a result of pleading guilty to committing fraud.

Q. In this case or in a different case?

A. In this case.

Q. Now, Mr. Horowitz, I want to ask you some more about your meetings with federal prosecutors. When you began meeting with federal prosecutors, did you describe your own role in the fraud at Iconix?

A. I did.

Q. Did you describe Neil's role as well?

A. I did.

Q. Do you recall specifically how many times you met with the government since you pled guilty?

A. I don't recall a specific number.

Q. When did you first start -- what year, approximately, did you first start meeting with the government about this case?

A. I believe it was 2018.

Q. So, in the past four years or so, is it possible you met

| MB85col3 | Horowitz - Direct | Page 1029 |

with the government over 40 times?

A. Yes.

Q. Is it possible you met over 50 times with the government in that time?

A. Yes.

Q. What sort of topics did you discuss at those meetings -- withdrawn.

What sorts of things did you discuss at your meetings with the government in those meetings?

A. We discussed a wide range of activities, transactions, and other accounting at Iconix.

Q. Did you talk about some topics that were not covered in your testimony today?

A. Yes.

Q. And other days of this trial?

A. Yes.

Q. Did you review documents at those meetings with prosecutors?

A. Yes.

Q. Did some of those documents include voluminous records including voluminous financial records?

A. Yes.

Q. And have you met with the government in anticipation for this specific trial in the last couple of weeks and months?

A. Yes.

| MB85col3 | Horowitz - Direct | Page 1030 |

Q. Is it possible that those meetings exceeded, you know, 10 or 15 meetings?

A. Yes.

Q. And in your meetings with the government, did you disclose other illegal conduct that you committed over the years to the government?

A. Yes.

Q. Did you disclose a personal drug use?

A. Yes.

Q. Can you describe the drug use you disclosed in those meetings?

A. I discussed smoking marijuana, and I discussed and told the government about my use of psychedelic drugs before 1998.

Q. And while you were at Iconix, did you smoke marijuana during your time as the COO of Iconix?

A. Yes.

Q. Did any of that marijuana use in any way affect your ability to remember or perceive what was happening around you at the time concerning the events covered in your testimony?

A. No.

Q. To your understanding, how did the government learn about your drug use?

A. From me telling them.

Q. Now, Mr. Horowitz, you said you pled guilty to federal crimes at the beginning of your testimony. Do you recall that?

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

---

MB85col3  Horowitz - Direct  Page 1031

A. Yes.

Q. And before you pled guilty, did you enter into a cooperation agreement with the government?

A. Yes.

Q. Can we please publish what is in evidence as Government Exhibit 1514-A? We can come back to this.

Now, have you reviewed a copy of your cooperation agreement prior to your testimony today?

A. Yes.

Q. Did you review it with your lawyer before entering into it?

A. Yes.

Q. And after you signed that agreement, did you plead guilty to the crimes we have discussed in your testimony today and in the prior days this week?

A. Yes.

Q. If we can now go to Government Exhibit 1514-A?

Do you recognize what is on your screen now which is being published for the jury as well? Mr. Horowitz, do you recognize that?

A. Yes, I do.

Q. If we go to the last page, what do you recognize this to be? Is that your signature?

A. Yes.

Q. On the bottom left above "Seth Horowitz?"

A. Yes, it is.

---

MB85col3  Horowitz - Direct  Page 1032

Q. Next to the date December 2nd, 2019?

A. Yes.

Q. Let's go back to the top of the document.

Mr. Horowitz, why did you plead guilty to the federal crimes you have testified about committing?

A. Because I am guilty of those crimes.

Q. Have you been sentenced yet for committing the federal crimes you have discussed with this jury?

A. I have not.

Q. And when you are sentenced, what is your understanding the maximum sentence you could face?

A. I could face 70 years in prison.

Q. Will there be a financial penalty component to your sentence?

A. Yes.

Q. And what are you required to do under your cooperation agreement with the government?

A. I am required to provide information on any subject matter that they ask, provide testimony on any subject that they ask, and meet with them at their request.

Q. And what is your understanding of what the government -- or the U.S. Attorney's office for the Southern District of New York -- is obligated to do if you live up to your obligations under this agreement?

A. If I live up to all of the obligations of this agreement,

---

MB85col3  Horowitz - Direct  Page 1033

of which there are other elements, the Southern District can or will write a letter on my behalf to the Judge.

Q. Is one of the obligations under this agreement that you are required to tell the truth?

A. Yes.

Q. Mr. Horowitz, what do you understand will be in this letter that you get at sentencing from the government if you comply with all of the obligations you mentioned earlier -- meeting with the government, testifying, telling the truth?

A. If I do those things, the government will write a letter on my behalf outlining my cooperation.

Q. Would that letter include all of the crimes you committed?

A. Yes, it would.

Q. Would it also list the things you cooperated about and how you assisted the government?

A. Yes, it will.

Q. And if the government submits this letter, what effect does that have on the possible sentence you face?

A. Hopefully it will help reduce that sentence.

Q. Does it have any guarantees? Are there any sentence changes that are automatically changed -- withdrawn.

Is there anything that automatically happens when the letter goes in? Are there any guarantees?

A. There are no guarantees.

Q. Does the outcome of this trial have any bearing on whether

---

MB85col3  Horowitz - Cross  Page 1034

the government will submit that letter that you have described?

A. No, it does not.

Q. And if the government does write the letter, does that mean that the Judge that sentences you will necessarily give you a lower sentence than a Judge otherwise would?

A. No, it does not.

Q. Have you been promised anything about what your sentence would be based on your cooperation?

A. No.

Q. Who decides what your sentence would be, Mr. Horowitz?

A. The judge.

Q. Does anyone else decide apart from the judge?

A. No.

MR. LENOW: No further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. HECKER:

Q. Good afternoon, Mr. Horowitz.

A. Good afternoon.

Q. My name is Sean Hecker, I'm one of Neil Cole's lawyers, and I am going to ask you some questions. Is that OK?

A. OK.

Q. Sir, we have never met before, correct?

A. Correct.

Q. But before testifying today we have established that you

---

# A-821

UNITED STATES OF AMERICA, V
NEIL COLE,

| MB85col3 | Horowitz - Cross | Page 1035 |
| --- | --- | --- |

have met with the government quite a few times. Is that fair?

A. That's fair.

Q. You estimated that on 40 or 50 different occasions you sat down in meetings with prosecutors from the U.S. Attorney's office; correct?

A. That is correct.

Q. And there were also federal agents in those meetings. Is that true?

A. That is true.

Q. Who were the federal agents that met with you 40 or 50 times?

A. I don't recall their names.

Q. You don't recall the names of any of the federal agents you met with?

A. I met with -- one gentleman's name is Nick.

Q. Is it Nicholas Kroll?

A. Yes.

Q. Nicholas Kroll is in court here today, yes?

A. Yes.

Q. Where is he seated?

A. He is in the back right.

Q. So you do remember his name, yes?

A. I do remember his name.

Q. You have met with him 40 or 50 different times, yes?

A. I don't believe so.

| MB85col3 | Horowitz - Cross | Page 1036 |
| --- | --- | --- |

Q. Sir, he escorted you in and out of the courtroom today, and yesterday, and last Friday; right?

A. That is correct.

Q. So you remember his name, yes?

A. I remember Nick's name.

Q. And there were other agents there as well; is that true?

A. That is true.

Q. OK.

Now, most of those meetings took place at the U.S. Attorney's office next-door, right?

A. That is correct.

Q. Some of them were by video? I imagine that happened during COVID, right?

A. That is correct.

Q. And those meetings, that would include Mr. Lenow, yes?

A. At times.

Q. Out of the 40 or 50 times you met with the government, is it fair to say that Mr. Lenow was there 90 to 95 percent of those occasions?

A. I don't believe so.

Q. You think it is less than that?

A. Yes.

Q. What about in preparing for your trial, for this trial, this testimony in this trial, I believe you said you met with the government between 10 and 15 times just over the last

| MB85col3 | Horowitz - Cross | Page 1037 |
| --- | --- | --- |

couple weeks; is that right?

A. That's correct.

Q. Was Mr. Lenow at all of those meetings?

A. Yes, he was.

Q. And Agent Kroll was also at those meetings?

A. Most of those meetings.

Q. OK.

And when you had -- I want to just be clear. Those meetings first started happening in December of 2018; is that true?

A. Which meetings are you referring to?

Q. Meeting with the government.

A. The total amount? Yes.

Q. The first meeting you ever had with the U.S. Attorney's office was in December of 2018, correct?

A. That is correct. I believe.

Q. And I believe we established that from the time you submitted your resignation letter, the longer resignation letter in April of 2014 until four and a half years later, December 2018, you had no meetings with any government entity, correct?

A. I don't recall that.

Q. Well, you never told anyone that there was something fraudulent about these transactions that you did, until December of 2018 and thereafter; correct?

| MB85col3 | Horowitz - Cross | Page 1038 |
| --- | --- | --- |

A. Generally correct.

Q. OK.

Now, how long were these meetings you had with the government?

A. They ranged from four to six hours I would say, on average.

Q. So, just doing basic math, we are talking about a few hundred hours of meetings with the government. Is that fair?

A. That's fair.

Q. And, am I correct that on some occasions the government would select documents for you to review in your meetings, yes?

A. They selected documents they would ask me questions about, yes.

Q. And sometimes they would give you a set of documents to take home with you for homework, right?

A. No.

Q. You are sure about that, sir?

A. Yes.

Q. In preparing for your testimony, did the government give you a selection of documents and ask you to review those in preparing for your testimony?

A. I don't believe so. They gave me a binder of documents to use during virtual meetings.

Q. And, sir, isn't it true that when you say you prepared for your testimony at this trial, one of the things you did was to review the questions you would be asked and the answers that

UNITED STATES OF AMERICA, V
NEIL COLE,

MB85col3          Horowitz - Cross          Page 1039

you would give in response to those questions?
A. No.
Q. Sir, one of the things you did in your preparation was described as mock cross-examination. Is that true?
A. That is true.
Q. And in that context, one of the prosecutors pretended to be a defense lawyer; is that true?
A. Somebody from their office did, yes.
Q. It was a prosecutor?
A. I believe so.
Q. And they asked you questions, right?
A. They did.
Q. Leading questions like the ones I am asking you?
A. I don't recall.
Q. Well, and you gave answers in response to those practice questions, yes?
A. I gave answers, yes.
Q. And if they didn't like the answers you could talk about how to answer differently. Isn't that true?
A. No.
Q. You discussed other ways of answering the questions, isn't that true?
A. Yes.
Q. Sir, the underlying events we are talking about at this trial occurred in 2013, '14, and the beginning of 2015,

MB85col3          Horowitz - Cross          Page 1040

correct?
A. They occurred in 2014 and 2015.
Q. You started at Iconix in 2012, correct?
A. That is correct.
Q. In fact, the original Southeast Asia joint venture, that was signed in 2013; true?
A. That is true.
Q. But you didn't personally participate in the negotiation of what the jury has heard referred to as SEA-1, right?
A. That is correct.
Q. You ran point in the negotiations with GBG on SEA-2 and SEA-3, correct?
A. On SEA-2, correct.
Q. And SEA-3 as well, right?
A. I wouldn't necessarily refer to it as "running point."
Q. You told the SEC that you were the lead negotiator, correct?
A. Correct.
Q. That was true, yes?
A. It was partially true, yes.
Q. So, when I say you are running point I am thinking about you being the lead negotiator of SEA-2 and SEA-3. Are you comfortable with that?
A. Yes.
Q. Now, you testified that you signed a cooperation agreement

MB85col3          Horowitz - Cross          Page 1041

on December 2nd, 2019, correct?
A. That is correct.
Q. So, that's a year after you began meeting with the government, true?
A. Approximately.
Q. In fact, you met with the government approximately 14 times from your first meeting until your signature on the cooperation agreement on December 2nd, 2019; isn't that true?
A. I don't recall the specific amount of times.
Q. Well, at some point in your meetings with the government you understood that you faced prosecution and you had a choice, correct?
A. That is correct.
Q. The government told you that one option for you would be to plead guilty and sign a cooperation agreement to try to work yourself out of the problem that you faced; true?
A. Not completely.
Q. I'm sorry?
A. Not completely.
Q. Partially true?
A. Partially true.
Q. Sir, you believe that cooperation is your best hope for obtaining leniency at your sentencing; isn't that true?
A. That is true.
Q. And you have not yet been sentenced; correct?

MB85col3          Horowitz - Cross          Page 1042

A. That is correct.
Q. In fact, the government has asked to postpone your sentencing multiple times; isn't that right?
A. I believe so.
Q. And the idea here is that you would only be sentenced after your testimony in this case, true?
A. I believe so.
Q. And there are no plans for you to testify against anyone else, correct?
A. Not that I'm aware of.
Q. This is your only shot, correct?
A. I don't know.
Q. Now, you understand that the Judge's sentence will depend on a variety of different factors; right?
A. Yes.
Q. But one of the things that the Judge's sentence will depend on is that letter that you hope the government will write to the Judge, correct?
A. I don't know.
Q. Well, sir, you know that if the government submits a letter to the Judge, that could have a positive effect on your sentencing; correct?
A. It could.
Q. And, in fact, that's your hope; right?
A. Yes.

# A-823

UNITED STATES OF AMERICA, V
NEIL COLE,
November 8, 2022

| MB85col3 | Horowitz - Cross | Page 1043 |
|---|---|---|

Q. And you understand that if the government agrees that you have complied with your cooperation agreement, that letter will tell the Court that you provided substantial assistance in connection with the government's investigation; true?

A. Partially true.

Q. Well, you understand that the cooperation agreement uses that phrase, right? "Substantial assistance." Yes?

A. It does use substantial assistance.

Q. And you understand that it's the government that decides whether or not they think you provided substantial assistance, correct?

A. That is correct.

Q. And that's what would trigger their obligation under your cooperation agreement, to ask the judge for leniency on your behalf; correct?

A. That's too loaded a question to say correct to.

Q. Sir, you understand the government is not obligated to write a letter on your behalf; right?

A. That is correct.

Q. But if the government determines that you have been truthful and that you have provided substantial assistance in their investigation, then they would have to write the letter; right?

A. There are a few other elements but that is correct, yes.

Q. You want that letter to be favorable for you?

| MB85col3 | Horowitz - Cross | Page 1044 |
|---|---|---|

A. Yes.

Q. You're hoping that the government is happy with your testimony and relays that to the Judge, yes?

A. I don't know if I would use the word "happy" but I will agree.

Q. Satisfied? You need to respond orally.

A. Sorry. Yes.

Q. What you are hoping for is called a 5K1.1 letter, right?

A. That is correct.

Q. And your hope and expectation is that a 5K1 letter would result in a lower sentence for you, correct?

A. That is my hope.

Q. And, in fact, your hope is to serve no jail time; right?

A. Yes.

Q. Now, we discussed the cooperation agreement that you signed with the government on December 2nd, that was almost three years ago; correct?

A. That is correct.

Q. And that agreement imposed certain obligations on you; correct?

A. That is correct.

Q. And one of them is that you are required to meet with the government whenever they ask you to meet with them; true?

A. Basically true.

Q. You certainly fulfilled that obligation, correct? Yes?

| MB85col3 | Horowitz - Cross | Page 1045 |
|---|---|---|

A. That is true.

Q. You met with them whenever they wanted, right?

A. I believe so.

Q. And that agreement doesn't require you to meet with me?

A. I don't believe.

Q. And we have never met, you have never met with any members of Mr. Cole's defense team, correct?

A. I don't believe so.

Q. The agreement with the government is your deal with the government, right?

A. Yes.

Q. There are no terms of your agreement with the government other than what is spelled out in the cooperation agreement itself, true?

A. True.

Q. In fact, there is language in the agreement with the government that says that, right?

A. I believe so.

Q. Mr. Lam, can we call out what is in evidence as Government Exhibit GX- 1514-A and pull out the paragraph at the top of page 6, please?

Mr. Horowitz, can you read that paragraph?

A. Sure.

"This agreement supersedes any prior understandings, promises, or conditions between this office and the defendant.

| MB85col3 | Horowitz - Cross | Page 1046 |
|---|---|---|

No additional understandings, promises or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties."

Q. You understood once you signed this agreement that the language of this written agreement would bind you and bind the government; correct?

A. That is correct.

Q. It was important to you to have clarity about what terms were in the agreement and what was out of the agreement; correct?

A. That is correct.

Q. And the government owes you no additional binding obligations other than what is reflected in this agreement, true?

A. That is true.

Q. And that's what that paragraph you just read means, right?

A. Yes.

Q. Now, sir, I believe you testified today that the SEA-2 joint venture was the first time you negotiated the joint venture agreement, correct?

A. I believe so.

Q. But in your experience as a businessman you negotiated many different business agreements, correct?

A. That is correct.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col3          Horowitz - Cross          Page 1047

Q. Just not joint venture agreements, right?
A. I have never done a joint venture agreement, correct.
Q. Before SEA-2?
A. That is correct.
Q. Now, you are familiar with this type of contractual provision as a result of your time as a businessman, correct?
A. That is correct.
Q. It's called an "integration clause," right?
A. I don't know if that's what it's called.
Q. Well, what would you call it?
A. I don't really have a name for it.
Q. But you are familiar with the concept that an agreement can spell out explicitly that no additional understandings, promises, or conditions are agreed to, other than what is in the agreement; correct?
A. That is correct.
Q. And that no other understandings will be entered into unless in writing and signed by all the parties; correct?
A. I am aware of this type of paragraph, yes.
Q. It comes up frequently in business, does it not?
A. I believe that it does.
Q. And, in fact, there are provisions just like this in SEA-2 and SEA-3; correct?
A. Yes.
Q. Now, just quickly, can we pull back up the resignation

MB85col3          Horowitz - Cross          Page 1048

letter which I believe is Government Exhibit 1197? And if we could pull up the attachment do you recall being asked about this by Mr. Lenow a few minutes ago?
A. Yes, I do.
Q. And I just want to be clear about something.
If you could scroll down, please?
And Mr. Horowitz, if you could review what's reflected there on page 1 and then I'm going to ask to scroll down to page 2. Tell me when you have had a chance to review it.
That can be published, that is in evidence. Thank you.
A. I have read the bottom half of the first page.
Q. If we can scroll down to the next page? And just read up to where it says "accounts receivable."
A. I have reviewed it.
Q. I just want to make clear one thing. You wrote this in April 2014, correct?
A. That is correct.
Q. There is no mention of --
A. April. I believe it is April 2015.
Q. My apologies. Thank you for the correction. April 2015, correct?
A. Correct.
Q. And at that time there was no mention of there being a joint venture in this document, correct?

MB85col3          Horowitz - Cross          Page 1049

A. That is correct.
Q. And, in fact, at the time you wrote this letter, as you noted here, you weren't aware that Rocawear Kids had ever been terminated; correct?
A. That is correct.
Q. We can take that down.
Now, sir, I want to back up for a moment. You testified on direct examination about your professional background and I just want to go back over a few items. Am I correct, sir, that from December of 2005 until September of 2007, you were the CEO of Everlast, correct?
A. That's correct.
Q. And that's a position you inherited after your father passed away; is that right?
A. In part, yes.
Q. In part?
A. Yes.
Q. What do you mean by that?
A. It was not a position that could be handed down, it was something that the board had to approve.
Q. I see. You succeeded your father?
A. Correct.
Q. And you were CEO of Everlast for less than two years, true?
A. That is true.
Q. And then you went to a company called Modell's. Is that

MB85col3          Horowitz - Cross          Page 1050

right?
A. That is correct.
Q. And you left that job after a few years; true?
A. That's true.
Q. And then, in November 2011, you first talked to Neil Cole about potential employment at Iconix; true?
A. I believe that timing is correct.
Q. And at that time you were interviewing for a job as president and CEO of the mens division, true?
A. I don't recall that being the title.
Q. Let me see if I can refresh your recollection.
Mr. Lam, do you mind showing the witness DX 1016?
Have you had a chance to review that document?
A. I have.
Q. Does it refresh your recollection that, in November of 2011, that you were talking to Neil Cole about a job as president and CEO of the mens division?
A. It does not.
Q. You can take that down.
Sir, who is Lew Frankfurt?
A. Lew Frankfort was a mentor of mine and the former CEO of Coach.
Q. And when you say he was a mentor to you, did you meet with him in connection with your discussions with Neil Cole about potentially taking a position at Iconix?

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

MB85col3     Horowitz - Cross     Page 1051

A. I believe that we did.
Q. And did he give you advice about those discussions?
A. I don't recall.
Q. You continued to consult with -- is it Frankfort?
A. It is Frankfort.
Q. You continued to consult with Mr. Frankfort over time in connection with issues that would come up at Iconix, correct?
A. That is correct.
Q. When you first spoke to Neil Cole about the possibility of joining Iconix you also discussed your desire to have a seat on the board of directors, correct?
A. I believe Neil brought that up.
Q. I didn't ask you who brought it up. I said you discussed with Neil Cole your desire to have a seat on the board of directors, correct?
A. I don't recall.
Q. You recall discussing a board seat, you just don't recall whether you were the one who said you wanted it or whether he brought it up? Is that your testimony?
A. Yes.
Q. You know you discussed it?
A. Correct.
Q. Are you saying that you didn't want a board seat?
A. No.
Q. You did want a board seat.

MB85col3     Horowitz - Cross     Page 1052

A. I believe so.
Q. OK, but you are not sure whether you are the one who raised the topic?
A. Or the timing of it, correct.
Q. You were actually never offered a board seat, correct?
A. That is correct.
Q. And in 2011 you also weren't offered the title of CEO of the mens division, right?
A. Correct.
Q. So you decided at that point, in November of 2011, that you wouldn't join Iconix, right?
A. That is not why I drew that conclusion but I did decide at that time not to join Iconix.
Q. So you decided you wouldn't join in November 2011, correct?
A. That is correct.
Q. But, by March of 2012 you resumed discussions with Iconix about potentially joining the company, true?
A. That is true.
Q. And you thought the opportunity had great financial upside for you, right?
A. Yes.
Q. And I believe you testified yesterday that you decided to take the job at Iconix because, in your words, it was an excellent opportunity to make money, to make significant money.
    True?

MB85col3     Horowitz - Cross     Page 1053

A. That sounds right.
Q. And you signed an employment agreement with Iconix on or about April 2nd, 2012; true?
A. That is true.
    MR. HECKER: Actually, at this time, your Honor, rather than doing it one by one, if I could move the admission of exhibits that I have discussed with the government? If the Court would give me one moment to confirm there are no issues?
    THE COURT: Sure.
    (Counsel conferring)
    MR. HECKER: Your Honor, we will do this one at a time for now and will push the group in later.
    THE COURT: OK.
    MR. HECKER: I move the admission of Defendant's Exhibit 1025.
    MR. LENOW: No objection.
    THE COURT: 1025 will be received.
    (Defendant's Exhibit 1025 received in evidence)
BY MR. HECKER:
Q. Mr. Lam, if you would publish that e-mail and the attachment? So, if you go to 1025-A1?
    Sir, is this the original employment agreement that you signed with Iconix?
A. It appears to be so, yes.
Q. Why don't we scroll to page 19.

MB85col3     Horowitz - Cross     Page 1054

    Is that your signature, sir, on the right?
A. Yes, it is.
Q. And this agreement was your initial deal with Iconix, right?
A. That is correct.
Q. And Iconix hadn't made any other binding commitments to you with respect to your employment at Iconix other than what was in your employment agreement, right?
A. Correct.
Q. You had a three-year employment agreement, true?
A. That is correct.
Q. And if we could, Mr. Lam, go to the page that ends in 01 and 02? Can we pull out the base salary paragraph?
    Am I correct, sir, that the terms of your agreement with Iconix initially were that you would be paid at a rate of $500,000 a year for the first year, $550,000 a year for the second year, and $600,000 a year in the third year?
A. That is correct.
Q. And, in addition, that agreement provided that you would be eligible to receive an annual cash bonus too, correct?
    If we go to the next page, maybe that will be helpful.
A. That is correct.
Q. And that bonus could be up to a hundred percent of your base salary, correct?
A. That is correct.

UNITED STATES OF AMERICA, V
 NEIL COLE,                                                    **November 8, 2022**

---

MB85col3          Horowitz - Cross          Page 1055

Q. So, in other words, in your first year at Iconix you were guaranteed a base salary of $500,000 and you could make an additional $500,000 on top of that as a bonus; right?
A. That is correct.
Q. And your agreement also provided that you would receive 75,000 shares of restricted stock, true? I believe that is on the next page. Page 3. I'm sorry.
     Am I reading that correctly?
A. You are correct.
Q. And the stock is restricted, meaning that you couldn't sell it the minute you received it; right?
A. That is correct.
Q. And the restrictions would roll off annually for a third of your stock, right?
A. Yes. Every year, one third; correct.
Q. And you testified on direct that in fact you delayed your resignation so that you would get more of your stock. Is that in reference to the restricted stock or something else?
A. That was in reference to this restricted stock.
Q. You wanted to be sure that you could get the additional stock before you left the company, right?
A. That is correct.
Q. This is during this time when you were very torn up and concerned about the conduct you had engaged in at the company; is that true?

---

MB85col3          Horowitz - Cross          Page 1056

A. That is true.
Q. But you wanted to get paid; right?
A. That is true.
Q. Because that was good for you.
A. That is true.
Q. Now, am I correct, sir, that with respect to the annual bonus component of your compensation, that turned on hitting certain annual financial metrics; true?
A. That is correct.
Q. And you testified on direct that those included earnings; correct?
A. EBIDTA.
Q. EBIDTA is just earnings before you take out things like interest, taxes, and depreciation; right?
A. That is correct.
Q. Can we use shorthand earnings for that?
A. Sure.
Q. And earnings per share, that is just the same things earnings but now divided by the number of shares?
A. That is correct. That is accurate.
Q. And, to be very clear, your compensation and that of other executives at Iconix did not turn on quarterly financial metrics; correct?
A. That is correct.
Q. And revenue, standing alone, was not a metric; correct?

---

MB85col3          Horowitz - Cross          Page 1057

A. That is correct.
Q. Now, Mr. Horowitz, the Iconix board of directors never made any commitment to you that you would end up as Neil Cole's successor as CEO; correct?
A. That is correct.
Q. And they never told you or committed to you that you would become CEO within five years of joining the company.
A. That is correct.
Q. That never happened, right?
A. That never happened.
Q. But isn't it a fact, Mr. Horowitz, that right after you left Iconix, you told other people that the board of Iconix had committed to make you the CEO within five years of joining the company?
A. I don't recall that.
Q. Well, let's show the witness DX 1638.
     Sir, let me ask you this, who is Rodney Clark?
A. Rodney Clark is a financial advisor that I work with.
Q. And you spoke to him about your time at Iconix, correct?
A. Generally speaking, correct.
Q. And this is an e-mail exchange that you had with Mr. Clark on June 15, 2015, right?
A. That is correct.
     MR. HECKER: Your Honor, we move the admission of DX 1638.

---

MB85col3          Horowitz - Cross          Page 1058

     MR. LENOW: No objection.
     THE COURT: It will be received.
     (Defendant's Exhibit 1638 received in evidence)
BY MR. HECKER:
Q. Now, Mr. Lam, if you could pull up in the first paragraph the language that says: I looked at Iconix as a safe place to make great income.
     Do you see that? Keep going. Let me stop there. Could you please read what you wrote to Mr. Clark on June 5, 2015?
A. "But I looked at Iconix as a safe place to make great income and build equity with the board's commitment to be the CEO in five years."
Q. That's what you wrote to Mr. Clark, correct?
A. That is what I wrote to Mr. Clark.
Q. That wasn't true?
A. That part was not true.
Q. You lied to Mr. Clark, yes?
A. Yes.
Q. This was right after you left Iconix?
A. Yes.
Q. And you lied to him about this because you thought it would make you look better in the eyes of someone who was important to you and your career future, correct?
A. That's fair.

---

UNITED STATES OF AMERICA, V
 NEIL COLE,                                                                     **November 8, 2022**

| MB85col3 | Horowitz - Cross | Page 1059 |
|---|---|---|

Q. Did you ever correct the record with Mr. Clark and tell him that in fact you had just made that up, that the board had never committed to make you CEO in five years?
A. No.
Q. Mr. Clark advises companies on potential M&A transactions; is that true?
A. He did, yes. Still may.
Q. And that meant that if someone were looking to potentially buy a company like Iconix, Mr. Clark could advise in connection with a transaction like that, true?
A. I don't know if that size acquisition is outside of his expertise but, in general, M&A or mergers and acquisitions was his area of expertise.
Q. And did you ever talk to Mr. Clark about potentially engaging in a transaction to try to buy Iconix?
A. No.
Q. So, this e-mail you sent to him in which you lied about the board's commitment to make up the CEO, what were you looking for from Mr. Clark?
A. I don't recall.
Q. We can take this down.
     Now, Mr. Horowitz, the reality is that it wasn't very long into your time at Iconix that you became dissatisfied with your role there; isn't that true?
A. I wouldn't say dissatisfied with my role, I would say

| MB85col3 | Horowitz - Cross | Page 1060 |
|---|---|---|

dissatisfied with the culture.
Q. Well, within the very first few months that you were at Iconix you were already discussing the possibility of taking a job somewhere else, right?
A. I was interviewing for another position, correct.
Q. In fact, you talked to a recruiter about a potential role that you wanted as president of a watch company called Tourneau? Is that true?
A. In general that's true.
Q. And that was in June of 2012, correct?
A. I don't recall the specific timing of it.
Q. Let's see if we can refresh your recollection.
     Can we show the witness DX 1022? And if you can scroll down to 003?
     First of all, does this help refresh your recollection about the timing of the discussions that you had to try to become president of Tourneau?
A. Not the specific timing but I do recall that it was early in my time at Iconix.
Q. When you say early in your time, within three months of joining the company?
A. I recall being within the first six months of me being there.
Q. Well, sir, is June within three months of April?
A. Yes.

| MB85col3 | Horowitz - Cross | Page 1061 |
|---|---|---|

Q. So --
A. Yes.
Q. So you were looking to leave for another job within three months of joining Iconix, correct?
A. Correct.
Q. Now, just to be very clear, you didn't go and tell Mr. Cole that you were dissatisfied and you were looking to leave for another job within three months of getting to Iconix, right?
A. I did not tell Mr. Cole about looking for another job.
Q. Because you didn't think that would be good for you, right?
A. Yes.
Q. If you stayed at Iconix, having tried to leave, you didn't want your boss to know that you had tried to leave within three months of signing your employment agreement; correct?
A. That's correct.
Q. That's a bad look, yes?
A. That's fair.
Q. Now, you never became president of Tourneau, right?
A. That is correct.
Q. And so you decided to stick it out for a little while longer at Iconix, right?
A. That is correct.
Q. But it wasn't long, was it, sir, before you began to feel that Neil Cole was disrespecting you?
A. That's correct.

| MB85col3 | Horowitz - Cross | Page 1062 |
|---|---|---|

Q. By June of 2012 you felt that Mr. Cole was disrespectful to you, correct?
A. That is correct.
Q. You felt he was putting you down in order to make himself look stronger. Wasn't that your view at the time?
A. I believe so.
Q. And, in fact, at the time you sent yourself an e-mail that included your thoughts about what you might say to Mr. Cole about his being disrespectful to you, true?
A. I believe that is true.
Q. And you sent that to yourself in mid-June 2012, yes?
A. I believe so.
Q. Mr. Lam, can you show the witness DX 1023-A1?
     Sir, this is an e-mail that you drafted, yes?
A. Yes.
     MR. HECKER: I want to move the admission of 1023-A1.
     MR. LENOW: We object. Hearsay.
     THE COURT: Come to side bar.
     Actually, you know what we will do, ladies and gentlemen? It is almost 2:40 so we will break for the day. We will get back together tomorrow morning. Be safe getting home. Until then, don't discuss the case, don't listen to anything about the case, don't read anything about the case.
     Be safe.
     (Continued on next page)

# A-828

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB85col3 | Horowitz - Cross | Page 1063 |
|---|---|---|

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

(Witness steps down)

THE COURT: You folks can be seated. Mr. Hecker, why isn't it hearsay?

MR. HECKER: Well, Judge, this -- I feel like deja vu all over again. This document came in the last time for the same reason, which is that it is not offered for the truth but entirely for his state of mind and it goes precisely to one of the issues which is core to the defense which is his feeling about being disrespected by Neil Cole and looking to fight back. It's core and it came in last time over the government's objection, there wasn't in limine practice about it, so we submit it should come in.

THE COURT: There was what? There was in limine practice about it?

MR. HECKER: There was not.

THE COURT: Mr. Lenow?

MR. LENOW: Sure. Judge, this did come in last time but I think that it doesn't mean that it has to come in in this trial too. And specifically, when the record is more developed and we see how it was used, I think that provides a foundation for us to look back and see whether it was used properly. If defense wants to question Mr. Horowitz --

THE COURT: Sit down and speak into the microphone.

| MB85col3 | Horowitz - Cross | Page 1064 |
|---|---|---|

MR. LENOW: If defense wants to question Mr. Horowitz about his feelings around this time about Mr. Cole and if he even wants to use the document to refresh him I think that seems permissible to me, but this isn't an e-mail to -- this is a message to himself, essentially kind of a diary entry of sorts, it is clearly not a statement. And they want it in for the matter truth of the matter asserted, that what he is saying here is true, is that Mr. Horowitz feels this way, that X, Y, and Z happened, that this is his actual thought process at the time and he believes it.

So, again if they want to get into this topic of the relationship, that's fine, they can use it to refresh if Mr. Horowitz doesn't remember, but essentially diary entries, there were a number of times at the prior trial where the Court didn't let it in, and here based on a more fulsome record this document really shouldn't come in. I think they can get what they want to get by questioning the witness in the normal course about his mental state at the time and using this to refresh if necessary.

I think they can get where they need to go without admitting this what I think is a plain hearsay document in this trial.

MR. HECKER: I appreciate the advice about how to try our case from the government but, in fact, this document is not offered for the truth, it is not being offered to show that

| MB85col3 | Horowitz - Cross | Page 1065 |
|---|---|---|

Neil Cole screamed or cursed at him but that's how he felt at the time. It is not hearsay, it is not being offered for the truth, and it speaks volumes about how he felt that he drafted this note to himself about it in real-time.

THE COURT: I mean, if it is being used for that purpose then it is not hearsay. If the government wants to recommend or suggest an instruction to the jury about that I would be happy to give the jury an instruction.

Did I give the jury an instruction last time?

MR. HECKER: No.

MR. LENOW: I don't believe so.

Judge, there is one other part of this in terms of how it was used? If I could have a second, just 20 seconds to review it?

THE COURT: Sure.

MR. LENOW: I think there is a specific part that I think is important for the Court to see but let me just make sure I am thinking of the right document here. (pause)

Right, this is what I recall. So, I think what is being offered for the truth here is a statement from Mr. Cole that's baked in the cake here. In the second paragraph there is a statement here about a conversation with Mr. Cole, so just for some context. In the first part Mr. Horowitz is talking about how he is being berated by Mr. Cole and told how he needs to make more revenue and so forth, and in the second paragraph

| MB85col3 | Horowitz - Cross | Page 1066 |
|---|---|---|

there is this kind of bipolar, totally opposite statement from Mr. Cole that seems to be reversing himself where he is saying, and here is the quote: I was told to relax, take your time, calm down. It doesn't matter if we another 5 million or 10 million off in the mens division. These are two very opposite redactions and directions.

So I think the way this was used last time was to make the substantive point for the truth of the matter asserted that Cole had actually told Horowitz that, essentially, take your time, it doesn't matter, we don't need more revenue; right? So that this document is being used to buttress the defense point -- the substantive and for the truth of the matter asserted point that Cole, in fact, told Horowitz what is in this document about it doesn't matter if we are another 5 million or 10 million off in the mens division.

So I think that's definitely for the truth of the matter asserted and that's why this should not come in.

MR. HECKER: Your Honor, all of this is -- none of this is being offered for the truth of the matter asserted, it is being offered to show what this witness thought at the time about his interactions with Neil Cole and it is just not offered for the truth, it is not hearsay.

THE COURT: I mean, to the extent that there are factual assertions there, I mean, so long as it is not being offered for the truth then it can come in but, like I said, if

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                 November 8, 2022

| MB85col3 | Horowitz - Cross | Page 1067 |
|---|---|---|

you want me to give the jury an instruction, I can do that.

MR. LENOW: Judge, can I ask -- oh, I'm sorry.

THE COURT: Go ahead.

MR. LENOW: We will take the instruction but I just would note there was another document, this is the one that defense opened on, where the Court redacted the self-serving statements of Mr. Cole that were offered for their truth. There is an e-mail, if you might recall this was for the SEA-1 transaction and the first sentence said something like, you know, negotiate hard or something like that, and the second sentence was not a directive but was, there is this statement of Mr. Cole and the Court redacted that sentence. So, what we propose is the part in here where it says in the second paragraph -- maybe we can highlight this for the Court to kind of --

THE COURT: I think, you know, I think that we are talking apples and oranges here because what I -- or the e-mail that was used in opening was not hearsay because it was a direction.

MR. HECKER: And it was written by Mr. Cole. And they argued that the second sentence was self-serving. We actually also thought there was a direction but this is very different, this is all from Horowitz and none of it is being offered for the truth. To the extent there is any direction in here from Neil Cole, that would come in, too, by the way. But this is a

| MB85col3 | Horowitz - Cross | Page 1068 |
|---|---|---|

Horowitz to Horowitz document and that's what we are inquiring about, what was going through his head at the time.

THE COURT: Well, I mean, the one thing you may want to consider, Mr. Hecker, is whether we need the whole thing or whether you can agree on some redactions. We have to consider that as well.

MR. HECKER: I am happy to consider it, Judge, but I actually just think it is not hearsay and it is admissible and I laid the predicate for it as the author of the document.

MR. LENOW: Just so I understand, the Court would instruct the jury that the statement from Mr. Cole: It doesn't matter if we were another 5 million or 10 million off in the mens division; that that's hearsay and that's not being offered for its truth?

THE COURT: I wouldn't necessarily focus on a particular statement. I would say that this document is being offered not for the truth but to comment on Mr. Horowitz' state of mind, if you find that it did affect his state of mind.

MR. LENOW: Understood.

THE COURT: I don't know that I necessarily -- I don't ordinarily focus on particular statements within documents like that.

MR. LENOW: Understood. Judge, we appreciate the Court's views on this. If we could just mull it over and confer with the defense? It is very possible we could have a

| MB85col3 | Horowitz - Cross | Page 1069 |
|---|---|---|

proposal for the Court in the morning on this.

THE COURT: Sure.

MR. LENOW: Thank you.

THE COURT: OK. Anything else? Was there any agreement on the instruction to the jury about -- I forget the issue, the other issue.

MR. HECKER: Yes, Judge, about consulting counsel.

THE COURT: Yes.

MR. HECKER: We are all worried about clients continuing to be incentivized to call counsel when they hear from the SEC. So, the language we would propose is very simple. It would be: You have heard testimony to the effect that Mr. Cole discussed consulting with counsel after receiving the SEC letter. It is perfectly proper for someone to consult with legal counsel in that context. I instruct you to disregard any inference or suggestion that it is improper to consider hiring legal counsel.

MR. THOMAS: We have no objection to the form of the instruction. We would just propose to add to that first sentence: You have heard testimony that Cole and now Mr. Horowitz... so just add "and Horowitz" so its application is even across the witnesses' testimony, your Honor.

MR. HECKER: We do join that.

THE COURT: So, someone tell me exactly what you want me to say.

| MB85col3 | Horowitz - Cross | Page 1070 |
|---|---|---|

MR. THOMAS: Perhaps we can e-mail it to chambers so you have it verbatim for the morning.

THE COURT: That would be even better.

MR. HECKER: Your Honor, just one other issue while we are here?

THE COURT: Sure.

MR. HECKER: This relates to the government's proposal to put on a summary witness to review, I think, something like 136 slides. I know we wrote a letter about it, we haven't yet heard from the government, but particularly in light of the direct examination of Mr. Horowitz, which I think we can all agree was rather thorough when it came to walking through the timeline, it is very difficult to understand how, under a 403 analysis, it would make any sense to redo that exercise with someone who isn't a percipient witness and, in the end, it's effectively giving the government a first closing before their next closing before their rebuttal. And, as we have indicated, if that's how we are going to do this, we could also put on a summary witness to review documents we like but we think it is wholly unnecessary and a waste of the jury's time and, frankly, improper in this context.

THE COURT: We will have to hear what the government says.

MR. THOMAS: Your Honor, it's still the case that we expect this witness would present her summary charts at the end

# A-830

UNITED STATES OF AMERICA, V
NEIL COLE,

November 8, 2022

| MB85col3 | Horowitz - Cross | Page 1071 |
| --- | --- | --- |

of the next week so we are still more than a week away. When those are finalized it is our intention to respond to the defense letter in writing. But, there is a --

THE COURT: You may want to do that before the midnight before she testifies.

MR. THOMAS: We certainly will, your Honor. I think we are aiming for Friday or Saturday of this week.

THE COURT: OK.

MR. THOMAS: But, there is a mistaken assumption here. What the defense letter has pointed to is a proposal in the Maxwell case to have a witness not present a chart but simply to describe on the stand connections between documents. What we are proposing here is a summary chart that the summary witness would present. It's not going to be anywhere lengthy, descriptive testimony of anything. The idea is to give the jury tools to understand the evidence that they have which, at this point, is quite extensive.

THE COURT: OK. So, like I said, I will await to receive your submission.

Anything else?

MR. HECKER: No, your Honor.

THE COURT: OK. And Mr. Hecker, I won't hold to you this either, but will we be done with Mr. Horowitz tomorrow, do you think?

MR. HECKER: Close call.

| MB85col3 | Horowitz - Cross | Page 1072 |
| --- | --- | --- |

THE COURT: OK. Very well. Good night, folks.
(Adjourned to November 9, 2022 at 9:00 a.m.)

Page 1073

INDEX OF EXAMINATION

Examination of:                                        Page
SETH HOROWITZ
Direct By Mr. Lenow . . . . . . . . . . . . . . 876
Cross By Mr. Hecker . . . . . . . . . . . . . .1034

GOVERNMENT EXHIBITS

| Exhibit No. | | Received |
| --- | --- | --- |
| 2108 | . . . . . . . . . . . . . . . . . . . | 902 |
| 2107 | . . . . . . . . . . . . . . . . . . . | 904 |
| 706, 706-A, 706-C | . . . . . . . . . . . . . | 921 |

DEFENDANT EXHIBITS

| Exhibit No. | | Received |
| --- | --- | --- |
| 1025 | . . . . . . . . . . . . . . . . . . . | 1053 |
| 1638 | . . . . . . . . . . . . . . . . . . . | 1058 |

MB9YCOL1                                          Page 1078

called as a witness by the Government,
having been duly sworn, testified as follows:
CROSS-EXAMINATION CONTINUED
MB9YCOL1                    Horowitz - Cross
BY MR. HECKER:
Q. Good morning again, Mr. Horowitz.
A. Good morning.
Q. You'll recall that when we last broke, you were testifying about your feelings in 2012 and specifically June of 2012.
     Do you recall that?
A. I do.
Q. And do you recall that during that time period, you felt that Mr. Cole had been disrespectful to you? Correct?
A. That is correct.
Q. And that he was doing things that put you down to make him feel stronger.
     Do you recall that testimony?
A. I do.
Q. And you felt he was being disrespectful to you. True?
A. That is true.
Q. Now, at around that time, you sent yourself an email that was a draft of an email to Mr. Cole in which you lay out how you felt.
     Correct?
A. Mostly correct.

MB9YCOL1                                          Page 1079

Q. And you sometimes did that; right? When you were approaching a potentially stressful event or conversation, you would sometimes write out for yourself what you would want to say in advance of that event.
     Correct?
A. Generally speaking, at times, yes.
Q. Sometimes you would do it in the form of a draft email; right?
A. That is correct.
Q. Sometimes you would do it as like a draft script of what you might say; true?
A. At times, yes.
Q. And sometimes, you'd just make notes to yourself. Right?
A. Yes.
Q. That's because you want to practice what you want to say in order to make it more persuasive. Correct?
A. No.
Q. And sometimes you give yourself instructions about how to say it so that it will be more persuasive. Correct?
A. I don't believe so.
Q. Well, sir, let's look at Defense Exhibit 1023A1, which is in evidence.
     Would you agree with me, sir, that this is a draft email you wrote to yourself in June of 2012?
A. That is correct.

MB9YCOL1                                          Page 1080

     MR. HECKER: Let's just pull out the first two lines.
It says: "Neil, I'm completely confused by your directions and actions."
Q. Do you see that?
A. I do see that.
Q. And then you list some examples of things that are causing you confusion. True?
A. That appears to be true.
Q. And you felt like you were getting mixed messages from him about what he wanted from you. True?
A. That is true.
     MR. HECKER: Can we pull out the paragraph beginning: "However."
Q. You wrote: "Every time I attempt to take action, I'm told to stop. I'm moving too quickly. I was told I could not even have a two-day strategic meeting with my team because I was moving too fast. This strategic meeting would have resulted in finding real revenue for the company in a way to continue to identify revenue opportunities utilizing our resources in the most efficient and effective way. You were actually bothered by this. I was told relax. Take your time. Calm down. It doesn't matter if we're another 5 or 10 million off in the men's division. Those are two very opposite reactions and directions."
     Correct?

MB9YCOL1                                          Page 1081

A. That is what I wrote.
Q. And you found that befuddling; right?
A. Based on other conversation, yes.
Q. And you were frustrated by it. Yes?
A. I was frustrated by the contradiction.
Q. And you also felt that he was putting you down; right?
A. At other times, yes.
     MR. HECKER: And in this document, if we can just scroll down where it begins in the middle of the last paragraph on this first page through to the end: "You don't have to put me down." Can you pull that out, please.
     You can read as much as you want, but I'm focused on: "You don't have to put me down to try to show your position of strength."
     Do you see that?
A. I do.
Q. "It really is just insulting and reduces the respect I have for you."
     Do you see that?
A. I do.
Q. And then you explain some of the things that you feel like he's doing that you don't like, copying people in on what you think just be just between the two of you? Yes?
A. That is partially true.
Q. And you say: "And I'm left with two potential reactions:

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1     Page 1082

One, ignore it, but that shows weakness and an acceptance of disrespectful and inappropriate behavior, neither of which I can stomach; or two, fight back."

That's what you wrote; correct?

A. That is what I wrote.

Q. And that's how you were feeling at the time you wrote this in June of 2012. Correct?

A. That is correct.

Q. Sir, did you send this to Mr. Cole?

A. I did not.

Q. So in drafting this email and working through these issues, was this just an attempt for you to process these feelings on your own?

A. In part.

Q. Did you have a discussion with Mr. Cole in which you told him how you were feeling in June of 2012?

A. I don't recall.

Q. Now, we agree this is an example of you putting down in words what you'd like to communicate to someone else so you can try to get it just the way you want it. Right?

A. No.

Q. Well, sir, isn't it true that there were times when you were feeling stressed or concerned about having a difficult conversation where you would write down what you planned to say in advance?

MB9YCOL1     Page 1083

A. At times, yes.

Q. And can in fact, one example --

MR. LENOW: If we can have the instruction given.

MR. HECKER: We can take this down.

THE COURT: Ladies and gentlemen, the exhibit that Mr. Hecker is using now with Mr. Horowitz is not being offered for the truth.

In other words, you're not being asked to determine whether anything Mr. Horowitz wrote in this email is true or not. Rather, it is being offered for you to determine the extent to which, if at all, it provides insight into Mr. Horowitz's state of mind at the time he wrote the email.

Mr. Hecker.

MR. HECKER: Thank you, Judge.

Q. Sir, I believe you testified yesterday about a man called Lou Frankfort.

Do you recall that testimony?

A. I do.

Q. He's an executive coach; correct?

A. I don't believe so.

Q. He's a coach. Yes?

A. I don't believe so.

Q. You met with him regularly before you joined Iconix to give you advice about how to think about your career options. Yes?

A. Yes.

MB9YCOL1     Page 1084

Q. You met with him while you were at Iconix; true?

A. True.

Q. And he would give you advice about how to have conversations with folks within the company, about how to advance. Correct?

A. At times, yes.

Q. Did you pay Mr. Frankfort for advice?

A. No.

Q. He was just someone who did this on his free time?

A. Yes.

Q. Did he do this for many people or just for you?

A. I don't know.

Q. Did you find his advice helpful in navigating your career?

A. At times.

Q. And that's why you sought his feedback; correct?

A. Yes.

Q. And there came a time in March of 2013 -- are you with me? March of 2013.

A. Yes.

Q. So that's a little over nine years ago. And this was in advance of negotiating your amended employment agreement and becoming COO. Correct?

A. That timing sounds correct.

Q. But there were times before you had that promotion when you wanted to talk to Mr. Cole about trying to get better economics

MB9YCOL1     Page 1085

for yourself. True?

A. I don't recall doing that.

Q. You don't recall going to Mr. Cole and asking for more money at different times?

A. I recall having those conversations or that conversation, but I don't recall how many times or when.

Q. It happened. You just don't recall how many times it happened that you went to Mr. Cole seeking better economics for yourself. Fair?

A. Somewhat fair, yes.

Q. And isn't it true that one of those times when you wanted to go speak to Mr. Cole was in March of 2013?

A. I don't recall if that's the timing.

Q. You wrote out what you wanted to say to Mr. Cole about your compensation in a document that was called "loucomp.docx."

And "Lou" is a reference to Lou Frankfort. Correct?

A. I do believe that "Lou" is a reference to Lou Frankfort. I don't recall the document or writing the document.

Q. And that document contained a script of what you would say to Neil Cole to ask him for more money. Right?

A. I don't know.

Q. The script included the words you practiced saying so that when you had the conversation, it would be more persuasive. True?

A. No.

# A-833

UNITED STATES OF AMERICA, v.
NEIL COLE

**TRIAL**
**November 9, 2022**

MB9YCOL1     Page 1086

Q. Sir, the script not only told you what words you'd say, but it included some cues to say so it would be more powerful.
    Isn't that true?

A. I don't remember having a script. So I don't believe that's true.

Q. You wanted to appear confident and clear when you were having this conversation.
    Isn't that true?

A. I don't recall this conversation, but it would be normal for me to want to be clear and confident in communication.

Q. And to script yourself for that conversation.

A. I can't agree to that.

MR. HECKER: Well, let's look at -- for the witness at this point -- what is marked as Defendant's Exhibits 1036 and 1037.

Q. Do you agree with me, sir, that 1036 is a document that you authored which is reflected by the metadata for this document which shows you as the custodian, and the subject is "loucomp.docx."
    Do you see that?

MR. LENOW: Judge, objection. It's not in evidence yet.

MR. HECKER: I'm just asking the witness to establish the foundation.

THE WITNESS: What was the question?

MB9YCOL1     Page 1087

MR. HECKER: Can you read that back, please, Ms. Reporter.

(Record read)

BY MR. HECKER:

Q. You agree this is a document you wrote; correct?

A. I believe that it is.

MR. HECKER: Okay. We move the admission of 1036.

MR. LENOW: Objection. Hearsay.

THE COURT: We'll talk at sidebar.

(Continued on next page)

MB9YCOL1     Page 1088

(At sidebar)

THE COURT: So is this like the document for which I gave the jury an instruction?

MR. HECKER: It sure is. It's not being offered for the truth. It's absolutely offered for the fact that he scripted himself for conversations like this. And both know -- or we all know I should say -- that it's going to become relevant in relation to other documents in the case.

THE COURT: Is there another reason, Mr. Lenow?

MR. LENOW: Judge, first, I haven't had a chance to review the full document first. These are notes from himself. They're hearsay. In terms of the explanation that they're not being offered for the truth and that's a common refrain -- I'd like a second to review the document in full first. I'm not sure I understand the defense's proffer on why this comes in to show a non-hearsay purpose.

MR. HECKER: I think I explained it once already, and we've already established the foundation for it in the question leading up to it, which is that this gentleman often scripted himself. He actually denied giving himself cues about how to say it, although this document reflects those cues. So it's also being offered to just impeach him, but it's not being offered for the truth. It's being offered for the fact that he scripted himself.

MR. LENOW: Judge, the witness has said that he did

MB9YCOL1     Page 1089

write notes to himself. That doesn't then make every note that the witness has ever written to himself admissible. He said he wrote notes to himself.

I'm not sure what is the hearsay relevance of this particular document? Is it that any time Mr. Horowitz wrote a note to himself that it is admissible? I don't think that's the case.

What is the relevance of these particular notes?

MR. HECKER: I don't know how much longer we need to belabor this. I thought the Court had ruled on it already.

THE COURT: I think he stated the relevance of it, and Mr. Horowitz certainly wasn't clear in his agreement that he wrote such things, and he kept partially at least denying it. So it can be used to impeach, and it's not being offered for the truth of the matter. So it will be allowed subject to the same instruction.

MR. LENOW: I understand this document is coming in, but I do think there's a limit as to how many notes are necessary at this point.

Two, in terms of the what the witness said is that he didn't recall certain things. So I don't think he was denying things. So I think the first step would be to allow the witness to look at the document and, after he's been refreshed on it, respond.

I think there was kind of a skipping over the step of,

UNITED STATES OF AMERICA, v.
NEIL COLE

MB9YCOL1                                    Page 1090

did you write notes to this effect?  And he said he just didn't recall this specifics.  So I'm not sure there was a flat denial that this occurred.

We had skipped from not recalling to this being offered directly without giving the witness a chance to just respond to that.  Those are just two points going forward that I hope we can keep in mind.

THE COURT: To your second point, I don't think that that's the case.  He was asked several times in several different ways before he was even shown the document, did you sometimes write cues to yourself, etc., in terms of how you were going to say it.

With respect to the first point, Mr. Hecker, I have to say -- how many of these do you have?

MR. HECKER: I don't have a lot.  This is the first one.  We're just getting going here.

THE COURT: He's laying a marker.

MR. HECKER: We can deal with the next one next time.

THE COURT: Very well.

MB9YCOL1                                    Page 1091

(In open court; jury present)

THE COURT: Ladies and gentlemen, the exhibit will be received, subject to the same instruction that I gave you just a short while ago about it is not being offered for the truth but simply to the extent that you believe it may provide you with some insight into Mr. Horowitz's statement.

Mr. Hecker.

MR. HECKER: Thank you, your Honor.

At this time, we'd like to publish Exhibit 1036 for the jury.

And blow it up so we can see it.

Q. Now, sir, this is a script that you prepared.  Yes?
A. I believe it is notes.  I'm not sure if it's a script, but it is one that I prepared.
Q. And you saw it was called "Loucomp.doc."  Correct?
A. That is correct.
Q. Did you share this with Mr. Frankfort?
A. I don't believe I shared it with him, but I do believe it's a result of our conversations.
Q. So you met with Mr. Frankfort; correct?
A. Yes.
Q. And you had a conversation with him about how to present the argument to Mr. Cole that you deserved more compensation in March of 2013.
Yes?

MB9YCOL1                                    Page 1092

A. That's partially true.
Q. You were trying to make the case for yourself.  Yes?
A. I just don't recall.
Q. And this occurred at a time one year after you had signed a three-year employment agreement.  Correct?
A. The timing of this is one year after I had signed my agreement.
Q. One year after your agreement, you're meeting with Mr. Frankfort to give you advice about how to go back to Iconix to recut your deal.  Yes?
A. In general, yes.
Q. And that's what this script reflects.  Yes?
A. Again, I'm not sure that it's a "script," but it is notes.
Q. Well, it's interesting.  If we look, the first, number one -- and this is often how you would prepare documents?  Yes?  You would put them in outline form?
A. Correct.
Q. And you said: "The biggest success in my first 12 months is that we are aligned strategically."
And then you list some items on performance, things you think you've done well."
Yes?
A. That appears to be correct.
Q. And under B, you say: "I make Iconix better, more nimble, which is key to our growth."

MB9YCOL1                                    Page 1093

Do you see that?
A. That is what I wrote.
Q. You thought that was true?
A. I believe so.
Q. And you say under two: "I understand I have a contract that provides the economics for our arrangement."
Do you see that?
A. That is what number two says.
Q. But under that, you're pointing out -- you're saying anyway -- that you've been approached with opportunities that you've turned down blindly.
Do you see that?
A. That is what is listed in my notes.
Q. Well, was that true?
A. There was at least one opportunity that I turned down.
Q. So when you say "increasingly approached with opportunities, and I turned them down blindly," that wasn't quite true because you can only remember one such opportunity.
Yes?
A. Yes.  I just don't recall other opportunities at that time.
Q. You're goosing it a little bit because you want to have a negotiation with Mr. Cole to get more money and it's going to be more persuasive if you suggest that you're increasingly approached with opportunities, even though you only got one such approach.

**A-835**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1                                                    Page 1094

MR. LENOW: If counsel could just break the question down into individual questions.

THE COURT: Why don't you start by slowing down, Mr. Hecker.

MR. HECKER: I will. Thank you.

Q. You wanted to goose it a little bit for your discussion with Mr. Cole.

True?

A. I don't remember that.

Q. You were exaggerating.

A. I don't recall.

Q. Well, we agree that when you say, "increasingly approached with opportunities," plural, "and I turned them down blindly," that would suggest there was more than one. Yes?

A. Yes.

Q. But as you sit here now, you only remember one?

A. I remember one, and there were other conversations.

Q. Under C, you say: "In order to simply ignore opportunities brought my way, I would appreciate it if we took a fresh look at my compensation package."

Do you see that?

A. That is what I wrote.

Q. And the point of one and two is to set the predicate for a conversation that you want to have with Mr. Cole to try to get more money. Yes?

MB9YCOL1                                                    Page 1095

A. I would say that's a bit exaggerated.

Q. The next thing you write here, you write: "Pause."

Do you see that?

A. I do.

Q. That was like a stage cue for yourself. Yes?

A. It would appear to be so.

Q. What you wanted to do was to remind yourself, after making these first set of claims -- I'm doing a great job. I've got a lot of opportunities -- you wanted to really wait, let that sink in, before you make the ask. Right?

A. I don't remember, but that is what this looks to reflect.

Q. And at the bottom is the ask. Yes?

A. It reflects notes that outline an ask.

Q. And the ask would be that over the next three years, you want to double your compensation. Yes?

A. That is what the notes reflect.

Q. You want an equity gross up. You love equity. Yes?

A. That is what my notes reflect.

Q. You wanted a special bonus for the first year.

A. Again, this is what my notes reflect.

Q. And you wanted a higher salary.

A. Potentially.

Q. "And/or bonus" is what it says. Right?

A. These are my notes, yes.

Q. And I just want to be totally clear. You didn't think you

MB9YCOL1                                                    Page 1096

were entitled to any of this under your existing agreement. Right?

A. Under my existing agreement, no.

Q. But you wanted to go back with additional asks. Yes?

A. I don't recall doing so at the time, but yes.

Q. And you said you don't recall doing so at the time, but you do recall going to Mr. Cole and asking for more money. The thing you're not recalling now is whether it happened at exactly the time you wrote the script.

Is that fair?

A. That is fair.

MR. HECKER: We can take that down.

Q. It wasn't until a year later --

A. Can I clarify one thing?

Q. You'll get plenty of opportunity.

It wasn't until a year later when you actually did cut a new deal. Correct?

A. I signed a new agreement one year later.

Q. So March of 2014.

Do I have that right?

A. Approximately, yes.

Q. You received a promotion. Yes?

A. That is correct.

Q. Your new title was chief operating officer. True?

A. True.

MB9YCOL1                                                    Page 1097

Q. But you still reported to Mr. Cole; right?

A. Yes.

Q. And when you made this new deal with Iconix, that resulted in an amended employment agreement. Correct?

A. That is correct.

Q. That was the mechanism for changing the deal you had with Iconix. Yes?

A. Yes.

Q. And you signed that agreement in March 2014. Correct?

A. I believe so.

MR. HECKER: Okay. At this point, let's show the witness what's been moved into evidence as Defense Exhibit 1178.

Q. Is this your amended employment agreement from March 2014?

A. Yes, it is.

Q. If we turn to page 6, is that your signature?

A. Yes, it is.

Q. Now, on the first page of this document, item 3, do you agree with me that this paragraph includes a new higher base salary. Yes?

A. I believe that's true, yes.

Q. And you were eligible for a bonus on top of that? $625,000 a year.

A. Yes.

Q. And if we look at the next page, I believe we can see that.

UNITED STATES OF AMERICA, v.
NEIL COLE

MB9YCOL1     Page 1098

Do you see that there, up to 100 percent of your salary?

A. I do.

Q. And as was true with your original agreement, you still had entitlement to restricted stock units. Yes?

A. That is correct.

MR. HECKER: And if we can scroll down. Stop there for a moment.

Q. Do you agree with me that the fair-market value of the restricted stock units was pegged at $800,000? Yes?

A. That is correct.

Q. And this agreement -- and to be clear, again, these restricted stock units were going to become unrestricted a third, a third, a third over the next three years. Right?

A. I believe so.

Q. And you also received performance stock units or PSUs, if we scroll down.

A. That is correct.

Q. And those PSUs had a fair-market value of $2.8 million.
Is that correct? Right in the middle of the paragraph.

A. That is correct.

Q. And those PSUs were going to be allocated to you depending on whether the company was increasing its annual earnings and its annual cash flow. Yes?

MB9YCOL1     Page 1099

A. As we agreed to "earnings" yesterday, yes.

Q. And as we agreed to yesterday, it doesn't turn on quarterly numbers. It turns on annual numbers. Yes?

A. No. Our definition of earnings EBITDA, earnings per share.

Q. Fair enough. Earnings per share, EBITDA -- those were the metrics of earnings that were being used to determine your compensation. Correct?

A. Those were two of them, yes.

Q. And just so the jury is clear, it's an annual compensation, not a quarterly one.

A. That's correct.

Q. You were excited about your promotion; correct?

A. Yes.

Q. You thought it was a great step for you.

A. Yes.

Q. And you felt that at that point as COO, that you had gotten to a point with Mr. Cole where he considered you to be his clear number two.

A. I don't know if I would state it that way, but I was his right hand.

MR. LENOW: Let's show the witness what is in evidence as Defense Exhibit 1181.

Q. Sir, this is another communication between you and lfrankfort@coach.com.
Do you see that?

MB9YCOL1     Page 1100

A. Yes.

Q. And earlier, I asked you whether Mr. Frankfort was a coach.
Do you see why I may have been confused about that?
His email address is lfrankfort@coach.com.
Is that right?

A. That stands for the Coach brand.

Q. Right. I was confused because I thought he was your coach, but he actually works at Coach. True?

A. He worked at Coach. That's correct.

Q. But he's providing career advice to you on the side. Yes?

A. As a friend and mentor, yes.

Q. As a friend and mentor.
And on March 18, after you signed this new amended deal with the company, you wrote to tell him about it. Correct?

A. It appears that I did.

Q. And you said: "Great seeing you as always."
So you presumably had just met with him in connection with this issue. Yes?

A. I'm not presuming it was in connection with this, but I did apparently just see him.

Q. One, you tell him: Neil and I discussed the CCO." It looks like it's a typo. Right?
You meant COO. Right? That's what you say in the next part.

MB9YCOL1     Page 1101

A. I don't recall.

Q. Well, it says: "We agreed the COO was in line with what he wants, and I agree. He wants me as his clear-cut number two."
Do you see that?

A. I do.

Q. "For purposes of JVs, acquisitions, and the board."
Do you see that?

A. I do.

Q. Was that true?

A. I believe so.

Q. "He says he felt COO did this as he wants me to share his full P&L and EPS responsibilities."
Do you see that?

A. I do.

Q. And then he says: "In reference to president --" that's a title. Yes?

A. It is.

Q. "He says he's not ready to give this up but believes it will happen next year."
Do you see that?

A. I do.

Q. Was that true?

A. I believe so.

Q. Mr. Cole told you he wasn't ready to give you that title but believed it would happen the next year. Yes?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1     Page 1102

A. That sounds correct.

Q. That's what he told you. He told he he'd make you president the next year. Yes?

A. That he believed it would happen in the next year.

Q. Now, when Mr. Cole told you that he believed it would happen next year, meaning get the title of president, you knew he wasn't obligated to do that. Right?

A. That's correct.

Q. It wasn't a provision of your employment agreement that after one year you'd assume the president title. Correct?

A. That is correct.

Q. It wasn't in your agreement; right?

A. That is correct.

Q. And at this point, sir, isn't it true that you knew that if you didn't get a promise from Mr. Cole in writing, you couldn't count on it happening?

A. I don't believe so.

Q. Sir, you knew that he hadn't agreed in writing in your employment agreement to give you the title of president. So you knew you couldn't count on it. Correct?

A. I would separate those two statements.

Q. Sir, didn't you broadly believe that when you were negotiating with Mr. Cole, you had better get it in writing?

A. At times.

Q. You told that to the government multiple times in your

MB9YCOL1     Page 1103

meetings with them. Isn't that true?

A. I don't recall.

Q. You don't recall that?

A. I believe I shared that sentiment.

Q. You told that to them multiple times in meetings with the government beginning with the first meetings you had with them. Isn't that true?

A. I don't remember.

Q. You're not denying you said it. Right?

A. I'm not denying I said it.

Q. But you're saying now you don't remember what you told the government about this topic when you met with them in December of '18 and into 2019 three or four years ago. Right?

MR. LENOW: Objection to the compound nature of that question. If he can just break it up.

THE COURT: Sustained as to the form.

BY MR. HECKER:

Q. You're not denying you said it. Right?

A. I'm not denying I said it.

Q. You probably did; right?

A. I believe I probably referred to this topic with some specificity.

Q. The topic to be very clear -- Mr. Cole is a lawyer; yes?

A. That is true.

Q. And you believed that if you didn't get it in writing from

MB9YCOL1     Page 1104

him, it might not happen.

MR. LENOW: Sorry. Objection. What is the "it"?

BY MR. HECKER:

Q. You might not get whatever he's promising you. That is your view. That's what you told the government. Correct?

A. I believe I shared with them a personal experience. That is true.

Q. You shared it with them multiple times, four years after you left Iconix but in your first meetings with the government. Yes?

A. I don't remember.

Q. You don't remember those conversations with the government in 2018 or 2019.

Is that your testimony?

A. I don't remember the timing that you're referring to in tying those things together.

Q. Is it because you had so many meetings with the government that what you told them is blending together?

MR. LENOW: Objection. Argumentative.

THE COURT: Overruled.

THE WITNESS: Partially, yes.

BY MR. HECKER:

Q. But you have total clarity about every conversation you had back in 2014 with Iconix that's important to the government's case. Right?

MB9YCOL1     Page 1105

MR. LENOW: Objection.

THE COURT: That's argumentative.

BY MR. HECKER:

Q. You told the government in December 2018 -- strike that.

In your very first discussion with the government, you told them that you learned from Mr. Cole that you did not have an agreement if it wasn't in writing.

Does that sound familiar?

A. I don't remember the timing of the meeting, but that does sound familiar.

Q. It was your first meeting, even if you don't remember the date.

A. I don't remember it being the first meeting.

Q. One of your first meetings?

A. I just don't recall.

Q. You said it again when you met with them a week later in the second meeting, same sentiment, if you're going to make a deal with Mr. Cole, you better have it in writing.

Isn't that what you told them?

A. Again, I don't remember the timing.

Q. You're not denying it happened. You're just quibbling about exactly when you said it. Right?

A. When and in the context of saying it.

Q. Mr. Horowitz, you were never given the title of president of Iconix; true?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1 — Page 1106

A. That is true.

Q. And that was true, notwithstanding that you were hoping, during this time period of 2014, that you would one day run the company. Isn't that true?

A. That is true.

Q. You wanted to be the CEO?

A. Eventually, yes.

Q. That never happened obviously; right?

A. Correct.

Q. When you say "eventually," isn't it true, sir, that before you went to work with Iconix, you talked to Lou Frankfort about a potential private equity transaction in which you'd get a group of investors together to come buy Iconix and take it private.

Isn't that true?

A. I don't believe so.

Q. You don't believe so, or you don't remember that?

A. I don't believe so.

MR. HECKER: Please show the witness and the government what's been marked as Defense Exhibit 1010.

Q. And, sir, I'm just going to ask you: Do you agree with me that this is an email that you wrote to Lou Frankfort in 2011? Yes?

A. Yes.

MR. HECKER: Your Honor, I move the admission of 1010.

MB9YCOL1 — Page 1107

MR. LENOW: Your Honor, objection. Hearsay.

THE COURT: Sustained.

MR. HECKER: Your Honor, may I request a sidebar?

THE COURT: Sure.

(Continued on next page)

MB9YCOL1 — Page 1108

(At sidebar)

MR. HECKER: Your Honor, I gave this witness an opportunity to testify about whether he remembered this incident, and he claimed it didn't happen, not that he didn't remember it.

This document is offered purely for impeachment. His testimony that he doesn't believe that this happened is entirely contradicted by this document. It couldn't be clearer.

It says: "just to clarify, it's interesting and a topic we discussed. Iconix has a flow of approximately 73 million shares at $24 a share. I did speak with the banker I dealt with. He thinks the idea of a private group funding a small transaction would be better for me as it would present a greater opportunity to have greater equity. He's experienced in these size deals." And it goes on. But it's clearly a conversation about buying a chunk of the equity in a conversation with Mr. Frankfort, and he just denied now that he's ever done that.

MR. LENOW: That's not what this email is about. This actually came up in the first trial. This is actually about pursuing an acquisition of a totally separate equity acquisition that wasn't Iconix.

I don't believe Mr. Horowitz had the financial ability to acquire a $2 billion company at the time. They talk about

MB9YCOL1 — Page 1109

the idea of a private group funding a small transaction as a different purchase. So this is actually not what Mr. Hecker is representing it to be.

Your Honor did I think address this at the first trial. I'm just confirming this with our paralegal. I don't believe that this was offered, but we want to confirm that. But the point is this is hearsay and it doesn't contradict what the witness is saying.

THE COURT: I also didn't hear Mr. Horowitz deny that he had done what this suggests.

MR. HECKER: I think he flat out said he doesn't believe he talked to Mr. Frankfort about buying Iconix in 2011. I'm happy to make the record clear. It's true it may not have come in at the last trial, but I don't think they laid the predicate.

I'm offering it for impeachment. He's saying it didn't happen. I'm saying he did. The document suggests they did. On redirect, they're free to explore that.

MR. LENOW: This was addressed at the last trial. We're confirming this.

Did this come in at the last trial? I don't think it did.

MR. HECKER: No. Because I think they asked him if it refreshed his memory, and he said no.

MR. LENOW: This is literally the identical issue that

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1                                    Page 1110

was addressed at the last trial at sidebar. Your Honor kept it out.

Your Honor, just again, this is not contradicting what he is saying. This is talking about a possible other equity acquisition of a different company. This is not a contradiction of anything he just said.

THE COURT: I'm concerned about putting anything counterfactual before the jury. To the extent you will make the argument -- and it's not clear from the document whether they're talking about Iconix or some other company.

And if he does remember approaching some other company or thinking about acquiring some other company, then clearly this does not speak to the topic that you raised. I think it would unduly confuse the jury.

There's a 403 aspect to this that concerns me. I remember the topic. I don't remember how it was resolved last time, but I don't remember that this got into evidence. So I'm not going to allow it. But you can continue to --

MR. HECKER: Can I explore the topic so I can create a bit of a record?

THE COURT: Absolutely.

MR. HECKER: Thank you, Judge.

MB9YCOL1                                    Page 1111

(In open court; jury present)

MR. HECKER: Let's see if we can clear this up. Let's take that down for a moment.

Q. Mr. Horowitz, do you recall having a discussion with Mr. Frankfort, before you joined Iconix, about acquiring a significant chunk of equity of Iconix in a private transaction?

A. No.

Q. That came later in time when you had a discussion like that?

A. I don't recall ever having a conversation like that.

Q. We'll come back to it. We'll come back to it.

Now, at the point that you became COO in spring of 2014; correct?

A. That is correct.

Q. You were still one of about ten people who reported directly to Mr. Cole? Is that right?

A. That sounds about right.

Q. And you had four or five people reporting up to you. True?

A. That sounds right.

Q. Your objective as COO, in part, was to make a good impression on Mr. Cole. Yes?

A. Yes.

Q. And you also wanted to make a good impression on the board; right?

A. That is correct.

MB9YCOL1                                    Page 1112

Q. Now, part of your responsibilities included making a performance appraisal of yourself. Right?

A. I believe so.

Q. And it included your goals for yourself during your time at Iconix over I'll call it the short intermediate term.

Is that fair?

A. I believe so.

Q. Your objective was to ensure that your goals for the next year were clear. Yes?

A. If I was putting them together, I would want them to be clear, yes.

MR. HECKER: Let's show the witness what's in evidence as Defendant's Exhibit 1179. First let me just establish --

Q. This is your performance appraisal that you filled out in 2013?

A. That appears to be correct.

Q. So at the time you filled this out, you were president of the men's division. Yes?

A. That is what it appears to state, yes.

Q. Do you recall this?

A. Somewhat, yes.

MR. HECKER: Let's go to the second page and enlarge the objectives.

Q. Objective one.

Do you see that?

MB9YCOL1                                    Page 1113

A. I do.

Q. "Object one, to help company achieve 480 million in revenue and 300 in EBITDA, maximize shareholder value."

Do you see that?

A. I do.

Q. That was one your objectives. Yes?

A. As written, yes.

Q. And not just as written but in fact. Right?

Your objective was to help the company achieve its financial targets. Yes?

A. Yes.

Q. And just so the jury is entirely clear about this, there is nothing problematic inherently about a company and its senior executives trying to hit financial targets. Right?

A. Correct.

Q. That happens in every public company. Yes?

A. I would think so.

Q. And it happens in every private company; right?

A. It's a big generalization, but I would think so.

Q. But when you were COO of Baked By Melissa -- that's where you went after Iconix. Yes?

A. Yes.

Q. Did you set financial targets for the company?

A. Yes, we did.

Q. You had budgets; right?

UNITED STATES OF AMERICA, v.
NEIL COLE

MB9YCOL1 — Page 1114

A. Yes, we did.

Q. You were tracking what you hoped to achieve in revenue. Yes?

A. Yes.

Q. And the costs of getting there?

A. And the costs associated with running the business, yes.

Q. And there's nothing problematic about that.

A. No.

Q. The owner in fact wants you to do that. Yes?

A. In this situation, yes.

Q. Well, really in all situations, the owners of a company, the stockholders, want the executives to try to earn as much revenue as they can. Yes?

A. No.

Q. How about earnings? Are you good with earnings?

A. There are hundreds, if not thousands, of different companies that have different goals, whether it be revenue or earnings. I wouldn't agree to "all."

Q. Okay. So it's not all.
How about every company you've work at?

A. Again, it varied.

Q. Which company did you work at where you weren't striving to achieve financial targets?

A. We were always trying to achieve financial targets.

Q. So you're not disputing that. You're taking issue with the

MB9YCOL1 — Page 1115

idea that revenue and earnings would be key financial metrics that one would try to achieve when running a company?

A. I believe we're splitting hairs, or I am. So I apologize. We always tried to achieve financial goals.

Q. Fair enough. Why don't we leave that there.
The next objective that's identified --
If we scroll down to three. I apologize. Actually, if you scroll down to the bottom under "Actions." If you blow up "Actions."
This was a description of what you were planning to do to try to set up the business for financial success in 2014 and '15. Yes?

A. That appears to be correct.

Q. This is what you wrote; yes?

A. I believe so.

Q. And the first thing you mentioned was maximizing the Peanuts opportunities in 2014 and '15.
Do you see that?

A. I do see that.

Q. Peanuts was a big brand for the company. Yes? At that time.

A. Correct.

Q. And it was growing. Yes?

A. I believe so.

Q. It was successful. Right?

MB9YCOL1 — Page 1116

A. I believe there was a movie coming out at that time.

Q. Mr. Cole actually spent a lot of time working on that release of the movie at that time period. Yes? It was a big deal for the company.

A. It was a big deal for the company.

Q. And the next item that you mention here was navigating and assisting in the potential CAA game-changing transaction.
Do you see that?

A. I do.

Q. Am I correct, sir, that in fact CAA was a potential game-changing transaction for the company? Yes?

A. That is correct.

Q. CAA was the largest talent agency in the world at the time; right?

A. Yes.

Q. It represents movie stars and athletes; correct?

A. That is correct.

Q. That deal had a value of more than a billion dollars. Isn't that true?

A. I believe so.

Q. And Neil Cole led the work on that transaction, on that potential transaction.
Is that fair?

A. I believe it is fair.

Q. He ran point for Iconix?

MB9YCOL1 — Page 1117

A. That's correct.

Q. You also actually did -- you participated in maybe four or five meetings about the CAA deal? Yes?

A. I participated in far more meetings than that about CAA.

Q. You participated in more meetings than that?

A. Yes.

Q. How many meetings did you participate in about the topic of Iconix potentially acquiring CAA?

A. I'm sorry. Internal or external meetings?

Q. Either.

A. It could have been 20 or 30.

Q. How many of those were external with CAA?

A. Probably a handful.

Q. Is that where maybe I got my times confused?
Is that where maybe four or five times that you maybe participated in personal meeting with CAA?

A. That number is correct.

Q. But there may have been a few dozen internal meetings at Iconix about this potential game-changing transaction. Right?

A. That is correct.

Q. Now, the next line says: "Driving new revenue across the portfolio."
Do you see that?

A. I do.

Q. Because at this point, Iconix has a portfolio of brands.

# A-841

**MB9YCOL1** — Page 1118

Correct?

A. That is correct.

Q. And it engaged in a variety of different kinds of transactions in order to monetize the value of those brands. Right?

A. There would be like two types of transactions that we participated in this driving revenue across the brands.

Q. One was licensing the brand. Yes?

A. That is correct.

Q. And you also talked about joint ventures. Correct?

A. That is correct.

Q. Okay. And in each case, you're giving someone else the right to use the brand. Yes?

A. In licensing, yes.

Q. Well, in the JV context, you're allowing someone to own a portion of the actual brand itself and to participate in the revenue generated from sales in a particular geographic region. Right?

A. Essentially, yes.

Q. It's another way of getting revenue from your brands. Yes?

A. That is correct.

Q. There is nothing inherently wrong with that concept. Right?

A. Not that I'm aware of, no.

Q. Okay. And you mentioned here signing new licensees in 2014

**MB9YCOL1** — Page 1119

for bigger impact in 2015.

Do you see that?

A. I do.

Q. That's not a reference to joint venture transactions. That's a reference to what we might call run-of-the-mill licensing agreements.

Right?

A. That's correct.

Q. And you say right after that: "Improving relationships at WalMart and other key U.S. retailers."

Do you see that?

A. I do.

Q. And that was part of your job. Yes?

A. Yes.

Q. And, by the way, when we talk about relationships with WalMart and other key retailers, I just want to make sure we understand that.

With a retailer like WalMart, they sometimes also manufacture clothes; is that correct?

A. That is correct.

Q. And in a license deal with WalMart, you may license to them, for example, the ability to make Starter clothing which they can then sell in the WalMart store. Right?

A. That's correct.

Q. And that's all governed by a licensing agreement between

**MB9YCOL1** — Page 1120

you and WalMart; right?

A. That's correct.

Q. And the licensing agreement sets out the terms under which you're going to share the revenue. True?

A. Correct.

Q. And the revenue in this context is often called "royalties;" right?

A. That is correct.

Q. Now, in your experience, isn't it true that there would be times when retailers like WalMart or JC Penney or pick your retailer might come to Iconix at some point in the year and say, hey, we want you to contribute some money to the cost of building out some space within the WalMart so that we can display your brands.

That sometimes happened; right?

A. I don't recall something like that happening.

Q. When you were at Modell's -- you worked at Modell's previously; right?

A. That is correct.

Q. Those are sporting good stores; correct?

A. They were.

Q. And they sold brands that were actually manufactured by other companies. True?

A. True.

Q. And isn't it true that at Modell's, when you were there,

**MB9YCOL1** — Page 1121

there would be times when Modell's would go to the owners of the brands and say, hey, we want you to kick in to cover the costs of like signage or a display within the store?

A. That is correct.

Q. And that request to kick in some extra money for marketing or advertising, that wasn't always set out as a term in the licensing agreement. Correct? Sometimes they'd just ask you for that. Right?

A. If you're referring to Modell's, there was no licensing agreement.

Q. Even better.

It was common in the industry --

MR. LENOW: Objection to the commentary.

THE COURT: Sustained.

BY MR. HECKER:

Q. At Modell's, they might go to the brand owners and say, hey, can you kick in for the cost of advertising your brands in our store? Yes?

A. That is correct.

Q. They'd make that ask. Right?

A. At times, yes.

Q. And the brand owners could either say, sure. I'll give you the money. I like the idea of spending some money making it more obvious where the Starter sweatshirts are, the Champion sweatshirts, whatever the brand is. Right?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1                                    Page 1122

A. That's possible, yes.

Q. Or they could tell you to pound sand; right?

A. Or they could say no. Yes.

Q. Right, because they weren't contractually obligated to do that; true?

A. In many cases, that is true.

Q. But no crime in asking if they can kick in some advertising or marketing. They could say yes, they could say no, or they could negotiate something in the middle.

MR. LENOW: Objection to the question about "no crime."

THE COURT: Overruled.

THE WITNESS: In general, yes, that's true.

BY MR. HECKER:

Q. That happened at Iconix when you were there too. Isn't that true?

A. I don't remember that specific situation you're detailing.

Q. You don't remember JC Penney or WalMart or Sears coming to Iconix at the end of the year and saying, hey, kick in some money? It costs us a lot to have the space to include the Iconix brands. We want you to pay some money for this. You don't recall this?

A. I don't. I believe the Starter one might even be contractual.

Q. You're not disputing the proposition that this happened all

MB9YCOL1                                    Page 1123

the time in this industry. Correct?

A. I am not disputing that this happens in that industry, yes.

Q. Requests for noncontractual payments was common in this business. True?

A. It was common in the apparel and retail business.

Q. Now, below that section, there is a statement: "Working with Willy and the international team to properly maximize the revenue and profit of Latin America."
Do you see that?

A. I do.

Q. That's a reference to Willy Burkhardt; right?

A. It is.

Q. And Willy Burkhardt was actually, at this time, responsible for the international business for Iconix. True?

A. I believe that is true.

Q. And then you say: "Reconfiguring, if necessary, the China JV to maximize the market potential," what's that a reference to?

A. That is in reference to a China joint venture that was in place with a company that -- I forget their name.

Q. So the China JV, at this point in time, is not a reference to Li & Fung. Right?

A. That is correct.

Q. The company actually doing some business in China through a joint venture in China with a company other than Li & Fung

MB9YCOL1                                    Page 1124

initially. Yes?

A. Iconix was. Correct.

Q. Iconix was. I apologize.
And the next statement is: "Work more closely with L&F to ensure we take full benefit of our relationships."
Do you see that?

A. I do.

Q. Li & Fung was an important business partner of Iconix. Right?

A. Yes.

Q. At the time, were they the biggest apparel manufacturer in the world?

A. I believe that the parent company, Li & Fung, was.

Q. They're not some fly-by-night. They had been around for a very long time, and they were a very important partner for Iconix. Right?

MR. LENOW: Objection. Compound question.

THE COURT: Overruled.

THE WITNESS: That is correct.

BY MR. HECKER:

Q. And you wanted to take full benefit of their capabilities around the world; right?

A. Yes.

Q. And they had the ability in other regions of the world to produce and distribute apparel. Yes?

MB9YCOL1                                    Page 1125

A. Yes.

Q. That created an opportunity for a synergy for Iconix to contribute the intellectual property, the brands, and for Li & Fung to make and distribute the clothing. Yes?

A. No. I believe you're combining these business practices.

Q. So what I was describing was more of a traditional licensing agreement relationship?

A. I don't believe so.

Q. Well, when you said that you wanted to maximize Li & Fung to make sure we take the full benefit, what did you mean?

A. I meant I thought we had increasing licenses where I thought we could work together to increase their revenue. And I believed, as I believe you stated, that they had tremendous apparel manufacturing and distributing capabilities where we could potentially sign more licenses and do more business together.

Q. And isn't it true, sir, that at the time you prepared this, SEA-1 had already been signed. Right?

A. Yes.

Q. So you already had a joint venture between Iconix on the one hand and Li & Fung on the other. True?

A. That is true.

Q. You've seen that joint venture agreement. Yes?

A. I have seen that joint venture agreement.

Q. You weren't involved in negotiating SEA-1 though. Right?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1      Page 1126

A. That is correct.
Q. Neil Cole did that deal. Yes?
A. I don't know.
Q. In preparing for your testimony, have you looked at SEA-1?
A. I believe so, yes.
Q. So you know the basic deal in SEA-1; right?
A. Generally speaking, yes.
Q. Now, just to be clear, Li & Fung, like WalMart, was an important business partner for Iconix at this time period. Yes?
A. I would say that's fair.
Q. And it was important for Iconix to be responsive to requests that Li & Fung might make of you. Yes?
A. I believe so.
Q. And the reverse was true also; right?
A. Sure.
Q. Li & Fung presumably viewed Iconix as an important business partner. Right?
A. Presumably, yes.
Q. Just as we were talking a moment ago about the kind of conversations you might have had when you were at Modell's, about the brands that were selling in Modell's, you might make asks of one another at any point in time. True?
A. Hypothetically, yes.
Q. Well, not just hypothetically. It happened with respect to

MB9YCOL1      Page 1127

Li & Fung and Iconix making asks of one another in negotiations at various times during the entire time you were at the company.
A. That is true.
MR. HECKER: We can take that down.
Q. All right, sir. Now I want to turn your attention to 2014. Are you with me?
A. Yes.
Q. You've transitioned from being the head of the men's division to now the COO of the company. Right?
A. That is correct.
Q. And you're running point on some important initiatives for Iconix. Yes?
A. Yes.
Q. You're shaking your head. You don't like the characterization of "running point"?
A. That's not exactly how I would refer to it, but I'm in agreement.
Q. Would you be more comfortable if I said you were the primary negotiator on certain initiatives?
A. Either way. I think, again, we're --
Q. I don't want to split hairs with you either. Are you comfortable with "running point"?
A. In transaction or deals, yes.

MB9YCOL1      Page 1128

Q. When you were running point, we'll focus on those situations. Okay. Deal?
We established, for example, Mr. Cole was running point on CAA, not you. Yes?
A. That is correct.
Q. Even though you participated in some meetings, both externally and internally, that's Neil Cole's deal. Right?
A. That is correct.
Q. And I think we established yesterday that you ran point on SEA-2 and SEA-3. I'm not saying you didn't talk to Mr. Cole about it. I'm just saying you ran point on those negotiations. Yes?
A. I'll agree to that.
Q. Okay. Now, at the same time that Mr. Cole is running point on CAA and you're running point on the SEA-2, there are other executives at the company running point on additional initiatives that could be revenue-generating for the business. Yes?
A. I believe so.
MR. HECKER: Why don't we show the witness Government Exhibit 234 which is in evidence. If we could just blow up the whole thing.
Q. Do you recall testifying about this financial forecast P&L summary document that I believe you testified David Maslaton prepared?

MB9YCOL1      Page 1129

A. That is correct.
Q. And remind the jury who David Maslaton is.
A. David Maslaton was a member of the finance team at Iconix.
Q. Was he an accountant?
A. I don't know.
Q. But he was involved in financial planning. Yes?
A. Correct.
Q. And forecasting. Yes?
A. That is correct.
Q. So when you were working on something that you thought could either generate a cost or an expense, you had to share that information with Mr. Maslaton so he could incorporate it into his budgets and forecasts. Correct?
A. I don't recall it working that way exactly, no.
Q. Well, isn't it true that you often met with Mr. Maslaton when you had information about something that might affect the forecast for the company and its ability to hit its financial targets?
A. I don't believe so.
Q. You don't believe you met with Mr. Maslaton to update him on like deal status of something that would get reflected in this document?
A. Not often.
Q. So sometimes it happened?

MB9YCOL1     Page 1130

A. Just the two of us? Me updating him on business? I'm just trying to get clarity.

Q. Whether other people were there or not is not really material to me. I'm just trying to establish that if you had new information about a potential transaction, that needed to get communicated to Mr. Maslaton so he could incorporate it into this spreadsheet the company was using to track its performance relative to various objectives. Right?

A. Yes, but it was not directly from me to Maslaton, at least at all times.

Q. At least not regularly but sometimes?

A. Not regularly.

Q. That's fine.

You recall testifying about this document. Yes?

A. Yes.

Q. This is June 6, 2014. And we're like 3 1/2 weeks from the end of the quarter. Right?

A. That is correct.

Q. And what's listed on the left -- we went through this -- is the current forecast for revenue. Right?

A. That is correct.

Q. And then toward the bottom, it has what the consensus was among the Wall Street analysts who were following the company. Right?

A. The highlighted portion, that's correct.

MB9YCOL1     Page 1131

Q. And the portion on the right actually has numbers that are associated with it. Correct?

A. That is correct.

Q. And just to be clear, the Wall Street analysts, they're sitting in some big bank downtown with their own spreadsheets trying to get what the company is going to do with the quarter and for the year. Right?

A. I mean, at a high-level perspective. That's a big generalization.

Q. You would agree with me that the banks have analysts who conduct research and prepare models to try to guess whether the company -- how the company is going to do. Right?

A. Agree. I wouldn't use the word "guess," but I agree.

Q. Maybe it's an educated guess, but they don't know what the future holds. Right?

A. That's correct.

Q. Peanuts could go wild and generate a lot more revenue than was expected. Right?

A. That is correct.

Q. And that might cause you to really beat your numbers dramatically, and maybe the stock will go up and they would have been wrong. But that's a good thing. Yes?

A. In that scenario, yes.

Q. And the reverse is true too. There could be something unexpected that you think is going to happen that doesn't

MB9YCOL1     Page 1132

happen. Right?

A. Sure.

Q. And you might miss the numbers, and maybe the stock will go down. Right?

A. Correct.

Q. And this consensus is just an average of what the different folks at the different banks are projecting for the company based on their best guess, educated guess.

A. Correct.

Q. Okay. Now, at this point in time, there's a section of this chart that says "Opportunities and Risks."

Do you see that?

A. I do.

Q. And the first thing that's identified there, it says: "Middle East JV."

Do you see that?

A. I do.

Q. That was a potential transaction that the company was thinking about at the beginning of June 2014. Yes?

A. It was a potential transaction that the company was negotiating at that time.

Q. Right. They were in negotiations about a potential Middle East JV as of June 6, 2014.

A. That is correct.

Q. That was not a deal you were running point on. Correct?

MB9YCOL1     Page 1133

A. That is correct.

Q. So I don't want there to be any confusion about this because at a later time, the company actually did a Middle East JV, and you had been involved in the negotiations at one point. Correct?

A. That is correct.

Q. You didn't actually conclude that deal; right?

A. That is correct.

Q. Neil Cole did that deal. Yes?

A. That is correct.

Q. Will you be comfortable if, from now on, we refer to that deal as the MENA deal, Middle East North Africa deal?

A. Sure.

Q. You and testified about that yesterday. Yes?

A. Yes.

Q. So at this point, we're talking about a different potential joint venture transaction that someone else at the company is running point on. Right?

A. That is correct.

Q. Who was that?

A. I believe at this point, it was Willy Burkhardt.

Q. And we've established that Willy Burkhardt was the head of the international department at Iconix at that time?

A. That is correct.

Q. He separately reported up to Neil Cole; right?

MB9YCOL1     Page 1134

A. Yes. That is correct.

Q. He didn't report through you, did he?

A. No, but we worked together.

Q. You were colleagues.

A. That is correct.

Q. And so while you were working on what became SEA-2, he was working on the Middle East JV; right?

A. That is correct.

Q. That was another potential opportunity that the company had to generate revenue to try to hit its financial projections. Yes?

A. Yes.

Q. And in this chart, the reference to Li & Fung JV, that's the deal that you were negotiating at the time. Right?

A. That is the deal that we were negotiating at the time.

Q. Yes.
Now, in the columns to the right, there are a bunch of different columns called "Initiatives" with different potential dollar amounts attached to them.
Do you see that?

A. I do.

Q. And I just want this to be very clear.
The first of those gray columns, that's an initiative, described as an initiative, that might be worth $17 million.
Do you see that?

MB9YCOL1     Page 1135

A. I do.

Q. And under that, it says: "L&F plus Middle East."
Do you see that?

A. I do.

Q. And the idea there is if you add up the potential Li & Fung transaction and the Middle East transaction, that's approximately 10 plus 7, 17 -- it's actually a little more than that.
But that's sort of rough math. Right?

A. Correct.

Q. And then below that, it says: "China plus Middle East."
Do you see that?

A. I do.

Q. Just so the jury is clear, the reference to "China plus Middle East," that's different from what become SEA-3 which was a China deal with Li & Fung. Right?

A. I'm not sure.

Q. It appears to be a separate way of generating revenue that will help you hit your objectives; correct? As it's presented on this chart.

A. That is correct. But Umbro China is listed on this chart too.

Q. Okay. And Umbro China eventually became part of what became SEA-4. Right?

A. SEA-3.

MB9YCOL1     Page 1136

Q. I apologize. SEA-3.
And that was the deal you ran point on; right?

A. Yes.

Q. I thought we got past that.
Are you comfortable with "running point" on SEA-3?

A. I'm comfortable with those terms.

Q. So the reference here though to "China plus Middle East," that's not a reference to SEA-3. It's a different potential transaction, combined with the Middle East deal, to get $17 million. Correct? That's how it appears on this chart.

A. I don't agree with that.

Q. You're struggling with that because you said it mentions Umbro. Right?

A. I'm struggling with that because I don't recall whether "China" refers to an Umbro transaction or a different transaction.

Q. You don't know. It could be a totally separate transaction that could generate revenue for the company. Right?

A. That is correct.

Q. Initiative two, which is one column to the right, that's L & F and China. And for some reason, that says 10.
Do you see that?

A. I see that.

Q. And the next column, "Initiative," says "Sanrio." We haven't talked about that one.

MB9YCOL1     Page 1137

Do you see that?

A. I do see that.

Q. Now, am I right that Sanrio is a Japanese company that owned the brand Hello Kitty?

A. You are correct that they owned Hello Kitty.

Q. Hello Kitty is a pretty well-known children's brand, for lack of a better description?

A. That's fair.

Q. And it's particularly big in Japan. Yes?

A. I don't know, but I believe so.

Q. You didn't run point on that discussion; right?

A. That is correct.

Q. Which executive at Iconix ran point on Sanrio?

A. I don't recall if it was David Blumberg or Neil. I don't recall.

Q. But it was not a deal you were running point on. Right?

A. That's correct.

Q. But it was another initiative that the company was in discussions about that could generate revenue that could potentially get booked in the same second quarter. Right?

A. That is correct.

Q. And you didn't know whether it was likely to get booked, there was no chance it was going to get booked. You weren't running point on that deal. Right?

A. I was a part of regular meetings where updates were made on

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1     Page 1138

all of these.

Q. Okay. Fair enough.

So you knew something about the status of the discussions?

A. Yes.

Q. At the time anyway. Yes?

A. Yes.

Q. And at this point in time, it's listed as an initiative that could potentially generate $13 million?

A. That is what it' is listed as. That's correct.

Q. And that deal, as it turns out, didn't get completed in the quarter. Right?

A. That is correct.

Q. But you don't know, as you sit here now, whether, if the company had decided to prioritize the conclusion of that deal, the company could have generated some amount of revenue in the same quarter, in Q2.

A. I'm sorry. I didn't understand the question.

Q. The Sanrio transaction relating to Hello Kitty, that did not happen in the second quarter of 2014. Correct? Do you know that?

A. That is correct, and I do know that.

Q. It's on the sheet though because at this point, it's a possibility.

A. That is correct.

MB9YCOL1     Page 1139

Q. Okay. Fair enough.

Now, the last column which makes reference to initiatives of 20 million, it lists "LF plus China and Middle East plus Sanrio."

Do you see that?

A. I do see that.

Q. So that was a different combination of potential transactions that the company could have concluded to achieve its financial objectives, if they were able to get those deals done. Right?

A. That's fair.

Q. And you were involved in some of those discussions but not others.

Is that fair?

A. I was involved in regular updates on the status of these deals.

Q. Understood. But you weren't running point on the negotiations.

A. That is correct.

Q. Right. So you didn't know if there was some obstacle to getting the deal across the finish line before the end of the quarter or not.

A. That's not true.

Q. You felt you would have heard about that from the other executives negotiating the transactions?

MB9YCOL1     Page 1140

A. I would have heard about that in our financial meetings.

Q. Fair enough. At this point though, three-and-a-half weeks out, you agree with me that there are a number of different possible ways to hit your objectives for the quarter, according to this chart?

A. Yes.

MR. HECKER: Your Honor, this might be a good time. Am I off on my math?

THE COURT: You're off by ten minutes.

MR. HECKER: Great. I'll keep going. Apologies.

Q. Now, would you agree with me, sir, that there could be other initiatives that didn't make their way into this chart that could have still been completed before the end of the quarter?

A. It's unlikely.

Q. Well, didn't it in fact happen in the second quarter of 2014?

A. Did what happen?

Q. That you actually concluded a transaction that generated revenue for the company in June of 2014 that isn't on the June 6 chart.

A. That is correct.

Q. Well, when you just said a second ago that it was unlikely, it actually happened in the second quarter.

A. No. You're drawing a conclusion that's not accurate.

MB9YCOL1     Page 1141

Q. Okay. Let's clarify it.

Are you familiar with something called the Camelot transaction?

A. Yes.

Q. Am I right that that was a transaction that Neil Cole negotiated?

A. Yes.

Q. And it related to the Sharper Image brand; right?

A. That is correct.

Q. That was part of Iconix's portfolio. Yes?

A. That is correct.

Q. And am I correct that in the second quarter, Neil Cole was negotiating a sale of the online rights to the Sharper Image brand?

A. I am aware of that happening in June.

Q. Is it your testimony you think that didn't generate revenue for Iconix?

A. That is not my testimony.

Q. So it happened in June of 2014?

A. That is correct.

Q. So, for example, if we go to the next forecast, Government Exhibit 235, prepared by Mr. Maslaton and blow that up, there's a reference to the Camelot transaction. Yes?

A. Yes.

Q. Just so we're clear, that's not a joint venture

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1 — Page 1142

transaction; right?
A. No, it was not.
Q. It was just a sale of the portion of the intellectual property rights.
Is that the right way to think about it?
A. I believe so, yes.
Q. So Iconix still owned the Sharper Image brand, but they sold off the right to run the online business.
Is that fair?
A. I'm not in a position to agree or disagree with that.
Q. You didn't run point on that transaction; right?
A. That is correct.
Q. But you agree with me on June 6, it's not on Mr. Maslaton's spreadsheet. On June 19, 13 days later, it's on the spreadsheet and generating revenue. Right?
A. That's correct.
Q. And there might be other potential initiatives that the company was considering that didn't get to the point of making it into the Maslaton chart.
A. I don't believe that is the way that we communicated or built those forecasts.
Q. You don't know what Mr. Cole was working on.
A. Other than what he shared with me, that would be correct.
Q. Did you know on June 6 that he was negotiating what became the Camelot revenue-generating transaction?

MB9YCOL1 — Page 1143

A. I don't believe so.
Q. And within two weeks later, he's cut this deal, and he's generated $7.75 million. Right?
A. That is correct.
Q. That's more than the amount of this alleged overpayment you say happened in connection with SEA-2. Right?
A. $7.7 million is more than the $5 million inflated price.
Q. I'm glad we agree on that.
MR. LENOW: Objection. Move to strike.
THE COURT: Sustained.
MR. HECKER: I'll withdraw it.
We can take this down.
Q. In this May -- call it May/June -- 2014 period, you were negotiating directly with GBG executives about what became the SEA-2 transaction. Yes?
A. That is correct.
Q. And during negotiations at different points in time -- and we can show you documents, if it will help, although I think you saw them yesterday -- there were times when you emphasized to your GBG counterparts that timing was important to you. Yes?
A. Yes.
Q. And just so we're really clear, it was important to you. It was important to Mr. Cole. It was important to everybody at Iconix who was working to achieve its financial targets.

MB9YCOL1 — Page 1144

Is that correct?
A. That is correct.
Q. You were on that same page about hitting those financial targets if you could?
A. We were on the same page about hitting our financial targets.
Q. Right. And you communicated that to GBG. Yes?
A. Yes.
Q. And in fact, you told them multiple times, hey, if we can't get this done in time, you need to let me know because we'll need to prioritize other opportunities we have. Right?
A. I don't know if that's exactly how I put it. But, yes. I stressed that.
Q. We're not going to quibble about the words, the concept being, look, guys, if you're going to move now, we can do a deal. If you're not going to move now, just tell me so we can focus our energy elsewhere.
Is that fair?
A. That's fair.
Q. And you communicated that multiple times to GBG.
A. I believe so.
Q. And that was true.
A. That was true.
Q. If GBG couldn't do a deal with Iconix, you could go focus on Sanrio or some other deal that might lead to a

MB9YCOL1 — Page 1145

revenue-generating transaction. Yes?
A. I would agree with that.
Q. And that's why you told that to GBG. Yes?
A. Yes.
Q. Let's quickly look at a couple of examples of this, Government Exhibit 1035. I believe you saw this on your direct examination. This is an email that you sent to Jason Rabin.
The first line: "Jared, we need to know as soon as possible on the JV update. As you know, this is time sensitive. If we are not moving forward this quarter, we are going to need to make other decisions."
Do you see that?
A. I do.
Q. And that's exactly what we were just talking about. Right?
A. Yes.
Q. And that's in May.
A. That is correct.
Q. Continuing: "Obviously, you're our first choice as a partner as we consolidate Europe and extend our relationship in the Asia region, but timing is critical."
Do you see that?
A. I do see that.
Q. And this is what we were just talking about. Li & Fung had a relationship with Iconix that extended well beyond this one joint venture transaction in Southeast.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1                                    Page 1146

Isn't that true?

A. It extended beyond that Southeast Asia joint venture. That is correct.

Q. It extended far beyond it; right?

A. Yes. I could agree with that, yes.

Q. Well, Southeast Asia is in Southeast Asia. And you did a deal with them in Europe; correct?

A. Eventually, yes.

Q. You eventually did a deal with them in the Middle East in the Dakar region. Right?

A. Eventually.

Q. And in fact, your relationship with Li & Fung wasn't limited to doing joint venture transactions; right?

A. That is correct.

Q. Li & Fung also licensed many different Iconix brands. True?

A. That is true.

Q. Li & Fung licensed the Peanuts brand for sleepwear, costumes, and cosmetics. Isn't that right?

A. I don't believe I was familiar with that relationship at the time.

Q. Well, in the next sentence of the email we were just looking at, you said: "On Peanuts, I have not engaged Leanne on it but will do so now and get back to you."

Maybe if we scroll down maybe there's something I'm

MB9YCOL1                                    Page 1147

not remembering.

Oh, yes. Do you see that? "Are we all set with the exclusive for sleepwear, for mid tier regarding Peanuts"?

A. I do see that.

Q. And that's a reference to the license agreement you had with Li & Fung for a portion of what you're doing with the Peanuts brand. Right?

A. No.

Q. Well, what is it?

A. I believe that GBG was attempting to get a license for Peanuts, but that was outside of my responsibility.

Q. So you don't know what happened to the discussions between Iconix and Li & Fung regarding Peanuts.

A. Correct.

Q. But you're not disputing the idea that Li & Fung may have ended up being a licensee of Peanuts-branded products.

A. I don't know.

Q. Okay. Well, let's put this to the side.

Li & Fung also licensed Rocawear for boys' and girls' apparel; right?

A. Yes.

Q. And boys' and girls' sleepwear and underwear. Right?

A. For Rocawear Kids. Correct.

Q. And Li & Fung licensed Zoo York apparel in the United States; correct?

MB9YCOL1                                    Page 1148

A. That is correct.

Q. I just want the jury to be very clear about this.

The relationship between Iconix and Li & Fung was not merely international; right?

A. That is correct.

Q. Li & Fung manufactured and then sold products right here in the United States. Yes?

A. They sold those products here in the United States.

Q. And that included Zoo York, one of Iconix's big brands. Right?

A. I would not designate Zoo York as one of our bigger brands, but it was one of our brands.

Q. We got to see those cool ads about the skaters in Yankee Stadium yesterday.

That was Zoo York. Right?

A. That was Zoo York, yes.

Q. And Li & Fung was a licensee for Zoo York in the United States.

A. That is correct.

Q. Li & Fung licensed the Ecko brand. Correct?

A. I believe Li & Fung had the Ecko license for kids prior to this time period but not this time period.

Q. Nothing to do with a JV; right? Nothing to do with a joint venture agreement?

A. That was a separate agreement that predated all of this.

MB9YCOL1                                    Page 1149

Q. And Li & Fung licensed the Canon brand.

Are you familiar with that brand?

A. I'm familiar with the brand but not with the relationship.

Q. And what about Strawberry Shortcake?

Is that one you're familiar with?

A. I'm, again, familiar with the brand.

Q. Is that like a kids' brand?

A. It's a cartoon, I believe, that was made into a brand.

Q. And Li & Fung licensed that brand to sell sleepwear and beauty products?

Does that sound familiar?

A. It doesn't, but it's more than possible.

Q. The point though is just that Li & Fung was also a licensee for Iconix as part of its broader relationship with the company. Yes?

A. That is correct.

Q. And in addition to acting as a licensee, they also act as an agent for certain Iconix brands; right?

A. I believe so.

Q. Including for Peanuts in Asia.

A. I believe that was the case.

MR. HECKER: Is this a good moment, Judge?

THE COURT: Yes, it is.

Let's take our first break, ladies and gentlemen. Twenty minutes. Do not discuss the case.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL1                                    Page 1150

(Continued on next page)

---

MB95col2         Horowitz - Cross         Page 1152

(Jury present)

THE COURT: Mr. Hecker.

MR. HECKER: Thank you, your Honor.

BY MR. HECKER:

Q. Mr. Horowitz, we were, before the break, walking through the different types of business arrangements that Iconix had with Li & Fung during this period, that we have been talking about, call it 2013, 2014; fair?

A. Fair.

Q. And I believe one of the last questions I asked you was about the fact that Li & Fung sometimes worked as an agent for Iconix Brands. Do you recall that?

A. I recall the question, yes.

Q. And so, we had talked about joint ventures, we have talked about licensee emails. What does an agency agreement mean in this context? Can you explain that?

A. I'm not overly familiar with it but I believe it's a business arrangement where one party acts as a representative for another.

Q. And am I right that I think we got to this, that with respect to the Peanuts brand, Li & Fung was an agent for Peanuts in Asia including Japan -- no, sorry -- excluding Japan. Does that sound right?

A. I recall them being an agent in China. I don't have knowledge about the geographies.

---

MB9YCOL1                                    Page 1151

(In open court; jury not present)

THE COURT: Mr. Horowitz, you may step down.

(Witness temporarily excused)

THE COURT: Anything to raise?

MR. LENOW: Judge, just one moment, please.

(Pause)

THE COURT: Sure.

MR. LENOW: Judge, nothing from the government.

MR. HECKER: Nothing further.

THE COURT: Twenty minutes. Don't be late.

MR. HECKER: Thank you, your Honor.

(Recess)

(Continued on next page)

---

MB95col2         Horowitz - Cross         Page 1153

Q. As part of an agency agreement, am I correct that Li & Fung would be entitled to an agent fee that was a percentage of the royalties generated by the licensee of the brand? Does that sound right?

A. It does. But, again, I'm not very familiar with those types of arrangements.

Q. OK. But just so the jury is clear, Li & Fung and Iconix had business arrangements that spread across licensing deals, agency deals, and these joint ventures; right?

A. Yes. I'm aware of the one agency deal, but yes.

Q. OK.

Well, Li & Fung was also an agent for Peanuts in the United Kingdom and France, yes?

A. I don't know.

Q. Now, let's go right to the SEA-2 transactions that you spent a lot of time talking about on direct examination. The original joint venture agreement was negotiated by Neil Cole with Li & Fung, correct?

A. The original joint venture agreement being SEA-1?

Q. Yes, SEA-1.

A. That is my understanding but I was not a part of it.

Q. The joint venture for Southeast Asia, between Li & Fung on the one hand and Iconix on the other, started with an initial joint venture agreement that we called SEA-1; yes?

A. That is correct.

---

# A-850

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

| MB95col2 | Horowitz - Cross | Page 1154 |
| --- | --- | --- |

Q. And Neil Cole negotiated that agreement, yes?

A. I don't know.

Q. You came into the picture when it comes to this topic, when you began to run point on negotiating what became SEA-2; yes?

A. That's fair.

Q. OK. Now, Mr. Horowitz, I want to turn directly to SEA-2 and the allegations that you have made against Neil Cole in connection with the negotiation of that amendment to the original joint venture agreement. Are you with me?

A. I'm with you.

Q. Now, sir, on Monday I believe it was, on questioning from the government, you claimed that you learned, in a conversation that you say you had with Neil Cole in Neil's office in which you say he told you -- and I want to quote your testimony here to get it exactly right -- he told me that GBG had agreed to pay $5 million more for the joint venture in exchange for paying them back with some type of marketing fees.

Do you recall that testimony?

A. I do.

Q. And just so the jury is very clear, there is no witness that you say was in any meeting between you and Mr. Cole on this topic; correct?

A. There was no witness to the meeting that you are referring to.

Q. Between you and Mr. Cole. It was just the two of you?

| MB95col2 | Horowitz - Cross | Page 1155 |
| --- | --- | --- |

A. It was just the two of us.

Q. And while there were times during your time at Iconix where you made notes of things that you either observed or you were going to talk about in some discussion, you didn't make any notes of this discussion, correct?

A. That is correct.

Q. And is it fair to say, sir, that as you sit here now, you don't recall the precise words that you claim Mr. Cole said to you about this topic? Is that fair?

A. I don't recall the precise words.

Q. That's not surprising, right? This is a conversation you say happened in June of 2014 over eight years ago, right?

A. That is when the conversation took place.

Q. And you don't remember the date of this discussion, right?

A. In general I do.

Q. You don't recall the precise date, sir, right?

A. That is correct.

Q. There are many things that you, on direct examination, recalled; what day of the week, who was in the meeting, who popped in, who popped out, you knew it was a Thursday versus a Friday versus a meeting on a Sunday. This supposed conversation you don't know the precise date, correct?

A. That is correct.

Q. And you don't recall the precise words, correct?

A. That is correct.

| MB95col2 | Horowitz - Cross | Page 1156 |
| --- | --- | --- |

Q. And so we are clear, you are now claiming that this conversation happened in Neil Cole's office, true?

A. This conversation happened in Neil Cole's office.

Q. But isn't it true, sir, that in the second meeting you had with the government on December 17th, 2018 -- so almost four years ago but not quite -- in the second meeting you had with them you told the government you couldn't recall where that supposed discussion took place.

A. I don't remember saying that.

Q. You are not denying you said that?

A. I don't recall saying that.

Q. But you are not denying it, sir; correct?

A. I can't deny something that I don't recall, but I don't believe that I said that.

Q. Let's show the witness -- just the witness and the government -- DX 3539-023 at 01. If we can put that on the screen just for the witness?

I ask you to review that to yourself and tell me when you have had a chance to review that -- and if you want to highlight, like eight rows from the bottom -- do you see that?

A. Yes. I am just reading the document. I see that.

Q. Sir, does reviewing that document refresh your recollection that when you met with the government in December of 2018, you told them you couldn't recall where this supposed discussion took place?

| MB95col2 | Horowitz - Cross | Page 1157 |
| --- | --- | --- |

A. No, it does not.

Q. It doesn't refresh your recollection?

A. No, it does not.

Q. OK.

MR. LENOW: Move to strike the commentary.

MR. HECKER: I think I just guffawed.

THE COURT: Yes. He didn't say anything.

BY MR. HECKER:

Q. You can take that down.

Now, in questioning from Mr. Lenow you also testified -- and again, I want to get your testimony exactly right here -- you said: Mr. Cole informed me that I should tell Lauren Gee, one of our attorneys, to change the price of the joint venture and not to make any mention of the giveback.

Do you recall that testimony?

A. I do.

Q. And we can agree, Mr. Horowitz, that that last bit, this claim that Mr. Cole told you not to tell the attorney about the giveback, that's important? You agree with me?

A. Yes.

Q. In fact, immediately after you testified to that you were asked whether this episode caused you concern, right?

A. I believe so.

Q. Because we can agree that would be concerning, if you were instructed not to tell the attorneys something that you thought

# A-851

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

---

MB95col2    Horowitz - Cross    Page 1158

was important to the transaction, that would be important; right?

A. Correct.

Q. Sir, isn't it a fact that when you sat down with the government at the end of 2018, the very first time you met with them, December 10, 2018 -- you are supposedly finally coming clean on all of this, right, seeing if you can cut a deal -- you told the government that Mr. Cole told you he had gotten GBG to increase the price by $5 million and you should immediately go tell Lauren Gee but you made no mention, whatsoever, about some direction not to tell Lauren Gee about some giveback. Isn't that true?

A. I don't recall.

Q. Isn't a fact, sir, that in your first dozen meetings with the government through the end of 2018, the beginning of 2019, all the way right up to the point where you decide to sign a cooperation agreement at the end of 2019, in those first dozen meetings you talked about these events multiple times and you never once claimed that Mr. Cole had told you not to tell Ms. Gee about a purported giveback. Not one time. Isn't that true?

A. I don't believe so.

Q. The first time that this became part of your story was in November 2019 right before you signed the cooperation agreement. Isn't that a fact, sir?

---

MB95col2    Horowitz - Cross    Page 1159

A. I don't believe so.

Q. Now, your testimony on questioning from the government was that I walked right out of Neil's office, over to Lauren Gee, and told her we would be increasing the price of the joint venture by $5 million; correct?

A. That is correct.

Q. And you said that she told you the documents are with GBG. Do you recall that?

A. I do.

Q. And that meant that Iconix was now waiting for GBG and its lawyers to make revisions that they thought were appropriate to the legal documents for SEA-2, what became SEA-2; correct?

A. Correct. We were waiting for their revisions.

Q. For their revisions.

A. Excuse me. Revisions.

Q. That's what it meant to say that the documents were with GBG, right?

A. That's correct.

Q. And after you had the discussion with Ms. Gee, you came back and told Mr. Cole that you heard that Iconix was waiting to get the documents back from GBG. Isn't that true?

A. That is true.

Q. And this is really important. After you told --

MR. LENOW: Objection. Move to strike the commentary.

THE COURT: Overruled.

---

MB95col2    Horowitz - Cross    Page 1160

BY MR. HECKER:

Q. After you told Mr. Cole he said to you, in substance, let's see whether or not they put anything in the agreement about a $5 million coming back. Isn't that true?

A. No.

Q. Sir, didn't Neil Cole tell you let's see whether or not they put anything in the documents about a $5 million commitment?

A. No. I don't believe so. He said let's see what they come back with.

Q. OK. Let's see what they come back with. You understood that to mean let's see what they put in the documents, right?

A. That is correct.

Q. When the SEA-2 deal documents came back, isn't it true that there was no additional language in the written agreements relating to any marketing or other reimbursement that GBG had put into the contract that became SEA-2?

A. That is true.

Q. And isn't it also true, sir, that when the document came back, Mr. Cole was happy about that because he said it would give Iconix wiggle room -- by which you understood he meant flexibility -- about whether to make some payment, all of that payment, or none of that payment. Isn't that true?

A. No. That entire statement, in its entirety, is not true.

Q. Which parts are true?

---

MB95col2    Horowitz - Cross    Page 1161

A. Can you ask them -- can we break them down?

Q. Sir, you told the government, when you met with them in July of 2019 -- three years ago -- that Neil Cole was happy about that because he said it would give Iconix wiggle room, meaning flexibility about whether to make some payment, all of the payment, or none of the payment. Isn't that true?

A. As it pertained to the timing of the payment, that was true.

Q. Sir, just so we are really clear about this, when Neil Cole said it gave Iconix wiggle room that this claim that GBG might make for marketing or some other reimbursement was not in the documents, and when he said it gave you wiggle room, you understood that to mean the flexibility to make no payment, partial payment, or full payment of any marketing support that may be requested by GBG, correct?

A. That is not correct.

Q. Sir, you have testified in a prior proceeding relating to this matter, true?

A. That is true.

MR. HECKER: Transcript 454, 3 to 17.

Q. And before you testified in that prior proceeding you took an oath to tell the truth, correct?

A. That is correct.

Q. The same oath you took in front of these jurors, yes?

A. Yes.

---

MB95col2 — Horowitz - Cross — Page 1162

Q. And you were asked about this topic, were you not?
A. I believe so.
MR. HECKER: At this time, your Honor, we would like to publish transcript at 454, 3 to 17.
Put that on the screen, please? And I want to call out lines 3 to 17.
MR. LENOW: Sorry. Is this for the jury or just for the parties here?
MR. HECKER: It is impeachment and I am publishing it. And I am going to ask him if he was asked these questions and given these answers.
MR. LENOW: Can we have it for the parties first.
THE COURT: I'm sorry. Is that the government?
MR. LENOW: As long as it is just for the witness we have no objection to the witness being shown.
MR. HECKER: Well, we would like to publish it and I would like to ask him if he was asked these questions and if he gave these answers under oath.
MR. LENOW: The transcript is not in evidence so I think for now, anyways, it should just be the witness seeing this.
THE COURT: Overruled.
BY MR. HECKER:
Q. Sir, do you recall giving these answers to the following questions:

MB95col2 — Horowitz - Cross — Page 1163

"Q You previously told the government that when the SEA-2 deal documents came back without any marketing expense commitment, Mr. Cole was happy about that, correct?
"A I'm not sure that's exactly what he said but he was relieved or happy.
"Q You told the government that Mr. Cole was happy about that; yes or no?
"A I believe so.
"Q You told the government that Mr. Cole said it would give Iconix wiggle room, correct?
"A I believe so.
"Q And you understood "wiggle room" to mean the flexibility to make no payment, partial payment, or full payment of marketing expenses that may be requested by GBG, correct?
"A Within a certain period of time, that would be correct."
Do you recall giving those answers to those questions?
A. Yes, I do.
Q. And nothing about that that you need to change, correct?
A. Maybe clarify, but nothing to change.
Q. You can take that down.
Now, the SEA-2 deal was signed on June 30th, 2014; correct?
A. That is correct.
Q. And, before that time, you were never present for any conversation between Mr. Cole on the one hand and a

MB95col2 — Horowitz - Cross — Page 1164

representative of GBG on the other, during which Mr. Cole made a commitment to make a future payment of $5 million in connection with SEA-2 and that's before the deal was signed, correct?
A. That is correct.
Q. And before the deal was signed, you never heard Mr. Cole make any commitment with respect to SEA-2 other than what is reflected in the transaction documents; isn't that true?
A. That is not true.
Q. Sir, before the deal was signed, before June 30, 2014, did you ever personally hear Mr. Cole undertake any commitment or obligation to GBG in connection with the SEA-2 transaction other than what's in the transaction documents?
A. Only as he described it to me.
Q. So the answer is no?
A. Well, he said it to me.
Q. Sir, the question is whether you ever heard Mr. Cole make any commitment to GBG.
A. Then no.
Q. And if you didn't get it in writing, Mr. Cole didn't believe he was bound. Isn't that true?
MR. LENOW: Objection, Judge.
THE COURT: Overruled.
Do you understand the question, Mr. Horowitz?
THE WITNESS: I do.

MB95col2 — Horowitz - Cross — Page 1165

That is not true.
BY MR. HECKER:
Q. Sir, there are no documents created at or before SEA-2 being signed on June 30 that make any reference to any commitment or obligation by Iconix to reimburse GBG for marketing expenses. Isn't that true?
A. That is true.
Q. I asked you earlier whether you recall the date of the conversation that you claim you had with Mr. Cole in his office in which this topic of some supposed giveback was discussed; correct?
A. Correct.
Q. You couldn't recall the exact date, right?
A. I know approximately when it was.
Q. Right. And the government -- and you told the government this -- you said it coincided with the receipt of an e-mail you were copied on. Is that right?
A. I believe that is correct.
Q. And the e-mail is from June 24th and let's put it up, it is in evidence, Government 1043.
This is the e-mail dated June 24th, 2014: Spoke to Seth and we are fine.
This is the e-mail you told the government helps you know that this conversation with Mr. Cole happened around June 24th. Is that true?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB95col2     Horowitz - Cross     Page 1166

A. That is correct.

Q. You told the government that when you learned that $5 million was purportedly owed to GBG you included it in your weekly reports. Is that true?

A. I don't believe the totality of that is true.

Q. You didn't tell the government that when you understood there was $5 million that was going to be owed to GBG that you put it in your weekly reports to Mr. Cole, these Friday at 5:00s?

A. The $5 million commitment was included in my weekly reports.

Q. Not before June 30th, right?

A. No.

Q. Not before the deal was signed?

A. That's correct.

Q. You can take that down.

We will just show you briefly Defendant's Exhibit 1310 and 1310-A1.

This is your Friday at 5:00, correct?

A. That is correct.

Q. Actually sent on a Friday this time, yes?

A. It appears to.

Q. And it attaches your weekly update, that's 1310-A1, correct?

A. That is correct.

MB95col2     Horowitz - Cross     Page 1167

Q. This is June 27, 2014; yes?

A. It is.

Q. After you claim this conversation with Mr. Cole occurred, yes?

A. That is correct.

Q. No mention of this supposed $5 million commitment in this weekly update; correct?

A. That is correct.

Q. Now I can show you Defendant's Exhibit 1910 and 1910-A, these are in evidence. This is another Friday at 5:00, we are now mid-July, July 18, 2014, weekly update.

Do you see that?

A. I do.

Q. This one you also sent on a Friday, right?

A. Yes.

Q. And on the right side, that's your actual update; yes?

A. I believe so.

Q. And you make reference to the state of play with various initiatives you are working on, yes?

A. I'm just taking a second to review it.

Q. Sure.

A. That is correct.

Q. And just while we are on it, under international business development you say: Overall, I believe there are enough pieces in place, brands, opportunities, categories, territories

MB95col2     Horowitz - Cross     Page 1168

to continue to execute our international business development and corporate initiatives in the three-year plan.

Do you see that?

A. I do see that.

Q. And the first item is this reference to China Umbro that I believe you mentioned earlier. Do you see that?

A. I see that.

Q. And under 1A it says: Expect Descente return of documents early next week.

What was Descente?

A. Descente was another company that we were in negotiations with over Umbro China.

Q. Just so the jury is clear, when we looked earlier at the Maslaton spreadsheets, the financial projection charts and there was a reference to China Umbro, does this refresh your recollection that at that point -- this is before SEA-3 -- you were considering doing a deal with Descente?

A. I believe the parties changed over time. I don't recall if it was Descente at that time.

Q. Well, in July you are talking about Descente with return of the documents for China Umbro, right?

A. There were several parties at this time.

Q. Multiple potential business partners who wanted Umbro in China, yes?

A. I would say those we were negotiating with, yes.

MB95col2     Horowitz - Cross     Page 1169

Q. Umbro was a pretty popular brand at that time?

A. Yes.

Q. Where did Iconix purchase Umbro from? Do you remember?

A. I do.

Q. Where?

A. From Nike.

Q. And Nike had been doing business and selling Umbro products in China before Iconix bought the brand, correct?

A. That is correct.

Q. So it was a revenue-generating brand in China before Iconix even bought it, yes?

A. Correct.

Q. And at this point you are saying there were a few different potential business partners who would want to buy the rights to Umbro in China?

A. That is correct.

Q. Before you did the SEA-3 deal with Li & Fung, correct?

A. Yes.

Q. And just so we are clear, there is a mention of Global Brands here, yes?

A. There is.

Q. No mention of any $5 million commitment at this point, right?

A. That is correct.

Q. And under Global Brands there is that reference to Japan

# A-854

MB95col2     Horowitz - Cross     Page 1170

and San Rio again. Do you see that?

A. I see a reference to Japan that includes San Rio.

Q. And San Rio, again, that's the Hello Kitty brand we talked about earlier?

A. Yes.

Q. And, in the second quarter, Iconix didn't actually complete a transaction relating to San Rio, right?

A. That is correct.

Q. But it was still live in July as a possible revenue generating opportunity, true?

A. I don't know.

Q. Well, I'm assuming if you thought it was significant enough to include in your weekly report it was something that you were telling Mr. Cole about because it had some business potential for the company, right?

A. Yes. I don't know if it was a joint venture transaction or what we were working on at that point.

Q. You weren't running point on San Rio?

A. That is correct.

Q. You can take this down.

Now, can we put in front of the witness Government Exhibit 1053?

Sir, this is an e-mail that you send at the top to Neil Cole on August 5, 2014, and it is called Southeast Asia JV doc. Do you see that?

MB95col2     Horowitz - Cross     Page 1171

A. I do.

Q. And you say: Neil, attached is a recap of the terms of the SEA Asia JV for us to review as discussed.

Do you see that?

A. I do.

Q. You are running point but you are keeping him apprised at least of aspects of this negotiation, correct?

A. Not correct.

Q. Your testimony is you told him about every single detail; is that right?

A. That is correct.

Q. Let's look at the next document. Now, you have listed Southeast Asia JV, correct?

A. Well, actually my assistant did, but yes.

Q. Well, you sent this on to Mr. Cole as a way of filling him in on the status of the discussions at that point?

A. Not correct.

Q. You didn't forward this to Mr. Cole?

A. I did forward this to Mr. Cole.

Q. What did you take issue with in my question? I just want to make sure I am not missing something.

A. The purpose of sending it to him.

Q. Oh. You weren't trying to update him on the status of the transaction?

A. I was not.

MB95col2     Horowitz - Cross     Page 1172

Q. You thought he already knew about it, is that your testimony?

A. My testimony is that he had requested a recap of the existing joint ventures and I asked my assistant to pull the contracts and put together this recap.

Q. OK. So, Mr. Cole asked you for a recap, you provided it to him so that you could fill him in on what the status of the discussion was on SEA-2, yes? On SEA-3?

A. That is not correct.

Q. Oh, on the SEA joint venture more broadly?

A. On exactly what he asked for, which was a recap of the contracts for SEA.

Q. And that's what this is, correct?

A. That is what this is.

Q. And in this document you identified the purchase price of the -- you identify the original transaction, yes? $12 million?

A. Yes.

Q. And you describe the payment terms of that original joint venture transaction, correct?

A. That is correct.

Q. And just so the jury understands, the original transaction was negotiated at $12 million but GBG didn't have to pay Iconix all $12 million up front, right?

A. I was not familiar with the terms of that.

MB95col2     Horowitz - Cross     Page 1173

Q. Well, you were responsible for negotiating the amendment to the joint venture agreement; yes?

A. Yes.

Q. And I believe you testified you reviewed the transaction documents at some point in many of your meetings with the government, right?

A. Yes.

Q. And probably in real-time at Iconix, yes?

A. To some extent.

Q. Well, you are negotiating an amendment to an agreement, you would have to look at the original agreement in order to know how to amend it, yes?

A. That's a big step, but yes.

Q. Well, I understand you relied on lawyers to make sure you got it right but in terms of understanding the basics, like the price, the amount of money that is going from one side to the other, that, you are familiar with?

A. Yes.

Q. OK. In deal 1 this describes the payment schedule from GBG to Iconix for the initial closing of the transaction; correct?

A. I believe so.

Q. And you see here it says payable, as follows: $5.5 million closing payment; $3.5 million on first anniversary of closing; $1 million on second anniversary of closing; and then $2 million on second anniversary of closing conditional on FY14

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

| MB95col2 | Horowitz - Cross | Page 1174 |

royalty being greater than target royalty.

Do you see that?

A. I do see that.

Q. Are you familiar with the concept of an earnout?

A. Somewhat.

MR. HECKER: I apologize. Has this been published? I moved it into evidence at the beginning, it should be published. I apologize.

MR. LENOW: We have no objection to this being in evidence.

THE COURT: Very well. It will be received.

(Government's Exhibits 1053 and 1053-A1 received in evidence)

BY MR. HECKER:

Q. This is the summary of the JVs that you say Mr. Cole asked you for and that you provided, correct?

A. That my assistant put together based on the documents, correct.

Q. You were comfortable that it was accurate?

A. Yes.

Q. OK. So we are just walking through right now the terms of SEA-1, right?

A. Yes.

Q. And we were discussing the fact that it has, for the $12 million, payments come in five and a half, three and a

| MB95col2 | Horowitz - Cross | Page 1175 |

half, one, two, but that second two is conditional on royalty hitting above a target rate, correct?

A. Correct.

Q. And is that called an earnout provision?

A. I'm just not sure.

Q. OK. Now, under that, the second bullet, it says 15.9 and 500, right? That's $15.9 million and change, yes?

A. That is correct.

Q. And this describes the terms under which you would be repaid and it is clear from this it is over time; is that right?

A. That is right.

Q. OK. Now, in this document you agree with me, no reference to some commitment by Iconix to pay marketing to GBG in connection with this transaction; correct?

A. That is correct.

Q. That's not here.

A. That is correct.

Q. We can take that down.

And just so we are clear, that is after that transaction occurred, yes?

A. What is the "that"?

Q. The SEA-2 transaction.

A. I'm sorry?

Q. SEA-2, the transaction we have been talking about, that was

| MB95col2 | Horowitz - Cross | Page 1176 |

closed in June of 2014; correct?

A. That is correct.

Q. Now, I want to put in front of you the final transaction documents for SEA-2 and that should be defendant's 303, 303-A1, 303-A2, and 303-A3 and let's start with these. You agree with me, sir, what you see on the left of the screen is an e-mail from Lauren Gee, sent to a group of people that includes you, with the executed documents for SEA-2?

A. I do.

Q. And if you look at 303-A1, that's the first amended and restated shareholders agreement, yes?

A. That is correct.

Q. And it is called a First Amended Agreement because it is an amendment to the original joint venture agreement SEA-1; yes?

A. Yes.

Q. And if we look at 303-A2, that's a letter of acknowledgment and payment of consideration for a 50 percent share of additional marks, correct?

A. That is correct.

Q. And if we go to the next document, that's 303-A3, this is described as an amendment to the master licensing agreement; correct?

A. Yes.

Q. Now these are the entirety of the SEA-2 transaction documents; correct?

| MB95col2 | Horowitz - Cross | Page 1177 |

A. I believe so.

Q. Now, I want to direct your attention to 303-A2, the letter of acknowledgment and payment of consideration. Now, this provided that Li & Fung would pay Iconix $15.9 million for a 50 percent interest in the joint venture that would be acquired, correct?

A. That is correct.

Q. And am I right that the SEA-2 transaction essentially included two components, one was the rights to certain brands in Korea, which included the SEA-1 brands except for a couple brands like OP and Umbro; is that right?

A. That sounds about correct. I'm not -- specifically about the brands.

Q. OK. And we can go to it but I am not sure it is material in this context. The second piece of it were the rights in Europe and Turkey to Ecko, Zoo York, Marc Ecko Cut & Crew, Ed Hardy, and Sharper Image. Is that right?

A. It was Marc Ecko Cut & Sew; and that sounds correct.

Q. OK. And the agreement to include these brands in these territories resulted from the negotiation that you had with Jared Margolis, correct?

A. Correct; and other conversations.

Q. And with others at GBG, yes?

A. Yes.

Q. And you testified that before your negotiation of SEA-2 you

# A-856

| MB95col2 | Horowitz - Cross | Page 1178 |
|---|---|---|

hadn't ever negotiated a joint venture deal previously, correct?

A. That is correct.

Q. This was your first time?

A. That is correct.

Q. Now, we talked about two of the components but when you were negotiating this deal, initially there was a third component; is that true?

A. There were three deals being discussed, correct.

Q. The third deal related to Lee Cooper and the rights to Lee Cooper in Europe, correct?

A. That is correct.

Q. But discussions around that didn't result in Lee Cooper in Europe being included in SEA-2; right?

A. The Lee Cooper deal did not happen.

Q. And the negotiation for this deal took many months, yes?

A. That is correct.

Q. You started discussing what became this deal in March or April of 2014; right?

A. That is correct.

Q. Now, I want to show you what's in evidence as 1897. This is actually an e-mail -- at the top it is an e-mail that you sent to Jared Margolis actually in February of 2014. Do you see that?

A. I do.

| MB95col2 | Horowitz - Cross | Page 1179 |
|---|---|---|

Q. And it's in response to an e-mail from Margolis saying: What's next steps on master license for Umbro in Europe? Do you see that?

A. I do.

Q. He says: We want to leverage this, what we plan on doing in Southeast Asia. Do you see that?

A. I do.

Q. And you say: We have no plans for a master license in Europe for Umbro at this time. Happy to discuss China Umbro as we are down several paths and I have had some communications with Richard Kesembo on this subject. Do you see that?

A. I do.

Q. At least in this negotiation you are not copying in Mr. Cole, correct?

A. Mr. Cole is not copied on this e-mail, correct.

Q. Right. And, in fact, no one other than you and Mr. Margolis are copied on this particular e-mail exchange, correct?

A. That is correct.

Q. And later in March of 2014, you told Mr. Margolis that Iconix was working through options for non-Umbro brands in Europe and expected to make a proposal on those non-Umbro brands to Li & Fung or GBG, correct? Do you recall that?

| MB95col2 | Horowitz - Cross | Page 1180 |
|---|---|---|

A. I don't specifically recall that communication.

Q. Let's put in front of the witness Defendant's Exhibit 1898. Do you see the bottom e-mail: Jared, we are working through the structure options for adding the non-Umbro brands for the Europe JV. I will have something for you early next week. Do you see that?

A. I do.

Q. Again, this is just you to Mr. Margolis, right, no one else is copied?

A. The bottom e-mail, that is true.

Q. Right. And a few days later -- and we can put in front of the witness Defendant's Exhibit 1899 -- this is a follow-up exchange now looking at the middle e-mail on March 19th and he says to you: I wanted to follow up and see if there was a timeline for receiving some of the follow-up items that were discussed in our meeting so we can better prepare for our meetings in London. Do you see that?

A. I see that.

Q. And he says, for Umbro Europe -- under one -- he is looking for a breakdown specifying what rights are available in each of the territories. Do you see that?

A. I do.

Q. And in two he says I want a financial breakdown for the

| MB95col2 | Horowitz - Cross | Page 1181 |
|---|---|---|

non-joint venture brands Lee Cooper, Ed Hardy, Zoo York, and proposed deal structure for the roll-up of the non-Umbro brands; correct?

A. I do see that.

Q. And you respond at the top: We set a meeting in New York. And for that you copy some other folks. There are some other folks on the GBG side copied on this, correct?

A. That is correct.

Q. Melvin Thomas, his e-mail says: The Licensing Company. Is that referred to as TLC?

A. That is correct.

Q. What was TLC?

A. TLC was the joint venture partner in Europe for Iconix that was then bought by GBG. That was TLC.

Q. OK. And what did TLC do?

A. TLC did licensing and marketing.

Q. And they were acquired by Li & Fung?

A. By GBG/Li & Fung.

Q. By GBG. When was that?

A. I believe it was sometime in May or June of 2014.

Q. Is it before this transaction?

A. I'm sorry. I believe it was before that.

Q. Thank you. And again, Mr. Cole is not in this discussion you are having about this topic; correct?

**A-857**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB95col2          Horowitz - Cross          Page 1182

A. He is not on this e-mail.

Q. Now, I want to direct your attention to defendant's 1901 and 1901-A1, and on the left if we can blow it up it says: Jared, look forward to our meeting on Wednesday. Attached you will find proposed term sheets on both Li & Fung Europe expansion and China Umbro JV.
Do you see that?

A. I do see that.

Q. And he says: I have included a link via WeTransfer to an Umbro China deck.
Do you see that?

A. I do see that.

Q. If we now look at A1, do you agree with me this is what was attached to the e-mail as an Umbro China IP 50/50 JV proposal, yes?

A. I believe so.

Q. This is ultimately part of what became -- this became part of SEA-2 later, yes?

A. This became part of the September joint venture, correct.

Q. Sorry. SEA-3. Thank you.
Now let's show the witness Defendant's Exhibit 1902 and 1902-A.
1902, am I correct this is April 7, 2014, you are e-mailing Jared Margolis, and you are attaching what's on the screen in front of you: LFICONEUJV. Do you see that?

MB95col2          Horowitz - Cross          Page 1183

A. I do see that.

Q. That is Iconix Europe JV, yes?

A. What is Iconix Europe JV.

Q. That is what's attached here, yes, a proposal relating to this topic?

A. I believe so. Yes.

Q. And this is what you are sending to Mr. Margolis, yes?

A. Yes.

Q. And, again, this is just you to Mr. Margolis, yes?

A. Yes.

Q. Mr. Cole is not involved, no one else is involved. You are running point with Mr. Margolis at this point in connection with this communication, yes?

A. That is not true.

Q. Sir, the proposed amendment to the Europe JV included two different components under brand ownership -- and if you could look at the second page -- do you see the two different components identified here?

A. I do.

Q. One is Lee Cooper, yes?

A. That is correct.

Q. And on this one it says Iconix 51 percent, Li & Fung 49 percent; correct?

A. That is correct.

Q. And the other involved the brands that are identified under

MB95col2          Horowitz - Cross          Page 1184

2, correct?

A. That is correct.

Q. And for that it would be a 50/50 JV, yes?

A. Correct.

Q. And if you back out from this call out and look at the purchase price that was being discussed, you see the purchase price that was being discussed at this point was $22 million; correct?

A. Correct.

Q. And you see below that it says: JV annual marketing contribution.
Do you see that?

A. I do.

Q. And that's a $2 million request, right?

A. That is correct.

Q. What was your understanding of how that would be paid?

A. My understanding of how that would be paid is that the joint venture would have to spend $2 million on marketing.

Q. Am I right, by the way, that under the joint venture agreement between Iconix and Li & Fung or GBG, that there was an administrative fee that the local company -- in this case that would be Li & Fung or GBG -- of 15 percent, that went to them off the top of the gross revenues for the joint venture? That was a term of the original joint venture agreement and it carried through to SEA-2 and SEA-3.

MB95col2          Horowitz - Cross          Page 1185

A. I believe so.

Q. So, out of the first dollar that comes in, the first 15 cents would go to the joint venture partner, correct?

A. In exchange for certain services, correct.

Q. They had to do work on the ground, right?

A. That's a generalization but I could agree with it.

Q. Contribute people to help operate the joint venture?

A. They had more specific laid out responsibilities but -- that are laid out.

Q. And we have had discussions during this trial about monies that might be going from Li & Fung or GBG to Iconix in connection with purchasing the 50 percent interest, correct?

A. That is correct.

Q. And there have been discussions about monies that Iconix paid to GBG in connection with either SEA-1, SEA-2, SEA-3 or even on MENA, right?

A. That is correct.

Q. But we hadn't previously discussed this so I just want it to be clear. That's just a provision. Underlying joint venture agreement in which the joint venture partner collects 15 percent of the gross revenues for its work in connection with the joint venture, correct?

A. Can you just be more specific about the "that"?

Q. It is 15 percent of the gross revenue on the Southeast Asia joint venture goes out of the gross revenue that comes in, goes

UNITED STATES OF AMERICA, v.
NEIL COLE

MB95col2    Horowitz - Cross    Page 1186

to the Li & Fung local company that is set up as part of this joint venture.

A. I believe, in general, that is correct.

Q. OK. And the split of revenue between the parties is what's left after they take 15 percent off the top?

A. And other expenses.

Q. And other expenses, right?

A. That is the split of profit, correct.

Q. OK. Thank you. Now, we will come back to that.

If we could now put in front of the witness Defendant's Exhibit 1903?

This is an e-mail you sent to Jared Margolis on April 9, 2014, wrapping up, you say: Leaving my hotel in 10. I am 15 to 20 minutes away.

And you got an out of office reply, right?

A. I'm not sure if that's what I got there but I got a reply.

Q. OK. Well, in any event, the bottom line is you met with Jared Margolis on April 9, 2014 in the United Kingdom, correct?

A. And others, correct.

Q. There were others there as well, correct?

A. That is correct.

Q. Where did you meet with them?

A. At the Iconix Europe or TLC offices.

Q. Was that part of the Europe JV between Iconix and Li & Fung?

MB95col2    Horowitz - Cross    Page 1187

A. That office, I believe so, yes.

Q. And so, you met with them there and am I correct that during that meeting you reached a general agreement on the terms of your $22 million proposal but it was contingent on Turkey being added to the territories that would be covered by that agreement. Is that true?

A. I don't remember. This negotiation took many turns.

Q. Turkey ends up as part of the deal?

A. I believe so.

Q. Let's just show the witness -- actually, let's publish Defendant's Exhibit 1185.

Am I correct this is an e-mail in which you are bringing Mr. Cole up to speed on the eight to ten you spent with Andy Dunkley, and you say: LC.

Do you see that?

A. I do.

Q. You say this is an e-mail report you sent to Mr. Cole on April 9, yes?

A. May I have a second to read it?

Q. Sure.

A. Thank you. I have read the e-mail.

Q. Do you see the line where it says: We have agreed and Jason has agreed to do additional brands.

A. I do.

Q. And you see it says for $22 million, and then you say:

MB95col2    Horowitz - Cross    Page 1188

($10 million bottom line for Iconix) contingent upon Turkey being included.

Do you see that?

A. I do.

Q. Does this refresh your memory about what I was asking you about a moment ago?

A. It does not.

Q. You are not disputing what I said, you just don't remember?

A. Correct.

Q. And you said that: Li & Fung was also pushing to the Iconix's JV partner for China Umbro.

Do you see that?

A. I do.

Q. And you said you are attempting to close the week of May 4th?

A. As it pertains to the Europe conversation, that is what I am saying.

Q. Am I right, Mr. Horowitz, that one of the features of the SEA-2 transaction and the SEA-3 transaction was a discussion about what had been referred to as puts and calls? Do you recall those features?

A. Yes.

Q. And we have discussed this, I will do bit quickly but just to make sure we are on the same page -- a put meant that Li & Fung and GBG would have the right to sell its interest in

MB95col2    Horowitz - Cross    Page 1189

the joint venture back to Iconix after five years at a fixed minimum price, correct?

A. That all sounds correct.

Q. And for SEA-2 and SEA-3 that put feature had a minimum price; correct?

A. I believe that is correct.

Q. Would we be understanding one another if I referred to that as a floor?

A. Yes.

Q. And just so we are very clear about this, the concept of the floor is if the joint venture doesn't perform as we had hoped or even expected, that Li & Fung or GBG can pit the deal back to Iconix and still get back at least the floor amount; right?

A. That reflects one half of the negotiation.

Q. But that became part of both SEA-2 and SEA-3, yes?

A. As part, yes.

Q. As part of the negotiation it became part of the agreement?

A. Yes, it did.

Q. And I just want to make sure the jury understands this. The floor is the minimum amount they could get paid, it is not what they get paid. Right?

A. That is correct.

Q. What they get paid is a function of a mathematic calculation of five and a half times the revenue that is being

# A-859

**MB95col2**     Horowitz - Cross     Page 1190

generated in that year five of the deal, correct?

A. In general, correct. I believe there are other details that it would be 50 percent of that number but in general, yes.

Q. You take the revenue in year five, you multiply it by five and a half, and then because they only own half of it you pay them half of that number, yes?

A. Seeing the specific language would help, but in general that is correct.

Q. Just focus on general concepts, we can come back to the math in a moment.

But, what made these deals a little bit unusual is that if the deal did nothing at all, it was a total failure, notwithstanding the expectation that these brands which may have been generating revenue, maybe they generated no revenue, Iconix would still have to buy it back in five years at the floor price even if there was no revenue, yes?

A. If GBG put it back to them, yes.

Q. Which they might want to do if it was a total failure, yes?

A. It might.

Q. Now, let's take the scenario where it does amazingly well. In year five the joint venture is generating, pick a number -- $20 million across all the brands. Are you with me?

A. I'm with you.

Q. This provision meant that if Iconix wanted to buy it back from GBG at that point they wouldn't pay the floor amount,

**MB95col2**     Horowitz - Cross     Page 1191

right?

A. No.

Q. They'd pay five and a half times $100 million -- no, $20 million, sorry -- 20 times 5.5, yes? And then half that number for 50 percent of the interest.

A. In general, I would agree with that.

Q. That's the upside scenario for GBG where it does well but you want to buy it back from them, they get paid on the successful business at that point?

A. That is correct.

Q. Are you familiar with the idea that in business you don't get something for nothing?

A. I am familiar with the term.

Q. You don't get the right to be paid out five and a half times the revenue for free, right?

A. I'm sorry. I don't understand that question.

Q. Well, you weren't going to just give GBG 50 percent interest in the brands and say to them, hey, let's do this deal, and if it does wonderfully well, we will give you five and a half times 50 percent and we will pay you the upside, but if it does terribly we will still pay you money. Right?

A. I mean, there is a lot of guessing and assumptions in there.

Q. All right. Let's do a real example. Let's focus on the SEA-3 transaction first, if I could. No, let's do SEA-2. We

**MB95col2**     Horowitz - Cross     Page 1192

were on SEA-2, I want to make sure we are on the same page with this.

If we can go to DX 303-A2?

Would you agree with me this is the executed copy of what became SEA-2 dated June 30, 2014?

A. I do.

Q. And the purchase price for this transaction is $15.9 million, yes?

A. That is correct.

Q. And this actually spells out in the next paragraph the payment schedule for the $15.9 million.

Can you go to the next page, please?

At the top, does this have the payment schedule for the $15.9 million?

A. Yes, it does.

Q. And it provides that up front they pay 3.979. Do you see that?

A. I do.

Q. And then in the next year it is just under $4 million?

A. It is that same number, correct.

Q. Same number the next year, yes?

A. Yes.

Q. And the same number the following year. Do you see that?

A. Yes, I do see that.

Q. OK. Now, in the next paragraph there are some other

**MB95col2**     Horowitz - Cross     Page 1193

figures identified there and they're described as a minimum distribution amount. Do you see that?

A. I do.

Q. And you agree with me that the SEA-2 agreement provided that in the first year there was a minimum distribution of $1.5 million for Fiscal Year 2014.

Do you see that?

A. I do.

Q. And that goes to your joint venture partner without regard to what revenue is generated by the business, correct?

A. That number, yes, that is correct.

Q. Because if the business generates substantially more revenue for the JV, let's say it generates $10 million, they're going to get more than that minimum guaranteed amount, correct?

A. Correct.

Q. But if it's zero somehow, the bad case scenario, they still get $1.5 million, yes?

A. Yes.

Q. And if there is any revenue they also take 15 percent off the top as the local partner, yes?

A. For services provided, yes.

Q. They take in 15 percent as revenue, yes? For services provided. You don't get something for nothing. I mean, they're doing work?

A. I don't know if it would be revenue or not but they get

**A-860**

MB95col2     Horowitz - Cross     Page 1194

paid 15 percent.

Q. Out of the gross revenue, yes?

A. Out of the joint venture, correct.

Q. And they also get a minimum distribution of $1.5 million, yes? In year one?

A. That is correct.

Q. And for year two it's at least a million, correct?

A. Correct.

Q. So that's a total of $2.5 million, correct?

A. That is correct.

Q. And on top of that they get this 15 percent gross revenue fee, right? That's not in this part of the agreement but we agree it's in the agreement, written agreement?

A. We agree that it's in the agreement.

Q. OK. Now, that means that in year one they're paying you $3.979 million, yes?

A. That is correct.

Q. And if the deal does zero revenue they get back $1.5 million?

A. They get paid $1.5 million.

Q. Right. That's what the agreement provides.

A. Correct.

Q. So, in year one, if you took 3.979 and subtract out 1.5, you agree with me in year one the most they are out of pocket is like $2.4 million? For year one.

MB95col2     Horowitz - Cross     Page 1195

A. In part, yes.

Q. And, in fact, it is less than that because they have collected 15 percent off the top?

A. But your example was zero.

Q. OK. Right. So, in zero case scenario there is no additional revenue, right? This is worst case scenario.

A. Which is impossible.

Q. Which is impossible because some of these brands are already selling in the region, right?

A. Correct.

Q. So, a real worst case scenario would involve some money from the 15 percent but maybe you don't get to $3 million in revenue in which case this minimum number applies. Is that fair?

A. In hypotheticals that's fair.

Q. You expected it to do better than the minimum amount.

A. I believe so.

Q. Right?

A. I believe so.

Q. Yes.

And in year two they're paying you the same $3.979 million as the second installment on the total purchase price, correct?

A. That is correct.

Q. And again, they've got this minimum distribution amount of

MB95col2     Horowitz - Cross     Page 1196

a million dollars that they're going to get back guaranteed?

A. From the joint venture, correct.

Q. From the joint venture. Yes?

A. That is correct.

Q. And they're also getting this 15 percent, right?

A. Correct.

Q. OK. So, we agree there are a $2.5 million total that's guaranteed to come back to them, yes? From the joint venture in revenue to GBG?

A. That is correct.

Q. OK. Now, I want to show you this put/call feature we have been talking about so we can be specific.

Let's turn to page 22 of Defendant's Exhibit 303-A1. And if you would just pull out the whole thing?

Do you agree with me this is the five year put/call feature we were talking about in generic terms a moment ago but in SEA-2, yes?

A. Yes.

Q. OK. What this says is that after five years, two things can happen. Number one, Iconix can buy it back; correct?

A. That is correct.

Q. That's the call feature?

A. That is correct.

Q. And the put feature is that GBG can put it back to Iconix, make you buy it; yes?

MB95col2     Horowitz - Cross     Page 1197

A. That is correct.

Q. And would you agree with me, in general terms, if the deal is doing really well, Iconix' brands are selling great, GBG isn't going to be incentivized to put it back to you but you may want to call it back. Is that fair?

A. It depends on each company's goals at that time.

Q. Well, it's more likely that Iconix is going to want to buy it back if it is doing well than if it is doing poorly. Is that fair?

A. Maybe.

Q. OK. And the reverse is also true, GBG is more likely to want to keep it and not put it back to you if it is doing well? Yes?

A. Again, maybe. It depends on each company's goals at that time.

Q. OK. Well, let's take the realistic but bad case scenario. Are you with me? It is generating some revenue but not enough to cover the minimum distributions in year one and two. Are you with me?

A. Do I understand what are you saying?

Q. Are you following the hypothetical?

A. Yes. I will ask questions if I am not.

Q. OK. So, in year one and two it is doing OK but not great, and it continues to do OK and not great in years three, four, and five.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB95col2  Horowitz - Cross  Page 1198

Are we on the same page?

A. OK.

Q. In that scenario GBG is going to get the minimums in year one and two; yes?

A. That is correct.

Q. That's $2.5 million, right?

A. That is correct.

Q. They'll also get the 15 percent revenue from the fee for the work they're doing running the JV?

A. That is correct.

Q. What would you call that role? I just want to make sure we are using the same language.

A. Services? I don't know.

Q. OK. So five --

A. Licensing services?

Q. And years three, four and five there is not a minimum guarantee but they earn some revenue that is generated in years three, four and five; right?

A. In your hypothetical, yes.

Q. But it is not doing great, so in year five GBG says, listen, Mr. Horowitz, we want to exercise the put right we have in this deal.

Are you with me?

A. I'm with you.

Q. You do a calculation of 5.5 multiplied by the greater of

MB95col2  Horowitz - Cross  Page 1199

the royalty generated by the JV, right?

A. That's part of it, correct.

Q. And if the amount of that, 50 percent of that number doesn't hit the minimum of $7.6 million, you still have to pay them $7.6 million; is that right?

A. That is correct.

Q. OK. So, just adding up -- this is in the realistic but bad case scenario, right?

A. I wouldn't call it realistic. This is your scenario.

Q. My scenario where it is doing OK but not great. You agree with me that if you add the $7.6 million and the $2.5 million they're guaranteed, that's $10.1 million?

A. Correct.

Q. I'm just adding 7.6 plus 2.5.

A. I was doing the same.

Q. OK. And on top of that they are getting 15 percent of the revenue that comes in every year? That's worth something, right?

A. In exchange for their services, yes.

Q. Exchange for their services.

And they're also getting whatever revenue is generated in years three, four, and five that isn't guaranteed a minimum but there is something coming in in this scenario. Are you with me?

A. Yes.

MB95col2  Horowitz - Cross  Page 1200

Q. In this mediocre scenario do you agree with me that GBG is out of pocket, at most, $5 million paid over five years?

A. Under the limited scenario you have described I would agree with you.

Q. OK. Now let's assume a good scenario, the brands do well. What would that look like, from your perspective? How much revenue did you think this JV could generate as of year five if it was doing well?

A. I don't know.

Q. Would it be unrealistic to say $10 million of revenue?

A. That would not be beyond unrealistic.

Q. Not unrealistic?

A. Not unrealistic.

Q. Let's take a realistic good case scenario, $10 million. Am I correct that in terms of the -- that the minimums wouldn't kick in in that scenario, right? This is the realistic good scenario, you don't need to pay a minimum guaranteed amounts, correct?

A. Correct. Both parties would have earned that amount.

Q. And if you are earning $10 million in year five, the put/call feature tells you to multiply $10 million times 5.5. That's $55 million, correct?

A. Correct.

Q. And then you pay 50 percent of that, right?

A. Correct.

MB95col2  Horowitz - Cross  Page 1201

Q. That's $27.5 million, right?

A. That is correct.

Q. Just so we are really clear, in that scenario GBG has paid you 15.9, correct?

A. That is correct.

Q. And they earn revenue each of the five years of about -- of over $5 million a year, yes?

A. In that scenario that sounds correct.

Q. So that's over $25 million, right? 5 million a year times 5?

A. Correct.

Q. And if they're earning $10 million a year, that 15 percent is worth a million and a half a year, right?

A. Correct.

Q. And if you get that for five years, that's another $7.5 million? Do you follow me?

A. Yes.

Q. So, the $25 million in revenue from the revenue that's left after the 25 percent, plus 7.5, that's 32.5; right?

A. I believe so.

Q. And the payout under the put/call feature is 27.5. And if you add 27.5 and 32.5, that's $60 million that would have gone to GBG over the course of the five years, correct?

A. I'm going to take your word on some of that math, but yes.

Q. OK. That's what you described as a realistic scenario but

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

---

MB95col2    Horowitz - Cross    Page 1202

where it does well.

MR. LENOW: Objection. Mischaracterize the testimony.

THE COURT: I'm sorry. I couldn't hear you Mr. Lenow.

MR. LENOW: Objection. Mischaracterizes the testimony.

THE COURT: Overruled.

THE WITNESS: I'm sorry. What was the question then?

BY MR. HECKER:

Q. This realistic scenario where the JV performs well -- GBG generates $60 million coming its way over the course of the five years from the annual revenue, the 15 percent fee, and this put/call feature?

A. That sounds correct.

Q. For which they paid $15.9 million to enter the JV, correct?

A. In your scenario was the put executed?

Q. In that scenario it might be call, right?

A. But in that dollar amount, is that put or call executed?

Q. Yes.

A. So then they no longer have the assets, yes.

Q. Right. They're giving it back in that scenario either because you called it back or because they put it back?

A. I wanted to clarify the scenario.

Q. But you agree with me if you are paying $15.9 million for something, that is a pretty sweet return if that's how it plays out in that realistic but good scenario?

---

MB95col2    Horowitz - Cross    Page 1203

A. Yes.

Q. That's a good return on investment for GBG, yes?

A. I think that would be a good situation for both parties.

Q. Right. Win-win.

A. Yes.

Q. The bad case scenario that's realistic but it is worst case, GBG is basically out a million dollars a year, right? We just went through that one.

A. I'm not sure exactly how you got there but they were out approximately $5 million I believe is what --

Q. It is pretty simple math. This is the guaranteed minimums plus the 7.6 floor that you negotiated here in this provision, yes? Alone that's over 10, right?

A. Yes.

Q. And there is some additional revenue coming in, yes?

A. In the worst case scenario, you know, no, but it is minimal, yes, so fine.

Q. Sir, it is a pretty good deal for GBG to agree to pay you $5 million over the course of five years in the bad case downside scenario for the possibility of turning 15.9 into $60 million. Can we agree on that?

A. I mean, that's their decision but that seems like a reasonable business decision.

Q. It is a good deal, right, for GBG, as written?

A. I would say so.

---

MB95col2    Horowitz - Cross    Page 1204

Q. Would it surprise you that Jason Rabin came into this court --

MR. LENOW: Objection.

Q. -- and agreed it was a sick deal?

MR. LENOW: Objection.

THE COURT: Overruled.

A. Excuse me?

Q. Would it surprise you if Jason Rabin, from GBG, came into this court and said this was a sick deal for GBG?

A. Including the $5 million payback? No.

MR. HECKER: Move to strike as non-responsive. I'm asking about the agreement as written.

MR. LENOW: He answered the question asked, your Honor.

THE COURT: The request is strike is overruled.

BY MR. HECKER:

Q. I am asking you to focus on the agreement as written. We haven't mentioned any alleged overpayment, we are talking just the agreement as written. Are you with me?

A. Yes.

Q. Would it surprise you that Mr. Rabin said that paying $5 million over five years for the possibility of generating these outsized returns in a realistic but good scenario, that was a sweet deal for GBG, as written?

A. Would it surprise me that Mr. Rabin said that?

---

MB95col2    Horowitz - Cross    Page 1205

Q. Yeah.

A. No.

Q. And, sir, isn't it true that if we go through the same math for SEA-3, the deal for GBG is even sweeter, as written?

A. I don't believe so.

Q. Let's do it. Let's do it.

In SEA-3, sir, there was a similar provision of a put/call feature after year five. Do you recall that?

A. I do.

Q. Do you remember the amount of the floor for the put/call provision?

A. I do.

Q. What was the amount?

A. $15.5 million.

Q. And just so the jury is clear -- and you can take this down -- that's the minimum -- that's the floor for the put/call feature, correct?

A. That is correct.

Q. And we were just talking about this with SEA-2, SEA-3, same set of scenarios, that's if the deal does OK, realistic but not great, they can put it back for $15.5 million.

A. They can put it back for $15.5 million as a floor in any scenario.

Q. Right. That's the bad case scenario, yes?

A. Correct.

---

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB95col2     Horowitz - Cross     Page 1206

Q. One moment, just to make sure we are on the same page about the math.

If we could go to Defendant's Exhibit 304-A2?

You agree with me, sir, that this is an executed copy of SEA-3?

A. I believe so.

Q. One portion of the agreement, yes?

A. I don't see the signatures but I believe so.

Q. OK. If you want to go to the final page we can look at the signature. Is this the executed copy?

A. Yes.

Q. Now, if we turn to page 2, in this transaction for SEA-3 the purchase price is $21.5 million according to this agreement, correct?

You need to scroll up a little bit. I apologize.

And what is listed here is the payout of the $21.5 million?

A. I still don't see the $21.5 million but that was the price.

Q. Let's -- it is the price, let's go up and make sure, keep going up. Yes, if you want to --

A. Yes, I see it.

Q. This is the deal, right?

A. That is the price, $21.5 million.

Q. Let's go back to where it shows how the 21.5 is paid out over time.

MB95col2     Horowitz - Cross     Page 1207

This has the payment schedule right here, yes?

A. Yes.

Q. $4.3 million when the deal is signed?

A. Correct.

Q. Another 1.3 due at the end of 2014?

A. On December 13th, correct.

Q. So that's $5.6 million in year one, correct?

A. That is correct.

Q. And then in year two it's $1.1 million on March 31, 2015; $1.1 million on June 30th, 2015, and $4.3 million on the first anniversary of the date of this letter.

Do you see that?

A. I do.

Q. So those three payments, 1.1, 1.1, and 4.3, that adds up to $6.5 million; do you agree?

A. I do.

Q. Those are paid in 2015, yes?

A. Yes.

Q. And then in year, what would be the third year, it's $3.2 million; right?

A. Second anniversary.

Q. The second anniversary of the date of the letter, yes?

A. That is correct.

Q. And then in the third anniversary it is another 3.1 and the following year it is another 3.1?

MB95col2     Horowitz - Cross     Page 1208

A. That is correct.

Q. Do you see that? That's the payment schedule under the written agreement, yes?

A. Yes.

Q. OK. Now, under that, as was true in SEA-2, there are certain minimum distribution amounts going to GBG in the first couple years of the deal, correct?

A. That is correct.

Q. For Fiscal Year 2014 at least $2 million, yes?

A. Yes.

Q. So you agree with me, if you look at the 5.6 they pay in 2014 and you compare it to the $2 million they're guaranteed to get back, the minimum distribution amount, that math is that they're out of pocket $3.6 million in year one, at worst.

A. Not including other expenses -- yes, at worst.

Q. And, in fact, it is less than that, right, because, again, that same 15 percent administrative fee comes off the top for whatever revenue is being generated by the JV, yes?

A. I'm not sure if this JV has the same provisions.

Q. We will come back to it, it is the second amendment to the same joint venture agreement; yes?

A. It is, but I'm not sure that certain brands had that.

Q. OK. We will come back to that.

For 2015 that number is $2.5 million, right?

A. That is correct.

MB95col2     Horowitz - Cross     Page 1209

Q. So GBG gets a minimum of $2 million in year one, $2.5 million in year two. Do you see that?

A. Correct. Those are minimum distributions from the JV.

Q. So, in year two you look at the $6.5 million they pay in 2015 versus the $2.5 million they're guaranteed to get back in year two, right? You are out of pocket had $4 million for year two. In the worst case scenario that is not realistic because it doesn't include any other monies coming in?

A. Can we -- I will agree to the first part of what you said.

Q. OK. It is the minimum.

A. Correct.

Q. For 2016 there is another $300,000, correct?

A. As a minimum distribution from the JV, correct.

Q. And for 2017 there is a minimum distribution from the JV, it is $335,000; correct?

A. That is correct.

Q. OK. If we add up all those amounts, are you with me? 2.5 plus 655. Yes?

A. You have the benefit of the paper in that I do not.

Q. I apologize. You agree with me that 2, plus 2.5, plus 635, is basically $3.15 million? Just over 3 million bucks?

A. I'm sorry. I don't know which numbers you are adding up here.

Q. I am adding $2 million for 2014, $2.5 million for 2015 --

A. 4.5.

# A-864

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

| MB95col2 | Horowitz - Cross | Page 1210 |

Q. That's four and a half, yes?
A. Yes.
Q. And then I am adding 300 and 335?
A. I guess it is about $5.1 million.
Q. Guaranteed minimums. right?
A. Correct.
Q. OK. Now let's go to the put/call feature for this deal, and I believe it is at Defendant's Exhibit 304-A3, page 24.
If you can pull that out. We need to go to the next part, too.
I want you to look at what is in front of you now, sir. Is this the put/call feature with respect to SEA-3 agreement between the parties?
A. This appears to be part of it.
Q. Well, do you agree with me that the floor for this put/call feature was $15.5 million?
A. I do.
Q. OK. So let's go back to our math. We had $5.1 million in minimum distributions guaranteed plus a $15 million floor, right?
A. Correct.
Q. That math gets you to over $20 million, correct?
A. That is correct.
Q. On a purchase price of $21.5 million, correct?
A. That's correct.

| MB95col2 | Horowitz - Cross | Page 1211 |

Q. Less than a million dollars that GBG would be out of pocket in the bad case scenario, right?
A. I mean, in addition to other things, yes.
Q. That's their worst case scenario, is they pay you less than a million dollars spread out over five years if they're not generating any other revenue on this deal, correct?
A. In part, correct.
Q. And that's not realistic, right? Because we know these brands are generating some revenue. Do you agree?
A. At this point Lee Cooper was.
Q. Right.
And so, if the deal does well, what was a realistic scenario, from your perspective, of the deal performing well? For SEA-3, how much money would this generate for the JV?
A. Let's say this JV was generating $6 million a year.
Q. OK. That's not like a home run scenario but pretty good?
A. I would say that's pretty good.
Q. So that's a scenario where GBG is earning 50 percent of it at least, right? Because you are not sure about the 15 percent we can come back to that, but let's assume it is not there in this scenario, they're earning $3 million each year for five years, that's $15 million; correct?
A. Correct.
Q. And in this scenario, if Iconix wants to buy it back, or for whatever reason they want to put it back to you, they get

| MB95col2 | Horowitz - Cross | Page 1212 |

to keep the $15 they've already gotten, right?
A. That's correct.
Q. And the calculation for what they have to be paid is this same 5.5 multiplied by the royalty and then you take half of that number, yes?
A. That is correct.
Q. So, 6 times 5.5 is over $30 million. We agree?
A. Yes.
Q. I'm not that good at math but I know 6 times 5 is 30, it is more than that; yes?
A. Correct.
Q. So, at the very least, you would have to pay them over $15 million, correct?
A. Correct.
Q. And that's on top of the $15 million they've already made, yes?
A. Yes.
Q. So, they would have earned over $30 million during the five years of this deal in that realistic scenario that you laid out, yes?
A. Including the payback for the assets, yes.
Q. Right. After five years they've gotten $30 million they didn't have at the beginning of this deal, yes?
A. Well, they paid money for the deal and then they were paid, so --

| MB95col2 | Horowitz - Cross | Page 1213 |

Q. Yes. And what they -- the worst case scenario is they're out less than a million dollars paid out over five years, right?
A. Strictly as it pertains to cash, yes.
Q. Another pretty sweet deal for them, that's the downside scenario is less than a million bucks, yes? For the right to potentially get 30?
A. In terms of cash allocation? Yes. It does not take into account other considerations.
Q. That's if there is no other benefit going back to them that's not in the written agreement, right? That's just a written agreement, yes?
A. Yes.
Q. That's a sweet deal for GBG as written, correct?
A. It depends.
Q. They were pretty happy about it, yes?
A. I am sure you have asked them.
Q. We will.
MR. LENOW: Objection.
THE COURT: Sustained.
MR. HECKER: Can the Court remind me when our --
THE COURT: We can stop now, we are within two minutes.
MR. HECKER: I think now is a good time.
THE COURT: Very well.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

---

MB95col2        Horowitz - Cross        Page 1214

Ladies and gentlemen, we will take our break, we will get back together at 10 minutes after the hour. Don't discuss the case.

(Continued on next page)

---

MB95col2        Horowitz - Cross        Page 1215

(Jury not present)

THE COURT: Mr. Horowitz, you may step down and everyone can be seated.

(Witness steps down)

THE COURT: Anything to raise, Mr. Lenow?

MR. LENOW: No, your Honor.

MR. HECKER: No, your Honor.

THE COURT: OK. 20 minutes, folks.

(Recess)

(Continued on next page)

---

MB9YCOL3        Horowitz - Cross        Page 1216

AFTERNOON SESSION
1:10 p.m.

THE COURT: Mr. Horowitz, please come forward.

(In open court; jury present)

THE COURT: Everyone can be seated.

Mr. Hecker.

MR. HECKER: Thank you, your Honor.

And just one cleanup. The government has no objection, as I understand it, to moving into evidence defendant's 1901 and 1901A?

MR. THOMAS: No objection.

THE COURT: Very well. They are received.

(Defendant's Exhibits 1901 and 1901A received in evidence)

MR. HECKER: I got ahead of myself, and I actually showed it. So now the record is clean.

Q. There is going to be no more math, at least for a while.

I'd like to ask you about the discussions that took place between you and GBG earlier in term with respect to Lee Cooper.

Can you describe for the jury what the discussions were with Iconix on the one hand and GBG on the other about the potential inclusion of the Lee Cooper brand in what became SEA-2.

A. There were negotiations that spanned several months. Those

---

MB9YCOL3        Horowitz - Cross        Page 1217

negotiations included various structures, legal obstacles, to completing the transaction and eventually the inability to do the transaction.

Q. And the upshot of that is that the SEA-2 agreement contains no mention of Lee Cooper. Correct?

A. That agreement would have never contained anything to do with Lee Cooper.

Q. And notwithstanding that, you understood. And you understood that GBG understood that there was still a desire to try to do a Lee Cooper deal with GBG.

Is that true?

A. That is true.

Q. But there was no commitment or obligation to do it with them; right?

A. There was a mutual effort on both sides.

Q. Both parties thought it would be great if you could do it today. Yes?

A. Yes.

Q. There were discussions throughout the negotiations that GBG wanted Lee Cooper. Yes?

A. For Europe, yes.

Q. And there were other discussions in which either you or Mr. Cole told them, yeah. we want to do Lee Cooper with you.

Yes?

A. Yes.

---