# 23-7566

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL COLE, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT
VOLUME IV OF VII
(Pages A-866 to A-1151)**

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
BRONWYN C. ROANTREE
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

**TABLE OF CONTENTS**

PAGE

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Indictment, filed December 4, 2019 (Dkt. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . A-41

Excerpts of First Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-78

Government Memorandum of Law in Opposition to Defendant's
   Motions *in Limine* and Renewed Motion for Rule 17(c)
   Subpoenas, filed October 17, 2022 (Dkt. 226) . . . . . . . . . . . . . . . . . . . . A-493

Government's Requests to Charge,
   filed October 20, 2022 (Dkt. 230). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-566

Letter from U.S. Attorney's Office to the
   Honorable Edgardo Ramos,
   dated October 26, 2022 (Dkt. 238) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-626

Letter from David Oscar Markus to the Honorable Edgardo Ramos
   re Ethan Cole, dated November 18, 2022 (Dkt. 247) (with
   attached email from Edward Y. Kim to David Oscar Markus) . . . . . A-630

Excerpts of Final Pre-Trial Conference Transcript,
   dated October 27, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-632

Excerpts of Second Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-648

**Government Exhibits**

GX 104        Iconix Brand Group, Inc. Form 8-K,
              dated October 24, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1139

GX 105        Iconix Brand Group, Inc. Form 10-Q for the Quarterly
              Period Ended September 30, 2014 . . . . . . . . . . . . . . . . . . . A-1152

ii

PAGE

GX 207        Consultancy Agreement between Iconix Brand Group, Inc. and LF Centennial Limited, dated September 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1190

GX 210        Letter Agreement between Iconix Brand Group, Inc. and LF Asia Limited, dated June 30, 2014 . . . . . . . . . . . A-1195

GX 212        Letter Agreement between Iconix Brand Group, Inc. et al. and Global Brands Group Asia Limited, dated September 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1199

GX 1044      Email from Mark J. Stevens to Nicholas C.A. Cook et al., dated June 25, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . A-1205

GX 1058      Email from Neil Cole to Seth Horowitz, dated August 14, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1405

GX 1068      Email from Ethan Cole to Jared Margolis, dated August 28, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1407

GX 1091      Email from Lauren Gee to Robert Smits, dated September 11, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1409

GX 1098      Email from John Reda to David Maslaton, dated September 26, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1547

GX 1111      Email from Ethan Cole to Seth Horowitz, dated October 2, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1551

GX 1139      Email from Ethan Cole to Jared Margolis, dated December 1, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1555

GX 1197      Email from Seth Horowitz to Neil Cole, dated April 13, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1557

GX 1255      Undated notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1560

GX 1255-B    Metadata associated with GX 1255 . . . . . . . . . . . . . . . . . A-1561

GX 1335      Government summary exhibit, "Document Timeline" . A-1562

iii

PAGE

### Defense Exhibits

DX 0303-A1    Iconix SE Asia Limited First Amended and Restated
Shareholders Agreement ........................... A-1691

DX 0303-A2    Letter Agreement between Iconix Brand Group, Inc.
and LF Asia Limited, dated June 30, 2014............ A-1733

DX 0304-A2    Letter Agreement between Iconix Brand Group, Inc.
et al. and Global Brands Group Asia Limited,
dated September 17, 2014 ......................... A-1737

DX 0304-A3    Iconix SE Asia Limited Second Amended
and Restated Shareholders Agreement................ A-1743

DX 0558       FASB Accounting Standards Codification
605-50-45 ....................................... A-1790

DX 1140-U    Email from Neil Cole to Ericka Alford,
dated September 30, 2013 ......................... A-1792

DX 2334       Stipulation re Jason Rabin, dated October 26, 2021 ... A-1793

DX 3517-003   Notes re Ethan Cole attorney proffer,
dated July 22, 2019 (not admitted at trial) ............ A-1795

DX 3517-004   Federal Bureau of Investigation FD-302 re Ethan Cole
interview on July 29, 2019 (not admitted at trial) ..... A-1797

DX 3517-010   Notes re Ethan Cole, dated September 22, 2021
(not admitted at trial) .............................. A-1807

DX 3517-012   Notes re Ethan Cole, dated October 12, 2022
(not admitted at trial) .............................. A-1809

DX 3539-083   Federal Bureau of Investigation FD-302 re Seth
Horowitz interview on February 11, 2020
(not admitted at trial) .............................. A-1810

iv

PAGE

Excerpts of Sentencing Transcript, dated October 10, 2023 . . . . . . . . . . . A-1814

Notice of Appeal, dated October 27, 2023 (COA Dkt. 1) . . . . . . . . . . . . . A-1819

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

---

MB9YCOL3     Horowitz - Cross     Page 1218

Q. Maybe even we planned to do it; right?

A. We tried to do it.

Q. But there was no commitment to do it; correct?

A. No.

Q. And in fact, there was a discussion about doing something called a Lee Cooper tracking stock in Europe with GBG?
Do you recall those discussions?

A. At some point, a tracking stock was a mechanism that may work.

Q. We need to unpack it a little bit because I don't understand it.
What is a "tracking stock," and how would that provide a vehicle for the two companies working together as it related to Lee Cooper?

A. A "tracking stock," to my understanding, was a potential solution for not being able to put Lee Cooper into a joint venture structure. It was technical. It basically acted like they owned 49 percent. But, again, the structure ended up not working.

Q. And that agreement was never reduced to a written agreement between Iconix and GBG. Right?

A. Which agreement?

Q. An agreement to do a tracking stock that related to Lee Cooper. Correct?

A. We may have started to paper an agreement, but it did not

---

MB9YCOL3     Horowitz - Cross     Page 1219

end up happening.

Q. It never became a part of the deal, any deal.

A. There was never a deal.

Q. Right. So there was initial paper around it, there were discussions around it, but there was no commitment to do it with GBG. Right?

A. I would say that's correct.
MR. HECKER: Let's show Mr. Horowitz what's in evidence as Defendant's 1408. I think we can start in the middle portion, the email from Willy Burkhardt to you, September 30, 2014.

Q. Do you see that?

A. I do.

Q. Now, Mr. Burkhardt says -- withdrawn.
Let's go back to the bottom. Can we go down further. Entirely my fault. Go to the top, the very top. Okay.
This email on October 4, 2014, is from you to Willy Burkhardt; correct?

A. That is correct.

Q. And you say: "Also interesting development on EU Lee Cooper. Technically, we never agreed in writing to do the Lee Cooper tracking stock in Europe with GBG."
Do you see that?

A. I do.

Q. And what you meant by "technically, we never agreed to do

---

MB9YCOL3     Horowitz - Cross     Page 1220

it" is that it hadn't been reduced to a written agreement between the parties. True?

A. Doing it as a tracking stock had never been reduced to a contract.

Q. There was no deal between you and GBG to do a tracking stock for Lee Cooper in Europe. Correct?

A. Correct.

Q. And just to remind the jury, Willy Burkhardt, he was the head of international; correct?

A. Yes.

Q. So in the ordinary course of something relating to Lee Cooper in Europe, it might be Willy Burkhardt who is actually running point talking to potential business partners about doing something with Lee Cooper. Right?

A. Generally speaking, that is correct.

Q. Just so we're entirely clear, what you're telling Mr. Burkhardt here is that he's free to do some deal with someone else on Lee Cooper because you never agreed in writing to make Lee Cooper part of any deal with GBG; correct?

A. Not correct.

Q. When you say: "Technically, we never agreed in writing to do the Lee Cooper tracking stock in Europe with GBG," you meant there is no written agreement between the parties that obligates us to do Lee Cooper tracking stock in Europe with GBG. Right?

---

MB9YCOL3     Horowitz - Cross     Page 1221

A. As it pertained to a tracking stock specifically, that's correct.

Q. And what you're communicating to Mr. Burkhardt is, free to do it with someone else. We have flexibility.

A. That is not correct, and that is not what this email reflects.
MR. HECKER: Let's move on.

Q. I want to go back to August of 2014 between SEA-2 and SEA-3.
Are you with me?

A. Yes.

Q. In mid August, am I correct that Mr. Rabin contacted you with a list of asks?
Do you recall that?

A. I believe that is correct.

Q. And let's just quickly show you Defendant's 1334. This is you reporting to Mr. Cole that Mr. Rabin had called to discuss China Umbro and Lee Cooper which he will confirm Monday and then a list of asks, topics including Roc Kids and how to handle.
Do you see that?

A. I do.

Q. And then at the bottom, you say: "Look forward to hearing about the trip."
Am I right that Mr. Cole was on a trip at this time in

---

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

| MB9YCOL3 | Horowitz - Cross | Page 1222 |
|---|---|---|

Israel?

Do you recall that?

A. I recall him going to Israel. That appears to be what happened around this time.

Q. You do recall him going to Israel, and it appears to relate to this time period?

A. Yes. Sorry about that.

Q. And I now want you to look at Defendant's 1349. This is an email from Willy Burkhardt to Neil Cole copying you on August 22. And I want to point you to where the discussion is about London Fog and Korea.

Do you see that?

A. I see point 7.

Q. Do you know what issue had arisen with respect to the London Fog brand in Korea?

A. I do not.

Q. You don't know what that's a reference to?

A. I do not.

MR. HECKER: We can put that away.

Q. Am I correct, sir, that around this point GBG became one of the leading candidates to do the China Umbro deal in the third quarter? Yes?

A. Correct. The China Umbro Lee Cooper deal.

Q. And that is what became SEA-3. Yes?

A. Yes.

| MB9YCOL3 | Horowitz - Cross | Page 1223 |
|---|---|---|

Q. Now, by that point, you knew that GBG had acquired TLC. We talked about that earlier; right?

A. That is correct.

Q. And before the SEA-2 transaction was signed, you had discussions with representatives of TLC about taking over the marketing for Lee Cooper.

Do you recall that?

A. I do not.

MR. HECKER: Let's show you Defendant's 1310 and 1310A1. This is a weekly update from you to Neil Cole, June 27.

Q. Do you see that?

A. I do.

Q. This is one of your weekly updates? Yes?

A. It is.

Q. Do you see under the "Europe JV Consolidation" it states: "We can transition Lee Cooper under Angela/LF right away as deal is eminent"?

Do you see that?

A. I do see that.

Q. Who is Angela?

A. Angela was one of the executives or is at TLC/GBG.

Q. Am I right that it says that "Willy is more comfortable learning a lot when he's there this week and going back on"?

Do you see that?

| MB9YCOL3 | Horowitz - Cross | Page 1224 |
|---|---|---|

A. I do see that.

Q. So does that refresh your recollection that there were discussions with GBG and TLC about transitioning Lee Cooper promotion work to TLC?

A. It does not.

Q. At the time that the SEA-2 transaction was finalized, didn't you expect to transition the Lee Cooper marketing work to TLC?

A. I just don't recall that.

Q. On August 18 -- this is a few days after Mr. Rabin apparently called you with a list of asks -- you told Neil Cole that Rabin wanted $10 million or more.

Correct?

A. I believe that is what it said or that is what I said.

Q. That was an ask from Mr. Rabin. Yes?

A. Yes.

Q. I just want to put this in context.

We've had some discussion earlier today about the idea that a business partner might come to you with asks that aren't required of you, that are not obligating, according to any written agreement, and you still might decide to pay it.

Do you recall that testimony?

A. I recall something similar.

Q. Well, we talked about the fact that while you were at Iconix and even indeed at Modell's, there were times when, as

| MB9YCOL3 | Horowitz - Cross | Page 1225 |
|---|---|---|

the intellectual property owner, you might be asked for marketing or advertising.

They'd just ask for it; correct?

A. I don't know who the "they" is.

Q. Well, you testified earlier today. We talked about this. When you were at Modell's, you recall this happening. Yes?

A. That is correct. As a retailer asking our suppliers, yes.

Q. It's not limited to retailers; correct?

A. That's where I'm most familiar with it.

Q. It happens in the industry where a business partner might come to you and say, hey, we really might need more from you on this. These are my asks from you.

A. Sure.

Q. And isn't it true, sir, that when you met with the government in 2018, you told the government that a couple months after the SEA-2 deal in August or September, GBG started asking about the 5 million that they wanted in connection with the SEA-2 transaction and that you discussed that with Rabin and Margolis and they said, I want this from you?

Correct?

A. I don't recall those exact words or conversation. But in substance, that sounds about right.

Q. There was nothing weird about that at the time. When Mr. Margolis or Mr. Rabin are making these asks of you, that's

**A-868**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL3     Horowitz - Cross     Page 1226

not weird.

In this industry, it wasn't unusual. Correct?

A. Not correct.

Q. Isn't it what you told the government, when you met with them back in 2018 and 2019, that there was nothing weird about this at the time?

A. I don't believe so.

MR. HECKER: Let's look at Government 1063 in evidence.

Q. This is another weekly report that you sent to Neil Cole; correct?

A. That is correct.

Q. This is mid August 2014; right?

A. That is correct.

Q. And I want to go to entry number 5 in this document.

Do you see where it says Simon Bamber Umbro/P&L?

A. That's right.

Q. Simon Bamber, who was he?

A. He was originally a member of TLC and a licensee of Iconix.

Q. And this licensee -- you're saying that you agreed with the licensee to contribute 1 million in 2014 and 1 million in 2015 towards sponsorship of West Ham.

Do you see that?

A. I do.

Q. Is that an English Premiere League team?

MB9YCOL3     Horowitz - Cross     Page 1227

A. It is.

Q. And Mr. Bamber was a licensee for Umbro in Europe; correct?

A. That is correct.

Q. And you agreed Iconix would contribute $2 million over two years to support Umbro's sponsorship of that team; right?

A. That is correct.

Q. You thought that was an investment worth making in that relationship; correct?

A. I felt that it was an investment worth making for Umbro. Correct.

Q. You thought it would help promote the brand; right?

A. Yes.

Q. There was no contractual obligation or commitment, at the point you agreed to do this, when you decided to spend the $2 million to try to promote the Umbro brand in this way. Correct?

A. That is correct.

Q. And this concept isn't that atypical; right? There are other instances -- and we can review some of them, if you'd like -- in which you're advocating spending money that you're not contractually obligated to spend or that you think is going to be good for promoting the brands or developing business. True?

A. That sounds like a position I would take.

Q. It does?

MB9YCOL3     Horowitz - Cross     Page 1228

A. Yes.

Q. And that was true with Everton, for example; right? I'm sorry. For Descente, which owned the Umbro IP in Japan. Yes?

A. It was true for Everton which was another Premiere League team, but I don't know what you're referring to.

Q. So Everton is another soccer club. And you felt like spending money on Everton would help promote the Umbro brand; correct?

A. That is correct.

Q. Again, monies that you're paying that you think will benefit the company in the long run but that you're not obligated to pay contractually. True?

A. True.

Q. Now, sir, in early September 2014, you testified at length about the discussions that you had with GBG about their desire to get out of their obligations under the Rocawear Kids licensing agreement.

Do you recall that testimony?

A. I'm sorry. For clarity, you're asking if I testified about their position in early 2014?

Q. In September 2014.

A. About GBG's position in Rocawear Kids?

Q. Correct.

You testified about it?

A. Yes.

MB9YCOL3     Horowitz - Cross     Page 1229

Q. Whether you testified about it or not, in early spring, you were in discussions with GBG about the fact that they wanted out of that licensing agreement.

Is that correct?

A. We had discussions with GBG in which they wanted out of that Rocawear Kids agreement.

Q. They said they were losing money on that deal.

A. Yes.

Q. That's what they represented to you; correct?

But you testified, I believe, that Mr. Cole had trepidation about that during this period. Yes?

A. I testified that he had trepidation about letting GBG out of their agreement.

Q. Yes. I'm sorry. I should have been clearer. I'm talking about GBG wanting to get out and Mr. Cole having trepidation about letting them out.

Right?

A. That is correct.

Q. And that was true all the way through the end of 2014; right?

A. Neil would go back and forth on that subject.

Q. GBG wanted out.

A. Correct.

Q. They made that very clear to you in numerous conversations; correct?

# A-869

UNITED STATES OF AMERICA, v.
NEIL COLE

**TRIAL**
**November 9, 2022**

MB9YCOL3     Horowitz - Cross     Page 1230

A. That is correct.

Q. And Neil had concerns about letting them out. Correct?

A. At times. Other times, he wanted to do it.

Q. He wanted to do it. Yes?

A. Yes.

Q. But he never actually agreed to do it; correct?

A. Not correct.

Q. It never happened; right? The Rocawear Kids licensing agreement was not terminated in 2014; correct?

A. To my knowledge, that is correct.

Q. And it was true in 2015 until you left the company, never terminated. Correct?

A. To my knowledge, that's correct.

Q. But it's clear GBG wanted out. They were asking you to let them out.

A. Correct.

Q. One of the reasons he didn't want to let them out is because you were trying to accommodate them.
Is that true?

A. In part.

Q. You were trying to find a replacement who would become the licensee for Rocawear Kids. True?

A. True.

Q. You actually spent a lot of time and energy and resources devoted to trying to find a replacement for the Rocawear Kids

MB9YCOL3     Horowitz - Cross     Page 1231

brand. Correct?

A. Correct.

Q. One of the concerns is you couldn't find another counterparty to serve as the licensee who you weren't concerned about their ability to pay you; correct? Their credit worthiness.

A. At some point, that was Neil's concern.

Q. And Neil told you that he thought that GBG was a better credit. Correct?
Do you recall that testimony?

A. I recall him saying that, and I recall that testimony.

Q. And that meant, relative to other options, GBG was good for the money. Right?

A. That is what he was referring to.

Q. And other licensees or potential licensees weren't giving, at least Neil Cole, the same level of comfort; correct?

A. That was my understanding.

Q. Just so we're really clear, the Rocawear Kids license never terminated in 2014 or 2015. Correct?

A. That is correct.

Q. Okay. Sir, now, you testified at great length about the invoices for marketing that GBG sent over to Iconix.
Do you recall that testimony?

A. I do.

Q. And we aren't going to go through the exercise of reviewing

MB9YCOL3     Horowitz - Cross     Page 1232

all of the documents that were eventually sent over. I just have a couple very simple questions about it. Okay?
Are you with me?

A. Are you asking me if that's okay with you?

Q. Is that okay with you?

A. Sure.

Q. Skipping questions, you're good. Okay.
You met with GBG to discuss the invoices in late September 2014.
Is that your testimony?

A. Yes.

Q. And before you did that, you testified that you prepared a document that you were going to use in the meeting with GBG.
Do you recall that testimony?

A. I do.

MR. HECKER: And I want to pull up that document. It should have Government Exhibit 232.

Q. Do you recall answering questions about this document on direct examination from the government?

A. I do.

Q. And I believe you testified that this is a document that you created and then took notes on during your discussion with Mr. Cole.
Do I have your testimony correct?

A. That is correct.

MB9YCOL3     Horowitz - Cross     Page 1233

Q. And I want to pull out the first item relating to Zoo York Europe. It says: "1 million Zoo York Europe," and then there's a data symbol.
Just blow up that one line for now.
Just to be really clear about this, you testified that in the meeting with Mr. Cole, you typed in what he was telling you here after the hyphen: "Show-us work ... real expenses."
Do I have that right?

A. I typed up part of what he told me. That is correct.

Q. And in your notes to yourself to prepare for your discussions with GBG, what you wrote down was: "Show us work ... real expenses."
Correct?

A. That is what I wrote.

Q. But in your testimony, you didn't actually focus on that. You focused on what you understood Mr. Cole was asking you to do, to get expenses that passed the sniff test.
Do you recall using that expression multiple times during your testimony?

A. I do.

Q. And you said that it would give you more coverage.
Do you recall that testimony?

A. I recall that testimony.

Q. Make it look more real. Correct?

A. Correct.

# A-870

UNITED STATES OF AMERICA, v.
NEIL COLE

**TRIAL**
**November 9, 2022**

| MB9YCOL3 | Horowitz - Cross | Page 1234 |
| --- | --- | --- |

Q. The words you wrote in the actual meeting with Neil Cole are those that are on this document that you took notes on in real time.
Correct?
A. In part, yes.
Q. "Show-us work ... real expenses." Correct?
A. That is correct.
MR. HECKER: We can do all of them. Let's go to "2 million Ecko unlimited/Rocawear."
Q. Do you see that?
A. I do.
Q. The words you wrote there: "Show us expenses."
Do you see that?
A. I do.
Q. That's the best recollection you have of what the words were that you wrote down where they came from Neil Cole.
Correct?
A. In part.
Q. Sir, you testified --
You can put this down.
-- that you went back to GBG and you delivered the message that the initial invoices that they sent totaling $5 million with no description weren't going to cut it.
Correct?
A. Something to that effect.

| MB9YCOL3 | Horowitz - Cross | Page 1235 |
| --- | --- | --- |

Q. And you said, we need evidence that you're doing marketing work to support your request for $5 million.
A. No.
Q. In substance, that's what you're telling them, give me the invoices that will allow us to pay you 5 million for marketing that you're asking for.
A. What you just said is different than what you originally said.
Q. Okay. What I just said, does that work for you?
A. More accurate.
Q. And when the invoices came back, you testified that you weren't comfortable signing the invoices because you didn't think they were real.
Correct?
A. You're talking about two different batches of invoices.
Q. There was a batch of invoices you didn't want to sign; right?
A. Correct.
Q. Because you were worried about signing it. Correct?
A. That is correct.
Q. Because you didn't think that they reflected actual work that GBG had done for Iconix. Correct?
A. In part, correct.
Q. And they certainly didn't reflect work that all related to the SEA-2 joint venture. Right?

| MB9YCOL3 | Horowitz - Cross | Page 1236 |
| --- | --- | --- |

A. I believe so.
Q. Right?
A. I believe so.
Q. And just to be really clear about this, you didn't want to sign the invoices, but you wired the money. Right?
A. But I signed the wire transfer. That is correct.
Q. There was a line in there for you, and you decided that wiring the money for the marketing was okay but signing the invoices was not okay.
Was that what your testimony was?
A. Yes.
Q. What you testified was that you were in Neil's office, and you painted a picture of him going through the invoices and quickly frantically signing them.
Is that fair?
A. Over a period of a few seconds that I was in there, yes.
Q. You didn't see him reviewing them carefully; correct?
A. That is correct.
Q. And he signed them, and you did not.
A. This batch of invoices, which is different than what we were just discussing, that is correct.
Q. Now, you went through some math with the government about these invoices.
But do you recall that the actual amount of the invoices that -- the amount of the marketing money that was

| MB9YCOL3 | Horowitz - Cross | Page 1237 |
| --- | --- | --- |

paid to GBG was over $5.4 million? Correct?
A. I believe in total, that is correct.
Q. So your testimony is that in responding to this ask for $5 million of marketing money, that Iconix ended up sending more than they asked for to the tune of $400,000. Correct?
A. At that point, more money was due. Correct.
Q. Sir, isn't it true that some of the monies that were paid of the 5 million were actually booked as expenses on Iconix's book in 2014? True?
A. I believe so.
Q. In fact, something like two thirds of the amount. Yes?
A. I do not know.
Q. If it was booked as expenses in 2014, it reduced earnings for 2014. True?
A. That would be true.
Q. To the tune of something like $3.6 million?
Does that sound about right to you?
A. I do not know.
Q. You don't know?
A. I don't know.
MR. HECKER: If we could, I just want to return to a topic that we discussed earlier. Could we put up Exhibit 203, Government 203.
Q. Is this the SEA-3 local services agreement?
A. It appears to be. It would be helpful to see a little

**A-871**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL3          Horowitz - Cross          Page 1238

more.

MR. HECKER: We can scroll down. Go scroll.

Q. Tell us where you want us to go further.

A. You can scroll through it.

Q. I want to pause here for a moment.

Is this the SEA-3 joint venture agreement, part of it?

A. I just don't know.

MR. HECKER: Why don't we go to the signature page. Is that the last page? Can you go up one page. Keep going.

One moment.

(Pause)

BY MR. HECKER:

Q. I apologize, Mr. Horowitz. I'll represent to you, after discussion with the government, it doesn't have a date on it. But this is actually the original joint venture agreement SEA-1.

Are you with me?

A. Yes.

Q. And I want you to look at Section 3.01. And I just want to clean up this topic that we discussed earlier.

Is 3.01 the fees, "The monthly fees payable for services shall be equal to 15 percent of the gross revenue collected in the immediately preceding month"?

Do you see that?

A. I do see that.

MB9YCOL3          Horowitz - Cross          Page 1239

Q. Is it fair to say that's the 15 percent that we talked about earlier, when you're doing the math on these agreements, that goes to the GBG side of the ledger for work done in connection with the SEA joint venture?

A. Again, I cannot agree that this was a part of SEA-3. I believe those brands may have been treated differently.

Q. Okay. You just don't know. Fair enough.

All right, sir. I want to ask you some questions about an exhibit the government showed you that's Government 706.

Can we call that up, please. If you can make it a little bigger, please.

Do you recall being asked a series of questions about this document on your direct examination?

A. I do.

Q. And you testified that this is a document you prepared at Neil Cole's suggestion. Correct?

A. That David Maslaton and I put it together at Neil's suggestion, correct, or request.

Q. And this is a document you in fact put together with Mr. Maslaton; correct?

A. That is correct.

Q. And you testified I believe that you recall Mr. Maslaton coming to your office to prepare this with you.

Is that true?

MB9YCOL3          Horowitz - Cross          Page 1240

A. That is correct.

Q. And I just want to be really clear.

This document has no mention of alleged overpayments or secret side deals or anything like that listed on the document. Correct? Those words don't appear.

Correct?

A. I disagree.

Q. Sir, is it your testimony that David Maslaton was in on your secret scheme to inflate the value of the SEA-2 and SEA-3 transactions?

A. As far as I know, he was not in on the secret givebacks and inflated prices.

Q. And yet you worked on this document with him.

A. That is correct.

Q. And when you prepared this document sitting side by side with Mr. Maslaton, he never said to you, oh, my God. I can't believe Iconix did these deals where money is owed back to GBG.

He never said that to you; correct?

A. He did not.

Q. And there is no column of this document that says: "Overpayment." Correct?

A. There are substitute words in here. That is correct.

Q. I'm asking you about the word "overpayment" which is the word you used when you testified about this document to the grand jury probably 25 times yesterday.

MB9YCOL3          Horowitz - Cross          Page 1241

Is that word in this document?

A. I do not believe the word "overpayment" is in this document.

Q. This is the document that you created in real time about this topic -- correct? -- with Mr. Maslaton who is not in on your scheme?

Is that your testimony?

A. I was not aware of whether he was in or out or whether Neil had told him things or not.

Q. Sir, you're not claiming, as you testify in front of this jury, that David Maslaton was involved in some secret deals with you to inflate the value of SEA-2 and SEA-3, are you?

A. That's not what I'm testifying.

Q. I just want to be clear about that.

A. That's not what I said.

Q. Now, this document does make reference to a series of transactions in the upper left.

Do you see that?

A. I do.

Q. Am I correct, sir, that the first two line items, Korea and Europe, together are SEA-3.

Is that fair?

A. They are SEA-2.

Q. I'm sorry. Withdrawn.

SEA-2. Yes?

# A-872

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

| MB9YCOL3 | Horowitz - Cross | Page 1242 |
|---|---|---|

A. Yes.

Q. The words "SEA-2" don't appear here. But that's what those transactions reference to Korea Europe where it says: "All for Korea. Men's additional for Europe," and then there's the summary.

Together, those are SEA-2. Correct?

A. Together they represent SEA-2. That is correct.

Q. And China, Lee Cooper, and Umbro, that's a reference to SEA-3; correct?

A. Correct. LC and Umbro is a reference to SEA-3.

Q. And the next line says: "U.S. Rocawear Kids termination."

Do you see that?

A. I do.

Q. And if that had happened, which it didn't, you would have to eliminate $5 million in royalty that you expected in 2014 and 2015.

Is that correct?

A. I believe it was actually $6 million, but that's what the document states.

Q. That's what the document says; right?

A. Correct.

Q. And under "Global," it says: "Marketing initiatives to stimulate JV incremental 5 million in marketing investment." Correct?

A. That is correct.

| MB9YCOL3 | Horowitz - Cross | Page 1243 |
|---|---|---|

Q. Just so the jury is clear, that's the $5 million that GBG is asking you to pay when this document was created. Correct?

A. They're asking for payment on $5 million, and that is what is reflected in this document.

Q. And in this document, you didn't put the $5 million of marketing as part of SEA-2, the first two lines. It's separate. It's under "Global."

Is that correct?

A. That is correct.

Q. And I want you to go over this again. I just didn't understand your testimony.

In the next column over, do you see under "Net" where it says: "6,567,400."

Do you see that?

A. I do.

Q. You were asked about that number, and you testified on direct that that number is the $5 million overpayment number. Correct?

A. That is correct.

Q. But it doesn't say 5 million. Right?

A. That is correct.

Q. Explain to us what the extra $1.567 million represents in that number.

A. The 5 1/2 times value column is lower because Ecko

| MB9YCOL3 | Horowitz - Cross | Page 1244 |
|---|---|---|

Unlimited had its bankruptcy issue in Europe by the time this spreadsheet was put together.

Q. There is no mention here of Ecko. Right?

A. That is correct.

Q. Ecko though was part of the SEA-2 transaction. Yes?

A. That is correct.

Q. And something unexpected happened with respect to that brand.

Am I right?

A. Relatively unexpected.

Q. It went bankrupt.

A. Both parties were aware that might happen during the negotiations.

Q. Okay. But they didn't know it would happen; right?

A. They didn't know it would happen. Correct.

Q. But it did go bankrupt. Yes?

A. Correct.

Q. And now GBG's not thrilled about that. Right?

A. I don't know how they felt about it.

Q. Well, you're both unhappy about it. One of your brands that's in the JV has gone bankrupt.

That's not a good development. Correct?

A. It could be seen as a good development.

Q. If you're under water and you're trying to get protection from creditors; is that right?

| MB9YCOL3 | Horowitz - Cross | Page 1245 |
|---|---|---|

A. It wasn't a good development for the Ecko licensee, but it was an opportunity for the joint venture to replace them.

Q. You're including as an amount that's owed the 1.5 plus million dollars relating to Ecko, the value that's no longer there that was there at the time the deal was cut.

Is that true?

A. I'm sorry. I didn't understand that question.

Q. I'm just not understanding why you're reducing the price that's identified here because of the Ecko bankruptcy. So my questions are directed at understanding.

What you're listing in the 5.5 times value, that's not actually the price of the deal up front. Correct?

A. That is correct.

Q. You're just revaluing the deal now that Ecko has gone bankrupt.

Is that right?

A. It's a multiple that is being used to come up with some of those numbers that reflects Ecko's bankruptcy.

Q. But it wasn't your understanding that you, Iconix, was obligated to pay GBG $1.5 million more because Ecko went bankrupt, is it?

A. No, but there was a tie to the minimum distribution related to Ecko.

Q. Were they asking you to pay them additional monies as a result of bankruptcy?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL3    Horowitz - Cross    Page 1246

A. No.
Q. And there was no obligation to do it; right?
A. There was an obligation to pay the minimum distribution within the joint venture.
Q. But what does that have to do with this net number of 6.567?
A. It is directly correlated to the number to the right of it.
Q. It's just math. You're just changing the amount of the value of the brands because one of the brands is out of the mix.
Is that your testimony?
A. It's the math of the 5 1/2 times column. That is correct.
MR. HECKER: I got it. Okay. We can put that away.
Q. Now, sir, you discussed on your direct examination by Mr. Lenow the joint venture that became MENA.
Do you recall we mentioned this earlier?
A. Yes.
Q. And the purpose of that joint venture was to license certain brands in the Middle East North Africa region.
Correct?
A. That is correct.
Q. That region can be a little bit of a difficult place to do business at times if you're a newcomer to that area?
A. I believe that's an accurate depiction of the market.
Q. And we saw that Middle East JV had been identified going

MB9YCOL3    Horowitz - Cross    Page 1247

back to June of 2014 as a potential transaction. Correct?
Do you recall we discussed that earlier?
A. That is correct.
Q. And we discussed that Willy Burkhardt was engaged in negotiations with one potential joint venture partner. Correct?
A. I believe that Willy and Neil were both in communication with a potential partner.
Q. And was that joint venture partner called Abu Issa?
A. That is what I recall, yes.
Q. And that was one potential joint venture partner for that region. Yes?
A. Yes.
Q. But you ultimately, you, Iconix, ultimately entered into a joint venture with GBG for that region. Correct?
A. That is correct.
Q. And just so we're clear, I think in the timeline, you testified that you had been in negotiations with GBG about doing that transaction, but you weren't there when it got finalized?
A. Me personally?
Q. Correct.
A. That is correct.
Q. You went on vacation?
A. I had a day off for my anniversary.

MB9YCOL3    Horowitz - Cross    Page 1248

Q. And while you were gone, Neil ended up finalizing a negotiation of what became the MENA joint venture.
Correct?
A. That is correct.
Q. Am I right, backing up for a second, there was a time when you were considering the pros and cons of doing the deal with Abu Issa as opposed to GBG.
Correct? Do you recall that?
A. I believe so.
MR. HECKER: Let's just quickly show you Defendant's 1466.
Q. Is this a weekly update that you sent to Neil Cole on Monday, November 24, 2014?
A. Yes, it is.
MR. HECKER: Let's show now the attachment at A1. If we can pull up the discussion of Middle East JV, "Business Development Options" and just blow that part up for a moment.
Q. So at this point in early November, you're discussing the possibility of even doing two different joint ventures in the Middle East. Right?
A. That appears to be correct.
Q. And you're saying you could do one with GBG just focused on Lee Cooper and Umbro; right?
A. That is an idea here, yes.
Q. But at this point, you already had documents going back and

MB9YCOL3    Horowitz - Cross    Page 1249

forth about a full joint venture that had been sent to GBG. Correct?
A. I don't specifically recall, but that is what this reflects.
Q. And it says it would be easy to revise it to just limit that part of the joint venture to Lee Cooper and Umbro; correct?
A. Correct.
Q. That's not what was ultimately done, but this was just an idea at the time. Correct?
A. Correct.
Q. And the other potential joint venture partner that's referenced here is Abu Issa; is that correct?
A. That's correct.
Q. And the idea here is that you could do everything, other than Lee Cooper and Umbro, and not Peanuts with Abu Issa. Right?
A. That's correct.
Q. And you're saying it's hard to tell if Abu Issa is fully in, if they're really going to be able to do this deal with us. Right?
A. That is correct.
Q. And you're saying: "Will know more from our call with Willy."
And that's a reference to Willy Burkhardt; correct?

**A-874**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

| MB9YCOL3 | Horowitz - Cross | Page 1250 |
| --- | --- | --- |

A. That is correct.

Q. Because he was running point on doing the deal with Abu Issa. Yes?

A. At this point, I believe so.

Q. You say though in the second-to-the-last line, you say: "I'm skeptical."

Is it fair to say that you weren't persuaded that Abu Issa was going to be in on this deal? Correct?

A. Based on their back-and-forths, yes.

Q. There were kind of pros and cons, from your perspective, about doing business with each of the two partners. Right?

A. Separately, yes.

Q. And you thought that with respect to GBG, this was a trusted, known business partner. Right?

A. I don't recall using though exact words, but that sentiment seems correct.

MR. HECKER: Let's look at Defendant's 1471.

Q. Sir, is this another weekly update from December 1, 2014?

A. Yes, it is.

MR. HECKER: And if we can look at the attachment.

Q. Is this your weekly update?

A. Yes, it is.

Q. And you see under "Business Development Options," you say: "Middle East JV GBG/Abu Issa."

Do you see that?

| MB9YCOL3 | Horowitz - Cross | Page 1251 |
| --- | --- | --- |

A. I do.

Q. And does this refresh your recollection that at the time, in December of 2014, after the two Southeast Asia joint ventures 2 and 3 that we've talked about, you say: "One of the pros of GBG is that we know and trust the business partner"? Correct?

A. Correct.

Q. And you say: "It's a continuation of a global relationship that we can leverage."

Do you see that?

A. I do see that.

Q. And you say: "We know we will get paid." Right?

A. Correct.

Q. You say: "We know we can buy the IP back." Right?

A. Correct.

Q. And what you meant by that, sir, is that because you've done these other deals with GBG, you knew they would agree to have a put-call feature in the joint venture agreement that would allow Iconix to buy back GBG's interest in the JV if it was in Iconix's interest to do that.

A. I believed that at this point, I was confident that both parties wanted the puts and calls.

Q. You could get that from GBG. That was valuable to Iconix because if the brands did well, you might want to buy them back

| MB9YCOL3 | Horowitz - Cross | Page 1252 |
| --- | --- | --- |

and just own them yourself. Right?

A. That's one of the scenarios in which we might want to do that.

Q. And that was a benefit of doing the deal with GBG for MENA.

A. A potential benefit, yes.

Q. But you say: "Cons, they're not experts in the marketplace."

Do you see that?

A. I do see that.

Q. And what you meant by that is that, unlike Southeast Asia or Europe or other regions of the world where you had done joint ventures or licensing agreements with GBG, you hadn't actually done one in the Middle East, and you didn't know whether they really knew that geographic region as well.

Is that fair?

A. No.

Q. When you say, "not experts in the marketplace," what did you mean?

A. I simply meant that they were not experts in the Middle East.

Q. I was trying to capture that, but I'll take that.

They didn't know the Middle East well.

A. That was my understanding.

Q. Okay. They would have work to do in order to better understand the Middle East if they're going to perform their

| MB9YCOL3 | Horowitz - Cross | Page 1253 |
| --- | --- | --- |

role in the JV of identifying good licensees for example. Correct?

A. Perhaps.

Q. That takes time. You've got to fly people and go meet with the potential licensees in the Middle East or North Africa. Right?

A. That would be part of their job in a joint venture.

Q. Right. They'd have to do that work. Yes?

A. Potentially.

Q. Okay. And for Abu Issa, the contrast, you say: "Their pros are that they're an active wholesaler/retailer in the market."

Do you see that?

A. I do see that.

Q. And "Cons don't license market for a living and may need another partner to do so."

Do you see that?

A. I do see that.

Q. Okay. And the bottom line here is you're just describing the pros and cons of doing the deal with one of the two options that you had on the table at this time.

Correct?

A. Correct.

MR. HECKER: Okay. I think I'm done with that document.

# A-875

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

---

MB9YCOL3    Horowitz - Cross    Page 1254

Q. Ultimately Iconix decided to do the MENA transaction with GBG; correct?

A. That is correct.

Q. And you testified about this. You weren't involved in the financial negotiations, but it actually closed in two parts in December of 2014.

Isn't that right?

A. That sounds correct.

MR. HECKER: And we've already moved into evidence the documents that govern that transaction. And let's start with Government Exhibit 217. We can scroll through it, if you'd like, and look at the last page.

But this was the joint venture agreement that was dated December 19, 2014.

Q. Do you see that?

A. I do.

Q. Yes?

A. I do.

MR. HECKER: Why don't we pull up Government Exhibit 218. These are all in evidence. You can review them later. This is an administrative services agreement.

Q. Do you see that?

A. I do.

MR. HECKER: And if you scroll down. Keep going. Keep going.

---

MB9YCOL3    Horowitz - Cross    Page 1255

Q. Do you see under Article III, "Fees and Payments"?

A. I see it.

Q. This time for the MENA transaction you see that "The monthly fee payable for services shall be equal to 5 percent of the gross revenue"?

A. I do see that.

Q. That was a different result than we saw, at least with respect to SEA-1. And you're not recalling for sure whether or not it carried out for the rest of SEA-2 and SEA-3.

Do you agree?

A. I believe it was different for different brands.

MR. HECKER: And if we look at Government Exhibit 219. This is the master licensing agreement for this deal.

Q. Do you agree with me?

A. I do.

MR. HECKER: Let's go to Government 220. That's the local services agreement. If you could scroll down. Keep going. Keep going.

Q. Do you see here the local services agreement has the same 15 percent monthly fee that we saw in at least SEA-1.

Yes?

A. I see that here. It's unclear how this relates to the other.

Q. Understood.

And your testimony, just so the jury is clear, you're

---

MB9YCOL3    Horowitz - Cross    Page 1256

not taking issue with the idea that there was a monthly fee that GBG would have earned in connection with SEA-1, SEA-2, and SEA-3. But your recollection is that it may have differed by brand in terms of what percentage they captured off the top.

Is that right?

A. Partially correct. I also believed that the two brands in SEA-3 either had reduced or no service fees.

Q. Okay. That's fair.

Why don't we look at Government Exhibit 222. This is the subscription agreement dated December 19.

Do you see that?

A. I do.

Q. And finally, I skipped one, Government 221. It's actually the second subscription agreement dated December 24, 2014.

Do you see that?

A. I do see that.

Q. And the purchase price that's set forth in the two subscription agreements are added together to make the full purchase price for what became the MENA joint venture.

Isn't that true?

A. I believe so, but I don't know for sure.

Q. Well, we can pull up the two amounts. But you agree with me that the total purchase price for this deal was $18.8 million?

A. That sounds approximately correct.

---

MB9YCOL3    Horowitz - Cross    Page 1257

Q. Okay. And it was actually broken out in these two agreements. And I don't think the details matter, but it was 15.3 and 3.4.

Does that sound familiar to you?

A. It does not.

Q. I want to turn to the agreement that's at Government Exhibit 221 which is the second subscription agreement dated December 24, 2014. And I want you to look at page 17, Section 8.1(m).

If you would pull that up.

Now, do you agree with me, sir, that this subscription agreement, the written document between GBG and Iconix, includes a commitment in writing from Iconix to pay GBG $3.1 million for expenses related to due diligence and market analysis in the Middle East and North Africa?

A. Yes.

Q. That's in the written agreement; correct?

A. That is correct.

Q. So in the written agreement that was signed in December 2014 that Neil Cole negotiated, you had two things going on. Correct?

You have GBG paying Iconix $18.8 million. True?

A. Over time, yes.

Q. Over time. Yes?

A. Yes.

---

**A-876**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

---

MB9YCOL3          Horowitz - Cross          Page 1258

Q. And in the same written agreement, you have Iconix paying $3.1 million to GBG for expenses related to due diligence and market analysis. True?

A. True.

Q. Now, you testified that this $3.1 million payment that's part of this written agreement and an obligation of Iconix was actually some giveback relating to one of the other Southeast Asia transactions.

Isn't that true?

A. That is my belief.

Q. But you didn't -- you weren't involved in the negotiation of the written agreement.

That was Neil Cole and GBG. True?

A. I was involved in much of the negotiation up until the final days.

Q. You don't know what work GBG had to do in order to fulfill its obligation of being the joint venture partner in MENA in connection with this deal, either in the past or going forward. That's not something that you ultimately know.

Correct?

A. It was something I knew up until the day before this transaction was signed.

Q. But you don't know what work there might be in the future that they have to do in order to actually execute on this agreement.

---

MB9YCOL3          Horowitz - Cross          Page 1259

Correct?

A. Not if it's not in the agreement.

Q. And to be very clear about this, MENA, like SEA-1, which Neil Cole also negotiated, includes money paid by GBG to Iconix on the one hand and, in the same written agreement, Iconix agreeing to pay money back to GBG.

Isn't that true?

A. I don't recall about SEA-1, but that is true about MENA.

Q. And you know that the lawyers who prepared these documents saw these provisions. Correct?

A. I would assume that they did.

Q. And it went through the accountants at Iconix as well. Correct?

A. That is correct.

Q. I want to be very clear about this. To the extent the issue is money coming to Iconix and making a round trip back to GBG, that in and of itself, is what happened in MENA in the written agreement itself.

Correct?

A. That is correct.

Q. And none of the people who reviewed that -- not the lawyers, not the accountants, none of the executives of either side -- took issue with this position. Correct? To your knowledge.

A. I don't know.

---

MB9YCOL3          Horowitz - Cross          Page 1260

Q. And your testimony is that you don't know that in SEA-1, the first joint venture agreement, that it included a payment going from Iconix to GBG of $2 million for strategic consulting services?

You didn't know that?

A. I don't believe that I did.

Q. The government didn't show that to you when you met with them 50 some odd times?

A. I don't recall seeing that.

Q. And you don't recall seeing it when you're negotiating the amendments to that very agreement?

A. I don't recall that line.

MR. HECKER: I'm going to change topics. You can take that down.

Q. Now, Mr. Horowitz, you testified that in December of 2014, Iconix received what we'll call a comment letter from the SEC Division of Corporate Finance.

Is that right?

A. That is correct.

Q. And that comment letter asked various questions about the company's 10-K for 2013 and the accounting for its joint ventures.

Isn't that true?

A. That sounds accurate, though I think there were other questions. But that sounds accurate.

---

MB9YCOL3          Horowitz - Cross          Page 1261

Q. And the questions that they were asking for the company to explain as an accounting matter was why the company had recorded the net gains from those transactions in licensing in other revenue at the beginning of the transaction when the deal was done.

Correct?

A. I don't recall the specifics of the question.

Q. You recall that the questions actually related to how the company had decided to account for these deals. Yes?

A. These joint ventures, yes.

Q. Yes. For the joint ventures.

In fact, it wasn't limited to SEA-2 and SEA-3. Right?

A. That is correct.

Q. The question was whether the accountants, either at Iconix or BDO, had properly made the judgment that this revenue could be booked when the deal was done. That's what the SEC was asking about.

True?

A. In part, in part, that was what the SEC was asking about. There were other questions.

Q. There were also questions about the company's 10-K for 2013 and its 10-Q for its third quarter of 2014. Right?

A. I believe so.

Q. And with respect to SEA-2 and SEA-3, the SEC was asking about the nature of the transactions, the accounting guidance

---

# A-877

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

| MB9YCOL3 | Horowitz - Cross | Page 1262 |

that had been relied upon for the transaction, and whether the rights to the brands met certain definitions under ASC 805.

Is that vaguely familiar?

A. That sounds accurate.

Q. You're not an accountant; right?

A. That is correct.

Q. And you don't know what the right -- at the time, you didn't know what the right answer was with respect to exactly how you were supposed to account for these joint venture transactions.

True?

A. Generally speaking, it was true.

Q. And I believe you testified on direct examination that there were a number of different senior executives at Iconix who were involved in preparing Iconix's response to that comment letter.

A. That is correct.

Q. And that included a Mr. Schneiderman?

A. Yes.

Q. Who was he?

A. He was a member of the finance team.

Q. And that included Mr. Lupinacci. He was the CFO at the time.

Is that correct?

A. That is correct.

| MB9YCOL3 | Horowitz - Cross | Page 1263 |

Q. And Mr. Schaefer was the general counsel. Yes?

A. Yes.

Q. Ericka Alford was another lawyer at Iconix who participated in preparing the response?

A. I believe she did.

Q. And there was an outside law firm that also participated.

Isn't that true?

A. I believe so. I think there were different outside parties that played a part in both responses.

Q. And the company's outside auditor, that was BDO.

Is that right?

A. That is correct.

Q. BDO is a well-known forensic accounting and accounting firm?

A. Yes.

Q. They were the auditors for Iconix. Yes?

A. Yes.

Q. And they participated in this process of getting answers to the SEC about the accounting for the joint ventures, along with everyone else. Yes?

A. I don't recall if it was in response to the first letter or the first and second letter.

MR. HECKER: Okay. Let's show you what's in evidence as Defendant's 1506. If you look at the bottom.

Blow that up for a second.

| MB9YCOL3 | Horowitz - Cross | Page 1264 |

This is Mr. Schneiderman, the vice-president of finance.

Q. Was he also the treasurer for Iconix?

A. I'm not sure.

Q. Well, in any event, he's attaching to the group of folks that are identified on the "To" line, which included you and an outside lawyer named Bob Mittman at Blank Rome.

Do you see that?

A. I do.

Q. And Larry Shapiro is mentioned there. He's at BDO. Correct?

A. Correct.

Q. And it says: "Attached is our most recent draft of our response, which includes all comments and edits received to date."

Do you see that?

A. I do.

Q. "Because we're planning to file Friday, I expect to make at least one more turn between now and then. Please send me any comments."

Do you see that?

A. I do see that.

Q. And you personally reviewed drafts of the response before it was filed; correct?

A. That is correct.

| MB9YCOL3 | Horowitz - Cross | Page 1265 |

MR. HECKER: If we go to Defendant's 1508.

Q. Am I correct this is your response to Mr. Schneiderman in which you say: "Brian, thank you. I have no further comments on the two sections we discussed earlier this week."

And you say: "Due to formatting issues, I'm unable to see the way we treated the personnel updates. If you could please send the redline as a PDF, I am happy to review."

Do you see that?

A. Yes. I see all of that.

Q. You had an opportunity to comment on what went back to the SEC. True?

A. Yes.

MR. HECKER: If we could now pull up Government Exhibit 112.

Q. And I believe you testified about this document already. This is a copy of the February 11 comment letter from the SEC. Correct?

A. That is correct.

Q. And this request from the SEC, Division of Corporation Finance, requested, among other things, more detailed information regarding the JV transactions and the accounting for the JV transactions.

Correct?

A. I believe that is correct.

Q. And Iconix responded four days later on February -- strike

**A-878**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL3    Horowitz - Cross    Page 1266

that.

Iconix responded a couple weeks later on February 24, 2015. Is that true?

A. That sounds correct.

Q. And the same group of people were involved in preparing that response; correct?

A. I believe there were more people involved in this response.

Q. And in fact, there was also a special forensic accounting firm called AlixPartners that was brought in during that time. Isn't that true?

A. I believe so.

Q. And isn't it a fact that Neil Cole actually asked this additional outside forensic accounting firm, AlixPartners, to come in and assist? He hired them. Yes?

A. I don't recall, but that would make sense.

Q. There was a high degree of concern at Iconix about the possibility that the SEC's division of corporation and finance might take the position that the revenue that Iconix had booked from these transactions shouldn't have been booked as revenue. Correct?

A. That was one of the concerns. Correct.

Q. And there was also concern about whether the SEC Division of Corporate Finance might have a view about the minimum guarantees and these put-call features that we walked through

MB9YCOL3    Horowitz - Cross    Page 1267

with respect to SEA-2 and SEA-3. Correct?

A. That is one way to characterize it.

Q. And they had questions about the floor that you had negotiated for SEA-2 and SEA-3. Correct?

A. The floor that we had negotiated for the put and call. Correct.

Q. The floor that was negotiated for the put and call.

A. Yes.

Q. And am I correct that in connection with responding to this, the lawyer, Lauren Gee, sent you a table listing who had worked on the joint ventures. Right?

A. I don't recall if that's what she sent me.

MR. HECKER: Let's just quickly put in Defendant's 1564.

Q. Am I correct? This is Ms. Gee sending to you a list of who worked on these different JV transactions. Correct?

A. That is correct.

Q. And the table identifies you as the primary business contact for the SEA joint ventures. Correct?

A. That is correct.

Q. And you reviewed drafts of the February 24, 2015, response that was sent back to the SEC. Yes?

A. Yes.

MB9YCOL3    Horowitz - Cross    Page 1268

Q. And you had a chance to provide input and comments on that response. Correct?

A. That is correct.

MR. HECKER: Let's go to Defendant's 1568 and 1568A1.

Q. Am I correct, sir, that the document on the left is an email you wrote to Willy Burkhardt?

A. That is correct.

Q. February 15, 2015?

A. That is correct.

Q. And it shows that you wrote this from your mac.com email, but it looks like you copied yourself. Am I assuming that this was you working at home and then making sure that it got back on Iconix's system?

A. You're assuming that, and I believe that is correct.

Q. And the attachment --
If we can just go to that for a moment.
Am I correct that this attachment, which looks as though you commented on, includes -- it appears to be a draft response to the second comment in the letter which raised this issue of the primary business purpose of these transactions. Does that sound right?

A. I'm sorry. I don't see that reflected here.

Q. Do see here that there's a description of -- it's under the title "Initial formations of your international joint venture --"

MB9YCOL3    Horowitz - Cross    Page 1269

Can you just pull that down a little. Just at the top for a second.
It says: "Response." And then it says number two: "Initial formations of your international joint ventures between 2012 and 2014."
Do you see that?

A. Yes.

Q. And the first one is talking about a joint venture that the company had in India. Right?

A. That is correct.

Q. And if you look at the second bullet, do you see that there is a description of the primary business purpose of the transaction?

A. I do.

Q. Did you work on that joint venture?

A. No.

Q. Okay. So it says the primary business purpose was to generate revenue and profit for Iconix and its shareholders. Do you see that?

A. I do see that.

Q. If we go down to the bottom for the Canada JV, do you see again there is the same description of the primary business purpose? Do you see that?

A. I do see that.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL3    Horowitz - Cross    Page 1270

MR. HECKER: If we keep going down.

Q. There's a mention here of this Australia joint venture.
Do you see that?

A. I do.

Q. Was that one you negotiated?

A. No.

Q. Again, the same primary business purpose that's identified?
Do you see that?

A. I do.

MR. HECKER: Keep going down.

Q. Okay. Now, there's the description here of the initial formation of the SEA Asia JV.
That's the Li & Fung JV. Correct?

A. Correct.

Q. And here too, it says that the primary business purpose was "to generate revenue and profit for Iconix and its shareholders."
Do you see that?

A. I do.

Q. And then there's a further explanation of the details. Yes?

A. Yes.

Q. And I want to go to the next bullet for a moment.
Do you see where it says: "Iconix has a longstanding relationship with Li & Fung over the years as a licensee for

MB9YCOL3    Horowitz - Cross    Page 1271

many of Iconix's brands"?
Do you see that?

A. I do.

Q. Is says: "Over the course of the relationship, Iconix and Li & Fung determined that a partnership could be mutually beneficial."
Do you see that?

A. I do.

Q. That was true; right?

A. That's right.

Q. And it says: "For example, LF Asia is our agent for Peanuts in China."
Right? It goes on. Yes?

A. Yes.

Q. And you had a chance to comment on this description of what the purpose of these joint ventures was. Correct?

A. I did.

Q. And the company's CFO, Jeff Lupinacci, he signed the letter that went back to the SEC.
Isn't that true?

A. I believe so.

Q. Just to be very clear about this, in February of 2015, you didn't tell anyone from BDO that you thought this response was inaccurate or that there had been some material omission from this response.

MB9YCOL3    Horowitz - Cross    Page 1272

Correct?

A. That is correct.

Q. You didn't tell Mr. Schaefer; correct.

A. That is correct.

Q. None of the other lawyers at Iconix; correct?

A. That is correct.

Q. Not Blank Rome lawyers?

A. That is correct.

Q. Not Mr. Lupinacci?

A. That is also correct.

Q. And no one from the audit committee at Iconix; correct?

A. That is correct.

MR. HECKER: You can take that down.

Q. During the course of preparing the response, am I correct that there were discussions at Iconix about the puts and calls that were part of SEA-2 and SEA-3 specifically? Yes?

A. Yes.

Q. And the discussion included whether the floors that you negotiated on SEA-2 and SEA-3 that we spent some time going through in terms of the math, the question was whether that impacted the accounting and whether it was appropriate to recognize revenue on those transactions at the time they were done.

A. My recollection is there were questions around the puts, calls, and floors.

MB9YCOL3    Horowitz - Cross    Page 1273

Q. And the floors, yes?

A. It included questions on all three aspects.

Q. I'm asking about the floors.
The accountants were asking specifically about whether the puts with floors could negate the joint venture revenue that Iconix booked in connection with the deals for which you were the primary point of contact.

A. That is correct.

Q. And on February 17, 2015, BDO asked questions about the puts and calls and the percentages and the business purposes of those puts. Correct?

A. I don't recall.

MR. HECKER: Let's show you what's in evidence as Defendant's 501. This is in evidence.

Q. Correct?

A. Are you asking me?

MR. HECKER: Take a moment. You can take this down. We'll come back to that. I apologize.

Q. Let me just show you, only the witness, Defendant's 501 on page 1 and directing your attention to the entry that's on February 17.
Does this refresh your recollection that on February 17, 2015, BDO was asking questions about the puts and he calls and the percentages and business purpose of those puts and calls?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL3    Horowitz - Cross    Page 1274

A. I recall BDO asking questions. I can't specifically recall the date of 2-17. But in general, I agree.

Q. And this document doesn't refresh your recollection about the date?

A. Not specifically. It happened on or around this time.

Q. And you were the one --

You can take that down.

You were the one who negotiated the specifics of those puts and calls with Mr. Margolis in meetings with him and discussions with him.

Correct?

A. That is correct.

Q. And in fact, we've looked at term sheets in which Mr. Margolis said, in substance, in one of the negotiations, hey, you forgot to put in the puts in the term sheet.

Correct? Do you recall that?

A. I don't.

Q. You're not doubting that happened. And we can go through the exercise of pulling it up.

That was something that was important to them. Yes?

A. The puts and calls?

Q. Yes.

A. It was important to them.

Q. It was important to their economics in terms of how they looked at these deals, the puts and calls and the floors. Yes?

MB9YCOL3    Horowitz - Cross    Page 1275

A. That's my understanding, yes.

Q. Just to be very clear about this, it would have been in Iconix's interest to not have a floor in the put-call feature; correct?

A. That is correct.

Q. It only benefited GBG to have a minimum price at which this would have to trade if the put or call were exercised. Correct?

A. As one element of negotiated parts of a deal, yes. That is correct.

Q. Yes. On that element, it benefited GBG and not Iconix.

A. Not taking into account other -- yes, that's true.

Q. Yes. Just focused on the floor that was in the put-and-call feature, it benefited GBG; correct?

A. That is correct.

Q. It didn't benefit Iconix.

A. That is correct.

Q. In fact, it could cost Iconix real money at the end of five years if the deal hasn't performed well and you have to buy it back. Yes?

A. Correct.

Q. So it's very binary. The floor feature of the puts and calls was good for GBG and bad for Iconix.

But as part of the package deal, they were agreed to as part of SEA-2 and SEA-3. Yes?

MB9YCOL3    Horowitz - Cross    Page 1276

A. That is correct.

Q. And now, in mid February of 2015, BDO is asking specific questions about whether those provisions of those deals created an accounting issue for Iconix. Correct?

That was one of the questions they were asking?

A. They were asking questions about the puts and calls and floors. Correct.

Q. And isn't it true, sir, that you understood in February of 2015 that Mr. Cole believed that the floors on those puts and calls could impact the accounting for the transactions?

A. Yes. He thought that it could.

Q. And he told you that emphatically, did he not?

A. I believe that he did.

Q. It was your understanding that Mr. Cole believed that that floor on the puts and the calls could potentially be the cause of ruining the accounting on the joint venture. Correct?

MR. LENOW: Objection to Mr. Cole's belief.

THE COURT: Sustained.

BY MR. HECKER:

Q. Based entirely on what Mr. Cole said to you, you understood that he was concerned that the floor feature of the puts and calls itself could ruin the accounting for these deals. And he told you that.

MR. LENOW: Same objection.

THE COURT: Overruled.

MB9YCOL3    Horowitz - Cross    Page 1277

THE WITNESS: He was concerned about the puts and calls and floors.

BY MR. HECKER:

Q. And he told you that emphatically.

Isn't that true?

A. That is true.

Q. In fact, he criticized you for failing to consult with other members of senior management with respect to whether those floors created an accounting problem for Iconix.

Isn't that true?

A. As part of a blame game, that is true.

Q. That's your characterization. I'm just asking you very specifically.

He criticized you for failing to consult with folks within Iconix about whether the floor feature of the puts and calls you negotiated on SEA-2 and SEA-3 created an accounting problem for Iconix.

Yes or no?

A. That was the way that Neil communicated it, yes.

Q. Yes. He asked you who in finance you had worked with on those specific terms, the floors and the puts and calls. Correct?

A. Something to that effect.

Q. You thought those questions were totally outlandish and unfair; correct?

**A-881**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

MB9YCOL3    Horowitz - Cross    Page 1278

A. Yes.

Q. And you and Mr. Cole argued about exactly that issue in February 2015. True?

A. Partially true.

Q. Things got heated between you. Yes?

A. In general, yes.

Q. Now, eventually, there was a showdown between you and Mr. Cole. Correct?

A. I don't know which one you're referring to.

Q. I'm talking about on February 23, 2015.

Do you recall that you had what you have described as a "showdown" with Neil Cole?

A. There were several instances.

Q. Do you recall that there was one on February 23, 2015?

A. Approximately, yes.

Q. That stands out; right?

A. Yes.

Q. Do you need anything to refresh your recollection about that?

A. In general, no.

Q. He told you that if he'd known about that feature of those deals, he wouldn't have approved them or he would have asked BDO to sign in.

MR. LENOW: Objection. Hearsay.

MR. HECKER: I'm just asking if that's what he said.

MB9YCOL3    Horowitz - Cross    Page 1279

THE COURT: Overruled.

MR. LENOW: That's hearsay, Judge.

THE COURT: Overruled.

BY MR. HECKER:

Q. That's what he said to you; correct?

A. Sorry. Can you ask that question.

Q. Sure. He said to you that if he had known about the floor feature of the puts and calls in those deals, that he wouldn't have approved them, or at least he would have asked BDO.

That's what he said to you; correct?

A. He said something to that effect.

Q. And you got angry in response. Correct?

A. I believe so.

Q. You told him to stop pointing fingers at you.

Isn't that true?

A. Something to that effect.

Q. And you reminded him that these were good deals. Yes?

A. I believe I reminded him that we did these deals together.

Q. Mr. Cole asked you why you hadn't told him specifically about the floor feature of the put-call that's buried in those documents, didn't he?

A. He did not put it that way.

Q. You were very frustrated by his reaction and his blaming you about this put-call floor feature. Yes?

A. I was frustrated.

MB9YCOL3    Horowitz - Cross    Page 1280

Q. And you were angry at Mr. Cole; correct?

A. I was upset.

Q. You were mad.

A. I was frustrated.

Q. You felt he was wrongly accusing you of screwing up the accounting on these deals because of the put, the floor, that you negotiated on SEA-2 and three. Correct?

A. No. He was wrongly denying his knowledge of it.

Q. That's your characterization. Correct?

MR. LENOW: Objection. Argumentative.

THE COURT: Sustained.

BY MR. HECKER:

Q. Mr. Cole asked you repeatedly who in finance you'd worked with on these deals. Correct?

A. I don't know if it was "repeatedly," but he did ask that.

Q. Who did you work with in finance on SEA-2 and SEA-3?

A. Neil was my main contact on all of these deals.

Q. I'm asking you a very specific question, sir.

On SEA-2 and SEA-3, did you consult with anyone in the finance department in Iconix about the floor feature of these puts and calls in those deals?

Yes or no?

A. I don't recall that.

Q. It didn't happen; right?

A. There were many conversations about these deals with

MB9YCOL3    Horowitz - Cross    Page 1281

finance, a part of it.

Q. Now, you testified that during this period, you and Mr. Cole were arguing back and forth about how your different roles would be characterized in response to the SEC. True?

A. At one point, we had a very significant disagreement about that. That is true.

Q. You didn't want it to say that it had been negotiated by you with guidance from Neil Cole.

A. That is not correct.

Q. That's actually what you told the SEC in the end. Right?

What you told the SEC in the end was that SEA-2 and SEA-3 had been negotiated with Seth Horowitz with guidance from Neil Cole. Right?

A. Are you asking me if I told the SEC that?

Q. That's what Iconix told the SEC. Yes?

A. I believe so.

Q. And you signed off on that description. Yes?

A. Yes.

Q. And it was accurate, was it not?

A. Largely.

Q. Now, you talk about the dispute you had about it. But the response that the company actually put into the SEC, according to you, was accurate. Yes? About who negotiated it.

A. On those elements, yes.

**A-882**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 9, 2022

---

MB9YCOL3  Horowitz - Cross  Page 1282

MR. HECKER: Your Honor, if I could, I have not a lot more but enough more that I'm going to go through the end of today. And if we could just continue tomorrow rather than just these last four minutes, I would appreciate it.

THE COURT: Very well. So we'll finish just a tad early today, ladies and gentlemen. That will be the end of the day. We'll get together again tomorrow morning at 9:30.

Please do endeavor to be in the jury room no later than 9:15 or so. Until then do not discuss the case, read anything about the case, or look at anything about the case. Be safe getting home.

(Continued on next page)

---

MB9YCOL3  Horowitz - Cross  Page 1283

(In open court; jury not present)

THE COURT: Mr. Horowitz, you may step down.

(Witness temporarily excused)

THE COURT: Everyone can be seated.

Anything to raise?

MR. LENOW: Nothing from the government.

MR. HECKER: No, your Honor.

THE COURT: Okay. We'll see you tomorrow.

And if there is nothing to raise tomorrow, if you both agree that there is nothing to raise tomorrow, if you both agree, you can be here at 9:15 rather than 9:00. But I don't want to show up at 9:15 and be told that there are all these issues. Okay?

(Adjourned to November 10, 2022, at 9:00 a.m.)

---

Page 1284

```
              INDEX OF EXAMINATION
Examination of:                          Page
SETH HOROWITZ
Cross By Mr. Hecker  . . . . . . . . . . . .1079
              GOVERNMENT EXHIBITS
Exhibit No.                           Received
 217, 218, 219, 220, 221, and 222  . . . . . .1078
 1053 and 1053-A1  . . . . . . . . . . . . .1175
              DEFENDANT EXHIBITS
Exhibit No.                           Received
 5, 303, 303A, 304, 304A, 1023, 1023A  . . . .1078
 1143, 1178, 1179, 1181, 1185, 1199, . . . . .1078
      1205, 1205A, 1212, 1212A
 1213, 1226, 1227, 1239, 1243, 1244, . . . . .1078
      1256, 1271, 1279, 1286
 1300, 1310, 1310A, 1329, 1344, 1408,  . . . .1078
      1466, 1466A, 1475, 1506
 1568, 1568A, 1638, 1896, 1896A, 1897, . . . .1078
      1898, 1899, 1902, 1902A
 1903, 1904, 1904A, 1905, 1906, 1906A, . . . .1078
      1908, 1908A, 1909, 1910, 1910A
 1912 and 1908A1N  . . . . . . . . . . . . .1078
 1901 and 1901A  . . . . . . . . . . . . . .1217
```

---

**A-883**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

| MBA5col1 | Horowitz - Cross | Page 1289 |

(Jury present)

THE COURT: Everyone, please be seated.

Ladies and gentlemen, good morning. I trust you all had a very pleasant evening. Thank you, as always, for being so prompt.

We will now continue with the cross-examination of Mr. Horowitz, who is reminded that you are still under oath.

MR. HECKER: Thank you, your Honor.

SETH HOROWITZ, resumed.

CROSS-EXAMINATION (continued)

BY MR. HECKER:

Q. Good morning.

Good morning Mr. Horowitz.

A. Good morning.

MR. HECKER: Briefly, your Honor, on consent I would like to move into evidence Defendant's Exhibits 1244, 1564, and 1471, and 1471-A1.

THE COURT: On consent, they will be received.

MR. HECKER: Thank you, Judge.

(Defendant's Exhibits 1244, 1471, 1471-A1, 1564 received in evidence)

BY MR. HECKER:

Q. Now, Mr. Horowitz, I just want to take you back in time for a moment to clean one thing up in terms of the timeline. In mid-June 2014, that was the period in which you are running

| MBA5col1 | Horowitz - Cross | Page 1290 |

point on the negotiation of what became SEA-2, correct?

A. That is correct. That's the timing of my running point on the joint venture until the final price is made.

Q. If we could publish for the witness Defendant's Exhibit 1244? And for the jury?

Am I correct, sir, this is an e-mail that you wrote on Friday, June 13, 2014, to Neil Cole, and the subject is EU JV update. Do you see that?

A. I do.

Q. You report to Mr. Cole that you spoke to Jared tonight. That's a reference to Jared Margolis, correct?

A. That is correct.

Q. And you say: Bottom line is we may complete only part of the total transaction (Europe and Korea) at approximately $15 million of gain or revenue for Iconix in Q2.

Do you see that?

A. I do.

Q. You were updating Mr. Cole on the status of the negotiation and the fact that you might not complete all of it in Q2, correct?

A. In part, yes.

Q. But you are also informing him that the price of the deal will allow you to book $15 million of gain or revenue for Iconix in Q2, correct?

A. At that time, correct.

| MBA5col1 | Horowitz - Cross | Page 1291 |

Q. And then you say that you are going to wait until Q3 for the Lee Cooper EU portion of the transaction.

Do you see that?

A. I do.

Q. And just to remind the jury, am I correct, sir, that GBG at this point was eager to do the Lee Cooper EU portion of the transaction but for reasons that had to do with their spinout and the state of play for them, they couldn't get it done in Q2, correct?

A. That's not correct.

Q. Well, what was your understanding of why they couldn't do the Lee Cooper Europe portion of the transaction in Q2?

A. Iconix actually could not do the Lee Cooper transaction in many of the forms that we attempted to do it in.

Q. Is it true, sir, that both Iconix and GBG had discussions about doing Lee Cooper in the third quarter, if they could? Yes?

A. Yes, that is true.

Q. OK. And so this update, from your perspective, was explaining to Mr. Cole that we are going to do part of what we were contemplating but not the other part, correct?

A. That is correct.

Q. And that, as you wrote: This gives us everything we want revenue-wise for Q2. Do you see that?

A. I do.

| MBA5col1 | Horowitz - Cross | Page 1292 |

Q. And that was true at the time, correct?

A. I believe at the time it was.

Q. And, in fact, as you wrote here, the Lee Cooper portion of the transaction for accounting reasons would have resulted in Iconix booking revenue for that transaction because they weren't selling at least 50 percent of the JV interest; is that correct?

A. It would not have given us revenue.

Q. Correct?

A. I'm sorry. I didn't hear it that way.

Q. Sorry. Let me try again.

Is it correct that the Lee Cooper portion of this transaction, which you are pushing off to a later time, wasn't, itself, going to be revenue generating for Iconix, correct?

A. The Lee Cooper transaction was not going to generate revenue for Iconix.

Q. OK. But both GBG and Iconix ultimately wanted to do that deal, yes?

A. That's fair. Yes.

Q. OK. We can take that down.

Now, I want to return to the timeline that we were discussing yesterday when we broke and let's put it at March of 2015. Are you with me?

A. I am.

Q. Fair to say at that point it was entirely clear to you that

**A-884**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

| MBA5col1 | Horowitz - Cross | Page 1293 |

you were never going to be Neil Cole's successor as CEO of Iconix. Is that fair?

A. I don't think I was thinking that way at the time, but that was clear.

Q. It was clearly true that you were not going to be the next CEO of Iconix in March of 2015, true?

A. Yes, because I was planning on leaving the company.

Q. Right. Among other reasons, yes?

A. Yes.

Q. Now, you didn't think your relationship with Neil Cole would be able to continue at that point, true?

A. That is true.

Q. And you wanted to ensure that Mr. Cole wouldn't put the blame on you for the accounting issues that you were discussing with the SEC at that juncture, true?

A. In part.

Q. Well, it's true, sir, that you wanted to ensure that Mr. Cole wouldn't try to blame you, alone, for the transactions that the SEC was asking about, correct?

A. That is correct.

Q. You didn't want to be the scapegoat as you put it, right?

A. That is correct.

Q. OK. Now, you testified about this on direct examination and I just want to go back to it for a moment. Am I correct, sir, that beginning in February and March of 2015, you began

| MBA5col1 | Horowitz - Cross | Page 1294 |

making notes to yourself about conversations that you were having with folks at the company about the issues that were being raised in connection with the SEC inquiry. Is that true?

A. That is partially true, yes.

Q. Well, you had these almost, we will call them diary entries. Is that fair?

A. No.

Q. They're written notes to yourself, yes?

A. Yes.

Q. And they're broken down by day?

A. They include dates, yes.

Q. The dates where you were having conversations with Neil Cole and others about these topics, among other topics; yes?

A. Yes. Among other topics as well.

Q. And just so the jury is clear, in these notes to yourself that you wrote down at the time, there is no mention anywhere of any oral commitment in connection with either SEA-2 or SEA-3; true?

A. Not true.

Q. Sir, the words "overpayment," "oral commitment," "secret side deal," anything like that, there are no words like that in any of your diary entries that you wrote to yourself, true?

A. They were not diary entries. I don't recall if those exact terms were used, but they were referred to.

Q. They were referred to how?

| MBA5col1 | Horowitz - Cross | Page 1295 |

A. In a variety of ways.

Q. Name one.

A. There is a note about a subset of payments and repayments and notes about discussions about round tripping.

Q. Does the word "round tripping" appear in those diaries?

A. Yes, it does. It is not a diary, but it does.

Q. Sir, can we agree that when you talked about round tripping in the context of your diaries, you are actually talking about a conversation that you had with Mr. Cole about the notion of money coming, on the one hand, from GBG to Iconix, and on the other hand, money coming from Iconix to GBG in the same transaction. Is that fair?

A. No, that is not fair.

Q. Isn't that exactly the conversation you are having about money going from GBG to Iconix and Iconix to GBG in the same deal?

A. In part.

Q. And, in fact, that's exactly what happened with the MENA transaction, true?

A. That is not what I was referring to in those notes.

Q. It happened in the SEA-1 transaction, yes? Money going each direction?

A. That is correct.

Q. So, just so the jury is clear, your testimony is that you included code words for yourself but didn't actually explain

| MBA5col1 | Horowitz - Cross | Page 1296 |

what you thought had happened in connection with these transactions?

A. I did not use the exact terms of overpayment or inflated payment in my note.

Q. You are saying the word "subset" meant that to you?

A. That is correct.

Q. Sir, didn't you testify on direct examination that you didn't even admit to yourself that there were these problems with these transactions in your own diaries? Isn't that what you testified it on direct?

A. I don't believe that's exactly what I testified.

Q. Pretty close, yes?

A. I don't recall the exact words, but.

Q. You don't recall the exact words of your testimony?

A. That is correct.

Q. Sir, in March of 2015, am I correct that you asked Iconix to recalculate your stock-based compensation?

A. I asked Iconix to properly calculate my stock based compensation.

Q. You asked them to calculate it the way you wanted it calculated, correct?

A. I wanted it calculated the way it was in my contract.

Q. Well, your position with respect to this issue was that there were certain transactions in Latin America that you thought had to be excluded from the calculation to get to the

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

---

MBA5col1     Horowitz - Cross     Page 1297

numbers that you thought were the correct numbers, correct?

A. Not correct.

Q. Regardless of whether you are correct or the company was correct, the company and Neil Cole, in particular, disagreed with you about -- they pushed back on your claim that you were entitled to a better calculation of your stock-based compensation.

A. Absolutely not correct.

Q. Neil Cole resisted your request to recalculate your stock-based compensation, true?

A. For other reasons, true.

Q. I'm not asking you why.

You wanted more stock-based compensation, correct?

A. I wanted what was due, per my contract.

Q. You wanted more stock-based compensation; yes or no, Mr. Horowitz?

A. That's not a fair question.

MR. HECKER: Your Honor, that is a yes or no question. He either wanted more stock-based compensation or he did not. Whether he was entitled to it or not is not my question.

THE COURT: Mr. Horowitz, can you answer the question, as phrased?

THE WITNESS: I wanted my properly-based stock compensation, whether it was more or less.

BY MR. HECKER:

---

MBA5col1     Horowitz - Cross     Page 1298

Q. You were not asking the company to give you less stock-based compensation when you were asking them to change the calculation, were you, sir?

A. I wasn't asking them to change the calculation.

Q. You took the position you were entitled to more stock-based compensation. Can we agree on that?

A. Yes.

Q. And Mr. Cole pushed back on that request, yes?

A. That is correct.

Q. And you made the decision to leave Iconix a couple days later on March 12th. Is that true?

A. I don't believe that's the timing.

Q. Sir, isn't it true that on March 12th you contacted a lawyer to give you legal advice about the circumstances under which you could resign from Iconix?

A. I don't recall that timing.

Q. Let's show the witness -- and just the witness -- DX 1707.

I just ask you to look at entry 96, here. Does this refresh your recollection, sir, that on March 12, 2015, what you are discussing with counsel is your desire to resign from Iconix?

MR. LENOW: Objection to the question of the substance of his question of discussions with counsel.

MR. HECKER: I'm not going to ask him the substance of conversation, it is the topic of the conversation which is on

---

MBA5col1     Horowitz - Cross     Page 1299

the log.

THE COURT: Very well.

THE WITNESS: I don't recall the specific meeting.

BY MR. HECKER:

Q. You are not denying that you were talking to lawyers about resigning on March 12th, right?

A. Around March 12th or sometime in that time period I did discuss resigning with attorneys.

Q. Now, but you didn't want to resign right away, correct?

A. That is correct.

Q. You wanted to delay your resignation for a little bit, yes?

A. That is correct.

Q. And the reason you wanted to delay your resignation was that so you could have additional stock vest with you; yes?

A. That is correct.

Q. Just so we are very clear about this, this is, in your mind, and what you have told this jury, this is right in the aftermath of what you claim are these dirty deals, these fraudulent deals, and you are waiting to resign so you can get more stock from the company, yes?

A. That is correct.

Q. And you did in fact wait, yes?

A. That is correct.

Q. And you did in fact get that additional stock, yes?

A. I believe so.

---

MBA5col1     Horowitz - Cross     Page 1300

Q. And that was by April, right? The vesting date was actually the beginning of April 2015? Is that true?

A. It was the third anniversary of my employment agreement.

Q. So, April 2nd?

A. I believe that's correct.

Q. Now, by April 5th you are working on a résumé thinking about your next job; is that true?

A. I don't know.

Q. Well, let's put in front of the witness Defendant's Exhibit 1625 and the attachment.

Am I correct, sir, that this is an e-mail dated Sunday, April 5, 2015, from you at Seth Horowitz@yahoo.com or to Seth Horowitz@yahoo.com. Who is the Deuce?

A. I think it is like a name for the yahoo e-mail account or perhaps the Mac account.

Q. You wrote this document, yes?

A. I sent this document, correct.

Q. And you are preparing your résumé to, for purposes of finding your next job, yes?

A. It looks like I am preparing a résumé.

Q. And if we go under experience and where it talks about your period at --

MR. LENOW: Objection. Hearsay.

MR. HECKER: -- at Iconix.

Excuse me?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                       **November 10, 2022**

---

MBA5col1     Horowitz - Cross     Page 1301

MR. LENOW: I said objection, hearsay.

MR. HECKER: I haven't asked the question yet.

THE COURT: Finish the question.

BY MR. HECKER:

Q. Sir, this is a document you prepared, yes?

A. I don't remember but it appears so.

Q. Did someone else write your résumé in which you described your experience at Iconix in April of 2015?

A. This appears to be a draft of a résumé and if I sent it to myself I authored it.

Q. OK. So, just so we can look at it in terms of the description, you say: Key member of executive team --

MR. LENOW: Objection. Not in evidence.

MR. HECKER: I moved it into evidence.

THE COURT: This résumé?

MR. HECKER: It's 1625. Well, I would move it now.

MR. LENOW: I would make a hearsay objection, Judge.

MR. HECKER: It is not offered for the truth, Judge.

THE COURT: Let's talk at side bar.

(Continued next page)

---

MBA5col1     Horowitz - Cross     Page 1302

(At side bar)

THE COURT: So, first of all, is it or is it not one of the exhibits that was in the list?

MR. HECKER: I was just informed it is not on the list so it is a new exhibit and I apologize. I misspoke.

THE COURT: OK. And so we are clear, it's an e-mail from Mr. Horowitz to Mr. Horowitz attaching a draft résumé, correct?

MR. HECKER: Correct.

THE COURT: OK.

MR. HECKER: And just so I am clear, the purpose of offering it is to compare the description of his job experience with the testimony that he has given this jury over the last many days and they're not the same. So, I am not offering it for the truth, I am offering it for impeachment.

MR. LENOW: Two issues.

One, first of all, this is a draft résumé sent to himself so there is both a hearsay issue and a 403 issue. The fact that it is a draft itself, this isn't some kind of a statement to the outside world, it is not a formal statement, it is a draft statement, it is a work in progress. We talked earlier in Mr. Horowitz's testimony about the kind of notion of notes to himself or internal -- I mean, this is essentially notes to himself, it is just a draft document. And so, I just -- again, a similar objection to kind of throwing into

---

MBA5col1     Horowitz - Cross     Page 1303

evidence things are notes, drafts, things that were not sent to anyone else, are not final documents. I think he has already acknowledged that there is some kind of draft résumé here around April 6 so I don't think there is an additional purpose for putting it in evidence. And, the fact that it is a draft I think also -- this isn't a final version in terms of a statement of what he is saying to the world about his job history, it is a draft. His name is not even at the top of it.

So I think there is also a 403 issue here.

MR. HECKER: I don't understand why the fact that it is a draft matters. He authored it, obviously, and I am going to ask him about his own description of the job, and if on redirect they want to go back and say something about it being a draft to fix it, that's up to them.

THE COURT: The fact that it is a draft is of no particular moment, drafts are admitted all the time. It is being offered for impeachment. I don't know that the entire document should come in.

MR. HECKER: I am just going to blow up the one portion from the Iconix description of his time at Iconix.

MR. LENOW: If it is being offered as I guess -- if the defense is trying to offer this as a prior inconsistent statement, again, one, is I'm not sure that an internal draft to oneself that is a work in progress is a definitive statement of fact by a witness and I don't think it is. But, even if one

---

MBA5col1     Horowitz - Cross     Page 1304

were to assume that, under the rules of impeaching a witness with extrinsic evidence he has to be given the chance to -- there has to kind of be a predicate set of questions asked first and if they can set that up, maybe it is admissible. In the nature of a prior consistent statement it is a prior statement the witness adopts as true. This is just an internal work in progress. He hasn't expressed these facts to anyone as being true. They're a draft, right?

So I just, even if the Court does find this to be a prior inconsistent statement or that's what the set up is, there has to be the kind of foundational questions laid which I don't think we are there yet

THE COURT: So ask some questions.

MR. HECKER: I am going to, and we are going to move the admission and I am happy to just move the portion of the description of his time at Iconix.

THE COURT: Very well.

---

**A-887**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

---

MBA5col1     Horowitz - Cross     Page 1305

(In open court)

BY MR. HECKER:

Q. If we could put 1625-A1 back in front of Mr. Horowitz and pull out that section of the description of Iconix?

Sir, we agree you wrote this, yes?

A. Yes.

Q. You describe yourself as a key member of the executive team responsible for growing the market cap from $950 million to over $1.8 billion, yes?

A. Are you asking me if I wrote that?

Q. Yes.

MR. LENOW: Judge, objection. In terms of the process the Court laid out, we still have a foundation objection.

THE COURT: Overruled.

BY MR. HECKER:

Q. You wrote that, yes?

A. That is correct.

Q. And you also wrote the sentence beginning: Led strategy, negotiation, consummation of global joint ventures in China, Europe, Korea and Middle East.

Yes?

A. Yes.

Q. That was your description of the SEA-2 and 3, right? Because those were the first JV transactions you had ever done, yes?

---

MBA5col1     Horowitz - Cross     Page 1306

A. In this draft, yes.

Q. And you describe yourself as leading strategy negotiation and consummation of those joint ventures, yes?

A. Yes.

Q. That was accurate, was it not?

A. It was not.

Q. So, you were misrepresenting on your résumé, in April of 2015, your role in connection with those transactions?

A. This is not my résumé.

Q. It is a draft of your résumé that you prepared, yes?

A. That has open numbers and all kinds of things on it.

Q. So it was a draft, yes?

A. Yes.

Q. But the words that are there are yours?

A. That is true.

Q. And that's how you described your role on these transactions when you first drafted this draft résumé? Yes or no?

A. That is what I wrote in this draft, correct.

MR. HECKER: Your Honor, we move the admission of this portion of the document 1625-A1.

THE COURT: It will be received.

(Defendant's Exhibit 1625-A1 received in evidence)

BY MR. HECKER:

Q. Sir, you submitted your resignation letter on April -- we

---

MBA5col1     Horowitz - Cross     Page 1307

can take that down.

You submitted your draft -- sorry. Let me back up. You submitted your resignation letter to Iconix on April 13th, 2015; correct?

A. Correct. That was my second resignation letter.

Q. And you sent this one to both Neil Cole and to the board of directors, true?

A. True.

Q. And we have agreed that in your resignation letter there is no statement in that letter suggesting that Mr. Cole had told you about a conversation in which he had agreed to give an oral commitment to GBG in connection with either SEA-2 or SEA-3, correct?

A. I would need to hear all of that again. I'm sorry.

Q. Why don't we read that back?

A. Thank you.

(Record read)

A. I don't believe that is correct.

Q. Sir, your resignation letter, to the Iconix board, does not suggest that you learned from Mr. Cole that he had orally committed to pay marketing expenses, correct?

A. I don't believe that's correct.

Q. Let's pull up the document. Let's pull it up. GX- 1197.

This is the e-mail letter attaching your resignation letter, correct?

---

MBA5col1     Horowitz - Cross     Page 1308

A. That is correct.

Q. Let's pull up the resignation letter and just focus on the section that says terms of June 30th, September 27th amendments, and blow that up. It is over two pages, I believe. Start with "first."

Am I correct, sir, that in this description there is no mention of a conversation that you claim you had with Mr. Cole in which he told you that he had verbally committed to GBG to pay $5 million in marketing, correct?

A. That is stated correctly.

Q. You omitted that, yes?

A. There are details of that that are omitted, correct.

Q. There are material -- there are material details that you omitted in this letter, correct?

A. That is correct.

Q. You weren't truthful in this letter to the board, correct?

A. In part, correct.

Q. You misled the board, yes?

A. In part, correct.

Q. In part. I mean, yes or no? You lied to the board in your letter because you left out what you are now claiming are important details of your story, correct?

A. That is correct.

Q. Before submitting this letter you never suggested to anyone on the board that there was something improper in connection

---

# A-888

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

MBA5col1          Horowitz - Cross          Page 1309

with either SEA-2 or SEA-3, correct?

A. That is correct.

Q. There is no mention in your letter, for example, that Neil Cole had told you not to tell Lauren Gee about an agreement to pay marketing dollars to GBG, correct?

A. That is correct.

Q. You left that out too, yes?

A. Yes, I did.

Q. And, sir, am I correct that after this letter, unsurprisingly, the company convened a special committee to investigate the allegations that you made, yes?

A. Amongst other things, that is correct.

Q. You can take that down.

You didn't agree to the meet with the special committee, right?

A. That is correct.

Q. But after this point you did retain counsel, yes?

A. After my resignation? I'm sorry. At what point?

Q. Around the same time.

A. Yes.

Q. You retained counsel, you met with counsel, correct?

A. That is correct.

Q. And you understood at that time that the special committee, in the months following your resignation letter in 2015, was asking questions about your position with respect to these

MBA5col1          Horowitz - Cross          Page 1310

transactions; yes or no?

A. I don't know.

Q. Well, sir, you testified on direct examination as follows:

Would it surprise you if, around the time, your lawyers advocated on your behalf and claimed you were not involved in criminal conduct?

And you said: No.

Correct?

A. That is correct.

Q. And just so we are clear, I mean, it won't surprise you, you knew full well that in your communications with the special committee your position was that you hadn't committed any crimes, correct?

A. I don't recall that.

Q. OK. So your testimony for this jury is you don't recall that your lawyers advocated to the special committee that you had not done anything wrong?

MR. LENOW: Objection, Judge.

THE COURT: Overruled.

THE WITNESS: I don't remember.

BY MR. HECKER:

Q. Sir, you have had, like, a photographic memory of every meeting --

MR. LENOW: Objection.

Q. -- that the government has asked you about?

MBA5col1          Horowitz - Cross          Page 1311

THE COURT: Overruled.

Q. You don't remember if you, in working with your lawyers, advocated to the special committee that you committed no crimes in 2015?

MR. LENOW: Foundation.

A. I did not communicate with the special committee.

Q. You authorized your lawyers to talk to them, right, because you weren't willing to meet with them directly, yes?

A. In part.

Q. Sir, this is not complicated stuff. You had lawyers, yes?

A. Yes.

Q. The special committee was investigating the very transactions you had written them about and said were problematic, yes?

A. In part, yes.

Q. You hadn't implicated yourself of wrongdoing in your resignation letter, true?

A. That is true.

Q. And when the special committee was asking you questions, you met with your lawyers, you said to them, yeah, go advocate on my behalf that I did not commit crimes.

You remember that, yes?

MR. LENOW: Objection. Conversations with counsel.

THE COURT: Sustained.

BY MR. HECKER:

MBA5col1          Horowitz - Cross          Page 1312

Q. Sir, you authorized your counsel to tell the special committee that you had done nothing wrong in 2015, yes?

A. I don't recall that specifically.

Q. You recall it generally? That would seem like something you might remember, either I did commit crimes or I did not commit crimes --

MR. LENOW: Objection.

Q. -- and your testimony you is don't recall which of those paths of you took with the special committee through your lawyers?

MR. LENOW: Objection.

THE COURT: Sustained.

BY MR. HECKER:

Q. We can move on.

Sir, after you left the company -- I'm going to move forward a couple months. In August of 2015 am I correct that you spoke to private investors about Iconix? Yes?

A. I believe that is correct.

Q. You spoke with Lew Frankfort who we have talked about previously, yes?

A. I believe so.

Q. You sent Mr. Frankfort excerpts from Iconix' earnings calls so that you could talk to him about the business, yes?

A. I don't recall that specifically.

Q. Well, let's show the witness Defendant's Exhibit 1644.

Min-U-Script®          Southern District Court Reporters          (7) Pages 1309 - 1312

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

---

MBA5col1     Horowitz - Cross     Page 1313

Sir, this an e-mail from you to Lew Frankfort copying someone named Ernest Odinec on, it looks like August 11, 2015?

A. It is.

Q. And did you not send him Q&A -- questions and answers -- from an earnings call for Iconix in the second quarter of 2014?

A. I believe it was 2015.

Q. I'm sorry. I misspoke. 2015, you are correct. Yes?

A. Yes.

MR. HECKER: We will move this into evidence.

THE COURT: Any objection?

MR. LENOW: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1644 received in evidence)

BY MR. HECKER:

Q. At this time you were talking to -- first of all, who is Ernest Odinec?

A. Ernest Odinec was the son-in-law of Lew Frankfort and part of his investment group.

Q. They had a private investment group, yes?

A. That is correct.

Q. They considered making investments in companies, both public companies and private companies, yes?

A. I'm not sure.

Q. The firm is called Sycamore Partners; is that right?

A. That is not correct.

---

MBA5col1     Horowitz - Cross     Page 1314

Q. Which part -- is it this Benvolio Group?

A. That is correct.

Q. And, am I correct that in connection with this conversation, you are providing them information to discuss the possibility of either this group, or others, buying Iconix in August of 2015?

A. No.

Q. Sir, is it your testimony you didn't have discussions with investors about making a significant equity investment in Iconix, after you left, in August of 2015?

A. I don't recall that.

Q. You don't recall any discussions with investors about buying Iconix after you left?

A. About buying Iconix after I left? No, I do not.

Q. Buying stock in Iconix after you left.

A. I do not.

Q. Why are you sending the Q&A from the earnings call to Lew Frankfort and his son-in-law?

A. I believe because they asked me for it.

Q. Why?

A. I don't know. Maybe we discussed Iconix. Maybe they were wondering about the current state.

Q. Why don't we scroll down, go to the bottom of the e-mail. Keep going. Keep going. Go to the beginning of the e-mail chain. That's it. Go to the first e-mail after the earnings

---

MBA5col1     Horowitz - Cross     Page 1315

call is forwarded.

What conversation did you have with Ern about the Q&A on debt specifics?

A. I don't recall any conversation with Ern on debt specifics.

Q. Were you thinking about acquiring Iconix debt?

A. No.

Q. Did you have any discussions about investing either yourself or with partners in Iconix in August 2015?

A. No.

Q. Did you share information, financial information or information you were aware of from your time at Iconix, with this group of folks?

A. I may have. I don't recall.

Q. Why may you have?

A. Because they knew that Iconix was pay part of my life for the last few years and we continued to discuss it at times.

Q. Can we pull up Defendant's Exhibit 1645 and show the witness this document in the first instance?

This is an e-mail from you, you sent August 18, 2015, to Lew Frankfort and Ernest Odinec; correct?

A. It is.

Q. And what are you discussing here?

A. Some of the financial performance of Iconix.

Q. What is the reference to securitization of $730 million?

A. I believe that refers to a debt mechanism. I'm not fully

---

MBA5col1     Horowitz - Cross     Page 1316

sure.

Q. Do you see where it says: The securitization of $730 million described in 4(a) does not include some of the recently acquired IP.

Do you see that?

A. I do see that.

MR. HECKER: Let me move this exhibit, 1645, into evidence.

MR. LENOW: Judge, can we actually have a side bar on this?

THE COURT: OK.

(Continued next page)

---

**A-890**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

MBA5col1　　Horowitz - Cross　　Page 1317

(At side bar)

THE COURT: So we are talking, this is in August 2015?

MR. HECKER: Correct.

THE COURT: The E-mail with Lew Frankfort and Mr. Odinec?

MR. HECKER: Mr. Odinec and Lew Frankfort, and it is a discussion about -- questions that those investors have about Iconix' financials, and Mr. Horowitz shared with them confidential information from the company in violation of his agreements with the company. So, it is offered for impeachment. He is claiming not to remember it but this document well help refresh that. I'm happy to offer it subject to connection on his testimony about whether in fact this refreshes his recollection that he provided this information.

THE COURT: OK.

MR. THOMAS: Your Honor, the reason that we requested the side bar is because this document and this issue implicate the special committee's work and the restatement of Iconix' financials. The e-mail expressly refers to the restatement. Up to this point defense counsel has told us they don't want to open the door to exploring the restatement issues. If they're permitted to impeach on this topic, then we think that we are entitled to come back and call to the jury's attention what happened with the restatement.

THE COURT: Well, the first bullet point or number

MBA5col1　　Horowitz - Cross　　Page 1318

where he talks about the $730 million is Section 4(a) that he refers to, is that part of the restatement?

MR. THOMAS: It is the paragraph, I think, your Honor, of the restatement that occurred in August of 2015.

MR. HECKER: I'm not intending to get into the restatement at all, I'm only asking him whether he shared information with his colleague that was material non-public information. Very simple.

MR. THOMAS: Your Honor, that's the point. That's the context that the jury won't get for the exchange that is occurring.

MR. HECKER: Why does that matter? The only point is that he violated his agreements with the company to maintain confidentiality of non-public information. Why does it matter what information it is?

THE COURT: I mean, I think that I tend to agree with Mr. Hecker. Well, does the government dispute that the information provided by Mr. Horowitz was confidential internal information to Iconix?

MR. LENOW: Judge, can we have one second?

THE COURT: Sure.

(Counsel conferring)

MR. LENOW: So, Judge, this was addressed in Mr. Horowitz' testimony in the first trial and just from reading it, I mean, my reading of the testimony is I don't

MBA5col1　　Horowitz - Cross　　Page 1319

think that was established. Now, look. If defense can establish factually that some of this was non-public information at the time I understand where they're going, but I think from reading the transcript and my knowledge of the case, I think that a number of these facts were public. It is not clear to me that this information was not public. And so, if they want to try to lay that foundation factually that some of these facts were not public, I concede that point but just think they have to make that first and it is not clear to me, based on the reading of the trial transcript in the first testimony, that they did that. I don't think they did that in the first trial. So, if they want to try do that here --

And just secondarily, Mr. Thomas' point, there may be a way to do this that carefully navigates that point, right? I just think it is a rocky shoulder, dangerous point getting into the restatement what was shared, what wasn't. The point I am raising is it is not clear to me that it is non-public information that he wasn't permitted to share in the first place.

THE COURT: OK.

MR. HECKER: Your Honor, there was testimony about this. This came in in the last trial so it is not a surprise that we are going back over it. I imagine he has been prepped on it, too.

THE COURT: Again, I mean, I think the stated purpose

MBA5col1　　Horowitz - Cross　　Page 1320

for which Mr. Hecker is using it would be perfectly appropriate and either it was internal confidential information or it wasn't. So, see if you can establish that foundation.

MR. HECKER: Sounds good. Thanks, Judge.

# A-891

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                     November 10, 2022

---

MBA5col1    Horowitz - Cross    Page 1321

(In open court)

BY MR. HECKER:

Q. Can we show the document to Mr. Horowitz and scroll down, if need be?

Does this refresh your recollection that you were having discussions in August of 2015 with Lew Frankfort about some investment some folks were considering at this time?

A. It does not.

Q. Sir, you were speaking to Lew Frankfort during this period after you left and discussing, am I correct, financial information that was in the public realm? Yes?

A. I don't recall discussing those things with Lew, but.

Q. You know you did, yes?

A. No.

Q. Wall, let's go back to the first e-mail in the chain. Sorry, I guess it is the last in the line but the one we were looking at. Do you see here that you provided comments to Lew Frankfort about questions he is asking you about the financial status of Iconix at the time?

MR. LENOW: Objection. This document isn't in evidence yet, so if Mr. Hecker wants to lay a foundation to try to get it in, we have no objection, but the document is not in evidence yet.

THE COURT: Ask another question, Mr. Hecker.

BY MR. HECKER:

---

MBA5col1    Horowitz - Cross    Page 1322

Q. Sir, you provided information to Lew Frankfort in August 2015 that was material and non-public information. Isn't that true?

A. I don't believe so.

Q. You knew you were prohibited from doing that, yes?

A. No.

Q. You didn't know you were prohibited from providing material non-public information to people outside Iconix?

A. I don't believe that's what I did.

Q. I am asking if you are aware you weren't permitted to do that.

A. In general, yes.

Q. In general? I mean, your employment -- you worked at Iconix as the CEO, you were aware of the rules that prevented you from sharing material non-public information with people outside the company, yes?

A. As COO, yes.

Q. When you left, did you think you were permitted to then share material non-public information you had from your time at Iconix, with people outside of Iconix?

A. No.

Q. You were not permitted to do that?

A. That is correct.

Q. And you understood that?

A. Yes.

---

MBA5col1    Horowitz - Cross    Page 1323

Q. Sir, isn't it true that is precisely what you did in telling Lew Frankfort that the company had acquired additional IP that hadn't yet been publicly reported? Isn't that exactly what you did?

A. I don't believe so.

Q. We can move on. You can take that down.

Sir, your time at Iconix, and particularly in that last year at the company, was a chaotic time for you; is that fair?

A. Yes. At times.

Q. And you attribute much of that chaos to your interactions with Neil Cole, true?

A. I would say that is generally fair.

Q. And during that time you often felt out of control, yes?

A. No.

Q. Isn't it true, sir, that when you feel out of control what you try to do is display confidence or bravado?

A. I don't think so. No.

Q. Isn't it true that during that time when you felt out of control you often did things that you knew were wrong because of the thrill of doing it?

MR. LENOW: Objection. Can we have a side bar on this, Judge?

THE COURT: Sure.

(Continued next page)

---

MBA5col1    Horowitz - Cross    Page 1324

(At side bar)

THE COURT: I take it, Mr. Hecker, you have a document that says exactly that?

MR. HECKER: Yes.

MS. DABBS: Yes.

MR. LENOW: Judge, this is Jared Lenow.

There is a document that your Honor precluded last time expressly. There are some notes that Mr. Horowitz made long after he left Iconix that talk about the thrill of doing something wrong and I think he refers to like smoking cigarettes and other things like that -- and your Honor specifically precluded this last time -- your Honor should do so again. It is a note that is not referring to Mr. Horowitz' time at Iconix, it is a diary entry to himself about totally unrelated topics, and what this is, is it is a character assassination that you get a thrill from doing things, you are a bad person. Your Honor cut it off last time and you should do it again.

THE COURT: Why should I change my mind.

MR. HECKER: Because I'm laying a foundation to see whether we can impeach this witness.

The notion that it refers to cigarettes -- I am happy to hand the Court a copy of the note, but it makes express reference of chaos around Neil Cole. It is not dated. It is clearly part a diary, a handwritten diary that other pages,

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

| MBA5col1 | Horowitz - Cross | Page 1325 |

none of which was produced, this was produced because it mentioned Neil Cole. So we are not randomly fishing. But, if the Court reviews it, it doesn't say anything about cigarettes. They are making a representation about what the witness would say but we don't have to accept that representation.

THE COURT: When was this written?

MR. HECKER: We don't know. It is undated. The reason it was produced, I suspect, is because it makes reference to the Neil Cole chaos. It's his handwritten notes of what he was thinking and feeling in his private moments that's contemporaneous with the time period we are talking about.

THE COURT: That's the point. Is it? It could have been written, I don't know, years later.

MR. HECKER: No. I mean I -- no one has represented that.

MR. LENOW: Yes.

MR. HECKER: I don't have the diary so I don't know whether there are other pages of the diary that would help put this at a moment in time. It is clearly printed out from a book, they haven't given us the whole thing but they may know what came right before and what came right after and what time period it was.

MR. LENOW: Judge, this was all expressly discussed at side bar last time. We did -- I don't have it in front of me

| MBA5col1 | Horowitz - Cross | Page 1326 |

now but we did make a representation when it was produced that this was written no earlier than months after Mr. Horowitz left Iconix, months after the events at issue, and that was one of the reasons why your Honor said this is not fair game. And the reference to a mention of cigarettes, there was another topic that I don't want to put on the record that your Honor explicitly precluded reference to in this trial, that's doing things knowingly wrong, cigarettes, what are the notes that we produced from Mr. Horowitz' proffers he said that refers to smoking cigarettes and that other matter that your Honor said was out of bounds.

So, this doesn't refer to this at all. Your Honor said no last time, there is no reason to change the ruling this time.

MR. HECKER: Just to be really clear, we are not required to accept what this witness told you when you asked him about it when you were trying to understand what it relates to. I have no intention of going into anything about any personal -- the issue that was excluded, I don't even want to say it at side bar but we both know what we are talking about. I have no intention of going into it. The important thing, your Honor, is it describes a state of mind and a way of behaving when he feels out of control, like the moment we are in now and I think I am entitled to explore that with the jury.

MR. THOMAS: Your Honor, may we be heard once more on

| MBA5col1 | Horowitz - Cross | Page 1327 |

this topic?

MR. HECKER: I'm getting tag teamed here.

MR. THOMAS: First of all, the burden is on Mr. Hecker to lay the predicate that it is admissible as extrinsic proof, so the fact that he doesn't know is itself an argument against admission, but second, we are talking here about naked character evidence. The description that Mr. Hecker has provided about how the witness feels about his own conduct invites the jury to infer from his reasoning a propensity for misconduct. That is expressly what the rules forbid and this issue is collateral, they ought not be able to prove it up with the extrinsic record.

MR. HECKER: Your Honor, there are two things that are really important. First of all, I was in the middle of laying foundation for impeachment if he continued to deny that this is how he felt and acted at times like this. It goes entirely to his demeanor in front of the jury. I mean, it is relevant to understanding his propensity for being truthful or untruthful including that he is denying that that's how he felt.

THE COURT: But the problem with this document is it is out of context, temporally. We don't know where it comes from, we don't know what is before, what comes after, and because of that there is a danger -- and again, I'm going back to 403 -- that the jury -- because you won't be able to put it in its proper context -- will have a very skewed view of

| MBA5col1 | Horowitz - Cross | Page 1328 |

Mr. Horowitz based on this document which I think would be unfair.

We have had a day and a half or more of cross-examination of Mr. Horowitz, I think he has been impeached in any number of ways, so I'm not going to allow you to put this document in.

MR. HECKER: Can I just ask just for a representation from the government that they have looked at this notebook and looked at the days that come before it and after it to actually confirm that this happened after his time at Iconix? Because we have no way assessing that. This was produced to us as a single page that Mr. Horowitz gave to counsel and I think the only reason was because there is a stray reference to Mr. Cole among a litany of other stressful and family things that he was going through.

THE COURT: What is "J surgery"?

MR. MARKUS: His daughter.

MR. LENOW: I think it is a family member's surgery.

MR. HECKER: Which was in 2015, and the government has just effectively told us that they didn't get the notebook, they just took a page that was produced by his lawyer and didn't make any attempt to look through the diary. We don't know what else is in there and whether there are diary entries taken during the time period he was there. I don't know, we are definitely boxed out by not knowing, but it was a situation

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

---

MBA5col1    Horowitz - Cross    Page 1329

created by the government.

THE COURT: It may be, but I am not going to allow you to use this document.

MR. HECKER: OK.

---

MBA5col1    Horowitz - Cross    Page 1330

(In open court)

BY MR. HECKER:

Q. Now, sir, after you left Iconix, the next significant employment you had was at Baked by Melissa; is that true?

A. That is true.

Q. And Baked by Melissa was founded by a woman named Melissa Ben-Ishay? Is that true?

A. Melissa Ben-Ishay.

Q. Melissa Ben-Ishay. Is that how you pronounce it?

A. That's how she pronounces it.

Q. Ms. Ben-Ishay founded the company and initially had entrusted her brother to be the CEO of that company before you joined; is that true?

A. Yes, that's true.

Q. You replaced her brother as CEO of the company, yes?

A. Yes. That is true.

Q. And you joined the company in 2016; is that true?

A. I believe that is true.

Q. You became CEO in 2016, yes?

A. I believe that timing is correct.

Q. And the government, on direct examination, said to you: And when you started working at Baked by Melissa, did you tell your new employer that you had engaged in fraud at Iconix? And you said: No. And they asked you why not. And you said it was because you were trying to get a job and it wasn't public

---

MBA5col1    Horowitz - Cross    Page 1331

knowledge that you had engaged in any fraud, correct?

A. That is all correct.

Q. But in fact, sir, it is not surprising that you didn't tell her that you had engaged in a fraud because at that point, in 2016, that's what you were telling everybody, that you had not engaged in a fraud; correct?

A. I don't know if that's correct.

Q. Well, we have established that when you left you, through counsel, represented to the special committee of Iconix that you hadn't committed a crime, correct?

A. I don't know if we established that.

Q. You hadn't had a single meeting with any government regulator in which you suggested that you had done something wrong during your time at Iconix as of time you took this job, correct?

A. That sounds correct.

Q. Right. So you wouldn't tell Ms. Ben-Ishay, who has just entrusted you with running the company that she built, with information that you weren't even sharing with any government enforcement authorities, right, about your role at Iconix?

A. That's correct.

Q. Now, sir, while you were CEO you were the senior-most executive, yes?

A. That is correct.

Q. Ms. Ben-Ishay continued to be very actively involved in the

---

MBA5col1    Horowitz - Cross    Page 1332

company that she founded, yes?

A. Yes. I believe I promoted her to president.

Q. You promoted her to president. She was one of the significant shareholders of the company, yes?

A. Yes.

Q. I mean, she could hire you and she could fire you, right?

A. I believe so.

Q. She was your boss even if you were the one that promoted her to president, yes?

A. I don't recall exactly how that operating agreement worked but to some extent, yes. I mean -- to some extent.

Q. As the CEO of the company, the senior management, you owed duties to the owners of the company, correct?

A. Yes.

Q. You understood you owed fiduciary duties to the company, yes?

A. Yes.

Q. You are supposed to tell them everything that would be important to them to know, yes?

A. I believe that's fair.

Q. Now, at some point Ms. Ben-Ishay took leave, took maternity leave; is that true?

A. That is true.

Q. And so she was gone for chunks of 2018, right?

A. I believe that timing is correct. I'm not sure if it was

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

| MBA5col1 | Horowitz - Cross | Page 1333 |
| --- | --- | --- |

'17 or '18.

Q. Well, she was gone and she came back toward the end of 2018, yes?

A. I don't recall the timing, but I do recall her having a baby.

Q. Does that sound about right?

A. Again, I just don't recall the timing.

Q. Sir, am I correct that the first time you met with any government lawyers was the beginning of December 2018, December 3rd, 2018 with the SEC, and then you began the series of meetings with the group of folks from the U.S. Attorney's office and the FBI later in December; true?

A. Again, I don't recall the specific dates but, generally speaking, that sounds right.

Q. And you testified -- well, let me back up.

Before you did that, before you went in and sat down with the SEC and the U.S. Attorney's office, I take it you prepared for those meetings, yes?

A. I don't recall, but that's likely.

Q. Well, did you meet with your lawyers to prepare for the meetings with the government or did you just walk in there and sit down and start answering questions? I'm not going to ask you about the substance of your conversations with your lawyers, to be very clear. I'm just asking you did you sit down with them to prepare for meetings with the government.

| MBA5col1 | Horowitz - Cross | Page 1334 |
| --- | --- | --- |

A. Yes.

Q. That was a significant undertaking, yes?

A. Yes.

Q. At that point, at the end of 2018, you left Iconix three and a half years earlier, right?

A. 2018? That's correct.

Q. So, before you go in and answer questions from FBI agents and prosecutors, you met with your lawyers to prepare; right?

A. That is correct.

Q. You did what you could to try to refresh your recollection about things that had happened three and a half, four years earlier, right, you didn't remember that when you sat down with them the first time?

A. I don't recall what we specifically did.

Q. You don't recall whether you reviewed documents with lawyers before meeting with the government?

MR. LENOW: Objection.

THE COURT: Overruled.

THE WITNESS: Yes, we did.

BY MR. HECKER:

Q. They had binders of documents to prepare you, yes? I'm not going to asking you about specific documents but there were binders of documents for you to prepare before you meet with these guys, right?

A. Over time we had binders and more binders.

| MBA5col1 | Horowitz - Cross | Page 1335 |
| --- | --- | --- |

Q. Right. There were tons of binders and it was about stuff you hadn't thought about for years at that point, correct?

A. That is not correct.

Q. Your day job was being the CEO of Baked by Melissa, right?

A. That was my job.

Q. You were the senior-most executive, we agree on that?

A. That is correct.

Q. You were running the company?

A. That is correct.

Q. You thought successfully, yes?

A. That is correct.

Q. That's what was consuming your time and energy until the end of 2018 when you started meeting with the government, isn't that true?

A. In part that is true.

Q. But, by the time you are preparing for these meetings and then when you start having these meetings, you have to spend real time on that project of trying to get a cooperation agreement with the government. Isn't that true?

A. No. That's too many pieces put together.

Q. You testified you met with the government approximately 50 times, right?

A. I believe that's correct.

Q. And you said you spent five to six hours when you would sit down with them, true?

| MBA5col1 | Horowitz - Cross | Page 1336 |
| --- | --- | --- |

A. A majority of time, yes.

Q. And you met with your lawyers, we have agreed, reviewing binders of documents before you even had those meetings, correct?

A. That is correct.

Q. And after you started having those meetings, you would have had to have more meetings with your lawyers to prepare for the next session you had with them, true?

A. That is true.

Q. And when that was happening, Ms. Ben-Ishay was at the company as president working with you when you were CEO. True?

A. That is true.

Q. And every day you failed to tell her that you were going to go in to the government and sit down with them to try to work out a cooperation agreement to get out of a mess, correct?

A. Again, you have put too many assumptions together.

Q. I will make it real simple. You didn't say a word to Ms. Ben-Ishay in late 2018 that you were going to now go meet with the government regularly to try to get a cooperation agreement. Did you?

A. To be clear, I did not mention to Ms. Ben-Ishay that I was meeting with the government about Iconix.

Q. Ever, until after there was a press release issued, correct, about your guilty plea, a year later?

A. That is partially incorrect.

# A-895

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

MBA5col1    Horowitz - Cross    Page 1337

Q. Which part is incorrect?
A. I spoke to Melissa before the press release went out, I believe.
Q. After you pled guilty, yes?
A. That is correct.
Q. OK.
So, I just want to be really clear about this. You had no fewer than 15 meetings with the government between early December 2018 and the time you signed a cooperation agreement at the end of 2019; yes?
A. That sounds correct.
Q. During that same period you are meeting regularly with your liars to prepare for these meetings, yes?
A. That is correct.
Q. Can we agree that that was a major distraction for you, from the end of 2018 until you signed your cooperation agreement at the end of 2019?
A. Was it a major distraction? It was a distraction from me doing my duties as CEO at Baked by Melissa.
Q. It was a major distraction. You were physically absent for hours at a time on all of those days, yes?
A. That is correct.
Q. And it weighed on you, right? I mean, you are worrying about this, yes?
A. I am thinking about it, yes.

MBA5col1    Horowitz - Cross    Page 1338

Q. It was a major distraction. You are fighting me on that?
A. No.
Q. It was not a major distraction?
A. No, I'm not fighting on it.
Q. Oh. It was a major distraction.
A. I would say that's fair.
Q. OK.
Now, multiple times during that year, after Ms. Ben-Ishay came back from her maternity leave while she has entrusted the running of her company to you as CEO, she said to you, Where are you going? You seem distracted. And you looked her in the eye and you lied to her repeatedly. Isn't that true?
A. That is partially true.
Q. And not only is that true, but it worked. You persuaded her that you were doing something else and that that's what was distracting you, right?
A. I did have other things going on but I did not tell her about this investigation.
Q. She believed you that it had nothing to do with this investigation and your attempt to get a cooperation agreement when you told her those false stories, yes?
MR. LENOW: Objection to the question about another person's belief.
THE COURT: Sustained.

MBA5col1    Horowitz - Cross    Page 1339

BY MR. HECKER:
Q. Sir, you know, because she told you that you lied to her repeatedly, about the reason you were distracted for the entire year, the last year you were CEO of Baked by Melissa, she told you that, right?
A. She told me what?
Q. That you had lied to her repeatedly when she asked you about your physical and mental absences during your last year at Baked by Melissa and until you told her about what was going on?
A. I believe at some point she said something like that.
Q. Something like you lied to me repeatedly?
A. I don't remember her putting it that way.
Q. Let's see if we can refresh your recollection.
Can we put in front of the witness DX 3539-002 at page 26? And I would ask you to pull up the paragraph that starts from October '18 through the end.
Sir, does this refresh your recollection that she said to you that you deliberately lied to her every time she confronted you about your absences during this period?
A. That is what she wrote in this e-mail.
Q. And that was true, was it not?
A. In large part that was true.
Q. Sir, you are a very practiced liar, are you not?
MR. LENOW: Objection.

MBA5col1    Horowitz - Redirect    Page 1340

THE COURT: Sustained.
MR. HECKER: No further questions.
THE COURT: Redirect.
MR. LENOW: Can we keep that message up for the witness?
REDIRECT EXAMINATION
BY MR. LENOW:
Q. Mr. Horowitz, I just want to ask you a few more questions. First of all, you were just asked a number of questions about your interactions with Melissa Ben-Ishay -- is that how it is pronounced?
A. That is correct.
Q. Can you describe, were you given a chance by defense counsel to explain your relationship with Ms. Ben-Ishay after you left the company?
A. No.
Q. Can you please explain the full picture?
A. Melissa and I kept in touch quite frequently after I was terminated from Baked by Melissa. She reached out to me on a number of occasions for help with business issues including how to deal with COVID and the bakery and retail, and at times she would reach out and wish the best to me and my family.
Q. And in that same communication Mr. Hecker referred to, did Ms. Ben-Ishay also say to you that you taught her more than she ever could have imagined and you empowered her?

Min-U-Script®     Southern District Court Reporters     (14) Pages 1337 - 1340

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

| MBA5col1 | Horowitz - Redirect | Page 1341 |

MR. HECKER: Your Honor, objection, unless the government wants to move the admission of the document.

MR. LENOW: I will withdraw it.

BY MR. LENOW:

Q. Mr. Horowitz, on other occasions around the same day, did Ms. Ben-Ishay tell you that you empowered her and taught her more things than she ever imagined and other things of that nature?

A. Yes. We had a great relationship.

Q. We can take that down. Thank you.

Now, Mr. Horowitz, you were also asked a bunch of questions about running point on the SEA deals or the SEA-2 and SEA-3 deals. Do you recall those questions?

A. I do.

Q. And, to be clear, what was Neil Cole's role on the SEA-2 and SEA-3 deals?

A. Neil negotiated the final inflated price on SEA-2, and in SEA-3 Neil decided that we would take an inflated price in exchange for giving back Rocawear Kids.

Q. Did you do anything upon those deals without Neil Cole's approval?

A. No, I did not.

Q. Who made the decision about giving secret givebacks in exchange for fraudulent overpayments for SEA-2 and SEA-3?

A. Neil did.

| MBA5col1 | Horowitz - Redirect | Page 1342 |

Q. Who decided how much the givebacks and overpayments would be?

A. Neil did.

Q. Who decided how to make the givebacks?

A. Neil.

Q. Who decided what brands would be in those fraudulent invoices that you testified about?

A. Neil directed which brands should be in those invoices.

Q. Who decided when those invoices should be accounted for by Iconix?

A. Neil did.

Q. Who asked you to lie to the SEC about those transactions?

A. Neil did.

Q. You were asked some questions about insider trading. Mr. Horowitz, to your knowledge, have you ever knowingly provided inside information about Iconix or any other company to outsiders?

A. No, I have not.

Q. Did you discuss publicly available information with others on occasion?

A. I believe that I did.

Q. Can we please put up for the witness and for everyone what is in evidence, what is in evidence DX 1023-A1?

Now, Mr. Horowitz, do you recall being asked about this document by defense counsel?

| MBA5col1 | Horowitz - Redirect | Page 1343 |

A. I do.

Q. Were you asked about the whole document or just a part of it?

A. I was asked about part of the document.

Q. Let's talk about the whole document. Let's highlight, if we can for the witness, the first line: Neil, I am completely confused by your directions and actions.

Do you see that?

A. I do.

Q. Let's highlight the next paragraph after that and let's just walk through this paragraph, if you could. Just read it out loud, Mr. Horowitz, starting from: Three weeks ago...

A. Three weeks ago, when I was asked to look through the budget numbers and I responded with a $5 million approximate discrepancy and shortfall, you called me into your office and yelled and screamed, "If these are the" --

Q. You can say it, it is OK.

A. -- "if these are the fucking numbers, then go upstairs and start fucking firing people." I had many takeaways from this interaction. One, there are 12 people in the entire department and the entire payroll, including me, and the people on this team is under $2 million annually and, as such, is an absurd comment.

Q. Mr. Horowitz, can we pause there?

MR. HECKER: Your Honor, at this time we jus task for

| MBA5col1 | Horowitz - Redirect | Page 1344 |

the same instruction the Court gave when you put this in front of the jury the first time that it is not offered for the truth.

THE COURT: Yes.

Ladies and gentlemen, as you may recall, this document was not offered for the truth. But the assertions that are made therein are simply to have you determine whether it provides any insight, if at all, into Mr. Horowitz's state of mind at the time. OK?

BY MR. LENOW:

Q. Mr. Horowitz, what was the interaction here that you are describing with Mr. Cole? What actually happened?

A. What actually happened is that I pointed out that the mens division was going to be short revenue and this was his response.

Q. Well, what was his response?

A. That if we can't find the revenue, I better go start firing people.

Q. And you say you had a couple takeaways. One is there are 12 people in the entire department and the entire payroll including me. What are you expressing there in this note about the fact that there is only 12 people in the entire department after he says start firing people?

A. Well, even if we fired everybody, we wouldn't find the $5 million that we were short.

**A-897**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

MBA5col1        Horowitz - Redirect        Page 1345

Q. And, to be clear, the $5 million that you had found, was that -- did you actually find a $5 million issue there that you brought to Mr. Cole's attention?

A. That is correct.

Q. And, sir, what was his reaction to you bringing him this accurate information about a $5 million discrepancy? Did he thank you for bringing this fact to his attention?

A. No.

Q. What did he say?

A. He told me if that's the case, I better start firing people -- with expletives.

Q. And the fact that there are 12 people in the department, why are you noting that as suggesting that Mr. Cole's remark was absurd?

A. Because we couldn't make up $5 million by firing everybody, including myself.

Q. And then let's continue reading point 2: I better do something...

A. I better do something to drive revenue to make up for the accurately depicted shortfall. Then, we were discussing hiring someone to do PR and help in other marketing functions. Again, I was challenged with finding the $160,000 in revenue to justify the hire. You also recently had me in your office and said: What are you going to do about Ed Hardy? It's a fucking disaster. All three of these instances made it sound as if I

MBA5col1        Horowitz - Redirect        Page 1346

had better take action, and quickly.

Q. Let's pause there. The other two points that you mentioned about do something to drive revenue to make up for the accurately depicted shortfall and Ed Hardy being a disaster, what are those references to?

A. Deficiencies in brands within the mens business.

Q. And why are you making these points about potential things to raise with Mr. Cole? Why are these responses you had in mind?

A. Because he was furious about the $5 million shortfall and it was quite clear that I had better find a way to do something.

Q. OK.

And then I think defense counsel then raised this next paragraph with you so let's cover it. Then you say: However, every time I attempted to take action I am told to stop. I am moving too quickly. I was told I could not even have a two-day strategic meeting with my team because I was moving too fast. The strategic meeting would have resulted in finding real revenue for the company and a way to continue identifying revenue opportunities.

Let's just pause there. What is this tension you are describing here, Mr. Horowitz?

A. There is a tension between Neil being furious about a $5 million shortfall in the mens business and telling me I

MBA5col1        Horowitz - Redirect        Page 1347

better go fucking fire people in order to help make up for it, and then him telling me not to do anything and not to even have a strategic meeting with my team to try to figure it out.

Q. And then, later on in that paragraph -- and this is, I think, the part defense covered with you -- there is this part about you saying: Neil said relax, take your time, calm down. It doesn't matter if we are another 5 million or 10 million off in the mens division. Those are very opposite reactions and directions.

Can you explain what you mean by that, that you were getting opposite directions from Neil at the same time?

A. When I uncovered the discrepancy and the shortfall of the $5 million in the mens business he responded aggressively, told me to go fire people, and obviously that's telling me to take quick action to fix it, and on the other hand he wasn't letting me have strategic meetings with my team to try to find real revenue for the company.

Those are two very different directions and responses to the $5 million shortfall.

Q. Mr. Horowitz, during your time at Iconix at the time of the June and September 2014 joint ventures, did Mr. Cole seem concerned about revenue?

A. Yes.

Q. Would you describe him as being relaxed and not caring about whether the company made revenue numbers during those

MBA5col1        Horowitz - Redirect        Page 1348

times?

A. No.

Q. And then let's keep on going, you say: Please do not yell, scream, and curse at me about the numbers if I am not given the authority to do something about it.

And continuing: Before Joe left you couldn't stand him, you made him cry twice, both times it was after weekly mens meetings.

What are you referring to there?

A. An employee that Neil berated in front of others and made him cry.

Q. Is that the only time that happened?

A. No.

Q. And, Mr. Horowitz, here going down to the last, it says, please set me up to succeed, in the second line?

A. I do.

Q. And then under that you say, two lines under: Take me under your wing and teach me.

A. I do see that.

Q. What do you want to happen with your relationship with Neil Cole at this time?

A. I want to get closer to Neil, I want to be his right hand, I want to understand his thinking.

Q. And then later on you were asked about this -- again, a snippet by defense, not the whole document -- there is two

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                      **November 10, 2022**

| MBA5col1 | Horowitz - Redirect | Page 1349 |
|---|---|---|

numbers, one option, ignore it; or two, fight back. Can you just explain your thinking about what you were expressing there?

MR. HECKER: Objection to the predicate, your Honor.

THE COURT: Overruled.

THE WITNESS: At this time I'm identifying for myself two things I could do, I could just ignore what is going on -- but that's difficult to do in the face of these things -- or I could find a way to fight back.

BY MR. LENOW:

Q. And when you said fight back, what did you mean by that?

A. Have a backbone, tell him, stand up to him when he is yelling at people or be strong enough to question him face to face when he gives me contradicting direction.

Q. Let's take that down.

Now, Mr. Horowitz, on the topic of Mr. Cole and your relationship with him and others, just turning to the time period of the SEC comment letter, when those letters came in, can you remind the jury what was Neil Cole's reaction to those letters coming in the door?

A. He was nervous and panicked.

Q. And around that time in the following months after that letter when the first letter came in, did Neil talk about -- did there come a time when Neil talked about who was to blame for the SEC comment letter?

| MBA5col1 | Horowitz - Redirect | Page 1350 |
|---|---|---|

A. Yes.

Q. And who would be blamed?

A. Yes.

Q. What names did he throw out there as people who might be blamed?

A. Justin Abrahamson, Brian Snyderman, Jeff Lupinacci.

Q. Other people apart from himself?

A. Correct.

Q. How did he refer to them?

A. He referred to them as fall guys.

Q. Do you remember being asked some questions about whether -- about getting things in writing from Mr. Cole?

A. Yes.

Q. And when you, those statements that Mr. Hecker asked you about, were you referring to making a general statement on Mr. Cole getting things in writing or on a particular interaction you had with him?

A. I was referring to a particular interaction I had.

Q. And what was that particular interaction?

A. When I signed my new contract as COO, Neil told me that he couldn't put my -- he couldn't put a commitment to pay me a bonus in writing because it would make other executives upset.

Q. OK. And turning to the SEA-2 and SEA-3 transactions, Mr. Horowitz, did you think that GBG needed to get those promises, the secret giveback promises, in writing, from Neil

| MBA5col1 | Horowitz - Redirect | Page 1351 |
|---|---|---|

Cole, or did you think Neil was going to follow through on those promises?

MR. HECKER: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: Neil was going to follow through with those promises.

BY MR. LENOW:

Q. At any point in time did you believe that you and Neil could walk away from those secret giveback promises?

A. No.

Q. Why not?

A. One, because it was part of the deal. Two, because GBG had other leverage, too. They had, as we discussed, many relationships with them and they owed us money in different ways that they had leverage over us.

Q. And did Neil in fact arrange for Iconix to make, in essence, $5 million in marketing payments for the secret giveback for SEA-2? Did that in fact happen?

A. Yes, it did.

Q. Even though it wasn't in writing?

A. Yes, it did.

Q. And did, to your understanding, did Neil begin to make payments, secret giveback payments for SEA-3, even though that wasn't in writing?

A. Yes.

| MBA5col1 | Horowitz - Redirect | Page 1352 |
|---|---|---|

MR. HECKER: Objection, your Honor. Foundation.

THE COURT: Overruled.

BY MR. LENOW:

Q. You were asked some questions about the joint ventures, SEA-2 and SEA-3, and about GBG's profits from those joint ventures. Do you remember those questions? They went on for some about an hour, there was a lot of math. Does that ring a bell?

A. Yes.

Q. I want to ask just a few questions on that topic. Do you recall the defense asking you any questions about Iconix' profits under those scenarios or were they all focused on GBG?

A. I do not recall any questions about Iconix' profit in those scenarios.

Q. How are the profits from the JVs, SEA-2 and SEA-3, supposed to be divided under the agreements?

A. Profits from a joint venture, when it is operating, are split by the partnership 50/50.

Q. So each time that Mr. Hecker referred to GBG getting $10 million in profits from the joint venture to $5 million in profits, each of those times how much in profits would Iconix also get for that same distribution period?

A. The same amount.

Q. And was Iconix, on its own, well-positioned to move in these foreign countries, the joint ventures without a partner

# A-899

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

MBA5col1      Horowitz - Redirect      Page 1353

just on it own with Iconix' employees and resources?

A. I'm sorry?

Q. Let me rephrase the question.

Without a foreign partner who had familiarity in the territory, was Iconix, on its own, well-positioned to move into Southeast Asia or Korea just on its own?

A. No.

Q. And so, without a partner it would have been difficult for Iconix to monetize, to get money out of those assets in those foreign countries?

A. Yes.

Q. And so without a JV partner or a partner that was a local partner, would Iconix have been able to make any profits in those areas, generally speaking?

A. Generally speaking it would have been significantly smaller.

Q. Now, Mr. Horowitz, there were a number of questions about the value of these deals. Do you recall those questions on cross-examination?

A. I do.

Q. Now, do you recall extensive questioning from Mr. Hecker about all the benefits that Mr. Hecker was claiming GBG would get from these deals financially?

MR. HECKER: Objection to "Hecker was claiming."

MR. LENOW: I will withdraw that and ask it

MBA5col1      Horowitz - Redirect      Page 1354

differently.

Q. Do you recall a number of questions from defense counsel in which defense counsel made assertions about how good the deals were for GBG?

MR. HECKER: Objection to form.

THE COURT: Overruled.

Q. Do you recall those questions?

A. I do.

Q. Now, when you negotiated, Mr. Horowitz, when you were part of the people at Iconix negotiating these, the SEA-2 and SEA-3 deals with GBG, did you, yourself, make arguments to GBG about how valuable the assets were that Iconix was contributing?

A. I believe that I did.

Q. Did you, yourself, try to convince GBG of what Mr. Hecker's points were about these are great assets and great deals for GBG?

A. I believe I did.

Q. These were actually actual negotiations that you participated in and made some of those arguments yourself to GBG?

A. That is correct.

Q. So, for SEA-2, at the conclusion of those negotiations and before the inflated price, how much was GBG willing to pay after you made all your arguments about how good these assets were?

MBA5col1      Horowitz - Redirect      Page 1355

A. $10.9 million.

Q. Were all the arguments you made enough to convince GBG that $15.9 million was the right price?

A. No.

Q. How did that 15.9 price -- how did the 10.9 get elevated to 15.9 million? Was it because of arguments you made about how good the assets were and good the rates were?

A. No.

Q. What was the reason?

A. It was inflated to 15.9 million so we could hit our quarterly numbers.

Q. And the same question with SEA-3. Did you make many of the same arguments that Mr. Hecker made in your cross-examination about the value of these deals to GBG?

A. Yes.

Q. And after you in fact made many of those similar arguments, what was GBG willing to pay for SEA-3, that 50 percent interest?

A. Approximately $15 million.

Q. And why was the price then subsequently increased to approximately $21 million?

A. Again, it was increased so that Iconix could hit its quarterly numbers with the promise of a giveback.

Q. Mr. Horowitz, do you recall testifying or being asked questions about the SEA-2 contract or the closing date of

MBA5col1      Horowitz - Redirect      Page 1356

SEA-2, June 30th, of 2014? Do you recall those questions?

A. I do.

Q. Do you recall the questions about the closing of SEA-3 on September 17th, 2014?

A. I do.

Q. Let's talk about SEA-2 first.

So, you were asked a lot of questions by defense counsel about the time period leading up to SEA-2 closing on June 30th. Do you recall any questions about why that purchase price changed from $10 million to $15 million just before the end of the quarter?

A. Not specifically I don't.

Q. You don't recall any questions along those lines, right?

A. Not specifically I don't.

Q. Same question for SEA-3. Do you recall any questions from defense counsel about the changing of that SEA-3 purchase price just before the end of the quarter and the reasons why that changed?

A. No, I do not.

Q. No questions on that?

A. Not that I recall.

Q. What was the reason behind those last minute changes in the purchase price just before the end of each of those quarters?

A. To allow Iconix to hit its revenue and EPS numbers.

Q. Mr. Horowitz, do you recall being asked if it would

# A-900

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

| MBA5col1 | Horowitz - Redirect | Page 1357 |

surprise you if Jason Rabin said -- it was either SEA-2 or SEA-3 -- was a good deal? Do you recall being asked whether it would surprise you that he testified to that?

A. I do recall that.

Q. Mr. Horowitz, would it surprise you if Mr. Rabin testified to this jury that the purchase price for SEA-2 was inflated in exchange for a giveback?

A. No, that would not surprise me.

Q. Why not?

A. Because that's what happened. That's what he agreed to.

Q. Would it surprise you if Mr. Rabin testified to this jury that the purchase price for SEA-3 was increased in exchange for a giveback?

A. No, it would not.

Q. Why wouldn't that surprise you?

A. Same reasons; that's what happened and that's what he negotiated.

Q. OK. Can we put up for the government, defense, and all parties and the jury, Government 201?

Do you recall being asked questions about this Administrative Services Agreement dated September 30th, 2013?

A. I do.

Q. Do you recall being asked by defense counsel some questions suggesting that this resulted in payments to GBG?

A. I do.

| MBA5col1 | Horowitz - Redirect | Page 1358 |

Q. So, let's break this down a bit, Mr. Horowitz. Under this Administrative Services Agreement, let's look at the bottom two lines or bottom three lines of the first paragraph. Do you see where it says: Iconix Brand Group is the administrative manager. Iconix is defined as the administrative manager?

A. I do.

Q. So, who is the party in this that is providing the administrative services? Who is the administrative manager in this contract?

A. Iconix Brand Group.

Q. So Iconix is providing the services under this agreement, correct?

A. That is correct.

Q. Let's go to page 3.

THE COURT: We will go to page 3 after the break. It is 11:00, ladies and gentlemen. 20 minutes. Don't discuss the case.

(Continued on next page)

| MBA5col1 | Horowitz - Redirect | Page 1359 |

(Jury not present)

THE COURT: Mr. Horowitz, you may step down.

(Witness steps down)

THE COURT: Everyone can be seated. Anything to raise?

MR. LENOW: Nothing from us, Judge.

MR. HECKER: No, your Honor.

THE COURT: OK. 20 minutes. Don't be late.

(Recess)

(Continued on next page)

| MBAYCOL2 | Horowitz - Redirect | Page 1360 |

MR. LENOW: Ms. Wolfson, if we could put up page 3 of the administrative services agreement, and if we can highlight "Fees," the Section 301, "Fees" section. Just the first paragraph.

Q. Mr. Horowitz, you testified right before the break that Iconix is the administrative manager that's providing the services under this agreement.

Is that right?

A. That is correct.

Q. Who are the fees paid to? The 5 percent.

Who is getting the 5 percent fees under this agreement?

A. Iconix.

Q. Not GBG. Iconix?

A. That is correct.

MR. LENOW: You can take this down.

If we can please put up Government 1902. I'm not sure if this is in evidence. We'd offer Government Exhibit 1902. It's the same -- I'm sorry. Defense 1902. My apologies.

Let's go to the second page of this.

Q. Do you recall being asked about this document on cross-examination? It's an April 7 email from you to Jared Margolis.

We'll go to page 2 if we can. It has a term sheet attached.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                November 10, 2022

---

MBAYCOL2          Horowitz - Redirect          Page 1361

A. I do.

MR. LENOW: Let's wait until it pops up.

I'm sorry. I think it might be 1902A, the way it is with the defense exhibits, to get to the attachment. There we go. Let's go to the second page of 1902A1, the attachment.

Q. You were asked about this term sheet by defense counsel.

Do you recall that?

A. I do.

Q. Do you see some of the brands that ended up in SEA-2 listed here?

A. I do.

Q. Are there some brands here that actually did not end up in the SEA-2 Europe deal listed under the bottom number of brands?

A. Yes.

Q. Okay. So, for example, which ones do you see that did not end up in SEA-2?

A. I don't believe Material Girl, Artful Dodger, and I don't believe Sharper Image either.

Q. So if you wanted to compare the brands that ended up in the Europe SEA-2 deal to this one, it's not an apples-to-apples comparison.

Is that correct?

A. That's correct.

MR. LENOW: We can take this down.

Q. Mr. Horowitz, do you recall defense counsel, Mr. Hecker,

---

MBAYCOL2          Horowitz - Redirect          Page 1362

asking you about whether he had ever met you before?

A. Yes.

Q. Have you encountered other lawyers that represent Mr. Cole or have represented him?

MR. HECKER: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. LENOW:

Q. And, Mr. Horowitz, at a prior proceeding, did other lawyers representing Mr. Cole have an opportunity to question you?

MR. HECKER: Objection, your Honor.

THE COURT: Let's talk at sidebar.

(Continued on next page)

---

MBAYCOL2          Horowitz - Redirect          Page 1363

(At the sidebar)

MR. LENOW: Your Honor, we object to this line of questioning.

MR. HECKER: So has the government had 50 meetings to prepare for today? So this is their first crack at them that they've never had a chance to ask him questions before?

THE COURT: I'm not going to allow that.

---

MBAYCOL2          Horowitz - Redirect          Page 1364

(In open court; jury present)

BY MR. LENOW:

Q. Mr. Horowitz, I want to ask you some questions about your cooperation agreement.

Do you recall being asked about your cooperation agreement by defense counsel on cross?

A. I do.

Q. Under your cooperation agreement with the government, what are your obligations?

A. My obligations are to tell the truth, the whole truth, and I must appear for interviews or court proceedings like this whenever requested.

Q. Is there anything in your cooperation agreement about the government being happy or satisfied with your testimony?

A. No.

Q. What is your obligation on the stand here today and every day you've testified upped your cooperation agreement?

A. To tell the whole truth.

Q. Mr. Horowitz, do you believe it's in your interests to lie today to this jury?

A. No.

Q. Why not?

A. Because that would undo my cooperation agreement.

Q. If you lie, what could happen then?

A. My cooperation agreement could be thrown out.

---

# A-902

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

| MBAYCOL2 | Horowitz - Redirect | Page 1365 |
|---|---|---|

Q. Mr. Horowitz, at the end of the day, after your testimony is complete and you've testified and you get sentenced, who decides what your sentence will be?

A. The judge.

Q. Does the government decide in any way what your sentence will be?

A. No.

Q. The government writes a letter; right?

A. By -- yes. That's correct.

Q. Does the judge have to listen to what's in the letter?

A. No.

Q. Can the judge do whatever he wants?

A. Yes.

Q. Now, Mr. Horowitz, last topic.

Do you recall some questions from the defense about Neil Cole claiming he didn't know about the puts and calls in the Southeast Asia deals?

MR. HECKER: Objection. Foundation.

THE COURT: Overruled.

BY MR. LENOW:

Q. Do you recall some questions about that?

A. I do.

Q. Did Neil know about the puts and calls? Those deals based on your discussions with him when the deals were being negotiated and signed.

| MBAYCOL2 | Horowitz - Redirect | Page 1366 |
|---|---|---|

A. Yes.

Q. Did you talk to him about the terms of the SEA-2 and the SEA-3 deals as they were being negotiated?

A. Yes.

Q. Mr. Horowitz, let's look at what's in evidence as Government Exhibit 209.

Do you recognize as one of the SEA-2 deal documents?

A. I do.

MR. LENOW: Let's go to page 12.

Q. Mr. Horowitz, whose signature is that, that first signature, listed in this page?

A. Neil Cole.

MR. LENOW: Let's go to Government Exhibit 210.

Q. Do you recognize this as another deal document for the SEA-2 deal?

A. I do.

MR. LENOW: Let's go to page 3.

Q. Whose signature is on that page?

A. Neil Cole.

MR. LENOW: Let's take this down. Let's go to Government Exhibit 274.

Q. Do you recognize this as one of the deal documents for the SEA-2 deal?

A. I do.

MR. LENOW: Let's go to page 30.

| MBAYCOL2 | Horowitz - Redirect | Page 1367 |
|---|---|---|

Q. Whose signature is on that page?

A. Neil Cole.

MR. LENOW: Take that down. Let's put up for the witness Government Exhibit 211.

Q. Do you recognize this as one of the SEA-3 contracts?

A. I do.

MR. LENOW: Let's go to page 14.

Q. Whose signature is on this page twice?

A. Neil Cole.

MR. LENOW: Take that down. Let's go to Government Exhibit 212.

Q. Do you recognize this as another one of the SEA-3 deal documents?

A. I do.

MR. LENOW: Let's go to page four.

Q. Whose signature is on this one three times?

A. Neil Cole.

MR. LENOW: Take that down. Let's go to Government Exhibit 236, and let's pause for a second.

Q. Do you recognize this as one of the SEA-3 contracts?

A. I do.

MR. LENOW: Let's go to page 34, please.

Q. Whose signature is on this page?

A. Neil Cole.

Q. Whose signature is on every single one of the SEA-2 and

| MBAYCOL2 | Horowitz - Recross | Page 1368 |
|---|---|---|

SEA-3 deal documents that we just went through?

A. Neil Cole.

MR. LENOW: No further questions.

THE COURT: Anything more?

MR. HECKER: Just briefly.

RECROSS EXAMINATION

BY MR. HECKER:

Q. Sir, would it surprise you that Jason Rabin of GBG came into this courtroom and testified that the SEA-2 and SEA-3 transactions were not dirty deals?

A. Yes. That would surprise me.

Q. Would it surprise you that he testified that there was no shell game going on with respect to the SEA-2 and SEA-3 transactions?

A. Yes. That would surprise me.

Q. And, sir, under your cooperation agreement, who decides whether you're telling the truth in your testimony?

Isn't it the government that gets to decide whether or not to write that letter that you've met your obligations under the cooperation agreement?

A. I believe it is the government that makes that decision on whether or not they write the letter.

Q. And, sir, you testified that you have a great relationship with Melissa Ben-Ishay.

Is that correct?

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

---

MBAYCOL2     Horowitz - Recross     Page 1369

A. I believe I said have or had, yes.

Q. You testified just a few minutes ago on direct examination that you have a great relationship with Ms. Ben-Ishay.
Is that correct?

A. That is correct.

Q. But when you asked her for a reference letter in June of 2020, she refused because you had repeatedly lied to her until after the press release of your conviction was released.
True?

A. Part of that is true; part of that is not true.

MR. HECKER: Your Honor, we'll move the admission of DX3539002, just page 0026.

MR. LENOW: Objection. Hearsay. Extrinsic evidence of a collateral matter.

MR. HECKER: It's impeachment, your Honor.

THE COURT: Let's talk at sidebar.

(Continued on next page)

---

MBAYCOL2     Horowitz - Recross     Page 1370

(At the sidebar)

MR. LENOW: Judge, it's a statement from a nonparty witness offered for its truth.

MR. HECKER: It's offered for impeachment. He just testified that this was not true.

THE COURT: He did not say that exactly. I believe he said that that wasn't entirely true. I believe that's what he said.

MR. HECKER: Can I clean it up?

MR. LENOW: Your Honor, the bigger issue is that they're trying to prove intrinsically the impeachment on a collateral issue. Whether or not it was before or after a press release or whether or not Ms. Ben-Ishay did or did not write a reference letter is not an essential issue. And proving this through collateral evidence is forbidden.

THE COURT: I'm not going to allow this.

(In open court; jury present)

BY MR. HECKER:

Q. Sir, you answered the last question -- am I correct? -- because you think you told her before the press release was issued but after you signed the cooperation agreement to plead guilty.
Correct?

A. I believe that is correct.

Q. I see. So you're not taking issue with the fact that she

---

MBAYCOL2     Horowitz - Recross     Page 1371

refused to give you a reference letter because you had deliberately lied to her every time she confronted you about your absences, both physical and mental.
Correct?

A. I am not denying that.

Q. Because it's true?

A. Yes. That is true.

MR. HECKER: No, your Honor.

MR. LENOW: No redirect, Judge.

THE COURT: Mr. Horowitz, may step down.

THE WITNESS: Thank you, your Honor.

(Witness excused)

THE COURT: Government, please call your next witness.

MR. THOMAS: Yes, your Honor. The United States calls Ericka Alford.

THE COURT: Please watch your step. Please step up into the witness box and remain standing.

ERICKA ALFORD,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE COURT: Miss, you may be seated. Please bring your chair close to the microphone, and please arrange the microphone so that it is close to you as it can be. When you speak, please speak directly into the microphone.

Please begin by stating and spelling your first name

---

MBAYCOL2     Alford -Direct     Page 1372

and your last name.

THE WITNESS: Ericka Alford, E-r-i-c-k-a A-l-f-o-r-d.

THE COURT: Mr. Thomas.

MR. THOMAS: Thank you, your Honor.

DIRECT EXAMINATION
BY MR. THOMAS:

Q. Miss Alford, would you introduce yourself to the jury.

A. My name is Ericka Alford.

Q. When you do that, be sure to speak into the microphone. It's a challenge.

A. Sure.

Q. Thank you.
Ms. Alford, what do you do for a living?

A. I'm a lawyer.

Q. What kind of law do you practice?

A. Corporate law.

Q. What sort of corporate law do you focus on?

A. I'm a corporate generalist. I focus on SEC law, corporate governance, and some mergers and acquisitions work.

Q. For how long have you been practicing as a corporate generalist?

A. Approximately 20 years.

Q. Could you describe for the jury some of your professional experience over that time.

A. Sure. I have clerked for a judge. I have worked at a law

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

MBAYCOL2        Alford -Direct        Page 1397

Q. Where does that fall within Iconix's reporting calendar?
A. That would fall just prior to the end of the fourth quarter and the end of the fiscal year.
Q. In your time at Iconix, was there an effort to close transactions before the end of particular quarters?
A. Yes.
Q. Could you describe what you saw.
A. Sure. There was always a focus on closing transactions before the end of fiscal quarters and before the end of the close of the fiscal year.
Q. Now, Ms. Alford, you said you had worked at other public companies.
A. Yes.
Q. Is there anything unusual about public companies trying to close transactions by the end of particular quarters?
A. No, there's not.
Q. Was there anything unusual about the atmosphere at Iconix on that topic?
A. There was.
Q. What was that?
A. There was a focus or an obsession on closing deals by the end of the quarter, by the end of the fiscal year, that the commercial team was really focused on doing that. And it felt like it was many quarters and years during the time I was there.

MBAYCOL2        Alford -Direct        Page 1398

Q. Did Mr. Cole participate in that?
A. He did.
Q. In what way?
A. Mr. Cole was very intent on making the numbers by the end of the quarter and by the end of the fiscal year and, you know, drove the commercial teams hard to make that goal.
Q. From your observations, did that hard driving by Mr. Cole have an effect on the perspective of the commercial team?
A. Yes.
Q. What was the effect?
A. An obsessive focus on closing the deals by the end of the -- by the prescribed timeline. Whether it was the end of the quarter or the end of the fiscal year, there was a focus on that, a sort of single-minded focus on that, on making those timelines.
MR. THOMAS: Nothing further, your Honor.
THE COURT: Cross-examination.
MS. MOSS: Your Honor, may we go sidebar before I begin?
THE COURT: Sure.
(Continued on next page)

MBAYCOL2        Alford -Direct        Page 1399

(At the sidebar)
MS. MOSS: Your Honor, during Mr. Thomas' direct, he spent a good deal of time questioning Ms. Alford about 2021. The time period was September 30, just when it closed, and Mr. Cole's insistence that it be closed by the end of the quarter and about the pressure to get this done by the end of the quarter.
I think this has opened the door now to the admission of the entirety of the email that was put up on the stand which is DX1140. Before the government had insisted that we strike the second line in Mr. Cole's email which says: "If deal does not close, we are fine, although would still prefer to close."
This is inconsistent with the questioning by Mr. Thomas about the pressure to get it done. He's clearly saying in this email here that I'd like to get it done, but it's not necessary. So I'd like to admit the entirety of this email during her testimony.
THE COURT: Mr. Thomas?
MR. THOMAS: Your Honor, the Court originally excluded that line because it was a self-serving hearsay statement of Mr. Cole, not because it was irrelevant. It remains a self-serving hearsay statement of Mr. Cole.
Obviously, Mr. Cole, if he wishes to, could testify to that effect, but it would be improper at this point to admit his statements through this document to prove his state of

MBAYCOL2        Alford -Direct        Page 1400

mind. And we would continue to insist that the Court hold to its earlier ruling.
MS. MOSS: So the government wants to have its cake and eat it too. They want to create an impression, which is clearly inconsistent with what's in this document, that Mr. Cole had to finish at the end of every quarter. Clearly this document says otherwise. So they're misrepresenting to the jury and to this witness something that they know is not true.
THE COURT: You were about to say something.
MR. MARKUS: This idea that it's self-serving, there is no implication that he felt that there was an investigation or anything at this time. This was the email that they asked about of this witness. They asked about part of the email. So they've opened the door now with their questioning, their misleading questioning, about excluding the second line.
MR. THOMAS: Your Honor, may I respond to that?
THE COURT: You may.
MR. THOMAS: This is a document that the defense admitted. It's in evidence in its current form. I don't think there is anything improper about the government questioning the witness on a document the defense has already brought up. What is improper is eliciting from the witness Mr. Cole's own statement to prove something true.
THE COURT: Why isn't this impeachment of her

# A-905

MBAYCOL2          Alford - Cross          Page 1413

just kind of the normal kind of course, transaction back and forth between the lawyers of trying to update the documents. Yes.

MS. MOSS: At this time, I'd like to pull up DX1140, which is already in evidence. And if we could have the unredacted version, please:

THE WITNESS: Yes.

BY MS. MOSS:

Q. Now, we saw this on your direct, Ms. Alford. And I want to start with the bottom email, which is the first email. And this is an email from you. Do you see that?

A. I do.

Q. So this is an email where you're updating Mr. Cole about SEA-1. And it's sent on September 30. Do you see that?

A. I see that, yes.

Q. And I believe what you're telling him here is that you had been going back and forth with LF's lawyers. Do you want to take a look at it there?

A. Yes. Let me just take a quick look.

Q. Do you see that first line: "But are going back and forth on a few final points"?

A. Yes. I see that.

Q. And you go on to tell Mr. Cole: "LF has made some

MBAYCOL2          Alford - Cross          Page 1414

additional changes to control provisions that we cannot fully accept and Warren and Gibson, Dunn determined dividend policy is not profit neutral, so we cannot accept as presented." Do you see that?

A. I do.

Q. So this is an example, again, of maybe not necessarily pushback but some agreement about some of the terms that are going within the transaction documents. Correct?

A. Correct.

Q. Now, let's look at the entirety of Mr. Cole's response to you, which is above. Do you see that email? Do you see it's from Mr. Cole sent also on that same day, September 30. And it's to you. And he is c.c.'ing the other lawyers and Mr. Clayman, who is the chief financial officer. Do you see that?

A. Yes, I do.

Q. Now, a couple of different things about this email. What Mr. Cole is saying to you here is: "Be firm." Essentially don't give into anything you're not comfortable with. Do you see that?

A. I see that.

Q. And what Mr. Cole is telling you here is he uses the word

MBAYCOL2          Alford - Cross          Page 1415

"anything."

Right?

A. Yes. I see the word "anything."

Q. So he's dealing you: "Don't give into anything you are uncomfortable with." So stick to your guns and do what you think is right. Would you agree with that?

A. That was not how I took the message at the time. But, yes. I understand the wording in the email.

Q. And do you see that that could be how Mr. Cole could have conveyed that message was, you know, in response to you talking about going back and forth on a few points and that "We cannot actually accept things that Li & Fung have done." But he's telling you don't do anything you're uncomfortable with. Do you see that?

A. I see that in the sentence, yes.

Q. And just to be clear, Mr. Cole never asked you to do things that you were uncomfortable with, did he?

A. In this transaction?

Q. Correct.

A. There was a real push to move more quickly than we were comfortable with and to get this deal closed by the quarter end. And that did make me uncomfortable, yes.

Q. So that's a timing issue though. Do you agree with me on that?

MBAYCOL2          Alford - Cross          Page 1416

A. Yeah, but it affected substantive pieces of the transaction too.

Q. Okay. Understood. But let's look at what Mr. Cole says next in this line.

A. Sure.

Q. And this is something that we didn't see before on the direct. So what Mr. Cole tells you then on September 30 is: "If deal does not close, we are fine, although would still prefer to close." Do you see that?

A. I do.

Q. And so what Mr. Cole is telling you is that we don't have to close by the end of the quarter. I'd like to. But if we don't, it's fine. Do you see that?

A. I do see that that is what the second sentence could be interpreted to mean. Yes.

MS. MOSS: Thank you. We can take that down.

Q. Now, going through this process of reviewing the transaction documents for SEA-1, at some point, you saw that there was what's called a side letter and a consultancy agreement from Li & Fung. Do you recall that?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                November 10, 2022

MBAYCOL2        Alford - Cross        Page 1417

A. Yes.
Q. And Li & Fung's lawyers are the ones who prepared these documents and proposed these new items.
        Do you recall that?
A. Yes. Their outside counsel, yes.
Q. So they sent them over to you, meaning to say they sent them over to the Iconix lawyer and the Iconix outside counsel. So all of you also had the opportunity to review the consultancy agreement and the side agreement.
        Do you remember that?
A. Yes.
Q. And so you know, again, that Gibson, Dunn is looking at these documents?
A. Say that again.
Q. Do you know that Gibson, Dunn was looking at those documents?
A. At that time, yes. I assumed Gibson, Dunn was, yeah.
Q. To be clear, these are documents that are in writing.
        Do you remember that these are actual documents, part of the transaction, that were in writing?
A. Yes.
Q. And do you recall speaking to Warren Clayman about these documents?
A. In what connection? Can you be more specific.
Q. Just in reference to the documents, just speaking generally

MBAYCOL2        Alford - Cross        Page 1418

to him about this side letter and consultancy agreement.
A. I may have spoken to Warren about it, yes.
Q. Do you know that he was aware of the documents as well?
A. I think so. I think he's on some of the emails with the documents, but I don't know off the top of my head. I think he was on the emails though.
Q. And when you saw the side letter and when all the Iconix lawyers saw the side letter and the consultancy agreement, there is nothing about the content of those documents that stood out to you.
        Correct?
A. No. They were surprising because we received them without being aware they were coming. So that was the surprising factor about those documents.
Q. So that was the surprising factor, maybe the timing and you hadn't heard of them before.
        Correct?
A. Correct.
Q. But the timing wasn't something that raised a red flag to you?
A. No. Not on its face, no.
Q. And these documents ended up being signed and ended up being part of the SEA-1 transaction.
A. That's correct.
Q. Now, do you recall that what the consultancy agreement

MBAYCOL2        Alford - Cross        Page 1419

called for was for Iconix to pay a fee of $2 million to Li & Fung?
        Do you recall that?
A. Yes.
Q. And do you recall that the side letter called for Li & Fung to pay Iconix $2 million in consideration?
A. Yes.
        MS. MOSS: May I have one moment, your Honor?
        THE COURT: Yes.
        (Defense counsel confer)
        MS. MOSS: Your Honor, with consent, we will move to admit Government Exhibit 206 and Government Exhibit 207.
        THE COURT: Very well. They will be received.
        (Government's Exhibits 207 received in evidence)
        MS. MOSS: And just so we can all see them now, if we can pull up GX207.
Q. Ms. Alford, is this the consultancy agreement that was reviewed by the lawyers and ended up being part of the SEA-1 transaction?
A. Yes.
        MS. MOSS: And if we can go to the bottom of this document. And it's in the "Fee" section, number 3.
        This is where it provides -- I'm sorry. Actually, it's Iconix is agreeing to pay $2 million to Li & Fung.
Q. Do you see that?

MBAYCOL2        Alford - Cross        Page 1420

A. Yes.
        MS. MOSS: Now if we can pull up Government Exhibit 206.
Q. Ms. Alford, is this what you recognize to be the side letter with Li & Fung agreeing to pay Iconix $2 million consideration?
A. Can you scroll down a bit for me.
        MS. MOSS: Yes. Why don't we scroll all the way down.
        THE WITNESS: Yes.
BY MS. MOSS:
Q. And you see there in the highlighted portion this is where Li & Fung is agreeing to pay Iconix $2 million for consideration?
        Do you see that?
A. Yes. I see that.
Q. Okay. So what we're seeing in these two documents is that money is being paid from Iconix to Li & Fung. Correct?
A. Yes.
Q. And then going around back to Iconix is money paid by Li & Fung to Iconix.
        Do you see that?
A. I do.
        MS. MOSS: You can take that down. Thank you.
Q. Now, we know that lawyers saw these documents. Correct?
A. Correct.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 10, 2022

MBAYCOL2          Alford - Cross          Page 1421

Q. And we know that lawyers saw that the numbers evened out between the two companies.

Do you recall that?

A. Yes.

Q. And after this transaction closed, the lawyers at Iconix and particularly Lauren Gee -- she kept on top of this transaction to make sure that Iconix was actually following up and paying this money to Li & Fung.

Do you recall that?

A. Yes.

MS. MOSS: If we can pull up DX301, which is in evidence.

Q. This is the email from Ms. Gee, and this is on October 16.

Do you see that?

A. Yes.

Q. And it's going to Mr. Snyderman.

And Mr. Snyderman was in the finance department at Iconix?

A. That's correct. Yes.

Q. And I see that you were also c.c.'d on this, as well as Mr. Schaefer, the general counsel.

A. Correct.

Q. And now Warren Clayman was also c.c.'d on this. And, again, Mr. Clayman was the chief financial officer at the time.

Correct?

MBAYCOL2          Alford - Cross          Page 1422

A. I do.

Q. And Mr. Abrahamson was also in finance.

Do you see that?

A. I do.

Q. Now, we don't have to read the entirety of the agreement, but this is Ms. Gee being diligent and following up to make sure that this money is paid as part of this consultancy agreement.

Do you see that?

A. Yes, I do.

Q. And she's doing this because Iconix is obligated to pay this money.

Correct?

A. She's doing it because -- yes. She's following up on a payment schedule from the agreement to make sure the payments have been made. Yes.

Q. And Iconix was obligated to pay on this consultancy agreement. There was a contract, a signed contract, about it.

Isn't that right?

A. Yes.

Q. So she's staying on top of it, and she's actually reaching out to the finance people to make sure it gets done?

A. Correct.

Q. And the finance people were aware of this already and maybe not quite as on top of it as Ms. Gee, but they were aware of

MBAYCOL2          Alford - Cross          Page 1423

it.

Isn't that correct?

A. Yes. I believe so.

Q. From your experience at working at Iconix, do you know that expenses, when expenses are paid by Iconix to another company, they get marked as part of the books?

They go into the records.

A. Yeah.

Q. And the finance people need to know about certain things like that. Right?

A. I'm sorry. I'm not understanding the question.

The finance people need to know about payments they're making?

Q. Yes.

A. Yeah.

MS. MOSS: Okay. We can take that down. Thank you.

Q. Now, the government asked you or showed you a couple of exhibits on your direct examination.

Before we get to that, let me ask you about GX200, page 20. This is already in evidence. So we can show it to everyone.

I believe that what the government has shown you was this 9.9 paragraph.

Do you see that, Ms. Alford?

A. I do.

MBAYCOL2          Alford - Cross          Page 1424

Q. And this is what's referred to as an integration clause.

Do you know that term?

A. Yes, I do.

Q. So what this is saying is that the terms within the written agreement are the terms and obligations of the parties.

Correct?

A. Correct.

Q. And that makes the entire agreement and the entirety of the obligations between the parties.

Do you agree with that?

A. I do.

Q. And whether or not you discussed that with Mr. Cole, that's an important provision in this contract.

Would you agree to that?

A. Yes. It's a standard provision in most contracts of this nature.

Q. And it's a standard provision in this contract to mean that no promises or oral agreements would be binding on either party.

A. That are outside of the four corners of the document, yes.

Q. Correct.

And you know that as a lawyer; correct?

A. Correct.

Q. And that's something that could be important for a contract.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                      November 10, 2022

**Page 1481 — Karetsky - Cross**

A. Yes.

Q. And we heard you testify about the fact that in this context and your interaction with Mr. Cole, that there was an open window that was approaching because the results for the quarter were about to be announced, correct?

A. Yes.

Q. And you also testified that you had to ensure, at the time that Mr. Cole exercised his stock options, that the company was not buying back its own stock, correct?

A. Yes.

Q. So that's another limitation or restriction on the time during which, or the days during which a public company executive can transact in the stock of their company, correct?

A. Yes.

Q. And besides these restrictions that we have spoken about at a high level, there are other restrictions on when a public company executive, like Mr. Cole, can sell stock; correct?

A. Yes.

Q. For example, Mr. Cole would not have been able to transact in the company's stock -- so, again, exercise the options and take whatever steps thereafter that he chose -- if he came into possession of material non-public information in the course of his work at Iconix, right?

A. Yes.

Q. So, another example, if Iconix were about to acquire a new

**Page 1482 — Karetsky - Cross**

brand or were planning to enter into a significant transaction that, in and of itself, might put some more limitations around Mr. Cole's ability to transact in the stock, correct?

A. Yes, it could.

Q. And fair to say from your experience, interacting with him, that Mr. Cole's exercise of the options here and subsequent sale of the shares was timed to comply with all of these restrictions, correct?

A. Yes.

Q. It was your understanding, was it not, that Mr. Cole wanted to follow all of the rules that applied here, correct?

A. Yes.

Q. He consulted with you, Mr. Karetsky, for your professional assistance with this, correct?

A. Yes.

Q. You were a professional advisor -- still are -- working at a large financial institution, correct?

A. Yes.

Q. With relevant expertise in this sort of conduct?

A. Yes.

Q. You were in contact with personnel at Iconix in connection with the exercise of the openings and the sale, correct?

A. Yes, we were.

Q. I think we saw some e-mail correspondence to this effect, that included being in touch with Brian Snyderman who was

**Page 1483 — Karetsky - Cross**

Iconix' vice president of finance and treasurer, correct?

A. Yes.

Q. You were in touch, or at least copied on the e-mails was Jason Schaefer who was the general counsel of Iconix at the time, correct?

A. Yes.

Q. And you understood, also, that Mr. Cole was consulting with an accountant, a personal accountant in connection with the options?

A. Yes.

Q. And you also understood that he was consulting with an attorney in connection with them, correct?

A. Outside counsel I believe it was, yes.

Q. Outside counsel, right. That was Bob Mittman at Blank Rome, correct?

A. Yes.

Q. And forms, we were looking at a series of forms during your direct testimony, forms were filed that disclosed the stock sale here, correct?

A. Yes.

Q. There was the Form 4 that was filed by Iconix, correct?

A. Yes.

Q. And Barclays had to submit the SEC Form 144, correct?

A. Yes.

Q. Both of those forms are designed to describe precisely what

**Page 1484 — Karetsky - redirect**

happened in terms of the transaction in the shares of the company, correct?

A. Yes.

Q. And, Mr. Karetsky, after the stock sale in October of 2014 that we have been talking about, you understood that Mr. Cole continued to hold a very large position in Iconix, correct?

A. Yes.

MS. DABBS: No further questions. Thank you, sir.

THE COURT: Anything further?

MR. RODRIGUEZ: Very briefly, your Honor. And if we can please put up Government Exhibit 1117 and go to page 1?

REDIRECT EXAMINATION

BY MR. RODRIGUEZ:

Q. Mr. Karetsky, Ms. Dabbs asked you some questions about when Mr. Cole's stock options were set to expire. Do you recall that?

A. Yes.

Q. And this is a transaction that happened in October of 2014?

A. Yes.

Q. And one of the sets -- one group of options was set to expire the end of March of 2015, right?

A. Yes.

Q. That's five months later?

A. Yes.

Q. And the second tranche was set to expire at the end of

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

MBE5col1    Reda - Direct    Page 1551

Q. Let's show for the witness what is already in evidence and can be published to the jury Government Exhibit 320. Do you recognize the person depicted in Government Exhibit 320?
A. Yes, sir.
Q. Who do you recognize that to be?
A. Jason Rabin.
Q. How do you know Mr. Rabin?
A. He was an officer at GBG.
Q. Do you recall what his role was in 2014 when you were an assistant controller?
A. I believe his title at that time was chief marketing officer.
Q. Let's show to the jury and the witness Government Exhibit 321. Do you recognize 321?
A. I do.
Q. Who do you recognize it to be?
A. Jared Margolis.
Q. And who is Mr. Margolis?
A. He was on Jason's team. I know that he ran a division that was based in Asia but I don't know what he really did day-to-day other than those duties.
Q. And let's show the witness and the jury Government Exhibit 323. Do you recognize the person depicted in 323?
A. I do.
Q. Who is that?

MBE5col1    Reda - Direct    Page 1552

A. Ethan Cole.
Q. Who is Ethan Cole?
A. Ethan Cole was a manager of new business and licensing.
Q. Now, to focus you on 2014 and the last half of 2014, was that Mr. Cole's role at the time?
A. Yes, it was.
Q. Mr. Bianco, you can take this down. Let's publish for the jury what is already in evidence as Government Exhibit 1098.
Mr. Reda, do you see the e-mail on your screen that's marked Government Exhibit 1098?
A. I do.
Q. This is a message that you sent to Mr. Maslaton at Iconix on September 26, 2014. Do you see that?
A. Yes, sir.
Q. Mr. Reda, do you remember this message?
A. I do.
Q. How is it you came to send this message to Iconix?
A. Ethan Cole, prior to this, had asked me to create three invoices.
MR. MARKUS: Objection, your Honor, as to what another person told.
THE COURT: Sustained. Actually, no. Let's talk at side bar.
(Continued next page)

MBE5col1    Reda - Direct    Page 1553

(At side bar)
THE COURT: Co-conspirator?
MR. THOMAS: Your Honor, I expect actually the witness will say he was directed to send the e-mail so I don't think there is any substance to it, but to the extent the answer is beyond that, Mr. Cole's engagement with Mr. Reda is plainly in furtherance of the conspiracy in effort to get the money paid back.
MR. MARKUS: Your Honor, I know you ruled on this. I want to make sure that I -- I don't want to stand up every time there is an Ethan Cole reference. Can I have a standing objection to Ethan Cole hearsay based on our prior motion practice and our argument this morning and just keep it at that?
THE COURT: Sure.
MR. MARKUS: Thank you, your Honor.

MBE5col1    Reda - Direct    Page 1554

(In open court)
THE COURT: So, the objection is overruled.
You may answer.
BY MR. THOMAS:
Q. Mr. Reda, how is it you came to send this message?
A. Just prior to this, Ethan Cole asked me to prepare some invoices for marketing costs related to these brands that are referred to here.
Q. Mr. Reda, were you personally familiar with what the request related to?
A. No.
Q. Did you, yourself, provide any marketing --
A. No.
Q. Did you have any role in valuing any marketing work that had been done?
A. No.
Q. So, when you say you were asked to prepare the invoices, could you explain to the jury what that meant?
A. OK. So, basically there are two types of invoices, there are invoices -- at least at GBG there were invoices for merchandise, and there were invoices for non-merchandise, so both of them have to get into the system so this is a non-merchandise invoice that I was asked to prepare.
Q. Just to pause there for a second to make sure everyone can keep up --

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    November 14, 2022

| MBE5col1 | Reda - Direct | Page 1555 |
|---|---|---|

A. Yes.

Q. -- when you refer to the system --

A. Yes.

Q. -- can you explain what you mean?

A. Yes. So, SAP was our ERP and accounting system. That's where the general ledger was, all the accounting records, and all the operational processes as well, shipping, receiving, all of that.

Q. But what is the significance to your work that an invoice be in the system?

A. So it could be tracked and accounted for properly. Usually merchandising invoices amount to certain general ledger accounts and when the cash comes in it gets applied to these open invoices. So, it is a way just to keep track of invoices and to ensure that the accounting records are properly reflected.

Q. Mr. Bianco, if you could scroll down to the attachments and if you can enlarge that for Mr. Reda?

Mr. Reda, do you see here this document?

A. I do.

Q. Is this an invoice in the GBG template?

A. It's an invoice in an Excel template that says -- that I put Global Brands Group. So, I took an Excel invoice template and that's what I used to prepare this.

Q. Mr. Reda, to direct your attention to the cost on this

| MBE5col1 | Reda - Direct | Page 1556 |
|---|---|---|

invoice which is reflected as $2 million. Do you see this?

A. Yes, sir.

Q. Do you know how $2 million was selected to be the amount in this invoice?

A. No.

Q. Did you, yourself, make that determination, or did someone else?

A. Someone else did.

Q. How was that information conveyed to you?

A. I don't recall if it was via e-mail or via a phone call. That I don't remember.

Q. Do you know from whom that information came from?

A. From Ethan.

Q. Do you see there is a description that says marketing costs on the left-hand side?

A. Yes.

Q. Did you write that description or did that come from somewhere else?

A. I wrote it on there but that description came from Ethan.

Q. Mr. Bianco, if you could go to the next page?

Mr. Reda, would the same be true of the description and amounts on this page?

A. Yes, sir.

Q. And Mr. Bianco, if you could go to the third invoice?

Mr. Reda, would it also be true on this invoice here?

| MBE5col1 | Reda - Direct | Page 1557 |
|---|---|---|

A. Yes, sir.

Q. And Mr. Reda, just to ask you directly, do you know either way whether any of the marketing costs on this, on these three invoices were actually incurred by GBG?

A. Could you say that one more time, please?

Q. Do you know firsthand if GBG incurred marketing costs as reflected on these invoices?

A. No, I don't.

Q. Let's show just the witness and the parties Government Exhibit 110 -- I misspoke -- 1110.

Mr. Reda, do you see Government Exhibit 1110?

A. I do.

Q. Do you recognize this to be a message from Mr. Ethan Cole to you, copying others?

A. Yes.

MR. THOMAS: Your Honor, pursuant to the discussion at side bar, the government offers 1110.

THE COURT: Very well. It will be received.

(Government's Exhibit 1110 received in evidence)

BY MR. THOMAS:

Q. Mr. Bianco, if you would publish that for the jury?

Now, Mr. Bianco, let's go ahead to page 5 of this document. Mr. Reda, do you recognize what we are looking at mere?

A. Yes.

| MBE5col1 | Reda - Direct | Page 1558 |
|---|---|---|

Q. What is it that we are looking at?

A. This was an invoice that Ethan prepared with additional information on it.

Q. When you say additional information, do you mean additional beyond what had been on a similar invoice that we looked at in the last exhibit?

A. Correct. It has just a little more description.

Q. Mr. Reda, did you provide this extra description?

A. No.

Q. Do you know firsthand whether or not it is accurate?

A. No.

Q. And Mr. Bianco, if we could go to the next page of the exhibit?

Mr. Reda, would the same be true of this invoice here?

A. Yes.

Q. Does this one similarly update an invoice that we looked at in the last exhibit with the new description?

A. Yes.

Q. Do you know firsthand whether the description was accurate or not?

A. No.

Q. Mr. Bianco, if you can go to the third one?

Mr. Reda, is the same true of this third invoice as with the other two?

A. That's correct.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

| MBE5col1 | Reda - Direct | Page 1559 |
|---|---|---|

Q. Mr. Bianco, if you could go back to the e-mail and take us to page 2?

Now, Mr. Reda, I'm going to focus you on the top part of this message. Do you see Mr. Ethan Cole says: We have been asked to provide more detail on the invoices. Please see below.

A. Yes.

Q. Do you remember receiving this from Ethan Cole?

A. I do.

Q. And could you describe for the jury what is listed below Mr. Cole's message?

A. It looks like for the first invoice, the one for Zoo York, that there is additional details on there with specific costs assigned to them.

Q. Now, Mr. Reda, did you assign specific costs to each of those bullets?

A. No.

Q. Do you know firsthand how Mr. Ethan Cole came to assign those costs to each bullet?

A. No.

Q. In the invoices that we just looked at there weren't specific costs in them, were there?

A. No.

Q. For each of the bullets?

A. No.

| MBE5col1 | Reda - Direct | Page 1560 |
|---|---|---|

Q. Why is it that those line item costs weren't in the ultimate invoices?

A. I don't know.

Q. And, Mr. Bianco, if you scroll up in this message to the first page, please?

Do you see here in the message you send on October 1, 2014, you say: As discussed, give them the descriptions but don't assign a dollar value to each?

A. Yes.

Q. Why is it that you told that to Ethan Cole?

A. Because on the back end of the process -- so, these Excel invoices have to go into the system. Somebody has to sit there and manually type all of this information in there. I didn't want them to have to do that because it would have been duplicate work. We could have taken these invoices and the e-mail, that would have been part of the electronic file that would have went into the system. So all the backup was there, was not necessary for somebody to sit there and type in this information and that's why I said it.

Q. And, Mr. Bianco, if we can enlarge the very first message on this thread?

Do you see Ethan Cole writes you and he says: I spoke with Iconix and they said we don't need to assign specific value for each item.

A. Yes.

| MBE5col1 | Reda - Direct | Page 1561 |
|---|---|---|

Q. And he later says: If you approve of the form, I will arrange to have sent directly to Seth at Iconix.

A. Yes.

Q. Mr. Reda, how did the process work to convey invoices to the party that was expected to pay them? Let me ask it this way. As the assistant controller, were there occasions where you are sending out invoices directly?

A. Not really. No.

Q. How is it typically done?

A. Well, for the merchandising invoices obviously there is a sales order. Once the goods are shipped the sales order is matched to the shipping documents and an invoice is produced, and usually a team of people in the AR department would mail those invoices. If other non-merchandise invoices were prepared, usually the person that prepares them would send the invoices to get paid. And then, I would take those invoices -- or somebody would take those invoices to make sure that the billing department and the invoices got in the system.

Q. And in the system so they could be tracked?

A. Correct, in the system so they could be tracked so when the cash comes in it could be applied.

Q. Mr. Bianco, let's publish for everyone what is already in evidence as Government Exhibit 1111.

Mr. Reda, do you see this exhibit on your screen?

A. I do.

| MBE5col1 | Reda - Direct | Page 1562 |
|---|---|---|

Q. Do you recognize this as a message from Ethan Cole to Seth Horowitz copying you and Mr. Margolis?

A. Yes.

Q. What's happening in this message?

A. Ethan prepared invoices and he sent them to Seth Horowitz.

Q. Do you recognize the hyperlink in the body of the message?

A. Yes.

Q. Back at the time did you click on that hyperlink?

A. Yes.

Q. What was behind it? Do you remember?

A. It looked like some marketing materials. I couldn't say for sure exactly what it was, I just remember the brands that were in there and some marketing material.

Q. Mr. Bianco, let's page forward to the attachments and if you could enlarge the top third of the document?

Mr. Reda, do you see here that this is yet a third version of the Zoo York invoice?

A. Yes.

Q. And do you recognize that the total that is being billed has changed?

A. Yes.

Q. Did you decide to make that change or did someone else?

A. I didn't make that change, somebody else did.

Q. Do you know why this figure was selected?

A. No.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                 November 14, 2022

MBE5col1          Reda - Direct          Page 1563

Q. Mr. Bianco, if you could go to the next page and let's enlarge, again, the top third?

Mr. Reda, did you select the figure that is billed for in this exhibit?

A. No.

Q. Do you know how that number was selected?

A. Say that one more time, please?

Q. Do you know how that number came to be selected?

A. No, I don't.

Q. And let's, Mr. Bianco, go to the next invoice and if you can enlarge the top third again?

Mr. Reda, did you select the figure that's reflected in this invoice?

A. No.

Q. Do you know how it came to be selected?

A. No.

Q. Mr. Reda, did you ever add up the numbers in those three invoices?

A. No.

Q. Let's show just the witness and the parties Government Exhibit 1127.

Mr. Reda, do you recognize this to be an e-mail thread from Ethan Cole to you, copying others, sent on November 14, 2014?

A. Yes.

MBE5col1          Reda - Direct          Page 1564

MR. THOMAS: Your Honor, the government offers 1127, again subject to Mr. Markus' statements at side bar.

THE COURT: Very well. It will be received.

(Government's Exhibit 1127 received in evidence)

BY MR. THOMAS:

Q. Mr. Bianco, would you publish that for the jury?

Mr. Reda, I am going to start with the bottom message.

A. Sure.

Q. Mr. Bianco, if we can enlarge that?

Mr. Reda, you write Jared Margolis and Ethan Cole. Do you see you say: When are they going to pay this?

A. Yes.

Q. Why is it that you are following up with Jared and Ethan?

A. First of all, my boss has been -- I know this was on his radar in terms of getting the money in and I addressed it to them because they were -- at least Ethan prepared the invoices, the final versions, and he sent them on to Iconix.

Q. And you mentioned your boss. Just so the jury can keep up, who was your boss at the time?

A. My boss is Mark Caldwell and he was the controller at the time.

Q. The second part of your message you say: The auditors are asking about this.

A. Yes.

Q. Mr. Reda, was that accurate?

MBE5col1          Reda - Direct          Page 1565

A. No. I was just trying to light a fire under them. That's all.

Q. Why is that?

A. Because we wanted the money. I mean, if we invoice something, we should be paid for it.

Q. And Mr. Bianco, if you can go to the top message here?

Mr. Reda, do you see here that Ethan writes you on November 14th that Iconix processed the invoices last week and will get back to us today with a timeline for payment?

A. Yes.

Q. Was this the last time that you interacted with Ethan Cole about these invoices?

A. I don't believe so.

Q. Let's show the witness and the parties Government Exhibit 1137.

Mr. Reda, do you recognize this to be a message from Ethan Cole to you copying Mr. Margolis on December 1, 2014?

A. I do.

MR. THOMAS: Your Honor, once again, subject to the discussion at side bar, the government offers 1137.

THE COURT: It will be received.

(Government's Exhibit 1137 received in evidence)

BY MR. THOMAS:

Q. Mr. Bianco, if you can publish this for the jury? Let's start with the third message on this first page, if you can

MBE5col1          Reda - Direct          Page 1566

enlarge that.

Mr. Reda, do you see here that Ethan Cole writes you on November 20th, 2014: I just wanted to circle back and see if we have received payment from Iconix. Please let me know if I need to nudge them again.

A. Yes.

Q. And did you respond to him?

A. I did.

Q. Mr. Bianco, if you would enlarge the next message?

What is it that you conveyed to Ethan Cole?

A. That a sledgehammer may be more effective than a nudge. And I also said that our auditors, again, are inquiring -- which was not the case.

Q. What do you mean that wasn't the case?

A. They weren't -- the auditors were not asking about this. Again, I just was trying to light a fire under them to get the money in.

Q. And at least as far as you knew, had this money been received by GBG at this point?

A. I am not sure if -- I don't think it was at this time.

Q. And Mr. Bianco, if can you go to the first message?

Mr. Reda, do you see that Ethan Cole writes you on December 1, 2014?

A. Yes.

Q. And he writes: I spoke with Iconix this morning and they

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**                                                          November 14, 2022

---

MBE5col1     Reda - Direct     Page 1567

said that they have made payment for one of the three invoices ($1.9 million) with the others to follow.

Do you see that?

A. Yes.

Q. $1.9 million corresponds to one of those three invoices that we looked at?

A. Yes.

Q. And do you see that Mr. Ethan Cole continues: Please confirm that we have received the first payment as Jared will be with Neil Cole tomorrow.

Do you see that?

A. Yes.

Q. What did you understand that to mean?

A. That we received payment for $1.9 million. He wanted to know if we had received it and, if not, that he would let Jared know.

Q. Is Jared here a reference to a particular Jared?

A. Jared Margolis.

Q. Now, Mr. Reda, I want to pause for a second. You have talked about being an assistant controller.

A. Yes.

Q. Does the controller function see when cash comes in the door at GBG?

A. That's usually a treasury function. They are the custodians of the cash; they record the cash coming in and they

---

MBE5col1     Reda - Direct     Page 1568

record the cash going out.

Q. So, could you explain for the jury how it is that you would learn if a payment had been made or not?

A. They would usually tell me if something was posted and they would ask who does this cash belong to? If it was something that was not -- something that was not the normal accounts receivable process, I would say.

Q. So, Mr. Reda, do I have it correctly that the cash would be received by treasury?

A. Yeah.

Q. Treasury would then alert you in the controller's function?

A. If it wasn't part of the normal AR merchandise process, if this was a non-merchandise receipt and they couldn't match it up to anything, they would come to me.

Q. And at that point, what would you do?

A. I would either -- if I didn't recognize it right away -- I mean, this I recognized right away. If I usually didn't recognize it right away I would ask around. I would try to get the source document and then from the source document I would be able to follow up with somebody.

Q. So let's show the witness and the parties Government Exhibit 1140.

Mr. Reda, do you recognize this message from December 2nd, 2014?

A. Yes.

---

MBE5col1     Reda - Direct     Page 1569

Q. Is this a fair and accurate copy of a message you received?

A. Yes.

MR. THOMAS: The government offers 1140.

MR. MARKUS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1140 received in evidence)

BY MR. THOMAS:

Q. Mr. Bianco, if you could enlarge the table in the middle there and get the "to" and "from" information in the e-mail?

Mr. Reda, can you tell the jury what we are looking at here?

A. That's a statement or a -- a cash receipt statement from the bank.

Q. What's the significance of this to you?

A. That we actually received $1.9 million in.

Q. And Mr. Bianco, if you can enlarge the first message?

Mr. Reda, I realize I misspoke. I think I said you received this message but this is a message you sent?

A. Yes.

Q. What you write to Mr. Margolis and Ethan Cole is: We received the funds.

Do I have that right?

A. Yes.

Q. And then you write: The balance has to be received before year-end or we are going to have problems with the auditors.

---

MBE5col1     Reda - Direct     Page 1570

Can you make this happen? If not, we need to know now so Jason, Ron, and Mark are aware and can exert pressure.

A. Yes.

Q. Who are Jason, Ron, and Mark?

A. Mark is my boss. Ron, at the time I believe was the CFO. And Jason is Jason Rabin.

Q. Let's show the witness and the parties Government Exhibit 1143.

Mr. Reda, do you recognize this to be a message Mr. Ethan Cole sent to you copying others on December 2nd, 2014?

A. Yes.

MR. THOMAS: Your Honor, the government offers 1143, again subject to the discussion at side bar.

THE COURT: It will be received.

(Government's Exhibit 1143 received in evidence)

BY MR. THOMAS:

Q. Mr. Bianco, if you would publish this for the jury? And would you enlarge the first message?

Mr. Reda, do you see that Ethan Cole writes you, among other things: Jared met with Iconix today and the remainder will be sent out this week.

A. Yes.

Q. On what date did Ethan Cole send this message?

A. It looks like he sent it on the 2nd.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                    November 14, 2022

| MBE5col1 | Reda - Direct | Page 1571 |
| --- | --- | --- |

Q. And the "Jared" that is referenced here, who did you understand that to be?
A. Jared Margolis.
Q. Let's show the witness and the parties Government Exhibit 1177 and then 1177-A.
    Mr. Reda, you will have to give us a second, a think the-A file a native file he will have to open. Mr. Reda, while we are working on that I want to follow up on one thing. You mentioned your boss, Mr. Caldwell was it?
A. Yes, sir.
Q. Was the controller?
A. Yes.
Q. What role did he have that was different from you in your role as assistant controller?
A. He more or less interfaced with the CFO and with other executives of the company.
Q. So I think we are ready for 1177-A. Do you see that on your screen, sir?
A. Yes.
Q. Do you recognize this?
A. I recognize it, yes.
Q. And, Mr. Bianco, if you would just click through the tab so Mr. Reda can see them?
    Do you recognize all those tabs, sir?
A. I do.

| MBE5col1 | Reda - Direct | Page 1572 |
| --- | --- | --- |

    MR. THOMAS: The government offers 1177 and the attachment 1177-A.
    MR. MARKUS: No objection.
    THE COURT: It will be received.
    (Government's Exhibits 1177 and 1177-A received in evidence)
BY MR. THOMAS:
Q. Let's stay with 1177-A for the moment. Now that this is published to the jury, Mr. Reda, can you tell them what they are looking at here?
A. I believe that this was a series of payments that GBG or Li & Fung made to the joint venture.
Q. And if, Mr. Bianco, you can click into the receipts tab? What is reflected here?
A. This one I prepared. We had two cash receipts that came in, one on the 17th and one on the 24th.
Q. In what amounts did those receipts come in?
A. $2.4 million and $3.1 million.
Q. And you said they came in on the 17th and the 24th. Of what month did they come in?
A. December.
Q. And, Mr. Bianco, if we can go back now to 1177? Do you see here you are writing Mark Caldwell. Is that your boss?
A. Yes.
Q. What information are you providing Mr. Caldwell?

| MBE5col1 | Reda - Direct | Page 1573 |
| --- | --- | --- |

A. I am providing him a series of -- a breakdown of cash from the -- or payments made to the joint venture, monies received, and I was investigating what this money was for, and then telling them that of the original amounts that we billed, 2.1 related to the Peanuts is still open.
Q. Mr. Bianco, if you could highlight, do you see, Mr. Reda, you say: Iconix is disputing the billing we did for Peanuts. In the third item?
A. Yes.
Q. How did you come to learn that?
A. I believe Ethan told me that in an e-mail.
Q. And the second item, the monies that are received are R5 million and more you write: Investigating what this money is for. Will discuss with Ethan.
A. Yes.
Q. At the time that the money came in, did you know what it was for?
A. No. I didn't.
Q. Let's show the witness and the parties 1178.
    Mr. Reda, do you see this is a message that you sent to Ethan Cole and Jared Margolis on January 6, 2015?
A. Yes.
    MR. THOMAS: The government offers 1178.
    MR. MARKUS: No objection.
    THE COURT: It will be received.

| MBE5col1 | Reda - Direct | Page 1574 |
| --- | --- | --- |

    (Government's Exhibit 1178 received in evidence)
BY MR. THOMAS:
Q. Mr. Bianco, if you can publish that?
    Mr. Reda, do you see that you write: We received the attached money from Iconix with no backup as to what this is for.
A. Yes.
Q. Why is it that you wrote that?
A. Because we received money and I was not aware that additional monies were coming in from Iconix. I didn't know what it was for.
Q. Did the money correspond to any invoices that were in the system?
A. No.
Q. And then you write: When you know the purpose of these payments, is there someone at Iconix I could contact?
A. Yes.
Q. Why is it that you are sending this message and inquiry to Ethan Cole and Jared Margolis?
A. Because they were working with Iconix on these marketing invoices.
Q. And did Ethan Cole respond to your inquiry?
A. I believe he did, yes.
Q. Let's show the witness and the parties Government Exhibit 1180.

# A-915

UNITED STATES OF AMERICA, v.
NEIL COLE,
November 14, 2022

| MBE5col1 | Reda - Direct | Page 1575 |
|---|---|---|

Mr. Reda, do you see 1180 on your screen?

A. Yes.

Q. Do you recognize this as Ethan Cole responding to you, copying others, on January 7, 2015?

A. Yes.

MR. THOMAS: Your Honor, once again, subject to the discussion at side bar, the government offers 1180.

THE COURT: It will be received.

(Government's Exhibit 1180 received in evidence)

BY MR. THOMAS:

Q. Mr. Reda, now that this is published on the screen, can you tell the jury what it is we are looking at?

A. The top part or the bottom part?

Q. Well, why don't you orient us as to the thread in its entirety, if you could.

A. So, we received about $5.5 million -- roughly $5.5 million and I didn't know what this was for, so I had called Ethan and asked him what was this for. And he responded by sending me these invoices that were not in the system.

Q. Now, I want to take that in pieces.

A. Sure.

Q. Mr. Bianco, if you could go to the next page, the beginning of this thread?

Do you see that on January 6th, 2015, Ethan Cole responds to you to say: The first amount received is a lump

| MBE5col1 | Reda - Direct | Page 1576 |
|---|---|---|

sum payment for approximately 16 invoices.

A. Yes.

Q. And then he writes: These invoices primarily relate to showrooms, marketing, and creative work done for Zoo York, Candies, Starter, Rocawear, Danskin, Modern Amusement, Joe Boxer, Ed Hardy, and Umbro?

A. Yes.

Q. At the time that Mr. Ethan Cole sent you this message, were you aware that there were outstanding invoices that related to these companies and those services?

A. No.

Q. Do you see that Mr. Cole writes in the next paragraph: The second amount is related to commercial and financial due diligence in connection with the Middle East and North Africa joint venture transaction?

A. Yes.

Q. Had you known to expect that payment?

A. No.

Q. And, Mr. Bianco, if you can go to the top of this thread?

Do you see in the top message in this document Ethan Cole writes: I'm available to speak now. If not, please see 17 invoices attached. The one titled Middle East DD is for $3.1 million in transaction-related expenses. The other 16 amount to $2.4 million which is the second amount we received from Iconix.

| MBE5col1 | Reda - Direct | Page 1577 |
|---|---|---|

Do you see that?

A. Yes.

Q. And what was attached to this message?

A. There was 17 invoices; 16 related to all of the work that you previously described, all of the detail that you previously described, and this $3.1 million for due diligence.

Q. Mr. Reda, had you any memory of seeing the actual invoices before Ethan Cole sent them to you in this message?

A. No.

Q. Mr. Bianco, if you could go to the attachments?

Now, while that is coming up, Mr. Reda, I wanted to follow up on what you said about invoices being in the system.

A. Yes.

Q. Were these invoices in the system?

A. No, they weren't.

Q. Was it ordinary for you to learn of approximately 17 invoices that were not in the system?

A. Something this large I was surprised. Is that your question, sir? I'm sorry.

Q. Well, if this had happened in the ordinary course, what should have occurred?

A. That the invoices should have been in the system, or at least I would have been aware or somebody would have been aware that these invoices are prepared and that would get into the system ASAP.

| MBE5col1 | Reda - Direct | Page 1578 |
|---|---|---|

Q. And now we have on the screen one of the first invoices attached here at page 4 of the exhibit. Mr. Bianco, if you would enlarge the top third so that Mr. Reda has a hope of reading it?

A. Thank you.

Q. Let's just get the top third of that so we can get the text as big as we can.

Mr. Reda, can you see that now?

A. Yes.

Q. Do you see this is an invoice for the Middle East and North Africa transaction-related expenses?

A. Yes.

Q. Mr. Reda, did you select the amount that was used in this invoice?

A. No.

Q. Did you select the description?

A. No.

Q. Do you have firsthand knowledge of what work, if any, was done that is described here?

A. No, I don't.

Q. And Mr. Bianco, if you could go to the next attachment, page 5, and if we can enlarge the top third?

Mr. Reda, do you see here is an invoice dated December 6, 2014, for Candies Philippines?

A. Yes.

# A-916

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                November 14, 2022

---

MBE5col1        Reda - Cross        Page 1579

Q. Did you select the amount used in this invoice?

A. No.

Q. Do you know how that amount was selected?

A. No.

Q. Did you write the description?

A. No.

Q. Do you know how that description came to be included?

A. No.

Q. And, Mr. Reda, if we went through all the other invoices in this packet, would the same be true of those?

A. The same answer would be the same: Yes.

MR. THOMAS: Nothing further, your Honor.

THE COURT: Cross-examination.

MR. MARKUS: Thank you.

Good morning, ladies and gentlemen, good morning, your Honor, counsel.

CROSS-EXAMINATION

BY MR. MARKUS:

Q. Mr. Reda, hi.

A. Hi.

Q. My name is David Markus. I'm going to ask you a couple questions, OK?

A. Sure.

Q. Let's start where the prosecutor ended off about whether its normal course for invoices to be in the system.

---

MBE5col1        Reda - Cross        Page 1580

Do you remember those questions?

A. Yes.

Q. And you said sometimes -- well, what was your answer? Sometimes they are and sometimes they aren't?

A. I would say that if they weren't in the system, then it was a pretty quick -- we have got cash coming in, here are the invoices. That has happened before. For manual or non-merchandise invoices sometimes there would be a crossing communication.

Q. By the way, it happened quite frequently with Rabin and Margolis on deals that they were involved in, correct?

A. I know nothing about what deals they were involved with.

Q. Well, are you aware that it was pretty normal for you to find out about payments from companies like ABG, Spyder, and other companies that weren't in the system?

A. I don't recall if they were in the system or not. I know what you are referring to but I don't remember if they were in the system or not. But, again, that happened simultaneously.

Q. Right. So, just so that we are clear, and I will just show the witness at this point, your Honor, 1174-A22, if I might, just the witness and the government.

Do you see here an example of an invoice that was not in the system?

A. I don't know anything about that. That's Asia. I have nothing to do with Asia.

---

MBE5col1        Reda - Cross        Page 1581

Q. OK. Let's turn then to 2102-A1. If we can scroll in on the top?

Do you recognize this invoice, sir?

A. I do.

MR. MARKUS: Your Honor, at this time we move in 2102-A1.

MR. THOMAS: No objection, your Honor.

THE COURT: It will be received.

(Government's Exhibit 2102-A1 received in evidence)

BY MR. MARKUS:

Q. We can show the jury.

Mr. Reda, this is an example of an invoice to Spyder brand, correct?

A. It looks like it is to Authentic Brand --

Q. I'm sorry. You are right. At the top, Authentic Brands Group for the Spyder brand?

A. Yes.

Q. And this is for $8 million, correct?

A. Correct.

Q. Big round number, right?

A. Correct.

Q. And this was not an invoice that was in the system, correct?

A. I don't remember.

Q. This was a -- this has nothing to do with Iconix, correct?

---

MBE5col1        Reda - Cross        Page 1582

A. Correct.

Q. This is a totally different company, Authentic Brands Group; right?

A. Yes.

Q. And we are seeing a similar type of invoice that we saw with you and the prosecutor, correct?

A. Correct, but Spyder, if I may, was not in our system. Spyder had their own general ledger and they kept their own set of books. We would just get a trial balance from them every month and -- to include in our records.

Q. So, Mr. Reda, just to be clear, you found out about the payment of $8 million when it hit, right?

A. I don't even recall this money at all.

Q. OK.

THE COURT: Mr. Markus, it is 11:00 so we will break for 20 minutes.

Ladies and gentlemen, don't discuss the case.

(Continued on next page)

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

| MBE5col1 | Reda - Cross | Page 1591 |
|---|---|---|

Q. They charge a lot of money to people; right?
A. I guess. I've seen the bills.
Q. I'm sorry?
A. I've seen the invoices.
Q. And what they do is they go through transactions like you did at that small company to make sure everything is accurate and complete. Correct?
A. Correct.
Q. To make sure the books are right.
A. Correct.
Q. And they would see the payments for these marketing invoices coming in; correct?
A. I don't know if they saw them or not.
Q. Well, that's what an auditor is supposed to do. They're supposed to look at the books; right?
A. They're supposed to look at the books. But GBG was a big company. Whether they selected these invoices or not, I don't know.
Q. I think you said you've been doing this since 1983?
A. Yes, sir.
Q. And with all that experience from doing this from 1983, at the time you were seeing this, real time, these emails, these invoices, these were no red flags to you.
    Correct?
A. No.

| MBE5col1 | Reda - Cross | Page 1592 |
|---|---|---|

Q. In other words, you didn't say. Okay. Whoa. Whoa. We need to call in somebody to look at this. This is a problem. Right?
A. No, I didn't.
Q. Let's take a look at some of the documents the government walked you through and some of the others.
    MR. MARKUS: Your Honor, at this time I'd move in Defense Exhibit 2901 without objection.
    MR. THOMAS: No objection.
    THE COURT: It will be received.
    (Defendant's Exhibit 2901 received in evidence)
    MR. MARKUS: We can show the witness and the jury Defense Exhibit 2901.
    Do you see on the bottom here this is an is being sent from Ethan Cole to Mark Caldwell?
A. Yes.
Q. And Mark Caldwell, as you said, was your boss; right?
A. Yes.
Q. Do you see where he says the invoice should be made out to David Maslaton?
A. No.
Q. Do you know whether he was somebody at Iconix or not?
A. Yes.
Q. And Ethan Cole tells your boss, if you're emailing the invoice, also copy this guy Seth Horowitz. Right?

| MBE5col1 | Reda - Cross | Page 1593 |
|---|---|---|

A. Yes.
Q. There is no mention of copying Neil Cole on this; right?
A. No.
Q. And then if we scroll up, Caldwell is copied there. Ethan Cole copies you into this exchange.
    Do you see that?
A. I think Mark copied me, not Ethan.
Q. All right. It's from Mark Caldwell. He's the one copying you into this exchange. Right?
A. Yes, sir.
Q. Because you were going to prepare those invoices; right?
A. Yes, sir.
Q. You were asked to prepare them.
    And there's nothing wrong with that. Right?
A. Correct.
Q. Now, during the questioning by the prosecutor, we saw a lot of these emails by Ethan Cole; right?
A. Yes.
Q. I guess would you agree with me that Ethan Cole would be the best person to testify as to what Ethan Cole meant. Right?
    MR. RODRIGUEZ: Objection, your Honor.
    THE COURT: Sustained.
BY MR. MARKUS:
Q. Well, you can't testify as to what Ethan Cole meant; right?
A. No.

| MBE5col1 | Reda - Cross | Page 1594 |
|---|---|---|

Q. Only he knows; right?
A. Correct.
    MR. MARKUS: We can take that down. The next email in the chain is Government Exhibit 1108. We would move in Government Exhibit 1108 without objection.
    MR. THOMAS: No objection.
    THE COURT: It will be received.
    (Government's Exhibit 1108 received in evidence)
BY MR. MARKUS:
Q. Now, do you see this email from you and Maslaton and Ethan Cole?
A. Yes, sir.
Q. And this is from September of 2014; right?
A. Yes, sir.
Q. And what you're doing here is you're asking for payment; right?
A. I'm asking when we could expect payment, yes.
    MR. MARKUS: If we scroll down to the very first email in that chain, do you see there where you're emailing David Maslaton and saying: "Check out the attached invoices for marketing costs related to the respective brands"?
    THE WITNESS: Yes.
Q. The invoices at that point had round dollar figures, 2 million, 1 million, and so on.
    Correct?

# A-918

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

MBE5col1     Reda - Cross     Page 1595

A. Correct.

Q. That was no red flag to you; right?

A. No.

Q. There was nothing wrong with that; right?

A. No.

Q. That's something you've seen, not just with Iconix but with a number of other brands. Correct?

A. Up until that point, yes.

Q. And it didn't strike you as unusual; right?

A. No.

MR. MARKUS: Okay. We can take that down.

Q. By the way, you were trying to get immediate payment on these invoices; right?

A. Yes.

Q. What quarter was it at the end of September 2013? Do you remember what quarter that was?

A. That was third quarter.

Q. So you were trying to get paid by the end of the third quarter?

A. By the end of the year.

Q. And if you get it by the end of the year, the books would reflect it. Right?

A. Yes.

Q. For both companies; right?

A. What do you mean by "for both companies"?

MBE5col1     Reda - Cross     Page 1596

Q. In other words, if Iconix sends it to you, it would reflect it on their books that money is going out.

A. Yes. It should.

MR. MARKUS: Let's look at Defense Exhibit 1409. I would move this in again I believe without objection.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1409 received in evidence)

MR. MARKUS: Let's scroll to the top there.

Q. You saw this with the government. Do you remember this email from Ethan Cole to you and Margolis?

A. Yes.

Q. What he's selling you is he's asking you to provide more detail about the emails; right?

A. No.

Q. There's nothing unusual about that; right?

A. No.

Q. In fact, good business people would want to know the specifics of an invoice before paying it out; right?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: I would imagine. It would make payment easier.

BY MR. MARKUS:

MBE5col1     Reda - Cross     Page 1597

Q. And in fact, Ethan Cole then breaks down in the rest of that email how the invoice would be more specific. Correct? Do you see those numbers next to each of the invoices there?

A. I do.

MR. MARKUS: If we could go to the next exhibit in this chain, which is Defense Exhibit 1410. I'd move that in I believe without objection, your Honor.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1410 received in evidence)

BY MR. MARKUS:

Q. If we look at the middle of that email, Mr. Reda, do you see here where you're writing to Mr. Ethan Cole: "As discussed, give them descriptions but don't assign a dollar value to each"? Do you see that?

A. Yes.

Q. Again, nothing suspicious or unusual about not assigning a particular dollar value to the amounts; correct?

A. Correct.

Q. No red flags for you; right?

A. No.

MR. MARKUS: We can take that down. Next is Government Exhibit 1111, which is already in evidence. We

MBE5col1     Reda - Cross     Page 1598

could show the jury and the witness.

Q. You remember this exhibit; right?

A. Yes.

Q. This is the one where Ethan Cole is copying you but sending it to Horowitz and Margolis with the backup material for some of these invoices. Right?

A. Correct.

Q. By the way, he includes this link with a slide deck. I think you said you clicked on it. Right?

A. Yes.

Q. There was nothing unusual about that; right?

A. Unusual? I really didn't know what it meant to tell you the truth.

Q. Right. I'm not asking about the specifics. But nothing unusual about including backup for the invoices. Right?

A. No.

Q. And you're a previous auditor and a CPA. And you didn't say, hey, hey. What's going on here; right?

A. No.

Q. Because you've seen now the invoices change from specific -- I'm sorry. From big, round numbers to specific numbers in the invoices. Right?

A. I did.

Q. And you didn't think that was a problem; correct?

# A-919

MBE5col1      Reda - Cross      Page 1607

A. Yes, sir.

Q. And t his is at the beginning of the year 2015; right?

A. Correct.

Q. And what's going on here, Mr. Reda, is you see money coming into GBG and money going out to Iconix. Correct?

A. Correct.

Q. In other words, the joint venture payments bullet one is money that's been paid to the joint venture -- or to Iconix I should say.

Is that right?

A. I believe so.

Q. And then monies received is money to GBG from Iconix; right?

A. Correct.

Q. And so there's nothing wrong with money going each way between two companies; right?

A. No.

Q. That's not a red flag or a problem.

As a trained CPA and an auditor, you see this all the time, money going back and forth between two companies. Right?

A. Yes.

Q. And that's what you were discussing here, money going out and money coming in. Right?

A. Yes.

Q. Round tripping in any event; right?

MBE5col1      Reda - Cross      Page 1608

A. I don't know what that means.

Q. In any event, nothing wrong with money going out and money coming in. No red flags. Right?

A. No.

MR. MARKUS: Let's go to the next one.

THE WITNESS: But, again, I wasn't involved with the accounting of the joint venture.

MR. MARKUS: I know. I have to follow up with you because the prosecutor has asked you questions about these emails. So I just want to follow up with you on some questions.

THE WITNESS: I just wanted to make that clear.

BY MR. MARKUS:

Q. I know. You had nothing to do with any of these; right?

A. No.

Q. It was Ethan Cole who was the person behind these emails; right?

A. I don't know what you mean by that.

MR. MARKUS: Let's look at Defense Exhibit 1336. I move that in without objection.

THE COURT: Very well. It will be received.

(Defendant's Exhibit 1336 received in evidence)

BY MR. MARKUS:

Q. You see this is an email from Ethan Cole to you; right?

A. Yes.

MBE5col1      Reda - Cross      Page 1609

Q. This is at the beginning of the year; correct?

A. Yes.

Q. And he's making himself available to speak to you; right?

A. Yes.

Q. And do you see here in the third sentence, it says: "The one titled Middle East DD is for 3.1 million in transaction-related expenses"?

Do you see that?

A. Yes.

Q. Are you aware what he's referring to there is $3.1 million in a contract between Iconix and GBG to do the Middle East joint venture agreement?

A. Could you say that one more time.

Q. Do you know what this 3.1 million is for?

A. It says here it's for the Middle East due diligence.

Q. "DD" stands for due diligence; right?

A. Yes.

Q. Are you aware that that $3.1 million was documented in a contract?

A. I became aware of that later on. Here, I did not know.

Q. Later on you became aware that the $3.1 million was in writing. Right?

A. Later on, yes.

Q. And as such, are you aware that accountants, lawyers, auditors would have all seen that in the contract? Right?

MBE5col1      Reda - Cross      Page 1610

A. I would assume so.

Q. And no issues with a $3.1 million payment coming in from Iconix to GBG for $3.1 million. Right?

A. I'm sorry. Could you just repeat that one more time.

Q. Let me make it simple.

This was no secret, was it?

A. No.

Q. Look how many people are on this.

Everybody knew about the 3.1 million. Right?

A. Yes.

MR. MARKUS: We can take that down.

Q. By the way, are you aware that payments for Rocawear Kids continued to be made in 2015?

A. I don't recall.

Q. Do you know what I'm talking about with Rocawear Kids in minimum royalty payments?

A. Yes, I do.

Q. Are you aware that GBG was required under a contract to make minimum royalty payments to Iconix?

A. Yes.

Q. Are you aware of whether those royalty payments continued in 2014 and 2015?

A. I don't remember.

MR. MARKUS: Let me just show you for a moment, and not the jury, Defense Exhibit 2903. If we could look at the

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                November 14, 2022

---

MBE5col1          Reda - Cross          Page 1611

bottom of that.

Q. Does that refresh your recollection as to whether payments were being made with Rocawear Kids in 2015?

A. That's what it says here, yes.

Q. And does that refresh your recollection, sir?

A. Well, I did say we were obligated to pay them. So I'm not sure what you're asking me, sir.

Q. Were payments continued to be made pursuant to that Rocawear Kids obligation in 2015?

A. I believe they were.

MR. MARKUS: We can take that down. Thanks.

Q. Just to finish up, Mr. Reda, I want to be clear. You don't know Neil Cole; right?

A. No.

Q. And you have no firsthand knowledge about the transactions in SEA-1, SEA-2, or SEA-3. Correct?

A. Correct. I did not do the accounting for those joint ventures.

Q. You have no idea whether this was an overpayment, an underpayment, or a fair deal.

Is that right?

A. The joint venture?

Q. Yes.

A. I have no idea.

MR. MARKUS: I have nothing further, your Honor.

---

MBEYCOL2          Laramy-Binks - Direct          Page 1612

MR. THOMAS: Nothing more.

THE COURT: Sir, you may step down.

THE WITNESS: Thank you, sir.

(Witness excused)

THE COURT: Please call your next witness.

MR. LENOW: Yes, your Honor. The government calls Daisy Laramy-Binks.

DAISY LARAMY-BINKS,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: Miss, you may be seated. Please pull your chair up to the microphone and pull your microphone up towards you.

Please speak directly into the microphone and begin by stating your first last and your last name.

THE WITNESS: Daisy Laramy-Binks, D-a-i-s-y L-a-r-a-m-y B-i-n-k-s.

THE COURT: Mr. Lenow.

MR. LENOW: Thank you, Judge.

DIRECT EXAMINATION

BY MR. LENOW:

Q. Good afternoon, Ms. Laramy-Binks.

A. Hi.

Q. Directing your attention to the 2014 timeframe, where were you employed at that time?

---

MBEYCOL2          Laramy-Binks - Direct          Page 1613

A. I was employed at the licensing company working on the Iconix Europe brand portfolio.

Q. What is the licensing company?

A. It was a joint venture between Iconix Brand Group and the licensing company to bring the brands to the European market.

Q. So just to back up for a second.

So there was a joint venture; is that correct?

A. Correct.

Q. And who were the partners in the joint venture?

A. Iconix Brand Group in America and the licensing company in the UK.

Q. And you were employed by the licensing company?

A. Correct.

Q. Let's talk about the licensing company for a bit and get to the joint venture in a second.

What was the licensing company?

A. The licensing company was one of the foremost brand agencies in the UK at the time.

Q. So brand licensing, what does that mean?

A. It's the process by which you take a portfolio of brands and sell them into the local market, selling them and marketing them.

Q. When did you first start working in the licensing company?

A. It was towards the back end of 2011.

Q. Where were you physically located when you had that role?

---

MBEYCOL2          Laramy-Binks - Direct          Page 1614

A. In the London office in West London of the licensing company.

Q. Did there come a timeframe around the period we're discussing here where the licensing company was acquired by Global Brands Group or GBG?

A. Yes. Correct.

Q. Is that around the 2014 timeframe or a little before or after?

A. Correct. Yes.

Q. Now, you mentioned the Iconix Europe joint venture, and I want to ask you some questions about that.

So you said you were employed at the licensing company. Right?

A. Correct.

Q. So explain what you mean by you were working on the Iconix Europe portfolio.

A. So Iconix Europe was a collection of brands, about 25 to 30 brands. And I was focused day to day entirely on that brand portfolio of Iconix brands. I didn't do any work on the licensing company's own brand portfolio.

Q. Who did your salary actually get paid by during that timeframe?

A. The licensing company out of the joint venture. So I was employed by the -- sorry. No. I was employed by the licensing company. So it would have been the licensing company.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                November 14, 2022

MBEYCOL2          Laramy-Binks - Direct          Page 1615

Q. And in that 2014 timeframe, what was your title at the licensing company while you were working on the Iconix Europe portfolio of brands?

A. It was director brand licensing and marketing Europe.

Q. Who did you immediately report to at the licensing company?

A. It was to a lady called Angela Farrugia.

Q. Around that time, Ms. Laramy-Binks, can you describe for the jury the sort of work you would perform on a day-to-day basis as you were severing as the brand director of licensing and marketing for Iconix Europe.

A. So I did everything that was required of me to make the brand successful in the European market. So that included sales or supporting Angela pitching the brands. She was heading that.

I was creating all the pitch decks. I was doing all the marketing activation, everything from photo shoots to PR for the brands. So anything that made the brands more successful in the Europe market.

Q. And how many people at the licensing company were exclusively devoted to Iconix Europe around that time doing this sort of marketing work?

A. Honestly, I don't remember at the time. I think I was one of the few certainly. I might have had an assistant. But generally speaking, it was really myself and Angela spearheading it. I might have had a junior.

MBEYCOL2          Laramy-Binks - Direct          Page 1616

MR. LENOW: Now, Mr. Bianco, can we publish for the jury what's in evidence as Defense Exhibit 1407.

Q. Now, the first page of this document, do you see it's an invoice that says "Global Brands Group" at the top?

A. Yes.

Q. Just backing up, have you and I met prior to your testimony today to prepare for your testimony?

A. Yes. Correct.

Q. So prior to that happening in the last several weeks, had you ever seen this invoice before that?

A. No, I haven't.

MR. LENOW: Let's go down to the next page. Let's pause here.

Q. Ms. Laramy-Binks, have you seen this document that is attached to that invoice?

A. Yes.

MR. LENOW: Let's just page through this document, the next few pages, so the jury can see it and the witness as well.

Q. Ms. Laramy-Binks, describe generally what this is and if you recognize this document that we're now seeing.

A. So this is a document that I would have created. And it was showing the marketing activities and commercial activities that we were undertaking or had undertaken at this point on the Mossimo brand which was on the portfolio, so showing some of the marketing we'd done, the photo sheets we'd done, that kind

MBEYCOL2          Laramy-Binks - Direct          Page 1617

of thing.

Q. So you yourself created this deck?

A. Yes.

MR. LENOW: We can come back to this and take it down for now.

Q. Ms. Laramy-Binks, were you given a budget for your marketing work for Iconix Europe brands in that 2014 timeframe?

A. Yes, I was.

Q. Just kind of giving a rough estimate, what was your total, total annual budget for all of the Iconix brands in Europe around that time, 2014 or so?

A. I couldn't tell you an exact figure. But it would have been in the region of between $250,000 to $400,000 at the most.

Q. Per year?

A. Per year.

Q. And approximately how many Iconix brands were in your portfolio for the Iconix Europe JV?

A. I would say we had 25 to 30 at the most.

Q. And so that $200,000 to $400,000 approximation, that's for all of the brands together for Iconix Europe for a year?

A. Correct.

Q. Was that budget, that total annual budget, was that broken up by brand?

A. Yes, it was. We would have had a sheet that named each brand one by one, and it would have had its own row in the

MBEYCOL2          Laramy-Binks - Direct          Page 1618

activities listed that we would have done.

Q. Were there some brands that there was a higher budget for and some brands that there was a lower budget for?

A. Correct. There was some that we would spend almost nothing or literally nothing on, and some we would have more going on in the market, and we would have spent more against those.

Q. Can you give us some examples of what the brands are where you would have spent on the higher side out of that $200- to $400,000 budgeted?

A. Yes. I think, thinking about the 2014 timeframe, to my recollection, I think Mossimo, Rocawear, I believe even London Fog possibly. There were a couple like that that we spent more.

Q. In terms of those higher spending brands, the higher ranges, what are the kind of average numbers we're talking about for just those higher, the higher tier of spending?

A. I think at the time -- "at the time" I'm saying that kind of 2013 to '15 timeframe -- the more heavily marketed brands would have been in the region of say £50,000 to £80,000 each. But in some instances, there may have been some that exceeded that somewhat. I'm thinking I think Rocawear in one year -- and it might have been '14 -- was in the region of 150,000.

But we had some significant marketing contributions from our partners, our licensees, towards that which would have

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**                                                        **November 14, 2022**

MBEYCOL2          Laramy-Binks - Direct          Page 1619

maybe brought that down to half. And I think Mossimo, again, in 2014, you know, we overindexed them somewhat because, again, we had a major partner on board. But, again, not to numbers outside of the figure I gave you overall.

Q. Understood.

So I want to talk -- I want to ask you some questions about the actual day-to-day work of marketing.

Would you occasionally hire people outside of the licensing company to help with the marketing work?

A. Yes. Things like photographs, make-up artists, things like that, we would, yes.

Q. So when Iconix Europe would -- I'm sorry. Withdrawn.

When you would bring in someone outside the licensing company to do some of this work for the Iconix Europe brands, what was your understanding of where the invoices would go for those outside people coming in? If you paid a photographer, for example.

A. My understanding was that it was paid out of the joint venture, hence the budget we had for the Iconix Europe brands.

Q. And just generally speaking, why is it that? That the joint venture is paying for these expenses.

A. Yeah. Even now I work for Iconix Europe LLC, which is the European portion of our business. It has its own budget. It pays its own costs. It has its own profit-and-loss accounting.

Q. So Iconix Europe JV had its own revenue?

MBEYCOL2          Laramy-Binks - Direct          Page 1620

A. Correct. It has its own revenue.

Q. And it has its own expenses?

A. Correct.

Q. Now, when you did some of the marketing work that's reflected in the slides we saw, which we're going to come back to, did you and others inside the licensing company also yourselves do work as reflected in these slides as opposed to hiring outside people?

A. Yes. I tried to do as much in-house as I could because our budgets were tight. So I tried to be as cost effective as possible. And hence, if there was something that could be done in-house, we did it in-house.

Q. Could you give us some examples of things that you would do in-house that was marketing work.

A. I myself -- I'm Photoshop trained. So I might do a lot of the Photoshopping of imagery. I might do some of the actual what's called CAD designs or drawing the actual clothing designs or T-shirt graphics.

So we would do a lot of work creating documents. So creating making glossy brochures to sell the brands. And we could do all of that in-house or creating brand guidelines, things like that.

Q. So if you did some of that work, Photoshop and you would create images yourself, would you yourself then create an invoice to send to Iconix Europe for the work you had done?

MBEYCOL2          Laramy-Binks - Direct          Page 1621

A. No, because that was part of the salary I was being paid. So, no. I wouldn't do anything like that. The other thing we did was we used the licensing company's creative department. They had a creative department within the company of people who sat two desks down from me. And they could also do a lot of stuff for me. So between the two of us, we could do a lot of stuff to save money in-house.

Q. So when you would go to that creative team in-house, would they create invoices for the work they did and send invoices to Iconix Europe JV?

A. No. That was all considered free of charge. It was using internal resource.

Q. Generally speaking, did you have an understanding the licensing company to get some kind of standard contractual payment for the use of these services -- you doing work, the creative team doing work, things like that?

A. It was my understanding that there was a service agreement as part of the joint venture and that essentially the licensing company -- there was a mechanism.

I wasn't party to the service agreement, but there was a mechanism by which the licensing company was compensated for services it provided to the joint venture, including, for example, financial work, the lawyers that worked on our contracts, creatives, sales. All of that came within the service agreement and was covered essentially. So no one took

MBEYCOL2          Laramy-Binks - Direct          Page 1622

down hours or invoiced.

Q. So there was a contract that provided for set fees or set payments for those services?

A. That was my understanding, yes.

MR. LENOW: Let's go back to Government Exhibit 1407.

Q. I want to ask you about the invoice.

Again, you never -- this invoice is dated September 30, 2014.

Is it fair to say you never saw this invoice around this time or in the several years afterwards?

Is that correct?

A. No.

Q. So this number that's listed here, the approximately $1.9 million -- and there's a description for Mossimo marketing costs related to developing a comprehensive marketing strategy and plan for SEA, design and trend analysis, and comprehensive marketing and position analysis for Europe.

You say your slide deck was attached to this document. Is that correct?

A. Yes.

Q. Ms. Laramy-Binks, in terms of the slide deck that's attached here, what is your kind of maximum rough approximation for the cost of the work that is reflected in that slide deck?

A. I'd have to ballpark looking at it. But I mean it couldn't have been more than something like, you know, 160,000,

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

MBEYCOL2  Laramy-Binks - Direct  Page 1623

something in that region, at the absolute most because, I mean, the biggest cost there was the face, the use of the brands ambassador that you saw. And I know that was sub 100,000. Everything else was small incremental amounts of money. So certainly nothing obviously far beyond that.

Q. So having been the one who created that slide deck, how does the notion of the $1.9 million invoice for what's reflected in the slide deck, how does that strike you in terms of how proportionate it is to work reflected in the attached support?

A. I believe, it's just utterly, utterly out of keeping. I can't see any way you could possibly tie the two. That number is so far in excess of any annual budget that I'd seen at the time across our entire portfolio or indeed have seen since. And our revenue just wouldn't have supported anything like it. So, you know, certainly none of the activities I undertook or had seen undertaken for Mossimo could have even vaguely. It's just ludicrously out of whack.

Q. Ms. Laramy-Binks, at most, what do you think your entire budget for Mossimo would have been around this time in 2014?

What would you ballpark that out?

A. As I mentioned, I know that in this year, we overindexed. We did have a retailer to support that was significant. And I remember there being conversations about that.

But, again, it couldn't have been much more than in

MBEYCOL2  Laramy-Binks - Direct  Page 1624

the region of 150/160 at the absolute most. It just couldn't have been well in excess of that, which, as I said, it's more than some of the average sums we spent, which were to the 50 to 80 mark. But even then, it's just nowhere near a sum like this.

Q. Ms. Laramy-Binks, from your perspective, being the one who was doing this marketing work Iconix here at the time, would it make sense to spend $1.9 million on marketing Mossimo in Europe around this time?

A. It would have made absolutely no sense at all. I know that Mossimo, for example, it was a simple scenario commercially because we had one client, which was Blue Inc, which I think you saw in the documents.

And that one client was forecasting somewhere in the region of, for us, for revenue, at the very top, 400,000 in revenue which I understand to be it was an initial forecast.

So we wouldn't have even assumed we were necessarily going to definitely get that money in. So the thought of marketing at the 2 million level when you're only thinking you're going to get, as an absolute most, 400,000 would obviously make no sense at all.

I mean even in the kind of good old days back then, you might have spent 15 percent on revenue on marketing. Now you spend less. But certainly obviously that is so far in excess, it wouldn't have made sense.

MBEYCOL2  Laramy-Binks - Direct  Page 1625

Q. So in the description, at the bottom line of the description, it talks about analysis for Europe.

Drawing your attention to the two lines above that, it talks about a strategy and plan for SEA.

Ms. Laramy-Binks, did any of the work reflected in your deck reflect to Southeast Asia?

A. No. Absolutely not. Everything you see was done by me in Europe, so in the UK, for the European market but actually really only for the UK market because the retailer, Blue Inc was only present in the UK.

The face we chose, Bluey Robinson, was only really relevant in our market, barely even in Europe, let alone it certainly had no relevance in Southeast Asia. I know for sure the rights we signed for the photo shoots were all for Europe. So none of the materials could have been used outside of the European market.

Q. You mentioned Blue Inc.

What is Blue Inc?

A. Blue Inc was the retailer that was our licensee, our partner, our client. It was a British small retail chain. I can't remember how many doors they have, but maybe 100 doors, something like that, across the UK, a small men's retailer.

Q. They were a licensee for Mossimo?

A. Correct.

Q. They were the only licensee for Mossimo for Iconix Europe?

MBEYCOL2  Laramy-Binks - Direct  Page 1626

A. Correct.

Q. Is that correct?

A. Correct.

MR. LENOW: Let's go through the slides attached here. Let's go to the first page. Let's just pause here.

Q. Who is this gentleman listed or in the photograph on the first page?

A. This is Bluey Robinson. He was an MTV presenter for the UK.

MR. LENOW: Let's go through the next page.

Q. Let's kind of talk through some of what's described here, what's depicted here and talk through how it would have been paid for.

Mr. Bianco, let's please zoom on this page. Let's start on the left. Point 1 "Testimonial." It says: "Bluey Robinson to be the face of Mossimo."

How much do you think you would have paid Bluey Robinson approximately for one year of work around this time?

A. I believe we paid him in the region of £80,000, which I know was split. I remember we normally would pay a face in two tranches, 50 percent up front/50 percent later.

As I recall, this photo shoot actually went across two years. I believe it was maybe 2013 and 2014. So it's probable that half of it would have fallen into one year and half into the other.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

| MBEYCOL2 | Laramy-Binks - Direct | Page 1627 |
|---|---|---|

And I believe we also paid him -- I'm looking at the rest of the slide -- you know, to also do some appearances. So there may have been a few additional costs associated with the appearances. But the main bulk was about 80,000.

Q. So for additional appearances on a given event, like what would the range be of what you would pay Mr. Robinson to show up at a store or to play at a concert or something like that?

A. I think it was between 5- and 10,000. If it was a minor appearance, it might have been free. He might have done it out of goodwill. So if it was to turn up at the store for an hour, he might have done that for free.

If it was do a minor event, it might have been 5,000. If it was play a concert and wear our clothing, it might have been 10,000. But it wouldn't have been more than that.

Q. And these expensed that you described reflected in this deck in the $100,000-plus range, were these for just one year? Or would some of these potentially spread out across multiple years?

A. I think this was spread out across multiple years. And to the best of my recollection, I think this were spread possibly 2013 to '15 simply because, as I mentioned, we were kind of overindexing on what we were spending because this retailer was forecasting big things for the brand. We hadn't really marketed the brand before. So we wanted to get ahead of it and push it. So I think we spread the cost somewhat.

| MBEYCOL2 | Laramy-Binks - Direct | Page 1628 |
|---|---|---|

Q. So that figure you gave of the $100,000-plus number for the value of the work in the slides, that's across multiple years?

A. I believe that may be true, yes.

MR. LENOW: So let's continue looking through these slides, this one slide in particular. Let's keep the zoom in if we can.

Q. So point two listed here, PR and social media.

What kind of expense would have been associated with that sort of work?

A. We generally paid our PR agencies in the region of £2,000 a month to do a brand like this. It may have been a little bit less. So it was a monthly retainer of about 2,000 a month.

Q. And then there is some social media listed and some student guide advertising.

What's your best estimate of the amount that Iconix here would have -- or TLC and Iconix Europe would have spent on those expenditures?

A. We generally spent a couple of hundred pounds a month at the most on Facebook advertising, which was the only advertising I think we did on social media. The student guide, we would have paid as a one-off cost to feature in the guide. I don't remember the exact figure, but it would have been in the ballpark probably of about £1,000, something like that.

Q. And then there's a reference to a press day at Radiator.

What about that? What is that, and what would the

| MBEYCOL2 | Laramy-Binks - Direct | Page 1629 |
|---|---|---|

sort of costs associated with it be?

A. So a press day is when our PR agency would have held effectively a small-drinks gathering. They would have invited all of their press contacts to view the collections at their offices. And they charged us £500 per brand to turn up just to be present at that event so that we could benefit from all the press arriving.

Q. And then turning to point three on this overview of the deck, there is a mention to a face appearance. And I think earlier in your testimony, you talked about hiring the face or paying the face.

What does that refer to? The "face."

A. That would be, again, Bluey Robinson. And that would be what I was referring to before where we would have paid him £5,000 to £10,000 to turn up at a store or a gig to further promote the brand.

Q. And then turning to the NME activation, what is that? The red NME.

A. So NME was a prominent music magazine, and they basically offered us a sponsorship package. It was to sponsor a live music event and tour they were having. It was one significant London-based night of music. And celebrities were coming plus sponsoring some posters for some of the more minor events that they were holding. And we paid £30,000 I recall to just sponsor and have our logo appear and that kind of thing.

| MBEYCOL2 | Laramy-Binks - Direct | Page 1630 |
|---|---|---|

Q. And there's a club night at the bottom.

A. Yes. I honestly don't recall, and I don't think that ever happened. I think that was an idea of something we could have done but didn't go ahead.

Q. And then turning to point four, store launch.

In-store POS and windows, what is that?

A. So that's just saying that our -- hence Blue Inc at the top of the column. It's just saying what our retailer will be undertaking to do rather than us activating. And this was the window displays and printing point of sale, POS, materials in their stores, so putting up posters next to the clothing in their stores.

Q. What sort of costs would Iconix Europe would have incurred for that. The store launch you just described.

A. None. We obviously were providing the photo shoot which we'd already done, but there was no cost to us to do the window displays. And what they did in the store, it was all done by the retailer.

Q. There's an online presence listed under that.

What is that, and what sort of costs would be associated with it?

A. No costs. That was just us encouraging the retailer to promote our brands on their websites and put up banners and that kind of thing.

Q. And there's a trade show listed, Bright Tradeshow.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                November 14, 2022

MBEYCOL2      Laramy-Binks - Direct      Page 1631

A. Bright Tradeshow was a small European trade show, and clearly they were paying for us to attend. Hence, it's under their column of things that they were going to do. It wouldn't have been a lot of money in any case. It was probably something in the region of £7,000 it would have taken, but they were clearly funding attendance.

Q. Okay. There is no check, but I might have just missed it. There is no green checkmark next to that.

What would that suggest to you?

A. It may signify it just didn't happen in any case. It certainly hadn't happened by the time I did this slide, hence the lack of tick. The same with the club night.

Q. And then there's on the bottom hangers and shop fit and give-away product.

What are those, and what sort of costs would be associated with them?

A. So the hangers, neither would have been a cost to us because, as you can see, they're under the Blue Inc partner activation heading. It's something they were doing. They were clearly creating Mossimo-branded hangers in their stores at their own cost.

I had -- We had an idea about giving away some hats at the NME awards because celebrities would be there. We thought it was a good branding opportunity. And they had agreed to provide us with those hats because they were making the

MBEYCOL2      Laramy-Binks - Direct      Page 1632

product, therefore, could fund it.

Q. Ms. Laramy-Binks, I want to walk through the rest of this deck.

But is it fair to say this is a summary of the substance we're going to see in a little more detail later in the deck?

A. Correct. Yes.

Q. So if can kind of just walk us through this, kind of for efficiency's sake. Let's go to the next page. As we go page by page, just kind of explain what we're seeing. We'll just pause here. So one testimonial.

Why don't you start narrating the deck, and we'll just walk through it.

A. So I just did this list as I guess a map of the document. So the first thing I was going to talk about was the testimonial which is what we call the brand ambassador or the face of the brand, which is Bluey Robinson.

MR. LENOW: Why don't we zoom in so we can see the whole page. Let's stop here.

Q. What are we seeing here?

A. So this was the first photo shoot we did with Bluey Robinson at a location that we paid for. It cost us about £10,000. It was part of his, you know, the fee that we had paid him was that he had to undertake the photo shoot.

MR. LENOW: Let's go to the next page.

MBEYCOL2      Laramy-Binks - Direct      Page 1633

Q. What are we seeing here?

A. This was some of the takeup of the video that we'd shot which we shot at the same venue. You can see in the background, it's the same background. We always shoot video at the same time as the photo shoot.

Q. What sort of costs had been associated with that work?

A. It was part of the 10,000 of the photo shoot cost.

MR. LENOW: Go to the next page.

Q. What are we seeing here?

A. So on the left, you're seeing commentary from Bluey Robinson himself and I think his agent just saying they enjoyed the shoot and it was a good day and the team did well, just showing that the client was happy.

And on the right, it's just some flat shots of the products that I think we probably had shot in-house, just very basic, you know, fold it up on a table and shoot it and cut it off just to show the products off nicely.

MR. LENOW: Let's go to the next page.

Q. It's a computer with 40,000 paid views a day.

What's that referring to?

A. So this is our own website which I built. It was just saying that we obviously put our photo shoot on it, and that had garnered 40,000 page views.

Q. What would have been the cost to Iconix Europe been for this?

MBEYCOL2      Laramy-Binks - Direct      Page 1634

A. None, hence why I did it in-house. It might have been £100 for the hosting of the site.

MR. LENOW: Let's go to the next slide. Now we're looking at point two, PR and social media. I think we can go to the next slide. That's kind of like a header.

Q. What are we seeing here with these clippings?

A. This is the press coverage that our shoot was garnering. This would be the output from our retained PR agency where we were paying them 2,000 a month. And they would have, as a result, got this kind of coverage.

MR. LENOW: Let's just keep on paging down.

Q. Is this some more of the same, press coverage?

A. Yes. That's correct.

MR. LENOW: Let's continue down to the next slide, this Twitter slide.

Q. What's reflected here?

A. I think you're seeing two things here. You're seeing our PR agency, Radiator, as part of, again, their retainer, tweeting and doing their work, tweeting about the brand. And you're also seeing organic responses from Twitter.

Q. Beyond the 2,000 month retainer, what would the cost have been for this work to Iconix here?

A. No cost.

MR. LENOW: Next slide. Let's keep on going.

Q. What are we looking at here with the YouTube link?

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                November 14, 2022

MBEYCOL2        Laramy-Binks - Direct        Page 1635

A. This was SBTV, which was, I think, a YouTube channel. They came to shoot a video themselves of Bluey Robinson at our shoot for free. It was an editorial, and it was, again, a result of our PR agency's work.

Q. Let's continue going down, pausing here, this festival guide.

Is that what you referred to earlier?

A. That's correct.

Q. Let's keep on paging down.

And you earlier mentioned sponsoring -- let's go to the next page -- sponsoring an NME music festival.

Are these the slides we're seeing here?

A. Correct. Yes. These are the posters and the banner, the website banner, from the events.

Q. Let's kind of page through these NME slides.

Are these all relating to the NME sponsorship?

A. That's correct, yes.

Q. Let's keep on going.

Is this still the NME event?

A. That's correct.

MR. LENOW: Let's keep on going. Let's keep on going. Just pause here for a second.

Q. Is this still -- we're still looking at the NME awards here with the four hats?

A. That's correct. This was products that our retailer

MBEYCOL2        Laramy-Binks - Direct        Page 1636

provided for us to gift to celebrities at the event behind the scenes.

MR. LENOW: Let's go to the next two pages.

Q. So there's this House of Fraser slide.

What does that refer to?

A. The House of Fraser is a major British department store. And the retailer, Blue Inc, was also wholesaling out to a couple of accounts. This was one of them. So this is just showing the retailer's product on this department store's website and the use of our photo shoot.

Q. What were the costs, extra costs, to Iconix Europe or TLC have been?

A. No cost.

MR. LENOW: Let's keep on paging down. Here we see under the heading store launch some photographs. Let's just pause here.

Q. What is the jury seeing here?

A. So this is a photo on the left of Blue Inc's window display featuring our photo shoots and indeed the poster from the NME awards and our product. And on the right it's an in-store photo of our product.

Q. What would the cost have been to Iconix Europe for this expense?

A. No cost to having either. We obviously had provided the photo shoot as I mentioned before. And I believe we also

MBEYCOL2        Laramy-Binks - Direct        Page 1637

provided the photo backdrop on the right behind the clothing at some nominal cost. It was from a stock photo site. So there was a nominal cost in acquiring that photo. But otherwise, it was a free application.

MR. LENOW: Let's keep on paging down.

Q. Here we see talk about some light boxes.

What do those relate to?

A. Light boxes, the illuminated poster in the retailer. And the window was the image they used in the window display. It's just saying what Blue Inc puts in store to show off the brand.

MR. LENOW: Let's page down.

Q. This is a similar summary slide to what we saw earlier.

Is that fair?

A. That's correct.

MR. LENOW: Let's just keep paging down.

Q. This slide with Bluey Robinson again, what is being reflected there and the photo shoot below?

A. This is the update on our talent. So it's saying what's happened, you know, with him in the market. We obviously like to keep an eye on what the celebrity has been doing and any newness that we can benefit from.

And in this case, we're saying he had a new album or a new single. He's still working with MTV for another year. We're just saying this is the kind of stuff he's doing. And the photo shoot is the second photo shoot that we had done as

MBEYCOL2        Laramy-Binks - Direct        Page 1638

part of his contractual initial fee.

Q. And the photo shoot approximately would have cost approximately what?

A. Again, about 10,000.

MR. LENOW: Let's page down and to the end of this exhibit.

Q. This is a YouTube video. Can you just describe for the jury what that is.

A. The same as the other one. This would have been a behind-the-scenes video that we shot during the photo shoot as part of the £10,000 expenditure.

MR. LENOW: And just paging down.

Q. Just describe what the jury is seeing with these various clothing items at the top. And then at the bottom there's a mention of some sort of fragrance shop item.

A. So the clothing is a clothing range that I had actually designed myself for that retailer, for Blue Inc. They wanted some neon and kind of camo clothing. So I just designed that in-house, and it was just showing the latest range that would be going on sale, which I think you can see Bluey wearing.

And the fragrance, as part of Blue Inc's licensing agreement, they had the right to produce a fragrance so they could sell it next tills. And they also ended up wholesaling it to the fragrance shop as part of that.

So the fragrance was made by Blue Inc. It was sold to

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                        November 14, 2022

MBEYCOL2          Laramy-Binks - Direct          Page 1639

the fragrance shop. And here it's also saying it was gifted to our talents as well and he mentioned it on social media.

Q. What would the cost have been to the licensing company to do this work?

A. No cost for either.

MR. LENOW: Just paging down. Look at the next few slides.

Q. There are some headphones here.

Just describe what these are and how much it would have cost the licensing company.

A. This headphones I don't recall particularly well. Obviously we didn't make product. So either a headphones company on behalf of Blue Inc for Blue Inc themselves would have decided to try and make him some headphones.

I don't believe they were ever commercialized. But there would have been no cost obviously to that to us. It wasn't a project that we were involved with. It was just showing that headphones existed for the brand.

MR. LENOW: And then paging down to the next several pages. I think we're coming to the end here.

Q. This shoot competition and post-shoot activities, what does that relate to?

A. This looks like a shoot competition that we just ran on social media just saying to our Bluey fans, you know, what should he do on this shoot, just to drive engagements.

MBEYCOL2          Laramy-Binks - Direct          Page 1640

It's just a way of us reaching out to our fans on social media as regards to the shoots and trying to use his fame to get some engagement. I think it's just saying that after the shoot, on the day of the shoot, we had some press turn up and interview him, including SBTV, which you saw earlier.

MR. LENOW: Let's page through the next three slides. We're seeing a press day, pausing there.

Q. Is that the same press day you referred earlier in your testimony?

A. It could have been the same one. It could have been the following season. Again, seasonally, they would charge us 500 per brand. So it was something we commonly did each season.

MR. LENOW: Paging down.

Q. Here we're seeing a Bluey in-store visit, page in-store visit. Let's go to that page and the next page.

What is this referring to?

A. So I know at TLC we obviously were at the time discussing for Bluey to turn up and do almost a personal shopping trip within Blue Inc to create some buzz. I don't remember whether it happened or not.

And we're here, we're talking about him doing a performance in a cafe in London and putting some products around, which was the kind of event I was talking about earlier when I said we would spend, you know, 5,000 to come do another

MBEYCOL2          Laramy-Binks - Direct          Page 1641

minor event after the shoot just to keep the engagement happening.

Q. And then just paging down some more, is that a reference to a right of AMA with Bluey and some other events?

A. Yes.

Q. What would the costs there be to TLC to license a company for that sort of work?

A. So for things like Reddit, there wouldn't have been any additional costs. That would have been what was expected within his initial contract.

Q. Paging down to this PR new ambassador product plan, what is this sheet and who created it?

A. So this would have been created as part of my document. And I think it was just ideas of what we could do for the following season or the following year. Given where we were already at, this is what the PR agency thinks we should be working on.

And we could keep him. So it says Bluey Robinson has been paid to stay with us until spring/summer '15. And then we'll think about next peoples. It's just starting to think about what we should do next for the brand.

MR. LENOW: And then go to the last two slides of this deck. Pausing here.

Q. Can you give us a very general description of what this reflects and whether the licensing company paid any money for

MBEYCOL2          Laramy-Binks - Direct          Page 1642

them.

A. Yes. This wouldn't have any costs attached to it. This is just two examples of two different manufacturers. Visage is one, and Inspirational Threads is the name of another manufacturer who has designed some T-shirts and tops to basically pitch for Blue Inc's business.

So a retail like Blue Inc doesn't tend to produce their own clothing. They go to suppliers who would design and manufacture for them. These would have been two that we knew who would have said something along the lines of would you be happy for us to design a range to pitch to them to see if they would be willing to buy it. We included it in the deck just to see if there would be some new product interest.

MR. LENOW: We can take that down.

Q. So just to summarize, Ms. Laramy-Binks, in total, what would you say the total cost to TLC, what was reflected in this document was and the highest reflected?

A. Again, this is an estimate. But I don't think it would be more than 150/160 at the most.

MR. LENOW: Can we put up for the witness Government Exhibit 409.

Q. Ms. Laramy-Binks, do you recognize this document?

A. Yes.

Q. Have you reviewed it prior to your testimony today?

A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                November 14, 2022

MBEYCOL2        Laramy-Binks - Direct        Page 1643

Q. What is it?

A. This is a summary of kind of the good work that we had done to date. I think it covers three years that we had covered for our brands.

MR. LENOW: The government offers Government 309.

THE COURT: It will be received.

(Government's Exhibit 309 received in evidence)

MR. LENOW: Can we publish that for the jury, please.

Q. Now, Ms. Laramy-Binks, look at this first page of this document.

Do you see where it says Iconix Global Brands Group update?

A. Yes.

Q. Could you explain why it says Group Brands Group update.

A. I believe that was because Iconix had requested to see the deck to update the Brands Group, someone senior at that group.

Q. Who would you have provided this directly to? In normal practice.

A. To Angela Farrugia who would have been my boss.

Q. Do you have an understanding that Angela was in turn interacting with others at GBG hiring new executives?

A. Correct.

Q. Let's just kind of page through this document, and if we could just go through. We're not going to go through as much detail as last time.

MBEYCOL2        Laramy-Binks - Direct        Page 1644

MR. MARKUS: No objection.

THE COURT: Very well.

MR. LENOW: We'll just page through.

Q. Can you just describe the brand.

What brand are we seeing here?

A. The Ed Hardy brand.

Q. So create to this document, how would this have come about?

A. So Ed Hardy is a brand that needed a lot of repositioning work before it was a kind of appropriate for the European market for sale and before partners would have been wanting to buy the rights from us at the time. So, you know, we really put our heads together and said how can we make the brand really appealing.

And from a graphic designing standpoint, we wanted to take the kind of clean, fresh design approach using graphics from the brand graphic archive of Ed Hardy. So I had gone to the creative department at the licensing company and said, could you guys help me out in mocking up or creating kind of invented visual that would show off the brand in a way that it would best appeal to the retailers in the market. And this was the work that they did to show the brand.

Q. What would the cost have been to TLC to do this work?

A. None. It would have been us.

Q. Let's start paging this document.

Just pausing here.

MBEYCOL2        Laramy-Binks - Direct        Page 1645

Can you just describe how these images would have been created for Ed Hardy.

A. You can see in the title it says "Photo Shoot Mockup."

What we're trying to show here is what an eventual photo shoot for the brand could or should look like. So the creative team, again the licensing company's creatives, at the same time, the same kind of period work, would have downloaded these images from Google from another brand, which is common for internal-use only documents that aren't actually being printed out there and need rights.

And they would have Photoshopped, mocked them up, putting on the graphics that you can see the tiger prints, for example, on the bags. Those were Photoshopped on the original imagery, again, just so that we can show in our Brandex to our partners this is the kind of photo shoot and the kind of caliber of visual that could be done with Ed Hardy.

MR. LENOW: Let's keep on paging through the remainder of the Ed Hardy slides. Just keep on going. Keep on going. Just pausing there.

Q. Those Ed Hardy slides, the ones we've just seen, what would you assess the cost to TLC being from the slides we just reviewed relating to Ed Hardy?

A. None. It's all in-house work.

MR. LENOW: Let's now skip to page 22 of this document. I'm sorry. Let's actually skip to page 51.

MBEYCOL2        Laramy-Binks - Direct        Page 1646

Q. Let's just look through the next four pages here. Let's start with this one, Joe Boxer: "Clean up look and feel of brand. Overcame copyright issues. New PR push."

What does this slide reflecting?

A. Clearly this is just the work that we've been doing on the Joe Boxer brand to date. So we had made it look more, you know, cleaned up and fresh like we'd done on Ed Hardy just making it more appealing as a brand to the European market.

We had overcome copyright issues. We had a copyright issue with a company called The Smiley Company who owned the IP for a smiley face essentially, which was part of the Joe Boxer U.S. branding. So we found a way around that essentially, and we started to push the brand with a PR agency.

MR. LENOW: Let's go to the next page, just pausing here.

Q. So on the right-hand side, it says: "Removal of a smily face logo for clarity of brand, also copyright issues with Smiley World Corp."

Is that what you're referring to?

A. Yes.

Q. The next line: "Introduction of the boxer dog logo which lends itself perfectly to brand," what are you referring to there?

A. So we wanted to come up with a graphic device that could be used outside of the Joe Boxer logo word mark that you can see

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                      November 14, 2022

MBEYCOL2          Laramy-Binks - Direct          Page 1647

in the top right corner. In the absence of smiley face you can see on the back left, which is what the U.S. were using and which we were unable to use due to a copyright issue, as I say.

So obviously, due to the "boxer" wording, we thought a boxer dog logo would be good. And we trademark checked it, and it was feasible for use. So that's what we decided to use instead.

BY MR. LENOW:

Q. Just to pause here for a second and focus on this boxer dog logo, can you describe for the jury specifically how this idea for the boxer dog logo came about.

MR. MARKUS: Objection. Leading.

THE COURT: I'll give some leeway.

THE WITNESS: So simply we went into a meeting, and we had a five-minute chat saying what could we use as an icon instead of a smiley face because we needed something graphic to put on underwear because they tend to do prints, graphic prints. And we thought of the word "boxer," "boxer dog." And instantly thought of a boxer dog, and I think we just Googled it, and thought that will do.

MR. LENOW: Let's now take this down and go to Government Exhibit 241, and let's go to page 38. Let's go to the prior page actually to start, page 37.

Q. Do you see this invoice here --

Can we go to the top, Mr. Bianco.

MBEYCOL2          Laramy-Binks - Direct          Page 1648

Do you see this invoice here for Joe Boxer in the amount of approximately $196,000?

A. Yes.

MR. LENOW: Let's page down to the next several pages, just pausing there.

Q. Ms. Laramy-Binks, do you recognize -- first of all, have you seen -- prior to us meeting in preparation for this trial, did you ever see that invoice before?

A. No.

Q. And you've seen that invoice in preparation in the last week or so; is that correct?

A. Correct.

Q. Now, these slides show that are attached, the Joe Boxer slides, do you recognize those?

A. Yes.

Q. What are they?

A. They're the same slides we just went through which I had done to show the work we'd been doing on Joe Boxer.

MR. LENOW: Let's just go through the next several pages here. Mr. Bianco, let's pause here.

Q. And the new style guide, put new brand into effect. And the slide below it, various individuals, how much money was spent by TLC on that work?

A. None. The top document was done in-house by the creative department with me, and the bottom part was just faces I found

MBEYCOL2          Laramy-Binks - Direct          Page 1649

off Google that I thought would be good.

From, you know, Googling their profiles and their look, I thought would be good faces. We tended to recommend to potential clients the kind of faces they could use, and this was just an example.

MR. LENOW: Let's go back to that Joe Boxer invoice, and I have several questions about that.

Q. Ms. Laramy-Binks, just remind the jury:

What was the total cost to TLC of the work reflected in those four Joe Boxer slides we just saw?

A. There was no cost to the licensing company.

Q. So in terms of this invoice amount and its proportionality to the work reflected, what's your view on that?

A. It's completely out of -- it's completely out of keeping. As I mentioned -- yeah. It's completely out of keeping. The things mentioned each had zero cost. They were all in-house executions.

MR. LENOW: Let's now go to page 10 of this document, 241. Let's go to the slide before this here.

Q. Now, do you see this invoice here, Ms. Laramy-Binks, for $225,000 for Starter Black?

A. Yes.

Q. And do you see where it says underneath for Starter Black cost related to fee for use of marketing materials and brand assets in USA?

MBEYCOL2          Laramy-Binks - Direct          Page 1650

A. Yes.

MR. LENOW: So let's look at the backup that follows this invoice. Just stopping here.

Q. Do you recognize these supporting documents that follow the invoice?

A. Yes.

MR. LENOW: Let's just page through them one by one, and then I'll just follow up with some questions once we've looked at all of them together. Keep on going. Keep on going.

Q. Who is this individual listed on the right-hand side?

A. This is a model called David Valensi who we hired for the Starter campaign.

Q. Approximately how much would you estimate you spent on him?

A. I mean, it wouldn't have been more than 5,000. But he himself is probably less than that.

MR. LENOW: Keep on going down on the slides. Keep on going down. There's a mention of Twitter. Now we see a mention of -- there is some website contents. Just pausing there.

Q. What is this website content mentioned here and mention of a brand bible?

A. A brand bible was documents that we would have created, as you can see there under the contents, of every way in which a licensee should correctly use our brands and our logos, the correct fonts to use, all of that kind of stuff.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

MBEYCOL2          Laramy-Binks - Direct          Page 1651

And the online guidelines similarly were the rules essentially for using our brands online. So don't cut the logo in half, that kind of basic rules.

MR. LENOW: Let's just keep on paging through this. Let's go down. Pausing there.

Q. We see some photographs with the word "JD" on it.
Do you recognize what that is?

A. Yes. This was when the Starter Black Label brand entered JD Sports, which was one of the largest, most successful sports retailers in Europe. And it entered. It had great positioning, great point of sale, visuals, the logo shown. And it was a big moment for us.

Q. Was there any cost to TLC associated with this store selling this brand?

A. No. Our licensee put it into the store with their products obviously. And the store would have funded, you know, all the points of sale. Nothing to do with us.

MR. LENOW: All right. Let's just keep on paging down. Keep on going through this deck. Just continuing on. Keep on going. Keep on going. Let's pause over the last slide.

Q. So, Ms. Laramy-Binks, can you just summarize for the jury --

Let's go up to the last slide, Mr. Bianco --

Does the work we've just seen relating to Starter

MBEYCOL2          Laramy-Binks - Direct          Page 1652

that's attached to this invoice, what are the sort of things we just saw that TLC would have actually incurred expenses for?

A. The photo shoot, but obviously the models here featuring in these images are a photo shoot that we did which would have included the cost of the models themselves.

What you're seeing on this slide, the launch event that we did for a particular brand collaboration with a brand called Clements Ribeiro. They're featured in that shoot. Everything else you've just shown me -- online brand guidelines, brand guidelines, all of that would have had no cost. So just the photo shoot.

MR. LENOW: So looking at that invoice amount -- let's just go back up to it, page 9 I believe it is?

Do you have a view on the relationship between that figure there for Starter Black listed, $225,000, and the marketing support that you did in terms of how much it cost, whether that's proportional?

A. Yes. It's absolutely nowhere close. The one photo shoot -- and I think you saw that the launch events support that photo shoot with that brand collaboration might have been in the region of £20,000 maybe, and that was it.

Q. And when that sort of expenses came into TLC, who did the invoices go to?

A. To the joint venture.

MR. LENOW: Judge, I think now would be an appropriate

MBEYCOL2          Laramy-Binks - Direct          Page 1653

time for a break.

THE COURT: It is. It's ten minutes before the hour. We'll break for 20 minutes. Don't discuss the case.

(Continued on next page)

MBEYCOL2          Laramy-Binks - Direct          Page 1654

(In open court; jury not present)

THE COURT: Ms. Laramy-Binks, you may step down. Everyone can be seated.

(Witness temporarily excused)

THE COURT: Anything to raise?

MR. LENOW: Nothing, Judge.

MR. MARKUS: How much longer do you anticipate?

MR. LENOW: I think about 20 minutes, Judge.

THE COURT: Okay.

(Luncheon recess)

(Continued on next page)

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                      November 14, 2022

MBEYCOL2          Laramy-Binks - Direct          Page 1655

AFTERNOON SESSION
1:10 p.m.
(In open court; jury present)
THE COURT: Everyone please be seated.
Mr. Lenow.
MR. LENOW: Thank you, Judge.

Q. Ms. Laramy-Binks, I want to go back to Government Exhibit 241 where I think we left off.

Specifically let's turn to page 10 of this document.

Now, Ms. Laramy-Binks, we looked earlier at Government Exhibit 409. That was kind of a colorful slide deck you put together.

Do you recall that?

A. Yes.

Q. And these kind of black-and-white versions that we've reviewed now, what is the relationship between these black-and-white versions that are appended to these invoices in Government Exhibit 241 and the more colorful versions that you identified as your slide deck in Government Exhibit 409?

A. I would assume they're the same pages.

MR. LENOW: Mr. Bianco, could we stay on this page and turn to the right of the screen, and then let's put up on the other side of the screen Government Exhibit 409 and go to page 35.

Q. Ms. Laramy-Binks, having this up on the screen, are you

MBEYCOL2          Laramy-Binks - Direct          Page 1656

able to determine the relationship between those black-and-white versions that we've looked through and then the color version in Government's 409, at least for the Starter slide?

A. It looks like a photocopy of the original.

MR. LENOW: Let's just go to the next page of each of these documents just to see what follows. It's the same thing on Government Exhibit 241.

Q. Ms. Laramy-Binks, what appears to have been done with your version of this document with respect to this invoice?

Does it appear to have been placed behind the invoice?

A. Yes, it does.

MR. LENOW: We can take 409 down, and let's continue with 241. Let's go to page 63 of this document, please. We can just do one image at a time.

Q. So do you see this invoice for Rampage in the amount of approximately $201,000?

A. Yes.

Q. And it says: For Rampage to Global Brands for invoice. Costs related to creation of brand assets, including style guide and brand bible.

Do you see that?

A. Yes.

MR. LENOW: Let's look at the next page after this. Mr. Bianco, let's simultaneously put up next to this

MBEYCOL2          Laramy-Binks - Direct          Page 1657

actually -- let's put Government Exhibit 409 back up. And let's go to page 48, just so we have them side by side.

Q. Ms. Laramy-Binks, does this appear to be any similarity between these two? The black-and-white version attached to the invoice and the color version in your deck.

A. Yes. They look the same.

MR. LENOW: And let's keep that color version up there. Just page through the black-and-white one. Let's look through the next several pages. Let's keep on going. All right. Just pause there. We don't have to get to the next invoice.

Q. Ms. Laramy-Binks, these three pages of Rampage marketing work, what would you say that the work reflected here cost? What would be your best estimate of how much it cost TLC, the licensing company, to do?

A. It cost nothing. It was all done in-house.

Q. So, Ms. Laramy-Binks, based on that, let's go back to the invoice. Let's go up two or three pages here.

As the person who actually did the work that's appended to this invoice, what is your view on the proportionality between the amount of the invoice, $201,000, and the actual work that's reflected in the attached slides?

A. As the work cost nil, it's obviously completely out of proportion. The work was done -- I simply asked the creative team to just put together something that helped me sell the

MBEYCOL2          Laramy-Binks - Direct          Page 1658

brand as a casual request. So it had no cost to it.

Q. Does it make any sense to you that Global Brands Group would be sending Iconix an invoice for Rampage in the amount of $201,000 approximately?

MR. MARKUS: Objection your Honor.

THE COURT: Sustained as to form.

BY MR. LENOW:

Q. Based on your work at TLC, did you believe that your work would be attached to an invoice and sent to Iconix Brand Group from Global Brands Group?

A. Absolutely not.

Q. Why did you believe that wouldn't occur?

A. Because, as I said, it was simply something I requested for them to do casually to help me with my pitches. And we made those documents all the time, whether it was just in PowerPoint.

Or in this case, it was done in a format that we could print. So it was done in a slightly more high-falutin way. But I made those kind of requests all the time. It was just part of my day-to-day of my job. I would never have expected it to having a cost attached to it.

Q. Were you ever aware of any of your work being -- of an invoice being sent to Iconix for the work you performed?

A. No.

Q. And even if you had hired an outside contractor to do some

# A-932

| MBEYCOL2 | Laramy-Binks - Direct | Page 1659 |
|---|---|---|

of this work and there had been some cost to TLC associated with it, where should that invoice have been directed under the Iconix Europe JV structure?

A. To Iconix Europe, to the JV.

Q. Not to Iconix Brand Group?

A. Correct.

MR. LENOW: All right. Let's now turn to page 57 on 241. Let's keep these both up at the same time so we can do the side-by-side. But on Government Exhibit 241, let's go to page 57. On the right-hand side, Government 409, let's go to page 56 of Government Exhibit 409, the color version.

Let's just start on the left-hand side here with this invoice.

Q. Do you see where it's an invoice from Global Brands Group for Danskin costs related to rebranding campaign DTR roll-out plan and design work. And the cost listed is $238,000?

A. Yes.

MR. LENOW: Let's go to the next page of this document. Pausing here.

Q. Ms. Laramy-Binks, do you see any relation, apparent relation, between the document on the right, the page on the right and the page on the left?

A. Yes. They're the same.

Q. What appears to have been done with your slide deck?

A. I think it's been photocopied.

| MBEYCOL2 | Laramy-Binks - Direct | Page 1660 |
|---|---|---|

Q. And added to the invoice?

A. Correct.

MR. LENOW: Let's now on the left-hand side, let's just page through pages 56 through 60 just to kind of see the Danskin documents attached there, pausing there.

Q. Ms. Laramy-Binks, looking at those, the documents we just looked through --

Let's go back to the invoice --

How does the work there reflected compared to the amount of the invoice, in your view, of approximately $238,000?

A. Again, it's just dramatically out of keeping. The work there that you see is largely at no cost. We did one photo shoot, which you can see on the right, which again would have had a nominal value in the region of 10/15,000 at the very most.

Everything else that I saw you scan through -- product designs, I think it said it there on the slide -- it said it was done by Ghostforce for which was our DTR, our direct to retail licensee or partner. They did it. I didn't see anything else there that carried any cost even close.

Q. So based on that, does $238,000 seem an appropriate approximation of the work in question?

A. No. It's completely out of keeping.

MR. LENOW: Let's now go to page 69 of Government Exhibit 249, the black-and-white document. On the

| MBEYCOL2 | Laramy-Binks - Direct | Page 1661 |
|---|---|---|

right-hand side, the color document, let's go on this document to page 22.

Q. So let's start with the left-hand side, the black-and-white document.

Do you see where it says it's an invoice dated December 10, 2014, from Global Brands Group to Iconix. It says for Rocawear Black and BK Own. Costs related to brand extension campaign, style guides and brand assets, Rock BLK and BK own. $310,000.

Do you see that?

A. Yes.

MR. LENOW: Let's zoom out and page through the next dozen or so slides on the black-and-white document just for the jury and everyone to see, just pausing there actually for a second.

Q. Does there appear to be a relationship between your color deck on the right for Rocawear and the black-and-white images appended to this voice?

A. Yes. They seem identical.

MR. LENOW: Now let's page through that Government Exhibit 241, the black-and-white version, so everyone can see.

Q. Ms. Laramy-Binks, is it fair to say that prior to your testimony today, you reviewed this document, the black-and-white one?

A. Correct.

| MBEYCOL2 | Laramy-Binks - Direct | Page 1662 |
|---|---|---|

Q. As we're paging through this, just to ask, that number that we saw for Rocawear for $310,000, how does that compare to the work reflected in these Rocawear slides in terms of whether that approximates the costs or not?

A. It doesn't. I would say, at a minimum, it's over double approximately.

Q. Were there some expenses, some outside expenses, that were incurred for the Rocawear brand for this marketing material?

A. There were. This is the one that I was referring to earlier when I said the Rocawear brand, not Rocawear Black, Rocawear brand and Brooklyn's Own, but mainly Rocawear specifically, was one of the brands we spent more on.

However, as I said, we also got a significant contribution from our partners at the time. I believe we had three partners, possibly two, paying central marketing funds, as in, contractually, they had a percentage of their sales that they had to pay to us as marketing that we would spend.

So whatever amount we committed in the budget, we knew we would be reimbursed significantly. And to my recollection, whatever sum we agreed to spend for all of this, probably at least half, as I recall it, at least half came back to us.

Q. And those partners would be who? The licensees?

A. Correct, yes.

Q. Not Iconix?

A. No.

UNITED STATES OF AMERICA, v.
NEIL COLE,                                              November 14, 2022

MBEYCOL2          Laramy-Binks - Direct          Page 1663

Q. Not GBG?

A. No.

Q. But the licensee, the person who was actually selling the product in stores?

A. Correct.

Q. So this invoice, the $300,000, the expenses here would reflect about half in reality?

A. That would be prior to those contributions coming in. So, again, my recollection, I suspect that these costs may have gone across more than one year.

But I think this was one of the brands where the actual expenditure level was reasonably high for us because, as you saw, we had a number of ambassadors that we were using.

Those ambassadors were from 2012 onwards. But I think there was an expenditure level of something in the region of $150,000. But we then got, as I say, at least half of that back from the partners.

Q. So licensing companies costs for what's reflected in these slides you would estimate around say like a fourth of the $300,000 reflected in the invoice?

A. Right.

Q. Is that fair?

A. Yes. Taking into account the licensee contributions.

Q. And the work you described, was this over just one year? Or was it over the course of multiple years?

MBEYCOL2          Laramy-Binks - Direct          Page 1664

A. I believe this covered -- it's scrolling quite quickly. But I believe this was covering the Challenge Perceptions campaign. And that campaign had three faces attached to it. And those three faces were shot from 2012, and the final one was shot in '14, but it was actually going through into the '15 budget.

Q. That's all work reflected in these documents?

A. Correct.

Q. Some of it going back to 2012, so two years before this invoice?

A. Correct.

MR. LENOW: Now turning to -- if we can take -- on 241, let's go down to page 23. I'm sorry. 241 is the black-and-white one. Let's go to page 23. And then for the color version, let's go to page 3.

Q. And comparing these documents, do you see any similarity between them, Ms. Laramy-Binks?

A. They look identical.

MR. LENOW: Let's page through on the left the Ed Hardy work reflected in these slides. I think you talked about some of this earlier.

Q. This was some of the stuff you did yourself, the images we just saw?

A. The one above was done by the creative team and the licensing company.

MBEYCOL2          Laramy-Binks - Direct          Page 1665

Q. By TLC?

A. Correct.

Q. Does the work reflected here come anywhere near approaching $336,000?

A. No.

Q. What's your estimate for, just looking at the Ed Hardy work reflected here, the maximum amount that the licensing company would have been out of pocket for this?

A. Just watching it scroll one more time. I haven't seen anything on those slides that had any costs attached to it.

MR. LENOW: We can take both of these documents down.

And, Judge, at the present time, I'd offer Government Exhibit 1145 and 1147 which were discussed previously with the Court.

THE COURT: Those exhibits will be received.

(Government's Exhibits 1145 and 1147 received in evidence)

BY MR. LENOW:

Q. Ms. Laramy-Binks, I'm going to publish now Government Exhibit 1145.

Let's go down to the bottom most email of this on page 3. Let's pause there.

So, Ms. Laramy-Binks, looking at this email dated December 2, 2014, from Daisy Laramy-Binks to Inam Shah, do you see that?

MBEYCOL2          Laramy-Binks - Direct          Page 1666

A. Yes.

Q. Who is Inam Shah?

A. I believe his title was CFO. He was the head of finance of the licensing company at the time.

Q. And do you see the subject is "Jared?"

Do you see that?

A. Yes.

Q. Have you heard that name in connection with a GBG executive before?

A. Yes. I didn't know him, but I knew the name Jared. And I believe I had seen him in passing. I believe he held something akin to a town hall when the merger first happened.

Q. The merger between GBG and the licensing company?

A. Correct.

Q. On this email, do you sow where it says: "Hi, Jared. I do hope the below is helpful. Key brand turnaround summaries. See images and attachment by way of example."

Do you see that in that email that you wrote?

A. Yes.

Q. What are key turn around summaries?

A. A large part of what we did on these brands was turning them around as in making them more saleable and more attractive versus their current market perception, to make them more saleable for the European market. A lot of them had been -- Ed Hardy had been through a period of difficulty in the market.

**A-934**

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

| MBEYCOL2 | Laramy-Binks - Direct | Page 1667 |
| --- | --- | --- |

So these were some key -- key focused summaries of some of the work that we had done to reposition those brands for the European market.

MR. LENOW: Mr. Bianco, can we please put at the same time as this document -- let's put it right next to it -- Government Exhibit 409. Let's go to page 3 of that document. Actually just pausing.

Q. Do you see on the front cover it says Global Brands Group update?

Do you see that?

A. Yes.

MR. LENOW: Let's go to page 3 of that color document. We can pause there.

Q. In your email, Ms. Laramy-Binks, you say: "See images and attachment by way of example."

What sort of images relating to brand turnaround would you have had around this time in December of 2014?

A. I would have had all of the imagery. That's the kind of imagery we've looked through today in general, all of those photo sheets, maybe even products and brand bibles and all of that kind of imagery.

Q. So this appears to be a reference to this sort of colorful literature we're seeing on the right-hand side?

A. Correct.

Q. So in your email, just drawing your attention to some brand

| MBEYCOL2 | Laramy-Binks - Direct | Page 1668 |
| --- | --- | --- |

names, do you see where it says Ed Hardy?

A. Yes.

Q. And then at the very bottom of the first page, do you see where it says Mossimo?

A. Yes.

MR. LENOW: And then, Mr. Bianco, we can highlight that.

Q. And then continuing down in this email, continuing down, we see Rocawear listed.

Do you see that?

A. Yes.

MR. LENOW: Mr. Bianco, let's keep on paging down.

Q. Do you see Starter Black Label listed?

A. Yes.

Q. Do you see where it says Joe Boxer?

A. Yes.

Q. And Modern Amusement?

A. Yes.

MR. LENOW: Mr. Bianco, let's keep on paging down. Just pausing.

Q. Do you see Rampage listed, Ms. Laramy-Binks?

A. Yes.

MR. LENOW: Let's now continue up this email chain after you wrote to Inam.

Just to pause on the "From" and "To" line.

| MBEYCOL2 | Laramy-Binks - Direct | Page 1669 |
| --- | --- | --- |

Q. Just to be clear, Jared Margolis isn't on this email, this one right here.

Correct?

A. From what I can see here, correct.

Q. Now, based on your work at TLC, did Inam and others at TLC have interactions with GBG executives?

A. Yes.

MR. LENOW: Now let's go above this email. Let's pause here.

Q. So we see the next one. There's an email from Inam Shah to Jeremy Margolis, c.c. Daisy Laramy-Binks. "Subject: Forward from Jared."

Do you see that?

A. Yes.

Q. Do you see where Inam says: Hi, Jared. Please see key points from Daisy below as requested"?

A. Yes.

Q. "I've copied Daisy. So you can follow up directly if you have any questions"?

A. Yes.

MR. LENOW: Let's keep on going up in this email, just slowing down there a bit.

Q. It looks like you're dropped off the chain for a bit here.

Do you see where it says from Jared Margolis to Jason Rabin and Ethan Cole?

| MBEYCOL2 | Laramy-Binks - Direct | Page 1670 |
| --- | --- | --- |

And you're not on that email; correct?

A. Yes.

MR. LENOW: Just stay where this is, Mr. Bianco, for now.

Q. And the top of this chain, it looks like you're looped back in.

Do you see you're now on the next email?

A. Yes.

Q. And it's an email from Ethan Cole to Daisy Laramy-Binks copying Jeremy Margolis, a similar subject line of: "Forward for Jared."

Do you see that?

A. Yes.

Q. Now, I want to break down this email from Ethan to you.

At the top do you see Mr. Ethan Cole says: "Hi, Daisy. Following up on the below, I didn't see anything about Brooklyn Zone. Would you mind sending me a similar recap of our work on the brand to date."

Do you see that?

A. Yes.

Q. And then below that, it says: "Also, for each initiative listed below, wherever applicable, can you please send me some back-up documentation?"

Do you see that?

A. Yes.

## A-935

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

MBEYCOL2    Laramy-Binks - Direct    Page 1671

Q. And then he says: "For example, I see we did a challenge perception to marketing campaign for Rocawear. Would you mind sending me the campaign strategy and some imagery."

A. Yes.

Q. Just pausing there, did we see some of that imagery? The challenge perceptions marketing campaign for Rocawear, were those some of the images we just saw a little while ago in your deck?

A. Yes.

Q. And then Mr. Ethan Cole says: "Similarly, can you please send me any CAD work, marketing campaigns, photo shoot images, style guide, brand collateral, design work, strategy decks, etc., that we created for each brand listed in your email. Any documentation regarding PR agencies we engaged would be helpful as well."

Do you see that?

A. Yes.

Q. What is CAD work?

A. CAD work is the graphic design of the actual ranges of clothing, the technical drawings that are used to put a range together. So when you saw the board with all the T-shirts laid out, that is CAD work.

Q. And then drawing your attention just to the last line --

Can we highlight from "Just as and FYI on."

It says: "Just as an FYI, we are using this info to

MBEYCOL2    Laramy-Binks - Direct    Page 1672

show the Iconix the amazing brand-building work TLC has done thus far as Iconix will be engaging us to perform some consulting work for a number of brands."

Do you see that?

A. Yes.

Q. Just sitting here today and just reading this, Ms. Laramy-Binks, does this message from Ethan Cole make any sense to you?

A. Sitting here today, not really, no.

Q. Can you explain why that is.

MR. MARKUS: Objection as to the relevance as to why today it doesn't make any sense.

THE COURT: Overruled.

THE WITNESS: Because it would have been outside the model, the business model, of what we did to consult to Iconix and particularly because of the relationship we had with Iconix.

I was doing work for them each and every day of this ilk. So if they would have wanted more of that from me, they could have simply reached out to me directly and asked me for it, and I would have given them it.

And also because Iconix themselves, they had a big-budget marketing team in New York. And I think they were more than capable, and indeed did, this kind of work all the time routinely. So I don't know why this would have been

MBEYCOL2    Laramy-Binks - Cross    Page 1673

needed.

BY MR. LENOW:

Q. Anywhere in this message does Ethan Cole say to you that he wants to send invoices to Iconix for the work you've done?

A. No.

Q. Did Ethan Cole ever say that to you that you recall?

A. Absolutely not, no.

Q. Do you think it would make sense for that to happen?

A. No.

Q. Why not?

A. For all the reasons discussed. For starters, the work was historic so that the most part of what you've shown me was almost like a retrospective of the activities we've done over the past few years.

So it was paid for. It was done. It was paid for by the joint venture. It had been invoiced to the joint venture. It was gone and done. So it would have made no sense for there to be invoices flying around at this point.

MR. LENOW: No further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. MARKUS:

Q. Good afternoon, everybody.

Good afternoon, Ms. Laramy-Binks. My name is David Markus. Nice to meet you.

MBEYCOL2    Laramy-Binks - Cross    Page 1674

A. Nice to meet you.

Q. I just have a few follow-up questions, if I could.

A. Of course.

Q. I think you were just talking about how the invoices you saw don't match the hard costs that you walked through with the prosecutor.

Do you recall that?

A. Yes.

Q. Now, you're not here to explain to the jury why GBG asked for the amounts of money they asked for. Right?

A. Correct.

Q. You couldn't know that; right?

A. Correct.

Q. And in fact, the executives at GBG would be the best folks to talk about why they sent the invoices they sent. Right?

MR. LENOW: Objection.

THE COURT: Overruled.

THE WITNESS: Correct.

BY MR. MARKUS:

Q. What you were walking through with the prosecutor was just sort of the hard costs of doing what you did. Right?

A. That's correct, but one invoice would normally match the hard work.

Q. Let's talk about that for a second because I want to talk about why the invoices may have been higher. Okay?

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

---

MBEYCOL2          Margolis - Direct          Page 1691

THE WITNESS: I was not aware of that.

MR. MARKUS: Thank you. I have nothing further.

MR. LENOW: No further questions, Judge.

THE COURT: Ms. Laramy-Binks, you may step down.

(Witness excused)

THE COURT: Do you want to call your next witness.

MR. RODRIGUEZ: Your Honor, the United States calls Jared Margolis.

THE COURT: Sir, you want to snake your way around in front of this table and into the witness box. Remain standing.

JARED MARGOLIS,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE COURT: Sir, you may be seated.

Bring your chair up to the microphone. Bring the microphone close to you. When you speak, please speak directly into the microphone. And please begin by stating and spelling your first name and your last name.

THE WITNESS: Jared Margolis, J-a-r-e-d M-a-r-g-o-l-i-s.

DIRECT EXAMINATION
BY MR. RODRIGUEZ:

Q. Good afternoon, Mr. Margolis.

A. Good afternoon.

Q. Sir, did you receive a subpoena to testify here today?

---

MBEYCOL2          Margolis - Direct          Page 1692

A. I did.

Q. Are you testifying under a court order that compels you to testify?

A. Yes.

Q. Does that court order require you to testify, even if you don't want to testify?

A. Yes.

Q. Sir, if you refuse to answer questions today, can you be held in contempt?

A. I can.

Q. As you understand it, can you be prosecuted based purely on the things that you say today?

A. Yes.

Q. Sir, I'm drawing a distinction between the things that you say today and generally.

Can you be prosecuted purely based on the things that you say?

A. No.

Q. Do you understand, Mr. Margolis, that you are under oath and are required to tell the truth?

A. Yes.

Q. Does the court order giving you immunity protect you from prosecution in the event you lie or commit perjury on the stand today?

A. No.

---

MBEYCOL2          Margolis - Direct          Page 1693

Q. If you lie today, can you be prosecuted for that?

A. Yes.

Q. Has the government promised you anything in exchange for your testimony?

A. Yes.

Q. What has the government promised you?

A. No. I'm sorry.

Q. Has the government promised you that you will not be prosecuted at all?

A. No.

Q. Okay. Mr. Margolis, I want to ask you a few background questions about you.

What do you currently do for a living?

A. I'm an independent contractor.

Q. What industry have you worked in for most of your professional life?

A. In the fashion world.

Q. Approximately how many years have you been working in the fashion world?

A. Close to 27.

Q. I want to direct your attention to the time around 2010 or 2011.

Did you begin working for a company called Li & Fung around that time?

A. Yes.

---

MBEYCOL2          Margolis - Direct          Page 1694

Q. Did you work for a particular entity at Li & Fung called LF Asia?

A. Yes.

Q. Where were you based geographically in 2012 and 2013?

A. In Hong Kong.

Q. And then in late 2013/early 2014, did you return to the United States?

A. Yes.

Q. Were you still working for LF Asia at that point?

A. I was.

Q. What was your position at the time when you returned to the United States?

A. I was the executive vice-president of the licensing business.

Q. Did you hold that same title throughout 2014 as well?

A. I believe so.

Q. Can you describe what your duties and responsibilities were in that role?

A. It was to manage the licensing business.

Q. Who was your boss during that time?

A. Jason Rabin.

Q. Now, sir, at some point in 2014, did Li & Fung spin off a business called Global Brands Group, Inc. or GBG?

A. Yes.

Q. And when that happened, did you begin working for GBG?

---

**A-937**

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                November 14, 2022

---

MBEYCOL2     Margolis - Direct     Page 1695

A. I did.

Q. When you started working for GBG, what area of business were you generally working in?

A. In the business development side.

Q. What were your duties and responsibilities at that point?

A. Running the licensing business.

Q. Was GBG part of the Li & Fung group of companies?

A. It was.

Q. And when you came back to the United States, where were Li & Fung's offices located?

A. In the Empire State Building.

Q. Now, Mr. Margolis, during your time working at LF Asia and GBG, did you ever do business with a company called Iconix Brand Group?

A. I did.

Q. Who was the CEO of Iconix when you dealt with them in 2013 and 2014?

A. Neil Cole.

Q. Did you interact with Mr. Cole from time to time when you were working at Li & Fung and GBG?

A. Yes.

Q. Were there other Iconix executives that you interacted with during this time period?

A. Yes.

Q. Can you name a few, please.

---

MBEYCOL2     Margolis - Direct     Page 1696

A. Dan Castle, Seth Horowitz.

Q. Now, Mr. Margolis, I want to direct your attention to the fall of 2013.

Were you involved in negotiations around that time with Iconix to enter into a joint venture transaction with Iconix in Southeast Asia?

A. Yes.

Q. If I refer to that transaction as "SEA-1," will you understand what I mean?

A. Yes.

Q. All right. Sir, I want to direct now to 2014.

Was the Southeast Asia joint venture between Iconix and Li & Fung amended around that time?

A. Yes.

Q. Did you participate in the negotiations relating to that June 2014 amendment?

A. Yes.

Q. If I refer to that amendment in June 2014, to the Southeast Asia joint venture, as "SEA-2" will you know what I'm talking about?

A. Yes.

Q. Now, Mr. Margolis, besides you, who else from LF Asia or GBG was primarily involved in the negotiations surrounding SEA-2?

A. Jason Rabin.

---

MBEYCOL2     Margolis - Direct     Page 1697

Q. From the Iconix side, which folks were involved primarily in the negotiations surrounding SEA-2?

A. Seth Horowitz.

MR. RODRIGUEZ: I want to publish what is already in evidence as Government Exhibit 1028. If we can please publish that.

Q. Do you see that on your screen, sir?

A. I do.

Q. Is this an April 30, 2014, email from Neil Cole to Jason Rabin and you copying Seth Horowitz?

A. Yes.

Q. Mr. Cole referenced Europe and Korea in his email.

Do you see that?

A. I do.

Q. Did GBG and Iconix ultimately amend the Southeast Asia joint venture to cover Europe and Korea for certain brands?

A. Yes.

Q. Did that happen in June 2014 as part of the SEA-2 deal?

A. Yes.

Q. Mr. Cole also mentioned China in his email.

Do you see that?

A. I do.

Q. Did GBG and Iconix ultimately amend the joint venture to pertain to China for certain brands as part of the SEA-3 deal?

A. Yes.

---

MBEYCOL2     Margolis - Direct     Page 1698

MR. RODRIGUEZ: We can take that down.

Q. Now, Mr. Margolis, did Li & Fung have to pay Iconix a purchase price as part of SEA-2?

A. Yes.

Q. Were you involved in Li & Fung's efforts to determine the value of the assets that would be part of SEA-2?

A. Yes.

Q. Generally speaking, how did Li & Fung assess the value of the assets that would be part of SEA-2?

How did it go about that process?

A. It was based on a multiple of 5 1/2 times the revenue.

Q. Let's break that down.

When you talk about a "multiple of 5 1/2 times the revenue," can you explain to the jury a little bit more what it is that you're calculating and how you're doing it.

A. If the revenue was a dollar, then we valued the total business at $5.50.

Q. So you're taking the revenue --

A. I'm sorry. $7.50.

Q. So you're taking the revenue that the asset earns as a starting point?

A. Yes.

Q. And you're multiplying that by 5.5?

A. Yes.

Q. And that's how you valued the assets in the SEA-2

---

**A-938**

UNITED STATES OF AMERICA, v.
NEIL COLE,
                                                                    November 14, 2022

MBEYCOL2        Margolis - Direct        Page 1699

transaction?

A. Yes.

MR. RODRIGUEZ: Can we please publish Government Exhibit 1031, which is already in evidence.

Q. Sir, do you see that this is an email from Seth Horowitz to you dated May 2, 2014?

A. Yes.

Q. Was this a few days after the email Neil Cole sent on April 30, 2014, that we just looked at as Government Exhibit 1028?

A. Yes.

MR. RODRIGUEZ: Can we go to page 2 of the document here.

Q. Now, Mr. Margolis, is it fair to say that what Mr. Horowitz has sent you is a proposal?

A. Yes.

MR. RODRIGUEZ: And let's zoom in, please, on item 1A towards the top.

Q. Item 1A says: "Amending Southeast Asia JV to include Korea minus Umbro per terms agreed to 3.7m purchase price."
Do you see that?

A. I do.

Q. Now, Mr. Margolis, was the Southeast Asia joint venture eventually amended to include Korea as part of the deal?

A. It was.

MBEYCOL2        Margolis - Direct        Page 1700

Q. In addition to Korea, were there other parts of the deal as well that eventually became SEA-2?

A. Yes.

Q. I want to focus on this Korea piece for now.
At this time, May 2, 2014, what is the purchase price that Iconix was proposing that Li & Fung pay for this part of the deal? The Korea piece.

A. $3.7 million.

Q. Mr. Margolis, are you familiar with the term "due diligence" in the context of negotiating joint ventures with Iconix?

A. Yes.

Q. What does "due diligence" mean in that context?

A. To verify the information.

Q. And how do you go about verifying the information?

A. By looking at the numbers and making sure that they add up correctly.

Q. Does it relate to the multiple calculation that you were talking about earlier?

A. Yes.

Q. Did Li & Fung engage in due diligence when it came to the SEA-2 deal?

A. Yes.

Q. Were you involved in that process?

A. I was.

MBEYCOL2        Margolis - Direct        Page 1701

Q. Did you do some due diligence work to determine whether it was appropriate to pay Li & Fung -- excuse me. Let me start over.
Did you do some due diligence to determine whether it was appropriate for Li & Fung to pay $3.7 million for the Korea part of the deal?

A. Yes.

MR. RODRIGUEZ: Let's now go to what's already in evidence as Defense Exhibit 1205.

Q. Looking at that top email --
Let's zoom in on that, please.
-- do you recognize this as an email from you to Seth Horowitz dated May 6, 2014?

A. Yes.

Q. And, sir, was this email sent four days after the email Seth Horowitz sent you on May 2 that we just looked at as Government Exhibit 1031?

A. Yes.

MR. RODRIGUEZ: Let's look at the attachment that's also in evidence as Defense Exhibit 1205A1. Again, let's zoom in on item 1A.

Q. Now, sir, is it fair to characterize what you sent back to Seth Horowitz as a counterproposal by Li & Fung to his prior proposal?

A. Yes.

MBEYCOL2        Margolis - Direct        Page 1702

MR. RODRIGUEZ: Let's put them side by side. So let's have Defense Exhibit 1205A1 just like this side by side with Government Exhibit 1031, page 2. Let's zoom in on both items 1A.

Q. Sir, just to orient us here, we have Seth Horowitz's proposal on top and your counterproposal on the bottom.
Is that right?

A. Yes.

Q. If you look at your counterproposal on the bottom, Defense Exhibit 1205A1, what was your counterproposal for the Korea part of the deal?

A. 24 million.

Q. Sir, I'm just looking at what's zoomed in here?

A. I'm sorry. $3.3 million.

Q. So, Mr. Margolis, is it fair to say that at this point, Li & Fung did not accept Iconix's proposal that Li & Fung pay $3.7 million for the Korea part of the deal?

MR. MARKUS: I'm going to object. He's been leading the whole time. Objection. Leading.

THE COURT: Overruled.

MR. RODRIGUEZ: You can answer the question.

THE WITNESS: Can you repeat the question.

BY MR. RODRIGUEZ:

Q. Is it fair to say that at this point, Li & Fung did not accept Iconix's proposal to pay $3.7 million for the deal?

# A-939

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

---

MBEYCOL2     Margolis - Direct     Page 1703

MR. MARKUS: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. RODRIGUEZ:

Q. Mr. Margolis, what was the purchase price that you were proposing for this part of the deal?

A. 3.3.

Q. So that's $400,000 less than Seth Horowitz's original proposal; is that right?

A. Yes.

Q. Now, Mr. Margolis, at this point in the negotiations, did you want to pay as high a price as possible for SEA-2 or as low a price?

A. As low.

MR. RODRIGUEZ: We can take that down. Now let's publish what's already in evidence as Government Exhibit 1036.

Q. Looking at the top email, do you recognize this as an email from you Seth Horowitz to you dated May 23, 2014?

A. Yes.

Q. And so this was about two weeks after your counterproposal?

A. Yes.

Q. Let's look at the bottom on page 1 of this email. Do you see an email from someone named Lauren Gee here?

---

MBEYCOL2     Margolis - Direct     Page 1704

A. I do.

Q. And do you see the first line of her email says: "In connection with the amendment of the SEA JV, attached please find drafts of the following documents"? Do you see that, sir?

A. I do.

MR. RODRIGUEZ: Can we go to page 27 of Government Exhibit 1036.

Q. Do you see a letter up on your screen?

A. Yes.

Q. And looking in the upper left-hand corner, who is that letter addressed to?

A. LF Asia.

Q. And, sir, at the time of this document -- and you can see it says 5-8-2014 in the upper right-hand corner -- were you working for that company?

A. I was.

Q. Do you see the "Re" line says: "Acknowledgment and payment in consideration for 50 percent share of additional marks"?

A. Yes.

MR. RODRIGUEZ: Now I want to zoom in on the second full paragraph, please.

Q. Now, sir, do you see references in this paragraph to the republic of Korea, Europe, and Turkey?

A. I do.

---

MBEYCOL2     Margolis - Direct     Page 1705

Q. Were these territories part of the original SEA-1 deal?

A. No.

Q. Now, in this draft, what was the total fair-market value as of the date of this draft?

A. $21,835,000.

Q. As reflected in this draft, how much was your employer, LF Asia, going to be paying Iconix under the terms of this draft agreement?

A. $10,917,500.

MR. RODRIGUEZ: Let's take that down and please and publish what's already in evidence as Government Exhibit 1044.

Q. Now, sir, do you recognize this as an email from someone named Mark Stevens?

A. Yes.

Q. And do you see that, among other people, you're copied on it?

A. Yes.

Q. And do you see the date listed as June 25, 2014?

A. Yes.

Q. The email says in the first line: "I attach the following revised draft documents." Do you see that in the first line?

A. Yes.

Q. Now, sir, the date of this email is June 25, 2014. Did you have any conversations with anyone at Iconix

---

MBEYCOL2     Margolis - Direct     Page 1706

about when Iconix wanted this deal done?

A. Yes.

Q. Who did you discuss that with?

A. Seth Horowitz.

Q. And what did he tell you about when he wanted the deal done?

MR. MARKUS: Objection. Hearsay, your Honor.

THE COURT: Sustained.

BY MR. RODRIGUEZ:

Q. Mr. Margolis, is June 30 the end of the second quarter of 2014?

A. Yes.

MR. RODRIGUEZ: Let's look at page 8 of this document, please.

Q. Now, Mr. Margolis, are you familiar with the term "redline"?

A. Yes.

Q. What's a "redline"?

A. It's a markup of an agreement.

Q. Do you see that, looking at the upper right-hand corner, the date was listed as May 8, 2014, but now it's listed as June 25, 2014?

A. Yes.

MR. RODRIGUEZ: Let's zoom in again on the second full paragraph, please.

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

MBEYCOL2        Margolis - Direct        Page 1707

Q. Now, looking at the document, sir, do you see that the fair-market value has increased from $21,835,000 by $10 million to $31,835,000?

Do you see that?

A. I do.

Q. Do you see that LF Asia's 50 percent of such fair-market value has increased from $10,917,500 up by $5 million to $15,917,500?

A. I do.

Q. And was that, in other words, the purchase price that LF Asia would pay?

A. Yes.

Q. Now, Mr. Margolis, you testified you were doing due diligence in connection with this deal.

Is that right?

A. Yes.

Q. At the time, did the due diligence that you were doing support the fair-market value jumping up as reflected here by $10 million from $21.8 million to $31.8 million?

A. No.

Q. Between the draft of this agreement that we looked at from late May with the $10.9 million purchase price and the version here with the $15.9 million purchase price, were there any changes in terms of what assets LF Asia was actually going to be purchasing an interest in?

MBEYCOL2        Margolis - Direct        Page 1708

A. No.

Q. Had you decided that the assets were actually worth more money?

A. No.

Q. Mr. Margolis, is it fair to say that you were one of the principal people at GBG who was negotiating this deal with Iconix?

A. Yes.

Q. Mr. Margolis, did there come a time when you spoke to Jason Rabin about why the purchase price that Li & Fung would be paying to Iconix for SEA-2 jumped up by $5 million?

A. Yes.

Q. What did Jason Rabin tell you about why the purchase price for SEA-2 jumped up by $5 million?

MR. MARKUS: Objection. That's hearsay, your Honor.

THE COURT: Let's talk at sidebar.

(Continued on next page)

MBEYCOL2        Margolis - Direct        Page 1709

(At the sidebar)

THE COURT: I take it that it's a coconspirator statement?

MR. RODRIGUEZ: Correct; that Jason Rabin and Jared Margolis are part of the scheme. The testimony will be that Jason Rabin told Jared Margolis this so that he can execute on all of the invoice work.

THE COURT: So I got the wrong objection in other words.

MR. RODRIGUEZ: I'm not willing to stipulate that your Honor has ever gotten anything wrong.

MBEYCOL2        Margolis - Direct        Page 1710

(In open court; jury present)

BY MR. RODRIGUEZ:

Q. Mr. Margolis, what did Jason Rabin tell you about why the purchase price for SEA-2 jumped up by $5 million?

A. That we would get the money back.

Q. You would get the money back from who?

A. From Iconix.

Q. According to Jason Rabin, what did he tell you about where he learned that you would get the money back from Iconix?

A. From Iconix.

Q. Who at Iconix?

A. I believe Neil Cole.

Q. According to Mr. Rabin, how, under this arrangement, would GBG get that money back?

A. That we would invoice for marketing.

Q. Sir, based on your conversations with Mr. Rabin, was it your understanding that this idea came from GBG or Iconix?

A. From Iconix.

Q. And as you understood it, based on your conversations with Mr. Rabin, did Iconix make a firm commitment to return that extra $5 million to Li & Fung?

MR. MARKUS: Objection. Leading, your Honor.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. RODRIGUEZ:

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

---

MBEYCOL2          Margolis - Direct          Page 1711

Q. As you understood it, would Li & Fung have been willing to pay $15.9 million if there had not been such a firm commitment?

A. No.

Q. Now, sir, to the best of your knowledge, was this commitment to send back that extra $5 million to GBG, was it in writing? Or was it an oral agreement?

A. I don't know.

Q. Mr. Margolis, did this deal ultimately close with the $15.9 million purchase price?

A. Yes.

Q. And was that before the end of June of 2014?

A. Yes.

MR. RODRIGUEZ: We can take that down.

Q. Now, sir, are you familiar with something called a "preliminary investment proposal" or a "pip"?

A. Yes.

Q. What is that?

A. It's an overview of the potential investment.

Q. Is that a document that's created on the GBG side?

A. That is.

MR. RODRIGUEZ: Can we please publish what's already in evidence as Defense Exhibit 1312A1.

Q. Now, looking at the top, sir, do you see where it says: "Preliminary investment proposal to 27 June 2014"?

A. Yes.

---

MBEYCOL2          Margolis - Direct          Page 1712

MR. RODRIGUEZ: All right. Now, can we please zoom in on page 1 to the chart and specifically the row that says: "Size of amendments." That's fine just like that.

Q. Now, sir, do you see the reference to: "Total consideration for all amendments, $15.9 million"?

A. Yes.

Q. Would that be the final purchase price for SEA-2?

A. Yes.

Q. Now, what does it say next to: "Korea brands into SEA JV"?

A. 8.3 million.

MR. RODRIGUEZ: Can we please pull up what's already in evidence Defense Exhibit 1205A1. And let's put it next to this document, Defense Exhibit 1312A1. On 1312A1, let's zoom back in to the row we were looking at. On the document on the right, let's zoom back in on item 1A.

Q. Now, just to remind the jury, Mr. Margolis, in that document that's not the pip but the other document, your counterproposal, what is the price listed for the Korea piece of this deal?

A. 8.3 million.

Q. Not the pip, sir, the other document.

A. 3.3 million.

Q. Mr. Margolis, I just want to be clear here.

In May of 2014, were you proposing that Li & Fung pay $3.3 million for the Korea part of this deal as reflected in

---

MBEYCOL2          Margolis - Direct          Page 1713

this document?

A. Yes.

Q. And then looking at the pip, the zoom-in up top there, Defense Exhibit 1312A1, the Korea piece of the SEA-2 deal is listed at what price? Just the Korea piece.

A. 8.3 million.

Q. Mr. Margolis, is there a $5 million difference between the two?

A. Yes.

Q. Did the due diligence that you were doing support a $5 million increase on this part of the deal?

A. No.

Q. As you understand it, based on your involvement in the negotiations, what explains this $5 million increase for the Korea piece of the SEA-2 deal?

A. Can you please repeat the question.

Q. Based on your involvement in the negotiations, what explains this $5 million increase for the Korea piece of the SEA-2 deal?

A. That we would get the money back.

Q. From who?

A. From Iconix.

MR. RODRIGUEZ: We can take that down.

Q. Now, sir, after SEA-2 closed, did you soon thereafter begin negotiating another amendment to the Southeast Asia joint

---

MBEYCOL2          Margolis - Direct          Page 1714

venture with Iconix?

A. Yes.

Q. And did that eventually become the SEA-3 transaction?

A. Yes.

MR. RODRIGUEZ: Your Honor, at this time I'd like to move into evidence, subject to the prior discussions at sidebar, Government Exhibits 1047, 1054, 1087, 1097, and 1106.

THE COURT: Those exhibits will be received.

(Government's Exhibits 1047, 1054, 1087, 1097, and 1106 received in evidence)

MR. RODRIGUEZ: Let's please publish what's now in evidence as Government Exhibit 1047.

Q. Now, sir, do you recognize this as an email from Seth Horowitz to you dated July 28, 2014, copying others?

A. Yes.

Q. And this was about a month after SEA-2 closed?

A. Yes.

Q. Now, there's someone copied on this email named Ethan Cole. Do you see that?

A. I do.

Q. Which company did Ethan Cole work for?

A. For GBG.

Q. And who did Ethan Cole report to?

A. To me.

Q. What were Ethan Cole's duties and responsibilities?

---

**A-942**

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                November 14, 2022

| MBEYCOL2 Margolis - Direct Page 1715 |
| --- |

A. To help keep me organized and work on the deals that we were doing.

Q. To your knowledge, did Ethan Cole work for anyone else, other than you?

A. No.

Q. Now, the "Subject" line of this email is: "China, Umbro, and LC."

Do you see that?

A. I do.

Q. What's that referring to?

A. SEA-3.

Q. Is "LC" Lee Cooper?

A. It is.

Q. So when you say it is referring to SEA-3, specifically how does SEA-3 relate to China, Umbro, and Lee Cooper?

A. We purchased half of the IP in China for Lee Cooper and Umbro.

Q. And this email says: "Attached is a term sheet that should reflect our most recent conversation."

Do you see that?

A. I do.

MR. RODRIGUEZ: Let's go to page 2, please.

Q. Is this a proposal from Iconix?

A. It is.

Q. Let's look at the row that says "Purchase Terms" and zoom

| MBEYCOL2 Margolis - Direct Page 1716 |
| --- |

in on that.

What's the purchase price that Iconix is proposing that GBG pay at this point?

A. $15.5 million.

Q. Remind the jury which brands are under consideration here.

A. Lee Cooper and Umbro.

Q. And did the SEA-3 deal ultimately go forward?

A. It did.

MR. RODRIGUEZ: Okay. Let's come back to SEA-3 in a few minutes. We can take that down.

Q. Mr. Margolis, after SEA-2 closed, what were you expecting Iconix to do next with respect to that extra $5 million you testified about?

A. To pay us back.

Q. Did you end up participating in a process to get that $5 million back from Iconix?

A. Yes.

Q. Who else from your side, the GBG side, was primarily involved in that process with you?

A. Ethan.

Q. Ethan Cole?

A. Ethan Cole.

Q. Did you make Ethan Cole aware of the fact that GBG had paid this extra $5 million for SEA-2 in return for a commitment from Iconix that it would send the money back to GBG?

| MBE5col3 Margolis - Direct Page 1717 |
| --- |

A. Yes.

Q. Can you describe how you and Ethan Cole went about the process of getting that extra $5 million back from Iconix that Iconix owed to GBG for SEA-2.

A. We invoiced Iconix.

Q. For what?

A. For the $5 million.

Q. The $5 million -- excuse me. The $5 million in invoices related to what kinds of purported expenses?

A. Marketing.

MR. RODRIGUEZ: Let's take a look at what's in evidence as Government Exhibit 1068.

Q. Now, sir, do you recognize this as an email from Ethan Cole to you dated August 28, 2014?

A. I do.

(Continued on next page)

BY MR. RODRIGUEZ: (Continuing)

Q. And what's the e-mail account that Ethan Cole was using to send this?

A. His gmail account.

Q. And what is the e-mail account that you are receiving it at?

A. My gmail account.

Q. Was it a very typical practice for you and Ethan Cole to correspond using your personal e-mail accounts for company

| MBE5col3 Margolis - Direct Page 1718 |
| --- |

business?

A. No.

Q. Do you see that the subject line says: Iconix notes?

A. Yes.

Q. And do you see that the attachment is titled "summary of various AR?"

A. Yes.

Q. What does "AR" stand for?

A. Aged receivables.

Q. And what is that?

A. Money that's owed to us that's past due.

Q. There is a document attached to this e-mail; is that right?

A. Yes.

Q. Can we go to page 2, please? And let's zoom in on all of the text.

Now, sir, do you see that the title of this document is Summary of Various Accounts with Iconix?

A. Yes.

Q. Who prepared this document?

A. Ethan Cole.

Q. And at whose direction would he have prepared it?

A. Mine.

Q. What was the purpose of this document?

A. To lay out the details of the monies that needed to be paid back to us.

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 14, 2022

MBE5col3    Margolis - Direct    Page 1719

Q. Let's look at that first heading, A. It says: $5 million overpay from Iconix Korea.
Do you see that?
A. I do.
Q. What transaction was Iconix Korea referring to?
A. SEA-2.
Q. It uses the term $5 million overpay. What is that referring to?
A. For the money that we overpaid by $5 million.
Q. When you say the money we overpaid by $5 million, who is the "we?"
A. LF Asia GBG.
Q. And who did you overpay that $5 million to?
A. Iconix.
Q. And was that part of the SEA-2 deal?
A. It was.
Q. It goes on to say: The $5 million overpay from Iconix Korea will be offset by: And then do you see three bullets that follow?
A. I do.
Q. What does offset refer to here?
A. The $5 million.
Q. The three things that are listed there, $2.5 million Rocawear, $1 million Zoo York SEA marketing, $1.5 million Peanuts China marketing.

MBE5col3    Margolis - Direct    Page 1720

Do you see those?
A. I do.
Q. And those three numbers add up to what? 2.5, 1, and 1.5?
A. $5 million.
Q. What was GBG going to be doing with respect to the items listed here? And let me direct your attention to the Zoo York marketing and the Peanuts China marketing. What was going to be going on there?
A. We provided marketing.
Q. Did you invoice for that?
A. We did.
Q. Who did you invoice?
A. Iconix.
Q. And was that in connection with the overpay for the SEA-2 deal?
A. Yes.
Q. There is also a reference here to $2.5 million Rocawear.
Do you see that?
A. Yes.
Q. What's your understanding as to what that refers to?
A. That was towards a shortfall for LT shortfall for minimum guarantees from another business within Li & Fung.
Q. What does a shortfall mean in this context?
A. Monies that weren't -- sales that weren't achieved which related to royalties were short of paying from the guarantees.

MBE5col3    Margolis - Direct    Page 1721

Q. When it refers to Rocawear, does that refer to Rocawear or Rocawear Kids?
A. Rocawear Kids.
Q. And so as to this $2.5 million, was that money that GBG owed to Iconix?
A. Yes.
Q. And what is being proposed here in this document about that money that GBG owed to Iconix?
A. That that would go towards the $5 million.
Q. That it would be relieved?
A. Correct.
Q. Now, sir, ultimately did GBG get the $5 million back exactly as it's outlined here or did it change somewhat?
A. It changed.
Q. Let's look at item B, please.
It says: $4.5 million prosed overpay for Umbro/Lee Cooper China.
Do you see that?
A. I do.
Q. Mr. Margolis, this references Umbro/Lee Cooper China and a proposed overpay of $4.5 million. What deal is this referring to?
A. SEA-3.
Q. And am I correct that SEA-3 had not yet closed?
A. Yes.

MBE5col3    Margolis - Direct    Page 1722

Q. Can we just go back to the first page of the e-mail, please? Sir, do you see that the date of this e-mail is August 28, 2014?
A. Yes.
Q. Is Seth Horowitz on this e-mail?
A. No.
MR. RODRIGUEZ: Your Honor, I'm happy to move on if you want to make use of the next four minutes.
THE COURT: We can stop now.
Ladies and gentlemen, it is almost 2:40. It appears that the government is going to move on to a different topic so we will stop for the evening. We will get together again tomorrow morning. Please, don't be late. Please, do not discuss the case. Be safe getting home.
(Continued on next page)

UNITED STATES OF AMERICA, V
NEIL COLE,
November 15, 2022

MB1YCOL1     Page 1750

(In open court; jury present)

THE COURT: Everyone please be seated.

Ladies and gentlemen, good morning. I trust you all had a pleasant evening.

To the juror who was delayed, thank you, thank you, thank you for keeping us apprised of what was going on. It was very, very helpful to all of the parties.

And with that, we will continue with the direct examination of Mr. Margolis.

Mr. Margolis, you are reminded that you are still under oath.

Mr. Rodriguez.

JARED MARGOLIS, resumed
    called as a witness by the Plaintiff,
    having been duly sworn, testified as follows:
DIRECT EXAMINATION CONTINUED
MBFYCOL1     Margolis - Direct
BY MR. RODRIGUEZ:

Q. Good morning, Mr. Margolis.

Can we please publish Government Exhibit 1068, page 2, where we left off yesterday.

Sir, do you recall testifying about this document yesterday?

A. I do.

Q. Do you recall testifying about bullet point A, $5 million

MB1YCOL1     Page 1751

overpay from Iconix Korea?

A. Yes.

MR. RODRIGUEZ: Let's go to bullet point B now.

Q. It says: "$4.5 million proposed overpay for Umbro, Lee Cooper, China."

Do you see that?

A. I do.

Q. What deal did Umbro, Lee Cooper, China refer to?

A. SEA-3.

Q. The bullet underneath that says: "The 4.5M overpay for Umbro, Lee Cooper, China will be offset by Iconix paying the 4.5M in markdown money to Rainbow."

Do you see that?

A. I do.

Q. As you understood it, sir, were these issues being discussed with Iconix at the time?

A. Yes.

Q. The reference here to an offset through the $4.5 million in markdown money to Rainbow, do you know what that's referring to?

A. To the shortfall that --

Q. I interrupted you. I'm sorry.

Who owed that shortfall?

A. GBG.

Q. To who?

MB1YCOL1     Page 1752

A. To Iconix.

Q. What is Rainbow?

A. Rainbow is a retailer.

MR. RODRIGUEZ: Can we look at item C here: "Additional amounts TBD."

Q. Do you see that?

A. Yes.

Q. And the first bullet says: $3.5 million for Rocawear royalty in year two remains outstanding"?

A. Yes.

Q. What does that refer to?

A. To minimum guaranteed royalties owed to Iconix by GBG.

Q. And why is this, as you understand it, the $3.5 million listed here in this portion of the document?

A. To offset the overpay.

Q. For what? The overpay for what?

A. The overpay from Iconix to the joint venture.

Q. Now, sir, I just want to go back to the reference to Rainbow in part B.

What did Rainbow sell?

A. They sold consumer products.

Q. Did they have any relation with Rocawear Kids?

A. Yes.

Q. What was that?

A. They were the retailer that sold the apparel.

MB1YCOL1     Page 1753

Q. Including the Rocawear Kids apparel?

A. The Rocawear Kids apparel.

MR. RODRIGUEZ: Let's go to what's in evidence as Government Exhibit 1054, please.

Q. Sir, do you see this email exchange between you and Seth Horowitz on August 5 of 2014?

A. I do.

Q. Now, in that bottom email, he says: "Should we get together with Jason and Neil to discuss Rocawear Kids?"

Do you see that?

A. I do.

Q. Who is Jason and Neil?

A. Jason was my boss at GBG, and Neil was the CEO of Iconix.

Q. The subject line is: "China update LC and Umbro."

Do you see that?

A. I do.

Q. What, if anything, would you and Mr. Horowitz need to discuss with Neil and Jason regarding Rocawear Kids at this point?

A. We would discuss the shortfall.

Q. That who owed to who?

A. That GBG owed to Iconix.

MR. RODRIGUEZ: Let's go to Government Exhibit 1087, which is in evidence, please.

Q. Do you see this email from Ethan Cole to Jason Rabin

# A-945

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

MB1YCOL1     Page 1754

copying you dated September 9, 2014?
A. Yes.
Q. Do you see Ethan Cole says: "Hi, Jason. Attached please find a first draft of the termination letter that Seth provided"?
Do you see that?
A. I do.
Q. And as you understand it, is the "Seth" there Seth Horowitz?
A. Yes.
MR. RODRIGUEZ: And just looking at page 2 of the document.
Q. Is this a draft termination letter for Rocawear Kids?
A. It is.
Q. And looking at the first page of the email again, please, is the date of this email September 9, 2014?
A. Yes.
MR. RODRIGUEZ: Let's go to Government Exhibit 1091 in evidence.
Q. Now, sir, do you see this is an email that was sent two days later on September 11, 2014?
A. Yes.
Q. Do you see that you're the first person copied on this email?
A. I do.

MB1YCOL1     Page 1755

Q. And do you see that Ms. Gee is sending what she calls "Revised drafts of the SEA JV amendment documents for China, Umbro, Lee Cooper"?
A. Yes.
Q. And she refers to them as "blacklines" in her email.
Do you see that?
A. I do.
MR. RODRIGUEZ: Can we please take a look at page 52 of this exhibit. And I want to focus on that second paragraph, please.
Q. Mr. Margolis, do you see that the fair-market value has jumped up from $31 million to $43 million?
A. Yes.
Q. And the purchase price that Li & Fung is supposed to pay has jumped up to $21.5 million from $15.5 million.
Do you see that?
A. I do.
Q. That's a $6 million difference?
A. Yes.
Q. Now, Mr. Margolis, were you involved in negotiating this deal?
A. I was.
Q. Based on your involvement in these negotiations, did you actually believe that this deal was worth paying $21.5 million for?

MB1YCOL1     Page 1756

A. No.
Q. Did GBG actually end up agreeing to a purchase price of $21.5 million?
A. Yes.
Q. Why did GBG, as you understand it, pay $6 million more than the $15.5 million purchase price we saw in a prior draft?
A. Because we were going to get the money back.
Q. Who told you that?
A. Jason Rabin.
Q. And as you understood it, where did he learn that from?
A. From Neil Cole.
Q. Who was going to give the money back to who?
A. Iconix was going to give the money back to GBG.
Q. Mr. Margolis, did you recommend that GBG actually enter into this deal?
A. No.
Q. You didn't make any recommendation?
A. To me, this deal to pay $6 million more?
Q. Yes.
A. No.
Q. Let me ask you this: Did this deal ultimately close at $21.5 million?
A. I believe so.
Q. Based on your involvement in the negotiations, would GBG have been willing to close at that price without the commitment

MB1YCOL1     Page 1757

from Iconix you referenced?
MR. MARKUS: Objection, your Honor, whether GBG would be.
THE COURT: Overruled.
THE WITNESS: No.
MR. RODRIGUEZ: Okay. We can take that down.
Q. Sir, we were discussing SEA-3. I want to turn back to SEA-2 if I may.
Yesterday you testified that you were involved in the process of preparing invoices to submit to Iconix to get back a $5 million overpayment.
Do you remember that testimony?
A. Yes.
Q. Now, did GBG end up invoicing Iconix for $5 million?
A. Yes.
MR. RODRIGUEZ: Let's look at Government 1097 in evidence.
Q. Sir, do you see this email from Ethan Cole to you at the top dated September 25, 2014?
A. I do.
Q. There's an email on the bottom.
That was forwarded to you?
A. Yes.
Q. If we look at the top email, do you see a reference to -- it says that Ethan Cole says: "The invoices for Iconix have

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

MB1YCOL1                                Page 1758

been prepared. $5 million in total. Unless you have any comments, I will confirm with John that he can send."
        Do you see that?
A. I do.
Q. As you understood it, what was Ethan Cole looking for from you before he sent these invoices?
A. Direction on what to prepare.
Q. He says: "I will confirm with John that he can send."
        Who did you understand that to be referring to sending to?
A. To Iconix.
Q. Just to remind the jury, Ethan Cole worked for who?
A. For me.
Q. You were his boss?
A. I was.
Q. He worked at your direction?
A. Yes.
        MR. RODRIGUEZ: Can we please go to page 3 of this exhibit.
Q. Now, sir, do you see that this is an invoice directed to Iconix from GBG?
A. I do.
Q. And what is the invoice for?
A. For marketing.
Q. Related to which brand?

MB1YCOL1                                Page 1759

A. To Mossimo.
Q. Was that one of the brands that was part of the Southeast Asia joint venture?
A. Yes.
Q. Sir, as you understand it, who made the decision to bill Mossimo for this?
        Who picked that brand?
A. I don't remember.
Q. The cost here is -- excuse me. The description just says "marketing cost."
        Do you see that?
A. Yes.
Q. And the amount is $2 million.
        Do you see that?
A. I do.
Q. Sir, did you pick Mossimo as a brand, or did someone else?
A. I don't remember.
        MR. RODRIGUEZ: Let's look at page 5, please.
Q. Do you see this is another invoice from GBG to Iconix, this time for Peanuts China?
A. I do.
Q. Do you know who picked this brand? Peanuts.
A. I don't.
Q. And then finally looking at Zoo York on page 7, do you see that as a $1 million invoice?

MB1YCOL1                                Page 1760

A. I do.
Q. Now, sir, the three invoices we just went over listed marketing costs.
        Is that right?
A. Yes.
Q. Add the three invoices we looked at add up $5 million?
A. Yes.
Q. Mr. Margolis, why did these three invoices add up to $5 million?
A. Because that was the amount of money that we needed to get paid back.
Q. For what?
A. For the overpay.
Q. In connection with which deal?
A. SEA-2.
Q. In preparing these invoices, did you or Ethan Cole, to your knowledge, conduct any sort of analysis of the number of hours that were worked by GBG personnel in connection with these invoices?
A. No.
Q. Did you or Mr. Ethan Cole, to your knowledge, conduct any sort of analysis as to the costs of the salaries of the people involved?
A. No.
Q. Mr. Margolis, absent the arrangement that you've testified

MB1YCOL1                                Page 1761

about, would GBG have billed Iconix for these marketing costs absent that arrangement?
A. No.
Q. What was your understanding of who was supposed to pay marketing expenses as part of the Southeast Asia joint venture?
A. The joint venture.
Q. So why did you submit or have submitted these $5 million in invoices?
A. So we could get paid back the $5 million for the overpay.
        MR. RODRIGUEZ: We can take that down.
Q. Now, sir, did there come a point when these invoices were revised?
A. Yes.
Q. Why did that happen?
A. Because we were asked to revise the invoices.
Q. By whom?
A. By Seth Horowitz.
Q. As you understood it, what was the reason for that request?
A. Because he wanted us to adjust the numbers where it added up to the $5 million but they weren't just even numbers.
Q. And what, if anything, did you learn about Iconix wanted you to change about what the invoices said and what they included?
A. I don't remember.
        MR. RODRIGUEZ: Let's take a look. Can we publish

# A-947

MB1YCOL1                                                                 Page 1762

what's already in evidence as Government Exhibit 1111.

Q. Do you see this email from Ethan Cole to Seth Horowitz copying you dated October 2, 2014?

A. Yes.

Q. This was a few days after the original emails we looked at?

A. Yes.

Q. It says: "Please find the attached marketing invoices for Zoo York, Mossimo, and Peanuts."

Do you see that?

A. Yes.

Q. Whose direction would he be acting at?

A. My direction.

MR. RODRIGUEZ: Let's look at the attachments, please, starting with the first one. And if we can zoom in on the top third.

Q. Do you see this as a Zoo York invoice, sir?

A. I do.

Q. And the amount is $955,710.

Do you see that?

A. Yes.

Q. What is the brand here?

A. Zoo York.

MR. RODRIGUEZ: If it we can go to the next page, please.

Q. Do you see this Mossimo invoice here for $1,940,230?

MB1YCOL1                                                                 Page 1763

A. I do.

MR. RODRIGUEZ: And the next one, please.

Q. Peanuts for $2,104,060?

A. Yes.

Q. Now, sir, I just referred to -- and you just acknowledged -- three different numbers.

Sitting here right now, do you know what those three numbers add up to?

A. To $5 million.

Q. To the dollar?

A. To the best of my recollection, yes.

Q. Why do these three numbers add up to the dollar to $5 million?

A. To get paid back the $5 million in the overpay.

Q. How were these numbers on these invoices selected?

A. I don't remember.

Q. If there had been no $5 million overpay, would GBG have charged Iconix for these invoices?

MR. MARKUS: Your Honor, objection. Asked and answered and leading.

THE COURT: Overruled.

THE WITNESS: No.

MR. RODRIGUEZ: Can we please put Government Exhibit 1097, page 7, side by side with page 2 of 1111.

Q. Now, on the left, sir, the amount of that invoice is

MB1YCOL1                                                                 Page 1764

$950,710.

Do you see that?

A. I do.

Q. Do you know how that specific number was arrived at?

A. I don't.

Q. Did you or, to your knowledge, Ethan Cole do some sort of calculation to come up with that number?

A. No.

Q. Did you analyze the number of hours worked by people?

MR. MARKUS: Objection. Asked and answered, your Honor.

THE COURT: Overruled.

THE WITNESS: No.

BY MR. RODRIGUEZ:

Q. With respect to any of these invoices, did you do that kind of analysis?

A. No.

Q. Sir, was it a coincidence that these three invoices added up to $5 million?

A. Yes.

Q. It was a coincidence?

A. No. No. It wasn't a coincidence. I'm sorry.

Q. So why did they add up to $5 million?

A. Because it was towards the $5 million overpay.

Q. If you if look at the invoice on the left, is it fair to

MB1YCOL1                                                                 Page 1765

say that it has more detail in the description than the invoice on the right?

A. Yes.

Q. Who asked for that more detailed description?

A. Seth Horowitz.

Q. What was your understanding as to why that request was made?

A. Because we needed to show more detail to make it more presentable.

MR. RODRIGUEZ: Let's just take a look at 1111, please, and page 1.

Q. Now, do you see that Ethan Cole provided a link that says: "Please find the decks related to each"?

A. Yes.

Q. What did you understand those to be?

A. Backup for the invoices that we billed.

MR. RODRIGUEZ: Let's please publish what's in evidence as Government Exhibit 1106.

Q. Sir, do you recognize this as an email from Ethan Cole to you dated September 29?

A. Yes.

Q. And that's a few days after the initial invoices were sent?

A. Yes.

MR. RODRIGUEZ: If we can look at 1111 side by side for a moment with -- let me just look at 1111 side by side with

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

MB1YCOL1                                             Page 1766

those invoices. Actually, you know what, let's take that down.

Q. Now, when the revised invoices were sent, Mr. Margolis, was certain back-up documentation included?

A. Yes.

Q. Why was that back-up documentation included?

A. To show that there was -- that there was work done.

Q. And who requested that?

A. Seth Horowitz.

MR. RODRIGUEZ: If we can go back to 1106, please.

Q. Do you see Ethan Cole sent you an email saying: "Subject: Iconix invoices. Need your input on how I should position the marketing invoices to Angela and Gahl when I speak with them"?

Do you see that?

A. Yes.

Q. Now, Mr. Margolis, first of all, who is Angela and Gahl?

A. They used to work for me.

Q. In what company or capacity?

A. Angela was a cofounder of a company by the name of TLC that we acquired, and Gahl ran Southeast Asia for us.

Q. When Ethan Cole says to you: "Need your input on how I should position the marketing invoices," what did you understand him to mean by "position"?

A. I don't remember.

Q. Let me ask you this: Mr. Margolis, were Angela and Gahl aware of the $5 million overpay arrangement that you've been

MB1YCOL1                                             Page 1767

testifying about?

A. No.

Q. Were they aware of the fact that you've been testifying about that GBG was going to invoice Iconix for $5 million to get that overpayment back?

A. No.

Q. Did Mr. Ethan Cole know that?

A. Yes.

Q. Other than Ethan Cole and Jason Rabin, Mr. Margolis, did you tell anyone else at GBG about this $5 million overpayment?

A. No.

Q. When Mr. Cole is referring to "Angela and Gahl," what did you need from those folks, if anything, before you could submit the revised invoices to Iconix?

A. The details, the information.

MR. RODRIGUEZ: Your Honor, at this point, subject to prior discussions at sidebar, the government would offer Government Exhibits 1257, 1258, 1260, and 1263.

THE COURT: Those exhibits will be received.

(Government's Exhibits 1257, 1258, 1260, and 1263 received in evidence)

MR. RODRIGUEZ: Can we please publish Government Exhibit 1258.

Q. Now, do you recognize this as a September 30, 2014, email from Ethan Cole to Angela Farrugia?

MB1YCOL1                                             Page 1768

A. Yes.

Q. Is Angela Farrugia, as you understand it, the same Angela that Ethan Cole was talking about when he was talking about positioning the invoice?

A. Yes.

Q. He says in his email: "Hi, Angela. Can you please send me the marketing plan for Zoo York and Massimo? Jared recalled seeing impressive marketing initiatives for the global week presentations, but the FTP site wouldn't allow him to log in."

Do you see that?

A. I do.

Q. Mr. Margolis, why did Ethan Cole actually need these marketing materials from Angela Farrugia?

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: To provide backup.

BY MR. RODRIGUEZ:

Q. For what?

A. For the invoices.

Q. To who?

A. To Iconix.

Q. Looking at this email, did Neil Cole say anything to Angela Farrugia about invoicing Iconix?

A. No.

MR. RODRIGUEZ: Let's look at what's now in evidence

MB1YCOL1                                             Page 1769

as Government Exhibit 1263, please.

Q. Do you see that this is an email dated October 1 from Ethan Cole copying you?

A. Yes.

Q. Let's look at the bottom of page 1, please.

Do you see that Angela Farrugia wrote back to Ethan Cole's email that we had seen?

A. Yes.

Q. And she says: "I have a good Mossimo one that we developed for Blue Inc, but Zoo York is work in progress, but will send what I have."

Do you see that?

A. I do.

Q. Do you know what Blue Inc is?

A. It's a licensee that we had in Europe.

Q. In Europe?

A. Yes.

Q. Did it have anything to do with the Southeast Asia joint venture?

A. No.

Q. Mr. Margolis, directing your attention to where it says: "Zoo York is a work in progress," would you typically send a work in progress to a business partner to support an invoice?

A. Possibly.

Q. Is that something you typically did?

# A-949

UNITED STATES OF AMERICA, V
NEIL COLE,

MB1YCOL1                                      Page 1770

A. I don't recall. I may have. I wouldn't put it -- like put it past me.

MR. RODRIGUEZ: Your Honor, at this time, I'm going to move to admit again, prior to discussions at sidebar, 1136, all government exhibits, 1135, 1133, and 1143.

THE COURT: Very well. They will be received.

(Government's Exhibits 1136, 1135, 1133, and 1143 received in evidence)

MR. RODRIGUEZ: Let's please publish 1136.

Q. Now, sir, do you recognize this as a meeting invite you received from someone named Amanda Azzoli?

A. Yes.

Q. Who was Ms. Azzoli?

A. She was my assistant at the time.

Q. And the subject is: "Meeting. Jason, Neil Cole, Jared Margolis."

Do you see that?

A. I do.

Q. And the location is Iconix office.

Do you see that?

A. I do.

Q. And the date is December 2, 2014.

Do you see that?

A. Yes.

Q. So, Mr. Margolis, as reflected here, you had a meeting

MB1YCOL1                                      Page 1771

scheduled with Neil Cole and Jason Rabin at Iconix's office for September 2, 2014?

A. Yes.

MR. RODRIGUEZ: Let's publish what's in evidence as Government Exhibit 1135, please.

Q. Focusing on the top, is this an email from your assistant, Ms. Azzoli.

A. It is.

Q. And she's sending it to Toni Lombardi.

Who is that person?

A. Jason Rabin's assistant.

Q. And the subject says: "Meeting with Jason and Neil Cole."

Do you see that?

A. I do.

Q. And it says: "Hi, Toni. I hope you are well and had a great holiday. Jared will be joining the meeting with Jason and Neil Cole tomorrow."

Do you see that?

A. I do.

Q. And, Mr. Margolis, generally speaking, did you prepare for this meeting the next day, December 2, 2014, that you had scheduled with Jason Rabin and Neil Cole?

A. Yes.

Q. Did you ask Ethan Cole to help you prepare for that meeting?

MB1YCOL1                                      Page 1772

A. I did.

MR. RODRIGUEZ: Let's go to Government Exhibit 1133 which is now in evidence.

Q. Do you see this email chain between you and Ethan Cole dated December 1?

A. Yes.

Q. This is the day before the meeting you had scheduled with Ethan Cole?

A. Yes.

MR. RODRIGUEZ: Let's look at the bottom of the email chain, please.

Q. Right there do you see you sent Jason Rabin an email that says: "What time are we meeting with Neil?"

A. Yes.

Q. And the Neil you're referring to there is Neil Cole?

A. Yes.

Q. And then looking further up to the next email, you forwarded that to Mr. Ethan Cole.

Is that right?

A. Yes.

Q. And you say: "I'm meeting with Neil and Jason in the afternoon. I need to have everything organized in paper, where all the money is going in detail as discussed last week."

Do you see that?

A. I do.

MB1YCOL1                                      Page 1773

Q. What did you mean when you told Ethan Cole "where all the money was going"?

A. To invoice the $5 million that was owed to us for the overpay.

MR. RODRIGUEZ: Let's go to the top email, please.

Q. This is another email from you to Ethan Cole?

A. Yes.

Q. It says: "Additionally, what has been paid so far and the schedule on the balance."

Do you see that?

A. Yes.

Q. Are these further instructions that you're providing to Mr. Ethan Cole?

A. Yes.

Q. Now, Mr. Margolis, as a result of these instructions that you provided to Ethan Cole, did he prepare a summary for you?

A. Yes.

Q. Did you ask him to prepare that summary for you for your upcoming meeting with Jason Rabin and Neil Cole?

MR. MARKUS: Objection. Leading, your Honor.

THE COURT: Sustained.

BY MR. RODRIGUEZ:

Q. Why did you ask him to prepare that summary?

A. For our meeting with Neil Cole.

MR. RODRIGUEZ: Let's take a look at what is in

# A-950

**UNITED STATES OF AMERICA, V**
**NEIL COLE,**                                      November 15, 2022

MB1YCOL1                                      Page 1774

evidence as Government Exhibit 1139, please. And I want to zoom in, please, on the top. Perfect. That's great.

Q. Now, sir, do you see this email?

Is this the summary that you asked Mr. Cole to prepare? Mr. Ethan Cole.

A. Yes.

Q. And the subject says: "Notes for Iconix meeting."

Do you see that?

A. I do.

Q. And the date is December 1.

Do you see that?

A. Yes.

Q. Now, generally speaking, what's this email all about?

A. It's the summary of our deal.

Q. Okay. I want to direct your attention to that first word of the email "plugs."

Do you see that?

A. Yes.

Q. What do you understand "plugs" to mean in this context?

A. The overpay.

Q. And there are three different columns there.

Do you see that?

A. I do.

Q. "Europe/Korea," what does that refer to? Which deal?

A. SEA-2.

MB1YCOL1                                      Page 1775

Q. And "LC/Umbro China," which deal is that?

A. SEA-3.

Q. And "Middle East," which deal is that?

A. MENA.

Q. And is that a deal that, by the time of this email, had not closed?

A. Correct.

Q. Now, Mr. Margolis, the information that's laid out here, at the time, did you believe that Mr. Neil Cole was aware of these overpayments?

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. RODRIGUEZ:

Q. Would you have asked Ethan Cole to prepare this for your meeting with Neil Cole if you did not believe that Neil Cole was aware of it?

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: No.

BY MR. RODRIGUEZ:

Q. By the way, is Seth Horowitz on this email?

A. No.

MR. RODRIGUEZ: Let's come back to this document, and let's now go to 1137 in evidence.

MB1YCOL1                                      Page 1776

Q. Do you see this email from Ethan Cole to John Reda copying you dated December 1 at 6:00 p.m.?

A. Yes.

Q. And Ethan says: "I spoke with Iconix this morning, and they said they have made payments for one of the three invoices (1.9m) with the others to follow."

Do you see that?

A. I do.

Q. Am I correct that the "1.9m" refers to one of the invoices we saw earlier?

A. Yes.

Q. Mr. Ethan Cole continues in his email: "Please confirm that we have received the first payment as Jared will be with Neil Cole tomorrow and can pressure him if not."

Do you see that?

A. I do.

Q. Sir, what was your understanding at the time, if any, as to whether Neil Cole knew about the fact that GBG had invoiced Iconix?

A. That he was aware.

Q. Did you have conversations with Jason Rabin about the $5 million overpayment?

A. Yes.

Q. Did you have conversations with Jason Rabin about the fact that GBG would be invoicing Iconix to get that $5 million back?

MB1YCOL1                                      Page 1777

MR. MARKUS: Objection. Leading, your Honor.

THE COURT: Sustained.

BY MR. RODRIGUEZ:

Q. Did you have conversations with Jason Rabin about invoicing Iconix?

MR. MARKUS: Objection. Leading, your Honor.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. RODRIGUEZ:

Q. Did you have similar conversations with Seth Horowitz?

A. Yes.

MR. RODRIGUEZ: Let's go back now to 1139, please.

Q. I want to focus on this chart in the email.

Let's start with "Europe/Korea." The purchase price is listed as approximately $15.9 million.

Do you see that?

A. I do.

Q. And was that the ultimate purchase price for this deal?

A. Yes.

Q. The next row says: "Value based on rev multiple $10.9 million."

Do you see that?

A. I do.

Q. What do you understand "value based on rev multiple" to mean?

# A-951

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

MB1YCOL1     Page 1778

A. The multiple that we valued the revenue at.
Q. Is that a calculation that GBG performed?
A. Yes.
Q. With respect to what it would be buying as part of the SEA-2 deal?
A. Yes.
Q. The row underneath that says "plug."
    Do you see that?
A. I do.
Q. And it's approximately $5 million.
    Do you see that?
A. Yes.
Q. What's that referring to? "Plug."
A. The overpay.
Q. So for SEA-2, with respect to that $5 million plug, what were you anticipating was going to happen with that $5 million?
A. We were going to get paid back.
Q. Who was going to pay you back?
A. Iconix.
    MR. RODRIGUEZ: Now let's zoom out and go to the first bullet point below the chart.
    It says: "Thus far, we have invoiced $5 million in marketing for the Europe/Korea amendment."
Q. Do you see that?
A. Yes.

MB1YCOL1     Page 1779

Q. Which deal is this referring to?
A. SEA-2.
Q. In that first bullet, I want to focus on the word "for." It says: "We have invoiced $5 million in marketing for the Europe/Korea amendment."
    Do you see that?
A. Yes.
Q. Mr. Margolis, what, if any, connection was there between GBG invoicing Iconix $5 million and the SEA-2 deal?
    MR. MARKUS: Objection. Asked and answered.
    THE COURT: Sustained.
BY MR. RODRIGUEZ:
Q. The $5 million in marketing here, what's that referring to?
A. To the overpay.
Q. And Europe/Korea amendment, what deal is that?
A. SEA-2.
    MR. RODRIGUEZ: All right. Let's look at the chart for the next deal over, "LC/Umbro China."
Q. Do you see that the value based on multiple is $6 million less than the purchase price?
A. Yes.
Q. And there's a plug of $6 million?
A. Yes.
Q. What's that describing?
A. The overpay.

MB1YCOL1     Page 1780

Q. And what were you expecting would happen with respect to that overpay?
A. That we would get paid back.
    MR. RODRIGUEZ: Let's go back to the bullet points, please.
Q. Looking at the third bullet point, do you see it says: "The $6 million for China Umbro/LC will be offset the following"?
    Do you see that?
A. Yes.
Q. It mentions Rocawear royalties of $4.5 million.
    Do you see that?
A. I do.
Q. What's your understanding as to what that's referring to?
A. That's a part of the $6 million.
    MR. RODRIGUEZ: Let's go to the final column, please, where it says "Middle East."
Q. Do you see there's a $5 million plug referred to here?
A. I do.
Q. What's that a reference to?
A. The overpay.
Q. Now, if we look at the bottom in the email, there's a heading towards the bottom for Middle East. And it says: "As discussed, we have a hard close date of Monday, the 15th."
    Do you see that?

MB1YCOL1     Page 1781

A. I do.
Q. Just to remind the jury, did the Middle East transaction close at this point or not?
A. I don't remember.
Q. At the time of this email, had it closed?
A. No.
Q. If we go to the: "Miscellaneous Points to Discuss Section," do you see it says: "How to allocate the $5 million plug for the Middle East JV"?
A. Yes.
Q. Had there been any final decisions made about that yet?
A. No.
    MR. RODRIGUEZ: We can take the email down, please.
Q. Sir, towards the end of 2014, did you continue to seek payment on those invoices you've been testifying about?
A. Yes.
    MR. RODRIGUEZ: Can we put what's already in evidence as 1126 up.
Q. Do you recognize this as an email from Ethan Cole to Seth Horowitz copying you dated November 14, 2014?
A. Yes.
Q. And at the bottom of page 1, he says: "Hi, Seth. Finance has followed up on the marketing invoices. Any update on when we can expect to receive payment?"
    Do you see that?

UNITED STATES OF AMERICA, V
NEIL COLE,                                                              November 15, 2022

MB1YCOL1                                      Page 1782

A. Yes.
Q. At this point, had the three invoices that had been submitted to Iconix been paid yet?
A. No. They haven't.
MR. RODRIGUEZ: Let's go to Government Exhibit 1143, please.
Q. And do you recognize this, sir, as an email from Ethan Cole to John Reda dated December 2, 2014?
A. Yes.
Q. In the second email from the top, if we could, Mr. Reda says: "We received the funds. The balance has to be received before year end, or we are going to have problems with the auditors."
Do you see that?
A. I do.
MR. RODRIGUEZ: If we can go to the top email, please.
Q. Ethan Cole says: "Glad to see that we have received the first payment. Jared met with Iconix today, and the remainder will be sent out this week."
Do you see that?
A. Yes.
Q. And the date of this email is December 2, 2014.
Is that right?
A. Correct.
Q. And at this point, as you understood it, had at least one

MB1YCOL1                                      Page 1783

of the invoices been paid?
A. Yes.
MR. RODRIGUEZ: Your Honor, again, subject to prior discussions at sidebar, the government moves to admit Government Exhibits 1145, 1147, 1153, and 1154.
THE COURT: Those exhibits will be received.
(Government's Exhibits 1145, 1147, 1153, and 1154 received in evidence)
MR. RODRIGUEZ: Can we publish 1145, please.
Q. All right. Now, sir, do you see this email from Ethan Cole to Angela Farrugia copying you dated December 4?
A. Yes.
MR. RODRIGUEZ: Can we go to page 3, the bottom email.
Q. Do you see this email from Daisy Laramy-Binks?
A. Yes.
Q. And she is sending it to Inam Shah.
Do you know who that person is?
A. Yes.
Q. Who is it?
A. Inam was our finance.
Q. For which company?
A. For GBG management.
Q. Where was this person located?
A. In the UK.
Q. Was it GBG or TLC?

MB1YCOL1                                      Page 1784

A. He came from TLC, but he ran all of our --
Q. So the email says: "Hi, Jared. I do hope the below is helpful. Key brand turn around summaries."
Do you see that?
A. I do.
Q. We're not going to read it.
But what follows on pages 3 and 4, is it fair to say that it's a summary of work done on different brands?
A. Yes.
Q. So if we go to the next email at the bottom of page 2, the top of page 3, Inam says: "Hi, Jared. Please see key points from Daisy below as requested. I have copied Daisy so she can follow up directly if you have any questions."
Mr. Margolis, did you make this request of Inam Shah?
A. If I didn't, it was done through Ethan, but it was one of us.
Q. And at whose direction would he have done that?
A. Under mine.
Q. On the next email on page 2, do you see where you forward the prior email to Jason and Ethan Cole?
A. Yes.
Q. And then at the bottom of page 1 to the top of page 2, Ethan Cole writes to Daisy Laramy-Binks.
Do you see that?
A. Yes.

MB1YCOL1                                      Page 1785

Q. I want to focus you on his second paragraph. It says: "For each initiative listed below, wherever applicable, can you please send me some back-up documentation."
Do you see that?
A. I do.
Q. Now, Mr. Margolis, at this point in time, what was your understanding as to why Mr. Ethan Cole was asking for back-up documentation from Ms. Laramy-Binks?
A. So we can submit it to Iconix.
Q. In connection with what?
A. The overpay.
MR. RODRIGUEZ: If we can go to the last paragraph of the same email. It begins: "It is okay."
Q. "It is okay if you cannot dig up everything, but whatever supporting documentation you do have would be helpful. Just as an FYI, we are using this info to show Iconix the amazing brand-building work TLC has done thus far as Iconix will be engaging us to perform some consulting work for a number of their brands."
Do you see that?
A. I do.
Q. Was there any consulting work that was being contemplated at this time?
A. I don't remember.
Q. Why was Ethan Cole asking for this backup?

# A-953

MB1YCOL1                                                              Page 1786

A. To submit the invoices for the overpay to Iconix.

Q. In this email or any other email that you've seen, did Ethan Cole tell Daisy Laramy-Binks that this back-up documentation would be submitted in connection with an invoice to Iconix?

A. No.

MR. RODRIGUEZ: And if we can just go to the top of the email, please, the top email, rather, in the chain.

Q. And zooming in on that, this email from Ethan Cole to Angela Farrugia, do you see that?

A. Yes.

Q. And he says here: "We will discuss in detail on our call, but Iconix would like to engage us for a number on consulting agreements in the coming months."

Do you see that?

A. I do.

Q. Is there any reference to Iconix invoices here?

A. No.

Q. Further down, he says: "We do not need to beef up or change the aesthetics of whatever we have on file. We don't need to make it pretty."

Do you see that?

A. I do.

Q. What was your understanding, Mr. Margolis, as to why Ethan Cole is telling Angela Farrugia: "We don't need to make it

MB1YCOL1                                                              Page 1787

pretty"?

A. Because we were just adding it to the invoices for backup.

MR. RODRIGUEZ: Let's go to 1147 in evidence, please.

Q. Sir, do you see this email from Ethan Cole to you dated December 8, 2014?

A. Yes.

MR. RODRIGUEZ: If we could just zoom out for a second.

Q. Take a look. Does this appear to be the same email chain that be were looking at earlier with Daisy Laramy-Binks and Angela Farrugia?

A. Yes.

Q. Now, I just want to focus on that top email. This is an email just with Ethan Cole and you.

Is that right?

A. Yes.

Q. He says: "Hey, do you mind nudging the team on this?"

Let me pause for a second there.

Do you know what "team" he's referring to?

A. Yes.

Q. Who?

A. Angela and her team in the UK.

Q. He continues: "I can't send invoices to Iconix without the back-up info."

Do you see that?

MB1YCOL1                                                              Page 1788

A. I do.

Q. Is Daisy Laramy-Binks on this email?

A. No.

Q. Is Angela Farrugia on this email?

A. No.

Q. Who is the only person who received this email?

A. Ethan.

Q. Who received it?

A. Myself.

Q. As you understood it, why couldn't he send invoices to Iconix without the back-up info?

A. Because that's what we were asked to do.

Q. By whom?

A. By Seth Horowitz.

MR. RODRIGUEZ: Let's go to Government Exhibit 1154 in evidence, please.

Q. Do you see this email from Ethan Cole to you dated December 11?

A. Yes.

Q. The subject is: "Showroom pics from SEA."

Do you see that?

A. I do.

Q. It says: "Please remind Claire and Annabelle that we urgently need images of the Massimo/Candies/Zoo York showrooms. Even if they are not the most impressive, we need that."

MB1YCOL1                                                              Page 1789

Do you see that?

A. I do.

Q. Why, as you understood it, did Ethan Cole need this stuff?

A. So we could submit them with the invoices.

Q. And why, as you understood it, "even if they are not the most impressive, we need them."

A. So we could get paid.

Q. By whom?

A. Iconix.

MR. RODRIGUEZ: Let's turn to a different topic.

Q. Now, sir, were you involved in negotiations toward the later part of 2014 regarding another potential joint venture between Iconix and GBG in the Middle East?

A. Yes.

Q. Was there an acronym for that joint venture?

A. MENA.

MR. RODRIGUEZ: Let's go back briefly, if we could, to 1139, which is in evidence.

Q. Do you remember this email from Ethan Cole to you dated December 1?

A. Yes.

Q. And the Middle East column that's referred to in the chart, is that the MENA transaction?

A. Yes.

Q. At this point, at the point of this email, December 1, had

**A-954**

Page 1790

there been discussions about GBG paying more than $18.6 million for MENA?

A. Yes.

Q. And you were involved in these negotiations?

A. Yes.

Q. Based on your involvement in the negotiations, why would GBG have agreed to do that?

A. Because we were going to get the money back.

Q. From whom?

A. Iconix.

MR. RODRIGUEZ: Again, your Honor, subject to discussions at sidebar, the government would move to admit Government Exhibits 1167, 1170, and 1171.

THE COURT: Those exhibits will be received.

(Government's Exhibits 1167, 1170, and 1171 received in evidence)

MR. RODRIGUEZ: If we can please publish Government Exhibit 1167.

Q. Now, sir, do you see this December 18 email from Ethan Cole to Neil Cole and others, including copying you?

A. Yes.

Q. And the subject is: "Middle East JV terms."

Do you see that?

A. I do.

Q. And further down, it mentions a purchase price of about

Page 1791

$18.7 million.

Do you see that?

A. I do.

Q. Is that roughly the same as the revenue multiple calculation that we saw in the plugs email?

A. Yes.

Q. The reference there to "Diligence/market analysis payment increased to $3 million," do you see that?

A. Yes.

Q. Let's now go to page 2 of document and item 5 where it says: "Diligence/market analysis payment to GBG. Iconix to pay GBG $3.1 million at closing for expenses related to diligence and market analysis in the Middle East and North Africa."

Do you see that?

A. Yes.

Q. Mr. Margolis, in your experience, why did GBG conduct due diligence before entering into a joint venture transaction?

A. To make sure it was accurate and it was the right investment to make.

Q. Did that include figuring out what the appropriate price to pay would be?

A. Yes.

Q. Mr. Margolis, did GBG, in your experience, typically get paid by a counterparty in a joint venture for the costs that it

Page 1792

incurred in doing due diligence for that deal?

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: No.

BY MR. RODRIGUEZ:

Q. If GBG was paying an $18.9 million purchase price but getting $3.1 million pursuant to this payment, what does that net out to approximately?

A. 15 and change.

MR. RODRIGUEZ: Let's go to Government Exhibit 1171, please.

Q. Do you recognize this as an email from Ethan Cole to Seth Horowitz copying you dated December 3, 2014?

A. Yes.

Q. And the subject is: "Middle East Invoice."

Do you see that?

A. Yes.

Q. Ethan writes in his email: "Hi, Seth. Please find attached an invoice for transaction related to the expenses for the Middle East JV."

Do you see that?

A. Yes.

MR. RODRIGUEZ: Can we look at the attachment, please.

Q. Do you see a $3.1 million invoice?

A. I do.

Page 1793

MR. RODRIGUEZ: Can we now zoom in on the description, please.

Q. "Does commercial and financial due diligence in connection with the Middle East and North Africa joint transaction, market and positioning analysis of Middle East and North African brand portfolio."

Do you see that?

A. Yes.

Q. Mr. Margolis, before entering into the MENA transaction, would GBG have done due diligence and marketing analysis of its own?

Would that have been part of the normal process?

A. Yes.

Q. Even if it wasn't being paid for it?

A. Yes.

MR. RODRIGUEZ: Let's take a look at Government Exhibit 1178, please.

Q. And do you see this email from John Reda to Ethan Cole and you dated January 6, 2015?

A. Yes.

Q. He says: "Hi. We received the attached money from Iconix with no backup as to what this is for. Would you know the purpose of these payments? Is there someone at Iconix that I could contact?"

Do you see that?

# A-955

**MB1YCOL1**          Page 1794

A. I do.

MR. RODRIGUEZ: Let's go to page 2, please.

Q. On December 17, 2014, how much money did Iconix pay GBG?

A. $52.5 million.

Q. Just focusing on December 17, that line.

A. $2.4 million.

Q. And on December 24, 2014, how much money did Iconix pay GBG?

A. 3.1.

Q. And, as you understand it, did that relate to the MENA transaction?

A. Yes.

Q. I want to talk now about that approximately $2.4 million referenced in the first line.

MR. RODRIGUEZ: Your Honor, I believe, again, subject to everything at sidebar, the government would offer the native versions of Government Exhibits 1180A through 1180O.

THE COURT: Very well. They will be received.

(Government's Exhibits 1180A through 1180O received in evidence)

MR. RODRIGUEZ: And one more. 1181.

THE COURT: Very well.

(Government's Exhibit 1181 received in evidence)

MR. RODRIGUEZ: If we can please publish what's already in evidence as Government Exhibit 1180.

**MB1YCOL1**          Page 1795

Q. Sir, do you recognize this as an email from Ethan Cole to John Reda copying you dated January 7, 2015?

A. Yes.

MR. RODRIGUEZ: Let's go to page 2, please.

Q. Going to page 2, the response to John Reda's question in the middle of the page that begins: "The first amount."

So do you see Ethan Cole says: "The first amount received is a lump-sum payment for approximately 16 invoices. These invoices primarily relate to showrooms, marketing, and creative work done for" and then a bunch of brands follow?

Do you see that?

A. I do.

Q. So that first amount he was referring to, is that the approximately $2.4 million we saw?

A. Yes.

MR. RODRIGUEZ: Let's go to the top of page 2 of the email, please, where John Reda says: "Thank you, Ethan. For the first amount received, there are no invoices on the books for this cash. Do you have copies of these 16 invoices? Were they ever processed by the GBG billing/AR department?"

Q. Do you see that?

A. Yes.

MR. RODRIGUEZ: And then let's go to the top of page 1 where Ethan Cole says: "I'm available to speak now. If not, please see 17 invoices attached. The one titled Middle East DD

**MB1YCOL1**          Page 1796

is for 3.1 million in transaction-related expenses. The other amount to 2.4 million which is the second amount we received from Iconix."

Q. Do you see that?

A. I do.

Q. The $2.4 million, just to be clear, that relates to the 16 invoices?

A. Yes.

Q. What is your understanding as to what that $2.4 million in invoices was for?

A. It went towards the overpay.

MR. RODRIGUEZ: Staying on this document, let's just quickly look through some of the attachments. If we can just keep scrolling. And let's now look at the natives, please. I'll just pick the first one, A.

Q. Now, sir, you testified earlier about obtaining back-up documentation.

Do you recall that?

A. Yes.

Q. Were these invoices relating to that effort?

A. I believe so.

MR. RODRIGUEZ: Let's take a look at Government Exhibit 1181, please.

Q. Do you recognize this as an email dated January 8, 2015, from Ethan Cole to John Reda copying you?

**MB1YCOL1**          Page 1797

A. Yes.

Q. So let's look at page 2 in the middle where Reda asks: "Do you have copies of these 16 invoices? Were they ever processed by the GBG billing/AR department?"

Do you see that?

A. I do.

Q. Page 1, the second from the top, Reda asked again: "I just need to know if these invoices were processed in the accounting system, or did you just prepare the invoices and give them to Iconix? Did the invoices go to anyone else related to the GBG finance team?"

Do you see that?

A. I do.

Q. And the response from Ethan Cole: "These invoices were submitted directly to Iconix and were not processed by the GBG accounting system."

Do you see that?

A. Yes.

Q. Mr. Margolis, as you understood it, why were these invoices not submitted to the accounting staff before they went over to Iconix?

A. I'm not sure.

MR. RODRIGUEZ: One moment, your Honor.

(Government counsel confer)

BY MR. RODRIGUEZ:

**A-956**

MBFYCOL1          Margolis - Cross          Page 1798

Q. One final question, Mr. Margolis.

Did these invoices relate to the $5 million overpay for SEA-2?

A. Yes.

Q. What was the point of them?

A. To get paid back.

MR. RODRIGUEZ: Thank you. Nothing further at this time.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. MARKUS:

Q. Good afternoon, ladies and gentlemen.

Good afternoon, Mr. Margolis. My name is David Markus. I'm going to ask you a couple of questions. Okay? Probably more than a couple actually.

Let me start out with this idea about whether anything was secret.

You've been testifying about the transactions SEA-1, SEA-2, SEA-3, MENA.

Correct?

A. That's correct.

Q. And I want to be clear. Neil Cole Never asked you to keep anything secret about those transactions. Correct?

A. Correct.

Q. And, in fact, you never took any steps to keep the terms

MBFYCOL1          Margolis - Cross          Page 1799

secret about those transactions; correct?

A. That's correct.

Q. And the truth is Neil Cole never asked you to keep terms out of a written contract, out of a PIP, out of anything. Correct?

A. That's correct.

Q. And you never took any steps to keep those terms out of any contract, out of any PIP, or anything else.

Correct?

A. Can you please repeat that.

Q. You never took things out of a written contract.

You never took any steps to keep things secret, did you, sir?

A. No.

Q. Neil Cole never asked you to withhold any information from a lawyer; correct?

A. Correct.

Q. Neil Cole never asked you to withhold any information from an accountant; correct?

A. Correct.

Q. That last email we saw that the prosecutor showed you where an invoice wasn't submitted to GBG accounting, Neil Cole didn't ask you to do that. Correct?

A. Correct.

Q. In fact, Neil Cole was the one who said, I need to see your

MBFYCOL1          Margolis - Cross          Page 1800

work. I need to see what work you did on this marketing. Correct?

A. Can you repeat that, please.

Q. You understood that Iconix wanted to see the work on these marketing invoices; correct?

A. Yes.

Q. All right. There's nothing wrong about that; right?

A. No.

Q. I want to talk now for a moment about how many times you've met with the government before testifying.

Do you know how many times you've met with them?

A. I don't recall.

Q. Is it more or less than 20 times?

A. I honestly don't recall.

Q. Would you agree with me that it's probably more than 20?

A. Probably.

Q. I want to take you back to the very first one, Mr. Margolis. This was back at your home in March of 2019.

Do you remember getting the knock on your door from the FBI?

A. I do.

Q. And that was a pretty stressful and traumatic moment for you. Correct?

A. Correct.

Q. You weren't expecting the FBI to come knock on your door in

MBFYCOL1          Margolis - Cross          Page 1801

March of 2019; right?

A. No.

Q. And they asked you a number of questions in March of 2019; right?

A. Yes.

Q. And you answered them.

A. To the best of my ability.

Q. You were truthful with them; correct?

A. Yes.

Q. And what you told the FBI was that there was nothing wrong with these transactions; correct?

A. Correct.

Q. You told them that GBG's lawyer, Rob Schmitz, was aware of each and every term of the transaction. Correct?

A. Correct.

Q. And you told the FBI that they should contact GBG's lawyer, Rob Schmitz. Correct?

A. Correct.

Q. You also told the FBI that GBG's CEO, Ron Ventricelli, knew each and every term of these transactions; correct?

A. Correct.

Q. And that they should contact Ron Ventricelli. Correct?

A. Yes.

Q. They asked you about Jason Rabin. Correct?

A. I don't recall, but yes. Over time.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

MBFYCOL1          Margolis - Cross          Page 1802

Q. Do you remember saying Jason Rabin may have been involved in these negotiations?
A. I don't recall that.
Q. Would that have been true or not true?
A. Well, he was involved with this.
Q. He was; right?
A. Correct.
Q. In fact, you tried to sort of minimize to the FBI Jason Rabin's role; correct?
A. I don't recall.
Q. Do you remember, as soon as the FBI left, who was your first phone call to?
A. I called Jason Rabin.
Q. That was your first call; right?
A. Yes.
Q. Because he was involved; right?
A. Yes.
Q. You wanted to give him a heads-up that the FBI had just knocked on your door; right?
A. Correct.
Q. And he told you, actually, Jared, the FBI just knocked on my door too.
A. Correct.
Q. He told you he was freaking out; right?
A. I don't remember.

MBFYCOL1          Margolis - Cross          Page 1803

Q. Let's discuss the players for a moment. I want to start out with Li & Fung.
    That was your original employer?
A. Correct.
Q. They're a huge, successful company; right?
A. At the time, yes.
Q. And you reported -- I think we just said -- to Jason Rabin. Right?
A. Yes.
Q. He was your boss?
A. Yes.
Q. And there are lots of layers between you, Jason Rabin, and the top people at Li & Fung. Correct?
A. Between Jason Rabin and I? Or between Jason Rabin and --
Q. Between you and the bosses at Li & Fung.
A. Yes.
Q. And you weren't the boss. You were sort of an executive but not one of the top executives. Right?
A. Correct.
Q. And is it fair to say Neil Cole of course was the CEO of Iconix.
    He was the boss; right?
A. Correct.
Q. So you weren't on an equal level with Neil Cole; right?

MBFYCOL1          Margolis - Cross          Page 1804

A. Right.
Q. There were top people at Li & Fung that Neil Cole would have talked to; correct?
A. Correct.
Q. And you were talking to people like Seth Horowitz at Iconix; right?
A. Correct.
Q. You weren't really talking to Neil Cole about these deals; correct?
A. Correct.
Q. Especially on SEA-2 and SEA-3, your primary contact was Seth Horowitz. Correct?
A. Correct.
Q. This is a guy with a huge ego; right?
    MR. RODRIGUEZ: Objection.
    THE COURT: Overruled.
BY MR. MARKUS:
Q. Now let's talk about Mr. Neil Cole for a moment.
    He is a well-known person in this industry; correct?
A. Yes.
Q. He developed this brand management model; correct?
A. Correct.
Q. And a number of other companies have followed this model that Mr. Cole has developed. Correct?
A. Correct.

MBFYCOL1          Margolis - Cross          Page 1805

Q. He was really a visionary here. Yes?
A. Yes.
Q. A pioneer in the field; right?
A. Right.
Q. Someone you admired; correct?
A. Correct.
Q. And just to be clear -- we're going to get to the exact math and everything else in a moment -- but you viewed each of these SEA transactions as very favorable to your company. Correct?
A. Correct.
Q. They were good deals for you guys. Yes?
A. They were.
Q. Now, Jason Rabin, you moved with him to Hong Kong to start work with him; correct?
A. Correct.
Q. And you wanted to starting some there, build a career with Mr. Rabin out in Asia. Correct?
A. Correct.
Q. Would you agree with me that Jason Rabin is an outgoing, charismatic person; right?
A. Yes.
Q. He's a smart guy; right?
A. Yes.

UNITED STATES OF AMERICA, V
NEIL COLE,                                                          November 15, 2022

| MBFYCOL1 | Margolis - Cross | Page 1806 |
| --- | --- | --- |

Q. He's not a forgetful man, is he?

MR. RODRIGUEZ: Objection.

THE COURT: Sustained as to the form.

BY MR. MARKUS:

Q. When you dealt with Jason Rabin, sir, did you find him to be forgetful or that he would forget things?

A. It's not really something I paid much attention to.

Q. Now, before the SEA-1 transaction, that was the first joint venture. Correct?

A. Sorry. Can you repeat that.

Q. Sure. SEA-1 was the first joint venture out in Asia between Li & Fung and Iconix. Correct?

A. Correct.

Q. Now, before that joint venture, before SEA-1, Iconix and Li & Fung had done lots and lots of business together. Correct?

A. Correct.

Q. And in fact, when you started doing this kind of work in 2013, you told many people you loved Iconix; right? You loved Neil Cole's company.

A. Correct.

Q. It was a great company; right?

A. Correct.

Q. Above board, ethical, easy to work with. Correct?

A. Correct.

Q. Now, we saw lots and lots of emails between you and Ethan

| MBFYCOL1 | Margolis - Cross | Page 1807 |
| --- | --- | --- |

Cole.

Do you remember those emails?

A. Yes.

Q. I want to talk to you for a moment about who Ethan Cole is.

This was, at the time, a young guy. Right?

A. Yes.

Q. He was doing a lot of work for you. Yes?

A. Yes.

Q. He was smart. Right?

A. Correct.

Q. Attentive; right?

A. Yes.

Q. Moral, ethical, and above board. Correct?

MR. RODRIGUEZ: Objection to form.

THE COURT: Break it down, Mr. Markus.

MR. MARKUS: Sure.

Q. Did you trust him?

A. I did.

Q. Did you think he was committing criminal acts?

MR. RODRIGUEZ: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. Did you think he was a moral person?

A. Yes.

Q. And just to be clear, Mr. Margolis, this Ethan Cole -- he's

| MBFYCOL1 | Margolis - Cross | Page 1808 |
| --- | --- | --- |

the person who would draft emails for you. Correct?

A. Correct.

Q. You weren't really an email guy; right?

A. Correct.

Q. You weren't on the computer, even reading your emails or responding to them. Right?

A. Not as much as others.

Q. I mean, a lot of us are always on our phone, checking our emails.

That's not you. Right?

A. That's not me. Correct.

Q. Ethan Cole really had that responsibility for you. Yes?

A. Yes.

Q. And so he would, a lot of times, read your emails for you and summarize them for you. Yes?

A. Yes.

Q. He would draft responses for you to give to other people; correct?

A. Correct.

Q. So sometimes when we're seeing your emails on the screen, those are actually Ethan Cole's words that he drafted for you. Yes?

A. From time to time, yes.

THE COURT: Mr. Markus, it's 11:00. So we'll break for 20 minutes.

| MBFYCOL1 | Margolis - Cross | Page 1809 |
| --- | --- | --- |

Ladies and gentlemen, don't discuss the case.

(Continued on next page)

**A-959**

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

MBFYCOL1          Margolis - Cross          Page 1810

(In open court; jury not present)

THE COURT: You may step down.

(Witness temporarily excused)

THE COURT: Everyone can be seated.

Anything to raise?

MR. RODRIGUEZ: No, your Honor.

MR. MARKUS: No, your Honor.

THE COURT: Twenty minutes, folks.

(Recess)

THE COURT: Did you wish to raise something, Mr. Thomas?

MR. THOMAS: Yes, your Honor. Just in the hope of, if we have a minute, of avoiding a sidebar, I expect that Mr. Markus will -- actually, I see the witness is here.

THE COURT: Yes.

We can go to sidebar.

MR. THOMAS: Yes. Let's do that.

(Continued on next page)

MBFYCOL1          Margolis - Cross          Page 1811

(At the sidebar)

MR. RODRIGUEZ: I know we discussed yesterday the anticipated cross-examination of Mr. Margolis and Mr. Markus asking a number of questions about are you aware that Ethan Cole said X, Y, and Z. And your Honor ruled on that, even though we objected.

I understand from Mr. Markus that he intends to ask a slightly different question which is something to the effect of are you aware that the government threatened Ethan Cole.

And the notion of "threat" I think there is absolutely no basis in the record for. And so that question -- I think it misstates the 3500.

THE COURT: Let me ask: Are you intending to ask Mr. Margolis whether he is aware that the government threatened Ethan Cole?

MR. MARKUS: Yes, your Honor. I can do it a number of different ways because I have the 3500 where --

THE COURT: It admits to having threatened Ethan Cole?

MR. MARKUS: Yes. It says that they believe he committed obstruction; that Ethan Cole understood that as a threat that he could get charged.

Can I ask whether he was told that the government viewed his comment as obstructive?

THE COURT: Any objection to that?

MR. THOMAS: Your Honor, in point of fact, the

MBFYCOL1          Margolis - Cross          Page 1812

government told his counsel that and said that only after Ethan Cole's counsel said he would take the Fifth anyway. That's the very first thing that happened on that call.

There is no relevance to whether or not his counsel was told that the government viewed Ethan Cole's proffer conduct as obstructive.

THE COURT: No.

MR. MARKUS: No, you mean I can't ask whether he viewed that?

THE COURT: Correct.

(Continued on next page)

MBFYCOL1          Margolis - Cross          Page 1813

(In open court; jury present)

MR. MARKUS: May I have just a moment?

THE COURT: Sure.

Mr. Markus.

MR. MARKUS: Thank you, your Honor.

Good morning, everybody, I think still. I lost track.

Q. Mr. Margolis, I know we've all discussed this, but Ethan Cole has no relation to Neil Cole.

Is that right?

A. That's correct.

Q. And this is a guy who -- is it fair to say that he was really helping you with all aspects of the business, in part, because you were disorganized? Correct?

A. Correct.

Q. And, Mr. Margolis, is it fair to say that you and Ethan Cole never intended to commit any sort of fraud? Right?

MR. RODRIGUEZ: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. Did you and Ethan Cole always act in good faith?

MR. RODRIGUEZ: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. Did you act in good faith?

MR. RODRIGUEZ: Objection to form.

# A-960

UNITED STATES OF AMERICA, V
NEIL COLE,                                          November 15, 2022

---

MBFYCOL1        Margolis - Cross        Page 1814

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. MARKUS:

Q. And did you have any reason to believe that Ethan Cole, who was acting at your direction, was ever acting in anything other than good faith?

MR. RODRIGUEZ: Same objection.

THE COURT: Overruled.

MR. MARKUS: You can answer, sir.

THE WITNESS: No.

BY MR. MARKUS:

Q. Now, are you aware that Ethan Cole always said that he has done nothing wrong?

A. Yes.

Q. And you're aware that he said he's innocent; correct?

MR. RODRIGUEZ: Objection.

THE COURT: Overruled.

BY MR. MARKUS:

Q. Are you aware of that?

A. I'm not. I've never -- I'm not aware.

Q. Are you aware that Ethan Cole always said that these invoices are legitimate?

MR. RODRIGUEZ: Objection. Misstates the record.

THE COURT: Overruled.

THE WITNESS: Can you repeat the question, please.

---

MBFYCOL1        Margolis - Cross        Page 1815

BY MR. MARKUS:

Q. Sure. Are you aware that Ethan Cole always said that these invoices are legitimate?

MR. RODRIGUEZ: Same objection.

THE COURT: Overruled.

THE WITNESS: I never thought that he was doing anything wrong, and I never thought I was doing anything wrong. So why would I have any other --

BY MR. MARKUS:

Q. It's not surprising to you in other words; right?

A. Correct.

Q. Because you believed that these invoices were legitimate; correct?

A. Correct.

Q. Did Ethan Cole go to Payless with you?

A. He was a consultant for me.

Q. You ended up working at Payless after working at GBG?

A. Correct.

Q. And what was your role at Payless?

A. I was the CEO.

Q. And so you hired Ethan Cole to sort of continue his work with you when you were the CEO at Payless?

A. He played a role in supporting.

Q. He supported you?

A. Correct.

---

MBFYCOL1        Margolis - Cross        Page 1816

Q. Are you still at Payless?

A. I'm not on the day-to-day. I'm a consultant.

Q. What happened with the CEO role?

A. I stepped down.

Q. Why?

A. Because the opportunity was not the same when I came in emerging out of bankruptcy. And then 90 days later, COVID happened.

Q. And does Ethan Cole still work at Payless?

A. He does not.

Q. Are you aware, Mr. Margolis, that Ethan Cole kept notes about meetings and the transactions in question?

A. I'm not.

Q. Did you know that he kept notes to himself in August of 2014?

A. I'm not aware.

Q. August 2014 is shortly after SEA-2 closed. Correct?

A. I believe so.

Q. And was there a meeting in August of 2014 with you, Ethan Cole, Seth Horowitz, and Willy Burkhardt?

A. I don't -- there very might well have been, but I don't recall.

Q. Do you remember a meeting where you and Ethan Cole were complaining that Iconix was not paying the marketing invoices?

A. I don't remember.

---

MBFYCOL1        Margolis - Cross        Page 1817

MR. MARKUS: If I could show the witness, just the witness and the government, Defense Exhibit 2309.

Q. Do you see this on the screen, Mr. Margolis?

A. Yes.

Q. Take a moment and review it and see if it refreshes your recollection about a meeting you had with Ethan Cole in August of 2014.

A. Okay.

Q. Does that refresh your recollection?

A. Yes.

MR. MARKUS: Your Honor, we'd move in Defense Exhibit 2309.

MR. RODRIGUEZ: Objection.

THE COURT: Yes. Let's talk at sidebar.

(Continued on next page)

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

---

MBFYCOL1      Margolis - Cross      Page 1818

(At the sidebar)

THE COURT: I've never seen this email I don't believe. I don't even understand what it says.

MR. MARKUS: This is an email from Ethan Cole. He kept notes to himself. And what he's talking about here is a meeting that he had with folks at Iconix in August of 2014 where he spoke up. He was angry about something. We believe it was about the invoices not being paid.

It lines up with those other emails that they showed. So that's why we want to show that Ethan Cole is speaking up at this meeting too because he was upset about the invoices not being paid.

And of course I could put this in without even him being refreshed, just as if Ethan Cole was on the stand. So that's why we want to put it in, your Honor.

MR. THOMAS: Well, your Honor, a couple of issues. Number one, the witness said it did refresh. At least that's the way that the court reporter transcribed it. So I think that the next proper question would be what is it that Mr. Margolis actually remembers himself.

Second, if Mr. Ethan Cole were on the stand, it's not at all obvious that this statement comes in. It's not impeaching. It lacks context, and the last line is extremely prejudicial.

THE COURT: Why isn't this hearsay? You can't put in

---

MBFYCOL1      Margolis - Cross      Page 1819

his own statement if he's on the stand and it's not impeaching.

MR. MARKUS: Well, I think it is. They're arguing that this was an obligation of course that we had to pay. Our position is that they didn't view it as an obligation so we don't have to pay. So they're upset that Iconix isn't paying this marketing invoice.

MR. THOMAS: Your Honor, that would add to this discussion and add a layer of speculation because it would interpret Mr. Cole's statements to be a reaction to what people at Iconix believed. So it's even more remote and less relevant.

THE COURT: I'm not letting this document in.

---

MBFYCOL1      Margolis - Cross      Page 1820

(In open court; jury present)

THE COURT: The objection is sustained.

BY MR. MARKUS:

Q. Having reviewed that document, I think you said your memory was refreshed, Mr. Margolis.

A. Yes. I mean, to a certain degree. I don't remember having the specific meeting.

Q. Do you remember that Ethan Cole got upset about marketing invoices not being paid?

A. I don't remember about him getting upset. I remember invoices not getting paid and we had to continue to push to get paid.

Q. And Iconix took the position that it was under no obligation to pay. Correct?

A. Not to my knowledge.

Q. All right. Let's talk about money going in each direction. We've seen documents related to SEA-1, SEA-2, SEA-3, MENA.

In each of those actual contracts, we've seen money going to GBG from Iconix and money coming from GBG to Iconix. Correct?

A. Correct.

Q. And there's nothing wrong with money going back and forth between companies. Right?

A. Correct.

Q. Let's go specifically into SEA-1. That's the original

---

MBFYCOL1      Margolis - Cross      Page 1821

joint venture.

Correct?

A. Correct.

Q. That closed on October 1, 2013. Right?

A. That sounds right.

Q. The first day of the quarter. Right?

A. Yes.

Q. October 1 is the first day of the fourth quarter?

A. Correct.

Q. And when something closes on the first day, you don't have a real sense of what consensus or guidance is going to be. Correct?

A. I mean -- in regards to?

Q. I'll move on.

On this original joint venture between Iconix and Li & Fung, the negotiations started way back in the spring of 2013. Correct?

A. I believe so.

Q. And the idea behind the joint venture, Mr. Margolis, is that Iconix was going to give these brands to the joint venture and you guys were going to give the expertise in Southeast Asia. Correct?

A. Correct.

Q. And you guys had people on the ground in Southeast Asia; right?

---

UNITED STATES OF AMERICA, V
NEIL COLE,                                                    November 15, 2022

MBFYCOL1          Margolis - Cross          Page 1822

A. Correct.

Q. To do the work and to develop the brands. Right?

A. Yes. To manage the partners.

Q. And you could do that part of the joint venture better than Iconix could. That was the idea; right?

A. Correct.

Q. Both companies were contributing to the joint venture. Yes?

A. Correct.

Q. And this was a really good opportunity for Li & Fung; correct?

A. Correct.

Q. And so to make sure that this was a good opportunity, you talked about due diligence with the prosecutor.

Do you remember that?

A. Yes.

Q. And due diligence is to make sure that this was what?

A. That it was accurate; that it made sense for us to do.

Q. Sorry. I cut you off. Go ahead.

A. That it made sense for us to do the deal.

Q. You also had to do a market analysis; right?

A. Correct.

Q. The prosecutor didn't ask you about market analysis.

So tell us: What is market analysis?

A. To go and see what the market needs today, what the

MBFYCOL1          Margolis - Cross          Page 1823

existing partners and the brands that are being operated in those countries to get a full assessment.

Q. And you did a lot of work of market analysis before the joint venture was first signed; correct?

A. Correct.

Q. You traveled all throughout Asia. Yes?

A. Correct.

Q. Philippines, Thailand, Indonesia, Singapore, Malaysia.

You and your team traveled to do this market analysis and due diligence; correct?

A. Yes.

Q. And there was a lot of work associated with that analysis; correct?

A. Correct.

Q. And for that work, you wanted to get paid. Yes?

A. I believe so.

Q. Well, do you remember, as part of the original joint venture, you all, meaning Li & Fung, asked for $2 million in consultancy work?

Do you remember that?

A. I do.

Q. And that was for work that had already been done as part of your travels, the market analysis, the due diligence. Correct?

A. Correct.

Q. So for the initial joint venture, the price that you were

MBFYCOL1          Margolis - Cross          Page 1824

going to pay to Iconix was $12 million. Correct?

A. Correct.

Q. And you were going to get $2 million back for consultancy. Right?

A. Correct.

Q. And that was all documented in contracts and legal work. Yes?

A. I believe so.

Q. And there was nothing wrong with money going back and forth between the two companies; right?

A. Correct.

Q. Now, this $2 million in consultancy, Mr. Margolis, I want to ask you about this because this is important.

MR. RODRIGUEZ: Objection to the commentary of "this is important."

THE COURT: Yes. Sustained.

BY MR. MARKUS:

Q. Well, sir, the $2 million, did you calculate that to the penny to make sure that all the travels were documented exactly to the penny to get paid the $2 million flat?

A. Not that I'm aware of.

Q. You just came up with the number for the consultancy of $2 million. Yes?

A. I wasn't the one doing it, but yes.

Q. To be clear, there's nothing wrong with not doing each line

MBFYCOL1          Margolis - Cross          Page 1825

item of calculations to the penny.

If you guys wanted to get paid $2 million, you can ask for $2 million. Right?

A. Correct.

Q. And that's part of the negotiations between the two parties. Yes?

A. Yes.

Q. And you asked for $2 million. And in this case, Iconix paid it; right?

A. That's correct.

Q. And that was part of the negotiations for the joint venture; right?

A. Yes.

MR. MARKUS: Let's put up on the screen what's already in evidence as Defense Exhibit 1108.

Q. Sir, do you see that you're copied on this email from Kevin Chow in late September 2013?

A. Yes.

Q. Now, the $2 million consultancy agreement, do you see in Section 1D: "Mark is working on the first draft of the side letter and consultancy agreement"?

A. I do.

Q. Mark is Mark Stevens at the law firm Mayer Brown; correct?

A. I believe so.

Q. And so Mark Stevens, the lawyer, saw the $2 million going

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

MBFYCOL1     Margolis - Cross     Page 1826

back to Iconix. Right?

A. Yes.

MR. MARKUS: Take that down. Thank you.

Let's put up on the screen what's already in evidence as Defense Exhibit 1109.

Q. Mr. Stevens responds; correct?

A. Yes.

Q. And you're copied on that email? Right, Mr. Margolis?

A. I am.

Q. And he drafted this $2 million side letter going back to Li & Fung. Correct?

A. Correct.

Q. Nothing wrong with that; right?

A. No.

MR. MARKUS: We can take that down.

Let's go to the next email in this chain, Government Exhibit 1001, which is already in evidence.

Q. Now, do you see here this is an email from Jason Rabin to you and others?

A. Yes.

Q. Actually, this email is slightly earlier in the chain. This is back in July.

Do you see that?

A. I do.

MR. MARKUS: If we can scroll up there.

MBFYCOL1     Margolis - Cross     Page 1827

Q. Do you see that Rabin says he has his attorney working on all the papers and the contact person?

A. Yes.

Q. It's about five lines down. There we go.

Do you see that one?

A. I do.

Q. If we scroll down a little bit, do you see towards the bottom, he says: "He also will work on the $2 million for us this year. Just need to give him wording that works."

Right?

A. Yes.

Q. In other words, what's going on here, Mr. Margolis, is that Li & Fung proposed to get $2 million back from Iconix. Right?

A. Correct.

Q. And as part of the negotiation, Iconix said, okay. Right?

A. Yes.

Q. And money is going back and forth on this deal. No issues. Yes?

A. Yes.

MR. MARKUS: All right. We can take that down.

Q. By the way, this ended up in a contract between the two parties, the $2 million. Correct?

A. Correct.

Q. So because it was in a contract, there was an obligation of Iconix to pay you for this consulting work. Yes?

MBFYCOL1     Margolis - Cross     Page 1828

A. Correct.

Q. And if Iconix didn't pay, you could sue or take other action because it was in a contract. Right?

A. Correct.

Q. But you guys had a long-working relationship with each other. Yes?

A. Yes.

Q. And so sometimes things ended up in a contract, and sometimes they didn't. Right?

A. Correct.

Q. And when they did, there was an obligation. Right?

A. Yes.

Q. And when not, there was no obligation. Correct?

MR. RODRIGUEZ: Objection. Legal conclusion.

THE COURT: Can you answer that question, Mr. Margolis?

THE WITNESS: Can you repeat the question. Sorry.

MR. MARKUS: Sure.

Q. When something wasn't in the contract, you understood that it wasn't a legal obligation. Correct?

A. If there was a commitment, there was a commitment. I don't -- but legally, I would assume still.

Q. Let's talk about sometimes when there was an oral promise that didn't happen.

Would you agree with me, just to take one example --

MBFYCOL1     Margolis - Cross     Page 1829

we'll talk about others -- on SEA-3, you're saying there was an oral promise on Rocawear -- correct? -- to terminate the Rocawear Kids obligation. Right?

That's what your position is.

A. That's to the best of my knowledge.

Q. That never happened did it?

A. Not that I'm aware of.

Q. We're going to talk about some others. Before we do, let's talk about the MENA deal.

In that deal that we saw, there was this $3.1 million going back to now it's GBG. Correct?

A. Correct.

Q. And that's in the contract; right?

A. The 3.1?

Q. Yes. Diligence; right?

A. I don't remember.

MR. MARKUS: I think without objection, I'd move in Government Exhibit 1167, your Honor.

THE COURT: Very well. It will be received.

(Government's Exhibit 1167 received in evidence)

BY MR. MARKUS:

Q. Do you see this is an email from Ethan Cole that you're copied on?

A. Yes.

Q. And do you see the subject is the "Middle East JV Terms"?

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                November 15, 2022

---

MBFYCOL1          Margolis - Cross          Page 1830

A. Yes.

Q. This is the MENA deal. Yes?

A. Yes.

Q. So what's going on here is Ethan Cole is listing the terms of the deal. Correct?

A. Correct.

Q. For everybody to see; right?

A. Yes.

Q. You see on the "To" line there's Lauren Gee, Jason Schaefer, lawyers for Iconix. Correct?

A. Correct.

Q. So the lawyers for Iconix saw the purchase price of $18.7 million in the first bullet; right?

A. Yes.

Q. And diligence going back to you all for $3.1 million. Right?

A. That's correct.

Q. There's no issue with this; right, Mr. Margolis?

A. I don't see any issue with this.

MR. MARKUS: We can take that down.

The next exhibit, which I believe is without objection, Government Exhibit 1171, which I'd move in, your Honor.

MR. RODRIGUEZ: No objection.

THE COURT: It will be received.

---

MBFYCOL1          Margolis - Cross          Page 1831

(Government's Exhibit 1171 received in evidence)

BY MR. MARKUS:

Q. An invoice gets sent to Iconix for this $3.1 million. Correct?

A. Correct.

Q. Do you see the invoice on the next page there?

A. I do.

Q. Now, sir, you didn't do a line-by-line hard-cost analysis of the due diligence in the Middle East. Right?

A. Correct.

Q. But you don't have to to bill the other side.

You don't have to do that analysis, do you?

A. No.

Q. In fact, you bill, not just Iconix, but you bill people all the time without doing an analysis of round cost of salaries and other things. Correct?

A. Correct.

Q. By the way, let's look at what's in as Government Exhibit 221. This is the agreement on MENA.

Do you recognize that?

A. Yes.

MR. MARKUS: If we could turn to page 17, paragraph M.

Q. Do you see that in the contract, it lists the $3.1 million. Correct?

A. Correct.

---

MBFYCOL1          Margolis - Cross          Page 1832

Q. And this is for expenses related to due diligence. Right?

A. Yes.

Q. The prosecutor asked you about due diligence.

But do you see the next part "and market analysis"?

A. Yes.

Q. There was a lot of work done to analyze the market in the Middle East. Correct?

A. Yes.

Q. This was a new market for you all, was it not?

A. Yes.

Q. So GBG had to do, not just due diligence but had to do a market analysis about whether this deal made sense. Right?

A. Correct.

Q. And you all decided that the amount you wanted to charge for this was $3.1 million. Right?

A. Yes.

Q. By the way, in life, things are worth what people are willing to pay for it. Right?

A. That's correct.

Q. So you, as part of the deal, negotiated $3.1 million for Iconix to pay GBG for this work. Right?

A. Yes.

Q. This was real work. This was not a sham, was it?

A. No.

Q. It was real work; correct?

---

MBFYCOL1          Margolis - Cross          Page 1833

A. There was work.

Q. And so there is nothing wrong with billing the other side for the work that was done. Correct?

A. Correct.

Q. And there's no requirement that you do a hard-cost analysis or an analysis of salaries to come up with that number. Right?

That's not how deals work, is it, sir?

A. No.

MR. MARKUS: All right. Thank you. You can take that down.

Q. So let's talk about the invoices then.

The prosecutor kept asking you about a $5 million figure. The truth is that the marketing invoices, at the end of the day, did not add up to $5 million. Correct?

A. Can you repeat that.

Q. Sure. Let me restate it for you.

Are you aware that at the end of the day, the invoices that Iconix paid to GBG totaled $5.4 million?

A. I wasn't aware of that.

MR. MARKUS: All right. Well, let's look at Government Exhibits 214, 215, and 216. We'll start with 214. I believe these are all in evidence.

Q. Do you see here Government Exhibit 214 which is an invoice that you all sent to Iconix?

A. Okay.

---

UNITED STATES OF AMERICA, V
NEIL COLE,
November 15, 2022

MBFYCOL1          Margolis - Cross          Page 1834

Q. Do you see that it's $1.94 million?
A. Yes.
Q. Let's try to remember that number. I'll write it down.
Let's look at the next one, 214. I'm sorry. 215. Sorry about that.
215, do you see that this one is for $955,000?
A. Yes.
Q. And do you see it says "Paid" right above that? "Net Amount Paid"?
A. Yes.
Q. So this is the amount that Iconix ultimately paid on the invoices that you sent. Correct?
A. Correct.
Q. So 1.94 on the first one. 955,000 on the next one.
Let's go to the third one, Government Exhibit 216.
And do you see at the top of this one, the amount that was paid was 2.467 million?
A. Yes.
Q. So if we add up those three figures, would you agree with me that we're at approximately $4.4 million?
A. Yes.
Q. So that $5 million that you were asked repeatedly about is not accurate. Correct?
MR. RODRIGUEZ: Objection. Sustained.
THE WITNESS: I don't know if there were other

MBFYCOL1          Margolis - Cross          Page 1835

invoices, additional invoices, that were submitted.
BY MR. MARKUS:
Q. You were also asked about an invoice that was initially submitted by Peanuts, for the Peanuts brand.
Do you remember that?
A. Yes.
Q. Peanuts has nothing to do with SEA-2; correct?
A. That's correct.
Q. It's unrelated. Yes?
A. Yes.
Q. You did a lot of marketing for Peanuts, did you not?
A. We did.
Q. And you looked for reimbursement from Iconix for marketing on the Peanuts brand.
You can take that down.
Do you know that, sir?
A. Yes.
Q. In other words, from time to time, you would go to Iconix and say, hey, we've done work on Peanuts. We'd like a contribution on marketing. Right?
A. Yes.
Q. Even though there was no contract for that; right?
A. Correct.
Q. Even though there was no obligation on that; correct?
A. Correct.

MBFYCOL1          Margolis - Cross          Page 1836

Q. In other words, there was no requirement that Iconix pay you on Peanuts, but you would make that ask sometimes of Iconix. Yes?
A. Yes.
Q. Sometimes they would pay; and sometimes they wouldn't. Correct?
A. Correct.
Q. Just because you sent a marketing invoice to Iconix, doesn't mean that they were going to pay it. Right?
A. If we sent an invoice, that means we had an understanding that we were going to get paid.
MR. MARKUS: Let's look at Defense Exhibit 1497 which I'd move in without objection, your Honor.
THE COURT: Very well. It will be received.
(Defendant's Exhibit 1497 received in evidence)
MR. MARKUS: Let's go to the bottom of this email, if we could. If we could keep scrolling down. Okay.
Q. Do you see you're copied on this email?
A. Yes.
Q. And there's a request from somebody at Peanuts to find out the status of receiving invoices.
Do you see that?
A. Yes.
MR. MARKUS: Let's scroll to the next one.
Q. Here, the chief operating officer is just saying to get

MBFYCOL1          Margolis - Cross          Page 1837

information. Right? Mr. Shah.
A. Yes.
Q. "Please provide the information."
Let's keep going up.
Now he's following up on that; correct?
A. Correct.
MR. MARKUS: Let's keep going up. We can skip that one.
Q. Do you see here -- who is Gahl Leddel?
A. He was working for us as a brand manager.
Q. Do you see that this person working for you as a brand manager is sending you an email saying: "Ray's candid feedback is that there are no other expenditures to charge for"?
Right?
A. Yes.
Q. In other words, you're trying to figure out a way to try and get more money from Iconix on the Peanuts brand. Right?
A. Yes.
Q. By the way, who is Ray here?
A. Ray Rand. We acquired Ray's company, but he was responsible for the Peanuts brand.
Q. Let's look at the next paragraph. It says: "His only suggestion is if they will agree to allow us to charge event consultancy for our management time for these world-class events."

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

---

MBFYCOL1     Margolis - Cross     Page 1838

Do you see that?

A. Yes.

Q. And what's being suggested to you there, Mr. Margolis, is we may want to go to Iconix and try to charge them for something we've never discussed before. Correct?

A. Correct.

Q. In other words, let's try to get money from them for consulting and management time on these world-class events. Right?

A. Correct.

Q. And Mr. Leddel says, listen. This could be justified because, in the next sentence: "These certainly added to the brand equity in our markets."
Right?

A. Yes.

Q. So just to be clear for the jury, what's going on here is that you're making an ask of Iconix for money. Correct?

A. Correct.

Q. And that happens all the time in your industry, does it not?

A. Correct.

Q. Even if it's not in the contract.

MR. MARKUS: All right. Thank you. You can take that down.

Let's look at what's already in evidence as Defense

---

MBFYCOL1     Margolis - Cross     Page 1839

Exhibit 2102A1.

Q. This is an invoice that you sent for the Spyder brand.
Do you remember that, sir?

A. I recall this, yes.

Q. The Spyder brand -- you see in the top Authentic Brands Group.
This has nothing to do with Iconix; correct?

A. Correct.

Q. This is an example, again, of you all asking another company for contributions or money. Correct?

A. Yes.

Q. Now, this is an $8 million flat figure.
Do you see that?

A. Yes.

Q. Now, you didn't go to Authentic Brands Group and say, hey, here are the hard costs for the salaries or anything like that for the contribution. Right?

A. Correct.

Q. You came up with this flat figure, $8 million. Right?

A. Right.

Q. And Authentic Brand Groups could decide whether to pay it or not to pay it. There was not an obligation.
Is that correct?

A. That's correct.

Q. And that happens all the time in your industry. There are

---

MBFYCOL1     Margolis - Cross     Page 1840

lots of examples of that; correct?

A. Correct.

Q. You've done that with the Marilyn Monroe brand; correct?

A. I believe so.

MR. MARKUS: If we could just show the witness and the government Defense Exhibit 1174A21.

Q. Is this another example of you guys going to a company and asking for a flat number without doing a hard-cost analysis?

A. Yes.

MR. MARKUS: Your Honor, we'd move in Defense Exhibit 1174A21.

MR. RODRIGUEZ: Your Honor, we'd object based on prior discussions.

THE COURT: It will not be received.

MR. MARKUS: You can take that down.

Q. So that we save time, is it fair to say that you would agree with me that I could show you many examples of the same type of thing?

A. These things typically happen.

Q. So when you say "these things typically happen," what "these things" are is you going to a partner and asking for money, even if it's not in the contract. Correct?

A. Yes.

Q. Okay. The invoices that you did submit to Iconix, can you and I agree, Mr. Margolis, that these were not sham invoices?

---

MBFYCOL1     Margolis - Cross     Page 1841

MR. RODRIGUEZ: Objection to form.

THE COURT: Overruled.

MR. MARKUS: You can answer, sir.

THE WITNESS: We invoiced for marketing.

BY MR. MARKUS:

Q. Right. Marketing that was done. Correct?

A. Marketing that was done.

Q. These weren't fake invoices; correct?

A. I don't believe they were fake invoices.

Q. And in fact, let's talk about some of them.
Do you remember the prosecutor showed you a bunch of emails where Ethan Cole was trying to gather documentation?
Do you remember those emails?

A. Yes.

Q. That was real work that he was collecting; right?

A. Yes.

Q. And the invoices reflected real work that the team did; correct?

A. Right.

Q. And some of the marketing that GBG did was for markets outside of the United States. Correct?

A. Correct.

Q. And so those materials could still be used in the United States, to your understanding. Correct?

A. Correct.

---

MBFYCOL1          Margolis - Cross          Page 1842

Q. And so, for example, GBG created marketing invoices for -- one of the invoices we saw was for Starter Black.
   Do you remember that?
A. Yes.
Q. And that was initially created for a market outside of the United States. Yes?
A. Yes.
Q. And then Iconix said, well, wow. These are pretty good. We'd like to use these in the United States. Right?
A. Yes.
Q. So GBG invoiced Iconix for the right to use that marketing material in the United States. Right?
A. Yes.
Q. So those invoices that we saw for Starter Black, those were real invoices for the use of Starter Black materials in the United States. Correct?
A. Correct.
Q. Nothing wrong with that; right?
A. I don't see anything wrong with that.
Q. Let's talk about Zoo York, another set of invoices you saw.
   Do you remember money being spent on the showroom in the United States for Zoo York?
A. Yes.
Q. And some of the invoices related to that. Right, Mr. Margolis?

MBFYCOL1          Margolis - Cross          Page 1843

A. Yes.
Q. And I think you said that some of these things were the responsibility of the joint venture. But certainly the Zoo York showroom was not the responsibility of the joint venture. Correct?
A. Correct.
Q. And it wasn't the responsibility of Iconix Europe; correct?
A. Correct.
Q. Because it was in the United States; right?
A. Yes.
Q. And, by the way, when we talk about Iconix or GBG, these are worldwide organizations or companies. Correct?
A. Correct.
Q. And so if Iconix was spending money on something in the United States, they don't look at it just for the United States. They want that to help the brand all throughout the world. Right?
   MR. RODRIGUEZ: Objection.
   THE COURT: Overruled.
   THE WITNESS: Yes. Who wouldn't?
BY MR. MARKUS:
Q. Right. So when money is spent on marketing, let's say for Zoo York or Starter Black or for any of these brands, it wouldn't be fair to try to peg it for one area of the world because the idea is marketing in one place may make this brand

MBFYCOL1          Margolis - Cross          Page 1844

hot for the whole world. Correct?
A. Correct.
Q. And there's nothing wrong with invoicing or trying to charge for that marketing work; correct?
A. Correct.
Q. By the way, when you submitted these invoices, you and Ethan Cole wanted GBG to be paid immediately on the invoices. Correct?
A. Yes. As soon as possible.
Q. Seth Horowitz didn't say to you, hey, submit the invoices now, but we'll pay you in 2015, did he?
A. I don't remember.
Q. I'm sorry?
A. I don't recall.
Q. Do you recall any mention of somebody at Iconix telling you that the invoices would be due in a year?
A. I don't.
Q. Okay. And I think we've established, Mr. Margolis, that there's nothing unusual about Li & Fung or GBG getting marketing contributions from business partners. Correct?
A. Correct.
   MR. MARKUS: Let's call up what's already in evidence as Defense Exhibit 1048.
Q. This is an email from Jason Rabin to you.
   Do you see that?

MBFYCOL1          Margolis - Cross          Page 1845

A. I do.
Q. Do you see where it says: "Subject Brand"?
A. Yes.
Q. Brand was one of the ways that Mr. Rabin and you referred to the joint ventures. Correct?
A. I believe so.
   MR. MARKUS: If we could scroll down there.
Q. Do you see -- one second. If we could scroll up just a little bit --
   -- where it says: "I spoke to Neil Cole"?
A. Yes.
Q. So this is Jason Rabin speaking to Neil Cole; correct?
A. Yes.
   MR. MARKUS: If we could scroll down. One second. I lost my spot.
Q. Fair to say that in these emails, what Mr. Rabin is expressing to you and others is that Iconix is a good business partner? Right?
A. Yes.
Q. And that you guys can trust each other; correct?
A. Yes.
Q. And in fact, he talks about there being no downside risk involved in these deals.
   Do you see that in bold there?
A. Yes.

UNITED STATES OF AMERICA, V
NEIL COLE,                                                    November 15, 2022

| MBFYCOL1 | Margolis - Cross | Page 1846 |

Q. And I think you said before you viewed these as good deals for you all. Yes?

A. Correct.

MR. MARKUS: We can take that down.

Q. I want to talk to you about that idea that these were good deals. Let me give you a hypothetical, Mr. Margolis. Let's say you're buying a stock, Amazon stock.

Are you with me?

A. I'm with you.

Q. And your stockbroker says, Mr. Margolis, the price of the stock is 100 bucks. If you give me 100 bucks, you get one share of stock. In five years, I will guarantee that no matter what, you can sell it for $95.

Are you with me?

A. I'm with you.

Q. That would be a floor on what you could lose; correct?

A. Correct.

Q. And your broker tells you, and you get all the upside. So if Amazon triples to 300, you could sell it and triple your price. Right?

A. Yes.

Q. That would be a sick deal for you; correct?

A. Yes.

Q. Because there's no downside; right?

A. Correct.

| MBFYCOL1 | Margolis - Cross | Page 1847 |

Q. You're guaranteed losing no money or a little bit. But you have all the upside potential; right?

A. Yes.

Q. And the example I just gave to you with Amazon stock, that's really what happened with SEAs-2 and 3; correct?

A. Yes.

Q. Because on SEA-2 -- let's take each one -- you were able to negotiate a floor in the contract to make -- and now I'm getting all confused with my wording. Let's back up.

In SEA-2, there was what's called a put and a call. Correct?

A. Correct.

Q. And a put is you could put it all back to Iconix, the whole joint venture, at the end of five years. Right?

A. Correct.

Q. And there was a floor, a minimum amount on that; correct?

A. Correct.

Q. So there was literally no downside risk to you on SEA-2; correct?

A. Correct.

Q. Only upside.

A. Correct.

Q. And that's without any overpayment, without any marketing expenses coming back to you. What's in the contract was a sick deal for you.

| MBFYCOL1 | Margolis - Cross | Page 1848 |

Correct?

A. Correct.

Q. Okay. And that's because if you had overpaid, it wouldn't have been such a good deal. Correct?

A. We wouldn't have agreed to do it if we had overpaid. We wouldn't have agreed to overpay.

MR. MARKUS: Let's look at Defense Exhibit 1285, which I'll move in without objection, your Honor.

THE COURT: Very well. It will be received.

(Defendant's Exhibit 1285 received in evidence)

BY MR. MARKUS:

Q. This is an email do you see at the top from Ethan Cole to you, sir?

A. Yes.

Q. And when it says: "Project Brand 2," that means SEA-2; correct?

A. I believe so.

Q. And what Ethan Cole is -- do you see at the bottom of this email, he says: "Best regards, Jared Margolis"?

A. Yes.

Q. So what he's doing here is he's drafting one of your emails for you?

A. Okay.

Q. I'm sorry?

A. Yes.

| MBFYCOL1 | Margolis - Cross | Page 1849 |

Q. And so what would happen is Mr. Ethan Cole would send this email to you. Then you'd copy and paste it and send it along to Kevin.

Correct?

A. Correct.

Q. Kevin is one of the higher-ups at GBG?

A. He worked for -- he was part of our business development --

THE COURT: Can you move closer to the microphone, sir.

THE WITNESS: He was part of our business development team.

BY MR. MARKUS:

Q. Let's look at the email. Ethan says for you: "Once we move forward with Lee Cooper, Iconix has agreed to give us a floor price on the put call equal to the purchase price 14 million. This will bring the total backstop to 21.6, equal to the sum of the purchase price and the Europe brands purchase price."

Do you see that?

A. I do.

Q. So what he's saying here, Mr. Margolis, is that you are guaranteed to get dollar for dollar back on SEA-2. Correct?

A. Correct.

Q. And this was an idea that you had come up with to try to negotiate with Iconix; right?

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                November 15, 2022

MBFYCOL1          Margolis - Cross          Page 1850

A. Yes.

Q. And you convinced Seth Horowitz to agree to this; correct?

A. Correct.

Q. And when you convinced him to agree to this, you were pretty happy about it; right?

A. Yes.

Q. Because this was a sick deal for you and GBG because you had literally no downside on SEA-2. Correct?

A. Correct.

Q. So the final purchase price of SEA-2 had no downside risk; right?

A. Right.

Q. Regardless of whether any marketing dollars came back to you or not, there was no downside risk. Yes?

A. No, because we were going to get -- we had a backstop, and we were going to get the other monies.

Q. Let's put aside the other money for a second.

A. Okay. For this specific deal.

Q. For this specific deal, I want you to put aside the marketing dollars, the 5.4 marketing dollars.

A. Okay.

Q. On SEA-2, without those marketing dollars, it was a great deal. You couldn't lose a buck. Right?

A. Correct.

Q. On the terms of the contract, you could not lose $1;

MBFYCOL1          Margolis - Cross          Page 1851

correct?

A. Correct.

MR. MARKUS: We can take that down. Let's look at Defense Exhibit 1184, which I'd move in without objection.

THE COURT: It will be received.

(Defendant's Exhibit 1184 received in evidence)

BY MR. MARKUS:

Q. Do you see this is an email from you to Jason Rabin in April of '14?

A. Yes.

Q. And you're discussing a meeting that you had with Seth Horowitz on Umbro, China, and Lee Cooper. Right?

A. Yes.

Q. Which deal is that? SEA-2 or SEA-3?

A. SEA-3.

Q. So on SEA-3, you also ask Mr. Horowitz for having these backstops. Correct?

A. Correct.

Q. Is another word for "backstop" "floor"?

A. Yes.

Q. So you proposed these floors to Seth Horowitz; correct?

A. Correct.

Q. And he agreed to it; right?

A. Yes.

Q. And that meant no risk to GBG; correct?

MBFYCOL1          Margolis - Cross          Page 1852

A. Correct.

Q. So just so that we're all on the same page, on SEA-3, without any termination to Rocawear, without any payments coming back, the deal was a great deal for you. Correct?

A. That's correct.

Q. Because you had no downside risk and only upside. Right?

A. Correct.

Q. So if these brands performed, GBG would make tons of money; correct?

A. Yes.

Q. And if the brands didn't perform, you'd get your money back. Right?

A. Correct.

Q. So Seth Horowitz agreed to some -- I mean, this was pretty crazy. Right?

MR. RODRIGUEZ: Objection.

THE COURT: Sustained as to form.

BY MR. MARKUS:

Q. Had you ever seen this before in any of the deals you had done with Iconix?

A. No.

Q. And so by agreeing to the backstop or the floor, you weren't overpaying for SEA-2 or SEA-3. These deals were guaranteed dollar for dollar. Right?

A. Yes.

MBFYCOL1          Margolis - Cross          Page 1853

MR. MARKUS: Okay. You can take that down.

Your Honor, I have a little ways to go, but can I just confer with my colleagues for one moment?

THE COURT: Sure.

(Defense counsel confer)

BY MR. MARKUS:

Q. So I'm going to move off that topic on the advice of my colleagues there. I think everybody will be happy about that.

Let's talk about the investment committee and the PIPS now for a moment.

Do you know what I'm talking about when I use those terms, Mr. Margolis?

A. Yes.

Q. The prices that we just saw for SEA-2 and SEA-3, the final contractual terms -- the floors, the puts, the contracts -- you had to tell the investment committee the material terms of the contract. Correct?

A. Correct.

Q. So the way that that would get communicated to the investment committee is through what's called a PIP; right?

A. Correct.

Q. And a PIP is a preliminary investment proposal; right?

A. Correct.

Q. And the investment committee wouldn't just approve deals willy-nilly, would they?

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                November 15, 2022

MBFYCOL1          Margolis - Cross          Page 1854

A. No.

Q. They wanted to make sure that the deal was a good one; correct?

A. Correct.

Q. That's why you had to submit it to them; correct?

A. Correct.

Q. So what was submitted to the investment committee at Li & Fung and GBG is the final purchase price. Correct?

A. Correct.

Q. There was never a discussion on SEA-2 about marketing payments coming back to GBG; correct?

A. Correct.

Q. They saw the price of SEA-2 as $15.9 million. Right?

A. Yes.

Q. And they approved it at that price; correct?

A. Yes.

Q. So they didn't think it was an overpayment. Correct?

MR. RODRIGUEZ: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. They approved the deal at $15.9 million. Correct?

A. Correct.

Q. And I think the prosecutor asked you whether you told anybody else about this alleged overpayment. And you said you did not.

MBFYCOL1          Margolis - Cross          Page 1855

Correct?

A. I don't believe so, besides my -- besides our general counsel.

Q. Your general counsel knew about them?

A. All these deals.

THE COURT: I'm sorry. We can't hear you, Mr. Margolis.

THE WITNESS: I'm sorry. Yeah. He was aware of all of our deals.

BY MR. MARKUS:

Q. He was aware of what was in the contract; right?

A. Correct.

Q. Was he aware of your claim that money was going to go back to you all?

A. Not that I'm aware of.

Q. So the senior people at the company, at GBG Li & Fung, the senior people on the investment committee, approved these deals at those prices. Correct?

A. Correct.

Q. Because we can agree there's nothing in the PIP about future marketing invoices on SEA-2; right?

A. Correct.

Q. There's nothing in the PIP on SEA-3 about termination of Rocawear; correct?

A. Correct.

MBFYCOL1          Margolis - Cross          Page 1856

Q. And the investment committee isn't in the business of overpaying for deals; right?

A. Correct.

Q. This is a company that's been around for over a hundred years; right?

A. Correct.

Q. They are a pretty smart and savvy company; correct?

A. Correct.

Q. And they wouldn't overpay on deals; correct?

MR. RODRIGUEZ: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. Let me ask you something: Would you consider yourself a dealmaker?

A. Yes.

Q. And as a dealmaker, would you do deals sometimes that are above what a flat 5.5 multiplier would be or other multipliers might be?

A. It depends on the opportunity.

Q. Right. So there are times when you may pay more than -- if you were just looking at a calculator, this number times 5.5 equals this, you, as a dealmaker, may say, you know what. It's worth more than that.

Right?

A. Yes.

MBFYCOL1          Margolis - Cross          Page 1857

Q. Let's give an example that everybody knows.

In the height of the housing market, somebody might list their house for X amount of dollars; right?

A. Yes.

Q. And it may go for higher than what's even being asked for. Right?

A. Correct.

Q. Because people want to make sure they get it. Right.

A. Yes.

Q. That's not an overpayment, is it?

A. No.

Q. It's what somebody was willing to pay for it; right?

A. Correct.

Q. And in this case, the investment committee on SEA-2 was willing to pay 15.9; correct?

A. Correct.

Q. Without any mention of marketing invoices. Yes?

A. Correct.

Q. And on SEA-3, they were willing to pay, whatever it was, 21 point something, without any mention of the termination of Rocawear. Right?

A. Correct.

Q. So those were fair and reasonable prices.

Just like the house going above, the asking price would be fair and reasonable. Right?

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

---

MBFYCOL1     Margolis - Cross     Page 1858

A. Correct.

Q. I don't want to spend a lot of time on this, Mr. Margolis. But would you agree with me that in every contract in this case, there was a provision that said this is the entire agreement?

I can show you one example. Let's look at what's in evidence as Defense Exhibit 303A2.

Do you see what this is, sir? This is one of the final papers on SEA-2.

A. Yes.

Q. Final contracts.

A. Yes.

Q. If you scroll down on that page, do you see -- we can highlight -- where it talks about it being the entire agreement? I believe it's on the next page. Sorry about that.

Do you see here where this letter agreement says that this is the entire agreement? Anything else doesn't really matter.

Do you see that?

A. Yes.

Q. And you're aware this is a provision that's in all of the contracts between Iconix and GBG; correct?

A. That makes sense, yes.

Q. Because you don't want to have commitments or obligations that aren't reflected in the contract. Correct?

---

MBFYCOL1     Margolis - Cross     Page 1859

A. Correct.

Q. If there is a commitment, you want to make sure it gets in the contract so you can enforce it; right?

A. Right.

Q. We've seen other examples like with Peanuts where it's not in the contract and you can go make an ask of your business partner. Right?

A. Right.

MR. MARKUS: We can take that down. Thank you.

Q. I want to talk about SEA-2 now.

Just so that we're clear, we agree there's nothing in the contracts on SEA-2 regarding a future marketing payment; right?

A. Correct.

(Continued on next page)

---

MBF5col2     Margolis - Cross     Page 1860

BY MR. MARKUS:

Q. That's different than, for example, SEA-1 where we saw a $2 million commitment coming back, correct?

A. Correct.

Q. Different than MENA where we saw a $3.1 million obligation coming back, right?

A. Correct.

Q. So, GBG knew how to put something in a contract if it wanted it to be a legal obligation, correct?

A. Correct.

Q. And because you saw and the lawyers saw nothing wrong with money coming back, if it wanted to make those marketing dollars a commitment, it could have put it in the contract, right?

A. Correct.

Q. Just like it did with SEA-1, just like it did with MENA, right?

A. Correct.

Q. And I want to be very clear on this, Mr. Margolis, you at the time that SEA-2 was completed, at the time the transaction was completed, you never once heard anyone personally make a commitment for a future marketing payment, correct?

A. Correct.

Q. You never heard Neil Cole or Seth Horowitz commit to paying GBG back $5 million, correct?

A. I was in conversations with Seth Horowitz about getting

---

MBF5col2     Margolis - Cross     Page 1861

back the $5 million.

Q. Afterwards, never at the time the agreement was done did you ever hear Seth Horowitz commit to you about $5 million, correct?

A. I don't recall.

Q. In fact, you had made an assumption that there was a commitment on a future marketing payment, correct?

A. I was under the -- I was with the understanding that we were going to receive the money back.

Q. Let's show you -- do you remember testifying in a prior proceeding, sir?

A. Yes.

Q. And do you remember, if we can show Defendant's Exhibit 3003 at page -- we will start at 1425 which is page 183 of the exhibit. Can you see that on the screen, sir?

A. Yes.

Q. Do you remember being asked at line 14:

"Q Sir, at the time of the transaction, you did not personally hear anyone make a commitment to make a future payment?

"A Correct."

Do you remember giving that question and answer?

A. Yes.

Q. And if you go down to line 20:

"Q And you testified on direct that it was your understanding that there was a firm commitment?

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

---

MBF5col2    Margolis - Cross    Page 1862

"A Correct.

"Q But you didn't hear anyone make a firm commitment, correct?

"A Correct."

Do you remember that, sir?

A. Yes.

Q. And if we turn to the next page, 1426, line 2 you were asked:

"Q In fact, you are making an assumption that there was an agreement by Iconix to make a future payment, correct?

"A Correct."

Do you remember being asked that question and giving that answer?

A. Yes.

Q. So, you had made an assumption that there was going to be a payment but you never heard that from anyone, did you, sir?

A. Correct.

Q. OK. Now, Mr. Margolis, one of the important terms in SEA-2 was a minimum guarantee of $3 million, right?

A. Yes.

Q. And another important term at the beginning of when you were negotiating SEA-2 was a brand called Lee Cooper, yes?

A. Yes.

Q. And GBG wanted Lee Cooper to be included in SEA-2, yes?

A. Yes.

Q. But it turns out Lee Cooper could not be included in SEA-2,

---

MBF5col2    Margolis - Cross    Page 1863

right?

A. Yes.

Q. And so the purchase price ends up changing when Lee Cooper gets taken out, correct?

A. Correct.

Q. Now, you had an understanding that Lee Cooper was going to be made part of a future deal, correct?

A. Correct.

Q. Who made -- how did you come to have that understanding?

A. Because it was a brand that we wanted to deal with.

Q. Did someone promise to you or commit to you that it would be in a future deal?

A. I believe Seth.

Q. And so Seth made an oral representation to you that Lee Cooper would become part of a future deal, correct?

A. Correct.

Q. Did that end up becoming part of the contract in SEA-2?

A. Not that I'm aware of.

Q. Did it become part of any side letter or written commitment that Lee Cooper would come to be managed by GBG in a future deal?

A. Not that I'm aware of.

Q. He just told you orally, correct?

A. Correct.

Q. And you believed him, right?

---

MBF5col2    Margolis - Cross    Page 1864

A. Yes.

Q. But you didn't get that into a contract, did you?

A. No.

Q. And it turns out, Mr. Margolis, that because it wasn't in the contract, it didn't happen; right?

MR. RODRIGUEZ: Objection.

THE COURT: Overruled.

THE WITNESS: We just never pushed to get the deal done.

BY MR. MARKUS:

Q. There was, you are saying, a promise from Seth Horowitz that Lee Cooper would come in the next deal, correct?

A. Correct.

Q. And it didn't happen, did it?

A. It did not.

Q. If it is not in writing you can't count on it, correct?

MR. RODRIGUEZ: Objection. Legal conclusion.

THE COURT: Sustained.

BY MR. MARKUS:

Q. This wasn't in writing, was it?

A. No.

Q. So, you couldn't count on Lee Cooper coming to you in the next deal because it wasn't in writing?

MR. RODRIGUEZ: Same objection.

THE COURT: Sustained.

---

MBF5col2    Margolis - Cross    Page 1865

BY MR. MARKUS:

Q. By the way, that $3 million payment guarantee in SEA-2 had to change once Lee Cooper was taken out of the deal, right?

A. Yes.

Q. And so, initially, it was proposed to switch it to 1.8 and then 1.2? Do you remember that, sir?

A. I don't.

MR. MARKUS: Let's show Defendant's Exhibit 2116, I believe without objection.

THE COURT: It will be received.

(Defendant's Exhibit 2116 received in evidence)

BY MR. MARKUS:

Q. If we scroll down to the e-mail at the bottom, do you see Seth Horowitz is sending you an e-mail on June 25, 2014?

A. Yes.

Q. And Mr. Horowitz is explaining to you that the separated timing of Lee Cooper -- that's what we were just talking about -- that he is promising you at a later time Lee Cooper could be included, right?

A. Yes.

Q. Not at this time, right?

A. Yes.

Q. And he changed the terms of $3 million to guarantee of a 1.2 distribution in 2014 and a 1.8 distribution guarantee for Lee Cooper. Do you see that?

---

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                                November 15, 2022

| MBF5col2 | Margolis - Cross | Page 1866 |
|---|---|---|

A. Yes.

Q. Of course, the Lee Cooper doesn't happen so that 1.8 doesn't happen, right?

A. This is -- this is the -- this is related to SEA-3.

Q. OK. And Lee Cooper doesn't happen there either, does it?

A. It does happen there.

Q. Let's scroll up, and do you see here where you say to Ethan Cole that shouldn't be a problem, right, what Mr. Horowitz is proposing?

A. Yes.

Q. And Ethan Cole says: I don't see a problem with this other than the fact that we put $1.5 million for the non-Lee Cooper Europe brands in the PIP.

Do you see that?

A. Yes.

Q. And so what's going on here, Mr. Margolis, is Seth Horowitz is saying let's make it 1.2, and Ethan Cole is saying, well, there is a problem because we already included 1.5 in the PIP.

Right?

A. Yes.

Q. And so, the idea is these PIPs needed to be accurate even to hundreds of thousands of dollars, correct?

A. Yes.

Q. If the PIP said 1.2 -- if it said 1.5 and it was really 1.2, that would not be accurate, correct?

| MBF5col2 | Margolis - Cross | Page 1867 |
|---|---|---|

A. Correct.

Q. And so, what Ethan Cole is saying, is hey, we have a little bit of a problem, we need to ask Seth Horowitz for 1.5 million because that's what the PIP reflects, correct?

A. Correct.

Q. And so, these PIPs that went to the investment committee needed to be really accurate and complete, right?

A. Yes.

Q. And just to be clear, it never had anything about a future marketing payment, correct?

A. Correct.

Q. And by the way, SEA-3 that you said included Lee Cooper, that included only Lee Cooper China, not Lee Cooper Europe, correct?

A. Correct.

MR. MARKUS: We can take that down.

Q. And we discussed, Mr. Margolis, that when GBG wanted to get marketing support, or showroom support, or due diligence support into a contract it could, correct?

A. Yes.

MR. MARKUS: Let me show you, without objection I believe, Defendant's Exhibit 408-A1.

MR. RODRIGUEZ: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 408-A1 received in evidence)

| MBF5col2 | Margolis - Cross | Page 1868 |
|---|---|---|

BY MR. MARKUS:

Q. Do you see that this is an agreement that you had engaged in with Iconix?

A. Yes.

Q. Let's turn to page 5, paragraph 8. Do you see there is a paragraph here about showroom support?

A. Yes.

Q. And what the amount, if we look about five lines down, it says $3.5 million, correct?

A. Correct.

Q. Here is a big round number for building out a showroom on a contract that you did with Iconix, right?

A. Yes.

Q. And so, did you do a line-by-line analysis of hard costs and salaries to come to the $3.5 million?

A. No.

Q. There is nothing wrong with asking for $3.5 million back in the contract, right?

A. Yes.

Q. And if you wanted Iconix to be obligated to pay you, GBG certainly knew how to do that, correct?

A. Yes.

Q. In fact, we have seen it now with this showroom support for $3.5 million, we have seen it in MENA for $3.1 million, we have seen it in SEA-1 for $2 million, correct?

| MBF5col2 | Margolis - Cross | Page 1869 |
|---|---|---|

A. Correct.

Q. If GBG wanted a commitment for a big number coming back to GBG it could put it in the contract, correct?

A. Yes.

Q. And you didn't do that with SEA-2 or SEA-3, correct?

A. Correct.

Q. SEA-2 had no commitment in the contract for marketing of $5 million, correct?

A. Correct.

Q. GBG could have insisted on that being in the contract if it wanted Iconix to be obligated, correct?

A. Can you repeat that, please?

Q. Sure.

GBG could have insisted, just like we see here it insisted on $3.5 million being included for showroom support, GBG could have insisted on $5 million in marketing support be included in the contract for SEA-2, correct?

MR. RODRIGUEZ: Objection. Calls for a legal conclusion.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. MARKUS:

Q. And it did not, correct?

A. No.

Q. And for SEA-3 it could have insisted that termination for

**A-974**

UNITED STATES OF AMERICA, V
NEIL COLE,                                                      November 15, 2022

| MBF5col2 | Margolis - Cross | Page 1870 |
|---|---|---|

Rocawear Kids be included but it did not, correct?

A. Correct.

MR. MARKUS: You can take that down. Thank you.

Q. By the way, GBG purchased a company called Coco Bahn, right?

A. Yes.

Q. What is Coco Bahn?

A. It was a licensing agency out of Korea.

Q. And that's before SEA-2 closed, correct?

A. Correct.

Q. And this licensing company, Coco Bahn in Korea, would help you expand the brands in Korea, correct?

A. Yes.

Q. And it could increase the value of brands in Korea, correct?

A. Correct.

Q. Another reason why something might be more valuable in Korea than it was before Coco Bahn, right?

A. Correct.

Q. That's the whole reason you bought Coco Bahn, correct?

A. Yes.

Q. So, if we see things going up in value in Korea, that's one reason it might have gone up in value, correct?

A. Yes.

Q. By the way, when something isn't in a contract, as a good

| MBF5col2 | Margolis - Cross | Page 1871 |
|---|---|---|

business partner you may still make asks to get payments, right?

A. Yes.

Q. For example, I think GBG, with London Fog, had some buyer's remorse on London Fog, right?

A. Yes.

Q. That was a portion of the Korea contract, right?

A. Correct.

Q. And so, London Fog wasn't doing as great as you had hoped, right?

A. Correct.

Q. And so you went to Iconix and you said, hey, London Fog isn't doing so great, we would like some contributions here, right?

A. Correct.

Q. Now, that wasn't in the contract. There was no firm commitment that Iconix would help you if London Fog didn't pan out, right?

A. I remember that -- I don't know if it was pre-closing or not but that we -- that London Fog business was not in good -- it was not what it was supposed to be, what the numbers showed.

Q. Right. And so you went to Iconix and said, help us out, right?

A. Yes.

Q. That's what good business partners do, yes?

| MBF5col2 | Margolis - Cross | Page 1872 |
|---|---|---|

A. Yes.

Q. Let's talk about SEA-3, we are getting there Mr. Margolis. You were the main negotiator on SEA-3 with Seth Horowitz, right?

A. Yes.

Q. You don't even remember Neil Cole being involved in those negotiations, correct?

A. Correct.

Q. By the way, different companies were trying to enter into joint ventures with Iconix at the time, correct?

A. Correct.

Q. And so, just like in the housing market when we see lots of people bidding on the same house, you saw a risk that Iconix might do a deal with a different company, right?

A. Yes.

Q. And you didn't want that to happen, right?

A. Correct.

Q. You wanted SEA-3 for GBG, right?

A. Yes.

Q. You viewed that as valuable, correct?

A. Yes.

Q. And, by the way, part of your expertise, Mr. Margolis is dealing with celebrities, yes?

A. Yes.

Q. And you had discussions about using David Beckham with

| MBF5col2 | Margolis - Cross | Page 1873 |
|---|---|---|

SEA-3, correct?

A. Yes.

Q. With the Umbro brand, right?

A. Yes.

Q. And you told Iconix about, hey, we have this exciting opportunity with Beckham, right?

A. Yes.

Q. And that's one of the reasons why you pitched it being more valuable to Iconix, right?

A. That's correct.

Q. You said, listen, these other companies might be interested but we have Beckham, right?

A. Yes.

Q. You have also explained to Iconix, like listen, we've been long-term business partners, right?

A. Yes.

Q. Some of these other companies are -- they may look really nice, they're new to the game, but they don't have the long-term relationship we do, right?

A. Yes. We wanted to get the deal done.

Q. You wanted to get the deal done. And so, the price that SEA-3 gets done at, $21.5 million, that's the price that the investment committee approved, correct?

A. Yes.

Q. That's the price that was in the PIP, correct?

# A-975

MBF5col2        Margolis - Cross        Page 1874

A. Correct.

Q. And, by the way, this whole idea of Rocawear Kids being terminated, it was never terminated, was it?

A. Not that I'm aware of.

Q. One of the things you mentioned was purchase prices being determined based on a multiple of 5.5 times. Do you remember that?

A. Yes.

Q. That's not always the multiple you used, correct?

A. For this -- for these joint ventures they were consistent.

Q. Really? Let's look at on SEA-3, Government Exhibit 1139 which is already in evidence. This is this chart that you went through with the prosecutor, correct?

A. Yes.

Q. And the middle column, LC/Umbro China, there was no revenue for Umbro China yet, right?

A. But it was a based on a number that they said was -- it was based on a number that they had other partners --

Q. Mr. Margolis, there was no revenue on Umbro China yet, correct?

A. There was no revenue but we were guaranteed.

Q. Exactly. You were guaranteed something?

A. Correct.

Q. But it wasn't based on 5.5 on revenue. There was no revenue on Umbro yet, right?

MBF5col2        Margolis - Cross        Page 1875

A. Correct.

Q. So, it was not fair to say with the prosecutor that you used a 5.5 multiplier to figure out what these brands were worth, correct?

MR. RODRIGUEZ: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. You didn't use a 5.5 multiplier on actual revenue for Umbro China at that point, did you, sir?

A. Not for actual revenue.

Q. OK.

And in fact you didn't use a 5.5 multiplier on the Europe and Turkey deals, correct? You used an 11.3 multiplier, didn't you?

A. Not that I'm aware of.

MR. MARKUS: Let's call up Defendant's Exhibit 1312-A1, without objection.

MR. RODRIGUEZ: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1312-A1 received in evidence)

BY MR. MARKUS:

Q. If we go to page 6 of this exhibit, and if we -- there we go.

Do you see on the top of page 7 there where it says multiple 11.3 on the left next to "multiple" there?

MBF5col2        Margolis - Cross        Page 1876

A. Yes.

Q. You were using a multiplier of 11.3 on SEA-2, correct?

A. If that's the case then, again, there was guaranteed distributions or --

Q. Right. I mean, there is all sorts of things that go into the calculus of how much you are willing to pay, yes?

A. Yes.

Q. It's not fair to say we are going to base it only on 5.5 times and that's what the price is worth, correct?

A. Correct.

MR. MARKUS: You can take that down. Thanks.

Q. Things are worth what people are willing to pay for them, right?

A. Yes.

Q. Things are worth what happens in a negotiation, right?

A. Correct.

Q. And in this case you negotiated floors for the first time, right?

A. Yes.

Q. That made the deal extremely valuable to you, right?

A. Yes.

Q. You negotiated, on MENA, 3.1 coming back. That was extremely valuable, right?

A. Correct.

Q. And the terms in the contracts were really good deals that

MBF5col2        Margolis - Cross        Page 1877

were approved by the investment committee, right?

A. Correct.

Q. The investment committee did not approve any overpayment, correct?

MR. RODRIGUEZ: Objection.

THE COURT: Overruled.

BY MR. MARKUS:

Q. You may answer.

A. Correct.

Q. I want to end with this, Mr. Margolis. We started by talking to you about whether there were any secrets that Neil Cole asked you to take. I want to ask you, do you believe, in your heart, that you have done anything wrong in this case?

MR. RODRIGUEZ: Objection.

THE COURT: Overruled.

THE WITNESS: No.

BY MR. MARKUS:

Q. Do you believe that you have done anything wrong with SEA-1, 2, 3, with MENA, or with these marketing invoices?

A. No.

Q. Do you believe that you are a dirty business partner, Mr. Margolis? I'm sorry?

A. No.

Q. Do you believe that you engaged in any dirty shell transactions?

# A-976

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                                                    November 15, 2022

MBF5col2          Margolis - Redirect          Page 1878

A. No.
Q. Do you believe that you were involved in any sham deals?
A. No.
     MR. MARKUS: Thank you. I have nothing further, Mr. Margolis.
     THE COURT: Any redirect?
     MR. RODRIGUEZ: Yes, your Honor.
REDIRECT EXAMINATION
BY MR. RODRIGUEZ:
Q. Mr. Margolis, you were asked a lot of questions about whether there were overpayments. Do you recall that?
A. Yes.
Q. Why did the price for SEA-2 jump by $5 million?
A. Because we were going to get the money back.
Q. From who?
A. From Iconix.
Q. Who told you that?
A. Jason Rabin.
Q. Did you understand that to be a firm commitment from Iconix?
A. Yes.
     MR. RODRIGUEZ: Let's look at Government Exhibit 1068 which is in evidence. Let's pause here.
Q. Do you remember Mr. Margolis showing you some e-mails and saying there is a bunch of lawyers on it, right? Do you recall

MBF5col2          Margolis - Redirect          Page 1879

those questions, sir?
A. Yes.
Q. Do you see any lawyers on this document?
A. No.
Q. OK. Let's go to the next page. It says: $5 million overpay from Iconix Korea. Right?
A. Yes.
Q. It says that in black and white, right?
A. Yes.
Q. You were asked a lot of questions about what GBG sometimes does with invoices and other deals. Do you recall that?
A. Yes.
Q. I want to ask you about what GBG actually did with the invoices in this deal and why they did it. Why did GBG submit $5 million in invoices for marketing to Iconix?
A. So we can receive the money.
Q. In return for what?
A. For the overpay.
Q. In connection with what deal?
A. SEA-2.
Q. That's why you did it?
A. Yes.
Q. Now, let's talk about SEA-3. Why did the price jump by $6 million?
A. Why did it jump?

MBF5col2          Margolis - Redirect          Page 1880

Q. Why did it jump up, as we saw in the drafts, by $6 million?
A. Because we were going to get the money back.
Q. Who told you that?
A. Jason Rabin.
Q. Did you understand that to be a firm commitment from Iconix based on your conversations with Jason Rabin?
A. Yes.
     MR. RODRIGUEZ: Can we go to Government Exhibit 1139, please, already in evidence?
Q. Now, do you see this e-mail between Ethan Cole and Jared Margolis?
A. Yes.
Q. Are there any lawyers for GBG on this e-mail?
A. No.
Q. Any lawyers for Iconix on this e-mail?
A. No.
Q. OK. Let's look at the first bullet, thus far we have invoiced...
     Thus far we have invoiced $5 million in marketing for the Europe/Korea amendment. Do you see that?
A. Yes.
Q. Is that why you submitted $5 million in marketing invoices?
A. Yes.
Q. Do you recall some questions about the Korea piece of this deal?

MBF5col2          Margolis - Redirect          Page 1881

A. I recall.
Q. Do you recall Mr. Markus asking you some questions --
A. Yes.
Q. -- about the Korea piece of this deal?
A. Yes.
Q. And do you recall yesterday you submitted a counter-proposal to Seth Horowitz for the Korea piece to be $3.3 million?
A. Yes.
Q. And then do you recall that in the PIP that wound up being $8.3 million?
A. Yes.
Q. Why was there a $5 million difference in the Korea piece between $3.3 million and $8.3 million?
A. Because we were going to get paid back the money by submitting the invoices for marketing.
Q. It had nothing to do with Coco Bahn, right?
A. It had nothing to do with Coco Bahn.
Q. You were also asked some questions about David Beckham. Do you recall that?
A. Yes.
Q. Did David Beckham have anything to do with the purchase price for SEA-3 jumping by $6 million?
A. No.
Q. Mr. Markus asked you a hypothetical about Amazon stock. Do

Min-U-Script®          Southern District Court Reporters          (37) Pages 1878 - 1881

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

---

MBF5col2    Margolis - Redirect    Page 1882

you recall that?

A. Yes.

Q. He said if you pay $100, there is a $95 floor.  Do you recall that?

A. Yes.

Q. And that's a sick deal, he said something like that?

A. Yes.

Q. Is it even more sick if you get $5 back?

A. I don't understand.

Q. That's way better deal, right?  In this hypothetical you get $5 back in return?

A. Yes.

Q. You were asked some questions about the invoices.  Do you recall that?

A. Yes.

Q. And Mr. Margolis, you, yourself, don't do marketing work, right?

A. Correct.

Q. People like Daisy Laramy-Binks do marketing work, right?

A. Correct.

Q. That's her job, right?

A. Yes.

Q. She would know how much her work is worth, right?

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

---

MBF5col2    Margolis - Recross    Page 1883

THE WITNESS: Yes.

BY MR. RODRIGUEZ:

Q. You were asked some questions, sir, about your own belief about your own conduct and whether it was wrong.  Do you recall that?

A. Yes.

Q. Is lying to auditors wrong?

A. Yes.

Q. Is lying to the SEC wrong?

A. Yes.

Q. Is lying to investors wrong?

A. Yes.

Q. Is leaving out material terms of a deal from SEC filings wrong?

A. Yes.

MR. RODRIGUEZ: I have nothing further, your Honor.

RECROSS EXAMINATION

BY MR. MARKUS:

Q. Mr. Margolis I'm not going to yell at you, I'm just going to ask a couple questions.

MR. MARKUS: Let's call up 1068 that the prosecutor just showed you again, and the next page.

Q. Who wrote this?

A. Ethan Cole.

Q. So, would he be the best person to ask about this document?

---

MBF5col2    Margolis - Recross    Page 1884

MR. RODRIGUEZ: Objection.

THE COURT: Sustained.

BY MR. MARKUS:

Q. The prosecutor asked you about lawyers not being copied and accountants not being copied on this document.  Do you know who else wasn't copied?  Neil Cole wasn't copied was he, sir?

A. No.

MR. MARKUS: Thank you.  I have nothing further.

MR. RODRIGUEZ: Nothing further, your Honor.

THE COURT: OK.  Mr. Margolis, you may step down.

(Witness excused)

THE COURT: Ladies and gentlemen, it is close enough to 12:50, we will break now and get back together at 10 minutes after the hour.  Do not discuss the case.

(Continued on next page)

---

MBF5col2    Margolis - Recross    Page 1885

(Jury not present)

THE COURT: Everyone can be seated.

Do we have a witness?

MR. THOMAS: Yes, your Honor; we have two.

THE COURT: OK.  Anything else to raise either side?  OK, folks.  20 minutes.

(Recess)

MR. RODRIGUEZ: Your Honor, can we put the witness on the stand?

THE COURT: Sure.

You just need to snake around and up into the plastic box there.

THE WITNESS: All right.

(Continued on next page)

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

---

MBF5col2     Burkhardt - Cross     Page 1922

the idea of coming up with a so-called tracking stock for Lee Cooper Europe being discussed?

A. I had forgotten it but now that I see it, yes, I do recall.

Q. And you see here that Mr. Horowitz is noting that it technically was not an agreement because there was no -- there was no writing that evidenced an agreement to do that with GBG.

Do you see that?

A. Yes.

Q. And so, does this help refresh your memory that there were discussions with GBG about participating in Lee Cooper Europe but in fact those were never reduced to an agreement?

Do you see that?

A. Yes.

MR. HECKER: I think we can take that down.

Q. Now, Mr. Burkhardt, you did understand, by mid-2014, that Iconix had quite an extensive relationship with GBG and Li & Fung, the parent company, yes?

A. Yes.

Q. And you were asked some questions, for example, about your involvement in three specific joint ventures in Europe, Southeast Asia, and Middle East North Africa, correct?

A. Correct.

Q. But the relationship between Iconix and GBG extended far beyond just those joint venture agreements, correct?

A. It did.

---

MBF5col2     Burkhardt - Cross     Page 1923

Q. It was one of Iconix' largest partners, yes?

A. Yes.

Q. And at the time you knew which brands had been contributed into each of the joint ventures, correct?

A. Correct.

Q. And with respect to SEA-3, am I right that that deal included a 50 percent interest in both Lee Cooper China and also Umbro China? Yes?

A. That is correct.

Q. And you thought that the real value of that SEA-3 transaction was really the rights to Umbro and China; correct?

A. No.

Q. Didn't you think that the rights to Umbro in China were valuable?

A. Oh, absolutely. But you said most.

Q. OK. Fair enough.

So, the deal was valuable both because of Umbro in China but also because of Lee Cooper in China?

A. Correct. Lee Cooper had an existing business in China so it was valuable.

Q. Am I right, did you understand that historically the rights to Umbro in Korea had been sold for $10 million the year before?

A. Correct.

Q. And you agree with me China is a significantly bigger

---

MBF5col2     Burkhardt - Cross     Page 1924

market than Korea?

A. Of course. Yes.

Q. Many times bigger?

A. Yes.

Q. Is it fair to say that the SEA-3 transaction signed in September of 2014, was priced based on an understanding of the parties that both Umbro and Lee Cooper could be big sellers in what was a very large Chinese market?

A. That was certainly the hope, yes.

Q. With respect to Umbro there weren't yet revenues, correct?

A. Correct.

Q. But there had been historically, isn't that true?

A. Yes.

Q. And that was true because the Umbro brand used to be owned by Nike, right?

A. Correct.

Q. And, in fact, Iconix had purchased the Umbro brand from Nike just a couple years earlier for, like, $225 million; right?

A. Correct.

Q. And you knew that Umbro, historically, had had significant licensees in China when it was owned by Nike, yes?

A. I didn't know that but I knew it was a significant business.

Q. In any event, you saw the Umbro brand --

---

MBF5col2     Burkhardt - Cross     Page 1925

A. Yes.

Q. -- like the Lee Cooper brand as potentially very valuable in China?

A. Yes.

Q. And you didn't believe at the time that the SEA transaction was somehow priced too high, in other words that GBG had overpaid for the rights to both Lee Cooper in China and Umbro in China?

MR. RODRIGUEZ: Objection.

THE COURT: Overruled.

MR. HECKER: At the time, his understanding.

THE COURT: Overruled.

THE WITNESS: I'm sorry. Can you repeat the question?

MR. HECKER: Sure. Actually, can we read that back?

(Record read)

THE WITNESS: Is that the question?

MR. HECKER: Yes.

THE WITNESS: Actually, no I did think that it was slightly overpriced but not by any egregious amount.

BY MR. HECKER:

Q. OK. But didn't you think you could actually exploit the Umbro brand more effectively than GBG was exploiting it?

A. After about six months, yes, but not at the time of the deal.

Q. OK. So after about six months --

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

MBF5col2        Burkhardt - Cross        Page 1954

Q. And here Mr. Horowitz describes his views of the pros and cons of doing business with Abu Issa, correct?

A. Yes.

Q. And he says that the pro -- and there is just one -- is active wholesaler/retailer in the market; right?

A. Correct.

Q. And that part was true?

A. Yes.

Q. Under cons he has got a number. The first one he says is that Abu Issa don't license/market for a living and may need another partner to do so.

Do you see that?

A. Yes.

Q. And we agree that's also true?

A. We were never anticipating another partner but this is Seth projecting that we would need another partner. But, that was never part of our discussion.

Q. You didn't doubt that he believed that when he wrote that to Neil Cole?

A. He never expressed that to me, but I assume if he wrote it he believed it.

Q. OK. And the second con relates to the fact that it would mean receiving funds from the Middle East.

Do you see that?

A. I do. Yes.

MBF5col2        Burkhardt - Cross        Page 1955

Q. Do you recall that concern being discussed with Neil Cole?

A. No. Again, I didn't have this concern at all. Abu Issa had cash here in this country, this was not an issue.

Q. You understood that the potential issue here is actually at least the perception that there could be risks of accepting money coming in from the Middle East to the United States, yes?

A. Correct. Seth just didn't know what Abu Issa's financial status was.

Q. This is what he is telling Neil Cole at the time you are pitching him on the Abu Issa deal, right?

A. Absolutely. Yes.

Q. And the final con was unlikely to close by year end.

Do you see that?

A. Right. Yes.

Q. And it appeared from what we just reviewed that that was a real concern, yes?

A. Absolutely. Yes.

MR. HECKER: OK. You can take that down.

Q. In any event, we agree that the decision was made to run this Middle East joint venture with GBG and not Abu Issa, correct?

A. Correct.

Q. And we saw the letter you wrote to Abu Issa kind of letting them down as it relates to this joint venture but saying, hey, maybe we can do business in some other way in the future?

MBF5col2        Burkhardt - Cross        Page 1956

A. Correct.

Q. And even in that letter, in mid-December, there was still discussion about trying to find an efficient tax structure and issues about where to set up any corporate entity, right? Like there was still uncertainty about how you would structure it if you wanted to do that deal, correct?

A. Yes. That is correct.

Q. And that remained true to the end?

A. Absolutely.

Q. Now, you testified you were not a party to the negotiations with GBG that led to the MENA transaction, correct?

A. Correct.

Q. You testified that in your experience each party would pay their own due diligence, right?

A. Correct.

Q. And I don't think you were asked this but is it your position that ordinarily, if GBG had to do a lot of work to understand the market of the Middle East which was new to them, your expectation would have been that they would have to incur that cost?

A. Absolutely.

Q. But you don't know what demands were made by GBG on Iconix when they were actually negotiating that deal, correct?

A. No.

Q. And so you don't know why, ultimately, as part of that

MBF5col2        Burkhardt - Cross        Page 1957

deal, the agreement was reached for Iconix to pay for the cost of diligence, market analysis, whatever they thought GBG was asking for as part of the deal, yes?

A. Can you rephrase that?

Q. That was inartful, at best.

You weren't a party to those negotiations so you don't know why, at the end of the day, it became part of the deal that Iconix actually had to reimburse or pay GBG $3.1 million for both due diligence and market analysis, correct?

A. Right. I do not.

Q. OK. You testified about a couple relatively small marketing expenses that were run through the JV, correct?

A. Correct.

Q. Am I correct, sir, that in 2014 Iconix booked $36 million worth of advertising expenses in 2014? Does that sound about right?

A. I don't remember but not -- it doesn't sound wrong.

Q. And that, the marketing expenses at the JV level might be a tiny fraction of that, correct?

A. Sure.

Q. And it's true, is it not, that in 2014 Iconix' revenue was over $460 million?

A. Yes.

Q. And you knew that Iconix' revenue just from the GBG/Li & Fung relationship exceeded $50 million that year? Do

UNITED STATES OF AMERICA, V
NEIL COLE,

November 15, 2022

MBF5col2     Burkhardt - Redirect     Page 1958

you know that?

A. Say that again?

Q. The revenue that Iconix earned from its relationship with GBG in 2014 exceeded $50 million in revenue?

A. Certainly not from international, no.

Q. In total?

A. Right. Yes. There was a very large domestic relationship.

Q. So, would it surprise you that of a $36 million marketing budget for the year, that something like 10 percent of it might go to cover expenses that GBG was demanding Iconix pay for marketing?

A. In international? Yes. That's a very hard number.

Q. Not limiting to international. We discussed the fact that the relationship between the two entities exceeded the JV that you were involved in, correct?

A. Sure. That could be agreed to, of course.

MR. HECKER: I have no further questions.

MR. RODRIGUEZ: Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. RODRIGUEZ:

Q. Mr. Burkhardt, Mr. Hecker was asking you questions about expenses towards the end of his examination. Do you recall that?

A. Yes.

Q. And he was asking you whether certain things would surprise

MBF5col2     Burkhardt - Redirect     Page 1959

you.

A. Yes.

Q. Would it surprise you if Iconix paid for the same thing twice?

MR. HECKER: Objection. Foundation.

THE COURT: Overruled.

THE WITNESS: I'm sorry. Can you repeat the question?

BY MR. RODRIGUEZ:

Q. Would it surprise you if Iconix paid for the same expenses twice?

A. Of course. Yes.

Q. That's not normal in your experience?

A. Not a business practice, no.

Q. You were also asked some questions about GBG's experience in the Middle East region.

Do you recall that?

A. Yes.

Q. Do you normally pay a counterparty more because they bring less experience to the deal?

A. No.

MR. HECKER: Objection. Foundation. And it also -- this is a fact witness, not some kind of an expert.

THE COURT: Overruled.

THE WITNESS: I'm sorry. Repeat the question again?

Sorry.

MBF5col2     Page 1960

BY MR. RODRIGUEZ:

Q. Sure. Do you normally pay a counterparty more because they bring less experience to the deal?

A. No.

MR. RODRIGUEZ: Thank you, nothing further.

MR. HECKER: I have no further questions.

THE COURT: Mr. Burkhardt, you may step down.

(Witness excused)

THE COURT: Ladies and gentlemen, we are about eight minutes from the end of the day so rather than start a new witness, we will end our day a little early. I hope you don't mind. We will get together again tomorrow morning at 9:30. Please don't be laid. Be safe getting home. Don't discuss the case.

(Continued on next page)

MBF5col2     Page 1961

(Jury not present)

THE COURT: Everyone can be seated. Anything to raise?

MR. THOMAS: Your Honor, just an update on timing. We expect tomorrow to be mostly the Larry Shapiro day, which I know is everyone's favorite day of this particular trial, but we think there is a high probability that we are going to be resting on Thursday at the end of the day or at the very beginning of Friday. Mr. Shapiro is really the last lengthy witness that we expect. We are going to call another investor victim, but other than that it is really short witnesses after Mr. Shapiro so we are getting --

THE COURT: What about Agent Collins?

MR. THOMAS: We are going to call two summary charts persons; the SEC person who will do the math on EPS and Agent Collins, but we expect Agent Collins' testimony to be brief.

THE COURT: OK.

Anything from you folks? Then we should expect to do the charge, can we do it Thursday afternoon?

MR. HECKER: That sounds great, Judge.

THE COURT: OK. We will get it to you tomorrow. I just need to look at my calendar and see what I have on Thursday. 5:00 Thursday. OK?

MR. HECKER: OK.

THE COURT: If something goes away we can maybe push

# A-981

MBG5col1     Shapiro - Direct     Page 1986

referring to rows within a table of financial information?

A. Yes. Included in the company's financial statements is an income statement. That's their operating statement that shows how much they made, what they sold, what they spent with either net income or net loss at the bottom, so I am referring to a page of the company's financial statement.

Q. Mr. Shapiro, in your time with Iconix did the concept of EBITDA come up? E-B-I-T-D-A?

A. It did.

Q. What is EBITDA?

A. It refers to something we talked about a few minutes ago called non-GAAP income. It is an accounting metric that a number of public companies, including Iconix, would present to investors. It is away of attempting to take company's net income, which is the bottom line of its operations, how much money the company made at the end of the year, and they back out certain things that they think the investors should consider when evaluating the company's performance.

Q. Mr. Shapiro, is revenue a component of EBITDA?

A. Revenues would be in the calculation of determining EBITDA.

Q. So, holding all else equal, if revenue goes up, what effect on EBITDA?

A. EBITDA would go up.

Q. Are you familiar with the concept of expenses?

A. I am.

MBG5col1     Shapiro - Direct     Page 1987

Q. What are expenses?

A. Expenses are the opposite of revenue. Revenue is the money that comes in to fund operations and expenses are the monies that go out in the form of typically expenses.

Q. In your work with Iconix, did EPS come up?

A. It did.

Q. Can you tell the jury what that stands for?

A. EPS is a critical number for public companies and it is called earnings per share, and it is often times one of the triggers that is used by analysts, investors, to try to rationalize or determine what the company's stock price should be.

So, earnings per share -- do you want me to tell you how it is computed simply? Or you don't want to get into that.

Q. Mr. Shapiro, would you explain, generally, how earnings per share is calculated?

A. Earnings per share would be if the company made money -- hopefully the company made money -- at the end of the day you would take that number and use that in a numerator in a calculation and the denominator would be the number of shares of the company. So, if the company made a million dollars and had a million shares of stock that are out there -- if I do my math right -- so earnings per share would be one, so it would be a dollar. The reason why that is used to help analysts and investors to determine the fairness of the stock price is if a

MBG5col1     Shapiro - Direct     Page 1988

stock was selling, let's say, at $5 a share, then typically the public company is getting valuated based on peers in the group is a multiple of earnings per share. In the simple example I just gave the earnings per share would be one, the stock price would be five, so it is a five-to-one ratio. And then they would take that ratio and compare it to other public companies in that field and say are they doing better or worse than other companies. So, earnings per share is a critical number.

Q. Is revenue a component of EPS?

A. Well, revenue less expenses equals earnings and earnings is the numerator in EPS.

Q. So, holding all else constant, if revenue goes up, what effect is there on EPS?

A. EPS would have to go up.

Q. Mr. Shapiro, in your time at Iconix, did you become aware that they reported a figure known as non-GAAP diluted EPS?

A. I believe they did, yes.

Q. Could you explain to the jury what that means?

A. Well, to the extent that the company presented GAAP financial statements and GAAP financial information, the company also presented non-GAAP information -- and I attempted, hopefully artfully, to explain what non-GAAP is. And so if the company wants to explain to an investor, well, here is our GAAP information and it is gobbledegook and a lot of accounting rules and we paid BDO a lot to get all those numbers, we think

MBG5col1     Shapiro - Direct     Page 1989

you should look at our company this way, and they used non-GAAP numbers, EBITDA which you mentioned or some other way to determine your numbers. Then, to follow through, they want to do an earnings per share of that non-GAAP number, just like they did the earnings per share of the GAAP number. So, it is just a way of breaking down their non-GAAP numbers by share which is what you just asked.

Q. So, Mr. Shapiro, I'm going to take a moment to focus on revenue and expenses before we dive into the actual auditing work, if that's OK.

A. Sure.

Q. With respect to revenue, are there accounting rules that inform your consideration of whether the company is accurately recognizing its revenue?

A. A significant number, yes.

Q. We don't need to go into this in great detail right now, but could you share with the jury some of the main principles that apply to that consideration?

A. Yeah. Revenues is, as I said, it's the engine that drives the car so it is critical and may include a number of complexities or may not, it may just be simply selling a product for a certain amount of money. But the basic underlying principles of generating and earning revenue would be there has to be something to sell, there has to be a product, a widget, whatever it may be or a service. So, you

# A-982

MBG5col1     Shapiro - Direct     Page 1990

have to provide something of value, there has to be an understanding between the parties, and the parties have to come to agreement to purchase that product or service. It has to be a binding commitment that the customer, the buyer of that service or product will then pay for, then there is all kinds of guidance as to how do you determine what they paid for. And then, once all of those criteria -- and it is a bit more complex than that as you imagine -- once the criteria has been met, you have an understanding between the parties, you come to an agreement on the price, the purchaser is committed to pay that price, and the company had delivered the product or service, then revenue could be booked.

Q. Mr. Shapiro, I'm going to focus for a moment on a phrase you used "binding commitment." Can that commitment be oral?

A. Yes, it could be either written or oral. As long as it is binding on the parties, it need not be in writing.

Q. And when it comes to these accounting rules, what's your consideration of form versus substance for agreements like that?

A. It always speaks to substance of the transaction. So, if I understand your question, you need -- there needs to be business purpose -- well, why don't you clarify form and substance for me.

Q. Sure. Mr. Shapiro, let me come at it in a different way in a moment. We were also talking about expenses?

MBG5col1     Shapiro - Direct     Page 1991

A. I did.

Q. Are there accounting rules you look to to determine when an expense is appropriate to have been taken?

A. Sure. There are accounting rules on everything in a company's financial statements so revenues -- expenses would be part of revenue.

Q. And could you give the jury a sense of what considerations go into expenses?

A. Well, it is the opposite of revenue. So, once the company makes a commitment to purchase something, a service or a product, and there is an understanding between, often times, a contract, a purchase order, an invoice, it is binding on the company to pay the amount specified by the seller of that product or service so it is basically the opposite of the revenue number just referred to, it is a binding agreement between the parties. In this case the company is now buying the product or service instead of selling the product or service.

Q. Mr. Shapiro, are you familiar with the concept of prepaid revenue or prepaid expense?

A. I am.

Q. What does that mean?

A. Prepaid means the party paid for the product or service before the product or service was delivered.

Q. What effect does that have on when or how it would be

MBG5col1     Shapiro - Direct     Page 1992

accounted for?

A. Well, accounting -- GAAP, I shouldn't say accounting -- GAAP requires financially prepared under the accrual method of accounting rather than the cash method of accounting.

So, cash means -- and everybody has a checkbook and when you write a check, that is a cash basis. But, if you purchase something and you could pay for it 30 days later and you have got that billed in your checkbook and you haven't paid it yet, for your purposes you haven't paid it, you don't have the expense. When you write the check, then you have the expense. That's not the way GAAP works and that's not the way companies who present financial statements under GAAP work. Once you get that invoice and you purchase that product, then you are bound, legally, to make that payment and that's called the accrual method of accounting.

So prepayment -- getting back to prepayment -- so, prepayment would be the company made that payment but they haven't gotten the benefit of what it is the company paid for. So, they pay for a service, they pay for the product, the service or the product hasn't been delivered yet. So, under GAAP, that's not an expense. Despite the fact that it was paid, it is not an expense. It doesn't become an expense until the product is delivered or the service is delivered. So, it doesn't go through the operating statement, it gets hung up on the balance sheet -- I don't know if we are going to get into

MBG5col1     Shapiro - Direct     Page 1993

those different statements -- but, it doesn't get reflected in the company's earnings or operating statement because the product hasn't been delivered.

Q. So, Mr. Shapiro, just to focus on that for a second. If a service had been performed in the past and then was paid today, would it be appropriate to classify that as a prepaid expense?

A. No. That's the opposite of prepaid expense.

Q. Why is that?

A. Under GAAP, expenses need to be recorded when the service has been provided, not when it is paid for. So, companies don't prepare financial statements -- under GAAP they don't prepare financial statements under the cash basis. So, paying an amount or receiving an amount does not dictate the recording of revenues or expenses, it has to be when the service or product is delivered or sold.

Q. So, Mr. Shapiro, I want to try to combine a couple of these elements to see if they make sense for us, some of the principles.

In your work, including with Iconix, do you encounter situations where there are transactions in which Iconix is both paying money and receiving money from a counterparty?

A. Yes.

Q. What sort of principles come into play in assessing how to account for those transactions?

A. We are now getting into some complex areas within GAAP and

# A-983

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBG5col1    Shapiro - Direct    Page 1994

accounting principles. It is not -- in some cases it is not uncommon, in other cases it is fairly unusual, but do you want me to go through when it is done or as related to Iconix?

Q. For the moment I was hoping you could identify for the jury some of the principles or considerations you have in mind on how to tackle the accounting for a situation where Iconix both pays and receives money from a counterparty.

A. So, when a company sells a product it generates revenue and I have indicated the significance and importance of revenue, that's the engine that drives the company's financial statements. That's an important metric, obviously, to the auditor, to investors, to the company. And there is a lot of accounting rules that follow that. At times the company may, at the same time or sometime shortly thereafter, make a payment to the same party that they just sold something to and the accounting rules deal with -- well, number one, it is a flag that says, well, wait a minute here, you just sold something recording revenues and now you are paying that same party for something, whatever that something is. There are accounting rules that dictate could you treat those transactions separately and record each one of them separately, revenue when you collect money and expense or an asset when you pay money, or is there a lack of substance where you are unable to treat them separately. And there is a fair amount of accounting guidance that indicates if you can't otherwise support that

MBG5col1    Shapiro - Direct    Page 1995

each one stands on its own, then the accounting would make you put them together. So, if you pay X and received Y, you would net the difference and then book that difference one way or the other, revenue or expense.

Hopefully I didn't get too bollixed up on that.

Q. Mr. Shapiro, continuing with that for a moment, if it were the case that the payment that Iconix received was dependent on Iconix' agreement to pay money back to the counterparty, what considerations would you bring to bear on that?

A. It would certainly call into question whether those two transactions should be viewed separately and accounted for separately. If one was dependent on the other, we would have to look at it very closely to determine why is it done that way? Why are they so interdependent? Is there value? Is there business substance? Is there economic substance? Is there business purpose? Is there fair value to each transaction? But, if one is dependent on the other, it would certainly raise a flag as to the fairness in equity. And again, we are getting back to this form over substance. I think that you asked me and at one point I asked for clarification. It has to make sense. If you receive money and then turn around and pay a portion of that back, the question is, well, how do you account for it? And you don't look to the agreements. The agreements might say I'm going to sell you a product for X and you have to pay us Y for something else. The

MBG5col1    Shapiro - Direct    Page 1996

agreements don't dictate accounting. Economic substance and fair value determines accounting.

So, if the situation you brought up exists, the company we would valuate, and certainly auditors would need to audit and question whether those are two separate transactions that get accounted for separately or one transaction that gets netted and you book the net number.

Q. Mr. Shapiro, are you familiar with the term "round tripping?"

A. I am.

Q. What is that?

A. Well, it is pretty much what we just got finished talking about.

So, round tripping means the money goes round in a circle. It may not be the same amount of money but a company receives X amount of money and contemporaneously or dependent on them collecting that money, they have to make a payment, either that exact same amount or a smaller amount. So, the money goes out and then comes back in. It is just accounts that we talked about, a company sold a product, received funds, and entered into a commitment to purchase something from that same party and round tripping has been a concept that's gotten some companies in trouble by inflating -- by treating it separately and inflating the numbers, and in other instances it has been done appropriately and hasn't gotten companies in

MBG5col1    Shapiro - Direct    Page 1997

trouble.

But, round tripping is typically what is referred to as a red flag and heightened sensitivity by auditors to make sure that, again, there is two transactions here, the receipt of money and the payment of money. The accounting for that is something that accountants would need to look at and companies would need to evaluate.

Q. Mr. Shapiro, are the sensitivities about round tripping something that you have presented to the audit committee of Iconix about?

A. Yes. There was at least one instance in a period prior to the period we are talking about when I wasn't even the audit partner when there was a rather significant transaction that occurred at the company that we thought was sensitive enough that could be questioned regarding the concept of round tripping. And again, since auditors have to be skeptical and questioning of things that could be considered to be round tripping transactions and how to account for it, if in fact it is a round tripping transaction. There was a particular matter I can't remember the year, 2011 maybe, that we got comfortable with the company's accounting but thought it raised to the level of sensitivity that we thought that the company's audit committee should be made aware of what we thought about and how it might be viewed by a third-party, particularly somebody like the SEC.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

---

MBGYCOL2    Shapiro - Direct    Page 2046

So we wanted to make sure we highlighted it for the audit committee.

Q. Mr. Shapiro, you said you wanted to highlight it for the audit committee.

In fact was this information presented to the audit committee?

A. It was. It would have bee emailed or sent to the audit committee prior to the meeting so they could read up on it and be familiar with it. And then it would be presented by myself and my team during the course of the audit committee meeting, which almost always was in person.

Q. And for the meeting for this quarter, did Mr. Cole attend to your memory?

A. Yes. As I indicated, it's my recollection that Mr. Cole attend all the audit committee meetings.

Q. And when there was a presentation about this transaction, did Mr. Cole raise any concerns about the way it was described?

A. No.

MR. THOMAS: Mr. Bianco, you can take that down. Let's put up Government Exhibit 105, which is in evidence.

Q. Mr. Shapiro, could you tell us what we're looking at here as Government Exhibit 105.

A. This is the third quarter 10-Q, so for the period ended September of 2014. It's similar to what we discussed with the second quarter. This is the required filing to present

---

MBGYCOL2    Shapiro - Direct    Page 2047

financial and nonfinancial information to the SEC regarding the company's results from the third quarter of '14.

MR. THOMAS: Let's advance to page 12 of the PDF.

Q. Mr. Shapiro, could you orient us as to where we are within this quarterly filing here at page 12.

A. I believe we're in the footnotes of the financial statements which, again, is part of the financial statements. And it's a narrative governed by GAAP as to what needs to be included in those financial statements to give the reader a better understanding of the numbers presented.

Q. Mr. Shapiro, do you see the description that relates to the Iconix Southeast Asia joint venture?

A. I do.

Q. I want to focus your attention on the paragraph that begins: "In September 2014."

Do you see that paragraph?

A. I do.

Q. Did the company report a gain from a transaction in September of 2014?

A. It did.

Q. What gain did it record?

A. The gain resulting from this transaction, as it's explained here, is $18.7 million.

Q. Did it report a purchase price?

A. The purchase price for the company's sale of these

---

MBGYCOL2    Shapiro - Direct    Page 2048

trademarks for this joint venture was $21.5 million.

Q. Would verifying that computation have been within the scope of the review that was conducted in this quarter by BDO?

A. Yeah. I think I indicated for a quarterly review, we don't need to verify these numbers. But because we would need to verify this because -- again, it's a year-end -- it would be good practice.

And it was within BDO's practice and other firm's as well was to do as much auditing verification procedures in connection with the Q, even though it's not required for review.

We would want to make sure that the numbers were accurate because we would need to audit it at year end anyway. And because of the significance, if there was an error, we'd like to bring it to the company's attention earlier rather than later.

So I don't know if we would have completed our verification procedures, but we would have done as much as possible in the limited period of time that we had to do the review to attempt to verify as much as possible which, again, went beyond the requirement of a review. But it was just good business practice, and it gave us a jump start. It tested something that we would have had to have tested at year end anyway.

Q. Mr. Shapiro, I'm going to give you another hypothetical.

---

MBGYCOL2    Shapiro - Direct    Page 2049

If it had been the case that the parties to this transaction actually agreed to transact at $15.5 million but that they also greed that LF Asia would pay $6 million more in exchange for Iconix's commitment to send $6 million back, would you have wanted to know?

A. Absolutely.

Q. Why?

A. For the same reason we discussed. It would be a round-trip transaction. The company received money under the understanding that they would give some of it back.

So the question was did they really sell that asset for $21 million when they had to give money back. So what was the nature of giving the money back. Was there a purpose to it. Was value going to be received from that payback.

Again, accounting guidance is pretty clear. And if it were to be a round-trip transaction, which arguably it would be, then the sensitivity and the skepticism with the orders 10-I would raise.

And we would want to get to the bottom of why is it being done in this matter and its fair value and business purpose associated with it. So we just want to make sure the accounting is correct.

Q. Now, to build on that hypothetical for a moment, if there wasn't fair value for the $6 million going back, what impact would that have on the computation on the revenue and gain?

---

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBGYCOL2          Shapiro - Direct          Page 2050

A. Similar to the $5 million we discussed. It would reduce the revenue and then reduce the gain.

Q. And, Mr. Shapiro, to build still further on that hypothetical, if the manner of the contemplated return payment was actually relief of a future minimum royalty obligation -- are you with me?

A. I am.

Q. -- what effect would that have on the accounting?

A. Well, we would separate -- let me think about this. If -- wait a minute here. Ask your question again.

Q. If the manner in which the 6 million would be returned to LF Asia was by relieving them of future minimum royalty obligations, what effect on the accounting would there be?

A. I'm a little confused with the question because -- when you say to relieve them of future payments, the future royalty payments is the receipt of money.

If this is intended to reimburse them for the receipt of future money? Is that your question?

Q. Yes. In the amount of 6 million.

A. Right. Then it would have -- I'm confused with the structure of the sentence. It would then -- well, number one, we'd have to understand why is it being done that way and does it relate to the money they received on the 21.5 million. But in any event, the 6 million wouldn't be part the gain.

Q. Why is that?

MBGYCOL2          Shapiro - Direct          Page 2051

A. Because it wouldn't have anything to do with -- it wouldn't have anything to do with the sale of the asset. So they would have received the money in the form of 21.5 million. But then they're giving that money back for something in the future that they otherwise would have been entitled to receive.

So the $6 million wouldn't have anything to do with the sale of the asset. So, therefore, if it had nothing to do with the fair value of the asset, it would therefore reduce the proceeds and reduce the gain.

MR. THOMAS: Mr. Bianco, can we go to page 26.

Q. Mr. Shapiro, could you orient us once more as to where we are in the document here.

A. Again, it's required information per the SEC that is included in the company's 10-Q. This is management's opportunity to explain, hopefully in easy English for a reader to understand, the key transactions that occurred during the quarter, in this case the third quarter of '14, and to explain in this context how the company performed during the period to give the readers a better understanding of the numbers that were presented in the financial statements.

MR. THOMAS: Mr. Bianco, if you could enlarge the highlights of: "Current Quarter Section."

Q. Mr. Shapiro, did BDO play any role in selecting what to highlight in this third Q?

A. No.

MBGYCOL2          Shapiro - Direct          Page 2052

Q. Do you see the third bullet relates to "Gain related to the sale of our Umbro and Lee Cooper trademarks in greater China territory to our Iconix Southeast joint venture"?

A. I do.

Q. Who is it that selected or made the decision to highlight this transaction in the Q?

A. Someone within management of the company.

Q. Of Iconix?

A. I'm sorry. Of Iconix.

MR. THOMAS: Mr. Bianco, if you could enlarge the next paragraph: "Licensing and Other Revenue."

Q. Mr. Shapiro, do you see here that the company reported a figure for licensing and other revenue for the current quarter?

A. I do.

Q. And do you see that they note that that represented a 6 percent increase as compared to the prior year quarter?

A. I do.

Q. And then if you --

MR. THOMAS: Mr. Bianco, if you could highlight the sentence beginning: "Additionally."

Q. Mr. Shapiro, do you see that sentence: "Additionally, we realized an $18.7 million gain in the current quarter on our sale of Umbro and Lee Cooper trademarks in the greater China territory"?

A. I do.

MBGYCOL2          Shapiro - Direct          Page 2053

Q. Would that gain figure be accurate if the $6 million payment back to LF Asia did not have value?

A. No. As I explained, not as clearly as I would have liked to explain, if there was no value to the 6 million, then the gain would be reduced by 6 million. The revenue would be reduced by 6 million.

Q. So the $113.8 million figure would have to be reduced by 6 million?

A. Correct.

MR. THOMAS: Mr. Bianco, you can take this down. Let's show the witness Government Exhibit 502.

Q. Mr. Shapiro, do you recognize this?

A. I do.

Q. Is this a management representation letter for the third quarter of 2014?

A. It is.

MR. THOMAS: The government offers 502.

MS. DABBS: No objection.

THE COURT: It will be received.

(Government's Exhibit 502 received in evidence)

MR. THOMAS: Mr. Bianco, could you publish that.

Q. Mr. Shapiro, now that it's up on everyone's screens, can you describe what we're looking at.

A. This is similar to what we discussed or I discussed. In the last quarter at the conclusion and prior to the filing --

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

---

MBGYCOL2          Shapiro - Direct          Page 2054

at the conclusion of the review and prior to filing a 10-Q, for us to be comfortable to sign off and as required by this language, we would be required to obtain a representation letter from management of the company and particularly those members of management of the company that we relied on during the course of the review procedure.

And this is their way of confirming in writing to us that everything that they've done in connection with the preparation of the financial statements and everything they've given us and told us in connection with the review was true and accurate and complete to the best of their knowledge.

We're required to get that. It's important to us that they commit in writing that everything they told us was accurate and true. So we would get that signed by members of management before we would sign off on the financial-- for the review opinion on the financial statements for the 10-Q.

MR. THOMAS: Mr. Bianco, could you jump to page 5 for us.

Q. For the third quarter, Mr. Shapiro, who made the representations to BDO on behalf of Iconix?

A. It's the members of management that we worked with the most during the course of the quarterly review. So it would be Neil Cole, the CEO; and the CFO; and the company's controller.

Q. Mr. Shapiro, I note that the COO of Iconix isn't on this list.

---

MBGYCOL2          Shapiro - Direct          Page 2055

Why is that?

A. It was an unusual situation, I must admit, because typically we'd have a lot of interactions with the company's chief operating officer. But my experience with the years that I was on Iconix is that our team, and myself personally but somebody on our team, had very minimal dealings on accounting matters with the company's chief operating officer.

So the requirement or the standard is the people that we work with -- you're always required to have the CEO and the CFO on that. Whether you work with them or not, you're required to have them. And it's assumed that if anything goes on at the company, those would be the two people that would know the most.

And then you get signatures from those others that you talked to and relied on, and we didn't rely much or talk much to the chief operating officer. So we didn't feel it necessary to get that opinion, to get that signature.

Q. Now, Mr. Shapiro, we talked about this maybe a little bit at the very beginning.

But did you interact with Neil Cole directly from time to time in the course of these audits and reviewed?

A. Yes.

MR. THOMAS: Now, Mr. Bianco, take us back to page 1, paragraph 1, if you would. If you could enlarge the first numbered paragraph.

---

MBGYCOL2          Shapiro - Direct          Page 2056

Q. Mr. Shapiro, I'm not going to go through this in length again like we did for the second quarter.

But did you rely on this first representation when you were conducting the review for Q3?

A. We did.

MR. THOMAS: Mr. Bianco, could you take us to paragraph 6.

Q. Mr. Shapiro, did you rely on this representation when conducting the review for Q3?

A. We did.

Q. If Mr. Cole had made an oral commitment to return money with respect to that September Southeast Asia joint venture, would you have considered this representation to have been accurate?

A. No. Again, whether it's written or oral, if it's a binding agreement between the parties that materially affected financial statements, then we'd want to know about it. If that occurred and it wasn't disclosed to us, then we would have had a problem with that.

Q. So, Mr. Shapiro, just to pause on that.

If the parties had a handshake deal that they intended to perform on, would that be good enough for you?

A. If it's binding on the parties, yes.

MR. THOMAS: Let's go to page 2, paragraph 7.

Q. Mr. Shapiro, did you rely on this representation for the Q3

---

MBGYCOL2          Shapiro - Direct          Page 2057

review?

A. We would have relied on this statement as well. We would have relied on all paragraphs in this letter.

Q. If Mr. Cole could not have truthfully made this representation to you, would you have wanted to know at the time?

A. Of course. We take fraud pretty seriously during the course of the audit.

MR. THOMAS: Mr. Bianco, you can take this down. Let's show the witness Government Exhibits 105A and 105B which are in evidence.

Q. Mr. Shapiro, do you see what's on the screen as 105A and 105B?

A. I do.

Q. What are we looking at?

A. Similar to the last quarter, these are required by the SEC, written, signed certifications by the CEO of the company certifying that the information presented in this 10-Q is fairly represented, accurate, complies with the rules and regulations of the SEC.

It has to be included in this -- well, in the 10-Q, as well as the 10-K, the same exhibits. It would be included in the filing that's filed with the SEC.

Q. Who made these representations and certifications on behalf of Iconix?

---

# A-987

MBGYCOL2  Shapiro - Direct  Page 2058

A. Neil Cole.

Q. Were these representations part of the filing that was made?

A. It was.

Q. And were these available to shareholders and perspective shareholders?

A. As part of the filing, yes.

MR. THOMAS: Mr. Bianco, you can take this down. Let's show Mr. Shapiro what's been marked as Government Exhibit 104, which is in evidence. If you could enlarge the first third.

Q. Mr. Shapiro, do you see what we're looking at here?

A. I do. I see it.

Q. What is it?

A. It's the company's 8-K that they filed on October 24, '14 I'm presuming. On the next page, it would include the company's earnings release for the third quarter, similar to what we looked at and explained in the second quarter.

MR. THOMAS: Mr. Bianco, could you jump to page 4.

Q. Mr. Shapiro, is that earnings release that you mentioned right here?

A. Right.

MR. THOMAS: Mr. Bianco, if you would enlarge the bullet points for us.

Q. Mr. Shapiro, what role did BDO have in selecting or

MBGYCOL2  Shapiro - Direct  Page 2059

drafting these bullets?

A. As I indicated, we had no specific guidance or requirement to audit or review this information. But instead, we read it. As a professional courtesy and as a client service, we would read it and provide our commentary or recommendations, if we had any, to management prior to its release.

So we would just read it and make sure it's consistent with the information we determined from performing the procedures of the review and also consistent with our understanding as to the guidance provided on these kinds of things by the SEC.

Q. Now, Mr. Shapiro, do you see in the first bullet there's a reference again to "Diluted non-GAAP EPS"?

A. I do.

Q. Under that hypothetical I gave you, if Mr. Cole had committed to return $6 million to GBG in exchange for GBG paying $6 million more on the Southeast Asia joint venture in September, would this number have been impacted if that were the case?

A. It would.

Q. In what way?

A. The 6 million would not be part of the gain. We explained that. So the revenues would be decreased. The income would be reduced by the same amount. And the non-GAAP earnings would be reduced. And then based on the calculation of EPS, the EPS

MBGYCOL2  Shapiro - Direct  Page 2060

would be reduced.

Q. And to focus you on the second bullet, "Revenue of $113.8 million," do you see that?

A. I do.

Q. Would that figure be correct under the hypothetical I've given you?

A. Of course if this number reflects the company's revenue. If this number were overstated by 6 million, this number would be reduced by 6 million.

MR. THOMAS: Mr. Bianco, you can take this down.

Q. Now, Mr. Shapiro, I'm going to turn now away from the reviews and talk about the year-end audit.

Are you with me?

A. I'm with you.

Q. Great.

Did you participate in work on the year-end audit for the year 2014?

A. I did.

Q. In what way did you participate in the audit itself?

A. I was the audit engagement partner for that audit, supervising the staff, reviewing the work, making sure the work was done in conformance with the standards and that the financial statements were done in conformance with the GAAP.

Q. You've mentioned a few times in our conversation that you had a team helping you.

MBGYCOL2  Shapiro - Direct  Page 2061

Could you describe for the jury, generally, how it is that other people assisted you with the audit.

A. Yes. As you can see from the numbers, it's a good-sized company, $400- to $500 million in revenues, a lot of transactions, tens of thousands of transactions. I couldn't do all of that myself, and I wouldn't want to do all that myself. So I had people at various levels helping me.

So at any particular time, a review might be fewer than the audit. But the audit, in particular, I'd have what we call a senior manager or director who is one step away or close to -- one or two steps away from being a partner, someone experienced, a six- or seven- or eight- or ten-year experienced accountant work on the account to more closely supervise the staff.

And then I'd have -- the team would have one or two or two or three people that know the ropes a little bit and then possibly one or two others who are relatively young and inexperienced and getting that experience. So it would be about four or five people in addition to myself at various levels.

Q. Now, you've also mentioned that a year-end audit could involve weeks or maybe months of work.

Is there any planning that went into its execution?

A. I would hope so.

MR. THOMAS: Let's show the witness which is in

**A-988**

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

| MBGYCOL2 | Shapiro - Direct | Page 2066 |
|---|---|---|

So given the significance of revenue; the importance of revenue; and, in some cases, the complexity of revenue, I can't think of too many instances where revenue recognition would not be a highlight.

Q. To focus you on maybe the sixth bullet, joint ventures. Do you see that one?

A. Yes?

Q. Why were joint ventures within the scope of this audit?

A. Joint ventures, although it was a common business practice at the company, at least it was for the last couple of years and for the remaining years, joint venture accounting generally is complex accounting.

It's not run-of-the-mill accounting 101 kind of stuff. There are some very complex accounting rules that deal with how joint ventures get recorded. Given the complexity of joint ventures in general and given the magnitude of the joint venture transactions that Iconix entered into in that year -- and we've reviewed some of them. There are even more that we probably didn't talk about.

Because of the magnitude of the transactions and the significance of the transactions and the complexity of joint venture accounting, it was a focus of the audit which we wanted to convey to the audit committee which I think they were well-versed on the complexity and magnitude of joint ventures.

MR. THOMAS: Mr. Bianco, could you take us to page 11.

| MBGYCOL2 | Shapiro - Direct | Page 2067 |
|---|---|---|

And if you could enlarge for us the revenue recognition tables in the center of the page.

Q. Mr. Shapiro, what information is being conveyed here?

A. Yeah. For all the items that we've highlighted for the audit committee, all the bullets we just looked at on the last page, we would explain in the left-hand column why we're highlighting those items. So the left-hand column of bullets pretty much explains why we're focusing on revenue recognition.

And then the right-hand column indicates in very condensed form -- our audit program and steps were much more encompassing than these items, the way they're described.

So the why is in the first column, and the how we're going to test it is in the right-hand column.

Q. And, Mr. Shapiro, if I could just have you move that microphone ever so slightly closer. Thank you.

On the left-hand side four checkmarks down below the first bullet, do you see: "External pressure to meet certain revenue guidance"?

A. I do.

Q. What was the significance of that observation? Well, similarly to when we looked at SAB 99, companies are oftentimes under pressure to meet what's expected of them, again, expected of them by analysts, by investors. That affects stock price. That affects a whole bunch of things that's important to the company.

| MBGYCOL2 | Shapiro - Direct | Page 2068 |
|---|---|---|

So one of the key areas for public companies is meeting those expectations. And revenue would oftentimes be a key expectation of the analysts and of investors.

Q. And on the right-hand side, drawing your attention to the second bullet, one of the "hows" you have listed is "Perform testing of significant transactions as they are completed throughout the year and in conjunction with quarterly reviews."

Do you see that there?

A. I do.

Q. What is it that you're conveying there?

A. Again, we're conveying how we're going to specifically focus in on significant transactions during the year.

Q. This phrase, "significant transactions," does that have any relationship to the planning materiality and testing concepts that you talked about earlier?

A. Indirectly. I don't want to confuse. If we use $10 million as planning materiality, that doesn't then mean anything under $10 million we ignore. First of all, the guidance doesn't let you ignore it. And you don't want to ignore all accounts and transactions under 10 million because if you ignore many of them, they could, in the aggregate, exceed 10 million.

So if there were 10 accounts of $8 million each, that's $80 million. So I don't want to leave the impression that anything under $10 million we weren't interested in.

| MBGYCOL2 | Shapiro - Direct | Page 2069 |
|---|---|---|

There are a whole bunch of factors that we used in connection with the audit. And we audited many accounts and many transactions far below $10 million.

MR. THOMAS: Mr. Bianco, if you could take us to page 12. If you could enlarge for Mr. Shapiro and the jury the joint venture boxes.

Q. Mr. Shapiro, do you see that enlarged on your screen?

A. I do.

Q. Were joint ventures within the scope of the year-end audit?

A. For sure. Again, complex accounting, significant dollar amounts, materially affecting financial statements, joint ventures was also a focus of the audit.

Q. And on the right-hand side, do you see the first bullet? It says: "Review joint venture agreements and consider whether the entity is required to be consolidated in accordance with appropriate literature"?

A. I do.

Q. I don't want to take us too far down the road of consolidation. But could you tell the jury what consideration that refers to.

A. It indicated that joint venture accounting is complex and, in the case of Iconix, oftentimes complex, not unless. In the case of Iconix, these joint ventures were set up to sell an asset and record a gain.

And the question is did they sell the asset and lose

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBGYCOL2          Shapiro - Direct          Page 2074

explanation of how they tested the information and validated and verified the information in this memo.

MR. THOMAS: The government offers Defense Exhibit 432.

MS. DABBS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 432 received in evidence)

MR. THOMAS: Mr. Bianco, if you would publish that for the jury and enlarge the box at the top.

Q. Mr. Shapiro, do you see the second-to-the-last sentence of this box reads: "In addition, the terms noted in the memo were traced and agreed to the purchase agreement"?

A. I do.

Q. If there were an ancillary oral agreement that modified the written terms, would you have wanted to know?

A. Yes.

Q. Why is that?

A. As I've said, it would affect the accounting. If it was material, it would affect the conclusion. It would affect the accounting considerations. And it obviously would affect the resulting gain. So if it was binding on the parties, we would want to know about it.

Q. If the hypothetical I gave you earlier was true, that is, that Mr. Cole committed to return $6 million to GBG in exchange for their agreeing to pay $6 million more at the time of the

MBGYCOL2          Shapiro - Direct          Page 2075

transaction, would you have concluded that BDO had properly accounted for this transaction here?

A. This one I think was the 5 million?

Q. My mistake. Yes. The $5 million.

A. Yes. As we discussed, when we discussed this transaction and certainly when we discussed the other transaction, if 5 million of the purchase price or selling price had to be returned and no value was received by the company for the 5 million, then that would certainly change the conclusion, reduce the selling price, and reduce the gain by the 5 million.

MR. THOMAS: Mr. Bianco, you can take this down.

Q. Mr. Shapiro, at the conclusion of the audit process, did you present the findings to the audit committee?

A. We do.

Q. Why do you do that?

A. Well, number one, it makes sense. And number two and more importantly, it's required. So the standards that we follow under the auditing standards require, both for the planning purposes, to advise the audit committee how we plan on performing the audit and, equally important, at the conclusion of the audit, what we did and hopefully in connection and consistent with the plan we presented months earlier. And what we did, what we found, what was important to bring to their attention, and other required communications.

MR. THOMAS: Can we publish what I think is in

MBGYCOL2          Shapiro - Direct          Page 2076

evidence as Defense Exhibit 550A1.

Q. Could you tell the jury what we're looking at here, sir.

A. This is that wrap-up communication to the audit committee that I just summarized. So near the conclusion of the audit, prior to the filing of the company's annual Form 10-K, we would meet with the audit committee. This booklet would be sent to them, email or otherwise, prior, a day or two prior, to the meeting.

And this summarizes to the audit committee what's open on the audit, what's left to do before we could finish and sign off, what key transactions occurred that we wanted to bring to their attention, what considerations we gave regarding those transactions, and other required communications.

Q. Now, in the course of presenting the audit work to the audit committee, did Mr. Cole raise any concerns about the way the transactions were described or discussed?

A. No.

MR. THOMAS: Could we go to page 6 of this document.

Q. Mr. Shapiro, do you see here that there is a list of Q4 significant transactions?

A. I do.

Q. And then there's a note that: "Significant transactions from Q1 through Q3 have previously been discussed in the quarterly communications books."

A. I do.

MBGYCOL2          Shapiro - Direct          Page 2077

Q. Why aren't those significant transactions restated again in this audit wrap-up communication?

A. Well, it would make it somewhat unwieldy and repetitive. The significant transactions from the first three quarters were presented to the audit committee in written format and in similar communications.

So to repeat pages of transactions that had already been communicated to the audit committee we deemed would be a wasted effort of paper and time.

Q. And, Mr. Shapiro, to focus you on the first bullet, do you see in December 2014?

A. I do.

Q. And there is a reference to a Middle East and North -- a sale of trademarks, among other places, for the Middle East North Africa joint venture.

Do you see that?

A. I do.

Q. Mr. Shapiro, if, in connection with that joint venture, Iconix had made a $3.1 million payment to the counterparty as partial payback for the $6 million it had received with SEA-3, would you have wanted to know?

A. Certainly.

Q. Why is that?

A. Well, the reason stated earlier. If payments are made, we would want to understand why it's being made, what the business

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBGYCOL2          Shapiro - Direct          Page 2090

A. I do.

Q. Mr. Shapiro, if there were additional oral terms to those agreements, would you have wanted to know at the time you reviewed this section?

A. If they were binding on the parties and material to the transaction, I would absolutely want to know about them.

Q. To focus on the June 2014 transaction, in the hypothetical I've been giving you, if Mr. Cole had agreed to pay $5 million back to Li & Fung in exchange for Li & Fung paying $5 million more at the time of the transaction, would you have wanted to know that?

A. Yes.

Q. Would that have influenced or affected the gain and the sale price that are reported here?

A. Yes.

Q. In what way?

A. If there is no value to the $5 million giveback, then the company didn't receive the higher amount. They received the lower amount because they had to return part of the higher amount they would have received. So we would reduce the gain from that transaction.

Q. To focus you on the September 2014 paragraph, under the hypothetical I've been giving you, if Mr. Cole had agreed to send $6 million back to GBG in exchange for GBG paying $6 million more for that transaction, would you have wanted to

MBGYCOL2          Shapiro - Direct          Page 2091

know?

A. Yes.

Q. Why is that?

A. For the same reason we've discussing. It would have affected the accounting for the transaction, the substance of the transaction, and the resulting gain from the transaction.

Q. How would that have impacted the gain reported here in this section?

A. The way you explained it hypothetically, it would reduce the gain by 6 million.

THE COURT: Mr. Thomas, it's now 12:50. So we'll break.

Twenty minutes, ladies and gentlemen. Don't discuss the case.

(Continued on next page)

MBGYCOL2          Shapiro - Direct          Page 2092

(In open court; jury not present)

THE COURT: Mr. Shapiro, you may step down.

(Witness temporarily excused)

THE COURT: Anything to raise?

MR. THOMAS: No, your Honor.

MS. DABBS: No, your Honor.

THE COURT: Give me a timeframe, Mr. Thomas.

MR. THOMAS: Ten/fifteen minutes, your Honor.

THE COURT: Okay. 20 minutes, folks.

(Luncheon recess)

(Continued on next page)

MBG5col3          Shapiro - Direct          Page 2093

(Jury present)

THE COURT: Everyone, please be seated.

BY MR. THOMAS:

Q. Showing the witness Government Exhibit 503.

Mr. Shapiro, do you see what is marked Government Exhibit 503 on your screen?

A. I do.

Q. Is this the management representation letter that was provided to BDO by Iconix in connection with the 2014 year-end audit?

A. It is.

MR. THOMAS: The government offers 503.

MS. DABBS: No objection.

THE COURT: It will be received.

(Government's Exhibit 503 received in evidence)

MR. THOMAS: Mr. Bianco, can you publish this?

BY MR. THOMAS:

Q. Mr. Shapiro, now that this is on the screen, can you tell the jury what, if any differences there are, between the year-end representation letter and the quarterly review representation letters we looked at before?

A. It would be a similar concept but more all-encompassing since the audit involves so much more work, as I indicated; outside verification, three to four months' worth of work versus three or four days' worth of work. So, significantly

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

| MBG5col3 | Shapiro - Direct | Page 2094 |

more work, as a result we would expect more information and more representations from companies in connection with that additional work. So, it is a similar concept, some of the paragraphs are similar, if not exact, but there would be a lot more in there to cover the additional procedure done in connection with the audit.

MR. THOMAS: Mr. Bianco if you could skip ahead to the signature page which might be around page 5 and scroll forward, page 9?

Q. Do you see, Mr. Shapiro, at page 9, signatures?

A. I do.

Q. Who made these representations on behalf of Iconix?

A. Again, the same individuals we had before. These were the individuals that we communicated the most with and, by definition, would have to know the most about the company.

Q. If a company's executives had been unwilling or unable to make these representations to BDO, would that have been a consideration in your determining whether to issue an audit opinion?

A. Yes.

Q. How?

A. It's a requirement that we obtain this. So, if one of these individuals were unwilling or unable to sign it, we would be unable to conclude and sign off on the financial statements.

MR. THOMAS: Mr. Bianco, if you could take us to page

| MBG5col3 | Shapiro - Direct | Page 2095 |

1 in the first numbered paragraph?

Q. Mr. Shapiro, do you see the representation made at page 1, paragraph 1?

A. I do.

Q. Did you rely on that representation in conducting the audit work for year-end 2014?

A. I did.

MR. THOMAS: Mr. Bianco, if you could take us to paragraph 3, which is on page 2, and if you could enlarge 3(a)?

Q. Mr. Shapiro, do you see the representation here that the company has made available to you all financial records and related data?

A. I do.

Q. If there had been oral promises that bore on the transactions related to Southeast Asia, would you have expected the company to make that information known to you?

A. If the information was binding on the parties and material to financial statements, yes.

Q. Let's go to paragraph 30. Do you see the representation made at paragraph 30, Mr. Shapiro?

A. I do.

Q. Did you rely on that representation?

A. I did.

Q. Let's go last to paragraph 36. Do you see the representation here: We are not aware of any linked or barter

| MBG5col3 | Shapiro - Direct | Page 2096 |

transactions, including transactions entered into under separate agreements where one of the arrangements is contingent upon execution of another arrangement, except for agreements where such linkage, barter or contingent nature is explicitly stated in the contact terms.

A. I do.

Q. Can you explain to the jury what this representation is getting at?

A. This deals with transactions that are connected to one another and it gets back into -- although it includes more than -- but it gets back into this round tripping discussion we have talked about where one transaction is connected and contingent upon another transaction and that deals with the appropriate accounting for those linked transactions.

Q. So, Mr. Shapiro, to take one of the hypotheticals as an example, with respect to the June Southeast Asia joint venture, if there had been a promise by Mr. Cole to send $5 million back to LF Asia under the cover of marketing payments in exchange for LF Asia increasing the purchase price by $5 million, would that be a linked transaction you would have wanted to know about?

A. Yes.

Q. Why is that?

A. Because it would affect the accounting for the transactions. We would have to establish the business purpose,

| MBG5col3 | Shapiro - Direct | Page 2097 |

the economic substance, and the fair value to assess whether the accounting for those transactions was properly accounted for.

MR. THOMAS: Mr. Bianco, you can take this down and let's show the witness Government's Exhibits 107-A and 107-B. And these are in evidence so we can publish them to the jury.

Q. Mr. Shapiro, what are we looking at here?

A. These are identical documents that we looked at for the 10-Qs that -- both the second and third quarter 10-Qs that were shown earlier, it is identical. It is a requirement that the CEO sign certification for 10-Qs and 10-Ks certifying that all the information in the 10-K is true and accurate, conformative with the rules and regulations of the SEC.

Q. Did Mr. Cole make those certifications with respect to the 2014 10-K?

A. He did.

Q. And were those certifications filed publicly?

A. As part of the 10-K filing, yes.

Q. Were they available to shareholders and prospective shareholders?

A. As part of the 10-K, yes.

MR. THOMAS: Mr. Bianco, you can take this down and I will show the witness Government Exhibit 106. And this is also in evidence. Can you enlarge first third?

Q. Mr. Shapiro, can you tell us what we are looking at here?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBG5col3          Shapiro - Cross          Page 2102

questions you were asked, you don't have firsthand knowledge of whether Iconix undertook any commitment or obligation to GBG in connection with SEA-2 or SEA-3 that was not reflected in the written agreements pertaining to those transactions, correct?

A. Correct.

Q. And you have no firsthand knowledge of any agreement for GBG to increase or pay a higher purchase price in connection with either of those transactions in exchange for Iconix agreeing to give something back in some form, correct?

A. I'm sorry. What was the first part of that sentence?

Q. You don't have firsthand knowledge of whether there was any such obligation or commitment, correct?

A. Correct.

Q. And if there was no agreement or commitment or obligation along those lines, then there would have been nothing for Iconix to inform BDO -- your audit team -- with respect to any such agreement, commitment, or obligation, correct?

A. There wouldn't be anything to tell us so I guess I agree on that.

Q. We can agree on that.
So, you were asked some questions on direct examination about whether Mr. Cole raised any questions or issues or concerns with respect to the accuracy of descriptions about these two transactions, the SEA-2 and SEA-3 transactions in a variety of different documents. Do you recall those

MBG5col3          Shapiro - Cross          Page 2103

questions?

A. I do.

Q. You were asked some questions about content and descriptions that appear in some of BDO's own materials like the audit wrap-up and quarterly review documents; correct?

A. Correct.

Q. And you were asked questions about descriptions that appear in Iconix' public filings, 10-Qs and 10-Ks; correct?

A. Correct.

Q. If Mr. Cole believed that those transaction descriptions were accurate, then there would be nothing for him to raise as a concern or an issue, correct?

A. Under that premise, agreed.

Q. I want to ask some questions about just BDO's engagement with Iconix broadly. You have testified that you, as the engagement partner, had overall responsibility for the engagement, correct?

A. Correct.

Q. And you had a team that you worked with, a team of maybe four or five people in addition to yourself?

A. Correct.

Q. And you, with overall responsibility, you relied on the team to do substantial amounts of audit-related work, correct?

A. Correct.

Q. You couldn't, sir, as the engagement partner, be in the

MBG5col3          Shapiro - Cross          Page 2104

weeds on everything, correct?

A. Couldn't -- say that again?

Q. Sorry. Be in the weeds. I am using a term but I can be more precise.
You couldn't look at all of the details of the transactions that were within the audit scope, correct, not as the engagement partner?

A. That is correct. I would rely on my people to do so.

Q. And you have characterized Iconix, in your testimony, as a good-sized company, right?

A. I did.

Q. A company that had in excess of $460 million of revenue in 2014, correct?

A. Correct.

Q. A company that was engaged in tens of thousands of transactions I believe you testified?

A. Correct.

Q. And in the same way, sir, that you were the engagement partner on the audit with overall responsibility relying on your team, Mr. Cole was the CEO of Iconix relying on a number of people at his company, correct?

A. Correct.

Q. Now, your team and you, from time to time, would be in interactions and discussions with finance and accounting personnel at Iconix, correct?

MBG5col3          Shapiro - Cross          Page 2105

A. Correct.

Q. I believe you testified that Iconix was a company that would engage, with some frequency, and consult with the BDO team on a variety of matters over time, correct?

A. Correct.

Q. And we have seen, during your testimony, some white papers that were prepared by Mr. Snyderman at Iconix, correct?

A. Correct.

Q. He was an accountant by training, yes?

A. Yes.

Q. And he served as the company's vice president of finance, correct?

A. I believe that was his title.

Q. And you dealt with him directly from time to time, yes?

A. Correct.

Q. He reported to the CFO of the company, correct?

A. Correct.

Q. And in 2013, when you rejoined Iconix as engagement partner after having rotated off, that meant that Mr. Snyderman reported to Warren Clamen, correct?

A. At that time, yes.

Q. And then, after Mr. Clamen left the company, Mr. Lupinacci became the CFO, correct?

A. Correct.

Q. And one of Mr. Snyderman's responsibilities was to prepare

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBG5col3    Shapiro - Cross    Page 2110

phone, correct?

A. Correct.

Q. It was a productive and -- it was a productive relationship, fair to say?

A. Fair to say.

Q. And, as far as you know, BDO never expressed any concern to Mr. Cole about the level of cooperation that BDO received from the company, correct?

A. Correct.

Q. Not about level of cooperation and engagement from the CFO or anyone else from the finance and accounting team, correct?

A. Correct.

Q. And you have testified that, so far as you recall, Mr. Cole would attend audit committee meetings when they happened, correct?

A. Correct.

Q. And you may have had some other interactions with Mr. Cole over time when you were at Iconix, correct?

A. Correct.

Q. Outside of those meetings, correct?

A. Yes.

Q. Fair to say that you and your team interacted much more frequently with the CFO and controller and people responsible for actually doing accounting analysis for the financial statements?

MBG5col3    Shapiro - Cross    Page 2111

A. Than Mr. Cole?

Q. Yes.

A. Yes.

Q. And relatedly, as far as you know, BDO never expressed any concern to Mr. Cole about its access to documents and other information, correct?

A. Correct.

MS. DABBS: Can we please put up on the screen what is in evidence as Government Exhibit 238, Mr. Lam? Thank you so much.

Q. Mr. Shapiro, do you recognize this document as an audit committee meeting agenda from February of 2014?

A. I do.

MS. DABBS: And if we scroll forward just a bit so Mr. Shapiro can see the content, there are also some associated materials that are attached to this agenda. Mr. Lam, if we can scroll past these pages where there is no content? And if we could go to page 17 of the document, ultimately?

Q. This is the start of the audit wrap-up portion of this package of materials? Would you agree with me, Mr. Shapiro?

A. Correct.

Q. And this one relates to the 2013 year-end and that audit, correct?

A. Correct.

MS. DABBS: And if we can just go to page 20 and just

MBG5col3    Shapiro - Cross    Page 2112

pull out the last two bullet points at the bottom of this page, please?

Q. Do you see there, Mr. Shapiro, the first bullet point that I am highlighting here says: All records and information requested were freely available for our inspection. Do you see that, sir?

A. Correct.

Q. And that was a statement by BDO in this audit wrap-up, correct?

A. Yes.

Q. And, to your knowledge, at the time this document was prepared, that was an accurate statement, correct?

A. Correct.

Q. And just directing your attention to the last bullet point on the page, that one states: Management's cooperation was excellent. We received full access to all information that we requested while performing our audit, and we acknowledge the full cooperation extended to us by all levels of company personnel throughout the course of our work. Do you see that statement there, sir?

A. I do.

Q. Was that statement by BDO in this audit wrap-up document an accurate statement at the time it was made?

A. It was.

Q. And I'm not going to go through an exercise of putting more

MBG5col3    Shapiro - Cross    Page 2113

materials in front of you, sir, but would you agree with me that statements of that type appeared in BDO's audit wrap-up documents and other materials authored by BDO in terms of the experience with Iconix providing information when requested and interactions with management?

A. Certainly for the years in question, yes.

Q. Great. And I could have prefaced it by emphasizing that that is all I am focused on. Thank you for that clarification. Now, I want to turn to a topic that you spent some time testifying about, I am just going to call it, loosely, transactions where there are payments going in both directions simultaneously. And so, I think you were talking about situations where Iconix is both paying money to a counterparty or business partner and receiving money from that same counterparty, correct?

A. Correct.

Q. Now, I think you referred to that sort of scenario, where money is going in both directions, you referred to it as a potential round tripping transaction and something that could cause concern and require heightened scrutiny, correct?

A. Correct.

Q. And I think you referred to those types of transactions as raising a red flag under GAAP, correct?

A. Correct.

Q. Am I right, sir, that GAAP doesn't refer to those types of

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBG5col3      Shapiro - Cross      Page 2114

transactions as red flag transactions so much as just providing accounting provisions that tell you how to account for that situation when it arises?

A. GAAP doesn't address auditor red flags, auditing standards direct auditor's red flags. So, GAAP just dictates how things get accounted for.

Q. And GAAP has specific provisions that deal with precisely that situation, right, the payment -- where there is payment going in both directions at the same time or near the same time between the same two parties, correct?

A. Correct.

Q. And that's not a provision that's in GAAP for Iconix, that's because this comes up, from time to time, in business transactions, correct?

A. Correct.

Q. And so, it's important to understand the proper way to account for it which is why GAAP exists for consistency and how to account for such common situations that arise in business transactions, correct?

A. Correct.

Q. And BDO signed off as the auditor for the company -- well, let me take a step back.

You have indicated that it is the company's job, in the first instance, to identify the appropriate accounting treatment for a given transaction, correct?

MBG5col3      Shapiro - Cross      Page 2115

A. Correct.

Q. And then BDO, as part of its audit process or its review processes, will take a look at what the company's conclusions were and make a determination of its own as to whether BDO agrees with that or not, correct?

A. Correct.

Q. And I assume in a situation where -- well, withdrawn. I'm not going to assume anything.

In a situation where the company had reached one determination and BDO had a different perspective, there would be a discussion about that, correct?

A. Correct.

Q. But am I correct that the company had a number of transactions over time that involved funds going in both directions and BDO signed off on accounting treatment that the company had arrived at for those transactions, correct?

A. Correct.

Q. So, I want to talk through some examples like that and I guess, in particular Iconix, would you agree with me that the principal asset of the company was its intellectual property, the brands that it owned?

A. That was their business.

Q. And when you rejoined the company after having rolled off the engagement for a period of time and you rejoined in, I think you said it was 2013, I believe you testified that it was

MBG5col3      Shapiro - Cross      Page 2116

kind of a different company at that point, right? It was purely a licensing company, correct?

A. Correct.

Q. And that was a novel business model at the time, was it not?

A. It was.

Q. Would you agree with me that Mr. Cole had created something in Iconix that was quite unique at the time?

A. No question.

Q. So, I'm going to go back to these examples of transactions now and let's see if we can tick through a few of them. I guess to set it up, as a licensing company, it wasn't uncommon, for example, for Iconix to enter into a licensing arrangement or agreement with a counterparty pursuant to which Iconix would receive payments of royalties from that counterparty, correct?

A. Correct.

Q. And also at the same time to agree -- for Iconix to agree to make a payment to that counterparty for some specified work or service, correct?

A. Correct.

Q. That happened frequently at Iconix, correct?

A. I'm not sure about frequently. It certainly happened on a few -- maybe more than a few occasions.

Q. OK.

Were you aware that Iconix signed an exclusive

MBG5col3      Shapiro - Cross      Page 2117

licensing agreement with Sears, the retailer, for the Joe Boxer brand, which provided for Sears to make royalty payments to Iconix and at the same time Iconix paid Sears a $4 million payment for fixtures and advertising?

A. I'm not aware what -- I'm not sure what year that occurred, if it happened during my watch or not and -- it sounds familiar. I don't know how I know that, whether it's -- I have learned it subsequently or I was a partner when that agreement came up.

Q. OK.

Were you aware that Iconix had signed an exclusive agreement with Kohl's that gave Kohl's rights to the Candies brand and Iconix simultaneously agreed to provide Kohl's with a $4 million marketing support payment?

A. Sounds familiar.

Q. Do you recall being made aware, in 2014, that Iconix agreed to provide a $2 million payment to Kohl's for advertising activities in connection with a Kohl's license agreement pursuant to which Kohl's was making payments to Iconix?

A. Sounds familiar.

MS. DABBS: If we can just pull up and place before the witness and the parties, Mr. Lam, what's been marked for identification as Defendant's Exhibit 1633-A1?

Q. Mr. Shapiro, do you recognize this as a BDO work paper relating to BDO's review procedures for the first quarter of

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

---

MBG5col3     Shapiro - Cross     Page 2118

2015?

A. Yes. I believe it's a client-prepared work paper and then BDO would make comments on it so it is something that we would have and work with during the course of the review.

Q. OK.

MS. DABBS: I'm going to offer Defendant's Exhibit 1633-A1, please, I believe without objection.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1633-A1 received in evidence)

MS. DABBS: Mr. Lam, looking at the column all the way to the right that says "Reference," can you highlight the green content there where you already had your cursor in the expense row? Maybe that wasn't very clear. That is great. Thank you, Mr. Lam.

BY MS. DABBS:

Q. We can see here, Mr. Shapiro, it states -- and I am looking all the way to the right of the document, can you see that text in the box that's all the way to the right?

A. I do.

Q. On the bottom? OK.

It indicates the company -- and I am looking, sorry, about halfway down in that section of text with the sentence beginning, The company also... It states: The company also increased spent advertising costs of approximately $2 million

---

MBG5col3     Shapiro - Cross     Page 2119

with the brand Mudd. In the prior year the licensee Kohl's paid for all advertising. In the current year the company renewed Kohl's' agreement and agreed to pay all advertising costs, thus increasing advertising.

Do you see that language there?

A. I do.

Q. Is this an example, as I indicated, Mr. Shapiro, of Iconix in the context of a licensing agreement already in place where Kohl's was making payments to Iconix of Iconix agreeing to make a $2 million payment for advertising activities?

A. Yes.

Q. And at the time BDO deemed this treatment -- and what I am referring to is the treatment that the revenue from the licensing fees or the royalty payments was treated as revenue and the advertising $2 million expenditure was treated as an expense separately, correct?

A. Correct.

Q. And, at the time, BDO deemed that that treatment was appropriate and correct, yes?

A. Correct.

Q. And, Mr. Shapiro, I believe you were asked some questions about one of the joint venture transactions that took place in 2014 after the SEA-2 and 3 transactions, the Middle East North Africa joint venture transaction. Do you recall those few questions you were asked about that?

---

MBG5col3     Shapiro - Cross     Page 2120

A. I do.

MS. DABBS: If we can please place before the witness what is in evidence as Government Exhibit 221, please?

Q. This appears to be the subscription agreement between Iconix and GBG with respect to that transaction, the MENA transaction, correct?

A. Correct?

Q. And it was entered into on December 24th, 2014, correct?

A. Correct.

Q. Do you recall, Mr. Shapiro, that as part of this agreement, Iconix agreed to make a payment to GBG of $3.1 million for expenses related to due diligence and market analysis?

A. I do.

MS. DABBS: And if we can look at page 17 of the PDF and Section 8.1(m)? Right there. Thank you.

Q. That provision states, as we have just discussed: Iconix shall pay to GBG, by wire transfer in immediately available funds, an amount equal to $3.1 million.

Do you see that language there, stir?

A. I do.

Q. Incidentally, this description here, a payment by Iconix by wire transfer for $3.1 million, would you agree that that is a cash payment, a payment of cash consideration?

A. Yes.

Q. And when I say consideration, I am using that term because

---

MBG5col3     Shapiro - Cross     Page 2121

I believe that's a term that is used in the accounting guidance; is that correct?

A. I'm sorry. Say that again?

Q. The word "consideration," that is a term that is used in the accounting guidance, correct?

A. I think it is more than just accounting guidance but, yes, represents the amount of funds received or to be received. Total amount the company is going to receive.

Q. And, am I correct that consideration means something of value? It could be funds, it could be something else, correct?

A. Right.

Q. And for the MENA transaction, this $3.1 million payment was treated as an expense in Iconix' financial statements, correct?

A. Correct.

Q. It was not treated as a reduction in the revenue that was recognized or the gain that was recognized as a result of the MENA transaction, correct?

A. Correct.

Q. You were asked some questions, incidentally, on direct, about this payment -- a hypothetical question relating to whether you would have wanted to know if this payment represented -- I'm not going to get the precise words right -- but if you would want to know whether it represented a payback in connection with a different transaction. Do you recall being asked that question broadly?

---

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBG5col3          Shapiro - Cross          Page 2126

concerns about the SEA-1 transaction at the time, correct?
A. At the time, correct.
Q. And didn't raise any concerns about the treatment of the $2 million consulting payment that went from Iconix to Li & Fung, correct, being treated as an expense?
A. We didn't know about the amount at the time.
Q. You didn't know about the amount at the time?
A. No.
Q. Well, sir, you have talked a bit about how BDO had access to documents and access to management, correct?
A. Would have had access to information provided to us by the company, correct.
Q. You were aware that all the transaction documents for SEA-1, including the consultancy payment that I am talking about, were reviewed by the finance and accounting professionals and the lawyers at Iconix, were you not?
A. I'm not aware of what the accounting people saw or didn't see.
Q. OK. I will move on and we may return to that topic. Sorry, I am just trying to see what I can skip. Just give me a moment?
We were discussing that it was not uncommon or rare for Iconix to engage in transactions where there were funds moving in both directions, correct?
A. I'm sorry. Say the first part of that sentence again?

MBG5col3          Shapiro - Cross          Page 2127

Q. We have discussed that it is not unusual for companies to enter into licensing agreements or similar agreements, where they receive money from a counterparty, and simultaneously agree to make a payment for something different in exchange at the same time, correct? That's not unusual?
A. Correct. In certain industries, including this one, correct.
Q. Particularly not unusual in Iconix' business, correct?
A. Correct.
Q. And there is accounting literature directly on point for that situation, correct, where there are payments going in both directions?
A. Correct.
Q. Am I correct that at least one piece of the accounting literature or accounting provisions that address that situation is what's referred to as ASC -- or Accounting Standards Codification -- Section 605-50-45?
A. I don't know all the sub numbers but ASC 605 was the primary accounting guidance for revenue.
Q. OK. We may come back to the specific provision in a moment, maybe we will be able to avoid that.
Now, just taking a step back, would you agree -- I think you have testified that accounting determinations can be quite complex, correct?
A. Certainly some areas could be.

MBG5col3          Shapiro - Cross          Page 2128

Q. And I think you characterized the accounting for the joint venture transactions in particular as being quite complicated and involved, correct?
A. Often times they are, correct.
Q. Would you agree that accounting determinations can involve the exercise of judgment?
A. Often times, correct.
Q. And I believe you described the revenue recognition rules or the rules around revenue as being particularly complex, correct?
A. In certain instances, correct.
Q. I believe you testified that close to a hundred percent of your audits would include revenue recognition as a focus, right?
A. Correct.
Q. Both because the rules are complex, correct?
A. That would be part of it as well as the significance of the amounts involved, correct.
Q. Right.
And I think you characterized revenue as the engine that drives the car, correct?
A. I used that example.
Q. It is important at Iconix and it is important at every company, correct?
A. I would certainly hope so.

MBG5col3          Shapiro - Cross          Page 2129

Q. And would you also agree that accounting determinations sometimes involve estimating things?
A. Of course.
Q. And possible that different accountants may have different views on the appropriate accounting treatment for a particular transaction, correct?
A. Correct.
Q. Where a transaction is complex and involves estimates that would be doubly true, would you agree?
A. I agree.
Q. I am trying to skip some pages, bear with me. Let's see what we can do here.
You have referred a couple of times to BDO's national office. Am I right about that?
A. I believe I referred to them, yes.
Q. OK.
And is it a fair characterization that BDO's national office had technical experts who were available to folks like yourself, engagement partners and their teams, for particularly complicated accounting questions?
A. Correct.
Q. And you were able to consult with the national office on a number of matters during your time as the engagement partner for Iconix, correct?
A. Correct.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBG5col3    Shapiro - Cross    Page 2130

Q. I think we have seen references to BDO national in a variety of documents that we have looked at, that was something that you did from time to time to take advantage of their expertise, correct?

A. Correct.

Q. You characterized the process of responding to the SEC's comment letters that were sent to Iconix at the end of 2014 and the beginning of 2015, I think, as one of the longest communications you have ever experienced with the SEC, correct?

A. Not one of. The longest.

Q. Fair enough.

And BDO's national office was involved or you consulted with them in connection with assisting the company with that process, correct?

A. Very actively.

MS. DABBS: Can we please put before the witness and the parties what's been marked for identification as Defendant's Exhibit 408-A1?

Q. Mr. Shapiro, do you recognize this as a license agreement between Iconix and a company called Kids Headquarters?

A. OK.

Q. And it's a license agreement that relates to the Rocawear brand, correct?

A. Correct.

MS. DABBS: Your Honor, at this time I want to offer

MBG5col3    Shapiro - Cross    Page 2131

Defendant's Exhibit 408-A1, I believe without objection.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 408-A1 received in evidence)

BY MS. DABBS:

Q. Mr. Shapiro, are you aware that under this licensing agreement Kids Headquarters agreed to make royalty payments to Iconix?

A. Not particularly. I wouldn't typically review license agreements as a part of my role.

Q. The company had tens of thousands of agreements, correct?

A. I'm not sure of tens of thousands but certainly many, many agreements.

Q. Many, many agreements. OK.

Well, let's look at a particular part of this agreement, if we can, because we have talked about a scenario where there is a licensing agreement or some form of agreement that involves Iconix receiving royalty payments or licensing income, and then a payment going in the other direction.

MS. DABBS: So, if we can just look at page 5 of the PDF and paragraph 8, which is all the way at the top, if we can just zoom in on that?

Q. This agreement provides, Mr. Shapiro, that Iconix would make a one-time payment of $3.5 million to Kids Headquarters to be used in connection with the support of a showroom, correct?

MBG5col3    Shapiro - Cross    Page 2132

Do you see that language there?

A. I do.

Q. This is another example of Iconix having an agreement of some sort, this one being a licensing agreement?

A. I agree.

Q. OK. As far as you know, at the time that this agreement was entered into, BDO didn't raise any concerns with Mr. Cole about the fact that this agreement included a commitment to make payments of $3.5 million for showroom support, correct?

A. Not that I'm aware of.

Q. And Iconix, as it did in a number of other examples that we have looked at and as approved by BDO, treated this $3.5 million payment as an expense, not a reduction to revenue in connection with licensing fees, correct?

A. Well, I don't think it was treated as an expense. Fixtures would be more of an asset which would get amortized over a period of time into expense so it is different than marketing. I believe the accounting for this would have been to record the payment as an asset and then amortize it over the life of the agreement as an expense.

Q. OK. It was treated separately, though --

A. Separately from the licensing revenue.

Q. Understood.

You have referred, a number of times during your testimony, to ultimately the function of the accounting --

MBG5col3    Shapiro - Cross    Page 2133

well, withdrawn. Let me start that one again -- accounting in the appropriate accounting treatment being determined by economic substance, business purpose, and fair value; correct?

A. Correct.

Q. And I think overarching those points you have asked sort of a broader question, Does it make sense? Is that correct?

A. I believe I used that term. It is nice when accounting makes sense.

Q. So, I just want to spend a little bit of time on these concepts, if we can, and specifically I am talking about the concepts of business purpose and fair value. OK?

Now, you would agree that, in the Iconix international joint venture transactions, Iconix had a legitimate business purpose for entering into those transactions, correct?

A. Absolutely.

Q. Those transactions made sense for Iconix as a company, correct?

A. Certainly.

Q. Iconix wanted to extend the reach of its brands -- the company's main asset -- to geographies where it didn't have a presence, correct?

A. Correct.

Q. And the joint venture transactions were essentially the approach that the company took to monetizing its brands, these key assets that the company had, correct?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBG5col3          Shapiro - Cross          Page 2134

A. Correct.
Q. They owned global rights to the brands in most cases and this is a way of making sure that they're taking full advantage of the value of those assets, correct?
A. Correct.
Q. Similarly, Iconix' joint venture partners, so for the SEA-2 and 3 transactions, that was GBG, right?
A. Correct.
Q. Those joint venture partners, like GBG, also had a legitimate business purpose for entering into joint venture agreements with Iconix, correct?
A. I would certainly hope so.
Q. It was appealing to them to have partial ownership of potentially valuable brands and to be able to share in the revenue stream generated by those brands, correct?
A. Correct.
Q. There was a valid business purpose. Those joint venture transactions, at large, broadly defined, made sense for both of the business participants, correct?
A. Absolutely.
Q. And would you agree that Iconix and its personnel had opinions and perspectives as to the value of the brands that were owned by the company?
A. Say that again?
Q. Would you agree that Iconix and its personnel had

MBG5col3          Shapiro - Cross          Page 2135

perspectives or opinions about the value of the brands that the company owned?
A. I believe so, yes.
Q. The company was required to reach those determinations so it knew what value to attribute to its brands on the company's balance sheet, correct?
A. Well, I am confused by the question.
        Its financial statements reflected the cost they paid for it, and in the case of joint ventures the amount they sold it for, so that's not the fair value -- what might have been the fair value at the time when they paid for it and when they sold it. So, I'm not quite sure I understand your question. Fair value changes over a period of time.
Q. Sure.
        And perhaps tied to that, the company had to do impairment testing on its brands on an annual basis, correct?
A. Correct.
Q. And that was designed to make sure that the value, at which the company was carrying those brands on its balance sheet that you have described as sort of the picture of the health of the company, was supportable, correct?
A. Correct.
Q. And BDO would conduct its own testing of the company's testing with respect to that carrying value, correct?
A. Correct.

MBG5col3          Shapiro - Cross          Page 2136

Q. And those value determinations involved, in part, looking at things like historical revenue generated by those brands, correct?
A. Correct.
Q. And it involved making some predictions or estimating future revenue that might be generated, correct?
A. Correct.
Q. Those determinations involved judgment, yes?
A. Correct.
Q. They involve making predictions and estimates about things that haven't happened yet that may or may not prove accurate, correct?
A. Correct.
Q. And when Iconix was assessing the potential value of its brands in geographies where they don't even have a track record yet, that's an even more speculative exercise, correct?
A. Correct, but I'm not quite sure that was necessarily part of the calculation of the fair value of the brands for purposes of determining the asset values on the balance sheet. Asset values on a balance sheet are based on cost, not fair value. It is only based on fair value when fair value is below cost. If fair value exceeds cost, then cost is still the number.
Q. Understood, and that's a helpful clarification. Let me see if I can put a finer point on what I am interested in getting to here.

MBG5col3          Shapiro - Cross          Page 2137

        The joint venture transactions required Iconix to form a view about what it thought an appropriate sale price for brands in particular geographies was, correct?
A. Sure, along with what someone is willing to pay for it.
Q. And whatever internal view Iconix might have had about the value of the brands it was contributing to an international joint venture, you would agree with me that Iconix may well try to sell the brands for something more than that, correct?
A. That would be to their benefit if they were able to do that.
Q. Nothing unusual about that at all, right?
A. I don't believe so.
Q. The seller of an asset generally wants to get more money for the asset, yes?
A. They want to get as much as they could get.
Q. As much as you can get, correct?
A. Correct.
Q. And if Iconix managed to sell some number of its brands in the context of a joint venture transaction with a partner, and the partner is receiving the ability to share in the future value of those brands -- essentially to co-own those brands -- and managed to sell them for a higher price, there is nothing wrong with that, correct?
A. It would be good for them.
Q. Assuming it's an arm's length transaction between a willing

UNITED STATES OF AMERICA, v.
NEIL COLE

**TRIAL**
**November 16, 2022**

---

MBG5col3    Shapiro - Cross    Page 2142

A. Gotcha.

Q. OK. Based on that framework, there would be nothing for Mr. Cole to include in the management representation letter or report to BDO about any side agreements or separate agreements relating to SEA-2, correct?

A. If they didn't exist there would be nothing to tell us.

Q. And based on those assumptions, BDO would have had no issue, during the 2014 audit, with Iconix recognizing revenue for SEA-2 based on the $15.9 million purchase price that was paid by GBG at the time, correct?

A. Correct.

Q. And we have looked at Mr. Snyderman's white paper for the SEA-2 transaction and I think we now --

MS. DABBS: Let's just put up on the screen, Mr. Lam, if we can, please, for the witness and the parties, Defendant's Exhibit 432. And this is now, I believe, in evidence so I think we can publish this for the jury. And if we can pull out the red box at the top of the document, Mr. Lam, please?

Q. This indicates -- this red box language -- horribly phrased -- but when we see the red lettering on these documents, that's BDO's addition to the documents, correct?

A. Correct.

Q. And the last sentence here says: Based on procedures performed, BDO concludes that transaction was properly accounted for.

---

MBG5col3    Shapiro - Cross    Page 2143

Correct?

A. Correct.

Q. That's essentially the hypothetical that I have laid out for you, correct?

A. Well, I -- sure.

Q. And in that same box at the top of the document it also states, and this is the second sentence: Please refer to WP -- does WP stand for work paper?

A. Yes.

Q. Work papers. Fair to characterize those as the work product that BDO generates when it is reviewing transactions and conducting its audit work?

A. Right. Whether BDO prepared it or whether the client prepared it and we tested it, it was another calculation to determine the cost of the item to determine the gain.

Q. Got it. OK.

And so, it says: Please refer to work paper S.100.01 for procedures performed on valuation and conclusions reached.

Do you see that language there?

A. I do.

Q. So, as we were discussing for the joint venture transactions that it entered into, Iconix would do its own valuation calculation, correct?

A. Right. When you say valuations, this is referring to the cost amount so it isn't valuations, it is the amount recorded

---

MBG5col3    Shapiro - Cross    Page 2144

on the company's books that were sold to compute the gain. The selling price is established. To determine the gain you have to reduce the cost basis not the value. The value is presumably what it was sold for. So, what this refers to is the company's calculation or test work as to how much of that asset was recorded on the books that was sold to enable the company, and us, to determine the amount of the gain. So, it is not based on projections or value, it is based on the amount that's on the books that's going to be removed from the books.

Q. Got it. The cost basis.

A. Cost basis.

Q. OK.

So, we can then return to what I think we were discussing earlier as the value -- the fair value on the transaction is the price arrived at between a willing buyer and a willing seller, correct?

A. Correct. That's what determined the selling price.

Q. OK.

A. Cost is what they paid for it years ago.

Q. OK, now I have another hypothetical for you. So, I want you to assume that Iconix had no commitment or obligation to make any future marketing payments to GBG in connection with the SEA-2 transaction, so no commitment or obligation to make a future marketing payment of $5 million. Are you with me?

A. So far.

---

MBG5col3    Shapiro - Cross    Page 2145

Q. OK, and I think you have testified a number of times that for revenue to be recognized or for there to be an accounting consequence from some business activity it has to be binding on the parties, correct?

A. Correct.

Q. OK, so first, the first assumption we have established no obligation or commitment to make a future marketing payment. I want you to further assume that in the fourth quarter of 2014, so a number of months later, Iconix decided separately and independently to make a marketing support payment to GBG based on a request from GBG for that support, and further, that the marketing support payment provided an identifiable value and benefit to Iconix.

Do you understand those assumptions?

A. So far.

Q. In those circumstances, Iconix' payment of a marketing allowance or marketing expense in the fourth quarter would have no impact on the company's second quarter gain from the SEA-2 transaction, correct?

A. Under those assumptions, correct.

Q. And you would agree with me that Iconix' business, as we have discussed, was to own brands and enter into licensing and other agreements to monetize those brands, correct?

A. Correct.

Q. Those agreements took a lot of different forms, correct?

---

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

| MBG5col3 | Shapiro - Cross | Page 2146 |
| --- | --- | --- |

A. Correct.
Q. Licensing agreements, agency agreements; correct?
A. Correct.
Q. Joint venture transactions as we have seen, correct?
A. Correct.
Q. Outright sales of brands that the company owned, correct?
A. Correct.
Q. And all of those types of transactions generated revenue for the company, correct?
A. Correct.
Q. And one way to make a brand successful is to invest in marketing and advertising, correct?
A. Correct.
Q. And Iconix did a lot of that, correct?
A. It was their primary model.
Q. The primary model is for Iconix to spend money on marketing and advertising?
A. Have their products that they own be sold.
Q. And sometimes the marketing and advertising were Iconix' own efforts and sometimes the company made payments to support marketing and advertising efforts by others, correct?
A. Correct.
Q. Such as its licensees?
A. Correct.
Q. And its entities with which it had agency agreements,

| MBG5col3 | Shapiro - Cross | Page 2147 |
| --- | --- | --- |

correct?
A. Correct.
Q. And its joint venture partners, correct?
A. I believe so. Correct.
Q. You would agree, would you not, that those other partners of Iconix' depended on the company to market and support the brands, yes?
A. Yes.
Q. As a general matter then you would agree, would you not, that Iconix had a business purpose for spending money on marketing, correct?
A. Absolutely.
Q. And a business purpose for supporting its licensees and its business partners with funds for marketing, yes?
A. Yes.
Q. OK, let's turn to a different scenario but also tied to the SEA-2 transaction.
    Assume that there is a link between a $5 million marketing payment made by Iconix in the fourth quarter of 2014 and the SEA-2 transaction. Assume that those things are linked. OK?
A. Assume they are?
Q. Linked.
A. Linked?
Q. Linked.

| MBG5col3 | Shapiro - Cross | Page 2148 |
| --- | --- | --- |

A. Linked.
Q. Yes. I don't know why it sounded odd when I said it to myself. That's the word I was going for?
A. Linked or not linked, I didn't know if you said not linked.
Q. They are connected, there is a relationship between them.
A. I'm sorry. There is no relationship or there is a relationship?
Q. There is a relation.
A. Got it. They are linked.
Q. Now, if Iconix received an identifiable benefit for that payment and the fair value of that benefit was in the range of $5 million, then the marketing payment could properly be treated as an expense rather than an offset to revenue, correct?
A. Correct.
Q. Even where there is a link between those two things?
A. Correct, as we have discussed.
Q. It is similar to the $3.1 million payment from Iconix to GBG in the MENA transaction, yes?
A. Yes.
Q. And BDO signed off on that accounting in the MENA transaction, correct?
A. Correct.
Q. You were asked some questions about GAAP, G-A-A-P, the Generally Accepted Accounting Principles, and you were also

| MBG5col3 | Shapiro - Cross | Page 2149 |
| --- | --- | --- |

asked some questions about the timing of revenue recognition. Do you recall those questions?
A. I do.
Q. And, as a general matter, am I correct, under GAAP, that revenue may be recognized when it's realized or realizable if it is earned? Would you agree with that?
A. Yes.
Q. I appreciate that the guidance is more complicated in terms of the particulars of that but at a high level that's the rule of thumb, correct?
A. At the highest level, yes.
Q. And the timing of revenue recognition under GAAP depends on when the money is earned rather than when cash is actually received, correct?
A. Correct.
Q. And that's called accrual accounting and I believe you spoke about that too, correct?
A. Correct.
Q. Just one more question on the topic of timing. For expenses, so we have looked at some of these examples of expenditures by Iconix that relate to things like fixtures, advertising, marketing, etc. For expenses you would agree that depending on the expense, sometimes it's appropriate to book the expense in the current period when the payment is made, correct?

# A-1001

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 16, 2022

MBG5col3     Shapiro - Cross     Page 2150

A. Correct.

Q. And sometimes, again depending on the nature of the expense, it's appropriate to book the expense over a period of time or in a future period, even when the payment is made in the current period, correct?

A. Correct. Different between cash and accrual basis of accounting.

Q. And in the expense context, would you refer to that latter situation as a prepaid expense?

A. Correct.

Q. And that's because you benefit from that expenditure over time, right? Even if you receive the cash up front or -- sorry -- make the payment up front, you benefit from that payment you have made in terms of resulting work and services over a more extended period of time rather than just the moment the payment is made, correct?

A. Correct.

Q. So, in the context of marketing expenses, would you agree that something like a payment to purchase an ad in a newspaper that's going to run on a specific day -- to the extent anybody does that anymore -- would be an expense that, under most circumstances, would be classified as a current expense?

A. Upon it being in the newspaper ad, yes.

Q. And, in contrast, an expense that involved, for example, creating a marketing campaign that would then be rolled out to

MBG5col3     Shapiro - Cross     Page 2151

a number of different countries, that would be utilized over a period of, perhaps, many months. Correct?

A. I don't believe that's correct, no.

Q. What about something like a showroom that would be used for a period of time?

A. That would be -- a showroom included equipment or assets that have a longer life like a fixture, that would be set up as an asset and amortized over the useful life of that asset or the life of the agreement, whichever is shorter.

Q. OK. Let's leave expenses and go back to revenue at least for a moment here.

The Accounting Standards Codification or the ASC, my understanding -- tell me if I am wrong -- is that that's where GAAP is memorialized. Is that fair to say?

A. That's fair to say.

Q. And you have referred to ASC 605, that sets forth criteria for determining when revenue is considered realized or realizable and earned, correct?

A. Correct.

Q. And it has a number of different criteria that one has to look to, correct?

A. Correct.

Q. You need persuasive evidence of an arrangement, correct?

A. Correct.

Q. Delivery has to occur or services have to have been

MBG5col3     Shapiro - Cross     Page 2152

rendered, correct?

A. Correct.

Q. The price, the seller's price to the buyer has to be fixed and something that you can determine, correct?

A. Correct.

Q. And you have to be comfortable that you are going to be able to collect that amount, correct?

A. Correct.

Q. And you have referred a number of times in your testimony to the need for any commitment that relates to recognition of revenue to be a binding commitment on the parties, correct?

A. Correct.

Q. Now, ASC 605 includes a number of different scenarios to help guide practitioners with their accounting determinations, correct?

A. Correct.

Q. It includes questions and interpretive responses to those questions, yes?

A. Correct.

Q. Sometimes you look at it for a particular situation you are trying to solve for and it doesn't quite answer it, you have to sort of extrapolate, correct?

A. Correct.

Q. It is all, I think you have testified, pretty involved and complicated; correct?

MBG5col3     Shapiro - Cross     Page 2153

A. Correct. It could be.

Q. The people who make these judgments, ultimately, are people with certifications like those that you have and educational training and practice experience to make complex accounting determinations, correct?

A. I would hope so.

Q. One more hypothetical relating to SEA-2.

Assume that there is a connection or a link between a $5 million marketing payment made by Iconix and the SEA-2 transaction. Assume even that the $5 million payment is an incentive to GBG. You would agree with me that the $5 million marketing payment in that hypothetical constitutes cash consideration for GAAP purposes, correct?

A. I'm not quite sure I understand the question.

Q. Well, a payment of $5 million is a form of consideration and you would agree that the form is cash, correct?

A. OK. I got it.

Q. And, am I correct that GAAP provides that where cash consideration is given as a sales incentive, so from a seller to a buyer, there is a presumption that that consideration will be netted or will reduce revenue? Would you agree with that?

A. Say that again?

Q. Am I correct that GAAP provides, where cash consideration is given as a sales incentive, so from a seller to a buyer, there is a presumption that the cash consideration, that

# A-1002

MBG5col3 — Shapiro - Cross — Page 2154

incentive payment, will be netted or will reduce revenue?
A. I'm not aware of that particular paragraph but it would make sense to me that that would be the effect.
Q. That's in ASC 605-50-45-2, correct?
A. I don't know the paragraph numbers.
Q. OK. But it's a presumption that can be overcome, correct?
A. I would have to look at the particular guidance and weigh the factors.
MS. DABBS: OK. Well, maybe we can pull up for the witness and the parties what is marked for identification as Defendant's Exhibit 558. And we should just let Mr. Shapiro see the first page of this document if we can, please.
Q. Do you see that this is Section 605-50-45?
A. I do.
MS. DABBS: If we can go to the second page and highlight the section that's titled 45-2, Cash Consideration, and just blow that up for Mr. Shapiro at the moment?
Q. Why don't you take a look at that, sir, and see if it refreshes your recollection of the particular provision and what it provides.
A. Got it. It is what we have been talking about.
Q. What we have been talking about; there is cash consideration going in a different direction from the main transaction, correct?
A. Correct.

MBG5col3 — Shapiro - Cross — Page 2155

Q. And this is a provision that describes how one should think about accounting for it, correct?
A. Say again?
Q. This provision governs how one should account for a situation when there is a sale that takes place and then some cash payment at the same time going from the seller to the buyer, correct?
A. Correct.
Q. And am I correct that there is a presumption that that sort of incentive payment would reduce revenue? Yes?
A. Correct.
Q. But it's a presumption that can be overcome, correct?
A. Correct.
Q. And we have seen many examples of that as we have been talking to each other with respect to transactions where payments from the seller, in this case Iconix, to a buyer, are treated separately from the main transaction, correct?
A. Correct.
Q. It ties to considerations we have been talking about with respect to business purpose and that there is an actual benefit of the transaction, correct?
A. Correct.
MS. DABBS: We can take this down now, please, Mr. Lam. Thank you.
Q. I want to turn now to focus a bit on the SEA-3 transaction

MBG5col3 — Shapiro - Cross — Page 2156

and I will try to introduce a hypothetical question for you, sir. Now, you will know, I think by this point, when I refer to SEA-3 I am talking about the joint venture transaction that closed in September 2014 between Iconix and GBG?
A. Agreed.
Q. And I believe you are aware of, Mr. Shapiro, that the government alleges that the purchase price paid by GBG in that transaction was increased by $6 million in exchange for an agreement by Iconix to terminate a licensing agreement and relieve GBG of its obligations under that agreement, correct?
A. Correct.
Q. So, first I would like you to assume that there was no commitment or obligation by Iconix at the time of the SEA-3 transaction to release GBG from its Rocawear Kids licensing agreement and associated payment obligations.
Are you with me?
A. So far.
Q. And I would like you to further assume that the SEA-3 purchase price was an agreed upon, arm's length negotiated purchase price between a willing buyer and willing seller of $21.5 million.
Do you understand that assumption too?
A. I do.
Q. In those circumstances BDO would not have had any issue or problem in 2014 with Iconix recognizing gain based on a

MBG5col3 — Shapiro - Cross — Page 2157

$21.5 million purchase price, correct?
A. Correct.
Q. And Mr. Snyderman prepared, and we have seen during your direct testimony, a white paper concerning the SEA-3 transaction, correct?
A. Correct.
Q. And BDO reviewed that, correct?
A. Correct.
Q. And BDO did its usual procedures of looking beyond the white paper to see the transaction documents, correct?
A. We did.
Q. Now, would you agree with me, Mr. Shapiro, that letting GBG out of an obligation is not a form of cash consideration going from Iconix to GBG, correct?
A. Say again?
Q. Letting GBG out of an obligation is not a form of cash consideration going from Iconix to GBG, correct?
A. I'm sorry. I am going to have to ask you to repeat that again.
Q. Sure.
A. I am having trouble.
Q. In the context of the SEA-2 transaction, the government posed hypotheticals to you that involved a purchase price for the transaction, correct?
A. Correct.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

---

MBHYCOL1      Page 2165

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                    19 Cr. 869 (ER)

NEIL COLE,

            Defendant.        Trial
------------------------------x
                          New York, N.Y.
                        November 17, 2022
                             9:10 a.m.
Before:


            HON. EDGARDO RAMOS,

                        District Judge
            APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  ANDREW M. THOMAS
    JUSTIN V. RODRIGUEZ
    JUSTIN RODRIGUEZ
    Assistant United States Attorneys

KAPLAN HECKER & FINK, LLP
    Attorneys for Defendant
BY:  SEAN HECKER
    JENNA M. DABBS

MARKUS/MOSS, PLLC
    Attorneys for Defendant
BY:  DAVID O. MARKUS
    ANITA M. MOSS
```

---

MBHYCOL1      Page 2166

(Trial resumed)

(Open court; jury not present)

THE COURT: Okay. On the record. Good morning, everyone. I understand that there is a dispute concerning certain exhibits that the government wishes to put in.

Mr. Lenow, I'm happy to hear you.

MR. LENOW: Thank you, Judge.

So there are ten emails that the government proposes to put in. There is agreement on authenticity. I guess the question is just admissibility beyond that. Our position is that each of them are coconspirator statements or admissible on additional grounds as well and admissible as non-hearsay on that basis. Five emails of the are from Ethan Cole; two of the emails are from Neil Cole; two are from Jason Rabin; and one is from Seth Horowitz, all during the time of the conspiracy.

I understand that the defense objection is that these aren't being put in through a witness or some of these witnesses have already testified. But of course, that's not a criteria for admissibility.

The question is is the document authentic. Is there a hearsay preclusion or reason to keep it out. These are authentic. They're admissible as non-hearsay. A number of these email authors were never called as witnesses, specifically Neil Cole, Neil Cole obviously as well.

Your Honor already ruled in this trial that when there

---

MBHYCOL1      Page 2167

is an authenticity stipulation and when the documents are admissible as non-hearsay, they can be put in just on that basis alone.

So your Honor has already addressed this issue. It is not the law that they can be put in through a witness. We can call any of these witnesses to admit these exhibits based on the coconspirator factual predicate.

So I think they should be admitted at this time. These were marked before trial. They are summary charts. They are admissible, and they should be admitted.

THE COURT: Do you have any other fact witnesses that will be testifying?

MR. LENOW: So an investor witness will be testifying, and then two summary witnesses. And these emails are all in Lauren Collins' charts. So to the extent the defense doesn't want to cross-examine a witness, there will be someone who is a witness that will be testifying about charts with these in them. Those are the remaining witnesses.

THE COURT: Why now?

MR. LENOW: Sure, Judge. I think, in terms of the Ethan Cole and the Neil Cole emails, obviously neither Ethan Cole nor -- sorry. Neither Ethan or Neil Cole has been a witness in the case.

In terms of Rabin and Seth Horowitz, when they were on the stand, we were trying to proceed efficiently. We rounded

---

MBHYCOL1      Page 2168

up our exhibits and kind of noticed that there were several ones that we do want to enter into evidence.

They were not entered when that witness was on the stand. These were marked before trial. There is nothing in them that's a surprise. They are admissible as coconspirator statements. So that's the reason for why now.

THE COURT: Mr. Hecker.

MR. HECKER: Efficiency is doing a lot of work in the sense that, when it was uttered, because what they really mean to state is that they forgot to put them in when the witness was on the stand. That's quite obvious.

The way we proceeded from the outset of trial is we worked rather collaboratively with the government the evening before trial to indicate the exhibits that we intended to put in through witnesses. And it gave us an opportunity to come to court and argue about whether particular exhibits we were taking issue with.

This is a complete subversion of process. They forgot to put the Exhibits in. Now they want them in because they're going to put in this 130-something page deck, which we've taken issue with for other reasons.

But this is precisely the problem. They're going to put it in through a witness who doesn't have any relevant understanding of the facts, other than what the government has given this person to make the presentations to the jury. So

---

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL1     Page 2169

it's just unfairness upon unfairness from our perspective. We probably wouldn't have argued about them in real time. Given the Court's rulings, for example, we have the Neil Cole objection. But if they would put them in through Margolis or Rabin, we would cross-examined those witnesses about the documents. We would have been fine with them, and now we can't. It's literally because they forgot, and now they want this in their summary chart presentations.

THE COURT: I'm going to let in the emails. First of all, I've reviewed them. There is nothing in any of the emails that is new. And even assuming that the government forgot to put them in through the witnesses that they did call, the fact remains that they are admissible. They are relevant.

They are -- I'm going to guess here, but I think the government said this. These are emails that the defense has known about from the outset, likely on the list of exhibits that they provided.

And I don't think, given the vast amount of evidence that has been put in, that there is any marginal prejudice that accrues to the defense by allowing these emails to come in. So the emails will come in.

Now, with respect to the charts, Mr. Lenow.

MR. LENOW: I think Mr. Thomas will handle this one, Judge.

THE COURT: Okay. Mr. Thomas.

MBHYCOL1     Page 2170

MR. THOMAS: Your Honor, I hadn't known, until Mr. Hecker raised it this morning, that there was an objection to those three pages. Those three pages change the existing slides in one way, which is to account for the --

THE COURT: I'm sorry. Can I just stop you for a second.

You said you didn't know until this morning that there was going to be an objection.

Didn't you get them last night?

MR. THOMAS: Well, two of the three I believe were produced as 3500 for Ms. Chambarry a day or two ago. So I'm not sure that's quite accurate.

And then the third chart, which is the "beat or missed" table was produced last night.

THE COURT: The what table?

MR. THOMAS: Judge, it's a table that says "beat or missed" and sort of matches up analyst or company guidance, that table. Just by way of background, these charts all change existing charts that Ms. Chambarry testified to at the last trial by accounting for the possibility that the MENA due diligence payment was an expense that would have to be backed out if it was part of the scheme.

So if it's the case that the defense isn't going to cross Ms. Chambarry on whether or not her EPS math is correct under the MENA scenario, then we are actually fine not offering

MBHYCOL1     Page 2171

these charts. But if they are going to cross-examine her about her EPS math based on this MENA payment, we think we're entitled to get ahead of that.

THE COURT: Mr. Hecker?

MR. HECKER: I'm happy to make that trade. We'll keep MENA out and the charts out.

THE COURT: Okay. Very well. Anything else?

I did want to raise an issue myself. I don't generally impose time limits on summations. I happen to be of the belief generally that after an hour-and-a-half, you start to lose it, you start to lose the jury and you don't gain a whole heck of a lot.

So my guidance to you is that you keep it to no more than two hours but really, you know, between an hour-and-a-half/two hours I think at most. That will give you plenty of time to sum up.

Yes, Mr. Markus.

MR. MARKUS: That sounds great to me, your Honor. There's no way I'll use two hours. I'm going to be closing for the defense.

One question about the Court's procedure on rebuttal, how much time do you allow the government on rebuttal?

THE COURT: What I'm thinking -- our day is 4 1/2 hours. So I'm thinking no more than two hours for the defense, no more than two hours for the government, and no more than a

MBHYCOL1     Page 2172

half hour for rebuttal.

MR. MARKUS: Thank you, your Honor.

THE COURT: Okay. So be guided. I have learned the hard way that you start to lose the jury after a couple of hours?

Anything else that you now wish to discuss? It's now 9:22.

MS. DABBS: Your Honor, just briefly recognizing the time and the likelihood that we don't have the space to talk about this at length right now.

We do expect that Mr. Cole will testify in the defense case. We filed a motion in limine that related to what we've all lovingly referred to as the "Candies" evidence. I had a conversation with Mr. Thomas just trying to make sure that we understand the government's position about what might open the door to that evidence.

We appreciate that there are aspects of rulings on that request that cannot be made by the Court until after Mr. Cole testifies and that certain things do depend on what he says. But we also think that some don't and could be concluded by the Court in advance.

And I think, to the extent we can put some clarity around those things in advance of the testimony, that's certainly in our interest, and I think it's in the collective interest.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL1                                                    Page 2177

we've been focused on.  Correct?

A.  Correct.

MS. DABBS: The defense offers Exhibit 558.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 558 received in evidence)

MS. DABBS: If we could publish now for the jury and go to the second page.  Actually, let's go back to the first page with my apologies.

If we would just pull out for the jury and highlight right in the middle of the page the title here: "Vendor's Income Statement Characterization of Considerations Given to a Customer."

Q.  The income statement, Mr. Shapiro, is what we've spoken about that reflects the revenue that the company is earning. It states the sort of operating results of the company?

A.  Correct.

Q.  And we've talked about the consideration, and whether that consideration is in the form of cash or something else; correct?

A.  Correct.

MS. DABBS: If we could now go to the second page of the document, please.

Q.  I had focused you yesterday before, when we were all looking at this exhibit together, Mr. Shapiro, on the top part

MBHYCOL1                                                    Page 2178

of this page, Section 45-2, cash consideration.  Correct?

A.  Right.

Q.  And we were talking about this being a provision that one would look to in a factual situation or a context where there is a transaction between a seller and a buyer and there's also a situation where the seller is giving cash consideration to the buyer at the same time or near the same time that the buyer is purchasing an asset in the seller.

Correct?

A.  Correct.

MS. DABBS: If we could now go down to Section 45-3.

Q.  Would you agree with me, sir, that Section 45-3 applies to a situation where the consideration being given in this broad hypothetical we're discussing by the seller to the buyer is something other than cash?

A.  Correct.

Q.  So the provision says:  "If the consideration consists of a free product or service --" there's a parenthetical -- "or anything other than cash."  And it states: "including credits that the customer can apply against trade amounts owed to the vendor."

Correct?

A.  That's what it says, yes.

Q.  And then it continues after that next paragraph:  "The cost of the consideration shall be characterized as an expense as

MBHYCOL1                                                    Page 2179

opposed to a reduction of revenue."

Correct?

A.  Correct.

Q.  Now, am I correct, Mr. Shapiro, that in accounting, one often looks to what actually happens to ensure the accuracy of the financial statements?

A.  That's a good statement.

Q.  Let's go to an example to see if we can illustrate the point together.

The accounts receivable for a company, those are the amounts, the receivables, that the company expects to receive. Correct?  Monies the company expects to receive?

A.  Yes.

Q.  And the company will have a number for its accounts receivable.  Yes?

A.  Yes.

Q.  And then ultimately, their finance and accounting people and then their auditors will look to see whether those receivables actually came in.  Correct?

A.  Correct.

Q.  And if they do, that's a good indication that the accounts receivable number was a good number.  It was a supported number.  Correct?

A.  Correct.

Q.  Now, you are aware that GBG's obligations under the

MBHYCOL1                                                    Page 2180

Rocawear Kids licensing agreement were not terminated. Correct?

A.  I am aware of that.  Correct.

Q.  And you are aware that GBG satisfied its royalty obligations under that license agreement.  Correct?

A.  I believe that's correct.

Q.  And royalty payments from GBG were received by Iconix. Correct?

A.  Correct.

Q.  And your understanding is that those payments, when they arrived, were recorded as revenue by Iconix.  Correct?

A.  Correct.

Q.  And specifically, is it your understanding that Iconix recognized as revenue from GBG, in connection with the Rocawear Kids licensing agreement, $1,250,000 in the third quarter of 2014, $1,250,000 in the fourth quarter of 2014, and $3.5 million in the year 2015?

Is that consistent with your understanding?

A.  I don't remember the exact amounts, but I knew the amounts came in per the agreement and it was recorded as revenue when they came in.

Q.  So the alleged thing of value, the cancellation of the Rocawear Kids licensing agreement, when the SEA-3 transaction closed, never materialized.

Correct?

# A-1006

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL1                                    Page 2181

A. Correct.

Q. And as an accounting matter, how do you book something that never happened, sir?

A. Well, I'm not quite sure that question makes any sense because not happening involves oftentimes looking into the future, which is beyond the audit period. So if something didn't happen after the opinion was done, you'd have to look at what became evident when the financial statements were issued, not what ultimately happened a year or two later.

Q. Okay. But when those payments came in, they're recognized as revenue. That's really the only way to treat them. Correct?

A. Correct.

Q. You testified yesterday about the topic of materiality, and I just want to turn to that topic in brief now.

I believe you testified, Mr. Shapiro, that materiality really focuses on what would be significant to a reader of the financial statements. Correct?

A. Correct.

Q. And you spent some time talking about SAB 99; correct?

A. Correct.

Q. And looking at considerations in that document that relate to qualitative materiality. Yes?

A. Yes. In addition to quantitative. Yes.

Q. Yes. Because both are important. Right? Both are

MBHYCOL1                                    Page 2182

relevant factors.

A. Yes.

Q. And usually, an auditor such as yourself or an accountant would be appropriating materiality in the context of an error that was made. Correct?

A. Correct.

Q. And we also talked about it in the scope of planning the scope of your audit. Yes?

A. Correct.

Q. Because you can't look at every single thing for a company that has tens of thousands of transactions. Right?

A. Correct.

Q. You have to choose the level that you would focus on, and those would typically be more significant or more material accounts or transactions. Correct?

A. Correct, as well as those that are a bit more risky or a bit more complex, but correct.

Q. And I believe that one of the qualitative materiality considerations that Mr. Thomas focused on with you yesterday related to whether a particular transaction allows the company to meet or exceed, either its own forecast or an analyst consensus estimate.

Correct?

A. Correct.

Q. And I believe you spoke yesterday about there being a

MBHYCOL1                                    Page 2183

number of different revenue sources for Iconix. Correct?

A. Say that again.

Q. I believe you spoke yesterday about there being a number of different sources of revenue for the company, Iconix. Correct?

A. Correct.

Q. They had revenue coming in as a result of licensing and agency agreements that were in place; correct?

A. Correct.

Q. They had revenue from the sale of trademarks from time to time?

A. Correct.

Q. They had revenue from joint venture transactions where they were selling assets to a buyer, to their joint venture partner or to the joint venture itself, which the partner was then becoming a shareholder in. And there was revenue recognized in connection with those transactions. Correct?

A. Correct.

Q. All of those things in a given quarter contribute to the company making or to the company meeting or exceeding its own forecasts and consensus estimates. Correct?

A. Correct.

Q. And there was a focus, as I said, on the qualitative materiality. As you've indicated, both qualitative and quantitative are relevant to the consideration. And so let's

MBHYCOL1                                    Page 2184

just focus on the quantitative aspect for a moment.

Would you agree that it is common to apply, as a rule of thumb, a materiality threshold of 5 percent of pretax income?

A. For quantitative purposes, that's usually a starting point.

Q. And recognize that it's a starting point and there might be other things that one would need it look to, and you spoke at length about those yesterday. Correct?

A. That's correct.

Q. Now, for its 2013 audit, am I correct that BDO established a materiality threshold of $10 million in pretax income?

A. I believe that's correct.

Q. Now, in the year 2014, Iconix reported revenue of approximately $460 million. Correct?

A. That sounds correct.

Q. The $5 million by which the government has alleged revenue was overstated as a result of the SEA-2 transaction, that's about 1.1 percent of total revenue for that year. Correct?

A. That sounds about right.

Q. And the $6 million by which the government has alleged revenue was overstated as a result of the SEA-3 transaction, that's about 1.3 percent of that total revenue number. Correct?

A. That sounds right.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL1    Shapiro - Redirect    Page 2209

businesses in this industry may provide each other.

Do you remember questions of that sort?

A. I do.

Q. And specifically about whether Iconix would sometimes pay its counterparties to support marketing or to build out showrooms or things of that nature.

A. Correct.

Q. If Iconix had such an agreement and it related to another transaction, would that be a linked transaction, sir?

A. When you say it was connected to "another transaction," could you clarify your question.

Q. Sure. Let me give you a better hypothetical.

If there were an agreement by Mr. Cole to provide marketing support to GBG and that agreement was made in connection with SEA-2, would those transactions be linked?

A. Yes.

Q. In connection with the year-end audit, did Mr. Cole make any representations to you about whether or not there were any linked transactions that had not been disclosed?

A. No.

Q. Did Mr. Cole ever tell you that there was a linked transaction between the marketing payments and SEA-2?

A. No.

MR. THOMAS: Nothing further, your Honor.

MS. DABBS: Just briefly. Recross.

MBHYCOL1    Shapiro - Recross    Page 2210

RECROSS EXAMINATION
BY MS. DABBS:

Q. Mr. Shapiro, Mr. Thomas asked you about the guaranteed royalty payments that were part of the Rocawear licensing agreement.

Do you recall that?

A. I do.

Q. And he showed you the list of payments to be made at future periods in time; correct?

A. Correct.

Q. And you indicated that those payments are recognizable because they're deemed to be collectible. Correct?

A. They're recognizable in the period they're due.

Q. Because that's when the company is obligated. Correct?

A. That's when the other party is obligated to make that payment.

Q. And those payments -- they're binding because they're in the contract. Correct?

A. Correct.

Q. You were shown SAB 104.

Does that guidance change anything about the GAAP provisions that we were looking at earlier this morning?

A. Not particularly.

Q. You were asked some questions about your review of the SEA-3 transaction in the third quarter. Well, actually,

MBHYCOL1    Shapiro - Recross    Page 2211

withdrawn. Let me go to a different place briefly.

Mr. Thomas asked you questions about things you might have liked to know. Correct?

A. Correct.

Q. And that included some things that you might have liked to know from a person named Jason Rabin.

Is that correct?

A. I'm not quite sure who that individual even is.

Q. Fair enough.

Are you aware that Jason Rabin said that the payment by GBG in connection with the SEA-2 transaction was not an overpayment?

A. I don't know who that person is either.

Q. Are you aware that Mr. Rabin expressed the view that the SEA-2 transaction was a great deal for GBG without any separate agreement about money coming back?

A. No.

Q. And are you aware that Mr. Rabin said that the SEA-3 transaction did not involve any overpayment?

A. I'm not aware of anything Mr. Rabin might have said since I don't know who he is.

Q. You were asked some questions about your desire to know about oral commitments made by the company.

Correct?

A. Correct.

MBHYCOL1    Shapiro - Recross    Page 2212

Q. You would agree with me that in a negotiation, parties may discuss a number of different possibilities and options.

Correct?

A. Say that again.

Q. You would agree with me that in a negotiation, parties may discuss all sorts of possibilities for a transaction. Right?

A. I'm having trouble understanding your question.

Q. That's fair.

Am I correct that you would want to know about an oral commitment to the extent it was a binding obligation of the company? Correct?

A. Got it. Good question. I got that one.

Q. Thank you.

And that's because the binding obligations are what dictate the numbers that can be recognized by the company.

Correct?

A. Correct.

Q. If Mr. Cole did not believe that there was any binding obligation with respect to a future payment in connection with SEA-2 or any future consideration with respect to SEA-3, there would have been nothing more to report to BDO.

Correct?

A. No. I don't believe that's correct.

Q. Okay. Look, if there was no agreement for a future payment in connection with either of those transactions, then the

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL1          Nanda - Direct          Page 2233

A. Yes. I would like to know that if it's inaccurate. Yes.

Q. Did your fund continue to buy shares in Iconix in August of 2014 after this form 10-Q was filed?

A. That's what the data shows in the previous exhibit.

MR. RODRIGUEZ: Let's show Dr. Nanda Government Exhibit 104, please.

Q. Do you see this Iconix form 8-K, sir?

A. Yes.

MR. RODRIGUEZ: Let's go to page 4.

Q. Do you see this press release dated October 28, 2014?

A. Yes, I do.

Q. Again, there's a revenue figure reported in the second bullet of $113.8 million.

Do you see that?

A. Yes.

Q. Sir, you relied on the accuracy of that number?

A. Yes, I would.

Q. If the revenue for the quarter had actually gone down, would you have wanted to know that in making your investment decisions?

A. Yes.

Q. If the revenue for the quarter had gone down and, as a result, analyst consensus had been missed, would you have wanted to know that?

A. Yes. It would affect my -- it could affect my decision.

MBHYCOL1          Nanda - Direct          Page 2234

Q. A similar question with respect to the non-GAAP EPS measurements there.

Do you see those?

A. Yes.

Q. You would have wanted to know if those were inaccurate?

A. Yes, I would.

Q. That could have affected your investment decisions?

A. It could, yes.

Q. Now, sir, as I mentioned, the date you can see here of this is October 28 of 2014.

Did your small cap growth fund continue to buy shares in Iconix in November of 2014 after this was filed?

A. I'd have to refer to the previous data again.

Q. Sure.

MR. RODRIGUEZ: Let's show Dr. Nanda 1512A again, please, and go to the second page.

Q. Sir, does that refresh your recollection that after that press release came out, your fund continued to buy shares in Iconix in November of 2014?

A. Yes. I was buying on a couple of days in November. That's what it shows here.

Q. And you would have been doing so in reliance of the accuracy of the financial figures in the press release?

A. Yes.

MR. RODRIGUEZ: We can take that down. And let's show

MBHYCOL1          Nanda - Direct          Page 2235

Dr. Nanda just a few more documents starting with Government Exhibit 105.

Q. Do you see this form, Iconix Form 10-Q for the quarter ending September 30 of 2014?

A. Yes.

MR. RODRIGUEZ: Let's go to page 3, please.

Q. That licensing and other revenue figure of approximately $113 million, do you see that?

A. Yes.

Q. That number mattered to you?

A. It would.

Q. The accuracy of that number mattered to you?

A. It would matter, yes.

Q. Did you purchase even more Iconix shares after this 10-Q came out in December of 2015?

A. I'd again have to refer to the data there.

MR. RODRIGUEZ: Okay. Let's show Dr. Nanda 1512A again.

THE WITNESS: So you said December 2014?

MR. RODRIGUEZ: I'll ask the question again.

Let's go to the third page of this document, please. I'm sorry.

Q. Does this refresh your recollection that after that filing came out, you continued to buy Iconix shares in December of 2015?

MBHYCOL1          Nanda - Direct          Page 2236

A. This shows up to November on this page.

MR. RODRIGUEZ: I'm sorry. I said '15. I meant to say '14.

THE WITNESS: Yes. I was buying in December 2014.

BY MR. RODRIGUEZ:

Q. In reliance on the accuracy of the financial measurements in Iconix's filings?

A. That would be one of the things that I would be relying on.

Q. Okay. Just two more filings, sir?

Starting with Government Exhibit 106, do you see this Iconix form 8-K?

A. Yes.

Q. And going to page 4, the February 27, 2015, press release, do you see that?

A. Yes, I do.

Q. And do you see that Iconix reported annual revenue for 2014 of $461.2 million?

A. Yes.

Q. And, sir, you were relying on the accuracy of that revenue number?

A. I would rely on it being accurate, yes.

MR. RODRIGUEZ: And finally, let's just go to Government Exhibit 107.

Q. Do you see this Form 10-K, sir?

A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBH5col2          Collins - Direct          Page 2257

A. April 30th, 2014.

Q. So, on the timeline we see that red arrow with April 30th next to it. What does that correspond to?

A. That's the date of this document.

Q. And is it fair to say that for every document on this timeline, there is a red arrow on that timeline that places the document on this timeline, relative to the SEA deals?

A. Yes. Correct.

MR. LENOW: Let's just go to the next slide so the jury can see the next one and one more forward. Pause it here.

Q. What is the date of this document, Agent Collins?

A. May 2nd, 2014.

Q. Let's skip forward a bit to page 26. This e-mail, do you see where it says: Spoke to Seth and we are fine. And it includes from Neil Cole to Jason Rabin, cc Seth Horowitz, subject: Phone discussion?

A. Yes.

Q. And there is three photographs at the top left-hand side, Agent Collins; do you see that?

A. Yes, I do.

Q. And do those correspond to the names in the e-mail?

A. Yes.

Q. Is it fair to say that throughout this deck there is small photographs, similar photographs of certain individuals reflected in the documents on various pages here?

MBH5col2          Collins - Direct          Page 2258

A. Yes.

Q. Did you put a photograph -- or is there a photograph here for every single participant on every single e-mail?

A. No.

Q. Just some participants?

A. Correct.

Q. And after this June 24th e-mail -- let's just go to the next slide after I spoke to Seth, we are fine. Agent Collins, what is the date of this e-mail? The date of the e-mail indicated on the page?

A. June 25, 2014.

MR. LENOW: We can take that down.

Q. So, we are at June 25th, let's go forward in time to page 39. What is the date of this e-mail, Agent Collins?

A. August 13, 2014.

Q. Is there another e-mail down further down with a different date?

A. Correct; August 14th, 2014.

Q. Can you just read the text at the bottom? First it starts in the red and then it turns purple.

A. It says: Let's discuss tomorrow. Will be tough to do China without Roc Kids.

Q. And Agent Collins, did you pick the highlighting in this document or is the highlighting selected by others?

A. No, I did not select the highlighting.

MBH5col2          Collins - Direct          Page 2259

Q. And just look at the bottom of the page, the August 14th date, where does that lie in relation to the SEA-2 and 3 deals on the timeline?

A. It is approximately in between the two deals.

MR. LENOW: We can take that down.

Q. Let's now go to page 45 so moving forward in this deck, and Agent Collins, is it fair to say we are skipping pages but the ones that we skipped have additional content with this timeline framework on the bottom? Is that fair?

A. Yes.

Q. So, now we are at page 45. What is the date of this e-mail?

A. August 28, 2014.

Q. So about two weeks after that last e-mail we saw?

A. Yes.

Q. And do you see where it says -- just drawing your attention to the orange highlighting where it says: 5 million overpay from Iconix Korea, the 5 M overpay from Iconix in Korea will be offset by.

Do you see that portion in orange?

A. Yes.

Q. And then the amounts below that, 2.5 M Rocawear, 1.0 M Zoo York SEA marketing, 1.5 M Peanuts China marketing, topped with Rocawear in purple and then the marketing mentions in green.

Do you see that?

MBH5col2          Collins - Direct          Page 2260

A. Yes, I do.

Q. And who are the participants in this particular e-mail where that 2.5 million Rocawear, 1.0 million Zoo York, and 1.5 million Peanuts China are listed?

A. Ethan Cole and Jared Margolis.

Q. Let's go to the next slide on page 46. August 28th, where are we now in terms of the time line?

A. Couple days after; September 2nd, 2014.

Q. And drawing your attention to the right-hand side -- actually pausing, who are the participants on this e-mail?

A. Seth Horowitz and Neil Cole.

Q. Do you see that on the right-hand side there is, in purple and two green lines of highlighting, the purple says, in part, 2.5 million relief of Rocawear Kids then 1.5 M Peanuts marketing, 1.0 M Zoo York marketing.

Do you see that?

A. Yes.

Q. How do those numbers compare to the numbers we saw in the prior slides listed for Rocawear, Peanuts, and Zoo York?

A. They're identical.

Q. Let's go to the next slide, page 47. Is this the same day as that prior e-mail that we just saw?

A. Yes.

Q. And then do you see the top where Neil Cole writes: The latest thoughts on Rocawear Kids?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

---

MBH5col2     Collins - Direct     Page 2261

A. Yes.

Q. And then the response from Seth Horowitz: We should use it as a bargaining chip with GBG?

A. Yes.

Q. And then the response from Neil Cole highlighted in red, can you just read that response, please?

A. If it will be a part of final deal with Umbro/China. Very worried about timing for Q3.

MR. LENOW: Let's go now forward in time to page 86 so skipping forward about 40 pages.

Q. Agent Collins, what is the date of this chart?

A. November 3rd, 2014.

Q. Let's say this is -- let's go to the next page. Do you see this a meeting invitation, Agent Collins?

A. Yes.

Q. And Agent Collins, drawing your attention to the required attendees, do you see the names Jason Rabin, Jared Margolis, Ethan Cole, and Seth Horowitz listed under required attendees?

A. Yes.

Q. And also Amanda Azzoli?

A. Yes.

Q. Is that the same day or a different day from the November 3rd document we just looked at in the prior slide?

A. It is the same day.

Q. And then what's the subject and location of this

---

MBH5col2     Collins - Direct     Page 2262

conference?

A. Meeting with Seth, yes, and the location is ESB 9th floor exec conference room.

Q. And what's the start time for this meeting on November 3rd?

A. 3:30 p.m.

Q. Let's go to the next slide and what is the date of this e-mail from Seth Horowitz to Neil Cole?

A. November 3rd, 2014.

Q. Can you just read the highlighted text?

A. Meeting with Jason and Jared went well. Will update you in the a.m.

Q. Let's just go through one final series of four slides in this deck --

MR. HECKER: Your Honor, may we have a side bar?

THE COURT: Sure.

(Continued next page)

---

MBH5col2     Collins - Direct     Page 2263

(At side bar)

MR. HECKER: This is Sean Hecker.

I just want to make a record. This is a complete abuse of the summary chart rule and the evidence of that is that rather than putting in front of a summary witness a chart that helps summarize voluminous data, the government is taking, like, 10 percent of a 130-page deck, having the witness say something about it, and then they're going to shove it in to the jury. And then, in their closing they're going to say, hey, we've already pulled together an advocacy piece that selects the stuff we think is most important for you to look at and you should review it. That is not what this rule was designed to do, it is absolutely an attempt to close twice except they're going to tell the jury to review it later and the evidence of that is clear. They're not even reviewing 10 percent of this chart with this witness. I have never seen anything like it. It is why the examples they cited in support of it are much shorter because you can actually review it with a witness.

It is just totally inappropriate. I have never seen anything like it and I think it is wholly improper.

MR. LENOW: Judge, so in terms of skipping around, we are doing our best to accommodate the Court and defense counsel's concerns to make this go smoothly. And in terms of voluminousness, we have already had this argument, your Honor

---

MBH5col2     Collins - Direct     Page 2264

has already ruled many of the charts we have submitted have a ton of additional data packed on an additional page, 30 or 40 messages. So, just the formatting of whether you have one message on a page and 40 pages or 40 messages on one page is obviously not substantive. Your Honor has addressed this issue, your Honor has ruled against this. We are trying to proceed efficiently as your Honor has requested that we do.

THE COURT: I will say this. On the law I stand by my prior decision. What is happening is not ideal, to be sure. I appreciate that we are trying to get through this as quickly as possible. I thought I had made clear that my thinking on that was that there would be less slides and not less testimony about each of the slides. All of this is in evidence.

To the extent that there is an objection, the objection is overruled. let's just get through this.

MR. LENOW: Understood.

---

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBH5col2     Collins - Direct     Page 2265

(In open court)

BY MR. LENOW:

Q. Agent Collins, we will just do a few more slides here and we can move along.

A. Sure.

Q. If we can now go to slide 95, please? Agent Collins, what's the date of this e-mail exchange?

A. December 1st, 2014.

Q. And then do you see the e-mail from the top from Margolis to Rabin about timing meeting with Neil, response from Margolis, and: I am meeting with Neil and Jason in the afternoon. I have to have everything organized on paper where all the money is going, in detail, as discussed last week.

A. Yes.

Q. And then the response from Ethan Cole: Got it. Will have it prepared.

A. Yes.

Q. And then the last e-mail here, highlighting a portion from Margolis: Additionally, what has been paid so far and schedule on the balance.

A. Yes.

MR. LENOW: Let's go to the next slide, 96.

Q. Then can you read the e-mail from the top from Neil Cole to Jason Rabin?

A. Where can we meet today?

MBH5col2     Collins - Direct     Page 2266

Q. Is that December 1st, the same date as the prior e-mail?

A. Yes.

Q. And then at the bottom do you see where it says: Let's do 8:30 tomorrow morning? Response: Yes, I will be there. From Jason Rabin to Neil Cole, copying Seth Horowitz and Pauline Israel?

A. Yes.

MR. LENOW: Let's go to the next slide, 97.

Q. Agent Collins, can you read the cop e-mail from Jared Margolis, the "Hi Seth," the highlighted yellow portion?

A. Sure.

Can Ethan contact someone in your team to gather all the details of all the allocations so we are properly prepared for our meeting later today with Jay on and Neil?

Q. Then the next highlighted portion.

A. I want to make sure we are aligned prior to the meeting.

Q. And then what does Seth Horowitz respond in his e-mail to Margolis and Ethan Cole?

A. The response is: My understanding is that we are going to be aligning at the meeting.

MR. LENOW: Let's look at the next slide, 98.

Q. Agent Collins, who is this e-mail from and who is it to?

A. From Ethan Cole to Jared Margolis.

Q. And is this the same date as the prior e-mails we looked at or a different date?

MBH5col2     Collins - Direct     Page 2267

A. Same date.

Q. And just looking at the, under clubs, do you see under Europe Korea the purchase price is listed as approximately $15.9 million?

A. Yes.

Q. And under that a value based on revenue of $10.9 million?

A. Yes.

Q. And around $5 million, $5,017,500?

MR. MARKUS: Objection. Leading, your Honor.

THE COURT: Overruled.

Q. Do you see that?

A. Yes.

Q. And then under LC Umbro China, drawing your attention, do you see where it says, in red, can you just read the numbers there for purchase price --

A. Sure.

Q. -- value, then plug for the three for LC Umbro China?

A. For LC Umbro China the purchase price is $21,500,000, the value based on brand multiple is $15,500,000, and the plug is $6 million.

MR. LENOW: We can take that down.

Q. Agent Collins, I want to show you another one of your charts that is in evidence as Government 1341, and we can publish that for all parties and the jury.

Agent Collins, we looked at a chart of deals earlier.

MBH5col2     Collins - Direct     Page 2268

Is it fair to say this relates to the SEA-2 deal?

A. Yes.

Q. And, on the X axis, what are we seeing there?

A. That's the second quarter of the fiscal year, April through June.

Q. And then the Y axis on the left-hand side, what do we see there?

A. That's the purchase price in millions.

Q. And looking at the key, is it fair to say this represents listed purchase prices in certain documents for a Lee Cooper Europe transaction and for a Korea, Turkey, and Europe transaction involving non-Lee Cooper brands?

A. Yes.

Q. The latter part that I just read that is highlighted in kind of orange, is that those bars correspond to that part of the key?

A. Yes. Correct.

Q. Is that the deal that ended up becoming SEA-2, to your understanding?

A. Yes.

Q. Based on the documents?

A. Yes, based on the documents.

Q. And this, going along these bars, taking the first one as an example so it says May 2nd, 2014, then underneath that GX- 1031. What does that date represent and what does the

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBH5col2  Chambarry - Direct  Page 2301

BY MR. THOMAS:

Q. Ms. Chambarry, as part of your assignment did you look at the impact, based on the assumptions, that there would be for analyst consensus and company guidance?

A. Yes, I did. I took a look at the impact, the alleged revenue inflation, along with the corresponding costs that had Iconix beating or missing analyst consensus or beating or missing or meeting company guidance.

Q. And at the conclusion of your work, did you summarize your findings in a series of slides?

A. Yes, I did.

MR. THOMAS: Your Honor, I am going to walk up to the witness, for convenience sake, a stack of slides.

THE COURT: Very well.

BY MR. THOMAS:

Q. Ms. Chambarry, do you see in that stack slides that you have prepared?

A. Yes, these are slides that I prepared.

Q. Are they fair and accurate copies of slides that you prepared in advance of today's testimony?

A. Yes, they are.

Q. And would referring to those slides assist you in presenting your findings to the jury?

A. Absolutely. Yes.

MR. THOMAS: Your Honor, at this time the government

MBH5col2  Chambarry - Direct  Page 2302

offers Government Exhibit 1303, 1310, 1313, 1314, 1315, 1318, 1321, 1324, and 1326.

MR. HECKER: No objection.

THE COURT: They will be received.

(Government's Exhibits 1303, 1310, 1313, 1314, 1315, 1318, 1321, 1324, and 1326 received in evidence)

MR. THOMAS: Ms. Wolfson, if you can put up on the screen Government Exhibit 1303?

BY MR. THOMAS:

Q. Ms. Chambarry, can you explain to the jury what we are looking at here?

A. Yes. These are the set of assumptions that the Department of Justice -- U.S. Attorney's office -- provided for me in order to do my analysis.

So, what this reflects is -- the left-hand panel reflects the time period that we are talking about, and then there is the inflation that I am assuming, both on the revenue and on the cost side.

Q. And when you say revenue and cost, I want to take those one at a time. What are the assumptions with respect to revenue?

A. OK. So, for the second quarter 2014 I am assuming the revenue was inflated by $5 million, for the third quarter 2014 I am assuming the revenue was inflated by $6 million, and for the full year 2014 I am assuming the revenue was inflated by $11 million.

MBH5col2  Chambarry - Direct  Page 2303

Q. You also mentioned the cost side. Can you explain what the assumptions were there?

A. For the costs I was assuming that the costs were inflated only for the full year 2014 and that amount is $3,642,600.

MR. THOMAS: If we can show the witness and publish for the jury Government Exhibit 1313?

Q. Ms. Chambarry, could you explain to the jury what is represented here on this slide?

A. Yeah. So, this slide shows the impact the revenue inflation -- the alleged revenue inflation had on Iconix' reported growth rate, and they report their growth rate to their investors in their public filings. And in calculating a growth rate, just for the background, basically for the way Iconix does it is they take a look at the change in a particular metric, and in this one it is going to be revenue, and they took a look at the change in revenue from the existing time period to the exact same time period in the preceding year. So, when we are looking, for example, on the second quarter of 2014, they're looking at how much did revenue grow or decline in the second quarter of 2014 relative to the second quarter of 2013. And if there is a positive growth, then it tends to send a positive signal to the market. If there is a negative growth, it tends to send more of a negative signal to the market.

Q. So, the computations reflected here, what do they signify?

MBH5col2  Chambarry - Direct  Page 2304

A. So -- I'm sorry. Can you clarify about what do they signify?

Q. Yes.

If we take, for example, the without inflation category of columns, do you see that in the center of the slide?

A. Yes, I do.

Q. What does that mean?

A. So, when we are looking at this we look at the second quarter of 2014, we see that Iconix reported a growth rate for the second quarter 2014 to its investors of 3.32 percent, so that means that the revenue that they reported for the second quarter of 2014 was 3.32 percent higher than the revenue that had been reported for the second quarter of 2013. And then, when we look at the third quarter of 2014, we see that they reported a revenue growth rate of 6.13 percent, and for the full year of 2014, they reported a growth rate of 6.61 percent.

Now, if we take a look at the column without the inflation we see that had Iconix reported their revenue without the alleged inflation, for the second quarter of 2014 they actually would have reported a decline in their revenue relative to the second quarter 2013 of 1.03 percent. And then, for the third quarter of 2014, they would have reported a growth rate of 0.54 percent, and for the full year 2014 they would have reported a growth rate of 4.07 percent. And, again,

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBH5col2    Chambarry - Direct    Page 2305

this is if they had reported the revenue without the inflation.

Q. Ms. Chambarry, in the very final column there is a heading Growth Rate Inflation.

A. Yes.

Q. Can you explain what that represents?

A. Yes. That basically represents how much the growth rate that Iconix reported was inflated having reported the revenue with the alleged inflation. So, when I look at the yellow column entitled Growth Rate Inflation, what it says is in the second quarter of 2014 Iconix -- the reported growth rate was inflated by 4.34 percent. When I look at the third quarter of 2014, the reported growth rate to investors was inflated by 5.60 percent. And when I looked at the full year 2014, the reported growth rate was inflated by 2.54 percent.

MR. THOMAS: Ms. Wolfson, if we could publish Government Exhibit 1310?

Q. Ms. Chambarry, what are we looking at here?

A. This exhibit looks at the impact that the inflated revenue had on Iconix either beating or missing analyst revenue consensus or meeting or missing company revenue guidance.

Q. Can you explain what your understanding of analyst revenue consensus is?

A. Yes. So, analyst revenue consensus is basically a forward-looking statement of what the analysts expect Iconix' revenue to be in the upcoming quarter or year. It is an

MBH5col2    Chambarry - Direct    Page 2306

average of the analysts' expectations so it is usually one number. And so, what happens is either Iconix can miss it, and that means that the revenue falls below analyst consensus, or they can beat it, and the revenue falls above analyst consensus.

Q. Ms. Chambarry, to illustrate for the jury where this information comes from, can you explain how it is you figured out what analyst consensus was for Iconix?

A. Yeah. Analyst consensus is readily available. There is a database called I/B/E/S, and I/B/E/S is really a financial -- it is a hub for financial information that is heavily relied on by economists and academics, and it provides a lot of financial information including financial statements, news on companies, analyst reports. And then, also, I/B/E/S can calculate the analyst consensus, and that's where I got it from.

Q. Can you explain to the jury what information is being conveyed in 1310, here?

A. Yes. So this, with the information being conveyed here is whether the impact -- pardon me -- the impact, the inflation, inflated revenue had on Iconix either missing or beating analyst consensus.

So, when we start with the second quarter of 2014, had Iconix reported their revenue without the inflation, they would have missed analyst consensus. But, instead, they reported the revenue with the inflation and they met and they beat analyst

MBH5col2    Chambarry - Direct    Page 2307

consensus.

When we look at the third quarter of 2014, had Iconix reported the revenue without the alleged inflation they would have missed analyst consensus, yet in reporting the revenue including the alleged inflation, they beat analyst consensus.

Q. On the right-hand side of this table there is a heading company revenue guidance?

A. Yes.

Q. What is company revenue guidance?

A. So, when we are looking at company revenue guidance that is also a forward-looking statement but that's put forth by the company, and that's what the company expects the revenue to be in the upcoming -- for Iconix they only publish it for the full year so it is the revenue that they expect to meet in the upcoming full year. That's usually presented in a range, and so you can either miss it if you fall below the range, meet it if you fall within the range, or beat it if you fall above the range.

Q. Ms. Chambarry, if the jury wanted to find the company's guidance, what document should they look to to find that fact?

A. That's actually, at least for Iconix -- it depends on the companies but for Iconix it is reported in the 8-K. The 8-K is basically an intermittent statement that puts forth material changes in the company, and they also publish an 8-K whenever they publish financial statements, they're just quarterly or

MBH5col2    Chambarry - Direct    Page 2308

annual reports.

Q. And are those 8-Ks for earnings releases where you obtained the information for this table?

A. Yes, it is.

MR. THOMAS: Ms. Wolfson, let's put up for the jury Government Exhibit 1314.

Q. Ms. Chambarry, as part of your assignment were you asked to do some math on something called EPS?

A. Yes, I was.

Q. Could you explain to us what EPS is?

A. Absolutely.

So, EPS stands for earnings per share, and the way that you calculate EPS, it basically represents the company's earnings per share traded in the stock exchange. Right? So, we start with the company's revenue and then from the revenue, what you see here in the left-hand circle, from the revenue you have to subtract out the costs and so that would be in the middle circle, the orange part. So, you subtract out the costs and you have the income before taxes. Then, once you have the income before taxes, to get to the net income you have to subtract out the taxes. So, in the third circle you see I subtract out the taxes in gray, and now we are left with a piece of the pie that is the net income. And then, in the last circle you see the portion that is the net income is being divided up by the shareholders -- for here I am using eight

# A-1014

| UNITED STATES OF AMERICA, v. | TRIAL |
|---|---|
| NEIL COLE | November 17, 2022 |

MBH5col2     Chambarry - Direct     Page 2309

shares as an example -- so, each of the eight shares would have earned one eighth of the pie.

MR. THOMAS: Ms. Wolfson, if we could go to Government Exhibit 1315?

Q. Ms. Chambarry, what are we looking at here?

A. Here we are looking at my calculation that I did that calculates the impact the revenue, along with the corresponding costs, had on Iconix' earning per share.

So, if you look at the bottom line you will see that once I take the inflated revenue and the corresponding costs into consideration, for the second quarter 2014 Iconix -- this is one step back. What I am calculating is actually the non-GAAP EPS but that's a bit of a mouthful so sometimes I just refer to it as the EPS.

So, for the second quarter 2014, the EPS was inflated by seven cents; for the third quarter of 2014 the EPS was inflated by eight cents; and for the full year 2014, the EPS was inflated by 10 cents.

MR. THOMAS: Ms. Wolfson, if we can publish Government Exhibit 1318?

Q. Ms. Chambarry, what are we looking at here?

A. Here we are looking at the impact the alleged -- the EPS inflation had on the EPS that was reported to the investors.

So, as before, the tables we looked at, the left-hand side is the time period I was asked to analyze, and then the

MBH5col2     Chambarry - Direct     Page 2310

middle section looks at the reported EPS, and then the EPS excluding the inflation that we just went over in the last -- that I just showed you the calculation for in the last table. And the last section looks at the dollars and the percent that EPS was inflated.

So, for example, for the second quarter of 2014, Iconix reported an EPS of 75 cents. Had they reported the EPS without the inflation they would have reported the EPS of 68 cents. Therefore, the EPS was inflated by 7 cents, or 10.21 percent.

Q. And if you do that math for the third quarter of 2014, what did you find?

A. I found that the EPS was inflated by 13.02 percent.

Q. And for the full year 2014?

A. 3.86 percent.

MR. THOMAS: Now let's publish Government Exhibit 1324.

Q. Ms. Chambarry, what are we looking at here?

A. This is similar to a chart we already took a look at for the revenue but now we are looking at it from the perspective of the EPS. This chart shows the impact the inflated EPS had on Iconix' reported EPS growth rate. So, as before, we are looking at the change and calculating the growth rate, we are looking again at the change within the same time period versus the preceding year. So, for example, the second quarter of

MBH5col2     Chambarry - Direct     Page 2311

2014, Iconix reported an EPS of 75 cents and a growth rate of 4.17, which means that they reported that their EPS in the second quarter 2014 was 4.17 percent higher than the EPS reported in the second quarter of 2013.

Q. Within the without inflation columns, what information is represented there?

A. So, that's representing the recalculation of the growth rate had Iconix reported the EPS without the inflation.

Again, when we are looking at the second quarter of 2014, as we said before, the inflation was 7 cents. Had they reported the EPS without the inflation, they would have reported EPS of 68 cents instead of 75, and they would have actually reported a decline relative to the second quarter of 2013 of 5.49 percent. There --

Q. I didn't mean to interrupt you.

A. Oh, no. I was going to go on to for the second quarter of 2014 I determined that the EPS was inflated by 9.6 -- the EPS growth rate, pardon me -- the EPS growth rate was inflated by 9.65 percent.

Q. And assuming the assumption is correct?

A. Yes, assuming the assumption is correct.

Q. Then, for the other two periods, was there also growth rate inflation with respect to this non-GAAP EPS?

A. Yes. For the third quarter of 2014 I calculated that the growth rate inflation was 14.81 percent, and for the full year

MBH5col2     Chambarry - Direct     Page 2312

2014 I calculated the growth rate inflation for the EPS was 4.32 percent.

MR. THOMAS: Can we publish for the jury Government Exhibit 1321?

Q. Ms. Chambarry, do you recognize this?

A. Yes, I do.

Q. What are we looking at here?

A. So now, again, this is similar to the chart that we looked at for revenue but this time what we are looking at is the impact the inflated EPS had on Iconix beating or missing analyst consensus for EPS, or missing, meeting, or beating company guidance for EPS.

Q. Now, you explained with respect to revenue a little bit about analyst consensus. Could you tell the jury what analyst consensus is for EPS?

A. So, again, analyst consensus for EPS would be the same thing from the perspective that it is a forward-looking statement of what analysts expect the company's EPS to be for the upcoming quarters or years.

Q. And based on the assumptions that you were provided in the computation that you did, what would have happened if the EPS had been correct, according to your math?

A. So, for the second quarter of 2014, had Iconix reported the EPS without the inflation, they would have still beat analyst consensus but we know that they reported the EPS with the

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBH5col2          Chambarry - Direct          Page 2313

alleged inflation and they beat analyst consensus. And, for the third quarter of 2014, had Iconix reported the EPS without the alleged inflation, they would have beat analyst consensus, yet we know they reported it with the alleged inflation and, again, they beat analyst consensus.

Q. What about for the full year 2014?

A. Yes. So, when we come to the full year 2014, you know, that's an interesting -- that's an interesting point because, you know, one thing that, you know, to take -- I know that one of the issues that we are coming to terms with in this trial is whether the EPS inflation is true inflation or not. But, assuming that it is true inflation, entering the full year 2014, Iconix found themself in the position where they have reported the fraudulent EPS in the second quarter of 2014 and they've reported the fraudulent EPS in the third quarter of 2014. Now, come the full year of 2014, Iconix has an opportunity to be truthful to their investors and report the EPS without the inflation. Had they reported the EPS without the inflation for the full year of 2014 they would have missed analyst consensus. But, instead, they reported it with the alleged inflation and they beat analyst consensus.

Q. Ms. Chambarry, that is based on the assumptions?

A. Based on the assumptions, yes. I am assuming that the inflation is true inflation, yes.

Q. To focus you on the right-hand side, Company EPS Guidance,

MBH5col2          Chambarry - Direct          Page 2314

if you do the math based on the assumptions, what effect does that have on meeting or beating company EPS guidance?

A. Again, in that same scenario, come full year 2014, had Iconix reported their EPS excluding the inflation, they would have missed their company guidance, yet in reporting the EPS with the inflated -- sorry -- reporting the inflated EPS, they beat company guidance. So, they fell above the range of company guidance.

MR. THOMAS: Let's show, for the witness, Government Exhibit 1326.

Q. Ms. Chambarry, separate from EPS and separate still from revenue, were you also asked to do some math about a sale of stock by Mr. Cole?

A. Yes, I was.

Q. Could you tell the jury what they see here in Government Exhibit 1326?

A. Yes.

So, October 31, 2014, Mr. Cole exercised some options that I believe were part of an in-place stock plan, and then after they exercised options they sold stock. And in the process of that transaction, Mr. Cole had net proceeds of $33.8 million.

Q. When you say net proceeds is that a figure before tax?

A. Yes, that's a figure before tax, yes.

MR. THOMAS: Nothing further, your Honor.

MBH5col2          Chambarry - Cross          Page 2315

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. HECKER:

Q. Good afternoon, Ms. Chambarry.

A. Good afternoon.

Q. I think this is clear but I just want to make sure it is clear. You were just provided assumptions by the U.S. attorney's office, correct?

A. That's correct.

Q. And all of the work that you did was based on the notion that those assumptions were true, correct?

A. That's correct. Yes.

Q. And I can tell during your response to questions you tried to -- you tried to ensure that you made clear that you were basing it on the assumption that there was inflation, right?

A. Yes. That's what I said, yes.

Q. Sometimes you slipped and you just said "the inflation" or "the fraud" but in fact you don't know one way or the other because you don't know anything about the underlying facts, correct?

A. No. My very first slide says that these are assumptions and I carried them through.

Q. And when you carried them through, the remaining slides, they just talk about the effect of the inflation, they don't say assumed inflation, but we can all understand that all of

MBH5col2          Chambarry - Cross          Page 2316

your charts simply assume that there was inflation, correct?

A. Assumes that the inflation provided to me was accurate, yes.

Q. Correct.

A. Yes.

Q. And you don't know whether it was or wasn't?

A. No, I don't.

Q. And you are not testifying here as an expert today, correct?

A. No, I'm not.

Q. You just did the calculations based on some data sets and the assumptions and that's how we get your charts, correct?

A. That's correct. Yes.

MR. HECKER: If I might ask to pull back up Government Exhibit 1321?

Q. You prepared this chart based on the math that you did, yes?

A. Yes.

Q. With respect to the full year 2014, did you do the analysis with the scenario where there was no $6 million inflation associated with the SEA-3 transaction?

A. Did I do the analysis where -- I'm sorry. Can you --

Q. Your assumption in this case is that there was inflation with respect to two transactions, correct?

A. Yes.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

| MBH5col2 | Chambarry - Cross | Page 2317 |

Q. One was SEA-2, yes?

A. I don't know the name of the transactions, so when you say SEA-2 to me I don't know what those are.

Q. Fair enough.
One of the transactions you were asked to assume occurred in the second quarter of 2014, yes?

A. Yes.

Q. And you were told to assume it involved $5 million inflated revenue, yes?

A. Yes.

Q. And you don't know whether that's true or not but that's the math that you used, yes?

A. Yes.

Q. And you were told that in the third quarter there was another transaction and you should assume there was $6 million of inflated revenue in connection with that transaction, yes?

A. Yes.

Q. Did you do the math on the full year if there was no inflation on that third quarter transaction, in other words if we take $6 million out of the assumption?

A. So, no, I did not do that math. I was not asked to do that math.

Q. You weren't asked to do that math, but isn't it true that if you did that math and you took $6 million out of the assumed inflation amount Iconix would still beat its full year analyst

| MBH5col2 | Chambarry - Cross | Page 2318 |

EPS consensus for 2014?

A. I actually don't know because I don't have the numbers memorized.

Q. Possible, right?

A. Yeah, I don't know. I don't know.

Q. And, even on your assumed inflation, Iconix beat the estimates in the second quarter without any inflation, correct?

A. I'm sorry. Can you repeat your question again?

Q. Sure. I am just reading your chart.

A. Fine. I apologize. I just didn't understand your question. That's all.

Q. Oh, no problem. No problem. I want to make sure I am understanding your chart correctly.

A. That's fine. That's fine.

Q. The second quarter 2014 --

A. Yes.

Q. -- the middle of the three columns, it says: Analyst EPS Consensus. Do you see that?

A. I do. Yes.

Q. And it says: Without inflation, second quarter 2014 beat.

A. Yes. Yes, that's what I testified to, yes.

Q. So even if there was no inflation they would still beat analyst expectations in the second quarter, yes?

A. Yes. Now, my question is when you say there is no inflation, are you talking about the inflated revenue was not

| MBH5col2 | Chambarry - Cross | Page 2319 |

reported or are you talking about there was no inflation and the revenue -- what do you mean by no inflation?

Q. Let's try to make this absolutely clear.
You assumed there was inflation, yes?

A. Yes.

Q. If we assume there was no inflation --

A. OK. So all the revenue reported was accurate?

Q. Let me try this again.

A. OK. Thank you.

Q. Let's take out the inflation. OK?

A. Yes. OK.

Q. So, second quarter, $5 million of assumed inflation is deducted.

A. Yes.

Q. They didn't increase their revenue by $5 million improperly.

A. Yes.

Q. They would still beat second quarter estimates, yes?

A. Yes. That's what I said. Yes.

Q. And the third quarter, same thing. If we take out the assumed inflation so there is $6 million less in revenue, still beat analyst expectation in the third quarter?

A. For the EPS? Yes.

Q. For the EPS.
And just so the jury understands, the assumptions all

| MBH5col2 | Chambarry - Cross | Page 2320 |

turn on the revenue assumption, right? The rest is just math and the impact on the earnings per share and the remaining things you calculated, yes?

A. Yes. For the second and third quarter we are looking at inflated revenue, there is no corresponding costs.

Q. You assume no corresponding costs.
And you also weren't asked to do any charts relating to a transaction in 2013 at all, correct?

A. For this, no, not for this proceeding, no.

Q. In preparing for your testimony you were not asked to make any assumptions about any transaction in 2013?

A. No.

MR. HECKER: You can take that down.

Q. The consensus estimate refers to the average of all the estimates of these individual research analysts that work at various companies?

A. Yes.

Q. And an individual analyst's estimate could be higher than the consensus, yes?

A. Can be, yes.

Q. Could be lower than consensus?

A. Can be, yes.

Q. We are really just talking about an average, correct?

A. We are. We are talking about an average.

Q. Some analysts update their estimate more frequently than

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBH5col2     Chambarry - Cross     Page 2333

Iconix would have still beat the estimates for the second quarter and for the third quarter.

Do you see that?

A. Yes. I do see that.

Q. For the full year, when you were determining whether Iconix would have beat or missed analyst's EPS consensus, you relied on the same I/B/E/S data? Yes.

A. Yes.

Q. When number did you use?

What was the actual EPS estimate that you used for the full year 2014?

A. I'll be honest. I don't remember the actual EPS estimate that I used. I don't have those numbers. I can tell you this. I used the I/B/E/S number that was most recently made available prior to the full year, full-year results, being recorded.

The reason I did that is because what I was taking a look at was, you know, we knew that going into the full year of 2014, what had actually happened was Iconix had reported -- now, again, we're assuming that this fraudulent revenue is fraudulent.

So going into the second quarter '14, Iconix reported the fraudulent revenue. I'm sorry. This is the EPS. Reported the fraudulent EPS. In going into the third quarter of '14, Iconix reported the fraudulent EPS. Coming into the full year of 2014, Iconix still has the opportunity, as always, assuming

MBH5col2     Chambarry - Cross     Page 2334

this is fraudulent revenue, to be truthful to their investors.

So I looked at the point in time when the full-year 2014 results were going to be presented, and I said what was the analyst estimate at that point. Had Iconix been truthful at that point and actually reported the EPS without the alleged inflation, would they have met analyst consensus, and they wouldn't have.

Q. Ms. Chambarry, that whole answer again assumes that they should have disclosed something that they didn't. Correct?

A. I'm sorry. Can you --

Q. Let me try again. I'm really just trying to understand. I think you answered the question in there.

It's that you used the I/B/E/S data that came out before they reported the full year 2014 earnings. Yes?

A. Yes. That's what I said.

Q. If I were to show you a chart for the I/B/E/S data for January 2014 through February -- and that's Defendant's Exhibit 2325. And I'd like to move the admission of Defendant's 2325.

MR. RODRIGUEZ: Your Honor, I don't expect we'll have an objection after there's some foundation.

THE COURT: Okay. Ask some more questions, Mr. Hecker.

BY MR. HECKER:

Q. You've seen this document before. Yes?

A. It was structured differently. I'm assuming I've seen it

MBH5col2     Chambarry - Cross     Page 2335

before, but yes. It was structured differently. Yes.

Q. This reflects that I/B/E/S data for Iconix stock, from January 2014 until February 19, 2015, changed over time. Correct?

A. Yes. It changed over time. Yes.

Q. And the number you used would have been the February 19, 2015 number, the $2.76 estimate for FY 2014. Yes?

A. Yes. That's the estimate, yes.

Q. But if you look at what the estimate was in, for example, June 2014, it was much lower. Correct?

It was $2.63. Yes?

A. Yes. It's $2.63.

Q. 13 cents lower.

A. Yes.

Q. If you look at it in the third quarter, if you take the number from September 18, 2014, it's $2.67. Yes?

A. Yes.

MR. HECKER: Okay. I'm done with this. Let's go back to Government Exhibit 1321.

Q. When you concluded that full year 2014 would have missed without the inflation, you're using this $2.76 number that was calculated -- the estimate was in February of 2015. Yes?

A. Yes.

Q. And you explained why you did that, and I understand why. But my question is going to be really simple.

MBH5col2     Chambarry - Cross     Page 2336

Did you look at whether in the second quarter, when the first transaction took place and the estimate was $2.63, not $2.76, whether Iconix was on track to beat the estimate as of the second quarter for the full year?

A. I'm sorry. That's getting a little complicated. Can you repeat that again, please.

Q. The full-year estimate that you used of $2.76, that's an estimate that was made in February of 2015. Yes?

A. Yes.

Q. When these transactions took place, it was in June and September of 2014. Yes?

A. Yes.

Q. And at that time, the full-year analyst consensus estimates were lower. Yes?

A. They were lower, yes.

Q. And in fact, when you say "miss" here without inflation, do you see that?

A. Yes.

Q. If you were to use the number, either $2.63 or $2.67 as the estimate, not the one that was calculated in February but the one that actually existed in 2014, am I correct that Iconix --

A. That number would be irrelevant.

Q. This is a really simple math question for you, very simple.

At the time of these transactions, the analyst estimate for the full year was $2.63 or $2.67 in the third

# A-1018

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

---

MBHYCOL3   Chambarry - Redirect   Page 2337

quarter.

Do you agree with me?

A. I agree with you, but --

Q. The actual revenue number for full year 2014 for Iconix, without the inflation, was higher than both of those numbers.

Yes or no?

A. I believe it was, yes. Though I don't see the relevance.

Q. I understand you don't, but I think the jury does.

I have no further questions.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. THOMAS:

Q. Ms. Chambarry, shy did you use the number most closely published in time before the annual 2014 filing?

A. Because that represents the analysts' perspective at the time of prior to the filing. So that's why I used the number. It represents the analysts' perspective just prior to the full year coming forth.

And therefore, had Iconix, under the assumption that the revenue was inflated and that the EPS was inflated, had they been truthful at the year end, they would have missed those guidances -- would have missed those analyst consensus. Pardon me.

MR. THOMAS: Nothing further, your Honor.

THE COURT: Ms. Chambarry, you may step down.

---

MBHYCOL3   Chambarry - Redirect   Page 2338

THE WITNESS: Thank you.

(Witness excused)

THE COURT: Government, do you have another witness?

MR. THOMAS: No other witness. We do want to offer a few stipulations, not read them, just offer them.

THE COURT: Very well.

MR. THOMAS: Government 2001, which is a stipulation related to deal documents; Government 2004, which is related to certain records of Mr. Horowitz; Government Exhibit 2005, actually which I just offered; and Government Exhibit 2006, which is a stipulation related to certain invoices.

THE COURT: There being no objection, they will be received.

(Government's Exhibits 2001, 2004, 2005, and 2006 received in evidence)

THE COURT: Anything else from the government?

MR. THOMAS: No, your Honor. The government rests.

THE COURT: Very well.

Ladies and gentlemen, I need to speak to the lawyers at sidebar for a little legal work, and we'll be right with you.

(Continued on next page)

---

MBHYCOL3   Chambarry - Redirect   Page 2339

(At the sidebar)

THE COURT: So do you want to make a motion, and I can defer my ruling until later?

MR. HECKER: We'll make the motion under Rule 29 for a dismissal of all elements of all counts.

MR. THOMAS: We oppose the motion, your Honor. The record so far, including, the testimony of Mr. Horowitz, establishes the evidence.

MR. HECKER: We'll defer the remainder of our argument.

THE COURT: Very well. The motion is denied.

You'll be calling Mr. Cole next?

MR. HECKER: Yes.

---

MBHYCOL3   Cole - Direct   Page 2340

(In open court; jury present)

THE COURT: Does Mr. Cole wish to put on a defense case?

MS. DABBS: Yes. Thank you, your Honor. The defense calls Neil Cole.

THE COURT: Please watch your step. Step up into the witness box and remain standing.

NEIL COLE,
   called as a witness by the Defendant,
   having been duly sworn, testified as follows:

THE COURT: Mr. Cole, I believe you know what I'm going to tell you. Let's see if you've been paying attention.

Ms. Dabbs.

MS. DABBS: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. DABBS:

Q. Good afternoon, Mr. Cole.

A. Good afternoon.

Q. Why are you testifying today?

A. Well, it's -- after everything I've heard at this trial, especially from Mr. Horowitz, I feel I have no choice. And I really want to set the record straight.

Also, you know, I've been going through this since these allegations for almost 7 1/2 years. And I've testified any time, given the opportunity. I spoke to the special

---

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL3  Cole - Direct  Page 2341

committee for two days. I spoke to the SEC for ten hours.

I spoke at another -- I was -- I testified about a year ago at another proceeding, and I'm going to testify today because it's very important I tell my story and tell the truth.

Q. Let's start with just a little bit of background about you, Mr. Cole.

How old are you?

A. I'm 65 years old.

Q. Where do you live?

A. I live in Manhattan.

Q. With whom do you live?

A. I live with my wife, Lizzy, and my daughter, Charlie.

Q. How old is Charlie?

A. Charlie is a senior in high school, and she's 17 years old.

Q. And have you always lived in New York, Mr. Cole?

A. Yes. My whole life, except when I went to undergraduate in Gainesville, Florida.

Q. Do you have any other children besides your daughter, Charlie?

A. I do. I have two. I wouldn't call them children. I have big boys. Brandon is 36, and Alex is 33. And I have a grandchild named Simon who is two.

Q. You've been sitting here listening to the witnesses testify in this trial. Correct?

A. I have.

MBHYCOL3  Cole - Direct  Page 2342

Q. And you listened to the government's opening statement?

A. I did.

Q. Mr. Cole, at any time in 2013, 2014, 2015 while you were the CEO of Iconix, did you believe that Iconix provided false or misleading information about its financial results in any manner?

A. No, I did not.

Q. Did you believe that the financial results reported for the company during your tenure as CEO in that time period were accurate?

A. Yes, I did then, and I do today.

Q. What about the transactions the company entered into while you were the CEO?

Did you believe that those transactions were appropriate?

A. I did.

Q. Did you believe they were in the best interests of the company and your shareholders?

A. Yes, I did.

Q. At any time in 2013, 2014, or 2015, while you were the CEO of Iconix, did you try to mislead the company's auditors?

A. I did not.

Q. Several of the charges in this case involve public filings that Iconix made with the SEC and certifications that you signed in connection with those filings.

MBHYCOL3  Cole - Direct  Page 2343

When you signed those certifications, did you believe them to be accurate?

A. Yes.

Q. Did you believe that Iconix's public filings during the time you were CEO were truthful and accurate?

A. I did.

Q. During this trial, you have heard testimony from witnesses about the Southeast Asia joint venture set of transactions starting with SEA-1 and continuing with the amendments, SEA-2 and SEA-3.

As far as you know, Mr. Cole, what commitments or obligations, if any, did Iconix undertake in connection with those transactions that were not in the written transaction documents?

A. Absolutely none.

Q. You've been charged with several different crimes in this case.

Did you commit any of those crimes, sir?

A. I did not.

Q. I want to step back and talk a little about your professional background, and we'll go even a step back before that.

Can you tell the jury where you grew up.

A. I grew up on Long Island in a town called Great Neck and went to high school there.

MBHYCOL3  Cole - Direct  Page 2344

Q. Can you describe your educational background after high school.

A. I graduated high school at the University of Florida in Gainesville. And then I went to law school for a year at New England Law, and then I transferred back home to Hofstra Law School.

Q. Approximately when did you get your law degree from Hofstra?

A. In 1982.

Q. Did you like law school?

A. Not really. I'm not really a book person. Just reading about case law and precedence didn't really -- I didn't really enjoy that. But my mom wanted a lawyer, so I pushed through.

Q. I suppose it may not be for everyone.

Why did you -- what caused you to transfer to Hofstra Law School?

A. I wanted to be close to the family business. We had an exciting company that was about two miles or three miles from the law school, and I wanted to join the family business at that time.

Q. And what sort of business was the family business?

A. The family was a footwear business. My dad used to make shoes in Brooklyn, manufacture. And then along the way, my brother, Kenneth, and Abbey joined.

And they came up with a new concept of importing and

# A-1020

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL3   Cole - Direct   Page 2345

found a brand of shoe called Candies, and the business exploded. So I wanted to be close to it.

Q. And did you, after graduating law school, did you take the bar exam?

A. I did.

Q. Did you pass?

A. The second time.

Q. After law school, did you continue working in the family business?

A. I did. I went right to the family business. Even when I was in law school, I was working in the family business and practiced. I was in the basement reading books, and my brother was upstairs doing all the fun stuff. So I ended up going upstairs after about six months and hired one of my law school professors to handle the legal side of our company.

Q. And what was the "fun stuff" that was happening upstairs that was more appealing to you?

A. The marketing, the branding, the licensing. We had a brand that was in demand. So we got inquiries that people wanted to license it and pay us a royalty. So to me, it just seemed like a phenomenal business where you could lend your name out to people, and you get royalty. So I was so enamored with it, I based my entire career around it.

Q. Apart from the business aspect of it that you just discussed, was there anything else about the marketing aspect

MBHYCOL3   Cole - Direct   Page 2346

of it that was particularly appealing to you?

A. It was all just very exciting, the whole concept of it, creating, meeting interesting people and celebrities. At the time I was young, and just trying to make this brand was pretty exciting to me, and it became my life's work.

Q. You spoke briefly about your educational background. Do you have any formal accounting training?

A. No.

Q. Have you ever worked as an accountant in any capacity?

A. No.

Q. When you were working in the family business, how was it working for your father?

A. It was okay. I mean, I learnt a lot. He was a hard-working, hard-driving, in every morning at 6:30 and left at 7:00 or 8:00 at night and made comments to us like we had to get there before him and leave after. But I enjoyed it.

After a while, I left. And my brother left after a couple of years and started his business. And I was with my dad for about three years before I left also. He was difficult to work with.

Q. What did you do next?

A. I started a licensing company called New Retail Concepts. And invented a brand. And we licensed it out to everybody and went public in a small, little public offering. We raised a few million dollars and started licensing.

MBHYCOL3   Cole - Direct   Page 2347

Q. I want to fast-forward shortly to your time at Iconix. But can you just briefly describe your professional experience, your work experience, between New Retail Concepts and Iconix.

A. Yes. It was always the same company. It was always the same public vehicle that changed its business a few different times. After -- No Excuses was our first big brand. As a public company, we weren't getting noticed because we only got 5 percent of sales. And even though the sales -- we were doing really well. It was well over a hundred million dollars.

And we created a lot of excitement with the No Excuses brand by having all of these spokespeople that were a little controversial at the time, people like Donna Rice and Joan rivers and Marla Maples.

So we carried a lot of buzz and excitement, but we didn't get noticed as a public company. So we ended up merging or taking over our jeans company. So I went into jeans business for about four or five years.

There, it was interesting. We were making jeans in 12 countries. I was just flying around the world making jeans. At the time, it was acid wash. It just came back. I saw my daughter wearing it again.

We had a warehouse full of jeans, and they started turning yellow. So I ended up licensing the name No Excuses to

MBHYCOL3   Cole - Direct   Page 2348

WalMart or a gentleman who sold WalMart. And I went back into the licensing business for a few years and bought the family brand.

And then a few years of doing licensing again, once again, didn't get scale. And we had the opportunity to merge into the footwear business. So I went into the footwear business which was the family business that I learnt.

And I did that I think for 12 years and built a really big, interesting, exciting shoe business and did a lot of interesting marketing and branding and recreated the family name, which was very fulfilling. And my dad got to see it before he passed.

And then, once again, 2005, fast-forward, what I remember, I had a warehouse full of either high heels or flats, and people wanted the opposite. And I ended up going back into the licensing business for the third time in my late 40's.

And this time, it worked. We changed the name to Iconix Brand Group in 2005, and that was the beginning of that venture.

Q. And how did you come up with the name Iconix for the company at that point in 2005?

A. We had a few different brands. At that time we still owned the family brand Candies, and we owned a brand called Bongo. We bought another brand called Badgley Mischka which was a couture gown brand, which was interesting. We were looking to

UNITED STATES OF AMERICA, v.
NEIL COLE

MBHYCOL3          Cole - Direct          Page 2349

show people the business model, that we buy great brands. At least that's what we thought we were going to do.

We found -- we thought Iconic was a great. And we found a stock symbol was Icon. So we had a contest in the company, and somebody won and came up with the name Iconix with an x rather than a c.

Q. At a high level, what was your vision for the company, at that point? This third effort, at a licensing company.

A. I was just hoping to grow and help shareholders and increase the stock price and just do all the right things and never envisioned what would happen over the next ten years. It was really a dream come true.

Q. And when Iconix was first established in 2005, I think you referred to some of them, but how many brands did Iconix own and control?

A. We owned Candies, Bongo, and Badgley Mischka. And the light bulb, the big acquisition which kind of taught us the model is we bought a brand called Joe Boxer. And Joe Boxer was an underwear brand.

It had a royalty agreement with K-Mart -- K-Mart-Sears because they had already merged. They were bringing in $20 million a year, and they had 2.5 years left. So they had $50 million of royalty.

I think the big thing that happened was we were able to borrow $40 million against the $50 million, which was

MBHYCOL3          Cole - Direct          Page 2350

surprising at the time. I found a great banker who would help us. So we got $40 million against future royalty.

We gave $40 million of our stock, at the time, which was two or three bucks. So we brought in $20 million of royalty, and we hired three people. So like $18 million went to the bottom line.

And we said, wow. Let's do a lot of it. And over the next ten years, we bought 35 different brands. We were able to raise close to $2 billion, and the company became worth $3 billion, and it was an amazing ride. It was a wonderful time.

Q. You just referred in describing the sample of Joe Boxer and acquiring that brand and how that came to be, that $18 million went to the bottom line.

Can you just explain what you mean by that.

A. Well, we just hired three people. It ended up being my general counsel who joined us at that time and a couple of brand managers. So I think the overhead was less than half a million.

Then we spent a million and a half on advertising. That's the beauty of the model, really low overhead and high royalty. So that's how it worked.

Q. Got it.

And you mentioned that it was a period of tremendous growth from that point on in terms of brands acquired. Correct?

MBHYCOL3          Cole - Direct          Page 2351

A. Yes.

Q. Can you just name the different segments of the business in terms of the different types of brands that Iconix acquired during the time period after its formation.

A. Sure. We started in fashion, because that was our background and coming out of the footwear business and fashion and jeanswear. And we bought brands like OP, which was an old surfwear brand. We bought London Fog, which was an old outerwear business. We bought Danskin which was this incredible, active hundred-year-old brand. So all three of those were really incredible heritage brands. So that was that area.

Then we started buying men's brands. And we bought Rocawear, and that's where I got to start working with Jay-Z. In the men's segment, we bought Ecko and worked with Marc Ecko and his team and Ed Hardy, which was not our greatest purchase.

From there, we went more into home because we said, wow. The concept of just owning intellectual property of great brands can really work in any industry. So in home, we bought Canon, Fieldcrest, Charisma, Waverly, all of these wonderful brands.

Last but not least, we said, wow. Let's get into the entertainment business, and we had an opportunity to start buying entertainment brands. And one of my favorites at the time was Peanuts because my wife watched Snoopy.

MBHYCOL3          Cole - Direct          Page 2352

And that really helped in the global because Peanuts was in 70 countries. So overnight, it really changed the business model. It helped us really look outside the world and all of the opportunities. So it was lots of different segments of fashion, home, and entertainment.

Q. And were there particular qualities that you would look for in brands that the company acquired?

How did you determine which brands to focus on?

A. We looked for brands that had strong appeal and that people knew. What we did is we kind of quietly, you know, shopped the brand in the acquisition process. We went to people like WalMart or Target or Macy's and said, would you like this?

And they said, yes. And they said, it's going to cost us this, and you have to commit to this. So we got huge commitments from all these great retailers who never got to own brands directly before, control. They were always competing and had to worry about the competition with the brand. Now they could have their own exclusive brand which was pretty unique.

We ended up doing like $3 billion with WalMart, $2 billion with Target, $2 billion with Kohl's. And it became pretty big. And the retailers loved it because they now had exclusive brands, good margins because they didn't have to buy it from someone.

They all had direct businesses and direct offices. So

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL3    Cole - Direct    Page 2353

this gave them ability to make higher margins and own a brand that exclusively drove people to their store. And we brought them great celebrity marketing and branding. So we were like kind of an ad agency that owned the intellectual property and got a small royalty from the retailers and sometimes from the wholesale for wholesale.

Q. Besides the retailers -- I think you just said sometimes wholesalers -- just to make sure everyone is tracking, what kinds of companies served as licensees for Iconix?

A. You know, in the beginning, before we really expanded into the retail business, we had kids' companies that we went to with great kids' brands like Peanuts and Strawberry Shortcake.

Every different type of people wanted brands. Brands is the only thing that distinguishes the product. Everybody has a sock, but how do you make the sock special and stand out and try to get repeat purchases. If you're just selling something without a name on it, you're not going to build any equity. So that's part of why brands were so important.

Q. And what did Iconix do, if anything, to support and to grow the brands that it acquired and owned over the years?

A. Our goal or our mission was to make them relevant. Nobody cared that London Fog was a great brand a hundred years ago or Danskin was great 70 years ago. We had to make it exciting and relevant for today.

So we got amazing celebrities, people like Jay-Z and

MBHYCOL3    Cole - Direct    Page 2354

Madonna and Britney Spears. We did something with Beyoncé. We did something with Taylor Swift. We got these celebrities to associate with our brands.

So that gave us tremendous credibility with the retailer and the consumer, that these were exciting, new, relevant brands. So we had about 60 people just focusing on branding and marketing and PR. When I left is when social media started really booming. So that became a big part of the business.

Q. In the 2014 timeframe, how large was Iconix relative to other businesses that were focused on licensing?

A. We became the second largest license company in the world behind only Disney. We brought in over 460 million of royalty income. We had -- which resulted -- I think our overhead at the time, we had about 100 some odd people and rent. We ended up making close to roughly about $250 million profit pretax.

Q. And you referred to having a number of people who were focused on marketing work and advertising and celebrity endorsements.

Did Iconix have a budget for advertising or marketing or expenses of that nature?

A. Yes. Every year, we presented a budget to the board of directors in the October prior to the following year. So based on how much revenue we were projecting and how many people and salaries we had in overhead, there was always an advertising

MBHYCOL3    Cole - Direct    Page 2355

presentation. But that was really -- I say "simple," but at the time it seemed simple. We just had two costs, people and advertising. So those two things we budgeted for the board.

Q. And in your experience, were there occasions when your partnership, whether those were licensees or agency agreement partners, came to Iconix and requested marketing or advertising support?

A. All the time. Any time we'd go to a meeting, that's kind of what we did. We were the ones who made the brands relevant, exciting. Part of our deals had a royalty we had to spend, but we had a lot of discretion on where the dollars went. Each brand was vying for attention and royalty or to be taken care of.

In the beginning, I said, these are my children, along with my other children. At one point, we were kind of running an orphanage. Each of the brands wanted attention.

So we -- and every licensee can, how come you got so and so for this brand, and how come you're not doing such and such for our brand. So our goal was to take the ad budget, and we convinced -- especially if we had a WalMart or a Target, if we spent $3 million, we got them to spend $10 million. So often we did the creative, and the licensee took our creative, and they're the ones who leveraged it and spent money with it.

Q. In 2014, how did you think the business was doing?

A. We were doing great. The business was wonderful.

MBHYCOL3    Cole - Direct    Page 2356

Q. Did you think the business was in trouble or declining?

A. No. We made 200 -- our company was worth $3 billion. Sometimes analysts or people in the market thought we weren't growing as quickly as we were. But we were -- internationally, our business was booming because when we did, which I'm sure we're going to talk about, these joint venture deals, we sold half of it.

But once we were done selling it, we no longer got credit for the revenue. Because it was 50/50, it wasn't our revenue. So it was kind of -- I say below the line.

So we were expanding dramatically around the globe. Although it didn't -- our revenue only went from 430 million to 460 million, but our brands were growing a lot quicker.

We had over -- for instance, in China, we had a thousand stores and other parts of the world, but we weren't getting credit for the revenue. But we did get credit when we told people we were doing $15 billion. People started understanding the growth and how it all worked.

Q. Is that something that you had to explain to people who were following the company and its progress?

A. I did. I did. Once again, I knew it would all work out. Obviously I never expected what happened to happen. I knew that if we did the right thing and, no matter how the revenue was captured, top line to bottom line, that the company would do well, as long as we made profit.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL3          Cole - Direct          Page 2357

Q. We will come to the joint venture transactions. I want to ask just a few more questions about the structure of the company and the management of the company.

And focusing on the 2014 time period, about how many employees did Iconix have?

A. We had about 150. About 100 of them were based mostly in Manhattan or around here. Most came to the office. But we purchased two brands that were based in the UK, Umbro, which was based in Manchester, England, and Lee Cooper, which was based in London. So we also had about 50 people in the UK or greater Britain, Great Britain.

Q. And just focused again on the 2014 time period after the company experienced the growth you've described, can you describe how you viewed your role as the CEO of the company, what you were focused on and what you viewed your role as.

A. I was responsible for the company, and I was responsible to lead it and the vision and the future of the company. What was wonderful about my job was I got to do a little bit of everything. I had different reports from all over.

The key to success, which, when I look back at what happened and where I went wrong and some of the good part, it was all about the people you attract because when it gets to the size it got, you can't do everything yourself.

And you have to attract good talent. That should have been my number one job, which I tried. But I obviously made

MBHYCOL3          Cole - Direct          Page 2358

some mistakes along the way. But I was in charge. I was the chief executive officer, and I reported to the board. And the board was my boss, but I got to be the visionary for the company.

Q. And there's been certain testimony during this trial, Mr. Cole, that I know you've heard about your management style.

How would you describe your management style?

A. I was pretty intense. You know, I worked 12/14 hours a day. What was wonderful is it seemed like two. I just loved what I did. You know, the people around me -- a lot of them had been with me since the beginning. I had employees with me 20 years/25 years -- I trusted. I let them do their thing because I trusted them.

But I sat here and listened to a couple of people say things that actually shouldn't surprise me because actually they were just with me for a couple of years, and they never got my level of trust, and it didn't work.

But I think if you talked to a hundred people, I know there was respect that went both ways. I know there were a couple of bad hires. I was tough, hardworking, intense.

That's how we built the company. I shouldn't say that's how we built the company, but that's how I was. Looking back and one of the similarities -- maybe that's why you asked me about my father -- maybe I'm a little bit like my dad.

Q. About how many people reported directly to you in 2014?

MBHYCOL3          Cole - Direct          Page 2359

A. I believe, from looking at the charts and everything, about ten people directly reported to me.

Q. And I just want to focus in on a couple of the different functions of the company that reported in to you.

Starting with the legal function at the company, can you just speak briefly to the legal function, the size of it, and what the role of the legal department was from your perspective.

A. As the company grew, we kept hiring lawyers. We had great outside lawyers that cost a lot of money. We had White & Case and Gibson, Dunn and Blank Rome. When you're doing thousands of transactions, we built an in-house law firm. And I think around that time, we had about seven.

The function was to do all the agreements and to protect us. Also we had a tremendous amount of trademarks. Every time we bought a trademark, usually it was -- most good brands that we purchased all had trademarks in a hundred countries and then in ten different ways. They all had their own different types, whether it be a horse or a something.

So we had a big trademark maintenance team, because renewals were constant, and also a big licensing agreement team. And then we hired different people as we continued to grow. And I think in 2014, we had about seven full-time lawyers besides four, a few associates. Then we had these three large outside firms.

MBHYCOL3          Cole - Direct          Page 2360

Q. And in the finance and accounting function at the company, can you just speak to your perspective on what the role of the CFO and the finance and accounting personnel at the company was.

A. Just to work with the banks, the auditors, deal with -- I think Mr. Shapiro called it the "engine." I look as it more as the gas. But just dealing with money and making sure that reporting was correct, making sure that bills were paid on time, making sure people paid us, just handling the day-to-day finance of a company.

Q. We've heard a bit about this trial about Friday at Fives.

A. Yes.

Q. Can you just speak to the jury a bit about what you used them for, what your practice was for them.

A. Yes. I think it was my brother's idea, but I adopted it and loved it because you got to see what everyone was doing. I traveled a lot. So I asked everyone, give me a couple of pages every Friday and tell me what you're doing, what's going on, do you need my help, what are your plans for the next week or two. It was kind of just a way to keep me knowing because a lot of people felt I ignored them, and a lot of people felt I was too much in their business.

So it was a little bit of all. But it was a wonderful vehicle to keep abreast of what's going on in the company, especially as it got really big.

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL3     Cole - Direct     Page 2361

Q. And we've seen during the trial some forecast documents. Can you just speak to what the purpose of those was from your perspective.

A. These were to help me understand where we were with our budgets and our guidance and consensus. It basically -- every month how much money came in in royalty. We'd true it up so we got to keep counting where we were in the quarter in the year. So it was for visibility in understanding what was happening from the finance side and performance side.

Q. And now let's turn to the international joint ventures undertaken by Iconix. Can you just speak to the strategic rationale behind those joint ventures. Why did the company pursue them?

A. Well, we were in New York City. And when we bought a brand, it usually had a couple of international deals because America is the king of entertainment, the king of brands. So every acquisition had deals in different countries. We never felt we were really getting paid. Because they were so far away, we didn't know what was going on. I was based in New York with a young child at the time. And the last thing I wanted to do was to be on planes everywhere, not that I would go to Australia and know what to do. I didn't know the culture. I didn't know the people. I didn't know the celebrities and which brands to buy. So the

MBHYCOL3     Cole - Direct     Page 2362

concept was to find someone in the territory who we could all align with, someone that could be our partner. Just to get another licensee, we didn't think that would really work, because, whether to get paid or just -- they didn't really have the interest of ownership. So we came up with an idea, what if we sell half of our IP or intellectual property or brand in the territory and have a strong partner. So that was the concept of the original JVs.

Q. At the time you just testified you came up with the model, was that something that other companies were doing? Was that sort of a known structure in your experience?

A. I don't know. We were kind of leaders, and nobody was kind of doing what we were doing, at least in the fashion business. I believe -- to me, there are great other IP companies that people don't really think of as IP companies let's say like Microsoft is really an IP company or Coca-Cola who owns a formula. So I'm sure there are different ways. But this wasn't what I thought other people were doing. I thought this was best for us; that if we found a great, trusted partner who was embedded with the retailers in those territories and the culture, that -- our goal was to have Iconix in every continent with a great, reliable partner.

Q. Did you work with lawyers and finance professionals to come up with the joint venture model?

MBHYCOL3     Cole - Direct     Page 2363

A. We did. We worked really hard with White & Case and then Gibson, Dunn and BDO. I think Larry was up here saying he was just an auditor, but he told us how to structure it from a finance point of view because BDO had people around the country, around the world really. So, yes. Of course we tried to hire the best professionals and put together the best structure to protect our plans and ourselves for the best operating model.

Q. And when did Iconix begin entering into joint ventures and in what territories or countries?

A. Our first one was actually with a friend -- I believe it was my brother or another friend, a guy named Silas Chou was one of our first partners. And Silas is famous in our industry because he was the original owner of Tommy Hilfiger and Michael Kors. Silas was based in Hong Kong, and his daughter was there, Veronica, and she became our president. So we took all our IP to China and sold it to him at a very modest price because it didn't have a lot of business there. I wouldn't say overnight, but in about three/four years we had over a thousand stores with our brands throughout China, incredibly successful. Our second one -- I don't know which one was the first or second. But we also did one in South America with a great family, the Falic brothers who owned I believe duty free shops. So they knew the international and South American business.

MBHYCOL3     Cole - Direct     Page 2364

And we sold them all the South American IP. I think it was like $6 million or 50 percent of it. And overnight, it became worth $20 million or $30 million of royalty. So we had two incredible success stories in our first few years. Maybe through '06, '07, '08 is when that happened.

Q. There's been some testimony during the trial about put-and-call options in connection with the joint venture transactions. Can you just speak to that feature and your perspective on that, please.

A. We started doing a lot of deals. We did a deal in Australia with Dunlop. We did a deal in India with Reliance, the Reliance Group, who was the largest company in the country. So I think we had six or seven powerful partners. And we started realizing that they all kind of have different agendas necessarily than us. Some of them would be amazing and put a lot of resources like Silas and his daughter. Others would like park us and were not that interested. So we decided that we needed a feature in the JVs to be able to buy it back or they would sell it to us. So we came up with this put and call. I think David Blumberg in our office who was in charge of strategy who had a lot of M&A being background and banking. So we started putting those features in our deals in the middle, somewhere around '08, '09, and '10.

# A-1025

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

---

MBHYCOL3     Cole - Direct     Page 2365

Q. And the government's allegations in this case relate to a joint venture partnership between Iconix and initially Li & Fung and then GBG. I want to turn to that topic now.

First, what was the relationship between Li & Fung and GBG?

A. GBG came after. Li & Fung was our licensee in a lot of businesses. It seems like when we bought Rocawear, they were one of the largest licensees of Rocawear. When which bought Ecko, they were one of the largest licensees of Ecko, Zoo York, and others.

So when we acquired brands, usually Li & Fung was on the list of our new licensee. So I started to build up a really good relationship top to bottom in the company. The CEO, Bruce Rockowitz, became a friend. I met Victor and William Fung in Hong Kong a couple of times. And Dow Famulak became a personal friend of my wife and I.

Actually Lizzy, my wife, used to work at Li & Fung. Then I also got to know Jason along the way. Our kids went to school together.

Q. You're speaking about Mr. Rabin?

A. Yes. Jason Rabin. So I kind of knew a lot of people in the company. And I always thought if we ever wanted to sell the company, they would be the perfect company to do it because they didn't have brands and they were doing 20-some-odd-billion dollars and were the largest supply chain company in the world.

---

MBHYCOL3     Cole - Direct     Page 2366

So I always looked at them as the end strategy. So that's how I looked at Li & Fung.

Q. What do you mean by the "end strategy"?

A. I always thought that the business we built we could sell to them one day in a merger or something. So they were always an important partner of mine or the company.

Q. How would you characterize the nature of the relationship that Iconix ultimately had with Li & Fung?

How would you compare that to relationships the company had with others, whether they were licensees or whether they were other business partners of different types?

A. Li & Fung was our biggest customer. And I think we did about 11 percent of our business -- I think they brought in about $50 million a year. I think we had 18 or 19 licensing agreements, joint ventures, or agency agreements. So they were our largest customer. I think WalMart was number two, and Target was number three.

Q. I want to turn to the Southeast Asia joint venture.

Was that, to your recollection, the first joint venture transaction Iconix entered with Li & Fung?

A. SEA-1?

Q. Yes. SEA-1.

A. Yes. That was our first.

Q. Just specific to SEA-1, recognizing it may not be that different, what was the rationale for that transaction from

---

MBHYCOL3     Cole - Direct     Page 2367

your perspective?

A. As I mentioned, Li & Fung would be the perfect partner in Asia. They were based in Hong Kong. They had offices throughout the region. I figured they knew all of the retailers because they were the largest supplier in the region, and I knew all of them.

I shouldn't say I knew all of them. I knew a lot of the management. So I tried to -- I think I reached out to them first and asked Jason and Dow would they be interested in being our partner in the region. And that's where SEA-1 came about.

Q. And how would you describe your role, if any, in connection with the negotiation of the SEA-1 transaction?

A. I originated it. I worked with Jason somewhat. Neither of us are -- we both have lawyers and accountants and people that do the followup. I spoke with Jason about it throughout June/July/August until it closed. I guess it closed October 1.

Q. Were there others at Iconix who worked on that transaction?

A. Yes. Lots of people.

Q. Who else?

A. Dan Castle at the time was in charge of international. So he got more involved. I think he was working with Jared Margolis who you met. At the time I had my core team that started the whole international business like my lawyer, Andy Tarshis, my general counsel.

My CFO, Warren Clayman, was very involved in that

---

MBHYCOL3     Cole - Direct     Page 2368

deal. They had done numerous other joint ventures. So it was kind of a boilerplate at this point I'd say. Barbara Becker at Gibson, Dunn was our attorney who oversaw the whole team that had done I think five or six other JVs of its kind worked on SEA-1.

Q. When the deal ultimately concluded and the transaction documents were complete, did you sign the SEA-1 deal documents on behalf of the company?

A. I did.

Q. Can you just speak, in brief, about your practice with respect to signing deal documents.

A. I signed them. As Mr. Shapiro said yesterday, although I think he was exaggerating, he said we had tens of thousands of deals. I thought it more like a thousand. Every day on my desk there was a stack.

My assistant had these beautiful yellow tabs. We had a signing table. I went over there and literally got my hand sore signing docs, whether it be trademark registrations, whether it be license agreements, whether it be financings. I signed a lot of stuff.

Did I read most of it? I didn't read most of it because I had great people around me. Usually my lawyer stood over me and told me the deals that I was looking at. I had a review sheet on everything.

I shouldn't say all of them, but a lot of times I had

---

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL3     Cole - Direct     Page 2369

a review sheet. So I knew what I was signing. And they would talk to me and tell me what I was signing and what I was doing because I'm an attorney, and I know how important it is to documents and signing documents.

So I would never sign something I know nothing about. But I asked questions, usually what the price is and what they're getting, and I signed.

Q. And what was your general understanding as to whether finance and accounting professionals at Iconix reviewed the transaction documents for SEA-1 prior to your signing those documents?

A. I would assume every document we signed we had a pretty intense legal team, whether it be in-house or out-house, when I call them out-house lawyers. But we had -- and the accountants. BDO knew everything we were doing before we did it.

So we were pretty -- the company was growing very quickly, and lots was going on. So we had lots of professionals around us at all times. That's why we had the best well-known law firms in the world like Gibson, Dunn and White & Case working on everything we did.

Q. We've heard some testimony at this trial -- and I asked you a general question earlier -- about the put-and-call options in various joint venture agreements that the company entered into.

Did the initial Southeast Asia joint venture

MBHYCOL3     Cole - Direct     Page 2370

agreement, to your recollection, include put-and-call options?

A. I believe so.

Q. And was there, to your recollection, a backstop or a floor in the initial SEA joint venture for the put-and-call option?

A. No. There was never a backstop or a floor in anything we did or any JV we did that I can remember. I'm sure the prosecutor is going to look for one tonight. But I don't recall any backstops. I personally believe it was a Seth Horowitz/Jared Margolis invention that happened in SEA-2. Again, that's my belief. I can't imagine, when I look at that deal, how that came about.

Q. Let's move forward to the SEA-2 transaction and that time period.

And first, I just want to ask you a high-level question about your working relationship with Mr. Horowitz.

How would you describe your relationship with Mr. Horowitz during the time that you worked together?

A. Complicated. When Seth joined us, I had known him. Actually, we went to the same temple. Seth, you know, he was different. He wanted to be the boss. He wanted to have his own little group, and he kind of came in and was very insular.

He brought in a coach, if you call it that, not the Coach that Mr. Markus or Mr. Hecker was referring to. But he had this guy named Steen Kanter who I ended up hiring as our counselor to mediate between the two of us.

MBHYCOL3     Cole - Direct     Page 2371

And Seth would close his door and want to do it all. He didn't want to share. He didn't really care about other people in the company helping him. He wanted to have his own little team.

And we became pretty -- I don't know if we had a relationship like that in the beginning of a company. I saw in this trial and in the last proceeding that at the time he was looking for a job, and I was looking for a replacement.

We were at each other all the time because, you know, he didn't c.c. anybody. He wanted to be the boss, and he wanted to have people underneath him. He didn't talk to any people level with him. And I ended up losing a couple people at the time who came to me and said it was Seth. I lost someone who went on to become the leader of a great licensing company.

After about six months, we kind of calmed down, and he was a hard-worker. And you could see by his Friday at Fives that he was doing a lot of stuff. He was doing a lot of production.

And I guess about a year-and-a-half or two years into the job, I had lost a couple of key people that had made a lot of money. One retired, and one moved back up to Connecticut.

And we had never had a chief operating officer before. So I decided to give Seth -- and he wanted to be president. I did not want him to be president at the time. So I gave him

MBHYCOL3     Cole - Direct     Page 2372

the title of COO in March of 2014 which ended up being the biggest mistake of my life.

Q. How did Mr. Horowitz's responsibilities change as a result of the promotion to COO?

A. A little more contact with me. He used to be up on a different floor. He came down to the executive level. He started -- he was still running the men's brands. I don't think we hired a replacement to run all the men's brands.

He went with us on the work on CAA and when we originally went out to LA to meet all the partners at CAA. So he was part of the executive team, along with a couple of others with us.

And then he took over the relationship, which was now GBG because -- actually, it wasn't GBG. It was still Li & Fung. He took over that relationship when I was doing a lot of other things at that time.

And also it was a little bit uncomfortable to me because I did have a personal relationship with Jason Rabin where I didn't want to do it. So I thought Seth would be better to do those kinds of JV deals.

Q. What do you mean about the personal relationship and that causing you not to have the direct interaction?

A. It was very hard. Jason was always asking me for stuff. I would rather be his friend than work day to day. And Dow was a real personal friend of mine. So I thought it was best that

# A-1027

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL3          Cole - Direct          Page 2373

Seth do it.

Plus I was working on a couple of what I would call transformational deals, changing the whole company. So I thought Seth would be best to handle the Li & Fung relationship.

Q. Since you just referred to it, what were you spending your time on in the spring to early summer part of 2014?

A. We came up with this amazing idea. A friend of mine actually had a big bank -- it's become a big bank -- who was very close with the partners at CAA. So the concept of taking this large licensing company at the time and combining it with the largest talent agency in the world we thought would be amazing.

It would be transformational for us, etc. So I was pretty excited and focused on working with CAA and spent a lot of time with Bryan Lourd, Richard Lovett, and all the CAA team trying to see if I could make that deal.

Also when I look back, not that I have real memory where I know things from Thursday or Friday like some others that have come up here, I was trying to launch a movie, which was very exciting to me. We had made a deal with Fox to launch a Peanuts movie which was the first time because Charles Shultz would never let anyone recreate his work.

So we were able to get Jeannie Schulz, his wife, to let us do a Peanuts movie which would have been the first of

MBHYCOL3          Cole - Direct          Page 2374

its kind of. I think we had deals in 70 countries. And Peanuts was our -- when we bought it, it was doing about 50 million in royalty, and it was already over 100 million.

So I was enamored. I spent a lot of time on the Peanuts movie in Santa Rosa, L.A., Las Vegas just getting involved with the movie and also involved with CAA at the time.

Q. I want to focus now on the SEA-2 transaction or the first amendment to the Southeast Asia joint venture transaction.

Who took the lead in negotiating that transaction on behalf of the company?

A. Seth.

Q. And what was your role in connection with SEA-2?

A. I was the COO. So Seth reported to me periodically on what was happening, and that was my role.

Q. And we spoke about the final agreements for SEA-1.

Do you recall whether you signed the final agreements for SEA-2?

A. I did.

Q. How would you compare, during this time period -- again, I'm focused on the time period from sort of the spring into the summer of 2014.

When the SEA-2 transaction is under discussion and when you also were focused on some of the other matters you just mentioned, how would you compare the time that you spent, for example, on the CAA potential transaction and opportunity,

MBHYCOL3          Cole - Direct          Page 2375

to the time that you spent directly working on the SEA-2 transaction?

A. I spent very little, almost no, time on SEA-2 or working with Li & Fung. I saw a few phone calls which I'm not so sure they were on SEA-2, and I read Seth's Friday at Fives. But I spent zero time in negotiating SEA-2. But I was running the company, and we had lots going on, besides what I mentioned before about CAA and the Peanuts movie.

Q. And how would you compare your involvement in the SEA-2 transaction and the negotiations in particular of that transaction with your degree of involvement in negotiations around the initial joint venture, the SEA-1 transaction?

A. I was a lot more involved in SEA-1. I worked with the lawyers. I worked with the accountants. I worked with the team. I spoke to Jason periodically and negotiated the numbers, and I never did that in SEA-2 or SEA-3.

Q. What, if anything, do you recall about the negotiation of the SEA-2 transaction?

A. I recall -- there were a lot of negotiation because it was a very tricky time. When you say what do I recall, let me put a caveat that, as I mentioned, I've been through four different investigations.

So I've seen lots of documents, and I've seen lots of people testify. So I'm not sure when I'm recalling, am I recalling from 2014, or am I recalling from everything that's

MBHYCOL3          Cole - Direct          Page 2376

happened to my life over the last seven years. So I don't know if I'm recalling from the date.

But if you want to ask the -- maybe you could be a little bit more specific about the question.

Q. I'm happy to be more specific.

Do you recall whether kind of the component parts of the transaction shifted over time?

A. Yes. The transaction was moving all over the place because originally, Li & Fung was involved -- I'm sorry. Lee Cooper was involved, and it was a $25 million deal. And then at one point, it went down to an $11 million deal, and it closed at around $60 million or $59.

So I saw all the moving parts. I even saw it two hours ago when the government presented charts. Once again, I'm not going to say when my recollection is exactly from. But I know it was a complicated deal only because Li & Fung was -- you had I think a $3 billion company spinning out of a -- and they kept talking to their lawyers and changing the deal based on what was happening. I've also seen all the forecasts and stuff.

Q. And you mentioned Lee Cooper being one the moving parts.

What is Lee Cooper, and how was that part of the business doing at the time SEA-2 was under discussion?

A. Lee Cooper was or is a denim brand based out of the UK, and Iconix had bought it about a year before, maybe two years

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBHYCOL3          Cole - Direct          Page 2377

before. I believe we paid $68 million for it. It had hundreds of stores all over places like Israel, because I saw them, and places -- in the Middle East, and in Turkey it had a huge business. So in Europe it was kind of like a Levi situation of denim. So that's what I know about Lee Cooper.

We had an office in London. We had a couple of offices in London because but the JV that Angela Farrugia ran was in London. But then when we bought Lee Cooper, there was another office in London.

And Angela wanted to run Lee Cooper. So she wanted to take over that office and merge the office. So she was the biggest proponent at Li & Fung who really wanted Lee Cooper along the way. So she was pushing management to make Lee Cooper part of the deal, and Lee Cooper was doing well throughout Europe at the time.

Q. Mr. Cole, I just want to ask you a follow-up question about the point you were making with respect to recollection because I think it's important that it's clear.

Are you making the point that it's a little bit difficult for you to parse what you recall sitting here today about events in 2014 versus what you've seen in the course, for example, of this trial?

A. Yes. I've seen these documents so often unfortunately.

MR. THOMAS: Objection, your Honor.

THE COURT: I'm sorry. Do you want to come to

MBHYCOL3          Cole - Direct          Page 2378

sidebar.

(Continued on next page)

MBHYCOL3          Cole - Direct          Page 2379

(At the sidebar)

MR. THOMAS: I assume that Ms. Dabbs does not want us to inquire about Mr. Cole's participation in the various investigations that have occurred. I count this is the fourth time that Mr. Cole has explained or elaborated to the jury about the many times he's been asked questions.

We're getting to a point where we think we would be entitled to inquire into those events. I just wanted to put that marker down because at this point, Mr. Cole has adverted to these past investigations on numerous occasions.

MS. DABBS: Well, I think he's struggling with -- and the only reason why I asked the follow-up question was because I think the way it initially came across, it may not have been clear.

But we can move on so that there is not another occasion for that to be mentioned. I don't think the way that he's described is such that it would now permit the government to now approach -- the jury also has heard about a special committee, and they understand that the SEC was asking questions.

So I'm not sure that there is anything that is not already effectively in front of the jury in terms of the substance, and I don't think it would be permissible to get into more details of those things in this proceeding.

THE COURT: I guess I didn't quite understand what the

MBHYCOL3          Cole - Direct          Page 2380

objection was about. He has, I guess by way of explanation, as to why he's not going to remember certain details, said that things are starting to sort of meld together in his mind.

I don't think he's connected it to an extent -- but he may. We'll say -- that would permit the government in fairness to go back over certain prior investigations. I don't think we're there, and I don't think that's where you want to go.

MS. DABBS: Certainly not, Judge.

THE COURT: So let's move it along.

MS. DABBS: Okay.

MBHYCOL3          Cole - Direct          Page 2381

(In open court; jury present)

BY MS. DABBS:

Q. Mr. Cole, I had asked you some questions about Lee Cooper.

Was Lee Cooper ultimately included in the SEA-2 transaction?

A. No.

Q. And from where you sat and your understanding of the discussions around this transaction, how were things left between Iconix and GBG with respect to Lee Cooper at the point when the SEA-2 transaction concluded?

A. I had numerous discussions with I'll call top management. I spoke to Ron Ventricelli. I spoke to Dow Famulak and saw correspondence from Bruce that they wanted some sort of my word or just they asked me to keep Lee Cooper available to them down the road, and I told them I would.

Q. So GBG was interested in pursuing it at some point in the future?

A. Yes, they were.

Q. Mr. Cole, did you make a verbal agreement with GBG to increase the purchase price for SEA-2 by $5 million in exchange for Iconix agreeing to pay $5 million back to GBG in the future?

A. No.

Q. Were you aware of any verbal agreements with GBG to increase the purchase price for SEA-2 by $5 million in exchange

MBHYCOL3          Cole - Direct          Page 2382

for Iconix agreeing to pay $5 million back to GBG in the future?

A. Absolutely not.

Q. What conversations, if any, do you recall having with GBG in connection with the SEA-2 transaction regarding future marketing payments?

A. None.

Q. Mr. Cole, did Iconix undertake any commitment or obligation to GBG in connection with the SEA-2 transaction that was not reflected in the written transaction documents?

A. No. The written transaction documents is how we ran our business.

Q. What do you mean by that?

A. It's a contract, and how could I possibly rely on oral. Everything we did was in writing, and I'm an attorney. And that's how you do business, especially in a large company. Because there were so many people working for me, how could I possibly know what everyone is negotiating or thinking or talking.

Q. When was the first time that you recall hearing someone claiming that there was a supposed verbal agreement to pay GBG back for a portion of the SEA-2 purchase price?

A. When Seth resigned in the middle of April 2015, he came out with this outlandish claim, which he had never mentioned to anyone before in any form whatsoever, including the thousands

MBHYCOL3          Cole - Direct          Page 2383

of people, investors, and professionals. It came out of nowhere nine months later.

Q. I want turn now, Mr. Cole, to the second amendment to the SEA joint venture or what we've called at various points the SEA-3 transaction.

Who negotiated the SEA-3 transaction on behalf of Iconix?

A. Seth Horowitz.

Q. And what brands or territories were involved?

I guess what brands and territories were involved, to your recollection, in SEA-3?

A. It was our two UK brands, Umbro and Lee Cooper, for China, greater China, some of the territories.

Q. And we talked about Lee Cooper a bit.

What sort of a brand is Umbro?

A. Umbro is a wonderful football brand. And when I say "football," most know that in America we call it soccer. But Umbro was around for a hundred years, and it was the outfit of Team London or England and had a really incredible history. We bought it from Nike for 200 -- 20-some-odd-million dollars about maybe in 2011/2012.

So it was a great football brand. And in thinking back, that's why Seth and I probably got along better, because he spent a lot of time in Manchester with Umbro, and he had something where he could run and that I didn't know anybody.

MBHYCOL3          Cole - Direct          Page 2384

So it was a brand that Seth ran out of Manchester, England.

Q. And what was your understanding at the time -- so this is in the sort of later summer/early fall of 2014.

At the time when the SEA-3 agreement is under discussion, what was your understanding of how GBG felt about the two brands that were part of that transaction? Lee Cooper and Umbro.

A. They were very excited about both, especially Angela, who was a UK person and knew both brands well. And they were also I know at the time talking to David Beckham about doing something.

They thought there could be some relation with Umbro and David. So they thought both were amazing deals. I hate to use words that other people have used up here. I don't know if it's "sick" or "amazing," but they were very excited about both brands.

Q. And what was your role in connection with the SEA-3 transaction?

A. I was the CEO, and I led Friday at Fives. I don't remember a single direct discussion. I'm sure I spoke to Seth about it, seeing it in his Friday at Fives. But I don't remember any negotiation in any part of that deal or contract.

Q. What, if any, obligations or commitments did Iconix undertake to GBG in connection with the SEA-3 transaction, other than those set forth in the written transaction

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

---

MBHYCOL3    Cole - Direct    Page 2385

documents?

A. Absolutely none.

Q. You've heard some testimony earlier in this trial and even today about the Kids Headquarters license agreement for Rocawear Kids.

Do you recall that generally?

A. I do.

Q. What, if anything, do you remember about that license agreement?

Can you just set that up for us.

A. When we bought Rocawear Kids Headquarters, which was Jason Rabin's prior company before he and his family sold it to Li & Fung, had a license for Rocawear, and it was a large business.

Rocawear at one point was a billion-dollar business at the heyday of they called it urban brands. And I think it was doing over $125 million when we bought Rocawear. I remember having my first meeting with Jay. Jason came with me because he was a large customer or a large licensee, one of the largest licensees.

So come I think in '14, it wasn't doing so well anymore. That whole -- Macy's used to have a whole floor called urban with tons of brands like Ecko and Rocawear and various others, FUBU and Southpole. And that kind of down trended. All the big logos and that business started to go the other way.

---

MBHYCOL3    Cole - Direct    Page 2386

So we had just signed an agreement that has been in this trial. We just signed a renewal with them about a year prior which had substantial minimums. So Jason would often call me and say, how the hell do I get out of Rocawear or give me some concessions or lower the minimums.

So that was a common theme for about let's say six or eight months starting sometime in 2014. But we never did. I was fine with it if I found a replacement. Why would I give away money or give away a solid contract from a great credit unless I found a replacement. We never found a replacement, and we never terminated, and they paid us every penny they owed us.

THE COURT: That takes us to the end of the day, ladies and gentlemen. We'll get back together tomorrow morning. Be safe getting home. Please do whatever you need to do to be here on time. Don't discuss the case or read anything about the case or listen to anything about the case.

(Continued on next page)

---

MBH5col4    charge conference    Page 2387

(In open court; jury not present)

THE COURT: Okay. Everyone can be seated.

We are getting together again at 5:00.

Is there anything that anyone wishes to raise at this point?

MR. THOMAS: Not from us, Judge.

MS. DABBS: No, your Honor.

THE COURT: I do have a matter on, a criminal matter, which I will hold here. You can leave stuff around, but do be aware of that.

(Recess)

(Continued on next page)

THE COURT: Just you, Mr. Rodriquez?

MR. RODRIGUEZ: Well, Mr. Thomas finds himself occupied. Mr. Lenow? Your guess is as good as Mine, Judge.

THE COURT: Are we expecting him?

MR. RODRIGUEZ: We are expecting him. We are not waiting for him.

THE COURT: We have a couple of minutes.

In the meantime, can I ask, are you going to have another witness?

MR. HECKER: No.

THE COURT: So there is a chance that we finish tomorrow?

MR. HECKER: We might have to ask Mr. Thomas that

---

MBH5col4    charge conference    Page 2388

question, but yes.

THE COURT: Because you seem to be making, at least in my mind geographically, a lot of progress, Ms. Dabbs.

MS. DABBS: Yes. I think there are, we were about halfway through, I would guess, from the materials that I had in front of me, and I am obviously going to do a little more work tonight, your Honor, so that may shift a bit.

THE COURT: You should rest.

MS. DABBS: Good advice.

THE COURT: OK. We are all gathered.

You have all received my draft instructions. I suspect that this session, hope against hope, that it won't be too lengthy because we have been through this exercise before. As the parties can see, I guess particularly the government, I included some of the language that you wanted me to include. I did not include a lot of other language.

As I am sitting here I am recalling that you wanted me to put in the history and rationale of the securities laws. I did not include that. You wanted me to put in, I guess what substantially came from the guidelines that were put in through Mr. Shapiro, and I am thinking about the bullet points, etc. I did not put that in. The parties are also aware that there is a front section that's basically boilerplate, there is a back section that's basically boilerplate, and then the middle section is what we should be concentrating on.

---

## A-1031

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBH5col4     charge conference     Page 2401

evidence that an exchange..." towards the end, "the government promised to bring that cooperation to the attention..." I believe it should say, "to the attention of the sentencing Court."

THE COURT: Right.

Anything from you, Mr. Hecker?

MR. HECKER: Not on that.

We do object to the uncalled witness instruction --

THE COURT: OK.

MR. HECKER: -- which currently reads that each party had an equal opportunity or lack of opportunity to call any of these witnesses. We think that is inaccurate in this case, particularly as it relates to Ethan Cole, which we obviously have spoken about at length. Our request would be to give a Judge Sand instruction on missing witnesses not easily available to the defendant and I'm happy to propose language, but we don't think that the instruction, as given, is accurate here.

MR. RODRIGUEZ: So, your Honor, I suppose it is now my turn to say that that's now how it was done last time because that's now how it was done last time. The way it was done is the way that the Court is proposing it here, and obviously the Ethan Cole issue was just as ripe last time as it was here.

I disagree on the merits with Mr. Hecker that the kind of instruction that he is requesting is appropriate. What the

MBH5col4     charge conference     Page 2402

law says is that to get the kind of instruction that Mr. Hecker is requesting, which is not the one that's here that the Court has proposed, Ethan Cole would have to be "peculiarly within the control of the government." And I think the Second Circuit law is clear that in these circumstances he is not. Just because the government has chosen not to immunize him does not put him within the control of the government. He has chosen, on his own, to invoke and to plead the Fifth. That does not put him in the control of the government. And so, the kind of instruction that Mr. Hecker is requesting here would not be appropriate. The one that the Court is proposing here would be appropriate or no such instruction at all.

MR. HECKER: Your Honor, two things. One is I don't think the issue was framed this way before the last trial and one significant difference was the statute of limitations as to the underlying conduct would have expired, which is why we re-raised this issue as aggressively as we did. So that's the reason -- that's the reason we don't think it is accurate to say that he was equally available to both sides. It is quite clear the government could have chosen to immunize him and didn't and, in fact, did the opposite, which was to suggest to his counsel that he could be charged based on information he provided to the government separate and apart from the underlying crime.

If the Court is going to give the instruction, at the

MBH5col4     charge conference     Page 2403

very least we would just ask to delete the sentence that we think is really inaccurate: "I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses." I mean, that is just not true, not even close to true on these facts.

THE COURT: How is it not? I mean, in any particular case there is always -- and obviously, as you are aware, this is an argument that is made in every case and I don't see how Mr. Ethan Cole's situation makes this case any different. The government is always free to immunize whoever they want, and for their own reasons they don't. That doesn't make this instruction inaccurate. Moreover, I think it would be prejudicial for the government not to let the jury know that this is the case.

MR. HECKER: I mean, I understand the Court's ruling. I would say if you read that instruction without that one sentence it's still telling the jury not to draw any inference or reach any conclusion as to what they would have testified to so it is not like it is an instruction that we like, but I do think that one sentence is just -- just feels very off here.

MR. RODRIGUEZ: Your Honor, I would just add, I think that is part of the standard instruction here and the government would request that it be kept.

THE COURT: Yes. I'm going to keep it.

And then, as I am looking down the page, it does

MBH5col4     charge conference     Page 2404

appear that particular investigative techniques is not appropriate in this case.

MR. RODRIGUEZ: We were going to raise that, your Honor, yes. I don't think it is that kind of case and so the government would have no problem omitting that instruction.

THE COURT: Any objection?

MR. HECKER: One moment.

(Counsel conferring)

MR. HECKER: I think it is fine.

THE COURT: So, that section comes out.

MR. MARKUS: Your Honor, I'm so sorry. Just to go back to the uncalled witness instruction, that one line. I do plan on saying in closing, Where is Ethan Cole? And the government will now cite this instruction and say the defense could have called him to the stand and they'll say the Judge is going to instruct you that the defense had an equal opportunity to call Ethan Cole, which that's not correct, we could not -- we could not -- it is impossible to call Ethan Cole. So, if the government is planning on using this instruction that way, that would mislead the jury.

MR. RODRIGUEZ: Your Honor, I kind of agree because that's not what we would say. What we would say is we had an equal opportunity or lack of opportunity to call Mr. Cole and, therefore, it is appropriate.

MR. MARKUS: But that's why Mr. Hecker's suggestion to

MBH5col4    charge conference    Page 2405

take that sentence out is correct, because then the rest of the instruction, you can't draw any inferences. Then the government can make that claim. But to say that each party had an equal opportunity, we did not have an equal opportunity with the government, only they had the opportunity to call him.

THE COURT: I'm not going to change it. Preparation of witnesses.

MR. RODRIGUEZ: Nothing from the government.

THE COURT: Mr. Hecker?

MR. HECKER: No.

THE COURT: Charts and summaries.

MR. HECKER: Were there summaries?

MR. RODRIGUEZ: So, your Honor, candidly, just the reference to the particular exhibit numbers, I wasn't sure -- here is what I would say. If the defense wants that in, the government has no objection to it, but given the penultimate sentence, I don't think the reference to the particular exhibit numbers is necessary. But, again, we will defer to the defense on that.

MR. HECKER: I think we want it clear which are demonstrative exhibits.

THE COURT: OK. I will keep them in. Stipulation stays, correct?

MR. RODRIGUEZ: Yes, your Honor.

MR. HECKER: Yes.

MBH5col4    charge conference    Page 2406

THE COURT: Sympathy or bias, punishment.

OK. Unless there is any typographical or grammatical errors on the balance of this I'm going to keep my usual language.

MR. RODRIGUEZ: The government didn't have anything else on this.

THE COURT: So then the only outstanding issue is the defendant's theory of the case, correct?

MR. HECKER: One thing that is not in here other than that is law enforcement testimony charge, a standard charge, given that Special Agent Collins works in the greatest law enforcement investigative organization in the world.

THE COURT: In the world.

MR. HECKER: We should probably include it.

MR. RODRIGUEZ: No objection.

THE COURT: OK. So I will just stick my usual instruction in, you will get a copy of it --

MR. HECKER: Thank you.

THE COURT: -- prior to it being made final.

Now, with respect to the theory of the case, I haven't had a great deal of time to look at this but my inclination is to give less than what the defense asked for and more than what the government asks for.

MR. HECKER: Part of that sounds good.

THE COURT: So, we are done. I would keep, or what I

MBH5col4    charge conference    Page 2407

would provide to the jury is the defense's first paragraph. Any objection to that?

MR. RODRIGUEZ: Yes, your Honor. May I?

THE COURT: Sure.

MR. RODRIGUEZ: Before getting into the specific objections, I just want to start with sort of three principles which I think the Court is familiar with.

One, obviously the defense is entitled to this instruction but they're not necessarily to entitled to the wording of their choice.

Two, the statements in here, to the extent they are statements about the law, must be correct statements about the law and the last sentence of the first paragraph is not a correct statement of the law and this is something that was addressed last time. That will be the primary objection.

The third point is, again, while they are entitled to a statement about the theory of the defense, they are not entitled to advocacy and martialing of the evidence which is what clauses like "unlike other joint venture contracts, like SEA-1 and MENA." That's an example of advocacy and martialing of the evidence. But, I think the core issue here is the issue of the contract. It is not a correct statement of the law to say that because the written contracts did not include these binding commitments that Iconix was not obligated to make the payments. That is not a correct statement of the law. I

MBH5col4    charge conference    Page 2408

think, as your Honor put it last time, the merger and integration clauses mean nothing if the intention behind them was corrupt. And so, it is certainly appropriate, in closing, for the defense to say, Ladies and Gentlemen of the Jury, you should consider these merger and integration clauses as evidence, as circumstantial evidence of the fact that these alleged side deals didn't exist, or that Mr. Cole believed in good faith that they didn't exist. But they are not entitled to this instruction which is legally incorrect.

THE COURT: Mr. Hecker?

MR. HECKER: Well, first of all, we don't make any mention of the integration clause in this instruction; and second, the whole point of this is to look at the case from the defendant's perspective and explain what his defense to the charge is. I think it is quite clear that Mr. Cole's theory of the defense is that he didn't make a binding commitment and the reason he didn't is because it wasn't in the written contract. That was his understanding of why it wasn't a binding commitment, it is evidence of his good faith. So, I think that's all this says. It doesn't say, As a matter of law, I instruct you to find X, Y, and Z. That's not what this is.

THE COURT: Isn't there another place in the instructions, and I am forgetting where, where we talk about particular witnesses' understandings about the agreements is not binding on you, the jurors?

UNITED STATES OF AMERICA, v.
NEIL COLE

TRIAL
November 17, 2022

MBH5col4     charge conference     Page 2409

MR. RODRIGUEZ: I would have to look, your Honor. I'm sorry.

THE COURT: Do you have that Mr. Troncoso?

LAW CLERK: I am looking through as well. Yes. Any testimony you may have heard --

THE COURT: Tell me what page.

LAW CLERK: It is on page 8, I believe.

THE COURT: You believe?

LAW CLERK: Yes. It says: Although you may consider such testimony, it is not controlling.

THE COURT: OK. At page 8, the first full paragraph.

MR. RODRIGUEZ: So, your Honor, this is with respect to materiality to investors. I don't think it goes to Mr. Cole's understanding of the contracts.

THE COURT: I am just happy I didn't make that up.

What if we were to include in that last sentence: "Moreover, Mr. Cole contends that because the written contracts on SEA-2 and SEA-3 did not include any binding commitment, unlike other joint venture contracts, it was his good faith understanding that Iconix was not obligated to give anything back to GBG."

MR. HECKER: That is exactly what I was looking to do but your Honor did it better. I think that works perfectly.

MR. RODRIGUEZ: So, your Honor, again, I appreciate the Court's middle ground here but it is still our position

MBH5col4     charge conference     Page 2410

that it is not appropriate to instruct on this. But, given the choice, we will take that.

THE COURT: It is also in a section called Theory of the Defense so, I mean, that's been the defense all along, that's what Mr. Cole testified to this afternoon, I assume he will testify similarly tomorrow, and you will have every opportunity to rebut that.

Now, a question for you all. Where should we put this?

MR. HECKER: It does seem like it should go after the substantive charge discussion because it does apply to the entirety of the eight counts.

THE COURT: So then after good faith, before venue?

MR. HECKER: Yes.

MR. RODRIGUEZ: No objection.

THE COURT: OK. Are we done?

MR. HECKER: I think we are done.

MR. MARKUS: Your Honor, I know you are going to think I'm crazy, and just tell me -- I am sure you do already, but.

THE COURT: Are we going back to the missing witness?

MR. MARKUS: Yes. I was just going to ask for, if the Court -- if I am not wasting my time, could I draft a letter tonight and submit it? Just because I do think this is a really important issue. If you are telling me there is zero chance I'm not going to waste my time with it.

MBH5col4     charge conference     Page 2411

THE COURT: There is zero chance but how you want to spend your time is no concern of mine.

MR. MARKUS: If there is no chance I won't do it, your Honor.

THE COURT: Are we done? Anything from you?

MR. RODRIGUEZ: Nothing more on this, your Honor. I was just going to raise sort of scheduling.

THE COURT: Yes. Please.

MR. RODRIGUEZ: So, I am fairly confident, speaking for Mr. Thomas, that if Mr. Cole's direct ends pretty early tomorrow, that his cross will be complete as well. It doesn't sound like there is another defense witness and so I think I am speaking for both parties when I say it's our hope that the Court would not expect the parties to close tomorrow if we got there.

THE COURT: No. I suspect that Mr. Cole -- it is my hope that his complete testimony will be concluded tomorrow. If it does, even if it's, you know, there is another hour or so left in the day, I won't require the parties to close tomorrow. That way we can spend Monday closing, Tuesday morning instructing the jury, and they can begin their deliberations Tuesday late morning.

Does that work?

MR. HECKER: Yes. Or even Monday potentially, right?

THE COURT: Unlikely, because we are going to stay

MBH5col4     charge conference     Page 2412

with the same schedule and I'm assuming that the summations will be at least an hour and a half, at least an hour and a half, and then another half hour. If I read these instructions it will take us beyond 2:40 and I -- you know, you may have noticed that I am like a toddler and I crave routine.

MR. HECKER: It's great. We all like routine.

THE COURT: So, it is my hope that we will conclude closings on Monday, I will instruct Tuesday morning, and they can begin their deliberations.

MR. HECKER: Can I re-raise the issue that your Honor mentioned earlier about the possibility, if we did have an hour tomorrow, charging tomorrow and going right to closing Monday? Because I do think we -- our preference would be to give the case to the jury with enough time that if they wanted to start deliberating Monday and then still have all day Tuesday before the very long break.

THE COURT: I'm happy to do that but the government never said whether they wished me to give the instruction first.

MR. RODRIGUEZ: So, the short answer is we are open to that. Certainly if the Court could complete the instruction tomorrow I think the situation we would want to avoid is the government closes on one day and then it is not until the next day that the defense closes. So, if we were in a position where the Court could give and complete the charge tomorrow and

# A-1034

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col1     Page 2421

including trial. The government is -- there is no rule that says the government has to put its pencil down when investigating when trial starts. That is just not how it works. We are continually investigating and we are continually getting new materials and what Rule 16 requires is that we produce them promptly -- which we did -- once they are in our custody, control, and possession.

So, the next question is what can the government do with these terms. The government is not seeking to introduce them into evidence. There is no indication to the government that these are verbatim transcripts or that Mr. Cole has adopted these memoranda. Instead, there is two things that the government can do. One, if appropriate -- well, we can refresh Mr. Cole's recollection with anything and so we can use these to refresh Mr. Cole's recollection, but they also give us a good faith credible basis to ask certain questions based on the things that are in the memoranda.

And so, that's what the government intends to do with these memoranda.

MR. HECKER: Your Honor, I have been practicing for 25 years and I have never had a Rule 16 statement of my client produced after he begins testifying. It has never happened before.

When Mr. Rodriquez is noting the facts, the fact that our client spoke to the special committee for two days was

MBi5col1     Page 2422

known to everyone for years and the government would have us believe that they asked politely in the past to get access to those statements or to be told what they said, which were declined by the special committee which was cooperating with the government for years on this investigation. If the government didn't believe that they couldn't get them, why did they ask -- if they believed they couldn't get them, why did they ask yesterday? They didn't learn for first time after he testified that he spoke to the special committee for two days. If that is the impression the government is trying to leave it is absolutely misleading and I don't think that is what Mr. Rodriquez is actually saying.

THE COURT: Well, we can very easily check that, right? He can drag Mr. Richards in here.

MR. HECKER: We can. We can have a hearing to determine what efforts the government made before he began testifying to get this material.

THE COURT: I would rather not go that route. I take the government at their word. I don't know how politely they asked, or not, or whether they insisted or not.

Let me ask -- well, I won't ask. I don't know that I am going to have the opportunity to read these things very carefully prior to the jury being here, although I will review them. For now the government is precluded from using them for all the reasons that Mr. Hecker said concerning the prejudice

MBi5col1     Page 2423

to Mr. Cole from the lack of having these materials prior to his taking the stand.

MR. HECKER: Thank you, Judge.

MR. RODRIGUEZ: Your Honor, I just want to --

MR. HECKER: Wait, wait. If we are going to -- if there is going to be more argument I want to make the record clear about two additional points.

THE COURT: OK.

MR. HECKER: Point one, we did not have -- this group of lawyers who was preparing Mr. Cole to make the decision about whether to testify -- we did not have Paul Weiss' notes of those interviews. And number two, I don't know whether the notes that they took match up to what this memo says he said. And we can't know that. So, the fact that Mr. Cole knew seven years ago what he said is of no moment, at all, in terms of making a decision about whether to testify, or not, at this trial. And, of course, Mr. Markus points out correctly, that it is always the case that the defendant knows what he said at some prior date.

THE COURT: OK.

MR. RODRIGUEZ: Your Honor, I just want to address sort of the misconduct allegations and make the record clear on that.

Frankly, I'm not quite sure what Mr. Hecker is suggesting but if Mr. Hecker is suggesting that we coerced

MBi5col1     Page 2424

Mr. Richards into producing these --

THE COURT: I don't think that is what he is saying.

MR. RODRIGUEZ: OK, I just --

THE COURT: He is saying that you got it so easily last night, why didn't you ask before.

MR. RODRIGUEZ: And I just want to address that, and the answer is we think that the playing field changed because they produced documents in response to the Seth Horowitz subpoena. And so, what's the harm in asking if they produced documents in response to that subpoena to ask if they would make a comparable production with respect to Mr. Cole.

MR. HECKER: That happened a week and a half ago.

MR. RODRIGUEZ: But Mr. Cole testified on direct and put directly before the jury: I spoke before the special committee for two days. That's what's triggered us to ask.

THE COURT: You can't use it. I mean, I will read them but my ruling at this point is that these materials are precluded.

Anything else?

MR. MARKUS: One other issue, your Honor.

THE COURT: Yes, sir.

MR. MARKUS: I emailed Ethan Cole's -- I spoke to Ethan Cole's lawyer Ed Kim yesterday, to confirm -- because the defense has been making efforts to call Ethan Cole as a witness. I have an e-mail, we are printing it right now, we

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

Page 2425

just got it from Mr. Ethan Cole's lawyer that I will produce and we would like to file with the Court, it is from Edward Kim, Ethan Cole's lawyer, that he would confirm that Mr. Cole would -- Mr. Ethan Cole would invoke his Fifth Amendment right and decline to testify, if called by the defense.

THE COURT: OK.

Ms. Sussman, thank you for your edits. I am pretty much sure it was you and Mr. Then and someone else not sitting at the table. That was very careful, very useful. Thanks.

Anything else from you guys?

MR. THOMAS: Just one minor issue to take advantage of the time we have. I do intend to inquire of Mr. Cole about the circumstances of his departure from Iconix. He has put his credibility and time with the company squarely at issue and so I think that's fair game but wanted to flag that so we could talk about it now.

MS. DABBS: Well, I'm not sure what has changed in the posture that we have been operating under during the course of the trial, and Mr. Cole obviously testified last time and he said, simply -- in his testimony and I expect he will do the same again today -- the time frame of when he left the company and we were planning to leave it at that. So, I don't think, your Honor, that that should permit the government then to inquire about subsequent events. I don't think the fact of his testifying puts in issue all of those subsequent events. And,

Page 2426

obviously, if that's the government's position, then we might have a much more prolonged experience with this testimony and there might be other steps that we would want to take in terms of the record because that opens up a whole other can of worms.

THE COURT: I'm sorry. So, what is it that you intend to do?

MS. DABBS: I intend to ask Mr. Cole when he departed from Iconix, when he left the company, and have him give the time frame.

MR. THOMAS: Your Honor, the reason that's not sufficient to give us a fair chance to examine Mr. Cole is at least two-fold. First, throughout the trial there has been a suggestion that Mr. Horowitz somehow had it out for Mr. Cole. That is sort of paranoid thinking that Mr. Cole expresses with respect to other people at the company and the circumstances that are attendant to that are bound up with his departure. He, for example, accused Mr. Cuneo of trying to engineer a takeover of Iconix and blamed Mr. Cuneo at that time of wanting to be CEO and ousted him for that reason. It goes directly to Mr. Cole's --

THE COURT: That hasn't come out though, has it?

MS. DABBS: No, your Honor. It has not.

MR. THOMAS: That is precisely the point, your Honor. The only thing that has come out is that Seth Horowitz had it out for Mr. Cole. What the jury is entitled to know is that

Page 2427

Mr. Cole approaches issues in this way of blaming other people having it out for him and that is expressed most clearly with Peter Cuneo in his departure.

The second thing is we are not intending, pursuant to the Court's ruling, to get into the restatement or the factual finding of the special committee, but Mr. Cole has presented himself to the jury as the consummate businessman who everyone at Iconix was happy with, whose performance was satisfactory, and whose word on that company ought be taken as true and the company forced him to resign and that fact is extremely relevant.

THE COURT: As I recall, I allowed the government to re-examine Mr. Cuneo in a very limited basis concerning his view or his opinion of Mr. Cole because, as I recall, Ms. Dabbs asked him a series of questions -- it was you, Ms. Dabbs?

MS. DABBS: It was Ms. Moss.

THE COURT: Ms. Moss asked him a series of questions concerning Mr. Cuneo's opinion of Mr. Cole at an earlier point in time, visionary, etc., things of that nature, and I allowed the government very limited leeway to ask Mr. Cuneo whether his opinion changed.

And I always think to myself, oh, I shouldn't have done that, when I give either side leeway and they go off, but I think it would be appropriate for the government to inquire as to some of the circumstances of his departure from the

Page 2428

company that, you know, it wasn't exactly Mr. Cole's idea to leave willingly. Period.

Has the jury heard that there was an investigation yet? I am forgetting.

MR. THOMAS: Your Honor, the jury has heard that Mr. Cole spoke to investigators at the special committee and they heard it from Mr. Cole.

THE COURT: That's right. That there was a special committee. Yes. OK. So, I would allow some limited questioning along those lines.

MS. DABBS: OK. Your Honor, I think we will reserve the ability to object as I suppose we always do if the questioning goes beyond that because I think it is that one question, your Honor, and if that, I continue to think that is not a question that, on this record, is proper. But, I take the Court's ruling and I don't think it goes beyond that.

THE COURT: OK.

MS. DABBS: And we will be policing it carefully.

THE COURT: Very well. OK. Anything else?

MR. THOMAS: Thank you, your Honor. Nothing further.

THE COURT: OK.

(Recess)

(Continued on next page)

# A-1036

UNITED STATES OF AMERICA V
NEIL COLE,
November 18, 2022

MBi5col1    Cole - Direct    Page 2429

(Jury present)

THE COURT: Everyone, please be seated.

Ladies and gentlemen, good morning. Thank you, as always. We will now continue with the direct examination of Mr. Cole, who is reminded that you are still under oath, sir.

THE WITNESS: I understand, your Honor.

NEIL COLE, resumed.

THE COURT: Ms. Dabbs.

MS. DABBS: May I proceed, your Honor?

THE COURT: You may.

DIRECT EXAMINATION

BY MS. DABBS:

Q. Good morning, everyone.

Good morning, Mr. Cole.

A. Good morning, Ms. Dabbs.

Q. I want to return to the SEA-2 transaction, that first amendment to the Southeast Asia joint venture. Do you recall seeing documents in the course of his trial relating to the purchase price for that transaction?

A. I do.

MS. DABBS: Mr. Lam, can we pull up Government Exhibit 1029, which is in evidence?

Q. Mr. Cole, do you see that this is an e-mail from Mr. Horowitz to you on May 1st, 2014?

A. Yes.

MBi5col1    Cole - Direct    Page 2430

Q. And in this e-mail Mr. Horowitz informs you, just looking at the start of the e-mail: We have hit a few road bumps today with the LF amendment for Europe but we have a solution. And then he proposes, in this e-mail, that we can amend the Southeast Asia joint venture to extend the rights of a number of brands that are listed there, to include European distribution for $10 million gain and amend the Europe JV to include Lee Cooper for $12 million.

Do you see that there?

A. I do.

MS. DABBS: Can we pull up now Government Exhibit 1032 which is also in evidence, please?

Q. And Mr. Cole, do you see that this is another update from Mr. Horowitz to you on the status of his discussions with GBG?

A. Yes.

Q. And the date of this e-mail is May 2nd, 2014?

A. Yes.

MS. DABBS: Now let's pull up, please, Government Exhibit 1208, which is also in evidence.

Q. Mr. Cole, do you see this is an e-mail on May 14, 2014, from Mr. Horowitz to you?

A. Yes, I do.

Q. And he is providing here, according to the e-mail, a term sheet for the LF amendment?

A. Yes.

MBi5col1    Cole - Direct    Page 2431

MS. DABBS: Now let's fast forward in time just a bit and look at Government Exhibit 1038, which is also in evidence, please.

Q. Mr. Cole, do you see that this is a June 3rd, 2014 e-mail from Mr. Horowitz, to you, in which he is updating you on discussions that he is having with GBG?

A. I do.

Q. Mr. Cole, do you have any reason to think that you did not receive these e-mails that we have just walked through?

A. No. I would -- I have no reason to believe I did not see them.

Q. And did you read them at the time?

A. Probably. I have no reason to believe I didn't read them.

MS. DABBS: Now if we can please pull up Government Exhibit 234, which is in evidence?

Q. Mr. Cole, do you recognize this as one of the forecast documents from June 6 of 2014?

A. I do.

MS. DABBS: If we can highlight in the middle column there, the middle under Opportunities and Risks where it says Li & Fung JV, this document shows that as of June 6th -- actually, you know, what, Mr. Lam can we blow out of this and go back to the bottom of the document, the rows at the bottom and pull those up, please? Sure. That's great.

Q. And do you see here, Mr. Cole, that this document shows, as

MBi5col1    Cole - Direct    Page 2432

of June 6th, an anticipated purchase price for the combination of Korea and Europe of roughly $10.9 million?

A. OK. I think I see 10.4 -- 2.8 plus 7.6.

Q. Fair enough. I was looking at the purchase price row and not revenue gain.

If you look at the purchase price row and combine those numbers you get 10.9, yes?

A. Yes. I'm sorry. You are right.

Q. Mr. Cole, can you explain to the jury how you utilized forecast documents like this one during your time at Iconix? What was the discussion that would happen around this document, who would be part of that discussion?

A. If you scan down in the document it was basically a forecast for the company where we would look at all the opportunities that we had and everything that was happening for the quarter. As we got -- collected royalty, we would put it into the forecast and as we were making progress on transactions or acquisitions or joint ventures, we would also put it in.

MS. DABBS: Now if we can please pull up Government Exhibit 1041 which is in evidence? And if we can blow that up so it is a little bit clearer for everybody? Thank you very much.

Q. Mr. Cole, do you see that this is an e-mail from Mr. Cole to you on June 12, 2014?

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col1        Cole - Direct        Page 2433

A. Yes.

Q. And just take a moment to look at it and can you explain the substance of this e-mail, please? What is happening in this e-mail?

A. This is where Seth tells me that the new price that he has negotiated is $15 million for Q2 on SEA-2.

Q. And what are you being told in this e-mail about the components of the transaction, if you will?

A. I think Lee Cooper, which has been in and out throughout over the previous two months, was now going to be put off and into the third quarter and we were going to do the other two components for $10 million.

Q. Ultimately, the SEA-2 transaction closed with a purchase price of $15.9 million.

Do you recall that, Mr. Cole?

A. Correct.

Q. Do you have any understanding of what caused the price to move around during the negotiations in the way that it did?

A. GBG was going to be a new company. At the time it was Li & Fung and they were spinning out the whole U.S. licensee business -- they were mostly licensees not licensors -- into a new structure, so it would be two different public companies, one Li & Fung and one called Global Brands Group or GBG.

Q. Do you recall pushing Mr. Horowitz to get a higher purchase price on the transaction?

MBi5col1        Cole - Direct        Page 2434

A. I don't recall, but I was always looking for higher purchase prices. That was kind of my job.

Q. Mr. Cole, did you commit to GBG that you would pay them back $5 million in exchange for a higher purchase price on the SEA-2 deal?

A. No.

Q. And were you aware of any commitment or obligation to GBG in connection with SEA-2 that was not reflected in the written transaction documents?

A. Absolutely not.

Q. And yesterday, and a bit just now, we were talking about the Lee Cooper components of these discussions and I believe you have testified that Lee Cooper was ultimately not included in the SEA-2 transaction but you told GBG that you would hold it open for them down the road.

Do you recall saying that in your testimony yesterday?

A. Yes. I had spoken to top management, I had spoken to Ron Ventricelli, Dow Famulak, and I heard from Bruce Rockowitz how important Lee Cooper was and I told them we would do it down the road.

Q. Was that a promise, Mr. Cole?

A. It wasn't in the agreement so it wasn't binding but it was -- that's how I felt what I wanted to do for them.

Q. I want to turn now to the second amendment to the Southeast Asia joint venture, the September 2014 transaction that we have

MBi5col1        Cole - Direct        Page 2435

been referring to as SEA-3, and we started talking about this a bit at the end of the day yesterday and I just want to get to the point where we had gotten to so that we don't repeat or re-tread grounds.

Before we concluded yesterday we were talking about the Rocawear Kids licensing agreement. Do you remember talking about that subject, Mr. Cole?

A. I do.

Q. I believe you testified Iconix had discussions with GBG over a period of a number of months, as you recall, about GBG's desire to get out of that licensing agreement.

Do you recall that?

A. Correct, or else reduce the minimums.

Q. Did Iconix make a verbal agreement with GBG to increase the purchase price for SEA-3 by $6 million in exchange for letting GBG out of the Rocawear Kids licensing agreement or terminating that agreement?

A. No.

Q. Did Iconix make efforts to get GBG out of that licensing agreement, so far as you recall?

A. Yes. I know I personally called a lot of people and looked for prospects who would step into GBG's shoes and take over the obligation or the opportunity.

Q. And how did those efforts resolve?

A. It didn't. That part of the business segment was

MBi5col1        Cole - Direct        Page 2436

downtrending at the time and people were not looking to be -- become a replacement for that license.

Q. Mr. Cole, did you understand there to be any link between Iconix' efforts at that time to replace GBG on the Rocawear Kids' licensing agreement and the SEA-3 transaction?

A. No. There was no link.

MS. DABBS: If we can please pull up what is in evidence as Government Exhibit 1052?

Q. Mr. Cole, do you recognize this as an e-mail from Mr. Horowitz to you on -- I actually had a different date in my notes. Sorry. This is not the right number. Bear with me a second. I apologize.

MS. DABBS: We can take that down, Mr. Lam, I have the wrong number. We can come back to that.

I'm sorry, your Honor.

Q. So, I think I said Government Exhibit 1052. OK. I guess this is the right one. I apologize. I just have the wrong date.

Mr. Cole, do you recognize this as an e-mail from Mr. Horowitz to you on August 5, 2014?

A. Yes.

Q. And it appears that Mr. Horowitz is updating you on a number of different things. I want to direct you to point two of this e-mail.

A. Yes.

# A-1038

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col1          Cole - Direct          Page 2437

Q. And you see that it states there: In the interim, we are working with GBG with a goal of closing end of August. I have not mentioned the Rocawear Kids component until we agree it is the right move.

Do you see that language there?

A. I do.

Q. What was your understanding of what Mr. Horowitz meant when he referred to the Rocawear Kids component?

A. I don't -- you know, I know at the time they wanted to get out of Rocawear so, you know, I don't know whether he was considering that or could be together. But, I don't know what he was thinking.

Q. Were they components of the same thing, the SEA-3 transaction and the efforts to get GBG out of the Rocawear licensing agreement, were those part of the same thing in your mind at the time?

A. No. They were separate initiatives but GBG wanted both so -- but they were, ended up -- they were not linked.

MS. DABBS: If we can pull up Government Exhibit 1058 which is in evidence as well? This is a string of e-mails and maybe we can page forward so that Mr. Cole has a chance to see where it begins.

Q. Do you see it appears this is an e-mail string that begins on August 13th, and then if we scroll up it appears to be forwarded to you or sent to you by Mr. Horowitz and you then

MBi5col1          Cole - Direct          Page 2438

respond to Mr. Horowitz's e-mail?

Do you see that, Mr. Cole?

A. I do.

Q. In your e-mail at the top I just want to direct your attention to that. You state: Let's discuss tomorrow. Will be tough to do China without Roc Kids.

What did you mean by that, Mr. Cole?

A. It was my understanding that GBG wanted to do China and they also wanted to get out of Roc Kids, so to do these two deals at the same time I thought could be difficult. Or tough.

Q. Mr. Cole, did you mean that it would be difficult to do the SEA-3 transaction without a commitment to relieve GBG of its Rocawear licensing agreement obligations?

A. Possibly. I know that they wanted to get out. I know that we weren't going to get them out unless they found it but I do not believe it was part of the same transaction.

Q. Did you make a commitment to GBG that they would get out of the Rocawear Kids licensing agreement?

A. Absolutely not. We never did it and they paid.

MS. DABBS: We can take that down, Mr. Lam.

Q. Now, later in 2014, Mr. Cole, did you authorize Iconix to pay marketing invoices from GBG that totaled approximately $5.4 million?

A. I did.

Q. Did you believe at the time that you authorized payment on

MBi5col1          Cole - Direct          Page 2439

those invoices that Iconix had an obligation to make those payments?

A. Absolutely not.

Q. If Iconix didn't have an obligation to make those payments, why did you authorize them?

A. GBG was our largest client, I believe it was, like, 11 percent of the business, they brought in over 50 million of royalty and we had about, I think, 18 or 19 agreements with them and we were working on a lot more and I felt a little bad that we decided not to go forward with Lee Cooper, or they -- I never got the pressure so I never had to deal with it but I knew they wanted it. I also was -- felt bad that we never found a replacement for Rocawear. Also, they were having troubles in Korea where London Fog they thought was worth a lot more and it ended up being worth a little less. So, a lot of whining, and Mr. Horowitz was advocating to give them $5 million throughout the fall so I finally -- I had it in my budget, the company had a $36 million budget and we only spent around 32 or thirty-some-odd, so I decided, as I have done other times in the past, I gave them a chargeback or marketing for, it ended up being $5.4 million.

Q. Was it surprising to you that GBG was asking for marketing payments at this time?

A. No, they were always asking which was always uncomfortable so -- but, you know, we had given them marketing payments

MBi5col1          Cole - Direct          Page 2440

before on Peanuts and, you know, they were -- it is kind of what Jason did. It was known in the market with all the license -- all the companies that he was always looking for concessions or whether it be marketing money or other monies for his company.

Q. And what, if any understanding, did you have at the time about marketing work that had been done or was being done by GBG?

A. I knew TLC very well because they were my partner and I liked and respected Angela, and Melvin, and Simon Bamber was a part of that group, they had a big marketing team, a beautiful office, and Angela would tell me that the marketing people in New York don't understand Europe, that Europe is high-end and European people don't like American brands. So, she wanted to become a marketer for Iconix in all parts of the world that she thought were cool or more European-type so -- and I respected her work, she did good work through the years, and so I was comfortable with TLC or now GBG doing work with us because GBG had bought TLC right in between SEA-1 and SEA-2 so we inherited GBG as a partner when they bought TLC because TLC was our prior partner.

Q. And what connection, if any, was there in your mind between the SEA-2 transaction and the marketing invoices that you authorized payment on in the fall of 2014?

A. Absolutely none.

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col1      Cole - Direct      Page 2441

Q. You testified a bit about advertising expenses and the budget. So, is it your testimony that you had room in the budget to make the payment that was being requested at that time?

A. Yes.

Q. Mr. Horowitz testified that he spoke to you in late September 2014 regarding invoices received from GBG and sending more detailed invoices. Do you recall a conversation with Mr. Horowitz about GBG marketing invoices around that time in or about September 2014?

A. I do.

Q. What --

A. I'm not sure I recall from seven years ago but I have lived it for the last seven years so I recall the issue.

Q. And what do you recall about that conversation sitting here today?

A. I remember we got invoices that were somewhat, call it round numbers which, you know, having seen in this trial that GBG does that with a lot of their customers but for me it didn't -- wasn't right so I -- you know, this is non-contractual, so in all non-contractual money we get backup, and I asked for, to give us backup for these invoices.

Q. Mr. Horowitz testified during this trial that during a meeting with him you told him the invoices didn't pass the sniff test or needed to look more real. Is that what you said?

MBi5col1      Cole - Direct      Page 2442

A. No. And it's -- I asked him for real invoices, I did not talk about sniffing.

Q. And what happened next in terms of moving this forward and the ultimate authorization of payment on those invoices?

A. In November/December, when I agreed to do it, they sent -- as I have seen in this trial, I don't remember seeing it so much in the past -- they sent three packs of invoices, it looks like. The first two packs I'm not sure I saw because my initials aren't on them. The third pack I do remember Horowitz putting them on my desk and I do remember signing my initials on the invoices.

Q. And ultimately they were paid, correct?

A. Correct.

Q. Did you scrutinize the supporting materials that at least, in some instances, were attached to the invoices that you approved?

A. I did not.

Q. And when you approved them, did you believe that the invoices were a sham?

A. Absolutely not.

Q. Did you think that GBG was doing actual marketing work on behalf of the brands that GBG had in common with Iconix?

A. I know they were doing actual marketing work because I had seen it over the last five years.

Q. Did you take any steps to determine what the cost to GBG

MBi5col1      Cole - Direct      Page 2443

had been of the specific marketing work that they had done?

A. No.

Q. Why not?

A. It didn't -- you know, they were a great partner of ours and we had a lot of business with them in the past and even more in the future and they requested $5 million and we ended up paying them $5.4 million and I wasn't questioning the detail of the invoices.

MS. DABBS: Let's pull up Government Exhibit 1063 which is in evidence, please.

Q. Mr. Cole, do you see that this appears to be an August 18, 2014 e-mail from Mr. Horowitz to you attaching one of his weekly updates or Friday at 5:00s?

A. Yes.

Q. If we can turn to the actual update which follows, on the first page, in Section 1(b), which is labeled GBG, I just want to direct your attention to the (i) that is under that section.

First of all, Mr. Cole, backing up, do you recall receiving this update from Mr. Horowitz?

A. No, but I have no reason to doubt it wasn't sent. I was overseas at the time but I have no doubt I would have read it sometime catching up, whether it be on a plane or somewhere.

Q. And at that, that (i) in the section of the document, it states $5 million of current marketing liabilities.

Do you see that language, Mr. Cole?

MBi5col1      Cole - Direct      Page 2444

A. I do.

Q. Did you understand Iconix to have marketing liabilities to GBG at this time?

A. No. I had no knowledge of it nor did I do it -- I remember reading it at the time.

Q. Why does Mr. Horowitz refer to $5 million in marketing liabilities in this document?

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: I have no idea.

MS. DABBS: If we can pull up Government Exhibit 1069 which is in evidence, please?

BY MS. DABBS:

Q. Mr. Cole, does this appear to be a September 2nd, 2014 e-mail from Mr. Horowitz to you attaching another weekly update?

A. Yes.

Q. And if we can look at the update portion of this document, please, under the heading GBG -- the second GBG, thank you and if we look at again (i) at the top there: At Jason's request, I walked Jared through our proposed $5 million of current marketing liability.

Do you see that language there, sir?

A. I do.

Q. Mr. Cole, what was your understanding at the time of why

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

| MBi5col1 | Cole - Direct | Page 2445 |

Mr. Horowitz described our proposal relating to $5 million of current marketing liabilities?

A. I don't know. And, it says Rocawear Kids underneath it so I -- maybe he was, you know, proposing if we can get out of Rocawear Kids that -- and then fixtures. And I know they were always doing good marketing in Peanuts because they hired -- or they bought my former agent and had a big team there. So, I didn't think twice and -- because they were always proposing money.

MS. DABBS: And if we could just zoom back out here and if we could go to the second page of this attachment?

Q. There is point 10 there, Mr. Cole, titled "GBG Topics." Do you see that?

A. Yes.

Q. And then there is a list of it looks like six things under Mr. Horowitz' GBG topics update. We are not going to unpack these at any length but can you just characterize what your understanding was or what Mr. Horowitz' role was at this time with respect to the relationship with GBG?

A. Seth had taken over the relationship and it, you know, A through F are just big ideas, especially looking at F about all sorts of acquisitions and partners in Japan and China. All over the world, they were, you know, a good -- to expand the relationship we were working on we were always working on a lot of different businesses, especially they really wanted Japan

| MBi5col1 | Cole - Direct | Page 2446 |

and Latin America because we had big businesses in those places.

Q. To your understanding, did Mr. Horowitz have primary responsibility for this relationship with GBG at this point?

A. He did.

Q. Mr. Cole, when you authorized payment of that approximately $5.4 million in marketing invoices to GBG, did you view it as a liability of the company?

A. No. It was -- you know, a relationship builder and good faith and, as I mentioned, we had kind of -- I wouldn't say backed out of our word but they hadn't pressed us on Lee Cooper because they had been looking for that, very important to them. We had been unable to get them out of the Rocawear license which they continued probably to lose money on and paid us $6 million above the $21 million, and it was relationship building, which I did often. I did it with Wal-Mart, I did it with -- I wrote Wal-Mart checks, I wrote JC Penney checks, Kohl's, all important customers. I wanted to be a good partner and that's how you build business and build relationship.

Q. And did you believe that that marketing money was something that had been committed to earlier or promised to GBG earlier?

A. Absolutely not. It was never committed earlier than when it was given.

Q. Did you believe it had any relationship at all to the SEA-2 transaction that closed a number of months earlier?

| MBi5col1 | Cole - Direct | Page 2447 |

A. No. Absolutely not.

MS. DABBS: We can take this down, Mr. Lam. Thank you.

Q. There has also been testimony during this trial about a Middle East North Africa joint venture transaction with GBG --

A. Yes.

Q. -- which we have referred to as MENA. What role, if any, did you play in the negotiation of the MENA joint venture?

A. I wasn't very involved in drafting the agreements or, you know -- Seth continued to run point on the relationship but in the middle of December Seth went away, I believe to the Bahamas or somewhere, and I decided, after I thought our other competitor -- we had, I think as Mr. Burkhardt said, we were also going down two paths. We were negotiating with somebody who was in Qatar called Abu Issa, and I decided that it was best to go with GBG and I was involved in the final negotiation with Mr. Rabin.

Q. And what, if anything, do you recall about that final negotiation and the result to the ultimate result of it on the MENA transaction?

A. When I looked at it it was an arrangement that Seth and maybe Jared or Jason, it was a $24 million deal with a $6 million something giveback for something and I went over -- I remember meeting with Jason in his office at the Empire State Building and the deal closed at 18.7 with $3.1 million for

| MBi5col1 | Cole - Direct | Page 2448 |

their diligence and their work pre-deal.

Q. OK. And Mr. Horowitz speculated during his testimony that there was a $3.1 million component of the MENA transaction that may have been a way for Iconix to pay GBG back monies owed on inflated purchase prices and specifically the inflated purchase price -- the allegedly inflated purchase price for SEA-3. Do you recall there being a $3.1 million diligence or market analysis payment that was part of the MENA deal? Do you recall that number?

A. I recall there was a payment but it had nothing to do with prior arrangements or prior -- it was not in the agreement in any prior deal.

Q. And in the MENA deal was the $3.1 million market analysis and diligence payment reflected in the transaction documents?

A. Yes. Every -- I would make a bold statement but any deal that I was involved in was in contractual. I am an attorney and I know how business works and so I was -- it was obviously in the agreements.

Q. Fair to say it was in the transaction documents because it was a part of the deal?

A. Correct.

Q. Now, the $3.1 million payment that was part of the MENA transaction, did that seem like a reasonable payment to you at the time?

A. I don't recall much. I just, in my mind, I was getting

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

---

MBi5col1     Cole - Direct     Page 2449

15.6. What the other side or Jason wanted was not that relevant to me. I just saw that, you know, Iconix shareholders netted 15.6 and I thought it was a reasonable, you know, good deal for Iconix, which is what my focus was. But, I did not focus too hard on what they were asking.

Q. Was it your understanding that GBG would need to do market analysis work in connection with that transaction?

A. Yes. I believe they did. They were based -- you know, most of their business was either based in Hong Kong or London and this business was in, as Willy said, I believe lots of foreign countries and all have different rules and different issues whether it is Bahrain or Qatar or Saudi Arabia. And so, I think it was an area for them and, you know, they usually hired Price Waterhouse and did diligence so I would assume they must have done their diligence.

Q. Did you take any steps to try to determine the actual cost to GBG of any market analysis or diligence work that they had done or that they planned to do?

A. No. I didn't care. I was focused on my shareholders and my company.

Q. Fair to say that that $3.1 million was a negotiated number?

A. Definitely. It was at 6 when I got involved.

MS. DABBS: And let's just pull up, if we can, Government Exhibit 706 which is in evidence, please.

Q. Mr. Cole, this is a document that has come out during the

---

MBi5col1     Cole - Direct     Page 2450

course of this trial and as one that was created by Mr. Horowitz. Is this a document that you recall seeing in 2014 at the time of these various transactions?

A. No.

MS. DABBS: We can take that down, Mr. Lam. Thank you.

Q. Mr. Cole, I want to transition to a different topic. There has been a fair amount of focus during this trial on the ends of quarters and financial reporting periods and the importance of making numbers, whether those are guidance numbers, forecasted numbers, or analyst consensus numbers, so let's talk about that topic for a moment.

When you were the CEO of Iconix, did you pay attention to consensus estimates?

A. Yes. I paid attention to budget, our guidance, and also consensus.

Q. Why did you pay attention to those things?

A. Those were our goals. You know, we had to hit our budget to get our bonus and for the company to succeed, and when we got -- we didn't get guided quarterly, we got guided yearly because it was a little tricky figuring out when the royalty came in a week before, a week after, and consensus was what the street was projecting for the company. So, all three of them were important and I paid attention.

Q. And did you track how the business was doing each quarter

---

MBi5col1     Cole - Direct     Page 2451

relative to each of those things?

A. Sure. I would say more than each quarter. As you saw, those profit forecasts that we put together was our way of tracking kind of our -- meeting our goals.

Q. And was that the objective of meeting your goals and tracking how the company was doing relative to those goals? Was that something you discussed with others at the company?

A. Sure. My management would often discuss it, how we are doing and, you know, which -- where we are missing, which licensees are good and which are bad, and where are we looking to -- you know, very inquisitive. We bought 30 companies so we were always buying new revenue and often we were selling revenue and we were often doing joint ventures and expanding categories. It was -- I try to explain it to people, we were playing monopoly and we had lots of property and we were looking to buy property.

Q. Did you push for transactions -- referring to transactions being one of the things you were tracking, did you push for transactions to close before quarter end?

A. Sometimes.

Q. Why is that?

A. A couple reasons. You want to get credit for what is out there, number one. Number two, you -- I didn't like to announce a quarter and have what I call inside information floating out there so that some people know and others that are

---

MBi5col1     Cole - Direct     Page 2452

all working on the deal. And third, which maybe was a little pet peeve of mine -- maybe my first -- to me, lawyers never finish anything unless you give them a date. They're all -- each side is billing and billing and billing and if you don't tell them you ever want to close they'll never close. So, I was always giving lawyers dates so that they would compromise and get deals done.

Q. And were transactions, as a general matter, important to Iconix' business and, accordingly, to its results?

A. Sure. You know, we had a lot of -- always had royalty income, we were always looking to buy revenue, we were always looking to do JVs and expand worldwide so there were -- we kept the legal department pretty busy.

Q. Was that a new development in 2014?

A. No. We had done it since we started over the last 10 years. We had -- we also were very much involved in the financial market. We raised a lot of money, we raised a couple billion dollars over the years through different methods of bonds and public offers. So, there was all -- and also, we had a pretty elaborate tax structure where we had all of our international trademarks were in Luxembourg.

So, we had a lot of lawyers and a lot of, you know, as I heard described by my former accountant and my former board of director person, it was a very complex situation for them. To me it wasn't complex because it was a lot simpler than

---

UNITED STATES OF AMERICA V
NEIL COLE,
November 18, 2022

| MBi5col1 | Cole - Direct | Page 2453 |

running an operational company.

Q. We have heard testimony during this trial about your exercise of stock options and your sale of the resulting Iconix stock in October of 2014. Why did you exercise options at that time?

A. This was stock options that were granted to me when Iconix started, I guess about nine and a half years earlier. They were expiring in March so about four months prior to when I exercised it. The way -- they call them blackout days. We are not allowed to sell -- we are only allowed to sell for X amount of days after a quarter and you are not allowed to sell 15 days prior to a quarter, and then it gets especially long on year-end. So, if I didn't sell by December 15th, I wouldn't have been able to sell until we issue our 10-K which probably would have been two and a half, three months later.

So, when you really look at the days, there was a very limited amount of windows left to exercise and if I wanted to sell them, sell them. So, that's why I exercised at this time after so many years.

Q. And you mentioned that the options were expiring in March. Was that the case with respect to all of the options or just some of them?

A. It was -- out of the 1 million shares it was 800,000 shares. There was another 200,000 shares expiring in December but I figured if I was going to be out there and be a selling

| MBi5col1 | Cole - Direct | Page 2454 |

shareholder I only wanted to do it once. I hadn't done it before in the public market. You know, people are skeptical when they see CEOs sell stock and they own stock, they are saying, What does he know? So, I wanted to do it once and I decided to do it in a bulk sale where it was quick, efficient, and then I could tell everyone why I sold and I continued to -- I think before the selling I had 90 percent of my assets were Iconix, and after I think 80 percent I still owned, 80 percent of my personal assets were still in Iconix stock after I exercised and sold these options.

Q. And just on the sale, perhaps some of what you just said is part of the answer but why did you elect to sell the stock once you had exercised the options as opposed to holding that stock that resulted from the exercise?

A. These were -- you don't get capital gains so you have to pay operating income, which is about 50 percent, so you have to pay half of the money for taxes immediately. So if you sold -- you know, I obviously didn't have that kind of money so I would have -- 50 percent of what I get went to taxes and then I also had to pay another $4 million or $5 million to exercise the option. So, let's say I got 35 and I netted 17, I would have had to pay -- and if I didn't sell I would have had to come up with $20 million. So, I sold it and decided, also, to diversify.

Q. And you were referring to the potential reaction of the

| MBi5col1 | Cole - Direct | Page 2455 |

market and investors to the CEO of the company selling stock. Is there a relationship between that and the timing of the stock sale here in terms of proximity to the end of the quarter?

A. Yes. I wanted to make sure all the information was out, that no one thought I was holding anything or that there were deals or anything so you wanted to -- I think you will see most CEO sales happen a few days after the -- quote unquote -- window opens and you are permitted to legally sell shares so I think it is like 48 or 72 hours after you release is when you are allowed to sell.

Q. I want to turn to the comment letters received by the company from the SEC's division of corporation of finance. We have heard about that during this trial.

Mr. Cole, can you describe, from your perspective, what happened in the December 2014 into early 2015 time period with respect to comment letters that were received from the SEC?

A. Yes. We started receiving -- you know, comment letters are normal. I should say we had gotten them numerous times through the years and it is just a comment on your 10-K from the prior year. But I think we had gotten some in even September, October, but they started -- it got real thick, it was like a hundred page document. It was obvious they didn't understand our business model, they were going after us for segment

| MBi5col1 | Cole - Direct | Page 2456 |

reporting, they wanted us to break down licensing between entertainment and thinking that it wasn't just licensing. And what ended up being the biggest issue was how we structured the JVs. As the letters got bigger and BDO got involved -- very involved because they were the ones who helped structure and advise us -- it was interesting to hear Mr. Shapiro say he still believes the accounting was right after 18 months of fighting because they were the ones who told us how to do it.

So, it was, you know, they were questioning a lot of, you know, the big issue that ended up coming out was this a, what they called a variable interest entity -- or a VIE -- or was it not a sale and we were just starting a new company where you had to sell half and recognize the gain? Or were we starting, I will call it, New Co together as partners. And there was just a lot of criteria. As I said, nobody kind of knew -- you know, we were unique. There was no company like ours except, like REITs like real estate people. So, actually, the beverage department was working, the woman running it was running our -- from corporate finance.

So, it was a grueling process that we started and they wanted to -- they questioned everything about us and who we were and how we accounted for everything.

Q. And you referred to BDO. Was anyone else involved in the comment letter process, the process of understanding what the questions were and responding?

UNITED STATES OF AMERICA V
NEIL COLE,                                                    November 18, 2022

| MBi5col1 | Cole - Direct | Page 2457 |

A. Well, BDO got nervous -- we all got nervous -- and they brought in their national office and people were flying in from Texas and Chicago and the owner of BDO. But I got a little nervous too because BDO was so adamant that they told us the right thing to do. Maybe they didn't want personal liability. So, I hired a forensic auditor called Alix & Partners and they would meet me over at my lawyer's office and advised me over my shoulder. We were worried that BDO would back off and maybe not stand by the 10-K. So, we had extra scrutiny at that time. So, as Larry said, I didn't know about -- or the other day he didn't know so much about Alix because Alix was kind of running a separate analysis of everything that BDO had advised us on.

Q. And what about Iconix company personnel? Who, from the company to your recollection, was involved in the back and forth regarding the comment letter process at this time?

A. All the management. When I say management, none of the creatives, we didn't bring in our marketing people and our product people, but CFO, general counsel. Willy was head of international, head of strategy. You know, I think everyone that was on my floor of top management was all hands on board.

Q. And in the course of preparing responses to questions from the SEC what information, if any, did you learn that you did not recall previously knowing about some of the joint venture transactions?

A. Yeah. I believe it was Larry Shapiro or others started,

| MBi5col1 | Cole - Direct | Page 2458 |

you know, using the word round tripping and what they meant was -- they explained to me that the deals -- if the deals had no economic substance, for instance when you add up the backstops or put floors on puts and up add the minimum guarantees, that if you are, you know, if GBG is paying you $20 million and then at the end of five years you give them back $20 million, what are you doing? Like, this is not business. Or this is not a good deal. Or it is, there is issues. So, I got very worried. I, for the first time, I dug in and understood how it all worked, I had never looked at SEA-2 or seen how -- I never even really focused on the word "floor" or "put with the floor" and then added up all the different minimum guarantees that Horowitz had given to GBG and, you know, the deals were just crazy. There was no sane purpose why Iconix would do a deal like that. And we all kind of told Seth. You know, I was trying to be calm at certain points but I had to -- my head of strategy who had been with me for 10 or 11 years, a guy named David Blumberg and he was livid and he and Seth almost had a fight, a physical fight in the office. It was just a very tough time where Seth felt that he was -- I think the word throwing under a bus or something that he said up here. So, you know, Seth felt that he was being attacked and he was being held out and, you know, I asked him, Who did you work with on these deals? And nobody -- I mean, nobody in top management, the CFO never saw the deals, the

| MBi5col1 | Cole - Direct | Page 2459 |

general counsel backed away. It was -- you know, Seth had this little team of deal people that he worked with and nobody would stand by the deals in the company because they were somewhat outrageous or just not good business sense how they were negotiated.

Q. And the terms that you are referring to that became front and center in this comment letter, the puts with the floors and the guaranteed payments or guaranteed minimums, were those terms part of the written transaction documents for SEA-2 and SEA-3?

A. Yes.

Q. But you hadn't focused on them before?

A. No. I missed it or I didn't read the documents. I read the top -- you know, I was -- but I did not even understand what a floor and a put was. And then Horowitz said you knew about it, you knew about it. And I said, show me the documents. And he came into my office and put what I think you put in front of me now, documents now, I think it was the June 3rd document and the May 12th document and one of them said puts with floors but there was no numbers, there was nothing. So, he -- and I am sure the prosecutor is going to try to show me anywhere where I saw those deals and I didn't. But, you know, I -- so, no, I did not know about how these deals worked until mid-February of '15 and I was worried about what the would happen and whether we would have to restate and the

| MBi5col1 | Cole - Direct | Page 2460 |

scrutiny we were under.

MS. DABBS: Let's pull up, if we can, Mr. Lam, Government Exhibit 1038, which is in evidence, and may well be one of the documents you were just referring to, Mr. Cole.

Q. We looked at this one a little earlier this morning, an e-mail from Mr. Horowitz to you. I just want to focus your attention on part 3 and the first part 3 of this e-mail, if we can, please. It begins: There was a lot of questions/concern.

A. Yes.

Q. Do you see that this update, which you know the subject line of the e-mail is LF meeting. Do you understand that to be a reference to Li & Fung?

A. Yes.

Q. And that highlighted start of paragraph 3 or first paragraph 3, do you see that that appears to refer to a floor on the buyback after five years? Do you see that there?

A. I do.

Q. Do you have a recollection of receiving this e-mail?

A. I'm not going to say I didn't receive it because my name is on it but I don't have a recollection of understanding what it meant or I don't see any numbers, you know, a buyback could be for $2 million. It wasn't the whole purchase price. So, no, I did not understand what Mr. Horowitz was negotiating with Mr. Margolis.

MS. DABBS: We can take that down, Mr. Lam.

# A-1044

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

Cole - Direct — Page 2461

Q. During the comment letter discussions what, if anything, did Mr. Horowitz say about supposed verbal agreements with GBG?

A. Not a word. He didn't say anything to anybody even though he was writing these private diaries and he was obviously working with attorneys and he was out to get the company --

MR. THOMAS: Objection, your Honor.

THE COURT: Overruled.

A. He said -- he didn't say a single word to investors, to professionals, to anyone at the company, and this was obviously made up when he walked out the door.

Q. When is the first time you recall any mention of a verbal agreement in connection with SEA-2 or SEA-3?

A. When Mr. Horowitz sent his resignation letter to me and the board it was, you know, seven years ago or eight years ago, that's when I first heard of his allegations.

Q. And did you review the submission that Iconix made or submissions that Iconix made to the SEC division of corporation finance in response to the comment letters?

A. Of course. I was very involved and very, you know -- I was very sensitive and I read every word of those agreements because our company was under attack.

Q. And did you read the response letter that the company submitted on February 24th, 2015?

A. I read all of them so I know there were various ones and I don't -- unless you put February 24th up here but I know I read

Cole - Direct — Page 2462

all of those agreements, I was very involved.

Q. Did you believe that the company's responses, that those submissions to SEC Corporation Finance, were truthful and accurate?

A. They were truthful and accurate.

Q. Was any material information intentionally omitted from those submissions, as far as you know?

A. No.

Q. Mr. Cole, in or around March of 2015, do you recall becoming aware of an issue with Mr. Horowitz' bonus for the year 2014?

A. Yes.

Q. What do you remember about that?

A. You know, this is when the company was a little bit in, having issues with this SEC investigation, we were all very concerned. Mr. Horowitz or Seth walked into my office and told me he wanted more money, or he didn't like his bonus and thought it should be recalculated in a different way. I was -- I was shocked. Like, he was in another world. Like, he didn't understand what was going on in the company, that we were under attack and they were questioning the basics of what we do, at least what we were doing internationally, and this person walked into my office and asked for more money and I -- it was -- it was crazy.

Q. We have heard some testimony about Mr. Horowitz'

Cole - Direct — Page 2463

resignation from the company. What is the earliest discussion you recall having with Mr. Horowitz about his resigning?

A. He came into my office a week before and asked -- and handed me a letter and it was, like, two lines saying, "I resign." And I said why? I was asking what is happening? Why? What did we do? To me it was the worst possible timing.

Q. Why is that?

A. We were in the middle of this investigation still with Corporate Finance and I thought we were close to finishing and I think if he resigned, it would set off all sorts of questions and further scrutiny. So I said, Seth, I don't know what you want. Why don't you just go take off for a month or two, go speak to a lawyer, go speak to whoever, and I will help you get a job, but to resign right now in the middle of this scrutiny would be incredibly dangerous for everybody, or just bad. I don't know if I used the word dangerous.

Q. What happened next with respect to Mr. Horowitz and his tenure at the company?

A. A week later I remember opening a letter as clear as day. I was sitting in my office, I read this letter, and my life changed forever. Physically, I had nerve pain shot through my legs, which I still have today, but I knew that him -- these crazy allegations would, you know, kind of change my life. So, you know, it did.

Q. What did you do when you received that second resignation

Cole - Direct — Page 2464

letter from Mr. Horowitz?

A. Well, it was the first because we agreed to rip up the first one, this was the real one. I did what I had to do. I called the board meeting and I told the board -- I think it was an hour or two later we called a special board meeting and discussed next steps and they -- I think the next morning every computer in the whole company was taken and the company was, you know, everyone was shocked and here we are, seven and a half years later, on the fourth proceeding.

Q. Mr. Cole, when did you stop working at Iconix?

A. I ended up leaving the company sometime in early August.

Q. August of 2015?

A. Yes.

Q. And were you ultimately asked to resign from the company?

A. Yeah. I would say, you know, they -- it was a nice ask. They asked me to be a consultant, but clearly I had lost confidence and I left the company.

Q. Mr. Cole, did you enter into any secret side deals with GBG?

A. No.

Q. Did you run a con or a shell game while you were the CEO of Iconix?

A. No. And it makes no sense I would.

MS. DABBS: No further questions.

THE COURT: Cross-examination.

UNITED STATES OF AMERICA V
NEIL COLE,
November 18, 2022

---

MBi5col1     Cole - Cross     Page 2465

MR. THOMAS: May I inquire, your Honor?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. THOMAS:

Q. Good morning, Mr. Cole.

A. Good morning, Mr. Thomas.

Q. Mr. Cole, can you be taken at your word?

A. Is that a trick question?

Q. Can you be taken at your word?

A. I try to do the best with my word. I think you can take it.

Q. So, is that a yes, you can be taken at your word?

A. Yes.

Q. If you give someone your word, does it mean something?

A. I do my best.

Q. Sir, does it mean something when you give someone your word?

A. Yes.

Q. When you make a promise, can you be counted on to follow through on your promise?

A. I believe my friends and associates would say so.

Q. Sir, when you make a promise, will you follow through on it even if it is not in writing?

A. In business I -- I chose to put everything in writing because there is so much going on when you do tens of thousands

---

MBi5col1     Cole - Cross     Page 2466

of agreements. So I, you know -- my wife says I said something four days ago and I often don't remember so she might disagree, but in business everything was in agreements, if that's what you mean.

Q. Sir, so it is not possible for you to make a promise that is not in writing that a business partner could count on?

A. I believe my business partners believed in me and that's why I was able to build the business.

Q. They could rely on your word?

A. I think they most wanted contracts.

Q. They could rely on your word, right, sir?

A. I don't know. I don't know. I think -- most people I did business with or maybe everybody at this level knew that agreements had to be in writing.

Q. Well, Mr. Cole, yesterday when you took the oath to tell the truth do you remember that, right?

A. I do.

Q. You spoke those words out loud, right?

A. Yes, Mr. Thomas.

Q. You didn't put that in writing.

A. I did not.

Q. OK. Can the jury still take your word that you are telling the truth?

A. Yes.

Q. Now, Mr. Cole, I want to establish a few points of clarity

---

MBi5col1     Cole - Cross     Page 2467

on the issues that we have discussed.

A. Sure.

Q. The first thing, I want to just ask about some basics. In 2004 Iconix was a public company, correct?

A. Two thousand what?

Q. In 2014 Iconix was a public company, right?

A. Yes.

Q. And it was headquartered right here in Manhattan?

A. It was.

Q. The Southeast Asia joint venture, that began in 2013, right?

A. The initial contract and deal started in October of 2013.

Q. So that deal began in 2013, right?

A. Correct.

Q. You signed those deal documents, right?

A. I did.

Q. It was amended the following year in June of 2014, right?

A. Correct.

Q. And you signed those deal documents too, didn't you?

A. I did.

Q. And you publicized the terms of that amendment including in earnings releases, right?

A. Yes. It was our obligation and we did publicize it.

Q. And you publicized it in the quarterly filing that you made that quarter, right?

---

MBi5col1     Cole - Cross     Page 2468

A. In the 10-Q, yes.

Q. That was a quarterly filing you made that quarter, right?

A. Sure.

Q. And the Southeast Asia deal was amended again in September of 2014, right?

A. Correct.

Q. And you signed those deal documents too?

A. I did.

Q. And you publicized the terms of that deal in an earning release, right?

A. I did.

Q. Those terms were also reflected in the quarterly filing for that quarter?

A. Yes.

Q. Now, I want to make sure that we all understand precisely what your position is with respect to SEA-2. I heard you say a number of times on direct that there were no commitments. Are you saying that nobody --

A. Can I correct you? You said there were no commitments? There was a lot of commitments, it was a big document.

Q. Mr. Cole, are you saying that nobody at Iconix agreed to a side deal with SEA-2 or are you just saying that you didn't know about one.

A. I have no idea about everyone at Iconix. I know that it wasn't in the documents and no one that I have ever spoken to

---

# A-1046

UNITED STATES OF AMERICA V
NEIL COLE,                                                                          November 18, 2022

---

MBi5col1              Cole - Cross              Page 2469

knew of anyone, except what Mr. Horowitz has alleged.
Q. So, Mr. Cole, I want to be clear about it. You are saying
   it is possible there was a secret side deal for SEA-2?
A. No.
Q. So you know, for certain, there were no side agreements
   with SEA-2?
A. Correct.
Q. You were involved enough in the negotiations to know that
   fact?
A. Yes. I signed the documents.
Q. Now, yesterday Ms. Dabbs asked you what commitments or
   obligations, if any, did Iconix undertake in connection with
   that transaction were not written in the transaction documents.
   Do you remember that question?
A. Correct.
Q. And you said absolutely none?
A. Correct.
Q. I want to be clear again. Are you saying there is no
   promise of any kind or just that promise wasn't in writing?
A. The agreement, everything was in the agreement.
Q. So, sir, let me ask you again. Are you saying there was no
   side promise of any kind or just the promise wasn't in the
   agreement?
A. I don't understand the question.
Q. Sir --

---

MBi5col1              Cole - Cross              Page 2470

A. I think it is a trick question. Can you say it again?
Q. When you say there is no commitment or obligation --
A. That wasn't in the agreement.
Q. Are you referring to a commitment or obligation that you
   believe could be enforceable in a court or are you saying there
   is no commitment of any kind, even a handshake deal?
A. There was no commitment because -- in the agreement.
Q. So, I'm going to ask you some similar questions about
   SEA-3.
A. Sure.
Q. For SEA-3, are you saying nobody at Iconix agreed to a side
   deal or just that you didn't know about it?
A. I have sat here and heard Iconix -- Iconix -- I have heard
   Horowitz, or Seth, saying he agreed he thought there was a side
   deal but I don't think he understood business, that it was
   signed, and it wasn't agreed to.
Q. Sir, I am asking about your memory at the time the
   transactions happened.
A. There was absolutely no side deals, everything was in the
   agreement.
Q. And you know that from your own participation?
A. Yes. I was the CEO and I was the signatory.
Q. And yesterday Ms. Dabbs asked you, again, what commitments
   or obligations, if any, did Iconix undertake in connection with
   the SEA-3 transaction that were not written in the transaction

---

MBi5col1              Cole - Cross              Page 2471

documents. Do you remember that question?
A. Yes. There were none.
Q. And you said none. And the jury, should the jury
   understand that that means that there is not going to be an
   unenforceable promise that was on the side?
A. Not from myself; and I was running the company and I signed
   the agreements.
Q. Is it possible that Mr. Horowitz made that promise?
A. I don't think Mr. Horowitz had the authority to do that
   promise.
Q. Mr. Horowitz, the COO, didn't have authority to bind the
   company?
A. No. Not for $13 million, whatever the amount of money it
   was. You know, especially he didn't tell the board, he didn't
   tell the CFO, he didn't tell anybody. He had absolutely no
   authority to do that.
Q. Sir, again, I want to make sure I understand. Are you
   saying that there was no criminal side deal or just you didn't
   know about it?
A. There was no criminal side deal and there was no -- and I
   didn't know about it because I was the CEO and signatory of the
   agreements.
Q. I want to turn to the prices for a second.
        MR. THOMAS: Let's show the witness Government Exhibit
   1044 and if we can go to page 8. And Mr. Bianco if we can

---

MBi5col1              Cole - Cross              Page 2472

enlarge the second paragraph?
A. Is this SEA-1 or 2?
Q. Sir, you can see the numbers reflected here in that
   paragraph that is enlarged before you, right?
A. Can you give me a minute to read it?
Q. Go right ahead.
A. Thank you. Got it.
Q. And you see this is a blackline, right?
A. Looks like a blueline or redline. Not black, redline.
Q. This reflects changes over a prior draft, right?
A. Yes.
Q. And you can see that what has changed in this paragraph is
   the price, right?
A. Yes.
Q. And the price here increases by $5 million as compared to
   the prior draft, right?
A. No, it looks like 10. Oh I see -- the first the fair
   market is 10 and then the -- down below is 5. Yes, I see it.
Q. Sir, you recognize that $15.9 million price to be the price
   that SEA-2 closed at, right?
A. Correct.
Q. Sir, why did the price go up by $5 million?
A. I don't know exactly. Mr. Horowitz sent me a letter and
   told me he negotiated 15.9.
Q. You don't know why it went up?

---

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col1          Cole - Cross          Page 2473

A. I have guesses. My attorneys don't like when I guess but if you ask I will give you my thoughts of why it went up.

Q. I am not asking for a guess, I am asking what you know.

A. No, I know that GBG really wanted Lee Cooper and they thought they would, so that's probably why they agreed to 15.9.

Q. Let's unpack that for the jury so that they can follow. Your guess is that GBG paid $5 million more in the hopes that later on you would do a different transaction?

A. That we would add it on.

When you say 5 million more, originally it was 25 million so I think maybe they thought they were getting a good deal at 15. And so, you know, the price was moving all around and I got a phone call from Mr. Ventricelli, who was the COO in charge of Jason, and I also spoke to Dow Famulak, and they both were very concerned with Lee Cooper going forward. And then, you know, Seth told me in an e-mail that he got 15. So, I thought it was great.

Q. Let me see if I can pull those pieces out. First of all, here this draft reflects that $5 million increase, right?

A. Yes. I don't know the date or what -- the timing, but this says it went from this redline was 10.9 to 15.9 at the bottom.

Q. The deal would be better for GBG if they only had to pay 10.9 for it, right?

A. Even better if they paid 5.

Q. 10.9 is better than 15.9, right?

MBi5col1          Cole - Cross          Page 2474

A. Yes. And definitely better than 25.

Q. And you said that there was interest or concern about doing Lee Cooper, right?

A. Yes. They were doing a spinout at the time where GBG -- this now is Li & Fung, not GBG, because GBG started on July 7th, 2014. And Li & Fung was a $23 billion company and they spun out GBG to be a $3 million company. So, everyone in this trial has been saying it is one company. It is not. They were two different public companies, both based in Hong Kong.

Q. Well, in point of fact it is not Li & Fung, it is LF Asia that is part of this transaction, right?

A. It is a subsidiary, they are Li & Fung, they own a hundred percent of LF Asia.

Q. Again, I want to make sure the jury can catch up to what you are saying here. The suggestion that you are making is that Li & Fung agreed to pay $5 million more in the hopes that down the line there would be some other deal that wasn't in these documents, right?

MS. DABBS: Objection. Mischaracterizes the testimony.

THE COURT: Overruled.

A. I think it was a relationship. I think they knew we wanted 15, we were working on so many deals together, but also their investment committee obviously loved the deal, you know, they agreed to everything. And I don't know if they knew about Lee

MBi5col1          Cole - Cross          Page 2475

Cooper -- I think they did because the three people that I spoke to are all on the investment committee and the relationship, we just had a lot of businesses going on together, they wanted to expand the Peanuts relationship, we were just launching the Peanuts movie and they wanted our business in Japan which was substantial. So, I think they wanted to -- when Horowitz probably asked for 15 they agreed; it was a good deal for them, a good deal for us.

Q. So, they paid $15 million because they want to be a good business partner?

A. Or they thought -- obviously here it says it was fair market value.

Q. They paid $15 million because they thought they were going to be a good business partner?

A. No. They thought it was the value. If you read the PIP, which is all them, all together, they said this was a great deal. And you actually heard Rabin and everyone thought it was a great deal.

Q. Mr. Cole, at the time that the transaction closed did you have insight into the PIPs that were over at Li & Fung?

A. No. I have seen them over the last few years.

Q. Did you read them at the time to know what they said?

A. No. I didn't have access. Those were internal documents of GBG when they said they liked the deal.

Q. So, you would agree with me then that it could not have

MBi5col1          Cole - Cross          Page 2476

been your understanding at this time that they paid 15.9 because of the PIP, right?

A. Yes. And what my thought process, I couldn't care what they said, as long as I was getting my money for my shareholders, that was what I am focused on. I don't care what the partner is thinking.

MR. THOMAS: So let's go to SEA-3. Can we put up Government Exhibit 1091 and go to page 52? And, Mr. Bianco, if you would enlarge the second paragraph?

Q. Mr. Cole, do you recognize this to be another markup of a deal document with respect to SEA-3?

A. I do.

Q. And, once again, what has changed here is the price?

A. Yes. The price went from 15.5 to 21.5.

Q. Why did the price go up?

A. I have no idea. I have thoughts if you want to hear them.

MR. THOMAS: Mr. Bianco, you can take this down.

Q. Now, Mr. Cole, you are a salesman, right?

A. I think we all are in our own way, but part of building my business was obviously selling things.

Q. And over the years you have sold footwear, right?

A. I -- when I started I was selling shoes out of my car but later I did actually -- yeah, I was CEO of a footwear company.

Q. You also sold denim, right?

A. I did.

# A-1048

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

| MBi5col1 | Cole - Cross | Page 2477 |
|---|---|---|

Q. And later, and for most of your career, you sold brands; right?

A. Bought and sold.

Q. I'm sorry. I didn't hear that answer.

A. Bought and sold.

Q. OK. You sold brands, right?

A. Usually the rights to brands or in territories usually one of the things -- I don't think we ever sold a whole brand at Iconix but we sold a lot of pieces of brands in pieces of territories and -- but I don't think I ever sold a full brand.

Q. Well, Mr. Cole, you promoted brands, right?

A. Yes; marketed and promoted.

Q. Tried to get people to buy things with the brands on them, right?

A. Yes, to help the licensees because then it would help us. If we did great marketing and branding then the licensees would sell more and it would help our company and our shareholders.

Q. And at times you have described Iconix as sort of a marketing company that happened to own brands, right?

A. Yeah. I think I said an advertising agent or marketing company or branding company.

Q. So, you spent a lot of time figuring out what messages work best for your audience, right?

A. That's how you sell brands. You figure out who should be the face of the brand and how to market the brand and how to --

| MBi5col1 | Cole - Cross | Page 2478 |
|---|---|---|

at the end of the day it is mostly the product. If the product is great, you get repeat business.

Q. And, Mr. Cole, when you told the jury yesterday about how the business was formed, when you shared that story you used lines in that story that you have used in telling it before, right?

A. I don't know. I used to teach at a university and so I told -- often told the story that, you know, that Iconix took three times in my career to do it so I -- you know, when I talk to students or I talk to -- when I tell people about the story I would do that.

Q. Or the press, right?

A. The press I would, you know, often be at conferences and things but sometimes I spoke to the press, yes.

Q. Including on TV, right?

A. Yes, I did TV.

Q. And so, for example, yesterday when you referred to the brands as your kids, that's something you have had in the can for a long time, right?

A. When you say the can?

Q. I mean that's a line that you have used for years.

A. Similar to when you said I said true under oath? Yeah. I probably -- I did talk a lot about that the brands were my kids and then when we got so many of them it was like an orphanage.

Q. Now, Mr. Cole, in advance of your testimony yesterday you

| MBi5col1 | Cole - Cross | Page 2479 |
|---|---|---|

rehearsed what you were going to say to the jury, right?

A. Little bit. Yeah. I have thought about it over the last period of time.

Q. And you met with Renato Stabile before testifying, right?

A. I think it is Stabile.

Q. He is a jury consultant, right?

A. He is.

Q. And that is part of an effort to craft precisely what you want to tell them about who you are and what you did?

MS. DABBS: Objection.

THE COURT: Overruled.

A. Yes, but I am here to tell the truth, Mr. Thomas.

Q. Well, Mr. Cole, back in 2014 when you made public statements about your company, you wanted to make the company look good, right?

A. I am sure.

Q. That's the same thing yesterday, right?

A. I want to look good and, most importantly, tell the truth.

Q. OK. But, in 2014, when you talked about the company, sometimes you stretched the truth, right?

A. I don't know what you are referring to. I would have to see what are you talking about.

Q. So you don't think you ever stretched the truth in talking about the company?

A. I don't know. I'm a salesman so it maybe could be my

| MBi5col1 | Cole - Cross | Page 2480 |
|---|---|---|

truth, what I thought. But if the reporter thought something different, but.

Q. You say your truth?

A. Yes, what I believed.

Q. OK. Well, let's take an example from yesterday. Yesterday you mentioned that you did $3 billion with Wal-Mart, $2 billion with Target, $2 billion with Kohl's.

Do you remember saying that?

A. Yes.

Q. Now, if the jury took away from those references that those figures were revenue figures they would be mistaken, right?

A. Well, they were the customer's revenue.

Q. Not Iconix' revenue?

A. No. Iconix got a small percent which is why I said when we did $14 billion, we only got $450 million, which averaged, like, 3 percent.

Q. So, in fact, in whole year 2014, Iconix reported less than $500 million in licensing revenue, right?

A. Correct, but our brands, which were growing, were doing a lot of business in a lot of -- all over the world. We would get a small fraction of the revenue of how the brands were doing.

Q. Sir, my question was in the whole year 2014, Iconix reported less than $500 million in licensing revenue. That's right, isn't it?

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col1     Cole - Cross     Page 2481

A. Sure. I think we reported $461 million is what I said yesterday.

Q. And yesterday you also said that your company was second only to Disney in terms of licensing?

A. Licensing revenue, yes.

Q. And that's also a line that you have used before, right?

A. Oh it was in the -- we were on the cover of a magazine in the industry that said that.

Q. Mr. Cole, that's sort of like having a coffee with David Beckham and saying you are the second best soccer player at the table, isn't it?

A. I don't understand. Why are you having a cup of coffee with David Beckham?

Q. Let me show it this way.

A. Who is having coffee? You are? Or am I?

Q. Disney reported something like $40 billion in revenue in fiscal year 2014. Does that sound right to you?

A. I don't know.

Q. That $40 billion figure is multiples beyond what Iconix ever reported, right?

A. Well, I think now you are going back to our $14 billion. I think that's because the theme parks and everything, their royalty revenue was a small percent of the $40 billion. You should check that out, Mr. Thomas, because I think their top line is their revenue from ESPN and places like that and they

MBi5col1     Cole - Cross     Page 2482

only get a little percent of it, so I think their royalty revenue is not nearly that high.

Q. Mr. Cole, did they report more revenue than Iconix?

A. Sure. That's because their license -- they own ESPN, they own Disney parks, they have all these places that do operation. They're not solely a licensing company like Iconix.

Q. OK, well let's talk about something else that you said. You said, including today, that the company did thousands of transactions; right?

A. I was trying to calm it down because Mr. Shapiro said tens of thousands but, yes, I think thousands would be a good reference. When I heard Mr. Shapiro say tens of thousands I thought he was exaggerating.

Q. And I think I heard you say yesterday that you literally got your hands sore signing docs because there were so many documents to sign?

A. Yes.

Q. OK.

A. I would often go home and --

Q. I want to talk about the context here. You don't mean thousands of joint ventures, right?

A. No, but trademarks were a big -- you know, because when you have the joint ventures you have to sign the trademark registrations in every country, in every way the trademark is done so many different ways. And then -- but not actually a

MBi5col1     Cole - Cross     Page 2483

joint venture deal or even when we bought a company and there was, you know, huge documents but it would be one time.

Q. So, if we are talking about joint ventures, before Southeast Asia the company had only formed seven by 2008, right?

A. I don't know, but it sounds right.

Q. You don't know?

A. I don't know exact whether it was eight or six or twelve. I don't know exactly, no.

Q. Well, it is not dozens, right?

A. I will take your word for it, Mr. Thomas.

Q. Well, Mr. Cole, you were there, you were the CEO, right?

A. It was eight, nine years ago. I don't remember. I knew we had 11 or 12 deals, I don't know exactly when we signed them.

Q. Not thousands of joint ventures, though?

A. No. We had thousands of licensees.

Q. And if the jury understood the transactions to be brand acquisitions that wouldn't be right either, right?

A. If the jury understood what brand acquisitions? I don't understand.

Q. The thousands of transactions, that didn't refer to thousands of brand acquisitions, right?

A. No, we bought -- I think about 30 different companies that had IP and a lot of them had different types of IPs and different logos so it was a tremendous amount of -- whenever we

MBi5col1     Cole - Cross     Page 2484

bought a company it was a tremendous amount of paperwork, especially in the financing part of it.

MR. THOMAS: Let's show the witness and the parties Government Exhibit 3049, can you enlarge the bottom?

Q. Mr. Cole, do you recognize this?

A. I don't, but no reason to believe I did not see it.

Q. But you see what it says on the document, right?

A. It is an annual report and 10-K from 2014.

MR. THOMAS: Go to page 2, keep going forward, Mr. Bianco?

Q. Mr. Cole, do you recognize this?

A. When you say recognize it, what do you mean? Do I recognize a page from my 10-K nine years ago? I mean, I have no doubt that this was done by the company. Correct.

Q. Well, do you understand what you are looking at?

A. I do.

MR. THOMAS: And Mr. Bianco, if you can go to page 174?

Q. That's your signature there, sir?

A. No. I think it is EDGARized of some sort. That is not my signature but that's my name.

Q. That "/s" doesn't represent your signature?

A. I don't know. I know what my signature looks like, that looks like a machine did that. I have no doubt that I signed it, though.

# A-1050

UNITED STATES OF AMERICA V
NEIL COLE,                                                                    November 18, 2022

---

MBi5col1          Cole - Cross          Page 2485

MR. THOMAS: The government offers 3049.

MS. DABBS: No objection.

THE COURT: It will be received.

(Government's Exhibit 3049 received in evidence)

MR. THOMAS: Publish to the jury?

BY MR. THOMAS:

Q. Mr. Cole, so the jury can catch up, that "/s Neil Cole," that's you approving the filing of this document, right?

A. OK. I don't doubt it.

Q. I am asking you, sir.

A. I'm not -- I would have approved this document.

Q. You did approve the document?

A. OK. I just don't see my signature. I don't know how it works, so.

Q. Well, Mr. Cole, in your time filing documents at Iconix, you didn't know that "/s Neil Cole" would be your signature?

A. Yes, but it is a machine that does it so how would I know whether I did it or not?

MR. THOMAS: OK. Mr. Bianco, we can take this down for a second.

A. But I don't doubt that I would sign our annual report.

Q. Mr. Cole, you are required by law to sign the quarterly report?

A. Right. Of course. Of course.

Q. And did you sign it?

---

MBi5col1          Cole - Cross          Page 2486

A. Sure.

Q. Is there any doubt in your mind that you signed the document?

A. Not at all, I just don't see my signature.

Q. Now, yesterday you talked about Li & Fung being the company's biggest customer?

A. Yes.

Q. And you said that Wal-Mart was number two?

A. I believe.

Q. And Target was number three?

A. I don't. Yes, I believe that at the time as far as the amount of business they did.

MR. THOMAS: Let's put up in evidence Government Exhibit 103, if we can go to PDF page 33? And Mr. Bianco if you can enlarge the second paragraph that is on this page?

Q. Do you see here the document says: Our licensees, Wal-Mart, Target, Kohl's and K Mart/Sears, were our four largest direct-to-retail licensees during the current six months. Do you see that?

A. I do.

Q. Now, Mr. Cole, if we were to look through this document in its entirety, would there be any reference to Li & Fung being the company's most important partner?

A. I think there is, yes.

MR. THOMAS: OK. Well, Mr. Bianco --

---

MBi5col1          Cole - Cross          Page 2487

A. Important. If you ask me, I liked Wal-Mart better than Li & Fung, but.

Q. I'm not asking who you liked, I am asking whether this quarterly filing disclosed that Li & Fung was the company's biggest partner?

A. I think it would say the biggest partner that wasn't a retailer. I think if you look for that paragraph you will find it. These are all retail direct licenses. There is another part, I believe, of the document, that talks about how GBG/Li & Fung was the largest non-retail partner.

Q. Well, Mr. Cole, would you believe me if I told you that if you searched this document for LF Asia, or Li & Fung, or LF, it comes up 18 times and only in the joint ventures?

A. I don't know. I would believe you.

Q. OK. Let's look at page 10.

MR. THOMAS: Now, Mr. Bianco, if you can enlarge Iconix Europe?

Q. Mr. Cole, you see in that bottom paragraph there is a description of LF Asia Limited which then gets defined as LF Asia, an affiliate of Li & Fung Limited?

A. Yes.

Q. And there are references there, in here to LF Asia, right?

A. Sure.

MR. THOMAS: And let's go to page 11 and if we enlarge -- let's go to the next page and enlarge that.

---

MBi5col1          Cole - Cross          Page 2488

Q. More references to LF Asia here?

A. Sure.

Q. Sure?

A. Yes.

Q. There are, right?

A. Yes. I see them.

Q. Because LF Asia is identified to the public as being the joint venture partner for Southeast Asia, right?

A. Correct.

Q. And identified to the public as being the joint venture partner for Iconix Europe, right?

A. Yes.

Q. And, Mr. Bianco, do you want to -- we can Ctrl-F through here but, Mr. Cole, where is it that we would find that LF Asia is the biggest customer?

A. I will show you after the break. I mean, my attorney is the one who would look for it so -- I don't know that -- how could I even see it? I don't have the document.

Q. You said yesterday that you always envisioned that Li & Fung would buy out the company, right?

A. Yes. They were, I thought, a perfect end game to merge or to buy out because they didn't own brands but they were the largest supplier around the world. So, I thought they would be a great partner or great owner of the company that would buy us out.

---

# A-1051

MBi5col1          Cole - Cross          Page 2489

Q. Was that a disclosure that you made in the quarterly filing?

A. No. You would never disclose something like that.

Q. You wouldn't tell shareholders the end game plan for your company?

A. No, because you are not going to tell someone that you like, you know, that you -- who you want to sell to because they haven't said they wanted to buy us. You can't mislead people. I am just saying, my personal opinion, which is all the relationship that I built up and down management in the time I spent in Hong Kong, you know, I secretly admired them at the time and thought that they would be a great end game that could buy the company because they needed brands. They didn't own brands. They were the largest supply chain company in apparel but they did not own brands.

Q. Did I hear you correctly that you secretly admired them?

A. Well, they knew we admired them. We admired each other. I think we had 19 deals and they brought in $50 million a year from us and I -- so, they were important to us.

Q. I want to be clear about this, too. Did you admire Jason Rabin? Is he one that you admired?

A. Jason was a friend.

Q. Did you admire him?

A. As a -- what do you mean? In what way? As a person? As a businessman? As a --

MBi5col1          Cole - Cross          Page 2490

Q. I mean did you admire him. Whatever you understand the word admire to mean.

A. I don't think I admired him but he was a friend.

Q. What about Jared Margolis, did you admire him?

A. Absolutely not.

Q. What about Ethan Cole, did you admire him?

A. I don't believe I met him. I know you guys are going to say I met him -- I was hoping to meet him this trial but I don't remember meeting Ethan.

Q. So did you admire Ethan Cole?

A. No. I didn't know him, how could I admire him?

MR. THOMAS: Now, because we had this document up, Mr. Bianco, can we go to page 13?

Q. One of the last topics Ms. Dabbs addressed with you is the subject of floors on puts.

A. Yes.

Q. Mr. Cole, you would agree that there is no disclosure about floors on puts in this document, right?

A. I haven't read the -- you want me to read this whole document? I mean, point me to something you want me to read and I will read it but I can't look at this massive document and tell you --

MR. THOMAS: Mr. Bianco, let's enlarge the first four paragraphs.

Q. And again, Mr. Cole, to be clear to the jury, we are

MBi5col1          Cole - Cross          Page 2491

looking here at a quarterly filing that Iconix made in 2014, right?

A. Yeah. And I will try to be clear to me too so I know what I am reading. What is the date? What quarter?

Q. Mr. Cole, you don't recognize this to be the quarterly filings from the second quarter of 2014?

A. No. You have to show me the cover and what it is before I can recognize what it is.

MR. THOMAS: Mr. Bianco, let's go to the first page.

A. Yes, this is the 10-Q from the second quarter ending June 30.

Q. And, Mr. Cole, this is a document that you reviewed and signed, right?

A. Yeah. I would usually, on Qs and Ks, it is mostly boilerplate so what my attorneys would do for me is highlight everything different from the last Q because the document was pretty voluminous and I didn't have the patience to or the ability to read all of it, but it was only -- I read the form and anything new from the last Q I would read.

Q. Well, Mr. Cole, did you understand you had a legal obligation to read it and certify that it was accurate?

A. No. I had a legal obligation to certify that it was accurate and I had a lot of people, I had seven lawyers, and I had outside lawyers and they highlighted everything that was new from the last Q and I definitely read one of them, so -- I

MBi5col1          Cole - Cross          Page 2492

didn't have the ability to read -- if I read Qs and Ks it would be different and then I would have decided to be a lawyer. But, I basically just read anything that was unique or new or any new transactions in each of my Qs and Ks.

Q. So, Mr. Cole, there are three Qs filed each year, right?

A. Correct.

Q. And one K?

A. Correct. And then there is also proxy statements, the annual reports, and every time we do a deal there was an 8-K, lots of stuff to read, and I am trying to run a company so I hired -- I have a great SEC lawyer outside and then I had SEC lawyers inside and they read everything and confirmed it and they showed me everything that was different from this period from the last period.

THE COURT: Mr. Thomas, it is 11:00 so we will take our first break.

Twenty minutes, ladies and gentlemen. Don't discuss the case.

(Continued on next page)

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col1     Cole - Cross     Page 2493

(Jury not present)

THE COURT: Everyone can be seated.

Anything to raise?

MR. THOMAS: Nothing from us, Judge.

MS. DABBS: No, your Honor.

THE COURT: OK. Don't be late.

(Recess)

(Continued next page)

MBIYCOL2     Cole - Direct     Page 2494

(In open court; jury present)

THE COURT: Everyone please be seated.

Mr. Thomas.

MR. THOMAS: Thank you, your Honor.

Q. Mr. Cole, yesterday I think I heard you say that in 2014, "The business was wonderful and we were doing great." Is that right?

A. I believe I said something similar, yes.

Q. Now, do you recall that in 2013, you were projecting 20 to 25 percent annual growth at Iconix?

A. I don't recall that.

Q. Do you remember going on TV with Jim Cramer in 2013?

A. I know I was on with Jim Cramer a couple of times, but I don't remember exactly 2013.

Q. Do you remember telling Jim Cramer that you were expected 20 to 25 percent growth that year?

A. No. But I could have. I just don't remember what I told Mr. Cramer.

Q. Well, 20 to 25 growth was a lot more growth than the company experienced in 2014. Right?

A. Not necessarily.

Q. Well, in 2014, the company reported a 7 percent increase in revenues. Right?

A. Yes, but not necessarily in how the brand was doing around the world.

MBIYCOL2     Cole - Direct     Page 2495

Q. So there was a 7 percent growth in revenues in 2014?

A. Yes, but similar to when you were talking before about Disney, our brands were growing tremendously around the world. But the way the JVs worked, once you sold them, they no longer became part of revenue. So we had 11 deals around the world that were growing, but they were not necessarily in the revenue column.

Q. Sir, because you brought up that topic, we should clarify for the jury that's true for some joint ventures but not others. Right?

The Europe joint venture was consolidated with Iconix's books. Right?

A. Yes. We owned 51 percent of that, but I think most of them were 50/50.

Q. The Buffalo brand joint venture was consolidated with Iconix's books? Right?

A. I don't know.

Q. You don't remember?

A. I don't remember.

MR. THOMAS: Let's go to Government Exhibit 103, page 12. If you could back up one page actually. Mr. Bianco, could you go forward to Buffalo brand. There you go. And if you could go one more down.

Q. Do you see that, sir? We're talking about Buffalo brand here.

MBIYCOL2     Cole - Direct     Page 2496

A. Yes. I see it says 51 percent. So that would not be -- the revenue would be included in the top part.

Q. And that's what this table is; right?

A. I don't know.

Q. You don't know what this table represents in the filing?

A. Not offhand. I'd have to read more about it. I do agree that we owned 51 percent. So it would be captured on the revenue side.

Q. So this point you're making that analysts, for example, don't see the revenue, that's only true with respect to certain joint ventures. Right?

A. That's right. I think most.

Q. There are some that Iconix reports on its own books.

A. Yes. I think probably just these two. Maybe you could show me more, but I think just Europe and Canada.

MR. THOMAS: You can take this down.

Q. Mr. Cole, isn't it the fact that by year end 2014 Iconix had started to fall behind its peer companies?

A. No.

MR. THOMAS: Let's show the witness Government Exhibit 3049 and go to page 121. If we could enlarge that graph.

Q. Do you see here there's a comparison of a five-year cumulative total return in this table?

A. Okay.

Q. Do you see the top, light-colored line graph represents the

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBIYCOL2          Cole - Direct          Page 2497

peer group index?

A. Yes. I see it down below.

Q. And do you see that the Iconix Brand Group, Inc. line is there tilting below it for 2014. Right?

A. Yes. But who's my peer group? Or who is Iconix's peer group? All of NASDAQ? Like tech companies?

Q. Sir, does this show that Iconix Brand Group is behind its peer group index?

A. I don't know what "peer group" here is. We were the leaders in our industry. So I can't imagine. If it's all of NASDAQ, okay. I just don't know who the "peer group" is.

Q. Well, sir, you see that NASDAQ market index is represented here. Right?

A. I do.

Q. Separately from the peer group?

A. I do.

Q. And the peer group is above Iconix.

A. Yeah. Can you show me the peer group?

Q. On this chart, the peer group is above Iconix.

A. Who is the peers? Because no one ever really understood who our "peers" were.

Q. Mr. Cole, my question is: The peer group index is above the Iconix Brand Group. Right?

A. Yes. I just don't know who our peers are. If that's what the chart says, I agree.

MBIYCOL2          Cole - Direct          Page 2498

MR. THOMAS: Mr. Bianco, we can take this down.

Q. Now, Mr. Cole, I just want to make sure that we all have an accurate impression of how big Iconix was.

At the start of 2013, Iconix had about 20 employees. Right?

A. I don't know.

Q. You don't remember?

A. I don't.

Q. Does 20 sound right?

A. I think we had more in '13.

Q. Do you recall telling Jim Cramer in 2013 that you had 20 employees?

A. No.

Q. Would it be wrong if you had?

A. I can't imagine we grew from 20 to 150 in a year and a half or two, but we bought a lot of companies. So possibly.

Q. Now, you've mentioned the Iconix offices in Manhattan; right?

A. Yes.

Q. How many floors did you have?

A. We had two floors.

Q. How many people worked there?

A. I think I heard about a hundred. So I don't know exactly.

Q. You don't know how many people worked on the two floors of your company?

MBIYCOL2          Cole - Direct          Page 2499

A. It changed all the time. So I don't know.

Q. Let's talk about 2014.

How many people worked there then?

A. I don't know exactly.

Q. More than 50?

A. Yes.

Q. More than 100?

A. I think we said earlier that we had about 100 people in New York.

Q. All right. I want to turn a little bit and talk about the transformational deals that you discussed on direct.

Do you remember using that phrase, "transformational deals"?

A. Sure.

Q. The first one I want to talk about is the Peanuts movie.

Do you remember talking about that?

A. I do.

Q. If the jury were to look at the credit reel for that movie, would they find your name on it?

A. I was no longer with the company I think when it came out.

Q. If the jury looked at the credits, would they find your name in them?

A. I don't know.

Q. You didn't direct the movie, did you?

A. No.

MBIYCOL2          Cole - Direct          Page 2500

Q. You didn't write the movie?

A. I did not.

Q. You didn't animate the movie?

A. No.

Q. You did no voice acting for the movie?

A. No, I didn't.

Q. And you weren't responsible for distributing the movie.

A. No, but we were responsible for the licensing of all the products that go with the movie.

Q. Is there a lot of licensing that happens during the run time of the film?

A. No, but leading up to the film, it's a crazy amount of work. I think we got hundreds and hundreds of licensees working with people like Target and WalMart and McDonald's. Everyone does stuff with the movie. It was a tremendous amount of work for our company.

Q. I see. So it's not that you're working on the movie. It's that you're working on the products that people will sell when the movie comes out.

A. Right.

Q. Let's talk about the other transformational deal, CAA.

Do you remember that one?

A. I do.

Q. That stands for Creative Artists Agency?

A. Yes.

# A-1054

UNITED STATES OF AMERICA V
NEIL COLE,                                                                November 18, 2022

MBIYCOL2          Cole - Direct          Page 2501

MR. THOMAS: Let's put up, just for demonstrative purposes, Government Exhibit 3048.

Q. Mr. Cole, you recognize this; right?

A. I do. I believe we used it somewhere, maybe in opening.

Q. Your attorneys put this up for the jury right at the start of the case?

A. Yes.

Q. Now, Mr. Cole, would you agree this chart is misleading. Right?

A. I don't know. Tell me why.

Q. You don't know whether the chart is misleading or not?

A. No.

Q. Mr. Cole, it could be that the chart is misleading?

A. You'd have to explain it to me. I don't understand what you're saying.

Q. Let's do it this way. The label on this chart says: "Iconix Annual Revenue Versus Alleged Overpayments." Is that right?

A. Yes.

Q. It has this really big red oval for CAA; right?

A. Yes.

Q. It has 1.15 billion there.

A. That was the purchase price we were negotiating.

Q. Exactly. It wasn't revenue. Right?

A. No. I think revenue was like 7- 800 million.

MBIYCOL2          Cole - Direct          Page 2502

Q. Mr. Cole, this chart shows CAA as 1.15 billion. Right?

A. Yes. That was the deal price.

Q. And that's not revenue.

A. No.

Q. And that's not revenue compared to alleged overpayments; right?

A. The deal was 1.15. I don't know how, but okay.

Q. In fact, if this chart reflected the revenue from CAA, there would be no bubble for CAA. Right?

A. No. It would be about 7- 800 million was the CAA revenue.

Q. Well, sir, the CAA never closed; right?

A. No. It never closed.

Q. The company reported zero dollars associated with CAA in its quarterly filing in the second quarter of 2014? Right?

A. Correct. The deal never closed.

Q. And the company reported zero dollars in revenue associated with the CAA deal in the third quarter of 2014; right?

A. Zero revenue ever. We never closed the deal.

Q. And zero dollars for the full year 2014 too. Right?

A. Correct.

Q. So I want to stick with CAA for a moment.

The reason that you talked about CAA on direct is because you wanted the jury to think you were distracted by that deal while this all happened. Right?

MS. DABBS: Objection.

MBIYCOL2          Cole - Direct          Page 2503

THE COURT: Overruled.

THE WITNESS: I spent a lot of time on CAA. And it was -- they had 6,000 employees. It was a new and unique model for us. So it was a tremendous amount of our time and my focus because I thought it would be transformative.

BY MR. THOMAS:

Q. Well, it's for that reason I want to be very clear what we're talking about.

Are you suggesting it's possible you were distracted by CAA while a side deal occurred?

A. I wasn't distracted. It's where I was putting my focus. I thought it was good for the company. The SEA deals we had already done seven, eight, nine, ten of them. And it was kind of boilerplate I thought, and Seth was working with them.

I'm not sure how one has anything to do with the other, but I wasn't an active participant where I was incredibly active, thinking that the CAA transaction -- there were millions of documents. It was a crazy endeavor for our company because we never did anything like it. So it was a lot of learning.

Q. Mr. Cole, I want to be clear.

Are you suggesting there could have been a secret side deal while you were focused on all the paperwork about CAA?

A. There was never a secret side deal. Everything was in the agreement. So that's not how we did business.

MBIYCOL2          Cole - Direct          Page 2504

Q. You even though you were focused on CAA, you knew enough about the deal to know there's no secret side deal.

A. Correct. I know enough about the company, and I know enough about how we do business and just how business works.

MR. THOMAS: Let's take this down, Mr. Bianco.

Q. When you worked on CAA, there were proposed term sheets -- right? -- from time to time?

A. I believe so.

Q. And proposed letters of intent; right?

A. Yes.

Q. And one of the proposals contemplated that Iconix would pay to participate in the deal through a mix of cash and stock. Right?

A. I don't recall.

Q. In all that time you worked on the deal, you don't remember how you would pay for it?

A. The deal never closed, and it's been eight years/nine years.

MR. THOMAS: Let's show the witness Government Exhibit 3052.

Q. Sir, do you recognize this to be one of the term sheets?

A. Okay.

Q. That's a question, sir.

Do you recognize it?

A. I don't recognize the document. I don't think you could

UNITED STATES OF AMERICA V
NEIL COLE,                                                                                            November 18, 2022

MBIYCOL2        Cole - Direct        Page 2505

show me any document that I would recognize, unless it was part of this trial, because that's what I've been dealing with. I have no doubt that it's real. But I don't personally recognize the CAA document.

MR. THOMAS: Mr. Bianco, could you page forward maybe to the signature lines here.

Q. Having now flipped through it there, do you see this is a proposal for CAA?

A. Yes. From June 9. I got it.

MR. THOMAS: Mr. Bianco, can you go back to page 1.

Q. Mr. Cole, now having flipped through the document and seeing your name on the last page, do you now agree that this is a proposal that Iconix sent?

A. Yes. I don't doubt it.

MR. THOMAS: The government offers 3052.

MS. DABBS: Objection.

THE COURT: Sidebar.

(Continued on next page)

MBIYCOL2        Cole - Direct        Page 2506

(At the sidebar)

THE COURT: Mr. Thomas, what does this document say?

MR. THOMAS: It says that they're going to pay for the deal in a mix of cash and stock, which is the fact that he claimed he couldn't remember. And that fact is relevant because the stock price is relevant.

So by manipulating the stock price up by manipulating these transactions and inflating revenue, he has to pay fewer shares to obtain CAA. This very point and, if not this document, but a substantially similar ones were presented at the first trial.

MS. DABBS: He did not testify that it didn't involve stock. He can use it to refresh his recollection.

MR. THOMAS: Your Honor, I don't understand the basis of the objection.

THE COURT: What's the basis of the objection?

MS. DABBS: The basis of the objection is that he testified that he didn't recall what the specifics were about the use of stock. Now the government is offering to introduce this exhibit which he doesn't even recognize from the time. You can use the document to try to refresh his recollection if that was a part or a component of the consideration on that deal. I don't think they can just offer it.

THE COURT: There's been a substantial testimony about the CAA deal. Mr. Cole has testified about the CAA deal and

MBIYCOL2        Cole - Direct        Page 2507

his attention to it during the relevant time period. So it's arguably relevant. There is no dispute as to its authenticity I assume. He's authenticated it. So it's minimally relevant. I'll allow it.

MBIYCOL2        Cole - Direct        Page 2508

(In open court; jury present)

THE COURT: The objection is overruled. It will be received.

(Government's Exhibit 3052 received in evidence)

MR. THOMAS: Mr. Bianco, if you would publish that for the jury.

Q. Mr. Cole, do you see the second numbered paragraph beginning "Purchase Price"? Right?

A. Yes.

Q. You see the purchase price, at least as of this date, was to be $1.1 billion?

A. Yes.

MR. THOMAS: Mr. Bianco, if you would go to the second page. If you scroll down a little bit so Mr. Cole can see it.

Q. Do you see that the contemplated consideration would be a mix of cash and stock?

A. Yes.

Q. Now, the way a deal like this works is that the higher Iconix's stock price is, the fewer shares it has to pay into the deal. Right?

A. Correct.

Q. So if Iconix's stock price was high, fewer shares to participate at this price.

A. Correct.

MR. THOMAS: You can take that down, Mr. Bianco.

# A-1056

UNITED STATES OF AMERICA V
NEIL COLE,
November 18, 2022

MBIYCOL2    Cole - Direct    Page 2509

Q. Now, Mr. Cole, on direct, you said you worked a lot on this deal, but you didn't work alone on it. Right?
A. Yes.
Q. There were outside lawyers?
A. Yes. I believe so.
Q. The general counsel worked on it; right?
A. I don't know if Jason -- mostly the business team, but I'm sure Jason had to be involved with the LOIs and the deals.
Q. And the business team included David Blumberg; right?
A. Yes. David was probably working most closely with me.
Q. He was running point; right?
A. Yeah. I personally had a relationship with Bryan Lourd and Richard Lovett more than David, but David was helping me with the understanding of the business.
Q. Mr. Cole, to be very clear, CAA never agreed to any of the term sheets that you sent over; right?
A. We never signed the deal.
Q. They never agreed to the term sheets. Right?
A. I don't know if they agreed to the term sheets, but the deal never signed.
Q. They never sent you back a signed term sheet that you recall. Right?
A. No.
Q. They never sent back a signed letter of intent?
A. No.

MBIYCOL2    Cole - Direct    Page 2510

Q. The deal was never, ever close to being completed; right?
A. I thought it was.
    MR. THOMAS: Let's look at Government Exhibit 1293.
Q. Sir, do you recognize this to be an email from Jason Schaefer to you on May 18, 2014?
A. I do. Probably a Friday at Five.
    MR. THOMAS: The government offers 1293.
    MS. DABBS: No objection.
    THE COURT: It will be received.
    (Government's Exhibit 1293 received in evidence)
    MR. THOMAS: If you can publish that for the jury.
Q. So, Mr. Cole, to orient us in time, this is May 18, 2014. Right?
A. Correct.
Q. So that's about five months before SEA-3 closes; right?
A. Yes.
Q. A month and change before SEA-2 closes?
A. Correct.
    MR. THOMAS: Mr. Bianco, if you would enlarge here the "Deals" section.
Q. Do you see here there is a reference to "Tesla"?
A. Yes. That was our code name for CAA.
Q. That's the code name for the CAA transaction; correct?
A. Correct.
Q. And what Mr. Schaefer writes here, among other things in

MBIYCOL2    Cole - Direct    Page 2511

that last line, is that he's not doing any further work on the issue "until we hear back from CAA on Monday." Right?
A. Yes. That's what it says.
Q. The way the deal worked is it was starts and stops. And you were never quite sure if they were interested. Right?
A. Yes. That's how most deals work.
Q. In this one in particular, there were moments where the negotiation stalled entirely; right?
A. I don't recall.
Q. You don't recall either way, or you don't recall that happening?
A. I don't recall either way.
Q. So it could very well be that there were periods when you weren't working on this at all.
A. No. We were always working, but I don't know if CAA stopped responding to our documents. But we worked pretty hard, mostly on the HR side, trying to understand how to deal with 6,000 people.
Q. Mr. Cole, is it fair to say that by early July, this deal was totally dead?
A. Yes. I met with Bryan sometime in July, and he said he couldn't get his partners there. But I still pitched for a few more months and tried to convince him and change his mind. But it lost a lot of its steam where we kind of moved on sometime in July.

MBIYCOL2    Cole - Direct    Page 2512

Q. Fair to say that by the time SEA-3 rolls around, you are not working on CAA? Right?
A. No. I'm working on other things.
Q. You were working on other things than CAA; right?
A. Correct.
    MR. THOMAS: Now let's go to Government Exhibit 1290.
Q. This is another update from Mr. Schaefer to you, this one on July 14, 2014.
    Do you recognize that?
A. No. But no doubt that it's real if you say. It has my name on it.
Q. It has Mr. Schaffer's name on it.
A. Correct.
Q. It has your name on it?
A. Yes.
Q. This is in a format you recognize?
A. It's in a format I recognize, but it's very tough -- any document you put up, I'm not going to say I recognize it. But if it's to me, it would have probably come to me and I would have seen it.
    MR. THOMAS: The government offers 1290.
    MS. DABBS: No objection.
    THE COURT: It will be received.
    (Government's Exhibit 1290 received in evidence)
    MR. THOMAS: Mr. Bianco, could you enlarge the deals

MBIYCOL2          Cole - Direct          Page 2513

section, both one and two.

Q. Mr. Cole, do you see here he updates you on the Tesla transaction again?

A. Yes.

Q. And he says: "Waiting on next steps. No legal expenses currently being incurred."

Do you see that?

A. I do.

Q. This is July 14, 2014; right?

A. Correct.

Q. And in this deal section, there are only two deals that he's updating you about; right?

A. Yes.

Q. And the other one is Umbro China; right?

A. Correct.

Q. And that becomes part of SEA-3?

A. Correct.

MR. THOMAS: Mr. Bianco, you can take this down.

Q. Now, Mr. Cole, at various points in your direct examination, you talked about Seth Horowitz. So I want to pick up that subject for a moment.

A. Okay.

Q. Fair to say that you blame him for your situation?

A. Yes.

Q. Okay. And you talked about the floors on the puts being

MBIYCOL2          Cole - Direct          Page 2514

Mr. Horowitz's idea on direct.

A. They could have been Mr. Margolis or someone from -- or elsewhere. I have no idea where they came from.

Q. Mr. Cole, the reason that you're emphasizing the floors on the puts is because you want to explain why Mr. Horowitz felt uncomfortable during the SEC comment letter process. Right?

MS. DABBS: Objection.

THE COURT: Overruled.

THE WITNESS: No.

BY MR. THOMAS:

Q. Mr. Cole, isn't it your theory that Mr. Horowitz made up his allegations about the overpays and givebacks because he was upset that you blamed him for the floors on the puts?

MS. DABBS: Objection to the form of the question.

THE COURT: Sustained as to the form.

BY MR. THOMAS:

Q. Mr. Cole, your theory is that Mr. Horowitz made up the allegations about the overpay for SEA-2; right?

MS. DABBS: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. THOMAS:

Q. And your theory is that he made up the allegations about the overpayments for SEA-3; right?

A. Correct.

MBIYCOL2          Cole - Direct          Page 2515

Q. And you think one of the reasons that he did that was because he was upset about the floors on the puts?

A. No. Can I explain?

Q. No.

In the SEC comment letter process, you did blame him for the floors on the puts. Right?

A. It was more than the floors on the puts. It was also the minimum guarantees. It was basically a business deal that people thought there was no business purpose if you're selling and then giving the money back, and I blame Mr. Horowitz for that. Yes.

Q. So, Mr. Cole, you used that expression on direct as well, and I just want to follow up.

Are you saying that the SEA-2 and SEA-3 transactions did not have a business purpose in your view?

A. They were just horrible for the Iconix side. For GBG, they were pretty good. They were great deals. But Iconix has never done a deal like that which was so horrible.

Q. So from your perspective, did SEA-2 have a business purpose in your view?

A. I think it would be tough to find a good business purpose.

Q. Is that a no?

A. It would be tough to find a good business purpose. I don't believe it was good for us.

Q. Was there a business purpose to SEA-2, sir? I'm just

MBIYCOL2          Cole - Direct          Page 2516

trying to get an answer to my question.

MS. DABBS: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Not a good business purpose, no.

BY MR. THOMAS:

Q. And for SEA-3, was there a business purpose for SEA-3 in your view?

A. Not if we were giving all the money back, and then we had to pay a huge amount of money if it was successful. We had to first buy it. And then if it was a disaster, we give back the money. So a sane businessperson would look at those deals and not understand. They make no sense.

Q. So, Mr. Cole, to follow up on that, are you saying that no sane businessperson would sign that deal?

A. At least to my perspective.

Q. So you did sign the deal; right?

A. I did, because I didn't focus on the floors or the puts or the minimum guarantees.

Q. Now, at the time, Mr. Horowitz, he's not some rogue employee; right?

A. Well, he was new. He was brand new in this position. He just got the job, and this was the first deal that he negotiated that he kind of -- that he ran point on.

Q. The "position" you're referring to is chief operating officer of the company. Right correct?

# A-1058

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBIYCOL2          Cole - Direct          Page 2517

A. Correct.

Q. Is that the second highest-ranking executive of the company?

A. Possibly. He really wasn't, but if he grew, he was pushing to be president. So it was a resort. But no one else reported to him. There was not a structure. Usually COOs have CFO's. Unfortunately, it was still a spider they call it. But it wasn't a spider. It was a direct line where all the important people in the company still reported to me.

Q. Mr. Cole, I'm not sure that I follow.
Was Mr. Horowitz the chief operating officer of your company in 2014?

A. Yes. By title.

Q. That's what you told shareholders; right?

A. Correct.

Q. Did you tell them that his title was not accurately describing his function?

A. No. It was. But he had the responsibility as pre except he added GBG. He was still -- he spent a lot of time in the UK working on Umbro. And then he also ran the men's divisions. I think the only responsibility that changed was he was on the conference calls with me, and then he also took over the GBG relationship.

Q. Well, the change is that you promoted him; right?

A. Correct.

MBIYCOL2          Cole - Direct          Page 2518

Q. You gave him a new title?

A. Correct.

Q. And you introduced him to the public as the COO of Iconix; right?

A. I did.

Q. Now, Mr. Cole, yesterday you talked about troubles that you had with Mr. Horowitz when he first started at Iconix.

A. Yes.

Q. Notwithstanding those troubles, you still promoted him in 2014; right?

A. I did.

Q. You met with him on a daily basis; right?

A. I wouldn't say "daily." Sometimes five times a day, and sometimes we wouldn't speak for a couple of days, especially when both of us traveled.

Q. When you were in the office, sometimes you guys met privately in your office together. Right?

A. Sure.

Q. So like when Mr. Schaefer told us about seeing you and Mr. Horowitz early in the morning, that happened. Right?

A. Yes, but I don't think Mr. Schaefer could have seen us because, just based on your pictures, my desk was way back. But, yes. He was in my office and numerous times a day usually, if I was in the office or he was around.

Q. And there were times when you suggested Mr. Horowitz to be

MBIYCOL2          Cole - Direct          Page 2519

a speaker for charity events; right?

A. Maybe. We both had charitable causes together. So I supported his initiatives, and he supported mine.

Q. And you let him speak on behalf of the company at investor conferences?

A. Sometimes, if I didn't want to go.

Q. You let him speak on behalf of the company at investor conferences. Right?

A. Yes, sometimes, when he got that job.

Q. He represented the company to the public; right?

A. Sometimes, yes.

Q. So let's turn topics and talk for a moment about accounting. You mentioned that you have no formal accounting training.
Did I hear that right?

A. True. Yes.

Q. But you have worked at a public company that has employed accountants for years; right?

A. Correct. I was a CEO of a public company for 29 years.

Q. And you had to attend audit committee meetings over that time?

A. I did.

Q. And you've attended many audit committee meetings; right?

A. Three of four times 29, I've attended about 130 audit committee meetings probably.

MBIYCOL2          Cole - Direct          Page 2520

Q. You've talked to a lot of chief financial officers; right?

A. Often. Daily.

Q. You've looked at books and records of your company; right?

A. Sure.

Q. Mr. Cole, I just want to be clear about what you know and don't know about accounting.
You know what revenue is; right?

A. I do.

Q. And you know what expenses are; right?

A. I do.

Q. And you knew, as you told us earlier, that there is a way to structure a joint venture transaction so that you could record a gain on your books when it happened. Right?

A. That's at least what Mr. Shapiro told us.

Q. That's what you reported to the public in your Qs and Ks?

A. We did, when it was appropriate.

Q. Mr. Cole, you're generally familiar with GAAP; right?

A. I know the retail store Gap. And I've heard the terminology, but I don't really know -- it's generally accepted accounting principles, but I don't know what those principles are.

Q. I'm not asking if you're an expert in the principles.
I'm asking if, in your time as CEO, you encountered GAAP.

A. Probably. I didn't know it was what I was encountering at

MBIYCOL2          Cole - Direct          Page 2521

the time. But I definitely know the basics, if that's what GAAP is.

Q. Well, Mr. Cole, are you asserting that you didn't know that the financial statements of the company were prepared in accordance with GAAP?

A. I'm sure they were. If they were supposed to be, then they were.

Q. That's what you represented to the public, right?

A. Then they were.

Q. Are you saying that you didn't know what GAAP was when you made those representations?

A. I don't know what it is today, if you ask me what GAAP is. But I know, if it's a standard, we operate at the highest standard.

Q. And you know there are rules and regulations that require the company to present financial information in a way that is not misleading; right?

A. Correct.

Q. There are antifraud rules that apply to companies like Iconix; right?

A. Sure. Yes.

Q. If a company publishes numbers in public disclosures, they can't be materially misleading or false. Right?

A. Correct.

Q. And you reviewed all of Iconix's public filings; right?

MBIYCOL2          Cole - Direct          Page 2522

A. I did.

Q. And you signed them?

A. I did.

Q. And you know, in connection with those filings, that you needed to make certain representations to BDO. Right?

A. Yes.

Q. You had to file management rep letters with them; right?

A. Yes.

Q. And you provided those rep letters.

A. Right.

Q. Among those things that you represented to BDO is that they were apprised of any financial agreements that the company had. Right?

A. Correct.

Q. Okay. And you understood that Iconix's auditors would want to know about any linked transactions; right?

A. Correct.

Q. Now, Mr. Cole, I want to follow up on a specific accounting concept that you referenced in your direct this morning, and that's "roundtripping."

A. Yes.

Q. In 2014, you had heard that term before; right?

A. I don't believe so.

Q. Well, you were in the courtroom when Mr. Shapiro testified that he presented to the audit committee and you about the

MBIYCOL2          Cole - Direct          Page 2523

sensitivity surrounding roundtripping; right?

A. I heard Mr. Shapiro talk about something that happened in 2011 and that he said it at the audit committee, but I have no recollection. I did look into it, but I didn't know about it in 2014.

Q. You had never seen or heard the word "roundtripping"?

A. I don't remember hearing the word.

MR. THOMAS: So let's show the witness Government Exhibit 1520.

Q. Sir, you recognize these to be minutes of a meeting of the audit committee of Iconix's board of directors; right?

A. Okay.

Q. Do you recognize the format?

A. Sure.

Q. Is that a yes?

A. Yes.

MR. THOMAS: Mr. Bianco, if you would go to the next page. If you could enlarge the center paragraph.

Q. Do you see this is formatted in the way that the board -- the audit committee formats their minutes. Right?

A. Yes.

MR. THOMAS: The government offers 1520.

MS. DABBS: Objection.

THE COURT: Overruled.

(Government's Exhibit 1520 received in evidence)

MBIYCOL2          Cole - Direct          Page 2524

MR. THOMAS: Mr. Bianco, if you could publish this for the jury.

Q. Mr. Cole, do you see here there is a section of these audit committee minutes that has been enlarged?

A. I do.

Q. Do you see there in the second full paragraph that it relates to Mr. Cuneo turning the meeting over to Mr. Wyss and Mr. Shapiro?

A. Yes.

Q. That's a reference to Larry Shapiro who was here the other day?

A. Yes.

Q. And a few sentences down, do you see the words "roundtripping" in quotation marks?

A. I do.

MR. THOMAS: Mr. Bianco, if you could take this down and go to the first page, and if you could enlarge the top two paragraphs.

Q. Mr. Cole, you attended this meeting; right?

A. If my name is there, I don't doubt it.

Q. So you were there when they talked about roundtripping in 2011?

A. Probably, yes.

Q. Sir, you said if your name is there, you don't doubt it. Your name is here. You doubt it?

# A-1060

UNITED STATES OF AMERICA V
NEIL COLE,                                                November 18, 2022

MBIYCOL2          Cole - Direct          Page 2525

A. Yes. But from 13 or 12 years ago, I don't. I recall the transaction that you just showed on the next page.

Can I explain what happened?

Q. Mr. Cole, did the audit committee of the board of directors take accurate minutes in your time at the company?

A. I have no reason to doubt the minutes are accurate.

Q. So if the minutes reflect your presence at this meeting, then you were present. Right?

A. Correct.

MR. THOMAS: You can take that down.

Q. Now, just to go back to the management rep letter for a moment, you were aware not only that you had to make representations to BDO but that they relied upon them to do their work. Right?

A. Correct.

Q. The audit could not be completed unless you gave that representation.

A. Correct. Me and the CFO.

Q. Okay. So one concept that has come up a couple of times, in the last few days in particular, is the concept of a binding commitment within the meaning of the auditing guidance.

Do you remember that?

A. I remember Mr. Shapiro often said it had to be binding.

MR. THOMAS: Let's show the witness what's already in evidence as Defense Exhibit 558.

MBIYCOL2          Cole - Direct          Page 2526

Q. Mr. Cole, you were in the courtroom when Ms. Dabbs showed this document to Mr. Shapiro and asked him questions about it. Right?

A. Correct.

Q. This is particular auditing guidance?

A. I don't want to opine on auditor stuff.

Q. Or accounting guidance. Excuse me.

A. Yes. I don't know what it is or even be comfortable interpreting it for you. I was in the courtroom when Ms. Dabbs showed this to Mr. Shapiro.

Q. So fair to say then, Mr. Cole, that you were not relying on this particular provision of the auditing guidance to come to a conclusion about whether or not a giveback had occurred? Right?

MS. DABBS: Objection.

THE COURT: Overruled.

THE WITNESS: I would not have read accounting stuff.

BY MR. THOMAS:

Q. You didn't read this in 2014 before the SEA-2 deal; right?

A. No.

Q. And you didn't read it in 2014 before the SEA-3 deal. Right?

A. No.

MR. THOMAS: You can take this down.

Q. Another concept that's come up are merger and integration

MBIYCOL2          Cole - Direct          Page 2527

clauses.

Are you familiar with that topic?

A. I am. I'm an attorney.

Q. Mr. Cole, did you practice law?

A. For about six months, but I've also been a businessman for 29 years. So I understand what an integration clause is.

Q. In that time, have you litigated a lot of merger and integration clause cases?

A. It's somewhat ironic. But the roundtripping in 2011 was the only time I'd been in a courtroom in my life, and we won a $50 million verdict, and the integration clause was an important part of it.

MR. THOMAS: I see. So let's show you Government Exhibit 200.

Q. First, Mr. Cole, do you see this? Share purchase agreement for SEA-1.

A. Yes.

MR. THOMAS: Let's go to page 20. Mr. Bianco, if you could enlarge "Entire Agreement."

Q. Mr. Cole, did you read this paragraph before you signed the document?

A. Probably not.

Q. Okay.

A. Although it was the first SEA agreement. So I'm sure we all spent a little extra time before the amendments. So I

MBIYCOL2          Cole - Direct          Page 2528

possibly could have read the agreement, but it wasn't -- as I mentioned before, I had so much -- so many agreements, I depend on my lawyers often. But I'm not going to say I didn't read it.

Q. Mr. Cole, I want to be clear because you described for the jury your practice with respect to legal agreements.

I think I heard you yesterday say that you had your lawyers prepare you just a summary of the terms.

A. Yes. Often.

Q. But there were times when you just went page by page through the document?

A. Yes. If it was new or different, I would take it home and read a couple of things. But my practice was to rely on my lawyers, both inside and out.

Q. Well, earlier today, you told us that SEA was the seventh or eighth time you had done this template for joint ventures. Right?

A. Not me but the company. Gibson, Dunn and Andy Tarshis had done this deal. I had confidence in them. So I probably did not read it.

Q. Do you have any memory of reading this as you sit here today?

A. I don't.

Q. Did you ever ask Mr. Schaefer what it meant?

A. Mr. Schaefer, no. I knew -- Mr. Tarshis is the one who did

UNITED STATES OF AMERICA V
NEIL COLE,                                                     November 18, 2022

MBIYCOL2          Cole - Direct          Page 2529

this deal who was with me for eight or nine years whom I trusted.

Q. Mr. Schaefer was at the company while this agreement was in force. Right?

A. I think Mr. Tarshis -- Mr. Schaefer joined like a week or two before this deal signed. So I think Mr. Tarshis was -- worked with Barbara Becker at Gibson, Dunn on drafting it. So I would have had total confidence.

Q. Mr. Cole, my question is slightly different.

Did you ever seek advice from Mr. Schaefer about what this meant?

A. I don't recall.

Q. Did you ever seek advice from Ms. Alford about what this meant?

A. No. I think by this time in my career, I know what an integration agreement is. It's kind of the ABCs of business.

Q. So you know that they can be void if a contract is voided for fraud?

A. I didn't know that because I never participated in fraud.

MR. THOMAS: Let's go to Government Exhibit 210, if we can go to the second page, if we could enlarge the last full paragraph.

Q. Mr. Cole, do you recognize this to be the side letter agreement for SEA-2. Right?

A. When you say "side letter," what do you mean?

MBIYCOL2          Cole - Direct          Page 2530

Q. This is the letter that promises the parties what the price is and who's paying who.

A. Is it called a "side letter"?

MR. THOMAS: Let's go to the first page.

THE WITNESS: This is the amendment -- right? -- of SEA-2?

BY MR. THOMAS:

Q. It says: "Acknowledgment and payment of consideration for 50 percent shares of additional marks."

Right?

A. Okay.

Q. And it's styled as a letter?

A. Okay.

Q. Do you recognize this?

A. I don't recognize any particular documents, but I have no reason to believe I didn't see it as part of the agreement.

Q. Mr. Cole, you don't recognize this SEA-2 purchase price document?

A. From these proceedings? Sitting here? Okay. But it's tough for me to say -- are you talking about from 2014 or from yesterday?

MR. THOMAS: Well, Mr. Bianco, let's go to the next page.

Q. Did you seek any advice from Mr. Schaefer about the meaning of this paragraph?

MBIYCOL2          Cole - Direct          Page 2531

A. I don't recall seeking advice from Mr. Schaefer about this paragraph.

Q. Did you consult him about what would happen if there was an oral side agreement with this language in the document?

A. I think it's very clear. It says undertakings have to be -- it has to be written and not oral.

Q. Mr. Cole, my question is: Did you ask Mr. Schaefer for his advice on that topic?

A. No, I did not. I can't imagine I would because I knew -- as I said, I know what an integration agreement says.

Q. Mr. Cole, I again want to be very clear about your position.

Your position is that there was just no promise made to Li & Fung to pay back $5 million. Right?

A. Correct.

MS. DABBS: Objection to the form.

THE COURT: Overruled.

THE WITNESS: Correct.

BY MR. THOMAS:

Q. So it's not that there was a promise, but it's unenforceable because of the merger clause. Right?

A. There was no agreement. It says nothing oral happens before, but I know of no promise that the company made and signed and agreed to to Li & Fung.

Q. Mr. Cole, I just want to be clear about your belief.

MBIYCOL2          Cole - Direct          Page 2532

Your belief is that there was just no promise made; right?

A. Correct.

Q. Not that there was a promise made but it wasn't legally enforceable because of these words. Right?

A. No. I believe Horowitz made this up after his 50 meetings and his nine months after the agreement, or maybe before the 50 meetings.

MR. THOMAS: Let's go to Government Exhibit 212, page 2.

Q. Do you recognize this to be the SEA-3 consideration side letter?

A. Okay.

Q. Is that to say you do recognize it?

A. I'll take your word for it. I didn't see the front, but I'm sure. And I'm sure it's the same integration clause as the other two you showed me.

Q. Since we're talking about SEA-3, I want to make sure I ask you about this too.

Did you consult Mr. Schaefer about these words with respect to SEA-3?

A. I don't recall consulting Mr. Schaefer.

Q. Did you consult Ms. Alford about the words in SEA-3?

A. No. She was on maternity leave, but I don't think I would consult anyone about an integration clause.

UNITED STATES OF AMERICA V
NEIL COLE,                                                                                    November 18, 2022

| MBIYCOL2          Cole - Direct          Page 2533 |
| --- |

Q. Mr. Cole, sitting here today, do you remember whether or not you read this clause at the time that these documents were executed?

A. I don't.

Q. Again, to be very clear, it's your position that there just simply was no promise to overpay and give back money with respect to SEA-3. Right?

MS. DABBS: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: My position is there was no agreement between the parties. It's pretty obvious because we never paid it, and they never asked for it.

BY MR. THOMAS:

Q. Mr. Cole, is it possible to break a promise?

A. Not legally because you could sue and you could get the money back.

MR. THOMAS: I'll maybe come back to that thought in a moment.

Q. Your position is that there was no promise with respect to SEA-3 to overpay and give back the money. Right?

A. I know that the company made no agreement that was binding that was in an agreement that was signed on anything to do with SEA-3 that we did.

Q. So, Mr. Cole, is it possible that someone from the company made an oral agreement that just wasn't binding?

| MBIYCOL2          Cole - Direct          Page 2534 |
| --- |

A. I don't believe that was an agreement. I think it has to be -- every businessman knows that when you do a business, just like your rent or your car payment, it's in writing, you sign it, and you're obligated. If it's not, if it's a part of a negotiation or people believe it, it's unenforceable, and it's not real.

Q. Mr. Cole, I just want to be very clear about what you believe.

Did someone make a promise to overpay for SEA-3 on behalf of the company?

MS. DABBS: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't believe so. Or I haven't heard a valid person say that, nor prove it.

BY MR. THOMAS:

Q. So, Mr. Cole, your position is not that there were words that were spoken. They're just not legally enforceable. Right?

A. I was not witness to any words or part of any agreement or any discussion. I rely, as the CEO of the company, on agreements that are signed, enforceable, that have integration clauses, that are signed, and that are real.

Q. Well, Mr. Cole, when you say that you relied on them, you don't read all of the agreements. Right?

A. But I have lawyers that read them, and I know they have

| MBIYCOL2          Cole - Direct          Page 2535 |
| --- |

integration clauses, and I know how business works. Any CEO would say the same thing.

Do you think any CEO of a company knows about the thousands of agreements they have? That's why you have agreements. If people are running around, hundreds of people, talking and negotiating and they come back a year later when they're angry and say they said something, everyone knows it's meaningless.

Q. Mr. Cole, when you say "thousands of agreements," you don't mean thousands of joint venture agreements; right?

A. What's special about a joint venture?

That was small compared to our -- our acquisition agreements averaged $200/$300 million.

Q. Mr. Cole, in every public filing that we've looked at from your company in 2014, you boasted about the joint ventures, didn't you?

A. Because that's what we were doing. If we were acquiring companies, we would have put them in there if you look at every other opinion.

Q. The joint ventures are in the highlights of the quarterly filings; right?

A. It sounds like it in what you showed in the bottom.

Q. And in the annual K; right?

A. Correct.

Q. And they're highlights because they're highlights of your

| MBIYCOL2          Cole - Direct          Page 2536 |
| --- |

company. Right?

A. No. It was important to tell the investors what we were doing, what was real growth and what was new deals. If we bought something, it would be in the highlight. It was what we were expected to do and what we did.

Q. So the highlights section of the annual 10-K did not represent the highlights of your company?

MS. DABBS: Objection.

THE COURT: Overruled.

THE WITNESS: Not necessarily. You know, I don't think, for instance, if we did $460 million and highlighted $12 million, I don't think it would mean very much. And I think an investor would understand that. I don't think it would be the highlight of the company.

BY MR. THOMAS:

Q. Mr. Cole, because you keep talking about relying on lawyers, I want to ask about the puts on the floors one more time.

A. You mean the floors on the puts.

Q. The floors on the puts. Yes. Thank you.

Those are in the documents right for SEA-2?

A. Yes.

Q. They're in the documents for SEA-3?

A. Yes.

Q. Lawyers worked on those deals; right?

# A-1063

UNITED STATES OF AMERICA V
NEIL COLE,                                                                                      November 18, 2022

---

MBIYCOL2          Cole - Direct          Page 2537

A. Yes.

Q. Those terms are right there on the page?

A. Yes. Lauren Gee worked on the deals, who we haven't seen here. I don't know if you -- I don't know think you can rely on them as businessmen. What I'm saying is those deals are ridiculous as a businessperson, not as a lawyer.

Q. That's why I'm asking about the term itself.

A. The term itself --

Q. Leaving aside the business purpose, the only thing standing between you and knowing that term is in the agreement is reading the agreement. Right?

A. Correct.

Q. And that was true for 2, the second deal.

A. Every agreement. If I don't rely on my attorneys to do it, but, yes. I didn't -- I don't believe I read the agreements or the details. I obviously read and knew how much it was and things like that.

Q. That was also true for SEA-3; right?

A. Correct.

Q. So when you talk about being surprised by Seth Horowitz had agreeing to the floors on the puts, that surprises because you didn't read the agreements. Right?

A. No. It's just a shocking term. We had never done it in our previous eight or nine agreements. I don't believe I ever did a deal in my life where someone gives you something and you

---

MBIYCOL2          Cole - Direct          Page 2538

give it back. It just makes -- no one would do that. It doesn't make any business purpose.

MR. THOMAS: Now let's go to Government Exhibit 1038 which came up on direct.

Q. Do you recognize this from earlier this morning?

A. Yes.

Q. Sir, Ms. Dabbs asked you about paragraph 3.

A. Yes.

Q. And that has a floor on the buyback after five years. That phrase is there?

A. Yes.

Q. That is the floor on the put that we're talking about; right?

A. Yes.

Q. So this time it's right there in the email; right?

A. Yes.

Q. You said on direct that you didn't know what that referred to.

Did you ask Mr. Horowitz when he sent you this message?

A. No. I don't recall, especially there's no number. Having a floor of let's say 2 million or 3 million on a $20 million deal makes sense. But to give all the money back after you buy it, that didn't make sense to me. But, no. I didn't recall this email until this trial.

---

MBIYCOL2          Cole - Direct          Page 2539

Q. So, Mr. Cole, let me make sure I understand that. You don't take issue with having floors on puts. You take issue with the numerical dollar value that was assigned to the floor.

A. Correct. I never heard the concept before, I didn't believe, at the time.

Q. You had never heard the concept of a floor?

A. A floor on a put that came close to the price of the deal makes no sense to me. To me, that could be roundtripping.

Q. Did you ask Mr. Horowitz what this meant at the time?

A. I don't recall asking him at the time.

Q. Okay. If you had asked him, you might have learned what he was talking about. Right?

A. Yeah. If he told me what he was doing, I would have told him we weren't going to do that.

MR. THOMAS: Well, let's go to Government Exhibit 1292 just for the witness and the parties I think.

Q. Do you recognize this to be an email you received from Mr. Schaefer attaching deal documents or an update on the deal -- excuse me -- on June 26, 2014?

A. I mean, the title is right, and I would have seen it. I'm not going to go through the same do I recognize. But, yes. I'm sure I got it.

MR. THOMAS: The government offers 1292 to the extent we haven't already.

---

MBIYCOL2          Cole - Direct          Page 2540

MS. DABBS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1292 received in evidence)

MR. THOMAS: Now, if you could leave this up here for a moment, Mr. Bianco.

Q. Mr. Cole, do you see here that attached to the document are the blacklines from the agreements?

A. No. I don't see from what you're showing me, but I have no doubt they were. I see all the attachments, yes.

Q. Blackline consideration side letter. And then later on blackline shareholders' agreement. Right?

A. Yes.

Q. If you had read the attachments to this email, you would have seen that there were floors on the puts; right?

A. Yes.

Q. But you didn't read it.

A. No. It looks like it's 100/200 pages.

MR. THOMAS: You can take that down.

Q. Turning topics for just a moment, we've talked a little bit about Li & Fung, LF Asia, and GBG. I want to return to that subject a little bit more.

You signed every deal that was done with GBG or Li & Fung. Right?

A. I believe so. What I've seen in this courtroom.

Q. Okay. And you had a role in picking who Iconix would

---

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBIYCOL2     Cole - Direct     Page 2541

partner with for those deals; right?

A. Yes. I was the ultimate decision in the company, and I relied on the advice of others, and I made the decision of who to --

Q. So when GBG got picked, that's a reflection of your decision-making. Right?

A. Correct.

Q. And two of the GBG executives who had primary responsibility for the Iconix relationship were Jason Rabin and Jared Margolis. Right?

A. Correct.

Q. In public statements, you've called GBG or its predecessor, LF Asia, a best-in-class partner. Right?

A. It sounds like I would.

Q. You referred to them as the "gold standard." Right?

A. Okay.

Q. Is that correct?

A. I don't know. You can show it to me, but I'm not denying it. I'm sure I could have said that. They were our partner.

Q. Mr. Cole, in a prior proceeding, did you refer to GBG as the "gold standard"?

A. I will take your word for that, Mr. Thomas. I just said I thought they were the endgame. So I definitely thought they were the gold standard.

Q. And you were in the courtroom when Jason Rabin testified;

MBIYCOL2     Cole - Direct     Page 2542

right?

A. I did.

Q. You were in the courtroom when Jared Margolis testified?

A. I did -- or I was.

Q. Mr. Cole, is it still your opinion that Jason Rabin represents the gold standard?

A. No.

Q. Is it your opinion that Jared Margolis represents the gold standard in the industry?

A. Absolutely not.

Q. You would agree they're not best-in-class partners; right?

A. Every company they've been associated with recently has gone bankrupt.

Q. These are the people that you and your team worked with on the deals. Right?

A. At the time, yes. That's what I thought.

Q. These are the people that you and your team worked with to do the SEA deals; right?

A. Correct.

Q. Now, Mr. Margolis was one of the executives who had primary responsibility for GBG. Right?

A. Okay.

Q. Sir, do you know?

A. I didn't work with him. I believe Mr. Margolis, after looking through all the documents at this trial, worked very

MBIYCOL2     Cole - Direct     Page 2543

closely with Mr. Horowitz.

Q. Mr. Cole, I want to pause there for a second to make sure that I heard you correctly.

Is it your testimony that you didn't work with Mr. Margolis?

A. Rarely. My primary contact, for the little contact I had for 2 and 3 -- mostly I got it from Seth. I did see periodic phone calls with Jason which definitely could have been about SEA-2.

Q. I want to stick with Mr. Margolis for a second.

Sir, you're on emails with Mr. Margolis throughout 2014, aren't you?

A. I don't know. You just showed me 50 people I'm on emails with that I've never met.

Q. Are you saying that you never met Mr. Margolis?

A. I did meet Mr. Margolis. Whenever I would see Mr. Rabin, sometimes Mr. Margolis would be with him.

MR. THOMAS: Let's show the witness Government Exhibit 1133. I think this is in evidence and can be published to the jury. If we can enlarge this central paragraph. Mr. Bianco, if you could enlarge the December 1 message at 7:16.

Q. Do you see here in this message Margolis writes: "I'm meeting with Neil and Jason in the afternoon"?

A. Yes.

Q. You understand you are the "Neil" right?

MBIYCOL2     Cole - Direct     Page 2544

A. I am the "Neil." Yes. Probably.

Q. And "Jason" refers to Jason Rabin?

A. Yes.

MR. THOMAS: Let's take this down. Let's go to Government 1136. If we can enlarge the top.

Q. You do recognize this too, don't you?

A. I do.

Q. And this refers to: "Subject meeting: Jason, Neil Cole, Jared Margolis." Right?

A. Yes.

Q. And the meeting location is listed as "Iconix office, 1450 Broadway at 40th Street."

Right?

A. Yes.

Q. And that would be a meeting between you, Mr. Margolis, and Jason Rabin; right?

A. Yes.

MR. THOMAS: You can take this down.

Q. Now, I want to come back to the negotiating history of SEA-2 briefly.

You said that you, I think yesterday, spent very little, almost no, time on SEA-2 or working with Li & Fung.

Is that right?

A. Correct.

Q. Was that an accurate statement?

UNITED STATES OF AMERICA V
NEIL COLE,
November 18, 2022

MBIYCOL2          Cole - Direct          Page 2545

A. I believe so.

Q. Now, after SEA-1 was closed, isn't it true that you continued to negotiate with them about brands for Korea?

A. Yes.

Q. And that Korea piece became SEA-2; right?

A. Correct. That's what Mr. Horowitz and Mr. Margolis had all of those emails about.

MR. THOMAS: Let's look at Government Exhibit 2111.

Q. Do you recognize this to be a message that you sent to Ms. Alford copying Jason Schaefer and others?

A. Okay. Yes.

MR. THOMAS: The government offers 2111, to the extent we haven't already.

MS. DABBS: No objection.

THE COURT: It will be received.

(Government's Exhibit 2111 received in evidence)

MR. THOMAS: Mr. Bianco, if you would publish that.

Q. Mr. Cole, this is a message you're on about the negotiation surrounding the Iconix Korea joint venture. Right?

A. Okay. I've never heard of an Iconix Korea, but I gather, before we talked about SEA-2, we were talking about something different.

Q. You were talking about having it as a standalone joint venture; right?

A. I gather, yes.

MBIYCOL2          Cole - Direct          Page 2546

Q. And that gets combined with a couple of other pieces and becomes SEA-2; right?

A. Yes.

Q. And this is you participating in the discussions about the Korea piece of that in February of 2014. Correct?

A. Correct. This was before Mr. Horowitz got involved.

Q. Right. Mr. Horowitz isn't on this message at all?

A. Correct.

MR. THOMAS: We can take this down. Let's go to Government Exhibit 2110.

Q. Do you recognize this to be a message that you sent to Erica Alford and Jason Schaefer and Dan Castle on March 25, 2014?

A. Okay.

Q. Do you see the subject is "Korea JV status"?

A. Okay.

MR. THOMAS: The government offers 2110.

MS. DABBS: No objection.

THE COURT: It will be received.

(Government's Exhibit 2110 received in evidence)

MR. THOMAS: Mr. Bianco, if you would publish that for the jury.

Q. Mr. Cole, we're looking here at a March 25, 2014, message that you sent. Right?

A. Yes.

MBIYCOL2          Cole - Direct          Page 2547

Q. And this, again, is about the Korea piece of the deal that becomes SEA-2. Right?

A. Okay.

Q. Is that correct?

A. Yes. It looks like it.

Q. And if you look at Ms. Alford's message below --
Mr. Bianco, if you could enlarge the second full paragraph.
-- you'll see that you're even included in the discussion about the $3.3 million purchase price for those marks.

A. Yes.

Q. And at one point in time, there were later deal documents -- right? -- that had the Korea piece at 3.3?

A. I believe so, yes.

MR. THOMAS: You can take that down, Mr. Bianco.

Q. Mr. Horowitz -- not on this message either.

A. No. I think he took over for men.

Q. So as late as March 25, 2014, you were still primarily involved in the GBG relationship. Right?

A. Yes. And I think right around this time, Jason had a heart attack or open-heart surgery.

Q. Up until the end of March 2014, you were the primary person in charge of GBG; right?

A. Okay.

MBIYCOL2          Cole - Direct          Page 2548

Q. Is that right?

A. I think so. I don't know who else was working --

Q. Mr. Cole, I asked because yesterday and today you said that you handed that relationship off to Mr. Horowitz. Right?

A. Yeah. I think right around this time.

Q. And I want to be clear to the jury that there are months after SEA-1 where it was still your deal. Right?

A. Do you mean the future JV? Because we had 18 deals. Every part of our company was involved with Li & Fung.

Q. Including you.

A. Including me, yes.

Q. Including you with respect to the Korea marks to be done in a deal with GBG. Right?

A. That's what it looks like on March 25. Yes.

Q. All right. Let me turn and focus for a moment on Jason Rabin.
Now, I think I heard you say yesterday and again today that you didn't personally want to deal with Jason because Jason was always asking you for stuff?

A. Yeah. It was uncomfortable because we were also friends. We had similar -- we were in the same social circle, and our kids went to school. So I didn't feel comfortable doing business with Jason.

Q. What he was asking for were side agreements with you. Right?

# A-1066

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

---

MBIYCOL2     Cole - Direct     Page 2549

A. He was asking for money. You can call them whatever you want in the agreement or outside the agreement. He was asking for chargebacks. He was asking for cash, money.

Q. He was asking for money on the side of the deals that you already had; right?

A. No. And actually, it was the opposite. In SEA-1 and 4, they're in the deals when I dealt with Jason.

Q. By "SEA-4," you mean MENA?

A. MENA. Those are in the deal when I do business. When Horowitz and Margolis are when these allegations came about.

Q. Let's pause there for a moment, Mr. Cole.

If I understand you correctly, what you've said there, Mr. Rabin was not honest or accurate when he told the jury that you had made a commitment to him. Right?

A. No. You had threatened to indict him. And therefore, he changed his story. If you look at what he originally said for the first four years and then after you threatened him, you got him to change his story.

Q. Mr. Cole, what Mr. Rabin told the jury you think was false. Right?

A. I believe that 80 percent was true except that one line that you forced him to say unless he would have been indicted.

Q. You think when Mr. Rabin told the jury that you made a commitment to him, that he was testifying falsely. Right?

A. A hundred percent.

---

MBIYCOL2     Cole - Direct     Page 2550

Q. And you think, when Mr. Margolis said that such a commitment existed, he testified falsely. Right?

A. The same threat you made to Margolis is the same threat that you made to Rabin, and you definitely got them both to lie.

Q. Mr. Cole, I'd ask you to answer my question.

And my question is: You think Mr. Margolis testified falsely when he said there was this side arrangement. Right?

A. Mr. Margolis only heard it from Rabin. So I think Rabin is the one. Margolis might have thought he had something because he heard it from Rabin. He didn't hear it from me or Horowitz or anyone. Mr. Margolis didn't testify to anything. He just basically said he spoke to Mr. Rabin. Rabin I believe that you forced him to lie.

Q. Mr. Cole, I want to make sure that I understand.

Do you think it's possible that Mr. Margolis was telling the truth?

A. Yes. I think Mr. Margolis might have thought Rabin had told him that there was a $5 million -- I guess Margolis was kind of programmed like a robot when he kept saying, $5 million, $5 million overpayment.

Q. So it would be entirely believable to you that Mr. Margolis thought at the time and heard from Mr. Rabin at the time that there was an overpayment?

A. Possibly.

---

MBIYCOL2     Cole - Direct     Page 2551

Q. Now I want to focus on Mr. Rabin again for a second.

Even after you passed off this relationship to Mr. Horowitz, you kept in direct contact with Mr. Rabin. Is that right?

A. I always spoke to Jason about different things, and whether they were personal or friendship or about his health and business. So I did speak to Jason once in a while.

Q. You guys would talk on the phone; right?

A. Correct.

Q. You would sometimes meet up in person; right?

A. Sometimes, yes.

Q. You would exchange emails; right?

A. Yes.

Q. He was a primary business contact of yours at GBG; right?

A. Yes. I also talked to Dow Famulak, who was his boss, who was president. And I spoke to Ron Ventricelli. And I also spoke to Bruce Rockowitz who was the COO of the whole Company.

But Jason -- I tried to change the relationship because in the beginning in SEA-1, we were doing business on Rocawear and a lot of licenses. But I wasn't definitely comfortable dealing with Jason on a business point of view. I'm not denying I did speak to Jason about business from here.

Q. Mr. Cole, you gave us a list of people you dealt with. I just want to make sure I understand.

Jason Rabin was one of the primary business contacts

---

MBIYCOL2     Cole - Direct     Page 2552

that you had at GBG; right?

A. Yes.

Q. And you would deal with him directly?

A. Sometimes.

Q. You would deal with him directly, even after Mr. Horowitz began to run point on deals. Right?

A. Correct.

Q. Now, you brought up what you called SEA-4, MENA. So I want to turn to that.

A. Sure.

MR. THOMAS: Let's go to Government Exhibit 1167.

Q. Do you recognize this as a message that you received from Ethan Cole?

A. I don't recognize the message, but it looks like my email. So I'm sure I got it.

Q. You don't recognize this even from the trial, sir?

A. Yes. I have no reason to think I didn't see it.

Q. And Ethan Cole -- he works at GBG; right?

A. Yes. He was a junior person who came from Canada. I think he was 22 or 23 years old when he wrote this email. But he was -- as we heard, he was Margolis' assistant or secretary or whatever.

Q. Sir, did you know Ethan Cole well enough to know his personal biography?

A. I've learnt it recently. I didn't know Ethan Cole well

---

UNITED STATES OF AMERICA V
NEIL COLE,                                                                      November 18, 2022

MBIYCOL2          Cole - Direct          Page 2553

enough at the time. I might have met him, but I didn't know him. I didn't do business with him.
Q. Well, MENA is business; right?
A. Yes.
Q. And he's sending you an email about MENA?
A. I think he's sending it on behalf of Jared or the company. But he's also sending it to five other people in my company -- the lawyers, Seth, Jason, all the people involved in the deal.
Q. Sir, is this a business communication or not?
A. It is.
Q. Okay. And it comes from Ethan Cole?
A. Yeah. Actually, can I correct myself a little bit. I think by this time, Seth had went away on December 18. And I might have taken over and possibly met with Jason and negotiated the final terms. So this could be memorializing that discussion.
Q. Sir, on direct examination, you said that you negotiated the diligence payment down. Right?
A. Correct.
Q. That's not correct, is it?
A. It is.
Q. Look at the third bullet here.
Do you see that this reflects that the payment increased to 3.1?
A. Yeah, but it was 6 a week ago.

MBIYCOL2          Cole - Direct          Page 2554

Q. This document says: "Increased to 3.1."
A. Yes. But pull up the documents that say it was 6 million.
Q. Mr. Cole, does this document say: "Increased to 3.1"?
A. Yes. That's what this document says.
Q. And 3.1 is the amount that you ultimately paid; right?
A. Yes.
MR. THOMAS: Let's go to Government Exhibit 1171. If we could go to page 2. Mr. Bianco, if you could just enlarge the price and up. Thank you.
Q. Mr. Cole, do you recognize this to be the invoice for MENA?
A. I assume it is. I don't recognize it, having seen it at the time. But I have no doubt that this was the invoice as per the contract.
Q. Mr. Cole, in 2014, there was a rule at your company that you had to sign off on any transaction above $250,000. Right?
A. I would assume that.
Q. Was that the rule or not?
A. Yes. This was a contractual agreement that was part of the documents. But I signed every wire, or I cosigned. I made sure that I wasn't the only signature, but I would have had to sign off. But this was in the documents. Everyone knew about it.
Q. Well, Mr. Cole, there is no backup to this invoice. Right?
A. Yeah. It was contractual. The backup is the big agreement.

MBIYCOL2          Cole - Direct          Page 2555

Q. Mr. Cole, did you ever see any market analysis that GBG prepared for you?
A. No.
Q. Did you know what due diligence they did, if any?
A. It really didn't matter to me. I know they did diligence because it was the Middle East and they hadn't been there.
Q. Mr. Cole, I want to take you up on that point.
It didn't matter because this payment wasn't for value; right?
A. No. It was. We got 18.7. They got 3.1. So we netted. What I was focused on, my shareholders. We netted 15.7 million, which is what I cared about.
Q. Mr. Cole, what did your shareholders get for this $3.1?
A. They got $15.7 million. I looked at the agreement as a whole. This was something that my partner or my good business consultant wanted -- not consultant. The person on the other side of the deal. So I agreed to it because I was focused on we got $15.7 million which I thought was a great deal.
Q. Mr. Cole, I want to break that down.
Are you saying that you agreed to send the $3.1 million back because they agreed to pay $3.1 million above the $15 million price?
A. No. They agreed to give us 18.7, and we agreed to give them 3.1.
Q. And you got to tell shareholders it was 15; right?

MBIYCOL2          Cole - Direct          Page 2556

A. I netted it.
Q. The $3.1 million washes out; right?
A. Yes. It washes out of the 18.7. So we would net 15.6.
Q. And you didn't get anything for it.
A. We got 15.6.
Q. Did you get any diligence?
A. It wasn't my diligence. It was his. I couldn't care less.
Q. Did you get any market analysis?
A. He was the one. It was him, not me.
Q. You're paying a counterparty to learn about a market you're hiring him to work in; right?
A. I was getting $15.7 million, which was a great multiple. But Mr. Rabin and how he dealt with PricewaterHouse and whoever he dealt with was irrelevant to me. I was focused on me and my shareholders and what was good for our company.
Q. Mr. Cole, I want to press on this for a second.
Why not just do the deal at $15 million and not have money flow in a circle?
A. This is what Mr. Rabin wanted. He originally wanted 6.
Q. And you reported to your shareholders the higher price of 18; right?
A. Right. Mr. Shapiro saw it. The national office saw it. Everyone saw it. We had done similar types of deals through the last ten years.
Q. Did you ever tell Mr. Shapiro that you never received a

# A-1068

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

---

MBIYCOL2    Cole - Direct    Page 2557

market analysis?

A. I don't think Mr. Shapiro cared. He was looking at Iconix. He's not the auditor for GBG.

Q. Mr. Cole, would you agree with me that there was a culture of roundtripping at your company?

A. Absolutely not. If you want, I'll tell you other examples like this.

Q. I want to show you Government Exhibit 207.

A. "Roundtripping" means --

THE COURT: There is no question before you, Mr. Cole.

THE WITNESS: Well, he accused me of having a culture.

BY MR. THOMAS:

Q. Do you recognize this document?

A. I do.

Q. This is the consultancy agreement your lawyers have talked about for SEA-1?

A. Correct.

MR. THOMAS: Now if we can go to page 2.

Q. In this document, your company agrees to pay $2 million to LF Asia; right? Or to Li & Fung, its affiliate. Right?

A. Correct.

MR. THOMAS: Mr. Bianco, if you could enlarge the paragraph beneath the installment schedule, the text beneath the installment schedule above "Terms and Transactions."

Q. Mr. Cole, that amount of money was going to be paid to LF

---

MBIYCOL2    Cole - Direct    Page 2558

Asia, regardless of whether they did anything of value to you at all; correct?

A. Well, they had already performed the value. They had been working for us for the prior three months before the deal closed. This is what Mr. Rabin asked me for the 2 million, and I was fine because we were getting 12.

Q. Let's break that down for the jury.

A. Sure.

Q. This consulting agreement purports to a hire Li & Fung affiliate to provide consulting.

A. Correct. It's an agreement that we signed in July, if you want to pull that up.

Q. This agreement was signed in July?

A. No. There was a predecessor where hired GBG to go into the territory and evaluate and meet with all of the licensees. And this is what the 2 million payment was for.

Q. Mr. Cole, I want to focus on this document.

This is a document that you signed at the end of September 2013; right?

A. Correct, I think as part of 20 other documents.

Q. And this document purports to hire a Li & Fung affiliate as a consultant; right?

A. Correct, but they had already done the work.

Q. You weren't looking for any future consulting?

A. I don't believe so. They were going to be our partner

---

MBIYCOL2    Cole - Direct    Page 2559

after the deal closed.

Q. This document is just a vehicle to get 2 million that Jason wanted it out to Jason. Right?

A. Jason drafted it. Jason asked for it. I said to my lawyers, if you're not comfortable, don't do it. We signed it, and we got 12 million. He got 2. You saw the 8 million he did with Spyder. He did 50 of these. This is how he did business, and I was okay, if my accountants and lawyers were okay.

Q. Did you tell Mr. Shapiro whether your company received any consulting services?

A. If Mr. Shapiro asked. My CFO was the one who negotiated this deal and my lawyers. I was there in the beginning, and I was there talking to Jason. But I put Jason in touch with Warren Clayman, who was my CFO. When he asked for the money, I said, if my CFO and my lawyers are comfortable, I am okay with it. It was accommodating the customer.

Q. So, Mr. Cole, would you agree with me that a CEO shouldn't be sending millions of dollars out the door for no value?

A. I got 12. What do you mean no value? I got $12 million.

Q. You're buying cash with cash?

Is that what you're saying?

A. No. It was part a bigger deal. If you saw it, it was a telephone book of agreements. We looked at it. There were like 20 lawyers. The lawyers and the accountants were all over this deal. And I was accommodating the customer. And I told

---

MBIYCOL2    Cole - Direct    Page 2560

them, don't do anything you're not comfortable with.

Q. Mr. Cole, I want to come back to my question, which is: Would you agree with me that it would be irresponsible for a CEO to send millions out the door without getting anything of value in return?

A. Yes, but that's not what happened here.

Q. You would agree it would be irresponsible?

A. Yeah. But we got $12 million.

Q. With respect to the marketing payments, the 5 million and change, the 5.4 million, that's money you sent out the door and got nothing in return for. Right?

A. No. We got a lot in return.

MR. THOMAS: Let's go to Government Exhibit 1068. If we can go to the next page.

Q. Now, Mr. Cole, you recognize this document from these proceedings; right?

A. Yes. It's Ethan Cole, who we haven't seen him here, writing this to Jared Margolis.

Q. Do you see these bullets under the $5 million overpay sentence?

A. I do.

Q. You've seen those kinds of bullets before; right?

A. Mr. Ethan Cole's bullets? What do you mean? Like a circle?

Q. These bullets were in updates provided to you by

---

# A-1069

---

MBIYCOL2     Cole - Direct     Page 2561

Mr. Horowitz. Right?

A. Yes. There was obviously a negotiation going on of some sort, but these are requests going back and forth. Yes.

Q. Requests back and forth about an overpay. Right?

A. I don't know what they were thinking.

MR. THOMAS: Let's go to Government Exhibit 1063.

THE WITNESS: Rocawear -- that doesn't make sense to me. But go ahead.

MR. THOMAS: Can we go to the next page. If we could enlarge the GBG section.

Q. This is an example of Mr. Horowitz updating you about his negotiations with GBG; right?

A. This is an example of a Friday at Five that Mr. Horowitz sent me.

Q. You read those; right?

A. I tried. This one I was away. I'm sure, as I mentioned before when Ms. Dabbs showed it to me, that I read it at some time. But I don't recall reading it in the middle of August or at this time. It could have been a week later. It was my practice to read Friday at Fives.

Q. Mr. Horowitz at the time was your COO; right?

A. He was.

Q. And he was negotiating the SEA-3 transaction; right?

A. If you scroll down and look at the next one, he was negotiating lots of transactions with GBG, especially on the

---

MBIYCOL2     Cole - Direct     Page 2562

next report.

Q. Which you knew; right?

A. Sure, especially after I read it.

Q. Here in the first line it says: "5 million of current marketing liabilities"?

A. Yes.

Q. Now, 5 million, that's the same amount in that Ethan Cole message that we just saw; correct?

A. Yes.

Q. And "marketing liabilities," do you see those words?

A. I do.

Q. And "liability" is of course something that is owed; right?

A. Correct.

Q. And you understood that; right?

A. No.

Q. You don't understand the word "liability" to mean something that is owed?

A. I do, but I did not focus or understand that -- we did not owe them any money. This was the first Horowitz said something, two months after SEA-2 closed, and we didn't owe them any money.

But I don't recall reading it at the time. I do recall speaking to Horowitz about asking for marketing money in September and October, but I don't recall August 18.

Q. Mr. Cole, you agree the word "liability" means that

---

MBIYCOL2     Cole - Direct     Page 2563

something is owed?

A. Correct.

Q. That liability can be created by a promise. Right?

A. In my world, it's created by an agreement, and it's usually -- and it's signed. It's a business agreement signed by two parties and two companies.

Q. Have you ever heard of a "handshake deal"?

A. Not in the business world that I lived in. When I had tens of thousands or thousands of agreements, people that weren't me, that were responsible for financials, shaking hands was not the practice. The company did not operate that way.

Q. As a CEO, it was your job to be a good steward of the company's finances. Right?

Mr. Bianco, you can take this down.

THE WITNESS: Correct.

BY MR. THOMAS:

Q. And that included keeping expenses down where you could; right?

A. Yes. I always tried to do that.

Q. And you had a budget; right?

A. I do. I had a yearly budget that the board approved, and I did my best to keep a discipline throughout the company.

Q. And part of keeping that budget is to push back on expenses that don't make sense; right?

A. Yes. Always push back.

---

MBIYCOL2     Cole - Direct     Page 2564

Q. Expenses that don't serve the business purpose; right?

A. Yes. If it wasn't something that made sense to me from a business purpose, I would a hundred percent push back.

Q. Spending that was extravagant; right?

A. Sure.

MR. THOMAS: Let's show the parties and the witness Government Exhibit 1809.

Q. Mr. Cole, do you recognize this to be a message from you to Dari Marder?

A. Yes.

Q. And this is February 12, 2013?

A. Correct.

Q. If you look down, do you see this relates to Zoo York?

A. I'm not sure it's Zoo York because I happen to know of this sign because I'm a Yankee fan. And this was a sign in Yankee Stadium, and we ended up doing the deal for Starter. We didn't do it for Zoo York.

MR. THOMAS: Your Honor, the government offers 1809.

MS. DABBS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1809 received in evidence)

MR. THOMAS: Can you publish this for the jury.

Q. Mr. Cole, this is an example of you pushing back on a $500,000 expense for a sign at Yankee Stadium; right?

A. Sure.

---

UNITED STATES OF AMERICA V
NEIL COLE,                                                                November 18, 2022

MBIYCOL2          Cole - Direct          Page 2565

Q. It is, isn't it?

A. Well, it's a negotiation.

Q. You were pushing back on the $500,000 expense; right?

A. Well, I have to read the three emails, if you want me to do that.

Q. Take your time.

A. I just read the top one that says he wants 500,000 for a sign. That was my question.

Do you want me to read the other two?

Q. The top message here is he wants 500,000 for a sign; right?

A. Correct.

Q. That's not a price that you were willing to pay without learning more. Right?

A. Sure. I definitely had a question mark asking about the 500,000.

Q. And there were times when you pushed back on expenses related to Super Bowl advertising; right?

A. I pushed back on lots of expenses, especially with my marketing people who liked to spend money. Yes?

Q. Because there is not unlimited marketing money; right?

A. Correct. We had a budget. We presented to the board. That was kind of the only flexibility I had in running the company because, different than a traditional company that had a lot of goods and retail, we just had people and market and rent.

MBIYCOL2          Cole - Direct          Page 2566

And then you had the revenue that came in, and that's how you got earnings, so a profit. So marketing was one of the few levers I had in running the business. So I was always very careful in my marketing.

Q. So you would watch those expenses particularly carefully; right?

A. Correct. It was one of the few levers I had in the company.

Q. And there were occasions where you pushed back on $75,000 marketing expenditures; right?

A. I heard Ms. Alford say I pushed back on $5,000. So I'm sure I pushed back on $75,000. So I was careful.

Q. Mr. Cole, you're not the sort of CEO who sends $5 million out the door without looking so see what it's for.

Is that right?

A. Absolutely not.

MR. THOMAS: Let's show Mr. Cole what's in evidence as Government Exhibit 415 -- defense Exhibit 415. Excuse me. My mistake.

If you could enlarge the top third, Mr. Bianco.

Q. Do you recognize this, Mr. Cole?

A. I do from this trial.

Q. And this is the invoice from Zoo York it says.

A. Yes.

Q. And it describes "Comprehensive Positioning, Marketing, and

MBIYCOL2          Cole - Direct          Page 2567

Launch Analysis for SEA"?

A. Yes.

Q. That's Southeast Asia; right?

A. It is.

Q. And then the next line says: "Comprehensive Research and Marketing Analysis Complete with Launch Plan for Europe"?

A. Yes.

Q. And it has a price tag of $955,710. Right?

A. Correct.

Q. Now, in the realm of marketing invoices, this is at the high end of what your company would ever pay. Right?

A. No.

Q. There are lots of single invoices that approach a million dollars?

A. Yeah.

Q. You had a $36 million marketing budget; right?

A. Yes. But we also tried to get our retail partner to spend double that. So we tried to get a hundred million dollars a year.

Q. If you spent your marketing budget in million-dollar increments, there would be 36 invoices. Right?

A. Sure. Sure.

Q. For that year.

Okay. Let's go to page 11.

Now, Mr. Cole, did you look at the backup to this

MBIYCOL2          Cole - Direct          Page 2568

invoice before you paid it?

A. No. I don't believe I ever saw it.

Q. You sent a million dollars out the door without looking at the backup?

A. Well, I agreed to give Mr. Rabin $5 million, and we ended up giving him $5.4 million. I did not look at the backup.

Q. Now, when you say you "agreed" to do that, he asked for it, and you said you would, and then you did. Right?

A. In November and December of 2014.

Q. You had an agreement with Mr. Rabin to pay this invoice?

A. He asked for it, and I approved it.

Q. Did you have an agreement with Mr. Rabin to pay this invoice?

A. No. I paid it because I wanted to pay it.

Q. So you misspoke earlier when you said you had an agreement?

MS. DABBS: Objection.

THE COURT: Overruled.

THE WITNESS: It was an agreement signed. I told him I would send the money, but there was no prior agreement.

BY MR. THOMAS:

Q. I want to break that down for a second.

He asked for it, and you sent him the money. But you didn't agree to send the money?

A. I sent it when I sent it. There was no agreement until I sent the money. There was never an agreement. He just took

UNITED STATES OF AMERICA V
NEIL COLE,                                                                November 18, 2022

MBIYCOL2          Cole - Direct          Page 2569

the money.

Q. Mr. Cole, did you agree to send the money or not?

A. I agreed when I sent it. By sending the money, I think that's an agreement.

Q. So if money is going to the counterparty, that represents an agreement. Right?

A. That recommends that I've granted his offer for his chargeback.

Q. When you say "chargeback," what is it that you mean?

A. In the industry I grew up in and anyone who's been in the apparel/footwear -- you do business with Macy's. You do business with Nordstrom. You do business with JC Penney -- you are ship them goods, let's say for $100. At the end of the season, they come back usually for 10 or 15.

Is it for co-op advertising? Is it for sell-through agreements? Is it for shipping violations? So it was very common, more common than not, where you get a percent of the money that you ship to people.

They call that a chargeback or a co-op partnership, definitely a world that Mr. Rabin, Mr. Horowitz, and Mr. Margolis live in because they all were former retailers before they got into the licensing business.

But a chargeback is common. If you look at any of their companies, they have ten people that just deal in chargebacks, which are not contractual, and just requests or

MBIYCOL2          Cole - Direct          Page 2570

demands for money.

Q. Mr. Cole, chargebacks relate to merchandise; right?

A. It could be advertising, co-op advertising, fixtures for in store. Violations. If they give you a window to ship it at between two and four, if it comes at one, they charge money.

THE COURT: Mr. Thomas, it's 12:50. So we'll take the break.

Ladies and gentlemen, don't discuss the case.

(Continued on next page)

MBIYCOL2          Cole - Direct          Page 2571

(In open court; jury not present)

THE COURT: Everyone can be seated.

Mr. Thomas, do we end today?

MR. THOMAS: Yes, your Honor. I'm expecting maybe 20 more minutes.

THE COURT: I understand that you want to put Mr. Kim's email on the record. If you want to do that, you can do it yourself. Just put a cover letter on it.

MR. MARKUS: Sure, your Honor.

THE COURT: Anything else to raise?

MR. THOMAS: Nothing from us.

MS. DABBS: No, your Honor.

THE COURT: Don't be late, folks.

(Luncheon recess)

(Continued on next page)

MBi5col3          Cole - Cross          Page 2572

THE COURT: It appears unlikely that I am going to be instructing the jury this afternoon. I don't want to keep them past 2:40 so I guess that puts us back to the normal the parties close, and then I will instruct them Tuesday morning.

MR. HECKER: Thanks, Judge.

THE COURT: But we will see how quickly this goes.

(Continued on next page)

# A-1072

| MBi5col3 | Cole - Cross | Page 2573 |
|---|---|---|

(Jury present)

THE COURT: Everyone, please be seated.

Mr. Thomas.

MR. THOMAS: Thank you, your Honor.

Mr. Bianco, if you can put back up Defendant's Exhibit 415 and take us back to page 11?

BY MR. THOMAS:

Q. Mr. Cole, you recognize this to be marketing work that Iconix USA paid for, right?

A. Yes. I believe it was created by Iconix USA.

Q. And this photo is in a New York City Subway station?

A. Yes. The heritage of Zoo York was New York City, so although we use this campaign around the world, everything we marketed, it was New York City because skate was usually California. And that was the heritage of Zoo York, to show off New York City.

Q. And, Mr. Cole, you knew that your company paid for this advertising copy in around February of 2013, right?

A. I don't know this is advertising copy, it just looks like a picture of Chaz Ortiz who was our -- he was one of the skaters. This doesn't look like an ad to me.

Q. You did an event with Zoo York and Chaz Ortiz at Yankee Stadium, right?

A. It wasn't an event, it was a viral video that we ran in America and we ran many places in the world. But it was a

| MBi5col3 | Cole - Cross | Page 2574 |
|---|---|---|

video that -- it was a really cool video where these skaters took over New York City -- took over Yankee Stadium at midnight and got their way in. And so, it was a viral video that we created.

Q. And Yankee Stadium charged for access, right?

A. Yeah. I think they gave us a break, too, because we were customers or we were sponsors of Starter and Umbro.

Q. Iconix paid the charge, right?

A. Sure. Whatever they charged I think we would have paid.

Q. You paid that in 2013?

A. I don't know the date but that sounds right.

MR. THOMAS: Let's show the witness Government Exhibit 1808.

Q. Mr. Cole, do you see on your screen a message that you sent, on February 11, 2013, to Jameel Spencer and Seth Horowitz?

A. Yes.

Q. You recognize this as a message that you sent about Yankee Stadium and Chaz, right?

A. Yes. It looks right.

MR. THOMAS: The government offers 1808.

MS. DABBS: No objection.

THE COURT: It will be received.

(Government's Exhibit 1808 received in evidence)

MR. THOMAS: Mr. Bianco if you can publish that?

| MBi5col3 | Cole - Cross | Page 2575 |
|---|---|---|

BY MR. THOMAS:

Q. Mr. Cole, what we are looking at here is you commenting on Yankee Stadium and Chaz going way over budget, right?

A. Yes. I said it must be way over. I was guessing.

Q. This is in February of 2013, right?

A. Correct.

Q. And the event you are talking about where you took over Yankee Stadium, that's this event, Yankee Stadium and Chaz, right?

A. Once again, I wouldn't call it an event, it was a video we shot for distribution so it wasn't an event.

Q. Well, that video is this video, right?

A. I don't see a video.

Q. That video related to Yankee Stadium and Chaz, right?

A. Yeah. I think it was part of the campaign.

MR. THOMAS: If we could go back to Defendant's Exhibit 415 and if we can go back to page 11.

Q. This is material from that same campaign, right, sir?

A. I don't doubt it. I don't know.

MR. THOMAS: Could you page forward, Mr. Bianco? Page forward again? Page forward again?

Q. This is all stuff about Zoo York?

A. Yes. It looks like a sales deck or a pitch or --

Q. Lots of images of New York City in here, right?

A. Yes.

| MBi5col3 | Cole - Cross | Page 2576 |
|---|---|---|

MR. THOMAS: And keep going, Mr. Bianco?

Q. Here, this is that viral video that you are talking about, right?

A. Sure.

Q. Is that a yes?

A. The one on the bottom left, yes.

MR. THOMAS: And, Mr. Bianco, if you can go to the first page of this exhibit?

Q. Mr. Cole, there is no list of advertisement costs that is appended to this document, right?

A. No. There is no media -- how much money was spent on media.

Q. Right. GBG doesn't purport to provide a list of TV spots that they paid for, or radio spots that they paid for, or print campaigns that they purchased; right?

A. Yes. It just says marketing costs relating to positioning, marketing and launch analysis.

Q. Sitting here today, did you ever receive any marketing analysis from them?

A. I don't recall. I never recall seeing this.

Q. And you paid this before you ever saw any marketing analysis, right?

A. When you say "this," what do you mean? Yankee Stadium?

Q. This invoice. You paid this invoice --

A. Yes.

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col3          Cole - Cross          Page 2577

Q. -- without having receiving any marketing analysis from GBG?

A. Correct. I told Jason I was going to reimburse marketing for $5 million.

Q. And when, if the backup here accurately reflects the cost its backup for a campaign that Iconix USA had already paid for, right?

A. No, not necessarily. It could have been for -- what we did is we did a lot of creative out of New York and we sent the creative all over the world to Australia, to South -- you know, to different places. So, our creative could have been used there and they could have spent this money on different things. I have no idea.

Q. Did it matter to you whether they actually spent the money or not?

A. I knew they did good work. I wasn't that concerned. I knew that Angela makes a lot of money, the rent is a lot of money. You know, they had pretty high costs because I was partners in the company, you know, and I sat here and listened to Ms. Binks or Daisy Binks, and she kept talking about it was done in-house but the house cost a lot of money. Angela, alone, made over a million dollars, so I think Ms. Binks was a little out of sorts.

Q. We will get to Ms. Laramy-Binks in a moment.
     You keep referring to Angela and I want to make sure

MBi5col3          Cole - Cross          Page 2578

the jury keeps up. You are talking about Angela Ferrugia, right?

A. Correct.

Q. She worked for TLC, right?

A. She was the founder of TLC along with Melvin Thomas and Simon Bamber, and they sold their business to Li & Fung, I believe, for $70 million.

Q. Mr. Cole, you are aware she continued as a subsidiary of GBG, right?

A. Correct. When they bought it -- when GBG or Li & Fung bought it and GBG spun out, it went with the GBG spinout.

Q. And this invoice here, this is an invoice that is being paid to GBG USA Inc., right?

A. Correct. I told Jason he could have the money. I didn't tell TLC they could have the money.

Q. Right.
     You said before maybe this would pay for Angela but Angela doesn't work at GBG USA, right?

A. No, I said Angela was going to do the work over there and the money was granted to GBG, correct.

Q. When you say granted, you mean you paid it and didn't care whether they actually had any expenses or not, right?

A. I didn't know their expenses. I asked for real invoices because there was no contractual obligation and the company had a policy whenever people, you know, just like when we deal with

MBi5col3          Cole - Cross          Page 2579

lawyers we ask for how many hours and what each associate charged. Pretty much every bill we had backup. So, when Seth showed me the bills I said give us backup. Did I really look are care what the backup was? You know, I wanted it to be real backup because I know they did a lot of work over the years.

Q. The backup here is work that Iconix USA had done, right?

A. I don't agree. I don't agree.

Q. Sir, is there any page in this document that reflects independent work done by GBG?

A. I haven't seen the document, but if you want to take me through the whole document I am happy to look at it because I don't know. I was not involved in Zoo York advertising or marketing.

Q. Sir, isn't it true that you approved this bill not knowing whether or not they had spent even a dollar on marketing Zoo York?

A. I do not remember ever seeing this invoice or the backup with it but I agreed to give Mr. Rabin $5 million which ended up being $5.5 million for the GBG relationship.

Q. I see. And it didn't matter whether he did $5 million of advertising work or not?

A. No. We asked for real backup. And I believe on the stand I think both Jason and Jared said it was real. So, they were the ones who did it, not me. I have a whole different set of worries in my company than GBG.

MBi5col3          Cole - Cross          Page 2580

Q. Well, Mr. Cole, one of your worries as a CEO is making sure that you keep expenses down, right?

A. Correct, which is why I granted the $5.4 million to keep expenses down but it was in my budget.
     As I mentioned, we didn't give them Lee Cooper, we didn't get them out of Rocawear. They were a $50 million royalty, we had $140 million non-order and we were negotiating ten other deals. This was a concession to one of my most valuable customers for a very tough year because we didn't go forward with Lee Cooper, Zoo York, and others.

Q. So, this statement was linked to the Lee Cooper deal falling through?

A. It was linked to the relationship and, you know, when we got a round number like what they did obviously with Spyder and ten other companies I wanted -- our policy was we wanted backup in the system. Did I look at the invoices? I didn't.

Q. And you don't know whether or not they did even a dollar of marketing work on your behalf, right?

A. I know they did because they had a team over there, I had been over there, I saw the overhead, I saw the operation, and I had confidence in Angela that they --

Q. "Over there." You are talking about the UK, right?

A. Correct.

Q. And are you talking about TLC, right?

A. It was now GBG. TLC was now owned by GBG, it was a

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col3          Cole - Cross          Page 2581

wholly-owned sub. There was no more TLC, it was GBG, and Angela worked for GBG.

Q. Mr. Cole, do you know whether or not GBG internally accounted for those two companies differently?

A. I have no idea but they were a hundred -- GBG owned a hundred percent of TLC.

Q. And this statement was going to Jason Rabin at GBG USA, right?

A. I had granted a credit or a chargeback for advertising support to GBG.

Q. This payment was going to GBG USA and Jason Rabin, right?

A. Correct, but they owned TLC and that's where I believe the marketing is there.

MR. THOMAS: Let's go to Defendant's Exhibit 1407 and if we can enlarge the first third?

Q. Mr. Cole, you recognize this to be another invoice that you approved, right?

A. I don't believe I approved the invoice from sitting here at this trial. I believe I wired the -- I approved the wire but I don't believe I actually signed this invoice.

Q. Mr. Cole, again, no payments can leave your company in excess of $250,000 without your signoff, right?

A. Oh, two signoffs, but that's why I signed the wire. I don't believe I actually signed this invoice.

Q. OK, so you approved the payment for the invoice but not the

MBi5col3          Cole - Cross          Page 2582

invoice?

A. Correct. I approved all $5.4 million.

Q. So, let's look at page 2.

Now, Mr. Cole, you were at the trial when Daisy Laramy-Binks testified, right?

A. Yes.

Q. And you heard her testify that the amount on the face of this invoice was just utterly, utterly out of keeping with the cost to prepare it, right?

A. I heard Ms. Binks testify to that.

Q. And you heard her say that it was just ludicrously out of whack with the work reflected in the deck, right?

A. Yes, but what I sat here -- and although it sounds like Ms. Binks worked for me for three years I never heard of her. It looked pretty substantial to me. Ms. Binks kept talking about her house but I -- it was very impressive marketing and, you know, the festival, all these different things. So, I don't know as much as Ms. Binks but she kept saying it was done in-house but, you know, the house costs a lot of money over there. I have been there. I have been there, it is a beautiful house, and they have 20 people working there and Angela makes a lot of money. So, although she thought everything was free because it only cost $200,000, it is an expensive house they built.

Q. So, you thought you were paying for TLC's offices when you

MBi5col3          Cole - Cross          Page 2583

made this payment?

A. I was paying -- I agreed to give Mr. Rabin $5.4 million credit for the relationship.

Q. And whether he used that for Angela's salary or marketing didn't matter to you?

A. Well, Angela's salary was marketing, it was part of marketing. It is a misnomer. In my company, when we said 36 million that was for media but we had another 30 million, we had 80 people doing that. So, people cost a lot of money, computers, re-touching, all the things. So, it is all very valuable and it seemed like Ms. Binks didn't understand her house or how expensive her house was. I am not questioning what she thought. And let's say I did look at this invoice but I'm not going to say oh, this backup I did, but how do I know what Bluey Richardson cost all these people and festivals and all these things. So, I don't know --

Q. Mr. Cole --

A. -- who in my company approved it. I didn't look at the details because I had agreed to give Jason the money and I did ask for backup because every invoice in our company that is non-contractual we asked for backup.

Q. I see. You asked for the backup, right?

A. I did.

Q. But you didn't review it?

A. I did not review it. Personally.

MBi5col3          Cole - Cross          Page 2584

MR. THOMAS: All right. Let's go to Government Exhibit 216.

Q. You remember this to be a payment packet that Marcia McLaughlin walked us through?

A. I do.

MR. THOMAS: And Mr. Bianco, if you could page forward to the invoices?

Q. Mr. Cole, Ms. McLaughlin was correct when she identified your initials on these invoices, right?

A. Yes.

Q. And if we went through each page we would find your initials on each and every one of them, right?

A. Yes.

Q. Mr. Cole, did you look at the backup for these things?

A. No.

Q. Did it matter to you whether or not that backup reflected the true value of the invoice?

A. I looked at it but I did not investigate it. I was fine with it. If Jason, Jared, and the whole financial representative, I was OK with their word. I had already agreed to give them the money.

Q. And then you sent the money?

A. Correct. We wired them $5.4 million.

MR. THOMAS: Now, we can take this down.

Q. I want to turn topics and talk about the end of your time

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col3          Cole - Cross          Page 2585

at Iconix.

A. Sure.

Q. I may have written this down wrong so please correct me if I did. I think I heard you say that there was a nice ask for you to leave the company at the end of your time?

A. I wouldn't say it was a nice ask but it was -- I could tell I lost the board's confidence because of what Horowitz said and, you know, they hired me to be a consultant of some sort for a few months. And, so, I left.

Q. Mr. Cole, they forced you to resign, right?

A. You could argue that, if I fought them. It could have been contagious or conticious (sic) or whatever the right word is.

Q. I'm not sure that I understood your answer. They forced you to resign, right?

A. They never, you know -- they told me they would like me to, it never got to a force.

Q. When they said that you told them they were acting like it was Soviet Russia, right?

A. I don't recall what they told me it was like.

MR. THOMAS: Let's show the witness Government Exhibit 3000, and if you can enlarge the body text?

Q. Mr. Cole this is a message that you sent to members of the board of directors on August 3rd, 2014, right?

A. Yes.

MR. THOMAS: The government offers Government Exhibit

MBi5col3          Cole - Cross          Page 2586

3000.

MS. DABBS: Objection, your Honor. Can we approach, please?

THE COURT: Yes.

(Continued next page)

MBi5col3          Cole - Cross          Page 2587

(At side bar)

MS. DABBS: Your Honor, I think that this is beyond the scope of what we had discussed in terms of what's fair game for Mr. Cole's departure from the company. He has acknowledged that he was asked to resign, and ultimately resigned, and I thought that was where we were going to leave it.

THE COURT: Why don't you ask, use it to refresh his recollection and see what he says but you are not putting the document in.

MR. THOMAS: Your Honor, I want to make one other point which isn't obvious from the questions which is, in this document, Mr. Cole represents that he was not allowed to tell his side of the story. That is an outright lie. Yesterday he testified that he spoke to the special committee for two hours.

MR. RODRIGUEZ: Days.

MR. THOMAS: Days. Those two days precede the sending of this message so it is directly relevant to his credibility.

MS. DABBS: How does being interviewed by a special committee relate to telling his story to the board of directors of the company?

MR. THOMAS: It is a special committee of the board of directors.

THE COURT: Are you going to refresh his recollection and are you going to leave it at that.

MR. THOMAS: Yes, your Honor.

MBi5col3          Cole - Cross          Page 2588

(Continued next page)

# A-1076

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

---

MBi5col3      Cole - Cross      Page 2589

(In open court)

BY MR. THOMAS:

Q. Mr. Cole, to direct your attention to the first sentence of this message, I would ask you just to read that to yourself and look up when you are done.

A. I already read it.

Q. Mr. Cole, does this refresh your recollection that you compared the situation to being treated like it was Soviet Russia?

A. Yes.

Q. You can take down that exhibit.

Now, Mr. Cole, we had spoken earlier about Mr. Rabin, Mr. Horowitz, and Mr. Margolis. I want to talk about some of the other witnesses briefly.

Mr. Cole, is it your opinion that Jason Schaefer gave false testimony today?

MS. DABBS: Objection.

THE COURT: Overruled.

BY MR. THOMAS:

Q. False testimony in this proceeding?

A. Not that I noticed.

Q. Ericka Alford?

A. No.

Q. So, just to make sure that I understand, the people in this proceeding that you think that gave false testimony are

---

MBi5col3      Cole - Cross      Page 2590

Mr. Margolis?

A. Yes. It's the three people that you threatened.

Q. Everyone else was telling the truth?

A. Pretty much. I didn't see any issues just except those people that you have met with a hundred times and threatened.

Q. Those are the three people who worked on SEA-2 with you, right?

A. Which three people?

Q. Mr. Horowitz, your COO, he worked on SEA-2, right?

A. Yes, he worked on it with Mr. Margolis.

Q. Mr. Rabin, right?

A. He was involved in that, yes.

Q. He is your personal friend?

A. He is a friend, yes. Was a friend. Was a friend.

Q. And Mr. Margolis, he worked for Mr. Rabin?

A. Correct.

Q. And they all worked on SEA-2, right?

A. Correct.

Q. And SEA-3?

A. I don't think Mr. Rabin worked on SEA-3 but those two definitely did.

Q. Mr. Rabin signed off on the deal, right?

A. He did.

Q. And they all say there was an overpay in both of those deals.

---

MBi5col3      Cole - Redirect      Page 2591

A. Yes. After 50 meetings, five years, and being threatened to be indicted or put in prison.

Q. They all say there was an overpay for those two deals, right?

A. Correct, because you gave them immunity.

Q. They all say there was an overpay for those two deals, right?

A. They believed that after being threatened and after meeting a hundred times with the government.

MR. THOMAS: Nothing further, your Honor.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MS. DABBS:

Q. Mr. Cole, Mr. Thomas was just asking you some questions about your perspectives on testimony of various witnesses in this trial. Do you recall those questions?

A. I do.

Q. Did you hear Mr. Rabin testify that there was no overpayment on SEA-2 and SEA-3?

A. Mr. Rabin, I don't think remembered anything. He often checked -- you know, if you look it up, he kept changing his testimony and I think he didn't remember a lot so I don't remember -- I hate to not remember what he didn't remember but Mr. Rabin was all over the board.

Q. Mr. Cole, there were some questions at the start of

---

MBi5col3      Cole - Redirect      Page 2592

Mr. Thomas' cross about your position and wanting to make sure he understood your position and I just want to follow up on some of those questions.

Did you, yourself, reach any agreement or make any commitment to GBG that was not reflected in the transaction documents in connection with either SEA-2 or SEA-3?

A. I did not. I was not.

Q. Were you aware of anyone else making such an agreement?

A. No, I was not.

Q. Mr. Thomas asked you some questions about your preparation for testifying at this trial. Do you recall those questions?

A. I do.

Q. And he asked you about meeting with Mr. Stabile to prepare for testimony?

A. I do.

Q. Did you meet with Mr. Stabile 50 times to prepare for your testimony at this trial?

A. No. We met once for two hours.

Q. Mr. Thomas asked you some questions about your characterization of Li & Fung as Iconix' biggest customer. I just want to pull up a couple of documents here for you in the first instance, Mr. Cole.

MS. DABBS: Can we pull up, just for the witness and the parties, Government Exhibit 101, please?

Q. If you can take a look at this, Mr. Cole, and tell us, do

---

UNITED STATES OF AMERICA V
NEIL COLE,
November 18, 2022

---

MBi5col3          Cole - Redirect          Page 2593

you recognize this to be the company's 10-K for the year ended December 31st, 2013?

A. I do.

MS. DABBS: I move to admit Government Exhibit 101.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Government's Exhibit 101 received in evidence)

MS. DABBS: And if we can go forward, please, to page 14 of the PDF? And if we could just highlight that very top paragraph under table of contents?

BY MS. DABBS:

Q. Just directing your attention to the second part of that paragraph, Mr. Cole.

A. Yes.

Q. Do you see there it says the company's largest wholesale licensee was Li & Fung USA?

A. Yes.

Q. Is that the content of the company's public filings that you were thinking of during Mr. Thomas' questioning?

A. Yes.

MS. DABBS: And if we could pull up what is marked for identification as Defendant's Exhibit 1, please?

Q. Mr. Cole, do you recognize this as the Iconix 10-K for the year ended December 2012?

A. Yes.

---

MBi5col3          Cole - Redirect          Page 2594

MS. DABBS: We offer Defendant's Exhibit 1.

MR. THOMAS: No objection.

THE COURT: It will be received.

(Defendant's Exhibit 1 received in evidence)

MS. DABBS: And if we can look at the bottom of page 10 and top of page 11 of the PDF, please?

BY MS. DABBS:

Q. Do you see there, Mr. Cole, the company's largest wholesale licensee was Li & Fung?

A. Yes.

Q. Is that the similar disclosure you were thinking of when you testified on cross-examination earlier?

A. Yes.

Q. You had mentioned that you secretly admired Li & Fung. Do you recall that exchange with Mr. Thomas?

A. I did.

Q. Did you tell Li & Fung that you thought someday they might ultimately buy the company Iconix?

A. No, I did not.

Q. Mr. Thomas asked you some questions about whether you are a man of your word, Mr. Cole. Do you recall those questions?

A. I do.

Q. Have you ever told someone in a business context that you would do something and not been able to follow through?

A. Possible. I always try to follow through.

---

MBi5col3          Cole - Redirect          Page 2595

Q. Is it fair to say that in a negotiation, in your experience, there can be a lot of different matters discussed?

A. Sure. Always.

Q. And, in your view, what is the ultimate agreement of the parties?

A. What you agreed to and what's in writing and what you sign and what you disclose to your shareholders and, you know, what the agreement is.

Q. Mr. Thomas asked you some questions about the business purpose of the SEA-2 and 3 joint venture transactions. Do you recall those questions?

A. Not -- he asked me lots. I'm not specifically clear which question.

Q. Let's see if I can orient us. Did you believe that it was in Iconix' interest to enter into the joint venture transactions that it entered into in order to monetize the company's brands globally?

A. Yes.

Q. In that way, did you believe that there was a business purpose to partnering with Li & Fung and then GBG in the joint venture transactions that the company did in 2013 and 2014?

A. Yes. Conceptually I believed it was like all the other JVs and it would be good for Iconix.

Q. Is there a distinction, in your view, between the business purposes as we are discussing it and the actual economics of

---

MBi5col3          Cole - Redirect          Page 2596

the transactions that were ultimately entered into?

A. Yes.

Q. And when you said that you thought that these were horrible deals, which of those were you referring to?

A. I think SEA-2 and 3 were, you know, basically whatever we received we had to give back and if the things -- and on a worst case scenario and things were good, we had to pay a lot of money to buy it one day. So, I thought that they were just horrendous business deals when I learned about all the details, I guess, six or nine months later.

Q. And is that then fair to say that it was the economics of the deals more than the just fact of the deals?

A. No. The concept of the deals was great. Partnering with Li & Fung in China where they lived and Southeast Asia was great. The economics are what I think made them not good deals for Iconix shareholders.

Q. Mr. Thomas showed you a document that was a piece of accounting guidance. Do you recall seeing that document?

A. I do.

Q. And he had asked you if you relied upon it in making determinations in your role as CEO of the company. Do you recall those questions?

A. I do.

Q. Mr. Cole, who did you rely on to ensure that transactions at the company were accounted for appropriately?

---

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col3      Cole - Redirect      Page 2597

A. CFO and all the accounting people that worked on the deals.

Q. And, to your knowledge, did the CFO and the finance organization and the accounting professionals at the company review transaction documents for Iconix' deals?

A. Yes.

Q. And, to your understanding, did the lawyers at the company and outside counsel review those documents?

A. Yes. They created the documents and negotiated the documents.

Q. And, to your understanding did BDO, in its auditing capacity, review transaction documents?

A. Yes. Both before the deal and after the deal.

MS. DABBS: If we could just pull up on the screen Government Exhibit 1290, please? And this is in evidence and can be published to the jury.

Q. This, Mr. Cole, you recognize this was one of Mr. Schaefer's weekly updates that Mr. Thomas showed you?

A. I do.

Q. And I believe he highlighted the deals section of this document. Do you see that?

A. Yes.

Q. And he asked you some questions about these -- just these two deals in Mr. Schaefer's update, correct?

A. Yes.

Q. Were you seeing information about other deals in

MBi5col3      Cole - Redirect      Page 2598

negotiation in other people's weekly updates?

A. Of course. Everyone -- Mr. Schaefer would probably only see a deal once it is being papered.

Q. And Mr. Thomas asked you some questions about whether you asked Mr. Schaefer for his advice about the meaning of integration clauses in the transaction documents. Do you recall those questions?

A. I do.

Q. I want to ask you about your understanding. What did you understand those clauses or components of agreements to mean?

A. That none of the negotiations leading up to the final contract mean anything and that everything was in the agreement and nobody can claim anything else when you sign the agreement. And it was to protect everyone that -- people coming up and saying, well, you promised me this and we need this. It is, like -- so it basically said the agreement is the agreement and that's what counts and the rest is not enforceable and doesn't mean anything.

Q. Now, you believe you have testified that there were times when business partners asked for money from Iconix, correct?

A. Yes. Often.

Q. And on those occasions, as the CEO of the company, fair to say that you would make a judgment about whether you thought that that was an appropriate expenditure for the company?

A. Yes.

MBi5col3      Cole - Redirect      Page 2599

Q. And sometimes that happened in the context of a transaction negotiation, correct?

A. Yes.

Q. We have seen examples along the way in the MENA transaction and the SEA-1 transaction? Would you agree with that?

A. Yes.

Q. In your understanding, Mr. Cole, was there anything wrong in those agreements that I have just mentioned, with money going back and forth between the parties?

A. No.

Q. Were those agreements that were reviewed by in-house and outside counsel at Iconix, to your understanding?

A. Yes.

Q. Were they reviewed by accounting and finance personnel at the company, so far as you understood?

A. Yes.

Q. Were they reviewed by the company's auditors?

A. Yes.

Q. You didn't think that there was anything improper with that, did you?

A. No, there wasn't.

Q. Did you think there was anything fraudulent in that?

A. No.

Q. Mr. Thomas spent some time walking through the attachments to some of the marketing invoices that had been introduced in

MBi5col3      Cole - Redirect      Page 2600

this case. Do you recall looking at the Zoo York campaign and some of other pages of the slide decks?

A. Yes. I believe that just happened.

Q. What was your understanding of whether GBG spent money on marketing and advertising for Iconix' brands?

A. I know they did. So, I believe it was common that they did.

Q. And did you think that they spent extensive amounts of money on marketing?

A. Sometimes. If it helped them get customers. You know, sometimes, you know, a lot of times it was built for the JV, others times they came to us, you know -- I had a lot of requests on Peanuts because they were our agent in China and we used to run big events. We had something called Art and Life, and others, where they would come to me and ask for either reimbursement or to do it with them.

Q. Would you agree that it was in Iconix' interest for its licensees and joint venture partners to invest in marketing?

A. Generally, yes, but sometimes I said no if I didn't think it was good for the company. So, I often said yes, and often said no.

Q. And on this particular payment, the $5 million request by GBG that you ultimately authorized $5.4 million on, you thought that that was an appropriate expense for the company at the time?

UNITED STATES OF AMERICA V
NEIL COLE,

November 18, 2022

MBi5col3      Cole - Redirect      Page 2601

A. I thought it was good for the future of the company and the relationship and -- to do that.

Q. And at that time did you have any understanding that there was any link or for you -- withdrawn.

For you, was there any link between that payment and the joint venture transactions that we have focused on, SEA-2 and SEA-3?

A. No. There wasn't.

MS. DABBS: Just one moment, your Honor?

(Counsel conferring)

BY MS. DABBS:

Q. Mr. Cole, take a moment and look at the jury in this case.

A. I have been looking at them for the last three weeks, but.

Q. Did you commit any of the crimes that you have been charged with in this case, sir?

A. I did not.

MS. DABBS: No further questions.

THE COURT: Mr. Cole?

THE WITNESS: Oh. I'm sorry.

THE COURT: You are not quite done.

THE WITNESS: Cross and recross.

MR. THOMAS: May I inquire, your Honor?

THE COURT: Yes, you may.

THE WITNESS: Thought I could leave on a high note.

RECROSS EXAMINATION

MBi5col3      Cole - Recross      Page 2602

BY MR. THOMAS:

Q. Mr. Cole, Ms. Dabbs showed you some filings that described Li & Fung. Did you see those?

A. Filings that describe Li & Fung. I'm not sure.

Q. She showed you the 2012 10-K, right?

A. Yes.

Q. And the 2013 10-K?

A. Correct.

Q. But not the 2014 documents, right?

A. Sure. I'm sure they can get that.

Q. You said the economics of the deal were terrible when you learned about them later, right?

A. Correct.

Q. And you said that about SEA-2 and SEA-3?

A. Correct.

Q. The only thing standing between you and understanding the terms of those deals was reading the documents when they were sent to you, right?

A. Yes, and usually people in my company kept me abreast of economics.

I was, you know -- I think Mr. Horowitz was the only executive who didn't cc me on everything important. He wanted to run his own deals so he did -- he -- I think we saw documents where he basically said, Why do you cc everybody? and that was my culture, because when you have so many people and

MBi5col3      Cole - Recross      Page 2603

so many brains, you want to use them. But, Mr. Horowitz never showed them to me, no.

Q. So, Mr. Cole, my question was about the terms of the deal and the only thing standing between you and knowing the terms of the deal was you reading the documents, right?

A. Correct.

Q. And you signed them, right?

A. I did.

Q. And all you needed to do to know what you were signing was look at the words on the page, right?

A. It's not just the words on the page. Have you seen these deals? They're like telephone books.

Q. It is the words on the pages, right?

A. Pages. I will give you pages.

Q. OK.

A. In the books, we will call them.

Q. Now, Ms. Dabbs asked you about any link between marketing and the Southeast Asia joint ventures, right?

A. The marketing that was --

Q. The $5.4 million in marketing?

A. Correct.

Q. Do you remember that topic?

A. I do.

Q. That is a marketing payment to Mr. Rabin, right?

A. Excuse me?

MBi5col3      Cole - Recross      Page 2604

Q. That was a payment to Mr. Rabin and GBG, right?

A. It was to GBG at the request of -- really, I never remembered speaking to Mr. Rabin but Seth Horowitz was advocating for the payment.

Q. That's a payment that you sent to GBG USA, right?

A. It was invoiced from Iconix to GBG USA, yes, or that we -- payment they invoiced us and we paid them back, yes.

Q. You approved the wire, right?

A. I did.

Q. The wire went to GBG USA, right?

A. Correct.

Q. And they're the counterparty in Southeast Asia, right?

A. They were the counterparty to the SEA-1, 2, 3 in the end.

Q. OK. So, in 2014 they paid you to participate in the deals, right?

A. I'm sorry?

Q. In 2014 they paid you to participate in the Southeast Asia 2 and 3, right?

A. Yes. They paid us 21 and 16, so $37 million.

Q. And that same year you paid them $5.4 million as marketing, right?

A. Correct.

Q. And $3.1 for market analysis, right?

A. Well, I didn't include MENA, you just said 2 and 3.

Q. In 2014 you paid them $3.1 million for marketing analysis,

UNITED STATES OF AMERICA V
NEIL COLE,                                                           November 18, 2022

MBi5col3                                                    Page 2605

right?

A. OK. Then they also gave me $18 million more so I got $55 million for 8.

Q. Mr. Cole, my question is did you pay them $3.1 million for market analysis?

A. Yes. On MENA when they gave me -- when I netted 15.7 or 15.6.

Q. So, in 2014 between you and GBG there is money going both ways, right?

A. There is. And the same thing with most of my customers. If you look at Wal-Mart, Target, there was money going both ways because I used to pay for fixturing and marketing and branding and that's why we got such big arrangements.

MR. THOMAS: Nothing further, your Honor.

MS. DABBS: Nothing more, your Honor.

THE COURT: Mr. Cole, you may now step down.

THE WITNESS: OK.

(Witness excused)

THE COURT: Do you have another witness?

MR. HECKER: Your Honor, the defense rests.

THE COURT: So, ladies and gentlemen, here is what we are going to do. It's Friday and we are now at the end of our week. I am going to let you go early and this will be our schedule starting on Monday. On Monday the parties will close, that will take up probably the majority of the day, and we will

MBi5col3                                                    Page 2606

keep our usual 9:30 to 2:40 day. On Tuesday morning I will instruct you on the law, it is going to take about an hour and a half or so. But, starting on Tuesday, our schedule is in your hands. If you wish, you can continue to keep the 9:30 to 2:40 day, but if you want to stay longer, that is entirely up to you, so long as there is unanimity. You guys can stay as long as you want Tuesday and every subsequent day that you deliberate. OK?

With that, thank you, again. Have a wonderful weekend. Do not talk about the case, listen to anything about the case, or read anything about the case.

Be safe getting home.

(Continued on next page)

MBi5col3                                                    Page 2607

(Jury not present)

THE COURT: Everyone, be seated.

Anything more?

MR. THOMAS: No, your Honor.

MR. HECKER: No, your Honor.

THE COURT: OK. Have a great weekend. I will expect from the government, if you can get it to me today, the indictment.

MR. THOMAS: Oh, we can -- we will send it to Mr. Troncoso again.

THE COURT: That's fine.

MR. THOMAS: It is filed on the docket in a letter at the time of the motions were filed is my recollection. It is an attachment to the letter that we filed before the trial began.

THE COURT: OK.

MR. HECKER: And, your Honor, we still need to consult with the government about the verdict sheet, which we will do and get you something by this weekend.

THE COURT: Great.

MR. MARKUS: Not guilty first.

(Adjourned to November 21, 2022 at 9:00 a.m.)

Page 2608

INDEX OF EXAMINATION

Examination of:                                    Page

NEIL COLE

Direct By Ms. Dabbs  . . . . . . . . . . . . . .2429

Cross By Mr. Thomas  . . . . . . . . . . . . . .2465

Redirect By Ms. Dabbs  . . . . . . . . . . . .2591

Recross By Mr. Thomas  . . . . . . . . . . . .2602

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                November 21, 2022

MBLYCOL1                                                            Page 2610

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,
          v.                          19 Cr. 869 (ER)
NEIL COLE,
                Defendant.            Trial
------------------------------x
                                      New York, N.Y.
                                      November 21, 2022
                                      9:15 a.m.
Before:

                    HON. EDGARDO RAMOS,

                                      District Judge
                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  ANDREW M. THOMAS
     JUSTIN V. RODRIGUEZ
     JUSTIN RODRIGUEZ
     Assistant United States Attorneys

KAPLAN HECKER & FINK, LLP
     Attorneys for Defendant
BY:  SEAN HECKER
     JENNA M. DABBS

MARKUS/MOSS, PLLC
     Attorneys for Defendant
BY:  DAVID O. MARKUS
     ANITA M. MOSS

MBLYCOL1                                                            Page 2611

(Trial resumed)

(In open court; jury not present)

THE COURT: It's now 9:15, and it is with some trepidation that I ask if there is anything either side wishes to raise.

MR. RODRIGUEZ: No, Judge.

MR. MARKUS: No, your Honor. Just one question.

THE COURT: Sure.

MR. MARKUS: It sounds, from the discussions you've had with the government, that closings will ease up much of the day.

Is the Court going to give the jury the option of doing the charge today, if they want to stay later so they could come in tomorrow and actually deliberate for a full day before the holidays?

THE COURT: I am happy to ask them if they wish to stay beyond 2:40. I can tell you that in past trials, I have asked this any number of times, and not once has the jury taken me up on it.

MR. MARKUS: I believe that. Thank you.

THE COURT: Good morning.

(Pause)

(Continued on next page)

MBLYCOL1            Summation - Mr. Thomas            Page 2612

(In open court; jury present)

THE COURT: Good morning, everyone. Please be seated. Ladies and gentlemen, welcome back. I trust you had a wonderful weekend.

As I indicated, we will be moving to summations today. It is anticipated that summations will take up the major part of the day. Depending on when whey finish and depending upon how you all feel, if we have enough time, we may also do the jury instructions, but we'll revisit that at the end of the day.

So the schedule will be slightly different today. We will be guided the length of the summations. So we will take our first break at the end of the government's summation and then our second break when the defense finishes its summation.

With that, will the government please present your summation.

Mr. Thomas.

MR. THOMAS: Yes, your Honor.

Neil Cole cheated. In 2014, when it appeared that his company would fall short of its goals, he made the extra money appear from nowhere. Then he told shareholders that Iconix had made record revenue; that it beat analyst expectations; that it continued to grow.

But Neil Cole only showed investors what he wanted them to see. Behind his numbers looked an ugly truth that only

MBLYCOL1            Summation - Mr. Thomas            Page 2613

his inner-circle understood -- the truth that Cole had met those targets by convincing a personal friend to loan him millions based on the promise to send the extra money back later, the truth that Iconix paid most of that money back disguised behind phony invoices, the truth that all of this money moved in a big circle, the truth that Neil Cole had cheated.

Ladies and gentlemen, at the end of this trial, it's clear beyond a reasonable doubt that in 2014, Neil Cole struck side deals to make his company look better than it was. He hid that arrangement from the company's auditors and lawyers. And he reported the make-believe numbers to Wall Street, even though he knew they were false. Neil Cole committed fraud, and it's time to find him guilty.

Now, the government has charged Mr. Cole with participating in a scheme to defraud Iconix's shareholders, and it is our burden to prove his guilt beyond a reasonable doubt. And to meet that burden, we've presented weeks of evidence, including testimony from witnesses, public filings, emails, company records.

And this point, a few basic background facts appear beyond reason dispute. So I want to run through those basics. First, there is no dispute that in 2014 and 2015, Iconix was a publicly traded company headquartered right here in Manhattan. Nobody disputes that Iconix entered into the Southeast Asia

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

| MBLYCOL1 | Summation - Mr. Thomas | Page 2614 |

joint ventures in 2013 and amended that agreement in June and September of 2014.

It's not even seriously in dispute that shortly before SEA-2 and SEA-3 were signed, the purchase price that Li & Fung and GBG had agreed to pay Iconix was increased by millions, by $5 million in SEA-2, by $6 million in SEA-3.

And it's not in dispute that Neil Cole reported those higher prices to Wall Street in the form of SEC filings and press releases. You can see it in the quarterly filings and in the annual filings.

And it's not even in dispute that Iconix paid millions to GBG in the final months of 2014. That was purportedly in the form of marketing and market analysis payments that Neil Cole personally approved the wires or the invoices for like this stack right here at Government Exhibit 216.

What is in dispute at this pretrial is whether all of those things were connected, whether the money GBG paid to Iconix was linked to the money that Iconix paid back to GBG. And at the end of the trial, the answer is clear.

The evidence shows this was all a scheme by Neil Cole to move money back and forth so he could make his company look better than it was. The $5 million for SEA-2 and the $5 million that Iconix paid for marketing, that's the same 5 million moving in a circle from Rabin to Cole and from Cole back to Rabin.

| MBLYCOL1 | Summation - Mr. Thomas | Page 2615 |

The $6 million that SEA paid and the $3.1 for MENA due diligence, that's the plan in its form to move the same money back and forth again, from Rabin to Cole and from Cole back to Rabin.

And the corporate filings, the 10-Ks the 10-Qs, they claim that revenue for these boosted deal prices. But Neil Cole approved each and every one of those filings without mentioning the promises that made those underlying agreements a reality. Neil Cole participated in dirty deals with GBG. He did it to inflate his company's financial metrics, and the proof is overwhelming.

In the time I have today, I'm going to do four things to try to help you sort through the evidence. First, I'm going to walk you through the testimony and documents that show Iconix engineered a revenue inflation scam.

Then I'm going to walk you through the evidence that shows that Neil Cole was personally in on it; that he directed it. Third, I'm going to briefly explain how the evidence matches up to the formal charges that you'll be asked to confront in the verdict form.

Now, when I do all of this, I'm going to address points raised by the defense in their opening statements, things they developed on cross-examination. So let me say at the outset the defendant has no burden.

His lawyers didn't have to stand up at all. He was

| MBLYCOL1 | Summation - Mr. Thomas | Page 2616 |

not required to give an opening statement or cross-examine any witness, and he certainly didn't have to testify. The burden to prove each count rests with the government. It's a burden we embrace. It's a burden that we've met.

But if the defendant chooses to make an opening statement; if the defense chooses to cross-examine witnesses; if, as here, the defendant himself takes the stand, then you can and you should ask yourself if the statements, if the questions, if the arguments make sense, if their positions find any support in the actual evidence in the record.

I want to turn to that evidence. Let's start first with how this scheme actually worked. Ladies and gentlemen, this is a fraud in three steps: The first step, inflate the deal prices. That gives you more revenue.

The second step is report those inflated numbers to Wall Street in those public filings, and the third step is to send the extra money back to pay back the inflation.

So did Neil Cole inflate revenue? The evidence says yes, absolutely. Jason Rabin told you that the price increases depended on Cole's promise to send the extra money back.

For SEA-2, Rabin explained the extra money was linked to the promise to take it back as marketing. You can see that in the transcript. And you can perhaps remember it from Mr. Rabin being on the stand.

He said: "Neil said if I raise the price by 5

| MBLYCOL1 | Summation - Mr. Thomas | Page 2617 |

million, we could bill it back for marketing. And without Cole's promise to send the money back, Rabin told you he would not have paid more.

With SEA-3, Rabin explained that the extra money was linked to a promise to relieve the Rocawear Kids shortfall. He said: "We paid $6 million more to relieve the Rocawear shortfall." That's right there in the transcript.

Without Cole's promise to sent that money back, Rabin would not have paid more for SEA-3. Now Jason Rabin would know if there was a side deal because he was the one who worked it out with Neil Cole directly. He and Neil Cole have known each other for years. They're friends. And Rabin said there was a side deal.

But it's not just Jason Rabin. Seth Horowitz told you that the $5 million for SEA-2 and the $5 million in market expenses were also connected. He said the deal price went up because they agreed to give the $5 million back to GBG in the future. And that's in the transcript too.

The deal prices jumped because of that promise. And Horowitz told you that that extra $5 million was going back to GBG. And Horowitz told you that for SEA-3, Cole agreed to relieve the Rocawear Kids shortfall in exchange for $6 million on that deal. He says it right there in the transcript. Horowitz would know if there was a side deal because he was Neil Cole's right-hand man when this happened, and Neil Cole

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL1        Summation - Mr. Thomas        Page 2618

told him.

And of coarse Jared Margolis also told you that these things were connected. And we heard it from Jason Rabin at the time all of these promises happened. He said that on the stand, that the money would come back from Iconix, and that's why the price went up.

Jared Margolis spoke to Jason Rabin at the time. He was the one tasked with getting the money back. He would know. So all told, you have three men across two different companies who all remember the same thing. Neil Cole got these deal prices higher by promising to send the extra money back later. That's how Neil Cole inflated revenue, by making secret side deals.

So what about step two of this scheme. And Neil Cole turned around and boasted to Wall Street about the joint ventures and the revenue they brought in without saying anything about his promises.

He did that in the second quarter right here. This is Government Exhibit 103. He did that again in the third quarter. This is Government 105. He did it again at the end of the year, the annual filing. That's Government 107.

To be able to put these higher prices into the financials, Neil Cole had to hide his promises, his side deals, from the auditors. And that's because if the auditors knew that the extra money for the deals was going right back to GBG,

MBLYCOL1        Summation - Mr. Thomas        Page 2619

they won't have let Neil Cole claim the extra revenue in these filings.

In fact, Neil Cole -- he had to certify to the auditors that there was no linked transaction that had not been disclosed. That's right here, Government Exhibit 503 in a representation letter that Neil Cole signed. And that was step two, get the public to think that Iconix was better than it was.

Once that happened, it was time for step three, to send the money back. And Neil Cole did send millions back to GBG in 2014, and you can see an example right here on this slide.

This is Zoo York invoice, and Neil Cole personally authorized the wire. And he also approved the payment for this one. This is related to the Mossimo invoice, and he approves it right there in the email.

And you heard Neil Cole personally signed off on at least 16 other invoices to GBG. He initialed all of them. That's that little squiggly N circle on the bottom.

And how do you know that this money related to scheme? Well, both sides of these dirty deals needed to keep track of the money. So they wrote down what they each received and what they owed.

And they wrote it down at the time this was all happening. So on the GBG side, you have this from August of

MBLYCOL1        Summation - Mr. Thomas        Page 2620

2014. This is a gmail to gmail message about summary of various AR. Margolis told us "AR" is aged receivable.

So what is it that GBG is receiving here? Well, the attachment spells it out pretty clearly. This is government 1068. "Pay back for the 5 million overpay from Iconix Korea." That's the SEA-2 overpayment.

And this message specifically identifies one plan to get that money back: Rocawear relief, marketing for Zoo York, and Peanuts China, three payments totaling an even $5 million, the same value as the overpayment.

And GBG updated their records a month or so later after they sent over the first wave of marketing invoices and while they were negotiating about a potential MENA giveback.

That's right here in Government Exhibit 1139. You can see this tallies up what the agreed value for the deal was based on market multiples, what GBG paid, and what Iconix owed GBG back.

And it explicitly shows the marketing invoices were sent for the Korea/Europe amendment. That's here at the bottom of the same exhibit, 1139. This also shows that the SEA-3 overpayment is going to be offset by Rocawear royalties of $4.5 million and payments for fixtures.

And then what happens is in December of 2014, Iconix sent over millions for GBG to settle up. And you can see that here, Government Exhibit 1178. And that was step three, send

MBLYCOL1        Summation - Mr. Thomas        Page 2621

the money back.

That was Cole's scheme in three steps: Convince GBG to pay more so he could claim higher revenue, report the higher figures to Wall Street to make his company look better, and then send the money back. And it worked.

You heard from the witnesses. And you only need to look at a handful of records to know that those witnesses are telling the truth; that they're corroborated time and again by the contemporaneous emails.

But as we heard on Friday, it's Mr. Cole's position that these overpayments, these givebacks, did not happen. This is entirely made up. This is a fabrication of Mr. Horowitz and this is the result of government pressure on Mr. Rabin and Mr. Margolis. The entire thing is a fiction.

So let's walk through the evidence in detail that shows that these witnesses are telling the truth and that Neil Cole is not.

I want to start first with SEA-2. Now, the negotiations in SEA-2, you can pick them up here at Government Exhibit 1031. This is one of the term sheets that shows how an amendment to the Southeast Asia joint venture might work. This one is from May 2014.

And in it, Iconix proposes a deal with two steps: First, an amendment that adds Korea, Europe, and Turkey to the JV for a total price of 11.3 and a second step involving a

# A-1084

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL1      Summation - Mr. Thomas      Page 2622

potential license relating to Lee Cooper and the Europe joint venture. But from there, the parties negotiate further. And as they do, the price comes down. And you can see that right here at Defense Exhibit 1205A1.

And you can see what happened specifically is that the price associated with the Korea piece declined. You see Korea was 3.7 in Government Exhibit 1031, and now it's 3.3 in Defense Exhibit 1205A1. The price came down by $400,000 as the parties negotiated it.

And then Jared Margolis tried to press the price down even further, even as the documents were being finalized by the lawyers. And you know that Margolis pressed for an even better deal because Horowitz reported back to Neil Cole about that. And you can see that in Government Exhibit 1038.

In his message to Cole, Horowitz described how it got heated for a bit. Told them we're not moving on price and not going to renegotiate. Horowitz held firm. And after hard-negotiating by both sides, these were finally going to be the prices for the deal.

So the lawyers drew up a contract, and you can see that at Government Exhibit 1036. The draft contract they drew up had the deal valued at 10.9 million for a 50 percent interest.

And while all of this is going on, Iconix was tracking how this deal would affect their financials, how it would play

MBLYCOL1      Summation - Mr. Thomas      Page 2623

in to the projections for the quarter. Remember charts like these?

This is Government 234. These are forecasts of how Iconix would do every quarter, and this particular version is from June 2014. Now, if you look closely, you'll see that Iconix was tracking the deal on this chart at 3.3 million for Korea and 7.6 million in Europe for a total of 10.9 million.

But as of the date of this spreadsheet, Iconix was also on track to miss its revenue and EPS targets if the only deal that closed was the Southeast Asia joint and if that deal closed at this $10.9 million.

You can see that, if you look closely at this exhibit, by taking the revenue forecast on the left-hand side that reflects licensing income expected over the period and you add it to the forecast for each of the particular deals.

If you just add in the Southeast Asia figures, Iconix is going to miss its targets, and not just Iconix. But Neil Cole the visionary, the clever brand management business he had built, that he had promoted, that he had sold, it was about to come up short.

And we heard what that would mean for him in the business. Investors like Noah Snyder who wanted winners would put their money elsewhere because to them, a revenue problem was an everything problem.

And investors who quantified everything like Sudhir

MBLYCOL1      Summation - Mr. Thomas      Page 2624

Nanda, who we heard from at the end of the trial, they would rank Iconix lower in their investment models, meaning they would buy less Iconix stock or they would even start selling it. Neil Cole didn't want to miss, not even by a little. And we heard from witness after witness that he was obsessed with meeting these targets.

Erica Alford told you, sure. Lots of public companies try to make their quarterly numbers, nothing wrong with that. But she also told you that there was something unusual about the atmosphere at Iconix. She described an obsession on closing dealings by the end of the quarter.

When it looked like they were going to miss that's when Cole told Horowitz an idea for how to bridge the gap, convince his friend Jason Rabin to pay more for the deal by agreeing to give the extra money back later. That's when Cole specifically asked Horowitz to evaluate whether the money could be given back in the form of a relief on the Rocawear Kids license.

Now, I can't tell you at precisely what time on what day Cole shared this plan with Horowitz, but the evidence actually gets us pretty close. You see, on June 6, 2014, the forecast spreadsheet was tracking the deal at 10.9. We just saw that.

And on June 9, 2014, Rabin reached out to Cole directly. And you can see that here at Government Exhibit

MBLYCOL1      Summation - Mr. Thomas      Page 2625

1289. And by June 10, 2014, Horowitz was writing notes of a potential overpayment proposal. And that's reflected at 1255.

Now, you may not remember this document -- this is Government Exhibit 1255 -- but this is a terrible document for Neil Cole because it sketches out an overpaid scenario. That Li & Fung would pay $13.3 million for the Korea IP.

That's the IP that Li & Fung had negotiated down to 3.3 million from 3.7. This is the IP that Iconix was tracking in its own books at 3.3. And now there's a possibility that Li & Fung would pay 13.3 million? No way.

Why is it that Li & Fung would pay $10 million more than it had bargained for? Well, Horowitz wrote down the possibilities. One was Rocawear Kids. Another was amending the Zoo York license. What Horowitz is doing is he's sketching out ways to get money back to Li & Fung.

Ladies and gentlemen, this is a postcard straight from the birthplace of scheme. This is Neil Cole and Seth Horowitz trying to game out how they'll bridge the gap in their books by engineering an overpay and giveback scheme with Jason Rabin. And they're to decide what it will take to get Rabin to play ball, and they are already at work on the fraud on June 10, 2014. And from there, it's just nuts and bolts of crafting a side deal that works for everyone.

On June 12, Horowitz got back to Neil with some analysis. That's reflected here at Government Exhibit 1039.

# A-1085

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

---

MBLYCOL1     Summation - Mr. Thomas     Page 2626

And what Horowitz reports is that doing the giveback through Roc Kids would be difficult and might create other problems for the company. So they need to think about a different way to get the deal done.

And in the middle of that, Rabin reaches out to Cole again. That's Government Exhibit 1040. In the same very same day, Horowitz's updates to Cole reflect that the parties are now on track for 15 million. That's Government Exhibit 1041. They could do the deal at 15 million which meant a $5 million overpay for SEA-2. So you can figure how this all worked out.

Rabin agreed to pay $5 million more for the Korea/Europe piece of the deal based on Neil Cole's promise to send back that money later.

And lo and behold, the new prices show up in Iconix's internal tracking. You can see that in Government Exhibit 235. This is the bottom panel of those forecast documents, and this one is from June 19, 2014.

Now this tracking sheet shows that Korea is projected to have a purchase price of 8.3 million, 5 million more than the original 3.3 million price. And now, if you add up the math, Iconix and Neil Cole are suddenly on track to lock up the quarter. You can see that right here.

This is a $5 million overpayment, and it's right here in Iconix's records, but it's not just in Iconix's records. It's in the Li & Fung records too. Remember how Mr. Markus

---

MBLYCOL1     Summation - Mr. Thomas     Page 2627

made a big deal about the PIPS and the Li & Fung investment committee?

Well, the Li & Fung guys had to shoehorn $5 million into their paperwork too. So check out Defense Exhibit 1312A1. I think we're looking at page 3 here. It shows that $10.9 million deal with Korea valued at 3.3 million, just like in the Iconix records.

But a week later, the Korea brands jump up to 5 million. Different page, same exhibit. Just like the price jumped up in Iconix's charts, it's jumping up here without any explanation. There is no analysis to support this price. There is no math. There are no projections, just a $5 million jump all associated with the Korea piece.

Now, what does happen before this jump is that Cole tells Rabin that he understood the deal from Horowitz. You can see that in Defense Exhibit 1289: "Spoke to Seth, and we are fine."

That's Cole confirming the giveback right before GBG presents this inflated deal to its investment committee. And then the deal documents suddenly inflate this new higher price of 15.9. You can see that at Government Exhibit 1044. This is page 8.

Now, on paper, the deals are the same -- the same territories, same brand, just all at a new, higher price. This is a last-minute change that favors Iconix by millions of

---

MBLYCOL1     Summation - Mr. Thomas     Page 2628

dollars.

After all, the parties had exchanged drafts and term sheets for weeks with a $10.9 million price. And then suddenly, the purchase price increases by $5 million days before the deal is signed with no new brands, no new territories, nothing new.

It's as if suddenly GBG was agreeing to pay millions more for the deal. And if that were the case, it would be pretty remarkable, especially since you heard that one brands in this deal, Marc Ecko, was struggling.

GBG would be paying more for less. It's like telling a New York City landlord that you're willing to pay more rent once you figure out that the dishwasher is breaking. It doesn't make sense.

Well, we've seen that this was a theme between GBG and Iconix when Neil Cole and Jason Rabin were involved. Good money for bad service. And we'll see that again.

None of this makes any sense, unless there is a side deal, unless there is something that is not reflected in the records. And we know that there was. Remember Government Exhibit 1068. Ethan Cole writes: "Overpay," "Overpay" in black and white right there on the page of.

Why would he write down "Overpay" if there was no arrangement to overpay. That doesn't even make sense. Not only is he sketching out the amounts here, but he's writing

---

MBLYCOL1     Summation - Mr. Thomas     Page 2629

down how to make the money come back.

Those notes reflect the very same points that Iconix has in its notes about how the money would come back. You can see that as Government Exhibit 1069. These are notes Horowitz sent to Neil Cole on September 2, 2014.

And they are nearly word for word the same thing that Ethan Cole wrote down. One of the things that's listed here is that Horowitz says he walked Jared through "our proposed 5 million of current marketing liabilities," "our current marketing liabilities."

This reflects in September 2014 that the parties had an understanding that Iconix owed $5 million to GBG. When the SEA-2 price jumped by $5 million, when the participants in the scheme begin taking notes about $5 million in liabilities, when Ethan Cole is keeping a list of the overpay, that's when you know that the money in this agreement is not for what it appears to be. It was for a scheme.

Let's recap. There are three quick reasons that you know these guys struck a side deal on SEA-2: First, the price jumps up at the last minute; months of negotiating, and then boom, extra $5 million for Iconix.

Second, that jump in price, it saves the quarter. Iconix was going to miss. Then they weren't. Third, the parties wrote this all down at the time. Ethan Cole and Jared Margolis wrote it down, "Overpay." Seth Horowitz wrote it down

---

# A-1086

MBLYCOL1    Summation - Mr. Thomas    Page 2630

and sent it to Neil, "our liabilities."

I'm going to pause for a moment to touch on an issue that's come up a few times at this trial. To hear the defense tell it, these are just sweet deals, great deals. The GBG guys were excellent negotiators.

And they may have said, at the last minute, hey, wait a second, the deal we negotiated, too good. Let's pay you 5 million more just at the end just to be nice.

And I expect we'll hear that even at the higher prices that GBG and Li & Fung paid, the deals were still good for them. So if you add up the math, if you do a little of this, a little of that, no overpay.

Well, could the brands have been worth more than the parties paid? Sure. Could in Iconix have persuaded somebody to pay more than they persuaded Jason Rabin to pay? Sure. Maybe; maybe not.

But so what. The evidence shows that the parties had negotiated one price for the deal and that GBG would not budge from there. They succeed in negotiating the deal with Iconix at the $10.9 million price. And then suddenly, at end of this process, they have a higher price for the same deal.

It doesn't make sense. I expect, either today or tomorrow, the judge is going to give you an instruction that I think is going to be important on this issue. I expect he's going to tell you that even if Neil Cole believed that

MBLYCOL1    Summation - Mr. Thomas    Page 2631

everything could work out in the end and that his investors will not lose money, that will not excuse intentionally fraudulent, and false actions on his part.

What that means is it doesn't matter if, in the abstract, these were sweet, sick deals. It doesn't matter if these properties could have been worth more. What matters is that Neil Cole was lying to investors about what the deals were.

Here, the witnesses say the price jumps because of a promise to send the money back. There's no evidence of any other explanation for the price jump. Now, sure, Mr. Cole offered some guesses on Friday as to why the price jumped. And that alone is pretty amazing I think, since Mr. Cole keeps insisting that he had really had no involvement in these deals at all.

But Neil Cole's guesses aren't based on the evidence. Every other witness who was involved in these negotiations testified that the price went up because Neil Cole promised to send the money back, and that secret arrangement was hidden from Iconix's investors.

Let's focus for a second on the giveback. We talked about the inflated purchase prices. So where's the giveback? Ultimately, it's in the invoices. In September 2014, it was time for GBG to get the money back for SEA-2.

So GBG sent invoices for marketing. Remember Rabin

MBLYCOL1    Summation - Mr. Thomas    Page 2632

assigns Jared Margolis to carry this out, and Margolis had Ethan Cole actually go ahead and send them.

Well, what he sent was this. This was the first wave of invoices here at Government Exhibit 1098 -- no details, no backup, just three sheets of paper that total an even $5 million, and they call for payment immediately.

Now, what had happened was that Horowitz had conveyed Neil Cole's instructions for how Iconix wanted to paper this giveback. You can see that at Government Exhibit 1084. That's on the left-hand side here.

And GBG had taken that assignment a bit too literally as they invoiced precisely those amounts for precisely those brands. This was substandard work for something this delicate, which Seth Horowitz immediately recognized.

And these invoices called for immediate payment, which was earlier than what they had agreed. So Horowitz wrote Maslaton who received these invoices: "Don't know that they're thinking." That's here at Government Exhibit 1100.

And then Horowitz and Neil Cole discussed how these invoices would not suffice to conceal the giveback. As Horowitz testified, the invoices needed to look more real in case anybody from accounting would look at them. As it happens, on Friday, Neil Cole really didn't say much different when he testified.

So Cole and Horowitz conveyed the message to GBG that

MBLYCOL1    Summation - Mr. Thomas    Page 2633

these invoices needed to be redone. And over at GBG, Ethan Cole tried to figure out what would work. He whipped up new versions of the invoices now with descriptions.

And then on October 1, Ethan Cole recirculated them to the GBG invoice guy, John Reda. You heard from him. But they still had round dollars, and you can see that at Government Exhibit 1110.

And then amazingly, GBG sent over further revisions of the same invoices. That's right here, Government Exhibit 1111, different descriptions and now different amounts too. But they still add up to an even 5 million.

Why new amounts for the same invoices? Do you think that in the one day between the earlier draft and this one Ethan Cole called around the world and added up all the work that had been done? Do you think he gathered receipts? Do you think he punched all of the expenses into a calculator?

No. Of course not. He pulled the numbers out of thin air with one purpose in mind. They had to add up to $5 million. Changing the numbers from even numbers to these numbers doesn't make it more real. It just makes them appear more real because the appearance of real was all that mattered to Neil Cole. It's about plausible deniability.

And I want to pause here for a moment because this is an easy way to know this whole thing was a sham, different invoice figures, different descriptions still add up to 5

# A-1087

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL1     Summation - Mr. Thomas     Page 2634

million.

Is it normal to then resubmit invoices with different numbers for the same accounts and then have them still add up to 5 million? Isn't that a bit like trying to re-gift something back to a person who gave it to you but hoping they won't notice because you changed the wrapping paper? It's the same thing in different packaging, $5 million in givebacks just with new descriptions.

And this makes it obvious that the invoices don't matter. It's obvious that these numbers don't reflect some real assessment of work that was done. The only thing that matters is the 5 million, and that matters because that was the agreement. The 5 million is what Iconix promised to pay GBG. Jason Rabin told us that.

Why was 5 million the amount that was billed? Because that was what was agreed upon to pay. That agreement drove the billing. Margolis says essentially the same thing. And what happens to the invoices from this point on makes it even more obvious that the whole thing is a fraud.

Remember how Horowitz told you that Mr. Cole became uncomfortable paying GBG for Peanuts marketing? So he rejected that particular invoice and asked them to start over again.

Well, a reference to that is in Government Exhibit 1212. There's a reference you can see here to the pending Peanuts spends. That part, GBG needed to rework. And the

MBLYCOL1     Summation - Mr. Thomas     Page 2635

schemers had to figure out how to plug that hole by the end of the year because GBG was getting antsy about receiving its money back.

So on December 1, Margolis wrote Horowitz about aligning. You can see that in Government Exhibit 1134. Margolis asks here for help to gather all of the details of all of the allocations so we're properly prepared for the meeting with Neil, the meeting with Neil Cole.

So take a moment to think about this for a second. If Neil Cole was correct and there was no secret side deal, what is it these guys are referring to in this message? What is it that they need to work out? What are the allocations that they need to come to?

It refers to the overpay and giveback. Horowitz testified that it's obvious. "The details of all of the allocations refer to the details of how we're going to pay back GBG for the inflated prices."

Now, the purpose of this meeting was to figure out how to get the rest of the money Iconix owed to GBG out the door. And what they settle on is, for SEA-2, that Iconix can pick whichever invoices it wants to pay, as long as it will pay enough to make them back.

So on December 12, 2014, Ethan Cole arrives at Iconix for a meeting. That's reflected in Government Exhibit 1206. And when he showed up, he handed Horowitz a big stack of

MBLYCOL1     Summation - Mr. Thomas     Page 2636

invoices. And you can see that right here in this testimony.

As Horowitz recalled, Ethan Cole said, we don't care which ones you pay. Just pay us. It wasn't about the invoices. It was about the giveback. And Cole ultimately chose which ones to approve, and Cole personally initialed them.

Marcia McLaughlin told us that she recognized his initials on each of those 16 pages, and Cole didn't deny it last Friday. But neither Cole nor Horowitz told GBG which ones they had picked, and that creates an absurd and telling fact, that the two sides of this scheme could not keep straight which sham invoices had actually been paid.

You see, when Iconix sent GBG the money for invoices, the GBG accounts receivable guy -- that's John Reda. He couldn't figure out what the money related to because there were no invoices in the system that would correspond to that amount. So he reached out to Ethan Cole to ask what the money was for.

But Ethan Cole didn't actually know which invoices from the stack Neil Cole had actually picked to pay. So he was left to guess the ones that he thought that Iconix had paid. And you know what. He guessed wrong.

The invoices in Iconix records for what they paid and what GBG had in its records for what they paid, they don't match. And they're summarized here in this chart, Government

MBLYCOL1     Summation - Mr. Thomas     Page 2637

Exhibit 1334.

This is just a summary. You should look at the underlying exhibits. If you want, you can match them up yourself. What you'll see is that they don't match. The two sides couldn't keep straight what they had paid.

If GBG had really performed work and really had billed for it, wouldn't you think they would know what it is that they had billed for? Of course they would. Any normal business would know.

But this was just window dressing. This was a giveback disguised as make-believe bills, and keeping track of make-believe turns out to be pretty hard. And you could know for certain that these invoices were a sham because you have seen for yourself what it is that GBG said it had done.

Remember Ethan Cole had to write around the world for marketing copy to use as backup for these invoices. An example of that is right here at Government Exhibit 1257. And when Ethan Cole wrote around and made these requests, he lied. He said things like it came up in conversation. Or here at Government Exhibit 1149, it relates to some consulting work that they're expecting down the line. These statements were not true. Ethan Cole was trying to find something, anything he could send to Iconix to make the bills look passible.

If this was legitimate billing, would Ethan Cole need

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL1          Summation - Mr. Thomas          Page 2638

to lie to make it happen?  Do you typically need to lie to a store clerk to get a receipt for something that you bought?

Ethan Cole wasn't trying to cover marketing expenses. He was trying to plug a hole created by the overpay, and he did it by scrounging around his company for anything he could use to paper over the giveback.

Now, you heard from Daisy Laramy-Binks, the English woman who worked for Iconix Europe, the Europe JV.  She told you how she developed brand turn-around strategies and brand buyables and how she spent years doing it.  And you can compare her work to what Ethan Cole ultimately delivered to Iconix. It's the same stuff, page after page of the same material.

And the amounts billed for it were facially absurd. Ms. Laramy-Binks, the woman who actually did the work that's in these decks that are stuck to the back of these invoices, she told you so directly.  She said it's utterly, utterly out of keeping, totally out of whack.

These bills aren't for SEA, and they're not even GBG's work.  Ms. Laramy-Binks did this work for Iconix Europe, the joint venture that GBG and Iconix had, and that's one that Iconix had a majority interest in.

So another fact here is that when Neil Cole approved these invoices, he was causing Iconix to pay twice for the same work.  It had paid its share as a joint venture partner once. And the second time, he was causing Iconix to pay Somebody who

MBLYCOL1          Summation - Mr. Thomas          Page 2639

didn't even do the work in the first place.

That's not the only double billing.  You saw some of the backup was for a Yankee Stadium viral video that was arranged and paid for by Iconix itself, and you can see that in Defense Exhibit 415.  And the backup for all of these invoices is just a stack of PowerPoints and screenshots, various pictures appended to a big bill.

Is this the way that Iconix usually handled its marketing working work?  Willy Burkhardt told you no.  The expenses here dwarfed anything that the joint ventures had in their marketing budget.

And Mr. Cole and his lawyers keep saying that Iconix, outside of the joint ventures, had a big budget, something like 35 million.  But that means that these payments to GBG represented a huge chunk of even Iconix's annual budget, more than 10 percent of their total annual budget in go one to GBG basically for nothing.  It's like putting $5 million in the blender at the end of the year.

And not for nothing, GBG was already paid to provide marketing support.  And you know that because the contracts for the joint ventures have a local services agreement that required the local services partner, GBG, to provide marketing expertise and to develop marketing advising and strategies, yet again, work that had been paid for before.

All told, this invoice story really is about as close

MBLYCOL1          Summation - Mr. Thomas          Page 2640

as you get in an accounting case to a Saturday morning cartoon. The only thing that's missing here is a banana peel for somebody to slip on.  It would be a farce if it wasn't a fraud. You'd think you could expect more from Iconix's most important business partner.

But in the end, I think Seth Horowitz said it best. The invoices were really just to cover, something to pass a sniff test.  It's just about plausible deniability.

So, to recap the absurdity here, GBG sent multiple waves of invoices to Iconix for work it was already obligated to perform as a local services partner, ones that had no descriptions at all but added up to $5 million.

The second set had descriptions but different values, and they still add up to $5 million.  The backup to this work included stuff that Iconix had already paid for once.  And to get even that together, GBG lied to get the documents.

And what Iconix ultimately paid for these invoices didn't match up with what GBG told its billing department the money was for.  None of this passed the sniff test.  This is a total sham.

If you got multiple versions of the same bill with different descriptions, different amounts of work showing as proof work something that you yourself had done, would you pay it?  Of course not.

When Neil Cole signed these invoices, he was not

MBLYCOL1          Summation - Mr. Thomas          Page 2641

paying marketing expenses.  And, amazingly, on Friday, Neil Cole basically admitted as much.  Did you catch it?

He said he was paying $5.4 million for the relationship with GBG.  You can see that in the transcript:  "I was paying -- I agreed to give Mr. Rabin $5.4 million credit for the relationship."

Well, not for nothing, by the way, Cole said he agreed to make this payment.  That's an agreement that wasn't in writing, and that agreement was the giveback.  Cole inflated the prices for SEA-2, and he sent the inflated monies back disguised as marketing invoices.  That's SEA-2, and that's proof beyond a reasonable doubt.

Now, before we talk about SEA-3, I want to take a moment to talk about another recurring theme that we've heard at the trial.  The defense has argued that there is no scheme to have overpayments and givebacks because Cole did not write down his plans in the contract documents.

And they have focused on the merger and integration clauses in those documents.  You know the ones by now.  They have a lot of jargon.  They say this agreement is the only agreement.

Well, the evidence is that those are nothing special. None of the lawyers who testified said anything about Cole consulting them about those provisions, and the fact that those provisions are in the contract does not mean that Neil Cole

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL1          Summation - Mr. Thomas          Page 2642

could not have in fact made side agreements.

Whether Neil Cole struck those deals is for you to decide. And here, the people who negotiated and signed those agreements, other than Mr. Cole, they say there were other promises.

They say those deals would not have happened without those promises, and they say those promises were part of the arrangement. That makes them part of the fraud. And that really ends the story.

But the fact that the lawyers didn't write these side agreements in the contracts is, in part, the point. The lawyers who put those clauses into the contracts did not know about Neil Cole's side deals. You might say the secret side deals were kept secret.

After all, if a person made a side deal and they wanted to make it secret, would they write it down? Would they send the terms to the lawyers? Of course not.

Saying Cole could not have made secret side promises because the contracts don't refer to them is upside down thinking. It turns around cause and effect. It would be no different than a thief telling the cops he couldn't have stolen from the corner store because he doesn't have a receipt in his pocket. It makes the evidence of the crime somehow evidence of its absence.

This one, it could only work if it wasn't in the

MBLYCOL1          Summation - Mr. Thomas          Page 2643

agreements because Larry Shapiro testified that if this agreement were known to the auditors, they would not have allowed Cole to claim the extra revenue, and that extra revenue was the whole goal.

So when Cole's staff summarized the deal documents, Cole didn't tell them about his secret side deal. In fact, he instructed Seth Horowitz not to tell them. And when these deals came up in audit committee meetings, Neil Cole sat quietly and said nothing.

And when the auditors asked Cole to certify that he had told them everything, including whether there were any linked transactions that had not been disclosed, Neil Cole lied. He signed those representation letters, even though he knew that the transactions were linked.

When it came time to file the company's financials with the SEC, he lied again. And by doing so, Cole ensured that the investing public was presented with false information about the Southeast Asia joint ventures and false financial information about Iconix.

And none of that, none of it is okay just because the lawyers wrote down some words in a contract. Indeed, I expect Judge Ramos will instruct you that what matters here is whether Neil Cole participated in a scheme to defraud and did so with an intent to deceive, not whether some secret side deal would be enforceable or not in a court in a different case. The

MBLYCOL1          Summation - Mr. Thomas          Page 2644

merger clauses are simply a distraction from the fact that Neil Cole participated in a scheme, and he kept it a secret.

Let's turn to SEA-3. Here's what happened. The parties were talking about doing a deal at 15.5, and they had the paperwork drafted. But the Middle East joint venture that we heard about, it still wasn't ready.

And without it, Neil Cole was not going to be able to have the quarter that he wanted. And you can see that in Government Exhibit 250. As of August 19, Iconix was projecting it needed both the potential joint ventures to close the gap because, once again, the licensing revenue wasn't enough to get the job done.

For the second quarter in a row, Iconix and Neil Cole faced the prospect of missing consensus and this time even falling short of last year's figures. And you can see that if you look at the forecast and compare it to the consensus figures, which are at the bottom. It's what's zoomed in here on the slide of 250.

So even though Neil Cole told you on Friday that the company was doing great, the numbers say otherwise. It was on track to miss. Iconix still had a revenue problem. So after talking about it, after waiting to see if it would really be necessary, Cole and Horowitz decided to solve the problem once again with the assistance of Jason Rabin.

There was no doubt that Mr. Rabin would play ball.

MBLYCOL1          Summation - Mr. Thomas          Page 2645

After all, Rabin was already reminding Cole and Horowitz to pay him the 5 million that they owed him for SEA-2, and he was asking for more. And that's reflected right here in 1063.

There's a reference to the "10 million and more discussed with you." This is an email Seth Horowitz sends to Neil Cole that reflects contemporaneous conversations between Rabin and Cole about 10 million and more.

So Cole and his crew cranked the dirty deal machine into action once more. Horowitz hosted a meeting. You can see that here at Government Exhibit 1082. And this email invitation -- it tells us that this meeting was at Iconix's offices.

And all these guys got together, and you heard even Neil Cole popped in. And they worked to figure out who owed what to whom. And the outcome of this meeting was that Cole would finally give Rabin something that Rabin had always wanted, approximately $6 million in relief for the Rocawear Kids minimum royalty payments.

In fact, the whole thing unfolded as Cole had predicted weeks earlier when he wrote: "Tough to do China without Roc Kids." That's Government Exhibit 1058.

You know what, on the stand on Friday, Neil Cole basically confirmed that that is what this message meant; that there was relief that Jason Rabin wanted and that, in his mind, was going to be bound up with discussions about SEA-3.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL1          Summation - Mr. Thomas          Page 2646

And when had Ms. Dabbs asked him: "Do you mean that it would be difficult to do the SEA-3 transaction without a commitment to relieve GBG of its Rocawear licensing obligations?"

The first words out of Neil Cole's mouth were: "Possibly. I know they wanted to get out." You can see that right here in the transcripts. So even Cole knew that Rabin wanted out of the Roc Kids agreement, and he knew that in 2014.

But to get out of this agreement, Rabin would have to give Cole what Cole wanted too, enough revenue for Iconix to make the quarter. So they made a deal, money for me/money for you, win/win.

And that's why a few days after this meeting, the GBG guys write for a copy of the Rocawear termination agreement. That's Government Exhibit 1085. And that's why suddenly Iconix starts tracking is SEA-3 as a $21.5 million transaction instead of a $15.5 million traction in its books. And you can see that in Government Exhibit 231.

This is a tracking chart from September 9, 2021. And before the September 5 meeting, the deal was 15.5. And after the meeting, the deal is 18. That's a $6 million price jump, less the cost basis.

And then of course the deal documents change too. You can see that at Government Exhibit 1091. The price in the documents jumps up by 6 million, and then the parties go

MBLYCOL1          Summation - Mr. Thomas          Page 2647

through with it. GBG sends the inflated price to Iconix just as agreed.

You know why the price jumped. Horowitz says it was because of this side promise. Rabin says it was because of that promise too. And Margolis says he heard that's why it jumped, and he heard it at the time. That's the agreement to inflate the deal terms, and that's proof beyond a reasonable doubt.

On this one, there's even more. You can see the outline of the secret agreement within the contract itself, sort of an echo of the side deal that Neil Cole struck.

First, in the puts and calls section, remember the purchase price jumps up by 6 million. Look here at Government Exhibit 1210. This is one of the lawyer's blacklines, the documents that reflect changes between drafts.

And you can see here at page 1 that the lawyers are undoing a change to the price of the floor of the put option. And despite all of the bluster you've heard about sick and sweet deals, this is a curious edit because when the purchase price increased to 21.5, the lawyers had also increased the price of the put option to 21.5.

And that would make sense because GBG would want the right to force Iconix to buy back its interest in this IP for at least the same price as it paid to obtain it. The whole concept of these deals, of course, was that these brands were

MBLYCOL1          Summation - Mr. Thomas          Page 2648

going to be brought to new territories and become extremely valuable.

But the parties changed it back to 15.5, $6 million less. Why is that? Because Cole and Rabin knew that the $6 million increase in the purchase price had nothing to do with the value of the assets in SEA-3. It had to do with the overpayment, and Neil Cole didn't want to have to give GBG another $6 million in five years when it came time to buy this back.

Now, the second echo of the side deal is in the installment payment schedule. Horowitz testified that Cole wanted the payments to line up with when the Rocawear Kids royalties would be due.

Well, one of the final changes to this document was amending that payment schedule, and you can see that at Government Exhibit 1244. In those amendments, this is proof that the contract was tailored to accommodate the side deal, and it's hiding right there in the documents.

And on top of the contracts, on top of the emails between Horowitz and Neil Cole, on top of the testimony from the people who struck this deal, you have the secret ledgers.

You have Government Exhibit 1068 which captures the scheme as it began to work out what the overpayment would be, and that's right here in the proposed overpayment Section. And then you have what it is that this overpayment became.

MBLYCOL1          Summation - Mr. Thomas          Page 2649

That's reflected in Government Exhibit 1139, a $6 million plug. And this also lists out what it is that Iconix has promised in exchange for that 6 million, how the $6 million will be offset.

And you know that second overpayment was not some sort of misunderstanding by Jared Margolis or Ethan Cole because on the Iconix side, you have documents like Government Exhibit 706. This is a chart that Horowitz prepared, and this reflects a $6 million overpayment on SEA-3. Everybody in these deals had that overpayment in their records.

So let's recap. Just like SEA-2, the price jumps. The witnesses say it was because of a commitment to return that $6 million back to GBG. And to be honest, there's no credible evidence whatsoever that the price jumped for any other reason. Once again, the price jumps just in time for Iconix to save its quarter, pretty remarkable coincidence.

And once again, the fact of these plugs or overpayments or offsets, they're documented in emails, in ledgers, and in updates. And they're from the time the scheme was in action.

Now, Cole's lawyers have argued that there cannot be a scheme on this one because the SEA-3 payment never made its way back to GBG in the form of the Rocawear Kids release.

Now, part of this is a wonderful argument because it's essentially an argument that Neil Cole did not keep his promise

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                    **November 21, 2022**

| MBLYCOL1 | Summation - Mr. Thomas | Page 2650 |
|---|---|---|

to Jason Rabin so he couldn't have committed fraud. Wouldn't it be something if you could erase the existence of a promise just by not honoring it.

It's like a guy who tells his wife that he's going to go pick up groceries, and then, when he comes home empty handed, he's like, sorry, honey. I've got no groceries. I couldn't have possibly promised to get them. this is more backwards reasoning.

Larry Shapiro told us what matters is what the arrangement was at the time. And the records and the witnesses, they show that the arrangement at the time was that there was $6 million promised back to GBG in exchange for a $6 million inflated price. It's as simple as that.

Let's talk for a minute about that giveback. Let's follow the plan to send the money back to GBG and what actually happened. Now, the original notion was that Iconix would send that money back in the form of royalty relief.

Remember Rabin testified that the $6 million was going to be used to offset the Rocawear shortfall. You can see that right here in the transcript. And after SEA-3, Iconix worked to give that money back as planned.

And the first step was to figure out who would take over as licensee. And Iconix did that. Even Neil Cole concedes that they did that work. And when it looked like they had somebody lined up, Horowitz wrote Rabin.

| MBLYCOL1 | Summation - Mr. Thomas | Page 2651 |
|---|---|---|

And you can see that in Government Exhibit 1096. He projected that they would be able to finalize that agreement in the coming week. But Horowitz and Neil Cole himself were still working out the kinks in this plan because Iconix needed to be sure it had an adequate substitute for GBG before it pulled the trigger on the switch. Otherwise, there would be problems for Iconix's books.

Horowitz took notes as he and Neil Cole discussed exactly what to do, and that's Government Exhibit 232. You've seen these notes a few times, but it wasn't just Horowitz and Cole who met to make the giveback happen.

Cole and Rabin met too, and you can see evidence of that reflected here at Government Exhibit 1277. And over the next few weeks, Horowitz, Margolis, and Ethan Cole kept working out precisely how to get the $6 million back to GBG in a way that worked for everyone. And by November, Horowitz writes down where things stand. That's another fact reflected in his spreadsheet at Government Exhibit 706.

So why didn't the giveback happen right then and there? Well, in November, Neil Cole was considering making GBG the partner for the new MENA joint venture. After all the months of negotiating with Abu Issa, they still weren't going to be done by the quarter end, which is what he really needed. So he decided to make the switch. But now with GBG possibly in that deal, that created wiggle room, new opportunities that

| MBLYCOL1 | Summation - Mr. Thomas | Page 2652 |
|---|---|---|

hadn't existed before.

So at Government Exhibit 1255, by November 17, Horowitz is letting Cole know that the Rocawear Kids release is ready to go, but perhaps they could retrade to get this money back a different way. And then all of these details are going to be finalized when the MENA joint venture is.

This all culminates in a meeting with Neil Cole himself at Iconix's offices. And you can see evidence of that meeting right here, Government Exhibit 1136.

It's to prepare for this meeting, a meeting with Neil Cole, that Margolis asks Ethan Cole to prepare that ledger of where the money is going to be sent. He writes: "I'm meeting with Neil and Jason in the afternoon. I need to have everything organized in paper, where all the money is going in detail as discussed last week."

And this is how that plugs email gets created, this email that shows a $6 million increase for China Umbro to be offset by Roc Kids relief totaling 4.5 million plus fixtures of 1.5 million for a total of 6 million, 6 million to go back to GBG for the $6 million SEA-3 overpay.

The plan for the giveback is right there in the document. Ethan Cole uses the word "offset," cancel out. That's just another way to say "giveback," and it's right there in black and white on the page.

This is more evidence that the giveback was understood

| MBLYCOL1 | Summation - Mr. Thomas | Page 2653 |
|---|---|---|

and agreed by the parties. Nothing about that evidence is diminished because later, after the SEC began investigating and asking questions, GBG paid royalties.

The promise at the time is obvious from the testimony. It's obvious from the documents. It's obvious from the deal terms because the price goes up. Why would GBG negotiate for one price and then suddenly pay 6 million more for nothing in return. it wouldn't.

But in any event, there is actually great proof that Neil Cole sent millions back for the SEA-3 overpayment too. So remember when Horowitz talked about sending money back through MENA? That is, in part, exactly what happened.

Here's is a provision of the MENA agreement. This reflects $3.1 million going back to GBG. This is Government Exhibit 219. And here is the invoice for that payment. This is Government Exhibit 1180.

Does this kind of thing look familiar? Willy Burkhardt told you that GBG had no presence in the Middle East. So is this a payment for due diligence or part of the SEA-3 giveback?

What Burkhardt told you is that their presence in the Middle East was actually largely nonexistent. So what he told you -- he's the guy running the joint ventures. He never saw any market analysis. In fact, he told you that normally parties conduct their own diligence.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

| MBLYCOL1 | Summation - Mr. Thomas | Page 2654 |
| --- | --- | --- |

So why would Iconix pay its counterparty to assess whether the counterparty should get into the deal. They wouldn't. And when it was Abu Issa doing the negotiating, there is no evidence that they were planning to do that.

I want to pause here for a second because I think I heard during this trial that the idea is that Iconix paid GBG money so that GBG would get up to speed; when you put that differently, that Iconix paid GBG millions because GBG didn't know what they were doing in the Middle East, and that makes no business sense.

If you were going to hire a plumber to fix your faucet, would you pay him more when you learned that he had never worked on a sink or a faucet before? No. That's not how service payments work. You hire expertise. You pay more when they know more. This whole thing is preposterous.

The reason this payment shows up when GBG enters the picture on MENA is because it allowed Cole to keep up his scheme with GBG and it was easier to pay them back through MENA than to sort out the Rocawear Kids issue.

And all of this has to unfold while the SEC is sniffing around. And you know that everyone understood that MENA could be used in this scheme because Ethan Cole wrote that down too at the time. That's the third column, Government Exhibit 1139, just like SEA-2, just like SEA-3, another possible vehicle to get money between these two businesses.

| MBLYCOL1 | Summation - Mr. Thomas | Page 2655 |
| --- | --- | --- |

In fact, Iconix paid many of the invoices for SEA-2 at the very same time as it paid the MENA due diligence fee. And remember Ethan Cole sent the invoices, including the MENA invoices, to John Reda. And they all came out of nowhere, 17 invoices that weren't in the system.

This is Government Exhibit 1180. This was like giveback Christmas. GBG finally got all of the millions that it wanted, everything that was owed for SEA-2, for saving Cole's quarter, and a big chunk for SEA-3.

So to recap, Iconix began to prepare the termination that it had actually promised. But after a meeting with Neil Cole, the parties decided that they would retrade. And ultimately Iconix paid back a chunk of this money disguised behind a different invoice for market analysis, market analysis that Iconix never received, that's being explained now as paying somebody more because they didn't know what they were doing.

Now, does the fact that Cole originally promised to make the giveback in the form of royalty relief mean that there was no scheme when he ultimately made the giveback through MENA? Not at all.

It means that dollars are dollars and the parties were working out how to hide the payments as they went along. This is like store credit, and they were trying to figure out how to spend it. By December 2014, they had started to settle up.

| MBLYCOL1 | Summation - Mr. Thomas | Page 2656 |
| --- | --- | --- |

That is SEA-3. Not I want to turn now and talk about Neil Cole because the big remaining question here is did Neil Cole know about it. Could this have happened without his knowledge. Could these secret deals be secret even from him. No way. Not only did he know, he was in charge of the scheme. He directed it. And I will give you five reasons why you know that he was in on it.

So, first, he told witnesses about the scheme.

Second, he's copied on numerous documents, meeting invites, updates about the scheme. He paid sham invoices. He tried to cover up his own involvement. And he cashed out when he had the chance.

Let's talk briefly about each of these. The first reason that you know that Neil Cole was in on the scheme is because the people who worked with him in the scheme said he knew about it. Rabin said so. Rabin spoke directly to Neil Cole, not some other person at Iconix, Neil Cole himself. And Rabin told you that Cole gave him his word.

Next Horowitz said so. Horowitz heard it directly from Neil Cole too. Horowitz worked steps down the hall from Neil Cole, and they met together privately in Neil Cole's office all the time.

And on Friday, Neil Cole said he's sometimes see Horowitz up to five times a day. Horowitz was in Neil Cole's inner circle, and Horowitz said that Neil Cole told him about

| MBLYCOL1 | Summation - Mr. Thomas | Page 2657 |
| --- | --- | --- |

the arrangement.

Rabin and Horowitz were on calls, in meetings, trading emails with Neil Cole. And they say that he knew. That's clear and overwhelming proof that Neil Cole knew of the scheme.

If you credit either Horowitz's or Rabin's testimony, that means that Neil Cole was in on it and, frankly, in charge of it. This evidence is so devastating that the defense resorts to tinfoil hat conspiracies to try to explain it away. And you heard that from Neil Cole himself on Friday.

Neil Cole's position is that Seth Horowitz made up all of these allegations in 2015 as part of some revenge campaign. And Neil Cole's position is that the government threatened innocent Jared Margolis and Jason Rabin and made them say that Neil Cole was involved.

All three men are lying. Only Neil Cole himself is telling the truth at this trial about what happened. Well, a few common sense wrinkles spoil that fantasy.

For one thing, Horowitz pled guilty to securities fraud and other crimes. And why would he plead guilty to participating in a scheme that he made up?

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

MR. THOMAS: If the argument is that he hates Neil Cole so much that he's going to risk the consequences, that's pretty extraordinary. Your common sense tells you that's not

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL1      Summation - Mr. Thomas      Page 2658

how people behave, and the facts tell you that Horowitz did not invent a thing.

You sat here for two days as Horowitz walked through email after email, note after note. And almost everything he told you matches up to a document, a calendar invite, an email.

Their argument that Rabin made it up too, that's even more farfetched. The theory here is that the government threatened Rabin to change his story. Is there even a shred of support for that claim? Rabin had to be compelled to come to court. He had to be ordered to answer questions.

So why accuse Rabin of making it up? Why accuse Horowitz of cooking up some kind of revenge fantasy? Because if you believe either of those witnesses, then Neil Cole is toast. Then what he said on the stand is an utter lie.

For SEA-2 and for SEA-3, the four businesspeople who worked on these deals in any serious way are Cole, Horowitz, Rabin, and Margolis. And three of them say that Neil Cole agreed to the overpay in exchange for givebacks.

It's not a numbers game. You have to evaluate the credibility of the witnesses, match it up to the facts, the other testimony, and ask yourselves does it make sense.

But here, the only testimony that doesn't make sense Neil Cole's. Think about it. Did Horowitz time travel back to 2014 and send Neil Cole updates with words like "marketing liabilities" only so he could bring them up in a courtroom?

MBLYCOL1      Summation - Mr. Thomas      Page 2659

Did Horowitz know to pick a story that would line up exactly with words like "overpay" and "offset" that Ethan Cole and Jared Margolis wrote in emails that they exchanged without Horowitz?

Did Horowitz know to make the prices jump on the deals just the right amount and at just the right time so that there would be no other explanation for why the prices went up? None of that makes sense.

And you know that Neil Cole understands that too because on the stand, even Neil Cole was having trouble explaining away Jared Margolis' testimony. You may not have caught the precise wording at the time.

But as you can see here, when I confronted Mr. Cole about whether it was possible that Margolis had honestly thought at the time and heard from Mr. Rabin at the time that there was an overpayment, he said, "Possibly."

And that's a telling remark because the only possible way that Margolis could have heard about an overpayment at the time of those transactions is because there was an overpayment and he heard it from Jason Rabin. For Neil Cole to be telling the truth, all three of Horowitz, Rabin, and Margolis must be lying. And the facts simply show that they're not.

The second reason that you know Neil Cole was in on the scheme is because of the documents. Lots of documents have been shown on the screens, and there are many more pages in

MBLYCOL1      Summation - Mr. Thomas      Page 2660

evidence.

If you take a careful look, you're going to see that Cole was regularly updated and joining meetings about the fraud. For example, Cole receives this message from Rabin shortly before SEA-2: "Spoke to Seth, and we are fine." That's Defense Exhibit 1281. Again, that's Rabin confirming the giveback arrangement before the deal goes to the committee.

Or how about Government Exhibit 1069. This is one of updates where Seth Horowitz refers to "current marketing liabilities," again, "liabilities," not a favor, not a hope, not an informal request, "liabilities," a commitment to giveback the money.

Now, on Friday Neil Cole said he couldn't recall if he had read this update or not. He professed to have overlooked this phrasing at the time. But there isn't any doubt that he read this one because Neil Cole responds to this update. And that's government Exhibit 1070.

Cole asks: "Latest thought on Roc Kids?" That's Neil Cole asking about the potential giveback. And the document shows Neil Cole was in meetings about the scheme. For example, after the first set of invoices came in, Seth Horowitz had his assistant print out two copies, one for him one for Neil Cole, so they could go through them together. That's Government Exhibit 1101. And you can see that request right here: "Please print out two copies of these attachments."

MBLYCOL1      Summation - Mr. Thomas      Page 2661

And Horowitz took notes of these meetings with Cole, and those are reflected at 232. Those notes show that Horowitz and Cole talked about this scheme just as Horowitz said they did.

And it shows that Cole and Horowitz are talking about reporting some of the marketing as prepay, you know, to spread the costs out over time which incidentally is exactly what ended up happening with the invoices.

Think about that for a moment. Neil Cole even knew about that minor piece of the plan. And it isn't just in meetings. It isn't just Cole in meetings with Horowitz. Jason Rabin and Neil Cole are in touch about meeting together. That's Government Exhibit 1245.

And an invite goes around for that meeting. That's Government Exhibit 1136. And remember it's in advance of this meeting that Jared writes Ethan to help him get ready: "I need to have everything organized in paper where it's all going." Once again, that's reflected at Government Exhibit 1133. This is the message, once more, that prompts Ethan Cole to prepare this plugs email. That's this one, 1139.

I know I've referred to this a few times at this point. But you should check out the "Subject" line here because it says: "Notes for Iconix meeting." This is what Ethan Cole prepared so that Jared Margolis and Jason Rabin could tell Neil Cole what it is he owed them and how it should

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                November 21, 2022

| MBLYCOL1 | Summation - Mr. Thomas | Page 2662 |
|---|---|---|

be paid.

And you know that meeting happened because in Government Exhibit 1143, Ethan Cole tells John Reda that it happened. And you know that it happened because Margolis follows up with the Iconix people. That's Government Exhibit 1142.

He writes: "Anything on Peanuts?" That's a reference to whether Neil Cole has made a decision on how he'll pay the balance of the SEA-2 overpayment.

And to that, Seth writes: "Working on it. Should have solutions tomorrow."

Lo and behold, the very next day, Cole and Horowitz met to figure out what to do. Notice the "Subject" here: "GBG with Seth pre-meeting." So think about this. In the space of two days, Neil Cole attends two separate meetings that the documents show are obviously about overpays and givebacks.

Neil Cole knew about the scheme. He attended the meetings. He reviewed the spreadsheets. He heard all about the details. As near as I can tell, the best the defense has on this point is that Neil Cole really wasn't paying attention. He wasn't reading his emails. He wasn't tracking the updates. He had a lot going on.

Now, this, I think, is an example of Neil Cole trying to have it both ways because he has sworn up and down that there were no side deals. But when it comes to emails and

| MBLYCOL1 | Summation - Mr. Thomas | Page 2663 |
|---|---|---|

messages and calendar appointments that show he's in the deals and knows about them, he claims he didn't read them. He was too busy. He was traveling.

The sharpest articulation of this defense of course is CAA; that Neil Cole was just too busy trying to hang out with people in L.A. to commit fraud. Well, the evidence has shown there is no Hollywood alibi.

This CAA deal -- it took meetings, sure. There were some term sheets. There was even I think a letter of intent, but it didn't happen. The deal never closed. So at the beginning of the case when the defense wowed us with the big bubble chart about how great this deal might be, they left out that that deal earned zero dollars in revenue for Iconix, zero dollars.

The $5 million in revenue Neil Cole claimed by inflating SEA-2 in the second quarter of 2014 is $5 million more in revenue than Cole brought in with CAA. The $6 million in revenue that Cole claimed by inflating SEA-3 is $6 million more than he ever saw from CAA.

Every quarter, Neil Cole had to report hard numbers to Wall Street, including revenue. And CAA helped him in no way meet those numbers. So the suggestion that Neil Cole was not focused on his company and on what was actually bringing money in the door is absurd. CAA is not a defense. It's a sideshow.

The third reason you know that Neil Cole was in on the

| MBLYCOL1 | Summation - Mr. Thomas | Page 2664 |
|---|---|---|

scheme is because Neil Cole personally approved the payments back to GBG. Neil Cole's signatures are on the wire transfers and the invoices that send money back.

And this includes this final batch of 16 invoices that Ethan Cole dropped off. They each have Neil Cole's signature on them. Marcia McLaughlin took you through each and every one.

And what Cole was paying for was nonsense, make-believe work you heard from Daisy Laramy-Binks that didn't cost GBG a dime. And on top of that all, there's the fact that Cole knew that he was paying marketing invoices in a way that was illogical based on the contractual relationship with GBG.

You heard repeatedly throughout the trial that GBG charged Iconix for marketing -- excuse me. The marketing gets charged to the joint venture. That's reflected in Mr. Burkhardt's testimony.

And you know that in addition to that, the marketing services performed by the local service partner are paid as a fee to GBG. And you know that because that's reflected in the local services agreement, Government Exhibit 203.

In fact, Neil Cole admitted that he really wasn't paying for services. When I asked him about the invoices, he agreed that he gave Jason Rabin a $5.4 million credit for the relationship.

Now, that's a remarkable admission that the money

| MBLYCOL1 | Summation - Mr. Thomas | Page 2665 |
|---|---|---|

really wasn't for marketing, and it's made all the more remarkable because Neil Cole first got on the stand, and he said Daisy Laramy-Binks didn't know what she was talking about.

But of course she did. After all, what right-minded executive would approve millions in payments for something his company had already paid for. What serious businessperson pays a counterparty a set monthly fee to provide marketing strategy and then just sends over millions of dollars willy-nilly with no receipt to back up what had been done.

Nobody does that in business. Certainly not Neil Cole. He's a guy who took weeks to approve a $5,000 expense for the legal department, which you heard from Ericka Alford.

He looked at details down to $10,000. You heard that from Jason Schaefer. He's a guy in the details. He's in the weeds. A CEO who approves payments, millions of dollars in payments going to GBG for nothing, is a guy who knows there's a scheme and knows the payments have to be made as part of it. Cole knew that the invoices were a sham, and he made them anyway. He was in on it.

The fourth reason you know that Cole knew about the scheme is that he tried to cover up his involvement. Remember the SEC comment letters? When SEC showed up, it was a serious headache for Cole. The more the SEC learned about the joint ventures, the more likely that they would inadvertently reveal what was going on.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

| MBLYCOL1 | Summation - Mr. Thomas | Page 2666 |

So Cole tried to take steps to protect himself by keeping his name out of it. Remember that one of the comment letters asked Iconix to identify the individual responsible for negotiating and executing the transactions.

Well, Cole tried to rewrite history. He tried to leave his name out of it. But both Jason Schaefer and Seth Horowitz told you about the argument between Cole and Horowitz over whether Cole would be identified.

After all, Cole was talking to directly to Rabin on each of the deals. We saw emails and calendar appointments about that. And Horowitz told you that he refused to let Cole erase him, his own involvement, and that Horowitz ultimately prevailed. The very fact that Cole tried to keep his own name out of it tells you that he knew he was going to be in trouble.

The fifth way that you know that Cole was in on the scheme is that he knew when to cash out. Now, We've repeatedly heard how Neil Cole built Iconix into a great company; how he cared about it; how he worked hard to have it succeed.

But these arguments don't make it less likely that Neil Cole cheated in 2014. They just explain why he did. You see, after years of growth, Cole found himself in a tough situation.

As Horowitz told us, several of the large brands were in a state of decline. In fact, in 2014, Iconix was beginning to fall behind its peers, and you can see that in Government

| MBLYCOL1 | Summation - Mr. Thomas | Page 2667 |

Exhibit 3049.

To make up for declining revenues, Cole had turned to joint ventures. And that was fine, but it was sort of like a drug you heard from Mr. Horowitz, something that Iconix got hooked on and became addicted to.

And even Jason Schaefer remembers that Neil Cole would say that the licensing model was broken. The business just wasn't working out the way that it used to. So Cole became obsessed with the joint ventures as a way to plug the gaps, and not just with the deals generally, but with the metrics, which is precisely how they would impact the company's quarterly reporting.

Remember Erica Alford told you about the constant drum beat, the obsession at quarter end, how Cole pushed so hard on timing that it made her uncomfortable about the substance of the deals.

In Q2 and Q3 2014, the mathematical reality was that Iconix was going to miss its targets with the deals it had ready to go at the prices that it had ready for them.

Did Iconix have millions of other revenue? Sure. But it didn't have enough. So Neil Cole cheated to cross the finish line. He did it in Q2. He did it in Q3. And by doing it, he avoided a collapse in the company's growth.

It's a lot to manage a scheme and to keep it from everybody for so long. And how could he know how long he could

| MBLYCOL1 | Summation - Mr. Thomas | Page 2668 |

succeed. So Cole decided to pay himself. He sold stock, and not just a little. A lot. And you can see those details summarized in Government Exhibit 1326.

And the timing of this sale tells you that he knew. He had these options for nine years, and he chose to exercise and sell them only after his company announced false figures for two quarters in a row.

It wasn't going to get any better for Neil Cole and Iconix, and Cole knew it. So he dumps stock, and he made sure he got something out of his scam. The witness testimony, the emails, the calendar appointments, the phony invoices, the attempted coverup, the attempted stock sale -- it all shows you that Neil Cole was in on it.

But before I talk about the charges briefly, I want to turn to one last factual topic, which is good faith. I expect the defense is going to argue that at all times, Neil Cole acted in good faith. And if that were true, it would be a defense. But it isn't true, not even remotely close to true. In fact, Neil Cole repeatedly acted with absolute bad faith and with the intent to deceive, and we have proven that beyond a reasonable doubt.

Now, the good-faith argument that I think you'll hear will go something like this: I'm Neil Cole. He's been in the business a long time. He's seen a lot of money flow this way and that. He relied on lawyers. He relied on accountants.

| MBLYCOL1 | Summation - Mr. Thomas | Page 2669 |

Nobody told him it was a problem, and nobody raised any particular problems with SEA-2 and SEA-3 and all the promises that Neil Cole made were in the contracts. So how could he have done anything wrong. But now you know better.

First of all, what Neil Cole told us that he actually believes on the stand is that Seth Horowitz made it all up. So Neil Cole is arguing in good faith, in case you credit Seth Horowitz, in case you find GBG sincerely believed that there were side deals, because then he wants to say, I didn't know about them or I relied on the lawyers. I didn't think it was a problem.

And he can make arguments in the alternative. He can make contradictory arguments. There's nothing wrong with that. And it's absolutely true that good faith is a defense to fraud.

But at the end of the day, there is only one set of facts, and here those facts are catastrophic for Neil Cole, because if you find that Seth Horowitz or Jason Rabin or Jared Margolis is telling the truth, then it means that Neil Cole lied on the stand.

And it means that the side deals happened and that Neil Cole knew about them, and that would be an unmistakable sign that he was not acting in good faith, and that would be the end of the defense.

But let's take good faith seriously for a moment. By my count, there will be roughly three purported sources of Neil

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

---

MBLYCOL1          Summation - Mr. Thomas          Page 2670

Cole's good faith -- the legal work, meaning the contracts and the legal team; the fiance team, meaning the accountants and the auditors; and Neil Cole's personal experience with SEA-1 and MENA. So I want to touch on each of those briefly. Let's start with the lawyers.

One of the most amazing things about the purported good-faith defense is that Neil Cole is claiming that he relied in good faith on the written contracts as a representation of what the parties had promised each other.

In his business, what the parties agreed to in writing is in writing he says. A couple of problems with that. First of all, Neil Cole says he never read the contracts. You heard that on Friday. Best case is scenario is he had a lawyer give him a list of terms.

So how did Neil Cole form a good-faith belief that there was no giveback in the contracts when he didn't read them in the first place. Good faith isn't a mystical belief. It isn't make-believe. It has to be sincere. And sincerely, Neil Cole didn't care about the contracts.

Take the merger and integration clauses specifically. No evidence whatsoever that Cole read them at the time of the deals or that he consulted any lawyers on his staff about the meaning of those terms in any way.

Perhaps, for that reason, Cole said on the stand on Friday that he knows about those clauses generally because he

---

MBLYCOL1          Summation - Mr. Thomas          Page 2671

himself has a law degree. So after pointing out how fancy the lawyers are that work for his company, he's not actually saying that he relied on the fancy lawyers.

And you know that he obviously doesn't believe that the lawyers are significant players in these deals because when it comes time to blame Seth Horowitz for the supposedly horrible terms that Seth snuck into those deals, well, then the lawyers don't matter.

Those terms went by the same fancy law firms that Neil Cole is trying to hide behind now. The truth is that Jason Schaefer, the former general counsel, told us, at the start of this case, Neil Cole treated lawyers like scriveners, paper-pushers, nothing else.

And what's more, Neil Cole's interactions with his lawyers actually show his bad faith. You may recall, at the start of case, that the defense showed you part of this exhibit, Defense 1140.

And it said this would be powerful evidence of Neil Cole's good faith because Neil Cole was telling the lawyers he didn't want them to do anything they weren't comfortable with.

But when they asked Ericka Alford, the lawyer who received this message, if she thought that Neil Cole was telling her to do what Ericka Alford thought was right, she testified that's not how she took the message at the time.

And then defense counsel said, well, I mean at least

---

MBLYCOL1          Summation - Mr. Thomas          Page 2672

we can agree that Neil Cole never made you do anything you're uncomfortable with. You can see that right here. And this is what happens. Ms. Alford said: "There was a real push to move more quickly than we were comfortable with and to get this deal closed," which meant it wasn't just about timing. But Ms. Alford set them straight. She said: "It affected substantive pieces of the transactions too."

This shows how hollow Neil Cole's argument is, this powerful evidence of Neil Cole's good faith is him writing an email that ran contrary to everything that he had said and done in the days leading up to it.

It wasn't about good faith. Just like everything else, it's about plausible deniability. And the same issues -- back to substantive pieces here. The same issues apply to the finance team.

Cole wants to argue now that he relied on a team of in-house accountants and auditors to make sure everything was correct, but the in-house accountants and the auditors can only do their job it they're provided with accurate information.

Horowitz told you that they kept the terms of the deals from the accounting people because they wanted to be able to recognize the higher prices, and Shapiro told you that if Neil Cole had struck side deals to inflate revenue, he would have wanted to know. But nobody told Shapiro about those deals, and if Cole kept Shapiro in the dark, then Cole acted in

---

MBLYCOL1          Summation - Mr. Thomas          Page 2673

bad faith.

Perhaps the most curious part of this argument of all is the repeated use of the phrase "binding commitment" as in Neil Cole did not make any binding commitment to send the money back. And I expect the reason we'll hear that phrase is because it comes up in the accounting literature.

But that's curious for two reasons: First, Neil Cole's factual position is that Horowitz made it up. So it's not really about a binding promise. It's like Neil Cole -- it's not as though Neil Cole was saying Horowitz made an offhand remark that got misinterpreted or he said we could explore it but it was taken as a promise. Cole is saying Horowitz made up the whole thing.

And the second reason it's curious is because there's absolutely zero evidence that Neil Cole had any understanding of the intricacies of the accounting rules at the time of SEA-2 and SEA-3.

In fact, on Friday, Neil Cole professed not to have any familiarity at all with the generally accepted accounting principles, which is remarkable by the way. Now Neil Cole is going to make assessments about whether a contract is reliable enough to be recognized under the accounting guidance. It's simply preposterous.

And it's all the more remarkable because there is evidence that Cole was on notice for all of these deals that

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL1          Summation - Mr. Thomas          Page 2674

roundtripping was a problem and it was sensitive for the auditors. Larry Shapiro told you that. You saw that in the audit committee meeting minutes. Neil Cole was there. He knew that the accountants understood that these could be a problem, that if there were linked payments, there would be more questions.

Just like with the lawyers, the accounting evidence shows that Neil Cole wanted plausible deniability. A good illustration of this is what happened with the invoices. Neil Cole seems quite proud of the fact that when the first set of invoices arrived, he asked for backup. What is more telling, however, is that he didn't read them.

Remember this exchange: "You asked for backup. Right?

"I did.

"But you didn't review it.

"I did not review it."

Cole makes it clear he's not relying on back-up documentation. He just wanted a paper trail, something that would satisfy accountants and auditors if they looked for some support for the payments that he was making.

Neil Cole told us ultimately he paid these invoices because he had Jason's word: "I was okay with their word. I had already agreed to give them the money."

Now, this is a remarkable thing to say, of course,

MBLYCOL1          Summation - Mr. Thomas          Page 2675

because these words are not written down in a contract. And it's a remarkable admission, of course, that he had agreed to send the money back.

But there is zero evidence that even this explanation was given to Larry Shapiro. If Shapiro had heard this, he would have investigated further. What Cole did was paper his file and hope that nobody came asking. That's not good faith. That's fraud and wishful thinking.

Now, the last part of this good-faith defense that I want to touch on are these other deals, SEA-1 and MENA. The argument is that when Neil Cole and Jason Rabin agree to send money to each other, Cole puts his payments in the contracts, and nobody ever told him that that was improper.

Now this part of the defense is a little awkward since the millions that Cole sent to GBG for marketing are most certainly not in any contract. But nevertheless, the defense keeps pointing to agreements that were signed at the time like SEA-1. Apparently they want you to take the SEA-1 experience as the authoritative guide for the only way a deal can come together.

That doesn't make sense for lots of reasons. For one thing, when Cole's lawyers tried to get Shapiro to agree that Shapiro had blessed the consulting payment made with SEA-1, Shapiro told you that he had not known about it at the time. That's reflected in the transcript right here. Once again,

MBLYCOL1          Summation - Mr. Thomas          Page 2676

Cole is just using the paper as a cover story and saying it was on the auditors to stop him.

And SEA-1, by the way, is the deal where the lead Iconix lawyer working on it, Ericka Alford, told you that Cole had made her uncomfortable. So SEA-1 is not an example of accountants and lawyers telling Cole that roundtripping is a okay. That's an auditor being kept in the dark. That's a lawyer saying that she was uncomfortable with what Cole was doing.

In any event, it doesn't matter. So what if Neil Cole didn't commit fraud with SEA-1. Does that say anything at all about other deals? As my colleague, Jared Lenow, told you at start of this case, the core of this trial is about two deals, SEA-2 and SEA-3.

The issue isn't what did Neil Cole do in some other deal some other time. The question is what did he do in SEA-2 and SEA-3. In fact, take a look. When you get the verdict form, you'll see that Counts Three and Four relate to false filings that Neil Cole made after SEA-2. And you'll see that Counts Five and Six relate to false filings Neil Cole made after SEA-3. You won't see any count about false filings that relate to SEA-1.

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

MR. THOMAS: SEA-1 is a sideshow. So let's turn to,

MBLYCOL1          Summation - Mr. Thomas          Page 2677

MENA. First of all, MENA cannot be a basis for Neil Cole's good-faith understanding for things that happened in the second and third quarter because MENA had not closed yet.

More importantly, however, in talking about MENA, Neil Cole revealed a lot about how he thinks about joint ventures. And it turns out that he thinks about them as a way to claim higher deal prices, even if he needs to send millions to the other side to make it happen.

In fact, what Neil Cole said on Friday about MENA is some of the best evidence in this entire trial of bad faith, and here is what I have in mind. With MENA, I asked Mr. Cole about the diligence payment as it related to the purchase price.

"The $3.1 million diligence payment, that washes out. Right?

"Yes. It washes out of the 18.7. That's the total deal price. So we would net 15.6.

"I said you didn't get anything for it."

What he said was: "we got 15.6." And that's an extraordinary thing to say because what Neil Cole is saying is that he got payment as a return for his payment, money for money, money moving in a circle.

I asked him if he got any diligence or marketing analysis.

And then he continued here: "It wasn't my diligence.

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL1          Summation - Mr. Thomas          Page 2678

It was his. I couldn't care less. I was focused on me, and my shareholders and what was good for our company."

Cole got nothing in return for the $3.1 million. What he was saying is that he got a net $15 million. That's an extraordinary thing to say because netting this amount is exactly the accounting treatment that Larry Shapiro says you should apply to SEA-2 and SEA-3 if there were side deals.

So if I asked Cole: "Why not just do the deal at 15, not go through the whole charade of paying Rabin 3.1 million and having Rabin pay back 18 just to get back to 15?"

Here's his answer. "This is what Mr. Rabin wanted." This is Cole admitting that he and Rabin structured a deal so they could each get cash.

And then I asked him if he reported that higher price to shareholders, and he said that he had: "You reported to shareholders that higher price of 18. Right?

"Right."

And then he immediately makes the same argument that I expect his lawyers will make about good faith: "But the accountants signed off on it. So it's totally fine."

You can see that Neil Cole never told the accountants, never sold Mr. Shapiro the facts. Cole knew that Iconix had not received any market analysis or diligence, and he didn't care. But he kept those facts to himself.

So MENA illustrates exactly how Cole approached these

MBLYCOL1          Summation - Mr. Thomas          Page 2679

deals to avoid getting caught -- negotiate with Rabin directly, get higher deal prices, have just enough paperwork so that nobody digs too deeply into the real details.

Cole knew he approached deals in this way. Rabin knew he approached deals in this way. Horowitz knew he approached deals in this way. But you know who didn't know that Cole approached joint ventures in this way? His lawyers, his accountants, and his shareholders who would read in the Qs and the Ks and think that the transactions were described as they actually happened. This is bad faith through and through.

Now I've been talking about the facts. I want to speak to you for a moment about the formal charges that you'll be asked to consider.

When Neil Cole participated in the overpay and giveback scheme for SEA-2 and SEA-3, he committed multiple federal crimes. Count One charges Cole with securities fraud.

And I expect the judge will tell you that an important part of assessing that charge is asking whether Neil Cole participated in a scheme to deceive investors in Iconix stock by trying to inflate revenue and EPS.

Counts Two through Seven -- they all charge Neil Cole with making false filings and periodic reports filed with the SEC. Two counts relate to the filings for the second quarter of 2014. That's the quarter that Iconix announced SEA-2.

Two counts relate to the filings for the third quarter

MBLYCOL1          Summation - Mr. Thomas          Page 2680

of 2014, the quarter Iconix announced SEA-3. And two counts relate to the filings for year end 2014, which incorporates both SEA-2 and SEA-3.

And finally, Count Eight charges Cole with misleading the conduct of audits at Iconix. And that count relates to the fact that Neil Cole hid what he had done from BDO and from Larry Shapiro.

And the evidence shows that Neil Cole is guilty of each and every one of these offenses. Neil Cole executed the SEA-2 and SEA-3 deal knowing they inflated prices. Neil Cole reported those inflated prices to the public in filings with the SEC after both of those deals and again at the end of 2014. When he did that, he left out important aspects of his arrangements with secret side deals with GBG.

(Continued on next page)

MBL5col2          Summation - Mr. Thomas          Page 2681

MR. THOMAS: And Neil Cole also hid those side deals from the auditors so he could make sure to claim the inflated prices as revenue because everybody knows that revenue mattered.

Neil Cole, when he did all of this, he participated in a scheme to defraud. He knew that it was wrong when he did so, he knew it was wrong when he hid the details from the auditors, he knew it was wrong when he certified all of this stuff was accurate so he is guilty of each and every count.

That brings us to the end. As the defendant's lawyers have made sure to point out, years ago people thought that Neil Cole was a visionary. They thought he was an innovator outsider and someone who came up with very clever business strategies. And as for that business strategy, it was to exploit brands for profit, to sell washed up brands to licensees abroad or to Wal-Mart here, let them make and sell the stuff while he sat back and collected checks as people bought goods with logos on them. It was certainly a vision. But that vision began to falter in 2014 and he wasn't going to make the business targets that Wall Street expected him to make through ordinary work. So, Neil Cole decided to cheat. All that he needed was a few partners to pull it off. So, Cole reached out to a friend who was willing to work out a little more than an ordinary deal and Cole cultivated an ambitious protegee at Iconix who wanted nothing more to get into the

# A-1099

MBL5col2                                               Page 2682

inner circle and they all worked out a side agreement, they gave Cole the revenue he needed. But, in 2014, the SEC began to ask questions and tensions got so high between Cole and Horowitz, his right-hand man, that their partnership snapped and that's when the secret side deal stopped being secret. That's when Seth Horowitz sent a resignation letter that revealed those two deals to the board of directors.

Now that you have seen all of the e-mails and all of the spreadsheets and all of the Friday at 5:00s and all those deal documents you know what happened. Neil Cole struck secret side agreements. He inflated revenue to claim -- he inflated deal prices to claim more revenue. He signed the financial statements knowing that they reported those false inflated figures. He represented to his auditors that he had given them the facts to do their work but he had hidden the truth from them. And, after all of that, he sent millions back to his friends at GBG to pay them for what they had done.

Neil Cole cheated to make his business look better than it was. It is as simple as that. Neil Cole, is guilty.

Thank you.

THE COURT: Thank you, Mr. Thomas.

Ladies and gentlemen, it is time for first our break right, it is a quarter after now, we will reconnoiter at 11:35. Don't discuss the case.

(Continued on next page)

MBL5col2                                               Page 2683

(Jury not present)

THE COURT: Please, be seated. 11:35. Don't be late folks.

MR. MARKUS: Judge, can we raise a couple of issues?

THE COURT: Yes.

MR. MARKUS: Just real quickly, your Honor.

The government, a number of times in its closing, said Neil Cole was in charge of this fraud so we would ask the Court to consider those arguments in considering whether to strike the aiding and abetting theory which they never mentioned or pursued one time in their closing an aiding and abetting theory.

The second issue that I would like to raise is they argued that you could draw inferences from Seth Horowitz' guilty plea which the Court will instruct the jury that they cannot do. I thought that was improper. So, I would ask the Court to instruct the jury that that comment was improper.

And finally --

THE COURT: I didn't hear that. Did you say that?

MR. THOMAS: I did not, your Honor. That's a mischaracterization. What I said was it would be illogical for Mr. Horowitz to plead guilty to something that he invented. They are suggesting that there is an inference from his plea that can be drawn from Mr. Cole's guilt.

MR. MARKUS: He is he said why would Mr. Horowitz

MBL5col2                                               Page 2684

plead guilty if he didn't do this so that's an inference he is trying to argue to the jury that this scheme must have occurred if Seth Horowitz pled guilty.

THE COURT: I think that is covered in the instructions, so I don't think I need to do anything with respect to that.

With respect to your first point concerning aiding and abetting, did you wish to respond?

MR. THOMAS: Your Honor, aiding and abetting is in the indictment. It is totally proper to charge the jury. Just because we characterized the evidence and martialed the facts in a particular way doesn't mean the jury shouldn't hear that charge at this time.

THE COURT: The application is denied.

MR. MARKUS: And the only last point, your Honor, is that Mr. Thomas went for -- how many minutes? An hour and 45 minutes, I believe, so we think that the rebuttal should be limited to 15 minutes at this point.

THE COURT: I didn't put a particular time limit on it. As I recall I said I will give you guys as many as two hours but try to keep it under that, and I believe I said two hours for main summation, two hours for defense summation, and half hour for rebuttal, so we will keep it at that. But, if you can keep it under a half hour, that would be so much the better.

MBL5col2                                               Page 2685

MR. MARKUS: I thought we should get equal time.

(Continued on next page)

# A-1100

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

| MBL5col2 | Summation - Mr. Markus | Page 2686 |

(Jury present)

THE COURT: Everyone can be seated.

Ladies and gentlemen, we will now hear Mr. Cole's summation by Mr. Markus.

Mr. Markus.

MR. MARKUS: Thank you, your Honor.

Good morning, ladies and gentlemen. All the way back on Halloween, if you can believe it, we started this case, and the prosecutor said Neil Cole engaged in a shell game. Do you remember that? That was the first words out of his mouth. We didn't hear the words "shell game" from Mr. Thomas in over an hour and 45 minutes. The prosecutor also told you back on Halloween that these were dirty deals. Dirty business partners, overpayments, secret and binding obligations to pay back GBG, and that Neil acted with criminal intent. But not one of those claims is supported by the evidence, let alone by proof beyond a reasonable doubt. Shell games, ladies and gentlemen, have three shells, and the prosecution initially pointed to SEA-1, SEA-2, and SEA-3. With SEA-1 we know that each and every term was in the contract. Everybody saw money going both ways. And they pretty much abandoned that SEA-1. Even Mr. Thomas ended with, well, maybe that was legal in his closing. With SEA-3 there was no giveback at all. Rocawear Kids was never terminated. We are going to talk a lot about that. So, we are left with SEA-2, one shell, and as we are

| MBL5col2 | Summation - Mr. Markus | Page 2687 |

going to discuss, there was simply no binding obligation for marketing in exchange for a higher price. It did not happen and Neil Cole didn't think it was going to happen.

Ladies and gentlemen, Neil Cole is innocent. He is a good man. He was a visionary. He was not exploiting things. He created a real business, a great business. As the prosecution witness called him, he was an outsider, he was a visionary. He is a good father. He is a good grandfather. He is a good husband. He is a good brother. And, he is a good friend. And, ladies and gentlemen, he is innocent.

Now, let's take a step back for a moment and talk about what the government needs to prove and how they completely failed. For starters, in every single criminal case in this court house -- every single one -- the prosecution must prove two things: One, that there was a criminal act, and two, that there was a criminal mind. And Neil Cole did not commit any criminal act and he certainly did not have any criminal mind.

To win this case -- to win it, ladies and gentlemen -- the government admitted all the way back in opening statement that it had to prove fraud for each and every count. Fraud they have to prove. And to do that they would have to prove each and every one of the following three things: First, a secret overpayment; second, that there was a secret and binding obligation to give back money in connection with the joint

| MBL5col2 | Summation - Mr. Markus | Page 2688 |

ventures; and third, that Neil Cole knew about one and two and acted in bad faith to deceive and defraud investors.

Let's go through how they can't prove any of this. First, there was no secret overpayment. Now, I know we have joked a lot about in this trial whether these were great deals, sick deals. It looks like even the government has now come around to the position that these were sick, great deals. Why are we focused so much on this? Let me give you an example. We have talked about a couple of examples.

Imagine going to the car dealership and buying a car for $20,000 and the dealer says, you know what? At the end of five years you can sell it back to us for twenty grand. All of us would want that car, right? We would all do that deal. So, that's what was going on in these SEAs. There were these floors on 2 and 3 and we are going to talk a lot about it but that's what made these deals so good. So, why are we focused on this? Why do we keep talking about why these deals were great? Because there was no need to promise anything else back to get it done. That's the whole point. GBG wanted to do these deals. Who is in the best position to say whether this was an overpayment or not? The buyer. The GBG witnesses, right? So, let's look at what they said.

Jared Margolis. Was this a sick deal for you and GBG because you had literally no downside on SEA-2? Correct.

So Jared Margolis is saying there was no overpayment,

| MBL5col2 | Summation - Mr. Markus | Page 2689 |

as written. Remember, this is the first thing they say they have to prove, that there was inflation in these deals. Their own witnesses got on the stand and told you that's not true.

Look at what Jason Rabin said. There was no downside risk in any of these joint ventures -- and we walked him through each one -- on SEA-1, so there was no overpayment, correct? Correct. What about SEA-2? You don't view it as an overpayment, do you? No. What about on SEA-3? So, just to tie this up and we can move on -- under the terms of the contract -- that means without talking without any payment back or givebacks or anything like this, there was no overpayment here? Correct.

So, their own witnesses have told you that there was no inflation, that there was no overpayment. That dooms their case right from the start. You can go back in that jury room and just on this alone say they lose. That's it, case over.

How else do we show -- do we prove to you that there was no secret overpayment? Well, these PIPs that we talked about -- by the way, in all that time, an hour and 45 minutes, we don't hear about the PIPs. This is powerful evidence. Why? PIPs are Preliminary Investment Proposals, that's what PIP stands for, Preliminary Investment Proposals, and this was on the GBG side.

So, remember Jason Rabin told you that he had to include all the material terms in those PIPs to get them

MBL5col2     Summation - Mr. Markus     Page 2690

approved. Why? Because the investment committee at GBG would review it. And so they put in there all of the relevant terms. Now, if you are Jason Rabin you want to make the deal look as good as you can to get it done, right? So you want to put anything in there that would make the deal look better for GBG and make you look good. He didn't think he was doing anything wrong so of course he would have included, if there was a marketing payment back, he would have put that in the PIP so that the investment committee would say wow, Rabin, you are doing a great job here. Look at this, you are getting these floors for the exact amount back and you are getting $5 million back. Really good. But it wasn't in there. Why? Because there was no promise. Jason Rabin didn't think he was doing anything wrong so he had every incentive to include in the PIP those dollars.

Everybody, by the way, sees the price go up in those PIPs so you can see -- you can track when you are back in the jury room -- those preliminary investment proposals show the price moving up. By the way, it doesn't always move up. In SEA-2 it starts higher and moves down and then goes up so they show you from one point in time but it bounces around quite a bit and the investment committee sees that and they approve it.

So, let's talk about the investment committee for a second. They approved the purchase price with no mention of the overpayment. Li & Fung is no joke of a company. This is a

MBL5col2     Summation - Mr. Markus     Page 2691

company that's been around for a hundred years. They're sophisticated, powerful, and smart business people, and the investment committee is made up of objective people to see is this deal -- is this proper or not. And so when they review this deal as an overpayment, they see the prices in the PIP and they approve it and that shows that it is fair market value. Nothing was secret. The final prices were in there, the 15.9 for SEA-2, 21 and change for SEA-3, and the investment committee approves the deals as written. Why? Because they were good deals and fair deals without any overpayment.

The lawyers and accountants saw the prices move around and they don't say, hey, what's going on here, this is a problem. Why is that, ladies and gentlemen? Because, in negotiations, prices move around. They may not understand how business works. I understand. They've been in government for a long time. But, when you are in business, prices pop around and move and that's what negotiation is. And no lawyer or accountant said, hey, we have got a problem here, why is the price moving up?

So, all of the objective evidence here -- and I'm going to ask you to look at the objective evidence, not at what people who have an incentive to lie say, but the objective evidence shows that this was not an overpayment and that, alone, number one, is gone. And that, alone, is a not guilty on each and every count. But, there is more than that. There

MBL5col2     Summation - Mr. Markus     Page 2692

was no secret giveback obligation, so let's talk about it.

First, in SEA-1, and I know the prosecutors don't want to talk about SEA-1, but look at Count One in the indictment. The date in Count One starts as far back as 2013. That's when the first joint venture was done. And so, remember, 2 and 3 are just amendments. The first joint venture, the one that Neil Cole led on, there was money going back and forth in SEA-1. Everything was out in the open. That money going back and forth was approved by lawyers, was approved by accountants, was approved by auditors. Now, they say Larry Shapiro didn't see it. No way. Remember all the testimony. They looked at all of these documents with a fine tooth comb. They saw the money going back and forth and they approved it. Neil put it in the contract and it got approved so in his mind money can go back and forth and there is no issue with that. There is no reason to hide it.

The integration clause. I want to talk about the integration clauses for a second because these are really important. If you would believe the prosecution, these integration clauses are meaningless. The contract terms that have been around that go into these contracts are meaningless. But that, again, is not how business works. We have these integration clauses for a reason, right? So that we know what's in the contract is the contract. Even Neil Horowitz -- Neil Horowitz, oh God -- even Seth Horowitz said Neil believed

MBL5col2     Summation - Mr. Markus     Page 2693

you do not have an agreement if it wasn't in writing. Remember this testimony? First, let's look at the integration clauses, these are each and every contract.

By the way, you would think if there was an obligation when Rocawear Kids wasn't terminated, GBG would be jumping up and down, Hey, what about the obligation? Let's sue. They couldn't sue because an integration clause would not allow it. And that, by the way, a civil case is much lower standard of proof, we are going to talk about that in a minute, preponderance of the evidence. They have to prove their case beyond a reasonable doubt. They couldn't even sue. They shouldn't be allowed to bring a criminal case.

But remember what Horowitz said? In your very first discussion with the government you told them that you learned from Mr. Cole that you did not have an agreement if it wasn't in writing. Does that sound familiar? That does sound familiar. This is the way Neil Cole and other successful businessmen ran their businesses. It had to be in writing or it was not a deal.

What about SEA-3? The Rocawear Kids obligations were not terminated or given back. That is a critical, critical flaw in the prosecution's argument. They say there was an obligation to give back with Rocawear Kids. Well, what happened? The Judge is going to tell you to look at the words and actions to determine whether things happen or not. What

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                        November 21, 2022

MBL5col2        Summation - Mr. Markus        Page 2694

was the action here? Rocawear Kids was never given back. Why? Because it wasn't in the contract and it was not an obligation. So, what was in contracts? We saw the MENA deal, $3.1 million. This is really important, ladies and gentlemen. If the parties wanted to make a contractual, binding obligation they would put it in the contract. So we saw with the MENA deal $3.1 million in the contract.

By the way, this is at the time when the SEC was looking. So, obviously Neil didn't think there was anything wrong with money going back and forth because it was right there in the contract at the very beginning in SEA-1 and in MENA. If the parties wanted to make this binding they could have put it in the contract just like they did with MENA. And that's that point that I raised there.

And I want to just pause for a second and talk about Seth Horowitz' comment. Even in his twisted telling of the events he said that he and Neil had a discussion where Neil wanted to see if the contract came back with marketing in it. That's what Seth Horowitz said, that Neil wanted to see if it was in there, because if it wasn't in there he would have wiggle room. So, even according to Seth Horowitz in his twisted re-telling of the events, if it wasn't in the contract Neil thought it wasn't binding.

Let's talk about the third thing the government must prove: That Neil acted in bad faith. But all of the evidence,

MBL5col2        Summation - Mr. Markus        Page 2695

objective evidence here, is that Neil acted in good faith and did not intend to defraud investors. Ladies and gentlemen, I have never, ever seen a case where there is not one bad e-mail or text from the defendant. Never once. In a fraud case? I challenge Mr. Rodriquez, when he gets up here, to show you all one bad e-mail from Neil Cole. One. There is not and that speaks volumes. Instead, the e-mails, texts, everything else in this case show Neil Cole's good faith. Now, it was quite something to listen to the prosecutor put up an e-mail that showed Neil's good faith and say, no, that shows bad faith. It is amazing. If there is an e-mail that's good for Neil, that's bad. If there is no e-mail, that's bad. You can't win with these people. Look at the e-mail here that they put on the screen. This was Neil Cole, back in September, to Ericka Alford: Be firm and not careful to give in to anything you are not comfortable with. If deal does not close we are fine although would still prefer to close.

They take things that are good and twist them into bad. Show me a bad one.

By the way, this e-mail, on September 30th, regarding SEA-1, again actions, of course, always speak louder than words. When does it close? When does SEA-1 close? On the first day of the quarter, not at the end. So, I think that's pretty telling and it shows also that there were numerous leavers that could be pulled to get deals done, numerous things

MBL5col2        Summation - Mr. Markus        Page 2696

out there for Iconix to do. They did not need to inflate.

Neil asked for backup. Again, this is another one where if you do something good, they twist it into something bad. Remember, if Neil would have paid those invoices that came, the $5 million, what would they have said? They would have said that's guilty. The fact that he asked for backup, that must be guilty, too. You cannot win. This shows good faith, he wanted to see it, he wanted to see the real work.

The $5.4 million in marketing was disclosed to accountants and auditors and investors. This all hit the books, it was there for everyone to see. They didn't keep the $5.4 million in marketing secret. These were not big deals for Iconix, it was 1 percent of their revenue, something we talked about in opening and they didn't respond to at all in this trial or in closing. These were not big deals for Iconix. This is another really important fact, ladies and gentlemen, and something the prosecution ignored.

Jason Rabin frequently made asks of his business partner that were not required per a contract. Why is that so important? That's what happened here. After the fact Jason Rabin made an ask, you are going to see it when we talk about the documents for $10 million or more. It wasn't tied to the joint venture, it wasn't in the contract, it wasn't binding. That's what happened in these kinds of deals all of the time. And here is Jason Rabin saying it. Is there anything unusual

MBL5col2        Summation - Mr. Markus        Page 2697

about getting marketing contributions? There is nothing unusual about that, correct? Correct. And even if it is not in the original contract there is nothing unusual about it? Correct. In other words, if you have a deal, for X amount of dollars, you may go to that partner later and say hey Disney; hey Iconix; we need some marketing money, we need some contributions here; correct? Correct.

He is explaining to you how this business works. The way this business works is there is a deal struck, that's the terms that are obligations and binding, and then a lot of times, depending on how the deals go, you can go to your partners and try to get more money.

Rabin himself: Have you gone to business partners and asked for marketing contributions even when it is not in the contract? Correct. When you do that, Mr. Rabin, there is no obligation for your business partner to pay those marketing contributions? Correct.

He is making an ask. Sometimes they pay it and sometimes they don't, just like we saw in SEA-3. GBG made an ask and it didn't happen. They made an ask for Rocawear Kids to be terminated, it did not happen. It wasn't linked, it happened after.

The reason you ask it is because sometimes good business partners do things that aren't in the contract, correct? Correct. If you asked Iconix to make a contribution

# A-1103

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBL5col2  Summation - Mr. Markus  Page 2698

that wasn't in the contract and Iconix said no, you couldn't go to court and sue them, could you? No. He is telling you right here that it wasn't an obligation. And this is the money line. You could only obligate Iconix or other business partners for things in the contract? Correct.

So where does the evidence of bad faith come from? It comes from this guy Seth Horowitz -- and we are going to talk about Seth Horowitz for quite a bit. I see that the prosecutors mentioned Ethan Cole more than Seth Horowitz -- which was surprising to me -- in their closing since they didn't call Ethan Cole, but we are going to talk about Seth Horowitz for a while. And you heard from Jason Rabin and Jared Margolis, that they didn't believe they were doing anything wrong, that they were acting in good faith. These are the people that they called to the stand. And what did Margolis and Rabin say? That we acted in good faith. Neil never thought he was doing anything wrong, he is no different than those two witnesses. So, let's talk about the witnesses for some time now. Of course, these were the three things they had to prove and they didn't prove any one of them.

Jason Rabin. So, Jason Rabin's testimony alone -- alone, ladies and gentlemen -- is reasonable doubt in this case. He was one of the best witnesses for the Defense. What does he start out by saying? The word "dirty shell" game has been used in this case. Do you believe you were involved in a

MBL5col2  Summation - Mr. Markus  Page 2699

dirty shell game? No. What about "dirty business partner," do you believe you were a dirty business partner? No. What about sham deals, do you believe you engaged in sham deals? No. Do you believe you engaged in criminal fraud? No.

This is their witness telling you there was no fraud, telling you there was good faith. And remember, I even asked Jason Rabin, did Neil Cole ever ask you to keep a secret? Remember that? And he said no. Their whole premise of the case was that these were all secret deals. Neil Cole never asked anybody to keep anything secret. Rabin says it and Margolis says it.

What about whether these were fair market value deals? Jason Rabin, when he first gets that knock on the door from the FBI, what does he tell them? Li & Fung would only pay fair market value in these transactions. But, ladies and gentlemen, it's pretty telling what happened after that. Do you remember when I asked Jason Rabin did the prosecutors -- to be fair to these guys it wasn't these guys it was a different set of prosecutors -- do you remember them raising their voice with you, getting upset with you? And Rabin admitted that when he told the prosecutors that these were fair deals, that these were reasonable prices, they had to raise their voice, get that testimony to change. Why do you raise your voice with a witness? Why do you get upset with his testimony? And fear set in, ladies and gentlemen. Fear. Nobody, not Jason

MBL5col2  Summation - Mr. Markus  Page 2700

Rabin -- nobody -- wants to be sitting where Neil Cole is sitting. So, it is not hard to change from these were fair deals to there was some inflation there. All you have to do is change it a little bit and you get immunity and you don't have to sit there.

But after that testimony changes, you know what happens? There is cross-examination. And cross-examination, it has been said by judges like Judge Ramos, is the greatest vehicle for discovering the truth. Cross-examination. And so, we asked Mr. Rabin so many questions about what happened and 75 times do you know what he said? "I don't remember." 75 times. He didn't even remember a deal called MENA. Didn't even remember it. How can this witness, who said "I don't remember" 75 times, be enough for proof beyond a reasonable doubt? How? They want to tell you how to interpret e-mails, calls, meetings that Jason Rabin had but Jason Rabin couldn't tell you. It is for the witness to tell you what the evidence is, not for them. The Judge is going to instruct you that what a lawyer says is not evidence so Mr. Thomas, it was pretty compelling going through what he believes somebody might have meant but then you have to say, but wait, I heard from Rabin himself and Rabin said that's not what it meant. One thing he did remember is he didn't like working with Seth Horowitz, he had a huge ego and wasn't easy to work with. He also remembered that it was common in this industry to make asks. He has been doing it his

MBL5col2  Summation - Mr. Markus  Page 2701

whole career and he did it in this case.

So, here is an e-mail from -- a note from August 18th, after SEA-2, and this is critical and we are going to talk about the timeline in a moment, but here is Seth Horowitz telling Neil Cole on August 18th, long after SEA-2, months after, Rabin says he needs the $10 million and more. He is making an ask. And of course when we asked Jason Rabin directly whether there was an overpayment on these deals -- we have gone through this -- there was no overpayment. So, let's talk about Jared Margolis for a second.

You remember Jared Margolis? I couldn't tell when he was testifying whether it was Mr. Rodriquez testifying or whether it was Mr. Margolis testifying. I would say 90 percent of the words came out of Mr. Rodriquez' mouth. And when we got Mr. Margolis to answer a question it was like a robot. There was an overpayment. He just kept saying that one line over and over and over again. But, again, the truth crept out on cross-examination. He said he acted in good faith. And again, you saw that frustration creep out on redirect. Mr. Rodriquez had to raise his voice with the witness, right in front of you, when he wasn't getting the answers that he liked. You can imagine what happened behind closed doors.

MR. RODRIGUEZ: Objection.

THE COURT: Sustained.

MR. RODRIGUEZ: Move to strike, your Honor.

# A-1104

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

---

MBL5col2        Summation - Mr. Markus        Page 2702

THE COURT: Overruled.

MR. MARKUS: Mr. Margolis told you that he didn't think he was doing anything wrong. That's what he said. Neither did Jason Rabin. And neither did Ethan Cole. And let's look at the testimony then. Here is what Mr. Margolis said: Are you aware that Ethan Cole always said that these invoices were legitimate? I never thought he was doing anything wrong and I never thought I was doing anything wrong.

That's what Jared Margolis believed. Jared Margolis believed these were legitimate.

Now, a key concept came out from Margolis' testimony and this is critical, ladies and gentlemen. GBG and Iconix knew how to put something into a contract when it wanted it to be binding. Remember on SEA-1, the $2 million was in the contract, right? Remember on MENA, $3.1 was in the contract. Remember that? Other deals, $3.5 million for a showroom in the contract.

Now, does that mean that the showroom cost $3.5 million? Of course not. Nobody is here to say that. That's not what this case is about. This case is not about whether the due diligence was really worth $3.1 million or whether the showroom was really worth $3.5 million. Things are worth what people are willing to pay for them. That's how you decide how much things are worth and these are things in the contract and approved by both sides by committees, lawyers,

---

MBL5col2        Summation - Mr. Markus        Page 2703

auditors, accountants and that's what was agreed to as the fair price. And you see Jared Margolis say right here: GBG could have insisted on $5 million in marketing support be included in the contract for SEA-2. Right? Yes. In other words, if they wanted it to be a binding obligation, they could have put it right there in the contract. There was nothing stopping them. Nobody thought they were doing anything wrong, there was no reason for it to be kept a secret. If they wanted it to be binding, just like they did with SEA-1, just like they did with MENA, just like they did with the showroom, they could have put it right there. It only makes sense to keep it secret if you were doing something wrong but clearly they did not think that because they put it in the contracts when they wanted it to be binding. Literally no one saw anything wrong with it, with all of those times it was in the contract.

If the lawyers, accountants, and auditors were all OK with those deals, then Neil Cole, if there was really a binding obligation -- if there was really a binding obligation -- could have just put it in the contract. GBG could have said, hey, we need this in writing. But, they didn't. And so, what does Jared Margolis say? He says if GBG wanted the termination for Rocawear Kids in the contract, they could have included it, but they didn't.

What else is important? Jared Margolis didn't negotiate these deals with Neil Cole. He wasn't the one

---

MBL5col2        Summation - Mr. Markus        Page 2704

speaking to Neil, he was dealing with Seth Horowitz. And this is pretty critical because they say they have three witnesses who say Neil Cole made a binding obligation. What does Jared Margolis actually say? Let's look at the testimony. You never once heard anyone personally make a commitment for a future marketing payment, correct? Correct.

So, what happened here, ladies and gentlemen? The government tried to get Rabin and Margolis to say that their understanding was a binding commitment. They were pretty frightened up there. And fear manifests itself in lots of different ways. With Jason Rabin, how did it manifest itself? With: I don't remember. I don't remember. I don't remember. That's how it manifested with Jason Rabin. With Jared Margolis how did it manifest? He just repeated the same line over and over again: It was an overpayment. That's what he did. Of course, when the FBI first came to their houses neither one of them thought it was an overpayment. That's what they told the FBI when they got that knock on the door. Their testimony changed over time. So, did they actually believe there was a binding commitment? I think you can really doubt it based on what you saw from the witness stand. I think you can say there is reasonable doubt there but, actually, at the end of the day, what they thought isn't the question for you all. That's not really the question. The question is what did Neil Cole think. Did he think there was a binding commitment? And on that

---

MBL5col2        Summation - Mr. Markus        Page 2705

question there is no evidence. So, why did the prosecutors keep trying to get these witnesses to use the words "binding commitment?" Because you heard from their auditor Larry Shapiro that those were the magic words, right? So they tried over and over to get them to say "binding" because the most they could get was "firm commitment." What does firm commitment mean in business anyway? Did Neil say I'm going to try to find you a new licensee for Rocawear Kids? Maybe he said that. Not in connection with the joint venture, maybe he said it as a good partner, I'm going to try to do that because good business partners try to help each other out on issues but that doesn't make it binding, it doesn't make it part or linked to a transaction.

These are the types of discussions that happen every day of the week in business. We all say things when we are negotiating and when we are trying to get other people to do things. Remember when John Reda was up on the stand and he said I put in the e-mail that the auditors are pressing me for an answer? The auditors weren't pressing him. He just put that to try to get something done. People say things all the time to try to get things done but unless it is in writing, it is in a contract, it is not binding.

Let's talk about the next witness, Seth Horowitz. Now, Judge Ramos is going to give you special instructions regarding Mr. Horowitz. He is going to give you two

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBL5col2      Summation - Mr. Markus      Page 2706

instructions regarding Mr. Horowitz, let me show what he is going to tell you. I suspect Judge Ramos will tell you that cooperating witness' should be scrutinized with special care and caution -- cooperating witnesses like Seth Horowitz. Why? Because Horowitz has a motive to lie. He has a motive to testify falsely. And, ladies and gentlemen, you saw him on the stand. You saw Seth Horowitz. He did not remember what happened. He memorized a script. 50 times. 50? Truth does not need 50 meetings, ladies and gentlemen. Truth does not need 300 hours of practice. Truth doesn't need to practice cross-examination day after day after day to figure out better answers. This is not a game. This is not how truth and justice work.

Remember on direct examination, he would remember the day of the week that he had a particular meeting. He would say that was a Thursday. That was a Friday. But then, when Mr. Hecker was asking him questions, he couldn't even remember basic things. I guess they didn't practice that question during their 300 hours.

Now, listen. A good lawyer should interview all the witnesses. That's what lawyers do. But witnesses are bound to detect what the lawyer is questioning about. Right? They're bound to try to make the lawyer happy, mold their story to the lawyer. That sometimes happens, it is inadvertent, it is not the intentional grooming of a witness. When a witness is

MBL5col2      Summation - Mr. Markus      Page 2707

interviewed 50 times it's no longer about finding out information, it is no longer about the truth. Ladies and gentlemen, Broadway shows have less rehearsals than 50. When do you have to rehearse the truth? Good, bad, or ugly, you don't need to rehearse it. You get on the stand and you answer the questions but if it is like a production like it is a Broadway show, then you have to work. Then you have to try to persuade. That takes work. You have to work on those lines, you have to know when to pause and to be dramatic. You have to work out little stories and anecdotes so that it comes out just right. Do you remember the story that he went to dinner and his stomach hurt? It didn't hurt so bad that he waited around for his stock, apparently, but his stomach hurt at dinner.

50 times, ladies and gentlemen. I want you to think about that when you go back into the jury room. I want you to think about the 50 times. What could possibly be the benefit of meeting with a witness 50 times to talk about the same set of facts? This is supposed to be about the truth, not about putting on a performance.

And, you saw from his own e-mails that he practiced when he was going to give a big speech. He says: Pause. He knows how to script himself. And look at this note to himself where he says "Pause." I didn't notice this until last night when I was preparing for the closing but look at bullet point no. 2 what he says. This is where he is rehearsing how to get

MBL5col2      Summation - Mr. Markus      Page 2708

more from Neil Cole. He says: I understand that I have a contract that provides the economics of our arrangement. Here is Seth Horowitz realizing Neil Cole is a man of the contract and he is going to make an ask of Neil Cole that's outside of the contract. Even Seth Horowitz realizes contracts control. He admitted that this was like a stage cue for himself.

Ladies and gentlemen, most people rehearse their lines to get applause at a show. Seth Horowitz wasn't looking for applause, he was looking for something much more important, looking for his freedom. Only these prosecutors can ask the Judge for a lower sentence. Only these prosecutors can ask for no jail time and I would be the first to admit Seth Horowitz memorized his lines really, really well, unlike Jason Rabin who was given a smaller role and couldn't remember his lines, unlike Jared Margolis who just said the same line over and over and over again. But when you look at the objective evidence you can see how things get twisted.

This was notes that Seth Horowitz said he took while in the room with Neil Cole. Do you remember this? And he said Neil Cole told him show us work, show us expenses, show us real expenses. But when he got on the stand, how did that get changed? How did that get twisted? It got twisted from show us work to this has to pass the sniff test. I mean, here is somebody writing down in real-time what Neil Cole said which is totally innocent and it just gets changed after 50 meetings.

MBL5col2      Summation - Mr. Markus      Page 2709

What else does Seth Horowitz say? He says companies make asks all of the time. It is common in the apparel and retail business, but if it is not in writing then it does not count and that's exactly what he told the prosecutors from the very beginning. One thing Seth Horowitz agrees on is that if it wasn't in writing from Neil Cole, you could not count on it. He said it over and over and over again on the stand. And really in a lot of ways, this is the whole case. In SEA-1 there is a $2 million commitment in the contract, you can count on it. In MENA, a $3.1 million commitment in the contract, you can count on it. The employment, that was a contract he tried to get out of it and Neil Cole said, no. The Rocawear Kids, not in the contract, doesn't happen. Lee Cooper doesn't happen.

This guy -- Seth Horowitz -- is a snake. He lies and lies and lies, even on the little things. He lied to his own mentor. Do you remember that, we showed and he said to his mentor that the board promised him he would be CEO in five years? He was trying to make himself look good to his own mentor, which is strange. He lied to Neil when he first accepted the job. He lied in court when he tried to squirm around when Mr. Hecker was saying: This is your résumé? He said it is a draft. Who squirms around like that? He lied to the board. Take a look at his resignation letter. There is no mention of MENA in his resignation letter. There is no mention

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBL5col2      Summation - Mr. Markus      Page 2710

that he engaged in any wrongdoing. He is just trying to throw Neil under the bus. He lied to the special committee, he lied to Melissa for a year, every single day. He went into the Baked by Melissa and lied to Melissa.

He waited to collect his stock. What kind of guy is this? The ego on this man. He said on the stand he promoted Melissa to president. Do you remember that testimony? You could get a glimpse into what makes this guy tick. This was Melissa's company and he said he promoted her to president. But most importantly, ladies and gentlemen, he lied to you repeatedly. He tried to say he didn't run point on SEA-2 and 3 when all the evidence says he did. He lied about asking for his bonus to be recalculated so he could get a lower amount, he wanted to make sure it was right. He lied about Neil telling him not to tell Lauren Gee. It is just a flat out lie, there was never a mention of that to the prosecutors in the 15 to 20 first meetings.

And this is really important, ladies and gentlemen. The so-called diaries, the notes to himself, there is nothing about a verbal agreement. Nothing. These were self-serving notes that he was making to try to get Neil Cole and not once does he mention the secret obligation, secret overpayment. Nothing about that. You can bet that while he is trying to make a case against Neil in those secret notes to himself he would have included it. When did he first raise these

MBL5col2      Summation - Mr. Markus      Page 2711

accusations against Neil Cole? The first time was in April of 2015. This is when he was angry, being criticized by Neil for the floors on the puts in those deals because Neil found out about them for the first time then. And Horowitz says in his own words he was furious around frustrated. His relationship with Neil had soured at that point. He no longer had Neil's support. And what do people do when they're cornered like that? They emotionally lash out, they make things up with unfounded allegations. And so, he targeted Neil Cole.

And you know, ladies and gentlemen, it reminds me of a story from when I was a young kid. So, my dad was a lawyer and I used to follow him around everywhere to his trials. I would sit in the back of the courtroom and watch him. It is what made me happy. I know it is weird.

So, I would get on the road with him and one time we were on the road driving and we see this young boy who must have been, I don't know, 11 or 12, shooting a shotgun at the side of a barn. And we looked closer and we see that he had hit the bullseye, like, 10 times, all 10 shots right in the bullseye. My dad pulls over and says we have to see how this kid does this. So, we walked up. Hey son, how are you hitting the bullseye every time? He says, let me show you. Picks up the shotgun, so big it was shaking, fires. Then we all start to walk up to the barn and takes a piece of chalk out of his pocket and circles right where the bullet hits the barn.

MBL5col2      Summation - Mr. Markus      Page 2712

That's exactly what Seth Horowitz would do. He would take a fact and then put a circle around it. That's how he made his bullseyes in this case. Seth Horowitz is lying because he does not want to take the blame for the SEA-2 and 3 deals. And remember what the prosecutor said? He said you should draw an inference. He said Seth Horowitz pled guilty. Why would he plead guilty? The Judge will instruct you cannot draw any inference from that. Judge Ramos will tell you no conclusion, no inference of any kind can be drawn from that.

So, let's compare Neil Cole, for a second, to Seth Horowitz. Neil Cole took the stand when he did not need to. He was authentic, he was real. Imagine if this was hanging over your head for the past eight years. Did he get a little rough or angry with Mr. Thomas? You bet. I would too if I was falsely accused of a trial. And I have to say, we have become really close with Neil and his family. They are such good people. I understand Neil may not be everybody's cup of tea. Maybe you like him and maybe you don't, but this is not a likability contest, this is a criminal trial and Neil Cole's life is on the line. And he got up there and answered every single question that Mr. Thomas asked. He didn't say "I don't remember" 75 times. He didn't rehearse 50 times. He wasn't a robot, ladies and gentlemen. He was real and authentic up there. And that has to count for something.

I want you to put yourself in his shoes for a moment.

MBL5col2      Summation - Mr. Markus      Page 2713

These accusations have been hanging over his head like a dark cloud. He was asked to resign from the company that he built from the ground up and then some prosecutor gets up and calls him a fraudster? Talk about shell games. They criticized his success, they say he exploited brands. I mean, how dare they? This was a great and successful business and it's been hard for Neil to watch as this company has been destroyed based on these false accusations.

So, yes, he was a little frustrated. You bet. Who wouldn't be when you are falsely accused of a crime.

You know, Mark Twain said that a lie travels halfway around the world before the truth can put its pants on in the morning? The lies that Neil Cole has had to deal with the last eight years that have ruined his life, of course he got on that stand to set the record straight. His family has stood behind him.

Thank you, Lizzy. I hope I am not letting you down right now. His two boys Brandon and Alex, thank you. His sister Abby. His brother Kenneth Cole. His friends who are here, thank you.

So, look at how they cross-examined Neil. On whether he read the integration clause, on whether the lawyers told him the meaning of the integration clause. That's totally irrelevant. Integration clauses are in contracts every day. Businessmen know this and they rely on contracts, this is how

UNITED STATES OF AMERICA, V
NEIL COLE,
November 21, 2022

MBL5col2     Summation - Mr. Markus     Page 2714

business is done. That's the whole point of a contract. What people say leading up to it doesn't matter. And so, what does Rabin say about it? Rabin says in your mind you can only obligate Iconix or other business partners for things that are in the contract, correct? Yes. That's what every business person understands. And the prosecutors are trying to criminalize regular old business.

Look how Neil's deals, SEA-1 and MENA compared to Seth's deals, SEA-2 and 3. On SEA-1 and MENA there are givebacks in the contracts. This is very powerful evidence that, one, Neil didn't see a problem with money going both ways; two, Neil operated openly and transparently; and three, that Neil believed that an actual commitment needs to go in the contract. MENA was done when BDO the auditors were on site and responding to questions by the SEC. Obviously Neil Cole didn't think there was anything wrong with money going both ways.

The prosecutor asked Neil if he was a man of his word. A man's word in business is finalized by the contract. Look at Rocawear. That was never terminated. Look at Lee Cooper. Lots of things are said in a negotiation. Did Neil live up to the contracts? You bet he did. That's why we have contracts, so that people can't get on the stand and make things up later. That's the whole reason we have them and that's how business works.

So, the prosecutor asked him, is there a business

MBL5col2     Summation - Mr. Markus     Page 2715

of -- is there a culture of round tripping because of SEA-1 and MENA? But these deals were approved by the lawyers, by the accountants. Money can go back and forth as long as the folks agree to it.

So, what did the prosecutors say? They kept saying well, the marketing, there wasn't hard costs of $5.4 million. Again, that's not how business works, ladies and gentlemen. The request came, which is not abnormal in this line of work. An ask comes, and then you can pay it or not pay it. If Neil said I'm not paying that $5 million, they couldn't sue him, they couldn't go after Iconix for that $5 million. The prosecutor said the only thing standing between you and understanding the economics of the contracts was reading the words on the pages. I printed out all the words on the pages. These are all the words on SEA-1, 2, and 3. Here they are. Have you read all the words on the pages? CEOs don't read all of the words on the pages, that's not what CEOs do, that's not how business works.

One thing businessmen do know is how a contract works, the terms of a contract control.

By the way, you know what would have happened if he read every word of these contracts? Do you know what would have happened? He wouldn't have seen any obligation to give back money on SEA-2 or 3 because it wasn't in here. It was in SEA-1 and MENA because they knew how to obligate each other

MBL5col2     Summation - Mr. Markus     Page 2716

when they wanted to.

What about the other witnesses? You heard a lot from these "if" witnesses that we called. Cuneo: If there was fraud would you have wanted to know? Of course. Right? If there was fraud would you have wanted to know? There was a lot of hypothetical witnesses but these "if" witnesses were just trying to create smoke screens so you wouldn't focus on the fact that they could not prove the "if."

Same with the investor, Nanda.

Remember Karetsky? He was the guy that talked about the sale of the stock? He said it would be highly unusual for a CEO to exercise the options and not sell because there would be a huge tax implication. The government cannot have it both ways, ladies and gentlemen. They say he sold the stock because of the fraud but then why would he keep 80 percent of his net worth in the company? He didn't think there was any fraud going on. 80 percent of his net worth was in Iconix stock. So what's really going on here? Why do we keep hearing about the sale of stock? They're hoping that if you hear about a sale with a large amount of money, that you will turn on. That's what they're hoping. And remember all the way back to voir dire when we were questioning everybody and so many jurors said they could not be fair to CEOs who made a lot of money? Do you remember how many people said that? But you all didn't, you all said you could be fair. Neil Cole made a lot of money.

MBL5col2     Summation - Mr. Markus     Page 2717

That is not a crime in America, at least not yet. You all promised us you could be fair. This is a distraction.

What about Larry Shapiro? Now, I have to say, this was a really, really important witness but he was a little bit of a snoozer, Larry Shapiro, the last guy. He went through the accounting rules all day. There were no objections which was a first that we heard from Judge Ramos. First for me too. But, why was he so important? Because he didn't raise any issues, the auditor, with the showroom for $3.5 million in the contract, he didn't raise any problem with $2 million going back and forth on SEA-1, $3.1 million going back and forth on MENA. And this was really critical, ladies and gentlemen. He said he would only want to know about an oral promise if it was binding. How many times did he say that? Over and over and over again. He said if it wasn't binding there would be no obligation, there would be no crime. And Neil Cole never thought it was binding. Here is what he said: Revenue can't be recognized unless there is a binding obligation on the parties? Correct. And by the way, how did he account for the MENA transaction? He accounted for it at $18 million in revenue. He didn't subtract the $3.1 million. He didn't think it was suspicious, he didn't think it was fraudulent. And if this guy, the book on accounting didn't think there was a problem with it, why would Neil Cole? Literally not one reason to keep it secret. When it is in the contract it got accounted

# A-1108

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBL5col2  Summation - Mr. Markus  Page 2718

for as revenue. When the $3.1 million was in the contract, that whole $18 million got counted as revenue. They didn't need to keep anything secret if it was really there.

He also admitted -- and this is really important -- that the accounting for SEA-3 is still correct, to this day, because Rocawear Kids was never terminated. And he said even if Rocawear Kids was terminated, the accounting, the revenue would still be reported in the same way.

What about Lauren Collins, the summary witness with the summary chart with all the different things? They asked you to take that summary presentation that she made back with you to look at it. Remember, they made it, they didn't include everything, it's not worth anything because they didn't know anything. The actual FBI agents who know something haven't been called to testify, they're still sitting in the back of the courtroom.

The last witness they called was Ms. Chambarry. Remember her? She talked about the EPS and whether it beat for the quarter. So, this is the chart she showed. Remember? So, this is really important for a couple of reasons. One, they beat second quarter and third quarter without the inflation. That shows Neil Cole's good faith. They didn't need any inflation to beat. That's really important and why she is one of the best witnesses for us. But guess what she also says. She says they also would have beaten for the full year if you

MBL5col2  Summation - Mr. Markus  Page 2719

used the right numbers. Yes. And so what really happens if you use the right numbers on those two things? They beat, without inflation, for the full year of 2014. And that's why she is so very important to us because they did not need these deals to beat for the quarter or for the full year.

The next witness I want to talk about is Ethan Cole. Here is Ethan Cole, I'm going to put him in the witness box. They spent more time talking about Ethan Cole in their closing argument than they spent talking about Seth Horowitz. They called every single witness in the world except for Ethan Cole. They flew someone in from London who has never met Neil Cole but they wouldn't call Ethan Cole, the guy who did these invoices. He is literally down the street living his best life. They're petrified to call this guy.

What do we know about Ethan Cole? We know he was a young guy who was reading and writing e-mails for Jared Margolis, in his early 20s, said he was innocent, said the invoices were real. So, he would not lie and change his story in exchange for immunity. You are entitled to hear from him. The prosecution bears the burden of proof. They're trying to tell you what Ethan Cole meant in his notes or e-mails but they wouldn't call him as a witness? That's not right. That's not how our system of justice is supposed to work.

Now, the Judge is going to read you an instruction that says witnesses are available to both sides. But,

MBL5col2  Summation - Mr. Markus  Page 2720

remember, they have the burden of proof. They can't ask you to guess what Ethan Cole would say. They can't ask you to guess or speculate what those e-mails or notes that Ethan Cole wrote. That's not proof. It is certainly not proof beyond a reasonable doubt.

This table right here is the only table that can give someone immunity for their testimony. They gave it to Rabin and Margolis. We can't do it, we don't have that power. They refused to do it for Ethan Cole. They decided not to and that is reason to doubt.

Some questions that we could have asked Ethan Cole? Did you believe you did anything wrong? No. Did you understand that GBG did valuable marketing for Iconix brands? Yes. Did you ever have a conversation with Neil Cole about these deals? Nope. When you told the prosecutors these things, did they tell you they were going to charge you and go after you? Why didn't you change your story for them, Ethan? Weren't you making these internal documents that Neil Cole never saw in order to help Jason Rabin for his later asks?

Even Mr. Thomas, in his closing argument, had a question for Ethan Cole. He said, Why would Ethan Cole write what he wrote months after the deal? Why were you afraid to call him and ask him? Why? Because they knew those answers would detonate their case. They knew Ethan Cole wouldn't give the answers they wanted.

MBL5col2  Summation - Mr. Markus  Page 2721

So, let's talk about the deals for a moment. SEA-1, this is the original deal, it is charged in Count One all the way back to 2013. The government has run away from this deal. Nobody in this trial has said anything funky about SEA-1. They didn't ask their witnesses one single question about SEA-1. This is the deal Neil was the prime negotiator on, it was nothing secret, it was signed, money went both ways, auditors saw it, and it was approved. This is critical because it shows that there was a real obligation they could have put it in the deal. And they just ignore things when it doesn't fit their theory. SEA-1 closed on day one of the quarter. They ignore that. Also, there is no floors on those puts and calls, no guarantees. This is the deal Neil negotiated, it shows that the feature only appears for the first time once Seth Horowitz does it. And why is it so important? It is important because that's when Seth Horowitz gets ridiculed by Neil. When Neil finds out about these deals with the floors he gets pissed and he tells Seth, these are really dumb, what were you thinking? And that's when the fight starts.

SEA-2, we discussed there was not an overpayment and not an obligation. And all of the evidence backs it up. First, there is not a single document -- not one single document -- from the time of the SEA-2 transaction or the negotiations leading up to it that references any commitment by Iconix to pay future marketing. Now, there were tons of

# A-1109

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

---

MBL5col2    Summation - Mr. Markus    Page 2722

documents generated leading up to SEA-2. Term sheets, transaction summaries, e-mails, internal e-mails with Iconix, internal e-mails with GBG. There is not one e-mail, document, or anything else leading up to SEA-2. No one in May, June, July -- anything -- that references an obligation.

You can see lots of terms being discussed. Lee Cooper comes in and out. Things like this. But nothing about marketing. And that absence of documents is very revealing because people can get on the stand and say something eight or nine years later but they can't change the documents.

We have talked about the PIPs. They didn't include them. If there was a commitment, Rabin and Margolis would have put it in the PIP. They didn't think there was anything wrong with it, they would have included it. And that is such an important part of the case. Of course, we have seen the contracts didn't include it. And even according to Seth Horowitz' twisted account, what does he say? He says Neil was happy that when the contract came back there was nothing in there about marketing. Even according to this twisted account. Why was he happy? Because it gave them wiggle room. That means they didn't have to pay it, there was no obligation, even according to this crazy account.

So, what did the contract say? The contracts say that the fair market value is $15.9 million. Now, Mr. Thomas, in his closing, picked a point in time of the negotiation to show

---

MBL5col2    Summation - Mr. Markus    Page 2723

that the price goes up. Remember that? But if you take a few weeks back, the price was higher. It doesn't just jump up, there is movement of the price up and down. When Lee Cooper was in the deal it was $25 million. So, it was higher at one point. The bottom line is the fair market value of the deal is $15.9, that's what both parties agreed to and that's what the integration clause is there for.

These are two sophisticated public companies, ladies and gentlemen. They documented every single item in the contract. If there was showroom support, they put it in there. Look at the contract here, $3.5 million. Right there in the contract. There is no prohibition to money going back and forth. One of the central features of the prosecution case is that they had to keep this secret because there is something wrong with it. Money going back and forth had to be kept secret according to the prosecutors. No. It's right there in black and white. Same with MENA, look at the contract. It is right there in black and white, money going back and forth. Nobody thought there was anything wrong with that, that's the important part of this.

So, what does the government say? And this is really important. The argument goes, by Mr. Thomas, well, they had to keep it a secret so they didn't put it in the contract. But remember, the GBG side, Rabin and Margolis, didn't think there was anything wrong with it. So they had no incentive to keep

---

MBL5col2    Summation - Mr. Markus    Page 2724

it out of a contract. If they wanted to make sure there was an obligation to get that back and they didn't think there was anything wrong with it, they would have put it in the contract. They included commitment for less than the 5 million, we saw the $3.5. And, by the way, the prosecutor said, Do you see the 5 million going back and forth? No. You don't see 5 for 5. They gloss over it and show it was 5.4. Initially in the spreadsheet they said it was 5.6. That's why you need these things in writing. If there is an obligation, you need it in writing.

So, they rely on this guy Seth Horowitz but they have a real problem, ladies and gentlemen, because every single conversation that Seth Horowitz says that he had with Neil Cole, there is not one person to corroborate it. Not one. No once else was present.

Here is where I think we are going to get to the most important part of this case because you saw a lot of documents in Mr. Thomas' closing, documents that made it look like there was a discussion of marketing liabilities. What I am going to show you right now is there was never once a discussion in marketing liabilities leading up to the SEA-2 transaction. Let's take a look at the documents, first Seth Horowitz' secret notes to himself, nothing about marketing leading up to it. Fridays at Five, nothing in any document of Friday at Five to Neil Cole leading up to the transaction. Let's look at e-mails

---

MBL5col2    Summation - Mr. Markus    Page 2725

leading up to.

So, this is an e-mail on June 12 before the closing from Seth Horowitz to Neil Cole. Here is where he is saying: The bottom line of the transaction, we are going to get $15 million. Why does Seth Horowitz need to update Neil Cole if Neil Cole had already worked this out with Jason Rabin? Why? There is no mention of marketing here.

What about as we go forward towards the closing, here is a weekly update, June 27th, 2014, lengthy, lengthy notes. On June 27, to Neil Cole; not a whisper, not a reference to marketing obligation.

The prosecutors kept saying they wrote it down at the time. No, they didn't. There is not one text, e-mail, note at the time about a marketing commitment. This may be the first time in the history of a fraud case where the so-called secret notes are kept secret from the person on trial.

July 18th, still no mention of any marketing payment. So, when is the first time? This is so important, ladies and gentlemen, I can't stress this enough. When is the first time we see any reference to marketing? Seven weeks after SEA-2, on August 5th. I'm sorry, it is not even on this one. On August 5th, Seth Horowitz says he is going to recap the deal. There is not a commitment on August 5th, I misspoke. The first time you see it is on August 14th. And how does it come up? The first time you see anything about it months and months after

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

---

MBL5col2          Summation - Mr. Markus          Page 2726

the deal closes, Jason Rabin has a list of asks. This is a critical document that they can't explain. Why would Jason Rabin be asking for it months and months after if there was an obligation? No. He is making asks like we see is common in the industry. Four days after this where Jason Rabin makes his list of asks, Seth Horowitz, four days later, explores the asks that Jason Rabin is making. And this is probably the most important document in the case. This is the first time marketing liabilities is mentioned anywhere, August 18th, months after SEA-2 closes. And what do you see in bullet no. 2? Jason says he needs $10 million more. I see it as $5 of marketing. That language is critical. I see it as? There was no obligation here. There was no promise before. This is Horowitz trying to figure out how can we make our business partner happy. I see it as maybe paying them $5 million in marketing liabilities.

So, let me reiterate. SEA-2 -- oh, by the way, the only time you see Ethan Cole's e-mails come after this, after this August note. Those Ethan Cole e-mails do not happen at the time, only afterwards. Of course we can't ask Ethan Cole where he heard about it from or what he meant by it.

So, let me reiterate, SEA closes on June 30th. The very first time there is a mention of $5 million in any document -- in any document -- is seven weeks later on August 18th. The documents don't lie. Anyone can get on the stand,

---

MBL5col2          Summation - Mr. Markus          Page 2727

especially if they're being threatened with prosecution, and say we had a conversation about it. But the documents are what's critical and you don't see marketing discussed until seven weeks later. And how do you see it discussed? I see it as when talking about the asks. So, we see SEA-2 closed on the 30th, we don't see any mention of marketing, $5 million, Government Exhibit 1063, take a look at it.

So, the prosecutor is going to get a chance to come back up here and respond to this and I imagine they're going to say something like, well, this was a secret so you wouldn't expect to see it in a document. Right? But they can't have it both ways. If it is a secret, why are they discussing it in August? The real reason you don't see it is because there was no promise made of $5 million in marketing. They can't say it was a secret at one point but not a secret later on. There was no binding obligation back in June. I challenge Mr. Rodriquez to explain that.

So, why did the SEA-2 transaction jump around? It didn't just go up, they grayed out those portions of the spreadsheet where it goes up and down. Lee Cooper was taken out and you heard Mr. Cole say he was going to try to get Lee Cooper back to them but that wasn't binding. Korea became more valuable, you heard about the purchase of Coco Bahn. There is lots and lots of reasons why the price might go up but that's irrelevant. Neil wasn't involved in the day-to-day. He wanted

---

MBL5col2          Summation - Mr. Markus          Page 2728

Seth Horowitz to fight for the highest possible price he could, he saw the price start at $25 million and then it ended up at $15.9. Why did Iconix pay the marketing? Because a good business partner, months later, asked for it. They were upset that Lee Cooper had been taken out of the deal and it never got made so they tried to help their business partner out. There is nothing wrong with that, that's not illegal. That's not inflation.

SEA-3. This is where they have the biggest problem. We know there was no commitment to give back $6 million because $6 million was never given back. There was no release of Rocawear Kids and this is undisputed. So, what does the government say? Well, Iconix still intended. But intended it, that's not a commitment, that's not binding on anybody. And that's the whole point. You can intend to do Lee Cooper in another quarter but it is not a binding commitment, it's not in the contract.

So, what do they try to do? Even though none of their witnesses would support them they try to say, well, the MENA deal is 3.1 going back. Not one of their witnesses said that. Not one. Rabin asked about MENA. He said I don't remember MENA. They can't just make things up to try to have proof beyond a reasonable doubt.

Remember Rabin himself? Do you remember a deal called MENA? No. Do you have any recollection? No. That's not

---

MBL5col2          Summation - Mr. Markus          Page 2729

proof beyond a reasonable doubt, ladies and gentlemen.

What about the resignation letter? Is their theory backed up by the resignation letter? Nope. There is no mention of MENA in Seth Horowitz' resignation letter. There is, by the way, no mention of overpayments or givebacks either. Of course, his letter was drafted with lawyers' help.

Anyway, you have seen no evidence of GBG demanding, in the weeks or months after SEA-3, that Iconix terminate Rocawear Kids. You never see it. Why don't you see GBG jumping up and down, hey, you promised us, terminate the obligation. You don't see it because there was no promise. Think about that for a second. If GBG had paid $6 million more than the fair market value and expected to get something done in exchange for the $6 million, you would expect to see e-mail after e-mail, hey, you promised. What happened? Do what you said you were going to do. But, there was none of that.

So, they recognize they have huge, huge problems with SEA-1, 2, and 3, so they do two things in this case. They try to distract you with marketing invoices and stock options. The first is marketing invoices. Before Iconix was going to help its business partner out with marketing, which happened all of the time, Neil asked for backup. There is nothing wrong with that. You can't win with these guys. As I said, no matter what you do, you lose. The government spent days and days and days trying to prove these false marketing invoices. They flew

---

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

---

MBL5col2     Summation - Mr. Markus     Page 2730

someone in from London. What do we know? It had nothing to do with Neil Cole. He didn't prepare these invoices. All he said was, hey, guys, before I pay something, let me see the backup. That's now a crime? This was all done on the GBG side. And by the way, not for nothing, their own witnesses said it was legit, there was nothing phony or fraudulent about them, correct? Correct. Look at what Rabin is saying about it. These were real, not sham. That's what the GBG guy was saying. How is Neil supposed to know?

And this is a really important piece of evidence that the prosecutor, in his hour and 45, didn't talk about. These kinds of asks for huge numbers get made all the time in this industry. This has nothing to do with Iconix. This is GBG asked Spyder, asked a group called Authentic Brands Groups for $8 million. Look at what they're asking for, for marketing support, for e-commerce, search engine optimization. Do you think that costs $8 million? Of course not, but that's how the business works, that's how this line of business works, nobody thought there was anything wrong with it. And that's why we have you all. Right? To separate the good from the bad. They don't get to decide.

The exercise of options. So let's look at the actual blackout periods. You know what? I will talk about that in a second but just remember the options, that Neil Cole had these options for 10 years, he built a fantastic company. And they

---

MBL5col2     Summation - Mr. Markus     Page 2731

were going to expire. What should he have done? Let them expire worthless? I mean, this is just absurd. He could have exercised them at higher values beforehand. The stock was higher before. Let's look at the period when he exercised.

Neil exercised options October 31, the same date this trial started. He could not have exercised in the end of December, all of January, all of February, or the end of March because there are blackout periods. You are not permitted to do it. So, they're trying to turn normal business, the exercise of options, into a crime. They don't get to decide that. You do, ladies and gentlemen.

I am coming to a close, I promise. I know you have been listening to lawyers all day, for a month. You must be sick of us. I am sick of us.

I want to take a moment and thank you guys, though, because serving on a jury, other than serving in the military during a time of war, there is nothing more important than serving on a jury. It is the greatest service you can do for country. So, I know on behalf of the government, on behalf of the Judge, on behalf of the defense, we all thank you for this. And we are coming up on the Thanksgiving holiday so, you know, I am grateful that the United States still has this gem, this jewel of trial by jury. It is really incredible that this still works and I am grateful for it. I know it has been a long three weeks and it has been a sacrifice, so thank you.

---

MBL5col2     Summation - Mr. Markus     Page 2732

Each and every one of you, thank you.

I am also going to fill you in on a little secret today. It is my 50th birthday today and my family and my friends are saying, you are in court on your 50th birthday? You should be on a beach in Florida enjoying yourself. And I told them, No. I'm thankful that I get to spend my birthday doing this, the thing that I love the most in the world. It is why I went to law school, to be able to represent someone like Neil Cole, an innocent man, falsely accused of a crime. So, I'm doing what I love doing and I thank you guys for doing this as well.

I want to talk to you about what the Judge is going to instruct you on reasonable doubt. Here is the instruction you are going to get, it is part of it: What is reasonable doubt? The words almost define themselves. It is a doubt based on reason. It is a doubt that a reasonable person has after carefully weighing all of the evidence that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life. Proof beyond a reasonable doubt must therefore be proof of such a convincing character that a reasonable person would not hesitate to rely upon making it a most important decision.

I think about a story about Seth Horowitz, Jason Rabin and Jared Margolis standing outside the courtroom. You are here, it is 9:15. Court is supposed to start at 9:30. Seth

---

MBL5col2     Summation - Mr. Markus     Page 2733

Horowitz tells you, Judge Ramos told me court is not starting at 9:30 today, you guys can all go home, don't worry about it. You say, well, I would like to ask the Judge myself, can I ask him myself? And Seth says, Why? I promoted Judge Ramos to his position. You see Jared Margolis and Jason Rabin standing there and you say, Mr. Rabin, did the Judge really say that? Jason Rabin says, I don't remember what the Judge said. So, you turn to Jared Margolis and you say Margolis, is that what the Judge said? And he said: The Judge said it was an overpayment. I mean, you would hesitate, you would not leave and go home based on what these three jokers told you. You would go in to court and follow the judge's instructions.

So, what is reasonable doubt, ladies and gentlemen? It's not by a preponderance of the evidence. This is a horse race where a horse wins by a nose. So, if you are listening to the witnesses and you hear the witnesses going back and forth on direct examination you think the government might be winning, on cross-examination you think the defense might be winning, that's going back and forth. That's how you prove a case in a civil courtroom, by just a nose. But that's not proof beyond a reasonable doubt. Proof beyond a reasonable doubt is Secretariat at the Belmont Stakes. For the prosecution to win this case, they have to win the horse race like that. And they have just so failed. They so failed, ladies and gentlemen, they didn't come close to that.

---

# A-1112

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

---

MBL5col2  Summation - Mr. Markus  Page 2734

The Judge is going to instruct you that good faith on the part of Mr. Cole is a complete defense to each and every one of the charges in the case. An honest mistake in judgment, or an honest error, or even carelessness, does not rise to the level of the criminal conduct. He has no burden to prove his good faith. The government must prove the bad faith and intent to defraud beyond a reasonable doubt. If the evidence leaves you with a reasonable doubt, you must find him not guilty. And so, I just want to talk for a moment about what that means.

The prosecution must prove beyond a reasonable doubt that Neil Cole acted in bad faith. So, when you go back into the jury room, if you say we believe that Neil Cole acted in good faith, most likely acted in good faith -- and I am going to go through a list of these -- if you believe he probably acted in bad faith, you know what you have to say? That's not guilty. If you say it is highly likely that he acted in bad faith, that's not guilty. If you think there is clear and convincing evidence that he acted in bad faith, that's not guilty. The only way you can find him guilty is with proof beyond a reasonable doubt. So, you can go back in there and say, you know, I'm not sure, or I think maybe he did it. Not enough. Not enough. They couldn't even bring a lawsuit by a preponderance, GBG, forget about reasonable doubt.

OK. Last slide I'm going to show you. You are ready for me to sit down. Last slide. Here are 10 reasonable doubts

---

MBL5col2  Summation - Mr. Markus  Page 2735

that I would like to go through with you. Now, when you go back in the jury room the Judge will tell you, you can elect the foreperson. That foreperson can run the deliberations, but each of you are entitled to have your voices heard. So, each of you can take one of these questions, come up with some of your own, and lead the discussion:

Did the contracts allow for verbal side deals? Absolutely not.

Did GBG overpay for 1, 2, and 3? You heard Rabin and Margolis say no.

Was GBG's investment committee just a rubber stamp? Of course not. This was a sophisticated public company. They wouldn't just rubber stamp a deal.

They believed these were the fair market values of the deal. That's reasonable doubt. There was no overpayment.

Did Iconix terminate Rocawear Kids? No. Go talk about that.

If this was a binding obligation, why didn't it happen? Actions speak louder than words.

Did the government call Ethan Cole or any other witness who did not have a deal who implicated Neil Cole? Remember, the only people that pointed the finger at Neil Cole are people who had a deal with the government and the Judge is going to instruct you that you have to view those people with extra caution.

---

MBL5col2  Summation - Mr. Markus  Page 2736

Was this the first time that Iconix contributed, in large round numbers, to partners? Of course not. We hear that this is very common in the industry, to make asks after the contract.

Can someone, who rehearsed their testimony 50 times, be believed? To me, ladies and gentlemen, this is the easiest way to find reasonable doubt. Why would Seth Horowitz have to be prepped 50 times? Why? Explain it when you get up here, please.

Was there one e-mail or text to or from Neil Cole with even a mention of overpayment or giveback before or during these deals? I showed you the timeline, that critical timeline. The first time it gets mentioned is the list of asks in August. Please take a look at that.

Were there any payments or marketing expenses kept off the books? Nope. Every single marketing expense hit the books, nothing was kept secret.

And was any inflation needed to meet EPS consensus? No.

I am sure I left some out but I like David Letterman's old Top 10 so that's why I did it that way.

So, there is eight counts, ladies and gentlemen. I'm asking you to find him not guilty of all eight. What you cannot do is compromise. Don't go back there and say, well, the prosecution did a lot of work, the defense did a lot of

---

MBL5col2  Summation - Mr. Markus  Page 2737

work, let's give each side a couple of counts. What they're hoping for is like throwing spaghetti up on the wall and one strand sticks.

Please, Neil Cole did not commit fraud. He is not guilty of all eight counts. Do not compromise back there. Please.

Now, I'm about to sit down. I am sure everybody is happy about that. But, I'm going to sit down and I'm going to pull what little hair I have out because I'm going to say I forgot to say all of these things, I forgot to make this argument, I forgot to talk about this witness, and I'm not going to get a chance to speak after Mr. Rodriquez. And he is a great lawyer. He is really good. But you know when he is up there talking, you know what I would want to say. I would want to jump out of my chair. You have seen it a couple times during the trial where I can't hold myself back. And I wish I could get up and respond to Mr. Rodriquez but I'm not going to be able to. But, when you go in the jury room, what would Markus respond to that? What would Hecker? What would Dabbs? What would moss? What would they say to Mr. Rodriquez? You know the arguments we would raise.

Ladies and gentlemen, thank you for sitting here. I am asking you to find Neil Cole not guilty. He is innocent. He is innocent, ladies and gentlemen. I'm asking you. Thank you.

---

# A-1113

UNITED STATES OF AMERICA, V
NEIL COLE,                                                                           November 21, 2022

MBL5col2                                                    Page 2738

THE COURT: Thank you, Mr. Markus.

Ladies and gentlemen, it is 10 minutes after the hour so we will break until 1:30. Don't discuss the case.

(Continued on next page)

---

MBL5col2                                                    Page 2739

(Jury not present)

THE COURT: Everyone can be seated.

Something to raise? OK, folks.

(Recess)

(Continued on next page)

---

MBLYCOL3          Summation - Mr. Rodriguez          Page 2740

AFTERNOON SESSION

1:30 p.m.

(In open court; jury present)

THE COURT: Everyone can be seated.

Ladies and gentlemen, now we will proceed with the government's rebuttal summation.

Mr. Rodriguez.

MR. RODRIGUEZ: There was no overpayment. That's what Mr. Markus told you. There was no overpayment.

Now, I'm struggling a little bit with my eyesight, but item A says, Government Exhibit 1068: "$5 million overpay that's the SEA-2 overpayment. Item B -- remember SEA-3 had not closed at this point -- "4.5 proposed overpay for Umbro Lee Cooper China." They're working out and proposing the SEA-3 overpayment. But, Mr. Markus says there was no overpay.

Government Exhibit 1139, what's this? All lined up in a row in a nice, neat chart. There's the purchase price in row one. There's what the deals were based on. Based on the revenue multiple and the plug, that's the overpay.

Now, how do you know that this overpay was linked to the marketing and to the giveback on SEA-3? Right there in the document. $5 million in marketing for the Europe/Korea amendment, $4 million for the Europe/Korea amendment. That's the SEA-2 overpay. $6 million for China Umbro Lee Cooper will offset the following for. That's the overpay.

---

MBLYCOL3          Summation - Mr. Rodriguez          Page 2741

But Mr. Markus says there's no overpay. Mr. Markus wishes that these documents didn't exist. He told you today is his 50th birthday, and I'm sure that when he goes home tonight and blows out the candles, he should wish that he could just make a wish and make these documents disappear, but he cannot.

And Mr. Cole has a whole team of very capable lawyers: Mr. Hecker, Mr. Markus, Ms. Moss, Ms. Dabbs, Ms. Sussman, Mr. Then. Here's the thing. Not one of them is a magician. They cannot make these documents and all the other documents that Mr. Thomas walked through and that were presented at this trial disappear. And because they can't make them disappear, they have to create distractions that take your mind and attention away from them.

Mr. Markus asked if there was a document about the overpay that preceded the June 30 SEA-2 closing. Yes, there is, Government Exhibit 1255 and 1255B. You can look at it back in the jury room. It's dated June 9. It's from Seth Horowitz to Neil Cole, and they're talking about the overpay.

It starts in that document at $10 million, but they're working it out. They're working out the overpay. You have seen evidence in this case that the defendant was in on a scheme, overpayments for givebacks. Pay him more today, and he'll give it back to you later. Pay him more today so he can lie to his investors and hit his revenue targets -- Mr. Markus talked a lot about EPS targets. He didn't talk about the

**A-1114**

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2742 |

revenue targets.

But if you do that for Mr. Cole, he'll give you some of the money back later. Do not be fooled by distractions that take your attention away from the evidence, evidence like Government Exhibits 1063 and 1069 that say clear as day in black and white $5 million of current marketing liabilities, liabilities that were being paid and owed because of an overpay.

Now, I'm not going to respond to every argument that Mr. Markus made because you've seen the evidence. Mr. Thomas has walked you through it. I'm not going to do it again. You don't need me to do it again.

If there are any documents that you want to see, I would encourage you to look at that timeline that was prepared, Government Exhibit 1335. That's a helpful document that you can have with you as you're deliberating, and you'll see that all of the key documents are lined up chronologically. And if there's any doubt, look at the underlying documents behind that timeline.

So what I want to do in my limited time here is focus on Mr. Markus' key argument, which is that when it really comes down to it, he's trying to get you to believe the same thing that Neil Cole tried to get you to believe when he was on that witness stand -- that Seth Horowitz, Jason Rabin, and Jared Margolis -- the three of them, they're all making it up, folks.

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2743 |

They're all out to frame Mr. Cole.

Now, let me first pause and address what is really at the center of the defendant's conspiracy theory. It's this delusion that because I speak with a loud voice, that somehow all of these witnesses were threatened by the government and that's why they testified the way they did. There is not a shred of evidence to support such an outrageous claim.

By the way, did any of the defendant's lawyers ask any of the witnesses, did the government threaten you? Why didn't they ask that question? Because they didn't want you to hear the answer. There is not a shred of evidence to support this conspiracy theory.

But let's start with all of the reasons why you should reject Mr. Markus' arguments about these witnesses and why you know they testified truthfully. First, their testimony is backed up by other evidence you've seen at this trial, evidence like some that I just showed you, evidence that Mr. Thomas walked you through. I'm not going to walk you through it again.

But this was evidence that was created long before any of these witnesses ever met with the government, long before they met with the government. Did they travel back in time after being threatened by government to create these documents? Of course not. These documents were created, supporting their testimony, as the scheme unfolded.

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2744 |

Now, Mr. Markus challenged me to show you or talk about a document that Neil Cole himself wrote that's a bad document. Here's one, Government Exhibit 1058. This was Neil Cole's email: "Tough to do China without Roc Kids."

What does that mean? Tough to do SEA-3 unless we relieve them of their Rocawear Kids payment obligations. That email alone, Government Exhibit 1058, shows that the link between those two was clear as day in Mr. Cole's mind. You can convict based on that email.

Now, here's the thing, and I'm ready to admit it. Why aren't there as many bad emails from Mr. Cole as from the other participants in this scheme? Mr. Cole was better at this fraudulent scheme than the other people in it.

He had better email discipline than the others did. He was smart enough to know not to put things down in writing except when he slipped. But here's the thing. He didn't have to be the one putting things down in writing. He was in charge of this scheme.

When you're the CEO and when you're running a fraudulent scheme, you have other people whose job it is to keep track of the overpayments, to keep track of the invoices. He was smart enough to put some distance between himself and his fraud. It doesn't mean that there was not fraud. It just means he's good at it. He's better than the other people in this scheme.

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2745 |

Now, I also want to talk about witness meetings because Mr. Markus spent a lot of time talking about how many times the witnesses met with the government. Listen to Judge Ramos, not Mr. Markus.

Judge Ramos will tell you in his instructions there is nothing improper or unusual about a witness meeting with lawyers before testifying. That's what the judge is going to tell you. And he will tell you that this is done to conserve your time and the Court's time.

And your common sense will tell you that these witnesses who testified, they're the ones who know the facts. They're the ones who lived through this. The lawyers on either side, we didn't live through this. We didn't know the facts until we interviewed and learned them from the witnesses. So is it really that surprising that it's going to take a while to learn all of this?

Mr. Markus kept saying, oh, he rehearsed his testimony 50 times. Zero basis in the record to suggest that all of those meetings were going over Seth Horowitz's testimony, zero basis.

Is it at all surprising that it's going to take a little while to go over all of these documents that you saw at this trial? Again, Judge Ramos' instructions should be followed. There is nothing improper or unusual about witnesses meeting and preparing with attorneys at trial.

UNITED STATES OF AMERICA, V
NEIL COLE,                                                          November 21, 2022

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2746 |
| --- | --- | --- |

And Mr. Markus made reference to it. It wasn't the same prosecutors for all of those meetings. It wasn't the same prosecutors. That's another reason why there had to be more meetings, so more prosecutors could learn the facts.

Now, I mentioned Judge Ramos' instructions because he's going to give you an instruction on this point. You can listen, and you can look to his instructions. You're not going to find any instructions about meeting with a jury consultant to prepare for testimony.

Mr. Cole told you that he rehearsed his testimony and he didn't just get on the stand and let his truth flow forth. He met with and worked with a jury consultant ahead of time.

And, again, let's be very clear. I'm not talking about how many times Mr. Cole had to meet with Ms. Dabbs who was the one who was asking the questions and had to learn the facts of the case. However many times that happened, that's totally fine.

What I'm talking about is that Mr. Cole felt the need to work with a jury consultant before telling you folks what he did as if speaking to a group of people is such a challenging and difficult task for the CEO of a public company, a visionary like Mr. Cole.

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

MR. RODRIGUEZ: Consider this, when you consider the

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2747 |
| --- | --- | --- |

things when the defense says oh, yes. Listen to Mr. Cole on this point, consider is the defendant telling me the truth, or is he telling me what his jury consultant thinks I might want to hear?

MR. MARKUS: Judge, objection. It's improper. Move to strike, Mr. Rodriguez.

THE COURT: Overruled.

MR. RODRIGUEZ: The second reason the defendant is wrong about these witnesses is that he always wants to have it both ways with them. When these witnesses say something the defense likes, then yes. Mr. Markus says, yes, believe that. That's when you should believe them.

So, for example, when Seth Horowitz was on the stand and he admitted that he did not tell Melissa from Baked by Melissa that he was meeting with the government, that he did not tell her that he had pleaded guilty and accepted responsibility for his crimes, yes. Mr. Markus says believe that.

When Margolis and Rabin testified that they didn't think they were doing dirty deals -- Mr. Markus spent a lot of time on this. Yes. Mr. Markus says, please believe that too. That's so important, but, but Mr. Markus says don't believe these witnesses when they say that the defendant promised givebacks for overpayments. Don't do that.

The defendant wants to have it both ways, but it

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2748 |
| --- | --- | --- |

doesn't make sense. It doesn't make sense to accept these witnesses' testimony only when they say the things that the defense likes and then to reject their testimony when they say things that the defense doesn't like.

How else do you know that these witnesses told you the truth? Consider this: If these witnesses were really just going to come in here and lie to you, if they were so afraid, Mr. Margolis, of my loud voice, as the defense would have you believe, wouldn't they have told better lies? Wouldn't they have told better lies?

Let's take Seth Horowitz for an example. He told you that the defendant chose $5 million as the amount of the SEA-2 overpayment because that's what Iconix needed to hit its financial goals. He told you that GBG agreed to that for the $5 million giveback.

Now, what he did not tell you is that he himself was there for that initial conversation. Right? He didn't tell you that. He didn't tell you that he was listening in on the phone.

If Seth Horowitz was really up there just lying to save himself, why wouldn't he say, oh, yeah. I was there. I heard that conversation. That's good for me. Wouldn't that have been better? If he was on the witness stand just lying to give himself credit, wouldn't he have told better lies?

He didn't overstate what happened because it doesn't

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2749 |
| --- | --- | --- |

matter to him if the defendant is convicted. You can see that in his cooperation agreement. You can see that the only thing that his cooperation depends on is whether or not he tells the truth.

The same things for Margolis and Rabin. Both of them testified, as Mr. Markus emphasized, at length, that they didn't think that what they were doing was wrong. If they were so scared of the government, did their fear just magically melt away at that point?

Wouldn't they have just said, oh, yes. What I did was wrong and terrible. Wouldn't that have been better for the government? They didn't do that because they were just telling you what they believed about their own conduct.

By the way, Mr. Markus spent so much time on this because he thinks it's so important. Is it really that surprising that Rabin and Margolis don't think that what they did was wrong?

Those are exactly the kind of people that the defendant wanted to be a part of his criminal scheme, people who would go along with it without hesitation. Imagine if you were planning a bank robbery, and let's say you needed a getaway driver and you needed a lookout.

Would you hire the people who said, oh, geez, bank robbery. I don't know. Isn't that wrong?

Are those the people that you want in your scheme? Of

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

MBLYCOL3          Summation - Mr. Rodriguez          Page 2750

course not.  You want -- and Neil Cole wanted -- Jason Rabin and Jared Margolis, people who would be enthusiastic participants in this crime because, perversely, they think there is nothing wrong with it.

He didn't choose them because they are best-in-class partners.  He chose them because they would play ball and have no second thoughts about being a part of this scheme.

What did they care if Neil Cole was misrepresenting numbers to Iconix and its shareholders and its investors and its auditors?  They didn't have to report Iconix's financials.  They do not care if Neil Cole cheats and lies.  That's why they were chosen to participate in this scheme.

How else do you know these witnesses are telling the truth?  Their incentives.  It's certainly not to please the government because, as I said, if that was the case and they were up there lying, they would have told much better lies.  But their only incentive is to tell the truth.

And I want to take Seth Horowitz specifically because the only way that he could even possibly maybe help himself out is if he tells the truth.  He came in, and he met with the government voluntarily after he resigned from Iconix.

He wasn't arrested.  He wasn't charged with a crime.  He came in and freely admitted it and pled guilty.  He put himself on the hook, he told you on the stand, for up to 70 years in prison.

MBLYCOL3          Summation - Mr. Rodriguez          Page 2751

But what Mr. Markus would have you believe, however, is that he decided to do all of that just to come here and lie to you about his old boss.  Are you kidding me?

Seth Horowitz would have to be crazy to decide to do that.  He would have to be the Mayor of Crazy Town to do that because here's what his thinking would have to be in this world of Crazy Town that you're being asked to imagine.

He would have to come in and tell the government that he committed all of these crimes, even though he actually didn't commit them.  He would then have to come in here and lie about the defendant and that he was involved in these crimes.

And then in this Crazy Town world of thinking, he would just have to hope that the lies that he told the government about the defendant didn't contradict anything else that people like Jason Rabin and Jared Margolis told the government about the defendant or what the documents said.

And then he would just have to hope that maybe the government would believe him and use this information in a case against the defendant.  But wait.  There's more because then he would have to believe and just hope that maybe the defendant will go to trial.  Maybe the defendant will go to trial.  And he, Seth Horowitz, will be asked to testify.

But wait.  We're not done yet because there's more, because in this Crazy Town world of thinking, he would just have to keep hoping that while the witness is on the stand,

MBLYCOL3          Summation - Mr. Rodriguez          Page 2752

while he's on the stand being subject to cross-examination, his lies wouldn't be exposed.

And here is the huge one.  Here is the kicker in this Crazy Town world of thinking.  The defense wants you to believe this.  They want you to believe that he would just have to hope that one day he will get enough credit for testifying against the defendant that would have all been worth it to confess his crimes and plead guilty in the first place, because remember what the government has agreed to do here.

If Seth Horowitz complies with his agreement, all the government has agreed to do is to send a letter to a judge like Judge Ramos.  That's it.  A letter.  Sentencing is totally up to the judge.

You heard this.  You can see it in the cooperation agreement.  The judge can take that letter, crumple it up, and throw it out because the sentence that Seth Horowitz receives is up to the judge.

What happens at this trial does not affect anything with respect to his cooperation.  Seth Horowitz can't take his guilty plea back.  He's on the hook for serious felonies.  His fate is in the hands of a judge, not prosecutors.

For him to go through and make these decisions in this Crazy Town world of thinking would be outrageous.  No one would do that.  He took a far simpler approach, if I tell the truth, I can't get caught lying.

MBLYCOL3          Summation - Mr. Rodriguez          Page 2753

Ladies and gentlemen, people don't lie to get themselves into trouble.  They lie to get themselves out of trouble.  But the defense wants you to believe that Seth Horowitz raised his hand, and he said, yup.  I'm lying about committing serious crimes.  This makes no sense.

Mr. Markus also spent a lot of time talking about Ethan Cole.  Where's Ethan Cole?  He even put up a big blowup in the witness stand, a perfect distraction, if there ever was one, a big, cardboard sign in the witness stand.

What's he distracting you from?  Judge Ramos' instructions.  He will tell you that there are people whose names you've heard during the course of this trial that did not in court to testify.  Ethan Cole is one of them.

But he's also going to tell you that each party had an equal opportunity or lack of opportunity to call any of these witnesses.  He's going to tell that their absence "should not affect your judgment in any way."  Listen to Judge Ramos, not Mr. Markus.

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

MR. RODRIGUEZ: It's just another distraction.

Now, I want to talk to you a little bit about Mr. Markus' theory of what it is that Mr. Cole did here.  Look.  Mr. Mr. Cole did not have to testify at this trial, but he did.  He took that witness stand, and now it is your job to

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2754 |
|---|---|---|

scrutinize his testimony just like you would with any other witness.

Think about how he answered Mr. Thomas' questions. Can you be taken at your word? Is that a trick question? They could rely on your word. Right, sir?

I don't know. I don't know.

MR. MARKUS: That doesn't have the rest of the answer. I object.

MR. RODRIGUEZ: Who doesn't know whether they can be taken at their word or whether their word can be relied on. Is that something you would need to think about?

It's pretty stunning because Mr. Cole said with respect to Jason Rabin and Jared Margolis, I was okay with their word.

Was this someone who was up there just to tell you the truth? No, it was not.

THE COURT: Can I just interrupt.

If there's going to be an objection, just say "Objection." When you hear the word "Objection," stop.

MR. RODRIGUEZ: Yes, your Honor.

THE COURT: Go ahead.

MR. RODRIGUEZ: What about he when was shown documents? What did Mr. Cole say? I don't recognize any particular documents. The sacred, written agreement that the defendant held so dear, he didn't recognize it. Is that

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2755 |
|---|---|---|

someone who is here to tell you the truth.

What about the price jumping up. Why did the price jump up? I have guesses he says. It became increasingly clear during his testimony that he was not concerned about the facts but, rather, with guesses and baseless conspiracy theories.

What about at the end of his cross-examination. He was asked a very simple question. Mr. Thomas was asking him about the three main government's witnesses -- Mr. Horowitz, Mr. Rabin, and Mr. Margolis. They all say there was an overpay for these two deals. Right? Simple question. Everyone in the courtroom knows what they said.

Did he answer it truthfully? Did he say, yes. That's what they said? No. He spouted more baseless conspiracy theories. They believed that after being threatened and after meeting 100 times with the government. There is no basis in the record for this. It also contradicts his own arguments.

What about the Seth Horowitz resignation letter. That wasn't sent until after anybody started meeting with the government. Mr. Cole was so out of control up there that he forgot the party line.

And I want to just touch on a few other of these defenses. We heard a lot about CAA during the course of the trial. You even saw that big bubble. We didn't hear a word about CAA from Mr. Markus. I guess, after all, Mr. Cole wasn't too busy to work on these deals.

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2756 |
|---|---|---|

MR. MARKUS: Objection, your Honor.

THE COURT: Overruled.

MR. RODRIGUEZ: He does seem to suggest, Mr. Markus, that these deals, they were not big deals. They didn't really matter. These two deals, SEA-2 and SEA-3, they were highlighted in the quarterly filings.

SEA-2 is one of two deals highlighted in the quarterly filings. SEA-3 is the only one highlighted in the quarterly filings. These deals were important. They were important because they allowed the defendant to hit his revenue goals.

We heard a lot about these deals being sick deals for GBG. It doesn't matter. They were sick deals for Iconix because they allowed Iconix to hit their revenue goals. What about the contracts? Why wasn't all of this in the contracts asked Mr. Markus?

It couldn't have been in the contracts. If they had put these overpayment-for-giveback scheme in the contracts, they would not have been allowed to claim the revenue that they desperately needed to hit their goals. This is a total distraction. You don't put fraudulent deals into the written documents. That's why they're fraudulent.

The integration clause, you can't write yourself out of being held accountable for fraud. You can't say, I didn't have a secret fraudulent side deal because I signed a piece of paper that says there are no secret, fraudulent side deals.

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2757 |
|---|---|---|

This is not a magic eraser. It does not erase fraud.

And you heard that from Jason Schaefer. The integration clause means nothing if there's fraud. That's the ABCs of business. Everybody knows that. Everybody knows that. The integration clause doesn't save the day. Contracts are only as good as the people behind them and the intent behind them, and the intent behind this contract was corrupt.

I want to briefly touch -- I'm not going to have time to address all of Mr. Markus' arguments. So I just want to briefly touch on the invoices. Mr. Cole requested the backup, but he didn't even review it.

And that is exactly the point. Even Mr. Markus is saying, yes, he requested it. You can't have it both ways. Well, if you're going to request it, at least review it. And he didn't even review it. And who was the best person to know what that backup meant? It was Ms. Laramy-Binks. She took the stand, and she explained it to you.

I'm going to sit down now. I just want to make two points. The standard here is beyond a reasonable doubt. We have met that standard. It is the standard that's applied every day in every criminal case across the country, and it does not require you to leave your common sense at the door.

Mr. Cole was the CEO. He was the man in charge. He has blamed everyone else at every possible turn. But today the blame game is over. Hold him accountable for his crimes with

Case: 23-7566, 02/28/2024, DktEntry: 26.1, Page 258 of 291

# A-1118

UNITED STATES OF AMERICA, V
NEIL COLE,

November 21, 2022

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2758 |

the only verdict that is consistent with the evidence, the law, and common sense. On each and every count, the defendant is guilty.

THE COURT: Thank you, Mr. Rodriguez.

Ladies and gentlemen, it's now 2:00 in the afternoon. If I were to read you the charge now, it would take me about an hour-and-a-half, so until about 3:30, which is substantially beyond how long we usually sit.

So unless there is a wave of no. Let's listen to some more, I'm going to let you go for today. And we'll start tomorrow at 9:30 with the instructions.

Is that okay? Do not discuss the case. Don't listen to anything about the case. Don't read anything about the case. Be safe getting home. We'll start tomorrow at 9:30.

(Continued on next page)

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2759 |

(In open court; jury not present)

THE COURT: Everyone can be seated.

I did not see in the transcript -- it may be there, but I did not see it in the LiveNote. There was an objection which I sustained and then a motion to strike which I overruled.

So I just want to make sure I said that if it's not there.

Yes, Mr. Markus.

MR. MARKUS: Thank you, your Honor.

Just two notes: One is I'm not sure how to handle this other than to move for a mistrial. But the prosecutor said in his rebuttal that there was a document, government exhibit 1255, which was an email from Horowitz to Cole.

That is not accurate. 1255 is one of those Horowitz notes to himself. That was inaccurate, and I was unable to obviously object or respond.

The other thing, your Honor, is this whole Ethan Cole instruction, I just want to preserve my objection. As you noted, some of it didn't make it in there. There was a lot of burden-shifting going on with the government's argument regarding Ethan Cole, and I believe it misrepresented the defense's ability to call him, as I've said a number of times.

So I think our issue before the closing came to bear with Mr. Rodriguez's closing saying that the defense had an

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2760 |

equal opportunity to call Ethan Cole, which we did not.

MR. RODRIGUEZ: Your Honor, on the first point, I very well may have misspoke. Obviously I was racing against the clock there to put too much into too little period of time.

Certainly the jury is going to hear that anything that the lawyers say is not evidence and that the evidence is the evidence. So if I misspoke in identifying the document, it certainly wasn't intentional, and the jury will get an instruction on that.

On the Ethan Cole point, your Honor, we spoke about this at the charge conference. I believe I referred to the instructions. I know that your Honor is going to say in the instructions to the jury, if the lawyers have misstated the law, which I don't believe I did, it's my instructions that govern. So I don't think any other action is needed at this point.

THE COURT: Very well. I agree. Certainly you have preserved your objection with respect to Mr. Ethan Cole.

Anything else?

MR. MARKUS: Your Honor, on the Government Exhibit 1255, I would just request a two-sentence instruction from the Court that says, in response to Mr. Markus' challenge that there were emails to Neil Cole, the prosecutor pointed to Government Exhibit 1255 as an example when in fact that is not an example of an email to Mr. Cole. They made it seem like

| MBLYCOL3 | Summation - Mr. Rodriguez | Page 2761 |

there was one, and there is literally not one document predating the closing of the deal.

MR. THOMAS: Your Honor, both are unwarranted as a matter of law and also factually inaccurate. The exhibit that Mr. Rodriguez referred to in his rebuttal was also discussed at length in the government's opening summation. So the jury certainly both saw and heard and understood that it was notes of a meeting that Mr. Horowitz and Mr. Cole had.

That, coupled with the Court's instruction that what the lawyers say isn't evidence, is certainly sufficient to mitigate any prejudice or potential prejudice that could arise. Affirmatively instructing them on whether or not Mr. Markus' challenge had been met or not and in what circumstance just opens the door to all sorts of mischief.

THE COURT: I agree with that. I think if the jury were to take Mr. Rodriguez up on his challenge and go to Exhibit 1255, if that's the number, and see that he was wrong, well, then that's that in terms of any prejudice to Mr. Cole.

Anything else?

MR. THOMAS: No, your Honor.

THE COURT: Have a good night. See you tomorrow. Tonight be late.

(Adjourned to November 22, 2022, at 9:00 a.m.)

Min-U-Script®                 Southern District Court Reporters                 (38) Pages 2758 - 2761

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                          November 22, 2022

MBMYCOL1                                                                Page 2762

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

          v.                            19 Cr. 869 (ER)

NEIL COLE,

                    Defendant.          Trial

------------------------------x

                                        New York, N.Y.
                                        November 22, 2022
                                        9:15 a.m.

Before:


                    HON. EDGARDO RAMOS,

                                        District Judge

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  ANDREW M. THOMAS
     JUSTIN V. RODRIGUEZ
     JUSTIN RODRIGUEZ
     Assistant United States Attorneys

KAPLAN HECKER & FINK, LLP
     Attorneys for Defendant
BY:  SEAN HECKER
     JENNA M. DABBS

MARKUS/MOSS, PLLC
     Attorneys for Defendant
BY:  DAVID O. MARKUS
     ANITA M. MOSS

MBMYCOL1                                                                Page 2763

(Trial resumed)

THE COURT: Anything anyone wishes to raise?

MR. THOMAS: No, your Honor.

MR. HECKER: No, your Honor.

THE COURT: You should be aware that I will tell the jury that I will give you the lunch hour from approximately 12:30 to approximately 1:30 and, if they have a note during that period of time, it may take us longer to respond to them. That's a lie. What I mean is you should be within five minutes of being contacted that we have a note from the jury.

MR. HECKER: It's a white note.

THE COURT: We can call it that.

(Pause)

(In open court; jury present)

THE COURT: Everyone please be seated.

Ladies and gentlemen, good morning. I trust you all had a pleasant evening. Thank you, as always, for being on time.

You will note that you have a binder in each of your chairs. This binder contains three documents: First, it contains the instructions that I'm going to read to you in a couple of minutes.

That's provided for your convenience. You can read along, if you wish, or you can simply listen. You will have the instructions with you as you deliberate. So you don't have

MBMYCOL1                                                                Page 2764

to memorize everything or try to remember everything that I say.

Secondly, it also contains the verdict form that you will be required to fill out when you've reached your verdict. We only need one copy signed by your foreperson. But it's being provided to each of you, again, for your convenience.

Finally, it also contains a copy of the indictment which contains the charges in this case. The indictment, as I will tell you in my instructions, is of absolutely no evidentiary value. It's simply the charges that the government was required to attempt to prove. So that's one.

Two, as I indicated previously, starting today, our schedule is in your hands. What that means is you can leave at 2:40 if your deliberations should not be concluded by then. Or you can stay later if you wish. You can leave earlier if you wish and decide to pick up again on Monday morning. I simply ask that you just let us know what it is that you wish to do.

Finally, if history is any guide, I read at about two minutes per page. It's 39 pages. So it's going to be an hour-and-a-half. If you want to stand up and stretch at any point during that time, I will not take offense.

However, it is the practice that judges read the instructions to the jury. Obviously the words of the law that I'm going to read to you are very important. And it certainly will not do for judges to sit up here and ad-lib. So we all

MBMYCOL1                              Charge                            Page 2765

read them. You can read along. You can listen. You will have them with you. With that, let us begin at page 1.

Members of the jury, we have almost reached that point where you will begin your final function as jurors. As you will appreciate, this is one of the most important duties of citizenship in this country.

My instructions to you will be in four parts:

First I will give some introductory instructions about the role of the Court and about the jury and about the presumption of innocence and the government's burden of proof.

Second, I will describe the charges and the law governing those charges which you will apply to the facts as you find them to be established by the proof.

Third, I will give you instructions concerning the evaluation of evidence. And the fourth and final section of these instructions will relate to your deliberations.

I will first describe the role of the Court and of the jury. It is my duty to instruct you as to the law, and it is your duty to accept these instructions of law and apply them to the facts as you determine them.

If an attorney stated a legal principle different from any than that I state to you in my instructions, it is my instructions that you must follow. You should not single out any instruction as alone stating the law, but you should consider my instructions as a whole when you retire to

UNITED STATES OF AMERICA, v.
 NEIL COLE,

November 22, 2022

MBMYCOL1          Charge                    Page 2766

deliberate.

You should not be concerned about the wisdom of any rule that I state, regardless of any opinion you may have about what the law may be or ought to be. It would be a violation your oath to base your verdict on any view of the law other than that which I give you.

You, the members of the jury, are the sole and exclusive judges of the facts. You pass on the evidence, determine the credibility of witnesses, resolve such conflicts as there may be in the testimony, draw whatever reasonable inferences you decide to draw from the facts as you determine them, and determine the weight of the evidence.

In doing so, remember that you took an oath to render judgment impartially and fairly, without prejudice or sympathy or fear, and based solely on the evidence and applicable law.

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that given to any other party to this litigation. By the same token, the government is entitled to no less consideration.

The defendant, Neil Cole, has pleaded not guilty and has denied every charge against him. That means the government has the burden to prove him guilt beyond a reasonable doubt. That burden of proof never shifts to Mr. Cole. A defendant in a criminal case never has the burden to call any witnesses or

MBMYCOL1          Charge                    Page 2767

produce any evidence.

Even though Mr. Mr. Cole has presented evidence in his defense, it is not his burden to prove himself not guilty. It is always the government's burden to prove each of the elements of the crimes charged beyond a reasonable doubt.

In other words, Mr. Cole starts with a clean slate. He is presumed innocent of all charges against him, and he must be presumed to be innocent by you throughout your deliberations until such time, if ever, that you, as a jury, unanimously find that the government has proven him guilty beyond a reasonable doubt. The presumption of innocence alone requires that you acquit Mr. Cole if the government fails to prove him guilty beyond a reasonable doubt.

Since the government is required to prove each of the elements of the crimes charged beyond a reasonable doubt in order to convict Mr. Cole of a given charge, the question then is what is a reasonable doubt.

The words almost define themselves. It is a doubt based upon reason. It is doubt that a reasonable person could have after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life.

Proof beyond a reasonable doubt must, therefore, be proof of a convincing character that a reasonable person would not hesitate to rely upon in making an important decision.

MBMYCOL1          Charge                    Page 2768

A reasonable doubt is not caprice or whim. It is not speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. The law does not require that the government prove guilt beyond all possible doubt. Proof beyond a reasonable doubt is sufficient to convict.

If, after fair and impartial consideration of the evidence, you have a reasonable doubt as to Mr. Mr. Cole's guilt with respect to a particular charge against him, you must find him not guilty of that charge.

On the other hand, if, after a fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of Mr. Cole's guilt with respect to a particular charge against him, you should find him guilty of that charge.

Let us now turn to the specific charges in the indictment. The indictment contains eight counts or charges. I will at times refer to each count by the number assigned to it in the indictment.

You should know that there is no significance to the order of these numbers or the specific number of counts charged. And indeed, my instructions may follow a different order than the order in which the various counts appear in the indictment. In your deliberations and in reaching your verdict, you must consider each count separately. You must return a separate verdict as to each count.

MBMYCOL1          Charge                    Page 2769

The indictment in this case is not evidence. It merely describes the charges made against Mr. Cole. It is a set of accusations. It may not be considered by you as evidence of Mr. Cole's guilt. Only the evidence or lack of evidence introduced at the trial in this case decides that issue.

Count One charges that from 2013 through 2015, Mr. Cole committed securities fraud by engaging in a scheme to fraudulently inflate Iconix's publicly reported revenue and earnings per share or EPS.

Counts Two through Seven charge that Mr. Cole caused to be filed with the SEC or the Securities and Exchange Commission certain reports that allegedly omitted material facts and contained materially misleading statements.

Count Eight charges that from 2013 through 2015, Mr. Cole improperly influenced the conduct of audits by making affirmative misrepresentations to and intentionally withholding information from Iconix's auditor, BDO, relating to the Southeast Asia joint ventures or "SEA JVs."

In a few moments, I will instruct you on each of those charges in more detail. You must consider each individual charge separately and evaluate each on the proof or lack of proof that relates to that charge.

You must consider whether the government has carried its burden of proof with respect to each count. Your verdict

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 22, 2022

MBMYCOL1     Charge     Page 2770

on any single count should not control your decision on any other count. I will provide you with the verdict form, and you will need to report the results of your deliberations on the verdict form.

Let us turn first to the securities fraud charge which is listed in Count One of the indictment.

Count One alleges that Mr. Cole committed the substantive offense of securities fraud. Specifically, Count One alleges that from 2013 through 2015, in connection with the purchase or sale of Iconix stock, Mr. Cole knowingly and willfully engaged in a scheme to fraudulently inflate Iconix's publicly reported revenue and EPS.

In order to meet its burden of proof, the government must prove each of the following three elements beyond:

First, that in connection with the purchase or sale of Iconix securities, Mr. Cole did any one or more of the following:

One, employed a device, scheme, or artifice to defraud;

Or made an untrue statement of a material fact or omitted to state a material fact which made what was said under the circumstances misleading;

Or engaged in an act, practice, or course of business that operated or would operate as a fraud or deceit upon a purchaser or seller.

MBMYCOL1     Charge     Page 2771

Second, that Mr. Cole acted knowingly, willfully, and with an intent to defraud; and

third, that in furtherance of the fraudulent conduct, there occurred at least one use of any means or instrument of transportation or communication in interstate commerce or the use of the mails or the use of any facility of any national securities exchange.

The first element that the government must prove beyond a reasonable doubt is that in connection with the purchase or sale of Iconix securities, Mr. Cole did one or more of the following:

One, employed a device, scheme, or artifice to defraud;

Two, made an untrue statement of material fact or omitted to state a material fact which made what was said under the circumstances misleading; or,

Three, engaged in an act, practice, or course of business that operated or would operate as a fraud or deceit upon a purchaser or seller of Iconix securities.

A device, scheme, or artifice to defraud is merely a plan to accomplish a fraudulent objective. Fraud is a general term that embraces all efforts and means that individuals devise to deceive and take advantage of others.

A statement, representation, claim, or document is false if it is untrue when made and was then known to be untrue

MBMYCOL1     Charge     Page 2772

by the person making it or causing it to be made. A representation or statement is fraudulent if it was made with an intent to deceive.

The concealment of material facts in a manner that makes what is said or represented deliberately misleading may also constitute false or fraudulent statements under the statute.

The failure to disclose information may also constitute a fraudulent representation if the defendant was under a legal, professional, or contractual duty to make such a disclosure, the defendant actually knew such disclosure was required to be made, and the defendant failed to make such disclosure with the intent to defraud.

It is not necessary for the government to establish all three types of fraudulent conduct. But to find the government has proven the first element, you must be unanimous as to at least one type of conduct you find to have been proven beyond a reasonable doubt.

You cannot find that the government has proven the first element of securities fraud unless you find that Mr. Cole participated or agreed to participate in fraudulent conduct that was in connection with a purchase or sale of securities.

The requirement that the fraudulent conduct be in connection with a purchase or sale of securities is satisfied so long as there was some nexus or relation between the

MBMYCOL1     Charge     Page 2773

allegedly fraudulent conduct and the sale or purchase of securities.

Fraudulent conduct may be in connection with the purchase or sale of securities if you find that the alleged fraudulent conduct touched upon a securities transaction.

You need not find that Mr. Cole actually participated in a specific purchase or sale of a security if you find that he participated or agreed to participate in fraudulent conduct that was in connection with a purchase or sale of securities.

It is not necessary for you to find that Mr. Cole was or would be the actual seller of the securities. It is sufficient if the misrepresentation or omission of material fact involved the purchase or sale of securities.

By the same token, the government need not prove that he personally made the misrepresentation or that he omitted the material fact. It is sufficient if the government establishes that Mr. Cole caused the statement to be made or the fact to be omitted.

With regard to the alleged misrepresentations and omissions, you must determine whether the statements made were true or false when made and, in the case of alleged omissions, whether the omissions were misleading.

If you find that the government has accomplished beyond a reasonable doubt that the statement was false or a statement was omitted rendering the statements that were made

MBMYCOL1          Charge                    Page 2774

misleading, you must next determine whether the state of mind or omission was material under the circumstances.

The word "material" here refers to the nature of the false or misleading statements. We use the word "material to distinguish between the kinds of statements we care about and those that are of no real importance.

Matters that are material may also include fraudulent half-truths or omissions of material fact. A material fact is one that a reasonable person would have considered important in making his or her investment decision.

That means that if you find a particular statement of fact or omission to have been untruthful or misleading, before you can find that statement or omission to be material, you must also find that the statement or omission was one that would have mattered to a reasonable person in making their decision.

Any testimony that you may have heard from any witness with respect to whether a particular fact would or would not have been important to him or to investors in general reflect that witness' individual views.

Although you may consider such testimony, it is not controlling. It is for you to determine whether the particular fact would have been significant to a reasonable investor in making an investment decision.

In considering whether a statement or omission was

MBMYCOL1          Charge                    Page 2775

material, let me caution you that it is not a defense if the material misrepresentation or omission would not have deceived a person of ordinary intelligence.

In addition, a written disclaimer cannot render any misrepresentation, including any oral misrepresentation, immaterial as a matter of law. Once you find that the offense involved the making of material misrepresentations or omissions of material facts, it does not matter whether any of the other victims involved were careless, gullable, or even negligent or that they might have uncovered the scheme on their own had they probed more deeply because the law protects the gullable and unsophisticated, as well as the experienced investor.

Nor does it matter whether the alleged unlawful conduct was or would have been successful or whether the defendant profited or would have profited as a result of the alleged scheme. Success is not an element of the offense.

If, however, you find that the defendant expected to or did profit from the alleged scheme, you may consider that in relation to the element of intent which I will discuss in a moment.

The second element of the substantive securities fraud charge in Count Two relates to Mr. Cole's state of mind. If you find that the government has met its burden of proving that Mr. Cole engaged in the charged scheme, that is, the factor I just explained, the government must then prove beyond a

MBMYCOL1          Charge                    Page 2776

reasonable doubt that Mr. Cole engaged in the scheme knowingly, willfully, and with an intent to defraud.

To act "knowingly" means to act intentionally, deliberately, voluntarily rather than by mistake, accident, ignorance, or carelessness. To act "willfully" means to act voluntarily and with a wrongful purpose.

Whether Mr. Cole acted knowingly, willfully, and with an intent to defraud is a question of fact for you to determine like any other fact question. Direct proof of knowledge and in intent to deceive is not required.

Knowledge and criminal intent may, like any other fact, be established by circumstantial evidence. What is referred to as drawing inferences from circumstantial evidence is no different from what people normally mean when they say, use your common sense.

Science has not yet devised a manner of looking into a person's mind and knowing what the person is thinking. However, you do have before you evidence of certain actions and statements by Mr. Cole.

The government contends that these actions and statements show beyond a reasonable doubt Mr. Cole's knowledge of the unlawful purposes of his actions.

On the other hand, Mr. Cole denies, either that these acts and statements occurred or that they show that he had such knowledge and intent. It is for you to determine whether the

MBMYCOL1          Charge                    Page 2777

government has established beyond a reasonable doubt that Mr. Cole had such knowledge and intent.

Direct proof of knowledge and fraudulent intent is not always available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past, he committed an act of fraudulent intent.

Such direct proof is not required. The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence based upon a person's outward manifestations, his words, his conduct, his acts, and all of the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

Please note that if Mr. Cole honestly believed that his actions were proper and not in furtherance of any unlawful scheme, then such good faith would be a complete defense to all of the charges here.

An honest belief in the truth of the representations made by a defendant is a complete defense, however inaccurate the statements may turn out to be. Thus, by way of example, if Mr. Cole honestly believed that Iconix's statements to investors were accurate and not misleading, that would be a complete defense to the charges of securities fraud, even if that belief ultimately proved to be inaccurate.

However, the defendant does not bear the burden of

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 22, 2022

MBMYCOL1        Charge        Page 2778

proving his good faith. It remains at all times the government's burden to prove beyond a reasonable doubt that the defendant acted knowingly, willfully, and with an intent to defraud.

With respect to Count One of the indictment, the third and final element that the government must prove beyond a reasonable doubt is that Mr. Cole used or caused to be used the mails or the instrumentalities of interstate commerce in furtherance of the scheme to defraud.

Let me first note that it is not necessary for the government to prove that both the mails and an instrumentality of interstate commerce were used in furtherance of the fraudulent scheme. Only one of the above, either the mails or an instrumentality of interstate commerce is enough. But you must be unanimous as to at least one.

In considering this element, it is not necessary for you to find that the defendant was or would have been directly or personally involved in any mailing or the use of any instrumentality of interstate commerce.

If the conduct alleged would naturally and probably result in the use of the mails or an instrumentality of intestate commerce, this element would be satisfied. Nor is it necessary that the items sent through the mails or communicated through an instrumentality of interstate commerce did or would contain fraudulent material or anything criminal or

MBMYCOL1        Charge        Page 2779

objectionable. The matter mailed or communicated may be entirely innocent, so long as it is in furtherance of the scheme to defraud or fraudulent conduct.

The use of the mails or the interstate commerce need not be central to the execution of the scheme or even be incidental to it. All that is required is that the use of the mails or an instrumentality of interstate commerce bears some relation to the object of the scheme or fraudulent conduct.

In fact, the actual purchase or sale of a security need not be accompanied by the use of the mails or an instrumentality of interstate commerce, so long as the mails or instrumentality of interstate commerce are used in the furtherance of the scheme and the defendant was still engaged in actions that were part of the fraudulent scheme when the mails or the instrumentalities of interstate commerce were used.

The use of the term "mails" is are self-explanatory and includes the United States Mail and Federal Express and other commercial mail couriers. The term "instrumentality of interstate commerce" means instruments, devices, and means of conducting trade, commerce, transportation, or communication among any two states or between this country and a foreign country.

Examples of instrumentalities of interstate commerce include telephone calls, emails or text messages, the use of a

MBMYCOL1        Charge        Page 2780

facility of a national securities exchange, such as a stock or options trade made on the NASDAQ.

Now let's turn to Counts Two through Seven of the indictment which charge that the defendant made or caused to be made false statements and reports in documents required to be filed under the Securities Exchange Act of 1934.

Counts Two through Seven charge different filings in which the defendant either made or caused to be made false statements. Count Two relates to Iconix's second quarter 2014 press release on Form 8-K filed on approximately July 30, 2014.

Count Three relates to Iconix's second quarter 2014 quarterly report on the Form 10-Q filed on approximately August 6, 2014.

Count Four relates to Iconix's third quarter 2014 press release on Form 8-K filed on approximately October 29, 2014.

And Count Five relates to Iconix's third quarter 2014 quarterly report on Form 10-Q filed on approximately November 7, 2014. Count Six relates to Iconix's 2014 year-end press release on Form 8-K, filed on approximately 27, 2015. And Count Seven relates to Iconix's 2014 annual report on Form 10-K filed on approximately March 2, 2015.

The SEC requires public companies to file quarterly reports on Form 10-Qs for each of the first three quarters of every fiscal year and and reports on Form 10-Ks.

MBMYCOL1        Charge        Page 2781

The SEC also requires public companies to file current reports on Form 8-K for, among other reasons, any public announcement or release that discloses material, nonpublic information regarding that company's results of operations or financial condition for a completed quarterly or annual fiscal period.

In order to meet its burden of proof on Counts Two through Seven, the government must prove each of the following elements beyond a reasonable doubt:

First, that Iconix was required by the Securities and Exchange Commission Act of 1934 to file the document charged in that count; and

Second, that Mr. Cole knowingly and willfully made or caused to be made a materially false or misleading statement from that document.

With respect to each of Counts Two through Seven, the government must show:

First, that Iconix was required by the securities Exchange Act of 1934 to file the document charged in the particular count.

I instruct you that public companies are required to file documents and reports as prescribed by the SEC. These include quarterly reports on Form 10-Q and current reports on Form 8-K for, among other reason, any public announcement or release that discloses material, nonpublic information

# A-1124

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 22, 2022

MBMYCOL1          Charge          Page 2778

proving his good faith. It remains at all times the government's burden to prove beyond a reasonable doubt that the defendant acted knowingly, willfully, and with an intent to defraud.

With respect to Count One of the indictment, the third and final element that the government must prove beyond a reasonable doubt is that Mr. Cole used or caused to be used the mails or the instrumentalities of interstate commerce in furtherance of the scheme to defraud.

Let me first note that it is not necessary for the government to prove that both the mails and an instrumentality of interstate commerce were used in furtherance of the fraudulent scheme. Only one of the above, either the mails or an instrumentality of interstate commerce is enough. But you must be unanimous as to at least one.

In considering this element, it is not necessary for you to find that the defendant was or would have been directly or personally involved in any mailing or the use of any instrumentality of interstate commerce.

If the conduct alleged would naturally and probably result in the use of the mails or an instrumentality of intestate commerce, this element would be satisfied. Nor is it necessary that the items sent through the mails or communicated through an instrumentality of interstate commerce did or would contain fraudulent material or anything criminal or

MBMYCOL1          Charge          Page 2779

objectionable. The matter mailed or communicated may be entirely innocent, so long as it is in furtherance of the scheme to defraud or fraudulent conduct.

The use of the mails or the interstate commerce need not be central to the execution of the scheme or even be incidental to it. All that is required is that the use of the mails or an instrumentality of interstate commerce bears some relation to the object of the scheme or fraudulent conduct.

In fact, the actual purchase or sale of a security need not be accompanied by the use of the mails or an instrumentality of interstate commerce, so long as the mails or instrumentality of interstate commerce are used in the furtherance of the scheme and the defendant was still engaged in actions that were part of the fraudulent scheme when the mails or the instrumentalities of interstate commerce were used.

The use of the term "mails" is are self-explanatory and includes the United States Mail and Federal Express and other commercial mail couriers. The term "instrumentality of interstate commerce" means instruments, devices, and means of conducting trade, commerce, transportation, or communication among any two states or between this country and a foreign country.

Examples of instrumentalities of interstate commerce include telephone calls, emails or text messages, the use of a

MBMYCOL1          Charge          Page 2780

facility of a national securities exchange, such as a stock or options trade made on the NASDAQ.

Now let's turn to Counts Two through Seven of the indictment which charge that the defendant made or caused to be made false statements and reports in documents required to be filed under the Securities Exchange Act of 1934.

Counts Two through Seven charge different filings in which the defendant either made or caused to be made false statements. Count Two relates to Iconix's second quarter 2014 press release on Form 8-K filed on approximately July 30, 2014.

Count Three relates to Iconix's second quarter 2014 quarterly report on the Form 10-Q filed on approximately August 6, 2014.

Count Four relates to Iconix's third quarter 2014 press release on Form 8-K filed on approximately October 29, 2014.

And Count Five relates to Iconix's third quarter 2014 quarterly report on Form 10-Q filed on approximately November 7, 2014. Count Six relates to Iconix's 2014 year-end press release on Form 8-K, filed on approximately 27, 2015. And Count Seven relates to Iconix's 2014 annual report on Form 10-K filed on approximately March 2, 2015.

The SEC requires public companies to file quarterly reports on Form 10-Qs for each of the first three quarters of every fiscal year and and reports on Form 10-Ks.

MBMYCOL1          Charge          Page 2781

The SEC also requires public companies to file current reports on Form 8-K for, among other reasons, any public announcement or release that discloses material, nonpublic information regarding that company's results of operations or financial condition for a completed quarterly or annual fiscal period.

In order to meet its burden of proof on Counts Two through Seven, the government must prove each of the following elements beyond a reasonable doubt:

First, that Iconix was required by the Securities and Exchange Commission Act of 1934 to file the document charged in that count; and

Second, that Mr. Cole knowingly and willfully made or caused to be made a materially false or misleading statement from that document.

With respect to each of Counts Two through Seven, the government must show:

First, that Iconix was required by the securities Exchange Act of 1934 to file the document charged in the particular count.

I instruct you that public companies are required to file documents and reports as prescribed by the SEC. These include quarterly reports on Form 10-Q and current reports on Form 8-K for, among other reason, any public announcement or release that discloses material, nonpublic information

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 22, 2022

MBMYCOL1          Charge          Page 2782

regarding the company's results of operations or financial conditions for a completed quarterly or annual fiscal period. If you find that Iconix was a public company, then it was required to file these reports.

The government must next prove with respect to each of Counts Two through Seven that Mr. Cole made or caused to be made materially false and misleading statements in each filing.

As I have instructed you, a statement or representation is false if it is untrue when made and known at the time to be untrue by the person making it or causing it to be made.

A statement is misleading if it is either an untrue statement as a material fact or if it omits to state a material fact which makes the statements made misleading in light of the circumstances under which they were mad made.

I have defined the term "material" for you previously, and you should use that definition for you here. I have also defined the terms "knowingly" and "willfully." Those same definitions apply here.

To establish this element, the government must prove beyond a reasonable doubt that Mr. Cole made or caused to be made the alleged false or misleading statement or statements of material fact in the SEC report at issue.

The government need not prove that Mr. Cole himself physically made or otherwise personally prepared the statements

MBMYCOL1          Charge          Page 2783

in question. It is sufficient if the government has proved that he caused materially false information to be filed by some person.

Finally, the government must prove beyond a reasonable doubt that Mr. Cole acted knowingly, willfully, and with an intent to defraud. I have already defined those terms, and the same definitions apply here.

Count Eight of the indictment charges Mr. Cole with misleading the conduct of audits from 2013 through 2015. Specifically, Count Eight charges Mr. Cole that Mr. Cole made affirmative misrepresentations to and intentionally withheld information from Iconix's outside auditor, BDO, relating to the SEA JVs.

The law prohibits directors or officers of a corporation that has publicly traded securities from making or causing to be made false or misleading statements to an accountant either in connection with an audit or in connection with the company's financial statements or in connection with the preparation and filing of documents with the SEC.

To establish that Mr. Cole committed the offense charged in Count Eight, the government must prove each of the following elements beyond a reasonable doubt:

First, that at the time of the alleged offense, Mr. Cole was a director or officer of a public second;

Second, that Mr. Cole directly or indirectly made or

MBMYCOL1          Charge          Page 2784

caused to be made a materially false or misleading statement to an auditor in connection with, A, an audit or examination of the financial statements of the issuer required to be made; or, B, the preparation or filing of any document required to be filed with the SEC; and

Third, that Mr. Cole acted knowingly, willfully, and with the specific intent to defraud the auditors.

The first element of the offense that the government must establish beyond a reasonable doubt is that at the time of the alleged offense, Mr. Cole was an officer or director of an issuer.

The term "issuer" in the statute means any person or entity that issues or proposes to issue any security. If you find that Iconix was a public company, then it was an issuer.

The term "officer" includes a chief financial officer, president, vice-president, secretary, treasury, or principle financial officer, comptroller or principal accounting officer, or any person routinely performing corresponding functions with respect to any organization, whether incorporated or unincorporated.

The term "director" means any director of a corporation or any person performing similar functions with respect to any organization, whether incorporated or unincorporated.

I have already described for you the concepts of

MBMYCOL1          Charge          Page 2785

willfulness, falsity, and materiality and have explained that a public company is required to file financial statements with the SEC.

You should apply those same instructions here, except that you should consider whether the false or misleading statements would have been material to a reasonable auditor instead of a reasonable investor.

Each of the counts of the indictment also charge the defendant with violating the aiding and abetting statute. That is, the defendant is charged not only as a principal who committed the crimes but also as an aider and abettor and with having willfully caused those crimes.

As a result, there is an additional way that the government may establish Mr. Cole's guilt on the counts charged in the indictment through aiding and abetting. Aiding and abetting a crime is one manner of committing that crime. A defendant can be convicted of committing a crime if he helps someone else to commit that crime.

For example, if the government proves beyond a reasonable doubt that Mr. Cole committed the substantive securities fraud alleged in Count One, then you need not consider aiding and abetting with respect to that count. If, however, you find that the government did not prove beyond a reasonable doubt that the Mr. Cole engaged in the securities fraud charged in Count One, to continue using

UNITED STATES OF AMERICA, v.
 NEIL COLE,                                                          November 22, 2022

| MBMYCOL1 Charge | Page 2786 |
| --- | --- |

that count as an example, you should consider whether the government has nonetheless proved beyond a reasonable doubt that he aided and abetted someone else in the commission of that offense. And, again, while I have used Count One as an example, this concept of aiding and abetting is alleged in all of the counts charged in the indictment.

Under the federal aiding and abetting statute, whoever "aids, abets, counsels, demands, induces, or procures" the commission of an offense is punishable as a principal. In other words, a person who aids and abets another to commit a substantive crime is just as guilty of that crime as if he had personally committed it.

You may thus find Mr. Cole guilty if you find beyond a reasonable doubt that the government has proven that someone committed the substantive offense and that he helped or assisted that person in the commission of the offense.

The first requirement of aiding and abetting liability is that someone else has committed the crime at issue. Mr. Cole cannot be convicted of aiding and abetting if nobody committed the underlying crime.

But if you do find that the underlying crime at issue was committed by someone other than him, you should whether he aided or abetted the person who actually committed securities fraud, made false statements and filings with the SEC, or mislead the conduct of audits.

| MBMYCOL1 Charge | Page 2787 |
| --- | --- |

To aid and abet another to commit a crime, the defendant must have willfully and knowingly associated himself in some way with the crime, and he must have willfully and knowingly sought by some act to help make the crime succeed.

In the aiding and abetting context, participation in a crime is willful if action is taken voluntarily and intentionally. The mere presence of the defendant in a place where a crime is being committed, even coupled with knowledge that a crime is being committed, is not enough to make him an aider and abettor.

A defendant's acquiescence in the criminal conduct of others, even with guilty knowledge, is not enough to establish aiding and abetting. An aider and abettor must have his own affirmative interest in the criminal venture. To determine whether Mr. Cole aided and abetted the commission of the crime, ask yourself these questions.

Did someone other than Mr. Cole commit the crime at issue. Did Mr. Cole participate in the crime charged as something that he wished to bring about.

Did he associate himself with the attempt to commit the crime by other people knowingly and willfully. Did he seek by his actions to make their criminal venture succeed.

If so, Mr. Cole is an aider and abettor and therefore guilty of the offense. If not, then he is not an aider and abettor and he is not guilty as an aider and abettor of that

| MBMYCOL1 Charge | Page 2788 |
| --- | --- |

offense.

The second way in which the government can prove a defendant's guilt under 18 U.S. Code, Section 2 is through a finding beyond a reasonable doubt that the defendant willfully caused the crime.

Section 2(b) of the aiding and abetting statute which relates to willfully causing a crime reads as followed:

"Whoever willfully causes an act to be done, which, if directly performed by him or another, would be an offense against the United States" shall be guilty of a federal crime.

What does the term "willfully caused" mean. It means that the defendant himself may not have physically committed the crime or supervised or participated in the actual criminal conduct charged in the indictment.

The meaning of term "willfully caused" can be found in the answers to the following questions: First, did the in defendant have the mental state necessary to commit the offenses you are considering; and

Second, did the defendant intentionally cause another person to commit the action or actions that constituted the crime.

If you are persuaded beyond a reasonable doubt that the answer to both of these questions is yes, then the defendant is guilty of the crimes charged just as if the defendant had actually committed it. To find the defendant

| MBMYCOL1 Charge | Page 2789 |
| --- | --- |

liable under this provision of the statute, the government need not prove that he acted through a guilty intermediary.

Good faith on the part of Mr. Cole is a complete defense to each and every one of the charges in this case. If Mr. Cole believed in good faith that he was acting properly, even if he was mistaken in that belief and even if others were injured by his conduct, he cannot be found guilty.

An honest mistake in judgment or an honest error in management or even carelessness does not rise to the level of criminal conduct. By way of example, if Mr. Cole honestly believed that Iconix's statements to investors were accurate and not misleading, that would be a complete defense to Count One, securities fraud, even if that belief ultimately proved to be inaccurate.

Similarly, if Mr. Cole honestly believed the SEC filings referenced in Counts Two through Seven were accurate, that would be a complete defense to those charges, even if that belief ultimately proved to be inaccurate.

Let me remind you that Mr. Cole has no burden to prove his good faith. Rather, the government must prove bad faith and intent to defraud beyond a reasonable doubt. If the evidence in this case leaves you with a reasonable doubt as to whether Mr. Cole acted in bad faith or with an intent to defraud, then you must find him not guilty.

In considering whether or not a defendant has acted in

# A-1127

MBMYCOL1          Charge                    Page 2790

good faith, however, you are instructed that a belief by the defendant, if such belief existed, that ultimately everything would work out such that no investors would lose any money does not necessarily constitute good faith.

No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by him.

It is Neil Cole's theory of defense that he did not agree to any secret, binding commitment to provide GBG with something of value in exchange for any overpayment in connection with SEA-2 or SEA-3 and that he did not act in bad faith to misleading investors or auditors.

Moreover, Mr. Cole contends that because the written contracts on SEA-2 and SEA-3 did not include any binding commitment, unlike other joint venture contracts like SEA-1 and MENA, it was his good-faith understanding that Iconix was not obligated to give anything back to GBG, regardless of what anyone from LF or GBG thought or what Mr. Horowitz may have said.

With respect to any given count you are considering, the government, in addition to proving the essential elements of that charge, must also prove that at least one act in furtherance of the charge occurred in the Southern District of New York. This requirement is called venue.

The Southern District of New York is the judicial

MBMYCOL1          Charge                    Page 2791

district that includes Manhattan and the Bronx, as well as several other counties not relevant to this case.

The government does not have to prove that a completed crime was committed within the Southern District of New York or that Mr. Cole was ever in the Southern District of New York. It is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred in this district.

The act itself need not be a criminal act. It could include, for example, processing or executing a securities trade within this district. And the act need not have been taken by Mr. Cole, so long as the act was part of the crime that you find he committed.

Unlike the elements of the offenses which must be proven beyond a reasonable doubt, the government is only required to prove venue by a preponderance of the evidence. A preponderance of the evidence means that it is more probable than not that some act in furtherance of the crime you are considering occurred in this district.

The indictment refers to various dates and amounts. I instruct you that it does not matter if a specific event is alleged to have occurred on or about a certain date or month but the testimony indicates that in fact it was a different date or month.

Nor does it matter if the indictment alleges that a transaction involved a specific number but the testimony

MBMYCOL1          Charge                    Page 2792

indicates that it was a different amount. The law requires only a substantial similarity between the dates, months, and amounts alleged in the indictment and the dates, months, and amounts established by the evidence.

You have heard testimony from a government witness, Mr. Horowitz, who pled guilty to charges arising out of the same facts as this case. You are instructed that you are to draw no conclusions or inferences of any kind about Mr. Cole's guilt or innocence from the fact that a prosecution witness pled guilty to similar charges. That witness' decision to plead guilty was a personal decision about his own guilt. It may not be used by you in any way as evidence against or unfavorable to Mr. Cole.

You may not draw any inference, favorable or unfavorable, towards the government or Mr. Cole from the fact that any person, other than Mr. Cole, is not on trial here. You may also not speculate as to the reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors.

Under our Constitution, a defendant has no obligation to testify or to present any evidence because it is the government's burden to prove a defendant's guilt beyond a reasonable doubt. That burden remains with the government throughout the entire trial and never shifts to a defendant. A defendant is never required to prove that he or she is

MBMYCOL1          Charge                    Page 2793

innocent.

You may not attach any significance to the fact that the defendant did or did not testify. In this case, Mr. Cole did testify, and he was subject to cross-examination like any other witness. You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of the case. You should not disregard this testimony simply because he is charged as the defendant in this case.

The fact that Mr. Cole decided to testify does not shift the burden of proof to him. The burden remains at all times on the government to prove the elements of each offense beyond a reasonable doubt.

Now to the evaluation of evidence.

You are to consider only the evidence in this case. The evidence in this case is the sworn testimony of the witnesses, the exhibits received in evidence, and the stipulations to which the parties have agreed.

Anything you may have seen or heard about this case outside the courtroom is not evidence and must be entirely disregarded.

Exhibits which may have been marked for identification but not received into evidence may not be considered by you as evidence. Only those exhibits received into evidence may be considered as evidence.

UNITED STATES OF AMERICA, v.
 NEIL COLE,

November 22, 2022

MBMYCOL1          Charge                    Page 2794

It is for you to decide the weight, if any, to be given to the testimony and stipulations you have heard or the exhibits you have seen. Testimony that I have excluded or stricken is not evidence and may not be considered by you in rendering your verdict.

You are not to consider as evidence questions asked by the lawyers. It is the witness' answers that are evidence, not the questions. Arguments or objections by the attorneys are not evidence because the attorneys are not witnesses. What they have said to you in their opening statements and their summations is intended to help you understand the evidence to reach your verdict.

If, however, your recollection of the evidence differs from the statements made by the advocates in their opening statements or summations, go with your recollection of the evidence.

Finally, any statements or rulings that I have made do not constitute evidence. Because you are the sole and exclusive judges of the facts, I do not mean to indicate any opinion as to what the facts are or what the verdict should be. The rulings I have made during the trial are not any indication of my views.

Also, you should not draw any inference from the fact that I may on occasion have asked certain questions of witnesses. Those questions were intended only to clarify or

MBMYCOL1          Charge                    Page 2795

expedite and are not an indication of my view of the evidence. In short, if anything I have said or done seemed to you to indicate an opinion on any matter you need to consider, you must disregard it.

There are two types of evidence that you may properly use in reaching your verdict. One type of evidence is called direct evidence. One kind of direct evidence is a witness' testimony about something they know by virtue of their own senses -- something the witness has seen, felt, touched, or heard. Direct evidence may also be in the form of an exhibit.

The other type of evidence is circumstantial evidence. Circumstantial evidence is evidence that tends to prove one fact indirectly by proof of other facts.

Here is a simple example of circumstantial evidence. Assume that when you came into the courthouse this morning, the sun was shining and it was a nice day. Assume that the courtroom blinds are drawn and you cannot look outside.

As you are sitting here, someone walks in with an umbrella that is dripping wet. Somebody else then walks in with a raincoat that is also dripping wet. Now, you cannot look outside the courtroom, and you can cannot see whether or not it is raining. So you have no direct evidence of that fact.

But based on the combination of the facts that I have asked you to assume, it would be reasonable and logical for you

MBMYCOL1          Charge                    Page 2796

to conclude that in between the time that you arrived at the courthouse and the time these people walked in, it had started to rain.

That is all there is to circumstantial evidence. You infer, on the basis of reason and experience and common sense, from an established fact the existence or the nonexistence of some other fact.

Many facts, such as a person's state of mind, can only rarely be proved by direct evidence. Circumstantial evidence is of no less value than direct evidence. You are to consider both types of evidence.

The law makes no distinction between the two but simply requires that before convicting a defendant, you, the jury, must be satisfied of the defendant's guilt beyond a reasonable doubt from all of the evidence in the case.

It is the duty of the attorney for each side in a case to object when the other side offers testimony or other evidence which the attorney believes is not admissible.

Counsel also have the right and duty to ask the Court to make rulings of law. All those questions of law must be decided by me. You should not show any prejudice against an attorney or his client because the attorney objected on the admissibility of evidence or asked for a conference outside of the hearing of the jury or asked the Court for a ruling on the law.

MBMYCOL1          Charge                    Page 2797

As I already indicated, my rulings on the admissibility of evidence do not indicate any opinion about the weight or the effect of such evidence. You are the sole judges of the credibility of all witnesses and the weight of all evidence.

If, however, I sustained an objection to any evidence or if I ordered evidence stricken, that evidence must be entirely ignored. I have used the term "infer," and the lawyers in their arguments have asked you to draw inferences. When you draw an inference, you conclude, from one or more established facts, that another fact exists. And you do so on the basis of your reason, experience, and common sense.

The process of drawing inferences from facts in evidence is not a matter of guesswork, suspicion, or speculation. An inference is a reasoned, logical deduction or conclusion that you, the jury, may draw but are not required to draw from the facts which have been established by either direct or circumstantial evidence.

In considering inferences, you should use your common sense and draw from the facts which you find to be proven whatever reasonable inferences you find to be justified in light of your experience.

Now for the important subject of evaluating testimony. How do you evaluate the credibility or believability of the witnesses. The answer is that you use your plain common sense.

UNITED STATES OF AMERICA, v.
 NEIL COLE,

November 22, 2022

| MBMYCOL1 | Charge | Page 2798 |
| --- | --- | --- |

There is no magic formula by which you can evaluate testimony. You should use the same tests for truthfulness that you would use in determining matters of importance in your everyday lives. You should ask yourselves did the witness impress you as honest, open, or candid. Or was the witness evasive and edgy as if hiding something.

How did he or she appear -- that is, his or her bearing, behavior, manner and appearance while testifying. How responsive was the witness to the questions asked and on cross-examination.

You should consider the opportunity the witness had to see, hear, and know about the things about which he or she testified; the accuracy of his or her memory; his or her candor or lack of candor; his or her intelligence, the reasonableness and probability of his or testimony; its consistency or lack of consistency with other credible evidence; and its corroboration or lack of corroboration by other credible evidence.

In short, in deciding the credibility, you should size the witness up in light of his or her demeanor, the explanations given, his or her interest in the case, and all of the other evidence in the case. Always remember to use your common sense, good judgment, and life experience.

Few people recall every detail of every event precisely the same way. A witness may be inaccurate, contradictory, or even untruthful in some respects and yet

| MBMYCOL1 | Charge | Page 2799 |
| --- | --- | --- |

entirely believable and truthful in other respects.

It is for you to determine whether such inconsistencies are significant or inconsequential. If you find that a witness is intentionally telling a falsehood, that is always a matter of importance that you should weigh carefully.

If you find that any witness has wilfully testified falsely as to any material fact, that is, as to an important matter, the law permits you to disregard completely the entire testimony of that witness upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything.

However, the law does not require you to consider such a witness as totally unbelievable. You may is accept so much of his or her testimony as you deem true and disregard what you feel is false. You are not required to accept the testimony, even though the testimony is uncontradicted and the witness' testimony is not challenged.

You may decide, because of the witness' bearing or demeanor or because of the inherent improbability of the testimony or for other reasons, that the testimony is not worthy of belief.

On the other hand, you may find, because of a witness' bearing and demeanor and based upon your consideration of all the other evidence in the case, that the witness is truthful.

| MBMYCOL1 | Charge | Page 2800 |
| --- | --- | --- |

By the processes which I have just described, you, as the sole judges of the fact, decide which of the witnesses you will believe, what portions of their testimony you accept, and what weight you will give to it.

In deciding whether to believe a witness, you should also specifically note any evidence of bias, hostility, or affection that the witness may have towards one of the parties. Likewise, you should consider evidence of any other interest or motive that the witness may have in cooperating or not cooperating with a particular party. If you find any such bias, hostility, affection, interest, or motive, you must then consider whether or not it affected or colored the witness' testimony.

You should also take into account any evidence that a witness may benefit or suffer in some way from the outcome of the case. Such interest in the outcome may create a motive to testify falsely, and it may sway a witness to testify in a way that advances his or her own interests.

Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, you should then bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care.

Keep in mind though that it does not automatically follow that testimony given by an interested witness is to be

| MBMYCOL1 | Charge | Page 2801 |
| --- | --- | --- |

disbelieved. There are many people who, no matter what their interest in the outcome of the case may be, would not testify falsely.

It is for you to decide, based on your own perceptions and common sense, to what extent, if at all, the witness' bias or interest has affected his or her testimony. You are not required to disbelieve an interested witness. You may accept as much as his or her testimony as you deem reliable and reject as much as you deem unworthy of acceptance.

You have heard from one witness, Mr. Horowitz, who testified that he was involved in criminal conduct and who subsequently pled guilty to his criminal conduct pursuant to what is called a "cooperation agreement" with the government. You may consider that guilty plea only in determining the witness' believability.

In that connection, let me remind you that Mr. Horowitz pled guilty after entering into an agreement with the government to testify. There is evidence that in exchange for Mr. Horowitz's promise to testify truthfully and completely, the government promised to bring that cooperation to the attention of the sentencing court.

The government frequently must rely on the testimony of cooperating witnesses and other witnesses who have admitted to participating in crimes. You may properly consider the testimony of such cooperating witnesses and convict the

UNITED STATES OF AMERICA, v.
 NEIL COLE,                                                November 22, 2022

MBMYCOL1        Charge              Page 2802

defendant on the basis of such the testimony of alone, if it convinces you of that defendant's guilt beyond a reasonable doubt.

However, because of the possible interest a cooperating witness may have in testifying, the cooperating witness' testimony should be scrutinized with special care and caution.

a witness who realizes that he may be able to obtain his own freedom or receive a lighter sentence by giving testimony favorable to the prosecution has a motive to testify falsely.

Therefore, you must examine such testimony with caution and weigh it great care. If, after scrutinizing such testimony, you decide to accept it, you may give it whatever weight, if any, you find it deserves.

In evaluating testimony of a cooperating witness, you should ask yourselves whether this witness would benefit more by lying or by telling the truth.

Was his testimony made up in a way because he believed or hoped to somehow receive favorable treatment by testifying falsely? Or did he believe that his interests would be served by testifying truthfully?

If you believe that the witness was motivated by hopes of personal gain, was the motivation one that would cause him to lie or to tell the truth? Did this motivation color his

MBMYCOL1        Charge              Page 2803

testimony?

If you find the testimony was false, you should reject it. If, however, after a cautious and careful examination of the cooperating witness' testimony and demeanor on the witness stand, you are satisfied that the witness told the truth, you should accept it as credible and act upon it accordingly.

As with any witness, let me emphasize that issue of credibility need not be decided in all-or-nothing fashion. Even if you find that a witness testified falsely in one part, you may still accept his or her testimony in other parts, or you may disregard all of it. That is a determination entirely for you, the jury.

One final note in this regard. It is no concern of yours why the government made an agreement with Mr. Horowitz. Your sole concern is to decide whether the witness was giving truthful testimony in the case before you. In sum, you should look to all the evidence in deciding what credence and what weight, if any, you will give to a witness' testimony.

You have also heard testimony from government witnesses who testified pursuant to compulsion and immunity orders by the Court. The government is entitled to call such witnesses.

The fact that a witness' testimony cannot be used against him in a prosecution does not disqualify him from

MBMYCOL1        Charge              Page 2804

testifying and does not preclude you from accepting that testimony as true.

As with the cooperating witness testimony, you may want to consider whether such witnesses would benefit more by lying or by telling the truth. If you believe the witness was motivated by personal gain, was the motivation one that would cause him to lie, or was it one that would cause him to tell the truth?

Again, if you find the testimony is false, you should reject it. If you are satisfied that the witness told the truth, you should accept it. As I have previously instructed you, the issue of credibility need not be decided in an all-or-nothing fashion.

Even if you find that a witness testified falsely in one part, you still may accept his testimony in other parts or may disregard all of it. Credibility is a determination entirely for you, the jury.

You have heard the testimony of Special Agent Collins, a law enforcement witness who testified during this trial about certain charts and documents. The fact that a witness is or was employed by the government does not mean that his or her testimony deserves more or less consideration or greater weight than that of any other witness.

At the same time, it is legitimate for defense counsel to try to attack the credibility of a law enforcement witness

MBMYCOL1        Charge              Page 2805

on the grounds that her testimony may be colored by a personal or professional interest in the outcome of case. It is your decision, after reviewing all the evidence, whether to accept or reject the testimony.

There are people whose names you've heard during the course of the trial that did not appear in court to testify. I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses.

Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to, had they been called. Their absence should not affect your judgment in any way.

You should remember my instruction, however, that the law does not impose on a defendant in any criminal case the burden or duty of calling any witnesses or producing any evidence and that the burden always rests with the government to prove a defendant's guilt beyond a reasonable doubt.

The fact that one party called more witnesses and introduced more evidence than the other does not mean that you should find the facts in favor of the side offering the most witnesses. The burden of proof is always on the government, and Mr. Cole is not required to call any witnesses or offer any evidence since he is presumed to be innocent.

You have heard evidence that prior to appearing in court, witnesses have discussed the facts of the case and their

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 22, 2022

MBMYCOL1          Charge          Page 2806

testimony with attorneys. Although you may consider this fact when you are evaluating a witness's credibility, I should tell you that there is nothing improper or unusual about a witness' meeting with lawyers before testifying so that the witness can be aware of the subject that he or she will be questioned about and can focus on those subjects and have the opportunity to prepare or review relevant exhibits before being questioned about them.

Such consultation helps conserve your time and the Court's time. In fact, it would be unusual for a lawyer to call a witness without such consultation.

Some of the exhibits that were admitted into evidence were in the form of charts and summaries. I decided to admit these charts and summaries in place or of or in addition to the underlying documents that they represent in order to save time and avoid unnecessary inconvenience.

You should consider these charts and summaries admitted into evidence as you would any other evidence. As I stated during the trial, other charts and summaries were accepted as demonstrative exhibits.

These charts and summaries were shown to you in order to make other evidence more meaningful and to aid you in considering the evidence. They were not admitted as evidence but as demonstrative aids for the testimony of a witness.

They are no better than the testimony and documents

MBMYCOL1          Charge          Page 2807

upon which they are based. And therefore, you are to give them no greater consideration than you would give to the evidence upon which they are based. Exhibits 1334 to 1335 and 1340 to 1344 are demonstrative aids, and you should consider them only for that purpose.

In this case, you have heard evidence in the form of stipulations of testimony. A stipulation of testimony is an agreement between the parties that if, called as a witness, a person would have given certain testimony. You must accept as true that the witness would have given that testimony. However, it is for you to determine the effect to be given that testimony.

You have also heard evidence in the form of stipulations of fact. A stipulation of fact is an agreement between the parties that a certain fact is true. You must regard such agreed-upon facts as true.

Under your oath as jurors, you are to evaluate the evidence calmly and objectively, without sympathy or prejudice. You to be completely fair and impartial. You are to be guided solely by the evidence in this case.

And the crucial bottom-line question that you must ask yourselves, as you sift through the evidence, is has the government proven the elements of the crimes charged beyond a reasonable doubt.

It would be improper for you to consider, in deciding

MBMYCOL1          Charge          Page 2808

the facts of the case, any personal feelings you may have about the race, religion, national origin, sex, disability, or age of any party or witness or any other such irrelevant factor.

It would be equally improper for you to allow any feelings you might have about the nature of the crimes charged to interfere with your decision-making process.

All parties are entitled to the same fair trial at your hands. They stand equal before the law and are to be dealt with as equals in this court. If you let fear or prejudice or bias or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

If you have a reasonable doubt as to Mr. Cole's guilt with respect to a particular count, you should not hesitate to render a verdict of acquittal on that charge. But on the other hand, if you should find that the government has met its burden of proving Mr. Cole's guilt beyond a reasonable doubt with respect to a particular count, you should not hesitate, because of sympathy or any other reason, to render a verdict of guilty on that charge.

In determining whether the government has proven the charges beyond a reasonable doubt, you should not consider the question of possible punishment in the event that you are to find Mr. Cole guilty as charged.

The duty of imposing a sentence rests exclusively upon

MBMYCOL1          Charge          Page 2809

the Court. Your function is to weigh the evidence in the case and to determine whether or not Mr. Cole is guilty beyond a reasonable doubt solely upon the basis of such evidence.

Therefore, I instruct you that you cannot allow a consideration of the punishment which may be imposed upon Mr. Cole, if he is convicted, to influence your verdict in any way or in any sense enter into your deliberations.

Now, with respect to your deliberations, you shall now retire to decide the case. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement.

Each of you must decide the case for yourself, but you should do so only after consideration of the case with your fellow jurors. Your verdict and your answers to each question on the verdict form must be unanimous.

Discuss in a way your respective opinions dispassionately without sympathy, prejudice, or favor toward either party and about that conclusion which, in your good conscious, appears to be in accordance with the truth.

As you deliberate, please listen to the opinions of your fellow jurors and ask for an opportunity to express your own views. Every juror should be heard. No one juror should hold center stage in the jury room. And no one juror should control or monopolize the deliberations. You should all listen to one another with courtesy and respect.

# A-1132

UNITED STATES OF AMERICA, v.
 NEIL COLE,                                                    November 22, 2022

| MBMYCOL1          Charge          Page 2810 |
|---|

If, after stating your own view, and if, after listening to your fellow jurors, you become convinced that your view is wrong, do not hesitate, because of stubbornness or pride, to change your view.

On the other hand, do not surrender your honest convictions and beliefs concerning the weight or effect of the evidence solely because of the opinions of your fellow jurors or because you are outnumbered or for the mere purpose of returning a verdict. Your final vote must reflect your conscientious belief as to how the issues should be decided. Your verdict must be unanimous.

You are not to discuss the case until all jurors are present. Nine or ten or even eleven jurors together is just a gathering of individuals. Only when all jurors are present do you constitute a jury, and only then may you deliberate.

If any of you took notes during the course of the trial, you should not show your notes or discuss your notes with any other juror during your deliberations. Any notes you have taken are to be used solely to assist you and are not a substitute for the transcript of the testimony which has been taken down verbatim by the court reporters.

The fact that a particular juror has taken notes entitles that juror's views to no greater weight than that of any other jury. And please remember that if notes were taken during the lawyer's arguments, the lawyers' arguments are not

| MBMYCOL1          Charge          Page 2811 |
|---|

evidence.

The exhibits will be sent to you in the jury room. If you want any of the testimony read back to you, that can be arranged. Please appreciate that it is not always easy to locate the testimony that you might want. So be as specific as you possibly can as to what witness and what portion of that witness' testimony you would like to hear.

Any communication with the Court should be made in writing, signed by your foreperson, and given to the court security officer who will be outside the jury room while you deliberate.

I will respond to any questions or requests you have as promptly as possible, either in writing or by having you return to the courtroom so I can speak to you in person.

In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached. So do not ever indicate, in a note or otherwise, what the vote is or which way the majority is leaning or anything like that.

Your first task when you retire to deliberate is to select, by your own vote, one of you to sit as your foreperson. The foreperson does not have any more power or authority than any other juror. And his or her vote or opinion does not count for any more than any other juror's vote or opinion.

The foreperson is merely your spokesperson to the

| MBMYCOL1          Charge          Page 2812 |
|---|

Court. He or she will send out any notes. When you have reached a unanimous verdict, you should send a note signed by the foreperson.

The note should only say: "The jury has reached a unanimous verdict." You should not indicate how you decided the case. You will then return to open court where the foreperson will announce the verdict on behalf of the jury.

The foreperson will receive a verdict form on which to record your verdict. It lists the questions that you must resolve based on the evidence and the instructions that I have given you. When the foreperson has completed the form, he or she must sign his or her name, and the form will be marked as a court exhibit.

The most important part of this case, members of the jury, is the part that you, as jurors, are about to play as you deliberate on the issues of fact. It is for you and you alone to decide whether the government has proved beyond a reasonable doubt each of the essential elements of the crimes with which Mr. Cole was charged.

If the government has succeeded on a particular count, your verdict should be guilty as to that count. If it has failed, your verdict should be not guilty.

I know that you will try the issues that have been presented to you according to the oath that you have taken as jurors. In that oath, you promised that you would well and

| MBMYCOL1          Charge          Page 2813 |
|---|

truly try the issues in this case and render a true verdict according to the law and the evidence, impartially and fairly, without prejudice or sympathy.

Your function is to weigh the evidence in the case and to determine whether the government has proved beyond a reasonable doubt Mr. Cole's guilt of the crimes charged in the indictment.

As I previously stated, your verdict must be unanimous. Again, if at any time you are not in agreement, you are not to reveal the standing of the jurors, that is, the split of the vote, to anyone, including me, at any time during your deliberations.

Now, at this time, the regular jurors will begin their deliberations in the case. Nevertheless, the alternate jurors are not quite excused. While the jury conducts its deliberations, you do not have to be in court.

But you should give Ms. Rivera your phone numbers where you can be reached because it is possible that one or more of you could be needed to deliberate if a regular juror is unable to continue.

Ms. Rivera will call you if deliberations are completed without needing you so that you will know that you are completely finished. Between now and then, you must continue to observe all the restrictions I have instructed you throughout the trial.

UNITED STATES OF AMERICA, v.
 NEIL COLE,                                                November 22, 2022

MBMYCOL1          Charge          Page 2814

That is, you must not discuss this case with anyone, including your fellow alternate jurors, the regular jurors, other people involved in the trial, members of your family, friends, coworkers, or anyone else.

You may not communicate with anyone about the case on your cell phone, through email, text messaging, or by way of any other social networking websites, including Facebook, Twitter, and Linkedin.

Do not speak at all with any of the parties, the witnesses, or the attorneys. Do not permit anyone to discuss the case with you. Do not friend or follow one another or any participant in this trial on Facebook, Twitter, Linkedin, or any other social networking website.

Do not even remain in the presence of anyone discussing the case. If anyone approaches you and tries to talk to you about the case, please report that to me through Ms. Rivera immediately.

Do not listen to or watch or read any news reports concerning this trial, if there were to be any. Do not do any research on the interest or otherwise. And do not visit any places mentioned during the trial or conduct any kind of investigation of your own, including on social media.

Should you be asked to participate in reaching a verdict in this case, the only information you will be allowed to consider in deciding this case is what you learned in this

MBMYCOL1          Charge          Page 2815

courtroom during the trial.

I am sorry that you will probably miss the experience of deliberating with the jury, but the law provides for a jury of 12 persons in this case. So before the rest of the jury begins their deliberations, if you have any clothing or objects, you are asked to pick them up and withdraw them before deliberations start.

Now, ladies and gentlemen, give me a couple of minutes. I need to talk to the lawyers at sidebar briefly.

(Continued on next page)

MBMYCOL1          Charge          Page 2816

(At the sidebar)

THE COURT: Did I misread anything or misstate anything?

MR. THOMAS: No.

MR. HECKER: No.

THE COURT: Any other objections, other than those that have already been made throughout the trial?

MR. HECKER: No.

MR. THOMAS: None from the government, your Honor.

(In open court; jury present)

THE COURT: Ladies and gentlemen, before you begin to deliberate, a couple of other notes. We will be sending in the exhibits. They'll be on a thumb drive or some such thing, and you'll be able to look at all the exhibits as you deliberate, and that will be done promptly after you begin.

If you have a note with any question, we will answer that question as promptly as possible. You should know, however, that I will give the attorneys from 12:30 approximately to 1:30 approximately for lunch. So to get any note during that time period, it may take us a little longer to get back to you, but we will get back to you as soon as we possibly can.

With that, ladies and gentlemen, can we have the CSO step forward.

(Court security officer sworn)

MBMYCOL1          Charge          Page 2817

THE COURT: Ladies and gentlemen, you may now discuss case.

(At 10:42 a.m., the jury retired to deliberate)

THE COURT: Everyone can be seated.

Do make sure that we have cell numbers so that we can contact you if we get a note. And please do be within five minutes of here once you get that call.

(Recess pending verdict)

(Continued on next page)

UNITED STATES OF AMERICA, v.
 NEIL COLE,                                                                                    **November 22, 2022**

MBMYCOL1            Charge                        Page 2818

AFTERNOON SESSION
1:45 p.m.

THE COURT: Okay, folks.  On the record.  We did receive a note.  But before we get to the note, I wanted to advise the parties that the jury told Ms. Rivera, when she was showing them how to use the thumb drive and the exhibits, that they wished to leave today no later than 2:30.

The note that we received approximately ten minutes go -- it's now ten minutes of 2:00 -- reads: "Can we bring our notes home with the understanding we won't show them to anyone?"  And is signed by juror Tim Eddis.

I propose to tell them that they cannot bring the notes home with them.  It is our practice to keep the notes in the jury room.

Any objection to that?

MR. THOMAS: No, your Honor.

MR. HECKER: No, your Honor.

THE COURT: Very well.  So I will simply write on the note:  "Unfortunately, no."  We will await.

Do you guys want me to bring the jury out before we send them home for the weekend?

MR. THOMAS: Your Honor, we would favor that but not strongly.

MR. HECKER: We don't have a view on it.  I don't think it's necessary, I don't feel strongly.

MBMYCOL1            Charge                        Page 2819

THE COURT: Very well.  In that event, we will provide them with this note, period.  I won't bring them out.

(Jury deliberations resumed at 1:50 p.m.)

(Adjourned to November 28, 2022, at 9:30 a.m.)

# A-1135

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**                                                    November 23, 2022

---

MBMYCOL1                                                              Page 2820

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          19 Cr. 869 (ER)

NEIL COLE,

               Defendant.              Trial

------------------------------x

                              New York, N.Y.
                              November 23,2022
                              2:00 p.m.

Before:

               HON. EDGARDO RAMOS,

                         District Judge

               APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  ANDREW M. THOMAS
     JUSTIN V. RODRIGUEZ
     JUSTIN RODRIGUEZ
     Assistant United States Attorneys

KAPLAN HECKER & FINK, LLP
     Attorneys for Defendant
BY:  SEAN HECKER
     JENNA M. DABBS

MARKUS/MOSS, PLLC
     Attorneys for Defendant
BY:  DAVID O. MARKUS
     ANITA M. MOSS

---

MBMYCOL1                                                              Page 2821

(Trial resumed)

(The Court and all parties present remotely)

THE DEPUTY CLERK: Counsel please state your name for the record starting with the government.

MR. THOMAS: Good afternoon, your Honor, it's Andrew Thomas and Justin Rodriguez is also on the line.

THE DEPUTY CLERK: And counsel for defendant.

MS. DABBS: Good afternoon, your Honor. This is Jenna Dabbs. And my colleagues Rebecca Sussman and Jeffrey Then are on the line as well.

THE COURT: Good afternoon to you all.

I called this conference this morning at approximately 11:55 a.m. We received an email from Juror No. 1, Ms. Perez, advising us that she had tested positive and requesting guidance on the Court's COVID protocols. So you know, the Court's COVID protocols are that you can return to the court six days after the onset of COVID symptoms, so long as you have tested negative for COVID before coming to court two different times within no less than 24 hours between them.

As I calculated, she can come back on Monday and continue deliberations with her fellow jurors, so long as she tests negative on Saturday and 24 hours later on Sunday. Ms. Rivera spoke with her and she seems amenable to doing that and will be in touch with Ms. Rivera over the weekend.

In the meantime, we also contacted Alternate No. 1,

---

MBMYCOL1                                                              Page 2822

Mr. Sicignano, and advised him that we may be needing him as early as Monday, and he was amenable to that.

So that you are aware even if she did not test negative, she could return to the courthouse ten days after the onset of symptoms, which I believe would put us at Wednesday. I don't want to lose two or even one day of deliberations. So my recommendation to you is that we wait to hear from Ms. Perez over the weekend and if she tests negative Saturday and Sunday, then she'll be welcome back. And if she does not, then we should excuse her and have Mr. Sicignano come in.

Is there any objection, any questions, any concerns to that, Mr. Thomas?

MR. THOMAS: Not from the government, no, your Honor.

THE COURT: Ms. Dabbs.

MS. DABBS: No, your Honor, that sounds like a fine approach.

THE COURT: In that event, we will await to hear from Ms. Perez Saturday and Sunday, and we'll be in touch via email.

MR. THOMAS: Your Honor, we just wanted to have Ms. Dabbs confirm that Mr. Cole is waiving his appearance. Obviously, this was scheduled to deal with this emergent issue, just wanted to make sure that was on the record.

MS. DABBS: Yes. Yes, happy to waiver Mr. Cole's appearance for this purpose.

THE COURT: Anything else?

---

MBMYCOL1                                                              Page 2823

MS. DABBS: Your Honor, just one question -- and maybe it applies to the court's COVID protocols -- is there an expectation or plan to notify any of the other jurors or would that not be typically be done?

I'm asking a question not taking a position on what is appropriate. I obviously trust that the Court will be following the appropriate protocols.

THE COURT: There is no requirement that anyone else be advised. What I would propose to do, if we excuse Ms. Perez, is to let them know why it was that she was excused and to ask if anyone else was concerned, because we do have the ability to test the jurors in court. So that is what I would propose to do.

MS. DABBS: Got it. Thank you, your Honor.

THE COURT: Anything else from the government?

MR. THOMAS: No, your Honor. Thank you very much.

THE COURT: Happy Thanksgiving.

(Adjourned to November 28, 2022, at 9:30 a.m.)

---

Min-U-Script®                    Southern District Court Reporters                    (1) Pages 2820 - 2823

**UNITED STATES OF AMERICA, v.**
**NEIL COLE,**
November 28, 2022

---

MBSHColF — Page 2824

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                    19 Cr. 869 (ER)

NEIL COLE,

            Defendant.          Trial

------------------------------x
                                New York, N.Y.
                                November 28, 2022
                                9:15 a.m.
Before:

                HON. EDGARDO RAMOS,

                        District Judge

                APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  ANDREW M. THOMAS
     JUSTIN V. RODRIGUEZ
     JUSTIN RODRIGUEZ
     Assistant United States Attorneys

KAPLAN HECKER & FINK, LLP
    Attorneys for Defendant
BY:  SEAN HECKER
     JENNA M. DABBS

MARKUS/MOSS, PLLC
    Attorneys for Defendant
BY:  DAVID O. MARKUS
     ANITA M. MOSS

---

MBSHColF — Page 2825

(Trial resumed; jury not present)

THE COURT: OK. It's almost 9:15.

This is what I intend to do with -- I'm going to bring the jury out at 9:30 so we can advise them of Ms. Perez's positive test. I'm not going to require them to all be tested. I will let them know that we have the -- we have tests here in the courthouse and that if anyone wants to be tested, that that can be arranged, and then we'll see what they say. But almost all of them are here. I think we're missing only one.

Anything either side wants to raise?

MR. THOMAS: No, your Honor.

MR. HECKER: Number one, just to apologize again to the Court and to the Court's staff for my error, and I realize it caused work over the holiday weekend which I'm very sorry about.

In terms of the instruction to the -- what will be the new jury, will the Court instruct them under Rule 24 to begin anew, whatever that will mean in this context?

THE COURT: Yes, yes.

MR. HECKER: Thank you.

THE COURT: OK. So I think they're almost all here. I think we're only missing one.

So we're off the record.

(Discussion off the record)

(Recess)

---

MBSHColF — Page 2826

THE COURT: We're going to bring them out now since we're all here.

(Jury present)

THE COURT: Ladies and gentlemen, good morning. I trust you all had a wonderful holiday weekend. Welcome back.

The reason I need to speak with you this morning is two reasons: First of all, as you no doubt are aware, Ms. Perez, who was Juror No. 1, is not here, and she's not here because she advised us last Wednesday that she tested positive for COVID. We were holding on to the hope that prior to today she would have tested negative so that she could rejoin you. Unfortunately, that was not the case.

We did reach out to certain of you who spent the most time closest to her to advise you of the positive test, and that was in accordance with our courthouse COVID protocols. Those protocols do not require the rest of you to have been told, but we're telling you now. And I also wanted to let you know that if you want to be tested, we can arrange for that here at the courthouse at no cost to you. Just let us know through some note that you do want to have a test done here, and we can make that happen.

The second reason to bring you out is because Mr. Carrasquillo, who was formerly our Alternate Juror No. 1, is now part of the jury having replaced Ms. Perez. Now, what that means as a practical matter is that this is now an

---

MBSHColF — Page 2827

entirely new jury from the jury that began deliberations last Tuesday, and what that means is that you have to begin your deliberations anew. So it's like you're just starting now with this new composition of jurors. OK?

So we will let you return to your deliberations. As always, let us know if you have any questions via a note signed by your foreperson, and we will get back to you just as soon as we can. The only other request that I would make of you is that you let us know what your day is going to be like, so when you expect to end your day today and on any subsequent day.

OK. With that, you can begin your deliberations.

(Jury deliberations resumed at 9:30 a.m.)

THE COURT: Unless there's anything to discuss, I will be upstairs.

MR. THOMAS: Your Honor, the only thing we wanted to raise, as a matter of completing the record after yesterday's motion, we understand the Court's email to have been the equivalent of factual findings and that the defense sort of agrees with those findings. We just wanted to propose that that be formalized in some fashion so that the record could be intelligible later.

THE COURT: I guess I don't know what that means. I suppose I could put a short order on the record saying that the defendant's motion to excuse Alternate No. 1 is denied. I think everything is under seal so far, correct?

---

UNITED STATES OF AMERICA, v.
NEIL COLE,

November 28, 2022

MBSHColF                                      Page 2828

MR. HECKER: Correct, your Honor.

THE COURT: Any objection to that?

MR. HECKER: No.

THE COURT: OK. So then we'll draft something.

MR. THOMAS: Thank you, your Honor.

(Recess pending verdict)

(At 10:30 a.m., verdict)

THE COURT: OK. I think you all got copies. We received a note. It will be marked Court Exhibit No. 2, and it reads in its entirety as follows: "The jury has reached a unanimous verdict."

Now, before I bring the jury out, does either side want me to poll the jury?

MR. HECKER: Yes, your Honor.

THE COURT: Very well. The jury will be polled. And we can bring them out.

By the way, so the parties know, I do speak with the jury afterwards. Never to ask about the case or the lawyers or the parties, just to talk to them about the process, how they've been treated, anything we can do better, that sort of thing.

(Jury present)

THE COURT: Ladies and gentlemen, we have received your note addressed to me. It has been marked as Court Exhibit No. 2, and it reads in its entirety as follows: "The jury has

MBSHColF                                      Page 2829

reached unanimous verdict." And it is signed by your foreperson, Mr. Eddis.

Mr. Eddis, is that correct?

THE FOREPERSON: That's correct.

THE COURT: Jazmin, would you get the verdict form.

Ms. Rivera, would you please take the verdict.

THE DEPUTY CLERK: On Count One, which charges the defendant with securities fraud, how do you find?

JUROR: We find Neil Cole, the defendant guilty.

THE DEPUTY CLERK: On Count Two, which charges the defendant with making and causing to be made false statements in reports and documents required to be filed under the Securities Exchange Act of 1934 in connection with the Form 8-K filed by Iconix attaching a press release reporting Iconix's financial results for the three- and six-month periods ending June 30, 2014, how do you find?

THE FOREPERSON: We find Neil Cole, the defendant, guilty.

THE DEPUTY CLERK: On Count Three, which charges the defendant with making and causing to be made false statements in reports and documents required to be filed under the Securities Exchange Act of 1934 in connection with the Form 10-Q filed by Iconix for the second quarter of 2014, how do you find?

THE FOREPERSON: We find Neil Cole, the defendant,

MBSHColF                                      Page 2830

guilty.

THE DEPUTY CLERK: On Count Four, which charges the defendant with making and causing to be made false statements in reports and documents required to be filed under the Securities Exchange Act of 1934 in connection with the Form 8-K filed by Iconix attaching a press release reporting Iconix's financial results for the third and -- excuse me, for the three- and nine-month periods ending September 30, 2014, how do you find?

THE FOREPERSON: We find Neil Cole, the defendant, guilty.

THE DEPUTY CLERK: Count Five, on Count Five, which charges the defendant with making and causing to be made false statements in reports and documents required to be filed under the Securities Exchange Act of 1934 in connection with the Form 10-K filed by Iconix for the third quarter of 2014, how do you find?

THE FOREPERSON: We find Neil Cole, the defendant, guilty.

THE DEPUTY CLERK: On Count Six, which charges the defendant with making and causing to be made false statements in reports and documents required to be filed under the Securities Exchange Act of 1934 in connection with the Form 8-K filed by Iconix attaching a press release reporting Iconix's financial results for the full year of 2014, how do you find?

MBSHColF                                      Page 2831

THE FOREPERSON: We find Neil Cole, the defendant, guilty.

THE DEPUTY CLERK: On Count Seven, which charges the defendant with making and causing to be made false statements in reports and documents required to be filed under the Securities Exchange Act of 1934 in connection with the Form 10-K filed by Iconix for the full year 2014, how do you find?

THE FOREPERSON: We find Neil Cole, the defendant, guilty.

THE DEPUTY CLERK: On Count Eight, which charges the defendant with misleading the conduct of audits, how do you find?

THE FOREPERSON: We find Neil Cole, the defendant, guilty.

THE COURT: Mr. Eddis, you may be seated.

Ladies and gentlemen, I'm now going to ask a question of each of you, and you will answer yes or no.

Juror No. 1, is this your verdict?

JUROR NO. 1: Yes.

THE COURT: Juror No. 2, is this your verdict?

JUROR NO. 2: Yes.

THE COURT: Juror No. 3, is this your verdict?

JUROR NO. 3: Yes.

THE COURT: Juror No. 4, is this your verdict?

JUROR NO. 4: Yes.

# A-1138

UNITED STATES OF AMERICA, v.
NEIL COLE,                                                                        November 28, 2022

---

MBSHColF                                                                          Page 2832

THE COURT: Juror No. 5, is this your verdict?

JUROR NO. 5: Yes.

THE COURT: Juror No. 6, is this your verdict?

JUROR NO. 6: Yes.

THE COURT: Juror No. 7, is this your verdict?

JUROR NO. 7: Yes.

THE COURT: Juror No. 8, is this your verdict?

JUROR NO. 8: Yes.

THE COURT: Juror No. 9, is this your verdict?

JUROR NO. 9: Yes.

THE COURT: Juror No. 10, is this your verdict?

JUROR NO. 10: Yes.

THE COURT: Juror No. 11, is this your verdict?

JUROR NO. 11: Yes.

THE COURT: Juror No. 12, is this your verdict?

JUROR NO. 12: Yes.

THE COURT: And so say you all.

Ladies and gentlemen, your jury duty is now completed. On behalf of all of the parties, I want to thank you for the work that you've done. You were very attentive throughout the trial. I thanked you every morning for being on time, and I meant it. It always seems to me to be a work of -- a feat of engineering to get 12 or 13 people out of their normal lives to come in here every day and ask you to do the important work that needs to be done.

---

MBSHColF                                                                          Page 2833

I will let you know, at least it's my belief, that our jury system is the envy of the Western world because they understand that when it comes to settling very important issues like this that touch upon the very liberty of our fellow citizens, we rely literally on our neighbors and on your collective wisdom to help us make these decisions. So thank you very much.

You can now discuss this case with anyone that you wish. It is possible that certain news outlets or reporters may reach out to you. If you wish to speak with them, you can. If you don't wish to speak with them and go back to your regular lives, you can simply tell them that, and they will no longer bother you. My only request to you is that if you do choose to speak with reporters, that you speak about your own experience and your own thought process and not that of other -- of your fellow jurors.

I am going to impose just a little bit longer on you. If I could just ask you to wait a few minutes in the jury room if you can. If you can't, obviously, then you should go. But I'd like to come in and speak with you for just a moment. OK.

(Jury excused)

THE COURT: Everyone can be seated.

Any motions or requests for extension of time to make motions?

MR. HECKER: We will ask for an extension of time,

---

MBSHColF                                                                          Page 2834

your Honor. If we could have -- given the holidays, would the Court give us 45 days?

THE COURT: That's fine.

MR. HECKER: Thank you.

THE COURT: We'll get you an actual date as to when that is.

Any requests from the government?

MR. THOMAS: No, your Honor, no requests. We just ask that bail be continued on the current conditions.

THE COURT: Bail will be continued on the current conditions. Obviously, Mr. Cole, it will be very important for you to continue -- there's been nothing brought before me indicating that you have been in violation of any of those conditions. It's very important that you continue to do that.

Unless there is anything else, we are adjourned. Thank you all for your professional courtesies throughout.

(Adjourned)

---

A-1139

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

## FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15 (d)**
**of The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): October 24, 2014**

# ICONIX BRAND GROUP, INC.
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **0-10593** | **11-2481903** |
|---|---|---|
| **(State or Other Jurisdiction** | **(Commission** | **(IRS Employer** |
| **of Incorporation)** | **File Number)** | **Identification No.)** |

| **1450 Broadway, New York, New York** | **10018** |
|---|---|
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code (212) 730-0030**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

GOVERNMENT
EXHIBIT
104
19 Cr. 869 (ER)

**Item 2.02**       **Results of Operations and Financial Conditions.**

On October 28, 2014, Iconix Brand Group, Inc., a Delaware corporation, (the "Registrant") issued a press release announcing its financial results for the fiscal quarter and nine months ended September 30, 2014. As noted in the press release, the Registrant has provided certain non–U.S. generally accepted accounting principles ("GAAP") financial measures, the reasons it provided such measures and a reconciliation of the non–U.S. GAAP measures to U.S. GAAP measures. Readers should consider non–GAAP measures in addition to, and not as a substitute for, measures of financial performance prepared in accordance with U.S. GAAP. A copy of the Registrant's press release is being furnished hereto as Exhibit 99.1 and is incorporated herein by reference.

**Item 5.07**       **Submission of Matters to a Vote of Security Holders**

At the Annual Meeting of Stockholders of the Registrant held on October 24, 2014, the Registrant's stockholders entitled to vote at the meeting voted: (i) for the election of the six individuals named below to serve as directors of the Registrant to hold office until the Registrant's Annual Meeting of Stockholders to be held in 2015 and until their successors have been duly elected and qualified; (ii) for the ratification of the appointment of BDO USA, LLP as the Registrant's independent registered public accounting firm for the fiscal year ending December 31, 2014; and (iii) for, by non-binding advisory vote, the resolution approving named executive officer compensation.

(i)       The votes cast by stockholders with respect to the election of directors were as follows:

| Director | Votes Cast "For" | Votes Withheld | Broker Non-Votes |
|---|---|---|---|
| Neil Cole | 38,123,913 | 1,546,971 | 4,393,288 |
| Barry Emanuel | 28,221,464 | 11,449,420 | 4,393,288 |
| Drew Cohen | 37,705,524 | 1,965,360 | 4,393,288 |
| F. Peter Cuneo | 28,368,074 | 11,302,810 | 4,393,288 |
| Mark Friedman | 26,213,124 | 13,457,760 | 4,393,288 |
| James A. Marcum | 39,066,413 | 604,471 | 4,393,288 |

(ii)      The votes cast by stockholders with respect to the ratification of the appointment of BDO USA, LLP as the Registrant's independent registered public accounting firm for the fiscal year ending December 31, 2014 were as follows:

| | Votes Cast "For" | Votes Cast "Against" | Abstentions |
|---|---|---|---|
| Appointment of BDO USA LLP | 43,245,327 | 719,854 | 98,991 |

(iii)     The votes cast by stockholders with respect to the proposal to approve, by non-binding advisory vote, the resolution approving named executive officer compensation were as follows:

| | Votes Cast "For" | Votes Cast "Against" | Abstentions | Broker Non-Votes |
|---|---|---|---|---|
| Named Executive Officer Compensation | 20,164,118 | 19,338,830 | 167,936 | 4,393,288 |

**Item 9.01**       **Financial Statements and Exhibits.**

(d) Exhibits.

99.1      Press Release of Iconix Brand Group, Inc. dated October 28, 2014.

# A-1141

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ICONIX BRAND GROUP, INC.**
(Registrant)

By:  /s/ Jeff Lupinacci
Name: Jeff Lupinacci
Title: Executive Vice President and Chief Financial
Officer

Date: October 29, 2014

**Exhibit 99.1**

CONFIDENTIAL FINAL RELEASE

### ICONIX BRAND GROUP REPORTS RECORD REVENUE AND EARNINGS FOR THE THIRD QUARTER 2014

- *Record Q3 diluted non-GAAP EPS of $0.73, a 23% increase over prior year quarter*

- *Record Q3 revenue of $113.8 million, a 6% increase over prior year quarter*

- *Raising 2014 diluted non-GAAP EPS guidance to $2.72-$2.77*

- *Providing 2015 revenue guidance of $485-$500 million*

- *Providing 2015 diluted non GAAP EPS guidance of $2.90-$3.10*

NEW YORK, New York—October 28, 2014 – Iconix Brand Group, Inc. (NASDAQ: ICON) ("Iconix" or the "Company"), today announced financial results for the third quarter ended September 30, 2014.

**Q3 2014 Results for Iconix Brand Group, Inc.:**

Total revenue for the third quarter of 2014 was approximately $113.8 million, a 6% increase as compared to approximately $107.2 million in the third quarter of 2013. On a non-GAAP basis, as described in the tables below, net income attributable to Iconix was $38.3 million, a 16% increase as compared to the prior year quarter of approximately $33.1 million. Non-GAAP diluted EPS for the third quarter of 2014 increased 23% to $0.73 compared to $0.59 in the prior year quarter. GAAP net income attributable to Iconix for the third quarter of 2014 was approximately $33.8 million, a 16% increase as compared to $29.0 million in the prior year quarter, and GAAP diluted EPS for the third quarter of 2014 was $0.58, a 15% increase compared to $0.50 in the prior year quarter. Free cash flow attributable to Iconix for the third quarter was approximately $61.8 million, a 14% increase as compared to the prior year quarter of approximately $54.3 million. EBITDA attributable to Iconix for the third quarter was approximately $65.5 million, as compared to approximately $65.6 million in the prior year quarter.

**Nine months ended September 30, 2014:**

Total revenue for the nine months ended September 30, 2014 was approximately $348.8 million, a 7% increase as compared to approximately $327.4 million for the prior year period. On a non-GAAP basis, as defined in the tables below, net income attributable to Iconix for the nine month period was approximately $117.2 million, a 5% increase as compared to approximately $112.0 million in the prior year period, and non-GAAP diluted earnings per share was approximately $2.22 for the nine month period, a 20% increase versus $1.85 for the prior year period. GAAP net income attributable to Iconix for the nine month period of 2014 was approximately $128.9 million, a 26% increase as compared to $101.9 million in the prior year period, and GAAP diluted EPS for the nine month period of 2014 increased 33% to $2.21 compared to $1.67 in the prior year period. Free cash flow attributable to Iconix for the nine month period was approximately $179.8 million, an 8% increase over the prior year period of approximately $167.0 million. EBITDA attributable to Iconix for the nine month period was approximately $213.4 million, a 5% increase as compared to approximately $202.8 million in the prior year period.

EBITDA, free cash flow, non-GAAP net income and non-GAAP diluted EPS are all non-GAAP metrics and reconciliation tables for each are attached to this press release.

Neil Cole, Chairman and CEO of Iconix Brand Group, Inc. commented, "Our strong third quarter and year to date results reflect the continued strength of our overall portfolio and the power of our business model. With solid brand performance domestically supported by large direct-to-retail licenses, and double digit growth around the world driven by our global brands and joint ventures, we continue to execute in line with our successful track record. As we look to 2015, we expect to continue to drive positive organic growth, and with our strong balance sheet we plan to deliver additional value as we execute on our acquisition strategy and continue to opportunistically repurchase stock."

**2014 Guidance for Iconix Brand Group, Inc.:**

- Maintaining 2014 revenue guidance of $455-$465 million

- Raising 2014 non-GAAP diluted EPS guidance to $2.72-$2.77 from $2.60-$2.70

- Raising 2014 GAAP diluted EPS guidance to $2.61-$2.65 from $2.50-$2.60

- Maintaining 2014 free cash flow guidance of $215-$222 million

This guidance relates to the Company's existing portfolio of brands and does not include any additional acquisitions.

**2015 Guidance for Iconix Brand Group, Inc.:**

The Company is initiating the following guidance for 2015

- 2015 revenue guidance of $485-$500 million

- 2015 non-GAAP diluted EPS guidance of $2.90-$3.10

- 2015 GAAP diluted EPS guidance of $2.82-$3.00

- 2015 free cash flow guidance of $220-230 million

This guidance relates to the Company's existing portfolio of brands and does not include any additional acquisitions.

See reconciliation tables below for non-GAAP metrics. These non-GAAP metrics may be inconsistent with similar measures presented by other companies and should only be used in conjunction with our results reported according to U.S. GAAP. Any financial measure other than those prepared in accordance with U.S. GAAP should not be considered a substitute for, or superior to, measures of financial performance prepared in accordance with U.S. GAAP.

**About Iconix Brand Group, Inc.**

About Iconix Brand Group, Inc. Iconix Brand Group, Inc. owns, licenses and markets a growing portfolio of consumer brands including: CANDIE'S (R), BONGO (R), BADGLEY MISCHKA (R), JOE BOXER (R), RAMPAGE (R), MUDD (R), MOSSIMO (R), LONDON FOG (R), OCEAN PACIFIC (R), DANSKIN (R), ROCAWEAR (R), CANNON (R), ROYAL VELVET (R), FIELDCREST (R), CHARISMA (R), STARTER (R), WAVERLY (R), ZOO YORK (R), ED HARDY (R), SHARPER IMAGE (R), UMBRO (R), LEE COOPER (R), ECKO UNLTD. (R), and MARC ECKO (R). In addition, Iconix owns interests in the ARTFUL DODGER (R), MATERIAL GIRL (R), PEANUTS (R), TRUTH OR DARE (R), BILLIONAIRE BOYS CLUB (R), ICE CREAM (R), MODERN AMUSEMENT (R), BUFFALO (R) and NICK GRAHAM (R) brands. The Company licenses its brands to a network of leading retailers and manufacturers that touch every major segment of retail distribution from the luxury market to the mass market in both the U.S. and worldwide. Through its in-house business development, merchandising, advertising and public relations departments, Iconix manages its brands to drive greater consumer awareness and equity.

# A-1144

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995. The statements that are not historical facts contained in this press release are forward-looking statements that involve a number of known and unknown risks, uncertainties and other factors, all of which are difficult or impossible to predict and many of which are beyond the control of the Company, which may cause the actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by such forward looking statements. Such factors include, but are not limited to, uncertainty regarding the results of the Company's acquisition of additional licenses, continued market acceptance of current products and the ability to successfully develop and market new products particularly in light of rapidly changing fashion trends, the impact of supply and manufacturing constraints or difficulties relating to the Company's licensees' dependence on foreign manufacturers and suppliers, uncertainties relating to customer plans and commitments, the ability of licensees to successfully market and sell branded products, competition, uncertainties relating to economic conditions in the markets in which the Company operates, the ability to hire and retain key personnel, the ability to obtain capital if required, the risks of litigation and regulatory proceedings, the risks of uncertainty of trademark protection, the uncertainty of marketing and licensing acquired trademarks and other risks detailed in the Company's SEC filings. The words "believe", "anticipate", "estimate", "expect", "confident", "continue", "will", "project", "provide", "guidance" and similar expressions identify forward-looking statements. Readers are cautioned not to place undue reliance on these forward looking statements, which speak only as of the date the statement was made. All forward-looking statements are qualified by these cautionary statements and apply only as of the date they are made. The Company undertakes no obligation to update any forward-looking statement, whether as a result of new information, future events or otherwise.

# #

Contact Information:
  Jaime Sheinheit
  Investor Relations
  Iconix Brand Group
  212.730.0030

# A-1145

**Unaudited Condensed Consolidated Income Statements**
*(in thousands, except earnings per share data)*

| | Three Months Ended Sept. 30, | | Nine Months Ended Sept. 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Licensing and other revenue | $ 113,750 | $ 107,175 | $ 348,831 | $ 327,362 |
| Selling, general and administrative expenses | 50,190 | 45,705 | 142,685 | 128,142 |
| Operating income | 63,560 | 61,470 | 206,146 | 199,220 |
| Interest and other expenses, net | 20,525 | 20,614 | 23,952 | 47,583 |
| Equity earnings on joint ventures | (4,084) | (3,388) | (12,881) | (7,588) |
| Other expenses – net | 16,441 | 17,226 | 11,071 | 39,995 |
| Income before income taxes | 47,119 | 44,244 | 195,075 | 159,225 |
| Provision for income taxes | 9,907 | 13,740 | 56,239 | 47,432 |
| Net income | $ 37,212 | $ 30,504 | $ 138,836 | $ 111,793 |
| Less: Net income attributable to non-controlling interest | 3,433 | 1,507 | 9,970 | 9,891 |
| Net income attributable to Iconix Brand Group, Inc. | $ 33,779 | $ 28,997 | $ 128,866 | $ 101,902 |
| Earnings per share: | | | | |
| Basic | $ 0.70 | $ 0.54 | $ 2.65 | $ 1.76 |
| Diluted | $ 0.58 | $ 0.50 | $ 2.21 | $ 1.67 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 47,991 | 53,325 | 48,682 | 57,966 |
| Diluted | 58,457 | 57,805 | 58,306 | 61,150 |

**Selected Balance Sheet Items:**
*(in thousands)*

| | (Unaudited) 9/30/2014 | 12/31/2013 |
|---|---|---|
| Total Assets | $2,848,233 | $2,864,158 |
| Total Liabilities | $1,798,750 | $1,762,216 |
| Total Stockholders' Equity and Mezzanine Equity | $1,049,483 | $1,101,942 |

The following tables detail unaudited reconciliations from non-GAAP amounts to U.S. GAAP and include reconciliations related to ASC Topic 470 as it relates to accounting for convertible debt, incremental dilutive shares related to our convertible debt that are covered by our existing convertible note hedges, and non-cash gains related to the re-measurement of investments.

Note: All items in the following reconciliation tables are attributable to Iconix Brand Group, Inc. and exclude results related to non-controlling interests.

# A-1146

*(in thousands, except per share data)*

| Net income reconciliation | (Unaudited) Three months ended | | (Unaudited) Nine months ended | |
| --- | --- | --- | --- | --- |
| | Sept. 30, 2014 | Sept. 30, 2013 | Sept. 30, 2014 | Sept. 30, 2013 |
| Non-GAAP net income (1) | $38,270 | $33,089 | $117,191 | $111,959 |
| | | | | |
| GAAP net income | $33,779 | $28,997 | $128,866 | $101,902 |
| Adjustments: | | | | |
| Non-cash interest related to ASC Topic 470 | 6,910 | 6,393 | 19,932 | 15,713 |
| Non-cash gain related to investment in Iconix Latin America | — | — | (37,893) | — |
| Taxes related to above item | (2,419) | (2,301) | 6,286 | (5,656) |
| Net | 4,491 | 4,092 | (11,675) | 10,057 |
| Non-GAAP net income | $38,270 | $33,089 | $117,191 | $111,959 |

# A-1147

**Non-GAAP weighted average diluted shares reconciliation**

| | (Unaudited) Three months ended | | (Unaudited) Nine months ended | |
|---|---|---|---|---|
| | Sept. 30, 2014 | Sept. 30, 2013 | Sept. 30, 2014 (3) | Sept. 30, 2013 |
| Non-GAAP weighted average diluted shares | 52,704 | 56,153 | 52,895 | 60,599 |
| GAAP weighted average diluted shares | 58,457 | 57,805 | 58,306 | 61,150 |
| Less: additional incremental dilutive shares covered by hedges for: (2) | | | | |
| 2.50% Convertible Notes | (2,485) | (728) | (2,338) | (243) |
| 1.50% Convertible Notes | (3,268) | (924) | (3,073) | (308) |
| Subtotal | (5,753) | (1,652) | (5,411) | (551) |
| Non-GAAP weighted average diluted shares | 52,704 | 56,153 | 52,895 | 60,599 |

| | (Unaudited) Three months ended | | (Unaudited) Nine months ended | |
|---|---|---|---|---|
| **Diluted EPS reconciliation** | Sept 30, 2014 | Sept 30, 2013 | Sept 30, 2014 (3) | Sept 30, 2013 |
| Non-GAAP diluted EPS (1) | $ 0.73 | $ 0.59 | $ 2.22 | $ 1.85 |
| GAAP diluted EPS | $ 0.58 | $ 0.50 | $ 2.21 | $ 1.67 |
| Adjustments for non-cash interest related to ASC 470, net of tax | $ 0.15 | $ 0.09 | $ 0.43 | $ 0.18 |
| Non-cash gain related to investment in Iconix Latin America, net of tax | — | — | ($ 0.42) | — |
| Non-GAAP diluted EPS | $ 0.73 | $ 0.59 | $ 2.22 | $ 1.85 |

| Forecasted Diluted EPS | Year Ending Dec. 31, 2014 | | Year Ending Dec. 31, 2015 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| Forecasted Non-GAAP diluted EPS (1) | $ 2.77 | $ 2.72 | $ 3.10 | $ 2.90 |
| Forecasted GAAP diluted EPS | $ 2.65 | $ 2.61 | $ 3.00 | $ 2.82 |
| Non-cash gain related to re-measurement of investment, net of tax | ($0.43) | ($0.43) | ($0.52) | ($0.52) |
| Adjustments for non-cash interest related to ASC 470, net of tax, and incremental dilutive shares covered by hedges | $ 0.55 | $ 0.54 | $ 0.62 | $ 0.60 |
| Forecasted Non-GAAP Diluted EPS | $ 2.77 | $ 2.72 | $ 3.10 | $ 2.90 |

(1) Non-GAAP net income and non-GAAP diluted EPS (along with non-GAAP weighted average diluted shares) are non-GAAP financial measures which represent net income excluding any non-cash interest related to ASC Topic 470 and non-cash non-recurring gains and charges, net of tax, and any incremental dilutive shares related to our convertible notes that are covered by their respective hedges. The Company believes these are useful financial measures in evaluating its financial condition because they are representative of only actual cash results.

(2) Based on the average closing stock price for the three month and nine month periods ended September 30, 2014 there were potential dilutive shares related to our convertible notes for GAAP purposes; however, the Company will not be responsible for issuing a portion of these shares as they are covered by our convertible notes hedges.

(3) Non-GAAP diluted shares for the nine month period ended September 30, 2014 includes a correction to the first quarter 2014 non-GAAP diluted share count by 1.2 million fewer shares related to the anti-dilutive impact of the Company's convertible notes hedges.

**EBITDA Reconciliation from Net Income**
*(in thousands)*

| | (Unaudited) Three months ended | | (Unaudited) Nine months ended | |
|---|---|---|---|---|
| | Sept. 30, 2014 | Sept. 30, 2013 | Sept. 30, 2014 | Sept. 30, 2013 |
| EBITDA (4) | $65,497 | $65,564 | $213,424 | $202,813 |
| Reconciliation of EBITDA: | | | | |
| Net Income | 33,779 | 28,997 | 128,866 | 101,902 |
| Add: Income taxes | 9,907 | 13,740 | 56,239 | 47,432 |
| Add: Net interest expense and non-cash gain related to investment in Iconix Latin America | 20,410 | 20,489 | 23,604 | 46,825 |
| Add: Depreciation and amortization of certain intangibles | 1,401 | 2,338 | 4,715 | 6,654 |
| EBITDA | $65,497 | $65,564 | $213,424 | $202,813 |

# A-1149

| EBITDA Reconciliation from Cash Flow from Operations | (Unaudited) Nine months ended | |
| --- | --- | --- |
| | Sept. 30, 2014 | Sept. 30, 2013 |
| EBITDA (4) | $ 213,424 | $ 202,813 |
| Reconciliation of EBITDA: | | |
| Net cash provided by operating activities | 124,446 | 160,218 |
| Add / (Less): | | |
| Cash interest expense, net | 35,807 | 26,980 |
| Cash taxes | 24,027 | 32,186 |
| Other | 5,516 | 6,756 |
| Net income attributable to non-controlling interest | (9,970) | (9,891) |
| Stock compensation expense | (14,726) | (12,528) |
| Provision for doubtful accounts | (5,522) | (4,724) |
| Net change in balance sheet items | 53,846 | 3,816 |
| EBITDA | $ 213,424 | $ 202,813 |

(4)   EBITDA, a non-GAAP financial measure, represents net income before income taxes, interest, other non-operating gains and losses, depreciation and amortization expenses. The Company believes EBITDA and EBITDA margin provide additional information for determining its ability to meet future debt service requirements, investing and capital expenditures, and is useful because it provides supplemental information to assist investors in evaluating the Company's financial condition. EBITDA margin represents EBITDA divided by licensing and other revenue.

## Free Cash Flow Reconciliation from Net Income

| (in thousands) | (Unaudited) Three months ended | | (Unaudited) Nine months ended | |
| --- | --- | --- | --- | --- |
| | Sept. 30, 2014 | Sept. 30, 2013 | Sept. 30, 2014 | Sept. 30, 2013 |
| Free Cash Flow (5) | $ 61,784 | $ 54,312 | $ 179,781 | $ 166,982 |
| Reconciliation of Free Cash Flow: | | | | |
| Net Income | 33,779 | 28,997 | 128,866 | 101,902 |
| Add/(Less): | | | | |
| Depreciation and amortization of intangibles | 1,401 | 2,338 | 4,715 | 6,654 |
| Amortization of convertible note | 7,613 | 7,168 | 22,041 | 17,705 |
| Amortization of finance fees | 1,286 | 1,171 | 3,997 | 2,898 |
| Non-cash compensation expense | 6,379 | 4,597 | 14,552 | 12,528 |
| Provision for doubtful accounts | 3,577 | 2,618 | 5,522 | 4,724 |
| Non-cash income taxes | 7,834 | 7,817 | 38,682 | 21,183 |
| Non-cash gain related to investment in Iconix Latin America | — | — | (37,893) | — |
| Other | 150 | — | 385 | 450 |
| Subtotal | 28,240 | 25,709 | 52,001 | 66,142 |
| Less: Capital expenditures | (235) | (394) | (1,086) | (1,062) |
| Free Cash Flow | $ 61,784 | $ 54,312 | $ 179,781 | $ 166,982 |

# A-1150

| Free Cash Flow Reconciliation from Cash Flow from Operations | (Unaudited) Nine months ended | |
|---|---|---|
| | Sept. 30, 2014 | Sept. 30, 2013 |
| Free Cash Flow (5) | $ 179,781 | $ 166,982 |
| | | |
| Reconciliation of Free Cash Flow: | | |
| Net cash provided by operating activities | 124,446 | 160,218 |
| Add / (Less): | | |
| Non-cash deferred tax items | 6,469 | 5,937 |
| Net income attributable to non-controlling interest | (9,970) | (9,891) |
| Gain on sale of securities | 125 | 5,395 |
| Capital expenditures | (1,086) | (1,046) |
| Other | 5,951 | 2,553 |
| Net change in balance sheet items | 53,846 | 3,816 |
| Free Cash Flow | $ 179,781 | $ 166,982 |

# A-1151

| Forecasted Free Cash Flow | Year Ending Dec. 31, 2014 | | Year Ending Dec. 31, 2015 | |
|---|---|---|---|---|
| | High | Low | High | Low |
| Free Cash Flow | $220,000 | $215,000 | $230,000 | $220,000 |
| Reconciliation of Free Cash Flow: | | | | |
| Net income | 154,000 | 148,000 | 166,000 | 156,000 |
| Add: | | | | |
| Depreciation and amortization of intangibles | 5,000 | 5,000 | 5,800 | 5,800 |
| Amortization of convertible note | 29,500 | 29,500 | 31,500 | 31,500 |
| Amortization of finance fees | 5,000 | 5,000 | 4,700 | 4,700 |
| Non-cash compensation expense | 18,500 | 18,500 | 20,000 | 16,000 |
| Bad debt expense | 4,000 | 3,500 | 2,000 | 4,000 |
| Non-cash income taxes | 45,000 | 45,000 | 46,000 | 47,000 |
| Non-cash non-recurring gain | (38,000) | (38,000) | (44,000) | (44,000) |
| Other | 1,000 | 1,000 | — | — |
| subtotal | 68,000 | 67,000 | 67,000 | 66,000 |
| Less: Capital expenditures | (2,000) | (2,000) | (2,000) | (1,000) |
| Free Cash Flow | $222,000 | $215,000 | $230,000 | $220,000 |

(5) Free Cash Flow, a non-GAAP financial measure, represents net income before depreciation, amortization, non-cash compensation expense, bad debt expense, net equity earnings from certain joint ventures, non-cash income taxes, non-cash interest related to convertible debt, non-cash non-recurring gains and charges, less capital expenditures. Free Cash Flow excludes any changes in Balance Sheet items, mandatory debt service requirements and other non-discretionary expenditures. Free Cash Flow should not be considered in isolation, as a measure of residual cash flow available for discretionary purposes, or as an alternative to operating results presented in accordance with GAAP. The Company believes Free Cash Flow is useful because it provides supplemental information to assist investors in evaluating the Company's financial condition.