# 23-7566

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL COLE, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT
VOLUME V OF VII
(Pages A-1152 to A-1408)**

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
BRONWYN C. ROANTREE
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

## TABLE OF CONTENTS

PAGE

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Indictment, filed December 4, 2019 (Dkt. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . A-41

Excerpts of First Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-78

Government Memorandum of Law in Opposition to Defendant's
    Motions *in Limine* and Renewed Motion for Rule 17(c)
    Subpoenas, filed October 17, 2022 (Dkt. 226) . . . . . . . . . . . . . . . . . . . . A-493

Government's Requests to Charge,
    filed October 20, 2022 (Dkt. 230) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-566

Letter from U.S. Attorney's Office to the
    Honorable Edgardo Ramos,
    dated October 26, 2022 (Dkt. 238) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-626

Letter from David Oscar Markus to the Honorable Edgardo Ramos
    re Ethan Cole, dated November 18, 2022 (Dkt. 247) (with
    attached email from Edward Y. Kim to David Oscar Markus) . . . . . A-630

Excerpts of Final Pre-Trial Conference Transcript,
    dated October 27, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-632

Excerpts of Second Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-648

### Government Exhibits

GX 104      Iconix Brand Group, Inc. Form 8-K,
            dated October 24, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1139

GX 105      Iconix Brand Group, Inc. Form 10-Q for the Quarterly
            Period Ended September 30, 2014 . . . . . . . . . . . . . . . . . . A-1152

ii

PAGE

GX 207      Consultancy Agreement between Iconix Brand Group, Inc. and LF Centennial Limited, dated September 30, 2013 ................................................ A-1190

GX 210      Letter Agreement between Iconix Brand Group, Inc. and LF Asia Limited, dated June 30, 2014 ............ A-1195

GX 212      Letter Agreement between Iconix Brand Group, Inc. et al. and Global Brands Group Asia Limited, dated September 17, 2014 ................................. A-1199

GX 1044      Email from Mark J. Stevens to Nicholas C.A. Cook et al., dated June 25, 2014 ............................ A-1205

GX 1058      Email from Neil Cole to Seth Horowitz, dated August 14, 2014 ......................................... A-1405

GX 1068      Email from Ethan Cole to Jared Margolis, dated August 28, 2014 .................................... A-1407

GX 1091      Email from Lauren Gee to Robert Smits, dated September 11, 2014 .................................. A-1409

GX 1098      Email from John Reda to David Maslaton, dated September 26, 2014 .................................. A-1547

GX 1111      Email from Ethan Cole to Seth Horowitz, dated October 2, 2014 ...................................... A-1551

GX 1139      Email from Ethan Cole to Jared Margolis, dated December 1, 2014 .................................. A-1555

GX 1197      Email from Seth Horowitz to Neil Cole, dated April 13, 2015 ........................................ A-1557

GX 1255      Undated notes ...................................... A-1560

GX 1255-B      Metadata associated with GX 1255 ................. A-1561

GX 1335      Government summary exhibit, "Document Timeline" . A-1562

iii

PAGE

**Defense Exhibits**

DX 0303-A1    Iconix SE Asia Limited First Amended and Restated
              Shareholders Agreement ........................... A-1691

DX 0303-A2    Letter Agreement between Iconix Brand Group, Inc.
              and LF Asia Limited, dated June 30, 2014 ........... A-1733

DX 0304-A2    Letter Agreement between Iconix Brand Group, Inc.
              et al. and Global Brands Group Asia Limited,
              dated September 17, 2014 ......................... A-1737

DX 0304-A3    Iconix SE Asia Limited Second Amended
              and Restated Shareholders Agreement................ A-1743

DX 0558       FASB Accounting Standards Codification
              605-50-45 ........................................ A-1790

DX 1140-U     Email from Neil Cole to Ericka Alford,
              dated September 30, 2013 ......................... A-1792

DX 2334       Stipulation re Jason Rabin, dated October 26, 2021 ... A-1793

DX 3517-003   Notes re Ethan Cole attorney proffer,
              dated July 22, 2019 (not admitted at trial) ............ A-1795

DX 3517-004   Federal Bureau of Investigation FD-302 re Ethan Cole
              interview on July 29, 2019 (not admitted at trial) ..... A-1797

DX 3517-010   Notes re Ethan Cole, dated September 22, 2021
              (not admitted at trial) .............................. A-1807

DX 3517-012   Notes re Ethan Cole, dated October 12, 2022
              (not admitted at trial) .............................. A-1809

DX 3539-083   Federal Bureau of Investigation FD-302 re Seth
              Horowitz interview on February 11, 2020
              (not admitted at trial) .............................. A-1810

iv

PAGE

Excerpts of Sentencing Transcript, dated October 10, 2023 . . . . . . . . . . . A-1814

Notice of Appeal, dated October 27, 2023 (COA Dkt. 1) . . . . . . . . . . . . . A-1819

A-1152

## United States
## Securities and Exchange Commission
### Washington, D.C. 20549

## FORM 10-Q

☒ **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the Quarterly Period Ended September 30, 2014**

**OR**

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the Transition Period From _____ to _____.**

**Commission file number 0-10593**

# ICONIX BRAND GROUP, INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **11-2481903** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1450 Broadway, New York, NY** | **10018** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(212) 730-0030**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes ☐ No ☒

Indicate the number of shares outstanding of each of the issuer's classes of Common Stock, as of the latest practicable date.

Common Stock, $.001 Par Value – 47,975,556 shares as of November 4, 2014.

GOVERNMENT EXHIBIT
105
19 Cr. 869 (ER)

# A-1153

Part I. Financial Information

Item 1. Financial Statements

**Iconix Brand Group, Inc. and Subsidiaries**
Condensed Consolidated Balance Sheets
(in thousands, except par value)

| | September 30, 2014 (unaudited) | December 31, 2013 |
|---|---|---|
| **Assets** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 129,527 | $ 278,789 |
| Restricted cash – current | 48,688 | 58,858 |
| Accounts receivable, net | 131,802 | 90,777 |
| Deferred income tax assets | 6,560 | 4,160 |
| Other assets – current | 53,343 | 48,008 |
| Total Current Assets | 369,920 | 480,592 |
| Property and equipment: | | |
| Furniture, fixtures and equipment | 22,320 | 21,197 |
| Less: Accumulated depreciation | (14,508) | (12,360) |
| | 7,812 | 8,837 |
| Other Assets: | | |
| Other assets | 52,220 | 23,630 |
| Trademarks and other intangibles, net | 2,028,623 | 1,955,644 |
| Deferred financing costs, net | 21,105 | 25,103 |
| Investments and joint ventures | 136,698 | 139,376 |
| Goodwill | 231,855 | 230,976 |
| | 2,470,501 | 2,374,729 |
| Total Assets | $ 2,848,233 | $ 2,864,158 |
| **Liabilities, Redeemable Non-Controlling Interest and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 38,605 | $ 30,482 |
| Deferred revenue | 30,760 | 29,126 |
| Current portion of long-term debt | 61,123 | 61,250 |
| Other liabilities – current | 12,120 | 10,964 |
| Total current liabilities | 142,608 | 131,822 |
| Deferred income tax liability | 303,172 | 260,605 |
| Long-term debt, less current maturities | 1,340,660 | 1,366,069 |
| Deferred revenue, net of current portion | — | 724 |
| Other liabilities | 12,310 | 2,996 |
| Total Liabilities | 1,798,750 | 1,762,216 |
| Redeemable Non-Controlling Interest | 14,045 | — |
| Commitments and contingencies | | |
| Stockholders' Equity | | |
| Common stock, $.001 par value shares authorized 150,000; shares issued 78,102 and 77,048, respectively | 78 | 77 |
| Additional paid-in capital | 929,606 | 910,145 |
| Retained earnings | 786,743 | 657,877 |
| Accumulated other comprehensive income (loss) | (12,608) | 16,486 |
| Less: Treasury stock – 30,619 and 25,920 shares at cost, respectively | (785,414) | (599,816) |
| Total Iconix Brand Group, Inc. Stockholders' Equity | 918,405 | 984,769 |
| Non-controlling interest | 117,033 | 117,173 |
| Total Stockholders' Equity | 1,035,438 | 1,101,942 |
| Total Liabilities, Redeemable Non-Controlling Interest,and Stockholders' Equity | $ 2,848,233 | $ 2,864,158 |

See Notes to Unaudited Condensed Consolidated Financial Statements.

2

# A-1154

---

Unaudited Condensed Consolidated Income Statements
(in thousands, except earnings per share data)

**Iconix Brand Group, Inc. and Subsidiaries**
**Unaudited Condensed Consolidated Statements of Income**
**(in thousands, except earnings per share data)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2014 | 2013 |
| Licensing and other revenue | $ 113,750 | $ 107,175 | $ 348,831 | $ 327,362 |
| Selling, general and administrative expenses | 50,190 | 45,705 | 142,685 | 128,142 |
| Operating income | 63,560 | 61,470 | 206,146 | 199,220 |
| Other (income) expenses: | | | | |
| Interest expense | 21,130 | 21,230 | 63,533 | 54,522 |
| Interest and other income | (605) | (616) | (39,581) | (6,939) |
| Equity earnings on joint ventures | (4,084) | (3,388) | (12,881) | (7,588) |
| Other expenses – net | 16,441 | 17,226 | 11,071 | 39,995 |
| Income before income taxes | 47,119 | 44,244 | 195,075 | 159,225 |
| Provision for income taxes | 9,907 | 13,740 | 56,239 | 47,432 |
| Net income | $ 37,212 | $ 30,504 | $ 138,836 | $ 111,793 |
| Less: Net income attributable to non-controlling interest | $ 3,433 | $ 1,507 | $ 9,970 | $ 9,891 |
| Net income attributable to Iconix Brand Group, Inc. | $ 33,779 | $ 28,997 | $ 128,866 | $ 101,902 |
| Earnings per share: | | | | |
| Basic | $ 0.70 | $ 0.54 | $ 2.65 | $ 1.76 |
| Diluted | $ 0.58 | $ 0.50 | $ 2.21 | $ 1.67 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 47,991 | 53,325 | 48,682 | 57,966 |
| Diluted | 58,457 | 57,805 | 58,306 | 61,150 |

See Notes to Unaudited Condensed Consolidated Financial Statements.

3

# A-1155

**Iconix Brand Group, Inc. and Subsidiaries**
**Unaudited Condensed Consolidated Statements of Comprehensive Income**
**(in thousands)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2014 | 2013 |
| Net income | $ 37,212 | $ 30,504 | $ 138,836 | $ 111,793 |
| Other comprehensive income: | | | | |
| Foreign currency translation | (26,524) | 12,200 | (29,144) | 5,005 |
| Unrealized gain on investments | 50 | — | 50 | — |
| Total other comprehensive income | (26,474) | 12,200 | (29,094) | 5,005 |
| Comprehensive income | $ 10,738 | $ 42,704 | $ 109,742 | $ 116,798 |
| Less: comprehensive income attributable to non-controlling interest | (3,433) | (1,507) | (9,970) | (9,891) |
| Comprehensive income attributable to Iconix Brand Group, Inc. | $ 7,305 | $ 41,197 | $ 99,772 | $ 106,907 |

See Notes to Unaudited Condensed Consolidated Financial Statements.

4

**Iconix Brand Group, Inc. and Subsidiaries**

Unaudited Condensed Consolidated Statement of Stockholders' Equity

Nine Months Ended September 30, 2014
(in thousands)

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Treasury Stock | Non-Controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| Balance at January 1, 2014 | 77,048 | $ 77 | $ 910,145 | $657,877 | $ 16,486 | $(599,816) | $ 117,173 | $1,101,942 |
| Shares issued on exercise of stock options and warrants | 302 | — | 3,792 | — | — | — | — | 3,792 |
| Shares issued on vesting of restricted stock | 752 | 1 | — | — | — | — | — | 1 |
| Tax benefit of stock option exercises | — | — | 1,480 | — | — | — | — | 1,480 |
| Compensation expense in connection with restricted stock and stock options | — | — | 14,726 | — | — | — | — | 14,726 |
| Shares repurchased on the open market | — | — | — | — | — | (171,627) | — | (171,627) |
| Cost of shares repurchased on vesting of restricted stock and exercise of stock options | — | — | — | — | — | (13,971) | — | (13,971) |
| Change in redemption value of redeemable non-controlling interest | — | — | (537) | — | — | — | — | (537) |
| Net income | — | — | — | 128,866 | — | — | 9,970 | 138,836 |
| Foreign currency translation | — | — | — | — | (29,144) | — | — | (29,144) |
| Distributions to non-controlling interest holders | — | — | — | — | — | — | (10,110) | (10,110) |
| Unrealized Gain on Investments | — | — | — | — | 50 | — | — | 50 |
| Balance at September 30, 2014 | 78,102 | $ 78 | $ 929,606 | $786,743 | $ (12,608) | $(785,414) | $ 117,033 | $1,035,438 |

See Notes to Unaudited Condensed Consolidated Financial Statements.

5

# A-1157

**Iconix Brand Group, Inc. and Subsidiaries**

Unaudited Condensed Consolidated Statements of Cash Flows
(in thousands)

| | Nine Months Ended September 30, 2014 | Nine Months Ended September 30, 2013 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net income | $ 138,836 | $ 111,793 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation of property and equipment | 2,154 | 1,897 |
| Amortization of trademarks and other intangibles | 3,392 | 5,765 |
| Amortization of deferred financing costs | 3,997 | 2,898 |
| Amortization of convertible note discount | 22,041 | 17,705 |
| Stock-based compensation expense | 14,726 | 12,528 |
| Non-cash gain on re-measurement of equity investment | (37,893) | — |
| Provision for doubtful accounts | 5,530 | 4,968 |
| Earnings on equity investments in joint ventures | (12,881) | (7,588) |
| Distributions from equity investments | 6,303 | 4,217 |
| Gain on sale of securities | (125) | (5,395) |
| Gain on sale of trademarks | (44,895) | (17,809) |
| Deferred income tax provision | 32,212 | 15,246 |
| Changes in operating assets and liabilities, net of business acquisitions: | | |
| Accounts receivable | (35,530) | (8,186) |
| Other assets – current | 31,325 | (639) |
| Other assets | (30,034) | 942 |
| Deferred revenue | 216 | 13,722 |
| Accounts payable, accrued expenses and other liabilities | 25,072 | 8,154 |
| Net cash provided by operating activities | 124,446 | 160,218 |
| | | |
| Cash flows used in investing activities: | | |
| Purchases of property and equipment | (1,086) | (1,046) |
| Acquisition of interest in IPH Unltd | — | (45,000) |
| Acquisition of interest in Buffalo | — | (76,500) |
| Acquisition of Lee Cooper | — | (66,667) |
| Acquisition of interest in Complex Media | — | (25,120) |
| Acquisition of interest in Mary Media | — | (32,000) |
| Acquisition of trademarks of Rocawear diffusion brand | — | (8,000) |
| Proceeds from sale of securities | 720 | 5,395 |
| Acquisition of interest in Iconix Latin America | (42,000) | — |
| Proceeds from sale of trademarks | 14,730 | 23,361 |
| Additional investments in joint ventures | (2,500) | (373) |
| Additions to trademarks | (790) | (344) |
| Purchase of securities | (5,998) | — |
| Net cash used in investing activities | (36,924) | (226,294) |
| | | |
| Cash flows (used in) provided by financing activities: | | |
| Shares repurchased on the open market | (168,168) | (406,333) |
| Proceeds from long-term debt | — | 662,188 |
| Proceeds from sale of warrants | — | 57,707 |
| Payment for purchase of convertible note hedge | — | (84,106) |
| Payment of long-term debt | (47,574) | (79,800) |
| Deferred financing costs | — | (3,839) |
| Acquisition of interest in MG Icon | — | (3,000) |
| Distributions to non-controlling interest holders | (10,110) | (4,440) |
| Excess tax benefit from share-based payment arrangements | 1,480 | — |
| Shares repurchased on vesting of restricted stock and exercise of stock options | (13,696) | (2,737) |
| Proceeds from exercise of stock options and warrants | 3,512 | 328 |
| Restricted cash – current | 1,708 | (29,998) |
| Net cash provided by (used in) financing activities | (232,848) | 105,970 |
| | | |
| Effect of exchange rate changes on cash | (3,936) | 807 |
| Net increase (decrease) in cash and cash equivalents | (149,262) | 40,701 |
| Cash and cash equivalents, beginning of period | 278,789 | 238,672 |
| Cash and cash equivalents, end of period | $ 129,527 | $ 279,373 |

6

**Supplemental disclosure of cash flow information:**

| (in thousands) | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | | 2013 | |
| Cash paid during the period: | | | | |
| Income taxes | $ | 3,508 | $ | 16,478 |
| Interest | $ | 36,051 | $ | 27,439 |
| | | | | |
| Non-cash investing activities: | | | | |
| Sale of trademarks for note receivable | $ | 39,339 | $ | 8,919 |
| | | | | |
| Non-cash financing activities: | | | | |
| Shares repurchased on the open market included in payables | $ | 3,459 | $ | — |

See Notes to Unaudited Condensed Consolidated Financial Statements.

7

**Iconix Brand Group, Inc. and Subsidiaries**

Notes to Unaudited Condensed Consolidated Financial Statements
September 30, 2014
(dollars are in thousands (unless otherwise noted) except per share data)

## 1. Basis of Presentation

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management of Iconix Brand Group, Inc. (the "Company", "we", "us", or "our"), all adjustments (consisting primarily of normal recurring accruals) considered necessary for a fair presentation have been included. Operating results for the three months ("Current Quarter") and the nine months ("Current Nine Months") ended September 30, 2014 are not necessarily indicative of the results that may be expected for a full fiscal year.

Certain prior period amounts have been reclassified to conform to the current period's presentation.

For further information, refer to the consolidated financial statements and footnotes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2013 ("FY 2013").

## 2. Trademarks and Other Intangibles, net

Trademarks and other intangibles, net consist of the following:

| (000's omitted) | Estimated Lives in Years | September 30, 2014 | | December 31, 2013 | |
| --- | --- | --- | --- | --- | --- |
| | | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Indefinite life trademarks and copyrights | Indefinite | $2,015,256 | $ — | $1,939,534 | $ — |
| Definite life trademarks | 10-15 | 19,628 | 10,622 | 19,622 | 9,531 |
| Non-compete agreements | 2-15 | 940 | 392 | 940 | 215 |
| Licensing contracts | 1-9 | 24,440 | 20,627 | 23,979 | 18,685 |
| | | $2,060,264 | $ 31,641 | $1,984,075 | $ 28,431 |
| Trademarks and other intangibles, net | | | $ 2,028,623 | | $ 1,955,644 |

In September 2014, the Company contributed certain trademarks in China to its Iconix Southeast Asia joint venture, thereby decreasing indefinite-lived trademarks by approximately $5.2 million.

In June 2014, the Company contributed certain trademarks in Korea, Europe and Turkey to its Iconix Southeast Asia joint venture, thereby decreasing indefinite-lived trademarks by approximately $3.6 million. Also in June 2014, the Company sold the exclusive right to use the "sharperimage.com" domain name and Sharper Image trademark in connection with the operation of a branded website and catalog distribution in specified jurisdictions, thereby decreasing indefinite-lived trademarks by approximately $2.2 million.

In February 2014, the Company acquired the 50% interest in Iconix Latin America held by its joint venture partner, thereby increasing its ownership in Iconix Latin America to 100%. As a result of this transaction, Iconix Latin America is now consolidated with the Company, which increased the Company's indefinite life trademarks by $82.4 million. In January 2014, the Company acquired a 1% interest in Iconix Europe, thereby increasing its ownership in Iconix Europe to 51%. As a result of this transaction, Iconix Europe is now consolidated with the Company, which increased the Company's indefinite life trademarks by $27.0 million. See Note 3 for further explanation of these transactions.

Amortization expense for intangible assets for the Current Quarter and for the three months ended September 30, 2013 (the "Prior Year Quarter") was $0.9 million and $2.0 million, respectively. Amortization expense for intangible assets for the Current Nine Months and for the nine months ended September 30, 2013 (the "Prior Year Nine Months") was $3.4 million and $5.8 million, respectively.

The trademarks of Candie's, Bongo, Joe Boxer, Rampage, Mudd, London Fog, Mossimo, Ocean Pacific, Danskin, Rocawear, Cannon, Royal Velvet, Fieldcrest, Charisma, Starter, Waverly, Ecko, Zoo York, Peanuts, Ed Hardy, Sharper Image, Umbro, Modern Amusement, Buffalo and Lee Cooper have been determined to have an indefinite useful life and accordingly, consistent with ASC Topic 350, no amortization has been recorded in the Company's unaudited condensed consolidated income statements. Instead, each of these intangible assets are tested for impairment annually and as needed on an individual basis as separate single units of accounting, with any related impairment charge recorded to the statement of operations at the time of determining such impairment. The annual evaluation of the Company's indefinite-lived trademarks is performed as of October 1, the beginning of the Company's fourth fiscal quarter. Consistent with ASC Topic 350, there was no impairment of the indefinite-lived trademarks during the Current Nine Months or the Prior Year Nine Months. Further, as it relates to the Company's definite-lived trademarks, and consistent with ASC Topic 360, there was no impairment of the definite-lived trademarks during the Current Nine Months or the Prior Year Nine Months.

8

**3. Acquisitions, Investments and Joint Ventures**

_Acquisitions_

_Iconix Latin America_

In December 2008, the Company contributed substantially all rights to its brands in Mexico, Central America, South America, and the Caribbean (the "Latin America Territory") to Iconix Latin America LLC ("Iconix Latin America"), a then newly formed subsidiary of the Company. On December 29, 2008, New Brands America LLC ("New Brands"), an affiliate of the Falic Group, purchased a 50% interest in Iconix Latin America. In consideration for its 50% interest in Iconix Latin America, New Brands agreed to pay $6.0 million to the Company. New Brands paid $1.0 million upon closing of this transaction and committed to pay an additional $5.0 million over the 30-month period following closing. As of December 31, 2011 this obligation was paid in full.

During FY 2011, the Company contributed to Iconix Latin America its share of the rights to revenues from IPH Unltd (see below) for the exploitation of the Ecko brands in the Latin America Territory. Also in FY 2011, the Company contributed to Iconix Latin America its rights to the Ed Hardy brands for the Latin America Territory. During FY 2012, the Company contributed to Iconix Latin America the rights to the Zoo York and Sharper Image brands for the Latin America Territory. In consideration for these contributions, New Brands agreed to pay an aggregate of approximately $5.7 million to the Company. As of December 31, 2013, the balance owed to the Company under this obligation was approximately $1.7 million, $1.2 million of which was included in other assets – current and $0.5 million of which is included in other assets on the Company's consolidated balance sheet. The Company had recorded the consideration associated with these transactions as other liabilities, which was to be recognized over a period of three years.

Prior to the 2014 Buy-out (defined below), based on the corporate structure, voting rights and contributions of the Company and New Brands, Iconix Latin America was not subject to consolidation. This conclusion was based on the Company's determination that the entity met the criteria to be considered a "business", and therefore was not subject to consolidation due to the "business scope exception" of ASC Topic 810. As such, prior to the 2014 Buy-out, the Company had recorded its investment under the equity method of accounting.

In February 2014, the Company purchased from New Brands its 50% interest in Iconix Latin America for $42.0 million, which was funded entirely from cash on hand (the "2014 Buy-out"), thereby taking full ownership of 100% of the equity interests in Iconix Latin America. The following is a reconciliation of cash paid to New Brands:

_(000's omitted)_

| | |
|---|---|
| Fair value of 50% interest in Iconix Latin America | $42,698 |
| Less: note receivable owed to the Company | (1,695) |
| Add: accrued distributions due to New Brands | 997 |
| Cash paid to New Brands | $42,000 |

As a result of the 2014 Buy-out and in accordance with ASC Topic 805, the Company recorded a non-cash pre-tax re-measurement gain of approximately $37.9 million, representing the increase in fair value of its original 50% investment in Iconix Latin America. This re-measurement gain is included in interest and other income on the Company's unaudited condensed consolidated income statement in the Current Nine Months. Further, as a result of the 2014 Buy-out, the balance owed to the Company from New Brands was settled. As a result of the 2014 Buy-out, Iconix Latin America is subject to consolidation and is included in the Company's unaudited condensed consolidated financial statements at September 30, 2014.

The estimated fair value of the assets acquired, less liabilities assumed, is allocated as follows:

| | |
|---|---|
| Fair value of 50% interest in Iconix Latin America | $42,698 |
| Value of initial equity investment prior to 2014 Buy-out | 4,805 |
| Gain on re-measurement of initial equity investment | 37,893 |
| | $85,396 |
| Trademarks | 82,400 |
| License agreements | 700 |
| Cash | 1,842 |
| Net working deficit, excluding cash | (676) |
| Goodwill | 1,130 |
| | $85,396 |

The Iconix Latin America trademarks have been determined by management to have an indefinite useful life and accordingly, consistent with ASC Topic 350, no amortization is being recorded in the Company's consolidated income statements. The goodwill and trademarks are subject to a test for impairment on an annual basis. The $1.1 million of goodwill resulting from the 2014 Buy-out is deductible for income tax purposes.

9

As of September 30, 2014, the impact of consolidating Iconix Latin America on the Company's unaudited consolidated balance sheet has increased current assets by $9.2 million, non-current assets by $84.3 million, current liabilities by $1.6 million and total liabilities by $1.6 million. For the Current Nine Months, the impact of consolidating Iconix Latin America on the Company's consolidated income statement has increased licensing and other revenue by $5.4 million and operating income by $4.6 million.

### Lee Cooper

In February 2013, the Company, through its wholly-owned subsidiary Iconix Luxembourg Holdings SÀRL, acquired the Lee Cooper brand for approximately $72.7 million, of which the Company paid $66.7 million in cash (funded entirely from cash on hand) and assumed liabilities of approximately $6.0 million. Founded in 1908, Lee Cooper is an iconic British denim brand that has expanded into multiple lifestyle categories including men's and women's casual wear, footwear and accessories.

### *Joint Ventures*

### *Iconix Europe*

In December 2009, the Company contributed substantially all rights to its brands in the European Territory (defined as all member states and candidate states of the European Union and certain other European countries) to Iconix Europe LLC, a then newly formed wholly-owned subsidiary of the Company ("Iconix Europe"). Also in December 2009 and shortly after the formation of Iconix Europe, an investment group led by The Licensing Company and Albion Equity Partners LLC purchased a 50% interest in Iconix Europe through Brand Investments Vehicles Group 3 Limited ("BIV"), to assist the Company in developing, exploiting, marketing and licensing the Company's brands in the European Territory. In consideration for its 50% interest in Iconix Europe, BIV agreed to pay $4.0 million, of which $3.0 million was paid upon closing of this transaction in December 2009 and the remaining $1.0 million of which was paid in January 2011. As a result of this transaction, the Company recognized a gain of approximately $7.0 million for 2009 which is included in licensing and other revenue on the consolidated income statement in 2009. Pursuant to the terms of the Iconix Europe operating agreement and subject to certain conditions, the Company was entitled to recognize a preferred profit distribution from Iconix Europe of at least $6.0 million, after which all profits and losses are recognized 50/50 in accordance with each principal's membership interest percentage.

At inception and prior to the January 2014 transaction described below, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and BIV, that Iconix Europe is not a variable interest entity and was not subject to consolidation. The Company had recorded its investment under the equity method of accounting.

In January 2014, the Company consented to the purchase of BIV's 50% ownership interest in Iconix Europe by LF Asia Limited ("LF Asia"), an affiliate of Li & Fung Limited. In exchange for this consent, the Company received $1.5 million from LF Asia. As a result of this transaction, the Company recorded a gain of $1.5 million, which is included in licensing and other revenue in the Company's unaudited condensed consolidated income statement for the Current Nine Months. In addition, the Company acquired an additional 1% equity interest in Iconix Europe from LF Asia, and amended the operating agreement (herein referred to as the "IE Operating Agreement") thereby increasing its ownership in Iconix Europe to a controlling 51% interest and reducing its preferred profit distribution from Iconix Europe to $3.0 million after which all profits and losses are recognized 51/49 in accordance with each principal's membership interest percentage.

The estimated fair value of the assets acquired, less liabilities assumed, is allocated as follows:

| | |
|---|---|
| Fair value of 50% interest in Iconix Europe | $13,800 |
| Value of initial equity investment prior to this transaction | 13,800 |
| Gain on re-measurement of initial equity investment | — |
| | $27,600 |
| Trademarks | 27,000 |
| Cash | 677 |
| Net working deficit, excluding cash | (77) |
| | $27,600 |

ASC Topic 810 affirms that consolidation is appropriate when one entity has a controlling financial interest in another entity. As a result of this transaction, the Company owns a 51% membership interest in Iconix Europe compared to the minority owner's 49% membership interest. Further, the Company believes that the voting and veto rights of the minority shareholder are merely protective in nature and do not provide the minority shareholder with substantive participating rights in Iconix Europe. As such, Iconix Europe is subject to consolidation with the Company, which is reflected in the unaudited condensed consolidated financial statements as of September 30, 2014.

10

In accordance with ASC Topic 810, the Company recognizes the non-controlling interest of Iconix Europe as equity in consolidated financial statements and separate from the parent's equity. As such, the amount of net income attributable to the non-controlling interest of Iconix Europe for the Current Quarter and Current Nine Months has been included in net income attributable to non-controlling interest in the unaudited condensed consolidated income statement.

Pursuant to the IE Operating Agreement, for a period following the fifth anniversary of the closing of this transaction (i.e. January 2014) and again following the eighth anniversary of the closing of this transaction, the Company has a call option to purchase, and LF Asia has a put option to initiate the Company's purchase of LF Asia's 49% equity interests in Iconix Europe for a calculated amount as defined in the IE Operating Agreement. As a result of the January 2014 transaction, the Company will carry this redeemable non-controlling interest as mezzanine equity on the Company's unaudited condensed consolidated balance sheet. The Company will accrete the difference between the fair value of the put option and the non-controlling interest at inception over the five year term of the first put option to additional paid-in-capital on the Company's balance sheet.

As of September 30, 2014, the impact of consolidating Iconix Europe on the Company's unaudited consolidated balance sheet has increased current assets by $2.0 million, non-current assets by $27.0 million, current liabilities by $0.9 million and total liabilities by $0.9 million. For the Current Nine Months, the impact of consolidating Iconix Europe on the Company's consolidated income statement has increased licensing and other revenue by $2.0 million and operating income by $0.1 million.

### *LC Partners U.S.*

In March 2014, the Company, through its wholly-owned subsidiary domiciled in Luxembourg, contributed its rights to the Lee Cooper trademarks in the U.S. through a royalty-free perpetual master license agreement to LC Partners U.S. LLC ("LCP"), a then newly formed wholly-owned Delaware limited liability company. Subsequent to this contribution, the Company sold 50% of the equity interests in LCP to Rise Partners LLC ("Rise Partners") for $4.0 million, of which $0.8 million was received during the Current Nine Months, with the remaining $3.2 million to be paid in four equal annual installments on the first through the fourth anniversaries of the closing date. As of September 30, 2014, $0.8 million of the $3.2 million is included in other assets – current, with the remaining $2.4 million included in other assets in the unaudited condensed consolidated balance sheet. As a result of this transaction the Company recorded a $4.0 million gain, which is included in licensing and other revenue in the unaudited condensed consolidated income statement in the Current Nine Months.

At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and Rise Partners, that LCP is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting.

### *Buffalo Brand Joint Venture*

In February 2013, Iconix CA Holdings, LLC ("ICA Holdings"), a Delaware limited liability company and a wholly-owned subsidiary of the Company, formed a joint venture with Buffalo International ULC ("BII"). The name of the joint venture is 1724982 Alberta ULC ("Alberta ULC"), an Alberta, Canada unlimited liability company. The Company, through ICA Holdings, paid $76.5 million, which was funded entirely from cash on hand, in exchange for a 51% controlling ownership of Alberta ULC which consists of a combination of equity and a promissory note. BII owns the remaining 49% interest in Alberta ULC. Alberta ULC owns the intellectual property rights, licenses and other assets relating principally to the Buffalo David Bitton brand (the "Buffalo brand"). Concurrently, Alberta ULC and BII entered into a license agreement pursuant to which Alberta ULC licensed the Buffalo brand to BII as licensee in certain categories and geographies. Additionally, ICA Holdings and BII entered into a shareholder agreement with respect to their ownership of Alberta ULC.

The following table is a reconciliation of cash paid to sellers and the fair value of the sellers' non-controlling interest:

| | |
|---|---|
| Cash paid to sellers | $ 76,500 |
| Fair value of 49% non-controlling interest to sellers | 59,489 |
| | $135,989 |

The fair value of the assets acquired is allocated as follows:

| | |
|---|---|
| Trademarks | $142,600 |
| License agreements | 2,400 |
| Non-compete agreement | 940 |
| Goodwill | 4,060 |
| Deferred tax liability | (14,011) |
| | $135,989 |

11

ASC Topic 810 affirms that consolidation is appropriate when one entity has a controlling financial interest in another entity. The Company owns a 51% membership interest in Alberta ULC compared to the minority owner's 49% membership interest. Further, the Company believes that the voting and veto rights of the minority shareholder are merely protective in nature and do not provide the minority shareholder with substantive participating rights in Alberta ULC. As such, Alberta ULC is subject to consolidation with the Company, which is reflected in the unaudited condensed consolidated financial statements.

In accordance with ASC Topic 810, the Company recognizes the non-controlling interest of Alberta ULC as equity in the unaudited condensed consolidated financial statements and separate from the parent's equity. As such, the amount of net income attributable to the non-controlling interest has been included in net income attributable to non-controlling interest in the unaudited condensed consolidated income statement for the Current Quarter.

### Iconix Israel Joint Venture

In November 2013, the Company contributed substantially all rights to its wholly-owned and controlled brands in the State of Israel and the geographical regions of the West Bank and the Gaza Strip (together, the "Israel Territory") to Iconix Israel LLC ("Iconix Israel"), a then newly formed subsidiary of the Company through an exclusive, royalty-free perpetual master license agreement with Iconix Israel. Shortly thereafter, M.G.S. Sports Trading Limited ("MGS") purchased a 50% interest in Iconix Israel for approximately $3.3 million. MGS paid $1.0 million upon the closing of the transaction and committed to pay an additional $2.3 million over the 36-month period following closing. As a result of this transaction, the Company recorded a gain of $2.3 million at the closing, which was included in licensing and other revenue in FY 2013. As of September 30, 2014, of the $1.8 million remaining due to the Company from MGS, approximately $0.8 million is included in other assets – current and $1.0 million is included in other assets on the unaudited condensed consolidated balance sheet.

Pursuant to the Iconix Israel amended and restated operating agreement, for a period following the second anniversary of the closing of this transaction (i.e. November 2013), the Company has a call option to purchase from MGS 5% of the equity interests held by MGS in Iconix Israel for a calculated amount as defined in the amended and restated operating agreement.

At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and MGS, that Iconix Israel is not a variable interest entity and is not subject to consolidation. The Company has recorded its investment under the equity method of accounting.

### Iconix Southeast Asia Joint Venture

In October 2013, the Company contributed substantially all rights to its wholly-owned and controlled brands in Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor (together, the "Southeast Asia Territory") to Lion Network Limited ("Iconix SE Asia"), a then newly formed subsidiary of the Company through an exclusive, royalty-free perpetual master license agreement with Iconix SE Asia. Shortly thereafter, LF Asia purchased a 50% interest in Iconix SE Asia for $12.0 million. LF Asia paid $7.5 million upon the closing of the transaction and committed to pay an additional $4.5 million over the 24-month period following closing. The Company may earn an additional $2.0 million based on certain criteria relating to the achievement of Iconix SE Asia revenue targets through the year ending December 31, 2014. As a result of this transaction, the Company recorded a gain of $4.7 million, which was included in licensing and other revenue in FY 2013.

In June 2014, the Company contributed substantially all rights to its wholly-owned and controlled brands in the Republic of Korea, and its Ecko, Zoo York, Ed Hardy and Sharper Image Brands in the European Union, and Turkey, in each case, to Iconix SE Asia. In return, LF Asia agreed to pay the Company $15.9 million, of which $4.0 million was paid at closing. As a result of this transaction the Company recorded a $13.6 million gain, which is included in licensing and other revenue in the unaudited condensed consolidated income statement for the Current Nine Months.

In September 2014, the Company contributed substantially all rights to its Lee Cooper and Umbro brands in the People's Republic of China, Hong Kong, Macau and Taiwan (together, the "Greater China Territory"), to Iconix SE Asia. In return, LF Asia agreed to pay the Company $21.5 million, of which $4.3 million was paid at closing. As a result of this transaction the Company recorded an $18.7 million gain, which is included in licensing and other revenue in the unaudited condensed consolidated income statement for the Current Quarter.

As of September 30, 2014, of the $35.6 million remaining due to the Company from LF Asia, $15.3 million is included in other assets—current and $20.3 million is included in other assets on the unaudited condensed consolidated balance sheet.

Pursuant to the Iconix SE Asia second amended and restated shareholders' agreement, for a period following the second anniversary of the closing of the October 2013 transaction, the Company has a call option to purchase from LF Asia 5% of the equity interests held by LF Asia in Iconix SE Asia for a calculated amount as defined in the Iconix SE Asia second amended and restated shareholders agreement. Further, for a period following the fifth anniversary and again following the eighth anniversary of the closing of this transaction, the Company has a call option to purchase from LF Asia the right to the Europe territory, the Southeast Asia territory and/or the Korean territory on an individual basis (together, the "Territories"), and LF Asia has a put option to initiate the Company's purchase all or a portion of the Territories, in each case for a calculated amount as defined in the Iconix SE Asia second amended and restated shareholders agreement.

12

Also, pursuant to the Iconix SE Asia second amended and restated shareholders' agreement, for a period following the fifth anniversary and again following the eighth anniversary of the closing of the September 2014 transaction, the Company has a call option to purchase from LF Asia the Greater China Territory, and LF Asia has a put option to initiate the Company's purchase of the Greater China Territory, in each case for a calculated amount as defined in the Iconix SE Asia second amended and restated shareholders agreement. In addition, in connection with the June 2014 and September 2014 transactions, the Company guaranteed minimum distributions relating to royalty revenue on specified brands through the 2017 calendar year. Certain distributions paid by the Company under this guarantee may be distributed back to the Company pursuant to the exercise of the put and call options described above.

At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and LF Asia, that Iconix SE Asia is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting.

### Iconix Canada Joint Venture

In June 2013, the Company contributed substantially all economic rights to its brands in Canada to Iconix Canada L.P. and ICO Brands L.P. (together with general partner 8560854 Canada, Inc., "Iconix Canada"), each then a newly formed joint venture with BII and its subsidiaries. In consideration for its aggregate 50% interest in Iconix Canada, BII agreed to pay $17.8 million in cash to the Company, of which approximately $8.9 million was paid upon closing of this transaction in June 2013, the remaining $8.9 million of which is a note payable to the Company to be paid over five years from the date of closing, with final payment in June 2018. Of the $8.2 million note receivable at September 30, 2014, approximately $3.0 million is included in other assets – current, the remaining $5.2 million of which is included in other assets on the unaudited condensed consolidated balance sheet. As a result of this transaction, the Company recognized a gain of approximately $9.8 million which is included in licensing and other revenue on the consolidated income statement for FY 2013.

Pursuant to the limited partnership agreements between the Company and BII and its subsidiaries, between the second and third anniversaries of June 2013, the Company has a call option to purchase from BII and its subsidiaries 5% of the equity interests held by BII and its subsidiaries in Iconix Canada for a calculated amount as defined in the partnership agreements.

At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and BII, that Iconix Canada is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting.

### Iconix Australia Joint Venture

In September 2013, the Company formed Iconix Australia, LLC ("Iconix Australia"), a Delaware limited liability company and a wholly-owned subsidiary of the Company, and contributed substantially all rights to its wholly-owned and controlled brands in Australia and New Zealand through an exclusive, royalty-free perpetual master license agreement with Iconix Australia. Shortly thereafter Pac Brands USA, Inc. ("Pac Brands") purchased a 50% interest in Iconix Australia for $7.2 million in cash, all of which was received upon closing of this transaction in September 2013. As a result of this transaction, the Company recorded a gain of $5.1 million, which is included in licensing and other revenue in the FY 2013.

Following the second anniversary of the closing of this transaction (i.e. September 2013) and for a period of six months thereafter, the Company may exercise a call option to purchase a 5% interest in Iconix Australia from Pac Brands for a calculated amount as defined in the Iconix Australia operating agreement. Subsequent to the earlier of any exercise of the call option by the Company and six months following the second anniversary of the closing of this transaction, Pac Brands may exercise a put option to initiate the purchase of all of Pac Brands' ownership interests in Iconix Australia by the Company for a calculated amount as defined in the Iconix Australia operating agreement.

At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company and Pac Brands, that Iconix Australia is not a variable interest entity and not subject to consolidation. The Company has recorded its investment under the equity method of accounting.

### IPH Unltd

In October 2009, the Company consummated, through IPH Unltd, a then newly formed subsidiary of the Company, a transaction with the sellers of the Ecko portfolio of brands, including Ecko and Zoo York (the "Ecko Assets"), pursuant to which the sellers sold and/or contributed the Ecko Assets to IPH Unltd in exchange for a 49% membership interest in IPH Unltd and $63.5 million in cash which had been contributed to IPH Unltd by the Company. As a result of this transaction, the Company owned a 51% controlling membership interest in IPH Unltd. In addition, as part of this transaction, IPH Unltd borrowed $90.0 million from a third party to repay certain indebtedness of the sellers.

On July 27, 2011 the Company, through its newly formed wholly owned subsidiary ZY Holdings LLC ("ZY Holdings"), acquired the Zoo York trademark and related assets from IPH Unltd for a net purchase price of $18.0 million, effectively increasing its ownership in the Zoo York assets from 51% to 100%. In accordance with ASC Topic 810, no gain was recognized on this transaction as the Company retained a controlling interest in the Zoo York assets before and after the increase in its ownership interest.

13

ASC Topic 810 affirms that consolidation is appropriate when one entity has a controlling financial interest in another entity. Prior to May 17, 2013, the Company owned a 51% membership interest in IPH Unltd compared to the minority owner's 49% membership interest. Further, the Company believed that the voting and veto rights of the minority shareholder were merely protective in nature and did not provide them with substantive participating rights in IPH Unltd. As such, prior to May 17, 2013, IPH Unltd was subject to consolidation with the Company, which is reflected in the consolidated financial statements.

In accordance with ASC Topic 810, prior to May 17, 2013, the Company recognized the non-controlling interest of IPH Unltd as equity in the consolidated financial statements and separate from the parent's equity.

On May 17, 2013 the Company purchased the remaining 49% minority interest in IPH Unltd for $45.0 million in cash, increasing its ownership in IPH Unltd from 51% to 100%. In accordance with ASC Topic 810, no gain was recognized on this transaction as the Company retained a controlling interest in IPH Unltd before and after the increase in its ownership interest.

On May 30, 2013, the Company paid to the holders of the Ecko Note (see Note 5) approximately $52.7 million, representing total outstanding principal and accrued interest to date. This Ecko Note was issued by IPH Unltd in connection with the Company's original acquisition of a 51% interest in the Ecko and Zoo York brands and related assets in October 2009.

### Peanuts Holdings

On June 3, 2010 (the "Peanuts Closing Date"), the Company consummated an interest purchase agreement with United Feature Syndicate, Inc ("UFS") and The E.W. Scripps Company (the "Parent") (Parent and UFS, collectively, the "Sellers"), pursuant to which it purchased all of the issued and outstanding interests ("Interests") of Peanuts Worldwide, a then newly formed Delaware limited liability company, to which, prior to the closing of this acquisition, copyrights and trademarks associated with the Peanuts characters and certain other assets were contributed by UFS. On the Peanuts Closing Date, the Company also assigned its right to buy all of the Interests to Peanuts Holdings, a newly formed Delaware limited liability company and joint venture owned 80% by Icon Entertainment LLC ("IE"), a wholly-owned subsidiary of the Company, and 20% by Beagle Scout LLC, a Delaware limited liability company ("Beagle") owned by certain Schulz family trusts.

Further, on the Closing Date, IE and Beagle entered into an operating agreement with respect to Peanuts Holdings (the "Peanuts Operating Agreement"). Pursuant to the Peanuts Operating Agreement, the Company, through IE, and Beagle made capital contributions of $141.0 million and $34.0 million, respectively, in connection with the acquisition of Peanuts Worldwide. The Interests were then purchased for $172.1 million in cash, as adjusted for acquired working capital.

In connection with the Peanuts Operating Agreement, the Company through IE, loaned $17.5 million to Beagle (the "Beagle Note"), the proceeds of which were used to fund Beagle's capital contribution to Peanuts Holdings in connection with the acquisition of Peanuts Worldwide. The Beagle Note bears interest at 6% per annum, with minimum principal payable in equal annual installments of approximately $2.2 million on June 3, with any remaining unpaid principal balance and accrued interest to be due on June 3, 2015, the Beagle Note maturity date. Principal may be prepaid at any time. The Beagle Note is secured by the membership interest in Peanuts Holdings owned by Beagle. As of September 30, 2014, the current portion of approximately $2.4 million is included in other assets –current in the unaudited condensed consolidated balance sheet.

ASC Topic 810 affirms that consolidation is appropriate when one entity has a controlling financial interest in another entity. The Company owns an 80% membership interest in Peanuts Holdings, compared to the non-controlling owner's 20% membership interest. As such, Peanuts Holdings is subject to consolidation with the Company, which is reflected in the Company's unaudited condensed consolidated financial statements as of September 30, 2014.

In accordance with ASC Topic 810, the Company recognizes the non-controlling interest of Peanuts Holdings as equity in the consolidated financial statements and separate from the parent's equity.

### Investments

### Marcy Media LLC

In July 2013, the Company purchased a 10% minority interest in Marcy Media LLC ("Marcy Media"), a multi-media portfolio company which owns a 50% interest in Roc Nation LLC, an entertainment and talent management company, for $32.0 million. At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company that Marcy Media is not a variable interest entity and not subject to consolidation. As the Company does not have significant influence over Marcy Media, its investment has been recorded under the cost method of accounting.

Also in July 2013, the Company acquired the global rights to the "Roc Nation" name, a diffusion brand of Rocawear, to use and register as a trademark for apparel, footwear and related categories for $8.0 million.

14

*Complex Media Inc.*

In September 2013, the Company purchased convertible preferred shares which, on an as converted basis as of the closing date, equaled an approximate 14.4% minority interest in Complex Media Inc. ("Complex Media"), a multi-media lifestyle company which, among other things, owns Complex magazine and its online counterpart, Complex.com, for $25.0 million. At inception, the Company determined, in accordance with ASC 810, based on the corporate structure, voting rights and contributions of the Company that Complex Media is not a variable interest entity and not subject to consolidation. As the Company does not have significant influence over Complex Media, its investment has been recorded under the cost method of accounting.

*Unaudited Pro Forma Information*

Unaudited pro forma information for the transactions completed in the Current Nine Months is not presented, as such pro forma disclosure is not required with respect to such transactions because the effects of such transactions, each by themselves or in the aggregate, are considered immaterial to the Company.

**4. Fair Value Measurements**

ASC Topic 820 "Fair Value Measurements", which the Company adopted on January 1, 2008, establishes a framework for measuring fair value and requires expanded disclosures about fair value measurement. While ASC 820 does not require any new fair value measurements in its application to other accounting pronouncements, it does emphasize that a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability. As a basis for considering market participant assumptions in fair value measurements, ASC 820 established the following fair value hierarchy that distinguishes between (1) market participant assumptions developed based on market data obtained from sources independent of the reporting entity (observable inputs) and (2) the reporting entity's own assumptions about market participant assumptions developed based on the best information available in the circumstances (unobservable inputs):

Level 1: Observable inputs such as quoted prices for identical assets or liabilities in active markets

Level 2: Other inputs that are observable directly or indirectly, such as quoted prices for similar assets or liabilities or market-corroborated inputs

Level 3: Unobservable inputs for which there is little or no market data and which requires the owner of the assets or liabilities to develop its own assumptions about how market participants would price these assets or liabilities

The valuation techniques that may be used to measure fair value are as follows:

(A) Market approach – Uses prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities

(B) Income approach – Uses valuation techniques to convert future amounts to a single present amount based on current market expectations about those future amounts, including present value techniques, option-pricing models and excess earnings method

(C) Cost approach – Based on the amount that would currently be required to replace the service capacity of an asset (replacement cost)

To determine the fair value of certain financial instruments, the Company relies on Level 1 inputs generated by market transactions of identical instruments where available, Level 2 inputs generated by market transactions of similar instruments where available and in the absence of Level 1 inputs, and Level 3 inputs using an income approach when Level 1 and Level 2 inputs are not available. The Company's assessment of the significance of a particular input to the fair value measurement requires judgment and may affect the valuation of financial assets and financial liabilities and their placement within the fair value hierarchy.

*Financial Instruments*

As of September 30, 2014 and December 31, 2013, the fair values of cash, receivables and accounts payable approximated their carrying values due to the short-term nature of these instruments. The fair value of notes receivables and note payable from and to our joint venture partners approximate their carrying values, and the fair value of our cost basis investments approximate their carrying values. The carrying value of marketable securities is marked to its fair value, which is determined using level one inputs. The estimated fair values of other financial instruments subject to fair value disclosures, determined based on Level One inputs including broker quotes or quoted market prices and the related carrying amounts are as follows:

| (000's omitted) | September 30, 2014 | | December 31, 2013 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Long-term debt, including current portion | $    1,401,783 | $1,674,413 | $    1,427,319 | $1,786,232 |

15

Financial instruments expose the Company to counterparty credit risk for nonperformance and to market risk for changes in interest. The Company manages exposure to counterparty credit risk through specific minimum credit standards, diversification of counterparties and procedures to monitor the amount of credit exposure. The Company's financial instrument counterparties are investment or commercial banks with significant experience with such instruments.

### *Non-Financial Assets and Liabilities*

The Company accounts for non-recurring adjustments to the fair values of its non-financial assets and liabilities under ASC Topic 820 using a market participant approach. The Company uses a discounted cash flow model with Level 3 inputs to measure the fair value of its non-financial assets and liabilities. The Company also adopted the provisions of ASC 820 as it relates to purchase accounting for its acquisitions. The Company has goodwill, which is tested for impairment at least annually, as required by ASC Topic 350. Further, in accordance with ASC Topic 350, the Company's indefinite-lived trademarks are tested for impairment at least annually, on an individual basis as separate single units of accounting. Similarly, consistent with ASC Topic 360 as it relates to accounting for the impairment or disposal of long-lived assets, the Company assesses whether or not there is impairment of the Company's definite-lived trademarks. There was no impairment, and therefore no write-down, of any of the Company's long-lived assets during the Current Nine Months or FY 2013.

### 5. Debt Arrangements

The Company's net carrying amount of debt is comprised of the following:

| (000's omitted) | September 30, 2014 | December 31, 2013 |
|---|---|---|
| Senior Secured Notes | $ 789,311 | $ 836,888 |
| 1.50% Convertible Notes | 335,772 | 323,418 |
| 2.50% Convertible Notes | 276,700 | 267,013 |
| Total | $ 1,401,783 | $ 1,427,319 |

### *Senior Secured Notes*

On November 29, 2012, Icon Brand Holdings, Icon DE Intermediate Holdings LLC, Icon DE Holdings LLC and Icon NY Holdings LLC, each a limited-purpose, bankruptcy remote, wholly-owned direct or indirect subsidiary of the Company, (collectively, the "Co-Issuers") issued $600.0 million aggregate principal amount of Series 2012-1 4.229% Senior Secured Notes, Class A-2 (the "2012 Senior Secured Notes") in an offering exempt from registration under the Securities Act of 1933, as amended.

Simultaneously with the issuance of the 2012 Senior Secured Notes, the Co-Issuers also entered into a revolving financing facility of Series 2012-1 Variable Funding Senior Notes, Class A-1 (the "Variable Funding Notes"), which allows for the funding of up to $100 million of Variable Funding Notes and certain other credit instruments, including letters of credit. The Variable Funding Notes were issued under the Indenture and allow for drawings on a revolving basis. Drawings and certain additional terms related to the Variable Funding Notes are governed by the Class A-1 Note Purchase Agreement dated November 29, 2012 (the "Variable Funding Note Purchase Agreement"), among the Co-Issuers, Iconix, as manager, certain conduit investors, financial institutions and funding agents, and Barclays Bank PLC, as provider of letters of credit, as swingline lender and as administrative agent. The Variable Funding Notes will be governed, in part, by the Variable Funding Note Purchase Agreement and by certain generally applicable terms contained in the Indenture. Interest on the Variable Funding Notes will be payable at per annum rates equal to the CP Rate, Base Rate or Eurodollar Rate, as defined in the Variable Funding Note Purchase Agreement.

As of September 30, 2014, no amounts under the Variable Funding Notes have been drawn. There is a commitment fee on the unused portion of the Variable Funding Notes facility of 0.5% per annum. It is anticipated that any outstanding principal of and interest on the Variable Funding Notes will be repaid in full on or prior to January 2018. Following the anticipated repayment date, additional interest will accrue on the Variable Funding Notes equal to 5% per annum. The Variable Funding Notes and other credit instruments issued under the Variable Funding Note Purchase Agreement are secured by the collateral described below.

On June 21, 2013, the Co-Issuers issued $275.0 million aggregate principal amount of Series 2013-1 4.352% Senior Secured Notes, Class A-2 (the "2013 Senior Secured Notes" and, together with the 2012 Senior Secured Notes, the "Senior Secured Notes") in an offering exempt from registration under the Securities Act of 1933, as amended.

16

The Senior Secured Notes and the Variable Funding Notes are referred to collectively as the "Notes." The Notes were issued in securitization transactions pursuant to which substantially all of Iconix's United States and Canadian revenue-generating assets (the "Securitized Assets"), consisting principally of its intellectual property and license agreements for the use of its intellectual property, were transferred to and are currently held by the Co-Issuers. The Securitized Assets do not include revenue generating assets of (x) the Iconix subsidiaries that own the Badgley Mischka trademark, the Ecko Unltd trademark, the Mark Ecko trademark, the Umbro trademark and the Lee Cooper trademark, (y) the Iconix subsidiaries that own Iconix's other brands outside of the United States and Canada or (z) the joint ventures in which Iconix and certain of its subsidiaries have investments and which own the Artful Dodger trademark, the Modern Amusement trademark and the Buffalo trademark and a 50% interest in the Ice Cream trademark and the Billionaire Boys Club trademark.

The Notes were issued under a base indenture and related supplemental indentures (collectively, the "Indenture") among the Co-Issuers and Citibank, N.A., as trustee (in such capacity, the "Trustee") and securities intermediary. The Indenture allows the Co-Issuers to issue additional series of notes in the future subject to certain conditions.

While the Notes are outstanding, payments of interest are required to be made on the Senior Secured Notes on a quarterly basis. To the extent funds are available, principal payments in the amount of $10.5 million and $4.8 million are required to be made on the 2012 Senior Secured Notes and 2013 Senior Secured Notes, respectively, on a quarterly basis.

In June 2014, the Company sold the "sharperimage.com" domain name and the exclusive right to use the Sharper Image trademark in connection with the operation of a branded website and catalog distribution in specified jurisdictions, in which the Senior Secured Notes had a security interest pursuant to the Indenture. As a result of this permitted disposition, the Company paid an additional $1.6 million in principal in July 2014.

The legal final maturity date of the Senior Secured Notes is in January of 2043, but it is anticipated that, unless earlier prepaid to the extent permitted under the Indenture, the Senior Secured Notes will be repaid in January of 2020. If the Co-Issuers have not repaid or refinanced the Senior Secured Notes prior to the anticipated repayment date, additional interest will accrue on the Senior Secured Notes equal to the greater of (A) 5% per annum and (B) a per annum interest rate equal to the excess, if any, by which the sum of (i) the yield to maturity (adjusted to a quarterly bond-equivalent basis), on the anticipated repayment date of the United States treasury security having a term closest to 10 years plus (ii) 5% plus (iii) with respect to the 2012 Senior Secured Notes, 3.4%, or with respect to the 2013 Senior Secured Notes, 3.14%, exceeds the original interest rate. The Senior Secured Notes rank pari passu with the Variable Funding Notes.

Pursuant to the Indenture, the Notes are the joint and several obligations of the Co-Issuers only. The Notes are secured under the Indenture by a security interest in substantially all of the assets of the Co-Issuers (the "Collateral"), which includes, among other things, (i) intellectual property assets, including the U.S. and Canadian registered and applied for trademarks for the following brands and other related IP assets: Candie's, Bongo, Joe Boxer (excluding Canadian trademarks, none of which are owned by Iconix), Rampage, Mudd, London Fog (other than the trademark for outerwear products sold in the United States), Mossimo, Ocean Pacific and OP, Danskin and Danskin Now, Rocawear, Starter, Waverly, Fieldcrest, Royal Velvet, Cannon, Charisma, and Sharper Image (other than for a "Sharper Image" branded website or catalog in the United States and other specified jurisdictions); (ii) the rights (including the rights to receive payments) and obligations under all license agreements for use of those trademarks; (iii) the following equity interests in the following joint ventures: an 85% interest in Hardy Way LLC which owns the Ed Hardy brand, a 50% interest in MG Icon LLC which owns the Material Girl and Truth or Dare brands, a 100% interest in ZY Holdings LLC which owns the Zoo York brand, and an 80% interest in Peanuts Holdings LLC which owns the Peanuts brand and characters; and (iv) certain cash accounts established under the Indenture.

If the Company contributes a newly organized, limited purpose, bankruptcy remote entity (each an "Additional IP Holder" and, together with the Co-Issuers, the "Securitization Entities") to Icon Brand Holdings LLC or Icon DE Intermediate Holdings LLC, that Additional IP Holder will enter into a guarantee and collateral agreement in a form provided for in the Base Indenture pursuant to which such Additional IP Holder will guarantee the obligations of the Co-Issuers in respect of any Notes issued under the Base Indenture and the other related documents and pledge substantially all of its assets to secure those guarantee obligations pursuant to a guarantee and collateral agreement.

Neither the Company nor any subsidiary of the Company, other than the Securitization Entities, will guarantee or in any way be liable for the obligations of the Co-Issuers under the Indenture or the Notes.

The Notes are subject to a series of covenants and restrictions customary for transactions of this type, including (i) that the Co-Issuers maintain specified reserve accounts to be used to make required payments in respect of the Notes, (ii) provisions relating to optional and mandatory prepayments, including mandatory prepayments in the event of a change of control (as defined in the supplemental indentures) and the related payment of specified amounts, including specified make-whole payments in the case of the Senior Secured Notes under certain circumstances, (iii) certain indemnification payments in the event, among other things, the transfers of the assets pledged as collateral for the Notes are in stated ways defective or ineffective and (iv) covenants relating to recordkeeping, access to information and similar matters. The Company has been compliant with all covenants under the Notes from inception through the Current Quarter.

The Notes are also subject to customary rapid amortization events provided for in the Indenture, including events tied to (i) the failure to maintain a stated debt service coverage ratio, which tests the amount of net cash flow generated by the assets of the Co-Issuers against the amount of debt service obligations of the Co-Issuers (including any commitment fees and letter of credit fees with respect to the

17

Variable Funding Notes, due and payable accrued interest, and due and payable scheduled principal payments on the Senior Secured Notes), (ii) certain manager termination events, (iii) the occurrence of an event of default and (iv) the failure to repay or refinance the Notes on the anticipated repayment date. If a rapid amortization event were to occur, Icon DE Intermediate Holdings LLC and Icon Brand Holdings LLC would be restricted from declaring or paying distributions on any of its limited liability company interests.

The Company used approximately $150.4 million of the proceeds received from the issuance of the 2012 Senior Secured Notes to repay amounts outstanding under its revolving credit facility (see below) and approximately $20.9 million to pay the costs associated with the 2012 Senior Secured Notes financing transaction. In addition approximately $218.3 million of the proceeds from the 2012 Senior Secured Notes were used for the Company's purchase of the Umbro brand. The Company used approximately $7.2 million of the proceeds received from the issuance of the 2013 Senior Secured Notes to pay the costs associated with the 2013 Senior Secured Notes securitized financing transaction.

As of September 30, 2014, the total principal balance of the Notes is $789.3 million, of which $61.1 million is included in the current portion of long-term debt on the Company's unaudited condensed consolidated balance sheet. As of September 30, 2014 and December 31, 2013, $47.8 million and $52.4 million, respectively, is included in restricted cash on the unaudited condensed consolidated balance sheet and represents short-term restricted cash consisting of collections on behalf of the Securitized Assets, restricted to the payment of principal, interest and other fees on a quarterly basis under the Senior Secured Notes.

*1.50% Convertible Notes*

On March 18, 2013, the Company completed the issuance of $400.0 million principal amount of the Company's 1.50% convertible senior subordinated notes due March 15, 2018 ("1.50% Convertible Notes") in a private offering to certain institutional investors. The net proceeds received by the Company from the offering, excluding the net cost of hedges and sale of warrants (described below) and including transaction fees, were approximately $390.6 million.

The 1.50% Convertible Notes bear interest at an annual rate of 1.50%, payable semi-annually in arrears on March 15 and September 15 of each year, beginning on September 15, 2013. However, the Company recognizes an effective interest rate of 6.50% on the carrying amount of the 1.50% Convertible Notes. The effective rate is based on the rate for a similar instrument that does not have a conversion feature. The 1.50% Convertible Notes will be convertible into cash and, if applicable, shares of the Company's common stock based on a conversion rate of 32.4052 shares of the Company's common stock, subject to customary adjustments, per $1,000 principal amount of the 1.50% Convertible Notes (which is equal to an initial conversion price of approximately $30.86 per share) only under the following circumstances: (1) during any fiscal quarter beginning after December 15, 2017 (and only during such fiscal quarter), if the closing price of the Company's common stock for at least 20 trading days in the 30 consecutive trading days ending on and including the last trading day of the immediately preceding fiscal quarter is more than 130% of the conversion price per share, which is $1,000 divided by the then applicable conversion rate; (2) during the five consecutive business day period immediately following any five consecutive trading day period in which the trading price per $1,000 principal amount of the 1.50% Convertible Notes for each day of that period was less than 98% of the product of (a) the closing price of the Company's common stock for each day in that period and (b) the conversion rate per $1,000 principal amount of the 1.50% Convertible Notes; (3) if specified distributions to holders of the Company's common stock are made, as set forth in the indenture governing the 1.50% Convertible Notes ("1.50% Indenture"); (4) if a "change of control" or other "fundamental change," each as defined in the 1.50% Indenture, occurs;; and (5) during the 90 day period prior to maturity of the 1.50% Convertible Notes. If the holders of the 1.50% Convertible Notes exercise the conversion provisions under the circumstances set forth, the Company will need to remit the lower of the principal balance of the 1.50% Convertible Notes or their conversion value to the holders in cash. As such, the Company would be required to classify the entire amount outstanding of the 1.50% Convertible Notes as a current liability in the following quarter. The evaluation of the classification of amounts outstanding associated with the 1.50% Convertible Notes will occur every quarter.

Upon conversion, a holder will receive an amount in cash equal to the lesser of (a) the principal amount of the 1.50% Convertible Note or (b) the conversion value, determined in the manner set forth in the 1.50% Indenture. If the conversion value exceeds the principal amount of the 1.50% Convertible Notes on the conversion date, the Company will also deliver, at its election, cash or the Company's common stock or a combination of cash and the Company's common stock for the conversion value in excess of the principal amount. In the event of a change of control or other fundamental change, the holders of the 1.50% Convertible Notes may require the Company to purchase all or a portion of their 1.50% Convertible Notes at a purchase price equal to 100% of the principal amount of the 1.50% Convertible Notes, plus accrued and unpaid interest, if any. Holders of the 1.50% Convertible Notes who convert their 1.50% Convertible Notes in connection with a fundamental change may be entitled to a make-whole premium in the form of an increase in the conversion rate.

Pursuant to guidance issued under ASC Topic 815, the 1.50% Convertible Notes are accounted for as convertible debt in the accompanying consolidated balance sheet and the embedded conversion option in the 1.50% Convertible Notes has not been accounted for as a separate derivative. For a discussion of the effects of the 1.50% Convertible Notes and the 1.50% Convertible Notes Hedges and Sold Warrants defined and discussed below on earnings per share, see Note 7.

As of September 30, 2014 and December 31, 2013, the amount of the 1.50% Convertible Notes accounted for as a liability was approximately $335.8 million and $323.4 million, respectively, and is reflected on the consolidated balance sheet as follows:

| (000's omitted) | September 30, 2014 | December 31, 2013 |
|---|---|---|
| Equity component carrying amount | $ 49,931 | $ 49,931 |
| Unamortized discount | 64,228 | 76,582 |
| Net debt carrying amount | 335,772 | 323,418 |

For the Current Quarter and the Prior Year Quarter, the Company recorded additional non-cash interest expense of approximately $3.9 million and $3.7 million, respectively, representing the difference between the stated interest rate on the 1.50% Convertible Notes and the rate for a similar instrument that does not have a conversion feature.

For the Current Nine Months and the Prior Year Nine Months, the Company recorded additional non-cash interest expense of approximately $11.4 million and $7.9 million, respectively, representing the difference between the stated interest rate on the 1.50% Convertible Notes and the rate for a similar instrument that does not have a conversion feature.

For each of the Current Quarter and the Prior Year Quarter, cash interest expense relating to the 1.50% Convertible Notes was approximately $1.5 million, respectively.

For the Current Nine Months and the Prior Year Nine Months, cash interest expense relating to the 1.50% Convertible Notes was approximately $4.5 million and $3.2 million, respectively.

The 1.50% Convertible Notes do not provide for any financial covenants.

On March 18, 2013, the Company used a portion of the proceeds from the 1.50% Convertible Notes to repurchase 2,964,000 shares of its common stock in a private transaction with a third party for $69.0 million. See note 6 for further information on our stock repurchase program.

In connection with the sale of the 1.50% Convertible Notes, the Company entered into hedges for the 1.50% Convertible Notes ("1.50% Convertible Note Hedges") with respect to its common stock with one entity (the "1.50% Counterparty"). Pursuant to the agreements governing these 1.50% Convertible Note Hedges, the Company purchased call options (the "1.50% Purchased Call Options") from the 1.50% Counterparty covering up to approximately 13.0 million shares of the Company's common stock. These 1.50% Convertible Note Hedges are designed to offset the Company's exposure to potential dilution upon conversion of the 1.50% Convertible Notes in the event that the market value per share of the Company's common stock at the time of exercise is greater than the strike price of the 1.50% Purchased Call Options (which strike price corresponds to the initial conversion price of the 1.50% Convertible Notes and is simultaneously subject to certain customary adjustments). On March 13, 2013, the Company paid an aggregate amount of approximately $84.1 million of the proceeds from the sale of the 1.50% Convertible Notes for the 1.50% Purchased Call Options, of which $29.4 million was included in the balance of deferred income tax assets at March 13, 2013 and is being recognized over the term of the 1.50% Convertible Notes. As of September 30, 2014, the balance of deferred income tax assets related to this transaction was approximately $20.4 million.

The Company also entered into separate warrant transactions with the 1.50% Counterparty whereby the Company, pursuant to the agreements governing these warrant transactions, sold to the 1.50% Counterparty warrants (the "1.50% Sold Warrants") to acquire up to approximately 13.0 million shares of the Company's common stock at a strike price of $35.5173 per share of the Company's common stock. The 1.50% Sold Warrants will become exercisable on June 18, 2018 and will expire by September 1, 2018. The Company received aggregate proceeds of approximately $57.7 million from the sale of the 1.50% Sold Warrants on March 13, 2013.

Pursuant to guidance issued under ASC Topic 815 "Derivatives and Hedging" as it relates to accounting for derivative financial instruments indexed to, and potentially settled in, a company's own stock, the 1.50% Convertible Note Hedge and the proceeds received from the issuance of the 1.50% Sold Warrants were recorded as a charge and an increase, respectively, in additional paid-in capital in stockholders' equity as separate equity transactions. As a result of these transactions, the Company recorded a net increase to additional paid-in-capital of $3.0 million in March 2013.

The Company has evaluated the impact of adopting guidance issued under ASC Topic 815 regarding embedded features as it relates to the 1.50% Sold Warrants, and has determined it had no impact on the Company's results of operations and financial position through September 30, 2014, and will have no impact on the Company's results of operations and financial position in future fiscal periods.

As the 1.50% Convertible Note Hedge transactions and the warrant transactions were separate transactions entered into by the Company with the 1.50% Counterparty, they are not part of the terms of the 1.50% Convertible Notes and will not affect the holders' rights under the 1.50% Convertible Notes. In addition, holders of the 1.50% Convertible Notes will not have any rights with respect to the 1.50% Purchased Call Options or the 1.50% Sold Warrants.

19

If the market value per share of the Company's common stock at the time of conversion of the 1.50% Convertible Notes is above the strike price of the 1.50% Purchased Call Options, the 1.50% Purchased Call Options entitle the Company to receive from the 1.50% Counterparties net shares of the Company's common stock, cash or a combination of shares of the Company's common stock and cash, depending on the consideration paid on the underlying 1.50% Convertible Notes, based on the excess of the then current market price of the Company's common stock over the strike price of the 1.50% Purchased Call Options. Additionally, if the market price of the Company's common stock at the time of exercise of the 1.50% Sold Warrants exceeds the strike price of the 1.50% Sold Warrants, the Company will owe the 1.50% Counterparty net shares of the Company's common stock or cash, not offset by the 1.50% Purchased Call Options, in an amount based on the excess of the then current market price of the Company's common stock over the strike price of the 1.50% Sold Warrants.

These transactions will generally have the effect of increasing the conversion price of the 1.50% Convertible Notes to $35.5173 per share of the Company's common stock, representing a 52.5% percent premium based on the last reported sale price of the Company's common stock of $23.29 per share on March 12, 2013.

Moreover, in connection with the warrant transactions with the 1.50% Counterparty, to the extent that the price of the Company's common stock exceeds the strike price of the 1.50% Sold Warrants, the warrant transactions could have a dilutive effect on the Company's earnings per share.

***2.50% Convertible Notes***

On May 23, 2011, the Company completed the issuance of $300.0 million principal amount of the Company's 2.50% convertible senior subordinated notes due June 2016 ("2.50% Convertible Notes") in a private offering to certain institutional investors. The net proceeds received by the Company from the offering, excluding the net cost of hedges and sale of warrants (described below) and including transaction fees, were approximately $291.6 million.

The 2.50% Convertible Notes bear interest at an annual rate of 2.50%, payable semi-annually in arrears on June 1 and December 1 of each year, beginning December 1, 2011. However, the Company recognizes an effective interest rate of 7.25% on the carrying amount of the 2.50% Convertible Notes. The effective rate is based on the rate for a similar instrument that does not have a conversion feature. The 2.50% Convertible Notes will be convertible into cash and, if applicable, shares of the Company's common stock based on a conversion rate of 32.5169 shares of the Company's common stock, subject to customary adjustments, per $1,000 principal amount of the 2.50% Convertible Notes (which is equal to an initial conversion price of approximately $30.75 per share) only under the following circumstances: (1) during any fiscal quarter beginning after June 30, 2011 (and only during such fiscal quarter), if the closing price of the Company's common stock for at least 20 trading days in the 30 consecutive trading days ending on the last trading day of the immediately preceding fiscal quarter is more than 130% of the conversion price per share, which is $1,000 divided by the then applicable conversion rate; (2) during the five business day period immediately following any five consecutive trading day period in which the trading price per $1,000 principal amount of the 2.50% Convertible Notes for each day of that period was less than 98% of the product of (a) the closing price of the Company's common stock for each day in that period and (b) the conversion rate per $1,000 principal amount of the 2.50% Convertible Notes; (3) if specified distributions to holders of the Company's common stock are made, as set forth in the indenture governing the 2.50% Convertible Notes ("2.50% Indenture"); (4) if a "change of control" or other "fundamental change," each as defined in the 2.50% Indenture, occurs; and (5) during the 90 day period prior to maturity of the 2.50% Convertible Notes. If the holders of the 2.50% Convertible Notes exercise the conversion provisions under the circumstances set forth, the Company will need to remit the lower of the principal balance of the 2.50% Convertible Notes or their conversion value to the holders in cash. As such, the Company would be required to classify the entire amount outstanding of the 2.50% Convertible Notes as a current liability in the following quarter. The evaluation of the classification of amounts outstanding associated with the 2.50% Convertible Notes will occur every quarter.

Upon conversion, a holder will receive an amount in cash equal to the lesser of (a) the principal amount of the 2.50% Convertible Note or (b) the conversion value, determined in the manner set forth in the 2.50% Indenture. If the conversion value exceeds the principal amount of the 2.50% Convertible Notes on the conversion date, the Company will also deliver, at its election, cash or the Company's common stock or a combination of cash and the Company's common stock for the conversion value in excess of the principal amount. In the event of a change of control or other fundamental change, the holders of the 2.50% Convertible Notes may require the Company to purchase all or a portion of their 2.50% Convertible Notes at a purchase price equal to 100% of the principal amount of the 2.50% Convertible Notes, plus accrued and unpaid interest, if any. Holders of the 2.50% Convertible Notes who convert their 2.50% Convertible Notes in connection with a fundamental change may be entitled to a make-whole premium in the form of an increase in the conversion rate.

Pursuant to guidance issued under ASC Topic 815, the 2.50% Convertible Notes are accounted for as convertible debt in the accompanying consolidated balance sheet and the embedded conversion option in the 2.50% Convertible Notes has not been accounted for as a separate derivative. For a discussion of the effects of the 2.50% Convertible Notes and the 2.50% Convertible Notes Hedges and Sold Warrants defined and discussed below on earnings per share, see Note 7.

# A-1172

As of September 30, 2014 and December 31, 2013, the amount of the 2.50% Convertible Notes accounted for as a liability was approximately $276.7 million and $267.0 million, respectively, and is reflected on the consolidated balance sheet as follows:

| (000's omitted) | September 30, 2014 | December 31, 2013 |
|---|---|---|
| Equity component carrying amount | $ 35,996 | $ 35,996 |
| Unamortized discount | 23,300 | 32,987 |
| Net debt carrying amount | 276,700 | 267,013 |

For the Current Quarter and the Prior Year Quarter, the Company recorded additional non-cash interest expense of approximately $3.1 million and $2.9 million, respectively, representing the difference between the stated interest rate on the 2.50% Convertible Notes and the rate for a similar instrument that does not have a conversion feature.

For the Current Nine Months and the Prior Year Nine Months, the Company recorded additional non-cash interest expense of approximately $8.8 million and $8.2 million, respectively, representing the difference between the stated interest rate on the 2.50% Convertible Notes and the rate for a similar instrument that does not have a conversion feature.

For each of the Current Quarter and the Prior Year Quarter, cash interest expense relating to the 2.50% Convertible Notes was approximately $1.9 million, respectively.

For each of the Current Nine Months and the Prior Year Nine Months, cash interest expense relating to the 2.50% Convertible Notes was approximately $5.6 million, respectively.

The 2.50% Convertible Notes do not provide for any financial covenants.

In connection with the sale of the 2.50% Convertible Notes, the Company entered into hedges for the 2.50% Convertible Notes ("2.50% Convertible Note Hedges") with respect to its common stock with two entities (the "2.50% Counterparties"). Pursuant to the agreements governing these 2.50% Convertible Note Hedges, the Company purchased call options (the "2.50% Purchased Call Options") from the 2.50% Counterparties covering up to approximately 9.8 million shares of the Company's common stock. These 2.50% Convertible Note Hedges are designed to offset the Company's exposure to potential dilution upon conversion of the 2.50% Convertible Notes in the event that the market value per share of the Company's common stock at the time of exercise is greater than the strike price of the 2.50% Purchased Call Options (which strike price corresponds to the initial conversion price of the 2.50% Convertible Notes and is simultaneously subject to certain customary adjustments). On May 23, 2011, the Company paid an aggregate amount of approximately $58.7 million of the proceeds from the sale of the 2.50% Convertible Notes for the 2.50% Purchased Call Options, of which $20.6 million was included in the balance of deferred income tax assets at May 23, 2011 and is being recognized over the term of the 2.50% Convertible Notes. As of September 30, 2014, the balance of deferred income tax assets related to this transaction was approximately $6.9 million.

The Company also entered into separate warrant transactions with the 2.50% Counterparties whereby the Company, pursuant to the agreements governing these warrant transactions, sold to the 2.50% Counterparties warrants (the "2.50% Sold Warrants") to acquire up to 9.76 million shares of the Company's common stock at a strike price of $40.6175 per share of the Company's common stock. The 2.50% Sold Warrants will become exercisable on September 1, 2016 and will expire by the end of 2016. The Company received aggregate proceeds of approximately $28.8 million from the sale of the 2.50% Sold Warrants on May 23, 2011.

Pursuant to guidance issued under ASC Topic 815 "Derivatives and Hedging" as it relates to accounting for derivative financial instruments indexed to, and potentially settled in, a company's own stock, the 2.50% Convertible Note Hedge and the proceeds received from the issuance of the 2.50% Sold Warrants were recorded as a charge and an increase, respectively, in additional paid-in capital in stockholders' equity as separate equity transactions. As a result of these transactions, the Company recorded a net reduction to additional paid-in-capital of $9.4 million in May 2011.

The Company has evaluated the impact of adopting guidance issued under ASC Topic 815 regarding embedded features as it relates to the 2.50% Sold Warrants, and has determined it had no impact on the Company's results of operations and financial position through September 30, 2014, and will have no impact on the Company's results of operations and financial position in future fiscal periods.

As the 2.50% Convertible Note Hedge transactions and the warrant transactions were separate transactions entered into by the Company with the 2.50% Counterparties, they are not part of the terms of the 2.50% Convertible Notes and will not affect the holders' rights under the 2.50% Convertible Notes. In addition, holders of the 2.50% Convertible Notes will not have any rights with respect to the 2.50% Purchased Call Options or the 2.50% Sold Warrants.

If the market value per share of the Company's common stock at the time of conversion of the 2.50% Convertible Notes is above the strike price of the 2.50% Purchased Call Options, the 2.50% Purchased Call Options entitle the Company to receive from the 2.50% Counterparties net shares of the Company's common stock, cash or a combination of shares of the Company's common stock and cash, depending on the consideration paid on the underlying 2.50% Convertible Notes, based on the excess of the then current market price of the Company's common stock over the strike price of the 2.50% Purchased Call Options. Additionally, if the market price of the Company's common stock at the time of exercise of the 2.50% Sold Warrants exceeds the strike price of the 2.50% Sold Warrants, the Company will owe the 2.50% Counterparties net shares of the Company's common stock or cash, not offset by the 2.50% Purchased Call Options, in an amount based on the excess of the then current market price of the Company's common stock over the strike price of the 2.50% Sold Warrants.

21

# A-1173

These transactions will generally have the effect of increasing the conversion price of the 2.50% Convertible Notes to $40.6175 per share of the Company's common stock, representing a 75% percent premium based on the last reported sale price of the Company's common stock of $23.21 per share on May 17, 2011.

Moreover, in connection with the warrant transactions with the 2.50% Counterparties, to the extent that the price of the Company's common stock exceeds the strike price of the 2.50% Sold Warrants, the warrant transactions could have a dilutive effect on the Company's earnings per share.

### Debt Maturities

As of September 30, 2014, the Company's debt maturities on a calendar year basis are as follows:

| (000's omitted) | Total | October 1 through December 31, 2014 | 2015 | 2016 | 2017 | 2018 | Thereafter |
|---|---|---|---|---|---|---|---|
| Senior Secured | $ 789,311 | $ 15,281 | $61,123 | $ 61,123 | $61,123 | $ 61,123 | $529,538 |
| 1.50% Convertible Notes[1] | 335,772 | — | — | — | — | 335,772 | — |
| 2.50% Convertible Notes[2] | 276,700 | — | — | 276,700 | — | — | — |
| Total | $1,401,783 | $ 15,281 | $61,123 | $337,823 | $61,123 | $396,895 | $529,538 |

[1] Reflects the net debt carrying amount of the 1.50% Convertible Notes in the consolidated balance sheet as of September 30, 2014, in accordance with accounting for convertible notes. The principal amount owed to the holders of the 1.50% Convertible Notes is $400.0 million.

[2] Reflects the net debt carrying amount of the 2.50% Convertible Notes in the consolidated balance sheet as of September 30, 2014, in accordance with accounting for convertible notes. The principal amount owed to the holders of the 2.50% Convertible Notes is $300.0 million.

## 6. Stockholders' Equity

### Stock Repurchase Program

In October 2011, the Company's Board of Directors authorized a program to repurchase up to $200 million of the Company's common stock over a period of approximately three years (the "2011 Program"). In February 2013, the Company's Board of Directors authorized another program to repurchase up to $300 million of the Company's common stock over a three year period (the "February 2013 Program"). This program was in addition to the 2011 Program, which was fully expended as of February 27, 2013. In July 2013, the Company's Board of Directors authorized a program to repurchase up to $300 million of the Company's common stock over a period of approximately three years ("July 2013 Program"). The July 2013 Program was in addition to the February 2013 Program, which was fully expended on August 15, 2013. In February 2014, the Company's Board of Directors authorized another program to repurchase up to $500 million of the Company's common stock over a three year period (the "February 2014 Program" and together with the 2011 Program and the February 2013 Program, the "Repurchase Programs"). The February 2014 Program is in addition to the July 2013 Program.

The following table illustrates the activity under the Repurchase Programs, in the aggregate, for the FY 2014, FY 2013, FY 2012 and FY 2011:

| | # of shares repurchased as part of stock repurchase programs | Cost of shares repurchased (in 000's) |
|---|---|---|
| Q3 YTD 2014 | 4,400,000 | $ 171,627 |
| FY 2013 | 15,812,566 | 436,419 |
| FY 2012 | 7,185,257 | 125,341 |
| FY 2011 | 1,150,000 | 19,138 |
| Total, FY 2011 through September 30, 2014 | 28,547,823 | $ 752,525 |

22

# A-1174

As of September 30, 2014, $47.5 million and $500.0 million remained available for repurchase under the July 2013 Program and February 2014 Program, respectively.

### *2009 Equity Incentive Plan*

On August 13, 2009, the Company's stockholders approved the Company's 2009 Equity Incentive Plan ("2009 Plan"). The 2009 Plan authorizes the granting of common stock options or other stock-based awards covering up to 3.0 million shares of the Company's common stock. All employees, directors, consultants and advisors of the Company, including those of the Company's subsidiaries, are eligible to be granted non-qualified stock options and other stock-based awards (as defined) under the 2009 Plan, and employees are also eligible to be granted incentive stock options (as defined) under the 2009 Plan. No new awards may be granted under the Plan after August 13, 2019.

On August 15, 2012, the Company's stockholders approved the Company's Amended and Restated 2009 Plan ("Amended and Restated 2009 Plan"), which, among other items and matters, increased the shares available under the 2009 Plan by an additional 4.0 million shares to a total of 7.0 million shares issuable under the Amended and Restated 2009 Plan and extended the 2009 Plan termination date through August 15, 2022.

### *Shares Reserved for Issuance*

At September 30, 2014, 2,327,860 common shares were reserved for issuance under the Amended and Restated 2009 Plan. At September 30, 2014 there were no common shares available for issuance under any previous Company plan.

### *Stock Options and Warrants*

The Black-Scholes option valuation model was developed for use in estimating the fair value of traded options which have no vesting restrictions and are fully transferable. In addition, option valuation models require the input of highly subjective assumptions including the expected stock price volatility. Because the Company's employee stock options have characteristics significantly different from those of traded options, and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock options.

There was no compensation expense related to stock option grants or warrant grants during the Current Quarter or Prior Year Quarter, as well as no compensation expense in current year nine months or the prior year nine months.

Summaries of the Company's stock options, warrants (other than warrants issued related to our 1.50% Convertible Notes and 2.50% Convertible Notes) and performance related options activity, and related information for the Current Nine Months are as follows:

| | Options | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at January 1, 2014 | 1,313,077 | $ 6.22 |
| Granted | — | — |
| Canceled | — | — |
| Exercised | (162,000) | 4.18 |
| Expired/Forfeited | — | — |
| Outstanding at September 30, 2014 | 1,151,077 | $ 6.51 |
| Exercisable at September 30, 2014 | 1,151,077 | $ 6.51 |

| *Warrants* | Warrants | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at January 1, 2014 | 190,000 | $ 19.80 |
| Granted | — | — |
| Canceled | — | — |
| Exercised | (140,000) | 21.63 |
| Expired/Forfeited | — | — |
| Outstanding at September 30, 2014 | 50,000 | $ 14.67 |
| Exercisable at September 30, 2014 | 50,000 | $ 14.67 |

23

All warrants issued in connection with acquisitions are recorded at fair market value using the Black Scholes model and are recorded as part of purchase accounting. Certain warrants are exercised using the cashless method.

The Company values other warrants issued to non-employees at the commitment date at the fair market value of the instruments issued, a measure which is more readily available than the fair market value of services rendered, using the Black Scholes model. The fair market value of the instruments issued is expensed over the vesting period.

*Restricted stock*

Compensation cost for restricted stock is measured as the excess, if any, of the quoted market price of the Company's stock at the date the common stock is issued over the amount the employee must pay to acquire the stock (which is generally zero). The compensation cost, net of projected forfeitures, is recognized over the period between the issue date and the date any restrictions lapse, with compensation cost for grants with a graded vesting schedule recognized on a straight-line basis over the requisite service period for each separately vesting portion of the award as if the award was, in substance, multiple awards. The restrictions do not affect voting and dividend rights.

The following tables summarize information about unvested restricted stock transactions:

|  | Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Non-vested, January 1, 2014 | 2,770,147 | $ 20.53 |
| Granted | 256,324 | 40.64 |
| Vested | (147,044) | 19.00 |
| Forfeited/Canceled | (48,590) | 25.81 |
| Non-vested, September 30, 2014 | 2,830,837 | $ 22.34 |

The Company has awarded time-based restricted shares of common stock to certain employees. The awards have restriction periods tied to employment and vest over a maximum period of 5 years. The cost of the time-based restricted stock awards, which is the fair market value on the date of grant net of estimated forfeitures, is expensed ratably over the vesting period. The Company has awarded performance-based restricted shares of common stock to certain employees. The awards have restriction periods tied to certain performance measures. The cost of the performance-based restricted stock awards, which is the fair market value on the date of grant net of estimated forfeitures, is expensed when the likelihood of those shares being earned is deemed probable.

Compensation expense related to restricted stock grants for the Current Quarter and the Prior Year Quarter was approximately $6.5 million and $4.6 million, respectively. Compensation expense related to restricted stock grants for the Current Nine Months and the Prior Year Nine Months was approximately $14.7 million and $12.5 million, respectively. An additional amount of $7.8 million of expense related to time-based restricted shares is expected to be expensed evenly over a period of approximately three years. During the Current Nine Months and the Prior Year Nine Months, the Company repurchased shares valued at $14.0 million and $2.7 million, respectively, of its common stock in connection with net share settlement of restricted stock grants and option exercises.

**7. Earnings Per Share**

Basic earnings per share includes no dilution and is computed by dividing net income available to common stockholders by the weighted average number of common shares outstanding for the period. Diluted earnings per share reflect, in periods in which they have a dilutive effect, the effect of restricted stock-based awards, common shares issuable upon exercise of stock options and warrants and shares underlying convertible notes potentially issuable upon conversion. The difference between basic and diluted weighted-average common shares results from the assumption that all dilutive stock options outstanding were exercised and all convertible notes have been converted into common stock.

As of September 30, 2014, of the total potentially dilutive shares related to restricted stock-based awards, stock options and warrants, approximately 0.1 million were anti-dilutive, compared to less than 0.1 million as of September 30, 2013.

As of September 30, 2014 and 2013, none of the performance related restricted stock-based awards issued in connection with the Company's named executive officers were anti-dilutive.

The 1.50% Convertible Notes and Warrants and the 2.50% Convertible Notes and Warrants that would be subject to conversion to common stock were dilutive as of September 30, 2014 and therefore have been included in this calculation.

24

A reconciliation of weighted average shares used in calculating basic and diluted earnings per share follows:

| (000's omitted) | For the Three Months Ended September 30, (unaudited) | | For the Nine Months Ended September 30, (unaudited) | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Basic | 47,991 | 53,325 | 48,682 | 57,966 |
| Effect of exercise of stock options | 987 | 1,158 | 1,036 | 1,123 |
| Effect of assumed vesting of performance related to restricted stock-based awards | 381 | 180 | 127 | 60 |
| Effect of assumed vesting of restricted stock | 1,387 | 1,489 | 1,369 | 1,450 |
| Effect of convertible notes subject to conversion | 5,753 | 1,653 | 5,411 | 551 |
| Effect of convertible notes warrants subject to conversion | 1,958 | — | 1,681 | — |
| Diluted | 58,457 | 57,805 | 58,306 | 61,150 |

## 8. Commitments and Contingencies

*Normal Course litigation*

From time to time, the Company is also made a party to litigation incurred in the normal course of business. While any litigation has an element of uncertainty, the Company believes that the final outcome of any of these routine matters will not have a material effect on the Company's financial position or future liquidity.

## 9. Related Party Transactions

*The Candie's Foundation*

The Candie's Foundation, a charitable foundation founded by Neil Cole for the purpose of raising national awareness about the consequences of teenage pregnancy, owed the Company $.4 million at September 30, 2014 and less than $0.1 million at December 31, 2013. The Candie's Foundation intends to pay-off the entire borrowing from the Company during 2014, although additional advances will be made as and when necessary.

*Travel*

The Company recorded expenses of $95 and $72 in the Current Nine Months and Prior Year Nine Months, respectively, for the hire and use of aircraft solely for business purposes owned by a company in which the Company's chairman, chief executive officer and president is the sole owner. Management believes that all transactions were made on terms and conditions no less favorable than those available in the marketplace from unrelated parties.

## 10. Segment and Geographic Data

The Company has one reportable segment, licensing and commission revenue generated from its brands. The geographic regions consist of the United States, Japan and Other (which principally represent Canada and Europe). Revenues attributed to each region are based on the location in which licensees are located.

The net revenues by type of license and information by geographic region are as follows:

| (000's omitted) | For the Three Months Ended September 30, (unaudited) | | For the Nine Months Ended September 30, (unaudited) | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Licensing and other revenue by category: | | | | |
| Direct-to-retail license | $ 33,462 | $ 35,663 | $ 119,877 | $ 119,745 |
| Wholesale license | 50,160 | 56,479 | 138,136 | 170,434 |
| Entertainment and other | 30,128 | 15,033 | 90,818 | 37,183 |
| | $ 113,750 | $ 107,175 | $ 348,831 | $ 327,362 |
| Licensing and other revenue by geographic region: | | | | |
| United States | $ 65,888 | $ 75,783 | $ 227,861 | $ 221,964 |
| Japan | 6,565 | 9,754 | 23,084 | 21,738 |
| Other[1] | 41,297 | 21,638 | 97,886 | 83,660 |
| | $ 113,750 | $ 107,175 | $ 348,831 | $ 327,362 |

(1)   No single country represented 10% of the Company's revenues in the periods presented within "Other" on this table.

25

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*Executive Summary.* We are a brand management company engaged in licensing, marketing and providing trend direction for a diversified and growing consumer brand portfolio. Our brands are sold across every major segment of retail distribution, from luxury to mass. As of September 30, 2014, we owned the following iconic consumer brands: Candie's, Bongo, Badgley Mischka, Joe Boxer, Rampage, Mudd, London Fog, Mossimo, Ocean Pacific/OP, Danskin/Danskin Now, Rocawear, Cannon, Royal Velvet, Fieldcrest, Charisma, Starter, Waverly, Ecko, Zoo York, Sharper Image, Umbro and Lee Cooper. In addition, Peanuts Holdings, a joint venture in which we have an 80% controlling investment, owns, through its wholly-owned subsidiary Peanuts Worldwide, the Peanuts brands and characters; Alberta ULC, a joint venture in which we have a 51% controlling investment, owns the Buffalo brand; Hardy Way, a joint venture in which we have an 85% controlling investment, owns the Ed Hardy brands; MG Icon, a joint venture in which we have a 50% investment, owns the Material Girl and Truth or Dare brands; Scion LLC, a joint venture in which we have a 50% controlling investment, owns the Artful Dodger brand and has investments in the BBC and Ice Cream brands; and Icon Modern Amusement, a joint venture in which we have a 51% controlling investment, owns the Modern Amusement brand. We license our brands worldwide through over 1,000 direct-to-retail and wholesale licenses for use across a wide range of product categories, including sportswear, fashion accessories, footwear, entertainment, home products and décor, and beauty and fragrance. Our business model allows us to focus on our core competencies of marketing and managing brands without many of the risks and investment requirements associated with a more traditional operating company.

Our licensing agreements with leading retail and wholesale licensees throughout the world provide us with a predictable stream of guaranteed minimum royalties.

Our growth strategy is focused on increasing licensing revenue from our existing portfolio of brands through the addition of new product categories, expanding the retail penetration of our existing brands and optimizing the sales of our licensees. We will also seek to continue the international expansion of our brands by partnering with leading licensees and/or joint venture partners throughout the world. In addition, we believe we will continue to acquire iconic consumer brands and other asset light businesses with applicability to a wide range of merchandise categories and an ability to further diversify our brand portfolio.

**Highlights of Current Quarter**

- Record Q3 revenue of $113.8 million

- Record Q3 operating income of $63.6 million

- Gain related to the sale of our Umbro and Lee Cooper trademarks in the Greater China territory to our Iconix Southeast Asia joint venture

***Results of Operations***

*The Current Quarter compared to the Prior Year Quarter*

*Licensing and Other Revenue.* Licensing and other revenue for the Current Quarter totaled $113.8 million, a 6% increase as compared to $107.2 million for the Prior Year Quarter. Our Peanuts brands, certain women's fashion brands and certain home brands performed well in the Current Quarter, generating an aggregate increase of $4.3 million as compared to the Prior Year Quarter. This aggregate increase was offset by an aggregate decrease of $9.3 million primarily related to our Umbro brand due to the timing of the transition from Nike operated territories to our new licensee base, as well as general weakness in certain men's brands, specifically our Rocawear and Ecko brands as we complete the transition to our new core licensees. Additionally, we realized an $18.7 million gain in the Current Quarter on the sale of our Umbro and Lee Cooper trademarks in the Greater China territory to our Iconix SE Asia joint venture, as compared to a $5.1 million gain realized in the Prior Year Quarter on the formation of our Iconix Australia joint venture (see Note 3 of Notes to Unaudited Condensed Consolidated Financial Statements for descriptions of these transactions).

*Operating Expenses.* SG&A totaled $50.2 million for the Current Quarter as compared to $45.7 million for the Prior Year Quarter, an increase of $4.5 million. This increase in SG&A was driven by an increase of (i) $3.7 million increase in advertising related to fixture programs and Umbro sponsorship agreements, (ii) $2.6 million in compensation expense primarily due to the timing of earning out certain performance based compensation. These amounts were partially offset by an aggregate decrease of $1.8 million in professional fees and talent fees related to Peanuts brands.

*Operating Income.* Operating income for the Current Quarter increased to $63.6 million, or approximately 56% of total revenue, compared to approximately $61.5 million or approximately 57% of total revenue in the Prior Year Quarter.

*Other Expenses – Net.* Other expenses – net was approximately $16.4 million in the Current Quarter as compared to $17.2 million other expense – net in the Prior Year Quarter. Our equity earnings on joint ventures increased approximately $0.7 million from approximately $3.4 million in the Prior Year Quarter to $4.1 million in the Current Quarter, primarily due to international joint ventures created after the Prior Year Quarter in 2013—see Note 3 to Notes to Unaudited Condensed Consolidated Financial Statements for a description of these joint ventures.

*Provision for Income Taxes.* The effective income tax rate for the Current Quarter is approximately 21.0% resulting in a $9.9 million income tax expense, as compared to an effective income tax rate of 31.1% in the Prior Year Quarter which resulted in the $13.7 million income tax expense. The decrease in our effective tax rate primarily relates to a larger portion of our income in the Current Quarter as compared to the Prior Year Quarter being generated and permanently reinvested in countries outside the U.S. that have lower statutory rates than the U.S., primarily driven by the sale of our Umbro and Lee Cooper trademarks in the Greater China territory to our Iconix SE Asia joint venture.

*Net Income.* Our net income was approximately $37.2 million in the Current Quarter, compared to net income of approximately $30.5 million in the Prior Year Quarter, as a result of the factors discussed above.

*The Current Nine Months compared to the Prior Year Nine Months*

*Licensing and Other Revenue.* Licensing and other revenue for the Current Nine Months totaled $348.8 million, a 7% increase as compared to $327.4 million for the Prior Year Nine Months. Our Peanuts brands, certain women's fashion brands and certain home brands performed well in the Current Nine Months, generating an aggregate increase of $27.9 million as compared to the Prior Year Nine Months. This aggregate increase was offset by an aggregate decrease of $35.2 million primarily related to our Umbro brand due to the timing of the transition from Nike operated territories to our new licensee base, as well as general weakness in our mens brands, specifically our Rocawear and Ecko brands as we complete the transition to our new core licensees. Additionally, in the Current Nine Months we realized (i) an aggregate $32.3 million gain in the Current Nine Months on the sale of certain trademarks to our Iconix SE Asia joint venture (see Note 3 of Notes to Unaudited Condensed Consolidated Financial Statements for descriptions of these transactions), (ii) a $7.8 million gain on the sale of the "sharperimage.com" domain name and certain categories under the Sharper Image trademark and (iii) a $4.0 million gain on the formation of a Lee Cooper U.S. joint venture, as compared to an aggregate $14.9 million gain realized in the Prior Year Nine Months on the formation of our Iconix Canada and Iconix Australia joint ventures (see Note 3 of Notes to Unaudited Condensed Consolidated Financial Statements for descriptions of these transactions).

*Operating Expenses.* SG&A totaled $142.7 million for the Current Nine Months compared to $128.1 million for the Prior Year Nine Months an increase of $14.6 million. This increase in SG&A was driven by (i) an increase of $10.3 million in talent expenses related to the incremental increase in revenue in our Peanuts business (see above), and (ii) a $7.9 million increase in compensation mostly due to recently completed acquisitions, and a (iii) $4.1 million increase in other G&A related to retail support at Macy's . These increases were partially offset by (i) a decrease of $2.5 million in advertising expenses due to the timing of certain initiatives and (ii) a decrease of $2.8 million in professional fees primarily related to professional fees incurred in connection with an unconsummated transaction in the Prior Year Nine Months, and (iii) a $2.1 million decrease in consulting fees.

*Operating Income.* Operating income for the Current Nine Months increased to $206.1 million, or approximately 59% of total revenue, compared to $199.2 million or approximately 61% of total revenue in the Prior Year Nine Months.

*Other Expenses – Net.* Other expense – net was approximately $11.1 million in the Current Nine Months as compared to $40.0 million in the Prior Year Nine Months. Interest expense increased approximately $9.0 million for the following reasons: (i) an increase in interest related to our Senior Secured Notes (issued November 2012 and June 2013) of approximately $3.8 million, due to the second tranche of Senior Secured Notes issued in June 2013, (ii) an increase of approximately $5.0 million in interest related to our 1.50% Convertible Notes issued March 2013, partially offset by $1.7 million of interest expense related to our Ecko Note (extinguished in May 2013) in the Prior Year Nine Months for which there is no comparable expense in the Current Nine Months. Interest and other income increased $32.7 million from $6.9 million in the Prior Year Nine Months to approximately $39.6 million in the Current Nine Months primarily due to a $37.9 million non-cash gain in the Current Nine Months related to the fair value re-measurement of our original 50% interest in Iconix Latin America – see Note 3 to Notes to Unaudited Condensed Consolidated Financial Statements for a description of this transaction, as compared to a $5.4 million gain in the Prior Year Nine Months related to the sale of securities for which there is no comparable transaction in the Current Nine Months. Our equity earnings on joint ventures increased approximately $5.3 million from approximately $7.6 million in the Prior Year Nine Months to $12.9 million in the Current Nine Months, primarily due to international joint ventures created since June 2013 as compared to a full nine months of earnings in the Current Nine Months, partially offset by our Latin America joint venture which was included in equity earnings on joint ventures until February 2014 when we began consolidating following our purchase of our partner's remaining interest in Iconix Latin America – see Note 3 to Notes to Unaudited Condensed Consolidated Financial Statements for a description of these joint ventures.

*Provision for Income Taxes.* The effective income tax rate for the Current Nine Months is approximately 28.8% resulting in a $56.2 million income tax expense, as compared to an effective income tax rate of 29.8% in the Prior Year Nine Months which resulted in the $47.4 million income tax expense. The decrease in our effective tax rate primarily relates to, a smaller portion of our income in the Current Nine Months as compared to the Prior Year Nine Months being generated and permanently reinvested in countries outside the U.S. that have lower statutory rates than the U.S., partially offset by a one-time tax assessment of approximately $2.1 million related to new legislation on income earned in New York State.

*Net Income.* Our net income was approximately $138.8 million in the Current Nine Months, compared to net income of approximately $111.8 million in the Prior Year Nine Months, as a result of the factors discussed above.

**Liquidity and Capital Resources**

*Liquidity*

Our principal capital requirements have been to fund acquisitions, working capital needs, share repurchases and, to a lesser extent, capital expenditures. We have historically relied on internally generated funds to finance our operations and our primary source of capital needs for acquisition has been the issuance of debt and equity securities. At September 30, 2014 and December 31, 2013, our cash totaled $129.5 million and $278.8 million, respectively, not including short-term restricted cash of $48.7 million and $58.9 million, respectively, which primarily consists of cash and cash equivalent deposits, held in accounts primarily for debt service.

We believe that cash from future operations, our currently available cash and capacity for additional financings under our Senior Secured Notes facility will be sufficient to satisfy our anticipated working capital requirements for the foreseeable future, including early redemptions by our convertible notes' holders in the event circumstances allow for early redemptions. We intend to continue financing future brand acquisitions through a combination of cash from operations, bank financing and the issuance of additional equity and/or debt securities. See Note 5 of Notes to the Unaudited Condensed Consolidated Financial Statements for a description of certain prior financings consummated by us.

*Changes in Working Capital*

At September 30, 2014 and December 31, 2013 the working capital ratio (current assets to current liabilities) was 2.59 to 1 and 3.65 to 1, respectively.

*Operating Activities*

Net cash provided by operating activities decreased approximately $35.8 million, from $160.2 million in the Prior Year Nine Months to $124.4 million in the Current Nine Months. After excluding the non-cash gain in the Current Nine Months related to the fair value re-measurement of our original 50% interest in Iconix Latin America and the deferred taxes associated with that non-cash gain, the decrease in net cash provided by operating activities was primarily related to an increase in the gain on sale of trademarks (see Note 3 of Notes to Unaudited Condensed Consolidated Financial Statements for descriptions of these transactions) and an increase in our earnings from our equity investments in joint ventures in the Current Nine Months, as well as an aggregate decrease in the net change in balance sheet items of approximately $22.9 million. These aggregate decreases were partially offset by an increase in amortization of the convertible note discount related to the 1.50% Convertible Notes financed in March 2013, and a gain on the sale of securities of $5.4 million in the Prior Year Nine Months as compared to $0.1 million in the Current Nine Months.

*Investing Activities*

Net cash used in investing activities decreased approximately $189.4 million, from $226.3 million in the Prior Year Nine Months to $36.9 million in the Current Nine Months. This decrease is primarily due to our purchase of the remaining 50% interest in Iconix Latin America from our joint venture partner in the Current Nine Months for $42.0 million in cash, as compared to the following acquisitions in the Prior Year Nine Months: our acquisition of a 51% interest in Buffalo for $76.5 million in cash, our acquisition of Lee Cooper for $66.7 million in cash, our acquisition of the remaining 49% interest in IPH Unltd from our joint venture partner for $45.0 million in cash, our investment in Marcy Media for $32.0 million in cash, and our investment in Complex Media for $25.0 million in cash.

*Financing Activities*

Net cash used in financing activities was $232.8 million in the Current Nine Months, compared to $106.0 million of net cash provided by financing activities in the Prior Year Nine Months. In the Prior Year Nine Months we issued our 1.50% Convertible Notes which resulted in net proceeds of $365.6 million (which includes the purchase of hedges and sale of warrants), as well as the issuance of the second tranche of our Senior Secured Notes which resulted in net proceeds of $270.2 million. There were no comparable financings in the Current Nine Months. This was partially offset by a decrease in share repurchases of $238.1 million from $406.3 million in the Prior Year Nine Months to $168.2 million in the Current Nine Months, and a decrease in principal payments of $32.2 million from $79.8 million in the Prior Year Nine Months compared to $47.6 million in the Current Nine Months primarily related to the early extinguishment of our Ecko Note in May 2013, partially offset by an increase in principal payments related to the second tranche of our Senior Secured Notes which was issued in June 2013 for which there were no principal payments in the Prior Year Nine Months.

28

***Other Matters***

*New Accounting Standards*

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASU 2014-09, "Revenue from Contracts with Customers (Topic 606)," which is the new comprehensive revenue recognition standard that will supersede all existing revenue recognition guidance under U.S. GAAP. The standard's core principle is that a company will recognize revenue when it transfers promised goods or services to a customer in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. This ASU is effective for annual and interim periods beginning on or after December 15, 2016, and early adoption is not permitted. Companies will have the option of using either a full retrospective approach or a modified approach to adopt the guidance in the ASU. We are currently evaluating the impact of adopting this guidance.

In April 2014, the FASB issued Accounting Standards Update No. 2014-08 (ASU 2014-08) "Presentation of Financial Statements (Topic 205) and Property, Plant, and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity." ASU 2014-08 raises the threshold for a disposal to qualify as a discontinued operation and requires new disclosures of both discontinued operations and certain other disposals that do not meet the definition of a discontinued operation. This ASU is effective for annual periods beginning on or after December 15, 2014. Early adoption is permitted but only for disposals that have not been reported in financial statements previously issued. We do not expect this new accounting pronouncement to have an impact on our consolidated financial statements.

*Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995* The statements that are not historical facts contained in this report are forward looking statements that involve a number of known and unknown risks, uncertainties and other factors, all of which are difficult or impossible to predict and many of which are beyond our control, which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward looking statements. These risks are detailed our Form 10-K for the fiscal year ended December 31, 2013 and other SEC filings. The words "believe", "anticipate," "expect", "confident", "project", "provide", "guidance" and similar expressions identify forward-looking statements. Readers are cautioned not to place undue reliance on these forward looking statements, which speak only as of the date the statement was made.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

We limit exposure to foreign currency fluctuations by requiring the majority of our licenses to be denominated in U.S. dollars. Certain other licenses are denominated in Japanese Yen and the Euro. To mitigate interest rate risks, we have, from time to time, purchased derivative financial instruments such as forward contracts to convert certain portions of our revenue and cash received in foreign currencies to fixed exchange rates. If there were an adverse change in the exchange rate from Japanese Yen to U.S. dollars or the Euro to U.S. dollars of less than 10%, the expected effect on net income would be immaterial.

Moreover, in connection with the warrant transactions with the counterparties related to our 2.50% Convertible Notes and our 1.50% Convertible Notes, to the extent that the price of our common stock exceeds the strike price of the warrants, the warrant transactions could have a dilutive effect on our earnings per share.

The effect, if any, of these transactions and activities on the trading price of our common stock will depend in part on market conditions and cannot be ascertained at this time, but any of these activities could adversely affect the value of our common stock.

**Item 4. Controls and Procedures**

The Company, under the supervision and with the participation of its management, including its principal executive officer and principal financial officer, evaluated the effectiveness of the design and operation of its disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, herein referred to as the Exchange Act) as of the end of the period covered by this report. The purpose of disclosure controls is to ensure that information required to be disclosed in our reports filed with or submitted to the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls are also designed to ensure that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure. Based on this evaluation, the principal executive officer and principal financial officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information required to be included in our periodic SEC filings and ensuring that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms.

The principal executive officer and principal financial officer also conducted an evaluation of internal control over financial reporting, herein referred to as internal control, to determine whether any changes in internal control occurred during the nine months ended September 30, 2014 that may have materially affected or which are reasonably likely to materially affect internal control. Based on that evaluation, there has been no change in the Company's internal control during the nine months ended September 30, 2014 that has materially affected, or is reasonably likely to materially affect, the Company's internal control.

29

**PART II. Other Information**

**Item 1. Legal Proceedings.**

See Note 8 of Notes to Unaudited Condensed Consolidated Financial Statements.

**Item 1A. Risk Factors.**

In addition to the risk factors disclosed in Part 1, Item 1A, "Risk Factors" of our Annual Report on Form 10-K for the year ended December 31, 2013, set forth below are certain factors that have affected, and in the future could affect, our operations or financial condition. We operate in a changing environment that involves numerous known and unknown risks and uncertainties that could impact our operations. The risks described below and in our Annual Report on Form 10-K for the year ended December 31, 2013 are not the only risks we face. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our financial condition and/or operating results.

***Our existing and future debt obligations could impair our liquidity and financial condition, and in the event we are unable to meet our debt obligations we could lose title to our trademarks.***

As of September 30, 2014, our consolidated balance sheet reflects debt of approximately $1,401.8 million, including secured debt of $789.3 million under our Senior Secured Notes. In accordance with ASC 470, our 1.50% Convertible Notes and our 2.50% Convertible Notes are included in our $1,401.8 million of consolidated debt at a net debt carrying value of $335.8 and $276.7 million, respectively; however, the principal amount owed to the holders of our 1.50% Convertible Notes and 2.50% Convertible Notes is $400.0 million (due March 2018) and $300.0 million (due June 2016), respectively. We may also assume or incur additional debt, including secured debt, in the future in connection with, or to fund, future acquisitions or refinance our existing debt obligations. Our debt obligations:

- could impair our liquidity;

- could make it more difficult for us to satisfy our other obligations;

- require us to dedicate a substantial portion of our cash flow to payments on our debt obligations, which reduces the availability of our cash flow to fund working capital, capital expenditures and other corporate requirements;

- could impede us from obtaining additional financing in the future for working capital, capital expenditures, acquisitions and general corporate purposes;

- impose restrictions on us with respect to the use of our available cash, including in connection with future acquisitions;

- make us more vulnerable in the event of a downturn in our business prospects and could limit our flexibility to plan for, or react to, changes in our licensing markets; and

- could place us at a competitive disadvantage when compared to our competitors who have less debt.

In addition, as of September 30, 2014, approximately $52.9 million, or 30%, of our total cash (including restricted cash) was held in foreign subsidiaries. Our investments in these foreign subsidiaries are considered indefinitely reinvested and unavailable for the payment of any U.S. based expenditures, including debt obligations. Any repatriation of cash from these foreign subsidiaries may require the accrual and payment of U.S. federal and certain state taxes, which could negatively impact our results of operations and/or the amount of available funds. While we currently have no intention to repatriate cash from these subsidiaries, should the need arise domestically, there is no guarantee that we could do so without adverse consequences.

While we believe that by virtue of the cash on our balance sheet as of September 30, 2014, our ability to draw down additional funds under a revolving financing facility consisting of variable funding notes, additional capacity under our Senior Secured Notes facility, and the guaranteed minimum and percentage royalty payments due to us under our licenses we will generate sufficient revenues from our licensing operations to satisfy our obligations for the foreseeable future, in the event that we were to fail in the future to make any required payment under agreements governing our indebtedness or fail to comply with the financial and operating covenants contained in those agreements, we would be in default regarding that indebtedness. A debt default could significantly diminish the market value and marketability of our common stock and could result in the acceleration of the payment obligations under all or a portion of our consolidated indebtedness.

***A substantial portion of our licensing revenue is concentrated with a limited number of licensees such that the loss of any of such licensees could decrease our revenue and impair our cash flows.***

Our licensees Wal-Mart, Target, Kohl's and Kmart/Sears were our four largest direct-to-retail licensees during the Current Nine Months, representing approximately 13%, 6%, 5% and 5%, respectively, of our total revenue for such period. Because we are dependent on these licensees for a significant portion of our licensing revenue, if any of them were to have financial difficulties affecting their ability to make payments, or if any of these licensees decides not to renew or extend any existing agreement with us, or to significantly reduce its sales of licensed products under any of the agreement(s), our revenue and cash flows could be reduced substantially.

30

# A-1182

*We have a material amount of goodwill and other intangible assets, including our trademarks, recorded on our balance sheet. As a result of changes in market conditions and declines in the estimated fair value of these assets, we may, in the future, be required to write down a portion of this goodwill and other intangible assets and such write-down would, as applicable, either decrease our net income or increase our net loss.*

As of September 30, 2014, goodwill represented approximately $231.9 million, or approximately 8% of our total consolidated assets, and trademarks and other intangible assets represented approximately $2,028.6 million, or approximately 71% of our total consolidated assets. Under current U.S. GAAP accounting standards, goodwill and indefinite life intangible assets, including some of our trademarks, are no longer amortized, but instead are subject to impairment evaluation based on related estimated fair values, with such testing to be done at least annually. While, to date, no impairment write-downs have been necessary, any write-down of goodwill or intangible assets resulting from future periodic evaluations would, as applicable, either decrease our net income or increase our net loss and those decreases or increases could be material.

*Convertible note hedge and warrant transactions that we have entered into may affect the value of our common stock.*

In connection with the initial sale of our 2.50% Convertible Notes, we purchased convertible note hedges, herein referred to as 2.50% Convertible Note Hedges, from affiliates of Barclays PLC and Goldman Sachs Inc., herein referred to as the 2.50% Hedge Counterparties. At such time, the hedging transactions were expected, but were not guaranteed, to eliminate the potential dilution upon conversion of the 2.50% Convertible Notes. Concurrently, we entered into warrant transactions with the 2.50% Hedge Counterparties, herein referred to as the 2.50% Sold Warrants.

Moreover, in connection with the 2.50% Sold Warrants, to the extent that the price of our common stock exceeds the strike price of the 2.50% Sold Warrants, the warrant transaction could have a dilutive effect on our earnings per share which may affect the value of our common stock.

## Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

There have been no unregistered sales of equity securities during the Current Quarter. The following table represents information with respect to purchases of common stock made by the Company during the Current Quarter:

| Month of purchase | Total number of shares purchased* | Average price paid per share | Total number of shares purchased as part of publicly announced plans or programs (1)(2) | Maximum number (or approximate dollar value) of shares that may yet be purchased under the plans or programs |
|---|---|---|---|---|
| July 1 – July 31 | 11,815 | $ 43.15 | — | $ 574,790,125 |
| August 1 – August 31 | 625 | $ 41.75 | — | $ 574,790,125 |
| September 1 – September 30 | — | $ — | 700,000 | $ 547,475,455 |
| Total | 12,440 | $ 43.08 | 700,000 | $ 547,475,455 |

(1) On July 22, 2013, the Board of Directors authorized the repurchase of up to $300 million of the Company's common stock over a period ending July 22, 2016, herein referred to as the July 2013 Program. The July 2013 Program is in addition to the February 2013 Program and the 2011 Program. The July 2013 Program does not obligate the Company to repurchase any specific number of shares and may be suspended at any time at management's discretion.

(2) On February18, 2014, the Board of Directors authorized the repurchase of up to $500 million of the Company's common stock over a period ending February 18, 2017, herein referred to as the 2014 Program. The 2014 Program is in addition to prior programs. The 2014 Program does not obligate the Company to repurchase any specific number of shares and may be suspended at any time at management's discretion.

\* Amounts not purchased under the repurchase plan represent shares surrendered to the Company to pay withholding taxes due upon the vesting of restricted stock.

31

**Item 6. Exhibits**

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT |
|---|---|
| Exhibit 31.1 | Certification of Chief Executive Officer Pursuant To Rule 13a-14 or 15d-14 of The Securities Exchange Act of 1934, As Adopted Pursuant To Section 302 Of The Sarbanes-Oxley Act of 2002* |
| Exhibit 31.2 | Certification of Chief Financial Officer Pursuant To Rule 13a-14 or 15d-14 of The Securities Exchange Act of 1934, As Adopted Pursuant To Section 302 Of The Sarbanes-Oxley Act of 2002* |
| Exhibit 32.1 | Certification of Chief Executive Officer Pursuant To 18 U.S.C. Section 1350, As Adopted Pursuant To Section 906 of The Sarbanes-Oxley Act of 2002* |
| Exhibit 32.2 | Certification of Chief Financial Officer Pursuant To 18 U.S.C. Section 1350, As Adopted Pursuant To Section 906 of The Sarbanes-Oxley Act of 2002* |
| Exhibit 101.INS | XBRL Instance Document* |
| Exhibit 101.SCH | XBRL Schema Document* |
| Exhibit 101.CAL | XBRL Calculation Linkbase Document* |
| Exhibit 101.DEF | XBRL Definition Linkbase Document* |
| Exhibit 101.LAB | XBRL Label Linkbase Document* |
| Exhibit 101.PRE | XBRL Presentation Linkbase Document* |

\* Filed herewith.

32

**A-1184**

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Iconix Brand Group, Inc.**
**(Registrant)**

Date: November 7, 2014

/s/ Neil Cole

Neil Cole
Chairman of the Board, President and Chief Executive Officer

Date: November 7, 2014

/s/ Jeff Lupinacci

Jeff Lupinacci
Executive Vice President and Chief Financial Officer

33

A-1185

**Exhibit 31.1**

ICONIX BRAND GROUP, INC.

CERTIFICATION PURSUANT TO RULE 13a-14 OR 15d-14 OF

THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO

SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Neil Cole, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the period ended September 30, 2014 of Iconix Brand Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 7, 2014

/s/ Neil Cole
_____
Neil Cole
President and Chief Executive Officer

**Exhibit 31.2**

ICONIX BRAND GROUP, INC.

CERTIFICATION PURSUANT TO RULE 13a-14 OR 15d-14 OF

THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO

SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Jeff Lupinacci, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the period ended September 30, 2014 of Iconix Brand Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 7, 2014


/s/ Jeff Lupinacci
Jeff Lupinacci
Executive Vice President and Chief Financial Officer

**Exhibit 32.1**

ICONIX BRAND GROUP, INC.

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,

AS ADOPTED PURSUANT TO SECTION 906 OF

THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Iconix Brand Group, Inc. (the "Company") on Form 10-Q for the period ended September 30, 2014 (the "Report"), I, Neil Cole, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

(1) The Report fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ Neil Cole
Neil Cole
President and Chief Executive Officer

Date: November 7, 2014

**Exhibit 32.2**

ICONIX BRAND GROUP, INC.

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,

AS ADOPTED PURSUANT TO SECTION 906 OF

THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Iconix Brand Group, Inc. (the "Company") on Form 10-Q for the period September 30, 2014 (the "Report"), I, Jeff Lupinacci, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

(1) The Report fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

/s/ Jeff Lupinacci
Jeff Lupinacci
Executive Vice President and Chief Financial Officer

Date: November 7, 2014

A-1189

# A-1190

*Execution Version*

THIS CONSULTANCY AGREEMENT is entered into and effective as of September 30, 2013 (this "**Agreement**") between:

1.    **ICONIX BRAND GROUP, INC.**, a Delaware corporation (the "**Company**"); and

2.    **LF CENTENNIAL LIMITED**, a company incorporated with limited liability in the British Virgin Islands with company number 1043130 (the "**Consultant**").

## BACKGROUND

(A)    The Company is engaged in the business of licensing brands worldwide and has retained and wishes to continue to retain the Consultant to provide services to the Company on the terms and subject to the conditions of this Agreement.

(B)    The Consultant has in-depth knowledge regarding the market for consumer goods in Asia.

(C)    The Company has engaged the Consultant to provide services on the terms set out in this Agreement.

## OPERATIVE PART

1.    **Definitions**

The following terms are defined:

"**Affiliate**" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, "control," "controlling," "controlled by" or "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and

"**Person**" means any individual or any partnership, corporation, estate, trust, company or other legal entity.

2.    **Appointment**

The Company has since 1st August 2013 retained and continues to retain the Consultant and the Consultant agrees to provide to the Company brand strategy services in Asia to assist the Company in developing its brands (the "**Services**").

3.    **Fee**

The Company shall pay to the Consultant a fixed fee of US$2,000,000, which shall be payable in four installments as follows:



GOVERNMENT
EXHIBIT
207
19 Cr. 869 (ER)

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.      ICON-148-00000040

(a) The first installment of US$500,000 will be paid on or before 15th October 2013;

(b) The second installment of US$500,000 will be paid on or before 31st October 2013;

(c) The third installment of US$500,000 will be paid on or before 30th November 2013; and

(d) The first installment of US$500,000 will be paid on or before 31st December 2013.

This fee shall be payable regardless of the level of services required by the Company and rendered by the Consultant.

4.  **Term and Termination**

The term of this Agreement will commence on the date of this Agreement but with an Effective Date of 1st August 2013, and shall continue until 31st December 2013 (the "**Term Date**"). This Agreement shall terminate on the Term Date or upon such other date as agreed in writing between the Consultant and the Company.

5.  **Independent Contractors**

The Consultant shall be an independent contractor with respect to the Company and at no time and for no purpose shall the Consultant be considered an employee or agent of the Company. It is hereby agreed by both the Consultant and the Company that the agreement herein contained does not constitute a contract of employment for the purposes of any related labour legislation, the payment of income tax or of national insurance contributions or for any other purposes whatsoever. The Consultant shall not be entitled to participate in any pension, bonus, profit-sharing, health insurance, or other employee plans or arrangements of the Company. The Consultant shall have no authority to make or execute any contract, sales, or other agreement in the name or for the account of the Company, or to make any representation or create or incur any obligation or liability of any kind, express or implied, on behalf of the Company. The Consultant shall be responsible for paying all taxes related to payments the Company makes to the Consultant, including but not limited to income tax and mandatory insurance coverage.

6.  **Exclusion of Liability**

Neither the Consultant nor any of its Affiliates shall be liable, whether in contract, tort (including negligence) or otherwise, to the Company or be deemed to be in breach of any provision of this Agreement by reason of the performance of, any delay in performing, or any failure to perform, any of its obligations under this Agreement. This Clause 6 shall survive the expiry or termination of this Agreement.

7.  **Miscellaneous**

7.1  Assignment
Neither the Consultant nor the Company may assign its obligations under this Agreement. The Consultant is permitted to assign the right to receive the Fee to any Affiliate.

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-148-00000041

7.2     Governing Law

This Agreement shall be governed by and construed in accordance with the laws of Hong Kong Special Administrative Region

7.3     Amendment

This Agreement shall not be amended other than by an instrument in writing signed by both of the parties hereto.

7.4     Severability

If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected and shall be enforceable to the maximum extent permitted by law.

7.5     Counterparts

This Agreement may be executed in one or more counterparts with the same effect as if each of the parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or electronic transmission shall be deemed to be their original signatures for all purposes.

*[Signature page follows.]*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-148-00000042

# A-1193

IN WITNESS WHEREOF, the Company and the Consultant have each caused this document to be executed by themselves or their duly authorised officers as of the day and year first above written.

_____
For and on behalf of
**LF CENTENNIAL LIMITED**

_____
For and on behalf of
**ICONIX BRAND GROUP, INC.**

*Consultancy Agreement*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.　　　　ICON-148-00000043

IN WITNESS WHEREOF, the Company and the Consultant have each caused this document to be executed by themselves or their duly authorised officers as of the day and year first above written.

For and on behalf of
**LF CENTENNIAL LIMITED**

For and on behalf of
**ICONIX BRAND GROUP, INC.**

*Consultancy Agreement*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-148-00000044

# A-1195

To:     LF Asia Limited
11th Floor, LiFung Tower,
888 Cheung Sha Wan Road,
Kowloon,
Hong Kong

Date:  30 June 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks**

Reference is hereby made to (a) the Amendment No. 1 to the Master License Agreement (the "*Master License Agreement Amendment*") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("*Iconix*"), certain of Iconix's wholly owned subsidiaries ("*Licensors*") and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("*Licensee*"), amending the Master License Agreement (the "*Existing Master License Agreement*"), effective as of September 30, 2013, by and among Iconix, Licensors and Licensee, and (b) the First Amended and Restated Shareholders Agreement of Iconix SE Asia Limited (the "*First Amended and Restated Shareholders Agreement*" and, together with the Master License Agreement Amendment, the "*SEA JV Amendments*") to be entered into as of the date hereof by and between Iconix and LF Asia Limited ("*LF*"), amending the Shareholders Agreement of Lion Network Limited (the "*Existing Shareholders Agreement*"), effective as of September 30, 2013, by and between Iconix and LF. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Existing Master License Agreement as amended by the Master License Agreement Amendment (or if not therein defined, in the First Amended and Restated Shareholders Agreement), as applicable.

Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by Licensors in the Republic of Korea, Europe or Turkey granted by Licensors to Licensee pursuant to the SEA JV Amendments (the "*Additional Marks*") is deemed to have a fair market value of US$31,835,000, and that because Iconix and LF each own 50% of Licensee, LF's ownership of 50% of Licensee will provide LF a benefit equal to 50% of such fair market value, or US$15,917,500.

In order to compensate Iconix for the transfer of 50% of the fair market value of the Additional Marks to LF (through LF's 50% shareholding in Licensee) pursuant to the SEA JV Amendments, Iconix and LF hereby agree that LF shall pay Iconix US$15,917,500 (the "*Additional Marks Consideration*"), which amount Iconix and LF shall treat for all U.S. tax purposes as paid by LF to Iconix in exchange for 50% of the Additional Marks, following which each of Iconix and LF shall be treated for U.S. tax purposes as contributing its respective share of the Additional Marks to the Licensee.

LF shall pay the Additional Marks Consideration to Iconix as follows, in each case by wire transfer in immediately available funds:



GOVERNMENT
EXHIBIT
210
19 Cr. 869 (ER)

Page 1

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                                    **ICON-034-00029129**

# A-1196

(a)     US$3,979,375 on the date hereof;

(b)     US$3,979,375 on the first (1st) anniversary of the date of this letter;

(c)     US$3,979,375 on the second (2nd) anniversary of the date of this letter; and

(d)     US$3,979,375 on the third (3rd) anniversary of the date of this letter.

Iconix hereby agrees that the distributions by Licensee to the LF Shareholder pursuant to the First Amended and Restated Shareholders Agreement in respect of the New Licensed Brands in the New Territory shall be (a) for fiscal year 2014, at least US$1,500,000 (the "**2014 Minimum Distribution Amount**") and (b) for fiscal year 2015, at least $1,000,000 (the "**2015 Minimum Distribution Amount**" and, together with the 2014 Minimum Distribution Amount, the "**Minimum Distribution Amounts**"); provided that, if the LF Shareholder's share of Licensee's distributable amounts in respect of 2014 or 2015 is less than the Minimum Distribution Amount for such year, then the deficit (the "**Deficit**") shall be paid to the LF Shareholder by Licensee out of the distributions otherwise payable to the Iconix Shareholder for such year; provided further that, if Licensee's distributable amounts in respect of 2014 or 2015 are not sufficient to make a distribution to the LF Shareholder that is equal to or greater than the Deficit for such year, then Iconix shall pay such Deficit to the LF Shareholder in cash.

To the extent the transactions contemplated in this letter agreement result in the assessment of any tax (such tax, if any, the "**Korean Withholding Tax**") by the applicable tax authority in the Republic of Korea (the "**Korean Tax Authority**"), Iconix and LF agree that LF shall (a) withhold from the relevant payment of Additional Marks Consideration an amount equal to the Korean Withholding Tax, (b) appoint a tax administrator necessary for the payment of the Korean Withholding Tax to the Korean Tax Authority, the costs of which appointment shall be borne entirely by LF and shall not be withheld from the Additional Marks Consideration, (c) pay or cause to be paid the Korean Withholding Tax to the Korean Tax Authority, and (d) within ten (10) days of the payment of the Korean Withholding Tax in foregoing clause (c), submit to Iconix evidence of such payment in form satisfactory to Iconix in its sole discretion. All amounts properly withheld as Korean Withholding Tax and paid (or caused to be paid) to the Korean Tax Authority by LF pursuant to this paragraph shall be treated as amounts paid to Iconix as Additional Marks Consideration for U.S. tax purposes.

This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV Amendments, the Existing Master License Agreement, the Existing Shareholders Agreement and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

*[Signature page follows.]*

Page 2

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-034-00029130**

# A-1197

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

For and on behalf of
Iconix Brand Group, Inc.
By: Neil Cole
Title: Chief Executive Officer

Acknowledged and agreed:

_____
For and on behalf of
LF Asia Limited

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks*

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**       **ICON-034-00029131**

# A-1198

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

_____

For and on behalf of
Iconix Brand Group, Inc.

Acknowledged and agreed:

_____

For and on behalf of
LF Asia Limited
by Jason Rabin

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks*

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                          **ICON-034-00029132**

# A-1199

To:     Global Brands Group Asia Limited
        f/k/a LF Asia Limited
        9th Floor, LiFung Tower,
        888 Cheung Sha Wan Road,
        Kowloon,
        Hong Kong

Date:  17 September 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks**

Reference is hereby made to (a) the Amendment No. 2 to the Master License Agreement (the "*Master License Agreement Amendment*") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("*Iconix*"), certain of Iconix's wholly owned subsidiaries ("*Licensors*"), and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("*Licensee*"), amending the Master License Agreement (as amended by Amendment No. 1 to Master License Agreement, effective as of June 30, 2014, the "*Existing Master License Agreement*"), by and among Iconix, Licensors and Licensee, and (b) the Second Amended and Restated Shareholders Agreement of Iconix SE Asia Limited (the "*Second Amended and Restated Shareholders Agreement*" and, together with the Master License Agreement Amendment, the "*SEA JV Amendments*") to be entered into as of the date hereof by and between Iconix and Global Brands Group Asia Limited, f/k/a LF Asia Limited ("*GBG*"), amending the First Amended and Restated Shareholders Agreement of Lion Network Limited (the "*Existing Shareholders Agreement*"), effective as of June 30, 2014, by and between Iconix and GBG. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Existing Master License Agreement as amended by the Master License Agreement Amendment (or if not therein defined, in the Second Amended and Restated Shareholders Agreement), as applicable.

Iconix and GBG acknowledge and agree that the right to use certain trademark registrations or applications owned by Iconix Luxembourg Holdings S.ar.l. ("*Iconix Luxembourg*") and Red Diamond Holdings S.ar.l. ("*Red Diamond*" and, together with Iconix Luxembourg, the "*CHMT Marks Licensors*") in the People's Republic of China, the Hong Kong Special Administrative Region of the People's Republic of China, the Macau Special Administrative Region of the People's Republic of China, and the Republic of China (the "*CHMT Territory*") granted by Licensors to Licensee pursuant to the SEA JV Amendments (the "*CHMT Marks*") is deemed to have a fair market value of US$43,000,000, and that because Iconix and GBG each own 50% of Licensee, GBG's ownership of 50% of Licensee will provide GBG a benefit equal to 50% of such fair market value, or US$21,500,000.

In order to compensate the CHMT Marks Licensors for the transfer of 50% of the fair market value of the CHMT Marks to GBG (through GBG's 50% shareholding in Licensee) pursuant to the SEA JV Amendments, the CHMT Marks Licensors and GBG hereby agree that GBG shall pay US$21,500,000 (the "*CHMT Marks Consideration*"), of which US$17,000,000 shall be payable to Iconix Luxembourg and US$4,500,000 shall be payable to

GOVERNMENT
EXHIBIT
212
19 Cr. 869 (ER)

Page 1

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-051-00052301

19 Cr. 869 (ER)

# A-1200

Red Diamond, and which amount the CHMT Marks Licensors and GBG shall treat for all U.S. and Luxembourg tax purposes as paid by GBG to the CHMT Marks Licensors in exchange for 50% of the CHMT Marks, following which each of the CHMT Marks Licensors and GBG shall be treated for U.S. and Luxembourg tax purposes as contributing its respective share of the CHMT Marks to the Licensee.

GBG shall pay the CHMT Marks Consideration to the CHMT Marks Licensors as follows, in each case by wire transfer in immediately available funds:

(a)     US$4,300,000 on the date hereof;

(b)     US$1,300,000 on December 13, 2014;

(c)     US$1,100,000 on March 31, 2015;

(d)     US$1,100,000 on June 30, 2015;

(e)     US$4,300,000 on the first (1st) anniversary of the date of this letter;

(f)     US$3,200,000 on the second (2nd) anniversary of the date of this letter;

(g)     US$3,100,000 on the third (3rd) anniversary of the date of this letter; and

(h)     US$3,100,000 on the fourth (4th) anniversary of the date of this letter.

Iconix hereby agrees that the distributions by Licensee to the GBG Shareholder pursuant to the Second Amended and Restated Shareholders Agreement (a) in respect of the CHMT Marks in the CHMT Territory shall be (i) for fiscal year 2014, at least US$2,000,000 (the "*2014 Minimum Distribution Amount*") and (ii) for fiscal year 2015, at least $2,500,000 (the "*2015 Minimum Distribution Amount*", and (b) in respect of the CHMT Marks licensed to the Licensee by Red Diamond in the CHMT Territory shall be (i) for fiscal year 2016, at least US$300,000 (the "*2016 Minimum Distribution Amount*") and (ii) for fiscal year 2017, at least US$335,000 (the "*2017 Minimum Distribution Amount*") (and, together with the 2014 Minimum Distribution Amount, the 2015 Minimum Distribution Amount and the 2016 Minimum Distribution Amount, the "*Minimum Distribution Amounts*"); provided that, if the GBG Shareholder's share of Licensee's distributable amounts in respect of 2014, 2015, 2016 or 2017 is less than the Minimum Distribution Amount for such year, then the deficit (the "*Deficit*") shall be paid to the GBG Shareholder by Licensee out of the distributions otherwise payable to the Iconix Shareholder for such year; provided further that, if Licensee's distributable amounts in respect of 2014, 2015, 2016 or 2017 are not sufficient to make a distribution to the GBG Shareholder that is equal to or greater than the Deficit for such year, then Iconix Luxembourg and Red Diamond shall pay such Deficit to the GBG Shareholder in cash.

This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV Amendments, the Existing Master License Agreement, the Existing Shareholders Agreement and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

Page 2

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-051-00052302

## A-1201

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

*[Signature page follows.]*

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-051-00052303**

# A-1202

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

For and on behalf of
RED DIAMOND HOLDINGS SÀRL

For and on behalf of
RED DIAMOND HOLDINGS SÀRL

For and on behalf of
ICONIX BRAND GROUP, INC.

Acknowledged and agreed:

For and on behalf of
GLOBAL BRANDS GROUP ASIA LIMITED, f/k/a
LF ASIA LIMITED

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.      ICON-051-00052304

# A-1203

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
ICONIX BRAND GROUP, INC.

Acknowledged and agreed:

_____
For and on behalf of
GLOBAL BRANDS GROUP ASIA LIMITED, f/k/a
LF ASIA LIMITED

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks*

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.** **ICON-051-00052305**

# A-1204

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

_____
For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
ICONIX BRAND GROUP, INC.

Acknowledged and agreed:

_____
For and on behalf of
GLOBAL BRANDS GROUP ASIA LIMITED, f/k/a
LF ASIA LIMITED

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks*

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**

**ICON-051-00052306**

---

**From:** Stevens, Mark J. [mark.stevens@mayerbrownjsm.com]
**Sent:** 6/25/2014 11:18:01 AM
**To:** Cook, Nicholas C.A. [nicholas.cook@mayerbrownjsm.com]; Alyssa Perlowitz [aperlowitz@iconixbrand.com]; Kim, Brian J. [BKim@gibsondunn.com]; Lauren Gee [lgee@iconixbrand.com]; bbecker@gibsondunn.com; D'Amico, Evan M. [EDAmico@gibsondunn.com]; Seth Horowitz [shorowitz@iconixbrand.com]; Jason Schaefer [jschaefer@iconixbrand.com]
**CC:** Jared Margolis (Jaredmargolis@lfasia.com) [Jaredmargolis@lfasia.com]; Robert Smits [RobertSmits@lfusa.com]; DMS - K-Pop (#14448383) [MayerBrownJSMFile.14448383.current@dms.mayerbrownjsm.com]; Ethan Cole [ethancole@lfusa.com]; Kevin Chow KL (LFAsia) [KevinChowKL@lfasia.com]; Ming Ho [mingho@fung1937.com]; Ryan Lee (Fung 1937) [RyanLee@Fung1937.com]
**Subject:** RE: Iconix SEA - MLA Amendment Schedules
**Attachments:** Consideration Side-Letter - Korea and Europe+Turkey -MBJSM 6_25_2014 (33856798_4).DOCX; Consideration Side-Letter -compared against GDC draft (33960851_1).PDF; Iconix - LF - Amendment 1 to Master License Agreement - MBJSM - 6_25_2014 (33856797_4).DOCX; Iconix LF - Amendment 1 to Master License Agreement) - as compared against GDC version (33960805_1).PDF; SHA - Project Brand+ - Conformed Copy (33753303_3).DOCX; SHA - Project Brand+ - Conformed Copy - compare against GDC draft (33960723_1).PDF; SHA - Project Brand+ - Conformed Copy - compared against executed copy (33960709_1).PDF

Dear Gibson Dunn/ Iconix teams,

I attach the following revised draft documents:

1.    consideration side letter - the word version is clean, and the pdf version shows a comparison as against the GDC draft.

2.    amendment no. 1 to the MLA - again, the word version is clean, and the pdf version shows a comparison as against the GDC draft.

3.    conformed copy of the shareholders' agreement.  So that the various groups can more readily digest the proposed changes, we have prepared a conformed copy as to how the shareholders' agreement would look after the draft amendment agreement is entered into.  The word version is clean.  One pdf version shows how our proposed version differs from the GDC draft.  The other pdf version shows how our proposed version differs from the existing executed shareholders' agreement.  In terms of process, we would recommend the parties focussing for now on how the shareholders' agreement should look post-amendment. Once that version is agreed or substantially agreed, we would propose finalising the amending agreement, which ought at that stage to be a largely mechanical exercise.  In other words, we do not have any issue as to how the amendments are to be implemented, and we are just trying to ensure that all interested parties can see the impact of the proposed changes on the face of one document while we get to a final position.

Please note that these documents remain subject to ongoing review by our clients and ourselves.

Kind regards
Mark

Mark Stevens
Partner
Mayer Brown JSM
Direct Tel: +852 2843 2326
Direct Fax: +852 2103 5453
mark.stevens@mayerbrownjsm.com
www.mayerbrownjsm.com


-----Original Message-----
From: Cook, Nicholas C.A.
Sent: Tuesday, June 24, 2014 9:14 PM
To: Alyssa Perlowitz (aperlowitz@iconixbrand.com); Kim, Brian J.; Lauren Gee; bbecker@gibsondunn.com; D'Amico, Evan M.; shorowitz@iconixbrand.com; Jason Schaefer (jschaefer@iconixbrand.com)
Cc: Jared Margolis (Jaredmargolis@lfasia.com); Robert Smits; Stevens, Mark J.; DMS - K-Pop (#14448383); Ethan Cole; Kevin Chow KL (LFAsia); Ming Ho; Ryan Lee (Fung 1937)
Subject: Iconix SEA - MLA Amendment Schedules

Dear Gibson Dunn & Iconix teams,

We are working with Rob Smits of LF USA in relation to the amendments to the SEA documentation.

GOVERNMENT
EXHIBIT
1044
19 Cr. 869 (ER)

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032103

# A-1206

We have been provided with the schedules to the MLA amendment (as attached). We have some comments on these schedules, all of which relate to Parts A, B and the table (which we suggest naming Part C) of Schedule C-1:

1.       The Lee Cooper agreements have been removed from Part B. They have been left in Part C but we understand they should be removed as the Lee Cooper aspects of the deal will happen later.

2.       Two new agreements have been added to Part C with Viva Optique Inc. in relation to Bongo and Candies ("C/B Agreement(s)"). Part B indicates this is one agreement. Grateful if you could clarify and correct the schedules.

3.       We assume the C/B Agreement is being provided in relation to Europe (as it was not included in relation to Korea or SEA). Grateful if you can explain why this agreement (dated in 2008) was not included in the SEA JV or Korea DD given it has a worldwide scope and covers brands involved in SEA / Korea.

4.       The agreement between IP Holdings Unltd LLC and Centennial Pacific Ltd. in relation to Zoo York has been removed from Part A of the schedules we saw during the due diligence but has been added to Part C. From the summary included in Part C, this runs from 11/9/10 (i.e. is an old agreement) and covers Korea (and SEA and others) and we believe it should be reinstated in Part A.

5.       An agreement between IP Holdings Unltd LLC and Centennial Pacific Ltd. in relation to Ecko has been removed from Part A and Part C. The term runs until 2015 and covers countries which include SEA and Korea. Please explain its removal.

6.       There is an agreement in Part A with Stationary Team International BV in relation to Ecko. There is a similar agreement in Part B. However, Part C (which should describe both agreements if there are two agreements) only describes the agreement in Part B. Please correct / clarify.

7.       A number of contracts are indicated in Schedules A and B as covering just "Ecko" but in Part C are indicated as covering related brands "Ecko Unltd, "Rhino logo", "Marc Ecko Cut & Sew", "Rhino I Design", etc in Part C. Please can you correct the schedules and make these consistent (presumably by amending Part A and B).

8.       We notice some of the licenses reference territories such as the Isle of Man, Channel Islands and similar. We see that the Part B list has been prepared on the basis these territories form part of "Europe" (but without this being made express). Would you have any objection to clarifying this in the definition of "Europe"?

Grateful if you could check the above and let us have word versions of the schedules (of both the last circulation and any revised versions) for the purposes of running markups, etc.

Thanks in advance
Nick

Nicholas Cook
Associate
Mayer Brown JSM
16th - 19th Floors
Prince's Building
10 Chater Road
Central, Hong Kong
Direct Tel.: +852 2843 2255
Mobile:      +852 9285 1676
Direct Fax: +852 2103 5126
nicholas.cook@mayerbrownjsm.com<mailto:nicholas.cook@mayerbrownjsm.com>
www.mayerbrownjsm.com<http://www.mayerbrownjsm.com/>

<SEA Amendment Schedules 6 19 14.pdf>

---

—

The information in this email is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate that information. If you have received this email in error, please notify us and destroy it immediately.

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                                        ICON-043-00032104

# A-1207

A list of the partners of Mayer Brown JSM may be inspected on our website www.mayerbrownjsm.com or provided to you on request.

Mayer Brown is a global legal services provider comprising legal practices that are separate entities (the "Mayer Brown Practices"). The Mayer Brown Practices are: Mayer Brown LLP and Mayer Brown Europe - Brussels LLP, both limited liability partnerships established in Illinois USA; Mayer Brown International LLP, a limited liability partnership incorporated in England and Wales (authorized and regulated by the Solicitors Regulation Authority and registered in England and Wales number OC 303359); Mayer Brown, a SELAS established in France; Mayer Brown JSM, a Hong Kong partnership and its associated entities in Asia; and Tauil & Chequer Advogados, a Brazilian law partnership with which Mayer Brown is associated. "Mayer Brown" and the Mayer Brown logo are the trademarks of the Mayer Brown Practices in their respective jurisdictions.

Mayer Brown是一个由各家不同法律执业机构所组成的全球性法律服务提供机构(「Mayer Brown Practices」)。Mayer Brown Practices包括: Mayer Brown LLP和Mayer Brown Europe - Brussels LLP,两家均为于美国伊利诺伊成立的有限责任合伙; Mayer Brown International LLP,一家于英格兰及威尔斯注册成立的有限责任合伙(经律师监管局授权并受其监管,并于英格兰及威尔斯注册,注册号为OC 303359);Mayer Brown,一家于法国成立的私人执业股份公司(SELAS);Mayer Brown JSM,一家香港的合伙和其在亚洲的相联机构;及 Tauil & Chequer Advogados,与Mayer Brown联合经营的一家巴西的合伙。「Mayer Brown」和「Mayer Brown」标识是个别Mayer Brown Practices在其各自的司法管辖区的商标。

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-043-00032105

**A-1208**

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-043-00032106

# A-1209

MBJSM Comments  6/25/2014

[ICONIX LETTERHEAD]

To:   LF Asia Limited
      11th Floor, LiFung Tower,
      888 Cheung Sha Wan Road,
      Kowloon,
      Hong Kong

Date:  30 June 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks**

Reference is hereby made to (a) the Amendment No. 1 to the Master License Agreement (the "*Master License Agreement Amendment*") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("*Iconix*"), certain of Iconix's wholly owned subsidiaries ("*Licensors*") and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("*Licensee*"), amending the Master License Agreement (the "*Existing Master License Agreement*"), effective as of September 30, 2013, by and among Iconix, certain Iconix affiliates (as licensors) and Licensee, and (b) the Amendment No. 1 to the Shareholders Agreement of Iconix SE Asia Limited (the "*Shareholders Agreement Amendment*" and, together with the Master License Agreement Amendment, the "*SEA JV Amendments*") to be entered into as of the date hereof by and between Iconix and LF Asia Limited ("*LF*"), amending the Shareholders Agreement of Lion Network Limited (the "*Existing Shareholders Agreement*"), effective as of September 30, 2013, by and between Iconix and LF. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Existing Master License Agreement as amended by the Master Licnese Agreement Amendment (or if not therein defined, in the Existing Shareholders Agreement as amended by the Shareholders Agreement Amendment), as applicable.

Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by Licensors in the Republic of Korea, Europe or Turkey granted by Licensors to Licensee pursuant to the SEA JV Amendments (the "*Additional Marks*") is deemed to have a fair market value of US$31,835,000, and that because Iconix and LF each own 50% of Licensee, LF's ownership of 50% of Licensee will provide LF a benefit equal to 50% of such fair market value, or US$15,917,500.

In order to compensate Iconix for the transfer of 50% of the fair market value of the Additional Marks to LF (through LF's 50% shareholding in Licensee) pursuant to the SEA JV Amendments, Iconix and LF hereby agree that LF shall pay Iconix **US$15,917,500** (the "*Additional Marks Consideration*"), which amount Iconix and LF shall treat for all U.S. tax purposes as paid by LF to Iconix in exchange for 50% of the Additional Marks, following which each of Iconix and LF shall be treated for U.S. tax purposes as contributing its respective share of the Additional Marks to the Licensee.

LF shall pay the Additional Marks Consideration to Iconix as follows, in each case by wire transfer in immediately available funds:

Page 1

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                                        ICON-043-00032107

# A-1210

MBJSM Comments 6/25/2014

(a)     US$3,979,375 on the date hereof;

(b)     US$3,979,375 on the first (1st) anniversary of the date of this letter;

(c)     US$3,979,375 on the second (2nd) anniversary of the date of this letter; and

(d))    US$3,979,375 on the third (3rd) anniversary of the date of this letter.

**[Note: to discuss further the minimum contribution guarantee and the novation of the SEA and Europe contracts.]**

To the extent the transactions contemplated in this letter agreement result in the assessment of any tax (such tax, if any, the "*Korean Withholding Tax*") by the applicable tax authority in the Republic of Korea (the "*Korean Tax Authority*"), Iconix and LF agree that LF shall (a) withhold from the relevant payment of Additional Marks Consideration an amount equal to the Korean Withholding Tax, (b) appoint a tax administrator necessary for the payment of the Korean Withholding Tax to the Korean Tax Authority, the costs of which appointment shall be borne entirely by LF and shall not be withheld from the Additional Marks Consideration, (c) pay or cause to be paid the Korean Withholding Tax to the Korean Tax Authority, and (d) within [ten (10)] days of the payment of the Korean Withholding Tax in foregoing clause (c), submit to Iconix evidence of such payment in form satisfactory to Iconix in its sole discretion. All amounts properly withheld as Korean Withholding Tax and paid (or caused to be paid) to the Korean Tax Authority by LF pursuant to this paragraph shall be treated as amounts paid to Iconix as Additional Marks Consideration for U.S. tax purposes.

This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV Amendments, the Existing Master License Agreement, the Existing Shareholders Agreement and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

[*Signature page follows.*]

Page 2

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032108

# A-1211

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

_____
For and on behalf of
Iconix Brand Group, Inc.

Acknowledged and agreed:

_____
For and on behalf of
LF Asia Limited

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-043-00032109

# A-1212

GIBSON DUNN DRAFT
5/8  MBJSM Comments  6/25/2014

[ICONIX LETTERHEAD]

To:     LF Asia Limited
        11th Floor, LiFung Tower,
        888 Cheung Sha Wan Road,
        Kowloon,
        Hong Kong

                                    Date:  [_____],30 June 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks**

Reference is hereby made to (a) the Amendment No. 1 to the Master License Agreement (the "***Master License Agreement Amendment***") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("***Iconix***"), certain of Iconix's wholly owned subsidiaries ("***Licensors***") and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("***Licensee***"), amending the Master License Agreement (the "***Existing Master License Agreement***"), effective as of September 30, 2013, by and among Iconix, Licensorscertain Iconix affiliates (as licensors) and Licensee, and (b) the Amendment No. 1 to the Shareholders Agreement of Iconix SE Asia Limited (the "***Shareholders Agreement Amendment***" and, together with the Master License Agreement Amendment, the "***SEA JV Amendments***") to be entered into as of the date hereof by and between Iconix and LF Asia Limited ("***LF***"), amending the Shareholders Agreement of Lion Network Limited (the "***Existing Shareholders Agreement***"), effective as of September 30, 2013, by and between Iconix and LF.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the SEA JV AmendmentsExisting Master License Agreement as amended by the Master Licnese Agreement Amendment (or if not therein defined, in the Existing Shareholders Agreement as amended by the Shareholders Agreement Amendment), as applicable.

Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by Licensors in the Republic of Korea, Europe or Turkey granted by Licensors to Licensee pursuant to the SEA JV Amendments (the "***Additional Marks***") is deemed to have a fair market value of $21,835,000,US$31,835,000, and that because Iconix and LF each own 50% of Licensee, LF's ownership of 50% of Licensee will provide LF a benefit equal to 50% of such fair market value, or $10,917,500.US$15,917,500.

In order to compensate Iconix for the transfer of 50% of the fair market value of the Additional Marks to LF (through LF's 50% shareholding in Licensee) pursuant to the SEA JV Amendments, Iconix and LF hereby agree that LF shall pay Iconix $10,917,500US$15,917,500 (the "***Additional Marks Consideration***"), which amount Iconix and LF shall treat for all U.S. tax purposes as paid by LF to Iconix in exchange for 50% of the Additional Marks, following which each of Iconix and LF shall be treated for U.S. tax purposes as contributing its respective share of the Additional Marks to the Licensee.

ICON-043-00032110

GIBSON DUNN DRAFT
5/8 MBJSM Comments 6/25/2014

LF shall pay the Additional Marks Consideration to Iconix as follows, in each case by wire transfer in immediately available funds:

(a) US$3,979,375 on the date hereof;

(b) US$3,979,375 on the first (1st) anniversary of the date of this letter;

(c) US$3,979,375 on the second (2nd) anniversary of the date of this letter; and

(d)) US$3,979,375 on the third (3rd) anniversary of the date of this letter.

**[Note: to discuss further the minimum contribution guarantee and the novation of the SEA and Europe contracts.]**

To the extent the transactions contemplated in this letter agreement result in the assessment of any tax (such tax, if any, the "***Korean Withholding Tax***") by the applicable tax authority in the Republic of Korea (the "***Korean Tax Authority***"), Iconix and LF agree that LF shall (a) withhold from the relevant payment of Additional Marks Consideration an amount equal to the Korean Withholding Tax, (b) appoint a tax administrator necessary for the payment of the Korean Withholding Tax to the Korean Tax Authority, the costs of which appointment shall be borne entirely by LF and shall not be withheld from the Additional Marks Consideration, (c) pay or cause to be paid the Korean Withholding Tax to the Korean Tax Authority, and (d) within [ten (10)] days of the payment of the Korean Withholding Tax in foregoing clause (c), submit to Iconix evidence of such payment in form satisfactory to Iconix in its sole discretion. All amounts properly withheld as Korean Withholding Tax and paid (or caused to be paid) to the Korean Tax Authority by LF pursuant to this paragraph shall be treated as amounts paid to Iconix as Additional Marks Consideration for U.S. tax purposes.

This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV Amendments, the Existing Master License Agreement, the Existing Shareholders Agreement and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

[*Signature page follows.*]

ICON-043-00032111

# A-1214

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

_____

For and on behalf of
Iconix Brand Group, Inc.

Acknowledged and agreed:

_____

For and on behalf of
LF Asia Limited

ICON-043-00032112

# A-1215

Document comparison by Workshare Compare on 25 June 2014 23:06:09

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://ASIDMS/Current/33856798/1 |
| Description | #33856798v1<Current> - Consideration Side-Letter - Korea and Europe+Turkey - GD 5/8/2014 |
| Document 2 ID | interwovenSite://ASIDMS/Current/33856798/4 |
| Description | #33856798v4<Current> - Consideration Side-Letter - Korea and Europe+Turkey -MBJSM 6/25/2014 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 17 |
| Deletions | 7 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 24 |

ICON-043-00032113

# A-1216

**MBJSM Comments**
**6/25/2014**

## AMENDMENT NO. 1 TO MASTER LICENSE AGREEMENT

This **AMENDMENT NO. 1 TO MASTER LICENSE AGREEMENT** (this "***Amendment***"), is entered into effective as of [30 June], 2014, by and among **ICONIX BRAND GROUP, INC.**, a Delaware corporation ("***Iconix***"), the wholly owned subsidiaries of Iconix listed on Annex 1 hereto (each of the foregoing individually being referred to as a "***Licensor***" collectively, "***Licensors***"), and **ICONIX SE ASIA LIMITED** (f/k/a Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 ("***Licensee***").

### WITNESSETH:

**WHEREAS,** in connection with the Share Purchase Agreement effective as of September 30, 2013 (the "***Purchase Agreement***") between Iconix and LF Asia Limited, a limited liability company organized under the laws of Hong Kong with company number 0872646 ("***LF***"), Licensors and Licensee entered into a Master License Agreement effective as of September 30, 2013 (the "***Existing License Agreement***"; capitalized terms used herein without definition shall have the meanings ascribed to them in the Existing License Agreement as amended by this Amendment) pursuant to which Licensors granted to Licensee the exclusive right, subject to the exceptions and other terms and conditions set forth in the Existing License Agreement, to use and display, and to grant sublicenses to third parties to use and display, certain trademark registrations or applications owned by Licensors in a specified territory that does not include the Republic of Korea, Europe or Turkey;

**WHEREAS**, Iconix and LF currently each own 50% of the shares of Licensee;

**WHEREAS,** in recognition of the fact that the right to use certain trademark registrations or applications owned by Licensors in the Republic of Korea, Europe or Turkey is deemed to have a fair market value of US$31,835,000, and that Iconix and LF each own 50% of Licensee, LF has agreed by a side letter dated on or about the date of this Amendment ("**Purchase Side Letter**") to pay Iconix 50% of such fair market value, or US$15,917,500 in exchange for Iconix and Licensors agreeing to amend the Existing License Agreement to expand the territory in which certain trademark registrations or applications owned by Licensors are exclusively licensed to Licensee (subject to the exceptions); and

**WHEREAS**, Iconix, Licensors and Licensee desire to amend the Existing License Agreement to expand the territory in which certain trademark registrations or applications owned by Licensors will be licensed to Licensee under the Existing License Agreement and to amend the Existing License Agreement in certain other respects as hereinafter set forth.

The following terms are defined for the purposes of this Amendment:

"***Affiliate***" has the meaning given to it in the Purchase Agreement.

"***Applicable Iconix Party***" shall mean Iconix and each Licensor.

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**   **ICON-043-00032114**

"***Contracts***", when described as being those of or applicable to any Person, shall mean any and all contracts, agreements, commitments, arrangements or other undertakings, whether formal or informal, written or oral, including any amendment and other modifications thereto, to which such Person is a party or by which such Person or its properties or assets is subject or bound.

"***Existing Claims***" means, with respect to the Additional Licensed Marks, those pending or threatened actions, oppositions, claims and proceedings listed on Schedule 3-I hereto.

"***knowledge***," "***best knowledge***," and any other words or phrases bearing on the knowledge or awareness as to any specified matters of: (a) Iconix, shall mean the knowledge that Neil Cole or Seth Horowitz actually has or would reasonably be expected to have if he had made reasonable enquiries of the relevant members of management of Iconix, its Affiliates and the Licensee as to the specified matters and (b) LF, shall mean the knowledge that Jason Rabin or David Thomas actually has or would reasonably be expected to have if he had made reasonable enquiries of the relevant members of management of LF, its Affiliates and the Licensee as to the specified matters.

"**Liens**" has the meaning given to it in the Purchase Agreement.

"***Marks***" means trade names, trademarks, service marks and trade dress, and all identifications, labels, insignia or indicia thereof, and all registrations and applications for registration for the foregoing and all common law trademark rights relating thereto.

"***Subsidiary***" shall have the meaning given to it in the Purchase Agreement.

"***Third Party Licensee***" means a Person to which a Licensor has granted a license to use Additional Licensed Marks in the Applicable New Territory pursuant to an Additional Licensed Mark Existing License.

"***Transaction Documents***" shall mean this Amendment, the amendment to the Shareholders Agreement and the Purchase Side Letter.

**NOW, THEREFORE**, for and in consideration of the premises and covenants and conditions forth below, Licensors and License agree to amend the Existing License Agreement as follows:

## AGREEMENT

1. Amendments to Definitions.

(a)     Section 1 of the Existing License Agreement is hereby amended by deleting the definitions of "Agreement", "Countries"/"Country", "Existing Licenses", "Future Mark", "Licensed Marks", "New Multicountry License", "Retained Multicountry License" and "Territory" in their entirety and inserting in their place the following:

2

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032115**

# A-1218

"*Agreement*" means the Master License Agreement effective as of September 30, 2013 by and among Iconix, the Licensors and Licensee, as amended by Amendment No. 1 with effect from the Amendment No. 1 Effective Date, and as the same may be amended from time to time;

"*Country*" means any country within the Territory and "*Countries*" means (to the extent applicable in the context) all relevant Countries within the Territory;

"*Existing Licenses*" means the existing licenses that cover the use of the Licensed Marks in one or more Countries, granted under the license agreements set out in Part A and Part B of Schedule C, in the case of licenses of Existing Licensed Marks, and the Additional Licensed Mark Existing Licenses, in the case of licenses of Additional Licensed Marks;

"*Future Mark*" means any trademark of which any Licensor (or other wholly owned Subsidiary of Iconix) acquires the exclusive ownership, and which no Licensor owned on the Relevant Date;

"*Licensed Marks*" means, collectively, the Existing Licensed Marks, the Additional Licensed Marks;

"*New Multicountry License*" means any license of any Licensed Mark granted by any Licensor to a Person that covers a territory including both: (a) a Country (being within the Territory); and (b) a country outside of the Territory, and which was not in place at the date of the Existing License Agreement, in the case of a license of an Existing Licensed Mark, or the Amendment No.1 Effective Date, in the case of a license of an Additional Licensed Mark;

"*Retained Multicountry Licenses*" means the Existing Licenses that cover a territory including both: (a) a Country (being within the Territory); and (b) a country outside of the Territory, as listed under Part B of Schedule C, in the case of a license of an Existing Licensed Mark or under Part B of Schedule C-1, in the case of a license of an Additional Licensed Mark;

"*Territory*" means, collectively, the Existing Territory and the Applicable New Territory (and any reference to Territory in this Agreement shall be interpreted in accordance with the definition of Licensed Marks within such Territory);

(b)     Section 1 of the Existing License Agreement is hereby amended by adding the following new definitions in alphabetical order in Section 1:

"*Additional E+T Licensed Marks*" means, collectively, the trademark registrations or applications in Europe and/or Turkey set forth in Schedule A-1 and any registrations and applications in Europe and/or Turkey which become or are deemed to be Licensed Marks through the operation of this Agreement (including any such New Marks);

"*Additional Korean Licensed Marks*" means, collectively, the trademark registrations or applications in the Republic of Korea set forth in Schedule A-1 and any registrations and applications in the Republic of Korea which become or are deemed to be Licensed Marks through the operation of this Agreement (including any such New Marks);

3

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032116

"*Additional Licensed Mark Existing Licenses*" means the existing licenses that cover the use of the Licensed Marks in one or more Countries, granted under the license agreements set out in Part A and Part B of Schedule C-1 (and as further particularized in Part C of that schedule);

"*Additional Licensed Marks*" means, collectively, the Additional Korean Licensed Marks and the Additional E+T Licensed Marks;

"*Agreement*" means the Master License Agreement effective as of September 30, 2013 by and among Licensors and Licensee, as amended by Amendment No. 1, and as the same may be amended from time to time;

"*Amendment No. 1*" means Amendment No. 1 to the Master License Agreement effective as of the Amendment No. 1 Effective Date, by and among Licensors and Licensee;

"*Amendment No. 1 Effective Date*" means [30 June 2014], the effective date of Amendment No. 1;

"*Applicable New Territory*" means (a) with reference to the Additional Korean Licensed Marks, the Republic of Korea; and/or (b) with reference to the Additional E+T Licensed Marks, Europe and Turkey;

"**Effective Date**" means September 30, 2013;

"*Europe*" means, collectively, the countries listed on Schedule D hereto;

"*Existing Licensed Marks*" means, collectively, the trademark registrations or applications set forth in Schedule A and any registrations and applications in SEA which become or are deemed to be Licensed Marks through the operation of this Agreement (including any such New Marks);

"*Existing Territory*" means in relation to the Existing Licensed Marks, SEA;

"**Relevant Date**" to the extent applicable, the Effective Date or the Amendment No. 1 Effective Date; and

"*SEA*" means Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.

2. <u>License of Certain Marks in a Composite Form Only</u>. The parties agree and acknowledge that, notwithstanding anything contained in the Existing License Agreement or this Amendment to the contrary, (a) Licensors have not obtained a registration for or filed an application to register "Marc Ecko Cut & Sew" as a single trademark anywhere in the Territory but have obtained registrations or filed applications to register for each of "Marc Ecko" and "Cut & Sew" separately and (b) the license granted in Section 2 of the Existing License Agreement, as amended hereby, with respect to each of "Marc Ecko" and "Cut & Sew" authorizes Licensee only to use such trademarks together side-by-side as "Marc Ecko Cut & Sew" and not in any other manner.

4

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032117**

3. <u>Amendment of Relevant Date</u>. The following sections of the Existing License Agreement are hereby amended as follows:

(a)     In Section 3.1, the two references to "the date of this Agreement" shall be deleted in their entirety and a reference to "the Relevant Date" shall be inserted in their respective places.

(b)     In Section 11.2, the reference to "the date hereof" shall be in its entirety and a reference to "the Relevant Date" shall be inserted in its place.

4.     <u>Representations and Warranties of Licensors</u>. Iconix and each Licensor represents, warrants and covenants that such Licensor (or in the case of Iconix, each Licensor and Iconix) has the full right, power and authority to grant the licenses contemplated to be granted to Licensee under the Existing License Agreement, as amendment by this Amendment (and Iconix is the sole direct/indirect shareholder of each Licensor and has the full right, power and authority to sign this Amendment on behalf of each Licensor).

5. <u>Representations and Warranties of Iconix</u>.  Iconix hereby represents and warrants to Licensee as follows:

          **5.1**     *(intentionally left blank)*

          **5.2**     *(intentionally left blank)*

          **5.3**     *(intentionally left blank)*

          **5.4     Authority; Binding Agreement**

. The execution and delivery by Iconix of this Amendment and each Applicable Iconix Party of each of the other Transaction Documents to which such Applicable Iconix Party is (or is to be) a party, the performance by such Applicable Iconix Party of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary action on the part of such Applicable Iconix Party, and the Applicable Iconix Party has all necessary power and authority with respect thereto. This Amendment is and each of the other Transaction Documents to which any Applicable Iconix Party is to be a party will be when executed and delivered by or on behalf of such Applicable Iconix Party, the legal, valid and binding obligation of such Applicable Iconix Party, enforceable against such Applicable Iconix Party in accordance with its respective terms, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

          **5.5 Noncontravention**

. Neither the execution and delivery by or on behalf of any Applicable Iconix Party of this Amendment or any of the other Transaction Documents to which such Applicable Iconix Party is (or is to be) a party, the consummation by such Applicable Iconix Party of any of the transactions contemplated hereby or thereby, nor the performance by such Applicable Iconix

5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032118**

Party of its obligations hereunder or thereunder will (nor with the giving of notice or the lapse of time or both would) (a) conflict with or result in a breach of any provision of (x) any Additional Licensed Mark Existing License or other Contract to which such Applicable Iconix Party is a party or bound or any other obligation of such Applicable Iconix Party to any Person, or (y) the certificate of incorporation or certificate of formation and memorandum and articles of association or by-laws or limited liability company agreement, in each case as applicable, of such Applicable Iconix Party, each as amended to date, (b) obligate the Licensee or LF to pay any royalty or other compensation to any Person, (c) result in the creation or imposition of any Lien upon the Additional Licensed Marks or the Licensee's rights thereto under the Agreement, or any other assets of the Licensee, or (d) constitute a violation of any Law (as defined below) applicable to the Applicable Iconix Party, except in the case of clauses (a)(x), (c) and (d), for such conflicts, breaches, Liens and violations as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect Iconix or the Licensee or impair the ability of Iconix to perform its obligations hereunder or under the Agreement. For purposes of this Amendment, "*Law*" shall mean any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order, of any Governmental Authority (as hereinafter defined in **Section 5.6**)

### 5.6 Consents

. Except as disclosed in Schedule 5.6 hereto, no consent, approval, waiver, notice, order, or authorization of, or registration, qualification, designation, declaration, recordal or filing with, any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority (each, a "*Governmental Authority*") or any other Person (including any party to an Additional Licensed Mark Existing License) is required in connection with the execution and delivery by each of the Applicable Seller Parties of this Amendment and each of the other Transaction Documents to which each Applicable Iconix Party is (or is to be) a party, the performance by any Applicable Iconix Party of its obligations hereunder and thereunder or consummation by such Applicable Iconix Party of the transactions contemplated hereby or thereby, except as would not, individually or in the aggregate, reasonably be expected to have a materially adverse effect on Iconix or the Licensee or impair the ability of such Applicable Iconix Party to perform its obligations hereunder or under the Transaction Documents to which it is a party.

### 5.7    Intellectual Property

.

(a)    All rights, title and interests with respect to the Additional Licensed Marks in the Applicable New Territory, as set forth on Schedule A-1 to the Agreement (attached as Annex 2 hereto), are owned by the applicable Licensor, free and clear of any Liens other than the

6

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032119

Additional Licensed Mark Existing Licenses to which such Licensor is a party and any Liens specified on Schedule 5.7(a) hereto;

(b) Each of the wholly owned Subsidiaries of Iconix that owns the Additional Licensed Marks in the Applicable New Territory has granted to the Licensee a perpetual and exclusive (subject to the exceptions set forth in the Agreement) license of the Additional Licensed Marks owned by such Person for use in the Territory in connection with the Applicable Licensed Products and Services;

(c) To the knowledge of Iconix, except for the Existing Claims (as defined below), the use, licensing and/or sublicensing of the Additional Licensed Marks in the Applicable New Territory in connection with the design, manufacture, promotion, advertising and sale of products covered by the trademark registrations and applications for the Additional Licensed Marks in the Applicable New Territory (the "***Applicable Classes***") does not infringe upon any intellectual property rights or any other rights of any other Person;

(d) Schedule A-1 to the Agreement (attached as Annex 2 hereto) is a complete and accurate list of all of the registrations and applications for registration of Additional Licensed Marks in the Applicable New Territory; and the status of each Additional Licensed Mark on Schedule A-1 to the Agreement (attached as Annex 2 hereto) is complete and accurate, and, to the knowledge of Iconix, all of the trademark registrations and applications for registration for the Additional Licensed Marks in the Applicable New Territory as set forth on Schedule A-1 to the Agreement (attached as Annex 2 hereto) are valid and subsisting, the registrations are enforceable in all material respects, and, except as set forth in Schedule 5.7(d) hereto, none of such filings has expired or been abandoned, opposed, canceled or otherwise invalidated; and all fee payments, actions and/or filings required to be taken or made prior to the date hereof and within the ninety (90) day period hereafter in order to maintain such registrations in full force and effect and maintain such applications pending have been taken and made;

(e) To the knowledge of Iconix, except for the Existing Claims, no other Person, other than Third Party Licensees pursuant to Additional Licensed Mark Existing Licenses, owns or has rights in the Applicable New Territory to any Additional Licensed Mark;

(f) Parts A and B of Schedule C-1 to the Agreement (attached as Annex 3 hereto) constitutes a complete and accurate list of all of the existing licenses which cover the use of the Additional Licensed Marks in one or more Countries in the Applicable New Territory, and Part C of Schedule C-1 constitutes a table accurately specifying for each such license, the identity of the applicable Licensor, the Third Party Licensee granted rights thereunder, the Additional Licensed Mark(s) licensed, the licensed goods, the applicable territory, the term and the status of the agreement;

(g) Iconix has delivered to LF a correct and complete copy of the Additional Licensed Mark Existing Licenses (as amended to date);

(h) Except as disclosed in Schedule 5.7(h) hereto, (i) each Additional Licensed Mark Existing License is valid and in full force and effect, (ii) 'any Licensor that is party thereto is not in violation or breach of or in default of its obligations under any such

7

Additional Licensed Mark Existing License, and to Iconix's knowledge, no Third Party Licensee is in violation or breach of or in default of its obligations under any such Additional Licensed Mark Existing License, which violation, breach or default would, individually or in the aggregate, reasonably be expected to have a material adverse effect on such Licensor or the Licensee or impair the ability of such Licensor or the Licensee to perform its obligations under any Transaction Document, nor has any Third Party Licensee provided Iconix or any Licensor any express notice of an intent to breach any such Additional Licensed Mark Existing License and (iii) and no Person (including any Third Party Licensee under any Existing License) has, to Iconix's knowledge, any rights with respect to the Additional Licensed Marks other than as expressly provided under an Additional Licensed Mark Existing License;

(i)     Except for the Existing Claims, to the knowledge of Iconix, neither Iconix, any Affiliate (as defined below) of Iconix (including any Licensor), or their respective licensees of the Additional Licensed Marks (including the Third Party Licensees) nor any other party to any Additional Licensed Mark Existing License has infringed upon, misappropriated or otherwise violated, or is currently infringing upon, misappropriating or otherwise violating, any Marks (as defined below) or any other intellectual property right of any other Person in the Applicable New Territory as a result of use of the Additional Licensed Marks in the Applicable New Territory in connection with the design, manufacture, promotion, advertising and sale covered by the Applicable Classes, and, to the knowledge of Iconix, no Person has infringed, misappropriated or otherwise violated, or is currently infringing, misappropriating or otherwise violating, or otherwise challenging the validity or enforceability of Iconix's, any Affiliate of Iconix's (including any Licensor) or Third Party Licensee's rights under any Additional Licensed Mark Existing License, with respect to any Additional Licensed Mark in the Applicable New Territory and in the Applicable Classes, except the Existing Claims; and

(j)     Except for the Existing Claims, neither Iconix, any Affiliate of Iconix (including any Licensor), nor, to the knowledge of Licensor, their respective licensees and Affiliates has received from any Person any written notice, demand, threat, letter, claim or request alleging that the use of the Additional Licensed Marks in the Applicable New Territory and in the Applicable Class has or may have infringed or misappropriated or may be infringing or misappropriating or may infringe or misappropriate any intellectual property right of a third party, or challenging the validity, effectiveness or enforceability of any Additional Licensed Marks Existing License.

### 5.8 No Actions

. No claim, action, suit, arbitration, inquiry, litigation or investigation or other proceeding is pending or, to the best knowledge of Iconix, threatened against Iconix, any Licensor or any other Affiliate of Iconix, or the Licensee (a) which questions the validity of this Amendment or any of the other Transaction Documents to which Iconix or any other Applicable Iconix Party is (or is to be) a party or the right of Iconix or any such Applicable Iconix Party to enter into this Amendment or any such Transaction Document, to perform its obligations hereunder or thereunder or to consummate the transactions contemplated hereby or thereby or (b) which would, either individually or in the aggregate, reasonably be expected to have a material adverse effect on any Applicable Iconix Party or impair the ability of any Applicable Iconix Party to perform its obligations hereunder or under any of the other Transaction Documents to which

8

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**          **ICON-043-00032121**

**A-1224**

such Applicable Iconix Party is (or is to be) a party. None of the Applicable Seller Parties is a party to or subject to any writ, order, decree, injunction or judgment of any Governmental Authority that would materially adversely affect it or the performance by any Applicable Iconix Party of its obligations hereunder or under any of the other Transaction Documents to which such Applicable Iconix Party is (or is to be) a party.

### 5.9 Contracts

. Except for the Agreement and the Contracts disclosed in Schedule 5.9 hereto, none of Iconix or any of its Subsidiaries is party to any Contract that purports to limit such party's freedom to compete freely in relation to any line of business or in any geographic area within the Applicable New Territory.

### 5.10 *(Intentionally left blank)*

### 5.11 *(Intentionally left blank)*

### 5.12 Information and projections

. To the knowledge of Iconix, the royalty figures provided by Iconix to LF in respect of the financial year[s] ended December 31, 2012 and 2013 as set out in Schedule 5.12 are complete, accurate and not intentionally misleading. To the knowledge of Seller, the forecasts of royalty for the year[s] ending December 31, 2014[, 2015, 2016, 2017 and 2018] have been prepared in good faith and on reasonable assumptions which remain valid at the date of this Amendment.

### 5.13 *(Intentionally left blank)*

### 5.14 Exclusivity of Representations and Warranties
. Neither Iconix nor any of its Affiliates is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this Agreement, and Iconix hereby disclaims any other such representations and warranties.

6. Survival; Indemnification; Limitation.

(a)    Iconix shall have no liability under this Amendment for breach of or inaccuracy in any representation or warranty set forth in Section 5 (other than those contained in Sections 4, 5.4 and 5.9) or to indemnify Licensee Indemnified Parties (as defined below) under Section 6(b) against any such breach or inaccuracy, unless Iconix receives notice in writing from Licensee of a claim under said representations and warranties or indemnity on or before the date which is eighteen (18) months following the date of this Amendment.

(b)    Iconix shall indemnify and defend and hold harmless Licensee, its Affiliates and their respective officers, directors, shareholders, members, employees, advisors, agents and controlling persons (the "***Licensee Indemnified Parties***") from and against any and all losses, obligations, deficiencies, liabilities, claims (whether actual or threatened), damages, costs and expenses (including, without limitation, the amount of any settlement entered into pursuant hereto, and all reasonable legal fees and other expenses incurred in connection with the

9

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032122

investigation, prosecution or defense of any matter indemnified pursuant hereto) ("*__Losses__*") which the Licensee Indemnified Parties may sustain, suffer or incur and which arise out of, are caused by, relate to, or result or occur from or in connection with any breach of or inaccuracy in any representation or warranty made by Iconix in Section 3 of this Amendment. Licensee shall be entitled to the benefit of this Section 4(b) and the indemnity herein for itself and as agent for the other Licensee Indemnified Parties.

**[Note: as the beneficiary of the warranty and indemnity is the Licensee, it should be double these figures in order to be like for like with the SEA JV.]]**

(c)　　Notwithstanding anything contained in this Amendment to the contrary, Iconix shall not be required to pay an aggregate amount in excess of US$15,917,500 (the "*__Licensor Liability Cap__*") in respect of all Losses incurred by Licensee Indemnified Parties by reason of any breach of, or inaccuracy in, any representation or warranty of Iconix under this Agreement. Iconix shall not be liable for any claim for breach of, or inaccuracy in, any representations or warranties, or any claim for indemnification in respect of any such breach or inaccuracy, unless the aggregate Losses suffered by the Licensee Indemnified Parties exceed US$636,700 (the "*__Basket__*"). Losses to which the Basket applies, as described in the preceding sentence, are hereinafter referred to as the "*__Basket Losses__*." At such time as the Basket Losses of the Licensee Indemnified Parties, in the aggregate, exceed the Basket, the full amount of all such Basket Losses that have been incurred or suffered by the Licensee Indemnified Parties which are entitled to be recovered under this Amendment shall be recoverable (and not merely the portion of such Basket Losses exceeding the Basket). The parties agree to treat any indemnification payment pursuant to this **Section 6** as an adjustment to the Additional Marks Consideration (as defined in and contemplated by the Purchase Side Letter) for tax purposes.

(d)　　In calculating any amount of Losses recoverable pursuant to this Section 6, the amount of such Losses shall be reduced by any insurance proceeds actually received by the indemnified party relating to such Loss (net of any costs of collection of such amounts, including, but not limited to, attorneys' fees and expenses) and any recoveries actually received by the indemnified party from third parties pursuant to indemnification or similar obligations and increased by the cost of enforcing such claim for indemnification (including, but not limited to, attorney's fees and expenses).

(e)　　Notwithstanding anything contained herein, Iconix shall be liable only for actual Losses of Licensee Indemnified Parties and shall not be liable for special, incidental, indirect, consequential, or punitive damages, including business interruption, diminution of value, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Amendment.

(f)　　No Licensee Indemnified Party shall have any claim or recourse against Iconix or any of its Affiliates under this Section 4 or otherwise with respect to any breach or inaccuracy of any representation and warranty set forth in Section 5 of which Licensee had actual knowledge prior to the date hereof.

6. Purchase Agreement Indemnification Procedures. The provisions of Section 5.4, 5.5, and 5.7 of the Purchase Agreement relating to third party claims, assistance and exclusive

10

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**　　　　**ICON-043-00032123**

remedy are hereby incorporated herein by this reference, _mutatis mutandis,_ and shall apply to any indemnification claims asserted by any Licensee Indemnified Party under Section 6(b) of this Amendment.

7. Allocation of Royalties. Iconix agrees to pay to Licensee (a) promptly following receipt by Iconix or any other Person any and all royalties, advertising contributions or other fees, compensation or other amounts with respect to sales in the Applicable New Territory received from any Third Party Licensee pursuant to an Additional Licensed Mark Existing License for periods following the date hereof (collectively, "***Additional Licensed Mark Existing License Amounts***") that any Third Party Licensees pursuant to the Additional Licensed Mark Existing Licenses pay to Iconix or any Licensor on or after the date hereof under the Additional Licensed Mark Existing Licenses, except to the extent such amounts relate to any periods preceding the date hereof; and (b) promptly following the date hereof, an amount equal to all Additional Licensed Mark Existing License Amounts that any Third Party Licensees pursuant to Additional Licensed Mark Existing Licenses are required to have paid to Iconix or any Licensor prior to the date hereof under the Additional Licensed Mark Existing Licenses as advances or other prepaid amounts for any period after the date hereof.

8. Exercise of the Put/Call under the Agreement.

The following is inserted in the Existing License Agreement as a new section 7A:

To the extent that LF and/or Iconix exercise a Partial Exercise (as defined in and in accordance with the Shareholders Agreement), the parties hereto agree to use all reasonable efforts to negotiate, agree and thereafter amend this Agreement to the extent necessary to give effect to the commercial intention of the Partial Exercise including termination of licensed rights and the removal of any assets (including intellectual property) which are the subject of the Partial Exercise.

8. Addition of Certain Exhibits.

(a) The Existing License Agreement is hereby amended by adding thereto:

    (i) Schedule A-1 in form attached as Annex 2 hereto,

    (ii) Schedule C-1 in the form of Annex 3 hereto and

    (iii) Schedule D in the form of Annex 4 hereto.

(b) The Existing License Agreement is hereby amended by inserting the contents of Annex 5 into Part B of Schedule C.

(c) The Existing License Agreement is hereby amended by deleting in its entirety Annex 1 to the Existing License Agreement and inserting in its place Annex 1 to this Amendment. To the extent any Licensor set out in Annex 1 of this Amendment was not a party to the Existing License Agreement, the parties hereto agree with such Licensor that such Licensor will become a party to and be bound by the Agreement with effect from the Amendment No. 1 Effective Date.

11

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.** **ICON-043-00032124**

# A-1227

**[Note: former section 8 to be provided for in a separate side-letter (and subject to separate review/comment).]**

9.  No Other Amendment.  Except as expressly set forth in this Amendment, the terms and provisions of the Existing License Agreement will remain in full force and effect.

10.  Counterparts.  This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument

12

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032125**

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment the day and year first above written.

**LICENSORS:**

BADGLEY MISCHKA LICENSING LLC
HARDY WAY, LLC
ICONIX BRAND GROUP, INC. [1]
IP HOLDINGS LLC
IP HOLDINGS UNLTD LLC
MOSSIMO HOLDINGS LLC
OFFICIAL PILLOWTEX LLC
OP HOLDINGS LLC
RED DIAMOND HOLDINGS SÀRL [2]
SHARPER IMAGE HOLDINGS LLC
STUDIO IP HOLDINGS LLC
ZY HOLDINGS LLC

By Iconix Brand Group, Inc., as Licensor / on behalf of the above-listed wholly-owned subsidiaries

By: _____
Name:
Title:

ICONIX LUXEMBOURG HOLDINGS SÀRL

By: _____
Name:
Title:

By: _____
Name:
Title:

---

[1] Note: this entity is a Licensor under the Existing License Agreement described as follows in schedule C (as amended following our DD review): "License Agreement between Iconix Brand Group Inc. and Donnerwood Media, Inc., dated July 15, 2012, as amended on January 13, 2014.

[2] Note: as we are amending the Master License Agreement, this entity should be included (as it was a party to the original Master License Agreement).

13

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-043-00032126

# A-1229

RED DIAMOND HOLDINGS SÀRL

By: _____
Name:
Title:

By: _____
Name:
Title:

ICONIX BRAND GROUP, INC.

By: _____

Name:
Title:

**LICENSEE:**

ICONIX SE ASIA LIMITED

By: _____
Name:
Title:

14

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032127

# A-1230

MBJSM Comments
6/25/2014

## ANNEX 1

1. BADGLEY MISCHKA LICENSING LLC
2. HARDY WAY, LLC
3. ICONIX BRAND GROUP, INC.
4. ICONIX LUXEMBOURG HOLDINGS SÀRL
5. IP HOLDINGS LLC
6. IP HOLDINGS UNLTD LLC
7. MOSSIMO HOLDINGS LLC
8. OFFICIAL PILLOWTEX LLC
9. OP HOLDINGS LLC
10. RED DIAMOND HOLDINGS SÀRL
11. SHARPER IMAGE HOLDINGS LLC
12. STUDIO IP HOLDINGS LLC
13. ZY HOLDINGS LLC
14. Any wholly owned subsidiary of Iconix that owns any Existing Licensed Mark as of the date of the Existing License Agreement or any Additional Licensed Mark as of the date of Amendment No.1.

**[Note: Iconix to confirm if any other entities own relevant IP. Subject to further comments from LF in relation to Europe+Turkey.]**

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**

ICON-043-00032128

# A-1231

**MBJSM Comments**
**6/25/2014**

**ANNEX 2**

**Schedule A-1**

**Additional Licensed Marks**

**See Attached**

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                                         ICON-043-00032129

# A-1232

**MBJSM Comments**
**6/25/2014**

## ANNEX 3

### Schedule C-1

**Additional Licensed Mark Existing Licenses**

**Part A – Existing Licenses**

**Part B – Retained Multicountry Licenses**

**Part C – Details of the Additional Licensed Mark Existing Licenses**

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032130**

# A-1233

## ANNEX 4

### Schedule D

### Definition of "Europe"

Albania
Andorra
Austria
Belarus
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
Former Yugoslav Republic of Macedonia
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Moldova
Monaco
Montenegro
Netherlands
Norway
Poland .
Portugal
Romania
Russia
San Marino
Serbia
Slovakia
Slovenia

Current 33856797.2 24-Jun-14 18:03

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**           **ICON-043-00032131**

# A-1234

Spain
Sweden
Switzerland
Ukraine
Uzbekistan
United Kingdom [(including for the avoidance of doubt the Crown Dependencies of Jersey, Guernsey and the Isle of Man)] **[Note to confirm/discuss with LF.]**
Vatican City State

Current 33856797.2 24-Jun-14 18:03

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032132**

# A-1235

Current 33856797.2 24-Jun-14 18:03

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-043-00032133

# A-1236

**ANNEX 5**

**Insertion into Part B of Schedule C**

**[Note: to insert the inadvertently omitted SEA agreement.[**

Current 33856797.2 24-Jun-14 18:03

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.** ICON-043-00032134

# A-1237

**MBJSM Comments**
**6/25/2014**

**Schedule 5.7(a)**

**<u>Liens</u>**

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.    ICON-043-00032135

# A-1238

**MBJSM Comments**
**6/25/2014**

**Schedule 5.7(d)**

**Exceptions to Validity of Additional Licensed Mark Existing Licenses**

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.　　　　　　　　　　　　　　ICON-043-00032136

# A-1239

**MBJSM Comments**
**6/25/2014**

**Schedule 5.7(h)**

**<u>Infringements with respect to any Additional Licensed Mark</u>**
**<u>in the Applicable New Territory and in the Applicable Classes</u>**

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032137**

# A-1240

**Schedule 5.9**

**<u>Contracts in relation to the Additional Licensed Marks</u>**

Current 33856797.2 24-Jun-14 18:03

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**

ICON-043-00032138

# A-1241

**Schedule 5.12**

**Information and Projections**

Current 33856797.2 24-Jun-14 18:03

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                              **ICON-043-00032139**

# A-1242

**MBJSM Comments**
**6/25/2014**

**Schedule 3-I**

**<u>Existing Claims</u>**

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032140

**A-1243**

~~Gibson Dunn Draft Dated 5/27/14~~
MBJSM Comments
6/25/2014

### AMENDMENT NO. 1 TO MASTER LICENSE AGREEMENT

This **AMENDMENT NO. 1 TO MASTER LICENSE AGREEMENT** (this "***Amendment***"), is entered into effective as of [●30 June], 2014, by and among **ICONIX BRAND GROUP, INC.**, a Delaware corporation ("***Iconix***"), the wholly owned subsidiaries of Iconix listed on Annex 1 hereto (each of the foregoing individually being referred to as a "***Licensor***" collectively, "***Licensors***"), and **ICONIX SE ASIA LIMITED** (f/k/a Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 ("***Licensee***").

### WITNESSETH:

**WHEREAS,** in connection with the Share Purchase Agreement effective as of September 30, 2013 (the "***Purchase Agreement***") between Iconix and LF Asia Limited, a limited liability company organized under the laws of Hong Kong with company number 0872646 ("***LF***"), Licensors and Licensee entered into ~~the~~a Master License Agreement effective as of September 30, 2013 (the "***Existing License Agreement***"; capitalized terms used herein without definition shall have the meanings ascribed to them in the Existing License Agreement as amended by this Amendment) pursuant to which Licensors granted to Licensee the exclusive right, subject to the exceptions and other terms and conditions set forth in the Existing License Agreement, to use and display, and to grant sublicenses to third parties to use and display, certain trademark registrations or applications owned by Licensors in a specified territory that does not include the Republic of Korea, Europe or Turkey;

**WHEREAS**, Iconix and LF currently each own 50% of the shares of Licensee;

**WHEREAS,** in recognition of the fact that the right to use certain trademark registrations or applications owned by Licensors in the Republic of Korea, Europe or Turkey is deemed to have a fair market value of ~~$21,835,000,~~US$31,835,000, and that Iconix and LF each own 50% of Licensee, LF has agreed by a side letter dated on or about the date of this Amendment ("**Purchase Side Letter**") to pay Iconix 50% of such fair market value, or ~~$10,917,500~~US$15,917,500 in exchange for Iconix and Licensors agreeing to amend the Existing License Agreement to expand the territory in which certain trademark registrations or applications owned by Licensors are exclusively licensed to Licensee (subject to the exceptions); and

~~**WHEREAS**, Iconix and LF entered into the Amended and Restated Operating Agreement of Iconix Europe LLC, effective as of January 13, 2014 (the "*Operating Agreement*"); and~~

**WHEREAS**, Iconix, Licensors and Licensee desire to amend the Existing License Agreement to expand the territory in which certain trademark registrations or applications owned by Licensors will be licensed to Licensee under the Existing License Agreement and to amend the Existing License Agreement in certain other respects as hereinafter set forth.

The following terms are defined for the purposes of this Amendment:

ICON-043-00032141

"*Affiliate*" has the meaning given to it in the Purchase Agreement.

"*Applicable Iconix Party* " shall mean Iconix and each Licensor.

"*Contracts*", when described as being those of or applicable to any Person, shall mean any and all contracts, agreements, commitments, arrangements or other undertakings, whether formal or informal, written or oral, including any amendment and other modifications thereto, to which such Person is a party or by which such Person or its properties or assets is subject or bound.

"*Existing Claims*" means, with respect to the Additional Licensed Marks, those pending or threatened actions, oppositions, claims and proceedings listed on Schedule 3-I hereto.

"*knowledge*," "*best knowledge*," and any other words or phrases bearing on the knowledge or awareness as to any specified matters of: (a) Iconix, shall mean the knowledge that Neil Cole or Seth Horowitz actually has or would reasonably be expected to have if he had made reasonable enquiries of the relevant members of management of Iconix, its Affiliates and the Licensee as to the specified matters and (b) LF, shall mean the knowledge that Jason Rabin or David Thomas actually has or would reasonably be expected to have if he had made reasonable enquiries of the relevant members of management of LF, its Affiliates and the Licensee as to the specified matters.

"**Liens**" has the meaning given to it in the Purchase Agreement.

"*Marks*" means trade names, trademarks, service marks and trade dress, and all identifications, labels, insignia or indicia thereof, and all registrations and applications for registration for the foregoing and all common law trademark rights relating thereto.

"*Subsidiary*" shall have the meaning given to it in the Purchase Agreement.

"*Third Party Licensee*" means a Person to which a Licensor has granted a license to use Additional Licensed Marks in the Applicable New Territory pursuant to an Additional Licensed Mark Existing License.

"*Transaction Documents*" shall mean this Amendment, the amendment to the Shareholders Agreement and the Purchase Side Letter.

**NOW**, **THEREFORE**, for and in consideration of the premises and covenants and conditions forth below, Licensors and License agree to amend the Existing License Agreement as follows:

**AGREEMENT**

1. Amendments to Definitions.

(a)     Section 1 of the Existing License Agreement is hereby amended by deleting the definitions of "Agreement", "Countries"/"Country", "Existing Licenses", "Future Mark",

2

ICON-043-00032142

"Licensed Marks", "New Multicountry License", "Retained Multicountry License" and "Territory" in their entirety and inserting in their place the following:

"***Agreement***" means the Master License Agreement effective as of September 30, 2013 by and among Iconix, the Licensors and Licensee, as amended by Amendment No. 1 with effect from the Amendment No. 1 Effective Date, and as the same may be amended from time to time;

"***Country***" means any country within the Territory and "***Countries***" means (to the extent applicable in the context) all relevant Countries within the Territory;

"***Existing Licenses***" means the existing licenses that cover the use of the Licensed Marks in one or more Countries, granted under the license agreements set out in Part A and Part B of Schedule C, in the case of licenses of Existing Licensed Marks, and ~~Part A and Part B of Schedule C-1,~~the Additional Licensed Mark Existing Licenses, in the case of licenses of Additional Licensed Marks;

"***Future Mark***" means any trademark of which any Licensor (or other wholly owned Subsidiary of Iconix) acquires the exclusive ownership, and which no Licensor owned on the Relevant Date;

"***Licensed Marks***" means, collectively, the Existing Licensed Marks, the Additional Licensed Marks ~~and other trademark registrations and applications deemed to be Licensed Marks through the operation of this Agreement~~;

"***New Multicountry License***" means any license of any Licensed Mark granted by any Licensor to a Person that covers a territory including both: (a) a Country (being within the Territory); and (b) a country outside of the Territory, and which was not in place at the date of the Existing License Agreement, in the case of a license of an Existing Licensed Mark, or the Amendment No.1 Effective Date, in the case of a license of an Additional Licensed Mark;

"***Retained Multicountry Licenses***" means the Existing Licenses that cover a territory including both: (a) a Country (being within the Territory); and (b) a country outside of the Territory, as listed under Part B of Schedule C, in the case of a license of an Existing Licensed Mark or under Part B of Schedule C-1, in the case of a license of an Additional Licensed Mark;

"***Territory***" means, collectively, the Existing Territory and the Applicable New Territory~~.~~ (and any reference to Territory in this Agreement shall be interpreted in accordance with the definition of Licensed Marks within such Territory);

(b)     Section 1 of the Existing License Agreement is hereby amended by adding the following new definitions in alphabetical order in Section 1:

"***Additional E+T Licensed Marks***" means, collectively, the trademark registrations or applications in Europe and/or Turkey set forth in Schedule A-1 and any registrations and applications in Europe and/or Turkey which become or are deemed to be Licensed Marks through the operation of this Agreement (including any such New Marks);

3

ICON-043-00032143

**A-1246**

"***Additional Korean Licensed Marks***" means, collectively, the trademark registrations or applications in the Republic of Korea set forth in Schedule A-1 and any registrations and applications in the Republic of Korea which become or are deemed to be Licensed Marks through the operation of this Agreement (including any such New Marks);

"***Additional Licensed Mark Existing Licenses***" means the existing licenses that cover the use of the Licensed Marks in one or more Countries, granted under the license agreements set out in Part A and Part B of Schedule C-1 (and as further particularized in Part C of that schedule);

"***Additional Licensed Marks***" means, collectively, the ~~trademark registrations or applications set forth in Schedule A-1~~Additional Korean Licensed Marks and the Additional E+T Licensed Marks;

"***Agreement***" means the Master License Agreement effective as of September 30, 2013 by and among Licensors and Licensee, as amended by Amendment No. 1, and as the same may be amended from time to time;

"***Amendment No. 1***" means Amendment No. 1 to the Master License Agreement effective as of ~~May __, 2014,~~the Amendment No. 1 Effective Date, by and among Licensors and Licensee;

"***Amendment No. 1 Effective Date***" means [~~_____,~~30 June 2014], the effective date of Amendment No. 1;

"***Applicable New Territory***" means~~, (a)~~ with reference to the Additional Korean Licensed Marks, the Republic of Korea~~;~~ and~~,~~/or (b) with reference to the Additional ~~Licensed Marks other than the Additional Korean~~E+T Licensed Marks, Europe and Turkey;

"**Effective Date**" means September 30, 2013;

"***Europe***" means, collectively, the countries listed on Schedule D hereto~~.~~;

"***Existing Licensed Marks***" means, collectively, the trademark registrations or applications set forth in Schedule A and any registrations and applications in SEA which become or are deemed to be Licensed Marks through the operation of this Agreement (including any such New Marks);

"***Existing Territory***" means in relation to the Existing Licensed Marks, SEA;

"**Relevant Date**" to the extent applicable, the Effective Date or the Amendment No. 1 Effective Date; and

"***SEA***" means Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.

2.    License of Certain Marks in a Composite Form Only.   The parties agree and acknowledge that, notwithstanding anything contained in the Existing License Agreement or this

4

ICON-043-00032144

Amendment to the contrary, (a) Licensors have not obtained a registration for or filed an application to register "Marc Ecko Cut & Sew" as a single trademark anywhere in the Territory but have obtained registrations or filed applications to register for each of "Marc Ecko" and "Cut & Sew" separately and (b) the license granted in Section 2 of the Existing License Agreement, as amended hereby, with respect to each of "Marc Ecko" and "Cut & Sew" authorizes Licensee only to use such trademarks together side-by-side as "Marc Ecko Cut & Sew" and not in any other manner.

3. Amendment of Relevant Date. The following sections of the Existing License Agreement are hereby amended as follows:

(a) In Section 3.1, the two references to "the date of this Agreement" shall be deleted in their entirety and a reference to "the Relevant Date" shall be inserted in their respective places.

(b) In Section 11.2, the reference to "the date hereof" shall be in its entirety and a reference to "the Relevant Date" shall be inserted in its place.

4. Representations and Warranties of Licensors. Iconix and each Licensor represents, warrants and covenants that such Licensor (or in the case of Iconix, each Licensor and Iconix) has the full right, power and authority to grant the licenses contemplated to be granted to Licensee under the Existing License Agreement, as amendment by this Amendment (and Iconix is the sole direct/indirect shareholder of each Licensor and has the full right, power and authority to sign this Amendment on behalf of each Licensor).

3.5. Representations and Warranties of Iconix. Iconix hereby represents and warrants to Licensee as follows:

5.1 *(intentionally left blank)*

5.2 *(intentionally left blank)*

5.3 *(intentionally left blank)*

5.4 **Authority; Binding Agreement**. The execution and delivery by Iconix of this Amendment and each Applicable Iconix Party of each of the other Transaction Documents to which such Applicable Iconix Party is (or is to be) a party, the performance by such Applicable Iconix Party of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary action on the part of such Applicable Iconix Party, and the Applicable Iconix Party has all necessary power and authority with respect thereto. This Amendment is and each of the other Transaction Documents to which any Applicable Iconix Party is to be a party will be when executed and delivered by or on behalf of such Applicable Iconix Party, the legal, valid and binding obligation of such Applicable Iconix Party, enforceable against such Applicable Iconix Party in accordance with its respective terms, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

5

ICON-043-00032145

**5.5 Noncontravention**. Neither the execution and delivery by or on behalf of any Applicable Iconix Party of this Amendment or any of the other Transaction Documents to which such Applicable Iconix Party is (or is to be) a party, the consummation by such Applicable Iconix Party of any of the transactions contemplated hereby or thereby, nor the performance by such Applicable Iconix Party of its obligations hereunder or thereunder will (nor with the giving of notice or the lapse of time or both would) (a) conflict with or result in a breach of any provision of (x) any Additional Licensed Mark Existing License or other Contract to which such Applicable Iconix Party is a party or bound or any other obligation of such Applicable Iconix Party to any Person, or (y) the certificate of incorporation or certificate of formation and memorandum and articles of association or by-laws or limited liability company agreement, in each case as applicable, of such Applicable Iconix Party, each as amended to date, (b) obligate the Licensee or LF to pay any royalty or other compensation to any Person, (c) result in the creation or imposition of any Lien upon the Additional Licensed Marks or the Licensee's rights thereto under the Agreement, or any other assets of the Licensee, or (d) constitute a violation of any Law (as defined below) applicable to the Applicable Iconix Party, except in the case of clauses (a)(x), (c) and (d), for such conflicts, breaches, Liens and violations as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect Iconix or the Licensee or impair the ability of Iconix to perform its obligations hereunder or under the Agreement. For purposes of this Amendment, "*Law*" shall mean any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order, of any Governmental Authority (as hereinafter defined in **Section 5.6**)

**5.6 Consents**. Except as disclosed in Schedule 5.6 hereto, no consent, approval, waiver, notice, order, or authorization of, or registration, qualification, designation, declaration, recordal or filing with, any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority (each, a "*Governmental Authority*") or any other Person (including any party to an Additional Licensed Mark Existing License) is required in connection with the execution and delivery by each of the Applicable Seller Parties of this Amendment and each of the other Transaction Documents to which each Applicable Iconix Party is (or is to be) a party, the performance by any Applicable Iconix Party of its obligations hereunder and thereunder or consummation by such Applicable Iconix Party of the transactions contemplated hereby or thereby, except as would not, individually or in the aggregate, reasonably be expected to have a materially adverse effect on Iconix or the Licensee or impair the ability of such Applicable Iconix Party to perform its obligations hereunder or under the Transaction Documents to which it is a party.

**5.7 Intellectual Property**.

(a) All rights, title and interests with respect to the Additional Licensed Marks ~~(as defined below)~~ in the Applicable New Territory ~~(as defined below)~~, as set forth on Schedule

6

ICON-043-00032146

A-1 to the Agreement (attached as Annex 2 hereto), are owned by the applicable Licensor, free and clear of any Liens (as defined in the Purchase Agreement) other than the Additional Licensed Mark Existing Licenses to which such Licensor is a party and any Liens specified on Schedule 35.7(a) hereto;

(b) Each of the wholly owned Subsidiaries of Iconix that owns the Additional Licensed Marks in the Applicable New Territory has granted to the Licensee a perpetual and exclusive (subject to the exceptions set forth in the Agreement) license of the Additional Licensed Marks owned by such Person for use in the Territory in connection with the Applicable Licensed Products and Services;

(c) To the knowledge of Iconix, except for the Existing Claims (as defined below), the use, licensing and/or sublicensing of the Additional Licensed Marks in the Applicable New Territory in connection with the design, manufacture, promotion, advertising and sale of products covered by the trademark registrations and applications for the Additional Licensed Marks in the Applicable New Territory (the "***Applicable Classes***") does not infringe upon any intellectual property rights or any other rights of any other Person;

(ed) Schedule A-1 to the Agreement (attached as Annex 2 hereto) is a complete and accurate list of all of the registrations and applications for registration of Additional Licensed Marks in the Applicable New Territory; and the status of each Additional Licensed Mark on Schedule A-1 to the Agreement (attached as Annex 2 hereto) is complete and accurate, and, to the knowledge of Iconix, all of the trademark registrations and applications for registration for the Additional Licensed Marks in the Applicable New Territory as set forth on Schedule A-1 to the Agreement (attached as Annex 2 hereto) are valid and subsisting, the registrations are enforceable in all material respects, and, except as set forth in Schedule 35.7(ad) hereto, none of such filings has expired or been abandoned, opposed, canceled or otherwise invalidated; and all fee payments, actions and/or filings required to be taken or made prior to the date hereof and within the ninety (90) day period hereafter in order to maintain such registrations in full force and effect and maintain such applications pending have been taken and made;

(de) To the knowledge of Iconix, except for the Existing Claims, no other Person, other than Third Party Licensees (as defined below) pursuant to Additional Licensed Mark Existing Licenses (as defined below), owns or has rights in the Applicable New Territory to any Additional Licensed Mark;

(ef) Parts A and B of Schedule C-1 to the Agreement (attached as Annex 3 hereto) constitutes a complete and accurate list of all of the existing licenses which cover the use of the Additional Licensed Marks in one or more Countries in the Applicable New Territory, together withand Part C of Schedule C-1 constitutes a table accurately specifying for each such license, the identity of the applicable Licensor, the Third Party Licensee granted rights thereunder, the Additional Licensed Mark(s) licensed, the licensed goods, the applicable territory, the term and the status of the agreement;

(fg) Iconix has delivered to LF a correct and complete copy of the Additional Licensed Mark Existing Licenses (as amended to date);

7

ICON-043-00032147

# A-1250

(h)  Except as disclosed in Schedule ~~3~~5.7(~~f~~h) hereto, (i) each Additional Licensed Mark Existing License is valid and in full force and effect, (ii) ~~to the best of Iconix's knowledge, the~~ '~~any~~ Licensor that is party thereto is not in violation or breach of or in default of its obligations under any such Additional Licensed Mark Existing License, and to Iconix's knowledge, no Third Party Licensee is in violation or breach of or in default of its obligations under any such Additional Licensed Mark Existing License, which violation, breach or default would, individually or in the aggregate, reasonably be expected to have a material adverse effect on such Licensor or the Licensee or impair the ability of such Licensor or the Licensee to perform its obligations ~~hereunder~~under any Transaction Document, nor has any Third Party Licensee provided Iconix or any Licensor any ~~written~~express notice of an intent to breach any such Additional Licensed Mark Existing License and (iii) and no Person (including any Third Party Licensee under any Existing License) has, to Iconix's knowledge, any rights with respect to the Additional Licensed Marks other than as expressly provided under an Additional Licensed Mark Existing License;

(~~g~~i)  Except for the Existing Claims, to the knowledge of Iconix, neither Iconix, any Affiliate (as defined below) of Iconix (including any Licensor), or their respective licensees of the Additional Licensed Marks (including the Third Party Licensees) nor any other party to any Additional Licensed Mark Existing License has infringed upon, misappropriated or otherwise violated, or is currently infringing upon, misappropriating or otherwise violating, any Marks (as defined below) or any other intellectual property right of any other Person in the Applicable New Territory as a result of use of the Additional Licensed Marks in the Applicable New Territory in connection with the design, manufacture, promotion, advertising and sale covered by the Applicable Classes, and, to the knowledge of Iconix, no Person has infringed, misappropriated or otherwise violated, or is currently infringing, misappropriating or otherwise violating, or otherwise challenging the validity or enforceability of Iconix's, any Affiliate of Iconix's (including any Licensor) or Third Party Licensee's rights under any Additional Licensed Mark Existing License, with respect to any Additional Licensed Mark in the Applicable New Territory and in the Applicable Classes, except ~~as specified in Schedule 3(g)~~the Existing Claims; and

(~~h~~j)  Except for the Existing Claims, neither Iconix, any Affiliate of Iconix (including any Licensor), nor, to the knowledge of Licensor, their respective licensees and Affiliates has received from any Person any written notice, demand, threat, letter, claim or request alleging that the use of the Additional Licensed Marks in the Applicable New Territory and in the Applicable Class has or may have infringed or misappropriated or may be infringing or misappropriating or may infringe or misappropriate any intellectual property right of a third party, or challenging the validity, effectiveness or enforceability of any Additional Licensed Marks Existing License.

~~For purposes of this Section 3,~~

~~"*Additional Licensed Marks*" has the meaning set forth in Section 1(b) of this Amendment.~~

8

ICON-043-00032148

# A-1251

"*Additional Licensed Mark Existing License*" means any Existing License set forth on Part A or Part B of Schedule C-1 attached as Annex 3 hereto.

"*Affiliate*" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person, or is under common control with that Person. For purposes of this definition, "*control*," "*controlling*," "*controlled by*" or "*under common control with*," means the possession, directly or indirectly of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or by contract or otherwise.

"*Applicable New Territory*" as the meaning set forth in Section 1(b) of this Amendment.

"*Existing Claims*" means, with respect to the Additional Licensed Marks, those pending or threatened actions, oppositions, claims and proceedings listed on Schedule 3-I hereto.

"*Marks*" means trade names, trademarks, service marks and trade dress, and all identifications, labels, insignia or indicia thereof, and all registrations and applications for registration for the foregoing and all common law trademark rights relating thereto.

"*Third Party Licensee*" means a Person to which a Licensor has granted a license to use Additional Licensed Marks in the Applicable New Territory pursuant to an Additional Licensed Mark Existing License.

**5.8 No Actions**. No claim, action, suit, arbitration, inquiry, litigation or investigation or other proceeding is pending or, to the best knowledge of Iconix, threatened against Iconix, any Licensor or any other Affiliate of Iconix, or the Licensee (a) which questions the validity of this Amendment or any of the other Transaction Documents to which Iconix or any other Applicable Iconix Party is (or is to be) a party or the right of Iconix or any such Applicable Iconix Party to enter into this Amendment or any such Transaction Document, to perform its obligations hereunder or thereunder or to consummate the transactions contemplated hereby or thereby or (b) which would, either individually or in the aggregate, reasonably be expected to have a material adverse effect on any Applicable Iconix Party or impair the ability of any Applicable Iconix Party to perform its obligations hereunder or under any of the other Transaction Documents to which such Applicable Iconix Party is (or is to be) a party. None of the Applicable Seller Parties is a party to or subject to any writ, order, decree, injunction or judgment of any Governmental Authority that would materially adversely affect it or the performance by any Applicable Iconix Party of its obligations hereunder or under any of the other Transaction Documents to which such Applicable Iconix Party is (or is to be) a party.

**5.9 Contracts**. Except for the Agreement and the Contracts disclosed in Schedule 5.9 hereto, none of Iconix or any of its Subsidiaries is party to any Contract that purports to limit such party's freedom to compete freely in relation to any line of business or in any geographic area within the Applicable New Territory.

**5.10** *(Intentionally left blank)*

9

ICON-043-00032149

**5.11** *(Intentionally left blank)*

**5.12 Information and projections**. To the knowledge of Iconix, the royalty figures provided by Iconix to LF in respect of the financial year[s] ended December 31, 2012 and 2013 as set out in Schedule 5.12 are complete, accurate and not intentionally misleading. To the knowledge of Seller, the forecasts of royalty for the year[s] ending December 31, 2014[, 2015, 2016, 2017 and 2018] have been prepared in good faith and on reasonable assumptions which remain valid at the date of this Amendment.

**5.13** *(Intentionally left blank)*

**5.14 Exclusivity of Representations and Warranties**. Neither Iconix nor any of its Affiliates is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this Agreement, and Iconix hereby disclaims any other such representations and warranties.

~~4.~~6. Survival; Indemnification; Limitation.

(a)     Iconix shall have no liability under this Amendment for breach of or inaccuracy in any representation or warranty set forth in Section ~~3~~5 (other than those contained in Sections 4, 5.4 and 5.9) or to indemnify Licensee Indemnified Parties (as defined below) under Section ~~4~~6(b) against any such breach or inaccuracy, unless Iconix receives notice in writing from Licensee of a claim under said representations and warranties or indemnity on or before the date which is eighteen (18) months following the date of this Amendment.

(b)     Iconix shall indemnify and defend and hold harmless Licensee, its Affiliates and their respective officers, directors, shareholders, members, employees, advisors, agents and controlling persons (the "***Licensee Indemnified Parties***") from and against any and all losses, obligations, deficiencies, liabilities, claims (whether actual or threatened), damages, costs and expenses (including, without limitation, the amount of any settlement entered into pursuant hereto, and all reasonable legal fees and other expenses incurred in connection with the investigation, prosecution or defense of any matter indemnified pursuant hereto) ("***Losses***") which the Licensee Indemnified Parties may sustain, suffer or incur and which arise out of, are caused by, relate to, or result or occur from or in connection with any breach of or inaccuracy in any representation or warranty made by Iconix in Section 3 of this Amendment. Licensee shall be entitled to the benefit of this Section 4(b) and the indemnity herein for itself and as agent for the other Licensee Indemnified Parties.

**[Note: as the beneficiary of the warranty and indemnity is the Licensee, it should be double these figures in order to be like for like with the SEA JV.]]**

(c)     Notwithstanding anything contained in this Amendment to the contrary, Iconix shall not be required to pay an aggregate amount in excess of US$~~5,458,750~~15,917,500 (the "~~"~~***Licensor Liability Cap***") in respect of all Losses incurred by Licensee Indemnified Parties by reason of any breach of, or inaccuracy in, any representation or warranty of Iconix under this Agreement.  Iconix shall not be liable for any claim for breach of, or inaccuracy in, any representations or warranties, or any claim for indemnification in respect of any such breach or

10

ICON-043-00032150

# A-1253

inaccuracy, unless the aggregate Losses suffered by the Licensee Indemnified Parties exceed US$~~218,350~~ 636,700 (the "***Basket***").  Losses to which the Basket applies, as described in the preceding sentence, are hereinafter referred to as the "***Basket Losses***."  At such time as the Basket Losses of the Licensee Indemnified Parties, in the aggregate, exceed the Basket, the full amount of all such Basket Losses that have been incurred or suffered by the Licensee Indemnified Parties which are entitled to be recovered under this Amendment shall be recoverable (and not merely the portion of such Basket Losses exceeding the Basket).  The parties agree to treat any indemnification payment pursuant to this **Section 6** as an adjustment to the Additional Marks Consideration (as defined in and contemplated by the Purchase Side Letter) for tax purposes.

(d)     In calculating any amount of Losses recoverable pursuant to this Section ~~4,~~6, the amount of such Losses shall be reduced by any insurance proceeds actually received by the indemnified party relating to such Loss (net of any costs of collection of such amounts, including, but not limited to, attorneys' fees and expenses) and any recoveries actually received by the indemnified party from third parties pursuant to indemnification or similar obligations and increased by the cost of enforcing such claim for indemnification (including, but not limited to, attorney's fees and expenses).

(e)     Notwithstanding anything contained herein, Iconix shall be liable only for actual Losses of Licensee Indemnified Parties and shall not be liable for special, incidental, indirect, consequential, or punitive damages, including business interruption, diminution of value, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Amendment.

(f)     No Licensee Indemnified Party shall have any claim or recourse against Iconix or any of its Affiliates under this Section 4 or otherwise with respect to any breach or inaccuracy of any representation and warranty set forth in Section ~~3~~5 of which Licensee had actual knowledge prior to the date hereof.

~~5.~~6.   Purchase Agreement Indemnification Procedures.  The provisions of Section 5.4, ~~5.5~~5.5, and 5.7 of the Purchase Agreement relating to third party claims, assistance and exclusive remedy are hereby incorporated herein by this reference, mutatis mutandis, and shall apply to any indemnification claims asserted by any Licensee Indemnified Party under Section ~~4~~6(b) of this Amendment.

~~6.~~7.   Allocation of Royalties.  Iconix agrees to pay to Licensee (a) promptly following receipt by Iconix or any ~~Licensor~~other Person any and all royalties, advertising contributions or other fees, compensation or other amounts with respect to sales in the Applicable New Territory received from any Third Party Licensee pursuant to an Additional Licensed Mark Existing License for periods following the date hereof (collectively, "***Additional Licensed Mark Existing License Amounts***") that any Third Party Licensees pursuant to the Additional Licensed Mark Existing Licenses pay to Iconix or any Licensor on or after the date hereof under the Additional Licensed Mark Existing Licenses, except to the extent such amounts relate to any periods preceding the date hereof; and (b) promptly following the date hereof, an amount equal to all Additional Licensed Mark Existing License Amounts that any Third Party Licensees pursuant to Additional Licensed Mark Existing Licenses ~~shall~~are required to have paid to Iconix or any

11

ICON-043-00032151

Licensor prior to the date hereof under the Additional Licensed Mark Existing Licenses as advances or other prepaid amounts for any period after the date hereof.

8. Exercise of the Put/Call under the Agreement.

The following is inserted in the Existing License Agreement as a new section 7A:

To the extent that LF and/or Iconix exercise a Partial Exercise (as defined in and in accordance with the Shareholders Agreement), the parties hereto agree to use all reasonable efforts to negotiate, agree and thereafter amend this Agreement to the extent necessary to give effect to the commercial intention of the Partial Exercise including termination of licensed rights and the removal of any assets (including intellectual property) which are the subject of the Partial Exercise.

~~7.~~8. Addition of Certain Exhibits.

(a) The Existing License Agreement is hereby amended by adding thereto:

(i) Schedule A-1 in form attached as Annex 2 hereto,

(ii) Schedule C-1 in the form of Annex 3 hereto and

(iii) Schedule D in the form of Annex 4 hereto.

~~8.   Operating Agreement.  Each of LF and Iconix hereby acknowledge and agree that, notwithstanding anything to the contrary in the Operating Agreement, (a) a pledge by any Iconix Member (as defined in the Operating Agreement) of all or any portion of its Units (as defined in the Operating Agreement) or any right or interest therein shall not constitute a Transfer (as defined in the Operating Agreement) under the Operating Agreement, (b) any Five-Year Put Notice (as defined in the Operating Agreement), which is delivered pursuant to Section 7.05(a) of the Operating Agreement, shall be delivered by the LF Members (as defined in the Operating Agreement) to, and the LF Members shall only be required to deliver such Five-Year Put Notice to, Iconix and Iconix Europe LLC, and (c) regardless of whether Iconix is the Iconix Member if and when the Five-Year Put Notice is delivered, Iconix (or its designee) shall have the sole right to purchase all (but not less than all) of the Units of the LF Members upon the exercise of a Five-Year Put (as defined in the Operating Agreement) pursuant to Section 7.05(a) of the Operating Agreement.~~

(b) The Existing License Agreement is hereby amended by inserting the contents of Annex 5 into Part B of Schedule C.

(c) The Existing License Agreement is hereby amended by deleting in its entirety Annex 1 to the Existing License Agreement and inserting in its place Annex 1 to this Amendment. To the extent any Licensor set out in Annex 1 of this Amendment was not a party to the Existing License Agreement, the parties hereto agree with such Licensor that such Licensor will become a party to and be bound by the Agreement with effect from the Amendment No. 1 Effective Date.

12

ICON-043-00032152

**A-1255**

**[Note: former section 8 to be provided for in a separate side-letter (and subject to separate review/comment).]**

9. <u>No Other Amendment</u>.  Except as expressly set forth in this Amendment, the terms and provisions of the Existing License Agreement will remain in full force and effect.

10. <u>Counterparts</u>.  This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument

13

ICON-043-00032153

# A-1256

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Amendment the day and year first above written.

**LICENSORS:**

BADGLEY MISCHKA LICENSING LLC
HARDY WAY, LLC
ICONIX BRAND GROUP, INC. [1]
IP HOLDINGS LLC
IP HOLDINGS UNLTD LLC
MOSSIMO HOLDINGS LLC
OFFICIAL PILLOWTEX LLC
OP HOLDINGS LLC
RED DIAMOND HOLDINGS SÀRL [2]
SHARPER IMAGE HOLDINGS LLC
STUDIO IP HOLDINGS LLC
ZY HOLDINGS LLC

By Iconix Brand Group, Inc., as Licensor / on behalf of the above-listed wholly-owned subsidiaries

By: _____
Name:
Title:

ICONIX LUXEMBOURG HOLDINGS SÀRL

By: _____
Name:
Title:

By: _____
Name:
Title:

---

[1] Note: this entity is a Licensor under the Existing License Agreement described as follows in schedule C (as amended following our DD review): "License Agreement between Iconix Brand Group Inc. and Donnerwood Media, Inc., dated July 15, 2012, as amended on January 13, 2014.
[2] Note: as we are amending the Master License Agreement, this entity should be included (as it was a party to the original Master License Agreement).

14

ICON-043-00032154

RED DIAMOND HOLDINGS SÀRL

By: _____
Name:
Title:

By: _____
Name:
Title:


ICONIX BRAND GROUP, INC.


By: _____

Name:
Title:

**LICENSEE:**

ICONIX SE ASIA LIMITED

By: _____
Name:
Title:

**FOR PURPOSES OF SECTION 8 ONLY:**

LF ASIA LIMITED

By: _____
Name:
Title:

15

ICON-043-00032155

# A-1258

~~Gibson Dunn Draft Dated 5/27/14~~
**MBJSM Comments**
**6/25/2014**

**ANNEX 1**

1. BADGLEY MISCHKA LICENSING LLC
2. HARDY WAY, LLC
3. ICONIX BRAND GROUP, INC.
4. ICONIX LUXEMBOURG HOLDINGS SÀRL
~~4.~~5. IP HOLDINGS LLC
~~5.~~6. IP HOLDINGS UNLTD LLC
~~6.~~7. MOSSIMO HOLDINGS LLC
~~7.~~8. OFFICIAL PILLOWTEX LLC
~~8.~~9. OP HOLDINGS LLC
~~9.~~10. RED DIAMOND HOLDINGS SÀRL
~~10.~~11. SHARPER IMAGE HOLDINGS LLC
~~11.~~12. STUDIO IP HOLDINGS LLC
~~12.~~13. ZY HOLDINGS LLC
~~13.~~14. Any wholly owned subsidiary of Iconix that owns any Existing Licensed Mark as of the date of the Existing License Agreement or any Additional Licensed Mark as of the date of Amendment No.1.
**[Note: Iconix to confirm if any other entities own relevant IP. Subject to further comments from LF in relation to Europe+Turkey.]**

ICON-043-00032156

~~Gibson Dunn Draft Dated 5/27/14~~
**MBJSM Comments**
**6/25/2014**

**ANNEX 2**

**Schedule A-1**

**Additional Licensed Marks**

**See Attached**

ICON-043-00032157

# A-1260

~~Gibson Dunn Draft Dated 5/27/14~~
**MBJSM Comments**
**6/25/2014**

**ANNEX 3**

**Schedule C-1**

**Additional Licensed Mark Existing Licenses**

**Part A – Existing Licenses**

**Part B – Retained Multicountry Licenses**

**Part C – Details of the Additional Licensed Mark Existing Licenses**

ICON-043-00032158

**A-1261**

ANNEX 4

**Schedule D**

**Definition of "Europe"**

Albania
Andorra
Austria
Belarus
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
Former Yugoslav Republic of Macedonia
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Moldova
Monaco
Montenegro
Netherlands
Norway
Poland .
Portugal
Romania
Russia
San Marino
Serbia

19Current 33856797.2 24-Jun-14 18:03

ICON-043-00032159

**A-1262**

Slovakia
Slovenia
Spain
Sweden
Switzerland
Ukraine
Uzbekistan
United Kingdom [(including for the avoidance of doubt the Crown Dependencies of Jersey, Guernsey and the Isle of Man)] **[Note to confirm/discuss with LF.]**
Vatican City State

20Current 33856797.2 24-Jun-14 18:03

ICON-043-00032160

**A-1263**

21 Current 33856797.2 24-Jun-14 18:03

ICON-043-00032161

**A-1264**

**ANNEX 5**

**Insertion into Part B of Schedule ~~3(a)~~C**

**[Note: to insert the inadvertently omitted SEA agreement.]**

22Current 33856797.2 24-Jun-14 18:03

ICON-043-00032162

# A-1265

**MBJSM Comments**
**6/25/2014**

**Schedule 5.7(a)**

**Liens**

ICON-043-00032163

# A-1266

Gibson Dunn Draft Dated 5/27/14
MBJSM Comments
6/25/2014

**Schedule 3̶5.7(f̶d)**

**<u>Exceptions to Validity of Additional Licensed Mark Existing Licenses</u>**

ICON-043-00032164

# A-1267

~~Gibson Dunn Draft Dated 5/27/14~~
**MBJSM Comments**
**6/25/2014**

**Schedule ~~3~~5.7(~~g~~h)**

**Infringements with respect to any Additional Licensed Mark
in the Applicable New Territory and in the Applicable Classes**

ICON-043-00032165

# A-1268

**Schedule 5.9**

**Contracts in relation to the Additional Licensed Marks**

Current 33856797.2 24-Jun-14 18:03

ICON-043-00032166

**A-1269**

**Schedule 5.12**

**Information and Projections**

Current 33856797.2 24-Jun-14 18:03

ICON-043-00032167

**A-1270**

~~Gibson Dunn Draft Dated 5/27/14~~
MBJSM Comments
6/25/2014

**Schedule 3-I**

**Existing Claims**

ICON-043-00032168

**A-1271**

Document comparison by Workshare Compare on 25 June 2014 23:00:03

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://ASIDMS/Current/33856797/1 |
| Description | #33856797v1<Current> - 101727800_3 (Iconix LF - Amendment 1 to Master License Agreement) |
| Document 2 ID | interwovenSite://ASIDMS/Current/33856797/4 |
| Description | #33856797v4<Current> - Iconix - LF - Amendment 1 to Master License Agreement - MBJSM - 6/25/2014 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 208 |
| Deletions | 85 |
| Moved from | 4 |
| Moved to | 4 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 301 |

ICON-043-00032169

A-1272

CONFORMED COPY
RELATIVE TO:
**Gibson Dunn Draft Dated 6/6/14**
**MBJSM changes 25/6/14**

# ICONIX SE ASIA LIMITED
# SHAREHOLDERS AGREEMENT

Dated as of September 30, 2013
as amended and conformed on [●] 2014

THE SHARES REFERRED TO IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS

14448383 / 33753303

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**　　　　　**ICON-043-00032170**

# A-1273

BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032171

# A-1274

## TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS; OPERATION OF COMPANY ..................................................1
Section 1.01    Definitions .................................................................1
Section 1.02    Incorporation; Name .....................................................6
Section 1.03    Registered Office; Principal Office ......................................7
Section 1.04    Business Purpose .......................................................7
Section 1.05    Shareholders ...........................................................7
Section 1.06    No Personal Liability ...................................................7

ARTICLE II SHAREHOLDINGS AND CAPITAL STRUCTURE ....................................7
Section 2.01    Capital Structure ......................................................7
Section 2.02    Loans .................................................................8

ARTICLE III DISTRIBUTIONS ...............................................................8
Section 3.01    Distributions ..........................................................8
Section 3.02    Tax Distributions ......................................................9

ARTICLE IV MANAGEMENT OF COMPANY ..............................................9
Section 4.01    General Provisions Concerning Management ............................9
Section 4.02    Appointment of Directors ..............................................9
Section 4.03    Resignation and Removal of Directors .................................9
Section 4.04    Administrative Manager ...............................................10
Section 4.05    Local Manager .......................................................10
Section 4.06    Actions Requiring Unanimous Consent of all the Directors .............10
Section 4.07    Shareholder Approval .................................................13
Section 4.08    Officers .............................................................14
Section 4.09    Board Meetings; Written Resolutions ..................................14
Section 4.10    Quorum; Voting ......................................................15
Section 4.11    Company Minutes .....................................................15

ARTICLE V BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL
MATTERS ................................................................................15
Section 5.01    Books and Records ...................................................15
Section 5.02    Fiscal Year ..........................................................16
Section 5.03    Bank Accounts and Temporary Investments ...........................16
Section 5.04    Classification as a Partnership; Tax Decisions .........................17

ARTICLE VI TRANSFERS ...................................................................17
Section 6.01    Transfers ............................................................17
Section 6.02    Share Certificates ....................................................17
Section 6.03    Registration as a Shareholder .........................................18
Section 6.04    Put and Call Options ..................................................19

ARTICLE VII TERMINATION AND LIQUIDATION ..........................................21

*Current 30293237.7 30-Sep-13 01:44*

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032172**

# A-1275

## TABLE OF CONTENTS

(continued)

|  |  | Page |
|---|---|---|
| Section 7.01 | Termination | 21 |
| Section 7.02 | Effect of Termination. | 21 |
| Section 7.03 | Winding Up | 21 |
| ARTICLE VIII INDEMNIFICATION | | 22 |
| Section 8.01 | Insurance | 22 |
| ARTICLE IX REPRESENTATIONS | | 22 |
| Section 9.01 | General | 22 |
| ARTICLE X MISCELLANEOUS | | 23 |
| Section 10.01 | Information | 23 |
| Section 10.02 | Notices | 24 |
| Section 10.03 | Parties Bound; No Third Party Beneficiaries | 24 |
| Section 10.04 | Governing Law; Submission to Jurisdiction | 24 |
| Section 10.05 | Amendment | 25 |
| Section 10.06 | Entire Agreement | 25 |
| Section 10.07 | Confidentiality | 25 |
| Section 10.08 | Severability | 25 |
| Section 10.09 | Counterparts; Facsimile or Electronic Transmission | 26 |
| Section 10.10 | Construction | 26 |
| Section 10.11 | Successors and Assigns | 26 |
| Section 10.12 | Headings and Captions | 26 |
| Section 10.13 | No Waiver | 26 |
| Section 10.14 | Additional Instruments | 27 |
| Section 10.15 | Publicity | 27 |
| Section 10.16 | Remedies | 27 |
| Section 10.17 | Specific Performance | 27 |

EXHIBITS

| Exhibit "A" | BRANDS |
|---|---|
| Exhibit "B" | SHARES AND PERCENTAGE SHAREHOLDINGS |
| Exhibit "C" | FORM OF DEED OF ADHERENCE |
| Exhibit "D" | TAX ALLOCATIONS |

Current 30293237.7 30-Sep-13 01:44

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.    ICON-043-00032173

# A-1276

## ICONIX SE ASIA LIMITED
## SHAREHOLDERS AGREEMENT

This SHAREHOLDERS AGREEMENT of Iconix SE Asia Limited (formerly known as Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 (the "***Company***"), is entered into effective as of September 30, 2013 (the "***Effective Date***") and as amended by [the Amendment No. 1] effective as of [the Amendment No. 1 Effective Date], by and between LF Asia Limited, a Hong Kong limited liability company ("***LF***"), and Iconix Brand Group, Inc., a Delaware corporation ("***Iconix***").

## R E C I T A L S:

Iconix has caused the incorporation of the Company on September 10, 2013.

Iconix and LF entered into a Share Purchase Agreement pursuant to which LF purchased from Iconix one (1) Share in the Company, representing fifty percent (50%) of the issued share capital of the Company (such Share Purchase Agreement, as may be amended or modified from time to time, the "***Purchase Agreement***").

Iconix and LF were subsequently each allotted 49 Shares, giving them each 50 shares in total (being 50% of the Shares in the Company) ("**Initial Allotment**").

**[Note: if applicable, to reference the agreement under which the Expanded Brands and New Licensed Brands are purchased.]**

The parties hereto wish to enter into this Agreement (reflecting [the Amendment No. 1]) to reflect the respective rights, duties and obligations of the Shareholders with respect to the Company.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## DEFINED TERMS; OPERATION OF COMPANY

### Section 1.01    Definitions

. Within the context of this Agreement, the following terms shall have the following meanings:

"***Accounting Standards***" has the meaning set forth in Section 5.01.

"***Administrative Manager***" has the meaning set forth in Section 4.04.

Current 30293237.7 30-Sep-13 01:44

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**          **ICON-043-00032174**

"*Administrative Services Agreement*" means the Administrative Manager Services Agreement dated as of the date hereof by and between the Company and Iconix, as the same may be amended from time to time.

"*Affiliate*" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, "control," "controlling," "controlled by" or "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Equity Securities, by Contract or otherwise.

"Agreed Value" has the meaning set forth in Section 6.04(b).

"*Agreement*" means this Shareholders Agreement, effective as of September 30, 2013, by and between Iconix and LF, as amended by Amendment No. 1, and as the same may be amended from time to time.

"*All Rights*" means, together, all of the Europe Rights, the Existing Rights and the Korea Rights.

"*Amendment No. 1*" means Amendment No. 1 to the Shareholders Agreement effective as of the Amendment No. 1 Effective Date, by and between Iconix and LF.

"*Amendment No. 1 Effective Date*" means [_____, 2014], the effective date of Amendment No. 1.

"*Board*" means the board of directors of the Company as it is constituted at the relevant time.

"*Brands*" means, collectively, the Existing Brands (with respect to the Existing Territory), the Expanded Brands (with respect to the Expanded Territory) and the New Licensed Brands (with respect to the New Territory).

"*Business*" means (i) all consumer products including but not limited to the fashion, jewelry, eyewear, footwear, apparel, swimwear, outerwear, small leather goods and accessories, watches, food, fast moving consumer goods, home, fragrance and beauty lines of business and all accessories associated with all such lines of business, (ii) all lines of business reasonably related or ancillary thereto (including the establishment and operation of retail stores), and (iii) any other line of business approved by the Shareholders.

"*Business Day*" means a day, other than a Saturday or a Sunday, on which banks are open for business in each and all of the State of New York (United States of America) and Hong Kong.

"*Change of Control*" means (i) a change of control (including but not limited to by way of merger, consolidation or transfer of Equity Securities) of an entity, (ii) the direct or indirect sale by an entity of all or substantially all of its assets or (iii) any Person or group of Persons (other an Affiliate of such entity) becoming the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the outstanding Equity Securities of an entity.

2

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032175**

# A-1278

"*Communications*" has the meaning set forth in Section 10.02.

"*Companies Ordinance*" means the Companies Ordinance, chapter 622 of the laws of Hong Kong (and, to the extent it was relevant prior to 3 March 2014, the Companies Ordinance, chapter 32 of the laws of Hong Kong).

"*Company*" has the meaning set forth in the Preamble.

"*Company Account*" has the meaning set forth in Section 5.03.

"*Confidential Information*" means all confidential or proprietary information, knowledge, systems or data relating to the business, assets, prospects, operations, finances, policies, strategies, intentions or inventions of the Company or any of its Subsidiaries (including any of the terms of this Agreement) from whatever source obtained, subject to the terms of this Agreement.

"*Contract*" means any agreement, bond, commitment, contract, franchise, indemnity, indenture, lease, license, purchase order or other instrument of any kind, whether oral or written.

"*Deed of Adherence*" has the meaning set forth in Section 6.03.

"*Designated Costs*" has the meaning set forth in Section 4.06(a)(i).

"*Directors*" has the meaning set forth in Section 4.02.

"*Effective Date*" has the meaning set forth in the Preamble.

"*Electronic Transmission*" means any form of communication, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

"*Equity Securities*" means any share, any partnership interest, any limited liability company interest and any other ownership interest in an entity, including any options or warrants to purchase the foregoing and other securities convertible, exchangeable or exercisable into the foregoing.

"*Europe*" means, collectively, the countries listed on **Exhibit "E"**.

"*Europe Rights*" means the rights granted to the Company under the Master License Agreement in respect of the New Licensed Brands in the New Territory.

"*Existing Brands*" means the brand names, logos and word phrases listed in **Exhibit "A"** and any other brand names, logos and word phrases which the Company hereafter uses in the Existing Territory in connection with the Business as approved by the Board.

"*Existing Rights*" means the rights granted to the Company under the Master License Agreement in respect of the Existing Brands in the Existing Territory.

3

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc. ICON-043-00032176

# A-1279

"***Existing Territory***" means Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.

"***Expanded Brands***" means the brand names, logos and word phrases listed in **Exhibit "A"** other than OP/Ocean Pacific and Umbro, and any other brand names, logos and word phrases which the Company hereafter uses in the Expanded Territory in connection with the Business as approved by the Board.

"***Expanded Territory***" means the Republic of Korea.

"***Five-Year Call***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Call Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Call Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Shares***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Reference Royalty Amount***" has the meaning set forth in Section 6.04(b)(ii)(A) .

"***Fully Exercised***" means one or more exercises of the Five-Year Put/Call which result in the purchase by the Iconix Shareholder of All Rights, and "***Full Exercise***" shall be construed accordingly.

"***Governmental Authority***" means any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority.

"***HKIAC***" has the meaning set forth in Section 10.04.

"***Iconix***" has the meaning set forth in the Preamble.

4

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc. ICON-043-00032177

**A-1280**

"*Iconix Directors*" has the meaning set forth in Section 4.02.

"*Iconix Shareholder*" means Iconix, together with its Transferees, if any.

"*Korea Rights*" means the rights granted to the Company under the Master License Agreement in respect of the Expanded Brands in the Expanded Territory.

"*Law*" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

"*LF*" has the meaning set forth in the Preamble.

"*LF Directors*" has the meaning set forth in Section 4.02.

"*LF Shareholder*" means LF, together with its Transferees, if any.

"*Local Manager*" has the meaning set forth in Section 4.05.

"*Local Services Agreement*" means the Local Manager Services Agreement dated as of the date hereof by and between the Company and LF, as the same may be amended from time to time.

"*Master License Agreement*" means the Master License Agreement, effective as of September 30, 2013, by and among the Company, Iconix and the Licensors (as defined therein), as amended by Amendment No.1, and as the same may be amended from time to time.

"***New Licensed Brands***" means the brand names, logos and word phrases listed in **Exhibit "A-1"** and any other brand names, logos and word phrases which the Company hereafter uses in the New Territory in connection with the Business as approved by the Board.

"*New Territory*" means Europe and Turkey.

"*Other License Agreement*" means any license or similar agreement by and between the Company or one of its Subsidiaries and another Person granting such Person rights to use the Brands in the Territory.

"*Partial Exercise*" means an exercise of the Five-Year Put/Call which does not result in a Full Exercise.

"*Percentage Shareholding*" means the percentage determined in accordance with Section 2.01(b).

"*Permitted Parent Change of Control*" means (i) a Change of Control of, in the case of the Iconix Shareholder, Iconix and, in the case of the LF, Global Brands Group Limited.

"*Person*" means any individual or any partnership, corporation, estate, trust, company or other legal entity.

"*Purchase Agreement*" has the meaning set forth in the Recitals.

5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032178

"*Securities Act*" means the Securities Act of 1933, as amended, or any similar federal statute then in effect, and any reference to a particular section thereof shall include a reference to the comparable section, if any, of any such similar federal statute, and the rules and regulations promulgated thereunder.

"*Share*" means a share in the Company.

"*Shareholders*" means the Iconix Shareholder and the LF Shareholder.

"*Share Certificate*" has the meaning set forth in Section 2.01(c).

"*Subsidiary*" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (i) of which such Person or any other subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any subsidiary of such Person do not have a majority of the voting interests in such partnership) or (ii) at least fifty percent (50%) of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries, or by such Person and one or more of its subsidiaries.

"*Territory*" means, collectively, the Existing Territory (with respect to the Existing Brands), the Expanded Territory (with respect to the Expanded Brands) and the New Territory (with respect to the New Licensed Brands).

"*Transfer*" means to sell, convey, transfer, syndicate, assign, mortgage, pledge, hypothecate or otherwise encumber or dispose of in any way, including by operation of law or otherwise, any Shares, or any Change of Control of the Company. The Person who is transferring Shares shall be referred to as the "Transferor" and the Person who is acquiring the Shares shall be referred to as the "Transferee."

"*Two-Year Call*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Notice*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Purchase Price*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Shares*" has the meaning set forth in Section 6.04(a).

"*Year*" means the tax and financial accounting period specified in Section 5.02.

### Section 1.02    Incorporation; Name

. The Company was incorporated by the filing of the form of incorporation with the Companies Registry of Hong Kong. A certificate of incorporation was issued by the Companies Registry of Hong Kong on September 10, 2013. The Shareholders hereby confirm the incorporation of the Company as a company with limited liability under and pursuant to the provisions of the Companies Ordinance. Whenever the terms of this Agreement conflict with the provisions of the articles of association of the Company, the terms of this Agreement shall prevail.

6

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032179**

Accordingly, the parties hereto shall exercise their respective voting and other rights as holders of Shares to procure that the articles of association of the Company are amended to remove any conflict.

### Section 1.03    Registered Office; Principal Office

.    The registered office of the Company required under the Companies Ordinance shall be as designated in the incorporation form filed with the Companies Registry, and may be changed by the Board in accordance with the Companies Ordinance. The principal business office of the Company shall be located at the principal business office of the Local Manager, or such other address as shall be designated by the Board.

### Section 1.04    Business Purpose

. The Company has been formed for the purpose of engaging, directly or through its Subsidiaries, in the following activities: (i) developing, exploiting and promoting the Brands licensed to the Company pursuant to the Master License Agreement or another Contract in the Territory by way of a license, sublicense or otherwise relating to the Business in exchange for royalty payments, and/or other consideration, (ii) purchasing or licensing third party Brands for the purposes of developing them in the Territory; (iii) engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing; (iv) engaging in other similar business opportunities as agreed to by both of the Shareholders and (v) unless otherwise agreed by the Shareholders, adopting a business model that is in accordance with the then-approved business plan and is asset light, working capital light and with an EBITDA margin of not less than 75%. References in this Agreement to the "ordinary course of business" shall be construed in conjunction with the business purpose set out in this Section 1.04.

### Section 1.05    Shareholders

.    The name, number of Shares and Percentage Shareholding held by each Shareholder is set forth on **Exhibit "B"**, as the same may be amended from time to time in accordance with this Agreement.

### Section 1.06    No Personal Liability

.    Except as provided by the applicable Law, no Shareholder or any Director shall be personally liable for any obligations of the Company and no Shareholder shall have any obligation or be required to make any loan or otherwise advance any funds to the Company other than as provided in Section 2.01(d) or 2.01(e).

### ARTICLE II

### SHAREHOLDINGS AND CAPITAL STRUCTURE

### Section 2.01    Capital Structure

.

7

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032180**

**A-1283**

     (a)    <u>Shareholdings</u>. The initial shareholdings of the Shareholders (after giving effect to the purchase transaction contemplated by the Purchase Agreement) are set forth on **Exhibit "B"** attached hereto.

     (b)    <u>Percentage Shareholding</u>. Each Shareholder shall have the Percentage Shareholding in the Company determined by dividing the number of Shares owned by such Shareholder by the total number of issued Shares. The Percentage Shareholding of each Shareholder (after giving effect to the purchase transaction contemplated by the Purchase Agreement) shall be set forth next to such Shareholder's name on **Exhibit "B"** attached hereto.

     (c)    <u>Share Certificates</u>. Upon the request of any Shareholder, a share certificate (each, a "***Share Certificate***") issued by the Company in accordance with the provisions of the articles of association of the Company shall evidence the Shares in the Company held by such requesting Shareholder.

     (d)    <u>New Allotment of Shares</u>. *(Omitted as spent).*

     (e)    <u>Further Subscription for Shares</u>. In the event that the Company is to pay any Future Mark Acquisition Consideration (as defined in the Master License Agreement) or any Jointly Owned Mark Acquisition Consideration (as defined in the Master License Agreement) under the Master License Agreement, the Shareholder will subscribe for new Shares, in accordance with their Percentage Shareholding, in order to put the Company in funds to pay the relevant Future Mark Acquisition Consideration or any Jointly Owned Mark Acquisition Consideration (as the case may be), with subscription price therefor being set by the Directors, and the Shareholders will pass such resolutions and procure that the Directors pass such resolutions as are necessary to give effect to the provisions of this Section 2.01(e).

### Section 2.02    Loans

  . Without in any way limiting the authority of the Board to cause the Company to borrow funds from an unaffiliated third party (instead of, or in addition to, any loan(s) of the type contemplated by this Section 2.02), any Shareholder or Affiliate of a Shareholder may, with the consent of all the Directors, lend or advance money to the Company; <u>provided</u>, that such loan shall be on terms and conditions not less favorable than those available from unaffiliated third parties for similar loans (unless otherwise unanimously agreed by the Directors).

### ARTICLE III

### DISTRIBUTIONS

### Section 3.01    Distributions

  . At such times as the Board determines is in the best interest of the Company and the Shareholders, the Company shall pay dividends or make other distributions to the Shareholders in proportion to their Percentage Shareholdings. The Shareholders agree that, to the extent practicable and permitted by any applicable Law and regulation, unless otherwise agreed by the Shareholders, the dividend policy of the Company shall be to distribute the maximum amount of distributions allowed by the Companies Ordinance.

8

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**          **ICON-043-00032181**

### Section 3.02    Tax Distributions

. Upon Iconix's reasonable request, and subject to such dividend being lawfully permitted, the Board shall cause the Company to distribute to each Shareholder in respect of each Year, an amount of cash which equals (i) the amount of taxable income allocable to the Shareholder in respect of such Year, multiplied by (ii) the combined maximum individual United States federal and state income tax rate attributable to such taxable income (determined as if all Shareholders were residents of the State of New York and taking into account (i) the deductibility of state income taxes for United States federal income tax purposes) and (ii) the amount of taxable losses previously allocated to such Shareholders in prior fiscal years (and not used in prior fiscal years to reduce taxable income for the purpose of making distributions under this Section 3.02). Such distributions based upon estimates of the taxable income for the year may be made on a quarterly or other basis as shall be determined by Iconix (in its sole discretion). All amounts so distributed shall be treated as amounts distributed to the Shareholder pursuant to Section 3.01 of this Agreement, depending on the source of the item that generated such taxable income, and shall be reduced by any amounts withheld for taxes with respect to the Shareholder pursuant to Section 3.01.

### ARTICLE IV

### MANAGEMENT OF COMPANY

### Section 4.01    General Provisions Concerning Management

. Subject to the provisions hereof, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board. The Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company described herein, including all powers, statutory or otherwise, possessed by directors of a company with limited liability incorporated under the laws of Hong Kong. Except as otherwise required by law, approval of any action by the Board in accordance with this Agreement and the articles of association of the Company shall constitute approval of such action by the Company.

### Section 4.02    Appointment of Directors

. The Company shall have four Directors, two (2) of whom shall be Persons designated by LF and its Transferees, if any (the "*LF Directors*"), and two (2) of whom shall be Persons designated by Iconix and its Transferees, if any (the "*Iconix Directors*," and together with the LF Directors, the "*Directors*"). The initial LF Directors shall be Jason Rabin and David Thomas and the initial Iconix Directors shall be Neil Cole and Warren Clamen.

### Section 4.03    Resignation and Removal of Directors

. Each Director shall serve until death, dissolution, resignation or removal, in accordance with this Agreement and the articles of association of the Company. A Director may resign at any time upon giving written notice of resignation to the Company. A Director may be removed at any time with or without cause only by the Shareholder who appointed such Director (*e.g.*, an Iconix Director can only be removed by Iconix). If a Director ceases to serve as a Director

9

at any time for any reason, the resulting vacancy shall be filled by a Person designated by the Shareholder whose designee created the vacancy

### Section 4.04    Administrative Manager

.    Subject to the provisions of the Administrative Services Agreement, Iconix, as Administrative Manager (the "*Administrative Manager*") shall have the responsibilities and provide to the Company the services referred to therein.

### Section 4.05    Local Manager

.    Subject to the provisions of the Local Services Agreement, LF, as Local Manager (the "*Local Manager*") shall have the responsibilities and provide to the Company the services referred to therein.

### Section 4.06    Actions Requiring Unanimous Consent of all the Directors

.

(a)    Notwithstanding any provision of this Agreement, subject to Section 4.07, approval of the following actions shall require the unanimous consent of all the Directors:

(i)    approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the costs and expenses (including those payable under the Administrative Services Agreement and the Local Services Agreement) associated with the ongoing operations of the Company (the "*Designated Costs*") pursuant to such annual business and development plan and annual budget are less than twenty percent (20%) of net revenue projected in such annual business and development plan and annual budget; provided that, if the actions in this clause (i) are to be taken by the Iconix Directors, the Iconix Directors shall consult with the LF Directors, in good faith, regarding such proposed annual business and development plan and annual budget, and take into consideration any comments or proposed changes recommended by the LF Directors;

(ii)    approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the Designated Costs pursuant to such annual business and development plan and annual budget are twenty percent (20%) or greater of net revenue projected in such annual business and development plan and annual budget;

(iii)    any change in the scope or nature of the business or activities of the Company or any or any of its Subsidiaries;

(iv)    appointment or removal of, entry into an employment agreement with or approval of any delegation of or change to the authority or responsibilities of any officer of the Company or any of its Subsidiaries, or approval of the terms and conditions of employment of any officer or employee of the Company or any of its Subsidiaries or any change thereto provided that, if the actions in this clause (iv) are to be taken by the Iconix Directors, (A) at least thirty (30) days prior to taking any such action the Iconix Directors shall have provided the LF Directors with,

10

# A-1286

as applicable, identity of any individual proposed to be appointed or removed, the employment history of and references for any potential officer, a detailed summary of the terms of any proposed employment agreement, a summary of the reasons for any delegation or change in the authority or responsibilities of any officer and/or a summary of any terms and conditions of employment proposed to be approved, and shall have consulted with the LF Directors, in good faith, regarding such proposed action and taken into consideration any comments or proposed changes recommended by the LF Directors, and (B) the Iconix Directors shall not hire any new officer unless the position for such officer was included in the then current annual business and development plan and annual budget;

(v)     with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries in the ordinary course of business;

(vi)     with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries outside the ordinary course of business;

(vii)     incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business ;

(viii)     incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) outside the ordinary course of business or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business;

(ix)     lending any money (except deposits with banks or other institutions) by the Company or any of its Subsidiaries;

(x)     entry into any Contract by the Company or any of its Subsidiaries outside the ordinary course of business;

(xi)     commencement or settlement by the Company or any of its Subsidiaries of any legal action, arbitration proceeding, mediation or other dispute resolution other than in the ordinary course of business;

(xii)     adopting or amending any employee benefit or equity plan of the Company or any of its Subsidiaries;

(xiii)     appointment or removal of auditors of the Company or any of its Subsidiaries;

(xiv)     subject to Section 4.06(a)(xv), changing the accounting policies of the Company or any of its Subsidiaries or of the Year of the Company or any of its Subsidiaries;

11

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032184

(xv) changing the accounting policies of the Company or any of its Subsidiaries by reason of being compelled to do so by reason of changes to IFRS and/or GAAP;

(xvi) giving of any guarantee or indemnity of the Company or any of its Subsidiaries;

(xvii) assignment of any debts of the Company or any of its Subsidiaries;

(xviii) transfer, disposal or creation of any security interest in property of the Company or any of its Subsidiaries;

(xix) entry into any Other License Agreement, or amendment, modification, termination of the Master License Agreement or any existing Other License Agreement;

(xx) approving of the creation or acquisition of any Subsidiaries and the adoption of governance agreements or arrangements in respect thereof, or any other investment in, or the acquisition of stocks or bonds of, other Persons or any Equity Securities in any other Person; provided, that there shall be no limitation on the Board's authority to delegate, in a manner mutually acceptable to the Board, the making of investments as part of cash management in the ordinary course of business of the Company;

(xxi) any Transfer of Shares in the Company; and

(xxii) authorizing an officer, an employee or any other individual to approve disbursements on behalf of the Company;

provided, that upon and subsequent to any exercise of the Call Option (as defined herein) pursuant to Section 6.04, the actions in clauses (i), (iv), (v), (vii), (ix), (xv) and (xxii) of this Section 4.06(a) shall be taken by the Iconix Directors in their sole discretion (after reasonable, good faith consultation with the LF Directors), notwithstanding, for the avoidance of doubt, Section 4.08 of this Agreement.

(b) The parties acknowledge and agree that any and all decisions or actions by the Company with respect to an agreement between the Company and a Shareholder or Affiliate of a Shareholder relating to: (i) the exercise or enforcement of the Company's rights thereunder; (ii) any amendments or waivers thereto; or (iii) any approvals required or requests made thereunder shall be taken by the Directors designated by the other Shareholder in their sole discretion.

(c) Subsequent to the exercise of the Call Option (as defined herein), the Iconix Directors will consult in good faith with the LF Directors prior to taking any actions outside of the ordinary course of business and take into consideration any comments or proposed changes recommended by the LF Directors.

(d) The Iconix Directors shall not take any action in their sole discretion if such action would reasonably be expected to have a materially adverse effect on the value of the Shares

12

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**

**A-1288**

held by the LF Shareholder, taking into consideration the existence of the Five Year Put/Call unless the Shareholders mutually agree that any such action is in the best interests of the Company.

### Section 4.07    Shareholder Approval

. Notwithstanding any provision of this Agreement, approval of any of the following shall require unanimous approval by all of the Shareholders:

(a)    admission of any Person (whether by subscription or transfer) as a shareholder of the Company or any of its Subsidiaries;

(b)    grant of, or entry into an agreement to grant, any option, pledge or other encumbrance in respect of the Shares or of any other Equity Securities of the Company or any of its Subsidiaries;

(c)    except as provided under Article III or Section 6.04, declaration, payment or approval by the Company or any of its Subsidiaries of any repurchase or redemption of the Company's or any of its Subsidiaries' securities or any dividend or other distribution to the Shareholders or to the members or shareholders of any of the Company's Subsidiaries (other than Subsidiaries wholly owned by the Company or any of its Subsidiaries);

(d)    delegation of any powers or responsibilities by the Board or Directors other than to an individual or a committee of individuals designated with the unanimous consent of the Directors or to officers pursuant to Section 4.08;

(e)    change of the number of Directors or the number of directors of any Subsidiary of the Company;

(f)    removal of a Director other than by the Shareholder that designated or nominated such Director or removal of a director of any of the Company's Subsidiaries;

(g)    the entering into by the Company or any of its Subsidiaries of any Contract outside the ordinary course of business;

(h)    participation in, termination of or any other actions taken by the Company or any of its Subsidiaries with respect to any venture, partnership or joint venture, or acquisition or disposal of shares or other equity interests in another Person or the acquisition of the business or assets of another Person;

(i)    entry into any transaction by the Company or any Subsidiary of the Company with any Shareholder or any Affiliate of any Shareholder (including entering into any loans between any Shareholder or any Affiliate of any Shareholder and the Company, but not including entering into the Master License Agreement);

(j)    increase or decrease the issued share capital or (as applicable) the authorized share capital or maximum number of shares, in each case of the Company or any of its Subsidiaries;

13

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032186

(k)     reclassification of securities of the Company or any of its Subsidiaries (including any subdivision or consolidation of shares) or recapitalization of the Company or any of its Subsidiaries;

(l)     entry into any merger, amalgamation or consolidation of the Company or any of its Subsidiaries with another Person;

(m)     a resolution for winding up, the termination or dissolution of, or the entering into of bankruptcy, insolvency or receivership by, the Company or any of its Subsidiaries;

(n)     sale or disposal of all of the Shares or all or any substantial part of the Company's or any of its Subsidiaries' business or assets;

(o)     change of the name of the Company or any of its Subsidiaries;

(p)     amendment or modification of the Company's or any of its Subsidiaries' memorandum of association or articles of association or other organizational documents (as applicable);

(q)     reorganization of the Company or any of its Subsidiaries; and

(r)     a private or public issuance or offering for sale of any securities of the Company or any of its Subsidiaries or the listing on any exchange of any securities of the Company or any of its Subsidiaries.

### Section 4.08     Officers

. Subject to the limitations set forth in Section 4.06, the Board shall have the authority to establish such officers of the Company as they shall determine, and to appoint individuals to serve as such officers, including chairman, chief executive officer, one or more vice presidents, secretary, assistant secretary, treasurer and assistant treasurer. An individual may hold more than one office at any time.

### Section 4.09     Board Meetings; Written Resolutions

. Board meetings may be called by any Director. The Board shall meet not less than once every three (3) months. Any Director may participate in a Board meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear and speak to each other at the same time or in sequence, and participation in a Board meeting pursuant to this provision shall constitute presence at the meeting; provided, that at least one of such Board meetings per year shall be held in person at a location to be unanimously determined by the Directors. All meetings of the Board shall be called on not less than three (3) Business Days' prior notice. All actions required or permitted to be taken by the Board may also be approved by the execution of a written resolution executed by all the Directors, and any such written resolution may be executed in counterparts.

14

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032187

# A-1290

### Section 4.10 Quorum; Voting

      (a)    A quorum must exist at all times of a Board meeting, including the reconvening of any Board meeting that has been adjourned, for any action taken at such Board meeting to be valid.

      (b)    Except as otherwise specified in this Agreement:

      (i)    a quorum shall be constituted at a Board meeting only if at least one (1) LF Director and one (1) Iconix Director are present; and

      (ii)    all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, which majority must include at least one (1) LF Director and one (1) Iconix Director.

      (c)    Upon and subsequent to the closing of any Two-Year Call pursuant to Section 6.04:

      (i)    a quorum shall be constituted at a meeting if a majority of the Directors is present, regardless of the identity of the Directors comprising such majority; and

      (ii)    all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, regardless of the identity of the Directors comprising such majority.

### Section 4.11 Company Minutes

      (a)    . The decisions and resolutions of the Board shall be reported in minutes, which shall state the date, time and place of the meeting (or the date of the written resolution in lieu of meeting), the Directors present at the meeting, the resolutions put to a vote (or the subject of a written resolution) and the results of such voting (or written resolution). The minutes shall be entered in a minute book kept at the registered office of the Company and a copy of the minutes shall be provided upon request to each Director.

## ARTICLE V

## BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL MATTERS

### Section 5.01 Books and Records

    . The Administrative Manager shall procure that accurate, full and complete books and records of the Company are maintained, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business and affairs. Such books and records initially shall be prepared and maintained by the Administrative Manager; and, at such time as the Board determines, such books and records shall be prepared and maintained by employees of the Company. Upon request in writing, each

15

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.        **ICON-043-00032188**

Shareholder and its duly authorized representative shall have access to inspect and copy any of such books and records at all reasonable times during normal business hours. The Company shall deliver or cause to be delivered to each Shareholder consolidated financial statements (all of which shall be prepared in accordance with the financial reporting standards and interpretations (including: (a) Hong Kong Financial Reporting Standards; (b) Hong Kong Accounting Standards; and (c) Interpretations) issued by the Hong Kong Institute of Certified Public Accountants applied on a consistent basis (the "*Accounting Standards*")), as follows: (i) as soon as available (but in any event not later than twenty (20) days after the end of each quarter), a consolidated balance sheet as at the end of such quarter and the related consolidated statements of income and cash flows for such quarter and for the period from the beginning of the current calendar year (i.e., the calendar year in which such quarter falls) to the end of such quarter, setting forth, in each case, in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the current calendar year; and (ii) as soon as available (but in any event not later than one hundred twenty (120) days after the end of each calendar year), a consolidated balance sheet as at the end of such calendar year and the related consolidated statements of income, cash flows and stockholders', members' or other owners' equity for such calendar year, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the calendar year covered by such financial statements. The Company shall also deliver to each Shareholder upon request copies of any reports or statements the Company receives from its third party licensees. The financial statements to be provided under this Agreement shall not be required to be audited unless required by applicable Law or so requested by either Shareholder.

### Section 5.02    Fiscal Year

. The year of the Company for tax and financial accounting purposes ("*Year*") shall end on the last day of the month of December, unless a different year end is approved in accordance with Section 4.07

### Section 5.03    Company Accounts

. All receipts, funds and income of the Company shall be deposited in the name of the Company in a bank account of a commercial bank, savings and loan association or other financial institution (the "*Company Account*") as the Local Manager shall determine. Withdrawals from the Company Account shall be made on the signature of (a) an officer of the Administrative Manager or such other Person as shall be designated by the Administrative Manager and (b) an officer of the Local Manager or such other Person as shall be designated by the Local Manager; provided that no withdrawal from the Company Account shall be made (i) with respect to any expense subject to the Directors' or the Shareholders' approval rights pursuant to Section 4.06 or Section 4.07, respectively, until such approval has been obtained, or (ii) for the purpose of making any payment to a Director or an Affiliate of a Director or any distribution to the Shareholders unless the amount of such payment or distribution is in accordance with ARTICLE III or has been approved by the Shareholders. There shall be no commingling of the moneys and funds of the Company with moneys and funds of the Administrative Manager, the Local Manager or any other entity or Person.

16

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032189**

### Section 5.04    Classification as a Partnership; Tax Decisions

.    The Company shall elect within 75 days of its formation to be taxable as a partnership for United States federal income tax purposes, pursuant to Treasury Regulation Section 301.7701-3(b)(1)(i) by having each Shareholder sign Form 8832 as prepared by Iconix. During such time as the Company would be classified as a partnership under the foregoing sentence, neither the Company nor any Shareholder shall take any action that would result in the Company being taxed as other than a "partnership" for United States federal income tax purposes, including, but not limited to, electing to be taxed as other than a "partnership" by filing Internal Revenue Service Form 8832, "Entity Classification Election" without the prior written consent of all of the Shareholders.    All elections required or permitted to be made by the Company and all other tax decisions and determinations relating to United States federal, state, local or foreign tax matters shall be made by the Board, in consultation with the Company's attorneys and/or accountants as the Board deems necessary or advisable.    For U.S. federal income tax purposes, income of the Company shall be allocated in accordance with the provisions of **Exhibit "D"**.

## ARTICLE VI

## TRANSFERS

### Section 6.01    Transfers

.    Except as expressly provided in this **ARTICLE VI**, (i) no Shareholder may directly or indirectly Transfer any or all of its Shares or any right or interest therein; (ii) any direct or indirect offer to Transfer, or any attempted or purported Transfer of, any Shares in violation of any of the provisions of this Agreement shall be void *ab initio*; (iii) the Company shall reject and refuse to register on its books the Transfer of any Shares which are purported to have been transferred otherwise than in compliance with the provisions of this Agreement; and (iv) and the Company shall not recognize any Person receiving any Shares as a shareholder of the Company, nor shall any Person have any rights as a shareholder of the Company, unless the Transfer of Shares to such Person shall have been made pursuant to the terms of this Agreement. Notwithstanding any provisions of this Agreement, a Shareholder may Transfer all (but not some only) of its Shares (a) pursuant to a Permitted Parent Change of Control or (b) to any Affiliate of such Shareholder, provided that if such Affiliate at any time no longer constitutes an Affiliate of Iconix or LF, as applicable, any such Shares transferred to such Affiliate shall immediately be transferred to Iconix or LF, as applicable, or one of their respective Affiliates.

### Section 6.02    Share Certificates

.

(a)    Each Share Certificate issued to a Shareholder pursuant to Section 2.01(c) shall have the following legend conspicuously written, printed, typed or stamped on its face, or upon the reverse with a conspicuous reference to such legend on its face:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF A SHAREHOLDERS AGREEMENT OF [LION NETWORK LIMITED]/[ICONIX SE ASIA LIMITED], DATED AS OF SEPTEMBER 30, 2013, AS

17

IT MAY BE AMENDED FROM TIME TO TIME, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN.

THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS, IN RELIANCE UPON APPLICABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE AND FOREIGN SECURITIES LAWS. THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE. THE SHARES MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL [LION NETWORK LIMITED]/[ICONIX SE ASIA LIMITED] IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE MUST COMPLY WITH THE OTHER TRANSFER RESTRICTIONS SET FORTH IN THE SHAREHOLDERS AGREEMENT."

(b)     Upon the sale of any Shares pursuant to (i) an effective registration statement under the Securities Act or pursuant to Rule 144 under the Securities Act or (ii) another exemption from registration under the Securities Act or upon the termination of this Agreement, the Share Certificates representing such Shares shall be replaced, at the expense of the Company, with certificates or instruments not bearing the legends required by this Section 6.02; provided that the Company may condition such replacement of certificates under clause (ii) upon the receipt of an opinion of securities counsel reasonably satisfactory to the Company.

(c)     In case of loss or destruction of a Share Certificate, no new Share Certificate shall be issued in lieu thereof except upon satisfactory proof to the Company of such loss or destruction, and upon the giving to the Company of satisfactory security against loss by bond or otherwise. Any such new Share Certificate shall be plainly marked "Duplicate" upon its face.

**Section 6.03     Registration as a Shareholder**

. Except as provided in Section 6.01 and Section 6.04, no Person other than the LF Shareholder and the Iconix Shareholder shall be registered in the register of shareholders of the Company as a shareholder of the Company without the prior written unanimous consent of the Board and the Shareholders. If the LF Shareholder or the Iconix Shareholder proposes to transfer Shares to an Affiliate, it shall be a condition to the transfer that such Affiliate shall execute and deliver a deed of adherence in substantially the form attached hereto as **Exhibit "C"** (the "***Deed of Adherence***") pursuant to which such Transferee shall agree to be legally bound by this Agreement. Except as otherwise set forth herein, the Affiliate to which Shares are transferred shall pay all costs and expenses incurred by the Company in connection with such admission.

18

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                              **ICON-043-00032191**

# A-1294

### Section 6.04    Put and Call Options.

(a)    <u>Two-Year Call Option</u>.  For the six- (6-) month period following the second (2nd) anniversary of the Effective Date, the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder and the Company (a "***Two-Year Call Notice***") to initiate the purchase by the Iconix Shareholder of five percent (5%) of the total Shares in issue (the "***Two-Year Call Shares***") at a purchase price (the "***Two-Year Call Purchase Price***") in cash equal to 10% multiplied by 115% multiplied by the sum of (i) the Purchase Price (as defined in the Purchase Agreement) paid or payable by LF to Iconix pursuant to the Purchase Agreement, *plus* (ii) $10,917,500 (such purchase initiated by a Two-Year Call Notice, a "***Two-Year Call***").  The Company shall pay an interim dividend in accordance with the then current dividend policy of the Company, to be calculated up to the day before closing of the Two Year Call.  LF agrees that following the closing of the Two-Year Call, LF has no objection to Iconix being able to consolidate the results of the Company into its own financial results.

(b)    <u>Five-Year Put/Call Option</u>.

(i)    For the six- (6-) month period following the fifth (5th) anniversary of the Effective Date (and, if a Five-Year Put/Call has not previously been Fully Exercised, for the six- (6-) month period following the eighth (8th) anniversary of the Effective Date), (i) the LF Shareholder may deliver an irrevocable written notice of election to the Iconix Shareholder and the Company (a "***Five-Year Put Notice***") to initiate the purchase by the Iconix Shareholder of , the Europe Rights, the Existing Rights and/or the Korea Rights (the "***Five-Year Put/Call Rights***") at a purchase price (the "***Five-Year Put Purchase Price***") in cash equal to the aggregate Agreed Value (as defined herein) (such purchase initiated by a Five-Year Put Notice, a "***Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder (a "***Five-Year Call Notice***," and each of the Five-Year Put Notice and the Five-Year Call Notice, a "***Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder of the Five-Year Put/Call Rights at a purchase price (the "***Five-Year Call Purchase Price***," and each of the Five-Year Put Purchase Price and the Five-Year Call Purchase Price, the "***Five-Year Put/Call Purchase Price***") in cash equal to 120% of the aggregate Agreed Value (such purchase initiated by a Five-Year Call Notice, a "***Five-Year Call***" and each of a Five-Year Put and a Five-Year Call, a "***Five-Year Put/Call***").  Prior to the closing of the Five-Year Put/Call pursuant to Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the Company shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to LF under the Local Services Agreement and pay all fees owing and accrued to Iconix under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the Five-Year Put/Call.

(ii)    If the Five-Year Put/Call is exercised in the six- (6-) month period following the fifth (5th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)    the LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2015 and (ii) the Year

19

ended December 31, 2018; *provided, however*, that the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *plus*

(B)      in the case of a Full Exercise, the amount of cash in the Company.

(iii)      If the Five-Year Put/Call is exercised in the six- (6-) month period following the eighth (8th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)      The LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and the Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2018 and (ii) the Year ended December 31. 2021; *provided, however*, that, the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *plus*

(B)      In the case of a Full Exercise, the amount of cash in the Company.

(c)      Put and Call Closings.  The closing of any Two-Year Call or Five-Year Put/Call under this Section 6.04 shall take place within (i) sixty (60) days after delivery of the Two-Year Call Notice or (ii) sixty (60) days after the delivery of the Five-Year Put/Call Notice (or, if later, within 30 days after the royalty information necessary to calculate the Agreed Value is available), as the case may be, unless another date is mutually agreed upon by the parties to the sale.

(d)      Put and Call Closings – Partial Exercise.  In the case of an exercise of the Five-Year Put/Call which constitutes a Partial Exercise, at the closing of the relevant Five Year Put/Call, the Iconix Shareholder shall pay [to the LF Shareholder] the Five-Year Put/Call Price, and the parties hereto shall use all reasonable endeavours to negotiate and agree (for the purposes of obtaining director consent pursuant to Section 4.06(xix)) changes to the Master License Agreement to the extent necessary to remove from the Master License Agreement, the Europe Rights, the Existing Rights and/or the Korea Rights which are the subject to the Partial Exercise, as appropriate.

(e)      Put and Call Closings – Two Year Call and Full Exercise.  At the closing of any Two-Year Call or Five-Year Put/Call which results in a Full Exercise, the LF Shareholder shall deliver to the Company for cancellation the Share Certificate or Certificates, if any, representing the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable, and the Iconix Shareholder shall take all actions and execute and deliver and pay to the LF Shareholder the Two-Year Call Purchase Price or the Five-Year Put/Call Price, as applicable, and all instruments and documents as may be necessary or desirable to consummate the sale of the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable.  The Company shall thereupon cancel the Share Certificate(s) representing the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable, enter the purchaser's name in the register of shareholders of the Company and, upon request of the purchase pursuant to Section 2.01(c), issue a Share Certificate to the purchaser

20

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032193**

evidencing the purchaser's entitlement to the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable.

(f)     Stamp Duty. The Hong Kong stamp duty payable in respect of the sale and purchase of the Shares pursuant to an exercise of any option pursuant to this Section 6.04 shall be borne by Iconix and LF in equal shares. Iconix and LF shall each pay their respective share of the Hong Kong stamp duty on completion of the exercise of the relevant option and shall co-operate to ensure that the instrument of transfer and bought and sold notes in respect of the sale and purchase of the relevant Shares are duly presented for stamping within the time limits prescribed by the Stamp Duty Ordinance and are duly stamped as soon as practicable after completion of the exercise of the relevant option.

## ARTICLE VII

## TERMINATION AND LIQUIDATION

### Section 7.01    Termination

(a)     . This Agreement shall terminate on the first to occur of the following:

(a)     the Percentage Shareholding of any Shareholder is equal to one hundred percent (100%); or

(b)     a resolution is passed by the Shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, shareholders or other contributors.

### Section 7.02    Effect of Termination.

(a)     On termination of this agreement, Sections 10.02, 10.03, 10.04, 10.07, 10.15 and this Section 7.02(a) shall continue in force.

(b)     Termination of this agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including the right to claim damages or indemnification in respect of any breach of the Agreement which existed at or before the date of termination.

### Section 7.03    Winding Up

(a)     . Where the Company is to be wound up and its assets distributed, the parties shall agree on a suitable basis for dealing with the interests and assets of the Company and shall endeavor to ensure that, before dissolution:

(b)     all existing contracts of the Company are performed to the extent that there are sufficient resources;

(c)     the Company shall not enter into any new contractual obligations; and

21

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**     **ICON-043-00032194**

(d)     the Company's assets are distributed as soon as practical.

## ARTICLE VIII

## INDEMNIFICATION

### Section 8.01     Insurance

.  The Company shall maintain for such periods as the Board shall in good faith unanimously determine, at its expense, insurance in an amount determined unanimously in good faith by the Board to be appropriate, on behalf of any person who is or was a director or officer of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or other enterprise, including any Subsidiary of the Company, against any expense, liability or loss asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, subject to customary exclusions.

## ARTICLE IX

## REPRESENTATIONS

### Section 9.01     General

.  As of the date hereof, each of the Shareholders makes each of the representations and warranties applicable to such Shareholder as set forth in this **ARTICLE IX**, and such representations and warranties shall survive the execution of this Agreement.

(a)     Due Incorporation or Formation; Authorization of Agreement.  If such Shareholder is a corporation, partnership, trust, limited liability company, or other legal entity, it is duly organized or formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the power and authority to own property and carry on its business as owned and carried on at the date hereof and as contemplated hereby and such Shareholder is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder, and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate or partnership or company action.  This Agreement constitutes the legal, valid, and binding obligation of such Shareholder, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b)     No Conflict or Default.  The execution, delivery, and performance of this Agreement and the consummation by such Shareholder of the transactions contemplated hereby (i) will not conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, or any arbitrator, applicable to such Shareholder, and (ii) will not conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, operating agreement, or other organizational documents of such

22

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032195**

Shareholder, or of any material agreement or instrument to which such Shareholder is a party or by which such Shareholder is or may be bound or to which any of its material properties or assets are or may be subject.

(c)     Governmental Authorizations. Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by. any governmental or regulatory authority that is required in connection with the valid execution, delivery, acceptance, and performance by such Shareholder under this Agreement or the consummation by such Shareholder of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date of this Agreement.

(d)     Litigation. There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Shareholder, threatened against or affecting such Shareholder or any of such Shareholder's properties, assets, or businesses in any court or before or by any governmental department, board, agency, instrumentality, or arbitrator which, if adversely determined, could (or in the case of an investigation could lead to any action, suit, or proceeding which, if adversely determined, could) reasonably be expected to materially impair such Shareholder's ability to perform its obligations under this Agreement.

(e)     Securities Representations

. Such Shareholder represents and agrees that the Shares acquired pursuant hereto will be acquired for such Shareholder's own account, for investment, and not with a view to the distribution or resale thereof. Such Shareholder further represents that it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of acquiring the Shares. Such Shareholder understands that such Shares have not been registered under the Securities Act or any state or other securities laws, and cannot be sold, assigned, transferred, pledged or otherwise disposed of unless so registered under the Securities Act and applicable state or other securities laws or unless an exemption from the registration requirements thereof is available.

## ARTICLE X

## MISCELLANEOUS

### Section 10.01     Information

. For so long as any Shareholder is a reporting company under the securities laws of the United States and/or Hong Kong, the Company shall provide to such Shareholder on a timely basis, in addition to the financial statements that the Company is required to deliver to the Shareholders pursuant to Section 5.01, all such information as such Shareholder determines is necessary for it to comply with its reporting obligations under such securities laws, including but not limited to financial information; provided, that any additional expense incurred by the Company or any other Shareholder in connection with or as a consequence of providing such information shall be borne by such Shareholder. It is agreed that a failure to deliver such financial statements on a timely basis shall not be considered a breach of any term or condition of this Agreement, it being agreed that the Shareholders shall use commercially reasonable efforts to

23

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                                    **ICON-043-00032196**

# A-1299

replace the auditors of the Company in the event that the Board determines that any such delay has been caused by the auditors.

### Section 10.02 Notices

. All notices, approvals, consents, requests, instructions, and other communications (collectively "***Communications***") required to be given in writing pursuant to this Agreement shall be validly given, made or served only if in writing and when delivered personally or by registered or certified mail, return receipt requested, postage prepaid, or by a reputable overnight or same day courier, addressed to the Company, the Directors or the Shareholders, as the case may be, at the address(es) thereof on record at the principal office of the Company. All Communications required or permitted hereunder shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, or if not during such hours, then on the next Business Day, (c) five (5) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) three (3) Business Days after deposit with FedEx or other overnight courier, specifying delivery by such date, with written verification of receipt. The designation of the Person to receive such Communication on behalf of a Shareholder or the address of any such Person for the purposes of such Communication may be changed from time to time by written notice given to the Company pursuant to this Section 10.02.

### Section 10.03 Parties Bound; No Third Party Beneficiaries

. This Agreement shall inure to the benefit of and shall be binding upon all of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties (other than to an Affiliate of a Shareholder following a Transfer permitted by Section 6.01). No provision of this Agreement is intended to or shall be construed to grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement to or upon any Person other than the parties hereto.

### Section 10.04 Governing Law; Submission to Jurisdiction

. This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of Hong Kong. Any dispute, difference or claim arising out of or in connection with this Agreement shall be referred to and finally determined by arbitration in Hong Kong at Hong Kong International Arbitration Centre (the "***HKIAC***") in accordance with the UNCITRAL Arbitration Rules as at present in force. The language to be used in the arbitration proceedings shall be English. There shall be three arbitrators, of which one shall be appointed by the Iconix Shareholder, one shall be appointed by the LF Shareholder and one (who shall act as president of the tribunal) shall be jointly appointed by the two arbitrators appointed by the Iconix Shareholder and the LF Shareholder. The Iconix Shareholder and the LF Shareholder shall each appoint one arbitrator within 30 days of the notice of arbitration, failing which such appointment shall be made, at the request of either party, by the Chairman of the HKIAC. If the two arbitrators so appointed by the Iconix Shareholder and the LF Shareholder fail to agree upon the third arbitrator within 15 days of the appointment of the second arbitrator, the third arbitrator shall be appointed by the Chairman of the HKIAC upon the written request of either party. The arbitral

24

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc. ICON-043-00032197

# A-1300

award shall be final and binding on all Parties. In relation to all matters referred to arbitration by this Agreement, the right of appeal under section 23 of the Arbitration Ordinance (Cap. 341 of the Laws of Hong Kong) and the right to make an application under section 23A thereof are hereby excluded. Any costs of arbitration (including without limitation all reasonable legal costs of the winning party) shall be borne by the losing party unless otherwise determined by the arbitral award. Nothing herein shall prevent a Party from seeking injunctive or other emergency relief against the other at any time in a court having competent jurisdiction.

### Section 10.05    Amendment

. No amendment, change or modification to this Agreement shall be valid unless the same is in writing and signed by all of the Shareholders.

### Section 10.06    Entire Agreement

. This Agreement and the Purchase Agreement, together with all exhibits and schedules hereto and thereto (which are deemed incorporated herein), contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof.

### Section 10.07    Confidentiality

. Subject to the requirements of applicable Law, each Shareholder shall maintain in confidence all Confidential Information (i) transferred to the Company or to the other Shareholder by reason of the transactions contemplated by this Agreement and (ii) all information received from the other Shareholder as a result of any due diligence investigation conducted relative to the execution of this Agreement and shall use such information only for the benefit of the Company and or in connection with evaluating the transactions contemplated hereby, and except in accordance with the immediately succeeding sentence, shall not disclose any such information to a third party, other than (i) to its officers, directors, employees, advisors, attorneys or accountants who need to know and who agree to keep such information confidential, (ii) to its actual or proposed lenders or other financing sources having been made aware of the restrictions set forth in this Section 10.07, (iii) to the extent disclosure is required by law, statute, rule, regulation or judicial process (including, but not limited to, applicable securities laws) or (iv) upon the lawful demand of any court or agency or regulator having jurisdiction over such Shareholder (including, but not limited to, any securities regulatory authority, including rating agencies and national securities exchanges, to which the disclosing Shareholder is subject) or make any unauthorized use thereof. The obligation of confidentiality and non-use shall not apply to any information which (A) is or becomes generally available to the public through no fault of the receiving party, (B) is independently developed by the receiving party or (C) is received in good faith from a third party who is lawfully in possession of such information and has the lawful right to disclose or use it.

### Section 10.08    Severability

. If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

25

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032198**

**Section 10.09     Counterparts; Facsimile or Electronic Transmission**

. This Agreement may be executed in one or more counterparts with the same effect as if all of the Shareholders had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile or Electronic Transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or Electronic Transmission shall be deemed to be their original signatures for all purposes.

**Section 10.10     Construction**

. Words in the singular include the plural and in the plural include the singular. The words "including," "includes," "included" and "include," when used, are deemed to be followed by the words "without limitation". Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not defined in this Agreement shall have the meanings determined by the Accounting Standards. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, and all attachments thereto and instruments incorporated therein. This Agreement is the result of arms-length negotiations between the parties hereto and no provision hereof, because of any ambiguity found to be contained herein or otherwise, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of that provision. A reference to a Law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any subordinate legislation for the time being in force made under it.

**Section 10.11     Successors and Assigns**

. This Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Shareholders and their respective successors, but neither this Agreement nor any rights, interests or obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party or parties hereto, subject to the provisions in respect of restrictions on Transfers set forth herein.

**Section 10.12     Headings and Captions**

. The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

**Section 10.13     No Waiver**

. The failure of any Shareholder to insist upon strict performance of a covenant

26

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032199**

hereunder or of any obligation hereunder or to exercise any right or remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of such Shareholder's right to demand strict compliance therewith in the future unless such waiver is in writing and signed by the Shareholder giving the same.

### Section 10.14    Additional Instruments

.    Each Shareholder agrees to execute and deliver such additional agreements, certificates, and other documents and to do all such other acts and things as may be required by law or necessary or appropriate to carry out the intent and purposes of this Agreement.

### Section 10.15    Publicity

.    The parties shall consult with each other before issuing any press release with respect to this Agreement or the transactions contemplated hereby and shall not issue any such press release or make any such public statement without the prior consent of the other party, which shall not be unreasonably withheld, conditioned or delayed; provided, however, that any party may, without the prior consent of the other parties (but after prior consultation, to the extent practicable in the circumstances) issue such press release or make such public statement as may upon the advice of outside counsel be required by law or the rules and regulations of the NASDAQ or the Stock Exchange of Hong Kong Limited or the rules of any other applicable exchange.

### Section 10.16    Remedies

.    Except as otherwise provided herein, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every remedy under this Agreement or now or hereafter existing at law or in equity.

### Section 10.17    Specific Performance

.    Each Shareholder acknowledges and agrees that its respective remedies at law for a breach or threatened breach of any of the provisions of this Agreement would be inadequate and, in recognition of that fact, agrees that, in the event of a breach or threatened breach by a Shareholder of the provisions of this Agreement, in addition to any remedies at law, the Company or any other Shareholder shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

*[Signature page follows.]*

27

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032200**

# A-1303

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed and delivered as of the day and year first above written.

LF ASIA LIMITED


By: _____
      Name:
      Title:

ICONIX BRAND GROUP, INC.


By: _____
      Name:
      Title:

*Shareholders Agreement*

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**    **ICON-043-00032201**

# A-1304

## Exhibit "A"

### BRANDS

FASHION BRANDS:
1. Badgley Mischka
2. Bongo
3. Candie's
4. Danskin / Danskin Now
5. Ecko Unltd./Marc Ecko Cut & Sew
6. Ed Hardy
7. Joe Boxer
8. Lee Cooper
9. London Fog
10. Mossimo
11. Mudd
12. OP / Ocean Pacific[1]
13. Rampage
14. Rocawear
15. Starter
16. Umbro
17. Zoo York

HOME BRANDS:
18. Cannon
19. Charisma
20. Fieldcrest
21. Royal Velvet
22. Sharper Image
23. Waverly

---

[1] Philippines only for Ocean Pacific

A-1

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-043-00032202

# A-1305

## Exhibit "A-1"

## ADDITIONAL BRANDS

Ecko Unlimited
Zoo York
Marc Ecko Cut & Sew
Ed Hardy
Sharper Image

A-2

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032203

# A-1306

## Exhibit "B"

### SHARES AND PERCENTAGE SHAREHOLDINGS
### AS OF THE INITIAL ALLOTMENT

| Shareholder | Shares | Percentage Interest |
|---|---|---|
| Iconix Brand Group, Inc. | 50 | 50% |
| LF Asia Limited | 50 | 50% |
| Total | 100 | 100% |

B-1

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-043-00032204

<u>Exhibit "C"</u>

**FORM OF DEED OF ADHERENCE**

The undersigned is executing and delivering this Deed of Adherence (this "**Deed**") pursuant to the Shareholders Agreement of Iconix SE Asia Limited dated as of September 30, 2013 (as amended on [●], 2014) and as the same may hereafter be amended, amended and restated, supplemented or otherwise modified, the "***Agreement***").

Capitalized terms used in this Deed which are not defined herein shall have the respective meanings given to them in the Agreement.

Now this Deed witnesses as follows:

1.  The undersigned, pursuant to Section 6.03 of the Agreement, undertakes to and covenants with and for the benefit of all the parties to the Agreement and for the benefit of any other person who becomes a party to the Agreement after the date of this Deed to comply with the provisions of and perform all of the obligations in the Agreement as if the undersigned had been a party to the Agreement as [*state capacity*], except to the extent that those obligations have already been performed.

2.  The undersigned agrees to hold the Shares [transferred][issued] to [it]/[him] with the benefit of the rights, and subject to the restrictions, set out in the Agreement and the articles of association of the Company and consents to [its]/[his] name being entered in the register of Shareholders of Company as the holder of the Shares acquired.

3.  The undersigned confirms that [it]/[he] has been given and has read a copy of the Agreement and all documents in the agreed form.

4.  The undersigned hereby irrevocably appoints [        ] of [        ], fax: [        ] as its agent to receive on its behalf in Hong Kong service of any proceedings arising out of or in connection with the Agreement. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by the undersigned).

5.  This Deed and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with Hong Kong law.

**IN WITNESS** of which the undersigned has executed this document as a deed and delivered it on the _____ day of _____, _____.

[*insert appropriate signature provisions*]

C-1

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**          **ICON-043-00032205**

**A-1308**

<u>**Exhibit "D"**</u>

**TAX ALLOCATIONS**

Additional Provisions Applicable for U.S. Federal Income Tax Purposes

1.  <u>Defined Terms.</u>

1.1  "*Capital Account*" means with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 2 of this **Exhibit "D"** below and in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv).

1.2  "*Capital Contribution*" means, with respect to a Partner, a contribution of cash or property to the Company pursuant to this Agreement.

1.3  "*Code*" means the United States Internal Revenue Code of 1986, as amended and as hereafter amended, or any successor law.

1.4  "*Fiscal Year*" means the calendar year unless otherwise required by the Code.

1.5  "*Gross Asset Value*" means, with respect to any property of the Partnership other than money, such property's adjusted basis for U.S. federal income tax purposes, except that the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Tax Matters Partner considers appropriate, whenever such adjustment is permitted under Regulations Section 1.704-1(b)(2)(ii).

1.6  "*Interest*" means the Percentage Shareholding of a Shareholder in the Company.

1.7  "*Net Profits*" and "*Net Losses*" means, with respect to any Fiscal Year or other relevant period of calculation, any taxable income or taxable loss of the Partnership for such Fiscal Year or other period, with the following adjustments:

1.7.1.  any income that is exempt from U.S. federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be added to such taxable income or loss;

1.7.2  any expenditures described in Code Section 705(a)(2)(B) (or treated as expenditures described in Code Section 705(a)(2)(B) pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be subtracted from such taxable income or loss;

D-1

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032206**

1.7.3     in the event the Gross Asset Value of any Partnership property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property for purposes of computing Net Profits or Net Losses;

1.7.4     gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

1.7.5     in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, cost recovery or amortization computed in accordance with Regulations Section 1.704-1(b)(2)(iv)*(g)(3)*; and

1.7.6     any other provisions or items which are specifically allocated pursuant to Sections 3.2 or 3.3 hereof shall not be taken into account in computing Net Profits or Net Loss.

1.8     "***Partner***" means any Shareholder of the Company.

1.9     "***Partnership***" means the Company.

1.10     "***Regulations***" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

2.     Capital Accounts.

2.1     Each Partner's Capital Account shall have an initial balance equal to the fair market value of such Partner's initial Capital Contribution to the Partnership.

2.2.     Each Partner's Capital Account shall be increased by the sum of:

2.2.1     the amount of cash and the fair market value of any other property (net of liabilities that the Partnership is considered to assume or take subject to) constituting additional contributions by such Partner to the capital of the Partnership,

2.2.2     the portion of any Net Profits and other income or gain items allocated to such Partner's Capital Account.

2.3     Each Partner's Capital Account shall be decreased by the sum of:

2.3.1     the amount of cash and the fair market value of any other property (net of liabilities that such Partner is considered to assume or take subject to) distributed by the Partnership to such Partner; plus

D-2

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**     **ICON-043-00032207**

**A-1310**

    2.3.2   the portion of any Net Losses and other expense, loss or deduction items allocated to such Partner's Capital Account.

3.        <u>Allocation of Net Profits and Net Losses</u>.

    3.1    The Net Profits and Net Losses of the Partnership for each Fiscal Year or other relevant period of calculation, as determined by the Board in accordance with the provisions hereof, shall be allocated among the Partners in accordance with their respective Interests, such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the amount that each Partner would receive if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with this Agreement to the Partners immediately after making such allocation.

    3.2    In the event any Partner has a deficit adjusted Capital Account balance at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Partner is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Partner shall be specially allocated items of income and gain in the amount of such excess as quickly as possible; <u>provided</u>, that an allocation pursuant to this Section 3.2 shall be made only if and to the extent that a Partner would have a deficit adjusted Capital Account balance in excess of such sum after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.2 were not in this Schedule to this Agreement.

    3.3    Any special allocations of items of income, gain, loss or deduction pursuant to Section 3.2 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount of any items so allocated and all other items allocated to each Partner shall, to the extent possible, be equal to the net amount that would have been allocated to each Partner if the special allocations under Section 3.2 had not occurred.

    3.4    The Board is authorized to adjust the allocations hereunder if it considers an adjustment is necessary to:

        3.4.1   carry out the intentions of this Agreement; or

        3.4.2   to maintain substantial economic effect or otherwise comply with the requirements of Section 704(b) of the Code and the Regulations thereunder.

D-3

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**        **ICON-043-00032208**

# A-1311

3.5    Notwithstanding Section 3.1, in any year in which the Partnership sells substantially all of its assets or liquidates, each Partner shall be allocated Net Profits or Net Losses (or items thereof) to the extent necessary to cause its Capital Account balance to reflect the amount that will be distributable to such Partner in liquidation of the Partnership pursuant to this Agreement.

4.    <u>Tax Allocation</u>.

For Tax Purposes, items of Partnership income, gain, loss, deduction and credit for each Fiscal Year shall be allocated to and among the Parties in the same manner as the corresponding items of Net Profits and Net Losses and specially allocated items are allocated to them pursuant to Section 3 hereof, taking into account any variation between the adjusted tax basis and book value of the Partnership property in accordance with the principles of Code Section 704(c). The Board shall be authorized to make appropriate adjustments to the allocations of items to comply with Code Section 704 or applicable Regulations thereunder.

5.    <u>Tax Matters Partner; Elections; Treatment as Partnership</u>.

The initial Tax Matters Partner shall be Iconix. Subject to Section 5.04 of this Agreement, the Tax Matters Partner is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities.

6.    <u>Liquidation of the Partnership; No Capital Account Makeup</u>.

6.1    After all liabilities of the Partnership have been satisfied or duly provided for, the remaining assets of the Partnership shall be applied and distributed to the Partners in accordance with this Agreement.

6.2    Notwithstanding anything to the contrary herein, no Partner shall be obligated to restore to the capital of the Partnership any deficit balance in its Capital Account.

D-4

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**    **ICON-043-00032209**

# A-1312

### Exhibit "E"

### DEFINITION OF "EUROPE"

Albania
Andorra
Austria
Belarus
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
Former Yugoslav Republic of Macedonia
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Moldova
Monaco
Montenegro
Netherlands
Norway
Poland .
Portugal
Romania
Russia
San Marino
Serbia
Slovakia
Slovenia
Spain

E-1

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00032210

# A-1313

Sweden
Switzerland
Ukraine
Uzbekistan
United Kingdom [(including for the avoidance of doubt the Crown Dependencies of Jersey, Guernsey and the Isle of Man)] **[Note to confirm/discuss with LF.]**
Vatican City State

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00032211**

# A-1314

CONFORMED COPY
RELATIVE TO:
**Gibson Dunn Draft Dated 6/6/14**
**MBJSM changes 25/6/14**

# ICONIX SE ASIA LIMITED
# SHAREHOLDERS AGREEMENT*

Dated as of September 30, 2013
as amended and conformed on [●] 2014

THE SHARES REFERRED TO IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE

---

\* ~~To consider consequential changes in due course.~~

14448383 / 33753303

ICON-043-00032212

SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS.  ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

ICON-043-00032213

# A-1316

## TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS; OPERATION OF COMPANY ........................ 1
    Section 1.01      Definitions .................................................................................. 1
    Section 1.02      Incorporation; Name ................................................................. 6
    Section 1.03      Registered Office; Principal Office ......................................... 6̶7
    Section 1.04      Business Purpose ...................................................................... 6̶7
    Section 1.05      Shareholders ............................................................................. 7
    Section 1.06      No Personal Liability ................................................................ 7

ARTICLE II SHAREHOLDINGS AND CAPITAL STRUCTURE ..................... 7
    Section 2.01      Capital Structure ....................................................................... 7
    Section 2.02      Loans ......................................................................................... 8

ARTICLE III DISTRIBUTIONS ................................................................................ 8
    Section 3.01      Distributions .............................................................................. 8
    Section 3.02      Tax Distributions ...................................................................... 8

ARTICLE IV MANAGEMENT OF COMPANY .................................................... 8̶9
    Section 4.01      General Provisions Concerning Management ......................... 8̶9
    Section 4.02      Appointment of Directors ........................................................ 9
    Section 4.03      Resignation and Removal of Directors ................................... 9
    Section 4.04      Administrative Manager ......................................................... 9̶10
    Section 4.05      Local Manager ........................................................................ 9̶10
    Section 4.06      Actions Requiring Unanimous Consent of all the Directors ... 9̶10
    Section 4.07      Shareholder Approval .............................................................. 12
    Section 4.08      Officers .................................................................................... 1̶3̶14
    Section 4.09      Board Meetings; Written Resolutions ..................................... 1̶3̶14
    Section 4.10      Quorum; Voting ....................................................................... 14
    Section 4.11      Company Minutes .................................................................... 1̶4̶15

ARTICLE V BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND
FINANCIAL MATTERS ............................................................................................ 1̶4̶15
    Section 5.01      Books and Records .................................................................. 1̶4̶15
    Section 5.02      Fiscal Year ............................................................................... 1̶5̶16
    Section 5.03      Bank Accounts and Temporary Investments ......................... 1̶5̶16
    Section 5.04      Classification as a Partnership; Tax Decisions ...................... 1̶5̶16

ARTICLE VI TRANSFERS ....................................................................................... 1̶6̶17
    Section 6.01      Transfers .................................................................................. 1̶6̶17
    Section 6.02      Share Certificates .................................................................... 1̶6̶17
    Section 6.03      Registration as a Shareholder ................................................. 1̶7̶18
    Section 6.04      Put and Call Options. ............................................................... 1̶7̶18

ARTICLE VII TERMINATION AND LIQUIDATION ......................................... 2̶1̶20

- i-

*Current 30293237.7 30-Sep-13 01:44*

ICON-043-00032214

**A-1317**

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| Section 7.01 | Termination | ~~21~~20 |
| Section 7.02 | Effect of Termination. | 21 |
| Section 7.03 | Winding Up | 21 |
| ARTICLE VIII INDEMNIFICATION | | 21 |
| Section 8.01 | Insurance | 21 |
| ARTICLE IX REPRESENTATIONS | | ~~22~~21 |
| Section 9.01 | General | ~~22~~21 |
| ARTICLE X MISCELLANEOUS | | 23 |
| Section 10.01 | Information | 23 |
| Section 10.02 | Notices | 23 |
| Section 10.03 | Parties Bound; No Third Party Beneficiaries | ~~24~~23 |
| Section 10.04 | Governing Law; Submission to Jurisdiction | 24 |
| Section 10.05 | Amendment | 24 |
| Section 10.06 | Entire Agreement | 24 |
| Section 10.07 | Confidentiality | 24 |
| Section 10.08 | Severability | 25 |
| Section 10.09 | Counterparts; Facsimile or Electronic Transmission | 25 |
| Section 10.10 | Construction | 25 |
| Section 10.11 | Successors and Assigns | 26 |
| Section 10.12 | Headings and Captions | 26 |
| Section 10.13 | No Waiver | 26 |
| Section 10.14 | Additional Instruments | 26 |
| Section 10.15 | Publicity | 26 |
| Section 10.16 | Remedies | 26 |
| Section 10.17 | Specific Performance | 26 |

EXHIBITS

| | |
|---|---|
| Exhibit "A" | BRANDS |
| Exhibit "B" | SHARES AND PERCENTAGE SHAREHOLDINGS |
| Exhibit "C" | FORM OF DEED OF ADHERENCE |
| Exhibit "D" | TAX ALLOCATIONS |

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032215

**ICONIX SE ASIA LIMITED**
**SHAREHOLDERS AGREEMENT**

This SHAREHOLDERS AGREEMENT of Iconix SE Asia Limited (formerly known as Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 (the "*Company*"), is entered into effective as of September 30, 2013 (the "*Effective Date*") and as amended by [the Amendment No. 1] effective as of [the Amendment No. 1 Effective Date], by and between LF Asia Limited, a Hong Kong limited liability company ("*LF*"), and Iconix Brand Group, Inc., a Delaware corporation ("*Iconix*").

**R E C I T A L S:**

Iconix has caused the incorporation of the Company on September 10, 2013.

Iconix and LF are enteringentered into a Share Purchase Agreement pursuant to which LF is purchasingpurchased from Iconix one (1) Share of HK$1.00 in the Company, representing fifty percent (50%) of the issued share capital of the Company (such Share Purchase Agreement, as may be amended or modified from time to time, the "*Purchase Agreement*").

Iconix and LF were subsequently each allotted 49 Shares, giving them each 50 shares in total (being 50% of the Shares in the Company) ("**Initial Allotment**").

**[Note: if applicable, to reference the agreement under which the Expanded Brands and New Licensed Brands are purchased.]**

The parties hereto wish to enter into this Agreement (reflecting [the Amendment No. 1]) to reflect the admission of LF as a Shareholder and set forth the respective rights, duties and obligations of the Shareholders with respect to the Company.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

**ARTICLE I**

**DEFINED TERMS; OPERATION OF COMPANY**

**Section 1.01** Definitions. Within the context of this Agreement, the following terms shall have the following meanings:

"*Accounting Standards*" has the meaning set forth in Section 5.01.

"*Administrative Manager*" has the meaning set forth in Section 4.04.

"*Administrative Services Agreement*" means the Administrative Manager Services Agreement dated as of the date hereof by and between the Company and Iconix, as the same may be amended from time to time.

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032216

"*Affiliate*" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, "control," "controlling," "controlled by" or "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Equity Securities, by Contract or otherwise.

"Agreed Value" has the meaning set forth in Section 6.04(b).

"*Agreement*" means this Shareholders Agreement, effective as of September 30, 2013, by and between Iconix and LF, as amended by Amendment No. 1, and as the same may be amended from time to time.

"*All Rights*" means, together, all of the Europe Rights, the Existing Rights and the Korea Rights.

"*Amendment No. 1*" means Amendment No. 1 to the Shareholders Agreement effective as of May ___, 2014,the Amendment No. 1 Effective Date, by and between Iconix and LF.

"*Amendment No. 1 Effective Date*" means [_____, 2014], the effective date of Amendment No. 1.

"*Board*" means the board of directors of the Company as it is constituted at the relevant time.

"*Brands*" means, collectively, the Existing Brands (with respect to the Existing Territory), the Expanded Brands (with respect to the Expanded Territory) and the New Licensed Brands (with respect to the New Territory).

"*Business*" means (i) all consumer products including but not limited to the fashion, jewelry, eyewear, footwear, apparel, swimwear, outerwear, small leather goods and accessories, watches, food, fast moving consumer goods, home, fragrance and beauty lines of business and all accessories associated with all such lines of business, (ii) all lines of business reasonably related or ancillary thereto (including the establishment and operation of retail stores), and (iii) any other line of business approved by the Shareholders.

"*Business Day*" means a day, other than a Saturday or a Sunday, on which banks are open for business in each and all of the State of New York, (United States of America) and Hong Kong.

"*Change of Control*" means (i) a change of control (including but not limited to by way of merger, consolidation or transfer of Equity Securities) of an entity, (ii) the direct or indirect sale by an entity of all or substantially all of its assets or (iii) any Person or group of Persons (other an Affiliate of such entity) becoming the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the outstanding Equity Securities of an entity.

2

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032217

"***Communications***" has the meaning set forth in Section 10.02.

"***Companies Ordinance***" means the Companies Ordinance, chapter ~~32~~622 of the laws of Hong Kong (and, ~~when it comes into operation,~~to the extent it was relevant prior to 3 March 2014, the Companies Ordinance, chapter ~~622~~32 of the laws of Hong Kong).

"***Company***" has the meaning set forth in the Preamble.

"***Company Account***" has the meaning set forth in Section 5.03.

"***Confidential Information***" means all confidential or proprietary information, knowledge, systems or data relating to the business, assets, prospects, operations, finances, policies, strategies, intentions or inventions of the Company or any of its Subsidiaries (including any of the terms of this Agreement) from whatever source obtained, subject to the terms of this Agreement.

"***Contract***" means any agreement, bond, commitment, contract, franchise, indemnity, indenture, lease, license, purchase order or other instrument of any kind, whether oral or written.

"***Deed of Adherence***" has the meaning set forth in Section 6.03.

"***Designated Costs***" has the meaning set forth in Section 4.06(a)(i).

"***Directors***" has the meaning set forth in Section 4.02.

"***Effective Date***" has the meaning set forth in the Preamble.

"***Electronic Transmission***" means any form of communication, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

"***Equity Securities***" means any share, any partnership interest, any limited liability company interest and any other ownership interest in an entity, including any options or warrants to purchase the foregoing and other securities convertible, exchangeable or exercisable into the foregoing.

"***Europe***" means, collectively, the countries listed on **Exhibit "E"**.

"***Europe Rights***" means the rights granted to the Company under the Master License Agreement in respect of the New Licensed Brands in the New Territory.

"***Existing Brands***" means the brand names, logos and word phrases listed in **Exhibit "A"** and any other brand names, logos and word phrases which the Company hereafter uses in the Existing Territory in connection with the Business as approved by the Board.

"***Existing Rights***" means the rights granted to the Company under the Master License Agreement in respect of the Existing Brands in the Existing Territory.

3

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032218

"***Existing Territory***" means Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.

"***Expanded Brands***" means the brand names, logos and word phrases listed in **Exhibit "A"** other than OP/Ocean Pacific and Umbro, and any other brand names, logos and word phrases which the Company hereafter uses in the Expanded Territory in connection with the Business as approved by the Board.

"***Expanded Territory***" means the Republic of Korea.

"***Five-Year Call***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Call Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Call Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Shares***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Reference Royalty Amount***" has the meaning set forth in Section ~~Section~~ 6.04(b)(ii)(A) .

"***Fully Exercised***" means one or more exercises of the Five-Year Put/Call which result in the purchase by the Iconix Shareholder of All Rights, and "***Full Exercise***" shall be construed accordingly.

"***Governmental Authority***" means any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority.

"***HKIAC***" has the meaning set forth in Section 10.04.

4

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032219

**A-1322**

"*Iconix*" has the meaning set forth in the Preamble.

"*Iconix Directors*" has the meaning set forth in Section 4.02.

"*Iconix Shareholder*" means Iconix, together with its Transferees, if any.

"*Korea Rights*" means the rights granted to the Company under the Master License Agreement in respect of the Expanded Brands in the Expanded Territory.

"*Law*" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

"*LF*" has the meaning set forth in the Preamble.

"*LF Directors*" has the meaning set forth in Section 4.02.

"*LF Shareholder*" means LF, together with its Transferees, if any.

"*Local Manager*" has the meaning set forth in Section 4.05.

"*Local Services Agreement*" means the Local Manager Services Agreement dated as of the date hereof by and between the Company and LF, as the same may be amended from time to time.

"*Master License Agreement*" means the Master License Agreement, effective as of September 30, 2013, by and among the Company, Iconix and the Licensors (as defined therein), as amended by Amendment No.1, and as the same may be amended from time to time.

"*New Licensed Brands*" means the brand names, logos and word phrases listed in **Exhibit "A-1"** and any other brand names, logos and word phrases which the Company hereafter uses in the New Territory in connection with the Business as approved by the Board.

"*New Territory*" means Europe and Turkey.

"*Other License Agreement*" means any license or similar agreement by and between the Company or one of its Subsidiaries and another Person granting such Person rights to use the Brands in the Territory.

"*Partial Exercise*" means an exercise of the Five-Year Put/Call which does not result in a Full Exercise.

"*Percentage Shareholding*" means the percentage determined in accordance with Section 2.01(b).

"*Permitted Parent Change of Control*" means (i) a Change of Control of, in the case of the Iconix Shareholder, Iconix and, in the case of the LF, ~~Li & Fung~~Global Brands Group Limited.

5

ICON-043-00032220

"*Person*" means any individual or any partnership, corporation, estate, trust, company or other legal entity.

"*Purchase Agreement*" has the meaning set forth in the Recitals.

"*Securities Act*" means the Securities Act of 1933, as amended, or any similar federal statute then in effect, and any reference to a particular section thereof shall include a reference to the comparable section, if any, of any such similar federal statute, and the rules and regulations promulgated thereunder.

"*Share*" means a share in the Company.

"*Shareholders*" means the Iconix Shareholder and the LF Shareholder.

"*Share Certificate*" has the meaning set forth in Section 2.01(c).

"*Subsidiary*" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (i) of which such Person or any other subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any subsidiary of such Person do not have a majority of the voting interests in such partnership) or (ii) at least fifty percent (50%) of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries, or by such Person and one or more of its subsidiaries.

"*Territory*" means, collectively, the Existing Territory (with respect to the Existing Brands), the Expanded Territory (with respect to the Expanded Brands) and the New Territory (with respect to the New Licensed Brands).

"*Transfer*" means to sell, convey, transfer, syndicate, assign, mortgage, pledge, hypothecate or otherwise encumber or dispose of in any way, including by operation of law or otherwise, any Shares, or any Change of Control of the Company. The Person who is transferring Shares shall be referred to as the "Transferor" and the Person who is acquiring the Shares shall be referred to as the "Transferee."

"*Two-Year Call*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Notice*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Purchase Price*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Shares*" has the meaning set forth in Section 6.04(a).

"*Year*" means the tax and financial accounting period specified in Section 5.02.

**Section 1.02** Incorporation; Name. The Company was incorporated by the filing of the form of incorporation with the Companies Registry of Hong Kong. A certificate of incorporation

6

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032221

was issued by the Companies Registry of Hong Kong on September 10, 2013. The Shareholders hereby confirm the incorporation of the Company as a company with limited liability under and pursuant to the provisions of the Companies Ordinance. Whenever the terms of this Agreement conflict with the provisions of the articles of association of the Company, the terms of this Agreement shall prevail. Accordingly, the parties hereto shall exercise their respective voting and other rights as holders of Shares to procure that the articles of association of the Company are amended to remove any conflict. ~~The Shareholders agree that the name of the Company be changed to "Iconix SE Asia Limited" as soon as reasonably possible, from which time the Company shall be operated under such name.~~

Section 1.03    Registered Office; Principal Office. The registered office of the Company required under the Companies Ordinance shall be as designated in the incorporation form filed with the Companies Registry, and may be changed by the Board in accordance with the Companies Ordinance. The principal business office of the Company shall be located at the principal business office of the Local Manager, or such other address as shall be designated by the Board.

Section 1.04   Business Purpose. The Company has been formed for the purpose of engaging, directly or through its Subsidiaries, in the following activities: (i) developing, exploiting and promoting the Brands licensed to the Company pursuant to the Master License Agreement or another Contract in the Territory by way of a license, sublicense or otherwise relating to the Business in exchange for royalty payments, and/or other consideration, (ii) purchasing or licensing third party Brands for the purposes of developing them in the Territory; (iii) engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing; (iv) engaging in other similar business opportunities as agreed to by both of the Shareholders and (v) unless otherwise agreed by the Shareholders, adopting a business model that is in accordance with the then-approved business plan and is asset light, working capital light and with an EBITDA margin of not less than 75%. References in this Agreement to the "ordinary course of business" shall be construed in conjunction with the business purpose set out in this Section 1.04.

Section 1.05    Shareholders. The name, number of Shares and Percentage Shareholding held by each Shareholder is set forth on **Exhibit "B"**, as the same may be amended from time to time in accordance with this Agreement.

Section 1.06   No Personal Liability. Except as provided by the applicable Law, no Shareholder or any Director shall be personally liable for any obligations of the Company and no Shareholder shall have any obligation or be required to make any loan or otherwise advance any funds to the Company other than as provided in Section 2.01(d) or 2.01(e).

## ARTICLE II

## SHAREHOLDINGS AND CAPITAL STRUCTURE

Section 2.01    Capital Structure.

7

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032222

(a)     Shareholdings.  The initial shareholdings of the Shareholders (after giving effect to the purchase transaction contemplated by the Purchase Agreement) are set forth on **Exhibit "B"** attached hereto.

(b)     Percentage Shareholding.  Each Shareholder shall have the Percentage Shareholding in the Company determined by dividing the number of Shares owned by such Shareholder by the total number of issued Shares.  The Percentage Shareholding of each Shareholder (after giving effect to the purchase transaction contemplated by the Purchase Agreement) shall be set forth next to such Shareholder's name on **Exhibit "B"** attached hereto.

(c)     Share Certificates.  Upon the request of any Shareholder, a share certificate (each, a "***Share Certificate***") issued by the Company in accordance with the provisions of the articles of association of the Company shall evidence the Shares in the Company held by such requesting Shareholder.

(d)     New Allotment of Shares.  ~~As soon as practicable following the date of this Agreement (and in any event before payment of any dividend is made), the Iconix Shareholder and the LF Shareholder shall each be allotted 49 Shares, and to satisfy the subscription price therefor, each shall pay par value of HK$1.00 per Share to the Company.  The Shareholders will pass such resolutions and procure that the Directors pass such resolutions as are necessary to give effect to the provisions of this Section 2.01(d).~~ *(Omitted as spent).*

(e)     Further Subscription for Shares.  In the event that the Company is to pay any Future Mark Acquisition Consideration (as defined in the Master License Agreement) or any Jointly Owned Mark Acquisition Consideration (as defined in the Master License Agreement) under the Master License Agreement, the Shareholder will subscribe for new Shares, in accordance with their Percentage Shareholding, in order to put the Company in funds to pay the relevant Future Mark Acquisition Consideration or any Jointly Owned Mark Acquisition Consideration (as the case may be), with subscription price therefor being set by the Directors, and the Shareholders will pass such resolutions and procure that the Directors pass such resolutions as are necessary to give effect to the provisions of this Section 2.01(e).

**Section 2.02   Loans**.  Without in any way limiting the authority of the Board to cause the Company to borrow funds from an unaffiliated third party (instead of, or in addition to, any loan(s) of the type contemplated by this Section ~~2.02,~~2.02), any Shareholder or Affiliate of a Shareholder may, with the consent of all the Directors, lend or advance money to the Company; provided, that such loan shall be on terms and conditions not less favorable than those available from unaffiliated third parties for similar loans (unless otherwise unanimously agreed by the Directors).

**ARTICLE III**

**DISTRIBUTIONS**

**Section 3.01**   Distributions.  At such times as the Board determines is in the best interest of the Company and the Shareholders, the Company shall pay dividends or make other distributions to the Shareholders in proportion to their Percentage Shareholdings.   The

8

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032223

Shareholders agree that, to the extent practicable and permitted by any applicable Law and regulation, unless otherwise agreed by the Shareholders, the dividend policy of the Company shall be to distribute the maximum amount of distributions allowed by the Companies Ordinance.

> **Section 3.02**    Tax Distributions.  Upon Iconix's reasonable request, and subject to such dividend being lawfully permitted, the Board shall cause the Company to distribute to each Shareholder in respect of each Year, an amount of cash which equals (i) the amount of taxable income allocable to the Shareholder in respect of such Year, multiplied by (ii) the combined maximum individual United States federal and state income tax rate attributable to such taxable income (determined as if all Shareholders were residents of the State of New York and taking into account (i) the deductibility of state income taxes for United States federal income tax purposes) and (ii) the amount of taxable losses previously allocated to such Shareholders in prior fiscal years (and not used in prior fiscal years to reduce taxable income for the purpose of making distributions under this Section 3.02).  Such distributions based upon estimates of the taxable income for the year may be made on a quarterly or other basis as shall be determined by Iconix (in its sole discretion).  All amounts so distributed shall be treated as amounts distributed to the Shareholder pursuant to Section 3.01 of this Agreement, depending on the source of the item that generated such taxable income, and shall be reduced by any amounts withheld for taxes with respect to the Shareholder pursuant to Section 3.01.

**ARTICLE IV**

**MANAGEMENT OF COMPANY**

> **Section 4.01**    General Provisions Concerning Management.  Subject to the provisions hereof, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board.  The Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company described herein, including all powers, statutory or otherwise, possessed by directors of a company with limited liability incorporated under the laws of Hong Kong.  Except as otherwise required by law, approval of any action by the Board in accordance with this Agreement and the articles of association of the Company shall constitute approval of such action by the Company.

> **Section 4.02**    Appointment of Directors.  The Company shall have four Directors, two (2) of whom shall be Persons designated by LF and its Transferees, if any (the "***LF Directors***"), and two (2) of whom shall be Persons designated by Iconix and its Transferees, if any (the "***Iconix Directors***," and together with the LF Directors, the "***Directors***").  The initial LF Directors shall be Jason Rabin and David Thomas and the initial Iconix Directors shall be Neil Cole and Warren Clamen.

> **Section 4.03**    Resignation and Removal of Directors.  Each Director shall serve until death, dissolution, resignation or removal, in accordance with this Agreement and the articles of association of the Company.  A Director may resign at any time upon giving written notice of resignation to the Company.  A Director may be removed at any time with or without cause only by the Shareholder who appointed such Director (*e.g.*, an Iconix Director can only be

9

~~Current 30293237.7 30-Sep-13 01:44~~

removed by Iconix). If a Director ceases to serve as a Director at any time for any reason, the resulting vacancy shall be filled by a Person designated by the Shareholder whose designee created the vacancy.

   **Section 4.04** Administrative Manager. Subject to the provisions of the Administrative Services Agreement, Iconix, as Administrative Manager (the "***Administrative Manager***") shall have the responsibilities and provide to the Company the services referred to therein.

   **Section 4.05** Local Manager. Subject to the provisions of the Local Services Agreement, LF, as Local Manager (the "***Local Manager***") shall have the responsibilities and provide to the Company the services referred to therein.

   **Section 4.06** **Actions Requiring Unanimous Consent of all the Directors**.

     (a) Notwithstanding any provision of this Agreement, subject to Section 4.07, approval of the following actions shall require the unanimous consent of all the Directors:

     (i) approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the costs and expenses (including those payable under the Administrative Services Agreement and the Local Services Agreement) associated with the ongoing operations of the Company (the "***Designated Costs***") pursuant to such annual business and development plan and annual budget are less than twenty percent (20%) of net revenue projected in such annual business and development plan and annual budget; provided that, if the actions in this clause (i) are to be taken by the Iconix Directors, the Iconix Directors shall consult with the LF Directors, in good faith, regarding such proposed annual business and development plan and annual budget, and take into consideration any comments or proposed changes recommended by the LF Directors;

     (ii) approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the Designated Costs pursuant to such annual business and development plan and annual budget are twenty percent (20%) or greater of net revenue projected in such annual business and development plan and annual budget;

     (iii) any change in the scope or nature of the business or activities of the Company or any or any of its Subsidiaries;

     (iv) appointment or removal of, entry into an employment agreement with or approval of any delegation of or change to the authority or responsibilities of any officer of the Company or any of its Subsidiaries, or approval of the terms and conditions of employment of any officer or employee of the Company or any of its Subsidiaries or any change thereto provided that, if the actions in this clause (iv) are to be taken by the Iconix Directors, (A) at least thirty (30) days prior to taking any such action the Iconix Directors shall have provided the LF Directors with, as applicable, identity of any individual proposed to be appointed or removed, the employment history of and references for any potential officer, a detailed summary of the terms of any proposed employment agreement, a summary of the reasons for any delegation or change in the authority or responsibilities of any officer and/or a summary of any

10

ICON-043-00032225

terms and conditions of employment proposed to be approved, and shall have consulted with the LF Directors, in good faith, regarding such proposed action and taken into consideration any comments or proposed changes recommended by the LF Directors, and (B) the Iconix Directors shall not hire any new officer unless the position for such officer was included in the then current annual business and development plan and annual budget;

(v)      with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries in the ordinary course of business;

(vi)      with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries outside the ordinary course of business;

(vii)      incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business ;

(viii)      incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) outside the ordinary course of business or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business;

(ix)      lending any money (except deposits with banks or other institutions) by the Company or any of its Subsidiaries;

(x)      entry into any Contract by the Company or any of its Subsidiaries outside the ordinary course of business;

(xi)      commencement or settlement by the Company or any of its Subsidiaries of any legal action, arbitration proceeding, mediation or other dispute resolution other than in the ordinary course of business;

(xii)      adopting or amending any employee benefit or equity plan of the Company or any of its Subsidiaries;

(xiii)      appointment or removal of auditors of the Company or any of its Subsidiaries;

(xiv)      subject to Section 4.06(a)(xv), changing the accounting policies of the Company or any of its Subsidiaries or of the Year of the Company or any of its Subsidiaries;

(xv)      changing the accounting policies of the Company or any of its Subsidiaries by reason of being compelled to do so by reason of changes to IFRS and/or GAAP;

(xvi)      giving of any guarantee or indemnity of the Company or any of its Subsidiaries;

11

ICON-043-00032226

(xvii)  assignment of any debts of the Company or any of its Subsidiaries;

(xviii)  transfer, disposal or creation of any security interest in property of the Company or any of its Subsidiaries;

(xix)  entry into any Other License Agreement, or amendment, modification, termination of the Master License Agreement or any existing Other License Agreement;

(xx)  approving of the creation or acquisition of any Subsidiaries and the adoption of governance agreements or arrangements in respect thereof, or any other investment in, or the acquisition of stocks or bonds of, other Persons or any Equity Securities in any other Person; provided, that there shall be no limitation on the Board's authority to delegate, in a manner mutually acceptable to the Board, the making of investments as part of cash management in the ordinary course of business of the Company;

(xxi)  any Transfer of Shares in the Company; and

(xxii)  authorizing an officer, an employee or any other individual to approve disbursements on behalf of the Company;

provided, that upon and subsequent to any exercise of the Call Option (as defined herein) pursuant to Section 6.04, the actions in clauses (i), (iv), (v), (vii), (ix), (xv) and (xxii) of this Section 4.06(a) shall be taken by the Iconix Directors in their sole discretion (after reasonable, good faith consultation with the LF Directors), notwithstanding, for the avoidance of doubt, Section 4.08 of this Agreement.

(b)  The parties acknowledge and agree that any and all decisions or actions by the Company with respect to an agreement between the Company and a Shareholder or Affiliate of a Shareholder relating to: (i) the exercise or enforcement of the Company's rights thereunder; (ii) any amendments or waivers thereto; or (iii) any approvals required or requests made thereunder shall be taken by the Directors designated by the other Shareholder in their sole discretion.

(c)  Subsequent to the exercise of the Call Option (as defined herein), the Iconix Directors will consult in good faith with the LF Directors prior to taking any actions outside of the ordinary course of business and take into consideration any comments or proposed changes recommended by the LF Directors.

(d)  (c) Subsequent to the exercise of the Call Option (as defined herein), the Iconix Directors will consult in good faith with the LF Directors prior to taking any actions outside of the ordinary course of business and take into consideration any comments or proposed changes recommended by the LF Directors.  The Iconix Directors shall not take any action in their sole discretion if such action would reasonably be expected to have a materially adverse effect on the value of the Shares held by the LF Shareholder, taking into consideration the

12

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032227

existence of the Five Year Put/Call unless the Shareholders mutually agree that any such action is in the best interests of the Company.

**Section 4.07**    Shareholder Approval.  Notwithstanding any provision of this Agreement, approval of any of the following shall require unanimous approval by all of the Shareholders:

(a)    admission of any Person (whether by subscription or transfer) as a shareholder of the Company or any of its Subsidiaries;

(b)    grant of, or entry into an agreement to grant, any option, pledge or other encumbrance in respect of the Shares or of any other Equity Securities of the Company or any of its Subsidiaries;

(c)    except as provided under Article III or Section 6.04, declaration, payment or approval by the Company or any of its Subsidiaries of any repurchase or redemption of the Company's or any of its Subsidiaries' securities or any dividend or other distribution to the Shareholders or to the members or shareholders of any of the Company's Subsidiaries (other than Subsidiaries wholly owned by the Company or any of its Subsidiaries);

(d)    delegation of any powers or responsibilities by the Board or Directors other than to an individual or a committee of individuals designated with the unanimous consent of the Directors or to officers pursuant to Section 4.08;

(e)    change of the number of Directors or the number of directors of any Subsidiary of the Company;

(f)    removal of a Director other than by the Shareholder that designated or nominated such Director or removal of a director of any of the Company's Subsidiaries;

(g)    the entering into by the Company or any of its Subsidiaries of any Contract outside the ordinary course of business;

(h)    participation in, termination of or any other actions taken by the Company or any of its Subsidiaries with respect to any venture, partnership or joint venture, or acquisition or disposal of shares or other equity interests in another Person or the acquisition of the business or assets of another Person;

(i)    entry into any transaction by the Company or any Subsidiary of the Company with any Shareholder or any Affiliate of any Shareholder (including entering into any loans between any Shareholder or any Affiliate of any Shareholder and the Company, but not including entering into the Master License Agreement);

(j)    increase or decrease the issued ~~or~~share capital or (as applicable) the authorized share capital or maximum number of shares, in each case of the Company or any of its Subsidiaries;

13

~~Current 30293237.7 30 Sep 13 01:44~~

ICON-043-00032228

(k)      reclassification of securities of the Company or any of its Subsidiaries (including any subdivision or consolidation of shares) or recapitalization of the Company or any of its Subsidiaries;

(l)      entry into any merger, amalgamation or consolidation of the Company or any of its Subsidiaries with another Person;

(m)      a resolution for winding up, the termination or dissolution of, or the entering into of bankruptcy, insolvency or receivership by, the Company or any of its Subsidiaries;

(n)      sale or disposal of all of the Shares or all or any substantial part of the Company's or any of its Subsidiaries' business or assets;

(o)      change of the name of the Company or any of its Subsidiaries;

(p)      amendment or modification of the Company's or any of its Subsidiaries' memorandum of association or articles of association or other organizational documents (as applicable);

(q)      reorganization of the Company or any of its Subsidiaries; and

(r)      a private or public issuance or offering for sale of any securities of the Company or any of its Subsidiaries or the listing on any exchange of any securities of the Company or any of its Subsidiaries.

**Section 4.08**      Officers.  Subject to the limitations set forth in Section 4.06, the Board shall have the authority to establish such officers of the Company as they shall determine, and to appoint individuals to serve as such officers, including chairman, chief executive officer, one or more vice presidents, secretary, assistant secretary, treasurer and assistant treasurer.  An individual may hold more than one office at any time.

**Section 4.09**      Board Meetings; Written Resolutions.  Board meetings may be called by any Director.  The Board shall meet not less than once every three (3) months.  Any Director may participate in a Board meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear and speak to each other at the same time or in sequence, and participation in a Board meeting pursuant to this provision shall constitute presence at the meeting; provided, that at least one of such Board meetings per year shall be held in person at a location to be unanimously determined by the Directors.  All meetings of the Board shall be called on not less than three (3) Business Days' prior notice.  All actions required or permitted to be taken by the Board may also be approved by the execution of a written resolution executed by all the Directors, and any such written resolution may be executed in counterparts.

14

ICON-043-00032229

Section 4.10    Quorum; Voting.

(a)    A quorum must exist at all times of a Board meeting, including the reconvening of any Board meeting that has been adjourned, for any action taken at such Board meeting to be valid.

(b)    Except as otherwise specified in this Agreement:

(i)    a quorum shall be constituted at a Board meeting only if at least one (1) LF Director and one (1) Iconix Director are present; and

(ii)    all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, which majority must include at least one (1) LF Director and one (1) Iconix Director.

(c)    Upon and subsequent to the closing of any Two-Year Call pursuant to Section 6.04:

(i)    a quorum shall be constituted at a meeting if a majority of the Directors is present, regardless of the identity of the Directors comprising such majority; and

(ii)    all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, regardless of the identity of the Directors comprising such majority.

Section 4.11   **Company Minutes**.  The decisions and resolutions of the Board shall be reported in minutes, which shall state the date, time and place of the meeting (or the date of the written resolution in lieu of meeting), the Directors present at the meeting, the resolutions put to a vote (or the subject of a written resolution) and the results of such voting (or written resolution).  The minutes shall be entered in a minute book kept at the registered office of the Company and a copy of the minutes shall be provided upon request to each Director.

**ARTICLE V**

**BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL MATTERS**

Section 5.01    Books and Records.  The Administrative Manager shall procure that accurate, full and complete books and records of the Company are maintained, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business and affairs.  Such books and records initially shall be prepared and maintained by the Administrative Manager; and, at such time as the Board determines, such books and records shall be prepared and maintained by employees of the Company.  Upon request in writing, each Shareholder and its duly authorized representative shall have access to inspect and copy any of such books and records at all reasonable times during normal business hours.  The Company shall deliver or cause to be delivered to each Shareholder consolidated financial statements (all of which shall be prepared in accordance with the financial reporting standards and interpretations (including: (a) Hong Kong Financial Reporting Standards;

15

Current 30293237.7 30-Sep-13 01:44

(b) Hong Kong Accounting Standards; and (c) Interpretations) issued by the Hong Kong Institute of Certified Public Accountants applied on a consistent basis (the "***Accounting Standards***")), as follows: (i) as soon as available (but in any event not later than twenty (20) days after the end of each quarter), a consolidated balance sheet as at the end of such quarter and the related consolidated statements of income and cash flows for such quarter and for the period from the beginning of the current calendar year (i.e., the calendar year in which such quarter falls) to the end of such quarter, setting forth, in each case, in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the current calendar year; and (ii) as soon as available (but in any event not later than one hundred twenty (120) days after the end of each calendar year), a consolidated balance sheet as at the end of such calendar year and the related consolidated statements of income, cash flows and stockholders', members' or other owners' equity for such calendar year, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the calendar year covered by such financial statements. The Company shall also deliver to each Shareholder upon request copies of any reports or statements the Company receives from its third party licensees. The financial statements to be provided under this Agreement shall not be required to be audited unless required by applicable Law or so requested by either Shareholder.

**Section 5.02** Fiscal Year. The year of the Company for tax and financial accounting purposes ("***Year***") shall end on the last day of the month of December, unless a different year end is approved in accordance with Section 4.07

**Section 5.03 Company Accounts**. All receipts, funds and income of the Company shall be deposited in the name of the Company in a bank account of a commercial bank, savings and loan association or other financial institution (the "***Company Account***") as the Local Manager shall determine. Withdrawals from the Company Account shall be made on the signature of (a) an officer of the Administrative Manager or such other Person as shall be designated by the Administrative Manager and (b) an officer of the Local Manager or such other Person as shall be designated by the Local Manager; <u>provided</u> that no withdrawal from the Company Account shall be made (i) with respect to any expense subject to the Directors' or the Shareholders' approval rights pursuant to Section 4.06 or Section 4.07, respectively, until such approval has been obtained, or (ii) for the purpose of making any payment to a Director or an Affiliate of a Director or any distribution to the Shareholders unless the amount of such payment or distribution is in accordance with ARTICLE III or has been approved by the Shareholders. There shall be no commingling of the moneys and funds of the Company with moneys and funds of the Administrative Manager, the Local Manager or any other entity or Person.

**Section 5.04 Classification as a Partnership; Tax Decisions**. The Company shall elect within 75 days of its formation to be taxable as a partnership for United States federal income tax purposes, pursuant to Treasury Regulation Section 301.7701-3(b)(1)(i) by having each Shareholder sign Form 8832 as prepared by Iconix. During such time as the Company would be classified as a partnership under the foregoing sentence, neither the Company nor any Shareholder shall take any action that would result in the Company being taxed as other than a "partnership" for United States federal income tax purposes, including, but not limited to, electing to be taxed as other than a "partnership" by filing Internal Revenue Service Form 8832, "Entity Classification Election" without the prior written consent of all of the Shareholders. All

16

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032231

elections required or permitted to be made by the Company and all other tax decisions and determinations relating to United States federal, state, local or foreign tax matters shall be made by the Board, in consultation with the Company's attorneys and/or accountants as the Board deems necessary or advisable. For U.S. federal income tax purposes, income of the Company shall be allocated in accordance with the provisions of **Exhibit "D"**.

## ARTICLE VI

### TRANSFERS

**Section 6.01**     Transfers. Except as expressly provided in this **ARTICLE VI**, (i) no Shareholder may directly or indirectly Transfer any or all of its Shares or any right or interest therein; (ii) any direct or indirect offer to Transfer, or any attempted or purported Transfer of, any Shares in violation of any of the provisions of this Agreement shall be void *ab initio*; (iii) the Company shall reject and refuse to register on its books the Transfer of any Shares which are purported to have been transferred otherwise than in compliance with the provisions of this Agreement; and (iv) and the Company shall not recognize any Person receiving any Shares as a shareholder of the Company, nor shall any Person have any rights as a shareholder of the Company, unless the Transfer of Shares to such Person shall have been made pursuant to the terms of this Agreement. Notwithstanding any provisions of this Agreement, a Shareholder may Transfer all (but not some only) of its Shares (a) pursuant to a Permitted Parent Change of Control or (b) to any Affiliate of such Shareholder, provided that if such Affiliate at any time no longer constitutes an Affiliate of Iconix or LF, as applicable, any such Shares transferred to such Affiliate shall immediately be transferred to Iconix or LF, as applicable, or one of their respective Affiliates.

**Section 6.02**   Share Certificates.

(a)     Each Share Certificate issued to a Shareholder pursuant to Section 2.01(c) shall have the following legend conspicuously written, printed, typed or stamped on its face, or upon the reverse with a conspicuous reference to such legend on its face:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF A SHAREHOLDERS AGREEMENT OF [LION NETWORK LIMITED]/[ICONIX SE ASIA LIMITED], DATED AS OF SEPTEMBER 30, 2013, AS IT MAY BE AMENDED FROM TIME TO TIME, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN.

THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS, IN RELIANCE UPON APPLICABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE AND FOREIGN SECURITIES LAWS. THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE. THE SHARES MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY

17

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032232

APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL [LION NETWORK LIMITED]/[ICONIX SE ASIA LIMITED] IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE MUST COMPLY WITH THE OTHER TRANSFER RESTRICTIONS SET FORTH IN THE SHAREHOLDERS AGREEMENT."

(b)     Upon the sale of any Shares pursuant to (i) an effective registration statement under the Securities Act or pursuant to Rule 144 under the Securities Act or (ii) another exemption from registration under the Securities Act or upon the termination of this Agreement, the Share Certificates representing such Shares shall be replaced, at the expense of the Company, with certificates or instruments not bearing the legends required by this Section 6.02; provided that the Company may condition such replacement of certificates under clause (ii) upon the receipt of an opinion of securities counsel reasonably satisfactory to the Company.

(c)     In case of loss or destruction of a Share Certificate, no new Share Certificate shall be issued in lieu thereof except upon satisfactory proof to the Company of such loss or destruction, and upon the giving to the Company of satisfactory security against loss by bond or otherwise. Any such new Share Certificate shall be plainly marked "Duplicate" upon its face.

**Section 6.03**     Registration as a Shareholder.  Except as provided in Section 6.01 and Section 6.04, no Person other than the LF Shareholder and the Iconix Shareholder shall be registered in the register of shareholders of the Company as a shareholder of the Company without the prior written unanimous consent of the Board and the Shareholders.  If the LF Shareholder or the Iconix Shareholder proposes to transfer Shares to an Affiliate, it shall be a condition to the transfer that such Affiliate shall execute and deliver a deed of adherence in substantially the form attached hereto as **Exhibit "C"** (the "***Deed of Adherence***") pursuant to which such Transferee shall agree to be legally bound by this Agreement.  Except as otherwise set forth herein, the Affiliate to which Shares are transferred shall pay all costs and expenses incurred by the Company in connection with such admission.

**Section 6.04**     Put and Call Options.

(a)     Two-Year Call Option.  For the six- (6-) month period following the second (2nd) anniversary of the Effective Date, the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder and the Company (a "***Two-Year Call Notice***") to initiate the purchase by the Iconix Shareholder of five percent (5%) of the total Shares in issue (the "***Two-Year Call Shares***") at a purchase price (the "***Two-Year Call Purchase Price***") in cash equal to 10% multiplied by 115% multiplied by the sum of (i) the Purchase Price (as defined in the Purchase Agreement) paid or payable by LF to Iconix pursuant to the Purchase Agreement, *plus* (ii) $10,917,500 (such purchase initiated by a Two-Year Call Notice, a "***Two-Year Call***").  The Company shall pay an interim dividend in accordance with the then current dividend policy of the Company, to be calculated up to the day before closing of the Two

18

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032233

Year Call.  LF agrees that following the closing of the Two-Year Call, LF has no objection to Iconix being able to consolidate the results of the Company into its own financial results.

(b)     Five-Year Put/Call Option.

(i)     For the six- (6-) month period following the fifth (5th) anniversary of the Effective Date (and, if a Five-Year Put/Call has not ~~been exercised~~ previously been Fully Exercised, for the six- (6-) month period following the eighth (8th) anniversary of the Effective Date), (i) the LF Shareholder may deliver an irrevocable written notice of election to the Iconix Shareholder and the Company (a "***Five-Year Put Notice***") to initiate the purchase by the Iconix Shareholder of ~~all (but not less than all) of the Shares held by the LF Shareholder~~, the Europe Rights, the Existing Rights and/or the Korea Rights (the "***Five-Year Put/Call ~~Shares~~Rights***") at a purchase price (the "***Five-Year Put Purchase Price***") in cash equal to the aggregate Agreed Value (as defined herein) (such purchase initiated by a Five-Year Put Notice, a "***Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder (a "***Five-Year Call Notice***," and each of the Five-Year Put Notice and the Five-Year Call Notice, a "***Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder of the Five-Year Put/Call ~~Shares~~Rights at a purchase price (the "***Five-Year Call Purchase Price***," and each of the Five-Year Put Purchase Price and the Five-Year Call Purchase Price, the "***Five-Year Put/Call Purchase Price***") in cash equal to 120% of the aggregate Agreed Value (such purchase initiated by a Five-Year Call Notice, a "***Five-Year Call***" and each of a Five-Year Put and a Five-Year Call, a "***Five-Year Put/Call***").  Prior to the closing of the Five-Year Put/Call pursuant to Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the Company shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to LF under the Local Services Agreement and pay all fees owing and accrued to Iconix under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the Five-Year Put/Call.

(ii)     If the Five-Year Put/Call is exercised in the six- (6-) month period following the fifth (5th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)     the LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2015 and (ii) the Year ended December 31, 2018; *provided*, *however*, that~~, for purposes of calculating the Agreed Value, the portion of~~ the Agreed Value attributable to the ~~New Licensed Brands in the New Territory during such Year~~Europe Rights shall not be less than $7,617,500; *plus*

(B)     in the case of a Full Exercise, the amount of cash in the Company.

(iii)     If the Five-Year Put/Call is exercised in the six- (6-) month period following the eighth (8th) anniversary of the Effective Date, Agreed Value shall be equal to:

19

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032234

(A)    The LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and the Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2018 and (ii) the Year ended December 31. 2021; *provided*, *however*, that, for purposes of calculating the Agreed Value, the portion of the Agreed Value attributable to the New Licensed Brands in the New Territory during such YearEurope Rights shall not be less than $7,617,500; *plus*

(B)    In the case of a Full Exercise, the amount of cash in the Company.

(c)    Put and Call Closings.  The closing of any Two-Year Call or Five-Year Put/Call under this Section 6.04 shall take place within (i) sixty (60) days after delivery of the Two-Year Call Notice or (ii) sixty (60) days after the delivery of the Five-Year Put/Call Notice (or, if later, within 30 days after the royalty information necessary to calculate the Agreed Value is available), as the case may be, unless another date is mutually agreed upon by the parties to the sale.

(d)    Put and Call Closings – Partial Exercise.  In the case of an exercise of the Five-Year Put/Call which constitutes a Partial Exercise, at the closing of the relevant Five Year Put/Call, the Iconix Shareholder shall pay [to the LF Shareholder] the Five-Year Put/Call Price, and the parties hereto shall use all reasonable endeavours to negotiate and agree (for the purposes of obtaining director consent pursuant to Section 4.06(xix)) changes to the Master License Agreement to the extent necessary to remove from the Master License Agreement, the Europe Rights, the Existing Rights and/or the Korea Rights which are the subject to the Partial Exercise, as appropriate.

(e)    (c) Put and Call Closings.  The closing of any Two-Year Call or Five-Year Put/Call under this Section 6.04 shall take place within (i) sixty (60) days after delivery of the Two-Year Call Notice or (ii) sixty (60) days after the delivery of the Five-Year Put/Call Notice (or, if later, within 30 days after the royalty information necessary to calculate the Agreed Value is available), as the case may be, unless another date is mutually agreed upon by the parties to the salePut and Call Closings – Two Year Call and Full Exercise.  At the closing of any Two-Year Call or Five-Year Put/Call which results in a Full Exercise, the LF Shareholder shall deliver to the Company for cancellation the Share Certificate or Certificates, if any, representing the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable, and the Iconix Shareholder shall take all actions and execute and deliver and pay to the LF Shareholder the Two-Year Call Purchase Price or the Five-Year Put/Call Price, as applicable, and all instruments and documents as may be necessary or desirable to consummate the sale of the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable.  The Company shall thereupon cancel the Share Certificate(s) representing the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable, enter the purchaser's name in the register of shareholders of the Company and, upon request of the purchase pursuant to Section 2.01(c), issue a Share Certificate to the purchaser

20

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032235

evidencing the purchaser's entitlement to the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable.

(f)    (d) Stamp Duty.  The Hong Kong stamp duty payable in respect of the sale and purchase of the Shares pursuant to an exercise of any option pursuant to this Section 6.04 shall be borne by Iconix and LF in equal shares. Iconix and LF shall each pay their respective share of the Hong Kong stamp duty on completion of the exercise of the relevant option and shall co-operate to ensure that the instrument of transfer and bought and sold notes in respect of the sale and purchase of the relevant Shares are duly presented for stamping within the time limits prescribed by the Stamp Duty Ordinance and are duly stamped as soon as practicable after completion of the exercise of the relevant option.

## ARTICLE VII

## TERMINATION AND LIQUIDATION

**Section 7.01    Termination**.  This Agreement shall terminate on the first to occur of the following:

(a)    the Percentage Shareholding of any Shareholder is equal to one hundred percent (100%); or

(b)    a resolution is passed by the Shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, shareholders or other contributors.

**Section 7.02    Effect of Termination.**

(a)    On termination of this agreement, Sections 10.02, 10.03, 10.04, 10.07, 10.15 and this Section 7.02(a) shall continue in force.

(b)    Termination of this agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including the right to claim damages or indemnification in respect of any breach of the Agreement which existed at or before the date of termination.

**Section 7.03    Winding Up**.  Where the Company is to be wound up and its assets distributed, the parties shall agree on a suitable basis for dealing with the interests and assets of the Company and shall endeavor to ensure that, before dissolution:

(b)    all existing contracts of the Company are performed to the extent that there are sufficient resources;

(c)    the Company shall not enter into any new contractual obligations; and

(d)    the Company's assets are distributed as soon as practical.

21

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032236

## ARTICLE VIII

### INDEMNIFICATION

**Section 8.01**    Insurance.  The Company shall maintain for such periods as the Board shall in good faith unanimously determine, at its expense, insurance in an amount determined unanimously in good faith by the Board to be appropriate, on behalf of any person who is or was a director or officer of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or other enterprise, including any Subsidiary of the Company, against any expense, liability or loss asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, subject to customary exclusions.

## ARTICLE IX

### REPRESENTATIONS

**Section 9.01**    General.  As of the date hereof, each of the Shareholders makes each of the representations and warranties applicable to such Shareholder as set forth in this **ARTICLE IX**, and such representations and warranties shall survive the execution of this Agreement.

(a)    Due Incorporation or Formation; Authorization of Agreement.  If such Shareholder is a corporation, partnership, trust, limited liability company, or other legal entity, it is duly organized or formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the power and authority to own property and carry on its business as owned and carried on at the date hereof and as contemplated hereby and such Shareholder is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder, and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate or partnership or company action.  This Agreement constitutes the legal, valid, and binding obligation of such Shareholder, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b)    No Conflict or Default.  The execution, delivery, and performance of this Agreement and the consummation by such Shareholder of the transactions contemplated hereby (i) will not conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, or any arbitrator, applicable to such Shareholder, and (ii) will not conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, operating agreement, or other organizational documents of such Shareholder, or of any material agreement or instrument to which such

22

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032237

Shareholder is a party or by which such Shareholder is or may be bound or to which any of its material properties or assets are or may be subject.

      (c)    <u>Governmental Authorizations</u>.  Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by, any governmental or regulatory authority that is required in connection with the valid execution, delivery, acceptance, and performance by such Shareholder under this Agreement or the consummation by such Shareholder of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date of this Agreement.

      (d)    <u>Litigation</u>.  There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Shareholder, threatened against or affecting such Shareholder or any of such Shareholder's properties, assets, or businesses in any court or before or by any governmental department, board, agency, instrumentality, or arbitrator which, if adversely determined, could (or in the case of an investigation could lead to any action, suit, or proceeding which, if adversely determined, could) reasonably be expected to materially impair such Shareholder's ability to perform its obligations under this Agreement.

      (e)    <u>Securities Representations</u>.  Such Shareholder represents and agrees that the Shares acquired pursuant hereto will be acquired for such Shareholder's own account, for investment, and not with a view to the distribution or resale thereof.  Such Shareholder further represents that it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of acquiring the Shares.  Such Shareholder understands that such Shares have not been registered under the Securities Act or any state or other securities laws, and cannot be sold, assigned, transferred, pledged or otherwise disposed of unless so registered under the Securities Act and applicable state or other securities laws or unless an exemption from the registration requirements thereof is available.

**ARTICLE X**

**MISCELLANEOUS**

    **Section 10.01**   Information.  For so long as any Shareholder is a reporting company under the securities laws of the United States and/or Hong Kong, the Company shall provide to such Shareholder on a timely basis, in addition to the financial statements that the Company is required to deliver to the Shareholders pursuant to Section 5.01, all such information as such Shareholder determines is necessary for it to comply with its reporting obligations under such securities laws, including but not limited to financial information; <u>provided</u>, that any additional expense incurred by the Company or any other Shareholder in connection with or as a consequence of providing such information shall be borne by such Shareholder.  It is agreed that a failure to deliver such financial statements on a timely basis shall not be considered a breach of any term or condition of this Agreement, it being agreed that the Shareholders shall use commercially reasonable efforts to replace the auditors of the Company in the event that the Board determines that any such delay has been caused by the auditors.

    **Section 10.02**   Notices.  All notices, approvals, consents, requests, instructions, and other communications (collectively "***Communications***") required to be given in writing

23

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032238

pursuant to this Agreement shall be validly given, made or served only if in writing and when delivered personally or by registered or certified mail, return receipt requested, postage prepaid, or by a reputable overnight or same day courier, addressed to the Company, the Directors or the Shareholders, as the case may be, at the address(es) thereof on record at the principal office of the Company. All Communications required or permitted hereunder shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, or if not during such hours, then on the next Business Day, (c) five (5) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) three (3) Business Days after deposit with FedEx or other overnight courier, specifying delivery by such date, with written verification of receipt. The designation of the Person to receive such Communication on behalf of a Shareholder or the address of any such Person for the purposes of such Communication may be changed from time to time by written notice given to the Company pursuant to this Section 10.02.

**Section 10.03**   Parties Bound; No Third Party Beneficiaries.  This Agreement shall inure to the benefit of and shall be binding upon all of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties (other than to an Affiliate of a Shareholder following a Transfer permitted by Section 6.01).  No provision of this Agreement is intended to or shall be construed to grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement to or upon any Person other than the parties hereto.

**Section 10.04**   Governing Law; Submission to Jurisdiction.  This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of Hong Kong. Any dispute, difference or claim arising out of or in connection with this Agreement shall be referred to and finally determined by arbitration in Hong Kong at Hong Kong International Arbitration Centre (the "***HKIAC***") in accordance with the UNCITRAL Arbitration Rules as at present in force.  The language to be used in the arbitration proceedings shall be English.  There shall be three arbitrators, of which one shall be appointed by the Iconix Shareholder, one shall be appointed by the LF Shareholder and one (who shall act as president of the tribunal) shall be jointly appointed by the two arbitrators appointed by the Iconix Shareholder and the LF Shareholder.  The Iconix Shareholder and the LF Shareholder shall each appoint one arbitrator within 30 days of the notice of arbitration, failing which such appointment shall be made, at the request of either party, by the Chairman of the HKIAC. If the two arbitrators so appointed by the Iconix Shareholder and the LF Shareholder fail to agree upon the third arbitrator within 15 days of the appointment of the second arbitrator, the third arbitrator shall be appointed by the Chairman of the HKIAC upon the written request of either party.  The arbitral award shall be final and binding on all Parties.  In relation to all matters referred to arbitration by this Agreement, the right of appeal under section 23 of the Arbitration Ordinance (Cap. 341 of the Laws of Hong Kong) and the right to make an application under section 23A thereof are hereby excluded.  Any costs of arbitration (including without limitation all reasonable legal costs of the winning party) shall be borne by the losing party unless otherwise determined by the arbitral award.  Nothing herein shall prevent a Party from seeking injunctive or other emergency relief against the other at any time in a court having competent jurisdiction.

24

Current 30293237.7 30-Sep-13 01:44

**Section 10.05**    Amendment.  No amendment, change or modification to this Agreement shall be valid unless the same is in writing and signed by all of the Shareholders.

**Section 10.06**    Entire Agreement.  This Agreement and the Purchase Agreement, together with all exhibits and schedules hereto and thereto (which are deemed incorporated herein), contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof.

**Section 10.07**    Confidentiality.  Subject to the requirements of applicable Law, each Shareholder shall maintain in confidence all Confidential Information (i) transferred to the Company or to the other Shareholder by reason of the transactions contemplated by this Agreement and (ii) all information received from the other Shareholder as a result of any due diligence investigation conducted relative to the execution of this Agreement and shall use such information only for the benefit of the Company and or in connection with evaluating the transactions contemplated hereby, and except in accordance with the immediately succeeding sentence, shall not disclose any such information to a third party, other than (i) to its officers, directors, employees, advisors, attorneys or accountants who need to know and who agree to keep such information confidential, (ii) to its actual or proposed lenders or other financing sources having been made aware of the restrictions set forth in this Section 10.07, (iii) to the extent disclosure is required by law, statute, rule, regulation or judicial process (including, but not limited to, applicable securities laws) or (iv) upon the lawful demand of any court or agency or regulator having jurisdiction over such Shareholder (including, but not limited to, any securities regulatory authority, including rating agencies and national securities exchanges, to which the disclosing Shareholder is subject) or make any unauthorized use thereof.  The obligation of confidentiality and non-use shall not apply to any information which (A) is or becomes generally available to the public through no fault of the receiving party, (B) is independently developed by the receiving party or (C) is received in good faith from a third party who is lawfully in possession of such information and has the lawful right to disclose or use it.

**Section 10.08**    Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

**Section 10.09**    Counterparts; Facsimile or Electronic Transmission.  This Agreement may be executed in one or more counterparts with the same effect as if all of the Shareholders had signed the same document.  All counterparts shall be construed together and shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile or Electronic Transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile or Electronic Transmission shall be deemed to be their original signatures for all purposes.

**Section 10.10**    Construction.  Words in the singular include the plural and in the plural include the singular.  The words "including," "includes," "included" and "include," when

25

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032240

used, are deemed to be followed by the words "without limitation". Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not defined in this Agreement shall have the meanings determined by the Accounting Standards. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, and all attachments thereto and instruments incorporated therein. This Agreement is the result of arms-length negotiations between the parties hereto and no provision hereof, because of any ambiguity found to be contained herein or otherwise, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of that provision. A reference to a Law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any subordinate legislation for the time being in force made under it.

**Section 10.11** Successors and Assigns. This Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Shareholders and their respective successors, but neither this Agreement nor any rights, interests or obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party or parties hereto, subject to the provisions in respect of restrictions on Transfers set forth herein.

**Section 10.12** Headings and Captions. The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

**Section 10.13** No Waiver. The failure of any Shareholder to insist upon strict performance of a covenant hereunder or of any obligation hereunder or to exercise any right or remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of such Shareholder's right to demand strict compliance therewith in the future unless such waiver is in writing and signed by the Shareholder giving the same.

**Section 10.14** Additional Instruments. Each Shareholder agrees to execute and deliver such additional agreements, certificates, and other documents and to do all such other acts and things as may be required by law or necessary or appropriate to carry out the intent and purposes of this Agreement.

**Section 10.15** Publicity. The parties shall consult with each other before issuing any press release with respect to this Agreement or the transactions contemplated hereby and shall not issue any such press release or make any such public statement without the prior consent of the other party, which shall not be unreasonably withheld, conditioned or delayed; provided, however, that any party may, without the prior consent of the other parties (but after prior consultation, to the extent practicable in the circumstances) issue such press release or make such public statement as may upon the advice of outside counsel be required by law or the

26

ICON-043-00032241

**A-1344**

rules and regulations of the NASDAQ or the Stock Exchange of Hong Kong Limited or the rules of any other applicable exchange.

> **Section 10.16**   Remedies.  Except as otherwise provided herein, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every remedy under this Agreement or now or hereafter existing at law or in equity.

> **Section 10.17**   Specific Performance.  Each Shareholder acknowledges and agrees that its respective remedies at law for a breach or threatened breach of any of the provisions of this Agreement would be inadequate and, in recognition of that fact, agrees that, in the event of a breach or threatened breach by a Shareholder of the provisions of this Agreement, in addition to any remedies at law, the Company or any other Shareholder shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

[<em>Signature page follows.</em>]

27

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032242

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed and delivered as of the day and year first above written.

LF ASIA LIMITED

By: _____
     Name:
     Title:

ICONIX BRAND GROUP, INC.

By: _____
     Name:
     Title:

*Shareholders Agreement*

ICON-043-00032243

# A-1346

**Exhibit "A"**

**BRANDS**

FASHION BRANDS:
1. Badgley Mischka
2. Bongo
3. Candie's
4. Danskin / Danskin Now
5. Ecko Unltd./Marc Ecko Cut & Sew
6. Ed Hardy
7. Joe Boxer
8. Lee Cooper
9. London Fog
10. Mossimo
11. Mudd
12. OP / Ocean Pacific[‡*]
13. Rampage
14. Rocawear
15. Starter
16. Umbro
17. Zoo York

HOME BRANDS:
18. Cannon
19. Charisma
20. Fieldcrest
21. Royal Velvet
22. Sharper Image
23. Waverly

---

[‡*] Philippines only for Ocean Pacific

A- 1

ICON-043-00032244

# A-1347

## Exhibit "A-1"

## ADDITIONAL BRANDS

Ecko Unlimited

Zoo York

Marc Ecko Cut & Sew

Ed Hardy

Sharper Image

A-2

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032245

# A-1348

**Exhibit "B"**

SHARES AND PERCENTAGE SHAREHOLDINGS
AS OF THE ~~EFFECTIVE DATE~~INITIAL ALLOTMENT

| **Shareholder** | **Shares** | **Percentage Interest** |
|---|---|---|
| Iconix Brand Group, Inc. | ~~1~~50 | 50% |
| LF Asia Limited | ~~1~~50 | 50% |
| Total | ~~2~~100 | 100% |

B-1

~~30293237.4~~

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032246

**A-1349**

### Exhibit "C"

FORM OF DEED OF ADHERENCE

The undersigned is executing and delivering this Deed of Adherence (this "**Deed**") pursuant to the Shareholders Agreement of Iconix SE Asia Limited dated as of September 30, 2013 (as amended on [●], 2014) and as the same may hereafter be amended, amended and restated, supplemented or otherwise modified, the "***Agreement***").

Capitalized terms used in this Deed which are not defined herein shall have the respective meanings given to them in the Agreement.

Now this Deed witnesses as follows:

1. The undersigned, pursuant to Section 6.03 of the Agreement, undertakes to and covenants with and for the benefit of all the parties to the Agreement and for the benefit of any other person who becomes a party to the Agreement after the date of this Deed to comply with the provisions of and perform all of the obligations in the Agreement as if the undersigned had been a party to the Agreement as [*state capacity*], except to the extent that those obligations have already been performed.

2. The undersigned agrees to hold the Shares [transferred][issued] to [it]/[him] with the benefit of the rights, and subject to the restrictions, set out in the Agreement and the articles of association of the Company and consents to [its]/[his] name being entered in the register of Shareholders of Company as the holder of the Shares acquired.

3. The undersigned confirms that [it]/[he] has been given and has read a copy of the Agreement and all documents in the agreed form.

4. The undersigned hereby irrevocably appoints [      ] of [      ], fax: [      ] as its agent to receive on its behalf in Hong Kong service of any proceedings arising out of or in connection with the Agreement. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by the undersigned).

5. This Deed and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with Hong Kong law.

**IN WITNESS** of which the undersigned has executed this document as a deed and delivered it on the _____ day of _____, _____.

[*insert appropriate signature provisions*]

C-1

ICON-043-00032247

**A-1350**

**Exhibit "D"**

**TAX ALLOCATIONS**

Additional Provisions Applicable for U.S. Federal Income Tax Purposes

1. <u>Defined Terms.</u>

    1.1    "***Capital Account***" means with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 2 of this **Exhibit "D"** below and in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv).

    1.2    "***Capital Contribution***" means, with respect to a Partner, a contribution of cash or property to the Company pursuant to this Agreement.

    1.3    "***Code***" means the United States Internal Revenue Code of 1986, as amended and as hereafter amended, or any successor law.

    1.4    "***Fiscal Year***" means the calendar year unless otherwise required by the Code.

    1.5    "***Gross Asset Value***" means, with respect to any property of the Partnership other than money, such property's adjusted basis for U.S. federal income tax purposes, except that the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Tax Matters Partner considers appropriate, whenever such adjustment is permitted under Regulations Section 1.704-1(b)(2)(ii).

    1.6    "***Interest***" means the Percentage Shareholding of a Shareholder in the Company.

    1.7    "***Net Profits***" **and** "***Net Losses***" means, with respect to any Fiscal Year or other relevant period of calculation, any taxable income or taxable loss of the Partnership for such Fiscal Year or other period, with the following adjustments:

        1.7.1.  any income that is exempt from U.S. federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be added to such taxable income or loss;

        1.7.2  any expenditures described in Code Section 705(a)(2)(B) (or treated as expenditures described in Code Section 705(a)(2)(B) pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be subtracted from such taxable income or loss;

D-1

ICON-043-00032248

**A-1351**

1.7.3 in the event the Gross Asset Value of any Partnership property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property for purposes of computing Net Profits or Net Losses;

1.7.4 gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

1.7.5 in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, cost recovery or amortization computed in accordance with Regulations Section 1.704-1(b)(2)(iv)*(g)(3)*; and

1.7.6 any other provisions or items which are specifically allocated pursuant to Sections 3.2 or 3.3 hereof shall not be taken into account in computing Net Profits or Net Loss.

1.8 "***Partner***" means any Shareholder of the Company.

1.9 "***Partnership***" means the Company.

1.10 "***Regulations***" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

2. <u>Capital Accounts</u>.

2.1 Each Partner's Capital Account shall have an initial balance equal to the fair market value of such Partner's initial Capital Contribution to the Partnership.

2.2. Each Partner's Capital Account shall be increased by the sum of:

2.2.1 the amount of cash and the fair market value of any other property (net of liabilities that the Partnership is considered to assume or take subject to) constituting additional contributions by such Partner to the capital of the Partnership,

2.2.2 the portion of any Net Profits and other income or gain items allocated to such Partner's Capital Account.

2.3 Each Partner's Capital Account shall be decreased by the sum of:

2.3.1 the amount of cash and the fair market value of any other property (net of liabilities that such Partner is considered to assume or take subject to) distributed by the Partnership to such Partner; plus

D-2

ICON-043-00032249

    2.3.2   the portion of any Net Losses and other expense, loss or deduction items allocated to such Partner's Capital Account.

3.    <u>Allocation of Net Profits and Net Losses</u>.

    3.1   The Net Profits and Net Losses of the Partnership for each Fiscal Year or other relevant period of calculation, as determined by the Board in accordance with the provisions hereof, shall be allocated among the Partners in accordance with their respective Interests, such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the amount that each Partner would receive if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with this Agreement to the Partners immediately after making such allocation.

    3.2   In the event any Partner has a deficit adjusted Capital Account balance at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Partner is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Partner shall be specially allocated items of income and gain in the amount of such excess as quickly as possible; <u>provided</u>, that an allocation pursuant to this Section 3.2 shall be made only if and to the extent that a Partner would have a deficit adjusted Capital Account balance in excess of such sum after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.2 were not in this Schedule to this Agreement.

    3.3   Any special allocations of items of income, gain, loss or deduction pursuant to Section 3.2 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount of any items so allocated and all other items allocated to each Partner shall, to the extent possible, be equal to the net amount that would have been allocated to each Partner if the special allocations under Section 3.2 had not occurred.

    3.4   The Board is authorized to adjust the allocations hereunder if it considers an adjustment is necessary to:

    3.4.1   carry out the intentions of this Agreement; or

    3.4.2   to maintain substantial economic effect or otherwise comply with the requirements of Section 704(b) of the Code and the Regulations thereunder.

ICON-043-00032250

**A-1353**

3.5     Notwithstanding Section 3.1, in any year in which the Partnership sells substantially all of its assets or liquidates, each Partner shall be allocated Net Profits or Net Losses (or items thereof) to the extent necessary to cause its Capital Account balance to reflect the amount that will be distributable to such Partner in liquidation of the Partnership pursuant to this Agreement.

4.     Tax Allocation.

For Tax Purposes, items of Partnership income, gain, loss, deduction and credit for each Fiscal Year shall be allocated to and among the Parties in the same manner as the corresponding items of Net Profits and Net Losses and specially allocated items are allocated to them pursuant to Section 3 hereof, taking into account any variation between the adjusted tax basis and book value of the Partnership property in accordance with the principles of Code Section 704(c). The Board shall be authorized to make appropriate adjustments to the allocations of items to comply with Code Section 704 or applicable Regulations thereunder.

5.     Tax Matters Partner; Elections; Treatment as Partnership.

The initial Tax Matters Partner shall be Iconix. Subject to Section 5.04 of this Agreement, the Tax Matters Partner is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities.

6.     Liquidation of the Partnership; No Capital Account Makeup.

6.1     After all liabilities of the Partnership have been satisfied or duly provided for, the remaining assets of the Partnership shall be applied and distributed to the Partners in accordance with this Agreement.

6.2     Notwithstanding anything to the contrary herein, no Partner shall be obligated to restore to the capital of the Partnership any deficit balance in its Capital Account.

D-4

ICON-043-00032251

D-4

ICON-043-00032252

**A-1355**

**Exhibit "E"**

**DEFINITION OF "EUROPE"**

Albania

Andorra

Austria

Belarus

Belgium

Bosnia and Herzegovina

Bulgaria

Croatia

Cyprus

Czech Republic

Denmark

Estonia

Finland

Former Yugoslav Republic of Macedonia

France

Georgia

Germany

Greece

Hungary

Iceland

Ireland

Italy

E-1

ICON-043-00032253

**A-1356**

Latvia

Liechtenstein

Lithuania

Luxembourg

Malta

Moldova

Monaco

Montenegro

Netherlands

Norway

Poland .

Portugal

Romania

Russia

San Marino

Serbia

Slovakia

Slovenia

Spain

ICON-043-00032254

**A-1357**

Sweden

Switzerland

Ukraine

Uzbekistan

United Kingdom [(including for the avoidance of doubt the Crown Dependencies of Jersey, Guernsey and the Isle of Man)] **[Note to confirm/discuss with LF.]**

Vatican City State

ICON-043-00032255

# A-1358

Document comparison by Workshare Compare on 25 June 2014 22:43:38

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://ASIDMS/Current/33753303/2 |
| Description | #33753303v2<Current> - SHA - Project Brand+ - Conformed Copy - GD Draft 6/6/14 |
| Document 2 ID | interwovenSite://ASIDMS/Current/33753303/3 |
| Description | #33753303v3<Current> - SHA - Project Brand+ - Conformed Copy |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 85 |
| Deletions | 64 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 153 |

ICON-043-00032256

**A-1359**

EXECUTION COPYCONFORMED COPY
RELATIVE TO:
**Gibson Dunn Draft Dated 6/6/14**
**MBJSM changes 25/6/14**

# LION NETWORKICONIX SE ASIA LIMITED
# SHAREHOLDERS AGREEMENT

Dated as of September 30, 2013
as amended and conformed on [●] 2014

THE SHARES REFERRED TO IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL LION NETWORKICONIX SE ASIA LIMITED IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND

Current 30293237.7 30-Sep-13 01:4414448383 / 33753303

ICON-043-00032257

*Draft 11.2.08*
*For Discussion Purposes Only*

FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS.  ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

**Error! Unknown document property name.**
30293237.4
Current 30293237.7 30-Sep-13 01:44

ICON-043-00032258

**A-1361**

TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS; OPERATION OF COMPANY .......................... 1
    Section 1.01     Definitions .................................................................. 1
    Section 1.02     Incorporation; Name .................................................. ~~5~~6
    Section 1.03     Registered Office; Principal Office ............................ ~~5~~7
    Section 1.04     Business Purpose ...................................................... ~~5~~7
    Section 1.05     Shareholders ............................................................. ~~6~~7
    Section 1.06     No Personal Liability ................................................ ~~6~~7

ARTICLE II SHAREHOLDINGS AND CAPITAL STRUCTURE ....................... ~~6~~7
    Section 2.01     Capital Structure ...................................................... ~~6~~7
    Section 2.02     Loans ........................................................................ ~~7~~8

ARTICLE III DISTRIBUTIONS .......................................................................... ~~7~~8
    Section 3.01     Distributions ............................................................. ~~7~~8
    Section 3.02     Tax Distributions ...................................................... ~~7~~8

ARTICLE IV MANAGEMENT OF COMPANY ................................................. ~~8~~9
    Section 4.01     General Provisions Concerning Management ............. ~~8~~9
    Section 4.02     Appointment of Directors .......................................... ~~8~~9
    Section 4.03     Resignation and Removal of Directors ...................... ~~8~~9
    Section 4.04     Administrative Manager ............................................ ~~8~~10
    Section 4.05     Local Manager .......................................................... ~~8~~10
    Section 4.06     Actions Requiring Unanimous Consent of all the Directors ..... ~~8~~10
    Section 4.07     Shareholder Approval ............................................... ~~11~~12
    Section 4.08     Officers .................................................................... ~~12~~14
    Section 4.09     Board Meetings; Written Resolutions ....................... ~~13~~14
    Section 4.10     Quorum; Voting ....................................................... ~~13~~14
    Section 4.11     Company Minutes ..................................................... ~~13~~15

ARTICLE V BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND
FINANCIAL MATTERS ...................................................................................... ~~14~~15
    Section 5.01     Books and Records ................................................... ~~14~~15
    Section 5.02     Fiscal Year ............................................................... ~~14~~16
    Section 5.03     Bank Accounts and Temporary Investments ............ ~~14~~16
    Section 5.04     Classification as a Partnership; Tax Decisions ......... ~~15~~16

ARTICLE VI TRANSFERS .................................................................................. ~~15~~17
    Section 6.01     Transfers .................................................................. ~~15~~17
    Section 6.02     Share Certificates .................................................... ~~15~~17
    Section 6.03     Registration as a Shareholder ................................... ~~16~~18
    Section 6.04     Put and Call Options. ............................................... ~~17~~18

ARTICLE VII TERMINATION AND LIQUIDATION .................................... ~~18~~20

- i-

*Current 30293237.7 30-Sep-13 01:44*

ICON-043-00032259

**A-1362**

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| Section 7.01 | Termination | ~~18~~20 |
| Section 7.02 | Effect of Termination. | ~~19~~21 |
| Section 7.03 | Winding Up | ~~19~~21 |
| ARTICLE VIII INDEMNIFICATION | | ~~19~~21 |
| Section 8.01 | Insurance | ~~19~~21 |
| ARTICLE IX REPRESENTATIONS | | ~~19~~21 |
| Section 9.01 | General | ~~19~~21 |
| ARTICLE X MISCELLANEOUS | | ~~21~~23 |
| Section 10.01 | Information | ~~21~~23 |
| Section 10.02 | Notices | ~~21~~23 |
| Section 10.03 | Parties Bound; No Third Party Beneficiaries | ~~21~~23 |
| Section 10.04 | Governing Law; Submission to Jurisdiction | ~~22~~24 |
| Section 10.05 | Amendment | ~~22~~24 |
| Section 10.06 | Entire Agreement | ~~22~~24 |
| Section 10.07 | Confidentiality | ~~22~~24 |
| Section 10.08 | Severability | ~~23~~25 |
| Section 10.09 | Counterparts; Facsimile or Electronic Transmission | ~~23~~25 |
| Section 10.10 | Construction | ~~23~~25 |
| Section 10.11 | Successors and Assigns | ~~24~~26 |
| Section 10.12 | Headings and Captions | ~~24~~26 |
| Section 10.13 | No Waiver | ~~24~~26 |
| Section 10.14 | Additional Instruments | ~~24~~26 |
| Section 10.15 | Publicity | ~~24~~26 |
| Section 10.16 | Remedies | ~~24~~26 |
| Section 10.17 | Specific Performance | ~~24~~26 |

EXHIBITS

Exhibit "A"     BRANDS
Exhibit "B"     SHARES AND PERCENTAGE SHAREHOLDINGS
Exhibit "C"     FORM OF DEED OF ADHERENCE
Exhibit "D"     TAX ALLOCATIONS

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032260

**~~LION NETWORK~~ICONIX SE ASIA LIMITED**
**SHAREHOLDERS AGREEMENT**

This SHAREHOLDERS AGREEMENT of Iconix SE Asia Limited (formerly known as Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 (the "***Company***"), is entered into effective as of September 30, 2013 (the "***Effective Date***") and as amended by [the Amendment No. 1] effective as of [the Amendment No. 1 Effective Date], by and between LF Asia Limited, a Hong Kong limited liability company ("***LF***"), and Iconix Brand Group, Inc., a Delaware corporation ("***Iconix***").

**R E C I T A L S:**

Iconix has caused the incorporation of the Company on September 10, 2013.

Iconix and LF ~~are entering~~entered into a Share Purchase Agreement pursuant to which LF ~~is purchasing~~purchased from Iconix one (1) Share ~~of HK$1.00~~ in the Company, representing fifty percent (50%) of the issued share capital of the Company (such Share Purchase Agreement, as may be amended or modified from time to time, the "***Purchase Agreement***").

Iconix and LF were subsequently each allotted 49 Shares, giving them each 50 shares in total (being 50% of the Shares in the Company) (**"Initial Allotment"**).

**[Note: if applicable, to reference the agreement under which the Expanded Brands and New Licensed Brands are purchased.]**

The parties hereto wish to enter into this Agreement (reflecting [the Amendment No. 1]) to reflect ~~the admission of LF as a Shareholder and set forth~~ the respective rights, duties and obligations of the Shareholders with respect to the Company.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

**ARTICLE I**

**DEFINED TERMS; OPERATION OF COMPANY**

**Section 1.01**     Definitions.  Within the context of this Agreement, the following terms shall have the following meanings:

"***Accounting Standards***" has the meaning set forth in Section 5.01.

"***Administrative Manager***" has the meaning set forth in Section 4.04.

"***Administrative Services Agreement***" means the Administrative Manager Services Agreement dated as of the date hereof by and between the Company and Iconix, as the same may be amended from time to time.

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032261

"*Affiliate*" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, "control," "controlling," "controlled by" or "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Equity Securities, by Contract or otherwise.

"Agreed Value" has the meaning set forth in Section 6.04(b).

"*Agreement*" means this Shareholders Agreement, effective as of September 30, 2013, by and between Iconix and LF, as amended by Amendment No. 1, and as the same may be amended from time to time.

"*All Rights*" means, together, all of the Europe Rights, the Existing Rights and the Korea Rights.

"*Amendment No. 1*" means Amendment No. 1 to the Shareholders Agreement effective as of the Amendment No. 1 Effective Date, by and between Iconix and LF.

"*Amendment No. 1 Effective Date*" means [_____, 2014], the effective date of Amendment No. 1.

"*Board*" means the board of directors of the Company as it is constituted at the relevant time.

"*Brands*" means the brand names, logos and word phrases listed in **Exhibit "A"** and any other brand names, logos and word phrases which the Company hereafter uses in the Territory in connection with the Business as approved by the Board., collectively, the Existing Brands (with respect to the Existing Territory), the Expanded Brands (with respect to the Expanded Territory) and the New Licensed Brands (with respect to the New Territory).

"*Business*" means (i) all consumer products including but not limited to the fashion, jewelry, eyewear, footwear, apparel, swimwear, outerwear, small leather goods and accessories, watches, food, fast moving consumer goods, home, fragrance and beauty lines of business and all accessories associated with all such lines of business, (ii) all lines of business reasonably related or ancillary thereto (including the establishment and operation of retail stores), and (iii) any other line of business approved by the Shareholders.

"*Business Day*" means a day, other than a Saturday or a Sunday, on which banks are open for business in each and all of the State of New York, (United States of America) and Hong Kong.

"*Change of Control*" means (i) a change of control (including but not limited to by way of merger, consolidation or transfer of Equity Securities) of an entity, (ii) the direct or indirect sale by an entity of all or substantially all of its assets or (iii) any Person or group of Persons

2

ICON-043-00032262

(other an Affiliate of such entity) becoming the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the outstanding Equity Securities of an entity.

"***Communications***" has the meaning set forth in Section 10.02.

"***Companies Ordinance***" means the Companies Ordinance, chapter ~~32~~622 of the laws of Hong Kong (and, ~~when it comes into operation,~~to the extent it was relevant prior to 3 March 2014, the Companies Ordinance, chapter ~~622~~32 of the laws of Hong Kong).

"***Company***" has the meaning set forth in the Preamble.

"***Company Account***" has the meaning set forth in Section 5.03.

"***Confidential Information***" means all confidential or proprietary information, knowledge, systems or data relating to the business, assets, prospects, operations, finances, policies, strategies, intentions or inventions of the Company or any of its Subsidiaries (including any of the terms of this Agreement) from whatever source obtained, subject to the terms of this Agreement.

"***Contract***" means any agreement, bond, commitment, contract, franchise, indemnity, indenture, lease, license, purchase order or other instrument of any kind, whether oral or written.

"***Deed of Adherence***" has the meaning set forth in Section 6.03.

"***Designated Costs***" has the meaning set forth in Section 4.06(a)(i).

"***Directors***" has the meaning set forth in Section 4.02.

"***Effective Date***" has the meaning set forth in the Preamble.

"***Electronic Transmission***" means any form of communication, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

"***Equity Securities***" means any share, any partnership interest, any limited liability company interest and any other ownership interest in an entity, including any options or warrants to purchase the foregoing and other securities convertible, exchangeable or exercisable into the foregoing.

"***Europe***" means, collectively, the countries listed on **Exhibit "E"**.

"***Europe Rights***" means the rights granted to the Company under the Master License Agreement in respect of the New Licensed Brands in the New Territory.

"***Existing Brands***" means the brand names, logos and word phrases listed in **Exhibit "A"** and any other brand names, logos and word phrases which the Company hereafter uses in the Existing Territory in connection with the Business as approved by the Board.

3

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032263

"*Existing Rights*" means the rights granted to the Company under the Master License Agreement in respect of the Existing Brands in the Existing Territory.

"*Existing Territory*" means Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.

"*Expanded Brands*" means the brand names, logos and word phrases listed in **Exhibit "A"** other than OP/Ocean Pacific and Umbro, and any other brand names, logos and word phrases which the Company hereafter uses in the Expanded Territory in connection with the Business as approved by the Board.

"*Expanded Territory*" means the Republic of Korea.

"*Five-Year Call*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Call Notice*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Call Purchase Price*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call Notice*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call Purchase Price*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call Shares*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put Notice*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put Purchase Price*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Reference Royalty Amount*" has the meaning set forth in Section 6.04(b)(ii)(A) .

"*Fully Exercised*" means one or more exercises of the Five-Year Put/Call which result in the purchase by the Iconix Shareholder of All Rights, and "*Full Exercise*" shall be construed accordingly.

"*Governmental Authority*" means any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority.

4

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032264

"***HKIAC***" has the meaning set forth in Section 10.04.

"***Iconix***" has the meaning set forth in the Preamble.

"***Iconix Directors***" has the meaning set forth in Section 4.02.

"***Iconix Shareholder***" means Iconix, together with its Transferees, if any.

"***Korea Rights***" means the rights granted to the Company under the Master License Agreement in respect of the Expanded Brands in the Expanded Territory.

"***Law***" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

"***LF***" has the meaning set forth in the Preamble.

"***LF Directors***" has the meaning set forth in Section 4.02.

"***LF Shareholder***" means LF, together with its Transferees, if any.

"***Local Manager***" has the meaning set forth in Section 4.05.

"***Local Services Agreement***" means the Local Manager Services Agreement dated as of the date hereof by and between the Company and LF, as the same may be amended from time to time.

"***Master License Agreement***" means the Master License Agreement ~~dated~~, effective as of ~~the date hereof~~September 30, 2013, by and ~~between~~among the Company, Iconix and the Licensors (as defined therein), as amended by Amendment No.1, and as the same may be amended from time to time.

"***New Licensed Brands***" means the brand names, logos and word phrases listed in Exhibit "A-1" and any other brand names, logos and word phrases which the Company hereafter uses in the New Territory in connection with the Business as approved by the Board.

"***New Territory***" means Europe and Turkey.

"***Other License Agreement***" means any license or similar agreement by and between the Company or one of its Subsidiaries and another Person granting such Person rights to use the Brands in the Territory.

"***Partial Exercise***" means an exercise of the Five-Year Put/Call which does not result in a Full Exercise.

"***Percentage Shareholding***" means the percentage determined in accordance with Section 2.01(b).

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032265

"***Permitted Parent Change of Control***" means (i) a Change of Control of, in the case of the Iconix Shareholder, Iconix and, in the case of the LF, ~~Li & Fung~~Global Brands Group Limited.

"***Person***" means any individual or any partnership, corporation, estate, trust, company or other legal entity.

"***Purchase Agreement***" has the meaning set forth in the Recitals.

"***Securities Act***" means the Securities Act of 1933, as amended, or any similar federal statute then in effect, and any reference to a particular section thereof shall include a reference to the comparable section, if any, of any such similar federal statute, and the rules and regulations promulgated thereunder.

"***Share***" means a share in the Company.

"***Shareholders***" means the Iconix Shareholder and the LF Shareholder.

"***Share Certificate***" has the meaning set forth in Section 2.01(c).

"***Subsidiary***" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (i) of which such Person or any other subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any subsidiary of such Person do not have a majority of the voting interests in such partnership) or (ii) at least fifty percent (50%) of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries, or by such Person and one or more of its subsidiaries.

"***Territory***" means ~~Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.~~, collectively, the Existing Territory (with respect to the Existing Brands), the Expanded Territory (with respect to the Expanded Brands) and the New Territory (with respect to the New Licensed Brands).

"***Transfer***" means to sell, convey, transfer, syndicate, assign, mortgage, pledge, hypothecate or otherwise encumber or dispose of in any way, including by operation of law or otherwise, any Shares, or any Change of Control of the Company. The Person who is transferring Shares shall be referred to as the "Transferor" and the Person who is acquiring the Shares shall be referred to as the "Transferee."

"***Two-Year Call***" has the meaning set forth in Section 6.04(a).

"***Two-Year Call Notice***" has the meaning set forth in Section 6.04(a).

"***Two-Year Call Purchase Price***" has the meaning set forth in Section 6.04(a).

"***Two-Year Call Shares***" has the meaning set forth in Section 6.04(a).

6

ICON-043-00032266

**A-1369**

"*Year*" means the tax and financial accounting period specified in Section 5.02.

Section 1.02   Incorporation; Name.  The Company was incorporated by the filing of the form of incorporation with the Companies Registry of Hong Kong.  A certificate of incorporation was issued by the Companies Registry of Hong Kong on September 10, 2013.  The Shareholders hereby confirm the incorporation of the Company as a company with limited liability under and pursuant to the provisions of the Companies Ordinance.  Whenever the terms of this Agreement conflict with the provisions of the articles of association of the Company, the terms of this Agreement shall prevail.  Accordingly, the parties hereto shall exercise their respective voting and other rights as holders of Shares to procure that the articles of association of the Company are amended to remove any conflict.  ~~The Shareholders agree that the name of the Company be changed to "Iconix SE Asia Limited" as soon as reasonably possible, from which time the Company shall be operated under such name.~~

Section 1.03   Registered Office; Principal Office.  The registered office of the Company required under the Companies Ordinance shall be as designated in the incorporation form filed with the Companies Registry, and may be changed by the Board in accordance with the Companies Ordinance.  The principal business office of the Company shall be located at the principal business office of the Local Manager, or such other address as shall be designated by the Board.

Section 1.04   Business Purpose. The Company has been formed for the purpose of engaging, directly or through its Subsidiaries, in the following activities: (i) developing, exploiting and promoting the Brands licensed to the Company pursuant to the Master License Agreement or another Contract in the Territory by way of a license, sublicense or otherwise relating to the Business in exchange for royalty payments, and/or other consideration, (ii) purchasing or licensing third party Brands for the purposes of developing them in the Territory; (iii) engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing; (iv) engaging in other similar business opportunities as agreed to by both of the Shareholders and (v) unless otherwise agreed by the Shareholders, adopting a business model that is in accordance with the then-approved business plan and is asset light, working capital light and with an EBITDA margin of not less than 75%.  References in this Agreement to the "ordinary course of business" shall be construed in conjunction with the business purpose set out in this Section 1.04.

Section 1.05   Shareholders.  The name, number of Shares and Percentage Shareholding held by each Shareholder is set forth on **Exhibit "B"**, as the same may be amended from time to time in accordance with this Agreement.

Section 1.06   No Personal Liability.  Except as provided by the applicable Law, no Shareholder or any Director shall be personally liable for any obligations of the Company and no Shareholder shall have any obligation or be required to make any loan or otherwise advance any funds to the Company other than as provided in Section 2.01(d) or 2.01(e).

7

ICON-043-00032267

## ARTICLE II

## SHAREHOLDINGS AND CAPITAL STRUCTURE

**Section 2.01**    Capital Structure.

(a)    Shareholdings.  The initial shareholdings of the Shareholders (after giving effect to the purchase transaction contemplated by the Purchase Agreement) are set forth on **Exhibit "B"** attached hereto.

(b)    Percentage Shareholding.  Each Shareholder shall have the Percentage Shareholding in the Company determined by dividing the number of Shares owned by such Shareholder by the total number of issued Shares.  The Percentage Shareholding of each Shareholder (after giving effect to the purchase transaction contemplated by the Purchase Agreement) shall be set forth next to such Shareholder's name on **Exhibit "B"** attached hereto.

(c)    Share Certificates.  Upon the request of any Shareholder, a share certificate (each, a "***Share Certificate***") issued by the Company in accordance with the provisions of the articles of association of the Company shall evidence the Shares in the Company held by such requesting Shareholder.

(d)    New Allotment of Shares.  ~~As soon as practicable following the date of this Agreement (and in any event before payment of any dividend is made), the Iconix Shareholder and the LF Shareholder shall each be allotted 49 Shares, and to satisfy the subscription price therefor, each shall pay par value of HK$1.00 per Share to the Company.  The Shareholders will pass such resolutions and procure that the Directors pass such resolutions as are necessary to give effect to the provisions of this Section 2.01(d).~~*(Omitted as spent).*

(e)    Further Subscription for Shares.  In the event that the Company is to pay any Future Mark Acquisition Consideration (as defined in the Master License Agreement) or any Jointly Owned Mark Acquisition Consideration (as defined in the Master License Agreement) under the Master License Agreement, the Shareholder will subscribe for new Shares, in accordance with their Percentage Shareholding, in order to put the Company in funds to pay the relevant Future Mark Acquisition Consideration or any Jointly Owned Mark Acquisition Consideration (as the case may be), with subscription price therefor being set by the Directors, and the Shareholders will pass such resolutions and procure that the Directors pass such resolutions as are necessary to give effect to the provisions of this Section 2.01(e).

**Section 2.02   Loans**.  Without in any way limiting the authority of the Board to cause the Company to borrow funds from an unaffiliated third party (instead of, or in addition to, any loan(s) of the type contemplated by this Section ~~2.02,~~2.02), any Shareholder or Affiliate of a Shareholder may, with the consent of all the Directors, lend or advance money to the Company; provided, that such loan shall be on terms and conditions not less favorable than those available from unaffiliated third parties for similar loans (unless otherwise unanimously agreed by the Directors).

8

ICON-043-00032268

## ARTICLE III

### DISTRIBUTIONS

**Section 3.01**    Distributions.  At such times as the Board determines is in the best interest of the Company and the Shareholders, the Company shall pay dividends or make other distributions to the Shareholders in proportion to their Percentage Shareholdings.   The Shareholders agree that, to the extent practicable and permitted by any applicable Law and regulation, unless otherwise agreed by the Shareholders, the dividend policy of the Company shall be to distribute the maximum amount of distributions allowed by the Companies Ordinance.

**Section 3.02**    Tax Distributions.  Upon Iconix's reasonable request, and subject to such dividend being lawfully permitted, the Board shall cause the Company to distribute to each Shareholder in respect of each Year, an amount of cash which equals (i) the amount of taxable income allocable to the Shareholder in respect of such Year, multiplied by (ii) the combined maximum individual United States federal and state income tax rate attributable to such taxable income (determined as if all Shareholders were residents of the State of New York and taking into account (i) the deductibility of state income taxes for United States federal income tax purposes) and (ii) the amount of taxable losses previously allocated to such Shareholders in prior fiscal years (and not used in prior fiscal years to reduce taxable income for the purpose of making distributions under this Section 3.02).   Such distributions based upon estimates of the taxable income for the year may be made on a quarterly or other basis as shall be determined by Iconix (in its sole discretion).   All amounts so distributed shall be treated as amounts distributed to the Shareholder pursuant to Section 3.01 of this Agreement, depending on the source of the item that generated such taxable income, and shall be reduced by any amounts withheld for taxes with respect to the Shareholder pursuant to Section 3.01.

### ARTICLE IV

### MANAGEMENT OF COMPANY

**Section 4.01**    General Provisions Concerning Management.  Subject to the provisions hereof, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board.  The Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company described herein, including all powers, statutory or otherwise, possessed by directors of a company with limited liability incorporated under the laws of Hong Kong.  Except as otherwise required by law, approval of any action by the Board in accordance with this Agreement and the articles of association of the Company shall constitute approval of such action by the Company.

**Section 4.02**    Appointment of Directors.  The Company shall have four Directors, two (2) of whom shall be Persons designated by LF and its Transferees, if any (the "***LF Directors***"), and two (2) of whom shall be Persons designated by Iconix and its Transferees, if any (the "***Iconix Directors***," and together with the LF Directors, the "***Directors***").  The initial

9

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032269

LF Directors shall be Jason Rabin and David Thomas and the initial Iconix Directors shall be Neil Cole and Warren Clamen.

**Section 4.03**  Resignation and Removal of Directors.  Each Director shall serve until death, dissolution, resignation or removal, in accordance with this Agreement and the articles of association of the Company.  A Director may resign at any time upon giving written notice of resignation to the Company.  A Director may be removed at any time with or without cause only by the Shareholder who appointed such Director (*e.g.*, an Iconix Director can only be removed by Iconix).  If a Director ceases to serve as a Director at any time for any reason, the resulting vacancy shall be filled by a Person designated by the Shareholder whose designee created the vacancy.

**Section 4.04**  Administrative Manager.  Subject to the provisions of the Administrative Services Agreement, Iconix, as Administrative Manager (the "***Administrative Manager***") shall have the responsibilities and provide to the Company the services referred to therein.

**Section 4.05**  Local Manager.  Subject to the provisions of the Local Services Agreement, LF, as Local Manager (the "***Local Manager***") shall have the responsibilities and provide to the Company the services referred to therein.

**Section 4.06   Actions Requiring Unanimous Consent of all the Directors**.

(a)  Notwithstanding any provision of this Agreement, subject to Section 4.07, approval of the following actions shall require the unanimous consent of all the Directors:

(i)  approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the costs and expenses (including those payable under the Administrative Services Agreement and the Local Services Agreement) associated with the ongoing operations of the Company (the "***Designated Costs***") pursuant to such annual business and development plan and annual budget are less than twenty percent (20%) of net revenue projected in such annual business and development plan and annual budget; provided that, if the actions in this clause (i) are to be taken by the Iconix Directors, the Iconix Directors shall consult with the LF Directors, in good faith, regarding such proposed annual business and development plan and annual budget, and take into consideration any comments or proposed changes recommended by the LF Directors;

(ii)  approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the Designated Costs pursuant to such annual business and development plan and annual budget are twenty percent (20%) or greater of net revenue projected in such annual business and development plan and annual budget;

(iii)  any change in the scope or nature of the business or activities of the Company or any or any of its Subsidiaries;

(iv)  appointment or removal of, entry into an employment agreement with or approval of any delegation of or change to the authority or responsibilities of any officer of the Company or any of its Subsidiaries, or approval of the terms and conditions of

10

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032270

employment of any officer or employee of the Company or any of its Subsidiaries or any change thereto provided that, if the actions in this clause (iv) are to be taken by the Iconix Directors, (A) at least thirty (30) days prior to taking any such action the Iconix Directors shall have provided the LF Directors with, as applicable, identity of any individual proposed to be appointed or removed, the employment history of and references for any potential officer, a detailed summary of the terms of any proposed employment agreement, a summary of the reasons for any delegation or change in the authority or responsibilities of any officer and/or a summary of any terms and conditions of employment proposed to be approved, and shall have consulted with the LF Directors, in good faith, regarding such proposed action and taken into consideration any comments or proposed changes recommended by the LF Directors, and (B) the Iconix Directors shall not hire any new officer unless the position for such officer was included in the then current annual business and development plan and annual budget;

(v)      with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries in the ordinary course of business;

(vi)      with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries outside the ordinary course of business;

(vii)      incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business ;

(viii)      incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) outside the ordinary course of business or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business;

(ix)      lending any money (except deposits with banks or other institutions) by the Company or any of its Subsidiaries;

(x)      entry into any Contract by the Company or any of its Subsidiaries outside the ordinary course of business;

(xi)      commencement or settlement by the Company or any of its Subsidiaries of any legal action, arbitration proceeding, mediation or other dispute resolution other than in the ordinary course of business;

(xii)      adopting or amending any employee benefit or equity plan of the Company or any of its Subsidiaries;

(xiii)      appointment or removal of auditors of the Company or any of its Subsidiaries;

11

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032271

(xiv)   subject to Section 4.06(a)(xv), changing the accounting policies of the Company or any of its Subsidiaries or of the Year of the Company or any of its Subsidiaries;

(xv)   changing the accounting policies of the Company or any of its Subsidiaries by reason of being compelled to do so by reason of changes to IFRS and/or GAAP;

(xvi)   giving of any guarantee or indemnity of the Company or any of its Subsidiaries;

(xvii)   assignment of any debts of the Company or any of its Subsidiaries;

(xviii)   transfer, disposal or creation of any security interest in property of the Company or any of its Subsidiaries;

(xix)   entry into any Other License Agreement, or amendment, modification, termination of the Master License Agreement or any existing Other License Agreement;

(xx)   approving of the creation or acquisition of any Subsidiaries and the adoption of governance agreements or arrangements in respect thereof, or any other investment in, or the acquisition of stocks or bonds of, other Persons or any Equity Securities in any other Person; provided, that there shall be no limitation on the Board's authority to delegate, in a manner mutually acceptable to the Board, the making of investments as part of cash management in the ordinary course of business of the Company;

(xxi)   any Transfer of Shares in the Company; and

(xxii)   authorizing an officer, an employee or any other individual to approve disbursements on behalf of the Company;

provided, that upon and subsequent to any exercise of the Call Option (as defined herein) pursuant to Section 6.04, the actions in clauses (i), (iv), (v), (vii), (ix), (xv) and (xxii) of this Section 4.06(a) shall be taken by the Iconix Directors in their sole discretion (after reasonable, good faith consultation with the LF Directors), notwithstanding, for the avoidance of doubt, Section 4.08 of this Agreement.

(b)   The parties acknowledge and agree that any and all decisions or actions by the Company with respect to an agreement between the Company and a Shareholder or Affiliate of a Shareholder relating to: (i) the exercise or enforcement of the Company's rights thereunder; (ii) any amendments or waivers thereto; or (iii) any approvals required or requests made thereunder shall be taken by the Directors designated by the other Shareholder in their sole discretion.

(c)   Subsequent to the exercise of the Call Option (as defined herein), the Iconix Directors will consult in good faith with the LF Directors prior to taking any actions

12

ICON-043-00032272

outside of the ordinary course of business and take into consideration any comments or proposed changes recommended by the LF Directors.

(d)     ~~(c) Subsequent to the exercise of the Call Option (as defined herein), the Iconix Directors will consult in good faith with the LF Directors prior to taking any actions outside of the ordinary course of business and take into consideration any comments or proposed changes recommended by the LF Directors.~~  The Iconix Directors shall not take any action in their sole discretion if such action would reasonably be expected to have a materially adverse effect on the value of the Shares held by the LF Shareholder, taking into consideration the existence of the Five Year Put/Call unless the Shareholders mutually agree that any such action is in the best interests of the Company.

**Section 4.07**     Shareholder Approval.  Notwithstanding any provision of this Agreement, approval of any of the following shall require unanimous approval by all of the Shareholders:

(a)     admission of any Person (whether by subscription or transfer) as a shareholder of the Company or any of its Subsidiaries;

(b)     grant of, or entry into an agreement to grant, any option, pledge or other encumbrance in respect of the Shares or of any other Equity Securities of the Company or any of its Subsidiaries;

(c)     except as provided under Article III or Section 6.04, declaration, payment or approval by the Company or any of its Subsidiaries of any repurchase or redemption of the Company's or any of its Subsidiaries' securities or any dividend or other distribution to the Shareholders or to the members or shareholders of any of the Company's Subsidiaries (other than Subsidiaries wholly owned by the Company or any of its Subsidiaries);

(d)     delegation of any powers or responsibilities by the Board or Directors other than to an individual or a committee of individuals designated with the unanimous consent of the Directors or to officers pursuant to Section 4.08;

(e)     change of the number of Directors or the number of directors of any Subsidiary of the Company;

(f)     removal of a Director other than by the Shareholder that designated or nominated such Director or removal of a director of any of the Company's Subsidiaries;

(g)     the entering into by the Company or any of its Subsidiaries of any Contract outside the ordinary course of business;

(h)     participation in, termination of or any other actions taken by the Company or any of its Subsidiaries with respect to any venture, partnership or joint venture, or acquisition or disposal of shares or other equity interests in another Person or the acquisition of the business or assets of another Person;

(i)     entry into any transaction by the Company or any Subsidiary of the Company with any Shareholder or any Affiliate of any Shareholder (including entering into any

13

ICON-043-00032273

loans between any Shareholder or any Affiliate of any Shareholder and the Company, but not including entering into the Master License Agreement);

(j) increase or decrease the issued ~~or~~share capital or (as applicable) the authorized share capital or maximum number of shares, in each case of the Company or any of its Subsidiaries;

(k) reclassification of securities of the Company or any of its Subsidiaries (including any subdivision or consolidation of shares) or recapitalization of the Company or any of its Subsidiaries;

(l) entry into any merger, amalgamation or consolidation of the Company or any of its Subsidiaries with another Person;

(m) a resolution for winding up, the termination or dissolution of, or the entering into of bankruptcy, insolvency or receivership by, the Company or any of its Subsidiaries;

(n) sale or disposal of all of the Shares or all or any substantial part of the Company's or any of its Subsidiaries' business or assets;

(o) change of the name of the Company or any of its Subsidiaries;

(p) amendment or modification of the Company's or any of its Subsidiaries' memorandum of association or articles of association or other organizational documents (as applicable);

(q) reorganization of the Company or any of its Subsidiaries; and

(r) a private or public issuance or offering for sale of any securities of the Company or any of its Subsidiaries or the listing on any exchange of any securities of the Company or any of its Subsidiaries.

**Section 4.08** Officers.  Subject to the limitations set forth in Section 4.06, the Board shall have the authority to establish such officers of the Company as they shall determine, and to appoint individuals to serve as such officers, including chairman, chief executive officer, one or more vice presidents, secretary, assistant secretary, treasurer and assistant treasurer.  An individual may hold more than one office at any time.

**Section 4.09** Board Meetings; Written Resolutions.  Board meetings may be called by any Director.  The Board shall meet not less than once every three (3) months.  Any Director may participate in a Board meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear and speak to each other at the same time or in sequence, and participation in a Board meeting pursuant to this provision shall constitute presence at the meeting; provided, that at least one of such Board meetings per year shall be held in person at a location to be unanimously determined by the Directors.  All meetings of the Board shall be called on not less than three (3) Business Days' prior notice.  All actions required or permitted to be taken by the Board may also be

14

ICON-043-00032274

approved by the execution of a written resolution executed by all the Directors, and any such written resolution may be executed in counterparts.

        **Section 4.10**    Quorum; Voting.

        (a)     A quorum must exist at all times of a Board meeting, including the reconvening of any Board meeting that has been adjourned, for any action taken at such Board meeting to be valid.

        (b)     Except as otherwise specified in this Agreement:

        (i)     a quorum shall be constituted at a Board meeting only if at least one (1) LF Director and one (1) Iconix Director are present; and

        (ii)     all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, which majority must include at least one (1) LF Director and one (1) Iconix Director.

        (c)     Upon and subsequent to the closing of any Two-Year Call pursuant to Section 6.04:

        (i)     a quorum shall be constituted at a meeting if a majority of the Directors is present, regardless of the identity of the Directors comprising such majority; and

        (ii)     all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, regardless of the identity of the Directors comprising such majority.

    **Section 4.11  Company Minutes**. The decisions and resolutions of the Board shall be reported in minutes, which shall state the date, time and place of the meeting (or the date of the written resolution in lieu of meeting), the Directors present at the meeting, the resolutions put to a vote (or the subject of a written resolution) and the results of such voting (or written resolution). The minutes shall be entered in a minute book kept at the registered office of the Company and a copy of the minutes shall be provided upon request to each Director.

**ARTICLE V**

**BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL MATTERS**

        **Section 5.01**    Books and Records. The Administrative Manager shall procure that accurate, full and complete books and records of the Company are maintained, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business and affairs. Such books and records initially shall be prepared and maintained by the Administrative Manager; and, at such time as the Board determines, such books and records shall be prepared and maintained by employees of the Company. Upon request in writing, each Shareholder and its duly authorized representative shall have access to inspect and copy any of such books and records at all reasonable times during

15

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032275

normal business hours. The Company shall deliver or cause to be delivered to each Shareholder consolidated financial statements (all of which shall be prepared in accordance with the financial reporting standards and interpretations (including: (a) Hong Kong Financial Reporting Standards; (b) Hong Kong Accounting Standards; and (c) Interpretations) issued by the Hong Kong Institute of Certified Public Accountants applied on a consistent basis (the "*Accounting Standards*")), as follows: (i) as soon as available (but in any event not later than twenty (20) days after the end of each quarter), a consolidated balance sheet as at the end of such quarter and the related consolidated statements of income and cash flows for such quarter and for the period from the beginning of the current calendar year (i.e., the calendar year in which such quarter falls) to the end of such quarter, setting forth, in each case, in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the current calendar year; and (ii) as soon as available (but in any event not later than one hundred twenty (120) days after the end of each calendar year), a consolidated balance sheet as at the end of such calendar year and the related consolidated statements of income, cash flows and stockholders', members' or other owners' equity for such calendar year, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the calendar year covered by such financial statements. The Company shall also deliver to each Shareholder upon request copies of any reports or statements the Company receives from its third party licensees. The financial statements to be provided under this Agreement shall not be required to be audited unless required by applicable Law or so requested by either Shareholder.

> **Section 5.02** Fiscal Year. The year of the Company for tax and financial accounting purposes ("*Year*") shall end on the last day of the month of December, unless a different year end is approved in accordance with Section 4.07

> **Section 5.03** **Company Accounts**. All receipts, funds and income of the Company shall be deposited in the name of the Company in a bank account of a commercial bank, savings and loan association or other financial institution (the "*Company Account*") as the Local Manager shall determine. Withdrawals from the Company Account shall be made on the signature of (a) an officer of the Administrative Manager or such other Person as shall be designated by the Administrative Manager and (b) an officer of the Local Manager or such other Person as shall be designated by the Local Manager; provided that no withdrawal from the Company Account shall be made (i) with respect to any expense subject to the Directors' or the Shareholders' approval rights pursuant to Section 4.06 or Section 4.07, respectively, until such approval has been obtained, or (ii) for the purpose of making any payment to a Director or an Affiliate of a Director or any distribution to the Shareholders unless the amount of such payment or distribution is in accordance with ARTICLE III or has been approved by the Shareholders. There shall be no commingling of the moneys and funds of the Company with moneys and funds of the Administrative Manager, the Local Manager or any other entity or Person.

> **Section 5.04** **Classification as a Partnership; Tax Decisions**. The Company shall elect within 75 days of its formation to be taxable as a partnership for United States federal income tax purposes, pursuant to Treasury Regulation Section 301.7701-3(b)(1)(i) by having each Shareholder sign Form 8832 as prepared by Iconix. During such time as the Company would be classified as a partnership under the foregoing sentence, neither the Company nor any Shareholder shall take any action that would result in the Company being taxed as other than a

16

ICON-043-00032276

# A-1379

"partnership" for United States federal income tax purposes, including, but not limited to, electing to be taxed as other than a "partnership" by filing Internal Revenue Service Form 8832, "Entity Classification Election" without the prior written consent of all of the Shareholders. All elections required or permitted to be made by the Company and all other tax decisions and determinations relating to United States federal, state, local or foreign tax matters shall be made by the Board, in consultation with the Company's attorneys and/or accountants as the Board deems necessary or advisable. For U.S. federal income tax purposes, income of the Company shall be allocated in accordance with the provisions of **Exhibit "D"**.

## ARTICLE VI

## TRANSFERS

**Section 6.01**    Transfers. Except as expressly provided in this **ARTICLE VI**, (i) no Shareholder may directly or indirectly Transfer any or all of its Shares or any right or interest therein; (ii) any direct or indirect offer to Transfer, or any attempted or purported Transfer of, any Shares in violation of any of the provisions of this Agreement shall be void *ab initio*; (iii) the Company shall reject and refuse to register on its books the Transfer of any Shares which are purported to have been transferred otherwise than in compliance with the provisions of this Agreement; and (iv) and the Company shall not recognize any Person receiving any Shares as a shareholder of the Company, nor shall any Person have any rights as a shareholder of the Company, unless the Transfer of Shares to such Person shall have been made pursuant to the terms of this Agreement. Notwithstanding any provisions of this Agreement, a Shareholder may Transfer all (but not some only) of its Shares (a) pursuant to a Permitted Parent Change of Control or (b) to any Affiliate of such Shareholder, provided that if such Affiliate at any time no longer constitutes an Affiliate of Iconix or LF, as applicable, any such Shares transferred to such Affiliate shall immediately be transferred to Iconix or LF, as applicable, or one of their respective Affiliates.

**Section 6.02**    Share Certificates.

(a)    Each Share Certificate issued to a Shareholder pursuant to Section 2.01(c) shall have the following legend conspicuously written, printed, typed or stamped on its face, or upon the reverse with a conspicuous reference to such legend on its face:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF A SHAREHOLDERS AGREEMENT OF [LION NETWORK LIMITED]/[ICONIX SE ASIA LIMITED], DATED AS OF SEPTEMBER 30, 2013, AS IT MAY BE AMENDED FROM TIME TO TIME, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN.

THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS, IN RELIANCE UPON APPLICABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE AND FOREIGN SECURITIES LAWS. THE SHARES HAVE BEEN

17

Current 30293237.7 30-Sep-13 01:44

ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE. THE SHARES MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL [LION NETWORK LIMITED]/[ICONIX SE ASIA LIMITED] IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE MUST COMPLY WITH THE OTHER TRANSFER RESTRICTIONS SET FORTH IN THE SHAREHOLDERS AGREEMENT."

(b) Upon the sale of any Shares pursuant to (i) an effective registration statement under the Securities Act or pursuant to Rule 144 under the Securities Act or (ii) another exemption from registration under the Securities Act or upon the termination of this Agreement, the Share Certificates representing such Shares shall be replaced, at the expense of the Company, with certificates or instruments not bearing the legends required by this Section 6.02; provided that the Company may condition such replacement of certificates under clause (ii) upon the receipt of an opinion of securities counsel reasonably satisfactory to the Company.

(c) In case of loss or destruction of a Share Certificate, no new Share Certificate shall be issued in lieu thereof except upon satisfactory proof to the Company of such loss or destruction, and upon the giving to the Company of satisfactory security against loss by bond or otherwise. Any such new Share Certificate shall be plainly marked "Duplicate" upon its face.

**Section 6.03** Registration as a Shareholder. Except as provided in Section 6.01 and Section 6.04, no Person other than the LF Shareholder and the Iconix Shareholder shall be registered in the register of shareholders of the Company as a shareholder of the Company without the prior written unanimous consent of the Board and the Shareholders. If the LF Shareholder or the Iconix Shareholder proposes to transfer Shares to an Affiliate, it shall be a condition to the transfer that such Affiliate shall execute and deliver a deed of adherence in substantially the form attached hereto as **Exhibit "C"** (the "***Deed of Adherence***") pursuant to which such Transferee shall agree to be legally bound by this Agreement. Except as otherwise set forth herein, the Affiliate to which Shares are transferred shall pay all costs and expenses incurred by the Company in connection with such admission.

**Section 6.04** Put and Call Options.

(a) Two-Year Call Option. For the six- (6-) month period following the second (2nd) anniversary of the Effective Date, the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder and the Company (a "***Two-Year Call Notice***") to initiate the purchase by the Iconix Shareholder of five percent (5%) of the total Shares in issue (the "***Two-Year Call Shares***") at a purchase price (the "***Two-Year Call Purchase Price***") in cash equal to 10% multiplied by 115% multiplied by the sum of (i) the Purchase Price (as defined in the Purchase Agreement) paid or payable by LF to Iconix in respect of all of the

18

ICON-043-00032278

~~Shares~~pursuant to the Purchase Agreement, *plus* (ii) $10,917,500 (such purchase initiated by a Two-Year Call Notice, a "***Two-Year Call***").  The Company shall pay an interim dividend in accordance with the then current dividend policy of the Company, to be calculated up to the day before closing of the Two Year Call.  LF agrees that following the closing of the Two-Year Call, LF has no objection to Iconix being able to consolidate the results of the Company into its own financial results.

(b)    Five-Year Put/Call Option.

(i)    For the six- (6-) month period following the fifth (5th) anniversary of the Effective Date (and, if a Five-Year Put/Call has not ~~been exercised~~ previously been Fully Exercised, for the six- (6-) month period following the eighth (8th) anniversary of the Effective Date), (i) the LF Shareholder may deliver an irrevocable written notice of election to the Iconix Shareholder and the Company (a "***Five-Year Put Notice***") to initiate the purchase by the Iconix Shareholder of ~~all (but not less than all) of the Shares held by the LF Shareholder~~, the Europe Rights, the Existing Rights and/or the Korea Rights (the "***Five-Year Put/Call ~~Shares~~Rights***") at a purchase price (the "***Five-Year Put Purchase Price***") in cash equal to the aggregate Agreed Value (as defined herein) (such purchase initiated by a Five-Year Put Notice, a "***Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder (a "***Five-Year Call Notice***," and each of the Five-Year Put Notice and the Five-Year Call Notice, a "***Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder of the Five-Year Put/Call ~~Shares~~Rights at a purchase price (the "***Five-Year Call Purchase Price***," and each of the Five-Year Put Purchase Price and the Five-Year Call Purchase Price, the "***Five-Year Put/Call Purchase Price***") in cash equal to 120% of the aggregate Agreed Value (such purchase initiated by a Five-Year Call Notice, a "***Five-Year Call***" and each of a Five-Year Put and a Five-Year Call, a "***Five-Year Put/Call***").  Prior to the closing of the Five-Year Put/Call pursuant to Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the Company shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to LF under the Local Services Agreement and pay all fees owing and accrued to Iconix under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the Five-Year Put/Call.

(ii)    If the Five-Year Put/Call is exercised in the six- (6-) month period following the fifth (5th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)    the LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2015 and (ii) the Year ended December 31, 2018; provided, however, that the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *plus*

(B)    in the case of a Full Exercise, the amount of cash in the Company.

19

ICON-043-00032279

(iii)     If the Five-Year Put/Call is exercised in the six- (6-) month period following the eighth (8th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)     The LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and the Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2018 and (ii) the Year ended December 31. 2021; *provided, however,* that, the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *plus*

(B)     In the case of a Full Exercise, the amount of cash in the Company.

(c)     Put and Call Closings.  The closing of any Two-Year Call or Five-Year Put/Call under this Section 6.04 shall take place within (i) sixty (60) days after delivery of the Two-Year Call Notice or (ii) sixty (60) days after the delivery of the Five-Year Put/Call Notice (or, if later, within 30 days after the royalty information necessary to calculate the Agreed Value is available), as the case may be, unless another date is mutually agreed upon by the parties to the sale.

(d)     Put and Call Closings – Partial Exercise.  In the case of an exercise of the Five-Year Put/Call which constitutes a Partial Exercise, at the closing of the relevant Five Year Put/Call, the Iconix Shareholder shall pay [to the LF Shareholder] the Five-Year Put/Call Price, and the parties hereto shall use all reasonable endeavours to negotiate and agree (for the purposes of obtaining director consent pursuant to Section 4.06(xix)) changes to the Master License Agreement to the extent necessary to remove from the Master License Agreement, the Europe Rights, the Existing Rights and/or the Korea Rights which are the subject to the Partial Exercise, as appropriate.

(e)     (c) Put and Call Closings.  The closing of any Two-Year Call or Five-Year Put/Call under this Section 6.04 shall take place within (i) sixty (60) days after delivery of the Two-Year Call Notice or (ii) sixty (60) days after the delivery of the Five-Year Put/Call Notice (or, if later, within 30 days after the royalty information necessary to calculate the Agreed Value is available), as the case may be, unless another date is mutually agreed upon by the parties to the salePut and Call Closings – Two Year Call and Full Exercise.  At the closing of any Two-Year Call or Five-Year Put/Call which results in a Full Exercise, the LF Shareholder shall deliver to the Company for cancellation the Share Certificate or Certificates, if any, representing the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable, and the Iconix Shareholder shall take all actions and execute and deliver and pay to the LF Shareholder the Two-Year Call Purchase Price or the Five-Year Put/Call Price, as applicable, and all instruments and documents as may be necessary or desirable to consummate the sale of the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable.  The Company shall thereupon cancel the Share Certificate(s) representing the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable, enter the purchaser's name in the register of shareholders of the Company and, upon request of the purchase pursuant to Section 2.01(c), issue a Share Certificate to the purchaser evidencing the purchaser's entitlement to the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable.

20

ICON-043-00032280

(f)     (d) Stamp Duty.  The Hong Kong stamp duty payable in respect of the sale and purchase of the Shares pursuant to an exercise of any option pursuant to this Section 6.04 shall be borne by Iconix and LF in equal shares. Iconix and LF shall each pay their respective share of the Hong Kong stamp duty on completion of the exercise of the relevant option and shall co-operate to ensure that the instrument of transfer and bought and sold notes in respect of the sale and purchase of the relevant Shares are duly presented for stamping within the time limits prescribed by the Stamp Duty Ordinance and are duly stamped as soon as practicable after completion of the exercise of the relevant option.

## ARTICLE VII

## TERMINATION AND LIQUIDATION

**Section 7.01     Termination**.  This Agreement shall terminate on the first to occur of the following:

(a)     the Percentage Shareholding of any Shareholder is equal to one hundred percent (100%); or

(b)     a resolution is passed by the Shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, shareholders or other contributors.

**Section 7.02     Effect of Termination.**

(a)     On termination of this agreement, Sections 10.02, 10.03, 10.04, 10.07, 10.15 and this Section 7.02(a) shall continue in force.

(b)     Termination of this agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including the right to claim damages or indemnification in respect of any breach of the Agreement which existed at or before the date of termination.

**Section 7.03     Winding Up**.  Where the Company is to be wound up and its assets distributed, the parties shall agree on a suitable basis for dealing with the interests and assets of the Company and shall endeavor to ensure that, before dissolution:

(b)     all existing contracts of the Company are performed to the extent that there are sufficient resources;

(c)     the Company shall not enter into any new contractual obligations; and

(d)     the Company's assets are distributed as soon as practical.

21

Current 30293237.7 30-Sep-13 01:44

## ARTICLE VIII

## INDEMNIFICATION

**Section 8.01**      Insurance.  The Company shall maintain for such periods as the Board shall in good faith unanimously determine, at its expense, insurance in an amount determined unanimously in good faith by the Board to be appropriate, on behalf of any person who is or was a director or officer of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or other enterprise, including any Subsidiary of the Company, against any expense, liability or loss asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, subject to customary exclusions.

## ARTICLE IX

## REPRESENTATIONS

**Section 9.01**      General.  As of the date hereof, each of the Shareholders makes each of the representations and warranties applicable to such Shareholder as set forth in this **ARTICLE IX**, and such representations and warranties shall survive the execution of this Agreement.

(a)      Due Incorporation or Formation; Authorization of Agreement.  If such Shareholder is a corporation, partnership, trust, limited liability company, or other legal entity, it is duly organized or formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the power and authority to own property and carry on its business as owned and carried on at the date hereof and as contemplated hereby and such Shareholder is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder, and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate or partnership or company action.  This Agreement constitutes the legal, valid, and binding obligation of such Shareholder, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b)      No Conflict or Default.  The execution, delivery, and performance of this Agreement and the consummation by such Shareholder of the transactions contemplated hereby (i) will not conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, or any arbitrator, applicable to such Shareholder, and (ii) will not conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, operating agreement, or other organizational documents of such Shareholder, or of any material agreement or instrument to which such

22

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032282

Shareholder is a party or by which such Shareholder is or may be bound or to which any of its material properties or assets are or may be subject.

(c)     Governmental Authorizations.  Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by, any governmental or regulatory authority that is required in connection with the valid execution, delivery, acceptance, and performance by such Shareholder under this Agreement or the consummation by such Shareholder of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date of this Agreement.

(d)     Litigation.  There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Shareholder, threatened against or affecting such Shareholder or any of such Shareholder's properties, assets, or businesses in any court or before or by any governmental department, board, agency, instrumentality, or arbitrator which, if adversely determined, could (or in the case of an investigation could lead to any action, suit, or proceeding which, if adversely determined, could) reasonably be expected to materially impair such Shareholder's ability to perform its obligations under this Agreement.

(e)     Securities Representations.  Such Shareholder represents and agrees that the Shares acquired pursuant hereto will be acquired for such Shareholder's own account, for investment, and not with a view to the distribution or resale thereof.  Such Shareholder further represents that it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of acquiring the Shares.  Such Shareholder understands that such Shares have not been registered under the Securities Act or any state or other securities laws, and cannot be sold, assigned, transferred, pledged or otherwise disposed of unless so registered under the Securities Act and applicable state or other securities laws or unless an exemption from the registration requirements thereof is available.

## ARTICLE X

## MISCELLANEOUS

**Section 10.01**    Information.  For so long as any Shareholder is a reporting company under the securities laws of the United States and/or Hong Kong, the Company shall provide to such Shareholder on a timely basis, in addition to the financial statements that the Company is required to deliver to the Shareholders pursuant to Section 5.01, all such information as such Shareholder determines is necessary for it to comply with its reporting obligations under such securities laws, including but not limited to financial information; provided, that any additional expense incurred by the Company or any other Shareholder in connection with or as a consequence of providing such information shall be borne by such Shareholder.  It is agreed that a failure to deliver such financial statements on a timely basis shall not be considered a breach of any term or condition of this Agreement, it being agreed that the Shareholders shall use commercially reasonable efforts to replace the auditors of the Company in the event that the Board determines that any such delay has been caused by the auditors.

**Section 10.02**    Notices.  All notices, approvals, consents, requests, instructions, and other communications (collectively "***Communications***") required to be given in writing

23

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032283

pursuant to this Agreement shall be validly given, made or served only if in writing and when delivered personally or by registered or certified mail, return receipt requested, postage prepaid, or by a reputable overnight or same day courier, addressed to the Company, the Directors or the Shareholders, as the case may be, at the address(es) thereof on record at the principal office of the Company. All Communications required or permitted hereunder shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, or if not during such hours, then on the next Business Day, (c) five (5) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) three (3) Business Days after deposit with FedEx or other overnight courier, specifying delivery by such date, with written verification of receipt. The designation of the Person to receive such Communication on behalf of a Shareholder or the address of any such Person for the purposes of such Communication may be changed from time to time by written notice given to the Company pursuant to this Section 10.02.

**Section 10.03**    Parties Bound; No Third Party Beneficiaries. This Agreement shall inure to the benefit of and shall be binding upon all of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties (other than to an Affiliate of a Shareholder following a Transfer permitted by Section 6.01). No provision of this Agreement is intended to or shall be construed to grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement to or upon any Person other than the parties hereto.

**Section 10.04**    Governing Law; Submission to Jurisdiction. This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of Hong Kong. Any dispute, difference or claim arising out of or in connection with this Agreement shall be referred to and finally determined by arbitration in Hong Kong at Hong Kong International Arbitration Centre (the "*HKIAC*") in accordance with the UNCITRAL Arbitration Rules as at present in force. The language to be used in the arbitration proceedings shall be English. There shall be three arbitrators, of which one shall be appointed by the Iconix Shareholder, one shall be appointed by the LF Shareholder and one (who shall act as president of the tribunal) shall be jointly appointed by the two arbitrators appointed by the Iconix Shareholder and the LF Shareholder. The Iconix Shareholder and the LF Shareholder shall each appoint one arbitrator within 30 days of the notice of arbitration, failing which such appointment shall be made, at the request of either party, by the Chairman of the HKIAC. If the two arbitrators so appointed by the Iconix Shareholder and the LF Shareholder fail to agree upon the third arbitrator within 15 days of the appointment of the second arbitrator, the third arbitrator shall be appointed by the Chairman of the HKIAC upon the written request of either party. The arbitral award shall be final and binding on all Parties. In relation to all matters referred to arbitration by this Agreement, the right of appeal under section 23 of the Arbitration Ordinance (Cap. 341 of the Laws of Hong Kong) and the right to make an application under section 23A thereof are hereby excluded. Any costs of arbitration (including without limitation all reasonable legal costs of the winning party) shall be borne by the losing party unless otherwise determined by the arbitral award. Nothing herein shall prevent a Party from seeking injunctive or other emergency relief against the other at any time in a court having competent jurisdiction.

24

ICON-043-00032284

Section 10.05    Amendment.  No amendment, change or modification to this Agreement shall be valid unless the same is in writing and signed by all of the Shareholders.

Section 10.06    Entire Agreement.  This Agreement and the Purchase Agreement, together with all exhibits and schedules hereto and thereto (which are deemed incorporated herein), contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof.

Section 10.07    Confidentiality.  Subject to the requirements of applicable Law, each Shareholder shall maintain in confidence all Confidential Information (i) transferred to the Company or to the other Shareholder by reason of the transactions contemplated by this Agreement and (ii) all information received from the other Shareholder as a result of any due diligence investigation conducted relative to the execution of this Agreement and shall use such information only for the benefit of the Company and or in connection with evaluating the transactions contemplated hereby, and except in accordance with the immediately succeeding sentence, shall not disclose any such information to a third party, other than (i) to its officers, directors, employees, advisors, attorneys or accountants who need to know and who agree to keep such information confidential, (ii) to its actual or proposed lenders or other financing sources having been made aware of the restrictions set forth in this Section 10.07, (iii) to the extent disclosure is required by law, statute, rule, regulation or judicial process (including, but not limited to, applicable securities laws) or (iv) upon the lawful demand of any court or agency or regulator having jurisdiction over such Shareholder (including, but not limited to, any securities regulatory authority, including rating agencies and national securities exchanges, to which the disclosing Shareholder is subject) or make any unauthorized use thereof.  The obligation of confidentiality and non-use shall not apply to any information which (A) is or becomes generally available to the public through no fault of the receiving party, (B) is independently developed by the receiving party or (C) is received in good faith from a third party who is lawfully in possession of such information and has the lawful right to disclose or use it.

Section 10.08    Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

Section 10.09    Counterparts; Facsimile or Electronic Transmission.  This Agreement may be executed in one or more counterparts with the same effect as if all of the Shareholders had signed the same document.  All counterparts shall be construed together and shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile or Electronic Transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile or Electronic Transmission shall be deemed to be their original signatures for all purposes.

Section 10.10    Construction.  Words in the singular include the plural and in the plural include the singular.  The words "including," "includes," "included" and "include," when

25

ICON-043-00032285

used, are deemed to be followed by the words "without limitation". Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not defined in this Agreement shall have the meanings determined by the Accounting Standards. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, and all attachments thereto and instruments incorporated therein. This Agreement is the result of arms-length negotiations between the parties hereto and no provision hereof, because of any ambiguity found to be contained herein or otherwise, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of that provision. A reference to a Law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any subordinate legislation for the time being in force made under it.

Section 10.11    Successors and Assigns. This Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Shareholders and their respective successors, but neither this Agreement nor any rights, interests or obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party or parties hereto, subject to the provisions in respect of restrictions on Transfers set forth herein.

Section 10.12    Headings and Captions. The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

Section 10.13    No Waiver. The failure of any Shareholder to insist upon strict performance of a covenant hereunder or of any obligation hereunder or to exercise any right or remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of such Shareholder's right to demand strict compliance therewith in the future unless such waiver is in writing and signed by the Shareholder giving the same.

Section 10.14    Additional Instruments. Each Shareholder agrees to execute and deliver such additional agreements, certificates, and other documents and to do all such other acts and things as may be required by law or necessary or appropriate to carry out the intent and purposes of this Agreement.

Section 10.15    Publicity. The parties shall consult with each other before issuing any press release with respect to this Agreement or the transactions contemplated hereby and shall not issue any such press release or make any such public statement without the prior consent of the other party, which shall not be unreasonably withheld, conditioned or delayed; provided, however, that any party may, without the prior consent of the other parties (but after prior consultation, to the extent practicable in the circumstances) issue such press release or make such public statement as may upon the advice of outside counsel be required by law or the

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032286

rules and regulations of the NASDAQ or the Stock Exchange of Hong Kong Limited or the rules of any other applicable exchange.

      **Section 10.16**   Remedies.  Except as otherwise provided herein, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every remedy under this Agreement or now or hereafter existing at law or in equity.

      **Section 10.17**   Specific Performance.  Each Shareholder acknowledges and agrees that its respective remedies at law for a breach or threatened breach of any of the provisions of this Agreement would be inadequate and, in recognition of that fact, agrees that, in the event of a breach or threatened breach by a Shareholder of the provisions of this Agreement, in addition to any remedies at law, the Company or any other Shareholder shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

[<em>Signature page follows.</em>]

27

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032287

**A-1390**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed and delivered as of the day and year first above written.

LF ASIA LIMITED

By: _____
     Name:
     Title:

ICONIX BRAND GROUP, INC.

By: _____
     Name:
     Title:

*Shareholders Agreement*

ICON-043-00032288

# A-1391

**Exhibit "A"**

**BRANDS**

FASHION BRANDS:
1.  Badgley Mischka
2.  Bongo
3.  Candie's
4.  Danskin / Danskin Now
5.  Ecko Unltd./Marc Ecko Cut & Sew
6.  Ed Hardy
7.  Joe Boxer
8.  Lee Cooper
9.  London Fog
10. Mossimo
11. Mudd
12. OP / Ocean Pacific[*]
13. Rampage
14. Rocawear
15. Starter
16. Umbro
17. Zoo York

HOME BRANDS:
18. Cannon
19. Charisma
20. Fieldcrest
21. Royal Velvet
22. Sharper Image
23. Waverly

---

[*] Philippines only for Ocean Pacific

A- 1

ICON-043-00032289

# A-1392

**Exhibit "A-1"**

**ADDITIONAL BRANDS**

Ecko Unlimited

Zoo York

Marc Ecko Cut & Sew

Ed Hardy

Sharper Image

B~~A~~ ~~1~~2

Current 30293237.7 30-Sep-13 01:44

ICON-043-00032290

**A-1393**

**Exhibit "B"**

SHARES AND PERCENTAGE SHAREHOLDINGS
AS OF THE ~~EFFECTIVE DATE~~INITIAL ALLOTMENT

| Shareholder | Shares | Percentage Interest |
|---|---|---|
| Iconix Brand Group, Inc. | ~~1~~50 | 50% |
| LF Asia Limited | ~~1~~50 | 50% |
| Total | ~~2~~100 | 100% |

~~30293237.4~~B-1

~~Current 30293237.7 30-Sep-13 01:44~~

ICON-043-00032291

**A-1394**

**Exhibit "C"**

FORM OF DEED OF ADHERENCE

The undersigned is executing and delivering this Deed of Adherence (this **"Deed"**) pursuant to the Shareholders Agreement of ~~Lion Network~~Iconix SE Asia Limited dated as of ~~[●]~~September 30, 2013 (as amended on [●], 2014) and as the same may hereafter be amended, amended and restated, supplemented or otherwise modified, the "*Agreement*").

Capitalized terms used in this Deed which are not defined herein shall have the respective meanings given to them in the Agreement.

Now this Deed witnesses as follows:

1. The undersigned, pursuant to Section 6.03 of the Agreement, undertakes to and covenants with and for the benefit of all the parties to the Agreement and for the benefit of any other person who becomes a party to the Agreement after the date of this Deed to comply with the provisions of and perform all of the obligations in the Agreement as if the undersigned had been a party to the Agreement as [*state capacity*], except to the extent that those obligations have already been performed.

2. The undersigned agrees to hold the Shares [transferred][issued] to [it]/[him] with the benefit of the rights, and subject to the restrictions, set out in the Agreement and the articles of association of the Company and consents to [its]/[his] name being entered in the register of Shareholders of Company as the holder of the Shares acquired.

3. The undersigned confirms that [it]/[he] has been given and has read a copy of the Agreement and all documents in the agreed form.

4. The undersigned hereby irrevocably appoints [      ] of [      ], fax: [      ] as its agent to receive on its behalf in Hong Kong service of any proceedings arising out of or in connection with the Agreement. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by the undersigned).

5. This Deed and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with Hong Kong law.

**IN WITNESS** of which the undersigned has executed this document as a deed and delivered it on the ____ day of _____, _____.

[*insert appropriate signature provisions*]

C-~~1~~1

ICON-043-00032292

C-~~2~~1

ICON-043-00032293

**A-1396**

<u>Exhibit "D"</u>

**TAX ALLOCATIONS**

Additional Provisions Applicable for U.S. Federal Income Tax Purposes

1.  <u>Defined Terms.</u>

1.1  "***Capital Account***" means with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 2 of this **Exhibit "D"** below and in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv).

1.2  "***Capital Contribution***" means, with respect to a Partner, a contribution of cash or property to the Company pursuant to this Agreement.

1.3  "***Code***" means the United States Internal Revenue Code of 1986, as amended and as hereafter amended, or any successor law.

1.4  "***Fiscal Year***" means the calendar year unless otherwise required by the Code.

1.5  "***Gross Asset Value***" means, with respect to any property of the Partnership other than money, such property's adjusted basis for U.S. federal income tax purposes, except that the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Tax Matters Partner considers appropriate, whenever such adjustment is permitted under Regulations Section 1.704-1(b)(2)(ii).

1.6  "***Interest***" means the Percentage Shareholding of a Shareholder in the Company.

1.7  "***Net Profits***" and "***Net Losses***" means, with respect to any Fiscal Year or other relevant period of calculation, any taxable income or taxable loss of the Partnership for such Fiscal Year or other period, with the following adjustments:

1.7.1.  any income that is exempt from U.S. federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be added to such taxable income or loss;

1.7.2  any expenditures described in Code Section 705(a)(2)(B) (or treated as expenditures described in Code Section 705(a)(2)(B) pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be subtracted from such taxable income or loss;

D-~~1~~1

ICON-043-00032294

**A-1397**

1.7.3  in the event the Gross Asset Value of any Partnership property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property for purposes of computing Net Profits or Net Losses;

1.7.4  gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

1.7.5  in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, cost recovery or amortization computed in accordance with Regulations Section 1.704-1(b)(2)(iv)*(g)(3)*; and

1.7.6  any other provisions or items which are specifically allocated pursuant to Sections 3.2 or 3.3 hereof shall not be taken into account in computing Net Profits or Net Loss.

1.8  "***Partner***" means any Shareholder of the Company.

1.9  "***Partnership***" means the Company.

1.10  "***Regulations***" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

2.  <u>Capital Accounts</u>.

2.1  Each Partner's Capital Account shall have an initial balance equal to the fair market value of such Partner's initial Capital Contribution to the Partnership.

2.2.  Each Partner's Capital Account shall be increased by the sum of:

2.2.1  the amount of cash and the fair market value of any other property (net of liabilities that the Partnership is considered to assume or take subject to) constituting additional contributions by such Partner to the capital of the Partnership,

2.2.2  the portion of any Net Profits and other income or gain items allocated to such Partner's Capital Account.

2.3  Each Partner's Capital Account shall be decreased by the sum of:

2.3.1  the amount of cash and the fair market value of any other property (net of liabilities that such Partner is considered to assume or take subject to) distributed by the Partnership to such Partner; plus

ICON-043-00032295

2.3.2 the portion of any Net Losses and other expense, loss or deduction items allocated to such Partner's Capital Account.

3. <u>Allocation of Net Profits and Net Losses</u>.

3.1 The Net Profits and Net Losses of the Partnership for each Fiscal Year or other relevant period of calculation, as determined by the Board in accordance with the provisions hereof, shall be allocated among the Partners in accordance with their respective Interests, such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the amount that each Partner would receive if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with this Agreement to the Partners immediately after making such allocation.

3.2 In the event any Partner has a deficit adjusted Capital Account balance at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Partner is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Partner shall be specially allocated items of income and gain in the amount of such excess as quickly as possible; <u>provided</u>, that an allocation pursuant to this Section 3.2 shall be made only if and to the extent that a Partner would have a deficit adjusted Capital Account balance in excess of such sum after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.2 were not in this Schedule to this Agreement.

3.3 Any special allocations of items of income, gain, loss or deduction pursuant to Section 3.2 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount of any items so allocated and all other items allocated to each Partner shall, to the extent possible, be equal to the net amount that would have been allocated to each Partner if the special allocations under Section 3.2 had not occurred.

3.4 The Board is authorized to adjust the allocations hereunder if it considers an adjustment is necessary to:

3.4.1 carry out the intentions of this Agreement; or

3.4.2 to maintain substantial economic effect or otherwise comply with the requirements of Section 704(b) of the Code and the Regulations thereunder.

ICON-043-00032296

**A-1399**

3.5      Notwithstanding Section 3.1, in any year in which the Partnership sells substantially all of its assets or liquidates, each Partner shall be allocated Net Profits or Net Losses (or items thereof) to the extent necessary to cause its Capital Account balance to reflect the amount that will be distributable to such Partner in liquidation of the Partnership pursuant to this Agreement.

4.      <u>Tax Allocation</u>.

For Tax Purposes, items of Partnership income, gain, loss, deduction and credit for each Fiscal Year shall be allocated to and among the Parties in the same manner as the corresponding items of Net Profits and Net Losses and specially allocated items are allocated to them pursuant to Section 3 hereof, taking into account any variation between the adjusted tax basis and book value of the Partnership property in accordance with the principles of Code Section 704(c).  The Board shall be authorized to make appropriate adjustments to the allocations of items to comply with Code Section 704 or applicable Regulations thereunder.

5.      <u>Tax Matters Partner; Elections; Treatment as Partnership</u>.

The initial Tax Matters Partner shall be Iconix.  Subject to Section 5.04 of this Agreement, the Tax Matters Partner is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities.

6.      <u>Liquidation of the Partnership; No Capital Account Makeup</u>.

6.1      After all liabilities of the Partnership have been satisfied or duly provided for, the remaining assets of the Partnership shall be applied and distributed to the Partners in accordance with this Agreement.

6.2      Notwithstanding anything to the contrary herein, no Partner shall be obligated to restore to the capital of the Partnership any deficit balance in its Capital Account.

ICON-043-00032297

**A-1400**

D-4

ICON-043-00032298

# A-1401

**Exhibit "E"**

**DEFINITION OF "EUROPE"**

Albania

Andorra

Austria

Belarus

Belgium

Bosnia and Herzegovina

Bulgaria

Croatia

Cyprus

Czech Republic

Denmark

Estonia

Finland

Former Yugoslav Republic of Macedonia

France

Georgia

Germany

Greece

Hungary

Iceland

Ireland

Italy

E-1

ICON-043-00032299

# A-1402

Latvia

Liechtenstein

Lithuania

Luxembourg

Malta

Moldova

Monaco

Montenegro

Netherlands

Norway

Poland .

Portugal

Romania

Russia

San Marino

Serbia

Slovakia

Slovenia

Spain

E-1

ICON-043-00032300

Sweden

Switzerland

Ukraine

Uzbekistan
United Kingdom [(including for the avoidance of doubt the Crown Dependencies of Jersey, Guernsey and the Isle of Man)] **[Note to confirm/discuss with LF.]**

Vatican City State

E-2

ICON-043-00032301

# A-1404

Document comparison by Workshare Compare on 25 June 2014 22:42:13

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://ASIDMS/Current/33753303/1 |
| Description | #33753303v1<Current> - SHA - Project Brand - Execution Version |
| Document 2 ID | interwovenSite://ASIDMS/Current/33753303/3 |
| Description | #33753303v3<Current> - SHA - Project Brand+ - Conformed Copy |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 216 |
| Deletions | 114 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 336 |

ICON-043-00032302

| From: | Neil Cole [ncole@iconixbrand.com] |
|---|---|
| Sent: | 8/14/2014 7:50:50 AM |
| To: | Seth Horowitz [shorowitz@iconixbrand.com] |
| Subject: | Re: Umbro/LC China |

lets discuss tomorrow. Will be tough to do China without Roc kids but agree the risk is huge on both Roc kids and Ed Hardy/rainbow

Sent from my iPad

On Aug 13, 2014, at 11:56 PM, "Seth Horowitz" <shorowitz@iconixbrand.com> wrote:

Per below, looks like GBG wants to move forward with Umbro and LC in China.
Spent a lot of time with Allyson on Rocawear kids model today. Believe we should not go forward with taking this back. Also believe we need to start smaller with Ed Hardy and Rainbow. We should start kids "division" w/ Jonathon Cohen with Ecko Unltd and Ed Hardy. Then, be prepared to take over Rocawear kids if necessary at end of GBG term (through '15). Will walk you through the logic and model. With so much uncertain (terms of transition, fixtures, etc..) believe we can avoid having a problem with GBG if we don't move forward on Roc kids. Will remain silent with them on all of this until we discuss. Hope you're having a great trip.
Best,
Seth

Sent from my iPad

Begin forwarded message:

**From:** Jared Margolis <JaredMargolis@GlobalBrandsGroup.com>
**Date:** August 13, 2014 at 4:48:38 PM EDT
**To:** "'shorowitz@iconixbrand.com'" <shorowitz@iconixbrand.com>
**Subject: Umbro/LC China**

Jason and Dow on board. Meeting with Bruce to get sign off on Monday.

Let me know when we can catch up
Best regards,

Jared Margolis
Executive Vice President - Business Development and Licensing
LF Asia - Hard & Soft Goods

A-1405

GOVERNMENT
EXHIBIT
1058
19 Cr. 869 (ER)

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-127-00001909

9/F, Lifung Tower,
888 Cheung Sha Wan Road,
Kowloon, Hong Kong
Direct line: (852) 2300 3077

CONFIDENTIALITY NOTICE - This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain information that is confidential or legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

A-1406

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-127-00001910

# A-1407

From: Ethan Cole <erapcole@gmail.com> – on behalf of – Ethan Cole <erapcole@gmail.com>

Sent: Thursday, August 28, 2014 3:39 PM

To: Jared Margolis <jaredmargolis24@gmail.com>

Subject: Iconix Notes

Attach: Summary of Various AR.doc



Confidential Treatment Requested by Jared Margolis

JM0000026

# A-1408

**Summary of Various Amounts with Iconix**

**A.**     **$5 Million Overpay from Iconix Korea**

- The $5M overpay from Iconix Korea will be offset by:

    - $2.5M Rocawear

    - $1.0M Zoo York SEA Marketing

    - $1.5M Peanuts China Marketing

**B.**     **$4.5 Million Proposed Overpay for Umbro / Lee Cooper China**

- The $4.5M overpay for Umbro / Lee Cooper China will be offset by Iconix paying the $4.5M in markdown money to Rainbow

**C.**     **Additional Amounts – TBD**

- $3.5M in Rocawear royalty for YR2 remains outstanding

- $3.5M in fixtures remains outstanding

- No wiggle room with Iconix Latin America transaction

- Possible wiggle room with Iconix Australia / Japan

Confidential Treatment Requested by Jared Margolis                                                                                                           JM0000027