# 23-7566

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL COLE, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT
VOLUME VI OF VII
(Pages A-1409 to A-1690)**

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
BRONWYN C. ROANTREE
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

**TABLE OF CONTENTS**

                                                                                    PAGE

District Court Docket Entries .......................................... A-1

Indictment, filed December 4, 2019 (Dkt. 1).......................... A-41

Excerpts of First Trial Transcript .................................... A-78

Government Memorandum of Law in Opposition to Defendant's
    Motions *in Limine* and Renewed Motion for Rule 17(c)
    Subpoenas, filed October 17, 2022 (Dkt. 226) ................... A-493

Government's Requests to Charge,
    filed October 20, 2022 (Dkt. 230)............................... A-566

Letter from U.S. Attorney's Office to the
    Honorable Edgardo Ramos,
    dated October 26, 2022 (Dkt. 238)............................. A-626

Letter from David Oscar Markus to the Honorable Edgardo Ramos
    re Ethan Cole, dated November 18, 2022 (Dkt. 247) (with
    attached email from Edward Y. Kim to David Oscar Markus) ..... A-630

Excerpts of Final Pre-Trial Conference Transcript,
    dated October 27, 2022 ....................................... A-632

Excerpts of Second Trial Transcript................................. A-648

**Government Exhibits**

GX 104      Iconix Brand Group, Inc. Form 8-K,
            dated October 24, 2014............................. A-1139

GX 105      Iconix Brand Group, Inc. Form 10-Q for the Quarterly
            Period Ended September 30, 2014 .................. A-1152

ii

PAGE

GX 207     Consultancy Agreement between Iconix Brand Group, Inc. and LF Centennial Limited, dated September 30, 2013 .......................................................... A-1190

GX 210     Letter Agreement between Iconix Brand Group, Inc. and LF Asia Limited, dated June 30, 2014............ A-1195

GX 212     Letter Agreement between Iconix Brand Group, Inc. et al. and Global Brands Group Asia Limited, dated September 17, 2014 ...................................... A-1199

GX 1044    Email from Mark J. Stevens to Nicholas C.A. Cook et al., dated June 25, 2014 ............................ A-1205

GX 1058    Email from Neil Cole to Seth Horowitz, dated August 14, 2014........................................ A-1405

GX 1068    Email from Ethan Cole to Jared Margolis, dated August 28, 2014 ................................... A-1407

GX 1091    Email from Lauren Gee to Robert Smits, dated September 11, 2014................................. A-1409

GX 1098    Email from John Reda to David Maslaton, dated September 26, 2014................................. A-1547

GX 1111    Email from Ethan Cole to Seth Horowitz, dated October 2, 2014..................................... A-1551

GX 1139    Email from Ethan Cole to Jared Margolis, dated December 1, 2014 ................................... A-1555

GX 1197    Email from Seth Horowitz to Neil Cole, dated April 13, 2015......................................... A-1557

GX 1255    Undated notes ...................................... A-1560

GX 1255-B  Metadata associated with GX 1255 ................. A-1561

GX 1335    Government summary exhibit, "Document Timeline" . A-1562

iii

PAGE

**Defense Exhibits**

DX 0303-A1    Iconix SE Asia Limited First Amended and Restated Shareholders Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1691

DX 0303-A2    Letter Agreement between Iconix Brand Group, Inc. and LF Asia Limited, dated June 30, 2014 . . . . . . . . . . . . A-1733

DX 0304-A2    Letter Agreement between Iconix Brand Group, Inc. et al. and Global Brands Group Asia Limited, dated September 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . . A-1737

DX 0304-A3    Iconix SE Asia Limited Second Amended and Restated Shareholders Agreement. . . . . . . . . . . . . . . A-1743

DX 0558    FASB Accounting Standards Codification 605-50-45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1790

DX 1140-U    Email from Neil Cole to Ericka Alford, dated September 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . A-1792

DX 2334    Stipulation re Jason Rabin, dated October 26, 2021 . . . A-1793

DX 3517-003    Notes re Ethan Cole attorney proffer, dated July 22, 2019 (not admitted at trial) . . . . . . . . . . . A-1795

DX 3517-004    Federal Bureau of Investigation FD-302 re Ethan Cole interview on July 29, 2019 (not admitted at trial) . . . . . A-1797

DX 3517-010    Notes re Ethan Cole, dated September 22, 2021 (not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1807

DX 3517-012    Notes re Ethan Cole, dated October 12, 2022 (not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1809

DX 3539-083    Federal Bureau of Investigation FD-302 re Seth Horowitz interview on February 11, 2020 (not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1810

iv

PAGE

Excerpts of Sentencing Transcript, dated October 10, 2023 . . . . . . . . . . . A-1814

Notice of Appeal, dated October 27, 2023 (COA Dkt. 1) . . . . . . . . . . . . . A-1819

| From: | Lauren Gee [lgee@iconixbrand.com] |
|---|---|
| Sent: | 9/11/2014 6:22:30 PM |
| To: | Robert Smits [robertsmits@globalbrandsgroup.com] |
| CC: | JaredMargolis@GlobalBrandsGroup.com; Seth Horowitz [shorowitz@iconixbrand.com]; Jason Schaefer [jschaefer@iconixbrand.com] |
| Subject: | Revised China Umbro/Lee Cooper Transaction Documents (SEA JV Amendment) |
| Attachments: | Blacklined A&R Shareholders Agreement 9.11.14.pdf; Blacklined Consideration Side Letter 9.11.14.pdf; Blacklined MLA Amendment No. 2 9.11.14.pdf; 101780130_8 (Iconix LF - Amendment 2 to Master License Agreement (GDC 9.....docx; 101780136_3 (Iconix LF - China (Umbro and Lee Cooper) Consideration Side....docx; 101780528_8 (Iconix SEA - 2nd Amended & Restated Shareholders Agreement ....docx |

Rob,

Attached please find revised drafts of the SEA JV amendment documents for China Umbro/Lee Cooper, together with blacklines marked against the prior drafts.  Please let me know if you have any additional comments or if your team is now signed off.

Best,
Lauren

_____

Lauren Gee
Iconix Brand Group, Inc.
1450 Broadway, 3rd Floor
New York, NY 10018
Tel: (212) 597-4731
lgee@iconixbrand.com
_____

**GOVERNMENT EXHIBIT 1091**
19 Cr. 869 (ER)

**A-1410**

GIBSON DUNN DRAFT – 089/11/14/14

# ICONIX SE ASIA LIMITED
# SECOND AMENDED AND RESTATED
# SHAREHOLDERS AGREEMENT

Amended and restated on AugustSeptember [___], 2014

THE SHARES REFERRED TO IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

33753303.5

ICON-043-00034620

TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS; OPERATION OF COMPANY......................................1
  Section 1.01      Definitions.........................................................................1
  Section 1.02      Incorporation; Name..........................................................8
  Section 1.03      Registered Office; Principal Office....................................8
  Section 1.04      Business Purpose...............................................................8
  Section 1.05      Shareholders......................................................................8
  Section 1.06      No Personal Liability.........................................................8
ARTICLE II SHAREHOLDINGS AND CAPITAL STRUCTURE.........................9
  Section 2.01      Capital Structure................................................................9
  Section 2.02      Loans..................................................................................9
ARTICLE III DISTRIBUTIONS...............................................................................9
  Section 3.01      Distributions......................................................................9
  Section 3.02      Tax Distributions.............................................................10
ARTICLE IV MANAGEMENT OF COMPANY.....................................................10
  Section 4.01      General Provisions Concerning Management..................10
  Section 4.02      Appointment of Directors.............................................1011
  Section 4.03      Resignation and Removal of Directors.........................1011
  Section 4.04      Administrative Manager..................................................11
  Section 4.05      Local Manager.................................................................11
  Section 4.06      Actions Requiring Unanimous Consent of all the Directors...........11
  Section 4.07      Shareholder Approval....................................................1314
  Section 4.08      Officers.............................................................................15
  Section 4.09      Board Meetings; Written Resolutions.............................15
  Section 4.10      Quorum; Voting............................................................1516
  Section 4.11      Company Minutes.............................................................16
ARTICLE V BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND
FINANCIAL MATTERS..........................................................................................16
  Section 5.01      Books and Records...........................................................16
  Section 5.02      Fiscal Year........................................................................17
  Section 5.03      Company Accounts...........................................................17
  Section 5.04      Classification as a Partnership; Tax Decisions............1718
ARTICLE VI TRANSFERS......................................................................................18
  Section 6.01      Transfers...........................................................................18
  Section 6.02      Share Certificates.............................................................18
  Section 6.03      Registration as a Shareholder.........................................19
  Section 6.04      Put and Call Options........................................................19
ARTICLE VII TERMINATION AND LIQUIDATION............................................22
  Section 7.01      Termination.......................................................................22
  Section 7.02      Effect of Termination....................................................2223
  Section 7.03      Winding Up......................................................................23
ARTICLE VIII INDEMNIFICATION.......................................................................23
  Section 8.01      Insurance...........................................................................23

*Current 30293237.7 30-Sep-13 01:44*
*33753303.5*

ICON-043-00034621

**A-1412**

**TABLE OF CONTENTS**

(continued)

| | | | Page |
|---|---|---|---|
| ARTICLE IX REPRESENTATIONS | | | 23 |
| Section 9.01 | General | | 23 |
| ARTICLE X MISCELLANEOUS | | | ~~24~~25 |
| SECTION 10.01 | Information | | ~~24~~25 |
| SECTION 10.02 | Notices | | 25 |
| SECTION 10.03 | Parties Bound; No Third Party Beneficiaries | | 25 |
| SECTION 10.04 | Governing Law; Submission to Jurisdiction | | ~~25~~26 |
| SECTION 10.05 | Amendment | | 26 |
| Section 10.06 | Entire Agreement | | 26 |
| Section 10.07 | Confidentiality | | 26 |
| SECTION 10.08 | Severability | | ~~26~~27 |
| SECTION 10.09 | Counterparts; Facsimile or Electronic Transmission | | ~~26~~27 |
| SECTION 10.10 | Construction | | 27 |
| SECTION 10.11 | Successors and Assigns | | ~~27~~28 |
| SECTION 10.12 | Headings and Captions | | ~~27~~28 |
| SECTION 10.13 | No Waiver | | ~~27~~28 |
| SECTION 10.14 | Additional Instruments | | ~~27~~28 |
| SECTION 10.15 | Publicity | | 28 |
| SECTION 10.16 | Remedies | | 28 |
| Section 10.17 | Specific Performance | | 28 |

EXHIBITS

| | |
|---|---|
| Exhibit "A" | BRANDS |
| Exhibit "B" | SHARES AND PERCENTAGE SHAREHOLDINGS |
| Exhibit "C" | FORM OF DEED OF ADHERENCE |
| Exhibit "D" | TAX ALLOCATIONS |
| Exhibit "E" | Definition of "Europe" |
| Exhibit "F" | Partial Exercise Plan |

Current 30293237.7 30-Sep-13 01:44
33753303.5

ICON-043-00034622

**ICONIX SE ASIA LIMITED**
**SECOND AMENDED AND RESTATED**

**SHAREHOLDERS AGREEMENT**

This SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT of Iconix SE Asia Limited (formerly known as Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 (the "***Company***"), originally effective as of September 30, 2013 (the "***Effective Date***"), as amended and restated effective as of June 30, 2014, and as further amended and restated effective as of ~~August~~September [__], 2014, by and between LF Asia Limited, a Hong Kong limited liability company ("***LF***"), and Iconix Brand Group, Inc., a Delaware corporation ("***Iconix***").

**R E C I T A L S:**

Iconix has caused the incorporation of the Company on September 10, 2013.

Iconix and LF entered into that certain Share Purchase Agreement pursuant to which LF purchased from Iconix one (1) Share in the Company, representing fifty percent (50%) of the issued share capital of the Company (such Share Purchase Agreement, as may be amended or modified from time to time, the "***Purchase Agreement***").

Iconix and LF were subsequently each allotted 49 Shares, giving them each 50 shares in total (being 50% of the Shares in the Company) ("***Initial Allotment***").

In connection with Iconix and LF's entry into the Purchase Agreement and the Initial Allotment, Iconix and LF entered into that certain Shareholders Agreement of Lion Network Limited, effective as of September 30, 2013, as amended and restated effective as of June 30, 2014 (the "***Previous Shareholders Agreement***") to reflect the respective rights, duties and obligations of the Shareholders with respect to the Company.

The parties hereto wish to amend and restate the Previous Shareholders Agreement to reflect the changes to the respective rights, duties and obligations of the Shareholders with respect to the Company in connection with the transactions contemplated pursuant to (a) that certain Amendment No. 2 to the Master License Agreement, effective as of ~~August~~September [__], 2014, by and among Iconix and the other Licensors named therein, and the Company and (b) that certain letter agreement by and between Iconix and LF, effective as of ~~August~~September [__], 2014.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

33753303.5

ICON-043-00034623

**A-1414**

**ARTICLE I**

**DEFINED TERMS; OPERATION OF COMPANY**

**Section 1.01**    Definitions.  Within the context of this Agreement, the following terms shall have the following meanings:

"***Accounting Standards***" has the meaning set forth in Section 5.01.

"***Adjusted CHMT Purchase Price***" has the meaning set forth in Section 6.04(b)(iii)(A).

"***Administrative Manager***" has the meaning set forth in Section 4.04.

"***Administrative Services Agreement***" means the Administrative Manager Services Agreement dated as of the date hereof by and between the Company and Iconix, as the same may be amended from time to time.

"***Affiliate***" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person.  For purposes of this definition, "control," "controlling," "controlled by" or "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Equity Securities, by Contract or otherwise.

"***Agreed Value***" has the meaning set forth in Section 6.04(b).

"***Agreement***" means this Second Amended and Restated Shareholders Agreement, effective as of ~~August~~September [__], 2014, amending and restating the Previous Shareholders Agreement, and as the same may be amended from time to time.

"***All Rights***" means, together, all of the Europe Rights, the Existing Rights, the Korea Rights, and the CHMT Rights.

"***Board***" means the board of directors of the Company as it is constituted at the relevant time.

"***Brands***" means, collectively, the Existing Brands (with respect to the Existing Territory), the Expanded Brands (with respect to the Expanded Territory), the New Licensed Brands (with respect to the New Territory), and the CHMT Brands (with respect to the CHMT Territory).

"***Business***" means (i) all consumer products including but not limited to the fashion, jewelry, eyewear, footwear, apparel, swimwear, outerwear, small leather goods and accessories, watches, food, fast moving consumer goods, home, fragrance and beauty lines of business and all accessories associated with all such lines of business, (ii) all lines of business reasonably

2

33753303.5

ICON-043-00034624

**A-1415**

related or ancillary thereto (including the establishment and operation of retail stores), and (iii) any other line of business approved by the Shareholders.

"***Business Day***" means a day, other than a Saturday or a Sunday, on which banks are open for business in each and all of the State of New York (United States of America) and Hong Kong.

"***Change of Control***" means (i) a change of control (including but not limited to by way of merger, consolidation or transfer of Equity Securities) of an entity, (ii) the direct or indirect sale by an entity of all or substantially all of its assets or (iii) any Person or group of Persons (other an Affiliate of such entity) becoming the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the outstanding Equity Securities of an entity.

"***CHMT Brands***" means the brand names, logos and word phrases listed in **Exhibit "A-2"** and any other brand names, logos and word phrases which the Company hereafter uses in the CHMT Territory in connection with the Business as approved by the Board.

"***CHMT Five-Year Call***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Five-Year Call Notice***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Five-Year Call Purchase Price***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Five-Year Put***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Five-Year Put/Call***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Five-Year Put/Call Notice***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Five-Year Put/Call Purchase Price***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Five-Year Put/Call Rights***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Five-Year Put Notice***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Five-Year Put Purchase Price***" has the meaning set forth in Section 6.04(b)(ii).

"***CHMT Put/Call Distribution***" has the meaning set forth in Section 3.01.

3

ICON-043-00034625

# A-1416

"*CHMT Rights*" means the rights granted to the Company under the Master License Agreement in respect of the CHMT Brands in the CHMT Territory.

"*CHMT Territory*" means the People's Republic of China, Hong Kong, Macau and Taiwan.

"*Communications*" has the meaning set forth in Section 10.02.

"*Companies Ordinance*" means the Companies Ordinance, chapter 622 of the laws of Hong Kong (and, to the extent it was relevant prior to 3 March 2014, the Companies Ordinance, chapter 32 of the laws of Hong Kong).

"*Company*" has the meaning set forth in the Preamble.

"*Company Account*" has the meaning set forth in Section 5.03.

"*Confidential Information*" means all confidential or proprietary information, knowledge, systems or data relating to the business, assets, prospects, operations, finances, policies, strategies, intentions or inventions of the Company or any of its Subsidiaries (including any of the terms of this Agreement) from whatever source obtained, subject to the terms of this Agreement.

"*Contract*" means any agreement, bond, commitment, contract, franchise, indemnity, indenture, lease, license, purchase order or other instrument of any kind, whether oral or written.

"*Deed of Adherence*" has the meaning set forth in Section 6.03.

"*Designated Costs*" has the meaning set forth in Section 4.06(a)(i).

"*Directors*" has the meaning set forth in Section 4.02.

"*Dividend Policy*" has the meaning set forth in Section 3.01.

"*Effective Date*" has the meaning set forth in the Preamble.

"*Electronic Transmission*" means any form of communication, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

4

33753303.5

ICON-043-00034626

"***Equity Securities***" means any share, any partnership interest, any limited liability company interest and any other ownership interest in an entity, including any options or warrants to purchase the foregoing and other securities convertible, exchangeable or exercisable into the foregoing.

"***Europe***" means, collectively, the countries listed on **Exhibit "E"**.

"***Europe Rights***" means the rights granted to the Company under the Master License Agreement in respect of the New Licensed Brands in the New Territory.

"***Existing Brands***" means the brand names, logos and word phrases listed in **Exhibit "A"** and any other brand names, logos and word phrases which the Company hereafter uses in the Existing Territory in connection with the Business as approved by the Board.

"***Existing Rights***" means the rights granted to the Company under the Master License Agreement in respect of the Existing Brands in the Existing Territory.

"***Existing Territory***" means Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.

"***Expanded Brands***" means the brand names, logos and word phrases listed in **Exhibit "A"** other than OP/Ocean Pacific and Umbro, and any other brand names, logos and word phrases which the Company hereafter uses in the Expanded Territory in connection with the Business as approved by the Board.

"***Expanded Territory***" means the Republic of Korea.

"***Five-Year Call***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Call Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Call Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Rights***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put Notice***" has the meaning set forth in Section 6.04(b)(i).

33753303.5

ICON-043-00034627

"***Five-Year Put Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Fully Exercised***" means one or more exercises of the Five-Year Put/Call, together with the exercise of the CHMT Five-Year Put/Call, which result in the acquisition by the Iconix Shareholder of All Rights, and "***Full Exercise***" shall be construed accordingly. In the case of a Full Exercise, the LF Shareholder shall sell all of its Shares in the Company to the Iconix Shareholder and closing thereof shall take place in accordance with the provisions of Section 6.04(e).

"***Governmental Authority***" means any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority.

"***HKIAC***" has the meaning set forth in Section 10.04.

"***Hong Kong***" means the Hong Kong Special Administrative Region of the People's Republic of China.

"***Iconix***" has the meaning set forth in the Preamble.

"***Iconix Directors***" has the meaning set forth in Section 4.02.

"***Iconix Luxembourg***" means Iconix Luxembourg Holdings S.ar.l.

"***Iconix Shareholder***" means Iconix, together with its Transferees, if any.

"***Korea Rights***" means the rights granted to the Company under the Master License Agreement in respect of the Expanded Brands in the Expanded Territory.

"***Law***" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

"***LF***" has the meaning set forth in the Preamble.

"***LF Directors***" has the meaning set forth in Section 4.02.

6

33753303.5

ICON-043-00034628

"*__LF Shareholder__*" means LF, together with its Transferees, if any.

"*__Local Manager__*" has the meaning set forth in Section 4.05.

"*__Local Services Agreement__*" means the Local Manager Services Agreement dated as of the date hereof by and between the Company and LF, as the same may be amended from time to time.

"*__Macau__*" means the Macau Special Administrative Region of the People's Republic of China.

"*__Master License Agreement__*" means the Master License Agreement, effective as of September 30, 2013, by and among the Company, Iconix and the Licensors (as defined therein), as amended by Amendment No. 1 to Master License Agreement, effective as of June 30, 2014, as further amended by Amendment No. 2 to Master License Agreement, effective as of ~~August~~September [___], 2014 and as the same may be amended from time to time.

"*__New Licensed Brands__*" means the brand names, logos and word phrases listed in **Exhibit "A-1"** and any other brand names, logos and word phrases which the Company hereafter uses in the New Territory in connection with the Business as approved by the Board.
"*__New Territory__*" means Europe and Turkey.

"*__Other License Agreement__*" means any license or similar agreement by and between the Company or one of its Subsidiaries and another Person granting such Person rights to use the Brands in the Territory.

"*__Partial Exercise__*" means an exercise of the Five-Year Put/Call and/or the CHMT Five-Year Put/Call which does not result in a Full Exercise. In the case of a Partial Exercise, the Company shall relinquish whichever is relevant of the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights in favour of the Iconix Shareholder through amendment to the Master License Agreement, and closing thereof shall take place in accordance with the provisions of Section 6.04(d) and notwithstanding that such transaction is between the Company and the Iconix Shareholder, the Five-Year Put/Call Price and/or the CHMT Five-Year Put/Call Price in the case of a Partial Exercise will be paid by the Iconix Shareholder to the LF Shareholder pursuant to Section 6.04(d).

"*__Partial Exercise Plan__*" means the plan to be implemented in the context of a Partial Exercise, consistent with the principles set out in **Exhibit "F"**.

"*__Percentage Shareholding__*" means the percentage determined in accordance with Section 2.01(b).

"*__Permitted Parent Change of Control__*" means (i) a Change of Control of, in the case of the Iconix Shareholder, Iconix and, in the case of the LF, Global Brands Group Limited.

7

33753303.5

ICON-043-00034629

"**_Person_**" means any individual or any partnership, corporation, estate, trust, company or other legal entity.

"**_Previous Shareholders Agreement_**" has the meaning set forth in the Recitals.

"**_Purchase Agreement_**" has the meaning set forth in the Recitals.

"**_RD Brands_**" means the brand names, logos and word phrases listed in **Exhibit "A-3"**.

"**_Red Diamond_**" means Red Diamond Holdings S.ar.l.

"**_Securities Act_**" means the Securities Act of 1933, as amended, or any similar federal statute then in effect, and any reference to a particular section thereof shall include a reference to the comparable section, if any, of any such similar federal statute, and the rules and regulations promulgated thereunder.

"**_Share_**" means a share in the Company.

"**_Shareholders_**" means the Iconix Shareholder and the LF Shareholder.

"**_Share Certificate_**" has the meaning set forth in Section 2.01(c).

"**_Subsidiary_**" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (i) of which such Person or any other subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any subsidiary of such Person do not have a majority of the voting interests in such partnership) or (ii) at least fifty percent (50%) of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries, or by such Person and one or more of its subsidiaries.

"**_Taiwan_**" means the Republic of China.

"**_Territory_**" means, collectively, the Existing Territory (with respect to the Existing Brands), the Expanded Territory (with respect to the Expanded Brands), the New Territory (with respect to the New Licensed Brands) and the CHMT Territory (with respect to the CHMT Brands).

"**_Transfer_**" means to sell, convey, transfer, syndicate, assign, mortgage, pledge, hypothecate or otherwise encumber or dispose of in any way, including by operation of law or

8

33753303.5

ICON-043-00034630

otherwise, any Shares, or any Change of Control of the Company. The Person who is transferring Shares shall be referred to as the "*Transferor*" and the Person who is acquiring the Shares shall be referred to as the "*Transferee*."

"***Two-Year Call***" has the meaning set forth in Section 6.04(a).

"***Two-Year Call Notice***" has the meaning set forth in Section 6.04(a).

"***Two-Year Call Purchase Price***" has the meaning set forth in Section 6.04(a).

"***Two-Year Call Shares***" has the meaning set forth in Section 6.04(a).

"***Year***" means the tax and financial accounting period specified in Section 5.02.

**Section 1.02** Incorporation; Name. The Company was incorporated by the filing of the form of incorporation with the Companies Registry of Hong Kong. A certificate of incorporation was issued by the Companies Registry of Hong Kong on September 10, 2013. The Shareholders hereby confirm the incorporation of the Company as a company with limited liability under and pursuant to the provisions of the Companies Ordinance. Whenever the terms of this Agreement conflict with the provisions of the articles of association of the Company, the terms of this Agreement shall prevail. Accordingly, the parties hereto shall exercise their respective voting and other rights as holders of Shares to procure that the articles of association of the Company are amended to remove any conflict.

**Section 1.03** Registered Office; Principal Office. The registered office of the Company required under the Companies Ordinance shall be as designated in the incorporation form filed with the Companies Registry, and may be changed by the Board in accordance with the Companies Ordinance. The principal business office of the Company shall be located at the principal business office of the Local Manager, or such other address as shall be designated by the Board.

**Section 1.04** Business Purpose. The Company has been formed for the purpose of engaging, directly or through its Subsidiaries, in the following activities: (i) developing, exploiting and promoting the Brands licensed to the Company pursuant to the Master License Agreement or another Contract in the Territory by way of a license, sublicense or otherwise relating to the Business in exchange for royalty payments, and/or other consideration, (ii) purchasing or licensing third party Brands for the purposes of developing them in the Territory; (iii) engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing; (iv) engaging in other similar business opportunities as agreed to by both of the Shareholders and (v) unless otherwise agreed by the Shareholders, adopting a business model that is in accordance with the then-approved business plan and is asset light, working capital light and with an EBITDA margin of not less than 75%. References in this Agreement to the

9

33753303.5

ICON-043-00034631

**A-1422**

"ordinary course of business" shall be construed in conjunction with the business purpose set out in this Section 1.04.

**Section 1.05**    Shareholders.    The name, number of Shares and Percentage Shareholding held by each Shareholder is set forth on **Exhibit "B"**, as the same may be amended from time to time in accordance with this Agreement.

**Section 1.06**    No Personal Liability.    Except as provided by the applicable Law, no Shareholder or any Director shall be personally liable for any obligations of the Company and no Shareholder shall have any obligation or be required to make any loan or otherwise advance any funds to the Company other than as provided in Section 2.01(d) or 2.01(e).

## ARTICLE II

## SHAREHOLDINGS AND CAPITAL STRUCTURE

**Section 2.01**    Capital Structure.

(a)    Shareholdings.    The initial shareholdings of the Shareholders (after giving effect to the purchase transaction contemplated by the Purchase Agreement) are set forth on **Exhibit "B"** attached hereto.

(b)    Percentage Shareholding.    Each Shareholder shall have the Percentage Shareholding in the Company determined by dividing the number of Shares owned by such Shareholder by the total number of issued Shares.    The Percentage Shareholding of each Shareholder (after giving effect to the purchase transaction contemplated by the Purchase Agreement) shall be set forth next to such Shareholder's name on **Exhibit "B"** attached hereto.

(c)    Share Certificates.    Upon the request of any Shareholder, a share certificate (each, a "***Share Certificate***") issued by the Company in accordance with the provisions of the articles of association of the Company shall evidence the Shares in the Company held by such requesting Shareholder.

(d)    New Allotment of Shares.    *(Omitted as spent).*

(e)    Further Subscription for Shares.    In the event that the Company is to pay any Future Mark Acquisition Consideration (as defined in the Master License Agreement) or any Jointly Owned Mark Acquisition Consideration (as defined in the Master License Agreement) under the Master License Agreement, the Shareholder will subscribe for new Shares, in accordance with their Percentage Shareholding, in order to put the Company in funds to pay the relevant Future Mark Acquisition Consideration or any Jointly Owned Mark Acquisition Consideration (as the case may be), with subscription price therefor being set by the Directors, and the Shareholders will pass such resolutions and procure that the Directors pass such resolutions as are necessary to give effect to the provisions of this Section 2.01(e).

10

33753303.5

ICON-043-00034632

**Section 2.02   Loans**.  Without in any way limiting the authority of the Board to cause the Company to borrow funds from an unaffiliated third party (instead of, or in addition to, any loan(s) of the type contemplated by this Section 2.02), any Shareholder or Affiliate of a Shareholder may, with the consent of all the Directors, lend or advance money to the Company; provided, that such loan shall be on terms and conditions not less favorable than those available from unaffiliated third parties for similar loans (unless otherwise unanimously agreed by the Directors).

## ARTICLE III

## DISTRIBUTIONS

**Section 3.01**   Distributions.  At such times as the Board determines is in the best interest of the Company and the Shareholders, the Company shall pay dividends or make other distributions to the Shareholders in proportion to their Percentage Shareholdings.  The Shareholders agree that, to the extent practicable and permitted by any applicable Law and regulation, unless otherwise agreed by the Shareholders, the dividend policy of the Company shall be to distribute the maximum amount of distributions allowed by the Companies Ordinance (the "***Dividend Policy***").  Notwithstanding anything to the contrary contained herein, promptly following the delivery of a CHMT Five-Year Put Notice or CHMT Five-Year Call Notice and in any event prior to the closing of the CHMT Five-Year Put/Call, the Company shall make a distribution (the "***CHMT Put/Call Distribution***") in cash to the Iconix Shareholder in an amount equal to the lesser of (i) the amount of cash in the Company and (ii) the sum of (w) the amount, if any, by which distributions accrued or made to the LF Shareholder in respect of the CHMT Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2014 were lower than $1,500,000, *plus* (x) the amount, if any, by which distributions accrued or made to the LF Shareholder in respect of the CHMT Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2015 were lower than $3,000,000, *plus* (y) the amount, if any, by which distributions accrued or made to the LF Shareholder in respect of the RD Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2016 were lower than $300,000, *plus* (z) the amount, if any, by which distributions accrued or made to the LF Shareholder in respect of the RD Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2017 were lower than $335,000.

**Section 3.02**   Tax Distributions.  Upon Iconix's reasonable request, and subject to such dividend being lawfully permitted, the Board shall cause the Company to distribute to each Shareholder in respect of each Year, an amount of cash which equals (i) the amount of taxable income allocable to the Shareholder in respect of such Year, multiplied by (ii) the combined maximum individual United States federal and state income tax rate attributable to such taxable income (determined as if all Shareholders were residents of the State of New York and taking into account (i) the deductibility of state income taxes for United States federal income tax purposes) and (ii) the amount of taxable losses previously allocated to such Shareholders in prior fiscal years (and not used in prior fiscal years to reduce taxable income for the purpose of making distributions under this Section 3.02).  Such distributions based upon estimates of the taxable income for the year may be made on a quarterly or other basis as shall be determined by Iconix (in its sole discretion).  All amounts so distributed shall be treated as

11

33753303.5

ICON-043-00034633

amounts distributed to the Shareholder pursuant to Section 3.01 of this Agreement, depending on the source of the item that generated such taxable income, and shall be reduced by any amounts withheld for taxes with respect to the Shareholder pursuant to Section 3.01.

ARTICLE IV

## MANAGEMENT OF COMPANY

**Section 4.01** General Provisions Concerning Management. Subject to the provisions hereof, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board. The Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company described herein, including all powers, statutory or otherwise, possessed by directors of a company with limited liability incorporated under the laws of Hong Kong. Except as otherwise required by law, approval of any action by the Board in accordance with this Agreement and the articles of association of the Company shall constitute approval of such action by the Company.

**Section 4.02** Appointment of Directors. The Company shall have four Directors, two (2) of whom shall be Persons designated by LF and its Transferees, if any (the "***LF Directors***"), and two (2) of whom shall be Persons designated by Iconix and its Transferees, if any (the "***Iconix Directors***," and together with the LF Directors, the "***Directors***"). The initial LF Directors shall be Jason Rabin and David Thomas and the initial Iconix Directors shall be Neil Cole and Jeff Lupinacci.

**Section 4.03** Resignation and Removal of Directors. Each Director shall serve until death, dissolution, resignation or removal, in accordance with this Agreement and the articles of association of the Company. A Director may resign at any time upon giving written notice of resignation to the Company. A Director may be removed at any time with or without cause only by the Shareholder who appointed such Director (*e.g.*, an Iconix Director can only be removed by Iconix). If a Director ceases to serve as a Director at any time for any reason, the resulting vacancy shall be filled by a Person designated by the Shareholder whose designee created the vacancy.

**Section 4.04** Administrative Manager. Subject to the provisions of the Administrative Services Agreement, Iconix, as Administrative Manager (the "***Administrative Manager***") shall have the responsibilities and provide to the Company the services referred to therein.

**Section 4.05** Local Manager. Subject to the provisions of the Local Services Agreement, LF, as Local Manager (the "***Local Manager***") shall have the responsibilities and provide to the Company the services referred to therein.

**Section 4.06 Actions Requiring Unanimous Consent of all the Directors**.

(a) Notwithstanding any provision of this Agreement, subject to Section 4.07, approval of the following actions shall require the unanimous consent of all the Directors:

12

33753303.5

ICON-043-00034634

(i)    approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the costs and expenses (including those payable under the Administrative Services Agreement and the Local Services Agreement) associated with the ongoing operations of the Company (the "***Designated Costs***") pursuant to such annual business and development plan and annual budget are less than twenty percent (20%) of net revenue projected in such annual business and development plan and annual budget; <u>provided</u> that, if the actions in this clause (i) are to be taken by the Iconix Directors, the Iconix Directors shall consult with the LF Directors, in good faith, regarding such proposed annual business and development plan and annual budget, and take into consideration any comments or proposed changes recommended by the LF Directors;

(ii)    approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the Designated Costs pursuant to such annual business and development plan and annual budget are twenty percent (20%) or greater of net revenue projected in such annual business and development plan and annual budget;

(iii)    any change in the scope or nature of the business or activities of the Company or any or any of its Subsidiaries;

(iv)    appointment or removal of, entry into an employment agreement with or approval of any delegation of or change to the authority or responsibilities of any officer of the Company or any of its Subsidiaries, or approval of the terms and conditions of employment of any officer or employee of the Company or any of its Subsidiaries or any change thereto provided that, if the actions in this clause (iv) are to be taken by the Iconix Directors, (A) at least thirty (30) days prior to taking any such action the Iconix Directors shall have provided the LF Directors with, as applicable, identity of any individual proposed to be appointed or removed, the employment history of and references for any potential officer, a detailed summary of the terms of any proposed employment agreement, a summary of the reasons for any delegation or change in the authority or responsibilities of any officer and/or a summary of any terms and conditions of employment proposed to be approved, and shall have consulted with the LF Directors, in good faith, regarding such proposed action and taken into consideration any comments or proposed changes recommended by the LF Directors, and (B) the Iconix Directors shall not hire any new officer unless the position for such officer was included in the then current annual business and development plan and annual budget;

(v)    with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries in the ordinary course of business;

(vi)    with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries outside the ordinary course of business;

13

ICON-043-00034635

(vii)    incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business ;

(viii)    incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) outside the ordinary course of business or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business;

(ix)    lending any money (except deposits with banks or other institutions) by the Company or any of its Subsidiaries;

(x)    entry into any Contract by the Company or any of its Subsidiaries outside the ordinary course of business;

(xi)    commencement or settlement by the Company or any of its Subsidiaries of any legal action, arbitration proceeding, mediation or other dispute resolution other than in the ordinary course of business;

(xii)    adopting or amending any employee benefit or equity plan of the Company or any of its Subsidiaries;

(xiii)    appointment or removal of auditors of the Company or any of its Subsidiaries;

(xiv)    subject to Section 4.06(a)(xv), changing the accounting policies of the Company or any of its Subsidiaries or of the Year of the Company or any of its Subsidiaries;

(xv)    changing the accounting policies of the Company or any of its Subsidiaries by reason of being compelled to do so by reason of changes to IFRS and/or GAAP;

(xvi)    giving of any guarantee or indemnity of the Company or any of its Subsidiaries;

(xvii)    assignment of any debts of the Company or any of its Subsidiaries;

(xviii)    transfer, disposal or creation of any security interest in property of the Company or any of its Subsidiaries;

(xix)    entry into any Other License Agreement, or amendment, modification, termination of the Master License Agreement or any existing Other License Agreement;

(xx)    approving of the creation or acquisition of any Subsidiaries and the adoption of governance agreements or arrangements in respect thereof, or any other investment in, or the acquisition of stocks or bonds of, other Persons or any Equity Securities in any other

14

33753303.5

ICON-043-00034636

Person; <u>provided</u>, that there shall be no limitation on the Board's authority to delegate, in a manner mutually acceptable to the Board, the making of investments as part of cash management in the ordinary course of business of the Company;

        (xxi)   any Transfer of Shares in the Company; and

        (xxii)  authorizing an officer, an employee or any other individual to approve disbursements on behalf of the Company;

<u>provided</u>, that upon and subsequent to any exercise of the Call Option (as defined herein) pursuant to Section 6.04, the actions in clauses (i), (iv), (v), (vii), (ix), (xv) and (xxii) of this Section 4.06(a) shall be taken by the Iconix Directors in their sole discretion (after reasonable, good faith consultation with the LF Directors), notwithstanding, for the avoidance of doubt, Section 4.08 of this Agreement.

        (b)     The parties acknowledge and agree that any and all decisions or actions by the Company with respect to an agreement between the Company and a Shareholder or Affiliate of a Shareholder relating to: (i) the exercise or enforcement of the Company's rights thereunder; (ii) any amendments or waivers thereto; or (iii) any approvals required or requests made thereunder shall be taken by the Directors designated by the other Shareholder in their sole discretion.

        (c)     Subsequent to the exercise of the Call Option (as defined herein), the Iconix Directors will consult in good faith with the LF Directors prior to taking any actions outside of the ordinary course of business and take into consideration any comments or proposed changes recommended by the LF Directors.

        (d)     The Iconix Directors shall not take any action in their sole discretion if such action would reasonably be expected to have a materially adverse effect on the value of the Shares held by the LF Shareholder, taking into consideration the existence of the Five Year Put/Call unless the Shareholders mutually agree that any such action is in the best interests of the Company.

    **Section 4.07**   Shareholder Approval.  Notwithstanding any provision of this Agreement, approval of any of the following shall require unanimous approval by all of the Shareholders:

        (a)     admission of any Person (whether by subscription or transfer) as a shareholder of the Company or any of its Subsidiaries;

        (b)     grant of, or entry into an agreement to grant, any option, pledge or other encumbrance in respect of the Shares or of any other Equity Securities of the Company or any of its Subsidiaries;

        (c)     except as provided under ARTICLE III or Section 6.04, declaration, payment or approval by the Company or any of its Subsidiaries of any repurchase or redemption of the Company's or any of its Subsidiaries' securities or any dividend or other distribution to

33753303.5

ICON-043-00034637

**A-1428**

the Shareholders or to the members or shareholders of any of the Company's Subsidiaries (other than Subsidiaries wholly owned by the Company or any of its Subsidiaries);

(d)  delegation of any powers or responsibilities by the Board or Directors other than to an individual or a committee of individuals designated with the unanimous consent of the Directors or to officers pursuant to Section 4.08;

(e)  change of the number of Directors or the number of directors of any Subsidiary of the Company;

(f)  removal of a Director other than by the Shareholder that designated or nominated such Director or removal of a director of any of the Company's Subsidiaries;

(g)  the entering into by the Company or any of its Subsidiaries of any Contract outside the ordinary course of business;

(h)  participation in, termination of or any other actions taken by the Company or any of its Subsidiaries with respect to any venture, partnership or joint venture, or acquisition or disposal of shares or other equity interests in another Person or the acquisition of the business or assets of another Person;

(i)  entry into any transaction by the Company or any Subsidiary of the Company with any Shareholder or any Affiliate of any Shareholder (including entering into any loans between any Shareholder or any Affiliate of any Shareholder and the Company, but not including entering into the Master License Agreement);

(j)  increase or decrease the issued share capital or (as applicable) the authorized share capital or maximum number of shares, in each case of the Company or any of its Subsidiaries;

(k)  reclassification of securities of the Company or any of its Subsidiaries (including any subdivision or consolidation of shares) or recapitalization of the Company or any of its Subsidiaries;

(l)  entry into any merger, amalgamation or consolidation of the Company or any of its Subsidiaries with another Person;

(m)  a resolution for winding up, the termination or dissolution of, or the entering into of bankruptcy, insolvency or receivership by, the Company or any of its Subsidiaries;

(n)  sale or disposal of all of the Shares or all or any substantial part of the Company's or any of its Subsidiaries' business or assets;

(o)  change of the name of the Company or any of its Subsidiaries;

16

33753303.5

ICON-043-00034638

(p)     amendment or modification of the Company's or any of its Subsidiaries' memorandum of association or articles of association or other organizational documents (as applicable);

(q)     reorganization of the Company or any of its Subsidiaries; and

(r)     a private or public issuance or offering for sale of any securities of the Company or any of its Subsidiaries or the listing on any exchange of any securities of the Company or any of its Subsidiaries.

**Section 4.08**     Officers.  Subject to the limitations set forth in Section 4.06, the Board shall have the authority to establish such officers of the Company as they shall determine, and to appoint individuals to serve as such officers, including chairman, chief executive officer, one or more vice presidents, secretary, assistant secretary, treasurer and assistant treasurer.  An individual may hold more than one office at any time.

**Section 4.09**     Board Meetings; Written Resolutions.  Board meetings may be called by any Director.  The Board shall meet not less than once every three (3) months.  Any Director may participate in a Board meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear and speak to each other at the same time or in sequence, and participation in a Board meeting pursuant to this provision shall constitute presence at the meeting; provided, that at least one of such Board meetings per year shall be held in person at a location to be unanimously determined by the Directors.  All meetings of the Board shall be called on not less than three (3) Business Days' prior notice.  All actions required or permitted to be taken by the Board may also be approved by the execution of a written resolution executed by all the Directors, and any such written resolution may be executed in counterparts.

**Section 4.10**     Quorum; Voting.

(a)     A quorum must exist at all times of a Board meeting, including the reconvening of any Board meeting that has been adjourned, for any action taken at such Board meeting to be valid.

(b)     Except as otherwise specified in this Agreement:

(i)     a quorum shall be constituted at a Board meeting only if at least one (1) LF Director and one (1) Iconix Director are present; and

(ii)     all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, which majority must include at least one (1) LF Director and one (1) Iconix Director.

(c)     Upon and subsequent to the closing of any Two-Year Call pursuant to Section 6.04:

17

33753303.5

ICON-043-00034639

(i)      a quorum shall be constituted at a meeting if a majority of the Directors is present, regardless of the identity of the Directors comprising such majority; and

(ii)      all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, regardless of the identity of the Directors comprising such majority.

**Section 4.11   Company Minutes**.  The decisions and resolutions of the Board shall be reported in minutes, which shall state the date, time and place of the meeting (or the date of the written resolution in lieu of meeting), the Directors present at the meeting, the resolutions put to a vote (or the subject of a written resolution) and the results of such voting (or written resolution).  The minutes shall be entered in a minute book kept at the registered office of the Company and a copy of the minutes shall be provided upon request to each Director.

**ARTICLE V**

**BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL MATTERS**

**Section 5.01**      Books and Records.  The Administrative Manager shall procure that accurate, full and complete books and records of the Company are maintained, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business and affairs.  Such books and records initially shall be prepared and maintained by the Administrative Manager; and, at such time as the Board determines, such books and records shall be prepared and maintained by employees of the Company.  Such books and records shall include a clear statement of royalty generated by the Company under the Master License Agreement and Other Agreements, and broken down as between the Europe Rights, the Existing Rights, the Korea Rights and the CHMT Rights and the Administrative Manager shall provide such information to the LF Shareholder within as soon as reasonably practicable following the LF Shareholder's request to provide such information. Upon request in writing, each Shareholder and its duly authorized representative shall have access to inspect and copy any of such books and records at all reasonable times during normal business hours.  The Company shall deliver or cause to be delivered to each Shareholder consolidated financial statements (all of which shall be prepared in accordance with the financial reporting standards and interpretations (including: (a) Hong Kong Financial Reporting Standards; (b) Hong Kong Accounting Standards; and (c) Interpretations) issued by the Hong Kong Institute of Certified Public Accountants applied on a consistent basis (the "***Accounting Standards***")), as follows: (i) as soon as available (but in any event not later than twenty (20) days after the end of each quarter), a consolidated balance sheet as at the end of such quarter and the related consolidated statements of income and cash flows for such quarter and for the period from the beginning of the current calendar year (i.e., the calendar year in which such quarter falls) to the end of such quarter, setting forth, in each case, in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the current calendar year; and (ii) as soon as available (but in any event not later than one hundred twenty (120) days after the end of each calendar year), a consolidated balance sheet as at the end of such calendar year and the related consolidated statements of income, cash flows and stockholders', members' or other owners'

18

33753303.5

ICON-043-00034640

**A-1431**

equity for such calendar year, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the calendar year covered by such financial statements. The Company shall also deliver to each Shareholder upon request copies of any reports or statements the Company receives from its third party licensees. The financial statements to be provided under this Agreement shall not be required to be audited unless required by applicable Law or so requested by either Shareholder.

**Section 5.02** Fiscal Year. The year of the Company for tax and financial accounting purposes ("*Year*") shall end on the last day of the month of December, unless a different year end is approved in accordance with Section 4.07

**Section 5.03 Company Accounts**. All receipts, funds and income of the Company shall be deposited in the name of the Company in a bank account of a commercial bank, savings and loan association or other financial institution (the "***Company Account***") as the Local Manager shall determine. Withdrawals from the Company Account shall be made on the signature of (a) an officer of the Administrative Manager or such other Person as shall be designated by the Administrative Manager and (b) an officer of the Local Manager or such other Person as shall be designated by the Local Manager; provided that no withdrawal from the Company Account shall be made (i) with respect to any expense subject to the Directors' or the Shareholders' approval rights pursuant to Section 4.06 or Section 4.07, respectively, until such approval has been obtained, or (ii) for the purpose of making any payment to a Director or an Affiliate of a Director or any distribution to the Shareholders unless the amount of such payment or distribution is in accordance with ARTICLE III or has been approved by the Shareholders. There shall be no commingling of the moneys and funds of the Company with moneys and funds of the Administrative Manager, the Local Manager or any other entity or Person.

**Section 5.04 Classification as a Partnership; Tax Decisions**. The Company shall elect within 75 days of its formation to be taxable as a partnership for United States federal income tax purposes, pursuant to Treasury Regulation Section 301.7701-3(b)(1)(i) by having each Shareholder sign Form 8832 as prepared by Iconix. During such time as the Company would be classified as a partnership under the foregoing sentence, neither the Company nor any Shareholder shall take any action that would result in the Company being taxed as other than a "partnership" for United States federal income tax purposes, including, but not limited to, electing to be taxed as other than a "partnership" by filing Internal Revenue Service Form 8832, "Entity Classification Election" without the prior written consent of all of the Shareholders. All elections required or permitted to be made by the Company and all other tax decisions and determinations relating to United States federal, state, local or foreign tax matters shall be made by the Board, in consultation with the Company's attorneys and/or accountants as the Board deems necessary or advisable. For U.S. federal income tax purposes, income of the Company shall be allocated in accordance with the provisions of **Exhibit "D"**.

33753303.5

ICON-043-00034641

**A-1432**

**ARTICLE VI**

**TRANSFERS**

**Section 6.01** Transfers. Except as expressly provided in this **ARTICLE VI**, (i) no Shareholder may directly or indirectly Transfer any or all of its Shares or any right or interest therein; (ii) any direct or indirect offer to Transfer, or any attempted or purported Transfer of, any Shares in violation of any of the provisions of this Agreement shall be void *ab initio*; (iii) the Company shall reject and refuse to register on its books the Transfer of any Shares which are purported to have been transferred otherwise than in compliance with the provisions of this Agreement; and (iv) and the Company shall not recognize any Person receiving any Shares as a shareholder of the Company, nor shall any Person have any rights as a shareholder of the Company, unless the Transfer of Shares to such Person shall have been made pursuant to the terms of this Agreement. Notwithstanding any provisions of this Agreement, a Shareholder may Transfer all (but not some only) of its Shares (a) pursuant to a Permitted Parent Change of Control or (b) to any Affiliate of such Shareholder, provided that if such Affiliate at any time no longer constitutes an Affiliate of Iconix or LF, as applicable, any such Shares transferred to such Affiliate shall immediately be transferred to Iconix or LF, as applicable, or one of their respective Affiliates.

**Section 6.02** Share Certificates.

(a) Each Share Certificate issued to a Shareholder pursuant to Section 2.01(c) shall have the following legend conspicuously written, printed, typed or stamped on its face, or upon the reverse with a conspicuous reference to such legend on its face:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF THE SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT OF ICONIX SE ASIA LIMITED, EFFECTIVE AS OF ~~AUGUST~~SEPTEMBER [___], 2014, AS IT MAY BE AMENDED FROM TIME TO TIME (THE "SHAREHOLDERS AGREEMENT"), INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN.

THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS, IN RELIANCE UPON APPLICABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE AND FOREIGN SECURITIES LAWS. THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE. THE SHARES MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION

20

33753303.5

ICON-043-00034642

REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE MUST COMPLY WITH THE OTHER TRANSFER RESTRICTIONS SET FORTH IN THE SHAREHOLDERS AGREEMENT."

(b)     Upon the sale of any Shares pursuant to (i) an effective registration statement under the Securities Act or pursuant to Rule 144 under the Securities Act or (ii) another exemption from registration under the Securities Act or upon the termination of this Agreement, the Share Certificates representing such Shares shall be replaced, at the expense of the Company, with certificates or instruments not bearing the legends required by this Section 6.02; provided that the Company may condition such replacement of certificates under clause (ii) upon the receipt of an opinion of securities counsel reasonably satisfactory to the Company.

(c)     In case of loss or destruction of a Share Certificate, no new Share Certificate shall be issued in lieu thereof except upon satisfactory proof to the Company of such loss or destruction, and upon the giving to the Company of satisfactory security against loss by bond or otherwise. Any such new Share Certificate shall be plainly marked "Duplicate" upon its face.

**Section 6.03**     Registration as a Shareholder.  Except as provided in Section 6.01 and Section 6.04, no Person other than the LF Shareholder and the Iconix Shareholder shall be registered in the register of shareholders of the Company as a shareholder of the Company without the prior written unanimous consent of the Board and the Shareholders.  If the LF Shareholder or the Iconix Shareholder proposes to transfer Shares to an Affiliate, it shall be a condition to the transfer that such Affiliate shall execute and deliver a deed of adherence in substantially the form attached hereto as **Exhibit "C"** (the "***Deed of Adherence***") pursuant to which such Transferee shall agree to be legally bound by this Agreement.  Except as otherwise set forth herein, the Affiliate to which Shares are transferred shall pay all costs and expenses incurred by the Company in connection with such admission.

**Section 6.04**     Put and Call Options.

(a)     Two-Year Call Option.  For the six- (6-) month period following the second (2nd) anniversary of the Effective Date, the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder and the Company (a "***Two-Year Call Notice***") to initiate the purchase by the Iconix Shareholder of five percent (5%) of the total Shares in issue (the "***Two-Year Call Shares***") at a purchase price (the "***Two-Year Call Purchase Price***") in cash equal to 10% multiplied by 115% multiplied by the sum of (i) the Purchase Price (as defined in the Purchase Agreement) paid or payable by LF to Iconix pursuant to the Purchase Agreement, *plus* (ii) $10,917,500 (such purchase initiated by a Two-Year Call Notice, a "***Two-Year Call***"), *plus* (iii) the Adjusted CHMT Purchase Price.  The Company shall pay an interim dividend in accordance with the Dividend Policy of the Company, to be calculated up to the day before closing of the Two Year Call.  LF agrees that following the closing of the Two-Year Call, LF has no objection to Iconix being able to consolidate the results of the Company into its own financial results.

21

33753303.5

ICON-043-00034643

(b)     Five-Year Put/Call Option.

(i)     For the six- (6-) month period following the fifth (5th) anniversary of the Effective Date (and, if a Five-Year Put/Call has not previously been Fully Exercised, for the six- (6-) month period following the eighth (8th) anniversary of the Effective Date), (i) the LF Shareholder may deliver an irrevocable written notice of election to the Iconix Shareholder and the Company (a "***Five-Year Put Notice***") to initiate the acquisition by the Iconix Shareholder of the Europe Rights, the Existing Rights and/or the Korea Rights (the "***Five-Year Put/Call Rights***") at a purchase price (the "***Five-Year Put Purchase Price***") in cash equal to the aggregate Agreed Value (as defined herein) (such purchase initiated by a Five-Year Put Notice, a "***Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder (a "***Five-Year Call Notice***," and each of the Five-Year Put Notice and the Five-Year Call Notice, a "***Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder of the Five-Year Put/Call Rights at a purchase price (the "***Five-Year Call Purchase Price***," and each of the Five-Year Put Purchase Price and the Five-Year Call Purchase Price, the "***Five-Year Put/Call Purchase Price***") in cash equal to 120% of the aggregate Agreed Value (such purchase initiated by a Five-Year Call Notice, a "***Five-Year Call***" and each of a Five-Year Put and a Five-Year Call, a "***Five-Year Put/Call***").  Prior to the closing of the Five-Year Put/Call pursuant to Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the Company shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to LF under the Local Services Agreement and pay all fees owing and accrued to Iconix under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the Five-Year Put/Call.

(ii)     For the six- (6-) month period following the fifth (5th) anniversary of the Effective Date, (i) the LF Shareholder may deliver an irrevocable written notice of election to the Iconix Shareholder and the Company (a "***CHMT Five-Year Put Notice***") to initiate the acquisition by the Iconix Shareholder (or Iconix Luxembourg and Red Diamond) of the CHMT Rights (the "***CHMT Five-Year Put/Call Rights***") at a purchase price (the "***CHMT Five-Year Put Purchase Price***") in cash equal to the aggregate Agreed Value (such purchase initiated by a CHMT Five-Year Put Notice, a "***CHMT Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder (a "***CHMT Five-Year Call Notice***," and each of the CHMT Five-Year Put Notice and the CHMT Five-Year Call Notice, a "***CHMT Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder (or Iconix Luxembourg and Red Diamond) of the CHMT Five-Year Put/Call Rights at a purchase price (the "***CHMT Five-Year Call Purchase Price***," and each of the CHMT Five-Year Put Purchase Price and the CHMT Five-Year Call Purchase Price, the "***CHMT Five-Year Put/Call Purchase Price***") in cash equal to the aggregate Agreed Value (such purchase initiated by a CHMT Five-Year Call Notice, a "***CHMT Five-Year Call***" and each of a CHMT Five-Year Put and a CHMT Five-Year Call, a "***CHMT Five-Year Put/Call***").  Prior to the closing of the CHMT Five-Year Put/Call pursuant to Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the Company shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to LF under the Local Services Agreement and pay all

22

33753303.5

ICON-043-00034644

fees owing and accrued to Iconix under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the CHMT Five-Year Put/Call.

(iii)    If the Five-Year Put/Call is exercised in the six- (6-) month period following the fifth (5th) anniversary of the Effective Date, and/or the CHMT Five-Year Put/Call is exercised, Agreed Value shall be equal to:

(A)    the LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and Other License Agreements in respect of the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights (as applicable) for (i) the Year ended December 31, 2015 and (ii) the Year ended December 31, 2018; *provided*, *however*, that the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *provided further*, *however*, that the Agreed Value attributable to the CHMT Rights shall not be less than (1) $15,500,000, *less* (2) the sum of (x) the amount, if any, by which distributions accrued or made to the LF Shareholder pursuant to ARTICLE III in respect of the Year ended December 31, 2014 were lower than $1,500,000, *plus* (y) the amount, if any, by which distributions accrued or made to the LF Shareholder pursuant to ARTICLE III in respect of the Year ended December 31, 2015 were lower than $3,000,000$21,500,000 (such Agreed Value attributable to the CHMT Rights, the "***Adjusted CHMT Purchase Price***"); *plus*

(B)    in the case of a Full Exercise, the amount of cash in the Company after payment of the CHMT Put/Call Distribution to the Iconix Shareholder.

(iv)    If the Five-Year Put/Call is exercised in the six- (6-) month period following the eighth (8th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)    The LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and the Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2018 and (ii) the Year ended December 31. 2021; *provided*, *however*, that, the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *plus*

(B)    In the case of a Full Exercise, the amount of cash in the Company.

(c)    <u>Put and Call Closings</u>.  The closing of any Two-Year Call, Five-Year Put/Call or CHMT Five-Year Put/Call under this Section 6.04 shall take place within (i) sixty (60) days after delivery of the Two-Year Call Notice, (ii) sixty (60) days after the delivery of the Five-Year Put/Call Notice (or, if later, within thirty (30) days after the royalty information necessary to calculate the applicable Agreed Value is available), or (iii) sixty (60) days after the delivery of the CHMT Five-Year Put/Call Notice (or, if later, within thirty (30) days after the royalty information necessary to calculate the applicable Agreed Value is available), as the case may be, unless another date is mutually agreed upon by the parties to the sale.

23

33753303.5

ICON-043-00034645

(d)    Put and Call Closings – Partial Exercise.  In the case of an exercise of the Five-Year Put/Call or a CHMT Five-Year Put/Call which constitutes a Partial Exercise, at the closing of the relevant Five-Year Put/Call or the CHMT Five-Year Put/Call, as applicable, the Iconix Shareholder shall pay, or in the case of a CHMT Five-Year Put/Call shall cause Iconix Luxembourg and Red Diamond to pay, to the LF Shareholder the Five-Year Put/Call Price or the CHMT Five-Year Put/Call Price, as applicable, and the parties hereto shall implement the Partial Exercise Plan.

(e)    Put and Call Closings – Two Year Call and Full Exercise.  At the closing of any Two-Year Call or Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable) which results in a Full Exercise, the LF Shareholder shall deliver to the Company for cancellation the Share Certificate or Certificates, if any, representing the Two-Year Call Shares or all of its Shares, in the case of a Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable), as applicable, and the Iconix Shareholder shall take all actions and execute and deliver and pay, or in the case of a CHMT Five-Year Put/Call cause Iconix Luxembourg and Red Diamond to pay, to the LF Shareholder the Two-Year Call Purchase Price or the Five-Year Put/Call Price (and the CHMT Five-Year Put/Call Price, if applicable), as applicable, and all instruments and documents as may be necessary or desirable to consummate the sale of the Two-Year Call Shares or all of its Shares, in the case of a Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable), as applicable.  The Company shall thereupon cancel the Share Certificate(s) representing the Two-Year Call Shares or all of the LF Shareholder's Shares, in the case of a Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable), as applicable, enter the purchaser's name in the register of shareholders of the Company and, upon request of the purchase pursuant to Section 2.01(c), issue a Share Certificate to the purchaser evidencing the purchaser's entitlement to the Two-Year Call Shares or all of the LF Shareholder's Shares, in the case of a Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable), as applicable.

(f)    Stamp Duty.  The Hong Kong stamp duty payable in respect of the sale and purchase of the Shares pursuant to an exercise of any option pursuant to this Section 6.04 shall be borne by Iconix and LF in equal shares. Iconix and LF shall each pay their respective share of the Hong Kong stamp duty on completion of the exercise of the relevant option and shall co-operate to ensure that the instrument of transfer and bought and sold notes in respect of the sale and purchase of the relevant Shares are duly presented for stamping within the time limits prescribed by the Stamp Duty Ordinance and are duly stamped as soon as practicable after completion of the exercise of the relevant option.

## ARTICLE VII

## TERMINATION AND LIQUIDATION

**Section 7.01    Termination**.  This Agreement shall terminate on the first to occur of the following:

(a)    the Percentage Shareholding of any Shareholder is equal to one hundred percent (100%); or

24

33753303.5

ICON-043-00034646

(b)     a resolution is passed by the Shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, shareholders or other contributors.

**Section 7.02     Effect of Termination.**

(a)     On termination of this agreement, Sections 10.02, 10.03, 10.04, 10.07, 10.15 and this Section 7.02(a) shall continue in force.

(b)     Termination of this agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including the right to claim damages or indemnification in respect of any breach of the Agreement which existed at or before the date of termination.

**Section 7.03     Winding Up**.  Where the Company is to be wound up and its assets distributed, the parties shall agree on a suitable basis for dealing with the interests and assets of the Company and shall endeavor to ensure that, before dissolution:

(a)     all existing contracts of the Company are performed to the extent that there are sufficient resources;

(b)     the Company shall not enter into any new contractual obligations; and

(c)     the Company's assets are distributed as soon as practical.

## ARTICLE VIII

## INDEMNIFICATION

**Section 8.01     Insurance.**  The Company shall maintain for such periods as the Board shall in good faith unanimously determine, at its expense, insurance in an amount determined unanimously in good faith by the Board to be appropriate, on behalf of any person who is or was a director or officer of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or other enterprise, including any Subsidiary of the Company, against any expense, liability or loss asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, subject to customary exclusions.

## ARTICLE IX

## REPRESENTATIONS

**Section 9.01     General.**  As of the date hereof, each of the Shareholders makes each of the representations and warranties applicable to such Shareholder as set forth in this

25

33753303.5

ICON-043-00034647

**ARTICLE IX**, and such representations and warranties shall survive the execution of this Agreement.

(a) <u>Due Incorporation or Formation; Authorization of Agreement</u>. If such Shareholder is a corporation, partnership, trust, limited liability company, or other legal entity, it is duly organized or formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the power and authority to own property and carry on its business as owned and carried on at the date hereof and as contemplated hereby and such Shareholder is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder, and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate or partnership or company action. This Agreement constitutes the legal, valid, and binding obligation of such Shareholder, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b) <u>No Conflict or Default</u>. The execution, delivery, and performance of this Agreement and the consummation by such Shareholder of the transactions contemplated hereby (i) will not conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, or any arbitrator, applicable to such Shareholder, and (ii) will not conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, operating agreement, or other organizational documents of such Shareholder, or of any material agreement or instrument to which such Shareholder is a party or by which such Shareholder is or may be bound or to which any of its material properties or assets are or may be subject.

(c) <u>Governmental Authorizations</u>. Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by, any governmental or regulatory authority that is required in connection with the valid execution, delivery, acceptance, and performance by such Shareholder under this Agreement or the consummation by such Shareholder of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date of this Agreement.

(d) <u>Litigation</u>. There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Shareholder, threatened against or affecting such Shareholder or any of such Shareholder's properties, assets, or businesses in any court or before or by any governmental department, board, agency, instrumentality, or arbitrator which, if adversely determined, could (or in the case of an investigation could lead to any action, suit, or proceeding which, if adversely determined, could) reasonably be expected to materially impair such Shareholder's ability to perform its obligations under this Agreement.

(e) <u>Securities Representations</u>. Such Shareholder represents and agrees that the Shares acquired pursuant hereto will be acquired for such Shareholder's own account, for

26

33753303.5

ICON-043-00034648

investment, and not with a view to the distribution or resale thereof. Such Shareholder further represents that it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of acquiring the Shares. Such Shareholder understands that such Shares have not been registered under the Securities Act or any state or other securities laws, and cannot be sold, assigned, transferred, pledged or otherwise disposed of unless so registered under the Securities Act and applicable state or other securities laws or unless an exemption from the registration requirements thereof is available.

## ARTICLE X

## MISCELLANEOUS

**Section 10.01** Information. For so long as any Shareholder is a reporting company under the securities laws of the United States and/or Hong Kong, the Company shall provide to such Shareholder on a timely basis, in addition to the financial statements that the Company is required to deliver to the Shareholders pursuant to Section 5.01, all such information as such Shareholder determines is necessary for it to comply with its reporting obligations under such securities laws, including but not limited to financial information; provided, that any additional expense incurred by the Company or any other Shareholder in connection with or as a consequence of providing such information shall be borne by such Shareholder. It is agreed that a failure to deliver such financial statements on a timely basis shall not be considered a breach of any term or condition of this Agreement, it being agreed that the Shareholders shall use commercially reasonable efforts to replace the auditors of the Company in the event that the Board determines that any such delay has been caused by the auditors.

**Section 10.02** Notices. All notices, approvals, consents, requests, instructions, and other communications (collectively "***Communications***") required to be given in writing pursuant to this Agreement shall be validly given, made or served only if in writing and when delivered personally or by registered or certified mail, return receipt requested, postage prepaid, or by a reputable overnight or same day courier, addressed to the Company, the Directors or the Shareholders, as the case may be, at the address(es) thereof on record at the principal office of the Company. All Communications required or permitted hereunder shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, or if not during such hours, then on the next Business Day, (c) five (5) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) three (3) Business Days after deposit with FedEx or other overnight courier, specifying delivery by such date, with written verification of receipt. The designation of the Person to receive such Communication on behalf of a Shareholder or the address of any such Person for the purposes of such Communication may be changed from time to time by written notice given to the Company pursuant to this Section 10.02.

**Section 10.03** Parties Bound; No Third Party Beneficiaries. This Agreement shall inure to the benefit of and shall be binding upon all of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties (other than to an Affiliate of a Shareholder following a Transfer

27

33753303.5

permitted by Section 6.01). No provision of this Agreement is intended to or shall be construed to grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement to or upon any Person other than the parties hereto.

Section 10.04 Governing Law; Submission to Jurisdiction. This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of Hong Kong. Any dispute, difference or claim arising out of or in connection with this Agreement shall be referred to and finally determined by arbitration in Hong Kong at Hong Kong International Arbitration Centre (the "*HKIAC*") in accordance with the UNCITRAL Arbitration Rules as at present in force. The language to be used in the arbitration proceedings shall be English. There shall be three arbitrators, of which one shall be appointed by the Iconix Shareholder, one shall be appointed by the LF Shareholder and one (who shall act as president of the tribunal) shall be jointly appointed by the two arbitrators appointed by the Iconix Shareholder and the LF Shareholder. The Iconix Shareholder and the LF Shareholder shall each appoint one arbitrator within 30 days of the notice of arbitration, failing which such appointment shall be made, at the request of either party, by the Chairman of the HKIAC. If the two arbitrators so appointed by the Iconix Shareholder and the LF Shareholder fail to agree upon the third arbitrator within 15 days of the appointment of the second arbitrator, the third arbitrator shall be appointed by the Chairman of the HKIAC upon the written request of either party. The arbitral award shall be final and binding on all Parties. In relation to all matters referred to arbitration by this Agreement, the right of appeal under section 23 of the Arbitration Ordinance (Cap. 341 of the Laws of Hong Kong) and the right to make an application under section 23A thereof are hereby excluded. Any costs of arbitration (including without limitation all reasonable legal costs of the winning party) shall be borne by the losing party unless otherwise determined by the arbitral award. Nothing herein shall prevent a Party from seeking injunctive or other emergency relief against the other at any time in a court having competent jurisdiction.

Section 10.05 Amendment. No amendment, change or modification to this Agreement shall be valid unless the same is in writing and signed by all of the Shareholders.

Section 10.06 Entire Agreement. This Agreement and the Purchase Agreement, together with all exhibits and schedules hereto and thereto (which are deemed incorporated herein), contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof.

Section 10.07 Confidentiality. Subject to the requirements of applicable Law, each Shareholder shall maintain in confidence all Confidential Information (i) transferred to the Company or to the other Shareholder by reason of the transactions contemplated by this Agreement and (ii) all information received from the other Shareholder as a result of any due diligence investigation conducted relative to the execution of this Agreement and shall use such information only for the benefit of the Company and or in connection with evaluating the transactions contemplated hereby, and except in accordance with the immediately succeeding sentence, shall not disclose any such information to a third party, other than (i) to its officers, directors, employees, advisors, attorneys or accountants who need to know and who agree to keep such information confidential, (ii) to its actual or proposed lenders or other financing sources having been made aware of the restrictions set forth in this Section 10.07, (iii) to the

28

33753303.5

ICON-043-00034650

extent disclosure is required by law, statute, rule, regulation or judicial process (including, but not limited to, applicable securities laws) or (iv) upon the lawful demand of any court or agency or regulator having jurisdiction over such Shareholder (including, but not limited to, any securities regulatory authority, including rating agencies and national securities exchanges, to which the disclosing Shareholder is subject) or make any unauthorized use thereof. The obligation of confidentiality and non-use shall not apply to any information which (A) is or becomes generally available to the public through no fault of the receiving party, (B) is independently developed by the receiving party or (C) is received in good faith from a third party who is lawfully in possession of such information and has the lawful right to disclose or use it.

Section 10.08    Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

Section 10.09    Counterparts; Facsimile or Electronic Transmission.    This Agreement may be executed in one or more counterparts with the same effect as if all of the Shareholders had signed the same document.  All counterparts shall be construed together and shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile or Electronic Transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile or Electronic Transmission shall be deemed to be their original signatures for all purposes.

Section 10.10    Construction.  Words in the singular include the plural and in the plural include the singular.  The words "including," "includes," "included" and "include," when used, are deemed to be followed by the words "without limitation".  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  All accounting terms not defined in this Agreement shall have the meanings determined by the Accounting Standards.  Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, and all attachments thereto and instruments incorporated therein.  This Agreement is the result of arms-length negotiations between the parties hereto and no provision hereof, because of any ambiguity found to be contained herein or otherwise, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of that provision. A reference to a Law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any subordinate legislation for the time being in force made under it.

29

33753303.5

ICON-043-00034651

**A-1442**

**Section 10.11** Successors and Assigns. This Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Shareholders and their respective successors, but neither this Agreement nor any rights, interests or obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party or parties hereto, subject to the provisions in respect of restrictions on Transfers set forth herein.

**Section 10.12** Headings and Captions. The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

**Section 10.13** No Waiver. The failure of any Shareholder to insist upon strict performance of a covenant hereunder or of any obligation hereunder or to exercise any right or remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of such Shareholder's right to demand strict compliance therewith in the future unless such waiver is in writing and signed by the Shareholder giving the same.

**Section 10.14** Additional Instruments. Each Shareholder agrees to execute and deliver such additional agreements, certificates, and other documents and to do all such other acts and things as may be required by law or necessary or appropriate to carry out the intent and purposes of this Agreement.

**Section 10.15** Publicity. The parties shall consult with each other before issuing any press release with respect to this Agreement or the transactions contemplated hereby and shall not issue any such press release or make any such public statement without the prior consent of the other party, which shall not be unreasonably withheld, conditioned or delayed; provided, however, that any party may, without the prior consent of the other parties (but after prior consultation, to the extent practicable in the circumstances) issue such press release or make such public statement as may upon the advice of outside counsel be required by law or the rules and regulations of the NASDAQ or the Stock Exchange of Hong Kong Limited or the rules of any other applicable exchange.

**Section 10.16** Remedies. Except as otherwise provided herein, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every remedy under this Agreement or now or hereafter existing at law or in equity.

**Section 10.17** Specific Performance. Each Shareholder acknowledges and agrees that its respective remedies at law for a breach or threatened breach of any of the provisions of this Agreement would be inadequate and, in recognition of that fact, agrees that, in the event of a breach or threatened breach by a Shareholder of the provisions of this Agreement, in addition to any remedies at law, the Company or any other Shareholder shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

[<i>Signature page follows.</i>]

30

33753303.5

ICON-043-00034652

**A-1443**

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of 30 June 2014.

LF ASIA LIMITED


By: _____
      Name:
      Title:

ICONIX BRAND GROUP, INC.


By: _____
      Name:
      Title:

*Second Amended and Restated Shareholders Agreement*

ICON-043-00034653

**A-1444**

**Exhibit "A"**

**BRANDS**

FASHION BRANDS:
1. Badgley Mischka
2. Bongo
3. Candie's
4. Danskin / Danskin Now
5. Ecko Unltd./Marc Ecko Cut & Sew
6. Ed Hardy
7. Joe Boxer
8. Lee Cooper
9. London Fog
10. Mossimo
11. Mudd
12. OP / Ocean Pacific[*]
13. Rampage
14. Rocawear
15. Starter
16. Umbro
17. Zoo York

HOME BRANDS:
18. Cannon
19. Charisma
20. Fieldcrest
21. Royal Velvet
22. Sharper Image
23. Waverly

---

[*] Philippines only for Ocean Pacific

A- 1

33753303.5

ICON-043-00034654

**A-1445**

**Exhibit "A-1"**

**ADDITIONAL BRANDS**

Ecko Unlimited
Zoo York
Marc Ecko Cut & Sew
Ed Hardy
Sharper Image

A-1

33753303.5

ICON-043-00034655

**A-1446**

**Exhibit "A-2"**

**CHMT BRANDS**

Lee Cooper
Umbro

33753303.5

ICON-043-00034656

**A-1447**

**Exhibit "A-3"**

**RD BRANDS**

Lee Cooper

33753303.5

ICON-043-00034657

**A-1448**

**Exhibit "B"**

SHARES AND PERCENTAGE SHAREHOLDINGS
AS OF THE INITIAL ALLOTMENT

| Shareholder | Shares | Percentage Interest |
|---|---|---|
| Iconix Brand Group, Inc. | 50 | 50% |
| LF Asia Limited | 50 | 50% |
| Total | 100 | 100% |

33753303.5

ICON-043-00034658

**A-1449**

**Exhibit "C"**

FORM OF DEED OF ADHERENCE

The undersigned is executing and delivering this Deed of Adherence (this **"Deed"**) pursuant to the Shareholders Agreement of Iconix SE Asia Limited dated as of September 30, 2013 (as amended on June 30, 2014 and as further amended on ~~August~~September [__], 2014) and as the same may hereafter be amended, amended and restated, supplemented or otherwise modified, the "***Agreement***").

Capitalized terms used in this Deed which are not defined herein shall have the respective meanings given to them in the Agreement.

Now this Deed witnesses as follows:

1.  The undersigned, pursuant to Section 6.03 of the Agreement, undertakes to and covenants with and for the benefit of all the parties to the Agreement and for the benefit of any other person who becomes a party to the Agreement after the date of this Deed to comply with the provisions of and perform all of the obligations in the Agreement as if the undersigned had been a party to the Agreement as [*state capacity*], except to the extent that those obligations have already been performed.

2.  The undersigned agrees to hold the Shares [transferred][issued] to [it]/[him] with the benefit of the rights, and subject to the restrictions, set out in the Agreement and the articles of association of the Company and consents to [its]/[his] name being entered in the register of Shareholders of Company as the holder of the Shares acquired.

3.  The undersigned confirms that [it]/[he] has been given and has read a copy of the Agreement and all documents in the agreed form.

4.  The undersigned hereby irrevocably appoints [        ] of [        ], fax: [        ] as its agent to receive on its behalf in Hong Kong service of any proceedings arising out of or in connection with the Agreement. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by the undersigned).

5.  This Deed and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with Hong Kong law.

**IN WITNESS** of which the undersigned has executed this document as a deed and delivered it on the ____ day of _____, _____.

[*insert appropriate signature provisions*]

C-1

33753303.5

ICON-043-00034659

**A-1450**

**Exhibit "D"**

**TAX ALLOCATIONS**
Additional Provisions Applicable for U.S. Federal Income Tax Purposes

1.    Defined Terms.

1.1    "*Capital Account*" means with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 2 of this **Exhibit "D"** below and in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv).

1.2    "*Capital Contribution*" means, with respect to a Partner, a contribution of cash or property to the Company pursuant to this Agreement.

1.3    "*Code*" means the United States Internal Revenue Code of 1986, as amended and as hereafter amended, or any successor law.

1.4    "*Fiscal Year*" means the calendar year unless otherwise required by the Code.

1.5    "*Gross Asset Value*" means, with respect to any property of the Partnership other than money, such property's adjusted basis for U.S. federal income tax purposes, except that the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Tax Matters Partner considers appropriate, whenever such adjustment is permitted under Regulations Section 1.704-1(b)(2)(ii).

1.6    "*Interest*" means the Percentage Shareholding of a Shareholder in the Company.

1.7    "*Net Profits*" and "*Net Losses*" means, with respect to any Fiscal Year or other relevant period of calculation, any taxable income or taxable loss of the Partnership for such Fiscal Year or other period, with the following adjustments:

1.7.1.    any income that is exempt from U.S. federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be added to such taxable income or loss;

1.7.2    any expenditures described in Code Section 705(a)(2)(B) (or treated as expenditures described in Code Section 705(a)(2)(B) pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be subtracted from such taxable income or loss;

D-1

33753303.5

ICON-043-00034660

**A-1451**

1.7.3    in the event the Gross Asset Value of any Partnership property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property for purposes of computing Net Profits or Net Losses;

1.7.4    gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

1.7.5    in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, cost recovery or amortization computed in accordance with Regulations Section 1.704-1(b)(2)(iv)*(g)(3)*; and

1.7.6    any other provisions or items which are specifically allocated pursuant to Sections 3.2 or 3.3 hereof shall not be taken into account in computing Net Profits or Net Loss.

1.8    "*__Partner__*" means any Shareholder of the Company.

1.9    "*__Partnership__*" means the Company.

1.10    "*__Regulations__*" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

2.    Capital Accounts.

2.1    Each Partner's Capital Account shall have an initial balance equal to the fair market value of such Partner's initial Capital Contribution to the Partnership.

2.2.    Each Partner's Capital Account shall be increased by the sum of:

2.2.1    the amount of cash and the fair market value of any other property (net of liabilities that the Partnership is considered to assume or take subject to) constituting additional contributions by such Partner to the capital of the Partnership,

2.2.2    the portion of any Net Profits and other income or gain items allocated to such Partner's Capital Account.

2.3    Each Partner's Capital Account shall be decreased by the sum of:

2.3.1    the amount of cash and the fair market value of any other property (net of liabilities that such Partner is considered to assume or take subject to) distributed by the Partnership to such Partner; plus

D-2

33753303.5

ICON-043-00034661

**A-1452**

  2.3.2 the portion of any Net Losses and other expense, loss or deduction items allocated to such Partner's Capital Account.

3. <u>Allocation of Net Profits and Net Losses</u>.

  3.1 The Net Profits and Net Losses of the Partnership for each Fiscal Year or other relevant period of calculation, as determined by the Board in accordance with the provisions hereof, shall be allocated among the Partners in accordance with their respective Interests, such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the amount that each Partner would receive if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with this Agreement to the Partners immediately after making such allocation.

  3.2 In the event any Partner has a deficit adjusted Capital Account balance at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Partner is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Partner shall be specially allocated items of income and gain in the amount of such excess as quickly as possible; <u>provided</u>, that an allocation pursuant to this Section 3.2 shall be made only if and to the extent that a Partner would have a deficit adjusted Capital Account balance in excess of such sum after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.2 were not in this Schedule to this Agreement.

  3.3 Any special allocations of items of income, gain, loss or deduction pursuant to Section 3.2 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount of any items so allocated and all other items allocated to each Partner shall, to the extent possible, be equal to the net amount that would have been allocated to each Partner if the special allocations under Section 3.2 had not occurred.

  3.4 The Board is authorized to adjust the allocations hereunder if it considers an adjustment is necessary to:

   3.4.1 carry out the intentions of this Agreement; or

   3.4.2 to maintain substantial economic effect or otherwise comply with the requirements of Section 704(b) of the Code and the Regulations thereunder.

D-3

33753303.5

ICON-043-00034662

3.5     Notwithstanding Section 3.1, in any year in which the Partnership sells substantially all of its assets or liquidates, each Partner shall be allocated Net Profits or Net Losses (or items thereof) to the extent necessary to cause its Capital Account balance to reflect the amount that will be distributable to such Partner in liquidation of the Partnership pursuant to this Agreement.

4.     <u>Tax Allocation</u>.

For Tax Purposes, items of Partnership income, gain, loss, deduction and credit for each Fiscal Year shall be allocated to and among the Parties in the same manner as the corresponding items of Net Profits and Net Losses and specially allocated items are allocated to them pursuant to Section 3 hereof, taking into account any variation between the adjusted tax basis and book value of the Partnership property in accordance with the principles of Code Section 704(c).  The Board shall be authorized to make appropriate adjustments to the allocations of items to comply with Code Section 704 or applicable Regulations thereunder.

5.     <u>Tax Matters Partner; Elections; Treatment as Partnership</u>.

The initial Tax Matters Partner shall be Iconix.  Subject to Section 5.04 of this Agreement, the Tax Matters Partner is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities.

6.     <u>Liquidation of the Partnership; No Capital Account Makeup</u>.

6.1     After all liabilities of the Partnership have been satisfied or duly provided for, the remaining assets of the Partnership shall be applied and distributed to the Partners in accordance with this Agreement.

6.2     Notwithstanding anything to the contrary herein, no Partner shall be obligated to restore to the capital of the Partnership any deficit balance in its Capital Account.

33753303.5

ICON-043-00034663

**A-1454**

D-4

33753303.5

ICON-043-00034664

**A-1455**

**Exhibit "E"**

**DEFINITION OF "EUROPE"**

Albania
Andorra
Austria
Belarus
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
Former Yugoslav Republic of Macedonia
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Moldova
Monaco
Montenegro
Netherlands
Norway
Poland .
Portugal
Romania
Russia
San Marino
Serbia
Slovakia
Slovenia

E-1

33753303.5

ICON-043-00034665

**A-1456**

Spain

33753303.5

ICON-043-00034666

**A-1457**

Sweden
Switzerland
Ukraine
Uzbekistan
United Kingdom (including for the avoidance of doubt the Crown Dependencies of Jersey, Guernsey and the Isle of Man)
Vatican City State

33753303.5

ICON-043-00034667

**A-1458**

**Exhibit "F"**
**PARTIAL EXERCISE PLAN**

As soon as possible following a Partial Exercise, the Iconix Shareholder and the LF Shareholder shall:-

1. identify and agree changes to the Master License Agreement which are necessary to remove from the Master License Agreement the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights, which are the subject of the relevant Partial Exercise, and any obligations with respect thereto;

2. either consent to (as Shareholders) or procure that the Directors nominated by them consent to (i) amendments the Master License Agreement to give effect to the changes agreed contemplated by paragraph 1. of this Exhibit "F" for the purposes of Section 4.06(a)(xix) and (ii) any other matters in respect of which consent is required under this Agreement in order to give effect to the Partial Exercise Plan and closing of the Partial Exercise;

3. identify and agree which contracts and other arrangements entered into between the Company and third parties and which relate to the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights which are the subject of the Partial Exercise are to be assigned by the Company to the Iconix Shareholder, to the effect that all rights and obligations (including, without limitation, to receive revenue and to pay costs) are to be so assigned with effect from the closing date applicable to the relevant Partial Exercise;

4. agree that to the extent that any revenue or costs which ought to be for the account of the Iconix Shareholder (on the one hand) or the Company or any Subsidiary of the Company (on the other hand) but were in fact collected by or borne by the incorrect party, then the Iconix Shareholder and the Company (or its relevant Subsidiary) will promptly reimburse the other accordingly.

5. as regards the negotiation of any documents which need to occur as part of the Partial Exercise Plan, the Iconix Shareholder will negotiate and agree on the part of the Iconix Shareholder and its Affiliates, and the LF Shareholder will negotiate and agree on the part of the Company and any Subsidiary of the Company.

F-1

33753303.5

ICON-043-00034668

**A-1459**

Document comparison by Workshare Professional on Thursday, September 11, 2014 5:56:35 PM

| **Input:** | |
|---|---|
| Document 1 ID | interwovenSite://NYDMS/AL/101780528/7 |
| Description | #101780528v7<AL> - Iconix SEA - 2nd Amended & Restated Shareholders Agreement (GDC 8.14.14) |
| Document 2 ID | interwovenSite://NYDMS/AL/101780528/8 |
| Description | #101780528v8<AL> - Iconix SEA - 2nd Amended & Restated Shareholders Agreement (GDC 9.11.14) |
| Rendering set | GDCrendering |

| **Legend:** | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| **Statistics:** | |
|---|---|
| | Count |
| Insertions | 36 |
| Deletions | 27 |
| Moved from | 4 |
| Moved to | 4 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 71 |

ICON-043-00034669

# A-1460

GIBSON DUNN DRAFT – 0809/11/2014

To:     LF Asia Limited
        11th Floor, LiFung Tower,
        888 Cheung Sha Wan Road,
        Kowloon,
        Hong Kong

                                              Date:  [__] AugustSeptember 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks**

      Reference is hereby made to (a) the Amendment No. 2 to the Master License Agreement (the "***Master License Agreement Amendment***") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("***Iconix***"), certain of Iconix's wholly owned subsidiaries ("***Licensors***"), and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("***Licensee***"), amending the Master License Agreement (as amended by Amendment No. 1 to Master License Agreement, effective as of June 30, 2014, the "***Existing Master License Agreement***"), by and among Iconix, Licensors and Licensee, and (b) the Second Amended and Restated Shareholders Agreement of Iconix SE Asia Limited (the "***Second Amended and Restated Shareholders Agreement***" and, together with the Master License Agreement Amendment, the "***SEA JV Amendments***") to be entered into as of the date hereof by and between Iconix and LF Asia Limited ("***LF***"), amending the First Amended and Restated Shareholders Agreement of Lion Network Limited (the "***Existing Shareholders Agreement***"), effective as of June 30, 2014, by and between Iconix and LF.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Existing Master License Agreement as amended by the Master License Agreement Amendment (or if not therein defined, in the First Amended and Restated Shareholders Agreement), as applicable.

      Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by Iconix Luxembourg Holdings S.ar.l. ("***Iconix Luxembourg***") and Red Diamond Holdings S.ar.l. ("***Red Diamond***" and, together with Iconix Luxembourg, the "***CHMT Marks Licensors***") in the People's Republic of China, the Hong Kong Special Administrative Region of the People's Republic of China, the Macau Special Administrative Region of the People's Republic of China, and the Republic of China (the "***CHMT Territory***") granted by Licensors to Licensee pursuant to the SEA JV Amendments (the "***CHMT Marks***") is deemed to have a fair market value of [US$31,000,000],43,000,000, and that because Iconix and LF each own 50% of Licensee, LF's ownership of 50% of Licensee will provide LF a benefit equal to 50% of such fair market value, or [US$15,500,000].21,500,000.

      In order to compensate the CHMT Marks Licensors for the transfer of 50% of the fair market value of the CHMT Marks to LF (through LF's 50% shareholding in Licensee) pursuant to the SEA JV Amendments, the CHMT Marks Licensors and LF hereby agree that LF shall pay [US$15,500,000]21,500,000 (the "***CHMT Marks Consideration***"), of which $[___]US$17,000,000 shall be payable to Iconix Luxembourg and $[___]US$4,500,000 shall

Page 1

ICON-043-00034670

GIBSON DUNN DRAFT – 0809/11/2014

be payable to Red Diamond, and which amount the CHMT Marks Licensors and LF shall treat for all U.S. and Luxembourg tax purposes as paid by LF to the CHMT Marks Licensors in exchange for 50% of the CHMT Marks, following which each of the CHMT Marks Licensors and LF shall be treated for U.S. and Luxembourg tax purposes as contributing its respective share of the CHMT Marks to the Licensee.

LF shall pay the CHMT Marks Consideration to the CHMT Marks Licensors as follows, in each case by wire transfer in immediately available funds:

(a)     [US$3,100,000]4,300,000 on the date hereof;

(b)     [US$3,100,000]4,300,000 on the first (1st) anniversary of the date of this letter;

(c)     [US$3,100,000]4,300,000 on the second (2nd) anniversary of the date of this letter;

(d)     [US$3,100,000]4,300,000 on the third (3rd) anniversary of the date of this letter;

(e)     [US$3,100,000]4,300,000 on the fourth (4th) anniversary of the date of this letter.

Iconix hereby agrees that the distributions by Licensee to the LF Shareholder pursuant to the Second Amended and Restated Shareholders Agreement (a) in respect of the CHMT Marks in the CHMT Territory shall be (ai) for fiscal year 2014, at least US$1,500,000 (the "*2014 Minimum Distribution Amount*") and (bii) for fiscal year 2015, at least $3,000,000 (the "*2015 Minimum Distribution Amount*", and (b) in respect of the CHMT Marks licensed to the Licensee by Red Diamond in the CHMT Territory shall be (i) for fiscal year 2016, at least US$300,000 (the "*2016 Minimum Distribution Amount*") and (ii) for fiscal year 2017, at least US$335,000 (the "*2017 Minimum Distribution Amount*") (and, together with the 2014 Minimum Distribution Amount, the 2015 Minimum Distribution Amount and the 2016 Minimum Distribution Amount, the "*Minimum Distribution Amounts*"); provided that, if the LF Shareholder's share of Licensee's distributable amounts in respect of 20142014, 2015, 2016 or 20152017 is less than the Minimum Distribution Amount for such year, then the deficit (the "*Deficit*") shall be paid to the LF Shareholder by Licensee out of the distributions otherwise payable to the Iconix Shareholder for such year; provided further that, if Licensee's distributable amounts in respect of 20142014, 2015, 2016 or 20152017 are not sufficient to make a distribution to the LF Shareholder that is equal to or greater than the Deficit for such year, then Iconix Luxembourg and Red Diamond shall pay such Deficit to the LF Shareholder in cash.

This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV Amendments, the Existing Master License Agreement, the Existing Shareholders Agreement and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

ICON-043-00034671

A-1462

GIBSON DUNN DRAFT – 0809/11/2014

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

*[Signature page follows.]*

Page 3

ICON-043-00034672

# A-1463

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

_____
For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
ICONIX BRAND GROUP, INC.

Acknowledged and agreed:

_____
For and on behalf of
LF ASIA LIMITED

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks*

ICON-043-00034673

# A-1464

Document comparison by Workshare Professional on Thursday, September 11, 2014 5:55:35 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://NYDMS/AL/101780136/2 |
| Description | #101780136v2<AL> - Iconix LF - China (Umbro and Lee Cooper) Consideration Side Letter |
| Document 2 ID | interwovenSite://NYDMS/AL/101780136/3 |
| Description | #101780136v3<AL> - Iconix LF - China (Umbro and Lee Cooper) Consideration Side Letter |
| Rendering set | GDCrendering |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 21 |
| Deletions | 26 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 47 |

ICON-043-00034674

**A-1465**

GIBSON DUNN DRAFT – 0809/1411/2014

**AMENDMENT NO. 2 TO MASTER LICENSE AGREEMENT**

This **AMENDMENT NO. 2 TO MASTER LICENSE AGREEMENT** (this ”***Amendment***”), is entered into effective as of [__] AugustSeptember, 2014, by and among **ICONIX BRAND GROUP, INC.**, a Delaware corporation ("***Iconix***"), the wholly owned subsidiaries of Iconix listed on Annex 1 hereto (each of the foregoing individually being referred to as a "***Licensor***" collectively, "***Licensors***"), and **ICONIX SE ASIA LIMITED** (f/k/a Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 ("***Licensee***").

**WITNESSETH**:

**WHEREAS,** in connection with the Share Purchase Agreement effective as of September 30, 2013 (the "***Purchase Agreement***") between Iconix and LF Asia Limited, a limited liability company organized under the laws of Hong Kong with company number 0872646 ("***LF***"), Licensors and Licensee entered into that certain Master License Agreement effective as of September 30, 2013, as amended by that certain Amendment No. 1 to Master License Agreement, dated as of June 30, 2014 (the "***Existing License Agreement***"; capitalized terms used herein without definition shall have the meanings ascribed to them in the Existing License Agreement as amended by this Amendment), pursuant to which Licensors granted to Licensee the exclusive right, subject to the exceptions and other terms and conditions set forth in the Existing License Agreement, to use and display, and to grant sublicenses to third parties to use and display, certain trademark registrations or applications owned by Licensors in a specified territory;

**WHEREAS**, Iconix and LF currently each own 50% of the shares of Licensee;

**WHEREAS,** in recognition of the fact that the right to use the trademark registrations or applications covering or relating to the "UMBRO" or "LEE COOPER" brands that are owned by Iconix Luxembourg Holdings S.ar.l. ("***Iconix Luxembourg***") and Red Diamond Holdings S.ar.l. ("***Red Diamond***" and, together with Iconix Luxembourg, the "***CHMT Marks Licensors***"), respectively, in the CHMT Territory (as defined below) is deemed to have a fair market value of [US$31,000,000],43,000,000, and that Iconix and LF each own 50% of Licensee, LF has agreed by a side letter dated on or about the date of this Amendment ("***Purchase Side Letter***") to pay to Iconix Luxembourg and Red Diamond 50% of such fair market value, or [US$15,500,000]21,500,000 in exchange for Iconix and Licensors agreeing to amend the Existing License Agreement to provide for the CHMT Marks Licensors to grant to Licensee an exclusive license to such registrations or applications owned by the CHMT Marks Licensors in the CHMT Territory (subject to the exceptions contained herein); and

**WHEREAS**, Iconix, Licensors and Licensee desire to amend the Existing License Agreement to provide for the CHMT Marks Licensors to grant an exclusive license to Licensee of such trademark registrations or applications owned by the CHMT Marks Licensors in the CHMT Territory and for Iconix Luxembourg to grant a non-exclusive license of certain endorsement, sponsorship and similar rights and to amend the Existing License Agreement in certain other respects as hereinafter set forth.

**NOW**, **THEREFORE**, for and in consideration of the premises and covenants and conditions forth below, Licensors and License agree to amend the Existing License Agreement as follows:

ICON-043-00034675

**A-1466**

**AGREEMENT**

1.      Amendments to Definitions.

(a)      The Preamble of the Existing License Agreement is hereby amended by deleting the parenthetical definition "(this "*Agreement*")" and inserting in its place the following:

(as amended by Amendment No. 1 (as defined below) and Amendment No. 2 (as defined below), and as the same may be amended from time to time, this "*Agreement*")

(b)      Section 1 of the Existing License Agreement is hereby amended by deleting the definitions of "Existing Licenses", "Licensed Marks", "New Multicountry License", "Retained Multicountry License" and "Territory" in their entirety and inserting in their place the following:

"*Existing Licenses*" means the existing licenses that cover the use of the Licensed Marks in one or more Countries, granted under the license agreements set out in Part A and Part B of Schedule C, in the case of licenses of Existing Licensed Marks, the Additional Licensed Mark Existing Licenses, in the case of licenses of Additional Licensed Marks, and the CHMT Licensed Marks Existing Licenses, in the case of licenses of the CHMT Licensed Marks;

"*Licensed Marks*" means, collectively, the Existing Licensed Marks, the Additional Licensed Marks and the CHMT Licensed Marks;

"*New Multicountry License*" means any license of any Licensed Mark granted by any Licensor to a Person that covers a territory including both: (a) a Country (being within the Territory); and (b) a country outside of the Territory, and which was not in place at the date of the Existing License Agreement, in the case of a license of an Existing Licensed Mark, or the Amendment No.1 Effective Date, in the case of a license of an Additional Licensed Mark, or the Amendment No. 2 Effective Date, in the case of a license of a CHMT Licensed Mark;

"*Retained Multicountry Licenses*" means the Existing Licenses that cover a territory including both: (a) a Country (being within the Territory); and (b) a country outside of the Territory, as listed under Part B of Schedule C, in the case of a license of an Existing Licensed Mark, or under Part B of Schedule C-1, in the case of a license of an Additional Licensed Mark, or under Part B of Schedule C-2, in the case of a license of a CHMT Licensed Mark;

"*Territory*" means, collectively, the Existing Territory, the Applicable New Territory, and the CHMT Territory (and any reference to Territory in this Agreement shall be interpreted in accordance with the definition of Licensed Marks within such Territory);

(c)      Section 1 of the Existing License Agreement is hereby amended by adding the following new definitions in alphabetical order in Section 1:

"*Amendment No. 2*" means Amendment No. 2 to the Master License Agreement effective as of the Amendment No. 2 Effective Date, by and among Licensors and Licensee;

"*Amendment No. 2 Effective Date*" means [__] ~~August~~September 2014, the effective date of Amendment No. 2;

"*Articles*" means a product bearing a Licensed Mark, including, without limitation, Umbro Goods;

"*CHMT Licensed Marks*" means, collectively, the trademark registrations or applications in the CHMT Territory set forth in Schedule A-2 and any registrations and applications in the CHMT Territory which become or are deemed to be Licensed Marks through the operation of this Agreement;

2

ICON-043-00034676

**A-1467**

"***CHMT Licensed Marks Existing Licenses***" means the existing licenses that cover the use of the CMHT Licensed Marks in one or more Countries, granted under the license agreements set out in Part A and Part B of Schedule C-2 (and as further particularized in Part C of that schedule);

"***CHMT Territory***" means the People's Republic of China, Hong Kong, Macau and Taiwan;

"***Hong Kong***" means the Hong Kong Special Administrative Region of the People's Republic of China;

"***Macau***" means the Macau Special Administrative Region of the People's Republic of China;

"***Relevant Date***" to the extent applicable, the Effective Date, the Amendment No. 1 Effective Date or the Amendment No. 2 Effective Date; and

"***Taiwan***" means the Republic of China.

2.       Definitions Applicable in this Amendment:  The following terms are defined solely for the purposes of this Amendment:

"***Applicable Iconix Party***" shall mean Iconix and each Licensor.

"***Books and Records***" means all technical, business and financial records, or other documentation and information in any form whatsoever (including written, printed, electronic or computer printout form) material to the reports to be provided under this Amendment.

"***Contracts***", when described as being those of or applicable to any Person, shall mean any and all contracts, agreements, commitments, arrangements or other undertakings, whether formal or informal, written or oral, including any amendment and other modifications thereto, to which such Person is a party or by which such Person or its properties or assets is subject or bound.

"***Digital New Media***" means any and all means by which any (audio, visual, or other) information, data and/or material is made available and/or disseminated by means of a radio, television, computer or other processing unit, telecommunications, electronic communications, information service and/or delivery and/or receiving device, mechanism and/or means, in each case whether analogue, digital or otherwise or any other device, mechanism and/or means which is the same as, similar to, varies and/or supersedes any and/or all the same, either now known or hereinafter invented (including the "Internet", the "World Wide Web", "Wireless Application Protocol", "Short Messaging Service", "Universal Mobile Telecommunications System" (and all related applications, including latest generation mobile telephony), "General Packet Radio Services/Systems", and "Global System for Mobile Communications").

"***Existing Claims***" means, with respect to the Additional Licensed Marks, those pending or threatened actions, oppositions, claims and proceedings listed on Exhibit A hereto.

"***knowledge***," "***best knowledge***," and any other words or phrases bearing on the knowledge or awareness as to any specified matters of: (a) Iconix, shall mean the knowledge that Neil Cole or Seth Horowitz actually has or would reasonably be expected to have if he had made reasonable enquiries of the relevant members of management of Iconix, its Affiliates and the Licensee as to the specified matters and (b) LF, shall mean the knowledge that Jason Rabin or David Thomas actually has or would reasonably be expected to have if he had made reasonable enquiries of the relevant members of management of LF, its Affiliates and the Licensee as to the specified matters.

"***Liens***" has the meaning given to it in the Purchase Agreement.

3

ICON-043-00034677

"*Marks*" means trade names, trademarks, service marks and trade dress, and all identifications, labels, insignia or indicia thereof, and all registrations and applications for registration for the foregoing and all common law trademark rights relating thereto.

"*Net Sales*" means the Net Retail Sales and the Net Wholesale Sales.

"*Net Retail Sales*" means gross sales of Umbro Goods through Owned Stores as received by the Licensee, its Affiliates, licensees, distributors and Sublicensees, to its customers reduced only by: consumption taxes and shipping charges actually passed on to customers, allowances, and returns.

"*Net Wholesale Sales*" means the sum of gross sales of Umbro Goods in the Territory other than through Owned Stores as invoiced by the Licensee, its Affiliates, licensees, distributors and Sublicensees, to its customers which, for the avoidance of doubt does include department stores and other consignees in the case that they sell Umbro Goods for the Licensee on a consignment sale basis) reduced only by: actual discounts for prompt payment or volume discounts actually earned and taken by customers on the basis of the Licensee's usual trade conditions and returns.

"*Owned Stores*" means all or any: (i) retail premises owned, operated or controlled by the Licensee, its Affiliates, licensees, sublicensees and distributors in the Territory; (ii) store-in-store concession areas or bays in retail outlets or department stores where such concession areas or bays are owned, operated or controlled by the Licensee and its Affiliates and each of their respective licensees, sub-licensees and distributors in the Territory; or (iii) any retail site operated or accessed via Digital New Media and owned, operated or controlled by the Licensee and its Affiliates and each of their respective licensees, sub-licensees and distributors.

"*Subsidiary*" shall have the meaning given to it in the Purchase Agreement.

"*Third Party Licensee*" means a Person to which a Licensor has granted a license to use Additional Licensed Marks in the Applicable New Territory pursuant to an Additional Licensed Mark Existing License.

"*Umbro Goods*" means all Articles bearing the Umbro Trademarks.

"*Umbro Trademarks*" means any and all CHMT Licensed Marks that cover or relate to "UMBRO", both in words and as logos.

3.  Representations and Warranties of Licensors. Iconix and each Licensor represents, warrants and covenants that such Licensor (or in the case of Iconix, each Licensor and Iconix) has the full right, power and authority to grant the licenses contemplated to be granted to Licensee under the Existing License Agreement, as amended by this Amendment (and Iconix is the sole direct/indirect shareholder of each Licensor and has the full right, power and authority to sign this Amendment on behalf of each Licensor).

4.  Representations and Warranties of Iconix. Iconix hereby represents and warrants to Licensee as follows:

(a)  Authority; Binding Agreement: The execution and delivery by each Applicable Iconix Party of this Amendment, the performance by such Applicable Iconix Party of its obligations hereunder, and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all necessary action on the part of such Applicable Iconix Party, and the Applicable Iconix Party has all necessary power and authority with respect thereto. This Amendment will be when executed and delivered by or on behalf of such Applicable Iconix Party, the legal, valid and binding obligation of such Applicable Iconix Party, enforceable against such Applicable Iconix Party in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws

4

ICON-043-00034678

affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b)      Noncontravention:  Neither the execution and delivery by or on behalf of any Applicable Iconix Party of this Amendment, the consummation by such Applicable Iconix Party of any of the transactions contemplated hereby, nor the performance by such Applicable Iconix Party of its obligations hereunder will (nor with the giving of notice or the lapse of time or both would) (i) conflict with or result in a breach of any provision of (x) any CHMT Licensed Marks Existing License or other Contract to which such Applicable Iconix Party is a party or bound or any other obligation of such Applicable Iconix Party to any Person, or (y) the certificate of incorporation or certificate of formation and memorandum and articles of association or by-laws or limited liability company agreement, in each case as applicable, of such Applicable Iconix Party, each as amended to date, (ii) obligate the Licensee or LF to pay any royalty or other compensation to any Person, (iii) result in the creation or imposition of any Lien upon the CHMT Licensed Marks or the Licensee's rights thereto under the Agreement, or any other assets of the Licensee, or (iv) constitute a violation of any Law (as defined below) applicable to the Applicable Iconix Party, except in the case of clauses (i)(x), (iii) and (iv), for such conflicts, breaches, Liens and violations as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect Iconix or the Licensee or impair the ability of Iconix to perform its obligations hereunder or under the Agreement. For purposes of this Amendment, "***Law***" shall mean any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order, of any Governmental Authority (as hereinafter defined in Section 4(c) of this Amendment).

(c)      Consents:  Except as disclosed in Exhibit B hereto, no consent, approval, waiver, notice, order, or authorization of, or registration, qualification, designation, declaration, recordal or filing with, any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority (each, a "***Governmental Authority***") or any other Person (including any party to a CHMT Licensed Marks Existing License) is required in connection with the execution and delivery by each of the Applicable Iconix Parties of this Amendment, the performance by any Applicable Iconix Party of its obligations hereunder or consummation by such Applicable Iconix Party of the transactions contemplated hereby, except as would not, individually or in the aggregate, reasonably be expected to have a materially adverse effect on Iconix or the Licensee or impair the ability of such Applicable Iconix Party to perform its obligations hereunder.

(d)      Intellectual Property:

(i)      All rights, title and interests with respect to the CHMT Licensed Marks in the CHMT Territory, as set forth on Schedule A-2 to the Agreement (attached as Annex 2 hereto), are owned by the applicable Licensor, free and clear of any Liens other than the CHMT Licensed Marks Existing Licenses to which such Licensor is a party and any Liens specified on Exhibit C hereto;

(ii)      Each of the wholly owned Subsidiaries of Iconix that owns the CHMT Licensed Marks in the CHMT Territory has granted to the Licensee a perpetual and exclusive (subject to the exceptions set forth in the Agreement) license of the CHMT

5

ICON-043-00034679

# A-1470

Licensed Marks owned by such Person for use in the Territory in connection with the Applicable Licensed Products and Services;

(iii)   To the knowledge of Iconix, except for the Existing Claims (as defined below), the use, licensing and/or sublicensing of the CHMT Licensed Marks in the CHMT Territory in connection with the design, manufacture, promotion, advertising and sale of products covered by the trademark registrations and applications for the CHMT Licensed Marks in the CHMT Territory (the "***Applicable Classes***") does not infringe upon any intellectual property rights or any other rights of any other Person;

(iv)   Schedule A-2 to the Agreement (attached as Annex 2 hereto) is a complete and accurate list of all of the registrations and applications for registration of CHMT Licensed Marks in the CHMT Territory; and the status of each CHMT Licensed Mark on Schedule A-2 to the Agreement (attached as Annex 2 hereto) is complete and accurate, and, to the knowledge of Iconix, all of the trademark registrations and applications for registration for the CHMT Licensed Marks in the CHMT Territory as set forth on Schedule A-2 to the Agreement (attached as Annex 2 hereto) are valid and subsisting, the registrations are enforceable in all material respects, and, except as set forth in Exhibit D hereto, none of such filings has expired or been abandoned, opposed, canceled or otherwise invalidated; and all fee payments, actions and/or filings required to be taken or made prior to the date hereof and within the ninety (90) day period hereafter in order to maintain such registrations in full force and effect and maintain such applications pending have been taken and made;

(v)   To the knowledge of Iconix, except for the Existing Claims, no other Person, other than Third Party Licensees pursuant to CHMT Licensed Marks Existing Licenses, owns or has rights in the CHMT Territory to any CHMT Licensed Mark;

(vi)   Parts A and B of Schedule C-2 to the Agreement (attached as Annex 3 hereto) constitutes a complete and accurate list of all of the existing licenses which cover the use of the CHMT Licensed Marks in one or more Countries in the CHMT Territory, and Part C of Schedule C-2 constitutes a table accurately specifying for each such license, the identity of the applicable Licensor, the Third Party Licensee granted rights thereunder, the CHMT Licensed Mark(s) licensed, the licensed goods, the applicable territory, the term and the status of the agreement;

(vii)   Iconix has delivered to LF a correct and complete copy of the CHMT Licensed Marks Existing Licenses (as amended to date);

(viii)   Except as disclosed in Exhibit E hereto, (i) each CHMT Licensed Marks Existing License is valid and in full force and effect, (ii) to Iconix's knowledge, the Licensor that is party thereto is not in violation or breach of or in default of its obligations under any such CHMT Licensed Marks Existing License, and to Iconix's knowledge, no Third Party Licensee is in violation or breach of or in default of its obligations under any such CHMT Licensed Marks Existing License, which violation, breach or default would, individually or in the aggregate, reasonably be expected to have a material adverse effect on such Licensor or the Licensee or impair the ability of such Licensor or the Licensee to perform its obligations under this Amendment, nor has any Third Party Licensee provided Iconix or any Licensor any written notice of an intent to breach any such CHMT Licensed Marks Existing License and (iii) and no Person (including any Third Party Licensee under any Existing License) has, to Iconix's

6

ICON-043-00034680

# A-1471

knowledge, any rights with respect to the CHMT Licensed Marks other than as expressly provided under an CHMT Licensed Marks Existing License;

(ix)     Except for the Existing Claims, to the knowledge of Iconix, neither Iconix, any Affiliate (as defined below) of Iconix (including any Licensor), or their respective licensees of the CHMT Licensed Marks (including the Third Party Licensees) nor any other party to any CHMT Licensed Mark Existing License has infringed upon, misappropriated or otherwise violated, or is currently infringing upon, misappropriating or otherwise violating, any Marks (as defined below) or any other intellectual property right of any other Person in the CHMT Territory as a result of use of the CHMT Licensed Marks in the CHMT Territory in connection with the design, manufacture, promotion, advertising and sale covered by the Applicable Classes, and, to the knowledge of Iconix, no Person has infringed, misappropriated or otherwise violated, or is currently infringing, misappropriating or otherwise violating, or otherwise challenging the validity or enforceability of Iconix's, any Affiliate of Iconix's (including any Licensor) or Third Party Licensee's rights under any CHMT Licensed Marks Existing License, with respect to any CHMT Licensed Mark in the Applicable New Territory and in the Applicable Classes, except the Existing Claims; and

(x)     Except for the Existing Claims, neither Iconix, any Affiliate of Iconix (including any Licensor), nor, to the knowledge of Licensor, their respective licensees and Affiliates has received from any Person any written notice, demand, threat, letter, claim or request alleging that the use of the CHMT Licensed Marks in the CHMT Territory and in the Applicable Class has or may have infringed or misappropriated or may be infringing or misappropriating or may infringe or misappropriate any intellectual property right of a third party, or challenging the validity, effectiveness or enforceability of any CHMT Licensed Marks Existing License.

(e)     No Actions:  No claim, action, suit, arbitration, inquiry, litigation or investigation or other proceeding is pending or, to the best knowledge of Iconix, threatened against Iconix, any Licensor or any other Affiliate of Iconix, or the Licensee (a) which questions the validity of this Amendment or the right of Iconix or any such Applicable Iconix Party to enter into this Amendment, to perform its obligations hereunder or to consummate the transactions contemplated hereby or (b) which would, either individually or in the aggregate, reasonably be expected to have a material adverse effect on any Applicable Iconix Party or impair the ability of any Applicable Iconix Party to perform its obligations hereunder.  None of the Applicable Iconix Parties is a party to or subject to any writ, order, decree, injunction or judgment of any Governmental Authority that would materially adversely affect it or the performance by any Applicable Iconix Party of its obligations hereunder.

(f)     Contracts:  Except for the Agreement and the Contracts disclosed in Exhibit F hereto, none of Iconix or any of its Subsidiaries is party to any Contract that purports to limit such party's freedom to compete freely in relation to any line of business or in any geographic area within the CHMT Territory.

(g)     Information and Projections:  To the knowledge of Iconix, the royalty figures provided by Iconix to LF in respect of the financial year ended December 31, 2013 as set out in Exhibit G are complete, accurate and not intentionally misleading. To the knowledge of Iconix, the forecasts of royalty for the year ending December 31, 2014 have been prepared in good faith and on reasonable assumptions which remain valid at the date of this Amendment.

7

ICON-043-00034681

(h)     Exclusivity of Representations and Warranties:  Neither Iconix nor any of its Affiliates is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this Agreement, and Iconix hereby disclaims any other such representations and warranties.

5.     Survival; Indemnification; Limitation.

(a)     Iconix shall have no liability under this Amendment for breach of or inaccuracy in any representation or warranty set forth in Section 4 of this Amendment (other than those contained in Sections 4(a) and 4(b) of this Amendment) or to indemnify Licensee Indemnified Parties (as defined below) under Section 5(b) of this Amendment against any such breach or inaccuracy, unless Iconix receives notice in writing from Licensee of a claim under said representations and warranties or indemnity on or before the date which is eighteen (18) months following the date of this Amendment.

(b)     Iconix shall indemnify and defend and hold harmless Licensee, its Affiliates and their respective officers, directors, shareholders, members, employees, advisors, agents and controlling persons (the "***Licensee Indemnified Parties***") from and against any and all losses, obligations, deficiencies, liabilities, claims (whether actual or threatened), damages, costs and expenses (including, without limitation, the amount of any settlement entered into pursuant hereto, and all reasonable legal fees and other expenses incurred in connection with the investigation, prosecution or defense of any matter indemnified pursuant hereto) ("***Losses***") which the Licensee Indemnified Parties may sustain, suffer or incur and which arise out of, are caused by, relate to, or result or occur from or in connection with (x) any breach of or inaccuracy in any representation or warranty made by Iconix in Section 4 of this Amendment and (y) without duplication, any claim brought by a licensee under any of the CHMT Licensed Marks Existing Licenses arising out of an event that occurred prior to the date hereof. Licensee shall be entitled to the benefit of this Section 5(b) and the indemnity herein for itself and as agent for the other Licensee Indemnified Parties.

(c)     Notwithstanding anything contained in this Amendment to the contrary, Iconix shall not be required to pay an aggregate amount in excess of [US$~~15,500,000~~21,500,000 (the "***Licensor Liability Cap***") in respect of all Losses incurred by Licensee Indemnified Parties by reason of any breach of, or inaccuracy in, any representation or warranty of Iconix under this Agreement.  Iconix shall not be liable for any claim for breach of, or inaccuracy in, any representations or warranties, or any claim for indemnification in respect of any such breach or inaccuracy, unless the aggregate Losses suffered by the Licensee Indemnified Parties exceed [US$~~620,000~~860,000 (the "***Basket***").  Losses to which the Basket applies, as described in the preceding sentence, are hereinafter referred to as the "***Basket Losses***."  At such time as the Basket Losses of the Licensee Indemnified Parties, in the aggregate, exceed the Basket, the full amount of all such Basket Losses that have been incurred or suffered by the Licensee Indemnified Parties which are entitled to be recovered under this Amendment shall be recoverable (and not merely the portion of such Basket Losses exceeding the Basket).  The parties agree to treat any indemnification payment pursuant to this Section 5 as an adjustment to the CHMT Marks Consideration (as defined in and contemplated by the Purchase Side Letter) for tax purposes.

(d)     In calculating any amount of Losses recoverable pursuant to this Section 5, the amount of such Losses shall be reduced by any insurance proceeds actually received by the indemnified party relating to such Loss (net of any costs of collection of such amounts, including, but not limited to, attorneys' fees and expenses) and any recoveries actually received

8

ICON-043-00034682

by the indemnified party from third parties pursuant to indemnification or similar obligations and increased by the cost of enforcing such claim for indemnification (including, but not limited to, attorney's fees and expenses).

(e)     Notwithstanding anything contained herein, Iconix shall be liable only for actual Losses of Licensee Indemnified Parties and shall not be liable for special, incidental, indirect, consequential, or punitive damages, including business interruption, diminution of value, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Amendment.

(f)     No Licensee Indemnified Party shall have any claim or recourse against Iconix or any of its Affiliates under this Section 5 or otherwise with respect to any breach or inaccuracy of any representation and warranty set forth in Section 4 of this Amendment of which Licensee had actual knowledge prior to the date hereof.

6.     Purchase Agreement Indemnification Procedures.  The provisions of Sections 5.4, 5.5, and 5.7 of the Purchase Agreement relating to third party claims, assistance and exclusive remedy are hereby incorporated herein by this reference, mutatis mutandis, and shall apply to any indemnification claims asserted by any Licensee Indemnified Party under Section 5(b) of this Amendment.

7.     Allocation of Royalties.  Iconix agrees to pay to Licensee (a) promptly following receipt by Iconix or any other Person any and all royalties, advertising contributions or other fees, compensation or other amounts with respect to sales in the CHMT Territory received from any Third Party Licensee pursuant to an CHMT Licensed Mark Existing License for periods following the date hereof (collectively, "***CHMT Licensed Mark Existing License Amounts***") that any Third Party Licensees pursuant to the CHMT Licensed Marks Existing Licenses pay to Iconix or any Licensor on or after the date hereof under the Additional Licensed Mark Existing Licenses, except to the extent such amounts relate to any periods preceding the date hereof; and (b) promptly following the date hereof, an amount equal to all CHMT Licensed Mark Existing License Amounts that any Third Party Licensees pursuant to CHMT Licensed Marks Existing Licenses shall have paid to Iconix or any Licensor prior to the date hereof under the CHMT Licensed Marks Existing Licenses as advances or other prepaid amounts for any period after the date hereof.

8.     Endorsement Logos and Sponsorship.

(a)     Iconix Luxembourg hereby grants the Licensee a non-exclusive license, with the right to grant sublicenses to any Sublicensee, to use and commercially exploit any trademarks, names, photographs, signatures, likenesses and other publicity or other rights of any soccer teams and players (such teams and players being collectively referred to as the "***Sponsorship Partners***") as to which Iconix Luxembourg has been granted rights (including all marketing and other materials in the possession of Iconix Luxembourg in which any of the foregoing are embodied) (collectively, "***Sponsorship Rights***") in connection with the advertisement or promotion of the Umbro Goods in the CHMT Territory, provided that the scope of such non-exclusive license is strictly limited to the extent that Iconix Luxembourg's contracts with Sponsorship Partners permit the exercise of such Sponsorship Rights in the CHMT Territory (or any jurisdictions forming part thereof).

(b)     Subject to the payment of the amounts specified under Section 8(c) and the marketing fee under Section 9 below, Iconix Luxembourg hereby grants the Licensee a non-exclusive license to grant to Sublicensees the right to use and commercially exploit the Sponsorship Rights in connection with the manufacture and sale of (x) any replica uniforms that

9

ICON-043-00034683

utilize the Umbro Trademarks ("***Umbro Licensed Uniforms***") or (y) any Umbro Goods (other than Umbro Licensed Uniforms) that utilize any Sponsorship Rights ("***Other Umbro Licensed Products***" and, together with Umbro Licensed Uniforms, "***Umbro Licensed Products***") in the CHMT Territory, <u>provided</u> that (i) the scope of such non-exclusive license is strictly limited to the extent that the relevant contracts of Iconix Luxembourg (or its Affiliates) with the Sponsorship Partners permit the use and exploitation of the Sponsorship Rights in connection with Umbro Licensed Products in the CHMT Territory and for the relevant term of any such contract, and (ii) the Licensee shall not, and shall not permit any Sublicensee to, use any Sponsorship Rights without first obtaining Iconix Luxembourg's consent to each such use, and Iconix Luxembourg shall within 14 calendar days from the receipt of the request by the Licensee send a response approving or rejecting the request, with consent deemed provided absent any response from Iconix Luxembourg within such 14 calendar day period.  For the avoidance of doubt, the Sponsorship Rights granted in this <u>Section 8(b)</u> may be exercised solely in connection with the Umbro Licensed Products manufactured and sold by Sublicensees.

(c)    In addition to any sales, advertising or other royalties or amounts payable to Licensee pursuant to any Sublicense Agreement, the Licensee shall require that each Sublicensee pay to Iconix Luxembourg pursuant to the Sublicense Agreement to which such Sublicensee is a party, and shall hold in trust for the exclusive benefit of Iconix Luxembourg and promptly pay to Iconix Luxembourg if and when received from each Sublicensee: (i) an incremental royalty in an amount equal to twenty-five percent (25%) of the Sublicensee's Net Wholesale Sales or Net Retail Sales, as applicable, of any Umbro Licensed Uniforms, <u>provided</u> that any Sublicensee operating pursuant to a direct to retail license agreement with Licensee (a "***DTR Partner***") shall instead pay an incremental twelve and a half percent (12.5%) of such DTR Partner's Net Retail Sales of Umbro Licensed Uniforms (the "***Umbro Licensed Product Badge Royalty Rate***"); and (ii) an incremental royalty in an amount equal to fifteen percent (15%) of the Sublicensee's Net Wholesale Sales or Net Retail Sales, as applicable, of any Other Umbro Licensed Products, <u>provided</u> that any DTR Partner shall instead pay an incremental seven and a half percent (7.5%) of such DTR Partner's Net Retail Sales of Other Umbro Licensed Products (the "***Badge Royalty Rate***" and, together with the Umbro Licensed Product Badge Royalty Rate, the "***Royalty Rates***"); in each case following the process and subject to the terms set out in <u>Sections 8(d)</u>, <u>8(e)</u>, <u>8(f)</u>, <u>8(g)</u>, <u>8(h)</u> and <u>8(i)</u>.

(d)    On or before the 30th day after every calendar month the Licensee shall provide Iconix Luxembourg with the written report setting forth the amounts of Net Sales and its calculation of any royalties payable pursuant to the Royalty Rates (the "***Badge Royalties***") for the previous calendar month and in the aggregate, to date, for Licensee's current fiscal year (the "***Licensee Sales Reports***").

(e)    The Licensee shall pay the Badge Royalties simultaneously with its submission of the Licensee Sales Reports.

(f)    The Licensee shall keep, and shall procure that its relevant Affiliates and licensees keep, complete and accurate books and records and shall keep and maintain all the Books and Records relating to the Licensee Sales Reports in such detail as will enable the Licensor to ascertain the accuracy of the reported Badge Royalties.  During the term of the Agreement, Iconix Luxembourg shall have the right to inspect or cause its independent certified public accountant to inspect, at its own cost, such Books and Records relating to this Licensee Sales Reports upon reasonable prior notice to the Licensee and during the Licensee's regular business hours.

10

ICON-043-00034684

**A-1475**

(g) In the event a Sponsorship Partner requires minimum sales of Umbro Licensed Products in the CHMT Territory pursuant to any agreement between such Sponsorship Partner and Iconix Luxembourg that governs Iconix Luxembourg's rights to the Sponsorship Rights licensed by such Sponsorship Partner, the Licensee agrees to indemnify Iconix Luxembourg for any penalty or other liability imposed under such agreement in the event the minimum sales are not met in the CHMT Territory for any reason.

(h) In the event that any Sponsorship Partner requires Iconix Luxembourg to pay any additional amounts pursuant to any agreement between such Sponsorship Partner and Iconix Luxembourg that governs Iconix Luxembourg's rights to the Sponsorship Rights licensed by such Sponsorship Partner, the Royalty Rates shall be subject to increase by a commensurate amount.

(i) The Licensee agrees to accept and abide by the common worldwide policy on replica product launch dates reasonably determined by Iconix Luxembourg for the worldwide market.

9. <u>Brand Marketing</u>. In consideration of the rights granted by the CHMT Licensors to Licensee under Sections 8(a) and (b) and the provision and license of Materials relating to the CHMT Licensed Marks by the CHMT Licensors pursuant to Section 8 of the Agreement, Licensee agrees to pay to CHMT Licensors during the term of the Agreement an annual marketing fee equal to eight percent (8%) of the royalty revenue payable to Licensee pursuant to any Sublicense Agreement in respect of any CHMT Licensed Marks and/or any of the Sponsorship Rights in each fiscal year, which fee shall be paid by Licensee within thirty (30) days after the end of each such fiscal year of Licensee; <u>provided</u>, <u>however</u>, that for purposes of calculating such annual marketing fee, the royalty revenue of the CHMT Licensed Marks shall not include the Badge Royalties.

10. <u>Addition of Certain Exhibits</u>.

(a) The Existing License Agreement is hereby amended by adding thereto:

(i) Schedule A-2 in form attached as <u>Annex 2</u> hereto,

(ii) Schedule C-2 in the form of <u>Annex 3</u> hereto and

(iii) Schedule D in the form of <u>Annex 4</u> hereto.

(b) The Existing License Agreement is hereby amended by inserting the contents of <u>Annex 5</u> into <u>Part B</u> of <u>Schedule C</u>.

(c) The Existing License Agreement is hereby amended by deleting in its entirety <u>Annex 1</u> to the Existing License Agreement and inserting in its place <u>Annex 1</u> to this Amendment. To the extent any Licensor set out in <u>Annex 1</u> of this Amendment was not a party to the Existing License Agreement, the parties hereto agree with such Licensor that such Licensor will become a party to and be bound by the Agreement with effect from the Amendment No. 2 Effective Date.

11. <u>No Other Amendment</u>. Except as expressly set forth in this Amendment, the terms and provisions of the Existing License Agreement will remain in full force and effect.

12. <u>Counterparts</u>. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument

11

ICON-043-00034685

**A-1476**

 

 

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Amendment the day and year first above written.

**LICENSORS:**

BADGLEY MISCHKA LICENSING LLC
HARDY WAY, LLC
IP HOLDINGS LLC
IP HOLDINGS UNLTD LLC
MOSSIMO HOLDINGS LLC
OFFICIAL PILLOWTEX LLC
OP HOLDINGS LLC
SHARPER IMAGE HOLDINGS LLC
STUDIO IP HOLDINGS LLC
ZY HOLDINGS LLC

By Iconix Brand Group, Inc., as Licensor / on behalf of the above-listed wholly-owned subsidiaries

By: _____
Name:
Title:
ICONIX LUXEMBOURG HOLDINGS SÀRL
By: _____
Name:
Title:
By: _____
Name:
Title:

12

ICON-043-00034686

**A-1477**

RED DIAMOND HOLDINGS SÀRL

By: _____
Name:
Title:
By: _____
Name:
Title:

ICONIX BRAND GROUP, INC.

By: _____

Name:
Title:

13

ICON-043-00034687

**A-1478**

**LICENSEE:**

ICONIX SE ASIA LIMITED

By: _____
Name:
Title:

14

ICON-043-00034688

**A-1479**

ICON-043-00034689

# A-1480

Document comparison by Workshare Professional on Thursday, September 11, 2014 5:54:28 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://NYDMS/AL/101780130/7 |
| Description | #101780130v7<AL> - Iconix LF - Amendment 2 to Master License Agreement (GDC 8.14.14) |
| Document 2 ID | interwovenSite://NYDMS/AL/101780130/8 |
| Description | #101780130v8<AL> - Iconix LF - Amendment 2 to Master License Agreement (GDC 9.11.14) |
| Rendering set | GDCrendering |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 10 |
| Deletions | 12 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 22 |

ICON-043-00034690

# A-1481

GIBSON DUNN DRAFT – 09/11/2014

## AMENDMENT NO. 2 TO MASTER LICENSE AGREEMENT

This **AMENDMENT NO. 2 TO MASTER LICENSE AGREEMENT** (this "***Amendment***"), is entered into effective as of [__] September, 2014, by and among **ICONIX BRAND GROUP, INC.**, a Delaware corporation ("***Iconix***"), the wholly owned subsidiaries of Iconix listed on Annex 1 hereto (each of the foregoing individually being referred to as a "***Licensor***" collectively, "***Licensors***"), and **ICONIX SE ASIA LIMITED** (f/k/a Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 ("***Licensee***").

### WITNESSETH:

**WHEREAS,** in connection with the Share Purchase Agreement effective as of September 30, 2013 (the "***Purchase Agreement***") between Iconix and LF Asia Limited, a limited liability company organized under the laws of Hong Kong with company number 0872646 ("***LF***"), Licensors and Licensee entered into that certain Master License Agreement effective as of September 30, 2013, as amended by that certain Amendment No. 1 to Master License Agreement, dated as of June 30, 2014 (the "***Existing License Agreement***"; capitalized terms used herein without definition shall have the meanings ascribed to them in the Existing License Agreement as amended by this Amendment), pursuant to which Licensors granted to Licensee the exclusive right, subject to the exceptions and other terms and conditions set forth in the Existing License Agreement, to use and display, and to grant sublicenses to third parties to use and display, certain trademark registrations or applications owned by Licensors in a specified territory;

**WHEREAS,** Iconix and LF currently each own 50% of the shares of Licensee;

**WHEREAS,** in recognition of the fact that the right to use the trademark registrations or applications covering or relating to the "UMBRO" or "LEE COOPER" brands that are owned by Iconix Luxembourg Holdings S.ar.l. ("***Iconix Luxembourg***") and Red Diamond Holdings S.ar.l. ("***Red Diamond***" and, together with Iconix Luxembourg, the "***CHMT Marks Licensors***"), respectively, in the CHMT Territory (as defined below) is deemed to have a fair market value of US$43,000,000, and that Iconix and LF each own 50% of Licensee, LF has agreed by a side letter dated on or about the date of this Amendment ("***Purchase Side Letter***") to pay to Iconix Luxembourg and Red Diamond 50% of such fair market value, or US$21,500,000 in exchange for Iconix and Licensors agreeing to amend the Existing License Agreement to provide for the CHMT Marks Licensors to grant to Licensee an exclusive license to such registrations or applications owned by the CHMT Marks Licensors in the CHMT Territory (subject to the exceptions contained herein); and

**WHEREAS,** Iconix, Licensors and Licensee desire to amend the Existing License Agreement to provide for the CHMT Marks Licensors to grant an exclusive license to Licensee of such trademark registrations or applications owned by the CHMT Marks Licensors in the CHMT Territory and for Iconix Luxembourg to grant a non-exclusive license of certain endorsement, sponsorship and similar rights and to amend the Existing License Agreement in certain other respects as hereinafter set forth.

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-043-00034690

# A-1482

NOW, THEREFORE, for and in consideration of the premises and covenants and conditions forth below, Licensors and License agree to amend the Existing License Agreement as follows:

## AGREEMENT

1.     Amendments to Definitions.

(a)     The Preamble of the Existing License Agreement is hereby amended by deleting the parenthetical definition "(this "*Agreement*")" and inserting in its place the following:

(as amended by Amendment No. 1 (as defined below) and Amendment No. 2 (as defined below), and as the same may be amended from time to time, this "*Agreement*")

(b)     Section 1 of the Existing License Agreement is hereby amended by deleting the definitions of "Existing Licenses", "Licensed Marks", "New Multicountry License", "Retained Multicountry License" and "Territory" in their entirety and inserting in their place the following:

"*Existing Licenses*" means the existing licenses that cover the use of the Licensed Marks in one or more Countries, granted under the license agreements set out in Part A and Part B of Schedule C, in the case of licenses of Existing Licensed Marks, the Additional Licensed Mark Existing Licenses, in the case of licenses of Additional Licensed Marks, and the CHMT Licensed Marks Existing Licenses, in the case of licenses of the CHMT Licensed Marks;

"*Licensed Marks*" means, collectively, the Existing Licensed Marks, the Additional Licensed Marks and the CHMT Licensed Marks;

"*New Multicountry License*" means any license of any Licensed Mark granted by any Licensor to a Person that covers a territory including both: (a) a Country (being within the Territory); and (b) a country outside of the Territory, and which was not in place at the date of the Existing License Agreement, in the case of a license of an Existing Licensed Mark, or the Amendment No. 1 Effective Date, in the case of a license of an Additional Licensed Mark, or the Amendment No. 2 Effective Date, in the case of a license of a CHMT Licensed Mark;

"*Retained Multicountry Licenses*" means the Existing Licenses that cover a territory including both: (a) a Country (being within the Territory); and (b) a country outside of the Territory, as listed under Part B of Schedule C, in the case of a license of an Existing Licensed Mark, or under Part B of Schedule C-1, in the case of a license of an Additional Licensed Mark, or under Part B of Schedule C-2, in the case of a license of a CHMT Licensed Mark;

"*Territory*" means, collectively, the Existing Territory, the Applicable New Territory, and the CHMT Territory (and any reference to Territory in this Agreement shall be interpreted in accordance with the definition of Licensed Marks within such Territory);

2

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034691

# A-1483

(c)    Section 1 of the Existing License Agreement is hereby amended by adding the following new definitions in alphabetical order in Section 1:

"*Amendment No. 2*" means Amendment No. 2 to the Master License Agreement effective as of the Amendment No. 2 Effective Date, by and among Licensors and Licensee;

"*Amendment No. 2 Effective Date*" means [__] September 2014, the effective date of Amendment No. 2;

"*Articles*" means a product bearing a Licensed Mark, including, without limitation, Umbro Goods;

"*CHMT Licensed Marks*" means, collectively, the trademark registrations or applications in the CHMT Territory set forth in Schedule A-2 and any registrations and applications in the CHMT Territory which become or are deemed to be Licensed Marks through the operation of this Agreement;

"*CHMT Licensed Marks Existing Licenses*" means the existing licenses that cover the use of the CMHT Licensed Marks in one or more Countries, granted under the license agreements set out in Part A and Part B of Schedule C-2 (and as further particularized in Part C of that schedule);

"*CHMT Territory*" means the People's Republic of China, Hong Kong, Macau and Taiwan;

"*Hong Kong*" means the Hong Kong Special Administrative Region of the People's Republic of China;

"*Macau*" means the Macau Special Administrative Region of the People's Republic of China;

"*Relevant Date*" to the extent applicable, the Effective Date, the Amendment No. 1 Effective Date or the Amendment No. 2 Effective Date; and

"*Taiwan*" means the Republic of China.

2.    Definitions Applicable in this Amendment:  The following terms are defined solely for the purposes of this Amendment:

"*Applicable Iconix Party*" shall mean Iconix and each Licensor.

"*Books and Records*" means all technical, business and financial records, or other documentation and information in any form whatsoever (including written, printed, electronic or computer printout form) material to the reports to be provided under this Amendment.

"*Contracts*", when described as being those of or applicable to any Person, shall mean any and all contracts, agreements, commitments, arrangements or other undertakings, whether formal or informal, written or oral, including any amendment and other modifications

3

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034692

thereto, to which such Person is a party or by which such Person or its properties or assets is subject or bound.

"***Digital New Media***" means any and all means by which any (audio, visual, or other) information, data and/or material is made available and/or disseminated by means of a radio, television, computer or other processing unit, telecommunications, electronic communications, information service and/or delivery and/or receiving device, mechanism and/or means, in each case whether analogue, digital or otherwise or any other device, mechanism and/or means which is the same as, similar to, varies and/or supersedes any and/or all the same, either now known or hereinafter invented (including the "Internet", the "World Wide Web", "Wireless Application Protocol", "Short Messaging Service", "Universal Mobile Telecommunications System" (and all related applications, including latest generation mobile telephony), "General Packet Radio Services/Systems", and "Global System for Mobile Communications").

"***Existing Claims***" means, with respect to the Additional Licensed Marks, those pending or threatened actions, oppositions, claims and proceedings listed on Exhibit A hereto.

"***knowledge***," "***best knowledge***," and any other words or phrases bearing on the knowledge or awareness as to any specified matters of: (a) Iconix, shall mean the knowledge that Neil Cole or Seth Horowitz actually has or would reasonably be expected to have if he had made reasonable enquiries of the relevant members of management of Iconix, its Affiliates and the Licensee as to the specified matters and (b) LF, shall mean the knowledge that Jason Rabin or David Thomas actually has or would reasonably be expected to have if he had made reasonable enquiries of the relevant members of management of LF, its Affiliates and the Licensee as to the specified matters.

"***Liens***" has the meaning given to it in the Purchase Agreement.

"***Marks***" means trade names, trademarks, service marks and trade dress, and all identifications, labels, insignia or indicia thereof, and all registrations and applications for registration for the foregoing and all common law trademark rights relating thereto.

"***Net Sales***" means the Net Retail Sales and the Net Wholesale Sales.

"***Net Retail Sales***" means gross sales of Umbro Goods through Owned Stores as received by the Licensee, its Affiliates, licensees, distributors and Sublicensees, to its customers reduced only by: consumption taxes and shipping charges actually passed on to customers, allowances, and returns.

"***Net Wholesale Sales***" means the sum of gross sales of Umbro Goods in the Territory other than through Owned Stores as invoiced by the Licensee, its Affiliates, licensees, distributors and Sublicensees, to its customers which, for the avoidance of doubt does include department stores and other consignees in the case that they sell Umbro Goods for the Licensee on a consignment sale basis) reduced only by: actual discounts for prompt payment or volume discounts actually earned and taken by customers on the basis of the Licensee's usual trade conditions and returns.

4

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034693

# A-1485

"*Owned Stores*" means all or any: (i) retail premises owned, operated or controlled by the Licensee, its Affiliates, licensees, sublicensees and distributors in the Territory; (ii) store-in-store concession areas or bays in retail outlets or department stores where such concession areas or bays are owned, operated or controlled by the Licensee and its Affiliates and each of their respective licensees, sub-licensees and distributors in the Territory; or (iii) any retail site operated or accessed via Digital New Media and owned, operated or controlled by the Licensee and its Affiliates and each of their respective licensees, sub-licensees and distributors.

"*Subsidiary*" shall have the meaning given to it in the Purchase Agreement.

"*Third Party Licensee*" means a Person to which a Licensor has granted a license to use Additional Licensed Marks in the Applicable New Territory pursuant to an Additional Licensed Mark Existing License.

"*Umbro Goods*" means all Articles bearing the Umbro Trademarks.

"*Umbro Trademarks*" means any and all CHMT Licensed Marks that cover or relate to "UMBRO", both in words and as logos.

3.     Representations and Warranties of Licensors. Iconix and each Licensor represents, warrants and covenants that such Licensor (or in the case of Iconix, each Licensor and Iconix) has the full right, power and authority to grant the licenses contemplated to be granted to Licensee under the Existing License Agreement, as amended by this Amendment (and Iconix is the sole direct/indirect shareholder of each Licensor and has the full right, power and authority to sign this Amendment on behalf of each Licensor).

4.     Representations and Warranties of Iconix. Iconix hereby represents and warrants to Licensee as follows:

(a)     Authority; Binding Agreement:  The execution and delivery by each Applicable Iconix Party of this Amendment, the performance by such Applicable Iconix Party of its obligations hereunder, and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all necessary action on the part of such Applicable Iconix Party, and the Applicable Iconix Party has all necessary power and authority with respect thereto. This Amendment will be when executed and delivered by or on behalf of such Applicable Iconix Party, the legal, valid and binding obligation of such Applicable Iconix Party, enforceable against such Applicable Iconix Party in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b)     Noncontravention:  Neither the execution and delivery by or on behalf of any Applicable Iconix Party of this Amendment, the consummation by such Applicable Iconix Party of any of the transactions contemplated hereby, nor the performance by such Applicable Iconix Party of its obligations hereunder will (nor with the giving of notice or the lapse of time or both would) (i) conflict with or result in a breach of any provision of (x) any CHMT Licensed Marks Existing License or other Contract to which such Applicable Iconix Party is a party or bound or any other obligation of such Applicable Iconix Party to any Person, or (y) the

5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-043-00034694

certificate of incorporation or certificate of formation and memorandum and articles of association or by-laws or limited liability company agreement, in each case as applicable, of such Applicable Iconix Party, each as amended to date, (ii) obligate the Licensee or LF to pay any royalty or other compensation to any Person, (iii) result in the creation or imposition of any Lien upon the CHMT Licensed Marks or the Licensee's rights thereto under the Agreement, or any other assets of the Licensee, or (iv) constitute a violation of any Law (as defined below) applicable to the Applicable Iconix Party, except in the case of clauses (i)(x), (iii) and (iv), for such conflicts, breaches, Liens and violations as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect Iconix or the Licensee or impair the ability of Iconix to perform its obligations hereunder or under the Agreement. For purposes of this Amendment, "***Law***" shall mean any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order, of any Governmental Authority (as hereinafter defined in Section 4(c) of this Amendment).

(c)     Consents:  Except as disclosed in Exhibit B hereto, no consent, approval, waiver, notice, order, or authorization of, or registration, qualification, designation, declaration, recordal or filing with, any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority (each, a "***Governmental Authority***") or any other Person (including any party to a CHMT Licensed Marks Existing License) is required in connection with the execution and delivery by each of the Applicable Iconix Parties of this Amendment, the performance by any Applicable Iconix Party of its obligations hereunder or consummation by such Applicable Iconix Party of the transactions contemplated hereby, except as would not, individually or in the aggregate, reasonably be expected to have a materially adverse effect on Iconix or the Licensee or impair the ability of such Applicable Iconix Party to perform its obligations hereunder.

(d)     Intellectual Property:

(i)     All rights, title and interests with respect to the CHMT Licensed Marks in the CHMT Territory, as set forth on Schedule A-2 to the Agreement (attached as Annex 2 hereto), are owned by the applicable Licensor, free and clear of any Liens other than the CHMT Licensed Marks Existing Licenses to which such Licensor is a party and any Liens specified on Exhibit C hereto;

(ii)     Each of the wholly owned Subsidiaries of Iconix that owns the CHMT Licensed Marks in the CHMT Territory has granted to the Licensee a perpetual and exclusive (subject to the exceptions set forth in the Agreement) license of the CHMT Licensed Marks owned by such Person for use in the Territory in connection with the Applicable Licensed Products and Services;

(iii)     To the knowledge of Iconix, except for the Existing Claims (as defined below), the use, licensing and/or sublicensing of the CHMT Licensed Marks in the CHMT Territory in connection with the design, manufacture, promotion, advertising

6

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034695

# A-1487

and sale of products covered by the trademark registrations and applications for the CHMT Licensed Marks in the CHMT Territory (the "***Applicable Classes***") does not infringe upon any intellectual property rights or any other rights of any other Person;

       (iv)    Schedule A-2 to the Agreement (attached as Annex 2 hereto) is a complete and accurate list of all of the registrations and applications for registration of CHMT Licensed Marks in the CHMT Territory; and the status of each CHMT Licensed Mark on Schedule A-2 to the Agreement (attached as Annex 2 hereto) is complete and accurate, and, to the knowledge of Iconix, all of the trademark registrations and applications for registration for the CHMT Licensed Marks in the CHMT Territory as set forth on Schedule A-2 to the Agreement (attached as Annex 2 hereto) are valid and subsisting, the registrations are enforceable in all material respects, and, except as set forth in Exhibit D hereto, none of such filings has expired or been abandoned, opposed, canceled or otherwise invalidated; and all fee payments, actions and/or filings required to be taken or made prior to the date hereof and within the ninety (90) day period hereafter in order to maintain such registrations in full force and effect and maintain such applications pending have been taken and made;

       (v)    To the knowledge of Iconix, except for the Existing Claims, no other Person, other than Third Party Licensees pursuant to CHMT Licensed Marks Existing Licenses, owns or has rights in the CHMT Territory to any CHMT Licensed Mark;

       (vi)    Parts A and B of Schedule C-2 to the Agreement (attached as Annex 3 hereto) constitutes a complete and accurate list of all of the existing licenses which cover the use of the CHMT Licensed Marks in one or more Countries in the CHMT Territory, and Part C of Schedule C-2 constitutes a table accurately specifying for each such license, the identity of the applicable Licensor, the Third Party Licensee granted rights thereunder, the CHMT Licensed Mark(s) licensed, the licensed goods, the applicable territory, the term and the status of the agreement;

       (vii)    Iconix has delivered to LF a correct and complete copy of the CHMT Licensed Marks Existing Licenses (as amended to date);

       (viii)    Except as disclosed in Exhibit E hereto, (i) each CHMT Licensed Marks Existing License is valid and in full force and effect, (ii) to Iconix's knowledge, the Licensor that is party thereto is not in violation or breach of or in default of its obligations under any such CHMT Licensed Marks Existing License, and to Iconix's knowledge, no Third Party Licensee is in violation or breach of or in default of its obligations under any such CHMT Licensed Marks Existing License, which violation, breach or default would, individually or in the aggregate, reasonably be expected to have a material adverse effect on such Licensor or the Licensee or impair the ability of such Licensor or the Licensee to perform its obligations under this Amendment, nor has any Third Party Licensee provided Iconix or any Licensor any written notice of an intent to breach any such CHMT Licensed Marks Existing License and (iii) and no Person (including any Third Party Licensee under any Existing License) has, to Iconix's

7

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-043-00034696

knowledge, any rights with respect to the CHMT Licensed Marks other than as expressly provided under an CHMT Licensed Marks Existing License;

(ix)     Except for the Existing Claims, to the knowledge of Iconix, neither Iconix, any Affiliate (as defined below) of Iconix (including any Licensor), or their respective licensees of the CHMT Licensed Marks (including the Third Party Licensees) nor any other party to any CHMT Licensed Mark Existing License has infringed upon, misappropriated or otherwise violated, or is currently infringing upon, misappropriating or otherwise violating, any Marks (as defined below) or any other intellectual property right of any other Person in the CHMT Territory as a result of use of the CHMT Licensed Marks in the CHMT Territory in connection with the design, manufacture, promotion, advertising and sale covered by the Applicable Classes, and, to the knowledge of Iconix, no Person has infringed, misappropriated or otherwise violated, or is currently infringing, misappropriating or otherwise violating, or otherwise challenging the validity or enforceability of Iconix's, any Affiliate of Iconix's (including any Licensor) or Third Party Licensee's rights under any CHMT Licensed Marks Existing License, with respect to any CHMT Licensed Mark in the Applicable New Territory and in the Applicable Classes, except the Existing Claims; and

(x)     Except for the Existing Claims, neither Iconix, any Affiliate of Iconix (including any Licensor), nor, to the knowledge of Licensor, their respective licensees and Affiliates has received from any Person any written notice, demand, threat, letter, claim or request alleging that the use of the CHMT Licensed Marks in the CHMT Territory and in the Applicable Class has or may have infringed or misappropriated or may be infringing or misappropriating or may infringe or misappropriate any intellectual property right of a third party, or challenging the validity, effectiveness or enforceability of any CHMT Licensed Marks Existing License.

(e)     No Actions:  No claim, action, suit, arbitration, inquiry, litigation or investigation or other proceeding is pending or, to the best knowledge of Iconix, threatened against Iconix, any Licensor or any other Affiliate of Iconix, or the Licensee (a) which questions the validity of this Amendment or the right of Iconix or any such Applicable Iconix Party to enter into this Amendment, to perform its obligations hereunder or to consummate the transactions contemplated hereby or (b) which would, either individually or in the aggregate, reasonably be expected to have a material adverse effect on any Applicable Iconix Party or impair the ability of any Applicable Iconix Party to perform its obligations hereunder.  None of the Applicable Iconix Parties is a party to or subject to any writ, order, decree, injunction or judgment of any Governmental Authority that would materially adversely affect it or the performance by any Applicable Iconix Party of its obligations hereunder.

(f)     Contracts:  Except for the Agreement and the Contracts disclosed in Exhibit F hereto, none of Iconix or any of its Subsidiaries is party to any Contract that purports to limit such party's freedom to compete freely in relation to any line of business or in any geographic area within the CHMT Territory.

(g)     Information and Projections:  To the knowledge of Iconix, the royalty figures provided by Iconix to LF in respect of the financial year ended December 31, 2013 as set

8

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-043-00034697

**A-1489**

out in Exhibit G are complete, accurate and not intentionally misleading. To the knowledge of Iconix, the forecasts of royalty for the year ending December 31, 2014 have been prepared in good faith and on reasonable assumptions which remain valid at the date of this Amendment.

(h)    Exclusivity of Representations and Warranties: Neither Iconix nor any of its Affiliates is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this Agreement, and Iconix hereby disclaims any other such representations and warranties.

5.    Survival; Indemnification; Limitation.

(a)    Iconix shall have no liability under this Amendment for breach of or inaccuracy in any representation or warranty set forth in Section 4 of this Amendment (other than those contained in Sections 4(a) and 4(b) of this Amendment) or to indemnify Licensee Indemnified Parties (as defined below) under Section 5(b) of this Amendment against any such breach or inaccuracy, unless Iconix receives notice in writing from Licensee of a claim under said representations and warranties or indemnity on or before the date which is eighteen (18) months following the date of this Amendment.

(b)    Iconix shall indemnify and defend and hold harmless Licensee, its Affiliates and their respective officers, directors, shareholders, members, employees, advisors, agents and controlling persons (the "***Licensee Indemnified Parties***") from and against any and all losses, obligations, deficiencies, liabilities, claims (whether actual or threatened), damages, costs and expenses (including, without limitation, the amount of any settlement entered into pursuant hereto, and all reasonable legal fees and other expenses incurred in connection with the investigation, prosecution or defense of any matter indemnified pursuant hereto) ("***Losses***") which the Licensee Indemnified Parties may sustain, suffer or incur and which arise out of, are caused by, relate to, or result or occur from or in connection with (x) any breach of or inaccuracy in any representation or warranty made by Iconix in Section 4 of this Amendment and (y) without duplication, any claim brought by a licensee under any of the CHMT Licensed Marks Existing Licenses arising out of an event that occurred prior to the date hereof. Licensee shall be entitled to the benefit of this Section 5(b) and the indemnity herein for itself and as agent for the other Licensee Indemnified Parties.

(c)    Notwithstanding anything contained in this Amendment to the contrary, Iconix shall not be required to pay an aggregate amount in excess of US$21,500,000 (the "***Licensor Liability Cap***") in respect of all Losses incurred by Licensee Indemnified Parties by reason of any breach of, or inaccuracy in, any representation or warranty of Iconix under this Agreement. Iconix shall not be liable for any claim for breach of, or inaccuracy in, any representations or warranties, or any claim for indemnification in respect of any such breach or inaccuracy, unless the aggregate Losses suffered by the Licensee Indemnified Parties exceed US$860,000 (the "***Basket***"). Losses to which the Basket applies, as described in the preceding sentence, are hereinafter referred to as the "***Basket Losses***." At such time as the Basket Losses of the Licensee Indemnified Parties, in the aggregate, exceed the Basket, the full amount of all such Basket Losses that have been incurred or suffered by the Licensee Indemnified Parties which are entitled to be recovered under this Amendment shall be recoverable (and not merely the portion of such Basket Losses exceeding the Basket). The parties agree to treat any

9

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.     **ICON-043-00034698**

# A-1490

indemnification payment pursuant to this Section 5 as an adjustment to the CHMT Marks Consideration (as defined in and contemplated by the Purchase Side Letter) for tax purposes.

(d)     In calculating any amount of Losses recoverable pursuant to this Section 5, the amount of such Losses shall be reduced by any insurance proceeds actually received by the indemnified party relating to such Loss (net of any costs of collection of such amounts, including, but not limited to, attorneys' fees and expenses) and any recoveries actually received by the indemnified party from third parties pursuant to indemnification or similar obligations and increased by the cost of enforcing such claim for indemnification (including, but not limited to, attorney's fees and expenses).

(e)     Notwithstanding anything contained herein, Iconix shall be liable only for actual Losses of Licensee Indemnified Parties and shall not be liable for special, incidental, indirect, consequential, or punitive damages, including business interruption, diminution of value, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Amendment.

(f)     No Licensee Indemnified Party shall have any claim or recourse against Iconix or any of its Affiliates under this Section 5 or otherwise with respect to any breach or inaccuracy of any representation and warranty set forth in Section 4 of this Amendment of which Licensee had actual knowledge prior to the date hereof.

6.     Purchase Agreement Indemnification Procedures.  The provisions of Sections 5.4, 5.5, and 5.7 of the Purchase Agreement relating to third party claims, assistance and exclusive remedy are hereby incorporated herein by this reference, mutatis mutandis, and shall apply to any indemnification claims asserted by any Licensee Indemnified Party under Section 5(b) of this Amendment.

7.     Allocation of Royalties.  Iconix agrees to pay to Licensee (a) promptly following receipt by Iconix or any other Person any and all royalties, advertising contributions or other fees, compensation or other amounts with respect to sales in the CHMT Territory received from any Third Party Licensee pursuant to an CHMT Licensed Mark Existing License for periods following the date hereof (collectively, "***CHMT Licensed Mark Existing License Amounts***") that any Third Party Licensees pursuant to the CHMT Licensed Marks Existing Licenses pay to Iconix or any Licensor on or after the date hereof under the Additional Licensed Mark Existing Licenses, except to the extent such amounts relate to any periods preceding the date hereof; and (b) promptly following the date hereof, an amount equal to all CHMT Licensed Mark Existing License Amounts that any Third Party Licensees pursuant to CHMT Licensed Marks Existing Licenses shall have paid to Iconix or any Licensor prior to the date hereof under the CHMT Licensed Marks Existing Licenses as advances or other prepaid amounts for any period after the date hereof.

8.     Endorsement Logos and Sponsorship.

(a)     Iconix Luxembourg hereby grants the Licensee a non-exclusive license, with the right to grant sublicenses to any Sublicensee, to use and commercially exploit any trademarks, names, photographs, signatures, likenesses and other publicity or other rights of any

10

soccer teams and players (such teams and players being collectively referred to as the "***Sponsorship Partners***") as to which Iconix Luxembourg has been granted rights (including all marketing and other materials in the possession of Iconix Luxembourg in which any of the foregoing are embodied) (collectively, "***Sponsorship Rights***") in connection with the advertisement or promotion of the Umbro Goods in the CHMT Territory, provided that the scope of such non-exclusive license is strictly limited to the extent that Iconix Luxembourg's contracts with Sponsorship Partners permit the exercise of such Sponsorship Rights in the CHMT Territory (or any jurisdictions forming part thereof).

(b)     Subject to the payment of the amounts specified under Section 8(c) and the marketing fee under Section 9 below, Iconix Luxembourg hereby grants the Licensee a non-exclusive license to grant to Sublicensees the right to use and commercially exploit the Sponsorship Rights in connection with the manufacture and sale of (x) any replica uniforms that utilize the Umbro Trademarks ("***Umbro Licensed Uniforms***") or (y) any Umbro Goods (other than Umbro Licensed Uniforms) that utilize any Sponsorship Rights ("***Other Umbro Licensed Products***" and, together with Umbro Licensed Uniforms, "***Umbro Licensed Products***") in the CHMT Territory, provided that (i) the scope of such non-exclusive license is strictly limited to the extent that the relevant contracts of Iconix Luxembourg (or its Affiliates) with the Sponsorship Partners permit the use and exploitation of the Sponsorship Rights in connection with Umbro Licensed Products in the CHMT Territory and for the relevant term of any such contract, and (ii) the Licensee shall not, and shall not permit any Sublicensee to, use any Sponsorship Rights without first obtaining Iconix Luxembourg's consent to each such use, and Iconix Luxembourg shall within 14 calendar days from the receipt of the request by the Licensee send a response approving or rejecting the request, with consent deemed provided absent any response from Iconix Luxembourg within such 14 calendar day period.  For the avoidance of doubt, the Sponsorship Rights granted in this Section 8(b) may be exercised solely in connection with the Umbro Licensed Products manufactured and sold by Sublicensees.

(c)     In addition to any sales, advertising or other royalties or amounts payable to Licensee pursuant to any Sublicense Agreement, the Licensee shall require that each Sublicensee pay to Iconix Luxembourg pursuant to the Sublicense Agreement to which such Sublicensee is a party, and shall hold in trust for the exclusive benefit of Iconix Luxembourg and promptly pay to Iconix Luxembourg if and when received from each Sublicensee: (i) an incremental royalty in an amount equal to twenty-five percent (25%) of the Sublicensee's Net Wholesale Sales or Net Retail Sales, as applicable, of any Umbro Licensed Uniforms, provided that any Sublicensee operating pursuant to a direct to retail license agreement with Licensee (a "***DTR Partner***") shall instead pay an incremental twelve and a half percent (12.5%) of such DTR Partner's Net Retail Sales of Umbro Licensed Uniforms (the "***Umbro Licensed Product Badge Royalty Rate***"); and (ii) an incremental royalty in an amount equal to fifteen percent (15%) of the Sublicensee's Net Wholesale Sales or Net Retail Sales, as applicable, of any Other Umbro Licensed Products, provided that any DTR Partner shall instead pay an incremental seven and a half percent (7.5%) of such DTR Partner's Net Retail Sales of Other Umbro Licensed Products (the "***Badge Royalty Rate***" and, together with the Umbro Licensed Product Badge Royalty Rate, the "***Royalty Rates***"); in each case following the process and subject to the terms set out in Sections 8(d), 8(e), 8(f), 8(g), 8(h) and 8(i).

11

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                              **ICON-043-00034700**

**A-1492**

(d)    On or before the 30th day after every calendar month the Licensee shall provide Iconix Luxembourg with the written report setting forth the amounts of Net Sales and its calculation of any royalties payable pursuant to the Royalty Rates (the "***Badge Royalties***") for the previous calendar month and in the aggregate, to date, for Licensee's current fiscal year (the "***Licensee Sales Reports***").

(e)    The Licensee shall pay the Badge Royalties simultaneously with its submission of the Licensee Sales Reports.

(f)    The Licensee shall keep, and shall procure that its relevant Affiliates and licensees keep, complete and accurate books and records and shall keep and maintain all the Books and Records relating to the Licensee Sales Reports in such detail as will enable the Licensor to ascertain the accuracy of the reported Badge Royalties.  During the term of the Agreement, Iconix Luxembourg shall have the right to inspect or cause its independent certified public accountant to inspect, at its own cost, such Books and Records relating to this Licensee Sales Reports upon reasonable prior notice to the Licensee and during the Licensee's regular business hours.

(g)    In the event a Sponsorship Partner requires minimum sales of Umbro Licensed Products in the CHMT Territory pursuant to any agreement between such Sponsorship Partner and Iconix Luxembourg that governs Iconix Luxembourg's rights to the Sponsorship Rights licensed by such Sponsorship Partner, the Licensee agrees to indemnify Iconix Luxembourg for any penalty or other liability imposed under such agreement in the event the minimum sales are not met in the CHMT Territory for any reason.

(h)    In the event that any Sponsorship Partner requires Iconix Luxembourg to pay any additional amounts pursuant to any agreement between such Sponsorship Partner and Iconix Luxembourg that governs Iconix Luxembourg's rights to the Sponsorship Rights licensed by such Sponsorship Partner, the Royalty Rates shall be subject to increase by a commensurate amount.

(i)    The Licensee agrees to accept and abide by the common worldwide policy on replica product launch dates reasonably determined by Iconix Luxembourg for the worldwide market.

12

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**          **ICON-043-00034701**

## A-1493

9.      Brand Marketing.  In consideration of the rights granted by the CHMT Licensors to Licensee under Sections 8(a) and (b) and the provision and license of Materials relating to the CHMT Licensed Marks by the CHMT Licensors pursuant to Section 8 of the Agreement, Licensee agrees to pay to CHMT Licensors during the term of the Agreement an annual marketing fee equal to eight percent (8%) of the royalty revenue payable to Licensee pursuant to any Sublicense Agreement in respect of any CHMT Licensed Marks and/or any of the Sponsorship Rights in each fiscal year, which fee shall be paid by Licensee within thirty (30) days after the end of each such fiscal year of Licensee; provided, however, that for purposes of calculating such annual marketing fee, the royalty revenue of the CHMT Licensed Marks shall not include the Badge Royalties.

10.      Addition of Certain Exhibits.

(a)      The Existing License Agreement is hereby amended by adding thereto:

(i)      Schedule A-2 in form attached as Annex 2 hereto,

(ii)      Schedule C-2 in the form of Annex 3 hereto and

(iii)      Schedule D in the form of Annex 4 hereto.

(b)      The Existing License Agreement is hereby amended by inserting the contents of Annex 5 into Part B of Schedule C.

(c)      The Existing License Agreement is hereby amended by deleting in its entirety Annex 1 to the Existing License Agreement and inserting in its place Annex 1 to this Amendment. To the extent any Licensor set out in Annex 1 of this Amendment was not a party to the Existing License Agreement, the parties hereto agree with such Licensor that such Licensor will become a party to and be bound by the Agreement with effect from the Amendment No. 2 Effective Date.

11.      No Other Amendment.  Except as expressly set forth in this Amendment, the terms and provisions of the Existing License Agreement will remain in full force and effect.

12.      Counterparts.  This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument

13

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                                    ICON-043-00034702

# A-1494

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Amendment the day and year first above written.

**LICENSORS:**

BADGLEY MISCHKA LICENSING LLC
HARDY WAY, LLC
IP HOLDINGS LLC
IP HOLDINGS UNLTD LLC
MOSSIMO HOLDINGS LLC
OFFICIAL PILLOWTEX LLC
OP HOLDINGS LLC
SHARPER IMAGE HOLDINGS LLC
STUDIO IP HOLDINGS LLC
ZY HOLDINGS LLC

By Iconix Brand Group, Inc., as Licensor / on behalf of the above-listed wholly-owned subsidiaries

By: _____
Name:
Title:

ICONIX LUXEMBOURG HOLDINGS SÀRL

By: _____
Name:
Title:

By: _____
Name:
Title:

14

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00034703**

# A-1495

RED DIAMOND HOLDINGS SÀRL

By: _____
Name:
Title:

By: _____
Name:
Title:

ICONIX BRAND GROUP, INC.

By: _____

Name:
Title:

15

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc. ICON-043-00034704

# A-1496

**LICENSEE:**

ICONIX SE ASIA LIMITED

By: _____

Name:

Title:

16

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.     ICON-043-00034705

# A-1497

GIBSON DUNN DRAFT – 09/11/2014

To:  LF Asia Limited
     11th Floor, LiFung Tower,
     888 Cheung Sha Wan Road,
     Kowloon,
     Hong Kong

Date:  [__] September 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks**

Reference is hereby made to (a) the Amendment No. 2 to the Master License Agreement (the "*Master License Agreement Amendment*") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("*Iconix*"), certain of Iconix's wholly owned subsidiaries ("*Licensors*"), and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("*Licensee*"), amending the Master License Agreement (as amended by Amendment No. 1 to Master License Agreement, effective as of June 30, 2014, the "*Existing Master License Agreement*"), by and among Iconix, Licensors and Licensee, and (b) the Second Amended and Restated Shareholders Agreement of Iconix SE Asia Limited (the "*Second Amended and Restated Shareholders Agreement*" and, together with the Master License Agreement Amendment, the "*SEA JV Amendments*") to be entered into as of the date hereof by and between Iconix and LF Asia Limited ("*LF*"), amending the First Amended and Restated Shareholders Agreement of Lion Network Limited (the "*Existing Shareholders Agreement*"), effective as of June 30, 2014, by and between Iconix and LF. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Existing Master License Agreement as amended by the Master License Agreement Amendment (or if not therein defined, in the First Amended and Restated Shareholders Agreement), as applicable.

Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by Iconix Luxembourg Holdings S.ar.l. ("*Iconix Luxembourg*") and Red Diamond Holdings S.ar.l. ("*Red Diamond*" and, together with Iconix Luxembourg, the "*CHMT Marks Licensors*") in the People's Republic of China, the Hong Kong Special Administrative Region of the People's Republic of China, the Macau Special Administrative Region of the People's Republic of China, and the Republic of China (the "*CHMT Territory*") granted by Licensors to Licensee pursuant to the SEA JV Amendments (the "*CHMT Marks*") is deemed to have a fair market value of US$43,000,000, and that because Iconix and LF each own 50% of Licensee, LF's ownership of 50% of Licensee will provide LF a benefit equal to 50% of such fair market value, or US$21,500,000.

In order to compensate the CHMT Marks Licensors for the transfer of 50% of the fair market value of the CHMT Marks to LF (through LF's 50% shareholding in Licensee) pursuant to the SEA JV Amendments, the CHMT Marks Licensors and LF hereby agree that LF shall pay US$21,500,000 (the "*CHMT Marks Consideration*"), of which US$17,000,000 shall be payable to Iconix Luxembourg and US$4,500,000 shall be payable to Red Diamond, and which amount the CHMT Marks Licensors and LF shall treat for all U.S. and Luxembourg tax purposes as paid by LF to the CHMT Marks Licensors in exchange for 50% of the CHMT

Page 1

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.  ICON-043-00034706

# A-1498

Marks, following which each of the CHMT Marks Licensors and LF shall be treated for U.S. and Luxembourg tax purposes as contributing its respective share of the CHMT Marks to the Licensee.

LF shall pay the CHMT Marks Consideration to the CHMT Marks Licensors as follows, in each case by wire transfer in immediately available funds:

(a)    US$4,300,000 on the date hereof;

(b)    US$4,300,000 on the first (1st) anniversary of the date of this letter;

(c)    US$4,300,000 on the second (2nd) anniversary of the date of this letter;

(d)    US$4,300,000 on the third (3rd) anniversary of the date of this letter;

(e)    US$4,300,000 on the fourth (4th) anniversary of the date of this letter.

Iconix hereby agrees that the distributions by Licensee to the LF Shareholder pursuant to the Second Amended and Restated Shareholders Agreement (a) in respect of the CHMT Marks in the CHMT Territory shall be (i) for fiscal year 2014, at least US$1,500,000 (the "*2014 Minimum Distribution Amount*") and (ii) for fiscal year 2015, at least $3,000,000 (the "*2015 Minimum Distribution Amount*", and (b) in respect of the CHMT Marks licensed to the Licensee by Red Diamond in the CHMT Territory shall be (i) for fiscal year 2016, at least US$300,000 (the "*2016 Minimum Distribution Amount*") and (ii) for fiscal year 2017, at least US$335,000 (the "*2017 Minimum Distribution Amount*") (and, together with the 2014 Minimum Distribution Amount, the 2015 Minimum Distribution Amount and the 2016 Minimum Distribution Amount, the "*Minimum Distribution Amounts*"); provided that, if the LF Shareholder's share of Licensee's distributable amounts in respect of 2014, 2015, 2016 or 2017 is less than the Minimum Distribution Amount for such year, then the deficit (the "*Deficit*") shall be paid to the LF Shareholder by Licensee out of the distributions otherwise payable to the Iconix Shareholder for such year; provided further that, if Licensee's distributable amounts in respect of 2014, 2015, 2016 or 2017 are not sufficient to make a distribution to the LF Shareholder that is equal to or greater than the Deficit for such year, then Iconix Luxembourg and Red Diamond shall pay such Deficit to the LF Shareholder in cash.

This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV Amendments, the Existing Master License Agreement, the Existing Shareholders Agreement and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

[*Signature page follows.*]

Page 2

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.    ICON-043-00034707

# A-1499

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

_____
For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
ICONIX BRAND GROUP, INC.

Acknowledged and agreed:

_____
For and on behalf of
LF ASIA LIMITED

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034708

**A-1500**

GIBSON DUNN DRAFT – 9/11/14

ICONIX SE ASIA LIMITED
SECOND AMENDED AND RESTATED
SHAREHOLDERS AGREEMENT

Amended and restated on September [＿＿], 2014

THE SHARES REFERRED TO IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

# A-1501

## TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS; OPERATION OF COMPANY ...................................................1
    Section 1.01    Definitions .............................................................................1
    Section 1.02    Incorporation; Name .............................................................8
    Section 1.03    Registered Office; Principal Office......................................8
    Section 1.04    Business Purpose ..................................................................8
    Section 1.05    Shareholders .........................................................................9
    Section 1.06    No Personal Liability ...........................................................9

ARTICLE II SHAREHOLDINGS AND CAPITAL STRUCTURE.........................................9
    Section 2.01    Capital Structure ..................................................................9
    Section 2.02    Loans ..................................................................................10

ARTICLE III DISTRIBUTIONS ...................................................................................10
    Section 3.01    Distributions ......................................................................10
    Section 3.02    Tax Distributions ...............................................................10

ARTICLE IV MANAGEMENT OF COMPANY .............................................................11
    Section 4.01    General Provisions Concerning Management .....................11
    Section 4.02    Appointment of Directors...................................................11
    Section 4.03    Resignation and Removal of Directors ...............................11
    Section 4.04    Administrative Manager......................................................11
    Section 4.05    Local Manager ...................................................................12
    Section 4.06    Actions Requiring Unanimous Consent of all the Directors.....................12
    Section 4.07    Shareholder Approval ........................................................14
    Section 4.08    Officers..............................................................................16
    Section 4.09    Board Meetings; Written Resolutions.................................16
    Section 4.10    Quorum; Voting..................................................................16
    Section 4.11    Company Minutes ..............................................................17

ARTICLE V BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL
MATTERS.............................................................................................................17
    Section 5.01    Books and Records.............................................................17
    Section 5.02    Fiscal Year.........................................................................18
    Section 5.03    Company Accounts.............................................................18
    Section 5.04    Classification as a Partnership; Tax Decisions...................18

ARTICLE VI TRANSFERS .........................................................................................19
    Section 6.01    Transfers............................................................................19
    Section 6.02    Share Certificates ..............................................................19
    Section 6.03    Registration as a Shareholder ............................................20
    Section 6.04    Put and Call Options...........................................................20

*Current 30293237.7 30-Sep-13 01:44*
*33753303.5*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.        ICON-043-00034710

# A-1502

<u>**TABLE OF CONTENTS**</u>

(continued)

|  |  |  | Page |
|---|---|---|---|
| ARTICLE VII | TERMINATION AND LIQUIDATION | | 23 |
| Section 7.01 | Termination | | 23 |
| Section 7.02 | Effect of Termination | | 24 |
| Section 7.03 | Winding Up | | 24 |
| | | | |
| ARTICLE VIII | INDEMNIFICATION | | 24 |
| Section 8.01 | Insurance | | 24 |
| | | | |
| ARTICLE IX | REPRESENTATIONS | | 24 |
| Section 9.01 | General | | 24 |
| | | | |
| ARTICLE X | MISCELLANEOUS | | 26 |
| SECTION 10.01 | Information | | 26 |
| SECTION 10.02 | Notices | | 26 |
| SECTION 10.03 | Parties Bound; No Third Party Beneficiaries | | 27 |
| SECTION 10.04 | Governing Law; Submission to Jurisdiction | | 27 |
| SECTION 10.05 | Amendment | | 27 |
| Section 10.06 | Entire Agreement | | 27 |
| Section 10.07 | Confidentiality | | 27 |
| SECTION 10.08 | Severability | | 28 |
| SECTION 10.09 | Counterparts; Facsimile or Electronic Transmission | | 28 |
| SECTION 10.10 | Construction | | 28 |
| SECTION 10.11 | Successors and Assigns | | 29 |
| SECTION 10.12 | Headings and Captions | | 29 |
| SECTION 10.13 | No Waiver | | 29 |
| SECTION 10.14 | Additional Instruments | | 29 |
| SECTION 10.15 | Publicity | | 29 |
| SECTION 10.16 | Remedies | | 30 |
| Section 10.17 | Specific Performance | | 30 |

<u>EXHIBITS</u>

| | |
|---|---|
| Exhibit "A" | BRANDS |
| Exhibit "B" | SHARES AND PERCENTAGE SHAREHOLDINGS |
| Exhibit "C" | FORM OF DEED OF ADHERENCE |
| Exhibit "D" | TAX ALLOCATIONS |
| Exhibit "E" | Definition of "Europe" |
| Exhibit "F" | Partial Exercise Plan |

-ii-

Current 30293237.7 30-Sep-13 01:44
33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                **ICON-043-00034711**

# A-1503

**ICONIX SE ASIA LIMITED
SECOND AMENDED AND RESTATED
SHAREHOLDERS AGREEMENT**

This SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT of Iconix SE Asia Limited (formerly known as Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 (the "***Company***"), originally effective as of September 30, 2013 (the "***Effective Date***"), as amended and restated effective as of June 30, 2014, and as further amended and restated effective as of September [___], 2014, by and between LF Asia Limited, a Hong Kong limited liability company ("***LF***"), and Iconix Brand Group, Inc., a Delaware corporation ("***Iconix***").

**R E C I T A L S:**

Iconix has caused the incorporation of the Company on September 10, 2013.

Iconix and LF entered into that certain Share Purchase Agreement pursuant to which LF purchased from Iconix one (1) Share in the Company, representing fifty percent (50%) of the issued share capital of the Company (such Share Purchase Agreement, as may be amended or modified from time to time, the "***Purchase Agreement***").

Iconix and LF were subsequently each allotted 49 Shares, giving them each 50 shares in total (being 50% of the Shares in the Company) ("***Initial Allotment***").

In connection with Iconix and LF's entry into the Purchase Agreement and the Initial Allotment, Iconix and LF entered into that certain Shareholders Agreement of Lion Network Limited, effective as of September 30, 2013, as amended and restated effective as of June 30, 2014 (the "***Previous Shareholders Agreement***") to reflect the respective rights, duties and obligations of the Shareholders with respect to the Company.

The parties hereto wish to amend and restate the Previous Shareholders Agreement to reflect the changes to the respective rights, duties and obligations of the Shareholders with respect to the Company in connection with the transactions contemplated pursuant to (a) that certain Amendment No. 2 to the Master License Agreement, effective as of September [___], 2014, by and among Iconix and the other Licensors named therein, and the Company and (b) that certain letter agreement by and between Iconix and LF, effective as of September [___], 2014.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## DEFINED TERMS; OPERATION OF COMPANY

### Section 1.01    Definitions

. Within the context of this Agreement, the following terms shall have the following

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00034712**

meanings:

"*Accounting Standards*" has the meaning set forth in Section 5.01.

"*Adjusted CHMT Purchase Price*" has the meaning set forth in Section 6.04(b)(iii)(A)

"*Administrative Manager*" has the meaning set forth in Section 4.04.

"*Administrative Services Agreement*" means the Administrative Manager Services Agreement dated as of the date hereof by and between the Company and Iconix, as the same may be amended from time to time.

"*Affiliate*" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, "control," "controlling," "controlled by" or "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Equity Securities, by Contract or otherwise.

"*Agreed Value*" has the meaning set forth in Section 6.04(b).

"*Agreement*" means this Second Amended and Restated Shareholders Agreement, effective as of September [ ], 2014, amending and restating the Previous Shareholders Agreement, and as the same may be amended from time to time.

"*All Rights*" means, together, all of the Europe Rights, the Existing Rights, the Korea Rights, and the CHMT Rights.

"*Board*" means the board of directors of the Company as it is constituted at the relevant time.

"*Brands*" means, collectively, the Existing Brands (with respect to the Existing Territory), the Expanded Brands (with respect to the Expanded Territory), the New Licensed Brands (with respect to the New Territory), and the CHMT Brands (with respect to the CHMT Territory).

"*Business*" means (i) all consumer products including but not limited to the fashion, jewelry, eyewear, footwear, apparel, swimwear, outerwear, small leather goods and accessories, watches, food, fast moving consumer goods, home, fragrance and beauty lines of business and all accessories associated with all such lines of business, (ii) all lines of business reasonably related or ancillary thereto (including the establishment and operation of retail stores), and (iii) any other line of business approved by the Shareholders.

"*Business Day*" means a day, other than a Saturday or a Sunday, on which banks are open for business in each and all of the State of New York (United States of America) and Hong Kong.

"*Change of Control*" means (i) a change of control (including but not limited to by way of merger, consolidation or transfer of Equity Securities) of an entity, (ii) the direct or indirect sale by an entity of all or substantially all of its assets or (iii) any Person or group of Persons (other an

2

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc. ICON-043-00034713

# A-1505

Affiliate of such entity) becoming the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the outstanding Equity Securities of an entity.

"*CHMT Brands*" means the brand names, logos and word phrases listed in **Exhibit "A-2"** and any other brand names, logos and word phrases which the Company hereafter uses in the CHMT Territory in connection with the Business as approved by the Board.

"*CHMT Five-Year Call*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Call Notice*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Call Purchase Price*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put/Call*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put/Call Notice*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put/Call Purchase Price*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put/Call Rights*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put Notice*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put Purchase Price*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Put/Call Distribution*" has the meaning set forth in Section 3.01.

"*CHMT Rights*" means the rights granted to the Company under the Master License Agreement in respect of the CHMT Brands in the CHMT Territory.

"*CHMT Territory*" means the People's Republic of China, Hong Kong, Macau and Taiwan.

"*Communications*" has the meaning set forth in Section 10.02.

"*Companies Ordinance*" means the Companies Ordinance, chapter 622 of the laws of Hong Kong (and, to the extent it was relevant prior to 3 March 2014, the Companies Ordinance, chapter 32 of the laws of Hong Kong).

"*Company*" has the meaning set forth in the Preamble.

"*Company Account*" has the meaning set forth in Section 5.03.

"*Confidential Information*" means all confidential or proprietary information, knowledge, systems or data relating to the business, assets, prospects, operations, finances, policies, strategies,

3

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                ICON-043-00034714

# A-1506

intentions or inventions of the Company or any of its Subsidiaries (including any of the terms of this Agreement) from whatever source obtained, subject to the terms of this Agreement.

"*Contract*" means any agreement, bond, commitment, contract, franchise, indemnity, indenture, lease, license, purchase order or other instrument of any kind, whether oral or written.

"*Deed of Adherence*" has the meaning set forth in Section 6.03.

"*Designated Costs*" has the meaning set forth in Section 4.06(a)(i).

"*Directors*" has the meaning set forth in Section 4.02.

"*Dividend Policy*" has the meaning set forth in Section 3.01.

"*Effective Date*" has the meaning set forth in the Preamble.

"*Electronic Transmission*" means any form of communication, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

"*Equity Securities*" means any share, any partnership interest, any limited liability company interest and any other ownership interest in an entity, including any options or warrants to purchase the foregoing and other securities convertible, exchangeable or exercisable into the foregoing.

"*Europe*" means, collectively, the countries listed on **Exhibit "E"**.

"*Europe Rights*" means the rights granted to the Company under the Master License Agreement in respect of the New Licensed Brands in the New Territory.

"*Existing Brands*" means the brand names, logos and word phrases listed in **Exhibit "A"** and any other brand names, logos and word phrases which the Company hereafter uses in the Existing Territory in connection with the Business as approved by the Board.

"*Existing Rights*" means the rights granted to the Company under the Master License Agreement in respect of the Existing Brands in the Existing Territory.

"*Existing Territory*" means Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.

"*Expanded Brands*" means the brand names, logos and word phrases listed in **Exhibit "A"** other than OP/Ocean Pacific and Umbro, and any other brand names, logos and word phrases which the Company hereafter uses in the Expanded Territory in connection with the Business as approved by the Board.

"*Expanded Territory*" means the Republic of Korea.

4

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00034715**

# A-1507

"*Five-Year Call*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Call Notice*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Call Purchase Price*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call Notice*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call Purchase Price*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call Rights*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put Notice*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put Purchase Price*" has the meaning set forth in Section 6.04(b)(i).

"*Fully Exercised*" means one or more exercises of the Five-Year Put/Call, together with the exercise of the CHMT Five-Year Put/Call, which result in the acquisition by the Iconix Shareholder of All Rights, and "*Full Exercise*" shall be construed accordingly. In the case of a Full Exercise, the LF Shareholder shall sell all of its Shares in the Company to the Iconix Shareholder and closing thereof shall take place in accordance with the provisions of Section 6.04(e).

"*Governmental Authority*" means any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority.

"*HKIAC*" has the meaning set forth in Section 10.04.

"*Hong Kong*" means the Hong Kong Special Administrative Region of the People's Republic of China.

"*Iconix*" has the meaning set forth in the Preamble.

"*Iconix Directors*" has the meaning set forth in Section 4.02.

"*Iconix Luxembourg*" means Iconix Luxembourg Holdings S.ar.l.

"*Iconix Shareholder*" means Iconix, together with its Transferees, if any.

5

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                                   ICON-043-00034716

# A-1508

"***Korea Rights***" means the rights granted to the Company under the Master License Agreement in respect of the Expanded Brands in the Expanded Territory.

"***Law***" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

"***LF***" has the meaning set forth in the Preamble.

"***LF Directors***" has the meaning set forth in Section 4.02.

"***LF Shareholder***" means LF, together with its Transferees, if any.

"***Local Manager***" has the meaning set forth in Section 4.05.

"***Local Services Agreement***" means the Local Manager Services Agreement dated as of the date hereof by and between the Company and LF, as the same may be amended from time to time.

"***Macau***" means the Macau Special Administrative Region of the People's Republic of China.

"***Master License Agreement***" means the Master License Agreement, effective as of September 30, 2013, by and among the Company, Iconix and the Licensors (as defined therein), as amended by Amendment No. 1 to Master License Agreement, effective as of June 30, 2014, as further amended by Amendment No. 2 to Master License Agreement, effective as of September [__], 2014 and as the same may be amended from time to time.

"***New Licensed Brands***" means the brand names, logos and word phrases listed in **Exhibit "A-1"** and any other brand names, logos and word phrases which the Company hereafter uses in the New Territory in connection with the Business as approved by the Board.

"***New Territory***" means Europe and Turkey.

"***Other License Agreement***" means any license or similar agreement by and between the Company or one of its Subsidiaries and another Person granting such Person rights to use the Brands in the Territory.

"***Partial Exercise***" means an exercise of the Five-Year Put/Call and/or the CHMT Five-Year Put/Call which does not result in a Full Exercise. In the case of a Partial Exercise, the Company shall relinquish whichever is relevant of the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights in favour of the Iconix Shareholder through amendment to the Master License Agreement, and closing thereof shall take place in accordance with the provisions of Section 6.04(d) and notwithstanding that such transaction is between the Company and the Iconix Shareholder, the Five-Year Put/Call Price and/or the CHMT Five-Year Put/Call Price in the case of a Partial Exercise will be paid by the Iconix Shareholder to the LF Shareholder pursuant to Section 6.04(d).

6

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034717

# A-1509

"***Partial Exercise Plan***" means the plan to be implemented in the context of a Partial Exercise, consistent with the principles set out in **Exhibit "F"**.

"***Percentage Shareholding***" means the percentage determined in accordance with Section 2.01(b).

"***Permitted Parent Change of Control***" means (i) a Change of Control of, in the case of the Iconix Shareholder, Iconix and, in the case of the LF, Global Brands Group Limited.

"***Person***" means any individual or any partnership, corporation, estate, trust, company or other legal entity.

"***Previous Shareholders Agreement***" has the meaning set forth in the Recitals.

"***Purchase Agreement***" has the meaning set forth in the Recitals.

"***RD Brands***" means the brand names, logos and word phrases listed in **Exhibit "A-3"**.

"***Red Diamond***" means Red Diamond Holdings S.ar.l.

"***Securities Act***" means the Securities Act of 1933, as amended, or any similar federal statute then in effect, and any reference to a particular section thereof shall include a reference to the comparable section, if any, of any such similar federal statute, and the rules and regulations promulgated thereunder.

"***Share***" means a share in the Company.

"***Shareholders***" means the Iconix Shareholder and the LF Shareholder.

"***Share Certificate***" has the meaning set forth in Section 2.01(c).

"***Subsidiary***" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (i) of which such Person or any other subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any subsidiary of such Person do not have a majority of the voting interests in such partnership) or (ii) at least fifty percent (50%) of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries, or by such Person and one or more of its subsidiaries.

"***Taiwan***" means the Republic of China.

"***Territory***" means, collectively, the Existing Territory (with respect to the Existing Brands), the Expanded Territory (with respect to the Expanded Brands), the New Territory (with respect to the New Licensed Brands) and the CHMT Territory (with respect to the CHMT Brands).

"***Transfer***" means to sell, convey, transfer, syndicate, assign, mortgage, pledge,

7

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00034718**

hypothecate or otherwise encumber or dispose of in any way, including by operation of law or otherwise, any Shares, or any Change of Control of the Company. The Person who is transferring Shares shall be referred to as the "Transferor" and the Person who is acquiring the Shares shall be referred to as the "Transferee."

"*Two-Year Call*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Notice*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Purchase Price*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Shares*" has the meaning set forth in Section 6.04(a).

"*Year*" means the tax and financial accounting period specified in Section 5.02.

### Section 1.02    Incorporation; Name

. The Company was incorporated by the filing of the form of incorporation with the Companies Registry of Hong Kong. A certificate of incorporation was issued by the Companies Registry of Hong Kong on September 10, 2013. The Shareholders hereby confirm the incorporation of the Company as a company with limited liability under and pursuant to the provisions of the Companies Ordinance. Whenever the terms of this Agreement conflict with the provisions of the articles of association of the Company, the terms of this Agreement shall prevail. Accordingly, the parties hereto shall exercise their respective voting and other rights as holders of Shares to procure that the articles of association of the Company are amended to remove any conflict.

### Section 1.03    Registered Office; Principal Office

. The registered office of the Company required under the Companies Ordinance shall be as designated in the incorporation form filed with the Companies Registry, and may be changed by the Board in accordance with the Companies Ordinance. The principal business office of the Company shall be located at the principal business office of the Local Manager, or such other address as shall be designated by the Board.

### Section 1.04    Business Purpose

. The Company has been formed for the purpose of engaging, directly or through its Subsidiaries, in the following activities: (i) developing, exploiting and promoting the Brands licensed to the Company pursuant to the Master License Agreement or another Contract in the Territory by way of a license, sublicense or otherwise relating to the Business in exchange for royalty payments, and/or other consideration, (ii) purchasing or licensing third party Brands for the purposes of developing them in the Territory; (iii) engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing; (iv) engaging in other similar business opportunities as agreed to by both of the Shareholders and (v) unless otherwise agreed by the Shareholders, adopting a business model that is in accordance with the then-approved business plan and is asset light, working capital light and with an EBITDA margin of not less than 75%. References in this Agreement to the "ordinary course of business" shall be construed in

8

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034719

conjunction with the business purpose set out in this Section 1.04.

### Section 1.05 Shareholders

. The name, number of Shares and Percentage Shareholding held by each Shareholder is set forth on **Exhibit "B"**, as the same may be amended from time to time in accordance with this Agreement.

### Section 1.06 No Personal Liability

. Except as provided by the applicable Law, no Shareholder or any Director shall be personally liable for any obligations of the Company and no Shareholder shall have any obligation or be required to make any loan or otherwise advance any funds to the Company other than as provided in Section 2.01(d) or 2.01(e).

## ARTICLE II

## SHAREHOLDINGS AND CAPITAL STRUCTURE

### Section 2.01 Capital Structure

.

(a) Shareholdings. The initial shareholdings of the Shareholders (after giving effect to the purchase transaction contemplated by the Purchase Agreement) are set forth on **Exhibit "B"** attached hereto.

(b) Percentage Shareholding. Each Shareholder shall have the Percentage Shareholding in the Company determined by dividing the number of Shares owned by such Shareholder by the total number of issued Shares. The Percentage Shareholding of each Shareholder (after giving effect to the purchase transaction contemplated by the Purchase Agreement) shall be set forth next to such Shareholder's name on **Exhibit "B"** attached hereto.

(c) Share Certificates. Upon the request of any Shareholder, a share certificate (each, a "*Share Certificate*") issued by the Company in accordance with the provisions of the articles of association of the Company shall evidence the Shares in the Company held by such requesting Shareholder.

(d) New Allotment of Shares. *(Omitted as spent).*

(e) Further Subscription for Shares. In the event that the Company is to pay any Future Mark Acquisition Consideration (as defined in the Master License Agreement) or any Jointly Owned Mark Acquisition Consideration (as defined in the Master License Agreement) under the Master License Agreement, the Shareholder will subscribe for new Shares, in accordance with their Percentage Shareholding, in order to put the Company in funds to pay the relevant Future Mark Acquisition Consideration or any Jointly Owned Mark Acquisition Consideration (as the case may be), with subscription price therefor being set by the Directors, and

9

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.** **ICON-043-00034720**

# A-1512

the Shareholders will pass such resolutions and procure that the Directors pass such resolutions as are necessary to give effect to the provisions of this Section 2.01(e).

### Section 2.02    Loans

. Without in any way limiting the authority of the Board to cause the Company to borrow funds from an unaffiliated third party (instead of, or in addition to, any loan(s) of the type contemplated by this Section 2.02), any Shareholder or Affiliate of a Shareholder may, with the consent of all the Directors, lend or advance money to the Company; provided, that such loan shall be on terms and conditions not less favorable than those available from unaffiliated third parties for similar loans (unless otherwise unanimously agreed by the Directors).

## ARTICLE III

## DISTRIBUTIONS

### Section 3.01    Distributions

. At such times as the Board determines is in the best interest of the Company and the Shareholders, the Company shall pay dividends or make other distributions to the Shareholders in proportion to their Percentage Shareholdings. The Shareholders agree that, to the extent practicable and permitted by any applicable Law and regulation, unless otherwise agreed by the Shareholders, the dividend policy of the Company shall be to distribute the maximum amount of distributions allowed by the Companies Ordinance (the "***Dividend Policy***"). Notwithstanding anything to the contrary contained herein, promptly following the delivery of a CHMT Five-Year Put Notice or CHMT Five-Year Call Notice and in any event prior to the closing of the CHMT Five-Year Put/Call, the Company shall make a distribution (the "***CHMT Put/Call Distribution***") in cash to the Iconix Shareholder in an amount equal to the lesser of (i) the amount of cash in the Company and (ii) the sum of (w) the amount, if any, by which distributions accrued or made to the LF Shareholder in respect of the CHMT Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2014 were lower than $1,500,000, *plus* (x) the amount, if any, by which distributions accrued or made to the LF Shareholder in respect of the CHMT Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2015 were lower than $3,000,000, *plus* (y) the amount, if any, by which distributions accrued or made to the LF Shareholder in respect of the RD Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2016 were lower than $300,000, *plus* (z) the amount, if any, by which distributions accrued or made to the LF Shareholder in respect of the RD Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2017 were lower than $335,000.

### Section 3.02    Tax Distributions

. Upon Iconix's reasonable request, and subject to such dividend being lawfully permitted, the Board shall cause the Company to distribute to each Shareholder in respect of each Year, an amount of cash which equals (i) the amount of taxable income allocable to the Shareholder in respect of such Year, multiplied by (ii) the combined maximum individual United States federal and state income tax rate attributable to such taxable income (determined as if all Shareholders

10

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034721

# A-1513

were residents of the State of New York and taking into account (i) the deductibility of state income taxes for United States federal income tax purposes) and (ii) the amount of taxable losses previously allocated to such Shareholders in prior fiscal years (and not used in prior fiscal years to reduce taxable income for the purpose of making distributions under this Section 3.02). Such distributions based upon estimates of the taxable income for the year may be made on a quarterly or other basis as shall be determined by Iconix (in its sole discretion). All amounts so distributed shall be treated as amounts distributed to the Shareholder pursuant to Section 3.01 of this Agreement, depending on the source of the item that generated such taxable income, and shall be reduced by any amounts withheld for taxes with respect to the Shareholder pursuant to Section 3.01.

## ARTICLE IV

## MANAGEMENT OF COMPANY

### Section 4.01   General Provisions Concerning Management

. Subject to the provisions hereof, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board. The Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company described herein, including all powers, statutory or otherwise, possessed by directors of a company with limited liability incorporated under the laws of Hong Kong. Except as otherwise required by law, approval of any action by the Board in accordance with this Agreement and the articles of association of the Company shall constitute approval of such action by the Company.

### Section 4.02   Appointment of Directors

. The Company shall have four Directors, two (2) of whom shall be Persons designated by LF and its Transferees, if any (the "*LF Directors*"), and two (2) of whom shall be Persons designated by Iconix and its Transferees, if any (the "*Iconix Directors*," and together with the LF Directors, the "*Directors*"). The initial LF Directors shall be Jason Rabin and David Thomas and the initial Iconix Directors shall be Neil Cole and Jeff Lupinacci.

### Section 4.03   Resignation and Removal of Directors

. Each Director shall serve until death, dissolution, resignation or removal, in accordance with this Agreement and the articles of association of the Company. A Director may resign at any time upon giving written notice of resignation to the Company. A Director may be removed at any time with or without cause only by the Shareholder who appointed such Director (*e.g.*, an Iconix Director can only be removed by Iconix). If a Director ceases to serve as a Director at any time for any reason, the resulting vacancy shall be filled by a Person designated by the Shareholder whose designee created the vacancy.

### Section 4.04   Administrative Manager

. Subject to the provisions of the Administrative Services Agreement, Iconix, as Administrative Manager (the "*Administrative Manager*") shall have the responsibilities and

11

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034722

# A-1514

provide to the Company the services referred to therein.

### Section 4.05    Local Manager

.  Subject to the provisions of the Local Services Agreement, LF, as Local Manager (the "***Local Manager***") shall have the responsibilities and provide to the Company the services referred to therein.

### Section 4.06    Actions Requiring Unanimous Consent of all the Directors

.

  (a)  Notwithstanding any provision of this Agreement, subject to Section 4.07, approval of the following actions shall require the unanimous consent of all the Directors:

  (i)  approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the costs and expenses (including those payable under the Administrative Services Agreement and the Local Services Agreement) associated with the ongoing operations of the Company (the "***Designated Costs***") pursuant to such annual business and development plan and annual budget are less than twenty percent (20%) of net revenue projected in such annual business and development plan and annual budget; provided that, if the actions in this clause (i) are to be taken by the Iconix Directors, the Iconix Directors shall consult with the LF Directors, in good faith, regarding such proposed annual business and development plan and annual budget, and take into consideration any comments or proposed changes recommended by the LF Directors;

  (ii)  approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the Designated Costs pursuant to such annual business and development plan and annual budget are twenty percent (20%) or greater of net revenue projected in such annual business and development plan and annual budget;

  (iii)  any change in the scope or nature of the business or activities of the Company or any or any of its Subsidiaries;

  (iv)  appointment or removal of, entry into an employment agreement with or approval of any delegation of or change to the authority or responsibilities of any officer of the Company or any of its Subsidiaries, or approval of the terms and conditions of employment of any officer or employee of the Company or any of its Subsidiaries or any change thereto provided that, if the actions in this clause (iv) are to be taken by the Iconix Directors, (A) at least thirty (30) days prior to taking any such action the Iconix Directors shall have provided the LF Directors with, as applicable, identity of any individual proposed to be appointed or removed, the employment history of and references for any potential officer, a detailed summary of the terms of any proposed employment agreement, a summary of the reasons for any delegation or change in the authority or responsibilities of any officer and/or a summary of any terms and conditions of employment proposed to be approved, and shall have consulted with the LF Directors, in good faith, regarding such proposed action and taken into consideration any comments or proposed changes recommended by the LF Directors, and (B) the Iconix Directors shall not hire any new officer

12

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**    **ICON-043-00034723**

unless the position for such officer was included in the then current annual business and development plan and annual budget;

(v)     with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries in the ordinary course of business;

(vi)     with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries outside the ordinary course of business;

(vii)     incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business ;

(viii)     incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) outside the ordinary course of business or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business;

(ix)     lending any money (except deposits with banks or other institutions) by the Company or any of its Subsidiaries;

(x)     entry into any Contract by the Company or any of its Subsidiaries outside the ordinary course of business;

(xi)     commencement or settlement by the Company or any of its Subsidiaries of any legal action, arbitration proceeding, mediation or other dispute resolution other than in the ordinary course of business;

(xii)     adopting or amending any employee benefit or equity plan of the Company or any of its Subsidiaries;

(xiii)     appointment or removal of auditors of the Company or any of its Subsidiaries;

(xiv)     subject to Section 4.06(a)(xv), changing the accounting policies of the Company or any of its Subsidiaries or of the Year of the Company or any of its Subsidiaries;

(xv)     changing the accounting policies of the Company or any of its Subsidiaries by reason of being compelled to do so by reason of changes to IFRS and/or GAAP;

(xvi)     giving of any guarantee or indemnity of the Company or any of its Subsidiaries;

(xvii)     assignment of any debts of the Company or any of its Subsidiaries;

13

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**          **ICON-043-00034724**

(xviii) transfer, disposal or creation of any security interest in property of the Company or any of its Subsidiaries;

(xix) entry into any Other License Agreement, or amendment, modification, termination of the Master License Agreement or any existing Other License Agreement;

(xx) approving of the creation or acquisition of any Subsidiaries and the adoption of governance agreements or arrangements in respect thereof, or any other investment in, or the acquisition of stocks or bonds of, other Persons or any Equity Securities in any other Person; provided, that there shall be no limitation on the Board's authority to delegate, in a manner mutually acceptable to the Board, the making of investments as part of cash management in the ordinary course of business of the Company;

(xxi) any Transfer of Shares in the Company; and

(xxii) authorizing an officer, an employee or any other individual to approve disbursements on behalf of the Company;

provided, that upon and subsequent to any exercise of the Call Option (as defined herein) pursuant to Section 6.04, the actions in clauses (i), (iv), (v), (vii), (ix), (xv) and (xxii) of this Section 4.06(a) shall be taken by the Iconix Directors in their sole discretion (after reasonable, good faith consultation with the LF Directors), notwithstanding, for the avoidance of doubt, Section 4.08 of this Agreement.

(b) The parties acknowledge and agree that any and all decisions or actions by the Company with respect to an agreement between the Company and a Shareholder or Affiliate of a Shareholder relating to: (i) the exercise or enforcement of the Company's rights thereunder; (ii) any amendments or waivers thereto; or (iii) any approvals required or requests made thereunder shall be taken by the Directors designated by the other Shareholder in their sole discretion.

(c) Subsequent to the exercise of the Call Option (as defined herein), the Iconix Directors will consult in good faith with the LF Directors prior to taking any actions outside of the ordinary course of business and take into consideration any comments or proposed changes recommended by the LF Directors.

(d) The Iconix Directors shall not take any action in their sole discretion if such action would reasonably be expected to have a materially adverse effect on the value of the Shares held by the LF Shareholder, taking into consideration the existence of the Five Year Put/Call unless the Shareholders mutually agree that any such action is in the best interests of the Company.

**Section 4.07    Shareholder Approval**

. Notwithstanding any provision of this Agreement, approval of any of the following shall require unanimous approval by all of the Shareholders:

(a) admission of any Person (whether by subscription or transfer) as a shareholder of the Company or any of its Subsidiaries;

14

33753303.5

(b)    grant of, or entry into an agreement to grant, any option, pledge or other encumbrance in respect of the Shares or of any other Equity Securities of the Company or any of its Subsidiaries;

(c)    except as provided under ARTICLE III or Section 6.04, declaration, payment or approval by the Company or any of its Subsidiaries of any repurchase or redemption of the Company's or any of its Subsidiaries' securities or any dividend or other distribution to the Shareholders or to the members or shareholders of any of the Company's Subsidiaries (other than Subsidiaries wholly owned by the Company or any of its Subsidiaries);

(d)    delegation of any powers or responsibilities by the Board or Directors other than to an individual or a committee of individuals designated with the unanimous consent of the Directors or to officers pursuant to Section 4.08;

(e)    change of the number of Directors or the number of directors of any Subsidiary of the Company;

(f)    removal of a Director other than by the Shareholder that designated or nominated such Director or removal of a director of any of the Company's Subsidiaries;

(g)    the entering into by the Company or any of its Subsidiaries of any Contract outside the ordinary course of business;

(h)    participation in, termination of or any other actions taken by the Company or any of its Subsidiaries with respect to any venture, partnership or joint venture, or acquisition or disposal of shares or other equity interests in another Person or the acquisition of the business or assets of another Person;

(i)    entry into any transaction by the Company or any Subsidiary of the Company with any Shareholder or any Affiliate of any Shareholder (including entering into any loans between any Shareholder or any Affiliate of any Shareholder and the Company, but not including entering into the Master License Agreement);

(j)    increase or decrease the issued share capital or (as applicable) the authorized share capital or maximum number of shares, in each case of the Company or any of its Subsidiaries;

(k)    reclassification of securities of the Company or any of its Subsidiaries (including any subdivision or consolidation of shares) or recapitalization of the Company or any of its Subsidiaries;

(l)    entry into any merger, amalgamation or consolidation of the Company or any of its Subsidiaries with another Person;

(m)    a resolution for winding up, the termination or dissolution of, or the entering into of bankruptcy, insolvency or receivership by, the Company or any of its Subsidiaries;

15

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.    ICON-043-00034726

(n)     sale or disposal of all of the Shares or all or any substantial part of the Company's or any of its Subsidiaries' business or assets;

(o)     change of the name of the Company or any of its Subsidiaries;

(p)     amendment or modification of the Company's or any of its Subsidiaries' memorandum of association or articles of association or other organizational documents (as applicable);

(q)     reorganization of the Company or any of its Subsidiaries; and

(r)     a private or public issuance or offering for sale of any securities of the Company or any of its Subsidiaries or the listing on any exchange of any securities of the Company or any of its Subsidiaries.

### Section 4.08     Officers

.  Subject to the limitations set forth in Section 4.06, the Board shall have the authority to establish such officers of the Company as they shall determine, and to appoint individuals to serve as such officers, including chairman, chief executive officer, one or more vice presidents, secretary, assistant secretary, treasurer and assistant treasurer.  An individual may hold more than one office at any time.

### Section 4.09     Board Meetings; Written Resolutions

.  Board meetings may be called by any Director.  The Board shall meet not less than once every three (3) months.  Any Director may participate in a Board meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear and speak to each other at the same time or in sequence, and participation in a Board meeting pursuant to this provision shall constitute presence at the meeting; provided, that at least one of such Board meetings per year shall be held in person at a location to be unanimously determined by the Directors.  All meetings of the Board shall be called on not less than three (3) Business Days' prior notice.  All actions required or permitted to be taken by the Board may also be approved by the execution of a written resolution executed by all the Directors, and any such written resolution may be executed in counterparts.

### Section 4.10     Quorum; Voting

.

(a)     A quorum must exist at all times of a Board meeting, including the reconvening of any Board meeting that has been adjourned, for any action taken at such Board meeting to be valid.

(b)     Except as otherwise specified in this Agreement:

(i)     a quorum shall be constituted at a Board meeting only if at least one (1) LF Director and one (1) Iconix Director are present; and

16

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034727

(ii)     all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, which majority must include at least one (1) LF Director and one (1) Iconix Director.

(c)     Upon and subsequent to the closing of any Two-Year Call pursuant to Section 6.04:

(i)     a quorum shall be constituted at a meeting if a majority of the Directors is present, regardless of the identity of the Directors comprising such majority; and

(ii)     all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, regardless of the identity of the Directors comprising such majority.

### Section 4.11     Company Minutes

(a)     .  The decisions and resolutions of the Board shall be reported in minutes, which shall state the date, time and place of the meeting (or the date of the written resolution in lieu of meeting), the Directors present at the meeting, the resolutions put to a vote (or the subject of a written resolution) and the results of such voting (or written resolution).  The minutes shall be entered in a minute book kept at the registered office of the Company and a copy of the minutes shall be provided upon request to each Director.

### ARTICLE V

### BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL MATTERS

### Section 5.01     Books and Records

.  The Administrative Manager shall procure that accurate, full and complete books and records of the Company are maintained, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business and affairs.  Such books and records initially shall be prepared and maintained by the Administrative Manager; and, at such time as the Board determines, such books and records shall be prepared and maintained by employees of the Company.  Such books and records shall include a clear statement of royalty generated by the Company under the Master License Agreement and Other Agreements, and broken down as between the Europe Rights, the Existing Rights, the Korea Rights and the CHMT Rights and the Administrative Manager shall provide such information to the LF Shareholder within as soon as reasonably practicable following the LF Shareholder's request to provide such information.  Upon request in writing, each Shareholder and its duly authorized representative shall have access to inspect and copy any of such books and records at all reasonable times during normal business hours.  The Company shall deliver or cause to be delivered to each Shareholder consolidated financial statements (all of which shall be prepared in accordance with the financial reporting standards and interpretations (including: (a) Hong Kong Financial Reporting Standards; (b) Hong Kong Accounting Standards; and (c) Interpretations) issued by the Hong Kong Institute of Certified Public Accountants applied on a consistent basis (the "*Accounting Standards*")), as follows: (i) as soon as available (but in any event not later than

17

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.        ICON-043-00034728

twenty (20) days after the end of each quarter), a consolidated balance sheet as at the end of such quarter and the related consolidated statements of income and cash flows for such quarter and for the period from the beginning of the current calendar year (i.e., the calendar year in which such quarter falls) to the end of such quarter, setting forth, in each case, in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the current calendar year; and (ii) as soon as available (but in any event not later than one hundred twenty (120) days after the end of each calendar year), a consolidated balance sheet as at the end of such calendar year and the related consolidated statements of income, cash flows and stockholders', members' or other owners' equity for such calendar year, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the calendar year covered by such financial statements. The Company shall also deliver to each Shareholder upon request copies of any reports or statements the Company receives from its third party licensees. The financial statements to be provided under this Agreement shall not be required to be audited unless required by applicable Law or so requested by either Shareholder.

### Section 5.02 Fiscal Year

. The year of the Company for tax and financial accounting purposes ("**_Year_**") shall end on the last day of the month of December, unless a different year end is approved in accordance with Section 4.07

### Section 5.03 Company Accounts

. All receipts, funds and income of the Company shall be deposited in the name of the Company in a bank account of a commercial bank, savings and loan association or other financial institution (the "**_Company Account_**") as the Local Manager shall determine. Withdrawals from the Company Account shall be made on the signature of (a) an officer of the Administrative Manager or such other Person as shall be designated by the Administrative Manager and (b) an officer of the Local Manager or such other Person as shall be designated by the Local Manager; provided that no withdrawal from the Company Account shall be made (i) with respect to any expense subject to the Directors' or the Shareholders' approval rights pursuant to Section 4.06 or Section 4.07, respectively, until such approval has been obtained, or (ii) for the purpose of making any payment to a Director or an Affiliate of a Director or any distribution to the Shareholders unless the amount of such payment or distribution is in accordance with ARTICLE III or has been approved by the Shareholders. There shall be no commingling of the moneys and funds of the Company with moneys and funds of the Administrative Manager, the Local Manager or any other entity or Person.

### Section 5.04 Classification as a Partnership; Tax Decisions

. The Company shall elect within 75 days of its formation to be taxable as a partnership for United States federal income tax purposes, pursuant to Treasury Regulation Section 301.7701-3(b)(1)(i) by having each Shareholder sign Form 8832 as prepared by Iconix. During such time as the Company would be classified as a partnership under the foregoing sentence, neither the Company nor any Shareholder shall take any action that would result in the

18

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**            **ICON-043-00034729**

Company being taxed as other than a "partnership" for United States federal income tax purposes, including, but not limited to, electing to be taxed as other than a "partnership" by filing Internal Revenue Service Form 8832, "Entity Classification Election" without the prior written consent of all of the Shareholders. All elections required or permitted to be made by the Company and all other tax decisions and determinations relating to United States federal, state, local or foreign tax matters shall be made by the Board, in consultation with the Company's attorneys and/or accountants as the Board deems necessary or advisable. For U.S. federal income tax purposes, income of the Company shall be allocated in accordance with the provisions of **Exhibit "D"**.

## ARTICLE VI

## TRANSFERS

### Section 6.01    Transfers

.   Except as expressly provided in this **ARTICLE VI**, (i) no Shareholder may directly or indirectly Transfer any or all of its Shares or any right or interest therein; (ii) any direct or indirect offer to Transfer, or any attempted or purported Transfer of, any Shares in violation of any of the provisions of this Agreement shall be void *ab initio*; (iii) the Company shall reject and refuse to register on its books the Transfer of any Shares which are purported to have been transferred otherwise than in compliance with the provisions of this Agreement; and (iv) and the Company shall not recognize any Person receiving any Shares as a shareholder of the Company, nor shall any Person have any rights as a shareholder of the Company, unless the Transfer of Shares to such Person shall have been made pursuant to the terms of this Agreement. Notwithstanding any provisions of this Agreement, a Shareholder may Transfer all (but not some only) of its Shares (a) pursuant to a Permitted Parent Change of Control or (b) to any Affiliate of such Shareholder, provided that if such Affiliate at any time no longer constitutes an Affiliate of Iconix or LF, as applicable, any such Shares transferred to such Affiliate shall immediately be transferred to Iconix or LF, as applicable, or one of their respective Affiliates.

### Section 6.02    Share Certificates

.

(a)    Each Share Certificate issued to a Shareholder pursuant to Section 2.01(c) shall have the following legend conspicuously written, printed, typed or stamped on its face, or upon the reverse with a conspicuous reference to such legend on its face:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF THE SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT OF ICONIX SE ASIA LIMITED, EFFECTIVE AS OF SEPTEMBER [__], 2014, AS IT MAY BE AMENDED FROM TIME TO TIME (THE "SHAREHOLDERS AGREEMENT"), INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN.

THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS, IN RELIANCE UPON APPLICABLE EXEMPTIONS

19

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00034730**

FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE AND FOREIGN SECURITIES LAWS. THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE. THE SHARES MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE MUST COMPLY WITH THE OTHER TRANSFER RESTRICTIONS SET FORTH IN THE SHAREHOLDERS AGREEMENT."

(b) Upon the sale of any Shares pursuant to (i) an effective registration statement under the Securities Act or pursuant to Rule 144 under the Securities Act or (ii) another exemption from registration under the Securities Act or upon the termination of this Agreement, the Share Certificates representing such Shares shall be replaced, at the expense of the Company, with certificates or instruments not bearing the legends required by this Section 6.02; provided that the Company may condition such replacement of certificates under clause (ii) upon the receipt of an opinion of securities counsel reasonably satisfactory to the Company.

(c) In case of loss or destruction of a Share Certificate, no new Share Certificate shall be issued in lieu thereof except upon satisfactory proof to the Company of such loss or destruction, and upon the giving to the Company of satisfactory security against loss by bond or otherwise. Any such new Share Certificate shall be plainly marked "Duplicate" upon its face.

**Section 6.03    Registration as a Shareholder**

. Except as provided in Section 6.01 and Section 6.04, no Person other than the LF Shareholder and the Iconix Shareholder shall be registered in the register of shareholders of the Company as a shareholder of the Company without the prior written unanimous consent of the Board and the Shareholders. If the LF Shareholder or the Iconix Shareholder proposes to transfer Shares to an Affiliate, it shall be a condition to the transfer that such Affiliate shall execute and deliver a deed of adherence in substantially the form attached hereto as **Exhibit "C"** (the "***Deed of Adherence***") pursuant to which such Transferee shall agree to be legally bound by this Agreement. Except as otherwise set forth herein, the Affiliate to which Shares are transferred shall pay all costs and expenses incurred by the Company in connection with such admission.

**Section 6.04    Put and Call Options.**

(a) Two-Year Call Option. For the six- (6-) month period following the second (2nd) anniversary of the Effective Date, the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder and the Company (a "***Two-Year Call Notice***") to initiate the purchase by the Iconix Shareholder of five percent (5%) of the total Shares in issue (the "***Two-Year Call Shares***") at a purchase price (the "***Two-Year Call Purchase Price***") in cash

20

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00034731**

equal to 10% multiplied by 115% multiplied by the sum of (i) the Purchase Price (as defined in the Purchase Agreement) paid or payable by LF to Iconix pursuant to the Purchase Agreement, *plus* (ii) $10,917,500 (such purchase initiated by a Two-Year Call Notice, a "***Two-Year Call***"), *plus* (iii) the Adjusted CHMT Purchase Price. The Company shall pay an interim dividend in accordance with the Dividend Policy of the Company, to be calculated up to the day before closing of the Two Year Call. LF agrees that following the closing of the Two-Year Call, LF has no objection to Iconix being able to consolidate the results of the Company into its own financial results.

        (b)      <u>Five-Year Put/Call Option</u>.

        (i)      For the six- (6-) month period following the fifth (5th) anniversary of the Effective Date (and, if a Five-Year Put/Call has not previously been Fully Exercised, for the six- (6-) month period following the eighth (8th) anniversary of the Effective Date), (i) the LF Shareholder may deliver an irrevocable written notice of election to the Iconix Shareholder and the Company (a "***Five-Year Put Notice***") to initiate the acquisition by the Iconix Shareholder of the Europe Rights, the Existing Rights and/or the Korea Rights (the "***Five-Year Put/Call Rights***") at a purchase price (the "***Five-Year Put Purchase Price***") in cash equal to the aggregate Agreed Value (as defined herein) (such purchase initiated by a Five-Year Put Notice, a "***Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder (a "***Five-Year Call Notice***," and each of the Five-Year Put Notice and the Five-Year Call Notice, a "***Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder of the Five-Year Put/Call Rights at a purchase price (the "***Five-Year Call Purchase Price***," and each of the Five-Year Put Purchase Price and the Five-Year Call Purchase Price, the "***Five-Year Put/Call Purchase Price***") in cash equal to 120% of the aggregate Agreed Value (such purchase initiated by a Five-Year Call Notice, a "***Five-Year Call***" and each of a Five-Year Put and a Five-Year Call, a "***Five-Year Put/Call***"). Prior to the closing of the Five-Year Put/Call pursuant to Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the Company shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to LF under the Local Services Agreement and pay all fees owing and accrued to Iconix under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the Five-Year Put/Call.

        (ii)      For the six- (6-) month period following the fifth (5th) anniversary of the Effective Date, (i) the LF Shareholder may deliver an irrevocable written notice of election to the Iconix Shareholder and the Company (a "***CHMT Five-Year Put Notice***") to initiate the acquisition by the Iconix Shareholder (or Iconix Luxembourg and Red Diamond) of the CHMT Rights (the "***CHMT Five-Year Put/Call Rights***") at a purchase price (the "***CHMT Five-Year Put Purchase Price***") in cash equal to the aggregate Agreed Value (such purchase initiated by a CHMT Five-Year Put Notice, a "***CHMT Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder (a "***CHMT Five-Year Call Notice***," and each of the CHMT Five-Year Put Notice and the CHMT Five-Year Call Notice, a "***CHMT Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder (or Iconix Luxembourg and Red Diamond) of the CHMT Five-Year Put/Call Rights at a purchase price (the "***CHMT Five-Year Call Purchase Price***," and each of the CHMT Five-Year Put Purchase Price and the CHMT Five-Year Call Purchase Price, the "***CHMT Five-Year Put/Call Purchase Price***")

21

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**      **ICON-043-00034732**

in cash equal to the aggregate Agreed Value (such purchase initiated by a CHMT Five-Year Call Notice, a "***CHMT Five-Year Call***" and each of a CHMT Five-Year Put and a CHMT Five-Year Call, a "***CHMT Five-Year Put/Call***"). Prior to the closing of the CHMT Five-Year Put/Call pursuant to Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the Company shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to LF under the Local Services Agreement and pay all fees owing and accrued to Iconix under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the CHMT Five-Year Put/Call.

(iii)   If the Five-Year Put/Call is exercised in the six- (6-) month period following the fifth (5th) anniversary of the Effective Date, and/or the CHMT Five-Year Put/Call is exercised, Agreed Value shall be equal to:

(A)   the LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and Other License Agreements in respect of the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights (as applicable) for (i) the Year ended December 31, 2015 and (ii) the Year ended December 31, 2018; *provided, however*, that the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *provided further, however*, that the Agreed Value attributable to the CHMT Rights shall not be less than $21,500,000 (such Agreed Value attributable to the CHMT Rights, the "***Adjusted CHMT Purchase Price***"); *plus*

(B)   in the case of a Full Exercise, the amount of cash in the Company after payment of the CHMT Put/Call Distribution to the Iconix Shareholder.

(iv)   If the Five-Year Put/Call is exercised in the six- (6-) month period following the eighth (8th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)   The LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and the Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2018 and (ii) the Year ended December 31. 2021; *provided, however*, that, the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *plus*

(B)   In the case of a Full Exercise, the amount of cash in the Company.

(c)   Put and Call Closings. The closing of any Two-Year Call, Five-Year Put/Call or CHMT Five-Year Put/Call under this Section 6.04 shall take place within (i) sixty (60) days after delivery of the Two-Year Call Notice, (ii) sixty (60) days after the delivery of the Five-Year Put/Call Notice (or, if later, within thirty (30) days after the royalty information necessary to calculate the applicable Agreed Value is available), or (iii) sixty (60) days after the delivery of the CHMT Five-Year Put/Call Notice (or, if later, within thirty (30) days after the royalty information necessary to calculate the applicable Agreed Value is available), as the case may be, unless another date is mutually agreed upon by the parties to the sale.

22

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-043-00034733

(d)    <u>Put and Call Closings – Partial Exercise</u>. In the case of an exercise of the Five-Year Put/Call or a CHMT Five-Year Put/Call which constitutes a Partial Exercise, at the closing of the relevant Five-Year Put/Call or the CHMT Five-Year Put/Call, as applicable, the Iconix Shareholder shall pay, or in the case of a CHMT Five-Year Put/Call shall cause Iconix Luxembourg and Red Diamond to pay, to the LF Shareholder the Five-Year Put/Call Price or the CHMT Five-Year Put/Call Price, as applicable, and the parties hereto shall implement the Partial Exercise Plan.

(e)    <u>Put and Call Closings – Two Year Call and Full Exercise</u>. At the closing of any Two-Year Call or Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable) which results in a Full Exercise, the LF Shareholder shall deliver to the Company for cancellation the Share Certificate or Certificates, if any, representing the Two-Year Call Shares or all of its Shares, in the case of a Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable), as applicable, and the Iconix Shareholder shall take all actions and execute and deliver and pay, or in the case of a CHMT Five-Year Put/Call cause Iconix Luxembourg and Red Diamond to pay, to the LF Shareholder the Two-Year Call Purchase Price or the Five-Year Put/Call Price (and the CHMT Five-Year Put/Call Price, if applicable), as applicable, and all instruments and documents as may be necessary or desirable to consummate the sale of the Two-Year Call Shares or all of its Shares, in the case of a Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable), as applicable. The Company shall thereupon cancel the Share Certificate(s) representing the Two-Year Call Shares or all of the LF Shareholder's Shares, in the case of a Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable), as applicable, enter the purchaser's name in the register of shareholders of the Company and, upon request of the purchase pursuant to Section 2.01(c), issue a Share Certificate to the purchaser evidencing the purchaser's entitlement to the Two-Year Call Shares or all of the LF Shareholder's Shares, in the case of a Five-Year Put/Call (and the CHMT Five-Year Put/Call, if applicable), as applicable.

(f)    <u>Stamp Duty</u>. The Hong Kong stamp duty payable in respect of the sale and purchase of the Shares pursuant to an exercise of any option pursuant to this Section 6.04 shall be borne by Iconix and LF in equal shares. Iconix and LF shall each pay their respective share of the Hong Kong stamp duty on completion of the exercise of the relevant option and shall co-operate to ensure that the instrument of transfer and bought and sold notes in respect of the sale and purchase of the relevant Shares are duly presented for stamping within the time limits prescribed by the Stamp Duty Ordinance and are duly stamped as soon as practicable after completion of the exercise of the relevant option.

## ARTICLE VII

## TERMINATION AND LIQUIDATION

### Section 7.01    Termination

(a)    . This Agreement shall terminate on the first to occur of the following:

(a)    the Percentage Shareholding of any Shareholder is equal to one hundred percent (100%); or

23

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.    ICON-043-00034734

(b)      a resolution is passed by the Shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, shareholders or other contributors.

### Section 7.02      Effect of Termination.

(a)      On termination of this agreement, Sections 10.02, 10.03, 10.04, 10.07, 10.15 and this Section 7.02(a) shall continue in force.

(b)      Termination of this agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including the right to claim damages or indemnification in respect of any breach of the Agreement which existed at or before the date of termination.

### Section 7.03      Winding Up

(a)      .  Where the Company is to be wound up and its assets distributed, the parties shall agree on a suitable basis for dealing with the interests and assets of the Company and shall endeavor to ensure that, before dissolution:

(a)      all existing contracts of the Company are performed to the extent that there are sufficient resources;

(b)      the Company shall not enter into any new contractual obligations; and

(c)      the Company's assets are distributed as soon as practical.

## ARTICLE VIII

## INDEMNIFICATION

### Section 8.01      Insurance

.  The Company shall maintain for such periods as the Board shall in good faith unanimously determine, at its expense, insurance in an amount determined unanimously in good faith by the Board to be appropriate, on behalf of any person who is or was a director or officer of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or other enterprise, including any Subsidiary of the Company, against any expense, liability or loss asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, subject to customary exclusions.

## ARTICLE IX

## REPRESENTATIONS

### Section 9.01      General

24

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034735

# A-1527

. As of the date hereof, each of the Shareholders makes each of the representations and warranties applicable to such Shareholder as set forth in this **ARTICLE IX**, and such representations and warranties shall survive the execution of this Agreement.

(a)     Due Incorporation or Formation; Authorization of Agreement.  If such Shareholder is a corporation, partnership, trust, limited liability company, or other legal entity, it is duly organized or formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the power and authority to own property and carry on its business as owned and carried on at the date hereof and as contemplated hereby and such Shareholder is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder, and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate or partnership or company action.  This Agreement constitutes the legal, valid, and binding obligation of such Shareholder, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b)     No Conflict or Default.  The execution, delivery, and performance of this Agreement and the consummation by such Shareholder of the transactions contemplated hereby (i) will not conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, or any arbitrator, applicable to such Shareholder, and (ii) will not conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, operating agreement, or other organizational documents of such Shareholder, or of any material agreement or instrument to which such Shareholder is a party or by which such Shareholder is or may be bound or to which any of its material properties or assets are or may be subject.

(c)     Governmental Authorizations.  Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by, any governmental or regulatory authority that is required in connection with the valid execution, delivery, acceptance, and performance by such Shareholder under this Agreement or the consummation by such Shareholder of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date of this Agreement.

(d)     Litigation.  There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Shareholder, threatened against or affecting such Shareholder or any of such Shareholder's properties, assets, or businesses in any court or before or by any governmental department, board, agency, instrumentality, or arbitrator which, if adversely determined, could (or in the case of an investigation could lead to any action, suit, or proceeding which, if adversely determined, could) reasonably be expected to materially impair such Shareholder's ability to perform its obligations under this Agreement.

(e)     Securities Representations

25

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034736

. Such Shareholder represents and agrees that the Shares acquired pursuant hereto will be acquired for such Shareholder's own account, for investment, and not with a view to the distribution or resale thereof. Such Shareholder further represents that it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of acquiring the Shares. Such Shareholder understands that such Shares have not been registered under the Securities Act or any state or other securities laws, and cannot be sold, assigned, transferred, pledged or otherwise disposed of unless so registered under the Securities Act and applicable state or other securities laws or unless an exemption from the registration requirements thereof is available.

## ARTICLE X

## MISCELLANEOUS

### Section 10.01    Information

. For so long as any Shareholder is a reporting company under the securities laws of the United States and/or Hong Kong, the Company shall provide to such Shareholder on a timely basis, in addition to the financial statements that the Company is required to deliver to the Shareholders pursuant to Section 5.01, all such information as such Shareholder determines is necessary for it to comply with its reporting obligations under such securities laws, including but not limited to financial information; provided, that any additional expense incurred by the Company or any other Shareholder in connection with or as a consequence of providing such information shall be borne by such Shareholder. It is agreed that a failure to deliver such financial statements on a timely basis shall not be considered a breach of any term or condition of this Agreement, it being agreed that the Shareholders shall use commercially reasonable efforts to replace the auditors of the Company in the event that the Board determines that any such delay has been caused by the auditors.

### Section 10.02    Notices

. All notices, approvals, consents, requests, instructions, and other communications (collectively "*Communications*") required to be given in writing pursuant to this Agreement shall be validly given, made or served only if in writing and when delivered personally or by registered or certified mail, return receipt requested, postage prepaid, or by a reputable overnight or same day courier, addressed to the Company, the Directors or the Shareholders, as the case may be, at the address(es) thereof on record at the principal office of the Company. All Communications required or permitted hereunder shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, or if not during such hours, then on the next Business Day, (c) five (5) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) three (3) Business Days after deposit with FedEx or other overnight courier, specifying delivery by such date, with written verification of receipt. The designation of the Person to receive such Communication on behalf of a Shareholder or the address of any such Person for the purposes of such Communication may be changed from time to time by written notice given to the Company pursuant to this Section 10.02.

26

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034737

**Section 10.03   Parties Bound; No Third Party Beneficiaries**

.  This Agreement shall inure to the benefit of and shall be binding upon all of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties (other than to an Affiliate of a Shareholder following a Transfer permitted by Section 6.01).  No provision of this Agreement is intended to or shall be construed to grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement to or upon any Person other than the parties hereto.

**Section 10.04   Governing Law; Submission to Jurisdiction**

.  This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of Hong Kong. Any dispute, difference or claim arising out of or in connection with this Agreement shall be referred to and finally determined by arbitration in Hong Kong at Hong Kong International Arbitration Centre (the "*HKIAC*") in accordance with the UNCITRAL Arbitration Rules as at present in force.  The language to be used in the arbitration proceedings shall be English.  There shall be three arbitrators, of which one shall be appointed by the Iconix Shareholder, one shall be appointed by the LF Shareholder and one (who shall act as president of the tribunal) shall be jointly appointed by the two arbitrators appointed by the Iconix Shareholder and the LF Shareholder.  The Iconix Shareholder and the LF Shareholder shall each appoint one arbitrator within 30 days of the notice of arbitration, failing which such appointment shall be made, at the request of either party, by the Chairman of the HKIAC. If the two arbitrators so appointed by the Iconix Shareholder and the LF Shareholder fail to agree upon the third arbitrator within 15 days of the appointment of the second arbitrator, the third arbitrator shall be appointed by the Chairman of the HKIAC upon the written request of either party.  The arbitral award shall be final and binding on all Parties.  In relation to all matters referred to arbitration by this Agreement, the right of appeal under section 23 of the Arbitration Ordinance (Cap. 341 of the Laws of Hong Kong) and the right to make an application under section 23A thereof are hereby excluded.  Any costs of arbitration (including without limitation all reasonable legal costs of the winning party) shall be borne by the losing party unless otherwise determined by the arbitral award.  Nothing herein shall prevent a Party from seeking injunctive or other emergency relief against the other at any time in a court having competent jurisdiction.

**Section 10.05   Amendment**

.  No amendment, change or modification to this Agreement shall be valid unless the same is in writing and signed by all of the Shareholders.

**Section 10.06   Entire Agreement**

.  This Agreement and the Purchase Agreement, together with all exhibits and schedules hereto and thereto (which are deemed incorporated herein), contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof.

**Section 10.07   Confidentiality**

27

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034738

# A-1530

. Subject to the requirements of applicable Law, each Shareholder shall maintain in confidence all Confidential Information (i) transferred to the Company or to the other Shareholder by reason of the transactions contemplated by this Agreement and (ii) all information received from the other Shareholder as a result of any due diligence investigation conducted relative to the execution of this Agreement and shall use such information only for the benefit of the Company and or in connection with evaluating the transactions contemplated hereby, and except in accordance with the immediately succeeding sentence, shall not disclose any such information to a third party, other than (i) to its officers, directors, employees, advisors, attorneys or accountants who need to know and who agree to keep such information confidential, (ii) to its actual or proposed lenders or other financing sources having been made aware of the restrictions set forth in this Section 10.07, (iii) to the extent disclosure is required by law, statute, rule, regulation or judicial process (including, but not limited to, applicable securities laws) or (iv) upon the lawful demand of any court or agency or regulator having jurisdiction over such Shareholder (including, but not limited to, any securities regulatory authority, including rating agencies and national securities exchanges, to which the disclosing Shareholder is subject) or make any unauthorized use thereof. The obligation of confidentiality and non-use shall not apply to any information which (A) is or becomes generally available to the public through no fault of the receiving party, (B) is independently developed by the receiving party or (C) is received in good faith from a third party who is lawfully in possession of such information and has the lawful right to disclose or use it.

### Section 10.08     Severability

. If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

### Section 10.09     Counterparts; Facsimile or Electronic Transmission

. This Agreement may be executed in one or more counterparts with the same effect as if all of the Shareholders had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile or Electronic Transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or Electronic Transmission shall be deemed to be their original signatures for all purposes.

### Section 10.10     Construction

. Words in the singular include the plural and in the plural include the singular. The words "including," "includes," "included" and "include," when used, are deemed to be followed by the words "without limitation". Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not defined in this Agreement shall have the meanings determined by the Accounting Standards. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or

28

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034739

referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, and all attachments thereto and instruments incorporated therein. This Agreement is the result of arms-length negotiations between the parties hereto and no provision hereof, because of any ambiguity found to be contained herein or otherwise, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of that provision. A reference to a Law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any subordinate legislation for the time being in force made under it.

### Section 10.11   Successors and Assigns

.   This Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Shareholders and their respective successors, but neither this Agreement nor any rights, interests or obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party or parties hereto, subject to the provisions in respect of restrictions on Transfers set forth herein.

### Section 10.12   Headings and Captions

.   The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

### Section 10.13   No Waiver

.   The failure of any Shareholder to insist upon strict performance of a covenant hereunder or of any obligation hereunder or to exercise any right or remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of such Shareholder's right to demand strict compliance therewith in the future unless such waiver is in writing and signed by the Shareholder giving the same.

### Section 10.14   Additional Instruments

.   Each Shareholder agrees to execute and deliver such additional agreements, certificates, and other documents and to do all such other acts and things as may be required by law or necessary or appropriate to carry out the intent and purposes of this Agreement.

### Section 10.15   Publicity

.   The parties shall consult with each other before issuing any press release with respect to this Agreement or the transactions contemplated hereby and shall not issue any such press release or make any such public statement without the prior consent of the other party, which shall not be unreasonably withheld, conditioned or delayed; provided, however, that any party may, without the prior consent of the other parties (but after prior consultation, to the extent practicable in the circumstances) issue such press release or make such public statement as may upon the advice of outside counsel be required by law or the rules and regulations of the NASDAQ

29

33753303.5

# A-1532

or the Stock Exchange of Hong Kong Limited or the rules of any other applicable exchange.

### Section 10.16    Remedies

. Except as otherwise provided herein, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every remedy under this Agreement or now or hereafter existing at law or in equity.

### Section 10.17    Specific Performance

. Each Shareholder acknowledges and agrees that its respective remedies at law for a breach or threatened breach of any of the provisions of this Agreement would be inadequate and, in recognition of that fact, agrees that, in the event of a breach or threatened breach by a Shareholder of the provisions of this Agreement, in addition to any remedies at law, the Company or any other Shareholder shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

*[Signature page follows.]*

30

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034741

# A-1533

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed and delivered as of 30 June 2014.

LF ASIA LIMITED

By: _____
     Name:
     Title:

ICONIX BRAND GROUP, INC.

By: _____
     Name:
     Title:

*Second Amended and Restated Shareholders Agreement*

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**     **ICON-043-00034742**

# A-1534

## Exhibit "A"

## BRANDS

FASHION BRANDS:
1. Badgley Mischka
2. Bongo
3. Candie's
4. Danskin / Danskin Now
5. Ecko Unltd./Marc Ecko Cut & Sew
6. Ed Hardy
7. Joe Boxer
8. Lee Cooper
9. London Fog
10. Mossimo
11. Mudd
12. OP / Ocean Pacific[1]
13. Rampage
14. Rocawear
15. Starter
16. Umbro
17. Zoo York

HOME BRANDS:
18. Cannon
19. Charisma
20. Fieldcrest
21. Royal Velvet
22. Sharper Image
23. Waverly

---

[1] Philippines only for Ocean Pacific

A-1

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.     ICON-043-00034743

# A-1535

## Exhibit "A-1"

### ADDITIONAL BRANDS

Ecko Unlimited
Zoo York
Marc Ecko Cut & Sew
Ed Hardy
Sharper Image

A-1

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00034744**

# A-1536

## Exhibit "A-2"

### CHMT BRANDS

Lee Cooper
Umbro

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00034745**

# A-1537

**Exhibit "A-3"**

**RD BRANDS**

Lee Cooper

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**          **ICON-043-00034746**

# A-1538

### Exhibit "B"

### SHARES AND PERCENTAGE SHAREHOLDINGS
### AS OF THE INITIAL ALLOTMENT

| Shareholder | Shares | Percentage Interest |
|---|---|---|
| Iconix Brand Group, Inc. | 50 | 50% |
| LF Asia Limited | 50 | 50% |
| Total | 100 | 100% |

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-043-00034747

# A-1539

## Exhibit "C"

### FORM OF DEED OF ADHERENCE

The undersigned is executing and delivering this Deed of Adherence (this "**Deed**") pursuant to the Shareholders Agreement of Iconix SE Asia Limited dated as of September 30, 2013 (as amended on June 30, 2014 and as further amended on September [___], 2014) and as the same may hereafter be amended, amended and restated, supplemented or otherwise modified, the "*Agreement*").

Capitalized terms used in this Deed which are not defined herein shall have the respective meanings given to them in the Agreement.

Now this Deed witnesses as follows:

1.  The undersigned, pursuant to Section 6.03 of the Agreement, undertakes to and covenants with and for the benefit of all the parties to the Agreement and for the benefit of any other person who becomes a party to the Agreement after the date of this Deed to comply with the provisions of and perform all of the obligations in the Agreement as if the undersigned had been a party to the Agreement as [*state capacity*], except to the extent that those obligations have already been performed.

2.  The undersigned agrees to hold the Shares [transferred][issued] to [it]/[him] with the benefit of the rights, and subject to the restrictions, set out in the Agreement and the articles of association of the Company and consents to [its]/[his] name being entered in the register of Shareholders of Company as the holder of the Shares acquired.

3.  The undersigned confirms that [it]/[he] has been given and has read a copy of the Agreement and all documents in the agreed form.

4.  The undersigned hereby irrevocably appoints [         ] of [       ], fax: [      ] as its agent to receive on its behalf in Hong Kong service of any proceedings arising out of or in connection with the Agreement. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by the undersigned).

5.  This Deed and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with Hong Kong law.

**IN WITNESS** of which the undersigned has executed this document as a deed and delivered it on the _____ day of _____, _____.

[*insert appropriate signature provisions*]

C-1

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034748

# A-1540

## Exhibit "D"

## TAX ALLOCATIONS

Additional Provisions Applicable for U.S. Federal Income Tax Purposes

1.  <u>Defined Terms.</u>

    1.1  "*Capital Account*" means with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 2 of this **Exhibit "D"** below and in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv).

    1.2  "*Capital Contribution*" means, with respect to a Partner, a contribution of cash or property to the Company pursuant to this Agreement.

    1.3  "*Code*" means the United States Internal Revenue Code of 1986, as amended and as hereafter amended, or any successor law.

    1.4  "*Fiscal Year*" means the calendar year unless otherwise required by the Code.

    1.5  "*Gross Asset Value*" means, with respect to any property of the Partnership other than money, such property's adjusted basis for U.S. federal income tax purposes, except that the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Tax Matters Partner considers appropriate, whenever such adjustment is permitted under Regulations Section 1.704-1(b)(2)(ii).

    1.6  "*Interest*" means the Percentage Shareholding of a Shareholder in the Company.

    1.7  "*Net Profits*" and "*Net Losses*" means, with respect to any Fiscal Year or other relevant period of calculation, any taxable income or taxable loss of the Partnership for such Fiscal Year or other period, with the following adjustments:

        1.7.1.  any income that is exempt from U.S. federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be added to such taxable income or loss;

        1.7.2  any expenditures described in Code Section 705(a)(2)(B) (or treated as expenditures described in Code Section 705(a)(2)(B) pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be subtracted from such taxable income or loss;

D-1

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-043-00034749

1.7.3   in the event the Gross Asset Value of any Partnership property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property for purposes of computing Net Profits or Net Losses;

1.7.4   gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

1.7.5   in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, cost recovery or amortization computed in accordance with Regulations Section 1.704-1(b)(2)(iv)*(g)(3)*; and

1.7.6   any other provisions or items which are specifically allocated pursuant to Sections 3.2 or 3.3 hereof shall not be taken into account in computing Net Profits or Net Loss.

1.8   "***Partner***" means any Shareholder of the Company.

1.9   "***Partnership***" means the Company.

1.10   "***Regulations***" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

2.   Capital Accounts.

2.1   Each Partner's Capital Account shall have an initial balance equal to the fair market value of such Partner's initial Capital Contribution to the Partnership.

2.2.   Each Partner's Capital Account shall be increased by the sum of:

2.2.1   the amount of cash and the fair market value of any other property (net of liabilities that the Partnership is considered to assume or take subject to) constituting additional contributions by such Partner to the capital of the Partnership,

2.2.2   the portion of any Net Profits and other income or gain items allocated to such Partner's Capital Account.

2.3   Each Partner's Capital Account shall be decreased by the sum of:

2.3.1   the amount of cash and the fair market value of any other property (net of liabilities that such Partner is considered to assume or take subject to) distributed by the Partnership to such Partner; plus

D-2

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**    **ICON-043-00034750**

# A-1542

    2.3.2   the portion of any Net Losses and other expense, loss or deduction items allocated to such Partner's Capital Account.

3.    <u>Allocation of Net Profits and Net Losses.</u>

    3.1    The Net Profits and Net Losses of the Partnership for each Fiscal Year or other relevant period of calculation, as determined by the Board in accordance with the provisions hereof, shall be allocated among the Partners in accordance with their respective Interests, such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the amount that each Partner would receive if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with this Agreement to the Partners immediately after making such allocation.

    3.2    In the event any Partner has a deficit adjusted Capital Account balance at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Partner is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Partner shall be specially allocated items of income and gain in the amount of such excess as quickly as possible; <u>provided</u>, that an allocation pursuant to this Section 3.2 shall be made only if and to the extent that a Partner would have a deficit adjusted Capital Account balance in excess of such sum after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.2 were not in this Schedule to this Agreement.

    3.3    Any special allocations of items of income, gain, loss or deduction pursuant to Section 3.2 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount of any items so allocated and all other items allocated to each Partner shall, to the extent possible, be equal to the net amount that would have been allocated to each Partner if the special allocations under Section 3.2 had not occurred.

    3.4    The Board is authorized to adjust the allocations hereunder if it considers an adjustment is necessary to:

        3.4.1   carry out the intentions of this Agreement; or

        3.4.2   to maintain substantial economic effect or otherwise comply with the requirements of Section 704(b) of the Code and the Regulations thereunder.

D-3

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**    **ICON-043-00034751**

# A-1543

3.5 Notwithstanding Section 3.1, in any year in which the Partnership sells substantially all of its assets or liquidates, each Partner shall be allocated Net Profits or Net Losses (or items thereof) to the extent necessary to cause its Capital Account balance to reflect the amount that will be distributable to such Partner in liquidation of the Partnership pursuant to this Agreement.

4. Tax Allocation.

For Tax Purposes, items of Partnership income, gain, loss, deduction and credit for each Fiscal Year shall be allocated to and among the Parties in the same manner as the corresponding items of Net Profits and Net Losses and specially allocated items are allocated to them pursuant to Section 3 hereof, taking into account any variation between the adjusted tax basis and book value of the Partnership property in accordance with the principles of Code Section 704(c). The Board shall be authorized to make appropriate adjustments to the allocations of items to comply with Code Section 704 or applicable Regulations thereunder.

5. Tax Matters Partner; Elections; Treatment as Partnership.

The initial Tax Matters Partner shall be Iconix. Subject to Section 5.04 of this Agreement, the Tax Matters Partner is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities.

6. Liquidation of the Partnership; No Capital Account Makeup.

6.1 After all liabilities of the Partnership have been satisfied or duly provided for, the remaining assets of the Partnership shall be applied and distributed to the Partners in accordance with this Agreement.

6.2 Notwithstanding anything to the contrary herein, no Partner shall be obligated to restore to the capital of the Partnership any deficit balance in its Capital Account.

D-4

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-043-00034752**

# A-1544

## Exhibit "E"

## DEFINITION OF "EUROPE"

Albania
Andorra
Austria
Belarus
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
Former Yugoslav Republic of Macedonia
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Moldova
Monaco
Montenegro
Netherlands
Norway
Poland .
Portugal
Romania
Russia
San Marino
Serbia
Slovakia
Slovenia
Spain

E-1

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034753

# A-1545

Sweden
Switzerland
Ukraine
Uzbekistan
United Kingdom (including for the avoidance of doubt the Crown Dependencies of Jersey, Guernsey and the Isle of Man)
Vatican City State

E-2

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034754

# A-1546

### Exhibit "F"

### PARTIAL EXERCISE PLAN

As soon as possible following a Partial Exercise, the Iconix Shareholder and the LF Shareholder shall:-

1.  identify and agree changes to the Master License Agreement which are necessary to remove from the Master License Agreement the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights, which are the subject of the relevant Partial Exercise, and any obligations with respect thereto;

2.  either consent to (as Shareholders) or procure that the Directors nominated by them consent to (i) amendments the Master License Agreement to give effect to the changes agreed contemplated by paragraph 1. of this Exhibit "F" for the purposes of Section 4.06(a)(xix) and (ii) any other matters in respect of which consent is required under this Agreement in order to give effect to the Partial Exercise Plan and closing of the Partial Exercise;

3.  identify and agree which contracts and other arrangements entered into between the Company and third parties and which relate to the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights which are the subject of the Partial Exercise are to be assigned by the Company to the Iconix Shareholder, to the effect that all rights and obligations (including, without limitation, to receive revenue and to pay costs) are to be so assigned with effect from the closing date applicable to the relevant Partial Exercise;

4.  agree that to the extent that any revenue or costs which ought to be for the account of the Iconix Shareholder (on the one hand) or the Company or any Subsidiary of the Company (on the other hand) but were in fact collected by or borne by the incorrect party, then the Iconix Shareholder and the Company (or its relevant Subsidiary) will promptly reimburse the other accordingly.

5.  as regards the negotiation of any documents which need to occur as part of the Partial Exercise Plan, the Iconix Shareholder will negotiate and agree on the part of the Iconix Shareholder and its Affiliates, and the LF Shareholder will negotiate and agree on the part of the Company and any Subsidiary of the Company.

F-1

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-043-00034755

Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 144 of 215

A-1547

| From: | John Reda [John.Reda@jimlar.com] |
| --- | --- |
| Sent: | 9/26/2014 8:59:23 AM |
| To: | David Maslaton [DMaslaton@iconixbrand.com] |
| CC: | Seth Horowitz [shorowitz@iconixbrand.com]; Ethan Cole [ethancole@lfusa.com] |
| Subject: | Invoices for Marketing Costs |
| Attachments: | Iconix - Mossimo SEA.PDF; Iconix - Peanuts China.pdf; Iconix - Zoo York.pdf |

Dear David:

Please see the attached invoices for the marketing costs related to the respective brands. Our bank information is on the invoices. Please call either Ethan or myself if you have any questions.

Best Rgs

John Reda

**John Reda, CPA** | Vice President – Assistant Corporate Controller



4620 Grandover Pkwy, Greensboro, NC 27407
(T) 336.500.8192 ◆ (C) 516-353-3808
johnreda@globalbrandsgroup.com
globalbrandsgroup.com

CONFIDENTIALITY NOTICE - This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain information that is confidential or legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

**GOVERNMENT EXHIBIT 1098**
19 Cr. 869 (ER)

# A-1548

# Global Brands Group USA Inc.

350 5th Avenue - 9th Floor
PH (646) 839-7000 - Fax (646) 839-7001

**Invoice: 09.25.14 M-SEA**

| SOLD TO: | |
|---|---|
| | ICONIX BRAND GROUP, INC.<br>1450 BROADWAY, 3RD FLOOR<br>NEW YORK, NY 10018 |
| ATTN: | DAVID MASLATON |

**September 25, 2014**

| DESCRIPTION | TOTAL |
|---|---|
| **For Mossimo SEA** | |
| **Marketing Costs** | $ 2,000,000 |
| **Total** | $ 2,000,000 |

**Due upon receipt**

Banking Information
| | |
|---|---|
| Beneficiary Name: | GBG USA, Inc. |
| Beneficiary Address: | 350 5th Ave, 9th Floor<br>New York, NY 10118 |
| Bank Name: | Citibank, N.A. |
| Bank Address: | 399 Park Avenue<br>New York, NY 10022 |
| Account No.: | 30619397 |
| ABA #: (Domestic Senders) | 021000089 |
| Swift Code: (Int'l Senders) | CITIUS33 |

| | |
|---|---|
| **Total Invoice Amount** | **$2,000,000** |

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**

**ICON-136-00008077**

# A-1549

## Global Brands Group USA Inc.

350 5th Avenue - 9th Floor
PH (646) 839-7000 - Fax (646) 839-7001

**Invoice: 09.25.14 PC**

| SOLD TO: | |
|---|---|
| | ICONIX BRAND GROUP, INC.<br>1450 BROADWAY, 3RD FLOOR<br>NEW YORK, NY 10018 |
| ATTN: | DAVID MASLATON |

**September 25, 2014**

| DESCRIPTION | TOTAL |
|---|---|
| **For Peanuts China** | |
| **Marketing Costs** | $ 2,000,000 |
| | |
| **Total** | $ 2,000,000 |

**Due upon receipt**

Banking Information
Beneficiary Name: GBG USA, Inc.
Beneficiary Address: 350 5th Ave, 9th Floor
New York, NY 10118

Bank Name: Citibank, N.A.
Bank Address: 399 Park Avenue
New York, NY 10022

Account No.: 30618397

ABA #: (Domestic Senders) 021000089

Swift Code: (Int'l Senders) CITIUS33

| | Total Invoice Amount | $2,000,000 |
|---|---|---|

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**

**ICON-136-00008078**

# A-1550

# Global Brands Group USA Inc.

350 5th Avenue - 9th Floor
PH (646) 839-7000 - Fax (646) 839-7001

**Invoice: 09.25.14 ZY**

**SOLD TO:**
ICONIX BRAND GROUP, INC.
1450 BROADWAY, 3RD FLOOR
NEW YORK, NY 10018
**ATTN:** DAVID MASLATON

**September 25, 2014**

| DESCRIPTION | TOTAL |
|---|---|
| **For Zoo York** | |
| **Marketing Costs** | $ 1,000,000 |
| **Total** | $ 1,000,000 |

**Due upon receipt**

Banking Information
Beneficiary Name: GBG USA, Inc.
Beneficiary Address: 350 5th Ave, 9th Floor
New York, NY 10118

Bank Name: Citibank, N.A.
Bank Address: 399 Park Avenue
New York, NY 10022

Account No.: 30619397

ABA #: (Domestic Senders) 021000089

Swift Code: (Int'l Senders) CITIUS33

| | |
|---|---|
| **Total Invoice Amount** | **$1,000,000** |

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**

ICON-136-00008079

# A-1551

Message
| | |
|---|---|
| **From:** | Ethan Cole [ethancole@lfusa.com] |
| **Sent:** | 10/2/2014 3:34:05 PM |
| **To:** | shorowitz@iconixbrand.com |
| **CC:** | Jared Margolis [JaredMargolis@GlobalBrandsGroup.com]; John Reda [John.Reda@jimlar.com] |
| **Subject:** | Marketing Invoices |
| **Attachments:** | Zoo York Invoice.pdf; Mossimo Invoice.pdf; Peanuts Invoice.pdf |

Hi Seth,

Please find attached the marketing invoices for Zoo York, Mossimo and Peanuts. In the link below please find the decks related to each.

https://private.filesanywhere.com/GBG/fs/v.aspx?v=89696b8b5c6170a8a46d

Thank you,

Ethan Cole
Manager - Business Development and Licensing
LF USA - Hard & Soft Goods
350 5th Avenue,
New York, NY 10118
Cell: (347) 448 1346

**GOVERNMENT
EXHIBIT
1111**
19 Cr. 869 (ER)

CONFIDENTIAL

GBG0018466

# Global Brands Group USA Inc.

350 5th Avenue - 9th Floor
PH (646) 839-7000 - Fax (646) 839-7001

**Invoice: 9.30.14 ZY**

| Bill TO: | |
|---|---|
| | ICONIX BRAND GROUP, INC.<br>1450 BROADWAY, 3RD FLOOR<br>NEW YORK, NY 10018<br>ATTN: Seth Horowitz |

**September 30, 2014**

| DESCRIPTION | TOTAL |
|---|---|

**For Zoo York**

**Marketing costs related to:**
**Comprehensive positioning, marketing and launch analysis for SEA**
**Comprehensive research and marketing analysis complete with launch plan for Europe**

| Due upon receipt | Total | $ 955,710 |
|---|---|---|

**Banking Information**
| | |
|---|---|
| **Beneficiary Name:** | GBG USA, Inc. |
| **Beneficiary Address:** | 350 5th Ave, 9th Floor |
| New York, NY 10118 | |
| **Bank Name:** | Citibank, N.A. |
| **Bank Address:** | 399 Park Avenue |
| | New York, NY 10022 |
| **Account No.:** | 30618397 |
| **ABA #: (Domestic Senders)** | 21000089 |
| **Swift Code: (Int'l Senders)** | CITIUS33 |

| | **Total Invoice Amount** | **$955,710** |
|---|---|---|

CONFIDENTIAL

GBG0018467

# A-1553

# Global Brands Group USA Inc.

350 5th Avenue - 9th Floor
PH (646) 839-7000 - Fax (646) 839-7001

**Invoice: 9.30.14 M**

Bill TO:
ICONIX BRAND GROUP, INC.
1450 BROADWAY, 3RD FLOOR
NEW YORK, NY 10018
ATTN: Seth Horowitz

**September 30, 2014**

| DESCRIPTION | TOTAL |
|---|---|

**For Mossimo**

Marketing costs related to:
Developing a comprehensive marketing strategy and plan for SEA
Design and trend analysis
Comprehensive marketing and positioning analysis for Europe

| Due upon receipt | Total | $ 1,940,230 |
|---|---|---|

**Banking Information**
Beneficiary Name:      GBG USA, Inc.
Beneficiary Address:   350 5th Ave, 9th Floor
New York, NY 10118
Bank Name:             Citibank, N.A.
Bank Address:          399 Park Avenue
New York, NY 10022
Account No.:           30618397
ABA #: (Domestic Senders) 21000089
Swift Code: (Int'l Senders)  CITIUS33

| | Total Invoice Amount | $1,940,230 |
|---|---|---|

CONFIDENTIAL

GBG0018468

# Global Brands Group USA Inc.

350 5th Avenue - 9th Floor
PH (646) 839-7000 - Fax (646) 839-7001

**Invoice: 9.30.14 PC**

**September 30, 2014**

Bill TO:

ICONIX BRAND GROUP, INC.
1450 BROADWAY, 3RD FLOOR
NEW YORK, NY 10018
ATTN: Seth Horowitz

| DESCRIPTION | TOTAL |
|---|---|

**For Peanuts**

Marketing costs related to:
Strategic analysis of China, HK, Macau and Taiwan market
Marketing and launch strategy for China, HK, Macau and Taiwan
IAPM Mall Event
Art + Life Event
Strategic analysis of Korea and SEA market complete with marketing plan

| Due upon receipt | Total | $ 2,104,060 |
|---|---|---|

**Banking Information:**

| | |
|---|---|
| Beneficiary Name: | GBG USA, inc. |
| Beneficiary Address: | 350 5th Ave, 9th Floor |
| | New York, NY 10118 |
| Bank Name: | Citibank, N.A. |
| Bank Address: | 399 Park Avenue |
| | New York, NY 10022 |
| Account No.: | 30618397 |
| ABA #: (Domestic Senders) | 21000089 |
| Swift Code: (int'l Senders) | CITIUS33 |

**Total Invoice Amount  $ 2,104,060**

CONFIDENTIAL

GBG0018469

# A-1555

**Message**

| | |
|---|---|
| **From:** | Ethan Cole [ethancole@globalbrandsgroup.com] |
| **Sent:** | 12/1/2014 10:42:50 PM |
| **To:** | Jared Margolis [JaredMargolis@GlobalBrandsGroup.com] |
| **Subject:** | Notes for Iconix Meeting |

## Plugs

| | Europe / Korea | LC / Umbro China | Middle East |
|---|---|---|---|
| Purchase Price | 15,917,500 | 21,500,000 | 23,604,000 |
| Value based on Rev Multiple | 10,900,000 | 15,500,000 | 18,604,000 |
| Plug | 5,017,500 | 6,000,000 | 5,000,000 |
| Cont Plug 14 | 3,000,000 | 2,000,000 | Q4 2014 |
| Cont Plug 15 | 3,250,000 | 2,500,000 | NA |

- Thus far we have invoiced $5M in marketing for the Europe / Korea amendment
  - Zoo York: $955k
  - Mossimo: $1.9M (Iconix says payment has been made – we requested confirmation of receipt from John Reda)
  - Peanuts: $2.1M
- Contribution plugs will be paid to GBG at year-end along with the distributions from the JV – no invoice required
- The $6M for China Umbro / LC will offset the following:
  - Rocawear Royalties of $4.5M ($1M in 2014 + $3.5M in 2015)
  - Fixtures of $1.5M
  - Confirm how we would like legal to handle this arrangement – can the Roc termination agreement also cover the fixtures?

### Plugs – Miscellaneous Points to Discuss
- How to allocate the $5M plug for the Middle East JV
- Cannoli's - $3 Million
- Consultancy Agreement

### JV Operational Issues
- For all JVs GBG would like control of JV finances (invoicing, cash receipts, accounts receivable, etc.)
- New Europe brands added to the SEA JV: As the Europe brands were added to the SEA JV, currently all license agreements have to be drafted with Iconix SEA as the contracting party. We would like to arrange for Iconix SEA to grant Iconix Europe a sublicense for the Europe brands so that Iconix Europe can be the contracting party. This will allow TLC to operate free from any ambiguity or confusion when dealing with licensees.

### Middle East
- As discussed, we have a hard close date of Monday the 15th.

 **GLOBAL BRANDS GROUP**

Ethan Cole | Manager- Business Development and Licensing |
350 Fifth Avenue | 5th floor | New York, NY 10118
T 347.448.1346
B: 646.582.6109
Ethancole@globalbrandsgroup.com

**GOVERNMENT EXHIBIT 1139**
19 Cr. 869 (ER)

**A-1556**

CONFIDENTIAL

GBG0020536

**From:** Seth Horowitz [sethhorowitz@mac.com]
**Sent:** 4/13/2015 9:03:31 AM
**To:** Neil Cole [ncole@iconixbrand.com]
**CC:** James Marcum [Jmar1615@aol.com]; pcuneio@cuneoco.com; Sue Gove [segove@yahoo.com]; Drew Cohen [DrewFromNY@aol.com]; Mark Friedman [mark@theretailtracker.com]; Barry Emanuel [barry@copen.org]; Jason Schaefer [jschaefer@iconixbrand.com]
**Subject:** Resignation
**Attachments:** 20150413075811.pdf

Please see attached.
Sincerely,
Seth

A-1557

GOVERNMENT EXHIBIT 1197
19 Cr. 869 (ER)

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-032-00069176

# A-1558

Seth Horowitz<br>
200 West End Avenue 15F<br>
New York, NY 10023

April 13, 2015

Neil Cole
CEO and President
Iconix Brand Group, Inc.
1450 Broadway, 3rd Floor
New York, NY 10018

Board of Directors
Iconix Brand Group, Inc.
1450 Broadway, 3rd Floor
New York, NY 10018

Dear Mr. Cole and Members of the Board,

I hereby tender my resignation as Chief Operating Officer of Iconix Brand Group, Inc. ("Iconix" or "the Company") under my Employment Agreement dated April 2, 2012, as amended. As Mr. Cole is aware, I initially tendered my resignation last Monday, April 6, 2015. Mr. Cole did not accept my resignation at that time and suggested that I take some time off away from the office and reconsider. I agreed to do so, and after reflecting over the past week, I remain firm in my decision to resign.

In addition, I want to bring to your attention certain accounting issues that the Company and/or the Board may wish to review, and which I hope have been or will be properly addressed in the Company's ongoing discussions with BDO and the Staff of the SEC's Division of Corporation Finance.

**Terms of June 30, 2014 and September 27, 2014 Amendments to the Southeast Asia Joint Venture**

First, I would like to highlight the negotiations and terms of the June 30, 2014 and September 27, 2014 amendments to the Southeast Asia joint venture with GBG (known as Li & Fung Asia as of June 30, 2014). In particular, the price of the June 30, 2014 transaction increased from $10.9 million, based on terms negotiated for additional Southeast Asia joint venture rights in Europe and Turkey ($7.6 million) and Korea ($3.3 million), to the eventual closing price of $15.9 million based on negotiations including Mr. Cole, between Iconix and GBG regarding Iconix's verbal commitment to compensate GBG for $5 million in marketing expenses. I am aware that Iconix paid GBG a portion of the $5 million for certain marketing expenses in the fourth quarter of 2014. I do not know whether these marketing expenses were considered or discussed with BDO, in connection with accounting for revenues from the joint venture.

I also understand that the price of the September 17, 2014 transaction increased from $15.5 million, based on terms negotiated for additional Southeast Asia joint venture rights in China, Ma-

1

# A-1559

cao, Hong Kong, and Taiwan, to $21.5 million following negotiations including Mr. Cole, between Iconix and GBG regarding primarily Iconix's release of GBG from its licensing agreement with Iconix for Rocawear, in particular GBG's obligation to pay Iconix $2.5 million in 2014 and $3.5 million in 2015 in connection with the Rocawear license. At Mr. Cole's request, I worked with the Iconix legal team to prepare the documents to release GBG from its Rocawear obligations, but, at Mr. Cole's direction, I did not send those documents to GBG, and thus, as far as I know, GBG has not been released from those obligations.

I do not know whether the verbal commitment regarding marketing expenses and release of GBG from its Rocawear obligations were communicated to BDO for its consideration. I do not have an accounting background and would not be in a position to disagree with the Company if it has already considered these matters in connection with the revenue issues regarding these joint ventures.

**Accounts Receivable**

Second, in a recent conversation with Mr. Cole regarding accounts receivable, Mr. Cole expressed concern that once the Company completes its transition to an automated invoicing system, with invoices and accounts receivable reports drawn from the general ledger, invoices could be sent to entities that do not in fact owe payment to the Company. I am not familiar with the facts underlying Mr. Cole's concerns regarding the accuracy of the Company's accounts receivable records, and Mr. Cole may already be exploring solutions.

As explained above, I do not have complete information regarding the concerns I have described in this letter, nor do I have sufficient knowledge of the issues to reach conclusions. I simply want to raise them for your consideration so that they can be addressed in an appropriate manner.

Sincerely,

Seth Horowitz

cc:    Barry Emanuel, Director
Drew Cohen, Director
F. Peter Cuneo, Director
Mark Friedman, Director
James Marcum, Director
Sue Gove, Director

Jason Schaefer, General Counsel

2

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**    **ICON-032-00069178**

# A-1560

1. LF pays $13.3m for 50% of Korea IP; rather then $3.3m.

2. Iconix terminates Rocawear Kids License with LF USA
   a. Impact on Fixturing (?)- currently amortizing over length of license agreement.
   b. 2014 immediate hand-off to New Rise
   c. Goes into new Rocawear model w/ KY
      i. Hire Jonathon Cohen
      ii. Hire Kids designer
      iii. Royalty average 20% on $20-$25m business.
      iv. Budgeted Royalty 2014: $5m , Actual will be $2.5 from LF, $2.5 approximately from New Rise. OK.

3. Iconix amends existing LF Zoo York license to 1% on actual sales over course of the business.
   a. LF agrees to act as global sourcing partner for all Zoo York International business.



GOVERNMENT EXHIBIT
1255
19 Cr. 869 (ER)

**A-1561**

**GOVERNMENT EXHIBIT**
**1255-B**
19 Cr. 869 (ER)

## Properties ⌄

| | |
|---|---|
| Size | 52.2KB |
| Pages | 1 |
| Words | 114 |
| Total Editing Time | 12 Minutes |
| Title | Add a title |
| Tags | Add a tag |
| Comments | Add comments |

## Related Dates

| | |
|---|---|
| Last Modified | 6/10/2014 5:12 PM |
| Created | 6/10/2014 4:59 PM |
| Last Printed | 6/10/2014 5:05 PM |

## Related People

Author

 Seth Horowitz

Add an author

Last Modified By

 Seth Horowitz

**A-1562**



# Document Timeline

# A-1563



**A-1564**





Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 162 of 215

**From:** Neil Cole [/O=ICONIXBRAND/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=NCOLE]
**Sent:** 4/30/2014 3:17:44 PM
**To:** Jason Rabin (LF Asia) [JasonRabin@lfasia.com]; Jared Margolis (JaredMargolis@lfasia.com) [JaredMargolis@lfasia.com]
**CC:** Seth Horowitz [shorowitz@iconixbrand.com]
**Subject:** Friday

Are you guys available to meet on Friday?
Would like to discuss Europe, Korea, China.

Brooooklynnn!!! (Big night)

A-1565

April 30




GOVERNMENT
EXHIBIT
1028
19 Cr. 869 (ER)

2013 ① 2014 ② ③ 2015 4



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 163 of 215

**A-1566**

From: Seth Horowitz [shorowitz@iconixbrand.com]
Sent: 5/1/2014 8:46:58 PM
To: Neil Cole [ncole@iconixbrand.com]
Subject: LF Europe

Neil,
We hit a few road bumps today with the LF Amendment for Europe. But we have a solution. Because we own 51% of the Europe JV we cannot amend that JV to include the new brands in a manner where we take the gain.
However, we can (1) amend the SE Asia JV to extend the rights of Ecko Unlimited, Zoo York, Ed Hardy, etc.. to include European distribution for $10m (gain) and (2) amend the Europe JV to include Lee Cooper (because we are only selling 49%) for $12m. It is neutral to our cost basis.
I have a meeting at Eli's school at 8:30 am tomorrow. Don't expect it to be long, but I need to attend. I should be in by 9:15.

GOVERNMENT
EXHIBIT
1029
19 Cr. 869 (ER)

May 1

 2013    1         2014  2         3        2015

5



**From:** Seth Horowitz [shorowitz@iconixbrand.com]
**Sent:** 5/2/2014 4:39:29 PM
**To:** Jared Margolis [JaredMargolis@lfasia.com]
**Subject:** LF amend
**Attachments:** LFAmend.docx

See attached.

---

May 2nd, 2014

Overall Deal:

1. $25,342,500 purchase price for:
   a. Amending SE Asia JV to include Korea (minus Umbro per terms agreed to) ($3.7m purchase price)
   b. Amending SE Asia to include Europe and Turkey rights for Ecko Unlimited, Zoo York, Marc Ecko Cut & Sew, Ed Hardy and Sharper Image. ($7.6175m purchase price)
      i. Upon the put/ call provision contemplated in the SE Asia agreement, the value of these brands will not be less then the purchase price of $7.6175.
   c. Amending Europe JV to include Lee Cooper 49% ownership in Europe and Turkey, via a perpetual Marketing and Brand Services Agency Agreement. The Agency Agreement would be terminable in connection with an exercise of the put or call, as applicable, in respect of Iconix Europe with a mechanic similar to the put/call in the Europe JV Agreement to determine value. ($14.025 purchase price)

---

Steps:

1. SE ASIA JV AMENDMENT in Q2 for $11,317,500:
   a. Amend SE Asia JV per terms (a) and (b) above.

2. Q3/Q4:
   a. LF has the right, at their sole discretion, to acquire 49% of Lee Cooper, through a perpetual Marketing and Brand Services fee that entitles LF to 49% of the revenue earned for $14.03m. This exclusive right will exist through Q4 of 2014.

GOVERNMENT EXHIBIT 1031
19 Cr. 869 (ER)

May 2

2013  1    2014  2    3    2015

6

# A-1568



From: Seth Horowitz [shorowitz@iconixbrand.com]
Sent: 5/2/2014 5:41:48 PM
To: Neil Cole [ncole@iconixbrand.com]
Subject: LF

Worked with Jason and Jared this afternoon. Proposed the Korea and non Lee Cooper EU transactions first with their right to do LC in 2nd half at predetermined price. Would get us $12m gross, 9.5 net this quarter. They think they can get it through. We will see...See you later.

Sent from my iPhone



GOVERNMENT EXHIBIT 1032

19 Cr. 869 (ER)







2015

2014

May 2

2013





Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 166 of 215

A-1569

**From:** Seth Horowitz [shorowitz@iconixbrand.com]
**Sent:** 5/8/2014 4:45:18 PM
**To:** Neil Cole [ncole@iconixbrand.com]
**Subject:** FW: Update

Just so you have the email chain.. Below..

**From:** "Jason Rabin (LF Asia)" <JasonRabin@lfasia.com>
**Date:** Tuesday, May 6, 2014 at 2:49 PM
**To:** Seth Horowitz <shorowitz@iconixbrand.com>
**Cc:** Jared Margolis <JaredMargolis@lfasia.com>
**Subject:** Re: Update

Dow left last night for hk he is working on it...I will let u know immed

Sent from my iPhone

On May 6, 2014, at 11:07 AM, "Seth Horowitz" <shorowitz@iconixbrand.com> wrote:

> Jared,
> We need to know as soon as possible on the JV update. As you know this is time sensitive. If we are not moving forward this quarter we are going to need to make other decisions. Obviously, you are our first choice as a partner as we consolidate Europe and extend our relationship in the Asia region- but timing is critical.

**From:** "Jason Rabin (LF Asia)" <JasonRabin@lfasia.com>
**Date:** Thursday, May 8, 2014 at 2:37 PM
**To:** Seth Horowitz <shorowitz@iconixbrand.com>
**Cc:** Jared Margolis <JaredMargolis@lfasia.com>
**Subject:** Re: Update

I spoke to him last night trying really hard...need until tom to find out...the timing is so hard but we are trying

GOVERNMENT
EXHIBIT
1035
19 Cr. 869 (ER)

May 8

2013    1          2014 2      3        2015   8

# A-1570



GOVERNMENT EXHIBIT 253
19 Cr. 869 (RR)



From: Seth Horowitz [shorowitz@iconixbrand.com]
Sent: 5/14/2014 12:24:44 PM
To: Neil Cole [ncole@iconixbrand.com]
Subject: LF Terms
Attachments: LFAmendmay2.pdf

Attached is the term sheet as of May 2nd. They have told us that they are going to do the whole transaction in Q2.
This term sheet contemplates the Lee Cooper portion in the back half of the year.
Seth

**A. Deal Overview:**

1. $24,942,500 purchase price:

   a. Amend SE Asia JV to include Korea ($3.3m purchase price – as previously summited for waiver)

   b. Amend SE Asia to include Europe and Turkey rights for Ecko Unlimited, Zoo York, Marc Ecko Cut & Sew, Ed Hardy and Sharper Image. ($7.6175m purchase price)

   Upon the put/ call provision contemplated in the SE Asia agreement, the value of these brands will not be less than the purchase price of $7.6175.

   c. Amend Europe JV to include Lee Cooper 49% ownership in Europe and Turkey, via a perpetual Marketing and Brand Services Agency Agreement.

   The Agency Agreement would be terminable in connection with an exercise of the put or call, as applicable, in respect of Iconix Europe with a mechanic similar to the put/call in the Europe JV Agreement to determine value. ($14.025 purchase price)

**B. Deal Execution – Step by Step:**

Note: I am presenting two alternative options as the first step in executing this deal. These two alternatives are titled, "*Alternative 1*" and "*Alternative 2*". We will choose either Alternative 1 or Alternative 2. See below.

**Step 1:**

*Alternative 1: Make one single amendment to account for both (a) and (b) above*

- SE ASIA JV AMENDMENT in Q2 for $10,917,500:
  a. Amend SE Asia JV per terms (a) and (b) in section "A" above.

**OR**

*Alternative 2: Make two separate amendments to account for (a) and (b) above*

- (i) SE ASIA JV AMENDMENT in Q2 for $3.3m
  a. Amend SE Asia JV per term (a) in section "A" above.

- (ii) SE ASIA JV AMENMENT in Q2 for $7.6175m
  a. Amend SE Asia JV per term (b) in section "A" above.

**Step 2: Lee Cooper Acquisition through Marketing and Brand Services Fee:**

- LF has the right, at their sole discretion, to acquire 49% of Lee Cooper, through a perpetual Marketing and Brand Services fee that entitles LF to 49% of the revenue earned for $14.03m. This exclusive right will exist through Q4 of 2014.

GOVERNMENT EXHIBIT 1208

May 14

2013        2014         2015

A-1571

10

Q2- 2014- Latest Forecast - P&L Summary
May-22-2014

|  | Q2 Forecast | Opportunities & Risks | | | | Q2 Latest | Q2 2013 |
|  |  | Middle East JV * | Korea JV * | Europe JV New Brands * | Other |  |  |
|---|---|---|---|---|---|---|---|
| Revenue | 100,022 | 6,900 | 2,800 | 7,618 | (405) | 116,935 | 115,125 |
| Compensation | 14,740 |  |  |  | (968) | 13,773 | 13,050 |
| Advertising | 9,171 |  |  |  | (649) | 8,522 | 8,448 |
| Other SG&A | 6,596 |  |  |  | 612 | 7,208 | 8,540 |
| Agent Fees | 3,020 |  |  |  | (120) | 2,900 | 2,623 |
| Talent Fees | 8,006 |  |  |  | (138) | 7,868 | 8,416 |
| SG&A | 41,533 | 0 | 0 | 0 | (1,262) | 40,271 | 41,077 |
| 84000 - Equity Income in JV | (2,563) |  |  |  | 139 | (2,423) | (2,264) |
| 84010 - Minority Interest | 4,256 |  |  |  | 151 | 4,407 | 3,680 |
| EBITDA | 56,796 | 6,900 | 2,800 | 7,618 | 566 | 74,680 / 64% | 72,633 / 63% |
| Depreciation & Amortization | 1,449 |  |  |  | 223 | 1,672 | 2,533 |
| Net Interest Expense | 20,856 |  |  |  | (185) | 20,671 | 13,102 |
| Min Int related to D&A and Int | (366) |  |  |  | 0 | (366) | (380) |
| Net Income Before Taxes | 34,857 | 6,900 | 2,800 | 7,618 | 528 | 52,703 | 57,378 |
| Taxes | 11,296 | 2,208 | 980 | 2,742 | 190 | 17,417 | 18,661 |
| Net Income | 23,561 | 4,692 | 1,820 | 4,875 | 338 | 35,286 | 38,717 |
| Adjustments for Non GAAP | 4,307 |  |  |  | 0 | 4,307 | 3,934 |
| Non GAAP | 27,868 | 4,692 | 1,820 | 4,875 | 338 | 39,593 | 42,651 |
| Sharecount * | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 58,994 |
| Non GAAP EPS | $0.52 | $ 0.09 | $ 0.03 | $ 0.09 | $ 0.01 | $ 0.73 | $ 0.72 |

Consensus
Revenue 116.04m Rev
EPS $0.67 EPS

Assumptions
• Assumes share price of $42 for incremental converts
• JV close June 30

|  | Middle East | Korea | Europe New |
|---|---|---|---|
| Purchase Price | 15.0 | 3.3 | 7.6 |
| Cost Basis | (8.1) | (0.5) | 0.0 |
| Net Revenue Gain | 6.9 | 2.8 | 7.6 |

33.00%
33.05%
-0.05%

| Opp + Risks Breakdown | |
|---|---|
| Target (Mossimo) | (810) |
| GL Damek (Umbro) | (546) |
| Umbro New Business | (467) |
| Confectione Kamerino (Umbro) | (463) |
| Walmart (Starter) | (442) |
| Roc Apparel | (340) |
| Brightstar | (222) |
| Kohl's (Candie's) | (185) |
| Target (Fieldcrest) | (151) |
| Walmart (Danskin) | 364 |
| PacSun (Modem Amusement) | 366 |
| Peanuts Brands | 1,037 |
| ES Originals (Rampage) | 1,209 |
| All Other | (233) |
| Total | (882) |

477

May 22

2013　1　2014　2　3　2015　11



GOVERNMENT EXHIBIT 254
19 Cr. 850 (ER)



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 170 of 215

A-1573

From: Seth Horowitz [shorowitz@iconixbrand.com]
Sent: 5/23/2014 12:04:38 PM
To: Jared Margolis [JaredMargolis@lfasia.com]
Subject: FW: SEA JV Amendment Transaction Documents
Attachments: 101727800_2 (Iconix LF - Amendment 1 to Master License Agreement).docx; 101727582_2 (Iconix LF - Amendment 1 to Shareholders Agreement).docx; 101728475_2 (Iconix LF - Additional Marks (Korea, Europe, Turkey) Consid....docx

Attached are the legal docs discussed

Best,

Seth

## LF shall pay Iconix **$10,917,500**

GIBSON DUNN DRAFT
5/8/2014

[ICONIX LETTERHEAD]

To: LF Asia Limited
11th Floor, LiFung Tower,
888 Cheung Sha Wan Road,
Kowloon,
Hong Kong

Date: [_____], 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks**

Reference is hereby made to (a) the Amendment No. 1 to the Master License Agreement (the "*Master License Agreement Amendment*") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("*Iconix*"), certain of Iconix's wholly owned subsidiaries ("*Licensors*") and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("*Licensee*"), amending the Master License Agreement (the "*Existing Master License Agreement*"), effective as of September 30, 2013, by and among Iconix, Licensors and Licensee, and (b) the Amendment No. 1 to the Shareholders Agreement of Iconix SE Asia Limited (the "*Shareholders Agreement Amendment*" and, together with the Master License Agreement Amendment, the "*SEA JV Amendments*") to be entered into as of the date hereof by and between Iconix and LF Asia Limited ("*LF*"), amending the Shareholders Agreement of Lion Network Limited (the "*Existing Shareholders Agreement*"), effective as of September 30, 2013, by and between Iconix and LF. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the SEA JV Amendments, as applicable.

Iconix and LF acknowledge and agree that the right to use certain trademark [regist]ions or applications owned by Licensors in the Republic of Korea, Europe or Turkey [...] by Licensors to Licensee pursuant to the SEA JV Amendments (the "*Additional* [Marks]") is deemed to have a fair market value of $21,835,000, and that because Iconix and LF [own] 50% of Licensee, LF's ownership of 50% of Licensee will provide LF a benefit equal [to 50%] of such fair market value, or $10,917,500.

[In] order to compensate Iconix for the transfer of 50% of the fair market value of the [Additio]nal Marks to LF, Iconix and LF hereby agree that LF shall pay Iconix $10,917,500 [("the Ad]ditional Marks Consideration"), which amount Iconix and LF shall treat for all U.S. [purp]oses as paid by LF to Iconix in exchange for 50% of the Additional Marks, following [...] each of Iconix and LF shall be treated for U.S. tax purposes as contributing its respective share of the Additional Marks to the Licensee.

To the extent the transactions contemplated in this letter agreement result in the assessment of any tax (such tax, if any, the "*Korean Withholding Tax*") by the applicable tax authority in the Republic of Korea (the "*Korean Tax Authority*"), Iconix and LF agree that LF shall (a) withhold from the Additional Marks Consideration an amount equal to the Korean Withholding Tax, (b) appoint a tax administrator necessary for the payment of the Korean Withholding Tax to the Korean Tax Authority, the costs of which appointment shall be borne

GOVERNMENT
EXHIBIT
1036
19 Cr. 889 (ER)

May 23





| 2013 | ① | | | 2014 ② | | ③ | | 2015 | 12 |



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 171 of 215

A-1574

**From:** Seth Horowitz [shorowitz@iconixbrand.com]

**Sent:** 5/30/2014 2:03:30 PM

**To:** Jared Margolis [JaredMargolis@lfasia.com]

**Subject:** Timing

Jared,

I know we keep discussing timing- but I want to set an achievable, specific timeline with you.

I believe our signing date should be no later then June 18th. We need this because we cannot find ourselves at the end of the Q with our backs to the wall. If we can't sign our deal by then we will have to make other decisions.

I also feel that this should be a very achievable timeline. Can we talk/sit Monday and work backwards from this date?

GOVERNMENT
EXHIBIT
1037
19 Cr. 869 (ER)

May 30

2013    1            2014 2      3         2015

13



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 172 of 215

**A-1575**

| | |
|---|---|
| From: | Seth Horowitz [shorowitz@iconixbrand.com] |
| Sent: | 6/3/2014 9:21:44 PM |
| To: | Neil Cole [ncole@iconixbrand.com] |
| Subject: | LF meeting |

Meeting went well.  Key takeaways:
1.  The LF attorneys wanted to know more about our Lux structure.  They did not oppose to the tracking stock and understood our need for alternate structure.  We did not bring up the agency option at this point as we are still working with Sang to determine if it is possible. We have a call with him tomorrow.  If it is possible and we prefer it or LF rejects tracking stock, we can change courses.
2.  We agreed that the SE Asia amendment - including Korea and Europe brands (not Lee Cooper) can happen in June and the Lee Cooper portion of the deal can happen in Q3 if structure delays us.  That is ok as we have no gain on that portion of the deal and we get the anticipated gain in q2.
3.  There was a lot of questions/concern around Ecko, Dirty Jerz, and Seth G/ MEE.  We took them through all of it - full transparency. With a floor on the buy back after 5 years and a backstop in Year 1 (both terms of our original term sheet) they got comfortable with the valuation of the IP.  It got heated for a bit- told them we were not moving on price- and not going to re-negotiate...then it calmed back down.
3.  The IC will formerly "approve" the deal on June 18 at a meeting in Hong Kong.  Prior to that we will have completed and agreed to legal docs.  Once we have IC approval, we will sign.  Goal is to sign June 20.
Best,
Seth

GOVERNMENT
EXHIBIT
1038
19 Cr. 869 (ER)

June 3



2013   1      2014 2      3      2015  14

**A-1576**





**From:** Seth Horowitz <shorowitz@iconixbrand.com>
**Sent:** Monday June 9, 2014 10:08 AM
**To:** Neil Cole <ncole@iconixbrand.com>
**Subject:** Update
**Attach:** June9.pdf

Neil,
Attached is a brief update on key topics.

June 4, 2014

**Weekly Update**

Strategic Initiatives
1. LF
   a. All Legal Docs were sent to LF GC. Goal is to have them completed prior to June 18 IC meeting.
      i. Willy and I reviewing document to go to licensees in advance of diligence calls this week and next being done by Angela. A bit tricky, but necessary.
      ii. IC meeting on June 18 to approve JV.
      iii. Internal employee/ structure discussions with Melvin, Angela and Jared start Tuesday. Meeting in person scheduled for Licensing Show (pending trip to Vegas).
2. China Umbro

All Legal Docs were sent to LF GC. Goal is to have them completed prior to June 18 IC meeting.
   i. Willy and I reviewing document to go to licensees in advance of diligence calls this week and next being done by Angela. A bit tricky, but necessary.
   ii. IC meeting on June 18 to approve JV.

confirmation this week that we can do so without impacting Lux structure.

China Umbro
   a. Descente. Three issues: (i) We are waiting to hear back on price (ii) They are negotiating some type of backstop- but believe we have a resolution (iii) Timing- All documents are prepared, but will be a lot of legal work in a short time for a Japanese company w/ a complicated structure.
   b. TPG/ Li Ning: Still quiet.
   c. Li & Fung: Verbally committed to $12m 50/50 JV, but need to wait until Q3.
   d. Simon Bamber- need to discuss in person.
   e. Win Hanverky – Call on Tuesday evening with new President and CFO.

SEC-00026744

GOVERNMENT
EXHIBIT
1247
19 Cr. 869 (ER)

June 9

2013   1   2014 2   3   2015

16

**A-1578**



**From:** Jason Rabin <jrabin@khny.com>
**Sent:** Monday, June 9, 2014 12:40 PM
**To:** Neil Cole <ncole@iconixbrand.com>
**Subject:**

Hi Neil..

Are you free for a quick call...

GOVERNMENT EXHIBIT 1254
19 Cr. 869 (ER)

2013  2014  2015

June 9





A-1580

From: Seth Horowitz
Sent: Tuesday, June 10, 2014 10:59 PM
To: Neil Cole
Subject: LF

I've been thinking about the LF transaction and I like it. Can share my thoughts in the am.

From: Neil Cole
Sent: Wednesday, June 11, 2014 3:05 AM
To: Seth Horowitz
Subject: Re: LF

Ok. Let's discuss in morning. Also have San Rio and Camelot in office tomorrow.

June 11

2013          1                              2014   2              3                              2015     19

GOVERNMENT EXHIBIT 1256
19 Cr. 869 (ER)



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 178 of 215

A-1581



>From: Seth Horowitz
>Sent: Thursday, June 12, 2014 8:03 AM
>To: Neil Cole
>Subject: Rocawear
>
>
>Did a lot of diligence work on margins/ product/ volume. Very difficult
>- in any model- at the current product/pricing/ distribution to make
>money. Good top line- no bottom. Should discuss.
>Best,
>Seth

GOVERNMENT
EXHIBIT
1039
19 Cr. 869 (ER)

June 12

2013          2014          2015

20

**A-1582**



**From:** Seth Horowitz [shorowitz@iconixbrand.com]
**Sent:** 6/12/2014 8:24:50 PM
**To:** Neil Cole [ncole@iconixbrand.com]
**Subject:** EU JV Update

Neil,
I spoke with Jared tonight. Bottom line is that we may complete only part of the total transaction (Europe and Korea) at approx. $15m of gain/ revenue for Iconix in Q2 and wait until 3rd quarter for the Lee Cooper EU portion of the transaction. This gives us everything we want, revenue wise, for Q2 and the Lee Cooper portion- which is a non gain transaction waits until Q3. This is because the structure of the Lee Cooper transaction is not an Amendment to an existing JV.
Best,
Seth



GOVERNMENT EXHIBIT
1041
19 Cr. 869 (ER)

2015

21



June 12



2014



2013



**A-1583**

From: Jason Rabin [/O=LFTLTD/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JASON RABINOF8]

Sent: 6/12/2014 9:59:55 AM

To: 'ncole@iconixbrand.com' [ncole@iconixbrand.com]

Hi Neil..are u free

June 12

GOVERNMENT
EXHIBIT
1140
19 Cr. 869 (ER)

| 2013 | ① | | | | 2014 ② | | ③ | | 2015 | 22 |

Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 181 of 215

A-1584



Reply    Reply All    Forward

## Re: Update

**David Maslaton**

**To:**    Seth Horowitz

**Cc:**    Jeff Lupinacci; Melissa Tidgwell

Tuesday, June 17, 2014 8:24 PM

Yes. I'm available all morning.

David Maslaton

> On Jun 17, 2014, at 8:22 PM, "Seth Horowitz"
<shorowitz@iconixbrand.com> wrote:
>
> David,
> Per my conversation with Neil this afternoon, we should sit down in the
am so I can walk you through the movement on strategic initiatives and
their timing so we can have new models for Thursdays meeting.
> Best,
> Seth

June 17

2013    1

2014    2        3

2015    23



GOVERNMENT
EXHIBIT
1042
19 Cr. 869 (ER)

A-1585



**A-1586**



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 184 of 215

**A-1587**

From: Neil Cole [/O=ICONIXBRAND/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=NCOLE]
Sent: 6/24/2014 12:09:33 PM
To: Jason Rabin (LF Asia) [JasonRabin@lfasia.com]
CC: Seth Horowitz [shorowitz@iconixbrand.com]
Subject: Phone discussion.

Spoke to Seth and we are fine.

June 24

2013       2014       2015



26

# A-1588









**US$15,917,500**

**$10,917,500**

June 25

2013    1    2014    2    3    2015    27



GOVERNMENT EXHIBIT 1044
13 Cr. 289 (ER)

| | |
|---|---|
| **From:** | Stevens, Mark J [mark.stevens@mayerbrownjsm.com] |
| **Sent:** | 6/25/2014 11:18:01 AM |
| **To:** | Cook, Nicholas C.A. [nicholas.cook@mayerbrownjsm.com]; Alyssa Perlowitz [aperlowitz@iconixbrand.com]; Kim, Brian J. [BKim@gibsondunn.com]; Lauren Gee [lgee@iconixbrand.com]; bbecker@gibsondunn.com; D'Amico, Evan M. [EDAmico@gibsondunn.com]; Seth Horowitz [shorowitz@iconixbrand.com]; Jason Schaefer [jschaefer@iconixbrand.com] |
| **CC:** | Jared Margolis (Jaredmargolis@lfasia.com) [Jaredmargolis@lfasia.com]; Robert Smits [RobertSmits@lfusa.com]; DMS - K-Pop (#14448383) [MayerBrownJSMFile.14448383.current@dms.mayerbrownjsm.com]; Ethan Cole [ethancole@lfusa.com]; Kevin Chow KL (LFAsia) [KevinChowKL@lfasia.com]; Ming Ho [mingho@fung1937.com]; Ryan Lee (Fung 1937) [RyanLee@Fung1937.com] |
| **Subject:** | RE: Iconix SEA - MLA Amendment Schedules |
| **Attachments:** | Consideration Side-Letter - Korea and Europe+Turkey -MBJSM 6_25_2014 (33856798_4).DOCX; Consideration Side-Letter -compared against GDC draft (33960851_1).PDF; Iconix - LF - Amendment 1 to Master License Agreement -MBJSM - 6_25_2014 (33856797_4).DOCX; Iconix LF - Amendment 1 to Master License Agreement) - as compared against GDC version (33960805_1).PDF; SHA - Project Brand+ - Conformed Copy (33753303_3).DOCX; SHA - Project Brand+ - Conformed Copy - compare against GDC draft (33960723_1).PDF; SHA - Project Brand+ - Conformed Copy - compared against executed copy (33960709_1).PDF |





GIBSON DUNN DRAFT
MBJSM Comment 6.25.2014

[ICONIX LETTERHEAD]

Date: ____ 30 June 2014

To: LF Asia Limited
11th Floor, LiFung Tower,
888 Cheung Sha Wan Road,
Kowloon,
Hong Kong

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks**

Reference is hereby made to (a) the Amendment No. 1 to the Master License Agreement (the "Master License Agreement Amendment") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("Iconix"), certain of Iconix's wholly owned subsidiaries ("Licensors") and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("Licensee"), amending the Master License Agreement (the "Existing Master License Agreement"), effective as of September 30, 2013, by and among Iconix, Licensors, certain Iconix affiliates (as licensors) and Licensee, and (b) the Amendment No. 1 to the Shareholders' Agreement of Iconix SE Asia Limited (the "Shareholders' Agreement Amendment" and, together with the Master License Agreement Amendment, the "SEA JT Amendments") to be entered into as of the date hereof by and between Iconix and LF Asia Limited ("LF"), amending the Shareholders Agreement of Lion Network Limited (the "Existing Shareholders' Agreement"), effective as of September 30, 2013, by and between Iconix and LF. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the SEA IV Amendment Existing Master License Agreement as amended by the Master License Agreement Amendment (or if not therein defined, in the Existing Shareholders Agreement as amended by the Shareholders Agreement Amendment) as applicable.

Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by Licensors in the Republic of Korea, Europe or Turkey granted by Licensors to Licensee pursuant to the SEA IV Amendments (the "Additional Marks") is deemed to have a fair market value of $21,835,000 US$31,835,000, and that because Iconix and LF each own 50% of Licensee, LF's ownership of 50% of Licensee will provide LF a benefit equal to 50% of such fair market value, or $10,917,500 US$15,917,500.

In order to compensate Iconix for the transfer of 50% of the fair market value of the Additional Marks to LF (through LF's 50% shareholding in Licensee) pursuant to the SEA IV Amendment, Iconix and LF hereby agree that LF shall pay Iconix $10,917,500 US$15,917,500 (the "Additional Marks Consideration"), which amount Iconix and LF shall treat for all U.S. tax purposes as paid by LF to Iconix in exchange for 50% of the Additional Marks, following which each of Iconix and LF shall be treated for U.S. tax purposes as contributing its respective share of the Additional Marks to the Licensee.





Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 186 of 215

**A-1589**

From:       Seth Horowitz [shorowitz@iconixbrand.com]
Sent:       6/29/2014 11:06:06 PM
To:         Neil Cole [ncole@iconixbrand.com]
Subject:    Fwd: SEA Transaction Status

Per the emails below, the LF docs are signed and wire transfer will happen from NY first thing in the am. I will continue to follow up to make sure we get the signature pages and wire in the am.

Best,
Seth

**GOVERNMENT
EXHIBIT
1046**
19 Cr. 869 (ER)

June 29



2013    ①                      2014 ②       ③               2015    28

A-1590







**A-1591**











Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 189 of 215

A-1592

## Q3- 2014- Latest Forecast - P&L Summary
Jul-17-2014

| | Q3 Forecast | Converts / Buybacks | Opportunities & Risks Umbro China | Opportunities & Risks Middle East JV | Opportunities & Risks Other | Q3 Latest | Q3 2013 | |
|---|---|---|---|---|---|---|---|---|
| Revenue | 97,410 | | 12,500 | 6,900 | 0 | 116,810 | 107,177 | 122,420,000 (5,610) |
| | | | | | | | | |
| Compensation | 15,142 | | | | 0 | 15,142 | 13,431 | |
| Advertising | 12,533 | | | | 0 | 12,533 | 8,294 | |
| Other SG&A | 10,119 | | | | 0 | 10,119 | 9,753 | |
| Agent Fees | 3,081 | | | | 0 | 3,081 | 2,829 | |
| Talent Fees | 9,435 | | | | 0 | 9,435 | 8,758 | |
| SG&A | 50,310 | 0 | 0 | 0 | 0 | 50,310 | 43,065 | 50,310 (0) |
| | | | | | | | | |
| 84000 - Equity Income in JV | (2,740) | | | | 0 | (2,740) | (3,388) | |
| 84010 - Minority Interest | 4,135 | | | | 0 | 4,135 | 1,934 | |
| | | | | | | | | |
| EBITDA | 45,705 | 0 | 12,500 | 6,900 | 0 | 65,105 56% | 65,566 61% | 70,704 (5,599) |
| | | | | | | | | |
| Depreciation & Amortization | 1,360 | | | | 0 | 1,360 | 2,640 | |
| Net Interest Expense | 20,887 | | | | 0 | 20,887 | 20,613 | |
| Min Int related to D&A and Int | (358) | | | | 0 | (358) | (427) | |
| | | | | | | | | |
| Net Income Before Taxes | 23,816 | 0 | 12,500 | 6,900 | (0) | 43,216 | 42,739 | |
| | | | | | | | | |
| Taxes | 8,365 | | 625 | 1,380 | 1,000 | 11,370 | 13,740 | |
| | | | | | | | | |
| Net Income | 15,450 | 0 | 11,875 | 5,520 | (1,000) | 31,845 | 28,999 | |
| | | | | | | | | |
| Adjustments for Non GAAP | 4,475 | | | | 0 | 4,475 | 4,090 | |
| | | | | | | | | |
| Non GAAP | 19,925 | 0 | 11,875 | 5,520 | (1,000) | 36,320 | 33,089 | |
| | | | | | | | | |
| Sharecount * | 53,800 | 53,800 | 53,800 | 53,800 | 53,800 | 53,800 | 56,153 | |
| | | | | | | | | |
| Non GAAP EPS | $0.37 | $ - | $ 0.22 | $ 0.10 | $ (0.02) | $ 0.68 | $ 0.59 | |

### Opp + Risks Breakdown
| | |
|---|---|
| Target (Mossimo) | (810) |
| GL Damek (Umbro) | (546) |
| Umbro New Business | (467) |
| Confectione Kamerino (Umbro) | (463) |
| Walmart (Starter) | (442) |
| Roc Apparel | (340) |
| Brightstar | (222) |
| Kohl's (Candie's) | (185) |
| Target (Fieldcrest) | (151) |
| Walmart (Danskin) | 364 |
| PacSun (Modern Amusement) | 366 |
| Peanuts Brands | 1,037 |
| ES Originals (Rampage) | 1,209 |
| All Other | (233) |
| Total | (882) |

Consensus
Revenue
EPS

111.430m Rev
$0.64 EPS

Assumptions
* Assumes share price of $43 for incremental converts

| | Middle East | Korea | Europe New | Umbro China | Sanrio |
|---|---|---|---|---|---|
| Purchase Price | 15.0 | 8.3 | 7.6 | 12.5 | 13.0 |
| Cost Basis | (8.1) | (0.4) | (1.4) | (2.5) | 0.0 |
| Net Revenue Gain | 6.9 | 7.9 | 6.3 | 10.0 | 13.0 |

35.13%

33.00%
26.31%
6.69%

GOVERNMENT EXHIBIT 255
10 Cr. 860 (ER)

July 17



 2013   1   2014   2   3   2015   31



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 190 of 215

**A-1593**

| From: | Seth Horowitz [shorowitz@iconixbrand.com] |
|---|---|
| Sent: | 7/28/2014 2:56:38 PM |
| To: | Jared Margolis [JaredMargolis@lfasia.com] |
| CC: | Ethan Cole [ethancole@lfusa.com]; Maurice Sasson [msasson@iconixbrand.com] |
| Subject: | China Umbro & LC |

Jared,

Attached is a term sheet that should reflect our most recent conversation. The purchase price went up to 15.5 (from 15) for reasons I can explain. It contemplates Cost basis and getting the guarantee you requested. Please let me know if this term sheet is acceptable and then we can layout next steps to get this completed.

Best,

Seth

## POSSIBLE CHINA JV FOR UMBRO + LEE COOPER
July 28, 2014

| Territories | China, Hong Kong, Macau & Taiwan |
|---|---|
| Deal Structure - Amendment to SE Asia JV | Iconix will sell 50% of the Umbro and Lee Cooper brands IP in the territory to GBG as part of SE Asia JV.<br><br>Iconix SE Asia Limited will be amended to consisting of IP in the territories for the Umbro and Lee Cooper brands |
| Purchase Terms | The purchase price will be US$ 15.5 million, payable 20% up front and 20% on each of the first, second, third and fourth year anniversaries of the effective date. |
| Umbro Brand Marketing Fee | For both Lee Cooper and Umbro, the JV will pay an annual brand-marketing fee to Iconix equal to 8% of royalty revenue.<br><br>In exchange, the JV will have rights to all Lee Cooper brand assets and Umbro Marketing Properties, including, but not limited to contracted players & teams.<br><br>Umbro licensees in region will pay an incremental Badge Fee of 25% of wholesale sales for Replica Kits and 15% of wholesale sales for associated co-branded products. Umbro Direct to Retail licensees will pay an incremental Badge Royalty of 12.5% on retail sales for Replica Kits and 7.5% on retail sales for associated co-branded products.<br><br>All Badge fees shall be paid in full to Iconix and shall not be included in revenue for the JV. |
| Profit Disbursement | All profit disbursements, drawn from revenues minus expenses for the JV, will be allocated to the partners on a pro-rata basis according to their respective ownership stakes |
| Guaranteed Distribution | Iconix will guarantee a minimum of $1M of profit distribution in 2014 and $3M of profit distribution in 2015 to GBG. Any payments of Service Fee's will be credited towards these numbers. |
| Put/Call Option | Following the fifth anniversary of closing, GBG may deliver notice to Iconix to initiate the purchase by Iconix of all of the shares held by GBG at a purchase price not less than $11.5m. |

GOVERNMENT EXHIBIT 1047<br>19 Cr. 809 (ER)

July 28




2013  ①  2014 ②  ③  2015

## FORM 8-K

## ICONIX BRAND GROUP, INC.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

On July 29, 2014, Iconix Brand Group, Inc., a Delaware corporation, (the "Registrant") issued a press release announcing its financial results for the fiscal quarter and six months ended June 30, 2014. As noted in the press release, the Registrant has provided certain non–U.S. generally accepted accounting principles ("GAAP") financial measures, the reasons it provided such measures and a reconciliation of the non–U.S. GAAP measures to U.S. GAAP measures. Readers should consider non–GAAP measures in addition to, and not as a substitute for, measures of financial performance prepared in accordance with U.S. GAAP. A copy of the Registrant's press release is being furnished hereto as Exhibit 99.1 and is incorporated herein by reference.

**ICONIX BRAND GROUP, INC.**

Delaware
(State or Other Jurisdiction of Incorporation)

1450 Broadway, New York, New York
(Address of Principal Executive Offices)

### ICONIX BRAND GROUP REPORTS RECORD REVENUE AND EARNINGS FOR THE SECOND QUARTER 2014

- *Record Q2 revenue of $118.9 million and non-GAAP diluted EPS of $0.75*

Total revenue for the second quarter of 2014 was approximately $118.9 million, a 3% increase as compared to approximately $115.1 million in the second quarter of 2013. EBITDA attributable to Iconix for the second quarter was approximately $78.2 million, an 8% increase as compared to $72.7 million in the prior year quarter. Free cash flow attributable to Iconix for the second quarter was approximately $60.0 million, as compared to the prior year quarter of approximately $60.8 million. On a non-GAAP basis, as described in the tables below, net income attributable to Iconix was $39.6 million, as compared to the prior year quarter of approximately $42.7 million. Non-GAAP diluted EPS for the second quarter of 2014 increased 4% to $0.75 compared to $0.72 in the prior year quarter. GAAP net income attributable to Iconix for the second quarter of 2014 was approximately $35.3 million, as compared to $38.7 million in the prior year quarter, and GAAP diluted EPS for the second quarter of 2014 was $0.60 compared to $0.66 in the prior year quarter.

Neil Cole, Chairman and CEO of Iconix Brand Group, Inc. commented, "With record results in the second quarter, we continue to demonstrate the power of our business model with our diversified revenue stream and strong free cash flow. As we look to the future we believe we can continue to deliver significant growth and increased value for our Company and shareholders through our global expansion plans, worldwide Peanuts business and additional acquisitions of global iconic brands.

GOVERNMENT
EXHIBIT
102
19 Cr. 869 (ER)

     

2013    1    July 29    2014   2    3    2015   33

**A-1595**

GOVERNMENT EXHIBIT 256
19 Cr. 889 (ER)

## Q3 - 2014: Latest Forecast - P&L Summary
Jul-31-2014

| | Q3 Forecast | Converts / Buybacks | Umbro China | Middle East JV | Other | Q3 Latest | Q3 2013 |
|---|---|---|---|---|---|---|---|
| | | | **Opportunities & Risks** | | | | |
| Revenue | 97,410 | | 12,500 | 6,900 | 0 | 116,810 | 107,177 |
| Compensation | 15,142 | | | | (2,108) | 13,035 | 13,431 |
| Advertising | 12,533 | | | | 0 | 12,533 | 8,294 |
| Other SG&A | 10,119 | | | | 0 | 10,119 | 9,753 |
| Agent Fees | 3,081 | | | | (0) | 3,081 | 2,829 |
| Talent Fees | 9,435 | | | | 0 | 9,435 | 8,758 |
| SG&A | 50,310 | | | | (2,108) | 48,202 | 43,065 |
| 84000 - Equity Income in JV | (2,740) | | | | 0 | (2,740) | (3,388) |
| 84010 - Minority Interest | 4,135 | | | | 0 | 4,135 | 1,934 |
| EBITDA | 45,705 | | 12,500 | 6,900 | 2,108 | 67,213 | 65,566 |
| | | | | | | 58% | 61% |
| Depreciation & Amortization | 1,360 | | | | 0 | 1,360 | 2,640 |
| Net Interest Expense | 20,887 | | | | 0 | 20,887 | 20,613 |
| Min Int related to D&A and Int | (358) | | | | 0 | (358) | (427) |
| Net Income Before Taxes | 23,816 | | 12,500 | 6,900 | 2,108 | 45,324 | 42,739 |
| Taxes | 8,365 | | 625 | 1,380 | 1,738 | 12,108 | 13,740 |
| Net Income | 15,450 | | 11,875 | 5,520 | 370 | 33,215 | 28,999 |
| Adjustments for Non GAAP | 4,475 | | | | 0 | 4,475 | 4,090 |
| Non GAAP | 19,925 | 0 | 11,875 | 5,520 | 370 | 37,691 | 33,089 |
| Sharecount * | 53,800 | 53,800 | 53,800 | 53,800 | 53,800 | 53,800 | 56,153 |
| Non GAAP EPS | $0.37 | $ - | $0.22 | $0.10 | $0.01 | $0.70 | $0.59 |

122,420,000
(5,610)

50,310
(2,108)

70,704
(3,491)

**Consensus**
Revenue: 111,430m Rev
EPS: $0.64 EPS

**Assumptions**
* Assumes share price of $43 for incremental converts

| | Middle East | Korea | Europe New | Umbro China | Sanrio |
|---|---|---|---|---|---|
| Purchase Price | 15.0 | 8.3 | 7.6 | 12.5 | 13.0 |
| Cost Basis | (8.1) | (0.4) | (1.4) | (2.5) | 0.0 |
| Net Revenue Gain | 6.9 | 7.9 | 6.3 | 10.0 | 13.0 |

35.13%

33.00%
26.71%
6.29%

**Opp + Risks Breakdown**

| | |
|---|---|
| Target (Mossimo) | (810) |
| GL Damek (Umbro) | (546) |
| Umbro New Business | (467) |
| Confectione Kamenno (Umbro) | (463) |
| Walmart (Starter) | (442) |
| Roc Apparel | (340) |
| Brightstar | (222) |
| Kohl's (Candie's) | (185) |
| Target (Fieldcrest) | (151) |
| Walmart (Danskin) | 364 |
| PacSun (Modern Amusement) | 366 |
| Peanuts Brands | 1,037 |
| ES Originals (Rampage) | 1,209 |
| All Other | (233) |
| Total | (882) |




2013 — 1 — 2014 — 2 — July 31 — 3 — 2015 — 34



GOVERNMENT EXHIBIT 257
19 Cr. 869 (ER)

**Q3- 2014- Latest Forecast - P&L Summary**
Aug-4-2014

| | Q3 Forecast | Converts / Buybacks | Umbro China | Middle East JV | Other | Q3 Latest | Q3 2013 | |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | 97,410 | | 12,500 | 6,900 | (3,253) | 113,556 | 107,177 | 116,810,000 |
| | | | | | | | | (3,254) |
| Compensation | 15,142 | | | | (2,096) | 13,046 | 13,431 | |
| Advertising | 12,533 | | | | (677) | 11,857 | 8,294 | |
| Other SG&A | 10,119 | | | | (2,080) | 8,039 | 9,753 | |
| Agent Fees | 3,081 | | | | (164) | 2,916 | 2,829 | |
| Talent Fees | 9,435 | | | | (3,260) | 6,174 | 8,758 | |
| SG&A | 50,310 | | | | (8,277) | 42,033 | 43,065 | 50,310 |
| | | | | | | | | (8,277) |
| 84000 - Equity Income in JV | (2,740) | 0 | 0 | 0 | 53 | (2,686) | (3,388) | |
| 84010 - Minority Interest | 4,135 | | | | 172 | 4,307 | 1,934 | |
| **EBITDA** | 45,705 | 0 | 12,500 | 6,900 | 4,798 | 69,903 | 65,566 | 65,105 |
| | | | | | | 62% | 61% | 4,798 |
| Depreciation & Amortization | 1,360 | | | | 0 | 1,360 | 2,640 | |
| Net Interest Expense | 20,887 | | | | 0 | 20,887 | 20,613 | |
| Min Int related to D&A and Int | (358) | | | | 0 | (358) | (427) | |
| Net Income Before Taxes | 23,816 | 0 | 12,500 | 6,900 | 4,798 | 48,014 | 42,739 | |
| Taxes | 8,365 | | 1,625 | 1,380 | 2,679 | 14,050 | 13,740 | |
| Net Income | 15,450 | 0 | 10,875 | 5,520 | 2,119 | 33,964 | 28,999 | |
| Adjustments for Non GAAP | 4,475 | | | | 0 | 4,475 | 4,090 | |
| Non GAAP | 19,925 | 0 | 10,875 | 5,520 | 2,119 | 38,439 | 33,089 | 36,320 |
| Sharecount* | 53,800 | 53,500 | 53,500 | 53,500 | 53,500 | 53,500 | 56,153 | 2,119 |
| **Non GAAP EPS** | $0.37 | $0.00 | $0.20 | $0.10 | $0.04 | $0.72 | $0.59 | $0.68 / $0.04 |

**Opportunities & Risks**

**Consensus**
Revenue
EPS
112.52m Rev
$0.62 EPS

**Assumptions**
* Assumes share price of $43 for incremental converts

Middle East
Purchase Price 15.0
Cost Basis (8.1)
Net Revenue Gain 6.9

35.13%

33.00%
29.26%
3.74%

**Opp + Risks Breakdown**

| | |
|---|---|
| Target (Mossimo) | (810) |
| GL Damek (Umbro) | (546) |
| Umbro New Business | (467) |
| Confectione Kamerino (Umbro) | (463) |
| Walmart (Starter) | (442) |
| Roc Apparel | (340) |
| Brightstar | (222) |
| Kohl's (Candie's) | (185) |
| Target (Fieldcrest) | (151) |
| Walmart (Danskin) | 364 |
| PacSun (Modern Amusement) | 366 |
| Peanuts Brands | 1,037 |
| ES Originals (Rampage) | 1,209 |
| All Other | (233) |
| Total | (882) |

2013 | 2014 | August 4 | 2015
1 | 2 | 3 | 35



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 194 of 215

**A-1597**

**From**: Seth Horowitz [mailto:shorowitz@iconixbrand.com]
**Sent**: Tuesday, August 05, 2014 12:08 PM
**To**: Jared Margolis
**Subject**: China Update- LC and Umbro

We will have the amendment ready by end of the week.
Should we get together (w/ Jason & Neil?) to discuss Rocawear kids?

**From**: Jared Margolis [JaredMargolis@GlobalBrandsGroup.com]
**Sent**: 8/5/2014 4:19:46 PM
**To**: Seth Horowitz [shorowitz@iconixbrand.com]
**CC**: Amanda Azzoli [amandaazzoli@globalbrandsgroup.com]
**Subject**: Re: China Update- LC and Umbro

Meeting with Jason in the am on amendment. Yes let's shoot for meeting with Jason and Neil on Thursday.

GOVERNMENT
EXHIBIT
1054
19 Cr. 869 (ER)

August 5



2013 ① 2014 ② ③ 2015

36

Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 195 of 215

A-1598

## FORM 10-Q

## ICONIX BRAND GROUP, INC.

## For the Quarterly Period Ended June 30, 2014

**Highlights of Current Quarter**

- Record Q2 revenue of $118.9 million
- Record Q2 operating income of $74.7 million
- Gain related to the sale of certain trademarks to our Iconix Southeast Asia joint venture

In June 2014, the Company contributed substantially all rights to its wholly-owned and controlled brands in the Republic of Korea, and its Ecko, Zoo York, Ed Hardy and Sharper Image Brands in the European Uniton, and Tutkery, in each case, to Iconix SE Asia. In return, LF Asia agreed to pay the Company $15.9 million, of which $4.0 million was paid at closing. As a result of this transaction, the Company recorded a gain of $13.6 million in the Current Quarter, which is included in licensing and other revenue in the unaudited condensed consolidated income statement.

Date: August 6, 2014

/s/ Neil Cole
Neil Cole
Chairman of the Board, President and Chief Executive Officer

GOVERNMENT
EXHIBIT
103
19 Cr. 869 (ER)

August 6








2013    1       2014 2     3      2015   37



**A-1599**

> On Aug 7, 2014, at 8:18 AM, "Seth Horowitz" <shorowitz@iconixbrand.com> wrote:
>
> Believe we have an interesting way of working out Rocawear kids and other issues.   I'm meeting with Rabbi Shiff now and will be in the office before 9.   Can we meet and discuss prior to heading over?

| | |
|---|---|
| From: | Neil Cole [ncole@iconixbrand.com] |
| Sent: | 8/7/2014 8:27:00 AM |
| To: | Seth Horowitz [shorowitz@iconixbrand.com] |
| BCC: | Neil Cole [ncole@iconixbrand.com] |
| Subject: | Re: GBG |

Will be there in about 15 minutes.

Sent from my iPad

August 7

GOVERNMENT
EXHIBIT
1056
19 Cr. 869 (ER)

2013   **1**     2014 **2**     **3**     2015   38



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 197 of 215

A-1600

**From:** Jared Margolis <JaredMargolis@GlobalBrandsGroup.com>
**Date:** August 13, 2014 at 4:48:38 PM EDT
**To:** "shorowitz@iconixbrand.com'" <shorowitz@iconixbrand.com>
**Subject: Umbro/LC China**

Jason and Dow on board. Meeting with Bruce to get sign off on Monday.

On Aug 13, 2014, at 11:56 PM, "Seth Horowitz" <shorowitz@iconixbrand.com> wrote:

Per below, looks like GBG wants to move forward with Umbro and LC in China. Spent a lot of time with Allyson on Rocawear kids model today. Believe we should not go forward with taking this back. Also believe we need to start smaller with Ed Hardy and Rainbow. We should start kids "division" w/ Jonathon Cohen with Ecko Unltd and Ed Hardy. Then, be prepared to take over Rocawear kids if necessary at end of GBG term (through '15). Will walk you through the logic and model. With so much uncertain (terms of transition, fixtures, etc..) believe we can avoid having a problem with GBG if we don't move forward on Roc kids. Will remain silent with them on all of this until we discuss. Hope you're having a great trip.

**From:** Neil Cole [ncole@iconixbrand.com]
**Sent:** 8/14/2014 7:50:50 AM
**To:** Seth Horowitz [shorowitz@iconixbrand.com]
**Subject:** Re: Umbro/LC China

lets discuss tomorrow. Will be tough to do China without Roc kids but agree the risk is huge on both Roc kids and Ed Hardy/rainbow

GOVERNMENT
EXHIBIT
1058
19 Cr. 869 (ER)

August 14



2013 ①  2014 ②  ③  2015  39

**A-1601**



From: Seth Horowitz [shorowitz@iconixbrand.com]
Sent: 8/14/2014 3:52:16 PM
To: Neil Cole [ncole@iconixbrand.com]
Subject: Jason

Jason Rabin called me today to discuss China Umbro and LC- which he will confirm Monday -and then a list of "asks" / topics including Roc kids and how to handle. On our list of things to discuss.. Re: Magic... I ended up leaving my trip as is- which enables me to be in the office Monday. I can do everything I need to do on Tuesday and half a day wednesday in Vegas. Look forward to hearing about the trip.


GOVERNMENT EXHIBIT 1060
19 Cr. 869 (ER)

2013    2014    2015

August 14









**A-1602**

From: Seth Horowitz [shorowitz@iconixbrand.com]
Sent: 8/18/2014 9:00:08 AM
To: Jared Margolis [jared.margolis@globalbrandsgroup.com]
Subject: FW: Iconix SEA China Amendment Documents
Attachments: 101780528_7 (Iconix SEA - 2nd Amended & Restated Shareholders Agreement ....docx; 101780130_7 (Iconix LF - Amendment 2 to Master License Agreement (GDC 8.....docx; 101780136_2 (Iconix LF - China (Umbro and Lee Cooper) Consideration Side....docx

Jared,
Good morning.
Attached please find initial drafts of the SEA China amendment documents, including the (1) second amended and restated shareholders agreement, (2) second amendment to the master license agreement and (3) consideration side letter.

# [US$15,500,000]

GIBSON DUNN DRAFT – 08/11/2014

To:   LF Asia Limited
      11th Floor, LiFung Tower,
      888 Cheung Sha Wan Road,
      Kowloon,
      Hong Kong

Date: [__] August 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks**

Reference is hereby made to (a) the Amendment No. 2 to the Master License Agreement (the "**Master License Agreement Amendment**") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("**Iconix**"), certain of Iconix's wholly owned subsidiaries ("**Licensors**"), and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("**Licensee**"), amending the Master License Agreement (as amended by Amendment No. 1 to Master License Agreement, effective as of June 30, 2014, the "**Existing Master License Agreement**"), by and among Iconix, Licensors and Licensee, and (b) the Second Amended and Restated Shareholders Agreement of Iconix SE Asia Limited (the "**Second Amended and Restated Shareholders Agreement**" and, together with the Master License Agreement Amendment, the "**SEA JV Amendments**") to be entered into as of the date hereof by and between Iconix and LF Asia Limited ("**LF**"), amending the First Amended and Restated Shareholders Agreement of Lion Network Limited (the "**Existing Shareholders Agreement**"), effective as of June 30, 2014, by and between Iconix and LF. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Existing Master License Agreement as amended by the Master License Agreement Amendment (or if not therein defined, in the First Amended and Restated Shareholders Agreement), as applicable.

Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by Iconix Luxembourg Holdings S.ar.l. ("**Iconix Luxembourg**") and Red Diamond Holdings S.ar.l ("**Red Diamond**" and, together with Iconix Luxembourg, the "**CHMT Marks Licensors**") in the People's Republic of China, the Hong Kong Special Administrative Region of the People's Republic of China, the Macau Special Administrative Region of the People's Republic of China, and the Republic of China (the "**CHMT Territory**") granted by Licensors to Licensee pursuant to the SEA JV Amendments (the "**CHMT Marks**") is deemed to have a fair market value of [US$31,000,000], and that because Iconix and LF each own 50% of Licensee, LF's ownership of 50% of Licensee will provide LF a benefit equal to 50% of such fair market value, or [US$15,500,000].

In order to compensate the CHMT Marks Licensors for the transfer of 50% of the fair market value of the CHMT Marks to LF (through LF's 50% shareholding in Licensee) pursuant to the SEA JV Amendments, the CHMT Marks Licensors and LF hereby agree that LF shall pay [US$15,500,000] (the "**CHMT Marks Consideration**"), of which $[__] shall be payable to Iconix Luxembourg and $[__] shall be payable to Red Diamond, and which amount the CHMT Marks Licensors and LF shall treat for all U.S. and Luxembourg tax purposes as paid by LF to the CHMT Marks Licensors in exchange for 50% of the CHMT Marks, following which each

Page 1

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc. ICON-044-00030973

GOVERNMENT EXHIBIT 1062
19 Cr. 869 (ER)

August 18

2013    2014   2015

41




**A-1603**

From: Seth Horowitz [shorowitz@iconixbrand.com]
Sent: 8/18/2014 1:56:23 PM
To: Neil Cole [ncole@iconixbrand.com]
Subject: Update
Attachments: aug18.pdf

Attached is a weekly update. Legal docs for GBG China LC/ Umbro went out this morning. I'm in the office until around 2pm today. A few topics on this to discuss.

a. China Umbro
   i. Both Jason and Jared called me to tell me GBG would like to complete the transaction for LC and Umbro in China. Jason had an additional ask on a plug number of $2m for this year vs. $1m that we had agreed to.
      1. GBG Docs are complete and sent out to GBG
   ii. Win Hanverky will get back to us the middle of next week on their interest level in being our JV Partner.
   iii. Descente has gone quiet since last communication: which was we are moving on without them unless they commit to the value and Sept. 5th closing date.

b. GBG
   i. $5m of current marketing liabilities
   ii. $15.5m value of 50% of LC and Umbro in China.
   iii. Desire to terminate Rocawear Kids license:
      1. $2.5m guarantee for back half of '14
      2. $3.5m guarantee for '15
      3. $2.2m in fixtures on our books.
   iv. Jason call:
      1. He claims there is Gross Margin in the go forward Rocawear kids orders that he is transferring to our new licensees and that he cant' lose the volume and gross profit. I explained that this business runs at a loss for him- if he was paying the markdowns on the orders he is transferring to new licensees, then he should keep the GM dollars, but if not, it won't work. We ended with both of us thinking more about it.
      2. He says he needs the "$10m and more" as he discussed w/ you.
         a. I see it as $5m of marketing liabilities and $2m from LC/ China deal.
         b. Getting creative about an additional $5m for this year is difficult.
            i. Rocawear Kids:
               1. Transition – but only on our terms:
                  a. Reduce GBG liability of $2.5m of royalty and $5m of Rainbow markdowns... in exchange for...
                  b. $23m price for China JV.

               c. Still need $3.5m back for '15 Royalty relief
               d. Fixture issue

GOVERNMENT EXHIBIT 1063
19 Cr. 869 (ER)

August 18

2013    1    2014  2    3    2015    42

**Q3- 2014- Latest Forecast - P&L Summary**
Aug-19-2014

| | Q3 Forecast | Opportunities & Risks | | | Q3 Latest | Q3 2013 |
|---|---|---|---|---|---|---|
| | | Umbro China | Middle East JV | Other | | |
| **Revenue** | 93,293 | 12,500 | 6,900 | 2,374 | 112,693 | 107,177 |
| Compensation | 13,425 | | | 2,374 | 15,799 | 13,431 |
| Advertising | 11,557 | | | | 11,557 | 8,294 |
| Other SG&A | 8,039 | | | | 8,039 | 9,753 |
| Agent Fees | 2,916 | | | | 2,916 | 2,829 |
| Talent Fees | 5,799 | | | | 5,799 | 8,758 |
| **SG&A** | 41,737 | | | | 44,111 | 43,065 |
| 84000 - Equity Income in JV | (2,559) | | | | (2,559) | (3,388) |
| 84010 - Minority Interest | 4,610 | | | | 4,610 | 1,934 |
| **EBITDA** | 49,505 | 12,500 | 6,900 | (2,374) | 66,531 | 65,566 |
| | | | | | 59% | 61% |
| Depreciation & Amortization | 1,627 | | | | 1,627 | 2,640 |
| Net Interest Expense | 20,887 | | | | 20,887 | 20,613 |
| Min Int related to D&A and Int | (358) | | | | (358) | (427) |
| **Net Income Before Taxes** | 27,349 | 12,500 | 6,900 | (2,374) | 44,375 | 42,739 |
| Taxes | 10,638 | 1,625 | 1,380 | (831) | 12,812 | 13,740 |
| **Net Income** | 16,712 | 10,875 | 5,520 | (1,543) | 31,564 | 28,999 |
| Adjustments for Non GAAP | 4,475 | | | 0 | 4,475 | 4,090 |
| **Non GAAP** | 21,187 | 10,875 | 5,520 | (1,543) | 36,039 | 33,089 |
| Sharecount * | 53,500 | 53,500 | 53,500 | 53,500 | 53,500 | 56,153 |
| **Non GAAP EPS** | $0.40 | $0.20 | $0.10 | ($0.03) | $0.67 | $0.59 |

| Consensus | |
|---|---|
| Revenue | 111.70m Rev |
| EPS | $0.62 EPS |

Latest: 111.70m Rev / $0.62 EPS

**Assumptions**
• Assumes share price actual to date



August 19

2013    2014    2015    43

GOVERNMENT EXHIBIT 250
19 Cr. 886 (ER)



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 202 of 215

**A-1605**

**From:** Seth Horowitz
**Sent:** Monday, August 25, 2014 11:26 AM
**To:** Neil Cole
**Subject:** GBG

I have a call with Jared on the China LC and Umbro JV at 2:00 today. Will update you after the call.

**From:** Neil Cole <ncole@iconixbrand.com>
**Date:** Monday, August 25, 2014 at 11:29 AM
**To:** Seth Horowitz <shorowitz@iconixbrand.com>
**Subject:** RE: GBG

Saw Jason over the weekend.

Said Bruce et al. "approved" the deal.

GOVERNMENT
EXHIBIT
1065
19 Cr. 869 (ER)

August 25

2013  1          2014 2        3          2015   44



From: Ethan Cole <erapcole@gmail.com> - on behalf of - Ethan Cole <erapcole@gmail.com>

Sent: Thursday, August 28, 2014 3:39 PM

To: Jared Margolis <jaredmargolis24@gmail.com>

Subject: Iconix Notes

Attach: Summary of Various AR.doc

**Summary of Various Amounts with Iconix**

A. **$5 Million Overpay from Iconix Korea**
- The $5M overpay from Iconix Korea will be offset by:
  - $2.5M Rocawear
  - $1.0M Zoo York SEA Marketing
  - $1.5M Peanuts China Marketing

B. **$4.5 Million Proposed Overpay for Umbro / Lee Cooper China**
- The $4.5M overpay for Umbro / Lee Cooper China will be offset by Iconix paying the $4.5M in markdown money to Rainbow

C. **Additional Amounts – TBD**
- $3.5M in Rocawear royalty for YR2 remains outstanding
- $3.5M in fixtures remains outstanding
- No wiggle room with Iconix Latin America transaction
- Possible wiggle room with Iconix Australia / Japan

2013 — 1 — 2014 — 2 — 3 — August 28 — 2015 — 45

GOVERNMENT EXHIBIT 1068 19 Cr. 869 (ER)



**From:** Seth Horowitz [shorowitz@iconixbrand.com]
**Sent:** 9/2/2014 1:52:05 PM
**To:** Neil Cole [ncole@iconixbrand.com]
**Subject:** Update
**Attachments:** sept2.pdf

Neil,
Attached is an update on some key topics.

China Umbro
  i. GBG
    1. $15.5 m for 50% of LC and Umbro in China.
    2. All diligence requests have been completed; including introduction letter to Lee Cooper licensees in China and HK.

GBG
  i. At Jason's request, I walked Jared through our proposed $5m of current marketing liabilities
    1. $2.5m relief of Rocawear kids in '14
      a. Still need to discuss $3.5m of '15 revenue and $2.0m in fixtures still on books.
    2. $1.5m of Peanuts marketing in China
    3. $1.0m Zoo York marketing in Europe.
  ii. Jared expressed that Jason would like to pay $20m for China JV – discuss other details.

A-1607

GOVERNMENT EXHIBIT 1069
19 Cr. 869 (ER)

September 2

2013    ①      2014 ②    ③      2015



On Sep 2, 2014, at 7:25 PM, "Neil Cole" <ncole@iconixbrand.com> wrote:

Latest thoughts on Rocawear kids?

**From:** Seth Horowitz
**Sent:** Tuesday, September 02, 2014 8:19 PM
**To:** Neil Cole
**Subject:** Re: Update

We should use it as a bargaining chip with GBG. They lose 8-10m on this business and want out. We can let them out of $2.5m in royalty this year and $3.5 next year in addition to wiping out a money loser for them. We will operate this business with Rodney/ Jonathon Cohen, and Kevin Yap. We will reduce the Rainbow business as it

On Sep 2, 2014, at 8:26 PM, "Neil Cole" <ncole@iconixbrand.com> wrote:

If it will be part of final deal with Umbro/China very worried about timing for Q3.

**From:** Seth Horowitz
**Sent:** Tuesday, September 02, 2014 8:29 PM
**To:** Neil Cole
**Subject:** Re: Update

Agree. Me too.

On Sep 2, 2014, at 8:31 PM, "Neil Cole" <ncole@iconixbrand.com> wrote:

Also like Davids idea if it is 20m having option to take over two quarters. Although with Middle East delayed might need it???

**From:** Seth Horowitz <shorowitz@iconixbrand.com>
**Sent:** Tuesday, September 2, 2014 8:36 PM
**To:** Neil Cole <ncole@iconixbrand.com>
**Subject:** Re: Update

Believe the 15.5 and Marcraft get us there with room. But total deal of $20 would lock up the quarter. Easy to break deal in pieces by quarter between the two brands if we wanted.

September 2

GOVERNMENT EXHIBIT 1070
19 Cr. 869 (ER)

2013  1

2014  2     3

2015  47

A-1608

**A-1609**

From: Seth Horowitz [sethhorowitz@mac.com]
Sent: 9/3/2014 9:51:48 PM
To: Seth Horowitz [shorowitz@iconixbrand.com]
Subject: GBG
Attachments: GBG.pdf



Wednesday, September 3, 2014

## Iconix/GBG

1. $5m marketing
   - $1m Zoo York Europe
   - $2m Peanuts China
   - $2m Mossimo SE Asia
   - 2014 Iconix P & L Impact of ($5m) versus current forecast

2. JV in China for Umbro and Lee Cooper
   - $21.5m 50% JV
   - $1.5m backstop 'in 14 (900k exposure to Iconix)
   - $2m backstop '15
   - 2014 Iconix P & L Impact of positive $19m. Increase of $5.6m versus current forecast

3. Rocawear Kids Termination (See Rocawear Termination Options Doc)
   - $2.5m royalty relief in '14 and transfer on orders to New Rise OR
   - $1.0m approximate royalty relief in '14 and GBG keeps on orders and gross profit
   - $3.5m royalty relief in '15
   - $8m backlog transfer to New Rise
   - New Rise purchase approx. $1.5m of existing inventory w/ 90 day payment terms
   - Fixture exposure of $2.0m
   - 2014 Iconix P & L Impact of approximate 900k of Rocawear royalty plus fixture exposure of $2.0m. ($2.9m) versus current forecast)
   - 2015 revenue impact neutral, incremental $1m in expenses.

4. Total Impact
   - ($2.3m) versus current forecast for '14 w/ fixture write down
   - (300k) without fixture write down versus current forecast for '14

September 3

GOVERNMENT EXHIBIT 1077

2013   1   2014   2   3   2015   48









Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 207 of 215

**A-1610**

**From:** Seth Horowitz <shorowitz@iconixbrand.com>
**Date:** September 3, 2014 at 10:02:05 PM EDT
**To:** Jason Schaefer <jschaefer@iconixbrand.com>
**Subject: Rocawear Kids Termination**

Jason,

Can you please prepare a simple termination notice for GBG/ LF per the terms below? We will need to Schedule "on orders" "wip" and "existing inventory".

## Rocawear Termination

Termination Terms - Option 1 (Preferred)

- Forgive $2.5m in minimum payments for second half of '14

- Forgive actual royalty "earned" in Q3

- Transfer all on orders to New Rise

- Transfer all WIP to New Rise

- Sell all inventory to New Rise at cost w/ 90 day terms

- Forgive $3.5m in minimum payments for '15

- GBG responsible for all markdowns to Rainbow and others on all goods shipped by GBG per agreements w/ retailer

- Office build out/ fixtures utilized for go forward Zoo York showrooms of GBG at Empire State Building

GOVERNMENT EXHIBIT 1079
19 Cr. 869 (ER)

September 3

2013  1  2014  2  3  2015  49



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 208 of 215

**A-1611**



| | |
|---|---|
| **From:** | Seth Horowitz [shorowitz@iconixbrand.com] |
| **Sent:** | 9/3/2014 10:06:02 PM |
| **To:** | Neil Cole [ncole@iconixbrand.com] |
| **Subject:** | GBG |

Worked on various models and analysis for us to discuss tomorrow. David M is also preparing cash flow analysis as we discussed.
Best,
Seth



September 3

GOVERNMENT
EXHIBIT
1078
19 Cr. 869 (ER)

2013  1    2014  2    3    2015   50



Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 209 of 215

A-1612

**From:** Ericka Alford [ealford@iconixbrand.com]
**Sent:** 9/4/2014 1:14:46 PM
**To:** Seth Horowitz [shorowitz@iconixbrand.com]
**CC:** Jason Schaefer [jschaefer@iconixbrand.com]
**Subject:** Draft Rocawear Kids Termination Letter
**Attachments:** Rocawear Kids Termination 9 4 14.docx

Seth,

Attached please find a draft of the termination agreement you requested. Please let me know if you have any questions or comments.

Please note that I am sending this in the interest of time and, as we discussed, Jason may have additional comments.

2. **Payments.** Any and all actual Royalties, Guaranteed Minimum Royalty Fees and Advertising Fees due to Licensor by Licensee from the period July 1, 2014 through the end of the Extension Term , shall be waived in connection with the Termination.

---

**Icon DE Holdings LLC**
**103 Foulk Road**
**Wilmington, Delaware 19803**

September ____, 2014

KHQ Investment LLC
350 Fifth Avenue, 9th Floor
New York, NY 10118
Attn: Jimmy Rosenfeld

Re: Amendment and License Consolidation Agreement by and between Icon DE Holdings LLC ("Licensor") and KHQ Investment LLC [, now known as Global Brands Group] ("Licensee"), dated as of December 16, 2013 and effective as of January 1, 2014 ("License Agreement")

Dear Mr. Rosenfeld:

This termination letter agreement (this "Letter Agreement") will confirm the agreement of Licensor and Licensee with respect to the termination of the above-referenced License Agreement. All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the License Agreement.

1. **Termination.** Subject to the terms and conditions set forth herein, Licensor and Licensee hereby confirm that the License Agreement shall be terminated (the "Termination") effective as of September ____, 2014, (the "Effective Date"), except for the provisions of the License Agreement which are specified to survive Termination. Such provisions shall, in each case, survive without prejudice and remain in full force and effect. The parties hereby confirm that all rights granted to Licensee under the Licensee Agreement shall terminate upon the _____ will automatically revert to Licensor, except as expressly set forth in this

____ and all actual Royalties, Guaranteed Minimum Royalty Fees and ____ due to Licensor by Licensee from the period July 1, 2014 through the end ____ erm , shall be waived in connection with the Termination. ____ anything to contrary in this Letter Agreement, if Licensee defaults in any of ____ forth in this Letter Agreement, all such actual Royalties, Guaranteed ____ Fees and Advertising Fees due under the License Agreement shall both ____ ely due and payable to Licensor in full, following written notice of default to Licensee and expiration of a five (5) business day period during which Licensee shall have the opportunity to cure its default.

3. **Current Orders, Work-in-process and Inventory.** Licensee represents and warrants that Schedule A hereto is a full and complete schedule of current orders, work-in-process ("WIP") and inventory in connection with the Licensed Products covered by the License Agreement. Licensee shall transfer all current orders, WIP and inventory to such third party

GOVERNMENT EXHIBIT 1080
19 Cr. 869 (ER)

September 4







2013 ① 2014 ② ③ 2015

51



From: Pauline Israel [pisrael@iconixbrand.com]
Sent: 9/4/2014 12:54:12 PM
To: Neil Cole [ncole@iconixbrand.com]; Seth Horowitz [shorowitz@iconixbrand.com]

Subject: GBG Terms
Location: NC's office

Start: 9/4/2014 3:00:00 PM
End: 9/4/2014 3:30:00 PM
Show Time As: Tentative

Required Attendees: Neil Cole (ncole@iconixbrand.com); Seth Horowitz (shorowitz@iconixbrand.com)

 

GOVERNMENT
EXHIBIT
1081
19 Cr. 869 (ER)

September 4

2013 ① 2014 ② ③ 2015 52



**From:** Joanna Pompilio [jpompilio@iconixbrand.com]
**Sent:** 9/5/2014 10:31:07 AM
**To:** Joanna Pompilio [jpompilio@iconixbrand.com]; Ethan Cole [ethancole@lfusa.com]; Seth Horowitz [shorowitz@iconixbrand.com]; Jared Margolis [JaredMargolis@GlobalBrandsGroup.com]; Amanda Azzoli [amandaazzoli@globalbrandsgroup.com]

**Subject:** FW: 2PM MEETING: Seth Horowitz / Jared Margolis
**Location:** 1450 Broadway at 40th Street - Conf. Room 3B

**Start:** 9/5/2014 2:00:00 PM
**End:** 9/5/2014 2:30:00 PM
**Show Time As:** Busy

  

September 5

2013  ① 2014 ② ③ 2015

GOVERNMENT EXHIBIT 1082
19 Cr. 869 (ER)

53

Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 212 of 215

**A-1615**



| | |
|---|---|
| From: | Seth Horowitz [shorowitz@iconixbrand.com] |
| Sent: | 9/5/2014 2:30:20 PM |
| To: | Joanna Pompilio [jpompilio@iconixbrand.com] |
| Subject: | GBG |
| Attachments: | GBG.pdf; ATT00001.txt |

Please printout 3 copies and bring into 3B.

Wednesday, September 3, 2014

### Iconix/GBG

1. $5m marketing
- $1m Zoo York Europe -
- $2m Peanuts China
- $2m Mossimo SE Asia
- 50% Q3/Q4, 50% prepay

2. JV in China for Umbro and Lee Cooper
- $21.5m 50% JV
- $2.0m contribution guarantee 'in 14
- $2.5m contribution guarantee in '15
- $4.3 payment upon signing. $1.3m due 12/13/14
- $4.3 payment on anniversary of JV. $1.1m due 3/31/15 and $1.1m due 6/31/15
- $4.7m on 2nd anniversary of JV
- $4.7m on 3rd anniversary of JV

3. Rocawear Kids Termination Option 1
- $2.5m royalty relief in '14 and transfer on orders to New Rise or TBD
- $3.5m royalty relief in '15
- Approximate $8m backlog transfer to New Rise or TBD
- New Rise purchase approx. $1.5m of existing inventory w/ 90 day payment terms
- Fixture TBD

GOVERNMENT EXHIBIT 1084
19 Cr. 869 (ER)

September 5







2013    1    2014   2    3    2015   54



From:     Ethan Cole [ethancole@lfusa.com]
Sent:     9/5/2014 5:06:55 PM
To:       shorowitz@iconixbrand.com
CC:       Jared Margolis [JaredMargolis@GlobalBrandsGroup.com]
Subject:  Termination Letter Soft Copy

Last thing – at your convenience can you please send a soft copy of the Rocawear termination letter.

Have a nice weekend.

September 5



GOVERNMENT
EXHIBIT
1085
19 Cr. 869 (ER)

2013    2014  ②    2015  55

# A-1617

GOVERNMENT EXHIBIT 1523 19 Cr. 390 (ER)

From:    Seth Horowitz [shorowitz@iconixbrand.com]
Sent:    9/8/2014 9:10:12 AM
To:      Neil Cole [ncole@iconixbrand.com]
Subject: Weekly Update
Attachments: sept8.pdf

Attached is my weekly update.



1. China JV

- Additional information request came from GBG on Friday. All responses will be done by Monday am. Jared is in China meeting with potential licensee this week. I have some fear that this meeting may/can lead to an attempt to renegotiate the JV/ push back. As such, have prepared thoughts on alternative.

- Simon Bamber has expressed interest in acquiring Diamond Icon and Master License for Europe with strong financial backing/ guarantees. This includes interest in China on term sheets already discussed. If necessary, will fly to London and get a deal done. Can go Thursday of this week or Wednesday of next week. GBG has committed to signing Sept. 15.

- Agreed to payment terms, for GBG JV in China, as discussed, etc.. with Jared.

3. Rocawear Kids Termination

- Walked Jared through Termination terms/ agreement. Will have feedback this week.

- Working with Rodney/ New Rise on transition.

September 8

2013  ①  2014 ②  September 8 ③  2015  56







Case: 23-7566, 02/28/2024, DktEntry: 28.1, Page 215 of 215

A-1618

## Q3- 2014- Latest Forecast - P&L Summary
Sep-9-2014

| | Q3 Forecast | Umbro / LC China | MetLife | Other | Q3 Latest | Q3 2013 | |
|---|---|---|---|---|---|---|---|
| **Revenue** | 92,211 | 18,000 | 5,000 | | 115,211 | 107,177 | 112,693,000 |
| | | | | | | | 2,518 |
| Compensation | 13,425 | | | 2,374 | 15,799 | 13,431 | |
| Advertising | 11,557 | | | | 11,557 | 8,294 | |
| Other SG&A | 8,039 | | | | 8,039 | 9,753 | |
| Agent Fees | 2,916 | | | | 2,916 | 2,829 | |
| Talent Fees | 5,799 | | 3,000 | | 8,799 | 8,758 | |
| SG&A | 41,737 | 0 | 3,000 | 2,374 | 47,111 | 43,065 | 42,033 |
| | | | | | | | 5,078 |
| 84000 - Equity Income in JV | (2,665) | | | | (2,665) | (3,388) | |
| 84010 - Minority Interest | 4,515 | | 400 | | 4,915 | 1,934 | |
| **EBITDA** | 48,624 | 18,000 | 1,600 | (2,374) | 65,850 | 65,566 | 69,903 |
| | | | | | 57% | 61% | (4,053) |
| Depreciation & Amortization | 1,627 | | | | 1,627 | 2,640 | |
| Net Interest Expense | 20,887 | | | | 20,887 | 20,613 | |
| Min Int related to D&A and Int | (358) | | | | (358) | (427) | |
| **Net Income Before Taxes** | 26,467 | 18,000 | 1,600 | (2,374) | 43,693 | 42,739 | |
| Taxes | 10,320 | 2,350 | 320 | (831) | 12,159 | 13,740 | |
| **Net Income** | 16,147 | 15,650 | 1,280 | (1,543) | 31,534 | 28,999 | |
| Adjustments for Non GAAP | 4,475 | | | 0 | 4,475 | 4,090 | |
| **Non GAAP** | 20,622 | 15,650 | 1,280 | (1,543) | 36,009 | 33,089 | 38,439 |
| | | | | | | | (2,430) |
| Sharecount * | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 | 56,153 | |
| **Non GAAP EPS** | $0.39 | $0.30 | $0.02 | ($0.03) | $0.68 | $0.59 | $0.68 |
| | | | | | | | $0.00 |

**Opportunities & Risks**

| Opp + Risks Breakdown | |
|---|---|
| Target (Mossimo) | (810) |
| GL Damek (Umbro) | (546) |
| Umbro New Business | (467) |
| Confectione Kamerino (Umbro) | (463) |
| Walmart (Starter) | (442) |
| Roc Apparel | (340) |
| Brightstar | (222) |
| Kohl's (Candie's) | (185) |
| Target (Fieldcrest) | (151) |
| Walmart (Danskin) | 364 |
| PacSun (Modern Amusement) | 366 |
| Peanuts Brands | 1,037 |
| ES Originals (Rampage) | 1,209 |
| All Other | (233) |
| **Total** | (882) |

**Consensus**
Revenue — 111.70m Rev
EPS — $0.62 EPS

**Assumptions**
- Assumes share price actual to date

1,446.5446

Purchase Price     Comp     653k = Emloyee EBITDA
Cost Basis                  635k = Exec EBITDA
Net Revenue Gain            1.1m = NC EBITDA

33.00%
27.83%
5.17%

September 9


GOVERNMENT EXHIBIT 231
10 Cr. B60 (ER)





2013    1    2014   2    3    2015   57