# 23-7566

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL COLE, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT
VOLUME VII OF VII
(Pages A-1691 to A-1858)**

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
BRONWYN C. ROANTREE
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

**TABLE OF CONTENTS**

PAGE

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Indictment, filed December 4, 2019 (Dkt. 1) . . . . . . . . . . . . . . . . . . . . . . . . . A-41

Excerpts of First Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-78

Government Memorandum of Law in Opposition to Defendant's
    Motions *in Limine* and Renewed Motion for Rule 17(c)
    Subpoenas, filed October 17, 2022 (Dkt. 226) . . . . . . . . . . . . . . . . . . . A-493

Government's Requests to Charge,
    filed October 20, 2022 (Dkt. 230) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-566

Letter from U.S. Attorney's Office to the
    Honorable Edgardo Ramos,
    dated October 26, 2022 (Dkt. 238) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-626

Letter from David Oscar Markus to the Honorable Edgardo Ramos
    re Ethan Cole, dated November 18, 2022 (Dkt. 247) (with
    attached email from Edward Y. Kim to David Oscar Markus) . . . . . A-630

Excerpts of Final Pre-Trial Conference Transcript,
    dated October 27, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-632

Excerpts of Second Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-648

**Government Exhibits**

GX 104       Iconix Brand Group, Inc. Form 8-K,
                dated October 24, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1139

GX 105       Iconix Brand Group, Inc. Form 10-Q for the Quarterly
                Period Ended September 30, 2014 . . . . . . . . . . . . . . . . . . A-1152

ii

PAGE

GX 207      Consultancy Agreement between Iconix Brand Group, Inc. and LF Centennial Limited, dated September 30, 2013 ............................................. A-1190

GX 210      Letter Agreement between Iconix Brand Group, Inc. and LF Asia Limited, dated June 30, 2014............ A-1195

GX 212      Letter Agreement between Iconix Brand Group, Inc. et al. and Global Brands Group Asia Limited, dated September 17, 2014 ..................................... A-1199

GX 1044      Email from Mark J. Stevens to Nicholas C.A. Cook et al., dated June 25, 2014 ............................. A-1205

GX 1058      Email from Neil Cole to Seth Horowitz, dated August 14, 2014........................................ A-1405

GX 1068      Email from Ethan Cole to Jared Margolis, dated August 28, 2014 .................................... A-1407

GX 1091      Email from Lauren Gee to Robert Smits, dated September 11, 2014 .................................. A-1409

GX 1098      Email from John Reda to David Maslaton, dated September 26, 2014 .................................. A-1547

GX 1111      Email from Ethan Cole to Seth Horowitz, dated October 2, 2014..................................... A-1551

GX 1139      Email from Ethan Cole to Jared Margolis, dated December 1, 2014 .................................. A-1555

GX 1197      Email from Seth Horowitz to Neil Cole, dated April 13, 2015......................................... A-1557

GX 1255      Undated notes ...................................... A-1560

GX 1255-B      Metadata associated with GX 1255 ................. A-1561

GX 1335      Government summary exhibit, "Document Timeline" . A-1562

iii

PAGE

**Defense Exhibits**

DX 0303-A1     Iconix SE Asia Limited First Amended and Restated
Shareholders Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1691

DX 0303-A2     Letter Agreement between Iconix Brand Group, Inc.
and LF Asia Limited, dated June 30, 2014 . . . . . . . . . . . . A-1733

DX 0304-A2     Letter Agreement between Iconix Brand Group, Inc.
et al. and Global Brands Group Asia Limited,
dated September 17, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . A-1737

DX 0304-A3     Iconix SE Asia Limited Second Amended
and Restated Shareholders Agreement . . . . . . . . . . . . . . . . A-1743

DX 0558         FASB Accounting Standards Codification
605-50-45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1790

DX 1140-U      Email from Neil Cole to Ericka Alford,
dated September 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . A-1792

DX 2334         Stipulation re Jason Rabin, dated October 26, 2021 . . . A-1793

DX 3517-003    Notes re Ethan Cole attorney proffer,
dated July 22, 2019 (not admitted at trial) . . . . . . . . . . . . A-1795

DX 3517-004    Federal Bureau of Investigation FD-302 re Ethan Cole
interview on July 29, 2019 (not admitted at trial) . . . . . A-1797

DX 3517-010    Notes re Ethan Cole, dated September 22, 2021
(not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1807

DX 3517-012    Notes re Ethan Cole, dated October 12, 2022
(not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1809

DX 3539-083    Federal Bureau of Investigation FD-302 re Seth
Horowitz interview on February 11, 2020
(not admitted at trial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1810

iv

PAGE

Excerpts of Sentencing Transcript, dated October 10, 2023 . . . . . . . . . . . A-1814

Notice of Appeal, dated October 27, 2023 (COA Dkt. 1) . . . . . . . . . . . . . A-1819

**A-1691**

**<u>EXECUTION VERSION</u>**

ICONIX SE ASIA LIMITED
FIRST AMENDED AND RESTATED
SHAREHOLDERS AGREEMENT

Amended and restated on June 30, 2014

THE SHARES REFERRED TO IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**　　　　ICON-032-00036631

**A-1692**

TABLE OF CONTENTS

| | | Page |
|---|---|---|

ARTICLE I DEFINED TERMS; OPERATION OF COMPANY

| Section 1.01 | Definitions | 1 |
|---|---|---|
| Section 1.02 | Incorporation; Name | 7 |
| Section 1.03 | Registered Office; Principal Office | 7 |
| Section 1.04 | Business Purpose | 7 |
| Section 1.05 | Shareholders | 7 |
| Section 1.06 | No Personal Liability | 7 |

ARTICLE II SHAREHOLDINGS AND CAPITAL STRUCTURE

| Section 2.01 | Capital Structure | 8 |
|---|---|---|
| Section 2.02 | Loans | 8 |

ARTICLE III DISTRIBUTIONS

| Section 3.01 | Distributions | 8 |
|---|---|---|
| Section 3.02 | Tax Distributions | 9 |

ARTICLE IV MANAGEMENT OF COMPANY

| Section 4.01 | General Provisions Concerning Management | 9 |
|---|---|---|
| Section 4.02 | Appointment of Directors | 9 |
| Section 4.03 | Resignation and Removal of Directors | 9 |
| Section 4.04 | Administrative Manager | 10 |
| Section 4.05 | Local Manager | 10 |
| Section 4.06 | Actions Requiring Unanimous Consent of all the Directors | 10 |
| Section 4.07 | Shareholder Approval | 12 |
| Section 4.08 | Officers | 14 |
| Section 4.09 | Board Meetings; Written Resolutions | 14 |
| Section 4.10 | Quorum; Voting | 14 |
| Section 4.11 | Company Minutes | 15 |

ARTICLE V BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL MATTERS

| Section 5.01 | Books and Records | 15 |
|---|---|---|
| Section 5.02 | Fiscal Year | 16 |
| Section 5.03 | Bank Accounts and Temporary Investments | 16 |
| Section 5.04 | Classification as a Partnership; Tax Decisions | 16 |

ARTICLE VI TRANSFERS

| Section 6.01 | Transfers | 17 |
|---|---|---|
| Section 6.02 | Share Certificates | 17 |
| Section 6.03 | Registration as a Shareholder | 18 |
| Section 6.04 | Put and Call Options | 18 |

ARTICLE VII TERMINATION AND LIQUIDATION

| Section 7.01 | Termination | 20 |
|---|---|---|
| Section 7.02 | Effect of Termination | 20 |
| Section 7.03 | Winding Up | 21 |

ARTICLE VIII INDEMNIFICATION

| Section 8.01 | Insurance | 21 |
|---|---|---|

ARTICLE IX REPRESENTATIONS

-i-

*Current 30293237.7 30-Sep-13 01:44*
*33753303.5*

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**

**ICON-032-00036632**

# A-1693

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| Section 9.01 | General | 21 |
| ARTICLE X MISCELLANEOUS | | |
| Section 10.01 | Information | 23 |
| Section 10.02 | Notices | 23 |
| Section 10.03 | Parties Bound; No Third Party Beneficiaries | 23 |
| Section 10.04 | Governing Law; Submission to Jurisdiction | 23 |
| Section 10.05 | Amendment | 24 |
| Section 10.06 | Entire Agreement | 24 |
| Section 10.07 | Confidentiality | 24 |
| Section 10.08 | Severability | 25 |
| Section 10.09 | Counterparts; Facsimile or Electronic Transmission | 25 |
| Section 10.10 | Construction | 25 |
| Section 10.11 | Successors and Assigns | 25 |
| Section 10.12 | Headings and Captions | 25 |
| Section 10.13 | No Waiver | 25 |
| Section 10.14 | Additional Instruments | 26 |
| Section 10.15 | Publicity | 26 |
| Section 10.16 | Remedies | 26 |
| Section 10.17 | Specific Performance | 26 |

EXHIBITS

| | |
|---|---|
| Exhibit "A" | BRANDS |
| Exhibit "B" | SHARES AND PERCENTAGE SHAREHOLDINGS |
| Exhibit "C" | FORM OF DEED OF ADHERENCE |
| Exhibit "D" | TAX ALLOCATIONS |
| Exhibit "E" | Definition of "Europe" |
| Exhibit "F" | Partial Exercise Plan |

Current 30293237.7 30-Sep-13 01:44
33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.　　　　ICON-032-00036633

# A-1694

## ICONIX SE ASIA LIMITED
## FIRST AMENDED AND RESTATED
## SHAREHOLDERS AGREEMENT

This FIRST AMENDED AND RESTATED SHAREHOLDERS AGREEMENT of Iconix SE Asia Limited (formerly known as Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 (the "*Company*"), originally effective as of September 30, 2013 (the "*Effective Date*") and as amended and restated effective as of June 30, 2014, by and between LF Asia Limited, a Hong Kong limited liability company ("*LF*"), and Iconix Brand Group, Inc., a Delaware corporation ("*Iconix*").

## RECITALS:

Iconix has caused the incorporation of the Company on September 10, 2013.

Iconix and LF entered into that certain Share Purchase Agreement pursuant to which LF purchased from Iconix one (1) Share in the Company, representing fifty percent (50%) of the issued share capital of the Company (such Share Purchase Agreement, as may be amended or modified from time to time, the "*Purchase Agreement*").

Iconix and LF were subsequently each allotted 49 Shares, giving them each 50 shares in total (being 50% of the Shares in the Company) ("*Initial Allotment*").

In connection with Iconix and LF's entry into the Purchase Agreement and the Initial Allotment, Iconix and LF entered into that certain Shareholders Agreement of Lion Network Limited, effective as of September 30, 2013 (the "*Previous Shareholders Agreement*") to reflect the respective rights, duties and obligations of the Shareholders with respect to the Company.

The parties hereto wish to amend and restate the Previous Shareholders Agreement to reflect the changes to the respective rights, duties and obligations of the Shareholders with respect to the Company in connection with the transactions contemplated pursuant to (a) that certain Amendment No. 1 to the Master License Agreement, effective as of June 30, 2014, by and among Iconix and the other Licensors named therein, and the Company and (b) that certain letter agreement by and between Iconix and LF, effective as of June 30, 2014.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## DEFINED TERMS; OPERATION OF COMPANY

**Section 1.01** **Definitions**. Within the context of this Agreement, the following terms shall have the following meanings:

"*Accounting Standards*" has the meaning set forth in Section 5.01.

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036634**

# A-1695

"*Administrative Manager*" has the meaning set forth in Section 4.04.

"*Administrative Services Agreement*" means the Administrative Manager Services Agreement dated as of the date hereof by and between the Company and Iconix, as the same may be amended from time to time.

"*Affiliate*" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, "control," "controlling," "controlled by" or "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Equity Securities, by Contract or otherwise.

"*Agreed Value*" has the meaning set forth in Section 6.04(b).

"*Agreement*" means this First Amended and Restated Shareholders Agreement, effective as of June 30, 2014, amending and restating the Previous Shareholders Agreement, and as the same may be amended from time to time.

"*All Rights*" means, together, all of the Europe Rights, the Existing Rights and the Korea Rights.

"*Board*" means the board of directors of the Company as it is constituted at the relevant time.

"*Brands*" means, collectively, the Existing Brands (with respect to the Existing Territory), the Expanded Brands (with respect to the Expanded Territory) and the New Licensed Brands (with respect to the New Territory).

"*Business*" means (i) all consumer products including but not limited to the fashion, jewelry, eyewear, footwear, apparel, swimwear, outerwear, small leather goods and accessories, watches, food, fast moving consumer goods, home, fragrance and beauty lines of business and all accessories associated with all such lines of business, (ii) all lines of business reasonably related or ancillary thereto (including the establishment and operation of retail stores), and (iii) any other line of business approved by the Shareholders.

"*Business Day*" means a day, other than a Saturday or a Sunday, on which banks are open for business in each and all of the State of New York (United States of America) and Hong Kong.

"*Change of Control*" means (i) a change of control (including but not limited to by way of merger, consolidation or transfer of Equity Securities) of an entity, (ii) the direct or indirect sale by an entity of all or substantially all of its assets or (iii) any Person or group of Persons (other an Affiliate of such entity) becoming the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the outstanding Equity Securities of an entity.

"*Communications*" has the meaning set forth in Section 10.02.

2

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-032-00036635

# A-1696

"*Companies Ordinance*" means the Companies Ordinance, chapter 622 of the laws of Hong Kong (and, to the extent it was relevant prior to 3 March 2014, the Companies Ordinance, chapter 32 of the laws of Hong Kong).

"*Company*" has the meaning set forth in the Preamble.

"*Company Account*" has the meaning set forth in Section 5.03.

"*Confidential Information*" means all confidential or proprietary information, knowledge, systems or data relating to the business, assets, prospects, operations, finances, policies, strategies, intentions or inventions of the Company or any of its Subsidiaries (including any of the terms of this Agreement) from whatever source obtained, subject to the terms of this Agreement.

"*Contract*" means any agreement, bond, commitment, contract, franchise, indemnity, indenture, lease, license, purchase order or other instrument of any kind, whether oral or written.

"*Deed of Adherence*" has the meaning set forth in Section 6.03.

"*Designated Costs*" has the meaning set forth in Section 4.06(a)(i).

"*Directors*" has the meaning set forth in Section 4.02.

"*Dividend Policy*" has the meaning set forth in Section 3.01.

"*Effective Date*" has the meaning set forth in the Preamble.

"*Electronic Transmission*" means any form of communication, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

"*Equity Securities*" means any share, any partnership interest, any limited liability company interest and any other ownership interest in an entity, including any options or warrants to purchase the foregoing and other securities convertible, exchangeable or exercisable into the foregoing.

"*Europe*" means, collectively, the countries listed on **Exhibit "E"**.

"*Europe Rights*" means the rights granted to the Company under the Master License Agreement in respect of the New Licensed Brands in the New Territory.

"*Existing Brands*" means the brand names, logos and word phrases listed in **Exhibit "A"** and any other brand names, logos and word phrases which the Company hereafter uses in the Existing Territory in connection with the Business as approved by the Board.

"*Existing Rights*" means the rights granted to the Company under the Master License Agreement in respect of the Existing Brands in the Existing Territory.

3

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**     **ICON-032-00036636**

"*Existing Territory*" means Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.

"*Expanded Brands*" means the brand names, logos and word phrases listed in **Exhibit "A"** other than OP/Ocean Pacific and Umbro, and any other brand names, logos and word phrases which the Company hereafter uses in the Expanded Territory in connection with the Business as approved by the Board.

"*Expanded Territory*" means the Republic of Korea.

"*Five-Year Call*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Call Notice*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Call Purchase Price*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call Notice*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call Purchase Price*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put/Call Rights*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put Notice*" has the meaning set forth in Section 6.04(b)(i).

"*Five-Year Put Purchase Price*" has the meaning set forth in Section 6.04(b)(i).

"*Fully Exercised*" means one or more exercises of the Five-Year Put/Call which result in the acquisition by the Iconix Shareholder of All Rights, and "*Full Exercise*" shall be construed accordingly. In the case of a Full Exercise, the LF Shareholder shall sell all of its Shares in the Company to the Iconix Shareholder and closing thereof shall take place in accordance with the provisions of Section 6.04(e).

"*Governmental Authority*" means any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority.

"*HKIAC*" has the meaning set forth in Section 10.04.

"*Iconix*" has the meaning set forth in the Preamble.

4

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.** ICON-032-00036637

# A-1698

"*Iconix Directors*" has the meaning set forth in Section 4.02.

"*Iconix Shareholder*" means Iconix, together with its Transferees, if any.

"*Korea Rights*" means the rights granted to the Company under the Master License Agreement in respect of the Expanded Brands in the Expanded Territory.

"*Law*" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

"*LF*" has the meaning set forth in the Preamble.

"*LF Directors*" has the meaning set forth in Section 4.02.

"*LF Shareholder*" means LF, together with its Transferees, if any.

"*Local Manager*" has the meaning set forth in Section 4.05.

"*Local Services Agreement*" means the Local Manager Services Agreement dated as of the date hereof by and between the Company and LF, as the same may be amended from time to time.

"*Master License Agreement*" means the Master License Agreement, effective as of September 30, 2013, by and among the Company, Iconix and the Licensors (as defined therein), as amended by Amendment No.1 to Master License Agreement, effective as of June 30, 2014, and as the same may be amended from time to time.

"*New Licensed Brands*" means the brand names, logos and word phrases listed in **Exhibit "A-1"** and any other brand names, logos and word phrases which the Company hereafter uses in the New Territory in connection with the Business as approved by the Board.

"*New Territory*" means Europe and Turkey.

"*Other License Agreement*" means any license or similar agreement by and between the Company or one of its Subsidiaries and another Person granting such Person rights to use the Brands in the Territory.

"*Partial Exercise*" means an exercise of the Five-Year Put/Call which does not result in a Full Exercise. In the case of a Partial Exercise, the Company shall relinquish whichever is relevant of the Europe Rights, the Existing Rights and/or the Korea Rights in favour of the Iconix Shareholder through amendment to the Master License Agreement, and closing thereof shall take place in accordance with the provisions of Section 6.04(d) and notwithstanding that such transaction is between the Company and the Iconix Shareholder, the Five-Year Put/Call Price in the case of a Partial Exercise will be paid by the Iconix Shareholder to the LF Shareholder pursuant to Section 6.04(d).

"*Partial Exercise Plan*" means the plan to be implemented in the context of a Partial Exercise, consistent with the principles set out in **Exhibit "F"**.

5

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036638**

# A-1699

"***Percentage Shareholding***" means the percentage determined in accordance with Section 2.01(b).

"***Permitted Parent Change of Control***" means (i) a Change of Control of, in the case of the Iconix Shareholder, Iconix and, in the case of the LF, Global Brands Group Limited.

"***Person***" means any individual or any partnership, corporation, estate, trust, company or other legal entity.

"***Previous Shareholders Agreement***" has the meaning set forth in the Recitals.

"***Purchase Agreement***" has the meaning set forth in the Recitals.

"***Securities Act***" means the Securities Act of 1933, as amended, or any similar federal statute then in effect, and any reference to a particular section thereof shall include a reference to the comparable section, if any, of any such similar federal statute, and the rules and regulations promulgated thereunder.

"***Share***" means a share in the Company.

"***Shareholders***" means the Iconix Shareholder and the LF Shareholder.

"***Share Certificate***" has the meaning set forth in Section 2.01(c).

"***Subsidiary***" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (i) of which such Person or any other subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any subsidiary of such Person do not have a majority of the voting interests in such partnership) or (ii) at least fifty percent (50%) of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries, or by such Person and one or more of its subsidiaries.

"***Territory***" means, collectively, the Existing Territory (with respect to the Existing Brands), the Expanded Territory (with respect to the Expanded Brands) and the New Territory (with respect to the New Licensed Brands).

"***Transfer***" means to sell, convey, transfer, syndicate, assign, mortgage, pledge, hypothecate or otherwise encumber or dispose of in any way, including by operation of law or otherwise, any Shares, or any Change of Control of the Company. The Person who is transferring Shares shall be referred to as the "Transferor" and the Person who is acquiring the Shares shall be referred to as the "Transferee."

"***Two-Year Call***" has the meaning set forth in Section 6.04(a).

"***Two-Year Call Notice***" has the meaning set forth in Section 6.04(a).

6

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc. ICON-032-00036639

# A-1700

"*Two-Year Call Purchase Price*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Shares*" has the meaning set forth in Section 6.04(a).

"*Year*" means the tax and financial accounting period specified in Section 5.02.

**Section 1.02    Incorporation; Name**.  The Company was incorporated by the filing of the form of incorporation with the Companies Registry of Hong Kong.  A certificate of incorporation was issued by the Companies Registry of Hong Kong on September 10, 2013.  The Shareholders hereby confirm the incorporation of the Company as a company with limited under and pursuant to the provisions of the Companies Ordinance.  Whenever the terms of this Agreement conflict with the provisions of the articles of association of the Company, the terms this Agreement shall prevail.  Accordingly, the parties hereto shall exercise their respective and other rights as holders of Shares to procure that the articles of association of the Company amended to remove any conflict.

**Section 1.03    Registered Office; Principal Office**.  The registered office of the Company required under the Companies Ordinance shall be as designated in the incorporation form filed with the Companies Registry, and may be changed by the Board in accordance with Companies Ordinance.  The principal business office of the Company shall be located at the principal business office of the Local Manager, or such other address as shall be designated by Board.

**Section 1.04    Business Purpose**. The Company has been formed for the purpose of engaging, directly or through its Subsidiaries, in the following activities:  (i) developing, exploiting and promoting the Brands licensed to the Company pursuant to the Master License Agreement or another Contract in the Territory by way of a license, sublicense or otherwise relating to the Business in exchange for royalty payments, and/or other consideration, (ii) purchasing or licensing third party Brands for the purposes of developing them in the Territory; (iii) engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing; (iv) engaging in other similar business opportunities as agreed to by both of the Shareholders and (v) unless otherwise agreed by the Shareholders, adopting a business model is in accordance with the then-approved business plan and is asset light, working capital light and with an EBITDA margin of not less than 75%.  References in this Agreement to the "ordinary course of business" shall be construed in conjunction with the business purpose set out in this Section 1.04.

**Section 1.05    Shareholders**.  The name, number of Shares and Percentage Shareholding held by each Shareholder is set forth on **Exhibit "B"**, as the same may be amended from time to time in accordance with this Agreement.

**Section 1.06    No Personal Liability**.  Except as provided by the applicable Law, no Shareholder or any Director shall be personally liable for any obligations of the Company and no Shareholder shall have any obligation or be required to make any loan or otherwise advance funds to the Company other than as provided in Section 2.01(d) or 2.01(e).

7

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                                    **ICON-032-00036640**

# A-1701

## ARTICLE II

## SHAREHOLDINGS AND CAPITAL STRUCTURE

**Section 2.01    Capital Structure**.

(a)    Shareholdings.  The initial shareholdings of the Shareholders (after giving effect to the purchase transaction contemplated by the Purchase Agreement) are set forth on **Exhibit "B"** attached hereto.

(b)    Percentage Shareholding.  Each Shareholder shall have the Percentage Shareholding in the Company determined by dividing the number of Shares owned by such Shareholder by the total number of issued Shares.  The Percentage Shareholding of each Shareholder (after giving effect to the purchase transaction contemplated by the Purchase Agreement) shall be set forth next to such Shareholder's name on **Exhibit "B"** attached hereto.

(c)    Share Certificates.  Upon the request of any Shareholder, a share certificate (each, a "***Share Certificate***") issued by the Company in accordance with the provisions of the articles of association of the Company shall evidence the Shares in the Company held by such requesting Shareholder.

(d)    New Allotment of Shares.  *(Omitted as spent).*

(e)    Further Subscription for Shares.  In the event that the Company is to pay any Future Mark Acquisition Consideration (as defined in the Master License Agreement) or any Jointly Owned Mark Acquisition Consideration (as defined in the Master License Agreement) under the Master License Agreement, the Shareholder will subscribe for new Shares, in accordance with their Percentage Shareholding, in order to put the Company in funds to pay the relevant Future Mark Acquisition Consideration or any Jointly Owned Mark Acquisition Consideration (as the case may be), with subscription price therefor being set by the Directors, and the Shareholders will pass such resolutions and procure that the Directors pass such resolutions as are necessary to give effect to the provisions of this Section 2.01(e).

**Section 2.02    Loans**.  Without in any way limiting the authority of the Board to cause the Company to borrow funds from an unaffiliated third party (instead of, or in addition to, any loan(s) of the type contemplated by this Section 2.02), any Shareholder or Affiliate of a Shareholder may, with the consent of all the Directors, lend or advance money to the Company; provided, that such loan shall be on terms and conditions not less favorable than those available from unaffiliated third parties for similar loans (unless otherwise unanimously agreed by the Directors).

## ARTICLE III

## DISTRIBUTIONS

**Section 3.01    Distributions**.  At such times as the Board determines is in the interest of the Company and the Shareholders, the Company shall pay dividends or make other distributions to the Shareholders in proportion to their Percentage Shareholdings.  The

8

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036641**

# A-1702

Shareholders agree that, to the extent practicable and permitted by any applicable Law and regulation, unless otherwise agreed by the Shareholders, the dividend policy of the Company be to distribute the maximum amount of distributions allowed by the Companies Ordinance (the "***Dividend Policy***").

Section 3.02    Tax Distributions.  Upon Iconix's reasonable request, and subject to such dividend being lawfully permitted, the Board shall cause the Company to distribute to Shareholder in respect of each Year, an amount of cash which equals (i) the amount of taxable income allocable to the Shareholder in respect of such Year, multiplied by (ii) the combined maximum individual United States federal and state income tax rate attributable to such taxable income (determined as if all Shareholders were residents of the State of New York and taking account (i) the deductibility of state income taxes for United States federal income tax purposes) and (ii) the amount of taxable losses previously allocated to such Shareholders in prior fiscal (and not used in prior fiscal years to reduce taxable income for the purpose of making under this Section 3.02).  Such distributions based upon estimates of the taxable income for the year may be made on a quarterly or other basis as shall be determined by Iconix (in its sole discretion).  All amounts so distributed shall be treated as amounts distributed to the Shareholder pursuant to Section 3.01 of this Agreement, depending on the source of the item that generated such taxable income, and shall be reduced by any amounts withheld for taxes with respect to the Shareholder pursuant to Section 3.01.

## ARTICLE IV

## MANAGEMENT OF COMPANY

Section 4.01    General Provisions Concerning Management.  Subject to the provisions hereof, the powers of the Company shall be exercised by or under the authority of, the business and affairs of the Company shall be managed under the direction of, the Board.  The Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company described herein, including all powers, statutory or otherwise, possessed by directors of a company with limited liability incorporated under the laws of Hong Kong.  Except as otherwise required by law, approval of any action by the Board in accordance with this Agreement and the articles of association of the Company shall constitute approval of such action by the Company.

Section 4.02    Appointment of Directors.  The Company shall have four Directors, two (2) of whom shall be Persons designated by LF and its Transferees, if any (the ***Directors***"), and two (2) of whom shall be Persons designated by Iconix and its Transferees, if (the "***Iconix Directors***," and together with the LF Directors, the "***Directors***").  The initial LF Directors shall be Jason Rabin and David Thomas and the initial Iconix Directors shall be Neil Cole and Jeff Lupinacci.

Section 4.03    Resignation and Removal of Directors.  Each Director shall until death, dissolution, resignation or removal, in accordance with this Agreement and the of association of the Company.  A Director may resign at any time upon giving written notice of resignation to the Company.  A Director may be removed at any time with or without cause only by the Shareholder who appointed such Director (*e.g.*, an Iconix Director can only be removed

9

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036642**

# A-1703

Iconix). If a Director ceases to serve as a Director at any time for any reason, the resulting shall be filled by a Person designated by the Shareholder whose designee created the vacancy.

**Section 4.04 Administrative Manager**. Subject to the provisions of the Administrative Services Agreement, Iconix, as Administrative Manager (the "*Administrative Manager*") shall have the responsibilities and provide to the Company the services referred to therein.

**Section 4.05 Local Manager**. Subject to the provisions of the Local Services Agreement, LF, as Local Manager (the "*Local Manager*") shall have the responsibilities and provide to the Company the services referred to therein.

**Section 4.06 Actions Requiring Unanimous Consent of all the Directors**.

(a) Notwithstanding any provision of this Agreement, subject to Section 4.07, approval of the following actions shall require the unanimous consent of all the Directors:

(i) approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the costs and expenses (including those payable under the Administrative Services Agreement and the Local Services Agreement) associated with the ongoing operations of the Company (the "*Designated Costs*") pursuant to such annual business and development plan and annual budget are less than twenty percent (20%) of net revenue projected in such annual business and development plan and annual budget; provided that, if the actions in this clause (i) are to be taken by the Iconix Directors, the Iconix Directors shall consult with the LF Directors, in good faith, regarding such proposed annual business and development plan and annual budget, and take into consideration any comments or proposed changes recommended by the LF Directors;

(ii) approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the Designated Costs pursuant to such annual business and development plan and annual budget are twenty percent (20%) or greater of net revenue projected in such annual business and development plan and annual budget;

(iii) any change in the scope or nature of the business or activities of the Company or any or any of its Subsidiaries;

(iv) appointment or removal of, entry into an employment agreement with or approval of any delegation of or change to the authority or responsibilities of any officer the Company or any of its Subsidiaries, or approval of the terms and conditions of employment any officer or employee of the Company or any of its Subsidiaries or any change thereto that, if the actions in this clause (iv) are to be taken by the Iconix Directors, (A) at least thirty days prior to taking any such action the Iconix Directors shall have provided the LF Directors as applicable, identity of any individual proposed to be appointed or removed, the employment history of and references for any potential officer, a detailed summary of the terms of any employment agreement, a summary of the reasons for any delegation or change in the authority responsibilities of any officer and/or a summary of any terms and conditions of employment proposed to be approved, and shall have consulted with the LF Directors, in good faith, regarding

10

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**          **ICON-032-00036643**

# A-1704

such proposed action and taken into consideration any comments or proposed changes recommended by the LF Directors, and (B) the Iconix Directors shall not hire any new officer unless the position for such officer was included in the then current annual business and development plan and annual budget;

(v)     with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries in the ordinary course of business;

(vi)     with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries outside the ordinary course of business;

(vii)     incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business ;

(viii)     incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) outside the ordinary course of business or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business;

(ix)     lending any money (except deposits with banks or other institutions) by the Company or any of its Subsidiaries;

(x)     entry into any Contract by the Company or any of its Subsidiaries outside the ordinary course of business;

(xi)     commencement or settlement by the Company or any of its Subsidiaries of any legal action, arbitration proceeding, mediation or other dispute resolution other than in the ordinary course of business;

(xii)     adopting or amending any employee benefit or equity plan of the Company or any of its Subsidiaries;

(xiii)     appointment or removal of auditors of the Company or any of its Subsidiaries;

(xiv)     subject to Section 4.06(a)(xv), changing the accounting policies of the Company or any of its Subsidiaries or of the Year of the Company or any of its Subsidiaries;

(xv)     changing the accounting policies of the Company or any of its Subsidiaries by reason of being compelled to do so by reason of changes to IFRS and/or GAAP;

(xvi)     giving of any guarantee or indemnity of the Company or any of its Subsidiaries;

11

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-032-00036644

(xvii)  assignment of any debts of the Company or any of its Subsidiaries;

(xviii) transfer, disposal or creation of any security interest in property of the Company or any of its Subsidiaries;

(xix)  entry into any Other License Agreement, or amendment, modification, termination of the Master License Agreement or any existing Other License Agreement;

(xx)  approving of the creation or acquisition of any Subsidiaries and the adoption of governance agreements or arrangements in respect thereof, or any other investment in, or the acquisition of stocks or bonds of, other Persons or any Equity Securities in any other Person; provided, that there shall be no limitation on the Board's authority to delegate, in a manner mutually acceptable to the Board, the making of investments as part of cash management in the ordinary course of business of the Company;

(xxi)  any Transfer of Shares in the Company; and

(xxii) authorizing an officer, an employee or any other individual to approve disbursements on behalf of the Company;

provided, that upon and subsequent to any exercise of the Call Option (as defined herein) pursuant to Section 6.04, the actions in clauses (i), (iv), (v), (vii), (ix), (xv) and (xxii) of this Section 4.06(a) shall be taken by the Iconix Directors in their sole discretion (after reasonable, good faith consultation with the LF Directors), notwithstanding, for the avoidance of doubt, Section 4.08 of this Agreement.

(b)  The parties acknowledge and agree that any and all decisions or actions by the Company with respect to an agreement between the Company and a Shareholder or Affiliate of a Shareholder relating to: (i) the exercise or enforcement of the Company's rights thereunder; (ii) any amendments or waivers thereto; or (iii) any approvals required or requests made thereunder shall be taken by the Directors designated by the other Shareholder in their sole discretion.

(c)  Subsequent to the exercise of the Call Option (as defined herein), the Iconix Directors will consult in good faith with the LF Directors prior to taking any actions outside of the ordinary course of business and take into consideration any comments or proposed changes recommended by the LF Directors.

(d)  The Iconix Directors shall not take any action in their sole discretion if such action would reasonably be expected to have a materially adverse effect on the value of the Shares held by the LF Shareholder, taking into consideration the existence of the Five Year Put/Call unless the Shareholders mutually agree that any such action is in the best interests of the Company.

**Section 4.07    Shareholder Approval.**  Notwithstanding any provision of this Agreement, approval of any of the following shall require unanimous approval by all of the Shareholders:

12

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036645**

(a)     admission of any Person (whether by subscription or transfer) as a shareholder of the Company or any of its Subsidiaries;

(b)     grant of, or entry into an agreement to grant, any option, pledge or other encumbrance in respect of the Shares or of any other Equity Securities of the Company or any of its Subsidiaries;

(c)     except as provided under Article III or Section 6.04, declaration, payment or approval by the Company or any of its Subsidiaries of any repurchase or redemption of the Company's or any of its Subsidiaries' securities or any dividend or other distribution to the Shareholders or to the members or shareholders of any of the Company's Subsidiaries (other than Subsidiaries wholly owned by the Company or any of its Subsidiaries);

(d)     delegation of any powers or responsibilities by the Board or Directors than to an individual or a committee of individuals designated with the unanimous consent of the Directors or to officers pursuant to Section 4.08;

(e)     change of the number of Directors or the number of directors of any Subsidiary of the Company;

(f)     removal of a Director other than by the Shareholder that designated or nominated such Director or removal of a director of any of the Company's Subsidiaries;

(g)     the entering into by the Company or any of its Subsidiaries of any Contract outside the ordinary course of business;

(h)     participation in, termination of or any other actions taken by the Company or any of its Subsidiaries with respect to any venture, partnership or joint venture, or acquisition or disposal of shares or other equity interests in another Person or the acquisition of the business or assets of another Person;

(i)     entry into any transaction by the Company or any Subsidiary of the Company with any Shareholder or any Affiliate of any Shareholder (including entering into any loans between any Shareholder or any Affiliate of any Shareholder and the Company, but not including entering into the Master License Agreement);

(j)     increase or decrease the issued share capital or (as applicable) the authorized share capital or maximum number of shares, in each case of the Company or any of its Subsidiaries;

(k)     reclassification of securities of the Company or any of its Subsidiaries (including any subdivision or consolidation of shares) or recapitalization of the Company or any of its Subsidiaries;

(l)     entry into any merger, amalgamation or consolidation of the Company or any of its Subsidiaries with another Person;

13

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036646**

(m)  a resolution for winding up, the termination or dissolution of, or the entering into of bankruptcy, insolvency or receivership by, the Company or any of its Subsidiaries;

(n)  sale or disposal of all of the Shares or all or any substantial part of the Company's or any of its Subsidiaries' business or assets;

(o)  change of the name of the Company or any of its Subsidiaries;

(p)  amendment or modification of the Company's or any of its Subsidiaries' memorandum of association or articles of association or other organizational documents (as applicable);

(q)  reorganization of the Company or any of its Subsidiaries; and

(r)  a private or public issuance or offering for sale of any securities of the Company or any of its Subsidiaries or the listing on any exchange of any securities of the Company or any of its Subsidiaries.

**Section 4.08    Officers**.  Subject to the limitations set forth in Section 4.06, the Board shall have the authority to establish such officers of the Company as they shall determine, and to appoint individuals to serve as such officers, including chairman, chief executive officer, one or more vice presidents, secretary, assistant secretary, treasurer and assistant treasurer.  An individual may hold more than one office at any time.

**Section 4.09    Board Meetings; Written Resolutions**.  Board meetings may be called by any Director.  The Board shall meet not less than once every three (3) months.  Any Director may participate in a Board meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear and speak to each other at the same time or in sequence, and participation in a Board meeting pursuant to this provision shall constitute presence at the meeting; provided, that at least one of such Board meetings per year shall be held in person at a location to be unanimously determined by the Directors.  All meetings of the Board shall be called on not less than three (3) Business Days' prior notice.  All actions required or permitted to be taken by the Board may also be approved by the execution of a written resolution executed by all the Directors, and any such written resolution may be executed in counterparts.

**Section 4.10    Quorum; Voting**.

(a)  A quorum must exist at all times of a Board meeting, including the reconvening of any Board meeting that has been adjourned, for any action taken at such Board meeting to be valid.

(b)  Except as otherwise specified in this Agreement:

(i)  a quorum shall be constituted at a Board meeting only if at least one (1) LF Director and one (1) Iconix Director are present; and

14

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036647**

**A-1708**

(ii)    all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, which majority must include at least one (1) LF Director and one (1) Iconix Director.

(c)    Upon and subsequent to the closing of any Two-Year Call pursuant to Section 6.04:

(i)    a quorum shall be constituted at a meeting if a majority of the Directors is present, regardless of the identity of the Directors comprising such majority; and

(ii)    all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, regardless of the identity of the Directors comprising such majority.

**Section 4.11    Company Minutes**.  The decisions and resolutions of the Board shall be reported in minutes, which shall state the date, time and place of the meeting (or the date the written resolution in lieu of meeting), the Directors present at the meeting, the resolutions put to a vote (or the subject of a written resolution) and the results of such voting (or written resolution).  The minutes shall be entered in a minute book kept at the registered office of the Company and a copy of the minutes shall be provided upon request to each Director.

## ARTICLE V

## BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL MATTERS

**Section 5.01    Books and Records**.  The Administrative Manager shall procure that accurate, full and complete books and records of the Company are maintained, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business and affairs.  Such books and records initially shall be prepared and maintained by the Administrative Manager; and, at such time as the Board determines, such books and records shall be prepared and maintained by employees of the Company.  Such books and records shall include a clear statement of royalty generated by the Company under the Master License Agreement and Other Agreements, and broken down as between the Europe Rights, the Existing Rights and the Korea Rights and the Administrative Manager shall provide such information to the LF Shareholder within as soon as reasonably practicable following the LF Shareholder's request to provide such information.  Upon request in writing, each Shareholder and its duly authorized representative shall have access to inspect and copy any of such books and records at all reasonable times during normal business hours.  The Company shall deliver or cause to be delivered to each Shareholder consolidated financial statements (all of which shall be prepared in accordance with the financial reporting standards interpretations (including: (a) Hong Kong Financial Reporting Standards; (b) Hong Kong Accounting Standards; and (c) Interpretations) issued by the Hong Kong Institute of Certified Public Accountants applied on a consistent basis (the "*Accounting Standards*")), as follows: (i) soon as available (but in any event not later than twenty (20) days after the end of each quarter), consolidated balance sheet as at the end of such quarter and the related consolidated statements income and cash flows for such quarter and for the period from the beginning of the current calendar year (i.e., the calendar year in which such quarter falls) to the end of such quarter,

15

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-032-00036648

forth, in each case, in comparative form the corresponding figures for the corresponding periods the previous calendar year and the corresponding figures from any financial plan for the current calendar year; and (ii) as soon as available (but in any event not later than one hundred twenty (120) days after the end of each calendar year), a consolidated balance sheet as at the end of such calendar year and the related consolidated statements of income, cash flows and stockholders', members' or other owners' equity for such calendar year, setting forth in each case in form the corresponding figures for the corresponding periods of the previous calendar year and corresponding figures from any financial plan for the calendar year covered by such financial statements. The Company shall also deliver to each Shareholder upon request copies of any reports or statements the Company receives from its third party licensees. The financial to be provided under this Agreement shall not be required to be audited unless required by applicable Law or so requested by either Shareholder.

Section 5.02 **Fiscal Year**. The year of the Company for tax and financial accounting purposes ("**_Year_**") shall end on the last day of the month of December, unless a different year end is approved in accordance with Section 4.07

Section 5.03 **Company Accounts**. All receipts, funds and income of the Company shall be deposited in the name of the Company in a bank account of a commercial savings and loan association or other financial institution (the "**_Company Account_**") as the Local Manager shall determine. Withdrawals from the Company Account shall be made on the of (a) an officer of the Administrative Manager or such other Person as shall be designated by Administrative Manager and (b) an officer of the Local Manager or such other Person as shall be designated by the Local Manager; provided that no withdrawal from the Company Account shall be made (i) with respect to any expense subject to the Directors' or the Shareholders' approval rights pursuant to Section 4.06 or Section 4.07, respectively, until such approval has been obtained, or (ii) for the purpose of making any payment to a Director or an Affiliate of a Director any distribution to the Shareholders unless the amount of such payment or distribution is in accordance with ARTICLE III or has been approved by the Shareholders. There shall be no commingling of the moneys and funds of the Company with moneys and funds of the Administrative Manager, the Local Manager or any other entity or Person.

Section 5.04 **Classification as a Partnership; Tax Decisions**. The Company shall elect within 75 days of its formation to be taxable as a partnership for United States federal income tax purposes, pursuant to Treasury Regulation Section 301.7701-3(b)(1)(i) by having Shareholder sign Form 8832 as prepared by Iconix. During such time as the Company would be classified as a partnership under the foregoing sentence, neither the Company nor any shall take any action that would result in the Company being taxed as other than a "partnership" United States federal income tax purposes, including, but not limited to, electing to be taxed as other than a "partnership" by filing Internal Revenue Service Form 8832, "Entity Classification Election" without the prior written consent of all of the Shareholders. All elections required or permitted to be made by the Company and all other tax decisions and determinations relating to United States federal, state, local or foreign tax matters shall be made by the Board, in with the Company's attorneys and/or accountants as the Board deems necessary or advisable. U.S. federal income tax purposes, income of the Company shall be allocated in accordance with the provisions of **Exhibit "D"**.

16

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                                    **ICON-032-00036649**

# A-1710

## ARTICLE VI

## TRANSFERS

**Section 6.01    Transfers**.  Except as expressly provided in this **ARTICLE VI**, (i) no Shareholder may directly or indirectly Transfer any or all of its Shares or any right or therein; (ii) any direct or indirect offer to Transfer, or any attempted or purported Transfer of, Shares in violation of any of the provisions of this Agreement shall be void *ab initio*; (iii) the Company shall reject and refuse to register on its books the Transfer of any Shares which are purported to have been transferred otherwise than in compliance with the provisions of this Agreement; and (iv) and the Company shall not recognize any Person receiving any Shares as a shareholder of the Company, nor shall any Person have any rights as a shareholder of the Company, unless the Transfer of Shares to such Person shall have been made pursuant to the of this Agreement.  Notwithstanding any provisions of this Agreement, a Shareholder may Transfer all (but not some only) of its Shares (a) pursuant to a Permitted Parent Change of or (b) to any Affiliate of such Shareholder, provided that if such Affiliate at any time no longer constitutes an Affiliate of Iconix or LF, as applicable, any such Shares transferred to such shall immediately be transferred to Iconix or LF, as applicable, or one of their respective

**Section 6.02    Share Certificates**.
(a)    Each Share Certificate issued to a Shareholder pursuant to Section 2.01(c) shall have the following legend conspicuously written, printed, typed or stamped on its face, or upon the reverse with a conspicuous reference to such legend on its face:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF THE FIRST AMENDED AND RESTATED SHAREHOLDERS AGREEMENT OF ICONIX SE ASIA LIMITED, EFFECTIVE AS OF JUNE 30, 2014, AS IT MAY BE AMENDED FROM TIME TO TIME (THE "SHAREHOLDERS AGREEMENT"), INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN.

THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS, IN RELIANCE UPON APPLICABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE AND FOREIGN SECURITIES LAWS.  THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE.  THE SHARES MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS.  ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE MUST COMPLY WITH THE OTHER TRANSFER RESTRICTIONS SET FORTH IN THE SHAREHOLDERS AGREEMENT."

17

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-032-00036650

# A-1711

(b)     Upon the sale of any Shares pursuant to (i) an effective registration statement under the Securities Act or pursuant to Rule 144 under the Securities Act or (ii) another exemption from registration under the Securities Act or upon the termination of this Agreement, the Share Certificates representing such Shares shall be replaced, at the expense of the Company, with certificates or instruments not bearing the legends required by this Section 6.02; provided that the Company may condition such replacement of certificates under clause (ii) upon the receipt of an opinion of securities counsel reasonably satisfactory to the Company.

(c)     In case of loss or destruction of a Share Certificate, no new Share Certificate shall be issued in lieu thereof except upon satisfactory proof to the Company of such loss or destruction, and upon the giving to the Company of satisfactory security against loss by bond or otherwise. Any such new Share Certificate shall be plainly marked "Duplicate" upon its face.

**Section 6.03     Registration as a Shareholder**. Except as provided in Section and Section 6.04, no Person other than the LF Shareholder and the Iconix Shareholder shall be registered in the register of shareholders of the Company as a shareholder of the Company the prior written unanimous consent of the Board and the Shareholders. If the LF Shareholder or the Iconix Shareholder proposes to transfer Shares to an Affiliate, it shall be a condition to the transfer that such Affiliate shall execute and deliver a deed of adherence in substantially the form attached hereto as **Exhibit "C"** (the "***Deed of Adherence***") pursuant to which such Transferee shall agree to be legally bound by this Agreement. Except as otherwise set forth herein, the Affiliate to which Shares are transferred shall pay all costs and expenses incurred by the in connection with such admission.

**Section 6.04     Put and Call Options.**

(a)     Two-Year Call Option. For the six- (6-) month period following the second (2nd) anniversary of the Effective Date, the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder and the Company (a "***Two-Year Call Notice***") to initiate the purchase by the Iconix Shareholder of five percent (5%) of the total Shares in issue (the "***Two-Year Call Shares***") at a purchase price (the "***Two-Year Call Purchase Price***") in cash equal to 10% multiplied by 115% multiplied by the sum of (i) the Purchase Price (as defined in the Purchase Agreement) paid or payable by LF to Iconix pursuant to the Purchase Agreement, *plus* (ii) $10,917,500 (such purchase initiated by a Two-Year Call Notice, a "***Two-Year Call***"). The Company shall pay an interim dividend in accordance with the Dividend Policy of the Company, to be calculated up to the day before closing of the Two Year Call. LF agrees that following the closing of the Two-Year Call, LF has no objection to Iconix being able to consolidate the results of the Company into its own financial results.

(b)     Five-Year Put/Call Option.

(i)     For the six- (6-) month period following the fifth (5th) anniversary of the Effective Date (and, if a Five-Year Put/Call has not previously been Fully Exercised, for six- (6-) month period following the eighth (8th) anniversary of the Effective Date), (i) the LF Shareholder may deliver an irrevocable written notice of election to the Iconix Shareholder and Company (a "***Five-Year Put Notice***") to initiate the acquisition by the Iconix Shareholder of , the

18

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036651**

Europe Rights, the Existing Rights and/or the Korea Rights (the "***Five-Year Put/Call Rights***") at purchase price (the "***Five-Year Put Purchase Price***") in cash equal to the aggregate Agreed (as defined herein) (such purchase initiated by a Five-Year Put Notice, a "***Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the LF Shareholder (a "***Five-Year Call Notice***," and each of the Five-Year Put Notice and the Five-Year Call Notice, a "***Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder of the Five-Year Put/Call Rights at a purchase price (the "***Five-Year Call Purchase Price***," and of the Five-Year Put Purchase Price and the Five-Year Call Purchase Price, the "***Five-Year Put/Call Purchase Price***") in cash equal to 120% of the aggregate Agreed Value (such purchase initiated by a Five-Year Call Notice, a "***Five-Year Call***" and each of a Five-Year Put and a Five-Five-Year Call, a "***Five-Year Put/Call***"). Prior to the closing of the Five-Year Put/Call pursuant Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the Company shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to LF under the Services Agreement and pay all fees owing and accrued to Iconix under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the Five-Year Put/Call.

(ii)     If the Five-Year Put/Call is exercised in the six- (6-) month period following the fifth (5th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)     the LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2015 and (ii) the Year ended December 31, 2018; *provided, however*, that the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *plus*

(B)     in the case of a Full Exercise, the amount of cash in the Company.

(iii)     If the Five-Year Put/Call is exercised in the six- (6-) month period following the eighth (8th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)     The LF Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and the Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2018 and (ii) the Year ended December 31. 2021; *provided, however*, that, the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *plus*

(B)     In the case of a Full Exercise, the amount of cash in the Company.

(c)     <u>Put and Call Closings</u>.  The closing of any Two-Year Call or Five-Year Put/Call under this Section 6.04 shall take place within (i) sixty (60) days after delivery of the Two-Year Call Notice or (ii) sixty (60) days after the delivery of the Five-Year Put/Call Notice

19

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036652**

# A-1713

if later, within 30 days after the royalty information necessary to calculate the Agreed Value is available), as the case may be, unless another date is mutually agreed upon by the parties to the sale.

(d)    Put and Call Closings – Partial Exercise.  In the case of an exercise of the Five-Year Put/Call which constitutes a Partial Exercise, at the closing of the relevant Five Year Put/Call, the Iconix Shareholder shall pay to the LF Shareholder the Five-Year Put/Call Price, and the parties hereto shall implement the Partial Exercise Plan.

(e)    Put and Call Closings – Two Year Call and Full Exercise.  At the closing of any Two-Year Call or Five-Year Put/Call which results in a Full Exercise, the LF Shareholder shall deliver to the Company for cancellation the Share Certificate or Certificates, if any, representing the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable, and the Iconix Shareholder shall take all actions and execute and deliver and pay to the LF Shareholder the Two-Year Call Purchase Price or the Five-Year Put/Call Price, as applicable, and all instruments and documents as may be necessary or desirable to consummate the sale of the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable.  The Company shall thereupon cancel the Share Certificate(s) representing the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable, enter the purchaser's name in the register of shareholders of the Company and, upon request of the purchase pursuant to Section 2.01(c), issue a Share Certificate to the purchaser evidencing the purchaser's entitlement to the Two-Year Call Shares or the Five-Year Put/Call Shares, as applicable.

(f)    Stamp Duty.  The Hong Kong stamp duty payable in respect of the sale and purchase of the Shares pursuant to an exercise of any option pursuant to this Section 6.04 shall be borne by Iconix and LF in equal shares. Iconix and LF shall each pay their respective share of the Hong Kong stamp duty on completion of the exercise of the relevant option and shall co-operate to ensure that the instrument of transfer and bought and sold notes in respect of the sale and purchase of the relevant Shares are duly presented for stamping within the time limits prescribed by the Stamp Duty Ordinance and are duly stamped as soon as practicable after completion of the exercise of the relevant option.

## ARTICLE VII

## TERMINATION AND LIQUIDATION

**Section 7.01    Termination**.  This Agreement shall terminate on the first to occur of the following:

(a)    the Percentage Shareholding of any Shareholder is equal to one hundred percent (100%); or

(b)    a resolution is passed by the Shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, shareholders or other contributors.

**Section 7.02    Effect of Termination.**

20

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036653**

# A-1714

(a)     On termination of this agreement, Sections 10.02, 10.03, 10.04, 10.07, 10.15 and this Section 7.02(a) shall continue in force.

(b)     Termination of this agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including the right to claim damages or indemnification in respect of any breach of the Agreement which existed at or before the date of termination.

**Section 7.03     Winding Up**. Where the Company is to be wound up and its distributed, the parties shall agree on a suitable basis for dealing with the interests and assets of Company and shall endeavor to ensure that, before dissolution:

(a)     all existing contracts of the Company are performed to the extent that there are sufficient resources;

(b)     the Company shall not enter into any new contractual obligations; and

(c)     the Company's assets are distributed as soon as practical.

## ARTICLE VIII

## INDEMNIFICATION

**Section 8.01     Insurance**. The Company shall maintain for such periods as the Board shall in good faith unanimously determine, at its expense, insurance in an amount determined unanimously in good faith by the Board to be appropriate, on behalf of any person is or was a director or officer of the Company, or is or was serving at the request of the Company a director, officer, employee or agent of another corporation or other enterprise, including any Subsidiary of the Company, against any expense, liability or loss asserted against such Person incurred by such Person in any such capacity, or arising out of such Person's status as such, to customary exclusions.

## ARTICLE IX

## REPRESENTATIONS

**Section 9.01     General**. As of the date hereof, each of the Shareholders makes each of the representations and warranties applicable to such Shareholder as set forth in this **ARTICLE IX**, and such representations and warranties shall survive the execution of this Agreement.

(a)     Due Incorporation or Formation; Authorization of Agreement. If such Shareholder is a corporation, partnership, trust, limited liability company, or other legal entity, it duly organized or formed, validly existing, and in good standing under the laws of the of its incorporation or formation and has the power and authority to own property and carry on business as owned and carried on at the date hereof and as contemplated hereby and such Shareholder is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse

21

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036654**

on its ability to perform its obligations hereunder, and the execution, delivery, and performance this Agreement has been duly authorized by all necessary corporate or partnership or company action. This Agreement constitutes the legal, valid, and binding obligation of such Shareholder, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b) <u>No Conflict or Default</u>. The execution, delivery, and performance of this Agreement and the consummation by such Shareholder of the transactions contemplated hereby (i) will not conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, or any arbitrator, applicable to such Shareholder, and (ii) will not conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, operating agreement, or other organizational documents of such Shareholder, or of any material agreement or instrument to which such Shareholder is a party or by which such Shareholder is or may be bound or to which any of its material properties or assets are or may be subject.

(c) <u>Governmental Authorizations</u>. Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by, any governmental or regulatory authority that is required in connection with the valid execution, delivery, acceptance, and performance by such Shareholder under this Agreement or the consummation by such Shareholder of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date of this Agreement.

(d) <u>Litigation</u>. There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Shareholder, threatened against or affecting such Shareholder or any of such Shareholder's properties, assets, or businesses in any court or before or by any governmental department, board, agency, instrumentality, or arbitrator which, if adversely determined, could (or in the case of an investigation could lead to any action, suit, or proceeding which, if adversely determined, could) reasonably be expected to materially impair such Shareholder's ability to perform its obligations under this Agreement.

(e) <u>Securities Representations</u>. Such Shareholder represents and agrees that Shares acquired pursuant hereto will be acquired for such Shareholder's own account, for investment, and not with a view to the distribution or resale thereof. Such Shareholder further represents that it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of acquiring the Shares. Such Shareholder understands that such Shares have not been registered under the Securities Act or any state or other securities laws, and cannot be sold, assigned, transferred, pledged or otherwise disposed of unless so registered under the Securities Act and applicable state or other securities laws or unless an exemption from the registration requirements thereof is available.

22

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                                    **ICON-032-00036655**

# A-1716

## ARTICLE X

## MISCELLANEOUS

**Section 10.01    Information.**    For so long as any Shareholder is a reporting company under the securities laws of the United States and/or Hong Kong, the Company shall provide to such Shareholder on a timely basis, in addition to the financial statements that the Company is required to deliver to the Shareholders pursuant to Section 5.01, all such information as such Shareholder determines is necessary for it to comply with its reporting obligations under such securities laws, including but not limited to financial information; provided, that any additional expense incurred by the Company or any other Shareholder in connection with or as a consequence of providing such information shall be borne by such Shareholder.  It is agreed that failure to deliver such financial statements on a timely basis shall not be considered a breach of term or condition of this Agreement, it being agreed that the Shareholders shall use reasonable efforts to replace the auditors of the Company in the event that the Board determines that any such delay has been caused by the auditors.

**Section 10.02    Notices.**    All notices, approvals, consents, requests, instructions, and other communications (collectively "***Communications***") required to be given in writing pursuant to this Agreement shall be validly given, made or served only if in writing and when delivered personally or by registered or certified mail, return receipt requested, postage prepaid, by a reputable overnight or same day courier, addressed to the Company, the Directors or the Shareholders, as the case may be, at the address(es) thereof on record at the principal office of Company.  All Communications required or permitted hereunder shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed if sent during normal business hours of the recipient, or if not during such hours, then on the next Business Day, (c) five (5) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) three (3) Business Days after deposit with FedEx or other overnight courier, specifying delivery by such date, with written verification of receipt. The designation of the Person to receive such Communication on behalf of a Shareholder or the address of any such Person for the purposes of such Communication may be changed from time time by written notice given to the Company pursuant to this Section 10.02.

**Section 10.03    Parties Bound; No Third Party Beneficiaries.**    This Agreement shall inure to the benefit of and shall be binding upon all of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties (other than to an Affiliate of a Shareholder following a Transfer permitted by Section 6.01).  No provision of this Agreement is intended to or shall be construed grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement or upon any Person other than the parties hereto.

**Section 10.04    Governing Law; Submission to Jurisdiction.**    This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of Hong Kong. Any dispute, difference or claim arising out of or in connection with this Agreement shall referred to and finally determined by arbitration in Hong Kong at Hong Kong International Arbitration Centre (the "***HKIAC***") in accordance with the UNCITRAL Arbitration Rules as at

23

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036656**

# A-1717

present in force. The language to be used in the arbitration proceedings shall be English. There shall be three arbitrators, of which one shall be appointed by the Iconix Shareholder, one shall be appointed by the LF Shareholder and one (who shall act as president of the tribunal) shall be jointly appointed by the two arbitrators appointed by the Iconix Shareholder and the LF Shareholder. The Iconix Shareholder and the LF Shareholder shall each appoint one arbitrator within 30 days of the notice of arbitration, failing which such appointment shall be made, at the request of either party, by the Chairman of the HKIAC. If the two arbitrators so appointed by the Iconix Shareholder and the LF Shareholder fail to agree upon the third arbitrator within 15 days the appointment of the second arbitrator, the third arbitrator shall be appointed by the Chairman the HKIAC upon the written request of either party. The arbitral award shall be final and on all Parties. In relation to all matters referred to arbitration by this Agreement, the right of under section 23 of the Arbitration Ordinance (Cap. 341 of the Laws of Hong Kong) and the to make an application under section 23A thereof are hereby excluded. Any costs of arbitration (including without limitation all reasonable legal costs of the winning party) shall be borne by losing party unless otherwise determined by the arbitral award. Nothing herein shall prevent a Party from seeking injunctive or other emergency relief against the other at any time in a court having competent jurisdiction.

**Section 10.05 Amendment**. No amendment, change or modification to this Agreement shall be valid unless the same is in writing and signed by all of the Shareholders.

**Section 10.06 Entire Agreement**. This Agreement and the Purchase Agreement, together with all exhibits and schedules hereto and thereto (which are deemed incorporated herein), contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof.

**Section 10.07 Confidentiality**. Subject to the requirements of applicable Law, each Shareholder shall maintain in confidence all Confidential Information (i) transferred to the Company or to the other Shareholder by reason of the transactions contemplated by this Agreement and (ii) all information received from the other Shareholder as a result of any due diligence investigation conducted relative to the execution of this Agreement and shall use such information only for the benefit of the Company and or in connection with evaluating the transactions contemplated hereby, and except in accordance with the immediately succeeding sentence, shall not disclose any such information to a third party, other than (i) to its officers, directors, employees, advisors, attorneys or accountants who need to know and who agree to such information confidential, (ii) to its actual or proposed lenders or other financing sources having been made aware of the restrictions set forth in this Section 10.07, (iii) to the extent disclosure is required by law, statute, rule, regulation or judicial process (including, but not to, applicable securities laws) or (iv) upon the lawful demand of any court or agency or regulator having jurisdiction over such Shareholder (including, but not limited to, any securities regulatory authority, including rating agencies and national securities exchanges, to which the disclosing Shareholder is subject) or make any unauthorized use thereof. The obligation of confidentiality and non-use shall not apply to any information which (A) is or becomes generally available to public through no fault of the receiving party, (B) is independently developed by the receiving party or (C) is received in good faith from a third party who is lawfully in possession of such information and has the lawful right to disclose or use it.

24

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.** **ICON-032-00036657**

# A-1718

**Section 10.08    Severability**. If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

**Section 10.09    Counterparts; Facsimile or Electronic Transmission**. This Agreement may be executed in one or more counterparts with the same effect as if all of the Shareholders had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile or Electronic Transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or Electronic Transmission shall deemed to be their original signatures for all purposes.

**Section 10.10    Construction**. Words in the singular include the plural and in the plural include the singular. The words "including," "includes," "included" and "include," when used, are deemed to be followed by the words "without limitation". Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not defined in this Agreement shall have the meanings determined by the Accounting Standards. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, all attachments thereto and instruments incorporated therein. This Agreement is the result of arms-length negotiations between the parties hereto and no provision hereof, because of any ambiguity found to be contained herein or otherwise, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of that provision. A reference to Law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any subordinate legislation for the time in force made under it.

**Section 10.11    Successors and Assigns**. This Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Shareholders and their respective successors, but neither this Agreement nor any rights, interests or obligations shall be assigned by any party hereto without the prior written consent of the other party or hereto, subject to the provisions in respect of restrictions on Transfers set forth herein.

**Section 10.12    Headings and Captions**. The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

**Section 10.13    No Waiver**. The failure of any Shareholder to insist upon strict performance of a covenant hereunder or of any obligation hereunder or to exercise any right or

25

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036658**

# A-1719

remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of Shareholder's right to demand strict compliance therewith in the future unless such waiver is in writing and signed by the Shareholder giving the same.

**Section 10.14  Additional Instruments**. Each Shareholder agrees to execute and deliver such additional agreements, certificates, and other documents and to do all such other and things as may be required by law or necessary or appropriate to carry out the intent and purposes of this Agreement.

**Section 10.15  Publicity**. The parties shall consult with each other before issuing any press release with respect to this Agreement or the transactions contemplated hereby and not issue any such press release or make any such public statement without the prior consent of other party, which shall not be unreasonably withheld, conditioned or delayed; provided, that any party may, without the prior consent of the other parties (but after prior consultation, to extent practicable in the circumstances) issue such press release or make such public statement as may upon the advice of outside counsel be required by law or the rules and regulations of the NASDAQ or the Stock Exchange of Hong Kong Limited or the rules of any other applicable exchange.

**Section 10.16  Remedies**. Except as otherwise provided herein, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every remedy under this Agreement or now or hereafter existing at law or in equity.

**Section 10.17  Specific Performance**.  Each Shareholder acknowledges and agrees that its respective remedies at law for a breach or threatened breach of any of the of this Agreement would be inadequate and, in recognition of that fact, agrees that, in the event a breach or threatened breach by a Shareholder of the provisions of this Agreement, in addition any remedies at law, the Company or any other Shareholder shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

*[Signature page follows.]*

26

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**          **ICON-032-00036659**

# A-1720

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of June ___, 2014.

LF ASIA LIMITED

By: _____
     Name:
     Title:

ICONIX BRAND GROUP, INC.

By: _____
     Name: Neil Cole
     Title: President and Chief Executive Officer

*First Amended and Restated Shareholders Agreement*
*of Iconix SE Asia Limited*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-032-00036660

# A-1721

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of June ___, 2014.

LF ASIA LIMITED

By: _____
    Name:
    Title:

ICONIX BRAND GROUP, INC.

By: _____
    Name:
    Title:

*First Amended and Restated Shareholders Agreement*
*of Iconix SE Asia Limited*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.          ICON-032-00036661

# A-1722

**Exhibit "A"**

**BRANDS**

FASHION BRANDS:
1. Badgley Mischka
2. Bongo
3. Candie's
4. Danskin / Danskin Now
5. Ecko Unltd./Marc Ecko Cut & Sew
6. Ed Hardy
7. Joe Boxer
8. Lee Cooper
9. London Fog
10. Mossimo
11. Mudd
12. OP / Ocean Pacific[1]
13. Rampage
14. Rocawear
15. Starter
16. Umbro
17. Zoo York

HOME BRANDS:
18. Cannon
19. Charisma
20. Fieldcrest
21. Royal Velvet
22. Sharper Image
23. Waverly

---

[1] Philippines only for Ocean Pacific

A-1

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.** **ICON-032-00036662**

# A-1723

**Exhibit "A-1"**

**ADDITIONAL BRANDS**

Ecko Unlimited
Zoo York
Marc Ecko Cut & Sew
Ed Hardy
Sharper Image

A-2

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**

**ICON-032-00036663**

# A-1724

## Exhibit "B"

### SHARES AND PERCENTAGE SHAREHOLDINGS
### AS OF THE INITIAL ALLOTMENT

| Shareholder | Shares | Percentage Interest |
|---|---|---|
| Iconix Brand Group, Inc. | 50 | 50% |
| LF Asia Limited | 50 | 50% |
| Total | 100 | 100% |

B-1

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.　　　　　ICON-032-00036664

**A-1725**

**Exhibit "C"**

**FORM OF DEED OF ADHERENCE**

The undersigned is executing and delivering this Deed of Adherence (this "**Deed**") pursuant to the Shareholders Agreement of Iconix SE Asia Limited dated as of September 30, 2013 (as amended on June 30, 2014) and as the same may hereafter be amended, amended and restated, supplemented or otherwise modified, the "*Agreement*").

Capitalized terms used in this Deed which are not defined herein shall have the respective meanings given to them in the Agreement.

Now this Deed witnesses as follows:

1. The undersigned, pursuant to Section 6.03 of the Agreement, undertakes to and covenants with and for the benefit of all the parties to the Agreement and for the benefit of any other person who becomes a party to the Agreement after the date of this Deed to comply with the provisions of and perform all of the obligations in the Agreement as if the undersigned had been a party to the Agreement as [*state capacity*], except to the extent that those obligations have already been performed.

2. The undersigned agrees to hold the Shares [transferred][issued] to [it]/[him] with the benefit of the rights, and subject to the restrictions, set out in the Agreement and the articles of association of the Company and consents to [its]/[his] name being entered in the register of Shareholders of Company as the holder of the Shares acquired.

3. The undersigned confirms that [it]/[he] has been given and has read a copy of the Agreement and all documents in the agreed form.

4. The undersigned hereby irrevocably appoints [      ] of [      ], fax: [      ] as its agent to receive on its behalf in Hong Kong service of any proceedings arising out of or in connection with the Agreement. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by the undersigned).

5. This Deed and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with Hong Kong law.

**IN WITNESS** of which the undersigned has executed this document as a deed and delivered it on the _____ day of _____, _____.

[*insert appropriate signature provisions*]

C-1

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.  ICON-032-00036665

# A-1726

### Exhibit "D"

### TAX ALLOCATIONS

Additional Provisions Applicable for U.S. Federal Income Tax Purposes

1.      Defined Terms.

1.1      "*Capital Account*" means with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 2 of this **Exhibit "D"** below and in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv).

1.2      "*Capital Contribution*" means, with respect to a Partner, a contribution of cash or property to the Company pursuant to this Agreement.

1.3      "*Code*" means the United States Internal Revenue Code of 1986, as amended and as hereafter amended, or any successor law.

1.4      "*Fiscal Year*" means the calendar year unless otherwise required by the Code.

1.5      "*Gross Asset Value*" means, with respect to any property of the Partnership other than money, such property's adjusted basis for U.S. federal income tax purposes, except that the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Tax Matters Partner considers appropriate, whenever such adjustment is permitted under Regulations Section 1.704-1(b)(2)(ii).

1.6      "*Interest*" means the Percentage Shareholding of a Shareholder in the Company.

1.7      "*Net Profits*" and "*Net Losses*" means, with respect to any Fiscal Year or other relevant period of calculation, any taxable income or taxable loss of the Partnership for such Fiscal Year or other period, with the following adjustments:

1.7.1.   any income that is exempt from U.S. federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be added to such taxable income or loss;

1.7.2   any expenditures described in Code Section 705(a)(2)(B) (or treated as expenditures described in Code Section 705(a)(2)(B) pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be subtracted from such taxable income or loss;

D-1

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-032-00036666

1.7.3     in the event the Gross Asset Value of any Partnership property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property for purposes of computing Net Profits or Net Losses;

1.7.4     gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

1.7.5     in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, cost recovery or amortization computed in accordance with Regulations Section 1.704-1(b)(2)(iv)*(g)(3)*; and

1.7.6     any other provisions or items which are specifically allocated pursuant to Sections 3.2 or 3.3 hereof shall not be taken into account in computing Net Profits or Net Loss.

1.8     "***Partner***" means any Shareholder of the Company.

1.9     "***Partnership***" means the Company.

1.10     "***Regulations***" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

2.     <u>Capital Accounts</u>.

2.1     Each Partner's Capital Account shall have an initial balance equal to the fair market value of such Partner's initial Capital Contribution to the Partnership.

2.2.     Each Partner's Capital Account shall be increased by the sum of:

2.2.1     the amount of cash and the fair market value of any other property (net of liabilities that the Partnership is considered to assume or take subject to) constituting additional contributions by such Partner to the capital of the Partnership,

2.2.2     the portion of any Net Profits and other income or gain items allocated to such Partner's Capital Account.

2.3     Each Partner's Capital Account shall be decreased by the sum of:

2.3.1     the amount of cash and the fair market value of any other property (net of liabilities that such Partner is considered to assume or take subject to) distributed by the Partnership to such Partner; plus

D-2

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**        **ICON-032-00036667**

# A-1728

2.3.2 the portion of any Net Losses and other expense, loss or deduction items allocated to such Partner's Capital Account.

3. <u>Allocation of Net Profits and Net Losses</u>.

3.1 The Net Profits and Net Losses of the Partnership for each Fiscal Year or other relevant period of calculation, as determined by the Board in accordance with the provisions hereof, shall be allocated among the Partners in accordance with their respective Interests, such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the amount that each Partner would receive if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with this Agreement to the Partners immediately after making such allocation.

3.2 In the event any Partner has a deficit adjusted Capital Account balance at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Partner is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Partner shall be specially allocated items of income and gain in the amount of such excess as quickly as possible; <u>provided</u>, that an allocation pursuant to this Section 3.2 shall be made only if and to the extent that a Partner would have a deficit adjusted Capital Account balance in excess of such sum after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.2 were not in this Schedule to this Agreement.

3.3 Any special allocations of items of income, gain, loss or deduction pursuant to Section 3.2 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount of any items so allocated and all other items allocated to each Partner shall, to the extent possible, be equal to the net amount that would have been allocated to each Partner if the special allocations under Section 3.2 had not occurred.

3.4 The Board is authorized to adjust the allocations hereunder if it considers an adjustment is necessary to:

3.4.1 carry out the intentions of this Agreement; or

3.4.2 to maintain substantial economic effect or otherwise comply with the requirements of Section 704(b) of the Code and the Regulations

D-3

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036668**

3.5    Notwithstanding Section 3.1, in any year in which the Partnership sells substantially all of its assets or liquidates, each Partner shall be allocated Net Profits or Net Losses (or items thereof) to the extent necessary to cause its Capital Account balance to reflect the amount that will be distributable to such Partner in liquidation of the Partnership pursuant to this Agreement.

4.    Tax Allocation.

For Tax Purposes, items of Partnership income, gain, loss, deduction and credit for each Fiscal Year shall be allocated to and among the Parties in the same manner as the corresponding items of Net Profits and Net Losses and specially allocated items are allocated to them pursuant to Section 3 hereof, taking into account any variation between the adjusted tax basis and book value of the Partnership property in accordance with the principles of Code Section 704(c). The Board shall be authorized to make appropriate adjustments to the allocations of items to comply with Code Section 704 or applicable Regulations thereunder.

5.    Tax Matters Partner; Elections; Treatment as Partnership.

The initial Tax Matters Partner shall be Iconix. Subject to Section 5.04 of this Agreement, the Tax Matters Partner is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities.

6.    Liquidation of the Partnership; No Capital Account Makeup.

6.1    After all liabilities of the Partnership have been satisfied or duly provided for, the remaining assets of the Partnership shall be applied and distributed to the Partners in accordance with this Agreement.

6.2    Notwithstanding anything to the contrary herein, no Partner shall be obligated to restore to the capital of the Partnership any deficit balance in its Capital Account.

D-4

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.    ICON-032-00036669

# A-1730

## Exhibit "E"

## DEFINITION OF "EUROPE"

Albania
Andorra
Austria
Belarus
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
Former Yugoslav Republic of Macedonia
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Moldova
Monaco
Montenegro
Netherlands
Norway
Poland .
Portugal
Romania
Russia
San Marino
Serbia
Slovakia
Slovenia
Spain

E-1

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**            **ICON-032-00036670**

**A-1731**

Sweden
Switzerland
Ukraine
Uzbekistan
United Kingdom (including for the avoidance of doubt the Crown Dependencies of Jersey, Guernsey and the Isle of Man)
Vatican City State

E-2

33753303.5

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.                    ICON-032-00036671

# A-1732

### Exhibit "F"

### PARTIAL EXERCISE PLAN

As soon as possible following a Partial Exercise, the Iconix Shareholder and the LF Shareholder shall:-

1.    identify and agree changes to the Master License Agreement which are necessary to remove from the Master License Agreement the Europe Rights, the Existing Rights and/or the Korea Rights, which are the subject of the relevant Partial Exercise, and any obligations with respect thereto;

2.    either consent to (as Shareholders) or procure that the Directors nominated by them consent to (i) amendments the Master License Agreement to give effect to the changes agreed contemplated by paragraph 1. of this Exhibit "F" for the purposes of Section 4.06(a)(xix) and (ii) any other matters in respect of which consent is required under this Agreement in order to give effect to the Partial Exercise Plan and closing of the Partial Exercise;

3.    identify and agree which contracts and other arrangements entered into between the Company and third parties and which relate to the Europe Rights, the Existing Rights and/or the Korea Rights which are the subject of the Partial Exercise are to be assigned by the Company to the Iconix Shareholder, to the effect that all rights and obligations (including, without limitation, to receive revenue and to pay costs) are to be so assigned with effect from the closing date applicable to the relevant Partial Exercise;

4.    agree that to the extent that any revenue or costs which ought to be for the account of the Iconix Shareholder (on the one hand) or the Company or any Subsidiary of the Company (on the other hand) but were in fact collected by or borne by the incorrect party, then the Iconix Shareholder and the Company (or its relevant Subsidiary) will promptly reimburse the other accordingly.

5.    as regards the negotiation of any documents which need to occur as part of the Partial Exercise Plan, the Iconix Shareholder will negotiate and agree on the part of the Iconix Shareholder and its Affiliates, and the LF Shareholder will negotiate and agree on the part of the Company and any Subsidiary of the Company.

F-1

33753303.5

**FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.**                    **ICON-032-00036672**

# A-1733



To:    LF Asia Limited
11th Floor, LiFung Tower,
888 Cheung Sha Wan Road,
Kowloon,
Hong Kong

Date:  30 June 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks**

Reference is hereby made to (a) the Amendment No. 1 to the Master License Agreement (the "***Master License Agreement Amendment***") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("***Iconix***"), certain of Iconix's wholly owned subsidiaries ("***Licensors***") and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("***Licensee***"), amending the Master License Agreement (the "***Existing Master License Agreement***"), effective as of September 30, 2013, by and among Iconix, Licensors and Licensee, and (b) the First Amended and Restated Shareholders Agreement of Iconix SE Asia Limited (the "***First Amended and Restated Shareholders Agreement***" and, together with the Master License Agreement Amendment, the "***SEA JV Amendments***") to be entered into as of the date hereof by and between Iconix and LF Asia Limited ("***LF***"), amending the Shareholders Agreement of Lion Network Limited (the "***Existing Shareholders Agreement***"), effective as of September 30, 2013, by and between Iconix and LF. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Existing Master License Agreement as amended by the Master License Agreement Amendment (or if not therein defined, in the First Amended and Restated Shareholders Agreement), as applicable.

Iconix and LF acknowledge and agree that the right to use certain trademark registrations or applications owned by Licensors in the Republic of Korea, Europe or Turkey granted by Licensors to Licensee pursuant to the SEA JV Amendments (the "***Additional Marks***") is deemed to have a fair market value of US$31,835,000, and that because Iconix and LF each own 50% of Licensee, LF's ownership of 50% of Licensee will provide LF a benefit equal to 50% of such fair market value, or US$15,917,500.

In order to compensate Iconix for the transfer of 50% of the fair market value of the Additional Marks to LF (through LF's 50% shareholding in Licensee) pursuant to the SEA JV Amendments, Iconix and LF hereby agree that LF shall pay Iconix US$15,917,500 (the "***Additional Marks Consideration***"), which amount Iconix and LF shall treat for all U.S. tax purposes as paid by LF to Iconix in exchange for 50% of the Additional Marks, following which each of Iconix and LF shall be treated for U.S. tax purposes as contributing its respective share of the Additional Marks to the Licensee.

LF shall pay the Additional Marks Consideration to Iconix as follows, in each case by wire transfer in immediately available funds:

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.    ICON-032-00036673

# A-1734

(a)    US$3,979,375 on the date hereof;

(b)    US$3,979,375 on the first (1st) anniversary of the date of this letter;

(c)    US$3,979,375 on the second (2nd) anniversary of the date of this letter; and

(d)    US$3,979,375 on the third (3rd) anniversary of the date of this letter.

Iconix hereby agrees that the distributions by Licensee to the LF Shareholder pursuant to the First Amended and Restated Shareholders Agreement in respect of the New Licensed Brands in the New Territory shall be (a) for fiscal year 2014, at least US$1,500,000 (the "*2014 Minimum Distribution Amount*") and (b) for fiscal year 2015, at least $1,000,000 (the "*2015 Minimum Distribution Amount*" and, together with the 2014 Minimum Distribution Amount, the "*Minimum Distribution Amounts*"); provided that, if the LF Shareholder's share of Licensee's distributable amounts in respect of 2014 or 2015 is less than the Minimum Distribution Amount for such year, then the deficit (the "*Deficit*") shall be paid to the LF Shareholder by Licensee out of the distributions otherwise payable to the Iconix Shareholder for such year; provided further that, if Licensee's distributable amounts in respect of 2014 or 2015 are not sufficient to make a distribution to the LF Shareholder that is equal to or greater than the Deficit for such year, then Iconix shall pay such Deficit to the LF Shareholder in cash.

To the extent the transactions contemplated in this letter agreement result in the assessment of any tax (such tax, if any, the "*Korean Withholding Tax*") by the applicable tax authority in the Republic of Korea (the "*Korean Tax Authority*"), Iconix and LF agree that LF shall (a) withhold from the relevant payment of Additional Marks Consideration an amount equal to the Korean Withholding Tax, (b) appoint a tax administrator necessary for the payment of the Korean Withholding Tax to the Korean Tax Authority, the costs of which appointment shall be borne entirely by LF and shall not be withheld from the Additional Marks Consideration, (c) pay or cause to be paid the Korean Withholding Tax to the Korean Tax Authority, and (d) within ten (10) days of the payment of the Korean Withholding Tax in foregoing clause (c), submit to Iconix evidence of such payment in form satisfactory to Iconix in its sole discretion. All amounts properly withheld as Korean Withholding Tax and paid (or caused to be paid) to the Korean Tax Authority by LF pursuant to this paragraph shall be treated as amounts paid to Iconix as Additional Marks Consideration for U.S. tax purposes.

This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV Amendments, the Existing Master License Agreement, the Existing Shareholders Agreement and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

*[Signature page follows.]*

Page 2

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.    ICON-032-00036674

# A-1735

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

For and on behalf of
Iconix Brand Group, Inc.
By: Neil Cole
Title: Chief Executive Officer

Acknowledged and agreed:

For and on behalf of
LF Asia Limited

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-032-00036675

# A-1736

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

_____

For and on behalf of
Iconix Brand Group, Inc.

Acknowledged and agreed:

_____

For and on behalf of
LF Asia Limited
by Jason Rabin

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of Additional Marks*

FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-032-00036676

# A-1737

To:   Global Brands Group Asia Limited
      f/k/a LF Asia Limited
      9th Floor, LiFung Tower,
      888 Cheung Sha Wan Road,
      Kowloon,
      Hong Kong

Date:  17 September 2014

Dear Sirs,

**Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks**

Reference is hereby made to (a) the Amendment No. 2 to the Master License Agreement (the "*Master License Agreement Amendment*") to be entered into as of the date hereof by and among Iconix Brand Group, Inc. ("*Iconix*"), certain of Iconix's wholly owned subsidiaries ("*Licensors*"), and Iconix SE Asia Limited (f/k/a Lion Network Limited) ("*Licensee*"), amending the Master License Agreement (as amended by Amendment No. 1 to Master License Agreement, effective as of June 30, 2014, the "*Existing Master License Agreement*"), by and among Iconix, Licensors and Licensee, and (b) the Second Amended and Restated Shareholders Agreement of Iconix SE Asia Limited (the "*Second Amended and Restated Shareholders Agreement*" and, together with the Master License Agreement Amendment, the "*SEA JV Amendments*") to be entered into as of the date hereof by and between Iconix and Global Brands Group Asia Limited, f/k/a LF Asia Limited ("*GBG*"), amending the First Amended and Restated Shareholders Agreement of Lion Network Limited (the "*Existing Shareholders Agreement*"), effective as of June 30, 2014, by and between Iconix and GBG. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Existing Master License Agreement as amended by the Master License Agreement Amendment (or if not therein defined, in the Second Amended and Restated Shareholders Agreement), as applicable.

Iconix and GBG acknowledge and agree that the right to use certain trademark registrations or applications owned by Iconix Luxembourg Holdings S.ar.l. ("*Iconix Luxembourg*") and Red Diamond Holdings S.ar.l. ("*Red Diamond*" and, together with Iconix Luxembourg, the "*CHMT Marks Licensors*") in the People's Republic of China, the Hong Kong Special Administrative Region of the People's Republic of China, the Macau Special Administrative Region of the People's Republic of China, and the Republic of China (the "*CHMT Territory*") granted by Licensors to Licensee pursuant to the SEA JV Amendments (the "*CHMT Marks*") is deemed to have a fair market value of US$43,000,000, and that because Iconix and GBG each own 50% of Licensee, GBG's ownership of 50% of Licensee will provide GBG a benefit equal to 50% of such fair market value, or US$21,500,000.

In order to compensate the CHMT Marks Licensors for the transfer of 50% of the fair market value of the CHMT Marks to GBG (through GBG's 50% shareholding in Licensee) pursuant to the SEA JV Amendments, the CHMT Marks Licensors and GBG hereby agree that GBG shall pay US$21,500,000 (the "*CHMT Marks Consideration*"), of which US$17,000,000 shall be payable to Iconix Luxembourg and US$4,500,000 shall be payable to



CONFIDENTIAL

GBG0235409

# A-1738

Red Diamond, and which amount the CHMT Marks Licensors and GBG shall treat for all U.S. and Luxembourg tax purposes as paid by GBG to the CHMT Marks Licensors in exchange for 50% of the CHMT Marks, following which each of the CHMT Marks Licensors and GBG shall be treated for U.S. and Luxembourg tax purposes as contributing its respective share of the CHMT Marks to the Licensee.

GBG shall pay the CHMT Marks Consideration to the CHMT Marks Licensors as follows, in each case by wire transfer in immediately available funds:

(a)     US$4,300,000 on the date hereof;

(b)     US$1,300,000 on December 13, 2014;

(c)     US$1,100,000 on March 31, 2015;

(d)     US$1,100,000 on June 30, 2015;

(e)     US$4,300,000 on the first (1st) anniversary of the date of this letter;

(f)     US$3,200,000 on the second (2nd) anniversary of the date of this letter;

(g)     US$3,100,000 on the third (3rd) anniversary of the date of this letter; and

(h)     US$3,100,000 on the fourth (4th) anniversary of the date of this letter.

Iconix hereby agrees that the distributions by Licensee to the GBG Shareholder pursuant to the Second Amended and Restated Shareholders Agreement (a) in respect of the CHMT Marks in the CHMT Territory shall be (i) for fiscal year 2014, at least US$2,000,000 (the "*2014 Minimum Distribution Amount*") and (ii) for fiscal year 2015, at least $2,500,000 (the "*2015 Minimum Distribution Amount*", and (b) in respect of the CHMT Marks licensed to the Licensee by Red Diamond in the CHMT Territory shall be (i) for fiscal year 2016, at least US$300,000 (the "*2016 Minimum Distribution Amount*") and (ii) for fiscal year 2017, at least US$335,000 (the "*2017 Minimum Distribution Amount*") (and, together with the 2014 Minimum Distribution Amount, the 2015 Minimum Distribution Amount and the 2016 Minimum Distribution Amount, the "*Minimum Distribution Amounts*"); provided that, if the GBG Shareholder's share of Licensee's distributable amounts in respect of 2014, 2015, 2016 or 2017 is less than the Minimum Distribution Amount for such year, then the deficit (the "*Deficit*") shall be paid to the GBG Shareholder by Licensee out of the distributions otherwise payable to the Iconix Shareholder for such year; provided further that, if Licensee's distributable amounts in respect of 2014, 2015, 2016 or 2017 are not sufficient to make a distribution to the GBG Shareholder that is equal to or greater than the Deficit for such year, then Iconix Luxembourg and Red Diamond shall pay such Deficit to the GBG Shareholder in cash.

This letter agreement and the agreements referred to herein, including, but not limited to, the SEA JV Amendments, the Existing Master License Agreement, the Existing Shareholders Agreement and any other agreements referred to therein or exhibits or schedules annexed thereto, constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

Page 2

CONFIDENTIAL

GBG0235410

**A-1739**

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

[*Signature page follows.*]

Page 3

CONFIDENTIAL

GBG0235411

# A-1740

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

For and on behalf of
RED DIAMOND HOLDINGS SÀRL

For and on behalf of
RED DIAMOND HOLDINGS SÀRL

For and on behalf of
ICONIX BRAND GROUP, INC.

Acknowledged and agreed:

For and on behalf of
GLOBAL BRANDS GROUP ASIA LIMITED, f/k/a
LF ASIA LIMITED

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks*

CONFIDENTIAL

GBG0235412

# A-1741

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

For and on behalf of
RED DIAMOND HOLDINGS SÀRL

For and on behalf of
RED DIAMOND HOLDINGS SÀRL

For and on behalf of
ICONIX BRAND GROUP, INC.

Acknowledged and agreed:

For and on behalf of
GLOBAL BRANDS GROUP ASIA LIMITED, f/k/a
LF ASIA LIMITED

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks*

CONFIDENTIAL

GBG0235413

# A-1742

Please confirm your further agreement as provided for in this letter agreement by signing and returning a copy of this letter to us.

Yours faithfully,

_____
For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
ICONIX LUXEMBOURG HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
RED DIAMOND HOLDINGS SÀRL

_____
For and on behalf of
ICONIX BRAND GROUP, INC.

Acknowledged and agreed:

_____
For and on behalf of
GLOBAL BRANDS GROUP ASIA LIMITED, f/k/a
LF ASIA LIMITED

*Letter Agreement*
*Re: Acknowledgement and Payment of Consideration for 50% Share of CHMT Marks*

CONFIDENTIAL

GBG0235414

**A-1743**

# ICONIX SE ASIA LIMITED
# SECOND AMENDED AND RESTATED
# SHAREHOLDERS AGREEMENT

Amended and restated on September 17, 2014

THE SHARES REFERRED TO IN THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS. ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

33753303.5
101780528.12



CONFIDENTIAL

GBG0235415

**A-1744**

TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS; OPERATION OF COMPANY ..................................................... 1
    Section 1.01    Definitions ........................................................................................ 1
    Section 1.02    Incorporation; Name ....................................................................... 8
    Section 1.03    Registered Office; Principal Office ................................................. 8
    Section 1.04    Business Purpose ............................................................................ 8
    Section 1.05    Shareholders ................................................................................... 8
    Section 1.06    No Personal Liability ...................................................................... 8

ARTICLE II SHAREHOLDINGS AND CAPITAL STRUCTURE ............................................. 9
    Section 2.01    Capital Structure ............................................................................ 9
    Section 2.02    Loans ............................................................................................. 9

ARTICLE III DISTRIBUTIONS ....................................................................................... 10
    Section 3.01    Distributions ................................................................................. 10
    Section 3.02    Tax Distributions .......................................................................... 10

ARTICLE IV MANAGEMENT OF COMPANY ................................................................. 11
    Section 4.01    General Provisions Concerning Management ............................... 11
    Section 4.02    Appointment of Directors ............................................................ 11
    Section 4.03    Resignation and Removal of Directors ........................................ 11
    Section 4.04    Administrative Manager ............................................................... 11
    Section 4.05    Local Manager .............................................................................. 11
    Section 4.06    Actions Requiring Unanimous Consent of all the Directors ....... 11
    Section 4.07    Shareholder Approval ................................................................... 14
    Section 4.08    Officers ......................................................................................... 15
    Section 4.09    Board Meetings; Written Resolutions .......................................... 16
    Section 4.10    Quorum; Voting ............................................................................ 16
    Section 4.11    Company Minutes ........................................................................ 16

ARTICLE V BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND
MATTERS ................................................................................................................... 17
    Section 5.01    Books and Records ....................................................................... 17
    Section 5.02    Fiscal Year ................................................................................... 17
    Section 5.03    Company Accounts ....................................................................... 17
    Section 5.04    Classification as a Partnership; Tax Decisions ............................ 18

ARTICLE VI TRANSFERS ............................................................................................ 18
    Section 6.01    Transfers ....................................................................................... 18
    Section 6.02    Share Certificates ......................................................................... 19
    Section 6.03    Registration as a Shareholder ...................................................... 19
    Section 6.04    Put and Call Options .................................................................... 20

-i-

101780528.12

CONFIDENTIAL

GBG0235416

# A-1745

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| **ARTICLE VII TERMINATION AND LIQUIDATION** | | 23 |
| Section 7.01 | Termination | 23 |
| Section 7.02 | Effect of Termination. | 23 |
| Section 7.03 | Winding Up | 24 |
| **ARTICLE VIII INDEMNIFICATION** | | 24 |
| Section 8.01 | Insurance | 24 |
| **ARTICLE IX REPRESENTATIONS** | | 24 |
| Section 9.01 | General | 24 |
| **ARTICLE X MISCELLANEOUS** | | 25 |
| SECTION 10.01 | Information | 25 |
| SECTION 10.02 | Notices | 26 |
| SECTION 10.03 | Parties Bound; No Third Party Beneficiaries | 26 |
| SECTION 10.04 | Governing Law; Submission to Jurisdiction | 26 |
| SECTION 10.05 | Amendment | 27 |
| Section 10.06 | Entire Agreement | 27 |
| Section 10.07 | Confidentiality | 27 |
| SECTION 10.08 | Severability | 27 |
| SECTION 10.09 | Counterparts; Facsimile or Electronic Transmission | 28 |
| SECTION 10.10 | Construction | 28 |
| SECTION 10.11 | Successors and Assigns | 28 |
| SECTION 10.12 | Headings and Captions | 28 |
| SECTION 10.13 | No Waiver | 28 |
| SECTION 10.14 | Additional Instruments | 28 |
| SECTION 10.15 | Publicity | 29 |
| SECTION 10.16 | Remedies | 29 |
| Section 10.17 | Specific Performance | 29 |

## EXHIBITS

| | |
|---|---|
| Exhibit "A" | BRANDS |
| Exhibit "B" | SHARES AND PERCENTAGE SHAREHOLDINGS |
| Exhibit "C" | FORM OF DEED OF ADHERENCE |
| Exhibit "D" | TAX ALLOCATIONS |
| Exhibit "E" | Definition of "Europe" |
| Exhibit "F" | Partial Exercise Plan |

101780528.12

CONFIDENTIAL

GBG0235417

# A-1746

### ICONIX SE ASIA LIMITED
### SECOND AMENDED AND RESTATED
### SHAREHOLDERS AGREEMENT

This SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT of Iconix SE Asia Limited (formerly known as Lion Network Limited), a company incorporated with limited liability in Hong Kong with company number 1965473 (the "*Company*"), originally effective as of September 30, 2013 (the "*Effective Date*"), as amended and restated effective as of June 30, 2014, and as further amended and restated effective as of September 17, 2014 (the "*Second Amendment Effective Date*"), by and between Global Brands Group Asia Limited, f/k/a LF Asia Limited, a Hong Kong limited liability company ("*GBG*"), and Iconix Brand Group, Inc., a Delaware corporation ("*Iconix*").

### RECITALS:

Iconix has caused the incorporation of the Company on September 10, 2013.

Iconix and GBG entered into that certain Share Purchase Agreement pursuant to which GBG purchased from Iconix one (1) Share in the Company, representing fifty percent (50%) of the issued share capital of the Company (such Share Purchase Agreement, as may be amended or modified from time to time, the "*Purchase Agreement*").

Iconix and GBG were subsequently each allotted 49 Shares, giving them each 50 shares in total (being 50% of the Shares in the Company) ("*Initial Allotment*").

In connection with Iconix and GBG's entry into the Purchase Agreement and the Initial Allotment, Iconix and GBG entered into that certain Shareholders Agreement of Lion Network Limited, effective as of September 30, 2013, as amended and restated effective as of June 30, 2014 (the "*Previous Shareholders Agreement*") to reflect the respective rights, duties and obligations of the Shareholders with respect to the Company.

The parties hereto wish to amend and restate the Previous Shareholders Agreement to reflect the changes to the respective rights, duties and obligations of the Shareholders with respect to the Company in connection with the transactions contemplated pursuant to (a) that certain Amendment No. 2 to the Master License Agreement, effective as of September 17, 2014, by and among Iconix and the other Licensors named therein, and the Company and (b) that certain letter agreement by and between Iconix and GBG, effective as of September 17, 2014.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

### ARTICLE I

### DEFINED TERMS; OPERATION OF COMPANY

**Section 1.01** **Definitions**. Within the context of this Agreement, the following terms shall have the following meanings:

101780528.12

GBG0235418

"*Accounting Standards*" has the meaning set forth in Section 5.01.

"*Adjusted CHMT Purchase Price*" has the meaning set forth in Section 6.04(b)(iii)

"*Administrative Manager*" has the meaning set forth in Section 4.04.

"*Administrative Services Agreement*" means the Administrative Manager Services Agreement dated as of the date hereof by and between the Company and Iconix, as the same may be amended from time to time.

"*Affiliate*" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, "control," "controlling," "controlled by" or "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Equity Securities, by Contract or otherwise.

"*Agreed Value*" has the meaning set forth in Section 6.04(b).

"*Agreement*" means this Second Amended and Restated Shareholders Agreement, effective as of September 17, 2014, amending and restating the Previous Shareholders Agreement, and as the same may be amended from time to time.

"*All Rights*" means, together, all of the Europe Rights, the Existing Rights, the Korea Rights, and the CHMT Rights.

"*Board*" means the board of directors of the Company as it is constituted at the relevant time.

"*Brands*" means, collectively, the Existing Brands (with respect to the Existing Territory), the Expanded Brands (with respect to the Expanded Territory), the New Licensed Brands (with respect to the New Territory), and the CHMT Brands (with respect to the CHMT Territory).

"*Business*" means (i) all consumer products including but not limited to the fashion, jewelry, eyewear, footwear, apparel, swimwear, outerwear, small leather goods and accessories, watches, food, fast moving consumer goods, home, fragrance and beauty lines of business and all accessories associated with all such lines of business, (ii) all lines of business reasonably related or ancillary thereto (including the establishment and operation of retail stores), and (iii) any other line of business approved by the Shareholders.

"*Business Day*" means a day, other than a Saturday or a Sunday, on which banks are open for business in each and all of the State of New York (United States of America) and Hong Kong.

"*Change of Control*" means (i) a change of control (including but not limited to by way of merger, consolidation or transfer of Equity Securities) of an entity, (ii) the direct or indirect sale by an entity of all or substantially all of its assets or (iii) any Person or group of Persons (other an Affiliate of such entity) becoming the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the outstanding Equity Securities of an entity.

2

101780528.12

CONFIDENTIAL                                                                           GBG0235419

# A-1748

"*CHMT Brands*" means the brand names, logos and word phrases listed in **Exhibit "A-2"** and any other brand names, logos and word phrases which the Company hereafter uses in the CHMT Territory in connection with the Business as approved by the Board.

"*CHMT Five-Year Call*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Call Notice*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Call Purchase Price*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put/Call*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put/Call Notice*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put/Call Purchase Price*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put/Call Rights*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put Notice*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Five-Year Put Purchase Price*" has the meaning set forth in Section 6.04(b)(ii).

"*CHMT Put/Call Distribution*" has the meaning set forth in Section 3.01(b).

"*CHMT Rights*" means the rights granted to the Company under the Master License Agreement in respect of the CHMT Brands in the CHMT Territory.

"*CHMT Territory*" means the People's Republic of China, Hong Kong, Macau and Taiwan.

"*Communications*" has the meaning set forth in Section 10.02.

"*Companies Ordinance*" means the Companies Ordinance, chapter 622 of the laws of Hong Kong (and, to the extent it was relevant prior to 3 March 2014, the Companies Ordinance, chapter 32 of the laws of Hong Kong).

"*Company*" has the meaning set forth in the Preamble.

"*Company Account*" has the meaning set forth in Section 5.03.

"*Confidential Information*" means all confidential or proprietary information, knowledge, systems or data relating to the business, assets, prospects, operations, finances, policies, strategies, intentions or inventions of the Company or any of its Subsidiaries (including any of the terms of this Agreement) from whatever source obtained, subject to the terms of this Agreement.

3

101780528.12

CONFIDENTIAL

GBG0235420

# A-1749

"***Contract***" means any agreement, bond, commitment, contract, franchise, indemnity, indenture, lease, license, purchase order or other instrument of any kind, whether oral or written.

"***Deed of Adherence***" has the meaning set forth in Section 6.03.

"***Designated Costs***" has the meaning set forth in Section 4.06(a)(i).

"***Directors***" has the meaning set forth in Section 4.02.

"***Dividend Policy***" has the meaning set forth in Section 3.01(a).

"***Effective Date***" has the meaning set forth in the Preamble.

"***Electronic Transmission***" means any form of communication, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

"***Equity Securities***" means any share, any partnership interest, any limited liability company interest and any other ownership interest in an entity, including any options or warrants to purchase the foregoing and other securities convertible, exchangeable or exercisable into the foregoing.

"***Europe***" means, collectively, the countries listed on **Exhibit "E"**.

"***Europe Rights***" means the rights granted to the Company under the Master License Agreement in respect of the New Licensed Brands in the New Territory.

"***Existing Brands***" means the brand names, logos and word phrases listed in **Exhibit "A"** and any other brand names, logos and word phrases which the Company hereafter uses in the Existing Territory in connection with the Business as approved by the Board.

"***Existing Rights***" means the rights granted to the Company under the Master License Agreement in respect of the Existing Brands in the Existing Territory.

"***Existing Territory***" means Indonesia, Thailand, Malaysia, Philippines, Singapore, Vietnam, Cambodia, Laos, Brunei, Myanmar and East Timor.

"***Expanded Brands***" means the brand names, logos and word phrases listed in **Exhibit "A"** other than OP/Ocean Pacific and Umbro, and any other brand names, logos and word phrases which the Company hereafter uses in the Expanded Territory in connection with the Business as approved by the Board.

"***Expanded Territory***" means the Republic of Korea.

"***Five-Year Call***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Call Notice***" has the meaning set forth in Section 6.04(b)(i).

4

101780528.12

CONFIDENTIAL

GBG0235421

# A-1750

"***Five-Year Call Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put/Call Rights***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put Notice***" has the meaning set forth in Section 6.04(b)(i).

"***Five-Year Put Purchase Price***" has the meaning set forth in Section 6.04(b)(i).

"***Fully Exercised***" means one or more exercises of the Five-Year Put/Call, together with the exercise of the CHMT Five-Year Put/Call, which result in the acquisition by the Iconix Shareholder of All Rights, and "***Full Exercise***" shall be construed accordingly. In the case of a Full Exercise, the GBG Shareholder shall sell all of its Shares in the Company to the Iconix Shareholder and closing thereof shall take place in accordance with the provisions of Section 6.04(e).

"***GBG***" has the meaning set forth in the Preamble.

"***GBG Directors***" has the meaning set forth in Section 4.02.

"***GBG Shareholder***" means GBG, together with its Transferees, if any.

"***Governmental Authority***" means any federal, state, local, municipal or foreign governmental authority, quasi-governmental authority (including any trademark registry or office or other governmental agency, commission, public authority, branch, department or official, and any court or other tribunal) or body exercising, or entitled to exercise, any governmentally derived administrative, executive, judicial, legislative, police, regulatory or taxing authority, or any self-regulatory organization, administrative or regulatory agency, commission, tribunal or authority.

"***HKIAC***" has the meaning set forth in Section 10.04.

"***Hong Kong***" means the Hong Kong Special Administrative Region of the People's Republic of China.

"***Iconix***" has the meaning set forth in the Preamble.

"***Iconix Directors***" has the meaning set forth in Section 4.02.

"***Iconix Luxembourg***" means Iconix Luxembourg Holdings S.ar.l.

"***Iconix Shareholder***" means Iconix, together with its Transferees, if any.

5

GBG0235422

# A-1751

"*Korea Rights*" means the rights granted to the Company under the Master License Agreement in respect of the Expanded Brands in the Expanded Territory.

"*Law*" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or order of any Governmental Authority.

"*Local Manager*" has the meaning set forth in Section 4.05.

"*Local Services Agreement*" means the Local Manager Services Agreement dated as of the date hereof by and between the Company and GBG, as the same may be amended from time to time.

"*Macau*" means the Macau Special Administrative Region of the People's Republic of China.

"*Master License Agreement*" means the Master License Agreement, effective as of September 30, 2013, by and among the Company, Iconix and the Licensors (as defined therein), as amended by Amendment No. 1 to Master License Agreement, effective as of June 30, 2014, as further amended by Amendment No. 2 to Master License Agreement, effective as of September 17, 2014 and as the same may be amended from time to time.

"*New Licensed Brands*" means the brand names, logos and word phrases listed in **Exhibit "A-1"** and any other brand names, logos and word phrases which the Company hereafter uses in the New Territory in connection with the Business as approved by the Board.

"*New Territory*" means Europe and Turkey.

"*Other License Agreement*" means any license or similar agreement by and between the Company or one of its Subsidiaries and another Person granting such Person rights to use the Brands in the Territory.

"*Partial Exercise*" means an exercise of the Five-Year Put/Call and/or the CHMT Five-Year Put/Call which does not result in a Full Exercise. In the case of a Partial Exercise, the Company shall relinquish whichever is relevant of the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights in favour of the Iconix Shareholder through amendment to the Master License Agreement, and closing thereof shall take place in accordance with the provisions of Section 6.04(d) and notwithstanding that such transaction is between the Company and the Iconix Shareholder, the Five-Year Put/Call Price and/or the CHMT Five-Year Put/Call Price in the case of a Partial Exercise will be paid by the Iconix Shareholder to the GBG Shareholder pursuant to Section 6.04(d).

"*Partial Exercise Plan*" means the plan to be implemented in the context of a Partial Exercise, consistent with the principles set out in **Exhibit "F"**.

"*Percentage Shareholding*" means the percentage determined in accordance with Section 2.01(b).

6

101780528.12

CONFIDENTIAL

GBG0235423

"***Permitted Parent Change of Control***" means a Change of Control of, in the case of the Iconix Shareholder, Iconix and, in the case of the GBG, Global Brands Group Limited.

"***Person***" means any individual or any partnership, corporation, estate, trust, company or other legal entity.

"***Previous Shareholders Agreement***" has the meaning set forth in the Recitals.

"***Purchase Agreement***" has the meaning set forth in the Recitals.

"***RD Brands***" means the brand names, logos and word phrases listed in **Exhibit "A-3"**.

"***Red Diamond***" means Red Diamond Holdings S.ar.l.

"***Second Amendment Effective Date***" has the meaning set forth in the Preamble.

"***Securities Act***" means the Securities Act of 1933, as amended, or any similar federal statute then in effect, and any reference to a particular section thereof shall include a reference to the comparable section, if any, of any such similar federal statute, and the rules and regulations promulgated thereunder.

"***Share***" means a share in the Company.

"***Shareholders***" means the Iconix Shareholder and the GBG Shareholder.

"***Share Certificate***" has the meaning set forth in Section 2.01(c).

"***Subsidiary***" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (i) of which such Person or any other subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any subsidiary of such Person do not have a majority of the voting interests in such partnership) or (ii) at least fifty percent (50%) of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries, or by such Person and one or more of its subsidiaries.

"***Taiwan***" means the Republic of China.

"***Territory***" means, collectively, the Existing Territory (with respect to the Existing Brands), the Expanded Territory (with respect to the Expanded Brands), the New Territory (with respect to the New Licensed Brands) and the CHMT Territory (with respect to the CHMT Brands).

"***Transfer***" means to sell, convey, transfer, syndicate, assign, mortgage, pledge, hypothecate or otherwise encumber or dispose of in any way, including by operation of law or otherwise, any Shares, or any Change of Control of the Company. The Person who is Shares shall be referred to as the "Transferor" and the Person who is acquiring the Shares shall referred to as the "Transferee."

7

"*Two-Year Call*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Notice*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Purchase Price*" has the meaning set forth in Section 6.04(a).

"*Two-Year Call Shares*" has the meaning set forth in Section 6.04(a).

"*Year*" means the tax and financial accounting period specified in Section 5.02.

**Section 1.02    Incorporation; Name.**   The Company was incorporated by the filing of the form of incorporation with the Companies Registry of Hong Kong.  A certificate of incorporation was issued by the Companies Registry of Hong Kong on September 10, 2013.  The Shareholders hereby confirm the incorporation of the Company as a company with limited under and pursuant to the provisions of the Companies Ordinance.  Whenever the terms of this Agreement conflict with the provisions of the articles of association of the Company, the terms this Agreement shall prevail.  Accordingly, the parties hereto shall exercise their respective and other rights as holders of Shares to procure that the articles of association of the Company amended to remove any conflict.

**Section 1.03    Registered Office; Principal Office.**  The registered office of the Company required under the Companies Ordinance shall be as designated in the incorporation form filed with the Companies Registry, and may be changed by the Board in accordance with Companies Ordinance.  The principal business office of the Company shall be located at the principal business office of the Local Manager, or such other address as shall be designated by Board.

**Section 1.04    Business Purpose.** The Company has been formed for the purpose of engaging, directly or through its Subsidiaries, in the following activities: (i) developing, exploiting and promoting the Brands licensed to the Company pursuant to the Master License Agreement or another Contract in the Territory by way of a license, sublicense or otherwise relating to the Business in exchange for royalty payments, and/or other consideration, (ii) purchasing or licensing third party Brands for the purposes of developing them in the Territory; (iii) engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing; (iv) engaging in other similar business opportunities as agreed to by both of the Shareholders and (v) unless otherwise agreed by the Shareholders, adopting a business model is in accordance with the then-approved business plan and is asset light, working capital light and with an EBITDA margin of not less than 75%.  References in this Agreement to the "ordinary course of business" shall be construed in conjunction with the business purpose set out in this Section 1.04.

**Section 1.05    Shareholders.**   The name, number of Shares and Percentage Shareholding held by each Shareholder is set forth on **Exhibit "B"**, as the same may be amended from time to time in accordance with this Agreement.

**Section 1.06    No Personal Liability.**  Except as provided by the applicable Law, no Shareholder or any Director shall be personally liable for any obligations of the Company and

8

101780528.12

CONFIDENTIAL

GBG0235425

no Shareholder shall have any obligation or be required to make any loan or otherwise advance funds to the Company other than as provided in Section 2.01(d) or 2.01(e).

## ARTICLE II

## SHAREHOLDINGS AND CAPITAL STRUCTURE

**Section 2.01    Capital Structure.**

(a)    Shareholdings.  The initial shareholdings of the Shareholders (after giving effect to the purchase transaction contemplated by the Purchase Agreement) are set forth on **Exhibit "B"** attached hereto.

(b)    Percentage Shareholding.  Each Shareholder shall have the Percentage Shareholding in the Company determined by dividing the number of Shares owned by such Shareholder by the total number of issued Shares.  The Percentage Shareholding of each Shareholder (after giving effect to the purchase transaction contemplated by the Purchase Agreement) shall be set forth next to such Shareholder's name on **Exhibit "B"** attached hereto.

(c)    Share Certificates.  Upon the request of any Shareholder, a share certificate (each, a "***Share Certificate***") issued by the Company in accordance with the provisions of the articles of association of the Company shall evidence the Shares in the Company held by such requesting Shareholder.

(d)    New Allotment of Shares.  *(Omitted as spent).*

(e)    Further Subscription for Shares.  In the event that the Company is to pay any Future Mark Acquisition Consideration (as defined in the Master License Agreement) or any Jointly Owned Mark Acquisition Consideration (as defined in the Master License Agreement) under the Master License Agreement, the Shareholder will subscribe for new Shares, in accordance with their Percentage Shareholding, in order to put the Company in funds to pay the relevant Future Mark Acquisition Consideration or any Jointly Owned Mark Acquisition Consideration (as the case may be), with subscription price therefor being set by the Directors, and the Shareholders will pass such resolutions and procure that the Directors pass such resolutions as are necessary to give effect to the provisions of this Section 2.01(e).

**Section 2.02    Loans.**  Without in any way limiting the authority of the Board to cause the Company to borrow funds from an unaffiliated third party (instead of, or in addition to, any loan(s) of the type contemplated by this Section 2.02), any Shareholder or Affiliate of a Shareholder may, with the consent of all the Directors, lend or advance money to the Company; provided, that such loan shall be on terms and conditions not less favorable than those available from unaffiliated third parties for similar loans (unless otherwise unanimously agreed by the Directors).

9

101780528.12

CONFIDENTIAL                                                                                                          GBG0235426

**A-1755**

### ARTICLE III

### DISTRIBUTIONS

**Section 3.01   Distributions.**

(a)     At such times as the Board determines is in the best interest of the Company and the Shareholders, the Company shall pay dividends or make other distributions to the Shareholders in proportion to their Percentage Shareholdings.  The Shareholders agree that, to the extent practicable and permitted by any applicable Law and regulation, unless otherwise agreed by the Shareholders, the dividend policy of the Company shall be to distribute the maximum amount of distributions allowed by the Companies Ordinance (the "***Dividend Policy***").

(b)     Notwithstanding anything to the contrary contained herein, promptly following the delivery of a CHMT Five-Year Put Notice or CHMT Five-Year Call Notice and in any event prior to the closing of the CHMT Five-Year Put/Call, the Company shall make a distribution (the "***CHMT Put/Call Distribution***") in cash to the Shareholders in proportion to their Percentage Shareholdings in an aggregate amount equal to the lesser of (i) the amount of cash in the Company, (ii) the maximum amount of distributions allowed by the Companies Ordinance, and (iii) the sum of (w) the amount, if any, by which distributions accrued or made to the GBG Shareholder in respect of the CHMT Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2014 were lower than $2,000,000, *plus* (x) the amount, if any, by which distributions accrued or made to the GBG Shareholder in respect of the CHMT Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2015 were lower than $2,500,000, *plus* (y) the amount, if any, by which distributions accrued or made to the GBG Shareholder in respect of the RD Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2016 were lower than $300,000, *plus* (z) the amount, if any, by which distributions accrued or made to the GBG Shareholder in respect of the RD Brands in the CHMT Territory pursuant to ARTICLE III in respect of the Year ended December 31, 2017 were lower than $335,000, and GBG shall immediately pay to the Iconix Shareholder an amount equal to the GBG Shareholder's share of any distribution payable pursuant to this Section 3.02(b).

**Section 3.02   Tax Distributions.**  Upon Iconix's reasonable request, and subject to such dividend being lawfully permitted, the Board shall cause the Company to distribute to Shareholder in respect of each Year, an amount of cash which equals (i) the amount of taxable income allocable to the Shareholder in respect of such Year, multiplied by (ii) the combined maximum individual United States federal and state income tax rate attributable to such taxable income (determined as if all Shareholders were residents of the State of New York and taking account (i) the deductibility of state income taxes for United States federal income tax purposes) and (ii) the amount of taxable losses previously allocated to such Shareholders in prior fiscal (and not used in prior fiscal years to reduce taxable income for the purpose of making under this Section 3.02).  Such distributions based upon estimates of the taxable income for the year may be made on a quarterly or other basis as shall be determined by Iconix (in its sole discretion).  All amounts so distributed shall be treated as amounts distributed to the Shareholder pursuant to Section 3.01 of this Agreement, depending on the source of the item that generated

10

101780528.12

GBG0235427

# A-1756

such taxable income, and shall be reduced by any amounts withheld for taxes with respect to the Shareholder pursuant to Section 3.01.

## ARTICLE IV

## MANAGEMENT OF COMPANY

**Section 4.01  General Provisions Concerning Management**. Subject to the provisions hereof, the powers of the Company shall be exercised by or under the authority of, the business and affairs of the Company shall be managed under the direction of, the Board. The Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company described herein, including all powers, statutory or otherwise, possessed by directors of a company with limited liability incorporated under the laws of Hong Kong. Except as otherwise required by law, approval of any action by the Board in accordance with this Agreement and the articles of association of the Company shall constitute approval of such action by the Company.

**Section 4.02  Appointment of Directors**. The Company shall have four Directors, two (2) of whom shall be Persons designated by GBG and its Transferees, if any (the "*GBG Directors*"), and two (2) of whom shall be Persons designated by Iconix and its if any (the "*Iconix Directors*," and together with the GBG Directors, the "*Directors*"). The GBG Directors shall be Jason Rabin and David Thomas and the initial Iconix Directors shall be Neil Cole and Jeff Lupinacci.

**Section 4.03  Resignation and Removal of Directors**. Each Director shall until death, dissolution, resignation or removal, in accordance with this Agreement and the of association of the Company. A Director may resign at any time upon giving written notice of resignation to the Company. A Director may be removed at any time with or without cause only by the Shareholder who appointed such Director (*e.g.*, an Iconix Director can only be removed Iconix). If a Director ceases to serve as a Director at any time for any reason, the resulting shall be filled by a Person designated by the Shareholder whose designee created the vacancy.

**Section 4.04  Administrative Manager**. Subject to the provisions of the Administrative Services Agreement, Iconix, as Administrative Manager (the "*Administrative Manager*") shall have the responsibilities and provide to the Company the services referred to therein.

**Section 4.05  Local Manager**. Subject to the provisions of the Local Services Agreement, GBG, as Local Manager (the "*Local Manager*") shall have the responsibilities and provide to the Company the services referred to therein.

**Section 4.06  Actions Requiring Unanimous Consent of all the Directors**.

(a)  Notwithstanding any provision of this Agreement, subject to Section 4.07, approval of the following actions shall require the unanimous consent of all the Directors:

(i)  approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where

11

101780528.12

GBG0235428

the costs and expenses (including those payable under the Administrative Services Agreement the Local Services Agreement) associated with the ongoing operations of the Company (the "***Designated Costs***") pursuant to such annual business and development plan and annual budget are less than twenty percent (20%) of net revenue projected in such annual business and development plan and annual budget; provided that, if the actions in this clause (i) are to be taken by the Iconix Directors, the Iconix Directors shall consult with the GBG Directors, in good faith, regarding such proposed annual business and development plan and annual budget, and take into consideration any comments or proposed changes recommended by the GBG Directors;

(ii)     approval of any annual business and development plan and annual budget of the Company or any of its Subsidiaries, including any amendments to the same, where the Designated Costs pursuant to such annual business and development plan and annual budget are twenty percent (20%) or greater of net revenue projected in such annual business and development plan and annual budget;

(iii)     any change in the scope or nature of the business or activities of the Company or any or any of its Subsidiaries;

(iv)     appointment or removal of, entry into an employment agreement with or approval of any delegation of or change to the authority or responsibilities of any officer of the Company or any of its Subsidiaries, or approval of the terms and conditions of employment of any officer or employee of the Company or any of its Subsidiaries or any change thereto provided that, if the actions in this clause (iv) are to be taken by the Iconix Directors, (A) at least thirty (30) days prior to taking any such action the Iconix Directors shall have provided the GBG Directors with, as applicable, identity of any individual proposed to be appointed or removed, the employment history of and references for any potential officer, a detailed summary of the terms of any proposed employment agreement, a summary of the reasons for any delegation or change in the authority or responsibilities of any officer and/or a summary of any terms and conditions of employment proposed to be approved, and shall have consulted with the GBG Directors, in good faith, regarding such proposed action and taken into consideration any comments or proposed changes recommended by the GBG Directors, and (B) the Iconix Directors shall not hire any new officer unless the position for such officer was included in the then current annual business and development plan and annual budget;

(v)     with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries in the ordinary course of business;

(vi)     with the exception of the acquisition of any intellectual property rights or other assets pursuant to the Master License Agreement, the lease, acquisition or disposal of any asset by the Company or any of its Subsidiaries outside the ordinary course of business;

(vii)     incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business ;

12

101780528.12

CONFIDENTIAL

GBG0235429

(viii)    incurrence by the Company or any of its Subsidiaries of any financial commitments, capital expenditures or indebtedness (real or contingent) outside the ordinary course of business or entering into any agreements to enter into such transaction or transactions, in each case in the ordinary course of business;

(ix)    lending any money (except deposits with banks or other institutions) by the Company or any of its Subsidiaries;

(x)    entry into any Contract by the Company or any of its Subsidiaries outside the ordinary course of business;

(xi)    commencement or settlement by the Company or any of its Subsidiaries of any legal action, arbitration proceeding, mediation or other dispute resolution other than in the ordinary course of business;

(xii)    adopting or amending any employee benefit or equity plan of the Company or any of its Subsidiaries;

(xiii)    appointment or removal of auditors of the Company or any of its Subsidiaries;

(xiv)    subject to Section 4.06(a)(xv), changing the accounting policies of the Company or any of its Subsidiaries or of the Year of the Company or any of its Subsidiaries;

(xv)    changing the accounting policies of the Company or any of its Subsidiaries by reason of being compelled to do so by reason of changes to IFRS and/or GAAP;

(xvi)    giving of any guarantee or indemnity of the Company or any of its Subsidiaries;

(xvii)    assignment of any debts of the Company or any of its Subsidiaries;

(xviii)    transfer, disposal or creation of any security interest in property of the Company or any of its Subsidiaries;

(xix)    entry into any Other License Agreement, or amendment, modification, termination of the Master License Agreement or any existing Other License Agreement;

(xx)    approving of the creation or acquisition of any Subsidiaries and the adoption of governance agreements or arrangements in respect thereof, or any other investment in, or the acquisition of stocks or bonds of, other Persons or any Equity Securities in any other Person; provided, that there shall be no limitation on the Board's authority to delegate, in a manner mutually acceptable to the Board, the making of investments as part of cash management in the ordinary course of business of the Company;

(xxi)    any Transfer of Shares in the Company; and

13

101780528.12

CONFIDENTIAL

GBG0235430

(xxii) authorizing an officer, an employee or any other individual to approve disbursements on behalf of the Company;

provided, that upon and subsequent to any exercise of the Call Option (as defined herein) pursuant to Section 6.04, the actions in clauses (i), (iv), (v), (vii), (ix), (xv) and (xxii) of this Section 4.06(a) shall be taken by the Iconix Directors in their sole discretion (after reasonable, good faith consultation with the GBG Directors), notwithstanding, for the avoidance of doubt, Section 4.08 of this Agreement.

(b) The parties acknowledge and agree that any and all decisions or actions by the Company with respect to an agreement between the Company and a Shareholder or Affiliate of a Shareholder relating to: (i) the exercise or enforcement of the Company's rights thereunder; (ii) any amendments or waivers thereto; or (iii) any approvals required or requests made thereunder shall be taken by the Directors designated by the other Shareholder in their sole discretion.

(c) Subsequent to the exercise of the Call Option (as defined herein), the Iconix Directors will consult in good faith with the GBG Directors prior to taking any actions outside of the ordinary course of business and take into consideration any comments or proposed changes recommended by the GBG Directors.

(d) The Iconix Directors shall not take any action in their sole discretion if such action would reasonably be expected to have a materially adverse effect on the value of the Shares held by the GBG Shareholder, taking into consideration the existence of the Five Year Put/Call unless the Shareholders mutually agree that any such action is in the best interests of the Company.

**Section 4.07    Shareholder Approval.** Notwithstanding any provision of this Agreement, approval of any of the following shall require unanimous approval by all of the Shareholders:

(a) admission of any Person (whether by subscription or transfer) as a shareholder of the Company or any of its Subsidiaries;

(b) grant of, or entry into an agreement to grant, any option, pledge or other encumbrance in respect of the Shares or of any other Equity Securities of the Company or any of its Subsidiaries;

(c) except as provided under ARTICLE III or Section 6.04, declaration, payment or approval by the Company or any of its Subsidiaries of any repurchase or redemption of the Company's or any of its Subsidiaries' securities or any dividend or other distribution to the Shareholders or to the members or shareholders of any of the Company's Subsidiaries (other than Subsidiaries wholly owned by the Company or any of its Subsidiaries);

(d) delegation of any powers or responsibilities by the Board or Directors than to an individual or a committee of individuals designated with the unanimous consent of the Directors or to officers pursuant to Section 4.08;

(e) change of the number of Directors or the number of directors of any Subsidiary of the Company;

14

101780528.12

CONFIDENTIAL                                                                 GBG0235431

(f)     removal of a Director other than by the Shareholder that designated or nominated such Director or removal of a director of any of the Company's Subsidiaries;

(g)     the entering into by the Company or any of its Subsidiaries of any Contract outside the ordinary course of business;

(h)     participation in, termination of or any other actions taken by the Company or any of its Subsidiaries with respect to any venture, partnership or joint venture, or acquisition or disposal of shares or other equity interests in another Person or the acquisition of the business or assets of another Person;

(i)     entry into any transaction by the Company or any Subsidiary of the Company with any Shareholder or any Affiliate of any Shareholder (including entering into any loans between any Shareholder or any Affiliate of any Shareholder and the Company, but not including entering into the Master License Agreement);

(j)     increase or decrease the issued share capital or (as applicable) the authorized share capital or maximum number of shares, in each case of the Company or any of its Subsidiaries;

(k)     reclassification of securities of the Company or any of its Subsidiaries (including any subdivision or consolidation of shares) or recapitalization of the Company or any of its Subsidiaries;

(l)     entry into any merger, amalgamation or consolidation of the Company or any of its Subsidiaries with another Person;

(m)     a resolution for winding up, the termination or dissolution of, or the entering into of bankruptcy, insolvency or receivership by, the Company or any of its Subsidiaries;

(n)     sale or disposal of all of the Shares or all or any substantial part of the Company's or any of its Subsidiaries' business or assets;

(o)     change of the name of the Company or any of its Subsidiaries;

(p)     amendment or modification of the Company's or any of its Subsidiaries' memorandum of association or articles of association or other organizational documents (as applicable);

(q)     reorganization of the Company or any of its Subsidiaries; and

(r)     a private or public issuance or offering for sale of any securities of the Company or any of its Subsidiaries or the listing on any exchange of any securities of the Company or any of its Subsidiaries.

**Section 4.08     Officers.**  Subject to the limitations set forth in Section 4.06, the Board shall have the authority to establish such officers of the Company as they shall determine, and to appoint individuals to serve as such officers, including chairman, chief executive officer,

15

101780528.12

CONFIDENTIAL

GBG0235432

one or more vice presidents, secretary, assistant secretary, treasurer and assistant treasurer. An individual may hold more than one office at any time.

**Section 4.09    Board Meetings; Written Resolutions**.  Board meetings may be called by any Director.  The Board shall meet not less than once every three (3) months.  Any Director may participate in a Board meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear and speak to each other at the same time or in sequence, and participation in a Board meeting pursuant to this provision shall constitute presence at the meeting; provided, that at least one of such Board meetings per year shall be held in person at a location to be unanimously determined by the Directors.  All meetings of the Board shall be called on not less than three (3) Business Days' prior notice.  All actions required or permitted to be taken by the Board may also be approved by the execution of a written resolution executed by all the Directors, and any such written resolution may be executed in counterparts.

**Section 4.10    Quorum; Voting**.

(a)    A quorum must exist at all times of a Board meeting, including the reconvening of any Board meeting that has been adjourned, for any action taken at such Board meeting to be valid.

(b)    Except as otherwise specified in this Agreement:

(i)    a quorum shall be constituted at a Board meeting only if at least one (1) GBG Director and one (1) Iconix Director are present; and

(ii)    all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, which majority must include at least one (1) GBG Director and one (1) Iconix Director.

(c)    Upon and subsequent to the closing of any Two-Year Call pursuant to Section 6.04:

(i)    a quorum shall be constituted at a meeting if a majority of the Directors is present, regardless of the identity of the Directors comprising such majority; and

(ii)    all decisions of the Board shall be taken by a majority of the Directors present at a meeting at which a quorum exists for such decision or action to be valid, regardless of the identity of the Directors comprising such majority.

**Section 4.11    Company Minutes**.  The decisions and resolutions of the Board shall be reported in minutes, which shall state the date, time and place of the meeting (or the date the written resolution in lieu of meeting), the Directors present at the meeting, the resolutions put to a vote (or the subject of a written resolution) and the results of such voting (or written resolution).  The minutes shall be entered in a minute book kept at the registered office of the Company and a copy of the minutes shall be provided upon request to each Director.

16

101780528.12

CONFIDENTIAL

GBG0235433

# A-1762

## ARTICLE V

## BOOKS AND RECORDS; FINANCIAL STATEMENTS; TAX AND FINANCIAL MATTERS

**Section 5.01    Books and Records**.  The Administrative Manager shall procure that accurate, full and complete books and records of the Company are maintained, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business and affairs.  Such books and records initially shall be prepared and maintained by the Administrative Manager; and, at such time as the Board determines, such books and records shall be prepared and maintained by employees of the Company.  Such books and records shall include a clear statement of royalty generated by the Company under the Master License Agreement and Other Agreements, and broken down as between the Europe Rights, the Existing Rights, the Korea Rights and the CHMT Rights and the Administrative Manager shall provide such information to the GBG Shareholder within as soon reasonably practicable following the GBG Shareholder's request to provide such information. Upon request in writing, each Shareholder and its duly authorized representative shall have to inspect and copy any of such books and records at all reasonable times during normal business hours.  The Company shall deliver or cause to be delivered to each Shareholder consolidated financial statements (all of which shall be prepared in accordance with the financial reporting standards and interpretations (including: (a) Hong Kong Financial Reporting Standards; (b) Kong Accounting Standards; and (c) Interpretations) issued by the Hong Kong Institute of Certified Public Accountants applied on a consistent basis (the "*Accounting Standards*")), as follows: (i) as soon as available (but in any event not later than twenty (20) days after the end of each quarter), a consolidated balance sheet as at the end of such quarter and the related consolidated statements of income and cash flows for such quarter and for the period from the beginning of the current calendar year (i.e., the calendar year in which such quarter falls) to the of such quarter, setting forth, in each case, in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the current calendar year; and (ii) as soon as available (but in any event not than one hundred twenty (120) days after the end of each calendar year), a consolidated balance sheet as at the end of such calendar year and the related consolidated statements of income, cash flows and stockholders', members' or other owners' equity for such calendar year, setting forth each case in comparative form the corresponding figures for the corresponding periods of the previous calendar year and the corresponding figures from any financial plan for the calendar covered by such financial statements.  The Company shall also deliver to each Shareholder upon request copies of any reports or statements the Company receives from its third party licensees. The financial statements to be provided under this Agreement shall not be required to be audited unless required by applicable Law or so requested by either Shareholder.

**Section 5.02    Fiscal Year**.  The year of the Company for tax and financial accounting purposes ("*Year*") shall end on the last day of the month of December, unless a different year end is approved in accordance with Section 4.07

**Section 5.03    Company Accounts**.  All receipts, funds and income of the Company shall be deposited in the name of the Company in a bank account of a commercial savings and loan association or other financial institution (the "*Company Account*") as the Local

17

101780528.12

CONFIDENTIAL

GBG0235434

Manager shall determine. Withdrawals from the Company Account shall be made on the of (a) an officer of the Administrative Manager or such other Person as shall be designated by Administrative Manager and (b) an officer of the Local Manager or such other Person as shall be designated by the Local Manager; provided that no withdrawal from the Company Account shall be made (i) with respect to any expense subject to the Directors' or the Shareholders' approval rights pursuant to Section 4.06 or Section 4.07, respectively, until such approval has been obtained, or (ii) for the purpose of making any payment to a Director or an Affiliate of a Director any distribution to the Shareholders unless the amount of such payment or distribution is in accordance with ARTICLE III or has been approved by the Shareholders. There shall be no commingling of the moneys and funds of the Company with moneys and funds of the Administrative Manager, the Local Manager or any other entity or Person.

**Section 5.04 Classification as a Partnership; Tax Decisions**. The Company shall elect within 75 days of its formation to be taxable as a partnership for United States federal income tax purposes, pursuant to Treasury Regulation Section 301.7701-3(b)(1)(i) by having Shareholder sign Form 8832 as prepared by Iconix. During such time as the Company would be classified as a partnership under the foregoing sentence, neither the Company nor any shall take any action that would result in the Company being taxed as other than a "partnership" United States federal income tax purposes, including, but not limited to, electing to be taxed as other than a "partnership" by filing Internal Revenue Service Form 8832, "Entity Classification Election" without the prior written consent of all of the Shareholders. All elections required or permitted to be made by the Company and all other tax decisions and determinations relating to United States federal, state, local or foreign tax matters shall be made by the Board, in with the Company's attorneys and/or accountants as the Board deems necessary or advisable. U.S. federal income tax purposes, income of the Company shall be allocated in accordance with the provisions of **Exhibit "D"**.

## ARTICLE VI

## TRANSFERS

**Section 6.01 Transfers**. Except as expressly provided in this **ARTICLE VI**, (i) no Shareholder may directly or indirectly Transfer any or all of its Shares or any right or therein; (ii) any direct or indirect offer to Transfer, or any attempted or purported Transfer of, Shares in violation of any of the provisions of this Agreement shall be void *ab initio*; (iii) the Company shall reject and refuse to register on its books the Transfer of any Shares which are purported to have been transferred otherwise than in compliance with the provisions of this Agreement; and (iv) and the Company shall not recognize any Person receiving any Shares as a shareholder of the Company, nor shall any Person have any rights as a shareholder of the Company, unless the Transfer of Shares to such Person shall have been made pursuant to the of this Agreement. Notwithstanding any provisions of this Agreement, a Shareholder may Transfer all (but not some only) of its Shares (a) pursuant to a Permitted Parent Change of or (b) to any Affiliate of such Shareholder, provided that if such Affiliate at any time no longer constitutes an Affiliate of Iconix or GBG, as applicable, any such Shares transferred to such Affiliate shall immediately be transferred to Iconix or GBG, as applicable, or one of their respective Affiliates.

18

101780528.12

CONFIDENTIAL

GBG0235435

**Section 6.02    Share Certificates**.

(a)    Each Share Certificate issued to a Shareholder pursuant to Section 2.01(c) shall have the following legend conspicuously written, printed, typed or stamped on its face, or upon the reverse with a conspicuous reference to such legend on its face:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF THE SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT OF ICONIX SE ASIA LIMITED, EFFECTIVE AS OF SEPTEMBER 17, 2014, AS IT MAY BE AMENDED FROM TIME TO TIME (THE "SHAREHOLDERS AGREEMENT"), INCLUDING CERTAIN RESTRICTIONS ON TRANSFER SET FORTH THEREIN.

THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE OR FOREIGN SECURITIES LAWS, IN RELIANCE UPON APPLICABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE AND FOREIGN SECURITIES LAWS.  THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE.  THE SHARES MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS, OR UNTIL ICONIX SE ASIA LIMITED IS SATISFIED THAT THE REGISTRATION OF SUCH SALE, TRANSFER OR OTHER DISPOSITION IS NOT REQUIRED UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE AND FOREIGN SECURITIES LAWS BECAUSE OF AVAILABLE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS.   ADDITIONALLY, ANY SALE, TRANSFER OR OTHER DISPOSITION OF ANY SHARE MUST COMPLY WITH THE OTHER TRANSFER RESTRICTIONS SET FORTH IN THE SHAREHOLDERS AGREEMENT."

(b)    Upon the sale of any Shares pursuant to (i) an effective registration statement under the Securities Act or pursuant to Rule 144 under the Securities Act or (ii) another exemption from registration under the Securities Act or upon the termination of this Agreement, the Share Certificates representing such Shares shall be replaced, at the expense of the Company, with certificates or instruments not bearing the legends required by this Section 6.02; provided that the Company may condition such replacement of certificates under clause (ii) upon the receipt of an opinion of securities counsel reasonably satisfactory to the Company.

(c)    In case of loss or destruction of a Share Certificate, no new Share Certificate shall be issued in lieu thereof except upon satisfactory proof to the Company of such loss or destruction, and upon the giving to the Company of satisfactory security against loss by bond or otherwise. Any such new Share Certificate shall be plainly marked "Duplicate" upon its face.

**Section 6.03    Registration as a Shareholder**.   Except as provided in Section and Section 6.04, no Person other than the GBG Shareholder and the Iconix Shareholder shall be registered in the register of shareholders of the Company as a shareholder of the Company the prior written unanimous consent of the Board and the Shareholders.  If the GBG Shareholder

19

CONFIDENTIAL                                                                                   GBG0235436

the Iconix Shareholder proposes to transfer Shares to an Affiliate, it shall be a condition to the transfer that such Affiliate shall execute and deliver a deed of adherence in substantially the form attached hereto as **Exhibit "C"** (the "***Deed of Adherence***") pursuant to which such Transferee shall agree to be legally bound by this Agreement. Except as otherwise set forth herein, the Affiliate to which Shares are transferred shall pay all costs and expenses incurred by the in connection with such admission.

### Section 6.04 Put and Call Options.

(a) <u>Two-Year Call Option</u>. For the six- (6-) month period following the second (2nd) anniversary of the Effective Date, the Iconix Shareholder may deliver an irrevocable written notice of election to the GBG Shareholder and the Company (a "***Two-Year Call Notice***") to initiate the purchase by the Iconix Shareholder of five percent (5%) of the total Shares in issue (the "***Two-Year Call Shares***") at a purchase price (the "***Two-Year Call Purchase Price***") in cash equal to 10% multiplied by 115% multiplied by the sum of (i) the Purchase Price (as defined in the Purchase Agreement) paid or payable by GBG to Iconix pursuant to the Purchase Agreement, *plus* (ii) $10,917,500, *plus* (iii) the Adjusted CHMT Purchase Price (such purchase initiated by a Two-Year Call Notice, a "***Two-Year Call***"). The Company shall pay an interim dividend in accordance with the Dividend Policy of the Company, to be calculated up to the day before closing of the Two Year Call. GBG agrees that following the closing of the Two-Year Call, GBG has no objection to Iconix being able to consolidate the results of the Company into its own financial results.

(b) <u>Five-Year Put/Call Option</u>.

(i) For the six- (6-) month period following the fifth (5th) anniversary of the Effective Date (and, if a Five-Year Put/Call has not previously been Fully Exercised, for six- (6-) month period following the eighth (8th) anniversary of the Effective Date), (i) the GBG Shareholder may deliver an irrevocable written notice of election to the Iconix Shareholder and Company (a "***Five-Year Put Notice***") to initiate the acquisition by the Iconix Shareholder of the Europe Rights, the Existing Rights and/or the Korea Rights (the "***Five-Year Put/Call Rights***") at purchase price (the "***Five-Year Put Purchase Price***") in cash equal to the aggregate Agreed (as defined herein) (such purchase initiated by a Five-Year Put Notice, a "***Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the GBG Shareholder (a "***Five-Year Call Notice***," and each of the Five-Year Put Notice and the Five-Year Call Notice, a "***Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder of the Five-Year Put/Call Rights at a purchase price (the "***Five-Year Call Purchase Price***," and of the Five-Year Put Purchase Price and the Five-Year Call Purchase Price, the "***Five-Year Put/Call Purchase Price***") in cash equal to 120% of the aggregate Agreed Value (such purchase initiated by a Five-Year Call Notice, a "***Five-Year Call***" and each of a Five-Year Put and a Five-Five-Year Call, a "***Five-Year Put/Call***"). Prior to the closing of the Five-Year Put/Call pursuant Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the Company shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to GBG under the Local Services Agreement and pay all fees owing and accrued to Iconix under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the Five-Year Put/Call.

20

101780528.12

CONFIDENTIAL

GBG0235437

(ii)     For the six- (6-) month period following the fifth (5th) anniversary of the Second Amendment Effective Date (and, if a CHMT Five-Year Put/Call has not been exercised, for the six- (6-) month period following the eighth (8th) anniversary of the Amendment Effective Date), (i) the GBG Shareholder may deliver an irrevocable written notice election to the Iconix Shareholder and the Company (a "***CHMT Five-Year Put Notice***") to the acquisition by the Iconix Shareholder (or Iconix Luxembourg and Red Diamond) of the Rights (the "***CHMT Five-Year Put/Call Rights***") at a purchase price (the "***CHMT Five-Year Purchase Price***") in cash equal to the aggregate Agreed Value (such purchase initiated by a CHMT Five-Year Put Notice, a "***CHMT Five-Year Put***") and (ii) the Iconix Shareholder may deliver an irrevocable written notice of election to the GBG Shareholder (a "***CHMT Five-Year Call Notice***," and each of the CHMT Five-Year Put Notice and the CHMT Five-Year Call a "***CHMT Five-Year Put/Call Notice***") to initiate the purchase by the Iconix Shareholder (or Iconix Luxembourg and Red Diamond) of the CHMT Five-Year Put/Call Rights at a purchase price (the "***CHMT Five-Year Call Purchase Price***," and each of the CHMT Five-Year Put Purchase Price and the CHMT Five-Year Call Purchase Price, the "***CHMT Five-Year Put/Call Purchase Price***") in cash equal to 120% of the aggregate Agreed Value (such purchase initiated a CHMT Five-Year Call Notice, a "***CHMT Five-Year Call***" and each of a CHMT Five-Year Put and a CHMT Five-Year Call, a "***CHMT Five-Year Put/Call***"). Prior to the closing of the CHMT Five-Year Put/Call pursuant to Section 6.04(c), (i) the Company shall operate its business and manage its investments in the ordinary course consistent with past practices and (ii) the shall pay an interim dividend in accordance with the Dividend Policy and pay all fees owing and accrued to GBG under the Local Services Agreement and pay all fees owing and accrued to under the Administrative Services Agreement, in each case, to be calculated up to the day before closing of the CHMT Five-Year Put/Call.

(iii)     If the Five-Year Put/Call is exercised in the six- (6-) month period following the fifth (5th) anniversary of the Effective Date, Agreed Value shall be equal to the GBG Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and Other License Agreements in respect of the Europe Rights, the Existing Rights, and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2015 and (ii) the Year ended December 31, 2018; *provided, however*, that the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500.

(iv)     If the CHMT Five-Year Put/Call is exercised in the six- (6-) month period following the fifth (5th) anniversary of the Second Amendment Effective Date, Agreed Value shall be equal to:

(A)     The GBG Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and Other License Agreements in respect of the CHMT Rights for (i) the Year ended December 31, 2015 and (ii) the Year ended December 31, 2019; *provided, however*, that the Agreed Value attributable to the CHMT Rights shall not be less than $15,500,000 (such Agreed Value attributable to the CHMT Rights, the "***Adjusted CHMT Purchase Price***"); *plus*

(B)     in the case of a Full Exercise, the lesser of the (x) amount cash in the Company after payment of the CHMT Put/Call Distribution to the Iconix Shareholder and (y) the maximum amount of distributions allowed by the Companies Ordinance.

21

101780528.12

CONFIDENTIAL                                                                                      GBG0235438

(v)     If the Five-Year Put/Call is exercised in the six- (6-) month period following the eighth (8th) anniversary of the Effective Date, Agreed Value shall be equal to:

(A)     The GBG Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and the Other License Agreements in respect of the Europe Rights, the Existing Rights and/or the Korea Rights (as applicable) for (i) the Year ended December 31, 2018 and (ii) the Year ended December 31. 2021; *provided, however*, that, the Agreed Value attributable to the Europe Rights shall not be less than $7,617,500; *plus*

(B)     In the case of a Full Exercise, the lesser of the (x) amount of cash in the Company and (y) the maximum amount of distributions allowed by the Companies Ordinance.

(vi)     If the CHMT Five-Year Put/Call is exercised in the six- (6-) month period following the eighth (8th) anniversary of the Second Amendment Effective Date, Agreed Value shall be equal to:

(A)     The GBG Shareholder's Percentage Shareholding *multiplied by* 5.5 *multiplied by* the greater of the royalty generated by the Company under the Master License Agreement and Other License Agreements in respect of the CHMT Rights for (i) the Year ended December 31, 2019 and (ii) the Year ended December 31, 2022; *provided, however*, that the Agreed Value attributable to the CHMT Rights shall not be less than Adjusted CHMT Purchase Price; *plus*

(B)     in the case of a Full Exercise, the lesser of the (x) amount of cash in the Company after payment of the CHMT Put/Call Distribution to the Iconix Shareholder and (y) the maximum amount of distributions allowed by the Companies Ordinance.

(c)     Put and Call Closings.  The closing of any Two-Year Call, Five-Year Put/Call or CHMT Five-Year Put/Call under this Section 6.04 shall take place within (i) sixty (60) days after delivery of the Two-Year Call Notice, (ii) sixty (60) days after the delivery of the Five-Year Put/Call Notice (or, if later, within thirty (30) days after the royalty information necessary to calculate the applicable Agreed Value is available), or (iii) sixty (60) days after the delivery of the CHMT Five-Year Put/Call Notice (or, if later, within thirty (30) days after the royalty information necessary to calculate the applicable Agreed Value is available), as the case may be, unless another date is mutually agreed upon by the parties to the sale.

(d)     Put and Call Closings – Partial Exercise.  In the case of an exercise of the Five-Year Put/Call or a CHMT Five-Year Put/Call which constitutes a Partial Exercise, at the closing of the relevant Five-Year Put/Call or the CHMT Five-Year Put/Call, as applicable, the Iconix Shareholder shall pay, or in the case of a CHMT Five-Year Put/Call shall cause Iconix Luxembourg and Red Diamond to pay, to the GBG Shareholder the Five-Year Put/Call Price or the CHMT Five-Year Put/Call Price, as applicable, and the parties hereto shall implement the Partial Exercise Plan.

(e)     Put and Call Closings – Two Year Call and Full Exercise.  At the closing any Two-Year Call or Five-Year Put/Call (or the CHMT Five-Year Put/Call, if applicable) which

22

101780528.12

GBG0235439

results in a Full Exercise, the GBG Shareholder shall deliver to the Company for cancellation the Share Certificate or Certificates, if any, representing the Two-Year Call Shares or all of its in the case of a Five-Year Put/Call (or the CHMT Five-Year Put/Call, if applicable), as and the Iconix Shareholder shall take all actions and execute and deliver and pay, or in the case a CHMT Five-Year Put/Call cause Iconix Luxembourg and Red Diamond to pay, to the GBG Shareholder the Two-Year Call Purchase Price or the Five-Year Put/Call Price (or the CHMT Five-Year Put/Call Price, if applicable), as applicable, and all instruments and documents as may be necessary or desirable to consummate the sale of the Two-Year Call Shares or all of its in the case of a Five-Year Put/Call (or the CHMT Five-Year Put/Call, if applicable), as The Company shall thereupon cancel the Share Certificate(s) representing the Two-Year Call Shares or all of the GBG Shareholder's Shares, in the case of a Five-Year Put/Call (or the CHMT Five-Year Put/Call, if applicable), as applicable, enter the purchaser's name in the register of shareholders of the Company and, upon request of the purchase pursuant to Section 2.01(c), a Share Certificate to the purchaser evidencing the purchaser's entitlement to the Two-Year Call Shares or all of the GBG Shareholder's Shares, in the case of a Five-Year Put/Call (or the CHMT Five-Year Put/Call, if applicable), as applicable.

(f)     Stamp Duty. The Hong Kong stamp duty payable in respect of the sale and purchase of the Shares pursuant to an exercise of any option pursuant to this Section 6.04 shall be borne by Iconix and GBG in equal shares. Iconix and GBG shall each pay their respective share of the Hong Kong stamp duty on completion of the exercise of the relevant option and shall co-operate to ensure that the instrument of transfer and bought and sold notes in respect of the sale and purchase of the relevant Shares are duly presented for stamping within the time limits prescribed by the Stamp Duty Ordinance and are duly stamped as soon as practicable after completion of the exercise of the relevant option.

## ARTICLE VII

## TERMINATION AND LIQUIDATION

**Section 7.01     Termination.** This Agreement shall terminate on the first to occur of the following:

(a)     the Percentage Shareholding of any Shareholder is equal to one hundred percent (100%); or

(b)     a resolution is passed by the Shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, shareholders or other contributors.

**Section 7.02     Effect of Termination.**

(a)     On termination of this agreement, Sections 10.02, 10.03, 10.04, 10.07, 10.15 and this Section 7.02(a) shall continue in force.

(b)     Termination of this agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including

23

101780528.12

right to claim damages or indemnification in respect of any breach of the Agreement which at or before the date of termination.

**Section 7.03     Winding Up.** Where the Company is to be wound up and its distributed, the parties shall agree on a suitable basis for dealing with the interests and assets of Company and shall endeavor to ensure that, before dissolution:

(a)     all existing contracts of the Company are performed to the extent that there are sufficient resources;

(b)     the Company shall not enter into any new contractual obligations; and

(c)     the Company's assets are distributed as soon as practical.

## ARTICLE VIII

## INDEMNIFICATION

**Section 8.01     Insurance.** The Company shall maintain for such periods as the Board shall in good faith unanimously determine, at its expense, insurance in an amount determined unanimously in good faith by the Board to be appropriate, on behalf of any person is or was a director or officer of the Company, or is or was serving at the request of the Company a director, officer, employee or agent of another corporation or other enterprise, including any Subsidiary of the Company, against any expense, liability or loss asserted against such Person incurred by such Person in any such capacity, or arising out of such Person's status as such, to customary exclusions.

## ARTICLE IX

## REPRESENTATIONS

**Section 9.01     General.** As of the date hereof, each of the Shareholders makes each of the representations and warranties applicable to such Shareholder as set forth in this **ARTICLE IX**, and such representations and warranties shall survive the execution of this Agreement.

(a)     Due Incorporation or Formation; Authorization of Agreement. If such Shareholder is a corporation, partnership, trust, limited liability company, or other legal entity, it duly organized or formed, validly existing, and in good standing under the laws of the of its incorporation or formation and has the power and authority to own property and carry on business as owned and carried on at the date hereof and as contemplated hereby and such Shareholder is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse on its ability to perform its obligations hereunder, and the execution, delivery, and performance this Agreement has been duly authorized by all necessary corporate or partnership or company action. This Agreement constitutes the legal, valid, and binding obligation of such Shareholder, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or

24

101780528.12

CONFIDENTIAL                                                                      GBG0235441

laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b)     No Conflict or Default.  The execution, delivery, and performance of this Agreement and the consummation by such Shareholder of the transactions contemplated hereby (i) will not conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, or any arbitrator, applicable to such Shareholder, and (ii) will not conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, operating agreement, or other organizational documents of such Shareholder, or of any material agreement or instrument to which such Shareholder is a party or by which such Shareholder is or may be bound or to which any of its material properties or assets are or may be subject.

(c)     Governmental Authorizations.  Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by, any governmental or regulatory authority that is required in connection with the valid execution, delivery, acceptance, and performance by such Shareholder under this Agreement or the consummation by such Shareholder of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date of this Agreement.

(d)     Litigation.  There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Shareholder, threatened against or affecting such Shareholder or any of such Shareholder's properties, assets, or businesses in any court or before or by any governmental department, board, agency, instrumentality, or arbitrator which, if adversely determined, could (or in the case of an investigation could lead to any action, suit, or proceeding which, if adversely determined, could) reasonably be expected to materially impair such Shareholder's ability to perform its obligations under this Agreement.

(e)     Securities Representations.  Such Shareholder represents and agrees that Shares acquired pursuant hereto will be acquired for such Shareholder's own account, for investment, and not with a view to the distribution or resale thereof.  Such Shareholder further represents that it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of acquiring the Shares.  Such Shareholder understands that such Shares have not been registered under the Securities Act or any state or other securities laws, and cannot be sold, assigned, transferred, pledged or otherwise disposed of unless so registered under the Securities Act and applicable state or other securities laws or unless an exemption from the registration requirements thereof is available.

## ARTICLE X

## MISCELLANEOUS

**Section 10.01    Information.**  For so long as any Shareholder is a reporting company under the securities laws of the United States and/or Hong Kong, the Company shall provide to such Shareholder on a timely basis, in addition to the financial statements that the

25

101780528.12

CONFIDENTIAL                                                     GBG0235442

Company is required to deliver to the Shareholders pursuant to Section 5.01, all such information as such Shareholder determines is necessary for it to comply with its reporting obligations under such securities laws, including but not limited to financial information; provided, that any additional expense incurred by the Company or any other Shareholder in connection with or as a consequence of providing such information shall be borne by such Shareholder. It is agreed that failure to deliver such financial statements on a timely basis shall not be considered a breach of term or condition of this Agreement, it being agreed that the Shareholders shall use reasonable efforts to replace the auditors of the Company in the event that the Board determines that any such delay has been caused by the auditors.

**Section 10.02    Notices.**  All notices, approvals, consents, requests, instructions, and other communications (collectively "*Communications*") required to be given in writing pursuant to this Agreement shall be validly given, made or served only if in writing and when delivered personally or by registered or certified mail, return receipt requested, postage prepaid, by a reputable overnight or same day courier, addressed to the Company, the Directors or the Shareholders, as the case may be, at the address(es) thereof on record at the principal office of Company. All Communications required or permitted hereunder shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed if sent during normal business hours of the recipient, or if not during such hours, then on the next Business Day, (c) five (5) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) three (3) Business Days after deposit with FedEx or other overnight courier, specifying delivery by such date, with written verification of receipt. The designation of the Person to receive such Communication on behalf of a Shareholder or the address of any such Person for the purposes of such Communication may be changed from time time by written notice given to the Company pursuant to this Section 10.02.

**Section 10.03    Parties Bound; No Third Party Beneficiaries.**  This Agreement shall inure to the benefit of and shall be binding upon all of the parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties (other than to an Affiliate of a Shareholder following a Transfer permitted by Section 6.01). No provision of this Agreement is intended to or shall be construed grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement or upon any Person other than the parties hereto.

**Section 10.04    Governing Law; Submission to Jurisdiction.**  This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of Hong Kong. Any dispute, difference or claim arising out of or in connection with this Agreement shall referred to and finally determined by arbitration in Hong Kong at Hong Kong International Arbitration Centre (the "*HKIAC*") in accordance with the UNCITRAL Arbitration Rules as at present in force. The language to be used in the arbitration proceedings shall be English. There shall be three arbitrators, of which one shall be appointed by the Iconix Shareholder, one shall be appointed by the GBG Shareholder and one (who shall act as president of the tribunal) shall be jointly appointed by the two arbitrators appointed by the Iconix Shareholder and the GBG Shareholder. The Iconix Shareholder and the GBG Shareholder shall each appoint one arbitrator within 30 days of the notice of arbitration, failing which such appointment shall be made, at the request of either party, by the Chairman of the HKIAC. If the two arbitrators so appointed by the

26

101780528.12

CONFIDENTIAL

GBG0235443

Iconix Shareholder and the GBG Shareholder fail to agree upon the third arbitrator within 15 of the appointment of the second arbitrator, the third arbitrator shall be appointed by the of the HKIAC upon the written request of either party. The arbitral award shall be final and binding on all Parties. In relation to all matters referred to arbitration by this Agreement, the of appeal under section 23 of the Arbitration Ordinance (Cap. 341 of the Laws of Hong Kong) the right to make an application under section 23A thereof are hereby excluded. Any costs of arbitration (including without limitation all reasonable legal costs of the winning party) shall be borne by the losing party unless otherwise determined by the arbitral award. Nothing herein prevent a Party from seeking injunctive or other emergency relief against the other at any time in court having competent jurisdiction.

**Section 10.05    Amendment**.    No amendment, change or modification to this Agreement shall be valid unless the same is in writing and signed by all of the Shareholders.

**Section 10.06    Entire Agreement**.    This Agreement and the Purchase Agreement, together with all exhibits and schedules hereto and thereto (which are deemed incorporated herein), contains the entire understanding among the parties and supersedes any prior and contemporaneous understandings and agreements between them respecting the subject matter hereof.

**Section 10.07    Confidentiality**.    Subject to the requirements of applicable Law, each Shareholder shall maintain in confidence all Confidential Information (i) transferred to the Company or to the other Shareholder by reason of the transactions contemplated by this Agreement and (ii) all information received from the other Shareholder as a result of any due diligence investigation conducted relative to the execution of this Agreement and shall use such information only for the benefit of the Company and or in connection with evaluating the transactions contemplated hereby, and except in accordance with the immediately succeeding sentence, shall not disclose any such information to a third party, other than (i) to its officers, directors, employees, advisors, attorneys or accountants who need to know and who agree to such information confidential, (ii) to its actual or proposed lenders or other financing sources having been made aware of the restrictions set forth in this Section 10.07, (iii) to the extent disclosure is required by law, statute, rule, regulation or judicial process (including, but not to, applicable securities laws) or (iv) upon the lawful demand of any court or agency or regulator having jurisdiction over such Shareholder (including, but not limited to, any securities regulatory authority, including rating agencies and national securities exchanges, to which the disclosing Shareholder is subject) or make any unauthorized use thereof. The obligation of confidentiality and non-use shall not apply to any information which (A) is or becomes generally available to public through no fault of the receiving party, (B) is independently developed by the receiving party or (C) is received in good faith from a third party who is lawfully in possession of such information and has the lawful right to disclose or use it.

**Section 10.08    Severability**.    If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

101780528.12

CONFIDENTIAL

GBG0235444

# A-1773

**Section 10.09  Counterparts; Facsimile or Electronic Transmission**. This Agreement may be executed in one or more counterparts with the same effect as if all of the Shareholders had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile or Electronic Transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or Electronic Transmission shall deemed to be their original signatures for all purposes.

**Section 10.10  Construction**. Words in the singular include the plural and in the plural include the singular. The words "including," "includes," "included" and "include," when used, are deemed to be followed by the words "without limitation". Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not defined in this Agreement shall have the meanings determined by the Accounting Standards. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, all attachments thereto and instruments incorporated therein. This Agreement is the result of arms-length negotiations between the parties hereto and no provision hereof, because of any ambiguity found to be contained herein or otherwise, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of that provision. A reference to Law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any subordinate legislation for the time in force made under it.

**Section 10.11  Successors and Assigns**. This Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Shareholders and their respective successors, but neither this Agreement nor any rights, interests or obligations shall be assigned by any party hereto without the prior written consent of the other party or hereto, subject to the provisions in respect of restrictions on Transfers set forth herein.

**Section 10.12  Headings and Captions**. The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

**Section 10.13  No Waiver**. The failure of any Shareholder to insist upon strict performance of a covenant hereunder or of any obligation hereunder or to exercise any right or remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of Shareholder's right to demand strict compliance therewith in the future unless such waiver is in writing and signed by the Shareholder giving the same.

**Section 10.14  Additional Instruments**. Each Shareholder agrees to execute and deliver such additional agreements, certificates, and other documents and to do all such other

28

101780528.12

CONFIDENTIAL

GBG0235445

and things as may be required by law or necessary or appropriate to carry out the intent and purposes of this Agreement.

**Section 10.15   Publicity**. The parties shall consult with each other before issuing any press release with respect to this Agreement or the transactions contemplated hereby and not issue any such press release or make any such public statement without the prior consent of other party, which shall not be unreasonably withheld, conditioned or delayed; <u>provided</u>, that any party may, without the prior consent of the other parties (but after prior consultation, to extent practicable in the circumstances) issue such press release or make such public statement as may upon the advice of outside counsel be required by law or the rules and regulations of the NASDAQ or the Stock Exchange of Hong Kong Limited or the rules of any other applicable exchange.

**Section 10.16   Remedies**. Except as otherwise provided herein, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every remedy under this Agreement or now or hereafter existing at law or in equity.

**Section 10.17   Specific Performance**.   Each Shareholder acknowledges and agrees that its respective remedies at law for a breach or threatened breach of any of the of this Agreement would be inadequate and, in recognition of that fact, agrees that, in the event a breach or threatened breach by a Shareholder of the provisions of this Agreement, in addition any remedies at law, the Company or any other Shareholder shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

*[Signature page follows.]*

29

101780528.12

CONFIDENTIAL

GBG0235446

# A-1775

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed and delivered as of 17 September 2014.

GLOBAL BRANDS GROUP ASIA
LIMITED, f/k/a LF ASIA LIMITED

By: _____
    Name:
    Title:

ICONIX BRAND GROUP, INC.


By: _____
    Name:
    Title:

*Second Amended and Restated Shareholders Agreement*

CONFIDENTIAL

GBG0235447

# A-1776

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed and delivered as of  17  September 2014.

GLOBAL BRANDS GROUP ASIA
LIMITED, f/k/a LF ASIA LIMITED

By: _____
    Name:
    Title:

ICONIX BRAND GROUP, INC.

By: _____
    Name:  Neil Cole
    Title:  President and Chief Executive Officer

*Second Amended and Restated Shareholders Agreement*

CONFIDENTIAL

GBG0235448

# A-1777

**Exhibit "A"**

**BRANDS**

FASHION BRANDS:
1. Badgley Mischka
2. Bongo
3. Candie's
4. Danskin / Danskin Now
5. Ecko Unltd./Marc Ecko Cut & Sew
6. Ed Hardy
7. Joe Boxer
8. Lee Cooper
9. London Fog
10. Mossimo
11. Mudd
12. OP / Ocean Pacific[1]
13. Rampage
14. Rocawear
15. Starter
16. Umbro
17. Zoo York

HOME BRANDS:
18. Cannon
19. Charisma
20. Fieldcrest
21. Royal Velvet
22. Sharper Image
23. Waverly

---

[1] Philippines only for Ocean Pacific

A-1

33753303.5
101780528.12

CONFIDENTIAL

GBG0235449

**A-1778**

**Exhibit "A-1"**

**ADDITIONAL BRANDS**

Ecko Unlimited
Zoo York
Marc Ecko Cut & Sew
Ed Hardy
Sharper Image

A-1

CONFIDENTIAL

GBG0235450

**A-1779**

**Exhibit "A-2"**

**CHMT BRANDS**

Lee Cooper
Umbro

101780528.12

CONFIDENTIAL

GBG0235451

# A-1780

**Exhibit "A-3"**

**RD BRANDS**

Lee Cooper

101780528.12

CONFIDENTIAL

GBG0235452

# A-1781

## Exhibit "B"

### SHARES AND PERCENTAGE SHAREHOLDINGS
### AS OF THE INITIAL ALLOTMENT

| Shareholder | Shares | Percentage Interest |
|---|---|---|
| Iconix Brand Group, Inc. | 50 | 50% |
| Global Brands Group Asia Limited | 50 | 50% |
| Total | 100 | 100% |

101780528.12

CONFIDENTIAL

GBG0235453

# A-1782

**Exhibit "C"**

**FORM OF DEED OF ADHERENCE**

The undersigned is executing and delivering this Deed of Adherence (this **"Deed"**) pursuant to the Shareholders Agreement of Iconix SE Asia Limited dated as of September 30, 2013 (as amended on June 30, 2014 and as further amended on September 17, 2014) and as the same may hereafter be amended, amended and restated, supplemented or otherwise modified, the "***Agreement***").

Capitalized terms used in this Deed which are not defined herein shall have the respective meanings given to them in the Agreement.

Now this Deed witnesses as follows:

1.  The undersigned, pursuant to Section 6.03 of the Agreement, undertakes to and covenants with and for the benefit of all the parties to the Agreement and for the benefit of any other person who becomes a party to the Agreement after the date of this Deed to comply with the provisions of and perform all of the obligations in the Agreement as if the undersigned had been a party to the Agreement as [*state capacity*], except to the extent that those obligations have already been performed.

2.  The undersigned agrees to hold the Shares [transferred][issued] to [it]/[him] with the benefit of the rights, and subject to the restrictions, set out in the Agreement and the articles of association of the Company and consents to [its]/[his] name being entered in the register of Shareholders of Company as the holder of the Shares acquired.

3.  The undersigned confirms that [it]/[he] has been given and has read a copy of the Agreement and all documents in the agreed form.

4.  The undersigned hereby irrevocably appoints [     ] of [     ], fax: [     ] as its agent to receive on its behalf in Hong Kong service of any proceedings arising out of or in connection with the Agreement. Such service shall be deemed completed on delivery to such agent (whether or not it is forwarded to and received by the undersigned).

5.  This Deed and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with Hong Kong law.

**IN WITNESS** of which the undersigned has executed this document as a deed and delivered it on the _____ day of _____, _____.

[*insert appropriate signature provisions*]

C-1

101780528.12

CONFIDENTIAL

GBG0235454

# A-1783

**Exhibit "D"**

**TAX ALLOCATIONS**

Additional Provisions Applicable for U.S. Federal Income Tax Purposes

1. <u>Defined Terms.</u>

1.1 "*Capital Account*" means with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 2 of this **Exhibit "D"** below and in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv).

1.2 "*Capital Contribution*" means, with respect to a Partner, a contribution of cash or property to the Company pursuant to this Agreement.

1.3 "*Code*" means the United States Internal Revenue Code of 1986, as amended and as hereafter amended, or any successor law.

1.4 "*Fiscal Year*" means the calendar year unless otherwise required by the Code.

1.5 "*Gross Asset Value*" means, with respect to any property of the Partnership other than money, such property's adjusted basis for U.S. federal income tax purposes, except that the Gross Asset Value of such property will be adjusted to its fair market value (i) whenever such adjustment is required in order for allocations under this Agreement to have "economic effect" within the meaning of Regulations Section 1.704-1(b)(2)(ii), and (ii) if the Tax Matters Partner considers appropriate, whenever such adjustment is permitted under Regulations Section 1.704-1(b)(2)(ii).

1.6 "*Interest*" means the Percentage Shareholding of a Shareholder in the Company.

1.7 "*Net Profits*" and "*Net Losses*" means, with respect to any Fiscal Year or other relevant period of calculation, any taxable income or taxable loss of the Partnership for such Fiscal Year or other period, with the following adjustments:

1.7.1. any income that is exempt from U.S. federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be added to such taxable income or loss;

1.7.2 any expenditures described in Code Section 705(a)(2)(B) (or treated as expenditures described in Code Section 705(a)(2)(B) pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be subtracted from such taxable income or loss;

D-1

101780528.12

CONFIDENTIAL

GBG0235455

# A-1784

1.7.3 in the event the Gross Asset Value of any Partnership property is adjusted pursuant to the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property for purposes of computing Net Profits or Net Losses;

1.7.4 gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

1.7.5 in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, cost recovery or amortization computed in accordance with Regulations Section 1.704-1(b)(2)(iv)*(g)(3)*; and

1.7.6 any other provisions or items which are specifically allocated pursuant to Sections 3.2 or 3.3 hereof shall not be taken into account in computing Net Profits or Net Loss.

1.8 "*Partner*" means any Shareholder of the Company.

1.9 "*Partnership*" means the Company.

1.10 "*Regulations*" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

2. Capital Accounts.

2.1 Each Partner's Capital Account shall have an initial balance equal to the fair market value of such Partner's initial Capital Contribution to the Partnership.

2.2. Each Partner's Capital Account shall be increased by the sum of:

2.2.1 the amount of cash and the fair market value of any other property (net of liabilities that the Partnership is considered to assume or take subject to) constituting additional contributions by such Partner to the capital of the Partnership,

2.2.2 the portion of any Net Profits and other income or gain items allocated to such Partner's Capital Account.

2.3 Each Partner's Capital Account shall be decreased by the sum of:

2.3.1 the amount of cash and the fair market value of any other property (net of liabilities that such Partner is considered to assume or take subject to) distributed by the Partnership to such Partner; plus

D-2

101780528.12

CONFIDENTIAL

GBG0235456

2.3.2   the portion of any Net Losses and other expense, loss or deduction items allocated to such Partner's Capital Account.

3.    Allocation of Net Profits and Net Losses.

3.1    The Net Profits and Net Losses of the Partnership for each Fiscal Year or other relevant period of calculation, as determined by the Board in accordance with the provisions hereof, shall be allocated among the Partners in accordance with their respective Interests, such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the amount that each Partner would receive if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with this Agreement to the Partners immediately after making such allocation.

3.2    In the event any Partner has a deficit adjusted Capital Account balance at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Partner is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Partner shall be specially allocated items of income and gain in the amount of such excess as quickly as possible; provided, that an allocation pursuant to this Section 3.2 shall be made only if and to the extent that a Partner would have a deficit adjusted Capital Account balance in excess of such sum after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.2 were not in this Schedule to this Agreement.

3.3    Any special allocations of items of income, gain, loss or deduction pursuant to Section 3.2 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount of any items so allocated and all other items allocated to each Partner shall, to the extent possible, be equal to the net amount that would have been allocated to each Partner if the special allocations under Section 3.2 had not occurred.

3.4    The Board is authorized to adjust the allocations hereunder if it considers an adjustment is necessary to:

3.4.1   carry out the intentions of this Agreement; or

3.4.2   to maintain substantial economic effect or otherwise comply with the requirements of Section 704(b) of the Code and the Regulations thereunder.

D-3

101780528.12

CONFIDENTIAL

GBG0235457

**A-1786**

3.5 Notwithstanding Section 3.1, in any year in which the Partnership sells substantially all of its assets or liquidates, each Partner shall be allocated Net Profits or Net Losses (or items thereof) to the extent necessary to cause its Capital Account balance to reflect the amount that will be distributable to such Partner in liquidation of the Partnership pursuant to this Agreement.

4. <u>Tax Allocation</u>.

For Tax Purposes, items of Partnership income, gain, loss, deduction and credit for each Fiscal Year shall be allocated to and among the Parties in the same manner as the corresponding items of Net Profits and Net Losses and specially allocated items are allocated to them pursuant to Section 3 hereof, taking into account any variation between the adjusted tax basis and book value of the Partnership property in accordance with the principles of Code Section 704(c). The Board shall be authorized to make appropriate adjustments to the allocations of items to comply with Code Section 704 or applicable Regulations thereunder.

5. <u>Tax Matters Partner; Elections; Treatment as Partnership</u>.

The initial Tax Matters Partner shall be Iconix. Subject to Section 5.04 of this Agreement, the Tax Matters Partner is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities.

6. <u>Liquidation of the Partnership; No Capital Account Makeup</u>.

6.1 After all liabilities of the Partnership have been satisfied or duly provided for, the remaining assets of the Partnership shall be applied and distributed to the Partners in accordance with this Agreement.

6.2 Notwithstanding anything to the contrary herein, no Partner shall be obligated to restore to the capital of the Partnership any deficit balance in its Capital Account.

D-4

101780528.12

CONFIDENTIAL

GBG0235458

# A-1787

**Exhibit "E"**

**DEFINITION OF "EUROPE"**

Albania
Andorra
Austria
Belarus
Belgium
Bosnia and Herzegovina
Bulgaria
Croatia
Cyprus
Czech Republic
Denmark
Estonia
Finland
Former Yugoslav Republic of Macedonia
France
Georgia
Germany
Greece
Hungary
Iceland
Ireland
Italy
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Moldova
Monaco
Montenegro
Netherlands
Norway
Poland .
Portugal
Romania
Russia
San Marino
Serbia
Slovakia
Slovenia
Spain

E-1

101780528.12

CONFIDENTIAL

GBG0235459

**A-1788**

Sweden
Switzerland
Ukraine
Uzbekistan
United Kingdom (including for the avoidance of doubt the Crown Dependencies of Jersey, Guernsey and the Isle of Man)
Vatican City State

E-2

101780528.12

CONFIDENTIAL

GBG0235460

**A-1789**

Exhibit "F"

**PARTIAL EXERCISE PLAN**

As soon as possible following a Partial Exercise, the Iconix Shareholder and the GBG Shareholder shall:

1.  identify and agree changes to the Master License Agreement which are necessary to remove from the Master License Agreement the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights, which are the subject of the relevant Partial Exercise, and any obligations with respect thereto;

2.  either consent to (as Shareholders) or procure that the Directors nominated by them consent to (i) amendments the Master License Agreement to give effect to the changes agreed contemplated by paragraph 1. of this Exhibit "F" for the purposes of Section 4.06(a)(xix) and (ii) any other matters in respect of which consent is required under this Agreement in order to give effect to the Partial Exercise Plan and closing of the Partial Exercise;

3.  identify and agree which contracts and other arrangements entered into between the Company and third parties and which relate to the Europe Rights, the Existing Rights, the Korea Rights and/or the CHMT Rights which are the subject of the Partial Exercise are to be assigned by the Company to the Iconix Shareholder, to the effect that all rights and obligations (including, without limitation, to receive revenue and to pay costs) are to be so assigned with effect from the closing date applicable to the relevant Partial Exercise;

4.  agree that to the extent that any revenue or costs which ought to be for the account of the Iconix Shareholder (on the one hand) or the Company or any Subsidiary of the Company (on the other hand) but were in fact collected by or borne by the incorrect party, then the Iconix Shareholder and the Company (or its relevant Subsidiary) will promptly reimburse the other accordingly.

5.  as regards the negotiation of any documents which need to occur as part of the Partial Exercise Plan, the Iconix Shareholder will negotiate and agree on the part of the Iconix Shareholder and its Affiliates, and the GBG Shareholder will negotiate and agree on the part of the Company and any Subsidiary of the Company.

F-1

101780528.12

CONFIDENTIAL

GBG0235461



Revenue > 605 Revenue Recognition > 605-50 Customer Payments and Incentives > 605-50-45 Other Presentation Matters
FASB Codification

Copyright © 2020 by Financial Accounting Foundation, Norwalk, Connecticut

# 605-50-45 Other Presentation Matters

Click here to link to 605-50-S45.

> **General Note:** The Other Presentation Matters Section provides guidance on other presentation matters not addressed in the Recognition, Initial Measurement, Subsequent Measurement, and Derecognition Sections. Other presentation matters may include items such as current or long-term balance sheet classification, cash flow presentation, earnings per share matters, and so forth. The FASB Codification also contains Presentation Topics, which provide guidance for general presentation and display items. See those Topics for general guidance.

## General

## > Vendor's Income Statement Characterization of Consideration Given to a Customer (Including a Reseller)

**45-1** A **vendor** may give a **customer** a sales incentive or other **consideration**. This Subtopic addresses the circumstances under which that consideration is either:

    a. An adjustment of the selling prices of the vendor's products or services and therefore characterized as a reduction of revenue when recognized in the vendor's income statement

    b. A cost incurred by the vendor for assets or services received from the customer and therefore characterized as a cost or expense when recognized in the vendor's income statement.

> **Pending Content:**
>
> **Transition Date:** *(P) December 16, 2017; (N) December 16, 2018* | **Transition Guidance:** 606-10-65-1

# A-1791

---

*Editor's Note: Paragraph 605-50-45-1 will be superseded upon transition, together with its heading:*

> **Vendor's Income Statement Characterization of Consideration Given to a Customer (Including a Reseller)**

[Paragraph superseded by Accounting Standards Update No. 2014-09]

---

**45-2 Cash consideration** (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, shall be characterized as a reduction of revenue when recognized in the vendor's income statement. That presumption is overcome and the consideration should be characterized as a cost incurred if, and to the extent that, both of the following conditions are met:

   a.  The vendor receives, or will receive, an identifiable benefit (goods or services) in exchange for the consideration. In order to meet this condition, the identified benefit must be sufficiently separable from the recipient's purchase of the vendor's products such that the vendor could have entered into an exchange transaction with a party other than a purchaser of its products or services in order to receive that benefit.

   b.  The vendor can reasonably estimate the fair value of the benefit identified under the preceding condition. If the amount of consideration paid by the vendor exceeds the estimated fair value of the benefit received, that excess amount shall be characterized as a reduction of revenue when recognized in the vendor's income statement.

---

Pending Content:

**Transition Date:** *(P) December 16, 2017; (N) December 16, 2018* | **Transition Guidance:** 606-10-65-1

 [Paragraph superseded by Accounting Standards Update No. 2014-09]

---

**45-3** If the consideration consists of a free product or service (for example, a gift certificate from the vendor or a free airline ticket that will be honored by another, unrelated entity), or anything other than cash (including credits that the customer can apply against trade amounts owed to the vendor) or equity instruments (see Example 9 [paragraph 605-50-55-43]),the cost of the consideration shall be characterized as an expense (as opposed to a reduction of revenue) when recognized in the vendor's income statement. That is, the free item is a deliverable in the exchange transaction and not a refund or rebate of a portion of the amount charged to the customer.

---

Pending Content:

**Transition Date:** *(P) December 16, 2017; (N) December 16, 2018* | **Transition Guidance:** 606-10-65-1

 [Paragraph superseded by Accounting Standards Update No. 2014-09]

# A-1792

| | |
|---|---|
| **From:** | Neil Cole |
| **Sent:** | Monday, September 30, 2013 1:29 PM |
| **To:** | Ericka Alford |
| **Cc:** | Lauren Gee; Jason Schaefer; Warren Clamen |
| **Subject:** | RE: SEA status |

Be firm and not critical to give in to anything not comfortable with.
If deal does not close we are fine, although would still prefer to close.

-----Original Message-----
From: Ericka Alford
Sent: Monday, September 30, 2013 8:45 AM
To: Neil Cole
Cc: Lauren Gee; Jason Schaefer
Subject: SEA status

Neil,

We are still looking to close today and are getting close, but are going back and forth on a few final points. LF has made some additional changes to control provisions that we cannot fully accept and Warren and Gibson Dunn determined dividend policy is not profit neutral, so we cannot accept as presented. However, we are trying to accommodate where we can to get this done and will keep you posted today.

Thanks,
Ericka

Sent from my iPhone



DEFENSE
EXHIBIT

**1140-U**

19 Cr. 869 (ER)

1

Produced pursuant to Disclosure Stipulation dated June 27, 2019
FOIA Confidential Treatment Requested by Iconix Brand Group, Inc.

ICON-R502-001-00007312

DX-1140-U-0001

**A-1793**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

UNITED STATES OF AMERICA      :

         - v. -      :    **STIPULATION**

NEIL COLE,      :    19 Cr. 869 (ER)

      Defendant.      :

-------------------------------------------------------- x

IT IS HEREBY STIPULATED AND AGREED by and between Neil Cole, the defendant, by and through his counsel, Lorin Reisner, Richard Tarlowe, and Andrew Reich, and the United States of America, by Damian Williams, United States Attorney, Scott Hartman, Noah Solowiejczyk, and Andrew Thomas, Assistant United States Attorneys, of counsel, that:

1.    On October 1, 2021, Jason Rabin was interviewed via WebEx by an Assistant United States Attorney ("AUSA") for the Southern District of New York. Rabin's attorney was present for the interview.

a.    An AUSA took contemporaneous notes of the interview and created an email memorandum from those notes that was sent to Peter Charalambous, a contractor for the United States Attorney's Office for the Southern District of New York. The notes in the email memorandum were not verbatim transcripts of the interview, and were not provided to Rabin to review for accuracy.

b.    According to the email memorandum, Jason Rabin made the following statement, in sum and substance:



DEFENSE
EXHIBIT

**2334**

19 Cr. 869 (ER)

    i.  Rabin understood he was causing Iconix to pay marketing invoices that Iconix had no obligation to pay.

    IT IS FURTHER STIPULATED AND AGREED that this stipulation may be received into evidence as a Defense Exhibit at trial.

Dated:   New York, New York
     October 26, 2021

            By: _____
               Lorin L. Reisner
               Richard C. Tarlowe
               Andrew D. Reich
               Attorneys for Neil Cole

               _____
               DAMIAN WILLIAMS
               United States Attorney for
               the Southern District of New York

               Scott Hartman
               Noah Solowiejczyk
               Andrew Thomas
               Assistant United States Attorneys

2

# A-1795

Ed Kim

Imperatore/Hartman/Lenow

Ethan Cole attorney proffer

July 22, 2019

He understood at some point that GBG had paid more for its share of Iconix shares that GBG believed they were worth. GBG believed it could recoup by billing Iconix for marketing and strategy work. At the time, Ethan did not think there was anything improper about that.

He did not have any knowledge about whether Iconix and GBG actually talked about that, or whether it was done internally at GBG.

Cole was involved in invoices for marketing expenses. He understood that marketing expenses were supposed to hit particular number.

He doesn't know if services actually provided.

He believes it was Jared who provided the numbers.

He went to law school in Canada. Briefly worked in law. But branding was his first real job. He was there to help Jared make sure things didn't slip through the cracks. He typed emails for Jared.

He graduated from joint undergrad/law school in 2013. He interned at an investment bank. Then at law firm in Canada for 8 months.

Spring 2014 – went to L&F to work in brand management business.

2016 – switched to corporate division

2018 – went to work for Rabin at Centric. He is now senior director of business development and strategy.

2014 to 2016 – started working for Jared. He can't remember Jason's title. Direct contact with Jason was somewhat limited given wide gap in seniority.

Basic responsibilities – Ethan functioned as a type of assistant to Jared. Helped Jared stay on top of things. Typed things up for Jared.

He came to understand that there was licensing agreement between Iconix and GBG related to Rocawear Kids.



3517-003
Cole, Ethan Rapoport
Page 1 of 2

# A-1796

He knew that GBG entered into JVs with Iconix. He remembers generally that in JVs, GBG would buy about 50 percent of Iconix's IP in certain brands. Revenue would be split with Iconix.

GBG may have received a management fee to cover overhead, but he doesn't know which JVs this was incorporated.

He doesn't recall the timing of JVs.

He remembers interacting with Horowitz on a number of occasions. He accompanied Margoils. He once met Cole as part of larger meeting. He once met David Maslaton.

He also passed information between Jared and legal team, which was drafting the deal docs. For one of later JVs, he coordinated some of diligence.

Payment terms – he understood that GBG was paying to get about 50 percent of IP in local markets, and Iconix and GBG would split revenue. Term sheet was simple and short – it predated his arrival at the company.

Ethan was not a participant on any negotiations over purchase price. He does have understanding that Iconix would pay higher price for GBG's share. He learned that internally at GBG. He believes he learned it from Jared and Jason. He does not recall any discussions between GBG and Iconix about that topic, but believes it was probably Jason who had that conversation on behalf of GBG.

Money getting recouped – he understood that GBG would pay a higher price because they could recoup the difference by billing Iconix for marketing and strategy work. He learned this from Jared. He doesn't know what discussions took place with Iconix about this.

Sent email Gmail to Gmail – doesn't recall why

# A-1797

318A-NY-3005279 Serial 48

-1 of 10-

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    08/27/2019

    ETHAN COLE, date of birth June 15, 1989 was interviewed pursuant to a proffer agreement at the United States Attorney's Office (USAO) for the Southern District of New York (SDNY) on July 29, 2019 by Federal Bureau of Investigation (FBI) Special Agent (SA) Robert Hupcher and Assistant United States Attorneys (AUSA's) Scott Hartman, Jared Lenow, and Edward Imperatore of the SDNY. Also present for the interview were Danette Edwards, Kristen Dieter, and Adelle Harris of the Securities and Exchange Commission (SEC) (telephonically). COLE's attorneys Ed Kim, Alex Messiter, and Chloe Marmet from Krieger Kim & Lewin LLP were also present. After being advised of the identities of the interviewing officials and the nature of the interview, COLE provided the following information:

    COLE studied law in Canada and attended Western University outside of Toronto in London, Ontario. COLE did a combined program and studied philosophy, business, and law. In Canada, there was a mandatory one year work requirement at a law firm before being able to become a lawyer. COLE finished law school in 2013 or 2014. COLE received an Honors Business Administration (HBA) degree as well as a law degree. During his business studies, COLE took a mixture of different business classes such as introduction to accounting and introduction to data analytics. COLE also took a finance elective and entrepreneurship elective. COLE took two accounting classes – an introductory accounting class and a second one that was geared towards finance. In accounting, COLE learned about debits and credits and how the financial statements related to each other. COLE took some business law in his second year which was taught by a practicing lawyer. There was a securities component as well. COLE did not think he studies touched on American securities law. COLE remembered references to US Generally Accepted Accounting Principles (GAAP). COLE learned about business valuations in his business classes such as discounted cash flows. One of COLE's courses was mostly focused on valuation and had a lot of case studies.

    After graduating, COLE spent six to seven months working at a corporate securities firm in Toronto and got put in touch with JARED MARGOLIS at LI & FUNG (L&F) and then quit his current job to work for MARGOLIS. COLE's father's friend started a brand called AUTHENTIC BRANDS GROUP (ABG) which was a similar company to ICONIX. MARGOLIS and RABIN had just moved back from Hong Kong and COLE's friend's father put COLE in touch with MARGOLIS. COLE's friend was COREY SALTER and COREY SALTER's father was JAMIE SALTER. COLE was

| | | |
|---|---|---|
| Investigation on | 07/29/2019 | at New York, New York, United States (In Person) |
| File # 318A-NY-3005279 | | Date drafted 08/08/2019 |
| by Robert Hupcher | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



3517-004
Cole, Ethan Rapoport
Page 1 of 10

# A-1798

318A-NY-3005279 Serial 48

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of (U) Interview of ETHAN COLE _____ , On 07/29/2019 , Page 2 of 10

unhappy working in law and did not enjoy it. COLE grew up with COREY SALTER and lived with COREY SALTER in college. MARGOLIS did not have a team in the United States and so the combination of COLE not wanting to do what COLE was doing and MARGOLIS' need to hire people was sort of a fit. COLE started at L&F in March 2014 but was not sure of the exact date. L&F eventually spun off GLOBAL BRANDS GROUP (GBG). COLE started as manager of licensing or business development and reported to MARGOLIS. MARGOLIS was either President or Executive Vice President. The company had many different divisions and COLE's division, brand management, was chaotic but MARGOLIS was the highest in that division. There was a men's division, a women's division, two kids' divisions – fashion and characters, a beauty division, a Europe division, an Asian division, and a footwear division. These divisions took licenses, took designs, and sold to retailers. Brand management was more of an agency business. 95% of the business at that time at L&F was licensing. L&F owned FRYE, a footwear brand, and some other brands but was mostly a licensing business. The FUNGS were a very prominent family. The Chief Executive Officer (CEO) was technically based in Hong Kong but the United States was the biggest piece of the business. JASON RABIN, DOW FAMULAK, and RON VENTRICELLI were in charge of the US. RABIN was maybe President of North America and VENTRICELLI was Chief Financial Officer (CFO) and FAMULAK maybe ran Europe and was more of a Chief Operating Officer (COO). L&F was trading on the Hong Kong stock exchange and the FUNGS were there so that was why the CEO was there. BRUCE ROCKOWITZ became the CEO of GBG. CENTRIC splitting off from GBG came from fighting within the FUNGS and politics. The FUNGS did not have a lot of input in the day to day management when COLE started as far as COLE knew. COLE had better insight now. MARGOLIS reported up to FAMULAK or RABIN. Brand management had offices all over the world and at some point it stopped being lumped into North America and instead got lumped into Europe. L&F bought RABIN's business – KIDS HEADQUARTERS (KHQ). The FUNGS wanted RABIN to build something in Hong Kong and RABIN wanted MARGOLIS to join him. RABIN had an idea about creating a global agency by buying smaller agencies that represented American brands. TLC was one of the agencies and COLE believed TLC was acquired by GBG before COLE joined GBG. TLC had offices in Europe, Asia, and the US. TLC was under the component of what MARGOLIS was in charge of. COLE thought TLC had a relationship with ICONIX before COLE started. There was some story for how much L&F paid for the European part of TLC. ICONIX had something to do with this. The joint venture (JV) was not performing the way people wanted it to perform.

L&F's offices were in the Empire State Building. Brand management had a corner in one of the floors and there were maybe 50 to 60 people in the group. A handful of these people reported to MARGOLIS. No one reported to COLE. There was a woman who ran TLC's US office and she sat in that office. MARGOLIS did not sit with the team. MARGOLIS sat in an old showroom with no windows. Eventually TLC was definitely the biggest part of the brand management business and by far the most sophisticated in terms of processes and management. A group in China represented PEANUTS and that was a big piece. There was a separate group in Southeast Asia (SEA) and one in Korea.

# A-1799

318A-NY-3005279 Serial 48

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of (U) Interview of ETHAN COLE , On 07/29/2019 , Page 3 of 10

The platform for L&F was acquisitions but some business came up organically. The two people in charge of TLC sat in London. The JENNIFER LOPEZ business and DAVID BECKHAM business became big pieces of the business for GBG. GBG had a 50/50 JV with BECKHAM for certain categories.

When COLE joined GBG, COLE organized MARGOLIS by preparing MARGOLIS for meetings, making sure the things MARGOLIS was working on were moving forward, and writing a lot of emails for MARGOLIS. COLE would sit across from MARGOLIS to write emails. MARGOLIS was limited in what he could do. MARGOLIS also had an assistant that changed over time. His assistants were PRISCILLA Last Name Unknown (LNU), AMANDA AZOLI, KATE LNU, and CLAUDIA LNU. At some point finance got moved to London. TLC also started implementing their own processes and things became more professional at that point. Before this, COLE was doing 1000 things. There was a lot of frustration with how disorganized MARGOLIS' world was. COLE and MAROGLIS were both frustrated along with the people that MARGOLIS reported to. MARGOLIS never really ran a business and was self-conscious about MARGOLIS' business ability. Every day seemed like a fire drill working for MARGOLIS. COLE's sense was that TLC had been running offices in different countries and they had a conversation with MARGOLIS about the shift in business. The finance people ended up reporting to IMAM LNU who was the finance person at TLC. A lot of functions started running out of Europe. The brand management group had a budget that was separate from L&F and that rolled into the L&F budget. Every office had their own budget which got pulled together to be the brand management budget. MARGOLIS had to submit this to MARGOLIS' bosses. Brand management was not a big focus for the budget and seemed like a small part of the budget.

There was definitely a sense from management like "we have to hit our numbers." Management would yell at people for not hitting their numbers and that would come down to brand management. MARGOLIS got pressure from someone above him about hitting numbers. MARGOLIS would go to a meeting, come back down, and then something was a big focus after that. Brand management generally hit its numbers either in the full profit and loss statement (P&L) or at least a bottom line number. Brand management had its own P&L along with every division. Eventually COLE moved to corporate and saw the process. COLE did not know if corporate L&F in China gave revenue guidance. COLE learned that it was important to hit the numbers because L&F was a public company and there was pressure to hit the numbers. COLE did not have stock in L&F or GBG. COLE bought stock in CENTRIC but was not given stock in CENTRIC.

MARGOLIS was in contact with the main L&F people in the US about hitting numbers. MARGOLIS would meet with each of these people and preparing for these meetings was always stressful. COLE's impression was that MARGOLIS and RABIN were good friends and went to Hong Kong together. They seemed like they were friends as well as colleagues and they socialized together outside of the office. RABIN had a role in the brand management part of the

**A-1800**

318A-NY-3005279 Serial 48

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of (U) Interview of ETHAN COLE ,On 07/29/2019 ,Page 4 of 10

business. MARGOLIS met with RABIN and then there would be things that they had to do after. RABIN was kept in the loop for what was happening with brand management but did not do day-to-day things.

COLE was in meetings with RABIN and other US heads but that was more of an exception than the norm. L&F's entire business was built on acquisitions but did have some organic growth. When COLE started, he was doing mostly day-to-day work as opposed to deals but the longer COLE was there and the more professional it became, the less grunt work he had to do and worked more on deals.

For the preliminary investment proposal (PIP), management would summarize a deal and it would get sent to the investment committee (IC) which was RABIN, VENTRICELLI, and FAMULAK and maybe a few other people. The investment committee was a committee of people but it was also looked at as a body. COLE never attended investment committee meetings. In the early days, the PIP was done out of Hong Kong. The people in Hong Kong put together really long PIP's and over time they became shorter and shorter. Many people in the room already knew what was happening before the PIP happened for North America.

COLE remembered some deals that the IC was not excited about and MARGOLIS would fight with all those guys about doing the deal. There was one deal that dealt with purchasing an agency in Latin America that the IC did not want to do and MARGOLIS did. The PIPs had to have a projection but were more qualitative overall. Sometimes COLE would talk about the PIPs with MARGOLIS but did not really talk about the meetings. MARGOLIS seemed like he could push to get the deals done that he wanted to get done.

COLE's compensation included a bonus but his compensation was not directly tied to the P&L. The bonus never became that meaningful. COLE thought the P&L and hitting numbers definitely had an impact on bonuses but did not know to what extent. There was a rubric for bonuses based on many things including the division. Brand management was the smallest division so by COLE being in that division, he got a smaller bonus. COLE knew now that there was a bonus pool that got allocated out. When someone got to the vice president level, they got stock options. MARGOLIS sometimes talked about how the L&F stock was not doing well. L&F did $20 billion in revenue. Brand management did around $400 million in revenue. The performance of the other divisions drove the stock price more than brand management.

After moving out of brand management in 2015 or 2016 and into corporate, COLE had more visibility into how North America was performing overall. COLE understood that GBG got spun off from L&F and brand management was part of the GBG spinoff. Anything to do with licenses, called the "branded business," as well as brand management, joined GBG. When the spinoff happened, ROCKOWITZ became the CEO and was still in Hong Kong. Other than that, COLE did not know if anything else really changed from a management

# A-1801

318A-NY-3005279 Serial 48

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of  (U) Interview of ETHAN COLE                              , On  07/29/2019 , Page  5 of 10

perspective. Prior to moving to corporate, COLE always worked for MARGOLIS. COLE was manager, then senior manager, then director, and was now senior director of business operations.

GBG got split in half recently. RABIN partnered with a private equity firm called CENTRIC BRANDS to buy half of GBG. COLE now worked for CENTRIC BRANDS. Kids' apparel, beauty, accessories, and some of men's and women's brands got spun off. CENTRIC BRANDS was mostly a license business and owned around five brands. CENTRIC BRANDS was 90% licensed. Brand management got left behind at GBG. DIFFERENTIAL BRANDS took half of GBG public and renamed it CENTRIC. CENTRIC BRANDS was publically traded in the US. Some of the floors were reconfigured in the Empire State Building so the floors were separate between the two companies. There was a transition agreement for two or three years where some internal functions between GBG and CENTRIC BRANDS liked information technology (IT) were shared.

COLE worked for JOE FAVUZZA who reported to RABIN. COLE was in budget meetings with the two of them for a while but then they hired a CFO. When the CENTRIC BRANDS spinoff happened, the private equity guys took over a lot of the functions such as mergers and acquisitions (M&A). COLE's role and job functions had deteriorated since CENTRIC BRANDS took over. FAVUZZA needed help on the finance part of the business and was doing a lot of the M&A stuff. COLE considered MARGOLIS a friend and spoke to him maybe once per month.

MARGOLIS was still in brand management and his division got merged with CAA, a talent agency. Over time, MARGOLIS become more marginalized and got relegated to more business development recently. COLE thought MARGOLIS was going to leave to go to PAYLESS. MARGOLIS wanted to move to Miami and RABIN did not really support MARGOLIS moving there. It pissed off MARGOLIS that RABIN was not supportive of MARGOLIS moving to Miami.

COLE first heard of ICONIX when he was in college. There were showrooms that COLE was aware of for some of ICONIX's brands.

COLE definitely remembered working on amendments to JV's at ICONIX.

COLE was shown what is marked as TAB 1 (SH-SEC-00000653). COLE remembered that DIRTY JERZ and MARC ECKO were having big issues internationally. This email was probably in the context of some type of diligence and they highlighted that they had issues with a licensee. If one of the licensees was insolvent, it could create issues for the JV.

COLE was shown what is marked as TAB 4 (SH-SEC-00000378). This was an example of an email that MARGOLIS wanted COLE to write and COLE would put it in an email for him. The $3 million plug was a guaranteed dividend or contribution to the GBG side. COLE did not know why this was included in the deal. The plug referred to a guaranteed distribution from ICONIX to GBG. It

**A-1802**

318A-NY-3005279 Serial 48

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of (U) Interview of ETHAN COLE , On 07/29/2019 , Page 6 of 10

was a way to protect GBG.

COLE was shown what is marked as TAB 3 (SH-SEC-00018195 – 97). COLE remembered there was something in one of the JV's where the trademarks were being held at a company in Luxembourg and that could have been what ICONIX LUX was. There was a China portion that included LEE COOPER and UMBRO. There was stuff in here that COLE could have written but some of it was maybe copied. COLE had a memory of putting together things like this. COLE did not remember discussing the $3 million contribution but some of the deals had floors or what COLE would call a backstop for when it got sold back. Section C-2 seemed like the section that described the backstop. It seemed like the plug referenced in Tab 4 was the same $3 million in section C-1. This was different than what was described in C-2. Section C-1 was saying that if the transaction closed by the end of the quarter, GBG would not receive less than $3 million in contributions. It seemed like this was not yet finalized by the time of this document.

COLE was shown what is marked as TAB 9 (EC-SDNY-00000253 – 54). This email was sent from COLE's Gmail account. This was a summary of what was going on. This was something that MARGOLIS would want to take to a meeting with ICONIX. There were different JV's that either had or had not finished. There were amounts that GBG overpaid and that GBG was going to invoice to ICONIX to try to get back. COLE remembered that at some point he learned about the overpayments but not at the beginning. There was talk about the purchase price jumping up. At some point it became clear that this was the way the deals were done. COLE's role in the JV was coordinating the terms of the JV with various departments and third parties. Certain things got dropped in towards the end of the process, like purchase price. At some point, legal commented on the purchase price jumping and COLE said that COLE did not know why it changed. There was not really due diligence around purchase price but rather there was due diligence around the existing business to make sure the business was doing what they said it was. RABIN and NEIL COLE would have an agreement for the purchase price around the JV's. The structure of these JV's was pretty similar. Aside from a P&L forecast, COLE did not know whether any type of discounted cash flow (DCF) or valuation was done for these JV's. This document was something that MARGOLIS wanted COLE to draft. COLE remembered the backstop being calculated at 5x or 5.5x. It was a way for ICONIX to buy it back. COLE's impression about the JV purchase price had to do with the relationship between ICONIX and GBG and things outside of brand management. It seemed like everything was a horse trade. The overpay piece was communicated down and also talk about submitting invoices. At some point COLE came to understand that GBG was paying more for JV's and then submitting invoices. For point B – markdown money was what would be paid to a retailer. There was some issue with money due to RAINBOW. That was not in the brand management division but somehow got lumped into this deal. COLE believed the markdown was for ICONIX brands at RAINBOW. In brand management, there were no markdowns. COLE remembered asking how much the markdown was for RAINBOW and MARGOLIS not

# A-1803

318A-NY-3005279 Serial 48

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of (U) Interview of ETHAN COLE                    , On 07/29/2019 , Page 7 of 10

knowing at the time. For section C – these were other things to discuss with ICONIX. It was possible that the $3.5 million in outstanding ROCAWEAR royalty was a way to get money back to GBG. These bullet points were clearly being connected. The reference to wiggle room at the bottom was referencing to different geographical locations and was probably not regarding the overpayment. There was a lot of internal conversations regarding this email. The piece COLE remembered clearly was about the invoice. They were going to invoice ICONIX for marketing and COLE reached out to the offices to ask what marketing had been done. MARGOLIS would assign values for the invoices and COLE created the invoices. GBG was invoicing to a number relating to the amount of the overpayment for the JV. COLE did not remember discussing the overpayment with RABIN. COLE did not recall any conversations with lawyers where were discussions of an overpayment. COLE remembered talking to MARGOLIS about invoicing to a specific number. COLE did not know why this was sent from COLE's Gmail account in the middle of workday. Sending email from his Gmail account was an exception and not the norm. The overpayment probably should have been in the PIP. There were no conversations COLE was aware of about including the overpayments in the PIP. COLE would be surprised if the investment did not know about the giveback. The giveback was a material part of the deal. Everything seemed like a horse trade.

COLE was shown what is marked as TAB 7 (COLE-SEC-00028585 – 94). COLE recognized this deal. COLE did not know how GBG was accounting for the deal and how this asset was put on the books. COLE never told anyone in accounting that there was a $5 million overpayment. COLE never told anyone besides MARGOLIS about the interest being worth $10 million instead of $15 million. COLE thought the accountants, lawyers, and auditors all knew everything. COLE had been there for a few months and there were other deals and things being done at the C-level. These were deals that were happening at the most senior level. The giveback did not seem like an issue to COLE at the time.

COLE attended a meeting with ICONIX regarding JV's where they discussed term sheets. COLE remembered talking about a new JV. There was a JV board meeting that COLE went to that discussed Europe and NEIL COLE was there. There was a meeting talking about the JV's at ICONIX with SETH HOROWITZ and MARGOLIS. The takeaway from the meeting was putting together a new JV. COLE did not remember the first time COLE met HOROWITZ. MARGOLIS knew HOROWITZ and they worked together on different things.

COLE was shown what is marked as TAB 10 (GBG0028570 – 74). KHQ was RABIN's old kids business. A license, ROCAWEAR, was being terminated and they were waiving the royalties. MARGOLIS and HOROWITZ were probably talking and in communication and then HOROWITZ sent it to MARGOLIS. This had nothing to do with brand management. JIMMY ROSENFELD was part of FISHMAN and TOBIN which was one of the kids divisions of GBG. COLE did not remember discussing this with ROSENFELD and did not know that ROSENFELD saw this. COLE did not remember MARGOLIS telling COLE to send this to RABIN. GBG would not have

# A-1804

318A-NY-3005279 Serial 48

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of  (U) Interview of ETHAN COLE                    , On  07/29/2019 , Page  8 of 10

terminated a license that GBG wanted to have.

COLE was shown what is marked as TAB 26 (GBG0020535). COLE recognized this document as a document sent from COLE's work email related to the JV. Regarding the $6 million for UMBRO China, these were things being lumped into brand management. COLE originally did not know how to get these numbers because they were not brand management. The meeting was probably MARGOLIS asking COLE for summaries of various things. The plugs section was talking about overpayments from Tab 9. The fixtures were a reference to signage in a retailer and promotions of a product. Fixtures become something that got grouped into ROCAWEAR but it was not part of the JV. COLE did not remember if there was a discussion with legal about this per the bullet point. The $5 million plug for the Middle East would have been in the context of an overpayment. MAROGLIS was always going over different things. This email could have been for internal discussions before the external meeting with ICONIX.

COLE was shown what is marked as TAB 14. MARK CALDWELL was an executive vice president and sat in Greensboro. MARGOLIS or RABIN told COLE to send this email. COLE did not recall a specific conversation with RABIN or MARGOLIS about this email before he sent it but there must have been one.

COLE was shown what is marked as TAB 15 (GBG0018351 – 58). JOHN REDA was bouncing around to different divisions and was a finance guy. CALDWELL probably tasked REDA to do this. COLE did not know how these numbers were arrived at but someone told COLE what they were. COLE would reach out to divisions to ask them what marketing was done.

COLE was shown what is marked as TAB 16 (ICON-136-00008076 – 79). DAVE MASLATON was someone at ICONIX.

COLE was shown what is marked as TAB 17 (GBG0018368). COLE wanted MARGOLIS to know about it in case he talked to RABIN. The ICONIX relationship from COLE's perspective had a HOROWITZ and MARGOLIS component as well as a NEIL COLE and RABIN component. RABIN asked to send the invoices out and RABIN was possibly pestering MARGOLIS about it.

COLE was shown what is marked as TAB 18 (GBG0045677 – 79 with attachments). COLE did not remember who asked to provide more detail on the invoices. Logically it made sense that it was ICONIX asking. COLE remembered some invoices were rejected by ICONIX. COLE remembered needing to get more detail and then needing to get backup. COLE remembered the backup being tons of decks. COLE could have reached out to the brand management team for the marketing materials here. All of the material in this email was brand management work. There was a lot of piecing things together. First, COLE had to know what marketing was done and COLE went to RABIN with it. Invoicing to the $5 million was clear to COLE when COLE prepared the first set of invoices. COLE was not sure whether COLE already had the detail he provided

# A-1805

318A-NY-3005279 Serial 48

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of (U) Interview of ETHAN COLE , On 07/29/2019 , Page 9 of 10

or if COLE had to scramble to get it. COLE did not believe the effort to identify the marketing work done had been done in August. It would have been done as part of the invoicing process. The detailed numbers in COLE's email came from MARGOLIS. COLE did not believe that MARGOLIS reached out to the different group to get the numbers. It seemed more arbitrary and not scientific – "we were invoicing to a number." MARGOLIS never told COLE that MARGOLIS knew how much the costs were. COLE had a conversation with someone higher up that the auditors would need support for the marketing done and that was why COLE had to get it. Receipts were never discussed in the context of providing support. COLE did not think there was anyone calculating the cost of any of these items. COLE believed TLC did the work and no one was contracted to do it. RM was RAY MOK. It was not typically an agent's job to do marketing. Asking for amounts was not part of a conversation COLE had with the different groups, as far as COLE could remember. MARGOLIS would go to the different offices and meet the people so he would know a lot of what was going on. COLE did not think the brand owners were big spenders on marketing.

COLE was shown what is marked as TAB 19 (GBG0018407 – 13). COLE did not remember a conversation with someone at ICONIX about this. COLE was creating the invoices but did not remember why he told REDA that COLE would send them to HOROWITZ. HOROWITZ seemed like the right guy to send these to. COLE would not be surprised if COLE had a conversation with HOROWITZ where HOROWITZ said COLE should send the invoices to HOROWITZ.

COLE was shown what is marked as TAB 20 (GBG0045724). Someone told COLE to redo the invoices and not to make these round numbers. There was only a handful of people who would have told COLE this. COLE did not remember a conversation with REDA. COLE remembered changing the numbers from round numbers to random numbers that were close to the round numbers but were not round numbers. This was done so the invoices would be approved. COLE had no evidence to support any of the amounts that were being charged. Changing the numbers was giving the impression that things were getting more granular. COLE did not believe that anyone had support for these numbers.

COLE was shown what is marked as TAB 21 (GBG0019451 – 54). COLE did not recall a conversation with REDA about a change in numbers for the invoice. COLE did not remember why MARGOLIS wanted to review these invoices.

COLE was shown what is marked as TAB 25 (GBG0037673 – 74). COLE did not remember whether there were conversations with ICONIX about the delay. COLE probably reached out to ICONIX and ICONIX said they were processed last week. MAURICE SASSON worked at ICONIX with HOROWITZ. COLE called SASSON because COLE did not feel comfortable calling HOROWITZ. COLE did not know ICONIX's finance people. COLE was not thinking about this in the context of auditors.

COLE was shown what is marked as TAB 27 (GBG0038027 – 29). There must

# A-1806

318A-NY-3005279 Serial 48

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of (U) Interview of ETHAN COLE                    , On 07/29/2019 , Page 10 of 10

have been a push to get these paid by the end of the year.

COLE was shown what is marked as TAB 28 (GBG0020547 – 49). COLE did not remember attending this meeting or a meeting before this with COLE.

COLE was shown what is marked as TAB 33 (GBG0041284 – 85). REDA was asking if they paid the invoice but they disputed the PEANUTS invoice and the other two were approved. COLE did not know ICONIX's position on the invoice they were not accepting. If REDA asked one question about the details, COLE did not know the details.

COLE was shown what is marked as TAB 34 (GBG0041349 – 50 with attachments). The process for COLE generating these invoices would have been the same as the other invoices. COLE did not remember who instructed him to do this but it was probably MARGOLIS. COLE looked at everything that was done for marketing, put a list together, and then generated the numbers. Fixturing for JCPENNEY would not have been related to the JV. ZOO YORK also had nothing to do with the JV. COLE believed COLE got the information for these from MARGOLIS. The amounts were given to COLE in round numbers and then COLE made up the exact numbers to put in here based on the round numbers. COLE did not remember talking about REDA's question with MARGOLIS or RABIN.

COLE was shown what is marked as TAB 36 (GBG0041370 – 72). COLE did not know if COLE spoke to RABIN or MARGOLIS before sending this invoice.

COLE was shown what is marked as TAB 37 (GBG0041385 – 87). COLE was not authorized to write off a $2.1 million invoice but COLE believed COLE was replying to his email and saying that they rejected the PEANUTS invoice. COLE did not remember if COLE spoke to anyone before sending this email.

COLE was shown what is marked as TAB 30 (COLE-SEC-00006159 – 60). COLE did not know why the $3.1 million payment was included as a bullet point. There was a $3.1 million market analysis. It was possible that COLE put together the attached term sheet.

# A-1807

1/2

9/22/2021 t/c Ed Kim, Alex Messiter
RE: Ethan Cole

▣ SH, NS, AT

SH: In Feb. 2020, you told us Ethan Cole would invoke 5th
Amendment. Still his position?

EK: Yes

SH: Have gotten into documents as part of trial prep.
including material from laptop.
There is concerning stuff about E.Cole's candor at the
proffer with us. Based on those docs and witnesses,
it is clear he obstructed our investigation.
For example:
- Docs show he took invoices to Iconix
to allow them to select what to pay
- GBG0246525 lists value, for example, of invoices
- Clear he didn't present to accounting as part of
this; GBG0247078
And there are others.

- SDNY had concerns at the time of proffers. Concerns now
amplified. It's not the sort of thing one forgets.
- It's an important topic. We won't let it go lightly.
- Possibility to cooperate. Not necessarily through taking a
charge. But would have to be prior to trial to
get credit.
-

EK: We will take a look. Would be surprised if E.Cole's
views will change after looking at documents — but don't want to
prejudge. Hard to demonstrate obstruction based on documents
he wasn't shown. E.Cole had gaps in memory.

3517-010
Cole, Ethan Rapoport
Page 1 of 2

**A-1808**

2/2

SH: We think he lied and omitted material facts.

EK: We understand. We will look at the documents. Don't want to prejudge, as I said.

3517-010
Cole, Ethan Rapoport
Page 2 of 2

**A-1809**

10/12/2022  t/c  Ed Kim (Ethan Cole counsel)                    1/1

EK

AT, TL, JR

- If called at trial, EC would invoke his 5th Amendment right. Concern would be §1001, in light of call last year
- Unless he is immunized, EC will not meet or prep with the government

DEFENSE
EXHIBIT

3517-012

19 Cr. 869 (ER)

3517-012
Cole, Ethan Rapoport
Page 1 of 1

DX-3517-012-001

# A-1810

318A-NY-3005279 Serial 108

- 1 of 4 -

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____06/10/2020_____

SETH HOROWITZ, date of birth ▮▮▮▮▮▮▮▮▮▮▮ was interviewed pursuant to a proffer agreement at the United States Attorney's Office (USAO) for the Southern District of New York (SDNY) on February 11, 2020 by Federal Bureau of Investigation (FBI) Special Agent (SA) Robert Hupcher and Assistant United States Attorneys (AUSA's) Scott Hartman and Edward Imperatore of the Southern District of New York. Also present was United States Securities and Exchange Commission (SEC) Sr. SA Adelle Harris (telephonic). HOROWITZ's attorneys Mark Cahn and Brendan McGuire from WilmerHale were also present. After being advised of the identities of the interviewing officials and the nature of the interview, HOROWITZ provided the following information:

On their own, HOROWITZ and JARED MARGOLIS did not make any deals happen between ICONIX and GLOBAL BRANDS GROUP (GBG) as neither had the authority to do so. On occasions, HOROWITZ had direct conversations with JASON RABIN.

HOROWITZ was shown document ICON-SEC-00001893. The structure of the payments changed for SEA III so ICONIX would still get the same amount of cash. There was contemplation of letting GBG out of the ROCAWEAR KIDS deal. Obviously the price also changed. The payment structure here changed before it was executed. In this draft it was $4.3 million in payments.

HOROWITZ was shown document ICON-051-00052302. In this version, it was $4.3 million at closing and then paying $1.3 million every few months and $3.5 million in total. This was the same amount as the ROCAWEAR KIDS license and that was on purpose. NEIL COLE's demand was that GBG would pay the same amount of cash that they would have paid during the ROCAWEAR KIDS agreement. HOROWITZ had to take the ROCAWEAR KIDS agreement and work backwards so the $21 million would not get split evenly and the chunk which was the same amount as ROCAWEAR KIDS would get paid when ROCAWEAR KIDS was due. COLE was angry that GBG was getting the advantage of paying over time when they owed ICONIX the money now.

HOROWITZ was shown document ICON-125-00000695. The cash flow analysis with DAVID MASLATON was in reference to determining the same amount of cash that GBG owed for ROCAWEAR KIDS.

HOROWITZ was shown document ICON-051-000011586. Regarding not moving forward with ROCAWEAR KIDS, there was some discussion regarding letting GBG out of ROCAWEAR KIDS. HOROWITZ was saying ICONIX should not let GBG out of

Investigation on __02/11/2020__ at __New York, New York, United States (In Person)__

File # __318A-NY-3005279__                    Date drafted __04/22/2020__

by __Robert Hupcher__

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.



3539-083
Horowitz, Seth
Page 1 of 4

# A-1811

318A-NY-3005279 Serial 108

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of  (U) Interview of SETH HOROWITZ                    , On  02/11/2020 , Page  2 of 4

ROCAWEAR KIDS since there were substantial minimums that ICONIX needed for the ROCAWEAR brand.  COLE said this was for impairment purposes.  ICONIX did not want to bring it up with GBG because it would cause so many problems.  ICONIX did not want to make waves when it was trying to close China.

HOROWITZ had a conversation with COLE where COLE said it was going to be harder to do deals with GBG now that the GBG was public because GBG needed the same things that ICONIX needed like revenue and profit.  This was after a meeting with GBG when they walked out of the Empire State Building and got into COLE's car.  Prior to this, GBG was not under the pressure to hit quarterly numbers and ICONIX was.  RABIN was saying that he wanted to pay $10 million more and get $10 million back from ICONIX.  By RABIN paying more, it was intellectual property (IP) so he could put it on the balance sheet as an asset.  HOROWITZ learned this from COLE on a basic level while HOROWITZ was at ICONIX.

ICON-SEC-001671 – The amounts at the bottom of this page were in addition to the $5 million that ICONIX owed GBG from SEA II.  The "$10 million and more" referenced a conversation that RABIN had directly with COLE.  There was not enough information to be confident that ICONIX was going to hit their number which was why there was the plug – to get guaranteed money to GBG.  "Getting creative" was a reference to COLE and HOROWITZ both knowing that what they were doing was not kosher and they were more than in the grey area.

COLE brought up CANDIES at the end of HOROWITZ's time at ICONIX when COLE was on a yelling tirade.  COLE said something like, "you're going to have what I had 15 years ago."  COLE said something like he was a better person because of it or he learned because of it.  HOROWITZ understood COLE to be telling him that they had been doing things that were wrong.  COLE was trying to both scare and comfort HOROWITZ by saying COLE was still here even after the investigation.  Someone, possibly DAVID BLUMBERG, told HOROWITZ that a lot of the CANDIES SEC documents were lost because of September 11th.  COLE said they had a target on COLE's back because the SEC did not get COLE the first time because of September 11th.

BLUMBERG was involved in the conversations about the givebacks.  HOROWITZ remembered the conversations about ICONIX letting GBG out of ROCAWEAR KIDS and remembered BLUMBERG being at the meeting.  HOROWITZ did not recall lawyers being involved in conversations that tied the SEA III deal to letting GBG out of ROCAWEAR KIDS.

HOROWITZ was shown document ICON-052-02-00010288.  This specifically did not include the increase in the purchase price or any type of exchange.  HOROWITZ did not recall ERICKA ALFORD asking about any type of exchange.

HOROWITZ was shown document SH-SEC-00018423.  The changes to the previous version reflected a meeting that HOROWITZ had with COLE.  This was HOROWITZ

# A-1812

318A-NY-3005279 Serial 108

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of (U) Interview of SETH HOROWITZ _____ , On 02/11/2020 , Page 3 of 4

writing as COLE was talking to him.  In the same conversation, COLE said the invoices could not be round numbers.  COLE wanted things that bad been done that could pass a sniff test for whether work actually had been done.  TLC was the former JV partner that had done work on these brands.  Had this work been done by the JV, ICONIX would have already paid for half if via the JV. This was one half of the JV billing the other half of the JV for the full marketing amount.  COLE was trying to make this look legitimate by saying have it billed by TLC.  TLC had previously done work on Zoo York because it was part of the SEA JV.  COLE was aware that there were already marketing decks floating around.  COLE wanted 50% of the whole thing to be prepaid for next year so $2.5 million would hit this year and $2.5 million would hit next year.  GBG had the master license for PEANUTS in China.  The highlighted portion referenced another method to try to get the same amount.  GBG would ask where the payment was for PEANUTS and COLE eventually told HOROWITZ that ICONIX would not do the PEANUTS deal.  HOROWITZ did not recall telling that to GBG.  Regarding 8.5 – COLE said that ICONIX was really letting GBG out of $8.5 million due to the $2 million in fixturing.

ICONIX's decision to stop GBG getting out of ROCAWEAR KIDS did not end ICONIX's obligation to GBG to pay GBG back.

MARGOLIS hand-delivered the second batch of invoices to the ICONIX office and said we need to get these paid right away.  MARGOLIS said something to the effect of, "pay the ones you want, you just have to get us to the total amount."  This was the big group that replaced the PEANUTS invoice.  It was just a pile of junk.  HOROWITZ walked it into COLE's office and told COLE that HOROWITZ was not comfortable signing these.  HOROWITZ knew that it was a pile of lies.  COLE opened them up, signed them, crossed out dates, made up new dates, and then told HOROWITZ to get the fuck out of his office. HOROWITZ signed the wire because he knew COLE signed off on the invoices and HOROWITZ thought at least he would not be alone in this.  They were past the point of no return.  COLE did not give HOROWITZ comfort that the invoices were ok.

HOROWITZ was shown document ICON-125-0000633.  HOROWITZ met with MARGOLIS and ETHAN COLE at GBG.  At some point, HOROWITZ was either in the office of GBG's Chief Financial Officer (CFO) or Director of Finance.  HOROWITZ had a clear recollection of being aware on a very conscious level at this meeting that this was all a bunch of "bs" and everyone was in on it.

HOROWITZ was shown document SH-SEC-0000768.  This was around the moment when the switch happened when ICONIX decided not the let GBG out of the RK agreement.

Regarding the conversation where COLE told GBG that ICONIX could not let them out of ROCAWEAR KIDS, COLE was very direct and used the word impairment with RABIN and MARGOLIS.  There was some back and forth on how ICONIX would pay back GBG and RABIN seemed satisfied that ICONIX would find a way to pay

# A-1813

318A-NY-3005279 Serial 108

FD-302a (Rev. 5-8-10)

318A-NY-3005279

Continuation of FD-302 of (U) Interview of SETH HOROWITZ                    , On 02/11/2020 , Page 4 of 4

GBG back.

HOROWITZ was shown document SH-SEC-0000737.  This referenced paying the MOSSIMO/ZOO YORK invoice.

HOROWITZ was shown document SH-SEC-00020297.  COLE came into HOROWITZ's office and closed the door.  This was regarding the response to the SEC. ICONIX started using words in the response about who negotiated and who provided guidance.  COLE told HOROWITZ that COLE wanted to change the MIDDLE EAST and NORTH AFRICA (MENA) JV transaction and even though COLE negotiated it, COLE wanted HOROWITZ to put HOROWITZ's name.  HOROWITZ agreed because HOROWITZ negotiated it as much as everyone else as COLE gave HOROWITZ guidance on it.  Instead of just changing MENA, COLE started changing all the JV's for who did what.  COLE was red-faced and screaming about selling stock.  HOROWITZ told WILLY BURKHARDT not to send anything until HOROWITZ saw it again because HOROWITZ was not in agreement with this.  HOROWITZ went into COLE's office after this and COLE said that he could pass a lie detector test.  COLE would give HOROWITZ feedback on HOROWITZ's Friday at fives.  HOROWITZ had conversations with COLE that showed COLE understood the terms of the JV's.  COLE talked about buying back the JV's.  "JS" was JASON SCHAEFER.  SCHAEFER was not allowed in COLE's office.  The "document" was in reference to the SEC Division of Corporate Finance (Corp Fin) response. SCHAEFER gave every document to finance meaning SCHAEFER was not just a rubber stamp.

When ICONIX was negotiating puts and calls during the JV's, HOROWITZ did not recall anyone talking about the puts and calls thinking there would be any issue with the accounting.  COLE was concerned that there were givebacks for the JV's.  In the response drafting meetings, HOROWITZ remembered thinking about the givebacks but not bringing them up because then COLE might have blamed them all on HOROWITZ.

3539-083
Horowitz, Seth
Page 4 of 4

NAADCOLS

respect for the law, to provide a just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes, and to provide Mr. Cole with needed medical care in the most effective manner. I've considered the need to avoid unwarranted sentence disparities among similarly-situated defendants, and the need to provide restitution to any victims of the offense.

Having considered these factors, it is my intention to impose a sentence of 18 months on each count, to be served concurrently. That will be followed by three years of supervised release on each count, also to be served concurrently.

I will not impose a fine as I find that Mr. Cole will not be able to pay a fine, due to the other financial aspects of the sentence, and I will execute the proposed consent order of forfeiture that has been provided. I will await the submission from Iconix concerning any possible restitution. I will order the mandatory special assessment of $100 on each count of conviction, for a total of $800.

I believe that this sentence is sufficient but not greater than necessary to comply with the purposes of sentencing set forth at section 3553(a)(2) for the following reasons: As I noted earlier, Mr. Cole, I watched, I sat through both trials, and, frankly, I believe Mr. Horowitz, and I did not believe you. I believe that you knew that the two

# A-1815

39

NAADCOLS

I've indicated?

Mr. Lenow?

MR. LENOW:  No, your Honor.

THE COURT:  Mr. Hecker.

MR. HECKER:  No, your Honor.

THE COURT:  In that event, it is the judgment of the Court that you be sentenced to 18 months on each count of conviction, to be served concurrently.  That will be followed by three years of supervised release on each count, also to be served concurrently.

The standard conditions of supervised release will apply.  Those conditions are set forth in the presentence report at pages 47 and 48 -- I'm sorry, 47 through 49, and are included in the judgment in their entirety herein.

The following mandatory conditions will be applied. They're set forth at page 47, and they are that you not commit another federal, state, or local crime; not unlawfully possess a controlled substance.  I will suspend the drug testing condition, because I do not believe that that is necessary in this instance.  Those mandatory conditions are included in their entirety in the judgment.

I also impose the following special conditions, which are set forth at page 49.  They are included in the judgment in their entirety, and they are that you must participate in an outpatient mental health treatment program approved by

40

NAADCOLS

probation, and continue taking any prescribed medications unless otherwise instructed by your health care provider.

You shall submit your person, and any property, residence, vehicle, papers, computer, or electronic data storage devices, to a search by any U.S. Probation Officer and, if needed, with the assistance of law enforcement. The search is to be conducted when there is reasonable suspicion concerning a violation of a condition of supervision or unlawful conduct by Mr. Cole.

You must not incur new credit charges or open additional lines of credit without the approval of probation unless you are in compliance with the installment payment schedule, and must provide the probation officer with any requested financial information.

If you do not live in the district during the period of supervised release, it is recommended that you be supervised by the district of residence.

As I indicated previously, I will not impose a fine. I will execute the preliminary order of forfeiture, which seeks forfeiture in the amount of $790,000. I believe approximately $790,200.

I will await the submissions concerning restitution, which, in any event, will be applied, if at all, within 90 days.

Are there any open counts?

42

NAADCOLS

a condition of supervised release.

MR. HECKER: And, your Honor, just for the record, we would object to the imposition of restitution, because the parties seeking restitution aren't a victim under the law. I also think, as a practical matter, the Court could amend the judgment if it ultimately determined, notwithstanding our objection, that restitution's appropriate.

THE COURT: Yes. So what I've indicated is that restitution, if any, is also imposed as a condition of supervised release, and, if any, will be determined over the course of the next 90 days.

Does that address your concern, Mr. Lenow?

MR. LENOW: Yes, Judge.

THE COURT: Okay. With that, I think that constitutes the sentence of the Court.

Mr. Cole, as you obviously are aware, you have a right to appeal both the conviction and the sentence. However, there are strict time limits within which you need to perfect that appeal.

So, Mr. Hecker, will you assure me that you will promptly and thoroughly discuss with Mr. Cole his appellate rights?

MR. HECKER: We absolutely will, your Honor.

THE COURT: Now, I take it that you are making an application today, Mr. Hecker to allow Mr. Cole to remain on

# A-1818

43

NAADCOLS

bail pending appeal.

MR. HECKER:  Yes, on consent from the government.

THE COURT:  Government does not oppose?

MR. LENOW:  That's correct, Judge.

THE COURT:  Very well.  Mr. Cole may remain on bail pending appeal subject to the same conditions that he has been over the last number of years.

Unless there's anything else, Mr. Lenow --

MR. LENOW:  Nothing further, Judge.  Thank you.

THE COURT:  Mr. Hecker?

MR. HECKER:  No, your Honor.  Thank you.

THE COURT:  In that event, we are adjourned.

Mr. Cole, good luck to you, sir.

(Adjourned)

**A-1819**

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

### United States District Court

Southern _____ District of New York _____

Caption:

United States

_____ v.

Neil Cole                              Docket No.: 19-cr-869-1-ER _____

_____              Hon. Edgardo Ramos _____

(District Court Judge)

Notice is hereby given that Neil Cole _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment ✓ , other _____

entered in this action on 10/13/2023 _____.                    (specify)

              (date)

This appeal concerns: Conviction only |___  Sentence only |___| Conviction & Sentence |✓ Other |___

Defendant found guilty by plea |___  trial |✓| N/A |___ .

Offense occurred after November 1, 1987?  Yes |✓  No |___  N/A |___

Date of sentence: 10/10/2023 _____  N/A |___

Bail/Jail Disposition: Committed |___  Not committed |✓| N/A |___

RECEIVED OCT 25 2023 S.D.N.Y - APPEALS

Appellant is represented by counsel? Yes ✓ | No |___  If yes, provide the following information:

Defendant's Counsel: Alexandra A.E. Shapiro

Counsel's Address: Shapiro Arato Bach LLP

1140 Ave of the Americas, New York, NY 10036

Counsel's Phone: (212) 257-4881

Assistant U.S. Attorney: Jared P. Lenow

AUSA's Address: One St. Andrews Plaza

New York, NY 10007

AUSA's Phone: (212) 637-1068

_____

                       Signature

#22596 - $505.00 - EN - 10/25/2023

# A-1820

Generated: Oct 25, 2023 12:52PM                                                      Page 1/1

## U.S. District Court

### New York Southern - Manhattan

Receipt Date: Oct 25, 2023 12:52PM

NEIL COLE

Rcpt. No: 22596                 Trans. Date: Oct 25, 2023 12:52PM                Cashier ID: #EN

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|----|---------|----------------------|-----|-------|-----|
| 203 | Notice of Appeal/Docketing Fee | | 1 | 505.00 | 505.00 |

| CD | Tender | | | | Amt |
|----|--------|--|--|--|-----|
| CC | Credit Card | | | | $505.00 |

|  |  |
|--|--|
| Total Due Prior to Payment: | $505.00 |
| Total Tendered: | $505.00 |
| Total Cash Received: | $0.00 |
| Cash Change Amount: | $0.00 |

**Comments**: 19CR869-1 ER

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.

CLOSED,APPEAL,ECF

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CRIMINAL DOCKET FOR CASE #: 1:19–cr–00869–ER All Defendants**

Case title: USA v. Cole                                  Date Filed: 12/04/2019

                                                         Date Terminated: 10/13/2023

Assigned to: Judge Edgardo
Ramos

**Defendant (1)**

**Neil Cole**                              represented by    **Anita Margot Moss**
*TERMINATED: 10/13/2023*                                    Markus/Moss PLLC
*also known as*                                             40 NW Third Street
Sealed Defendant 1                                          Ph 1
*TERMINATED: 10/13/2023*                                    Miami, FL 33128
                                                            305–379–6667
                                                            Fax: 305–379–6668
                                                            Email: mmoss@markuslaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **David Oscar Markus**
                                                            Markus/Moss PLLC
                                                            Penthouse 1
                                                            40 Nw Third Street
                                                            Miami, FL 33128
                                                            305–379–6667
                                                            Fax: 305–379–6668
                                                            Email: dmarkus@markuslaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Designation: Retained*

                                                            **Lorin L. Reisner**
                                                            Paul Weiss (NY)
                                                            1285 Avenue of the Americas
                                                            New York, NY 10019
                                                            (212) –373–3000
                                                            Fax: (212) 757–3990
                                                            Email: LReisner@paulweiss.com
                                                            *TERMINATED: 03/02/2022*
                                                            *LEAD ATTORNEY*
                                                            *Designation: Retained*

                                                            **Richard Craig Tarlowe**
                                                            Paul, Weiss, Rifkind, Wharton & Garrison LLP
                                                            (NYC)
                                                            1285 Avenue of the Americas
                                                            New York, NY 10019
                                                            (212) 373–3035
                                                            Fax: (212) 492–0035
                                                            Email: RTarlowe@paulweiss.com
                                                            *TERMINATED: 03/02/2022*
                                                            *LEAD ATTORNEY*
                                                            *Designation: Retained*

                                                            **Andrew David Reich**
                                                            DOJ–USAO

271–A Cadman Plaza East
Brooklyn, NY 11201
718–254–6452
Email: andrew.reich@usdoj.gov
*TERMINATED: 03/02/2022*
*Designation: Retained*

**Jeffrey Then**
Kaplan Hecker & Fink LLP
350 Fifth Avenue Suite 7110
New York, NY 10118
212–763–0883
Email: jthen@kaplanhecker.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jenna Minicucci Dabbs**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Suite 7110
New York, NY 10118
212–763–0883
Fax: 212–564–0883
Email: jdabbs@kaplanhecker.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Rebecca Ann Sussman**
Kaplan Hecker & Fink LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212–763–0883
Email: rsussman@kaplanhecker.com
*TERMINATED: 05/02/2023*
*Designation: Retained*

**Sean Hecker**
Kaplan Hecker and Fink LLP
350 Fifth Avenue Suite 7110
New York, NY 10118
212–763–0883
Fax: 212–564–0883
Email: shecker@kaplanhecker.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 15:78J.F MANIPULATIVE AND DECEPTIVE DEVICES SECURITIES FRAUD) (2) | IMPRISONMENT: 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. SUPERVISED RELEASE: 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. |
| 15:78M.F PERIODICAL AND OTHER REPORTS (MAKING FALSE SEC FILINGS) (3–8) | IMPRISONMENT: 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. SUPERVISED RELEASE: 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. |
| 15:7202 & 7242 & 78ff.F ACCOUNTS AND RECORDS, REPORTS, EXAMINE EXCHANGE (IMPROPERLY INFLUENCING THE CONDUCT OF AUDITS) (9) | IMPRISONMENT: 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. SUPERVISED RELEASE: 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. |

# A-1823

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:371.F CONSPIRACY TO COMMIT SECURITIES FRAUD, MAKE FALSE SEC FLINGS, MISLEAD THE CONDUCT OF AUDITS. (1) | Acquitted by Jury. |
| 18:371.F CONSPIRACY TO DESTROY, ALTER, AND FALSIFY RECORDS IN FEDERAL INVESTIGATIONS (10) | Acquitted by Jury. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**Plaintiff**

| USA | represented by | **Edward Arthur Imperatore** |
| --- | --- | --- |

Morrison & Foerster LLP
250 West 55th St
New York, NY 10019
212–468–4320
Email: EImperatore@mofo.com
*TERMINATED: 01/27/2022*
*LEAD ATTORNEY*
*Designation: Assistant US Attorney*

**Jared P Lenow**
US Attorneys Office
One St. Andrew's Plaza
New York, NY 10007
(212) 637–1068
Email: jared.lenow@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Scott Andrew Hartman**
U.S. Attorney's Office
One St. Andrew's Plaza
New York, NY 10007
(212) 637–2357
Fax: (212) 637–2527
Email: scott.hartman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Andrew Mark Thomas**
U.S. Attorney's Office– SDNY
One Saint Andrew's Plaza

New York, NY 10007
212−637−2106
Fax: 212−637−2527
Email: andrew.thomas2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Justin Victor Rodriguez**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
212−637−2591
Fax: 212−637−2443
Email: justin.rodriguez@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Noah David Solowiejczyk**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637−2473
Fax: (212) 637−2527
Email: noah.solowiejczyk@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/04/2019 | 1 | SEALED INDICTMENT as to Sealed Defendant 1 (1) count(s) 1, 2, 3−8, 9, 10. (jm) (Entered: 12/05/2019) |
| 12/05/2019 | 2 | Order to Unseal Indictment as to Sealed Defendant 1. (Signed by Magistrate Judge Barbara C. Moses on 12/5/19)(jm) (Entered: 12/05/2019) |
| 12/05/2019 | | INDICTMENT UNSEALED as to Neil Cole. (jm) (Entered: 12/05/2019) |
| 12/05/2019 | | Case Designated ECF as to Neil Cole. (jm) (Entered: 12/05/2019) |
| 12/05/2019 | | Case as to Neil Cole ASSIGNED to Judge Edgardo Ramos. (jm) (Entered: 12/05/2019) |
| 12/05/2019 | | Attorney update in case as to Neil Cole. Attorney Edward Arthur Imperatore,Scott Andrew Hartman,Jared P Lenow for USA added. (jm) (Entered: 12/05/2019) |
| 12/05/2019 | 16 | Minute Entry for proceedings held before Magistrate Judge Barbara C. Moses:Initial Appearance on disposition sheet as to Neil Cole held on 12/5/2019. Deft present with atty Lorin Reisner and Richard Tarlowe. AUSA Edward Imperatore present. Agreed conditions of release: $1 Million, 1 FRP, Secured by cash and/or property acceptable to USAO, Travel restricted to SDNY/EDNY/Continental US, Surrender travel documents (& No new applications), Pretrial supervision as directed by pretrial services, Deft to be released on own signature, remaining conditions to be met by 12/19/19. Deft to have no contact, direct or indirect, outside of the presence of counsel, with current or former employees of Iconix Brand Group, GBG, or BDO, except for defendant's family members. (jw) (Entered: 01/08/2020) |
| 12/05/2019 | | Minute Entry for proceedings held before Magistrate Judge Barbara C. Moses:Arraignment on disposition sheet as to Neil Cole (1) Count 1,2,3−8,9,10 held on 12/5/2019. Deft present with atty Edward Imperatore. AUSA Lorin Reisner and Richard Tarlowe. Deft arraigned and pleads not guilty. Next conference set before District Judge on 12/10/2019 (jw) (Entered: 01/08/2020) |
| 12/05/2019 | | Minute Entry for proceedings held before Magistrate Judge Barbara C. Moses: Plea entered by Neil Cole (1) Count 1,2,3−8,9,10 Not Guilty. (jw) (Entered: 01/08/2020) |
| 12/05/2019 | 17 | PRB Bond Entered as to Neil Cole in amount of $ 1,000,000. To be cosigned by one financially responsible person; Secured by Cash and/or Property acceptable to USAO; Travel limited to Continental US; Pretrial supervision as directed by PTS; Deft to be released on own signature; Remaining conditions to be met by 12/19/19; Deft to have no contact direct or indirect, Outside the Presence of Counsel with current or former |

| | | |
|---|---|---|
| | | employees of Iconix Brand Group, GBG, OR BDO, Except for Deft's family members (jw) (Entered: 01/08/2020) |
| 12/06/2019 | 4 | NOTICE OF ATTORNEY APPEARANCE: Lorin L. Reisner appearing for Neil Cole. Appearance Type: Retained. (Reisner, Lorin) (Entered: 12/06/2019) |
| 12/06/2019 | 5 | NOTICE OF ATTORNEY APPEARANCE: Richard Craig Tarlowe appearing for Neil Cole. Appearance Type: Retained. (Tarlowe, Richard) (Entered: 12/06/2019) |
| 12/06/2019 | 6 | NOTICE OF ATTORNEY APPEARANCE: Andrew David Reich appearing for Neil Cole. Appearance Type: Retained. (Reich, Andrew) (Entered: 12/06/2019) |
| 12/09/2019 | | Docket Annotation as to Neil Cole: All matters scheduled before the Hon. Edgardo Ramos, U.S.D.J. for the week of December 9, 2019 will be held in Courtroom 14D in the Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, New York 10007 (jar) (Entered: 12/09/2019) |
| 12/10/2019 | | Arrest of Neil Cole. (ap) (Entered: 12/11/2019) |
| 12/10/2019 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Initial Appearance as to Neil Cole held on 12/10/2019. Defendant Neil Cole present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSA Scott Hartman, Edward Imperatore and Jared Lenow present. Special Agent Nicholas Kroll, FBI. Court Reporter: Pam Utter. The government's status letter is due January 10, 2020. A pretrial conference is scheduled for January 17, 2019 at 11:30 AM. Speedy trial time is excluded from today, December 10, 2019, until January 10, 2020, in the interests of justice. Bail continued. (Pretrial Conference set for 1/17/2020 at 11:30 AM before Judge Edgardo Ramos) (Court Reporter Pam Utter) (ap) (Entered: 12/11/2019) |
| 12/11/2019 | 7 | LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 12/11/19 re: enter protective order . Document filed by USA as to Neil Cole. (Attachments: # 1 protective order)(Imperatore, Edward) (Entered: 12/11/2019) |
| 12/16/2019 | 8 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 12/10/19 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2020. Redacted Transcript Deadline set for 1/16/2020. Release of Transcript Restriction set for 3/16/2020. (McGuirk, Kelly) (Entered: 12/16/2019) |
| 12/16/2019 | 9 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 12/10/19 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2019) |
| 12/20/2019 | 10 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re: Scheduling of Trial . Document filed by Neil Cole. (Reisner, Lorin) (Entered: 12/20/2019) |
| 12/20/2019 | 11 | LETTER RESPONSE to Motion by USA as to Neil Cole addressed to Judge Edgardo Ramos from Edward Imperatore, Scott Hartman & Jared Lenow dated 12/20/2019 re: 10 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re: Scheduling of Trial .. (Imperatore, Edward) (Entered: 12/20/2019) |
| 12/20/2019 | 12 | LETTER REPLY TO RESPONSE to Motion by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re 10 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re: Scheduling of Trial .. (Reisner, Lorin) (Entered: 12/20/2019) |
| 12/20/2019 | 13 | MEMO ENDORSEMENT as to Neil Cole (1) on 10 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 20, 2019 re: Scheduling of Trial. ENDORSEMENT: The January 17, 2020 conference is rescheduled for January 7 at 11:30 a.m. in Courtroom 14D at 500 Pearl Street. (Signed by Judge |

| | | |
|---|---|---|
| | | Edgardo Ramos on 12/20/2019) (lnl) (Entered: 12/23/2019) |
| 12/23/2019 | | Set/Reset Hearings as to Neil Cole: Pretrial Conference set for 1/7/2020 at 11:30 AM in Courtroom 14D, 500 Pearl Street, New York, NY 10007 before Judge Edgardo Ramos. (lnl) (Entered: 12/23/2019) |
| 01/03/2020 | 14 | OPINION & ORDER as to Neil Cole. The Court is in receipt of the parties' letters regarding the dispute over a date for trial. Docs. 10, 11, 12. The Court will set a trial date in May 2020, but it will promptly inform the parties should the criminal trial before it scheduled in April 2020 be canceled. Should that trial be cancelled, the Court will entertain rescheduling the trial and related deadlines in this matter to April 2020. Accordingly, the status conference set for January 7, 2020 at 11:30 a.m. is canceled. A jury trial is scheduled for Monday, May 11, 2020 at 9:00 a.m, beginning with jury selection. Trial shall commence immediately thereafter. Motions in limine, proposed voir dire questions, proposed jury instructions, and proposed verdict forms are due April 13, 2020, and any responses or oppositions thereto are due April 27, 2020. The Final Pretrial Conference shall be held on May 7, 2020 at 3:30 p.m. It is SO ORDERED. (Signed by Judge Edgardo Ramos on 1/3/20) (jbo) (Entered: 01/03/2020) |
| 01/03/2020 | | Set/Reset Deadlines/Hearings as to Neil Cole: Responses due by 4/27/2020. Jury Trial set for 5/11/2020 at 09:00 AM; Pretrial Conference set for 5/7/2020 at 03:30 PM before Judge Edgardo Ramos. (jbo) (Entered: 01/03/2020) |
| 01/03/2020 | 15 | PROTECTIVE ORDER as to Neil Cole...regarding procedures to be followed that shall govern the handling of confidential material. (Signed by Judge Edgardo Ramos on 1/3/20)(jbo) (Entered: 01/03/2020) |
| 01/13/2020 | 18 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 12/10/19 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/3/2020. Redacted Transcript Deadline set for 2/13/2020. Release of Transcript Restriction set for 4/13/2020. (McGuirk, Kelly) (Entered: 01/13/2020) |
| 01/13/2020 | 19 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 12/10/19 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/13/2020) |
| 02/05/2020 | 20 | TRANSCRIPT of Proceedings as to Neil Cole re: Hearing held on 12/5/2019 before Magistrate Judge Barbara C. Moses. Court Reporter/Transcriber: Shari Riemer, (518) 581–8973, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/26/2020. Redacted Transcript Deadline set for 3/9/2020. Release of Transcript Restriction set for 5/5/2020. (mqu) (Entered: 02/05/2020) |
| 02/05/2020 | 21 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Hearing proceeding held on 12/5/2019 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (mqu) (Entered: 02/05/2020) |
| 02/17/2020 | 22 | JOINT LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 2/17/20 re: proposed pretrial schedule . Document filed by USA as to Neil Cole. (Imperatore, Edward) (Entered: 02/17/2020) |
| 02/18/2020 | 23 | MEMO ENDORSEMENT granting 22 JOINT LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 2/17/20 re: proposed pretrial schedule. ENDORSEMENT: The application is granted. SO ORDERED. (Signed by Judge Edgardo Ramos on 2/18/2020) (lnl) (Entered: 02/19/2020) |

| | | |
|---|---|---|
| 02/18/2020 | | Set/Reset Deadlines/Hearings as to Neil Cole: Pretrial Motions due by 3/2/2020. (lnl) (Entered: 02/19/2020) |
| 02/19/2020 | 24 | LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 2/19/2020 re: advance trial date . Document filed by USA as to Neil Cole. (Imperatore, Edward) (Entered: 02/19/2020) |
| 02/20/2020 | 25 | ENDORSED LETTERentered 24 LETTER MOTION advance trial date as to Neil Cole (1). Endorsement: Mr. Cole is directed to respond by Monday, February 24, 2020. (Signed by Judge Edgardo Ramos on 2/20/2020) (jar) (Entered: 02/20/2020) |
| 02/24/2020 | 26 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated 2/24/2020 re: 24 LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore dated 2/19/2020 re: advance trial date .. (Reisner, Lorin) (Entered: 02/24/2020) |
| 02/26/2020 | 27 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Edward Imperatore/Scott Hartman/Jared Lenow, dated February 19, 2020 re: Pursuant to the Court's January 2, 2020 Order (Docket 14), the Government respectfully requests that the Court advance the trial date by two weeks in the above–referenced case, from May 11, 2020 to April 27, 2020. ENDORSEMENT: The government's application is DENIED. SO ORDERED. (Signed by Judge Edgardo Ramos on 2/26/2020)(bw) (Entered: 02/26/2020) |
| 03/02/2020 | 28 | MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses*. Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 29 | MEMORANDUM in Support by Neil Cole re 28 MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses..* (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 30 | DECLARATION of Richard C. Tarlowe in Support as to Neil Cole re: 28 MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses..* (Attachments: # 1 Exhibit A – 2015 Iconix Form 8–K, # 2 Exhibit B – SEC Subpoena, # 3 Exhibit C – Email from SEC, # 4 Exhibit D – 2018 Iconix Form 8–K, # 5 Exhibit E – SEC Press Release, # 6 Exhibit F – SDNY Press Release, # 7 Exhibit G – Letter to SDNY, # 8 Exhibit H – Letter from SDNY, # 9 Exhibit I – Email to SDNY, # 10 Exhibit J – Email from SDNY, # 11 Exhibit K – Rhodes Transcript, # 12 Exhibit L – Rhodes Order)(Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 31 | LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated March 2, 2020 re: Defense Rule 17(c) Subpoenas . Document filed by USA as to Neil Cole. (Lenow, Jared) (Entered: 03/02/2020) |
| 03/02/2020 | 32 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated March 2, 2020 re: Letter Motion to Seal . Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 33 | MOTION to Compel *Discovery of Certain Electronic Data*. Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 34 | MEMORANDUM in Support by Neil Cole re 33 MOTION to Compel *Discovery of Certain Electronic Data..* (Tarlowe, Richard) (Entered: 03/02/2020) |
| 03/02/2020 | 35 | DECLARATION of Richard C. Tarlowe in Support as to Neil Cole re: 33 MOTION to Compel *Discovery of Certain Electronic Data..* (Attachments: # 1 Exhibit A – 2019 Letter to SDNY, # 2 Exhibit B – 2020 Letter from SDNY (redacted), # 3 Exhibit C – Filed Under Seal, # 4 Exhibit D – Filed Under Seal, # 5 Exhibit E – Filed Under Seal, # 6 Exhibit F – Filed Under Seal, # 7 Exhibit G – Filed Under Seal, # 8 Exhibit H – Filed Under Seal, # 9 Exhibit I – Filed Under Seal, # 10 Exhibit J – Filed Under Seal, # 11 Exhibit K – Filed Under Seal, # 12 Exhibit L – 2020 Email to SDNY (redacted), # 13 Exhibit M – 2020 Email from SDNY, # 14 Exhibit N – Filed Under Seal, # 15 Exhibit O – Filed Under Seal, # 16 Exhibit P – 2018 Iconix 8–K)(Tarlowe, Richard) (Entered: 03/02/2020) |

| | | |
|---|---|---|
| 03/17/2020 | 36 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated March 17, 2020 re: 31 LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated March 2, 2020 re: Defense Rule 17(c) Subpoenas .. (Tarlowe, Richard) (Entered: 03/17/2020) |
| 03/27/2020 | 37 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 27, 2020 re: Trial Date (Reisner, Lorin) (Entered: 03/27/2020) |
| 03/27/2020 | 38 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Edward Imperatore, Scott Hartman, and Jared Lenow dated 3/27/2020 re: Trial adjournment Document filed by USA. (Hartman, Scott) (Entered: 03/27/2020) |
| 03/31/2020 | 39 | MEMORANDUM in Opposition by USA as to Neil Cole re 33 MOTION to Compel *Discovery of Certain Electronic Data.*, 28 MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses..* (Attachments: # 1 Exhibit SEC Form, # 2 Exhibit Testimony Excerpt)(Lenow, Jared) (Entered: 03/31/2020) |
| 04/01/2020 | 40 | MEMO ENDORSEMENT as to Neil Cole on 38 LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Edward Imperatore, Scott Hartman, and Jared Lenow dated 3/27/2020 re: Trial adjournment. ENDORSEMENT: The May 11 jury trial is adjourned sine die. The final pretrial conference and all pretrial deadlines are also adjourned sine die as well. A pretrial conference is scheduled for June 4, 2020, at 11:00 AM. SO ORDERED. (Signed by Judge Edgardo Ramos on 4/1/2020) (lnl) (Entered: 04/01/2020) |
| 04/01/2020 | | Set/Reset Deadlines/Hearings as to Neil Cole: Pretrial Conference set for 6/4/2020 at 11:00 AM before Judge Edgardo Ramos. (lnl) (Entered: 04/01/2020) |
| 04/15/2020 | 41 | REPLY MEMORANDUM OF LAW in Support as to Neil Cole re: 28 MOTION to Compel *Disclosure by the Government Concerning SEC Coordination and Certain Instructions to Witnesses*. . (Tarlowe, Richard) (Entered: 04/15/2020) |
| 04/15/2020 | 42 | REPLY MEMORANDUM OF LAW in Support as to Neil Cole re: 33 MOTION to Compel *Discovery of Certain Electronic Data*. . (Attachments: # 1 Exhibit A – Excerpt of Spreadsheet, # 2 Exhibit B – Spreadsheet)(Tarlowe, Richard) (Entered: 04/15/2020) |
| 04/27/2020 | 43 | LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated April 27, 2020 re: Exclusion of Speedy Trial Time . Document filed by USA as to Neil Cole. (Attachments: # 1 Text of Proposed Order Exclusion of Speedy Trial Time)(Lenow, Jared) (Entered: 04/27/2020) |
| 04/30/2020 | 44 | ORDER 43 LETTER MOTION as to Neil Cole. It is hereby ORDERED that the time from the date of this Order to June 4, 2020, the date of the next pretrial conference in this matter, is excluded under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A). (Signed by Judge Edgardo Ramos on 4/30/20) (jw) (Entered: 04/30/2020) |
| 05/29/2020 | 45 | LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore, Scott Hartman & Jared Lenow dated 5/29/2020 re: adjourn conference . Document filed by USA as to Neil Cole. (Imperatore, Edward) (Entered: 05/29/2020) |
| 05/29/2020 | 46 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated May 29, 2020 re: 45 LETTER MOTION addressed to Judge Edgardo Ramos from Edward Imperatore, Scott Hartman & Jared Lenow dated 5/29/2020 re: adjourn conference .. (Reisner, Lorin) (Entered: 05/29/2020) |
| 06/03/2020 | 47 | ORDER denying 45 LETTER MOTION Adjournment the May 4 conference until late August 2020 as to Neil Cole (1). ENDORSEMENT: The government's application is DENIED. The conference currently scheduled for June 4, 2020, at 11:00 AM will proceed as a telephone conference. Counsel should call (877) 411–9748 and use access code 3029857#. (Members of the press and public may call the same number, but will not be permitted to speak during the conference.). (Signed by Judge Edgardo Ramos on 6/2/2020) (jar) (Entered: 06/03/2020) |
| 06/04/2020 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Pretrial Conference as to Neil Cole held on 6/4/2020 as to Neil Cole. Defendant Neil Cole appeared with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich by telephone. AUSA |

| | | |
|---|---|---|
| | | Scott Hartman, Edward Imperatore and Jared Lenow appeared by telephone. Court Reporter: Alena Lynch. A telephonic pretrial conference is scheduled for July 7, 2020 at 11:00 AM. Speedy trial time is excluded from today, June 4, 2020, until July 7, 2020, in the interests of justice. Bail continued ( Pretrial Conference set for 7/7/2020 at 11:00 AM before Judge Edgardo Ramos.) (jw) (Entered: 06/04/2020) |
| 06/15/2020 | 48 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 6/4/2020 before Judge Edgardo Ramos. Court Reporter/Transcriber: Alena Lynch, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/6/2020. Redacted Transcript Deadline set for 7/16/2020. Release of Transcript Restriction set for 9/14/2020. (McGuirk, Kelly) (Entered: 06/15/2020) |
| 06/15/2020 | 49 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 6/4/2020 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/15/2020) |
| 07/06/2020 | | Docket Annotation as to Neil Cole: Scheduling Notice – A telephonic pre–trial conference is scheduled for July 7, 2020 at 11:00 a.m. The parties should call (877) 411–9748 and use access code 3029857#. (Members of the press and public may call the same number, but will not be permitted to speak during the conference.) (jar) (Entered: 07/06/2020) |
| 07/07/2020 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Pretrial Conference as to Neil Cole held on 7/7/2020. Defendant and counsel for defendant Lorin Reisner and Andrew Reich, by telephone. For the government, Edward Imperatore, Scott Hartmen and Jared Lenow, by telephone. A telephonic pretrial conference is scheduled for August 11, 2020, at 11:00 a.m. Speedy trial time is excluded from today, July 7, 2020, until August 11, 2020, in the interest of justice. **The parties should call the court at (877) 411–9748; access code: 3029857**. (jar) (Entered: 08/10/2020) |
| 08/11/2020 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pretrial Conference as to Neil Cole held on 8/11/2020. Defendant Neil Cole appeared with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich by telephone. AUSA Scott Hartman, Edward Imperatore and Jared Lenow appeared by telephone. A control jury trial date is scheduled for February 8, 2021, at 9:30 a.m. Speedy trial time is excluded from today, August 11, 2020, until February 8, 2021, in the interests of justice. Bail continued. (Jury Trial set for 2/8/2021 at 09:30 AM before Judge Edgardo Ramos) (Court Reporter Kristin Carannante) (ap) (Entered: 08/11/2020) |
| 10/02/2020 | 50 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 7/7/20 before Judge Edgardo Ramos. Court Reporter/Transcriber: Jennifer Thun, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/23/2020. Redacted Transcript Deadline set for 11/2/2020. Release of Transcript Restriction set for 12/31/2020. (McGuirk, Kelly) (Entered: 10/02/2020) |
| 10/02/2020 | 51 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 7/7/20 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/02/2020) |
| 10/02/2020 | 52 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 8/11/20 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kristen Carannante, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/23/2020. Redacted Transcript Deadline set for 11/2/2020. Release of Transcript |

| | | |
|---|---|---|
| | | Restriction set for 12/31/2020. (McGuirk, Kelly) (Entered: 10/02/2020) |
| 10/02/2020 | 53 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 8/11/20 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/02/2020) |
| 12/23/2020 | 54 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 23, 2020 re: Telephonic Status Conference (Reisner, Lorin) (Entered: 12/23/2020) |
| 12/23/2020 | 55 | MEMO ENDORSEMENT as to Neil Cole on re: 54 LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated December 23, 2020 re: Telephonic Status Conference. ENDORSEMENT: The parties are directed to appear for a telephonic status conference on Tuesday, January 5, 2021 at 2:00 p.m. The parties are directed to dial (877) 411−9748 at that time and enter access code 3029857, followed by the pound (#) sign. (Status Conference set for 1/5/2021 at 02:00 PM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 12/23/2020) (ap) (Entered: 12/23/2020) |
| 12/29/2020 | 56 | MOTION to Quash *Defendant's Rule 17 Subpoena*. Document filed by USA as to Neil Cole. (Attachments: # 1 Exhibit A (Rule 17 subpoena))(Imperatore, Edward) (Entered: 12/29/2020) |
| 12/30/2020 | 57 | ORDER as to Neil Cole. On December 29, 2020, the Government filed a motion to quash Defendants Rule 17 subpoena served on non−party Baked by Melissa. Doc. 56. The Court directs Defendant to submit any opposition by January 20, 2021, and the Government to submit its reply by January 27, 2021. The parties are directed to appear for a telephonic hearing regarding the motion on February 2, 2021 at 11:00 am. The parties shall call the Court at (877) 411−9748 at that time and use access code 3029857, followed by the pound (#) sign.( Government reply due by 1/27/2021., Defendant opposition due by 1/20/2021, Telephone Conference set for 2/2/2021 at 11:00 AM before Judge Edgardo Ramos.) (Signed by Judge Edgardo Ramos on 12/30/2020)(jw) (Entered: 12/30/2020) |
| 01/04/2021 | 58 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated January 4, 2021 re: Pretrial Motions (Attachments: # 1 Exhibit A − July 29, 2020 SEC Letter, # 2 Exhibit B − August 24, 2020 SEC Letter)(Reisner, Lorin) (Entered: 01/04/2021) |
| 01/04/2021 | 59 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from Jared Lenow dated January 4, 2021 re: SEC Communications Document filed by USA. (Lenow, Jared) (Entered: 01/04/2021) |
| 01/05/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Status Conference as to Neil Cole held on 1/5/2021. Defendant Neil Cole appeared with counsel Lorin Reisner, Richard Tarlowe and Andrew Reich and Andrew Reich by telephone. AUSA Scott Hartman, Edward Imperatore and Jared Leno by telephone. A jury trial will be rescheduled to a date in the Spring. Speedy trial time is excluded from today, January 5, 2021, until April 1, 2021, in the interests of justice. Bail continued. (Court Reporter Khris Sellin) (ap) (Entered: 01/07/2021) |
| 01/12/2021 | 60 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 1/5/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Khristine Sellin, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/2/2021. Redacted Transcript Deadline set for 2/12/2021. Release of Transcript Restriction set for 4/12/2021. (McGuirk, Kelly) (Entered: 01/12/2021) |
| 01/12/2021 | 61 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 1/5/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction |

| | | |
|---|---|---|
| | | of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/12/2021) |
| 01/20/2021 | 62 | MEMORANDUM in Opposition by Neil Cole re 56 MOTION to Quash *Defendant's Rule 17 Subpoena*.. (Attachments: # 1 Exhibit A – United States v. Tuzman Letter, # 2 Exhibit B – United States v. Ahuja Transcript Excerpt, # 3 Exhibit C – United States v. Block Letter)(Tarlowe, Richard) (Entered: 01/20/2021) |
| 01/27/2021 | 63 | REPLY MEMORANDUM OF LAW in Support by USA as to Neil Cole re: 56 MOTION to Quash *Defendant's Rule 17 Subpoena*. . (Imperatore, Edward) (Entered: 01/27/2021) |
| 01/29/2021 | 64 | LETTER RESPONSE in Opposition by USA as to Neil Cole addressed to Judge Edgardo Ramos from Edward Imperatore dated 1/29/2021 re: 33 MOTION to Compel *Discovery of Certain Electronic Data*.. (Imperatore, Edward) (Entered: 01/29/2021) |
| 02/01/2021 | | Docket Annotation as to Neil Cole: Revised Teleconference Dial–In Information – The dial–in information for the February 2, 2021 conference is revised as follows: (917)933–2166 and conference ID 125314441#. (jar) (Entered: 02/01/2021) |
| 02/16/2021 | 65 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 2/2/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Vincent Bologna, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/9/2021. Redacted Transcript Deadline set for 3/19/2021. Release of Transcript Restriction set for 5/17/2021. (McGuirk, Kelly) (Entered: 02/16/2021) |
| 02/16/2021 | 66 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 2/2/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/16/2021) |
| 02/25/2021 | 67 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated February 25, 2021 re: Supplemental Authority in Support of Opposition to the Govt's Motion to Quash a Rule 17(c) Subpoena (Attachments: # 1 Exhibit A – United States v. Weigand Order)(Tarlowe, Richard) (Entered: 02/25/2021) |
| 03/10/2021 | 68 | OPINION AND ORDER as to Neil Cole. The Government's motion to quash Cole's Rule 17(c) subpoena is granted. The Clerk of Court is respectfully directed to terminate the motion. Doc. 56. (Signed by Judge Edgardo Ramos on 3/10/2021) (See ORDER set forth) (ap) (Entered: 03/10/2021) |
| 03/23/2021 | 69 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Motion to Compel Discovery of Certain Electronic Data (Reisner, Lorin) (Entered: 03/23/2021) |
| 03/23/2021 | 70 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated March 23, 2021 re: Letter Motion to Seal . Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 03/23/2021) |
| 03/23/2021 | 71 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Request for Issuance of Rule 17(c) Subpoenas . Document filed by Neil Cole. (Attachments: # 1 Exhibit A – Proposed Subpoena to Wilmer Cutler Pickering Hale and Dorr LLP, # 2 Exhibit B – Proposed Subpoena to Perkins Coie LLP, # 3 Exhibit C – January 10, 2020 Disclosure Excerpt [Filed under Seal], # 4 Exhibit D – May 6, 2020 Disclosure [Filed under Seal], # 5 Exhibit E – July 31, 2020 Letter to Government [Redacted], # 6 Exhibit F – August 7, 2020 Letter from Government, # 7 Exhibit G – December 28, 2020 Letter to Government [Redacted], # 8 Exhibit H – January 4, 2021 Letter from Government, # 9 Exhibit I – January 6 and 8, 2021 Email Exchange with Government, # 10 Exhibit J – January 25, 2021 Disclosure [Filed under Seal])(Reisner, Lorin) (Entered: 03/23/2021) |

# A-1832

| | | |
|---|---|---|
| 03/23/2021 | 72 | MEMO ENDORSEMENT as to Neil Cole re: 69 Letter Motion to Compel Discovery of Certain Electronic Data... ENDORSEMENT: The Government is directed to respond by Monday, March 29, 2021. So Ordered. (Responses due by 3/29/2021) (Signed by Judge Edgardo Ramos on 3/23/21)(jbo) (Entered: 03/24/2021) |
| 03/24/2021 | 73 | LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated March 24, 2021 re: Speedy Trial Time . Document filed by USA as to Neil Cole. (Attachments: # 1 Text of Proposed Order)(Lenow, Jared) (Entered: 03/24/2021) |
| 03/24/2021 | 74 | MEMO ENDORSEMENT as to Neil Cole (1) terminating 70 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated March 23, 2021 re: Letter Motion to Seal. ENDORSEMENT: Granted. The Clerk of Court is respectfully directed to terminate the motion. Doc. 70. (Signed by Judge Edgardo Ramos on 3/24/2021) (ap) (Entered: 03/24/2021) |
| 03/24/2021 | 75 | MEMO ENDORSEMENT as to Neil Cole on re: 71 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Request for Issuance of Rule 17(c) Subpoenas. ENDORSEMENT: The Government is directed to respond by March 31, 2021. (Responses due by 3/31/2021) (Signed by Judge Edgardo Ramos on 3/24/2021) (ap) (Entered: 03/24/2021) |
| 03/26/2021 | 76 | ORDER 73 LETTER MOTION addressed to Judge Edgardo Ramos from Jared Lenow dated March 24, 2021 re: Speedy Trial Time. It is hereby ORDERED that the time from the date of this Order through July 1, 2021 is excluded under the Speedy Trial Act, 18 U.S.C.§ 3161(h)(7)(A). (Signed by Judge Edgardo Ramos on 3/26/21) (jw) (Entered: 03/26/2021) |
| 03/29/2021 | 77 | LETTER RESPONSE in Opposition by USA as to Neil Cole addressed to Judge Edgardo Ramos from Jared Lenow dated March 29, 2021 re: 33 MOTION to Compel *Discovery of Certain Electronic Data..* (Lenow, Jared) (Entered: 03/29/2021) |
| 03/31/2021 | 78 | LETTER RESPONSE in Opposition by USA as to Neil Cole addressed to Judge Edgardo Ramos from Edward Imperatore dated 3/31/2021 re: 71 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Request for Issuance of Rule 17(c) Subpoenas .. (Imperatore, Edward) (Entered: 03/31/2021) |
| 04/06/2021 | 79 | LETTER REPLY TO RESPONSE to Motion by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated April 6, 2021 re 71 LETTER MOTION addressed to Judge Edgardo Ramos from Lorin L. Reisner dated March 23, 2021 re: Request for Issuance of Rule 17(c) Subpoenas .. (Reisner, Lorin) (Entered: 04/06/2021) |
| 04/06/2021 | 80 | LETTER REPLY TO RESPONSE to Motion by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated April 6, 2021 re 33 MOTION to Compel *Discovery of Certain Electronic Data..* (Attachments: # 1 Exhibit A – March 1, 2020 Discovery Letter [Redacted])(Reisner, Lorin) (Entered: 04/06/2021) |
| 06/01/2021 | 81 | ORDER as to Neil Cole: The Southern District of New York has reconfigured courtrooms and other spaces in its courthouses to allow civil jury trials to proceed as safely as possible during the COVID−19 pandemic. Under the centralized calendaring system currently in place, the Clerks Office schedules up to three jury trials to begin on each day of jury selection: a primary case and up to two back−up cases that may proceed in its place if the primary case does not go forward. The Clerks Office has notified the Court that this case has been placed on the jury trial for July 6, 2021. The case must be trial−ready for that day. The case is second on the list for jury trials for that day. This means that the case will not proceed on July 6, 2021, if the first trial scheduled for that date goes forward. If the case cannot proceed on the scheduled date, the Court will seek another jury trial date for as soon as possible thereafter. As soon as the Court confirms that the matter will proceed on July 6, 2021, it will inform the parties. The previously entered pretrial schedule is revised as follows: Motions in limine and proposed voir dire, jury instructions and verdict sheets are due June 8, 2021. Oppositions thereto are due June 22, 2021. A final pretrial conference will be held on July 1, 2021 at 4:30 p.m. (Motions due by 6/8/2021. Responses due by 6/22/2021. Ready for Trial by 7/6/2021. Pretrial Conference set for 7/1/2021 at 04:30 PM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 6/1/2021) (ap) (Entered: 06/02/2021) |

| | | |
|---|---|---|
| 06/02/2021 | 82 | LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/2/2021 re: Motion to adjourn . Document filed by USA as to Neil Cole. (Hartman, Scott) (Entered: 06/02/2021) |
| 06/03/2021 | 83 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated June 3, 2021 re: 82 LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/2/2021 re: Motion to adjourn .. (Reisner, Lorin) (Entered: 06/03/2021) |
| 06/07/2021 | 84 | MEMO ENDORSEMENT as to Neil Cole on 82 LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/2/2021 re: Motion to adjourn. ENDORSEMENT: The parties are directed to appear on June 11, 2021 at 11:00 a.m. for a telephonic hearing regarding the Government's request. The parties are directed to dial (877) 411–9748 at that time and enter access code 3029857, followed by the pound (#) sign. The Clerk of Court is respectfully directed to terminate the motion. Doc. 82. So ordered. (Telephone Conference set for 6/11/2021 at 11:00 AM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 6/7/2021) (lnl) (Entered: 06/07/2021) |
| 06/07/2021 | 85 | LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/7/2021 re: Request to suspend pretrial schedule . Document filed by USA as to Neil Cole. (Hartman, Scott) (Entered: 06/07/2021) |
| 06/07/2021 | 86 | LETTER RESPONSE in Opposition by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated June 7, 2021 re: 85 LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/7/2021 re: Request to suspend pretrial schedule .. (Reisner, Lorin) (Entered: 06/07/2021) |
| 06/08/2021 | 87 | MEMO ENDORSEMENT as to Neil Cole on 85 LETTER MOTION addressed to Judge Edgardo Ramos from the Government dated 6/7/2021 re: Request to suspend pretrial schedule. ENDORSEMENT: The deadline for motions in limine and proposed voir dire, jury instructions, and verdict sheets is stayed and will be reset at the June 11, 2021 conference. The Clerk of Court is respectfully directed to terminate the motion. Doc. 85. So ordered. (Signed by Judge Edgardo Ramos on 6/7/2021) (lnl) (Entered: 06/08/2021) |
| 06/08/2021 | 88 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated June 8, 2021 re: Scheduling Order (Reisner, Lorin) (Entered: 06/08/2021) |
| 06/08/2021 | 89 | MEMO ENDORSEMENT as to Neil Cole on 88 LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated June 8, 2021 re: Scheduling Order. ENDORSEMENT: The Government's deadline to make Giglio disclosures and to produce 3500 material, a witness list, and exhibits, as well as Defendant's deadline to provide notice of any advice–of–counsel defense, are hereby stayed. A new deadline will be set at the June 11, 2021 conference. So ordered. (Signed by Judge Edgardo Ramos on 6/8/2021) (lnl) (Entered: 06/08/2021) |
| 06/11/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Telephone Conference as to Neil Cole held on 6/11/2021. Defendant Neil Cole appeared with counsel Lorin Reisner, Richard Tarlowe and Andrew Reich and Andrew Reich by telephone. AUSA Scott Hartman and Jared Lenow. The July 6 jury trial is rescheduled for October 4, 2021 at 9:30 a.m. The government is directed to serve the 3500 material by July 15, 2021. Speedy trial time is excluded from today, June 11, 2021, until October 4, 2021, in the interests of justice. Bail continued. (Jury Trial set for 10/4/2021 at 09:30 AM before Judge Edgardo Ramos) (ap) Modified on 8/24/2021 (ap). (Entered: 08/23/2021) |
| 06/22/2021 | 90 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 6/11/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Martha Martin, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/13/2021. Redacted Transcript Deadline set for 7/23/2021. Release of Transcript Restriction set for 9/20/2021. (McGuirk, Kelly) (Entered: 06/22/2021) |
| 06/22/2021 | 91 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 6/11/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have |

| | | |
|---|---|---|
| | | seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/22/2021) |
| 08/30/2021 | 92 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Disclosure of Identity of Witness *[REDACTED]*. Document filed by Neil Cole. (Attachments: # 1 Exhibit A–Government Disclosure–Filed Under Seal)(Tarlowe, Richard) (Entered: 08/30/2021) |
| 08/30/2021 | 93 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Letter Motion to Seal . Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 08/30/2021) |
| 08/30/2021 | 94 | NOTICE OF ATTORNEY APPEARANCE Andrew Mark Thomas appearing for USA. (Thomas, Andrew) (Entered: 08/30/2021) |
| 08/30/2021 | 95 | MEMO ENDORSEMENT as to Neil Cole on re: 92 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Disclosure of Identity of Witness [REDACTED]. ENDORSEMENT: The Government is directed to respond by September 2, 2021. (Responses due by 9/2/2021) (Signed by Judge Edgardo Ramos on 8/30/2021) (ap) (Entered: 08/30/2021) |
| 08/30/2021 | 96 | MEMO ENDORSEMENT as to Neil Cole (1) granting 93 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Letter Motion to Seal. ENDORSEMENT: The requests are granted. The Clerk of Court is respectfully directed to terminate the motion. Doc. 93. (Signed by Judge Edgardo Ramos on 8/30/2021) (ap) (Entered: 08/30/2021) |
| 08/30/2021 | 97 | NOTICE OF ATTORNEY APPEARANCE Noah David Solowiejczyk appearing for USA. (Solowiejczyk, Noah) (Entered: 08/30/2021) |
| 09/02/2021 | 98 | LETTER RESPONSE in Opposition by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 9/2/2021 re: 92 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Disclosure of Identity of Witness *[REDACTED]*.. (Hartman, Scott) (Entered: 09/02/2021) |
| 09/03/2021 | 99 | MEMO ENDORSEMENT 92 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated August 30, 2021 re: Disclosure of Identity of Witness...ENDORSEMENT...Defendant's request is denied. The Clerk of Court is respectfully directed to terminate the motion. Doc. 92. (Signed by Judge Edgardo Ramos on 9/3/21) (jw) (Entered: 09/03/2021) |
| 09/07/2021 | 100 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the parties dated 9/7/2021 re: Joint Proposed Pretrial Schedule Document filed by USA. (Hartman, Scott) (Entered: 09/07/2021) |
| 09/08/2021 | 101 | MEMO ENDORSEMENT as to Neil Cole on re: 100 LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the parties dated 9/7/2021 re: Joint Proposed Pretrial Schedule. ENDORSEMENT: The parties' proposed pretrial schedule is approved. (Motions due by 9/10/2021. Responses due by 9/27/2021. Replies due by 9/29/2021) (Signed by Judge Edgardo Ramos on 9/8/2021) (ap) (Entered: 09/08/2021) |
| 09/09/2021 | 102 | SCHEDULING NOTICE as to Neil Cole. A final pretrial conference will be held on September 30, 2021 at 2:00 p.m. at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007, Courtroom 318. (Pretrial Conference set for 9/30/2021 at 02:00 PM in Courtroom 318, 40 Centre Street, New York, NY 10007 before Judge Edgardo Ramos) (ap) (Entered: 09/09/2021) |
| 09/10/2021 | 103 | MOTION in Limine *to Exclude Evidence of Financial Resources and Personal Spending*. Document filed by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 104 | MEMORANDUM in Support by Neil Cole re 103 MOTION in Limine *to Exclude Evidence of Financial Resources and Personal Spending*.. (Reisner, Lorin) (Entered: 09/10/2021) |

# A-1835

| | | |
|---|---|---|
| 09/10/2021 | 105 | MOTION in Limine *to Exclude Evidence of Prior SEC Investigation and Settlement*. Document filed by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 106 | MEMORANDUM in Support by Neil Cole re 105 MOTION in Limine *to Exclude Evidence of Prior SEC Investigation and Settlement*.. (Attachments: # 1 Exhibit A−Letter, # 2 Exhibit B−Order, # 3 Exhibit C−Email, # 4 Exhibit D−Proposed Stipulation)(Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 107 | MOTION in Limine *to Exclude Evidence of Stock Sale Proceeds*. Document filed by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 108 | MEMORANDUM in Support by Neil Cole re 107 MOTION in Limine *to Exclude Evidence of Stock Sale Proceeds*.. (Attachments: # 1 Exhibit A−Form 4, # 2 Exhibit B−Form 4, # 3 Exhibit C−Form 4, # 4 Exhibit D−Form 4, # 5 Exhibit E−Form 4, # 6 Exhibit F−Form 4, # 7 Exhibit G−Letter)(Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 109 | Proposed Voir Dire Questions by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 110 | Request To Charge by Neil Cole. (Reisner, Lorin) (Entered: 09/10/2021) |
| 09/10/2021 | 111 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated September 10, 2021 re: Proposed Verdict Form (Attachments: # 1 [Proposed] Verdict Form)(Tarlowe, Richard) (Entered: 09/10/2021) |
| 09/10/2021 | 112 | PROPOSED EXAMINATION OF JURORS by USA as to Neil Cole. (Thomas, Andrew) (Entered: 09/10/2021) |
| 09/10/2021 | 113 | Request To Charge by USA as to Neil Cole. (Thomas, Andrew) (Entered: 09/10/2021) |
| 09/10/2021 | 114 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Andrew Thomas, and Noah Solowiejczyk dated September 10, 2021 re: Proposed Verdict Form Document filed by USA. (Attachments: # 1 Exhibit Proposed Verdict Form)(Solowiejczyk, Noah) (Entered: 09/10/2021) |
| 09/10/2021 | 115 | MOTION in Limine *to (1) admit prior act evidence to establish defendant Neil Coles knowledge of certain accounting rules and intent as to the crimes charged in the Indictment; (2) admit what−if−you−had−known evidence from the companys outside auditors to establish the significance of concealed information; (3) preclude improper good acts evidence; (4) preclude evidence of irrelevant post−conspiracy events; (5) require Cole to make a factual proffer to support any accountant or presence of counsel defense; (6) preclude evidence that Iconix changed its accounting methodology after the charged conduct had ended; (7) preclude Cole from introducing evidence or argument regarding certain personal factors or the general profitability or desirability of Iconixs intellectual property assets; and (8) preclude the testimony of the defendants two proposed expert witnesses*. Document filed by USA as to Neil Cole. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Solowiejczyk, Noah) (Entered: 09/10/2021) |
| 09/22/2021 | 116 | MOTION to Compel *the Government to Immunize Certain Witnesses*. Document filed by Neil Cole. (Attachments: # 1 Exhibit A−Witness Interview Notes (Under Seal), # 2 Exhibit B−Witness Interview Notes (Under Seal), # 3 Exhibit C−Witness Interview Notes (Under Seal), # 4 Exhibit D−Letter from Government (Redacted))(Reisner, Lorin) (Entered: 09/22/2021) |
| 09/22/2021 | 117 | LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated September 22, 2021 re: Letter Motion to Seal . Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 09/22/2021) |
| 09/23/2021 | 118 | MEMO ENDORSEMENT as to Neil Cole on re: 117 LETTER MOTION addressed to Judge Edgardo Ramos from Richard C. Tarlowe dated September 22, 2021 re: Letter Motion to Seal...ENDORSEMENT...The government is directed to respond (Signed by Judge Edgardo Ramos on 9/23/21)(jw) (Entered: 09/24/2021) |
| 09/27/2021 | 119 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 9/27/2021 re: Defense request to Submit Material Ex Parte Document filed by USA. (Hartman, Scott) (Entered: 09/27/2021) |
| 09/27/2021 | 120 | MEMORANDUM in Opposition by USA as to Neil Cole re 105 MOTION in Limine *to Exclude Evidence of Prior SEC Investigation and Settlement*., 107 MOTION in |

| | | |
|---|---|---|
| | | Limine *to Exclude Evidence of Stock Sale Proceeds*., 103 MOTION in Limine *to Exclude Evidence of Financial Resources and Personal Spending*.. (Attachments: # 1 Exhibit A – GX–1504, # 2 Exhibit B – GX–121, # 3 Exhibit C – GX–170, # 4 Exhibit D – GX–123, # 5 Exhibit E – GX–1236, # 6 Exhibit F – GX–1234, # 7 Exhibit G – GX–242, # 8 Exhibit H – GX–123, # 9 Exhibit I – GX–1235, # 10 Exhibit J – GX –234, # 11 Exhibit K – GX–104, # 12 Exhibit L – GX–105, # 13 Exhibit M – GX–1107, # 14 Exhibit N – GX–1121 (Redacted))(Thomas, Andrew) (Entered: 09/27/2021) |
| 09/27/2021 | 121 | MEMORANDUM in Opposition by Neil Cole re 115 MOTION in Limine *to (1) admit prior act evidence to establish defendant Neil Coles knowledge of certain accounting rules and intent as to the crimes charged in the Indictment; (2) admit what−if−you−had−known evidence from the companys outside audit. (Attachments: # 1 Exhibit A − SEC Order Instituting Proceedings, # 2 Exhibit B − Mar. 23, 2020 Letter from Government, # 3 Exhibit C − Mar. 16, 2020 Expert Disclosure from Government)(Reisner, Lorin) (Entered: 09/27/2021)* |
| 09/29/2021 | 122 | SCHEDULING NOTICE of as to Neil Cole. The final pretrial conference currently scheduled for September 30, 2021 at 2:00 p.m., will be held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007, Courtroom 24B. (ap) (Entered: 09/29/2021) |
| 09/29/2021 | 123 | MEMORANDUM in Opposition by USA as to Neil Cole re 116 MOTION to Compel *the Government to Immunize Certain Witnesses*.. (Solowiejczyk, Noah) (Entered: 09/29/2021) |
| 09/29/2021 | 124 | REPLY MEMORANDUM OF LAW in Support as to Neil Cole re: 105 MOTION in Limine *to Exclude Evidence of Prior SEC Investigation and Settlement*., 103 MOTION in Limine *to Exclude Evidence of Financial Resources and Personal Spending*., 107 MOTION in Limine *to Exclude Evidence of Stock Sale Proceeds*. . (Attachments: # 1 Exhibit A − Historical Stock Data, # 2 Exhibit B − Government Slides)(Reisner, Lorin) (Entered: 09/29/2021) |
| 09/29/2021 | 125 | REPLY MEMORANDUM OF LAW in Support by USA as to Neil Cole re: 115 MOTION in Limine *to (1) admit prior act evidence to establish defendant Neil Coles knowledge of certain accounting rules and intent as to the crimes charged in the Indictment; (2) admit what−if−you−had−known evidence from the companys outside audit . (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Solowiejczyk, Noah) (Entered: 09/29/2021)* |
| 09/30/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pretrial Conference as to Neil Cole held on 9/30/2021. Defendant Neil Cole present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSA Scott Hartman, Andrew Thomas, Noah Solowiejczyk. Jury selection will beheld on October 5, 2021 at 10:00 a.m. Jury trial shall begin immediately thereafter. Motions in limine decided on the record. Bail continued. Court Reporter: Sam Mauro and Mike McDaniel. (jbo) (Entered: 10/12/2021) |
| 10/02/2021 | 126 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated October 2, 2021 re: reply in further support of motion in limine to exclude stock sale proceeds (ECF No. 107) (Reisner, Lorin) (Entered: 10/02/2021) |
| 10/03/2021 | 127 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Andrew Thomas, and Noah Solowiejczyk dated October 3, 2021 re: Request for Curcio Inquiry Document filed by USA. (Solowiejczyk, Noah) (Entered: 10/03/2021) |
| 10/03/2021 | 128 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin Reisner dated October 3, 2021 re: Juror Vaccination (redacted) . Document filed by Neil Cole. (Attachments: # 1 Exhibit A−United States v. Elder, 18 Cr. 092 (WFK) (E.D.N.Y.))(Reisner, Lorin) (Entered: 10/03/2021) |
| 10/03/2021 | 129 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Hartman, Solowiejczyk, and Thomas dated October 3, 2021 re: Further Response re Stock Sale Evidence Document filed by USA. (Thomas, Andrew) (Entered: 10/03/2021) |

| | | |
|---|---|---|
| 10/05/2021 | | Docket Annotation as to Neil Cole: **Trial Notice** – The jury selection and trial in this matter is scheduled to commence on October 5, 2021. Trial will commence immediately after jury selection, and will be held at the Daniel Patrick Moynihan United States Courthouse, 500 Peal Street, New York, NY 10007, Courtroom 24B. An overflow courtroom will be available for the duration of trial at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, Courtroom 619. (jar) (Entered: 10/05/2021) |
| 10/05/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Voir Dire held on 10/5/2021 as to Neil Cole. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury selection held. Jury sworn and empaneled. (jbo) (Entered: 10/12/2021) |
| 10/06/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/6/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial begun. (jbo) (Entered: 10/12/2021) |
| 10/12/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/12/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Jury trial held. (Court Reporter Rose Prater and Steven Greenblum) (ap) (Entered: 10/20/2021) |
| 10/13/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/13/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Jury trial held. (Court Reporter Rose Prater and Steven Greenblum) (ap) (Entered: 10/20/2021) |
| 10/14/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/14/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Jury trial held. (Court Reporter Rose Prater and Steven Greenblum) (ap) (Entered: 10/20/2021) |
| 10/15/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/15/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Jury trial held. (Court Reporter Rose Prater and Steven Greenblum) (ap) (Entered: 10/20/2021) |
| 10/17/2021 | 130 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Noah Solowiejczyk and Andrew Thomas dated October 17, 2021 re: Admissibility of Government Exhibits Document filed by USA. (Attachments: # 1 Exhibit A (GX 1068), # 2 Exhibit B (GX 1139), # 3 Exhibit C (GX 1084))(Solowiejczyk, Noah) (Entered: 10/17/2021) |
| 10/18/2021 | 131 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin L. Reisner dated October 18, 2021 re: Response to ECF No. 130 (Attachments: # 1 Exhibit A – Declarant's 3500 Statement, # 2 Exhibit B – Declarant's 3500 Statement, # 3 Exhibit C – Witness's 3500 Statement)(Reisner, Lorin) (Entered: 10/18/2021) |
| 10/18/2021 | 132 | MOTION to Seal Document 131 Letter, *(Exhibit B to Letter)*. Document filed by Neil Cole. (Tarlowe, Richard) (Entered: 10/18/2021) |
| 10/18/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/18/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/19/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/19/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial |

| | | |
|---|---|---|
| | | held. (jbo) (Entered: 11/04/2021) |
| 10/20/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/20/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/21/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/21/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/22/2021 | 133 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 9/30/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Michael McDaniel, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/12/2021. Redacted Transcript Deadline set for 11/22/2021. Release of Transcript Restriction set for 1/20/2022. (Moya, Goretti) (Entered: 10/22/2021) |
| 10/22/2021 | 134 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 9/30/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 10/22/2021) |
| 10/22/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/22/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |
| 10/23/2021 | 135 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Andrew Thomas, and Noah Solowiejczyk dated October 23, 2021 re: Proposed Modifications to Jury Charge Document filed by USA. (Solowiejczyk, Noah) (Entered: 10/23/2021) |
| 10/24/2021 | 136 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Andrew Thomas, and Noah Solowiejczyk dated October 24, 2021 re: Preclusion of Defense Expert Witnesses Document filed by USA. (Attachments: # 1 Exhibit A)(Solowiejczyk, Noah) (Entered: 10/24/2021) |
| 10/24/2021 | 137 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin Reisner dated October 24, 2021 re: Opposition to the Government's Letter on the Court's Proposed Jury Charges (Reisner, Lorin) (Entered: 10/24/2021) |
| 10/25/2021 | 138 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin Reisner dated October 24, 2021 re: Quash a Subpoena Served on Defendant Neil Cole . Document filed by Neil Cole. (Attachments: # 1 Exhibit A–Subpoena)(Reisner, Lorin) (Entered: 10/25/2021) |
| 10/25/2021 | 139 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Lorin Reisner dated October 25, 2021 re: Opposition to the Government's Letter to Preclude Expert Testimony (Reisner, Lorin) (Entered: 10/25/2021) |
| 10/25/2021 | 140 | LETTER MOTION addressed to Judge Edgardo Ramos from Lorin Reisner dated October 25, 2021 re: Requesting that the Indictment Not be Provided to the Jury . Document filed by Neil Cole. (Reisner, Lorin) (Entered: 10/25/2021) |
| 10/25/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/25/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. (jbo) (Entered: 11/04/2021) |

| | | |
|---|---|---|
| 10/26/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/26/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. Closing arguments begin. (jbo) (Entered: 11/04/2021) |
| 10/27/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/27/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. Closing arguments conclude. Jury charged, and jury begin deliberations. (jbo) (Entered: 11/04/2021) |
| 10/28/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/28/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. Jury deliberations continue. (jbo) (Entered: 11/04/2021) |
| 10/29/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 10/29/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury trial held. Jury deliberations continue. (jbo) (Entered: 11/04/2021) |
| 11/01/2021 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/1/2021. Defendant present with counsel Lorin Reisner, Richard Tarlowe, and Andrew Reich. AUSAs Scott Hartman, Andrew Thomas, Noah Solowiejczyk present. Court reporters: Rose Prater and Steven Greenblum. Jury returns a unanimous verdict on Counts 1 and 10. Defendant is found not guilty on both counts. As to counts 2 through 8, the jury was unable to reach a unanimous verdict, and a mistrial was declared. (jbo) (Entered: 11/04/2021) |
| 11/03/2021 | 141 | JURY VERDICT as to Neil Cole (1) Not Guilty on Count 1,10. (lnl) (Entered: 11/03/2021) |
| 11/12/2021 | 142 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 11/12/2021 re: Speedy Trial Exclusion Document filed by USA. (Hartman, Scott) (Entered: 11/12/2021) |
| 11/12/2021 | 143 | MEMO ENDORSEMENT as to Neil Cole on re: 142 The Government further requests that the Court exclude time under the Speedy Trial Act until January 15, 2022. For the reasons set forth above, the Government submits that the ends of justice served by the requested exclusion outweigh the interests of the public and the defendant in a speedy retrial of the open counts. See 18 U.S.C. §§ 3161(e), 3161(h)(7). The defendant consents to the requested exclusion Time excluded from 11/12/21 until 1/15/22....ENDORSEMENT...The application is granted. The Government is directed to inform the Court by January 15, 2022 how it wishes to proceed as to the open counts. Speedy trial time is excluded until January 15, 2022, in the interests of justice (Government Responses due by 1/15/2022) (Signed by Judge Edgardo Ramos on 11/12/21)(jw) (Entered: 11/15/2021) |
| 11/16/2021 | 144 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/5/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 145 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/5/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |

# A-1840

| | | |
|---|---|---|
| 11/16/2021 | 146 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/6/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 147 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/6/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 148 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/7/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 149 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/7/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 150 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/8/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 151 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/8/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 152 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/12/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 153 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/12/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 154 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/13/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court |

| | | |
|---|---|---|
| | | Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 155 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/13/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 156 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/14/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 157 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/14/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 158 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/15/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 159 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/15/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 160 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/18/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 161 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/18/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 162 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/19/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set |

| | | |
|---|---|---|
| | | for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 163 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/19/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 164 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/20/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 165 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/20/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 166 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/21/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 167 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/21/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 168 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/22/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 169 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/22/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 170 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/25/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |

# A-1843

| | | |
|---|---|---|
| 11/16/2021 | 171 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/25/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 172 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10//26/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 173 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/26/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 174 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/27/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 175 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/27/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 176 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/28/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 177 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/28/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 178 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/29/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 179 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/29/21 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven |

| | | |
|---|---|---|
| | | (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 180 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/1/21 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rose Prater, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2021. Redacted Transcript Deadline set for 12/17/2021. Release of Transcript Restriction set for 2/14/2022. (Moya, Goretti) (Entered: 11/16/2021) |
| 11/16/2021 | 181 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/1/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 11/16/2021) |
| 01/14/2022 | 182 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 1/14/2022 re: Extension of Deadline Document filed by USA. (Hartman, Scott) (Entered: 01/14/2022) |
| 01/14/2022 | 183 | MEMO ENDORSEMENT as to Neil Cole on 182 LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated 1/14/2022 re: Extension of Deadline. ENDORSEMENT: The application is granted. (Signed by Judge Edgardo Ramos on 1/14/2022) (lnl) (Entered: 01/14/2022) |
| 01/18/2022 | 184 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from the Government dated January 18, 2022 re: Extension of Deadline Document filed by USA. (Hartman, Scott) (Entered: 01/18/2022) |
| 01/18/2022 | 185 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman Noah Solowiejczyk Andrew Thomas dated January 18, 2022 re: The Government writes to seek a further extension of the deadline by which it must inform the Court of how it wishes to proceed with respect to the open counts in this matter (Count Two through Nine). Specifically, with the consent of the defendant, the Government respectfully requests that this deadline be extended to the end of the day on Friday, January 21, 2022, to allow discussions between the parties to continue. The Government further requests that the Court exclude time under the Speedy Trial Act until January 21, 2022. ENDORSEMENT: The application is granted. ( Responses due by 1/21/2022 )(Signed by Judge Edgardo Ramos on 1/18/2022)(bw) (Entered: 01/19/2022) |
| 01/21/2022 | 186 | MOTION for Edward Imperatore to Withdraw as Attorney . Document filed by USA as to Neil Cole. (Imperatore, Edward) (Entered: 01/21/2022) |
| 01/21/2022 | 187 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Noah Solowiejczyk and Andrew Thomas dated January 21, 2022 re: Retrial of Open Counts and Request for Status Conference Document filed by USA. (Solowiejczyk, Noah) (Entered: 01/21/2022) |
| 01/24/2022 | 188 | MEMO ENDORSEMENT as to Neil Cole re: 187 Letter Retrial of Open Counts and Request for Status Conference... ENDORSEMENT: A status conference will be held on January 28, 2022 at 11:30 a.m. Speedy trial time is excluded from January 21, 2022 until January 28, 2022, in the interest of justice. SO ORDERED. (Signed by Judge Edgardo Ramos on 1/24/22)(jbo) (Entered: 01/24/2022) |
| 01/27/2022 | 189 | MEMO ENDORSED granting 186 Motion to Withdraw as Attorney. Edward Arthur Imperatore withdrawn from case as to Neil Cole (1)... ENDORSEMENT: The application is granted. (Signed by Judge Edgardo Ramos on 1/27/22) (jbo) (Entered: 01/28/2022) |
| 01/31/2022 | 190 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 1/28/22 before Judge Edgardo Ramos. Court Reporter/Transcriber: Paula Horovitz, (212) 805–0348, |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/22/2022. Redacted Transcript Deadline set for 3/3/2022. Release of Transcript Restriction set for 5/2/2022. (Moya, Goretti) (Entered: 01/31/2022) |
| 01/31/2022 | 191 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 1/28/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 01/31/2022) |
| 03/02/2022 | 192 | ORDER ON MOTION TO WITHDRAW AS COUNSEL as to Neil Cole: Paul, Weiss' motion to withdraw as counsel is granted. Mr. Cole may contact Chambers should he require additional time to retain counsel in advance of trial. SO ORDERED. (Signed by Judge Edgardo Ramos on 2/25/2022) (lnl) (Entered: 03/02/2022) |
| 04/08/2022 | 193 | NOTICE OF ATTORNEY APPEARANCE: Sean Hecker appearing for Neil Cole. Appearance Type: Retained. (Hecker, Sean) (Entered: 04/08/2022) |
| 04/08/2022 | 194 | NOTICE OF ATTORNEY APPEARANCE: Jenna Minicucci Dabbs appearing for Neil Cole. Appearance Type: Retained. (Dabbs, Jenna) (Entered: 04/08/2022) |
| 04/08/2022 | 195 | NOTICE OF ATTORNEY APPEARANCE: Jeffrey Then appearing for Neil Cole. Appearance Type: Retained. (Then, Jeffrey) (Entered: 04/08/2022) |
| 04/09/2022 | 196 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Noah Solowiejczyk and Andrew Thomas dated April 9, 2022 re: Scheduling of Telephone Conference Document filed by USA. (Solowiejczyk, Noah) (Entered: 04/09/2022) |
| 04/11/2022 | 197 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Scott Hartman, Noah Solowiejczyk, Andrew Thomas, Jared Lenow, dated April 9, 2022 re: The parties write to jointly request a telephone conference with the Court regarding the scheduling of the retrial in the above–referenced matter. ENDORSEMENT: A telephone conference will be held on April 13, 2022 at 12 p.m. The parties are instructed to call (877) 411–9748 and enter access code 3029857# when prompted. SO ORDERED. ( Telephone Conference set for 4/13/2022 at 12:00 PM before Judge Edgardo Ramos. )(Signed by Judge Edgardo Ramos on 4/11/2022)(bw) (Entered: 04/11/2022) |
| 04/12/2022 | 198 | MOTION for David Oscar Markus to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–25997556. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Neil Cole. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Affidavit, # 3 Text of Proposed Order)(Markus, David) (Entered: 04/12/2022) |
| 04/12/2022 | 199 | MOTION for Anita Margot Moss to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–25997613. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Neil Cole. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Affidavit, # 3 Text of Proposed Order)(Moss, Anita) (Entered: 04/12/2022) |
| 04/13/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 199 MOTION for Anita Margot Moss to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–25997613. Motion and supporting papers to be reviewed by Clerk's Office staff., 198 MOTION for David Oscar Markus to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–25997556. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 04/13/2022) |
| 04/13/2022 | 200 | ORDER granting 198 Motion for David Oscar Markus to Appear Pro Hac Vice as to Neil Cole (1). (Signed by Judge Edgardo Ramos on 4/13/2022) (jar) (Entered: 04/13/2022) |

# A-1846

| | | |
|---|---|---|
| 04/13/2022 | 201 | ORDER granting 199 Motion for Anita Margot Moss to Appear Pro Hac Vice as to Neil Cole (1). (Signed by Judge Edgardo Ramos on 4/13/2022) (jar) (Entered: 04/13/2022) |
| 04/21/2022 | 202 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 4/13/22 before Judge Edgardo Ramos. Court Reporter/Transcriber: Paula Horovitz, (212) 805−0348, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2022. Redacted Transcript Deadline set for 5/23/2022. Release of Transcript Restriction set for 7/20/2022. (Moya, Goretti) (Entered: 04/21/2022) |
| 04/21/2022 | 203 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 4/13/22 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 04/21/2022) |
| 09/26/2022 | 204 | ORDER as to Neil Cole: At a conference held on April 13, 2022, a jury trial was scheduled for October 31, 2022 at 9:30 a.m. Trial will proceed as scheduled. The pretrial schedule remains unchanged: Motions in limine are due October 3, 2022 and oppositions thereto are due October 17, 2022. Proposed jury instructions, voir dire questions, and verdict sheets are due October 3, 2022 and objections thereto are due October 17, 2022. The final pretrial conference is rescheduled for 3:30 p.m. on October 27, 2022. (Motions due by 10/3/2022. Responses due by 10/17/2022. Pretrial Conference set for 10/27/2022 at 03:30 PM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 9/26/2022) (ap) (Entered: 09/26/2022) |
| 09/27/2022 | 205 | NOTICE OF ATTORNEY APPEARANCE Justin Victor Rodriguez appearing for USA. (Rodriguez, Justin) (Entered: 09/27/2022) |
| 09/30/2022 | 206 | NOTICE OF ATTORNEY APPEARANCE: David Oscar Markus appearing for Neil Cole. Appearance Type: Retained. (Markus, David) (Entered: 09/30/2022) |
| 09/30/2022 | 207 | NOTICE OF ATTORNEY APPEARANCE: Anita Margot Moss appearing for Neil Cole. Appearance Type: Retained. (Moss, Anita) (Entered: 09/30/2022) |
| 09/30/2022 | 208 | NOTICE OF ATTORNEY APPEARANCE: Rebecca Ann Sussman appearing for Neil Cole. Appearance Type: Retained. (Sussman, Rebecca) (Entered: 09/30/2022) |
| 09/30/2022 | 209 | LETTER MOTION addressed to Judge Edgardo Ramos from Jenna M. Dabbs dated September 30, 2022 re: 204 Order, Set Deadlines/Hearings,,,, re: joint request for partial adjustment of schedule for pre−trial submissions . Document filed by Neil Cole. (Dabbs, Jenna) (Entered: 09/30/2022) |
| 10/03/2022 | 210 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from Attorney Jenna M. Dabbs dated September 30, 2022 re: The parties write to jointly request a partial adjustment to the current schedule for the parties' submissions in advance of trial, see ECF 204, scheduled to commence on October 31, 2022. ENDORSEMENT: Proposed jury instructions, voir dire questions,and verdict sheets are now due October 20, 2022. SO ORDERED. (Signed by Judge Edgardo Ramos on 10/3/2022)(bw) (Entered: 10/03/2022) |
| 10/03/2022 | 211 | MOTION in Limine *to Exclude Conspiracy Evidence and Argument*. Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 212 | MEMORANDUM in Support by Neil Cole re 211 MOTION in Limine *to Exclude Conspiracy Evidence and Argument*.. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 213 | MOTION in Limine *to Permit Evidence of Iconix's December 2015 Purchase of SEA 3 Assets*. Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 214 | MEMORANDUM in Support by Neil Cole re 213 MOTION in Limine *to Permit Evidence of Iconix's December 2015 Purchase of SEA 3 Assets*.. (Hecker, Sean) (Entered: 10/03/2022) |

| 10/03/2022 | 215 | MOTION in Limine *to Preclude Cross−Examination as to the Candie's Internal Investigation, SEC Investigation, and Settlement*. Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
|---|---|---|
| 10/03/2022 | 216 | MEMORANDUM in Support by Neil Cole re 215 MOTION in Limine *to Preclude Cross−Examination as to the Candie's Internal Investigation, SEC Investigation, and Settlement*.. (Attachments: # 1 Exhibit A − 2020.03.23 Ltr. from USA, # 2 Exhibit B − 2022.09.26 Ltr. from USA)(Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 217 | MOTION in Limine *to Exclude Statements by Ethan Cole*. Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 218 | MEMORANDUM in Support by Neil Cole re 217 MOTION in Limine *to Exclude Statements by Ethan Cole*.. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 219 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 3, 2022 re: permission to file certain exhibits under seal and to redact portion of letter motion . Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/03/2022) |
| 10/03/2022 | 220 | MOTION in Limine . Document filed by USA as to Neil Cole. (Lenow, Jared) (Entered: 10/03/2022) |
| 10/03/2022 | 221 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 3, 2022 re: request for issuance of Rule 17(c) subpoenas . Document filed by Neil Cole. (Attachments: # 1 Exhibit A − Proposed Subpoena to WilmerHale, # 2 Exhibit B − Proposed Subpoena to Perkins Coie, # 3 Exhibit C − DX−0548 (Filed Under Seal), # 4 Exhibit D − 2020.05.06 Govt Disclosure (Filed Under Seal), # 5 Exhibit E − 2021.01.25 Govt Disclosure (Filed Under Seal), # 6 Exhibit F − 2022.9.27 Ltr. From S. Hecker to USA, # 7 Exhibit G − 2022.9.16 Ltr. From USA to S. Hecker, # 8 Exhibit H − 3554−001 (Filed Under Seal))(Hecker, Sean) (Entered: 10/03/2022) |
| 10/05/2022 | 222 | MEMO ENDORSED granting 219 LETTER MOTION permission to file certain exhibits under seal and to redact portion of letter motion as to Neil Cole (1)... ENDORSEMENT: The application to file under seal is granted. The Clerk of the Court is respectfully directed to terminate the motion, doc. 219. SO ORDERED. (Signed by Judge Edgardo Ramos on 10/5/22) (jbo) (Entered: 10/06/2022) |
| 10/17/2022 | 223 | DECLARATION of AUSA Andrew Thomas in Opposition by USA as to Neil Cole re: 217 MOTION in Limine *to Exclude Statements by Ethan Cole*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG)(Thomas, Andrew) (Entered: 10/17/2022) |
| 10/17/2022 | 224 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 17, 2022 re: permission to file exhibit under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/17/2022) |
| 10/17/2022 | 225 | MEMORANDUM in Opposition by Neil Cole re 220 MOTION in Limine .. (Attachments: # 1 Exhibit A − October 3, 2022 Government Disclosure (Filed Under Seal))(Hecker, Sean) (Entered: 10/17/2022) |
| 10/17/2022 | 226 | MEMORANDUM in Opposition by USA as to Neil Cole re 215 MOTION in Limine *to Preclude Cross−Examination as to the Candie's Internal Investigation, SEC Investigation, and Settlement*., 211 MOTION in Limine *to Exclude Conspiracy Evidence and Argument*., 221 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 3, 2022 re: request for issuance of Rule 17(c) subpoenas ., 213 MOTION in Limine *to Permit Evidence of Iconix's December 2015 Purchase of SEA 3 Assets*., 217 MOTION in Limine *to Exclude Statements by Ethan Cole*.. (Thomas, Andrew) (Entered: 10/17/2022) |
| 10/19/2022 | 227 | MEMO ENDORSEMENT as to Neil Cole (1) granting 224 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 17, 2022 re: permission to file exhibit under seal. ENDORSEMENT: The application to file under seal Exhibit to the Opposition is GRANTED. (Signed by Judge Edgardo Ramos on |

| | | |
|---|---|---|
| | | 10/19/2022) (ap) (Entered: 10/20/2022) |
| 10/20/2022 | 228 | PROPOSED EXAMINATION OF JURORS by USA as to Neil Cole. (Thomas, Andrew) (Entered: 10/20/2022) |
| 10/20/2022 | 229 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Lenow, Rodriguez, and Thomas dated October 20, 2022 re: Reformatted Trial Indictment and Proposed Verdict Form Document filed by USA. (Attachments: # 1 Exhibit A – Proposed Indictment for Distribution to Jury, # 2 Exhibit B – Proposed Verdict Form)(Thomas, Andrew) (Entered: 10/20/2022) |
| 10/20/2022 | 230 | Request To Charge by USA as to Neil Cole. (Thomas, Andrew) (Entered: 10/20/2022) |
| 10/20/2022 | 231 | Proposed Voir Dire Questions by Neil Cole. (Hecker, Sean) (Entered: 10/20/2022) |
| 10/20/2022 | 232 | Request To Charge by Neil Cole. (Hecker, Sean) (Entered: 10/20/2022) |
| 10/20/2022 | 233 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 20, 2022 re: submission of Proposed Verdict Form (Attachments: # 1 Exhibit / Proposed Verdict Form)(Hecker, Sean) (Entered: 10/20/2022) |
| 10/20/2022 | 234 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 20, 2022 re: supplemental authority (Attachments: # 1 Exhibit A – District of Colorado Order in United States v. McGuire)(Hecker, Sean) (Entered: 10/20/2022) |
| 10/25/2022 | 235 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSA Andrew Thomas dated October 25, 2022 re: Correction of Citation Error in Opposition Brief Document filed by USA. (Thomas, Andrew) (Entered: 10/25/2022) |
| 10/26/2022 | 236 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 26, 2022 re: permission to file exhibits under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/26/2022) |
| 10/26/2022 | 237 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 26, 2022 re: Final Pretrial Conference (Attachments: # 1 Exhibit A – GX–1522–A (Filed Under Seal), # 2 Exhibit B – GX–1522–B (Filed Under Seal))(Hecker, Sean) (Entered: 10/26/2022) |
| 10/26/2022 | 238 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Lenow, Rodriguez, and Thomas dated October 26, 2022 re: Response to Defendant's October 26, 2022 Letter Motion Concerning the Defendant's Statements and Double Jeopardy Document filed by USA. (Thomas, Andrew) (Entered: 10/26/2022) |
| 10/27/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Pretrial Conference as to Neil Cole held on 10/27/2022. Defendant Neil Cole present with counsel Sean Hecker, Jenna Dabbs, Jeffrey Then, Anita Moss, and David Markus. AUSA Andrew Thomas and Justin Rodriguez. Jury selection is scheduled for October 31, 2022 at 10:00 a.m., the jury trial will begin immediately thereafter. Motions in limine decided on the record. Bail continued. (Jury Selection set for 10/31/2022 at 10:00AM before Judge Edgardo Ramos., Jury Trial set for 10/31/2022 at 10:00 AM before Judge Edgardo Ramos) (ap) (Entered: 10/28/2022) |
| 10/28/2022 | 239 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from USA dated October 28, 2022 re: Voir Dire Document filed by USA. (Rodriguez, Justin) (Entered: 10/28/2022) |
| 10/28/2022 | 240 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 28, 2022 re: motion for Rule 17(c) subpoenas (Hecker, Sean) (Entered: 10/28/2022) |
| 10/30/2022 | 241 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Lenow, Rodriguez, and Thomas dated October 30, 2022 re: Further Response to Defendant's Requested Rule 17(c) Subpoenas Document filed by USA. (Thomas, Andrew) (Entered: 10/30/2022) |
| 10/31/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Selection as to Neil Cole held on 10/31/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Jury |

| | | |
|---|---|---|
| | | Selection began. (Court Reporter Pam Utter and Kelly Surina) (ap) (Entered: 11/07/2022) |
| 11/01/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Voir Dire held on 11/1/2022 as to Neil Cole. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Jury Selection completed. Jury sworn and empaneled. (Court Reporter Pam Utter and Kelly Surina) (ap) Modified on 11/15/2022 (ap). (Entered: 11/07/2022) |
| 11/02/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/2/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Jury trial begins. Opening statements. Evidence entered. (Court Reporter Pam Utter and Kelly Surina) (ap) (Entered: 11/07/2022) |
| 11/03/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/3/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Evidence entered. (Court Reporter Pam Utter and Kelly Surina) (ap) (Entered: 11/07/2022) |
| 11/04/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/4/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Evidence entered. (Court Reporter Pam Utter and Kelly Surina) (ap) (Entered: 11/07/2022) |
| 11/06/2022 | 242 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 6, 2022 re: permission to file exhibit under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 11/06/2022) |
| 11/06/2022 | 243 | LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated November 6, 2022 re: Expected Testimony and certain Government exhibits (Attachments: # 1 Exhibit A – Government Exhibit 1335 (Filed Under Seal), # 2 Exhibit B – Transcript Excerpt United States v. Maxwell)(Hecker, Sean) (Entered: 11/06/2022) |
| 11/07/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/7/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (jbo) (Entered: 11/16/2022) |
| 11/08/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/8/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (jbo) (Entered: 11/16/2022) |
| 11/09/2022 | 244 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from AUSAs Lenow, Rodriguez, and Thomas dated 11/9/2022 re: Defendant's Conduct and Request for Admonishment Document filed by USA. (Thomas, Andrew) (Entered: 11/09/2022) |
| 11/09/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/9/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (jbo) (Entered: 11/16/2022) |
| 11/10/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/10/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (jbo) (Entered: 11/16/2022) |

# A-1850

| 11/13/2022 | 245 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from USA dated November 13, 2022 re: Government Exhibits 409, 1145, and 1147 Document filed by USA. (Rodriguez, Justin) (Entered: 11/13/2022) |
|---|---|---|
| 11/13/2022 | 246 | RESPONSE in Opposition by USA as to Neil Cole re: 242 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated November 6, 2022 re: permission to file exhibit under seal .. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Lenow, Jared) (Entered: 11/13/2022) |
| 11/14/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/14/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (bw) (Entered: 11/21/2022) |
| 11/15/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/15/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (bw) (Entered: 11/21/2022) |
| 11/16/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/16/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. (bw) (Entered: 11/21/2022) |
| 11/17/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/17/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. The government rests its case. The defense's case begins. (bw) (Entered: 11/21/2022) |
| 11/18/2022 | 247 | LETTER MOTION addressed to Judge Edgardo Ramos from David Oscar Markus dated November 18, 2022 re: Reconsideration of unavailable witness instruction . Document filed by Neil Cole. (Attachments: # 1 Exhibit email re Ethan Cole)(Markus, David) (Entered: 11/18/2022) |
| 11/18/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Jury Trial as to Neil Cole held on 11/18/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Evidence entered. The defense rests its case. (bw) (Entered: 11/21/2022) |
| 11/21/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Jury Trial as to Neil Cole held on 11/21/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters Pam Utter and Kelly Surina. Summations held. (jw) (Entered: 11/30/2022) |
| 11/22/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Jury Trial as to Neil Cole held on 11/22/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Jury charged. Deliberations begin. (jw) (Entered: 12/05/2022) |
| 11/23/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Telephone Conference as to Neil Cole held on 11/23/2022. Defendant's appearance was waived. Counsel for defendant Jenna Dabbs, Rebecca Sussman, and Jeffrey Then. AUSA Andrew Thomas and Justin Rodriguez. Conference was held to discuss the illness of a juror. (ap) (Entered: 11/29/2022) |
| 11/26/2022 | 248 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker, dated November 26, 2022 re: permission to file letter and exhibit under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 11/26/2022) |

| | | |
|---|---|---|
| 11/28/2022 | 249 | ORDER as to Neil Cole: For the reasons discussed via email and in camera, Defendant's motion to dismiss Alternate Juror No. 1 is denied. It is SO ORDERED. (Signed by Judge Edgardo Ramos on 11/28/2022) (lnl) (Entered: 11/28/2022) |
| 11/28/2022 | 250 | TRANSCRIPT of Proceedings as to Neil Cole re: Conference held on 10/27/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Sara Beiter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/19/2022. Redacted Transcript Deadline set for 12/29/2022. Release of Transcript Restriction set for 2/26/2023. (McGuirk, Kelly) (Entered: 11/28/2022) |
| 11/28/2022 | 251 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Conference proceeding held on 10/27/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/28/2022) |
| 11/28/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Jury Trial as to Neil Cole held on 11/28/2022. Defendant present with counsel Sean Hecker, Jenna Dabbs, David Oscar Markus, Anita Margot Moss, Jeffrey Then, Rebecca Ann Sussman. AUSAs Andrew Thomas, Justin Rodriguez, and Jared Lenow present. Court reporters: Pam Utter and Kelly Surina. Juror 1 excused and replaced by Alternate 1. Jury reaches an unanimous verdict. The defendant was found guilty on counts 2 through 9 of the Indictment. (jw) (Entered: 12/05/2022) |
| 11/28/2022 | | JURY VERDICT as to Neil Cole (1) Guilty on Count 2,3–8,9. (jw) (Entered: 12/05/2022) |
| 11/30/2022 | 252 | VERDICT FORM as to USA v. Neil Cole. Dated: 11/28/2022. (bw) (Entered: 12/01/2022) |
| 12/16/2022 | 253 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 10/31/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 254 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 10/31/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 255 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/1/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 256 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/1/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |

| | | |
|---|---|---|
| 12/16/2022 | 257 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/2/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 258 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/2/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 259 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/3/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 260 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/3/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 261 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/4/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 262 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/4/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 263 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/7/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 264 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/7/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 265 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/8/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court |

| | | |
|---|---|---|
| | | Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 266 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/8/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 267 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/10/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 268 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/10/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 269 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/9/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 270 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/9/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 271 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/14/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 272 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/14/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 273 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/15/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set |

| | | |
|---|---|---|
| | | for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 274 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/15/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 275 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/16/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 276 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 12/16/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 277 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/18/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 278 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/18/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 279 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/21/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 280 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/21/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 281 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/22/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |

# A-1855

| | | |
|---|---|---|
| 12/16/2022 | 282 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/22/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 283 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/28/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Raquel Robles, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 284 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/28/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 285 | TRANSCRIPT of Proceedings as to Neil Cole re: Trial held on 11/17/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Kelly Surina, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/6/2023. Redacted Transcript Deadline set for 1/17/2023. Release of Transcript Restriction set for 3/16/2023. (McGuirk, Kelly) (Entered: 12/16/2022) |
| 12/16/2022 | 286 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Trial proceeding held on 11/17/2022 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/16/2022) |
| 01/05/2023 | 287 | LETTER MOTION addressed to Judge Edgardo Ramos from USA dated January 5, 2023 re: Proposed Schedule for Post–Trial Motions and Sentencing . Document filed by USA as to Neil Cole. (Rodriguez, Justin) (Entered: 01/05/2023) |
| 01/09/2023 | 288 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from AUSA Justin V. Rodriguez dated January 5, 2023 re: The Government writes on behalf of the parties to propose a schedule for the briefing of post–trial motions and sentencing. The parties have conferred and jointly propose the following: – Defense post–trial motions due on March 3, 2023. – Government response due on April 3, 2023. – Defense reply due on April 24, 2023. – Sentencing during the week of June 5, 2023 or June 12, 2023. ENDORSEMENT: The post–trial motions briefing schedule is approved. Sentencing will be held on June 14, 2023 at 10:30 a.m. SO ORDERED. ( Motions due by 3/3/2023. Responses due by 4/3/2023. Replies due by 4/24/2023. Sentencing set for 6/14/2023 at 10:30 AM before Judge Edgardo Ramos. )(Signed by Judge Edgardo Ramos on 1/9/2023)(bw) (Entered: 01/09/2023) |
| 01/19/2023 | 289 | MEMO ENDORSEMENT as to Neil Cole on re: 287 LETTER MOTION addressed to Judge Edgardo Ramos from USA dated January 5, 2023 re: Proposed Schedule for Post–Trial Motions and Sentencing. ENDORSEMENT: The post–trial motions briefing schedule is approved. Sentencing will be held on June 14, 2023 at 10:30 a.m. (Motions due by 3/3/2023. Responses due by 4/3/2023. Replies due by 4/24/2023. Sentencing set for 6/14/2023 at 10:30 AM before Judge Edgardo Ramos) (Signed by Judge Edgardo Ramos on 1/19/2023) (ap) (Entered: 01/19/2023) |
| 02/28/2023 | 290 | JOINT LETTER by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated February 28, 2023 re: Post–Trial Motions and Bail (Hecker, Sean) (Entered: 02/28/2023) |

# A-1856

| | | |
|---|---|---|
| 03/03/2023 | 291 | LETTER by USA as to Neil Cole addressed to Judge Edgardo Ramos from Jared Lenow dated March 3, 2023 re: Related Case Document filed by USA. (Lenow, Jared) (Entered: 03/03/2023) |
| 04/14/2023 | 292 | MOTION for Rebecca Sussman to Withdraw as Attorney . Document filed by Neil Cole. (Sussman, Rebecca) (Entered: 04/14/2023) |
| 04/14/2023 | 293 | DECLARATION of Rebecca Sussman in Support as to Neil Cole re: 292 MOTION for Rebecca Sussman to Withdraw as Attorney .. (Sussman, Rebecca) (Entered: 04/14/2023) |
| 04/27/2023 | 294 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated April 27, 2023 re: request for leave to file letter under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 04/27/2023) |
| 04/27/2023 | 295 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated April 27, 2023 re: request for adjournment of sentencing . Document filed by Neil Cole. (Hecker, Sean) (Entered: 04/27/2023) |
| 05/02/2023 | 296 | MEMO ENDORSEMENT as to Neil Cole (1) on 292 MOTION for Rebecca Sussman to Withdraw as Attorney. ENDORSEMENT: SO ORDERED. Rebecca Ann Sussman withdrawn from case. (Signed by Judge Edgardo Ramos on 4/28/2023) (ap) (Entered: 05/02/2023) |
| 05/02/2023 | 297 | MEMO ENDORSEMENT as to Neil Cole (1) granting 294 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated April 27, 2023 re: request for leave to file letter under seal. ENDORSEMENT: The application to file Cole's April 27, 2023 Letter Motion under seal is granted. (Signed by Judge Edgardo Ramos on 5/2/2023) (ap) (Entered: 05/02/2023) |
| 05/02/2023 | 298 | MEMO ENDORSEMENT as to Neil Cole (1) on 295 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated April 27, 2023 re: request for adjournment of sentencing. ENDORSEMENT: Sentencing is adjourned to July 25, 2023 at 10 a.m. The deadlines for the presentencing report are extended accordingly. (Signed by Judge Edgardo Ramos on 5/2/2023) (ap) (Entered: 05/02/2023) |
| 05/02/2023 | | Set/Reset Hearings as to Neil Cole: Sentencing set for 7/25/2023 at 10:00 AM before Judge Edgardo Ramos. (ap) (Entered: 05/02/2023) |
| 06/12/2023 | 299 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated June 12, 2023 re: request for leave to file letter under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 06/12/2023) |
| 06/12/2023 | 300 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated June 12, 2023 re: request for adjournment of sentencing . Document filed by Neil Cole. (Hecker, Sean) (Entered: 06/12/2023) |
| 06/13/2023 | 301 | MEMO ENDORSEMENT as to Neil Cole (1) granting 299 LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated June 12, 2023 re: request for leave to file letter under seal. ENDORSEMENT: The application to file under seal is granted.SO ORDERED. (Signed by Judge Edgardo Ramos on 6/13/2023) (lnl) (Entered: 06/13/2023) |
| 06/16/2023 | 303 | ENDORSED LETTER as to Neil Cole addressed to Judge Edgardo Ramos from Attorney Sean Hecker dated June 12, 2023 re: We write to respectfully request an adjournment of sentencing, currently scheduled for July 25, 2023, to a date in the first week of October. Mr. Cole respectfully seeks an extension for two reasons. ENDORSEMENT: Sentencing is adjourned to October 5, 2023 at 3:30 p.m. SO ORDERED. ( Sentencing set for 10/5/2023 at 03:30 PM before Judge Edgardo Ramos. )(Signed by Judge Edgardo Ramos on 6/16/2023)(bw) (Entered: 06/16/2023) |
| 08/28/2023 | 304 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated August 28, 2023 re: request for leave to file letter under seal . Document filed by Neil Cole. (Hecker, Sean) (Entered: 08/28/2023) |
| 08/28/2023 | 305 | CONSENT LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated August 28, 2023 re: request for adjournment of sentencing . Document filed by Neil Cole. (Hecker, Sean) (Entered: 08/28/2023) |

| | | |
|---|---|---|
| 08/28/2023 | 306 | MEMO ENDORSEMENT granting 304 LETTER MOTION filed by Neil Cole (1), addressed to Judge Edgardo Ramos from Attorney Sean Hecker dated August 28, 2023 re: request for leave to file letter under seal. ENDORSEMENT: The application to file a letter under seal is granted. SO ORDERED. (Signed by Judge Edgardo Ramos on 8/28/2023) (bw) (Entered: 08/28/2023) |
| 08/28/2023 | | Transmission to Sealed Records Clerk: as to Neil Cole. Transmitted re: 306 MEMO ENDORSEMENT, to the Sealed Records Clerk for the sealing of document. (bw) (Entered: 08/28/2023) |
| 08/28/2023 | 307 | MEMO ENDORSEMENT as to Neil Cole on re: 305 CONSENT LETTER MOTION filed by Neil Cole addressed to Judge Edgardo Ramos from Attorney Sean Hecker dated August 28, 2023 re: request for adjournment of sentencing. ENDORSEMENT: Sentencing is adjourned to October 11, 2023 at 4:00 p.m. SO ORDERED. ( Sentencing set for 10/11/2023 at 04:00 PM before Judge Edgardo Ramos. )(Signed by Judge Edgardo Ramos on 8/28/2023)(bw) (Entered: 08/28/2023) |
| 09/22/2023 | 309 | RESCHEDULING NOTICE as to Neil Cole. The sentencing hearing previously scheduled for October 11, 2023, is hereby rescheduled for October 10, 2023, at 4:00 p.m. at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, Courtroom 619. ( Sentencing set for 10/10/2023 at 04:00 PM in Courtroom 619, 40 Centre Street, New York, NY 10007 before Judge Edgardo Ramos. ) (/s/Jazmin Trotman, Courtroom Deputy to the Hon. Edgardo Ramos, Dated: September 22, 2023) (bw) (Entered: 09/22/2023) |
| 09/27/2023 | 310 | SENTENCING SUBMISSION by Neil Cole. (Attachments: # 1 Exhibit A – N – support letters)(Hecker, Sean) (Entered: 09/27/2023) |
| 09/29/2023 | 311 | Sentencing Letter by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated September 29, 2023 re: Supplemental Sentencing Submission. (Attachments: # 1 Exhibit O – support letter)(Hecker, Sean) (Entered: 09/29/2023) |
| 10/04/2023 | 312 | SENTENCING SUBMISSION by USA as to Neil Cole. (Thomas, Andrew) (Entered: 10/04/2023) |
| 10/05/2023 | 313 | LETTER MOTION addressed to Judge Edgardo Ramos from Sean Hecker dated October 5, 2023 re: U.S.S.G. § 4C1.1 . Document filed by Neil Cole. (Hecker, Sean) (Entered: 10/05/2023) |
| 10/09/2023 | 314 | Sentencing Letter by Neil Cole addressed to Judge Edgardo Ramos from Sean Hecker dated October 9, 2023 re: Supplemental Sentencing Submission. (Attachments: # 1 Exhibit P – support letter)(Hecker, Sean) (Entered: 10/09/2023) |
| 10/10/2023 | | Docket Annotation as to Neil Cole: The sentencing hearing scheduled for today, October 10, 2023, at 4:00 p.m. will be held in **Courtroom 318** at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007. (jar) (Entered: 10/10/2023) |
| 10/10/2023 | | Minute Entry for proceedings held before Judge Edgardo Ramos:Sentencing held on 10/10/2023 for Neil Cole (1) Count 2,3–8,9. Defendant present with counsel Sean Hecker, Anita Moss, and David Markus. AUSA Jared Lenow, Andrew Thomas, and Justin Rodriguez present. The Court sentenced the defendant to 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9 of the Indictment to run concurrently. The defendant shall be on supervised release for a term of 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently, subject to the standard conditions 1 –12, as well as the mandatory and special conditions as set forth in the judgment. No fine imposed. Defendant shall pay the United States $800 special assessment, due immediately. Preliminary Order of Forfeiture in the amount of $790,200 signed. Iconix will submit briefing regarding restitution by November 10, 2023. Defendant advised of his right to appeal. Mr. Cole may remain on bail pending appeal. (jw) (Entered: 10/13/2023) |
| 10/13/2023 | 315 | JUDGMENT In A Criminal Case. Date of Imposition of Judgment: 10/10/2023. Defendant Neil Cole (1) was found guilty on Count(s) 2, 3–8, and 9, after a plea of not guilty. The defendant has been found not guilty on Count(s) 1 and 10. IMPRISONMENT: 18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. SUPERVISED RELEASE: 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently. Standard Conditions of Supervision (See page 5 of Judgment). Additional Supervised Release Terms (See page 6 of Judgment). ASSESSMENT: |

| | | |
|---|---|---|
| | | $800.00, due immediately. – The determination of restitution is deferred until 1/10/2024. An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination. (Signed by Judge Edgardo Ramos on 10/12/2023)(bw) (Entered: 10/13/2023) |
| 10/20/2023 | 316 | TRANSCRIPT of Proceedings as to Neil Cole re: Sentence held on 10/10/2023 before Judge Edgardo Ramos. Court Reporter/Transcriber: Amy Walker, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/13/2023. Redacted Transcript Deadline set for 11/20/2023. Release of Transcript Restriction set for 1/18/2024. (McGuirk, Kelly) (Entered: 10/20/2023) |
| 10/20/2023 | 317 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Neil Cole. Notice is hereby given that an official transcript of a Sentence proceeding held on 10/10/203 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/20/2023) |
| 10/25/2023 | 318 | PRELIMINARY ORDER OF FORFEITURE/MONEY JUDGMENT as to Neil Cole. (Signed by Judge Edgardo Ramos on 10/10/2023) (See ORDER set forth) (Forwarded three certified copies to AUSA Tara LaMorte, via interoffice mail) (ap) (Entered: 10/25/2023) |
| 10/25/2023 | 319 | NOTICE OF APPEAL by Neil Cole from 315 Judgment. Filing fee $ 505.00, receipt number 22596. (tp) (Entered: 10/25/2023) |
| 10/25/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Neil Cole to US Court of Appeals re: 319 Notice of Appeal – Final Judgment. (tp) (Entered: 10/25/2023) |
| 10/25/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Neil Cole re: 319 Notice of Appeal – Final Judgment were transmitted to the U.S. Court of Appeals. (tp) (Entered: 10/25/2023) |