# 23-7566

*To Be Argued By:*
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NEIL COLE, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
BRONWYN C. ROANTREE
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

ISSUES PRESENTED...........................................................................3

STATEMENT OF THE CASE................................................................4

    A.   Iconix's Business................................................................4

    B.   The Charges.........................................................................5

    C.   First Trial ............................................................................7

          1.  Horowitz ...................................................................10

          2.  Rabin And Margolis .................................................12

          3.  Cole...........................................................................14

          4.  Deliberations And Verdict .......................................15

    D.   Motion Practice Following Acquittals ..............................15

    E.   Second Trial......................................................................17

    F.   Sentencing ........................................................................19

STANDARDS OF REVIEW .................................................................20

SUMMARY OF ARGUMENT ..............................................................20

ARGUMENT ........................................................................................22

I.     THE RETRIAL VIOLATED THE DOUBLE
      JEOPARDY CLAUSE......................................................................22

A.   The Fifth Amendment Precluded The Government
From Retrying Cole ................................................................23

   1.  The First Jury Necessarily Decided There Were No Secret
Side Agreements Between Cole And GBG ........................27

      a.   The sole disputed issue at the first trial was whether
Cole entered side agreements .....................................28

      b.   No rational jury could have found Cole made
side agreements with GBG yet acquitted
him of conspiracy ........................................................32

      c.   The district court erroneously relied on a hypertechnical
reading of the trial record ...........................................34

   2.  The Second Trial Forced Cole To Relitigate The Same Issue
Previously Decided In His Favor ......................................37

B.   At A Minimum, The District Court Erred By Refusing To
Exclude Evidence Of The Acquitted Conspiracy ...................40

II.   THE ERRONEOUSLY ADMITTED HEARSAY OF AN
UNCALLED WITNESS REQUIRES A NEW TRIAL ...............42

A.   Background...............................................................................43

B.   Ethan Cole's Emails Were Not Admissible
Co-Conspirator Statements......................................................47

   1.  The Government Failed To Establish A Conspiracy .........49

   2.  Ethan Cole And Neil Cole Were Not Co-Conspirators .....50

   3.  Ethan's Emails Did Not Further Any Conspiracy
With Neil Cole..................................................................53

C.   The Error Was Not Harmless ..................................................54

III.   THE MISLEADING "EQUALLY AVAILABLE" WITNESS
INSTRUCTION REQUIRES A NEW TRIAL................................56

A. Background...................................................................................57

B. The Uncalled Witness Instruction Was Reversible Error .......................58

C. The Error Was Not Harmless ...................................................60

CONCLUSION .......................................................................................62

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Anderson v. United States,*
    417 U.S. 211 (1974) ..............................................................................49

*Ashe v. Swenson,*
    397 U.S. 436 (1970) ................................................................ passim

*Blockburger v. United States,*
    284 U.S. 299 (1932) ..............................................................................25

*Brown v. Ohio,*
    432 U.S. 161 (1977) ..............................................................................24

*Burks v. United States,*
    437 U.S. 1 (1978) ..................................................................................23

*Green v. United States,*
    355 U.S. 184 (1957) ..............................................................................23

*Harris v. Washington,*
    404 U.S. 55 (1971) ................................................................................24

*Kelber v. Joint Indus. Bd. of Elec. Indus.,*
    27 F.3d 42 (2d Cir. 1994) ............................................................ 58, 59

*Krulewitch v. United States,*
    336 U.S. 440 (1949) ..............................................................................47

*McCardle v. Haddad,*
    131 F.3d 43 (2d Cir. 1997) .......................................................... 22, 59

*McElrath v. Georgia,*
    No. 22-721, 2024 WL 694921 (Feb. 21, 2024) ........................ 1, 24, 40

*Neder v. United States,*
    527 U.S. 1 (1999) ..................................................................................60

*Petrucelli v. Coombe*,
735 F.2d 684 (2d Cir. 1984) ...............................................................20

*Schiro v. Farley*,
510 U.S. 222 (1994) ...........................................................................29

*Sealfon v. United States*,
332 U.S. 575 (1948) ................................................ 21, 25, 26, 39, 40

*Swidler & Berlin v. United States*,
524 U.S. 399 (1998) ...........................................................................58

*Tehan v. United States ex rel. Shott*,
382 U.S. 406 (1966) ...........................................................................58

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
552 F.3d 93 (2d Cir. 2008) .................................................................48

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008) ............................................ 48, 54, 56, 62

*United States v. Becker*,
502 F.3d 122 (2d Cir. 2007) ...............................................................52

*United States v. Caccia*,
122 F.3d 136 (2d Cir. 1997) ................................................. 22, 59, 60

*United States v. Carbullido*,
307 F.3d 957 (9th Cir. 2002) ..............................................................34

*United States v. Castillo-Basa*,
483 F.3d 890 (9th Cir. 2007) ..................................................... 31, 33

*United States v. Coughlin*,
610 F.3d 89 (D.C. Cir. 2010) ..............................................................36

*United States v. DeVaugn*,
579 F.2d 225 (2d Cir. 1978) ...............................................................56

*United States v. Ferrarini*,
219 F.3d 145 (2d Cir. 2000) ...............................................................59

*United States v. Fiel*,
    35 F.3d 997 (4th Cir. 1994) ...............................................................41

*United States v. Gigante*,
    166 F.3d 75 (2d Cir. 1999) .......................................... passim

*United States v. Gil*,
    604 F.2d 546 (7th Cir. 1979) ...............................................................49

*United States v. Hernandez*,
    572 F.2d 218 (9th Cir. 1978) .................................... 33, 34, 39

*United States v. Hicks*,
    5 F.4th 270 (2d Cir. 2021) ......................................... 25, 37

*United States v. Joseph*,
    542 F.3d 13 (2d Cir. 2008) .................................................................56

*United States v. Kaiser*,
    609 F.3d 556 (2d Cir. 2010) ...............................................................54

*United States v. Kaplan*,
    490 F.3d 110 (2d Cir. 2007) ...............................................................20

*United States v. Kosinski*,
    976 F.3d 135 (2d Cir. 2020) ...............................................................51

*United States v. Kramer*,
    289 F.2d 909 (2d Cir. 1961) ....................................... passim

*United States v. Leach*,
    632 F.2d 1337 (5th Cir. 1980) .............................................................35

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015) ...............................................................51

*United States v. Martin Linen Supply Co.*,
    430 U.S. 564 (1977) .............................................................................1

*United States v. Maslin*,
    356 F.3d 191 (2d Cir. 2004) ...............................................................20

*United States v. Mayes,*
  No. 12-CR-385 (ARR), 2014 WL 25569 (E.D.N.Y. Jan. 2, 2014).....................41

*United States v. Mespoulede,*
  597 F.2d 329 (2d Cir. 1979) .......................................................... passim

*United States v. Mock,*
  604 F.2d 341 (5th Cir. 1979) ................................................... 33, 38, 39

*United States v. Myerson,*
  18 F.3d 153 (2d Cir. 1994) .......................................................60

*United States v. Ohayon,*
  483 F.3d 1281 (11th Cir. 2007) .................................................31

*United States v. Paone,*
  782 F.2d 386 (2d Cir. 1986) .....................................................48

*United States v. Quattrone,*
  441 F.3d 153 (2d Cir. 2006) .....................................................60

*United States v. Quintana-Quinones,*
  No. 86 Cr. 097 (JFK), 1987 WL 6435 (S.D.N.Y. Feb. 6, 1987).........................41

*United States v. Rivera,*
  22 F.3d 430 (2d Cir. 1994) .......................................................48

*United States v. Romeo,*
  114 F.3d 141 (9th Cir. 1997) .....................................................28

*United States v. Rossomando,*
  144 F.3d 197 (2d Cir. 1998) .....................................................59

*United States v. Silver,*
  864 F.3d 102 (2d Cir. 2017) ................................................. 20, 61

*United States v. Stanchich,*
  550 F.2d 1294 (2d Cir. 1977) ....................................................50

*United States v. Stewart,*
  907 F.3d 677 (2d Cir. 2018) .....................................................54

*United States v. Tellier*,
    83 F.3d 578 (2d Cir. 1996) ...................................................................... 21, 47, 48

*United States v. Torres*,
    604 F.3d 58 (2d Cir. 2010) ..................................................................... 50, 51, 59

*United States v. Vayner*,
    769 F.3d 125 (2d Cir. 2014) ...........................................................................56

*United States v. Whitaker*,
    702 F.2d 901 (11th Cir. 1983) ................................................................... 32, 36

*United States v. Williams*,
    205 F.3d 23 (2d Cir. 2000) ............................................................................58

*United States v. Willis*,
    14 F.4th 170 (2d Cir. 2021) ...................................................................... 49, 52

*United States v. Zemlyansky*,
    908 F.3d 1 (2d Cir. 2018) ......................................................................... 37, 40

*Yeager v. United States*,
    557 U.S. 110 (2009) ....................................................................... 20, 24, 27. 40

**Statutes and Rules**

15 U.S.C. §78j .................................................................................................6

15 U.S.C. §78m ...............................................................................................6

15 U.S.C. §78ff ...............................................................................................6

15 U.S.C. §7202 ..............................................................................................6

15 U.S.C. §7242 ..............................................................................................6

18 U.S.C. §371 ................................................................................................6

18 U.S.C. §1519 ..............................................................................................6

18 U.S.C. §3231 ..............................................................................................3

28 U.S.C. §1291 ..................................................................................3

Fed. R. Evid. 801 ......................................................... passim

## INTRODUCTION

Just last week, the Supreme Court reaffirmed "'the most fundamental rule in the history of double jeopardy jurisprudence'": "Once rendered, a jury's verdict of acquittal is inviolate." *McElrath v. Georgia*, No. 22-721, 2024 WL 694921, at *4 (Feb. 21, 2024) (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977)). This appeal arises from a retrial that broke that basic constitutional rule.

Neil Cole fought the criminal charges against him and won. A jury acquitted him of conspiracy to inflate revenues of the company he founded and built into a consumer brands powerhouse. The prosecution's theory was that Cole entered secret side deals with a counterparty to make certain transactions appear more lucrative than they were, and concealed this scheme from auditors and the SEC. In rendering its "not guilty" verdict, the jury necessarily rejected that theory. It found no side arrangements involving Cole and credited his testimony over that of the government's main witnesses.

The Double Jeopardy Clause exists for exactly this situation. The government doesn't get to try again once a jury has spoken and rendered an acquittal. This case should have ended there. Instead, the district court permitted the government a second bite at the apple—a retrial on the conspiracy's substantive objects, on which the jury had hung. At the retrial, the government

presented the same evidence and made the same arguments—often verbatim—to prove the same alleged side agreements. The issues presented to the second jury were, as a practical matter, the same ones the first jury already decided in Cole's favor. The retrial, and the re-presentation of the same evidence, violated the Double Jeopardy Clause.

To make matters worse, the retrial was tainted by inadmissible hearsay of an alleged member of the very conspiracy of which Cole was acquitted. The district court admitted two internal emails written by a low-level assistant at the counterparty, on the theory that the assistant and Cole were co-conspirators. But the assistant was unaware of any side agreements and never interacted with Cole. His emails satisfied none of the requirements for co-conspirator hearsay. And the government trumpeted these erroneously admitted emails over and over—with multiple witnesses and throughout its closing arguments—as conclusive proof of the "scheme" of which Cole had been acquitted.

The district court compounded that problem by inviting the jury to speculate that the defense could have called the assistant as a witness—even though the defense had no way to compel his testimony: The government threatened him with prosecution and refused to grant immunity, so he was unavailable to the defense. But the court told the jury the witness was equally available to both sides, enabling the government to spin the hearsay emails in a misleading way, while suggesting

that Cole *chose* not to call the witness because his testimony would have undermined the defense.

Cole should never have been retried. His conviction should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. The judgment of conviction was entered on October 13, 2023. (SPA-1). Cole timely filed a notice of appeal on October 25, 2023. (A-1819). This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

1.  Whether permitting a retrial on the substantive counts after Cole's acquittal violated the Double Jeopardy Clause or whether, at a minimum, evidence of the acquitted conduct should have been excluded from the second trial.

2.  Whether the district court erroneously admitted hearsay emails that failed to meet the requirements of Federal Rule of Evidence 801(d)(2)(E).

3.  Whether the district judge erroneously instructed the jury that a witness was equally available to the defense even though the government threatened to prosecute and refused to immunize him, and the defense could not have compelled his testimony.

## STATEMENT OF THE CASE

Cole appeals a judgment of conviction entered by the United States District Court for the Southern District of New York (Ramos, J.), following two jury trials.

### A. Iconix's Business

Cole was the founder and CEO of Iconix Brand Group. (A-658, A-721). Iconix dealt in consumer brands but did not manufacture or sell merchandise. Instead, its business was brand management. It reinvigorated well-known labels—such as London Fog, Peanuts, Danskin, and Umbro—by acquiring trademark rights, licensing those rights to apparel manufacturers and retailers, and collecting royalties. (A-658-59, A-721, A-1020-21). By 2014, Iconix owned over 30 different brands and was the second largest licensing company in the world, with annual revenue over $460 million and profits of nearly $250 million. (A-659, A-1022).

Iconix had thousands of license agreements worldwide, including major deals with big-name stores such as Walmart, Target, and Macy's. (A-669, A-1021). Iconix also entered joint ventures ("JVs") with third parties. (A-659, A-669-70, A-726, A-997-98). It would create a new entity, transfer brand rights to it, and sell a stake to a partner, which would then manage the JV and license the brands within a particular territory. (A-659, A-668, A-680, A-738-39).

Iconix was publicly traded and reached a market value of $2-3 billion. (A-659-60, A-721, A-725, A-1021). The government's witnesses admired Cole as "innovative," "visionary," and a "pioneer" for his "asset light" business model, which created revenue with minimal expense because Iconix dealt in intellectual property rather than goods. (A-667-68, A-721, A-724-25, A-727, A-957, A-994).

## B. The Charges

The indictment alleged that Cole led a multi-participant "scheme to falsely inflate Iconix's reported revenue and [earnings per share]" through three JVs entered in 2013-14. (A-48). Iconix's partner in these transactions was Li & Fung, one of the largest apparel companies in the world. (A-687, A-726, A-842). The transactions involved a subsidiary (LF Asia) that Li & Fung spun off in mid-2014 as Global Brands Group (together, "GBG"). (A-661, A-704).

The indictment alleged that Cole, representatives of GBG, and Seth Horowitz, Iconix's Chief Operating Officer, entered secret side agreements to artificially inflate Iconix's revenue for each deal. It alleged that GBG agreed to increase the amount paid for its JV interest in exchange for Cole's agreement to later "round trip" the extra consideration to GBG as a "giveback." (A-48-52, A-55). The first transaction, "SEA-1," involved brands in Southeast Asia. (A-48-50). The other two transactions, "SEA-2" and "SEA-3," were structured as SEA-1 amendments but covered different brands and territories. (A-48-49, A-51-52, A-

54-55). The indictment alleged that Cole and GBG inflated the deal prices just before the end of the quarter so Iconix's publicly reported revenue and earnings per share ("EPS") would meet market analysts' predictions. (A-48-50).

Count One charged conspiracy (18 U.S.C. §371) regarding the alleged revenue-inflation scheme among Cole, Horowitz, "and others." (A-48). The indictment identified three conspiracy objects: "securities fraud" (15 U.S.C. §§78j(b), 78ff); "making false and misleading statements" in SEC filings (15 U.S.C. §§78m(a), 78ff); and "improperly influencing the conduct of audits" (15 U.S.C. §§7202, 7242, 78ff). (A-60-63).

The indictment also charged these same objects as substantive offenses. Count Two charged securities fraud "to fraudulently inflate Iconix's publicly reported revenue and EPS" (A-65-66); Counts Three through Eight charged false statements in SEC filings (A-66-71); and Count Nine charged false or incomplete statements "relating to the SEA JVs" to Iconix's auditor (A-71-72).

Count Ten charged that in response to an SEC inquiry, Cole and co-workers "deleted emails related to the SEA JVs" and submitted false information to the SEC about the alleged side agreements, violating 18 U.S.C. §1519. (A-72-73).

## C. First Trial

Trial commenced on October 5, 2021 and lasted four weeks. Most of the key facts—*e.g.*, the parameters of each transaction, deal documents, and final purchase price—were undisputed.

For example, Cole and Jason Rabin, GBG's Chief Merchandising Officer, were the principal negotiators of SEA-1. (A-263, A-316, A-417). Near the end of their negotiations, GBG's purchase price increased from $10 million to $12 million. (A-265-70, A-276). But the deal didn't fit the government's "secret side agreements" narrative. The supposed giveback—a $2 million "consultancy" payment—was expressly memorialized in contracts prepared and reviewed by dozens of lawyers and available to auditors. (A-277-82, A-405, A-1190-94). Thus, the payment was not "secret," and "[a]ll of the parties' commitments were documented in the written agreements." (A-273, A-312). And contrary to the government's narrative of end-of-quarter shenanigans, Cole instructed Iconix's in-house lawyer to "[b]e firm" in negotiations and "[i]f [the] deal does not close we are fine." (A-406, A-1792). Indeed, SEA-1 closed at the beginning of the fourth quarter and thus had no impact on third-quarter revenues. (A-276-77, A-353).

Neither Cole nor Rabin were directly involved in the negotiations about SEA-2 and SEA-3, which were handled principally by their deputies: Horowitz for Iconix, and Jared Margolis for GBG. (A-323, A-380, A-387, A-406-07, A-409, A-

7

422).  After months of negotiations, SEA-2 closed on June 30, 2014 at a price of

$15,917,500, and SEA-3 closed on September 17, 2014 at $21,500,000.  (A-111,

A-132, A-1195, A-1199).  Both deal prices rose near the end of negotiations—

SEA-2 by $5 million and SEA-3 by $6 million.  (A-108, A-130, A-1212, A-1435).

But unlike SEA-1, the deal documents did not include any "giveback."

Instead, the government sought to tie SEA-2 to payments Iconix made to

GBG *months later*:  In September 2014, GBG sent three round-number invoices

asking Iconix to reimburse a total of $5 million in marketing costs.  (A-136-37, A-

1547).  Numerous witnesses testified that such marketing contributions are routine

in the industry because a licensee's marketing efforts also benefit the licensor, and

GBG regularly sought marketing contributions from many other deal partners.  (A-

305, A-307, A-360-61, A-374-77, A-401).  But Cole initially refused to pay

because GBG's invoices included no supporting materials, telling Horowitz GBG

needed to "[s]how us work[,] real expenses."  (A-138-39, A-208-09, A-297-98).

GBG then presented Iconix with new invoices that billed precise dollar amounts

and included backup documentation (A-139-40, A-209-10, A-1551); in response,

Cole authorized over $5.3 million in payments to GBG (A-144-47, A-385, A-408,

A-425).  The government called these invoices "phony" (A-483), but its own

witnesses confirmed they demonstrated "real work" GBG actually performed and

8

were not "fabricated" or "phony." (A-297-98, A-378-79). And the government could not explain why Iconix would pay 7% more than the SEA-2 price increase.

As to SEA-3, the government cited the pre-existing license for the Rocawear Kids brand, which GBG had asked to terminate. (*E.g.*, A-207-08, A-217). GBG was operating under a "shortfall," meaning its income did not cover required minimum payments to Iconix. (A-106, A-285). The parties had many discussions about relieving GBG from this obligation, but Iconix first needed a replacement licensee. (A-107, A-115, A-122, A-409). Ultimately the parties never terminated the license, even after SEA-3. (A-213, A-218, A-286, A-409-10). Nonetheless, the government contended that in exchange for an increased deal price, Cole had made a *binding commitment* to GBG to terminate the Rocawear license. (A-457).

There was not a single contemporaneous document reflecting or even hinting at either of the alleged secret side agreements, let alone any such document involving Cole. Moreover, the deal documents contained integration clauses confirming the lack of any oral agreements (A-216-17, A-338, A-1717, A-1734, A-1738, A-1772), and GBG's senior leadership approved both transactions *as written* (A-287-89, A-369-71).

The trial thus turned on witness testimony. Horowitz pleaded guilty and testified as a cooperator (A-86-87, A-167), while Rabin and Margolis testified for the government under immunity orders (A-262, A-314). All three testified about

9

secret side agreements in SEA-2 and SEA-3, but there were serious reasons to doubt their stories. Cole testified on his own behalf and emphatically denied the government's theory.

## 1. *Horowitz*

Horowitz was the government's first witness. During over five days of testimony, he repeatedly destroyed his own credibility. For example, Horowitz claimed to have started a journal in February 2015 specifically to memorialize and substantiate Cole's purported improprieties, yet the notes nowhere mentioned the supposed secret side agreements. (A-162, A-226). Horowitz said he "was scared to put in writing what I knew we had done wrong. I just couldn't write that down" (A-162)—even though his stated reason for taking the notes was to document Cole's culpability. Horowitz even tried to claim that an isolated and seemingly innocuous line in the notes—"something to the effect of Neil mentioned subsets"—was actually secret "code" for fraudulent overpayments and givebacks. (A-162, A-226). On material points—such as whether Iconix's paying the GBG invoices had any nexus to SEA-2—Horowitz repeatedly contradicted himself and refused to acknowledge his own prior inconsistent statements to the government. (*E.g.*, A-179-81). And Horowitz confessed that—beyond his penal interest in currying the government's favor—he harbored a personal animus against Cole and

10

the two frequently clashed, leaving Horowitz wanting to "fight back."  (A-172-74, A-224-25, A-244).

Horowitz could not identify a single meeting or communication in which GBG agreed to pay $5 million more for SEA-2.  Instead, Horowitz claimed Cole once mentioned that he "had gotten GBG to agree to a $5 million increase in the price in exchange for paying them back in some type of marketing fees in the future."  (A-108-10).  But Horowitz faltered when pressed for corroboration: Despite meeting with prosecutors over 30 times on this issue (A-237-38), he could not pinpoint the date of this supposed conversation, admitted no one else was present, and conceded he did not take notes or mention it to anyone else.  (A-178-79, A-181).  Horowitz also acknowledged that there was no mention of this supposed giveback in any email or other document leading up to SEA-2, in any conversation he had with GBG, or in any of his updates to Cole in the weeks after.  (A-181-83).

For SEA-3, Horowitz testified GBG agreed to pay an additional $6 million because Iconix "agree[d] to terminate the Rocawear Kids [license] with GBG."  (A-130).  But although Horowitz testified he and Cole had internal discussions about this possibility (A-122, A-125-26), he claimed the supposed GBG side agreement occurred at a meeting Cole did not attend, but only dropped in for a moment (A-127-29).

## 2. *Rabin And Margolis*

Rabin asserted that the SEA-2 price increased because Cole told him, "If you raise the price by 5 million, you can bill it back for marketing." (A-270-71). But on cross-examination Rabin conceded he was minimally involved in those negotiations and was hospitalized following open-heart surgery around the time of this supposed conversation. (A-291). Indeed, Rabin previously told the government he did not recall Iconix's "paying money back through marketing being particular to a certain deal" and believed Iconix had "no obligation to pay" GBG's marketing—statements directly at odds with his trial testimony. (A-299, A-447-78, A-1793-94).

Rabin was "not very involved in SEA-3" (A-284-85), and his testimony about it was equivocal. On direct, all Rabin could say about why the deal price increased was "[t]here was a discussion about increasing the price by $6 million to recover Rocawear's shortfall." (A-271). When the government prodded him if this was "something you discussed with Mr. Cole," Rabin said "Yes" but could provide no detail about that supposed conversation. (A-272 ("Q. How did those discussions unfold, to the best of your memory? A. To the best my memory, I thought that's how the deal was finalized….I don't remember what he said.")). Only when the government specifically led Rabin to say he and Cole "reach[ed] agreement on that point" did Rabin assert they did. (A-272). But Rabin also

suggested he learned about the price increase from GBG's CFO, or perhaps "from Iconix." (A-272). And he previously told the government he wasn't sure if terminating Rocawear Kids was linked to SEA-3 at all. (A-286).

Although Margolis was directly involved in both negotiations, he had no personal knowledge of any secret side agreement and hardly any contact with Cole. (A-352, A-380). His testimony as to SEA-2 rested on second-hand information and speculation: Margolis testified *Rabin* told him the price increased by $5 million and his "*understanding*" was GBG would get that money back from Iconix. (A-322-23). Margolis "did not personally hear anyone make a commitment to make a future payment," could recall no specific conversation with Rabin, and was simply "making an assumption that there was an agreement by Iconix to make a future payment." (A-361, A-387). As to SEA-3, all Margolis could say was GBG paid "$6 million more" "[b]ecause we were going to get the money back." (A-325, A-328, A-331). Even though he was "the principal negotiator," he could not confirm any conversation about using the Rocawear Kids license as a giveback. (A-382, A-387).

Rabin and Margolis both testified that Cole never asked to keep any part of SEA-1, SEA-2, or SEA-3 out of the deal documents or away from lawyers and accountants. (A-273, A-290, A-351, A-353, A-387). And—despite having

secured testimonial immunity—Rabin insisted he did not commit any crimes or do anything wrong.  (A-273).

3. *Cole*

Cole testified unequivocally that he had no secret side agreement with GBG in SEA-2, and that they didn't discuss marketing payments when the deal was entered.  (A-408).  And Cole flatly denied the supposed conversation about which Horowitz testified.  (A-408).

Similarly, Cole testified that neither he nor, to his knowledge, anyone else at Iconix made any side agreement with GBG in connection with SEA-3.  (A-410).  Rather, Cole testified, the first time he learned there might have been such an agreement on *either* deal was in April 2015, when Horowitz sent the Iconix board of directors a resignation letter referencing a "verbal commitment" about marketing expenses in SEA-2 and "Iconix's release of GBG" from the Rocawear Kids license in SEA-3.  (A-408, A-413; *see* A-1557-59).

Cole also addressed the alleged "givebacks."  He testified that although Iconix reimbursed GBG for marketing expenses in late 2014, it had no obligation to do so.  (A-408).  Rather, GBG "was obviously a big partner of ours," and he was concerned GBG was upset about certain unprofitable licenses and another deal that stalled.  (A-408-09).  To show GBG that Iconix valued their partnership—and because GBG was "doing some good marketing around the world"—"I agreed to

give them $5.4 million of marketing. We also had it available in our budget…[which was] $36 million." (A-409; *see* A-401). Cole admitted he "didn't look too closely at the backup" GBG sent because the details were unimportant. (A-409). And Cole confirmed that, contrary to the government's SEA-3 theory, the Rocawear Kids license was never terminated, nor did GBG ever demand that Iconix fulfill its supposed termination promise, as one would expect if Iconix had made such a commitment. (A-409; *see also* A-213, A-218, A-259).

### 4. *Deliberations And Verdict*

The trial thus came down to a "he said/he said" about secret side agreements—the jury had to decide whether it believed Horowitz (and, to a lesser extent, Rabin, and Margolis) or Cole.

The jury deliberated for over three days. It then acquitted Cole on Count One, the principal conspiracy charge, apparently rejecting Horowitz's claim about secret side agreements. (A-490). It also acquitted Cole on Count Ten, rejecting Horowitz's testimony that he deleted emails and other materials at Cole's direction. (A-490; *see* A-157-58). However, even after an *Allen* charge, the jury did not reach a verdict on the substantive counts. (A-490-92).

### D. Motion Practice Following Acquittals

After the government elected to retry Cole on the substantive counts, the defense moved *in limine* to exclude any evidence or argument that Cole conspired

15

with other individuals in connection with the charged schemes. (Dkt.212). It argued that putting those matters before another jury after the acquittals would violate the Double Jeopardy Clause.

In response, the government conceded the substantive counts were really no different from the acquitted Count One conspiracy: "It is the very essence of the Government's theory that the substantive charges involved the defendant *working with others as part of a scheme* to fraudulently inflate Iconix's revenue and [EPS] and, in the process, lie to the SEC and interfere with audits." (A-503 (emphasis added); *see* A-497, A-628-29, A-632). Therefore, the government argued, excluding conspiracy evidence "will, in effect,…prohibit[] [the government] from retrying the substantive counts" because it "cannot remove from the equation the other people the defendant 'committed wrongdoing or illegal acts with' and preserve fidelity to the evidence." (A-497).

Given those concessions, Cole asked the court to construe his motion as one seeking to bar retrial or dismiss the substantive counts on double jeopardy grounds. (Dkt.237). In response, the government reiterated that it *had* to focus its case on the alleged secret side agreements: "[T]he essence of each of the counts is that Cole and Jason Rabin *agreed to an overpay-for-giveback arrangement* and then worked with their subordinates to accomplish that plan. It is the theory reflected in the Indictment…; it is the theory that the Government presented to the jury at the

16

last trial…; and it is the theory that the Government will present at the retrial." (A-628 (emphasis added)).

The district court denied Cole's motion. While acknowledging that "the defense certainly makes a compelling argument," the court concluded the acquittal did not resolve any issues for the second trial because "the jury could have found beyond a reasonable doubt that Mr. Cole participated in a conspiracy but disagreed over the object of the conspiracy." (A-633-34). The court allowed the government to attempt to prove the same secret side agreements rejected by the first jury, as long as it refrained from calling them a "conspiracy." (A-634).[1]

### E. Second Trial

The second trial commenced on October 31, 2022, and replicated the first in nearly every respect.

For example, while studiously avoiding the word "conspiracy," the government argued that Cole, Horowitz, Rabin, and Margolis were "partners" in crime, working hand-in-glove to artificially inflate Iconix's revenues. (*E.g.*, A-1098). Indeed, the government argued, Cole chose them "to be a part of his criminal scheme" due to their willingness to further its criminal objectives: "Neil Cole wanted…people who would be *enthusiastic participants* in this crime….He

---

[1] Cole renewed his objection to this ruling during the retrial, which confirmed that the government was adhering to "the same exact testimony and playbook that the jury acquitted Mr. Cole of." (A-779-80).

chose them because *they would play ball* and have no second thoughts about *being a part of this scheme*….[to] misrepresent[] numbers to Iconix and its shareholders and its investors and its auditors." (A1115-16 (emphasis added)).

Again the government relied principally on Horowitz, Rabin, and Margolis, who again claimed—to varying extents—that SEA-2 and SEA-3 included secret side agreements. (A-683-85, A-753, A-768, A-940, A-945).[2] On cross-examination, the defense highlighted the same inconsistencies, selective memory, and logical gaps that it successfully established in the first trial. (*E.g.*, A-686-87, A-693, A-704, A-709-11, A-717, A-831-32, A-850, A-852-55, A-884, A-957, A-971-72; *see* A-813-14). Cole provided the same testimony as he had at the first trial. He unequivocally denied participating in or knowing about any secret side agreements and testified he paid GBG's invoices in late 2014 as "a concession to one of my most valuable customers for a very tough year," not because of any prior obligation. (A-1019, A-1029, A-1038, A-1073).

Once again the government was unable to point to any contemporaneous documents involving Cole that referenced side agreements. Instead, this time it relied heavily on two emails written by Margolis' assistant, Ethan Cole (no relation). Those emails had been admitted as co-conspirator statements under

---

[2] None of the substantive counts related to SEA-1, and the government abandoned it in the second trial: "So what if Neil Cole didn't commit fraud with SEA-1." (A-1097).

Federal Rule of Evidence 801(d)(2)(E) midway through the first trial. Accordingly, the defense moved *in limine* to preclude them in the second trial. (Dkt.218; *see* A-340). But the district court denied that motion. (A-645-47). As discussed *infra* at 42-56, these documents were a central part of the government's arsenal at the retrial; it even called two GBG witnesses who did not testify in the first trial but testified at length in the second about Ethan's other dealings within GBG, which Cole knew nothing about. (A-909-16, A-920-35).

The jury began deliberating on November 22, 2022, just before Thanksgiving. That afternoon, the jurors asked whether they could "bring our notes home [over the break]," which the court denied. (A-1134). The following Monday, after a juror with COVID was replaced, the jury returned a guilty verdict on all counts. (A-1137).

### F. Sentencing

The district court sentenced Cole principally to 18 months' imprisonment. (A-1815-16). Further demonstrating that the "he said/he said" question was dispositive, the court told Cole, "I sat through both trials, and, frankly, I believe Mr. Horowitz, and I did not believe you." (A-1814). With the government's consent, the court granted bail pending appeal. (A-1817-18).

19

## STANDARDS OF REVIEW

Whether double jeopardy barred a second trial, *United States v. Maslin*, 356 F.3d 191, 196 (2d Cir. 2004), and challenges to jury instructions, *United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017), are reviewed *de novo*.[3]  Evidentiary rulings are reviewed for abuse of discretion, and a district court abuses its discretion when "its decision rests on an error of law…or a clearly erroneous factual finding." *United States v. Kaplan*, 490 F.3d 110, 117-18 (2d Cir. 2007).  A trial court has "no discretion at all" to admit evidence that "would violate the Double Jeopardy Clause." *Petrucelli v. Coombe*, 735 F.2d 684, 690 (2d Cir. 1984).

## SUMMARY OF ARGUMENT

I.    "[T]he Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." *Yeager v. United States*, 557 U.S. 110, 119 (2009).  Applying this Court's two-step framework for analyzing such issues, *see United States v. Mespoulede*, 597 F.2d 329, 333 (2d Cir. 1979), Cole's Count One conspiracy acquittal barred the government from retrying him on the substantive counts. *First*, in voting unanimously to acquit, the first jury necessarily determined the government failed

---

[3] Unless otherwise noted, citations omit quotation marks, footnotes, emphasis, and alterations in the original source.

to prove any secret side agreement between Cole and GBG; that is "[t]he single rationally conceivable" explanation for its verdict. *Ashe v. Swenson*, 397 U.S. 436, 445 (1970). *Second*, double jeopardy precluded the second trial because the government's theory on the substantive counts "require[d] [Cole] to relitigate the very issue a jury decided in his favor." *Mespoulede*, 597 F.2d at 334. In refusing to bar retrial or dismiss the substantive counts, the district court handed the government "a second attempt to prove the agreement[s] which at each trial w[ere] crucial to the prosecution's case and which w[ere] necessarily adjudicated in the former trial to be non-existent. That the prosecution may not do." *Sealfon v. United States*, 332 U.S. 575, 580 (1948).

At a minimum, Cole is entitled to a new trial because the district court should have excluded evidence offered to establish the exact same agreements it had already tried and failed to prove. *See Ashe*, 397 U.S. at 446.

II.     The district court erroneously admitted Ethan Cole's emails as co-conspirator hearsay under Rule 801(d)(2)(E). That Rule requires proof of a conspiracy involving both Neil and Ethan Cole and that the emails were in furtherance of that conspiracy. *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996). The emails satisfied none of these requirements. The government failed to establish any conspiracy, let alone one involving both individuals. Ethan was a newly-hired, low-level GBG assistant, was uninvolved in the negotiations, barely

knew Neil Cole, and had no reason to inflate Iconix's revenue. His emails concerned GBG's efforts to obtain money *from Iconix* and could not have furthered any conspiracy. Yet the government repeatedly exploited these emails—presenting them over and over to the jury—to fill the glaring gap in its proof, which otherwise rested largely on the dubious credibility of Horowitz. The error deprived Cole of a fair trial.

III. The erroneous admission of the emails was further compounded by the jury instruction indicating Ethan was equally available to both the government and the defense that had "no factual predicate in the trial record." *McCardle v. Haddad*, 131 F.3d 43, 52 (2d Cir. 1997). Ethan was not available to the defense because the government threatened him with prosecution and declined to immunize him. The court's factually false instruction misled the jury and severely prejudiced the defense, fatally tainting the trial. *See United States v. Caccia*, 122 F.3d 136, 139 (2d Cir. 1997).

## ARGUMENT

## I. THE RETRIAL VIOLATED THE DOUBLE JEOPARDY CLAUSE

The government went to trial in 2021 and lost. During that trial, it attempted to prove that Cole and GBG entered secret side agreements to artificially inflate Iconix's revenue, and that these secret side agreements constituted a conspiracy to commit securities fraud through false SEC filings and deceit of auditors. But the

jury rejected the government's evidence, credited Cole, and unanimously acquitted him of conspiracy. In so doing, the jury necessarily determined that there were no secret side agreements, or that Cole did not participate in any such agreements. Either way, the Double Jeopardy Clause precluded a retrial based on the alleged side agreements—which were the basis for the substantive counts as well. Nor could the government constitutionally introduce evidence that led to the acquittal in any second trial.

## A. The Fifth Amendment Precluded The Government From Retrying Cole

The Double Jeopardy Clause guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Clause reflects the framers' judgment that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v. United States*, 355 U.S. 184, 187-88 (1957).

The Constitution provides the government only "one fair opportunity to offer whatever proof it [can] assemble," *Burks v. United States*, 437 U.S. 1, 16 (1978), and prohibits using a first trial as "a dry run for the second prosecution," forcing an acquitted defendant to "run the gauntlet a second time," *Ashe*, 397 U.S.

23

at 446-47.  The prohibition on successive trials is "a constitutional policy of finality for the defendant's benefit."  *Brown v. Ohio*, 432 U.S. 161, 165 (1977).  It "preserve[s] the jury's overriding responsibility to stand between the accused and a potentially arbitrary or abusive Government that is in command of the criminal sanction."  *McElrath*, 2024 WL 694921, at *4.

Critical for this appeal, the Double Jeopardy Clause also incorporates collateral estoppel principles to "preclude[] the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial."  *Yeager*, 557 U.S. at 119; *Mespoulede*, 597 F.2d at 334 ("[I]t places an unjust burden on a defendant to require him to relitigate the very issue a jury decided in his favor."). Collateral estoppel is thus "integral" to "the protection against double jeopardy." *Harris v. Washington*, 404 U.S. 55, 56 (1971) (per curiam).  "[T]o permit the Government to force a defendant who has won an acquittal to relitigate the identical question on a further charge…would permit the very abuses that led English judges to develop the rule against double jeopardy…enshrined in the Fifth Amendment."  *United States v. Kramer*, 289 F.2d 909, 916 (2d Cir. 1961) (Friendly, J.).

Accordingly, although a "substantive offense and a conspiracy to commit it are separate and distinct offenses," a conspiracy acquittal can bar the government

from retrying the defendant on substantive counts—particularly those which are the alleged conspiracy's objects. *Sealfon*, 332 U.S. at 578-80.

This Court employs a two-step framework to ascertain the double jeopardy implications of an acquittal. "Initially, we must determine what the first judgment decided. Then we must go on to examine how that determination bears on the second case." *Mespoulede*, 597 F.2d at 333. "The Government is free, within the limits set by the Fifth Amendment…to charge an acquitted defendant with other crimes claimed to arise from the same or related conduct; but it may not prove the new charge by asserting facts necessarily determined against it on the first trial." *Kramer*, 289 F.2d at 916.[4]

*Sealfon* is on point. There, a wartime policy restricted sugar suppliers' sales but exempted sales to the military. The government alleged that Sealfon, a syrup wholesaler, had written a letter to Greenberg, a syrup supplier, falsely representing sales to the Navy. Greenberg used invoices to Sealfon to obtain an exemption from the federal ration board. 332 U.S. at 576-77. The government charged Sealfon with conspiracy to defraud the United States and substantive fraud. A jury acquitted him of conspiracy, but he was tried again and convicted of fraud.

---

[4] Double jeopardy's issue preclusion rule, which is what is at issue here, is distinct from the rule of *Blockburger v. United States*, 284 U.S. 299 (1932), which "asks whether each offense contains an element not contained in the other." *United States v. Hicks*, 5 F.4th 270, 275 (2d Cir. 2021).

The Supreme Court reversed.  It held that the conspiracy acquittal barred prosecution for the substantive offense because it was clear the first jury made findings that precluded conviction for the substantive offense.  *Id.* at 579-80.  It based its holding on two factors.  *First*, although conspiracy has multiple elements, the Court assessed the acquittal "practical[ly]" and concluded the jury must have "determine[d] that petitioner, who concededly wrote and sent the letter, did not do so pursuant to an agreement with Greenberg to defraud."  *Id.*  *Second*, "[t]he basic facts in each trial were identical" and "the core of the prosecutor's case was in each case the same," demonstrating that Sealfon "could be convicted of either offense only on proof that he wrote the letter pursuant to an agreement with Greenberg."  *Id.* at 580.  Because that agreement was essential to the government's theory for both charges, "the earlier verdict preclude[d] a later conviction of the substantive offense."  *Id.*

*Sealfon* mandates the same result here.  The conspiracy and substantive counts all depended on the government's proving that SEA-2 and SEA-3 included secret side agreements between Cole and GBG.  The only practical, realistic interpretation of the acquittal is that the first jury decided there were no such agreements.  The Double Jeopardy Clause thus barred the government from relitigating this critical issue through the substantive counts.

26

1. *The First Jury Necessarily Decided There Were No Secret Side Agreements Between Cole And GBG*

To determine what factual issues a prior jury's acquittal decided, courts must not "hypertechnical[ly]" dissect each statutory element, "but with realism and rationality" consider the issues actually presented to the jury. *Ashe*, 397 U.S. at 444. "The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Yeager*, 557 U.S. at 120. "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case," the court must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 397 U.S. at 444; *accord Yeager*, 557 U.S. at 120.

Importantly, "[a] hung count is not a 'relevant' part of the 'record of the prior proceeding'" and "has no place in the issue-preclusion analysis." *Yeager*, 557 U.S. at 121-22. "Because a jury speaks only through its verdict, its failure to reach a verdict cannot—by negative implication—yield a piece of information that helps put together the trial puzzle…[and] should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return." *Id.* "The inquiry under *Ashe* is what the jury actually decided when it reached its verdict, not on

why the jury could not agree on the deadlocked count." *United States v. Romeo*, 114 F.3d 141, 144 (9th Cir. 1997).

The only practical, rational way to interpret the conspiracy acquittal is as a determination that the government failed to prove the alleged side agreements.

> a. *The sole disputed issue at the first trial was whether Cole entered side agreements.*

All the testimony and jury arguments at the first trial revolved around whether Cole entered secret side agreements with GBG. That was the only issue for the jury to resolve, and thus a "[s]traightforward application" of *Ashe*'s issue preclusion paradigm "can lead to but one conclusion": The jury acquitted because it decided that issue in Cole's favor. *Ashe*, 397 U.S. at 445.

It was undisputed, for example, that Iconix and GBG negotiated SEA-2 and SEA-3 each for months (A-101-02, A-112, A-185-92), and the deal prices rose by several million just before closings (A-108, A-130). There was no dispute that, months after SEA-2, GBG submitted marketing invoices to Iconix and Cole approved paying $5,363,280, or that in 2014 the parties extensively discussed terminating the Rocawear Kids license. (A-106, A-136-40, A-144-47, A-156, A-207-09, A-385, A-408-09, A-425). "The single rationally conceivable issue in dispute before the jury," *Ashe*, 397 U.S. at 445, therefore, was whether there was any connection between these events—that is, whether Cole and GBG secretly agreed to inflate Iconix's revenue by raising the deal prices in exchange for Cole's

commitment to provide "givebacks" to GBG. *See*, *e.g.*, *Mespoulede*, 597 F.2d at 333 ("jury must have decided that Mespoulede did not possess the cocaine" where other elements were stipulated or "never in dispute").

Thus, this became the focus of the parties' arguments—a key factor in assessing what the jury decided. *See*, *e.g.*, *Schiro v. Farley*, 510 U.S. 222, 233 (1994). The prosecution contended in opening that Cole made "a series of dirty deals with one of Iconix's biggest business partners," and "us[ed] secret dirty deals with the business partner to lie to investors, to inflate revenue." (A-79; *see* A-79-80 (Cole "proposed a secret dirty deal," "cut a secret deal with the business partner," and "hid[] the secret dirty deal from Iconix's auditors")). "This," the government said, was the "scheme" the jury would ultimately find: "a secret deal" that if "[y]ou pay my company more money up front to do a deal so I can claim more revenue for Iconix…I'll turn around and send that money right back to you." (A-79). The defense countered that "[t]he evidence will show…[t]here were no commitments or obligations other than what was in the contracts. There were no secret agreements or secret side deals." (A-81). Defense counsel returned repeatedly to the lack of such evidence in his opening. (*See* A-83-85 (*e.g.*, "allegations about a secret side agreement…are baseless"; "[t]here was no commitment or obligation…to make future marketing or other payments"; "[t]here was no secret agreement…to release GBG from any royalty obligations")).

29

After four weeks of trial, the parties resumed this debate in their summations. Once again, the government directed the jury to secret side agreements, arguing that "the central question in this case" was "[w]ere there secret agreements? Did Mr. Cole strike dirty deals? And was there a scheme for overpayments and givebacks?" (A-453). The government insisted there was "overwhelming proof that [Cole] was doing secret side deals" (A-456), and repeatedly urged the jury to convict on that basis, *e.g.*:

- GBG agreed to "overpay…so Cole could report more revenue. In exchange, Cole promised to send the overpayments back." (A-450).

- Cole and "businessmen who were willing to work out something a little more than the ordinary deal" "came up with…secret side arrangement[s]," "dirty deal[s]," "secret side deals." (A-452).

- Horowitz, Rabin, and Margolis all testified to "secret side deals." (A-453).

The defense, by contrast, advocated acquittal based on the government's failure to prove secret side agreements, *e.g.*:

- "There was no commitment or obligation undertaken by Iconix at the time of [SEA-2] to make a future payment to GBG." (A-468).

- "[W]hy isn't it in the transaction documents?...It's not there because there was no commitment or obligation." (A-469).

30

- "[T]here was no commitment or obligation undertaken by Iconix to release GBG from its royalty obligations under the Rocawear Kids license." (A-474).

In rebuttal, the prosecution resumed its case for finding secret side agreements. (*See*, *e.g.*, A-480 ("Three witnesses…testified credibly and truthfully …that there was an obligation, that there was a commitment."), A-479 ("You can look at the documents, and you can see that Mr. Cole agreed to these arrangements.")). The prosecutors told the jury this was all it needed to find to convict: *What you have to find, ladies and gentlemen, is that there were commitments here and that those commitments were designed to inflate revenue*." (A-481 (emphasis added)).

Given the parties' near-exclusive focus on purported secret side deals, "[t]here can hardly be mystery as to what was determined by the verdict of 'not guilty.'" *Kramer*, 289 F.2d at 914. The jury acquitted because the government failed to prove secret side agreements. *See United States v. Castillo-Basa*, 483 F.3d 890, 897-98 (9th Cir. 2007) (where "the central question" at trial was whether defendant "was afforded a deportation hearing," acquittal "necessarily decided" that "no deportation proceeding had occurred"); *United States v. Ohayon*, 483 F.3d 1281, 1287 (11th Cir. 2007) (where "lone dispute at trial was whether Ohayon was

aware of the contents of the bags," "a rational jury could not have acquitted [him]" on any other ground).

> b.  *No rational jury could have found Cole made side agreements with GBG yet acquitted him of conspiracy.*

The jury was instructed that the government had to prove three elements: (1) the existence of the charged conspiracy, defined as "an agreement…to accomplish one or more illegal goals"; (2) that Cole "intentionally joined the conspiracy"; and (3) "an overt act in furtherance of the conspiracy." (A-485-86). A finding that Cole and GBG agreed to artificially inflate revenue for SEA-2 or SEA-3 would have satisfied all three elements at once: Cole's entry into a side agreement would be his joinder in a conspiracy, and consummating the transaction at an inflated price would constitute an overt act. (*See* A-64, ¶44.c, g). As the government argued, all the jury "ha[d] to find…is that there were commitments here and that those commitments were designed to inflate revenue." (A-481).

In other words, "[v]iewing [the government's three main witness'] testimony with 'realism and rationality,'…no rational jury could have believed any of it while acquitting" Cole on Count One. *United States v. Whitaker*, 702 F.2d 901, 904 (11th Cir. 1983). The jury was presented with two flatly contradictory narratives: testimony by Horowitz (and, more equivocally, Rabin and Margolis) that Cole engaged in secret side agreements to artificially inflate revenue, and Cole's testimony that he did not. The jury had to resolve this conflict by crediting one

32

narrative or the other; it could not logically credit both. And it had to do so in light of Horowitz's stark and potentially damning admission that he conspired with Cole. (A-167 ("I pled guilty to committing fraud, being a part of a conspiracy to commit fraud, to inflating revenue, and making false statements to the SEC…I am guilty of those crimes."), A-86-87 ("I committed those offenses with other people"), A-165 ("I was Neil's right hand in this.")).

The government focused the jury on this credibility contest and urged the jury to believe its witnesses over Cole. (A-458 ("Three of them say Cole agreed to overpay in exchange for givebacks."), A-458 ("Horowitz, Rabin and Margolis are telling the truth.")). Whether Cole and GBG had secret side agreements was thus inescapable in the jury's deliberations, requiring it "to resolve the conflicting explanations as part of its decision." *United States v. Hernandez*, 572 F.2d 218, 222 (9th Cir. 1978); *see Castillo-Basa*, 483 F.3d at 899 (jury must have credited defendant's explanation "because [he] was the only witness the defense presented").

If the jury "believed [the government's witnesses] at all," it would have had to find a conspiracy involving Cole. *United States v. Mock*, 604 F.2d 341, 345 (5th Cir. 1979). But, as discussed *supra* at 10-14, there were ample reasons to discredit those witnesses and their attempts to implicate Cole, and the jury's acquittal on the obstruction conspiracy further demonstrates that it rejected Horowitz's testimony.

By acquitting, the jury necessarily rejected the government's witnesses and, crediting Cole, concluded there were no secret side agreements. *See Hernandez*, 572 F.2d at 221 (acquittal "depended upon…crediting, at least in part, [defendant's] testimony").

### c. The district court erroneously relied on a hypertechnical reading of the trial record.

In denying Cole's pre-trial motion, the district court seized on a single sentence in its conspiracy instructions, telling the jury if it could not agree on at least one charged object (*i.e.*, securities fraud, making false SEC filings, or obstructing auditors) it had to acquit. (A-634; *see* A-485-86). The court said this instruction supplied another conceivable basis for acquittal, and thus made it impossible to discern what, if any, issue the jury decided. (A-634).

But as the case was *actually tried*, the instruction could not have led to the acquittal. The district court's analysis hung on a purely theoretical hook, epitomizing "the hypertechnical and archaic approach of a 19th century pleading book" the Supreme Court has rejected. *Ashe*, 397 U.S. at 444; *see Mespoulede*, 597 F.2d at 333 (courts "must not… strain[] to postulate 'hypertechnical and unrealistic' grounds on which the jury could conceivably have rested its conclusions"). "Following *Ashe*,…[courts] must give jury verdicts the most rational interpretation possible," *United States v. Carbullido*, 307 F.3d 957, 962 (9th Cir. 2002), and a verdict is not impenetrable simply because the instructions

34

required multiple findings. Indeed, such a "technically restrictive" test "amounts simply to a rejection of collateral estoppel, since it is impossible to imagine a statutory offense in which the government has to prove only one element or issue to sustain a conviction." *Ashe*, 397 U.S. at 444 & n.9.

While "plausible in theory" that jurors might have divided over different conspiracy objects, "the most obvious difficulty with this is that the government did not try its case" in any way that could have led to that division. *United States v. Leach*, 632 F.2d 1337, 1340 (5th Cir. 1980); *Kramer*, 289 F.2d at 913 ("[T]he court must look not simply to the pleadings but to the record in the prior trial."). The government did not present the alleged conspiracy as having three unrelated and independently viable objects, each supported by separate proof. Rather, it focused almost exclusively on a single object: securities fraud. It elicited extensive testimony about the importance of Iconix's meeting the revenue and EPS goals investors expected, and portrayed Cole's supposed fixation on market opinion as driving the alleged revenue inflation scheme. (*E.g.*, A-97-99). It argued, for example, that Cole "used those [side agreements] to inflate the deal terms and… used those inflated figures to tout his business to investors." (A-453; *see also* A-451, A-455). The other two charged objects were presented merely as subsidiary means to effect securities fraud, not as ends in themselves. (*See, e.g.*, A-497 (government's "theory" is Cole "engaged in a scheme with others…to fraudulently

35

inflate Iconix's revenue and [EPS] and, *in the process*, lie to the SEC and interfere with audits") (emphasis added)).

In its summation, for example, the government told the jury that "really what this case is about" is "Cole's agreement with others to tell investors that Iconix was doing better than it was, and all the false filings he had to make along the way *to pull it off*." (A-455 (emphasis added)). The prosecutor discussed securities fraud for nearly 50 transcript pages before pausing, at the end, to address the other objects "a little bit" (A-462), describing alleged lies to auditors and the SEC as merely incidental to securities fraud. (*E.g.*, A-462 ("All of the lies, all of the hiding in this case, it all had a very specific purpose, to make the company look better than it should and specifically to make it look better in the quarterly and annual filings.")).

Against this backdrop, it is implausible and unrealistic to posit—as the district court did—that the jury on its own initiative "engage[d] in…mental gymnastics" to parse each object of the conspiracy. *Whitaker*, 702 F.2d at 904. "Collateral estoppel is not a semanticist's paradise, but is to be determined by applying conventional idioms to the jurors' deliberations." *Id.*; *see United States v. Coughlin*, 610 F.3d 89, 100 (D.C. Cir. 2010) (rejecting government's theory for acquittal because "neither Coughlin nor the government" invited jury to decide case on that basis). And even if the jury did differentiate among the three objects,

no rational juror who found Cole conspired to make false SEC filings or influence audits would not find he also conspired to commit securities fraud.

The record is thus "utterly devoid of any indication that the first jury could rationally have found" a conspiracy but disagreed over its object. *Ashe*, 397 U.S. at 445. "[A] rational jury could [not] have grounded its verdict upon an issue other than" the government's failure to prove the purported side deals between Cole and GBG. *Id.* at 444.[5]

### 2. The Second Trial Forced Cole To Relitigate The Same Issue Previously Decided In His Favor

Once the Court determines "what the first judgment decided," it must "examine how that determination bears on the second case"—*i.e.*, whether the second trial "require[d] [the defendant] to relitigate the very issue a jury decided in his favor." *Mespoulede*, 597 F.2d at 333-34. The government conceded "almost an entirety of overlap" between the conspiracy and substantive counts, and that to prove the substantive charges it had to prove Cole worked with others in the supposed scheme. (A-632; *see also* A-497, A-501, A-503, A-628-29).

---

[5] By contrast, this Court has declined to apply collateral estoppel only in cases where it could not readily determine what the jury decided—for example, where "the jury could have found that the conspiracy existed but that [defendant] had not joined it." *Hicks*, 5 F.4th at 277; *see United States v. Zemlyansky*, 908 F.3d 1, 12 (2d Cir. 2018) ("[T]he first jury could have found there was a conspiracy by individuals other than Zemlyansky.").

Each of the substantive counts—charging false statements to investors, the SEC, and Iconix's auditors—was predicated on the same alleged conduct as the Count One conspiracy. (A-51-54, ¶¶21-27, A-56-58, ¶¶32-35, A-59-60, ¶38, A-65-72, ¶¶45-60). Thus, as the government explained, the indictment detailed the "secret, undocumented agreement[s]" in its conspiracy allegations (A-48, ¶13, A-52, ¶22, A-55, ¶29, A-58, ¶36), and simply "incorporate[d] by reference the same factual allegations" into the substantive counts. (A-628). Though different offenses, "the essence of each of the counts [was] that Cole and Jason Rabin agreed to an overpay-for-giveback arrangement and then worked with their subordinates to accomplish that plan." (A-628).

To prevail on the substantive counts, therefore, the government had to prove the same secret side agreements it tried and failed to prove the first time, as the government effectively conceded. (A-497, A-503, A-628-29, A-632). That is why the second trial was a carbon copy of the first. The government called all but one of its 12 prior witnesses and used over 180 of the exhibits previously introduced. The government again aimed to prove that Cole, Rabin, Margolis, and Horowitz collaborated to artificially inflate Iconix's revenue through secret side agreements; "elicited essentially identical testimony" from its principal witnesses, *Mock*, 604 F.2d at 344; and made the same jury arguments—often nearly verbatim. The only difference was, the second time, the government tiptoed around the word

"conspiracy." (*Compare*, *e.g.*, A-1084, A-1089 (GX1255 "*straight from the birthplace of [the] scheme*" showing "an overpay and giveback scheme with Jason Rabin"; "*Cole and his crew* cranked the dirty deal machine into action once more."), *with* A-456-57 (GX1255 "*straight from the conspiracy*" showing an "overpayment and giveback with Li & Fung"; "*Cole and his conspirators…* cranked the dirty deal machine into action once more.") (emphasis added)).  And the government framed the issue for the jury precisely as before, saying the increased JV prices and Iconix's marketing payments were "not in dispute…What is in dispute at this [trial] is whether all of those things were connected."  (A-1082).

Following *Sealfon*, 332 U.S. at 579-80, this Court has repeatedly barred re-prosecution in similar cases.  *See Mespoulede*, 597 F.2d at 335-37 (cocaine possession acquittal precluded trial for conspiracy to distribute); *Kramer*, 282 F.2d at 919 (acquittal of burglarizing post offices precluded trial for conspiracy to break and enter same post offices).  *See also*, *e.g.*, *Mock*, 604 F.2d at 345 (double jeopardy precluded second trial where "government reintroduced the identical facts and theory of the facts which were rejected at the first trial"); *Hernandez*, 572 F.2d at 221 (double jeopardy precluded second trial where "[t]he issue at both trials was substantially identical").

39

Cole's second trial was an impermissible "second attempt to prove the agreement which at each trial was crucial to the prosecution's case and which was necessarily adjudicated in the former trial to be non-existent." *Sealfon*, 332 U.S. at 580. Allowing his conviction to stand would eviscerate the constitutional "interest in preserving the finality of the [first] jury's judgment." *Yeager*, 557 U.S. at 118; *see McElrath*, 2024 WL 694921, at *4 ("Once rendered, a jury's verdict of acquittal is inviolate.").

### B. At A Minimum, The District Court Erred By Refusing To Exclude Evidence Of The Acquitted Conspiracy

Even if Cole's prior acquittal did not bar retrial, it precluded the government from introducing evidence of a supposed conspiracy the first jury had rejected.

The law is settled that "[o]nce a jury ha[s] determined upon conflicting testimony that there was at least a reasonable doubt," the government cannot "present the same or different…evidence in a second prosecution" on separate but related charges "in the hope that a different jury might find that evidence more convincing." *Ashe*, 397 U.S. at 446; *see United States v. Zemlyansky*, 908 F.3d 1, 13 (2d Cir. 2018) ("[A]lthough the government is free to charge a defendant with new crimes arising out of the same conduct, it may not prove the new charge by asserting facts necessarily determined against it on the first trial."); *Mespoulede*, 597 F.2d at 335-36 (government "free to introduce new evidence," but "transaction is out of bounds on retrial" if already rejected by prior jury). In *Kramer*, for

example, this Court held that the defendant's prior burglary acquittal did not bar a subsequent trial for certain charges. Nonetheless, in remanding for retrial, the Court prohibited the government "from offering evidence which, [i]f believed, would necessarily lead to the conclusion that Kramer participated in the burglaries." 289 F.2d at 918; *see United States v. Fiel*, 35 F.3d 997, 1007 (4th Cir. 1994) (reversing conviction because "government was collaterally estopped from introducing evidence at the second trial").

The same rule governs here. Even if the government could properly have retried Cole on the substantive counts, it should not have been allowed to offer evidence which, if believed, could establish that Cole conspired with others. The district court should have excluded all evidence and argument about secret side agreements to artificially inflate Iconix's revenue, or any other evidence from which a second jury could find Cole worked with Horowitz, Rabin, or Margolis to commit the charged offenses. *See*, *e.g.*, *United States v. Mayes*, No. 12-CR-385 (ARR), 2014 WL 25569, at *6 (E.D.N.Y. Jan. 2, 2014) (precluding government from proving conspiracy with evidence of alleged agreement prior acquittal determined government failed to prove); *United States v. Quintana-Quinones*, No. 86 Cr. 097 (JFK), 1987 WL 6435, at *2 (S.D.N.Y. Feb. 6, 1987) (precluding government from proving cocaine conspiracy with evidence that resulted in possession and distribution acquittals).

The government argued below that if such evidence were excluded it would "in effect, be prohibited from retrying the substantive counts" because it "cannot remove from the equation the other people" with whom Cole allegedly committed crimes. (A-497). That such a ruling would have gutted the government's case only illustrates the complete overlap between the issues and evidence in both trials. It does not erase the serious double jeopardy problems with allowing the government to use the same evidence "to persuade the second jury of the same fact already litigated and resolved in [Cole's] favor." *Mespoulede*, 597 F.2d at 335.

## II. THE ERRONEOUSLY ADMITTED HEARSAY OF AN UNCALLED WITNESS REQUIRES A NEW TRIAL

Despite Cole's prior conspiracy acquittal, the government in the second trial claimed that Ethan Cole—a recent college graduate and low-level assistant at GBG—was a co-conspirator, and convinced the district court to admit two of his emails as co-conspirator statements. (A-645-47). But Ethan had no part in negotiating SEA-2 or SEA-3 and no knowledge of any side agreements. (A-941-42, A-1066-67, A-1795). The government failed to prove any conspiracy—let alone one involving both Ethan, the entry-level GBG employee, and Cole, Iconix's CEO—nor could Ethan's emails have been in furtherance of any such conspiracy. *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). The emails were inadmissible under Rule 801(d)(2)(E) and deprived Cole of a fair trial.

## A.   Background

In GX1068, sent to Margolis on August 28, 2014, Ethan purports to summarize various accounts with Iconix.  His email states that "[t]he $5M overpay from Iconix Korea will be offset by…Rocawear" and marketing expenses, and that "[t]he $4.5M [proposed] overpay" for SEA-3 "will be offset by Iconix paying… markdown money to Rainbow."  (A-1407).  GX1139, dated December 1, 2014, also to Margolis, has the subject "Notes for Iconix Meeting" and contains a chart listing SEA-2 and SEA-3 with the "Purchase Price," "Value," and "Plug" for each. It states that GBG invoiced $5 million in marketing expenses for the SEA-2 transaction and that "[t]he $6M for [SEA-3] will offset…Rocawear Royalties of $4.5M [and] Fixtures of $1.5M."  (A-1555).

The government argued that these notes reflected side agreements for GBG to increase each deal price ("overpay") because of Iconix's commitment to reimburse that increase ("offset" or "plug").  But neither email refers to any such agreement.  And in pre-trial proffers Ethan told the government he did not actually know whether Iconix and GBG had reached such an agreement, or whether GBG on its own sought to extract other payments to recoup part of its JV payments.  In fact, the two Coles did not know each other and at most crossed paths once at a larger meeting.  (A-1066-67, A-1796).  Ethan's duties principally involved typing emails for his boss, forwarding documents, and confirming that signature pages

were forthcoming. (A-515-16, A-941-42, A-958, A-1795, A-1799). Although involved in GBG's efforts to prepare marketing invoices for contribution from Iconix (*e.g.*, A-945-46, A-952), he had no role in negotiating SEA-2 or SEA-3. (A-1796). Accordingly, all he could say was it was his "impression" that the increase "had to do with the relationship between [Iconix] and GBG," it "seemed like…a horse trade," and there was "talk about submitting invoices." (A-1795, A-1802-03). Moreover, Margolis testified that "overpay" was an internal GBG term that simply meant paying more than "the deal was worth" and was used freely— including by GBG's president and general counsel—when discussing other matters; he could not recall ever using that term with Iconix. (A-379-80, A-388). And Ethan saw nothing wrong—certainly nothing illegal—with billing Iconix for marketing after SEA-2 was finalized. (A-1795).

Ethan's emails could have been referring to something other than a side agreement—such as simply paying more to help a valued business partner, hoping Iconix would return the favor one day. But that is not an "agreement," and as Larry Shapiro, Iconix's outside auditor, testified, the difference is *critical* under the accounting rules governing revenue recognition: Only "a binding agreement" for a return payment at the time of the transaction would impact Iconix's revenue, because only "binding obligations…dictate the numbers that can be recognized by the company." (A-986, A-989-91, A-999, A-1001, A-1007). If, for example,

Iconix decided *after* a JV transaction to help defray its partner's marketing expenses, the full purchase price should still be recognized as revenue. (A-999). Indeed, the record established that such marketing contributions occur *all the time* in the fashion industry (A-867-68, A-965-66) and are accounted for as expenses, not as reductions in revenue (A-994-95, A-1000). Thus, Shapiro confirmed, "if there was no agreement or commitment or obligation…, then there would have been nothing for Iconix to inform BDO [of]," no misstatements to Iconix's auditors, and no problem "with Iconix recognizing revenue for [the full] purchase price." (A-992, A-999).

Cole moved *in limine* to exclude Ethan Cole's emails. He argued that Ethan and Neil Cole were not co-conspirators and Ethan's internal GBG emails could not be in furtherance of the supposed conspiracy. (Dkt.217). The government opposed, citing first trial testimony about Ethan's involvement in preparing the GBG marketing invoices and Iconix-GBG communications in which Ethan and Neil Cole both appeared—often as cc's—none of which had anything to do with supposed side agreements. (A-512-18; Dkt.223). The district court found the emails admissible because the "communications" the government cited "prove[d] by a preponderance of the evidence that [Ethan] was a knowing and willing participant in the conspiracy." (A-645-47). The court made no finding that the particular emails at issue were in furtherance of any conspiracy.

The government then relied extensively on the emails throughout trial as the primary—if not exclusive—documentary evidence of the alleged side agreements, introducing them through a government paralegal who read them into the record (A-718-20), belaboring them in its questioning of Margolis (A-942-44, A-950-51, A-953-54, A-976), displaying them again with a government summary witness and summary exhibit (A-1009, A-1011, A-1606, A-1659), and trumpeting them repeatedly in summation (A-1083, A-1085, A-1090, A-1092-93, A-1113).

At the same time, the government knew that Ethan—the emails' author— would contradict its interpretation if he testified, so it used its immunity power to ensure the jury never hear his testimony. (*See supra* at 18-19; A-1795). The government refused to call him as a witness. (A-644). Then, to make sure the defense couldn't call him either, the government threatened Ethan with prosecution just before the first (2021) trial, not for the underlying offenses—the statute of limitations had run—but based on the proffer he gave in 2019. (A-638-39, A-644, A-1807). The prosecutors told Ethan's attorney it "is clear he obstructed" their investigation, and they "won't let it go lightly." (A-1807). That forced Ethan to invoke his Fifth Amendment right (A-631), rendering him unavailable to the defense. (A-1034-35). And despite selectively granting immunity to Ethan's boss (Margolis) and his boss's boss (Rabin)—whose testimony favored the

46

government—the prosecutors refused to confer immunity on Ethan.  (A-645-46, A-1108).

### B. Ethan Cole's Emails Were Not Admissible Co-Conspirator Statements

Ethan—a young, newly hired, low-level assistant at GBG—was not a member of the alleged conspiracy among Cole, Horowitz, Rabin, and Margolis to artificially inflate *Iconix's* revenues, nor could his internal GBG emails about recouping money *for GBG* have been in furtherance of it.  The emails were inadmissible under Rule 801(d)(2)(E).

The rule supplies a "narrow" basis for admitting what would otherwise be inadmissible hearsay.  *Krulewitch v. United States*, 336 U.S. 440, 444 (1949).  It provides that an out of court statement offered against a party for its truth is "not hearsay" if "made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  The rule thus requires the government to establish by a preponderance of the evidence "[1] that there was a conspiracy, [2] that both the declarant and the [defendant] were members of the conspiracy, and [3] that the statements were made during and in furtherance of the conspiracy." *Tellier*, 83 F.3d at 580; *see Gigante*, 166 F.3d at 82.

The declarant and the defendant must be unified in a "specific criminal goal"; the mere existence of some "general overriding conspiracy" is not enough and would eliminate any "limit to the proper use of Rule 801(d)(2)(E)." *Gigante*,

166 F.3d at 82-83 (Mafia membership insufficient to show conspiracy to commit a particular murder).  In fact, "[i]t is the unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E) in the first place."  *Id.* at 83. Further, there must be "some independent corroborating evidence" that the declarant and defendant were participants in the same conspiracy.  *United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008) (quoting *Gigante*, 166 F.3d at 82; *Tellier*, 83 F.3d at 580).  Hearsay statements do not satisfy the rule where there is no evidence the defendant "even knew [the declarant], or was aware" he made the statements.  *Id.* at 174; *cf. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 139-40 (2d Cir. 2008) (statements admissible because of numerous intercepted calls with declarant and defendant discussing scheme).

To satisfy the "in furtherance" requirement, the statement must "in some way have been designed to promote or achieve the goals of that conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994); *see United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986) ("idle chatter" not in furtherance).  That is, the statement must be directed at the conspiracy's "specific criminal purpose." *Gigante*, 166 F.3d at 83.  "[J]ust as the declarations of an agent bind the principal only when the agent acts within the scope of his authority, so the declaration of a conspirator must be made in furtherance of the conspiracy charged in order to be

admissible against his partner." *Anderson v. United States*, 417 U.S. 211, 219 n.6 (1974).

Ethan Cole's emails do not fulfill these requirements.

### 1. *The Government Failed To Establish A Conspiracy*

The government failed to establish a conspiracy beyond a reasonable doubt in the first trial, so the jury acquitted Cole of conspiracy. While not dispositive, the acquittals are nonetheless "relevant and persuasive" and must be given substantial weight in determining whether the government has established the "requisite criminal joint venture." *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979). Indeed, this Court has refused to find sufficient proof of a conspiracy under the preponderance standard in an analogous context (guidelines calculations) due to "gaps in the government's evidentiary presentation for…acquitted conduct" of the evidence. *United States v. Willis*, 14 F.4th 170, 189 (2d Cir. 2021). In *Willis*, lack of corroborating evidence raised questions about the credibility of police offer testimony and made it "implausible." *Id.*

Likewise, this case turned on largely uncorroborated cooperator testimony, and a "he said/he said" contest between government witnesses with major credibility issues and Cole. Cole denied any secret side agreements and was able to demonstrate that his practice was to include all commitments—even return payments—in deal documents, as he did in other GBG transactions. (A-1019, A-

1029, A-1040, A-1069, A-1077; *see also* A-408). And Cole testified that he paid GBG's marketing invoices solely to be a good partner, which happened "[a]ll the time" in the industry (A-1022, A-1038-40, A-1070-74, A-1078-79; *see also* A-401, A-408-09)—as the government's own witnesses confirmed (A-702-03, A-711, A-867-68, A-917-18, A-965-66, A-995, A-997; *see also* A-291, A-360-61). In *United States v. Stanchich*, this Court held that statements were properly admitted under the co-conspirator exception because the "mathematical chances...were infinitesimal" that anyone would engage in the conduct absent a conspiracy. 550 F.2d 1294, 1300 (2d Cir. 1977). The same cannot be said here, where the defense established a compelling counterpoint to the government's conspiracy narrative, which a jury credited.

### 2. *Ethan Cole And Neil Cole Were Not Co-Conspirators*

Even if the evidence established some conspiracy involving Neil Cole by a preponderance, the government failed to prove Ethan was a member.

To establish that someone was a co-conspirator, the government must prove he "entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent," and with "at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Torres*, 604 F.3d 58, 65, 71-72 (2d Cir. 2010). That showing was not met.

Ethan was an entry-level employee at GBG, a recent college graduate working as an assistant in his first job. (A-958, A-1795). He had no role in negotiations with Iconix, no connection to Neil Cole, no affiliation with Iconix, and no interest in or incentive to inflate *Iconix's* revenue, make false *Iconix* SEC filings, or mislead *Iconix's* investors and auditors. (*See* A-60-63¶¶40-43). There was nothing in the record to suggest that Ethan entered the alleged conspiracy with "knowledge of the purposes of the conspiracy." *Torres*, 604 F.3d at 71-72.

And there certainly was nothing to suggest that Ethan had the mens rea necessary for any of the conspiracy's objects—namely, an "intent to deceive, manipulate or defraud," *United States v. Litvak*, 808 F.3d 160, 178 (2d Cir. 2015) (securities fraud), and "willfulness" under the securities laws, meaning acting with "knowledge that [the] conduct [wa]s unlawful," *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020). Indeed, Ethan knew very little about the relevant JVs, was unaware of any arrangement for subsequent recoupment, and did not believe he was doing anything unlawful. (A-1795). Even Margolis—Ethan's boss and only link to the purported conspiracy—testified that he "never thought that [Ethan] was doing anything wrong" and believed GBG acted in good faith. (A-959-60). The invoices Ethan helped prepare reflected "real work" and "[m]arketing that was done" and were not "fake" (A-966), and large, round-number invoices for

marketing contributions—like GBG's initial invoices to Iconix—were routine both at GBG and in the industry generally (A-966).

In denying Cole's motion *in limine*, the district court cited "the emails and other communications" furnished by the government as establishing Ethan's "knowing and willing participa[tion] in the conspiracy." (A-646-47). But those documents at best showed that Neil and Ethan Cole were occasionally both included in group emails about other matters; none concerned the alleged conspiracy. Nor did the district court explain its reasoning or "say why" these documents established Ethan's conspiracy participation; "[i]n failing to do so, the district court did not account for the gaps in the government's evidence." *Willis*, 14 F.4th at 189 ("clearly erroneous" for court to find conspiracy by preponderance of evidence given "gaps"). The government also attempted to link Ethan to the conspiracy with Horowitz's testimony that Ethan hand-delivered GBG's invoices to him. (A-516). But Horowitz previously told the government *Margolis*, not Ethan, made the delivery (A-1812), and the district court ignored that contradiction.

In short, the government presented no evidence that Ethan Cole had the requisite intent to participate in any conspiracy with Iconix, *United States v. Becker*, 502 F.3d 122, 132 (2d Cir. 2007), let alone that he and Neil Cole participated in a conspiracy together, *Gigante*, 166 F.3d at 82.

### 3. *Ethan's Emails Did Not Further Any Conspiracy With Neil Cole*

Ethan's emails could not have furthered any of the objects of the alleged conspiracy involving Neil Cole. Those objectives, which supposedly related to *Iconix*'s revenue, would have succeeded or failed with or without the emails. Among other things, these were internal GBG communications from Ethan to his boss and were never sent to Cole or anyone else at Iconix. (A-1407, A-1555). And any plausible reference to secret side agreements in Ethan's emails would have been after the agreements were already reached: GX1068 was sent after SEA-2 had already closed and, though before SEA-3, reflected different "offsets" than the side agreements the government alleged; GX1139 was sent long after SEA-2 and SEA-3 had been finalized and the relevant quarters closed.

Rather, the emails reflect an entirely separate purpose: negotiating chargebacks *for GBG* so it could obtain money from Iconix. The government devoted pages and pages of trial transcript to Ethan's assembly of invoices and backup materials, and the supposed lies he told others at GBG in the process. (*See*, *e.g.*, A-909-911, A-934-35, A-945-48, A-952-53). But Neil Cole had no part in or knowledge of any of that, nor any interest in Ethan's succeeding. Under the government's theory, Cole's objectives were accomplished months before, when Iconix publicly reported its revenue figures to the market. (*See* A-1083

53

(government arguing Cole hid "his side deals…from the auditors" so Iconix could "claim the extra revenue in [SEC] filings")).

Whatever Ethan's objectives, his two emails did nothing to further any "specific criminal purpose" of Neil Cole, nor did the district court even make that required finding. (*See* A-646-47). Accordingly, the emails were erroneously admitted. *Gigante*, 166 F.3d at 83.

### C.   The Error Was Not Harmless

Ethan Cole's emails represented the government's only documentary evidence purporting to expressly link SEA-2 and SEA-3 to the supposed givebacks. The admission of those emails cannot plausibly have been harmless. *See United States v. Kaiser*, 609 F.3d 556, 573 (2d Cir. 2010).

The erroneous admission of evidence is harmless only "if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *Al-Moayad*, 545 F.3d at 164. Here, the government's case was weak, resting almost entirely on the say-so of Horowitz, whose credibility was highly dubious. This evidence was scrutinized by two juries, both of whom signaled the weakness of the government's case. The first deliberated for three days, required an *Allen* charge, ultimately acquitted Cole of two conspiracies, and was unable to reach verdict on the other counts. (A-487-92). *See United States v. Stewart*, 907 F.3d 677, 689 (2d Cir. 2018) (lengthy jury deliberations and necessity of *Allen*

charge "cut[] strongly against" harmless error). The second jury's deliberations were shorter, but the jury apparently found the evidence nettlesome enough to ask to continue reviewing trial materials over the extended Thanksgiving break, a request the court denied. (A-1134). But upon returning from break and being told that they had been sitting with a juror who tested positive for COVID—as the Omicron variant was surging—the reconstituted jury raced to a verdict in just 45 minutes, undoubtedly to minimize the chances of infection. (A-1136-37).

And the government clearly believed Ethan Cole's emails were powerful evidence: It fought tooth-and-nail to prevent the court from excluding them (A-504-25, A-640-44), and then gave them far more prominence in the second trial than in the first. It paraded the emails before the jury five times: through a government paralegal who read them into the record (A-718-20), at multiple points in Margolis' testimony (A-942-44, A-950-51, A-953-54, A-976), with a summary witness (A-1009, A-1011), throughout its summation (A-1083, A-1085, A-1090, A-1092-93), and once again on rebuttal (A-1113). In fact, after the defense challenged the prosecutors to identify even a single document demonstrating a "secret overpayment" agreement (A-1100-01, A-1103, A-1108-09, A-1112), the prosecutors responded by pointing to GX1068 and GX1139 in the very first words of their rebuttal. (A-1113). They presented those two documents as conclusive and irrefutable proof of secret side agreements, devastating to defense counsel's

55

arguments: "Mr. Markus wishes that these documents didn't exist….I'm sure that when he goes home tonight…he should wish that he could just make a wish and make these documents disappear, but he cannot." (A-1113).

Having repeatedly directed the jury to this evidence throughout the trial and then featured it as the pièce de résistance on rebuttal, the government cannot seriously claim "with fair assurance that the evidence did not substantially influence the jury." *United States v. Vayner*, 769 F.3d 125, 133 (2d Cir. 2014); *see also Al-Moayad*, 545 F.3d at 165 (evidentiary error not harmless where government "referred repeatedly to [evidence] in its arguments to the jury"); *United States v. Joseph*, 542 F.3d 13, 21 & n.7 (2d Cir. 2008) (rejecting harmlessness argument where government told jury erroneously admitted evidence was "devastating"); *United States v. DeVaugn*, 579 F.2d 225, 228 (2d Cir. 1978) (co-conspirator statements not harmless where government "focused extensively" on them in closing).

## III.  THE MISLEADING "EQUALLY AVAILABLE" WITNESS INSTRUCTION REQUIRES A NEW TRIAL

The government threatened to prosecute Ethan Cole and refused to grant him immunity, effectively rendering him unavailable to the defense. Yet the district court told the jury, counterfactually, that Ethan was equally available to both sides and instructed it to draw no inference from his absence. (A-1130). Given how

critical Ethan's emails were to the government's case, this erroneous instruction deprived Cole of a fair trial.

## A. Background

After procuring Ethan's unavailability and preventing him from testifying for the defense, the government requested an "equally available" witness instruction preventing the jury from drawing an adverse inference from the government's failure to call him, and misleadingly stating the defense could have called him as witness. (A-615). The defense objected that the instruction (which was phrased in general terms) was "inaccurate…particularly as it relates to Ethan Cole," because "the government could have chosen to immunize him and didn't and, in fact, did the opposite, which was to suggest…that he could be charged based on information he provided to the government separate and apart from the underlying crime." (A-1031). Cole's counsel asked the court to give a missing witness instruction instead, which would permit the jury to draw an adverse inference against the government for refusing to call Ethan. (A-1031). The court refused, overruled Cole's objection, and instructed the jury that Ethan was equally available to both sides, and the jury could draw no inference from his absence:

> There are people whose names you've heard during the course of the trial that did not appear in court to testify. I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to, had

they been called. Their judgment should not affect your judgment in any way.

(A-1130).

### B. The Uncalled Witness Instruction Was Reversible Error

The instruction was factually inaccurate and misleading. When Ethan predictably invoked his Fifth Amendment right not to testify after the government threatened to prosecute him, the defense was powerless to call him because of the government's own conduct. The instruction was thus inaccurate, misleading, and prejudicial.

The "basic purpose of a trial is the determination of truth." *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416 (1966). A defendant's right to present witnesses "serves the truth-seeking function of the trial process by protecting against the dangers of judgments founded on a partial or speculative presentation of the facts." *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000); *see also Swidler & Berlin v. United States*, 524 U.S. 399, 413 (1998) ("exclusion of relevant evidence from a criminal trial…may distort the record, mislead the factfinder, and undermine the central truth-seeking function of the courts"). Similarly, a trial court commits reversible error when its instructions give the jury a "misleading impression." *Kelber v. Joint Indus. Bd. of Elec. Indus.*, 27 F.3d 42, 47 (2d Cir. 1994). In *Kelber*, the district court refused to instruct the jury as to the plaintiff's theory that disparate understandings of a key phrase caused the

58

defendant to discriminate against her. This Court reversed and remanded for a new trial, holding the district court's instructions gave the jury "a misleading impression of plaintiff's claims." *Id.*

For the same reasons, "[a] party is not entitled to have the court give the jury an instruction for which there is no factual predicate in the trial record." *McCardle*, 131 F.3d at 52. A jury instruction is erroneous—and constitutes reversible error—if the facts do not support it. *See United States v. Rossomando*, 144 F.3d 197, 202 (2d Cir. 1998) (conviction reversed where predicate for "no harm" instruction was "insufficiently clear"); *see also United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2000) (conscious avoidance instruction improper where record would not permit that finding).

A district court thus abuses its discretion by instructing that an uncalled witness was "equally available" if, in fact, the witness was only available to one side and not the other. *Caccia*, 122 F.3d at 139. Here, the district court did just that by instructing the jury that both parties had an equal opportunity to call witnesses who did not testify. (A-1130). The instruction was factually false: The defense was powerless to call Ethan Cole, and it was the government—through threats of prosecution and a refusal to grant immunity—that rendered him unavailable. (A-636-37); *see Torres*, 845 F.2d at 1170 (district court "should have considered the informant's relationship to the government and his refusal to be

59

interviewed by the defense as factors in determining whether [he] was 'equally available' to both sides"). Given that Ethan was not, in fact, equally available to both sides, no uncalled witness instruction should have been given. *Caccia*, 122 F.3d at 139.[6]

### C. The Error Was Not Harmless

Nor can the government plausibly dismiss the instructional error as harmless. To satisfy that burden, the government would need to demonstrate "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18, (1999); *accord United States v. Quattrone*, 441 F.3d 153, 180 (2d Cir. 2006). It cannot do so here.

As discussed, during the second trial, the government made Ethan's emails—and its interpretation of them—a central part of its closing arguments, and a recurring motif throughout the trial. The defense clamored repeatedly for Ethan to testify so he could explain first-hand that he didn't know of any secret side agreements. But the government made sure that wouldn't happen.

---

[6] *United States v. Myerson*, 18 F.3d 153 (2d Cir. 1994), primarily concerned the denial of an adverse-inference instruction, which Cole does not raise on appeal. This Court upheld the no-inference instruction there, but the issues were very different: The instruction did not say the witness was equally available to both sides, and, unlike here, the district court found the defendant did not intend to call the witness and contested the instruction purely for "strategic" reasons. *Id.* at 157-58.

Unable to put Ethan before the jury, the defense did the next best thing: It highlighted Ethan's absence in its summation. Defense counsel pretended to "put [Ethan] in the witness box" using an oversized portrait of him and rattled off the many questions the defense would have asked if Ethan had been there in person. (A-1108).

But that argument was completely defanged by the district court's erroneous instruction, which the government latched on to in its rebuttal. The prosecutor reminded the jury that Cole's lawyer "spent a lot of time talking about Ethan Cole. Where's Ethan Cole?" (A-1116). The prosecutor seized on the court's instruction, telling the jury these arguments were legally irrelevant—"a perfect distraction"—and could play no role in its deliberations:

> What's he distracting you from? Judge Ramos' instructions. He will tell you that there are people whose names you've heard during the course of this trial that did not…testify. Ethan Cole is one of them. But he's also going to tell you that each party had an equal opportunity or lack of opportunity to call any of these witnesses. He's going to tell that their absence "should not affect your judgment in any way." Listen to Judge Ramos, not Mr. Markus.

(A-1116). Having specifically invoked the erroneous instruction in its summations, the government has no serious argument that it was harmless. *See*, *e.g.*, *United States v. Silver*, 864 F.3d 102, 118-23 (2d Cir. 2017) (instructional error not harmless where government relied on it in summation).

\* \* \*

61

The admission of Ethan Cole's emails was erroneous, and that error was compounded by the inaccurate and misleading uncalled witness instruction. "[E]ven if they are harmless when considered singly," their cumulative effect "amount[s] to a violation of due process requiring reversal." *Al-Moayad*, 545 F.3d at 178.

## CONCLUSION

The judgment should be reversed, and the case remanded with instructions to dismiss the indictment with prejudice. Alternatively, the Court should vacate and remand for a new trial.

Dated:   New York, New York
         February 28, 2024

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Daniel O'Neill
Bronwyn C. Roantree
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*
   *Neil Cole*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.  The undersigned counsel of record for Defendant-Appellant Neil Cole certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 13,863 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature of Microsoft Word 2023.

2.  This brief complies with the typeface requirements if Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2023 in 14-point font of Times New Roman.

Dated:    February 28, 2024

___Alexandra A.E. Shapiro___
Alexandra A.E. Shapiro

SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Judgment, entered October 10, 2023 (Dkt. 315) . . . . . . . . . . . . . . . . . . . . . . SPA-1

Significant Rules of Law:

    U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-9

    Fed. R. Evid. 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-10

AO 245B (Rev. 09/19)   Judgment in a Criminal Case   (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| NEIL COLE | Case Number:  19-cr-869-1-ER |
| | USM Number:  87546-054 |
| | Sean Hecker, Esq. |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)  2, 3, 4, 5, 6, 7, 8, and 9
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 USC 78j(b) and 78ff | Securities Fraud | 12/5/2019 | 2 |
| 15 USC 78m(a) and 78ff | Making False SEC Filings | 12/5/2019 | 3 |
| 15 USC 78m(a) and 78ff | Making False SEC Filings | 12/5/2019 | 4 |

    The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)  1 and _____

☐ Count(s) _____ ☐ is  ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/10/2023
Date of Imposition of Judgment

_____
Signature of Judge

Edgardo Ramos, U.S.D.J.
Name and Title of Judge

10\12\2023
Date

**SPA-2**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1A

Judgment—Page ___2___ of ___8___

DEFENDANT:  NEIL COLE
CASE NUMBER:  19-cr-869-1-ER

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 USC 78m(a) and 78ff | Making False SEC Filings | 12/5/2019 | 4 |
| 15 USC 78m(a) and 78ff | Making False SEC Filings | 12/5/2019 | 5 |
| 15 USC 78m(a) and 78ff | Making False SEC Filings | 12/5/2019 | 6 |
| 15 USC 78m(a) and 78ff | Making False SEC Filings | 12/5/2019 | 7 |
| 15 USC 78m(a) and 78ff | Making False SEC Filings | 12/5/2019 | 8 |
| 15USC7202,7242,&78ff | Improperly Influencing the Conduct of Audits | 12/5/2019 | 9 |

# SPA-3

AO 245B (Rev. 09/19)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page   3   of   8  

DEFENDANT:  NEIL COLE
CASE NUMBER:  19-cr-869-1-ER

## IMPRISONMENT

      The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
18 months on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at   _____ ☐ a.m.  ☐ p.m.  on   _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on   _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on   _____ to   _____

at   _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By   _____
DEPUTY UNITED STATES MARSHAL

# SPA-4

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page   4   of   8

DEFENDANT:   NEIL COLE
CASE NUMBER:   19-cr-869-1-ER

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

 3 years on counts 2, 3, 4, 5, 6, 7, 8, and 9, to run concurrently.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

      ☑ The above drug testing condition is suspended, based on the court's determination that you
            pose a low risk of future substance abuse. *(check if applicable)*

4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# SPA-5

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | Judgment—Page | 5 | of | 8 |
|---|---|---|---|---|

DEFENDANT:  NEIL COLE
CASE NUMBER:  19-cr-869-1-ER

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

# SPA-6

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3B — Supervised Release

Judgment—Page   6   of   8

DEFENDANT:  NEIL COLE
CASE NUMBER:  19-cr-869-1-ER

## ADDITIONAL SUPERVISED RELEASE TERMS

You must participate in an outpatient mental health treatment program approved by the United States Probation Office. You must continue to take any prescribed medications unless otherwise instructed by the health care provider. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the health care provider.

You shall submit your person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

You must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule.

You must provide the probation officer with access to any requested financial information.

Restitution, if any, is imposed as a condition of supervised release.

It is recommended that you be supervised by the district of residence.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
       Sheet 5 — Criminal Monetary Penalties

Judgment — Page   7   of   8

DEFENDANT: NEIL COLE
CASE NUMBER: 19-cr-869-1-ER

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 800.00 | $ | $ | $ | $ |

☑ The determination of restitution is deferred until _1/10/2024_ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

 ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

 ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

# SPA-8

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page    8    of    8

DEFENDANT: NEIL COLE
CASE NUMBER: 19-cr-869-1-ER

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $   800.00   due immediately, balance due

     ☐ not later than                 , or
     ☐ in accordance with ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C** ☐ Payment in equal         *(e.g., weekly, monthly, quarterly)* installments of $        over a period of
           *(e.g., months or years)*, to commence        *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal         *(e.g., weekly, monthly, quarterly)* installments of $        over a period of
           *(e.g., months or years)*, to commence        *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within        *(e.g., 30 or 60 days)* after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

## SPA-9

### U.S. Constitution, Amendment V

[Double Jeopardy Clause]

[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb[.]

# SPA-10

### Federal Rule of Evidence 801

[Exclusions from Hearsay]

(d) **Statements That Are Not Hearsay**.  A Statement that meets the following conditions is not hearsay:

[…]

    (2) **An Opposing Party's Statement.**  The statement is offered against an opposing party and:

[…]

      (E) was made by the party's conspirator during and in furtherance of the conspiracy.