# 23-7566

*To Be Argued By*:
JUSTIN V. RODRIGUEZ

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 23-7566

———◄•••►———

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

NEIL COLE, AKA Sealed Defendant 1,

*Defendant-Appellant.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

JUSTIN V. RODRIGUEZ,
ANDREW THOMAS,
DANIELLE R. SASSOON,
   *Assistant United States Attorneys,
      Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    A.  The Government's Case . . . . . . . . . . . . . . .   4

        1.  Revenue at Iconix. . . . . . . . . . . . . . . . .   4

        2.  Neil Cole's Overpayments-For-Givebacks
            Scheme . . . . . . . . . . . . . . . . . . . . . . . . .   7

            a.  The SEA-2 Scheme . . . . . . . . . . . .   7

            b.  The SEA-3 Scheme . . . . . . . . . . .   10

    B.  The 2021 Trial. . . . . . . . . . . . . . . . . . . . .   14

    C.  The 2022 Trial. . . . . . . . . . . . . . . . . . . . .   15

    D.  Sentencing. . . . . . . . . . . . . . . . . . . . . . . .   16

ARGUMENT:

POINT I—Cole's Retrial Did Not Violate the Double
    Jeopardy Clause . . . . . . . . . . . . . . . . . . . . . . .   18

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . .   18

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .   20

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . .   22

        1.  The Jury Instructions Show That the
            Jury Did Not Necessarily Reject Cole's
            Participation in an Overpayments-For-
            Givebacks Scheme . . . . . . . . . . . . . . . .   22

ii

PAGE

2.  The Jury's Acquittal on Conspiracy Did
    Not Foreclose Cole's Guilt in a Scheme
    Involving Others . . . . . . . . . . . . . . . . .  25

3.  The District Court Properly Admitted
    Evidence Introduced at the First
    Trial . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

POINT II—The District Court Properly Admitted
Documents from Ethan Cole as Co-Conspirator
Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  36

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  39

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  41

1.  The District Court Properly Concluded
    that a Conspiracy Existed . . . . . . . . . .  41

2.  The District Court Properly Concluded
    that Neil Cole and Ethan Cole were
    Members of the Conspiracy . . . . . . . . .  43

3.  The District Court Properly Concluded
    that Ethan Cole's Statements Were Made
    in Furtherance of the Conspiracy . . . .  45

POINT III—The District Court Did Not Err by Giving
an Uncalled Witnesses Instruction . . . . . . . . .  48

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  48

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  50

iii

PAGE

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

## TABLE OF AUTHORITIES

*Cases*:

*Ashe v. Swenson,*
    397 U.S. 436 (1970). . . . . . . . . . . . . . .  20, 24, 32, 34

*Bourjaily v. United States,*
    483 U.S. 171 (1987). . . . . . . . . . . . . . . . .  39, 40, 41

*Dowling v. United States,*
    493 U.S. 342 (1990). . . . . . . . . . . . . . . . .  32, 35, 42

*Neder v. United States,*
    527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . 50

*Sealfon v. United States,*
    332 U.S. 575 (1948). . . . . . . . . . . . . . . . . . . . 32, 33

*United States v. Ashraf,*
    320 F. App'x 26 (2d Cir. 2009) . . . . . . . . . . . . . . 46

*United States v. Bahna,*
    68 F.3d 19 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 50

*United States v. Bravo-Fernandez,*
    790 F.3d 41 (5th Cir. 2015) . . . . . . . . . . . . . . . . 26

*United States v. Caccia,*
    122 F.3d 136 (2d Cir. 1997) . . . . . . . . . . . . . . 51, 53

iv

PAGE

*United States v. Cala,*
    521 F.2d 605 (2d Cir. 1975) . . . . . . .   18, 21, 22, 23

*United States v. Caldarone,*
    944 F.3d 72 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 50

*United States v. Caruso,*
    225 F.3d 646, 2000 WL 1134359 (2d Cir. 2000) . 45

*United States v. Citron,*
    853 F.2d 1055 (2d Cir. 1988) . . . . . . . . . . . . . . . 24

*United States v. Clark,*
    613 F.2d 391 (2d Cir. 1979) . . . . . . . . . . . . . *passim*

*United States v. Coppola,*
    671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . 39, 40

*United States v. Delva,*
    858 F.3d 135 (2d Cir. 2017) . . . . . . . . . . . . . . . . 39

*United States v. Donovan,*
    55 F. App'x 16 (2d Cir. 2003) . . . . . . . . . . . . . . . 45

*United States v. Ebbers,*
    458 F.3d 110 (2d Cir. 2006) . . . . . . . . . . . . . . . . 52

*United States v. Gansman,*
    657 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 50

*United States v. Gigante,*
    166 F.3d 75 (2d Cir. 1999) . . . . . . . . . . . . . . . 39, 40

*United States v. Gugliaro,*
    501 F.2d 68 (2d Cir. 1974) . . . . . . . . . . . . . . . 21, 31

*United States v. Hernandez,*
    572 F.2d 218 (9th Cir. 1978) . . . . . . . . . . . . . . . 29

v

PAGE

*United States v. Hicks,*
    5 F.4th 270 (2d Cir. 2021) . . . . . . . . . . . 21, 24, 34

*United States v. Huezo,*
    546 F.3d 174 (2d Cir. 2008) . . . . . . . . . . . . . . . . 45

*United States v. Jackson,*
    778 F.2d 933 (2d Cir. 1985) . . . . . . . . . . . . . *passim*

*United States v. Kellerman,*
    431 F.2d 319 (2d Cir. 1970) . . . . . . . . . . . . . . . . 45

*United States v. Kramer,*
    289 F.2d 909 (2d Cir. 1961) . . . . . . . . . . . . . . . . 31

*United States v. Massino,*
    311 F. Supp. 2d 316 (E.D.N.Y. 2004). . . . . . . . . . 27

*United States v. McCall,*
    298 F. App'x 591 (9th Cir. 2008) . . . . . . . . . . 26, 27

*United States v. McGowan,*
    58 F.3d 8 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . 21

*United States v. Mespoulede,*
    597 F.2d 329 (2d Cir. 1979) . . . . . . . . . . . . . . . . 24

*United States v. Myerson,*
    18 F.3d 153 (2d Cir. 1994) . . . . . . . . . . . . . . 52, 53

*United States v. Nektalov,*
    461 F.3d 309 (2d Cir. 2006) . . . . . . . . . . . . . . . . 39

*United States v. Nelson,*
    599 F.2d 714 (5th Cir. 1979) . . . . . . . . . . . . . 25, 27

*United States v. Padilla,*
    203 F.3d 156 (2d Cir. 2000) . . . . . . . . . . . . . . . . 40

vi

PAGE

*United States v. Saa,*
    859 F.2d 1067 (2d Cir. 1988) . . . . . . . . . . . . . . . 50

*United States v. Seijo,*
    537 F.2d 694 (2d Cir. 1976) . . . . . . . . . . . . . . . . 21

*United States v. Tellier,*
    83 F.3d 578 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 40

*United States v. Torres,*
    845 F.2d 1165 (2d Cir. 1988) . . . . . . . . . . . . . . . 53

*United States v. Tramunti,*
    500 F.2d 1334 (2d Cir. 1974) . . . . . . . . . . . . . . . 29

*United States v. Tyler,*
    758 F.2d 66 (2d Cir.1985). . . . . . . . . . . .   27, 29, 31

*United States v. Willis,*
    14 F.4th 170 (2d Cir. 2021) . . . . . . . . . . . . . . . . 42

*United States v. Zemlyansky,*
    908 F.3d 1 (2d Cir. 2018) . . . . . . . . . . . . . . . 31, 34

*Yeager v. United States,*
    557 U.S. 110 (2009). . . . . . . . . . . . . . . . . . . . . . . 23

*Statutes, Rules & Other Authorities*:

Fed. R. Crim. P. 52(a). . . . . . . . . . . . . . . . . . . . . . . . 50

Fed. R. Evid. 801(d)(2)(E) . . . . . . . . . . . . . . . . . . . . 39

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 23-7566

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

NEIL COLE, also known as Sealed Defendant 1,

*Defendant-Appellant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Neil Cole appeals from a judgment of conviction entered on October 13, 2023, in the United States District Court for the Southern District of New York, following a four-week jury trial before the Honorable Edgardo Ramos, United States District Judge.

Indictment 19 Cr. 869 (ER) (the "Indictment") was filed on December 4, 2019, in ten counts. Count One charged Cole with conspiracy to commit securities fraud, to make false filings with the United States Securities and Exchange Commission, and to improperly influence the conduct of audits, in violation of 18 U.S.C. § 371. Count Two charged Cole with securities

2

fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5 & 244.100(b), and 18 U.S.C. § 2. Counts Three through Eight charged Cole with making false filings with the SEC, in violation of 15 U.S.C. §§ 78m(a) & 78ff, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, & 244.100(b), and 18 U.S.C. § 2. Count Nine charged Cole with improperly influencing the conduct of audits, in violation of 15 U.S.C. §§ 7202, 7242 & 78ff; 17 C.F.R. § 240.13b2-2, and 18 U.S.C. § 2. Count Ten charged Cole with conspiracy to destroy, alter, and falsify records in federal investigations, in violation of 18 U.S.C. § 371.

On October 5, 2021, Cole proceeded to trial on the charges in the Indictment. On November 1, 2021, the jury returned a verdict of not guilty on Counts One and Ten, the conspiracy counts. The jury was unable to reach a unanimous verdict on any of the substantive crimes charged in Counts Two through Nine, which were objects of the conspiracy charged in Count One. Judge Ramos declared a mistrial on those remaining counts.

On October 31, 2022, a retrial commenced on Counts Two through Nine. On November 28, 2022, the jury unanimously found Cole guilty of Counts Two through Nine.

On October 10, 2023, Judge Ramos sentenced Cole to 18 months of imprisonment, to be followed by three years' supervised release, and ordered forfeiture of $790,200 and a $800 mandatory special assessment.

Cole is on bail pending appeal.

3

## Statement of Facts

Neil Cole was Chief Executive Officer of Iconix Brand Group, Inc., a publicly-traded brand management company headquartered in Manhattan. (PSR ¶ 17).[1] Iconix was in the business of acquiring various brands, including clothing and fashion brands, and then licensing those brands to retailers, wholesalers and suppliers, who in turn produced and sold clothing and other products bearing the brand names. (PSR ¶ 17). From 2014 to 2015, Cole used his position to mislead the company's auditors and to deceive the investing public about the company's financial condition. (PSR ¶ 24). Specifically, Cole engaged in a scheme to falsely inflate Iconix's reported revenue and earnings per share by inducing a Hong Kong-based joint venture ("JV") partner, Global Brands Group Asia Limited ("GBG"), to purchase JV interests at artificially inflated prices based on Cole's promise to reimburse GBG for the overpayments. (PSR ¶ 24). Cole conducted

---

[1]    "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office in connection with Cole's sentencing; "Br." refers to Cole's brief on appeal; "A." refers to the appendix filed with Cole's brief; "GX" refers to a government exhibit at trial; "2021 Tr." and "2022 Tr." refer to the transcripts from Cole's 2021 trial and 2022 trial, respectively; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

4

that scheme with the assistance of Seth Horowitz, who served under Cole as the Chief Operating Officer of Iconix, and with the aid of two executives at GBG, Jason Rabin and Jared Margolis, and Ethan Cole (no relation), who worked for Margolis. (PSR ¶ 24). Cole executed the scheme so that Iconix could hit quarterly numbers to ensure Iconix met analyst consensus, such as revenue and earnings per share, and to fraudulently convey the impression to the investing public that Iconix was growing quarter after quarter, as Cole had publicly touted. (PSR ¶ 24).

## A.  The Government's Case

### 1.  Revenue at Iconix

Iconix used joint ventures to profit from its brands in foreign markets. (PSR ¶ 23). In a typical JV arrangement, Iconix created a subsidiary, transferred ownership of a trademark or brand to that subsidiary, and then transformed the subsidiary into a JV by selling a 50 percent ownership interest in the JV to another business pursuant to a joint venture agreement. (PSR ¶ 23). As part of the JV agreements, each JV partner was generally entitled to 50 percent of the JV's licensing revenue. (PSR ¶ 23). From an accounting perspective, when Iconix entered into a JV, Iconix recognized as revenue the purchase price paid to Iconix by the JV partner, less Iconix's cost basis in the trademarks. (PSR ¶ 23). Accordingly, the higher the price paid to Iconic by the JV partner, the more revenue Iconix could report on its financial statements. (PSR ¶ 23). At all relevant times, the buy-in purchase price

5

that Iconix received from its JV partners comprised a significant portion of Iconix's earnings. (PSR ¶ 23).

As a publicly traded company, Iconix was required to comply with the federal securities laws, which are designed to ensure that a publicly traded company's financial information is accurately recorded and disclosed to the investing public. (PSR ¶ 18). Among other things, Iconix was required to file with the SEC quarterly and annual financial statements (on SEC Form 10-Q and Form 10-K, respectively) and to make and keep books, records, and accounts that accurately and fairly reflected Iconix's business transactions. (PSR ¶ 18). At all relevant times, Cole signed Iconix's quarterly and annual financial reports. (PSR ¶ 18). Additionally, Cole certified that he reviewed the reports, that they did not contain any untrue statements of material fact, that they fairly presented in all material respects Iconix's financial condition, results of operations, and cash flows, and that he had disclosed to Iconix's outside auditor and the Audit Committee of its Board of Directors any fraud, whether or not material, that involved management, which included Cole himself and Horowitz. (PSR ¶¶ 18, 19).

Federal securities law further required that Iconix's annual financial statements be audited by independent certified public accountants. (PSR ¶ 20). Among the most critical financial metrics disclosed in Iconix's public filings with the SEC were Iconix's quarterly and annual revenue and earnings per share ("EPS"). (PSR ¶ 20). EPS is generally derived from calculating revenue, less expenses, and dividing that amount by the number of outstanding shares of

6

common stock. (PSR ¶ 20). In the press releases it is-
sued in connection with its periodic filings, Iconix reg-
ularly touted increases in its revenue and non-GAAP
diluted EPS, an EPS metric that excluded certain
gains and charges not relevant here. (PSR ¶ 20). Ico-
nix's press releases, which were typically issued
shortly before the company's quarterly filings, in-
cluded Iconix's actual revenue and EPS for the quarter
and year-to-date, as reflected in Iconix's SEC filings.
(PSR ¶ 20). Iconix executives, including Cole, publicly
emphasized revenue and EPS as the principal metrics
demonstrating Iconix's growth. (PSR ¶ 22). Cole and
his fellow executives also touted Iconix's consistent
record of revenue and earnings growth and of meeting
or exceeding Wall Street analyst consensus with re-
spect to these metrics. (PSR ¶ 22). Iconix submitted
press releases accompanying its quarterly filings with
the SEC, as exhibits to a Form 8-K, a report companies
must file with the SEC to inform the investing public
about major corporate events or announcements. (PSR
¶ 22).

At all relevant times, at the end of each reporting
period, in connection with the preparation of Iconix's
quarterly and annual financial statements, Cole
signed and caused to be submitted to Iconix's outside
auditor a management representation letter, in which
Cole represented, among other things, that "[t]here are
no material transactions that have not been properly
recorded in the accounting records underlying the con-
solidated financial statements," and that "[j]oint ven-
tures or other participations" "have been properly rec-
orded or disclosed in the consolidated financial state-
ments." (PSR ¶ 21).

### 2. Neil Cole's Overpayments-For-Givebacks Scheme

The trial evidence proved that Cole arranged for Iconix to enter into JVs with GBG that included inflated buy-in purchase prices on two occasions: (1) the Southeast Asia first amendment, or "SEA-2," which closed on June 30, 2014; and (2) the Southeast Asia second amendment, or "SEA-3," which closed on September 17, 2014. (PSR ¶ 25). Both SEA-2 and SEA-3 involved a fraudulent "round trip" transaction, lacking in economic substance, in which GBG paid an artificially inflated buy-in purchase price for its interest in the JV, in exchange for Cole's agreement that Iconix would give back the inflated portion of the purchase price to GBG. (PSR ¶ 25). Cole, who had previously received a presentation from Iconix auditors about "round tripping," knew that this kind of overpayments-for-givebacks scheme was improper. (PSR ¶ 25). Accordingly, Cole hid the inflated purchase prices and offsetting round-trip payments from Iconix's lawyers and outside auditors. (PSR ¶ 25).

### a. The SEA-2 Scheme

In October 2013, Cole arranged for Iconix to enter into a JV with GBG called the Southeast Asia JV, or "SEA-1." In 2014, Cole again sought out GBG as a partner in a JV that could help Iconix increase its revenue and EPS, including through the fraudulently inflated buy-in purchase price for GBG's interest in the JV. (PSR ¶ 26). Cole and Horowitz negotiated with representatives of GBG an amendment to SEA-1, *i.e.*, SEA-2, which involved the sale to GBG of an interest

8

in certain Iconix trademarks in Korea and various countries in Europe. (PSR ¶ 26).

During the SEA-2 negotiations, Cole reached a secret, undocumented agreement with representatives of GBG that GBG would inflate the buy-in purchase price to be paid to Iconix for GBG's interest in the JV by $5 million, from approximately $10.9 million to approximately $15.9 million, in exchange for Iconix's round-tripping approximately $5 million back to GBG in the form of payments purportedly for marketing, even though marketing expenses were supposed to be borne by the JV itself, and not by Iconix. (PSR ¶¶ 27, 38). Cole, with the assistance of Horowitz, structured the transaction in this fashion to falsely inflate the revenue that Iconix would recognize from SEA-2 by approximately $5 million. (PSR ¶ 27).

Cole sought to close SEA-2 in the second quarter of 2014 so that Iconix could recognize revenue during that quarter and meet analyst consensus for revenue and EPS. (PSR ¶ 28). On June 30, 2014, the last day of the second quarter of 2014, Iconix and GBG entered into a purchase agreement, which was styled as an amendment to SEA-1 and was signed by Cole (the "SEA-2 Purchase Agreement"). (PSR ¶ 28). The SEA-2 Purchase Agreement provided that GBG would pay a purchase price to Iconix of approximately $15,917,500 for GBG's interest in the JV. (PSR ¶ 28). The secret arrangement between Cole and GBG that Iconix would send back to GBG approximately $5 million, purportedly for marketing expenses, was undocumented. (PSR ¶ 28).

9

In approximately June 2014, Iconix recognized revenue from SEA-2 in the amount of approximately $13.6 million, reflecting the purchase price of $15,917,500, less Iconix's cost basis in the trademarks contributed to the JV. (PSR ¶ 29). The undisclosed and undocumented commitment that Cole made for Iconix to reimburse GBG for its $5 million overpayment, purportedly as compensation for marketing expenses incurred by GBG, was not accounted for in Iconix's books at the time SEA-2 was entered. (PSR ¶ 29).

On September 26, 2014, a representative of GBG submitted to Horowitz, among others, three sham invoices for purported "marketing costs," with large, round-dollar figures totaling approximately $5 million, including for brands that did not relate to SEA-2. (PSR ¶ 38). Shortly thereafter, Cole rejected the sham invoices, advising representatives from GBG that GBG needed to send more realistic-looking invoices. (PSR ¶ 38). In response, GBG revised the sham invoices in various ways, including, for example, by eliminating the large, round-dollar figures, to make them look more credible and less obviously fraudulent, and then re-submitted them to Iconix for payment. (PSR ¶ 38). Thereafter, in November and December of 2014, Cole authorized payments to GBG totaling approximately $5 million, purportedly as payment for the "revised" marketing invoices that GBG had submitted to Iconix. (PSR ¶ 38). In truth and as Cole well knew, the invoices were a sham, and the payments he authorized were not in consideration for marketing services, but, in fact, constituted the promised reimbursement to GBG for its inflated purchase price payment for SEA-2. (PSR ¶ 38).

10

Cole hid from Iconix's lawyers and its outside auditor that Cole had reached an understanding with GBG to increase the consideration GBG paid Iconix by $5 million in exchange for Cole's agreement for Iconix to roundtrip the $5 million back to GBG. (PSR ¶ 30). Iconix's Form 10-Q for the second quarter of 2014, which Cole signed and which Iconix filed with the SEC on August 6, 2014, disclosed, with respect to SEA-2, that GBG "agreed to pay [Iconix] $15.9 million" and "[a]s a result of this transaction [Iconix] recorded a gain of $13.6 million in the Current Quarter, which is included in licensing and other revenue in the unaudited condensed consolidated income statement." (PSR ¶ 30). The Form 10-Q failed to disclose that Iconix's revenue was inflated by approximately $5 million based upon GBG's overpayment and that Iconix had secretly agreed to reimburse GBG for this overpayment. (PSR ¶ 30). Nor was Iconix's commitment to transfer $5 million to GBG as purported consideration for marketing services disclosed or accounted for at the time SEA-2 was entered. (PSR ¶ 30).

### b.    The SEA-3 Scheme

In the late summer of 2014, Cole and Horowitz negotiated with representatives of GBG a second amendment to SEA-1, referred to as SEA-3, which involved the sale to GBG of an interest in certain Iconix brands in China, Hong Kong, Macau, and Taiwan. (PSR ¶ 31). As with SEA-2, Cole orchestrated SEA-3 as a fraudulent means of inflating Iconix's revenue and EPS. (PSR ¶ 31).

11

During the SEA-3 negotiations, Cole arranged for GBG to artificially inflate the buy-in purchase price it paid to Iconix by $6 million, from approximately $15.5 million to approximately $21.5 million, in exchange for Iconix's commitment to reimburse GBG the $6 million overpayment at a later time. (PSR ¶ 32).

During the summer and fall of 2014, while Iconix and GBG were negotiating SEA-3, Cole, Horowitz, and representatives of GBG, including Margolis and Ethan Cole, explored potential ways in which Iconix could round-trip back to GBG its $6 million purchase price overpayment, such as by excusing millions of dollars in royalty payments (though no such release ever occurred), or by hiding the payment in a joint venture relating to the Middle East and North Africa. (PSR ¶¶ 33, 39). They discussed, among other things, that an affiliate of GBG owed Iconix money in connection with an unrelated licensing agreement for the children's clothing brand Rocawear Kids, which Iconix owned and licensed to the GBG affiliate in exchange for guaranteed royalty payments. (PSR ¶ 33). By around the summer of 2014, the GBG affiliate was struggling to pay the guaranteed minimum royalties it owed to Iconix to license the Rocawear Kids, and the GBG affiliate wanted to be released from its payment obligations to Iconix. (PSR ¶ 33).

On August 13 and 14, 2014, Cole and Horowitz exchanged emails about the possibility of terminating the Rocawear Kids brand license and releasing the GBG affiliate of its royalty obligations (which had nothing to do with the SEA JVs) as a fraudulent means of giving back money to GBG for its JV overpayments.

12

(PSR ¶ 34). In the email exchange, Horowitz told Cole, in relevant part: "[s]pent a lot of time" on "Rocawear Kids model today...believe we should not go forward with taking this back." Cole responded, in relevant part: "let's discuss tomorrow...will be tough to do China [i.e., SEA-3] without Roc kids." (PSR ¶ 34). For discussions with Iconix, representatives of GBG prepared an internal GBG document reflecting the SEA-2 and SEA-3 "Overpay[ments]" and "offset[s]," including Iconix's forgiving the Rocawear Kids royalty payments owed by the GBG affiliate. (PSR ¶ 34). Although the prospect of releasing the GBG affiliate of its royalty obligations was discussed, no such release ever took place. (PSR ¶ 34).

Cole and Horowitz sought to close SEA-3 during the third quarter of 2014 so that Iconix could recognize revenue from the transaction during that quarter and meet analyst consensus for revenue and EPS. (PSR ¶ 35). On September 17, 2014, Iconix and GBG entered into a purchase agreement, which was styled as the second amendment to SEA-1 and signed by Cole. (PSR ¶ 35). The SEA-3 purchase agreement provided, in relevant part, that GBG would pay a purchase price of approximately $21.5 million for its interest in the JV, but did not document that Iconix would give back approximately $6 million. (PSR ¶ 35).

In approximately September 2014, Iconix recognized revenue from SEA-3 in the amount of approximately $18.7 million, reflecting the purchase price of approximately $21.5 million, less Iconix's cost basis in the brands contributed to the JV. (PSR ¶ 36). In truth and as Cole well knew, SEA-3 resulted in the false

13

inflation of Iconix's revenue by approximately $6 million. (PSR ¶ 36). The undisclosed and undocumented commitment that Cole made for Iconix to reimburse GBG for its $6 million overpayment was not accounted for in Iconix's books at the time SEA-3 was entered. (PSR ¶ 36). Cole hid from Iconix's lawyers and its outside auditor that Cole had reached an understanding with GBG to increase the consideration GBG paid to Iconix by approximately $6 million in exchange for Cole's agreement for Iconix to round-trip the $6 million back to GBG at a later time. (PSR ¶ 36).

On October 31, 2014, after executing the SEA-3 purchase agreement, Cole sold one million shares of his Iconix stock at a price of $39.51 per share, resulting in a pre-tax total gain of $39,510,000. (PSR n. 2).

Iconix's Form 10-Q for the third quarter of 2014, which Cole signed and which Iconix filed with the SEC on November 7, 2014, disclosed with respect to SEA-3, that GBG "agreed to pay [Iconix] $21.5 million" and "[a]s a result of this transaction [Iconix] recorded an $18.7 million gain, which is included in licensing and other revenue in the unaudited condensed consolidated income statement for the Current Quarter." (PSR ¶ 37). The Form 10-Q did not disclose that the purchase prices for SEA-2 and SEA-3 had been inflated by $5 million and $6 million, respectively, and that Cole had agreed that Iconix would reimburse GBG for those overpayments. (PSR ¶ 37).

Cole's actions with respect to SEA-2 and SEA-3 had a material impact on Iconix's accounting and Iconix's auditor would have wanted to know about them before reviewing Iconix's financial statements. (PSR ¶ 39).

14

By virtue of the fraudulent scheme, Iconix reported revenue and EPS within analyst consensus. (PSR ¶ 39). Absent the false inflation of revenue from SEA-2 and SEA-3, Iconix would have missed its quarterly revenue consensus in the second and third quarters of 2014, and its annual revenue consensus for the full year 2014. (PSR ¶ 39). Iconix would have nevertheless met EPS consensus for the full year 2014 without the inflated revenue from SEA-2 and SEA-3. (PSR ¶ 39).

## B. The 2021 Trial

On October 5, 2021, the parties proceeded to trial on the charges in the Indictment. The Government called twelve witnesses and introduced over 200 exhibits into evidence. The Government's witnesses included Iconix's former COO Seth Horowitz, who testified pursuant to a cooperation agreement with the Government, as well as Jason Rabin and Jared Margolis, GBG executives who each testified pursuant to immunity and compulsion orders.

Horowitz, Rabin, and Margolis all testified about their involvement in Cole's overpayments-for-givebacks scheme.[2] Horowitz explained that as part of the scheme, "[w]e inflated our revenues to hit quarterly numbers, and we didn't tell our finance team about it. We didn't tell our legal team about it." (A. 158). Due to

─────────

    [2]  At the 2021 trial, the Government presented evidence and argued that SEA-1, SEA-2, and SEA-3 were part of Cole's scheme. At the 2022 trial, the Government focused its evidence and arguments on SEA-2 and SEA-3.

15

Cole's scheme, Iconix "had over $11 million of revenue that was owed back to a partner [i.e., GBG] that was not properly accounted for." (A. 158). Rabin testified that GBG agreed to overpay for SEA-2 by $5 million because "Mr. Cole said: If you raise the price by 5 million, you can bill it back for marketing." (A. 270). Similarly, Rabin testified that he agreed to overpay for SEA-3 by $6 million based on a "firm commitment" by Cole to offset the Rocawear Kids royalty payments that GBG owed to Iconix. (A. 272). Margolis also testified that GBG agreed to overpay for SEA-2 and for SEA-3 "[b]ecause we [GBG] were going to get the money back," based on Cole's firm commitment, "from Iconix." (A. 323, 325). Unlike Horowitz, however, neither Rabin nor Margolis ever admitted to entering a criminal agreement with Cole or to knowingly committing any wrongdoing. (*See, e.g.*, 2021 Tr. 828 ("Q. Mr. Rabin, do you believe that you committed any crimes in connection with SEA-1, SEA-2, or SEA-3? A. No.").

Cole testified in his own defense and denied the existence of his overpayments-for-givebacks scheme. On November 1, 2021, the jury returned a verdict of not guilty on Counts One and Ten, the conspiracy counts. The jury was unable to reach a unanimous verdict on Counts Two through Nine, and a mistrial was declared on those remaining counts.

## C.  The 2022 Trial

On October 31, 2022, a retrial commenced on Counts Two through Nine. On November 28, 2022, the jury unanimously found Cole guilty of Counts Two

16

through Nine. The Government called 17 witnesses, including Horowitz, Rabin, and Margolis.

Horowitz, Rabin, and Margolis all testified again about their involvement in Cole's overpayments-for-givebacks scheme. Horowitz testified that, with respect to SEA-2 and SEA-3, "[w]e inflated the prices of the joint ventures with promises of givebacks in order to hit our financial goals." (A. 728). Rabin testified that GBG overpaid for SEA-2 and SEA-3 because, with respect to SEA-2, "Neil said if I raised the price by $5 million, we could bill it back for marketing," and, with respect to SEA-3, Cole said "if the price gets raised by $6 million, we could beat the Rocawear shortfall or offset the Rocawear shortfall." (A. 683, 684) Margolis similarly testified about the overpayments. (A. 940, 945). Like they did at the first trial, Rabin and Margolis adhered to their contention that they had not done anything wrong. (A. 687 (Rabin) ("Do you believe you engaged in criminal fraud? A. No"); A. 975 (Margolis) ("[D]o you believe, in your heart, that you have done anything wrong in this case? A. No")).

Cole again testified again in his own defense and denied all wrongdoing.

On November 28, 2022, the jury unanimously found Cole guilty of Counts Two through Nine.

### D.   Sentencing

On October 10, 2023, Judge Ramos sentenced Cole principally to 18 months of imprisonment, to be followed by three years' supervised release, and ordered forfeiture of $790,200. When calculating Cole's Guidelines range, Judge Ramos applied an obstruction-of-

17

justice enhancement based on Cole's perjury during
his testimony:

> I sat through both trials. I saw Mr. Horo-
> witz and Mr. Cole testify both times, and
> I have to say I believed Mr. Horowitz. I
> believed the version of facts that he told.
> I think it was consistent with the docu-
> ments that were put into evidence, the
> testimony of Mr. Margolis and Mr. Rabin,
> notwithstanding their disclaiming any li-
> ability or any wrongdoing. Specifically, I
> did not credit Mr. Cole's testimony that
> he had very little role in negotiating
> these joint ventures; that, you know, to
> the extent that anything untoward hap-
> pened, it was all Mr. Horowitz's doing.

(Dkt. 316 at 8-9). When imposing his sentence, Judge
Ramos reiterated to Cole:

> I believe that you knew that the two
> transactions involved had no economic
> substance. I believe that you entered into
> those transactions knowing that you
> would be paying back the $5 million and
> $6 million. I believe that you did that be-
> cause of your desire to have the company
> meet its revenue market consensus—con-
> sensus revenue targets, as it had for so
> many quarters before, and you did it for
> that reason.

(Dkt. 316 at 34-35).

18

# A R G U M E N T

## POINT I

### Cole's Retrial Did Not Violate the Double Jeopardy Clause

The jury at Cole's 2021 jury did not acquit him of the substantive counts in the Indictment. Nonetheless, Cole claims that the doctrine of collateral estoppel prohibited a retrial on those hung counts because the jury acquitted him of Count One at the end of Cole's first trial. (Br. 23). Because Cole cannot meet his "particularly onerous" burden, *United States v. Clark*, 613 F.2d 391, 400 (2d Cir. 1979), of showing that the first jury's verdict "*necessarily*" decided that Cole's overpayments-for-givebacks scheme did not exist or that Cole was not a part of it, *United States v. Cala*, 521 F.2d 605, 609 (2d Cir. 1975) (emphasis added), his claim should be rejected.

### A. Relevant Facts

At Cole's first trial, the District Court instructed the jury on the law with respect to each count of the Indictment, including the conspiracy count charged in Count One. As relevant here, the District Court informed the jury that Count One charged a conspiracy with three unlawful objects, namely securities fraud, making false filings with the SEC, and improperly influencing the conduct of audits. (A. 485-86). Judge Ramos further instructed the jury that:

> I instruct you that you must unanimously agree on which object, if any, was the

19

> specific object or objects alleged in the conspiracy. If the government fails to prove beyond a reasonable doubt that at least one of the unlawful objectives alleged in Count One was in fact an objective of the conspiracy, or if you cannot unanimously agree as to which of the unlawful objects alleged in the indictment have been proven beyond a reasonable doubt, then you must find Mr. Cole not guilty as to the conspiracy charge.

(A. 485-86). The first jury acquitted Cole of Count One, as well as Count Ten, and hung on the substantive counts that charged Cole with substantive offenses of securities fraud, making false filings with the SEC, and improperly influencing the conduct of audits.

Before Cole's retrial on the substantive counts, Cole moved *in limine* to prohibit "evidence and argument" that "has the specific purpose of proving conduct of which Mr. Cole has been acquitted." (Dkt. 212 at 1). In his initial motion, Cole did not move to dismiss the remaining counts on double jeopardy grounds or argue that his acquittal on Count One barred the Government from retrying him entirely. Instead, Cole conceded that the "Double Jeopardy Clause does not preclude prosecution for aiding and abetting a substantive offense following acquittal on conspiracy to commit the offense." (Dkt. 212). The Government opposed Cole's evidentiary motion. (Dkt. 226). Cole subsequently filed a letter asking the District Court to construe his *in limine* motion as a motion to bar retrial on

20

the remaining substantive counts or to dismiss the remaining counts. (Dkt. 237).

The District Court denied Cole's motion. Judge Ramos explained that under the law, a district court "is to take a practical approach examining the record, pleadings, evidence, and jury instructions in order to decide whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." (A. 633). The District Court emphasized that, "[i]t is the defendant's burden to establish that the case cannot move forward" and it is "a difficult burden since i[t] usually cannot be determined with any certainty upon what basis the previous jury reached its general verdict." (A. 633-34). Citing this Court, Judge Ramos further noted that the defendant's "burden is particularly onerous where the acquittal in the first trial involves the crime of conspiracy." (A. 634). Judge Ramos then determined that Cole had not met the "necessary burden" that he had to carry, agreeing with the Government "that the jury could have found beyond a reasonable doubt that Mr. Cole participated in a conspiracy but disagreed over the object of the conspiracy." (A. 634).

The jury instructions at Cole's retrial included an instruction on aiding and abetting liability. (2022 Tr. 2785-89).

## B. Applicable Law

The Double Jeopardy Clause of the Fifth Amendment embodies the doctrine of collateral estoppel as it applies to criminal prosecution. *See Ashe v. Swenson*,

21

397 U.S. 436 (1970). In "rare case[s]," the doctrine of collateral estoppel precludes relitigating "an issue of ultimate fact or an element essential to conviction" in a retrial that "has *necessarily* been determined in favor of the defendant" by a prior jury's verdict of not guilty. *Cala*, 521 F.2d at 607-608, 609 (emphasis added).

The defendant bears the burden of establishing collateral estoppel and that burden is "a heavy one." *United States v. Seijo*, 537 F.2d 694, 697 (2d Cir. 1976). The defendant's burden is to persuade "the court that the issue he seeks to foreclose was necessarily decided in his favor by the prior verdict." *United States v. McGowan*, 58 F.3d 8, 12 (2d Cir. 1995). It is "a most difficult burden since it usually cannot be determined with any certainty upon what basis the previous jury reached its general verdict." *United States v. Gugliaro*, 501 F.2d 68, 70 (2d Cir. 1974). "The burden of persuasion 'is particularly onerous where the acquittal in the first trial involves the crime of conspiracy.'" *United States v. Hicks*, 5 F.4th 270, 276 (2d Cir. 2021) (quoting *Clark*, 613 F.2d at 400); *see also United States v. Jackson*, 778 F.2d 933, 940 (2d Cir. 1985) ("When the first trial results in an acquittal on the conspiracy charge, generally there is no way of telling whether the basis for acquittal was disbelief of some portion of the Government's evidence, and what that portion might have been, or whether the jury simply regarded the evidence as insufficient to prove an agreement."). In light of the considerably high bar, "it is a rare case where a defendant can sustain his burden of establishing that the prior jury necessarily decided an essential issue in his favor." *Cala*, 521 F.2d at 609.

22

"In determining what issues were necessarily re-
solved by the prior proceedings, the court is to take a
practical approach, examining the record, pleadings,
evidence and jury instructions in order to decide
whether a rational jury could have grounded its ver-
dict upon an issue other than that which the defendant
seeks to foreclose from consideration." *Cala*, 521 F.2d
at 608. "If the jury could have done so in the prior case,
the claim of collateral estoppel must fail, since the de-
fendant can prevail only if the issue which he seeks to
preclude from consideration was necessarily resolved
in his favor in the prior proceeding." *Id.*

## C.   Discussion

Cole has not met his "particularly onerous" burden
of establishing collateral estoppel in this case, because
he has not shown that the jury at his first trial "neces-
sarily" decided with its acquittal on the conspiracy
charged in Count One that Cole did not engage in the
overpayments-for-givebacks scheme. *Clark*, 613 F.2d
at 400, 402.

### 1.   The Jury Instructions Show That the Jury Did Not Necessarily Reject Cole's Participation in an Overpayments-For-Givebacks Scheme

Cole cannot satisfy his heavy burden because the
record is inconclusive on whether the jury found Cole
never joined a conspiracy or whether it simply could
not agree on the object of the conspiracy. As Judge Ra-
mos recognized, in evaluating a collateral estoppel
claim, a court must consider the jury instructions
among other evidence in the record of the first trial.

23

*Cala*, 521 F.2d at 608; *Yeager v. United States*, 557 U.S. 110,119-20 (2009). Count One alleged three different objects of the charged conspiracy—securities fraud, making file filings with the SEC, and improperly influencing the conduct of audits. The District Court instructed the jury that "if you cannot unanimously agree as to which of the unlawful objects alleged in the indictment have been proven beyond a reasonable doubt, then you must find Mr. Cole not guilty as to the conspiracy charge." (2021 Tr. 2551-52). Therefore, as Judge Ramos correctly found, "the jury could have found beyond a reasonable doubt that Mr. Cole participated in a conspiracy but disagreed over the object of the conspiracy." (A. 634). Put another way, a rational jury may have returned a verdict of not guilty on Count One simply because, consistent with the District Court's instructions, they were unable to unanimously agree on an object of the conspiracy. On this record, without a special verdict form, "there is no way of telling," which, *if any*, of the objects of Count One the jury necessarily and unanimously found the Government did not prove beyond a reasonable doubt. *Jackson*, 778 F.2d at 940.

Cole does not dispute that the jury instructions could have given rise to this result. (Br. 35 (acknowledging that it is "plausible in theory that jurors might have divided over different conspiracy objections" (internal quotation marks omitted))). He tries to brush this aside by claiming that "as the case was *actually tried*, the instruction could not have led to the acquittal" because the "district court's analysis hung on a purely theoretical hook, epitomizing 'the hypertechnical and archaic approach'" that "the Supreme Court

24

has rejected." (Br. 34 (emphasis in Cole's brief) (citing *Ashe*, 397 U.S. at 444 and *United States v. Mespoulede*, 597 F.2d 329, 333 (2d Cir. 1979))). Not so. In eschewing a "hypertechnical" approach, *Ashe* specifically directed courts to examine the "pleadings, evidence, *charge*, and other relevant matter" in evaluating "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 397 U.S. at 444 (emphasis added). Cole also omits that while this Circuit has noted that courts should avoid "straining to postulate hypertechnical and unrealistic grounds on which the jury could conceivably have rested its conclusions," it has simultaneously stressed that "since it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant." *United States v. Citron*, 853 F.2d 1055, 1058 (2d Cir. 1988).

The record cannot withstand Cole's blind confidence that as the case was actually tried, a jury could not have disagreed about the conspiracy's objects. Cole's certitude runs headlong into this Court's frequent and recent emphasis that "[t]he burden of persuasion 'is particularly onerous where the acquittal in the first trial involves the crime of conspiracy.'" *Hicks*, 5 F.4th at 276 (quoting *Clark*, 613 F.2d at 400). That principle holds especially true here, where the conspiracy had three alleged objects. While the three objects here were linked by a common scheme, a jury may have divided about the principal objective on which the coconspirators had agreed, particularly given their

25

varying roles vis-à-vis Iconix. For example, some jurors might have concluded that Cole conspired with Rabin and Margolis to defraud Iconix investors, but that Rabin and Margolis (who worked at GBG) were unaware of Cole's dealings with Iconix's auditors and the SEC, while other jurors might have concluded that Cole acted alone in defrauding his investors, but conspired with Horowitz to deceive Iconix's auditors or the SEC. Judge Ramos also directed the jury to acquit even in a scenario where some jurors agreed that Cole conspired to commit one or more of the conspiracy's objects, as long as one or more jurors found that the Government failed to prove any object beyond a reasonable doubt. (A. 485-86 ("If the government fails to prove beyond a reasonable doubt that at least one of the unlawful objectives alleged in Count One was in fact an objective of the conspiracy, *or* if you cannot unanimously agree as to which of the unlawful objects alleged in the indictment have been proven . . . then you must find Mr. Cole not guilty as to the conspiracy charge."). For this reason alone, Cole's claim must fail.

## 2. The Jury's Acquittal on Conspiracy Did Not Foreclose Cole's Guilt in a Scheme Involving Others

Cole's claim also fails because as Cole himself conceded below, "the Double Jeopardy Clause does not preclude prosecution for aiding and abetting a substantive offense following acquittal on conspiracy to commit that offense." (Dkt. 212 at 6 (citing *United States v. Nelson*, 599 F.2d 714, 716 (5th Cir. 1979)). Even if the jury unanimously agreed that Cole did not enter an unlawful agreement with Horowitz, Rabin, or

26

Margolis, it may have found that their coordination amounted to one or all three witnesses aiding and abetting Cole's commission of the scheme, or vice versa, or that Cole perpetrated the crimes alone. This Court endorsed precisely this distinction in *Jackson*, holding that the government was not collaterally estopped from retrying a defendant on a substantive offense after an acquittal for conspiracy because "[w]hen the first trial results in an acquittal on the conspiracy charge, generally there is no way of telling whether the basis for acquittal was disbelief of some portion of the Government's evidence, and what that portion might have been," or "whether the jury simply regarded the evidence as insufficient to prove an agreement." *Jackson*, 778 F.2d at 940; *see also United States v. Bravo-Fernandez*, 790 F.3d 41, 48 (5th Cir. 2015) ("It is thus possible that a jury's acquittal on conspiracy reflects only that jury's finding that the government failed to prove . . . the element of agreement—rather than that the government failed to prove a violation of the predicate offense"); *United States v. McCall*, 298 F. App'x 591, 593-94 (9th Cir. 2008) (acquittal of securities fraud conspiracy did not preclude retrial on aiding and abetting theory of securities fraud related to same scheme to falsely inflate company revenue).

While conspiracy and aiding and abetting liability are similar, as Cole acknowledged below (Dkt. 212 at 6), they are not identical. This Court has long recognized that:

> [T]here is nothing inconsistent in [a] determination that the evidence was insufficient with respect to [a] conspiracy

27

> count but sufficient with respect to [an] aiding and abetting count. The two offenses are separate and distinct. The essence of conspiracy is proof of a conspiratorial agreement while aiding and abetting requires there be a "community of unlawful intent" between the aider and the principal. While a community of unlawful intent is similar to an agreement, it is not the same. Thus, a defendant may wittingly aid a criminal act and be liable as an aider and abettor . . . but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act.

*United States v. Tyler*, 758 F.2d 66, 70-71 (2d Cir.1985); *Jackson*, 778 F.2d at 940; *see also Nelson*, 599 F.2d at 716 (aiding and abetting the commission of a crime and conspiracy to commit that crime are separate and distinct offenses . . . . [t]hus as a general rule, the double jeopardy clause does not prevent prosecution for both conspiracy and aiding and abetting"); *United States v. Massino*, 311 F. Supp. 2d 316, 324 (E.D.N.Y. 2004) ("[A]cquittal for lack of proof of a conspiratorial agreement has no bearing on whether a second jury could find, examining the same acts, that the defendant had joined a 'community of unlawful intent.' "). This distinction was reflected in the District Court's jury instructions, which contained separate instructions for conspiracy and aiding and abetting liability in the first trial (2021 Tr. 2550, 2546-49), and an aiding and abetting instruction in the second trial (2022 Tr. 2785-89). *See McCall*, 298 F. App'x at 594

28

("If, as the acquittal suggests, the jury determined that defendants did not knowingly and willfully participate in the conspiracy, defendants still may have consciously shared in a criminal act, regardless of the existence of a conspiracy.").

A jury might therefore rationally have concluded that while Cole did not conspire with Rabin, Margolis, or Horowitz, one or all of them aided Cole's commission of the substantive offenses. With respect to Rabin and Margolis, that was eminently plausible because neither one testified that they hoped to achieve the specific illegal goals related to Iconix that were the objects of Count One. Rabin and Margulis testified that GBG agreed to overpay for SEA-2 and SEA-3 because Cole promised to send money back to GBG as marketing payments and excuse royalty payments GBG owed to Iconix. (2021 Tr. 816, 819-21, 1110, 1115, 1122). At no point in their testimony, however, did Rabin or Margolis expressly say that the "goals" they "hope[d] to achieve" included inflating Iconix's publicly reported revenue and EPS, causing Cole to make false filings with the SEC, or improperly influencing the conduct of audits of Iconix. In fact, through cross-examination, Cole highlighted that Rabin did not believe he was committing any crimes with Cole. (*See* 2021 Tr. 828 ("Mr. Rabin, do you believe that you committed any crimes in connection with SEA-1, SEA-2, or SEA-3? A. No.")). This testimony may have caused the jury to doubt whether Rabin and Margolis were knowing members of the specific criminal conspiracy with the specific criminal goals charged in Count One of the Indictment, without foreclosing that Rabin and Margolis

29

were part of Cole's "community of unlawful intent." *Tyler*, 758 F.2d at 70-71.

The same is true for Horowitz. To be sure, unlike Rabin and Margolis, Horowitz testified that he agreed with Cole to accomplish the illegal goals relating to Iconix that were the objects of the conspiracy charged in Count One and Cole strenuously argued to the jury that Horowitz was "not credible and he is not to be trusted." (2021 Tr. 2492 (defense summation)). But that does not lead to the inexorable conclusion, urged by Cole, that the jury disbelieved Horowitz's testimony about secret side agreements and instead credited Cole. (Br. 32-33). This Court rejected precisely this argument in *Jackson*, explaining that a juror "could have believed all or certainly almost all of [a cooperator's] testimony with respect to evidentiary facts without being convinced beyond a reasonable doubt of the ultimate fact" that the defendant entered into "an agreement to become a conspirator." *Jackson*, 778 F.2d at 941-42.[3]

-------------

[3] Citing *United States v. Hernandez*, 572 F.2d 218, 222 (9th Cir. 1978), Cole claims that by acquitting Cole, "the jury necessarily rejected the government's witnesses and, crediting Cole, concluded there were no secret side agreements." (Br. 34). This Court, however, has rejected the logic of *Hernandez*, permitting a defendant to be prosecuted for perjurious trial testimony even after an acquittal. *See, e.g.*, *United States v. Tramunti*, 500 F.2d 1334, 1346-47 (2d Cir. 1974).

30

The uncertainty of how the jury evaluated Horowitz's testimony is reinforced by the jury instructions. Judge Ramos told the jury that (1) "[e]ven if you find that a witness testified falsely in one part, you may still accept his or her testimony in other parts, or you may disregard all of it" (2021 Tr. 2571); and (2) the jury should "draw no conclusions or inferences *of any kind* about Mr. Cole's guilt or innocence from the fact that a prosecution witness pled guilty to similar charges" because "[t]hat witness' decision to plead guilty was a personal decision about his own guilt" and "may not be used by you in any way as evidence against or unfavorable to Mr. Cole." (2021 Tr. 2560 (emphasis added)). Thus, a rational jury could have chosen to disregard all of Horowitz's testimony without deciding that he testified falsely on every topic, or a rational jury could have credited Horowitz's explanation of events, while concluding that the underlying conduct did not amount to a conspiracy. As *Jackson* made clear, where, as here, it was "not necessary to acquittal that the jury disbelieve *all* of" a cooperator's testimony; "the judge instructed the jury in that trial [that] jurors are not required to reject or accept any particular witness's testimony *in toto*"; and "the witness's testimony in a first trial was extensive and covered a large number of events, it usually is nigh impossible to show that the jury disbelieved all of his testimony." *Jackson*, 778 F.2d at 942. For example, the jury may have concluded that while the coordination between Horowitz and Cole did not amount to an unlawful agreement, (1) Cole aided and abetted the offense by signing the disclosures and recommendation letters or (2) Horowitz aided and abetted Cole by negotiating

31

the overpayments-for-giveback agreements on his behalf. *See Tyler*, 758 F.2d at 70-71.

Thus, contrary to Cole's claims, the verdict on Count One does not show that the jury necessarily rejected Horowitz's testimony about secret side agreements (Br. 15), discredited Rabin and Margolis, or found that there was no overpayments-for-givebacks scheme (Br. 27-33). *See, e.g.*, *Gugliaro*, 501 F.2d at 70 ("it usually cannot be determined with any certainty upon what basis the previous jury reached its general verdict"); *United States v. Zemlyansky*, 908 F.3d 1, 9 (2d Cir. 2018) (rejecting collateral estoppel argument "[b]ecause none of the earlier acquittals necessarily decided an essential element" of the charge in the second trial).

This case is unlike *United States v. Kramer*, 289 F.2d 909 (2d Cir. 1961), on which Cole heavily relies. *Kramer* is a unique case where a previous acquittal of substantive offenses arising from post office burglaries settled that Kramer did not burglarize" the post offices and "was not responsible for whoever did," precluding a subsequent conspiracy prosecution related to the same burglaries. *Id.* at 915. As this Court subsequently explained, the later conspiracy prosecution was collaterally estopped because the "defense in the first trial consisted solely of a claim of alibi," *Jackson*, 778 F.2d at 939, and the question before the jury in the first trial was therefore not whether any crimes had been committed, but by whom. *Ashe* involved a similar posture; the defendant was tried for armed robbery and the "proof of the robbery was clear, but the evidence identifying the defendant as one of the robbers

32

was weak, and the defendant interposed an alibi defense." *Ashe*, 397 U.S. at 441. The Supreme Court held that after a jury acquitted the defendant of the robbery offense, the government was then foreclosed from prosecuting him for robbing a different victim during the same armed robbery because the first jury necessarily decided that he was not one of the robbers. *Id.*; *see also Dowling v. United States*, 493 U.S. 342, 347-48 (1990) (explaining that in *Ashe*, the "acquittal verdict could only have meant that the jury was unable to conclude beyond a reasonable doubt that the defendant was one of the bandits").

These alibi defenses are wholly different from the circumstances here, where the question before the jury was not the identity of the criminal, but whether Cole's conduct made him guilty of conspiracy and/or certain substantive crimes. This case is far more akin to *Jackson*, where this Court held that the government was not collaterally estopped from prosecuting a substantive drug offense and relying on the same evidence introduced at the defendant's first trial, which resulted in an acquittal on a conspiracy charge. *Jackson*, 778 F.2d at 942. Judge Friendly distinguished *Kramer*, which involved acquittal of a substantive offense prior to a conspiracy prosecution, from a case like this, where the jury acquitted the defendant of a conspiracy. Given the opacity of a conspiracy acquittal, "[t]here can . . . be no general principle that, after acquittal on a conspiracy count, the Government may not retry a defendant on a related substantive count." *Id.* at 940.

Cole cites *Sealfon v. United States*, 332 U.S. 575 (1948), as his sole example where an appellate court

33

held that a retrial on a substantive count following an acquittal on a conspiracy count of which the substantive count was an object violates the Double Jeopardy Clause. But that decision is of no help to Cole. In *Sealfon*, "on the particular facts [t]here involved," the only way that Sealfon could have been convicted of conspiracy was "on proof that he wrote [a] letter pursuant to an agreement with Greenberg." *Id.* at 580. After an acquittal on the conspiracy count, the Government retried the substantive count against Sealfon on an aiding and abetting theory. *Id.* at 577. But upon examination of the record, the Supreme Court found that Sealfon "could have aided and abetted Greenberg in no other way" other than writing the letter pursuant to an agreement with Greenberg. *Id.* at 580; *see also Jackson*, 778 F.2d at 941 (distinguishing *Sealfon* on that basis). The same is not true here. This case, unlike *Sealfon*, involved acquittal on a multi-object conspiracy related to a complicated and lengthy scheme that involved four potential coconspirators and far more than evidence of a single letter, and which permitted the conclusion that Cole was assisted by others in his overpayments-for-giveback scheme without conspiring with them. Cole has not identified a single case in the more than half century since *Sealfon* in the Supreme Court or this Circuit foreclosing prosecution on a substantive offense following an acquittal on a conspiracy count of which the substantive count was an object, much less one that resembles the facts here.

34

### 3. The District Court Properly Admitted Evidence Introduced at the First Trial

Cole mistakenly argues that "[e]ven if Cole's prior acquittal did not bar retrial, it precluded the government from introducing evidence of a supposed conspiracy the first jury had rejected." (Br. 40-41). Cole misunderstands the law. For example, he cites *Ashe* for the proposition that the government cannot "present the same or different . . . evidence in a second prosecution . . . in the hope that a different jury might find that evidence more convincing" (Br. 40 (quoting *Ashe*, 397 U.S. at 446). But *Ashe* made that observation in the context of explaining that a second prosecution for robbery was foreclosed altogether on the facts of that case. To successfully "challenge the Government's use of evidence at a retrial, the defendant must show that the Government sought to reuse the challenged evidence for the specific purpose of proving conduct of which he was previously acquitted." *Hicks*, 5 F.4th at 276. Because the witness testimony here was used to prove Cole's participation in the substantive offenses, Cole cannot establish error. *See Zemlyansky*, 908 F.3d at 9 (holding that "the District Court did not err in permitting the Government to reuse evidence from the first trial to prove [the defendant]'s guilt in the second because the evidence was used to prove different, nonprecluded conduct").

Where the government is not collaterally estopped from prosecuting a related charge in a second trial—as it should not have been here—this Court has upheld the use of evidence, including cooperator testimony, that is nearly identical to that in a preceding

35

conspiracy trial that resulted in acquittal. *See Clark*, 613 F.2d at 394-99 (both trials centered primarily on testimony of two "cooperating accomplices" who testified about how the defendants worked with other members of "the scheme" to import heroin). In *Jackson*, 778 F.2d at 936, this Court affirmed the defendant's conviction for a substantive drug offense even though the retrial on substantive counts after a conspiracy acquittal involved evidence "virtually identical to that at the first trial." In so holding, this Court described with approval that in *Clark* the "Government presented virtually the same evidence against [the defendants] that had been introduced at the first trial." *Id.* at 940. As *Jackson* explained, even if a jury does not accept the ultimate conclusion that a defendant conspired with a cooperating witness, the "Government [is] entitled to use the same testimony in order to establish another ultimate fact—aiding and abetting—at a second trial." *Jackson*, 778 F.2d at 941-42; *see also Dowling*, 493 U.S. at 348 ("we decline to extend *Ashe v. Swenson* and the collateral-estoppel component of the Double Jeopardy Clause to exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted").[4]

---

[4]  *Jackson* explained that "[a] defendant who relies on collateral estoppel for the exclusion of such a witness's testimony must generally single out the portions which must have been disbelieved in order to warrant an acquittal; Jackson did not, and could not,

36

In short, the District Court properly permitted Horowitz, Margolis, and Rabin to testify about Cole's overpayments-for-givebacks scheme in order to prove the substantive offenses at the second trial. *Clark*, 613 F.2d at 400, 402.

## POINT II

### The District Court Properly Admitted Documents from Ethan Cole as Co-Conspirator Statements

Cole claims that the District Court improperly admitted certain emails as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). The District Court, however, was well within its discretion in finding that the Government had satisfied the requirements of Rule 801(d)(2)(E) by a preponderance of the evidence.

### A.   Relevant Facts

At trial, the Government offered proof that one of the participants in Neil Cole's overpayments-for-givebacks scheme was Ethan Cole, who worked for Jared Margolis at GBG. For example, Margolis testified that:

- Margolis and Ethan Cole were part of the process of preparing and submitting the marketing invoices to Iconix to effectuate the return of the $5 million overpayment for SEA-2 (2022 Tr. 1717, 1720, 1757-58).

———————

do this." *Jackson*, 778 F.2d at 942. The same is true here for the reasons explained *supra*.

37

- To prepare these invoices, GBG did not conduct any analysis of the number of hours that were worked on marketing these brands. (2022 Tr. 1760).

- Absent the commitment from Iconix to return the $5 million overpayment on SEA-2, GBG would not have invoiced Iconix for these marketing expenses because these marketing expenses should have been paid for by the joint venture itself. (2022 Tr. 1760-61).

- Ethan Cole, in fact, did prepare the original round dollar figure invoices (GX 1097) and the revised invoices that provided more detail and, while still totaling $5 million, were in non-round dollar figures. (GX 1111). With respect to the revised invoices in non-round dollar figures, Margolis testified that, other than making sure they still added up to $5 million, no other analysis was conducted. (2022 Tr. 1763-64).

- To support the revised invoices requested by Iconix, Ethan Cole and Margolis worked together to obtain backup documentation as Iconix had requested. (2022 Tr. 1765, 1768, 1785-87).

- Ethan Cole had multiple interactions in which he made misleading and incomplete statements to other GBG employees in connection with obtaining this backup

38

documentation for the revised invoices.
(GX 1106; 2022 Tr. 1765-67; GX 1258;
2022 Tr. 1767-68).

In addition to Margolis's testimony, the Government also offered into evidence:

- Government Exhibit 1068, an August 28, 2014 message from Ethan Cole to Jared Margolis that attaches a "Summary of Various Amounts with Iconix," such as the "$5 Million Overpay from Iconix Korea"; a "$4.5 Million Proposed Overpay for Umbro/Lee Cooper China"; and notes about how the "overpay from Iconix Korea will be offset;" and,

- Government Exhibit 1139, a December 1, 2014 message from Ethan Cole to Jared Margolis that tabulates the various "Plugs" for the difference between (a) the final purchase prices for joint ventures related to Europe/Korea, LC/Umbro China, and Middle East and (b) the actual value of those deals based on revenue multiples. Like Government Exhibit 1068, Government Exhibit 1139 breaks out GBG's progress in recouping from Iconix the value of the overpayments.

These messages were strong and obvious proof of a conspiracy in which GBG overpaid for joint venture interests in exchange for Iconix's agreement to send the overpayment back to GBG in various disguised forms, including sham invoices. Indeed, Government Exhibit

1068 explicitly refers to two "Overpay" events and Government Exhibit 1139 was essentially a ledger of the secret side deals.

In advance of trial, the District Court denied Cole's motion to exclude Government Exhibits 1068 and 1139, finding that they were admissible as co-conspirator statements under Rule 801(d)(2)(E). (A. 645-647).

## B.   Applicable Law

A district court's evidentiary rulings are reviewed for abuse of discretion and will be reversed "only when the court acted arbitrarily or irrationally." *United States v. Nektalov*, 461 F.3d 309, 318 (2d Cir. 2006). Under this "deferential" standard, an evidentiary ruling may be disturbed "only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. Delva*, 858 F.3d 135, 156 (2d Cir. 2017).

A statement that "is offered against an opposing party" and "was made by the party's co-conspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E). To admit a statement under Rule 801(d)(2)(E), a district court must find by a preponderance of the evidence that (1) a conspiracy that included the defendant and the declarant existed, and (2) the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012).

"The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial. *See United States v.*

40

*Gigante*, 166 F.3d 75, 82 (2d Cir. 1999); *Coppola*, 671
F.3d at 246 (the objective of the joint venture need not
be any particular "crime charged in the indictment").

In determining whether the predicate conspiracy
has been established to admit the co-conspirator state-
ment, a district court must make a finding by the pre-
ponderance of the evidence. *Bourjaily*, 483 U.S. at 175.
When determining whether the predicate conspiracy
has been established, "the district court may consider
the hearsay statement itself" as evidence of "the exist-
ence of a conspiracy." *United States v. Padilla*, 203
F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S.
at 181). If it does so, however, "there must be some
independent corroborating evidence of the defendant's
participation in the conspiracy.'" *Padilla*, 203 F.3d at
161 (quoting *United States v. Tellier*, 83 F.3d 578, 580
(2d Cir. 1996)). In assessing whether a statement qual-
ifies as a co-conspirator statement, a court may con-
sider inadmissible evidence (such as hearsay). *See
Bourjaily*, 483 U.S. at 177-78 (citing Fed. R. Evid.
104(a)); *Gigante*, 166 F.3d at 82.

The findings a jury must make beyond a reasonable
doubt to convict a defendant of a conspiracy differ ma-
terially from the findings that a judge must make by a
preponderance to admit a statement under the co-con-
spirator exception. As the Supreme Court has ob-
served:

> Evidence is placed before the jury when it
> satisfies the technical requirements of
> the evidentiary Rules, which embody cer-
> tain legal and policy determinations. The
> inquiry made by a court concerned with

41

> these matters is not whether the propo-
> nent of the evidence wins or loses his case
> on the merits, but whether the eviden-
> tiary Rules have been satisfied. Thus, the
> evidentiary standard is unrelated to the
> burden of proof on the substantive issues,
> be it a criminal case or a civil case.

*Bourjaily*, 483 U.S. at 175.

For this reason, the law is clear: acquittal on a con-
spiracy count does not preclude introduction of co-con-
spirator statements at a subsequent retrial on sub-
stantive counts. *See Clark*, 613 F.2d at 402-03; *Jack-
son*, 778 F.2d at 942 n.3.

## C. Discussion

The District Court did not abuse its discretion
when it admitted Government Exhibits 1068 and 1139
pursuant to Rule 801(d)(2)(E). Judge Ramos's ruling
rested on a firm factual foundation and was far from
arbitrary, irrational, or manifestly erroneous.

### 1. The District Court Properly Concluded that a Conspiracy Existed

*First*, Judge Ramos properly concluded that the
trial record demonstrated at least by a preponderance
of the evidence that Cole and Ethan Cole conspired to
carry out the overpayments-for-givebacks scheme.
(A. 646-47). Cole concedes, as he must, that Cole's ac-
quittal of the conspiracy charged in Count One did not
prevent Judge Ramos from finding by a preponderance
of the evidence that Cole was a member of a conspiracy
for purposes of admissibility under Rule 801(d)(2)(E).

42

(Br. 49 (acknowledging that the acquittals are "not dispositive")); *see Clark*, 613 F.2d at 403-04; *Jackson*, 778 F.2d at 942 n.3; *see also Dowling*, 493 U.S. at 348-49 (issue preclusion inapplicable where issue presented in a subsequent trial is governed by a lower standard of proof). That finding was well supported by the record. Deal documents showed that millions of dollars for Iconix materialized near the end of negotiations for SEA-2 and SEA-3. Horowitz, Rabin, and Margolis testified that those last-minute additions reflected an agreement by GBG to increase the purchase price in exchange for offsetting later payments to GBG from Iconix. (A. 683, 684; 687; 728; 940, 945; 975). That testimony was corroborated by contemporaneous notes, calendar appointments, emails, marketing invoices, and draft royalty relief documents. (GX 1334, 1335, 1340.) Among them, of course, are Ethan Cole's emails that explicitly refer to "overpay" and "offset" in connection with the joint ventures. (*See* GX 1068 (A. 1407); GX 1139 (A. 1555)).

Cole's reliance on *United States v. Willis*, 14 F.4th 170, 189 (2d Cir. 2021) (Br. 49), is therefore irrelevant and misplaced. *Willis* involved an unrelated issue of relying on acquitted conduct to calculate drug weight under the United States Sentencing Guidelines and the district court's failure to explain "why" the narcotics evidence met the preponderance standard. *Id.* at 190. Here, by contrast, Judge Ramos reached his evidentiary determination after hearing extensive evidence of the conspiracy and argument from the parties, and based on reviewing Ethan Cole's emails and communications. (A. 646-47).

43

### 2. The District Court Properly Concluded that Neil Cole and Ethan Cole were Members of the Conspiracy

*Second*, Judge Ramos properly found that the overpayments-for-givebacks conspiracy involved both Neil Cole at Iconix, and Ethan Cole at GBG, for purposes of admitting Government Exhibits 1068 and 1139. Multiple trial witnesses and exhibits described Ethan Cole's active role in facilitating Iconix's givebacks to GBG.

To take an example: Horowitz testified about a September 5, 2014 meeting at Iconix that Ethan Cole also attended where the overpayments and givebacks were discussed.[5] Per Horowitz, at the meeting the group discussed "the structure of the initial giveback [i.e., the $5 million SEA-2 giveback] and the SEA-3 and Rocawear Kids termination," which Horowitz discussed with Neil Cole in advance of the meeting. (2022 Tr. 824). Horowitz further testified that he prepared a sheet summarizing the givebacks and overpayments that he handed out at the meeting (GX 1084; 2022 Tr. 825), and his account was corroborated by the cover email to this document which shows that he had his assistant print three copies of the document to bring into the conference room where the calendar

---

[5] A calendar invite sent from Seth Horowitz's assistant to Margolis, Ethan Cole and Horowitz (and certain of their assistants) reflects that a September 5, 2014 meeting occurred at 2:00 p.m. at a conference room in Iconix's offices. (GX 1082; 2022 Tr. 823-24).

44

entry indicates Horowitz was meeting with Margolis and Ethan Cole. The attachment to that email sets out information about the $5 million in marketing invoices that were used to effectuate the SEA-2 giveback, and also reflects discussion of the inflated $21.5 million purchase price on SEA-3 and the contemplated giveback for that inflation (royalty relief for GBG regarding minimum payments owed to Iconix for the brand Rocawear). (GX 1084, at 2). On September 5, 2014 at approximately 5:06 p.m.—mere hours after the 2:00 P.M. meeting at Iconix—Ethan Cole emailed Horowitz, copying Margolis, requesting a "soft copy" of the Rocawear license termination letter, that is, the contemplated secret giveback for SEA-3. (GX 1085).

The exhibits and testimony related to the invoices used to effectuate part of the SEA-2 giveback also illustrated that Ethan Cole and Neil Cole operated within the same scheme. GBG's initial attempts to invoice Iconix were met with frustration because the invoices were in large, round-dollar amounts with no backup and called for immediate payment. (*See* 2022 Tr. 859, 864, 888-89). Eventually, Ethan Cole dropped off to Horowitz a stack of invoices with instructions that Iconix select acceptable invoices to pay. (2022 Tr. 959, 961). Horowitz delivered the invoices to Cole, who initialed a subset of them, and authorized payment. (2022 Tr. 970-71 (Horowitz); 2022 Tr. 1486-1505; 1516-30 (McLaughlin)).

On appeal, Cole emphasizes that Ethan Cole was "an entry-level employee at GBG" with "no role in negotiations with Iconix" and "no affiliation with Iconix." (Br. 51). But it is well established that individuals may

45

play different, or even minor, roles in a criminal scheme and still be part of a conspiracy, *see, e.g.*, *United States v. Kellerman*, 431 F.2d 319, 323 (2d Cir. 1970), and that to be a coconspirator, a person need not know "all of the details of the conspiracy, so long as he knew its general nature and extent," *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008). Taken together, the evidence showed coordination between Ethan Cole, Horowitz, and Cole in furtherance of the giveback for the SEA-2 overpayment in the form of pretextual marketing payments. On this record, Judge Ramos did not abuse his discretion in finding that Ethan Cole was Cole's coconspirator.

### 3. The District Court Properly Concluded that Ethan Cole's Statements Were Made in Furtherance of the Conspiracy

*Third*, the record also supports the District Court's finding that Government Exhibits 1068 and 1139 constitute statements made by Ethan Cole in furtherance of the overpayments-for-givebacks conspiracy. This Court has repeatedly upheld the admissibility of records like these under Rule 801(d)(2)(E) that keep track of finances related to the commission of a crime. *See, e.g.*, *United States v. Caruso*, 225 F.3d 646, 2000 WL 1134359, at *2 (2d Cir. 2000) (affirming trial court's conclusion in mail fraud conspiracy trial that "ledger entries were made in the course and furtherance of [the conspiracy]"); *United States v. Donovan*, 55 F. App'x 16, 21-22 (2d Cir. 2003) (affirming trial court's admission in securities fraud conspiracy trial of a "ledger and . . . list [that] were both made during the conspiracy, as ways to keep track of the commissions

46

to the coldcallers, thereby indicating that the documents furthered the operations and efficiency of the conspiracy"); *United States v. Ashraf*, 320 F. App'x 26, 28-29 (2d Cir. 2009) (detecting "no error" in trial court's admission of "drug ledgers" under Rule 801(d)(2)(E)).

With respect to Government Exhibit 1068, the document expressly acknowledges the "overpayment" scheme and includes notes about how to accomplish the givebacks, which were a core part of the scheme. For example, the attachment to the email describes a "$5 Million Overpay from Iconix Korea" and goes on to state that "[t]he $5M overpay from Iconix Korea will be offset by . . . $2.5M Rocawear, $1.0 M Zoo York SEA Marketing, [and] $1.5M Peanuts China Marketing." The document also describes a "$4.5 Million Proposed Overpay for Umbro / Lee Cooper China" and goes on to state that this proposed overpayment "will be offset by Iconix paying the $4.5M in markdown money to Rainbow." (GX 1082). The attachment also references "Additional Amounts—TBD [To Be Determined]," which consist of, among other things, "$3.5M in Rocawear royalty for YR [year] 2" that "remains outstanding" and "$3.5M in fixtures" that "remains outstanding."

With respect to Government Exhibit 1139, a December 1, 2014 message from Ethan Cole to Jared Margolis tabulates the various "Plugs" for the difference between (a) the final purchase prices for joint ventures related to Europe/Korea, LC/Umbro China, and Middle East and (b) the actual value of those deals based on revenue multiples. Like Government Exhibit 1068, Government Exhibit 1139 breaks out GBG's

47

progress in recouping from Iconix the value of the over-payments, an ongoing effort that was central to the scheme. Margolis testified that the "plugs" in Exhibit 1139 referred to the overpayments that Neil Cole was aware of. (2022 Tr. 1774-75).

Moreover, Government Exhibit 1139 bears a strong resemblance to Government Exhibit 706, a spreadsheet prepared by Horowitz during the heart of the scheme, and reflects amounts owed to GBG to make them whole for overpayments. Both documents reflect efforts by each side of the conspiracy to keep track of their obligations to each other and what progress had been made toward achieving them. These documents enabled the coconspirators to have productive discussions about what to do next. Horowitz, for example, testified about a December 2, 2014 meeting between Neil Cole, Jason Rabin, Jared Margolis, and himself. Margolis testified that Ethan Cole prepared Government Exhibit 1139 at Margolis's direction in anticipation of that same meeting. (Tr. 1171-74). That testimony is further corroborated by a December 1, 2014 email chain between Horowitz, Margolis, and Ethan Cole (GX 1134), in which Margolis referenced "the allocations" that were to be discussed at a meeting with Neil Cole and Jason Rabin.

For all these reasons, Cole cannot demonstrate that Judge Ramos erred in admitting Government Exhibits 1068 and 1139.

48

## POINT III

### The District Court Did Not Err by Giving an Uncalled Witnesses Instruction

Cole argues that the District Court erroneously delivered an uncalled witness instruction. (Br. 56). Because the instruction accurately described that uncalled witnesses (including Ethan Cole) had been equally available or unavailable to both sides, Cole cannot demonstrate any error.

### A.   Relevant Facts

Ethan Cole did not testify at either of Cole's trials. At no point did Cole request that the Government immunize Ethan Cole or move for the District Court to order Ethan Cole's immunization.

On November 17, 2022, the parties appeared before the District Court for a charge conference. At the conference, Cole objected to the inclusion of the District Court's proposed uncalled witnesses instruction, because, according to Cole, Ethan Cole was not equally available or unavailable to the parties. (A. 1031). Cole argued that the Government "could have chosen to immunize [Ethan Cole] and didn't." (A. 1031). The Government responded that Ethan Cole was not "peculiarly within the control of the government" because Ethan Cole had "chosen, on his own, to invoke and to plead the Fifth," which does not put him in the government's control. (A. 1031). The District Court overruled Cole's objection, noting that Cole had failed to explain how his case was "any different" from the many cases where this argument is rejected, and that "it would be

49

prejudicial for the government not to let the jury know" that each party had an equal opportunity to call any of these witnesses. (A. 1031). The next day, defense counsel notified the District Court that he had received an email from counsel for Ethan Cole confirming that, if called as a witness at trial, Ethan Cole would invoke his Fifth Amendment right and decline to testify. (A. 1034-35; 631).

The District Court included the following uncalled witnesses charge in its instructions to the jury:

> There are people whose names you've heard during the course of the trial that did not appear in court to testify. I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses.

> Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to, had they been called. Their absence should not affect your judgment in any way.

> You should remember my instruction, however, that the law does not impose on a defendant in any criminal case the burden or duty of calling any witnesses or producing any evidence and that the burden always rests with the government to prove a defendant's guilt beyond a reasonable doubt.

(A. 1130).

50

## B.  Applicable Law

This Court reviews "a properly preserved claim of error regarding jury instructions *de novo*, but . . . will reverse only where, viewing the charge as a whole, there was a prejudicial error." *United States v. Caldarone*, 944 F.3d 72, 90 (2d Cir. 2019).

"When a witness equally available to both sides is not called by either, the trial court may in its discretion . . . instruct the jury that no unfavorable inference can be drawn against either side." *United States v. Bahna*, 68 F.3d 19, 22 (2d Cir. 1995). "[T]he availability of a witness . . . depend[s] . . . on all the facts and circumstances bearing upon a witness's relation to the parties, rather than merely on physical presence or accessibility." *United States v. Saa*, 859 F.2d 1067, 1076 (2d Cir. 1988).

Where a defendant has properly preserved an objection to the jury instructions, reversal will not be warranted if the alleged error was harmless. Fed. R. Crim. P. 52(a); s*ee United States v. Gansman*, 657 F.3d 85, 91-92 (2d Cir. 2011). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

## C.  Discussion

Here, the District Court did not abuse its discretion by giving an uncalled witness charge, because each party had an equal opportunity or lack of opportunity to call Ethan Cole as a witness. In arguing otherwise, Cole does not dispute that the content of the District

51

Court's instruction would have been legally accurate had Ethan Cole been equally available to both sides. *See, e.g.*, *United States v. Caccia*, 122 F.3d 136, 138-39 (2d Cir. 1997). But Cole claims that Ethan Cole was not equally available to him because the Government "threatened to prosecute Ethan Cole and refused to grant him immunity, effectively rendering him unavailable to the defense." (Br. 56). Cole's argument is factually and legally meritless.

On the facts, Cole's claim that the Government "threatened" Ethan Cole with prosecution and thereby "forced" him to invoke his Fifth Amendment right is baseless and was rejected by Judge Ramos below. (Br. 46). Similarly inaccurate is Cole's assertion that the Government "procur[ed] Ethan's unavailability and prevent[ed] him from testifying for the defense." (Br. 57). Cole's counsel tried to convince the District Court that notes of a conversation between Government counsel and counsel for Ethan Cole established that the Government "threatened" Ethan Cole, which the District Court firmly rejected. (Tr. 1811-12). In fact, in February 2020, counsel for Ethan Cole informed Government counsel that Ethan Cole would invoke his Fifth Amendment rights. (A. 1807). Then, at the beginning of a phone call a few days before Cole's first trial in 2021, counsel for Ethan Cole confirmed that it was still Ethan Cole's intention to invoke his Fifth Amendment rights. (A. 1807). Only after Ethan Cole's counsel confirmed his intent did Government counsel express concerns, based on newly obtained documents, that Ethan Cole had not been candid with the Government at a prior proffer session and that he had obstructed the Government's investigation.

52

(A. 1807). With this proper context, the District Court rejected the suggestion that the Government has threatened Ethan Cole. (A. 646 (The District Court: "I don't see that as a threat."). Accordingly, Cole's suggestion that the Government "threatened" Ethan Cole with prosecution and that those threats caused him to invoke his Fifth Amendment rights is belied by the facts.

On the law, this Court has recognized that "despite the government's power to grant immunity, a witness invoking his constitutional rights is unavailable to the government as well as the defense." *United States v. Myerson*, 18 F.3d 153, 158 (2d Cir. 1994). *Myerson* rejected the suggestion, made by Cole here, that prosecutorial discretion to grant immunity places a witness within the peculiar power of the Government, explaining that this would "unnecessarily infringe on the prosecutorial decision of whether or not to grant immunity." *Myerson*, 18 F.3d at 158; *see also United States v. Ebbers*, 458 F.3d 110, 118 (2d Cir. 2006) ("It is well established that '[t]he government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized.'"). Moreover, while Cole now claims he "clamored repeatedly for Ethan [Cole] to testify" (Br. 60), and that "the prosecutors refused to confer immunity on Ethan" (Br. 47), Cole made no genuine effort to procure Ethan Cole's testimony by, for example, asking the District Court to compel the Government to grant Ethan Cole immunity. *See Ebbers*, 458 F.3d at 119. As this Court has observed, courts are "reluctant to find a witness practically unavailable when

53

it appears that the defense has no real interest in calling the witness to the stand, but merely is engaged in a form of gamesmanship." *United States v. Torres*, 845 F.2d 1165, 1170 (2d Cir. 1988). That is precisely what happened in this case.

Finally, even if Cole could demonstrate error—which he cannot—any error was harmless. The uncalled witness instruction did not mention Ethan Cole by name, and Judge Ramos specifically told the jury that the absence of a witness "should not affect your judgment in any way" and reminded the jury that the defendant has no "burden or duty of calling any witnesses or producing any evidence." (A. 1130). Notably, while Cole sought a "missing witness" instruction below, he makes no effort on appeal to demonstrate that such a charge would have been appropriate instead because he is hard-pressed to show that Ethan Cole's testimony would have been "unfavorable to the government." *Myerson*, 18 F.3d at 159 (appellate courts "refuse[] to require that a missing witness charge be given in each instance that a witness asserts his Fifth Amendment privilege" in part because "a prosecutor's failure to immunize a witness does not, categorically, give rise to an inference that the witness's testimony would be unfavorable to the government"); *see also Caccia*, 122 F.3d at 138. Cole claims that the "defense clamored repeatedly for Ethan to testify so he could explain first-hand that he didn't know of any secret side agreements" (Br. 60), but if anything, the record suggests that had Ethan Cole testified, it would have been damning to the defense. Cole's decision not to seek forced immunization showed that Cole had a far greater interest in "highlight[ing] Ethan's absence in

54

its summation" than in actually calling Ethan Cole to the stand and risking that he would testify candidly about his incriminating emails and documents. (Br. 71). This Court can therefore be assured that the purported error did not contribute to the jury's determination of Cole's guilt.

## CONCLUSION

### The judgment of conviction should be affirmed.

Dated:    New York, New York
          May 29, 2024

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *of America.*

JUSTIN V. RODRIGUEZ,
ANDREW THOMAS,
DANIELLE R. SASSOON,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,067 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: DANIELLE R. SASSOON,
*Assistant United States Attorney*